# EXHIBIT BBB

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3    ---o0o---
4    IN RE ORACLE CORPORATION
     SECURITIES LITIGATION,
5
               MASTER FILE NO.
6              C-01-0988-MJJ
7    THIS DOCUMENT RELATES TO:
     ALL ACTIONS
8    _____/
9
10        C O N F I D E N T I A L
11        DEPOSITION OF SAFRA CATZ
12        Friday, March 23, 2007
13        Volume II (Pages 215 - 351)
14
15
16
17
18   REPORTED BY:
19   HOLLY MOOSE, RDR-CRR-CRP
     CSR NO. 6438
20
21
          SHEILA CHASE & ASSOCIATES
22           REPORTING FOR:
          LiveNote World Service
23        221 Main Street, Suite 1250
          San Francisco, CA 94105
24        Telephone: (415) 321-2300
          Fax: (415) 321-2301
25

1         A P P E A R A N C E S
2
     FOR THE PLAINTIFFS:
3
       LERACH, COUGHLIN, STOIA & ROBBINS
4      BY: MARK SOLOMON, ESQ.
         STACEY KAPLAN, ESQ.
5        SHAWN WILLIAMS, ESQ.
         MONIQUE C. WINKLER, ESQ.
6      100 Pine Street, Suite 2600
       San Francisco, CA  94111
7      (415)288-4545
8
     FOR THE DEFENDANTS AND THE WITNESS:
9
       LATHAM & WATKINS
10     BY: GREGORY P. LINDSTROM, ESQ.
       505 Montgomery Street, Suite 1900
11     San Francisco, CA  94111
       (415)391-0600
12
13   FOR DEFENDANT ORACLE CORPORATION:
14     ORACLE CORPORATION LEGAL DEPARTMENT
       BY: JAMES C. MAROULIS, ESQ.
15     500 ORACLE PARKWAY
       Redwood Shores, CA  94065
16     (650)506-4517
17
     ALSO PRESENT:  James Terrell, Videographer;
18      LiveNote World Services
        Eli Greenstein (via Internet feed)
19      Keith Mautner (via Internet feed)
        Ryan Guiboa (via Internet feed)
20
21   TAKEN AT:
22     LERACH, COUGHLIN, STOIA & ROBBINS
       100 Pine Street, Suite 2600
23     San Francisco, CA  94111
       (415)288-4545
24
25        ---o0o---

1          I N D E X
2
3    DEPOSITION OF SAFRA CATZ, VOLUME II
4
5    EXAMINATION BY:              PAGE
6    MR. SOLOMON                  221
7
8    CATZ EXHIBITS
9    Exhibit 43  1/19/01 e-mail to Cooperman from Catz,
             NDCA-ORCL 039432, 1 page        230
10
     Exhibit 44  1/19/01 e-mail to Wallace and Cooperman,
11           NDCA-ORCL 039431, 1 page        240
12   Exhibit 45  1/22/01 e-mail string, NDCA-ORCL
             041981-82, 2 pages      242
13
     Exhibit 46  1/29/01 e-mail string, NDCA-ORCL
14           035882-85, 4 pages      258
15   Exhibit 47  1/5/01 e-mail to Catz from Balkenhol,
             NDCA-ORCL 1053520-55, 36 pages    294
16
     Exhibit 48  1/24/01 e-mail to Catz from Lockhart,
17           NDCA-ORCL 609894, 1 page    303
18   Exhibit 49  1/24/01 e-mail to Ellison from Catz,
             NDCA-ORCL 035365, 1 page    307
19
     Exhibit 50  4/11/00 e-mail to Catz from Wallace,
20           NDCA-ORCL 014068-72, 5 pages    318
21   Exhibit 51  11/30/00 e-mail to tawilla and others
             from Mahon, NDCA-ORCL 025066-67, 2 pages  323
22
     Exhibit 52  11/19/00 License Checklist, NDCA-ORCL
23           255140, 1 page    324
24   Exhibit 53  11/30/00 e-mail to tawilla and others
             from Mahon, NDCA-ORCL 210354-55, 2 pages  325
25

1    PLAINTIFFS' EXHIBITS (CONTINUED)       PAGE
2
     Exhibit 54  10/21/02 e-mail to Roberts and others
3        from Quinn, no Bates numbers, 2 pages   329
4    Exhibit 55  Spreadsheet, NDCA-ORCL 1260319-21,
           1261526-30, 6 pages      331
5
     Exhibit 56  E-mail string, NDCA-ORCL 1056920-49
6        21 pages          335
7    Exhibit 57  3/28/01 e-mail to Kender and others from
           Morrisey, NDCA-ORCL 1027932-35, 4 pages  337
8
     Exhibit 58  3/28/01 e-mail to Wohl from Catz,
9        NDCA-ORCL 1026868-79, 12 pages      339
10
11   INSTRUCTIONS NOT TO ANSWER
12     Page 223, Line  7
13
14
15
16
17
18
19
20
21        ---o0o---
22
23
24
25

1    BE IT REMEMBERED that, pursuant to

2    Continuation and on Friday, March 23, 2007, commencing

3    at the hour of 1:04 p.m., before me, HOLLY MOOSE, CSR

4    No. 6438, a Certified Shorthand Reporter in the State of

5    California, there personally appeared

6

7              SAFRA CATZ,

8

9    called as a witness by Plaintiffs, who, having been

10   first duly resworn, was examined and testified as

11   hereinafter set forth:

12

13

14

15          ---o0o---

16

17

18

19

20

21

22

23

24

25

1    PROCEEDINGS          1:04 P.M.

2         THE VIDEOGRAPHER:  This begins tape 1 in

3    Volume II in the deposition of Safra Catz, in the matter

4    of In Re Oracle Corporation Securities Litigation, filed

5    in the United States District Court for the Northern

6    District of California, case number C-01-0988-MJJ.

7         Today's date is March 23, 2007.  The time on

8    the video monitor is 1:04.  Video operator today is

9    James Terrell, representing LiveNote World Service,

10   located at 221 Main Street, Suite 1250, San Francisco,

11   California, 94105.  The phone number is 415-321-2300.

12   The court reporter today is Holly Moose with Sheila

13   Chase & Associates, reporting on behalf of LiveNote

14   World Service.

15        Volume II is being taken on behalf of

16   plaintiff [sic] and is taking place at 100 Pine Street,

17   San Francisco, California.

18        And will counsel please identify -- introduce

19   yourselves and state whom you represent.

20        MR. SOLOMON:  Mark Solomon, representing

21   plaintiffs.

22        MS. KAPLAN:  Stacey Kaplan, representing

23   plaintiffs.

24        MS. WINKLER:  Monique Winkler, representing

25   plaintiffs.

1    MR. WILLIAMS:  Shawn Williams, representing

2    plaintiffs.

3         MR. LINDSTROM:  Greg Lindstrom, representing

4    defendants and the witness.

5         MR. MAROULIS:  James Maroulis of defendant

6    Oracle Corporation for defendant Oracle Corporation.

7         THE VIDEOGRAPHER:  Thank you.  You may

8    proceed.

9         MR. SOLOMON:  Want to swear the witness in

10   again, please.

11        (Witness resworn).

12              SAFRA CATZ,

13   having been first duly resworn, testified as follows:

14        EXAMINATION BY

15   MR. SOLOMON:  Q.  Good afternoon, Ms. Catz.

16   A.  Hello.

17   Q.  Are you still employed at Oracle Corporation?

18   A.  I was this morning, yes.

19   Q.  Okay.  And as of this morning, what was your

20   position?

21   A.  I'm president and chief financial officer.

22   Q.  Okay.  Have you had a opportunity to review

23   the transcript of the testimony that you previously gave

24   in this particular proceeding?

25   A.  Yes.

1    Q.  And have you corrected it to any extent?

2    A.  Oh, I don't remember if we corrected it.

3    Q.  Okay.  Have you read the complaint in this

4    matter?

5    A.  No.

6    Q.  Have you read any of the briefs in this

7    matter?

8    A.  No.

9    Q.  And have you looked at any documents in

10   preparation for this session of your deposition?

11   A.  Yes.

12   Q.  And when did you look at those documents?

13   A.  Yesterday.

14   Q.  And did you meet with your lawyers yesterday?

15   A.  I did.

16   Q.  And who did you meet with?

17   A.  I met with Greg Lindstrom and Jim Maroulis and

18   two other lawyers from Latham & Watkins.

19   Q.  Okay.  And do you know who they were?

20   A.  Yes.

21   Q.  Who were they?

22   A.  Well, Pat Gibbs is one of them.  And I know

23   she'll feel bad; I don't remember the other one's name.

24   Q.  Okay.  And how long did you meet with them

25   for?

1   A. An hour and a half, two hours.

2   Q. Okay. How many documents did you look at?

3   A. Two -- three. Three.

4   Q. Okay. Did the documents refresh your

5   recollection in any way as to what was recorded in them?

6   A. Not really.

7   Q. Did the documents relate to topics that you've

8   already been questioned about in this litigation?

9        MR. LINDSTROM: I'm going to object to that

10  question as invading the attorney/client privilege and

11  work product doctrine and instruct the witness not to

12  answer.

13       MR. SOLOMON: Okay.

14  Q. Have you talked to Mr. Ellison about this

15  litigation since the last session of your deposition?

16  A. About this litigation --

17  Q. Correct.

18  A. -- in general?

19  Q. Yes.

20  A. Yes.

21  Q. And what have you -- what have you -- describe

22  the conversations you've had with him, please.

23       MR. LINDSTROM: Let me -- let me interpose an

24  objection. As framed, the question would require you to

25  divulge -- potentially to divulge attorney/client

---

1   privileged communications that may have occurred with

2   Mr. Ellison and yourself while counsel was present.

3        I don't know whether any conversation -- such

4   conversations occurred. But in responding to counsel's

5   questions, I want to admonish you to only answer as to

6   independent conversations that you may have had with Mr.

7   Ellison about the litigation, without counsel present.

8        Do you understand?

9        THE WITNESS: Yes.

10       MR. SOLOMON: Okay.

11       THE WITNESS: What was the question?

12       MR. SOLOMON: Q. And the question is, with

13  respect to those conversations that Mr. Lindstrom just

14  described, can you describe those conversations to me.

15  A. Yeah.

16  Q. Okay.

17  A. He said "Do -- let's get an update on the

18  litigation."

19       I said "Okay. I'll call Dorian."

20  Q. Okay.          *

21  A. That's one of our lawyers. That's about the

22  whole conversation.

23  Q. When was that conversation?

24  A. I don't know. Sometime maybe six weeks ago.

25  I don't know. Some time ago.

---

1   Q. Okay. Did you speak with Mr. Ellison in the

2   context that Mr. Lindstrom described about an author

3   called Matthew Symonds?

4        MR. LINDSTROM: So you understand, just so

5   we're clear on this, we're talking about conversations

6   that you had with Mr. Ellison that were without counsel

7   present.

8        MR. SOLOMON: Correct.

9        THE WITNESS: Can you ask it again.

10       MR. SOLOMON: Yes.

11  Q. Have you spoken with Mr. Ellison about the

12  author Mr. Symonds?

13  A. No.

14  Q. Okay. Are aware of an issue concerning Mr.

15  Symonds in this litigation?

16  A. I've spoken to my lawyers.

17  Q. Okay. And that is the only source of your

18  awareness; is that right?

19       MR. LINDSTROM: Well, he --

20       THE WITNESS: Yes. I mean, but --

21       MR. LINDSTROM: He's -- he's -- counsel's not

22  entitled to know what your lawyers have told you. He is

23  entitled to know if there are other sources. So as he's

24  framed the question -- he said "that's the only source."

25  If the only source of your information about Mr. Symonds

---

1   is the lawyers, you're not permitted to respond.

2        On the other hand, he's asking a foundational

3   question. If it turns out that there's some other

4   source besides the lawyers, then he'll want to pursue

5   that.

6        Do you understand? Should we have the

7   question reread or reposed?

8        MR. SOLOMON: Could we read --

9        THE WITNESS: I have --

10       MR. SOLOMON: -- the question, please.

11       THE WITNESS: -- no source.

12       MR. SOLOMON: Q. Okay. So your testimony is

13  the only conversation you've had with Mr. Ellison

14  outside the presence of his lawyers concerning this

15  litigation, since your last deposition testimony was

16  given, was basically "Let's ask the lawyers for an

17  update"?

18  A. Yeah.

19  Q. "Let's go ahead," right? Nothing else, right?

20  A. Yeah, "What's happening," you know.

21  Q. Okay. Now, other than Mr. Ellison and other

22  than your lawyers, have you spoken about this litigation

23  to anybody else?

24  A. No. I -- like, I told my secretary, "I'm

25  going to a deposition about this."

1   Q. All right.

2   A. And she scheduled it.

3   Q. Okay. We'll have marked as the -- actually,

4   it's already been marked, but I'll have another copy

5   passed over to you of your interview with the special

6   litigation committee, which appears to have taken place

7   on July 18, 2002.

8       MR. LINDSTROM: For the record, Mark, this was

9   marked as Exhibit 10 at the previous session of

10  Ms. Catz' deposition.

11      MR. SOLOMON: Correct.

12      THE WITNESS: Okay.

13      MR. SOLOMON: Q. On page 1, is it accurate

14  that you have an MBA from Wharton and you have a JD from

15  Harvard Law School?

16  A. No.

17  Q. What's inaccurate about that?

18  A. I have a undergraduate degree from Wharton

19  School of Business, and I started at the University of

20  Pennsylvania Law School and I finished at Harvard. And

21  that would be more correct.

22  Q. So where's your JD from, from Harvard or from

23  Penn?

24  A. It's from Penn.

25  Q. Okay. And is it -- what's the title of your

1   degree from Wharton?

2   A. A Bachelor of Science in economics.

3   Q. Have you ever represented to anybody that you

4   had an MBA from Wharton?

5   A. No.

6   Q. And have you ever represented to anybody that

7   you had a JD from Harvard?

8   A. No. In fact, I've testified previously on

9   that same topic.

10  Q. I want to turn -- excuse me -- to page 20,

11  The control number at the bottom of the page is 297312.

12  First, you're aware that Mr. Ellison sold shares in

13  January of 2001; is that right?

14  A. He sold during this period, yeah. I don't

15  remember -- I don't know what month he sold.

16  Q. And have you ever spoken to Mr. Ellison about

17  those sales?

18  A. I don't think so. I don't think so.

19  Q. Is there a reason why you've never spoken with

20  Mr. Ellison about those sales?

21  A. No, I don't think so.

22  Q. Just a topic that's never come up?

23  A. The -- it came up not as a sale, but it

24  impacts the budget because of the tax impact of a sale.

25  So it impacts the CEO budget. So it wasn't about the

1   sales, but about the impact of the sales on the budget.

2   So that's what we talked about, you know, not the sales.

3   Q. And when you say "we," who do you mean?

4   A. Me and the finance people.

5   Q. And who are the finance people you're talking

6   about?

7   A. Oh, I don't remember.

8   Q. Are you aware that in 2000 -- in January of

9   2001 that Mr. Henley also sold stock?

10  A. I'm aware he sold during this period now, yes.

11  Q. And have you ever spoken to anybody about

12  Mr. Henley's stock sales?

13  A. No.

14  Q. Did you know the sales when they were made?

15      MR. LINDSTROM: Could we have the question

16  reread, please.

17      (Record read as follows:

18      QUESTION: Did you know the sales when

19      they were made?)

20      MR. SOLOMON: Q. Did you know of the sales

21  when they were made?

22  A. I knew about Larry Ellison's -- I don't know

23  exactly when they were made, but that they were going on

24  at one point. I became aware of that. And I didn't

25  know about Mr. Henley's.

1   Q. How did you become aware of Mr. Ellison's?

2   A. It was talked about in the office in some way.

3   In the office I overheard something about it.

4   Q. And who are you talking about when you say

5   that it was talked about?

6   A. I think Carol -- Carolyn Balkenhol, you know,

7   was involved in talking about it at the time.

8   Q. Anyone else?

9   A. No, I don't think so.

10      MR. SOLOMON: Have marked as the next exhibit

11  an e-mail dated January 19, 2001 from Safra Catz to Dan

12  Cooperman.

13      (Plaintiffs' Exhibit No. 43

14      marked for identification).

15      THE WITNESS: Are we done with the previous

16  document?

17      MR. SOLOMON: For the moment, yes.

18      MR. LINDSTROM: This is Exhibit 43, Counsel?

19      MR. SOLOMON: Yes, it is.

20  Q. Do you recognize this?

21  A. Yes.

22  Q. And it says, "I just found out something, so I

23  don't think I should trade."

24  You wrote that, correct?

25  A. Yes.

1  Q.  And what was it you'd found out?

2  A.  I'd found out that Mr. Ellison was selling

3  stock.

4  Q.  And how much stock had you found out he was

5  selling?

6  A.  Oh, I don't know how much he was selling.  I

7  don't think I -- I don't remember what he was selling.

8  Q.  You just knew of the fact that he was selling

9  some stock?

10  A.  I had found out that that was -- that he was

11  selling or it was his intention to sell.

12  Q.  Okay.  And why, as a result of simply finding

13  out that he was going to sell stock, did you think that

14  you should not trade?

15  MR. LINDSTROM:  Objection.  Asked and answered

16  in the prior session of her deposition.

17  THE WITNESS:  Yeah.

18  MR. SOLOMON:  Please answer it.

19  THE WITNESS:  As I've testified previously, I

20  didn't know if it was -- if it was a material nonpublic

21  thing to know that the largest, you know, shareholder

22  was selling stock, so I didn't want to trade, knowing

23  that.

24  MR. SOLOMON:  Q.  And what was it that

25  concerned you that it may be a material event, the fact

1  that Mr. Ellison was selling stock, although you didn't

2  know how much?

3  MR. LINDSTROM:  Asked and answered.

4  THE WITNESS:  As I told you, just the fact

5  that a large shareholder was selling -- was selling

6  stock, I didn't know if that was material or not.

7  MR. SOLOMON:  Q.  Did you believe that the

8  fact that Mr. Ellison was selling stock implied some message?

9  A.  No, not necessarily.  I just did not want to

10  trade, knowing that.

11  Q.  Did you discuss that reluctance to trade with

12  anybody?

13  A.  As I've testified before, I -- I did.

14  Q.  And who did you discuss that with?

15  A.  As I mentioned last time, I told Dan

16  Cooperman.

17  Q.  Did the fact that Mr. Selling -- Mr. Ellison

18  was selling stock alert you to the potential of a

19  litigation risk?

20  A.  I wasn't -- I wasn't thinking that much about

21  it one way or the other.  I just decided not to trade

22  myself.

23  Q.  Are you aware that Mr. Cooperman has testified

24  in this litigation that when he became aware that Mr.

25  Ellison was selling stock, he believed that that

1  heightened the litigation risk?

2  MR. LINDSTROM:  Assumes facts,

3  mischaracterizes his testimony.

4  THE WITNESS:  I have no idea what he said.

5  MR. SOLOMON:  Q.  What had prompted you to

6  want to sell stock in the first place?

7  MR. LINDSTROM:  Asked and answered.

8  THE WITNESS:  As I did in my last deposition,

9  I think in this chair, my husband had mentioned that to

10  me.

11  MR. SOLOMON:  Q.  Are you aware of any

12  husbands of any other Oracle employees who were urging

13  their spouses to sell stock at the same time?

14  A.  I don't know of any.

15  Q.  Have you heard that story internally at

16  Oracle?

17  A.  No.

18  MR. LINDSTROM:  Objection.  Assumes facts.

19  THE WITNESS:  No.

20  MR. SOLOMON:  Q.  Now, going back to what was

21  Exhibit 10 of your last deposition.

22  A.  Oh, okay.

23  Q.  And as you -- if you go back to the same page,

24  which is 297312, page 20, I'm looking at the bottom, and

25  it says, "Catz said she was aware that Henley and

1  Ellison sold shares in Q3 FY01, but she has never spoken

2  with them about those trades or the reasons for them."

3  You see that?

4  A.  Yes.

5  Q.  And that's true; that's how you just

6  testified, right?

7  MR. LINDSTROM:  Objection.  Mischaracterizes

8  her testimony.

9  THE WITNESS:  Well, this was true when I said

10  it, yeah.

11  MR. SOLOMON:  Q.  Except for the tax

12  implications, right?

13  A.  Yeah.  I didn't talk to them.  I thought you

14  asked me had I spoken to anybody.

15  Q.  That's fine.  That's fine.  Then you -- they

16  go on to say, "She did not recall whether she knew of

17  the sales at the time they were made."

18  Do you see that?

19  A.  Yeah, I do.

20  Q.  Now, how is it that you couldn't recall then,

21  but in fact we have a document that says you just

22  learned something?

23  MR. LINDSTROM:  Argumentative,

24  mischaracterizes her testimony.

25  THE WITNESS:  As I testified last time, this

1 sentence is not perfectly correct.

2        MR. SOLOMON: Okay.

3    Q.  What's wrong with --

4    A.  I did not know that Mr. Henley was trading,

5 but I did specifically know about Mr. Ellison.

6    Q.  So when it says, "She did not recall whether

7 she knew of the sales at the time they were made," it's

8 inaccurate to the extent it references back to Ellison's

9 sales; is that what you're saying?

10        MR. LINDSTROM: Asked and answered.

11        THE WITNESS: Yeah. I've testified about this

12 line before.

13        MR. SOLOMON: Q.  After you became aware that

14 Mr. Ellison was selling stock, consistent with the

15 message that you wrote on January 19th, 2001, did you

16 become involved in any way with his option exercises and

17 sales?

18        MR. LINDSTROM: Vague and ambiguous.

19        THE WITNESS: I don't know.  I don't remember

20 being involved.

21        MR. SOLOMON: Q.  Well, if you were involved,

22 could you tell me how you would likely have been

23 involved?

24    A.  No, I --

25        MR. LINDSTROM: Calls for speculation.

1        THE WITNESS: I don't recall being involved.

2        MR. SOLOMON: Q.  Okay.  You don't recall

3 asking anybody any questions in relation to his sales as

4 the sales were taking place?

5        MR. LINDSTROM: Vague and ambiguous.

6        THE WITNESS: I just don't remember.

7        MR. SOLOMON: Q.  So you may have done; you

8 simply don't remember.  Is that your testimony?

9    A.  I don't remember, as I sit here now, any

10 memory of this.

11    Q.  Do you remember being concerned as to how the

12 stock of Oracle performed while Mr. Ellison exercised

13 his options and sold?

14    A.  I don't actually remember that.  I don't -- as

15 I sit here right now, I don't have any memory of -- I

16 don't have any memory of that concept in my head.

17    Q.  You're aware that these sales in aggregate

18 constitute one of the biggest insider selling binges in

19 history?

20        MR. LINDSTROM: Argumentative.

21        MR. SOLOMON: Q.  Are you aware of that?

22        MR. LINDSTROM: Argumentative, assumes facts.

23        THE WITNESS: I actually don't know how it

24 rates compared to other big founder sales.

25        MR. SOLOMON: Q.  Do you agree that it was a

1 huge amount of money that was being -- huge amount of

2 money that was involved?

3        MR. LINDSTROM: Calls for a conclusion.

4        THE WITNESS: You know, I don't actually even

5 know the amount.

6        MR. SOLOMON: Q.  To this date, you don't know

7 the amount?

8    A.  I don't remember the amount.  But I -- it's a

9 large amount to me.

10    Q.  Do you think it was more than $10 million?

11        MR. LINDSTROM: No foundation.

12        THE WITNESS: You know what; there's a sheet

13 that lays out exactly how much it is.

14        MR. SOLOMON: Well, let's see if you have a

15 sense.

16    Q.  Is it more than $50 million?

17        MR. LINDSTROM: No foundation. She's told you

18 she doesn't know what the number is.

19        THE WITNESS: I don't remember what the amount

20 is.

21        MR. SOLOMON: Q.  More than $200 million, can

22 you tell me that?

23        MR. LINDSTROM: Same objection.

24        THE WITNESS: Yeah, I think it is more than

25 200 million. I don't know how much more, though.

1        MR. SOLOMON: Q.  More than 500 million?

2    A.  I don't know.

3    Q.  Were you aware of any floor on the price of

4 the stock that Mr. Ellison had instructed his brokers to

5 follow?

6    A.  At the time?  I don't remember any -- you

7 know, anything to do with his stock trade there.

8    Q.  Did you solicit of anybody, in the week that

9 he was trading, information as to Oracle's stock

10 performance and reasons for its performance?

11        MR. LINDSTROM: Can we have the question

12 reread, please.

13        (Record read as follows:

14        QUESTION: Did you solicit of anybody,

15        in the week that he was trading,

16        information as to Oracle's stock

17        performance and reasons for its

18        performance?)

19        MR. LINDSTROM: Objection. Vague and

20 ambiguous, compound.

21        THE WITNESS: I don't remember doing that.

22        MR. SOLOMON: Q.  Is it possible that you did

23 that?

24    A.  I don't know.

25    Q.  Knowing that Mr. Ellison was trading at the

1 time, and refraining because you thought that there was
2 a question as to its -- to the materiality of that
3 knowledge, were you interested in the stock performance
4 of Oracle as Mr. Ellison embarked on his sales?
5     MR. LINDSTROM: Objection. Calls for a
6 conclusion, vague and ambiguous.
7     THE WITNESS: I tell you, I don't remember my
8 thoughts six and a half years ago during that week or
9 month or quarter.
10     MR. SOLOMON: Q. Is it true that you've been
11 described by Mr. Ellison as someone who is particularly
12 in command of all the facts?
13     MR. LINDSTROM: Objection. Vague and
14 ambiguous.
15     THE WITNESS: I don't know.
16     MR. LINDSTROM: Assumes facts.
17     THE WITNESS: I don't know that he has.
18     MR. SOLOMON: Q. Do you believe your memory
19 is weaker than average?
20     A. I don't know what the average memory is,
21 but --
22     Q. Do you feel you have a good or a bad memory?
23     A. I don't know. I really don't know.
24     MR. SOLOMON: Let's have marked as the next
25 exhibit an e-mail dated Friday, the 19th of January,

1 2001.
2     (Plaintiffs' Exhibit No. 44
3     marked for identification).
4     (Brief interruption).
5     MR. LINDSTROM: The record should reflect that
6 it was not the witness's phone that was ringing, but she
7 has now assured that her phone is off so that we don't
8 have a similar interruption.
9     MR. SOLOMON: Q. Let me know if you recognize
10 this, please.
11     A. I recognize it, now that I see it.
12     Q. And this is -- that's your message at the top,
13 "Confirming in writing that I will not be trading during
14 this period"; is that right?
15     A. Yes.
16     Q. Now, you'd said in another e-mail earlier that
17 day --
18     A. Mm-hm.
19     Q. -- just a little bit earlier that day, that
20 you'd found something out. And I know you've testified
21 that it was the fact that Mr. Ellison was trading. Had
22 you found anything else out on or around January 19,
23 2001?
24     A. No, this is --
25     MR. LINDSTROM: That caused her not to trade?

1     MR. SOLOMON: Yeah.
2     THE WITNESS: No. No, this is all related.
3 This what I found out.
4     MR. SOLOMON: Q. You hadn't discovered any
5 negative information concerning Oracle before -- before
6 this date; is that right?
7     A. No, not at all.
8     Q. And you hadn't noticed that there was negative
9 growth rates affecting some of Oracle's business
10 divisions reported just before -- reported internally
11 just before this date?
12     MR. LINDSTROM: Assumes facts, argumentative.
13     THE WITNESS: No.
14     MR. SOLOMON: Q. Are you aware that Mr.
15 Ellison had discovered those facts and has admitted in
16 this litigation that he had?
17     MR. LINDSTROM: Assumes facts,
18 mischaracterizes his testimony.
19     THE WITNESS: I don't know that to be true.
20     MR. SOLOMON: Q. You haven't read his
21 testimony, have you?
22     A. I have not read any of his testimony.
23     MR. SOLOMON: Let's have marked as the next
24 exhibit another e-mail, dated March -- excuse me --
25 Monday, 22nd of January, 2001. Control numbers are

1 0419161 and 982, for the record.
2     (Plaintiffs' Exhibit No. 45
3     marked for identification).
4     MR. SOLOMON: The prior exhibit -- what was
5 the prior exhibit, please?
6     THE REPORTER: 44. We are now on 45.
7     MR. SOLOMON: -- 44 has the control number
8 039431 and is also dated the 19th of January, 2001.
9     Q. Let me know if you've seen this before.
10     A. I don't recognize it, but let me read it, find
11 out what it is.
12     Q. Sure.
13     A. Okay.
14     Q. Okay. So you recognize this?
15     A. I read it. I see what it says.
16     Q. There's a message at the top that says, "Got
17 them, will mail them back." Is that a message from you?
18     A. Yes. It looks like it.
19     Q. Okay. And you're responding to Jonathan
20 White; is that right?
21     A. Yes.
22     Q. And he says, "You should have received by fax
23 the forms for exercise and selling your options."
24     You see that?
25     A. Yes.

1    Q. Now, you didn't tell him that you weren't
2    going to sell; you just said "Got them, will mail them
3    back." Could you explain why.
4        MR. LINDSTROM: Objection to the preface as
5    argumentative, mischaracterizes the document.
6        You may respond.
7        THE WITNESS: Ask me again.
8        MR. SOLOMON: Q. You didn't tell him you
9    weren't going to sell; you just said "Got them, will
10   mail them back." Can you explain why.
11       MR. LINDSTROM: Same objections.
12       THE WITNESS: Yes.
13       MR. SOLOMON: Okay. Please explain why.
14       THE WITNESS: Because even though I wasn't
15   selling, I didn't think that I should tell him why I
16   wasn't selling, because it wasn't my information to
17   tell.
18       MR. SOLOMON: Q. Why would you have to tell
19   him why you weren't selling?
20       A. Because I had planned on selling.
21       Q. Well, why didn't you just tell him "I'm not
22   going to sell"? Why instead did you say "Got them, will
23   mail them back"?
24       MR. LINDSTROM: Objection. Argumentative.
25       THE WITNESS: Oh, I don't know. That's what I

1    decided to do, not have a discussion about it.
2        MR. SOLOMON: Q. And I'm asking you why --
3        MR. LINDSTROM: Objection. Asked and
4    answered.
5        MR. SOLOMON: Q. -- no explanation.
6        MR. LINDSTROM: I think she told you why.
7        MR. SOLOMON: Q. Because you decided, that's
8    why?
9        A. 'Cause I decided not to.
10       Q. But you can't give me a reason why?
11       A. I just told you.
12       MR. LINDSTROM: I think she did give you a
13   reason why.
14       MR. SOLOMON: Q. What's your reason why
15   again?
16       MR. LINDSTROM: The record will reflect the
17   testimony that she gave.
18       You may repeat your response.
19       THE WITNESS: I did not want to -- I did not
20   want to have a discussion and tell him that -- my reason
21   for not wanting to sell. So I just didn't tell him
22   anything.
23       MR. SOLOMON: Q. You said "Got them, will
24   mail them back." Did you mail them back?
25       A. Ultimately, probably, but I don't remember.

1    Q. Now, you see -- if you go to the bottom of
2    that page, there's an e-mail exchange involving Wendell
3    Laidley. Do you know who Wendell Laidley is?
4        A. Well, I think it says who he is on the bottom
5    of this e-mail, but I didn't know who he was until I
6    read it just now.
7        Q. Okay. Now, did you read this on Monday, the
8    22nd of January, 2001?
9        MR. LINDSTROM: When you say "this," can you
10   be more specific. There are several e-mails that are
11   imbedded here.
12       MR. SOLOMON: The message from Wendell
13   Laidley.
14       THE WITNESS: Did I read this?
15       MR. SOLOMON: Yes.
16       THE WITNESS: Oh, I think -- who knows.
17   Probably. I don't remember reading it, but ...
18       MR. SOLOMON: Q. Okay. And then if you --
19   you'll see that it's addressed to CSEQ U.S. Sales. Do
20   you know what that stands for?
21       A. Oh, yeah -- well, I can -- I --
22       MR. LINDSTROM: He wants to know if you know.
23       THE WITNESS: No idea.
24       MR. SOLOMON: Q. It wouldn't be Credit Suisse
25   Equities, something like that?

1    A. Oh, it could be --
2        MR. LINDSTROM: Objection. Calls for
3    speculation.
4        THE WITNESS: I just don't know. These are
5    little codes for something internal.
6        MR. SOLOMON: Q. Okay. And then -- now,
7    halfway into that first page, you'll see there's a
8    message from Brent Thill to Wendell Laidley and others.
9        Do you see that?
10       A. I see it.
11       Q. And who's Brent Thill?
12       A. I think he was a research analyst there at the
13   time.
14       Q. Is that the only way you know him?
15       A. Yeah, I barely know him at all. He's still a
16   research analyst at one of the firms. I don't know
17   that -- I don't think he's at Credit Suisse for Boston
18   anymore, though.
19       Q. Is he related to anybody at Oracle?
20       MR. LINDSTROM: Objection. No foundation,
21   calls for speculation.
22       THE WITNESS: I have no idea.
23       MR. SOLOMON: Q. And then above, there's a
24   message from Jonathan White. Do you know who Jonathan
25   White is?

1    A. Yes.

2    Q. And who's Jonathan White?

3    A. Well, he was my -- my private client account

4    executive at the time.

5    Q. Okay. And he says, "See below." Do you know

6    what he's referencing?

7    A. I guess he's telling me about this note.

8    Q. And do you know why he's telling you about

9    that note?

10    A. Oh --

11    MR. LINDSTROM: Objection. No foundation,

12    calls for speculation.

13    THE WITNESS: I guess he thought I'd be

14    interested.

15    MR. SOLOMON: Q. And were you interested?

16    A. I was kind of interested in Siebel, sure.

17    Q. Were you interested in Oracle's stock

18    performance at that time, in light of the fact that Mr.

19    Ellison was selling?

20    A. Was I -- you kind of asked me that before.

21    Was I interested in Oracle's stock performance. It's

22    kind of two related things, but not really.

23    Why don't you break that question down into

24    two.

25    Q. Well, that would -- that would remove the

---

1    relevance. What I'm asking is, is whether because you

2    knew that Mr. Ellison was selling, you were interested

3    in Oracle's stock performance at this particular time.

4    MR. LINDSTROM: Asked and answered.

5    THE WITNESS: I don't -- I don't remember

6    thinking about Mr. Ellison's stock price -- trade -- the

7    stock price he was getting for his trades. I just don't

8    remember thinking about that.

9    MR. SOLOMON: Q. If you go to the very top of

10    the first page, it says, "Re: FW: Oracle" and "Oracle

11    BUY," in parens. Then it says, "Few explanations for

12    weakness today."

13    Do you see that?

14    A. I do.

15    Q. Were you looking for explanations for the

16    weakness in Oracle's stock at that time?

17    A. No. This -- this is -- this wasn't -- I don't

18    know if I was or was not. This "few explanations for

19    weakness" is a title. It is -- it's not related to me

20    in any way.

21    Q. Okay. Did you speak with Mr. Ellison at all

22    during the week beginning Monday the 22nd of January,

23    2001?

24    MR. LINDSTROM: On any subject?

25    MR. SOLOMON: Yeah.

---

1    THE WITNESS: Oh, you know, I -- I don't know.

2    I'd have to look if he was in town. But I would -- I

3    can't remember talking to him, but I would expect that I

4    spoke to him. I just don't remember.

5    MR. SOLOMON: Q. Well, was he in town?

6    A. I don't know.

7    MR. LINDSTROM: No foundation.

8    MR. SOLOMON: Q. Is Mr. Ellison often sick?

9    A. I don't know often sick. Sometimes -- you

10    know, everyone has a cold once in a while. But no, not

11    unusually, no.

12    Q. Do you remember him being off sick at this

13    time?

14    A. Oh, I have no idea.

15    Q. And you haven't seen any documents, preparing

16    for any of your depositions in this case, that would

17    suggest that you knew that he was sick; is that right?

18    A. That he knew that he was sick or --

19    Q. That you knew.

20    A. I don't remember him being sick.

21    Q. So were you concerned or involved at all in

22    addressing any potential leakage of the information that

23    you thought perhaps might be material, that Mr. Ellison

24    was selling stock?

25    MR. LINDSTROM: Could we have that question

---

1    reread, please.

2    (Record read as follows:

3    QUESTION: So were you concerned or

4    involved at all in addressing any potential

5    leakage of the information that you thought

6    perhaps might be material, that Mr. Ellison

7    was selling stock?)

8    MR. LINDSTROM: Vague and ambiguous, compound.

9    MR. SOLOMON: So let me break that down.

10    Q. Were you concerned about any -- sorry. Were

11    you involved in addressing any potential leakage of that

12    information?

13    A. If you're asking was I involved in disclosing

14    the information, I don't remember, but I may have been.

15    Q. Have you seen any documents that refresh your

16    recollection one way or the other?

17    A. I haven't. But if you have some, I'd be

18    delighted to see them.

19    Q. Were you concerned about leakage of that

20    information at that time?

21    MR. LINDSTROM: Vague and ambiguous, calls for

22    a conclusion.

23    THE WITNESS: I don't remember even having

24    those -- that concept, other than that I did not want to

25    be the one putting this information out. I didn't know

1  if that was proper or not.

2      MR. SOLOMON:  Q.  What do you mean by "proper

3  or not"?

4      A.  I don't know -- I didn't know -- it was not my

5  information, so I didn't know if -- I didn't want to

6  tell a broker.

7      Q.  Why was Joe Lockhart fired?

8      MR. LINDSTROM:  No foundation, calls for

9  speculation, assumes facts.

10     THE WITNESS:  I don't remember that he was

11  fired, actually.

12     MR. SOLOMON:  Q.  Some of you apparently do;

13  some of you don't.  Why did Mr. Lockhart leave the

14  company?

15     MR. LINDSTROM:  Objection.  Argumentative.

16     THE WITNESS:  You know --

17     MR. LINDSTROM:  No foundation, calls for

18  speculation.

19     THE WITNESS:  -- I don't actually remember why

20  he left.  He wasn't there very long.

21     MR. SOLOMON:  Q.  Has it been said that you

22  and Mr. Ellison finish each other's sentences?

23     A.  Oh, I don't know what's said.

24     Q.  If someone were to say that, would that be

25  broadly accurate?

1      A.  I think it would depend what we were talking

2  about.

3      Q.  Were you involved in the hiring of

4  Mr. Lockhart?

5      A.  You know, I think I might have been.

6      Q.  How were you involved?

7      A.  I don't remember.

8      Q.  Did you assess his job performance while he

9  was there?

10     MR. LINDSTROM:  Objection.  Vague and

11  ambiguous.

12     THE WITNESS:  I'll tell you, I have so little

13  memory of him even being there.

14     MR. SOLOMON:  Q.  He was Mr. Clinton's press

15  secretary, correct?

16     A.  Yeah, he was President Clinton's press

17  spokesman.  I think so.  White House press spokesman

18  maybe.  Something like that basically.

19     Q.  Basically known by millions of people, right?

20     A.  I would think so.

21     Q.  But you have very little recollection about

22  him and his involvement at Oracle; is that your

23  testimony?

24     A.  Yeah.

25     MR. LINDSTROM:  Objection.  Argumentative.

1      THE WITNESS:  Yes.

2      MR. SOLOMON:  Q.  Did you discuss Mr.

3  Lockhart's departure from Oracle with Mr. Ellison?

4      A.  You know, as I sit here right now, I don't

5  have any memory of that.

6      Q.  Do you have an understanding why Mr. Ellison

7  sold -- exercised and sold the stock that he did in

8  January of 2001?

9      MR. LINDSTROM:  Could we have the question

10  reread, please.

11     (Record read as follows:

12     QUESTION:  Do you have an

13     understanding why Mr. Ellison sold --

14     exercised and sold the stock that he did in

15     January of 2001?)

16     THE WITNESS:  I don't have a full

17  understanding, but I have some understanding.

18     MR. SOLOMON:  Q.  Where have you derived that

19  understanding from?

20     A.  I'm not really sure, but I just -- I think I

21  know, and I'm not even a hundred percent sure.

22     Q.  You think you know where you derived the --

23     A.  No.

24     Q.  -- understanding from, but you're not a

25  hundred percent sure?

1      A.  No.  In fact, I mean I think I -- I think I

2  have an understanding, but I'm not even a hundred

3  percent sure.  But I -- but -- where did I -- I don't

4  really know where I derived that -- what I think to be

5  true.

6      Q.  So what's your less-than-100-percent

7  understanding?

8      MR. LINDSTROM:  Caution you against divulging

9  any attorney/client privileged communications you may

10  have had.  Otherwise you may respond to the question.

11     MR. SOLOMON:  I don't know how that could even

12  approach doing that, given the way I framed my question.

13     MR. LINDSTROM:  I think the way you --

14     MR. SOLOMON:  I didn't -- I'll ask the

15  question again.

16     Q.  What's your less-than-100-percent

17  understanding?

18     MR. LINDSTROM:  Well, but the point is if she

19  got it from legal counsel, then she's not -- you're not

20  entitled to have it.  If she has it from some other

21  basis, she can give it to you.

22     THE WITNESS:  I think that there were options

23  that were expiring.  That's -- that's what I, you know,

24  basically remember.

25     MR. SOLOMON:  Q.  And is that the extent of

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1   your understanding?

2   A.  It's the extent that I can think of right now.

3   Q.  When were they expiring?

4   A.  Oh, I don't know.

5   Q.  At the time that Mr. Ellison was engaging in

6   his sales transactions in January of 2001, were you

7   familiar with the rules surrounding insider trading?

8       MR. LINDSTROM:  Vague and ambiguous.

9       THE WITNESS:  Well, I, you know, knew them

10  generally.

11      MR. SOLOMON:  Q.  And what are -- please

12  describe for me the general rules you knew at that time.

13  A.  Well, there's some -- two different ones that

14  I could think of.  But, you know, this issue of trading

15  on material nonpublic information, that you're not

16  supposed to do that, that that's a violation.

17  Q.  And you said "two different ones."  What's the

18  other one?

19  A.  There's -- you know, I should know.  I

20  should -- but there's like 16b and 10b-5.  So 10b-5 is

21  material nonpublic information.  16b is another rule

22  that applies to insiders, and I don't remember how

23  exactly it works.

24  Q.  And did you have a discussion with anybody in

25  January of 2001 about either Rule 10b-5 or Rule 16b?

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1   A.  I don't know that I had a discussion with

2   anyone.  But when I talked to Dan Cooperman --

3       MR. LINDSTROM:  Wait a second.

4       THE WITNESS:  Oh.

5       MR. LINDSTROM:  He can ask you foundational --

6       THE WITNESS:  Right.  Oh, sorry.

7       MR. LINDSTROM: -- questions; for example, who

8   you had discussions with.  I think everybody here knows

9   that Mr. Cooperman's the general counsel of Oracle.  So

10  I don't want you divulging privileged communications

11  that you may have had concerning that subject with

12  Mr. Cooperman.

13      So for now, just confine yourself to the

14  question which was asked, which is, as I recall it, who

15  you had such discussions with.

16      MR. SOLOMON:  Q.  Yeah, the question was did

17  you have a discussion with anyone in January of 2001

18  about either Rule 10b-5 or Rule 16b?

19      MR. LINDSTROM:  Thank you.

20      So the answer to that would be yes or no.  And

21  then we'll go to who it was.

22      THE WITNESS:  Excluding any talk with a

23  lawyer?

24      MR. LINDSTROM:  No, no.  We're going to

25  take -- because of potential waiver issues and so forth,

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1   there are sort of -- there's a protocol that Mr. Solomon

2   and we will follow, which is he first gets to find out

3   whether you had any conversations, and then we'll go to

4   the question "With whom did you speak?"

5       So you can answer this question, including if

6   you had a conversation with a lawyer, if you recall such

7   a conversation in that time period.

8       THE WITNESS:  Well, I actually don't recall

9   either 10b-5 or 16b as a discussion -- you know, as a

10  concept mentioned necessarily.  But -- but -- ask that

11  again.  I'm sorry.  Maybe you should read -- can you ask

12  the question again.

13      MR. SOLOMON:  Q.  Did you have a discussion

14  with anyone in January of 2001 about either 10b-5 or

15  16b?

16  A.  I may have.

17  Q.  And who may you have had discussions with?

18      MR. LINDSTROM:  No foundation, calls for

19  speculation.

20      MR. SOLOMON:  There must be a limited

21  universe.

22      THE WITNESS:  It would be Dan Cooperman.

23      MR. SOLOMON:  Thank you.

24  Q.  Did you take or refrain from taking any action

25  as a result of your conversation with Dan Cooperman?

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1       MR. LINDSTROM:  Vague and ambiguous.

2       THE WITNESS:  I did not "take" or "not take"

3   any action as a -- as a result of my conversation with

4   Dan Cooperman.

5       MR. SOLOMON:  Let's have marked as the next

6   exhibit an e-mail dated Monday, January 29th, 2001,

7   the control numbers 035682 through 685.

8       (Plaintiffs' Exhibit No. 46

9       marked for identification.)

10      MR. LINDSTROM:  Is that 46, Counsel?

11      MR. SOLOMON:  Yes.

12      MR. LINDSTROM:  Thank you.

13      MR. SOLOMON:  Q.  Do you recognize this?

14  A.  Well, I've read it through.  I vaguely

15  remember it.

16  Q.  And you'll see on the first page it's dated

17  Monday, 29th of January, 2001.  And you write, "Larry

18  ended up out sick all last week.  I'm going to bring it

19  up at PDMC today if I can, Safra."

20      Do you see that?

21  A.  Yeah.

22  Q.  You wrote that, right?

23  A.  Definitely -- I mean, it looks like I did,

24  sure.

25  Q.  Does that help refresh your recollection about

1   Larry Ellison being out sick the week before that?

2     A.  Well, I say so right in the document.

3     MR. LINDSTROM:  The question is whether your

4   recollection is refreshed as a result of reading the

5   document.

6     THE WITNESS:  Not really, but I believe this

7   note.

8     MR. SOLOMON:  Q.  Do you know where Mr.

9   Ellison was while he was out sick?

10     A.  I don't remember at all.

11     Q.  You don't remember if he was vacationing in

12   Mexico?

13     A.  No.

14     Q.  If you go to the second page -- excuse me --

15   the third page of the document, you'll see that it's

16   dated the 25th of January, 2001, refers to BMC. It's

17   from Lori Norlander.

18     First of all, can you tell me who Lori

19   Norlander is?

20     A.  I don't know her.  I don't know who she is.

21     Q.  What about Scott Little; do you know who Scott

22   Little is?

23     A.  I think I might.

24     Q.  In the context of revenue recognition, have

25   you ever heard of a pull-in?

---

1     A.  No.

2     Q.  You ever heard of sales being pulled into a

3   fiscal -- an earlier fiscal quarter in order to make the

4   numbers?

5     A.  Have I ever heard of -- of --

6     Q.  Of revenue being, quote, end quote, pulled

7   into an earlier fiscal quarter in order to make

8   forecasted numbers.

9     MR. LINDSTROM:  Assumes facts, vague and

10   ambiguous, no foundation.

11     THE WITNESS:  Maybe.

12     MR. SOLOMON:  Q.  Have you heard of that in

13   the context of accounting fraud?

14     MR. LINDSTROM:  You're talking about whether

15   she's heard of that term --

16     MR. SOLOMON:  Correct.

17     MR. LINDSTROM:  -- "pulling"?

18     MR. SOLOMON:  Correct.

19     THE WITNESS:  Puling.  No.

20     MR. SOLOMON:  Q.  Have you ever heard of it

21   discussed in the context of fraudulent forecasting,

22   pulling in a transaction into an earlier period in which

23   to make numbers?

24     A.  No.

25     Q.  You were with DLJ for a long time, correct?

---

1     A.  Yes.

2     Q.  What did you do there?

3     A.  I was an investment banker.

4     Q.  So did you follow publicly-traded companies?

5     A.  Some.

6     Q.  Any of them in the high tech area?

7     A.  Absolutely.

8     Q.  Did you ever hear of any securities

9   litigations that involved allegations of accounting

10   fraud being committed by high-tech companies while you

11   were with DLJ?

12     A.  While I was at DLJ.  I don't remember if it

13   was while I was at DLJ.

14     Q.  Did you ever hear of channel stuffing while

15   you were at DLJ?

16     A.  Did I ever hear of the word "channel

17   stuffing"?  Yes.

18     Q.  And you know what that is?

19     A.  Yes, I think so.

20     Q.  So what is channel stuffing?

21     A.  Channel stuffing is when you sell to your

22   distributors more software than they really want.

23     Q.  And would you say that that is a good or a bad

24   practice?

25     MR. LINDSTROM:  Calls for a conclusion, vague

---

1   and ambiguous.

2     THE WITNESS:  You know, it would -- it would

3   depend on why and what and what's going on.

4     MR. SOLOMON:  Q.  Have you ever heard of

5   premature revenue recognition in connection with

6   high-tech companies that you followed when you were at

7   DLJ?

8     MR. LINDSTROM:  Premature revenue recognition?

9     MR. SOLOMON:  Mm-hm.

10     THE WITNESS:  I don't remember -- I don't

11   remember that term necessarily while I was at DLJ.

12     MR. SOLOMON:  Q.  Were you sensitive, while

13   you were at DLJ, to companies that DLJ was invested in

14   that may be accused of fraud?

15     MR. LINDSTROM:  Vague and ambiguous as to

16   "sensitive."

17     THE WITNESS:  I've -- DLJ was not an investor

18   in companies, at least not the part of the business that

19   I was involved in.

20     MR. SOLOMON:  Q.  Were you ever involved in

21   M&A?

22     A.  I was involved in mergers and acquisitions,

23   yes.

24     Q.  And as a result, you would be interested in

25   the potential for fraud at any of the companies involved

1  in the transactions you were dealing with; is that true?

2      MR. LINDSTROM: Vague and ambiguous, calls for

3  a conclusion.

4      THE WITNESS: I would be interested in

5  fraudulent behavior, of course.

6      MR. SOLOMON: Q. You were the CFO at Oracle

7  beginning in what year? When did you become the CFO?

8      A. I think about a year ago. Someone is going to

9  know the exact date. I don't know. I'd say it was

10  about a year ago, maybe a little longer.

11      Q. And for that position, is it necessary for you

12  to be familiar with basic accounting rules?

13      A. Well, I -- I have -- I think for that

14  position, you have to have some familiarity. However,

15  we have huge accounting staffs and outside auditors who

16  are very familiar with all the details of the accounting

17  rules.

18      Q. You testified earlier in your last session

19  about a deal with Hewlett-Packard at the end of the

20  second fiscal quarter of 2001. Do you recall that?

21      MR. LINDSTROM: Does she recall the deal or

22  the testimony?

23      MR. SOLOMON: Testimony.

24      THE WITNESS: I recall the testimony.

25      MR. SOLOMON: Q. Okay. Do you recall the

1  deal?

2      A. I recall it very, very vaguely.

3      Q. Do you recall that it was finalized late in

4  the evening of November 30th, 2000?

5      MR. LINDSTROM: Asked and answered, no

6  foundation.

7      THE WITNESS: I -- I recall from the previous

8  testimony and documents shown then.

9      MR. SOLOMON: Q. Where were you that day; do

10  you recall?

11      A. Well, I don't actually have a memory of that

12  day, so I don't actually know where I was necessarily.

13      MR. LINDSTROM: It's also vague as to the time

14  of day you're asking about.

15      MR. SOLOMON: Q. Are you aware that Mr.

16  Ellison was involved in negotiating that transaction?

17      MR. LINDSTROM: Assumes facts, no foundation.

18      THE WITNESS: I actually do not know that to

19  be true at all.

20      MR. SOLOMON: Q. Why do you not -- why do you

21  say that?

22      A. Because I don't remember him being involved in

23  negotiating that deal.

24      Q. And anybody that would suggest that he was

25  involved in negotiating that deal at best would be

1  mistaken; is that your testimony?

2      MR. LINDSTROM: Objection. Argumentative.

3      THE WITNESS: I told you that I don't remember

4  him being deeply involved in the negotiation of that

5  transaction.

6      MR. SOLOMON: Q. Who was deeply involved in

7  the negotiation of that transaction?

8      A. Well, there was -- there was a rep involved.

9  Mike DeCesare was involved. I remember him being

10  involved in it. I was involved in it. Folks on the H-P

11  side were involved. I just don't know who.

12      Q. Do you have any reason to believe that Mike

13  DeCesare is anything but a truthful person?

14      A. I don't know Mike DeCesare that well.

15      Q. Could you answer the question. Do you have

16  any reason to believe that Mike DeCesare is anything but

17  a truthful person?

18      MR. LINDSTROM: No foundation.

19      THE WITNESS: I -- I have no reason to

20  believe, as I sit here right now, that he is not

21  truthful.

22      MR. SOLOMON: Q. So so far from Oracle you've

23  identified Mike DeCesare and you. Is that it?

24      A. I just don't remember.

25      Q. What was your involvement?

1      A. You know, I remember so little about that

2  deal. I signed it; I know that. I saw that in the last

3  deposition. And I probably worked on some of the

4  wording. I just don't remember. I really shouldn't

5  even speculate. I don't remember.

6      Q. What was Mr. Ellison's involvement in that

7  deal?

8      MR. LINDSTROM: No foundation, assumes facts.

9      THE WITNESS: I just don't remember what his

10  involvement was.

11      MR. SOLOMON: Q. What was Mr. DeCesare's

12  involvement?

13      A. Well, Mr. DeCesare was coordinating it and had

14  sold the project. And he was -- he was involved in it.

15  I don't know exactly what he did.

16      Q. Were you begging the other side, the

17  counterparties of the Covisint deal, to finalize the

18  deal so that it could be recognized in 2001 at Oracle?

19      MR. LINDSTROM: Objection. Calls for a

20  conclusion, vague and ambiguous.

21      THE WITNESS: I don't know about necessarily

22  begging, but probably. We really wanted to get that

23  deal closed. I wanted to get it closed as soon as

24  possible. I wanted to close that deal very much.

25      MR. SOLOMON: Q. You said you don't know

1    necessarily about begging, but probably.  So you

2    probably were begging or you weren't begging?

3        A   I was asking -- I was wanting -- we were

4    working very, very hard to get it closed.  Very hard to

5    get it closed as soon as possible.

6        Q   Why?

7        A   It's a big deal, and we wanted that project,

8    and we wanted to be part of Covisint.  And it was in --

9    in negotiation for months.  And we wanted to close it

10   and be part of it.

11       Q   And didn't it end up being touch and go

12   whether or not you'd be able to actually make your

13   forecast numbers for Q201 as a result of Covisint

14   slipping?

15           MR. LINDSTROM:  Vague and ambiguous.

16           THE WITNESS:  You know what, I'd have to see,

17   you know, the numbers and how they -- how they came out.

18   So much of the quarter comes at the end that you don't

19   know if -- you know, I don't think -- actually -- I

20   don't know.  I just don't remember Q2's -- the way the

21   deals all fell in.  But I --

22           MR. SOLOMON:  Q.  Isn't it true that you've

23   already said before, concerning Q201, that you didn't

24   know until that night whether or not Oracle would make

25   it?

1        A   That's what I just said right now too.  At the

2    very end -- you know, I don't remember that night

3    necessarily, but, you know, you don't know till the end.

4        Q   Did anybody from Oracle inform the investing

5    public that Oracle just squeaked in to make the 2Q01

6    numbers?

7            MR. LINDSTROM:  Objection.  Calls for a

8    conclusion, vague and ambiguous, argumentative.

9            THE WITNESS:  No, we didn't --

10           MR. LINDSTROM:  Assumes facts also.

11           THE WITNESS:  Yeah.  It's -- we did not make

12   any disclosure about the quarter because it is a very

13   typical quarter, like every other quarter.  And it's

14   broadly known that the bulk of the business comes in at

15   the end.

16           MR. SOLOMON:  Q.  Now, what was it about cash

17   with respect to Covisint that was so important to you?

18       A   First of all, Covisint was a consortium.  It

19   was not an actual company with a long history.  And so

20   getting the cash is obviously very important because you

21   want to -- you want to get paid.

22           And getting the cash in this case also

23   signaled that this was a true commitment.  And I worked

24   very hard to make sure that we had the cash as part of

25   our negotiation.

1        Q   Who's -- who were the participants in the

2    consortium?

3        A   General Motors and Ford for sure.  And I can't

4    remember if at that point Chrysler was in and out -- in

5    or out.  And I have a memory that Nissan was in it too.

6    But I'm not a hundred percent sure.

7        Q   And what was wrong with their credit?

8        A   It wasn't based on their credit.  Covisint was

9    not based on their credit.

10       Q   Did you try to get individual -- strike that.

11   Did you try to get it based on their credit?

12       A   Oh, I don't know.

13           MR. LINDSTROM:  Vague and ambiguous.

14           MR. SOLOMON:  Q.  Did you make any attempt?

15       A   I don't remember.

16       Q   Did any of them say "What's your problem?

17   We'll offer the credit of our company"?

18       A   I don't remember that.

19       Q   And so you were very anxious to get it into

20   Q2, but you were also very anxious that there be a cash

21   component; is that right?

22       A   Yeah, I wanted -- I wanted the cash to -- to

23   transfer, yes.

24       Q   Okay.  What did they want before they got the

25   cash, anything?

1        A   Signed document.

2        Q   All right.  So you must have been acting with

3    alacrity to get them a signed document so you could get

4    the cash, right?

5        A   I'm not sure I understand your question.

6        Q   Well, you wanted the cash; you wanted it in

7    2Q; they needed the signed document.  So you were

8    working hard to get them the documents as quickly as

9    possible, right?

10       A   We were working very hard to come to agreement

11   on the contract, yeah, and get a signed document.  We

12   were working, negotiating very hard at the time.

13       Q   What involvement, if any, did you have in

14   Oracle's stock repurchase program in 2000 and 2001?

15       A   I wasn't very involved, but, you know, I knew

16   about it, and I'd be asked an opinion once in a while.

17       Q   Who would ask you opinions?

18       A   Jeff Henley or the treasurer at the time,

19   Bruce Lange.

20       Q   What opinions were they soliciting?

21       A   You know, I don't remember.  I don't really

22   remember, but things like the timing, the -- I don't

23   really remember in general.

24       Q   Do I take it from that you don't recall the

25   opinions that you gave?

1  A.  Right now the opinions I gave in '99, no.

2  MR. LINDSTROM:  Actually, the question was

3  2000, 2001.

4  THE WITNESS:  Oh.

5  MR. LINDSTROM:  If that makes a difference.

6  THE WITNESS:  Oh.  It doesn't make a

7  difference, 'cause I don't remember my opinion.  I don't

8  remember the buy-back.

9  MR. SOLOMON:  Q.  What about stock repurchases

10  around the time Mr. Ellison and Mr. Henley were selling

11  their stock; do you know anything about those?

12  A.  I don't remember anything about that right

13  now.

14  Q.  Consistent with your belief that you shouldn't

15  trade because you were in possession of material

16  information, did Oracle make that same determination

17  with respect to its repurchases?

18  MR. LINDSTROM:  No foundation, calls for

19  speculation.

20  THE WITNESS:  I don't know.

21  MR. SOLOMON:  Q.  Well, you were a very senior

22  executive at the time, were you not?

23  MR. LINDSTROM:  Argumentative.

24  THE WITNESS:  I made a decision not to trade.

25  Not necessarily with your -- whatever you just assumed

1  in your long question there.  But I made a decision not

2  to trade, not to sell.

3  MR. SOLOMON:  Q.  And that's because you

4  didn't want to violate the law; is that right?

5  A.  I didn't know if it violated the law or not.

6  I didn't want to sell.  I didn't -- I had information.

7  I didn't know if it violated the law or not.  I didn't

8  seek counsel on that one way or the other.

9  Moment I had information of any kind, I wasn't

10  very committed to selling at all, so I didn't sell.

11  Q.  So if you didn't seek counsel, tell me

12  everything about your conversation with Mr. Cooperman.

13  A.  I didn't seek outside counsel.

14  Q.  So you sought inside counsel?

15  A.  No, I just -- I -- I just told him.

16  Q.  I don't understand your answer.

17  A.  I did not seek advice.

18  Q.  And he didn't give you advice; is that right?

19  A.  I don't remember what he said, actually.

20  Q.  And if you were concerned about your own

21  sales, why weren't you concerned with Oracle's

22  transactions?

23  MR. LINDSTROM:  Argumentative.

24  THE WITNESS:  I didn't -- I didn't think about

25  the -- I did not think they were improper.  I didn't

1  think it was improper.  I did not even think about it.

2  MR. SOLOMON:  Q.  Did anybody think about it?

3  MR. LINDSTROM:  No foundation, calls for

4  speculation.

5  THE WITNESS:  I have no idea.

6  MR. SOLOMON:  Q.  Did they think about it and

7  coordinate the stock repurchases to actually coincide

8  with Mr. Ellison's sales?

9  MR. LINDSTROM:  No foundation, calls for

10  speculation, assumes facts.

11  THE WITNESS:  I have no idea.

12  MR. SOLOMON:  Q.  Do you have a view as to

13  whether that would be unlawful?

14  MR. LINDSTROM:  Hypothetical, calls for a

15  legal opinion.

16  THE WITNESS:  No idea.

17  MR. SOLOMON:  Q.  Do you know that

18  Mr. Cooperman has testified that he understands the

19  insider trading rules apply to Oracle in stock

20  repurchases?

21  MR. LINDSTROM:  No foundation, assumes facts.

22  THE WITNESS:  I have no idea what he's

23  testified to.

24  MR. SOLOMON:  Q.  Were you involved with Mr.

25  Ellison in the decision made in the fall of 2000 to

1  change the forecasting criteria?

2  A.  I don't know that that -- that we changed any

3  forecasting criteria.  I don't have any memory of

4  changing forecasting criteria any time.

5  Q.  So if that happened in the fall of 2000, it

6  was without your knowledge?

7  MR. LINDSTROM:  Assumes facts.

8  MR. SOLOMON:  I said "if that happened."

9  THE WITNESS:  I have no idea.  I told you, I

10  don't remember that happening.  As I sit here right now,

11  I don't remember that happening.

12  MR. LINDSTROM:  It's also vague and ambiguous

13  as to "criteria."

14  MR. SOLOMON:  Q.  The H-P transaction at the

15  end of 2Q01 involved a swap; do you agree?

16  MR. LINDSTROM:  Calls for a conclusion, calls

17  for a legal opinion, no foundation.  It's also asked and

18  answered in the prior session of her deposition.

19  THE WITNESS:  I've already testified about

20  this at length.

21  MR. SOLOMON:  Q.  And did it involve a swap?

22  A.  As I --

23  MR. LINDSTROM:  Same objections.

24  THE WITNESS:  As I testified previously, it

25  involved us buying -- it involved them buying software

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1    that they needed to buy, and some -- and it involved --
2    it involved a bunch of different things. It was all
3    things that we were doing, planning on doing.
4          MR. SOLOMON: Q. In January of 2000 [sic]
5    when you became aware that Mr. Ellison was engaged in
6    trading Oracle securities, did you take any steps to
7    begin preserving documentation that may be called for in
8    any litigation?
9          MR. LINDSTROM: Mischaracterizes her
10   testimony, assumes facts.
11        THE WITNESS: I don't remember even -- I did
12   not -- what did you ask me?
13        MR. SOLOMON: Q. I said in January -- and if
14   I said of "2000," then I misspoke. In January of 2001
15   when you became aware that Mr. Ellison was engaged in
16   trading Oracle securities, did you take any steps to
17   begin preserving documentation that may be called for in
18   any litigation?
19       A. I didn't take any steps. I didn't contemplate
20   litigation.
21       Q. Okay. Did there come a stage when you did
22   contemplate litigation concerning the events of the
23   third fiscal quarter of 2001?
24       MR. LINDSTROM: Vague and ambiguous.
25       THE WITNESS: I don't know when you sued us.

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1        MR. SOLOMON: Q. So when we sued you was the
2    first time you contemplated litigation; is that right?
3       A. I have no idea. I don't even remember at all.
4    This is six years ago, this whole thing.
5       Q. Okay. And although it's six years ago, are we
6    not talking about something unusual in the life of
7    Oracle and its executives?
8       MR. LINDSTROM: Vague, ambiguous, calls for a
9    conclusion.
10       THE WITNESS: What do you mean?
11       MR. SOLOMON: Talking about a billion dollars'
12   worth of insider selling, almost, plus Oracle missing
13   its forecast and the stock collapsing.
14       MR. LINDSTROM: Argumentative, assumes facts.
15   What's the question?
16       THE WITNESS: Is there a question in there?
17       MR. SOLOMON: I've asked --
18       THE WITNESS: Is it unusual.
19       MR. SOLOMON: -- answered your question,
20   although I'm not being deposed.
21       Q. Wasn't that an unusual event?
22       A. Unusual event that we missed the quarter?
23       Q. And that Mr. Ellison sold almost a billion
24   dollars' worth of stock within the quarter.
25       MR. LINDSTROM: Assumes facts, argumentative,

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1    calls for a conclusion.
2       THE WITNESS: I don't know. I don't know if
3    he's sold a billion dollars of stock since. I don't
4    know. I know we have missed quarters.
5       MR. SOLOMON: Q. At the time -- well, forget
6    that.
7       So you've missed quarters since, but you don't
8    know if Mr. Ellison's sold a billion dollars' worth of
9    stock within those missed quarters; is that what you're
10   saying?
11       A. No. I said both of those things are -- I
12   don't know if they're unusual or not. We've missed
13   quarters. We like to have it be unusual, but it's not
14   within our control. And -- entirely.
15       And he's sold stock since. I don't -- I don't
16   know the quarters have been at the same time. And I
17   don't know how much he sold, as I sit here right now.
18       Q. Do you know what a 10b-5-1 program is?
19       A. Yes.
20       Q. And is that what you're talking about when
21   you're talking about Mr. Ellison selling stock since?
22       A. Oh, I don't know. I don't know if he's done
23   it according to a 10b-5-1 plan.
24       Q. In any event, you became aware of the
25   litigation at some time after we filed it, correct, the

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1    lawsuit? Sometime after we filed it, you became aware
2    of it, fair?
3       A. I don't remember becoming aware of it.
4       Q. Okay.
5       A. It's been going for a while.
6       Q. What was your practice in 2000 and 2001 with
7    respect to your retention of Oracle records?
8       MR. LINDSTROM: Is this before or after your
9    lawsuit?
10       MR. SOLOMON: Let's start with 2000.
11       Q. What was your practice in calendar year 2000?
12       A. I don't know. I -- i --
13       MR. LINDSTROM: Yeah, can we have that reread.
14   I lost track of the question.
15       MR. SOLOMON: Q. What was your practice in
16   calendar year 2000 with respect to your retention of
17   Oracle records?
18       A. I'd keep some things; I wouldn't keep other
19   things. I would keep things that I was told I had to
20   keep.
21       Q. Like what?
22       A. Well, like in -- then? Oh, I don't know. I
23   don't remember -- I don't remember 2000 at all.
24       Q. Did you attend board meetings in 2000?
25       A. Yep.

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1   Q.  Did you get board packages?

2   A.  Yep.

3   Q.  How did you get them?

4   A.  Someone brought them to the office.

5   Q.  Did you file them?

6   A.  I don't know.  I don't think so.

7   Q.  So you get a board package for a particular

8   board meeting.  Did you have a practice as to what you'd

9   do with that package after the meeting?

10   MR. LINDSTROM:  Vague as to time.

11   MR. SOLOMON:  2000.

12   THE WITNESS:  In 2000, I think -- I don't

13   remember what I would do with it.  I think I would -- I

14   really don't remember if I would keep it on the shelf or

15   dispose of it.  I don't have -- I think I would not keep

16   it.

17   MR. SOLOMON:  Q.  And when you say "not keep

18   it," you're talking about a physical copy?

19   A.  Yeah.

20   Q.  What about electronic copies?

21   MR. LINDSTROM:  Of board packets?

22   MR. SOLOMON:  Correct.

23   THE WITNESS:  I don't think board packets are

24   distributed -- were distributed electronically.  I don't

25   know.  I don't remember them to be distributed, six

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1   years or seven years ago, electronically.

2   MR. SOLOMON:  Q.  And did your practice change

3   at all in calendar 2001?

4   MR. LINDSTROM:  The practice that she

5   described?

6   MR. SOLOMON:  Mm-hm.

7   MR. LINDSTROM:  Which was that she keeps some

8   things, doesn't keep others, keeps what she's told to

9   keep?

10   MR. SOLOMON:  Whatever you answered.

11   THE WITNESS:  Yeah.

12   MR. SOLOMON:  Q.  Did your practice change?

13   A.  Not that I know of.  I'd keep what I was told

14   to keep, get rid of stuff, keep some stuff I thought

15   might be helpful.

16   Q.  But you've never had a physical sort of row of

17   files of periodic reports in your office?  You don't

18   have that habit; is that fair?

19   MR. LINDSTROM:  Vague and ambiguous.

20   THE WITNESS:  I don't.  I don't have a shelf.

21   MR. SOLOMON:  Q.  Now, after -- did there come

22   a time when you received a document preservation

23   instruction?

24   A.  I don't remember receiving one, but I believe

25   I got one.

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1   Q.  Did you take any notice of it?

2   A.  Of course.  If it -- I don't remember

3   receiving it, but I know my own practice.

4   Q.  And -- you say your own practice.  What

5   practice are you referring to?

6   A.  I take a document preservation notice

7   extremely seriously.

8   Q.  As everybody should, correct?

9   A.  I do.

10   Q.  Do you think Mr. Ellison should take a

11   document preservation instruction seriously?

12   A.  I take one very -- I take it seriously.

13   Q.  Yes, but I'm asking you, do you think Mr.

14   Ellison should?

15   A.  I think everyone should.

16   Q.  Okay.  So tell me your practice that you

17   implemented as a result of the document preservation

18   instruction that you received.

19   A.  My regular practice.  Look around, you know,

20   the documents that I have; if I have anything, put them

21   in a pile, in a physical pile; prepare it for the

22   lawyers, to give it to them.  Anything that's related to

23   it also -- that happens afterwards goes in the pile.

24   My e-mail, I would make a file and I'd put

25   everything I had, if I had anything, in the file.  And

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1   anything that comes in afterwards I would attempt, you

2   know, in general to put it in the file.  And then the

3   lawyers look at that file and my computer.

4   Q.  And does that include anything you send out as

5   well?  You say "anything that comes in."  But does that

6   include anything you send out?

7   MR. LINDSTROM:  Vague and ambiguous.

8   THE WITNESS:  I don't think I -- I don't

9   collect my sent -- I don't collect things I send out

10   now.  I don't know if I used to then.  I would think it

11   would if -- if I -- if I had -- if I sent it out and got

12   it.

13   MR. SOLOMON:  Q.  If you sent an e-mail to

14   somebody after March of 2001 that referred in some way

15   to the events in this litigation, did your practice

16   include a mechanism that would make sure that such

17   e-mails were preserved?

18   A.  I just don't remember at that time.  I don't

19   know.

20   (Discussion off the record).

21   THE VIDEOGRAPHER:  This marks the end of tape

22   1 in Volume II in the deposition of Safra Catz.  At

23   2:27, going off the record.

24   (Recess taken).

25   THE VIDEOGRAPHER:  On record at 2:39.  This

1  marks the beginning of tape 2 in Volume II in the

2  deposition of Safra Catz.

3  MR. SOLOMON: Q. Okay, Ms. Catz. I was

4  asking you about the e-mails that you would have sent,

5  as opposed to e-mails you had received, after receiving

6  the document preservation instruction with respect to

7  this litigation.

8  And you answered that you don't remember at

9  that time, "I don't know," when I asked you whether your

10  practice postinstruction included a mechanism that would

11  make sure that such e-mails were preserved.

12  Do you recall that?

13  MR. LINDSTROM: You're talking about sent

14  e-mails?

15  THE WITNESS: My sent files?

16  MR. SOLOMON: Yes.

17  THE WITNESS: Oh, I had a sent file, and I

18  would go through it every once in a while and put the

19  stuff that I sent in that same file I mentioned before,

20  you know, the litigation preservation file.

21  MR. SOLOMON: Q. Okay. So before the break,

22  you didn't remember, but now you do remember that; is

23  that right?

24  A. No, I -- I don't remember the time frames of

25  that. I don't remember doing that. But that's -- that

1  would have been my practice.

2  Q. Okay. And did you advise any fellow employees

3  at Oracle that that ought to be their practice also?

4  A. I don't remember talking about it.

5  Q. How about with Mr. Ellison; did you ever talk

6  about it with Mr. Ellison?

7  MR. LINDSTROM: This document preservation --

8  MR. SOLOMON: Correct.

9  THE WITNESS: Holding his sent file? I don't

10  remember talking to him about it.

11  MR. SOLOMON: Q. Do you remember having any

12  conversation with him ever about his duty to preserve

13  documents?

14  A. I really don't remember.

15  Q. Would you have expected Mr. Ellison to have

16  preserved documents in this -- with respect to this

17  litigation?

18  MR. LINDSTROM: Calls for speculation.

19  THE WITNESS: I don't know.

20  MR. SOLOMON: Q. Knowing Mr. Ellison as you

21  do -- you know him well; is that right?

22  A. I know him pretty well, yes.

23  Q. So knowing him well, you have no idea whether

24  or not he would adhere or would not adhere to a document

25  preservation instruction with respect to this

1  litigation?

2  MR. LINDSTROM: Argumentative.

3  THE WITNESS: I would expect him to read it

4  and understand it.

5  MR. SOLOMON: Q. How about follow it?

6  A. And follow it.

7  Q. And are you aware that he did not follow the

8  preservation instruction in this litigation?

9  MR. LINDSTROM: Assumes facts.

10  THE WITNESS: I do not know that to be true at

11  all.

12  MR. SOLOMON: Q. Is it a fact you'd like to

13  know one way or the other?

14  MR. LINDSTROM: Irrelevant.

15  THE WITNESS: It would depend.

16  MR. SOLOMON: Q. Do you know what OSO is?

17  A. Yes.

18  Q. What's OSO?

19  A. Oracle Sales On-line.

20  Q. Do you have an understanding that the data

21  contained in Oracle Sales On-line as of the date of the

22  preservation instruction in this case would need to have

23  been preserved in order to adhere to the preservation

24  instruction?

25  MR. LINDSTROM: No foundation, vague and

1  ambiguous.

2  THE WITNESS: I don't know.

3  MR. SOLOMON: Q. Are you aware that OSO was

4  purged after we filed our lawsuit?

5  MR. LINDSTROM: Assumes facts, no foundation,

6  argumentative.

7  THE WITNESS: I have no idea.

8  MR. SOLOMON: Q. Would it surprise you to

9  learn that OSO was purged after we filed our litigation?

10  MR. LINDSTROM: Assumes fact -- assumes facts.

11  Irrelevant.

12  THE WITNESS: Would it surprise -- I have no

13  idea how they run OSO.

14  MR. SOLOMON: Q. Do you know who Matthew

15  Symonds is?

16  A. Yes.

17  Q. Who is he?

18  A. He's a writer.

19  Q. Met him?

20  A. Yes.

21  Q. Did he interview you?

22  A. I think so.

23  Q. Did he record his interview with you?

24  A. I don't know.

25  Q. How long was his interview -- was it just --

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  strike that.

2      How many times did he interview you?

3  A. You know, I barely remember being interviewed,

4  but I think he interviewed me one time.

5  Q. How long for?

6  A. I think not even an hour. I mean, really

7  brief time. I had to go.

8  Q. And you don't remember if he had a recording

9  device with him or not?

10  A. I don't.

11  Q. Are you aware that there's an order in this

12  litigation that Mr. Ellison and his codefendants produce

13  tapes and transcripts that were used by Mr. Symonds with

14  respect to the book Software?

15      MR. LINDSTROM: No foundation.

16      THE WITNESS: Um ...

17      MR. SOLOMON: Q. Are you aware of that?

18  A. Yes. Kind of.

19  Q. When you say "kind of," what do you mean?

20  A. My lawyers.

21      MR. LINDSTROM: Well ...

22      MR. SOLOMON: Q. Do you know what taking the

23  Fifth means?

24  A. Yes.

25  Q. Are you aware that Mr. Symonds has taken the

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  Fifth with respect to every question I've asked him

2  concerning his interactions with Mr. Ellison and his

3  knowledge concerning the events in this litigation?

4      MR. LINDSTROM: Now, let me admonish you, in

5  light of your last response, that as we've discussed

6  previously on the record, he's not entitled to conduct

7  discovery as to things you only know from your lawyers.

8      So in responding to these questions, such as

9  the one now pending, you can answer according to

10  knowledge, if you have any, apart from lawyers.

11      THE WITNESS: Can you ask it again.

12      MR. SOLOMON: Yes.

13  Q. Are you aware that Mr. Symonds has taken the

14  Fifth with respect to every question I've asked him

15  concerning his interactions with Mr. Ellison and his

16  knowledge concerning the events in this litigation?

17  A. No.

18  Q. Are you aware that I took his deposition in

19  London on Monday and Tuesday of this week?

20      MR. LINDSTROM: No foundation.

21      THE WITNESS: I don't know. I don't know if

22  you did take his deposition Monday and Tuesday.

23      MR. SOLOMON: Q. I'll represent to you that I

24  did. I'll represent to you that he took the Fifth with

25  respect to all the questioning. What is the Fifth? You

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  said you understood it. What is the Fifth?

2  A. I think it's the right against

3  self-incrimination.

4  Q. Do you have an understanding why Mr. Symonds

5  would take the Fifth with respect to questioning in this

6  litigation?

7  A. No.

8  Q. Were you involved in any way in negotiating a

9  contract between Mr. Ellison and Mr. Symonds in

10  connection with the book Softwar?

11  A. I wasn't involved in the negotiation, I don't

12  think.

13  Q. Were you aware in late 2000, early 2001 that

14  Mr. Symonds and Mr. Ellison were talking about

15  collaborating with respect to a book?

16  A. I don't know when I became aware of it. I

17  became aware of it at some time, but I couldn't place

18  the time.

19  Q. Okay. Other than with your lawyers, have you

20  discussed the issue of the writing by Mr. Symonds of the

21  book Softwar with Mr. Ellison?

22  A. In 2001? In 2001?

23  Q. Any time.

24  A. Yeah, we talked about the book whenever it was

25  written. I don't remember what year. So I don't know

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  if it was in 2001 or '2 or '3. But we talked about the

2  book a little bit.

3  Q. Describe the conversation, please.

4  A. "I'm working on the book." "How's it going?"

5  Stuff like that.

6  Q. Okay. Did you ever express a view to Mr.

7  Ellison as to whether or not you thought he should be

8  participating in writing the book?

9  A. I don't remember expressing a view.

10  Q. Did you have a view?

11  A. I don't remember specifically having a view at

12  that time.

13  Q. Do you have a view now?

14      MR. LINDSTROM: Yes or no.

15      THE WITNESS: Yes.

16      MR. SOLOMON: Q. And what's your view?

17      MR. LINDSTROM: Irrelevant.

18      THE WITNESS: What's my view about having a

19  book written about you?

20      MR. SOLOMON: About him.

21      THE WITNESS: About him, I mean.

22      MR. SOLOMON: Not about me.

23      THE WITNESS: About a person. My view is that

24  it's -- I don't like -- that it's not great to spend too

25  much time with the press. That's my view.

1    MR. SOLOMON:  Q.  Think Mr. Ellison spends too
2    much time with the press?
3    MR. LINDSTROM:  Irrelevant, not calculated to
4    lead to discovery of admissible evidence.
5    MR. SOLOMON:  Go ahead.
6    THE WITNESS:  I don't think he spends --
7    barely any time with the press now.
8    MR. SOLOMON:  Q.  Is that as a result of your
9    influence?
10   A.  I have no idea.
11   Q.  Mr. Ellison and Mr. Symonds close friends; do
12   you know?
13   MR. LINDSTROM:  No foundation, calls for a
14   conclusion.
15   THE WITNESS:  I think they're friendly.
16   MR. SOLOMON:  Q.  They socialize together?
17   MR. LINDSTROM:  No foundation.
18   THE WITNESS:  I think they might on occasion.
19   I'm not really the best person to ask, though.
20   MR. SOLOMON:  Q.  Do they know each other's
21   families?
22   MR. LINDSTROM:  No foundation.
23   THE WITNESS:  I think they might.  I just
24   don't know.
25   MR. SOLOMON:  Q.  Have you socialized with the

1    two of them together?
2    A.  I've been at an event where they each were.
3    Q.  What event was that?
4    A.  It was a party at Mr. Ellison's house.
5    Q.  When was that?
6    A.  I don't know.  Couple years ago, few years
7    ago.
8    Q.  When, to your knowledge, was the last time Mr.
9    Ellison was in touch with Mr. Symonds?
10   MR. LINDSTROM:  No foundation.
11   THE WITNESS:  I have no idea.
12   MR. SOLOMON:  Q.  Has Mr. Ellison mentioned
13   Mr. Symonds to you within the last three or four months?
14   A.  No.
15   Q.  Has Mr. Ellison mentioned the book Softwar to
16   you in the last three or four months?
17   A.  He hasn't.
18   Q.  Who, if you know, at Oracle was involved in
19   negotiating any of the agreements concerning Softwar
20   with Mr. "Simmonds" -- Mr. Symonds?
21   A.  I don't know that anybody was involved from
22   Oracle.
23   Q.  Are there any agreements between Oracle and
24   Mr. Symonds concerning the Softwar publication?
25   MR. LINDSTROM:  No foundation.

1    THE WITNESS:  I don't know.
2    MR. SOLOMON:  Q.  Have you ever heard of an
3    article entitled "The Rewards of Recklessness."
4    A.  I don't recognize that.
5    Q.  Do you view Mr. Ellison as reckless?
6    MR. LINDSTROM:  Calls for a conclusion, vague
7    and ambiguous.
8    THE WITNESS:  I don't -- I don't -- I'm not
9    sure what exactly it means, but basically I don't think
10   he's reckless, no.
11   MR. SOLOMON:  Q.  Do you think a description
12   of Mr. Ellison walking way out to the end of the limb
13   and then jumping up and down would be an accurate
14   description of Mr. Ellison?
15   MR. LINDSTROM:  Vague and ambiguous,
16   hypothetical, calls for speculation without any context.
17   THE WITNESS:  I wouldn't say that.
18   MR. SOLOMON:  Q.  Do you believe that the
19   rewards of recklessness are enormous?
20   MR. LINDSTROM:  Calls for a conclusion, vague
21   and ambiguous.
22   THE WITNESS:  The rewards for recklessness are
23   enormous.  I don't know.
24   MR. SOLOMON:  Q.  Is it the sort of statement
25   you'd expect Mr. Ellison to make?

1    A.  I don't know.
2    MR. SOLOMON:  Okay.  Let's have marked as the
3    next exhibit -- what number is it, please?
4    THE REPORTER:  47.
5    MR. SOLOMON:  Thank you -- marked as Exhibit
6    47 an e-mail from Carolyn Balkenhol to Ms. Catz, dated
7    the 5th of January, 2001, with the control numbers
8    1053820, 1053821 and 22.
9    (Plaintiffs' Exhibit No. 47
10   marked for identification).
11   THE WITNESS:  Which one are we on?
12   MR. SOLOMON:  Q.  I'm looking, first of all,
13   at the first page.  It's from Carolyn Balkenhol to you.
14   Do you see that?
15   A.  Yes.
16   Q.  And it says, "Forward: attachments for LE."
17   Do you see that?
18   A.  Yes.
19   MR. LINDSTROM:  So Counsel, are the
20   attachments attached or not?  I can't tell.  I mean, I
21   know you disassembled the document over there, and I
22   can't tell whether this is a partial exhibit or
23   whether --
24   MR. SOLOMON:  Okay.  We'll make it simple.
25   Let's add -- we'll leave it as one composite exhibit.

1 Let's add this to the back, and then I'll correct the
2 control numbers. And so now Exhibit 47 is going to be
3 the same first three pages, but the control range will
4 be 1053820 through 3855.
5 (Plaintiffs' Exhibit No. 47 modified).
6 MR. LINDSTROM: Thank you.
7 MR. SOLOMON: Q. So when you've had a chance,
8 just let me know whether you've seen this before.
9 MR. LINDSTROM: I assume you're referring to
10 the entire document.
11 MR. SOLOMON: Correct.
12 Q. And I'll represent that this is -- I've now
13 given it to you in the manner produced by the defendants
14 in the litigation.
15 A. There's a bunch of e-mails attached to it.
16 I'm sort of confused as to what's what. The whole back
17 is -- it's got e-mails. Is it all supposed to be one
18 attachment?
19 Q. It's the way it was produced, so I can't
20 really tell you much more than that. But if we go
21 through it, you can at least discern --
22 A. Okay.
23 Q. -- what, if anything, you recognize.
24 A. Okay.
25 Q. So on the second page, there's an exchange

1 between an Andrew and a Matthew. Do you see that?
2 A. Yeah.
3 Q. Do you know who the Andrew is referring to?
4 A. You know, I think it's an agent, like a book
5 agent or something like that.
6 Q. Okay.
7 A. But, you know, I'm not entirely sure. So
8 that's -- I probably shouldn't guess. But I think
9 that's what this is.
10 Q. Okay. Do you recognize having seen that
11 little exchange before?
12 A. I actually don't recognize -- I don't
13 recognize this exchange.
14 Q. Okay. Let's skip the next, which has
15 information concerning Carolyn Balkenhol.
16 A. Yeah, I don't know what that is.
17 Q. And then the next pages, through control
18 number 1053839, appear to be a draft agreement. Do you
19 see that?
20 A. Yeah, it looks like a draft of a -- of the
21 book.
22 MR. LINDSTROM: No, he's referring to --
23 THE WITNESS: 23 --
24 MR. LINDSTROM: -- a specific set of pages.
25 THE WITNESS: Yeah. This one, 23 --

1 MR. SOLOMON: 823 through 840.
2 THE WITNESS: Oh, 40.
3 MR. SOLOMON: I'm sorry, through 839.
4 THE WITNESS: 39. Okay. So I'm looking at
5 that. And it looks like a draft of an agreement.
6 MR. LINDSTROM: Question's whether you
7 recognize it.
8 THE WITNESS: Vaguely. Very vaguely.
9 MR. SOLOMON: Q. You've seen this before?
10 A. I have -- you know, now that I see it, I
11 recognize it vaguely, yeah, as -- yes.
12 Q. Now, did you review this at around the time it
13 was being circulated, which appears to be January 5,
14 2001?
15 A. You know, I have a memory of getting it and
16 sending it on to --
17 Q. Do you know -- go on.
18 A. -- to Dan Cooperman.
19 Q. Okay. And if you go to page 840, the next
20 page, it says, "For you first. Let me know if/when I
21 should pass along to Philip, Andy, Oracle attorneys, and
22 Joe."
23 Do you see that?
24 A. Yeah. Who wrote that?
25 Q. Do you believe that's the text of the message

1 from Carolyn Balkenhol to you that is on the very
2 first -- that's -- if you look at the very first page,
3 there's those -- that addressee information.
4 MR. LINDSTROM: No foundation, calls for
5 speculation.
6 THE WITNESS: I would be very surprised if
7 this was her sending this to me.
8 MR. SOLOMON: Okay.
9 THE WITNESS: This doesn't look like the text
10 of something she would send to me.
11 MR. SOLOMON: Okay.
12 Q. So you don't know who "you" is referring to
13 here?
14 A. Yeah, I don't know.
15 Q. And if you go to the next page, you'll see
16 there's a reference -- there's a message, "Dear Larry
17 and Carolyn."
18 A. Yeah.
19 Q. Have you seen that before?
20 A. I don't recognize it, but I can read through
21 it.
22 MR. LINDSTROM: Take your time.
23 THE WITNESS: Okay. Oh, okay. Okay, I read
24 it. Is there a question?
25 MR. SOLOMON: Q. Do you recognize that?

1    A.  I don't -- I don't, you know, recognize it

2    until I'm reading it.  I don't actually -- I don't

3    remember it at all.

4    Q.  Okay.  And your testimony is you don't believe

5    you were involved to any significant degree in this --

6    in the -- in reviewing or advising concerning this

7    agreement?

8    A.  I don't remember being involved in that.

9    Q.  Then if you look to the next page, you'll see

10   the heading of an article is called "Softwar, The

11   Rewards of Recklessness: A Portrait of Larry Ellison and

12   Oracle Corporation at War."

13       Do you see that?

14   A.  Yeah, I do.

15   Q.  Do you recognize the title?  And that's all

16   I'm asking you right now.

17   A.  I see it.  I don't recognize it at all.

18   Q.  Okay.  If you go to page 5 of the document,

19   which is 1053846.

20   A.  Of this Softwar --

21   Q.  Yes.

22   A.  The -- say that again.  053 ...

23   Q.  The last three numbers are 846.

24   A.  846.  Okay.

25   Q.  Okay.  Now, before I go into this text, let me

1    ask you a question.  Have you ever heard Mr. Ellison

2    tell a lie?  Ms. Catz ...

3    A.  Yeah.  Have I ever heard him tell a lie.  No,

4    I don't think so.

5    Q.  Okay.  Have you ever heard him being referred

6    to as a serial liar?

7        MR. LINDSTROM:  As a serial liar, those words?

8        MR. SOLOMON:  Those words.

9        THE WITNESS:  No.

10       MR. SOLOMON:  Q.  Have you heard that?

11   Now, if you'd look at the text of this, you'll

12   see that in the second full paragraph, which begins,

13   "But I didn't say that" -- do you see that?

14       MR. LINDSTROM:  Why don't you give her a

15   chance to read the paragraph.

16       MR. SOLOMON:  Just focus on that paragraph.

17       THE WITNESS:  I don't even know what it's

18   referring to.  Let me read the paragraph before for a

19   second.  Okay, I see it.

20       MR. SOLOMON:  Q.  All right.  Now, have you

21   ever heard Mr. Ellison say words to the effect "But I

22   was lying.  I had no intention of doing that.  I lied

23   because I wanted to appear balanced and reasonable and

24   because I needed time.  I never had a problem lying.  I

25   knew I was right"?  Have you ever heard that?

1    A.  I don't remember -- I don't remember him

2    saying that ever.

3    Q.  Surprised to see it here?

4        MR. LINDSTROM:  Irrelevant.

5        THE WITNESS:  Am I surprised to see that he

6    said he -- that he -- that this is written here?  I

7    don't know.

8        MR. SOLOMON:  Q.  You don't know if you're

9    surprised or not?

10       MR. LINDSTROM:  Objection.  Irrelevant, asked

11   and answered.

12       THE WITNESS:  This -- this sentence, you know,

13   sort of speaks for itself.  It's here.

14       MR. SOLOMON:  Q.  Do you believe he said that?

15       MR. LINDSTROM:  No foundation.

16       MR. SOLOMON:  Q.  Do you believe Mr. Ellison

17   said that?

18       MR. LINDSTROM:  The words in quotes on that

19   page?

20       MR. SOLOMON:  Correct.

21       MR. LINDSTROM:  No foundation, calls for

22   speculation.

23       THE WITNESS:  If he actually said it exactly

24   this way at the time, this -- this -- whenever this

25   happened, I don't know.

1        MR. SOLOMON:  Q.  The answer is you don't

2    know?

3        A.  I just don't.

4        Q.  Do you think it would be of concern to the

5    average investor if a senior executive of the company

6    they're investing in didn't have a problem lying?

7        MR. LINDSTROM:  No foundation, calls for

8    speculation, conclusion, argumentative.

9        THE WITNESS:  It would depend.

10       MR. SOLOMON:  Q.  What would it depend upon?

11       MR. LINDSTROM:  Same set of objections.

12       THE WITNESS:  The context of everything.

13       MR. SOLOMON:  Q.  The context of the lies?

14       A.  The whole context.  Why don't you reask me

15   your question.

16       Q.  Yeah.  Do you think it would be of concern to

17   the average investor if a senior executive of the

18   company they're investing in didn't have a problem

19   lying?

20       MR. LINDSTROM:  No foundation, calls for

21   speculation, conclusion.

22       THE WITNESS:  It might.

23       MR. SOLOMON:  Q.  Did you discuss a press

24   release concerning Mr. Ellison's trading in January 2001

25   with Mr. Ellison?

1   A.  I don't remember, as I sit here right now, but

2   I think I might have. I just don't remember.

3   Q.  Can you remember any of the contents of the

4   conversation you might have had?

5   A.  As I said —

6   MR. LINDSTROM:  No foundation.

7   THE WITNESS:  — I don't actually even

8   remember the conversation. But I'm — so no, obviously.

9   MR. SOLOMON:  Q.  But you're aware there's a

10  document that indicates that you had a conversation?

11  MR. LINDSTROM:  Argumentative.

12  THE WITNESS:  You know, I don't know if there

13  is or there isn't.  But if you have one, you know, show

14  me it.

15  MR. SOLOMON:  Q.  But you haven't seen a

16  document recently that suggests that you had a

17  conversation about the press release; is that your

18  testimony?

19  A.  Yes, it is my testimony.  I haven't seen a

20  document about it.

21  MR. SOLOMON:  Okay.  Have marked as the next

22  exhibit, 48, an e-mail dated Wednesday, 24th of

23  January, 2001.

24  (Plaintiffs' Exhibit No. 48

25  marked for identification).

1   THE WITNESS:  Okay.

2   MR. SOLOMON:  Q.  Do you recognize this?

3   A.  Yeah, kind of.

4   Q.  And you wrote, according to this, "I discussed

5   the press release with Larry and he approved one to hit

6   the moment the SEC publishes the notice or," in parens,

7   "the news leaks out in some way."

8   Do you see that?  You wrote that?

9   A.  I appear to have, sure.

10  Q.  And then it goes on to say, "The important

11  facts." You see that?

12  A.  Yes.

13  Q.  Who wrote that?

14  MR. LINDSTROM:  The question is who wrote

15  that.

16  MR. SOLOMON:  Yeah.

17  THE WITNESS:  I don't know.  I think I wrote

18  it.

19  MR. SOLOMON:  Okay.

20  Q.  So you write, "Larry exercised expiring

21  options for over 22 million shares."  See that?

22  A.  Yes.

23  Q.  So he had already exercised options for over

24  22 million shares; is that right?

25  A.  That's what I wrote in here.  That's what I

1   thought.  It's clear I had no idea because at the bottom

2   I ask, you know, is it over — you know, clearly I have

3   no idea.

4   Q.  So 22 million shares, that's a lot of shares,

5   right?

6   A.  Yeah.

7   Q.  So when did you become aware it was 22 million

8   shares?

9   A.  I don't know.

10  MR. LINDSTROM:  Assumes facts.

11  THE WITNESS:  You know, I don't — this is

12  what I wrote.  I must have thought it was 22 million.  I

13  don't know.  Sometime before I wrote it.

14  MR. SOLOMON:  Q.  Who told you that?

15  A.  I don't know.

16  Q.  You don't know how you learned that Mr.

17  Ellison was exercising options for over 22 million

18  shares?

19  MR. LINDSTROM:  Assumes facts, argumentative,

20  asked and answered.

21  THE WITNESS:  I don't remember, no.

22  MR. SOLOMON:  Q.  "The options would have

23  expired this year.  Worthless if not exercised."

24  You wrote that?

25  A.  Yes.

1   Q.  Who told you the options would have expired

2   this year, worthless if not exercised?

3   A.  I don't know.

4   Q.  You then say, "On exercise, he had an

5   immediate tax payment of" blank.  "He sold the shares in

6   same-day sales."  Did you write that?

7   A.  I wrote this whole paragraph apparently.

8   Q.  And what was the purpose of you writing this

9   paragraph?

10  A.  To prepare — to collect the information —

11  you know, I don't remember.  So — specifically.  But I

12  think it relates to a statement, it says — press —

13  putting out a press release when the SEC published the

14  notice.

15  Q.  Says, "His total share holdings are" blank

16  "after the sale."  See that?  That's your language as

17  well?

18  A.  I believe I wrote the entire paragraph.

19  Q.  At the bottom it says, "His outlook on the

20  company has not changed at all."  Do you see that?

21  A.  Yes.

22  Q.  Who told you his outlook on the company had

23  not changed at all?

24  A.  I don't know, but that's what I wrote.  That's

25  what I thought.

1  Q. Says, "He sold in 1996 for similar tax

2  planning purposes." Why did you write that?

3  A. I don't know.

4  Q. Who told you he sold in 1996 for similar tax

5  planning purposes?

6  A. I have no idea.

7  MR. SOLOMON: Mark as the next exhibit,

8  another e-mail dated Wednesday, January 24th, 2001,

9  the control number 035365.

10  (Plaintiffs' Exhibit No. 49

11  marked for identification).

12  MR. SOLOMON: Q. Let me know if you've seen

13  this before, after you've had a chance to look at it.

14  A. I don't recognize it. I don't recognize it.

15  Q. Now, you'll see that the time says "15:24,"

16  3:24 in the afternoon. And if you look at the prior

17  exhibit, which has the language that you wrote, the time

18  is 12:58. Do you see that?

19  A. Yeah. But that's -- you know, I don't know

20  when I wrote mine. That has no -- no time stamp, right.

21  This is when Mr. Lockhart sent an attachment.

22  Q. Right.

23  A. So --

24  Q. Now, do you know if this was a further draft

25  of the language -- of the refined version of the

1  language that you had set forth --

2  MR. LINDSTROM: Wait, let me understand.

3  MR. SOLOMON: Q. -- in Exhibit 48?

4  MR. LINDSTROM: So you're asking if 49 is a

5  refined version of 48?

6  MR. SOLOMON: Q. If the content of the

7  proposed press release, Ms. Catz, is a subsequent

8  version to the version that you had drafted in Exhibit

9  48.

10  A. I don't know if it's a subsequent version

11  necessarily, but it seems to be, to some extent, from

12  the context of that first one. You know, I'm -- I'm

13  trying to piece it together, but -- yeah. I mean, it

14  looks like a subsequent version.

15  Q. And do you have any understanding as to how

16  the revisions were made?

17  A. Well, someone wrote them. It says here, "This

18  is the press release Joe recommends."

19  Q. So let's -- let's see. It's from you. It's

20  to Larry Ellison.   •

21  A. Yes.

22  Q. And you write, "This is the press release Joe

23  recommends. I did tell him on the phone, before he

24  wrote it, about your interest in having the details of

25  the tax payment in the release. but he chose not to

1  include it. Please comment or revise or approve," in

2  bold.

3  Now, why -- did you -- you say you told Joe

4  Lockhart, before he wrote it, about Mr. Ellison's

5  interest about having the details of the tax payment in

6  the release. You see that?

7  A. I do.

8  Q. What -- what did Mr. Ellison tell you about

9  his interest in having the details of the tax payment in

10  the release?

11  A. I don't know. But, you know, in sort of

12  piecing back what I wrote, you know, six years ago, you

13  know, it looks like he wanted all the details in the

14  release.

15  Q. Why did he want the details of the tax payment

16  in the release?

17  MR. LINDSTROM: No foundation.

18  THE WITNESS: I don't know.

19  MR. SOLOMON: Q. Why did Mr. Lockhart choose

20  not to include it?

21  MR. LINDSTROM: No foundation.

22  THE WITNESS: I have no idea.

23  MR. SOLOMON: Q. Were you upset that

24  Mr. Lockhart chose not to include it?

25  A. I don't remember.

1  Q. Did you ever criticize Mr. Lockhart for not

2  including it?

3  A. I don't remember doing that, no.

4  Q. Was Mr. Ellison upset that Mr. Lockhart had

5  chosen not to include it?

6  MR. LINDSTROM: No foundation.

7  THE WITNESS: I have no idea.

8  MR. SOLOMON: Q. Did Mr. Ellison comment or

9  revise or approve the text in this exhibit?

10  A. I don't know if he commented or he revised it

11  or he approved it. We'd have to look at the final

12  release. I have no idea. But if you have the rest of

13  the documents, we can piece it together.

14  Q. Now, you would have had no concern,

15  presumably, continuing with your sales once the news of

16  Mr. Ellison's sales had hit the market; is that right?

17  MR. LINDSTROM: Argumentative, calls for

18  speculation.

19  THE WITNESS: I don't know. Concern, not

20  concern. I'd already made the decision I wasn't

21  selling, so I wasn't selling.

22  MR. SOLOMON: Q. Right. But you weren't

23  selling because you were concerned you had material

24  nonpublic information, right?

25  A. That's what I thought -- you know, that was

1  the reason I didn't sell.

2  Q. And at some stage you no longer had what you

3  thought may be material nonpublic information because

4  the news of Mr. Ellison's sales hit the market, right?

5  A. Yeah.

6  Q. And did you then pursue your sales?

7  A. No.

8  Q. Why not?

9  A. I don't know. I wanted to keep the stock.

10  Q. You changed your mind. Did your husband

11  change his mind as well?

12  MR. LINDSTROM: All right. There's two

13  questions -- assumes facts, argumentative.

14  THE WITNESS: Well --

15  MR. LINDSTROM: No foundation.

16  MR. SOLOMON: Well, let's break it down.

17  Q. You changed your mind. One minute you wanted

18  to sell; now you didn't, right?

19  MR. LINDSTROM: Argumentative,

20  mischaracterizes her testimony.

21  MR. SOLOMON: All right.

22  Q. Well, it's not minutes. Okay, you tell me.

23  A. I wasn't really interested in selling at any

24  time. My husband mentioned "Gee, why don't we sell a

25  little stock." I said okay.

1  Then I saw that Larry was selling, so I

2  decided not to sell. Never went back to it.

3  Q. How much stock had you been contemplating

4  selling?

5  A. You know, I don't remember. I didn't have

6  very much, so ... I don't know.

7  Q. It's just as well you didn't sell, isn't that

8  right, Ms. Catz, 'cause you were in possession of

9  material nonpublic information?

10  MR. LINDSTROM: Argumentative, assumes facts

11  and calls for a legal conclusion.

12  THE WITNESS: No.

13  MR. SOLOMON: Q. So when you were talking

14  about the timing of stock repurchases for Oracle, what

15  was your expertise in that regard?

16  MR. LINDSTROM: Assumes facts,

17  mischaracterizes her testimony.

18  THE WITNESS: I was part of the management

19  team.

20  MR. SOLOMON: Q. And no one ever advised you,

21  then, at the time, that engaging in securities

22  transactions for Oracle while in possession of inside

23  information -- material information would be a violation

24  of insider trading laws?

25  MR. LINDSTROM: Assumes facts,

1  mischaracterizes her testimony, calls for a legal

2  conclusion.

3  THE WITNESS: There's so many pieces to your

4  question. Can you just break it down a little.

5  MR. SOLOMON: Yes.

6  Q. While you were advising on securities -- on

7  stock repurchases for Oracle and under the impression

8  that you were in possession of material insider

9  information, no one advised you to refrain or direct

10  that Oracle refrain from engaging in stock repurchases?

11  MR. LINDSTROM: Assumes facts,

12  mischaracterizes her testimony, compound, and also vague

13  and ambiguous.

14  THE WITNESS: I don't even know how to answer

15  that. It has so many pieces, there's no way to even

16  answer that question 'cause it assumes things that are

17  just not right. By the time you get to the end of the

18  question, it's not a question.

19  MR. SOLOMON: Okay. Let's see where I'm not

20  right.

21  Q. You would be asked to advise, on occasion,

22  with respect to Oracle's stock repurchases, yes or no?

23  A. I was -- I may have been asked my opinion

24  about stuff.

25  Q. Okay. And you believed that you were in

1  possession or may be in possession of material nonpublic

2  inside information, and that's why you didn't sell stock

3  in January of 2001, correct?

4  A. I didn't know if I was or not.

5  Q. Okay.

6  A. I made the decision I wasn't going to sell.

7  Q. Okay. But you issued no instruction to

8  anybody at Oracle that Oracle not engage in stock

9  repurchases; is that right?

10  A. I didn't issue any orders about stock

11  repurchases. It was not my role.

12  Q. And you solicited -- you neither solicited nor

13  received any advice with respect to stock repurchases;

14  is that right?

15  A. I don't solicit advice -- you know, I don't --

16  I'm not in charge of stock repurchase -- I was not, at

17  the time, in charge of stock repurchases. So I don't

18  remember even the whole -- I don't even remember

19  repurchases. I don't remember anything you're talking

20  about.

21  Q. Bruce Lange and Deb Lange husband and wife?

22  A. Not anymore.

23  Q. Were they then?

24  A. I don't think so.

25  Q. Do you know when they split up?

1  A.  I don't know.  Long -- I don't know when.  It
2  predated me, I believe.
3  Q.  Were they on talking terms in 2001?
4  MR. LINDSTROM: No foundation.
5  THE WITNESS: I don't know them not to be on
6  talking terms, no.  I don't know.
7  MR. SOLOMON: Okay.  Let's take a break.
8  THE VIDEOGRAPHER: Off record at 3:28.
9  (Recess taken).
10  THE VIDEOGRAPHER: On record at 3:43.
11  MR. SOLOMON: Q.  You mentioned earlier, Ms.
12  Catz, that there would -- you would be involved.  I
13  believe, in budgeting for Mr. Ellison's projected sales;
14  is that right?
15  MR. LINDSTROM: Mischaracterizes her
16  testimony.
17  THE WITNESS: No.
18  MR. SOLOMON: Okay.  Let's see if we can get
19  some agreement.
20  Q.  You testified that his sales would be
21  budgeted; is that right?
22  A.  It would impact the budget -- maybe not the
23  budget, but the actuals, the -- somehow.  I can't
24  remember at the time how it worked, but it somehow
25  impacted the -- the actual results in the 700 cost

1  center.
2  Q.  So as a result, there was planning involved,
3  is that right, at Oracle with respect to that impact
4  before Mr. Ellison sold stock?
5  A.  I don't know.
6  MR. LINDSTROM: Assumes facts.
7  THE WITNESS: I don't know if there was
8  planning.  As I said, it would -- I may have said
9  budget, but it affects the results, the actuals.  So I
10  don't -- I think there was some sort of planning in
11  general about it in quarters, but I don't -- I don't
12  actually know.
13  MR. SOLOMON: Q.  Do you know what 700 cost
14  center refers to?
15  A.  Oh, yes.  I just used the term myself.  It's
16  the CEO cost center.  It's the CEO office cost center.
17  Q.  And describe that a little bit more, please.
18  What is the CEO office cost center?
19  A.  That's the entire description.  It's the cost
20  center in the result!'-- in the financial systems for
21  costs related to the CEO office -- some of the costs
22  related to the CEO office.
23  Q.  Okay.  And that -- and is there a budget
24  prepared with respect to anticipated items for that cost
25  center?

1  A.  You know, I am not sure how they handle the
2  CEO cost center.  But I think they make an estimate in
3  advance.  So there must be a budget, 'cause it has to
4  roll into the total budget.
5  Q.  And do you know what's in the 3Q01 budget to
6  account for the sales by Mr. Ellison that took place in
7  January of 2001?
8  MR. LINDSTROM: For that specific item?
9  MR. SOLOMON: Yes.
10  THE WITNESS: In the 700 cost center?
11  MR. SOLOMON: Yes.
12  THE WITNESS: No.
13  MR. SOLOMON: Q.  Do you know if that
14  information has been produced to us?
15  MR. LINDSTROM: Assumes facts.
16  THE WITNESS: I don't know if it exists.
17  MR. SOLOMON: Q.  Okay.  Was there a time
18  where you -- when you thought Mr. Ellison's -- Mr.
19  Ellison had a large number of options that would expire
20  in August of 2000?
21  A.  Is there a time that I thought that?
22  Q.  Was there a time that you thought that?
23  MR. LINDSTROM: Could we have the question
24  reread, please.
25  (Record read as follows:

1  QUESTION: Was there a time where you
2  -- when you thought Mr. Ellison's -- Mr.
3  Ellison had a large number of options that
4  would expire in August of 2000?)
5  THE WITNESS: Was there a time that I knew or
6  that I thought that he had options that expired in
7  August of 2000?
8  MR. SOLOMON: Q.  Was there a time that you
9  thought he had options -- a large number of options that
10  would expire in August of 2000?
11  A.  In August of 2000, I don't remember.
12  MR. SOLOMON: Have marked as the next exhibit
13  e-mails produced in this litigation, with the control
14  numbers 014068 through 72.
15  (Plaintiffs' Exhibit No. 50
16  marked for identification).
17  MR. SOLOMON: Q.  Do you recognize this?
18  A.  No.  I mean, I read it.  I see what it is.  I
19  don't remember it at all.
20  Q.  Okay.  Well, if you took at it, it's dated
21  Tuesday, 11th of April, 2000.  You see that?
22  A.  Yes.
23  Q.  And it appears to be from Barbara Wallace to
24  you; is that correct?
25  A.  Yes.

1    Q. And it says, "Here it is. You need to call

2    me. My new number is," and there's a number.

3        Do you see that?

4    A. Yes.

5    Q. And then it says, "S. Catz wrote we need

6    Larry's whole option list. A bunch expires this year

7    and we need to deal with them."

8        Do you see that?

9    A. Yes.

10    Q. And that appears to reflect that you were

11    involved in looking at his option list, identifying a

12    bunch were going to expire, and stating that you needed

13    to deal with them?

14    A. Yes.

15    Q. Is that right?

16    A. Yes.

17    Q. And then if you look over -- look at the

18    attachment, can you identify the options that you

19    thought were going to expire that year.

20    A. That they expire in 2000?

21    Q. Correct.

22    A. Well, I'm looking at the expiration lists. I

23    don't see any expiring in 2000. I see some expiring in

24    2001 on this list.

25    Q. All right. Think you made a mistake?

1    A. I sent this in 2000. I guess so. I mean -- I

2    don't know. I don't see them on -- I don't see any

3    expiring in 2000. So expiring this year at the end

4    of -- you know, I -- I -- I -- they were not expiring in

5    calendar year -- in the -- in that calendar year or in

6    the fiscal year that was going to end six weeks from

7    then. So it would be expiring next fiscal year.

8    Q. So you made a mistake, right?

9    A. I appear to have.

10    Q. Yeah. And assuming he -- you were right and

11    they expired in 2000 and not 2001, in August of 2001,

12    when, as of the date of this e-mail -- as of the date of

13    this e-mail, when would Mr. Ellison's next window or

14    windows with which to exercise any options that would

15    expire in August of 2000 have been open?

16        MR. LINDSTROM: Vague and ambiguous.

17        THE WITNESS: I'm sorry.

18        MR. LINDSTROM: No foundation.

19        THE WITNESS: Can you ask the question -- when

20    would -- if what? .

21        MR. SOLOMON: Q. Let's assume you're right

22    and there was a bunch of options expiring in August of

23    2000.

24    A. Did I say August? I didn't. They expire, I

25    don't know, sometime in --

1    Q. This year, right? And you're in 2000,

2    correct?

3    A. Yes, so sometime until the end of 2000.

4    Q. Okay. Right.

5    A. So December to -- whenever. Okay.

6    Q. Right.

7    A. So assuming -- so this is a hypothetical.

8    Assuming there were some that were expiring sometime in

9    calendar year 2000, when would the next window open?

10    Q. Yes.

11    A. From this date right here?

12    Q. Correct, yes.

13    A. Well, let's see. It's April. So I think the

14    window would be open right then and there, right?

15    I mean, unless there was some reason it wasn't

16    open. I would -- you know, I don't remember this time

17    period at all.

18    Then there'd be some period of closed period;

19    the window would close. And then sometime, I don't know

20    when -- I don't remember what our policy was -- after

21    earnings were announced in June, might open again. So

22    that's ...

23    Q. And do you recall any communication with

24    anyone in which you realized that in fact Mr. Ellison's

25    options that you were concerned about here expired in

1    August of 2001 and not in August of 2000?

2        MR. LINDSTROM: Any communication other than

3    Exhibit 50?

4        MR. SOLOMON: Correct.

5        THE WITNESS: I don't even remember this. Did

6    you ask me if I remember anything else?

7        MR. SOLOMON: Yes.

8        THE WITNESS: Oh. If you have documents, I'd

9    be delighted to see them. I don't even remember this

10    whole exchange.

11        MR. SOLOMON: Q. Okay. Did there come a time

12    when you realized you were wrong and there were not a

13    bunch of options expiring in 2000 that you needed to be

14    concerned about?

15    A. I don't remember being concerned, so I don't

16    remember realizing I shouldn't be concerned that

17    there -- that nothing was expiring in calendar 2000.

18    Q. Well, you say in your e-mail, "A bunch expires

19    this year and we need to deal with them."

20    A. Right.

21    Q. Does that not express a concern?

22        MR. LINDSTROM: Calls for a conclusion,

23    argumentative.

24        THE WITNESS: No -- I don't know. I don't

25    think it shows concern at all. It just shows we need to

1    handle it.

2        MR. SOLOMON:  Q.  Okay.  Do you recall being

3    involved at the end of 2001 in a deal with JDS Uniphase?

4    A.  Very little.  I don't remember being

5    involved -- I vaguely remember a deal.  Actually, there

6    was another deal with JDS Uniphase, so --

7    Q.  Do you remember --

8    A.  Sometime.

9    Q.  Sorry.

10   A.  So no, I don't really remember, no.

11   Q.  And if I say that it was a deal that was

12   finalized late on the last day of the quarter, does that

13   refresh your recollection?

14   A.  No.

15       MR. SOLOMON:  Have marked as the next exhibit

16   a document produced in this litigation with the control

17   numbers 025066 and 67.

18       (Plaintiffs' Exhibit No. 51

19       marked for identification).

20       MR. SOLOMON:  Q.  Recognize this?

21   A.  I -- I -- I know what it is.  I don't actually

22   recognize it, but I know what it is, sure.

23   Q.  And you'll see that you're an addressee.  Do

24   you see that?

25   A.  Yes.

---

1    Q.  And it's dated November the 30th, 2000, at

2    17:52.

3    A.  Yeah, 5:00 -- 6:00.

4    Q.  Okay.  From Loren "Mahon."

5    A.  Loren "Man."

6    Q.  Do you recognize that?

7    A.  Mm-hm, I do.

8    Q.  And it says, "Covisint and BAE fell off."

9        Does that reflect those deals not being ready

10   to be recognized within the quarter?

11   A.  Means those deals didn't get signed.  They

12   weren't going to come in this quarter.  They're done.

13   They go in the next year.

14   Q.  And the reference "JDS Uniphase, Teradyne,

15   Kaiser are in." do you recognize that?

16   A.  I do.  Means they're in.  They're signed.

17       MR. SOLOMON:  Let's mark as the next exhibit a

18   document produced in litigation with the control number

19   255140.

20       (Plaintiffs' Exhibit No. 52

21       marked for identification).

22       MR. SOLOMON:  Q.  Let me know if you recognize

23   this document.

24   A.  No.  No.

25   Q.  Okay.  You'll see that there is reference

---

1    under "fees" of, for total net fees, $28,656,113.50.  Do

2    you see that?

3    A.  Yes, I do.

4    Q.  Okay.  And do you know what that refers to?

5    A.  It looks like the total deal size, from the

6    document.

7    Q.  And it appears that the license at the top is

8    $21,525,871.  You see that?

9    A.  Yes, I do.

10   Q.  Is it your understanding that that amount was

11   recognized in 2001 with respect to this transaction?

12       MR. LINDSTROM:  No foundation, calls for

13   speculation.

14       THE WITNESS:  I do not remember the size of

15   the deal or how much was recognized in the quarter.

16       MR. SOLOMON:  Okay.  Let's have marked as the

17   next exhibit another document produced in this

18   litigation with the control numbers 210354 and 355.

19       (Plaintiffs' Exhibit No. 53

20       marked for identification).

21       MR. SOLOMON:  Q.  This is an e-mail from Loren

22   Mahon dated Thursday, November the 30th, 2000.  And

23   Safra Catz is an addressee, among others.  Let me know

24   if you recognize this, when you've had a chance to look

25   at it.

---

1    A.  I do not recognize it at all.

2    Q.  You don't dispute receiving it on

3    November 30th?

4    A.  No, I don't -- excuse me.  I do not dispute

5    receiving it.

6    Q.  And you'll see that it says at the top, "Per

7    what, they're going to sign," and in quotes, "operating

8    lease of," and it seems to be a typo, "d" --

9    A.  No.

10   Q.  -- "document today."

11   A.  No.

12   Q.  Oh, "old."  I see.  What does ofd mean?

13   A.  Oracle finance division.

14   Q.  So "They're going to sign," and in quotes, "an

15   operating lease ofd document today with an option to

16   prepay later."

17       Do you see that?

18   A.  Yes.

19   Q.  Do you understand what that means?

20   A.  Yeah, they're going to lease -- they're going

21   to sign a financing agreement.

22   Q.  And is that a typical transaction at Oracle;

23   do you know?

24   A.  Yes, it is.

25   Q.  Okay.  And it goes on to say, "We will take a

1  small hit, a million dollars or so," in parentheses,

2  "that may come back if they agree to pay net 30 or go

3  with a more traditional finance payment plan."

4      Do you see that?

5  A.  I do.

6  Q.  Are you familiar with that being a typical

7  practice at Oracle?

8      MR. LINDSTROM:  Vague and ambiguous, assumes

9  facts.

10     THE WITNESS:  I'm not sure -- what being --

11 doing an old or paying net 30?

12     MR. SOLOMON:  Paying net 30.

13     THE WITNESS:  Paying net 30 I think is -- is

14 our -- is our general finance time.  Depends on a few

15 things, but I think it's net 30 in general.

16     MR. SOLOMON:  Q.  And did -- did they go with

17 the operating lease?

18 A.  I have no idea.

19 Q.  How many customers -- strike that.

20     Is there anything concerning the operating

21 lease that concerns you in terms of the propriety of the

22 transaction described here?

23     MR. LINDSTROM:  Vague and ambiguous.

24     THE WITNESS:  I don't actually have any

25 details on this -- on what's described here.  So I don't

1  think there's anything -- any problem with this.  I

2  don't think there ever was.  I just don't know.

3      MR. SOLOMON:  Thank you.

4  Q.  Now, in 2002, did you become aware of an issue

5  surrounding Oracle's unapplied cash?

6      MR. LINDSTROM:  Vague.

7      THE WITNESS:  In 2002?  No.

8      MR. SOLOMON:  Q.  Have you ever heard of an

9  issue arising in this litigation concerning Oracle's

10 unapplied cash?

11 A.  Yes.

12 Q.  And have you heard that outside the presence

13 of your lawyers?

14 A.  I don't think so.

15 Q.  Were you ever involved in any investigation at

16 Oracle into the unapplied cash issues?

17     MR. LINDSTROM:  This is apart from the

18 litigation?

19     MR. SOLOMON:  Correct.

20     THE WITNESS:  No, I don't think I was.

21     MR. SOLOMON:  Q.  In 2002 did you attend audit

22 committees?

23 A.  I did.  Most of them, not all of them.  Not

24 all of them.  And -- but most of them, yeah.

25 Q.  In 2002 did any of the audit committees that

1  you attended address the issue of the unapplied cash

2  that is a subject of this litigation?

3  A.  I don't know.  I don't have a memory of that.

4      MR. SOLOMON:  Let's have marked as the next

5  exhibit a document produced in this litigation -- excuse

6  me -- previously exhibited in this litigation as Exhibit

7  12 to the Chen deposition.  Have it marked as an exhibit

8  in this -- a further exhibit in this litigation as well,

9  please.

10     (Plaintiffs' Exhibit No. 54

11     marked for identification).

12     MR. LINDSTROM:  So will it bear Exhibit 54 as

13 part of this deposition proceeding?

14     MR. SOLOMON:  Yes.

15 Q.  Now, Ms. Catz, I know you're not an addressee

16 on this.  And what I'd like you to do is just focus

17 initially on the paragraph that says, "There are three

18 deliverables" in that first bullet point.

19     And once you've had a chance to look, then let

20 me know.

21 A.  Okay.  Okay.  I've gotten through the

22 beginning.

23     MR. LINDSTROM:  I assume your purpose here is

24 to ask her whether any of this refreshes her

25 recollection, and you're not intending to ask her about

1  the later parts of the document.

2      MR. SOLOMON:  That is correct.

3  Q.  And my question is, does this refresh your

4  recollection as to whether or not an audit committee you

5  attended addressed the issue of unapplied cash in

6  calendar 2000?

7  A.  2002.

8  Q.  2002, excuse me.  Thank you.

9  A.  No.  I don't -- I don't -- I don't remember

10 this.  I don't remember this discussed.  I don't

11 remember this.  I just don't remember -- as I sit here

12 right now, I don't remember it.

13     MR. SOLOMON:  Okay.  Counsel, there's a court

14 order that all of the documents concerning the cleanup

15 be produced.  We have not seen any of the audit

16 committee minutes, which presumably would reflect at

17 least some information concerning the cleanup.  We ask

18 that those be produced, reserve the right to recall Ms.

19 Catz if it turns out that she is reflected in any way on

20 the documents that we believe you should have produced

21 but have not produced up until now.

22     MR. LINDSTROM:  You've made your statement.

23     MR. SOLOMON:  I have.

24     Okay.  Let's have marked as the next exhibit

25 another document produced in this litigation with the

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  control numbers 1260319 through -- I'll just read the
2  numbers because it's a condensed version of a large
3  spreadsheet. The numbers are 1260319, 320, 321, then
4  1261528, 529 and 530.
5  (Plaintiffs' Exhibit No. 55
6  marked for identification).
7  MR. SOLOMON: Q. Let me know if you recognize
8  the document generally, when you've had a chance to look
9  through it.
10  A. No.
11  Q. If you go to the fourth page of the exhibit,
12  which is the control number 1261528, you'll see halfway
13  down the page there's a reference to JDS Uniphase and
14  there's a date in the middle column, 30 November, '02.
15  Do you see that?
16  A. There's a whole bunch of references to JDS
17  Uniphase, and -- which date? They've got a few dates.
18  Q. I'm looking at 30 November, '02. You see
19  that?
20  A. There are three of those at least.
21  Q. 11098, excuse me, halfway down the page.
22  A. Okay.
23  Q. You see that?
24  MR. LINDSTROM: And 11098 is the number in the
25  left-hand column?

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  MR. SOLOMON: Correct, yes.
2  THE WITNESS: Okay.
3  MR. SOLOMON: Q. Do you have any idea what
4  that refers to?
5  A. No.
6  Q. Okay. Then if you go to the last page of the
7  exhibit, and you'll see there's a reference to 11098
8  again. And you go to the far right-hand side, it says,
9  "In the hands of Safra Catz, according to support reps.
10  New agreement was signed by Andy Bailey. Took money
11  away from support stream."
12  Do you see that?
13  A. In -- in 11098? No. It's in 11099.
14  Q. No, I'm looking at 11098.
15  A. No, no, no. 11098 is this fat column.
16  Q. Okay.
17  A. And it's -- well, I don't know.
18  Q. Well, either way, you see it's "in the hands
19  of Safra Catz"?
20  A. Yeah, I do, but -- yeah, it's on 11099, yeah.
21  Q. Okay.
22  A. It's on 11099. So I don't know what else is
23  on 11099, but whatever. Okay. I see it.
24  Q. And do you know what it refers to where it
25  says, "In the hands of Safra Catz, according to support

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  reps. New agreement was signed by Andy Bailey. Took
2  money away from support stream"?
3  A. No idea.
4  Q. And you don't recall being involved in this?
5  A. I don't remember this at all. I don't even
6  know what this is. 11099 is -- what is it? It's also
7  JDS Uniphase. No idea what it is.
8  Q. Do you recall whether Ms. Minton was involved
9  in investigating the unapplied cash situation at Oracle
10  in 2002?
11  MR. LINDSTROM: No foundation.
12  THE WITNESS: I don't know, no.
13  MR. SOLOMON: Q. Were you involved in
14  deciding who should address any issues involving
15  unapplied cash in 2002?
16  A. I don't think so.
17  Q. Do you recall in late 2000 and early 2001
18  hearing about customer complaints concerning the
19  performance of 11i?
20  A. I wouldn't be able to place the date
21  necessarily. But there were issues with the performance
22  of 11i in some cases.
23  Q. Are you aware that 11i was launched too early?
24  MR. LINDSTROM: Assumes facts.
25  THE WITNESS: I don't think that -- I don't

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1  know that to be true.
2  MR. SOLOMON: Q. Okay. You know that Mr.
3  Ellison's admitted that it was launched too early?
4  A. I do --
5  MR. LINDSTROM: Assumes facts,
6  mischaracterizes his testimony, and as you framed it to
7  this witness, it's vague and ambiguous.
8  MR. SOLOMON: I urge you to read his testimony
9  if you think that's true.
10  MR. LINDSTROM: That's not a question.
11  THE WITNESS: I do not know that to be true
12  one way or another.
13  MR. SOLOMON: Q. What do you think of the
14  practice of telling customers who were unhappy with
15  Oracle's products that if they wanted them fixed,
16  there'd have to be a reference for the product they were
17  unhappy with?
18  MR. LINDSTROM: Assumes facts.
19  THE WITNESS: I don't know of that practice at
20  all.
21  MR. SOLOMON: Q. So you don't -- you're
22  unaware that Larry Ellison's admitted engaging in that
23  practice?
24  MR. LINDSTROM: Assumes facts,
25  mischaracterizes his testimony, no foundation,

1    argumentative.

2         MR. SOLOMON:  Q.  Are you aware that there are

3    documents that demonstrate Mr. Ellison engaged in that

4    practice?

5         MR. LINDSTROM:  No foundation.

6         THE WITNESS:  No, I don't know that to be

7    true.

8         MR. SOLOMON:  Let's have marked as the next

9    exhibit a document produced in this litigation with the

10   control numbers 1056920 through 6940.

11        (Plaintiffs' Exhibit No. 56

12        marked for identification).

13        THE WITNESS:  Should I read the whole thing?

14        MR. SOLOMON:  Q.  I won't ask you to read the

15   whole thing.  Let me know, first of all, if you

16   recognize the exchange on the first page.

17        A.  I don't actually recognize it, but I see what

18   it is and I can understand it.

19        Q.  Okay.  And my question, then, is going to be

20   just with respect to Xerox.  There's language there that

21   says, "They have had significant issues with CRM and

22   order management integration.  Code stability,

23   lacking" -- sorry -- "lack of quoting capability with

24   iStore and lack of integration between contracts and

25   order management have major issues for them."

1         Do you see that?

2         MR. LINDSTROM:  In quotes?

3         MR. SOLOMON:  In quotes, yes.

4         Q.  Do you see that?

5         A.  I don't know where you're reading.  You're

6    reading what Mr. Sanderson wrote or what I wrote?

7         Q.  I'm looking where it says, "Please approve

8    this for Xerox," and then there's quotes.

9         A.  Oh, yeah, yeah.  Oh, I'm sorry.  Yeah.

10        Q.  Do you know who wrote the language in the

11   quotes?

12        A.  I have a -- I don't know.  I think it's

13   probably further down in the document somewhere.

14        Q.  And do you --

15        A.  I could find it.

16        Q.  That's okay.

17        A.  I can look for it.

18        Q.  That's okay.  Let's not waste your time

19   looking for it.

20        A.  Oh, okay.  Oh, yeah, here it is.  Yes, "They

21   have had" -- yeah, it looks like Mr. Sanderson wrote it

22   and I'm quoting him.

23        Q.  Had you been aware at around 14th of March,

24   2001 that Xerox was reporting these problems?

25        A.  Clearly this is written to me around the

1    14th of March -- on the 14th of March, so I -- I

2    appear to know it, sure.

3         Q.  What I'm asking is had you known that for a

4    while, or was this new news to you?

5         A.  I don't know.  I don't remember at all.

6         Q.  Had you been involved with Xerox as a client

7    prior to March 14th, 2001?

8         A.  I don't think so.

9         MR. SOLOMON:  Let's have marked as the next

10   exhibit a document produced in the litigation with the

11   control numbers 1027932 through 7935.

12        (Plaintiffs' Exhibit No. 57

13        marked for identification).

14        MR. SOLOMON:  Q.  Recognize any of these

15   exchanges, Ms. Catz?

16        A.  No.  I don't think I'm even part of them.

17        Q.  Okay.  If you look on the third page of the

18   exhibit.

19        A.  I'm just getting there right now.  Okay.

20   Yeah, I see that.

21        Q.  You'll see that you're an addressee.

22        A.  Yeah, in the middle here.

23        Q.  All right.  And you'll see that -- at the

24   bottom, if you read under "Tactical Problem," it says,

25   "Although the 11i performance does not stop them from

1    conducting business, it is serious enough that Chipotle

2    has removed themselves from the reference program until

3    the," open quotes, "'reality meets the hype,'" close

4    quotes.

5         You see that?

6         A.  No, I haven't found you yet.  But I --

7         Q.  It's --

8         A.  Oh, you're all the way at the bottom,

9    "Tactical Problem."

10        MR. LINDSTROM:  Why don't you take a moment

11   and read it.

12        THE WITNESS:  Okay, 'cause I hadn't gotten to

13   this part yet, to this note even.

14        MR. SOLOMON:  Q.  I'm looking under the

15   heading, "Tactical Problem."

16        A.  Yeah, I'm almost there.  Okay, I got that

17   "reality meets the hype."

18        Q.  When did -- do you know when the reality with

19   respect to 11i did meet the hype?

20        MR. LINDSTROM:  Argumentative, calls for a

21   conclusion, vague and ambiguous.

22        THE WITNESS:  You know, I didn't write this.

23   This is a quote.  This is written by someone else

24   quoting somebody else.

25        MR. SOLOMON:  Q.  Do you know that Mr.

1  Ellison's admitted that the 11i wasn't stable at least

2  until 2002?

3       MR. LINDSTROM: Assumes facts, no foundation,

4  mischaracterizes --

5       MR. SOLOMON: Q. Are you aware of that?

6       MR. LINDSTROM: -- his testimony.

7       THE WITNESS: I have no idea what he said.

8       MR. SOLOMON: Q. Have you ever heard him

9  admit, other than what I just represented to you, that

10  11i wasn't stable until at least 2002?

11       MR. LINDSTROM: Vague and ambiguous, calls for

12  a conclusion.

13       THE WITNESS: Actually, I don't remember that

14  at all.

15       MR. SOLOMON: Have marked as the next exhibit

16  another document produced in this litigation, control

17  numbers 1026868 through 879.

18       (Plaintiffs' Exhibit No. 58

19       marked for identification).

20       MR. SOLOMON: Q. My question is -- you'll see

21  that it's dated Wednesday, the 28th of March, 2001,

22  and its subject is "daily CRM escalated and strategic

23  information [sic] report."

24       And my question is did you receive on a

25  regular basis -- on a daily basis, I should say -- CRM

---

1  escalated and strategic information -- implementation

2  reports in the fourth fiscal quarter, 2001?

3       A. I don't think so.

4       Q. Would this be an unusual event for you to have

5  received this?

6       A. I don't know. I don't -- I don't remember

7  getting it daily, so I -- but I don't know if it's

8  unusual. I don't remember getting it at all, so I don't

9  know if I got it -- I -- clearly I don't get it daily

10  'cause this thing is forwarded to me.

11       I don't know if Mr. Wohl forwarded it to me

12  every day. I don't recognize it, and I don't remember

13  it.

14       MR. SOLOMON: Okay. Let's go off the record.

15       THE VIDEOGRAPHER: Off record, 4:23.

16       (Recess taken).

17       THE VIDEOGRAPHER: On record at 4:34.

18       MR. SOLOMON: Q. Ms. Catz, at EMC meetings in

19  the 2000/2001 time frame, is that true that you'd take

20  handwritten notes?,

21       A. Um ...

22       Q. You'd make handwritten notes, excuse me,

23       A. I would sometimes add to a to-do list.

24       Q. Okay. And would you write agendas for EMC

25  meetings as well?

---

1       A. Yeah. What I -- I would -- had a page, and I

2  would put in a list of things people told me they wanted

3  to talk about. And I'd distribute the list.

4       Q. Okay. What's happened to any handwritten

5  notes of EMC meetings that you took -- or that you made,

6  excuse me -- after this litigation commenced?

7       MR. LINDSTROM: Assumes facts. So you're

8  talking about handwritten notes for meetings that

9  predate --

10       MR. SOLOMON: Let me just repeat the question.

11       Q. What happened to any handwritten notes of the

12  EMC meetings that you took -- or you made, excuse me --

13  after this litigation commenced?

14       MR. LINDSTROM: But are the meetings after the

15  litigation commenced?

16       MR. SOLOMON: Yes, meetings after the

17  litigation commenced.

18       THE WITNESS: Oh. It was a to-do list. And

19  when I would do it, you know, it would be on these

20  little scraps of paper. And I'd write myself a note,

21  "Call Jim about," whatever.

22       And when I'd do it, I'd just cross it out.

23  And then, you know, when the list didn't have anything

24  on it, crumple it up, throw it out.

25       MR. SOLOMON: Q. Okay. So what happened with

---

1  respect -- did you make notes at EMC meetings,

2  handwritten notes, after this litigation commenced?

3       MR. LINDSTROM: Okay. So --

4       MR. SOLOMON: It's a very simple question.

5       Q. Did you?

6       A. Yeah, I don't know when this litigation

7  commenced. I don't remember.

8       Q. Right.

9       A. So you'd have to tell me. I don't know what

10  year that is.

11       Q. In March of 2001.

12       A. Okay. So --

13       Q. After that quarter elapsed.

14       A. I don't know if at that point I would do the

15  to-do list anymore. It was something I did when I first

16  got there.

17       Q. Might have been something you stopped doing

18  after we filed our lawsuit; is that what you're saying?

19       MR. LINDSTROM: No. Argumentative,

20  mischaracterizes her testimony.

21       THE WITNESS: No, I don't know when I stopped

22  doing it. It was something I did when I started.

23       MR. SOLOMON: Q. With respect to the book

24  Softwar, you're aware that Mr. Ellison wrote footnotes

25  to that book?

1   A. I do know he wrote footnotes on some of the

2   pages.

3   Q. How do you know that?

4   A. 'Cause I saw it in the book.

5   Q. So you've read the book?

6   A. I've read most of the book.

7   Q. When did you read it?

8   A. When it came out.

9   Q. And what happened to the initial drafts of Mr.

10  Ellison's footnotes for that book?

11        MR. LINDSTROM: No foundation.

12        THE WITNESS: I have no idea.

13        MR. SOLOMON: Q. Did you see any of his

14  drafts of his footnotes?

15   A. No.

16   Q. Do you know why drafts of his footnotes

17  weren't produced in this litigation?

18        MR. LINDSTROM: Assumes facts.

19        THE WITNESS: I have no idea.

20        MR. SOLOMON: Q. Were you involved in the

21  antitrust litigation that occurred with respect to the

22  PeopleSoft transaction?

23   A. Yes, I was.

24   Q. Are you aware that Softwar was an exhibit for

25  the government in that litigation --

---

1        MR. LINDSTROM: No foun --

2        MR. SOLOMON: Q. -- or at least excerpts of

3  it?

4        MR. LINDSTROM: No foundation, calls for

5  speculation.

6        THE WITNESS: I don't remember that, actually.

7        MR. SOLOMON: Q. Is it your testimony that

8  you had zero involvement in either negotiate -- well,

9  first of all, zero involvement in the negotiations of

10  the agreement with Mr. Symonds concerning Softwar?

11   A. I don't remember being involved in the

12  negotiations with Mr. Symond [sic].

13   Q. Okay.

14   A. I really don't.

15   Q. And is it your testimony that you had zero

16  involvement with respect to drafting the footnotes that

17  Mr. Ellison made?

18   A. Yeah, I don't think I had any involvement with

19  any footnotes at all.

20        MR. LINDSTROM: Where are we on time?

21        THE VIDEOGRAPHER: Four and ... 30 or

22  something. I'm not quite sure.

23        MR. LINDSTROM: Remaining?

24        THE VIDEOGRAPHER: Yes.

25        MR. SOLOMON: Q. Do you know what a debit

---

1  memo is?

2   A. Vaguely, yes.

3   Q. And in the context of Oracle, what is a debit

4  memo?

5   A. It's -- it's a financial -- it's a -- moving

6  something from -- debiting one account, moving it to

7  something else.

8   Q. And do you recall debit memos being involved

9  in the cleanup that took place in 2002 at Oracle?

10        MR. LINDSTROM: No foundation, vague and

11  ambiguous.

12        THE WITNESS: You know, I don't -- I don't

13  remember the details of what you're referring to. So I

14  don't know -- debit memos or credit memos, I don't

15  exactly know.

16        MR. SOLOMON: Q. Have you been involved in

17  refunding any sums to customers that have been held by

18  Oracle in unapplied cash until 2002?

19   A. Your question has really like two parts. So

20  if both things, I don't know about that second part you

21  said. I've been involved in cases where we have given,

22  you know, some sort of a refund or something to a

23  customer, so ...

24        MR. LINDSTROM: But he's only asking you about

25  ones in conjunction with the debit memo cleanup.

---

1        THE WITNESS: No, see, I wouldn't know

2  anything about that.

3        MR. SOLOMON: Q. You know nothing about that

4  whatsoever; that's your testimony, correct?

5   A. Refunding money to customers with -- debit

6  memo thing, no, I don't.

7   Q. So any refunds that you've made or been

8  involved in making to customers since 2002 have not been

9  related to any of the debit memo issues that are

10  involved in this litigation; is that right?

11   A. Yeah, I don't even know if I've actually been

12  involved in any refunds to customers since 2002, period.

13  But definitely not -- you know, not involved with this

14  debit memo stuff that you're talking about, that I know

15  of.

16   Q. Do you know that Mr. -- would you describe

17  many of the implementations of 11i as being significant

18  screwups for Oracle?

19        MR. LINDSTROM: Objection. Compound.

20        THE WITNESS: Would I describe that? No, I

21  would not.

22        MR. SOLOMON: Q. Okay. Do you know that Mr.

23  Ellison has described such implementations as having

24  been significant screwups?

25        MR. LINDSTROM: Assumes facts,

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1   mischaracterizes testimony, no foundation.

2       THE WITNESS: I have no idea -- I have no --

3   no idea that that's a true statement at all.

4       MR. SOLOMON: Q. Okay. Would you be

5   interested to learn whether it's a true statement or

6   not?

7       MR. LINDSTROM: Irrelevant.

8       THE WITNESS: It's your call, sir.

9       MR. SOLOMON: Q. Since March of 2001 when we

10  filed this litigation, you have attended EMC meetings,

11  correct?

12  A. Yes.

13  Q. And you have written agendas; is that right?

14  A. I don't write agendas anymore, actually.

15  Q. So that was a practice prior to this

16  litigation that hasn't -- did not continue thereafter;

17  is that right?

18      MR. LINDSTROM: Assumes facts.

19      THE WITNESS: No.

20      MR. LINDSTROM: Mischaracterizes her

21  testimony, argumentative.

22      THE WITNESS: No, that's not right.

23      MR. SOLOMON: Q. So tell me what is right,

24  please.

25  A. There were agendas for a long time. Then I

---

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1   got too busy to do them, so I stopped doing them.

2       MR. LINDSTROM: Where are we on time?

3       THE WITNESS: I don't know when that was,

4   though. I don't know how that relates to your

5   litigation.

6       THE VIDEOGRAPHER: Forty-five seconds.

7       MR. SOLOMON: Q. Okay. Please tell me, with

8   respect to the H-P transaction at the end of the second

9   fiscal quarter 2001, what discussion was there at the

10  board of directors meetings in January concerning that

11  transaction?

12      MR. LINDSTROM: No foundation, calls for

13  speculation, asked and answered at the last session.

14      THE WITNESS: You know, I don't remember any

15  talk about the H-P deal at the board of directors

16  meeting. I just don't have a memory of that at all.

17      MR. SOLOMON: Excuse me. Let me restate the

18  question -- actually, not restate the question. I'll

19  ask you another question.

20  Q. At a November 30 meeting of the board of

21  directors, what discussion was there concerning the H-P

22  deal?

23      MR. LINDSTROM: No foundation, asked and

24  answered.

25      THE WITNESS: I don't remember having a board

---

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1   meeting.

2       MR. SOLOMON: Q. What about an executive

3   committee meeting?

4   A. I don't know. Executive committee meetings

5   are on Monday usually, rarely at the end of the quarter,

6   so ...

7   Q. What executive level meeting did you ever have

8   concerning the H-P transaction?

9   A. I don't remember --

10      MR. LINDSTROM: No foundation.

11      THE WITNESS: I don't remember having a

12  meeting at executive committee or otherwise about H-P.

13      MR. LINDSTROM: So Counsel, you've consumed

14  your time.

15      MR. SOLOMON: Reserve our rights. Thank you

16  very much, Ms. Catz.

17      THE VIDEOGRAPHER: This marks the end of

18  videotape 2, Volume II in the deposition of Safra Catz.

19  The original videotapes will be retained by LiveNote

20  World Service. At 4:44, going off the record.

21      (Deposition concluded at 4:44 p.m.)

22

23          --o0o--

24

25

---

Catz, Safra - Vol. 2 3/23/2007 1:04:00 PM

1           CERTIFICATE OF WITNESS

2

3

4

5       I, the undersigned, declare under penalty of

6   perjury that I have read the foregoing transcript and I

7   have made any corrections, additions or deletions that I

8   was desirous of making; that the foregoing is a true and

9   correct transcript of my testimony contained therein.

10      EXECUTED this _____ day of _____,

11  200_, at _____, _____.

12

13

14

15

16

17      _____

18          Signature of Witness

19

20

21

22

23

24

25

Catz, Safra - Vol. 2  3/23/2007  1:04:00 PM

1             REPORTER CERTIFICATE

2             I hereby certify that the witness in the

3   foregoing deposition was by me duly sworn to testify to

4   the truth, the whole truth and nothing but the truth in

5   the within-entitled cause; that said deposition was

6   taken at the time and place herein named; that the

7   deposition is a true record of the witness's testimony

8   as reported to the best of my ability by me, a duly

9   certified shorthand reporter and a disinterested person,

10   and was thereafter transcribed under my direction into

11   typewriting by computer; that no review of the

12   transcript was requested by the witness or any party.

13             I further certify that I am not interested in

14   the outcome of said action, nor connected with, nor

15   related to any of the parties in said action, nor to

16   their respective counsel.

17             IN WITNESS WHEREOF, I have hereunto set my

18   hand this 8th day of April, 2007.

19

20       _____

              HOLLY MOOSE, CSR NO. 8438

21

22

23

24

25

REPORTER CERTIFICATE

1

2          I hereby certify that the witness in the

3    foregoing deposition was by me duly sworn to testify to

4    the truth, the whole truth and nothing but the truth in

5    the within-entitled cause; that said deposition was

6    taken at the time and place herein named; that the

7    deposition is a true record of the witness's testimony

8    as reported to the best of my ability by me, a duly

9    certified shorthand reporter and a disinterested person,

10   and was thereafter transcribed under my direction into

11   typewriting by computer; that no review of the

12   transcript was requested by the witness or any party.

13          I further certify that I am not interested in

14   the outcome of said action, nor connected with, nor

15   related to any of the parties in said action, nor to

16   their respective counsel.

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand this 6th day of April, 2007.

19                    _Holly Moose_

20          _____

21                    HOLLY MOOSE, CSR NO. 6438

22

23

24

25

                                        351

# EXHIBIT CCC

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | | |
|---|---|---|
| 1 | 00120:01 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA |
| 2 | 02 | IN AND FOR THE COUNTY OF SAN MATEO |
| 3 | 03 | ---o0o--- |
| 4 | 04 | COORDINATION PROCEEDING |
| 5 | 05 | |
| 6 | 06 | |
| 7 | 07 | PROCEEDING NO. 4180 |
| 8 | 08 | THIS DOCUMENT RELATES TO: |
| 9 | 09 | ALL ACTIONS |
| 10 | 10 | |
| 11 | 11 | |
| 12 | 12 | DEPOSITION OF JENNIFER L. MINTON |
| 13 | 13 | Thursday, April 1, 2004 |
| 14 | 14 | Volume II (Pages 120 - 231) |
| 15 | 15 | |
| 16 | 16 | CONFIDENTIAL PURSUANT TO A PROTECTIVE ORDER APPROVED BY |
| 17 | 17 | CONFIDENTIAL, AND THE CONTENTS ARE NOT TO BE REVEALED |
| 18 | 18 | ORDER OF THE COURT OR BY AGREEMENT OF THE PARTIES |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 | CSR NO. 6458 |
| 22 | 22 | |
| 23 | 23 | ROBERT BARNES ASSOCIATES |
| 24 | 24 | 760 Market Street, Suite 844 |
| 25 | 25 | Phone: (415)788-7191 |

Oracle Related Cases                                Page 120

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | | |
|---|---|---|
| 1 | 00121:01 | IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE |
| 2 | 02 | IN AND FOR NEW CASTLE COUNTY |
| 3 | 03 | |
| 4 | 04 | IN RE ORACLE CORPORATION |
| 5 | 05 | DERIVATIVE LITIGATION |
| 6 | 06 | _____ / |
| 7 | 07 | |
| 8 | 08 | |
| 9 | 09 | |
| 10 | 10 | |
| 11 | 11 | |
| 12 | 12 | |
| 13 | 13 | |
| 14 | 14 | |
| 15 | 15 | |
| 16 | 16 | |
| 17 | 17 | |
| 18 | 18 | |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 | |
| 22 | 22 | |
| 23 | 23 | |
| 24 | 24 | |
| 25 | 25 | |

Oracle Related Cases                                Page 121

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | | |
|---|---|---|
| 1 | 00122:01 | A P P E A R A N C E S |
| 2 | 02 | |
| 3 | 03 | FOR CALIFORNIA PLAINTIFFS: |
| 4 | 04 | BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 5 | 05 | 425 California Street, Suite 2025 |
| 6 | 06 | (415)433-3200 |
| 7 | 07 | AND |
| 8 | 08 | McMANIS, FAULKNER & MORGAN |
| 9 | 09 | 50 West San Fernando Street |
| 10 | 10 | San Jose, CA  95113 |
| 11 | 11 | AND |
| 12 | 12 | COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI |
| 13 | 13 | 700 El Camino Real |
| 14 | 14 | (650)871-5666 |
| 15 | 15 | |
| 16 | 16 | FOR THE DELAWARE PLAINTIFFS: |
| 17 | 17 | SCHIFFRIN & BARROWAY |
| 18 | 18 | Three Bala Plaza East, Suite 400 |
| 19 | 19 | (610)667-7706 |
| 20 | 20 | |
| 21 | 21 | |
| 22 | 22 | |
| 23 | 23 | |
| 24 | 24 | |
| 25 | 25 | |

Oracle Related Cases                                Page 122

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | | |
|---|---|---|
| 1 | 00123:01 | A P P E A R A N C E S (continued) |
| 2 | 02 | |
| 3 | 03 | FOR ORACLE CORPORATION AND THE WITNESS: |
| 4 | 04 | MORRISON & FOERSTER |
| 5 | 05 | 425 Market Street |
| 6 | 06 | (415)268-7126 |
| 7 | 07 | |
| 8 | 08 | FOR ORACLE CORPORATION: |
| 9 | 09 | ORACLE CORPORATION |
| 10 | 10 | 500 Oracle Parkway |
| 11 | 11 | (650)506-9221 |
| 12 | 12 | |
| 13 | 13 | FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY: |
| 14 | 14 | MAYER, BROWN, ROWE & MAW |
| 15 | 15 | 350 South Grand Avenue, 25th Floor |
| 16 | 16 | (213)229-9500 |
| 17 | 17 | |
| 18 | 18 | ALSO PRESENT: Andrew Martin, Videographer |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 | TAKEN AT: |
| 22 | 22 | BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 23 | 23 | San Francisco, CA  94104 |
| 24 | 24 | |
| 25 | 25 | ---o0o--- |

Oracle Related Cases                                Page 123

```
1   00124:01            I N D E X
2        02
3        03  DEPOSITION OF JENNIFER L. MINTON
4        04
5        05  EXAMINATION BY:                    PAGE
6        06    MR. DE GHETALDI (Resumed)         126
7        07    AFTERNOON SESSION                 183
8        08
9        09  DC EXHIBITS
10       10  238  E-mails, CA-ORCL 032260-63, 4 pages    126
11       11  239  Interview Of Jennifer Minton, 13 pages   178
12       12  240  Oracle Q3 FY01 Management Summary -
13       13       CA-ORCL 004802-10, 9 pages    204
14       14  241  Oracle Q3 FY01 Management Summary -
15       15       Week 6, CA-ORCL 030883-904, 23 pages   205
16       16  242  Oracle Q3 FY01 Management Summary -
17       17       CA-ORCL 004780-801, 22 pages    206
18       18  243  Affidavit Of Jennifer Minton In
19       19       Judgment, 16 pages             210
20       20
21       21             —o0o—
22       22
23       23
24       24
25       25
```

```
1   00125:01         BE IT REMEMBERED that, pursuant to
2        02  Continuation and on Thursday, April 1, 2004, commencing
3        03  at the hour of 9:09 a.m., before me, HOLLY MOOSE, CSR
4        04  No. 6438, a Certified Shorthand Reporter in the State of
5        05  California, there personally appeared
6        06
7        07          JENNIFER L. MINTON,
8        08
9        09  called as a witness by the Plaintiffs, who, having been
10       10  previously sworn, was examined and testified as
11       11  hereinafter set forth:
12       12
13       13
14       14
15       15             —o0o—
16       16
17       17
18       18
19       19
20       20
21       21
22       22
23       23
24       24
25       25
```

```
1   00126:01  PROCEEDINGS              9:09 A.M.
2        02
3        03         THE VIDEOGRAPHER:  This is the beginning of
4        04  Volume II, videotape 1 in the continuing deposition of
5        05  Jennifer Minton in the matter of Coordination Proceeding
6        06  Special Title Oracle Cases and In Re Oracle Cases.
7        07  Today's date is April 1, 2004.  The time is 9:09 a.m.
8        08         There being no new counsels present and unless
9        09  there are objections, we'll go on the record.
10       10  Everything remains the same as stated on Volume I, tape
11       11  1.  We're on the record.
12       12         MR. DE GHETALDI:  Thank you.
13       13         Good morning.
14       14         THE WITNESS:  Good morning.
15       15         MR. DE GHETALDI:  I'd like to have this
16       16  document marked as next in order.
17       17         MS. LAVALLEE:  238.
18       18         MR. DE GHETALDI:  238.
19       19         (DC Exhibit No. 238
20       20  marked for identification).
21       21         EXAMINATION RESUMED BY
22       22  MR. DE GHETALDI:  Q.  Have you had a chance to
23       23  review Exhibit 238?
24       24  A.  Yes.
25       25  Q.  Do you recall the issues that were under
```

```
1   00127:01  discussion in the e-mail string that makes up Exhibit
2        02  238?
3        03  A.  Not entirely.  Partially.
4        04  Q.  Can you tell me what you do recall about those
5        05  issues.
6        06  A.  There was a SWAT team that was headed up by
7        07  this — I think it was — let me find the name in here
8        08  again — by Rosser.  And he reported in to Mark
9        09  Barrenechea, who was a CRM development product VP —
10       10  or — I think he was a VP.  He could have been an EVP.
11       11  Q.  What is a SWAT team?
12       12  A.  It was a special team focused on selling and
13       13  marketing the CRM suite of applications.
14       14         THE REPORTER:  CRM what?
15       15         THE WITNESS:  CRM suite of applications.  And
16       16  what they were trying to do is issue comp plans for this
17       17  group that was tied to the CRM revenue.
18       18         MR. DE GHETALDI:  Okay.
19       19  Q.  What are the — do you recall anything about
20       20  the quotas that are being discussed in these e-mails?
21       21  CRM quotas, that is.
22       22  A.  It was the target that they were trying to get
23       23  their folks to deliver on.
24       24  Q.  All right.  Do you recall why Mr. Barrenechea
25       25  was apparently targeting a quota that was well under the
```

| | |
|---|---|
| 1 | 00128:01 corporate budget number? |
| 2 | 02 MR. ETH: Objection. Vague, misstates the |
| 3 | 03 document. |
| 4 | 04 MR. DE GHETALDI: Q. I'm looking at the first |
| 5 | 05 sentence in Christian Facey's e-mail to you on the first |
| 6 | 06 page of Exhibit 238 when I ask that question. |
| 7 | 07 A. Can you repeat the question. |
| 8 | 08 Q. Yes. Do you recall why Mr. Barrenechea was |
| 9 | 09 apparently targeting a quota that was well under the |
| 10 | 10 corporate budget number? |
| 11 | 11 A. No. |
| 12 | 12 Q. I'm handing you a document that was previously |
| 13 | 13 marked as Exhibit 48. Do you recall receiving Exhibit |
| 14 | 14 48? |
| 15 | 15 A. Yes. |
| 16 | 16 Q. Is Exhibit 48 one of the documents that you |
| 17 | 17 reviewed in preparation for your deposition? |
| 18 | 18 A. I believe I reviewed this in connection with |
| 19 | 19 my affidavit. |
| 20 | 20 Q. This e-mail relates to the NAS division, |
| 21 | 21 correct? |
| 22 | 22 A. Correct. |
| 23 | 23 Q. And do you know what Mr. Winton was referring |
| 24 | 24 to when he said "We finished the ops reviews this |
| 25 | 25 afternoon"? |

| | |
|---|---|
| 1 | 00129:01 A. Organizations tend to have operation reviews. |
| 2 | 02 So in an operations review, it's not uncommon for them |
| 3 | 03 to review the forecast. So I think that's what he was |
| 4 | 04 referring to. |
| 5 | 05 Q. He makes three numbered points. The first one |
| 6 | 06 was that, |
| 7 | 07 "The pipe had not grown as we had |
| 8 | 08 anticipated. We're actually slightly down |
| 9 | 09 from December end reporting." |
| 10 | 10 Did you discuss that issue with Mr. Winton at |
| 11 | 11 all after receiving this e-mail? |
| 12 | 12 A. I don't recall. |
| 13 | 13 Q. Was that issue discussed at any of the EMC |
| 14 | 14 meetings in January of 2001? |
| 15 | 15 A. I don't recall. |
| 16 | 16 Q. Is that the type of issue that would be |
| 17 | 17 discussed at an EMC meeting? |
| 18 | 18 A. Yes. |
| 19 | 19 Q. The second point that he makes is, |
| 20 | 20 "Lack of big deals. Unlike Q1 and Q2, |
| 21 | 21 we have few big deals in best case that |
| 22 | 22 could drive us past the 360 million line." |
| 23 | 23 Did you discuss that point with Mr. Winton |
| 24 | 24 after receiving this e-mail? |
| 25 | 25 A. Not that I recall. |

| | |
|---|---|
| 1 | 00130:01 Q. Did you discuss point 1 or point 2 with |
| 2 | 02 Mr. Roberts after receiving this e-mail? |
| 3 | 03 A. Not that I recall. |
| 4 | 04 Q. Do you recall whether Mr. Winton's second |
| 5 | 05 point was discussed at any of the EMC meetings in |
| 6 | 06 January 2001? |
| 7 | 07 A. Not that I recall. |
| 8 | 08 Q. Is point number 2 the type of issue that would |
| 9 | 09 have been discussed at an EMC meeting? |
| 10 | 10 A. Yes. |
| 11 | 11 Q. Then in point number 3 he says, |
| 12 | 12 "Drop in technology. As reflected in |
| 13 | 13 the softening pipe, both general business |
| 14 | 14 and majors see a slowdown in both Q3 and |
| 15 | 15 Q4." |
| 16 | 16 Did you discuss that point with Mr. Winton |
| 17 | 17 after receiving this e-mail? |
| 18 | 18 A. I don't recall if I discussed this meeting at |
| 19 | 19 all with Mr. Winton. |
| 20 | 20 Q. Did you discuss that point with Mr. Roberts |
| 21 | 21 after receiving this e-mail? |
| 22 | 22 A. I do not remember if I discussed this e-mail |
| 23 | 23 with George Roberts. |
| 24 | 24 Q. Okay. Do you recall whether the point that |
| 25 | 25 both general business and majors see a slowdown in |

| | |
|---|---|
| 1 | 00131:01 technology in both Q3 and Q4 was an issue that was |
| 2 | 02 discussed at any of the EMC meetings in January of 2001? |
| 3 | 03 A. I honestly do not recall. |
| 4 | 04 Q. Would that be the type of issue that would be |
| 5 | 05 discussed at an EMC meeting? |
| 6 | 06 A. Yes. |
| 7 | 07 Q. Mr. Winton continues, |
| 8 | 08 "General business's dot-com bubble has |
| 9 | 09 burst. They expect the west to end the |
| 10 | 10 year 30 or 40 million below" -- "or behind |
| 11 | 11 their original budget for technology." |
| 12 | 12 Do you recall discussing that issue with |
| 13 | 13 Mr. Roberts after receiving this e-mail? |
| 14 | 14 A. I do not recall discussing this e-mail with |
| 15 | 15 Mr. Roberts or with Mr. Winton. |
| 16 | 16 Q. Okay. I'm asking about the issue -- |
| 17 | 17 A. Any -- any content in this e-mail. |
| 18 | 18 Q. Okay. Do you recall whether the fact that |
| 19 | 19 general business's dot-com bubble has burst was |
| 20 | 20 discussed at any of the EMC meetings in January of 2001? |
| 21 | 21 MR. NADOLENCO: Objection. Asked and |
| 22 | 22 answered. |
| 23 | 23 MR. ETH: Well, and objection -- objection to |
| 24 | 24 form. |
| 25 | 25 THE WITNESS: I do not recall if this was |

**Page 132**

1  00132:01  discussed at an EMC meeting during January of 2001.
2  02  MR. DE GHETALDI: Q. Is that the type of
3  03  issue that would have been discussed at an executive
4  04  committee meeting?
5  05  A. Yes.
6  06  Q. Then Mr. Winton continues,
7  07  "Majors sees a slowdown in spending
8  08  along with smaller deal sizes."
9  09  MR. ETH: Objection. Says "spend."
10  10  MR. DE GHETALDI: You're right.
11  11  MR. ETH: Okay.
12  12  MR. DE GHETALDI: Q. Did you discuss that
13  13  point with either Mr. Winton or Mr. Roberts after
14  14  receiving this e-mail?
15  15  A. I do not recall discussing this e-mail with
16  16  Mr. Roberts or with Mr. Winton.
17  17  Q. Do you recall whether the fact that NAS's
18  18  majors division was seeing a slowdown in spending and
19  19  with smaller deal sizes was discussed at any of the
20  20  executive committee meetings in January 2001?
21  21  MR. ETH: Objection. Lack of foundation.
22  22  THE WITNESS: I do not recall.
23  23  MR. DE GHETALDI: Q. Is that the type of
24  24  issue that would commonly be discussed at an executive
25  25  committee meeting?

**Page 133**

1  00133:01  A. We would commonly discuss forecast issues at
2  02  an EMC meeting.
3  03  Q. Such as slowdown seen by an executive vice
4  04  president?
5  05  MR. ETH: Objection. Lack of foundation.
6  06  THE WITNESS: As I said, we would have
7  07  discussed issues relating to the forecast at an EC
8  08  meeting.
9  09  MR. DE GHETALDI: Q. Okay. Then Mr. Winton
10  10  continues that "the change in the ASP model for generic
11  11  tech hosting licenses."
12  12  Do you know what the ASP model for generic
13  13  tech hosting licenses Mr. Winton is referring to is?
14  14  A. I don't recall.
15  15  Q. Do you know what ASP stands for?
16  16  A. I'm sorry, I don't recall.
17  17  Q. Mr. Winton says that,
18  18  "The change in the ASP model for
19  19  generic tech hosting licenses coupled with
20  20  the dot-com crash is impacting the
21  21  projected tech results in that segment."
22  22  Did you discuss that issue with Mr. Winton or
23  23  Mr. Roberts after receiving this e-mail?
24  24  MR. ETH: Objection. Asked and answered.
25  25  THE WITNESS: I do not recall.

**Page 134**

1  00134:01  MR. DE GHETALDI: Q. Do you recall whether
2  02  that issue was discussed at any of the EMC meetings in
3  03  January of 2001?
4  04  A. I do not recall.
5  05  Q. And again, that would be the type of issue
6  06  that would commonly be discussed at an EMC meeting?
7  07  A. Forecasting issues would be commonly discussed
8  08  at an EC meeting.
9  09  Q. I'm going to hand you a document that was
10  10  previously marked as Exhibit 56. Have you had a chance
11  11  to review Exhibit 56?
12  12  A. I've reviewed this.
13  13  Q. Is Exhibit 56 one of the documents that you
14  14  reviewed in preparation for your deposition?
15  15  A. Yes.
16  16  Q. Do you recall asking Mr. English for a
17  17  forecast summary for OPI in mid January 2001?
18  18  A. I had frequently asked both Jim English, Sarah
19  19  Kopp and David Winton to provide me their own
20  20  independent assessment of the forecast. I did not want
21  21  to have them repeat to me what they thought -- what the
22  22  EVPs were reporting to Larry in the EMC; I wanted them
23  23  to give me their own unbiased independent view as to
24  24  what the forecast results were. And this is the type of
25  25  e-mail that I would get back with their independent

**Page 135**

1  00135:01  thinking.
2  02  Q. How often did you ask them for the source of
3  03  summaries?
4  04  A. I don't recall how frequently.
5  05  Q. Can you approximate for me how many times in a
6  06  quarter?
7  07  A. I'm sorry, I do not recall.
8  08  MR. DE GHETALDI: Time out.
9  09  THE VIDEOGRAPHER: Off the record, 9:26 a.m.
10  10  (Recess taken).
11  11  THE VIDEOGRAPHER: On the record, 9:28 a.m.
12  12  MR. DE GHETALDI: Q. Let's try this: You
13  13  said that you had frequently asked Mr. English and
14  14  Ms. Kopp and Mr. Winton to provide you with independent
15  15  assessments of the forecast. What did you mean by
16  16  "frequently"?
17  17  A. When they started to report in to me, which I
18  18  believe was somewhere, you know, around this time period
19  19  within a 12-month band, they -- they had originally
20  20  worked with the sales organization and reported to the
21  21  sales EVPs. And I wanted them to become more
22  22  independent and more mindful of the forecast and making
23  23  sure that they weren't just parroting whatever was being
24  24  said.
25  25  So, you know, once they started reporting to

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00136:01 me, after that point in time, even up through current
2   02 day, I have them provide me with their own independent
3   03 assessment of what they think the forecast is.
4   04        So as an example, Sarah Kopp once or twice a
5   05 quarter even today will send me an e-mail note with her
6   06 own views as to what we think -- or what she thinks the
7   07 organization will deliver in a given quarter.
8   08     Q.  All right.  So do you think that that -- a
9   09 similar schedule was followed back in the third quarter
10  10 of 2001?
11  11     A.  I was very interested in hearing their own
12  12 independent views, so it would be reasonable to presume
13  13 that I asked them to provide me more than once what
14  14 their thoughts were on the forecast.
15  15     Q.  Mr. Winton testified that he sent you monthly
16  16 reports.  Does that sound about right?
17  17     A.  I don't recall the frequency.
18  18     Q.  When Ms. Kopp said in Exhibit 56, "We have a
19  19 lot of pipe at challenging clients" --
20  20     A.  Where is that exhibit?
21  21        MR. ETH:  You're mixing it up.  It's English.
22  22 You said "Kopp."
23  23        MR. DE GHETALDI:  I'm sorry, Mr. English.
24  24 Thanks.
25  25     Q.  Mr. English said that OPI had a lot of pipe at
```

Oracle Related Cases                                    Page 136

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00137:01 challenging clients.  Did you discuss that statement
2   02 with him?
3   03     A.  I don't recall if I discussed this e-mail note
4   04 with him.
5   05     Q.  Do you recall whether you discussed it with
6   06 Mr. Sanderson?
7   07     A.  I do not recall if I discussed it with
8   08 Mr. Sanderson.
9   09     Q.  Do you recall whether the contents of this
10  10 e-mail, Exhibit 56, were discussed at any executive
11  11 committee meetings in the third quarter of 2001?
12  12     A.  I do not recall whether this was discussed at
13  13 any EC meeting.
14  14     Q.  When Mr. English says "One AVP talked of
15  15 starting to see indications of client delays on
16  16 decisions," did you make any effort to determine which
17  17 AVP he was talking about?
18  18     A.  Not that I recall.
19  19     Q.  Mr. English says that he analyzed upside deals
20  20 by win probability.  Do you see that section about three
21  21 quarters of the way down?
22  22     A.  Mm-hm.
23  23     Q.  Was there a program that allowed that type of
24  24 analysis to be done, an automated program of some kind?
25  25     A.  Do you recall the reports that we looked at
```

Oracle Related Cases                                    Page 137

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00138:01 yesterday that came out of OSO?
2   02     Q.  Yes.
3   03     A.  I -- he would be looking at that type of
4   04 information.
5   05     Q.  All right.  Was there a query that could be
6   06 run in OSO to sort to -- for deals with upsides of
7   07 40 percent probability or greater?
8   08     A.  I believe what they were doing was downloading
9   09 data from OSO into Excel.  And in Excel, they could sort
10  10 it in any fashion they so desired.
11  11     Q.  I see.  Now I'm going to hand you a document
12  12 that was marked as Exhibit 78.
13  13        Have you had a chance to review Exhibit --
14  14     A.  Yes.
15  15     Q.  -- 78?
16  16     A.  Yes.
17  17     Q.  You say at the beginning that Mr. Ellison made
18  18 it clear to everyone at the EMC meeting this week that
19  19 the license revenue growth target for this year and next
20  20 is 30 percent.  What sort of target was that?  I'm not
21  21 sure that I -- can you explain to me what Mr. Ellison
22  22 was talking about when he said this.
23  23     A.  He was --
24  24        MR. NADOLENCO:  Objection -- I apologize.
25  25 Objection.  Lacks foundation.
```

Oracle Related Cases                                    Page 138

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00139:01        THE WITNESS:  He's establishing a goal for the
2   02 sales organization to work towards.
3   03        MR. DE GHETALDI:  Q.  Was that 30 percent in
4   04 constant dollars or actual rates?
5   05        MR. NADOLENCO:  Same objection.
6   06        THE WITNESS:  It would have been in constant
7   07 dollars.
8   08        MR. DE GHETALDI:  Q.  That was the same amount
9   09 of growth that Oracle had given guidance for for license
10  10 revenue in December of 2000, correct?
11  11        MR. ETH:  Objection.  Misstates the record.
12  12        THE WITNESS:  I'd have to look back at the
13  13 actual document.  I thought it was 25 percent.
14  14        MR. DE GHETALDI:  Q.  For U.S.  I think it's
15  15 30 --
16  16     A.  No.  Well, we don't -- we don't -- we
17  17 don't give guidance by division.
18  18     Q.  I meant U.S. dollars -- or actual rates and
19  19 30 percent in constant dollars, I think was the guidance
20  20 that was given.
21  21        Now I'm going to hand you a document that was
22  22 previously marked as Exhibit 77.
23  23     A.  Is there a second page to this?
24  24     Q.  That was going to be one of my questions.
25  25     A.  Says "1 of 2."
```

Oracle Related Cases                                    Page 139

1  00140:01    Q.  I understand.  And this is the way that we
2  02  received it.  And so one of the questions that I would
3  03  have is where would you look to try and find the second
4  04  page of this e-mail?
5  05    A.  Where would I look?
6  06    Q.  Yeah.
7  07    A.  I've already provided everything to legal that
8  08  I had.
9  09    Q.  So it's your belief that -- do you recognize
10  10  the handwriting on this document?
11  11    A.  Yes.
12  12    Q.  Is it yours?
13  13    A.  Yes.
14  14    Q.  And it would be your belief that you provided
15  15  both pages of this document to legal?
16  16    A.  Well, it could have been that I only kept the
17  17  first page since it had all the key data that I needed.
18  18    Q.  How do you know that there was nothing on the
19  19  second page in terms of key data?
20  20    A.  Well, all the key data that I would look for
21  21  is right here on the first page.
22  22    Q.  Where you wrote "75 percent confidence level"
23  23  under Mr. Nussbaum's forecast number, what did you mean
24  24  by that?
25  25    A.  These look to be notes that I had taken.  I

---

1  00141:01  don't know.  I do not recall.
2  02    Q.  It appears that there is $91 million in
3  03  management judgment contained in the $225 million
4  04  forecast.  Is that the way that you read this document's
5  05  contents?
6  06    A.  Yes.
7  07    MR. ETH:  Object -- well--
8  08    THE WITNESS:  Sorry.
9  09    MR. ETH:  Object.  That's not what it says,
10  10  but ...
11  11    Go ahead.
12  12    MR. DE GHETALDI:  Q.  Is that your
13  13  understanding of what this document says?
14  14    A.  Yes.
15  15    Q.  Okay.  Is 91 million out of 225 million a
16  16  relatively high level of management judgment to be
17  17  included in a forecast?
18  18    MR. NADOLENCO:  Object to form.
19  19    THE WITNESS:  Not considering the amount of
20  20  large deals that they had in play.
21  21    MR. DE GHETALDI:  Q.  Would the amount of
22  22  large deals that OSI had in play indicate a greater risk
23  23  for achieving their forecast?
24  24    MR. NADOLENCO:  Same objection.
25  25    THE WITNESS:  The amount of deals that they

---

1  00142:01  had in play would not indicate a greater risk.
2  02    MR. DE GHETALDI:  Q.  Do you know what
3  03  Ms. Kopp meant when she said that Mr. Nussbaum was still
4  04  confident in the $225 million forecast as long as none
5  05  of the very large opportunities dropped out?
6  06    A.  He believed that he would meet his forecast,
7  07  assuming that he would be able to close a number of the
8  08  large deals that he had in his pipeline.
9  09    Q.  Was she saying that he needed to close all of
10  10  the large deals in the pipeline?
11  11    MR. NADOLENCO:  Objection.  Lacks foundation.
12  12    THE WITNESS:  No.  She summarized here some of
13  13  the deals that they needed to have close in order to
14  14  achieve the forecast.
15  15    MR. DE GHETALDI:  I don't know if you can find
16  16  Exhibit 150 in that stack you have there.
17  17    THE WITNESS:  Do you have a picture of ...
18  18    MR. DE GHETALDI:  Yeah, it's the
19  19  December 12th e-mail from Mr. Henley.
20  20    (Inaudible discussion).
21  21    MR. DE GHETALDI:  Q.  In the middle of the
22  22  first paragraph, Mr. Henley says,
23  23    "Based on strong applications
24  24  momentum, 30 percent constant dollar total
25  25  license growth seems like a reasonable

---

1  00143:01    target for the second half."
2  02    Do you see that?
3  03    A.  Yes, I do.
4  04    Q.  So do you -- does that refresh your memory as
5  05  to whether Oracle gave guidance of 30 percent license
6  06  revenue growth in constant dollars for Q3 2001?
7  07    A.  We give revenue growth estimates in U.S.
8  08  dollars, but we also indicate what currency effect that
9  09  there may be.
10  10    Q.  My question was does that refresh your
11  11  recollection as to the guidance that Oracle gave for
12  12  license revenue growth in constant dollars?
13  13    A.  We gave Q3 current exchange rates, it looks
14  14  like negative five percent.  So if we had given a 25
15  15  percent in U.S. dollars and the currency was negative,
16  16  then that would have been 30 percent constant.
17  17    Q.  All right.  Now I'm going to hand you a copy
18  18  of Exhibit 49.  Do you recall receiving Exhibit 49?
19  19    A.  Yes.
20  20    Q.  Is Exhibit 49 one of the documents that you
21  21  reviewed in preparation for your deposition?
22  22    A.  Yes.
23  23    Q.  All right.  Do you recall whether the contents
24  24  of Exhibit 49 were discussed at the January 29th, 2001
25  25  executive committee meeting?

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00144:01    A.  I do not recall.
2   02      Q.  Is the contents of Exhibit 49 the type of
3   03  material that would have been discussed at an executive
4   04  committee meeting?
5   05      A.  Yes.
6   06      Q.  Technology that is -- or what is -- what
7   07  products make up the tech business that Mr. Winton is
8   08  discussing?
9   09          MR. NADOLENCO:  Objection to the extent it
10  10  lacks foundation.
11  11          THE WITNESS:  We break out our license revenue
12  12  between applications and technology.  So technology
13  13  includes, as an example, database and application
14  14  server, any nonapplication-based revenues.
15  15          MR. DE GHETALDI:  Q.  As a percentage of NAS's
16  16  license business, can you estimate for me what the split
17  17  between technology and applications was in fiscal year
18  18  2001, just on average?
19  19      A.  I don't recall.
20  20      Q.  Do you recall whether NAS -- NAS's license
21  21  business was predominantly technology as opposed to
22  22  applications?
23  23      A.  I don't recall.
24  24      Q.  Going back to the one-page Exhibit 77, which
25  25  is the Sarah Kopp e-mail, do you have a practice of
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00145:01  saving e-mails that you receive, or do you have a
2   02  practice of deleting them?
3   03          MR. NADOLENCO:  Objection.  Compound.
4   04          THE WITNESS:  I save some and I delete others.
5   05          MR. DE GHETALDI:  Q.  Do you know whether
6   06  Exhibit 77 is the type of e-mail that you would have a
7   07  tendency to save or delete?
8   08      A.  I cannot characterize what type of e-mails I
9   09  might have save or delete.  It would be a decision that
10  10  I would make at that point in time.
11  11      Q.  Do you still have e-mails on any of your
12  12  computers dating back to 2001?
13  13          MS. SEGAL:  Object to form.
14  14          THE WITNESS:  All of my e-mails that I had
15  15  have been provided to legal.
16  16          MR. DE GHETALDI:  Q.  In electronic form or in
17  17  paper form or both?
18  18      A.  I believe they took electronic.  And if I had
19  19  any hard copies, it would have taken hard copy -- hard
20  20  copy e-mails as well.
21  21      Q.  Okay.  Now I'm going to hand you a document
22  22  that was previously marked as Exhibit 73.  Do you
23  23  recognize the handwriting on Exhibit 73?
24  24      A.  I would be speculating, but I do believe it
25  25  would be Roberta Ronsse's.  But I can't be certain.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00146:01    Q.  In the center of the first page of Exhibit 73
2   02  down towards the bottom, there's a handwritten note that
3   03  says "Footnote pipeline without Covisint."
4   04          Do you see that?
5   05      A.  Mm-hm.
6   06      Q.  Do you recall discussions in the third quarter
7   07  of 2001 on how to treat the Covisint deal in the
8   08  forecast?
9   09      A.  I don't understand precisely what you're
10  10  getting at.
11  11      Q.  Well, do you recall discussions about taking
12  12  Covisint out of a particular pipeline number?
13  13      A.  As indicated in Jim English's e-mail -- and
14  14  I -- you know, they did take it out in trying to come up
15  15  with the projected license revenues when applying the
16  16  historical conversion rates.
17  17      Q.  Do you know why they did that?
18  18      A.  I would think to be more conservative.  If I
19  19  may give an example ...
20  20      Q.  Yes.
21  21      A.  If you have a pipeline of a hundred and your
22  22  historical conversion rate was 50, then you would
23  23  predict your license revenues to be 50.
24  24          So if you included pipeline of -- if you
25  25  included Covisint in your pipeline and multiplied it by
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00147:01  the same amount, it would have given you a higher
2   02  pipeline number.  So because it was such a large and --
3   03  unusually large -- largest deal we've ever done, I
4   04  believe they took it out in coming up with their
5   05  predictions of the license revenues for the quarter.
6   06      Q.  All right.
7   07      A.  Otherwise it would have overstated their
8   08  predictive results.
9   09      Q.  Okay.  Now I'm going to hand you a document
10  10  that was previously marked as Exhibit 142.  Does Exhibit
11  11  140 -- or do you recognize Exhibit 142?
12  12      A.  Yes.
13  13      Q.  Can you tell me what it is, please.
14  14      A.  It is an upside analysis.  Based on the date,
15  15  it was the upside analysis prepared on December 11th.
16  16      Q.  Was this Exhibit 142 the upside analysis that
17  17  was used to arrive at Oracle's guidance figures that
18  18  were given on December 14th?
19  19      A.  As I stated yesterday, investor relations
20  20  would come up with their own model and we would come up
21  21  with ours.  So I do not know if we relied more heavily
22  22  on this one versus the investor relations ones.  They
23  23  may have been a little bit different.
24  24      Q.  But it was used in the process?
25  25      A.  It was considered -- it was considered.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00148:01   Q.  All right.  Is -- can you tell whether Exhibit
2   02  142 is a complete upside report?
3   03      A.  Yes.
4   04      Q.  That is, it is complete?
5   05      A.  Yes.
6   06      Q.  Okay.  If you can find Exhibit 232 in -- in
7   07  that stack.  It was probably --
8   08      A.  Can you show me what it looks like.
9   09      Q.  It was one of the first things that we looked
10  10  at yesterday.  It's the e-mail with the upside report
11  11  attached.
12  12      (Inaudible discussion).
13  13      MR. DE GHETALDI:  Q.  And if you can turn
14  14  towards the back -- in fact, the second to last page,
15  15  with Bates number 25540.
16  16      A.  Mm-hm.
17  17      Q.  It's the page titled "External Product
18  18  Revenues."
19  19      A.  Mm-hm.
20  20      Q.  I don't see that -- or a comparable page in
21  21  Exhibit 142.
22  22      A.  If you please go to 22 -- 2990.
23  23      Q.  Yes.
24  24      A.  See how we have technology and total
25  25  applications?
```

Oracle Related Cases                                    Page 148

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00149:01   Q.  Yes.
2   02      A.  That would be similar to the one that you're
3   03  pointing to, which is in a different format.
4   04      Q.  All right.  Do you know -- do you recall there
5   05  being a decision to stop including breakouts for ERP and
6   06  CRM and server and tools in the upside reports and
7   07  simply separate them between technology and
8   08  applications?
9   09      A.  I don't recall a specific event.
10  10      Q.  Okay.  Now, these upside reports, the one with
11  11  Exhibit 232 was -- was e-mailed.  And I think you said
12  12  yesterday that that was not something that you usually
13  13  did.
14  14      A.  Correct.
15  15      Q.  All right.  And they were usually handed out
16  16  at the EMC meetings themselves or distributed just prior
17  17  to the EMC meetings?
18  18      A.  We generally distributed them at the EC
19  19  meetings, as best as I recall.
20  20      Q.  Okay.  Did anybody get advance copies before
21  21  the meetings?
22  22      A.  At times I would provide Jeff Henley with a
23  23  copy of the upside report before the EC meeting.
24  24      Q.  Did -- or were different versions of the
25  25  upside report distributed to different persons at the
```

Oracle Related Cases                                    Page 149

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00150:01  executive committee meeting?  In other words, did some
2   02  people get some of the pages but not others?
3   03      A.  I don't recall what we were doing back then,
4   04  but I can tell you today we do not give the entire
5   05  package to anybody other than Larry Ellison, Safra Catz,
6   06  Chuck Phillips, Jeff Henley and myself.  And sales, if
7   07  they're even there.  They're generally participating via
8   08  telephone.
9   09      But the development guys only get the license
10  10  page that shows their product revenues forecast and the
11  11  next page that's -- the next page as well that shows the
12  12  license expense and margin.
13  13      Q.  Okay.
14  14      A.  We had a practice of not wanting everybody to
15  15  see our total revenues and earnings estimates at the EC
16  16  meetings.
17  17      Q.  What was the reason for that practice?
18  18      A.  They didn't --
19  19      MR. NADOLENCO:  Objection -- I apologize.
20  20  Objection to the extent it lacks foundation.
21  21      THE WITNESS:  We felt that they didn't have a
22  22  need to know.
23  23      MR. DE GHETALDI:  Q.  Did you not trust the
24  24  participants at these executive committee meetings?
25  25      MR. ETH:  Objection.  Vague, argumentative.
```

Oracle Related Cases                                    Page 150

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00151:01      MR. NADOLENCO:  And compound.  There's more
2   02  than one participant, right?
3   03      THE WITNESS:  It's not a matter of trust.  It
4   04  in essence protects them.  What they don't know won't
5   05  hurt them.
6   06      MR. DE GHETALDI:  Q.  How could knowing the
7   07  contents of an upside report hurt any of the
8   08  participants at an executive committee meeting?
9   09      A.  You would not want them to have information
10  10  that they might inadvertently tell somebody else about.
11  11  That's what I mean about what they don't know won't hurt
12  12  them.  So for example, somebody in charge of marketing
13  13  does not need to see what the financial results are
14  14  forecasted to be for the entire quarter.
15  15      Q.  What would -- well, I guess I'm not
16  16  understanding the problem with sharing this information
17  17  among the highest level of Oracle's management.  I --
18  18  I -- can you explain what the problem is with sharing
19  19  that information?  I mean, I assume that the people that
20  20  attend these meetings are the highest levels of Oracle's
21  21  management.  Am I right?
22  22      MR. ETH:  Is that the question?
23  23      MR. DE GHETALDI:  Yeah.
24  24      MR. ETH:  Okay.
25  25      THE WITNESS:  Yes, they are the executive --
```

Oracle Related Cases                                    Page 151

```
1    00152:01 or executive officers of the company. But some may only
2    02  be senior vice presidents.
3    03       MR. DE GHETALDI: Q. Was it your belief that
4    04  information in these upside reports can be misused?
5    05       MR. ETH: Objection. Asked and answered.
6    06       THE WITNESS: No. Let me rephrase that.
7    07  Intentionally misused? Can you ask the question again.
8    08  I want to make sure I respond correctly.
9    09       MR. DE GHETALDI: Q. My question was
10   10  whether it was your belief that information in these
11   11  upside reports could be misused by any of the
12   12  participants at the executive committee meetings.
13   13       A. Unintentionally misused was a concern, yes.
14   14       Q. And --
15   15       A. On my behalf.
16   16       Q. Right, that's fine. How did you feel that
17   17  this information could be unintentionally misused?
18   18       MR. NADOLENCO: Objection. Asked and
19   19  answered.
20   20       THE WITNESS: In the event they inadvertently
21   21  shared the financial forecast with somebody who should
22   22  not have had any reason to be apprised of it.
23   23       MR. DE GHETALDI: Okay. Why don't we take a
24   24  break.
25   25       THE WITNESS: Sure.
```

```
1    00153:01       THE VIDEOGRAPHER: Off the record, 10:04 a.m.
2    02  (Recess taken).
3    03       THE VIDEOGRAPHER: On the record, 10:24 a.m.
4    04       MR. DE GHETALDI: Q. If you could turn to the
5    05  fifth page of Exhibit 142, with Bates number 2990,
6    06  please.
7    07  (Discussion off the record).
8    08       THE WITNESS: Here we go.
9    09       MR. DE GHETALDI: Q. The upside -- I'd like
10   10  to talk about the upside numbers there in that column.
11   11       A. What page are you on? I'm sorry.
12   12       Q. It's Bates number 2990.
13   13       A. Okay.
14   14       Q. Now, do you consider the upside numbers for
15   15  the -- that are shown in that column there as within the
16   16  normal range as compared to the forecast numbers?
17   17       A. I would not make that analysis. I don't know
18   18  how you define a normal range. I would never view it in
19   19  those terms.
20   20       Q. All right. Well, I -- I -- I would be asking
21   21  about what you would consider to be a normal range, not
22   22  what -- not how I would define it.
23   23       MS. SEGAL: So what's the question?
24   24       MR. DE GHETALDI: Q. Do you consider the
25   25  upside numbers that are shown in that column within the
```

```
1    00154:01 normal range as compared to the forecast numbers? Are
2    02  they high or low historically, or do you have any sense
3    03  of that?
4    04       A. I don't have a sense of that. I look at each
5    05  quarter on its own.
6    06       Q. Except to the extent that you look at
7    07  historical conversion rates.
8    08       A. What's your question?
9    09       Q. Well, you say that you look at each quarter on
10   10  its own. Is that completely true?
11   11       A. I don't look at my upside numbers in one
12   12  quarter and compare them to my upside numbers in another
13   13  quarter. That is what I'm trying to convey.
14   14       Q. All right. As the quarter progresses, would
15   15  you expect that your potential number and the field's
16   16  forecast numbers would tend to come together?
17   17       A. Towards the end of the quarter, yes.
18   18       Q. All right. And as a quarter progresses, would
19   19  you expect --
20   20       A. Can I step back. I would expect the final
21   21  results to approximate my upside amounts, the potential
22   22  amounts, that is.
23   23       Q. The final results?
24   24       A. Mm-hm.
25   25       Q. The actual results?
```

```
1    00155:01       A. Correct.
2    02       Q. Okay. But I was asking about the field
3    03  forecast numbers. My question was would you expect your
4    04  potential numbers and the field forecast numbers to come
5    05  together as a quarter progresses?
6    06       A. If the field was increasing their forecast
7    07  throughout the quarter, I would likely decrease the
8    08  upside amounts during the quarter so that net -- I guess
9    09  I don't really understand your question.
10   10       Q. I'm trying to get a sense of your recollection
11   11  of historical trends, in particular the behavior of the
12   12  field's forecast numbers and your potential numbers as a
13   13  quarter progresses, and whether you recall those numbers
14   14  tending to come together as a quarter progresses.
15   15       A. What do you mean, come together?
16   16       Q. Become closer numerically.
17   17       A. There -- there could be times when the field
18   18  would increase their forecast during the quarter. I
19   19  would consider any increases in a forecast when arriving
20   20  at my upside adjustment at that stage of the quarter.
21   21  So my upside adjustments could go down as a consequence
22   22  if they increase their forecast. So, you know, it just
23   23  depended quarter to quarter and how the field revised
24   24  their adjustments.
25   25       Q. On this particular page, NAS is showing a
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00156:01 pipeline growth for total license of 97 percent. Do you

2   02 see that?

3   03      A. Yes.

4   04      Q. But they're only forecasting a 12-percent

5   05 increase in revenue. Do you see that?

6   06      A. Yes.

7   07      Q. Was that a dis -- were those numbers

8   08 disproportionate, in your opinion?

9   09          MR. ETH: Objection. Vague.

10  10          THE WITNESS: The pipeline growth does not --

11  11 is not necessarily tied to the forecast growth.

12  12          MR. DE GHETALDI: Q. Do you recall your

13  13 analysis of those two growth figures at the time --

14  14      A. I would have --

15  15      Q. -- that you prepared --

16  16      A. My analysis would have been applying the

17  17 historical conversion rate to the current quarter

18  18 pipeline to arrive at an estimated license number.

19  19          Again, it was our common practice to evaluate

20  20 historical conversion rates and apply it to current

21  21 quarter pipeline rates -- or current quarter pipeline

22  22 amounts to determine what we felt the license revenues

23  23 might be for the quarter.

24  24      Q. Do you recall discussions at the

25  25 December 11th EMC meeting about the fact that both OSI

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00157:01 and NAS were forecasting 11 and 18 percent below the

2   02 targeted 13 -- or 30 percent growth figure?

3   03      A. Where are you getting your numbers?

4   04      Q. Well, the targeted license revenue growth

5   05 figure was 30 percent, correct?

6   06      A. That was Larry's targeted 30 percent growth.

7   07      Q. And that was also the --

8   08      A. That was the goal he established for the

9   09 field.

10  10      Q. Yes. And that was also the guidance that was

11  11 given to the public, correct?

12  12          MR. ETH: Objection. Vague.

13  13          THE WITNESS: The guidance given to the public

14  14 was 25 percent in reported dollars with an estimated

15  15 conversion rate -- negative -- sorry -- currency effect

16  16 of five points.

17  17          MR. DE GHETALDI: Q. Thirty percent, right?

18  18      A. Correct.

19  19      Q. And the numbers here on this page that we're

20  20 looking at are constant dollars numbers, right?

21  21      A. Correct.

22  22      Q. So my question was do you recall discussions

23  23 at the December 11th, 2000 executive committee meeting

24  24 about the fact that OSI was forecasting only 19 percent

25  25 growth?

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00158:01      A. I do not recall any specific discussions;

2   02 however, it would be reasonable to assume that we

3   03 discussed the forecast.

4   04      Q. And would the same be true for the fact that

5   05 NAS only forecasting a 12-percent growth?

6   06      A. Again, I do not recall any details of the

7   07 discussions that were held at the EMC meeting; however,

8   08 we would clearly discuss the forecast 'cause that's a

9   09 standing agenda item.

10  10      Q. In arriving at an upside number, would it be

11  11 unusual for you to review particular deal information

12  12 from the spreadsheets with the best and the worst case

13  13 scenarios and include a particular deal in your upside

14  14 number that an executive vice president had not included

15  15 in a forecast?

16  16      A. It would be possible that we would have

17  17 included a deal in the upside numbers that was not

18  18 included in the executive's underlying commit forecast.

19  19      Q. All right. Do you recall doing that in the

20  20 third quarter of 2001?

21  21      A. I do not recall the specifics as to how I

22  22 arrived at the upside amounts in Q3 FY '01.

23  23      Q. All right. Now I'm going to hand you a

24  24 document that was previously marked as Exhibit 1 --

25  25      A. Sorry.

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00159:01      Q. -- 133. Do you recognize Exhibit 133?

2   02      A. This is an upside report. Based on the date,

3   03 the file name was as of January 15th.

4   04      Q. 2001?

5   05      A. Yes.

6   06      Q. If you could compare the first pages of

7   07 Exhibit 142 and 133, please. It appears that -- I want

8   08 to make sure that I'm reading this correctly -- the

9   09 pipeline growth percentages had declined from 52 percent

10  10 as of December 11th to 34 percent as of

11  11 January 15th.

12  12      A. That is correct.

13  13      Q. Would that fact have been something that would

14  14 have been discussed at an executive committee meeting,

15  15 that sort of trend?

16  16          MR. ETH: Objection. Vague.

17  17          THE WITNESS: That trend I don't recall being

18  18 discussed at an executive committee meeting.

19  19          MR. DE GHETALDI: Q. Would trends through --

20  20 trends in pipeline growth percentages as a quarter

21  21 progressed have -- be the type of subject that would be

22  22 discussed at an EMC meeting?

23  23      A. I do not recall discussing the trends of

24  24 pipeline -- of pipeline growth rates throughout a

25  25 quarter at an EC meeting.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00160:01    Q.  If you could turn, please, to the page with
2       02  Bates number 3345 in Exhibit 133.  And at the same time,
3       03  turn to the same page that we were looking at at Bates
4       04  number 2990 in Exhibit 142.
5       05          It appears as though there were reductions in
6       06  your upside numbers for both OSI and NAS in total
7       07  license technology and applications.  Am I reading these
8       08  charts correctly?
9       09    A.  Can you repeat the question.  You see what?  I
10      10  was looking at the first section --
11      11    Q.  Well, let's take it one by one.
12      12    A.  Can I just take a moment to explain to you how
13      13  this works?
14      14    Q.  Yes.
15      15    A.  Okay.  The numbers up here where it's got the
16      16  upside amounts --
17      17    Q.  Yes.
18      18    A.  -- those are allocated to technology and to
19      19  applications pro rata, based on the underlying forecast
20      20  that was submitted by the field.  So those are
21      21  calculated numbers, the splits.
22      22    Q.  They're calculated?
23      23    A.  Correct.
24      24    Q.  Can you explain how the calculation was made.
25      25    A.  Well, generally speaking, what we would do
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00161:01    is -- although it doesn't look like that's -- well,
2       02  normally what we would do is we would take the
3       03  technology number as a percentage of the total --
4       04    Q.  Mm-hm.
5       05    A.  -- this is the forecast as a percentage of
6       06  their forecast -- and multiply it by the upside amount
7       07  to arrive at the split of the upside between the two
8       08  license revenue components: technology and applications.
9       09    Q.  So in other words, you didn't do a specific
10      10  analysis down to -- for deriving an upside number for
11      11  technology and then do a separate analysis in order to
12      12  arrive at an upside number for applications?
13      13    A.  Well, we could have.  There was a point in
14      14  time when we did try and do it along those lines.
15      15    Q.  Mm-hm.
16      16    A.  And actually, as I look at this, it doesn't
17      17  look like it's allocating the revenue in proration to
18      18  the forecast.  So that may have indeed been the case at
19      19  that point in time.
20      20    Q.  All right.
21      21    A.  I can tell you today we just take the upside
22      22  amount and allocate it based on the submitted forecast
23      23  by product.
24      24    Q.  Okay.  Do you recall why you dropped your
25      25  upside number for OSI total license from 25 million to
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00162:01    zero between December 11th and January 15th?
2       02    A.  I don't recall specifically why I dropped it.
3       03  But it could have been based on a revised upside
4       04  analysis, given that the pipeline went down from the
5       05  beginning of the quarter.
6       06          Again, when we derived our upside amounts, it
7       07  was based on our conversion rate analyses, as well as
8       08  any information that I may have come by, either through
9       09  discussions at EC meetings or through discussions with
10      10  staff or through e-mails.
11      11          But I do not recall how and what the rationale
12      12  was as to how I came up with the upside amounts at one
13      13  point versus another point in the quarter.
14      14    Q.  It does look like the pipeline for OSI total
15      15  license declined by about $120 million over that span.
16      16    A.  That is correct.
17      17    Q.  So do you think that that would be -- or would
18      18  have been at least part of the reason for the decline in
19      19  the upside number?
20      20    A.  It would have been a consideration.  But it's
21      21  also very normal for the pipeline to decline during the
22      22  course of the quarter.
23      23    Q.  All right.  Is it normal for pipeline to
24      24  consistently decline from day one to quarter end?
25      25    A.  We take pictures of the pipeline when we do
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00163:01    our regular forecast.  And it's a very consistent trend
2       02  that the pipeline would go down because as you work on
3       03  your deals throughout the course of the quarter, some
4       04  deals solidify and others do not, or they -- and they
5       05  might get pushed out into a subsequent quarter.  So it's
6       06  not uncommon for pipeline to go down during the course
7       07  of a quarter.
8       08    Q.  Well, my question was whether it was common
9       09  for pipeline to decrease throughout the entire quarter,
10      10  from day one to the final day, as opposed to showing an
11      11  increase at the beginning of a quarter followed by a
12      12  decline to the end.
13      13    A.  It depended.  It was not necessarily --
14      14  generally speaking, it would decline.  However, there
15      15  have been situations where the sales organization met
16      16  with their team and reviewed the pipeline, reviewed the
17      17  detailed deals that made up the pipeline.  And they
18      18  could have increased or decreased their pipeline as a
19      19  result of those reviews.
20      20    Q.  If we look at the numbers for NAS, it looks
21      21  like license -- total license revenue upside number
22      22  declined from $50 million on December 11th to
23      23  $14 million on January 15th.  Am I reading that
24      24  correctly?
25      25    A.  Correct.
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00164:01    Q. Okay. The pipeline, however, declined only

02    $17 million or so, $16 million. Am I reading that

03    correctly?

04    A. It declined from 842 to 825, I think it says

05    here. It's difficult to read.

06    Q. Yeah. So much -- so there's a decline there,

07    but it's not as great as the decline that we looked at

08    for OSI's pipeline for the same period.

09       I'm just trying to get a sense of the relative

10    importance of declining pipeline for -- in your upside

11    analysis. And it looks like there was a much greater

12    decline in the OSI pipeline than NAS, but the NAS

13    pipe -- or the NAS upside declined much more

14    significantly than the OSI.

15    A. It declined less.

16    Q. Declined less?

17    A. The NAS?

18    Q. Yeah.

19    A. Declined less than OSI.

20    Q. $36 million as opposed to 26, the upside?

21    A. Oh, you're referring to the upside.

22    Q. Yeah.

23    A. Again, you can't look at one organization

24    versus another.

25    Q. You have to just look at the individual

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00165:01    organizations?

02    A. Correct.

03    Q. Prior to Q3 2001, do you recall your upsides

04    ever being negative?

05    A. My upside numbers have been positive and

06    negative over the course of several years.

07    Q. The upside reports that you turned over to the

08    legal department, how far back in time did those go; do

09    you recall?

10    A. I don't recall.

11    Q. Well, was it back to the time when you started

12    doing upside reports?

13    A. I provided whatever was requested. I do not

14    recall the dates.

15    Q. Do you recall whether you provided them back

16    five years in time?

17    A. I do not recall. I provided whatever was

18    requested.

19    Q. Do you still have copies of historical upside

20    reports?  •

21    A. I personally don't have copies.

22    Q. Are they available electronically?

23    A. All copies of the upside reports were provided

24    to legal. Hard copies would -- I just don't have any

25    more hard copies.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00166:01    Q. I asked about electronic copies.

02    A. I don't know where the electronic copies would

03    be other than within legal. They might be on the

04    corpfin server.

05    Q. And what is that?

06    A. As we discussed yesterday, it's the server

07    that the corporate finance group uses.

08    Q. In the third quarter of 2001, did you have a

09    belief that the executive vice presidents of the U.S.

10    divisions had a tendency to sandbag?

11    A. I believe -- I believe that the U.S. EVPs had

12    a tendency to sandbag not just in Q3, but in prior

13    quarters as well.

14    Q. Was one worse than the others?

15    MS. SEGAL: Object to form.

16    THE WITNESS: In my opinion -- and I don't

17    know if this is fact, but my impression was that Jay

18    Nussbaum was worse than the others.

19    MR. DE GHETALDI: Can we go off the record.

20    THE VIDEOGRAPHER: Off the record, 10:52 a.m.

21    (Brief interruption).

22    THE VIDEOGRAPHER: On the record, 11:08 a.m.

23    MR. DE GHETALDI: Q. I think before the break

24    that we were talking about the EVPs having a tendency to

25    sandbag. And I'm wondering whether you factored that

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00167:01    tendency into your upside analysis.

02    A. One of the reasons why we had the upside

03    analysis was because they forecasted below the actual

04    results that they delivered.

05    Q. Do you know whether there was a reason for

06    that tendency?

07    A. My impression is that they felt that they were

08    a hero if they delivered revenue in excess of their

09    committed forecast.

10    Q. Did you have any impression that they were

11    fearful of what might happen if they did not deliver

12    revenue at the level of their committed forecast?

13    A. No.

14    Q. Although this isn't a marked copy, I'll put

15    the number on. This is a copy of a document that was

16    marked as Exhibit 153.

17    A. Do you want me to go to a certain page?

18    Q. Well, before we do that, I'd like to go back

19    and just ask one more question about -- about the

20    sandbagging and how that -- how you analyzed that or

21    factored that into your upside analysis.

22       Do you have a particular methodology for that,

23    or how did you do it?

24    A. Again, I would evaluate the historical

25    conversion trends, apply those to the pipeline, and that

1  00168:01  would be one data point. I would also get other data

2  02  points in through discussions with the finance

3  03  individuals that supported the sales organization.  I

4  04  would also hear discussions at EC meetings.

5  05  And all of that information together helped me

6  06  to form my judgment in terms of deciding what upside

7  07  amounts I would include in an upside report. It's an

8  08  art, not a science.

9  09  Q.  Okay.  If you could turn to the same page that

10  10  we've been talking about, that is -- in this Exhibit 153

11  11  you'll find it as Bates number 3352.

12  12  A.  Mm-hm.

13  13  Q.  It looks to me like there were no changes in

14  14  the upside numbers here.  Am I reading that correctly?

15  15  MR. ETH: Objection.  Vague.  Changes from

16  16  what --

17  17  MR. DE GHETALDI: Well, changes from

18  18  January 15th.

19  19  MR. ETH: Okay.

20  20  THE WITNESS: That would be correct.

21  21  MR. DE GHETALDI: Q.  These reports are only a

22  22  week apart, yet they are in the second month of Q3.  Do

23  23  you recall a reason for the deviation from the normal

24  24  schedule that we talked about yesterday?

25  25  A.  Well --

1  00169:01  MR. ETH: Objection -- hold on.  Objection.

2  02  Misstates testimony, vague.

3  03  THE WITNESS: The forecast process -- the

4  04  process was to submit every two weeks in the first two

5  05  months of a quarter and then every week in the third

6  06  month of a quarter.

7  07  If there was an EC meeting held in between the

8  08  forecast weeks, we would print out the previous week's

9  09  forecast and bring that to the EC meeting.  So for

10  10  example, if the 15th was a forecast week and the

11  11  22nd was not, it would be reasonable to assume that we

12  12  would just print out the prior week's upside report and

13  13  bring that to an EC meeting.

14  14  And if there was any information that was

15  15  provided to us in that week since the EC meeting through

16  16  the next EC meeting, any changes would have been

17  17  reflected in that report.

18  18  MR. DE GHETALDI: Q.  So for example, the

19  19  pipeline numbers show some decline between

20  20  January 15th and January 22nd; is that correct?

21  21  A.  In total, the pipeline declined from 2,000,691

22  22  to 2,000,649.

23  23  Q.  So there was some decline, right?

24  24  A.  Correct.

25  25  Q.  So that would be an example of the type of new

1  00170:01  information that would be included in this -- the upside

2  02  report for the executive committee meeting that there

3  03  was not a forecast week?

4  04  A.  Yes, it would be an example.

5  05  Q.  I also notice that there are footnotes in

6  06  the -- on this page on the January 22nd upside report

7  07  that deal with the Covisint transaction and what OPI's

8  08  numbers would be like if you took out the Covisint

9  09  numbers.

10  10  A.  That is correct.

11  11  Q.  Do you recall why those footnotes were added

12  12  to this upside report?

13  13  A.  Because we wanted to see -- I believe it was

14  14  because we wanted to see how OPI or Sandy Sanderson's

15  15  business was performing without the Covisint deal.  It

16  16  was very well known that Safra Catz was very involved

17  17  with the Covisint deal, more so than the sales

18  18  organization within OPI.

19  19  Q.  So is it your recollection that this is

20  20  something that Safra Catz wanted to see?

21  21  A.  No, I didn't say that.

22  22  Q.  Oh.  Do you recall discussions at the

23  23  January 22nd executive committee meeting about OPI's

24  24  numbers without the Covisint transaction?

25  25  A.  I do not recall any specific discussions at

1  00171:01  any of the EC meetings.  We did, however, always discuss

2  02  the forecast.  It was a standing agenda item.

3  03  Q.  Why did you want to see how OPI -- OPI's

4  04  business was doing without the Covisint transaction?

5  05  A.  The OPI business was very large-deal centric.

6  06  And it was -- they also had a number of people in that

7  07  sales organization.  And they did not have enough volume

8  08  of smaller deals to support the size of their

9  09  organization.

10  10  So I believe at this point in time we were

11  11  trying to evaluate whether or not they needed to resize

12  12  the sales -- the number of salespeople that was in the

13  13  OPI organization.

14  14  Q.  On the second page of Exhibit 153 is the page

15  15  with Bates -- Bates -- Bates number 3549.  The row for

16  16  total operating expenses, do you see that?

17  17  A.  Mm-hm.

18  18  Q.  I want to make sure that I'm reading this

19  19  correctly.  Is this chart showing that there was a

20  20  forecast that expenses were going to grow 13 percent

21  21  over Q3 '00?

22  22  A.  Yes.

23  23  Q.  And the potential number was showing a

24  24  14-percent growth in expenses over Q3 '00?

25  25  A.  That's correct.

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00172:01   Q.  And in the upside column, I also see that
2   02   there are upside numbers for expenses.  Did -- did you
3   03   prepare those expense upside numbers using the same
4   04   methodology that you prepared the revenue upside
5   05   numbers?
6   06   A.  The license upside number, if I recall
7   07   correctly, is 15 percent of the upside number for
8   08   license, which was our estimate of the incremental
9   09   amount of sales commissions expenses that would be paid.
10  10   Q.  So the license expense upside number is simply
11  11   a percentage of the license revenue upside number.
12  12   A.  Generally speaking, it was a percentage.
13  13   There could have been additional input.  If I had a
14  14   calculator, I could recalculate for you and let you know
15  15   if it was 15 percent.  But I don't have one.
16  16   Q.  It looks close to 15.
17  17   A.  It looks close, right.
18  18   MR. DE GHETALDI:  All right.  I think we only
19  19   have a short time on the tape, so let's take a quick
20  20   break to switch tapes.
21  21   THE VIDEOGRAPHER:  This is the end of Volume
22  22   II, tape 1 in the deposition of Jennifer Minton on
23  23   April 1, 2004, the time 11:21 a.m.  We're off the
24  24   record.
25  25   (Recess taken).
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00173:01   THE VIDEOGRAPHER:  This is the beginning of
2   02   tape 2 in the deposition of Jennifer Minton
3   03   on April 1, 2004, the time 11:26 a.m.  We are on the
4   04   record.
5   05   MR. DE GHETALDI:  Q.  I'd like to go back just
6   06   a little bit when we were talking about these footnotes
7   07   on the page with Bates number 3552 in Exhibit 153.
8   08   I believe that there -- you were saying that
9   09   there was discussion about whether OPI needed to reduce
10  10   the number of salespeople that it had because the
11  11   number -- or the volume of deals didn't seem to support
12  12   the number of salespeople at that time.
13  13   Had the number of OPI's deals been greater in
14  14   the past than they were in Q3 '01?
15  15   A.  Can I clarify my earlier statement?
16  16   Q.  Sure.  Sure.
17  17   A.  What I meant to say was the volume of smaller
18  18   transactions.  So -- and I think it's best if I could
19  19   illustrate through an example.
20  20   Q.  Yeah.
21  21   A.  So let's assume that OPI had ten deals that
22  22   made up under $500,000, ten deals that were large deals
23  23   that made up 80 percent of their forecast.  That in
24  24   total would be -- did I say ten and ten?
25  25   Q.  Yes.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00174:01   A.  -- 20 deals, right?  But if they had a sales
2   02   force of 40 people, then clearly not all 40 sales reps
3   03   were producing deals, right?
4   04   So the large deals tended to mask the fact
5   05   that not all of their sales reps were productive.  So
6   06   when I spoke about volume, I meant volume of smaller
7   07   deals.
8   08   Q.  Okay.
9   09   A.  Does that make sense?
10  10   Q.  Yes, it does.
11  11   A.  Okay.
12  12   Q.  And that's helpful.  Was the number of smaller
13  13   deals in OPI greater in the past than it was in Q3 '01?
14  14   A.  I don't recall the specifics, but I do recall
15  15   that there was conversation that their large deals
16  16   masked the fact that they did not have -- that they had
17  17   too many -- it masked the fact that they did not have
18  18   very productive sales reps in that organization.
19  19   In other words, their margins could have been
20  20   even higher if they reduced their headcount, because the
21  21   number of heads that they had did not support the number
22  22   of deals they were transacting.
23  23   Q.  I see.  On page with Bates number 3553 and
24  24   3554, there are also footnotes about --
25  25   A.  This is 153?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00175:01   Q.  Yes.
2   02   A.  Okay.
3   03   Q.  There are also footnotes that detail OPI's
4   04   numbers without the $60 million Covisint deal.
5   05   A.  That is correct.
6   06   Q.  Were those included for the same reason as the
7   07   three footnotes on page 3552?
8   08   A.  Yes.  One is showing the quarter to date.  So
9   09   3553 is showing the quarter to date and 3554 is showing
10  10   the year to date license revenue growth rates without
11  11   the Covisint deal.
12  12   Q.  Do you recall whose idea it was to include
13  13   those footnotes?
14  14   A.  No, I do not.
15  15   Q.  Now I'm going to hand you a copy of a document
16  16   that was previously marked as Exhibit 134.
17  17   A.  Was there a particular page?
18  18   Q.  Yeah, if you could turn to page 3612, that's
19  19   similar to the pages that we've been looking at.
20  20   Now, there are changes here in the upside
21  21   numbers on January 29th from the upside numbers on
22  22   January 22nd.  And just so that I'm clear about
23  23   January 22nd, were you saying that when you prepared
24  24   the upside report for January 22nd, you didn't do a
25  25   new upside analysis but included financial information
```

1  00176:01  that had — hard financial data that had changed, such
2  02  as the pipeline data?
3  03  A.  What I was trying to say was that if it wasn't
4  04  a forecast week, that we would print out the same upside
5  05  analysis that was presented in the following — or in
6  06  the preceding week, excuse me.
7  07  Q.  Yes.
8  08  A.  And if there was any information that came to
9  09  our attention, we would have reflected that in the most
10  10  current — in that week's upside analysis.
11  11  Q.  I see.  Now, contrasting the upside numbers on
12  12  January 29th and the upside numbers on January 22nd,
13  13  there — am I reading it correctly for OSI's total
14  14  license number, there was a negative 35 million upside
15  15  number?
16  16  A.  That is correct.
17  17  Q.  Do you recall the reason for — the reason
18  18  that you arrived at that negative $35 million upside
19  19  number?
20  20  A.  I do not recall the specifics.
21  21  Q.  In general do you recall anything?
22  22  A.  I do not recall.
23  23  Q.  There's also a decline in the NAS upside
24  24  number for total license from $14 million to zero; is
25  25  that correct?

1  00177:01  A.  That is correct.
2  02  Q.  Do you recall anything about the reasons for
3  03  your decision to reduce that upside number?
4  04  A.  No, I do not.
5  05  Q.  Do you recall whether the e-mails from mid
6  06  January 2001 that we looked at earlier from the finance
7  07  people had anything to do with the — these declining
8  08  upside numbers?
9  09  MR. NADOLENCO:  Objection.  Asked and
10  10  answered.
11  11  THE WITNESS:  I do not recall.
12  12  MR. DE GHETALDI:  Q.  Do you recall any
13  13  discussions at the executive committee meeting about the
14  14  fact that by January 29th, the potential growth
15  15  percentage was only one percent?
16  16  MR. ETH:  Wait a minute.
17  17  MR. DE GHETALDI:  For — I'm sorry, for OSI
18  18  total license.
19  19  MR. ETH:  Okay.
20  20  THE WITNESS:  I do not recall the specifics of
21  21  any EC meetings held on January 29th.
22  22  MR. DE GHETALDI:  Q.  Do you recall any
23  23  discussions at any executive committee meeting in
24  24  December or January of Q3 '01 regarding the fact that
25  25  the forecasts for OSI and NAS total license were less

1  00178:01  than the targeted 30 percent growth number?
2  02  A.  I do not recall the specifics of any
3  03  discussion at any EC meeting.  As I stated before, the
4  04  forecast was a standing agenda item at every EC meeting.
5  05  So we clearly discussed the forecast, but I do not
6  06  recall any of the specifics.
7  07  MR. DE GHETALDI:  I'd like to have this marked
8  08  as next in order, please.
9  09  (DC Exhibit No. 239
10  10  marked for identification).
11  11  MR. DE GHETALDI:  Q.  Have you seen Exhibit
12  12  239 before today?
13  13  A.  Yes, I have.
14  14  Q.  Is this one of the documents that you reviewed
15  15  in preparation for your deposition?
16  16  A.  Yes, it is.
17  17  Q.  When was the first time you saw Exhibit 239?
18  18  A.  I don't recall exactly.
19  19  Q.  Well, was it within the last month?
20  20  A.  I saw this document yesterday — not
21  21  yesterday, but the day before — as an example.  But I
22  22  don't recall if I saw it before then.
23  23  Q.  In reviewing Exhibit 239 — I assume that you
24  24  did read the whole thing, correct —
25  25  A.  Yes, I did.

1  00179:01  Q.  — did you notice anything that did not
2  02  accurately reflect what you told the Special Litigation
3  03  Committee in June of 2002?
4  04  A.  Yes, I did.
5  05  Q.  And can you point out those areas, if there's
6  06  more than one.
7  07  MR. ETH:  Well, objection.  Calls for a
8  08  narrative.  I mean, do you want her —
9  09  MR. DE GHETALDI:  Maybe.
10  10  MR. ETH:  Do you want to lead her through
11  11  various things?
12  12  MR. DE GHETALDI:  Well, no, I —
13  13  MR. ETH:  Okay.  The ones she can remember
14  14  right now.
15  15  MR. DE GHETALDI:  Yeah.
16  16  THE WITNESS:  Well, off the top of my head, I
17  17  was not an account manager.
18  18  MR. DE GHETALDI:  Q.  All right.  Anything
19  19  else?
20  20  A.  I'd have to read the document again.
21  21  Q.  All right.  If you could turn to page 4,
22  22  please.  At the top of the page, the first paragraph
23  23  looks like there's a discussion about the forecasting
24  24  process and the methodology.  And it said,
25  25  "For examples, Minton noted," number

1  00160:01   one, "licensing forecasts have always
2  02   relied on weighted pipeline data and
3  03   historical conversion rate information."
4  04   Where -- can you tell me what weighted
5  05 pipeline data is.
6  06   A. Do you recall the report that we looked at
7  07 yesterday --
8  08   Q. The --
9  09   A. -- where there were deals and there were ...
10  10   Q. Yes.
11  11   A. That is what we're referring to, when you take
12  12 the summation of all of your deals, the total dollar
13  13 value, and you weight it by the estimated probability
14  14 that that deal will close.
15  15   Q. Just so that I confirm that my memory is
16  16 accurate, as an example, I'm showing you page Bates
17  17 number 25220 from Exhibit 21 and ask if that's the type
18  18 of report that you were just referring to.
19  19   A. It is a -- yes, it's the type of report.
20  20   Q. All right. And as to the historical
21  21 conversion rate information, where -- what would the
22  22 source of that information be?
23  23   A. Do you remember the license pipeline analysis?
24  24   Q. Yes. Just let me see if I can find that. I'm
25  25 showing -- are you referring to the document -- the type

1  00181:01 of document shown in Exhibit 112 that's titled "Pipeline
2  02 Reporting Package"?
3  03   A. Yes, I am.
4  04   Q. Okay. In the second paragraph on page 4, the
5  05 summary says,
6  06       "Generally Minton spends approximately
7  07   three to four hours per week on
8  08   forecasting, with the exception of the last
9  09   week of any given quarter."
10  10   Does that accurately reflect what you told the
11  11 Special Litigation Committee about how much time you
12  12 spend per week on forecasting?
13  13       MR. NADOLENCO: Object to the form.
14  14       THE WITNESS: Can you repeat the question.
15  15       MR. DE GHETALDI: Q. Does that accurately
16  16 reflect what you told the Special Litigation Committee
17  17 about how much time you spend per week on forecasting?
18  18   A. I'm not sure if the total hours are correct,
19  19 but more or less the process and the description of the
20  20 conference calls and so forth is correct.
21  21   Q. What about the total hours is incorrect?
22  22   A. I said I don't recall if that is what I said.
23  23   Q. Did you spend approximately three to four
24  24 weeks -- or three to four hours per week on forecasting
25  25 in fiscal year 2001?

1  00182:01   A. I would spend on Thursdays roughly, let's say,
2  02 an hour on a forecast call. I would spend roughly, you
3  03 know, anywhere from half-hour to an hour on the forecast
4  04 call. I would spend some time analyzing upside reports
5  05 and making -- having discussions with folks.
6  06       It's hard for me to say that it was always
7  07 three to four hours, but it's not out of line. It could
8  08 have been less.
9  09   Q. Okay. I'm just asking whether that
10  10 approximation was -- appears accurate to you.
11  11   A. It could have been less, could have been a
12  12 little more.
13  13   Q. Did you regularly have discussion with
14  14 particular folks in deriving your upside numbers?
15  15   A. Again, I would speak with all the sales
16  16 individuals, the sales executives on the forecast calls,
17  17 along with their finance representatives. I would speak
18  18 with Ivgen Guner. At times I would discuss it with Jeff
19  19 Henley. There were -- more or less the same individuals
20  20 that I've already told you about.
21  21   Q. All right. If you could turn to page 5,
22  22 please.
23  23   Can we go off the record.
24  24       THE VIDEOGRAPHER: Off the record, 11:47 a.m.
25  25   (Lunch recess from 11:47 to 12:47).

1  00183:01 AFTERNOON SESSION                    12:58 P.M.
2  02       THE VIDEOGRAPHER: On the record, 12:58 p.m.
3  03       EXAMINATION RESUMED BY
4  04       MR. DE GHETALDI: Q. If you could turn to
5  05 page 5 of Exhibit 239, please. In the first full
6  06 paragraph there that talks about sources of information
7  07 for adjustments to the upside report, do you see that
8  08 paragraph?
9  09   A. Yes.
10  10   Q. Is that an accurate summary of what you told
11  11 the SLC about that particular topic, that paragraph
12  12 there?
13  13   A. The big deal reports from Loren Mahan are not
14  14 used for preparing information for the upside report.
15  15 nor are the flash reports used.
16  16       Again, as I've stated before, the primary
17  17 sources of information that I would use were the
18  18 pipeline trend analyses and conversations with my staff
19  19 or on forecast calls and the like.
20  20   Q. All right. Is that an accurate summary,
21  21 though, of what you told the Special Litigation
22  22 Committee?
23  23   A. I don't recall precisely what I told the
24  24 litigation committee. This is their interpretation of
25  25 the discussion.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00184:01  Q.  Okay. Was this one of the inaccuracies that
02 you had noticed, that is, the inclusion of flash reports
03 and big deal reports and the sources of information to
04 your adjustments to the upside reports?
05  A.  Yes.
06  Q.  Point number 3 says trend analyses conducted
07 by your staff. What trend analyses were you referring
08 to there?
09  A.  Conversion trend analyses.
10  Q.  Pipeline conversion?
11  A.  Yeah.
12  Q.  All right. Any other trends analyses other
13 than that?
14  A.  No.
15  Q.  No, okay. If you could turn to page 6, the
16 last full paragraph, the second to last sentence of that
17 paragraph reads,
18      "At the end of each month, she
19  incorporates the actual results from these
20  areas into her calculations for the
21  remaining forecast for the quarter."
22  Is that an accurate summary of what you told
23 the Special Litigation Committee?
24  A.  May I explain what I told the litigation
25 committee?

Oracle Related Cases                    Page 184

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00185:01  Q.  Sure.
02  A.  So at the beginning of a quarter, you start
03 with a forecast. At the conclusion of the first month
04 of a quarter -- and we -- and by the way, we forecast
05 month 1, month 2, month 3. At the beginning of a
06 quarter, each of those months are forecast. At the end
07 of month 1, when you're -- when you've finalized your
08 financial results for that period, we would replace the
09 forecast for that month with the actuals. So you would
10 have one month of actuals, two months of forecast.
11      And at the end of month 2, we would replace
12 month 2's forecast with month 2 actuals. So you would
13 have two months of actuals, one month of forecast.
14  Q.  Did you do that for consulting, support and
15 education revenue?
16  A.  That was for all revenue and expenses.
17  Q.  Including license?
18  A.  Including license.
19  Q.  Okay. Where did -- were reports prepared that
20 showed the monthly forecast and the monthly actuals?
21  A.  We didn't look at the reports, but they were
22 contained within OFA, the Oracle Financial Analyzer
23 system.
24  Q.  So that was information that you considered in
25 preparing your upside reports?

Oracle Related Cases                    Page 185

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00186:01      MR. ETH:  Objection. Asked and answered.
02      THE WITNESS:  I evaluate what I think the
03 license forecast is going to be, based on the
04 discussions that I have and all the analyses that are
05 performed, as previously discussed. The difference
06 between what I think it's going to be versus what the
07 forecast is, as submitted by the field, would be the net
08 upside adjustment.
09      MR. DE GHETALDI:  Q.  All right. Part of the
10 information that you considered, then, was the actual
11 monthly results?
12  A.  No, I considered the forecast. I did not look
13 at what the individual actual results were in a given
14 quarter. I looked at the forecast.
15  Q.  I guess I'm confused. In OFA, the forecasts
16 are broken down by month for license, consulting,
17 support and education, correct?
18  A.  In OFA, the forecast is broken down by month
19 for all lines of businesses, both revenue and expenses.
20  Q.  Okay. Are the forecasts also broken down by
21 month by organization, sales organization?
22  A.  Every sales organization submits their
23 forecast by month.
24  Q.  And then when the actual results come in for a
25 month, OFA -- or the information in OFA shows the actual

Oracle Related Cases                    Page 186

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00187:01 results for the month instead of the forecast?
02  A.  We replace month 1 forecast with month 1
03 actual results. The reports that we get out of the
04 system for purposes of doing our quarterly forecasting
05 is quarterly information; it is not monthly information.
06  Q.  In the third quarter of 2001, did you consider
07 the actual results that were shown in OFA in arriving at
08 an upside number?
09      MR. ETH:  Objection. Asked and answered.
10      THE WITNESS:  I will state it for the record
11 one more time. I looked at the forecast. The forecast
12 may have included, after month 1 was completed, month 1
13 actual results. So it's -- month 1 and month 2 and
14 month 3 are forecasted at the beginning of a quarter.
15      MR. DE GHETALDI:  Yes.
16      THE WITNESS:  The forecast is revised
17 throughout the course of the quarter to copy actuals
18 into month 1 when month 1 is complete. It's then copied
19 into month 2 when month 2 is complete.
20      The sales organization will adjust any month
21 that has not yet been adjusted -- that has not yet been
22 reported as actuals to include their total forecast for
23 the quarter.
24      I derive what I think is going to be the
25 license forecast. I back out their forecast to come up

Oracle Related Cases                    Page 187

00188:01 with the upside amount. And I'm always looking at
02 quarterly totals; I'm not looking at individual monthly
03 results.
04      MR. DE GHETALDI:  Q.  If you could turn to
05 page 8, please.  In that first paragraph, the first
06 sentence reads,
07      "Minton noted that she was a bit
08      nervous entering into FY '01 because Q2
09      FY '01, while very successful, had been
10      even more back-end-loaded than usual."
11      Is that an accurate reflection of what you
12 told the SLC?
13      A.  Yes.
14      Q.  What did you mean by Q2 being even more
15 back-end-loaded than usual?
16      A.  We had a significant number of large deals
17 that were closed on the very last day of the quarter.
18      Q.  So were you nervous in Q2 itself about being
19 able to meet your numbers?
20      A.  In Q2 there were a number of large deals at
21 play.  And it wasn't until the very end of the quarter
22 that we had any certainty that we were going to make the
23 quarter -- quarterly predicted results.  We refer to
24 that as the cardiac close.
25      Q.  That particular quarter?

00189:01      A.  No, just the fact that when it's so
02 back-end-loaded and they have large deals, it's very
03 difficult to know whether or not you're going to make
04 the forecast until the very last day of the quarter.
05 That's that hockey stick effect I was telling you about.
06      Q.  Yes.  The last sentence of that particular
07 paragraph on page 8 says,
08      "Minton further noted that the holiday
09      season that falls in Q3 of Oracle's fiscal
10      year is not good for its business."
11      Is that an accurate summary of what you told
12 the Special Litigation Committee?
13      A.  I would have told them that the December
14 period for Christmas and New Year's is generally not our
15 strongest month within that quarter.
16      Q.  Have you ever conducted an analysis to
17 determine whether or not there was factual support for
18 the belief that you just expressed?
19      A.  I do not recall conducting an analysis on
20 December results itself.  However, I do recall you
21 showing me an analysis that we did which made me --
22 refreshed my memory of a long gone -- long-standing
23 analysis that we did that did show the monthly
24 distribution within a quarter.
25      Q.  Would it surprise you if I told you that

00190:01 December, as the first month of the quarter, had a
02 higher average contribution to the total quarterly
03 revenue than any other first month of Oracle's quarters?
04      A.  Given that we closed the Covisint deal, which
05 was a $60 million transaction, if that is factually
06 correct, it would not surprise me.
07      Q.  Well, I'm not talking about just the third
08 quarter of 2001.  I'm talking about the six years prior
09 to that, the historical averages show that December
10 contributed 21 percent, on average, to the quarter's
11 revenue, which was significantly higher than any other
12 first month of the other three quarters' contribution.
13      MR. ETH:  Objection.  Lack of foundation,
14 vague.
15      MR. DE GHETALDI:  Q.  Does that surprise you?
16      A.  I don't know if it does or not.
17      Q.  Well --
18      A.  I haven't studied those numbers.  It's more of
19 an impression that I'm giving you is that the holiday
20 season would -- would impact people's productivity.
21      Q.  Well, do you have any impression of -- of how
22 the fiscal years used by Oracle's customers might impact
23 the -- Oracle's revenues in December?
24      A.  No.
25      Q.  In other words, if a significant percentage of

00191:01 Oracle's customers used calendar years for their fiscal
02 years, would you not expect those customers to tend to
03 make purchases in the last month of their year if they
04 were going to be making them?
05      MR. ETH:  Objection.  Calls for speculation.
06      THE WITNESS:  I have no basis for a comment on
07 that.
08      MR. DE GHETALDI:  All right, that's fine.
09      Q.  Were you aware in Q2 fiscal year 2001 that
10 September's revenues showed a negative growth over the
11 September in the prior year?
12      A.  I don't recall.
13      Q.  Were you aware that October's revenues showed
14 negative growth over October of the prior year?
15      A.  I don't recall if it showed negative growth.  I
16 do recall it was a very slow start month 1 and 2.
17 That's why it was back-end-loaded.
18      Q.  If you could turn -- well, if you could turn
19 to page 9.  The paragraph in the middle of the page
20 underneath the title "Minton's View Of Q3 Fiscal Year
21 '01," the last sentence of that paragraph reads,
22      "In fact, Minton stated that at this
23      time the sales executives were very bullish
24      and reported that they were not seeing any
25      adverse impact from the economy."

00192:01     Is that an accurate summary of what you told

02 the Special Litigation Committee?

03      A.  I remember that during this time period that

04 there was a lot of press reports, news articles, what

05 have you, regarding the overall macroeconomic

06 environment.  And both Jeff and I were continuously

07 challenging the sales organization as to whether or not

08 they were seeing any impact of the economy on our Q3

09 financial forecast.

10          And, you know, they did not change their

11 forecasts significantly throughout the course of the

12 quarter until the very end of February.

13      Q.  Well, didn't -- didn't you observe that

14 Mr. Sanderson was hesitant on -- in the January calls?

15      A.  I don't recall.

16      Q.  What about Mr. Winton's January 2001 e-mail

17 that we looked at; didn't you -- or did you associate

18 the trends that he was discussing in that e-mail to you

19 with the macroeconomic climate?

20          MR. ETH:  Objection.  Vague.

21          THE WITNESS:  Again, they did not revise their

22 forecast.

23          MR. DE GHETALDI:  Q.  I understand.  My

24 question was whether you associated Mr. Winton's

25 January 11th, 2001 e-mail and the points that it

---

00193:01 raised with the macroeconomic downturn that you were

02 talking about.

03      A.  I don't recall.  We continuously challenged

04 the sales executives, and they weren't -- they were not

05 bringing down their sales forecast.

06      Q.  Do you recall challenging Mr. Roberts with the

07 points that Mr. Winton raised?

08      A.  I don't recall.

09      Q.  Well, do you recall how you were challenging

10 them?

11      A.  By asking the sales guy -- the finance guys

12 that were supporting the sales folks -- the sales force

13 to provide me with their own independent views of the

14 forecast.

15          I was trying to get another data point to

16 ensure that they concurred with the forecasts that were

17 being put forth by the sales executives.

18          And there was a lot of discussion in general

19 about, you know, the overall economic environment.

20 There was a belief that the tech sector, while there was

21 pressure in the tech sector, it was more in the hardware

22 side versus the software side.

23      Q.  By January 29th, with Mr. Winton's dot-com

24 analysis, did you observe pressure in the software side?

25          MR. ETH:  Objection.  Compound.

---

00194:01          THE WITNESS:  Mr. Winton's analysis pointed to

02 the fact that there was a slowdown in the dot-com sector

03 of the -- of the general business market.

04          MR. DE GHETALDI:  Q.  That was pretty severely

05 cutting into general business's revenues, right?

06          MR. NADOLENCO:  Object.

07          MR. ETH:  Objection to form.

08          THE WITNESS:  If I -- can I look at his

09 analysis?

10          MR. DE GHETALDI:  Sure.  Sure.

11          THE WITNESS:  I think his analysis showed the

12 Q3 and the Q4 forecast.

13          MR. DE GHETALDI:  Q.  Might want to look at

14 it.

15      A.  Yeah, he was showing that they still had the

16 forecast of 234 for the full year and that there was a

17 slowdown in the dot-com space.  I don't know how much of

18 this was -- 234 -- it's 234 out of -- or I should say

19 there was 51 in Q3 in the dot-com space out of 241.

20      Q.  Well, the -- if you could pass that back,

21 please.  Thank you.

22      A.  Which one is it?

23      Q.  49.  I think this is actually for all of NAS.

24 And you can confirm that by looking at the upside --

25      A.  This is technology and not applications.

---

00195:01      Q.  Yes, but for all of NAS, not just general

02 business.

03      A.  That would be correct.

04      Q.  Okay.  And that was showing negative growth

05 over the prior year.

06      A.  That is correct.

07      Q.  And --

08      A.  In the dot-com space.

09      Q.  In the dot-com space.  And -- no, for the --

10 all of technology.  It was negative 54 percent growth

11 for dot-com, negative six percent for all of technology

12 in NAS.

13          MR. ETH:  Objection.  Vague.

14          MS. SEGAL:  What's your question, Dario?

15          MR. DE GHETALDI:  We're talking about what the

16 numbers show and trying to establish that before we go

17 on.

18          MR. ETH:  The document speaks for itself.

19          MS. SEGAL:  I don't think there is a question

20 pending.  I think you're reading from the document.

21          MR. DE GHETALDI:  Well, I said that was

22 showing negative growth over the prior year, and

23 Ms. Minton said in the dot-com space, and I was trying

24 to determine whether it was just in the dot-com or

25 whether it was also in technology in all of NAS.

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
00196:01      THE WITNESS:  It was in technology as well.
02  So it was minus six percent.
03      MR. DE GHETALDI:  Right.
04  Q.  Did you associate that negative growth with
05  macroeconomic trends?
06  A.  I don't recall.
07  Q.  Do you recall --
08  A.  It's interesting to see, though, if you notice
09  their applications revenue is growing 103 percent and
10  their total -- -- their total revenue was still growing
11  12 percent.
12  Q.  Yes.  And 12 percent was less than the
13  30 percent that guidance was given for, right?
14  A.  But that's one division out of the entire
15  company.
16  Q.  Do you recall telling the Special Litigation
17  Committee that you remember -- that you recalled
18  Mr. Sanderson being hesitant on the January calls?
19  A.  I don't recall at the moment.
20  Q.  If you could turn to page 12, please.  Under
21  the section "stock sales," it said -- this reads,
22      "Minton has not sold any stock,"
23  quote, "for a long time," end quote.  "She
24  did not sell any stock in 2001.  She
25  recalls that in early January, she was
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
00197:01  sufficiently nervous about the economy that
02  she wanted to sell some Oracle stock."
03      Is that an accurate reflection of what you
04  told the Special Litigation Committee?  .
05  A.  They have it a little bit wrong in that it was
06  my husband who was sufficiently nervous.  He was the one
07  who insisted that I sell stock.
08  Q.  Do you recall telling that to the Special
09  Litigation Committee?
10  A.  Yes, I do.
11  Q.  The paragraph continues, "She recalls
12  sending an e-mail to Henley for clearance
13  to trade sometime in early January, but she
14  did not recall receiving a response to her
15  request; therefore, she never traded."
16      Is that an accurate reflection of what you
17  told the Special Litigation Committee?
18  A.  Yes, it is.
19  Q.  Okay.  Have you searched for that -- a copy of
20  that e-mail?
21  A.  I did, and I did not find it.
22  Q.  It says --
23  A.  I did not copy myself on it was the reason why
24  I did not find it.
25  Q.  What e-mail program were you using in Q3 2001?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
00198:01  A.  Oracle's.
02  Q.  Well, was it based on Netscape or Outlook; do
03  you recall?
04  A.  Netscape.
05  Q.  Didn't it automatically save e-mails that you
06  had sent to a sent folder?
07  A.  Yes, but I would periodically clean the sent
08  folder out.
09  Q.  Do you recall cleaning the sent folder out
10  between January of 2001 and March of 2001?
11  A.  If I recall correctly, the sent folder had a
12  number of days where it automatically cleansed itself.
13  Q.  Do you recall how many days that was?
14  A.  No, I don't.
15  Q.  The paragraph continues, "She recalls
16  Sanderson wanting to trade in the same time
17  frame.  Minton interpreted this as
18  Sanderson sharing her concerns about the
19  macroeconomic climate."
20      Is that an accurate reflection of what you
21  told the Special Litigation Committee?
22  A.  It's here.  I don't recall saying it, but it's
23  here.  I do -- I do remember thinking that he was going
24  to sell shares around that time period.
25  Q.  When you learned that Mr. Ellison was going to
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
00199:01  sell shares, did you interpret that as him sharing your
02  concerns about the macroeconomic climate?
03      MR. NADOLENCO:  Objection.
04      THE WITNESS:  Not at all.
05      MR. NADOLENCO:  I'm sorry.  Objection.
06  Assumes facts not in evidence.
07      MR. ETH:  Lack of foundation.
08      MR. DE GHETALDI:  Q.  And the paragraph end,
09      "She said that she would have been
10  comfortable selling in January because she
11  had no material inside information about
12  the company and its Q3 prospects."
13      Is that an accurate reflection of what you
14  told the Special Litigation Committee?
15  A.  I'm sorry, where are you?
16  Q.  The last sentence of the first full paragraph
17  of page 12 of Exhibit 239.
18  A.  I don't see what you just read there, sorry.
19  Can you please read what you read again.
20  Q.  "She said that she would have been
21  comfortable selling in January because she
22  had no material inside information about
23  the company and its Q3 prospects."
24  A.  That is correct.
25  Q.  Is that an accurate reflection of what you
```

## Page 200

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00200:01   told the Special Litigation Committee?
2    02   A.  Yes.
3    03   Q.  In January of 2001, you were privy to all of
4    04   the information in the upside reports, correct?
5    05   A.  Correct.
6    06   Q.  And you did not believe that there was
7    07   anything in those upside reports that was material
8    08   inside information; is that right?
9    09   A.  That's correct.
10   10   Q.  If that's the case, then I -- I still don't
11   11   understand the concern about sharing that information
12   12   with people at the executive committee meetings.
13   13       MR. ETH:  Objection.  Asked and answered
14   14   several times.
15   15       MR. NADOLENCO:  And form.
16   16       MS. SEGAL:  What is the question?
17   17       MR. NADOLENCO:  Yeah, is it your lack of
18   18   understanding?  You want her to confirm that?
19   19       MR. DE GHETALDI:  Maybe I should rephrase the
20   20   question.  My wife confirms that all the time and I
21   21   don't need additional confirmation, trust me.
22   22   Q.  Why was it not a problem for you to have that
23   23   information and a problem for other people who attended
24   24   the executive committee to have that information?
25   25       MR. ETH:  Objection.  Asked and answered.
```

## Page 201

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00201:01       THE WITNESS:  I am the chief accounting
2    02   officer and I was responsible for pulling together the
3    03   forecast.  So obviously I would need to have access to
4    04   that financial information.  Other individuals did not
5    05   have a need to know.
6    06       MR. DE GHETALDI:  Q.  Do you recall telling
7    07   the Special Litigation Committee that at the end of
8    08   January 2001 you were nervous about the microeconomic
9    09   environment?
10   10       MR. ETH:  Are you looking at a page or --
11   11       MR. DE GHETALDI:  No.
12   12       MR. ETH:  Are you looking at a page?
13   13       MR. DE GHETALDI:  No.
14   14       MR. ETH:  Oh, okay, I'm sorry.
15   15       THE WITNESS:  Can you repeat the question.
16   16       MR. DE GHETALDI:  Q.  Do you recall telling
17   17   the Special Litigation Committee that at the end of
18   18   January 2001 you were nervous about the microeconomic
19   19   environment?
20   20   A.  I probably told them that I was -- had
21   21   concerns about the macroeconomic environment.
22   22   Q.  I said micro.
23   23   A.  Oh, micro.  Sorry.  No.  It would have been
24   24   macro.
25   25       MR. ETH:  Dario, can we just take one minute.
```

## Page 202

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00202:01       MR. DE GHETALDI:  Yes.
2    02       MR. ETH:  I had too much iced tea.  I'll be
3    03   right back.
4    04       MR. DE GHETALDI:  All right.
5    05       THE VIDEOGRAPHER:  Off the record, 1:31 p.m.
6    06       (Recess taken).
7    07       THE VIDEOGRAPHER:  On the record, 1:41 p.m.
8    08       MR. DE GHETALDI:  Q.  What are run rates?
9    09   A.  Run rates?
10   10   Q.  Yeah.
11   11   A.  Can you put it in context for me, please.
12   12   Q.  Well, are run rates of an organization
13   13   something that you look at during the forecasting
14   14   process?
15   15   A.  I'm having a hard time putting the term "run
16   16   rate" -- defining it.  Sounds familiar, but I can't
17   17   quite put my finger on it.
18   18   Q.  Well, did you tell the Special Litigation
19   19   Committee that you look at run rates of an organization
20   20   so -- to see if there is any cushion in the forecast?
21   21   A.  It still is not intuitive to me.
22   22   Q.  Okay.  If you could dig out Exhibits 110 and
23   23   108, please.  Those are the two Garnick flash reports.
24   24       MR. ETH:  Are those from yesterday?
25   25       MR. DE GHETALDI:  Yeah.
```

## Page 203

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00203:01       THE WITNESS:  108 and ...
2    02       MR. DE GHETALDI:  110.
3    03       THE WITNESS:  110.  Yep.
4    04       MR. DE GHETALDI:  Q.  It looks like the
5    05   recipients of these flash reports are the executive vice
6    06   presidents, is that right, for the most part?
7    07   A.  I believe they're missing a few.  But they
8    08   would be members of the EC meeting -- of the executive
9    09   management committee.
10   10   Q.  Was there a time when these monthly revenue
11   11   results were not distributed to such a wide audience?
12   12   A.  Yes.
13   13   Q.  Do you recall when the audience was expanded?
14   14   A.  I thought you were asking a different
15   15   question.  So we would share this in month 1 and month
16   16   2, but month 3 we would not share with them the actual
17   17   monthly results.  So maybe I misunderstood your
18   18   question.
19   19   Q.  Do you recall a time when Mr. Ellison
20   20   wanted -- do you recall a time when the recipients of
21   21   these monthly results were limited to you and Mr. Henley
22   22   and Safra Catz and Mr. Ellison?
23   23   A.  Yes.
24   24   Q.  Okay.  Do you recall when that audience was
25   25   expanded?
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1    00204:01    A.  I don't recall precisely when Larry wanted us
2    02  to expand it, but he did ask that we do that.
3    03    Q.  Do you recall whether it was in fiscal year
4    04  2001?
5    05    A.  I don't recall when.
6    06    Q.  Do you recall him saying why he wanted the
7    07  audience expanded?
8    08    A.  He was attempting to generate competition.
9    09    Q.  Do you recall him saying how he thought that
10   10  would result from sharing the numbers in these reports?
11   11    A.  Waiting for an objection.  Figured I'd wait a
12   12  few minutes.
13   13        He -- he felt that if they -- that it would be
14   14  healthy competition for them to see each other's revenue
15   15  performance.
16   16        MR. DE GHETALDI:  I'd like to have this
17   17  document marked as next in order, which I believe is
18   18  240.
19   19        (DC Exhibit No. 240
20   20        marked for identification).
21   21        MR. DE GHETALDI:  Q.  Have you ever seen
22   22  Exhibit 240 before today?
23   23    A.  I'm sure I've seen a report similar to this.
24   24  Not sure if I've seen this exact one.
25   25    Q.  Okay.  Who prepares this kind of report?

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1    00205:01    A.  It would come out of the corporate financial
2    02  planning and analysis group.
3    03    Q.  Do you know who within that group was
4    04  responsible for preparing this type of report?
5    05    A.  Ivgen Guner was responsible for that
6    06  organization.  So somebody, more likely than not, that
7    07  reported to her would have prepared it.
8    08    Q.  All right.  Do you know the persons to whom
9    09  this type of report was distributed in fiscal year 2001?
10   10    A.  I'm not certain that we actually distributed
11   11  it, quite frankly.  We may have distributed it at an EMC
12   12  meeting, but I really don't recall.
13   13        MR. DE GHETALDI:  I'd like to have this
14   14  document marked as next in order, which I believe is
15   15  241.
16   16        (DC Exhibit No. 241
17   17        marked for identification).
18   18        MR. DE GHETALDI:  Q.  Have you ever seen the
19   19  type of report exemplified by Exhibit 241 before today?
20   20    A.  Yes.
21   21    Q.  Would this be a type of report that was
22   22  prepared by Ivgen Guner's group?
23   23    A.  This is the management summary downloaded
24   24  directly from Oracle Financial Analyzer.  That would
25   25  have been prepared by somebody in Ivgen Guner's group.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1    00206:01    Q.  Do you know to whom types of reports
2    02  exemplified by Exhibit 241 were distributed?
3    03    A.  These reports were generally used to assist in
4    04  the preparation of these upside reports.
5    05    Q.  I see.
6    06    A.  I really -- if I recall correctly, I don't
7    07  believe that this report or the headcount report was
8    08  actually distributed.  It was generally the upside
9    09  reports that were brought to the EC meetings and
10   10  distributed.
11   11        MR. DE GHETALDI:  And if I could have this one
12   12  marked as the next in order, which I believe is 242.
13   13        (DC Exhibit No. 242
14   14        marked for identification).
15   15        MR. DE GHETALDI:  Q.  Have you ever seen the
16   16  type of report exemplified by Exhibit 242 before?
17   17    A.  Yes.
18   18    Q.  Is this a report that's similar to Exhibit
19   19  241, with the difference being that one is in U.S.
20   20  dollars and one is in constant dollars?
21   21    A.  Yes.
22   22    Q.  Okay.  And 242 is, again, something that you
23   23  used to assist you in the preparation of the upside
24   24  reports?
25   25    A.  Yes.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1    00207:01    Q.  Do you know the production schedule for the
2    02  types of reports that are exemplified by Exhibit 240,
3    03  241 and 242; that is, how often were they prepared?
4    04    A.  These reports would have been printed out to
5    05  prepare the upside analysis.
6    06    Q.  Well, I note that each of these three were --
7    07  are dated January 22nd.
8    08    A.  Mm-hm.
9    09    Q.  And we looked at an upside report that was
10   10  also dated January 22nd.  So were these something --
11   11  did these have the most current information as of the
12   12  morning of the executive meetings?
13   13    A.  Yeah.  May I show you how they tie into one
14   14  another?
15   15    Q.  Yes.
16   16    A.  Okay.  If you go to Exhibit 153 and go to the
17   17  very -- the second page.
18   18    Q.  153.
19   19    A.  It's the upside analysis for 1/22.
20   20    Q.  Got it.
21   21    A.  All right.  I'll just use one number.
22   22    Q.  Yes.
23   23    A.  Our favorite topic, license revenues.  If you
24   24  look at the forecast in the Exhibit 242 --
25   25    Q.  Yes.

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00208:01   A.  -- you see a forecast of 1,253,433.
2   02   Q.  Yes.
3   03   A.  If you go to the upside analysis -- and this
4   04   is, again, the forecast at actual rates or reported
5   05   rates -- you see the same number there under "forecast"?
6   06   Q.  Yes.
7   07   A.  Okay.  Now, your upside analysis, if you go to
8   08   the very next page, and then if you go to the Exhibit
9   09   No. 241, which is the management summary in constant
10  10   dollars, you see the license forecast of 1,264,597?
11  11   Q.  Yes.
12  12   A.  Is that the same number that you see on the
13  13   upside analysis on page -- on the third page in,
14  14   referring to page 3550?
15  15   Q.  Yes.
16  16   A.  So these were the source reports coming out of
17  17   OFA.
18  18   Q.  Well, do you know why the numbers for
19  19   consulting and support -- or the numbers for consulting,
20  20   at least, are different?  Consulting revenue, forecast.
21  21   A.  No, I don't.  Appears to be a typo.
22  22   Q.  They should be the same; is that your
23  23   understanding?
24  24   A.  I think they should be the same.
25  25   Q.  Okay.  I'm going to hand you a copy of a
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00209:01   document that was previously marked as Exhibit 31.  I
2   02   don't have a copy of the marked --
3   03   A.  Do you want to keep all these separate?
4   04   Q.  Oh, no, that's fine.  I don't have a copy of
5   05   the marked exhibit, but that ... have you seen Exhibit
6   06   31 before today?
7   07   A.  Yes, I have.
8   08   Q.  Was this one of the documents that you
9   09   reviewed in preparation for your deposition?
10  10   A.  Yes, it was.
11  11   Q.  Do you recall noting any inaccuracies in
12  12   Exhibit 32 [sic]?
13  13   A.  I did not review this in its entirety, so ...
14  14   I'd have to do that.
15  15   Q.  Do you recall when the first time you saw
16  16   Exhibit 32 was?
17  17   MR. NADOLENCO:  31?
18  18   MR. DE GHETALDI:  31.  Thank you.
19  19   THE WITNESS:  I definitely remember seeing it
20  20   a couple of days ago.  I don't recall if I saw it before
21  21   then.
22  22   MR. DE GHETALDI:  Q.  If you could turn to
23  23   page 12, please.  At the bottom of the page, there's a
24  24   section on -- that's titled "Minton's Contemplated Stock
25  25   Sale in January 2001."
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00210:01   Skipping the first sentence of that paragraph,
2   02   the summary reads,
3   03   "When asked about clearance for this
4   04   contemplated stock sale, Minton stated that
5   05   she had sent an e-mail to Henley requesting
6   06   clearance for her planned trades.  She
7   07   vaguely recalled receiving her clearance
8   08   from Cooperman."
9   09   Do you recall sending Mr. Cooperman an e-mail
10  10   asking for clearance?
11  11   A.  I did not send Dan Cooperman an e-mail asking
12  12   for clearance.  I waited until -- I was -- I waited -- I
13  13   was going to wait until I got clearance from Jeff, but I
14  14   never got clearance from Jeff.
15  15   Q.  So as you sit here today, it's your
16  16   recollection that you did not ask Mr. Cooperman for
17  17   clearance?
18  18   A.  That's correct.
19  19   MR. DE GHETALDI:  Now I'd like this next
20  20   document marked as next in order, which I believe is
21  21   243.
22  22   (DC Exhibit No. 243
23  23   marked for identification).
24  24   MR. DE GHETALDI:  Q.  Have you seen Exhibit
25  25   243 before today?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00211:01   A.  Yes.
2   02   Q.  Is this one of the documents that you reviewed
3   03   prior to your deposition?
4   04   A.  Yes.
5   05   Q.  If you could turn, please, to page 9,
6   06   paragraph 25.  It begins -- or it reads,
7   07   "During Q3 '01, upside adjustments,
8   08   included information based on e-mails
9   09   received from David Winton on
10  10   January 11th, 2001, James English on
11  11   January 17th, 2001, Larry Garnick on
12  12   January 17th, 2001 and Sarah Kopp on
13  13   January 18th, 2001, among many other
14  14   e-mails and reports I received throughout
15  15   the quarter."
16  16   Is that an accurate statement?
17  17   A.  Yes.
18  18   Q.  If you can find Exhibit 108, which is
19  19   Mr. Garnick's January 17th, 2001 e-mail which was
20  20   marked as Exhibit 108.  Is that the e-mail that you were
21  21   referring to in paragraph 25?
22  22   A.  Yes, Wednesday, January 17th.
23  23   Q.  What in this particular e-mail -- what
24  24   information in this particular e-mail did you use to
25  25   base your upside adjustments in Q3 '01?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00212:01   A.  It was just data point.  But I don't recall
2   02   the specifics of how I determined my upside adjustments.
3   03   Q.  If you can locate Exhibits 48, 56 and 77.
4   04   They're all one-page e-mails, if that helps.
5   05   A.  It won't.
6   06   MR. ETH:  Are they from today or yesterday?
7   07   MR. DE GHETALDI:  Yesterday, I believe.
8   08   MR. ETH:  I don't know — I don't know if
9   09   yesterday's are in this pile.
10  10   MR. DE GHETALDI:  They are.
11  11   MR. ETH:  They are?
12  12   MR. DE GHETALDI:  Yeah.
13  13   MR. ETH:  Okay.
14  14   MR. DE GHETALDI:  Or they should be.  There's
15  15   one.
16  16   MR. NADOLENCO:  You have them?
17  17   THE WITNESS:  Yeah I do.
18  18   MR. DE GHETALDI:  Okay, good.
19  19   Q.  Let's start with Exhibit 48.  Is that the
20  20   e-mail from David Winton dated January 11th, 2001 that
21  21   you were referring to in paragraph 25 of Exhibit 243?
22  22   A.  Yes.
23  23   Q.  Do you know what information included in
24  24   Exhibit 48 you used to generate your upside adjustments
25  25   in Q3 '01?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00213:01   A.  Are you — which particular upside report?
2   02   Q.  Well, I mean, it — I don't know.  You say
3   03   here "upside adjustments — during Q3 '01, upside
4   04   adjustments included information based on these
5   05   particular e-mails.  Which upside adjustments did you
6   06   mean?
7   07   A.  Obviously anything that happened after the
8   08   date of the e-mail —
9   09   Q.  Okay.
10  10   A.  — versus prior thereto.
11  11   Q.  Okay.  Do you recall in any more detail which
12  12   particular upside adjustments you were referring to in
13  13   your affidavit?
14  14   A.  No, I do not.
15  15   Q.  Do you know which information contained in
16  16   Exhibit 48 you used to make the upside adjustments that
17  17   you were referring to in paragraph 25?
18  18   A.  Again, I do not recall the specifics of how I
19  19   arrived at the upside amounts.
20  20   Q.  If you could turn to Exhibit 56.  It's the
21  21   English e-mail.
22  22   A.  Mm-hm.
23  23   Q.  Is Exhibit 56 the English e-mail dated
24  24   January 17th, 2001 that you were referring to in
25  25   paragraph 25?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00214:01   A.  Yes, it is.
2   02   Q.  Okay.  Do you recall what information
3   03   contained in Exhibit 56 you used to derive your upside
4   04   adjustments that you were referring to in paragraph 25?
5   05   A.  In this e-mail, as well as this e-mail, as
6   06   well as — well, these first two e-mails, since it's the
7   07   ones that we talked about, I would have looked at the
8   08   forecast that they had said that they were going to
9   09   stick with, as well as their upside, as well as their
10  10   downside.  I would have evaluated it all.
11  11   Q.  And if you could turn to Exhibit 77, which is
12  12   the Sarah Kopp e-mail.
13  13   A.  Mm-hm.
14  14   Q.  Is Exhibit 77 the Sarah Kopp e-mail dated
15  15   January 18th, 2001 that you were referring to in
16  16   paragraph 25?
17  17   A.  Yes.
18  18   Q.  And do you recall what information contained
19  19   in that e-mail you were basing your upside adjustments
20  20   that you referred to in paragraph 25?
21  21   A.  I would have considered all of it.
22  22   Q.  If you could look at paragraph 26 at the
23  23   bottom of page 9 of Exhibit 243.
24  24   A.  Mm-hm.
25  25   Q.  You say, "As a historical matter,
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00215:01   before Q3 '01 the potential forecast, which
2   02   include [sic] upside adjustments, proved to
3   03   be our most accurate forecast."
4   04   I'd just like you to clarify me — clarify for
5   05   me, please, which potential forecast were you talking
6   06   about there?  Are you talking about the potential
7   07   forecast for total revenue?
8   08   A.  In the upside analysis, there's the column
9   09   "forecast," "upside" and "potential."
10  10   Q.  Yes.
11  11   A.  It's that column, "potential."
12  12   Q.  All right.  For all of the figures within that
13  13   column?  That is, for —
14  14   A.  For revenue.
15  15   Q.  For revenue.
16  16   A.  For license revenues is what I'm referring to
17  17   here.
18  18   Q.  License revenues, okay.  Thank you.  That's —
19  19   I just wanted that clarified.
20  20   And where you say "As a historical matter,
21  21   before Q3 '01" in paragraph 26, how long a historical
22  22   period are you talking about there?
23  23   A.  As discussed yesterday, I don't recall
24  24   exactly, but clearly in the 12 to 24 months — and I'm
25  25   guessing on the latter part, 24 months — prior — or I
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004 11:50:00 AM

```
00216:01  should say -- put it in terms of quarters -- or a
02  year -- the last year, as well as probably in the last
03  two years prior to this point, our forecasts were far
04  more predictive of the actual outcome of the quarter.
05  That is my recollection.
06  Q.  Okay.  And you say that they are far more
07  accurate than the unadjusted forecasts submitted by the
08  senior sales personnel when compared to the actual
09  results for the quarter.
10  A.  Mm-hm.
11  Q.  Are you talking about the cumulative forecasts
12  submitted by the senior sales personnel, or are you
13  talking about comparison of your potential forecast
14  compared to the unadjusted forecasts submitted by
15  individual senior sales personnel?
16  A.  In total, on a consolidated basis, my upside
17  numbers generally were more accurate than the numbers
18  that were presented -- or provided by the senior sales
19  folk.
20      THE REPORTER:  Senior sales what?
21      THE WITNESS:  Folk.  EVPs, sorry.
22      MR. DE GHETALDI:  Q.  If you could turn to
23  page 7, please.  In the middle of paragraph 20, it says,
24      "Upside reports are regularly prepared
25  each Friday and circulated weekly to
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004 11:50:00 AM

```
00217:01  certain members of the executive management
02  committee, including Ellison, Henley and
03  Catz, on Monday mornings." -
04      Is that an accurate statement?
05  A.  Yes.
06  Q.  So upside reports are prepared every week?
07  A.  If we -- as I explained to you before, if
08  there wasn't a forecast week, we would print out the
09  previous week's upside report and bring it to the EC
10  meeting.  And if by chance there were any known
11  adjustments to the forecast that were not -- you know,
12  that came in between the submitted forecast, then we
13  would reflect them in those reports.
14  Q.  And the types of changes that would be
15  reflected in those reports would include changes in
16  pipeline as well as forecast, correct?
17  A.  If we were advised that there was a change.
18  Q.  Would those reports receive new dates or would
19  they simply carry over the last upside report's dates
20  and have different numbers?
21  A.  We had a practice of saving the file based on
22  the date.  So they would have had a different date if
23  they were adjusted.
24  Q.  Okay.  And that sentence that I read says that
25  these reports were circulated to certain members of the
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004 11:50:00 AM

```
00218:01  executive management committee on Monday mornings.
02  Those executive management committee meetings took place
03  in the afternoons on Mondays, right?
04  A.  They started whenever Larry got there.  So he
05  would sometimes show up at 11; he would sometimes show
06  up at 11:30; he could show up at noon, or he could show
07  up not at all.  11 is still in the morning.
08  Q.  Yes, it is.  When were they -- did they have a
09  regularly scheduled start time?  I mean, given that Mr.
10  Ellison --
11  A.  On my calendar I believe I have it from 11 to
12  3.
13  Q.  Okay.  Did Mr. Ellison appear to you, during
14  the executive committee meetings, to pay much attention
15  to your upside reports?
16      MR. NADOLENCO:  Objection to form.
17      THE WITNESS:  Larry had a practice of wanting
18  to hear directly from the sales EVPs themselves as to
19  what their forecast was.  He felt that they should be
20  able to speak to their own forecast.  So he would
21  occasionally refer to the hard copy report, but
22  generally speaking, he has a dialogue every EC meeting
23  with the sales EVPs on their forecast.
24      MR. DE GHETALDI:  Q.  Did he generally have a
25  dialogue with you on your upside adjustments at these
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004 11:50:00 AM

```
00219:01  executive committee meetings?
02  A.  We may have discussed them during the meeting
03  at certain times.  But I cannot recall a specific
04  meeting when we did.
05  Q.  Okay.  My question was whether he generally
06  had a dialogue with you about your numbers the way he
07  did with the executive vice presidents about their
08  numbers.
09  A.  No.  He generally speaks directly to the
10  executive sales VPs.
11  Q.  At any -- well ... in -- if you could look in
12  Exhibit 243, still on page 7, but up in paragraph 19.
13  In the middle of that paragraph, it -- the affidavit
14  says,
15      "In all of this time, I've never known
16  of or relied on a," quote, "comfort gap,"
17  end quote, "between license revenue growth
18  percentages and pipeline growth
19  percentages, as defined by plaintiffs in
20  paragraph 58 of their second amended
21  complaint, as an indicator of Oracle's
22  financial performance."
23      Do you see that there?
24  A.  Mm-hm.
25  Q.  Have you ever heard of something called a
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1    00220:01  revenue gap?
2    02        MR. NADOLENCO: Objection to form. Vague.
3    03        THE WITNESS: I don't recall hearing of
4    04   anything called a revenue gap.
5    05        MR. DE GHETALDI: Q. Do you recall seeing
6    06   revenue gap as a part of Oracle's pipeline reporting
7    07   packages?
8    08   A. I don't understand the question.
9    09   Q. Do you recall that Oracle's pipeline reporting
10   10   packages contained a page titled "Revenue Gap" that
11   11   analyzed the difference between the license revenue
12   12   growth percentages and the pipeline growth
13   13   percentages --
14   14   A. May I refer to the document?
15   15   Q. -- in fiscal year -- in fiscal year 2001?
16   16   A. May I refer to the document?
17   17   Q. Yes. It's not on this one, but I can find one
18   18   for you. Take a break and we'll find one for you. It's
19   19   a different -- it's a different one.
20   20   A. I don't recall one. We have -- this is the
21   21   report that my group would produce. And there is no
22   22   revenue gap on this report.
23   23   Q. That's true. And I'll -- we'll take a break
24   24   and I'll find one for you when we take a break. Just a
25   25   couple minutes. And we're still going to meet our 3:00
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1    00221:01  time.
2    02   if you could turn, please, to page 11 in
3    03   Exhibit 243. In the second sentence of paragraph 32, it
4    04   reads.
5    05        "Pipeline data represents the total
6    06   value of license deals that the sales
7    07   organization reasonably believes will close
8    08   in a given quarter."
9    09        is that an accurate definition of what the
10   10   pipeline includes?
11   11   A. It could be better.
12   12   Q. Okay. How? How would you improve it?
13   13   A. I would say that the sales organization is
14   14   working on in a given quarter.
15   15   Q. Right. This sentence is a little too strong,
16   16   I think, would you agree, in use of the phrase
17   17   "reasonably believes will close"?
18   18   A. I agree.
19   19   Q. Okay.
20   20        MR. NADOLENCO: Dario?
21   21        MR. DE GHETALDI: Yes.
22   22        MR. NADOLENCO: I notice that the word
23   23   "decline" is written on here. Is that something your --
24   24   your team did?
25   25        MR. DE GHETALDI: I have no idea.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1    00222:01  MR. NADOLENCO: Okay.
2    02        MR. DE GHETALDI: I really don't. I saw that
3    03   too. It just shows that there is a decline.
4    04   Q. Then if you could turn, please, to the next
5    05   page, 12, in paragraph 33. Right in the middle of the
6    06   page there's a sentence that reads,
7    07        "Ultimately, Oracle's conversion rate
8    08   for Q3 '01 proved to be dramatically lower
9    09   than it had been in previous years" -- or
10   10   "in prior periods." I'm sorry.
11   11        Do you see that?
12   12   A. Yes, I do.
13   13   Q. Can you explain for me how the conversion rate
14   14   that you are referring to here would be calculated. We
15   15   talked about several conversion rates over the last two
16   16   days, and I'm just wondering if this is one of those or
17   17   a different one.
18   18   A. It's the pipeline conversion rate.
19   19   Q. At what point in time?
20   20   A. I'd have to go back and look at the data, but
21   21   I presume that it would be through the entire period,
22   22   based on the next statement.
23   23        MR. DE GHETALDI: All right. Well, we have
24   24   just a few minutes left on the tape. Why don't we take
25   25   the opportunity to take our last break of the day, and
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1    00223:01  we'll come back and finish.
2    02        THE VIDEOGRAPHER: This is the end of Volume
3    03   II, tape 2 in the deposition of Jennifer Minton on
4    04   April 1, 2004, the time, 2:25 p.m. We're off the
5    05   record.
6    06        (Recess taken).
7    07        THE VIDEOGRAPHER: This marks the beginning of
8    08   Volume II, tape 3 in the deposition of Jennifer Minton
9    09   on April 1, 2004, the time, 2:36 p.m. We are on the
10   10   record.
11   11        MR. DE GHETALDI: Q. I've handed you a copy
12   12   of Exhibit 138. And during the break I asked you to
13   13   turn to page 11 there.
14   14        Do you recognize the type of calculation that
15   15   is being made on this page to derive the numbers in the
16   16   column on the far right-hand side that are titled
17   17   "Growth Cap"?
18   18   A. I don't recognize this page at all. I do not
19   19   recall that we ever did this. Obviously it was in the
20   20   package, but I just don't remember seeing it.
21   21   Q. Okay. Going back to Exhibit 243. And please
22   22   turn to page 15. The second sentence reads, "Throughout
23   23   January 2001, however" --
24   24   A. Which paragraph?
25   25   Q. Oh, I'm sorry, paragraph 44.
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00224:01   A.  Okay.
2       02      Q.  The second sentence reads, "Throughout
3       03      January 2001, however, our forecast
4       04      consistently showed that we would achieve
5       05      our public projections."
6       06          Do you see that?
7       07      A.  Mm-hm.
8       08      Q.  What forecast are you referring to in that
9       09      sentence?
10      10      A.  I believe I was referring to our EPS.
11      11      Q.  And similarly, then, the public projections
12      12      would be the public projections for EPS only?
13      13      A.  That's what I believe I was referring to, yes.
14      14      Q.  It is true, is it not, that the forecast for
15      15      license by January 29th were below the 30 percent
16      16      constant dollar guidance?
17      17          MR. ETH:  Objection to form.
18      18          THE WITNESS:  The actuals, as you can see on
19      19      page 11, the license revenue was 24 percent, just one
20      20      point away from 25 percent.
21      21          MR. DE GHETALDI:  The --
22      22          THE WITNESS:  But again, this did not give me
23      23      any rise for concern, given that we have very
24      24      back-ended-loaded -- or back-end-loaded quarters.
25      25          MR. DE GHETALDI:  Q.  According to the
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00225:01   January 29th upside report that's Exhibit 134, the
2       02      forecast for license revenue was 23 percent, and the
3       03      potential forecast --
4       04      A.  No, that's not correct.  If you look here on
5       05      the actuals, license was 24 percent.
6       06      Q.  I was talking about the budget rate, the
7       07      constant dollar numbers.  That was what my question was
8       08      about.
9       09      A.  What is your question?
10      10          MR. ETH:  Where are you reading?
11      11          MR. DE GHETALDI:  I'm looking at the upside
12      12      report for January 29th, which is Exhibit 134.  And
13      13      I'm looking at page with Bates number 3610.
14      14      Q.  And it shows that the forecast growth for
15      15      license revenue was 23 percent and the potential growth
16      16      for license revenue was 27 percent as of that date,
17      17      correct?
18      18      A.  That is correct.
19      19      Q.  And you were not referring to those numbers,
20      20      then, in paragraph 44 of Exhibit 243; is that correct?
21      21      A.  Correct.  I was referring to the actuals.
22      22      Q.  Just for EPS?
23      23      A.  We only calculate EPS in actuals.
24      24      Q.  I just want to make sure that the record is
25      25      clear that in the second sentence of Exhibit 40 --
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00226:01   paragraph 44 of Exhibit 243 that the forecast that you
2       02      are referring to was only the forecast for EPS and not
3       03      the forecast for license revenue.
4       04      A.  Correct.
5       05      Q.  Did the implementation of OSO have an effect
6       06      on the number of deals that appeared in Oracle's
7       07      pipeline figures?
8       08      A.  The implementation of OSO.
9       09      Q.  Yeah.
10      10      A.  No, it's not the implementation of OSO that
11      11      impacts the way that the pipeline figures are shown.
12      12      Q.  What was it, if anything?
13      13      A.  Well, it's what data is put into OSO by the
14      14      sales organization.
15      15      Q.  I see.  Did -- are you aware of any study that
16      16      was done to determine whether the method of data
17      17      inputting -- or the method of putting data into OSO
18      18      affected the pipeline figures?
19      19      A.  From time to time, there would be instances
20      20      where salesmen -- or sales reps would not properly
21      21      characterize their opportunities in OSO.
22      22      Q.  Okay.  My question was whether there was
23      23      any -- whether you're aware of any study that quantified
24      24      the effect of the use of OSO on the pipeline numbers.
25      25      A.  I'm not aware of a study.
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00227:01   Q.  I know you're confused by the question.  Let
2       02      me just see if I can find my reason for asking it.  If
3       03      you could locate Exhibit 239, which is your initial
4       04      interview.
5       05      A.  Page number, please.
6       06      Q.  Bottom of page 8 and continuing on to the top
7       07      of page 9, where it says,
8       08          "Minton explained that an accurate
9       09      comparison of the pipeline between Q3 FY
10      10      '01 and Q3 FY '00 was not possible because
11      11      OSO was not used consistently across time
12      12      in FY '00.  She explained that OSO rolled
13      13      out slowly worldwide, but that by Q3 FY '01
14      14      it was almost complete.  She noted that as
15      15      a result of more deals being captured
16      16      electronically in the pipeline, the
17      17      conversion ratio numbers were dropping
18      18      slightly."
19      19          And my question referred to this section of
20      20      your interview summary and caused me to ask whether
21      21      you're aware of any studies that had been done that
22      22      quantified the difference between the way that deals
23      23      were entered in -- prior to the implementation of OSO
24      24      and after the implementation of OSO.
25      25      A.  I'm not aware of a study that analyzed that.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
 1   00228:01    Q.  Is it your understanding that the effect on
 2      02   the conversion ratio numbers was only slight?
 3      03       A.  I don't recall. But if we're capturing more
 4      04   of the pipeline and your pipeline value goes up, then
 5      05   your conversion ratio would go down if your forecast was
 6      06   held steady. It's a simple mathematical calculation.
 7      07       Q.  Yes. And my question went to the degree of
 8      08   the effect on the conversion ratio. And I understand
 9      09   the mathematics of it. I'm just wondering what your
10      10   sense of the degree of that effect was.
11      11       A.  I don't recall.
12      12       MR. DE GHETALDI:  All right. Well, that'll do
13      13   it, with the usual understanding that the parties have
14      14   differing views on whether we'll be back or not.
15      15       MR. ETH:  That's fine.
16      16       THE VIDEOGRAPHER:  At the end of Volume II,
17      17   tape 3, this concludes today's deposition of Jennifer
18      18   Minton. The original videotapes will be retained by Dan
19      19   Motlaz Video Productions LLC at 182 Second Street, Suite
20      20   202, San Francisco, California, 94105, telephone
21      21   415-624-1300. The time is 2:49 p.m. We're off the
22      22   record.
23      23       (Deposition concluded at 2:49 p.m.)
24      24
25      25       ---o0o---
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
 1   00229:01       CERTIFICATE OF WITNESS
 2      02
 3      03
 4      04
 5      05       I, the undersigned, declare under penalty of
 6      06   perjury that I have read the foregoing transcript and I
 7      07   have made any corrections, additions or deletions that I
 8      08   was desirous of making; that the foregoing is a true and
 9      09   correct transcript of my testimony contained therein.
10      10       EXECUTED this _____ day of _____,
11      11   200_, at _____ _____.
12      12
13      13
14      14
15      15
16      16
17      17       _____
18      18       Signature of Witness
19      19
20      20
21      21
22      22
23      23
24      24
25      25
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
 1   00230:01       REPORTER CERTIFICATE
 2      02       I hereby certify that the witness in the
 3      03   foregoing deposition was by me duly sworn to testify to
 4      04   the truth, the whole truth and nothing but the truth in
 5      05   the within-entitled cause; that said deposition was
 6      06   taken at the time and place herein named; that the
 7      07   deposition is a true record of the witness's testimony
 8      08   as reported to the best of my ability by me, a duly
 9      09   certified shorthand reporter and a disinterested person,
10      10   and was thereafter transcribed under my direction into
11      11   typewriting by computer; that the witness was given an
12      12   opportunity to read and correct said deposition and to
13      13   subscribe the same. Should the signature of the witness
14      14   not be affixed to the deposition, the witness shall not
15      15   have availed himself or herself of the opportunity to
16      16   sign or the signature has been waived.
17      17       I further certify that I am not interested in
18      18   the outcome of said action, nor connected with, nor
19      19   related to any of the parties in said action, nor to
20      20   their respective counsel.
21      21       IN WITNESS WHEREOF, I have hereunto set my
22      22   hand this 16th day of April, 2004.
23      23
24      24       _____
25      25
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
 1   00231:01       ROBERT BARNES ASSOCIATES
 2      02       San Francisco, California  94102
 3      03
 4      04           Date: 4/17/04
 5      05   TO: JENNIFER L. MINTON
 6      06       JORDAN ETH, ESQ.
 7      07       San Francisco, CA 94105
 8      08
 9      09   SPECIAL TITLE (RULE 1550(B))
10      10   Deposition taken April 1, 2004
11      11   Dear JENNIFER L. MINTON:
12      12   The original transcript of your deposition taken in the
13      13   at this office for your reading, correcting and signing.
14      14   copy. Please notify this office and all counsel in
15      15   deposition transcript.
16      16   Your rights regarding signature of this deposition are
17      17   original deposition transcript will be sealed in
18      18
19      19   transcript of your deposition, please contact this
20      20   Friday, to make an appointment.
21      21
22      22           Sincerely,
23      23
24      24           CSR No. 6438
25      25   cc: All counsel
```

# EXHIBIT DDD

Catz, Safra 7/20/2006 9:07:00 AM

1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3    -oOo-
4    IN RE
     ORACLE CORPORATION
5    SECURITIES LITIGATION
              MASTER FILE NO.
6             C-01-0988-MJJ
7    This Document Relates To:
8    ALL ACTIONS
9    _____/
10
11
          -oOo-
12
     CONFIDENTIAL
13
     VIDEOTAPED DEPOSITION OF SAFRA CATZ
14
          July 20, 2006
15
       -oOo-
16
17    SHEILA CHASE & ASSOCIATES
         REPORTING FOR:
18    LiveNote World Service
      221 Main Street, Suite 1250
19    San Francisco, CA 94105
      Telephone: (415) 321-2300
20    Fax: (415) 321-2301
21       -oOo-
22
23   Reported by:
     KELLIE A. ZOLLARS, CSR, RPR, CRR
24   CSR License No. 5735
25

Oracle                                    Page 1

---

Catz, Safra 7/20/2006 9:07:00 AM

1           I N D E X
2        INDEX OF EXAMINATION
3                          PAGE
4    EXAMINATION BY:
5    MR. BRITTON              8
6
7
8    "AFTERNOON SESSION"          117
9
10        -oOo-
11        INDEX OF EXHIBITS
12   SAFRA CATZ    DESCRIPTION    PAGE
13   EXHIBIT 1  E-mail chain - 2 pages
          CA-Orcl 025018 - 025019    7
14
     EXHIBIT 2  Ordering Document - 6 pages
15        HP 00030 - 00035    22
16   EXHIBIT 3  Agreement between Oracle and HP
          - 3 pages  HP 00001 - 00003    32
17
     EXHIBIT 4  Summary of HP's Oracle CRM purchase
18        in November 2000 - 5 pages    40
19   EXHIBIT 5  Internal HP memo - 2 pages
          HP 00069 - 00070    54
20
     EXHIBIT 6  E-mail with attachments
21        - 8 pages  HP 00053 - 00060    59
22   EXHIBIT 7  E-mail - 1 page  NDCA-ORCL 03920    66
23   EXHIBIT 8  E-mail with handwritten notes
          - 5 pages  NDCA-ORCL 020639 -
24        020643    66
25   //

Oracle                                    Page 2

---

Catz, Safra 7/20/2006 9:07:00 AM

1    EXHIBIT 9  E-mail chain - 7 pages
          NDCA-ORCL 609726 - 609732    77
2
     EXHIBIT 10  Binder containing an
3        interview memo and
         exhibits - 77 pages
4        NDCA-ORCL 297292 - 297357    83
5    EXHIBIT 11  E-mail chain - 3 pages
          NDCA-ORCL 041967 - 041969    88
6
     EXHIBIT 12  Covisint Issues List
7        - 8 pages
          NDCA-ORCL 152319 - 152326    92
8
     EXHIBIT 13  E-mail chain - 3 pages
9         NDCA-ORCL 144261 - 144263    99
10   EXHIBIT 14  E-mail chain - 4 pages
          NDCA-ORCL 034883 - 034885    102
11
     EXHIBIT 15  E-mail - 1 page
12        NDCA-ORCL 021009    104
13   EXHIBIT 16  E-mail - 1 page
          NDCA-ORCL 034333    108
14
     EXHIBIT 17  E-mail chain - 4 pages
15        NDCA-ORCL 028461 - 028464    112
16   EXHIBIT 18  E-mail chain - 4 pages
          NDCA-ORCL 013717 - 013720    124
17
     EXHIBIT 19  Phone message and e-mail
18        chain - 3 pages
          NDCA-ORCL 101654 - 101656    129
19
     EXHIBIT 20  E-mail including excerpts
20        - 5 pages
          NDCA-ORCL 061369 - 061373    132
21
     EXHIBIT 21  E-mail - 2 pages
22        NDCA-ORCL 055970 - 055971    134
23   EXHIBIT 22  E-mail - 3 pages
          NDCA-ORCL 024862 - 024864    142
24
     EXHIBIT 23  E-mail - 22 pages
25        NDCA-ORCL 035243 - 035264    145

Oracle                                    Page 3

---

Catz, Safra 7/20/2006 9:07:00 AM

1    EXHIBIT 24  E-mail - 4 pages
          NDCA-ORCL 035265 - 035268    150
2
     EXHIBIT 25  Excerpts from the deposition
3        of Mr. Nussbaum - 13 pages
         NDCA-ORCL 290854 - 857,
4        290859 - 860, 290921 - 926    155
5    EXHIBIT 26  E-mail - 2 pages
          NDCA-ORCL 035111 - 035112    159
6
     EXHIBIT 27  E-mail chain - 3 pages
7         NDCA-ORCL 063478 - 063480    162
8    EXHIBIT 28  E-mail chain - 4 pages
          NDCA-ORCL 035425 - 035428    165
9
     EXHIBIT 29  E-mail chain - 5 pages
10        NDCA-ORCL 111290 - 111293    167
11   EXHIBIT 30  E-mail chain - 2 pages
          NDCA-ORCL 034301 - 034302    169
12
     EXHIBIT 31  E-mail - 1 page
13        NDCA-ORCL 034384    172
14   EXHIBIT 32  E-mail chain - 13 pages
          NDCA-ORCL 228317 - 228329    173
15
     EXHIBIT 33  E-mail chain - 3 pages
16        NDCA-ORCL 120122 - 120124    175
17   EXHIBIT 34  E-mail chain - 6 pages
          NDCA-ORCL 156386 - 156389    179
18
     EXHIBIT 35  E-mail - 2 pages
19        NDCA-ORCL 040662 - 040663    184
20   EXHIBIT 36  Presentation by Nick Classic
          - 17 pages    190
21
     EXHIBIT 37  E-mail chain - 28 pages
22        NDCA-ORCL 350276 - 350303    193
23   EXHIBIT 38  E-mail - 2 pages
          NDCA-ORCL 096356 - 096357    200
24
     EXHIBIT 39  E-mail - 2 pages
25        NDCA-ORCL 042003 - 042004    201

Oracle                                    Page 4

Catz, Safra 7/20/2006 9:07:00 AM

1  EXHIBIT 40  E-mail - 1 page
   NDCA-ORCL 035270          203

2

   EXHIBIT 41  Ms. Catz's deposition transcript

3    - 149 pages
     (Various Bates numbers)      211

4

            -oOo-

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Oracle                                    Page 5

---

Catz, Safra 7/20/2006 9:07:00 AM

1        BE IT REMEMBERED THAT, pursuant to the laws
2   pertaining to the taking and use of depositions, and
3   on Thursday, July 20, 2006, commencing at the hour of
4   9:07 a.m. thereof, at the offices of LERACH COUGHLIN
5   STOIA GELLER RUDMAN & ROBBINS LLP, 100 Pine Street,
6   Suite 2600, San Francisco, before me,
7   KELLIE A. ZOLLARS, CSR No. 5735, a Certified Shorthand
8   Reporter in and for the State of California.
9            -oOo-
10  Appearing as counsel on behalf of Plaintiff:
11      LAW OFFICES of LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
12      By: DOUGLAS R. BRITTON, ATTORNEY AT LAW
           GAVIN M. BOWIE, ATTORNEY AT LAW
13         655 West Broadway, Suite 1900
           San Diego, California 92101-3301
14         (619) 231-1058
15  Appearing as counsel on behalf of Defendants and the
    witness:
16
        LAW OFFICES of LATHAM & WATKINS
17      By: GREGORY P. LINDSTROM, ATTORNEY AT LAW
           MICHELE F. KYROUZ, ATTORNEY AT LAW
18         505 Montgomery Street, Suite 1900
           San Francisco, California 94111-2562
19         (415) 391-0600
20  Appearing as counsel on behalf of Oracle Corporation:
21      ORACLE CORPORATION
        By: DORIAN DALEY
22         VICE PRESIDENT, LEGAL
           ASSOCIATE GENERAL COUNSEL
23         LITIGATION, TRADEMARK & COPYRIGHT GROUP
           500 Oracle Parkway, M/S 5op782
24         Redwood Shores, California 94065
           (650) 506-4846
25

Oracle                                    Page 6

---

Catz, Safra 7/20/2006 9:07:00 AM

1   Also Present:

2   James Terrell, Videographer

    Keith Mautner (receiving video via Internet)

3   Shawn Williams (receiving video via Internet)

4

5            -oOo-

6

7        SAFRA CATZ

8   having been first duly sworn to

9   tell the truth, the whole truth

10  and nothing but the truth, was

11  thereupon examined and testified

12  as is hereinafter set forth:

13

14           -oOo-

15  (Exhibit 1 was marked for identification.)

16      THE VIDEOGRAPHER: This begins the videotape

17  deposition of Safra Catz, Tape 1, Volume I, in the

18  matter entitled In re Oracle Corporation Securities

19  Litigation as filed in the United States District

20  Court for the Northern District of California, Master

21  File No. C 010988 MJJ. Today's date is July 20, 2006,

22  the time on the video monitor is 9:09.

23      The video operator today is James Terrell

24  representing LiveNote World Service located at

25  221 Main Street, Suite 1250, San Francisco, California

Oracle                                    Page 7

---

Catz, Safra 7/20/2006 9:07:00 AM

1   94105. The phone number is (415) 321-2300. The court

2   reporter is Kellie Zollars with Sheila Chase &

3   Associates reporting on behalf of LiveNote World

4   Service.

5        Today's deposition is being taken on behalf

6   of plaintiff, and is taking place at 100 Pine Street

7   in San Francisco, California.

8        And if counsel will please now introduce

9   yourselves and state whom you represent.

10      MR. BRITTON: Doug Britton with Lerach Coughlin

11  Stoia Geller Rudman & Robbins on behalf of plaintiffs.

12  And with me is Gavin Bowie.

13      MR. LINDSTROM: Greg Lindstrom on behalf of

14  defendants and the witness.

15      MS. KYROUZ: Michele Kyrouz from Latham & Watkins

16  on behalf of Oracle Corporation.

17      MS. DALEY: Dorian Daley on behalf of Oracle

18  Corporation.

19      THE VIDEOGRAPHER: If the reporter will swear the

20  witness.

21  (Witness sworn.)

22           -oOo-

23      EXAMINATION

24  BY MR. BRITTON:

25  Q. Good morning, Ms. Catz.

Oracle                                    Page 8

Catz, Safra  7/20/2006  9:07:00 AM

1  A. Good morning.
2  Q. Can you tell me what you did to prepare for
3  your deposition today.
4  A. I met with my attorneys, and I reviewed some
5  papers.
6  Q. When did you meet with your attorneys?
7  A. I met with them for an hour or so yesterday
8  and sometime last week for about three hours, like the
9  morning.
10  Q. Same lawyers?
11  A. Yes.
12  Q. Both times?
13  A. No. Everyone in this room except I didn't
14  meet with Michele yesterday. Just with Greg, and he
15  had -- and his colleague.
16  Q. When you say Greg and his colleagues, who are
17  you referring to?
18  A. Greg Lindstrom and Patrick Gibbs.
19  Q. Outside of the meeting with your lawyers, did
20  you do anything to prepare for your deposition today?
21  A. I reviewed some papers.
22  Q. Which papers did you read?
23  A. I read my previous deposition in a case
24  related to this, and I read the Special Litigation
25  Committee's report about my interview. And I read

Oracle                                      Page 9

Catz, Safra  7/20/2006  9:07:00 AM

1  some e-mails.
2  Q. And what e-mails did you read?
3  A. Oh. I don't know. Some -- you know, a bunch
4  of e-mails.
5  Q. Do you know what the topics were about?
6  A. I don't know, things that were going on at the
7  time.
8  Q. Can you be more specific?
9  A. Let me think of something in particular. One
10  of the e-mails was an e-mail about the quarter when we
11  missed the quarter, what this case is about, from one
12  of the senior EVPs about it.
13  Q. And who was the senior VP?
14  A. You know, I don't even remember exactly who
15  wrote the e-mail. Like, at what level it was written.
16  I --
17  Q. What division?
18  A. North America Sales.
19  Q. Was it George Roberts by any chance?
20  A. I don't know if it was George's notes or John
21  Nugent's note or this other guy who worked for him. I
22  can't remember exactly who wrote the note, but it was
23  something like that.
24  Q. Did that note refresh your recollection about
25  the events that took place back in 2000, 2001 time

Oracle                                      Page 10

Catz, Safra  7/20/2006  9:07:00 AM

1  period?
2  A. A little bit.
3  Q. Okay. And how did it refresh your
4  recollection?
5  A. Just reminded me a little bit of what they
6  were saying.
7  Q. What were they saying?
8  A. How sorry they were.
9  Q. Was it from Nick Classic?
10  A. Yes.
11  Q. Okay. Can you remember any other e-mails that
12  you reviewed outside of the meetings with your
13  attorneys?
14  A. I can't actually, like, describe one to you;
15  but if you show me one, I could see maybe.
16  Q. Okay. You mentioned that you read the SLC
17  report about your interview. Did you read the actual
18  report itself? It's 1200 pages, about this thick
19  (indicating). Or did you actually --
20  A. No.
21  Q. -- read your interview memo?
22  A. I don't think I've ever seen the 1200-page
23  thing. I just read this thing that was titled
24  interview with me.
25  Q. Okay. So it was your interview memo.

Oracle                                      Page 11

Catz, Safra  7/20/2006  9:07:00 AM

1  A. Yeah.
2  Q. Did you make any notes on the interview memo?
3  A. No..
4  Q. Did you put any notes on the e-mail note that
5  you were talking about?
6  A. No.
7  Q. Is there anything in the interview memo that
8  you reviewed that was inaccurate?
9  A. There were a bunch of things that were not how
10  I would have said it, or not exactly right. They
11  misspelled, like, almost every one of my direct
12  reports' names. There were things like that.
13  Q. Okay. Do you remember anything in particular
14  that was incorrect about the report?
15  A. No. All I remember is thinking "that's not
16  exactly the way I would have said that."
17  Q. But nothing --
18  A. But I can't remember what it was referring to.
19  Q. Other than the SLC report, your previous
20  deposition, and the e-mail that we spoke about, did
21  you review anything else outside of the presence of
22  your attorneys?
23  A. Yeah. I read Judge Stine's opinion.
24  Q. Is that the summary judgment opinion?
25  A. I guess so.

Oracle                                      Page 12

1    MR. LINDSTROM: He doesn't want you to guess.

2    THE WITNESS: I'm not sure actually. It was some

3    opinion he wrote.

4    BY MR. BRITTON:

5    Q. How thick was it? Do you remember?

6    A. 15 -- I don't remember so I'd have to guess.

7    Not that long.

8    Q. Anything else that you reviewed outside of the

9    presence of your attorneys?

10   A. No.

11   Q. Did you speak to anybody other than your

12   attorneys in preparation for your deposition today?

13   A. No.

14   Q. Now, the meeting with your attorneys last

15   week, you said that was three hours?

16   A. It might have been three and a half. But it

17   was the morning.

18   Q. And did you review any documents at this

19   meeting?

20   A. These same documents..

21   Q. Did you review any documents in the meetings

22   with your attorneys that you did not review outside of

23   the presence of your attorneys?

24   A. I'm sorry, I'm -- which one is the superset of

25   the other? What are you asking?

1    Q. I'm asking if you reviewed anything new.

2    Anything that you didn't review --

3    A. With my lawyers?

4    Q. Yeah.

5    A. No.

6    Q. Okay.

7    A. I don't think so.

8    Q. Okay. Same is true for yesterday's meeting?

9    A. Right.

10   Q. Have you ever read the complaint in this case?

11   A. No.

12   Q. Okay. I'm going to test your memory today.

13   Do you have an understanding what the class period is

14   in this case?

15   A. I don't exactly know specifically. It's about

16   that quarter we missed.

17   Q. The third quarter of 2001?

18   A. Fiscal third quarter of 2001. Which is, like,

19   December -- no. Which quarter is that. Third quarter

20   ends in February, right? So the December, January

21   February --

22   Q. Okay.

23   A. -- of 2001.

24   So December 2000. Right?

25   Q. So that would be December 1st, 2000, to

1    February 28, 2001?

2    A. Right.

3    Q. When I reference the class period, that's the

4    time period I'm talking about.

5    THE WITNESS: Is that the period? Okay. I didn't

6    know. I'm sorry.

7    MR. LINDSTROM: He's making that representation to

8    you --

9    MR. BRITTON: Right.

10   MR. LINDSTROM: -- so you can rely on that.

11   MR. BRITTON: When I say the class period, I'm

12   representing to you that's the period I'm talking

13   about.

14   THE WITNESS: I don't know if it was a leap year.

15   So February 28th.

16   MR. BRITTON: It's February 28th, right.

17   Q. Now, the time period that I'm talking about

18   unless I say otherwise is going to be the 2000, 2001

19   time period. Is that okay?

20   A. So it's that -- the whole two years?

21   Q. Yeah. So, generally speaking, when I'm asking

22   you questions, that's the time period that I'm going

23   to be talking about.

24   A. So all of 2000 and all of 2001? So not what

25   you call the class period.

1    Q. Well, I'll distinguish between the two.

2    A. Okay.

3    Q. So, generally, when I ask you questions,

4    that's the time period I'm asking about.

5    MR. LINDSTROM: So are you saying if you don't

6    specify a date, that she should assume you're

7    referring to the years 2000, 2001.

8    MR. BRITTON: Yes.

9    THE WITNESS: Okay. I'll try to keep that in my

10   head.

11   MR. BRITTON: In other words, I'm not -- unless I

12   say otherwise, I'm really not looking for information

13   about what you do today.

14   THE WITNESS: Oh.

15   MR. BRITTON: I'm looking for information what you

16   did back then.

17   THE WITNESS: Okay.

18   MR. BRITTON: Is that fair?

19   MR. LINDSTROM: And, Counsel, as long as we're

20   setting out these definitions, just for clarity in

21   terms of 2000, 2001, are you referring to calendar

22   years or Oracle fiscal years?

23   MR. BRITTON: Let's talk about Oracle fiscal

24   years.

25   MR. LINDSTROM: Thank you.

Catz, Safra 7/20/2006 9:07:00 AM

1    THE WITNESS: Oh, okay. So those start in '99.

2    MR. BRITTON: That would start --

3    THE WITNESS: May '99.

4    MR. BRITTON: -- May '99 and end in May 31st --

5    THE WITNESS: May 30.

6    MR. BRITTON: -- 2001.

7    THE WITNESS: How many days in May? 31.

8    BY MR. BRITTON:

9    Q. Okay. I want to take you to the second

10   quarter of 2001. Which would have been September,

11   October, November. Is that correct?

12   A. September, October, November of 2000..

13   Q. 2000. Which is Oracle's fiscal year --

14   A. Yes.

15   Q. -- 2000 -- or second quarter of 2001?

16   A. Fiscal 2000, yes.

17   Q. And you worked on a deal with Hewlett Packard

18   during that quarter?

19   MR. LINDSTROM: Objection. Vague and ambiguous.

20   THE WITNESS: Did I, myself, work on a deal?

21   There was a deal in that quarter, and I was involved

22   in it to some extent.

23   MR. BRITTON: Okay.

24   Q. How were you involved in it?

25   A. I was working with Oracle sales guys on the

Oracle                                          Page 17

Catz, Safra 7/20/2006 9:07:00 AM

1    different terms and the discounts and things like that

2    for the HP deal to some extent.

3    Q. Did you negotiate directly with HP?

4    A. I didn't, no.

5    Q. Who was doing the negotiations?

6    A. I think it's one of our sales guys. He

7    doesn't work at Oracle anymore, I think.

8    Q. Do you remember his name?

9    A. Mike,

10   Q. Cochran?

11   A. I don't think so. Like "dis" something.

12   Cesare.

13   Q. DeCesare.

14   So you were working with Mike on the terms and

15   discounts, and he was interfacing with HP; is that

16   fair?

17   A. That's -- I don't know who he was inter- -- I

18   assume so. He could have been dealing with another

19   Oracle guy and then HP; but he was the account rep, I

20   think, at the time. +

21   Q. Now, that was a barter transaction, wasn't it?

22   MR. LINDSTROM: Objection. Calls for a legal

23   conclusion.

24   THE WITNESS: Yeah. It depends what you mean by

25   barter so...

Oracle                                          Page 18

Catz, Safra 7/20/2006 9:07:00 AM

1    BY MR. BRITTON:

2    Q. Do you have an understanding what a barter

3    transaction is?

4    A. Not entirely.

5    Q. Oracle agreed to purchase products from HP in

6    exchange for HP agreeing to purchase products from

7    Oracle.

8    MR. LINDSTROM: Is that a representation from you

9    of what a barter transaction is? In other words, do

10   you want her to assume that in responding --

11   MR. BRITTON: No.

12   Q. I'm asking you did Oracle agree to purchase

13   products from HP in exchange for HP agreeing to

14   purchase products from Oracle?

15   A. I don't know if that's exactly what happened.

16   But Oracle bought products -- anyway Oracle was

17   already buying a lot of products, and Oracle wanted HP

18   to be the big CRM reference. I know that. And Oracle

19   was already very much trying to have an alternative to

20   Sun, which was our entire platform. So we were

21   already in the process of moving some of our

22   purchasing to HP, and had already done quite a bit.

23   And had planned to. At the same time HP had already

24   bought and was implementing Oracle CRM, but hadn't

25   done their global rollout; and to do it they would

Oracle                                          Page 19

Catz, Safra 7/20/2006 9:07:00 AM

1    have had to buy more software. So I think both of us

2    did the deals we were doing around the same time. Or

3    close to the same time.

4    Q. Okay.

5    A. I don't know, give or take a quarter or two.

6    Q. Were they contingent upon one another?

7    A. I don't think they were exactly contingent,

8    but I think people wanted to -- you know, I don't

9    really remember.

10   Q. Okay. Let me show you a document.

11   THE WITNESS: Is this yours?

12   THE REPORTER: No, that's yours.

13   MR. LINDSTROM: That's yours.

14   THE WITNESS: It has a "1" on it.

15   THE REPORTER: Yeah.

16   BY MR. BRITTON:

17   Q. Okay. I've placed in front of you what has

18   been marked as Catz Exhibit 1. Will you take a moment

19   to look at this exhibit.

20   And for the record, Catz Exhibit 1 starts at

21   Bates NDCA-ORCL 025018 and ends at 019.

22   A. Okay.

23   Q. Have you seen -- do you recognize Exhibit 1?

24   A. Yeah. I do.

25   It's me sending an e-mail to our accounting

Oracle                                          Page 20

1  people.

2  Q. Okay. And who's Tom Williams?

3  A. Revenue recognition accounting in finance.

4  Q. Jennifer Minton?

5  A. She's also -- she's, like, the head of

6  finance. I don't know exactly her title at this time.

7  Q. Okay. And this e-mail was dated

8  November 30th, 2000; is that right? At the top?

9  A. Yeah.

10  Q. And that's the last day of the second quarter

11  of 2001; is that right?

12  A. Yes.

13  Q. Does this refresh your recollection about

14  whether HP's purchase was contingent upon Oracle's

15  purchase?

16  A. Not entirely. This is --

17  MR. LINDSTROM: You've answered the question.

18  THE WITNESS: Okay.

19  BY MR. BRITTON:

20  Q. Okay. The e-mail below, the e-mail where you

21  forwarded to Tom Williams, from Gary Roberts to you,

22  do you see that?

23  A. Yes.

24  Q. It says, "I understand Larry and Carly are

25  discussing their purchase of our products this quarter

1  if we commit to purchase 20 to 30 million dollars of

2  their product over the next 18 to 24 months." Do you

3  see that?

4  A. I see that.

5  Q. Is that consistent with your recollection of

6  the HP transaction?

7  A. Not exactly.

8  Q. Okay. And how is it different?

9  A. Well, this is from our data center guy.

10  Q. Uh-huh.

11  A. So that's sort of what he is thinking. You

12  know, would he conclude it? I don't exactly remember

13  the details of what was really going on, though.

14  Q. Okay. You can put that document aside.

15  Now, you mentioned that HP had begun their

16  rollout of Oracle's CRM products prior to the second

17  quarter of 2001? Do you recall that?

18  A. I think they were in it during the second

19  quarter. I don't know when they started.

20  Q. Okay. The purchase that they made in the

21  second quarter of 2001, did that consist of updated

22  licenses as well as new licenses?

23  A. I don't remember.

24  Q. You don't remember. Okay.

25  (Exhibit 2 was marked for identification.)

1  BY MR. BRITTON:

2  Q. I have placed in front of you what has been

3  marked as Catz Exhibit 2. Will you take a moment to

4  look at this exhibit.

5  For the record, Exhibit 2 starts at Bates

6  HP 00030 and ends at 00035.

7  Do you recognize Exhibit 2?

8  A. No.

9  Q. Is this an Oracle document? Do you know? Do

10  you recognize the form?

11  A. Oh, yes.

12  Q. It is.

13  And what type of Oracle document is this? Is

14  there a term that identifies this?

15  A. Well, I think it might go by the title on the

16  top there, "Ordering Document."

17  Q. Ordering document?

18  So, based on your experience with these

19  documents, does this appear to be the ordering

20  document for HP of Oracle's licenses?

21  A. I, myself, don't have a lot of experience with

22  these documents; but it appears to be that by --

23  Q. Okay.

24  A. -- reading the face of it.

25  Q. Okay. If you turn to the second page. It

1  talks about -- the first column up above or the first

2  row, it has "license migration." Do you understand

3  what this is?

4  A. Generally, yes.

5  Q. What is license migration?

6  A. When you already have a license to a product

7  and you roll it into the new version or, you know, to

8  the new name. Actually, you're entitled to the new

9  version generally already.

10  Q. So is this reflecting that HP purchased its

11  existing Oracle licenses on August 31st of 1999 and

12  it's migrating them in the second quarter of 2001?

13  MR. LINDSTROM: Objection. No foundation. Calls

14  for speculation.

15  THE WITNESS: Could you say that again?

16  BY MR. BRITTON:

17  Q. Is this row reflecting that HP purchased its

18  original licenses from Oracle in -- on August 31st,

19  1999 --

20  MR. LINDSTROM: Same objections.

21  BY MR. BRITTON:

22  Q. -- and it's migrating them to updated licenses

23  in the second quarter?

24  MR. LINDSTROM: Sorry, Counsel.

25  Same objection. Document speaks for itself.

1  THE WITNESS: Actually, there's no way to tell

2  from this --

3  MR. BRITTON: Okay.

4  THE WITNESS: -- necessarily. I couldn't tell

5  you.

6  BY MR. BRITTON:

7  Q. Okay. Can you tell me what the total purchase

8  price was of the HP purchase in this second quarter of

9  2001 by this document?

10  A. The total new license fee?

11  Q. Yes.

12  A. I can't read it very well. I'm just reading

13  what it -- the first thing, that, I think is a dollar

14  sign. I mean, I suppose it could be a 5, but I think

15  it's a dollar sign. And the second one looks like a 2

16  to me and then a 1. Then a comma, 3, 31 or 7, I can't

17  tell, comma, 1 -- it's either 22 or 72.

18  MR. LINDSTROM: Counsel's passing you a magnifying

19  glass for your use if it is of assistance.

20  THE WITNESS: It's the -- it's hard to tell from

21  the copy. But it looks like 21 million or --

22  MR. BRITTON: Roughly 21?

23  THE WITNESS: -- something like that for a new

24  license.

25  BY MR. BRITTON:

1  Q. Roughly 23 million; is that right?

2  MR. LINDSTROM: The record should reflect she's

3  simply reading from the document.

4  THE WITNESS: Yeah. I don't remember so I'm just

5  reading what this document says.

6  MR. BRITTON: Right.

7  Q. The total fees are roughly 29.8 million; is

8  that correct?

9  MR. LINDSTROM: According to the document?

10  THE WITNESS: That's what the thing says.

11  BY MR. BRITTON:

12  Q. Now, does this refresh your memory about what

13  the total purchase price was of HP's purchase in the

14  second quarter of 2001?

15  A. It's -- assuming this is right and all that,

16  it looks like it's 21 million plus 4.0 -- 4.8 million

17  in support. The other support they already owed us so

18  that's not -- that doesn't count. They would have

19  paid us that anyway.

20  Q. Okay.

21  A. So that's not the deal.

22  Q. So the deal, at least as you remember

23  it, is the new license fee and then the total new

24  support fee?

25  A. It's actually as I read it from here. I

1  really don't remember.

2  Q. Okay. Do you have any memory about the value

3  of the HP purchase in the second quarter?

4  A. I didn't until we started this.

5  Q. Okay. Is this refreshing your memory?

6  A. It's a long time ago.

7  Q. Now, the front page of Exhibit 2, it

8  has the product description, quantity, license type,

9  but there's no price column. Do these ordering

10  documents in your experience typically have a price

11  per license attached to them?

12  A. I don't remember.

13  Q. Do you remember whether it was a fixed price

14  for HP in the second quarter of 2001?

15  A. I have no idea. I don't think so.

16  Q. And do you remember what the payment terms

17  were for the HP purchase back then?

18  A. No.

19  Q. The HP licenses -- withdrawn.

20  The Oracle licenses that HP purchased back in

21  1999, were those implemented successfully by the

22  second quarter of 2001 to your knowledge?

23  A. I think they were in the middle of it, of the

24  implementation at that point. Again, I don't know

25  when they bought the licenses.

1  Q. Do you remember how long the implementation

2  had taken prior to the second quarter of 2001?

3  A. No, I have no idea.

4  Q. Okay. Would the migrated licenses --

5  withdrawn.

6  Were the licenses that HP purchased in the

7  second quarter of 2001 delivered to HP?

8  MR. LINDSTROM: Objection. Vague and ambiguous as

9  to "delivered."

10  THE WITNESS: I don't know what you mean -- a lot

11  of our licenses are electronic delivery and so there's

12  no delivery -- "I have no idea" actually would be the

13  right answer.

14  BY MR. BRITTON:

15  Q. So you don't know how they were delivered to

16  HP in the second quarter of 2001?

17  A. I don't know how or if they even needed to be

18  delivered.

19  Q. Okay.

20  Take a look at the last page of Exhibit 2.

21  The very last page. It says "Shipment Summary CD

22  pack." Do you have an understanding what that means?

23  A. Yes..

24  Q. And what is your understanding?

25  A. A CD pack is a little box with some CDs in it.

1    Q. So if you're going to deliver a CD pack to a

2    customer, you have to do it by courier? Is that

3    correct?

4    A. Unless they have it already.

5    Q. Well, if they had it already, they wouldn't

6    have to ship a CD pack, would they?

7    MR. LINDSTROM: Objection. Calls for speculation.

8    THE WITNESS: Uhm, if they have the programs

9    already, they often ask for some CDs. But it's not

10   related, they just want CDs to just have an extra to

11   have on the shelf.

12   BY MR. BRITTON:

13   Q. Is that consistent with your memory of the HP

14   deal?

15   A. Oh, I don't remember anything about it.

16   Q. Based on your knowledge of the ordering

17   documents, am I correct to draw the conclusion that

18   Oracle's second quarter HP shipment was going to be

19   via CD pack?

20   A. No..

21   MR. LINDSTROM: Objection. No foundation.

22   BY MR. BRITTON;

23   Q. Why is that incorrect?

24   A. Can you ask me again.

25   Q. Am I correct in reading this document, based

1    on your experience with the ordering documents, to

2    conclude that the second quarter of 2001 purchase was

3    shipped to HP by a CD pack?

4    A. No.

5    Q. No. And why is that not correct?

6    A. Because when you already have the licenses,

7    there is no delivery required.

8    Q. Okay. And why would the ordering documents

9    have a shipment summary?

10   MR. LINDSTROM: Objection. No foundation. Calls

11   for speculation.

12   THE WITNESS: I have no --

13   MR. LINDSTROM: You may respond.

14   THE WITNESS: I have no idea. So -- I have

15   literally no idea why they'd also want a CD pack

16   because they had all the programs on site already.

17   BY MR. BRITTON:

18   Q. They did?

19   A. I would expect it.

20   Q. Is that consistent with your memory of the HP

21   deal?

22   A. Uhm, it's -- I'd have to look --

23   Q. Sure. Go ahead and look.

24   A. -- to see if everything they bought they

25   already had.

1    You know what, there's actually almost no way

2    to know necessarily. There is literally no way to

3    know from this document.

4    Q. Okay. And you don't have any independent

5    recollection?

6    A. I don't remember. No.

7    Q. You mentioned that Oracle wanted HP to be its

8    CRM -- withdrawn.

9    As part of this deal Oracle agreed to switch

10   over all of its servers to HP from Sun; is that

11   correct?

12   A. No.

13   MR. LINDSTROM: Objection. Mischaracterizes her

14   testimony.

15   THE WITNESS: No.

16   BY MR. BRITTON:

17   Q. What do you remember about that part of the

18   deal? What Oracle agreed to buy and what Oracle

19   agreed to switch over.

20   A. Well, we were already -- we were using a lot

21   of Sun, and we wanted to move to HP partially to have

22   not as rigid a focus just on Sun. So we wanted to buy

23   more HP, and we were going to put some systems on HP.

24   Q. Okay. When you say partially, what do you

25   mean? What do you remember?

1    A. I don't remember much.

2    MR. LINDSTROM: This is --

3    THE WITNESS: But not all.

4    BY MR. BRITTON:

5    Q. Do you remember that all of the CRM

6    development servers were going to be switched from Sun

7    to HP as part of this deal?

8    MR. LINDSTROM: Objection. Mischaracterizes her

9    testimony. Assumes facts.

10   THE WITNESS: I don't exactly remember.

11   (Exhibit 3 was marked for identification.)

12   BY MR. BRITTON:

13   Q. I have placed in front of you what has been

14   marked as Catz Exhibit 3. Take a moment to look at

15   this exhibit, and let me know if you recognize it.

16   For the record, Catz Exhibit 3 starts at Bates

17   HP 00001 -- that's four zeroes -- and ends at 00003.

18   A. Okay.

19   Q. Have you had a chance to review Exhibit 3?

20   A. Yes.

21   Q. Do you recognize it?

22   A. Yes.

23   Q. And is this the agreement that you signed on

24   behalf of Oracle with HP in the second quarter of

25   2001?

1   A. It appears to be, yeah.

2   Q. The last page, is that your signature?

3   A. Yes.

4   Q. Is that right?

5   Now, does this exhibit refresh your

6   recollection about whether Oracle had agreed to

7   exchange all of its CRM development servers from Sun

8   to HP?

9   A. Yes..

10   Q. Okay. And you did, right?

11   A. CRM development servers.

12   Q. Now, the first one, if you look on page 2 of

13   Exhibit 3, says "Oracle agrees to move 100 percent of

14   Oracle's production data to HP Unix servers by

15   May 31st. 2001." What is your understanding of that

16   term?

17   A. That means we are going to put our database

18   server on HP.

19   Q. So all of Oracle's database servers would now

20   be HP?

21   A. No, the production database.

22   Q. The production database.

23   How is that different than the other database

24   servers?

25   A. Oh, we have thousands of database servers at

1   Oracle. Tens of thousands probably.

2   Q. How is the production database as

3   distinguishable from the -- what part of the business

4   is the production databases?

5   A. Well, this would be the global single

6   instances database server. That's in production. Not

7   the development servers, not the testing servers, and

8   not the servers used by any of the other lines of

9   business. This is just your accounting -- the

10   database itself. This is the database that underlines

11   Oracle's global single instance system. And just the

12   database server. Not the middleware servers, not the

13   front end servers, not the security servers. There

14   are lots of servers.

15   Q. Okay. And, then, No. 2 is the agreement to

16   move all of the CRM development servers from Sun to

17   HP; is that right?

18   A. That's what it is, yes.

19   Q. And if you look at No. 3, it says, "Oracle

20   will operate all CRM online services, the Oracle

21   store, the Oracle web based customer interaction

22   database, and the Oracle defect database on HP Unix

23   servers by November 1st, 2001." Do you see that?

24   A. I see it.

25   Q. What is your understanding of this term?

1   A. I don't really remember -- the Oracle store

2   might have -- at the time must have been on a

3   standalone server. So it's that server. It's not a

4   very big server. Not many people buy Oracle software

5   off the store. I don't know what the web based

6   customer interaction database is.

7   Q. What about the CRM Online Services?

8   A. I don't, as I sit here right now, remember

9   what this is referring to.

10   Q. All right. The last one says that "Oracle

11   platinum systems CRM training, education, and

12   consulting implementation pilots will operate on HP

13   Unix servers by November 1st, 2001." Do you see that?

14   A. I see it.

15   Q. What is the Oracle platinum systems?

16   MR. LINDSTROM: What were they at this time?

17   MR. BRITTON: Correct.

18   THE WITNESS: I really don't remember. I don't

19   even remember this term.

20   BY MR. BRITTON:

21   Q. Now, you agreed on behalf of Oracle to a

22   three-year lockup provision for this agreement; is

23   that right?

24   MR. LINDSTROM: Objection. Document speaks for

25   itself.

1   THE WITNESS: I don't even know what's -- what do

2   you mean by lockup?

3   BY MR. BRITTON:

4   Q. You agreed to have HP be the exclusive

5   provider for Oracle for these provisions for three

6   years.

7   MR. LINDSTROM: Same objection.

8   Can you direct her to a specific part of the

9   document.

10   MR. BRITTON: I want her recollection first, and

11   then I'll show her the part of the document.

12   MR. LINDSTROM: So do you understand? The

13   question is do you recall independent of the document

14   the provision he's described?

15   THE WITNESS: I don't.

16   BY MR. BRITTON:

17   Q. Okay. If you look at No. 5. The first

18   sentence reads "Following the migrations described in

19   1 through 4 above for a period of three years after

20   the date of this letter agreement. HP will be the

21   exclusive provider to Oracle for the above uses," and

22   then it continues. Do you remember agreeing to that

23   term?

24   A. As i sit here right now, I don't really even

25   remember any of these terms.

Catz, Safra 7/20/2006 9:07:00 AM

1   Q. This was a noncancelable agreement; is that

2   right?

3   MR. LINDSTROM: Objection. Calls for a legal

4   conclusion. No foundation.

5   BY MR. BRITTON:

6   Q. Do you remember -- independent of the document

7   do you remember agreeing to that term?

8   A. As I said, I barely remember this agreement.

9   Q. Okay. So you don't remember binding Oracle to

10  a $30 million purchase that it couldn't cancel?

11  A. I don't actually.

12  Q. Okay. If you look at the first page of

13  Exhibit 3. The second paragraph. Does that refresh

14  your recollection whether you signed an agreement for

15  $30 million that was noncancelable?

16  A. I'm getting everything I remember from this

17  document from this document now. I literally don't

18  remember it in any kind of detail.

19  Q. Does this refresh your memory at all?

20  MR. LINDSTROM: Do you understand the question

21  that -- you can read the document, we can all read the

22  document. What he's asking you is as a result of

23  reading Exhibit 3, do you now remember that you --

24  that you signed a $30 million noncancelable agreement?

25  THE WITNESS: Purchase order?

Oracle                                          Page 37

---

Catz, Safra 7/20/2006 9:07:00 AM

1   MR. LINDSTROM: Yeah.

2   THE WITNESS: If some of these conditions --

3   MR. LINDSTROM: The question is --

4   THE WITNESS: Reading it is the only thing --

5   MR. BRITTON: Let me ask you.

6   MR. LINDSTROM: Can you rephrase it.

7   BY MR. BRITTON:

8   Q. We can. Like Counsel said, we can all read

9   the document, see what the document says. What I'm

10  asking you is if when you read this document, you say,

11  oh, now I remember I did that. Independent of what

12  the document says.

13  A. It's hard to be independent of the document.

14  I remember an HP deal; I remember us moving to HP, you

15  know, as one of the things we were doing. If I hadn't

16  seen this, I wouldn't remember it. But, you know, I

17  see what it says; so that's the detail. I didn't

18  remember the discount rates that we negotiated, which

19  are very high for HP; and had I seen this -- and I

20  still don't remember them at the time.

21  Q. The discount rates you're referring to, where

22  are you looking at on Exhibit 3?

23  A. At the bottom of this page, 50 percent off for

24  HP and 55 percent off, you know, for some of it is a

25  very high discount rate for HP historically; but I

Oracle                                          Page 38

---

Catz, Safra 7/20/2006 9:07:00 AM

1   don't remember -- like -- but I still don't remember

2   exactly the rate.

3   Q. Okay. Fair enough.

4   Do you remember the shipment being in two

5   parts, $15 million by the end of calendar year 2000

6   and then another $15 million later the next year?

7   MR. LINDSTROM: Independent of the document.

8   MR. BRITTON: Yes.

9   THE WITNESS: See, I don't remember any of these

10  kind of details. Looking at it, it looks like

11  actually in three parts or something.

12  BY MR. BRITTON:

13  Q. Where are you getting the three-part delivery?

14  A. You said delivery, right? So delivery is

15  No. 2. So it's 10 million in January 2001 and

16  5 million in April of 2001.

17  Q. Okay. Let me correct the question then.

18  The purchase -- do you remember the purchase

19  orders were going to be placed in two parts,

20  15 million in calendar year 2000 and 15 million in

21  calendar year 2001?

22  A. I don't remember at all. I just have the

23  document.

24  Q. Okay.

25  Okay. Do you remember being told that HP

Oracle                                          Page 39

---

Catz, Safra 7/20/2006 9:07:00 AM

1   didn't need the licenses that it was purchasing from

2   Oracle at that time?

3   A. No.

4   Q. You don't remember that. Okay.

5   Do you remember anybody telling you that HP

6   was purchasing them a year ahead of the time that they

7   would actually need them?

8   A. I don't remember that.

9   MR. BRITTON: Okay.

10  You can put that document aside for now.

11  (Exhibit 4 was marked for identification.)

12  BY MR. BRITTON:

13  Q. I placed in front of you what has been marked

14  as Exhibit 4. Take a look at this exhibit.

15  For the record, your name is not on here so I

16  just want you to familiarize yourself with the

17  document, and then I'm going to ask you questions

18  about specific points.

19  For the record, Exhibit 4 starts at Bates

20  HP 00019 and ends at 23.

21  MR. LINDSTROM: So, Counsel, is this a document

22  that has been produced in litigation by HP?

23  MR. BRITTON: Yes.

24  I'm not sure if this document was used at the

25  HP deposition or not.

Oracle                                          Page 40

1    THE WITNESS: Okay.
2    BY MR. BRITTON:
3    Q. Okay. So you've never seen this exhibit
4    before this; is that correct?
5    A. No.
6    Q. Okay. It appears to be a summary of HP's view
7    of the Oracle transaction in the second quarter of
8    2001. And I'm making that representation to you.
9        If you turn to the second page, the
10   paragraph 1. Second page of the exhibit.
11   A. Uhm, I -- all of this is dated in July of
12   2001. Which is the first quarter of our FY02, so it's
13   not -- you just said it was the second quarter, but it
14   isn't. It's what they were thinking or talking about
15   a full -- I think over a year later. Almost 15 months
16   later so -- in fact, it says so.
17   Q. 15 -- if you look at the first page, the first
18   paragraph, the first e-mail, it says, "As requested I
19   have attached a summary of HP's Oracle CRM purchase in
20   November 2000." And the document is dated July 2001.
21   So this was eight months later. Is that correct?
22   A. November -- whatever July follows, right.
23   Q. Right. So I'm representing this is -- maybe
24   their view in July of 2001, but it's their description
25   of what the November 2000 transaction was.

1    A. What they --
2    Q. Okay. I'm making that representation. You
3    can agree or disagree.
4        If you turn to the second page of Exhibit 4.
5    Paragraph 1, the second sentence says, "These licenses
6    were bought as an incentive for Oracle to help us
7    increase HP's revenue." Do you see that?
8    A. That's what it says.
9    Q. Is that consistent with your memory of the
10   second quarter 2001 HP transaction?
11   A. No. I don't know what they were thinking.
12   Q. Now, the last sentence of this paragraph 1
13   says, "Secondly, this agreement superseded the 1999
14   agreement." Is that consistent with your memory of
15   this transaction?
16   A. I don't even remember a 1999 agreement.
17   Q. Now, if you look down at paragraph 5. It
18   says, "It is expected that Oracle compensation will be
19   used but not until 2H FY02." Is that consistent with
20   your memory of the HP transaction? That HP was not
21   going to use certain modules until 2002?
22   A. I have no idea.
23   Q. All right. If you turn to page 4 of
24   Exhibit 4. It's the page with Bates HP 000022.
25   Can you tell me, is there standard payment

1    terms at Oracle for license purchases?
2    A. There are.
3    Q. There are.
4        What are those standard payment terms?
5    A. I don't know.
6    Q. Do you know what they are today?
7    A. I don't remember.
8    Q. If you look at the payment schedule on this
9    page. Is this -- it says 3 million due net 30 days
10   from effective date of agreement. Next line says
11   13.4 million due April 1st, 2001; next one
12   13.4 million due November 1st, 2001; and then,
13   finally, 2.1 million due December 1st, 2001. Do you
14   recall these payment terms?
15   A. No.
16   Q. Does that look wrong?
17   A. I have no idea.
18   Q. Are these payment terms consistent with
19   Oracle's standard payment terms?
20   MR. LINDSTROM: As of what point in time?
21   MR. BRITTON: Let's start with back in November
22   2000.
23   MR. LINDSTROM: No foundation.
24   THE WITNESS: I don't -- I don't know. I don't
25   remember what they were -- what the standard payment

1    terms are. I'm not even sure what this payment
2    schedule is as far as --
3    MR. BRITTON: Okay.
4    THE WITNESS: -- how it works or what the
5    structure is.
6    BY MR. BRITTON:
7    Q. Is this payment schedule consistent with
8    standard payment terms at Oracle as of today?
9    A. Uhm, I really don't know.
10   Q. All right. That's fair enough.
11   Do you remember -- assuming that this payment
12   schedule is correct, do you remember why Oracle did
13   not demand payment within 30 days of the November 2000
14   transaction?
15   A. I don't know.
16   Q. Look at the heading "Inbound Benefits of
17   Purchasing Early." It says "purchase," and the first
18   bullet point says "increase in discount from
19   40 percent to 60 percent." Do you remember giving HP
20   an increased discount to purchase in November 2000?
21   A. I don't remember at the time.
22   Q. Okay. The next bullet point says "20 percent
23   'swap' clause extended for two years." Do you know
24   what a swap clause is?
25   MR. LINDSTROM: As it's used in this HP document?

1    BY MR. BRITTON:

2        Q. Let's start with just is the phrase "swap

3    clause" used at Oracle?

4        A. Not the exact phrase swap clause.

5        Q. Okay. Is there another name for a swap clause

6    at Oracle? Is there different terminology?

7        A. Yeah. It would be called a product swap. If

8    that's what this is.

9        Q. And what is a product swap at Oracle?

10       A. Let's say you buy 100 database users and 50

11   rack users and 50 partitioning users. You might be

12   able to swap between, like, say, the rack and the

13   partitioning so you end up with 60 rack and 40

14   partitioning.

15       Q. Okay.

16       Is there a product swap that you remember in

17   the HP transaction?

18       A. I don't remember it as I sit here now.

19       Q. Okay. Do you remember extending a swap or a

20   product swap for HP for two years if they bought in

21   November of 2000?

22       A. As I sit here right now, I just really don't

23   remember from memory from a long time ago --

24       Q. Okay.

25       A. -- the details of this deal.

---

1        Q. Look at the last page.

2        Look under the heading "Outbound Benefits of

3    Purchasing Early." The first line says, "a binding

4    contract committing Oracle to" and then there's a

5    bullet point. And it says "a three-year exclusive

6    commitment for 100 percent of their production

7    environment to HP, 100 percent of their Oracle CRM

8    development environment to HP, 100 percent of their

9    CRM online services, targeting 500 customers in

10   year 1, and 100 percent of Oracle's new CRM customer

11   demonstration environment to be HP. Is that

12   consistent with your memory of the HP transaction?

13       A. No, not really.

14       Q. How is it different?

15       A. Well, when I -- when I sit here now, I don't

16   remember the details; but then we just looked at what

17   you called Exhibit 3, and it doesn't actually match

18   what this says.

19       Q. Okay. What's different?

20       A. Well, start with the first one. A

21   hundred percent of the production environment. That's

22   not what it says. It says the production data. And a

23   production environment is much broader than that. So

24   it involves, like, middleware servers and other

25   things. So it doesn't match, like, even in the first

---

1    tick.

2        Q. Do you remember whether all of Oracle's

3    production environment would be transformed from HP --

4    from Sun to HP?

5        MR. LINDSTROM: You're asking under the agreement?

6        MR. BRITTON: Yeah.

7        Q. Independently of your memory of the agreement,

8    do you remember whether Oracle agreed to swap the

9    entire production environment from Sun to HP?

10       A. I don't remember that to be right.

11       Q. Okay.

12       Okay. Is there anything else that's incorrect

13   in this listing?

14       MR. LINDSTROM: And we're talking about the first

15   bullet point, correct?

16       MR. BRITTON: Yes.

17       THE WITNESS: It talks about the CRM Online

18   Services. Which, as I said, I don't even know what

19   they are. And it talks about targeting 500 customers

20   in one year, which, you know, it's not in the other

21   agreement at all.

22       The 100 percent of the Oracle CRM development

23   environment. Again it says the CRM development

24   environment to HP; and here in the point 2 on your

25   Exhibit 3 it says the CRM servers. So your

---

1    development environment would also include things like

2    storage, which HP also sells. Which I think HP would

3    consider part of your environment, but that's not what

4    the agreement says.

5        MR. BRITTON: Okay.

6        THE WITNESS: Online services, again, I don't even

7    know what those are. As I sit here right now, I can't

8    remember.

9        100 percent of the new CRM customer demo

10   environment to HP. I don't -- I don't even know where

11   that is. I don't -- that's -- that doesn't seem to

12   even be in this agreement. So that's the first

13   bullet.

14       You know, and obviously it doesn't say

15   anything about the pricing and the requirements on

16   them to service appropriately. That's a problem. So

17   that's the first one.

18       BY MR. BRITTON:

19       Q. Were there any agreements that you are aware

20   of with HP that were not contained in Exhibit 3?

21       A. Oh, I don't know.

22       Q. The next bullet point says "a 3-year

23   commitment to deliver complete software parity with

24   Sun across all applications." What is -- do you

25   know -- do you have an understanding what complete

1  software parity means?

2  A. I don't use this term myself --

3  Q. Okay.

4  A. -- but --

5  Q. Just a general understanding of what software

6  parity means?

7  A. Software parity doesn't mean anything, it's

8  not a term that necessarily means anything. If you

9  read the whole sentence, you can get a sense of where

10  they're going.

11  Q. Okay. And what is your sense of where they're

12  going here?

13  MR. LINDSTROM: So you're asking her to interpret

14  the HP --

15  MR. BRITTON: Yeah. I'm trying -- I don't know

16  what software parity means, so I'm trying for my own

17  benefit to get an idea what software parity means.

18  THE WITNESS: Well, if you go back to Exhibit 3,

19  what Oracle said is they'll work on a plan and a

20  schedule that will support HP in parity with the

21  support provided to Sun.

22  MR. BRITTON: Okay. Fair enough.

23  Q. Now, if you look at the last paragraph, it

24  says, "to put this into context, in FY01 Oracle will

25  leverage approximately $6.5 billion of hardware. The

1  5 percent increase in our market share that Oracle

2  signed up to equates to $325 million of hardware for

3  HP just in the first year, not including the leveraged

4  services revenue." Is that paragraph consistent with

5  your memory of the HP transaction in November of 2000?

6  A. I have -- no.

7  Q. It's not. Okay.

8  How is it different?

9  A. I have no idea what they're talking about.

10  Q. Okay.

11  Okay. Fair enough.

12  Okay. Now, what -- do you have an

13  understanding in November of 2000 that many of the

14  licenses that Oracle had sold -- withdrawn.

15  Did you have an understanding in November of

16  2000 that many of the product modules that Oracle sold

17  HP did not work?

18  A. No.

19  Q. Is it your understanding that they did work?

20  A. Uhm, I believe that our products work

21  generally.

22  Q. Do you -- did you have an understanding in

23  November of 2000 that HP was complaining about the

24  quality of the product that Oracle had sold to them?

25  A. As I sit here right now, I don't have any

1  memory of that.

2  Q. Okay. Do you remember a dispute with HP about

3  support costs and a request for reimbursement?

4  MR. LINDSTROM: In what time frame?

5  MR. BRITTON: In 2001.

6  THE WITNESS: I don't remember that right now.

7  BY MR. BRITTON:

8  Q. Okay. If you look at Exhibit 4, page 2.

9  There's the second to the last full paragraph. It

10  says, "In terms of the support costs, there is already

11  a $2.2 million support FY012H cost reduction request

12  on the table with Oracle." Do you remember that

13  request for a cost reduction in support?

14  A. No.

15  Q. What is support? Do you know?

16  A. Yes, I know.

17  MR. LINDSTROM: In the context of the paragraph

18  you just --

19  BY MR. BRITTON:

20  Q. Let's talk about it generally. At Oracle what

21  is support?

22  A. We sell a license, an up-front license for a

23  perpetual license; and then simultaneously the

24  customer contracts for an annual fee to receive

25  product updates and phone and Internet support for a

1  year. And that's what we call -- we don't actually

2  call it support anymore, but it could be called

3  support.

4  Q. In the November 2000 time period was it called

5  support then?

6  A. Uhm, I think it was called license update

7  rights and product support or something like that.

8  Q. Okay. Did Oracle use the term showstoppers in

9  the 2000, 2001 time period?

10  A. Did anyone at Oracle use the word showstopper?

11  Q. Did you hear the term showstopper used at

12  Oracle?

13  A. I don't remember it, no.

14  Q. Do you have an understanding of what the term

15  showstopper means in terms of software use?

16  A. No. I --

17  MR. LINDSTROM: He doesn't want you to guess.

18  THE WITNESS: By whom? In what context?

19  BY MR. BRITTON:

20  Q. In terms of software implementation, do you

21  have an understanding of what the term showstopper

22  means?

23  A. Showstopper. Stop the show. Stop.

24  Q. Yeah, we can work out the word; but in terms

25  of, you know, software industry and Oracle's products,

1  did you have an understanding of what that term meant
2  at Oracle?
3  A. I don't remember even using that term or
4  thinking about it --
5  Q. Okay.
6  A. -- at the time.
7  Q. If you look at the last page of Exhibit 4.
8  The second to the last paragraph says, "While
9  14 showstoppers were not addressed in the contract, we
10  received very strong verbal reassurances from senior
11  executives at Oracle that our issues have the highest
12  priority possible within their organization and that
13  they have a solid plan to work with us to resolve
14  these issues." Do you see that?
15  A. I do.
16  Q. Is that consistent with your understanding of
17  what happened in the November 2001 time period?
18  A. I have no idea what this is referencing at all
19  or what it's regarding.
20  Q. Did you -- when you were working the HP
21  transaction in the second quarter of 2001, did you
22  give any verbal reassurances to any of HP's
23  executives?
24  A. I didn't speak to any of them.
25  Q. Okay. Were you aware of any verbal

1  reassurances to HP from any other Oracle executive?
2  A. I can't remember any.
3  MR. BRITTON: Okay. You can put that document
4  aside.
5  MR. LINDSTROM: Would this be a good time for a
6  break?
7  MR. BRITTON: I think it would.
8  MR. LINDSTROM: Okay.
9  THE VIDEOGRAPHER: Off the record at 10:20.
10  (Recess taken.)
11  THE VIDEOGRAPHER: On record at 10:29.
12  (Exhibit 5 was marked for identification.)
13  BY MR. BRITTON:
14  Q. Ms. Catz, I've placed in front of you what has
15  been marked as Catz Exhibit 5. Will you take a moment
16  to look at this exhibit.
17  And for the record, Exhibit 5 starts at Bates
18  HP 00069 and ends at 70. And for the record, the
19  Bates label is cut off on this copy.
20  MR. LINDSTROM: And, again, this is a document
21  produced by HP?
22  MR. BRITTON: It is.
23  Q. Have you had an opportunity to look at
24  Exhibit 5?
25  A. I did. You didn't put -- oh, yeah, you did.

1  A sticker.
2  Q. You are not on this e-mail; is that correct?
3  A. No.
4  MR. LINDSTROM: "No" meaning it's correct that
5  you're not on the e-mail?
6  THE WITNESS: That is correct, I am not on this
7  e-mail.
8  MR. BRITTON: You are not on this e-mail because
9  this is an internal HP e-mail.
10  Q. All right. Do you remember HP complaining
11  about a $50 million problem with Oracle software in
12  2001?
13  MR. LINDSTROM: Counsel, let me inquire as to the
14  relevance of this line of inquiry. I understand the
15  last exhibit attached a summary that pertained to the
16  2000 transaction, this appears to be October 31st,
17  2001. And it would not appear to be relevant to any
18  issue in the litigation of which I'm aware.
19  MR. BRITTON: Well, state --
20  MR. LINDSTROM: The only reason I say that, this
21  witness is being made available to you, as you know,
22  for one day only and I want to make sure that we
23  don't get -- that we use the time efficiently as a
24  result. It's your deposition.
25  BY MR. BRITTON:

1  Q. Do you remember a $50 million -- or HP raising
2  a $50 million issue with Oracle in 2001?
3  A. No.
4  Q. You don't.
5  And do you remember in 2001 HP complaining
6  that the software that it had purchased from Oracle
7  hadn't worked essentially for the entire time period,
8  from 1999 through 2001?
9  MR. LINDSTROM: Objection. No foundation.
10  Mischaracterizes the document.
11  THE WITNESS: I don't have any memory that that's
12  right.
13  BY MR. BRITTON:
14  Q. Okay. If you turn to page 2 of Exhibit 5.
15  Under the heading "Triggering problems/opportunities"
16  the first bullet point says, "Oracle has way
17  over-promised, under delivered on their CRM software."
18  You don't have any recollection of HP complaining
19  about that?
20  A. As I sit here right now, do I have memory of
21  any of -- of Craig Flower or whoever that is and this
22  concept that Oracle has way overpromised on our
23  software? I don't remember as of -- what is it?
24  October? October 31, 2001. I don't remember this.
25  Q. Now, you attended weekly development meetings

1   when -- in the 2000, 2001 time period; is that

2   correct?

3     A. Yes.

4     Q. And you attended them with Larry Ellison?

5     A. Yes.

6     Q. Okay. And did problems with the HP deal ever

7   come up at those development meetings?

8     MR. LINDSTROM: When you talk about HP, we're

9   talking about the CRM deal that is the subject of

10   Exhibit 5, correct?

11     MR. BRITTON: Right.

12     THE WITNESS: As I sit here now, I don't have any

13   specific memory of product -- which product or which

14   products even they were using, or which products they

15   were implementing.

16   BY MR. BRITTON:

17     Q. So it could have been discussed at the

18   development meetings, but you just don't remember? Is

19   that fair?

20     MR. LINDSTROM: Objection. Calls for speculation.

21     THE WITNESS: You know, I just don't remember,

22   with the different time periods and all that, about HP

23   specifically.

24   BY MR. BRITTON:

25     Q. Okay. If you look at the fourth sentence of

---

1   the same bullet we were looking at. It says, "Lots of

2   steps have been taken to mitigate this on the Oracle

3   side, including weekly joint HP/Oracle meetings with

4   the Oracle development team on showstopper bug/feature

5   issues." Did you participate in any of those

6   meetings?

7     A. I don't remember participating in any of those

8   meetings.

9     Q. Did those meetings actually exist?

10     A. I do not have, like, a personal knowledge of

11   them as I sit here right now.

12     Q. Okay. If you look down to the second to the

13   last bullet point. The one that says "HP is paying

14   way too much for Oracle software support." The last

15   two sentences read "HP is paying more for Oracle

16   software support than we do for support in other large

17   or enterprise software agreements. Add to this

18   Oracle's abysmal performance on the software delivery

19   side and we are simply paying too much." Now, it

20   appears from this document that HP was having a pretty

21   strong reaction to Oracle's software products, and you

22   don't remember anything about that?

23     MR. LINDSTROM: Objection. The document speaks

24   for itself. Argumentative.

25     THE WITNESS: This looks like a negotiation. I

---

1   really didn't write this. I don't know this person. I

2   don't know how they characterize things. This

3   document is a document that they wrote.

4   BY MR. BRITTON:

5     Q. Sitting here today, you don't have a single

6   memory of any quality problems with HP back in the

7   2000, 2001 time period?

8     MR. LINDSTROM: Objection. Asked and answered.

9     THE WITNESS: You know, as I sit here right now, I

10   don't remember a specific -- what this says. The way

11   you asked it. As of this time period or -- I just

12   don't remember.

13     MR. BRITTON: Fair enough.

14     Q. What do you remember about the negotiations

15   with HP?

16     A. Nothing. Very little.

17   Excuse me, very little. It was a long time

18   ago.

19     Q. Do you remember them occurring on the last day

20   of the quarter? Meaning the second quarter of 2001.

21     A. I didn't even remember them occurring in the

22   quarter.

23   (Exhibit 6 was marked for identification.)

24   BY MR. BRITTON:

25     Q. Did you talk to Larry about the -- Larry

---

1   Ellison about the HP deal in the second quarter of

2   2001?

3     MR. LINDSTROM: And when you talk about HP deal --

4   because I think the witness has testified they've done

5   other business with HP -- can we have an understanding

6   unless you specify otherwise, you're talking about the

7   CRM deal?

8     MR. BRITTON: Well, the deal that they signed, the

9   contract that we looked at.

10     MR. LINDSTROM: Exhibit 3.

11     MR. BRITTON: So I don't think it's limited to

12   CRM, I think there are other issues.

13     MR. LINDSTROM: Fair enough.

14     MR. BRITTON: But the agreement signed on

15   November 30th, 2000 --

16     THE WITNESS: Do I remember talking to Larry about

17   it?

18   BY MR. BRITTON:

19     Q. Yeah. Did you talk to Larry about the HP --

20     A. I don't remember talking to him as I sit here

21   right now.

22     Q. He was talking to Carly? Do you remember

23   that? Fiorina? The CEO of HP.

24     MR. LINDSTROM: About the deal?

25     THE WITNESS: I don't remember him talking to

1  Carly fiorini -- Fiorina about the HP deal.

2  BY MR. BRITTON:

3  Q. All right. Take a look at Exhibit 6. I've

4  placed in front of you what has been marked as

5  Exhibit 6. Please take a moment to look at this

6  exhibit.

7  And for the record, Exhibit 6 starts at Bates

8  HP 00053 and ends at 60.

9  Have you had a chance to look at Exhibit 6?

10  A. I have.

11  Q. Do you recognize Exhibit 6?

12  MR. LINDSTROM: Objection. Compound. Are you

13  asking her in the form that it appears with all the

14  attachments?

15  MR. BRITTON: Yes.

16  MR. LINDSTROM: So has she seen the e-mail with

17  the attachments?

18  MR. BRITTON: Right.

19  MR. LINDSTROM: As opposed to has she seen the

20  attachment.

21  MR. BRITTON: Correct.

22  THE WITNESS: I don't think I've ever seen this

23  e-mail.

24  BY MR. BRITTON:

25  Q. The first document attached to this e-mail is

1  three pages, and it's --

2  A. Excuse me. You know what, I didn't get all

3  the way through it.

4  I didn't see all this other stuff

5  (indicating).

6  Q. Okay. Go ahead, take a look.

7  (Witness reviews document.)

8  Okay.

9  A. I've now read it.

10  Q. You've now read the whole thing. So you don't

11  recognize the exhibit as it exists in its form that

12  was placed in front of you; is that correct?

13  A. There are two documents attached.

14  Q. Right.

15  A. The second one I don't recognize ever. I

16  don't remember ever seeing. I don't recognize that.

17  Q. And that second one is a proposed letter from

18  Larry Ellison to Carly Fiorina; is that right?

19  A. I think written by HP.

20  Not by us.

21  Q. Okay. Well, if you take a look at the first

22  the first page, it's from Michael DeCesare or

23  de -- how do you say that?

24  A. I don't know. DeCesare.

25  Q. And that e-mail is from him to Karen Montague

1  at HP. And he writes, "Karen, attached are the

2  following." And the second bullet point says, "the

3  letter Larry will sign regarding CRM development and

4  production usage." So it appears from the e-mail that

5  the letter comes from Oracle.

6  MR. LINDSTROM: Calls for speculation.

7  THE WITNESS: I have no idea where that letter

8  came from.

9  BY MR. BRITTON:

10  Q. And you've never seen it?

11  A. I don't recognize it at all.

12  Q. Okay. The first exhibit to this e-mail, the

13  first attachment is a draft of the agreement that you

14  signed; is that right?

15  A. It looks very similar to another exhibit.

16  Q. Did you -- we'll get to that.

17  Did you -- were you involved in working on

18  drafts of the agreement that you signed on

19  November 30th, 2001?

20  Withdrawn.

21  Were you involved in working on drafts of the

22  agreement that you signed on November 30th, 2000?

23  MR. LINDSTROM: Objection. Vague and ambiguous.

24  MR. BRITTON: With HP.

25  THE WITNESS: As I sit here right now, I don't

1  even remember doing this agreement.

2  BY MR. BRITTON:

3  Q. Okay. Do you remember whether the HP -- the

4  HP deal, the one on November 30th, 2000, went all the

5  way up to almost midnight on the last day of the

6  quarter?

7  A. I do not remember.

8  Q. Is that odd for deals to work all the way up

9  until midnight --

10  A. No.

11  Q. -- on the last day of the quarter?

12  A. No.

13  Q. How often does that happen?

14  A. Every quarter.

15  Q. Every quarter. So the last --

16  A. Often. Not every quarter, I suppose, but

17  often.

18  Q. So the last day of every quarter you work

19  until essentially midnight; is that right?

20  A. I may not be.

21  Q. Were you in the second quarter of 2001?

22  Oracle's fiscal year?

23  A. I have no recollection of that at all.

24  BY MR. BRITTON:

25  Q. So if you look at Exhibit 6, the letter that

Catz, Safra 7/20/2006 9:07:00 AM

1 Michael DeCesare sends to HP at 7:25 p.m.; is that
2 right? Am I reading that right?
3 MR. LINDSTROM: The document speaks for itself.
4 THE WITNESS: This is the time stamp on the e-mail
5 server at HP, I guess.
6 BY MR. BRITTON:
7 Q. And if you look at Exhibit 3. Go back to
8 Exhibit 3. We looked at it. It's the agreement that
9 you signed.
10 A. Yes.
11 Q. At the top is a fax tag that has 23:45.
12 A. Yes.
13 Q. Is the telephone number or the fax number
14 that's listed on that fax tag, is that familiar to you
15 at all?
16 A. 415 area code?
17 Q. Yeah.
18 A. I don't think so.
19 Q. 833-3880?
20 A. I don't know.
21 Q. You don't recognize that as an Oracle fax
22 number?
23 A. We're in the 650 area code.
24 Q. Okay.
25 Was Michael DeCesare in the 415 area code?

Oracle                                          Page 65

Catz, Safra 7/20/2006 9:07:00 AM

1 A. I have no idea.
2 Q. Do you know where he's based out of?
3 A. No. I don't.
4 (Exhibit 7 was marked for identification.)
5 BY MR. BRITTON:
6 Q. Okay. I have placed in front of you what has
7 been marked as plaintiff's Exhibit 7. Take a look at
8 this exhibit.
9 For the record, Exhibit 7 is a one-page e-mail
10 Bates NDCA-ORCL 039320.
11 A. Okay.
12 Q. Do you recognize Exhibit 7?
13 A. I don't remember it..
14 Q. Okay. So it's an e-mail from Mark Barrenechea
15 to Michael DeCesare and it's cc'd to you?
16 A. It is.
17 Q. Are you familiar with the time stamp on
18 Oracle's e-mails?
19 A. Not specifically.
20 Q. If you look at the date on this e-mail, it
21 says Friday, December 1st, 2000; then it has a time
22 stamp. Do you know how to interpret that time stamp?
23 A. Uhm...
24 MR. LINDSTROM: Is this the one that appears right
25 above the name "Mark J. Barrenechea"?

Oracle                                          Page 66

Catz, Safra 7/20/2006 9:07:00 AM

1 MR. BRITTON: Yes.
2 THE WITNESS: 00 -- I think that would be where
3 the hour would be, so it's 00 -- I think it would be
4 midnight, right?
5 BY MR. BRITTON:
6 Q. Right. Right after midnight.
7 A. And then 25. I -- it goes to seconds or
8 hundredths of a second.
9 Q. It's right after midnight?
10 A. That's what this looks like it's stamped at.
11 Q. And then --
12 A. I just don't know if that's when it is from
13 your laptop or whether this stamp is from the server.
14 I just don't know how we stamp our stuff.
15 Q. Now, the subject line says "HP is in," and it
16 has three exclamation marks --
17 A. Yes.
18 Q. -- is that right?
19 And Michael DeCesare wrote "for over
20 21 million in CRM license." Does this refresh your
21 recollection about the HP deal being signed right
22 around midnight on the day of the last quarter?
23 A. As I sit here right now, I don't remember at
24 all as to when it was or anything about it.
25 Q. Okay. When did you get the signed agreement

Oracle                                          Page 67

Catz, Safra 7/20/2006 9:07:00 AM

1 from HP?
2 A. I don't remember.
3 (Exhibit 8 was marked for identification.)
4 THE VIDEOGRAPHER: Twenty minutes of tape left,
5 Counsel.
6 BY MR. BRITTON:
7 Q. I have placed in front of you what has been
8 marked as Exhibit 9 (sic). Will you take a moment and
9 look at this -- pardon me. Exhibit?
10 THE REPORTER: 8.
11 MR. BRITTON: Yes.
12 Start over.
13 Q. I've placed in front of you what has been
14 marked Catz Exhibit 8. Please take a moment to look
15 at this exhibit.
16 I didn't identify this for the record. For
17 the record, Exhibit 8 starts at Bates NDCA-ORCL 020839
18 and ends at 43.
19 Do you recognize Exhibit 8?
20 A. No. Pieces of it are a fax of, like,
21 Exhibit 4 or something like that.
22 Q. Exhibit 3?
23 A. I mean, I recognize it from today. That. I
24 don't know what any of the rest of this is.
25 Q. Okay. Do you recognize the handwriting on the

Oracle                                          Page 68

1　front page of Exhibit 8?

2　A.　No.

3　Q.　At the top line in handwriting it says "THE

4　REAL STORY"?  Do you remember anybody being skeptical

5　about the HP deal in November 2000?

6　MR. LINDSTROM: Objection. Assumes facts.

7　THE WITNESS: I don't remember that to be true. I

8　don't know who wrote this. I don't know whose

9　handwriting this is.

10　BY MR. BRITTON:

11　Q.　The handwriting on the left, the third dash

12　down, it says "Sun is really unhappy." Do you

13　remember that to be true?

14　A.　No. I don't remember that to be true. I

15　don't know anything about...

16　Q.　Okay.

17　A.　-- Sun knowing about this even.

18　Q.　And the next handwritten line says "Is this

19　the way we" -- and then there's some scribble -- "are

20　going to do deals. Each has to buy something!"  Does

21　that refresh your recollection that at least some in

22　Oracle believed the HP deal to be a barter

23　transaction?

24　MR. LINDSTROM: Calls for speculation. No

25　foundation. Assumes facts.

1　THE WITNESS: I don't know anything about this. I

2　don't know who -- I don't know anything about this.

3　BY MR. BRITTON:

4　Q.　Now, the top fax tag up above says

5　December 1st, 2000, from Bardwick. Do you know who

6　Bardwick is?

7　A.　No.

8　Q.　Okay. This came from Oracle's files and it's

9　dated December 1st. And it's stamped December 1st,

10　2000, at 10:48 a.m.  If this was the first time Oracle

11　had received a signed agreement from HP, would Oracle

12　have been able to recognize revenue in the second

13　quarter?

14　MR. LINDSTROM: Objection. Calls for a legal

15　conclusion. No foundation. Calls for speculation.

16　THE WITNESS: The accountants have to look at when

17　deals come in and get signed and what's recognizable

18　and what isn't. They make the call on these kind of

19　matters, not me.

20　BY MR. BRITTON:

21　Q.　Do you have an understanding of what the

22　software revenue recognition rules are?

23　A.　It's not my specialty.

24　Q.　Do you have any understanding at all?

25　A.　I have some -- some understanding.

1　Q.　Okay. What's your understanding of the

2　software revenue recognition rules that governed

3　Oracle in the second quarter of 2001?

4　MR. LINDSTROM: Objection. Calls for a legal

5　conclusion.

6　THE WITNESS: Oh, there's all sorts of things that

7　would cover us.

8　BY MR. BRITTON:

9　Q.　Okay. What's your understanding of any of

10　them that cover you?

11　MR. LINDSTROM: Same objection.

12　THE WITNESS: That for you to recognize the

13　revenue you have to follow a rule that says you have

14　to have delivered the software.

15　BY MR. BRITTON:

16　Q.　Are you familiar with the rule that says you

17　have to have a signed agreement before you can

18　recognize revenue?

19　A.　I don't know the rule, but I would assume --

20　you know, I got to go look.

21　Q.　But generally --

22　A.　My understanding is you have to have an

23　agreement.

24　Q.　You have to have a signed agreement?

25　MR. LINDSTROM: No. She said "an agreement."

1　THE WITNESS: You have to have an agreement. I

2　have no idea -- I'd have to go look at the rules. Rev

3　rec is not my focus or was my focus at that time.

4　BY MR. BRITTON:

5　Q.　You're the CFO at Oracle?

6　MR. LINDSTROM: Today.

7　THE WITNESS: I am. Today.

8　BY MR. BRITTON:

9　Q.　And to your understanding today, do you have

10　to have a signed agreement before you can recognize

11　revenue in a quarter?

12　MR. LINDSTROM: Objection. Irrelevant. Calls for

13　a legal conclusion.

14　THE WITNESS: Today, I would have to go back to

15　the exact rules because they're also potentially where

16　you can click approve, so there's no signed agreement

17　but there is an agreement, and you can recognize that

18　revenue. Depending on probably a dozen other

19　requirements.

20　We have a complete group that is focused on

21　revenue recognition, that their entire job is knowing

22　those rules. And they report into Jennifer Minton --

23　no. Into Tom Olinger, who reports into Jennifer

24　Minton. And they are the specialists because there

25　are many rules that apply..

1    MR. BRITTON: Okay. Put that document aside.

2    Q. Was there a revenue recognition group in the

3    second quarter of 2001?

4    A. I don't remember, but I would -- I believe

5    there was one, yes. In fact, there was one.

6    Q. Okay. Did you interface with the revenue

7    recognition group during the last day of the second

8    quarter of 2001?

9    MR. LINDSTROM: Relating to this transaction?

10   MR. BRITTON: Relating to any transaction.

11   THE WITNESS: I don't remember.

12   BY MR. BRITTON:

13   Q. Did you make it a practice to interface with

14   the revenue recognition group on the last day of

15   quarters?

16   A. No.

17   Q. So you don't have anybody sitting there that

18   you can ask whether you can recognize revenue on the

19   last day of the quarter?

20   A. It isn't my job to make the call on whether

21   revenue is recognizable or not. It is a whole bunch

22   of other people's, including the auditors.

23   MR. BRITTON: Okay.

24       How much time do we have?

25   THE VIDEOGRAPHER: Ten.

1    MR. BRITTON: Let's go off the record.

2    THE VIDEOGRAPHER: This marks the end of Tape 1,

3    Volume I, in the deposition of Safra Catz at 11:02.

4    (Recess taken.)

5    THE VIDEOGRAPHER: On record at 11:09. This marks

6    the beginning of Tape 2 in Volume I of the deposition

7    of Safra Catz.

8    BY MR. BRITTON:

9    Q. Do you remember a deal with Covisint in the

10   third quarter of 2001?

11   A. Yes.

12   Q. Am I saying that correctly?

13   A. I'm not sure. I called it Covisint, but then

14   everybody else calls it Covisint. So I can't remember

15   what the right one is anymore. But it's close enough,

16   I know which one you mean.

17   Q. Now, the -- Covisint's business was an

18   automobile exchange; is that right?

19   A. Covisint was the purchasing department. So it

20   was the -- it was purchasing for the big auto

21   companies.

22   Q. Okay. And the big auto companies, Ford, GM,

23   Daimler-Chrysler?

24   A. Yeah, I think Chrysler was in there too; but

25   Ford and GM were the big guys.

1    Q. Big guys.

2        And Nissan?

3    A. I can't remember now. I just can't remember

4    if they were in or out.

5    Q. Okay. What did they buy from Oracle?

6    A. All our software.

7    Q. What software?

8    A. Everything.

9    Q. Database applications?

10   A. I think so.

11   Q. Okay. They were going to set up an exchange;

12   is that right?

13   A. They were going to set up a whole company.

14   Q. So the software that Oracle sold them in the

15   third quarter of 2001 was to deal with the exchange as

16   well as the company itself?

17   A. Everything. It was all the software they were

18   going to need to be a standalone company.

19   Q. Did you work with anybody directly from

20   Covisint?

21   A. I did.

22   Q. Do you remember who?

23   A. I don't right now.

24   Q. What was your role in the Covisint

25   transaction?

1    A. Well, somewhere along the line I got involved

2    in the negotiation with the -- with the Covisint

3    people and people from the auto companies.

4    Q. Okay. And then the Oracle team that was on

5    the Covisint transaction, Larry Ellison was the

6    executive sponsor?

7    A. I don't know.

8    Q. You don't know that.

9        Ray Lane, he developed the relationship, sat

10   on the advisory board; and you took over when he left,

11   correct?

12   MR. LINDSTROM: Objection. Compound.

13   THE WITNESS: You know, I don't remember that to

14   be right.

15   BY MR. BRITTON:

16   Q. Okay. What was Ray Lane's role, if any, in

17   Covisint?

18   A. He was involved in the beginning when it

19   wasn't even Covisint. It was something with Ford or

20   maybe something with GM. I can't really remember.

21   Q. Was there an advisory board --

22   A. I don't remember --

23   Q. -- to Covisint?

24   A. -- there being an advisory board to Covisint.

25   Q. What was Sandy Sanderson's role in Covisint?

1    A. Sandy was an SVP or an EVP at the time, and

2    Covisint and those car companies were accounts that

3    fell under Sandy.

4    Q. The Covisint deal started out as an equity

5    deal; isn't that right?

6    A. I don't think that's right, no.

7    MR. BRITTON: Okay.

8    (Exhibit 9 was marked for identification.)

9    BY MR. BRITTON:

10    Q. I'm handing you what has been marked as Catz

11    Exhibit 9. And Catz Exhibit 9 was marked in a

12    different deposition, different case, as DC 103.

13    For the record. Catz Exhibit 9 starts at Bates

14    NDCA-ORCL 609726 and ends at 732.

15    A. Okay. Thank you.

16    Q. Have you had a chance to look at Exhibit 9?

17    A. I have.

18    Q. Do you recognize it?

19    A. I recognize what it is.

20    Q. Okay.

21    A. I...

22    Q. Is Exhibit 9 one of the documents that you

23    reviewed in preparation for your deposition today

24    outside of the presence of your lawyers?

25    A. I don't think so.

1    Q. Okay. If you look to the second page of

2    Exhibit 9. The e-mail on the bottom that says -- it's

3    an e-mail from Rohit de Souza to Larry Ellison, and it

4    cc's a number of individuals. Who is Rohit de Souza?

5    A. I don't exactly remember his role; but I think

6    he's. like, related to sales, automotive sales, in

7    some way.

8    Q. If you look at the introductory sentence on

9    this e-mail, it says, "Yesterday we discussed

10    recrafting the Covisint deal to be a simpler license

11    deal." Do you remember changing the Covisint deal at

12    any point in time?

13    A. I remember the Covisint deal changing over

14    time, yes.

15    Q. And what did it change from? What did it

16    change to?

17    A. Well, I wasn't involved in when it started so

18    I can't really give you the exact from. But the deal

19    itself, the structure, the amounts of money, the

20    software in it, not irf it -- a bunch of things changed

21    in it throughout the process. It took a very long

22    time.

23    Q. Do you ever remember it being an equity deal?

24    A. It depends what you mean by equity deal.

25    Q. At any point in time did it have an equity

1    component to it?

2    A. It never had an equity component of Oracle.

3    Meaning Covisint receiving any equity of Oracle

4    Corporation. But it did have -- and I can't

5    remember -- something about us owning a piece of

6    Covisint. And I think it did even at the end.

7    Q. And was that included in the deal at the end

8    that was actually signed?

9    A. You know, I don't remember. We'd have to

10    look.

11    Q. Did the three -- the third paragraph, which

12    looks to be a single sentence, "Safra asked me to send

13    this to you...it's a little long winded...but" and

14    then it's "..." And then it has what appears to be a

15    proposal. Do you recognize this proposal?

16    A. It really doesn't have a proposal.

17    What Rohit is talking about is a conversation

18    with this Brian from Ford. Brian Kelley from Ford.

19    It's not a proposal.

20    Q. Okay. If you look at the next page, the one

21    that ends in 728.

22    A. Yes.

23    Q. There's a -- the name "Ron" and then it has

24    comma, "the following is an outline of a revised

25    business proposition that I plan to discuss with Brian

1    tomorrow." Do you know what that's referring to?

2    A. I don't exactly know; but this would have been

3    earlier in the e-mail you just talked about in this

4    chain. So this is somebody -- I don't know who,

5    somebody -- sending a note to someone named Ron. I

6    can't tell if it's all on the same e-mail. I don't

7    know if it's Ron at Ford -- I don't know what Ron this

8    is.

9    Q. Okay. The sentence we looked at on the prior

10    page is "Safra asked me to send this to you." Do you

11    recall asking Rohit to send information to Larry

12    Ellison?

13    A. As I sit here right now, I don't remember

14    asking Rohit to send a description of a discussion

15    with Brian Kelley.

16    Q. Look at the page that ends with Bates 729.

17    A. Yes.

18    Q. The first line after the bullet point there

19    says in handwriting, "the deal," and then it has

20    "license fees as follows: $225 million paid over

21    three years. 75 million each year." Do you recall

22    that as part of the Covisint discussion?

23    A. I don't remember offering to sell the software

24    for $225 million.

25    Q. The deal that ultimately closed, was that a

Catz, Safra 7/20/2006 9:07:00 AM

1 three-year deal or one-year deal?

2 A. I think it was a one-year deal.

3 Q. One-year deal. Okay.

4 A. It was for a perpetual license.

5 Q. It wasn't --

6 A. Not three -- it was one-time deal.

7 Q. A one-time deal. Okay.

8 If you look down to the second to the bottom

9 paragraph, it says, "for year one we commit

10 development to certain very specific milestones and

11 payments will be timed to these milestones." And then

12 it has a schedule. Do you recall any proposed payment

13 schedule for the Covisint transaction?

14 A. No.

15 Q. No. Okay.

16 If you can turn to the page that ends in 728.

17 A. I'm there.

18 Q. Okay. Under "software and licenses" it says,

19 "we would license and host the entire e-business suite

20 and exchange software globally," and then it has a

21 number of bullet points. Do you remember anything

22 about that provision?

23 A. Uhm, as I testified earlier, the ultimate

24 Covisint deal, which does not look anything like this

25 actually, involved host -- excuse me. Licensing all

Catz, Safra 7/20/2006 9:07:00 AM

1 of Oracle's software, I believe. But we'd have to go

2 check. But I believe it had most of the software that

3 they could use to run their company. I do not

4 remember it involving any hosting at all.

5 Q. Do you remember that ever being a potential

6 provision of the agreement?

7 A. I don't.

8 MR. LINDSTROM: Hosting?

9 MR. BRITTON: Hosting.

10 THE WITNESS: Hosting. I don't remember the

11 concept of hosting the business suite as part of the

12 deal as we sit here right now, but I don't remember

13 either way.

14 MR. BRITTON: Okay.

15 Q. All right. You can put that document aside.

16 When did the Covisint transaction close?

17 A. At the very beginning of December.

18 Q. And it closed for 60 million in license

19 revenues; is that right?

20 A. Yes, something like that.

21 Q. What was the support component to it?

22 A. Oh, I don't remember. We'd have to go look it

23 up.

24 Q. This was the largest deal in Oracle's history

25 at that point?

Catz, Safra 7/20/2006 9:07:00 AM

1 A. I believe it was.

2 Q. Okay.

3 A. That's what I was told.

4 Q. And when did the software ship?

5 A. I don't know.

6 Q. Do you remember how it was shipped? CD pack

7 or --

8 A. I don't remember.

9 (Exhibit 10 was marked for identification.)

10 BY MR. BRITTON:

11 Q. I am placing in front of you what's been

12 marked as Exhibit 10.

13 A. Should I read the whole thing?

14 Q. I believe you've already read this.

15 Is this the interview memo you testified going

16 over in preparation for your depo?

17 A. It looks like it from the first page.

18 MR. BRITTON: Okay. Yeah. I'll just call your

19 attention to -- maybe mark it for the record.

20 Exhibit 10 starts at Bates NDCA-ORCL 297292, and it

21 ends at 357. And this copy has an Exhibit K with

22 nothing attached.

23 MR. LINDSTROM: Yeah, I was going to say this

24 document, as it's been marked, has attachments A

25 through K and there's no K.

Catz, Safra 7/20/2006 9:07:00 AM

1 MR. BRITTON: Correct.

2 THE WITNESS: Also, I read the interview. I don't

3 know about all these exhibits.

4 MR. BRITTON: Right. These are all the exhibits

5 that were attached, with the exception of K it looks

6 like.

7 THE WITNESS: Okay. But I read the interview.

8 MR. BRITTON: Good. That's where --

9 MR. LINDSTROM: The interview and not the

10 attachments.

11 THE WITNESS: Yeah. I mean, I could go look

12 through them, but...

13 MR. BRITTON: No, no, no. I'm going to focus you

14 on the interview.

15 THE WITNESS: Okay.

16 BY MR. BRITTON:

17 Q. If you could turn to page 8.

18 If you look at -- the heading is Q3 of

19 FY 2001, and the first number is December. One. Read

20 the second paragraph of that.

21 MR. LINDSTROM: The one that begins "Catz was

22 heavily involved"?

23 MR. BRITTON: Yes.

24 THE WITNESS: Uh-huh.

25 (Witness reviews document.)

1   Uh-huh.

2   BY MR. BRITTON:

3   Q. Have you had a chance to read it?

4   A. The second paragraph?

5   Q. Yes.

6   A. Yes.

7   Q. Okay. The last sentence of the second

8   paragraph says, "Catz believes that the software

9   actually shipped in the second quarter." Before I ask

10  you about that sentence, do you remember having a

11  conversation with the Special Litigation Committee

12  about the Covisint transaction?

13  A. I don't remember the exact specifics of the

14  conversation, but I have, you know, a vague memory of

15  sitting with the lawyers and talking to them.

16  Q. Okay. The second paragraph that you just

17  read, is this an accurate reflection of what you told

18  the SLC?

19  MR. LINDSTROM: Objection. Compound.

20  THE WITNESS: Okay. There's so many different

21  things. Some of it's -- it's a long time ago, and I'm

22  not exactly sure that it's exactly -- I just don't

23  remember anymore telling them this. And I don't have

24  a memory of that last point which you asked me about.

25  MR. BRITTON: Right.

1   THE WITNESS: I just don't remember now whether I

2   told them this at the time or -- I just don't

3   remember.

4   BY MR. BRITTON:

5   Q. Okay. Is there anything in this paragraph

6   that you remember as being incorrect?

7   MR. LINDSTROM: Incorrect --

8   THE WITNESS: Incorrect?

9   MR. LINDSTROM: -- as it relates to the underlying

10  deal? Or what she said to them during the interview?

11  I just want the question to be clearer.

12  MR. BRITTON: I think they're one in the same, but

13  let's take it in two parts.

14  Q. Is there anything in the second paragraph that

15  is factually incorrect? Not what you told them, but

16  factually incorrect as it relates to the Covisint

17  transaction?

18  A. As I sit here right now, there's nothing in

19  here that I know to be incorrect. And there are

20  things that I don't know whether I -- I just don't

21  know if they're correct or not -- wait. I forgot

22  which one I'm -- which question am I answering?

23  Q. Whether it's substantively correct or --

24  A. Or incorrect.

25  Right now, whether it's correct or not, I

1   don't know necessarily that something is exactly

2   incorrect. As I sit here right now, I cannot be sure

3   that something is actually incorrect in this

4   paragraph.

5   Q. Okay. And, then, with the last sentence of

6   this paragraph, you just don't know one way or the

7   other when they shipped?

8   A. I just don't remember. As I sit here right

9   now, I just have no memory of this.

10  Q. Do you have a memory of ever reading that

11  sentence and saying that's not correct?

12  A. I just don't remember.

13  Q. Okay. You can put that document aside.

14  Now, the ultimate deal was for $60 million and

15  the discount was somewhere around 99 percent; is that

16  correct?

17  A. I don't remember the actual amount. It was

18  enormous.

19  Q. Why was it so high?

20  A. Because the more software you buy, the higher

21  discount you get. Kind of the Costco principle. And

22  they were buying just massive amounts of software, and

23  that was the discount that we could -- that was the

24  amount of money they were willing to pay for that

25  software..

1   Q. So the amount of software that they purchased

2   list price added up to an amount that you needed to

3   discount back down to the negotiated deal; is that

4   right?

5   A. What with the large amount of software -- I

6   don't know what the total list price was, but it was a

7   very large number that they weren't willing to pay.

8   Q. But do you remember whether to come up with

9   the price that you applied the discount to, do you

10  remember whether that was just a price that was picked

11  out of the -- you know, in a way to get down to the

12  negotiated deal, or was it a component of the software

13  that Covisint purchased?

14  MR. LINDSTROM: Objection. Vague and ambiguous.

15  THE WITNESS: I'm not exactly sure what you're

16  asking and --

17  MR. BRITTON: Let me do it this way.

18  (Exhibit 11 was marked for identification.)

19  BY MR. BRITTON:

20  Q. I've placed in front of you what has been

21  marked as Exhibit 11. Take a moment to look at this

22  exhibit.

23  For the record, Exhibit 11 starts at Bates

24  NDCA-ORCL 041967 and ends at 969.

25  My question is going to be on the last page of

Catz, Safra 7/20/2006 9:07:00 AM

| | |
|---|---|
| 1 | Exhibit 11. |
| 2 | Do you recognize Exhibit 11? |
| 3 | A. Now that I see it, I recognize this. |
| 4 | Q. There are parts that you're reacting to. What |
| 5 | parts of the e-mail are you reacting to? It appears |
| 6 | as though it's bringing back fond memories. |
| 7 | A. I'm just reacting to the way I signed off at |
| 8 | the end. |
| 9 | Q. Okay. "This is over"? |
| 10 | A. That's correct. |
| 11 | Q. Look to the last page. "Here is the breakdown |
| 12 | of license as it has been recognized by Covisint with |
| 13 | an across the board discount of 99.55 percent." It |
| 14 | carries it out several numbers. Does this refresh |
| 15 | your recollection about what the ultimate discount |
| 16 | percentage was for the Covisint transaction? |
| 17 | A. It was around here, yes. I knew it was high. |
| 18 | Q. All right. Under "License Category" it has |
| 19 | "Xchange" and under "list price" it has "$12 billion." |
| 20 | A. That's a lot of software. |
| 21 | Q. That's a lot of software. |
| 22 | What I was trying to ask you before was did |
| 23 | Covisint buy so much software that by list price it |
| 24 | amounted to $12 billion? Or was that a number that |
| 25 | was picked to give them a 99 percent discount to get |

Oracle

Page 89

Catz, Safra 7/20/2006 9:07:00 AM

| | |
|---|---|
| 1 | down to the negotiated deal? |
| 2 | A. No. The way it works is that when you buy |
| 3 | software, you buy it on the basis of a metric. |
| 4 | Something we can measure, count. And the Xchange |
| 5 | software had a metric at the time which was, like, |
| 6 | cost or cost of goods sold -- I don't remember what |
| 7 | the metric was. But since -- and it was predicated on |
| 8 | the price or the value of the product being sold on |
| 9 | the exchange. So as a result of the fact that the |
| 10 | auto companies -- I don't remember which ones, but |
| 11 | definitely GM and Ford -- were going to be buying |
| 12 | doors and windows and wheels and stuff, all of their |
| 13 | cost of goods sold number was going to go through this |
| 14 | exchange and get counted. And I don't know how much |
| 15 | they spend a year, but it could easily be, like, |
| 16 | 12 bill-- it could be some crazy number. That if |
| 17 | you multiply that number times the -- let's say a dime |
| 18 | per dollar or something like that, it comes out to |
| 19 | 12 billion. |
| 20 | Q. Okay. So that's how you used -- that's how |
| 21 | you came to the 12 billion dollar figure and then |
| 22 | applied the discount to get down to the negotiated |
| 23 | price? |
| 24 | A. That's right. The price they were willing to |
| 25 | pay for it. |

Oracle

Page 90

Catz, Safra 7/20/2006 9:07:00 AM

| | |
|---|---|
| 1 | Q. All right. |
| 2 | A. That's how it would be done. |
| 3 | Q. Now, there's discussions in this -- before I |
| 4 | get there, Xchange. What is this Xchange license? |
| 5 | What product is that? |
| 6 | A. It was, I think, a product called Xchange. |
| 7 | The Oracle Xchange. It was software that allowed you |
| 8 | to do purchasing -- |
| 9 | Q. Was this -- |
| 10 | A. -- on a computer. |
| 11 | Q. Was it designed particularly for Covisint, or |
| 12 | was it an existing product? |
| 13 | A. It was an existing product. |
| 14 | Q. Now, the e-mail below this -- and the e-mail |
| 15 | in previous pages -- is talking about adjusting the |
| 16 | discount across the different licenses. And |
| 17 | ultimately the answer was "no." Do you know why there |
| 18 | was this discussion about adjusting the license |
| 19 | percentages or the discount percentages? |
| 20 | A. Yes. |
| 21 | Q. Can you tell me? |
| 22 | A. Because Mike Rosser, who wrote this, was |
| 23 | compensated based on how much CRM Oracle sold. And so |
| 24 | the math that would come out using our standard policy |
| 25 | of applying the same discount to all the products in |

Oracle

Page 91

Catz, Safra 7/20/2006 9:07:00 AM

| | |
|---|---|
| 1 | the deal meant that he would get $128,179 in credit; |
| 2 | and he liked the idea of getting $5,724,967 in credit. |
| 3 | Q. Higher commission? |
| 4 | A. That would be what I understand it as. |
| 5 | MR. BRITTON: Okay. All right. You can put that |
| 6 | document aside. |
| 7 | (Exhibit 12 was marked for identification.) |
| 8 | MR. BRITTON: I have placed in front of you what |
| 9 | has been marked as Catz Exhibit 12. Will you take a |
| 10 | moment to look at this exhibit. |
| 11 | And for the record, Exhibit 12 starts at |
| 12 | Bates NDCA-ORCL 152320 and ends at 326. |
| 13 | I stand corrected. It starts at 152319 and |
| 14 | ends at 326. |
| 15 | (Witness reviews document.) |
| 16 | Q. If it will help your eyes at all, my questions |
| 17 | will be focused on pages 3 and 4. |
| 18 | A. The one that ends with 3 and 4? |
| 19 | Q. No. |
| 20 | A. In the middle? |
| 21 | Q. 21 and 22. |
| 22 | A. Oh. |
| 23 | So I should just stop reading? I'm only on... |
| 24 | Q. Unless you want to read the whole -- yeah. If |
| 25 | you want to read the whole thing, you can; but I'll be |

Oracle

Page 92

1 focusing my questions on just those areas.

2 A. This is just so dense and so long --

3 Q. Yeah.

4 A. -- so I'm just trying to remember it. It's

5 from, like, October or something of 2000.

6 Okay. I've read quickly through the second

7 half of it. Where did you want me to look?

8 Q. Well, first tell me if you recognize this

9 exhibit.

10 A. Not exactly.

11 Q. The first page is from Nicole Hamilton to you

12 and a bunch of others --

13 A. Yes.

14 Q. -- on October 6, 2000.

15 Do you recognize the form of which is

16 attached, the issues list?

17 A. I think so.

18 Q. What is this issues list?

19 A. It's, like, this thing Nicole Hamilton put

20 together of all these issues with Covisint.

21 Q. So am I fair to -- is it fair to say that the

22 issues that would prohibit Oracle from recognizing

23 revenue exist in here?

24 A. No. These are all the issues that Nicole

25 pulled out or summarized. They involved revenue

1 recognition, reading further in -- and all sorts of

2 things related to revenue recognition. But, then, all

3 sorts of legal liability issues, all sorts of legal

4 related issues, patent issues, warranty. Then all

5 sorts of business issues. Exclusivity. Just --

6 consulting. Just a myriad of wide open issues.

7 Q. Okay. If an issue that prevented Oracle from

8 rev -- recognizing revenue existed, would it be in

9 here?

10 MR. LINDSTROM: As of October -- the date of this

11 document?

12 MR. BRITTON: October 6, 2000. Correct.

13 THE WITNESS: It wouldn't necessarily be in here,

14 but it might be in here. This is focusing on specific

15 topics in some sort -- it's referencing something

16 else, a document of some sort.

17 MR. BRITTON: Okay.

18 THE WITNESS: So if it's in the document, it's in

19 here.

20 BY MR. BRITTON:

21 Q. Do you know what it's referencing?

22 A. I would guess some sort of an agreement. But

23 I'm speculating. But that's my sense.

24 Q. Okay.

25 A. It's some term sheet or something like that.

1 Q. All right. If you look to the page that ends

2 in 21.

3 A. Yes.

4 Q. The bottom row says. "80 percent discount

5 cannot be greater than current deal discount. Have

6 agreed to unlimited licenses discount on current deal

7 is nearly impossible." And we saw on that other

8 document that the discount was 99 percent. So how did

9 you resolve this issue, if you know?

10 A. What this is referencing is if the final

11 agreement that we looked at or that was referenced was

12 an unlimited deal. But it's not an unlimited deal.

13 See, this happened in October, and the deal was done

14 in December. So somewhere along the line -- see, it

15 says "If agree to unlimited licenses," but it's not

16 unlimited licenses. It's, you know, $12 billion worth

17 of --

18 Q. 12 billion dollars.

19 A. Or whatever it was. It was more than

20 12 billion, I think.

21 So if you agree to an unlimited, then it's

22 unlimited. So it's, like, infinity. How much are you

23 using?

24 Q. Right.

25 Was the metrics system that was used to value

1 the deal selected because of the unlimited license

2 issue?

3 A. Oh, I don't -- I don't remember.

4 Q. You don't remember. Okay.

5 All right. You can put that document aside.

6 At some point collectibility became an issue

7 for you with the Covisint transaction; is that right?

8 A. What do you mean collectibility? Whether

9 Covisint was good for the money?

10 Q. Yeah.

11 A. I wanted to get them -- the cash up front.

12 Q. Why?

13 A. Because it is a good sign. I always like to

14 get the money up front myself.

15 Q. Did you not think that Ford and GM were good

16 for the money?

17 A. Uhm, I just can't remember. But I definitely

18 had that as my negotiating requirement with them.

19 Q. Okay. Was that negotiating requirement based

20 on anything?

21 A. I can't remember.

22 Q. Was there revenue recognition rules that would

23 prohibit Oracle from recognizing revenue until it got

24 the cash in its hand?

25 A. I don't know.

1   I don't know.

2   Q. All right. Let me ask you it this way: If

3   everything that needed to happen for revenue to be

4   recognized on the transaction happened except for you

5   hadn't been paid yet, would Oracle have been able to

6   recognize revenue in the second quarter of 2000?

7   MR. LINDSTROM: Objection. Calls for a legal

8   conclusion. No foundation.

9   THE WITNESS: What? In the second quarter, no.

10   We booked that deal in the third quarter.

11   BY MR. BRITTON:

12   Q. In the second quarter of 2000, if everything

13   that had happened for revenue recognition to be proper

14   had happened with the exception of receiving the cash,

15   could Oracle have recognized the revenue in the second

16   quarter?

17   MR. LINDSTROM: Objection. Calls for a legal

18   conclusion. Speculation. No foundation.

19   THE WITNESS: I really don't know. We'd have to

20   go look at what's required, and we -- we'd have to go

21   back and figure out exactly what was going on.

22   BY MR. BRITTON:

23   Q. I'm just asking for your memory. So if you

24   don't know, that's --

25   A. Oh. Well, you're not asking me for my memory,

---

1   you're asking me about a hypothetical. Because the

2   deal itself wasn't signed. We hunted them down for

3   signature pages even in December. So you're not

4   asking about my memory of the time, you're asking a

5   hypothetical I can't answer.

6   Q. What I'm asking is your memory of the revenue

7   recognition rules.

8   A. Oh. I'm not the right person to ask.

9   Q. Okay. Were you the person that came up with

10   the "I want the cash now" demand?

11   A. Yes.

12   Q. Okay. And did you come up with that in

13   connection with anybody else, or was that your -- was

14   that your term?

15   A. It was a negotiating strategy..

16   Q. Okay.

17   When did -- if you remember, when did the --

18   that negotiating strategy come about?

19   A. Oh, I don't know.

20   Q. And you don't know why it came about?

21   A. Oh, I can't -- I don't have a specific issue,

22   but I wanted them -- I wanted to have something to

23   negotiate, and I wanted to be asking for the cash so

24   that they understood that I wanted something.

25   Q. Okay. You can put that document aside.

---

1   A. But, you know, as I think about it, I just

2   really can't remember where it came from or whose idea

3   it was or whether it was required. I just don't

4   remember now. But I remember I'm the one that kept

5   pushing for it.

6   Q. All right. Do you remember a transaction with

7   BellSouth in the 2000 time period?

8   A. I have a vague memory of BellSouth. I don't

9   know the time frames or anything like that.

10   Q. Now, do you remember what the transaction -- I

11   believe it occurred in the early part of 2000. Do you

12   recall what that transaction was comprised of?

13   A. Well, I don't remember a transaction,

14   actually. I remember a consulting project.

15   Q. Okay. What do you remember about BellSouth in

16   the 2000 time period?

17   A. It was -- well, I don't remember the time

18   frame so I can't answer specifically to the time frame

19   because I can't tie it to sometime five years ago or

20   six years ago.

21   (Exhibit 13 was marked for identification.)

22   BY MR. BRITTON:

23   Q. I've placed in front of you what has been

24   marked as plaintiff's Exhibit 13 -- or Catz

25   Exhibit 13. Take a moment to look at this exhibit.

---

1   A. I'm sorry. Did you ask me a question?

2   Q. Do you recognize it?

3   A. Do I have, like, a memory of it right now when

4   I look at it? Not particularly, no.

5   Q. Okay.

6   The -- there's two e-mails on the front page.

7   The bottom one is from Mark Berrenechea to Larry

8   Ellison, you, and a bunch of others. And it's dated

9   September 29, 2000. So you received this e-mail; is

10   that right?

11   A. I'm listed as a recipient. I probably

12   received it.

13   Q. No reason to believe you didn't?

14   A. No reason to believe I didn't receive it.

15   Q. If you look at the second page, it says

16   "EXPECTATIONS."

17   A. Uh-huh.

18   Q. It says, "BellSouth wants a development

19   partnership...we are delivering a consulting project."

20   Does that refresh your recollection about the

21   transaction and what was going on?

22   A. A little.

23   Q. Okay. How does it refresh your memory?

24   A. Well, we were doing a consulting project and

25   we were signed up to a consulting project, a custom

1 consulting project; and they wanted development more
2 involved to help --
3 Q. Okay.
4 A. -- the consultants.
5 Q. And is that something that Oracle provided to
6 BellSouth?
7 MR. LINDSTROM: More development?
8 MR. BRITTON: Yes.
9 THE WITNESS: Well, uhm, I don't really know if
10 they did or not. If Oracle did or not.
11 BY MR. BRITTON:
12 Q. Okay. The next line says, "Current
13 Implementation is 50 percent product, 50 percent
14 customizations"?
15 A. Yeah..
16 Q. Do you remember what the product was for this
17 BellSouth transaction?
18 A. I don't remember.
19 Q. You can put that document aside for the
20 moment, and we'll get back to it.
21 Now, the development part, they wanted --
22 BellSouth wanted to modify Oracle's products and then
23 patent it? Do you remember that?
24 MR. LINDSTROM: Objection. Assumes facts. No
25 foundation.

1 THE WITNESS: No, I don't remember that.
2 MR. BRITTON: Let me...
3 (Exhibit 14 was marked for identification.)
4 BY MR. BRITTON:
5 Q. I have placed in front of you what has been
6 marked as Exhibit 14. Take a moment to look at this
7 exhibit.
8 For the record, Exhibit 14 starts with Bates
9 NDCA-ORCL 034883 and ends at 886.
10 A. Okay.
11 Q. Do you recognize Exhibit 14?
12 A. I do now.
13 Q. You do?
14 A. Uh-huh.
15 Q. And what is Exhibit 14?
16 A. It's an e-mail. It's an e-mail chain.
17 Q. Okay. And do you remember the content of the
18 e-mail chain?
19 A. I do after reading the e-mail.
20 Q. All right. And the question I asked you
21 before was whether BellSouth was looking to take a
22 Oracle product, modify it, and then patent it.
23 A. Well --
24 Q. Am I misreading the e-mail?
25 A. -- it depends what you're saying. Because it

1 is unclear what they are specifically asking for.
2 Oracle holds the patents on its own products. This is
3 a consulting project, and they are -- it's hard to say
4 what they are asking for because the way part of this
5 reads is they would want to patent Oracle products.
6 which is obviously a nonstarter. If they want to
7 patent custom consulting, that's another matter, but
8 may not be acceptable either.
9 Q. So Larry said no on the -- at least the
10 agreement as it was proposed in this e-mail? Is that
11 right?
12 A. Generally he said something like no.
13 Q. How was the issue resolved?
14 A. Uhm, I -- I don't exactly remember how it was
15 resolved.
16 Q. But it was resolved at some point?
17 A. I'm not entirely sure if the master services
18 agreement for consulting was signed or not. I just
19 don't remember anymore.
20 Q. Okay.
21 A. But this is in April of 2000, right?
22 Q. Correct.
23 Do you remember an issue with the percentage
24 discounts that were being offered to BellSouth?
25 A. As I sit here right now, I don't remember

1 them.
2 (Exhibit 15 was marked for identification.)
3 BY MR. BRITTON:
4 Q. We've placed in front of you what has been
5 marked as Catz Exhibit 15. Will you take a moment to
6 look at this exhibit.
7 For the record, Catz Exhibit 15 is a one-page
8 e-mail that is Bates NDCA-ORCL 021009.
9 Do you recognize Exhibit 15?
10 A. Not really.
11 Q. All right.
12 The e-mail is dated April 26, 2000, it's from
13 HQAPP?
14 A. Yes.
15 Q. Do you know what that e-mail is?
16 A. HQAPP. It's an approval account.
17 Q. Is that an account that you had access to?
18 A. I do not log into HQAPP, no.
19 Q. Were you able to send approvals and things
20 over HQAPP by telling somebody else to enter it?
21 A. I didn't discuss the e-mailing. I discussed
22 the actual deal approvals with people who had access
23 to HQAPP.
24 Q. And then they would take that information and
25 pass it along with whatever they --

1    A. They would do what they're supposed to.

2    Q. Okay. Now, the top line says, "Everyone,

3    Safra and Larry wanted us to inform you that all deals

4    that are on the table and not closed with BellSouth at

5    this point will need to have some internal adjustments

6    made to the support and license revenue when booked."

7    Do you see that?

8    A. Yes.

9    Q. Do you know why?

10    A. Yes.

11    Q. Can you tell me why?

12    A. Because the support was quoted out at too low

13    a rate by mistake apparently.

14    Q. Okay. Why not just go back to the customer

15    and say "we need to change the discount percentage"?

16    A. I think that we put out a proposal we were

17    going to -- you know, I wasn't there. That's what I

18    would have done probably; but they made a proposal,

19    they wanted to stick with it.

20    Q. Okay. It says when these deals are booked, we

21    will need to JE license revenue to support to make the

22    resulting support 16 percent of net. Do you

23    understand JE to be journal entry?

24    A. Yes.

25    Q. Okay.

1    The next paragraph talks about the difference

2    in discounts, and the last sentence says, "We need to

3    try to reset BellSouth expectations up to at least

4    16 percent of net and explain that the first deal was

5    priced the way it was because of the included

6    freebies." Do you know what that is talking about?

7    A. I have no idea.

8    Q. Okay. Put that document aside.

9    All right. Now, this implementation had

10    considerable problems. Do you remember that?

11    A. The consulting project?

12    Q. Yeah.

13    A. I remember problems with this consulting

14    project.

15    Q. What do you remember about it?

16    A. That there were problems.

17    Q. Okay. Do you remember those problems costing

18    Oracle any money in terms of free services or free

19    support?

20    A. As I sit here right now, I don't have any

21    memory of any details on this project or even when it

22    was.

23    Q. Okay. If you go back to Exhibit 13. On the

24    second page there's a heading "Timetable."

25    A. Yes.

1    Q. It says, "We have 30 days to go live. This is

2    a no shit date." Did you make it?

3    A. I have no idea.

4    Q. If you look down to the big issues, the first

5    heading says, "17 product defects that need to be

6    fixed by 10/3," and it has some more information. The

7    next one is "23 product defects by October 23rd."

8    Then it has a parenthetical. The next bullet point

9    says, "115 consulting enhancements/defects by 10/3."

10    Then it goes on to list a number of different big

11    issues. Did you discuss these with Larry in December

12    of 2000?

13    A. Did I?

14    Q. Uh-huh.

15    A. I don't remember.

16    Q. Were these the subject of conversation at the

17    development meetings?

18    A. I don't know.

19    Q. Okay. Where did you learn of the problems

20    that you're remembering about BellSouth?

21    A. Oh, I don't remember.

22    Q. At the last heading on this page it says,

23    "extremely risky." Do you know what that's referring

24    to?

25    A. I don't know which part of this it's talking

1    about.

2    Q. And on the last side it says, "UPSIDE." "If

3    we go live, another 30 million in license, BellSouth

4    standardization on Oracle." So there was a

5    $30 million deal hanging on this implementation?

6    MR. LINDSTROM: Object. Mischaracterizes the

7    document. No foundation.

8    BY MR. BRITTON:

9    Q. Is that fair?

10    MR. LINDSTROM: Assumes facts.

11    THE WITNESS: I do not think that is correct, no.

12    BY MR. BRITTON:

13    Q. Okay. Do you remember anything about a

14    potential $30 million deal that was going to go into

15    effect after the implementation?

16    A. I don't. No.

17    (Exhibit 16 was marked for identification.)

18    BY MR. BRITTON:

19    Q. Put this in front of you, what has been marked

20    as Exhibit 16. Please take a moment to look at this

21    exhibit.

22    A. Do you have a question?

23    Q. Yeah. Do you recognize Exhibit 16?

24    A. I don't recognize it, you know, necessarily;

25    but I understand what it is.

Catz, Safra 7/20/2005 9:07:00 AM

1  Q. Let me mark it for the record first. For the
2  record, Exhibit 16 has -- it's a one-page e-mail with
3  Bates NDCA-ORCL 034333. Do you recognize Exhibit 18?
4  I think I asked you that.
5  A. Yeah, you asked me. I understand what it is.
6  I don't happen to remember it on its own.
7  Q. It's an e-mail you forwarded to Larry Ellison
8  on January 9, 2001?
9  A. It's actually an e-mail -- where's the -- it's
10  from me. Who's it to?
11  Q. It looks there's just a cc on it.
12  A. That doesn't make sense, right?
13  Q. I don't know if you can send an e-mail without
14  a "to" but with a cc.
15  A. I don't know. So I don't know who it was for,
16  but Larry was definitely cc'd on my comment.
17  Q. Okay.
18  All right. Now, the e-mail below is from Mark
19  Berrenechea. And he says, "The OSI consulting team is
20  wacked, Larry, and it's wasting our F'en time." Do
21  you remember the events that spawned this e-mail?
22  A. Very vaguely.
23  Q. Okay. What do you remember about them?
24  A. That this was a consulting project that was
25  not going well.

Catz, Safra 7/20/2005 9:07:00 AM

1  Q. Okay. Now, the last document that we saw said
2  that there was 30 days to go live. This document is
3  later than 30 days. Does this refresh your
4  recollection about whether BellSouth went live before
5  this?
6  A. I actually don't know. Because I don't know
7  which products were involved so I don't know if pieces
8  went live. It references a bunch of different things,
9  different -- so I really don't remember the details.
10  It talks about so many products that I don't know if
11  they went live on some and -- I just don't know.
12  Q. Okay.
13  A. It's six years ago.
14  MR. LINDSTROM: And the record should reflect that
15  when the witness was saying that "it" refers to so
16  many products, she was placing her hand on Exhibit 13
17  for identification.
18  THE WITNESS: Yes. I'm sorry.
19  MR. BRITTON: Correct.
20  THE WITNESS: Yes.
21  BY MR. BRITTON:
22  Q. Okay. You can put that document aside.
23  How did these implementation problems with
24  BellSouth affect Oracle's revenue recognition?
25  MR. LINDSTROM: Objection. Mischaracterizes

Catz, Safra 7/20/2005 9:07:00 AM

1  testimony.
2  THE WITNESS: Uhm, this is a -- this BellSouth
3  project -- and I don't remember the details of it --
4  is a consulting project.
5  BY MR. BRITTON:
6  Q. It was 50 percent product, 50 percent
7  customization?
8  A. No. No.
9  Q. Am I reading that wrong?
10  A. Yes. You are.
11  Q. Okay. Tell me how I'm reading that wrong.
12  Go back to Exhibit 13. Under "EXPECTATIONS"
13  it has "current implementation is 50 percent product,
14  50 percent customizations"?
15  A. Yes. The consulting project has a lot --
16  50 percent customization is a huge number, and so it's
17  a lot of custom code being built by Oracle
18  consultants.
19  Q. Okay.
20  A. It has nothing to do with revenue -- well,
21  revenue recognition of the product purchased.
22  Q. Okay. Do you know if Oracle recognized
23  revenue on the product purchased in the beginning?
24  A. Oh, I have no idea.
25  Q. Okay.

Catz, Safra 7/20/2005 9:07:00 AM

1  Have you ever heard of the term POEF before?
2  A. Yes.
3  Q. What does that mean to you?
4  A. Something to do with purchase orders.
5  Q. Purchase order exception form?
6  A. I think so.
7  Q. Okay. What are they used for?
8  A. Something when we don't have a purchase
9  order -- I'm not really sure. I'm not the right
10  person to ask. Someone in finance could answer that
11  question.
12  And I don't know that they're in use anymore.
13  Q. Was it used by Oracle to recognize revenue
14  when Oracle hadn't received a purchase order yet?
15  MR. LINDSTROM: In what time frame?
16  MR. BRITTON: 2000.
17  THE WITNESS: You know, I don't know. I'm not the
18  right person to ask.
19  BY MR. BRITTON:
20  Q. Who would be the right person?
21  A. Someone in accounting, finance, accounts
22  receivable. I'm not really sure.
23  (Exhibit 17 was marked for identification.)
24  BY MR. BRITTON:
25  Q. I've placed in front of you what has been

Catz, Safra 7/20/2006 9:07:00 AM

1  marked as Catz Exhibit 17. Will you take a moment to

2  look at this exhibit.

3      For the record, Exhibit 17 starts with Bates

4  NDCA-ORCL 028461, it ends at 464.

5      Do you recognize Exhibit 17?

6  A. Sort of.

7  Q. It's an e-mail from Jeff Henley to you, at

8  least the top one?

9  A. Yes, the top one is. It's a whole chain of

10 e-mails that don't involve me.

11 Q. And he's forwarding discussion about the use

12 of POEFs at Oracle?

13 A. Some of them. Yes. Actually, I guess I'm in

14 some of this chain.

15     This is from March of 2000.

16 Q. Right. Did Oracle use POEFs in the third

17 quarter of 2001?

18 A. I don't know.

19 Q. Fiscal 2001?

20 A. I don't know.

21 Q. Do you remember when POEFs were eliminated?

22 A. I don't know if they were eliminated.

23 Q. Okay. I'm sorry, I thought I heard you say

24 that you don't know if they were used today.

25 A. I don't know.

---

Catz, Safra 7/20/2006 9:07:00 AM

1  Q. Okay.

2  A. I don't know if they were eliminated, I don't

3  know if they're in use.

4  Q. Do you know if Oracle booked deals based upon

5  POEFs?

6  MR. LINDSTROM: In what time frame? Third quarter

7  of 2001?

8  MR. BRITTON: Let's go 2000, 2001.

9  THE WITNESS: I don't know. I mean, this talks

10 about POEFs as part of the deal. I don't know if you

11 mean based on — a deal was booked based on a lot of

12 things, not the least of which is a signed agreement.

13 MR. BRITTON: Okay.

14 THE WITNESS: Sometimes.

15 BY MR. BRITTON:

16 Q. Okay. This — if you look at the second page.

17 A. Yes.

18 Q. It says — if you look down to the fourth full

19 paragraph. It says, "One additional factor arising

20 from POEFs is the effect on our DSO. Looking at all

21 invoices created in" Q2000 it looks like, "(those that

22 have now gone 90 days past due), for all invoices

23 billed with purchase orders, $94 million or 9.3

24 percent, of the original invoices amount (net of

25 credits and adjustments) remains outstanding. For all

---

Catz, Safra 7/20/2006 9:07:00 AM

1  invoices booked under poefs for that same quarter,

2  $49 million or 25.63 percent remains outstanding"?

3  A. So there were a billion dollars booked

4  without — with POs, and a couple hundred million on

5  POEFs. That's the math.

6  Q. Right. And the DSOs are higher — wait a

7  minute. Let me ask you a different way.

8      What did you understand this paragraph to mean

9  when you received it?

10 A. Oh, I don't remember what I understood it to

11 mean.

12 Q. Do you have an understanding of what this

13 paragraph is saying today?

14 A. Yeah. Basically.

15 Q. Okay. What is it — what do you understand it

16 to mean?

17 A. That the collections team would prefer to have

18 a PO. Make it easier to —

19 Q. Easier to collect?

20 A. Easier to collect administratively.

21 Q. Okay.

22     Were write-offs with deals with POEFs, were

23 those higher than they were with deals with purchase

24 orders?

25 A. Oh, I don't know. You need to ask someone

---

Catz, Safra 7/20/2006 9:07:00 AM

1  other than me.

2  MR. BRITTON: Okay. You can put that document

3  aside.

4      Okay. Probably a good time for a lunch

5  break.

6  MR. LINDSTROM: Thank you..

7  THE VIDEOGRAPHER: This marks the end of Tape 2,

8  Volume I in the deposition of Safra Catz at 12:29.

9  Going off the record.

10 (Lunch recess taken at 12:29, proceedings to

11 resume at 1:00.)

12              -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

Catz, Safra  7/20/2006  9:07:00 AM

1  AFTERNOON SESSION

2  July 20, 2006          1:07 P.M.

3          -oOo-

4  THE VIDEOGRAPHER: On record at 1:07. This marks

5  the beginning of Tape 3 in Volume I of the deposition

6  of Safra Catz.

7          EXAMINATION (RESUMED)

8  BY MR. BRITTON:

9  Q. Ms. Catz, tell me what you remember about the

10  quality of 11i in calendar year 2000.

11  A. Well, I can't pin, you know, 11i on exactly

12  the dates 2000 or 2001. It's our current product line

13  still, 11i.

14      It came out around the date you talked about.

15  Q. May 2000?

16  A. I don't know. It came out in pieces so I

17  don't -- I really don't know exactly. But I'm sure

18  there's documents that show --

19  Q. Right.

20      Now, you attended the weekly development

21  meetings; is that right?

22  A. Yes. The weekly Larry Ellison development

23  meetings. There are many development meetings I

24  wouldn't attend.

25  Q. Correct.

Catz, Safra  7/20/2006  9:07:00 AM

1  Who was at those development meetings?

2  A. It would depend which development group was

3  involved. So Tuesday would be server tech, which is

4  the database middleware group run by Jack Rosewad. So

5  he'd have his direct reports in general, but some

6  would come or not.

7      Then one of the days -- it depended when, but

8  it was Mark Berrenechea and Ron Wald would have the

9  applications. And that's the business suite products.

10  And some other products too.

11      And then there was tools meeting, and that was

12  by a guy named Sohabe Avasi, and he had his direct

13  reports.

14  Q. The applications development meetings, were

15  those attended by both Ron Wald and Mark Berrenechea

16  together?

17  MR. LINDSTROM: In 2000.

18  THE WITNESS: I don't know. See, I'm not sure. I

19  think they were for -- at some period, and then there

20  were separate meetings. I can't exactly tell. But

21  I'm sure someone else could actually get you the

22  answer on that.

23  BY MR. BRITTON:

24  Q. Okay. What -- what were -- what was discussed

25  in the applications development meetings in 2000 about

Catz, Safra  7/20/2006  9:07:00 AM

1  the quality of 11i?

2  A. Oh, I don't remember. I can't even place

3  those meetings. I mean, in the clock -- in the sort of

4  schedule. Calendar.

5  Q. Okay. Let's do it, then, from event. After

6  11i's release, what were the development guys, the

7  applications development guys, saying about the

8  quality of 11i?

9  MR. LINDSTROM: In what time frame?

10  MR. BRITTON: It was released in May 2000. I'm

11  trying to pin -- she can't remember the time so I'm

12  trying to pin her to an event.

13  MR. LINDSTROM: But my request for clarification

14  is do you want to know what they were saying the first

15  month? The first six months? The first year?

16  MR. BRITTON: All right.

17  Q. Let's say after the first six months after its

18  release. What were the development guys saying about

19  the quality of 11i?

20  A. The 11i actually has many modules. It's on a

21  single integrated data module; but the modules

22  actually came out at different times. So it would

23  really depend on which products. I don't remember

24  them talking -- saying anything about -- anything

25  about the quality of Oracle financials when it came

Catz, Safra  7/20/2006  9:07:00 AM

1  out. I don't remember -- you know, I just don't

2  remember the discussion of 11i as a general thing.

3  You would talk about it related to different modules.

4  Q. Okay. The CRM modules, were those released at

5  the same time that the suite was released? Or were

6  those later?

7  A. The -- as I said before, the suite wasn't

8  released in one -- I don't remember it being released

9  in one thing, or management was released after

10  financials, I think. Someone would have the exact

11  schedule.

12      I don't know whether CRM -- I don't know when

13  CRM modules -- because there's different modules there

14  too, marketing and sales. I just don't remember when

15  those were released or if they were even released in

16  that time frame.

17  Q. Okay. Did you have any discussions within the

18  first six months of 11i's release about customer

19  implementations of 11i and problematic

20  implementations?

21  A. Did I have any discussions with anybody?

22  Q. During those development meetings. The

23  applications development meetings.

24  A. Uhm, I can't think of one right now. But I

25  vaguely -- you know, have a vague memory of

1  discussions of customer implementations.

2    Q. Okay.

3    A. I don't know specifically about problems. And

4  again, I wouldn't want to swear to the time frames at

5  all.

6    Q. Okay.

7      Can you tell me your understanding of how

8  Oracle's sales representatives used demonstrations to

9  sell the 11i suite in the 2000 time period?

10    A. Oh, I don't remember what exactly was going on

11  in 2000. In general, a demonstration is you show a --

12  you know, you -- it's a demonstration in typical

13  sales. You show a customer what a product -- what the

14  thing you're selling generally looks like under some

15  circumstances.

16      That period in particular, I'm not sure, may

17  have been a transition period between doing it on

18  their laptops, which is what most people historically

19  did, and doing it off a central server.

20    Q. Okay. What was the difference between the

21  two?

22    A. Oh, there's a big difference. When --

23  historically, what salesmen do, and they like to do,

24  is they configure the software on their laptop, and

25  they configure it some way they like, and they're

1  responsible for it. And they configure some version

2  of it -- might not be the most recent version but a

3  version of it to just show the customer some way. And

4  they then demonstrate the product the way they like to

5  do it.

6      The alternative is that it's all implemented

7  and configured on central servers, many of them, and

8  it has a number of different flows, process flows,

9  that try to show the customer different parts. And

10  that's it. So that's the difference.

11    Q. Okay. Where are the central servers located?

12    A. Oh, I don't know.

13    Q. Okay. They're not in the same location as a

14  demonstration if it's --

15    A. It depends what you mean. Let's say I'm at a

16  customer.

17    Q. Right.

18    A. The server is somewhere on an Oracle facility.

19    Q. Okay. So you'd have to hook up via the

20  Internet?

21    A. That's right.

22    Q. And you're not sure whether during the 2000

23  time period the demonstrations were utilizing the

24  central server or the laptops?

25    A. Yeah. I just don't remember.

1    Q. You remember the demonstrations costing Oracle

2  business in fiscal year 2000 or 2001?

3    MR. LINDSTROM: Vague and ambiguous.

4    THE WITNESS: I mean, as I sit here right now, the

5  demonstration costing us business? I remember them --

6  you know, they're part of the sales cycle, so you

7  would argue they get us business.

8  BY MR. BRITTON:

9    Q. Okay. Problematic demonstrations, you don't

10  recall that causing concern with potential customers

11  and causing Oracle to lose some customers?

12    MR. LINDSTROM: Vague and ambiguous.

13    THE WITNESS: Oh, you know, I don't know -- there

14  are so many pieces to that sentence I'm not really

15  sure what you're talking about. But I don't remember

16  problematic demos.

17  BY MR. BRITTON:

18    Q. You don't remember anything about problematic

19  demos in the 2000, 2001 time period?

20    A. I remember -- again, I don't know the time

21  period. I remember that many of the sales reps liked

22  doing things the old way, where they had it in their

23  own little laptop. And so I remember that they

24  were -- would let us know that they did not like the

25  central server demo concept.

1    MR. BRITTON: Okay.

2    (Exhibit 18 was marked for identification.)

3    MR. BRITTON: I have placed in front of you what

4  has been marked as Catz Exhibit 18. Will you take a

5  moment to look at this exhibit.

6      For the record, Exhibit 18 starts at

7  NDCA-ORCL 013717 and ends at 720.

8    A. Okay.

9    Q. Do you recognize Exhibit 18?

10    A. I don't really, but I know basically what it

11  is.

12    Q. Okay. There's a string of e-mails here. And

13  the second one, on the first page, is from George

14  Roberts and you're cc'd; is that right?

15    A. Yes.

16    Q. And it's dated October 10th, 2000; is that

17  right?

18    A. Yeah.

19    Q. Does this document refresh your recollection

20  about whether Oracle was using the central server

21  demos?

22    A. At that time?

23    Q. In 2000?

24    A. Yes.

25    Q. Right.

Catz, Safra 7/20/2006 9:07:00 AM

1    A. It says this is -- where's the date?

2    October 10th, 2000, we were on the central

3    demo system.

4    Q. Okay. Good.

5    Do you recall this e-mail? I'm not sure if I

6    asked you that.

7    A. I don't think you did ask me, and I don't

8    remember it actually.

9    Q. Okay. Do you recall the substance of the

10   e-mail? In other words, does it refresh your memory

11   about problematic demos in 2000?

12   A. It refreshes my memory to the extent -- I

13   don't remember any of these customers or anything

14   related to that, but just the general concept..

15   Q. Okay. And how does it refresh your memory?

16   A. It reminds me that the sales guys were having

17   a very hard time connecting to the network well.

18   Q. Okay. Do you know why that was?

19   A. I remember now a little bit about it, but I

20   don't remember the exact detail.

21   Q. Okay. What do you remember about it?

22   A. Sometimes it turned out that actually the

23   laptops didn't have the right -- enough memory, they

24   didn't have the right communication software. There

25   were a number of different things related to the

Oracle                                    Page 125

---

Catz, Safra 7/20/2006 9:07:00 AM

1    connection, you know, especially through the worldwide

2    web, and what was necessary at the customer site to

3    get through well.

4    Q. Okay. If you turn to the second page.

5    A. Okay.

6    Q. Down at Clopay. This demo that you're talking

7    about here was held in the Oracle office in

8    Cincinnati. So the problematic demos were not just

9    limited to the customer sites; is that right?

10   A. Yeah. This one appears to be in our office in

11   Cincinnati. I don't exactly know how that office is

12   actually connected, at what speed it's on; but

13   there's -- this one is internal, but I don't know what

14   the -- you know, again the laptop, the memory, all

15   those issues --

16   Q. Okay.

17   A. -- still apply. So I don't know. But this is

18   clearly in our internal site.

19   Q. Okay. Now, I asked you earlier whether you

20   were aware that the problematic demos were costing

21   Oracle business; and I believe your answer was you

22   thought that it was helping you get business.

23   A. No. You asked if our demos was costing us

24   business. That's how I heard you. Not the word

25   problematic.

Oracle                                    Page 126

---

Catz, Safra 7/20/2006 9:07:00 AM

1    Q. Okay.

2    A. Demos help you get business usually.

3    Q. Right.

4    A. A problematic demo would, I don't think, be

5    helpful to business, but I couldn't think of any deal

6    that the -- that a problematic demo stopped us from

7    getting business.

8    Q. Okay. If you look at the last page of

9    Exhibit 18. Can you read the first two sentences into

10   the record for me, please.

11   MR. LINDSTROM: On the page under "general

12   comments"?

13   MR. BRITTON: Under "Summary." First two

14   sentences under the "Summary" heading.

15   THE WITNESS: Summary?

16   MR. BRITTON: Yes.

17   THE WITNESS: I'm reading, "Our demo

18   deployment/methodology strategy is the right one.

19   However, the lead time between the release of our

20   products to the market, and our ability to show these

21   to our customers is hurting the business."

22   BY MR. BRITTON:

23   Q. Okay. Does that refresh your recollection --

24   let me ask it a different way.

25   Is that consistent with your memory about

Oracle                                    Page 127

---

Catz, Safra 7/20/2006 9:07:00 AM

1    whether problematic demos were hurting Oracle's

2    business in the fiscal 2001 time period?

3    A. Not really.

4    Q. Okay.

5    Do you understand what this sentence is trying

6    to convey in terms of the lead time between the

7    release of our products to the market and the ability

8    to show customers? What the lead time issue was?

9    MR. LINDSTROM: So the question is does she have

10   an understanding of what the lead time issue was as

11   reflected in that sentence?

12   MR. BRITTON: Correct.

13   THE WITNESS: I actually don't. I'm not sure I

14   even know who wrote this. Or who this is. Gayle

15   Fitzpatrick. So I don't know what they're referencing

16   or what she's -- if it's a woman. Or a man. I don't

17   know.

18   BY MR. BRITTON:

19   Q. Did you ever speak to Larry Ellison about the

20   problematic demo issue during the 2000, 2001 time

21   period?

22   A. I don't have a memory of speaking to him about

23   it.

24   BY MR. BRITTON:

25   Q. Okay. If you'll -- withdrawn on that last

Oracle                                    Page 128

Catz, Safra 7/20/2006 9:07:00 AM

1   question.

2   (Exhibit 19 was marked for identification.)

3   BY MR. BRITTON:

4   Q. I've placed in front of you what has been

5   marked as Catz Exhibit 19. Will you take a look at

6   this for me, and let me know if you recognize it.

7   For the record, Exhibit 19 starts at Bates

8   NDCA-ORCL 101654 and it ends at 101656.

9   A. Okay.

10  Q. Do you recognize Exhibit 19?

11  A. Not really.

12  Q. Okay. Do you know what an SC CEO --

13  withdrawn.

14  Do you know what an SC CEO desk call is?

15  A. When I look at this, I realize it's a phone

16  message.

17  Q. So the second page of Exhibit 19, that's a

18  phone message that George Roberts called --

19  A. Me.

20  Q. Called you?

21  A. Yes.

22  Q. And he was raising the problematic demo issue

23  with you; is that right?

24  A. Well, he called July 25th, he called regarding

25  the demo system. I had no idea. So I wrote back,

Catz, Safra 7/20/2006 9:07:00 AM

1   probably to him, "what's this about?"

2   Q. Right.

3   And then he told you "we are having challenges

4   with the 11i demo system that is costing us Q1

5   business"?

6   A. That's --

7   Q. Is that right?

8   A. -- what it says.

9   Q. Did you talk to him about this?

10  A. I don't know if I actually spoke to him or

11  not.

12  Q. Did you talk to Larry Ellison about that the

13  demo system's costing Oracle Q1 business?

14  MR. LINDSTROM: Objection. Assumes facts.

15  THE WITNESS: Again, I don't remember, you know,

16  whether that's what I felt. And I don't have any

17  memory of talking to Larry about that.

18  BY MR. BRITTON:

19  Q. Okay. Did you discuss the problematic demo

20  issues at the development meetings?

21  A. Uhm, I don't, as I sit here right now,

22  remember discussing problematic demos; but I do know

23  that we discussed the ADS demo system in development

24  meetings, though I couldn't pinpoint when or where.

25  Q. What does ADS stand for?

Catz, Safra 7/20/2006 9:07:00 AM

1   A. I don't know.

2   Q. Neither do I.

3   Now, if you turn to the first page of

4   Exhibit 19.

5   A. I'm on the first page.

6   Q. There's full -- four numbered paragraphs under

7   the second e-mail. First one reads "1-Order

8   management performance has been poor."

9   A. Uh-huh.

10  Q. Or "ADS believes this has been resolved in"

11  and then it's cut off, and it says "week." And No. 2

12  says, "Lack of data in CRM." Then it has the

13  sentence. 3 is "Lack of stable integrated instance."

14  And then 4 says, "Lack of data in emerging modules,

15  such as APS."

16  Is this consistent with your recollection of

17  the demo systems in fiscal 2000, 2001?

18  MR. LINDSTROM: Objection. Compound.

19  THE WITNESS: This is much more specific than any

20  memory I even have of this. This refers to things

21  that I don't even -- even reading them remember.

22  BY MR. BRITTON:

23  Q. Okay. Fair enough.

24  Were these issues discussed at the development

25  meetings?

Catz, Safra 7/20/2006 9:07:00 AM

1   MR. LINDSTROM: Compound.

2   THE WITNESS: Again, I don't -- I don't remember

3   this at all so the -- you know, points 1 through 4,

4   these don't look familiar. I just don't know if they

5   were discussed or not.

6   BY MR. BRITTON:

7   Q. Now, this document is dated July 30th, 2000;

8   is that right?

9   A. Yes.

10  Q. Or at least the first e-mail on the page.

11  A. Yeah. The other one is July 26th.

12  Q. Right.

13  So this is the first quarter of fiscal 2001?

14  A. Yeah. The call was July 25th. Yeah.

15  Q. So it's all in the first quarter of 2000?

16  A. It appears to be.

17  (Exhibit 20 was marked for identification.)

18  BY MR. BRITTON:

19  Q. Okay. I've placed in front of you what's been

20  marked as Exhibit 20. Will you take a moment to look

21  at this exhibit.

22  For the record, Exhibit 20 starts at Bates

23  NDCA-ORCL 081369 and ends at 73..

24  A. I see this.

25  Q. Do you recognize Exhibit 20?

Catz, Safra 7/20/2006 9:07:00 AM

1    A. As I sit here right now, I don't remember it.
2    But I recognize it from seeing it.
3    Q. Okay. This -- the top page is an e-mail from
4    Jeff Henley to you?
5    A. Yes.
6    Q. And it's dated April 19, 2001?
7    A. Yes.
8    Q. Okay. And he says, "Absolutely incredible.
9    We're blowing the opportunity of a life time with
10   11i." Do you see that?
11   A. That's what he says.
12   Q. And the next page goes on to describe
13   problematic demos and general business --
14   A. It goes on --
15   Q. -- right?
16   A. -- to describe the demo scores from general
17   business. And has all these excerpts, some of which
18   are referring to demos that did not go well for many
19   reasons, and some say the demo went well.
20   Q. Okay. So this is about nine months from the
21   date of the last e-mail we're still seeing demo
22   issues; is that right?
23   A. There are issues in these excerpts.
24   Q. Is that consistent with your recollection that
25   Oracle was facing demo issues for the better part of

Catz, Safra 7/20/2006 9:07:00 AM

1    nine months?
2    A. I didn't remember.
3    Q. When did Oracle resolve the issues with its
4    demos?
5    A. I have no idea.
6    MR. BRITTON: Okay. Put that one back on the
7    side.
8    (Exhibit 21 was marked for identification.)
9    BY MR. BRITTON:
10   Q. Do you remember an implementation with the
11   General Electric Auto Exchange in the 2000 time
12   period?
13   A. No.
14   Q. Are you familiar with the term or the acronym
15   MRO?
16   A. Generally.
17   Q. What does that mean to you?
18   A. It's a process where you fix stuff. Equipment
19   and stuff like that. I don't remember what -- I used
20   to know what it stood for, but it's something like the
21   airplane servicer would do. Like, you fix stuff that
22   exists already.
23   Q. Okay.
24   Okay. I've placed in front of you what's been
25   marked as Catz Exhibit 21. Please take a moment to

Catz, Safra 7/20/2006 9:07:00 AM

1    look at this exhibit.
2    MR. LINDSTROM: Counsel, are you representing to
3    the witness that GEAE is General Electric Auto
4    Exchange?
5    MR. BRITTON: That's my understanding.
6    THE WITNESS: You're not correct.
7    MR. BRITTON: I'm not. Well, we will get to it.
8    Q. Have you had a chance to look through
9    Exhibit 21?
10   A. I'm halfway through.
11   Yes, I see it.
12   Q. Okay. Do you recognize Exhibit 21?
13   A. I don't remember it, but I recognize it.
14   Q. Exhibit 21 is an e-mail from Steve McLaughlin
15   to you and others; is that right?
16   A. Yes.
17   Q. And he sent this on August 1st, 2000. Now,
18   the acronym GEAE, I see now where I went awry. Is
19   that General Electric Airplane exchange?
20   A. "Aircraft Engines."
21   Q. "Aircraft Engines." Very good.
22   And this e-mail is talking about the MRO
23   product; is that right?
24   A. Yes.
25   Q. Does this document refresh your recollection

Catz, Safra 7/20/2006 9:07:00 AM

1    at all about the MRO implementation at GEAE?
2    A. Yes. This is not a implementation of Oracle's
3    MRO product. We did not -- Oracle did not have an MRO
4    product. This is a project to build an MRO product
5    with General Electric Aircraft Engine as a development
6    partner. So there was no MRO product, period.
7    Q. Okay.
8    Was the development partnership with this MRO
9    software successful?
10   A. It wasn't MRO software. Was the partnership
11   to build this successful? I don't think so.
12   Q. Okay. And why is that?
13   A. I think it's very hard to build.
14   Q. Okay. How long did Oracle attempt to build
15   this MRO software?
16   A. I don't know.
17   Q. Did it cost Oracle any support fees that were
18   not reimbursed by the customer?
19   Withdrawn.
20   Did Oracle provide GEAE with any free support
21   services in connection with the MRO software?
22   A. We talked about what support means before.
23   Q. Yeah.
24   A. Are you using a different meaning?
25   Q. Yeah.

Catz, Safra 7/20/2006 9:07:00 AM

1    Withdrawn.

2       Let me ask it a different way.

3       Did Oracle give GEAE any free consulting

4    services in connection with this development

5    partnership?

6       A. Well, I don't really know. This is a joint

7    development project, so I really don't remember what

8    the -- you know, how the consulting piece of this

9    worked and whether any free consulting was given.

10      Q. Now, the -- okay.

11      Now, if you look down about a quarter of the

12   way down that e-mail, it says, "GEAE believes that the

13   11i MRO software will be delivered in late Q1, early

14   Q2 of calendar year '01. Oracle is not going to meet

15   the" --

16      A. I'm sorry. You know, I can't find where you

17   are. Could you start again?

18      Q. Yeah. It's --

19      A. Are we still on the first page?

20      Q. Yeah, we're still on the first page.

21      A. Okay.

22      Q. See the paragraph that starts with "the

23   original agreement"?

24      A. Yes.

25      Q. It's six lines down from there. It says

Catz, Safra 7/20/2006 9:07:00 AM

1    "GEAE" and then there's a long space.

2       A. Space. Okay.

3       Q. And "believes."

4       All right. "GEAE believes that the 11i MRO

5    software will be delivered in late Q1, early Q2 of

6    calendar year '01. Oracle is not going to meet the

7    amended dates as of July 31st, 2000. There are

8    significant architecture issues that cannot be

9    resolved in core 11i." Do you know what that's

10   referring to?

11      A. Not really.

12      Q. Did you discuss this e-mail with Larry

13   Ellison?

14      A. Uhm, I don't know. I really can't remember.

15   This project predated my working at Oracle.

16      Q. August 1st, 2000?

17      A. No, but August '98. So I wouldn't be the

18   expert on this project.

19      Q. Okay. My question was this is an e-mail from

20   Steve McLaughlin to you --

21      A. To me and a whole bunch of people.

22      Q. And my question was whether you discussed the

23   contents of this e-mail with Larry Ellison.

24      A. I couldn't tell you right now.

25      Q. Did you discuss the contents of this e-mail at

Catz, Safra 7/20/2006 9:07:00 AM

1    any development meeting?

2       A. Oh, I don't remember.

3       Q. Did Oracle lose any revenue as a result of not

4    being able to implement or manufacture the MRO

5    software?

6       MR. LINDSTROM: Objection. Vague and ambiguous.

7    Mischaracterizes testimony.

8       THE WITNESS: I don't believe we ever built this

9    product. So we never sold it. To anybody. Because

10   it was never built and I don't believe delivered. So

11   I don't know if anyone would have bought it if we

12   built it.

13      BY MR. BRITTON:

14      Q. If you look down almost to the end of the

15   paragraph that starts with "GEAE understands the

16   difficulties." Do you see that paragraph? It's the

17   next paragraph down.

18      A. Yes.

19      Q. Down at the bottom it says, "The potential

20   revenue impact from Aircraft for FY '01 is 12 to

21   14 million in lost revenue." Do you have an

22   understanding of what that paragraph means?

23      A. Where are you?

24      Q. Or that sentence.

25      A. The potential to --

Catz, Safra 7/20/2006 9:07:00 AM

1       Q. "The potential revenue impact" --

2       A. I see it.

3       Q. -- "to Oracle from aircraft for FY '01 is 12

4    to 14 million in lost revenue." Do you have an

5    understanding what that means?

6       A. I understand what Steve McLaughlin thinks

7    it's --

8       Q. What's your understanding?

9       A. That if we built it, they would have paid us

10   $4 million to buy it, and then they would have bought

11   some of our other stuff too.

12      Q. If you turn the page. The first bullet, "I

13   believe GE Company will close ranks and rally around

14   Oracle's inability to" --

15      (Reporter interruption.)

16      BY MR. BRITTON:

17      Q. "I believe that GE Company will close ranks

18   and rally around Oracle's inability to deliver on it's

19   contractual commitment for MRO. This will impact our

20   entire relationship, which has produced over

21   $350 million in revenue to Oracle over the last 4

22   years. I expect GEAE to position Consequential

23   Damages for this project to be significant (in excess

24   of 100 million dollars)." Do you see where I'm

25   reading?

1  A. I do.
2  Q. Okay. Did that come true? Did GE Company
3  close ranks and rally around Oracle's inability to
4  deliver --
5  A. No.
6  Q. -- on this contract?
7  A. No. GE is one of Oracle's largest global
8  customers and loves Oracle products
9  Q. All right. So I take it that the next
10  supposition didn't come to fruition either in terms of
11  consequential damages?
12  MR. LINDSTROM: Objection. Vague and ambiguous.
13  THE WITNESS: I -- General Electric did not sue
14  Oracle for consequential damages about anything.
15  BY MR. BRITTON:
16  Q. Okay. Do you recall the internal
17  implementation of 11i at Oracle?
18  A. Yeah. Generally.
19  Q. When did that start?
20  A. Oh, I don't know. I believe it started before
21  I got there. I really couldn't tell you. I'm not the
22  right person to ask.
23  Q. So you believe the Suite 11i product was being
24  implemented before you got there in '98?
25  A. Uhm, see, implementation includes a lot of

1  things that, uhm, are beyond just the different pieces
2  of the software.
3  Q. Uh-huh.
4  A. I got there in April of '99, and I believe
5  that some work in preparation for the implementation
6  had already begun. But I'm really not the right
7  person to ask.
8  MR. BRITTON: Okay.
9  (Exhibit 22 was marked for identification.)
10  BY MR. BRITTON:
11  Q. I have placed in front of you what has been
12  marked as Plaintiff's Exhibit 22. Will you take a
13  moment to look at this exhibit.
14  For the record, Exhibit 22 starts with
15  NDCA-ORCL 024862 and ends at 864.
16  A. Okay.
17  Q. Do you recognize Exhibit 22?
18  A. Not really.
19  Q. Okay. There is a string of e-mails in this
20  exhibit; is that right?
21  A. Yes.
22  Q. And they are dated in November of 2000?
23  A. Yes.
24  Q. Okay. The bottom e-mail on the first page is
25  from Mark Berrenechea to Ron Wald, and you're cc'd on

1  the e-mail?
2  A. I am one of the people cc'd.
3  Q. Okay. Were you aware at the time of the
4  issues that are described in Exhibit 22?
5  A. As I sit here right now, I don't remember them
6  at all.
7  Q. Okay. You received this e-mail?
8  A. I'm sure I did.
9  Q. Okay. Did you discuss the issues that are
10  outlined in Exhibit 22 with Larry Ellison?
11  A. I don't remember discussing them with him.
12  Q. Do you remember discussing the issues that are
13  reflected in Exhibit 22 at any of the development
14  meetings?
15  A. As I sit here right now, I don't have an
16  actual memory of -- of discussing this. But I don't
17  know that they weren't discussed either.
18  Q. Okay. The subject heading is "December
19  Rollout of 11.5.2." Do you know what Oracle was using
20  prior to version 11.5.2?
21  A. I'd have to guess.
22  Q. What's your guess?
23  MR. LINDSTROM: Objection. Calls for speculation.
24  THE WITNESS: Something with a smaller number than
25  .2.

1  BY MR. BRITTON:
2  Q. Was it a version of 11i?
3  A. I don't know.
4  Q. Look at the second page of Exhibit 22.
5  It says -- there's a heading that says, "As
6  for some specifics"? Do you see that?
7  A. "As for some specifics." Yes.
8  Q. Okay. The second sentence says,
9  "Customizations are all scheduled within scope of the
10  dates and should not be the problem at this point."
11  Do you see that?
12  A. Yes.
13  Q. Did -- when Oracle implemented 11i, did it
14  have to go through customizations to get it to work?
15  MR. LINDSTROM: Objection. Assumes facts.
16  THE WITNESS: I really don't know. I don't know
17  what this is referencing.
18  BY MR. BRITTON:
19  Q. Okay. If you look down at the bottom of the
20  e-mail it says Mark Berrenechea wrote --
21  A. Yes.
22  Q. -- No. 2. "The bug counts are at an 11 week
23  high." Three points down it says, "205 customizations
24  not complete." Did you have an understanding when you
25  received this e-mail about what that meant?

1 A. I don't remember.

2 I'm going to excuse -- I need to go to the

3 ladies room. Is that okay?

4 MR. BRITTON: Sure. Take a break.

5 THE VIDEOGRAPHER: Off record at 1:56.

6 (Recess taken.)

7 THE VIDEOGRAPHER: Okay. On record at 2:03.

8 BY MR. BRITTON:

9 Q. Ms. Catz, do you have an understanding that

10 the quality of 11i was costing Oracle business in

11 fiscal year 2001?

12 MR. LINDSTROM: Objection. Asked and answered.

13 THE WITNESS: I don't actually think it was.

14 MR. BRITTON: Okay.

15 (Exhibit 23 was marked for identification.)

16 BY MR. BRITTON:

17 Q. I have placed in front of you what has been

18 marked as Exhibit 23. Will you take a moment to look

19 at this exhibit.

20 For the record, Exhibit 23 starts at Bates

21 NDCA-ORCL 035243 and ends at 264.

22 MR. LINDSTROM: This is a very lengthy document.

23 Is there any particular part to which you want to draw

24 the witness's attention?

25 MR. BRITTON: Yeah.

---

1 Q. You know, just flip through it and let me know

2 if you recognize it. And then I am going to ask you

3 questions about pages 1 and 2 -- 1, 2 and 3 and the

4 last two pages in the document.

5 A. I'm sorry. This is, like, 20 pages. What did

6 you say you want me to look at?

7 Q. Flip through, let me know if you recognize it.

8 And then I need you to read the first three pages of

9 the document and the last two pages of the document.

10 A. Uhm, I don't actually recognize this.

11 Q. Okay.

12 The first page of Exhibit 23, it's an e-mail

13 from you to Ron Wald and Donald Kleiss; is that right?

14 A. Yes.

15 Q. So you're forwarding the e-mail with the

16 subject heading "The Cost Of Partnering With Oracle"?

17 A. Yes.

18 Q. Okay. Who's Donald Kleiss?

19 A. Head of manufacturing. At the time.

20 Manufacturing software.

21 Q. The e-mails that follow, they talk about

22 Oracle's partners, implementation partners,

23 experiencing problems with 11i OM. Is that a fair

24 statement of this e-mail?

25 MR. LINDSTROM: Objection. The document speaks

---

1 for itself.

2 THE WITNESS: The document references the actual

3 physical implementation of 11i order management.

4 BY MR. BRITTON:

5 Q. So OM stands for order management; is that

6 right?

7 A. Definitely.

8 Q. All right.

9 And you asked Ron Wald and Donald Kleiss for

10 an update on the situation in here. Did you ever get

11 one?

12 A. I don't remember.

13 Q. Okay. So you knew in December of 2000 that

14 Oracle was experiencing problems with its 11i order

15 management module; is that right?

16 MR. LINDSTROM: Objection. Mischaracterizes the

17 document.

18 THE WITNESS: In January 2001 I -- or it appears

19 to be -- or in December 19th, when I got this message,

20 one customer, this Brock Tools, was having a problem

21 with this other company's implement apps, some little

22 teeny implementer apps -- apps builder, apps -- apps

23 tech with their actual configuration and

24 implementation of order management.

25 BY MR. BRITTON:

---

1 Q. Okay. Who's Rene Nee?

2 A. She was in charge of alliances.

3 Q. And she told you that the same thing that was

4 happening with this teeny implementation firm was

5 happening across all of Oracle's partners; isn't that

6 right?

7 MR. LINDSTROM: Objection. Mischaracterizes the

8 document.

9 THE WITNESS: It says -- it actually doesn't say

10 what you just said.

11 BY MR. BRITTON:

12 Q. Okay.

13 Read the first paragraph into the record for

14 me, please.

15 A. "I cannot answer these questions for this

16 partner. As you can see it is a very poor reflection

17 on the Oracle partner program and Oracle overall when

18 we are not able to address the quality issues we are

19 facing with 11i OM right now across all our partners.

20 So I think it's if you can't answer all your partners.

21 Not that all of them are having problems, but if you

22 can't give an answer that applies to all your

23 partners. That's how I read it.

24 Q. Okay.

25 The next paragraph down. She says, "She is a

1   squeaky wheel, and I have had many conversations with

2   her over the last several months on her views of our

3   product quality, support partner program - however her

4   views are the same as all of our partners implementing

5   11i OM."

6   A. That's what Rene wrote.

7   Q. Okay. So you don't read that as her telling

8   you that all of Oracle's partners were experiencing

9   quality issues with 11i order management?

10  A. This paragraph says that Rene thinks that her

11  views -- this Rebecca, her views are the same as all

12  of our partners.

13  Q. Okay. Good.

14  Now, did you tell Larry Ellison about this?

15  A. Oh, I don't remember.

16  Q. Okay. If you look to the last two pages of

17  Exhibit 23. This is the letter -- I think you were

18  referring to this -- from Brock Tool and Supply to

19  Larry Ellison.

20  A. I was referring to it?

21  Q. Yeah. I thought when you referenced Brock

22  Tool, that's where you got the name from.

23  A. I didn't refer to a letter, but --

24  Q. Okay.

25  A. -- Miss Rebecca talks about Brock Tools.

1   Q. Okay.

2   If you look at the last two pages of

3   Exhibit 23. It's a letter from William Greeb at Brock

4   Tool and Supply, Inc., to Larry Ellison.

5   A. Yes.

6   Q. Did Oracle have a procedure in place to

7   respond to letters like this to Larry Ellison?

8   MR. LINDSTROM: In November of 2000?

9   MR. BRITTON: Yes.

10  THE WITNESS: Probably.

11  BY MR. BRITTON:

12  Q. Do you know what that procedure was?

13  A. No.

14  Q. Do you remember receiving this letter in

15  November of 2000?

16  A. No.

17  (Exhibit 24 was marked for identification.)

18  BY MR. BRITTON:

19  Q. I have placed in front of you what has been

20  marked as Exhibit 24. If you can take a moment to

21  flip through this exhibit.

22  Exhibit 24 starts at NDCA-ORCL 035265 and ends

23  at 268.

24  A. Is there a question?

25  Q. Yeah. Do you recognize Exhibit 24?

1   A. Well, you just showed me one that's very

2   similar to it.

3   Q. Okay. So my question was -- next question is

4   does this refresh your recollection on whether you

5   shared the information in Exhibit 23 with Larry

6   Ellison?

7   A. Well, I forwarded him this e-mail. I don't

8   know that I talked to him about it.

9   Q. But you did forward him the e-mail?

10  A. Well, it appears to be that from the e-mail.

11  I don't remember forwarding this e-mail.

12  MR. LINDSTROM: Right. His question is it's not

13  the e-mail is from you to him, but do you now remember

14  as a result of seeing the e-mail that you shared this

15  information with Larry. So the question is --

16  THE WITNESS: No, I don't remember any of this

17  about this Brock Tools thing at all.

18  BY MR. BRITTON:

19  Q. Okay. How did you decide in the third quarter

20  of 2001 time period what to send to Larry Ellison and

21  what not to send to Larry Ellison?

22  A. I just would send him what I thought he should

23  see.

24  Q. Okay. Was there any criteria that you used to

25  determine what you thought he should see?

1   A. I'm sure there's some implicit criteria in my

2   head, but I don't have a process or a policy manual or

3   anything.

4   Q. Can you tell me what the process is in your

5   head or the criteria in your head for what you sent

6   Larry Ellison?

7   A. Something I thought he should see.

8   Q. Okay. But how did you make that

9   determination?

10  A. By looking at what it was.

11  Q. Okay. And was there any categories of

12  information that you would send to Larry Ellison that

13  you can describe to me?

14  A. Something that I thought he might want an

15  update on and might not have an update on through his

16  own channels.

17  Q. How did you know what he would want an update

18  on?

19  A. I wouldn't necessarily know, I'd take a guess.

20  Q. Okay. Closed deals? Send him updates on what

21  deals were closing?

22  A. I might. But not necessarily.

23  Q. Forecasting topics?

24  A. Hard to say. Depends. It would depend.

25  Q. How about revenue shortfalls?

1   A. It would depend if it was in an e-mail or not.

2   A lot of things are not in e-mail.

3   Q. And let's talk about e-mail specifically. If

4   you received an e-mail that had information about

5   closed deals, would you send Larry Ellison those?

6   A. It would depend.

7   Q. Okay. What would it depend on?

8   A. First, if he knew already. Two, if it was

9   something that he'd been maybe involved in or had

10  heard about or might have been curious about. Third,

11  and actually I should have said first, is the size of

12  it.

13  Q. Okay. Let's talk about the size of it. What

14  size deals would you send to Larry versus not send to

15  Larry?

16  MR. LINDSTROM: What time frame?

17  MR. BRITTON: Third quarter 2001.

18  THE WITNESS: Oh, who knows. It would just

19  depend. Because all those things could hit. So it

20  could be a $200,000 little deal that he was curious

21  about. So it could be a small deal, it could be a

22  really big deal he didn't even know about.

23  BY MR. BRITTON:

24  Q. So you really didn't have any standard for

25  what --

1   A. No.

2   Q. You just sent him the stuff that you thought

3   was important?

4   A. I sent him what I thought I should send him.

5   Q. Okay.

6   Do you remember the sales people in the 2000,

7   2001 period being reluctant to sell the CRM part of

8   11i?

9   A. Do I know of any specific sales guy who

10  wouldn't sell CRM? No, I don't think so.

11  Q. Okay. How about in general? Had the sales

12  people been reluctant to sell CRM because of the

13  quality issues that Oracle was facing?

14  MR. LINDSTROM: Vague and ambiguous.

15  THE WITNESS: In 2000 and 2001, off the top of my

16  head, as I sit here right now, sales people sell what

17  we got and what customers want. So I can't think of a

18  case like that.

19  BY MR. BRITTON:

20  Q. Okay. Did you know that Jay Nussbaum was

21  reluctant to forecast CRM deals because of the quality

22  issues that Oracle was facing?

23  MR. LINDSTROM: Objection. Assumes facts.

24  THE WITNESS: Again, as I sit here right now, I

25  don't have any idea what you're talking about.

1   MR. BRITTON: Okay.

2   (Exhibit 25 was marked for identification.)

3   BY MR. BRITTON:

4   Q. I've placed in front of you what has been

5   marked as Catz Exhibit 25. Will you take a moment to

6   look at this exhibit.

7   For the record, Catz Exhibit 25 is an excerpt

8   of the videotape deposition of Jay Nussbaum taken on

9   Tuesday, March 23rd, 2004. And the Bates numbers in

10  here -- are they consecutive?

11  (Sotto voce discussion between Mr. Britton and

12  Mr. Bowie.)

13  MR. BRITTON: Okay. So the first Bates range is

14  290654 to 657. The next range is 859 and 860. The

15  next range is 921 to 926.

16  Q. I'm sure you haven't seen this before,

17  Ms. Catz; so what I'd like you to do is direct your

18  attention to the page with Bates NDCA-ORCL 290926.

19  If you could read pages 73 and 74 of the depo

20  transcript, which is 926 and 927 Bates numbers.

21  A. I don't think I'm reading the right place.

22  This AT&T stuff?

23  Q. Yeah. Yes.

24  A. Okay.

25  Q. Read from 73, line 18 to page 74, line 13.

1   A. Where it says "okay"?

2   Q. Yes.

3   A. That's Exhibit 75.

4   Am I supposed to read this out loud?

5   MR. BRITTON: No, read it --

6   MR. LINDSTROM: No, I think he wants you to read

7   it to yourself.

8   MR. BRITTON: -- to yourself, yes.

9   THE WITNESS: Okay.

10  BY MR. BRITTON:

11  Q. Okay. Have you had a chance to read it?

12  A. I -- what there is of it, yeah.

13  Q. Okay. Did you know that Jay Nussbaum was not

14  forecasting CRM deals in the 2000 time period?

15  A. No.

16  Q. Okay. He was in the executive management

17  committee meetings with you?

18  A. Yes.

19  Q. And he never brought that topic up?

20  A. That does not sound familiar at all.

21  Q. Okay. Is that something that you would have

22  wanted to know in the 2000 time period?

23  MR. LINDSTROM: Objection. Calls for speculation.

24  THE WITNESS: No -- I suppose.

25  BY MR. BRITTON:

Catz, Safra 7/20/2006 9:07:00 AM

1  Q. Is that the type of information that you would
2  have forwarded to Larry Ellison?
3  A. I have no idea.
4  Q. Well, who's -- Jay Nussbaum's the head of OSI;
5  is that correct?
6  A. Yes.
7  Q. So if the head of OSI told you that "I'm not
8  forecasting CRM deals because of the quality of CRM,"
9  you wouldn't have brought that to Larry Ellison?
10  MR. LINDSTROM: Objection. Mischaracterizes the
11  document and his testimony and is argumentative.
12  THE WITNESS: You've referenced, like, forwarding.
13  I have no idea if I would have mentioned this
14  hypothetical situation.
15  BY MR. BRITTON:
16  Q. Well, I don't think it's hypothetical. He
17  said "If these were CRM deals, I wouldn't have
18  forecast them."
19  A. This is what he says in 2004 about that.
20  Q. So you don't think he's being truthful?
21  A. I have no idea. I literally don't know.
22  Wouldn't -- don't remember.
23  Q. You don't know -- if he told you that, you
24  wouldn't have gone to talk to Larry about that?
25  A. The chain is so long in your hypothetical that

Catz, Safra 7/20/2006 9:07:00 AM

1  you're losing me.
2  Q. Okay.
3  A. If he would have said --
4  Q. If he had come up and --
5  A. If it was true and he would have said it, and
6  he would have said it to me, would I have then said it
7  to Larry. Maybe.
8  Q. Maybe not?
9  A. If Larry knew that to be so. You know, if if
10  if. Then I wouldn't need to tell him that.
11  Q. If you didn't think Larry Ellison knew that,
12  would you have told him?
13  MR. LINDSTROM: I am going to object to this whole
14  line of questioning as calling for speculation.
15  THE WITNESS: You know, who knows.
16  BY MR. BRITTON:
17  Q. The two lines down, where it has the "A," it
18  says, "Well, I think at this point in time people
19  would have wanted to see a little bit more stability
20  and the sales reps weren't anxious to sell until they
21  saw a little bit more stability." Did you know that
22  in the 2000 time period?
23  A. It does not sound familiar.
24  Q. Okay. Is that the type of information that
25  you would have told Larry Ellison about?

Catz, Safra 7/20/2006 9:07:00 AM

1  MR. LINDSTROM: Objection. Calls for speculation.
2  THE WITNESS: I don't know.
3  BY MR. BRITTON:
4  Q. Okay. Now, the reluctance to sell -- the
5  reluctance to sell CRM products in the 2000 time
6  period were not limited to OSI; is that right?
7  A. This is --
8  MR. LINDSTROM: Objection. No foundation.
9  THE WITNESS: This is this whole thing you're
10  saying about a reluctance to sell CRM products, you
11  really should go to the documents which show how much
12  CRM we were selling in 2000.
13  BY MR. BRITTON:
14  Q. Well, ma'am, I'm asking for your recollection.
15  A. I have no recollection whatsoever.
16  Q. So you don't recall if the reluctance by sales
17  people to sell CRM products were limited to OSI?
18  A. I do not know if there was a reluctance to
19  sell CRM product.
20  MR. BRITTON: All right.
21  (Exhibit 26 was marked for identification.)
22  BY MR. BRITTON:
23  Q. I've placed in front of you what's been marked
24  as Catz Exhibit 26. Will you take a moment to look at
25  this exhibit, please.

Catz, Safra 7/20/2006 9:07:00 AM

1  For the record, Exhibit 26 starts at Bates
2  NDCA-ORCL 035111 and ends at 112.
3  A. Okay.
4  Q. Do you recognize Exhibit 26?
5  A. I see it now. I recognize what it is. I
6  don't remember it.
7  Q. Okay. It's dated December 9, 2000?
8  A. Uh-huh.
9  Q. And it's from Sergio Giacoletto?
10  A. Yes.
11  Q. He was the head of EMEA; is that right?
12  And for the court reporter that's capital
13  E-M-E-A.
14  And you were cc'd on this e-mail; is that
15  correct?
16  A. Yes.
17  Q. Turn to the second page. Under the heading
18  "Risks And Opportunities" there's the acronym CRM?
19  A. Yes.
20  Q. Can you read the first sentence into the
21  record for me, please.
22  A. "We are loosing a bit of momentum. Sales
23  people are reluctant to engage to the product
24  problems. Lack of references and local language
25  issues."

Catz, Safra 7/20/2006 9:07:00 AM

1    Q. So Sergio Giacoletto told you essentially what

2    Jay Nussbaum testified to; is that right?

3        MR. LINDSTROM: Objection. Mischaracterizes the

4    document.

5        THE WITNESS: Not really.

6    BY MR. BRITTON:

7    Q. No?

8        So you're not reading this as the sales people

9    were reluctant to engage in selling CRM products due

10   to product problems?

11   A. This is -- this is -- this is a very broad

12   generalization, and he had a special group for CRM

13   sales. And it's a lack of references still, as the

14   products are new and local languages aren't all rolled

15   out, things like that. He's got a whole bunch of

16   different things going on that he's talking about.

17   Q. Including the sales people are reluctant to

18   sell the product?

19   A. That is one of the things -- that is one of

20   the things he is referencing.

21   Q. Did you talk to Larry Ellison about the issues

22   that are listed under CRM?

23   A. I don't remember. No, I don't think -- I

24   don't know.

25   Q. At the -- were these issues raised at the

Oracle                                        Page 161

Catz, Safra 7/20/2006 9:07:00 AM

1    executive committee management meetings?

2    A. Oh, I don't remember.

3        MR. BRITTON: All right. Put that document aside.

4        (Exhibit 27 was marked for identification.)

5    BY MR. BRITTON:

6    Q. All right. I've placed in front of you what

7    has been marked as Exhibit 27. Please take a moment

8    to look at this exhibit.

9        For the record, Exhibit 27 starts at Bates

10   NDCA-ORCL 063478 and ends at 480.

11   A. Okay.

12   Q. Do you recognize Exhibit 27?

13   A. Not really, but I see what it is.

14   Q. Okay. What is it?

15   A. An e-mail from Mark Jarvis with a forward from

16   some -- from me, with a forward from the Morgan

17   Stanley analyst, which is a forward from Forrester

18   Report. Something like that.

19   Q. Okay. Would you look at the second page of

20   Exhibit 27. There's an e-mail at the top. And I was

21   trying to get an idea if that is your e-mail that you

22   wrote in this string or if it's somebody else. Can

23   you tell?

24   A. I think so.

25   Q. Is that from you?

Oracle                                        Page 162

Catz, Safra 7/20/2006 9:07:00 AM

1    A. No.

2    Q. Who is it from?

3    A. It's from Charles Phillips, when he was an

4    analyst at Morgan Stanley, to me.

5    Q. Okay. So this e-mail is from Charles Phillips

6    to you talking about the perception of the quality

7    issues with 11i; is that right?

8    A. It's his comments to me.

9    Q. Okay. Now --

10   A. That this is a perception issue.

11   Q. Okay. The last -- second to the last sentence

12   of this e-mail he tells you "a few of the reps I spoke

13   with don't have the confidence to push CRM because of

14   the quality issues in the past." Do you know what

15   he's referring to there?

16   A. I'll get to it in a second.

17       Yeah, he appears to be referring to reps he

18   spoke to.

19   Q. Same message as Sergio and Jay Nussbaum?

20       MR. LINDSTROM: Objection. Mischaracterizes the

21   prior documents and testimony.

22   BY MR. BRITTON:

23   Q. Is that right?

24   A. What's your question?

25   Q. The same message he was giving you -- he was

Oracle                                        Page 163

Catz, Safra 7/20/2006 9:07:00 AM

1    giving you the same message that you were receiving

2    from Sergio Giacoletto and that Jay Nussbaum talked

3    about?

4    A. Actually, I read his e-mail to give the exact

5    opposite message.

6    Q. Okay.

7    A. Which is that it's really a perception issue

8    potentially.

9    Q. A? --

10   A. And that the reality is that the product's

11   good.

12   Q. So the sentence that says "a few of the reps I

13   spoke with don't have the confidence to push CRM

14   because of the quality issues in the past." It

15   doesn't tell you that the sales reps are reluctant to

16   sell CRM?

17       MR. LINDSTROM: Argumentative.

18       THE WITNESS: It's a perception of what he's saying.

19   And I think that his point is that the reality is not.

20   I don't know, a couple of rep's perception and to have

21   the reps learn the reality.

22   BY MR. BRITTON:

23   Q. My question was were the quality issues with

24   CRM resolved by March 2001?

25   A. I don't know. It depends what you mean by

Oracle                                        Page 164

Catz, Safra 7/20/2006 9:07:00 AM

1  quality issues, it depends what you mean by resolved.

2  It depends on everything.

3  MR. BRITTON: Okay.

4  (Exhibit 28 was marked for identification.)

5  BY MR. BRITTON:

6  Q. I've placed in front of you what's been marked

7  as Catz Exhibit 28. Will you take a moment to look at

8  this exhibit.

9  For the record, Exhibit 28 starts at Bates

10  NDCA-ORCL 035425 and ends at 428.

11  A. Okay.

12  Q. Do you recognize Exhibit 28?

13  A. Not really.

14  Q. Okay. The top e-mail is an e-mail from you to

15  Larry Ellison?

16  A. Yes.

17  Q. Is that right?

18  And you were forwarding him an e-mail about

19  Chipotle/McDonald's 11i issues, right?

20  A. That's actually not what the e-mail is about,

21  but that's the e-mail's title.

22  Q. That's the subject of the e-mail?

23  A. That's what it says.

24  (Mr. Mautner not receiving proceedings via

25  Internet.)

Catz, Safra 7/20/2006 9:07:00 AM

1  Q. Okay. If you look to the second page of this

2  exhibit, there's -- the e-mail at the bottom says,

3  "The Facts." It says, "Chipotle is a marquee

4  reference for Oracle Business Online. Chipotle has

5  finished an upgrade to 11i that was done by OCS" -- is

6  that Oracle Consulting Services?

7  A. I think so.

8  Q. "The McDonald's financial organization, which

9  performs all the accounting for Mc D's and its subs in

10  Columbus, uses the Chipotle 11i applications to

11  conduct Chipotle's back office accounting functions.

12  They are experiencing major performance problems with

13  11i as well as there still are some feature/function

14  gaps."

15  Do you remember forwarding that to Larry

16  Ellison on January 25th, 2001?

17  A. I don't remember forwarding it. But this

18  e-mail shows that I forwarded it.

19  Q. Did you talk to him about the

20  McDonald's/Chipotle issues?

21  A. Well, no, I don't remember talking with -- I

22  just don't remember talking with him about their

23  performance issues.

24  Q. Okay. Was this discussed in any of the

25  development meetings?

Catz, Safra 7/20/2006 9:07:00 AM

1  A. No. It's not a development issue.

2  Q. Okay.

3  A. It doesn't appear to be.

4  Q. Okay. Was this discussed at the executive

5  management committee meetings?

6  A. I don't remember discussing it.

7  MR. BRITTON: Okay.

8  Okay. You can put that aside.

9  (Exhibit 29 was marked for identification.)

10  BY MR. BRITTON:

11  Q. I've placed in front of you what has been

12  marked as Exhibit 29. Will you take a moment to look

13  at this exhibit.

14  For the record, Exhibit 29 starts at Bates

15  NDCA-ORCL 111294 and ends at -- it appears that this

16  e-mail is out of order. First page is 111294, and

17  then the next pages are 111290, 291, 292 and 293.

18  MR. LINDSTROM: So do you want to leave it the way

19  it is or do you want to rearrange it at a break? Or

20  how would you like to proceed?

21  MR. BRITTON: Let's leave it like it is.

22  THE WITNESS: Okay. I've read this.

23  BY MR. BRITTON:

24  Q. Do you recognize Exhibit 29?

25  A. No.

Catz, Safra 7/20/2006 9:07:00 AM

1  Q. Okay. The first page of the exhibit, which

2  has 111294, is an e-mail from Sergio Giacoletto to

3  Mark Jarvis; is that right?

4  A. That's what it appears to be, right.

5  Q. And you're cc'd?

6  A. Yep.

7  Q. And Sergio Giacoletto informs Mark Jarvis,

8  you, and Larry Ellison, Ron Wald, and Mark Berrenechea

9  that the negative press about 11i just cost him a

10  client. Is that right?

11  A. One loss at a client.

12  Q. Did you discuss this with Larry Ellison?

13  A. Oh, I don't remember.

14  Q. Did you discuss this at an executive

15  management committee meeting?

16  A. I don't remember this at all.

17  Q. Did you discuss the negative press about 11i

18  in any of the development meetings?

19  A. As I sit here right now, I really don't

20  remember talking about it. I just don't have that

21  memory right now.

22  Q. Okay. You can put that document aside.

23  You can put that aside.

24  A. Okay.

25  Q. Were you involved in Oracle's budgeting

1  process for fiscal year 2001?

2  A. Yes.

3  Q. And how were you involved in that?

4  A. I looked at the budgets.

5  Q. Did you help create any part of the budgets?

6  A. I don't think so.

7  Q. Did you -- withdrawn.

8  Did you have a role at all in approving the

9  budgets?

10  A. Not really..

11  Q. Okay. Who approved them?

12  A. The board. And Larry Ellison.

13  (Exhibit 30 was marked for identification.)

14  BY MR. BRITTON:

15  Q. I've placed in front of you what's been marked

16  as Exhibit 30. Take a moment to look at this exhibit.

17  For the record, Exhibit 30 starts at Bates

18  NDCA-ORCL 034301 and ends at 302.

19  A. Okay.

20  Q. Do you recognize Exhibit 30?

21  A. Not really.

22  Q. Okay. This has to do with the fiscal year '01

23  budget; is that right?

24  A. Fiscal year 2001 budget.

25  Q. Right.

1  And the top e-mail is from Ray Lane to Larry

2  Ellison, Jeff Henley, and yourself; is that right?

3  A. Yes.

4  Q. Okay. And then if you look down into the

5  body, there's the heading "Larry J. Ellison wrote" and

6  then there's a 30, 40, 50 plan. Do you see that?

7  A. I do.

8  Q. Okay. Do you have any knowledge of how Larry

9  Ellison came up with his growth figures for fiscal

10  year 2001?

11  A. No.

12  Q. Were you involved in the process at all of

13  establishing the 30 percent license growth target?

14  A. I don't even remember this concept.

15  Q. Okay.

16  Generally, do you work with Larry to develop

17  the growth targets for the years?

18  A. I give him my input.

19  Q. Okay.

20  And how do you come up with the growth

21  percentages that you give him?

22  A. Are you talking about --

23  MR. LINDSTROM: Vague as to time.

24  THE WITNESS: When are you talking -- because I'm

25  CFO now --

1  MR. BRITTON: I know.

2  THE WITNESS: -- so that's different.

3  I wasn't -- you know, I wasn't president, I

4  wasn't CFO. So what are we talking about datewise?

5  Q. Let's go back to the fiscal year 2001 plan.

6  A. Oh.

7  Q. Did you give Larry any input into what the

8  growth target should be then?

9  A. Oh, I can't remember.

10  Q. But Larry set the growth targets; is that

11  right?

12  A. Oh, I don't know. I think he's talking with

13  this whole group here (indicating)..

14  Q. But based on your recollection and your

15  involvement in the budgeting process for fiscal 2001,

16  did Larry Ellison set the budget targets?

17  MR. LINDSTROM: Alone?

18  THE WITNESS: On his own?

19  MR. BRITTON: Yes. Yes.

20  THE WITNESS: No, I don't think so.

21  BY MR. BRITTON:

22  Q. No?

23  Did he have a final say?

24  A. Uhm, he would have to approve what everybody

25  did, but the final say went to the Oracle Corporation

1  board.

2  Q. Okay.

3  Did they ever overrule him?

4  A. Oh, I don't know.

5  MR. BRITTON: All right.

6  (Exhibit 31 was marked for identification.)

7  MR. BRITTON: Okay. I have placed in front of you

8  what's been marked as Catz Exhibit 31. Will you take

9  a moment to look at this exhibit.

10  For the record, Exhibit 31 is a one-page

11  e-mail, Bates NDCA-ORCL 034364.

12  Q. Okay. Do you recognize Exhibit 31?

13  A. No.

14  Q. Okay. It's an e-mail about GAAP; is that

15  right?

16  A. I can't find the subject.

17  Oh, yeah, right here. Yes. It's about the

18  GAAP.

19  Q. And the top e-mail, you forwarded it to Larry

20  Ellison, right?

21  A. Yes.

22  Q. Can you tell me what about this e-mail you

23  thought was important enough to send to Larry Ellison?

24  A. I have no idea.

25  MR. BRITTON: Okay.

Catz, Safra 7/20/2006 9:07:00 AM

1    Okay. Put that document aside.

2    (Exhibit 32 was marked for identification.)

3    BY MR. BRITTON:

4    Q. Okay. I've placed in front of you what has

5    been marked as Exhibit 32. Will you take a moment to

6    look at this exhibit.

7    For the record, Exhibit 32 starts at Bates

8    NDCA-ORCL 228317 and ends at 329.

9    A. Okay.

10   Q. Do you recognize Exhibit 32?

11   A. Not really.

12   Q. The front e-mail is you forwarding the rest of

13   it to Larry Ellison; is that right?

14   A. I think so. It's kind of a funny e-mail.

15   Q. Yeah.

16   A. All these different fonts and duplicates and

17   blank pages.

18   Q. It's about Papa John's?

19   A. It appears to be about Papa John's

20   implementation.

21   Q. And, then, if you look at the page with Bates

22   324.

23   This is an e-mail about the history and the

24   situation. The second paragraph says, "I will

25   summarize and synthesize John Schnatter's comments."

Oracle                                          Page 173

Catz, Safra 7/20/2006 9:07:00 AM

1    And No. 1 says, "Lawyers and the press would love to

2    see us butt heads over this problem; however, it is

3    not our desire to get to this point. We would like to

4    see the system do what we bought it to do." No. 2,

5    "From my point of view I spent 8 million dollars to be

6    able to conduct 5 percent of my business over the Web.

7    To date, we are only able to get 1 percent before the

8    system bogs down and I am losing orders." 3 says, "I

9    am not a technical person and am somewhat spooked by

10   all of this. I have committed to my franchises that

11   we will get to 5 percent on the Web with this system,

12   and they believe me, and they have paid for it. I

13   don't want to have to write this off." So you

14   forwarded this information to Larry Ellison; is that

15   right?

16   A. Yes.

17   Q. Okay. What about this e-mail did you find it

18   important enough to send to Larry Ellison?

19   MR. LINDSTROM: And you're talking about the

20   entire collection now that's been marked as

21   Exhibit 32?

22   MR. BRITTON: Correct.

23   THE WITNESS: I just thought he should see it.

24   BY MR. BRITTON:

25   Q. Can you tell me why you thought he should see

Oracle                                          Page 174

Catz, Safra 7/20/2006 9:07:00 AM

1    it?

2    A. I thought maybe -- you know, I don't remember

3    doing it so I really would -- I really don't know what

4    about this in particular made me think -- you know,

5    made me think he should see it.

6    Q. Okay.

7    A. But I thought he should see it.

8    MR. BRITTON: Okay. Put that aside.

9    MR. LINDSTROM: Would this be a good time for a

10   break? It's been another hour.

11   MR. BRITTON: Let me see.

12   MR. LINDSTROM: Or would you prefer to go for a

13   little bit?

14   MR. BRITTON: You know, I've got three more

15   documents, and then I'll be finished with the line.

16   MR. LINDSTROM: Oh, I thought you were going to be

17   finished for the day.

18   MR. BRITTON: Oh, yeah, you wish. I wish.

19   THE VIDEOGRAPHER: We have 10 minutes of tape if

20   that makes a difference.

21   MR. BRITTON: Oh. Let's take a break.

22   THE VIDEOGRAPHER: This marks the end of Tape 3,

23   Volume I, of the deposition of Safra Catz. It's 3:00.

24   (Recess taken.)

25   (Exhibit 33 was marked for identification.)

Oracle                                          Page 175

Catz, Safra 7/20/2006 9:07:00 AM

1    THE VIDEOGRAPHER: On record at 3:12. This marks

2    the beginning of Tape 4, Volume I in the deposition of

3    Safra Catz.

4    BY MR. BRITTON:

5    Q. Ms. Catz, I have placed in front of you what

6    we've marked as Exhibit 33. Will you take a moment to

7    look at this exhibit.

8    For the record, Exhibit 33 starts at

9    NDCA-ORCL 120122 and ends at 124.

10   A. I see it, yes.

11   Q. Do you recognize Exhibit 33?

12   A. I don't remember it, but I see what it is.

13   Q. Okay. Do you recognize the issue?

14   A. Uhm, I do from the e-mail.

15   Q. Okay.

16   All right. So this e-mail you forwarded to

17   Michael Rocha, the top e-mail; is that right?

18   A. Yeah. To Mike Rocha.

19   Q. Okay. Who is Mike Rocha?

20   A. He is the head of support at the time.

21   Q. And the top e-mail you are explaining to Mike

22   that you had escalated the issue described in this

23   e-mail to Larry, not a different group; is that right?

24   A. Yes. I'm telling him I did it. I sent it to

25   Larry not Jennifer.

Oracle                                          Page 176

1    Q. Okay. Not Jennifer.

2    And then you say in the last sentence, "I did

3    not feel with a bit over a month left I could not

4    afford to not give Larry a heads up." Do you see

5    that?

6    A. Yes.

7    Q. Why did you feel that way?

8    A. Because the original note down at the bottom,

9    the one I forwarded, it says it's not in completion so

10    I can't tell what's really going on here, but it

11    concludes with -- if this is the conclusion, with five

12    weeks of selling left we have closed contracts that

13    represent 9 percent of the total open Q4 revenue. So

14    that didn't sound good.

15    Q. Okay.

16    A. So I didn't think that was good.

17    Q. Okay.

18    A. But I didn't know. And it's explained to me

19    later on.

20    Q. All right. Do you have an understanding of

21    what this table means?

22    MR. LINDSTROM: Is the table on page 2 of the

23    exhibit?

24    MR. BRITTON: Correct. Right above what you just

25    read into the record.

---

1    THE WITNESS: It's a table. The one that's cut

2    off a little bit?

3    MR. BRITTON: Yes.

4    THE WITNESS: Okay. So I'd have to study it.

5    It's not a table I'm used to. So -- okay. I kind of

6    understand it from looking at it.

7    MR. BRITTON: Okay.

8    The totals line. Look at the totals line.

9    And it's 45 million, 94 million adds to up 139

10    million. So I think the zeroes are just cut off

11    there.

12    THE WITNESS: Yeah, I think so.

13    BY MR. BRITTON:

14    Q. The 139, is that total support renewals for

15    the company for Q4?

16    A. That doesn't seem like the right number, to be

17    honest with you.

18    Q. Now, you say on the front page "They didn't

19    escalate this to Larry, I did. Mike, it is such a big

20    piece of our revenue that I thought it critical that

21    if there was a giant shortfall, we keep an eye on

22    expenses. If it's a system issue, the IT teams do

23    what they can to get it fixed." When you referenced

24    the big piece of our revenue, were you talking about

25    the 139 million on the next page?

---

1    A. I don't think so. I think I was just talking

2    about support in general.

3    Q. Support in general.

4    And the second page, the top e-mail from

5    Jennifer Minton to Jeff Henley and you --

6    A. I'm sorry. The previous page?

7    Q. The second page of the exhibit.

8    A. Yes.

9    Q. It's the one that ends --

10    A. Yes.

11    Q. -- in 123.

12    The second sentence says, "I have asked Larry

13    to resend this note to include the number of contracts

14    that have not been renewed since there are some

15    systems/process issues that may affect the forecasted

16    revenue." Do you know what systems/process issues are

17    being referred to in this e-mail?

18    A. I don't.

19    MR. BRITTON: Okay. You can put that document

20    aside.

21    (Exhibit 34 was marked for identification.)

22    BY MR. BRITTON:

23    Q. I've placed in front of you what has been

24    marked as Exhibit 34. Take a moment to look at this

25    exhibit.

---

1    For the record, Exhibit 34 starts at Bates

2    NDCA-ORCL 156386 and ends at 389.

3    A. Okay.

4    Q. Do you recognize Exhibit 34?

5    A. Not really.

6    Q. All right. The front page is an e-mail from

7    you to Larry Ellison?

8    A. Yeah.

9    Q. It's dated February 15th, 2001?

10    A. Yep.

11    Q. If you look three pages in, and the top e-mail

12    is talking about a $20 million shortfall in U.S.

13    support revenues in January and --

14    A. Yeah.

15    Q. -- December. Do you see that? Do you know

16    what the issue was?

17    A. No. I don't even know who wrote this e-mail.

18    I don't know who it's from.

19    Q. I don't know exactly who it's to. I don't

20    know if it's Mike Rocha. I literally -- no idea.

21    Q. Okay.

22    A. Uhm, the total support number for the quarter

23    must have been, like, a billion. So -- or more. So,

24    you know, I just don't know -- I don't know what this

25    is exactly --

1    Q. Okay.

2    A. -- when I sit here right now.

3    Q. As you sit here today, do you know why you

4    forwarded an e-mail about a $20 million shortfall in

5    support revenues to Larry Ellison?

6    A. As I sit here right now, I don't remember

7    doing it; but at the time I must have thought it was

8    worth sending to him.

9    Q. Do you know why?

10   A. I'm not actually sure.

11   Q. Okay.

12      Okay. What do you remember about the dot-com

13   part of Oracle's business in fiscal year 2000 and

14   fiscal year 2001?

15   MR. LINDSTROM: Objection. Vague and ambiguous.

16   THE WITNESS: If you mean like dot-coms, like

17   companies buying our software, they loved our

18   software.

19   MR. BRITTON: Correct.

20   Q. Do you remember at any point in time sales to

21   the dot-coms slowing in fiscal year 2001?

22   MR. LINDSTROM: Objection. Vague and ambiguous as

23   to dot-coms.

24   THE WITNESS: Yeah. Again, I mean, it kind of

25   depends what you mean by dot-coms overall. I mean,

1    this lawsuit is about our quarter where our revenues

2    didn't meet expectations.

3    MR. BRITTON: Yes. Correct.

4    Q. Do you have an idea -- I think you said it

5    depends what you mean by dot-coms overall.  Do you

6    have varying definitions in your mind about what

7    dot-coms mean?

8    A. Sure. You know, there were a lot of startups

9    that are called dot-coms. Pets.com, some of those

10   guys. Then there are dot-coms like -- the big guys.

11   Amazon, eBay, all these guys. And then there's really

12   all the things around it. Like, even though Cisco

13   wasn't a dot-com, Qualcomm -- all of this whole

14   dot-com area.

15      Oracle was kind of a dot-com.

16      So it would depend if you mean those little

17   startups.

18   Q. Did Oracle separate or categorize any part of

19   its business as the dot-com part of its business?

20   A. I didn't at my level --

21   Q. Okay.

22   A. -- separate out, you know, in our financial

23   reports or something like that. I didn't have a

24   "dot-com" line to look at.

25   Q. Were you aware of who general businesses --

1    withdrawn.

2       You're familiar with the NAS part of Oracle as

3    it existed in fiscal year 2001?

4    A. It was North America sales.

5    Q. North America sales. And the acronym is NAS?

6    A. Yeah.

7    Q. And that was divided into general business and

8    majors?

9    A. Yes.

10   Q. Okay. And general business sold to most of

11   the dot-coms companies; is that right?

12   A. General business had a definition regarding

13   the size of your company.

14   Q. Uh-huh.

15   A. So, like, Covisint was actually a dot-com, but

16   it wasn't in majors or in general business.

17   Q. Okay.

18      Would you agree with me that a large portion

19   of general business's sales went to dot-com companies?

20   MR. LINDSTROM: What time frame?

21   MR. BRITTON: Fiscal 2001.

22   MR. LINDSTROM: Vague and ambiguous.

23   THE WITNESS: You know, I'm not really the exact

24   person to ask because they didn't break it out for me.

25   But there are folks who would know because they

1    must -- I think they broke it out for themselves.

2    MR. BRITTON: Okay.

3    (Exhibit 35 was marked for identification.)

4    MR. BRITTON: I've placed in front of you what has

5    been marked as Exhibit 35. Take a moment to look at

6    this exhibit.

7       For the record, Exhibit 35 starts at Bates

8    NDCA-ORCL 040662 and it ends at 663.

9    A. Okay.

10   Q. Do you recognize Exhibit 35?

11   A. I don't remember it, but I see what it is from

12   the e-mail.

13   Q. Okay. Did you review this e-mail in

14   preparation for your deposition today?

15   A. No.

16   Q. Okay. The top e-mail is from Jeff Henley to

17   you; is that right?

18   A. Yeah. January 30, 2001.

19   Q. Okay. And what did you understand this e-mail

20   to mean when you received it?

21   A. I don't remember receiving it.

22   Q. Okay. But you don't dispute that you didn't

23   receive it; is that right?

24   A. Yeah, I'm sure I received it. I'm the "to" in

25   the e-mail.

1    Q. Do you know what the boxes down in the bottom

2    e-mail are referring to?

3    A. I'm trying to figure out how they add, or how

4    they relate to each other. So it's dot-com and ASPs

5    together as a group. So the -- I think you add the

6    last two to get to the first one. I don't know. I

7    have to do the math. 85 and 250.

8    MR. LINDSTROM: He's not asking you to speculate,

9    he just wants to know if you know.

10    MR. BRITTON: Right.

11    THE WITNESS: If I know what?

12    MR. BRITTON: What these boxes are conveying.

13    THE WITNESS: I think so. I'm not sure. That's

14    why I have to add it to see.

15    See if they add.

16    Okay. I think I do.

17    BY MR. BRITTON:

18    Q. Okay. What do you think these boxes are

19    saying?

20    A. Technology growth rates in one -- I don't even

21    know -- actually, I don't know. Oh. Okay. I think

22    it's for North America sales.

23    Q. Okay. That was Oracle's largest division?

24    A. I don't remember if it was the largest.

25    Q. And this is saying that they're going to

---

1    experience -- or projecting to experience a 6 percent

2    decline in growth in technology in Q3 2001; is that

3    right?

4    A. No, no, no. This is -- this is already in

5    FY '02. Right? This is January 2001 --

6    Q. Is Q3 '01?

7    A. Is Q3.

8    Q. '01.

9    A. Okay. Yeah.

10    MR. LINDSTROM: Can we have the question either

11    reposed or reread.

12    MR. BRITTON: Okay. Let me walk you through it.

13    Q. Do you understand this document to be telling

14    you that the projected growth rates for NAS's

15    technology part of its business in the third quarter

16    was a decline of 6 percent?

17    MR. LINDSTROM: Objection. The document speaks

18    for itself. Calls for speculation.

19    THE WITNESS: Yeah. Actually, I don't know where

20    these numbers are from.

21    BY MR. BRITTON:

22    Q. Okay. So you don't remember receiving this at

23    all?

24    A. I don't.

25    Q. Do you know what percentage of NAS's business

---

1    was made up of dot-coms and ASPs?

2    MR. LINDSTROM: In January 2001?

3    MR. BRITTON: Yes.

4    THE WITNESS: I don't know. You have -- I don't

5    know.

6    BY MR. BRITTON:

7    Q. Okay. What about the third quarter of 2000?

8    A. I don't know.

9    Q. Okay. Now, when you're forecasting -- or when

10    you were forecasting in the third quarter of 2001,

11    would you do year-over-year comparisons?

12    A. Of what?

13    Q. I --

14    A. I wasn't forecasting so I don't know what

15    you're talking about.

16    Q. When you were in the executive management

17    committee meeting -- you attended those; is that

18    right?

19    A. Yes.

20    Q. And you received Jennifer Minton's reports?

21    Forecasting reports?

22    A. The forecast report?

23    Q. Right.

24    The one that she'd pass out at every

25    meeting --

---

1    A. Yes.

2    Q. -- you'd get that, right?

3    A. Yes. I've testified that I received that.

4    Q. Okay. So you were involved in that discussion

5    about the forecast?

6    A. I was there while it was being discussed.

7    Q. Were you involved in it? Did you contribute

8    to the discussions?

9    A. As I sit here right now, I can't remember; but

10    I probably would have asked a question.

11    Q. Did you have an understanding at that time

12    that part of Oracle's forecasting process was to look

13    at the results of the prior year's same quarter?

14    A. Probably.

15    MR. LINDSTROM: He doesn't want you to guess. In

16    other words, he just wants your knowledge.

17    BY MR. BRITTON:

18    Q. Sitting here today --

19    A. Uh-huh.

20    Q. -- do you remember, as part of the forecasting

21    discussion during the executive committee management

22    meetings, doing a year-over-year comparison?

23    A. In executive committee the prior year's

24    results were in that forecast report.

25    Q. And if you look at the second page of

1   Exhibit 35, this is doing a year-over-year comparison

2   as well; is that right?

3   A. It appears to be.

4   Q. Okay. And my question for you, is that

5   consistent with Oracle's forecasting process in the

6   third quarter of 2001?

7   A. You know, I really don't know if it is or

8   it's -- or what it is. So just hold up.

9   I don't know if it's a year over year or it's

10   a sequential. This little square here is not clear

11   (indicating).

12   I --

13   Q. So the column that says "YOY dollar change"?

14   A. Oh, where is that?

15   Q. Top of page 2.

16   A. This one, the box I'm looking at on the front

17   page doesn't say that.

18   Q. Right.

19   And my question was -- is on page 2 of

20   Exhibit 35.

21   A. Yes. Then it's year-over-year change.

22   Q. And that's consistent with how you and others

23   on the executive management committee meeting were

24   looking at Oracle's forecast?

25   MR. LINDSTROM: Well, let me stop. Do you mean

1   these specific numbers as reflected in this box were

2   consistent with the way they were looking at the

3   forecast? Or just in general year-over-year

4   comparison?

5   MR. BRITTON: Correct, year-over-year comparisons.

6   THE WITNESS: In general, I would look at the

7   year-over-year comparison as one of the things I look

8   at.

9   BY MR. BRITTON:

10   Q. Okay. Did you send this to Larry Ellison?

11   A. I don't know.

12   Q. Okay. Did you discuss this at the executive

13   management committee meetings?

14   MR. LINDSTROM: Exhibit 35?

15   MR. BRITTON: Yes.

16   THE WITNESS: I don't know.

17   MR. BRITTON: Okay. Put that document aside.

18   (Exhibit 36 was marked for identification.)

19   BY MR. BRITTON:

20   Q. I have placed in front of you what's been

21   marked as Catz Exhibit 36. Will you take a moment and

22   look at this exhibit for me, please.

23   For the record, Exhibit 36 is a 17-page

24   presentation from Nick Classic. It does not have a

25   Bates stamp on it because of production issues.

1   And the first question is do you recognize it?

2   And my questions will be focused on page 10.

3   A. I don't think I have ever seen it before.

4   MR. BRITTON: Okay.

5   MR. LINDSTROM: Why don't you take a moment to

6   examine it.

7   THE WITNESS: Okay.

8   BY MR. BRITTON:

9   Q. Do you recognize Exhibit 36?

10   A. I told you I'd never seen it before.

11   Q. Okay.

12   I'll represent to you that this is a

13   presentation that Nick Classic testified that he gave

14   to George Roberts. If you turn to page 10 for me,

15   please.

16   There's the heading "Slowdown In Dot-Com

17   Space." The first bullet point says VC funding

18   getting -- or "VC funding tougher," then it has a

19   colon and it says, "Refocus on profitability, cost

20   sensitive IPOs, soft market, increase selectivity."

21   Did George Roberts raise these topics at any of the

22   executive management committee meetings in the second

23   quarter of 2001?

24   MR. LINDSTROM: And we're talking specifically

25   about the ones that are identified under the heading

1   "VC funding tougher"?

2   MR. BRITTON: Correct.

3   THE WITNESS: I don't remember him doing that.

4   BY MR. BRITTON:

5   Q. Okay. Do you remember him raising a slowdown

6   in the dot-com part of his business at all during the

7   executive management committee meetings?

8   A. I don't remember him doing that. I know he

9   didn't lower his forecast so I don't really.

10   Q. So, as you sit here today, it's news to you he

11   was learning that there was a slowdown in the dot-com

12   business?

13   A. Well, this isn't, like, about Oracle. This is

14   something -- it's in quotes. Now, I don't remember

15   when there started to be issues in this whatever

16   defined dot-com space, but I think he's talking about

17   the outside --

18   Q. Okay.

19   A. -- world.

20   Q. Do you remember George Roberts raising the

21   fact that the dot-com segment of the economy was

22   slowing down in the second quarter of 2000?

23   A. As I sit here right now, I really don't.

24   Q. If you look down to the third bullet point, it

25   says "Software rental." It says "rent versus buy, buy

1   as you grow, ASP hosting, conserve cash, smaller deal

2   size term." Do you remember George Roberts raising

3   any of those issues during the executive management

4   committee meeting?

5   A. In that quarter?

6   Q. In the second quarter of 2000.

7   A. In the second quarter. I don't.

8   Q. Do you remember -- do you remember the dot-com

9   bubble bursting at all in 2000?

10   A. I don't know when it burst 2000, 2001. I know

11   that concept, and I know that there were problems that

12   impacted lots of companies.

13   Q. Okay. It impacted Oracle's too?

14   (Reporter interruption.)

15   MR. LINDSTROM: Objection. Vague and ambiguous.

16   THE WITNESS: It impacted Oracle's -- some of

17   Oracle's customers.

18   BY MR. BRITTON:

19   Q. And it impacted Oracle?

20   A. It's hard to say what exactly impacted us, but

21   things definitely were not as good as they were during

22   the Internet, quote, bubble, (indicating quotes).

23   MR. LINDSTROM: Are we done with Exhibit 36?

24   MR. BRITTON: Yes.

25   (Exhibit 37 was marked for identification.)

1   BY MR. BRITTON:

2   Q. Okay. I've placed in front of you what has

3   been marked as Exhibit 37. If you flip through it and

4   let me know if you recognize it.

5   For the record, Exhibit 37 starts at Bates

6   NDCA-ORCL 350276 and ends at 303.

7   A. I've never seen this document, I don't think.

8   Q. Okay.

9   A. I don't recognize it in any way.

10   Q. Okay. Then let me focus your attention on

11   three pages. If you go to page 9 of this exhibit.

12   MR. LINDSTROM: The one with the heading "Market

13   Observations"?

14   MR. BRITTON: Yes.

15   BY MR. BRITTON:

16   Q. Are you there?

17   A. I'm there.

18   Q. Okay. The first bullet point, it says

19   "sluggish economic outlook." Do you remember George

20   Roberts raising this issue during the executive

21   management committee meeting?

22   MR. LINDSTROM: And again, we're talking about the

23   time frame of this document, January 9, 2001?

24   MR. BRITTON: Correct. That would be the third

25   quarter of 2001.

1   THE WITNESS: See, I just don't remember when the

2   economy started to soften --

3   MR. BRITTON: Okay.

4   THE WITNESS: -- as I sit here right now. So I do

5   not remember him mentioning this ahead.

6   MR. BRITTON: Okay.

7   THE WITNESS: At EC.

8   BY MR. BRITTON:

9   Q. All right. If you'd turn to page 12. Under

10   "market observations" there. It says, "Dot-com

11   fishing hole drying up. VC funding nonexistent.

12   Development license only." Skip one. "Already 41,515

13   layoffs in calendar year 2000. Survival mode for

14   calendar year 2001." Do you remember George Roberts

15   raising any of those issues in the third quarter of

16   2001?

17   A. I really can't place that at all.

18   Q. Now, if you'll turn to page 26. There's the

19   box that says -- I don't think we're on the same page.

20   A. No. I'm still looking at the document because

21   I've never seen it before.

22   (Witness reviews document.)

23   I'm sorry. What page are you on?

24   Q. 26.

25   A. Oh, I got a long way to go here.

1   Okay.

2   Q. Okay. 26 has issues, challenges, and

3   recommendations. And if you turn the page, this is

4   talking about the second half in fiscal year '02. So

5   presume that's the second half of 2001. It says,

6   "mid-teen technology growth rate." Below it it says

7   "no million dollar dot-com deals." Do you remember

8   George Roberts raising that as an issue?

9   MR. LINDSTROM: Well, what -- again, this -- the

10   document's dated January 2001, and it appears to be

11   speaking about the second half of '01, and then the

12   fiscal year '02 which would follow.

13   MR. BRITTON: Correct.

14   MR. LINDSTROM: So, are you asking him -- asking

15   her whether he raised it in January 2001?

16   MR. BRITTON: I'm -- let me rephrase.

17   Q. Do you recall George Roberts raising the fact

18   that NAS was seeing -- withdrawn.

19   Do you remember George Roberts raising the

20   fact that general business was seeing mid-teen

21   technology growth rates in fiscal year -- the second

22   half of fiscal year 2001 and fiscal year '02 during

23   any of the third quarter executive management

24   committee meetings?

25   A. I just don't remember.

1  Q. What about no million dollar dot-com deals?

2  A. Uhm, I really don't remember that to be so.

3  Q. Okay. If you look at the next box. The

4  second bullet point says, "dramatic decline in dot-com

5  business." Do you see that?

6  A. I see that.

7  Q. Does he raise -- does George Roberts raise

8  that as an issue during any of the third quarter

9  executive management committee meetings?

10  MR. LINDSTROM: So, just to be specific, are you

11  talking about that phrase, namely "dramatic decline in

12  dot-com business," or any of the items that are

13  enumerated beneath that?

14  MR. BRITTON: That phrase.

15  MR. LINDSTROM: Okay. Thank you.

16  THE WITNESS: I don't remember that in Q3, that he

17  was saying this at all.

18  MR. BRITTON: Okay.

19  THE WITNESS: At all.

20  BY MR. BRITTON:

21  Q. Is that information you would have wanted to

22  know about?

23  A. I don't know.

24  MR. LINDSTROM: Objection. Calls for speculation.

25  THE WITNESS: It would depend on the whole

1  context. I'm very interested in his forecast. This

2  is one piece of it.

3  BY MR. BRITTON:

4  Q. Do you know the dot-com business in the prior

5  year represented 10 percent of his business?

6  A. No. I don't know if that's true or not true.

7  Q. Do you know that it represented 10 percent of

8  Oracle's license revenues in Q3, 2000?

9  A. I don't know that. I don't know if that's

10  true or not.

11  Q. So, assuming that's true, if there was a

12  dramatic decline in that part of his business, is that

13  something you would have wanted to know?

14  MR. LINDSTROM: Objection. Calls for speculation.

15  THE WITNESS: Again, it's very dependent based on

16  the rest of the business because he has a big

17  business.

18  BY MR. BRITTON:

19  Q. So if 10 percent of Oracle's license revenues

20  disappeared, you wouldn't have wanted to know about

21  that?

22  MR. LINDSTROM: Objection. Calls for speculation.

23  Argumentative.

24  THE WITNESS: You know, once again, if 10 percent

25  from one place goes and 20 percent new shows up, I'm

1  net, you know, up 10. So that's what I care about, in

2  aggregate. You know, the little pieces -- maybe I

3  would -- maybe it would have mattered. Maybe I -- it

4  all depends.

5  BY MR. BRITTON:

6  Q. The question isn't whether it mattered, I'm

7  asking you whether you would have wanted to know --

8  A. Hard to say.

9  Q. So you can't tell me, sitting here today, if

10  you would want to know whether 10 percent of Oracle's

11  license revenues disappeared?

12  MR. LINDSTROM: Objection.

13  THE WITNESS: Again, once again --

14  MR. LINDSTROM: Asked and answered.

15  THE WITNESS: -- I don't know if it was

16  10 percent.

17  MR. LINDSTROM: Argumentative.

18  THE WITNESS: You know, it -- if it disappeared?

19  10 percent just -- the money disappeared --

20  MR. BRITTON: Demand wasn't there anymore.

21  THE WITNESS: -- out of the building?

22  MR. BRITTON: Well, the demand wasn't there

23  anymore. Sales disappeared.

24  MR. LINDSTROM: Objection. Argumentative. Asked

25  and answered. Calls for speculation.

1  THE WITNESS: I look at things in the totality.

2  BY MR. BRITTON:

3  Q. Well, to look at things in the totality you

4  would have needed to know about that.

5  MR. LINDSTROM: Argumentative.

6  THE WITNESS: Not necessarily.

7  MR. BRITTON: No? Okay.

8  You can put that document aside.

9  (Exhibit 38 was marked for identification.)

10  THE WITNESS: Okay. I see it.

11  BY MR. BRITTON:

12  Q. Do you recognize Exhibit 38?

13  A. I actually don't.

14  Q. Okay.

15  For the record, Exhibit 38 starts at Bates

16  NDCA-ORCL 096356 and ends at 357.

17  Okay. This is an e-mail from David Winton to

18  Jennifer Minton dated January 11, 2001. Did Jennifer

19  Minton discuss with you any of the issues that are

20  raised in Exhibit 38 in the third quarter of 2001?

21  A. I don't remember her discussing them with me.

22  Q. Okay. Were any of the issues that are

23  identified in Exhibit 38 discussed during any of the

24  executive management committee meetings in the third

25  quarter of 2001?

1   A. I can't remember. I mean, for sure the

2   forecast hadn't changed, but the -- but the upside or

3   best case may have changed. So it would -- if it

4   changed, it would be in the forecast report, and it

5   would be commented on. But I don't remember it as I

6   sit here right now.

7   MR. BRITTON: Okay. You can put that document

8   aside.

9   (Exhibit 39 was marked for identification.)

10   BY MR. BRITTON:

11   Q. I have placed in front of you what has been

12   marked as Exhibit 39.

13   For the record, Exhibit 39 starts with Bates

14   NDCA-ORCL 042003 and ends at 004.

15   A. Okay.

16   Q. Okay. Do you recognize Exhibit 39?

17   A. I don't remember it, but I see what it is.

18   Asking for a meeting.

19   Q. Okay. It's asking for a meeting. This is

20   George Roberts asking you to meet with John Nugent,

21   Mary Anne Gilespie, Ron Bunting, and Hilarie Koplow;

22   is that right?

23   A. Yes. That is what it is asking me to do.

24   Q. Did those meetings take place?

25   A. I don't know.

1   Q. Did you know that they did not take place? Or

2   you just don't have any recollection?

3   A. I do not remember them at all.

4   Q. Okay. As a practice, if you had scheduled a

5   meeting like this, would they have taken place?

6   A. Well, it's not scheduled. So if the meeting

7   is scheduled, it would usually take place. But this

8   is saying okay to schedule. But I don't -- I just

9   don't remember it. I don't know if it was scheduled

10   or not. Or whether it happened.

11   Q. Do you typically have business review meetings

12   with the various divisions each quarter?

13   A. Did I then?

14   Q. Yes.

15   A. By myself?

16   Q. Yes.

17   A. I don't know.

18   Q. Okay. You can put that document away.

19   Do you remember Jay Nussbaum requesting a

20   special Q3 incentive to drive the license business in

21   the third quarter of 2001?

22   A. I don't remember it.

23   Q. Oracle -- withdrawn.

24   In your experience at Oracle, have you ever

25   seen a request for a special incentive to drive

1   business?

2   MR. LINDSTROM: Objection. Vague and ambiguous.

3   THE WITNESS: Uhm, have we ever had a SPIF or a

4   promotion? A sales SPIF?

5   MR. BRITTON: Correct.

6   THE WITNESS: I have seen requests for SPIFs, yes.

7   BY MR. BRITTON:

8   Q. What is SPIF?

9   A. I don't know what it means. It's a -- you

10   know, some sort of extra money for the sales guy.

11   Q. Okay. How frequently do those occur?

12   A. The requests for them occur constantly.

13   Q. Do they occur from the executive VPs?

14   A. Yes.

15   MR. BRITTON: They do. Okay.

16   (Exhibit 40 was marked for identification.)

17   BY MR. BRITTON:

18   Q. Do you recognize Exhibit 40?

19   A. I don't remember it, but I -- I mean, I don't

20   recognize it; but I can see what it is.

21   Q. Is this a SPIF like you're talking about, the

22   special incentive request?

23   A. This is me asking Larry if he told Jay that

24   one of these was approved.

25   Q. Okay. Is the incentive that's referenced in

1   Exhibit 40 --

2   A. Yes.

3   Q. -- is that what you refer to as a SPIF?

4   A. It is.

5   Q. So that was not unusual to ask for that type

6   of incentive?

7   A. Sales people ask for these constantly. Used

8   to ask for these constantly.

9   Q. Okay. Put that document aside.

10   Now, you were interested in selling Oracle

11   stock in the third quarter of 2001; isn't that right?

12   A. I definitely asked for permission to sell

13   stock sometime around -- I think it was the third

14   quarter.

15   Q. Okay. Can you tell me why?

16   A. Because my husband asked me to.

17   Q. And what in particular -- withdrawn.

18   What was his reasoning for asking for you to

19   sell or request permission to sell your Oracle stock

20   at that point in time?

21   A. I'm not really sure.

22   Q. Okay. Was he concerned that the economy was

23   declining?

24   MR. LINDSTROM: No foundation. Calls for

25   speculation.

Catz, Safra 7/20/2006 9:07:00 AM

1  THE WITNESS: Uhm, I've already testified about
2  this before a number of times: but I think at the time
3  he was seeing other people selling near us, living
4  near us, and said why don't we maybe sell some of our
5  stock.
6  BY MR. BRITTON:
7  Q. And you hadn't sold any stock up to that point
8  in time; is that right?
9  A. No.
10  Q. Okay. Have you sold any stock since then?
11  A. Yes.
12  Q. How many shares and when?
13  A. Uhm, I sold -- last year? I think it was last
14  year.
15  Q. Okay.
16  A. Maybe it was the year before. I don't know..
17  One time I sold a million two shares.
18  Q. So, from the time you started with Oracle
19  until your stock sales, how many years had passed?
20  A. Six or something like that. Five or six.
21  Q. And you decided not to sell in the end; is
22  that right? In the third quarter of 2001?
23  A. That's correct.
24  Q. Can you tell me why?
25  A. As I testified previously, I learned that

Catz, Safra 7/20/2006 9:07:00 AM

1  Larry Ellison was putting in a plan to sell.
2  Q. And what about that gave you concern?
3  A. I just didn't know if knowing that the large
4  shareholder was going to sell stock was material
5  information or nonpublic information or something
6  where I knew something that others didn't; and I
7  didn't know if it mattered or didn't matter, but I
8  wasn't very committed to selling at all anyway so I
9  just said forget it.
10  Q. Okay. Well, executives sell stock together
11  all the time. What about Larry Ellison's sales gave
12  you a concern?
13  A. Uhm, nothing. It's just Larry Ellison is
14  Oracle's largest shareholder, and I don't know what
15  the rules around that and the market. I just didn't
16  want to bother.
17  Q. Okay. Now, you told the Special Litigation
18  Committee that you weren't aware of -- or you didn't
19  know whether you were aware of Larry Ellison's stock
20  sales at the time he was making those sales; is that
21  right?
22  A. I'm not --
23  MR. LINDSTROM: Objection.
24  THE WITNESS: -- actually sure that's what I told
25  the Special Litigation Committee.

Catz, Safra 7/20/2006 9:07:00 AM

1  MR. BRITTON: If you turn to Exhibit 12.
2  MR. LINDSTROM: Is there a page reference,
3  Counsel?
4  MR. BRITTON: Yes. Page 20 of Exhibit 12. It has
5  Bates 297312.
6  Q. Look under the heading "Sale of stock by
7  Henley, Ellison, Boskin and Lucas." The first two
8  sentences say, "Catz said she was aware that Henley
9  and Ellison sold shares in Q3 '01, but she has never
10  spoken to them about those trades or the reasons for
11  them. She did not recall if she knew of the sales at
12  the time they were made."
13  A. This is not a hundred percent accurate.
14  Q. So that's not true?
15  A. That is not -- well, it's true in parts and
16  not in others.
17  Q. Okay. Well, the statement "she did not recall
18  whether she knew of the sales at the time they were
19  made," that statement is not true?
20  A. I didn't know about some of the sales, and --
21  but I definitely knew, and I testified that I knew,
22  that Larry Ellison was going to sell stock.
23  Q. Did you tell the SLC this?
24  A. I'm sure.
25  MR. LINDSTROM: By the way, just so the record is

Catz, Safra 7/20/2006 9:07:00 AM

1  clear, did she tell the SLC this, referring to the
2  sentence that reads "she did not recall whether she
3  knew the sales at the time they were made."
4  MR. BRITTON: Correct.
5  THE WITNESS: I told them, I think, what, I'm
6  telling you.
7  MR. BRITTON: Okay.
8  THE WITNESS: And what I've testified to. Which
9  is I did not know -- you know, I don't know whether I
10  knew about the sales of Henley, Boskin and Lucas at
11  the time they were made. I did hear that Larry
12  Ellison was going to sell before he sold. So that
13  sentence, the only one you're focused on, is not
14  correct -- it's not perfectly correct.
15  MR. BRITTON: It's not correct. Okay.
16  Okay. Can we take five?
17  THE VIDEOGRAPHER: Off record at 4:02.
18  (Recess taken.)
19  THE VIDEOGRAPHER: Okay. On record at 4:10.
20  BY MR. BRITTON:
21  Q. Ms. Catz, do you know who Dan Cooperman is?
22  A. Yes.
23  Q. Who is he?
24  A. Oracle's general counsel.
25  Q. Okay. Is that who you sought clearance from

Catz, Safra 7/20/2006 9:07:00 AM

1  to trade in the third quarter of 2001?
2  A. Yes.
3  Q. Okay. Is it his job to determine whether
4  trading is appropriate or not?
5  MR. LINDSTROM: Objection. No foundation. Calls
6  for a legal conclusion.
7  THE WITNESS: He's the one you call. And I don't
8  know -- he does what he needs to do.
9  BY MR. BRITTON:
10  Q. Okay. Did you talk to him about what you had
11  discovered about Larry Ellison trading?
12  A. Yes.
13  Q. Did you ask him whether it would be
14  appropriate for you to trade?
15  A. No.
16  Q. You didn't?
17  A. I didn't ask him if it would be appropriate
18  for me to trade after I found out.
19  Q. Okay. And why did you not ask him?
20  A. I told -- because I was not going to trade.
21  Q. What if he would have said, "yes, you can
22  trade"? It's not material, that you could have
23  traded?
24  MR. LINDSTROM: Objection. Calls for speculation.
25  Hypothetical.

Oracle                                                    Page 209

Catz, Safra 7/20/2006 9:07:00 AM

1  THE WITNESS: I wasn't going to trade.
2  MR. BRITTON: Okay. I have no further questions.
3  THE WITNESS: Okay.
4  MR. LINDSTROM: So we're done with Ms. Catz's
5  deposition?
6  MR. BRITTON: Correct. Unless discovery turns
7  something else up, newly discovered. But for now
8  we're done.
9  MR. LINDSTROM: I think you and I are on the same
10  page. But, I mean, she's here to give you the seven
11  hours. What I understand you to be saying is that
12  you're done with her but reserving the right if
13  something that isn't available to you --
14  MR. BRITTON: Correct.
15  MR. LINDSTROM: -- today came up.
16  MR. BRITTON: Correct.
17  We have discovery orders in place that have
18  compelled additional discovery. So if something in
19  that additional discovery comes to light that requires
20  Miss Catz to reappear, we'll take it up with you at
21  that time. But based on what I have so far, I'm done
22  for today.
23  MR. LINDSTROM: Thank you.
24  MS. KYROUZ: We'd like to mark the transcript
25  confidential.

Oracle                                                    Page 210

Catz, Safra 7/20/2006 9:07:00 AM

1  THE VIDEOGRAPHER: This is the end of Videotape 4,
2  Volume I --
3  MR. BRITTON: Oh, you know what. Hold on one
4  second. Don't go off the record. One more thing.
5  Sorry.
6  THE WITNESS: Do you need me?
7  MR. BRITTON: Yes, I need you to go back on.
8  MR. LINDSTROM: You need to be careful.
9  THE WITNESS: This is like Columbo.
10  MR. LINDSTROM: This is where the trick
11  question --
12  THE WITNESS: One more thing..
13  MR. BRITTON: One more thing.
14  THE WITNESS: Columbo.
15  (Exhibit 41 was marked for identification.)
16  MR. BRITTON: Okay. Are we still --
17  THE VIDEOGRAPHER: We're sail rolling.
18  MR. BRITTON: Okay. Do you have another one of
19  these? I just want to mark this.
20  Q. Okay. Ms. Catz, I've placed in front of you
21  what I've marked as Exhibit 41, which is a copy of
22  your deposition transcript. A deposition you gave in
23  the derivative case.
24  A. I'm sorry, I already put my glasses away.
25  This is a deposition of who?

Oracle                                                    Page 211

Catz, Safra 7/20/2006 9:07:00 AM

1  Q. This is a copy of the transcript of your
2  deposition given in the derivative case.
3  A. I don't know, is my name on this somewhere?
4  Oh, yeah. Right on top.
5  MR. LINDSTROM: Are you representing to her that
6  that is what it is?
7  THE WITNESS: Is that what this is?
8  MR. BRITTON: Yes.
9  Q. My question is going to be is this the
10  deposition you reviewed in preparation for your
11  deposition today.
12  MR. LINDSTROM: And, again, just for sake of
13  clarity, this document has a number of exhibits
14  attached to it. So are you asking whether -- I
15  believe her testimony was she looked at the
16  transcript.
17  MR. BRITTON: Correct.
18  MR. LINDSTROM: So we should make sure we get a
19  clear record as to whether that is just the transcript
20  or also the exhibits that are attached here as part of
21  Catz Depo Exhibit 41.
22  THE WITNESS: Yeah. I think this is -- this is
23  it. I think I was deposed once, this looks like the
24  right lawyer.
25  MR. BRITTON: Okay.

Oracle                                                    Page 212

1       THE WITNESS: I think this Tobacco guy.

2       BY MR. BRITTON:

3       Q. But you did not review the exhibits in

4       preparation for your deposition?

5       A. No.

6       I'm sorry. I read the discussion.

7       Q. Just the discussion. Okay.

8       A. Me talking, the questions, the answers.

9       MR. BRITTON: Very good.

10      That is it. I promise.

11      THE VIDEOGRAPHER: Counsel.

12      MR. LINDSTROM: Thank you.

13      THE VIDEOGRAPHER: This is the end of Videotape 4,

14      Volume I, in the deposition of Safra Catz. The

15      original videotapes will be retained by LiveNote World

16      Service. We're going off the record at 4:15.

17      (At 4:15 p.m. the deposition proceedings

18      concluded.)

19              -oOo-

20

21

22

23              SAFRA CATZ

24

25

1       STATE OF CALIFORNIA  )

2       COUNTY OF SAN MATEO  )

3       I hereby certify that the witness in the

4       foregoing deposition, SAFRA CATZ, was by me duly sworn

5       to testify to the truth, the whole truth, and nothing

6       but the truth, in the within-entitled cause; that said

7       deposition was taken at the time and place herein

8       named; that the deposition is a true record of the

9       witness's testimony as reported by me, a duly

10      certified shorthand reporter and a disinterested

11      person, and was thereafter transcribed into

12      typewriting by computer.

13      I further certify that I am not interested in

14      the outcome of the within action, nor connected with,

15      nor related to any of the parties in said action, nor

16      to their respective counsel.

17      IN WITNESS WHEREOF, I have hereunto set my

18      hand this 31st day of July, 2006.

19

20              •

21      _____

22              KELLIE A. ZOLLARS, CSR

23              STATE OF CALIFORNIA

24

25

1  STATE OF CALIFORNIA    )

2  COUNTY OF SAN MATEO    )

3         I hereby certify that the witness in the

4  foregoing deposition,

5  was by me duly sworn to testify to the truth, the

6  whole truth, and nothing but the truth in the

7  within-entitled cause; that said deposition was taken

8  at the time and place herein named; that the

9  deposition is a true record of the witness's testimony

10  as reported by me, a duly certified shorthand reporter

11  and a disinterested person, and was thereafter

12  transcribed into typewriting by computer.

13         I further certify that I am not interested in

14  the outcome of the said action, nor connected with,

15  nor related to any of the parties in said action, nor

16  to their respective counsel.

17         IN WITNESS WHEREOF, I have hereunto set my

18  hand this _____ of _____, _____.

19

20

21         _____

22         KELLIE A. ZOLLARS, CSR

23         STATE OF CALIFORNIA

24

25