# EXHIBIT GGG

271

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3            SAN FRANCISCO DIVISION
 4
 5  In re ORACLE CORPORATION
 6  SECURITIES LITIGATION.
 7            Master File No. C-01-0988-MJJ
 8  This Document Relates To:
 9
10  ALL ACTIONS.
11  _____/
12
13            ---oOo---
14            CONFIDENTIAL
15  VIDEOTAPED DEPOSITION OF JENNIFER MINTON
16            Volume 2
17      Monday, September 25, 2006
18            ---oOo---
19  SHEILA CHASE & ASSOCIATES
          REPORTING FOR:
20      LiveNote World Service
      221 Main Street, Suite 1250
21  San Francisco, California 94105
          Phone: (415) 321-2300
22        Fax: (415) 321-2301
23
24  Reported by:
      RACHEL FERRIER, CSR
25  CSR No. 6948
```

272

```
 1            I N D E X
 2        INDEX OF EXAMINATION
 3                      PAGE
 4  EXAMINATION BY MR. BRITTON       277
 5
 6            ---oOo---
 7        INDEX OF EXHIBITS
 8  DESCRIPTION              PAGE
 9  Exhibit 22A  Financial Report
          Bates-stamped NDCA-ORCL
10        440076-092       295
11  Exhibit 23A  (None marked.)
12  Exhibit 24A  Financial Report
          Bates-stamped NDCA-ORCL
13        440093-109       295
14  Exhibit 25A  Financial Report
          Bates-stamped NDCA-ORCL
15        440110-126       295
16  Exhibit 26A  Financial Report
          Bates-stamped NDCA-ORCL
17        440127-143       295
18  Exhibit 27A  Financial Report
          Bates-stamped NDCA-ORCL
19        440144-160       295
20  Exhibit 28A  Financial Report
          Bates-stamped NDCA-ORCL
21        440246-262       295
22  Exhibit 29A  Financial Report
          Bates-stamped NDCA-ORCL
23        440161-177       295
24  Exhibit 30A  (None marked.)
25
```

273

```
 1  Exhibit 31A  Financial Report
          Bates-stamped NDCA-ORCL
 2        440178-194       295
 3  Exhibit 32A  Financial Report
          Bates-stamped NDCA-ORCL
 4        440195-211       295
 5  Exhibit 33A  Financial Report
          Bates-stamped NDCA-ORCL
 6        440212-228       295
 7  Exhibit 34A  Financial Report
          Bates-stamped NDCA-ORCL
 8        440229-245       295
 9  Exhibit 42   E-mail from Sarah Kopp
          to Jennifer Minton dated
10        1/18/01         302
11  Exhibit 43   E-mail from Larry Garnick
          to Jennifer Minton, et al.,
12        dated 1/17/01    311
13  Exhibit 44   License & Consulting Report
          Q3 FY01 Week 8      319
14
    Exhibit 45   E-mail from Larry Garnick
15          to Jennifer Minton, et al.,
          dated 2/8/01      333
16
17  Exhibit 46   E-mail from Jennifer Minton
          to Michael Rocha dated
18        2/16/01         343
19  Exhibit 47   E-mail from Jennifer Minton
          to Michael Rocha dated
20        4/20/01         356
21
22
23
24
25
```

274

```
 1      BE IT REMEMBERED that on Monday, September 25,
 2  2006, commencing at the hour of 1:08 p.m., thereof,
 3  at the Law Offices of LERACH, COUGHLIN, STOIA,
 4  GELLAR, RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite
 5  2600, San Francisco, California, before me, RACHEL
 6  FERRIER, a Certified Shorthand Reporter in and for
 7  the State of California, personally appeared
 8          JENNIFER MINTON,
 9  called as a witness by the Plaintiffs herein, who,
10  being by me first duly resworn/affirmed, was
11  thereupon examined and testified further as
12  hereinafter set forth.
13            ---oOo---
14  Appearing as counsel on behalf of Plaintiffs:
15    DOUGLAS R. BRITTON, Esquire
      GAVIN BOWIE, Esquire
16    LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
      ROBBINS, LLP
17    655 West Broadway, Suite 1900
      San Diego, California 92101-8498
18    (619) 231-1058
      dougb@lerachlaw.com
19    gbowie@lerachlaw.com
20
    Appearing as counsel on behalf of the Defendants:
21
      PETER A. WALD, Esquire
22    MICHELE F. KYROUZ, Esquire
      LATHAM & WATKINS, LLP
23    505 Montgomery Street, Suite 2000
      San Francisco, California 94111-2562
24    (415) 391-0600
      peter.wald@lw.com
25    michele.kyrouz@lw.com
```

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

275

1    JAMES C. MAROULIS, Esquire
     ORACLE CORPORATION
2    500 Oracle Parkway, MS 5OP7
     Redwood Shores, California 94065
3    (650) 506-5200
     jim.maroulis@oracle.com
4
5
6    Also present:  Cassia Leet, Videographer
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

276

1         THE VIDEOGRAPHER:  Here begins the
2    videotaped deposition of Jennifer Minton, Tape 1,
3    Volume 2, in the matter of In Re Oracle Corporation
4    Securities Litigation in the United States District
5    Court, Northern District of California, Case No.
6    C-01-0988-MJJ.
7         Today's date is September 25th, 2006, and
8    the time on the video monitor is 1:08.
9         The Video Operator today is Cassia Leet,
10   representing LiveNote World Service, located at
11   221 Main Street, Suite 1250, San Francisco,
12   California 94105; phone number, (415) 321-2300.
13        The Court Reporter is Rachel Ferrier of
14   Sheila Chase, reporting on behalf of LiveNote World
15   Service.
16        Today's deposition is being taken on behalf
17   of the plaintiff and is taking place at 100 Pine
18   Street, San Francisco, California.
19        Counsels, please introduce yourselves and
20   state whom you represent.
21        MR. BRITTON:  Doug Britton with Lerach,
22   Coughlin on behalf of plaintiffs.
23        MR. BOWIE:  Gavin Bowie with Lerach,
24   Coughlin on behalf of plaintiffs.
25        MR. WALD:  Peter Wald with Latham &

277

1    Watkins on behalf of the witness and defendant.
2         MS. KYROUZ:  Michele Kyrouz of Latham &
3    Watkins on behalf of the defendant.
4         MR. MAROULIS:  James Maroulis of Oracle
5    Corporation for Defendant Oracle Corporation.
6         MR. BRITTON:  Okay.
7         THE VIDEOGRAPHER:  Would the Court Reporter
8    please swear in the witness.
9              JENNIFER MINTON,
10   having been duly resworn, testified further as
11   follows:
12        THE VIDEOGRAPHER:  Please begin.
13            EXAMINATION
14   BY MR. BRITTON:
15   Q    Good afternoon, Ms. Minton.  Thank you for
16   coming back.
17        We've arranged, your counsel and I, to
18   exchange some documents that have wrong dates, and
19   I'll go through that as we go through the deposition.
20        The question I have is whether the reports
21   that are supposed to be produced pursuant to
22   Judge Infante's order going back to 1999 are here
23   today?
24        MS. KYROUZ:  No.
25        MR. BRITTON:  No --

278

1         MS. KYROUZ:  You mean the sales forecasts
2    that go back to '99?  No.  We will have those on
3    Friday.
4         MR. BRITTON:  Okay.  So given that there
5    may be some issues that we may have to cover with
6    Ms. Minton in a subsequent deposition, since they are
7    not here -- so you are going to take your position;
8    we will take ours -- but depending upon what those
9    documents mean, we will reserve our rights and
10   proceed accordingly.
11        MR. WALD:  Fair enough.  Let's agree that
12   we will reserve our rights without agreeing with what
13   you say.
14        MR. BRITTON:  Sure.
15        MR. WALD:  Doug, as I mentioned to you
16   right at the beginning, the witness would like to
17   clarify two points that she testified about
18   previously.
19        MR. BRITTON:  Certainly.  Why don't you do
20   that.
21        THE WITNESS:  Well, while I was thinking
22   about my testimony in recent days, I recalled that
23   there was a question that was asked of me about
24   whether or not I knew about the investigation that
25   the company undertook once we had some complaints

**279**

1  filed about accounting allegations.  I just want to
2  clarify what I did know.
3      I knew that there was an investigation
4  going on.  I knew that -- but I was not involved in
5  the actual underlying investigation itself.
6      In addition, I believe -- not believe, but
7  I know that after -- thinking about it, that I did
8  become aware of the results of the investigation
9  outside of attorney-client privileged communications.
10      And to further that point, I did, in fact,
11  have conversations with both -- with Tom Williams;
12  that I can't recall specifically anyone else that
13  evaluated the -- that discussed the financial results
14  of that investigation, and we did an evaluation of
15  those results to determine if there was a material
16  impact on our fiscal 2001 financial statements.
17      And we had concluded that we had not --
18  that there was not a material impact on those
19  financial statements, so I needed to clarify that
20  aspect of my testimony.
21      MR. WALD:  And just so the record is clear,
22  I believe the witness testified previously that she
23  did know the results but through privileged
24  communications, so this is a further elaboration of
25  that point.

**280**

1  BY MR. BRITTON:
2      Q    When did you become aware of the results of
3  the investigation?
4      A    I don't recall exactly when, but it would
5  have been after the investigation had been, for the
6  most part, concluded, and the investigation did not
7  even begin until after the allegations were actually
8  made, which I believe were sometime in October of
9  2002.
10      Q    How long after the investigation was
11  concluded did you become aware of the results?
12      A    Again, I do not recall how long it took for
13  the investigation to take place, but prior to
14  confer -- conveying the results of that investigation
15  to our audit committee meeting, which was done in an
16  attorney-privileged session, I had been made aware of
17  the financial results of it and whatnot, as I
18  previously testified.
19      Q    So you were made aware of the results of
20  the investigation at the audit committee meeting?
21      A    I was made aware at the audit committee
22  meeting.
23      Q    Okay.  Did you know before the audit
24  committee meeting?
25      A    I do -- I cannot recall the timing of when

**281**

1  I had conversations with Tom Williams, but it was
2  more likely than not that I was made aware of it
3  prior to the audit committee meeting because we did,
4  indeed, do an analysis as to whether or not the
5  financial results of that investigation -- whether or
6  not they had a material impact on our fiscal 2001
7  financial statements, and we concluded that we --
8  that they had not.
9      Q    Did you do an investigation or an
10  evaluation into whether they had an effect on the
11  second quarter of fiscal 2001?
12      A    I don't recall whether we did an audit --
13  whether we evaluated the financial impact on
14  fiscal 2Q.
15      Q    Okay.
16      A    I remember we did it for the full of the
17  fiscal year and that it was not material.  I also
18  believed that we evaluated the effect on Q3 and Q4,
19  but I don't recall precisely.
20      Q    Who was involved in this evaluation?
21      A    Tom Williams.
22      Q    Were you?
23      A    Did I perform the analysis?  No.  The
24  analysis was prepared for me.
25      Q    And in what form did the analysis take?

**282**

1  Was it written?
2      A    The analysis would have been a financial
3  analysis to evaluate the impact on our fiscal
4  financial -- fiscal 2001 financial periods -- period.
5      Q    Was it written, in writing?
6      A    I believe the underlying analysis was
7  performed in Excel.
8      Q    The results of that investigation that were
9  contained in the Excel spreadsheets, were those
10  produced in this litigation, do you know?
11      A    I do not have personal knowledge of what
12  was or was not provided.
13      MR. BRITTON:  Counsel, is that a question
14  that you can answer?
15      MS. KYROUZ:  No, it's not a question we can
16  answer right now.  I'm guessing somebody else on your
17  side probably knows the answer as well, but I can't
18  tell you today.
19  BY MR. BRITTON:
20      Q    Did you request Tom Williams to prepare
21  this financial analysis?
22      A    I don't recall.
23      Q    And how long after you became aware of the
24  results of the investigation did you receive this
25  financial analysis from Tom Williams?

283

```
1       A    Again, I did not say that I was -- that I
2  received an analysis. I was made aware of an
3  analysis that was performed.
4       Q    So you didn't receive the Excel
5  spreadsheets in your hand?
6       A    Not that I recall, no. I'm assuming they
7  were Excel spreadsheets because they were
8  mathematical computations. It could have been in the
9  form of a Word document.
10      Q    But you didn't see it or receive it; is
11  that right?
12      A    I don't recall the manner in which I became
13  aware of this information. I do know that it was
14  discussed at a audit committee meeting, and I --
15  again, I am testifying that I spoke to Tom Williams
16  more likely than not prior to that audit committee
17  meeting because we would have wanted to performed the
18  analysis, the evaluation as to whether or not it
19  would have had a material impact on our fiscal 2001
20  financial results, for which it did not, and for
21  which also our outside auditors concluded.
22      Q    Was this analysis shared with the outside
23  auditors?
24      A    Yes.
25      Q    Did the analysis show that the --
```

284

```
1  withdrawn.
2           Did the financial analysis show any impact
3  on Oracle's financial results for fiscal 2001?
4       A    The financial results showed that there was
5  an immaterial financial impact.
6       Q    And by "immaterial," can you tell me the
7  amount?
8       A    I don't recall precisely, but I recall it
9  was clearly less than $20 million in revenues.
10      Q    And in what quarter did it have the impact
11  of clearly less than 20 million in revenues?
12      A    I do not recall, but that was the impact
13  also for the full year. It was not the full impact
14  for any one quarter.
15      Q    And you can't tell me, sitting here today,
16  whether the analysis was performed for Q2, or can you
17  tell me that it was not performed for Q2?
18      A    I do not recall. I recall there being
19  analysis prepared in connection with the fiscal 2001
20  financial statements.
21      Q    Okay. Were you involved in presenting the
22  results of the analysis at all at the audit committee
23  meeting?
24      A    I attended the audit committee meeting.
25      Q    Did you have any discussions at the audit
```

285

```
1  committee meeting about the results of the analysis?
2       A    There were -- there were discussions about
3  the analysis and that it did not have a material
4  impact on our fiscal 2001 financial statements.
5           MR. WALD: And you have already testified
6  about the results of the investigation, so I think
7  that's perfectly fine. I just want to remind you
8  that the audit committee meeting that you are
9  testifying about was a privileged meeting --
10          THE WITNESS: That's correct.
11          MR. WALD: -- in which lawyers were
12  present --
13          THE WITNESS: That is correct.
14          MR. WALD: -- so I would caution you not to
15  reveal attorney-client confidences. Thank you.
16  BY MR. BRITTON:
17      Q    Were your outside auditors at this audit
18  committee meeting?
19      A    I don't recall.
20      Q    Were you involved in any discussions with
21  the outside auditors outside of this audit committee
22  meeting?
23      A    I don't recall any specifically, but it's
24  possible.
25      Q    Do you know if Tom Williams had any
```

286

```
1  discussions with the outside auditors outside of the
2  audit committee meeting?
3       A    Tom Williams would have discussed this with
4  the auditors.
5       Q    All right. Why don't you grab the
6  binder --
7           MR. WALD: I'm sorry. Was there a second
8  point that you wanted to clarify?
9           THE WITNESS: Yeah.
10          The second point that I wanted to
11  clarify -- you asked whether or not there were any
12  internal controls in effect. I don't recall the
13  question specifically at the moment. And my response
14  at the time was "I do know."
15          As I think back about it, we did, indeed,
16  have internal controls in place, including account
17  reconciliations, review of variation analyses, which,
18  as I did testify to, is no different than the types
19  of controls that an auditor -- a review that an
20  auditor would undertake to determine if there -- or
21  to detect and investigate if there were any items
22  that needed further investigation or to ensure that
23  accounts were fairly stated.
24  BY MR. BRITTON:
25      Q    All right. Going back to the
```

287

1  investigation, did you, personally, conclude that
2  there was no material impact on the 2001 financial
3  statements?
4      A   Based on the financial results that were
5  presented, yes.
6      Q   Okay.  You didn't do your own
7  investigation?
8      A   The investigation that was undertaken was
9  undertaken by the company under the direction of
10  counsel.
11      Q   Okay.  Other than the presentation
12  materials, did you review any other documents
13  relating to this investigation?
14      A   Not that I recall.  Again, there was a
15  discussion.  There -- I'm assuming that there was
16  some sort of analysis that I may have had presented
17  to me, but not that I recall, in order to compute the
18  impact that the financial results of the
19  investigation had on the fiscal 2001 financial
20  results, which were immaterial.
21      Q   Did you document your conclusions anywhere
22  about the impact of -- withdrawn.
23          Did you document your conclusions about the
24  investigation and the effect on Oracle's financial
25  statements anywhere?

288

1      A   I, personally?
2      Q   Mm-hmm.
3      A   No.
4      Q   Okay.  Did Tom Williams document the
5  conclusion anywhere?
6      A   I believe Tom Williams is the individual
7  who had documented the analysis or prepared and
8  documented the analysis.
9      Q   Okay.  And the analysis that he documented
10  and the conclusion that he documented, that was what
11  was presented at the audit committee meeting?
12      A   I think we are getting hung up in an
13  analysis.  I'm assuming he prepared a financial
14  analysis.
15      Q   Did you see it?
16      A   I remember seeing something that was
17  subject to client -- attorney-client privilege,
18  confidential information, so --
19      Q   Okay.  Did you see anything that was not
20  subject to the attorney-client privilege?
21      A   Not that I recall, but I did have
22  discussions about the financial results of the
23  investigation which, again, I want to emphasize, were
24  not material.
25      Q   And who came to the conclusion that the

289

1  impact on the financial statements was not material?
2      A   I came to the conclusion, as did other
3  members of the finance team.
4      Q   Did Tom Williams?
5      A   Yes.
6      Q   Okay.  Did Tom Williams come to that
7  conclusion before reaching the audit committee
8  meeting?
9      A   We had come to that conclusion, yes.
10      Q   So you both had come to that conclusion
11  before the audit committee meeting?
12      A   Yes.
13      Q   Okay.  So why don't you tell me about your
14  conversations with Tom Williams before the audit
15  committee meeting.
16      A   Again, I just recall that we had a
17  conversation about the financial results.
18      Q   Okay.  And did you talk -- did you ask
19  Mr. Williams about the impact on the second quarter
20  of fiscal 2001?
21      A   I do not recall.
22      Q   During this conversation with Tom Williams,
23  did he give you any materials that reflected his
24  analysis?
25      A   I do not recall.

290

1      Q   Okay.  Now, you are recalling quite a bit
2  about the investigation.
3          Why -- why were you not able to testify
4  about this in the first day of your deposition?
5      A   I didn't recall it at the time.
6      Q   Okay.  Did you have --
7      A   And when I was reading my deposition, my
8  memory was becoming refreshed.
9      Q   Okay.  Did you have any conversations with
10  anybody concerning your memory being refreshed?
11      A   The only conversations I've had regarding
12  my deposition have been with counsel.
13      Q   Okay.  Anybody else at Oracle?
14      A   Only with counsel.
15      Q   Okay.  And what about the reviewing your
16  deposition refreshed your memory about the details of
17  this investigation?
18          MR. WALD:  Again, for the record, the
19  witness did testify previously that she was aware of
20  the results but only through privileged
21  communications.  I think what got refreshed was that
22  she had conversations that were not privileged and,
23  therefore, that she had an obligation to disclose
24  them.
25          MR. BRITTON:  Right.

291

1    THE WITNESS:  And that's the clarification
2    I'm trying to make.
3    MR. BRITTON:  Right.  And I also think you
4    testified that she didn't know any of the details of
5    the investigation, so --
6    THE WITNESS:  No.  I was not involved in
7    the actual underlying investigation.  And I knew the
8    financial results, but I did -- was not involved in
9    the actual investigation itself.
10   MR. WALD:  I think -- just, Doug, I mean,
11   obviously the record is what it is --
12   MR. BRITTON:  Right.
13   MR. WALD:  -- I think you asked her two
14   questions.  I think one was her involvement in the
15   investigation.  I think she said she wasn't involved.
16   The second was the results, and I think she said that
17   she knew those but only through privileged
18   communication.
19   Subsequent to that, she realized that she
20   had these other conversations with Tom Williams, and
21   that's why she wanted to clarify that.
22   BY MR. BRITTON:
23   Q    Okay.  Did anybody influence your -- did
24   anybody influence the change in your recollection
25   about the investigation?

292

1    A    Absolutely not.
2    Q    Okay.  Now, let's go to the internal
3    controls.
4    Why were you not able, during the first day
5    of your deposition, to testify about the internal
6    controls that existed at Oracle?
7    A    At the time, I couldn't recall.  I believe
8    I said "I don't know" when I should have said "I
9    don't recall."
10   Q    And you are the -- were the controller
11   at the time at Oracle; is that right, during the
12   second and third quarter fiscal 2001?
13   A    Yes.
14   Q    Okay.  And you couldn't, on your first day
15   of your deposition, testify about any internal
16   controls at Oracle?
17   A    I couldn't recall about the specific
18   internal controls surrounding the unapplied cash
19   question that you put forth to me, not any internal
20   controls.  In fact, I did testify about internal
21   controls.
22   Q    Did you do any investigation after the
23   first day of your deposition into the internal
24   controls that impacted that unapplied cash account?
25   A    Can you repeat the question?

293

1    Q    Did you do any investigation into the
2    internal controls that would have affected the
3    unapplied cash account?
4    A    After my deposition?
5    Q    Yes.
6    A    Absolutely not.
7    Q    Okay.  Did you talk to anybody about the
8    internal controls that would have affected the
9    unapplied cash account?
10   A    The only conversations I've had are with
11   outside counsel, briefing them on my memory being
12   refreshed as a consequence of thinking about this
13   upcoming deposition.
14   Q    That's it?
15   A    That's all I would like to clarify.
16   Q    That's all you would like to clarify?
17   Okay.
18   Take the binder that's in front of you, I
19   would appreciate it.
20   Since your last deposition and based in
21   part on the testimony you gave about the legibility
22   of some of the reports that I've showed to you, I had
23   a conversation with your counsel about reports that
24   are easier to read, and there's some issues with the
25   dates on the reports that are easier to read in the

294

1    production.
2    Now, what has been presented to us today is
3    a binder of upside reports with an index of the
4    original reports that I marked at the last
5    deposition, and then new exhibit numbers with A's,
6    new Bates numbers, and then the dates on the far
7    right column.
8    Do you see where I'm looking?
9    A    Mm-hmm.
10   Q    Have you looked at these reports prior to
11   today?
12   A    I was shown the reprinted versions of these
13   reports today.
14   Q    Okay.  And will you agree that the reports
15   that are contained in the binder that are referenced
16   as Minton Exhibit 22A through 34A -- will you -- will
17   you agree that the dates on the reports are incorrect
18   and that the reports in this binder are the dates of
19   the upside reports that occurred in the third quarter
20   of 2001?
21   A    Yes.
22   Q    Okay.  And if you look at the first page of
23   the binder, there's the index -- very first page.
24   There's a column on the far right-hand side.
25   Will you agree that the dates that are

295

1   listed in that date column are the dates on the
2   corresponding exhibits?
3       A.   Are the dates of the upside reports, yes.
4       Q.   Correct.
5            And that other than the printed dates on
6   the reports, the reports are authentic copies of the
7   reports that were produced and printed out on those
8   respective dates?
9       A   Yes.
10           MR. BRITTON:  Counsel, thank you for
11   putting this together.  We appreciate it.
12           (Exhibit Nos. 22A, 24A-29A, 31A-34A were
13           marked for identification.)
14   BY MR. BRITTON:
15       Q   Now, if you would take a look at
16   Exhibit 24A for me, please.
17           I'm going to pull out the first page of
18   this.
19       Q   Okay.  We looked at Exhibit 24 during your
20   first deposition, so I just wanted to use this to
21   refresh your memory about where we were and where we
22   left off so I can ask you questions about subsequent
23   upside reports.
24           Is that okay?
25       A   Sure.

296

1       Q   Is that okay?
2       A   Sure.
3       Q   All right.  So if you turn to the second
4   page of Exhibit 24A, which is the December 25th, 2000
5   upside report, that shows the field forecast, your
6   upside adjustments, and the potential forecasts for
7   that date; is that right?
8       A   That is correct.
9       Q   Okay.  And the upside adjustment that you
10   made for license revenues as of that date was 159.9
11   million; is that right?
12       A   That is correct.
13       Q   Okay.  Now, if you turn to the page ending
14   with Bates 97?
15       A   Yes.
16       Q   These -- and on the top row, these are the
17   upside adjustments that are broken down by division;
18   is that right?
19       A   By organization, that is correct.
20       Q   Okay.  And for OSI, the upside adjustment
21   was 25 million?
22       A   That is correct.
23       Q   For NAS, the upside adjustment was
24   50 million?
25       A   That is correct.

297

1       Q   And for OPI, the upside adjustment was
2   35 million?
3       A   That is correct.
4       Q   And I think, for the record, Exhibit 24A
5   starts at Bates NDCA-ORCL 440093 and ends at 109.
6           Okay.  You can put that -- that's all I
7   have for that exhibit.
8           All right.  Now, I would like you to turn
9   to Exhibit 25A.
10          This is the upside report for January 15th,
11   2001; is that right?
12      A   That is correct.
13      Q   Okay.  And if you turn to the second page
14   of Exhibit 25A, that shows that the upside
15   adjustments for license revenues dropped to 94.910
16   million; is that right?
17      A   That is correct.
18      Q   Okay.  Can you tell me why you adjusted
19   your upside down from 159.5 million to 94.9 million?
20      A   As I previously testified, I don't recall,
21   nor did I ever document the specifics of how we
22   arrived at any upside adjustments at any point in
23   time.
24          I took into consideration various inputs,
25   whether they were held, you know, through EC

298

1   meetings, whether they were held through American --
2   America's Forecast calls, any e-mails or other
3   telephone conversations that I may have had with
4   management and/or with my finance team, so --
5       Q   Okay.  And down at the bottom of the page
6   with Bates 440111, there's market expectations, 12
7   cents, and that was the guidance that Oracle gave to
8   the street -- or the third quarter of 2001; is that
9   right?
10      A   This is as of 1/15?  That's correct.
11      Q   Okay.  And the earnings per share above
12   that was 12.11 cents.
13          That's the potential forecast; is that
14   right?
15      A   I'm sorry.  What page again?  40111?
16      Q   Yeah, 111, right above the market
17   expectations.
18          So you were -- you were forecasting 12.11
19   cents per share as of this date; right?
20      A   That is correct.
21      Q   Okay.  And the field was forecasting 10.6
22   cents per share; is that right?
23      A   I'm sorry.  I don't see where you see that
24   number.
25      Q   Earnings per share under the "Forecast"

299

1  column?
2  A  Oh, yes.  Sorry.
3  Q  Okay.  Now, the -- the two columns to the
4  right of the forecast upside and potential say:
5  Forecast versus prior year percentage and potential
6  growth percentage.
7  Do you see that?
8  A  Mm-hmm.
9  Q  So the left column is the field forecast
10  growth percentage; is that right?
11  A  The forecast versus prior year percentage?
12  Q  Yes.
13  A  The minus 17 percent?  Yeah, that's the
14  submitted forecast.
15  Q  Okay.  So the field was forecasting growth
16  of 20 percent year over year in license revenues; is
17  that right?
18  A  Where do you see 20 percent?
19  Q  Top row under "Q3 Forecasts vs. Prior
20  Year" --
21  A  For license --
22  Q  For license --
23  A  -- yes.
24  Q  Right, for license.
25  And you were forecasting 29 percent for

300

1  license; is that right?
2  A  That is correct.
3  Q  And this document was distributed at the
4  executive management committee meetings?
5  A  I don't believe that this document
6  necessarily was distributed, being that that was a
7  holiday, December 25th, Christmas.
8  MR. WALD:  This is January 15th.
9  THE WITNESS:  Oh, January 15th.  Oh, I'm
10  sorry.  I'm down one.
11  January 15 -- I'm not certain if we had an
12  EC meeting on that date or not.
13  BY MR. BRITTON:
14  Q  But if you had one, it would have been
15  distributed?
16  A  Well, here's the -- if we had one, it would
17  have been distributed, correct.
18  Q  Okay.  If you turn to the page that ends
19  with Bates 114 on Exhibit 25A, this breaks down
20  license revenue by organization; is that right?
21  A  That is correct.
22  Q  Okay.  And you have eliminated any upside
23  to OSI; is that right?
24  A  That is correct.
25  Q  Why did you do that?

301

1  A  I don't recall exactly why I made the
2  change to his forecast at that point in time.
3  Q  Okay.
4  A  Again, it would have been based off of
5  information that I received, as I testified earlier,
6  whether it be in conversations, e-mails, review of
7  historical pipeline conversion analyses, whatnot,
8  so --
9  Q  But you can't tell me specifics today on
10  why you dropped -- you eliminated the upside
11  adjustment --
12  A  No --
13  Q  -- for OSI?
14  A  -- we never documented specifically how we
15  documented our upside numbers.
16  Q  And that's the same answer for the NAS
17  upside adjustment; is that right?
18  A  That is correct.
19  Q  And you brought it down from 50 million to
20  14 million; is that right?
21  A  From which forecast period?
22  Q  From the prior report that we looked at,
23  which was December 25th?
24  A  I brought OSI down -- from 25 down to 0;
25  NAS, from 50 million to 14.

302

1  Q  And OPI you kept --
2  A  Remained at 35.
3  Q  -- kept at 35.
4  (Discussion off the stenographic record.)
5  (Exhibit No. 42 was marked for
6  identification.)
7  BY MR. BRITTON:
8  Q  Okay.  Placed before you what's been marked
9  as Plaintiffs' Exhibit 42.
10  Will you take a moment to look at this
11  exhibit, please?
12  Okay.  Do you recognize Exhibit 42?
13  A  Yes.
14  Q  What is Exhibit 42?
15  A  It's an e-mail note from Sarah Kopp to me,
16  giving me an update on the forecast for OSI.
17  Q  This was three days after the last upside
18  report that we looked at; is that right?
19  A  That would be correct.
20  Q  This is dated Thursday, and it's at 17:29.
21  Looks like military time.
22  That would be 2:29; is that right?
23  A  I'm not certain.  It depends on the date of
24  the person's -- I'm not sure how these dates are --
25  MR. WALD:  I think, normally, it's 5:29

303

1  p.m. in some time zone.
2       MR. BRITTON:  In some time zone.
3    Q   And would that have been before or --
4    A   That doesn't mean when I read it.
5    Q   This would have been before or after the
6  America's Forecast call on Thursdays?
7    A   I don't know if this came before or after
8  the forecast call.
9    Q   When do those typically take place?
10   A   On Thursday afternoons.
11   Q   Afternoons.
12   A   I believe early afternoons.
13   Q   Was this Mrs. Kopp's attempt to giving her
14  independent view of the forecast for OSI?
15   A   Yes.
16   Q   Now, if you look at the second paragraph
17  before the chart, it says, "He would like to sit in
18  tomorrow; just called me from the road and went over
19  his numbers with Larry."
20       And I presume that's talking about -- is
21  that Jay Nussbaum?
22   A   Yes.
23   Q   It says, "He is still confident in the 225,
24  as long as none of the very large opportunities drop
25  out."

304

1       Do you see that?
2    A   Yes.
3    Q   Okay.  Did this impact your upside
4  adjustments at all?
5    A   Again, I did not document precisely how I
6  arrived at my upside adjustments at any point in
7  time.  I would consider information such as these
8  types of e-mails when deriving my final upside
9  adjustments.
10   Q   Okay.  But you can't tell me if this
11  specifically did; is that right?
12   A   I cannot -- I can tell you that this would
13  be one point to consider when deriving my upside
14  adjustments.
15   Q   Okay.  Is it typical for Oracle to close
16  all of the large opportunities that it's -- it has
17  pending in a given quarter?
18   A   Not all deals close in a given quarter.
19   Q   How confident were you that none of the
20  very large opportunities would drop out?
21       MR. WALD:  The witness personally?  The
22  witness personally?
23       THE WITNESS:  At this point in time, I
24  don't recall.
25  BY MR. BRITTON:

305

1    Q   If you look down at the bottom, there's --
2  well, let's look in the columns that are in the
3  middle of the e-mail.  There's a "My Projection"
4  column.
5       Do you see that?
6    A   Yes.
7    Q   And "Jay's Forecast," do you see that?
8    A   Yes.
9    Q   "My Projections," that's Sarah Kopp's
10  estimate of what's going to happen in the quarter; is
11  that right?
12   A   Yes.
13   Q   All right.  And "Jay's Forecast" is Jay
14  Nussbaum's estimate of what would happen in the
15  quarter?
16   A   That is correct.
17   Q   If you look at "Jay's Forecast," at the
18  total, it says "225," and then there's a line that
19  says "75% confidence level."
20       Do you see that?
21   A   Yes.
22   Q   Do you recognize the writing?
23   A   Yes, it's my writing.
24   Q   And what led you to draw that conclusion?
25   A   I must have had a conversation with

306

1  somebody, Sarah and/or Jay, after printing out this
2  e-mail note, because I printed it out and I made
3  notations on it.
4    Q   Okay.
5    A   So it was likely based on input that I got
6  from either Sarah or the field -- or, I should say,
7  Sarah or Jay.
8    Q   Okay.  And did this impact your upside
9  adjustment for OSI?
10   A   I don't recall.  Did it impact it; was it
11  taken into consideration?  Yes, as was our America's
12  Forecast calls and any other conversations that I
13  had.  Again, I can testify over and over that there
14  are multiple data points that came into consideration
15  when determining my upside amounts.
16   Q   And, now, your upside adjustments were used
17  to give your view of what would happen in that
18  division for the quarter as of that period of time;
19  is that right?
20   A   My upside adjustments were to come to the
21  forecasts that we thought that the company would more
22  than likely meet.
23   Q   Right.
24       And when you were talking about a specific
25  organization, your upside adjustments would be used

307

1  for the same purpose for that organization; is that
2  right?
3      A   I would try my best, but it wasn't
4  necessarily -- you know, I might make it off on one
5  organization and maybe cancelled out by getting it
6  off on another organization, going in the opposite
7  direction.
8          But, in general, if you look at the
9  forecasts that I would come up with over the prior
10  history, my forecasts were more on line with our
11  actual results than were the field forecasts.
12     Q   All right.  Move to strike as
13  nonresponsive.
14         The 75 percent confidence level -- so as of
15  January 18, 2001, you were presented with
16  Mr. Nussbaum's forecast of 225 with the 75 percent
17  confidence level; is that fair?
18         MR. WALD:  Object to the form.
19         THE WITNESS:  No.  I've told you that I was
20  presented with this and that I wrote down 75 percent
21  confidence level.
22  BY MR. BRITTON:
23     Q   Is that -- well, I guess I should have
24  asked you:  What does 75 percent confidence level
25  mean?

308

1      A   That somebody was 75 percent confident in
2  achieving that forecast.
3      Q   Okay.  Most likely Jay Nussbaum?
4      A   Most likely Jay Nussbaum.
5      Q   So if Mr. Nussbaum presented with you 225
6  and said 75 percent confidence level, it would be
7  reasonable to assume that you would give a negative
8  upside adjustment to come in somewhere less than what
9  he thought he would do; is that fair?
10         MR. WALD:  Object to the form.
11         THE WITNESS:  No.
12  BY MR. BRITTON:
13     Q   Why not?
14     A   Because Jay's history of forecasting was
15  not accurate or always in line with his actual
16  results.
17     Q   Okay.  Now, your finance --
18     A   If I may?
19     Q   Sure.
20     A   There was clearly an awful lot of deals in
21  play, so he had to close just a couple of these large
22  deals, and he would have easily exceeded his
23  forecast.
24     Q   Okay.  Now, if you believed that, that
25  would have been reflected in your upside adjustments;

309

1  right?
2      A   Not necessarily.
3      Q   Why not?
4      A   My upside adjustments were based on my best
5  estimate at the time, so there was a large swing
6  factor, and so, again, this does not necessarily
7  indicate why or why -- let me step back.
8          How I came up with my upside adjustments
9  were based on a variety of information.  So the fact
10  that he had lots of large deals in play did not
11  necessarily mean that they would be converted by the
12  end of the quarter.
13     Q   Okay.  But if you believe that they would
14  be converted --
15         MR. WALD:  Sorry.
16         Were you done?  Were you done?
17         THE WITNESS:  Yes.
18  BY MR. BRITTON:
19     Q   If you believe they would be converted by
20  the end of the quarter, then you would have increased
21  the number base or with your upside adjustment; is
22  that right?
23     A   Not necessarily at this stage because we
24  have so many large deals that close on the very last
25  day of the quarter.  So I was being prudent.

310

1      Q   Okay.  Doing what?
2      A   By not increasing the upside above and
3  beyond the 225.
4      Q   Okay.  And you know that for sure that you
5  didn't do that?
6      A   Well, I'm looking at this one here for
7  226 -- sorry, January 22nd, and I didn't.  I didn't
8  do it here.
9      Q   Okay.  Well, we will get to that.  We will
10  get to that document.
11         Now, your finance report for OSI, Sarah
12  Kopp, she was your finance report; is that right?
13     A   She was a direct report.
14     Q   Of yours; right?
15     A   Yes.
16     Q   And her estimate was 205; is that right?
17     A   She believed that it was going to come out
18  around 210 at that time.
19     Q   Okay.  She says that in the --
20     A   In our schedule, it says 205, but in the
21  text, it says, "My sense still is that we'll come out
22  about 210 as it stands today."
23     Q   So she was $15 million less than Jay's
24  forecast; is that right?
25     A   At that point in time, that is correct.

311

1    Q.   Okay.  So you have $225 million forecast
2  for OSI with a 75 percent confidence level, and your
3  direct report is telling you may be a little less, at
4  210; is that fair?  Am I reading this document
5  fairly?
6    A.   That is correct.
7    Q.   Yet, you didn't change your upside
8  adjustment?
9    A.   That is correct.
10    Q.   How come?
11    A.   Because I didn't feel there was any
12  indicative information for me to reduce it at that
13  point in time.
14    Q.   Okay.
15         (Exhibit No. 43 was marked for
16         identification.)
17  BY MR. BRITTON:
18    Q.   I've placed in front of you what's been
19  marked as Minton Exhibit 43.
20         Will you take a moment to look at this
21  exhibit, please.
22         Do you recognize Exhibit 43?
23    A.   Yes, I do.
24    Q.   What is it?
25    A.   It is a e-mail from Larry Garnick

312

1  describing the results for December of fiscal '01.
2    Q.   You got this e-mail on January 17th, 2001?
3    A.   That's the date the e-mail was sent, yes.
4    Q.   If you look at the first paragraph of the
5  summary, Mr. Garnick is talking about growth rates,
6  and he takes out the Covisant transaction to look at
7  what OPI had done so far.
8         Do you see where I'm looking at?
9    A.   Yes.
10    Q.   Okay.  Do you know why Mr. Garnick looked
11  at OPI with Covisant and excluding Covisant?
12    A.   Because Covisant was a very large deal that
13  was transacted in December.
14    Q.   And why would --
15    A.   And had a binary effect on the financial
16  results.
17    Q.   So why remove it?
18    A.   Because it had a binary effect on the
19  financial results.
20    Q.   Okay.  And by removing it, what benefit did
21  that give you in looking at the results of the
22  company for December?
23    A.   It looked at what the underlying license
24  revenue growth would have been had we not closed that
25  transaction.

313

1    Q.   Okay.  And why was that important?
2    A.   It was just -- it was a data point to see
3  how well the transactions had closed in the month of
4  December.
5    Q.   Why was it important to look at the
6  transactions in that manner?
7    A.   One of the issues at that point in time was
8  the -- was OPI's relative profitability, and OPI
9  tended to have very large transactions and not very
10  many small transactions, but they had an awful lot of
11  head count, and so I specifically recall during this
12  time period us being focused on whether or not Sandy
13  Sanderson should be reducing his overall head count
14  and becoming more efficient and not relying so much
15  on large deals to make his forecast because of the
16  impact that it had on margins.
17    Q.   So without Covisant for the month of
18  December, OPI was down 85 percent year over year; is
19  that right?
20    A.   That's what this says, "Excluding Covisant,
21  OPI license revenue growth would have been negative
22  85%."
23    Q.   Okay.  If you go to the third bullet
24  point --
25    A.   Yes.

314

1    Q.   -- it says, "December license results
2  represents 19% of the total forecast for Q3 FY01."
3         Do you see where I'm reading?
4    A.   Yes.
5    Q.   That total forecast, do you know if that's
6  the field forecast or if it's the potential forecast
7  after your upside adjustment?
8    A.   I don't recall.  I would have to -- I
9  suspect it's the field, but I would have to do the
10  calculation to confirm.  I'm not certain.
11    Q.   Is there any way you can do that
12  calculation here?
13    A.   If you have a calculator.
14    Q.   I might.
15    A.   One that I can use.  I'm pretty fond of the
16  HPs.
17    Q.   I thought I did.  Not an HP.
18    A.   Does it go backwards or forwards?
19         So if you take a look at the numbers here,
20  62,584 for Sandy, and you back out the -- let's just
21  say 60 million -- that meant that he only did -- do
22  you see those numbers?
23    Q.   No.  I think you are going back to the
24  Covisant transaction.
25    A.   Didn't you ask me to recompute whether

315

1   there would be negative 85 percent growth?
2       Q    No, no. I asked you whether the total
3   forecast in the third bullet point was either the
4   field forecast or your potential forecast.
5       A    Well, then, we would have to compare the
6   numbers here. Well, they are not -- I can't compute
7   it based on the information here because I don't have
8   the forecast. Sorry.
9       Q    If you go down to the --
10      A    Now, I can try to go back to one of these
11  documents --
12      Q    If you could, yes --
13      A    -- if that's what you would like for me to
14  do.
15          MR. WALD:  Just for the record, I'm not
16  sure -- you know, with the caveat that they may or
17  may not line up in exactly the right time frame.
18          THE WITNESS:  If I take the number 240,524,
19  which is on the third page of Exhibit No. 43 --
20  BY MR. BRITTON:
21      Q    The third page or the second page?
22      A    On the third page.
23          -- to get to total license revenue?
24      Q    Okay. It shows up in both places, but
25  okay. The bottom -- the bottom column on the third

316

1   page of Exhibit 43.
2       A    Right.
3           Do you see the number there, 240,524?
4       Q    Yes.
5       A    So that's total license revenue for
6   December of fiscal '01 and actual U.S. dollars.
7           And just taking it based off of the
8   forecast as of January 15th --
9       Q    Which is Exhibit 25A?
10      A    Yes.
11          -- and I divide that by the 126,573, and I
12  get 19 percent.
13      Q    Where is the 1265 --
14      A    On 440114.
15          You refer to that as the Bates number; is
16  that correct?
17      Q    Yes.
18          MR. WALD:  Yes.
19  BY MR. BRITTON:
20      Q    So it's the field forecast?
21      A    So the field forecast would be 19 percent.
22          Let me just double-check. Yep.
23      Q    So in the third bullet point --
24      A    It would be 18 percent for the total
25  potential.

317

1       Q    Okay.  So on Exhibit 43, the first page,
2   the third bullet point where it references "December
3   license results represents 19% of the total forecast
4   for Q3 FY01," the total forecast referenced there is
5   the field forecast; is that right?
6       A    As I calculate it based off of this
7   forecast, which is January 15th, Exhibit 25A, it
8   would be 19 percent of the field forecast and
9   18 percent of the total license forecast.
10      Q    Then the next sentence says, "In FY00 and
11  FY99, December represented 18% and 19%, respectively,
12  of the quarter total."
13          Do you see that?
14      A    I do.
15      Q    Is it fair to read this document to mean
16  that December license results for Q301 were on track,
17  historically, to meet the field forecasts for the
18  quarter?
19          MR. WALD:  Can I have the question back?
20  Hold on.
21          To meet the field -- object to the form.
22          THE WITNESS:  I'm sorry. Can I have the
23  question read back.
24          (Record read by the Reporter as follows:
25          "QUESTION:  Is it fair to read this

318

1   document to mean that December license
2   results for Q301 were on track,
3   historically, to meet the field forecasts
4   for the quarter?")
5           THE WITNESS:  It would be fair to say that
6   we were on track; that the reality is the Covisant
7   transaction gave us a healthy start despite the fact
8   that we got off on a slow start, excluding Covisant.
9   So Q3's tend to be very back-end loaded.
10  BY MR. BRITTON:
11      Q    If you go down to the next bullet point, it
12  said, "Applications product growth was 216% and,"
13  brackets, "(ERP 385%)" and then CRM has a negative
14  58%.
15          Does that mean that year over year CRM
16  product growth was down 58 percent?
17      A    Yes.
18      Q    Okay.  Did this impact your --
19      A    For the month of December.
20      Q    Did this impact your upside adjustment at
21  all?
22      A    This particular point here?
23      Q    Mm-hmm.
24      A    Again, I don't recall. It would have been
25  another data point that I tended not to focus on the

319

1 product revenue forecasts. They weren't as
2 meaningful in deducing an upside number. I tended to
3 look at license revenues in totality, not by product.
4 Q. Put that document aside.
5 All right. If you turn to the
6 January 22nd, 2001 upside report, which is Exhibit
7 26A, starts at Bates 440127 and ends at 143; if you
8 look at the second page of Exhibit 26A, the upside
9 adjustment for license revenues is not changed; is
10 that right?
11 A. That is correct.
12 Q. Okay. And the earnings per share that you
13 are projecting is 12.06 cents per share?
14 A. That is correct.
15 Q. And the field is forecasting 10.7 cents per
16 share; is that right?
17 A. That is correct.
18 Q. If you go to the page ending with 131, no
19 adjustments to the -- withdrawn.
20 No upside adjustments for the
21 organizations, no change?
22 A. That is correct.
23 (Exhibit No. 44 was marked for
24 identification.)
25 BY MR. BRITTON:

320

1 Q. Placed in front of you what's been marked
2 as Plaintiffs' Exhibit 44.
3 Will you take a moment to look at this
4 exhibit.
5 A. This is for the week of January 22nd?
6 Q. That's one of my questions: Do you
7 recognize it, and what is it?
8 A. This is an America's Forecast report that
9 was sent out to Jay Nussbaum, Sandy Sanderson, and
10 George Roberts as well as other EC members and
11 finance team. And this document is a printout of
12 that report for the week of January 22nd.
13 Q. And January 22nd is a Monday; I checked.
14 A. Right.
15 Q. So would this have been produced after --
16 A. It's for that week.
17 Q. It would have been produced after the
18 executive management committee meeting or before?
19 A. This would have been produced in
20 preparation for the Thursday calls, not for the EC
21 meetings, so for the Thursday America's Forecast
22 calls.
23 Q. So any effect that information in this
24 document would have would show up on the following
25 week's upside report; is that right?

321

1 A. I would have to go back and look at a
2 calendar. But, generally speaking, we would take --
3 that would be correct, because you would have -- you
4 would have your forecast come in on Wednesday nights.
5 Some are, you know, pulled together Thursday
6 mornings. You would have this call. Then it would
7 be at the subsequent EC meetings where either the
8 numbers stay the same or they didn't, but these were
9 generally done after that forecast period.
10 Q. All right. The handwriting on these pages,
11 do you recognize it?
12 A. Roberta Ronsse.
13 Q. The first page, there's some handwriting on
14 the bottom that says, "Margin doing an analysis. The
15 margin downturn because of GB and 11i."
16 Do you know what that means?
17 A. I'm sorry. Can you repeat your question?
18 Q. Do you know what "margin downturn because
19 of GB and 11i" means?
20 A. No, I don't know what she was thinking when
21 she made these notations. Again, as I mentioned
22 earlier, we were looking at Sandy's business, because
23 if you backed out Covisant, he did not have revenue
24 growth, so we were focused on his margins and his --
25 and the fact that we felt that he had excess sales

322

1 capacity.
2 Q. The reference to "GB," I assume that
3 meant --
4 A. Where are you at?
5 Q. The first page, the handwritten remark
6 "margin downturn because of GB and 11i." I assume
7 "GB" meant general business.
8 Do you know what "GB" means here?
9 A. I'm sorry. I don't see where you are
10 seeing "GB."
11 Q. First page.
12 MR. WALD: I think what he's -- he's --
13 he's suggesting that that's what this says.
14 THE WITNESS: I don't see "GB" in there.
15 BY MR. BRITTON:
16 Q. What do you -- can you read that part that
17 says "margin downturn"? Can you read that part?
18 A. "Margin downturn because of" something plus
19 11i, but it's not GB -- well, maybe it is GB. I
20 don't know.
21 Q. All right.
22 A. But for -- if it's Sandy -- I mean, if you
23 would think that these comments are relating to
24 Sandy --
25 Q. That was my --

323

1    A   -- that does not make sense, because the
2   general business was not his turf; it wasn't part of
3   his overall territory.  That was under North America
4   Sales, George Roberts.
5    Q   Did any of the information that is
6   contained in Exhibit 44 impact your upside
7   adjustments for the following week?
8    A   Again, I do not recall specifically how I
9   came to any -- the amount of any upside adjustment in
10  any given forecast period.  I would consider all
11  types of data points, the America's Forecast calls,
12  any e-mails that I received, any conversations I may
13  have had, any meetings I may have attended that
14  discussed the forecast.
15   Q   All right.  I've placed in front of you
16  what has been marked in a previous deposition as
17  Winton Exhibit 51.
18       Will you take a moment to look at this
19  exhibit.
20       And, for the record, Exhibit -- Winton
21  Exhibit 51 starts at Bates NDCA-ORCL 040628 and ends
22  at 269.
23       Do you recognize Winton Exhibit 51?
24   A   Yes.
25   Q   What do you recognize it to be?

324

1    A   An e-mail note that David Winton sent to
2   George Roberts, with a copy to me, looking at the --
3   analyzing the impact of the deterioration in the
4   dot-com business on their revenue outlook for the
5   second half of fiscal '01.
6    Q   All right.  And the top box on the first
7   page references "tech."
8        Is that technology revenue?
9    A   I believe it's his entire revenue base.
10  I'm not sure if it's -- yeah, technology.  It
11  probably, most definitely, excludes applications.
12   Q   Excludes applications.  All right.
13       And it's forecasting for the fiscal year
14  '01, for Q3, a negative 8 percent growth for
15  technology; is that right?
16   A   I'm not sure if this is a forecast or an
17  outlook.  Meaning the budget?  I'm trying to see if
18  we have a breakdown of the total forecast.
19       So, I'm sorry.  What was your question
20  again?
21   Q   He's forecasting a negative 8 percent
22  growth in technology revenues for Q301.
23   A   So what confuses me, if I may -- that's why
24  I'm not certain if it's really technology or if it's
25  this whole sector --

325

1    Q   Sure.
2    A   -- is he's got a forecast on the
3   January 22nd forecast of --
4    Q   That would be Exhibit --
5    A   Exhibit 46.
6    Q   -- 26A?
7    A   Yes.  So that would just be technology.
8   Sorry.  I was reading above it.
9    Q   All right.  And then the next box shows
10  dot-coms and ASPs for Q3/01 down 54 percent?
11   A   That is correct.
12   Q   And then the technology brick and mortar up
13  31 percent; is that right?
14   A   That is correct.
15   Q   All right.  Did any of that information
16  contained in Winton Exhibit 51 impact your upside
17  adjustments?
18   A   I do not recall if this particular e-mail
19  had an impact.
20   Q   All right.
21   A   It would have been something I may have
22  considered.
23   Q   All right.  If you look to Exhibit 27A in
24  the binder, this is the January 29th, 2001 upside
25  report?

326

1    A   Yep.
2    Q   All right.  Starts at Bates NDCA-ORCL
3   440144 and ends at 160.
4        Looking at Winton Exhibit 51, can you tell
5   me if the upside report was prepared before or after
6   this e-mail?
7    A   This upside report -- the one that's for
8   January 29th --
9    Q   Right.
10   A   -- was likely prepared in advance of this
11  e-mail.
12   Q   So before this e-mail?
13   A   That would be correct.
14   Q   All right.
15       MR. WALD:  Doug, for the record, I think
16  the same numbers appear in the 1/22.
17       MR. BRITTON:  Do they?
18       MR. WALD:  Yeah, I think so.  You might
19  want to check.
20  BY MR. BRITTON:
21   Q   If you turn to the second page of
22  Exhibit 27A, so you have now reduced your upside
23  adjustment by about $50 million for license revenues;
24  is that right?
25   A   I have to do a compare.  I can see that I

327

1   brought down -- from the prior forecast, I didn't
2   have -- an upside adjustment for OSI.
3       Q   I'm looking total.
4       If you look at the second page --
5       A   Okay.
6       Q   -- of Exhibit 26A and compare it to the
7   second page of Exhibit 27A, a little more than
8   $50 million; is that right?
9       MR. WALD:  I'm sorry.  From which one,
10  Doug?  The prior one?
11      MR. BRITTON:  27 -- 26A --
12      THE WITNESS:  26A --
13      MR. BRITTON:  -- to 27A --
14      THE WITNESS:  -- it's showing it's gone
15  down not by 50 but by 95 million, 94.9.
16  BY MR. BRITTON:
17      Q   It's gone down by that?
18      A   I'm sorry.  Up by that.  That's the upside
19  adjustment.
20      Q   Right.
21      So it went from 94.9 million down to 43.4?
22      A   That is correct.
23      Q   And that's roughly --
24      A   50.
25      Q   -- 50 million?

328

1       All right.  If you look down at the bottom
2   on Exhibit 27A, the earnings per share, this is the
3   first time that your upside adjustment and your
4   forecast for earnings per share for the quarter fell
5   below market guidance; is that right?
6       A   Are you on 27A?
7       Q   Yes.
8       A   I see that the --
9       MR. WALD:  Object to form.
10      THE WITNESS:  -- EPS is 11.58 cents.
11      MR. BRITTON:  Right.
12      Q   And this was distributed at the executive
13  management committee meeting?
14      A   27A?
15      Q   Yes.
16      A   You are saying that the -- that it fell
17  below EPS?
18      Q   Correct.
19      That's the first time it fell below market
20  expectation --
21      MR. WALD:  Object to the form.
22  BY MR. BRITTON:
23      Q   -- is that right?
24      A   11.58 cents in rounded terms is 12
25  percent -- 12 cents.  Sorry.

329

1       Q   11.58 cents is less than 12 cents; is that
2   right?
3       A   But we have a practice of rounding, so this
4   is still hitting market expectations of 12 cents.
5       Q   Okay.  So with your rounding, you are right
6   at market expectation as of January 29th, 2001; is
7   that right?
8       A   We are still at market expectations of
9   12 cents.
10      Q   And the field is still forecasting
11  10.7 cents per share; is that right?
12      A   That is a combination of revenue and
13  expense, but, yes, still 10.7.  With upside
14  adjustments and other adjustments that were made, we
15  arrive at the 11.58, which is 12 cents.
16      Q   Now, if you go to the page ending with 148,
17  which is the organizational adjustments --
18      A   Yes.
19      Q   -- you are now down a negative $35 million
20  adjustment for OSI.
21      Do you see that?
22      A   Yes.
23      Q   Do you know why?
24      A   Again, I don't recall the specifics as to,
25  you know, how any of the upside numbers were derived.

330

1   We, unfortunately, never documented how we arrived at
2   those numbers.
3       Q   All right.  And you are still -- at zero
4   upside adjustments for NAS?
5       A   That is correct.
6       Q   And OPI, $35 million upside adjustment?
7       A   That is correct.
8       Q   Now, if you move to the February 5th, 2001
9   upside report, turn to the second page of that
10  report, your upside adjustments come down?
11      A   That is correct.
12      Q   From 43.4 million to 32.796 million?
13      A   That is correct, but the forecast also
14  changed; the forecast also came down.
15      Q   And that's the first time that the field
16  forecast came down; is that right?
17      A   I don't know.  I would have to go back and
18  validate if that's a true or not statement -- a true
19  statement or not.  Sorry.
20      Q   I'll represent that it is.
21      The earnings per share, now, this is the
22  first time without rounding that you are falling
23  below market expectation; is that right?
24      MR. WALD:  Object to form.
25      THE WITNESS:  Yes.

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

331

1 BY MR. BRITTON:
2    Q   So even with rounding, you are not going to
3 achieve market guidance?
4    A   At this point in the quarter.  But, again,
5 our quarters are so back-end loaded that this is not
6 indicative that we aren't going to make our quarter.
7    Q   Well, this is your best estimate of where
8 the quarter was going --
9    A   At that point in time.
10   Q   Okay.  And if you knew of anything that
11 would change in the last few days of the quarter,
12 they would have been reflected here; right?
13       MR. WALD:  As of February 5th?
14       MR. BRITTON:  Correct.
15       THE WITNESS:  If the information that came
16 to me in the last few days of the quarter had been
17 brought to my attention earlier in the corner -- in
18 the quarter, as of February 5th, they would have been
19 reflected here.
20       MR. BRITTON:  Right.
21   Q   And the field forecast, it's down to
22 10.5 cents per share; right?
23   A   That is correct.
24   Q   And this February 5th, 2001 upside report
25 was passed out at the executive committee meetings;

332

1 is that right?
2    A   If we had an executive committee meeting on
3 that date, it would have been passed out to certain
4 members of the executive committee.
5    Q   Okay.  And that would include Larry
6 Ellison, Jeff Henley, Sandy Sanderson, among others?
7    A   Sandy Sanderson -- no, it would not.  The
8 entire upside package was only distributed to Larry.
9 Jeff Henley, and Safra Catz, as well as myself.  The
10 field guys, meaning the folks such as Sandy
11 Sanderson, Jay Nussbaum, and whatnot, only received a
12 couple of pages from the forecast which showed the
13 license revenue forecast only.  We did not have a
14 wide distribution of the total company-wide forecast.
15   Q   All right.  If you turn to Exhibit 28A with
16 the Bates ending at 250?
17   A   Yes.
18   Q   Now, you have no upside adjustments for any
19 of the field organizations; is that right --
20 withdrawn.
21       You have no upside adjustments for OSI,
22 NAS, or OPI; is that right?
23   A   That is correct.
24   Q   Okay.  Why not?
25   A   Again, I do not have the -- I do not recall

333

1 the details, nor did I ever document the specific
2 reasons for any upside adjustment numbers.  I only
3 took into consideration all the various points of
4 data that I had to determine the upside numbers,
5 whether it was zero negative or positive.
6    Q   And do you think they were not sandbagging
7 as of this point in the quarter?
8    A   I don't recall.
9    Q   Okay.  If you thought they were
10 sandbagging, you would have an upside adjustment
11 there; right?
12   A   This reflected my best estimate as to where
13 we were going to land at the quarter -- at the end of
14 the quarter based on this time in the quarter.
15   Q   But am I correct that if you thought any
16 one of the division heads were sandbagging, you would
17 have put --
18   A   I would have put in an adjustment if I felt
19 that the forecast was not reflective of what I
20 thought we would ultimately do, based on all the
21 information that I had and my historical experience
22 of forecasting.
23       (Exhibit No. 45 was marked for
24 identification.)
25       THE WITNESS:  Can I just point something

334

1 out that you represented to be true and correct?
2       MR. BRITTON:  Sure.
3       THE WITNESS:  And I just want to make sure
4 that we all understand the facts.
5       MR. BRITTON:  Sure.
6       THE WITNESS:  So are you saying that the
7 forecast never came down as of what period in time?
8       MR. BRITTON:  January 29th, the field
9 forecast had not --
10      MR. WALD:  The representation was that it
11 had -- that February 5th was the first time it
12 dropped.
13      MR. BRITTON:  Right.
14      THE WITNESS:  Okay.  It -- okay.  And you
15 were referring solely to the America's --
16      MR. BRITTON:  Yes.
17      THE WITNESS:  -- not the entire
18 company-wide forecast.
19      MR. BRITTON:  Correct.  Correct.
20      My representation was the America's
21 organizations; February 5th was the first upside
22 adjustment -- or was the first upside report that
23 reflected a decrease in the field forecast.
24   Q   Is that not right?
25   A   I was looking at the total forecast.

335

1  license forecasts, and there are ups and downs.
2  Q   Right.
3      So I have placed in front of you --
4  MR. WALD:  It's 45, Doug?
5  MR. BRITTON:  Yes, 45.
6  Q   Placed in front of you what's been marked
7  as Minton Exhibit 45.
8      Will you take a moment to look at this
9  exhibit.
10  A   Okay.
11  Q   Do you recognize Exhibit 45?
12  A   Yes, I do.
13  Q   What is it?
14  A   It's an e-mail note from Larry Garnick
15  reporting on the January quarter-to-date revenue
16  results.
17  Q   Okay.  And you -- he sent this to you on
18  February 8, 2001?
19  A   He sent it on February 8, 2001, that is
20  correct.
21  Q   To you and others?
22  A   To me and others.
23  Q   Did any of the information contained in
24  Exhibit 45 affect your upside adjustments at any
25  point on or after February 8, 2001?

336

1  A   The information would have been considered
2  whether -- you know, how it impacted a specific
3  adjustment, I cannot speak to because, again, we
4  didn't document how we arrived at any of our upside
5  adjustments, whether a negative, positive, or none at
6  all.  It would have been another point to consider.
7  Q   All right.  If you turn to Exhibit 29A in
8  the binder -- this is the February 12, 2001 upside
9  report -- starts at Bates 440161 and ends at 177.
10      Is this the February 12th, 2001 upside
11  report?
12  A   The one that starts with 440161?
13  Q   Yes.
14  A   Yes.
15  Q   Turn to the second page.  Your earnings per
16  share projection under "Potential" has gone back up
17  to 11.58 cents per share.
18      Do you see that?
19  A   That is correct.
20  Q   And can you tell me why?
21  A   You want me to analyze the differences
22  between the February 12th forecast and the --
23  Q   If you can --
24  A   -- prior forecasts?
25  Q   -- tell from looking at the two reports why

337

1  it went back up.
2  A   The license revenues increased from --
3  wait.  Sorry.  This is 2/12.  You want to know from
4  the 5th?
5      So license revenues on the 5th were
6  1 million 259, and they went up to 1 million 285.  So
7  the field forecasts had gone up.
8      Do you see that, Doug?
9  Q   Yes.
10      And then --
11  A   Total revenues had gone from 2.829 to
12  2.871 -- or 2.829 -- sorry -- to -- I'm getting
13  confused here, from 2.818 from the field to 2.829.
14  Q   So license revenues went up about
15  10 million; is that right?
16  A   That's correct.
17  MR. WALD:  As a matter of field forecast.
18  THE WITNESS:  As a meter of field forecast.
19  BY MR. BRITTON:
20  Q   Your upside adjustment came down a million
21  three?
22  A   You know, I'm going to, if I may -- so what
23  do you want to look at?  The total forecast?
24  Q   I'm trying to figure out why you went back
25  up to 11.58 cents per share.

338

1      And you've already indicated there was a
2  $10 million increase in the field forecast, and I'm
3  asking you if your --
4  A   So we have to take these two reports side
5  by side to see what's changed.  And I would recommend
6  that we -- so you can see, again -- and I'm looking
7  now at the 2/8 -- I mean the February 5th to the
8  which date?
9  Q   February 5th is 28A to February 12th, which
10  is 29A.
11  A   Okay.  I'll put them in order like this.
12  MR. WALD:  And there's two pages you are
13  referring to, each of which has Bates numbers.  That
14  might be the easiest way to do it.
15  MR. BRITTON:  Right.
16  THE WITNESS:  Okay.  So --
17  MR. WALD:  February 5th.
18  THE WITNESS:  -- 442247?
19  MR. WALD:  Okay.  February 12th?
20  THE WITNESS:  Which is 440162?
21  MR. BRITTON:  Okay.
22  THE WITNESS:  So if you want to just look
23  at the potential column, or do you want to look at
24  the --
25  MR. BRITTON:  Well, I'm trying to figure

339

1   out --
2        THE WITNESS: -- forecast column?
3        MR. BRITTON: -- yeah.  I think it would be
4   the upside column now, because you've already
5   shown --
6        THE WITNESS:  The upside columns haven't
7   really changed much on total revenue.
8   BY MR. BRITTON:
9        Q    Your licensed upside adjustment went down
10  from 32.8 to 31.4?
11       A    That is correct.
12       Q    Okay.  Consulting.  Now there's an upside
13  adjustment of 1.9 million.
14            Do you see that?
15       A    Yes.
16       Q    Can you tell me why?
17       A    I do not recall.
18       Q    Okay.  And then support comes down from 8.5
19  million to 7.7 million; is that right?
20       A    It did, but the total forecasts stayed the
21  same.
22       Q    Right.
23       Q    Do you see that?
24            So maybe it's best just to go with the
25  total revenue numbers.

340

1            So the license revenue numbers increased
2   from 12 -- from 1.259 to 1.266.
3        Q    1.2 -- right.
4        Q    Right?
5            Flight (phonetic) consulting revenues went
6   up by roughly 2 million.
7        Q    Right.
8        A    The support revenues, despite the changes
9   to the upside amounts, remained at the 932, 933
10  million range.
11       Q    I see what you are saying, right.
12       A    Total revenues for education remained
13  roughly at the 116.  Other revenues remained the same
14  at 9.5.  So most of your increase was because of a
15  change in license.
16       Q    Right.
17       MR. WALD:  In the field forecast.
18       THE WITNESS:  In the field forecast.
19  BY MR. BRITTON:
20       Q    All right.  Now, let's look at support for
21  a second.
22            What is support?
23       A    Support revenues?
24       Q    Yes.
25       A    Post-contract support?

341

1        Q    Right.
2        A    We sell support contracts.
3        Q    Okay.  And what is that?  How does a
4   customer benefit from a support contract?
5        A    Well, when you buy a support contract, you
6   are entitled to get free maintenance and updates and
7   technical support assistance --
8        Q    Okay.
9        A    -- for your licenses.
10       Q    Can you tell me how support -- how a
11  contract for support revenue is accounted for at
12  Oracle?
13       A    It's accounted for ratably over the
14  contract period.
15       Q    Okay.  Is it a year contract?
16       A    Not always, but, generally speaking, they
17  are typically one year in advance, but if they are
18  government customers, they could be in quarterly in
19  arrears.
20       Q    Okay.  So would you say a majority of the
21  support contracts are a year?
22       A    I would say typically.
23       Q    Typically, support contracts are a year?
24            And then --
25       A    But some customers who have large license

342

1   contracts will by multiyear support.
2        Q    Okay.
3        A    Again, I could not testify as to what
4   percentage of which.
5        Q    Okay.
6        A    But they typically are one-year contracts.
7        Q    So for a year contract for support, when is
8   the money owed by the customer?
9        A    We typically bill one year in advance.
10       Q    So --
11       A    But, again, if it's a government customer,
12  it's quarterly in arrears.
13       Q    So if it's a typical customer that has a
14  year-support contract, all of the -- all the amount
15  is billed up front on Day 1, the entire year?
16       A    It's billed up front.
17       Q    Okay.  Now, is a accounts receivable all
18  that is owing as of Day 1 in terms of when they have
19  to pay?
20       A    That would be correct.
21       Q    Okay.  So they pay in advance, and then
22  Oracle ratably over the year recognizes 112; is that
23  right?
24       A    That is correct.
25       Q    All right.  Okay.

343

1    A   Should I put this one back in?

2    Q   Yes.

3    (Exhibit No. 46 was marked for

4    identification.)

5   BY MR. BRITTON:

6    Q   I've placed in front of you what's been

7   marked as Minton Exhibit 46.

8    Will you take a moment to look at this

9   exhibit.

10   A   You want me to read the whole thing, or

11   just --

12   Q   I think I am -- my questions are going to

13   focus on the first two pages.

14   A   Okay.

15   Q   Okay.  Do you recognize Exhibit 46?

16   A   Yes, I do.

17   Q   And what is Exhibit 46?

18   A   It's a note to Mike Rocha with a copy to a

19   number of other individuals regarding the -- some

20   issues that we had with the support revenues that

21   were recognized during the course of the quarter --

22   or, I should say -- yeah, during January, which would

23   be during the course of the quarter.

24   Q   And the e-mail is talking about a $20

25   million drop-off in revenue during the month of

344

1   January; is that right?

2   A   Yes, it is.

3   Q   So this e-mail is dated February 18th;

4   right?

5   A   Yes.

6   Q   When did you find out that support revenues

7   were off by $20 million?

8   A   In the middle of February, because we

9   wouldn't have had the results until sometime in

10   February.

11   Q   Okay.  So by the time you found out that

12   there was a $20 million drop-off in revenue in the

13   month of January for support, you already needed

14   rounding to get to market guidance for the quarter;

15   is that right?

16   A   This is not referring to the forecasts.

17   This is talking about the revenues that had been

18   booked to date in the month of February.

19   Q   Right.  And they were --

20   A   Sorry.  In the month of January.

21   Q   And they were $20 million less than

22   expected; right?

23   A   But we were investigating as to why.

24   Do you recall that this is the time when we

25   were upgrading to a new version of support renewals

345

1   called OKS?

2   A   Correct.

3   And my question is:  By the time -- when

4   you found this out, you already needed rounding to

5   get to market guidance in your forecast?

6   A   I don't know.  When I found this out, it

7   was mid-February.

8   When was rounding?

9   Q   Let's see --

10   A   If I may, this was talking about actual

11   revenues for the month.  It didn't mean that the

12   forecast for support was not going to be solidified.

13   The issue was trying to understand why our revenues

14   were not as -- what we expected them to be in the

15   month of January, and we had attributed that, based

16   on some theories at the time, to a few things, one

17   being that some contracts that should have been

18   renewed had not yet been renewed in the course of the

19   quarter as a consequence of our conversion from an

20   old system to OKS.

21   If those contracts were renewed in the

22   current quarter, then the revenue for those

23   contracts, if the contract renewal was effective,

24   let's say, from December 1st, then we would have had

25   all of the revenue recorded still in that quarter.

346

1   So this was highlighting an issue that we

2   needed to jump on top of, the whole support renewal

3   order process, and ensure that every contract that

4   was up for renewal was definitely being worked by the

5   support sales renewal organization so that the

6   revenue could be recognized in the current quarter.

7   Q   But this would affect your forecast?

8   A   No.  This is an actual revenue report

9   number --

10   Q   Okay.

11   A   -- it's not a forecast.

12   Q   And why did you --

13   A   That's why I'm trying to make the

14   distinction for you.

15   Q   Why did you say -- or why did you write on

16   the second page, The support organization reduced

17   their December and January revenue forecast by $20

18   million?

19   A   Can you show me where?

20   Q   Second page, bottom e-mail, first line.

21   A   And, again, I think it was because of the

22   fact that we had been converting to this system OKS.

23   Q   Right.

24   A   And in order for them to get back on track

25   with their forecasts, their monthly forecast, to get

347

1　to the total quarter forecast, they needed to renew
2　those contracts that were up for renewal in the
3　period that had not yet been renewed.
4　　　Q.　This wasn't good news, was it?
5　　　A.　This was -- what do you mean by "good
6　news"?
7　　　Q.　Well, it drove your forecasts down clearly
8　below market guidance, didn't it?
9　　　A.　This was -- had nothing -- this was dealing
10　with an issue with the system's conversion and the
11　fact that the system's conversion failed to allow our
12　support renewals reps to be as productive as possible
13　and to identify all support contracts that were
14　available for renewal during the period.
15　　　Q.　Okay.　If you look at Exhibit --
16　　　And if they had failed to do it, then we
17　would have a problem with the -- with our support
18　revenue for the quarter.
19　　　Q.　Okay.　If you look at Exhibit 31A -- it's
20　the upside report for February 19th, 2001.
21　　　If you look at the second page --
22　　　A.　What's the Bates number, please?
23　　　Q.　Bates number is 440179 of --
24　　　A.　997 or 179.
25　　　Q.　179, second page of Exhibit 31A, page 2.

349

1　had clearly caused our forecast to be in jeopardy,
2　but whether or not this 20 million relates to the
3　20 million that you see on that page, I do not
4　recall.
5　　　MR. WALD:　I'm sorry.　What's the
6　20 million on that page?　12 million, you mean?
7　　　THE WITNESS:　Sorry.　12 million.
8　BY MR. BRITTON:
9　　　Q.　Now, on the second page of Exhibit 31A, the
10　earnings per share projection with your upside
11　adjustments now is 11.23 cents --
12　　　A.　That's correct.
13　　　Q.　-- is that right?
14　　　Even with rounding, that's below market
15　guidance?
16　　　A.　That is correct.
17　　　Q.　Okay.　You can put -- actually, let's go
18　back to Exhibit 46 for a second.
19　　　This -- the first sentence says, "I have
20　asked the ERP team to focus on evaluating why we had
21　a $20 million drop off in revenue in the month of
22　January from support renewals."　But when I look at
23　the numbers reflected September through February,
24　about a paragraph down --
25　　　A.　Yeah.

348

1　　　A.　Yes.
2　　　Q.　You look a lot deeper into the document
3　than I am.
4　　　MR. WALD:　No, she's right.
5　　　THE WITNESS:　440179?
6　　　MR. BRITTON:　Right.
7　　　Q.　You now have a $12.8 million negative
8　adjustment to support.
9　　　MR. WALD:　Negative upside adjustment.
10　　　MR. BRITTON:　Yes, negative upside
11　adjustment to support.
12　　　Q.　The information that you received about
13　support revenues, as reflected in Exhibit 46, what
14　caused you to put in a negative upside adjustment for
15　support on February 19th, 2001?
16　　　A.　What I can tell you is we were concerned
17　that we would not make the support revenue forecast
18　as a consequence of these conversion problems.
19　Again, I don't know precisely how we derived at this
20　particular upside adjustment.
21　　　Q.　But is it reasonable to assume that the
22　issue that is being discussed in Exhibit 46 is the
23　same thing that's reflected in the negative upside
24　adjustment to support in Exhibit 31A?
25　　　A.　It is reasonable to assume that this issue

350

1　　　Q.　-- looks like the February number is what
2　is down.
3　　　Can you tell me why the $20 million
4　drop-off in revenue in the month of January would be
5　reflected in February, or am I reading this wrong?
6　　　A.　This is the opening revenue, not the actual
7　revenue for support.
8　　　Q.　Right.
9　　　A.　So, for example, it wouldn't include
10　contracts that had closed in the current quarter.　It
11　wouldn't include contracts that were in backlog.　We
12　had a lot of backlogged contracts, because the
13　support renewals team had not -- the support renewal
14　sales team had not renewed every single contract that
15　was up for renewal in the quarter; they had fallen
16　behind.　So this is just based on the contracts that
17　were in the system.
18　　　If you took that and looked at their
19　projected accounting distribution when the revenue
20　would be recognized in the subsequent months, it is
21　showing that there was a drop in -- from January to
22　February.　And this -- so, yeah.
23　　　MR. BRITTON:　Okay.　Why don't we take a
24　short break.
25　　　Five minutes until the tape.

351

1    THE VIDEOGRAPHER:  This marks the end of
2    Videotape No. 1, Volume 2, in the deposition of
3    Jennifer Minton.
4         Going off the record, the time is 2:53.
5         (Recess taken.)
6         THE VIDEOGRAPHER:  Here marks the beginning
7    of Tape No. 2, Volume No. 2, in the deposition of
8    Jennifer Minton.
9         The time is 3:01; we are back on the
10   record.
11   BY MR. BRITTON:
12   Q   Okay.  Ms. Minton, staying with Exhibit 46,
13   the numbers that are reflected in the September
14   through February chart there midway down, you see
15   where I'm reading?
16        Are those --
17        MR. WALD:  Page 1?  I'm sorry.
18        MR. BRITTON:  Yeah, page 1.
19   Q   Are those the numbers that are based upon
20   the estimated renewal rate for each of those months?
21   A   No.
22   Q   No.  Okay.
23        What are they?
24   A   And if I may, so what this represents is
25   the revenue that is already scheduled to be

352

1    recognized based on contracts that have already been
2    renewed and are recognized -- recognizable as revenue
3    during the period.
4    Q   Okay.
5    A   It does not represent contracts that are --
6    have not been renewed that should have been or could
7    have been renewed.  We had a large backlog of
8    contracts that had not yet been renewed, in part, due
9    to the system conversion issues that we had when we
10   upgraded internally to 11i.  And it also does not
11   include a number of those contracts that would come
12   up for renewal in the current February time period.
13        So it was only anything that was actually
14   entered in the system.  It's not your population of
15   total possible contracts for which you can recognize
16   revenue.
17   Q   Okay.  If you look down at the e-mail that
18   Michael Rocha wrote?
19   A   "Rocha."
20   Q   "Rocha."
21        He says, in the third sentence, "The $20
22   million shortfall that Jennifer refers to in her note
23   would mean that our renewal rate was approaching 70%
24   (we assume 98%)."
25        So where would -- so the drop off from

353

1    January to February of roughly $20 million does not
2    impact or have -- withdrawn.
3         Does Mr. Rocha's statement that "The $20
4    million shortfall that Jennifer refers to in her note
5    would mean that our renewal rate was approaching 70%
6    (we assume 98%)," does that have any impact on the
7    numbers that are reflected in September or from
8    January to February?
9    A   I would have to read the beginning part of
10   his note, but if he's referring -- so let me just
11   step back and see, because my note is after his.
12   Q   Okay.
13   A   Right?
14   Q   Yes.
15   A   So I think what Mike is stating, no
16   different than I, is that we must have either a
17   systems issue that's not capturing 100 percent of all
18   of our contracts, or that we haven't renewed all
19   that's possible to renew because our historical
20   conversion rates -- not conversion rates, excuse me,
21   our historical renewal rates are in the high 70s --
22   or high 90s -- or, sorry, low 90s.  Midpoint.  He
23   says 96.  I think it was probably just a tad below
24   that.
25        And if you look at what the schedule of

354

1    revenue is to be in February, that's what his -- I
2    think that's more or less what he's implying, is that
3    you can't have this kind of shortfall in revenue
4    that's real unless you had a sudden decline in your
5    support renewals rate.
6         So I'm not sure to which part of the
7    numbers in this long chain.  It would take me a few
8    minutes.  If you want me to take the time out to
9    review it all, I can.
10   Q   Okay.
11   A   But I think he's more or less
12   emphasizing my point, is that the revenue's there; we
13   just need some visibility to make sure that every
14   contract that is up for renewal in the quarter is
15   indeed renewed; that we have the visibility to it and
16   that we reconcile from the systems conversion that
17   all of the contracts came over into OKS from the
18   other system so that we know that we are indeed
19   recognizing the right amount of revenue for the
20   quarter.
21        And, Doug, I would have to go back and
22   look, but I don't think we had a significant
23   shortfall at the end of the day in support revenues
24   for the quarter.
25   Q   Yeah, we will have to look.

355

1    But the -- the sentence that I've been
2    referring to, the $20 million shortfall would mean a
3    renewal rate of 70 percent -- we assume 96 percent --
4    how do assumptions impact Oracle's recognition of
5    support revenues?
6        A    This is not an assumption of our revenue
7    recognition.  This is how we do our forecast.
8        So when we are preparing a support revenue
9    forecast, we make certain assumptions that our
10   contract base is going to renew, and that's what he's
11   referring to.
12       Q    Okay.  If at the end of -- let's take a
13   typical customer that we talked about earlier.
14   Somebody that buys one year of support.
15       At the end of the first year, does -- and
16   the contract expires, does Oracle assume that that
17   customer will renew the support contract and
18   recognize revenue in the quarter after the contract
19   expires?
20       A    We only recognize revenue after a contract
21   has been signed with the customer.  So, no, we would
22   not recognize revenue.
23       Our forecast would assume, however, that we
24   would recognize it, but we certainly would not
25   recognize the revenue until such time that we have a

356

1    signed commitment from the customer to renew that
2    contract for the year.
3        Q    All right.  So the contract expires;
4    revenue isn't recognized until somebody gets that
5    customer on the phone and that customer puts a
6    signature on a new contract; right?
7        A    Until the customer enters into a new
8    binding, legal agreement, we do not recognize the
9    revenue.
10       Q    Okay.
11       A    But the point -- well, I'll leave it at
12   that.
13       (Exhibit No. 47 was marked for
14       identification.)
15   BY MR. BRITTON:
16       Q    All right.  I've placed in front of you
17   what's been marked as Exhibit 47.
18       Will you take a moment to look at this
19   exhibit.
20       For the record, Exhibit 47 starts at Bates
21   NDCA-ORCL 120113 and ends at 114.
22       Do you recognize Exhibit 47?
23       A    I see the e-mail was sent to me.  I vaguely
24   recall it.
25       Q    What do you recognize it to be?

357

1        A    Again, it's an e-mail that's going --
2    that's -- discusses, in part, some of the -- how
3    should I say?  Some of the unknown facts around
4    revenue -- or contracts that did not appear to be
5    renewed and -- well, just contracts that did not
6    appear to be renewed.
7        Q    Okay.  If you look down at the bottom of
8    the first page, it talks about -- he asks, "Why was
9    there $24 million in backdated revenue recognized in
10   February?"
11       Can you tell me what "backdated revenue"
12   means?
13       A    No, because, if you see, I say:  Where are
14   you getting the $24 million backdated revenue?
15       So, Doug, at this time, there was a lot of
16   confusion and a lot of finger-pointing with Mark
17   Barrenechea's organization, the responsibility -- who
18   was responsible for developing the application, OKS
19   application.  You had the support renewals
20   organization that didn't have the sufficient reports
21   and complaining about the system not having the
22   necessary reporting capabilities in order for it
23   to -- in order for them to be able to renew all
24   contracts that were open for renewal, so you -- and
25   you just had a lot of unknown certainties going on,

358

1    so this was just a lot of -- where these numbers came
2    from, I don't know, but I can just tell you it was a
3    time where everybody was trying to get to the bottom
4    of some of these questions that were raised during
5    the course of the quarter and since we had actually
6    upgraded to OKS.
7        Q    The term "backdated revenue," does that
8    have a meaning at Oracle?
9        A    I believe what he's referring to here are
10   contracts that may have been recognized in the
11   current quarter because they related to contracts
12   that were up for renewal in previous quarters.
13       Q    Okay.
14       A    So if I can help you out here --
15       Q    Sure.
16       A    -- if you are -- in Month 1 through 12, we
17   recognize revenue.  Month 12 comes and goes and you
18   don't recognize -- you don't renew your contract but
19   we still provide you support during this open period,
20   if you recognize revenue -- sorry, if you renew the
21   contract in the subsequent quarter following that
22   expiration period, then that revenue for the prior
23   quarter, those three months where the contract had
24   not actually been recognized, would be recognized
25   upon contract signature.

359

1      Does that make sense?
2    Q    Yes.
3    A    So I suspect that's what he's referring to,
4    but I don't know.  This was a period of a lot of
5    confusion.
6    Q    Okay.  You can put that document aside.
7         Okay.  Were you involved -- withdrawn.
8         Do you have any knowledge about the finance
9    and audit committee's investigation of Jay Nussbaum
10   in fiscal 2001?
11   A    I did not know there was an investigation
12   that was initiated by the audit committee.
13   Q    Okay.  You have no knowledge of any
14   investigation --
15   A    Not that I recall --
16   Q    Okay.
17   A    -- that there was an investigation.
18   Q    Okay.  Did you -- were you a member of the
19   finance and audit committee?
20   A    The members of the finance and audit
21   committee are members of the board --
22   Q    Right.
23   A    -- I attend finance and audit committee
24   meetings.
25   Q    But you are not a member of those

360

1    meetings -- of those --
2    A    The members are your board of directors.
3    Q    Yeah.  Okay.
4    A    And if I may, when there's matters that are
5    discussed that are confidential relating to
6    employment matters or investigations or whatnot,
7    those are generally held in an executive session with
8    general counsel only in attendance as well as the
9    members of the audit committee.  That would be the
10   board of directors.
11        MR. BRITTON:  Okay.  I think I'm out of
12   time.
13        MR. WALD:  Thank you, Doug.
14        MR. BRITTON:  Thank you, Ms. Minton.
15        THE VIDEOGRAPHER:  No more questions?
16        MR. WALD:  Thank you, Madam Court Reporter.
17        THE VIDEOGRAPHER:  This marks the end of
18   Videotape No. 2, Volume 2, in the deposition of
19   Jennifer Minton.
20        The original videotapes will be retained by
21   LiveNote World Service.
22        Going off the record, the time is 3:16.
23        MS. KYROUZ:  We do want to mark the
24   transcript "Confidential."
25        MR. BRITTON:  Thank you.

361

1         (Deposition concluded at 3:16 p.m.)
2    //
3    //

362

1              CERTIFICATE OF WITNESS
2
3         I, the undersigned, declare under penalty of
4    perjury that I have read the foregoing transcript,
5    and I have made any corrections, additions, or
6    deletions that I was desirous of making; that the
7    foregoing is a true and correct transcript of my
8    testimony contained therein.
9
10   EXECUTED this _____ day of _____,
11   20___, at _____, _____.
                (City)           (State)
12
13
14
              _____
15              JENNIFER MINTON
16
17
18
19
20
21
22
23
24
25

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

363

1        CERTIFICATE OF DEPOSITION OFFICER

2        I, RACHEL FERRIER, CSR, CSR No. 6948, duly

3    authorized to administer oaths pursuant to Section

4    8211 of the California Code of Civil Procedure,

5    hereby certify that the witness in the foregoing

6    deposition was by me sworn to testify to the truth,

7    the whole truth and nothing but the truth in the

8    within-entitled cause; that said deposition was taken

9    at the time and place therein stated; that the

10   testimony of said witness was reported by me and was

11   thereafter transcribed by me or under my direction by

12   means of computer-aided transcription; that the

13   foregoing is a full, complete and true record of said

14   testimony; and that the witness was given an

15   opportunity to read and correct said deposition and

16   to subscribe same.

17       I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said caption.

22       IN WITNESS WHEREOF, I have hereunto subscribed

23   by my hand this 5th day of October, 2006.

24

25       RACHEL FERRIER, CSR No. 6948

1               CERTIFICATE OF DEPOSITION OFFICER

2        I, RACHEL FERRIER, CSR, CSR No. 6948, duly

3  authorized to administer oaths pursuant to Section

4  8211 of the California Code of Civil Procedure,

5  hereby certify that the witness in the foregoing

6  deposition was by me sworn to testify to the truth,

7  the whole truth and nothing but the truth in the

8  within-entitled cause; that said deposition was taken

9  at the time and place therein stated; that the

10  testimony of said witness was reported by me and was

11  thereafter transcribed by me or under my direction by

12  means of computer-aided transcription; that the

13  foregoing is a full, complete and true record of said

14  testimony; and that the witness was given an

15  opportunity to read and correct said deposition and

16  to subscribe same.

17        I further certify that I am not of counsel or

18  attorney for either or any of the parties in the

19  foregoing deposition and caption named, nor in any

20  way interested in the outcome of the cause named in

21  said caption.

22        IN WITNESS WHEREOF, I have hereunto subscribed

23  by my hand this 5th day of October, 2006.

24

25  _____
          RACHEL FERRIER, CSR No. 6948

# EXHIBIT HHH

Sevier, Jason  6/28/2006  9:09:00 AM

1

```
1
2       IN THE UNITED STATES DISTRICT COURT
3     FOR THE NORTHERN DISTRICT OF CALIFORNIA
4
        In re:
5     Oracle Corporation Securities  )
        Litigation.              ) Case No. C010988 MJJ
6     This Document Relates To:  All )
        Actions.              )
7     ------------------------------)
8
9             Wednesday, June 28, 2006
10                9:09 a.m.
11
12      * * * C O N F I D E N T I A L * * *
13
14         Confidential Videotaped Deposition
15      of JASON SEVIER, held at the offices of
16      David Feldman Worldwide, Inc., 805 Third
17      Avenue, New York, New York 10022, pursuant
18      to Subpoena, before Otis Davis, a Notary
19      Public of the State of New York.
20
21
22
23
24
25
```

2

```
1    A P P E A R A N C E S :
2      LERACH COUGHLIN STOIA GELLER RUDMAN &
3      ROBBINS, LLP
4      Counsel for Plaintiff
5         100 Pine Street, Suite 2600
6         San Francisco, California  92101
7      BY:  SHAWN A. WILLIAMS, ESQ.
8         shawnw@lerachlaw.com
9      AND:  KEITH MAUTNER, CPA, CMA
10     AND:  ASHAR AHMED, Summer Associate
11
12     LATHAM & WATKINS, LLP
13     Counsel for Defendants
14        650 Town Center Drive, 20th Floor
15        Costa Mesa, California  92626
16     BY:  PAUL V. KONOVALOV, ESQ.
17        paul.konovalov@lw.com
18     CHADBOURNE & PARK, LLP
19     Counsel for the Witness Jason Sevier
20        30 Rockefeller Plaza
21        New York, New York  10112
22     BY:  ROBERT SIDORSKY, ESQ.
23
24     ALSO PRESENT:
25         MANUEL ABRU, Legal Video Specialist
```

3

```
1
2
3
4
5         IT IS HEREBY STIPULATED AND
6     AGREED, by and among counsel for the
7     respective parties hereto, that the
8     filing, sealing and certification of
9     the within deposition shall be and
10    the same are hereby waived.
11        IT IS FURTHER STIPULATED AND
12    AGREED that all objections, except as
13    to the form of the question, shall be
14    reserved to the time of the trial.
15        IT IS FURTHER STIPULATED AND
16    AGREED that the within deposition may
17    be signed before any Notary Public
18    with the same force and effect as if
19    signed and sworn to before the Court.
20
21
22
23
24
25
```

4

```
1
2         THE VIDEOGRAPHER:  This is tape
3     number 1 of the videotaped deposition
4     of Jason Sevier, in the matter Oracle
5     Securities Litigation, In re:
6         This deposition is being held
7     at the offices of David Feldman
8     Worldwide, Inc., 805 Third Avenue, New
9     York, New York, on June 28, 2006 at
10    approximately 9:09 a.m.
11        My name is Manuel Abru, and I
12    am the legal video specialist.  The
13    court reporter is Otis Davis.
14        Will counsel please introduce
15    themselves.
16        MR. WILLIAMS:  Shawn Williams,
17    Lerach Coughlin Stoia Geller Rudman &
18    Robbins on behalf of plaintiffs.
19        MR. MAUTNER:  Keith Mautner
20    with Lerach Coughlin.
21        MR. WILLIAMS:  With me also is
22    Ashar Ahmed of Lerach Coughlin.
23        MR. KONOVALOV:  Good morning.
24    Paul Konovalov of Latham & Watkins for
25    the defendants.
```

249

1      Jason Sevier - Confidential
2  accounting jargon.
3      A.   I do not.
4      Q.   Earlier you -- withdrawn.
5          Do you know what a debit memo
6  is?
7          MR. SIDORSKY:  Objection to
8  form.
9          In general?
10         MR. WILLIAMS:  Yeah, in
11  general.
12         MR. SIDORSKY:  I am going to
13  object to this kind of general
14  question unrelated to any context of
15  the audit or the work papers.
16     A.   In general, no.
17     Q.   Have you ever used the term
18  "debit memo"?
19     A.   Myself personally?
20     Q.   Yes.
21     A.   No.
22     Q.   I am going to ask you to turn
23  to AA 001938, it's the second to the last
24  page.
25     A.   Okay.

250

1      Jason Sevier - Confidential
2      Q.   You see in that first row with
3  all the column headings --
4      A.   Yes.
5      Q.   Well, tell me what this
6  document is first?
7      A.   Once again, this is consistent
8  with the documents we have seen previously,
9  which it looks like it's a -- it's showing
10  a balance per the A/R aging and the balance
11  per the general ledger, which shows a
12  $500,000 difference.
13     Q.   Do you see where --
14         Do you see the column heading
15  that says Debit Memos?
16     A.   Yes, I see it.
17     Q.   Do you know what that means?
18     A.   I do not.
19     Q.   Or what it refers to?
20     A.   Do not.
21     Q.   You indicated earlier that you
22  saw a copy of the Complaint in this action.
23  Was it yesterday or during a meeting with
24  your lawyer?
25     A.   When I first met --

251

1      Jason Sevier - Confidential
2          MR. SIDORSKY:  I don't know
3  that you have to answer if you saw it
4  with me or how he saw it.
5          MR. WILLIAMS:  I think he
6  testified to that.
7          MR. SIDORSKY:  He did testify
8  to it.  So that's what I'm saying.
9  It's whatever he said -- I don't think
10  you are entitled to get more into
11  detail than that.
12         MR. WILLIAMS:  No, I'm not.
13     A.   Can you repeat the question.
14     Q.   I'm just asking you if you
15  recall testifying that you saw a copy of
16  the Complaint in this action.
17     A.   Yes.
18     Q.   Was that yesterday or a few
19  weeks ago?
20     A.   A few weeks ago.
21     Q.   You indicated you read some
22  allegations in there, but not all.
23     A.   Yes, I read some.
24     Q.   Do you recall reading the
25  allegations regarding the creation of many

252

1      Jason Sevier - Confidential
2  thousand debit memos in November of 2000?
3      A.   I recall reading something to
4  that effect in the Complaint.
5      Q.   Did you know prior to reading
6  the Complaint that Oracle had created
7  46,000 debit memos in November 2000?
8      A.   Did not.
9      Q.   No one mentioned that to you --
10         MR. SIDORSKY:  Objection to
11  form.
12     Q.   -- prior to you seeing that
13  Complaint, aside from your attorney?
14         MR. SIDORSKY:  Objection to
15  form.
16     A.   I don't have it in front of me,
17  but the Subpoena may have said something to
18  that effect.  I don't remember
19  specifically, but prior to receiving the
20  subpoena, I had no knowledge of debit
21  memos.
22     Q.   Did anybody on your engagement
23  team mention anything about debit memos
24  created in November of 2000 to you?
25     A.   No one did.

273

```
1
2            *** ERRATA SHEET ***
3     NAME OF CASE:  Oracle Securities Litigation
4     DATE OF DEPOSITION:  June 28, 2006
5     NAME OF WITNESS:  JASON SEVIER
6     PAGE  LINE      FROM          TO
7     ____|____|_____|_____
8     ____|____|_____|_____
9     ____|____|_____|_____
10    ____|____|_____|_____
11    ____|____|_____|_____
12    ____|____|_____|_____
13    ____|____|_____|_____
14    ____|____|_____|_____
15    ____|____|_____|_____
16    ____|____|_____|_____
17    ____|____|_____|_____
18    ____|____|_____|_____
19    ____|____|_____|_____
20
21            _____
22                JASON SEVIER
23    Subscribed and sworn to before me
24    This ____ day of _____, 2006.
25    _____   _____
```

275

```
1                     OTIS DAVIS
2
3     -------------------I N D E X------------------
4     WITNESS      EXAMINATION BY      PAGE
5     J. SEVIER     MR. WILLIAMS      5, 270
6                   MR. KONOVALOV      269
7
```

274

```
1     (Notary Public)       My Commission Expires:
2
3            C E R T I F I C A T E
4     STATE OF NEW YORK   )
5                     : ss.
6     COUNTY OF NEW YORK   )
7
8          I, OTIS DAVIS, a Notary Public
9     within and for the State of New York, do
10    hereby certify:
11          That JASON SEVIER, the witness
12    whose deposition is hereinbefore set
13    forth, was duly sworn by me and that such
14    deposition is a true record of the
15    testimony given by the witness.
16          I further certify that I am not
17    related to any of the parties to this
18    action by blood or marriage, and that I
19    am in no way interested in the outcome of
20    this matter.
21          IN WITNESS WHEREOF, I have hereunto
22    set my hand this 5th day of July 2006.
23
24
25            _____
```

274

1

2                      C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                              : ss.

5    COUNTY OF NEW YORK     )

6

7              I, OTIS DAVIS, a Notary Public

8         within and for the State of New York, do

9         hereby certify:

10             That JASON SEVIER, the witness

11        whose deposition is hereinbefore set

12        forth, was duly sworn by me and that such

13        deposition is a true record of the

14        testimony given by the witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage, and that I

18        am in no way interested in the outcome of

19        this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 5th day of July 2006.

22

23

24

25                       OTIS DAVIS

# EXHIBIT III

Venkataramana, Molly  4/13/2006  9:00:00 AM

1

```
1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3
4    In re ORACLE CORPORATION
     SECURITIES LITIGATION,
5
6    vs.      Master File No.: C-01-0988-MJJ
7    This Document Relates To:,
8       ALL ACTIONS.
9    _____/
10
11            ---o0o---
12        CONFIDENTIAL - Under the
     Revised Stipulated Protective Order Governing Confidentiality
13     DEPOSITION OF MOLLY VENKATARAMANA
14        Thursday, April 13, 2006
15            ---o0o---
16
17     SHEILA CHASE & ASSOCIATES
             REPORTING FOR
18       LiveNote World Service
         221 Main Street, Suite 1250
19     San Francisco, California 94105
           Phone:  (415) 321-2311
20           Fax:  (415) 321-2301
21
22   Reported by
     APRIL DAWN HEVEROH, CSR
23   CSR No. 8759
24
25
```

3

```
1        BE IT REMEMBERED that on Thursday, April 13,
2    2006, commencing at the hour of 9:08 A.M. thereof, at
3    the offices of Lerach, Coughlin, Stoia, Gellar, Rudman &
4    Robbins, LLP, 100 Pine Street, Suite 2600, San
5    Francisco, California, before me, APRIL DAWN HEVEROH,
6    CSR, a Certified Shorthand Reporter for the State of
7    California, personally appeared
8            MOLLY VENKATARAMANA
9    called as a witness by the Plaintiffs herein, who, being
10   by me first duly sworn, was thereupon examined and
11   testified as hereinafter set forth.
12            ---o0o---
13   Appearing as counsel on behalf of Plaintiff:
14       ELI GREENSTEIN, Esquire
         SHAWN A. WILLIAMS, Esquire
15       WILLOW E. RADCLIFFE, Esquire
         LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBIN
16       100 Pine Street, Suite 2600
         San Francisco, California  94111
17       (415) 288-4545
         elig@lerachlaw.com
18       shawnw@lerachlaw.com
19   Appearing as counsel on behalf of Defendant:
20       BRIAN T. GLENNON, Esquire
         MATTHEW RAWLINSON, Esquire
21       LATHAM & WATKINS
         633 West Fifth Street, Suite 400
22       Los Angeles, California  90071-2007
         (213) 485-1234
23       brian.glennon@lw.com
         matt.rawlinson@lw.com
24
25   Also present:  Keith Mautner and James Terrell
```

2

```
1    DEPOSITION OF MOLLY VENKATARAMANA, 4/13/06
2
3            I N D E X
4        INDEX OF EXAMINATION
                    PAGE
5    EXAMINATION BY MS.GREENSTEIN          5, 351
6    EXAMINATION BY MR. GLENNON            339
7            ---o0o---
8        INDEX OF EXHIBITS
9        DESCRIPTION              PAGE
10   Exhibit 1    Deposition Subpoena, 9 pages     9
11   Exhibit 2    Billing History by Customer, 54 pages   170
12   Exhibit 3    Billing Summary sorted by Customer Name,   192
                  26 pages
13   Exhibit 4    Handwritten notes regarding debit memos,   260
                  one page
14
15   Exhibit 5    Listing of meetings beginning with October  282
                  21 and ending with October 31, one page
16   Exhibit 6    E-mail printout from Ryan Roberts to    294
                  Ian Hatata, et al., one page
17
     Exhibit 7    E-mail printout from Kim Henderson to    310
18                Omid Fardanesh, one page
19   Exhibit 8    Spreadsheet Bates stamped PLF-ORC 000122 to  320
                  PLF-ORC 000129, 8 pages
20
21
22           ---o0o---
23
24
25
```

4

```
1            ---o0o---
2        P R O C E E D I N G S
3            ---o0o---
4        THE VIDEOGRAPHER:  This begins the videotaped
5    deposition of Molly Venkataramana, Tape 1, Volume 1, in
6    the matter in re Oracle Corporation Securities
7    Litigation as filed in the United States District Court
8    for the Northern District of California, master file
9    number C-01-0988-MJJ.
10       Today's date is April 13, 2006.  The time on
11   the video monitor is 9:08.  The video operator today is
12   James Terrell representing LiveNote World Service
13   located at 221 Main Street, Suite 1250, San Francisco,
14   California, 94105.  The phone number is (415) 321-2300.
15   The court reporter is April Heveroh of Sheila Chase &
16   Associates, reporting on behalf of LiveNote World
17   Service.
18       Today's deposition is being taken on behalf of
19   Plaintiff and is taking place at 100 Pine Street,
20   San Francisco, California.
21       If counsel will now please introduce
22   yourselves and state whom you represent.
23       MR. GREENSTEIN:  Eli Greenstein with Lerach,
24   Coughlin, Stoia, Geller, Rudman & Robbins representing
25   Plaintiffs.
```

253

1     A.  The 1,099 items.
2     Q.  Okay.  And what else was discussed?  And what
3  about those 1,099 items was discussed?
4     A.  The status.
5     Q.  And what does that mean?
6     A.  Where we were at in the resolution process of
7  each individual item.
8     Q.  Okay.  And did you speak during that meeting?
9     A.  Yes.
10     Q.  And what did you say?
11     A.  Explained the status of my items, my group's
12  items.
13     Q.  Okay.  And what was the status of your items?
14     A.  Some were resolved, some were still pending,
15  some we couldn't get any information on.
16     Q.  Okay.  About the ones that were resolved, what
17  do you remember about those?
18     A.  Some were refunded, some were applied to
19  invoices.
20     Q.  Okay.  And the ones that were unresolved, what
21  do you remember about those?
22     A.  We pretty much left them as unresolved.
23     Q.  And what do you mean by "we left them
24  unresolved"?
25     A.  Collections, you know, Mike Quinn would have

254

1  an opinion of what to do next; we would do that.  If it
2  still didn't resolve it, we just still left it
3  unresolved.
4     Q.  So when you say Mike Quinn had an opinion of
5  what things you should do next, what type of things
6  would he say you needed to do next?
7     A.  "Have you done X, have you done Y, have you
8  done Z?"  I mean, it wasn't --
9     Q.  So what are the different things you could do?
10     A.  "Have you run a billing history?  Have you
11  called the customer?  Have you escalated with the
12  customer?"
13     Q.  So can you explain to me the different types
14  of things that he told you that could be done to
15  possibly resolve these issues?
16     MR. GLENNON:  Objection.  Asked and answered.
17     THE WITNESS:  Contact the customer, escalate
18  within the customer.
19     MR. GREENSTEIN:  Q.  Okay.  Contact the
20  customer and do what?
21     A.  Ask them, escalate it up until you got the
22  answer that you needed to get it resolved.
23     Q.  Escalate it up --
24     A.  Within their hierarchy.
25     Q.  Okay.  And how did that resolve it?

255

1     A.  Hopefully, you would find somebody who would
2  know something about their item.
3     Q.  Okay.  And how many items -- you may have
4  already testified.  How many items, approximately, did
5  you have for your group?
6     MR. GLENNON:  Objection.  Asked and answered.
7     THE WITNESS:  It was divided by collections
8  manager.
9     MR. GREENSTEIN:  Q.  All right.
10     A.  So equally.
11     Q.  So approximately 200 items each?
12     A.  Approximately, probably, yes.
13     Q.  Okay.  And of those 200 items that you were
14  responsible for, do you recall which ones were resolved,
15  which ones were unresolved?
16     A.  No.
17     Q.  But some were unresolved?
18     A.  Yes.
19     Q.  Okay.  And do you recall the other collections
20  managers during those meetings, did they give updates as
21  to which items they resolved and had been unable to
22  resolve?
23     A.  Yes.
24     Q.  And did -- did each of those collections
25  managers have items that were unresolved?

256

1     A.  Yes.
2     Q.  And did they talk about what the problems they
3  were having with resolving those items?
4     A.  Yes.
5     Q.  Okay.  And what do you remember about those
6  discussions?
7     A.  Just lack of information.
8     Q.  Lack of what information?
9     A.  Contact information, just any information at
10  all regarding the receipt.
11     Q.  Okay.  And when you said that Mike Quinn had
12  opinions about what to do with them, was one of those
13  opinions to adjust up an invoice?
14     MR. GLENNON:  Objection.  Vague and ambiguous,
15  lack of foundation.
16     THE WITNESS:  I don't believe so, no.
17     MR. GREENSTEIN:  Q.  Do you know what
18  adjusting up an invoice is?
19     A.  Yes.
20     Q.  And what is your understanding of what
21  adjusting up an invoice is?
22     A.  If an invoice was credit memo'd, you would
23  adjust up the invoice.
24     Q.  How do you adjust up an invoice?
25     A.  I don't know.  I don't know.

Venkataramana, Molly  4/13/2006  9:00:00 AM

257

1    Q.  Okay.  Well, do you know who would know how to
2    adjust up an invoice?
3         MR. GLENNON:  Objection.  Calls for
4    speculation.
5         THE WITNESS:  AR, I assume.
6         MR. GREENSTEIN:  Q.  And why do you assume
7    that?
8    A.  They used to do it.
9    Q.  And when did they used to do it?
10   A.  If a credit memo was done incorrectly.
11   Q.  When you say "they used to do it," what do you
12   mean by that?  They don't do it anymore?
13   A.  I don't know.
14   Q.  Well, what did you mean when you said they
15   used to do it?
16   A.  When I was in collections.
17   Q.  And do you know of any specific instances
18   where an invoice was adjusted up?
19   A.  No.
20   Q.  Do you know the process by which an invoice is
21   adjusted up?
22   A.  No.
23   Q.  And you talked about incorrectly it was used
24   when there was a credit memo, and can you explain what
25   that means?

258

1         MR. GLENNON:  I'm going to just object to the
2    vagueness and the ambiguity in the question.
3         THE WITNESS:  Can we take a break?
4         MR. GLENNON:  Absolutely.
5         THE WITNESS:  Okay.
6         MR. GREENSTEIN:  Actually, can we stay on the
7    record?  I would just like you to answer that question.
8         MR. GLENNON:  Unless you need to check to see
9    if your answer is privileged, in which case we can take
10   a break.
11        THE WITNESS:  Can you repeat the question?
12        MR. GREENSTEIN:  Can you read it back, please?
13        THE REPORTER:  "And you talked about
14        incorrectly it was used when there was a
15        credit memo, and can you explain what that
16        means?"
17        THE WITNESS:  If a credit memo was found to be
18   done incorrectly, and the customer had made a payment on
19   that invoice, then the invoice would be adjusted up.
20        MR. GLENNON:  Do you want to take a break now?
21        MR. GREENSTEIN:  Brian --
22        MR. GLENNON:  She asked to take a break.  She
23   answered your question.
24        Do you need to take a break?
25        MR. GREENSTEIN:  I would like to follow up on

259

1    that question.
2         MR. GLENNON:  No, you can't.  She asked to
3    take a break --
4         MR. GREENSTEIN:  Are you telling her not to
5    answer the next question?
6         MR. GLENNON:  I'm telling her to take a break.
7    You said you had a question pending and I understand
8    that and I can appreciate that.  She answered your
9    question.  She wants to take a break.  She's going to
10   take a break.  It's my job to allow her to take a break,
11   and I can read back your instruction from the beginning
12   of the day where you said, "If you want to take a break
13   at any time, you can."  She's taking a break.  We'd like
14   to go off the record, please.
15        MR. GREENSTEIN:  Okay.
16        (Recess taken from 4:15 to 4:25 P.M.)
17        MR. GREENSTEIN:  Q.  Going back to the first
18   meeting where you discussed this on account project, do
19   you know why this occurred at that period of time,
20   versus some period of time before that?
21   A.  No.
22   Q.  Did they explain why they were doing this now?
23   A.  No.
24   Q.  They didn't?
25   A.  No.

260

1    Q.  Did they talk about a lawsuit in that meeting?
2    A.  No.
3    Q.  Okay.  In any of those meetings did they
4    discuss any lawsuit?
5    A.  No.
6         MR. GREENSTEIN:  I want to mark this next.
7         (Whereupon, Plaintiff's Exhibit 4 was marked
8         for identification.)
9         MR. GREENSTEIN:  Q.  For the record, this is
10   PLF-ORC 000414, some handwritten notes.  Just take a
11   look at it for a second.
12   A.  Can I clarify something?
13   Q.  Yes.
14   A.  You had previously asked me if Mike Quinn had
15   asked us to adjust up invoices associated with credit
16   memos, and I said no.
17        I want to change that answer to yes.  I
18   believe he did.
19   Q.  So Mike Quinn -- do you remember when this
20   occurred?
21   A.  In one of the subsequent status meetings on
22   the 1,099 items.
23   Q.  Okay.  And what do you recall about those
24   discussions?
25   A.  That if the credit memos were found to be

261

1 erroneous credit memos and should not -- the invoices
2 should not have been credit memo'd, to adjust up the
3 invoice.
4    Q.  Okay.  And did he explain what adjusting up an
5 invoice was?
6    A.  I don't believe so, no.
7    Q.  Did you know, at the time, what adjusting up
8 an invoice was?
9    A.  Yes.
10    Q.  Okay.  Did anybody ask why he was telling you
11 to do that?
12    A.  Yes.
13    Q.  And why was that?
14    A.  Because previously, collections would credit
15 memo invoices to -- collections would credit memo
16 invoices -- credit memo invoices erroneously.  And the
17 credit memos were not valid.
18    Q.  And did you guys discuss why those credit
19 memos were not valid?
20    A.  I don't believe so, no.
21    Q.  And what do you mean when you say they weren't
22 valid?
23    A.  We would credit memo it as bad debt.  It was
24 aged to some degree and this many days outstanding, so
25 therefore, we want to credit memo it as bad debt.

263

1    A.  Yes.
2    Q.  Okay.  And did you save those?
3    A.  Yes.
4    Q.  And are they on your computer today?
5    A.  No, I don't believe so, no.
6    Q.  Okay.  Well, what happened to them?
7       MR. GLENNON:  Objection.  Lack of foundation.
8       THE WITNESS:  I don't know.
9       MR. GREENSTEIN:  Q.  Well, did you ever delete
10 them from your computer?
11    A.  No.
12    Q.  Okay.  So there's a point where they were on
13 your computer, and now you're saying they're not on your
14 computer, correct?
15    A.  Yes.
16    Q.  And how is that possible?
17       MR. GLENNON:  Objection.  Asked and answered.
18 Calls for speculation.
19       THE WITNESS:  Different computers.
20       MR. GREENSTEIN:  Q.  What do you mean by that?
21    A.  The computer that I had when I was in
22 collections is not the computer I have now.
23    Q.  Did someone come and take your computer that
24 you had when you were in collections?
25    A.  No.

262

1    Q.  And how do you go about doing that?  How do
2 you credit memo it as bad debt?  What's the procedure?
3       MR. GLENNON:  Objection.  Lack of foundation.
4       THE WITNESS:  Just request that it be credit
5 memo'd due to the age it's outstanding and no customer
6 response.
7       MR. GREENSTEIN:  Q.  And who would request
8 that?
9    A.  Collections.
10    Q.  And did you ever request that?
11    A.  I believe so, yes.
12    Q.  And so what did you do when you had to request
13 that?
14    A.  I would put it on a spreadsheet.
15    Q.  Okay.  You put one item on a spreadsheet?
16    A.  Yes.
17    Q.  Or would you collect multiple items that
18 related to these erroneous credit memos on a
19 spreadsheet?
20    A.  Yes.
21    Q.  Okay.  And do you remember how many of these
22 there were?
23    A.  No.
24    Q.  And did those spreadsheets, or those -- how
25 were those kept?  Were those on your computer?

264

1    Q.  So what happened to it?
2    A.  When I went to India, it was given to somebody
3 else.  Reimaged, I assume, and given to somebody else.
4    Q.  And do you know who it was given to?
5    A.  No.
6    Q.  How do you know it was reimaged?
7    A.  I don't.
8    Q.  Well, you said you assumed it was reimaged.
9    A.  Exactly.
10    Q.  So why do you assume that?
11    A.  Because it was a computer.
12    Q.  So what does "reimaged" mean?
13    A.  Everything deleted off it and having it be
14 reimaged for a new user.
15    Q.  Okay.  And when did --
16       So you're saying that that occurred when you
17 went to India?
18    A.  Yes.
19    Q.  Okay.  And do you remember anything else about
20 that?
21       MR. GLENNON:  Objection.  Vague and ambiguous.
22       THE WITNESS:  No.
23       MR. GREENSTEIN:  Q.  Now, do you know anyone
24 else that moved to India whose computer was reimaged?
25    A.  No.

353

1   question again?
2   THE REPORTER:  "Question:  Did any of those
3       reports that you -- reports or documents that
4       you were asked about in that line of
5       questioning by defense counsel, did any of
6       those relate to cash receipts that were issued
7       in connection with a 550 invoice?"
8   MR. GLENNON:  Objection.  Assumes facts not in
9   evidence, vague and ambiguous and lack of foundation.
10   THE WITNESS:  I don't understand.
11   MR. GREENSTEIN:  Q.  Okay.  Well, let's take
12   the unapplied identified receipts report.  Do you
13   remember testifying about that?
14   A.  Yes.
15   Q.  Did that report ever refer to a 550 invoice?
16   MR. GLENNON:  Objection.  Asked and answered.
17   THE WITNESS:  I don't believe so, no.
18   MR. GREENSTEIN:  Q.  Okay.  Did that unapplied
19   identified receipts report ever refer to items of
20   unapplied cash that were related to a 550 invoice?
21   MR. GLENNON:  Objection.  Vague and ambiguous,
22   asked and answered, lack of foundation.
23   THE WITNESS:  I don't know.
24   MR. GREENSTEIN:  Q.  Okay.  In the unapplied,
25   unidentified receipts report, did that ever refer to

355

1   MR. GREENSTEIN:  Q.  So for the items of
2   unapplied cash that were reflected in the 1,099
3   spreadsheet, were any of those related to any underlying
4   transaction related to a 550 invoice?
5   MR. GLENNON:  Objection.  Asked and answered,
6   vague and ambiguous.
7   THE WITNESS:  No, I don't believe so.
8   MR. GLENNON:  Eli, it's 20 to 7:00.  You've
9   used your 7 hours.  He can get an accounting on the time
10   if you want.  How much more do you got?
11   MR. GREENSTEIN:  No, I'm done.
12   MR. GLENNON:  Okay.
13       Before we go off the record, let me just thank
14   Molly again for staying near 7:00 o'clock.
15       --oOo--
16       (Whereupon, the deposition was
17       concluded at 6:34 P.M.)
18
19   Dated: _____   Signed: _____
20
21
22
23
24
25

354

1   transactions or history of a particular item of
2   unapplied cash that related to a 550 voice?
3   MR. GLENNON:  Objection.  Vague and ambiguous,
4   asked and answered and lack of foundation.
5   THE WITNESS:  I don't know.
6   MR. GREENSTEIN:  Q.  And do you know what an
7   audit trail is?
8   A.  No.
9   Q.  Did the 1,099 spreadsheet that you testified
10   about earlier, did that include any information about
11   underlying transactions?  And when I say "underlying
12   transactions", I mean invoices generated, payments by
13   the customer, credit memos, did that 1,099 spreadsheet
14   ever refer to underlying transactions that were related
15   to 550 invoices?
16   MR. GLENNON:  Objection.  Asked and answered,
17   compound, vague and ambiguous, lack of foundation.
18   THE WITNESS:  So you're asking if the receipt
19   would ever trace me back to the debit memo?
20   MR. GREENSTEIN:  Q.  Yes.
21   A.  No.
22   Q.  Okay.  Would anything reflected on the 1,099
23   spreadsheet refer you back to a 550 debit memo?
24   MR. GLENNON:  Objection.  Asked and answered.
25   THE WITNESS:  No, I don't believe so.

356

1
2       REPORTER'S CERTIFICATE
3
4       I hereby certify that the foregoing is a true
5   record of the testimony as reported to the best of my
6   ability by me, a Certified Shorthand Reporter and a
7   disinterested person, and was thereafter transcribed
8   under my direction into typewriting by computer.
9
10       I FURTHER CERTIFY that I am not interested in
11   the outcome of the said action and not connected with
12   nor related to any of the parties in said action or
13   their respective counsel.
14   Dated: _____   _____

       APRIL DAWN HEVEROH, CSR
       CSR NO. 8759
15
16
17
18
19
20
21
22
23
24
25

1

2                    REPORTER'S CERTIFICATE

3

4           I hereby certify that the foregoing is a true

5    record of the testimony as reported to the best of my

6    ability by me, a Certified Shorthand Reporter and a

7    disinterested person, and was thereafter transcribed

8    under my direction into typewriting by computer.

9

10          I FURTHER CERTIFY that I am not interested in

11   the outcome of the said action and not connected with

12   nor related to any of the parties in said action or

13   their respective counsel.

14   Dated: _4-25-06_   _____
                         APRIL DAWN HEVEROH, CSR

15                              CSR NO. 8759

16

17

18

19

20

21

22

23

24

25

# EXHIBIT JJJ

Summers, Joel  3/21/2006  8:58:00 AM

1

```
1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
4
5    In re ORACLE CORPORATION
6    SECURITIES LITIGATION
7          Master File No. C-01-0988-MJJ
8    This Document Relates To:
9        ALL ACTIONS.
10    _____/
11              ---o0o---
12            CONFIDENTIAL
13       DEPOSITION OF JOEL SUMMERS
14       TUESDAY, MARCH 21, 2006
15              ---o0o---
16
17    SHEILA CHASE & ASSOCIATES

18       REPORTING FOR:

19    LiveNote World Service

20    221 Main Street, Suite 1250

21    San Francisco, California 94105

22    Phone:  (415) 321-2311

23    Fax:  (415) 321-2301
23    Reported by:
24    DIANA NOBRIGA, CSR, CRR
25    LICENSE NO. 7071
```

2

```
1              I N D E X
2         INDEX OF EXAMINATION
3                          PAGE
4    EXAMINATION BY MS. ANDERSON        7, 268
5    EXAMINATION BY MR. GIBBS           261
6              ---o0o---
7         INDEX OF EXHIBITS
8    DESCRIPTION                   PAGE
9
10   Exhibit 1   Revised Stipulated Protective
11          Order Governing Confidentiality  126
12   Exhibit 2   E-mail from CAG@us.oracle.com to
13          apps_hrd_mgr@uk.oracle.com, dated
14          27 mAR 2001 with attached document
15          entitled: HRMS All Bugs Report   126
16   Exhibit 3   E-mail dated 25 Feb 2001 from
17          crmopsqa_us@oracle.com to
18          mbarrene@us.oracle.com, et al,
19          Subject:  Bug Summary: ERP bug/
20          issues impacting CRM11i        141
21   Exhibit 4   Document entitled: Oracle Software
22          Powers the Internet            146
23
24
25
```

3

```
1    Exhibit 5   Two-page document entitled:
2          Oracle Confidential            160
3    Exhibit 6   E-mail dated 02 Mar 2001 from
4          Robert Hipps to Michael Murphy,
5          Subject:  Re: Liberty Mutual
6          Discoverer Problems            172
7    Exhibit 7   E-mail dated 03 Jan 2001 from
8          Cliff Godwin to Sanders,Roger,
9          Subject:  Fwd: R11i HRMS Online
10         performance Issues at Liberty
11         Mutual                         175
12   Exhibit 8   E-mail dated 28 Mar 2001 from
13         jdenis to Jean.denis@oracle.com,
14         et al, Subject: McDonald's/Chipotle
15         3/28 Status Report 1:30 PM (est)  179
16   Exhibit 9   Two-page document entitled:
17         Functional Issues Post 411i-B    199
18   Exhibit 10  Document entitled: Q1 R11i Product
19         Issues by Area                 204
20   Exhibit 11  E-mail dated 8 Jan 2001 from Joel
21         Summers to Mary Ann Anthony,
22         Subject:  Re: (Fwd: Bimbo delay)  209
23
24
25
```

4

```
1    Exhibit 12  E-mail dated 17 May 2001 from
2          Linda Clarkson to Karen Cooprider,
3          Subject: Payroll Performance CAB -
4          Meeting Documents              227
5    Exhibit 13  E-mail dated 28 Oct 2000 from
6          Kevin Glynn to Wohl, Ronald,
7          Subject:  (Fwd: R11i HRMS Issues)  230
8
9
10       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
11           PAGE   LINE
12            15    12
13            81    17
14            82     5
15             ---o0o---
16
17
18
19
20
21
22
23
24
25
```

253

1     And I had a member of my team who I had
2   monitoring that.  And I don't recall that they had a lot
3   of issues.  I met with them as well.
4     Q.  Okay.  And when was -- when had Posco
5   implemented the suite 11i, if you know?
6     A.  They were an early customer, but I don't
7   remember the dates.
8     Q.  And when did they purchase and implement the
9   HRMS?
10    A.  I believe they purchased HRMS at the same time
11  as part of the suite.  And the implementation I believe
12  was a year or two years afterwards.
13    Q.  Would that be in 2001?
14    A.  I --
15    Q.  Okay.  And who on your team was working with
16  Posco?
17    A.  Gentleman by the name of Allen Cai.
18    Q.  And why did Posco delay the implementation of
19  the HRMS components of suite 11i?
20    A.  I'm not sure they delayed it, per se.  I
21  believe that they simply had in their mind a staged
22  implementation.
23    Q.  Another customer I would like to ask you about
24  is Vodafone?
25    A.  Vodafone, yes.

254

1     Q.  Was Vodafone a customer that purchased HRMS
2   11i?
3     A.  They were an HRMS customer.
4     Q.  Okay.  And had they purchased the suite 11i?
5     A.  I don't -- I don't know.
6     Q.  Okay.  When did they implement HRMS?
7     A.  I don't recall exactly the time frame.
8     Q.  Do you recall hearing of customer complaints
9   with respect to the implementation of HRMS?
10    A.  I remember -- I remember customer happiness.
11  I don't remember a complaint, per se.
12    Q.  Do you remember hearing about any customer
13  complaints with respect to the products themselves?
14    A.  Not that I recall.  I just don't know.  I
15  don't remember.
16    Q.  What about University of Pittsburgh?
17    A.  I'm not -- not familiar with them.
18    Q.  Select Medical?
19    A.  Select Medical, yes.
20    Q.  Okay.  And when did Select Medical implement
21  HRMS 11i?
22    A.  I don't recall.
23    Q.  Did they implement -- okay.  But they were an
24  HRMS customer?
25    A.  They were.

255

1     Q.  Do you recall hearing about problems they
2   encountered with HRMS?
3     A.  They were on my radar at some point in time.
4     Q.  And when you say they were on the radar, does
5   that indicate to you there were problems being reported
6   with the implementation?
7     A.  Again, in the broad perspective of problem
8   being, could be this, could be this, could be that,
9   could be this --
10    Q.  A customer issue.
11    A.  Yeah, I believe that was the case.
12    Q.  And do you recall any of the specifics of the
13  issues encountered?
14    A.  No.
15    Q.  And do you know who on your team might have
16  more information about that?
17    A.  Beth Correa.  Oh, yeah, she was on my team at
18  the time.
19    Q.  Okay.  And when was that implementation?
20    A.  I --
21    Q.  Was it in the 2000/2001 time period?
22    A.  I can't -- Jennie, I just can't recall.  These
23  customers and time periods is --
24    Q.  Just a few more.  Master Protection?
25    A.  Don't remember them.

256

1     Q.  Bank First.
2     A.  Don't remember them.
3     Q.  Portal?
4     A.  Don't remember them.
5     Q.  Retech or Retech?
6     A.  Retech, I don't know if they were my customer
7   or not.
8     Q.  Do you recall hearing about their
9   implementation?
10    A.  No.
11    Q.  Okay.  Are you familiar with the term
12  interoperable as it relates to software?
13    A.  It sounds like one of those great software
14  terms that could mean a lot of different things.  And
15  I'm not sure what it means in this -- I'm not sure what
16  context you have.
17    Q.  If one were to say that -- are you -- are you
18  familiar with interoperability as it's used at Oracle?
19    MR. GIBBS:  Objection; still vague.
20    Answer if you can.
21    THE WITNESS:  I don't recall that term being a
22  term that was used a lot, no.  It may have been, but I
23  don't recall it.
24    MR. GIBBS:  Q.  When do you recall it being
25  used?

257

1    A.  I don't.  It is just a word that gets floated
2   around in the software business.
3    Q.  And what does it mean to you when you hear it
4   floated around?
5    A.  When I hear it floated around, I believe that
6   it means that I can -- I can plug and play.  I can take
7   a component here and plug out that module and then plug
8   in another module, and that those modules will behave --
9   they will play together nicely.
10    Q.  Okay.  In your experience, is there a certain
11   standard used to assess whether a product was ready to
12   be commercially released?
13    A.  You say a standard.  I am not familiar with --
14   do you mean an Oracle standard?
15    Q.  Yes.
16    A.  Or general industry standard or --
17    Q.  Well, factors that at Oracle would be used to
18   assess whether the product was ready for commercial
19   release.
20    A.  Factors --
21    Q.  At Oracle, first.
22    A.  Factors would be related to functionality that
23   was included.  Factors would be related to quality
24   metrics of the individual QA organizations and/or the
25   central packaging team.  Metrics would be related to

258

1   whether there was an underlying change in technology
2   during the release cycle, and had we embraced that
3   underlying technology change appropriately with testing,
4   et cetera.
5    Q.  Okay.  So what would be the minimum standards
6   for functionality, metrics, the factors you described,
7   before a product is considered ready for commercial
8   release?
9    A.  And I don't recall that there was a standard
10   for that.
11    Q.  Okay, at Oracle?
12    A.  In general.
13    Q.  Okay.
14    A.  Or, yes, at Oracle.
15    Q.  And these factors that you identified, do you
16   know -- were these the factors that were applied to HRMS
17   11i?
18    A.  I set standards for HRMS.  And again, 11i is
19   such a -- is a very broad term, you know, it's 11i.0,
20   it's 11i.1, and then all my release chain modules.  My
21   factors are generally -- generally relate to what my QA
22   department would see in numbers of defects, and whether
23   we had embraced the functionality that we intended to.
24    Q.  Okay.
25    A.  And the third thing I mentioned as well, which

259

1   is had we also incorporated if a technology change had
2   taken place during the release development process, had
3   we embraced that new technology.
4    Q.  And what number of defects would mean -- would
5   indicate to you that a product was not ready for
6   commercial release?
7    A.  It is no specific number, per se.  In general,
8   my goal was to release with zero P1s.  And my goal was
9   to release with, you know, a limited number of P2s.
10   Those would have to be reviewed on an individual basis.
11    Q.  Okay.  And were those goals met with respect
12   to HRMS 11i in --
13    A.  11i.0, 1, 2, 3, 4.
14    Q.  -- first in May of 2000?
15    A.  We generally met those goals.
16    Q.  For version 1?
17    A.  Again, we generally met those goals.
18    Q.  Do you remember any specifics --
19    A.  I do not remember.  I think what you're asking
20   for me is the defect counts that we had, and I don't
21   recall those, no.
22    Q.  Okay.  Do you -- for the release of version 2,
23   in the fall of 2000, do you recall whether you achieved
24   those goals of zero P1s and limited P2s?
25    A.  I don't recall specifically.

260

1    Q.  And what about for release 3 in January?
2    A.  I don't recall specifically.  And again --
3    Q.  Okay.  And do you know who at Oracle would set
4   the metrics or standards for determining whether a
5   product was ready for commercial release in general?
6    MR. GIBBS:  Objection; misstates his
7   testimony.
8    MS. ANDERSON:  Q.  For Oracle applications?
9    THE WITNESS:  If we change the word standards,
10   if you go back to the word metrics.
11    MS. ANDERSON:  Q.  Metrics.
12    A.  Ron Wohl would assess the metrics for the ERP
13   components at the time.  And Mark Barrenechea would, I
14   assume, assess the metrics for CRM.
15    Q.  And were there written reports about these
16   metrics evaluations?
17    A.  Written reports?  I don't recall the form that
18   the communications took.
19    Q.  Okay.  Were the results of these analyses
20   relayed to you and other people at Oracle?
21    A.  They were certainly relayed within Ron Wohl's
22   team, and Ron's direct reports, sure.
23    Q.  And were they relayed to Larry Ellison?
24    A.  I don't know.
25    Q.  Okay.  Do you know if they were relayed to

269

1       MS. ANDERSON:  Thank you.  I have no further
2    questions.
3       MR. GIBBS:  Me neither.
4       VIDEOGRAPHER:  In the deposition of Joel
5    Summers, this marks the end of tape five, Volume I.  The
6    original videotapes will be retained by LiveNote World
7    Service.  Going off record.  The time on the monitor is
8    5:47.
9       (Deposition concluded at 5:47 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

271

1       CERTIFICATE OF DEPOSITION OFFICER
2       I, DIANA NOBRIGA, hereby certify that the
3    witness in the foregoing deposition was by me duly sworn
4    to testify to the truth, the whole truth, and nothing
5    but the truth in the within-entitled cause; that said
6    deposition was taken at the time and place therein
7    stated; that the testimony of said witness was reported
8    by me, a Certified Shorthand Reporter and disinterested
9    person, and was thereafter transcribed into typewriting,
10    and that the pertinent provisions of the applicable code
11    or rules of civil procedure relating to the notification
12    of the witness and counsel for the parties hereto of the
13    availability of the original transcript of the
14    deposition for reading, correcting and signing have been
15    met.
16       I further certify that I am not of counsel or
17    attorney for either or any of the parties to said
18    deposition, nor in any way interested in the outcome of
19    the cause named in said action.
20       In WITNESS WHEREOF, I have hereunto
21    subscribed by my hand this 31st day of March 2006.
22
23
24       _____
25       DIANA NOBRIGA, CSR NO. 7071

270

1       CERTIFICATE OF WITNESS
2
3          I, the undersigned, declare under
4    penalty of perjury that I have read the foregoing
5    transcript, and I have made any corrections,
6    additions, or deletions that I was desirous of
7    making; that the foregoing is a true and correct
8    transcript of my testimony contained therein.
9
10    EXECUTED this _____ day of _____,
11
12    2006, at _____, _____.
13       (City)          (State)
14
15
16
17          _____
18       JOEL SUMMERS
19
20
21
22
23
24
25

1           CERTIFICATE OF DEPOSITION OFFICER

2             I, DIANA NOBRIGA, hereby certify that the

3   witness in the foregoing deposition was by me duly sworn

4   to testify to the truth, the whole truth, and nothing

5   but the truth in the within-entitled cause; that said

6   deposition was taken at the time and place therein

7   stated; that the testimony of said witness was reported

8   by me, a Certified Shorthand Reporter and disinterested

9   person, and was thereafter transcribed into typewriting,

10  and that the pertinent provisions of the applicable code

11  or rules of civil procedure relating to the notification

12  of the witness and counsel for the parties hereto of the

13  availability of the original transcript of the

14  deposition for reading, correcting and signing have been

15  met.

16          I further certify that I am not of counsel or

17  attorney for either or any of the parties to said

18  deposition, nor in any way interested in the outcome of

19  the cause named in said action.

20          In WITNESS WHEREOF, I have hereunto

21  subscribed by my hand this 31st day of March 2006.

22

23

24

25                  DIANA NOBRIGA, CSR NO. 7071

# EXHIBIT KKK

1

```
1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
4
5    In re ORACLE CORPORATION
6    SECURITIES LITIGATION.
7                    Master File No. C-01-0988-MJJ
8    This Document Relates To:
9
10     ALL ACTIONS.
11   _____/
12
13            ---o0o---
14            CONFIDENTIAL
15     DEPOSITION OF SOHAIB ABBASI
16      TUESDAY, MAY 9, 2006
17            ---o0o---
18
19     SHEILA CHASE & ASSOCIATES
           REPORTING FOR:
20       LiveNote World Service
         221 Main Street, Suite 1250
21     San Francisco, California 94105
         Phone: (415) 321-2311
22         Fax: (415) 321-2301
23
     Reported by:
24   DIANA NOBRIGA, CSR, CRR
     LICENSE NO. 7071
25
```

2

```
1              I N D E X
2         INDEX OF EXAMINATION
3                          PAGE
4    EXAMINATION BY MS. RADCLIFFE          8
5    EXAMINATION BY MS. BUSBY           159
6              ---o0o---
7         INDEX OF EXHIBITS
8    DESCRIPTION                   PAGE
9    Exhibit 1    Subpoena in a Civil Case     45
10   Exhibit 2    Revised Stipulated Protective
11        Order Governing Confidentiality     95
12   Exhibit 3    E-mail from John L. Hall, sent
13        February 28, 2001 to Sohaib
14        Abbasi; Henley, Jeffrey; Catz,
15        Safra                        99
16   Exhibit 4    E-mail from Sohaib Abbasi, sent
17        March 1, 2001 to Lawrence
18        Ellison; Hall, John          103
19   Exhibit 5    E-mail from Dennis F. Bonilla,
20        sent January 14, 2001 to Sohaib
21        Abbasi                       106
22   Exhibit 6    E-mail from Dennis F. Bonilla,
23        sent January 22, 2001 to
24        Sohaib Abbasi; Hall, John      108
25
```

3

```
1    Exhibit 7    E-mail from John L. Hall, sent
2        January 24, 2001 to Sohaib
3        Abbasi                       116
4    Exhibit 8    E-mail from Dennis F. Bonilla,
5        sent January 30, 2001 to John L.
6        Hall                         121
7    Exhibit 9    E-mail from Sohaib Abbasi, sent
8        January 26, 2001 to Lawrence
9        Ellison                      124
10   Exhibit 10    E-mail from Safra A. Catz, sent
11        January 29, 2001 to Ellison,
12        Lawrence                     127
13   Exhibit 11    E-mail from Dan Sharpley, sent
14        February 2, 2001, Subject:
15        Education Q3 Forecast 1/29/01    130
16   Exhibit 12    E-mail from John L. Hall, sent
17        March 14, 2001 to Sohaib Abbasi    132
18   Exhibit 13    E-mail from Ron Wohl, sent
19        March 16, 2001 to John L. Hall    135
20   Exhibit 14    E-mail from Jeremy Burton, sent
21        November 7, 2000 to sabbasi      136
22   Exhibit 15    E-mail from Jeff Henley, sent
23        February 27, 2001 to lellison;
24        jnussbau; jhenley; et al.       138
25
```

4

```
1    Exhibit 16    E-mail from Don Klaiss, sent
2        July 13, 2001 to John Reilly;
3        Abbasi, Sohaib; Godwin, Clifford    140
4    Exhibit 17    E-mail from Ka Wai Leung, sent
5        May 15, 2001 to Dennis Schurmeier    143
6    Exhibit 18    E-mail from Ka Wai Leung, sent
7        June 30, 2000 to Mark Milani     146
8    Exhibit 19    E-mail from Ka Wai Leung, sent
9        May 24, 2000 to snaroff@apple.com    147
10   Exhibit 20    E-mail from Sohaib Abbasi, $
11        May 17, 2001 to Godwin.Clifford    148
12   Exhibit 21    E-mail from Marco Tilli, sent
13        February 9, 2001 to Ron Giljum    150
14   Exhibit 22    Executive Dialogs - E-Business
15        Suite, Wednesday, October 3     154
16   Exhibit 23    E-mail from Titina Ott, sent
17        February 26, 2001 to
18        sohaib.abbasi@oracle.com        156
19
20
21
22
23
24
25
```

93

1  the management teams.
2      Q.  Do you know if there were any difficulties
3  discussed during these conversations with the various
4  modules within Oracle's suite 11i being able to speak
5  with each other?
6      MR. BIRN:  Objection; vague.
7      THE WITNESS:  I don't remember any --
8  any specific conversations dealing with different
9  modules being able to speak to one another.
10     MS. RADCLIFFE:  Q.  Do you remember that issue
11 ever arising while you were at Oracle?
12     MS. BUSBY:  Objection; vague.
13     THE WITNESS:  Over the years we have had lots
14 of conversations about different ways that the different
15 software products can communicate with one another.  So
16 I would expect that in the normal course of all the
17 software development over the years, we would have had
18 such conversations.
19     MS. RADCLIFFE:  Q.  Do you recall any
20 conversations with respect to the modules within suite
21 11i?
22     MS. BUSBY:  Objection; vague.
23     THE WITNESS:  I do not recall any specific
24 conversations about 11i modules talking to one another.
25     MS. RADCLIFFE:  Q.  The term intraoperable,

94

1  what is your understanding of that term?
2      MS. BUSBY:  Objection; vague.
3      THE WITNESS:  If I were to use that term, I
4  would use it to convey that the different parts within a
5  larger software offering work with one another.
6      MS. RADCLIFFE:  Q.  And is that what you
7  understood the term to mean when Oracle indicated that
8  Oracle's suite 11i was fully integrated and
9  intraoperable out of the box?
10     A.  That's what --
11     MS. BUSBY:  Objection; vague with respect to
12 which indications.
13     THE WITNESS:  That was my interpretation of
14 it, that they would work -- that it works with -- the
15 various pieces within the e-business suite work with one
16 another.
17     MS. RADCLIFFE:  Go off the record.
18     VIDEOGRAPHER:  We are going off the record.
19 The time is 12:30.
20     (Lunch recess, 12:30 p.m. - 1:40
21         p.m.)
22     VIDEOGRAPHER:  We are back on the record.  The
23 time is 1:40.
24     MS. RADCLIFFE:  Q.  And during the lunch
25 break, Mr. Abbasi, we provided to your counsel a

95

1  document entitled, "Revised Stipulated Protective Order
2  Governing Confidentiality," which I understand you have
3  signed.
4      A.  Yes, I have.
5      MS. RADCLIFFE:  We'll introduce that as the
6  next exhibit in order, which is Exhibit 2.
7      (Exhibit 2 marked for
8       identification.)
9      MS. RADCLIFFE:  And I also understand counsel
10 for Mr. Abbasi has also agreed to the terms of that
11 order.
12     MR. BIRN:  Yes, that's correct.
13     MS. RADCLIFFE:  Q.  Right before the break we
14 were discussing the term intraoperable.  And I wanted to
15 ask you whether you had conversations with -- or
16 discussions, I should say, with the same individuals we
17 discussed with respect to the term fully integrated.
18 And let me just phrase that as a question.
19     Did you participate in discussions where the
20 term intraoperable was discussed with Mr. Wohl?
21     A.  I don't recall any specific meeting where you
22 discussed a specific -- that specific term.
23     Q.  Do you recall any discussions where
24 Mr. Ellison was present with respect to the term
25 intraoperable?

96

1      A.  No, I do not.
2      Q.  Do you recall any discussions with
3  Mr. Barrenechea with respect to the term intraoperable?
4      A.  No, I do not.
5      Q.  Do you recall any discussions with Mr. Henley
6  with respect to the term intraoperable?
7      A.  No, I do not.
8      Q.  Do you recall any discussions with Ms. Catz
9  with respect to the term intraoperable?
10     A.  No, I do not.
11     Q.  And do you recall any discussions with
12 Mr. Sanderson with respect to the term intraoperable?
13     A.  No, I do not.
14     Q.  Do you have any knowledge of whether Oracle's
15 suite 11i was fully integrated and intraoperable out of
16 the box when it was first released?
17     MS. BUSBY:  Objection; vague.
18     THE WITNESS:  I am aware that the design of
19 Oracle Applications was around a common scheme that
20 enabled it to be fully integrated.
21     MS. RADCLIFFE:  Q.  And do you know if the
22 product functioned as designed when it was first
23 released?
24     MR. BIRN:  Objection; vague.
25     You can answer.

129

1   Mr. Hall?
2       A.   Yes, with John Hall I did.
3       Q.   And beyond those e-mails that we've looked at
4   regarding this issue, were there any oral conversations
5   you had with Mr. Hall regarding this issue?
6       A.   Yes, I did.
7       Q.   And do you recall the nature of those
8   conversations?
9       A.   It would be very similar to the text in this
10  e-mail, which is how long is it taking us to process the
11  order, and what the staffing was.
12      Q.   And do you recall who, for lack of a better
13  word, was the point person in reaching a resolution of
14  this issue?
15      A.   There was no one point person.  Given that we
16  were trying to look at alternatives to some of the
17  orders, there were different people that were looking at
18  that.  There were people that were looking at how, as
19  was referred to in the e-mail, we make up for the
20  shortfall in different geographies.  There were people
21  that were looking at specific issues dealing with the
22  staffing.  There were so many different things that were
23  being looked at.  There was no one point person for all
24  the different things.
25      Q.   And as the head of this division, were you

130

1   ultimately responsible for reaching a resolution of the
2   issue?
3       A.   Yes.
4       MS. RADCLIFFE:  Okay.
5       MR. BIRN:  Can we take a break when it's
6   convenient?
7       MS. RADCLIFFE:  Certainly can.
8       VIDEOGRAPHER:  We're going off the record.
9   The time is 2:56.
10          (Recess, 2:56 p.m. - 3:07 p.m.)
11      VIDEOGRAPHER:  We are back on the record.  The
12  time is 3:07.
13      MS. RADCLIFFE:  Mark next in order Exhibit 11.
14          (Exhibit 11 marked for
15           identification.)
16      MS. RADCLIFFE:  For the record, it's a
17  multiple page document NDCA-ORCL 133796 to 133798.
18      Q.   Mr. Abbasi, have you seen this document
19  before?
20      A.   Yes, I have.
21      Q.   And could you generally describe what this
22  document is?
23      A.   This document contains the then-current
24  education forecast, dated the last week of January,
25  2001.

131

1       MR. BIRN:  You should be careful.  There is a
2   top e-mail.  I'm not sure if you've seen that or not.
3   You seem to be copied on it on the first page.
4       THE WITNESS:  That original e-mail was
5   forwarded by John Hall to me, and I commented on the
6   forecast and some of the steps that we were taking to
7   reduce the time that it was taking for us to take
8   orders.  My e-mail was then forwarded, and that's the
9   part that I have not seen.
10      MS. RADCLIFFE:  Q.   And do you have any reason
11  to believe that this document was not created in the
12  ordinary course of Oracle's business?
13      A.   No, I do not have any reason to believe that.
14      Q.   And does this document refresh your
15  recollection whether or not you provided updates with
16  regards to the forecast to Mr. Ellison?
17      A.   I did provide him with this update.
18      Q.   And is it -- does it refresh your recollection
19  as to the impact of the GSI OM/OTA issues on the
20  education forecast for the fiscal quarter -- third
21  fiscal quarter of Oracle in 2001?
22      A.   Yes, it does.
23      Q.   And what is your recollection of the impact of
24  these issues on the forecast for the third quarter of
25  2001 of Oracle's fiscal year?

132

1       A.   The immediate impact was that it was taking us
2   much longer to book an order, and that, in turn,
3   affected our revenue in the U.S., as we were not able to
4   take orders as quickly as we were in the past.
5       Q.   And was that apparent as of February 1st of
6   2001?
7       A.   Yes, it was apparent where we were -- we knew
8   that we had -- that it was taking us longer to take the
9   orders at that point.  We also had a forecast at that
10  point that showed where we would be as of that point for
11  the quarter in education.
12      Q.   Did those forecasts take into account the
13  impact of the GSI OM/OTA issues?
14      A.   It would seem that the forecast did take that
15  into account.
16      MS. RADCLIFFE:  Thank you.  Mark this as
17  Abbasi Exhibit 12.
18          (Exhibit 12 marked for
19           identification.)
20      MS. RADCLIFFE:  For the record, this is a
21  multi-paged document, Bates number NDCA-ORCL 158192 to
22  158197.
23      Q.   Mr. Abbasi, have you seen this document
24  before?
25      A.   Yes, I believe I have.

133

1    Q.  And can you generally describe this document?
2    A.  It seems it has two parts.  One is discussing
3  the education results for Q3, fiscal Q3 of 2001, and
4  then the second part was the forecast for the subsequent
5  fiscal quarter for education.
6    Q.  For Q4 2001?
7    A.  Yes.
8    Q.  And do you have any reason to believe this
9  document was not created in Oracle's ordinary course of
10  business?
11    A.  No, I do not.
12    Q.  So does this document refresh your
13  recollection regarding the estimated loss of revenue as
14  a result of the processing -- extra processing time it
15  was taking to place orders at Oracle University?
16    A.  Yes, it does.
17    Q.  And what is that approximate amount of
18  revenue?
19    A.  I didn't -- it doesn't attribute a certain
20  dollar amount to the shortfall.  It just refers to the
21  results in Americas as having been impacted.  And it
22  also states that we're beginning to see performance
23  improvements.
24    Q.  Do you see the statement that indicates that
25  "The estimated lost revenue as a result of lower ILT and

134

1  TBT courses booked was approximately $20 million for the
2  quarter"?
3    A.  Yes.
4    Q.  Were there other courses that also were
5  impacted as a result of the process time issue?
6    A.  No.  Not that I can recall.
7    Q.  And do you know the approximate percentage
8  loss a $20 million loss in education was for the fiscal
9  third quarter for Oracle?
10    MR. BIRN:  Objection; vague.
11    I don't think the question makes sense, but
12  you can answer.
13    THE WITNESS:  Can you restate that question,
14  please?
15    MS. RADCLIFFE:  Q.  Sure.  Do you know --
16  well, I'll phrase it another way.
17    Do you know approximately how much revenue was
18  earned in the third quarter of fiscal year by the
19  education division at Oracle?
20    A.  Just looking at the numbers in front of me, it
21  was 110 million for the year -- for the quarter.
22    Q.  And do you have any reason to believe that
23  that number is not accurate?
24    A.  No, I do not have any reason to believe that.
25    MS. RADCLIFFE:  You can go ahead and set that

135

1  document aside.
2    Next mark in order, which I believe is Abbasi
3  Exhibit 13.
4    (Exhibit 13 marked for
5    identification.)
6    MS. RADCLIFFE:  For the record, it's a
7  multiple page document Bates number NDCA-ORCL 158356 to
8  158358.
9    Q.  Do you recognize this document, Mr. Abbasi?
10    A.  Yes, I do.
11    Q.  And were you a recipient of this document?
12    A.  I was copied on this document, on this e-mail.
13    Q.  And can you generally describe the e-mail?
14    A.  This is an e-mail from John Hall to Ron Wohl
15  requesting certain reports to be made available.
16    Q.  And do you have any reason to believe that
17  this document was not created in Oracle's normal course
18  of business?
19    A.  No, I do not.
20    Q.  Mr. Hall indicates that there is a concern
21  relating to Oracle's fiscal Q4 performance, that the
22  U.S. business is not recovering from the
23  January/February implementation.
24    Do you know which implementation Mr. Hall is
25  referring to?

136

1    MR. BIRN:  Just so the record is clear, I
2  think this is about "our Q4 performance."  You said
3  "Oracle's."
4    MS. RADCLIFFE:  Certainly.
5    THE WITNESS:  And "our" would be referring to
6  education.
7    I believe this is referring to use of 11i by
8  Oracle Education.
9    MS. RADCLIFFE:  Do you know if -- strike that.
10  You can put that document aside, please.
11    This is Abbasi Exhibit 14.
12    (Exhibit 14 marked for
13    identification.)
14    MS. RADCLIFFE:  For the record it's a
15  multi-paged document, Bates No. NDCA-ORCL 152840 to
16  152843.
17    Q.  Do you recognize this document, Mr. Abbasi?
18    A.  Yes, I do.
19    Q.  And were you a recipient of this document?
20    A.  I was copied on this e-mail note.
21    Q.  And do you have any reason to believe that
22  this document was not created in Oracle's normal course
23  of business?
24    A.  No, I do not.
25    Q.  The e-mail indicates that the U.S. revenue is

Abbasi, Sohaib  5/9/2006  9:06:00 AM

161

1  we should stipulate for the record that Mr. Abbasi -- if
2  it is agreeable with his counsel -- will have 30 days
3  from his counsel's receipt of the record, the transcript
4  in this action, to review and make any changes that they
5  deem appropriate.
6       And you can return the original transcript to
7  the court reporter.
8       MR. BIRN:  That's fine.  Thank you.
9       VIDEOGRAPHER:  This concludes videotape number
10  three, Volume I, in the deposition of Sohaib Abbasi.
11  All original videotapes will be retained by LiveNote
12  World Service.  We are going off the record.  The time
13  is 4:30.
14
15       (Deposition adjourned at 4:30 p.m.)
16
17
18
19
20
21
22
23
24
25

162

1       CERTIFICATE OF WITNESS
2
3       I, the undersigned, declare under
4  penalty of perjury that I have read the foregoing
5  transcript, and I have made any corrections,
6  additions, or deletions that I was desirous of
7  making; that the foregoing is a true and correct
8  transcript of my testimony contained therein.
9
10  EXECUTED this _____ day of _____,
11
12  2006, at _____, _____.
13      (City)      (State)
14
15
16
17      _____
18      SOHAIB ABBASI
19
20
21
22
23
24
25

163

1      CERTIFICATE OF DEPOSITION OFFICER
2     I, DIANA NOBRIGA, hereby certify that the
3  witness in the foregoing deposition was by me duly sworn
4  to testify to the truth, the whole truth, and nothing
5  but the truth in the within-entitled cause; that said
6  deposition was taken at the time and place therein
7  stated; that the testimony of said witness was reported
8  by me, a Certified Shorthand Reporter and disinterested
9  person, and was thereafter transcribed into typewriting,
10  and that the pertinent provisions of the applicable code
11  or rules of civil procedure relating to the notification
12  of the witness and counsel for the parties hereto of the
13  availability of the original transcript of the
14  deposition for reading, correcting and signing have been
15  met.
16     I further certify that I am not of counsel or
17  attorney for either or any of the parties to said
18  deposition, nor in any way interested in the outcome of
19  the cause named in said action.
20     In WITNESS WHEREOF, I have hereunto
21  subscribed by my hand this 15th day of May 2006.
22
23
24     _____
25     DIANA NOBRIGA, CSR NO. 7071

1       CERTIFICATE OF DEPOSITION OFFICER

2              I, DIANA NOBRIGA, hereby certify that the

3   witness in the foregoing deposition was by me duly sworn

4   to testify to the truth, the whole truth, and nothing

5   but the truth in the within-entitled cause; that said

6   deposition was taken at the time and place therein

7   stated; that the testimony of said witness was reported

8   by me, a Certified Shorthand Reporter and disinterested

9   person, and was thereafter transcribed into typewriting,

10  and that the pertinent provisions of the applicable code

11  or rules of civil procedure relating to the notification

12  of the witness and counsel for the parties hereto of the

13  availability of the original transcript of the

14  deposition for reading, correcting and signing have been

15  met.

16             I further certify that I am not of counsel or

17  attorney for either or any of the parties to said

18  deposition, nor in any way interested in the outcome of

19  the cause named in said action.

20             In WITNESS WHEREOF, I have hereunto

21  subscribed by my hand this 15th day of May 2006.

22

23

24

25             DIANA NOBRIGA, CSR NO. 7071

# EXHIBIT LLL

Campos, Raul  3/28/2006  9:02:00 AM

1

```
 1          IN THE U.S. DISTRICT COURT
 2         NORTHERN DISTRICT OF CALIFORNIA
 3                 --oOo--
 4   In Re Oracle Corporation Securities
     Litigation
 5
     This Document Relates to:
 6   All Actions.
                    No. C-01-0988-M33
 7
     _____/
 8
              --oOo--
 9
         Tuesday, March 28, 2006
10
              --oOo--
11         **CONFIDENTIAL**
     Under the  Revised Stipulated Protective Order Governing Confidential
12
           DEPOSITION OF
13           RAUL CAMPOS
               --oOo--
14
     Ref No.  C75
15   Reported By:  ELIZABETH A. WILLIS, CSR No. 12155
              Registered Professional Reporter
16
17
18
19
20
21
22
23
24
25
```

2

```
 1            A P P E A R A N C E S
 2
 3   For Plaintiffs:
 4      LERACH, COUGHLIN, STOIA, GELLER, RUDMAN &
        ROBBINS, LLP
 5      BY:  SHAWN WILLIAMS, ESQ.
             ELI GREENSTEIN, ESQ.
 6      100 Pine Street
        Suite 2600
 7      San Francisco, California 94111
        Telephone:  (415) 288-4545
 8      shawnw@lerachlaw.com
 9
10   For Defendants:
11      LATHAM & WATKINS
        BY:  PAUL V. KONOVALOV, ESQ.
12           JAMIE L. WIM, ESQ.
        650 Town Center
13      20th Floor
        Costa Mesa, California 92626-1925
14      Telephone:  (714) 540-1235
        paul.konovalov@lw.com
15
16
     Videographer: James Terrell
17
18
     Also present:  Gerry Fujimoto, Keith Mautner
19
20            --oOo--
21
22
23
24
25
```

3

```
 1                  INDEX
 2        EXAMINATION BY COUNSEL
 3                Page No.
 4   Examination by Mr. Williams . . . . . . . . . . .   7
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                 EXHIBITS
 2
 3   Deposition Exhibit No.     Description        Page No.
 4   Exhibit 1     Bates stamped document          83
                   PLF-ORC 000078 through PLF-ORC 000095.
 5
 6   Exhibit 2     Bates stamped document          139
                   PLF-ORC 000662 through PLF-ORC 000663.
 7   Exhibit 3     Bates stamped document          152
                   PLF-ORC 000663.
 8
 9   Exhibit 4     Bates stamped document          159
                   PLF-ORC 001633.
10   Exhibit 5     Bates stamped document
                   PLF-ORC 001234 through PLF-ORC 001236. 177
11
     Exhibit 6     Bates stamped document          191
12                 PLF-ORC 001161 through PLF-ORC 001215.
13   Exhibit 7   Plaintiffs' (Proposed) Revised Second  201
                   Amended Complaint for Violations of the
14                 Federal Securities Laws.  Demand for
                   Jury Trial.
15
     Exhibit 8     Bates stamped document          212
16                 ORCL 0122514 through ORCL 0122515.
17   Exhibit 9     Bates stamped document          219
                   PLF-ORC 001632.
18
     Exhibit 10   Bates stamped document HSBC 000001    223
19                 through HSBC 000002.
20   Exhibit 11   Bates stamped document PRG29686.      229
21   Exhibit 12   Bates stamped document              232
                   PLF-ORC 000015 through PLF-ORC 000016.
22
23
24
25
```

17

1    MR. KONOVALOV:  Go ahead and answer the
2  question.
3    MR. WILLIAMS:  Thank you.
4  BY MR. WILLIAMS:
5    Q.  What did you tell your wife?
6    A.  Well, she read the subpoena.
7    Q.  Okay.  And what did she say?
8    A.  She asked me what it was about.
9    Q.  Did you tell her?
10   A.  I read the subpoena.  I tried to make sense of
11 it and I told her I wasn't sure 100 percent what it was
12 about.
13   Q.  And did you talk about what it might be about?
14   A.  No.
15   Q.  When was the first -- well, so you talked to
16 your wife.  You talked to Ryan Roberts and you talked to
17 your in-laws, right?
18   A.  Yes.
19   Q.  When did you talk to your in-laws?
20   A.  A week later.
21   Q.  And what did you say to them?
22   A.  That I was being subpoenaed.
23   Q.  And did they ask you why?
24   A.  No, they didn't ask me why.
25   Q.  Why did you tell them about it?

18

1    A.  It was just, you know, dinnertime
2  conversation.
3    Q.  Did you show them the subpoena?
4    A.  No.
5    Q.  Do you have the subpoena here with you today?
6    A.  It is right here (indicating).
7    Q.  Have you written on it at all?
8    A.  No.
9    Q.  So you talked to your wife.  You talked to
10 your in-laws.  You talked to Ryan Roberts.  When was --
11 well, did you at some point meet with your attorneys?
12   A.  Yes.
13   Q.  And when was that?  When was the first time?
14   A.  Yesterday.
15   Q.  And who was at that meeting?
16   A.  All that is present here.
17   Q.  And where did that meeting occur?
18   A.  Here in Sacramento.
19   Q.  Okay.  Where?
20   A.  On, I believe, 3rd and S.
21   Q.  Was it your office or one of the lawyer's
22 offices?
23   A.  It was a law office.
24   Q.  Okay.  And how long did you meet?
25   A.  The meeting was approximately from 10:00 a.m.

19

1  to 3:00 p.m.
2    Q.  And did you review documents in your meeting?
3    A.  Yes.
4    Q.  Did any of the documents help you recall facts
5  that might be related to this case?
6    A.  Yes.
7    Q.  And what documents did you review that helped
8  you remember any facts?
9    A.  Various documents.
10   Q.  Okay.  Well, describe one for me.
11   A.  The ones that jogged my memory the most would
12 be cover -- cover letters of faxes.
13   Q.  Cover letters of faxes?
14   A.  Um-hum.
15   Q.  Describe them to me, please.
16   A.  They were faxes to a Joseph Russo.
17   Q.  Is that it?  I am sorry.  Are you talking
18 about more than one fax to Joseph Russo?
19   A.  Yes.
20   Q.  Okay.  And so those helped -- those faxes or
21 cover sheets helped you remember some facts?
22   A.  Correct.
23   Q.  Tell me what you remembered after you looked
24 at those cover sheets.
25   A.  I remembered actually speaking with him.

20

1    Q.  And speaking with him when?
2    A.  I am not sure.  I am not certain of the date.
3    Q.  Couple years ago, maybe?  Few years ago?
4    A.  At least.
5    Q.  And did you remember what you talked about
6  with Mr. Russo?
7    A.  Generally.
8    Q.  Okay.  Tell me about that.  Tell me what you
9  remember.
10   A.  I remember him being -- asking for the
11 company's billing histories.
12   Q.  Okay.  And is that all you remember about the
13 conversation?
14   A.  That was basically it.
15   Q.  What company's billing history?
16   A.  Phillips Petroleum.
17   Q.  Did you remember that yesterday?
18   A.  Yes.
19   Q.  So what I want to do is -- I just want to see
20 if I can extract as much of your independent
21 recollection as I can.  So if I seem to repeat certain
22 questions forgive me, okay?  So you remembered that you
23 talked to him about billing histories concerning
24 Phillips Petroleum?
25   A.  Correct.

125

1  A.  Yes, they are the ones who -- the first scope
2  of applying the funds to the invoices.
3  Q.  Okay.  Correct me if I am wrong -- so that
4  doesn't happen at the lock-box stage?
5  A.  No.  My knowledge -- or what I think is that
6  is the lockbox -- actually, they are the first ones to
7  receive all the checks.  They input them in.  We would
8  receive an e-mail of what customers, check numbers,
9  amounts, and all that.  We would receive an e-mail on a
10  daily basis of what the lockbox had received.  They
11  would send the hard copies of the checks to accounts
12  receivable.  They would input them into the system.
13  That e-mail that we would get wasn't -- if you saw a
14  check that came in that day on an e-mail you could not
15  query on that check because it wasn't -- it didn't exist
16  yet.  AR hasn't touched it.
17  Q.  So that -- the determination of what would go
18  to unapplied was something that happened after it hit
19  the lockbox.  And what -- then it went to AR and
20  somebody in AR would make the determination as to how
21  much would go to an invoice and what would be -- go to
22  unapplied?
23  A.  Yes.  They would input the check into the
24  system and then they would query on what invoice to see
25  if that was -- to apply it to.  And if there was a

126

1  remaining amount that would automatically go to
2  unapplied and they would not research it further to why
3  the customer might have paid or, you know, overpaid, or
4  if there is extra amount left or --
5  Q.  And that was your job -- to research it
6  further?
7  A.  Correct.
8  Q.  Now, what -- but if a customer simply overpaid
9  how could you reconcile that overpayment amount?
10  A.  Through research, through contacting the
11  customer mostly.
12  Q.  Right.  But if it was an overpayment then
13  there would be nothing to apply it to, right?
14  A.  Technically, yes.
15  Q.  Right.  So -- so once you did that -- once you
16  did some research and found that there was nothing -- in
17  circumstances where you found there was nothing to apply
18  it to did you refund the customers?
19  A.  If the customer would request a refund.
20  Q.  What about if a customer didn't request a
21  refund?
22  A.  It would remain unapplied.
23  Q.  Did you call customers to tell them, "Hey, you
24  have money unapplied.  Do you want it back?"
25  A.  No.

127

1  Q.  That wasn't Oracle's policy, right?
2  A.  I don't know if that is true.  I am not
3  certain.
4  Q.  Okay.  That money would just sit in unapplied
5  under those circumstances that we have been talking
6  about indefinitely?
7  A.  Correct.
8  Q.  While you were an Unapplied Specialist there
9  was monies in that On Account -- in the Unapplied
10  Account that had been there for more than a year?
11  A.  Correct.
12  Q.  And more than two years?
13  A.  Correct.
14  Q.  There was some in there for more than five
15  years?
16  A.  Possibly.
17  Q.  What -- I mean, do you or don't you know?
18  A.  I know there was checks in there that were
19  over two years old.  I am not sure of their age.
20  Q.  Okay.  And what would you do to try to
21  reconcile those or did you know that those would not be
22  reconciled?
23  A.  They are pretty much not reconcilable.
24  Q.  Okay.  And did you or anyone at Oracle send
25  letters to the customers saying, "Hey, there are these

128

1  items associated with you that are in our Unapplied
2  Account"?
3  MR. KONOVALOV:  Testify for yourself.
4  THE DEPONENT:  I did not personally send those
5  out.
6  MR. WILLIAMS:  Hold on a second.  Was there an
7  objection there?
8  MR. KONOVALOV:  I was seeking clarification.
9  MR. WILLIAMS:  We can go back.  We will ask
10  the reporter to re-ask the question and you can object
11  to the question.  Please don't coach the witness as to
12  how to testify.
13  MR. KONOVALOV:  It is a far cry from coaching,
14  but we can go ahead your way.
15  MR. WILLIAMS:  Can you read back the question
16  and allow him to make an objection?
17  COURT REPORTER:  "Q.  And
18  did you or anyone at Oracle
19  send letters to the customers
20  saying, 'Hey, there are these
21  items associated with you that
22  are in our Unapplied Account?'"
23  MR. KONOVALOV:  Objection.  Calls for
24  speculation to the extent it calls for information
25  beyond the witness' personal knowledge.

129

1    BY MR. WILLIAMS:
2    Q.  Okay.  Do you understand the question?
3    A.  Yes.
4    Q.  Can you answer the question?
5    A.  I did not personally send any letters out and
6    to my knowledge nobody else did either.
7    Q.  Did you call customers and tell them that they
8    had money in On Account that is available for refund or
9    anything like that?
10   A.  No.
11   Q.  Do you know if anyone else did at Oracle?
12   A.  Not to my knowledge.
13   Q.  Okay.  Now, the Unapplied Reports -- was that
14   a report that could be printed if you wanted to see
15   thousands of pages of documents?
16   A.  It is possible.
17   Q.  Well, does that mean you could have printed it
18   if you wanted to?
19   A.  If I wanted to.
20   Q.  You could?  Okay.  And did the Unapplied
21   Report exist up until the time you left Oracle?
22   A.  Yes.
23   Q.  And you were doing the same job -- reconciling
24   the Unapplied Account?
25   A.  Yes.

130

1    Q.  Were you ever a Senior Collections Analyst?
2    A.  Yes.
3    Q.  When was that?
4    A.  Approximately one-and-half years after I
5    started.  So --
6    Q.  And -- I am sorry.
7    A.  So, summer of 2002.
8    Q.  Summer of '02.  Can you tell me what your
9    duties were as a Senior Collections Analyst?
10   A.  The same duties as a collector.  It was more
11   of a pay grade advance.
12   Q.  Okay.  And was it a title or a level that was
13   recognized within the organization, or at least the
14   collections organization as -- meaning that people may
15   have reported to you?
16   A.  No, I did not have any reports, neither did
17   any senior collector.
18   Q.  Now, you indicated at times a customer might
19   ask for a refund of money in unapplied?
20   A.  Correct.
21   Q.  Right?  And were there general circumstances
22   in your experience as a Unapplied Specialist that that
23   would occur?
24   MR. KONOVALOV:  Objection.  Vague and
25   ambiguous.

131

1    THE DEPONENT:  It is possible for someone to
2    have called and, you know, if they happened to know that
3    they had an overpayment or duplicate payment they might
4    contact us.
5    BY MR. WILLIAMS:
6    Q.  Contact collections?
7    A.  Contact collections in general.
8    Q.  And then would they contact you?  Were you the
9    person they would call for a refund or someone else?
10   A.  They could call the collector individually,
11   depending on the type of customer since everybody was
12   alphabetical, and then I would be the one to initiate
13   the refunds.
14   Q.  So the collectors didn't have the authority
15   necessarily to initiate a refund?
16   A.  No.
17   Q.  Is that fair to say?
18   A.  Yes.
19   Q.  I am sorry.  Is it true that the collectors
20   did not have the authority to initiate a refund?
21   A.  They could initiate a refund.  They would send
22   their request to me and I would make a spreadsheet of
23   what the collectors during the week would want to have
24   refunded and then I would send that up to my manager.
25   Q.  Okay.

132

1    A.  And then he would request that.  He would
2    authorize a certain dollar range.  I am not sure if it
3    was 10,000.  Above him was another dollar amount --
4    maybe 50,000.  Maybe the director was 100,000, and on.
5    Q.  And that was in the summer -- well, that
6    was -- in the summer of '02, your supervisor was who?
7    Q.  Summer of 2002?
8    Q.  Summer of 2002?
9    A.  Summer of 2002, I would think it would be Ian
10   Hitata.
11   Q.  But there was a time frame in there where you
12   were reporting directly to Adam Hahn?
13   A.  No, never.
14   Q.  Never?
15   A.  I never -- he always had senior -- he was
16   always the Senior Manager of Collections while I was
17   there.
18   Q.  Senior Manager of Collections?
19   A.  Yes.
20   Q.  Okay.  So if a Collections Analyst had a
21   request for a refund why would they come to you?
22   A.  They would request it through me so I could
23   make a list.  Instead of the individual managers getting
24   individual requests all day long they would do it at the
25   end of the week.

Campos, Raul  3/28/2006  9:02:00 AM

137

1     A.  It is the template that collectors would use
2  to fill out the line items on the template -- customer
3  name, amount, where the check is coming from, the
4  reasoning.
5     Q.  And that's what -- is that what would be
6  forwarded to you when a collector wanted to get a refund
7  for a customer?
8     A.  Correct.
9     Q.  They would fill out a refund template?
10     A.  Yes.
11     Q.  And e-mail that to you?
12     A.  I believe later on we had a pipeline within
13  Oracle -- within our system that -- collectors would go
14  there and input all the information and managers would
15  do it -- do their approvals.
16     Q.  And you would just drawdown from that
17  report -- from that pipeline?
18     A.  Correct.
19     Q.  So a collector wouldn't have to communicate
20  with you directly about a requested refund.  They could
21  just go into the pipeline and fill out a form?
22     A.  Yes.  Before there was that pipeline it was
23  going through me and then the pipeline was created
24  because they wanted a more simplified way of doing it.
25  So they created the pipeline so each individual

138

1  collector would go in there and do it.  And I believe --
2  I don't know.  I am not even sure if it would be
3  e-mailed directly to the approver.
4     Q.  How was it communicated to you before the
5  pipeline?  Just by phone or e-mail?
6     A.  It would be by e-mails.
7     Q.  And so -- and then you would forward that --
8  you would put them all in one list or document and send
9  it to your manager?
10     A.  Correct.
11     Q.  Do you know what a custom refund form is?
12     A.  No.
13     Q.  How about detailed listing by customer of all
14  unapplied cash?  Is that the Unapplied Report?
15     A.  No, it is not the Unapplied Report.
16     Q.  What is that?
17     A.  A detailed listing of -- what was it called?
18     Q.  Detailed listing by customer of all unapplied
19  cash?
20     A.  That would be running a report on an
21  individual customer number -- what that person might
22  have in unapplied cash.
23     Q.  And have you heard of account 25005?
24     A.  No.
25     Q.  How about the Domestic Reconciliation and

139

1  Unapplied Report?
2     A.  Doesn't sound familiar.
3     Q.  Invoice register?
4     A.  No.
5     Q.  Receipt register?
6     A.  No.
7     Q.  What about a Reversed Receipt Report?
8     A.  No.
9     Q.  Unapplied receipts register?
10     A.  No.
11     Q.  I would ask the reporter to mark this document
12  as Campos No. 2.
13        (Exhibit No. 2 was marked for identification.)
14  BY MR. WILLIAMS:
15     Q.  Campos No. 2 is Bates numbered PLF-ORC 000662
16  and 663.  I would just ask you to take a look at that
17  and when you are done taking a look at it just let me
18  know.
19     A.  Okay.
20     Q.  Have you seen Campos No. 2 before?
21     A.  Yes, I have.
22     Q.  When was the last time you saw it?
23     A.  Last time -- probably about one of the last
24  times -- probably when I sent it.
25     Q.  Okay.  Did you review this document yesterday?

140

1     A.  Looks familiar.
2     Q.  I am asking if you reviewed this document
3  yesterday?
4     A.  I did review --
5     Q.  Any part of the document.
6     A.  I have reviewed the cover sheet.
7     Q.  This is the cover sheet that you indicated
8  earlier that refreshed your recollection about certain
9  things related to Joe Russo?
10     A.  Yes.
11        MR. KONOVALOV:  Counsel, I don't want to
12  interrupt your line of questioning, but are these -- do
13  we know these are part of the same document since the
14  cover page says, "6 pages," and, in fact, the fax cover
15  lines don't correspond?  The, "fax lines," not, "cover
16  lines."  One says, "3-27-02."  The other one says,
17  "12-6-01."
18        MR. WILLIAMS:  Actually, you know what?  Let's
19  separate these two.  I am sorry.  We will just deal with
20  the first page.  So Campos number 2 is just going to be
21  PLF-ORC 000662.  You can just take that top page off
22  because we will talk about the other one as well.
23  BY MR. WILLIAMS:
24     Q.  Okay.  Did you create this fax cover sheet?
25     A.  Yes.

141

1      Q.   And it was sometime in March of 2002?
2      A.   Correct.
3      Q.   Do you know the reason why you created it?
4      A.   At the time this was created was -- I was
5   speaking with Joseph Russo.
6      Q.   About what?
7      A.   I believe he was doing account reconciliation
8   with his company, Phillips Petroleum.
9      Q.   Does he work for -- does Joseph Russo -- did
10   Joseph Russo work with Phillips Petroleum?
11      A.   In my first conversations with him I believe
12   he did.
13      Q.   Okay.  Did you have other conversations with
14   him when he was working for someone else?
15      A.   I later found out he was not an employee of
16   Phillips Petroleum.
17      Q.   What did you find out?
18      A.   He was a third party agency hired by Phillips
19   Petroleum.
20      Q.   Do you know the name of that agency?
21      A.   No, I do not.
22      Q.   Have you heard of an agency called PRG?
23      A.   Doesn't sound familiar.
24      Q.   Okay.  How is it that you learned that he was
25   with another agency?

142

1      A.   I was trying to have Joseph Russo give me
2   something with the Phillips Petroleum letterhead --
3   something showing me he was from that company.  To my
4   knowledge he was not able to provide that.
5      Q.   Okay.  And so, can you tell me what your -- if
6   you recall what your initial conversation was with
7   Joseph Russo that ultimately resulted in you creating
8   this fax cover sheet?
9      A.   First conversations were him wanting a billing
10   history of -- from Phillips Petroleum.
11      Q.   And did you provide that to him?
12      A.   To my knowledge, yes.
13      Q.   And why did you?
14      A.   Because that was asked.  It was a request.
15      Q.   I am sorry?
16      A.   It was what he requested.
17      Q.   Okay.  And was it customary for Oracle to
18   provide its customers with billing history?
19      A.   Yes.
20      Q.   And just going down to the first section of
21   the cover sheet, you see where you write, "All of the
22   invoices that start with 550 are On Account cleanup"?
23      A.   Yes.
24      Q.   Do you know what that means?
25      A.   All the invoices that are -- starts with a 550

143

1   are debit memos.
2      Q.   Okay.
3           MR. KONOVALOV:  Just to clarify, it actually
4   says, "All 10 of the invoices that were 550 are On
5   Account cleanup."
6   BY MR. WILLIAMS:
7      Q.   Did you send Joseph Russo invoices?
8      A.   No, I did not.
9      Q.   But you sent him a billing history?
10      A.   I sent him a billing history.  Well, later on
11   in the lower portion of this fax it also says, "I have
12   included a copy of," I believe, "two different
13   invoices" -- one being consulting, the other one -- I am
14   not sure if it is education.  Yes, it is education.
15      Q.   Okay.  But so, the first -- I am still talking
16   about the first line there.  All 10 of the invoices that
17   start with 550 are On Account cleanup?
18      A.   Um-hum.
19      Q.   Now, the billing account history itself has
20   the invoice number --
21      A.   Yes.
22      Q.   -- on it?  And what did you mean when you
23   wrote, "On Account cleanup"?
24      A.   What I meant were those -- at that time -- at
25   that time when this was written those invoices, to my

144

1   knowledge, were On Account.  "On Account cleanup," might
2   have been the term I used at the time.
3      Q.   So the ones ending -- well, beginning with 550
4   were monies that Phillips Petroleum has available for
5   future use?
6      A.   That was my knowledge at the time.
7      Q.   I understand.
8      A.   That was it.
9      Q.   Okay.  And that was in March of '02.  Do you
10   know what, "On Account cleanup," means or was that just
11   some phrase that you chose to put in?
12      A.   That was a phrase I chose to put in.  The
13   actual term would have been, "On Account."
14      Q.   How did you -- how was it that you chose to
15   put in, "On Account cleanup" -- "account cleanup"?
16      A.   I don't know.
17      Q.   Do you know what a cleanup is as it relates to
18   the On Account?
19      A.   No.
20      Q.   So did somebody tell you that the 550s -- 550
21   invoices were related to an On Account cleanup?
22      A.   I believe somewhere on the -- either in the
23   system or on those particular invoices -- the 550s -- it
24   is somewhere on there.  It is stated, "On Account."
25      Q.   Cleanup or just --

145

1     A.  No, just, "On Account."
2     Q.  So I am focusing on the language, "cleanup."
3  I am trying to figure out where you -- what was the
4  basis of you including this cleanup language in there?
5     A.  I am not certain.
6     Q.  I understand that you are not certain.  Do you
7  have any understanding of where you may have gotten the
8  information that resulted in you calling this, "On
9  Account cleanup"?
10    A.  No.
11    Q.  Okay.  Now, the next line, do you see where
12  you write, "These funds are available for refund or to
13  apply to future or past-due invoices"?
14    A.  Yes.
15    Q.  What does that mean?
16    A.  Well, as I stated before, I thought these
17  funds were On Account and they were available at that
18  time for -- for refund or for future or past-due
19  invoices.
20    Q.  Um-hum.  And what was the basis of your belief
21  at that time?
22    A.  My knowledge of On Account at that time was
23  that the funds were on hold for future reference.
24    Q.  For refer -- or for future use by the
25  customer?

146

1     A.  For future use.
2     Q.  Okay.  And when you were a Collections Analyst
3  did you ever come across items or monies On Account for
4  a customer?
5     A.  Not that I recall.
6     Q.  How long were you a Collections Analyst?  Two
7  years, approximately?  Year-and-a-half?
8     A.  Two years.
9     Q.  Never came across an item that was On Account?
10    A.  Not to my knowledge.  It is possible, though.
11    Q.  How about On Reserve?
12    A.  It would have showed, "On Account," not, "On
13  Reserve."
14    Q.  How about monies in the Unapplied Account?
15    A.  Yes.
16    Q.  As a Collections Manager, I mean.
17    A.  Analyst.
18    Q.  Collections Analyst.
19    A.  Yes.
20    Q.  Do you see where -- the next line where it
21  says, "This is the same situation as the 200k plus
22  refund I did for you earlier this month."
23    A.  Yes.
24    Q.  Had you refunded Phillips Petroleum more than
25  $200,000 earlier in March of 2002?

147

1     A.  Yes.
2     Q.  And had you -- in order to do so had you done
3  a check request?
4     A.  Refund request?
5     Q.  I am sorry.  A refund request?
6     A.  Yes.
7     Q.  Have you seen that refund request?
8     A.  No.
9     Q.  Have you seen that refund request since you
10  prepared it?
11    A.  No.
12    Q.  And you say here that, "It is the same
13  situation."  Were those -- was that $200,000-plus
14  refund -- was that represented on an invoice with a 550
15  prefix?
16    A.  I don't recall.
17    Q.  Any reason to believe that you -- that it
18  wasn't, based on what you wrote here?
19    A.  I am not sure.
20    Q.  Do you know whether Oracle actually issued a
21  check or issued monies to Phillips Petroleum based on
22  your request?
23    A.  Yes.
24    Q.  Yes, they did?
25    A.  Yes, they did.

148

1     Q.  So is it fair to say that during this month --
2  during the month of March of 2002, you had several
3  conversations with Mr. Russo?
4     A.  Yes, around that time frame.
5     Q.  And do you know if you did an additional
6  request or an additional just -- refund request related
7  to the 10 invoices represented in this cover sheet or
8  referenced in this cover sheet?  I am sorry.
9        MR. KONOVALOV:  Sorry, Counsel.  Would you
10  read that question back, please?
11        COURT REPORTER:  "Q.  And
12        do you know if you did an
13        additional request or an
14        additional just -- refund
15        request related to the 10
16        invoices represented in this
17        cover sheet or referenced in
18        this cover sheet?"
19        THE DEPONENT:  I do not know if those 10 were
20  turned into a refund or not.
21        BY MR. WILLIAMS:
22    Q.  Did Joe Russo contact you directly at first or
23  was he referred to you by a Collections Analyst?
24    A.  I don't know.  I do not remember.
25    Q.  Can you read that second paragraph for me?

157

1    A.  Correct.
2    Q.  Okay.  How about the next column where it
3  says, "Applied amount"?
4    A.  That would mean how much money is applied to
5  that invoice.
6    Q.  Okay.  And, "applied," here means, you know,
7  the same as we were talking about earlier.  Some things
8  are unapplied; others are applied.  Is that fair?
9    A.  Yes.
10    Q.  Okay.  So when looking at the, "Applied,"
11  column that money has been applied to the invoice that
12  is represented in, I guess, the invoice number, right?
13    A.  Correct.
14    Q.  And what is the next column where it says,
15  "Credited amount"?
16    A.  That appears to be only in the consulting
17  field.  So I am thinking those would be speculating that
18  that is a credit of some sort that was
19  customer-received.
20    Q.  What do you mean, "It appears to only be in
21  the consulting field"?
22    A.  They appear to be at the bottom of the page
23  where the number on the very top -- they start with a 6
24  and those are consulting invoices.
25    Q.  Oh.  Well, how about the ones that are a

158

1  little further up -- the one that has 112.88?
2    A.  Yeah.  Those start with a number I am not
3  familiar with.
4    Q.  Well, 555 and 556 -- is that 556?
5    A.  556 and 566, yeah.  I am unfamiliar with
6  those.
7    Q.  But you are familiar with the 550 and the ones
8  with 6s?
9    A.  Correct.
10    Q.  Now, going to the next column, what does it --
11  what does, "Adjusted amount," mean?
12    A.  I am not sure, but if I were to speculate it
13  would be also something dealing with consulting that I
14  am not familiar with.
15    Q.  Okay.  You see the little handwritten
16  asterisks next to those initial invoice numbers?
17    A.  Yes.
18    Q.  Can you count those?  You can count them to
19  yourself.
20    A.  14.
21    Q.  And the first 10, or first 9 -- do they appear
22  to relate to the 550 accounts?
23    A.  Yes.
24    Q.  Or invoices?
25    A.  Yes.

159

1    Q.  Based on your review of Campos No. 2 and 3, do
2  you believe that the 10 invoices that you referred to in
3  Campos No. 2 -- the cover sheet to Joseph Russo -- are
4  represented by the first 10, 550 invoices on Campos No.
5  3?
6    A.  Correct.
7    Q.  And do you know why in the applied amount --
8  well, why these items or these amounts were referenced
9  as, "applied"?
10    A.  Dealing with all the invoices top to bottom?
11    Q.  I am sorry.  Let's just talk about the 550
12  invoices.
13    A.  No.
14    Q.  Is there any other definition for, "applied,"
15  other than what we have talked about today that you are
16  aware of at Oracle?
17    A.  Not to my knowledge.
18    Q.  Ask the reporter to mark this document as
19  Campos No. 4.
20      (Exhibit No. 4 was marked for identification.)
21  BY MR. WILLIAMS:
22    Q.  Campos No. 4 is Bates numbered PLF-ORC 001633.
23  I would just ask you to take a look at it.  Just read it
24  to yourself and let me know when you are done.
25    A.  Okay.

160

1    Q.  Okay.  Is this another Oracle spreadsheet -- I
2  mean, Oracle fax cover sheet that you created?
3    A.  Correct.
4    Q.  And it was created somewhere around April 5th,
5  of 2002?
6    A.  Yes.
7    Q.  To the same person we have been talking about
8  -- Joseph Russo at Phillips Petroleum?
9    A.  Correct.
10    Q.  Or at least on behalf of Phillips Petroleum --
11    A.  Correct.
12    Q.  -- right?  And so this is approximately a week
13  after your previous correspondence, at least based on
14  what we have here?
15    A.  Yes.
16    Q.  So was it typical for you to do -- after you
17  spoke to a customer to do additional research to find
18  out what you can about the customer's account before you
19  got back to them?
20    A.  Yes.
21    Q.  And that research would be the type of
22  research you discussed earlier -- reviewing their --
23  whatever was in the system about the customer?
24    A.  Right.
25    Q.  Possibly going to look at the checks that were

161

1  sent by the customer?
2     A.  Yes.
3     Q.  Maybe talk to AR -- people in AR?
4     A.  If need be.
5     Q.  I am sorry?
6     A.  If need be.
7     Q.  Anything I missed there?
8     A.  Talking to collectors regarding the individual
9  invoices that they might have more knowledge on than
10  myself.
11     Q.  Right.  Was it typical for you to go back to a
12  customer without having done that research?
13     A.  No.
14     Q.  So I am going to ask you to just read the
15  first sentence that you wrote to Mr. Russo.
16     A.  "Here is a copy of invoice 6016693.  This was
17  not an overpayment.  In fact, 4,956.45 was adjusted
18  off."
19     Q.  Now the 601 that was consulting --
20     A.  Correct.
21     Q.  -- right?*  And I am assuming, based on what
22  you wrote here, that you sent Mr. Russo a copy of the
23  invoice?
24     A.  Yes.
25     Q.  When was the last time you saw that invoice?

162

1     A.  Last time I sent it.
2     Q.  Do you have any recollection of what was on
3  the invoice?
4     A.  No.
5     Q.  How did you know that it wasn't a,
6  "overpayment," as you wrote here?
7     A.  I contacted the collector regarding this
8  account.  And this is -- the collector was the one who
9  told me that the $4,906.45 was adjusted off.  "Adjusted
10  off," was a term used with consulting.
11     Q.  Who was the collector?
12     A.  I believe the collector was Tyler.  We had two
13  Tylers.  I can't think of his last name at the moment.
14     Q.  It was a male?
15     A.  Yes.
16     Q.  Was the other Tyler a female or --
17     A.  That was a male also.
18     Q.  And they were both collectors?
19     A.  Yes.
20     Q.  And you have an independent recollection of
21  talking to Tyler about this specific account?
22     A.  I believe so.
23     Q.  And so what does, "adjusted off," mean?
24     A.  I was using the collector's terminology.
25     Q.  And what independent research did you do

163

1  separate and apart from talking to Tyler about this
2  invoice?
3     A.  None.
4     Q.  Okay.  I am going to ask you to go just read
5  the next sentence for me.
6     A.  "All invoices that start with 550 are actually
7  debit memos.  These were created to clean up our
8  Unapplied Account at the time.  They were more than
9  likely overpayments.  You will have to look at your
10  remittance information on all 10 checks to confirm
11  that."
12     Q.  What did you mean by, "All invoices that start
13  with 550 are actually debit memos"?
14     A.  That is what they are.  They are debit memos.
15     Q.  Right.  Well, what is a debit memo?
16     A.  I am not sure of the actual terminology of it.
17     Q.  You are not sure what the terminology is?
18     A.  No.
19     Q.  Did you know what the terminology of it was
20  when you were writing this to Mr. Russo?
21     A.  No.
22     Q.  And so why did you write it?
23     A.  Because that is what it says in the system.
24  That the 550s or debit memos, or -- either that or I
25  found out through another collector or more or less --

164

1  probably Sam Johanis in accounts receivable who would be
2  more familiar with that.
3     Q.  And how -- where in the system did it say that
4  these were debit memos?
5     A.  I am not sure right now.
6     Q.  I am sorry?
7     A.  I can't remember.
8     Q.  How do you know you saw that in the system?
9     A.  Well, either I saw it in the system or I asked
10  Sam Johanis in accounts receivable because that number
11  right there does not come up as one of our common
12  numbers.
13     Q.  The 550?
14     A.  The 550, yes.  At that time I had never seen
15  that number come up.  So that is when I would ask --
16     Q.  So --
17     A.  -- someone more senior than me.
18     Q.  So based on your testimony today you are not
19  sure what you did, but you think you either saw it in
20  the system or you spoke to someone in accounts
21  receivable?
22     A.  Correct.
23     Q.  Did you tell Joe Russo to call anybody in
24  accounts receivable to check that?
25     A.  No.

257

1    A.  Yes.
2    Q.  Did anyone at any time in '02 tell you to save
3  all of the e-mails on your computer?
4    A.  Not to my knowledge.
5    Q.  Did you ever get an e-mail from someone within
6  Oracle saying to preserve all the documents on your
7  computer?
8    A.  It is possible.
9    Q.  Do you remember that happening?
10    A.  I don't remember that happening.
11    Q.  Okay.  Do you remember taking any action
12  yourself to preserve any documents or e-mails in your
13  computer at Oracle?
14    A.  No.
15    Q.  No, what?
16    A.  I don't remember taking any action to save
17  anything.
18    Q.  Do you plan on being away for any extended
19  period of time over the next few months?
20    A.  No.
21    Q.  I am going to end the deposition here.  I
22  probably have about an hour left.  I may want to just
23  have a brief conversation sometime in the next couple of
24  months.  Is that okay?
25    A.  That's fine.

258

1    MR. KONOVALOV:  Well, by means of a second
2  deposition?
3    MR. WILLIAMS:  Yeah.
4    MR. KONOVALOV:  Because I don't know that we
5  would necessarily allow that to happen.
6    MR. WILLIAMS:  That's fine.  I am telling you
7  I haven't used all of my time.  So, right now I am
8  done.  I thank you for coming today.  I appreciate it.
9    MR. KONOVALOV:  I actually want to take a
10  quick break to see if we have any follow-up.
11    MR. WILLIAMS:  Okay.
12    THE VIDEOGRAPHER:  Off the record at 4:50.
13    (Off the record.)
14    THE VIDEOGRAPHER:  On the record at 4:55 p.m.
15    MR. KONOVALOV:  I have no questions.  I just
16  want to make clear on the record that we do make an
17  objection.  I understand you are not calling anyone yet,
18  but to the extent that you want to call the witness
19  back, it is unfair to have the witness come back a
20  second time if and when you decide you want to use up
21  the remaining time.  So, we don't have to resolve this
22  now.  I just want to make clear on the record that we
23  object to a second deposition.
24    MR. WILLIAMS:  I understand.  I understand.
25  You understand that we get seven hours?

259

1    MR. KONOVALOV:  I understand that, but it
2  is -- usually you get one opportunity to depose a
3  witness.  Again, we can agree to disagree on this.
4    MR. WILLIAMS:  Okay.  Thanks.
5    THE VIDEOGRAPHER:  This is the end of
6  videotape number 4, Volume 1 in the deposition of Raul
7  Campos.  The original videotapes will be retained by
8  LiveNote World Service.  We are going off the record at
9  4:55.
10    (Thereupon Volume 1 in the deposition of
11    Raul Campos recessed at 4:55 p.m.)
12
13
14    Signed under penalty of perjury:
15
16    _____
17    RAUL CAMPOS
18
19    _____
20    Date
21
22
23
24
25

260

1    --o0o--
2    I, ELIZABETH A. WILLIS, a Certified Shorthand
3  Reporter of the State of California, duly authorized to
4  administer oaths, do hereby certify:
5    That I am a disinterested person herein; that
6  the Witness, named in the foregoing deposition was by me
7  duly sworn to testify the truth, the whole truth, and
8  nothing but the truth; that the deposition was reported
9  in shorthand by me, ELIZABETH A. WILLIS, a Certified
10  Shorthand Reporter of the State of California, and
11  thereafter transcribed into typewriting.
12    That before completion of the deposition,
13  review of the transcript (  ) was (  ) was not
14  requested.  If requested, any changes made by the
15  deponent (and provided to the reporter) during the
16  period allowed are appended hereto.
17
18    _____
    ELIZABETH A. WILLIS, RPR, CSR 12155
19
20
    --o0o--
21
22
23
24
25

I, ELIZABETH A. WILLIS, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That I am a disinterested person herein; that the Witness, named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition was reporter in shorthand by me, ELIZABETH A. WILLIS, a Certified Shorthand Reporter of the State of California, and thereafter transcribed into typewriting.

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Date _____4/10/06_____

_____
ELIZABETH A. WILLIS,
RPR, CSR #12155

--o0o--

# EXHIBIT MMM

1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                      -oOo-
 4    IN RE
 5    ORACLE CORPORATION
      SECURITIES LITIGATION
 6                      MASTER FILE NO.
                        C-01-0988-MJJ
 7
      This Document Relates To:
 8
      ALL ACTIONS
 9
10    _____/
11
12
                       -oOo-
13
          HIGHLY CONFIDENTIAL
14
   VIDEOTAPED DEPOSITION OF THOMAS RATHJENS
15
            JUNE 30, 2006
16
17                     -oOo-
18     SHEILA CHASE & ASSOCIATES
         REPORTING FOR:
19        LiveNote World Service
      221 Main Street, Suite 1250
20      San Francisco, CA 94105
       Telephone: (415) 321-2300
21        Fax: (415) 321-2301
22                     -oOo-
23
   Reported by:
24 KELLIE A. ZOLLARS, CSR, RPR, CRR
   CSR License No. 5735
25
```

2

```
 1              I N D E X
 2         INDEX OF EXAMINATION
 3                          PAGE
 4  EXAMINATION BY:
 5    MS. ANDERSON            7, 165
 6    MR. HARRISON            149
 7
 8    "AFTERNOON SESSION"          82
 9
10                 -oOo-
11      INDEX OF EXHIBITS
12  RATHJENS    DESCRIPTION        PAGE
13  EXHIBIT 1   Subpoena In A Civil Case
                - 5 pages        11
14
    EXHIBIT 2   Ordering Document - 6 pages
15              HP 00030 - 00035     36
16  EXHIBIT 3   Letter Agreement between Oracle
                and  HP dated November 30, '00
17              - 3 pages  HP 00001 - 00003     47
18  EXHIBIT 4   E-mail dated 2/01/02 by Karen
                Montague with attached letter
19              - 8 pages  HP 00053 - 00060    51
20  EXHIBIT 5   Onsite Support Services Exhibit
                - 5 pages  HP 00045 - 00049    55
21
    EXHIBIT 6   Oracle Term License Lease Schedule
22              - 2 pages  HP 00050 - 00051    58
23  EXHIBIT 7   E-mail dated 9-21-01 with attachments
                - 9 pages  HP 00036 - 00040    61
24
25
```

3

```
 1  EXHIBIT 8   E-mail dated July 12, 2001 with
                attachments - 5 pages
 2              HP 00019 - 00023       66
 3  EXHIBIT 9   E-mail dated October 26, 2001,
                with attachments - 5 pages
 4              HP 00008 - 00012      106
 5  EXHIBIT 10  Spreadsheet entitled HP CRM/Wireless
                License Update - 2 pages
 6              HP 00013 - 00014      108
 7  EXHIBIT 11  E-mail dated October 31, 2001,
                with attachments - 3 pages
 8              HP 00071 - 00073      129
 9  EXHIBIT 12  E-mail dated October 31, 2001
                - 2 pages  HP 00069 - 00070    136
10
    EXHIBIT 13  E-mail dated December 19, 2001
11              - 2 pages  HP 00064 - 00065    163
12                     -oOo-
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1        BE IT REMEMBERED THAT, pursuant to the laws
 2  pertaining to the taking and use of depositions, and on
 3  Friday, June 30, 2006, commencing at the hour of 9:07 a.m.
 4  thereof, at the offices of GCA LAW PARTNERS LLP,
 5  1891 Landings Drive, Mountain View, California, before me,
 6  KELLIE A. ZOLLARS, CSR No. 5735, a Certified Shorthand
 7  Reporter in and for the State of California.
 8                     -oOo-
 9  Appearing as counsel on behalf of Plaintiffs:
10     LAW OFFICES OF LERACH COUGHLIN STOIA GELLER
11     RUDMAN & ROBBINS LLP
12     By:  JENNIE LEE ANDERSON, ATTORNEY AT LAW
13     100 Pine Street, Suite 2600
14     San Francisco, California 94111
15     Tel: (415) 288-4545
16     jenniea@lerachlaw.com
17
18  Appearing as counsel on behalf of Defendant Oracle
19  Corporation:
20     LAW OFFICES OF LATHAM & WATKINS
21     By:  MATTHEW D. HARRISON, ATTORNEY AT LAW
22     505 Montgomery Street, Suite 1900
23     San Francisco, California 94111-2562
24     Tel: (415) 391-0600
25     matt.harrison@lw.com
```

Rathjens, Thomas  6/30/2006  9:07:00 AM

5

```
1    LAW OFFICES OF LATHAM & WATKINS
2    By:  MELANIE M. BLUNSCHI, ATTORNEY AT LAW
3    633 W. Fifth Street, Suite 4000
4    Los Angeles, California 90071
5    Tel: (213) 485-1234
6
7    Appearing as counsel on behalf of Hewlett-Packard and the
8    witness:
9    GCA LAW PARTNERS LLP
10   By:  KIMBERLY A. DONOVAN, ATTORNEY AT LAW
11   1891 Landings Drive
12   Mountain View, California 94043
13   Tel: (650) 428-3900
14
15   Also present:
16   Jeff McKinney, Videographer
17   Keith Mautner
18
19                       -oOo-
20
21
22
23
24
25
```

6

```
1                       -oOo-
2              THOMAS RATHJENS
3         having been first duly sworn to
4          tell the truth, the whole truth
5           and nothing but the truth, was
6            thereupon examined and testified
7             as is hereinafter set forth:
8                       -oOo-
9    THE VIDEOGRAPHER:  Here begins Videotape No. 1,
10   Volume 1, in the deposition of Thomas Rathjens in the
11   matter of Oracle Securities Litigation in the U.S. District
12   Court, Central District of California, case number which is
13   C01-0988-MJJ.  Today's date is June 30th, 2006, and the
14   time on the video monitor is 9:07.
15       The video operator today is Jeff McKinney
16   representing LiveNote World Services located at 221 Main
17   Street, Suite 1250, San Francisco, California, ZIP code
18   94105.  Phone number (415) 321-2300.  The court reporter
19   producing the official transcript of today's testimony is
20   Kellie Zollars of LiveNote.
21       Will counsel please identify themselves and state
22   whom they represent.
23       MS. ANDERSON:  Jennie Lee Anderson of Lerach Coughlin
24   Stoia Geller Rudman Robbins on behalf of plaintiffs.
25       MR. HARRISON:  Matthew Harrison and Melanie Blunschi
```

7

```
1    of Latham & Watkins, on behalf of the defendants..
2        MS. DONOVAN:  Kimberly Donovan of GCA Law Partners
3    representing the deponent HP and Tom Rathjens.
4        THE VIDEOGRAPHER:  Will the court reporter please
5    swear in the witness.
6        (Witness sworn.)
7                       -oOo-
8                   EXAMINATION
9    BY MS. ANDERSON:
10   Q.  Good morning, Mr. Rathjens.
11   A.  Good morning.
12   Q.  If you could begin by stating your full name for
13   the record, please?
14   A.  Thomas Werner Rathjens.
15   Q.  Okay.  And also your address for the record?
16   A.  322 Indio Drive, Pismo Beach, California, 93449.
17   Q.  Thank you.
18       As I mentioned at the outset of the deposition, my
19   name is Jennie Lee Anderson.  I represent plaintiffs in
20   this matter, and I'll be taking the deposition today.  Have
21   you had your deposition taken before?
22   A.  I've done a deposition once.
23   Q.  Okay.  And what was the nature of your testimony
24   in that deposition?
25   A.  It was related to a guy trying to get some of my
```

8

```
1    father's estate.
2    Q.  Okay.  Have you ever had your deposition taken as
3    a representative of Hewlett-Packard in the past?
4    A.  No.
5    Q.  Okay.  And when you had your deposition taken
6    before, were you the plaintiff in that action?
7    A.  I forget who -- there was cross-complaints --
8    Q.  Okay.
9    A.  -- so there was --
10   Q.  How long ago was that?
11   A.  Ten years ago.
12   Q.  Okay.  So it's been a while so I'm going to go
13   over some ground rules --
14   A.  Okay.
15   Q.  -- that will govern the deposition today at the
16   outset.  The court reporter here will take down everything
17   that's said here today.  Now, she can't record nods of the
18   head and shakes of the head so try to respond verbally if
19   you can.  Do you understand?
20   A.  Yes.
21   Q.  Great.
22       Now, you understand you're testifying under oath,
23   correct?
24   A.  Correct.
25   Q.  And that that's the same oath that you would take
```

Rathjens, Thomas  6/30/2006  9:07:00 AM

9

1  if you were testifying in a court of law.  Do you
2  understand that?
3      A.  Yes.
4      Q.  We'll take several breaks during the day.  If you
5  feel at any time you need a break, feel free to let me
6  know; and we'll take one.  All I ask is that if there is a
7  pending question, that you answer the pending question
8  before we go on break.
9      A.  Okay.
10     Q.  Is that okay?
11         I'm going to be asking a series of questions today
12  and I'll try to be as clear as possible.  If at any time
13  you don't understand my question, just let me know, and
14  I'll try to clarify or rephrase the question.
15     A.  Okay.
16     Q.  Now, during the course of the deposition your
17  attorney or attorney from -- defense counsel may interpose
18  objections.  However, I'm entitled to an answer unless your
19  attorney specifically instructs you not to answer.  Do you
20  understand that?
21     A.  Yes.
22     Q.  Okay.  Now, is there any reason that you cannot
23  give full and complete testimony today?
24     A.  No.  Not that I'm aware of.
25     Q.  Okay.  Is there any kind of medical condition that

10

1  you suffer from that would prevent you from giving full and
2  complete testimony today?
3      A.  No.
4      Q.  Or are you on any type of medication that might
5  prevent you from giving full and complete testimony?
6      A.  No.
7      Q.  Okay.  Now, I know it's normal in the course of
8  conversation to sometimes anticipate what my question's
9  going to be, but in order for the court reporter to be able
10  to take down everything that's said, try to let me finish
11  my question before you start your answer.  And I'll try to
12  do the same, let you complete your answer before I move on
13  to my next question.  Does that sound okay?
14     A.  Sounds good.
15     Q.  Great.
16         Now, at a later date you'll have an opportunity to
17  review your testimony for inaccuracies and correct them.
18  And your attorney will probably explain that to you
19  further, but do you understand that you'll have an
20  opportunity to review your testimony at a later date?
21     A.  Yes.
22     MS. ANDERSON:  Great.
23     MS. DONOVAN:  Are you moving into the substance?  This
24  might be a good time to designate the transcript.
25     MS. ANDERSON:  Okay.

11

1      MS. DONOVAN:  Okay.  I understand that a protective
2  order has been entered in this case, and I would like to
3  designate the transcript as highly confidential under that
4  protective order on the basis I believe the testimony
5  you'll be eliciting will be falling under that category.
6      MS. ANDERSON:  Okay.  Plaintiffs have no objection.
7      MR. HARRISON:  No objection.
8      MS. DONOVAN:  Actually, along those lines, I would ask
9  if anything is desdesignated or any party seeks to
10  dedesignate anything, if Hewlett-Packard may be notified of
11  that so that we may --
12     MR. HARRISON:  I should just correct that and say I
13  don't have any objection at this time, without prejudicing
14  our ability at some later time to redesignate if needed.
15     MS. ANDERSON:  Understood.  And I'll make the same
16  exception.
17     Q.  Okay.  Mr. Rathjens, do you understand the subject
18  matter of the testimony that you've been designated to give
19  today?
20     A.  To a certain degree, yes.
21     MS. ANDERSON:  We'll go ahead and mark this exhibit as
22  Rathjens 1.
23     (Exhibit No. 1 was marked for identification.)
24     BY MS. ANDERSON:
25     Q.  Mr. Rathjens, just let me know when you've had a

12

1  chance to look at the document.
2      A.  Okay.
3         Okay.
4      Q.  Okay.  The document that's been marked Rathjens
5  Exhibit 1 is entitled Subpoena In A Civil Case.
6  Mr. Rathjens, have you seen this document before?
7      A.  Yes.
8      Q.  If you would please turn to page 2 of the
9  Schedule A.  Roman numeral III, it says "Deposition Subject
10  Matter."  If you could read over those subjects listed on
11  pages 2 and 3 to yourself, please.
12     A.  Okay.
13     Q.  Okay.  There are seven numbers under III.  Do you
14  understand that you have been designated by Hewlett-Packard
15  to give testimony on these seven issues?
16     A.  Yes.
17     Q.  And are you prepared to testify about those issues
18  today?
19     A.  Yes.
20     Q.  Okay.
21         Now, do you -- are you the person most qualified
22  at HP to discuss these matters?
23     MS. DONOVAN:  Objection.  Vague and ambiguous.
24     MR. HARRISON:  Join in the objection.
25     THE WITNESS:  I am most qualified on some of the

13

1  bullet points, there may be others more qualified on other
2  bullet points.
3      MS. ANDERSON:  Okay.
4      THE WITNESS:  But I believe I can cover these topics.
5  BY MS. ANDERSON:
6      Q.  Okay.  So you're prepared to testify about all
7  topics as you mentioned before?
8      A.  To the best of my ability.
9      Q.  Okay.  Great.
10         Now, how long have you known that you would be
11  testifying today regarding these matters?
12      A.  Maybe two months.
13      Q.  Okay.  And when -- so how did you learn that you
14  would be testifying as to these subject matters?
15      MS. DONOVAN:  Objection.  Attorney-client privilege.
16      THE WITNESS:  I received a phone call from our --
17      MS. DONOVAN:  Well, let's not reveal the substance of
18  any communication with legal counsel.
19      THE WITNESS:  Okay.
20  BY MS. ANDERSON:
21      Q.  Yeah.  Just so you know, any time I ask a question
22  that might touch on your communications with counsel, I'm
23  not asking for any of the substance of your conversation
24  with counsel.  I'm just trying to get a feel for when you
25  learned you were going to be designated and what you did to

14

1  prepare.
2         But are you instructing him not to answer the last
3  question?
4      MS. DONOVAN:  Yeah.  I think the way that it was it
5  does, by necessity, call for attorney-client
6  communications.
7      MS. ANDERSON:  Okay.
8      Q.  Okay.  So you testified that you learned
9  approximately two months ago that you would be testifying
10  as to these matters; is that accurate?
11      A.  Yes.
12      Q.  Okay..
13      A.  Could have been three months ago.
14      Q.  Okay.  And did you do anything to prepare for
15  today's testimony?
16      MS. DONOVAN:  I'll caution the witness again please
17  don't reveal any attorney-client communication, but I don't
18  think responding to the question would require that.
19      THE WITNESS:  I looked for documents related to this
20  subject matter on my computer, and I reviewed documents
21  that had been found by HP.
22  BY MS. ANDERSON:
23      Q.  Okay.  And did you review any documents other than
24  the ones that were produced in response to the subpoena
25  served to HP in preparation for your testimony today?

15

1      A.  I don't believe so.
2      Q.  Okay.
3         Okay.  And did you meet with your attorney to
4  prepare for your testimony today?
5      A.  Yes.
6      Q.  Okay.  And how long did you meet with your
7  attorney?
8      A.  A total of five or six hours.
9      Q.  Okay.  And was anyone else present at those
10  meetings?
11      MS. DONOVAN:  You can respond to that.
12      THE WITNESS:  Kim Donovan and Jennifer Rogers.
13  BY MS. ANDERSON:
14      Q.  And is Jennifer Rogers general counsel at
15  Hewlett-Packard?
16      A.  Yes.
17      Q.  Now, other than your attorney -- and when I refer
18  to your attorney I'll be referring to both Ms. Donovan and
19  Ms. Rogers --
20      A.  Okay.
21      Q.  -- did you discuss the subject matter of this
22  deposition with anyone else?
23      A.  I notified my immediate manager that I would be
24  taking some time out to do this deposition.
25      Q.  Okay.  Did you talk to any of your colleagues

16

1  about the subject matter of this deposition?
2      A.  No.
3      Q.  Okay.  Before we get started on the substance of
4  the deposition I'm going to just do a little bit of
5  background.  A few background questions with you.
6      A.  Okay.
7      Q.  First of all, did you graduate from high school?
8      A.  Yes.
9      Q.  Okay.  Could you just briefly describe your
10  educational background since graduation from high school.
11      A.  I have a mechanical engineering degree from
12  Santa Barbara and an MBA from Boulder.
13      Q.  Okay.  When did you get those degrees?
14      A.  In 1982 and 1986.
15      Q.  Okay.  And have you engaged in any kind of
16  informal or continuing education since you got your masters
17  degree?
18      A.  Only on-the-job type training or work-related
19  training.
20      Q.  Okay.  Now, when did you begin working for
21  Hewlett-Packard?
22      A.  About 11 years ago.
23      Q.  Okay.  And where did you work between the time
24  that you received your MBA and the time you began at
25  Hewlett-Packard?

17

1     A.  I worked in the nuclear power industry.  In
2  several locations.
3     Q.  For one company or --
4     A.  A few different companies.
5     Q.  Okay.  And so you began working at HP about 11
6  years ago, so approximately 1995.  Does that sound about
7  right?
8     A.  Yes.
9     Q.  And what was your first position at HP?
10    A.  A contracts representative.
11    Q.  And what were your job duties as contracts
12  representative?
13    A.  Negotiating terms and conditions on agreements
14  between HP and other companies.
15    Q.  And what were the -- what was the nature of these
16  agreements between HP and other companies?
17    A.  For HP to sell hardware and services to customers
18  and to also purchase consulting from subcontractors.  And
19  perhaps purchasing third party products.
20    Q.  What types of consulting would HP be purchasing
21  that you're referring to?
22    A.  HP delivers consulting to some of our customers
23  and sometimes we use subcontractors to help us deliver that
24  consulting.
25    Q.  Okay.  And how long were you in your position as a

18

1  contracts representative?
2     A.  Approximately three years.
3     MS. ANDERSON:  Can we just go off the record for just
4  a moment.
5     THE VIDEOGRAPHER:  Going off the record.  The time is
6  9:24.
7     (Recess taken.)
8     (Mr. Mautner joins proceedings.)
9     THE VIDEOGRAPHER:  Back on the record.  The time is
10  9:24 and 58 seconds.
11    MS. ANDERSON:  Okay.  We're back on the record.  And
12  for the record, I've been joined by my colleague Keith
13  Mautner.
14    Q.  Mr. Rathjens, before we went off the record
15  briefly you had mentioned that you -- your first job at HP
16  was as contract representative and you held that job for
17  three years.  Now, you mentioned as part of that job you
18  also negotiated contracts with respect to the purchase of
19  third party products; is that correct?
20    A.  Yes.
21    Q.  Okay.  Do you recall specifically any third party
22  products that you negotiated contracts for in that time
23  frame?
24    A.  I can think of one in particular.  A network
25  product that we resold to WalMart.  Another one that we

19

1  sold to Rockwell-Collins.
2     Q.  And were those products purchased solely for the
3  purpose of resale?
4     A.  Yes.
5     Q.  Okay.  Okay.  And where were you -- what HP
6  location were you physically located at when you were a
7  contracts representative?
8     A.  The Pleasanton office.
9     Q.  Okay.  And what was your next position at
10  Hewlett-Packard?
11    A.  As a project manager.
12    Q.  And what were your duties as a project manager?
13    A.  To deliver consulting engagements to customers.
14       Consulting and hardware.
15    Q.  Okay.  So these were consulting services around
16  the hardware that the customer had purchased; is that --
17    A.  Correct.  Around HP hardware and software.
18    Q.  And how long were you a project manager?
19    A.  I worked on external projects for about two years,
20  and then started doing internal project management within
21  HP.
22    Q.  Okay.  And what external projects did you work on
23  during that two-year time frame?
24    A.  I mentioned two.  WalMart, Rockwell-Collins.
25  Those were the main ones.

20

1     Q.  Okay.  So just following the time line, did you
2  start doing the internal project management around 2000?
3     A.  Approximately.
4     Q.  Okay.  And what did the internal project
5  management entail?
6     A.  Deploying software internally within HP.
7     Q.  Okay.  Now, as a project manager, we can start
8  first when you were working on the external projects.  Did
9  you continue -- did your duties with respect to contract
10  negotiation continue through that position?
11    A.  I was no longer a contracts representative, but I
12  still did do a bit of contracts negotiation during my work
13  as an external project manager.
14    Q.  Okay.  In what capacity?  If you can think of
15  examples.
16    A.  The one example I thought of is I resold a
17  software product to Rockwell-Collins.
18    Q.  Okay.  And you negotiated the terms of those --
19  that contract?
20    A.  Yes.
21    Q.  Okay.  And as an internal project manager, what
22  did your duties entail as somebody who was in charge of
23  employing software internally?
24    A.  Managing subcontractors, running daily status
25  meetings, identifying issues that need to be resolved.

21

1  Onboarding people onto the project.  Typical project
2  management duties.
3      Q.  Okay.
4      A.  Identifying schedule.
5      Q.  Okay.  And were you involved in identifying the
6  types of products HP needed to purchase and implement?
7      A.  I was more handed the products to implement rather
8  than being a part of the decision making process as to
9  which products we were going to implement.
10     Q.  Okay.  Do you know who was in charge of deciding
11 which products were going to be implemented?
12     A.  I think ultimately our CIO, or our CIOs were
13 responsible for the decisions on which software products we
14 would implement.
15     Q.  Okay.  And who were the CIOs when you were an
16 internal project manager?
17     A.  The two that come to mind are Sean Hickey and
18 Craig Flower.
19     Q.  Okay.  And how long were you an internal project
20 manager at HP?
21     A.  I still am.
22     Q.  Okay.  Okay.  As an internal project manager, do
23 you have people who report directly to you?
24     A.  No.
25     Q.  Okay.

22

1      A.  They're indirect reports.
2      Q.  Okay.  Approximately how many indirect reports do
3  you have?
4      A.  It varies depending on the project that I'm
5  working on.
6      Q.  And why do you describe these individuals as
7  indirect reports?
8      A.  I am charged with getting people to agree on
9  dates, running meetings, getting people to respond to
10 issues, questions.  They do not work for me from an HR
11 perspective.
12     Q.  Uh-huh.
13     A.  But they are accountable to answer questions and
14 make the project successful.
15     Q.  Okay.  And do you hold meetings with these
16 individuals who are working on the projects?
17     A.  Yes.
18     Q.  And do you have a name for the meetings that you
19 hold?
20     A.  Implementing internal projects, we have lots of
21 meetings, but typically we have a series of different
22 meetings to run the project.  On a weekly basis, some are
23 on a monthly basis, at times on a daily basis.
24     Q.  Now, are there other internal project managers at
25 HP?

23

1      A.  Yes.
2      Q.  Approximately how many other internal project
3  managers are there at HP?
4      A.  I would be guessing, but it has to be over 2000.
5      Q.  Okay.
6          Okay.  Other than having meetings with the
7  individuals who are working on your internal projects, do
8  you generate reports with respect to the progress of those
9  projects?
10     A.  Yes.
11     Q.  And what are the names of those reports?
12     A.  A -- it varies from project to project, but a
13 weekly status report would be a common name.
14     Q.  And the information in a weekly status report or a
15 report of similar nature, do you get that information from
16 the individuals who are reporting to you indirectly on the
17 project?
18     A.  Primarily.
19     Q.  Okay.  And is that mainly through the meetings?
20     A.  It's through meetings, through e-mail, through
21 voice conversations, telephone.  Instant messaging.
22     Q.  Uh-huh.  Okay.  And then you compile that into a
23 weekly status report?
24     A.  Typically, on a project, that's what I would do.
25     Q.  Okay.  And who -- who is the weekly status report

24

1  prepared for?
2      A.  Primarily for my -- my use to manage the project.
3  We collect status and roll it up to higher levels of
4  management, for higher level of management's use.
5      Q.  Okay.  Now, who do you report to directly as an
6  internal project manager?
7      A.  Currently?
8      Q.  We can start currently, uh-huh.
9      A.  A lady by the name of Linda Halsted.
10     Q.  And what is Ms. Halsted's title?
11     A.  Release manager.
12     Q.  Okay..
13         Today we'll be talking in large part about the
14 2000-2001 time frame.  So going forward, we'll be talking
15 about that time frame unless I specify otherwise.  Now,
16 going back to the 2000-2001 time frame, as an internal
17 project manager who were you reporting to directly?
18     A.  Mike Overly.
19     Q.  And what was Mr. Overly's title?
20     A.  I believe it was director of CRM.
21     Q.  And what generally were Mr. Overly's duties?
22     A.  To deploy software within HP related to CRM, and
23 to implement common processes and standards across HP
24 related to customer relationship management.
25     Q.  Okay.  And how many other individuals reported

25

1  directly to Mr. Overly in that time frame?
2     A.   Maybe 10 HP direct reports and 20 to 30
3  contractors.
4     Q.   Okay.  And were all of these individuals working
5  on implementations of CRM software at HP?
6     A.   Both implementing CRM software and getting to
7  common business process.  Processes.
8     Q.   What do you mean by common business processes?
9     A.   We were trying to get different groups within HP
10  to use common terminology, common steps to process customer
11  information, common reports.  And -- from both a regional
12  perspective and a business unit perspective.
13     Q.   And was that effort primarily a training effort,
14  training somebody to do these things in a uniform way?
15     A.   No.  It was more of gaining agreement and
16  consensus as to which the best process was to move forward,
17  knowing that someone would have to change the way they were
18  doing their work.
19     Q.   Okay.  Did that involve any technical development?
20  MS. DONOVAN:  Objection.  Vague, ambiguous.
21  THE WITNESS:  At times.
22  BY MS. ANDERSON:
23     Q.   Now, in the 2000-2001 time frame were you
24  working on internal implementation of CRM at
25  Hewlett-Packard?

26

1     A.   Yes.
2     Q.   Were you working on that exclusively?
3     A.   Yes.
4     Q.   Okay.  And who, if you can recall their names, was
5  on your -- the team reporting to you on the internal
6  implementation?
7     A.   There was quite a few people.
8     Q.   Oh, okay.
9     A.   I don't know -- do you want me to start listing
10  names?
11     Q.   Approximately how many people?
12     A.   Maybe a hundred.
13     Q.   Oh.  Okay.
14     And were -- was there any smaller group that was
15  reporting, gathering information from others, and bringing
16  it to you who was sort of your point person or a little bit
17  more of a direct report to you?
18     A.   Yes.  We had a tiered reporting structure that was
19  tiered from collecting information from the three regions
20  and also collecting information from the different
21  functional areas that we were -- had grouped the project
22  under.
23     Q.   Okay.  What were the three regions?
24     A.   EMEA, which is Europe and the Middle East area.
25     Q.   Okay.

27

1     A.   APJ.  Asia, Pacific, and Japan.
2     Q.   Okay.
3     A.   And the Americas.
4     Q.   And what were the functional areas?
5     A.   As I recall, we had sales force automation,
6  marketing, and call center were the three primary areas we
7  were -- had grouped our project under.
8     Q.   Now, in this tiered reporting structure who were
9  the individuals who were reporting most regularly to you
10  directly?
11     A.   As I recall, Darryl Neilsen for marketing; Kevin
12  McBride for sales force automation; and for call center,
13  Ramona Webster.
14     Q.   Now, within these three functional areas I'd like
15  to talk a little bit about what -- withdraw that question.
16     I'll come back to those functional areas in a
17  little bit.
18     Now, who did Mike Overly report to in that
19  2000-2001 period?
20     A.   Olivier Kohler.
21     Q.   Okay.  And what was Olivier Kohler's title?
22     A.   I don't know.
23     Q.   And do you know who Olivier Kohler reported to?
24     A.   I think it was Gills Bouchard.
25     Q.   And do you know Gills Bouchard's title?

28

1     A.   It's probably senior vice president of global
2  operations.
3     Q.   Okay.  Were both Kohler and Bouchard involved in
4  internal implementations of software at Hewlett-Packard?
5     A.   I would say indirectly.  They were in charge of
6  global operations.
7     Q.   Okay.  And do you know who Gills Bouchard reported
8  to?
9     A.   Uhm, I think he reported to our CEO.
10     Q.   Okay.  And who was the CEO at that time?
11     A.   At one point it could have been Carly Fiorina, and
12  her predecessor I'm drawing a blank on.
13     Q.   Okay.  Do you know when Carly Fiorina became CEO
14  of HP?
15     A.   Not off the top of my head.
16     Q.   Okay.
17     Now, in the 2000-2001 time period, in the course
18  of your employment did you participate in negotiating the
19  contracts for HP's purchases of software?
20     A.   Not really.
21     Q.   What do you mean by not really?
22     A.   There were others that were charged with
23  negotiating software purchases.
24     Q.   Okay.  And who were those individuals in that
25  2000-2001 time frame?

29

1    A.  The one that comes to mind is Karen Montague.
2    Q.  Okay.  And do you know Ms. Montague's title?
3    A.  It's a purchasing function, but I do not know her
4  title.
5    Q.  Okay.  And did Ms. Montague advise you of what was
6  going on with the negotiations with respect to purchasing
7  of software?
8    MR. HARRISON:  Objection.  Vague and ambiguous.
9    MS. DONOVAN:  Join.
10    THE WITNESS:  On a few occasions I was asked to -- for
11  my opinions or advice.
12    BY MS. ANDERSON:
13    Q.  And what were those occasions?
14    MS. DONOVAN:  I'll object to the extent it's not
15  relevant to any issues to be addressed in this deposition;
16  but if you want to generally describe those.  I'm a little
17  concerned, Counsel, about time.  I understand you're
18  entitled to get background information regarding this
19  particular witness; but since it was represented to me that
20  this was believed to be about a half-day deposition today,
21  I don't -- I just want to make sure we get to the scope of
22  the subpoena that he's here to testify about rather than
23  his background.
24    MS. ANDERSON:  Okay.  Well, No. 1 of the subject
25  matters is actual or contemplated agreements to purchase

30

1  software.  So I want to -- I think it's an appropriate line
2  of questioning.
3    MS. DONOVAN:  Well, it's to purchase CRM software,
4  etcetera, from Oracle during a particular period of time.
5  Thus far, as far as I know, you haven't asked anything
6  about that; you've just asked generally about him
7  personally and his background in the CRM area.
8    MS. ANDERSON:  Right.
9    Reporter, could you please read back the
10  question.
11    (Record was read by the reporter as follows:
12      "QUESTION:  And what were those occasions?")
13    THE REPORTER:  Do you need further back?
14    MS. ANDERSON:  I'll withdraw the question.
15    Q.  In the 2000-2001 period did you have occasion to
16  communicate with Karen Montague with respect to HP's
17  purchases of software?
18    A.  I believe so.
19    Q.  Okay.
20    A.  Yes.
21    Q.  And why was -- what was the nature of your
22  communications?
23    MS. DONOVAN:  Objection.  Vague, ambiguous.
24    MR. HARRISON:  Join.
25    THE WITNESS:  To understand where -- what additional

31

1  software needs we may have based on the status of our
2  deployment.
3    BY MS. ANDERSON:
4    Q.  Okay.
5      Okay.  Now, do you -- were you involved in the
6  purchasing decisions in November of 2000 with respect to
7  the purchase of Oracle software?
8    A.  I believe I joined the project after that purchase
9  decision was made.
10    Q.  Okay.  And approximately when did you join the
11  project?
12    A.  I think it was in December of 2000 or January of
13  2001.
14    Q.  Okay.  And when was your understanding -- strike
15  that.
16      When was a decision made to purchase software from
17  Oracle?
18    MR. HARRISON:  Objection.  Calls for speculation.
19  Lacks foundation.
20    MS. DONOVAN:  Vague and ambiguous.
21    THE WITNESS:  I think it was in November of 2000.
22    BY MS. ANDERSON:
23    Q.  Okay.  And do you know who was involved in making
24  that decision with respect to the November purchases?
25    A.  I believe Sean Hickey was the ultimate decision --

32

1    Q.  Okay.
2    A.  -- authority.
3    Q.  And do you know when Oracle and Hewlett-Packard
4  began discussing that purchase of software?
5    A.  No, I don't.
6    Q.  Okay.  Now, are you familiar with the term
7  Suite 11i as it relates to Oracle software?
8    A.  Yes.
9    Q.  Okay.  What's your understanding generally of
10  Suite 11i?
11    A.  It's a version -- a versioning number that Oracle
12  uses that encompasses some of their application software.
13    Q.  Okay.  And does that include -- you had mentioned
14  before CRM.  What does CRM stand for, if you can qualify?
15    A.  Customer relationship management.
16    Q.  Okay.  Did that include CRM modules?
17    A.  I believe so.
18    Q.  And are you familiar with the term ERP?
19    A.  Enterprise resource planning.
20    Q.  Okay.  And is it your understanding that 11i also
21  included ERP modules?
22    A.  I would be guessing, but my guess would be yes.
23    Q.  Okay.  Now, the -- in fall of 2000 HP made a
24  decision to purchase some Oracle software; is that
25  accurate?

33

1    A.  I believe so.

2    Q.  Okay.  And do you know what modules or

3  applications HP decided to purchase?

4    A.  The -- I described them in three functional areas.

5  I believe there is more detail that describes those

6  modules.

7    Q.  Okay.  So that was the sales force automation, the

8  marketing, and the call center?

9    A.  Correct.

10    Q.  Okay.  Do you know -- we can start with the

11  marketing.  Do you know what applications were included in

12  the marketing group?

13    A.  I recall one being called OMO.  Oracle Marketing

14  Online, I believe.

15    Q.  Okay.  Do you recall any others that were part of

16  that?

17    A.  For marketing?

18    Q.  Uh-huh..

19    A.  No.

20    Q.  Okay.  And what was that marketing software to be

21  used for?

22    A.  Marketing.

23       I believe that it is intended to automate

24  marketing functions, being able to help with direct

25  marketing to your customer -- your customers, understanding

34

1  which type of campaigns would go to which type of

2  customers.

3    Q.  Okay.

4    A.  That nature.

5    Q.  And was HP contemplating this purchase in order to

6  use this product internally?

7    A.  In general, yes, internally.  There may be areas

8  where it would touch externally.

9    Q.  Okay.  But it was -- was it considering purchasing

10  these products for any resale or for its own use?

11    A.  For HP's own use.

12    Q.  Okay.  And is the marketing, is that part of

13  the -- is that part of CRM?

14    A.  Yes.

15    Q.  Okay.  And is that part of -- were those modules

16  part of the Oracle Suite 11i?

17    A.  I believe so.

18    Q.  Okay.  And then sales force automation, what types

19  of modules are included in that group?

20    A.  Sales forecasting, opportunity management.  There

21  may be something called business intelligence.

22    Q.  Okay.  And who at HP would be using this type of

23  software?

24    A.  Our sales reps, our inside sales reps, and our

25  sales managers.

35

1    Q.  Okay.  And is this also part of CRM?

2    A.  Yes.

3    Q.  Okay.  And is this also part of the Suite 11i

4  Oracle products?

5    A.  I believe so.

6    Q.  Okay.  And the call center, if you could just

7  briefly describe the types of modules and applications that

8  are within the call center.

9    A.  They are -- I don't know the module names, but

10  it's to be able to bring up customer information as you're

11  talking to a customer on the phone.  And to assist in

12  recording -- recording interactions with customers.

13    Q.  Okay.  And who at HP would be utilizing this type

14  of software once it's implemented?

15    A.  Our inside sales reps and our call center agents.

16    Q.  Okay.  And is that part of CRM?

17    A.  I believe so.

18    Q.  And is that also part of Oracle Suite 11i?

19    A.  I believe so.

20    Q.  Now, when did HP, if you know, decide to begin

21  negotiations around the purchase of these software modules?

22    A.  I don't know, but I believe it was in the year

23  2000.

24       I don't know specifically.

25    Q.  Okay.  And were you informed of the content of the

36

1  negotiations during that October, November 2000 time period

2  regarding the purchase of the software?

3    A.  Not to any great extent.  Again, I joined the

4  project after the software purchase had been made.

5    MS. ANDERSON:  Okay.

6       Okay.  I'm going to ask the reporter to make this

7  Rathjens 2..

8    (Exhibit No. 2 was marked for identification.)

9    MS. ANDERSON:  Mr. Rathjens, if you can take a look at

10  this document.  Let me know when you've had a chance to

11  look it over.

12       For the record, this document has been Bates

13  stamped 00030 through 00035.

14    Q.  Okay.  Mr. Rathjens, have you seen this document

15  before?

16    A.  I believe so..

17    Q.  Okay.  What is it?

18    A.  It looks like the software purchase agreement.

19    Q.  Okay.  And was this document used by HP personnel

20  in the regular course of business?

21    MS. DONOVAN:  Objection.  Vague, ambiguous.  Calls for

22  a legal conclusion.

23    THE WITNESS:  I believe this is the document that was

24  used to purchase the software.

25    BY MS. ANDERSON:

37

1  Q.  Okay.  And is that the purchase of software in the
2  2000 time frame that we've been discussing?
3  A.  I believe so.
4  Q.  Okay.  Now, do you know why HP was considering
5  purchasing these Oracle CRM products?
6  MR. HARRISON:  Objection.  Lacks foundation.  Calls
7  for speculation.
8  THE WITNESS:  I believe HP wanted to consolidate some
9  of their software applications on a global basis.
10  BY MS. ANDERSON:
11  Q.  Okay.  And were they considering CRM solutions
12  from other vendors?
13  A.  Yeah.  I believe so.
14  Q.  Do you know what caused HP to choose the Oracle
15  applications?
16  A.  I believe HP thought that the Oracle applications
17  would scale to HP's needs.
18  Q.  Okay.  And do you know who at HP was in charge of
19  making that determination?
20  A.  Ultimately, at the time, I believe it was Sean
21  Hickey.
22  Q.  Okay.  Now, on the first page it references an
23  agreement, software license and service agreement, dating
24  back to it looks like February '94.  Are you familiar with
25  that underlying agreement?

38

1  A.  Not in any detail.
2  Q.  Okay.  And do you know why Hewlett-Packard was
3  considering purchasing the software at this time?
4  MR. HARRISON:  Objection.  Asked and answered.
5  THE WITNESS:  I believe we felt it was a good time to
6  begin consolidating some of our various software
7  applications.
8  BY MS. ANDERSON:
9  Q.  Okay.  If you could turn to page 2 of the exhibit.
10  At the top of the page it says license migration.  Are you
11  familiar with the term license migration?
12  A.  It's not a term that I use in my general
13  vocabulary.
14  Q.  Okay.  Do you have an understanding of how it's
15  used in this ordering document?
16  MR. HARRISON:  Objection.  Lacks foundation.
17  THE WITNESS:  I believe it refers to the number of
18  seats or licenses we were purchasing for each of these
19  modules.
20  BY MS. ANDERSON:
21  Q.  Now, at the time are you familiar with what
22  licenses -- what Oracle licenses HP had prior to this
23  purchase?
24  A.  Can you repeat the question.
25  Q.  Sure.  It wasn't a very good question.  Did HP --

39

1  had HP -- withdraw that.
2  Did HP already own licenses to Oracle software
3  prior to this purchase?
4  A.  I believe HP owned Oracle software license --
5  Oracle software prior to this purchase.  I do not know how
6  much CRM related software HP already owned at the time of
7  this purchase.
8  Q.  Okay.  Do you know whether they owned any CRM
9  software at the time prior to this purchase?
10  A.  I suspect they did.  Because it seemed like we
11  owned a lot of different softwares, and I imagine we had
12  purchased Oracle CRM somewhere within HP prior to this.
13  Q.  Okay.  Had you been involved in the implementation
14  of those priorly acquired licenses?
15  A.  No.
16  Q.  Okay.  Was -- and you mentioned that you became
17  involved in this project in -- shortly after the agreement
18  was struck in the December 2000 time frame; is that
19  accurate?
20  A.  I believe, yes.
21  Q.  And had you worked on implementing Oracle CRM
22  prior to that time?
23  A.  No.
24  Q.  Now, it appears under where it says license -- it
25  says existing licenses, and it mentions some of the modules

40

1  that we just discussed.  Now, are you familiar with whether
2  HP had begun implementing any of those modules?
3  MS. DONOVAN:  Objection.  Vague, ambiguous as to time.
4  THE WITNESS:  Can you restate the question, please.
5  MS. ANDERSON:  Sure.
6  Q.  It says existing licenses there, and it lists
7  several modules you've identified as CRM modules, and the
8  order date is in 1999.  So I was just wondering if you knew
9  one way or another whether HP had begun implementing those
10  modules, the licenses for which it appears were purchased
11  in August of '99.
12  A.  I really do not know.
13  Q.  Okay.  Now, near the middle of this page there's a
14  net license fee amount for approximately 21 million and
15  then a total fee for approximately 29 million, and it looks
16  like there's support fees in between.  Are you familiar
17  with -- can you explain what those support fees are for?
18  A.  I believe they give you rights to product
19  upgrades, access to Oracle support people to answer
20  questions.
21  Q.  Okay.  And do you know when those service licenses
22  were purchased?
23  A.  What do you mean by service licenses?
24  Q.  Well, it says -- it indicates these are for
25  service and support, and they're referred to as licenses;

41

1  so just when the support was purchased, I guess.  Or paid
2  for.
3      A.  I believe it was at the same time as this
4  purchase.
5      Q.  Okay.  And do you know -- these entries also refer
6  to migrated licenses.  Do you know who at HP would have
7  knowledge about what these -- what the migrated licenses
8  were?  And how they affected this deal?
9      MS. DONOVAN:  Objection.  Vague and ambiguous.
10      THE WITNESS:  I do not know.
11      MS. ANDERSON:  Okay.
12      THE WITNESS:  As I look at this, it seems that we
13  purchased additional licenses on top of what we already
14  owned.
15      MS. ANDERSON:  Okay.
16      Q.  Okay.  And if you turn to the second to the last
17  page of this exhibit.  Which is HP 34, there's a signature
18  block.  And under Hewlett-Packard it says Philip May.  Do
19  you know who Philip May is?
20      A.  Yes.
21      Q.  Who is he?
22      A.  He's an HP employee.
23      Q.  Okay.  And do you know if he was in charge of
24  negotiating the terms of this deal?
25      A.  I believe he was involved in negotiating the terms

42

1  of this deal.
2      Q.  What is his general duties at HP?
3      A.  My understanding is he was involved in selling HP
4  products to Oracle.
5      Q.  Okay.
6         And do you know who Shelly Curtis is?
7      A.  No.
8      Q.  Okay.  And did this agreement include a commitment
9  by Oracle to purchase products from Hewlett-Packard?
10      MR. HARRISON:  I am going to object on the basis this
11  is not within the scope of discovery from third parties
12  under the discovery plan.  And if you're going to proceed
13  with questions that don't have to do with anything that is
14  covered by the discovery plan for Oracle's customers, then
15  I'm going to seek relief from the Court.  If you want to
16  establish why you're asking questions about what Oracle had
17  to do with purchase of products from HP, then that's fine.
18  But this is, I think, a violation of the discovery plan.
19      MS. ANDERSON:  Do you intend to stop the deposition?
20      MR. HARRISON:  Well, I'm asking you why you're asking
21  these questions and what it has to do with the topics in
22  the discovery plan that are allowed to be asked by Oracle's
23  customers.
24      MS. ANDERSON:  I'm asking questions that are within
25  the scope of the subpoena served to HP.

43

1      MR. HARRISON:  Right.
2      MS. ANDERSON:  And I am going to continue to ask the
3  questions as I see appropriate.  Now, if you want to get
4  Judge Infante on the phone, we can.
5      MR. HARRISON:  I will.  I would like to do that.
6      MS. ANDERSON:  Okay.  So you --
7      MR. HARRISON:  Because if you're going to --
8         But first let's meet and confer, and tell me why
9  you're going to ask questions about this.  Because it has
10  nothing to do with the discrete topics that are in the
11  discovery plan with regard to Oracle's customers.
12         I have a copy of it if you want to look at it.
13      MS. DONOVAN:  From the point of view of HP, it is our
14  understanding that the scope of the subpoena is the scope
15  of the subpoena; however that is, of course, limited by any
16  discovery orders in the case.  So to the extent that
17  there's any limitation based on the discovery orders in the
18  case, we would not testify beyond the scope of the order in
19  the case.
20      MS. ANDERSON:  Okay.  We have noticed this deposition
21  for -- one of the subject matters is any agreement or
22  commitment by Oracle to purchase services in connection
23  with HP.  There have been no objections served to the
24  subpoena, and I'm going to proceed with this line of
25  questioning.

44

1      MS. DONOVAN:  As a third party witness, we have not
2  been involved in the scope of discovery permitted within
3  the case, of course.  However, our obligation to provide
4  testimony would be limited by any orders in the case.
5      MR. HARRISON:  And for the record, the scope of
6  discovery from third party customers, which was negotiated
7  by the parties and agreed upon by the Court are three
8  topics.  One is the United States economy; one is problems
9  with the product, which I'm happy to have you ask all you
10  want about it; and accounting issues relating to the debit
11  memos.
12      MS. ANDERSON:  I am going to proceed with this
13  questioning as I see fit.  If you're going to object and
14  stop this deposition right now, we can call Judge Infante
15  right now.  Otherwise I'm going to proceed with this
16  questioning.
17      MR. HARRISON:  Okay.  Then we're going to call Judge
18  Infante.  Unless you want to continue on the topics that
19  are set out by the discovery plan.
20      MS. ANDERSON:  I am going to continue with the topics
21  that are properly the subject matter of this deposition and
22  for which this witness has been proffered.
23      MR. HARRISON:  Okay.  Then we're going to call Judge
24  Infante.  And I'm going to move under Rule 30(d) that this
25  deposition is stopped and get a clarification on the scope

Rathjens, Thomas  6/30/2006  9:07:00 AM

45

1 of what customers --
2     MS. ANDERSON:  Okay.  Judge Infante has made clear
3 that objections with respect to relevancy and scope are not
4 going to be tolerated and especially not stopping a
5 deposition.  He said that in open court.  So if you want to
6 call him, we can.
7     MR. HARRISON:  Okay.  Let's stop the deposition.
8     MS. ANDERSON:  I think it would be a lot easier --
9 okay.
10     MR. HARRISON:  Because I think it's a violation, and I
11 don't think the deposition should proceed on these
12 questions.
13         So could we go off the record, please.
14     THE VIDEOGRAPHER:  Going off the record.  The time is
15 10:16.
16         (Recess taken for conference call with Judge
17 Infante - transcribed separately.)
18     (Discussion off the record.)
19     THE VIDEOGRAPHER:  This concludes recording No. 1 in
20 the deposition of Thomas Rathjens.  Going off the record.
21 The time is 11:22.
22     (Recess taken.)
23     THE VIDEOGRAPHER:  This is the beginning of Video
24 No. 2 in the deposition of Thomas Rathjens.  We're on the
25 record.  The time is 11:37.

46

1     MR. HARRISON:  This is Matt Harrison, representing
2 defendants; and I wanted to make an objection on the record
3 based on what my interpretation is of the motion on behalf
4 of defendants to limit the scope of the deposition and our
5 interpretation of the judge's ruling on that.
6         My objection would be that we move to -- we
7 object to any questions from this witness that are outside
8 of the scope of the discovery plan in the case, and we
9 reserve the right to move to strike any testimony relating
10 to that in a future motion.  Thank you..
11     MS. DONOVAN:  I'd also like to make a statement.
12 Kimberly Donovan on behalf of HP.  We did get some
13 clarification from the judge, although counsel didn't
14 really have an agreement as to whether the judge indicated
15 that examination should be limited on the topics of concern
16 that were raised.  And so at this time we're going to try
17 to have what I understand to be a brief examination of
18 the -- that we'll go into the topics that were of concern,
19 and so we will not object on the basis of relevance since
20 that's normally not appropriate, and with the limited
21 understanding we have of the orders in this case.  But at
22 some point if the examination appears to be more in depth
23 than anticipated, then we may raise those objections.
24     BY MS. ANDERSON:
25     Q.  Okay.  Mr. Rathjens, I'd just like to quickly

47

1 return your attention to Exhibit 2.  On the last page you
2 had told me that you had identified Philip May as a
3 Hewlett-Packard company (sic) and it says 11/30, 2000.  Is
4 that your understanding of when this agreement to purchase
5 these products was finalized?
6     A.  Yes.
7     MS. ANDERSON:  I'll have the reporter mark this next
8 document Rathjens 3.
9     (Exhibit No. 3 was marked for identification.)
10     BY MS. ANDERSON:
11     Q.  Mr. Rathjens, if you could just take a look at
12 that document and let me know when you've had a chance to
13 look it over.  I just have a couple of questions.
14     A.  Okay.
15     Q.  Okay.  Mr. Rathjens, have you seen this document
16 before?
17     A.  Yes.
18     Q.  What is this document?
19     A.  I believe it's an agreement for Oracle to purchase
20 products from Hewlett-Packard.
21     Q.  And is this document dated 11/30/2000?
22     A.  Yes.
23     Q.  And it appears to be a fax.  Do you know who sent
24 this fax?
25     A.  No.

48

1     Q.  Okay.  And do you know who received the fax?
2     A.  No.
3     MS. ANDERSON:  Okay.
4     MR. HARRISON:  Jennie, can I just ask you a question
5 real quick?
6     MS. ANDERSON:  No.  You can state an objection if you
7 have one.
8     MR. HARRISON:  Then -- well, the question I was going
9 to ask you, I am going to object to this document and the
10 line of questioning as outside the scope.  Can we agree
11 that that objection goes for any -- any of the questions
12 you have?  Or do I have to make one each time?
13     MS. ANDERSON:  That's fine with me if you want to make
14 a standing objection.
15     MR. HARRISON:  Thank you.
16     BY MS. ANDERSON:
17     Q.  Now, Mr. Rathjens, is it your understanding that
18 this document summarizes Oracle's end of the commitment
19 with respect to the agreement struck between HP and Oracle
20 on November 30th, 2000?
21     A.  Can you clarify which -- there's two documents
22 dated November 30th.
23     Q.  Uh-huh.
24     A.  Which document are you referring to?
25     Q.  Are these documents related?

49

1    MS. DONOVAN:  Objection.  Vague and ambiguous.
2    MS. ANDERSON:  If you know.
3    THE WITNESS:  I do not know.
4    BY MS. ANDERSON:
5    Q.  Okay.  And was it your understanding that
6    Exhibit 2 was contingent on Exhibit 3?
7    MS. DONOVAN:  Objection.  Vague, ambiguous, calls for
8    a legal conclusion.
9    MR. HARRISON:  Join in the objection.
10   MS. ANDERSON:  If you know.
11   THE WITNESS:  I don't know.
12   BY MS. ANDERSON:
13   Q.  Okay.  Do you know what a blanket purchase order
14   is?
15   A.  I believe it is a document where you can keep
16   ordering products against, as opposed to ordering
17   everything in one shot.  So it's --
18   Q.  Okay.  Is it fair to say it's an agreement to
19   purchase up to a certain amount but that it doesn't have to
20   be done in one order?  Is that accurate?
21   A.  I think so.
22   Q.  Okay.  And the -- Nos. 1 through 8 describe some
23   time lines.  Do you know whether Oracle purchased the
24   $30 million of hardware within the prescribed time?
25   A.  I think Oracle did, but I'm not absolutely certain

50

1    on that.
2    Q.  Okay.
3       Okay.  And if you could turn to the last page of
4    this document.  It appears that this is again signed by
5    Philip May.  Is that the same Philip May that we discussed
6    before?
7    A.  Yes.
8    Q.  And on behalf of Oracle, Safra Catz.  Do you know
9    who Safra Catz is?
10   A.  No, I do not.
11   Q.  Okay.  Do you know what Safra Catz's involvement
12   was in striking this agreement?
13   A.  Other than the signator for Oracle, I do not know
14   more than that.
15   Q.  Okay.  And are you aware of any other promises
16   that Oracle may have made to Hewlett-Packard on 11/30/2000?
17   MR. HARRISON:  Objection.  Vague and ambiguous.
18   BY MS. ANDERSON:
19   Q.  Other than those articulated in Rathjens 3?
20   A.  I am not aware of any other promises made on that
21   agreement.
22   Q.  If I could direct your attention back to Rathjens
23   No. 2 for a moment.  Do you know when the products
24   described in Rathjens 2 were shipped to HP?
25   A.  No.

51

1    Q.  Okay.  Do you know who would have that information
2    or where that information would be kept?
3    A.  There is a man named Jack Strukel that was
4    involved in receipt of HP software.
5    Q.  Meaning software that HP has purchased?
6    A.  Correct.
7    Q.  And that was part of his duties in the 2000-2001
8    time period?
9    A.  Yes.
10   MS. ANDERSON:  Okay.  Great.
11       I'll next have the reporter mark this as
12   Rathjens 4.  Except I'm missing one of these.
13       (Exhibit No. 4 was marked for identification.)
14   MS. ANDERSON:  Mr. Rathjens, if you could just take a
15   look at this document.
16       And while you do so, for the record, Rathjens 3
17   is a document Bates stamped HP 0001 through HP 00003.  And
18   the document being marked as Rathjens 4 is a document Bates
19   stamped HP 00053 through 60.
20   MR. HARRISON:  While he's reading the document, I just
21   want to make sure we have a standing objection on not just
22   the prior document but other documents that we believe are
23   outside of the scope.  Is that all right?
24   MS. ANDERSON:  Okay.  Are you identifying which
25   documents?

52

1    MR. HARRISON:  Well, if you want me to at the
2    beginning of each document, I will.
3    MS. ANDERSON:  Okay.
4    MR. HARRISON:  And any questions associated with it.
5    So I object that it is outside of the scope and move to
6    strike any testimony that's associated with it.  As with
7    Rathjen No. 3.  And 2 for that matter.
8    MS. ANDERSON:  You object to 2?  About the purchase of
9    the software that we're going to be talking about in this
10   deposition?
11   MR. HARRISON:  I object to -- as we got on the record,
12   object to the questions relating to the document.
13   MS. ANDERSON:  Okay.
14   Q.  Mr. Rathjens, have you had a chance to look over
15   Rathjens 4?
16   A.  Yes.
17   Q.  Have you seen this document before?
18   A.  It's very similar to the previous document so I'm
19   not sure which of the two I had seen before.
20   Q.  Okay.
21       And if you turn to HP 00057.  Have you seen that
22   document before?
23       Or that part of the document I should say.
24   A.  I believe I have seen this before.
25   Q.  Okay.  And what is that document that is 00057

53

1 through 00060 in Exhibit 4?
2      A.  It looks like it provides assurance that Oracle
3 will perform development and put some of their software on
4 HP hardware.
5      Q.  Okay.  And this is a letter to Carly Fiorina from
6 Larry Ellison; is that correct?
7      A.  Yes.
8      Q.  Okay.  And do you know whether these assurances
9 were met?  Or satisfied?
10      MR. HARRISON:  Objection.  Assumes facts not in
11 evidence.
12      THE WITNESS:  For the most part I believe these
13 commitments or these statements were met.
14      BY MS. ANDERSON:
15      Q.  Okay.  And if you could turn to the first page of
16 Exhibit 4.  It appears that Ms. Montague sent this to
17 herself at a later date but the original document was from
18 Michael DeCesare at Oracle.  Do you see that?
19      A.  Yes.
20      Q.  Do you know Michael DeCesare?
21      A.  I believe he was a sales manager at Oracle.
22      Q.  Okay.  And do you know the nature of his
23 communication with Ms. Montague on this issue?
24      MS. DONOVAN:  Objection.  Vague, ambiguous.
25      THE WITNESS:  It appears to me it was Oracle

54

1 committing to do some things on HP hardware.
2      BY MS. ANDERSON:
3      Q.  Okay.  And then also attaching the letter
4 agreement that looks very similar to what was marked as
5 Exhibit 3?
6      A.  Correct.  This looks like a draft --
7      Q.  Uh-huh.
8      A.  -- prior to the final Exhibit 3.
9      Q.  Okay.  And to the best of your knowledge, is
10 Rathjens 4 -- is it accurate to say this is an email that
11 was received by Ms. Montague in the regular course of
12 business in or around November of 2000 with these
13 attachments?
14      MR. HARRISON:  Objection.  Lacks foundation.  Calls
15 for speculation.
16      THE WITNESS:  Can you repeat the question, please.
17      MS. ANDERSON:  Yeah.
18      Q.  I'm just asking you to the best of your knowledge
19 this document is an e-mail on November 30th, 2000, from
20 Michael DeCesare to Karen Montague attaching these
21 documents?
22      MR. HARRISON:  Same objection.
23      THE WITNESS:  Yes.
24      BY MS. ANDERSON:
25      Q.  Okay.  And this was to further an agreement

55

1 between Oracle and HP in the regular course of business; is
2 that correct?
3      MR. HARRISON:  Same objections.  And it calls for a
4 legal conclusion.
5      MS. DONOVAN:  Join.
6      THE WITNESS:  Can you restate the question?
7      MS. ANDERSON:  I'll withdraw that question.
8      I'll withdraw the question.
9      Q.  Okay.  And do you have any additional knowledge
10 with respect to the agreement set forth in the attachments
11 to this November 30th e-mail?
12      MS. DONOVAN:  Objection.  Vague, ambiguous.
13      THE WITNESS:  Can you clarify what you mean by
14 additional knowledge?
15      MS. ANDERSON:  Sure.  I'm just wondering if you were
16 involved in these negotiations at all.
17      THE WITNESS:  I was not involved in these
18 negotiations..
19      MS. ANDERSON:  Okay.
20      I'll mark this as Rathjens 5.
21      (Exhibit No. 5 was marked for identification.)
22      BY MS. ANDERSON:
23      Q.  Mr. Rathjens, if you could just take a look at
24 what's been marked Exhibit 5.  For the record this has been
25 stamped HP 00045 to 00049.

56

1      A.  Okay.
2      Q.  Okay.  Mr. Rathjens, I apologize.  I have one more
3 question about Exhibit 4.  And that is it indicates that
4 Ms. Montague was corresponding with Oracle in this matter.
5 Do you know who else at HP was corresponding with Oracle
6 with respect to this agreement?
7      A.  I don't have the direct knowledge, but it appears
8 that Philip May was corresponding with Oracle.
9      MS. ANDERSON:  Okay.
10      MR. HARRISON:  I have the same objections with regard
11 to this document.  Any questions relating to this are
12 outside the scope.  Motion to strike.
13      BY MS. ANDERSON:
14      Q.  Okay.  Now, Exhibit 5.  Have you seen Exhibit 5
15 before?
16      A.  It doesn't strike me as something I've paid a lot
17 of attention to.
18      Q.  Okay.  It's a -- Onsite Support Services Exhibit
19 is the title of the document; is that correct?
20      A.  Yes.
21      Q.  Are you familiar with the support services that
22 Oracle provided HP?
23      A.  As I read this document, I'm trying to see if this
24 is support, uhm, in the sense of support to receive
25 upgrades or if this is for Oracle Consulting services.

57

1  Q.  Okay.  And are you able to determine that?
2  A.  It refers to an Exhibit A, and I'm not sure that I
3  see Exhibit A as part of this.
4  Q.  Okay.  Do you know if Oracle was providing support
5  services to HP with respect to CRM before this services
6  exhibit?  The date of the services exhibit, which is 12/1
7  of 2000?
8  MS. DONOVAN:  Objection.  Vague, ambiguous.
9  THE WITNESS:  It's common practice that HP would buy
10  support along with the software they purchase.  And from
11  the previous exhibits it looked like we had already
12  purchased Oracle software, so I assume that HP had
13  purchased support for software prior to this.
14  Q.  Okay.  To accompany the purchases of November
15  2000?  Is that accurate?
16  A.  In the previous exhibit we looked at it talked
17  about purchasing support so I'm trying to understand how
18  this differentiates from what was purchased on
19  November 30th.
20  Q.  Okay.  I see.
21  Do you recall making changes in the order --
22  excuse me.
23  Do you recall making changes in the support
24  services -- withdraw that question.  I'm sorry.  That was a
25  bad question.

58

1  Do you recall HP making changes in the support
2  with respect to the November 2000 software purchase around
3  this time?
4  A.  One day later?
5  Can you --
6  Q.  So is this part --
7  A.  Reask.
8  Q.  Is this part of the same transaction?  If you
9  know.
10  MR. HARRISON:  Objection.  Lacks foundation.  Calls
11  for speculation.
12  THE WITNESS:  I think this provides more detail
13  regarding that transaction.
14  BY MS. ANDERSON:
15  Q.  Okay.  Detail regarding what?
16  A.  Regarding the specific numbers of days of onsite
17  technical support.
18  Q.  Okay.  So providing greater detail to the document
19  that was Exhibit 2?
20  A.  That is my understanding.
21  MS. ANDERSON:  Okay.  If you could mark this as
22  Rathjens 5, please.
23  THE REPORTER:  It's 6.
24  MS. ANDERSON:  Excuse me, 6.
25  (Exhibit No. 6 was marked for identification.)

59

1  BY MS. ANDERSON:
2  Q.  Mr. Rathjens, if you could take a look at this.
3  In the meantime, for the record, this document has been
4  stamped HP 00050 to 51.
5  MR. HARRISON:  I'd like the same objection with regard
6  to the scope of this document.  Outside of the scope of the
7  discovery plan.
8  Do you want me to make a standing objection to
9  those questions for this document?
10  MS. ANDERSON:  That's fine.
11  MR. HARRISON:  I just don't want to be obstreperous
12  and interrupt your questioning every time.
13  MS. ANDERSON:  That's fine.
14  MR. HARRISON:  I also move to strike any testimony as
15  (inaudible).
16  THE REPORTER:  I'm sorry, I can barely hear you.
17  MR. HARRISON:  Sorry about that.  I said we'd also
18  move to strike any testimony relating to this document as
19  we have with the previous documents.
20  THE REPORTER:  Thank you..
21  MR. HARRISON:  I forget I don't have a microphone.  I
22  apologize.
23  BY MS. ANDERSON:
24  Q.  Mr. Rathjens, have you seen this document before?
25  A.  I may have seen it in the process of reviewing the

60

1  set of documents that were collected in the last three
2  months related to this.
3  Q.  Okay.  What does this document appear to be?
4  A.  It appears to be some terms and conditions around
5  leasing Oracle software for a period of time, as opposed to
6  owning it for a perpituity.
7  Q.  Okay.  And is this the type of document that HP
8  maintains in the regular course of its business?
9  MR. HARRISON:  Objection.  Lacks foundation.  Calls
10  for speculation.
11  THE WITNESS:  This looks like an Oracle supplied
12  document.
13  MS. ANDERSON:  Uh-huh.
14  Q.  Was this produced by HP?
15  A.  I don't -- I'd like to clarify.
16  Q.  Uh-huh.
17  A.  Produced by HP initially or produced by HP during
18  discovery?
19  Q.  During discovery.  During this case.
20  A.  Since it has an HP stamp on it, I would assume
21  it's produced by HP.
22  Q.  So this is a record that HP kept in its files
23  during the regular course of business; is that accurate?
24  MR. HARRISON:  Same objections.
25  THE WITNESS:  I think that is accurate.

61

```
1       BY MS. ANDERSON:
2       Q.  Okay.  And do you have -- other than what you've
3   gleaned from the face of this document, do you have any
4   other information with respect to this lease agreement?
5       MS. DONOVAN:  Objection.  Vague and ambiguous.
6       THE WITNESS:  It may tie to a previous agreement where
7   there was an ability to convert from leasing Oracle
8   software for a period of time to owning the software for an
9   indefinite period of time.
10      BY MS. ANDERSON:
11      Q.  Okay.  And if you could just look to Exhibit 2 for
12  a moment.
13      A.  Yes.
14      Q.  On page 2 of that exhibit.  Where it says "net
15  license fees" it has an amount.  And then on Exhibit 6 it
16  appears to be the same amount for the software.  Is this
17  lease schedule related to this November 2000 agreement?
18      MR. HARRISON:  Objection.  Lacks foundation.
19      THE WITNESS:  I would say yes.
20      MS. ANDERSON:  Okay.  Thank you.
21          Okay.  We'll mark this as Rathjens 7, please.
22      (Exhibit No. 7 was marked for identification.)
23      MS. ANDERSON:  For the record, while you have a chance
24  to look that over, Mr. Rathjens, this is a document that
25  has been stamped HP 00036 to HP 00044.
```

62

```
1       MR. HARRISON:  I'll make the same objections with
2   regard to Rathjens 7 as I have for previous documents
3   regarding scope.  And I also move to strike any testimony
4   that is outside of the scope of discovery.  Will you give
5   me the same standing objection with regard to this
6   document?
7       MS. ANDERSON:  That's fine.  You make the same
8   objection, you make the same objection.
9       THE WITNESS:  Okay.
10      BY MS. ANDERSON:
11      Q.  Okay.  Mr. Rathjens, have you seen this document
12  before?
13      A.  I may have seen it during reviewing the documents
14  collected by HP.
15      Q.  Okay.
16      A.  But I don't recall reviewing it in detail prior,
17  in the past.
18      Q.  Okay.  It appears to be a -- an e-mail of
19  December 21st, 2001, from Darrell Bush to Kelley Kinney and
20  with some attachments.  Is that fair?
21      A.  Yes.
22      Q.  Who is Darrell Bush, if you know?
23      A.  I do not know.
24      Q.  Okay.  Who is Kelley Kinney?
25      A.  I do not know.
```

63

```
1       Q.  Okay.  Do you -- what -- in the -- we'll start
2   with the page 1, the e-mail.  Do you know what a no charge
3   HP contract -- do you know what that refers to?
4       A.  I'm not familiar with that terminology.  This
5   appears to be a -- an Oracle purchase order that reflects
6   the agreement for HP to purchase the software as described
7   on that November 30th agreement.
8       Q.  Okay.  And why do you say that relates to the
9   November 30th agreement?
10      A.  The time frame of this is three weeks afterwards,
11  and it appears to clarify the licenses that we purchased in
12  combining the previous licenses owned that were migrated
13  along with the new license purchased.
14      MS. DONOVAN:  I just want to call your attention to
15  the year.  It's actually a year after.
16      THE WITNESS:  Oh.
17          Thank you for that.
18          So I was one year off.  I was thinking that this
19  was, as I stated, clarifying what we purchased and a
20  document that followed; but in looking at the date of the
21  e-mail, that doesn't make sense.
22      BY MS. ANDERSON:
23      Q.  Are you familiar with these purchases?
24      A.  To a certain extent I was familiar -- I was
25  familiar with what we had purchased and very interested in
```

64

```
1   making sure that we made the most effective use of our
2   purchase.
3       Q.  Okay.  Do you know why there was no charge --
4       MR. HARRISON:  Objection.  Assumes facts not in
5   evidence.  Sorry.
6       BY MS. ANDERSON:
7       Q.  -- no charge indicated on this ordering document?
8       A.  I do not know.  But, again, I suspect it's
9   clarifying what licenses we owned.  Or what licenses we had
10  purchased.
11      Q.  Okay.
12          Now, you said that you're familiar with the
13  purchases that HP made.  Were there purchases made by HP
14  between the November 2000 purchases and this no charge
15  contract here to the best of your knowledge?
16      MS. DONOVAN:  Objection.
17      MR. HARRISON:  Objection.
18      MS. DONOVAN:  Vague and ambiguous.
19      MR. HARRISON:  Join in the objection.
20      THE WITNESS:  I recall HP making an additional license
21  purchase after November 30th of 2000.
22      BY MS. ANDERSON:
23      Q.  And when was that?
24      A.  I do not recall.
25          I don't know the time line, but -- so...
```

65

1    Q.  Do you know whether it was within a matter of
2  months, or was that within a year?
3    A.  I think it was more on the year time frame.
4    Q.  And do you know what was purchased in that next --
5  in that next purchase that you think was sometime within a
6  year of November 30th, 2000?
7    A.  I do not off the top of my head.  There may be a
8  document that describes that within this discovery set of
9  documents.
10    Q.  Okay.
11      Now, you mentioned that when you first saw this
12  document and thought it was a year earlier, you mentioned
13  that it may have provided clarification on the November
14  2000 order.  Do you recall Oracle and HP having -- you
15  know, making that kind of clarification with respect to the
16  purchases of November of 2000?
17    MR. HARRISON:  Objection.  Vague and ambiguous.  Lacks
18  foundation.
19    THE WITNESS:  Can you please repeat the question?
20    BY MS. ANDERSON:
21    Q.  Sure.  When you had mentioned that there may be an
22  instance where there was clarification or follow-up
23  documents with respect to the products that had been
24  purchased, do you recall that happening with the November
25  2000 purchase?

66

1    MR. HARRISON:  Same objection.  Misstates prior
2  testimony.
3    THE WITNESS:  I think there was more discussions
4  around clarifying what we had purchased in a time frame
5  that was six months to a year to a year and a half after
6  the initial November 30th purchase.  I don't recall there
7  being any immediate clarifications, you know, right off the
8  bat, if you will.
9    MS. ANDERSON:  Okay.
10    I'd like to mark this next exhibit as Rathjens 8
11  I believe we're up to.
12    (Exhibit No. 8 was marked for identification.)
13    MR. HARRISON:  Same objections with regard to
14  Rathjens 8 regarding scope and any questions related
15  thereto.  And motion to strike testimony that's outside of
16  the scope of the discovery order in this case..
17    BY MS. ANDERSON:
18    Q.  Mr. Rathjens, let me know once you've had a chance
19  to look at Rathjens 8.
20    A.  Okay.
21    Q.  For the record, this has been Bates stamped
22  HP 00019 through HP 00023.
23    A.  Okay.
24    Q.  Okay.  Have you seen this document before?
25    A.  I don't recall if I had seen it before.

67

1    Q.  Okay.  If you look at the first page of the
2  exhibit, it appears that you're cc'd on this e-mail that
3  has the -- an attachment titled Oracle CRM Purchase
4  Summary..
5    A.  At the very top?
6    Q.  Uh-huh.
7    A.  Yes.
8    Q.  Okay.  What is this document?
9    A.  It appears to be a summary of -- to Sean Hickey of
10  where we were at with deploying the Oracle software.  And
11  what we had purchased.
12    Q.  And why was this -- what was the purpose of this
13  e-mail?
14    MR. HARRISON:  Objection.  Lacks foundation.  Calls
15  for speculation.
16    THE WITNESS:  I believe one -- one purpose was to see
17  if we should write off a -- some of the software, as
18  opposed to depreciating it over a three-year period.
19    BY MS. ANDERSON:
20    Q.  What do you mean by write off?
21    A.  I'm not an accounting expert, but I believe that
22  you have the ability to write off an expense rather than
23  depreciate it over the typical three-year period, which is
24  done with -- to my understanding with software.  You
25  depreciate it over three years.

68

1    Q.  And why was HP considering the option of writing
2  the software off?
3    MR. HARRISON:  Objection.  Lacks foundation.
4    THE WITNESS:  I believe to get a -- you know, a bigger
5  expense on the books to offset income and pay less taxes.
6  Period.
7    BY MS. ANDERSON:
8    Q.  And what's your understanding of the circumstances
9  under which software can be written off as opposed to
10  depreciated?
11    MR. HARRISON:  Objection.  Lacks foundation.  Calls
12  for speculation.
13    THE WITNESS:  I do not know the accounting rules on
14  when you can write off software versus depreciate it.
15    BY MS. ANDERSON:
16    Q.  Okay.  I have a few questions about the document.
17  If you could turn to the second page.  No. 2, Sean --
18  written by Sean Hickey, who we've mentioned before.  It
19  says it's critical to view this agreement as an enterprise
20  license agreement and not something specific to BCO.  Do
21  you know what BCO is?
22    A.  I believe It stands for business consulting
23  organization.
24    Q.  And do you know why he said that it was critical
25  to view the agreement as a enterprise license agreement as

69

1  opposed to a BCO?
2      MR. HARRISON:  Objection.  Lacks foundation.  Calls
3  for speculation.
4      THE WITNESS:  I think, yeah, we wanted to make sure
5  that the CRM implementation was HP wide and not specific to
6  this one organization within HP.
7      BY MS. ANDERSON:
8      Q.  Okay.  Now, if you look down to No. 5.  It is
9  expected Oracle Compensation will be used, but not until it
10  looks like fiscal year '02.  Do you have an understanding
11  of what that means?
12      MR. HARRISON:  Same objections.
13      THE WITNESS:  I talked about three functional areas
14  that I was involved in implementing.
15      MS. ANDERSON:  Uh-huh.
16      THE WITNESS:  This might be considered a fourth
17  functional area that we had not -- we chose not to pursue
18  deploying immediately.
19      BY MS. ANDERSON:
20      Q.  Why?
21      A.  Because what we were trying to do was already
22  complicated enough, and we were stretched to be successful
23  with the three areas we had chosen to go after.
24      Q.  Was -- excuse me.
25          Was the Oracle Compensation part of the November

70

1  2000 purchase?
2      A.  I'd have to go back and look at that exhibit.
3      Q.  But it's your understanding that HP owned Oracle
4  Compensation but was not deploying it?  Is that accurate?
5      A.  That's my understanding.
6      Q.  Okay.  As opposed to whether they chose not to
7  purchase it.  Do you know -- I mean, do you know one way or
8  the other whether it was purchased and not deployed or not
9  purchased?
10      A.  As I look back to Exhibit 2 --
11      Q.  Uh-huh.
12      A.  -- I see Incentive Compensation, quantity 7,300.
13  I believe that is related to this item, the fifth bullet on
14  this exhibit --
15      Q.  Okay.
16      A.  -- Exhibit 8.
17      Q.  You mentioned that the three areas of
18  implementation, and that's the implementation of the Oracle
19  CRM we were talking about before, were complicated enough.
20  What did you mean by that?
21      A.  In HP trying to deploy software globally is a
22  challenge.
23      Q.  Uh-huh.
24      A.  And trying to get all the parties to agree on
25  common processes, common settings, common work flow, time

71

1  lines to deploy is a very challenging task.  And we had
2  chosen not to take on the Oracle Compensation module at
3  that time.
4      Q.  Okay.  And if you could look at No. 7.  It says
5  the inbound call center implementation to replace Remedy
6  now delayed to fiscal year '02.  What was the cause of that
7  delay?
8      A.  There were multiple factors causing that delay.
9      Q.  And what were those factors?
10      A.  Gaining agreement from the HP stakeholders as to
11  when and how to replace Remedy.
12      Q.  Uh-huh.
13      A.  Delays in configuring the software to be
14  acceptable for our stakeholders on a global basis.
15      Q.  What do you mean by configuring?
16      A.  When we talk about getting the software ready to
17  deploy, often we talk about customization versus
18  configuring.  So the extent you need to set up the software
19  or modify it to make it work.
20      Q.  Okay.  And was that necessary for the inbound call
21  center CRM software?
22      A.  Yes.
23      Q.  Okay.  Why was that necessary?
24      A.  You need to set up the software to meet your
25  business needs.

72

1      Q.  And so was the delay trying to assess the business
2  needs?
3      A.  There were multiple factors in delaying the
4  deployment of this software.  And in HP it's very difficult
5  to deploy any piece of software globally..
6      Q.  And was one of the factors for the delay related
7  to the lack of functionality of the inbound call center --
8      MR. HARRISON:  Objection.
9      BY MS. ANDERSON:
10      Q.  -- CRM applications?
11      MR. HARRISON:  Objection.  Vague and ambiguous.  Calls
12  for speculation and assumes facts not in evidence.
13      THE WITNESS:  I would say the delay was in part due to
14  making the software function to meet our stakeholders
15  acceptance criteria.
16      BY MS. ANDERSON:
17      Q.  Okay.  Okay.  And was HP aware that this
18  additional functionality would need to be added before it
19  was deployable when they purchased the software?
20      MR. HARRISON:  Objection.  Lacks foundation.  Calls
21  for speculation.
22      THE WITNESS:  HP was aware that the software was being
23  developed and some modules of the Oracle CRM software --
24  some modules were more developed than others.
25      BY MS. ANDERSON:

73

1  Q.  And was that lack of development one of the
2  contributing factors that delayed use of the inbound call
3  center applications?
4  MR. HARRISON:  Objection.  Calls for speculation.
5  THE WITNESS:  Can you repeat the question.
6  MS. ANDERSON:  Sure.
7  Q.  Was that lack of development one of the
8  contributing factors that delayed use of the inbound call
9  center applications?
10  MR. HARRISON:  Same objection.  Asked and answered.
11  Misstates prior testimony.
12  THE WITNESS:  I think it contributed to it.
13  BY MS. ANDERSON:
14  Q.  Okay.
15  Now, who was responsible for the -- developing the
16  additional functionality for the call center software?
17  MS. DONOVAN:  Objection.  Vague, ambiguous.
18  MR. HARRISON:  Joined.
19  THE WITNESS:  There were several aspects to making the
20  software work.  Some to be delivered by Oracle development,
21  some to be delivered by the HP folks configuring the
22  software.  So it was a combination of going back to Oracle
23  development for changes and changing things on the software
24  that we had received.
25  BY MS. ANDERSON:

74

1  Q.  Okay.  And what aspects of making the software
2  work was the responsibility of Oracle development?
3  A.  It depended on the specific cases or the specific
4  issues.  In some cases we'd ask Oracle to make a change,
5  whether it was to fix a bug or to enhance the software.
6  In other cases there were things that we could
7  change to make the software work for our needs.
8  Q.  Okay.  And of the applications that Oracle -- or
9  excuse me, that HP purchased in November of 2000, were all
10  of those modules functional in November of 2000?
11  MR. HARRISON:  Objection.  Vague and ambiguous as to
12  the term functional.  And lacks -- calls for speculation.
13  THE WITNESS:  The definition of functional is broad.
14  Making some software work for a small company with one
15  sales motion is one thing.  Making it work for multiple
16  sales motions, multiple product lines, multiple languages
17  is another.  We have a very complicated vision, and we were
18  trying to make the software serve a lot of needs for HP.
19  BY MS. ANDERSON:
20  Q.  I'm not sure that you answered the question.  My
21  question was that were the applications that HP purchased
22  in November of 2000, were those modules functional in
23  November of 2000?
24  MR. HARRISON:  Same objections.  Talking about HP or
25  in general?

75

1  THE WITNESS:  This type of software is not functional
2  the day after you install it on a server.  There is lots of
3  configurations, settings, workflows, batch processes.
4  There are a lot of things to do to make the software work.
5  MS. ANDERSON:  Uh-huh.
6  Q.  Was there additional -- did Oracle promise that
7  additional functionality would be added in the future that
8  wasn't available in those modules in November of 2000?
9  MR. HARRISON:  Objection.  Vague and ambiguous.  Lacks
10  foundation.
11  THE WITNESS:  I'm not sure "promise" is the right
12  word.
13  BY MS. ANDERSON:
14  Q.  What would be the right word?
15  A.  Expectations.  We had lots of dialogue,
16  discussion, and process to get our requested changes into
17  the Oracle software done by Oracle development that we
18  expected to see in the software products at a further point
19  in time.
20  Q.  Okay.
21  A.  And that was a big premise on which we purchased
22  the software.  That Oracle would continue to develop it to
23  meet HP's needs.
24  Q.  Okay.  And was this -- did Oracle provide the
25  additional development and functionality as expected?

76

1  MR. HARRISON:  Objection.  Vague and ambiguous.
2  THE WITNESS:  It was on a case-by-case basis so we had
3  lots of change requests, lots of trouble tickets or defect
4  tickets that we tracked.  In some cases the changes were
5  delivered quickly, and other times they were delivered more
6  slowly, and in some cases not delivered.
7  MS. ANDERSON:  Okay.
8  Q.  Now, do you know when -- just back to Exhibit 8
9  briefly.  With respect to No. 5, when did HP implement
10  Oracle Compensation?  If you know.
11  A.  To my knowledge we never implemented Oracle
12  Compensation?
13  Q.  Why not?
14  MR. HARRISON:  Objection.  Lacks foundation.
15  THE WITNESS:  My understanding is this was not a high
16  priority for HP.  This is not where we get the biggest bang
17  for our buck, or for our efforts, and we chose not to
18  implement this.
19  BY MS. ANDERSON:
20  Q.  Okay.  And what about the inbound call center?  Do
21  you know when it was implemented?
22  A.  I do not believe it was implemented.
23  Q.  Why not?
24  MR. HARRISON:  Same objections.
25  THE WITNESS:  We -- HP chose to move to a different

77

1  software technology for its go-forward call center
2  solutions.
3      BY MS. ANDERSON:
4      Q.  What software technology was that?
5      A.  One of them was a Seibel call center, but I
6  believe HP is using several other call center technologies
7  going forward, including Remedy.
8      Q.  Okay.  And why did Oracle (sic) decide to move to
9  different software if it already owned the Oracle software?
10     MR. HARRISON:  Objection.  Asked and answered.
11     THE WITNESS:  You mean to say why did HP move to --
12     MS. ANDERSON:  Excuse me.  Thank you.
13     Q.  Why did HP decide to move to different software if
14  it already owned the Oracle software?
15     MR. HARRISON:  Same objections.
16     THE WITNESS:  At the time of the HP-Compaq merger
17  there was a -- we merged with Compaq, who was using Seibel
18  software in the CRM space; and a decision was made to
19  consolidate on the Seibel software rather than the Oracle
20  software.
21     Q.  Okay.  Were you involved in that decision?
22     A.  No.
23     Q.  Do you know why that decision was made?
24     MR. HARRISON:  Objection.  Lacks foundation.
25     THE WITNESS:  I believe it was for the best of HP.

78

1  They determined that this would be a better fit for HP as
2  HP merged with Compaq.
3      MS. ANDERSON:  Okay.
4      MS. DONOVAN:  When you get to a point, can we go ahead
5  and take a break.
6      MS. ANDERSON:  I just wanted to ask you a few
7  questions about the foundation of your testimony that I'm
8  not sure that we covered, and then it probably is a good
9  time to take a break.
10     Q.  Now, in the 2000 2000 (sic) time period you
11  testified that you were involved in implementations of
12  Oracle applications at HP; is that accurate?
13     A.  Yes.
14     Q.  And what was the nature of your involvement in the
15  implementation of Oracle applications in the 2000-2001 time
16  period?
17     A.  Managing the configuration, deployment, training,
18  management of change.  I had a fairly broad responsibility
19  to get the software configured and complete.
20     Q.  Okay.  And were you involved in the implementation
21  of all of the CRM modules that we discussed that were part
22  of the November 2000 purchase?
23     Let me withdraw that.
24     To the degree that HP implemented CRM Suite 11i
25  modules, were you involved in the implementation of those

79

1  modules?
2      A.  Yes.
3      Q.  And what was your -- was your involvement as you
4  described, the configuration, deployment, training,
5  management of change?
6      A.  What was the question?
7      Q.  I was just wondering if you -- you had said that
8  you managed configuration, deployment, training, and
9  management of change.  Is that the same for the
10  implementation of the CRM 11i products?
11     A.  Yes.
12     Q.  Okay.  And did you have any other duties in that
13  capacity?
14     A.  I managed the subcontractors that helped us put
15  the software configuration in place.
16     Q.  And was Oracle Consulting involved in the
17  implementation efforts of CRM 11i at HP?
18     A.  Yes.
19     Q.  And what was the extent of Oracle's obligations in
20  the implementation?
21     MR. HARRISON:  Objection.  Vague and ambiguous.
22     MS. DONOVAN:  Join.
23     THE WITNESS:  Can you repeat the question.
24     MS. ANDERSON:  I can rephrase it.
25     Q.  How was Oracle Consulting involved in the

80

1  implementation of CRM Suite 11i at HP?
2      A.  Oracle Consulting was helping us configure the
3  software, they were helping us communicate with Oracle
4  development to get changes coming from Oracle development.
5  They were helping us define our global business processes.
6  They were helping us with many aspects of the software
7  configuration and deployment.
8      Q.  Okay.  Approximately how many Oracle consultants
9  were at HP working on this project?
10     A.  It varied over time.  From 5 consultants to 20
11  consultants.
12     Q.  Okay.  And what about -- is that true for the
13  2000-2001 time period?
14     A.  I believe so.
15     Q.  Okay.  And were the -- were -- was Oracle
16  Consulting's role part of the 2000 -- let me rephrase that.
17     Were these obligations part of the November 2000
18  agreement, if you know?
19     MR. HARRISON:  Objection.  Lacks foundation.
20     THE WITNESS:  I believe they were distinct.
21     MS. ANDERSON:  Okay.  And -- okay.
22     We can take a break now.
23     MS. DONOVAN:  Okay.
24     THE VIDEOGRAPHER:  Going off the record.  The time is
25  12:40.

81

1     (Lunch recess taken at 12:40, proceedings to resume at
2     1:25 p.m. )
3              -oOo-
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82

1              AFTERNOON SESSION
2     JUNE 30, 2006                    1:34 P.M.
3              -oOo-
4     THE VIDEOGRAPHER:  We are back on the record.  The
5     time is 1:34.
6              EXAMINATION (RESUMED)
7     BY MS. ANDERSON:
8     Q.  Okay.  Welcome back, Mr. Rathjens.  If you could
9     return your attention to Exhibit 8, I have a few more
10    questions about that exhibit.
11        On page 2, if you could -- there are two No. 10s,
12    and I'd like you to take a look at the second No. 10, where
13    it says there is an ability to exchange up to 20 percent of
14    the licenses.  Are you familiar with that option?
15    MR. HARRISON:  I am going to just for the record voice
16    my objections to this document and the questioning outside
17    of the scope, which you agreed to be continuing, still
18    standing.  Thank you.
19    MS. ANDERSON:  (Nods head up and down.)
20    THE WITNESS:  Yes.
21    BY MS. ANDERSON:
22    Q.  And what is your understanding of that option?
23    A.  There's an ability to exchange 20 percent of one
24    type of license for another type of Oracle CRM related
25    license.

83

1     Q.  Okay.  And was that part of the November 2000
2     purchase?
3     A.  I think it was a subsequent -- part of a
4     subsequent purchase.
5         I'm not sure about that after looking at that.
6     Q.  Do you know if HP did exchange one type of Oracle
7     CRM license for another during that time period?  That time
8     period being 2000-2001?
9     A.  I think we did exercise that exchange.
10    Q.  Do you recall what modules or applications you
11    exercised that with respect to?
12    A.  No, I don't.
13    Q.  Do you recall when you exercised that --
14    A.  No.
15    Q.  Okay.
16        It indicates there's a concern because overall CRM
17    rollout is slowed.  Were there problems with implementation
18    that were causing this overall rollout described in this
19    document?
20    A.  Yes.
21    Q.  What were the implementation problems experienced
22    at HP with respect to that rollout?
23    A.  There was a variety of problems.  Some due to the
24    maturity of the software, some due to the ability to gain
25    HP consensus on common configurations and business

84

1     processes to roll out.  There's some fiefdoms to break down
2     within HP because you're retiring other people's software
3     and there is sometimes resistance to that that you need to
4     overcome.
5     Q.  Okay.  You mentioned maturity of the software.
6     What did you mean by that?
7     A.  Well, some of the software was more mature than
8     other modules, and it was being developed by Oracle during
9     this time frame.
10    Q.  Okay.  Of the modules purchased in the November of
11    2000 CRM deal, which of those would you describe as
12    immature?
13    MR. HARRISON:  Objection.  Vague and ambiguous.
14    Misstates testimony.
15    THE WITNESS:  If I can get to a software list.
16        I would say the sales force automation software
17    was more mature.  The marketing, mobile sales, and call
18    center software was not as fully developed to meet HP's
19    enterprise needs.
20    BY MS. ANDERSON:
21    Q.  Okay.  Did those -- the marketing, mobile sales,
22    and the call center software, did those not function as HP
23    originally expected?
24    MR. HARRISON:  Objection.  Asked and answered.  Vague
25    and ambiguous.

Rathjens, Thomas  6/30/2006  9:07:00 AM

85

1      MS. DONOVAN:  Objection.  Vague and ambiguous.
2      THE WITNESS:  When you say HP's expectations, there's
3   individuals within HP that I'm sure had different
4   expectations so it's hard to -- to state what our, HP's,
5   expectations were at that point in time.
6      BY MS. ANDERSON:
7      Q.  Okay.  In your experience, as someone who's
8   involved in the implementation efforts of the CRM, you
9   mentioned that some of them weren't implemented at all.
10     A.  Yes.
11     Q.  Was that in part because they lacked functionality
12   that you thought would be there?
13     MR. HARRISON:  Objection.  Asked and answered.  Vague
14   and ambiguous.
15     THE WITNESS:  They lacked the functionality that HP
16   stakeholders felt they needed to deploy it.
17     BY MS. ANDERSON:
18     Q.  Okay.  Now, you said that "it" was being
19   developed.  What do you mean by "it"?  Do you mean
20   Suite 11i or the -- I mean the CRM 11i modules?
21     A.  Yeah.  I believe when we started it might have
22   been at a version lower than 11i.  So software like this is
23   continually being upgraded, and the different modules
24   were -- had different -- had been under development for
25   different periods of time at Oracle, so some software was

86

1   more fully developed than others.
2      Q.  Okay.  Now, also on -- in Exhibit 8 on page 2, it
3   says that there's already a 2.2 million support cost
4   reduction on the request -- on the table with Oracle.  Are
5   you familiar with that cost reduction request?
6      A.  I know during this time frame we were negotiating
7   to reduce the forward support costs that we were paying for
8   software.
9      Q.  And why did HP think that the support costs should
10   be lower?
11     A.  I think good business is to always try and
12   negotiate to lower costs.
13     Q.  Uh-huh.
14     A.  And this type of cost is a ongoing cost that we
15   were trying to reduce our annual commitment.
16     Q.  Okay.  Was part of the reason because some of the
17   modules purchased weren't being implemented?
18     A.  I believe that is accurate.  We were concerned
19   that we were paying for support on software that we
20   hadn't -- had not deployed.
21     Q.  Okay.  In the last line of this note -- withdraw
22   that question.
23        If you could look at page 3 of the exhibit.
24   Page 3 continues the e-mail line.  I see that you're one of
25   the recipients of this original e-mail from Dave Smith.  Do

87

1   you know who Dave Smith is?
2      A.  I would characterize him as a controller type.
3      Q.  Uh-huh.
4      A.  An accounting person type.
5      Q.  Okay.  And this is describing a Oracle CRM
6   3 million (sic) potential write-off.
7      A.  13 million.
8      Q.  Excuse me.  13 million.
9         Do you know if HP took that write-off?
10     A.  No, I don't.
11     Q.  Okay.
12     A.  I'll retract that.  I believe that when we merged
13   with Compaq, we wrote off software.  Probably not -- Oracle
14   was not the only software that we took write-offs as part
15   of the Compaq merger, but my recollection is we would have
16   most likely taken a write-off at the time when we merged
17   with Compaq.  Or within a year from that time frame.
18     Q.  If you could turn to the very last page of this
19   exhibit.  Well, actually, the second to the last page
20   first.  Have you seen this document before?  That's
21   attached to this e-mail?
22     A.  Yes.
23     Q.  And it's titled Oracle CRM Module and Number of
24   User licensed -- User Licenses Purchased; is that correct?
25     A.  Yes.

88

1      Q.  When did you see this document previously?
2      A.  Well, I see that I am copied on the e-mail to
3   which it's attached, so I'm pretty sure I would have read
4   it at the time I received it in my in basket.
5      Q.  Okay.  I'd like to clarify.  At the very bottom of
6   the page it has a date that says 3/20/2006, but it's
7   attached to an e-mail that's dated July 12, 2001.
8      A.  Okay.
9      Q.  Do you know if that's the date that this was
10   printed for production?
11     MR. HARRISON:  Objection.  Lacks foundation.
12     THE WITNESS:  I would assume that this was -- has a
13   footer on it that provides a, you know, current date stamp.
14   So at the time it was reprinted this date was put on here.
15     BY MS. ANDERSON:
16     Q.  Okay.  Do you recall reviewing this document in
17   2001?
18     A.  I don't specifically recall it, but I'm sure that
19   at the time I was very in tune with this document.
20     Q.  Okay.  Do you know -- do you know why this
21   document was created?
22     MR. HARRISON:  Objection.  Lacks foundation.
23     THE WITNESS:  I know we were deciding if we should
24   convert some of these term licenses into perpetual
25   licenses, and there was a decision to be made whether we

89

1  should do that, and thus we were producing documents to
2  help with that decision making.
3      Q.  Okay.  And what were the factors that were being
4  weighed for that decision?
5      A.  The number of licenses and modules we had already
6  put into production.  The cost of ongoing support if we did
7  that conversion.  Were two of the main considerations.
8          I don't know if at this time frame we were
9  contemplating the Compaq merger; but if we were, that would
10  have been another consideration.
11     Q.  Okay.  If you could turn to the following page.
12         The last -- the second to the last paragraph
13  refers to 14 showstoppers.  Are you familiar with a
14  showstopper as it's referred to here?
15     A.  Yes.  We used the terminology showstopper quite
16  often.
17     Q.  What does that mean?
18     A.  That means you have an issue or something that's
19  keeping you from proceeding with something.  Whether it's a
20  testing, whether it's a deployment.  It depends on what
21  phase you're at and what it's relative to, but it's
22  something that you need to get fixed.  And it would be of a
23  very high priority.
24     Q.  Okay.  And do you know what these 14
25  showstoppers -- where it says they are not addressed in the

90

1  contract, do you know what those are?
2      A.  No, I don't.
3      Q.  Okay.  Do you know what verbal reassurances were
4  received from senior executives from Oracle as referred to
5  there in the note?
6      A.  No.
7      Q.  Are you aware of showstoppers that were affecting
8  the CRM 11i software that was purchased in November of
9  2000?
10     A.  I may be able to recall a -- some of them, but I
11  could not list these 14 showstoppers.
12     Q.  Okay.  What are some of the ones that you recall?
13     A.  Perhaps a search -- searching in different types
14  of languages.  We may have -- may have been one of them.
15     Q.  Do you know what applications that was affecting?
16     A.  Maybe the call center.
17         Perhaps the -- I'm guessing at what the 14 are so
18  I don't know them off the top of my head.  Maybe in mobile
19  sales we might have had something we were asking for.
20     Q.  And by something you were asking for, what do you
21  mean by that?
22     A.  Some piece of functionality that we wanted to see
23  incorporated into the software.
24     Q.  And was that functionality functionality that was
25  promised to be part of CRM Suite 11i in November of 2000?

91

1      MR. HARRISON:  Objection.  Lacks foundation.  Calls
2  for speculation.
3          Vague and ambiguous also.
4      THE WITNESS:  I don't believe so because in November
5  of 2000 we did not have the detail as to what was in the
6  software and what was not.
7  BY MS. ANDERSON:
8      Q.  Why not?
9      MR. HARRISON:  Same objections.
10     THE WITNESS:  I was not part of that purchase
11  negotiation; but as I recall, we didn't have a -- I did not
12  see the detailed specs of what each module contained.
13  BY MS. ANDERSON:
14     Q.  Okay.  And when was the detail as to what was in
15  the software provided to HP?
16     A.  I think --
17     MR. HARRISON:  Same objections.
18         Sorry.  Go ahead.
19     THE WITNESS:  I think with each release it describes
20  new features and functionality, so I think along with the
21  release you get documentation as to what is available.
22  BY MS. ANDERSON:
23     Q.  With respect to the software that was purchased in
24  November of 2000, was there -- was there functionality that
25  HP thought would be part of the software that wasn't?

92

1      MR. HARRISON:  Objection.  Asked and answered.  Calls
2  for speculation.  Lacks foundation.
3      THE WITNESS:  I think different people within HP had
4  different expectations.
5      MS. ANDERSON:  Uh-huh.
6      THE WITNESS:  And for myself, I was new to the program
7  so I was -- had a pretty much of a blank slate on my
8  personal expectations at that time.
9  BY MS. ANDERSON:
10     Q.  Okay.  If it wasn't known what the software
11  contained, then how did HP know which software it should
12  buy?
13     MR. HARRISON:  Same objections.
14     THE WITNESS:  My impression is software deals of this
15  magnitude are based on knowledge of a company's wherewithal
16  to deliver.  And we were -- we wanted to work with a
17  company that had staying power, and we believed Oracle was
18  a good partner.
19  BY MS. ANDERSON:
20     Q.  Okay.  Did HP purchase the software with the
21  understanding that additional functionality would be added
22  later?
23     MR. HARRISON:  Objection.  Asked and answered.  Vague
24  and ambiguous.
25         Lacks foundation.

93

1    THE WITNESS: Can you repeat the question.
2    MS. ANDERSON: Sure.
3    Q.  Did HP purchase the software, meaning CRM 11i,
4  with the understanding that additional functionality would
5  be added later?
6    MR. HARRISON: Same objections.
7    THE WITNESS: I would agree with that statement.
8    BY MS. ANDERSON:
9    Q.  Okay.  And did HP -- was HP required to pay for
10 the additional functionality as it was added?
11   MR. HARRISON: Same objections.
12   THE WITNESS: In some cases yes, in other cases no.
13 And this was one of the topics that we -- we had
14 discussions and negotiations over with Oracle.
15   BY MS. ANDERSON:
16   Q.  Okay.  So was there a dispute between HP and
17 Oracle with respect to whether HP had to pay for additional
18 functionality on certain modules?
19   MS. DONOVAN: Objection.  Vague, ambiguous.
20   MR. HARRISON: Joined.
21   THE WITNESS: There was active business discussions.
22 I don't know if "dispute" is the right word.
23   BY MS. ANDERSON:
24   Q.  Okay.  Now, you mentioned when HP first purchased
25 the software that there was -- that even what the software

94

1  would do was somewhat ambiguous.  Is that accurate?
2    MR. HARRISON: Objection.  Misstates prior testimony.
3  Lacks foundation.
4    THE WITNESS: Okay.  Can you repeat the question?
5    MS. ANDERSON: Maybe I can withdraw the question and
6  ask a better question.
7    Q.  In what instances was HP not required to pay for
8  additional functionality to the CRM 11i applications?
9    MR. HARRISON: Objection.  Vague and ambiguous.
10   THE WITNESS: Where the software was -- had a new
11 version coming out of the modules that we owned, we were
12 entitled to upgrade to that software with new functionality
13 that came with that next revision.
14   BY MS. ANDERSON:
15   Q.  Was the software in the version as purchased in
16 November of 2000, was it functional absent these upgrades?
17   MR. HARRISON: Objection.  Asked and answered.  Vague
18 and ambiguous.  Lacks foundation.
19   MS. DONOVAN: Objection.  Vague and ambiguous.
20   THE WITNESS: Again, functional for HP's
21 enterprise-wide needs in trying to cover multiple sales
22 motions, multiple business units, multiple customer types.
23 We had a very difficult implementation that we were going
24 after.
25   MS. DONOVAN: We should probably take a break pretty

95

1  quick.
2    MS. ANDERSON: Okay.  We can go off the record.
3    THE VIDEOGRAPHER: This concludes Videotape No. 2 in
4  the deposition of Thomas Rathjens.  Going off the record.
5  The time is 1:58.
6    (Recess taken.)
7    THE VIDEOGRAPHER: This is the beginning of Videotape
8  No. 3 in the deposition of Thomas Rathjens.  We're on the
9  record.  The time is 2:14.
10   MS. ANDERSON: And welcome back, Mr. Rathjens.
11   Q.  Mr. Rathjens, do you know when HP began
12 implementing Suite 11i CRM?
13   MS. DONOVAN: Objection.  Vague.  Ambiguous.
14   THE WITNESS: It appears that we had owned licenses
15 before November 30th, so I suspect we had implemented the
16 Oracle CRM modules somewhere within HP or in different
17 pockets of HP; but I believe, you know, following that
18 agreement of November 30th is when we were trying to come
19 up with a enterprise-wide solution for CRM.
20   BY MS. ANDERSON:
21   Q.  Okay.  And do you know when HP began implementing
22 the enterprise-wide solution for CRM that was contemplated
23 in the November 2000 purchase?
24   A.  I would say December of 2000.
25   Q.  Okay.  And did HP encounter problems with the

96

1  implementations?
2    THE WITNESS: Yes.
3    MR. HARRISON: Objection.  Asked and answered.
4    BY MS. ANDERSON:
5    Q.  And were some of those implementation problems
6  connected to problems with the software?
7    MR. HARRISON: Same objection..
8    THE WITNESS: Yes.
9    BY MS. ANDERSON:
10   Q.  Okay.  What types of problems with the software
11 did you encounter?
12   A.  There was a variety of problems that we'd track
13 and document that it's hard to -- it's hard to generalize
14 in deploying this type of software.  That's what you do, is
15 you identify something that needs to be changed, fixed,
16 upgraded; and you track it, and you get it resolved.
17   Q.  Okay.  And when was -- I know that you mentioned
18 the Compensation and the E-mail Center were never
19 implemented.  When -- of the modules that were implemented,
20 when was implementation complete, if you know?
21   A.  The sales force automation module was the one that
22 we implemented.  And I don't have the specific date, but I
23 believe it was a year and a half maybe later.
24   Q.  Okay.  Were any other of the CRM 11i modules
25 implemented at HP?

Rathjens, Thomas  6/30/2006  9:07:00 AM

97

1    A.  No.
2    Q.  Okay.  With respect to the -- I know we've talked
3  about a couple of them; but with respect to the other
4  modules that were purchased that were not implemented, why
5  was -- why weren't those implemented?
6    MR. HARRISON:  Objection.  Asked and answered.
7    THE WITNESS:  Predominately because we merged with
8  Compaq and chose to use the Seibel CRM suite.
9  BY MS. ANDERSON:
10    Q.  Okay.  When was the Compaq merger, if you recall?
11    A.  It was May.  And I'm not sure if it was 2002 or
12  2003.
13    Q.  Okay.  Were there any efforts to implement the
14  software purchased in November of 2000 prior to the merger
15  with Compaq other than the sales force module?
16    A.  Can you repeat that question.
17    Q.  Sure.  Were there any efforts to implement the
18  software purchased in November of 2000 prior to the merger
19  with Compaq other than the sales force module?
20    A.  Yes.  There were efforts made.
21    Q.  And which modules?
22    A.  Let me get to a list of modules.
23    MS. DONOVAN:  Exhibit 2 might be a good choice.
24    THE WITNESS:  Okay.
25    Thank you.

98

1    So the question is what modules did we make
2  efforts to implement?
3    MS. ANDERSON:  Correct.
4    THE WITNESS:  Marketing Online, Telesales, Sales
5  Online, Advanced Inbound, and eMail Center.
6    In looking at this list, I would say we did not
7  make a great effort to implement Mobile Sales --
8    MS. ANDERSON:  Okay..
9    THE WITNESS:  -- or Incentive Compensation.
10    I'm not sure about Services Online.  That may
11  have been buried within these other modules.
12  BY MS. ANDERSON:
13    Q.  Okay.  And why -- I'll withdraw that.
14    Of the modules where HP attempted to implement the
15  software, why weren't these modules ultimately implemented?
16    MR. HARRISON:  Objection.  Asked and answered.
17    THE WITNESS:  Because within HP, to implement this
18  enterprise type wide software is a very difficult task; and
19  even with the Seibel software that we moved to afterwards,
20  I think it was three years ago, we are still trying to
21  implement it.
22    MS. ANDERSON:  Okay.
23    THE WITNESS:  So these are very long deployment cycles
24  within HP to deploy this enterprise-wide software.
25  BY MS. ANDERSON:

99

1    Q.  Okay.  And did lack of functionality contribute to
2  HP's decision to not ultimately implement these modules?
3    MR. HARRISON:  Objection.  Asked and answered.  Vague
4  and ambiguous.
5    THE WITNESS:  The primary reason was the merger with
6  Compaq and the decision to switch software.
7  BY MS. ANDERSON:
8    Q.  And when did HP begin trying to implement these
9  modules that you've identified as modules that were not
10  ultimately implemented?
11    MR. HARRISON:  Objection -- same objections.
12    THE WITNESS:  I think in December of 2001 is when we
13  started looking -- you know, started configuring the
14  software, installing it for lack of a better term, playing
15  around with it in December of -- I said 2001, I meant to
16  say December of 2000.
17  BY MS. ANDERSON:
18    Q.  2000.  And at the time of the Compaq merger HP had
19  not been able to get the software to work?  Is that fair?
20    MR. HARRISON:  Objection.  Argumentative.  Vague and
21  ambiguous.  Misstates prior testimony.
22    THE WITNESS:  We got the sales force automation
23  software deployed on a global basis.  Leading up to the
24  Compaq merger we knew that there was a decision to be made,
25  and that also hampered our ability to further deploy.  We

100

1  were somewhat frozen because we knew -- the merger and
2  contemplating the merger slowed us down.
3  BY MS. ANDERSON:
4    Q.  We had talked some about the functionality of the
5  software that was part of the purchase in the fall of 2000,
6  and you had mentioned that different people at HP had
7  different expectations.  Did you discuss different people's
8  expectations with them with respect to the functionality of
9  the software?
10    MR. HARRISON:  Objection.  Vague and ambiguous.
11    THE WITNESS:  I'm not sure we discussed expectations,
12  if you will.  We just had numerous discussions on how to
13  overcome whatever obstacles we were facing at the time to
14  move forward.
15  BY MS. ANDERSON:
16    Q.  Okay.  Did you have discussions with Ms. Montague
17  about the functionality of the software?
18    A.  Yes.
19    Q.  And what were the nature of those discussions?
20    A.  One was on the exercising the swap, 20 percent
21  swap clause.
22    Q.  Uh-huh.
23    A.  Others were discussions whether additional
24  functionality would be in a new module or it should be
25  contained within an existing module..

Rathjens, Thomas  6/30/2006  9:07:00 AM

101

1  Q.  Were --
2  A.  Others --
3  Q.  Excuse me.
4  A.  -- we wanted to make sure we were not paying for
5  Oracle Consulting services that -- to fix bugs which should
6  be fixed under the support contract.  So we wanted to make
7  sure we were not paying for Oracle Consulting to fix things
8  that we felt we had paid for -- that we should get via the
9  standard support.
10  Q.  Okay.  And what do you mean by bugs?
11  A.  Bugs is a pretty common software term of something
12  not working that you feel should work.  So we categorize
13  changes as bugs, as new enhancements; and generally things
14  fall under those two categories.
15  Q.  And were there a lot of bugs in the CRM 11i
16  software?
17  MR. HARRISON:  Objection.  Vague and ambiguous and
18  lacks foundation..
19  THE WITNESS:  We were trying to implement a very large
20  software, so I'm not sure -- I'm not sure what you would
21  consider a lot.  So we had thousands of things we were
22  tracking, probably in the nature of 20,000.
23  BY MS. ANDERSON:
24  Q.  Thousands of bugs?  Are you referring to bugs
25  here?

102

1  A.  Thousands of bugs, thousands of change requests,
2  thousands of configurations.
3  Q.  Okay.  Now, in your conversations with
4  Ms. Montague did the functionality of the Oracle CRM
5  products, were those meeting her expectations?
6  MR. HARRISON:  Objection.  Lacks foundation.  Calls
7  for speculation.
8  THE WITNESS:  I don't know what Karen's
9  expectations --
10  BY MS. ANDERSON:
11  Q.  She didn't share that with you?
12  A.  Well, my discussions with Karen primarily centered
13  around purchasing something additional from Oracle or
14  negotiating for something new.
15  Q.  Okay.  You mean something new, new functionality
16  in an already purchased product?
17  A.  No.  In general my -- my discussions with her were
18  centered around HP's purchase of a -- either more software
19  or more consulting.
20  Q.  Okay.
21  A.  Or more support.
22  Q.  Okay.  Did HP decide to buy any more software from
23  Oracle?
24  A.  I believe HP buys a lot of software from Oracle
25  beyond the CRM suite.

103

1  Q.  Okay.  Were there any -- withdraw that.
2  Did HP buy additional Oracle applications after
3  November of 2000?
4  A.  I believe so.
5  Q.  Do you know if they were part of Suite 11i?
6  A.  I think we made a purchase after November of 2000.
7  I'm pretty sure we made one additional fairly large
8  software purchase.
9  Q.  Okay.  And do you know what that was for?
10  A.  I believe this 20 percent swap clause was related
11  to the second purchase, not the original November 30th
12  agreement.
13  Q.  Okay.  And do you know what software HP swapped
14  out?  What they didn't want anymore?
15  MR. HARRISON:  Objection.  Calls for speculation.
16  Assumes facts not in evidence.
17  THE WITNESS:  I know I made recommendations on which
18  to swap out, but I don't know what we actually ended up
19  doing.
20  BY MS. ANDERSON:
21  Q.  What were your recommendations?
22  A.  I think mobile sales was a recommendation to swap
23  out.
24  Q.  Why?
25  A.  At the time HP felt we were going to go with

104

1  wireless connection to a database rather than downloading
2  to a laptop and then, when you come back in the office,
3  resyncing with the master database, because our experience
4  was there's a very heavy support cost to pay with that,
5  with collisions; and so we were going to bypass, hopefully
6  leapfrog technology and go with wireless connections to the
7  data enterprise database rather than a disconnected mode.
8  Q.  Just to clarify, if you could look at Exhibit 8,
9  the one that's marked HP 00022.
10  There's a paragraph at the end that -- that
11  represents a swap clause, and it references the
12  November 30th, 2000 date.
13  MR. HARRISON:  Same objection.
14  BY MS. ANDERSON:
15  Q.  Does that refresh your memory as to whether the
16  swap clause was part of the 2000 purchase?
17  MR. HARRISON:  Same objection with regard to scope of
18  discovery in this case.  Move to strike testimony that's
19  beyond that scope.
20  THE WITNESS:  It does refresh my memory.  And I see
21  that the swap clause was contained in the November 2000
22  agreement.
23  BY MS. ANDERSON:
24  Q.  Okay.  So you had recommended --
25  A.  Under bullet 4.  Of Exhibit 2.

105

1    Q. So you had recommended that mobile sales be
2 swapped out because HP wanted to have this wireless
3 technology, and that wasn't available with Oracle?
4    A. At the time it wasn't clear if the mobile software
5 was for disconnect mode or wireless mode.
6    Q. Why wasn't it clear?
7    MR. HARRISON: Objection. Lacks foundation.
8    THE WITNESS: We were seeking clarification at the
9 time. That's my recollection.
10    BY MS. ANDERSON:
11    Q. Okay. Do you know why Oracle (sic) purchased
12 mobile sales not knowing whether it was wireless or not?
13    Or excuse me. HP purchased mobile sales not
14 knowing whether it was wireless or not?
15    MR. HARRISON: Same objection.
16    THE WITNESS: I think our feeling was it included both
17 disconnect and wireless.
18    MS. ANDERSON: Okay.
19    Q. Okay. I'd like to mark -- and what was that
20 feeling based on? That it included both?
21    MR. HARRISON: Objection. Vague and ambiguous.
22    THE WITNESS: I don't recall. I just remember we
23 having discussions on it.
24    MS. ANDERSON: Okay. I'd like to mark this next
25 exhibit as 9.

106

1    (Exhibit No. 9 was marked for identification.)
2    For the record, this is a document that's been
3 stamped HP 00008 to HP 00012. And at this time I'd also
4 like to memorialize on the record that HP, through its
5 counsel, has indicated that -- has agreed to authenticate
6 all the documents produced in this case.
7    MS. DONOVAN: That's correct. So we'll do that
8 subsequent to the deposition. Via some sort of writing.
9    MS. ANDERSON: Correct.
10    THE WITNESS: 3i versus 11i?
11    MS. DONOVAN: So everything we say needs to go on the
12 record so...
13    THE WITNESS: Hmmm.
14    (Sotto voce discussion between Ms. Anderson and
15 Mr. Mautner.)
16    THE WITNESS: Okay.
17    BY MS. ANDERSON:
18    Q. Okay. Now, have you seen this document before?
19    A. Yes.
20    Q. Okay. And first of all, what is this document?
21    A. I believe it's a document that HP used internally
22 to prepare for negotiating something with Oracle.
23    Q. And what was the purpose of that negotiation?
24    MR. HARRISON: Objection. Lack of foundation.
25    THE WITNESS: One purpose was to reduce our ongoing

107

1 support fees.
2    BY MS. ANDERSON:
3    Q. Okay. And do you -- withdraw that.
4    If you could look to the first page of the
5 document. We've talked about some of these people, and I
6 see you're on the "To" list of the recipients on this. And
7 who is Craig Flower?
8    A. Craig Flower is -- I call him a CIO.
9    Q. Okay.
10    All right. And could you -- having looked at this
11 document that's attached entitled HP - Oracle CRM
12 Negotiating Strategy, can you summarize what the dispute
13 was between HP and Oracle?
14    MR. HARRISON: Objection. Lacks foundation.
15 Misstates testimony.
16    MS. DONOVAN: Vague, ambiguous, and the document
17 speaks for itself.
18    THE WITNESS: We were trying to clarify what we owned,
19 and what support we should be paying going forward.
20    BY MS. ANDERSON:
21    Q. Okay. Halfway down the page it says "HP - CRM
22 Compensation," and it lists a number of credits, and it
23 says total CRM compensation 46.8 million. Do you know if
24 Oracle gave HP any of those credits?
25    A. I don't believe they did.

108

1    Q. Okay. Do you know what total CRM compensation
2 46.8 million refers to?
3    MR. HARRISON: Objection. Lack of foundation.
4    THE WITNESS: I think we were trying to come up with a
5 big number to position ourself for a negotiation.
6    BY MS. ANDERSON:
7    Q. Okay. Now, it says -- below "What HP Owns and
8 Why" it says that you created an Excel spreadsheet. Is
9 that correct?
10    A. That's what it says, yes.
11    MS. ANDERSON: And I'd like to have this marked next
12 in line.
13    THE REPORTER: It's No. 10.
14    MS. ANDERSON: Yeah.
15    (Exhibit No. 10 was marked for identification.)
16    BY MS. ANDERSON:
17    Q. I believe this was the other attachment to that
18 e-mail. This is HP 00013 to 14.
19    Does that look like the Excel spreadsheet that you
20 created?
21    A. It may be the Excel spreadsheet referred to, but I
22 don't believe I created it.
23    Q. Oh, okay.
24    A. I think I probably passed it on.
25    Q. Okay. And again, the date on the -- on

109

1  Exhibit 9 -- 10, it says 3/20/2006.  Is it your
2  understanding that this document was, in fact, created in
3  October of 2001 with respect to these negotiations?
4      A.  If this was attached to an e-mail with this same
5  date, then I would agree.  And I assume that in discovery
6  these -- this was attached to the e-mail.
7      Q.  If you look down to the last few lines of this
8  page, there are a couple of -- it says HP shipped server to
9  Oracle, and Oracle requests mount rack for server provided.
10  And it says Oracle will not pay for server, Oracle will not
11  pay for rack mount kit.  Do you know what that's
12  referencing?
13      A.  Yes.
14      Q.  What is that referencing?
15      A.  We were trying to get a server in Oracle to test
16  their wireless solution.
17      Q.  Okay.  Was that a payment that HP had demanded?
18      A.  No.
19      Q.  Okay.
20      A.  I would say "demand" is not a -- the right word.
21  We were encouraging Oracle to get a server installed to
22  test the wireless solution.
23      Q.  Okay.  And if you could look up at No. 3 further
24  up on the page.  There's a series of bullet points, and the
25  first bullet point indicates too much support paid.  Do you

110

1  know what's meant by that?
2      MR. HARRISON:  Objection.  Lacks foundation.  Calls
3  for speculation.
4      THE WITNESS:  In my mind it was unclear if we should
5  be paying for support prior to deploying -- putting
6  licenses into production.
7  BY MS. ANDERSON:
8      Q.  Uh-huh.  And so there was support being paid on
9  CRM 11i applications that HP wasn't using?
10      A.  Correct.
11      Q.  It also says fix bugs, and also references product
12  delays.  Do you know what product delays are referenced
13  there?
14      A.  Well, the wireless, I believe, is one of those.  I
15  believe partner Sales Online, POL, is another one.
16      And I'd have to read this in detail to see if
17  there's any others that are referred to in this document.
18      Q.  And what's meant by product delays?
19      MR. HARRISON:  Objection.  Lacks foundation.
20      THE WITNESS:  That the product was not meeting HP's
21  enterprise needs in our -- I used the term before, our
22  stakeholders would not agree to deploying it the way it was
23  currently configured.
24  BY MS. ANDERSON:
25      Q.  And who at HP communicated with Oracle with

111

1  respect to these types of delays?
2      MR. HARRISON:  Lacks foundation.
3      THE WITNESS:  Some of the people on this list.  Karen
4  Montague, Phil May, myself.
5      MS. ANDERSON:  Okay.
6      THE WITNESS:  And Craig Flower and Sean Hickey at a
7  higher level.
8  BY MS. ANDERSON:
9      Q.  And other than the communications that you
10  yourself had with Oracle, how did you know that these
11  people were communicating with Oracle?
12      A.  I participated in, I'll say, a couple negotiations
13  with Oracle.
14      Q.  Okay.  And about what was the time frame of these
15  negotiations?
16      A.  I would -- I suspect sometime after -- shortly
17  after the date of this e-mail.
18      Q.  Okay.  And do you know when HP first advised
19  Oracle of the complaints described in this -- in this
20  attachment to this e-mail?
21      MR. HARRISON:  Objection.  Lacks foundation.  Calls
22  for speculation.
23      THE WITNESS:  This e-mail attempts to provide somewhat
24  of a record of that --
25      MS. ANDERSON:  Uh-huh.

112

1      THE WITNESS:  -- so I...
2      MS. ANDERSON:  Okay.
3      THE WITNESS:  And I see some of the dates on here are
4  in 2000, which is a bit confounding.
5      MS. ANDERSON:  Okay.
6      Q.  If you look to the second page, there's a section
7  that says "Why HP should own POL."  What's POL?
8      A.  Partner Online.
9      Q.  Okay.  Now, why would you find the dates in 2000
10  on here confounding?
11      A.  Because I may be mistaken in my overall time line
12  of when I joined this project.
13      Q.  Uh-huh.
14      A.  When I was thinking of the -- the second
15  agreement, I believe it's this November agreement.
16      Q.  Uh-huh.
17      A.  So I may be -- I may be actually a year off on my
18  time line when I joined this project.  It was, you know,
19  six years ago.
20      Q.  Right.
21      A.  So I don't know if it's --
22      Q.  So you think you may have been working on -- with
23  the Oracle applications prior to the November 2000?
24      A.  Yes.  I'd have to go back and see when I started.
25  I'm pretty sure it was in a December time frame, and I

113

1    think it could have been one year earlier.
2        Q.  And was there an Oracle agreement that was
3    finalized in 1999, the implementation of which the products
4    which you were working on?
5        A.  I think that original contract that we looked at
6    in Exhibit 2 refers to those previous licenses we owned.
7        Q.  Okay.  So, back to the POL.  Do you know when
8    Oracle -- or excuse me, when HP -- it says -- it says in
9    No. 6 that it was the impression that we had enough POL/OSO
10   licenses to cover the HP enterprise.  What did that mean?
11       MR. HARRISON:  Objection.  Lacks foundation.
12       THE WITNESS:  Where do you want me to look?
13       MS. ANDERSON:  Sorry.
14       Q.  Under the "Why Should Oracle own POL" on page 2 --
15       A.  Yes.
16       Q.  Or page 3 of the exhibit.  Excuse me.
17           In No. 5.
18       A.  We felt and I felt that the Partner Online
19   licenses were part of the Oracle Sales Online licenses.
20   And when Oracle came out with a new module called Partner
21   Online, I felt we were entitled to -- to those licenses and
22   should not be paying additional license fees for those.
23       Q.  Okay.  And have you communicated with Kurt Speck
24   about that issue?
25       MS. DONOVAN:  Objection.  Vague, ambiguous.

114

1        THE WITNESS:  Yes.
2        BY MS. ANDERSON:
3        Q.  Okay.  And when did Oracle inform HP that they
4    were going to -- that the POL functionality was not
5    included in the OSO that HP had purchased?
6        A.  I believe these dates under "Why HP should own
7    POL" provide the history of that.
8        Q.  Okay.  You don't recall with any more specific
9    time line?
10       A.  No.
11       Q.  Okay.  If you could look down towards the bottom
12   of the page.  I have some questions about the last three
13   lines there.  First of all, there's a line that says
14   "Oracle is well aware of our needs and I suspect they're
15   holding up the release of the patch for reasons tied to
16   lead sharing."  Do you know what lead sharing refers to?
17       A.  It refers to sharing leads, sales leads, between
18   HP and Oracle.
19       Q.  Okay.  And do you know what -- are you familiar
20   with the patch that is referred to in this note?
21       A.  It refers to build 40 for 3i Version 2.
22       Q.  And what is build 40?
23       A.  This is -- 3i is the version they had before 11i.
24       Q.  Okay.
25       A.  So build 40 would be a lower-level numbering

115

1    sequence for how they version their software.
2        Q.  Okay.  Is the patch referenced, does that
3    reference any upgrade to 11i that you know of?
4        A.  No.
5        Q.  Okay.
6        A.  Although, as I look up higher, "Why HP should own
7    POL." --
8        Q.  Uh-huh.
9        A.  -- it describes a time frame during the 3iV2 to
10   11i upgrade.
11       Q.  Okay.  Do you know -- does that give you insight
12   as to the connection --
13       A.  No.
14       Q.  -- between the build 40 and then 11i where the
15   patch was involved?
16       THE WITNESS:  No.
17       MS. ANDERSON:  Okay.
18       Q.  Okay.  And as far as the POL functionality, other
19   than what's mentioned on this document, can you explain why
20   you were under the impression that POL was part of the OSO
21   license that HP had purchased?
22       A.  This document attempts to explain that in these
23   bullets under "Why HP should own POL."
24       Q.  Uh-huh.
25       A.  But we felt -- I felt that it was included in the

116

1    Oracle Sales Online licenses.
2        Q.  Why did you think that?
3        A.  Because we had discussions and an understanding
4    that we would be sharing lie- -- sharing leads between HP
5    and Oracle.  And we had started doing that or trying to do
6    that using the OSO module, and it seemed like this
7    functionality that was once in the OSO module was now in
8    this POL module, and we were being asked to -- if we wanted
9    to use it, we needed to purchase additional licenses.
10       Q.  Okay.  And did HP and Oracle ultimately come to an
11   agreement where they did share leads?
12       A.  I think HP and Oracle do a lot of joint sales
13   together.  HP sells hardware and Oracle software goes on
14   top of hardware.  So HP and Oracle share leads and go after
15   opportunities together.  How they do that, the level of
16   automation is not clear to me.
17       MS. ANDERSON:  Can we take a five-minute break?
18       MS. DONOVAN:  Sure.
19       THE VIDEOGRAPHER:  Going off the record.  The time is
20   2:56.
21       (Recess taken.)
22       THE VIDEOGRAPHER:  We are back on the record.  The
23   time is 3:11.
24       BY MS. ANDERSON:
25       Q.  Okay.  Mr. Rathjens, I want to spend a little bit

Rathjens, Thomas  6/30/2006  9:07:00 AM

117

1  of time clearing up some misunderstandings that may taint
2  the record a bit.
3      A.  Okay.
4      Q.  Now, you indicated just recently that you actually
5  believe that you started working on the Oracle CRM project
6  in December of '99, not December of 2000; is that true?
7      A.  I believe so, yeah.  I was off by a year.
8      Q.  Okay.  And now, given that we've looked at the
9  document that is the November 2000 purchase order, was that
10  November 2000 deal related to the prior purchase in 1999?
11      MS. DONOVAN:  Objection.  Vague, ambiguous.
12      MR. HARRISON:  Same objection.
13      THE WITNESS:  I think so.  I kept looking for this
14  agreement after the original agreement which had the swap
15  clause, so -- and that is the November 30th agreement.
16      BY MS. ANDERSON:
17      Q.  Okay.  So the second agreement had the swap
18  clause?
19      A.  Right.
20      Q.  Okay.  And so how were those -- how were the
21  purchases in 1999 and the 11/2000 purchase related?
22      MR. HARRISON:  Objection.  Same objection on the
23  record regarding scope of discovery, and move to strike any
24  testimony that's beyond that scope.  Per the judge's ruling
25  today.  Thank you.

118

1      MS. DONOVAN:  Objection.  Vague and ambiguous.
2      THE WITNESS:  I think the agreement of November of
3  2000, November 30th of 2000, we bought additional licenses.
4      BY MS. ANDERSON:
5      Q.  Okay.  And do you know why HP bought additional
6  licenses in November of 2000?
7      MR. HARRISON:  Same objection.  And with Counsel's
8  permission, I'd like it to be a running objection as we
9  discussed before, as to this line of questioning.
10      MS. ANDERSON:  That's right.  I'm just trying to clear
11  up the record.
12      MR. HARRISON:  Right.  And I don't want to have to
13  object every time.
14      THE WITNESS:  To be honest, I don't know why HP bought
15  additional licenses.
16      BY MS. ANDERSON:
17      Q.  Okay.  Do you have an opinion that they shouldn't
18  have bought additional licenses?
19      A.  My opinion was we had enough licenses at the time;
20  and I did not feel, personally, that we needed additional
21  licenses at that point in time.
22      Q.  Okay.  Were you informed why Oracle (sic) was
23  making those purchases in November of 2000?
24      MR. HARRISON:  Objection.  You mean Oracle or HP?
25      MS. ANDERSON:  HP.  Pardon me.  Thank you for the

119

1  clarification.
2      THE WITNESS:  I believe I was informed, and some of
3  this documentation describes that.
4      BY MS. ANDERSON:
5      Q.  In what respect?
6      A.  Well, maybe -- so why did we buy additional
7  licenses.  Maybe some people felt we didn't have enough to
8  complete our deployment.
9      Q.  But that wasn't your belief?
10      MS. DONOVAN:  Objection.  Misstates testimony.
11      THE WITNESS:  I believed we had enough licenses at the
12  time.
13      BY MS. ANDERSON:
14      Q.  Okay.  Did you tell anybody that that was your
15  opinion?
16      A.  I think so.
17      Q.  Okay.  Who did you tell?
18      A.  When we were discussing the negotiation or a
19  negotiation moving forward, I discussed it with Karen
20  Montague and Craig Flower and Phil May.  Philip May.
21      MS. DONOVAN:  Actually, just reminding you of time
22  frames, just to be sure, so you're talking in the prior to
23  November 30th time frame.
24      MS. ANDERSON:  All of these questions, yeah.
25      MS. DONOVAN:  Well, I want to make sure because Craig

120

1  Flower -- is that the right time frame for Craig Flower?
2      THE WITNESS:  I -- at some -- I believe it is.
3      MS. DONOVAN:  Okay.
4      THE WITNESS:  Because in -- this document dated
5  October has both Craig Flower and Sean Hickey.
6      MS. DONOVAN:  October 2001.  She's asking you prior to
7  November 30th, 2000.
8      THE WITNESS:  Oh.  I'm getting -- I'm sorry.
9      BY MS. ANDERSON:
10      Q.  Let me back up a bit.  So if you began working on
11  the CRM project in 1999, were you involved in the
12  negotiations with respect to the deal for additional
13  licenses in November of 2000?
14      MS. DONOVAN:  Objection.  Vague, ambiguous.
15      MR. HARRISON:  Join in that objection.
16      THE WITNESS:  To be honest, I can't recall.
17      BY MS. ANDERSON:
18      Q.  Okay.  Now, you indicated that you had expressed
19  your belief that additional licenses were not necessary at
20  that time to a few people.  And then your counsel raised an
21  issue with respect to Craig Flowers.  What is your concern
22  with Craig Flowers?  Was he somebody who you might not have
23  had contact with during that time?
24      A.  My concern -- I don't think I had a concern with
25  Craig Flower.  I had -- I was responsible for deploying the

121

1 CRM suite. HP has a lot of other dealings with Oracle that
2 I was not aware of --
3    Q.  Uh-huh.
4    A.  -- that are conducted at a much higher level.
5 Joint sales things.
6    Q.  Uh-huh.
7    A.  And so I was concerned with my piece of what I was
8 responsible for, and from my perspective I provided my
9 input on my perspective.
10    Q.  Okay. And just to make sure that -- just to make
11 sure that the record's clear, I had asked you who you had
12 relayed your belief that additional licenses weren't
13 necessary to. And you had mentioned, I think, three
14 people. I think you said Karen Montague -- let me ask
15 again so we make sure the record's clear. Who did you --
16       (Reporter interruption.)
17    BY MS. ANDERSON:
18    Q.  Who did you relay your belief that Oracle did --
19 excuse me, that HP did not need additional Oracle licenses
20 in November of 2000 to at HP?
21    A.  I relayed -- I conveyed that, my opinion, to Karen
22 Montague, Craig Flower, and perhaps Phil May.
23    Q.  Okay. And again, just to clarify, were you told
24 why Oracle (sic) was buying the additional licenses in
25 11 -- excuse me, I'm getting very tired.

122

1       Were you told why HP was buying additional
2 licenses in November of 2000 despite at least your belief
3 that they weren't needed at that time?
4    A.  I believe it was explained to me from HP's higher
5 level perspective why it made sense to buy additional
6 licenses.
7    Q.  Okay.
8    A.  And I think we received a very favorable discount
9 on those licenses.
10    Q.  Okay. Other than the discount, what else were you
11 told about the decision to purchase the licenses in
12 November of 2000?
13    A.  I don't recall.
14    Q.  Okay. Now, with respect to the purchases that you
15 were working on in the 1999 period, had Oracle implemented
16 any of the -- had HP implemented any of the CRM 11i
17 applications that were purchased in 1999?
18    A.  I do not know when we went live with the sales
19 force automation software or OSO.
20    Q.  Okay. And was your understanding of the November
21 2000 purchase that those licenses would provide additional
22 functionality?
23    MR. HARRISON:  Objection. Vague and ambiguous.
24    BY MS. ANDERSON:
25    Q.  Or just additional licenses?

123

1    A.  Can you repeat the question?
2    Q.  Sure.
3       Was it your understanding of the November 2000
4 purchase that those licenses would provide additional
5 functionality or just additional licenses?
6    MR. HARRISON:  Same objection..
7    THE WITNESS:  I think both.
8    BY MS. ANDERSON:
9    Q.  Okay. What was your understanding with regard to
10 functionality?
11    A.  I would like to get to the license count.
12    MS. DONOVAN:  Exhibit 2.
13    THE WITNESS:  Huh.
14       Okay. One more time. What was the question?
15    BY MS. ANDERSON:
16    Q.  Was it your understanding of the November 2000
17 purchase that those licenses would provide additional
18 functionality, or were they just additional licenses?
19    A.  I think both.
20    Q.  Okay. And then what was -- what was your
21 understanding of the additional functionality that would be
22 provided?
23    A.  Well, most of these are additional licenses to
24 licenses we already owned. So additional functionality
25 would come in the subsequent revisions of the software.

124

1    Q.  Uh-huh. And were -- okay. So --
2    MS. DONOVAN:  I'd like to take a quick break when you
3 get an opportunity.
4    MS. ANDERSON:  Okay. Let me just finish up.
5    MS. DONOVAN:  Go ahead and finish what you're doing,
6 though.
7    BY MS. ANDERSON:
8    Q.  Okay. And of the additional licenses that were
9 purchased in November of 2000, how many were actually
10 implemented and deployed? If you know.
11    A.  I think we deployed the Sales Online module
12 enterprise wide; and we had, prior to the HP merger, six or
13 seven thousand sales reps. So whether all of them used the
14 module or not, I am not certain; but it's my feeling we
15 deployed approximately 7,000 seats and provided training on
16 how to use it and got the software working for HP.
17    Q.  Okay. And do you know about the additional --
18 withdraw that.
19       Okay. And other than the Sales Online, do you
20 know one way or another whether the licenses purchased in
21 November of 2000 were ever used by HP?
22    MR. HARRISON:  Objection. Asked and answered.
23    THE WITNESS:  I think we deployed a few Marketing
24 Online licenses.
25    BY MS. ANDERSON:

125

1    Q.  What do you mean by a few?
2    A.  Less than a hundred.
3    Q.  Any others?
4    A.  I'm not sure if Services Online was used as part
5   of Sales Online.  It may have.
6    Q.  Okay.  And any others?
7    A.  Not that I recall.
8    Q.  So, as far as you know, the rest of them were
9   never used?  Is that accurate?
10    A.  That's accurate.
11    Q.  Now --
12    MS. DONOVAN:  Is this a good time for a quick break?
13    MS. ANDERSON:  Yes.  I forgot.
14    THE VIDEOGRAPHER:  Going off the record.  The time is
15   3:25.
16    (Recess taken.)
17    THE VIDEOGRAPHER:  We are back on the record.  The
18   time is 3:33.
19    MR. HARRISON:  Let me just state for the record again
20   that it's our position this entire line of questioning is
21   outside of the scope of discovery, and move to strike any
22   testimony that's outside of that scope.  And this is
23   precisely the line of questioning that Judge Infante said
24   on the record that has nothing to do with the facts of this
25   case.  Although he did say he would not rule on specific

126

1   questions, he specifically said that this was absolutely
2   not relevant; and, therefore, I want to state for the
3   record that we're going to move to strike and it's totally
4   irrelevant for third party testimony.  Thank you.
5    MS. ANDERSON:  Okay.  Welcome back.
6    MR. HARRISON:  And beyond the scope of discovery..
7    BY MS. ANDERSON:
8    Q.  If I could refer you to Exhibit 2, which I think
9   you have right there.  Now, this exhibit has a total amount
10   paid; but do you know how much Oracle (sic) paid per
11   license for the software?
12    A.  HP.
13    Q.  Excuse me, HP.  I am so sorry.  How much HP paid
14   for the software per license.
15    A.  We spent a lot of time calculating that.
16    Q.  And why did you spend time calculating that?
17    A.  Because it was not always clear how much we paid
18   because of the nature of the way we bought the licenses.
19   So they -- and I believe that's why Exhibit 10 may further
20   describe that.
21    Q.  The approximated cost per license?
22    A.  The modules had different costs, they were not all
23   priced the same.
24    Q.  Okay.  And then other -- and then other than the
25   spreadsheet in Exhibit 10, are you aware of other documents

127

1   which reflect the price per license?
2    MS. DONOVAN:  Objection.  Vague, ambiguous as to time.
3    BY MS. ANDERSON:
4    Q.  For the November 2000 purchase?
5    MS. DONOVAN:  As to the existence of those documents
6   at one period in time.
7    MS. ANDERSON:  I understand.
8    THE WITNESS:  Can you repeat the question.
9    BY MS. ANDERSON:
10    Q.  Yeah.  Are you aware of any -- other than the
11   spreadsheet that you've referenced here as Exhibit 10, are
12   you aware of other documents that would reflect the per
13   license price of the software purchased in November 2000?
14    A.  I'm not aware of what other documents show that.
15    Q.  Now, did HP pay for all of the Oracle software
16   that it received?
17    MS. DONOVAN:  Objection.  Vague, ambiguous.
18    MR. HARRISON:  Join.
19    Lacks foundation.
20    THE WITNESS:  I believe, yes.
21    BY MS. ANDERSON:
22    Q.  Okay.  And do you know if they paid by check or
23   wire?
24    A.  No.
25    Q.  Do you have any idea of the way in which they paid

128

1   Oracle?
2    A.  I really do not know.
3    MS. ANDERSON:  Okay.  Just for the record, to the
4   degree that HP has documents that support its payment to
5   Oracle, we would ask -- request they produce those as part
6   of the document production.
7    Now, we talked a little bit about bugs and
8   addressing also changes in the product.  Who at HP was
9   responsible for fixing bugs?  With respect to the CRM 11i
10   software.
11    A.  HP would fix HP generated bugs and Oracle --
12    Q.  So --
13    A.  -- and Oracle would fix Oracle bugs.
14    Q.  Okay.  So Oracle was responsible for fixing the
15   software bugs; is that accurate?
16    A.  Oracle was responsible for fixing the Oracle
17   software bugs.
18    Q.  Okay.  Now, what about addressing change orders or
19   product enhancements?  Was that part of Oracle's
20   responsibility as well?
21    A.  It was a negotiation.
22    Q.  Okay.
23    A.  We wanted to get HP requested changes into the
24   Oracle product, and we would prioritize those and encourage
25   Oracle to make the highest requested changes.

129

1      Q.  Okay.

2      A.  Highest priority changes.

3      Q.  And do you recall if HP was charged for those

4  changes?

5      A.  In general, we did not talk about additional

6  charges for that type of change request.

7      Q.  Okay.  Why not?

8      A.  In the context of this conversation we were asking

9  for changes to existing modules, and we'd expect those to

10  be changed in a subsequent version of the software.

11      Q.  And was that included in the price of the software

12  pursuant to HP's negotiations with Oracle?

13      A.  Yes.

14      MS. ANDERSON:  Okay.  I see.

15      I'd like to mark this exhibit next in line,

16  please.

17      (Exhibit No. 11 was marked for identification.)

18      BY MS. ANDERSON:

19      Q.  If you can take a moment to look at the document

20  that's been marked Exhibit 11.

21      For the record, this is HP 00071 to HP 00073.

22      A.  Okay.

23      Q.  Okay.  Given that we have an agreement that HP

24  will authenticate the documents produced, I'm going to jump

25  right into the questions in the interest of time.

130

1      Mr. Rathjens, does this appear to be an e-mail

2  with an attachment regarding the CRM Compensation meeting?

3      A.  Yes.

4      Q.  Okay.  And are you a recipient to this e-mail?

5      A.  Yes.

6      Q.  Okay.  Do you know why you received this e-mail?

7      A.  Because I was involved in part of the decision

8  making if we should convert these term licenses to

9  perpetual licenses.

10      Q.  And were these negotiations part of the -- were

11  these discussions part of the dispute regarding what

12  functionality was contained in the Oracle CRM 11i software

13  purchase in November of 2000?

14      MR. HARRISON:  Objection.  Vague and ambiguous.

15      MS. DONOVAN:  Objection.  Vague, ambiguous, misstates

16  prior testimony.

17      THE WITNESS:  I don't know if "dispute" is the right

18  word.

19      MS. ANDERSON:  Okay.

20      THE WITNESS:  But if you want to restate the question

21  I'll try and answer it.

22      BY MS. ANDERSON:

23      Q.  Well, this meeting it appears that there are HP

24  and Oracle attendees and you were cc'd on the document.  Is

25  it your understanding that this meeting was to resolve

131

1  differences between Oracle and HP as to what the software

2  purchased in November 2000 for the functionality contained

3  in that software of November 2000 contained?

4      MR. HARRISON:  Same objection.  Lacks foundation.

5      MS. ANDERSON:  Withdraw that question.  That was a bad

6  question.

7      Q.  What was your understanding of the meeting that

8  occurred on October 31st, 2001, according to this document

9  between HP and Oracle?

10      A.  I believe we were getting clarity on what we owned

11  and what we did not own.

12      Q.  Okay.

13      A.  And letting Oracle know that we were seriously

14  considering not converting the licenses.

15      Q.  And why was HP considering not converting the

16  licenses?

17      A.  Because it would -- it would reduce a one-time

18  payment.  It would also reduce future support fees.

19      Q.  Okay.

20      A.  We had an option --

21      Q.  Uh-huh.

22      A.  -- to pay to convert the licenses.

23      Q.  Uh-huh.

24      A.  And if we exercised that option, I believe it

25  costs us $2.1 million to do that.  And it would commit us

132

1  to additional support fees.

2      Q.  Okay.  And what would happen if they did not

3  convert -- what would happen if HP did not convert the

4  licenses?

5      MR. HARRISON:  Objection.

6      MS. DONOVAN:  Objection.  Vague, ambiguous, calls for

7  speculation.

8      MR. HARRISON:  Join.

9      THE WITNESS:  What was the question?

10      MS. ANDERSON:  Strike the question.  That's fine.

11      Q.  Can you please turn to page 2.

12      There's a section there called Support and

13  Quality, and in the first bullet point it references

14  quality issues.  Do you know what quality issues are being

15  referenced there?

16      MR. HARRISON:  Objection.  Lacks foundation.

17      THE WITNESS:  I would say bugs in the software.

18      BY MS. ANDERSON:

19      Q.  Okay.  And were those quality issues because there

20  were more bugs in the software than what HP thought there

21  should be?

22      MR. HARRISON:  Objection.  Lacks foundation.  Calls

23  for speculation.

24      THE WITNESS:  I would say there was more bugs than we

25  would have liked.

133

```
1    BY MS. ANDERSON:
2      Q.  Okay.  Why do you say that?
3      A.  Well, in any software you purchase or use you
4    would hope that there's not a lot of bugs.
5      Q.  Okay.
6      A.  But I think it's also the nature of software that,
7    you know, software is -- has bugs.
8      Q.  Did you complain to Oracle about -- excuse me.
9         Did you complain to Oracle about the bugs that HP
10   was encountering in their software?
11     MR. HARRISON:  Objection.  Vague as to time.
12     THE WITNESS:  We had an ongoing process where we would
13   log bugs and send them to Oracle, and ask them to fix them.
14   In some cases they would fix them, in other cases they were
15   not bugs, they were a way we were -- we misconfigured or
16   didn't understand it right.
17     MS. ANDERSON:  Uh-huh.
18     THE WITNESS:  In other cases, you know, it's not a
19   bug, it's a change request.  But it was -- it's the nature
20   of what we're implementing to identify things that were
21   slowing us down and...
22     BY MS. ANDERSON:
23     Q.  And when did you start identifying bugs to Oracle
24   that were affecting the CRM Suite 11i implementation
25   approximately?
```

134

```
1      A.  I think from one or two months after I joined the
2    project we had a process in place to log bugs, log change
3    requests, and process them within the HP project and with
4    Oracle.
5      Q.  And were all the bugs reported to Oracle?
6      MR. HARRISON:  Objection.  Lacks foundation.  Calls
7    for speculation.
8      THE WITNESS:  We would do our best to communicate the
9    things that we found that we thought needed to be fixed or
10   changed..
11     BY MS. ANDERSON:
12     Q.  Okay.  And what was the process that you described
13   how you would relay this to Oracle?
14     A.  We had several -- we had an issue tracking
15   database, and Oracle also has an issue tracking database;
16   and we would track bugs and changes in these respective
17   databases.
18     Q.  If you could look to the second bullet point
19   there.  The second -- it says "focus on '99 licenses only.
20   This is due to Oracle's belief that the" 2000 "licenses
21   were part of a larger win-win business deal."  Do you know
22   what they're referring to there?
23     MR. HARRISON:  As I have objected throughout the
24   deposition, this is beyond the scope of the discovery plan.
25   And it has nothing to do with Oracle's third party customer
```

135

```
1    discovery.  And ask that it be a rolling objection as well.
2      MS. ANDERSON:  You can answer the question.
3      MR. HARRISON:  And also calls for speculation.
4      THE WITNESS:  I think the larger win-win business was
5    to sell more HP hardware, where other Oracle CRM customers
6    would be putting their -- the Oracle CRM software and other
7    Oracle software on HP hardware.  So I think the larger
8    win-win business deal is jointly selling HP hardware and
9    Oracle software.
10     BY MS. ANDERSON:
11     Q.  Okay.  Do you know if that had anything to do with
12   Oracle's purchase of HP soft -- HP hardware?
13     MR. HARRISON:  Objection.  Same objection.
14     THE WITNESS:  I think --
15     MS. DONOVAN:  Objection.  Vague, ambiguous.
16     THE WITNESS:  We wanted to make sure the Oracle
17   software worked equally well on HP hardware as on our
18   competitor's hardware.
19     BY MS. ANDERSON:
20     Q.  Okay.  And Oracle and HP had an agreement where
21   that type of development would occur to ensure that?  Is
22   that your understanding?
23     MR. HARRISON:  Same objections.
24     THE WITNESS:  That is my understanding.  That there
25   was some commitments to move some of their development onto
```

136

```
1    HP servers.  As described in one of these documents.
2      BY MS. ANDERSON:
3      Q.  Okay.  And were you included in those negotiations
4    at all?
5      MS. DONOVAN:  Objection.  Vague, ambiguous.
6      THE WITNESS:  No.
7      MS. ANDERSON:  I'll have this marked as the next
8    exhibit in line.
9      THE REPORTER:  No. 12.
10     (Exhibit No. 12 was marked for identification.)
11     BY MS. ANDERSON:
12     Q.  If you could have a look at what's been marked as
13   Rathjens Exhibit 12.
14        I'll represent that this document was produced
15   with the first Bates number partially obscured but that it
16   is in order of Bates No. HP 00069 to HP 00070.
17     A.  Okay.
18     Q.  Okay.  Again, given that HP has agreed to
19   authenticate the records produced, I'll just jump right
20   into the questions.
21        Have you seen this document before, Mr. Rathjen?
22   "Rathjens."  Excuse me.
23     A.  Well, my name is not on the copy.  I am not sure
24   if I'd seen this before.  I think there's maybe previous
25   versions or documentations that may have led up to this
```

137

1   that I've seen, but I'm not sure if I've seen this specific
2   document before.
3       Q.  Do you have an understanding of the negotiations
4   that are referenced in this document?
5       A.  Yes.
6       Q.  Okay.  What's your understanding of those
7   negotiations?
8       A.  We wanted to --
9       MS. DONOVAN:  Objection.  Vague, ambiguous.
10      THE WITNESS:  We wanted to lower our software
11   support -- we wanted to lower our support costs.  We wanted
12   to negotiate for a revised support agreement.
13      BY MS. ANDERSON:
14      Q.  Okay.  On page 1 -- first of all, the first
15   paragraph of the e-mail on page 1.  Do you know who
16   Sebastian Gunningham is?
17      A.  He's an Oracle vice president or senior vice
18   president or something, I believe.
19      Q.  Did you communicate with him as part of your job
20   at HP?
21      A.  No.
22      Q.  It says here that it indicates in the e-mail that
23   HP has told Oracle that they have what's approaching a
24   $50 million problem.  Do you know what that $50 million
25   problem is they're referring to?

138

1       MR. HARRISON:  Objection.  Lacks foundation.  Calls
2   for speculation.
3       THE WITNESS:  I believe some of that is reflected in
4   the next page.
5       BY MS. ANDERSON:
6       Q.  Okay.  How so?
7       A.  Where in the second bullet it refers to impact up
8   to 30 million over the life of the existing contract.
9       Q.  And that would be if the contract wasn't canceled?
10   What does that mean?
11      MR. HARRISON:  Same objections.
12      THE WITNESS:  That bullet refers to what licenses we
13   owned and if new functionality was in licenses we already
14   purchased.
15      MS. ANDERSON:  Okay.
16      THE WITNESS:  In other cases we were trying to build a
17   case that we had to pay for other software and support
18   other software for a longer period of time because we were
19   unable to deploy the Oracle software in the time frames
20   that we had originally set out to hit.
21      BY MS. ANDERSON:
22      Q.  Okay.  And were these for the same delays that we
23   had discussed before with respect to deployment?
24      A.  Yes.
25      Q.  Now, in the second line of that second bullet

139

1   point that you just pointed it out says we entered an
2   enterprise agreement with Oracle and much/most of their CRM
3   software did not exist.  Do you have an understanding of
4   what's meant by that comment?
5       MR. HARRISON:  Same objections.
6       THE WITNESS:  I think I already referred to this on
7   the level of maturity of the various software modules.  And
8   some of these software modules -- you know, some of the
9   software was not developed yet.
10      BY MS. ANDERSON:
11      Q.  Okay.  And was that true at the time of the
12   November 2000 purchase?
13      MR. HARRISON:  Same objections.
14      THE WITNESS:  I think that's true at any point in
15   time.
16      MS. ANDERSON:  Okay.
17      THE WITNESS:  As a software company continues to
18   improve their product.
19      BY MS. ANDERSON:
20      Q.  Do you agree that when HP purchased software, that
21   most of the CRM software did not exist?
22      MR. HARRISON:  Objection.  Calls for speculation.
23   Lacks foundation.
24      THE WITNESS:  I think it's hard to quantify what this
25   means, most of their CRM software did not exist.  And so,

140

1   for example, Oracle purchased Seibel; so they have now a
2   lot more CRM software.
3       BY MS. ANDERSON:
4       Q.  Okay.  Was there software in the enterprise
5   agreement that was purchased that did not exist at the time
6   of purchase?
7       MR. HARRISON:  Objection.  Vague.
8       THE WITNESS:  I would say there is software
9   functionality certainly that did not exist.  Whether the
10   base -- the base module existed for the things we
11   purchased, I would -- it's not clear, but I would think
12   that there was at least a base module that was in place.
13      BY MS. ANDERSON:
14      Q.  Okay.  What function -- you referred there was
15   software functionality that certainly did not exist.  What
16   functionality are you referring to?
17      A.  Well, this Partner Online is referenced here.  I
18   believe they came out with a new business intelligence
19   module that was a new module, and we felt that the business
20   intelligent functionality was contained within the existing
21   modules we already owned.
22      Q.  That the functionality was there or that the
23   license covered the functionality?
24      A.  We felt that the license covered the
25   functionality.

141

1    Q.  But when the functionality was ultimately added to
2  the Oracle product, Oracle contended it was a different
3  product; is that accurate?
4    A.  Yes.
5    Q.  Okay.  And why did you think that that
6  functionality was included in the license purchase in
7  November of 2000?
8    A.  It would depend on the product that we're talking
9  about.
10    Q.  Okay.  Well, what product were you referring to?
11    A.  Well, for Partner Online we felt it was part of
12  the Sale Online module --
13    Q.  Right.  We discussed that.
14    A.  -- because it included lead sharing.
15    Q.  And what about the business intelligence?  I think
16  you --
17    A.  The business intelligence, my understanding is
18  there was reporting capabilities that came with each
19  module; and my recollection is -- is that.  And then, now,
20  that they were being bundled in a new module.  And that
21  they were asking us to -- or were saying that we did not
22  own.
23    Q.  Did the reporting capabilities exist when the
24  licenses were purchased in November of 2000?
25    A.  I'm sure there was some reporting capabilities

142

1  that existed; and they were most likely, you know,
2  continually developed --
3    Q.  Did --
4    A.  -- with each release.
5    Q.  Was it your understanding that HP contended
6  additional functionality would be added as part of the
7  license price?
8    MR. HARRISON:  Objection.  Calls for speculation.
9    THE WITNESS:  Yes.  We felt that there -- that the
10  software would continue to be developed and improved with
11  the various revisions.
12    BY MS. ANDERSON:
13    Q.  Okay.  And was that also true for POL?  Was it
14  your understanding that HP contended that the -- or
15  believed that the functionality of POL would be added as
16  part of the original license price?
17    A.  At the time we didn't even have the terminology
18  POL.
19    Q.  The functionality?
20    A.  Right.  And partner relationship management six
21  years ago wasn't discussed much.  So it's fairly new in the
22  industry.
23    Q.  Okay.  But -- well, strike that.
24    But the functionality that is included in the POL,
25  which HP contended that that should have been part of their

143

1  previously purchased license; is that accurate?
2    A.  I believe so.
3    Q.  Okay.  I just have one more question on this
4  exhibit.  If you could look to the first bullet point.  It
5  says that Oracle has over-promised and under delivered on
6  their CRM software.  What's your understanding of that
7  comment?
8    MR. HARRISON:  Objection.  Calls for speculation.
9  Lacks foundation.
10    THE WITNESS:  For the call center software and
11  marketing software, we thought it would be further along
12  than the software was.
13    BY MS. ANDERSON:
14    Q.  Why did you think that?
15    Because of Oracle's promises?
16    MR. HARRISON:  Objection.  Calls for speculation.
17    THE WITNESS:  Because we were having trouble
18  configuring the software to meet our enterprise needs.
19    BY MS. ANDERSON:
20    Q.  Okay.  And why were you having trouble with that
21  configuration?
22    MR. HARRISON:  Objection.  Asked and answered.  Vague
23  and ambiguous.
24    BY MS. ANDERSON:
25    Q.  Well, let me ask --

144

1    MS. DONOVAN:  I'll join.
2    BY MS. ANDERSON:
3    Q.  -- this way:  Were you having trouble with the
4  configuration because those software modules lacked the
5  functionality that HP anticipated they would have?
6    MR. HARRISON:  Objection.  Asked and answered.  Vague
7  and ambiguous.
8    THE WITNESS:  Can you repeat the question?
9    MS. ANDERSON:  Sure.
10    Q.  Was the trouble that you were having with
11  configuration because those software modules, that being
12  the call management and marketing software that you just
13  mentioned, lacked functionality that HP anticipated those
14  modules would have?
15    MR. HARRISON:  Same objections.
16    THE WITNESS:  Again, I think HP -- different people
17  had different expectations or anticipations; but we were
18  trying to get their software, the Oracle software, to meet
19  HP's needs.  Which are very, very complex.
20    BY MS. ANDERSON:
21    Q.  Uh-huh.  And were you able to do that?
22    A.  No.
23    Q.  Okay.  And was call management and marketing
24  software, were those ever implemented at HP?
25    MR. HARRISON:  Objection.  Asked and answered.

145

1    THE WITNESS: I think we had less than 100 marketing
2  licenses, and I don't believe --
3    MS. ANDERSON: Okay.
4    THE WITNESS:  -- we deployed the call center.
5    MS. ANDERSON:  Thank you for the clarification.
6    Q.  Now, it says that these problems were well
7  documented and repeatedly discussed.  Do you know how those
8  were documented?
9    A.  The most common form is e-mail.
10    Q.  Okay.  To whom?
11    MR. HARRISON:  Objection.  Lacks foundation.  Calls
12  for speculation..
13    THE WITNESS:  There was myself and the Oracle
14  Consulting project manager.
15    BY MS. ANDERSON:
16    Q.  So e-mail between yourself and the Oracle
17  Consulting project manager?
18    A.  Correct.  And I think there was lots of -- between
19  HP and Oracle, you know, you kind of have people that then
20  you communicate with.  So the person I would communicate is
21  different than the person that Craig Flower would
22  communicate with.
23    Q.  Uh-huh.
24    A.  The people that Karen Montague communicates with
25  are different.  So I think they're along the lines of who

146

1  you're lined up with.
2    Q.  Okay.  And who was the Oracle Consulting project
3  manager that you were in touch with?
4    A.  There was two of them.  First it was Howard
5  DeBaugh, and then following that it was Ramki Pitchuara.
6    Q.  Okay.  And when did you inform them that you felt
7  that functionality was lacking in these software
8  applications that are referenced in this bullet point
9  regarding the call management and marketing software?
10    MR. HARRISON:  Objection.  Misstates testimony.
11    THE WITNESS:  I don't know precisely, but Exhibit 9
12  has some time lines in it.
13    BY MS. ANDERSON:
14    Q.  Okay.  So that was part of that.
15    Around the same time frame?  In 2000-2001?
16    A.  Yes.
17    Q.  Okay.  And did you also contact these Oracle
18  project managers with respect to functionality in other
19  software modules that HP had purchased from Oracle?
20    A.  We sat side by side trying to deploy the software.
21    Q.  Okay.
22    A.  So we're in daily contact, hourly contact.  We
23  were running a project.
24    Q.  So would you say that Oracle was well aware of the
25  problems that you were encountering at HP with respect to

147

1  the implementation of the CRM 11i modules?
2    MR. HARRISON:  Objection.  Calls for speculation.
3  Lacks foundation.
4    THE WITNESS:  Yes.  Oracle was aware of our deployment
5  challenges.
6    BY MS. ANDERSON:
7    Q.  Okay.  And was that true in -- with respect to --
8  was that true in 1999?
9    A.  I'm hesitant to refer to dates --
10    Q.  Okay.
11    A.  -- but we worked side by side with Oracle, you
12  know, during this whole time.
13    Q.  Okay.  And you mentioned with respect to
14  Exhibit 9, certainly within that 2000-2001 time frame
15  described in Exhibit 9; is that fair?
16    A.  There are some dates described in that exhibit
17  where we refer to different events.
18    Q.  Okay.  And my last question is there's an impact
19  statement at the end of that paragraph.  It says that this
20  has caused months, in some cases over a year, in meeting
21  implementation time lines."  Do you recall in some cases
22  these functionality issues causing delays of months or over
23  a year with respect to HP's implementation time line?
24    A.  I think for the call center and marketing software
25  we did not deploy them as we had hoped to.

148

1    Q.  What was HP's implementation time line originally?
2    A.  I think a two-year -- a two-year time line seems
3  right.  It could have been three years.
4    Q.  Okay.
5    And was that true -- was that for the whole CRM
6  11i?
7    A.  Well, I think we started with the 3i version, so I
8  don't know if that...
9    Q.  Do you recall what the time line was for
10  implementation of the CRM 11i products?
11    A.  No.
12    MS. ANDERSON: Okay.
13    MS. DONOVAN:  How are we doing on time?
14    MS. ANDERSON:  I think I'm out of time.  So I have no
15  further questions at this time for the record.  I'll just
16  state that the Court has limited today's deposition to
17  approximately four and a half hours, however Plaintiffs
18  reserve the right to reopen the deposition with leave of
19  the Court if necessary.
20    MS. DONOVAN:  And I'd like to put on the record from
21  HP's point of view we believe that we have spent more than
22  the time that was indicated to us as the amount of time it
23  would be necessary for this deposition; and, further, that
24  there were, in our opinion, a lot of examination that was
25  repetitive or not falling within the categories in the

149

1  deposition subpoena so we certainly hope that it has been
2  completed.
3      MR. HARRISON:  I would join that objection.  And I
4  object to reopening of the deposition, although I will note
5  that I do have about -- a very short amount of time of
6  follow-up questions.
7      MS. ANDERSON:  Do you want to switch?
8      MR. HARRISON:  Yeah, let's go off the record, please.
9      THE VIDEOGRAPHER:  All right.  Going off the record.
10  The time is 4:11.
11      (Recess taken.)
12      THE VIDEOGRAPHER:  We are on the record.  The time is
13  4:19.
14                    -oOo-
15              EXAMINATION
16  BY MR. HARRISON:
17      Q.  Good afternoon, Mr. Rathjens.  As I introduced
18  myself, I'm Matthew Harrison on behalf of the defendants.
19  I'm going to ask you some follow-up questions regarding
20  your earlier testimony.  Obviously, it will not be my
21  intention to misstate any of your prior testimony.  If I do
22  by mistake, please let me know.  Okay?
23      A.  Okay.
24      Q.  Are you familiar with Oracle's fiscal calendar?
25      A.  I used to be.

150

1      Q.  Okay.
2      A.  But I'm not.  I forget what it is.
3      Q.  Do you know -- would it refresh your recollection
4  that it starts on June 1st and ends on May 31st of each
5  year?
6      A.  Okay.
7      Q.  Do you recall the time frame we've been discussing
8  in this deposition is 2000 to 2001.  Do you recall the
9  period of December 1 through February 28th -- December 1,
10  2000, February 28th, 2001?  I want to refer you to that
11  time period.
12      A.  Is that a three-month time period?
13      Q.  Yes.
14      A.  Okay.
15      Q.  Immediately after the deal we've been discussing
16  today in November of 2000.
17      A.  Okay.
18      Q.  Are you aware of whether or not there are any
19  licensing or database deals that were scheduled to -- well,
20  let me strike that.
21      Are you aware of any potential licensing deals
22  between Oracle and HP for that three-month period?
23      MS. ANDERSON:  Objection.  Form.
24      MS. DONOVAN:  Objection.  Vague, ambiguous.
25  BY MR. HARRISON:

151

1      Q.  Do you want me to repeat the question?
2      A.  Please.
3      Q.  My question is are you aware of any deals between
4  Oracle and HP for Oracle software that were to take place
5  during that three-month period from December of 2000 to
6  February 2001?
7      A.  No.
8      Q.  To your knowledge --
9      MS. ANDERSON:  I'm sorry.  Same objection.  Form
10  objection.
11  BY MR. HARRISON:
12      Q.  To your knowledge, was there any deal as a result
13  of the implementation of Oracle CRM at HP that HP did not
14  feel -- did not enter in specifically because it felt that
15  there were problems with the product?
16      MS. ANDERSON:  Objection.  Form.
17      THE WITNESS:  I'm sorry, you're going to have to
18  repeat the question.
19      MR. HARRISON:  Sure.  Absolutely.
20      Q.  Are you aware of any licensing deal for Oracle
21  software that -- or potential licensing deal for Oracle
22  software with HP that HP did not enter into because of
23  product problems based on HP's implementations of the CRM
24  product?
25      MS. ANDERSON:  Objection.  Form.

152

1      THE WITNESS:  I'm not aware of any deals we did not
2  enter into because of the product.
3  BY MR. HARRISON:
4      Q.  Are you aware of any licensing deals that Oracle
5  had with any other companies during that time frame that
6  did not go through because of perceived product problems?
7      MS. ANDERSON:  Objection.  Form.  And also calls for
8  speculation.
9      THE WITNESS:  No.  I'm not aware of any.
10  BY MR. HARRISON:
11      Q.  Do you know whether HP, during that time frame,
12  served as a reference account for Oracle for its products?
13      MS. DONOVAN:  Objection.  Vague, ambiguous.
14      MS. ANDERSON:  Same objection.  I mean I'll join.
15      THE WITNESS:  Is this a three-month time frame we're
16  talking about?
17  BY MR. HARRISON:
18      Q.  I'm just generally asking about the 2000-2001 time
19  frame?
20      A.  I believe HP did serve as a reference for Oracle.
21      Q.  Did you have any involvement in making that
22  decision from a HP standpoint?
23      MS. DONOVAN:  Objection.  Vague, ambiguous.
24      THE WITNESS:  I participated in some reference
25  selling.  I don't know that I had any decision making

153

1 whether we would -- I was asked to participate, and so I
2 did.
3       BY MR. HARRISON:
4       Q.  When you say reference selling, what do you mean
5 by that?
6       A.  Presentations to customers on what we were doing
7 at HP in the CRM space, how Oracle software in general
8 performed on HP hardware, and just sharing our experiences
9 in implementing CRM processes and CRM software.
10       Q.  Do you recall any of the specific customers or
11 potential customers of Oracle that you participated in
12 calls with?
13       A.  I do not recall any -- I was trying to remember
14 this.  I remember there was a financial institution from
15 Korea, there was a telecom company; but it's been so long
16 that I don't recall the companies' names.
17       Q.  Do you know whether HP today is a reference
18 customer for Oracle software?
19       MS. ANDERSON:  Objection.  Form.
20       THE WITNESS:  I do not know that; but as an educated
21 guess, I'm sure that we do a lot of joint selling, which
22 would imply that we are -- I forget the terminology you
23 stated, but we are -- serve as a reference.
24       BY MR. HARRISON:
25       Q.  In the June -- excuse me.  Let me rephrase that.

154

1       In the 2000-2001 time frame do you know what
2 modules of CRM that HP served as a reference customer for?
3       A.  I would say the modules that we discussed -- that
4 I discussed previously in general.  The Oracle sales
5 modules, the call center, and the Marketing Online.
6       Q.  I want to go back to the November 30, 2000 license
7 purchase that we've been discussing today at length; and I
8 wanted to ask you -- you know, I believe you earlier
9 testified you had some discussions around that license
10 purchase at the time; is that right?
11       A.  I must have had some discussions at that time.  I
12 was confusing myself between that license purchase and the
13 time frame when we were considering not making the --
14 converting the term licenses to perpetual licenses.  So I
15 was more involved in those discussions than in the
16 discussions of November 30th, 2000.
17       Q.  Your -- let me just make sure I understand what
18 you said.  You were more involved in the discussions in
19 late 2001 concerning the conversion to perpetual licenses?
20       A.  Correct.
21       Q.  Than you were in the discussions surrounding the
22 November 30th, 2000, purchase?
23       A.  That is correct.
24       Q.  Directing your attention to the November 30th
25 purchase.  At the time of that contract was it your

155

1 understanding that when HP purchased new modules and
2 licenses, it intended to implement all of the licenses that
3 it purchased?
4       MS. ANDERSON:  Objection.  Form.
5       BY MR. HARRISON:
6       Q.  Or utilize -- go ahead.
7       MS. ANDERSON:  Objection.  Form.  And also calls for
8 speculation.
9       BY MR. HARRISON:
10       Q.  I'm asking for your understanding only, not anyone
11 else's understanding.  Was it your understanding at the
12 time of that contract that HP intended to implement all of
13 the modules that it purchased in that contract?
14       A.  That is my understanding.  I don't know why you
15 would purchase software without intending to implement it.
16       Q.  Okay.  And was it your understanding that at the
17 time of that contract that HP intended to use all the
18 additional licenses that it purchased?
19       MS. ANDERSON:  Objection.  Form.
20       THE WITNESS:  I would have the same answer as the
21 previous question.  I can't imagine why you would -- a
22 company would purchase licenses without intending to deploy
23 them.
24       BY MR. HARRISON:
25       Q.  Okay.  And you said you weren't as involved in the

156

1 November 30th, 2000, negotiations as you were in the
2 negotiations that took place at the end of 2001, right?
3       A.  That's correct.
4       Q.  Okay.  So is it fair to say that you were not --
5 you were not aware of all the reasons that accompanied the
6 deal between HP and Oracle in November of 2000?
7       MS. ANDERSON:  Objection.  Form.
8       MS. DONOVAN:  I'll join.  And add that it calls for
9 speculation.
10       THE WITNESS:  I believe that's a -- that's correct,
11 that I was not aware of all the relationships between HP
12 and Oracle and why some of the decisions were made.
13       BY MR. HARRISON:
14       Q.  So you're not -- you don't know -- is it fair to
15 say that you're not aware of all of the reasons that were
16 discussed between the parties for entering into that deal?
17       MS. ANDERSON:  Objection.  Form.  And asked and
18 answered as well.
19       MS. DONOVAN:  Same objections.
20       THE WITNESS:  I believe -- yes, I was not aware of all
21 the discussions that took place.
22       BY MR. HARRISON:
23       Q.  Okay.  Earlier I believe you testified that HP did
24 not implement the Incentive Compensation module of CRM; is
25 that right?

157

1    A.  Yes.
2    Q.  When -- if you know, when did HP make the decision
3  not to implement that module?
4    A.  I think that decision was reviewed on a regular
5  basis every six months.
6    Q.  Do you recall when the final decision was made not
7  to implement that module globally?
8    A.  No.  But I suspect that it was related to the
9  merger with Compaq; and when we decided to use the Seibel
10  software, that would have been the final decision.
11    Q.  To your knowledge, up until that decision point --
12  and again I'm only asking what you know, your personal
13  knowledge, are you aware of whether HP indeed intended to
14  implement that product?
15    MS. ANDERSON:  Objection.  Form.
16    THE WITNESS:  I -- because HP purchased the product, I
17  would conclude that HP intended to use it.
18    BY MR. HARRISON:
19    Q.  We also discussed the call center module of CRM.
20  And you indicated that HP chose not to implement that
21  module because they moved to a Seibel call center with the
22  Compaq merger; is that right?
23    MS. ANDERSON:  Objection.  Form.  And mischaracterizes
24  his prior testimony.
25    MS. DONOVAN:  I'll join.

158

1    BY MR. HARRISON:
2    Q.  Okay.  Is it a fair characterization of your
3  testimony that the merger with Compaq was the main reason
4  why HP chose not to implement the call center module of
5  Oracle CRM?
6    MS. ANDERSON:  Same objections.
7    THE WITNESS:  We spent considerable time trying to
8  configure the software and get it to meet HP's needs, and
9  we were not successful in doing that before we merged with
10  Compaq.  And, thus, we -- when the merger took place and we
11  decided to go to the Seibel software is when we stopped
12  trying to put it into production.
13    BY MR. HARRISON:
14    Q.  When you say configure the software for HP's needs
15  what do you mean by that?  Configure the software?
16    A.  Get the software to meet the acceptance criteria
17  for the users within HP that anticipated using it.  Call
18  center agents and inside sales reps.  We were trying to
19  configure the software with work flows and with the data
20  and all the things that one does to get this type of
21  software set up and working in a production environment.
22    Q.  And in your experience would you say that that's
23  common in a global CRM implementation?
24    A.  In HP it is very difficult to get enterprise
25  software configured and deployed.

159

1    Q.  And you had those difficulties with regard to the
2  CRM implementation for call center, right?
3    MS. ANDERSON:  Objection.  Form.
4    MS. DONOVAN:  I'll join.
5    THE WITNESS:  We had -- we have difficulties -- we had
6  difficulties with Oracle software, we have had difficulties
7  with the Seibel software.
8    BY MR. HARRISON:
9    Q.  With regard to the call center module, until the
10  decision was made not to implement it -- now I'm referring
11  to the final decision when HP decided to go with Seibel --
12  was it your understanding that HP actually intended to
13  implement that software?
14    MS. ANDERSON:  Objection.  Form.
15    THE WITNESS:  Yes.  That was my understanding.  And I
16  was part of that intention.
17    BY MR. HARRISON:
18    Q.  Now, at the time -- let's go back to the 1999
19  contract.  And I promise I'll try to get through this as
20  fast as I can.  I don't have a whole lot more questions.
21  The videographer is going to need to change the tape, but I
22  apologize, I'll try to speed it up.
23      At the time of the 1999 contract for CRM modules,
24  are you aware of whether or not that was the version 3i of
25  Oracle's CRM?

160

1    MS. ANDERSON:  Objection.  Form.
2    THE WITNESS:  I would guess that it was 3i, yes.
3    BY MR. HARRISON:
4    Q.  Are you aware that -- whether or not Oracle's 11i
5  CRM modules added new functionality to the software?
6    MS. ANDERSON:  Objection.  Form.
7    THE WITNESS:  I would say yes, the 11i added new
8  functionality to 3i.
9    BY MR. HARRISON:
10    Q.  As part of the deal in November 2000, is it your
11  understanding that HP was getting the new functionality
12  that was involved with the 11i modules of CRM?
13    MS. ANDERSON:  Objection.  Form.
14    THE WITNESS:  I am not sure which version of the
15  software was associated with the November 30th, 2000 deal.
16    BY MR. HARRISON:
17    Q.  In your experience was it unusual for CRM software
18  or companies developing CRM software to add new
19  functionality as the product matured?
20    A.  State that again.
21    Q.  Was it unusual in your experience for companies
22  that were developing CRM software like Oracle to add new
23  functionality as the software matured?
24    A.  No, that's not unusual.  That's expected.
25    Q.  And in your experience did that sometimes include

161

1    functionality that wasn't even contemplated when the
2    software was first developed?
3        MS. ANDERSON: Objection. Form. And also calls for
4    speculation.
5        MS. DONOVAN: I'll join.
6        THE WITNESS: Yes.
7            You may have to repeat the question, but it --
8    the hor- -- the time frame horizon, I think you would have
9    to conclude that you dream up things in the future that you
10   couldn't dream up or contemplate in -- you know, several
11   years back.
12       MR. HARRISON: Okay. I think we need to break very
13   quickly.
14       THE VIDEOGRAPHER: This concludes Videotape No. 3 in
15   the deposition of Thomas Rathjens. We're going off the
16   record. The time is 4:36.
17       (Recess taken.)
18       THE VIDEOGRAPHER: This is the beginning of
19   Videotape no. 4 in the deposition of Thomas Rathjens.
20   We're on the record. The time is 4:39.
21       BY MR. HARRISON:
22       Q. Mr. Rathjens, I only have one more topic to follow
23   up on with you. We discussed a lot about the negotiations
24   that took place at the end of 2001 regarding certain
25   business negotiations between Oracle and HP. Do you recall

162

1    testifying about those topics?
2        A. Yes.
3        Q. Could you tell me what your recollection is of the
4    resolution of those negotiations.
5        A. I believe HP ended up making the payment for and
6    converting the term licenses into perpetual licenses.
7        Q. Were you involved directly in the meetings that
8    resulted in that resolution?
9        MS. DONOVAN: Objection. Vague, ambiguous.
10       THE WITNESS: I do not think I was in the meetings
11   with Oracle on that.
12       BY MR. HARRISON:
13       Q. How did you become knowledgeable about the
14   resolution of this -- these business negotiations at the
15   end of 2001?
16       MS. ANDERSON: Objection. Form.
17       MS. DONOVAN: Join.
18       THE WITNESS: I'm not sure; but I'd imagine I received
19   an e-mail that summarized the conclusion of that
20   negotiation.
21       BY MR. HARRISON:
22       Q. Do you know if Oracle gave any money back to HP as
23   a result of these negotiations at the end of 2001?
24       MS. ANDERSON: Objection. Form.
25       THE WITNESS: I do not know that Oracle gave any money

163

1    back to HP.
2        BY MR. HARRISON:
3        Q. Do you know if Oracle gave free consulting or
4    support services as a result of the resolution of these
5    negotiations?
6        MS. ANDERSON: Objection. Form.
7        MS. DONOVAN: Vague, ambiguous.
8        THE WITNESS: Can you please restate.
9        MR. HARRISON: Sure.
10       Q. As a result of this resolution of these
11   negotiations, are you aware of whether HP received free
12   consulting services from Oracle?
13       A. I do not believe HP received free consulting
14   services. I think we were successful in lowering our
15   go-forward support costs.
16       MR. HARRISON: I just want to mark one document, and
17   then I'm done. I'll ask a few quick questions about it.
18           I think the next in line is --
19       THE REPORTER: It's 13.
20       MR. HARRISON: 13.
21       (Exhibit No. 13 was marked for identification.)
22       MR. HARRISON: I'll give you a chance to read it; but
23   for the record I'll note that it is December 19th, 2001,
24   e-mail from Karen Montague to a number of people including
25   yourself. It's Bates stamped HP 00064 to 65.

164

1        THE WITNESS: Okay.
2        BY MR. HARRISON:
3        Q. I just wanted to ask you a couple of questions
4    about this. Is this consistent with your understanding of
5    the resolution between Oracle and HP at the end of 2001?
6        MS. ANDERSON: Objection. Form.
7        THE WITNESS: As I stated before seeing this document,
8    I believe I received an e-mail summarizing the outcome of
9    those discussions, and this is such a document.
10       BY MR. HARRISON:
11       Q. With regard to the -- if you look at No. 1 down at
12   Partners Online, at the bottom of that list.
13       A. Yeah.
14       Q. Earlier we discussed a negotiation between Oracle
15   and HP with regard to whether or not Partners Online was
16   owned -- was intellectual property or a license that was
17   owned by HP. Do you remember testifying about that?
18       A. Yes.
19       Q. Does this refresh your recollection about the
20   resolution of that negotiation?
21       A. Yes. It looks like we have Partner Online
22   licenses after this discussion and what was concluded.
23       Q. Does this refresh your recollection that Oracle
24   gave licenses for a certain amount of application users for
25   Partners Online to HP at this time?

165

1    MS. ANDERSON:  Objection.  Form.

2    THE WITNESS:  As I don't believe there was any

3  additional license purchases at this time, this looks like

4  a restatement of the licenses we owned, which gave HP the

5  Partners Online -- 5,500 Partners Online licenses.

6    MR. HARRISON:  I have no further questions.

7    MS. ANDERSON:  Okay.

8    MR. HARRISON:  Do we need to switch?

9    MS. ANDERSON:  No, that's fine.  I just have one

10  question.

11            FURTHER EXAMINATION

12  BY MS. ANDERSON:

13    Q.  I just have a follow-up question with respect to

14  the questioning on HP acting as a reference for Oracle.

15  First of all, you referred to it as reference selling.

16  What do you mean by that term?

17    A.  HP has a executive briefing center where they

18  bring in customers to demonstrate HP products, bring in

19  experts to talk about different things that are going on

20  within HP.  And I participated in maybe once a month

21  talking to a customer that was brought in to the HP

22  offices.  And I believe I also participated in one or two

23  at Oracle.

24    Q.  Okay.  And was -- was this reference selling part

25  of the Oracle-HP agreement to run Oracle software on HP

166

1  servers?

2    MS. DONOVAN:  Objection.  Vague, ambiguous.

3    MR. HARRISON:  Join.

4    THE WITNESS:  They were different in nature.  And some

5  were related to CRM -- some were, you know, where CRM had a

6  one hour slot to talk to a customer that is there all day.

7  But in general, it was to -- with Oracle it was to show HP

8  and Oracle's partnership in that the Oracle software worked

9  very well on HP hardware.

10  BY MS. ANDERSON:

11    Q.  Okay.  And at that time was HP live on any part of

12  CRM 11i?

13    MR. HARRISON:  Objection.  Vague as to time.

14    MS. DONOVAN:  I join.

15    THE WITNESS:  I'll join.

16  BY MS. ANDERSON:

17    Q.  I'm talking about the 2000-2001 time frame.

18    A.  Right.  I'm not sure.

19    These, as I stated, were maybe once a month that I

20  personally participated in.  I didn't participate in many

21  other joint selling activities that HP and Oracle would go

22  on, so I do not know -- I would say some took place before

23  we went live on Oracle Sales Online and some were after.

24    Q.  Okay.  And would you characterize these reference

25  sellings as a joint selling opportunity between HP and

167

1  Oracle?

2    A.  Yes.

3    MS. ANDERSON:  Okay.

4    MR. HARRISON:  Objection.  Vague.

5    MS. DONOVAN:  And -- yeah.  I'd like to interpose an

6  objection.  Vague and ambiguous.

7  BY MS. ANDERSON:

8    Q.  And are you aware of any other CRM 11i references

9  that Oracle was using at that time, in the 2000-2001 time

10  period?

11    MS. DONOVAN:  Objection.  Vague and ambiguous.  Calls

12  for speculation.

13    MR. HARRISON:  I join.

14    THE WITNESS:  I think Oracle and Cisco may have done

15  some joint -- similar joint selling.  I think Oracle --

16  well, for that matter, some of our competitors, Oracle and

17  IBM, Oracle and Sun.

18  BY MS. ANDERSON:

19    Q.  Were you aware of any CRM 11i references who were

20  just references, who were not part of a joint selling

21  effort with Oracle?

22    MS. DONOVAN:  Objection.

23  BY MS. ANDERSON:

24    Q.  In the 2000-2001 time period?  If you recall.

25    MS. DONOVAN:  Objection.  Vague and ambiguous.

168

1    MR. HARRISON:  Join.

2    THE WITNESS:  I don't recall.

3    MS. ANDERSON:  I have no further questions.

4    THE VIDEOGRAPHER:  Can we go?

5    MR. HARRISON:  Yes.

6    THE VIDEOGRAPHER:  This is the end of Videotape No. 4,

7  Volume 1, in the deposition of Thomas Rathjens.  The

8  original videotapes will be retained by LiveNote World

9  Services.  Now going off the record.  The time is 4:49.

10    (The proceedings adjourned at 4:49 p.m.)

11           -oOo-

12

13

14

15         THOMAS RATHJENS

16

17

18

19

20

21

22

23

24

25

Rathjens, Thomas  6/30/2006  9:07:00 AM

169

1    STATE OF CALIFORNIA )

2    COUNTY OF SAN MATEO )

3          I hereby certify that the witness in the foregoing

4    deposition, THOMAS RATHJENS, was by me duly sworn to

5    testify to the truth, the whole truth, and nothing but the

6    truth, in the within-entitled cause; that said deposition

7    was taken at the time and place herein named; that the

8    deposition is a true record of the witness's testimony as

9    reported by me, a duly certified shorthand reporter and a

10   disinterested person, and was thereafter transcribed into

11   typewriting by computer.

12         I further certify that I am not interested in the

13   outcome of the said action, nor connected with, nor related

14   to any of the parties in said action, nor to their

15   respective counsel.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17   this 3rd day of July, 2006.

18

19

20         _____

21         KELLIE A. ZOLLARS, CSR

22         STATE OF CALIFORNIA

23

24

25

1   STATE OF CALIFORNIA )

2   COUNTY OF SAN MATEO )

3           I hereby certify that the witness in the foregoing

4   deposition, THOMAS RATHJENS, was by me duly sworn to

5   testify to the truth, the whole truth, and nothing but the

6   truth, in the within-entitled cause; that said deposition

7   was taken at the time and place herein named; that the

8   deposition is a true record of the witness's testimony as

9   reported by me, a duly certified shorthand reporter and a

10  disinterested person, and was thereafter transcribed into

11  typewriting by computer.

12          I further certify that I am not interested in the

13  outcome of the said action, nor connected with, nor related

14  to any of the parties in said action, nor to their

15  respective counsel.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17  this 3rd day of July, 2006.

18

19

20  _____

21          KELLIE A. ZOLLARS, CSR

22          STATE OF CALIFORNIA

23

24

25

169