Exhibit 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MASTER FILE NO. C-01-0988-SI

LOCAL 144 NURSING HOME PENSION FUND,
UFCW LOCAL 56 RETAIL MEAT PENSION FUND,
DRIFTON FINANCE CORPORATION, AND ROBERT D. SAWYER, et al.

vs.

ORACLE CORPORATION, LAWRENCE J. ELLISON,
JEFFREY O. HENLEY, EDWARD J. SANDERSON

REBUTTAL REPORT

OF

D. PAUL REGAN, CPA, CFE

Initially Submitted: JUNE 22, 2007
Sworn: OCTOBER 16, 2008

## The Nature of My Assignment

I have been retained, through my employer, Hemming Morse, Inc., by Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs Local 144 Nursing Home Pension Fund, et al., to provide expert testimony regarding whether Oracle's revenue and earnings for the quarterly period ended November 30, 2000 ("2QFY01") were presented in accordance with Generally Accepted Accounting Principles ("GAAP"), and whether Oracle's financial statements were materially misstated. I submitted my expert report on May 25, 2007. The defendants' experts also submitted reports at that time. This rebuttal report responds to specific conclusions reached by J. Duross O'Bryan as quoted or referenced below, and should be reviewed in connection with my May 25, 2007 expert report. I have incorporated the conclusions and analyses of my prior report into this rebuttal report.

## Summary of My Expert Qualifications

My qualifications and hourly rate are included in my expert report dated May 25, 2007.

## Evidence Considered

The evidence I considered in this case is included in Exhibit B to my expert report dated May 25, 2007. In addition, new evidence I have considered since that time is included in Exhibit A to this response. In particular, I have considered the Expert Report of J. Duross O'Bryan ("O'Bryan Report"), which he presented on behalf of Oracle as described further below.

## Summary Response to Mr. O'Bryan's Expert Report

This rebuttal report contains the following principal conclusions, each of which is analyzed in greater detail in a related section of this rebuttal report:

1. Mr. O'Bryan's conclusion on materiality with respect to Oracle's Q2FY01 financial statements is incorrect and contrary to GAAP, including SAB 99,[1] because:

---

[1] Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 99, Materiality ("SAB 99"), *see* my May 25, 2007 report at ¶ 40.

      a. His analysis did not properly evaluate each misstatement individually and in the aggregate; and

      b. He failed to consider certain important factors and evidence.

2. Mr. O'Bryan's analysis of Oracle's Q2FY01 transfers to the Bad Debt Reserve is flawed in that:

      a. He did not provide any details underlying his assertion that selected transfers were supportable beyond the two examples in his report. Further, his conclusions related to the two examples rely on evidence developed by Oracle in 2003 rather than what was documented by Oracle contemporaneous to the transfers; and

      b. He appears to have incorrectly assumed that Ernst & Young LLP ("E&Y") had developed certain conclusions about the 2QFY01 transfers, however, it does not appear that E&Y ever reviewed the transfers in 2Q01 and never reached those conclusions.

3. Mr. O'Bryan's conclusion that the November 2000 Debit Memos had no financial statement impact is inaccurate.

## Mr. O'Bryan's Conclusion on Materiality With Respect to Oracle's 2QFY01 Financial Statements is Incorrect and Contrary to GAAP, Including SAB 99

Mr. O'Bryan's conclusion regarding the HP agreement in 2QFY01 is incorrect and lacks an independent and/or reliable analysis.

Mr. O'Bryan asserted that Oracle's $20.1 million transfer of unapplied cash to its Bad Debt Reserve in 2QFY01 was not material with respect to its financial statements. In doing so, Mr. O'Bryan failed to consider certain relevant evidence, including:

1) *Mr. O'Bryan failed to consider appropriate qualitative evidence, required under SAB 99, to properly conclude whether Oracle's 2QFY01 misstatements were material to its financial statements.*

A. <u>Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision in the estimate.</u>

Mr. O'Bryan concluded that the known misstatements are incapable of precise measurement.[2] However, it appears that he failed to consider the following:

- The transfer of customer overpayments was not the result of a subjective estimation process but rather a product of exact amounts improperly credited to Oracle's Bad Debt Reserve. Ultimately these transfers enabled an increase of exactly $20,000,000 to Oracle's revenue and pre-tax earnings in 2QFY01;[3] and

- The improper recognition of revenue related to the HP agreement results from a violation of the accounting rules prescribed under GAAP and is also subject to precise measurement.[4]

Accordingly, the misstatement amounts do not require subjective judgments as each are able to be precisely measured under GAAP. This factor proved particularly important for Oracle because as 2QFY01 neared completion, its revenues and EPS were just short of beating consensus analyst expectations.[5] In my opinion, under these circumstances the misstatement was material.

---

[2] O'Bryan Report, p.39.

[3] *See* my report dated May 25, 2007, p.13, footnote 37.

[4] *See* my report dated May 25, 2007, p.34-35.

[5] As noted in my original report in footnote 136, I have reviewed a series of forecast documents that appear to have been prepared by Oracle during the process to finalize its reported financial statements for Q2FY01. These forecast documents indicate that Oracle identified "potential" revenue of $2,640.5 million and EPS of $0.10 per share. Ultimately, Oracle reported revenue of $2,659.5 million and EPS of $0.11 per share. This difference of $19 million closely approximates the revenue related to the HP agreement recorded on the last day of Oracle's quarter [NDCA-ORCL

Page **4** of **18**

B. <u>Whether the misstatement masks a change in earnings or other trends.</u>

Mr. O'Bryan noted "no evidence" of this issue.[6] Therefore, it appears that he failed to consider the following evidence:

- Leading up to Q2FY01, Oracle established a trend of beating analysts' estimated EPS consensus. During the consecutive ten quarters preceding Q2FY01, Oracle announced EPS in excess of analysts' consensus nine times. During the single instance when Oracle merely met earnings (and revenue) consensus, the stock price fell 6%.

- Oracle's failure to beat analysts' consensus EPS for 2QFY01 was masked from investors as a direct result of the misstatements at issue in this dispute. Specifically, the known misstatements facilitated Oracle's ability to beat Q2FY01 consensus analysts' expectations by one penny, artificially inflating EPS from $0.10 to $0.11.

---

410399-415]. In addition, the $20,000,000 adjustment that was recorded to reduce Oracle's Bad Debt Reserve was an element of "Corporate Adjustments" that was characterized as "Q2FY01 Upside," and included as an addition to Oracle's 2QFY01 revenue and EPS in Oracle's forecast.

[6] O'Bryan Report, p. 39.

These factors support my conclusion that the misstatement was material because it masked the change in Oracle's earnings trends and Oracle would not have beaten analyst consensus expectations without the misstatements.

C. <u>Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.</u>

Mr. O'Bryan concluded that the misstatements impacted all of Oracle's operations, as opposed to a singular segment or other significant portion of the business.[7] In reaching this conclusion, Mr. O'Bryan does not appear to have considered, at least, the following:

- The approximately $20 million misstatement related to the HP agreement distorted the Company's application business growth rates. Several of Oracle's analysts commented on Oracle's reported 66% applications business growth rate in 2Q01 as one of the highlights of the quarter.[8&9] As growth rate

---

[7] O'Bryan Report, p.40, "The unapplied cash likely resulted from all of Oracle's operations, as opposed to a singular segment or other significant portion of the business."

[8] NDCA-ORCL 308884-85, Goldman Sachs, "*Oracle Reports Robust Apps Growth; Mgmt States Strong Business Outlook*," December 15, 2000, "Oracle delivered strong earnings, benefiting from: 1) growing traction in the application market fueling <u>applications revenue growth of 66%</u> (or 73% in local currencies). . . . Oracle emphasized that its key differentiation is its fully integrated suite of applications that installs relatively quickly, requiring minimal systems integration." (Emphasis added.)

[9] NDCA-ORCL 420587-89, Deutsche Banc Alex. Brown, "*Oracle Corporation [ORC] 'Strong Buy' Oracle F2Q Delivers the Goods*," December 15, 2000, "A key part of Oracle's strong F2Q was the strength of the applications business and, more importantly, marquee customer wins with the 11i e-business suit. <u>Applications license growth of 66%</u> solidly <u>outpaced Street expectations in the 50%-60% range</u>. The outperformance should also allay concerns about the viability of Oracle's

expectations appeared to range between 50% - 60%, the incremental revenues improperly recognized under the HP arrangement facilitated Oracle's ability to exceed these estimates. Excluding the improper HP revenues, the Company's applications business growth rate would have dropped to 54%, which would have been 12% below the reported rate; and further, analysts indicated the importance of Oracle's "notable" win at HP to its 11i business.[10&11]

These factors support my conclusion that Mr. O'Bryan's opinion was erroneous and the misstatements at issue were material, using an appropriate SAB 99 based analysis.

D. <u>Whether the misstatement involves concealment of an unlawful transaction.</u>

Mr. O'Bryan concludes, "[f]urthermore, there is no evidence that suggests that Oracle attempted to conceal these transactions."[12] However, he does not appear to consider at least the following:

---

applications business and the relative immaturity of release 11i following last quarter's decent, but slightly disappointing 42% growth." (Emphasis added.)

[10] NDCA-ORCL 420617-19, Thomas Weisel Partners LLC, "*66% Apps Growth Highlights In-Line Q2*," December 15, 2000, "<u>Oracle made up for disappointing applications license sales in Q1 by posting 66% growth in Q2</u>. <u>Notable wins</u> at American General, <u>Hewlett Packard</u>…highlighted solid demand for the company's 11i e-business suite. . . . We project Oracle must hit 60% apps growth over the next five years to justify its current valuation." (Emphasis added.)

[11] NDCA-ORCL 308890-93, Merrill Lynch, "*Oracle Systems: Q201: Steady As She Goes*," December 15, 2000, "Oracle began to show traction again in its applications business, and the company spoke confidently about improving its growth in applications through the remainder of FY01. The company noted 83 live customers on 11i and <u>new wins with HP (thought to be a $20 mil deal)</u>, Qualcomm and Compaq. This will be an important factor for increased sponsorship of ORCL this spring." (Emphasis added.)

[12] O'Bryan Report, p. 40.

- The November 2000 debit memos concealed the fact that Oracle had a large amount of customer overpayments and unapplied cash that it should have refunded to customers or escheated. Specifically, as set forth in my May 25, 2007 report, Oracle's creation of the debit memos allowed it to "apply" customer overpayments to the debit memos, making it look like an overpayment was actually applied to a legitimate invoice, which limited the ability of Oracle's customers to obtain refunds.[13]

- Oracle's usage of the debit memos for concealment purposes is also demonstrated by the fact that Oracle engaged in a "clean up" project beginning in October 2002 in which it reversed the November 2000 debit memos and refunded and escheated millions of dollars of debit memo overpayments that had been used to inflate the bad debt reserve in 2Q01.

These facts support my opinion that Mr. O'Bryan was incorrect when he concluded that "there is no evidence that suggests that Oracle attempted to conceal these transactions."

2) *Mr. O'Bryan failed to independently analyze, or offer an opinion on, the materiality of the misstatement if the HP agreement also violated GAAP.*

Mr. O'Bryan concluded that the $20.1 million pre-tax earnings impact of Oracle's improper transfers of customer overpayments was quantitatively immaterial to its 2QFY01 financial statements. In doing so, it appears that he failed to evaluate other known misstatements during Oracle's 2QFY01. Specifically, it appears that Mr. O'Bryan failed to consider the impact on his materiality analysis of Oracle's $19.9 million overstatement of revenue and pre-tax earnings related to its agreement with Hewlett Packard.[14] As a result, Mr. O'Bryan appears to have failed to consider that the aggregate

---

[13] *See* my report dated May 25, 2007 beginning at ¶ 26.

[14] While other second quarter misstatements, including the turnaround impact of prior period adjustments, may also impact an assessment of materiality, it is my understanding that Arthur

impact of these items was an overstatement of Oracle's 2QFY01, a) Net Income (after tax) by approximately 4%,[15] and b) application revenues of nearly 8%. Accordingly, Mr. O'Bryan's assessment of the quantitative impact of Oracle's known misstatements is incomplete.

3) *Mr. O'Bryan failed to opine on whether Oracle's reported EPS of $0.11 was materially different than its actual EPS of $0.10.*

Mr. O'Bryan's analysis of materiality does not address that the misstatement enabled Oracle to increase its reported EPS from $0.10 to $0.11. This $0.01 increase enabled Oracle to beat consensus analyst expectations for the period. In this case, the misstatements allowed Oracle to round its reported EPS up to $0.11 instead of rounding it down to $0.10. However, Mr. O'Bryan limits his opinion to the increment of EPS that facilitated the rounding, rather than the outcome of the rounding (*i.e.*, beating analyst expectations).[16] Therefore, his materiality analysis is incorrect because it looks at the misstatement in a vacuum, without considering the total reported financial statement impact. This impact is also considered in my analysis of the SAB 99 factors above.

4) *Mr. O'Bryan failed to acknowledge that the E&Y investigation was limited in scope and did not consider all of the relevant facts.*

Mr. O'Bryan's conclusion that the improper bad debt transfers in 2QFY01 were not material is based in part upon an analysis performed by E&Y, who replaced AA as Oracle's auditors in 2002. Specifically, Mr. O'Bryan states that:

---

Andersen LLP ("AA") did not produce a complete set of Q2FY01 working papers to enable a determination as to whether any such items existed. Regardless, Mr. O'Bryan failed to consider the possibility of these incremental misstatements in his analysis.

[15] In computing the incremental impact of all known misstatements, I have determined that the impact of any variable expense, such as commissions, related to the HP agreement on net income and EPS percentage changes would not impact the 4% EPS overstatement noted herein.

[16] O'Bryan Report, p.38, "This adjustment would reduce the Earnings Per Share calculation by just two-tenths of a cent. As such, this adjustment is not material from a quantitative sense…."

- "EY had to consider whether the transfers to Oracle's bad debt reserve during second quarter fiscal year 2001 created a material misstatement in Oracle's past financial statements."

- "EY concluded that these transfers from unapplied cash to bad debt reserve did not have a material impact to past financial statements."[17]

However, the evidence does not show that E&Y reached these conclusions. First, there is no evidence that E&Y was asked to perform any procedures that would enable them to reach a conclusion regarding the propriety of the bad debt transfers in 2Q01. Mr. O'Bryan does not cite any evidence that E&Y analyzed or even considered the impact of the bad debt transfers on Oracle's 2QFY01. In fact, E&Y's designated witness under Fed. R. Civ. P. 30(b)(6), Alex Bender, testified that he was not familiar with account 12601, which is the relevant Bad Debt Reserve account, or transfers to this account.[18]

In addition, Mr. Bender testified that the "totality of the procedures performed by Ernst & Young" were documented in their memorandum entitled "Oracle Corporation – Agreed Upon Procedures with Respect to Debit memos to Account #25005 in November 2000."[19] Mr. O'Bryan described this memorandum in detail in his report (*see* p.17). This memorandum does not contain any indication that E&Y performed analyses of Oracle's transfer of customer overpayments to the Bad Debt Reserve.

---

[17] O'Bryan Report, p.41.

[18] Deposition of Alexander Bender, September 21, 2006, 179:18-180:20, including "Q. Do you know if Ernst & Young in the course of its review or engagement related to the debit memo transactions ever looked at the transfers to Account 12601? A. No, I don't recall that specifically. No. Q. Do you recall if they looked at the transfers to the bad-debt reserve? A. For which period? Q. All. A. I don't recall, no." *See also* Bender at 202:12-18, "Q. Do you know when the transfer to Account 12601 happened? [Objection] A. I'm not familiar with the account balance you just referenced and the transfers to that account."

[19]   *Id.* at 51:1-19, 79:1-80:1, and 179:18-180:20, including "Do you know if Ernst & Young would have documented any review of transfers to the bad-debt reserve with respect to its engagement related to the debit memos? [Objection] A. If we would have done something, I believe we would have documented it, yes." *See also* the related E&Y memorandum at E&Y 000143-46.

Further, I considered the possibility that E&Y developed an understanding of the transfer of customer overpayments to the Bad Debt Reserve in 2QFY01 via a review of the Report of Oracle's Special Litigation Committee ("SLC"). However, the SLC only analyzed transfers made to the Bad Debt Reserve in 3QFY01, which totaled $5 million.[20&21] Mr. O'Bryan cites no independent evidence that E&Y or the SLC reviewed the impact of the transfers in 2QFY01.

It is also worthwhile to note that E&Y did not perform a quarterly review of Oracle's financial statements for 2QFY01, and did not issue any opinion with respect to Oracle's fiscal 2001 year. Further, Mr. Bender testified that E&Y did not know or understand how Oracle recorded customer overpayments in fiscal 2001 because it did not audit Oracle.[22] Therefore, it is not appropriate to assert that E&Y reached any conclusion regarding the propriety or materiality of the improper transfers to the bad debt reserve in 2QFY01. Accordingly, it is unclear how Mr. O'Bryan determined that "E&Y's conclusions were consistent with [his] own" after his review of Mr. Bender's testimony.[23]

Similarly, there is no indication that E&Y performed any procedures related to the HP agreement. There is also no evidence that AA, Oracle's external auditors in fiscal 2001, was provided with all of the information related to either of these misstatements. In accordance with the requirements of Generally Accepted Auditing Standards, an auditor is required to evaluate the materiality of known and likely misstatements on an individual

---

[20] *See* SLC Report at NDCA-ORCL 295582.

[21] NDCA-ORCL 296433, "'The Committee discussed with Banker [E&Y Audit partner] that certain transfers from unapplied cash to the bad debt reserve had occurred in Q3 of FY 2001, but that the maximum amount of cash moved to the bad debt reserve in Q3 was approximately $5 million."

[22] Deposition of Alexander Bender, September 21, 2006, 209:6-13, "Q. Do you know if E&Y had an understanding based on its debit memo engagement of how Oracle recorded customer overpayments in fiscal 2001? A. Not really, no. We understood that customer repayments (sic) would be one of the items that would potentially go into the 'on account' status as part of 25005. But since we didn't audit that period, I wouldn't know."

[23] *See* O'Bryan Report, p.31, Section D.

and on an <u>aggregated</u> basis.[24]  Since I am not aware of any evidence to suggest that Oracle's external auditors reviewed all evidence regarding Oracle's misstatements, his reliance on E&Y, AA, or a lack of restatement to conclude that the misstatements were not material is erroneous.[25]

In consideration of the evidence detailed above, I believe that Mr. O'Bryan's conclusions were incorrect.  Mr. O'Bryan failed to perform reasonable procedures and to evaluate appropriate and relevant evidence surrounding the misstatements of Oracle's Q2FY01 financial statements.  As demonstrated in the analyses above (and discussed in my May 25, 2007 report), it is my opinion as an accountant applying SAB 99 and AU 312, that the misstatements at issue in this matter were material.

### Mr. O'Bryan's Analysis of the Q2FY01 Transfers to the Bad Debt Reserve Is Flawed

Mr. O'Bryan acknowledges that Oracle transferred $20.1 million of unapplied cash to its Bad Debt Reserve in 2QFY01.[26]  However, Mr. O'Bryan reviewed only $10.6 million of the 2QFY01 transfers to the Bad Debt reserve.  Within this sample, Mr. O'Bryan identified only $1.5 million of transfers that he believes were supportable.  Nonetheless, other than two examples, Mr.

---

[24] AU 312, "Audit Risk and Materiality in Conducting an Audit," ¶ 34.  AU 312 is explicitly incorporated into SAB 99.

[25] In addition, Mr. O'Bryan stated that it is reasonable to conclude that the SEC was satisfied with Oracle's accounting treatment with respect to the debit memos.  Mr. O'Bryan failed to cite any evidence or perform an independent assessment of the evidence provided to the SEC.  Further, as noted in my report dated May 25, 2007, Oracle failed to provide the SEC with complete information in its presentation (*see* p.31).  In addition, Oracle did not provide the SEC with evidence related to the transfer of customer overpayments to the Bad Debt Reserve or the improper revenue recognition on the HP agreement.  Therefore, it is not possible to conclude that the SEC would have been satisfied that Oracle's misstatements were immaterial.

[26] As discussed in my report, Oracle calculated its 2QFY01 Bad Debt Reserve as of October 31, 2000.  However, Mr. O'Bryan appears to have calculated Oracle's transfers to its Bad Debt Reserve based on the three months ended November 30, 2000.  For purposes of assessing the impact of the transfers to the Bad Debt Reserve on 2QFY01 pre-tax earnings, the transfers to the Bad Debt Reserve for the three months ended October 31, 2000 totaled $19.4 million, and the subsequent $20.0 million adjustment that increased revenue by reducing the reserve.

O'Bryan did not provide any detail of these transfers or the specific documents that he reviewed. Therefore, his conclusion is not supported in his report.

In the two examples of supportable transfers provided by Mr. O'Bryan, it was not until fiscal 2003 that Oracle ascertained that this amount of the transfers in October and November 2000 were appropriate. The entries Oracle made in 2QFY01, which impacted its financial statements, needed to be based upon appropriate contemporaneous evidence gathered at the time the entries were made, not evidence identified two years later. Further, even his example related to Caltrans assumes that Oracle did not initiate a second invoice to Caltrans related to the payment of $112,464. While the collectors' notes state that "too much of concession was given to customer due to the customer sending in a payment," it is not clear from the documents that the original concession was inappropriate or, that the payment of $112,464 did not include a $91,254 customer overpayment.[27]

I also note that Mr. O'Bryan says that he "found some evidence which suggests that at least another $500,000 of the transfers were appropriate."[28] However, Mr. O'Bryan did not provide any evidence or details concerning those items. Therefore, Mr. O'Bryan's conclusions regarding this amount are not supported by his report.

Mr. O'Bryan further notes that Oracle took a "precautionary" measure to reverse these transfers.[29] To be clear, Oracle's "precautionary" measures were taken approximately two years after the Q2FY01 transfers, and after plaintiffs had made their accounting allegations. Furthermore, Oracle's actions as part of a "clean-up" beginning in October-November 2002 involved a blanket reversal of the transfers of customer overpayments to the Bad Debt Reserve as well as the specific reversal of the related November 2000 Debit Memos. This reversal indicates that during the entire time between the transfer and the reversal, Oracle's Bad Debt Reserve was overstated by the presence of these customer overpayments. In addition to the $20

---

[27] Amount of the overpayment obtained from O'Bryan Report, p. 35-36.

[28] O'Bryan Report, p. 33.

[29] O'Bryan Report, p. 20.

million transfers in 2QFY01, Oracle transferred nearly $40 million in other periods that were part of the November 2002 blanket reversal.[30] It does not appear that Mr. O'Bryan considered these facts in their totality.

## Mr. O'Bryan's Conclusion that the November 2000 Debit Memos Had No Financial Statement Impact Is Inaccurate

Mr. O'Bryan's conclusion that the November 2000 debit memos had "no financial impact"[31] is flawed for several reasons. First, as stated in my May 25, 2007 report, the debit memo transactions did have a financial impact by enabling Oracle to inflate its revenues and pre-tax earnings by at least $20 million in 2QFY01. Mr. O'Bryan fails to recognize that the unapplied cash receipts which were improperly transferred to Oracle's bad debt reserve during and prior to 2QFY01 were also applied to the November 2000 debit memos. As a result, Mr. O'Bryan's conclusions appear to be based on what happened on a single date (November 17, 2000), without taking into account the financial transactions that preceded the debit memos (such as the bad debt transfers) and occurred after the November 2000 debit memos (*i.e.*, credit memos and cash refunds), all of which had an impact on Oracle's financial statements.[32]

In reaching these conclusions, Mr. O'Bryan relied, in part, upon the testing performed by E&Y.[33] However, Mr. Bender who, as noted above was designated as E&Y's person-most-knowledgeable, stated that E&Y:

---

[30] *See* ¶ 43 of my report dated May 25, 2007.

[31] O'Bryan Report, p. 3, "Oracle's creation of and accounting for the over 46,000 debit memos processed on November 17, 2000 did not affect its financial statements in the second quarter of fiscal year 2001, or any other accounting period."

[32] As described in my report dated May 25, 2007, Oracle removed approximately $59.6 million that had been transferred into its Bad Debt Reserve (*see* ¶43). Ultimately, these amounts were refunded, applied to adjusted invoices and amounts previously written-off, kept and escheated. These funds had previously been maintained in Oracle's Bad Debt Reserve.

[33] O'Byran Report, p. 18, "As noted above, EY found no evidence that any revenue, or any other financial statement impact, was recorded as a result of the November 17, 2000 debit memo project."

Page **14** of **18**

- Did not look at the underlying transactions related to the debit memos, including unapplied cash items relating to debit memos that were transferred to the Bad Debt Reserve in 2QFY01. In fact, E&Y only looked at the debit memo entries themselves.[34]

- Would not necessarily have detected improper prior increases to income related to the debit memos. Specifically, E&Y did not look at Accounts 12601 or 25005 in 2QFY01, when a majority of the transfers of customer overpayments to the Bad Debt Reserve that effected Oracle's 2QFY01 results occurred.[35&36]

Further, Mr. O'Bryan's conclusions appear to be substantially premised upon testimony of current Oracle employee Greg Myers. This is notable because many documents contradict and refute testimony made by Mr. Myers in his deposition. For example, Mr. O'Bryan referenced the testimony of Mr. Myers that stated regarding the On Account designation, "from an accounting perspective, there was an offsetting debit that cleared that credit from sitting in Oracle's balance sheet."[37] However, to the extent that the On Account items had been transferred to the Bad Debt Reserve, the credit continued to be present on Oracle's balance sheet. As a result, Mr. O'Bryan's reliance on Mr. Myers' testimony is inconsistent with Mr. O'Bryan's conclusion that $20.1 million was transferred to the Bad Debt Reserve in 2QFY01.

---

[34] Deposition of Alexander Bender, September 21, 2006, 182:2-9, including "Q. Do you know if it reviewed the receipts related to the debit memos? A. I don't believe we looked at that. We looked at the journal entries to process the debit memos referred to here." *See also* 184:1-185:14.

[35] *Id.* at 235:23-236:22, including "Q. And I just want to clarify. I believe you previously stated Ernst & Young did not look at activity in September or October 2000 related to these debit memo transactions; is that correct? [Objection] A. These – I'm sorry. These debit memos were in November. So did we look at Account 25005 in September and October? The answer is no." Bender's testimony also shows that E&Y did not review the transfers in August 2000.

[36]   *Id.* at 202:12-18 and 216:6-10, including "Q. Do you know in connection with Ernst & Young's debit memo engagement whether or not it looked at transfers from accounts 25005 to 12601? A. As I indicated earlier, I don't recall doing that, no."

[37] *See* O'Bryan report, p.10, footnote 21.

**Mr. O'Bryan's Conclusion Regarding the HP Agreement in 2QFY01 Is Incorrect and Lacks an Independent and/or Reliable Analysis**

Mr. O'Bryan's Report did not provide an independent analysis of the documents, testimony or evidence surrounding the HP agreement. He also failed to provide foundational evidence or a reliable methodology for independently assessing the propriety of the HP agreement under GAAP. His conclusion is based entirely upon an unsupported assumption about what Oracle's auditor AA may have considered in 2001. This conclusion disregards the fact that AA did not appear to review all information necessary to fully assess the propriety of Oracle's revenue recognition treatment of the HP agreement. Therefore, Mr. O'Bryan's reliance on AA is misplaced, and his opinion on the HP agreement is incorrect.

Specifically, Mr. O'Bryan failed to perform any independent analysis of the facts and documents surrounding the HP deal, including, but not limited to: (i) the underlying source agreements between Oracle and HP, (ii) testimony of those involved in the negotiations and implementation of software sold to HP, including relevant deposition exhibits, (iii) correspondence within and between Oracle and HP surrounding the negotiated agreements and implementation matters identified (including e-mails and other documents), and (iv) the applicable GAAP standards and related interpretations, in place during Oracle's Q2FY01. As stated in my May 25, 2007 report, the evidence shows that the HP agreement was improperly recognized in 2QFY01.

Mr. O'Bryan failed to consider evidence indicating AA was not provided with all information by Oracle necessary to conclude on the propriety of its revenue recognition treatment of the HP agreement

It also appears that Mr. O'Bryan failed to consider whether AA reviewed, or had access to, all the evidence necessary to properly conclude on Oracle's recognition of revenue on the HP agreement. In fact, testimony during Gary Matuszak's[38] deposition demonstrates that certain relevant e-mails and documents surrounding the HP agreement (including negotiations pertaining to the contemporaneous sale of Oracle's software and its purchase of HP hardware) were not

---

[38] Gary Matuszak was AA's lead partner on the Oracle audit.

provided to AA. In one example, Mr. Matuszak testified that he was unaware of the history of concessions that HP had requested before moving forward with the November 2000 agreement.[39&40] As the existence of concessions either before or after the execution of a software license calls into question the fixed or determinable nature of fees due under an agreement, evidence such as this would have likely impacted AA's evaluation of revenue recognized under the HP agreement. Mr. Matuszak also testified that he was not aware of several internal Oracle e-mails discussing the reciprocal nature of the deal and confirming that HP's software purchase was contingent on Oracle's purchase of HP hardware.[41]

In addition, as discussed in my May 25, 2007 report,[42] there were 14 "show stoppers" that HP believed would prevent them from being able to roll out Oracle's product. Mr. Matuszak was not aware of these "show stoppers."[43] As matters surrounding the functionality of the software sold to HP would impact an auditor's assessment as to whether Oracle had effectively satisfied the delivery requirement under GAAP to record revenue, this information would also have likely impacted AA's evaluation of revenue recognized under the HP agreement. Mr. Matuszak

---

[39] Referring to the following excerpt from Deposition of Gary Matuszak, Exhibit 6 (NDCA-ORCL 020845) - an e-mail from Michael DeCesare, Oracle's Vice President of Sales –Western Region to various Oracle executives, including Larry Ellison, Chief Executive Officer, dated November 28, 2000, just two days prior to the purported execution of the HP agreement: "Over the past 8 weeks Oracle (Mike DeCesare) and HP (Phil May, Mike Griffith, Karen Montague, Mike Overly..) have been working on a series of concessions that has been requested by HP before they move forward on the purchase of the additional CRM licenses."

[40] Deposition of Gary Matuszak, August 1, 2000, 336:11-337:16; 338:19-25; 339:19-340:21. "Q. Were you aware of any concessions that were what's written here, that there were concessions that HP was requesting before they move forward on the purchase in Q2? A. I've not seen this memo before and so…I'm not aware of these concessions."

[41] *See id.* at 328:21-330:5; 332:7-334:1.

[42] *See* my report dated May 25, 2007 beginning at ¶ 103.

[43] Deposition of Gary Matuszak, August 1, 2000, 345:20-25.

appeared to agree with this perspective, but acknowledged that AA did not perform this type of analysis.[44&45]

The evidence, as outlined in my report dated May 25, 2007, demonstrates that Oracle improperly recognized $19.9 million in revenue on November 30, 2000 relating to the HP agreement. Therefore, irrespective of AA's knowledge or consideration of the evidence, AA's conclusions as to the propriety of Oracle's Q2FY01 reported revenue was inaccurate. Accordingly, it continues to be my opinion that Oracle failed to recognize revenue under the HP Agreement in accordance with GAAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of October, 2008, at San Francisco, California.


Respectfully submitted:

Signature: _____
D. Paul Regan, CPA, CFE

---

[44] *Id.* at 185:6-14, "Q. Okay. So – but did you ever perform an analysis with respect to this [HP] deal as to whether the functionality promised to Hewlett-Packard actually worked? [Objection] A. That was not within the scope of our work."; *see also* 171:11-172:15.

[45] *Id.* at 186:6-187:1-10, "Q. Would it change your analysis at all if you looked -- if the products listed on Oracle's available products list, if some of those hadn't even been developed yet, would that change your analysis if you knew that at the time? [Objection] A. If there were unavailable products in the license agreement, that certainly would have been a factor we would have considered."

**EXHIBIT A**

<u>DOCUMENTS CONSIDERED</u>
<u>Supplemental to Exhibit B to Expert Report of D. Paul Regan, May 25, 2007</u>

1.   Expert Report of J. Duross O' Bryan

2.   AU 312, Audit Risk and Materiality in Conducting an Audit