# EXHIBIT A

Foster, George  7/6/2007  8:56:00 AM

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION.
 7              Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9
10   ALL ACTIONS.
11   _____/
12
13        ---oOo---
14
     VIDEOTAPED DEPOSITION OF GEORGE FOSTER
15
        FRIDAY, JULY 6, 2007
16
        ---oOo---
17
18
19
20      SHEILA CHASE & ASSOCIATES
            REPORTING FOR:
21      LiveNote World Service
        221 Main Street, Suite 1250
22      San Francisco, California 94105
        Phone: (415) 321-2311
23      Fax: (415) 321-2301
24   Reported by:
     DIANA NOBRIGA, CSR, CRR
25   LICENSE NO. 7071
```

**2**

```
 1          I N D E X
 2       INDEX OF EXAMINATION
 3                    PAGE
 4   EXAMINATION BY MR. BRITTON          5
 5          ---oOo---
 6       INDEX OF EXHIBITS
 7   DESCRIPTION              PAGE
 8   Exhibit 1   Rebuttal Expert Report of
 9          George Foster           7
10   Exhibit 2   Affidavit of Raymond J. Lane    166
11   Exhibit 3   Oracle Total Company - Q3 FY01
12          Forecast            178
13   Exhibit 4   Expert Report of Alan G.
14          Goedde, Ph.D.        181
15   Exhibit 5   Figure II: Pipeline Growth within
16          Quarter vs. Year-Over-Year Actual
17          License Revenue Growth       184
18
19
20
21
22
23
24
25
```

**3**

```
 1        BE IT REMEMBERED that on Friday, July 6, 2007,
 2   commencing at the hour of 8:56 a.m., thereof, at the LAW
 3   OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
 4   RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 2600,
 5   San Francisco, California, before me, DIANA NOBRIGA, a
 6   Certified Shorthand Reporter in and for the State of
 7   California, personally appeared
 8          GEORGE FOSTER,
 9   as a witness by the plaintiffs herein, who, being by me
10   first duly sworn, was thereupon examined and testified
11   as hereinafter set forth.
12          ---oOo---
13   Appearing as counsel on behalf of the Plaintiffs:
14      DOUGLAS R. BRITTON, ESQUIRE
        STACEY KAPLAN, ESQUIRE
15      GAVIN BOWIE, ESQUIRE
        LERACH, COUGHLIN, STOIA, GELLAR,
16      RUDMAN & ROBBINS
        655 West Broadway, Suite 1900
17      San Diego, CA 92101-8498
        Dbritton@lerachlaw.com
18
19   Appearing as counsel on behalf of Defendants:
20      MICHELE F. KYROUZ, ESQUIRE
        ANDREW M. FARTHING, ESQUIRE
21      LATHAM & WATKINS
        505 Montgomery Street, Suite 1900
22      San Francisco, CA 94111-2562
        michele.kyrouz@lw.com
23
24   Also Present:  Alan G. Goedde, Ph.D.; Bruce Deal,
25   Analysis Group; James Terrell, Videographer
```

**4**

```
 1        VIDEOGRAPHER:  This begins the videotaped
 2   deposition of George Foster, tape one, Volume I, in the
 3   matter In Re Oracle Securities Litigation, as filed in
 4   the United States District Court for the Northern
 5   District of California, Master File No. C-01-0988-MJJ.
 6   Today's date is July 6, 2007.  The time is 8:56 on the
 7   video monitor.
 8        The video operator today is James Terrell,
 9   representing LiveNote World Service, located at 221 Main
10   Street, Suite 1250, San Francisco, California 94105.
11   The phone number is 415 321-2300.  The court reporter is
12   Diana Nobriga with Sheila Chase and Associates,
13   reporting on behalf of LiveNote World Service.
14        Today's deposition is being taken on behalf of
15   plaintiffs, and is taking place at 100 Pine Street in
16   San Francisco, California.
17        And if counsels will now please introduce
18   yourself and state whom you represent.
19        MR. BRITTON:  Doug Britton with Lerach
20   Coughlin on behalf of plaintiffs.  And with me here
21   today is Stacey Kaplan, Gavin Bowie and Dr. Alan Goedde.
22        MS. KYROUZ:  Good morning.  Michele Kyrouz and
23   Andrew Farthing of Latham and Watkins representing
24   defendants and the witness.  With us is Bruce Deal from
25   Analysis Group.
```

117

1    it wasn't supported by the facts.
2        Q.   The facts you're identifying are the ones
3    listed in your report; right?
4        A.   I can give you some of the facts.
5        Q.   What's your understanding of the facts?
6        A.   That the question was specifically asked to
7    Mr. Ellison, did he intend to institute more risk into
8    the forecast.  And he said no.  The question was asked,
9    I believe --
10       Q.   He said he wanted them to be more accurate;
11   right?
12       A.   He wanted them to be more accurate.  But the
13   question was specifically asked did he want more risk,
14   and he said no.  And then I believe the question was
15   asked of Mr. Henley, and he said he did not see evidence
16   of that.  And it was asked of Ms. Minton, and she said
17   she did not see evidence of that.
18       Q.   Did they say they did not see evidence of that
19   or did they say, "I do not recall"?
20       A.   I think Ms. Minton said, "I do not recall."
21       Q.   So did Mr. Henley; right?
22       A.   I can check --
23       Q.   Your understanding?
24       A.   My understanding is that I think Mr. Henley
25   did say he was not aware of it.

118

1        Q.   He also said that he's not involved in
2    Ms. Minton's forecast process, too; right?
3        A.   I think he has discussions with, meetings with
4    Ms. Minton, where I suspect forecast issues arise.
5        Q.   The e-mail that you're talking about in the
6    products division, as you referred to it, what is your
7    understanding about the mechanism that was going to be
8    used to increase the risk in the field forecast as
9    discussed in that e-mail?
10       MS. KYROUZ:  Objection; misstates the record
11   and his testimony.
12       THE WITNESS:  I don't believe there was a
13   mechanism to increase the risk in the forecast.
14       MR. BRITTON:  Q.  Okay.  Now, did you do any
15   testing to see if there was, in fact, any additional
16   risk put into the field forecast?
17       MS. KYROUZ:  Objection; vague.
18       THE WITNESS:  The testing I did was to look
19   at, I mean, what were the statements of the people, the
20   key people.  And I didn't see any evidence that they
21   were saying that was occurring.
22       MR. BRITTON:  Q.  Is that the only testing
23   that you think could have been done?
24       A.   I think certainly that would be the key one I
25   would look in the first place.

119

1        Q.   So that's the only testing you did?
2        A.   I believe that is the case.
3        Q.   If, in fact, that Mr. Ellison's directive
4    people followed, and people actually did put more risk
5    in the forecasts, would that change your opinions about
6    the reasonableness of Oracle's forecast process?
7        MS. KYROUZ:  Objection; incomplete
8    hypothetical.
9        THE WITNESS:  You can't look at just a number.
10   You have to look at what are the checks and balances.
11   And there are people above and below Ms. Minton, and you
12   would want to check what other factors is going on
13   there.
14       MR. BRITTON:  Q.  Let me give you a
15   hypothetical.  Let me start this way.  What is your
16   understanding of the amount of upside that Ms. Minton
17   put into the forecast on December 11th?
18       A.   I can -- I don't know the exact number.
19       Q.   Roughly.
20       A.   I think -- I prefer to just look at the
21   document.
22       Q.   You don't have an understanding independent of
23   the report?
24       A.   Well, I don't try and remember all the numbers
25   in a report.

# EXHIBIT B

Minton, Jennifer (30b6) 4/21/2005 9:00:00 AM

---

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
     In re ORACLE CORPORATION
 4   SECURITIES LITIGATION
                 Master File No. C-01-0988-MJJ
 5   This Document Relates To:
 6       ALL ACTIONS.
 7   _____/
 8
 9                    ---oOo---
10         DEPOSITION OF JENNIFER MINTON
11            Thursday, April 21, 2005
12                    ---oOo---
13
14         SHEILA CHASE & ASSOCIATES
15              25 Otsego Avenue
          San Francisco, California  94112
                Phone: (415) 333-7474
16               Fax: (415) 333-7412
17
18
19
20   Reported by:
     SANDRA L. CARRANZA, CSR, RPR, CRR
21   CSR No. 7062
22
23
24
25
```

---

**Page 2**

```
 1   INDEX PAGE (continued)
 2
 3   10   11/29/00 e-mail from "forecast" to
          pateam, et al., Bates stamped 040601
 4        - 040602                         130
 5   11   Document entitled, "November Flash
          Report," from Ivgen Guner to Jeff
 6        Henley, Bates stamped 019803     132
 7   12   String of e-mails; first is dated
          12/11/00, from Jeff Henley to "saas,"
 8        Bates stamped 020731             134
 9   13   Document entitled, "Americas Cumulative
          Weekly License Pipeline Trends," Bates
10        stamped 008131                   150
11   14   String of e-mails; first is dated
          9/15/00, from David Winton to George
12        Roberts, Bates stamped 040837    156
13   15   Document Bates stamped 024454,
          ending with 24464                161
14
15   16   Document entitled, "Oracle Corp. Pipeline
          Reporting Package, January 15, 2001,"
16        Bates stamped 00514 - 00523      161
17   17   Document entitled, "Large Deals in Q3,"
          Bates stamped 042297 - 042356    175
18
     18   Document entitled, "Big Deal Update,
19        November 17 Workday 8," Bates stamped
          025049 - 025067                  181
20
     19   Document entitled, "Sanderson-Q201
21        Oracle Product Industries Q3 Week 7,"
          Bates stamped 016213 - 016240    187
22
     20   Document entitled, "Oracle Product
23        Industries Q3 '01 and Q4 '01 Forecast
          Package Week 10 - January 31, 2000,"
24        Bates stamped 036971 - 039178    196
25
```

---

**Page 1 (lower left)**

```
 1              I N D E X
 2          INDEX OF EXAMINATION
 3                               PAGE
 4   MR. BRITTON                    7
 5     AFTERNOON SESSION          103
 6              ---oOo---
 7          INDEX OF EXHIBITS
 8   DESCRIPTION                  PAGE
 9   1   Plaintiffs' Notice of Deposition of
         Oracle Corporation Pursuant to Federal
10       Rule of Civil Procedure 30(b)(6)    11
11   2   Document entitled, "Week 2 of Budget
         Meetings, Bates stamped 028477 -
12       028480                              57
13   3   Document entitled, "Budget Growth Rate
         Comparison - License, Bates stamped
14       041949                              67
15   4   Document entitled, "Oracle Fiscal 2001
         Budget," Bates stamped 039895 -
16       039918                              69
17   5   String of e-mails; first is dated 6/19/00,
         from Lawrence Ellison to Jeff Henley,
18       Bates stamped 028499                82
19   6   7/28/00 e-mail from Jennifer Minto to
         Terry Ford, Bates stamped 041952    87
20
21   7   Document entitled, "License Revenue
         FOrecast Accuracy, Bates stamped
22       040637                              91
23   8   1/18/01 e-mail from Jennifer Minton to
         Ivgen Guner, Bates stamped 039315   95
24   9   String of e-mails; first is dated 10/18/00
25       from Jennifer Minton to Jeff Henley, Safra
         Catz, Mark Barrenechea, Sukumar Rathnam  114
```

---

**Page 3**

```
 1   INDEX PAGE (continued)
 2
 3   21   Document entitled, "Product Revenues,"
          Bates stamped 024411 - 024429     199
 4
     22   Document entitled, "Approvals/2000
 5        Forecast Report," Bates stamped
          041923                            200
 6
     23   Document entitled, "Q3 FY '01 Week1,
 7        December 4, 2000," Bates stamped
          039448 - 039477                   201
 8
     24   Document entitled, "Total Company Q3
 9        FY01 Forecast," Bates stamped
          039819 - 039850                   204
10
     25   Document entitled, "Total Company - 3
11        Year Forecast," Bates stamped 03944
          - 03956                           229
12
     26   Document entitled, "Oracle Corporation
13        Executive Committee Worldwide Forecast
          FY01 Management Summary, January 22,
14        2001, Week 6, Bates stamped 008755 -
          008776                            231
15
16               ---oOo---
17
18
19
20
21
22
23
24
25
```

---

Oracle

134

1  Jennifer Minton, this marks the beginning of Tape 3,
2  Volume I. Going on the record. The time is 12 -- 2:13,
3  excuse me.
4       MR. BRITTON: Q. Okay. I placed in front of
5  you what's been marked as Minton Exhibit 12.
6       And for the record, it starts with Bates 20731
7  and ends at 32.
8       Do you recognize Exhibit 12?
9   A. Yes, I do.
10   Q. And what is Exhibit 12?
11   A. It's an e-mail note that Larry Garnick
12  prepared, which he forwarded to me, and I subsequently
13  forwarded to Jeff, and he then subsequently responded
14  to, that itemized what our earnings per share were for
15  Q2 and Q3 for fiscal '98 through fiscal 2000.
16   Q. Okay. And did this analysis affect your
17  forecast at all for the third quarter of 2001?
18       MR. RUBENSTEIN: And, again, you are just
19  focusing on general process, right?
20       MR. BRITTON: Process. Yes.
21       THE WITNESS: No. This is not something that
22  we would generally have as a general process.
23       MR. BRITTON: Q. Did you use this process at
24  all for the third quarter of '01?
25   A. For developing the -- the forecasts that I

135

1  developed is the upside report.
2   Q. Right.
3   A. And I did not use this to develop the upside
4  report.
5   Q. The upside report, okay. Okay. Put that
6  aside.
7       Okay. Now going back to the pipeline
8  calculation that you performed, or that you looked in
9  connection with the upside report, did you adjust the
10  conversion rate to take into account any external
11  factors that may cause one year's results to be
12  different than the prior year's results?
13   A. No.
14   Q. Any economic factors whatsoever?
15   A. No.
16   Q. No. Okay.
17       So even though the market had changed
18  significantly in terms of like dot-com business, the
19  conversion rate, you didn't adjust for that at all when
20  you converted it over for purposes of making your upside
21  adjustments?
22       MR. RUBENSTEIN: Object to the form.
23       THE WITNESS: I did not consider any economic
24  factors when performing the license -- when we prepared
25  the license pipeline conversion package, it is solely

136

1  based on applying the historical conversion rates for
2  the same prior year corresponding period to the current
3  pipeline to determine what the upside would be.
4       MR. BRITTON: Q. Okay. And then you would
5  make your adjustments upward based upon that conversion
6  rate, plus talking to the financial heads in other
7  conversations that you had with business heads; is that
8  fair?
9   A. Yes. I would use a variety of data inputs to
10  come up with what I felt was the appropriate upside
11  number to get to the total consolidated forecast for the
12  quarter.
13   Q. Did you ever adjust those numbers down based
14  upon the conversion rate and your conversations? Did
15  you ever, in preparing the -- the consolidated upside
16  report, did you ever make adjustments downward to the
17  license revenues?
18   A. Sure.
19   Q. Okay. And what circumstances would cause you
20  to make the adjustments down?
21   A. In the event that the pipeline -- historical
22  pipeline conversion rate may have indicated a -- a lower
23  license forecast than what was submitted, that would be
24  one reason. Another reason is there could have been an
25  error in the forecast submission that came to my

137

1  attention, and, therefore, I needed to adjust the
2  forecast down.
3       So, you know, you know, the upside column was
4  not just, you know, to make changes based on upside
5  reports or other additional information that I received.
6  It was also used to reflect any errors -- any
7  corrections to errors that were made in the underlying
8  forecast that was originally submitted in OFA.
9   Q. Okay. So if, say, for example, Jay Nussbaum
10  submitted his forecast that said a million dollars for
11  the quarter, and that analysis was based upon deals that
12  were in the pipeline that were likely -- likely to
13  close, you would actually make an adjustment downward
14  for -- for the upside forecast if circumstances
15  warranted -- if circumstances warranted it?
16   A. If -- if there was an error in the original
17  forecasts that were submitted, I would have adjusted it
18  downward. If the historical pipeline conversion ratio
19  told me that his forecast did not seem achievable based
20  on his historical conversion trends for the like for
21  like periods, then I would adjust it down.
22   Q. Now, did the business -- the individual
23  business units have access to their historical
24  conversion rates for them, those periods?
25   A. Yes, they did.

# EXHIBIT C

Ellison, Lawrence  9/21/2006  10:57:00 AM

229

```
1            IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3
4
5    In re ORACLE CORPORATION
6    SECURITIES LITIGATION.
7            Master File No. C-01-0988-MJJ
8    This Document Relates To:
9
10   ALL ACTIONS.
11   _____  _____/
12
13            ---oOo---
14            CONFIDENTIAL
15   VIDEOTAPED DEPOSITION OF LAWRENCE ELLISON
16            Volume II
17      Thursday, September 21, 2006
18            ---oOo---
19      SHEILA CHASE & ASSOCIATES
            REPORTING FOR:
20      LiveNote World Service
        221 Main Street, Suite 1250
21    San Francisco, California 94105
        Phone: (415) 321-2300
22        Fax: (415) 321-2301
23
24   Reported by:
     RACHEL FERRIER, CSR
25   CSR No. 6948
```

Ellison, Lawrence  9/21/2006  10:57:00 AM

383

1    Q    Okay. Do you remember him asking for an
2    example of an 11i implementation that had stood the
3    test of time?
4    A    I -- I don't.
5    Q    Do you -- did you point out the suite had
6    been only out a year but that a few customers had
7    adopted the no-modifications model out of poverty?
8    A    I certainly -- yes. Yeah. Techtronics
9    specifically, yeah.
10   Q    You don't recall Techtronics; is that
11   what --
12   A    No, I said I do vividly recall Techtronics.
13   Q    So is it accurate, then, that as of the
14   date of this -- of the meeting that's being referred
15   to here, the only examples offered by Oracle
16   personnel at the meeting of 11i up and running that
17   had stood the test of time was or were Techtronics
18   and Cisco?
19   A    No.
20   Q    Okay. And what you are saying, then, is --
21   A    They were just specific examples.
22   Q    Right.
23        As Matthew Symonds -- in other words, has
24   Matthew Symonds omitted other examples that were
25   given at that meeting?

384

1    A    I believe so.
2    Q    That's very misleading if he has, isn't it?
3         MR. LINDSTROM: Objection; argumentative.
4         THE WITNESS: No, I don't think so, but --
5    BY MR. SOLOMON:
6    Q    Okay. And then you enter a footnote or
7    clarification which reads: "As I've said before, our
8    forecasting system is not clairvoyant. Our
9    forecasting does statistical extrapolations based on
10   historical trends. If something that's outside our
11   mathematical model of the business changes, like a
12   war in the Middle East, our forecasting becomes
13   inaccurate."
14        Do you see that?
15   A    Yes, I do.
16   Q    Okay. And you stand by that?
17   A    Absolutely.
18   Q    Now, it wouldn't -- a war in the Middle
19   East is just one example. There could be who knows
20   how many examples; right?
21   A    Price of oil goes over a hundred dollars a
22   barrel, lots of things.
23   Q    And the point you are making is that while
24   your forecasting system does extrapolations based on
25   historic trends, if something is happening that would

385

1    suggest that the historical trend is not necessarily
2    reliable, then your forecasting will not be reliable;
3    is that right?
4    A    Right. Major macroeconomic change;
5    sudden -- sudden growth in the economy or sudden
6    shrinkage in the economy would cause -- you can't
7    extrapolate anymore.
8         MR. SOLOMON: Okay. Have marked as the
9    next exhibit another excerpt from the Softwar book.
10        (Exhibit No. 98 was marked for
11        identification.)
12   BY MR. SOLOMON:
13   Q    And you will see that this chapter is
14   called "Hungarian Lessons," and in chapter -- it says
15   Chapter 12, "Hungarian Lessons." I'm looking at the
16   language, "But the bit of GE he's" -- and it's
17   referring to you -- "improbably declared a model 11i
18   customer is in a far-flung outpost of Jack Welch's
19   sprawling imperium."
20        Do you see that?
21   A    I do.
22        MR. SOLOMON: Then I'm going to have marked
23   as the next exhibit another excerpt from the Softwar
24   book.
25        (Exhibit No. 99 was marked for

386

1         identification.)
2    BY MR. SOLOMON:
3    Q    When you referenced GE Power's
4    implementation of 11i, were you careful to say that
5    it was the Hungarian operation that was implemented?
6    A    Sometimes I mentioned Hungary specifically
7    as a green field; sometimes not. It was more than
8    just Hungary, but the very first one we did was in
9    Hungary.
10   Q    And I'm looking at the paragraph on
11   page 229 at the bottom that begins with, "The
12   contract."
13        Do you see that?
14   A    Okay.
15   Q    It says, "The contract was signed in late
16   October with a clear understanding that if Oracle
17   delivered at" -- and I'm not going to try and
18   pronounce the name.
19        Can you pronounce the name of that place?
20   A    I can't.
21   Q    It's V-e-r-e-s-e-g-y-h-a-z with an accent
22   z.
23        I'll continue: "GE would start rolling out
24   11i across its thirty or so other turbine plants.
25   Within a month, the project was in trouble."

EXHIBIT D

"The access [Symonds] got is apparent.... This access gives the reader a rare window on Ellison's mind." —*The New York Times*

"A sympathetic and revealing portrait of an idiosyncratic executive and company... Entertaining." —*Harvard Business Review*

IN A BUSINESS where great risks, huge fortunes, and even bigger egos are common, Larry Ellison stands out as one of the most outspoken, driven, and daring leaders of the software industry. The company he cofounded and runs, Oracle, is the number one business software company. Perhaps even more than Microsoft's, Oracle's products are essential to today's networked world.

In *Softwar*, journalist Matthew Symonds gives readers exclusive and intimate insight into both Oracle and the man who made it and runs it. As well as relating the story of Oracle's often bumpy path to industry dominance, Symonds deals with the private side of Ellison's life. With unlimited insider access granted by Ellison himself, Symonds captures the intensity and, some would say, the recklessness that have made Ellison a legend.

With a new and expanded epilogue for the paperback edition that tells the story behind Oracle's epic struggle to win control of PeopleSoft, *Softwar* is the most complete portrait undertaken of the man and his empire—a unique and gripping account of both the way the computing industry really works and an extraordinary life.



**MATTHEW SYMONDS** is currently political editor of *The Economist*, but before that was the magazine's technology and communications editor for nearly four years. He has also been a founding editorial director of *The Independent* and strategy director of BBC Worldwide Television. Symonds lives in London with his wife and three children.

"Software titan Larry Ellison has been busy scribbling footnotes to the most detailed account yet of this outsized life.... He also responds and sometimes challenges the account of author Matthew Symonds—a twist in presentation that adds a real-time feel to the 500-page biography." —Lisa Baertlein, Reuters

"An unusually candid study of how a tiny start-up ... grew—sometimes painfully—into a Silicon Valley institution." —*Financial Times*



Cover design by Michael Accordino
Cover photograph by Oliver Laude
Author photograph by Jenny Geddes

Visit us online at www.simonsays.com

U.S. $16.00

ISBN 0-7432-2505-8

# SOFTWAR

AN INTIMATE PORTRAIT OF

## LARRY ELLISON AND ORACLE

## MATTHEW SYMONDS

"Symonds excels at letting readers into the 59-year-old Ellison's often turbulent personal life.... [and] produces a wonderful image of Ellison who is far [from]..."

An Intimate

Portrait of

Larry Ellison

and Oracle

# SOFTWAR

MATTHEW SYMONDS

with Commentary

by Larry Ellison

Simon & Schuster Paperbacks
New York London Toronto Sydney

*To Alison and the children with all my love*

SIMON & SCHUSTER PAPERBACKS
Rockefeller Center
1230 Avenue of the Americas
New York, NY 10020

Copyright © 2003 by Matthew Symonds and Larry Ellison
Epilogue copyright © 2004 by Matthew Symonds and Larry Ellison
All rights reserved, including the right of reproduction
in whole or in part in any form.

First Simon & Schuster trade paperback edition 2004

SIMON & SCHUSTER PAPERBACKS and colophon are registered trademarks of
Simon & Schuster, Inc.

For information regarding special discounts for bulk purchases,
please contact Simon & Schuster Special Sales at 1-800-456-6798 or
business@simonandschuster.com

Designed by Karolina Harris
Manufactured in the United States of America

10   9   8   7   6   5   4   3   2   1

Library of Congress Cataloging-in-Publication Data
Symonds, Matthew.
     Software : an intimate portrait of Larry Ellison and Oracle / Matthew Symonds with
commentary by Larry Ellison.
     p.   cm.
     1. Ellison, Larry.   2. Oracle Corporation—History.   3. Computer software
industry—United States—History.   4. Businessmen—United States—Biography.
     I. Ellison, Larry.  II. Title.
HD9696.63.U62E4478   2003
338.7'6100530973—dc22                            2003058989

ISBN 0-7432-2504-X
0-7432-2505-8 (Pbk)

# ACKNOWLEDGMENTS

There are many people without whose help and advice this book could not have been written. Above all, I'm grateful to Larry Ellison, whose enthusiasm and commitment never wavered even after it became clear that the story would not only have its share of twists and turns but would have a conclusion somewhat less clear cut than he had hoped. My thanks also to Melanie Craft, who bore with fortitude my invasion of her and Larry's privacy. Very many Oracle executives, both past and present, gave freely of their time and thoughts. It's not possible to mention everyone; they know who they are, and they are quoted in the book. But with Mark Jarvis, Jeff Henley, Safra Catz, Mark Barrenechea, Jay Nussbaum, and Ron Wohl I enjoyed a kind of extended conversation over a period getting on for two years. I was continually struck by the frankness and openness of those working for Oracle today, even when it came to talking about their boss. I would also like to record my thanks to Ray Lane. He understood that my relationship with Ellison was collaborative, but he still consented to be interviewed on two occasions, each time for several hours. He may not realize it, but he still has some good friends at Oracle. I also want to mention Joshua Lederberg, Steve Jobs, Jimmy Linn, Jon Bannenberg, and Laura Seccombe, who, in their different ways, gave me insights into Ellison's life that were unique. I must thank, too, those who helped me in practical ways, in particular Joyce Higashi, Carolyn Balkenhol, and Judy Sim. Without them there really would have been no book. I should pay tribute to my literary agent, Andrew Wylie, and my editor at Simon & Schuster, Geoff Kloske. From the outset, Andrew helped shape and define the project and continually buoyed me with his confidence

# CONTENTS

| | | |
|---|---|---|
| | *Author's Note* | xi |
| 1 | Larry and Me | 1 |
| 2 | On the Road | 11 |
| 3 | The War on Complexity | 36 |
| 4 | Beginnings | 54 |
| 5 | To the Limit | 75 |
| 6 | Growing Up | 90 |
| 7 | Best-of-Breed | 112 |
| 8 | Falling Out | 136 |
| 9 | The Laboratory | 161 |
| 10 | Ready or Not . . . | 184 |
| 11 | Taking Stock | 205 |
| 12 | Hungarian Lessons | 227 |
| 13 | Hill by Hill | 233 |
| 14 | The Last Database | 246 |
| 15 | Enemies | 263 |
| 16 | Chained to the Job | 285 |

VIII        ACKNOWLEDGMENTS

and support; Geoff honed, tightened, and, where necessary, discreetly made me intelligible to Americans. Finally, my thanks to Bill Emmott, the editor of *The Economist*, who graciously allowed me a year's leave to pursue this project and whose imaginative suggestion in 1997 that I should write about the unfolding drama of the Internet led directly to my meeting Larry Ellison.

x   CONTENTS

17  Alternative Stress                      302
18  Sayonara Swan Song                      322
19  Family Values                           331
20  Three Strikes, You're Out               347
21  Larryland                               369
22  A Life Beyond Oracle                    380
23  "A Scrap of Information"                 400
24  The Golden Nugget                       418
25  A Perfect Storm                         433
26  "The First Loser"                       454
27  The Biggest Water Bottle                471

Epilogue                                    487
Index                                       499

# AUTHOR'S NOTE

In March 2000, I received a telephone call from Larry Ellison. He had an idea for doing a book about e-business and globalization and wanted to know if I would be interested in coauthorship. I was flattered, but it wasn't something I wanted to do for a number of reasons. In the first place, a relationship with Ellison of that kind would mean I would have to give up writing about the technology business for *The Economist* because of the potential for conflict of interest. Second, I had no desire to add to the torrent of indifferent books about the e-business phenomenon that were then flooding the business publishing market. Third, although we shared many views and I had grown to like Ellison and enjoy his company in the brief time I had known him, I thought that coauthoring a book with him would be a nightmare.

But while we were talking, a much more appealing proposition began to form in my mind: what I would be interested in doing was writing an intimate portrait of Ellison and his company on the basis of having a very high degree of access to both him and Oracle. I explained that I would have to have complete editorial control and that it might be some time before I could take leave of absence from *The Economist*. Ellison's answer was immediate: he'd love me to do it, and he was prepared to wait until I was ready.

Nine months later, in December 2000, accompanied by my New York–based literary agent, Andrew Wylie, I met with Ellison at his Japanese-style villa in Atherton, a leafy and very expensive suburb some twenty miles to the southwest of San Francisco that is home to much of the Silicon Valley establishment. The meeting had three purposes. First, I

needed to establish the basis of my working relationship with Ellison: Wylie had concluded that there should be a formal collaboration agreement between us. Second, although Ellison and I had recently discussed the book over dinner at my house in London, I did not yet have a settled idea of what it should be, although I had already ruled out doing a conventional biography. I knew that if the project was to engage Ellison it would have to be relevant to his current concerns. Most of all, I wanted to test Ellison's claim that Oracle was poised for true greatness.

One of the things I had noticed while covering the technology business was that many of its key players had extraordinarily little interest in even the recent past. It was as much as most of them could do to remember what it was that Microsoft had done to end up in court. Even Marc Andreessen was much keener to talk about the new businesses he was investing in than his epic struggle against Bill Gates while at Netscape. His attitude was: been there; done that; move on. When Microsoft's witnesses were confronted with damning e-mails they'd written only a couple of years before, it is just possible their surprise and struggle to guess what they might have meant at the time wasn't completely phony. Ellison doesn't suffer from that kind of amnesia, but even though he reads history voraciously and tries to learn from it, what really interests him is not the last five years but the next five. To Ellison, the present and the near future elide so gracefully as to be almost indistinguishable. And when talking about software, last year is another country.

A collaboration agreement that gave me everything I would need was quickly reached. An innovative twist, devised by Andrew Wylie, was that Ellison would have a kind of right of reply or commentary within the book, which he could use either to express a counterpoint to any of my conclusions that he disagreed with or to amplify things that he thought important. Neither of us would be able to alter the words of the other. It is a unique form of joint copyright. I think it has worked.

There is one other thing I would like to say about my relationship with Ellison. In the course of my research, I met, somewhat to my surprise, a number of people who assumed that Ellison was paying me to write what he hoped would be a sympathetic account of his life. This is not the case. My compensation and expenses have been covered in full by the advance from my publisher. That said, I have stayed as his guest during my many visits to Oracle and have traveled with him on his private planes. I have also spent time with Ellison on his boats, recording extensive interviews during his vacations and, most recently, joining him in Auckland to report at first hand on his America's Cup campaign. Has this degree of inti-

macy undermined my ability to be objective about Ellison? It is hard for me to say, but I don't believe so. I like Ellison and there is much about him that I admire, but I am frequently critical of him. Most of us, I think, are able to reach reasonably objective judgments about even our closest friends. Liking them does not mean being oblivious to their faults. I have written the truth about Ellison as I have found it and reported faithfully, for better or ill, the words of the many people who know him whom I have interviewed. When Ellison's version of events appears questionable or his behavior less than admirable, I have said so. But to a great extent, the picture of Ellison that emerges is one formed by his own words during innumerable, at times brutally frank, conversations conducted over a period of two years. Ellison is, more often than not, his own harshest and most unrelenting critic.

"CRM in ninety days" initiative is licking his lips nervously and starting to sweat despite the air-conditioning. He agrees that the product isn't ready. Ellison says with rising incredulity, "You want to announce this, but not deliver until May . . . can anyone tell me why we're doing this? Why should we announce it now? Why shouldn't we wait until it works?"* It's a nasty moment, but Ellison is assured that the other flows are ready. The decision is made to pull the sales force compensation package until the problems are resolved and go ahead with launching the other flows on Tuesday.

• • •

When the day is over, Ellison and I drive the half mile to a canalside house he owns in Redwood Shores, where we can sit on the deck and watch the pelicans. Ellison's earlier belief (sincerely held) that Oracle alone might miraculously escape the recession sweeping through the rest of the technology industry now seems ludicrously optimistic. What really happened during those last few days in February at the end of the quarter? Was it a question of two or three big deals falling through at the last moment, as Ellison had earlier appeared to suggest, or was something more fundamental going on?

"No. It was a lot of deals—dozens, I'd say. Sometimes a deal was delayed. Sometimes the size of the deal dropped from $6 million to $2 million. All of a sudden people stopped buying in anticipation of their needs for the next couple of years. Instead they bought exactly what they needed for the next three months. There were even cases where companies that were already using our software were trying to find ways not to pay for it. I'm not going to mention names, but a very large wireless company that was supposed to give us $15 million or $20 million this quarter, based on their own published subscriber numbers, decided to dispute the amount. It was just a negotiating tactic. If we lowered their bill, they'd pay us this quarter. We didn't. Lots of tech companies and telcos are under financial stress, so they're being much more careful with their cash these days. The dot-com die-out is getting worse. Suddenly, moving all your business processes to the Internet doesn't seem so important anymore. It seems like e-business and the Internet are going out of fashion."

---

*LE writes: It made no sense to release the compensation flow until it was working successfully at Oracle. I had made this mistake too many times in the past. Never again.*

Matthew Symonds, Melanie Craft,
Larry Ellison at Woodside in
2002





I suggested that perhaps companies were no longer worried about Web-based "stealth competitors" coming from nowhere to eat their lunch. "That's exactly right," said Ellison. "Wal-Mart is no longer worried about Amazon.com—if Wal-Mart ever was worried about Amazon. A lot of companies have realized they don't have to move quite so quickly. They can be more deliberate and automate at a more rational rate. Flying the Internet flag isn't so cool anymore." Perhaps another factor was that simply making an announcement about what you were doing on the Internet was no longer likely to have a major impact on their stock price? "Absolutely," replied Ellison. "All these B2B exchanges . . . there were lots of companies that issued a press release about a B2B exchange and saw their stock price shoot up. Commerce One dished out about three of these B2B press releases for every one that we sent out. They killed us in the press release war. But that exchange business is gone now. And it's not just the exchange business that's dried up. Companies are much more cautious about buying any kind of new technology."

It is almost as if Ellison were talking about some semi-mythical period remembered only through the mists of time. I can't help reminding him that in mid-February, only ten weeks ago, he still thought Oracle would make its number. "Absolutely," he says. "We went into that quarter extremely confident. We got off to a great start. If you look at our quarter month by month, we had great growth in December, we were still way ahead in January, and then we hit the wall in February." When did he first know that something big had changed, and why didn't Oracle's own much-vaunted e-business systems provide any warning? "Our sales-forecasting system tells us how many deals are in the pipeline and multiplies their value by a historic close rate. If there's a change in close rate we detect that, but in our case we don't detect it until the last day or two of the quarter, because that's when we close so much of our business. I hate that. Consulting firms actually go out and train software buyers to negotiate right up until the last hour of the last day of our quarter before signing a multimillion-dollar deal. Most software companies will increase the discount on the last day just to get the deal into the quarter. It's a monster the industry has created by mapping its sales compensation plans to its fiscal reporting. I think that's a bad practice, and we've tried to put a stop to it at Oracle. But that hasn't stopped our big customers from asking—and taking us right up to the end of quarter before they sign."

I asked Ellison what he had expected the reaction to be when he issued the earnings warning. He said, "Well, the reaction had already occurred. The stock had already gone down dramatically. It was one very loud 'I

told you so.' It turns out that the analysts were looking at the macroeconomic forecast and that proved to be more accurate than our internal systems sales forecast." So how bad did he think things were going to get, and how did he plan to adjust to the new circumstances? "Well, first off, I thank God that we spent the last two years reengineering our company into an efficient global e-business. If we had just started the process of moving to the Internet now, we would really be in trouble. Yeah, we were disappointed in the quarter, but it wasn't a disaster: our sales went up, our margins went up, and our profits went up. I'm not happy, but I'm not going to go out and kill myself. We're really in pretty good shape. We're making a lot of money, and our products have never been stronger. We have release 9i of the database coming out soon. We have a cool new version of the application server that's going to drive BEA nuts. Our products are competitive, and our organization is efficient. Those two things allow me to sleep at night. The last time the economy slowed down [in 1991], Oracle lost money."

Even if the product cycle was in good shape, it was clear from the "CRM in ninety days" initiative that the marketing message was changing with the times. "That's true. Without the same sense of urgency about moving to the Internet, we have to sell differently. What we're selling now are very rapid, low-cost, low-risk implementations of automated business flows. The E-Business Suite contains several separate business flows. We can automate one flow at a time—like "procure-to-pay" or "opportunity-to-global-sales-forecast" and so on. We provide the software and the labor to get it up and running for a guaranteed fixed price, so customers get a guaranteed return on their investment with a minimum of risk. That's what's selling these days—return on investment. People have lost their appetite for risk.

"Selling separate flows solved another key problem for us. By talking about the E-Business Suite as complete, people thought that you have to buy and install the entire suite all at once. It's an all-or-nothing kind of deal. No, no, no. Not true. But our competitors used it against us quite effectively. So we thought that we had better start talking about the separate E-Business Suite flows inside the suite. That also lets us sell better against the best-of-breed specialists. We'll sign a contract guaranteeing to do a CRM flow in ninety days for X number of dollars. We tell our prospects to go ask IBM and Siebel how long it will take and how much it will cost for them to do the same thing. It was the best way we could think of to drive home the point that Oracle applications install faster and are much less expensive to run than the competition. Even today

mostly earnest and respectful, although one, Paul Mason, a senior analyst from IDC, soon starts to rub Ellison the wrong way with a fatal mix of overfamiliarity and sarcasm. Ellison starts off by ramming home his message about data fragmentation: "It's *the* issue. It's that simple." What's unique about Oracle, he argues, is its combination of a datacentric information architecture and the ease with which the E-Business Suite can be extended because Oracle uses Java rather than the proprietary tools of its rival applications vendors. The key difference between Oracle and the others—its counterpoint—is information management. Ellison says that he doesn't believe in separating data warehouses from transaction processing because too much time is lost. The combination of RAC and another feature on 9i that automatically maintains both old and new versions of the same data would make warehousing irrelevant. Burton volunteers that one of the benefits of this is that it "reduces conflicts between two separate instances." "Absolutely," purrs Ellison.

Ellison feels strongly that the analysts haven't yet given Oracle enough credit for RAC because they are hostile to real innovation. "It's like Galileo and the pope. Every time he had a new idea, the pope threatened to kill him." Instead of talking up IBM's DB2, why nor point out that with its shared-nothing architecture all it can do is share nothing really fast? "Drill down into this," he demands. "Write this down. Ask IBM why its UNIX database takes a different architectural approach from its mainframe versions. Please write this down. Why won't IBM demonstrate the speed of their hardware with their own database? You guys always say we're more expensive than IBM. But it's the cost of ownership that matters—the networking, the hardware, the labor. The software is always a tiny proportion of that. I'm almost done. This is a scam, and you guys have all fallen for it."

Having let off steam, Ellison answers questions on everything from peer-to-peer computing (which he dismisses as a "cute little technology that's good for exchanging music" but not something for the enterprise) and software as a service. Ellison says that in a very few years, the bulk of Oracle's business "will be on servers we manage." But the conventional ASPs (application service providers) were all wrong. Where the computer users were located was irrelevant; what mattered was who provided the skilled labor. "It doesn't matter where the computer is. As long as it's running in a standard certified configuration, you can put hardware wherever you want and we'll run it for you. And another thing: everyone focuses on our new license revenue, but the real value in our business is recurring revenues from license updates and support." IDC's Mason sug-

gests that this is typical Ellisonian arrogance. Everyone's wrong except him. Ellison responds, "Sure. If you're the first to say something or do something that conflicts with popular conventional wisdom, then what you're saying is, in effect, 'I'm right and everyone else is wrong.' That's what innovation means—being first. People never forgive you for being right too early.*

Ellison had been forceful, funny, and brilliantly controversial, but I didn't think he had necessarily won them over. He was more than capable of charming them; but it was as if he was too fastidious to try. Eight weeks later, Betsy Burton produced a report for Gartner entitled "Oracle Under Fire," which began with this broadside: "During the past 12 months, Oracle has been under increasing scrutiny from many of its customers, the business and technology press, investment firms, and Gartner. Some of the press attention is because of Oracle's sheer size, its impact on U.S. financial market indicators, and its 60 percent and larger stock price slippage in the past twelve months. Some is because of Oracle's flamboyant and contrarian CEO, Larry Ellison. Much of the attention, however, is because of real product, marketing and business issues."

The report itself was a mixture of the obvious and the out of date. Oracle, Burton said, would have to: provide "proof points" for 9i's "clustering scalability" and ability to "support very large databases"; regain "customer trust" after a U-turn on power unit pricing; "continue a sustained level of commitment to its application server"; resolve the quality issues with some of its ERP components, such as order management; deliver CRM product parity with Siebel; make sure that Oracle consulting

*LE writes: If you speak out in support of small, unimportant innovations that fly in the face of widely held beliefs—I do it all the time—you are likely to be dismissed as stupid or arrogant, and that's pretty much the end of it. However, if you defend a really big idea that challenges widely held beliefs, you're likely to generate a mass of hatred, and you just might pay for it with your life. When Galileo defended Copernicus, he was ridiculed, imprisoned, and then threatened with death unless he recanted. Charles Darwin cautiously postponed publishing On the Origin of Species and The Descent of Man for more than twenty years, but that judicious delay did not save him from vicious personal attacks coming from all ranks of contemporary society, from the dons at Oxford to the man in the street. In pleasant contrast, big discoveries that don't come into conflict with popularly held beliefs are quickly embraced and the discoverers are rewarded with popularity and fame. Such was the good fortune of Jonas Salk.*

and Oracle.com (its ASP offering) complemented its other channel relationships. Burton pointed out that she was far from suggesting that "Oracle, as a company was failing—quite the opposite," but the overall impression the report gave was highly negative, thanks in part to its last line: "We believe that recent actions and events will leave an indelible scar on customers' views of Oracle."*

Around the time that Burton's report came out, Oracle hired one of her Gartner colleagues, Peggy O'Neill, to take charge of analyst relations. I asked O'Neill what Oracle needed to do to get on better with such an influential constituency. She was in no doubt: "We fundamentally need to change the relationship with the analysts. We must talk to them more. . . . Don't broadcast to them. Listen to their advice and, if at all possible, incorporate it in your planning, marketing, and development. Historically, Oracle has never had that kind of interaction." I told her that I found it hard to imagine Ellison, whom she had yet to meet, taking that advice to heart. "The analysts are prepared to give Larry a bit more room because he's Larry," she said. "But the folks underneath Larry who copy that style won't get away with it. I've seen them with customers: they know how to be charming. They should try treating analysts like customers."

O'Neill was almost certainly right. But I found it hard to imagine Oracle schmoozing analysts and journalists with the polish and attention of, say, an IBM or a Cisco Systems. Technology companies that are run by engineers, such as Sun Microsystems, Microsoft, SAP, and Oracle are characterized by a particular kind of intellectual competitiveness that is highly unreceptive to the opinions of outsiders, who they think (usually correctly) are not as smart as they are. As long as they execute flawlessly, it's not a problem. But when something goes wrong, they can't expect any slack. O'Neill made another point: analysts, she said, "are a jaded lot." She might as well have said that analysts and technology journalists are professional cynics and that someone like Larry Ellison, who is relentlessly optimistic, calculatedly contrarian, and shamelessly devoted to hyperbole, brings out the absolute worst in them.

*LE writes: What most analysts say about your company has more to do with the financial results of your last couple of quarters than anything else. If you're growing revenue and earnings, they usually say nice things about your products and management. As Tevye says in Fiddler on the Roof, "When you got the money, they think you know." But our previous two quarters had not been good, so we got hammered.

# 15

# ENEMIES

A subject that's close to Ellison's heart is Oracle's enemies. He strongly believes that Oracle is always at its best when it has an identifiable enemy to go after: "We pick our enemies very carefully. It helps us focus. We can't explain what we do unless we compare it to someone else who does it differently. We don't know if we're gaining or losing unless we constantly compare ourselves to the competition." When Oracle was fighting its relational database rivals for market supremacy in the late 1980s and early 1990s, it was famous for the in-your-face aggression of its "attack" advertising.

The aggression hasn't altered, but the size and power of the firms with which Ellison wants Oracle to be compared have. These days, none other than IBM finds itself the regular target of Oracle's ads and Ellison's combative speeches, while not a little of Ellison's own fame has come directly from his highly public assaults on Microsoft and his obsession with one day overtaking the colossus of Redmond to make Oracle the number one software company in the world. When people think of Ellison, it's all too often as a kind of alter ego to Bill Gates, software's other billionaire.*

An odd effect of this was to diminish Oracle's own extraordinary suc-

*LE writes: If you're a fighter, the only way up is through the top fighters in your division. So we picked fights with IBM and Microsoft because they're the ones we had to beat to reach the top. By constantly measuring ourselves against the two top heavyweights, we constantly improve the competitiveness of our products and services.

EXHIBIT E

**Subject: Re: Thanks for taking my call: The Daily Business Close**
**Date:** Tue, 08 Jan 2002 14:20:46 -0800
**From:** Ivgen Guner <Ivgen.Guner@oracle.com>
**Organization:** Oracle Corporation
**To:** Mark Barrenechea <Mark.Barrenechea@oracle.com>
**CC:** Jennifer Minton <Jennifer.Minton@oracle.com>,
   "Schireson,Max" <MAX.SCHIRESON@oracle.com>,
   "Bonvanie,Rene" <RENE.BONVANIE@oracle.com>,
   IGUNER <IVGEN.GUNER@oracle.com>

Mark,

The package is attached.  Please call me if any questions.


Ivgen


Mark Barrenechea wrote:

> The historical information is now a priority.
>
> The data we are looking for includes (previous 4 qtrs, current qtr, and next:
>   1. Consulting Booking Forecast  and Billings Actual
>   2. License Revenue and Forecasts
>   3. Education Revenue and Forecasts
>   4. Support Renewal Revenues and Forecasts
>   5. Total revenues ( lets call the difference "other") and Total Forecast
>
> What ever we have, we will use.  It is an interesting notion of all lines of business forecasting.  We need
> to be in a position no later then June 1, 2002, that we have this functionality in production.  Sooner, if
> possible.
>
> --mark
>
> Jennifer Minton wrote:
>
> > The spreadsheet I am forwarding is not from OFA but excel. The data is obtained from OSO and
> > retained in excel files since we don't archive history in OSO.  We have asked for this enhancement
> > request for over two years as we like to keep historical data so we can evaluate the following trends:
> >
> >   • license pipeline growth , qtr over qtr for the same week (eg week 2 in a given quarter).  In
> >     addition, we also look at sequential pipeline growth.
> >   • forecast coversion ratios -- forecast as a % of pipeline.  We track this for every forecast period
> >     within a quarter.  This enables us to evaluate conversion rates.  The conversion rates have been
> >     declining over historical periods due to the economic recession.  When we were going through
> >     the dot.com bubble, the field would generally "sandbag" their forecast.  By evaluating historical
> >     trends, Jeff and I would be able to determine what the true forecast was by applying historical

**ORACLE CONFIDENTIAL**

1

**NDCA-ORCL 132078**

**CONFIDENTIAL–SUBJECT
TO PROTECTIVE ORDER**

conversion rates to the pipeline. As a side note, my upside analysis was usually spot on!

Ivgen will forward the excel analyses from last quarter to help you design the formats. We are willing to assist in any way possible.

Mark Barrenechea wrote:

 * Jennifer, Rene is working on the visualization and Max on "Numbers".
 We are iterating daily in preparation for Monday's Board Meeting;

 ** Rene and Max, we should review our daily changes with Jennifer ...
 even if just via email.

 *** Max, Jennifer will be forwarding a spread sheet from OFA to me.
 Would be great if Max and Rene can get a demo from OFA.

 --mark

| Pipeline Package.xls | **Name:** Pipeline Package.xls<br>**Type:** EXCEL File (application/msexcel)<br>**Encoding:** base64 |
|---|---|

Ivgen Guner <Ivgen.Guner@oracle.com>

ORACLE CONFIDENTIAL

NDCA-ORCL 132079

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

EXHIBIT F

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1

```
 1   00001:01   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2         02        IN AND FOR THE COUNTY OF SAN MATEO
 3         03           ---oOo---
 4         04   COORDINATION PROCEEDING
 5         05
 6         06
 7         07            PROCEEDING NO. 4180
 8         08   THIS DOCUMENT RELATES TO:
 9         09   ALL ACTIONS
10         10
11         11
12         12        DEPOSITION OF JEFFREY O. HENLEY
13         13            Tuesday, March 2, 2004
14         14            Volume I (Pages 1 - 274)
15         15
16         16   CONFIDENTIAL:  THIS TRANSCRIPT IS DESIGNATED AS
17         17   THE COURT ON JUNE 21, 2002, CONTAINS DOCUMENTS MARK
18         18   EXCEPT PURSUANT TO THE TERMS OF THE PROTECTIVE ORD
19         19
20         20   REPORTED BY:
21         21   HOLLY MOOSE, RDR-CRR-CRP
22         22
23         23
24         24        Certified Shorthand Reporters
25         25        San Francisco, California  94102
```

2

```
 1   00002:01   IN THE COURT OF CHANCERY OF THE STATE OF DELAWA
 2         02        IN AND FOR NEW CASTLE COUNTY
 3         03
 4         04   IN RE ORACLE CORPORATION
 5         05   DERIVATIVE LITIGATION
 6         06   _____/
 7         07
 8         08
 9         09
10         10
11         11
12         12
13         13
14         14
15         15
16         16
17         17
18         18
19         19
20         20
21         21
22         22
23         23
24         24
25         25
```

3

```
 1   00003:01         A P P E A R A N C E S
 2         02
 3         03   FOR CALIFORNIA PLAINTIFFS:
 4         04     BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
 5         05        ELIZABETH GUARNIERI, ESQ.
 6         06     San Francisco, CA  94104
 7         07
 8         08
 9         09     BY:  DAVID PEREZ, LAW CLERK
10         10     Suite 1000, Tenth Floor
11         11
12         12
13         13
14         14     BY:  DOUGLAS WILENS, ESQ.
15         15     Boca Raton, FL  33432
16         16
17         17
18         18
19         19     BY:  ALAN N. SALPETER, ESQ.
20         20     190 South La Salle Street
21         21     (312)782-0600
22         22
23         23
24         24
25         25
```

4

```
 1   00004:01       A P P E A R A N C E S (continued)
 2         02
 3         03   FOR ORACLE CORPORATION:
 4         04     MORRISON & FOERSTER
 5         05     755 Page Mill Road
 6         06     (650)813-5818
 7         07   AND
 8         08     ORACLE CORPORATION
 9         09     500 Oracle Parkway
10         10     (650)506-9221
11         11
12         12   ALSO PRESENT:  Joanna Lenn, Videographer
13         13           Jill Weader, Berman paralegal
14         14
15         15
16         16     425 California Street, Suite 2025
17         17     (415)433-3200
18         18
19         19
20         20
21         21            ---oOo---
22         22
23         23
24         24
25         25
```

205

```
 1   00205:01 more impact as you moved through December and into
 2   02  January, beginning and middle of January?
 3   03      A.  Impossible to tell.
 4   04      Q.  It's impossible to tell?  None of your
 5   05  indicators would allow you to determine that?
 6   06      A.  None.
 7   07      Q.  Okay.  And --
 8   08      A.  I already described the various indicators.
 9   09      Q.  Yes.
10   10      A.  I look at our competitors are saying [sic]; I
11   11  look at my pipeline; I look -- I look at my forecast; we
12   12  go back, we double-check the forecast.  All those
13   13  indicators still said we'd make the 25 percent and the
14   14  12 cents a share.
15   15      Q.  Okay.  Other than -- apart from making you the
16   16  12 cents a share [sic], did you see any slowdown where
17   17  you could still make your 12 cents, but yet it was still
18   18  impacting, the deals were still coming in slower than
19   19  you would have expected?
20   20      A.  I -- I -- I had no substantive information to
21   21  prove or disprove that.
22   22      Q.  Okay.
23   23      A.  Had a concern, as I said earlier.  But till
24   24  the last week of the quarter, we still thought we'd make
25   25  that forecast.
```

206

```
 1   00206:01      Q.  All right.
 2   02      A.  And you can go look at all the other
 3   03  competitors and what they said when they missed their
 4   04  March quarters.  They had all the same observations.
 5   05          Until you get to the end of the quarter,
 6   06  unfortunately, in this crazy business I'm in, you really
 7   07  don't test your customer to see what they really think
 8   08  about their business and what they really think about
 9   09  the economy.  And then they have to vote 'cause they
10   10  gotta sign a contract or not.  They voted in a big way
11   11  at the end of February.
12   12      Q.  And did you have any concerns regarding the
13   13  pipeline, as you went into -- moved into Q3 2001?
14   14      A.  I thought, if anything, it was probably a
15   15  little overstated.  I thought it was too good to be
16   16  true.  I discounted it to some degree.  And, you know,
17   17  we talked earlier about cleaning up pipelines and that
18   18  sort of thing.
19   19          So I -- I thought it would be great if it was
20   20  really that strong.  I knew it was strong, it continued
21   21  to look good, but I wasn't sure it was quite as strong
22   22  as it said -- as the absolute number it started at.
23   23      Q.  Okay.  And did you start to see the
24   24  pipeline -- did you see the pipeline continue to grow in
25   25  the December/January time frame?
```

207

```
 1   00207:01      A.  The pipelines never grow.  The pipelines
 2   02  typically, as I described earlier, get scrubbed; deals
 3   03  start slipping.  So the process is by -- I would say by
 4   04  the end of the first month, you kind of got a stability
 5   05  point, and they just slide from there because deals slip
 6   06  or deals get lost, or whatever.
 7   07      Q.  Okay.  And are you familiar with the term
 8   08  called "backfilling"?
 9   09      A.  Some people have used -- I -- I -- I -- that's
10   10  not a industry term, per se.  I mean ...
11   11      Q.  In what context have you heard it be used?
12   12      A.  It's been used inside the company where
13   13  somebody will say "This deal slipped, but I think I can
14   14  fill it or cover it with another deal that we -- now
15   15  looks like we'll be able to close."
16   16          So if that's what you mean by "backfilling" --
17   17  I'm guessing that's what you mean by "backfilling."
18   18      Q.  Okay.  And working off that definition of
19   19  "backfilling," did you have any understanding of whether
20   20  or not the field had a problem backfilling deals in Q3
21   21  2001?
22   22      A.  No.  As I testified earlier, you know, there's
23   23  always deals slip, deals come in, there's always
24   24  backfilling.  At the end of the day, what I care about
25   25  is "Are you going to make -- are you confident that this
```

EXHIBIT G

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

221

| 1 | 00221:01 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA |
|---|---|---|
| 2 | 02 | IN AND FOR THE COUNTY OF SAN MATEO |
| 3 | 03 | —oOo— |
| 4 | 04 | COORDINATION PROCEEDING |
| 5 | 05 | |
| 6 | 06 | |
| 7 | 07 | JUDICIAL COUNCIL COORDINATION |
| 8 | 08 | |
| 9 | 09 | |
| 10 | 10 | _____/ |
| 11 | 11 | |
| 12 | 12 | |
| 13 | 13 | DEPOSITION OF LAWRENCE J. ELLISON |
| 14 | 14 | FRIDAY, FEBRUARY 27, 2004 |
| 15 | 15 | Volume II (Pages 222 - 428) |
| 16 | 16 | |
| 17 | 17 | |
| 18 | 18 | |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 CSR NO. 2792 | |
| 22 | 22 | |
| 23 | 23 | ROBERT BARNES ASSOCIATES |
| 24 | 24 | 760 Market Street, Suite 844 |
| 25 | 25 | Phone: (415)788-7191 |

223

| 1 | 00223:01 | A P P E A R A N C E S |
|---|---|---|
| 2 | 02 | |
| 3 | 03 | FOR CALIFORNIA PLAINTIFFS: |
| 4 | 04 | BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 5 | 05 | ELIZABETH GUARNIERI, ESQ. |
| 6 | 06 | 425 California Street, Suite 2025 |
| 7 | 07 | (415)433-3200 |
| 8 | 08 | |
| 9 | 09 | |
| 10 | 10 | BY:  DARIO DE GHETALDI, ESQ. |
| 11 | 11 | AMANDA L. RIDDLE, ESQ. |
| 12 | 12 | Millbrae, CA  94030 |
| 13 | 13 | |
| 14 | 14 | |
| 15 | 15 | |
| 16 | 16 | FOR DELAWARE PLAINTIFFS: |
| 17 | 17 | |
| 18 | 18 | BY:  ROBERT WEISER, ESQ. |
| 19 | 19 | Bala Cynwyd, PA  19004 |
| 20 | 20 | |
| 21 | 21 | |
| 22 | 22 | FOR ORACLE CORPORATION: |
| 23 | 23 | MORRISON & FOERSTER |
| 24 | 24 | 425 Market Street |
| 25 | 25 | (415)268-7126 |

222

| 1 | 00222:01 | IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE |
|---|---|---|
| 2 | 02 | IN AND FOR NEW CASTLE COUNTY |
| 3 | 03 | |
| 4 | 04 | IN RE ORACLE CORPORATION |
| 5 | 05 | DERIVATIVE LITIGATION |
| 6 | 06 | _____/ |
| 7 | 07 | |
| 8 | 08 | |
| 9 | 09 | |
| 10 | 10 | |
| 11 | 11 | |
| 12 | 12 | |
| 13 | 13 | |
| 14 | 14 | |
| 15 | 15 | |
| 16 | 16 | |
| 17 | 17 | |
| 18 | 18 | |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 | |
| 22 | 22 | |
| 23 | 23 | |
| 24 | 24 | |
| 25 | 25 | |

224

| 1 | 00224:01 | A P P E A R A N C E S |
|---|---|---|
| 2 | 02 | (Continued) |
| 3 | 03 | |
| 4 | 04 | FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY: |
| 5 | 05 | MAYER BROWN ROWE & MAW, LLP |
| 6 | 06 | JAVIER RUBINSTEIN, ESQ. |
| 7 | 07 | Chicago, IL 60603-3441 |
| 8 | 08 | |
| 9 | 09 | |
| 10 | 10 | ALSO PRESENT:  ANDREW MARTIN, Videographer |
| 11 | 11 | |
| 12 | 12 | |
| 13 | 13 | |
| 14 | 14 | TAKEN AT: |
| 15 | 15 | BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 16 | 16 | San Francisco, CA  94104 |
| 17 | 17 | |
| 18 | 18 | |
| 19 | 19 | —oOo— |
| 20 | 20 | |
| 21 | 21 | |
| 22 | 22 | |
| 23 | 23 | |
| 24 | 24 | |
| 25 | 25 | |

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

285

```
1   00285:01 the quarter, and I'm not sure what she base -- quite
2   02  frankly, I'm not sure what she based that on.  She has
3   03  conversations with salespeople.  She has conversations
4   04  with finance people in the sales divisions.  So I'm not
5   05  exactly sure why she lowered her -- lowered the upside.
6   06      And I think she very well might have said --
7   07  again, in the meeting -- that the sales -- the sales
8   08  forecasts are not going up.  Therefore, I think there is
9   09  not as much upside.  There's not as much as she initially
10  10  thought in the quarter.
11  11      But again, I'm -- best I recall.
12  12      Q.  Okay.  That's fair.
13  13      On the next page, on page 7, the second
14  14  paragraph, the third sentence says:
15  15      "In Ellison's opinion, the forecasts tend
16  16      toward the same number and understate the
17  17      upside as well as the downside."
18  18      Is that your opinion about --
19  19      A.  Well, if you just -- where are you?
20  20      Q.  I'm sorry.  I'm in the second full paragraph --
21  21      A.  Second full paragraph.
22  22      Q.  -- page 7.
23  23      A.  Okay.
24  24      Q.  The third sentence.
25  25      A.  Okay.
```

287

```
1   00287:01 good job of forecasting.
2   02      Q.  So going back, I think -- I'm not sure that my
3   03  question was really answered.  Going back to the page 6,
4   04  the sentence in paragraph B, that says:
5   05      "In Q3 '01, the forecasts remained
6   06      consistent, i.e., did not rise over the
7   07      course of the quarter, giving
8   08      Jennifer Minton a basis for her decreased
9   09      'upside.'"
10  10      And my question was whether the decreased upside
11  11  was a reflection of softening in Oracle's business, to
12  12  you.
13  13      A.  Again, let me read this again carefully --
14  14      Q.  Sure, sure.
15  15      A.  Because I'm not sure whether I'm commenting on
16  16  Jennifer's methods or -- (reading document).
17  17      It would be helpful if I was on the right page.
18  18      Q.  Page 6.
19  19      A.  Paragraph A or B?
20  20      Q.  B.
21  21      A.  All right.  I'm there.
22  22      Q.  Third sentence.
23  23      A.  I think it's -- but I think it says exactly what
24  24  I said, is that the sales forecast, the field sales
25  25  forecast, did not grow during the quarter, and Jennifer
```

286

```
1   00286:01      Q.  Was that your opinion about the tendency of the
2   02  forecasts in fiscal year '01?  That is --
3   03      A.  I think all I'm trying to say here is that people
4   04  are making judgments based on conversations with people.
5   05  The salespeople are making judgments.  Jennifer is making
6   06  judgments as well.  So what we're dealing with here are
7   07  people making judgments.
8   08      Q.  Okay.
9   09      A.  And -- and in my -- you know, my inclination is
10  10  to work off hard data rather than judgment -- it's very
11  11  valuable -- and hard data, to me, is Jennifer has been
12  12  more accurate in forecasting than the salespeople have.
13  13  That, to me, is hard data.  So I tend to listen to her
14  14  more carefully than I listen to the salespeople.
15  15      On the other hand, when I analyze the data
16  16  personally.  I look at the actual size of the pipe, the
17  17  size of the pipeline and how much has actually -- has
18  18  actually been sold.
19  19      So I -- my inclination, how I differ from
20  20  Jennifer in doing forecasts -- and we're all different --
21  21  is I tend to look at more hard data, where I think she --
22  22  you know, she talks to more people and exercises more
23  23  judgment.
24  24      Q.  Uh-huh.  Okay.
25  25      A.  But again, having said that, she does a pretty
```

290

```
1   00290:01      back-end loaded that the flash reports for
2   02      the first two months provide very little
3   03      information about quarterly earnings."
4   04      Is that an accurate reflection of your beliefs as
5   05 to the value of the flash reports?
6   06      A. The majority of our revenue happens in the last
7   07 month of the quarter.
8   08      Q. Yes.
9   09      A. In fact, the majority of that quarter [sic]
10  10 happens in the last week.
11  11      Q. Yes.
12  12      A. And the majority of the big deals happen in the
13  13 last few days.
14  14      Having said all that, it's much better to get off
15  15 to a good start in the quarter than a bad start. So it's
16  16 good to get ahead.
17  17      In the specific example of Q3, we had signed a
18  18 very, very large deal, Covisint.
19  19      Q. Yes.
20  20      A. So -- and -- well, it's by no means a perfect
21  21 predictor, it's a useful predictor. Being off to a good
22  22 start is better than being off to a bad start. Being off
23  23 to a very good start is better than -- is better still.
24  24      Q. The second full paragraph -- in the second full
25  25 paragraph, the interview summary says:
```

291

```
1   00291:01      "Even absent Covisint, the company had a
2   02      solid start, in Ellison's view, given the
3   03      holidays are always slow sales in the
4   04      third quarter."
5   05      Is that -- does that accurately reflect what you
6   06 told the SLC?
7   07      A. Again, to amplify, we were -- we had a very, very
8   08 strong pipeline at the beginning of the quarter. So we
9   09 started the quarter with an extremely strong pipeline.
10  10 Then we closed this very, very large deal. So the
11  11 combination of having closed a very, very large deal and
12  12 very strong year-over-year pipeline growth led me to
13  13 believe we're off to a heck of a start.
14  14      Q. So was the sentence that I read an accurate
15  15 reflection of what you told the SLC?
16  16      A. Incomplete but accurate, yes.
17  17      Q. Okay. What is your understanding of the relative
18  18 importance of the first month's revenues to the quarter's
19  19 revenues?
20  20      A. In general --
21  21      Q. Yes.
22  22      A. -- again, it's a reasonable -- I've never gone --
23  23 I have not gone back and looked at how often, when we get
24  24 off to a good start, that's a predictor of a good
25  25 quarter. It's an interesting question. I really -- I
```

292

```
1   00292:01 don't know the answer to it. My sense is if we're off to
2   02 a good start in the first month and second month, that
3   03 it's a reasonable predictor that we're going to have a
4   04 good quarter. So it's not a hundred percent correlated.
5   05 Maybe it's only 60 percent correlated. But it's
6   06 useful -- it's useful in predicting the quarter. It is
7   07 not an accurate -- by no means an accurate predictor --
8   08 sometimes I think -- I think the quarter before this, in
9   09 Q2, we had a phenomenal number of big deals come in in
10  10 the last couple of days. We were behind, well behind,
11  11 and made it up. So there are certainly examples of being
12  12 behind and making it up and being ahead and falling --
13  13 and not making it up.
14  14      So there is some correlation to being off to a
15  15 good start.
16  16      Q. All right. This -- the sentence that I read seems
17  17 to indicate that December is, in your view, usually not a
18  18 good month.
19  19      A. Oh, it's normally a terrible month. So --
20  20 because of the holidays. A, it's -- we just finished a
21  21 quarter in November, so the salespeople are scrubbing
22  22 their pipelines and trying to come up with a forecast for
23  23 the remaining -- for the next quarter. They're taking
24  24 off, going -- so they're not doing a lot of selling in
25  25 the first couple of weeks of December. They're -- then
```

293

```
1   00293:01 take off for holiday for a couple of weeks, over
2   02 Christmas-New Year's. So it is not typically a good
3   03 month, and it's unusual for us to have a very strong
4   04 December.
5   05      We had a very strong December because of
6   06 Covisint.
7   07      Q. Does the fact that a number of your customers
8   08 have fiscal years that are the same as the calendar year
9   09 have an effect on Oracle's December revenues in
10  10 comparison to other months?
11  11      A. You would think so. Nonetheless, December is
12  12 not -- typically, not a good month for us, compared
13  13 with -- I mean, it's much -- November is a much bigger
14  14 month than December. So there's more of a correlation to
15  15 the end of our quarter than to the end of the customers'
16  16 fiscal year.
17  17      Q. What if you're just talking about first months of
18  18 quarters? What's your sense of how --
19  19      A. How is December?
20  20      Q. How is December, yes.
21  21      A. Versus a June?
22  22      Q. Yes.
23  23      A. Which is also a first month of a quarter.
24  24      Q. Right.
25  25      A. Complicated answer. If we had a number of big
```

EXHIBIT H

*Confidential*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---------------------------------------------------------)

IN RE ORACLE CORPORATION            )            MASTER FILE NO:

SECURITIES LITIGATION                     )            C01-0988-MJJ

---------------------------------------------------------)

## EXPERT REPORT OF R. GLENN HUBBARD

*Confidential*

I.   INTRODUCTION ............................................................................................ 3
     A.  Assignment ......................................................................................... 3
     B.  Qualifications ...................................................................................... 3
     C.  Summary of Opinions ......................................................................... 5
     D.  Bases of Opinions .............................................................................. 5
II.  BACKGROUND ON ORACLE ...................................................................... 9
     A.  Lines of Business ................................................................................ 9
     B.  Geographic Organization .................................................................. 12
     C.  The Hockey Stick Effect, Low Levels of Recurring License Revenue ............ 15
III. ORACLE'S 3Q FY2001 GUIDANCE and subsequent statements ................. 17
     A.  December 14, 2000 Guidance ........................................................... 17
     B.  Other Alleged Statements During 3Q FY2001 .................................. 19
IV.  SECTOR-SPECIFIC OUTLOOK .................................................................. 21
     A.  The Industry Outlook Was Positive Through February 2001 ............. 21
     B.  An Examination of Analyst Reports Corroborates Oracle's Statements ......... 28
     C.  Software Sector Indices Did Not Indicate Trouble ........................... 42
     D.  Oracle's Customer Base Was Diversified .......................................... 46
     E.  Summary of Sector-Specific Outlook ................................................ 50
V.   GENERAL MACROECONOMIC OUTLOOK ................................................ 52
     A.  Production Outlook ........................................................................... 52
     B.  Employment Outlook ........................................................................ 57
     C.  Personal Income and Consumer Confidence Outlook ....................... 60
     D.  Leading, Coincident, and Lagging Composite Economic Indicators ............ 64
     E.  Federal Open Market Committee ...................................................... 67
     F.  Macroeconomic Forecasts ................................................................ 71
     G.  National Bureau of Economic Research Business Cycle Dating Committee ......... 74
     H.  Summary of Macroeconomic Outlook ............................................... 76
VI.  ORACLE'S FORECASTING PROCESS AND INTERNAL FINANCIAL DATA ......... 78
     A.  Introduction ...................................................................................... 78
     B.  Description of Oracle's Forecast Process ......................................... 79
     C.  Historical Performance of Oracle's Forecast Process ....................... 92
     D.  Oracle's Forecasting During its Fiscal Year Third Quarter of 2001 ...... 94
VII. CONCLUSION .............................................................................................. 103

# I.   INTRODUCTION

## A.   Assignment

1. I have been retained by counsel for Oracle to address the following questions:

    a. What was the outlook for Oracle's business sector and the U.S. economy during Oracle's 3Q FY2001?

    b. Was Oracle's public guidance during its 3Q FY2001 consistent with the outlook for Oracle's business sector, the U.S. economy, and Oracle's own internal information?

2. I have also been retained to respond to opinions offered by Plaintiffs' expert(s). My work in this matter is ongoing, and to the extent that my opinions and conclusions are dependent on depositions, Expert Reports, and other evidence that may be produced after the submission of this Report, I may supplement or amend my opinions.

3. I am compensated for my work in this matter at my regular hourly rate of $1,000. My compensation is not contingent on the outcome of this litigation.

## B.   Qualifications

4. I am the Dean of the Graduate School of Business of Columbia University, where I also hold the Russell L. Carson Professorship in Finance and Economics. I am also a Professor of Economics in the Department of Economics, Faculty of Arts and Sciences, Columbia University.

5. I hold A.M. and Ph.D. degrees in economics from Harvard University, and B.A. and B.S. degrees from the University of Central Florida, *summa cum laude*. My fields of specialization include macroeconomics, corporate finance and financial institutions, industrial organization, public economics, public policy, and natural resource economics. I have authored more than 100 research articles, edited a number of books, and authored a leading textbook on money and financial markets and a new textbook on principles of economics.

6. From February 2001 to March 2003, I served as Chairman of the President's Council of Economic Advisers ("CEA"). Over that time period, I also served as Chair of the Economic Policy Committee for the Organization for Economic Co-operation and Development

*Confidential*

## VI.   ORACLE'S FORECASTING PROCESS AND INTERNAL FINANCIAL DATA

### A.   Introduction

157.   The Hockey Stick Effect and low level of recurring revenue, both noted earlier, make Oracle's quarterly license sales – its largest single revenue area – relatively uncertain. Nonetheless, Oracle has established a structured and rigorous process for forecasting that has historically had a high degree of accuracy. This process is similar to those of competitors and is used both internally to manage the business and externally to provide financial guidance. As in past quarters, the forecasting process for 3Q FY2001 was the basis for any guidance given, and the forecast process was used throughout the quarter to monitor progress.

158.   The forecast process began with sales representatives reporting to their business units their forecasts of projected sales to specific customers during the quarter. Business unit executives assessed these forecasts by evaluating specific deals in progress and created an overall forecast for their own business unit. Jennifer Minton, Senior Vice President and Corporate Controller, assessed these forecasts through discussions with business unit leaders and comparison with historical performance,[138] made additional revisions, aggregated the forecasts, and presented the results to Oracle's Executive Management Committee, which included the company's CFO, Jeff Henley and the CEO, Larry Ellison.

159.   Macroeconomic conditions were incorporated in the forecast through both sales representatives' estimates of the likely purchasing behavior of their prospective customers and the informed judgment of more senior executives based on their critical review of forecasting information received from their direct reports.[139] This process is exactly what one would expect in Oracle's type of business, in which software sales are the result of individual business purchasing decisions rather than a direct function of economic conditions.

---

[138]   As discussed later, Ms. Minton compared the conversion ratio implied by that quarter's forecast to the conversion ratio in the same quarter of the previous fiscal year.

[139]   Minton testified that during 3Q FY2001 "we were pushing [the sales executives] to find out whether or not there was any changes in their forecast which is a result of the macroeconomic conditions that were prevalent in the news, but nobody was moving off their forecast." Deposition of Jennifer Minton, July 7, 2006, pp. 237-38.

*Confidential*

160.   In developing projections and forecasts, it is appropriate for a company to start by asking the front line sales representatives for their sales prospects. However, it is also appropriate for more senior executives to evaluate these forecasts critically by assessing deals in progress and asking more detailed questions. This process incorporates current information on customer behavior and customer perceptions of the product (to the extent they are communicated to the sales representatives), while building in checks against the common tendency of sales representatives and executives to lower expectations for their performance by under-estimating their quarterly sales, a tendency known as "sandbagging."

161.   Oracle's forecast and guidance to the market in 3Q FY2001 followed its past practices, which had proven to be accurate. Throughout the quarter, Oracle's internal forecast was based on deal level analyses adjusted by management judgment. As I discuss below, the forecasts provided a reasonable basis for the belief that Oracle would achieve its EPS guidance of 12 cents throughout the quarter, and notwithstanding the decline in the forecasts over the course of the quarter, it was still reasonable for Oracle executives to believe that the quarterly guidance would be achieved.

## B.   Description of Oracle's Forecast Process

### i.   Overview

162.   Oracle's forecast and guidance were based primarily on the Upside Report. Upside Reports were prepared throughout the quarter[140] in a multi-stage process, integrating the perspectives of staff and executives from multiple levels of the company. Sales representatives reported their projected sales for the quarter into Oracle Sales Online ("OSO"), a database of sales leads. These projections, along with subdivision heads' judgment, were rolled up into subdivision-level sales forecasts. Business unit heads aggregated these subdivision level forecasts and applied their judgment to arrive at business unit-level forecasts. Finance staff entered business unit forecasts into a database of current and historical financial data, and compiled them into a report for Jennifer Minton, the Senior Vice President and Corporate Controller.

---

[140]   The Upside report was generally created bi-monthly during the first two months of the quarter, and weekly thereafter. *See* Figure 53 for a list of Upside reports relied on in this report by date and Bates number.

*Confidential*

163. Through discussions with her finance staff and other Oracle personnel, and based on her past forecasting experience, Jennifer Minton made adjustments, called "Upside," to these forecasts, resulting in the "potential" forecast, simply referred to as the "Potential." Thus, the Upside Report contained two forecasts:

   a. The "Forecast": the aggregated forecast from the business units, based on sales representatives' forecasts and business unit judgment,[141] and

   b. The "Potential": the forecast reflecting Jennifer Minton's Upside adjustment. In other words, Potential = Forecast + Upside. Note that the Upside adjustment could be positive or negative.[142]

164. The Potential was Oracle's best predictor of quarterly performance. As I demonstrate below, even the Potential was often below Oracle's actual results for the quarter, but still closer to the actual results than the Forecast.

165. The Forecast, Upside, and Potential were clearly displayed in each Upside Report and thus visible to select senior management. These forecasts were also compared to Oracle's "Pipeline," which was the total value of deals for a quarter that sales representatives were pursuing or had closed. The ratio of the forecast, either Forecast or Potential, to the Pipeline was known as the "Conversion Ratio." In other words:

   a. Pipeline = All sales closed during the quarter + All sales that may close during the quarter; and

   b. Conversion Ratio = Forecast (either Forecast or Potential) / Pipeline.[143]

166. The Conversion Ratios implied by the forecasts in the Upside Report were compared to the ratios of forecasts to actual sales achieved in the same quarter of the previous fiscal year.

---

[141] Throughout the remainder of this report Forecast refers specifically to the field's forecast, while an uncapitalized "forecast" may refer to any forecast.

[142] Deposition of Jennifer Minton, April 21, 2005, p. 137.

[143] The inverse of the Conversion Ratio is the Coverage Ratio – *i.e.*, Coverage Ratio = Pipeline / forecast (either Forecast or Potential). Deposition of David Winton, May 26, 2006, p. 152.

This comparison provided an internal check on the reasonableness of the forecast in the Upside Report. [144]

167.    Jennifer Minton's Upside Report was discussed in Executive Management Committee meetings, which included Ellison, Henley, and approximately ten other senior executives including the Executive Vice President (EVP) of each of the three North American sales divisions, Jay Nussbaum (EVP, Oracle Service Industries), Sandy Sanderson (EVP, Oracle Product Industries), and George Roberts (EVP, North American Sales), as well as the EVPs for Europe, Middle East and Africa (EMEA), and Asia Pacific (APAC) sales divisions. Only Henley, Ellison, and Safra Catz saw the entire Upside Report; other executives saw only pages relevant to their divisions. [145]   As I noted above, at the beginning of the quarter, the Upside Report was also used in determining the guidance to give to the market. [146]

### ii.      Forecasting in the Context of the Hockey Stick Effect and Low Levels of Recurring License Revenue

168.    Oracle's practice of basing its forecasts on sales representatives' projections, management assessment of deals in progress, and historical conversion ratios was reasonable given the inherent uncertainty of the company's license revenue, its biggest source of revenue. The combination of revenues being relatively nonrecurring and not booked until the end of the quarter meant that there were few substitutes to relying on sales representatives' projections and management judgment for forecasts. It also meant that management could not be certain about final financial results until the very end of the quarter. [147]

169.    Oracle's concentration of revenue at the end of the quarter and low levels of recurring license revenue quarter-to-quarter were consistent with industry norms. Oracle's competitors cited the Hockey Stick Effect and the lack of recurring license sales as reasons for reliance on pipeline and conversion ratio data for forecasting and for lack of clarity about final results until the very end of the quarter. BEA Systems, Ariba, Inc., Business Objects, S.A., Cognos,

---

[144] Deposition of Jennifer Minton, April 1, 2004, Exhibit 243, p. 9; Deposition of Jennifer Minton, July 7, 2006, p. 27; Deposition of Jennifer Minton, April 21, 2005, pp. 135-137.
[145] Deposition of Jennifer Minton, April 21, 2005, pp. 105-110; Deposition of Jeffrey Henley, March 2, 2004, pp. 116-117.
[146] Deposition of Jeffrey Henley, March 2, 2004, p. 189.
[147] Deposition of Jeffrey Henley, July 27, 2006, pp. 144-146.

Inc., Hyperion Solutions Corp., i2 Technologies, Inc., Informix Corp., J.D. Edwards, PeopleSoft Inc., SAP, and Sybase all reported receiving a significant portion of their license revenue in the last week or two of the quarter.[148]   Examples include:

a.   J.D. Edwards:

- *"[L]icense fee revenue is difficult to forecast due to its dependence on orders received and shipped in that quarter."*[149]

b.   BEA Systems:

- *"[W]e typically receive and fulfill most of our orders within the quarter, with the substantial majority of our orders typically received in the last month of each fiscal quarter. As a result, we may not learn of revenue shortfalls until late in a fiscal quarter, after it is too late to adjust expenses for that quarter."*[150]

c.   PeopleSoft:

- *"[W]e all know and we've all talked about the fact that the software company has two of the major dials to steer the ship, the pipeline and the conversion rate, and to some extent, it is a constant balance between keeping a high enough pipeline and a high enough conversion rate, and if you estimate what your conversion rate is going to be on your pipeline accurately, you're able to forecast quarter to quarter, and when either of the pipeline changes or the conversion rate, it can be scary."*[151]

### iii.   Structure and Timing of Oracle's Forecasting

170.   Oracle's forecasting process proceeded through multiple stages. In the early stages, sales representatives' projected sales were scrutinized by sales executives and finance staff. These sales executives made adjustments to the field forecast based on their judgment of the likelihood of closing deals in the pipeline. At later stages, more senior executives scrutinized

[148]   BEA Systems, Form 10-Q for the period ending April 30, 2001, p. 21;  Ariba Inc., Form 10-Q for the period ending December 31, 2000, p. 26;  Business Objects S.A., Form 10-K for the period ending December 31, 2000, p. 27;  Cognos Incorporated, Form 10-K for the period ending February 28, 2001, p. 23;  Hyperion Solutions Corp, Form 10-Q for the period ending December 31, 2000, p. 16;  i2 Technologies Inc., Form 10-K for the period ending December 31, 2000, p. 23;  Informix Corporation, Form 10-K for the period ending December 31, 2000, p. 19;  SAP Aktiengesellschaft, Form 20-F for the fiscal year ended December 31, 2000, pp. 10-11;  Sybase Inc., Form 10-K for the period ending December 31, 2000, p. 26.
[149]   J.D. Edwards 2000 10-K, filed January 11, 2001, p. 19.
[150]   BEA Systems 2000 10-K, filed May 1, 2001, pp. 19-20.
[151]   PeopleSoft earnings conference call, July 24, 2001.

business unit leaders' forecasts in light of the state of possible large deals and historical conversion ratios.

### a)   Business Unit Level

171.   In general, business unit forecasts were created using a bottom-up approach that originated with the sales representatives.  Sales representatives entered deals they were working, along with the potential value and probability of closing each deal, into Oracle Sales Online (OSO).  More senior sales executives (Area and Senior Vice Presidents) scrutinized deal level forecasts and applied their own judgment in arriving at subdivision forecasts presented to their supervisors.[152]  Business unit leaders (Executive Vice Presidents, or EVPs) met and spoke with their direct reports about these forecasts. Based on these discussions, Executive Vice Presidents would apply their own judgment to the subdivision forecasts in arriving at the business unit level forecasts, which were entered into the Oracle Financial Analyzer (OFA).[153]

172.   The discussion below focuses on the process within one business unit, North American Sales (NAS).  Based on a review of depositions of Oracle personnel in other business units, forecasting proceeded in a similar manner in other business units.  An organizational chart of NAS is included immediately below as Figure 40 to facilitate the discussion that follows.

---

[152]   Deposition of Nicholas Classick, April 12, 2006, pp. 74-75, 134-137; Deposition of Jennifer Minton, April 21, 2005, pp. 110-111; Deposition of John Nugent, May 24, 2006, pp. 77-78, 81-86.
[153]   Deposition of Jennifer Minton, April 21, 2005, pp. 102-103; Deposition of George Roberts, June 22, 2006, pp. 77-78, 81-86; Deposition of David Winton, May 26, 2006, p. 148.

Confidential

**Figure 40: Organizational Chart for Oracle's North American Sales Division: North American Sales (NAS)**



b)      **North American Sales (NAS)**

173.    David Winton, Director of Finance for NAS, was responsible for consolidating North American sales forecasts. He described the forecast process as:

- "... *a bottoms-up review of opportunities in the pipeline. It would start with each individual selling line of business, and they would do that similar process up to their highest executive... an SVP at the time... Then those folks would have a similar call with their boss... George Roberts, to review their submission of the forecast...* "[154]

---

[154]   Deposition of David Winton, May 26, 2006, p. 80.

174.    Each Regional Manager, Vice President and/or Senior Vice President typically had
weekly (or bi-weekly) forecast reviews with their direct reports. [155]  For instance, Nic
Classick, Area Vice President for the West region of General Business, NAS, had forecast
calls with his Regional Managers during the quarter in which they discussed the current
forecast. [156]  Classick describes these calls as follows:

- *"We would go over what their forecast amount is, both field and ISD; those are
  our telesales. And so then we would spend more time on the field forecast, and I
  would ask specific details on transactions greater than $500,000."* [157]

175.    In the latter part of the quarter Classick would ask questions about how close deals were
to completion:

> *"A. ...The last month we get into more specifics, like do you have the approval in
> or a contract drafted.*
>
> *Q. All trying to engage whether these deals were going to come in by quarter end;
> is that right?*
>
> *A. Yes.*
>
> *Q. You would ask them where they saw risk in their forecast; is that right?*
>
> *A. Yes.*
>
> *Q. Now, is that for both the big deals and the deals under 500,000?*
>
> *A. Yes."* [158]

176.    The next step in the NAS forecasting hierarchy was John Nugent, Senior Vice President
of General Business, NAS, who received forecasts from each of his direct reports.  Roughly
every two weeks during the first two months of the quarter Nugent and his staff reviewed
each line item, account, and dollar amount on the forecast.  During the last month of the
quarter, they generally conducted the review on a weekly basis.  They also reviewed the data

---

[155]   Deposition of David Winton, May 26, 2006, pp. 95-96.
[156]   Deposition of Nicholas Classick, April 12, 2006, pp. 133-135.
[157]   Deposition of Nicholas Classick, April 12, 2006, p. 135.
[158]   Deposition of Nicholas Classick, April 12, 2006, p. 137.

during informal phone calls throughout the quarter. This process enabled Nugent to revise the forecast with his management judgment. [159]   According to Nugent:

- *"It was ... bottom up, looking at every single deal, going through the process of understanding the elements of the deal, speaking with the individuals on these deal opportunities on a very frequent basis, and I would gain an understanding of the deals. And that's how it came up with that judgment factor. So it would be a roll-up of their numbers, with my judgment factor on top."*[160]

177.   Once Nugent completed his analyses, he passed his forecast to Winton, a finance analyst for Roberts. Roberts generally discussed these forecasts with his direct reports every two weeks during the first two months of the quarter and weekly during the last month of the quarter. They reviewed the deals in the forecasts much like Nugent did with his direct reports. [161]   According to Winton, the calls proceeded as follows:

- *"... each group would submit... an Excel spreadsheet on a template, what they thought the forecast was for that period. They would note any changes in the forecast... Then George [Roberts] would always like to hear about what he called the big deals... And questions would come up from George... in terms of just where they were in the sales stage, or did they need his help ... So it's really around what's still committed, and what are the steps to close, and do you need any executive help to come in and help close them?"*[162]

178.   Roberts described the calls in the following manner, "... you talk about the deals they are forecasting, which are the ones they committed they are going to close. And you talk about what are the other opportunities that can be upside to your forecast." [163]   In addition, "... forecasting you got to do actively by talking to people and reviewing the opportunities and having discussions on where you are at on each key opportunity." [164]

179.   After each call wrapped up, Roberts, Winton, and other staff would generally stay on the call and discuss what was presented, including upsides – deals that were not committed but were still considered opportunities for that quarter – and any corresponding risks. Occasionally, Roberts would ask his staff what they thought the forecasts should be based on

---

[159]   Deposition of John Nugent, May 24, 2006, p. 77.
[160]   Deposition of John Nugent, May 24, 2006, p. 83.
[161]   Deposition of John Nugent, May 24, 2006, pp. 92-94.
[162]   Deposition of David Winton, May 26, 2006, pp. 102-103.
[163]   Deposition of George Roberts, June 22, 2006, p. 252.
[164]   Deposition of George Roberts, June 22, 2006, p. 253.

Confidential

what they heard.  However, "[a]t the end of the day, he determined what his forecast was going to be, and if it was the same as the roll-up of the team, we had no judgment.  If it was different, he would apply judgment."[165]  Roberts' forecast was then passed along to Jennifer Minton's group for consolidation with the forecasts of other business units.

180.  Jay Nussbaum, Roberts' counterpart at OSI, elaborated on the factors management considered in developing the judgment to apply to the forecast:

- "It's a science in the minds of the finance people, it's an art form in the minds of the sales people... we had to put some judgment... we would look at the entire pipeline... and we would come up with a core baseline number for that and from that we would extrapolate the – not including the core number, what we would call the opportunity accounts that would really help us make or exceed that number... we would... go through the cycle of the sale, and ask the questions of the owner of that opportunity, CIO in a good mood these days, are they going to help us get it through the system, do they have a sense of urgency to get this done, have they done all the paperwork, is the selection process over, are we doing it with partners, without partners.  So you'd have a slew of questions that you'd want to ask just to validate that there is a reality that it would happen.  So from that you would pull out some deals and put it into the following quarter.  And that which was left was how you would make a judgment."[166]

### c)   Jennifer Minton and the Creation of the Upside Reports

181.  Upside Reports were generated from a combination of the business unit forecasts and management judgment by Jennifer Minton and her Financial Planning and Analysis ("FP&A") personnel, including Ivgen Guner.  These reports provided earnings and revenue growth estimates for each quarter.  Revenues were broken down by sales division and product and compared to the current Pipeline and the Conversion Ratio from the same fiscal quarter of the previous year.  The first page of an Upside Report is shown below in Figure 41, which is reproduced in larger form in Appendix D.  Minton played a central role in evaluating the business units' forecasts and developing the "Upside" adjustment and "Potential" forecast.  She had been involved in Oracle's forecasting process since June 1999 and remained in this role as of Oracle's 3Q FY2001.[167]

---

[165]  Deposition of David Winton, May 26, 2006, p. 148.
[166]  Deposition of Jay Nussbaum, March 23, 2004, pp. 30-34
[167]  Deposition of Jennifer Minton, April 1, 2004, Exhibit 243, pp. 7-8; Deposition of Jennifer Minton, July 7, 2006, pp. 89-91, 95.

*Confidential*

**Figure 41: Upside Report Structure**

#### d) Preparation of Upside Reports Throughout the Quarter

182.     Up to and including 3Q FY2001, Upside Reports were created roughly every other week during the first two months of a quarter and every week during the last month of a quarter.  In the final week of the quarter, Minton typically created these reports on a daily basis.[168]

183.     On Thursdays, forecasts were discussed on the Americas conference calls.  Attendees included Minton, Catz, Guner, and the Americas senior sales personnel and their support staff (Nussbaum and Kopp - OSI, Sanderson and English - OPI, Roberts and Winton - NAS). At times, Henley also participated on the calls.[169]  During the calls, senior sales personnel updated call participants on any changes to their forecasts, any significant changes to the status and/or timing of large deals and whether any transactions could benefit from the

---

[168]  Deposition of Jennifer Minton, April 1, 2004, Exhibit 243, p. 14; Deposition of Jennifer Minton, April 21, 2005, p. 92.

[169]  Not all persons listed attended the calls each week. Deposition of Jennifer Minton, July 7, 2006, pp. 27-28.

*Confidential*

involvement of senior management.  Each senior sales executive generally provided a forecast commitment, which included a best and worst-case scenario. [170]

184.    The document packages used during these calls contained forecast and large deal data. [171]

### e)    Jennifer Minton's Upside Adjustments

185.    On Fridays, or early Monday mornings, Minton made adjustments to the forecast based on the information she received on the Thursday calls, as well as the knowledge garnered by her staff.[172]  As of 3Q FY2001, this staff included Ivgen Guner, Lia Burke, and Roberta Ronsse.[173]  In particular, Guner, who was responsible for preparing underlying forecast analyses for Minton,[174] and Minton would discuss in detail any additional forecast data that was provided in the America's conference call on Thursdays.  These data could include any up-to-date information from the field organizations, such as corrections to original numbers or changes to forecasts based on recent events.  Minton also compared the conversion rate (actual license revenue as a percentage of total Pipeline) from the same quarter of the previous year to the current quarter's pipeline in order to estimate the actual conversion. [175]  The previous year's conversion ratio was used due to the seasonality of the business. [176]  Minton felt it was necessary to make these adjustments:

- "[t]here was, particularly within the North American sales organizations... a forecasting style... whereby nobody wanted to miss their commit forecast and they wanted to exceed it... there was pretty consistent behavior where the gentlemen in question in North America consistently exceeded their forecast, and therefore, that's why the... upside adjustments were made, so that we could get to what we really thought we were going to do in a given quarter." [177]

[170]  Deposition of Jennifer Minton, April 21, 2005, pp. 122-123.
[171]  Deposition of Sarah Kopp, June 14, 2006, pp. 71-72, Exhibit 12.
[172]  Deposition of Jennifer Minton, July 7, 2006, pp. 19-20, 25-28; Deposition of Jennifer Minton, April 21, 2005, pp. 136-137, 201-202.
[173]  Deposition of Jennifer Minton, April 21, 2005, p. 107.
[174]  Deposition of Jennifer Minton, April 1, 2004, pp. 205-206; Deposition of Jennifer Minton, April 1, 2004, Exhibit 243, pp. 8-9.
[175]  Deposition of Jennifer Minton, April 1, 2004, Exhibit 243, pp. 7-9; Deposition of Jennifer Minton, April 21, 2005, pp. 136-137; Deposition of Jennifer Minton, July 7, 2006, pp. 20, 22, 26-27.
[176]  Deposition of Jeffrey Henley, March 2, 2004, pp. 70, 149-150.
[177]  Deposition of Jennifer Minton, April 21, 2005, p. 154.

*Confidential*

186.   If Minton felt that there was excessive management judgment, she would factor that into her upside number.[178]   According to Minton, upside adjustments were based on numerous factors:

- *"The upside adjustments were based on a variety of factors: One was the license pipeline conversion analysis. We would take a look at the pipeline for the same corresponding prior year period, and look at what actually closed as a percentage of the pipeline to come up with a historical pipeline conversion ratio. And we would apply that to the current pipeline in order to predict what we thought would be the actual conversion... of the pipeline for the current quarter... it... had proven to be a fairly good predictor of what our true forecast and actual reports would be."[179]*

187.   In addition:

- *"... I would take a look at a variety of data points, the pipeline conversion ratio analysis, discussions from... the various forecast calls, whether it be through the EC meetings or through the Americas forecast calls on Thursdays. I would also take into consideration the number of upside deals that were not in the forecast, and any other input that I may have received from the field regarding... the forecast... I would make the decision... in consultation with Ivgen Guner [who prepared the underlying analyses to help derive the overall upside number]... there were occasions when I would consult with Jeff Henley..."[180]*

188.   Henley corroborates this process in his deposition:

- *"[Minton and her support staff] look at the forecasting track record of these [business] units. They talk to the finance people who have information that maybe the management – they feel they're being overly optimistic... these people typically have worked for Oracle a long time. Some of them may be a little more optimistic than some. And so we try to factor that in. So there's a variety of things they try to look at to try to come to what we really think is going to happen. That's what she calls potential... her best judgment... as to what she thinks is going to happen at the time."[181]*

189.   As indicated in Figure 42, Minton's upside adjustments in 3Q FY2001, after accounting for the factors discussed above, was conservative by historical measures because upside comprised less of the Forecast license revenue (six percent) than in each prior quarter going back to 4Q FY1999 (seven – 13 percent).

---

[178]   Deposition of Jennifer Minton, March 31, 2004, pp. 98-99.
[179]   Deposition of Jennifer Minton, April 21, 2005, p. 122.
[180]   Deposition of Jennifer Minton, April 21, 2005, p. 207.
[181]   Deposition of Jeffrey Henley, March 2, 2004, p. 72.

*Confidential*

**Figure 42: Initial Upside Adjustments by Quarter, 2Q FY2000 – 3Q FY2001**

| | TOTAL REVENUE | TOTAL LICENSE REVENUE | OSI LICENSE REVENUE | NAS LICENSE REVENUE | OPI LICENSE REVENUE |
|---|---|---|---|---|---|
| | Total Upside as a Percentage of Total Forecast | Total License Upside as a Percentage of License Forecast | OSI License Upside as a Percentage of OSI License Forecast | NAS License Upside as a Percentage of NAS License Forecast | OPI License Upside as a Percentage of OPI License Forecast |
| 1Q FY 1999 | 4% | 9% | --- | --- | --- |
| 2Q FY 1999 | 7% | 11% | --- | --- | --- |
| 3Q FY 1999 | 3% | 6% | --- | --- | --- |
| 4Q FY 1999* | 7% | 15% | --- | --- | --- |
| 1Q FY 2000 | 10% | 27% | --- | --- | --- |
| 2Q FY 2000 | 7% | 14% | --- | --- | --- |
| 3Q FY 2000 | 7% | 19% | 27% | 35% | 50% |
| 4Q FY 2000 | 13% | 28% | 44% | 26% | 105% |
| 1Q FY 2001 | 10% | 33% | 162% | 47% | 45% |
| 2Q FY 2001 | 6% | 16% | 20% | 16% | 24% |
| 3Q FY 2001** | 6% | 13% | 11% | 14% | 23% |

### f)      Executive Management Committee

190.    On Mondays, Minton submitted a finalized Upside Report to Henley and the rest of the Executive Management Committee, which included the CEO, Larry Ellison and Executive Vice Presidents (EVPs) Nussbaum, Sanderson, Roberts, and Catz, among others.  Some attendees, including the EVP of each business unit (Roberts, Sanderson and Nussbaum), received only a subset of the Upside Report that included license forecasts in total and by product line for their business unit. [182]

191.    Monday meetings began with a review of the forecasts. [183]  According to Minton, Ellison would "go around to each sales EVP [Executive Vice President] and ask that they provide him with an update with regard to their forecast." [184]  Henley testified that he "… grilled George Roberts and Sandy Sanderson and everybody else about how things were, and they continually came back that they weren't seeing the softness.  They read the economic report just like I did, but customers were still going to do these high ROI projects.  They felt good about making their quarter." [185]  In addition, according to Henley, "… we look painstakingly at previous years and trends… to try to figure out… is this a reasonable conversion ratio based on history." [186]  The committee would also review large deals that might close during the quarter.

---

[182] Deposition of Jennifer Minton, April 21, 2005, pp. 104-110; Deposition of Jeffrey Henley, March 2, 2004, pp. 85-86, 116-117.
[183] Deposition of Jennifer Minton, April 21, 2005, pp. 107-108.
[184] Deposition of Jennifer Minton, July 7, 2006, p. 32.
[185] Deposition of Jeffrey Henley, November 16, 2006, pp. 378-381.
[186] Deposition of Jeffrey Henley, March 2, 2004, p. 81.

*Confidential*

### g)    Summary of Forecasting Process

192.    Oracle's forecasting process followed a structured "bottom up" process. Sales representatives projected their sales for the quarter. Divisional and Business unit heads assessed these projections to create forecasts for their divisions. Jennifer Minton in turn assessed these forecasts and created a single companywide forecast.

193.    Management judgment plays a critical role in the forecasting process. Sales representatives tend to under-commit in their forecasts to ensure that they can deliver on their promised revenue.[187] Moreover, in an international organization spanning six continents and numerous countries and cultures with seven business units,[188] there will be considerable variability in forecasting behavior. Management assessment of forecasts is essential in such an environment to create accurate forecasts, both to identify possible deals that sales representatives may have left out of their forecasts, assess the overall probabilities of success, and to standardize the forecasts across business units.

194.    As I discuss below, the fact that the Potential forecast was generally larger and more accurate than the field forecast from the sales organizations underscores the proposition that management judgment played a critical role in creating an accurate forecast.

## C.    Historical Performance of Oracle's Forecast Process

195.    Oracle had a solid track record of meeting analysts' expectations for quarterly earnings per share. Of the 20 quarters during the 1995-2001 period for which three-months-ahead consensus estimates are available, Oracle missed the consensus estimate only three times. [*See Figure 43.*][189]

---

[187] Simons, Robert. *Performance Measurement and Control Systems for Implementing Strategy*, Prentice Hall: Upper Saddle River, New Jersey, 2000, p. 213.

[188] Business unit count based on 12/11/00 upside report, NDCA-ORCL 213091-213107.

[189] EPS values from Thomson I/B/E/S differ from the values in Oracle's 10-Qs for FY 3Q2000 and FY 4Q FY2000 because they exclude gains from sales of investments and from that of FY 1Q2001 due to rounding.

*Confidential*

**Figure 43: Oracle EPS by Quarter, Actuals and Analyst Forecasts, FY1995 – FY2002**



196.    Moreover, during the seven quarters prior to Oracle's 3Q FY2001, the Potential forecast had been a conservative[190] predictor of actual results. Indeed, the initial Potential forecast was always below, or in a few instances equal to, the actual results for the quarter, and closer to actual results than the Forecast. [*See* Figure 44.]

---

[190]   The Potential forecasted EPS was always equal to or less than actual EPS but for two instances; one instance in 1Q FY2001 in which the two were equal, and another instance in 2Q01 in which the Potential was $0.111 and the actual was $.11.

Confidential

**Figure 44: Oracle's EPS Consensus Estimates, Guidance, Forecasts and Actuals, 4Q FY1999 – 4QFY2001**



### D.    Oracle's Forecasting During its Fiscal Year Third Quarter of 2001

#### i.    Initial Forecast and Guidance

197.    As in past quarters, Oracle's guidance to the market was based on the Potential forecast from the Upside Report closest to the date of the company's quarterly conference call and other factors.[191]

#### ii.    Oracle's 3Q FY2001 Forecasts and Statements Were Reasonable Given Oracle's Internal Financial Data Throughout the Quarter

198.    The Potential forecast indicated throughout 3Q FY2001 that Oracle had a reasonable basis for believing it would achieve its guidance. As shown in Figure 45, Oracle's potential forecast, reflecting Jennifer Minton's Upside adjustment, remained above 12 cents per share until January 29, 2001, and never declined to less than 11.19 cents per share until a day before the end of the quarter. On January 29, the Potential forecast fell to 11.58 cents per share, which after rounding to the nearest whole cent (as was Oracle's practice),[192] was

---

[191]    Deposition of Jennifer Minton, July 7, 2006, pp. 123-125;  Deposition of Jeffrey Henley, March 2, 2004, p. 189.
[192]    Deposition of Jennifer Minton, September 25, 2006, pp. 328-329.

*Confidential*

equivalent to 12 cents per share.  On February 5, the Potential forecast fell for the first time below 11.5 cents per share to 11.29 cents per share.  However, the Potential forecast returned to 11.58 cents per share the next week on February 12.  As of the end of the next to last week of the quarter the Potential forecast was 11.23 cents per share.  The Potential forecast declined to 10.9 cents per share on February 27 and to 10.07 cents per share on February 28.  Thus, the Potential forecast indicated a rounded 12 cents per share as late as two and a half weeks before the end of the quarter, and was never below 11 cents per share until the last two days of the quarter.

**Figure 45:  Oracle's Forecasted EPS, 3Q FY2001**



199.    As demonstrated in Figure 46, Oracle was ahead of where it had been during 3Q FY2000, a quarter in which they far exceeded analysts' consensus estimate, in terms of Potential forecast as a percent of market expectations, until the last two days of 3Q FY2001.

*Confidential*

**Figure 46: Potential as a Percentage of Market Expectations, 3Q FY2001 vs. 3Q FY2000**

| 3Q FY2001 Date | 3Q FY2001 Actual EPS | 3Q FY2001 Consensus Estimate | 3Q FY2001 Guidance | 3Q FY2001 Forecast | 3Q FY2001 Potential | 3Q FY2001 Potential as a Percent of Consensus Estimate | 3Q FY2000 Date | 3Q FY2000 Consensus Estimate | 3Q FY2000 Potential | 3Q FY2000 Potential as a Percent of Consensus Estimate | 3Q FY2000 Actual as a Percent of Consensus Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/11/00 | 0.10 | 0.12 | 0.12 | 0.107 | 0.128 | 107% | | | | | |
| 12/12/00 | 0.10 | 0.12 | 0.12 | 0.107 | 0.128 | 107% | | | | | |
| 12/13/00 | 0.10 | 0.12 | 0.12 | 0.107 | 0.128 | 107% | 12/13/99 | 0.070 | 0.055 | 79% | 121% |
| 12/25/00 | 0.10 | 0.12 | 0.12 | 0.106 | 0.127 | 106% | | | | | |
| 1/15/01 | 0.10 | 0.12 | 0.12 | 0.106 | 0.131 | 101% | | | | | |
| 1/19/01 | 0.10 | 0.12 | 0.12 | 0.107 | 0.128 | 107% | | | | | |
| 1/22/01 | 0.10 | 0.12 | 0.12 | 0.107 | 0.121 | 100% | 1/24/00 | 0.070 | 0.062 | 89% | 121% |
| 1/29/01 | 0.10 | 0.12 | 0.12 | 0.107 | 0.116 | 97% | | | | | |
| 2/2/01 | 0.10 | 0.12 | 0.12 | 0.105 | 0.113 | 94% | | | | | |
| 2/5/01 | 0.10 | 0.12 | 0.12 | 0.105 | 0.113 | 94% | | | | | |
| 2/9/01 | 0.10 | 0.12 | 0.12 | 0.109 | 0.114 | 95% | 2/7/00 | 0.070 | 0.056 | 81% | 121% |
| 2/13/01 | 0.10 | 0.12 | 0.12 | 0.109 | 0.116 | 96% | 2/14/00 | 0.070 | 0.059 | 84% | 121% |
| 2/14/01 | 0.10 | 0.12 | 0.12 | 0.110 | 0.112 | 93% | 2/20/00 | 0.070 | 0.063 | 90% | 121% |
| 2/19/01 | 0.10 | 0.12 | 0.12 | 0.110 | 0.112 | 94% | 2/21/00 | 0.070 | 0.063 | 90% | 121% |
| 2/26/01 | 0.10 | 0.12 | 0.12 | 0.110 | 0.112 | 93% | 2/25/00 | 0.070 | 0.061 | 85% | 121% |
| 2/27/01 | 0.10 | 0.12 | 0.12 | 0.110 | 0.109 | 91% | 2/28/00 | 0.070 | 0.065 | 93% | 121% |
| 2/28/01 | 0.10 | 0.12 | 0.12 | 0.102 | 0.101 | 84% | 2/29/00 | 0.070 | 0.067 | 96% | 121% |

200. The above data support the conclusion that Oracle was not aware of a large decline in expected revenues until the very end of the quarter.[193]   An indication that the Potential forecast might be in jeopardy occurred on Monday, February 26, 2001.  George Roberts wrote to Minton, Ellison, Henley, Catz and Winton that he was reducing his forecast by $20 million from $320 million to $300 million after receiving an e-mail from Nic Classick, an Area Vice President in North American Sales' General Business West subdivision.  This included 70 deals worth a total of $10 million that fell out of Classick's forecast over the last few days.  Seventy percent of the accounts were "new economy" with the rest "brick and mortar."[194]   Nevertheless, $20 million was approximately 1.5 percent of Oracle's forecasted license revenue for 3Q FY2001 as of February 26, 2001 (which exceeded $1.2 billion).[195]   Therefore, this information alone did not signal that Oracle would miss its guidance for the quarter.

201. According to Nugent, Classick's superior, he felt good about achieving his forecast for the quarter:

---

[193]   For example, as of Tuesday, February 27, Sarah Kopp projected quarterly revenue of $243 million for OSI, only $7 million (less than 3 percent) below the December 11, 2000 Potential forecast for OSI.  NDCA-ORCL 300065.  Six hours later, she reduced this forecast to $225 million and then raised it to $230 million at 11:22 AM the next morning (Wednesday, February 28).  NDCA-ORCL 300067, NDCA-ORCL 003466.  Later that afternoon at 4:25 PM Kopp's projection for OSI fell to $178 million as deals at Lucent, American Electric Power, and CSFB fell though or were postponed to the next quarter.  NDCA-ORCL 003471.  The OSI forecast fell further that afternoon to $175 million.  NDCA-ORCL 003476.  During this time, the Potential forecast for OSI, which had stood at $250 million in the December 11th Upside Report, fell from $230 million on February 26th to $166 million at the end of February 28th.  Upside reports December 11, 2000, NDCA-ORCL 213091-107, February 26, 2001, NDCA-ORCL 1532944-60, February 28, 2001, NDCA-ORCL 1533006-22.

[194]   NDCA-ORCL 300208.

[195]   Upside Report February 26, 2001, NDCA-ORCL 1532944-60.

*Confidential*

- *"We didn't know what type of adjustment was going to be in the marketplace; was it going to be little, medium, large, nobody had any idea.*

  *But our current forecast that we had running up, we were secure with that, with that forecast.*

  *With that knowledge of, hey, we smell a little slowdown here, a little VC slowing down there, a little bit of this here, a little bit of that there, different market news. But, we get a lot of market news in a quarter.*

  *But all that market news doesn't affect my forecast. If all of the sudden the government says the economy is starting to pick up, I don't raise my forecast.*

  *All of the sudden new technology industry is doing so well, I don't raise my forecast in that particular technology industry. I look at my individual deals.*

  *And if I am comfortable with those individual deals, regardless of the dynamics -- if a competitor comes out with a competitive product, I don't lower my forecast.*

  *Whatever these dynamics are, I look at forecast. Are we okay with the forecast? Yes, we are fine.*

  *I felt absolutely fine with the forecast."*[196]

202.   Furthermore, a review of Big Deals over $500,000 for which a contract has been sent to a customer, provides further evidence that a positive situation deteriorated very rapidly at the very end of Oracle's 3Q FY2001—going from closing nearly three times as much revenue from Big Deals as in 3Q FY2000 and simultaneously having a pipeline of remaining Big Deals nearly double that of 3Q FY2000 on February 26, 2001 to the sudden drop the final two days of the quarter. [*See* Figure 47.]

**Figure 47:  Big Deals, 3Q FY2000 – 3Q FY2001**

| | Big Deals Closed | | | Unclosed Big Deals In Pipeline | | |
|---|---|---|---|---|---|---|
| Date | 3Q FY2000 | 3Q FY2001 | Growth from 3Q FY2000 to 3Q FY2001 | 3Q FY2000 | 3Q FY2001 | Growth from 3Q FY2000 to 3Q FY2001 |
| t – 5 | 73,000,000 | 145,000,000 | 99% | 630,000,000 | 618,000,000 | -2% |
| t – 4 | 76,000,000 | 191,000,000 | 151% | 629,000,000 | 635,000,000 | 1% |
| t – 3 | 73,000,000 | 213,000,000 | 192% | 521,000,000 | 621,000,000 | 19% |
| t – 2 | 177,000,000 | 229,000,000 | 29% | 477,000,000 | 591,000,000 | 24% |
| t – 1* | 334,000,000 | 332,000,000 | -1% | 126,000,000 | 218,000,000 | 73% |
| March 1 (t) | 366,000,000 | 420,000,000 | 15% | | | |

---

[196]   Deposition of John Nugent, May 24, 2006, pp. 272-273.

*Confidential*

### iii. Oracle's 3Q FY2001 Guidance and Later Statements Were Reasonable Given Historical Performance

203.   Despite the decline in Oracle's forecasts over the course of 3Q FY2001 discussed above, Oracle's guidance and later statements regarding its performance in 3Q FY2001 were reasonable throughout the quarter in light of Oracle's own historical experience.

204.   As Figure 48 shows, Oracle's earnings were highly seasonal within the fiscal year, with the first fiscal quarter being the weakest and the fourth the strongest. Therefore, quarterly performance was typically compared to the same fiscal quarter of the previous year.

**Figure 48: Oracle EPS by Quarter, FY1995 – FY2002**



205.   Figure 49 shows that Oracle's third fiscal quarter growth had ranged from between 14 and 70 percent per year during the years 1995 and 2000, with an average of 38 percent. Oracle's guidance of 12 cents per share for 3Q FY2001 implied a growth rate of 41 percent, well within the historical range and close to the historical average. Moreover, the year-over-year quarterly growth rates achieved in the three previous quarters were much higher than the average over the past four years, suggesting that the forecasted quarterly growth rate for 3Q

*Confidential*

FY2001 was reasonable. Also, in every fiscal year since 1995, 3Q EPS was greater than 1Q and 2Q EPS for the same quarter, and the FY2001 forecast was consistent with this pattern. As noted in the figure above, the actual 3Q EPS was below the 2Q EPS, a very unusual event. In addition, the guidance given at the beginning of 3Q FY2001 (12.0 cents per share) was conservative—below the 12.82 cents EPS indicated by the December 11, 2000 Upside Report.

**Figure 49: Oracle Year-Over-Year EPS Growth by Quarter**



206.     At the beginning of and during the quarter, the Potential conversion ratio (the Potential forecast divided by the Pipeline) was conservative given Oracle's recent experience. At the time guidance was given (week two), the Potential conversion ratio (Potential divided by the pipeline size in the relevant week) for 3Q FY2001 was below the actually achieved conversion ratio (actual end of quarter sales divided by pipeline size in the relevant week) in all but one of the previous quarters in FY2000 and FY2001 including the actually achieved conversion ratio for 3Q FY 2000. As discussed above, the seasonality of Oracle's sales meant that comparison to the same fiscal quarter of the previous year resulted in the most useful comparisons. As the quarter evolved, the Potential conversion ratio remained below the conversion ratios actually achieved for 3Q FY 2000 in all but weeks two and eight.

*Confidential*

Although the potential conversion ratio during the first eight weeks of 3Q FY2001 at times exceeded the conversion ratios actually achieved in 3Q FY2000, 1Q FY2001 and 2Q FY2001, it remained below or equal to all of the other actually achieved conversion ratios in the previous fiscal quarters of FY2000 and FY2001.  [*See* Figure 50.]  Moreover, with the exception of week four, the Potential conversion ratio was always below the average of the actually achieved conversion ratios of the previous six quarters. [*See* Figure 51.]

**Figure 50: Oracle's Pipeline Conversion Ratios by Week, 1Q FY2000 – 3Q FY2001**



*Confidential*

**Figure 51:  Oracle's Pipeline Conversion Ratios by Week, 3Q FY2001 vs. Historical Average**



207.    Throughout 3Q FY2001, the conversion ratio required to meet guidance in Oracle's 3Q FY2001 was similar to that realized in the third quarter of FY2000. In other words, had Oracle achieved in 3Q FY2001 the conversion ratio achieved in 3Q FY2000, it would have made approximately 12 cents per share.  This is consistent with Oracle's guidance and later statements being reasonable at the time.  [*See* Figure 52.]

*Confidential*

**Figure 52: Required Pipeline Conversion Ratios to Obtain $0.12 EPS Potential Forecast, 3Q FY2001**



208.    Furthermore, in six of the previous ten quarters (including 2Q FY2001, 4Q FY2000, 3Q FY2000, 4Q FY1999, 2Q1999, and 1Q FY1999) the Potential forecast had also been below guidance during an earlier part of the quarter, but Oracle nonetheless beat its guidance in each of those quarters.  In fact, in 3Q FY2000, the Potential forecast was 88 percent of the consensus EPS estimate two business days before the end of the quarter, but Oracle's actual results for the quarter ended up exceeding the estimate.[197]  By contrast, the Potential forecast never fell below 90 percent of guidance until the last day of 3Q FY2001.  [*See* Figure 45.]

209.    Given how close Oracle's forecasts remained to 12 cents per share, how Oracle had often outperformed its forecast, and how reasonable the conversion ratios were during the quarter in light of historical ratios, it was reasonable to expect throughout the quarter that Oracle would achieve its guidance in 3Q FY2001.

210.    Taking all these internal data together, it is clear that Oracle experienced a large decline in expected revenues at the very end of 3Q FY2001, and that prior to that time Oracle

---

[197]   In 3Q FY 2000, Oracle's EPS was 13 cents per share (split adjusted).  However, excluding gains on sales of stock, it was 8.5 cents per share.  The latter was the basis for the analyst consensus estimate. Thomson IBES; Oracle Forms 10-Q for the periods ended February 29, 2000 and February 28, 2001.

executives had reason to believe Oracle would achieve its forecasted guidance for the quarter, making Oracle's guidance and other statements reasonable when made.

## VII.   CONCLUSION

211.   At the beginning of Oracle's 3Q FY2001, during December 2000, forecasts for the U.S. economy remained positive, although modestly less so than in the past.  Oracle executives recognized this development; as Henley said during the December 14 earnings call: "We believe that (the U.S. economy) is slowing down, from what we can tell."[198]   During the quarter, some macroeconomic and sector indicators improved, others remained stable, and some declined, but it was not until after the close of Oracle's 3Q FY2001 that it became clear that the U.S. economy and the enterprise software sector had experienced dramatically poorer than expected performance.

212.   Oracle's forecasting process captured the impact of macroeconomic trends affecting customers through a structured forecasting process.  This process relied on executives evaluating sales representatives' forecasts of customer purchases.  Oracle's executives' projections reflected customers' interest in Oracle's products and therefore were related to macroeconomic conditions.  While Oracle did not base its forecast on specific macroeconomic indicators, Oracle executives were sufficiently aware of the uncertainty regarding the economy to question sales representatives' projections.  In fact, it is not surprising that Oracle did not fully anticipate the recession and reflect this in its forecast.  As one of the government's top economic policymakers, I myself did not accurately predict the onset of the recession.  Taking that down several levels to predicting how the economy will impact individual purchase decisions by individual companies is even more difficult, and thus it is not surprising that Oracle did not anticipate a sudden drop-off in revenues in 3Q FY2001, even with a well functioning and historically accurate forecasting process.

213.   Because Oracle's license revenues, like those of its competitors, tended not to be booked until the end of the quarter and did not come from the same customers quarter to quarter, the company's precise sales for the quarter were hard to predict; nevertheless, Oracle had

---

[198]   Transcript of Oracle's 12-14-00/4:30 p.m. CT conference call, confirmation #474122, NDCA-ORCL 003215-47, NDCA-ORCL 003218.

*Confidential*

consistently met or beat expectations and had a well-functioning forecasting process.  Sudden changes at the end of the quarter were difficult to anticipate, and indeed, the shortfall in Oracle's 3Q FY2001 revenues was not apparent until the very end of the quarter when sales did not materialize.  In sum, Oracle's forecasting process and internal data provided a reasonable basis for Oracle's guidance and later statements regarding its performance in 3Q FY2001.

*Confidential*

Respectfully submitted,

R. Glenn Hubbard

May 25, 2007