LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com

LATHAM & WATKINS LLP
  Sean M. Berkowitz (*pro hac vice*)
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
E-mail: sean.berkowitz@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, CA 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>———————————————<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-SI (JCS) (Consolidated)<br><br>CLASS ACTION<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**Judge:**   **Honorable Susan Illston**<br>**Date:**    **January 9, 2009**<br>**Time:**    **9:00 a.m.** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. THE ADVERSE INFERENCE ORDER ................................................................... 3

    A. The Inference Is Irrelevant To Loss Causation ............................................... 3

    B. The Inference Should Be Limited To Ellison's Knowledge ............................ 3

III. PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO LOSS CAUSATION ........................................................................................................ 5

    A. The Standard For Loss Causation On Summary Judgment ............................ 6

    B. Plaintiffs Do Not Assert A "Direct" Disclosure of the "Relevant Truth" ........................................................................................................... 8

    C. Plaintiffs Have Not Created a Genuine Issue Of Material Fact As To Whether the Market Learned The "Relevant Truth" "Indirectly" ................. 9

        1. There Is No Evidence The Market Learned The "Relevant Truth" About Suite 11i ............................................................................ 9

        2. There Is No Evidence The Market Learned The "Relevant Truth" About Oracle's Economy Statements ...................................... 12

        3. There Is No Evidence The Market Learned The "Relevant Truth" About Oracle's 2Q01 Results ................................................ 13

IV. PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO FALSE STATEMENTS ......................................................................................................... 14

    A. Defendants' December 14, 2000 Statements About Oracle's 3Q01 Guidance ...................................................................................................... 14

        1. There Is No Genuine Issue Of Material Fact As To Whether Oracle's 3Q01 Guidance Was "False" .................................... 14

        2. The Safe Harbor Protects Defendants' Statements Regarding 3Q01 Guidance ......................................................... 15

            a. The PSLRA Safe Harbor Applies ............................................... 15

            b. Plaintiffs Cannot Demonstrate Defendants Had "Actual Knowledge" That The 3Q01 Guidance Was "False" ........................................................................................... 15

    B. Defendants' Intra-Quarter Statements About the Economy ........................ 16

        1. The Economy Statements Are Forward-Looking .................................. 16

        2. There Is No Genuine Issue of Material Fact As To Whether

Oracle's Economy Statements Were "False" ......................................... 17

C. Defendants' Statements About Suite 11i ..................................................... 17

1. Plaintiffs' Suite 11i "Quality" Evidence Is Irrelevant Because There Is No Evidence Of Any Lost Sales Due To Suite 11i "Problems" ...................................................... 17

2. Plaintiffs' "Quality" Evidence Is Irrelevant Because The Challenged Statements Concern "Integration" ......................... 18

3. Plaintiffs' Limited "Integration" Evidence Does Not Create A Genuine Issue of Material Fact ............................................ 20

D. Defendants' Statements Regarding Oracle's 2Q01 Results................................ 20

1. Plaintiffs' Current 2Q01 Accounting Theories Are Unpled ................... 20

2. There Is No Genuine Issue of Material Fact As To Whether Oracle's 2Q01 Results Were "False" ...................................... 21

a. The Bad Debt Transfers ................................................. 21

b. The HP Transaction ...................................................... 22

V. PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO SCIENTER ............................... 23

A. There Is No Genuine Issue of Material Fact As To Whether Defendants' Statements Concerning Oracle's 3Q01 Guidance Or The Economy's Effect On That Guidance Were Made With Scienter ........................................................................................ 23

B. There Is No Genuine Issue of Material Fact As To Whether Defendants' Statements Concerning Oracle's 2Q01 Results Were Made With Scienter .............................................................................. 23

1. The Bad Debt Transfers ................................................................. 23

2. The HP Transaction ...................................................................... 24

VI. PLAINTIFFS' SECTION 20A CLAIM FAILS ............................................................ 25

VII. CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Byrnie v. Town of Cromwell Bd. of Educ.*,
   243 F.3d 93 (2d Cir. 2001).................................................................................................. 4

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................................................... 3, 14

*Gordon Partners v. Blumenthal*
   No. 02 Civ. 7377 (LAK), 2007 WL 1438753 (S.D.N.Y. May 16, 2007).............................. 3

*Gordon Partners v. Blumenthal*,
   No. 02 Civ. 7377 (LAK) (AJP), 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007)..................... 3, 5

*Gordon Partners v. Blumenthal*,
   No. 02 Civ. 7377 (LAK) (AJP)2008 WL 4376259 (2d Cir. Sept. 24, 2008)........................ 3

*Hamilton v. Signature Flight Support Corp.*,
   No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20,
   2005) ................................................................................................................................ 4

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ......................................................................................... 17

*In re Adobe Systems, Inc. Sec. Litig.*,
   787 F. Supp. 912 (N.D. Cal. 1992) .............................................................................. 15, 16

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999)............................................................................................. 23

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989)............................................................................... 15, 18, 23

*In re Broadcom Co. Sec. Litig.*,
   No. SA CV 01-275-GLT MLGX, 2004 WL 3390052 (C.D. Cal. Nov. 23,
   2004) .............................................................................................................................. 15

*In re Compuware Sec. Litig.*,
   386 F. Supp. 2d 913 (E.D. Mich. 2005)............................................................................. 7

*In re Daou, Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ......................................................................................... 12

*In re IKON Office Solutions, Inc. Sec. Litig.*,
   131 F. Supp. 2d 680 (E.D. Pa. 2001) .............................................................................. 7, 8

*In re Impax Labs., Inc. Sec. Litig.*,
   No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356 (July 18, 2007).................................. 14

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) ......................................................................... 7, 17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANTS' REPLY ISO MSJ
Master File No. C-01-0988-SI

*In re Merck & Co. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005).................................................................................... 10

*In re Motorola Sec. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007) ...................................................................... 7

*In re NTL, Inc. Sec. Litig. (Gordon Partners v. Blumenthal)*,
  244 F.R.D. 179 (S.D.N.Y. 2007) ............................................................................ 3

*In re Omnicom Group, Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008)................................................................. 7, 8

*In re Splash Tech. Holdings Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................ 15

*In re The Clorox Co. Sec. Litig.*,
  238 F. Supp. 2d 1139 (N.D. Cal. 2002) ................................................................ 15

*McCabe v. Ernst & Young LLP*
  494 F.3d 418 (3d Cir. 2007)................................................................................. 7, 8

*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*,
  No. Civ. 94-5522 RBK, 2005 WL 1541062 (D.N.J. June 30, 2005)................... 7, 8

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ......................................................................... 6, 7, 9

*Mosaid Techs. Inc. v. Samsung Elecs. Inc.*,
  224 F.R.D. 595 (D.N.J. 2004)................................................................................. 5

*Mosaid Techs. Inc. v. Samsung Elecs. Inc.*,
  348 F. Supp. 2d 332 (D.N.J. 2004) ......................................................................... 4

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding
  Corp.*,
  320 F.3d 920  (9th Cir. 2003) .............................................................................. 23

*Nursing Home Pension Fund v. Oracle Corp.*,
  242 F. Supp. 2d 671 (N.D. Cal. 2002) .................................................................. 20

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) .............................................................................. 14

*Robbins v. Koger Properties, Inc.*,
  116 F.3d 1441 (11th Cir. 1997) .............................................................................. 8

*Ryan v. Flowserve*,
  245 F.R.D. 560 (N.D. Tex. 2007) ..................................................................passim

*Skeete v. McKinsey & Co.*,
  No. 91 Civ. 8093 (PKL), 1993 U.S. Dist. LEXIS 9099 (S.D.N.Y. July 7,
  1993) ....................................................................................................................... 4

*Turner v. Hudson Transit Lines, Inc.*,
  142 F.R.D. 68 (S.D.N.Y. 1991) .............................................................................. 4

*W.V. Realty Inc. v. N. Ins. Co.*,
    334 F.3d 306 (3d Cir. 2003)..................................................................................................... 17

**STATUTES**

15 U.S.C. § 78u-5(c)(1)(B) ..................................................................................................... 15

## I.     INTRODUCTION

The story Plaintiffs tell in their Opposition bears no resemblance to the record.  This is not a matter of competing inferences.  Plaintiffs' Opposition is littered with factual assertions for which there is no support.  Clearly, Plaintiffs hope that this strategy will create the appearance of genuine fact issues.  Any fair-minded reading of the record establishes that it does not.

Because they know the evidence does not support their claims, Plaintiffs seek to expand the Court's adverse inference Order to touch every aspect of the case—including issues the Court has already ruled are unaffected by the inference, such as loss causation and accounting.  But Plaintiffs offer no evidence suggesting that any missing materials would have shown anything other than Ellison's personal knowledge of whatever facts Plaintiffs are able to prove, based on the massive discovery record developed in this case.  They have not, in other words, established prejudice sufficient to justify the nearly boundless inferences they seek to draw.

With or without the inference, Plaintiffs have not identified a genuine issue of fact as to loss causation.  On summary judgment, Plaintiffs must adduce evidence from which a reasonable jury could find that Oracle's stock price dropped because the "relevant truth" became "generally known."   This requires either a direct corrective disclosure or evidence that the market recognized a relationship between Oracle's March 1, 2001 announcement and the facts that Plaintiffs claim were concealed.  There is no such evidence.  As reflected in countless analyst reports and media articles at the time, the market understood Oracle's miss as signaling a sudden and dramatic downturn in the entire enterprise software industry, which impacted all of Oracle's competitors.  And of course, there is no dispute that this is exactly what happened.  The United States economy went into a recession starting March 2001 (not identified by the NBER until November 2001).  Oracle's miss was the harbinger of an industry-wide downturn that *did* affect all of its competitors.  Ignoring this reality, Plaintiffs urge the Court to rule, in effect, that any announcement of poor financial results reveals the "falsity" of previously announced forecasts.  Courts have uniformly rejected this argument.  Plaintiffs' total failure of proof on loss causation mandates judgment as a matter of law for Defendants on each of Plaintiffs' claims.

Defendants likewise are entitled to summary judgment because Plaintiffs have not

1   identified a genuine issue of material fact as to falsity.  Regarding Oracle's 3Q01 guidance,

2   Plaintiffs ask this Court, in hindsight, to second-guess Oracle's forecasting process, arguing that

3   it was flawed and rendered "unreliable" by certain internal and external changes.  But in order to

4   meet their burden, Plaintiffs must show that Oracle had no "reasonable basis" for its forecasts, or

5   that the speakers were aware of facts "tending *seriously* to undermine" them.  Plaintiffs do not

6   come close to meeting this burden.  Oracle's best internal data showed that it was on target to

7   meet guidance until the very end of the quarter, and there is no evidence that any of the speakers

8   believed otherwise.  The same is true for Defendants' statements during the quarter that Oracle

9   was not seeing the impact of the slowing economy on its business performance.  Those

10  statements were inextricably linked to Oracle's internal forecasting data, which throughout the

11  quarter indicated that Oracle was on target to meet guidance.  Because Oracle closes the majority

12  of its sales in the last week of the quarter, there simply is no genuine issue of material fact

13  concerning the truth of Defendants' intra-quarter statements.  This is so whether the statements

14  are regarded as "forward-looking" or as statements of present fact.

15          Nor can Plaintiffs demonstrate the falsity of Defendants' statements about Suite 11i.

16  First and most fundamentally, the allegedly concealed "facts" about Suite 11i would have been

17  material only if they had a material impact on Oracle's sales.  Here, despite massive discovery

18  from Oracle and its customers, Plaintiffs cannot identify a single 3Q01 deal that was lost due to

19  undisclosed "problems" with Suite 11i.  Nor is there any evidence that the statements were false.

20  Defendants told the market that, unlike best-of-breed offerings from separate vendors, Suite 11i

21  did not require expensive post-purchase systems integration in order for its components to share

22  data.  These statements were true, and Plaintiffs have not offered a shred of contrary evidence.

23          Finally, with respect to Plaintiffs' (unpled) accounting allegations, Plaintiffs cannot prove

24  falsity, materiality, or scienter.  The bad debt reserve claim is completely unfounded, and the

25  undisputed evidence shows that Defendants were unaware of the transfers until 2002.  Similarly,

26  the evidence is undisputed that Oracle's recognition of revenue on the HP deal was appropriate,

27  and Plaintiffs offer no evidence establishing that any Defendant thought otherwise.  In any event,

28  the revenue implications of the bad debt transfers and HP deal are immaterial as a matter of law.

## II.     THE ADVERSE INFERENCE ORDER[1]

### A.     The Inference Is Irrelevant To Loss Causation

This Court has already ruled, correctly, that the adverse inference will not assist Plaintiffs in proving loss causation.  Sept. 2, 2008 Order at 12.  Because loss causation requires proof that the "relevant truth" became "generally known" (*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343, 344 (2005)), even Plaintiffs agree that "[w]hether defendants' fraud moved the market is largely determined from publicly available data as opposed to internal information."  Pls.' Steinholt Opp. at 7 n.3 (citing *Ryan v. Flowserve*, 245 F.R.D. 560, 569 (N.D. Tex. 2007)).  Thus, as to loss causation, the inference does not affect Plaintiffs' summary judgment burden.

In that regard, the *Gordon Partners* case is instructive.  There, the court granted an adverse inference because defendant failed to preserve the email files of at least 44 "key players."  *In re NTL, Inc. Sec. Litig. (Gordon Partners v. Blumenthal)*, 244 F.R.D. 179, 198 (S.D.N.Y. 2007).  Based on emails produced by one of the "key players," the court found the missing emails would have supported plaintiff's case.  *Id.* at 200-201.  But on summary judgment, the court held that because the inference "relate[d] to defendants' knowledge about the company's financial and business operations," it was "irrelevant to the separate element of loss causation."  *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK) (AJP), 2007 WL 431864, at *14, n.8 (S.D.N.Y. Feb. 9, 2007).  Despite the inference, the court granted summary judgment for defendants on loss causation grounds.  *Id.*; 2007 WL 1438753, at *1-*3 (S.D.N.Y. May 16, 2007) *aff'd*, 2008 WL 4376259 (2d Cir. Sept. 24, 2008).  As in *Gordon Partners*, the adverse inference here—whatever its scope—is "irrelevant to the issue of loss causation."

### B.     The Inference Should Be Limited To Ellison's Knowledge

More broadly, the inference should not be extended to any issue other than Ellison's knowledge of facts that Plaintiffs are otherwise able to prove.[2]  The Court has already ruled that

---

[1] The Exhibits cited herein are true and correct copies of exhibits attached to previously filed declarations, including as identified in Defendants' Motion ("DMSJ") at 5 n.1, and Defendant Ellison's Opposition to Plaintiffs' Motion for Summary Judgment Under Section 20A ("20A Opp.") at 4 n.1, as well as the concurrently filed Glennon Declaration (Exs. 463-496).

[2]  The Order does not suggest that the inference would apply to the knowledge of the other two individual defendants, Jeffrey O. Henley and Edward J. "Sandy" Sanderson, nor do Plaintiffs suggest any reason why it should.  *See* DMSJ at 23 n.9.

1  the inference does not extend to Plaintiffs' 2Q01 accounting claims, for Plaintiffs have failed to

2  show that any missing evidence would have been "relevant" to those claims.  Sept. 2, 2008 Order

3  at 8.  As to the remaining issues, Plaintiffs complain that it would be difficult to show how they

4  have been harmed by the loss of evidence (Opp. at 1)—but that is precisely what courts have

5  required, and what parties have been able to show, before sanctions of the sort that Plaintiffs here

6  seek have been ordered.  *See* DMSJ at 22 (citing *Hamilton v. Signature Flight Support Corp.*,

7  No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088, at *23 (N.D. Cal. Dec. 20, 2005);

8  *Skeete v. McKinsey & Co.*, No. 91 Civ. 8093 (PKL), 1993 U.S. Dist. LEXIS 9099, at *22-24

9  (S.D.N.Y. July 7, 1993); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y.

10  1991)).  Plaintiffs' failure even to address these cases underscores the fact that Plaintiffs are

11  using the adverse inference to fill massive evidentiary holes in their case, rather than to address

12  any real harm suffered as the result of missing evidence from Ellison.  Moreover, Plaintiffs had

13  available to them many sources of circumstantial evidence regarding the content of Ellison's

14  emails and *Softwar* materials.[3]  On this record, there is no basis for finding that Plaintiffs have

15  suffered any prejudice from the missing materials, beyond their ability to show that Ellison knew

16  whatever facts Plaintiffs are able to establish based on the record assembled.

17       Contrary to Plaintiffs' argument, moreover, courts have not "rejected the very limitation

18  urged by [D]efendants."  Opp. at 1.  The limitations rejected in the cases Plaintiffs cite are

19  nothing like the limitation Defendants have suggested here.[4]  Defendants request that the

---

[3]  Plaintiffs received email productions from at least 129 different custodians, including the "key players" with whom Ellison interacted on all relevant issues.  Ex. 433.  Plaintiffs also took at least 70 depositions and asked hours of questions about emails with Ellison.  20A Opp. at 20.  Significantly, Plaintiffs present none of that evidence here, and with good reason:  none of it suggests that Ellison's emails would have contained unique evidence concerning the subjects identified in the Order.  With regard to the *Softwar* materials, Plaintiffs have both the published book and over 200 pages of interview transcripts.  Plaintiffs deposed Ellison for a total of three days, including a full day after they received the transcripts.  Again, Plaintiffs offer none of that evidence in support of their inference arguments.

[4]  In *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 98-99, 109-110 (2d Cir. 2001), the court held that an adverse inference was warranted, but only after finding that the plaintiff had produced "enough circumstantial evidence . . . to permit a reasonable trier of fact to conclude that the destroyed documents would show unlawful discrimination."  In *Mosaid Techs. Inc. v. Samsung Elecs. Inc.*, 348 F. Supp. 2d 332, 333-34 (D.N.J. 2004), the defendant in a patent case, Samsung, did not preserve a single technical email.  *Id.* at 334.  In considering competing adverse inference instructions, the court rejected defendant's instruction because it provided that

inference be carefully fashioned to address the only specific harm even arguably apparent from this record—the potential loss of evidence showing what facts Ellison knew.  The limitation Defendants seek is similar to the limitation imposed in *Gordon Partners*, where the court fashioned the inference to address the specific prejudice identified, but not to other elements, including loss causation.[5]  *See Gordon Partners*, 2007 WL 431864, at *14, n.8; *see also Gordon Partners*, 2007 WL 1438753, at *3, n.3.

### III.    PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO LOSS CAUSATION

Plaintiffs do not dispute that following Oracle's March 1, 2001 announcement of the 3Q01 earnings miss, all of its competitors saw their own stock prices decline on March 2, and then went on to miss or lower their own guidance.  Plaintiffs likewise do not dispute that the United States economy went into a recession in March 2001—though one that was not recognized until eight months later.  And Plaintiffs concede that in announcing the miss, Oracle did not tell the market: (1) that its 2Q01 results had been inflated; (2) that it had no "reasonable basis" for its 3Q01 guidance (or was aware of facts "tending seriously to undermine" such guidance); (3) that the U.S. economy had been negatively impacting its business throughout 3Q01; or (4) that previously undisclosed "problems with Suite 11i" caused the miss.  Indeed, as Plaintiffs concede, Oracle told the market exactly the opposite:  that the earnings miss was caused by a sudden and unexpected drop-off in sales at the very end of the quarter.  Nor do Plaintiffs contest that, despite a massive document production by Oracle, subpoenas to over 100 Oracle customers, and over 70 depositions, they are unable to cite a single 3Q01 deal that Oracle lost due to "problems with Suite 11i."  Furthermore, Plaintiffs do not contest that Oracle has never restated its 2Q01 results, and offer no evidence that the market was ever "told"—on March

---

the inference would apply only if the existing evidence was not sufficient to establish a material fact.  *Mosaid Techs. Inc. v. Samsung Elecs. Inc.,* 224 F.R.D. 595, 599 (D.N.J. 2004).  Importantly, the court also rejected the plaintiff's instruction because it went further than necessary to fulfill what the court called "the 'make whole' aim of the adverse inference instruction."  *Id.* at 600.

[5]  That the inference applied to both falsity and scienter in *Gordon Partners* does not suggest that the inference here should apply to issues beyond Ellison's knowledge.  In *Gordon Partners*, the defendant failed to preserve *any* email files for 44 of the 57 "key players" and the court made an explicit finding of prejudice, which Plaintiffs have not shown here.  Where, as here, the inference is based on materials from the files of a single witness, there is no basis for finding that Plaintiffs have suffered prejudice in their ability to prove facts about Oracle's business.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   or at any time thereafter—that those results were wrong.  Instead, Plaintiffs assert a hash of

2   disconnected arguments, none of which demonstrates a genuine issue of material fact on the

3   critical element of loss causation.

### A.      The Standard For Loss Causation On Summary Judgment

5          Although they no longer use the phrase "true financial condition," Plaintiffs argue that

6   Oracle's disclosure of disappointing 3Q01 results proves loss causation.  *See* Opp. at 46.

7   Specifically, Plaintiffs argue that Defendants' December 14, 2000 statements "succeeded in

8   masking the negative impact upon Oracle of the declining economy and problems with 11i," but

9   that the March 1, 2001 statements "disclosed the negative effects of 11i and the economy that

10  were masked by Oracle's false 2Q01 earnings and 3Q01 statements."  *Id.* at 45-46.  Plaintiffs

11  argue, in essence, that Oracle's disclosure of poor financial results on March 1, 2001 establishes

12  that its earlier guidance and intra-quarter statements were "false."

13         Plaintiffs do not cite a single court that has adopted this definition of the "relevant truth,"

14  and the Ninth Circuit and other courts have repeatedly rejected the very approach that Plaintiffs

15  suggest.  Indeed, as recently as August 2008, the Ninth Circuit specifically held even at the

16  pleadings stage that "loss causation" cannot be demonstrated through "euphemism" of the kind

17  that Plaintiffs urge.  *See Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049,

18  1062-65 (9th Cir. 2008) (holding that a disclosure of reduced earnings and earnings projections

19  did not meet pleading standard for loss causation because it did not reveal the "relevant truth"

20  regarding alleged fraudulent enrollment and financial aid practices).  As the *Metzler* court

21  recognized, "[s]o long as there is a drop in a stock's price, a plaintiff will always be able to

22  contend that the market 'understood' a defendant's statement precipitating a loss as a coded

23  message revealing the fraud," but "[e]nabling a plaintiff to proceed on such a theory would

24  effectively resurrect what *Dura* discredited. . . ."  *Id.* at 1064; *see also Flowserve*, 245 F.R.D. at

25  573-74 (rejecting argument that disclosures of earnings miss and reduced guidance, which

26  allegedly revealed the company's "true financial condition," established loss causation, when

27

28

1   disclosures did not reveal the alleged fraud).[6]  Plaintiffs previously cited *Daou* for their "true

2   financial condition" theory (Dkt. #1259 at 23), but *Metzler* makes clear that "Plaintiffs

3   adequately pled loss causation in *Daou* because their complaint alleged that the market learned

4   of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor

5   financial health generally."  *Metzler*, 540 F.3d at 1063.

6          Having cited no authority for their own suggested standard, Plaintiffs do not discuss,

7   distinguish, or even *cite* any of the leading loss causation summary judgment cases cited in

8   Defendants' opening brief, including *Flowserve, Williams, Omnicom,* and *McKowan*.  *See* DMSJ

9   at 40-43.  Indeed, Plaintiffs rely almost entirely on cases discussing loss causation at the pleading

10  stage, where the burden is far different than on summary judgment.  *See McCabe v. Ernst &*

11  *Young LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007).[7]  Thus, Defendants' central legal argument

12  remains unrebutted:  at summary judgment, Plaintiffs must come forward with evidence from

13  which a reasonable jury could find that the price of Oracle's stock dropped because the relevant

14  truth became "generally known."  *Dura*, 544 U.S. at 344.  This requires evidence of an express

15  corrective disclosure, or evidence that the market learned the "relevant truth" indirectly.  And in

16  order to show an "indirect" disclosure, Plaintiffs "must provide proof that the market recognized

17  a relationship between the event disclosed and the fraud."  *Flowserve*, 245 F.R.D. at 579 (citation

18  and internal quotations omitted).[8]

19  _____

20  [6]  *See also In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1041-43 (N.D. Cal. 2007); *In re Compuware Sec. Litig.*, 386 F. Supp. 2d 913, 918-19 (E.D. Mich. 2005); *McKowan*

21  *Lowe & Co., Ltd. v. Jasmine, Ltd.*, No. Civ. 94-5522 RBK, 2005 WL 1541062, at *8-10 (D.N.J. June 30, 2005); *In re IKON Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 688-91 (E.D. Pa. 2001).

22  [7]  Moreover, the one summary judgment authority Plaintiffs cite (*In re Motorola Sec. Litig.*, 505

23  F. Supp. 2d 501 (N.D. Ill. 2007)), undercuts their central argument regarding loss causation. There, the court granted summary judgment to the defendant where the plaintiffs were unable to

24  link the disclosure of an earnings miss with the disclosure of any facts underlying the alleged fraud (*i.e.*, the "relevant truth").  *Id.* at 547.

25  [8]  Plaintiffs argue that Defendants' citation to the Ninth Circuit's *Gilead* opinion is a "tectonic shift."  Opp. at 49.  That is just nonsense.  Defendants cited *Gilead* for the proposition that there

26  can be no loss causation where there is no connection between plaintiffs' claimed loss and the alleged corrective disclosure.  *See* DMSJ at 48.  The Ninth Circuit's *Gilead* opinion does not

27  undermine this point.  The Ninth Circuit simply found, in the pleading context, that plaintiffs' corrective disclosure allegations included not only the July Warning Letter upon which the

28  district court had focused, but also the October Press Release, with which the July Warning Letter had to be read.  Given the stock price decline following the October Press Release, the

1    Courts have not hesitated to grant summary judgment on the basis of loss causation.  In

2  *Ryan v. Flowserve*, for example, plaintiffs claimed that the market learned the "relevant truth"

3  through two press releases—one disclosing an earnings miss and reducing guidance, and another

4  reducing guidance a second time.  245 F.R.D. at 565.  In granting summary judgment for

5  defendants, the court first found that, comparing the complaint with those two announcements,

6  there had been no direct disclosure of the allegedly concealed facts.  *Id.* at 572.  Indeed, there (as

7  here) the alleged disclosures were largely consistent with the very prior statements that plaintiffs

8  claimed to be false.  *Id.*  The court also rejected plaintiffs' attempt to show loss causation

9  through the opinion of their expert, Bjorn Steinholt, who claimed (as he does here) that the

10  disclosures revealed the company's "true financial condition," even though those disclosures did

11  not reveal the alleged fraud.  *Id.* at 573.

12    In assessing whether the market learned the truth indirectly, the court reviewed analyst

13  reports for evidence that the market "recognized a relationship" between the announcements and

14  the allegedly concealed facts—and found that they showed no such thing.  *Id.* at 572-73.

15  Instead, the court found the analyst comments upon which plaintiffs relied "too attenuated" and

16  speculative to support an inference of loss causation.  *Id.* at 581-82.[9]  Here, as in *Flowserve*, no

17  reasonable jury could find for Plaintiffs on loss causation.

18    **B.    Plaintiffs Do Not Assert A "Direct" Disclosure of the "Relevant Truth"**

19    Plaintiffs do not seriously argue that Oracle's March 1, 2001 announcement directly

20  revealed the "relevant truth."  Plaintiffs have not cited a single March 1, 2001 statement

21  revealing any of the "facts" that Defendants allegedly concealed.  Indeed, those statements were

22

23  Ninth Circuit found that plaintiffs had *alleged* enough to support the element of loss causation
    for pleading purposes.  *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 049, 1075-58 (9th Cir.

24  2008).  In this respect, the Ninth Circuit's *Gilead* decision is perfectly consistent with
    Defendants' argument here—namely, that loss causation requires disclosure of the "relevant

25  truth."  Furthermore, as a pleadings case, *Gilead* articulates the substantive legal standard but
    does not speak to the quantum of evidence required to avoid summary judgment on loss

26  causation grounds.  *See McCabe*, 494 F.3d at 427 n.4.

27  [9]  Other courts have granted judgment as a matter of law on loss causation grounds.  *See, e.g.*,
    *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997); *In re Omnicom Group, Inc.*

28  *Sec. Litig*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008); *McKowan*, 2005 WL 1541062, at *9;
    *IKON*, 131 F. Supp. 2d at 691; DMSJ at 42-43; 20A Opp. at 43.

flatly inconsistent with what Plaintiffs claim was the "relevant truth,"[10] (*see* DMSJ at 43-45), which undercuts any inference of loss causation. *See Flowserve*, 245 F.R.D. at 572. Although Plaintiffs argue that they need not identify disclosures that "mirror" the allegations in the complaint (Opp. at 47), Defendants have not urged a "mirror-image" standard. *See* DMSJ at 45-46. Defendants have argued that loss causation requires evidence of a disclosure that was understood by the market to reveal material facts that were previously concealed. *Id.* (citing *Metzler*, 540 F.3d at 1063-64). Plaintiffs have not cited a single contrary authority.

### C.   Plaintiffs Have Not Created a Genuine Issue Of Material Fact As To Whether the Market Learned The "Relevant Truth" "Indirectly"

Lacking a direct disclosure, Plaintiffs assert that the market learned the truth indirectly. In support of the assertion, however, Plaintiffs cite a single analyst report and two newspaper articles, none of which creates a genuine issue of fact as to the market's understanding.[11]

### 1.   There Is No Evidence The Market Learned The "Relevant Truth" About Suite 11i

Plaintiffs cite a report in The Wall Street Journal and a UBS Warburg analyst report as proof that the "market" learned the "relevant truth" about Suite 11i. Opp. at 47-48. But neither report comes close showing an understanding by the market that the March 1, 2001 announcement was a disclosure that problems with Suite 11i had caused the earnings miss.

The Wall Street Journal article simply repeated Oracle's explanation for the miss—that customers had delayed purchasing due to concerns about the U.S. economy. Pls.' Opp. Ex. 436. Far from suggesting that the miss was caused by problems with Oracle's products, the article noted that Oracle's announcement "fuel[ed] additional worries" about the prospects of other companies selling "Internet-oriented" products. *Id.* That is why analysts found the "reason" for

---

[10]  For example, Defendants told the market that "[l]icense growth was strong in the first two months of Q3, and our internal sales forecast looked good up until the last few days of the quarter." Pls.' Opp. Ex. 196. They also told the market that Oracle was "well ahead" of its numbers in December and January and "really didn't see it in our business until the last few days" of the quarter. Ex. 393 at 419809. Defendants repeatedly stressed, moreover, that deals had not been lost to competitors, but that customers had delayed purchasing due to concerns about the economy, and still wanted to buy Suite 11i. *Id.* at 419802-05.

[11]  Plaintiffs also cite a December 14, 2000 statement by Henley regarding Oracle's 2Q01 results and Oracle's 3Q01 forecast (Opp. at 45)—but fail to explain how the very statement they claim was fraudulent can also constitute a "corrective disclosure." *See* Opp. at 2, 23-24.

1    Oracle's miss to be "at least as troubling" as its magnitude—because that reason was economic

2    and not specific to Oracle, thus raising concerns about the entire industry's future prospects.  *Id.*

3           Nor does the UBS report create a genuine issue of fact on this issue.  First, neither

4    Plaintiffs nor the report itself ever explains the meaning of the analyst's speculation that Suite

5    11i was "not ready for prime time."  Thus, it is unclear whether the statement referred to the

6    product's functionality, its ability to compete with "best-of-breed" solutions, or its overall

7    quality.  Like the analysts reports at issue in *Flowserve*, this vague speculation cannot create a

8    triable issue of fact as to loss causation, because it does not reflect the disclosure of any "relevant

9    truth."  *Flowserve*, 245 F.R.D. at 572.  Most fundamentally, nothing in this statement—or in the

10   report itself—indicates that Oracle's 3Q01 earnings miss was attributable to undisclosed product

11   problems with Suite 11i.  The report offers no evidence that 3Q01 deals were lost due to such

12   problems—and of course, the record shows that none were.[12]  Indeed, even crediting the

13   analyst's speculation, it does not refer to any "undisclosed" facts at all:  both before and during

14   3Q01, the market was well aware of concerns that Suite 11i, as a new and complex set of

15   products, was not at the same level of quality as a "mature" release.  *See* Ex. 127 at 307330; Ex.

16   138 at 111280; Ex. 139 at 005916; Ex. 140 at 009567.  Thus, the UBS analyst's vague

17   speculation that Suite 11i was "not ready for prime time" does not reflect "new" information

18   sufficient to establish loss causation, (*see*, *e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 541 F.

19   Supp. 2d 546, 554 (S.D.N.Y. 2008); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 270-71 (3d Cir.

20   2005)) and certainly, does not constitute evidence that the market understood the March 1, 2001

21   announcement as revealing the only "truth" that is "relevant" for loss causation purposes:  that

22   undisclosed problems with Suite 11i caused Oracle's earnings miss.[13]

23           Second, the UBS analyst's speculation is not probative of what the "market" understood,

24

---

25   [12] Plaintiffs have not identified a single 3Q01 deal that Oracle lost due to alleged problems with
     Suite 11i, much less demonstrated that such lost deals caused Oracle's 3Q01 miss.  *See* DMSJ at
26   32-34; 20A Opp. at 19-20; *infra* at 18.  Plaintiffs' repeated references to deals allegedly lost due
     to problems with Oracle's demonstration system (known as "ADS"), or the impact of those
27   issues on Oracle's "conversion rate" (Opp. at 18-19) are completely bogus.  *See infra* at 18.

28   [13] In fact, the UBS report blames the miss principally on Oracle's *database* business, referring to
     its applications results (Suite 11i) as "a somewhat more positive note" because it did
     "considerably better than the database business."  Pls.' Opp. Ex. 426.

1   in any event.  Any analysis of the record "as a whole" must account for the overall market

2   reaction—which undeniably attributed Oracle's 3Q01 miss to unexpected, end-of-quarter delays

3   in customer purchases due to emerging concerns about the U.S. economy.  *See* DMSJ at 41-42;

4   45-46; 20A Opp. at 39-40.  Indeed, viewing the UBS report together with the record "as a

5   whole," no reasonable jury could find that the "market" understood Oracle's March 1, 2001

6   announcement as a revelation that the earnings miss was due to previously undisclosed problems

7   with Suite 11i.  In reacting to Oracle's March 1, 2001 announcement, many analysts expressed

8   great confidence in Oracle's product lines (including Suite 11i), and wrote that Oracle would be

9   in a strong competitive position once the economic picture brightened:

10  - F.A.C./Equities:  "We do not think competitive or execution issues were involved in the
        shortfall. . . .  [We believe] that Oracle remains in strong competitive position." (Ex. 465)

11

12  - Prudential Securities:  "We continue to believe Oracle is in a strategically enviable
        position and should emerge from this economic slowdown with incremental
        marketshare." (Ex. 466)

13

14  - Wit SoundView:  "Although we are obviously disappointed, we see the miss as entirely
        due to the deterioration in the economy."  (Ex. 467).

15          Even after Oracle's March 15, 2001 announcement that applications growth had been

16  lower than it estimated on March 1, 2001, analysts continued to express confidence in Oracle's

17  product line.[14]  It is inconceivable that this many analysts would have expressed these views if,

18  as Plaintiffs claim, the "market" understood Oracle's March 1, 2001 announcement as revealing

19  that Suite 11i "just plain did not work."  RSAC ¶ 47(l); *see also id.* ¶¶ 52(s), 54(j), 55(b), 59(a),

20  64(a), 72.  In fact, as noted, analysts uniformly concluded that Oracle's 3Q01 earnings miss was

21  the harbinger of a sharp and sudden downturn in the entire enterprise software industry—causing

22  them to revise their models and ratings for the industry as a whole.  *See* DMSJ at 41-42, 45-46;

23  20A Opp. at 39-40.  That is why, on March 2, stock prices dropped for the entire industry.[15]

24

25  [14]  *See* Ex. 468 at 309262; Ex. 469 at 107516; Ex. 470 at 107490; Ex. 471 at 107475; Ex. 472 at
        107470.

26  [15]  In addition to the UBS report, Plaintiffs also cite a March 21, 2001 email among certain
        Oracle public relations staff, containing hearsay characterizations of unnamed "stories" tying
27      Oracle's shortfall to problems with Suite 11i.  Pls.' Opp. Ex. 420.  This email does not suggest
        that the "market" understood Oracle's miss as a revelation of the facts Defendants allegedly
28      concealed about Suite 11i, let alone that any such revelation caused Oracle's stock price to drop.
        Indeed, the email does not identify the "stories," or indicate whether they were published on

James Decl. Ex. 1 ¶57 (Dkt. #1505).  Plaintiffs simply ignore this undisputed evidence.

### 2. There Is No Evidence The Market Learned The "Relevant Truth" About Oracle's Economy Statements

Plaintiffs cite a March 2, 2001 article in the Los Angeles Times, apparently to prove that the market recognized a relationship between Oracle's 3Q01 miss and Defendants' intra-quarter statements about the economy.  Pls.' Opp. Ex. 419.  But that article simply repeated the reason Oracle gave for the miss—namely, that customers declined to close deals at the end of the quarter due to concerns about the U.S. economy—and reported that Oracle expressed surprise at the miss.  *Id.* (reporting that "[a] substantial number of customers cut computer-related spending, with senior executives refusing to sign off on software purchases that had been approved by subordinates, Oracle said").  Although the article referred to Oracle's December 2000 statements that its business was not being hurt by the economy, the article did not suggest that those statements had been false when made.  *Id.*  Having thus repeated Oracle's statements from March 1, 2001 and December 14, 2000, the Los Angeles Times article was not "new" information.  *See Omnicom Group*, 541 F. Supp. 2d at 554; *Flowserve*, 245 F.R.D. at 572.  It certainly does not show that the "market" understood the March 1 disclosure as revealing new facts that had been concealed by the Defendants:  namely, that the economy had been hurting Oracle's business throughout 3Q01.

In fact, analysts reacting to Oracle's announcement credited Oracle's explanation that, although it had seen strong license growth through the first two months of the quarter, customers delayed deals at the very end of the quarter due to concerns about the U.S. economy:

- JPMorgan H&Q:  "We generally give credence to the scenario outlined by Oracle management on last night's conference call that the major factor for the miss was a series of final contract sign-offs that failed to materialize from senior corporate management after initial budgets and contract approvals had been verified."  (Ex. 473 at 91392)

- Wit SoundView:  "A terrific December, well ahead in January, Oracle looked solid until a few days ago, when the company say a number of last minute deferrals at the CEO level."  (Ex. 470 at 107492)

---

March 2 or some later date.  *See In re Daou, Inc. Sec. Litig.*, 411 F.3d 1006, 1026-1027 (9th Cir. 2005).  Presumably, if any of these "stories" existed, they would be publicly available and Plaintiffs would have relied upon them directly, instead of a hearsay characterization.

- Thomas Weisel Partners: "Given that evidence of a shortfall did not surface until very late in Q3 (Friday, February 23, to be exact), and the weakness was so broad-based, we fear that investors will flee other software companies facing the same lack of visibility at quarter's end." (Ex. 474 at 09338)

- Needham: "Oracle was truly on a roll. Our field checks confirmed management's commentary that both December and January results were strong (and above budget). The company's applications solution stack was maturing and appeared set to enter the tornado of growth. . . . As the last week in February approached, deals that had been O.K'd by division managers were simply delayed when they reached the desk of the CFO or CEO." (Ex. 475 at 309196)

- Salomon Smith Barney: "After considerable strength in December and January, the company began to see significant deferrals as companies became cautious about the US economic outlook." (Ex. 483 at 091362).

In light of this record, no reasonable jury could conclude that the "market" understood Oracle's 3Q01 miss as revealing that the U.S. economy had been hurting Oracle's business throughout 3Q01, or that Defendants' intra-quarter statements about the economy were false.

### 3.  There Is No Evidence The Market Learned The "Relevant Truth" About Oracle's 2Q01 Results

Plaintiffs make no effort to show that the market understood Oracle's 3Q01 miss as a revelation that Oracle's 2Q01 results had been inflated.[16] Indeed, they do not purport to cite a single market observer who reacted to the miss by suggesting that it revealed problems with Oracle's prior financial statements. In fact, reacting to the announcement, analysts uniformly reiterated Oracle's "actual" 2Q01 EPS results of $0.11.[17] This ends the inquiry as to whether Oracle's March 1, 2001 announcement constituted an "indirect" disclosure that Oracle's 2Q01 results had been materially misstated (*i.e.*, if the analysts had "understood" the March 1, 2001 announcement as casting doubt on the integrity of Oracle's 2Q01 results, they would have reflected this "understanding" in their commentary—rather than reiterating Oracle's announced 2Q01 results). *See Flowserve*, 245 F.R.D. at 572.

Plaintiffs cite *In re Impax Labs., Inc. Sec. Litig.*, No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356 (N.D. Cal. July 18, 2007), for the proposition that the announcement of an

---

[16]  As noted in Defendants' Opposition to Plaintiffs' 20A Motion, Plaintiffs' claim that Oracle's 2Q01 results were the basis for its 3Q01 guidance is meritless. *See* 20A Opp. at 23-24.

[17]  This includes the UBS analyst Plaintiffs cite in their Opposition. *See* Pls.' Opp. Ex. 426; *see also* Ex. 465; Ex. 466; Ex. 473; Ex. 475; Ex. 476; Ex. 477; Ex. 478; Ex. 479; Ex. 480; Ex. 481; Ex. 482; Ex. 483; Ex. 484; Ex. 485; Ex. 486.

1  earnings miss is enough to "infer" an understanding by the market that the miss "was connected

2  to the accuracy of the Company's prior financial statements."  Opp. at 47.  *Impax* held no such

3  thing.  There, the plaintiffs identified two separate disclosures referring to the very factors that

4  plaintiffs claimed had been concealed.   2007 U.S. Dist. LEXIS 52356, at *18.  Moreover, Judge

5  Ware applied *Dura*'s pleading requirement that a plaintiff "give a defendant some indication of

6  the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.  At

7  summary judgment, of course, Plaintiffs' burden requires them to do much more. *See*, *e.g.*,

8  *McCabe*, 494 F.3d at 427 n.4.

9  **IV.    PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO FALSE STATEMENTS**

10         **A.    Defendants' December 14, 2000 Statements About Oracle's 3Q01 Guidance**

11                 **1.    There Is No Genuine Issue Of Material Fact As To Whether Oracle's**
                           **3Q01 Guidance Was "False"**

12         The undisputed evidence proves that Oracle's 3Q01 guidance had a "reasonable basis"

13  because the Potential projection supported Oracle's guidance throughout 3Q01. *See* DMSJ at 6-

14  16, 24-32.[18]  Faced with this evidence, Plaintiffs are left to argue that Defendants should have

15  disregarded the company's internal forecasts because of alleged "major changes" rendering those

16  forecasts "unreasonable."  Opp. at 24-29.  As detailed in Ellison's Opposition to Plaintiffs'

17  Motion for Summary Judgment, Plaintiffs' manufactured theories do not support an inference

18  that Oracle's forecasts lacked a "reasonable basis," or that the speakers were aware of facts

19  tending to "seriously undermine" them. *See* 20A Opp. at 5-19.

20         Oracle's forecasts were not derived by extrapolation, but by a robust, bottoms-up process

21  that had proven to be conservative and accurate.  DMSJ at 6-8; 20A Opp. at 11-13.  Despite a

22  purported "major economic change," Oracle entered 3Q01 riding a wave of record revenues and

23  earnings.  20A Opp. at 13-16.  There was no "directive" to increase the risk in Oracle's forecasts,

24  and the increase in applications opportunities reflected in Oracle's 3Q01 pipeline—driven by

25  Suite 11i's success during the first two quarters of FY 2001—was undeniably a positive sign that

26  further supported the reasonableness of Oracle's forecasts. *Id.* at 16-19 & n.15.

27

28

[18] Plaintiffs' authority illustrates just how far short of meeting this burden Plaintiffs fall. *Provenz v. Miller*, 102 F.3d 1478, 1487-88 (9th Cir. 1996) (false statement when company predicted quarterly profit of $624,000 despite a "best, most accurate" forecast of a $4,000,000 loss).

### 2.   The Safe Harbor Protects Defendants' Statements Regarding 3Q01 Guidance

#### a.   *The PSLRA Safe Harbor Applies*

Plaintiffs deny that the Safe Harbor applies to Defendants' statements about Oracle's guidance and assert that it should not apply at the summary judgment stage.  Opp. at 36-37, n.42. However, the Court unquestionably can decide the meaningfulness of Defendants' cautionary statements on summary judgment.  *See In re Broadcom Co. Sec. Litig.*, No. SA CV 01-275-GLT MLGX, 2004 WL 3390052, at *1 (C.D. Cal. Nov. 23, 2004); *In re The Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139, 1142 (N.D. Cal. 2002).  But even in the absence of meaningful cautionary statements, the Safe Harbor still protects forward-looking statements made without actual knowledge of their falsity.  *In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1071 & n.8 (N.D. Cal. 2001).  Since there is no dispute that the December 14 guidance was forward-looking, Plaintiffs must prove Defendants' "actual knowledge" that Oracle's forecasting process lacked a "reasonable basis," or that facts of which Defendants were aware "seriously undermine[d]" the guidance.  *See* 15 U.S.C. § 78u-5(c)(1)(B); *In re Adobe Sys.s, Inc. Sec. Litig.*, 787 F. Supp. 912, 919 (N.D. Cal. 1992); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).  Plaintiffs are unable to do so.

#### b.   *Plaintiffs Cannot Demonstrate Defendants Had "Actual Knowledge" That The 3Q01 Guidance Was "False"*

Plaintiffs attempt to prove actual knowledge by arguing that Defendants were aware of various "indicators" that undermined the accuracy of Oracle's forecast.  Opp. at 29-36.  In fact, these "indicators" are simply fragments of data, wrenched out of context.  Two of these "indicators"—Oracle's Flash Reports (with actual results) and pipeline growth—were discussed in opposition to Plaintiffs' 20A Motion (20A Opp. at 7-10), and the Delaware Court rejected precisely the same arguments Plaintiffs make here.[19]  *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 944, 948-52 (Del. Ch. 2004).

---

[19] Since this information only became available *after* December 14, 2000, even if Plaintiffs' arguments had merit, they would have no bearing on the viability of Plaintiffs' claims regarding statements made on that date, including the December 14, 2000 guidance.

Plaintiffs' remaining "indicator"—forecast and pipeline information from the three U.S. license sales divisions—clearly *supported*, and did not "seriously undermine" Oracle's guidance. The heads of NAS, OSI and OPI, and their finance directors all believed until the very end of the quarter that Oracle would meet guidance, and *did not significantly reduce their division-level forecasts until the very end of the quarter*. *See, e.g.*, Sanderson Decl. ¶¶ 6-8 (Dkt. #1220); Ex. 366 at 356:1-10, 379:2-11; Ex. 367 at 159:9-21; Pls.' Opp. Ex. 305; Pls.' Opp. Ex. 327; Ex. 368 at 132:15-133:24; Ex. 76; Pls.' Opp. Ex. 240; Pls.' Opp. Ex. 329. To suggest that these documents gave Defendants "actual knowledge" that Oracle's guidance was "false," when they reaffirm the forecasts on which that process and Oracle's guidance was based, is absurd.[20]

## B.  Defendants' Intra-Quarter Statements About the Economy

### 1.  The Economy Statements Are Forward-Looking

Plaintiffs erroneously argue that Defendants' intra-quarter statements about the impact of the economy on Oracle's business were not forward-looking, completely ignoring their own allegations linking those statements to Oracle's 3Q01 financial results. DMSJ at 29; RSAC ¶ 47.[21] Nor do Plaintiffs even attempt to rebut the undisputed fact that the market uniformly understood the economy statements to mean that Oracle was confident it would achieve 3Q01 guidance. DMSJ at 29, *citing* Ex. 166; Exs. 169-171; Ex. 173; Exs. 176-77.

Particularly in light of Oracle's well-known "hockey-stick" revenues, the question of whether the economy was affecting Oracle's business could only be determined once the 3Q01 results became known. Thus, the truth or falsity of the statements about the economy "could not

---

[20] Plaintiffs also argue that Oracle's *4Q01* forecasts should have indicated that Oracle would not achieve its *3Q01* guidance. Opp. at 35. But the state of the preliminary 4Q01 forecast during 3Q01 says nothing about Oracle's likely 3Q01 results—indeed, it does not say much about Oracle's likely 4Q01 results, either. At the end of a given quarter, some number of deals that do not close will slip into the forecast for the upcoming quarter. Thus, there is no reason these 4Q01 forecasts would have been alarming. Furthermore, the full-company 4Q01 Potential indicated Oracle would exceed analyst EPS estimates. Ex. 487 at 000312; Ex. 488 at 000425.

[21] Plaintiffs' argument that Defendants have admitted the economy statements are statements of present fact is both misleading and irrelevant. It is misleading because the falsity of all statements—whether forward-looking or otherwise—is determined at the time the statement is made. *See, e.g.*, *Adobe*, 787 F. Supp. at 917. Furthermore, it is irrelevant because arguments regarding legal conclusions do not constitute binding admissions, *W.V. Realty Inc. v. N. Ins. Co.*, 334 F.3d 306, 316 (3d Cir. 2003), and here the Court invited the parties to resubmit their summary judgment papers, with a particular focus on the relevant Safe Harbor issues.

be discerned until some point in time after the statement [was] made." *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999); *Leapfrog*, 527 F. Supp. 2d at 1046. As such, these statements were forward-looking and protected by the Safe Harbor, requiring Plaintiffs to prove actual knowledge of falsity. *Harris*, 182 F.3d at 805.

## 2. There Is No Genuine Issue of Material Fact As To Whether Oracle's Economy Statements Were "False"

The undisputed facts show that Defendants' statements about the economy were true when made, and were supported by Oracle's results for 1Q01 and 2Q01, as well as its internal forecast data for 3Q01. *See* DMSJ at 6-16, 28-32. Ignoring the context of the statements, which referred to the impact of the economy on Oracle's ability to achieve 3Q01 guidance, Plaintiffs claim the statements were false because certain portions of Oracle's business had declined (dot.com sales) or were growing at lower rates (Oracle's 3Q01 pipeline and certain information from two divisions). Opp. at 40-42. These arguments have been addressed and debunked elsewhere. *See* 20A Opp. at 8-10 (pipeline), 13-16 (dot.com sales); *supra* at Part IV.A.2.b. (division-level data).

## C. Defendants' Statements About Suite 11i

### 1. Plaintiffs' Suite 11i "Quality" Evidence Is Irrelevant Because There Is No Evidence Of Any Lost Sales Due To Suite 11i "Problems"

Plaintiffs' Opposition is an "evidence dump" of every negative thing they could find about Suite 11i in the massive record. Opp. at 12-23. However, Plaintiffs have not cited *any* evidence that such alleged problems led to 3Q01 lost sales—the only evidence that would have any bearing on their claims of material falsity. Indeed, Plaintiffs offer no explanation as to why any of the proffered "evidence" supports a reasonable inference that Defendants' statements about Suite 11i were materially false. *Cf. In re Apple Computer, Inc. Sec. Litig.*, 127 Fed. Appx. 296, 303 (9th Cir. 2005) ("Because design, marketing and manufacturing problems are common to business, a securities fraud claim must do more than allege the existence of such problems.").

Plaintiffs' theory has always been that the facts Defendants concealed about Suite 11i were "material" because the allegedly undisclosed "problems" with Suite 11i were having a devastating impact on Oracle's ability to sell Suite 11i. *See* RSAC ¶¶ 54, 66(a). But there is not

1  a scintilla of evidence that undisclosed "problems" with Suite 11i were having this kind of

2  impact on Oracle's sales.  Indeed, Suite 11i enjoyed robust sales in the first two quarters of

3  FY01, and Plaintiffs have not identified a single 3Q01 deal that Oracle allegedly lost due to

4  undisclosed "problems" with Suite 11i.  Although Plaintiffs repeatedly refer to demonstrations

5  causing "lost deals" or impacting Oracle's conversion rate (Opp. at 18-19), it is undisputed that

6  (1) the problems Oracle encountered with its product demonstration system ("ADS") were

7  hardware issues, which had nothing to do with Suite 11i or Defendants' statements about Suite

8  11i (Ex. 299 at 221:17-24; Ex. 308 at 65:19-25, 123:13-124:2, 152:13-153:15; Ex. 311 at

9  118:19-119:12; 206:22-207:14; *see also* Ex. 276 at 86:23-87:24, 211:24-213:4; Ex. 312 at

10 156:20-157:2), and (2) Plaintiffs offer no evidence that any of these alleged "lost deals" were

11 part of the forecast that formed the basis for Oracle's 3Q01 guidance, much less were of such a

12 magnitude as to cause the earnings miss.

13
14
        2.      **Plaintiffs' "Quality" Evidence Is Irrelevant Because The Challenged
                Statements Concern "Integration"**

15      As discussed in Defendants' opening brief, with one exception, every one of the

16 challenged statements about Suite 11i asserted the same basic point:  unlike separate "best of

17 breed" products from different vendors, the modules of Suite 11i did not need expensive post-

18 purchase "systems integration" in order to work together.  Ex. 370 at 003224-25; Ex. 283 at

19 035471; Ex. 285 at 306999-7001; Ex. 272 at 2-8, 14; DMSJ at 34-35.[22]

20      Nothing illustrates this more clearly than Ellison's November 29, 2000 speech, which

21
22
23
24
25
26
27
28
[22] Plaintiffs also challenge Sanderson's statement that Suite 11i had been translated into 23
languages. Ex. 375 at 14, 28, ¶ 23.  Sanderson's statement was indisputably true (Seiden Decl.
¶¶ 10-15 (Dkt. #1215); Ex. 322 at 143834).  Plaintiffs rely on evidence that there were bugs
affecting some translations, that certain screens may not have been translated, and that some
"minor" releases of Suite 11i (*e.g.*, 11i.3, 11.4) were first released in English and then later
released in other languages.  Opp. at 20.  But none of this renders Sanderson's statement
materially false.  *See* Ex. 380 at 206:14-208:12; Ex. 381 at 221:17-222:5; Ex. 382 229:16-
230:10; *see also* Ex. 383 at 307:24-308:11; Ex. 384 at 190:24-191:7; Ex. 381 at 222:24-223:15.
Statements that Suite 11i "works in every language" (which Plaintiffs did not identify in their
RSAC or contention interrogatory responses) were also true:  Suite 11i was written in Unicode
(unlike its predecessors), so it had the design capability to work in any number of supported
languages.  *See* Ex. 249 at 25-32; Ex. 250 at 617634; Ex. 278.  In any event, Plaintiffs contend
that Oracle's license revenue shortfall occurred in its U.S. sales divisions (*see, e.g.*, Opp. at 31-
35; 20A MSJ at 1-2), so statements regarding Suite 11i's foreign language capabilities clearly
were not material.

1    Plaintiffs selectively quote at page 12 of their Opposition.  There, Ellison explained the meaning

2    of "pre-integration"—that the design and engineering of Suite 11i eliminated the need for post-

3    purchase systems integration to make separate best-of-breed applications share data.  Pls.' Opp.

4    Ex. 405 at 2-4, 7-8; *see also* Ellison Decl., ¶ 16 (Dkt. # 1218); Pls.' Opp. Ex. 26 at 234430; Pls.'

5    Opp. Ex. 211; Pls.' Opp. Ex. 438 at 13-14.  Contrary to Plaintiffs' claim that Defendants said

6    Suite 11i was "easy to implement" and worked instantly "out of the box" (Opp. at 12-13, 21),

7    Ellison made clear that, although Suite 11i was easier to install than the "best of breed"

8    alternative, installing Suite 11i would still be a lengthy and difficult task, taking months to

9    complete.  Pls.' Opp. Ex. 405 at 37-38; *accord* Ex. 363 at 003237-8.[23]  Ellison also explained the

10   concept that Suite 11i was "complete" (which Plaintiffs suggest was a promise that it would be

11   defect-free, Opp. at 12-13), saying that it was "complete" in the sense that it included both CRM

12   and ERP software in a single suite.  Pls.' Opp. Ex. 405 at 10, 33; *accord* Ex. 56 at 003225.[24]

13          Plaintiffs cite no evidence that, like best-of-breed, Suite 11i required post-purchase

14   systems integration.[25]  Instead, most of Plaintiffs' evidence consists of hearsay complaints

15   regarding early bugs and their impact on a small sample of early adopters (Opp. at 14-22),

16   offered to prove that Suite 11i's quality was so poor that it "did not work" and "was virtually

17   unsellable" (notwithstanding massive sales of the product during 1Q and 2Q 2001, *see* DMSJ at

18   34); RSAC ¶¶ 6, 55-56, 66, 82; Ex. 375 at 16, 19-20, 85; Opp. at 15; *see also Nursing Home*

19   *Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 684 (N.D. Cal. 2002).  But this evidence is

20   irrelevant to the content of any of the challenged statements because it has nothing to do with the

21   question of whether post-purchase systems integration was required for Suite 11i to work.

22   _____

23   [23] When Ellison used the terms "Lego blocks" and "plug and play" (Opp. at 13), he was
     answering a question about whether companies could implement one module at a time.  Pls.'
     Opp. Ex. 438 at 13; *see also* Pls.' Opp. Ex. 405 at 26-27 (stating no companies were using the
24   "big bang" approach).  He did not did not indicate Suite 11i was "easy" to implement.

25   [24] No evidence suggests that the market understood Defendants' statements as a guarantee that
     Suite 11i would be free of bugs—something Plaintiffs' experts agree would have been without
26   precedent in the industry.  Ex. 132 at 28:20-22; Ex. 378 at 38 n.73; Ex. 102 at ¶¶ 43-47.  In fact,
     the market knew the difficulties faced by new software releases, and knew that Suite 11i was
27   facing its share of these very same issues.  *See* Ex. 138 at 111280; Ex. 140 at 009567; Ex. 209 at
     3; Ex. 147 at 101612; Ex. 210 at 309148; Ex. 211 at 307399; Ex. 245 at 085851.

28   [25] In fact, Plaintiffs' expert conceded that Suite 11i did not require post-purchase systems
     integration.  DMSJ at 35 (citing Ex. 197 at 148:22-149:8; 143:25-144:16; 227:11-228:9).

1   DMSJ at 35.  In any event, Plaintiffs and their expert concede they cannot prove anything about

2   Suite 11i's quality based on the record.  DMSJ at 36.  Thus, Plaintiffs' "quality" evidence is

3   irrelevant.

4           3.        **Plaintiffs' Limited "Integration" Evidence Does Not Create A**

5                   **Genuine Issue of Material Fact**

6         Plaintiffs' evidence using the term "integration" (Opp. at 15-17, 19) is just more

7   "quality" evidence; none of it suggests that Suite 11i required "systems integration."  For

8   example, Plaintiffs cite testimony from Mike DeCesare that Suite 11i was not integrated "out of

9   the box."  *Id.* at 15-16.  But DeCesare was discussing Suite 11i's *quality*—that early in its

10  lifecycle, bugs in new CRM modules affected ERP functionality.  Pls.' Opp. Ex. N at 266:13-

11  267:8; *see also id.* at 234:14-236:14, 272:20-273:16.  He also admitted that he was speculating

12  based on hearsay customer complaints.  *Id.* at 270:21-271:7.  And whatever criticisms DeCesare

13  had of Suite 11i's quality, he agreed that Suite 11i worked together without systems integration.

14  *Id.* at 261:4-263:19; 266:13-267:8.  Thus, his testimony does not create a triable issue of fact.

15        Likewise, the "Oracle Engineers' Report" from which Plaintiffs selectively quote does

16  not indicate that the components of Suite 11i required post-purchase systems integration.  Opp. at

17  19; *see* Pls.' Opp. Ex. 149.  In fact, the document states that Suite 11i was the first collection of

18  software to have "completely integrated business flows between ERP & CRM" and was

19  "probably one of the greatest achievements in the history of the software industry."  *Id.* at

20  069913.  It also describes "an additional housekeeping effort" to provide "recommendations"

21  that would address bugs or gaps in functionality, and to add additional features that the authors

22  believed would be attractive to customers a year after the Class Period.  *Id.*  Certainly, it does not

23  create a triable issue of fact regarding the challenged Suite 11i "integration" statements.

24      **D.**      **Defendants' Statements Regarding Oracle's 2Q01 Results**

25          **1.**        **Plaintiffs' Current 2Q01 Accounting Theories Are Unpled**

26        Plaintiffs' assertion that their 2Q01 accounting theories are not "new" or "unpled" is

27  baseless.  Opp. at 9.  Plaintiffs admit they first raised the bad debt transfer claim (but not the HP

28  "swap" claim) in a November 2002 *ex parte* application, but that did not amend their pleadings.

1  Plaintiffs did amend their complaint by filing the RSAC *after* they asserted the *ex parte*

2  allegations, but the RSAC does not mention the bad debt reserve, $20 million in 2Q01 bad debt

3  transfers, Account 12601, the bad debt "adjustment," or any alleged "swap" transaction with HP.

4          **2.**        **There Is No Genuine Issue of Material Fact As To Whether Oracle's**

5                     **2Q01 Results Were "False"**

6            a.     *The Bad Debt Transfers*

7        Despite a massive amount of accounting discovery, there *still* is no evidence that the bad

8  debt transfers rendered Oracle's 2Q01 financial statements materially false or misleading.

9  Moreover, the transfers were thoroughly investigated when they were discovered in 2002, as part

10  of the "Unapplied Cash Project."[26]  Oracle's independent auditor analyzed the results of this

11  Project, and concluded that there was no material financial impact for fiscal year 2001.  20A

12  Opp. at 25, n.23.  And, Oracle's 2Q01 financial statements never have been restated.  *Id.* at 25.[27]

13        Lacking facts to support their bad debt transfer claim, Plaintiffs attempt to obfuscate the

14  record by conflating their original "debit memo" theory with the new "bad debt transfer" theory,

15  claiming that Oracle "applied" the bad debt transfers to "the fake 'debit memo' invoices" to

16  make them appear "legitimate."  Opp. at 3.  This claim is preposterous and finds no support in

17  the record.  Not a single fact witness testified that the bad debt transfers were applied to the debit

18  memos, nor could they have been so applied.  It is undisputed that the debit memos—which

19  totaled $692 million—were created through simultaneous and offsetting debits and credits to the

---

21  [26] While investigating Plaintiffs' original accounting claim, Oracle discovered that low-level

22  collections analysts had reclassified to the bad debt reserve certain payments that they could not apply to open invoices.  O'Bryan Decl. Ex. 1, at 14-15, 19-20 (Dkt. #1504); Pls.' Opp. Ex. A at

23  70:15-25; Pls.' Opp. Ex. FFF at 157:4-18; Pls.' Opp. Ex. C at 179:3-10, 207:7-10; Ex. 489 ¶ 5; Ex. 490 ¶ 4.  These transfers—which occurred from 1998 through 2002—were not an isolated

24  2Q01 event.  O'Bryan Decl. Ex. 1 at 14; Ex. 491 at 104764.  There is no evidence that *any* of these transfers were made to inflate or manipulate Oracle's financial results.  Instead, Oracle's

25  collectors occasionally would transfer unapplied payments to the reserve when they had exhausted their research and could not find corresponding unpaid invoices.  O'Bryan Dec. Ex. 1

26  at 14; Pls.' Opp. Ex. C at 176:8-177:15, 211:23-212:10, 212:16-213:9.

27  [27]  Plaintiffs' argument that Oracle employees were "instructed" that any unresolved items would

28  be placed into the reserve rests entirely upon a single hearsay email from Neal Menon, whom they never deposed.  Opp. at 3 (citing Pls.' Opp. Ex. 27).  Moreover, not a single unapplied payment listed on the spreadsheet attached to Menon's email was transferred into the reserve in 2Q01.  Ex. 492 at 1534183-302 (listing entries into Account 12601 in 2Q01).

1    same account, and thus had no accounting or financial statement impact.  Ex. 217 ¶¶ 3-10; Ex.

2    218 at 144:3-23.  Plaintiffs' own expert admits as much.  20A Opp. at 23, n.22.

3                     b.      *The HP Transaction*

4           Plaintiffs argue that, with the HP deal, Oracle engaged in an "improper *quid pro quo*,"

5    and that Oracle's recognition of revenue was "knowingly improper" because the deal was not

6    executed until after the close of 2Q01.  Opp. at 8-9.  Most significantly, Plaintiffs *still* have not

7    defined an improper "swap" transaction, nor provided any authority to suggest that Oracle's

8    recognition of revenue on this transaction was improper, even though Defendants (repeatedly)

9    have introduced evidence demonstrating that Oracle's accounting for the transaction complied

10   with the relevant accounting literature (SOP 97-2).  20A Opp. at 26.  The undisputed evidence

11   shows that Oracle needed and used the servers it purchased in 2Q01, and that Oracle's

12   recognition of revenue on its sale of licenses to HP was reviewed and approved at every level.

13   *Id.* at 25-26 (citing evidence).[28]  Plaintiffs' argument that the HP transaction closed *after*

14   midnight on the last day of the second quarter, Opp. at 8-9, is frivolous.  The individual who

15   negotiated the sale for Oracle testified that the deal closed before the end of 2Q01 (Ex. 445 at

16   79:8-15; Ex. 444); the individual who signed the contract for Oracle affirmed that the deal was

17   executed before the end of 2Q01 (Ex. 443 at 3043126-27); and Oracle's independent auditor

18   concluded that the contract was executed before the end of 2Q01.  Ex. 442 at AA 001340.[29]

19

20

21

---

22   [28]  Plaintiffs cannot establish that Oracle "concealed key information from its auditor" about the
     HP transaction.  Plaintiffs rely upon an email from a former employee (DeCesare) and deposition
23   passages where they asked former audit engagement partner (Matuszak) to interpret emails that
     he did not recall seeing during the relevant time period.  Opp. at 9.  None of this evidence
24   demonstrates that Oracle "concealed" anything.  Tellingly, Matuszak *never* said that any of the
     documents he was shown during his deposition changed his conclusion about the propriety of
25   Oracle's accounting for the HP transaction.  Pls.' Opp. Ex. P at 326:8-330:5, 341:21-342:11,
     343:7-344:14.

26
     [29]  Plaintiffs quote Opposition Exhibit 183 as saying:  "This is a reapproval request for a Q2 deal
27   that didn't close."  Opp. at 9.  Pls.' Opp. Ex. 183 is a *database* deal that closed in February 2001;
     it had nothing to do with the 2Q01 sale of applications licenses.  *Compare* Pls.' Opp. Ex. 180 at
28   260109 (listing *applications* licenses) *with* Pls.' Opp. Ex. 183 at 257387 (listing *database*
     licenses).

1   **V.      PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO SCIENTER**

2       **A.      There Is No Genuine Issue of Material Fact As To Whether Defendants'
                 Statements Concerning Oracle's 3Q01 Guidance Or The Economy's Effect**

3                **On That Guidance Were Made With Scienter**

4           Citing the Ninth Circuit's reversal of this Court's dismissal of the RSAC, Plaintiffs rely

5   largely on stock sales by Ellison and Henley in an effort to establish scienter.  Opp. at 42-43.

6   But the *facts* currently before the Court were not before the Ninth Circuit on appeal from the

7   motion to dismiss (20A Opp. at 29-33),[30] and those facts completely negate any inference of

8   scienter.  *Apple*, 886 F.2d at 1117.[31]

9       **B.      There Is No Genuine Issue of Material Fact As To Whether Defendants'
                 Statements Concerning Oracle's 2Q01 Results Were Made With Scienter**

10

11               **1.      The Bad Debt Transfers**

12          The uncontroverted evidence demonstrates that Ellison, Henley and Sanderson were

13  unaware of the 2Q01 bad debt transfers until 2002.  Ellison Decl. ¶ 30 (Dkt. #1218); Henley

14  Decl. ¶ 28 (Dkt. #1216); Sanderson Decl. ¶ 29 (Dkt. #1220).[32]  Plaintiffs attempt to overcome

15  this glaring evidentiary hole by citing a series of Upside Reports showing preliminary EPS

16  figures and the "final version of the Bad Debt Analysis."  Opp. at 5.  None of these documents

17  contains *any* mention of the 2Q01 bad debt transfers.  Although some refer to a routine, end-of-

18  the-quarter reserve analysis, *e.g.*, Pls.' Opp. Ex. 4, the reserve analysis referenced in these

19  documents was a separate exercise performed at the end of every quarter by a group of personnel

---

[30] In addition to Ellison's and Henley's trades, Plaintiffs cite Oracle's own purchases of Oracle stock during 3Q01.  Plaintiffs have not even attempted to show that Ellison or Henley engaged in day-to-day supervision of a stock repurchase program operating for years before 3Q01 and to this day—much less controlled the program in a manner allowing either of them to "sell at higher prices."  DMSJ Opp. at 43 n.53.  Indeed, the undisputed testimony is that neither Henley nor Ellison was in such position.  Pls.' Opp. Ex. H at 289:11-290:7; Pls.' Opp. Ex. J at 700:15-701:10.  Furthermore, the Special Master specifically denied Plaintiffs' requests for discovery into the repurchase program as being completely irrelevant. Ex. 493 at 5.

[31] Plaintiffs misstate the holding of *America West* (DMSJ Opp. at 43), which held only that "a lack of stock sales by a defendant *is not dispositive as to scienter*"—but did not reject the holdings of *Acito* and *Advanta*.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).

[32] In fact, Plaintiffs did not even ask Ellison or Sanderson a single question about the bad debt transfers during their depositions, and Henley confirmed that he did not learn about the bad debt transfers until 2002.  Pls.' Opp. Ex. H at 451:1-9, 451:18-452:5.  Nor has a single fact witness testified that they ever discussed the bad debt transfers with any of the Defendants during 2Q01.

1   entirely separate from the collections analysts responsible for the bad debt transfers.  Pls.' Opp.

2   Ex. C at 123:22-124:10; Pls.' Opp. Ex. FFF at 158:4-160:1; Ex. 489 at ¶ 5; Ex. 490 at ¶ 4.

3          The bad debt reserve is an estimate, and consistent with GAAP, if reserve levels are too

4   high at quarter-end, Oracle is required make an adjustment and release any excess to revenue.

5   Pls.' Opp. Ex. EEE at 142:7-144:20, 216:13-217:3; Pls.' Opp. Ex. C at 122:14-125:10; Ex. 217 ¶

6   27.  At the end of 2Q01, as part of this routine analysis, Oracle released $20 million from its

7   reserve.  Pls.' Opp. Ex. 4 at 1610987.  There is no evidence that anyone responsible for the

8   reserve adjustment was aware of the bad debt transfers at the time (Pls.' Opp. Ex. FFF at 157:4-

9   18; Pls.' Opp. Ex. C at 179:3-10), and there is no evidence that Defendants were aware of the

10  $20 million reserve adjustment in 2Q01.  Nor would the amount of the 2Q01 adjustment have

11  put anyone on notice of the bad debt transfers or any alleged accounting impropriety.  Indeed, in

12  1Q01 Oracle released $33 million from its reserve accounts, and in 2Q00 and 1Q00, Oracle

13  released $25 million and $18 million, respectively.  Ex. 494 at 1607472.  Plaintiffs' attempt to

14  establish scienter with respect to the 2Q01 *bad debt transfers* by relying upon documents

15  referring to the separate, quarter-end *reserve analysis*, falls far short.[33]

16              **2.        The HP Transaction**

17         Plaintiffs similarly have not come forward with any evidence that Defendants knew (or

18  were reckless in not knowing) about the alleged improper accounting for the HP transaction.  As

19  noted above, Defendants had every reason to believe that the accounting for the HP transaction

20  was proper given the level of scrutiny it received.  *See supra* at 22; *see also* 20A Opp. 25-26.

21  Plaintiffs' reliance on hearsay emails suggesting that HP may not have needed all of the *software*

22  *licenses* has no bearing on whether *Oracle* needed the *servers* it purchased on November 30,

23  2000.  Opp. at 8 (citing Pls.' Opp. Ex. 60).  Moreover, while Plaintiffs claim that Sanderson

24

_____

25  [33]  There also is no evidence that Oracle adjusted its bad debt reserve in 2Q01 to "manufacture[]
    false earnings in order to report $0.11."  Opp. at 5 (citing Pls.' Opp. Ex. 7).  Plaintiffs evidence
26  demonstrates that the $20 million reserve adjustment *was not* what allowed Oracle to achieve
    2Q01 EPS of 11 cents.  Plaintiffs' Opposition Exhibit 7 shows Oracle's 2Q01 EPS of 10.34 cents
27  (440830), which would be rounded down to 10 cents EPS, *after* the $20 million reserve
    adjustment had been accounted for as revenue (440832).  Instead, an increase in revenues, and a
28  reduction in expenses increased 2Q01 earnings per share to 10.60 cents (rounded up to 11 cents
    for reporting purposes).  *Compare* Pls.' Opp. Ex. 7 at 440830 *with* Ex. 495 at 021393.

1   "questioned the integrity of the deal" based on certain handwritten notes (Opp. at 8), his notes

2   say no such thing, and Sanderson specifically affirmed that he believed the HP transaction was

3   accounted for properly.  Sanderson Decl. ¶ 12 (Dkt. #1220); Pls.' Opp. Ex. K at 489:7-13, 498:9-

4   500:13.[34]

5   **VI.    PLAINTIFFS' SECTION 20A CLAIM FAILS**

6           Defendants' opening brief showed that, if Plaintiffs' Section 10(b) claims fail, their

7   Section 20A claims necessarily fail, too, for lack of a "predicate" violation.  *See* DMSJ at 49-50.

8   Plaintiffs' Opposition does not even attempt to argue otherwise, let alone cite any contrary

9   authority.  Because Plaintiffs' Section 10(b) claims fail, their Section 20A claim fails as well.

10  **VII.    CONCLUSION**

11          For the foregoing reasons, Defendants respectfully request summary judgment or, in the

12  alternative, summary adjudication that certain facts are not in dispute.

13  Dated:  December 12, 2008                          LATHAM & WATKINS LLP

14                                                     Peter A. Wald
                                                       Patrick E. Gibbs
15                                                     Sean M. Berkowitz

16

17                                              By:_____/s/ Peter A. Wald___

18                                                     Peter A. Wald
                                                       Attorneys for Defendants

19

20

21

22

23

24

25

26  _____

27  [34]  Plaintiffs assume the truth of their own unsubstantiated allegations in arguing that
    "[c]ommitting accounting manipulations to 'manage' earnings is presumptively material."  Opp.

28  at 10.  There is no evidence that Defendants manipulated earnings.  Moreover, the relevant
    accounting literature (SAB 99) discusses materiality in the context of meeting, not beating,
    earnings expectations.  Ex. 496 at 4.