1  COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  MARK SOLOMON (151949)
   DOUGLAS R. BRITTON (188769)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5  marks@csgrr.com
   dougb@csgrr.com
6      – and –
   SHAWN A. WILLIAMS (213113)
7  WILLOW E. RADCLIFFE (200087)
   ELI R. GREENSTEIN (217945)
8  DANIEL J. PFEFFERBAUM (248631)
   100 Pine Street, Suite 2600
9  San Francisco, CA 94111
   Telephone: 415/288-4545
10 415/288-4534 (fax)
   shawnw@csgrr.com
11 willowr@csgrr.com
   elig@csgrr.com
12 dpfefferbaum@csgrr.com

13 Lead Counsel for Plaintiffs

14 [Additional counsel appear on signature page.]

15                    UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17 In re ORACLE CORPORATION          )  Master File No. C-01-0988-SI
   SECURITIES LITIGATION             )
18 ─────────────────────────────     )  CLASS ACTION
                                     )
19 This Document Relates To:         )  REPLY IN FURTHER SUPPORT OF
                                     )  PLAINTIFFS' MOTION FOR SUMMARY
20     ALL ACTIONS.                  )  JUDGMENT AGAINST LAWRENCE
                                     )  ELLISON FOR TRADING ON THE BASIS
21 ─────────────────────────────     )  OF MATERIAL NON-PUBLIC
                                        INFORMATION
22
                                        DATE:      January 9, 2009
23                                      TIME:      9:00 a.m.
                                        CTRM:      The Honorable Susan Illston
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     ARGUMENT ................................................................................................1

    A.      Ellison Traded on the Basis of Material Non-Public Information ...........................1

        1.      Ellison Received Oracle's Dismal Actual Results for December Less than 36 Hours Before He Suddenly Decided to Sell .........................2

        2.      Ellison's Focus on the Potential Forecast Is Misplaced...............................4

        3.      Oracle's Forecast Was Inaccurate Due to Economic Change ....................4

        4.      Oracle's Forecast Was Inaccurate Due to the Change in Its Product Mix and Problems with 11i...................................................................6

        5.      Ellison Knew When He Traded that Oracle's 2Q01 Financial Results Were Falsified ...........................................................................7

        6.      Defendants' False 2Q01 Results Were Material..........................................9

        7.      Ellison's Directive Rendered Oracle's Forecast Inaccurate ....................10

        8.      Ellison Knew that Oracle's Pipeline Had Collapsed ................................12

    B.      Plaintiffs Have Established Ellison's Scienter......................................................13

    C.      Plaintiffs Have Established Loss Causation .........................................................16

    D.      Ellison's Evidence Destruction Further Requires Summary Judgment.................22

III.    CONCLUSION...........................................................................................25

# TABLE OF AUTHORITIES

Page

**CASES**

*Akiona v. United States*,
938 F.2d 158 (9th Cir. 1991) ........................................23

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)..........................................8

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................16

*Byrnie v. Town of Cromwell Bd. of Educ.*,
243 F.3d 93 (2d Cir. 2001)..........................................23

*Croker v. Carrier Access Corp.*,
No. 05-cv-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603
(D. Colo. July 18, 2006)............................................19

*Dura Pharms. v. Broudo*,
544 U.S. 336 (2005)...............................................16

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*,
No. 04 C 1107, 2005 U.S. Dist. LEXIS 376
(N.D. Ill. Jan. 7, 2005) ............................................20

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ......................................15

*In re Bristol-Myers Squibb Sec. Litig.*,
No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448
(D.N.J. Aug. 17, 2005).............................................17

*In re Cardinal Health, Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ..............................17

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J. 1999) ...................................2

*In re Connetics Corp. Sec. Litig.*,
No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515
(N.D. Cal. Aug. 14, 2008)..........................................2

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ......................................16

1

2                                                                                                    **Page**

3    *In re Gilead Scis. Sec. Litig.*,
           536 F.3d 1049 (9th Cir. 2008) ...................................................................................16
4

5    *In re ICG Commc'ns Sec. Litig.*,
           No. 00-RB-1864 (BNB), 2006 U.S. Dist. LEXIS 6695
6          (D. Colo. Feb. 7, 2006) ...........................................................................................20

7    *In re Impax Labs., Inc., Sec. Litig.*,
           No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356
8          (N.D. Cal. July 18, 2007)..........................................................................................19

9    *In re JDS Uniphase Corp. Sec. Litig.*,
           No. C 02-1486 CW, 2007 U.S. Dist. LEXIS 76936
10         (N.D. Cal. Sept. 27, 2007) .........................................................................................1

11   *In re LDK Solar Sec. Litig.*,
           No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425
12         (N.D. Cal. May 29, 2008) ..........................................................................................8

13

14   *In re Motorola Sec. Litig.*,
           505 F. Supp. 2d 501 (N.D. Ill. 2007) ........................................................................17

15   *In re Oracle Corp. Derivative Litig.*
           867 A.2d 904 (Del. Ch. 2004), *aff'd*,
16         872 A.2d 960 (Del. 2005) ...........................................................................................2

17   *In re Petco Animal Supplies Inc. Sec. Litig.*,
           No. 05-CV-0823-H (RBB), 2005 WL 5957816
18         (C.D. Cal. Aug. 1, 2005)............................................................................................2

19

20   *Johnson v. Aljian*,
           394 F. Supp. 2d 1184 (C.D. Cal. 2004) ....................................................................14

21
     *Johnson v. Aljian*,
22         490 F.3d 778 (9th Cir. 2007), *cert. denied*,
           128 S. Ct. 1650 (2008)..........................................................................................1, 14
23

24   *Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*,
           728 F.2d 572 (1st Cir. 1984)....................................................................................22

25   *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
           534 F.3d 1068, 2008 U.S. App. LEXIS 15935 (July 25, 2008),
26         *amended by* 540 F.3d 1049 (9th Cir. 2008) ........................................................16, 21

27

28

Page

*Montalvo v. Tripos, Inc.*,
    No. 4:03CV995SNL, 2005 U.S. Dist. LEXIS 22752
    (E.D. Mo. Sept. 30, 2005)....................................................................................20

*MOSAID Techs. Inc. v. Samsung Elecs. Co.*,
    224 F.R.D. 595 (D.N.J.), *aff'd*,
    348 F. Supp. 2d 332 (D.N.J. 2004)........................................................................23

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
*Am. West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ..................................................................................2

*Nursing Home Pension Fund v. Oracle Corp.*,
    No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470
    (N.D. Cal. Dec. 20, 2006)......................................................................................16

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*,
    No. C 01-20418 JW, 2004 U.S. Dist. LEXIS 27008
    (N.D. Cal. May 27, 2004).........................................................................................2

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ...................................................................................1

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976).......................................................................................1, 2, 13

*United States v. Smith*,
    155 F.3d 1051 (9th Cir. 1998) ............................................................................1, 14

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78t-1 .....................................................................................................................1, 2

17 C.F.R.
    §240.10b-5 .................................................................................................................1

1    **I.      INTRODUCTION**

2          When Ellison suddenly decided to trade early, he knew that (i) Oracle had falsified its 2Q01

3    earnings; (ii) its forecasts were inaccurate; (iii) 11i was performing miserably; and (iv) there were

4    fundamental weaknesses in the U.S. divisions.  After his $894 million in sales, he destroyed his e-

5    mail files and over 100 hours of interview tapes and transcripts discussing the issues in this

6    litigation.  No reasonable jury could find that Ellison did not trade on the basis of material adverse

7    non-public information.[1]

8    **II.     ARGUMENT**

9          **A.      Ellison Traded on the Basis of Material Non-Public Information**

10          A fact is material if a reasonable investor would consider it important in his or her decision

11   making.  *See TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *United States v. Smith*, 155

12   F.3d 1051, 1064-65 (9th Cir. 1998).  Any reasonable investor would have considered the information

13   that Ellison possessed important.  Ellison, therefore, is left to mischaracterizing language from *Shaw*

14   *v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996), which **rejected** the same "Hail Mary"

15   argument that Ellison makes here:

16                 Defendants posit, in essence, that there can never be a duty to disclose
                   internally known, pre-end-of-quarter financial information, because any inferences
17                 about the quarter that might be drawn from such information could be rendered
                   unreliable by later developments in the same quarter, such as a sudden surge of
18                 profitable sales.  ***This position does not withstand scrutiny***.  Present, known
                   information that strongly implies an important future outcome is not immune from
19                 mandatory disclosure merely because it does not foreordain any particular outcome.

20   *Id*. at 1210.[2]  The language that Ellison quotes was not adopted by the *Shaw* court[3] and certainly is

21   not "the standard" for materiality of intra-quarter data.  Opp. at 5.  The standard in the Ninth Circuit

22   _____

23   [1]      Contrary to Ellison's suggestion, insider trading in violation of Rule 10b-5 may serve as a
     "predicate violation" for a §20A claim.  *Compare In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-
24   1486 CW, 2007 U.S. Dist. LEXIS 76936, at *13 (N.D. Cal. Sept. 27, 2007) (citing *Johnson v. Aljian*,
     490 F.3d 778, 781-82 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1650 (2008)) *with* Opp. at 33-34 (all
25   "Opp." references are to defendants' opposition to the instant motion).

26   [2]      Here, as elsewhere, all citations are omitted and emphasis is added unless otherwise noted.

27   [3]      In *Shaw*, the court merely found that plaintiff's ***allegations*** that the information indicated an
28   extreme departure from publicly known trends and uncertainties was sufficient to meet the classic

REPLY RE PLTFS' MOT FOR SUMMARY JUDGMENT AGAINST ELLISON - C-01-0988-SI        - 1 -

is the classic materiality standard first established in *TSC Indus.  See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003).[4]

### 1. Ellison Received Oracle's Dismal Actual Results for December Less than 36 Hours Before He Suddenly Decided to Sell

Ellison sold within 36 hours of receiving Oracle's horrible December results.  Mot. at 21-22 ("Mot." or "Motion" refer to plaintiffs' opening brief herein); Ex. 67.  Ellison attempts to escape the implications by now suggesting that he did not rely on actual results.  Opp. at 8.  But he testified that "when I analyze the data personally, I look at the actual size of the pipe, the size of the pipeline and how much has actually – has actually been sold."  Ex. C at 279:1-11, 286:15-18, 293:1-16.  First month actual results were precisely the sort of material information he knew would prevent him from trading.  Ex. F at 43:12-44:6 ("a massive drop in our . . . sales in Europe" "after the end of the first month" "would have required me to not trade").[5]  Both NAS and OSI (which account for a higher

---

materiality standard. *Id*. at 1211. *Shaw* is further distinguishable because there, defendants made no specific public projection.  Instead, the court made its materiality determination in relation to a range of possible results based on publicly known trends and uncertainties. *Id*. at 1210-11.  Regardless, plaintiffs' evidence meets even Ellison's mischaracterized *Shaw* "standard."

[4]    Ellison argues that plaintiffs' trades were not contemporaneous and then admits that both Kuehmichel and Chu purchased Oracle stock on January 23, 2001, *the same day Ellison sold*.  Opp. at 5 n.2.  Ellison's admission ends the inquiry. *See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*, No. C 01-20418 JW, 2004 U.S. Dist. LEXIS 27008, at *16-*17 (N.D. Cal. May 27, 2004); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 379 (D.N.J. 1999); *In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823-H (RBB), 2005 WL 5957816, at *37 (C.D. Cal. Aug. 1, 2005).  This Court's decision in *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515 (N.D. Cal. Aug. 14, 2008), is inapposite.  There, this Court dismissed plaintiffs' §20A claims, with leave to amend, because they brought a §20A claim against *several* defendants while alleging contemporaneous trading against only *one*. *Id*. at *37-*39.  No such defects are present here. *See* Ex. 106 at MORSTAN0101-02; Ex. 107.1 at BARD0014; Ex. 126.  All "Ex." references are to plaintiffs' opening and reply exhibits to the instant motion.

[5]    Ellison does not mention this testimony or argue that a reasonable investor would not have considered this information important.  Instead, Ellison relies heavily upon the Delaware Chancery Court opinion – a case involving extremely different facts and arguments.  Opp. at 6.  There, plaintiffs made no allegations regarding accounting or 11i, made no arguments regarding Ellison's evidence destruction, and did not challenge the reliability of the Potential Forecast (and had no testimony from Ellison regarding its inaccuracy), which Judge Strine relied on heavily in his opinion.  Judge Strine's opinion acknowledges that the actions are extremely different. *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 908 & n.6, 941-42 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).  And even taking the Potential Forecast at face value, Judge Strine noted that Ellison's statement on the March earnings call that Oracle was ahead at the end of January "just wasn't true" because the Potential Forecast "said he was going to miss."  Ex. 127 at 67:13-70:6.

percentage of Oracle's revenue than Europe) had suffered the exact type of "massive drop in sales" – revenue growth of *negative* 24% and *negative* 81%, respectively – that Ellison admitted would prevent him from trading. Exs. 18, 67, 89-90.  Aside from Covisint, *Oracle's U.S. divisions had sold less than $1.3 million in 11i products* (*negative* 92% growth).  Ex. 67.  Ellison admits that Covisint was an "outlier" that had to be removed for accurate analysis because it was not indicative of general trends in Oracle's business.  *Compare* Ex. D at 436:13-437:6, 450:6-453:8; Ex. N at 216:25-218:23 *with* Opp. at 7.  Defendants themselves removed Covisint when analyzing 3Q01 trends.  Ex. 67.  The 3Q01 trends were indicated by the rest of Oracle's business, which was performing dismally.  *Id*.

Defendants mislead the Court by arguing that the Flash Report was good news because Oracle had sold 19% of its forecast.  Opp. at 7.  The 19% represents the amount of the *Field Forecast* that had been sold, *which was well below Oracle's $0.12 External Forecast for every week of 3Q01*, despite the risk added by Ellison's directive.  Ex. M at 313:23-316:22; Ex. 16 at Ex. 12.

| Date | 12/11 | 12/25 | 1/15 | 1/22 | 1/29 |
|------|-------|-------|------|------|------|
| EPS  | 10.7  | 10.6  | 10.6 | 10.7 | 10.7 |

*Even with Covisint*, December 2000 contributed just 18% of the revenue necessary to meet Oracle's 3Q01 External Forecast – three percentage points below the 21% December average from 1996-2001. Exs. 18, 67, 89; Ex. 1 at 003221.  Without it, December 2000 contributed a paltry 14% of the External Forecast.  *Id*.  Given the negative trends in every U.S. division, however, Ellison knew that it was highly unlikely that Oracle would outperform historical trends in January and February.  Indeed, OSI sold just $3 million of the $35.8 million in license revenue that it forecasted for December and just $22.7 million of the $97.5 million that it forecasted for December and January combined. Exs. 67, 129; Ex. 128 at 038805.  NAS forecasted $80.4 million in revenue for December and January, combined, but by January 15, NAS had booked only $31.4 million (just $1.1 million in January). Exs. 18, 67; Ex. 130 at 038498-99; Ex. 89 at 440114; Ex. 131 at 038498.  Excluding Covisint, OPI booked just $2.6 million in license revenue in December. Ex. 67.  On January 13, OPI

1  forecasted $63.2 million in license revenue for January but, by the time Ellison started selling, had

2  not booked a single dollar that month.  Ex. 132 at 380177; Ex. 133 at 39193.

3  ### 2.    Ellison's Focus on the Potential Forecast Is Misplaced

4  Ellison relies on the Potential Forecast to argue against summary judgment, ignoring his,

5  Minton's and Henley's admissions that it was based on a year-over-year extrapolation that was

6  inaccurate in times of change.  Opp. at 6.  And Ellison has admitted as well that the conversion

7  analysis model caused Oracle's 3Q01 forecast to be inaccurate:

8  > The pipeline management – it's really just a closure rate. . . .  That has to do with the
change in the variable in the model – is what's the conversion rate of the pipeline.

9  > How – you know, if the pipeline is X, how much of it – will we convert 60 percent of
the pipeline, 30 percent of the pipeline, 40 percent of the pipeline – we had to change

10 > that variable in light of the slower economy.  So, it's just changing one number – but
the actual pipeline management was very accurate, albeit misleading, because of the

11 > changing, you know, the changing economy.

12 Ex. 115 at 050655-56; *see also id*. at 050623, 050624, 050637, 050642.[6]  Ellison also argues that

13 Minton made adjustments to her extrapolated upside, based on input from the Field, for changing

14 conditions.  Opp. at 17.  But Minton, who spent at most "3 to 4 hours per week on forecasting" for

15 the whole Company, was indisputably extrapolating, which necessarily undermined the forecast even

16 if she adjusted for some specific deals.  Ex. 134 at 611341; Ex. X at 181:4-182:8.  The conversion

17 ratio was the foundation of the Potential Forecast, which became inaccurate when Oracle faced so

18 many changes in 3Q01.

19 ### 3.    Oracle's Forecast Was Inaccurate Due to Economic Change

20 The phrase "major economic change" comes from Ellison himself and requires no hyper-

21 technical definition.  Ex. 12 at 211, 226; Ex. D at 384:6-385:7; Opp. at 13.  No reasonable investor

22

---

23 [6]    Despite these admissions, Ellison argues that because the conversion rate implied by Oracle's
3Q01 External Forecast was below that implied by the conversion analysis, Oracle must not have

24 relied upon the conversion analysis to forecast in 3Q01.  Opp. at 12.  But defendants have admitted
that Oracle's 3Q01 pipeline was overstated because Oracle's December move to 11i OSO was

25 causing sales representatives to include deals that they previously would not have felt comfortable
including.  Mot. at 20.  Defendants have admitted that they adjusted for the overstated pipeline, but

26 they did not adjust for the other changes, including the change in the economy, the product mix, and
Ellison's directive.  *Id*. at 6-20.  The difference in conversion ratios does not support Ellison's

27 argument.

28

1    could find that there was not a major economic change between the boom economy of 3Q00 and the

2    rapidly declining economy of 3Q01, which Minton admitted she did not take into account in the

3    conversion analysis.  Mot. at 6-8; Ex. A at 132:11-136:3.  Defendant Sanderson admits that "*the dot*

4    *com falloff" was a "major macroeconomic event*" that was discussed at EMC meetings.  Ex. Z at

5    88:5-89:11, 92:23-25.  Minton admits that in early January 2001, *the "general macroeconomic*

6    *environment was suffering*."  Ex. B at 223:14-18.  And Henley wrote internally on January 4, 2001,

7    that "*all data since the [December 14 earnings] call point to more economic softening* so there is

8    risk of slippage in deals."  Ex. 27.  Indeed, Henley, who sold $32 million in stock the same day had

9    already seen "slippage in deals" – $200 million in deals "slipped" from OSI's applications pipeline

10   just ten days earlier.  Exs. 18, 27, 28, 69-70.  Since Ellison knew the economic change undermined

11   Oracle's forecast, he traded on the basis of material non-public information.  Ex. F at 170:8-177:25;

12   Ex. 12 at 211, 226.

13        Ellison also argues that the economic change was not correlated to any downturn in Oracle's

14   business.  To do so, he charts the NASDAQ and the growth in Oracle's dot.com business from 3Q00

15   to 2Q01.  Opp. at 14.  But he misleadingly leaves out the numbers for 1Q00, 2Q00 and 3Q01,

16   inclusion of which evidences strong correlation.  *Id.*; Ex. 135.  Ellison says that as the NASDAQ

17   began to drop in March 2000, Oracle's growth rates did not decline with it.  Opp. at 14.  But

18   Oracle's growth rates were based on a year-over-year comparison.  And in both 1Q01 and 2Q01, the

19   NASDAQ was, on average, higher than it had been in 1Q00 and 2Q00.  Ex. 135.  In 3Q00, however,

20   the NASDAQ took off.  *Id.*  In direct correlation, Oracle's dot.com revenue almost doubled to

21   10.63% in 3Q00 and "hit a crescendo in Q3 and Q4" of 2000, according to Henley.  *Id.*; Ex. 115 at

22   050632.  By 3Q01, however, the NASDAQ had plummeted.  The difference between the NASDAQ

23   in 3Q00 and 3Q01 was severe – almost 1500 points.  Ex. 135.  As a result, Ellison knew that 3Q00

24   was not a reasonable basis for predicting 3Q01 results and that Oracle had much more difficult

25   comparisons in 3Q01 than in 1Q01 or 2Q01.  Mot. at 7-8, 36.  Ellison also knew that Oracle's

26   conversion ratios had decreased in 1Q01 and 2Q01 – by 11% and 8%, respectively, and that Oracle's

27   dot.com business was getting progressively worse.  Mot. at 6-8; Ex. 29.

28

####     4.     Oracle's Forecast Was Inaccurate Due to the Change in Its
              Product Mix and Problems with 11i

Ellison knew that Oracle's failure to adjust for the product mix change rendered its forecast inaccurate. Mot. at 9. Ellison now argues that had the product pipelines been analyzed separately on January 15, Oracle would have forecasted revenue growth of 26%. Opp. at 19. But Ellison's argument proves plaintiffs' point. On January 15, Oracle was forecasting license revenue growth of 32%. Exs. 18, 89. Simply adjusting for the change in the product mix would have yielded revenue growth of 26%, six percentage points lower.[7] Opp. at 19. And the 26% is without adjusting for the major year-over-year economic change facing Oracle or the problems with Oracle's applications products that made them more difficult to sell than previously. Mot. at 6-20.[8]

Ellison ignores numerous admissions that 11i problems also were adversely affecting Oracle's ability to sell 11i and convert its applications pipeline.[9] Mot. at 9-13. Numerous sources at Oracle have admitted that the product problems adversely affected Oracle's ability to sell 11i. Mot.

---

[7]     Ellison misconstrues plaintiffs' argument. *Id.* at n.16. Plaintiffs are not arguing that Ellison did these calculations, but rather are using them to illustrate his own testimony about why Oracle's forecast becomes inaccurate in times of change. Ex. D at 384:6-385:7. Ellison did not need to run calculations to understand this. In 3Q01, he knew that Oracle's pipeline contained more applications. Mot. at 9. And he knew that applications generally converted at lower rates because the Oracle sales force was not very good at selling them, they had longer deal cycles and required higher approvals. *Id.* In 3Q01, he also knew that Oracle had few references, could not demonstrate 11i, and that its sales force was reluctant to sell the product due to its instability. *Id.* at 9-12.

[8]     Ellison's argument that Oracle "exceeded" its 1Q01 and 2Q01 forecasts is both false and irrelevant. Opp. at 21. Oracle "exceeded" its 2Q01 forecast only by fraudulently recognizing revenue. Mot. at 14-18. Additionally, the customers buying in 1Q01 and 2Q01 were early adopters who did not expect, due to 11i's recent release, to see live references. By 3Q01, however, Ellison knew that Oracle's inability to provide 11i references was impeding its ability to convert its applications pipeline. *Id.* at 11-12. And by 3Q01, Oracle's sales force had become painfully aware of 11i's problems and were reluctant to sell the product. *Id.* at 12, 38. Also, Oracle's 3Q01 forecast was much more heavily dependent on applications sales than it had been previously. In 1Q01 and 2Q01, Oracle forecasted applications revenues of over $204 million and $267 million, 23% and 25% of the respective quarterly forecasts. Ex. 18; Ex. 136 at 1385; Ex. 137 at 122348. In 3Q01, Oracle forecasted applications sales of over $447 million, 32% of Oracle's quarterly forecast. Exs. 18, 69. Ellison knew that this higher exposure to applications made Oracle more vulnerable to the 11i problems.

[9]     Nussbaum would not even forecast CRM due to its instability. Ex. H at 68:7-74:13. And Nussbaum's testimony expands upon plaintiffs' allegation that 11i was like a car without wheels – he compared buying 11i CRM to buying a BMW but receiving one without a steering wheel, an engine, or tires and being told it would take more time and money to receive these items. *Id.*

1    at 9-13; Ex. 138 at 360416.[10]   Oracle did not have references in 3Q01 – Ellison's "key to selling

2    software" – because 11i did not work.  Mot. at 11-12; Ex. 12 at 239.  This forced Oracle to sell a

3    "concept" and harmed sales.  Ex. 138 at 360443-44, 360416.  And Oracle's inability to demonstrate

4    11i and its sales force's reluctance to even try to sell it because of its instability further impacted its

5    ability to sell 11i.  Mot. at 9-12.[11]   And when negative information regarding 11i reached the market

6    in 1Q01 and 2Q01, defendants responded by dedicating their 2Q01 earnings call to convincing the

7    market that 11i's early problems were behind Oracle.  Ex. 1 at 03221, 03224, 03226, 03229.  The

8    illegal swap transaction with HP enabled Oracle to report higher 2Q01 applications growth and to

9    successfully convince the market that the early 11i problems were behind it.  Mot. at 17-18.

10   **5.   Ellison Knew When He Traded that Oracle's 2Q01 Financial
              Results Were Falsified**

11

12        Ellison knew that Oracle fraudulently manufactured at least $40 million in revenue and

13   earnings in 2Q01 by: (a) transferring $20 million in improperly held "customer overpayments" into a

14   reserve account (Account 12601), converting that cash to income, and creating fake invoices ("debit

15   memos") to cover up the scheme; and (b) improperly booking $20 million in revenue on a reciprocal

16   "swap" deal with HP after midnight on the last day of 2Q01 – a transaction to which HP only agreed

17   because Oracle swapped $30 million for the revenue, an improper *quid pro quo*.  Mot. at 14-18.

18   Ellison knew that the accounting misconduct was the only way Oracle could "beat the street" in

19   2Q01 and legitimize its 3Q01 financial forecast of $0.12 per share and 75% applications growth.  *Id.*

20   Ellison also knew that the accounting manipulations delayed and concealed from investors the fact

21   [10]   Ellison argues that plaintiffs cannot pinpoint specific 11i deals lost as a result of 11i
22   problems.  Opp. at 20.  There is no need to.  As a result of his evidence destruction and apparent
      amnesia, Ellison himself cannot identify the reasons why 174 of 182 deals purportedly lost in
23   February did not close.  Ex. 119 at 4-13, 24.  This is true despite Ellison specifically telling the
      market after 3Q01 that the reason for deals not closing was the declining economy.  Ex. 115 at
24   050656; Ex. 104 at 092601-02, 092608, 092610, 092612, 092615.  Despite Ellison's statements and
      that, after the close of 3Q01, there was enough documentation to perform a "post mortem," that
25   evidence has disappeared.  *Id.*

26   [11]   Oracle was so desperate for references in 3Q01 that it made them up.  Many of the customers
      listed in the December 2000 analyst report were either not live at the time Oracle represented such to
27   analysts or were experiencing major problems with 11i.  Ex. 139 at 023376; Exs. 140-149.  Oracle
      even had to bribe one of the customers to remain a "reference."  Exs. 141, 150.

28

1    that the economy was already impacting Oracle and 11i was not functional yet. *Id.* Without the

2    accounting manipulations, Oracle would not have beat Wall Street expectations in 2Q01.[12]

3           Ellison inexplicably ignores the specific reports he received on November 27, December 1,

4    December 4, December 5, and December 8, 2000, all of which confirm that he knew that Oracle did

5    not earn $0.11 per share in 2Q01 and needed to manipulate its results to get over the top. Mot. at 16-

6    17; Ex. 62 at 440830, 440832; Exs. 124-125. Defendants also ignore the EC reports and e-mails that

7    demonstrate Oracle personnel were instructed to funnel customer overpayment funds into a

8    "reserve" account (Account 12601) that was tapped to increase Oracle's earnings by $20 million

9    *after* 2Q01 closed. Ex. 151 at 3042910; Ex. 63 at 1610987; Ex. 120. Defendants avoid completely

10   the evidence showing that Oracle engaged in a "clean up" of the customer funds whereby Oracle

11   created fictitious invoices or "debit memos" and applied the customer cash to those fake "debit

12   memo" invoices to make it appear as if the money was paid by customers for legitimate sales. Mot.

13   at 17; Exs. 121-123.1.

14          Defendants also ignore strong evidence showing that Ellison knew the HP transaction was

15   improper. Mot. at 14-15. HP did not need and *never used* the $20 million in software, never

16   installed it, and never received the functionality promised by Oracle (because that functionality did

17   not work or even exist). *Id*. at 14-16; Ex. 152, ¶¶93-96, 111-117. Simple GAAP accounting

18   required Oracle to account for the swap as a *single arrangement* by recognizing the $30 million

19   purchase commitment, effectively netting the transaction to $0. Ex. 152, ¶¶70, 88-92. Instead,

20   Oracle booked the revenue and ignored the $30 million piece of the deal. Even Sanderson

21   questioned the integrity of the "real story" behind the HP deal. Ex. 56 at 020839.[13]

22   _____

23   [12]    Plaintiffs have already disproved defendants' assertion that plaintiffs' allegations are "new"
     or "unpled" and that plaintiffs "abandoned" the accounting allegations. MSJ Opp. at 9-10. Plaintiffs
24   have been asserting the same accounting allegations involving Oracle's improper use of customer
     overpayments and debit memos to falsify its 2Q01 results for over six years of litigation and
25   discovery. Plaintiffs also have already rebutted defendants' claim that plaintiffs' expert did "no
     analysis" of the accounting allegations. Opp. at 27. Mr. Regan proffered detailed analysis on all the
26   accounting issues and defendants did not challenge the reliability of those opinions.

27   [13]    To be clear, Arthur Andersen's senior audit partner admitted to *never seeing or reviewing*
     *the evidence* showing the reciprocal nature of the deal. Ex. BB at 328:21-330:5, 332:7-334:1,
28

### 6. Defendants' False 2Q01 Results Were Material

From a quantitative perspective, defendants ignore the 4% overstatement of net income, 12% overstatement of applications growth from 54% to 66% (which was specifically touted by analysts), and 10% overstatement of Oracle's EPS.  Opp. at 24-25.  Plaintiffs' accounting expert found that the accounting misstatement was both quantitatively *and* qualitatively material.  Ex. 152, ¶¶39-41; Ex. 153 at 3-9.

Defendants ignore the fact that reasonable investors would have found it extremely significant and likely to alter the "total mix" of information if Oracle did not "beat the street" after beating expectations for four consecutive quarters, and *nine of the past ten quarters*.  Ex. 153 at 3-9. Indeed, during the single quarter in which Oracle merely "met" expectations during the prior ten fiscal quarters, Oracle's stock price *dropped 6%*.  *Id*. at 5.  Ellison admits that the "*only* thing that matter[s] . . . [is] a quarter that *beat[s]* expectations."  Ex. 12 at 204, 431.  Thus, Ellison knew that the impact of the accounting improprieties was material inside information.

Defendants also ignore that the HP deal inflated 2Q01 applications growth numbers from 54% to 66% and provided the market with Oracle's *only* purported customer reference for the Suite 11i CRM.  Mot. at 14-16; Ex. 12 at 239.  The HP deal thereby falsely misled investors to believe that 11i was stable and "gaining traction" with high-profile customers to drive 3Q01 growth.  Ex. 58 at 308932.  Analysts praised the deal.  Mot. at 15.  Oracle executives admitted to Ellison and Henley four days after 2Q01 closed that the deal was material: "*Without HP, it would have been different*." Ex. 116 at 020730.

---

338:19-340:21.  Similarly, neither Andersen's senior audit partner nor its 30(b)(6) witness even knew what a "debit memo" was and *never reviewed* any of the fraudulent debit memo/bad debt transfer transactions.  Ex. CC at 251:24-252:25.  Andersen's senior audit partner even admitted that Andersen "*would have liked to have known about it while we were out doing our review and audit work*."  MSJ Opp. at 6 n.8.  In any event, even if Andersen and Oracle's audit committee did review the HP deal, that does not negate the evidence of scienter.  *See In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425, at *31-*32 (N.D. Cal. May 29, 2008) ("lack of a restatement" and "unqualified opinion" of auditor does not negate scienter) ("[O]fficers and directors are not exonerated when their own audit committee finds nothing wrong in the company's accounting practices.  To rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities fraud enforcement."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (same).

### 7.    Ellison's Directive Rendered Oracle's Forecast Inaccurate

Before 3Q01, Ellison directed executives and finance personnel in the U.S. divisions to add risk to their field forecasts (to account for "sandbagging"). Mot. at 18-19. This change rendered Oracle's 3Q01 External Forecast inaccurate because Minton failed to adjust for it, adding $160 million in upside consistent with her historical practice. *Id*. There is a wealth of evidence of the directive. *Id*. At a North America Finance Team Meeting on October 4-5, 2000, Minton assigned Patricia McManus as Global Process Owner (at Oracle, the person in charge of resources for worldwide process standardization) for OSO training. Exs. 154, 155. McManus, aided by OPI Finance Manager Jim English, was to work with Ellison to develop new definitions for Oracle's forecasting categories (best case, most likely, worst case). Ex. 154. The next day, on October 6, 2000, McManus e-mailed English that Ellison had, indeed, changed the forecasting process:

> Larry has changed the way that he is interpreting our forecast. . . . This is a change from our current thinking in that our forecast has not usually had a significant amount of judgment. It was the amount that you believed you could deliver at a minimum. That emphasis has shifted to "worst" and *now our forecast is a number that includes more risk than in the past*. . . . We will incorporate this [change into] our OSO 11i training that is tentatively scheduled the week of 10/23.

Ex. 17 at 203683. Ellison has admitted that he is the "Larry" in the e-mail and that he did give the directive discussed in the e-mail. Ex. D at 423:24-425:1. Minton passed on the directive to EVPs and finance managers: "Larry [Ellison] made it clear that he wants everyone to submit realistic forecasts – he is not interested in 'commit' numbers." Ex. 65 at 151962. She attached a study by Henley showing that the U.S. division forecasts underestimated their actual results by, on average 15%-18%. *Id*. at 151959. Numerous executives, including Sanderson and Nussbaum, forwarded this e-mail chain, discussed methods for implementing Ellison's directive, and explicitly asked that it not be forwarded due to its "sensitive" content. Exs. 156, 157. The field personnel working with Ellison to create new definitions specifically noted that they caused the Field Forecast to have more risk. Ex. 17.

Despite this evidence and his own admission, Ellison argues that if the directive was implemented, plaintiffs should have more evidence of it. Opp. at 16. Ellison ignores the clear import of the *existing* evidence – McManus implemented the directive through OSO training, not

1  through company-wide correspondence (and defendants have not produced OSO training

2  documents). Ex. 17. And documents regarding the directive have emerged from the files of all three

3  U.S. finance managers and from the files of Sanderson, Nussbaum and Minton. Exs. 156, 157. The

4  lack of production from the files of other custodians is not surprising given that defendants did not

5  preserve them.[14]

6     Tellingly, the field level management judgment in all three U.S. divisions suddenly

7  skyrocketed in the weeks following the directive and remained uncharacteristically high through

8  3Q01 and 4Q01. *Compare* Goedde Decl., ¶¶19-23 *with* Opp. at 17. Minton testified that she took

9  no account of the directive. Ex. B at 19:17-19. Instead, she added upside on top of an inflated Field

10  Forecast, rendering Oracle's External Forecast inaccurate. And because Minton spent, at most, three

11  to four hours per week on forecasting for the entire Company, she was not "aware of the likelihood

12  that any particular deal would close," as Ellison claims, or, apparently, aware of changes in the

13  definitions applied by the Field to each of those deals.[15] Ex. X at 181:4-182:8; Ex. 134 at 611341;

14  Opp. at 17.

15

16

[14]  Defendants gave preservation notices to just six individuals in all three U.S. divisions combined (the EVPs and finance managers discussed above). They claim to have given notice to six more individuals. Ex. 158. Yet, NAS, OSI and OPI had thousands of employees, including Senior Vice Presidents (SVPs) and Area Vice Presidents (AVPs) who reported directly to the heads of the divisions (EVPs), Regional Managers (RMs) who reported to AVPs, sales managers who reported to RMs, and salespeople who reported to sales managers. *Id*. The U.S. divisions had six SVPs and 34 AVPs. *Id*. Of these 40 individuals, defendants claim to have given preservation notices to six of them (three SVPs and three AVPs) (yet two produced no documents). *Id*. Defendants gave no notice to the other 34 SVPs and AVPs, nor did they give preservation notices to a single RM. *Id*. Even McManus, the GPO in charge of working with Ellison to set forecasting definitions, did not receive a preservation notice. *Id*. Because neither Ellison nor McManus preserved their files, the lack of further evidence is not surprising.

[15]  Under Ellison's theory, Minton would have had to be aware of every pipeline deal in each U.S. division (there were thousands) and the mindset of the individual field representatives in selecting the category in which to place the deal. Opp. at 17. Minton was surely not privy to this level of detail. Ex. X at 181:4-182:8; Ex. 134 at 611341. Minton's purported conversations with field finance managers also would not have allowed her to accurately account for the directive. Opp. at 17. 3Q01 was the first quarter that these managers reported to Minton. Ex. Y at 139:20-141:24; Ex. 154. Ellison's argument assumes that these new direct reports were able to decipher changes in the forecasting styles of their EVPs and report those changes to Minton. This is too far-fetched. Ex. Y at 80:12-81:11, 143:3-18.

1          **8.      Ellison Knew that Oracle's Pipeline Had Collapsed**

2          Before Ellison sold his stock, Oracle's pipeline had taken an unprecedented nosedive. Mot.

3    at 22. Oracle's pipeline historically tended to increase in the quarter before declining at the end, and

4    even those late declines were nowhere near the size of the declines throughout 3Q01.[16] *Id.* Oracle's

5    plunging pipeline in December 2000 was unprecedented because most of the drop came from one

6    place – OSI's applications pipeline. Ex. 69 at 440080; Ex. 70 at 440097. This informed Ellison that

7    Oracle's U.S. license business growth (particularly in its applications business) was collapsing. The

8    drop was also unusual because it was not accompanied by a corresponding increase in the forecast

9    (as the deals closed), which informed Ellison that the deals were disappearing completely. Mot. at

10   23. Defendants now admit that they knew that the 3Q01 pipeline was overstated and "too good to be

11   true." Ex. K at 354:15-355:3; Ex. L at 270:2-14. This belies Ellison's argument that he thought the

12   34% growth was an indication of the health of Oracle's business. Opp. at 9.[17] NAS and OSI

13   specifically informed Ellison throughout 3Q01 of their pipeline problems. OSI's technology

14   pipeline plummeted at the very beginning of 3Q01. Ex. 68 at 610124. In fact, Henley noted at the

15

---

16   [16]      Pipeline declines were not a "normal part of Oracle's business" early in the quarter. Opp. at
17   8. Indeed, the pipeline historically increased in the beginning of the quarter before declining in the
     final month. Ex. 16 at Exs. 20 & 21. The decline in growth rates that defendants cite was nowhere
18   near the magnitude that Oracle experienced in 3Q01 or occurred much later in the quarter. Opp. at 8.

19   [17]      Ellison argues that because forecasted conversion ratios were lower in January 2001 than
     actual conversion ratios in previous quarters, there was no weakness in the pipeline. Opp. at 12.
20   Ellison's argument fails for several reasons. First, OSI, one of the divisions responsible for the miss,
     specifically informed Ellison that its forecasted conversion ratios had skyrocketed. Ex. 71. As a
21   result of OSI's massive pipeline declines, on January 18, its finance manager informed defendants
     that its forecasted conversion ratios were "[n]orth of 50%" across the board – far above the 30%-
22   40% range in which its EVP, Nussbaum, was comfortable. *Id.*; Ex. H at 36:2-6. This had been the
     case throughout 3Q01. In fact, as a result of its applications pipeline plummeting, by the end of
23   December, OSI was actually forecasting more applications than it had in its pipeline (a forecasted
     conversion rate over 100%) and its overall forecasted conversion rate was 87%. Exs. 34, 70. On
24   both December 19 and January 9, every one of OSI's verticals had forecasted conversion rates over
     60% with some as high as 91% and 94%. Ex. 159 at 096158; Ex. 160 at 096175. Ellison knew that
25   OSI had forecasted conversion rates that reflected the negative state of its pipeline. Ellison also
     knew that the December 2000 drop had not eliminated inflation from the move to OSO because it
26   had almost all come from one division's (OSI) applications pipeline. This major change in the
     pipeline, a main variable in calculating the forecasted conversion rate, artificially lowers the
27   forecasted conversion rate when compared to other quarters and renders Ellison's analysis
     meaningless.

28

---

1   time that he must have been concerned because OSI's technology pipeline was "down a lot." *Id.*;

2   Ex. N at 214:2-19.  NAS specifically informed defendants in early December that its pipeline was

3   not where it needed to be but, based on historical experience, that it expected its pipeline to increase

4   over the following weeks.  Ex. 21.  By the beginning of January, NAS reported that its "Pipe ha[d]

5   not grown as . . . anticipated.  We're actually down . . . from December end reporting."  Ex. 30 at

6   040617.

7          Ellison argues that the pipeline declines were expected because Oracle's pipeline was "too

8   good to be true" in 3Q01 as a result of Oracle's move to 11i OSO.  Opp. at 8-9; Ex. K at 354:15-

9   355:3; Ex. L at 270:2-14.  But even with the inflated pipeline, Oracle still had to convert ***higher***

10  percentages of its pipeline at several points in 3Q01 than it had in the boom economy of 3Q00 to

11  make its forecast.  Goedde Decl., Ex. C.  And even with the inflated pipeline, Oracle's comfort gap

12  was uncharacteristically narrow in 3Q01 and was negative for large parts of December and January.

13  Ex. 16 at Ex. 13.  Ellison specifically testified that pipeline growth was an indicator that he closely

14  tracked to monitor Oracle's business and that he monitored the "comfort gap" because it was

15  "incautious to . . . forecast sales growth without underlying pipeline growth."  Ex. F at 86:21-87:5;

16  Mot. at 23.  Reasonable investors would have found important that the indicators on which Ellison

17  relied were informing him that Oracle's business growth was sinking.[18]

18         **B.     Plaintiffs Have Established Ellison's Scienter**

19         Plaintiffs need only prove that Ellison knew information that a reasonable person would have

20  found important in trading.  *TSC Indus.*, 426 U.S. at 449.  Ellison knew that Oracle's December

21  results were important – he testified that actual results and pipeline were ***the*** indicators that he relied

22  on at Oracle and that adverse actual results in one of Oracle's divisions at the end of the first month

23  was material information that would have prevented him from trading.  Ex. C at 279:1-11; Ex. F at

24  43:12-44:6; Ex. 67.  The fact that he suddenly deviated from plan and decided to unload just 36

25  _____

26  [18]    Ellison's claim that pipeline growth was higher than forecasted growth "throughout the
    quarter" is misleading and inaccurate.  Opp. at 10.  The "comfort gap" was negative for half of the
27  month when Ellison sold.  Ex. 16 at Ex. 13.

28

1   hours after receiving exactly that type of information is compelling evidence that he traded on the

2   basis of that information.  Mot. at 21; Ex. 67.  When an insider trades while in possession of material

3   non-public information, a strong presumption arises that the insider traded on the basis of that

4   information.  *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004) (citing *Smith*, 155

5   F.3d at 1069), *aff'd*, 490 F.3d 778 (9th Cir. 2007).

6          Plaintiffs have also offered independent evidence that Ellison traded on the basis of the

7   material non-public information.  ***All*** of the evidence in the record proves that Ellison planned to sell

8   in April or August 2001.  Mot. at 24-27; *see also* Ex. 161.  But he diverted from the plan and sold in

9   January right after receiving the Flash Report.  Mot. at 41.  Prior to that, nobody had heard of any

10  plan by Ellison to trade in January, including even his own financial advisor and the executives in

11  charge of Oracle's trading clearances.  Mot. at 24-27.  In fact, Safra Catz, Ellison's closest

12  confidante who e-mailed and spoke with Ellison daily, was unaware of any plan by Ellison to trade

13  in January until he actually decided to do so on January 19.  Having received the same Flash Report

14  that Ellison received, she wrote on January 19 that "I just found out something so I don't think I

15  should trade."  Ex. 162.  Catz's explanation for this e-mail is that she had just found out that Ellison

16  was going to trade.  *Id.*; Ex. AA at 230:18-232:6.  Even accepting Catz's explanation as true, it

17  proves plaintiffs' argument that Ellison suddenly decided to trade in January.  Ellison claims that

18  plaintiffs' only proof is one e-mail with one mention of April.  Not true.  Several e-mails from

19  October 2000 until January 2001 discuss Ellison's sales in either April or August 2001.  Not once do

20  they mention any possibility of trading in January.  Exs. 97-98.

21         Ellison's argument that he never personally "spoke" to Deb Lange, the author of two of the e-

22  mails, is irrelevant.  Opp. at 33.  Lange was a SVP in charge of Oracle's Tax Department.  She

23  reported directly to Henley and attended Oracle's Finance and Audit Committee meetings.  Exs. 163,

24  164.  And she had worked with Ellison's financial advisors for years on a variety of different issues.

25  *See, e.g.*, Exs. 165, 167, 168; Ex. 166 at 042991; *see also* Ex. 169.  In August 2000, Lange called

26  Philip Simon to discuss the timing of Ellison's 2001 option exercises.  Ex. 170 .  After hearing from

27  Ellison's advisors that he would likely exercise his options in August 2001, Kris Fisher, a member of

28  Lange's staff, e-mailed back to ask if he could exercise before the May 2001 quiet period began (in

1   April) rather than in August.  Ex. 96.  By January 10, 2001, Lange was still under the impression that

2   Ellison was going to exercise in April or August 2001.[19]  Exs. 97-98.[20]

3          The suspicious nature of Ellison's "astronomical" sales is additional and strong evidence of

4   scienter.  *Id*. at 42-43.  Although the Ninth Circuit in this case already explicitly held that they were,

5   Ellison argues that his sales are not suspicious.  Mot. at 39-43; Opp. at 31-32.  In *In re Apple*

6   *Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989), the only case Ellison can muster, the court first

7   found that the defendant's sales were ***not suspicious in timing and amount*** because his sales were

8   completely in line with his trading history.  *Id*. at 1117.  Only after doing so did the court accept the

9   "credible and wholly innocent explanation[]" for the sales.  *Id*.  Ellison has no such explanation.

10  Overwhelming evidence shows that the timing and scale of Ellison's trades was compelled by

11  receipt of material non-public information.  Mot. at 21-22, 24-27, 41.  Ellison has no credible

12  argument to rebut the strong presumption that he traded on the basis of the material information in

13  his possession.[21]

14

15

16  _____

17  [19]    Ellison's argument that he sold on the advice of his financial advisor is also misleading.  His
    financial advisor had been pressuring him to diversify for years.  Ex. 88 at 300603.  It was his receipt

18  of adverse material non-public information that caused Ellison to sell, not any new advice from his
    advisors.  Mot. at 41.  In fact, Simon had no idea that Ellison planned to sell in January until January

19  19.  Ex. 88 at 300606.  And in October 2000, his advisors e-mailed Oracle that Ellison planned to
    sell in August but might be willing to sell in April (before the May quiet period) "depend[ing] on

20  Oracle's price and Larry's mood."  Ex. 96.

21  [20]    Now, to justify his sudden decision to sell, Ellison argues that he could not wait to trade until
    April or August 2001 because he ***could have*** come into possession of material non-public

22  information, such as an acquisition.  Opp. at 1.  But he knew there was no such acquisition on the
    horizon and that he could exercise but not sell or extend the options.  Ex. 12 at 216-17, 493.

23  Notably, Ellison had not previously been adverse to waiting until those last two windows.  Mot. at
    24.  Regardless, he sold while in possession of adverse material non-public information.

24  [21]    Ellison's assertion that the restrictions he placed on his sales somehow prove his innocence is

25  unavailing.  Opp. at 31-32.  The undisputed evidence shows that Ellison placed those restrictions on
    his stock to avoid driving down the price.  Mot. at 43.  To this end, Ellison even used Oracle's stock

26  repurchase program to stabilize the price.  Exs. 111-112.  And evidence shows that Ellison, Henley,
    and Catz made the decisions on the size and timing of stock repurchases.  Ex. 171 at 227665.  Far

27  from proving his innocence, Ellison's restrictions are simply further evidence of the heights to which
    he would climb to sell at a higher price.

28

REPLY RE PLTFS' MOT FOR SUMMARY JUDGMENT AGAINST ELLISON - C-01-0988-SI          - 15 -

1        **C.**      **Plaintiffs Have Established Loss Causation**

2        To show loss causation, plaintiffs must only "prove that the defendant's misrepresentation (or

3  other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms. v.*

4  *Broudo*, 544 U.S. 336, 346 (2005). "A plaintiff is not required to show 'that a misrepresentation was

5  the ***sole*** reason for the investment's decline in value'" – only that "'the misrepresentation is

6  one substantial cause'" of plaintiff's losses. *In re Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005)

7  (emphasis in original). In *Daou*, the Ninth Circuit held that Daou's announcement of dismal

8  earnings revealed the company's "true financial condition" – a condition that had been concealed by

9  defendants' accounting manipulations, which were not specifically disclosed in the announcement.

10  *Id*. at 1026. The Ninth Circuit found this connection between Daou's accounting manipulations and

11  the stock drop resulting from the earnings miss sufficient to show loss causation. *Id*.

12        That the concealed fraud caused an earnings miss, which in turn caused the stock price to

13  fall, satisfies the loss causation requirement. *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982,

14  989-90 (9th Cir. 2008); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

15  Nonetheless, defendants demand this Court require that a corrective disclosure not only be a mirror

16  image of their prior misrepresentations, but also amount to a direct confession of their fraud. Opp. at

17  35. Defendants even say there is no causal connection between their statements that the economy

18  was not affecting Oracle and their later disclosure that the economy had harmed Oracle because they

19  did not issue confessions but, instead, lied and told the market that they had only seen the effect in

20  the last few days. *Id*. at 36-37. As a result, defendants conclude they cannot be held liable. The

21  Ninth Circuit has squarely rejected this argument, holding that "neither *Daou* nor *Dura* require an

22  admission or finding of fraud before loss causation can be properly pled." *Metzler Inv. GMBH v.*

23  *Corinthian Colleges, Inc*., 534 F.3d 1068, 2008 U.S. App. LEXIS 15935 (July 25, 2008), *amended*

24  *by* 540 F.3d 1049, 1064 (9th Cir. 2008) ("*Corinthian*").

25        This Court has specifically rejected defendants' argument that the March 1 disclosure must

26  mirror the allegations of the Complaint. *Nursing Home Pension Fund v. Oracle Corp.*, No. C01-

27  00988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *36 (N.D. Cal. Dec. 20, 2006). This is because a fact-

28  for-fact disclosure test "would provide an expedient mechanism for wrongdoers to avoid securities

1  fraud liability." *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 544 (N.D. Ill. 2007); *see also In re*

2  *Bristol-Myers Squibb Sec. Litig.*, No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448, at *57 (D.N.J.

3  Aug. 17, 2005) (denying summary judgment for defendants, reasoning the law does not require "that

4  an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud"); *In re*

5  *Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 760 (S.D. Ohio 2006). "[T]he truth that a

6  misrepresentation or omission conceals" can make its way into the market in "a variety of . . . ways"

7  including "'that the higher earnings or sales in the future that one would have predicted based on the

8  misstatement do not materialize or the poor financial condition of the issuer, which the misstatement

9  masked, subsequently becomes obvious.'" *Motorola*, 505 F. Supp. 2d at 543-44.

10  Ellison's failure to disclose the effect of the economy on Oracle's business and the lack of

11  reasonable basis for Oracle's 3Q01 forecast proximately caused plaintiffs' loss. On March 1, 2001,

12  Oracle announced that it had missed its 3Q01 forecast and that the economy had affected its

13  business. Mot. at 44. It also disclosed that its conversion analysis model was the cause because of a

14  change in the economy, year-over-year.[22] Ex. 115 at 050655-56, 050623-24. Nothing more is

15  required.

16  The market also understood, on March 1, 2001, that 11i had not saved Oracle from the

17  declining economy as defendants had assured them it would (because of its purported ability to save

18  customers money). Mot. at 45-46. Instead, as a direct result of problems with 11i, Oracle did not

19  have customers who were saving money using 11i and, thus, few references. Mot. at 9-13; Ex. 45 at

20  162215; Ex. 172 at 059746. There is a direct causal connection between Ellison's omissions

21  regarding 11i and Oracle's disclosures on March 1. That day, Oracle also announced a miss of its

22  75% growth projection for 11i applications sales. *Id.* at 45. The market understood that these

23  disclosures related to the quality of 11i. *Id.* at 46.

24  _____

25  [22]    Defendants argue that later pre-announcements by other companies refute loss causation.

26  But because Oracle is a bellwether stock, it is not surprising that in the wake of Oracle's 3Q01
announcement, many of them pre-announced. Additionally, the specific companies relied upon by

27  Ellison and Henley as gauges for Oracle's business – Cisco and Sun – pre-announced much earlier in
3Q01, along with others. *See* Ex. 115 at 050620; Ex. 12 at 157; Ex. 93; Ex. 22 at 1053564.

28

1    Ellison says no evidence links 11i problems to Oracle's corrective disclosure, denouncing as

2    "rank speculation" Matthew Symonds' statement to the contrary in *Softwar*.[23]  Opp. at 42.  This

3    characterization is particularly remarkable given that Ellison destroyed the underlying materials

4    likely to shed light on where Symonds got his impression.  Symonds's conclusion finds ample

5    support – numerous media sources reached the very same conclusion in the days following Oracle's

6    March 1, 2001 pre-announcement.  Mot. at 46.  The *Los Angeles Times* (March 2, 2001) contrasted

7    Oracle's disclosure to earlier boasting by Ellison that Oracle was not being hurt by the slowing

8    economy because of 11i's functionality and efficiencies.  Ex. 173.  *The Wall Street Journal*

9    (March 2, 2001) reported that Oracle's "***reasons*** for the shortfall were at least as troubling to

10   analysts as its magnitude," in part because Ellison had only days earlier said to thousands of people

11   that 11i sales were "'tak[ing] off.'"  Ex. 174.  UBS Warburg (March 2, 2001) tied the earnings miss

12   directly ***to defects and gaps in Suite 11i applications*** and stated that it could not identify a single

13   customer that had "gone live" on a fully integrated Suite 11i.  Ex. 175.  UBS also found it

14   "particularly puzzling to attribute a $200M shortfall to the last couple of days of the quarter to a

15   change in the economic environment" and "that the weakness in Oracle's applications business is

16   because the company's applications were not yet ready for prime time."  *Id*. at 2-3.

17       Indeed, post-Class Period e-mail among Oracle's public relations staff confirmed that Oracle

18   itself believed that the market viewed its miss as related to 11i quality failures.  Ex. 176 at 2 ("***[W]e***

19   ***have seen several stories recently in the US that link our lower than expected [11i] apps sales to***

20   ***quality issues with 11i***.").  Later that month, Oracle personnel circulated a March 22, 2001 Gartner

21   article that offered further confirmation.  Ex. 177.  Despite the fact that the market and Oracle

22   employees specifically tied Oracle's March 1 announcement to problems with 11i, defendants argue

23   that plaintiffs cannot prove loss causation because they cannot show that 3Q01 deals were lost as a

24   result of the 11i problems.  Opp. at 38.  Plaintiffs have proven that 11i's problems caused a lack of

---

25

26   [23]    Specifically, *Softwar* states: "It didn't take a genius to see that not everything that was going
on could be explained by the weakening economy and edgy CEOs waiting for 'visibility' to return.

27   For anyone who wanted to see, there was mounting evidence that it wasn't only the economy that
prospective Oracle applications customers wanted to see stabilize."  Ex. 12 at 201.

28

1   references, reluctance by salespeople to sell the product (and by EVPs to even forecast it) and an

2   inability to demonstrate the product that made 11i difficult to sell and cost Oracle deals.[24]  Mot. at 9-

3   13.  Defendants' evidence destruction in this case has made it impossible to tell why many specific

4   deals were lost at Oracle.  *See infra*, §II.A.D.

5       Defendants also argue that Oracle's 4Q01 11i "success" means that the market could not

6   have understood the myriad problems with the product.  Opp. at 21.  This argument fails.  Oracle did

7   not have strong U.S. applications growth in 4Q01 and both the market and defendants attributed this

8   lackluster growth to negative public perception regarding 11i resulting from quality problems, as

9   well as a lack of references.  Ex. 138 at 360442 (Ellison: "You know, the big picture against 11i, is

10  quality problems, no references; quality problems, no references."); *id*. at 360416, 360431.  In fact,

11  Ellison himself coined the phrase "'brand damage'" to describe the effects on Oracle of the early 11i

12  problems.  Ex. 12 at 422-23, 430.

13      Plaintiffs' losses were also proximately caused by defendants' 2Q01 earnings manipulations

14  and by Ellison's failure to disclose this fraud prior to trading.  Mot. at 14-16, 46-47.  Accounting

15  fraud often will be revealed by a reduction in earnings.  "The reason – indeed, the only sensible

16  reason – why investors would be interested in the status of [specific company practices] would be to

17  enable them accurately to assess [the company's] earnings projections and prospects for future,

18  unprojected earnings."  *Croker v. Carrier Access Corp.*, No. 05-cv-01011-LTB-OES, 2006 U.S.

19  Dist. LEXIS 48603, at *22 (D. Colo. July 18, 2006).  For this reason, many courts have recognized

20  the causal connection between concealed accounting fraud and subsequent earnings announcements.

21  *See In re Impax Labs., Inc., Sec. Litig.*, No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356, at *17

22

23

24  [24]     Oracle's applications miss in Europe, which was not yet in economic decline, provides
    further support.  Europe missed its applications numbers because of problems with 11i, including the

25  language problems discussed in detail in plaintiffs' opposition to defendants' motion for summary
    judgment.  Indeed, internal Oracle e-mails detail that the "internal-only" explanation for the low

26  applications numbers was that "given the R11i problems in Q1/Q2 many of our salespeople decided
    to focus on technology to make their quota and wait for the product to be stable."  Ex. 44.  Ellison

27  was specifically informed of this same fact (but did not disclose it) before he traded.  Ex 41 at
    013402.

28

1   (N.D. Cal. July 18, 2007) (market understood that forecast miss was connected to the accuracy of the

2   company's prior financial statements).[25]

3          The improper swap transaction with HP allowed Oracle to report 2Q01 applications growth

4   of 66%, which analysts directly tied to the quality of 11i and to 11i's ability to drive future earnings

5   revenue, including in 3Q01. Mot. at 14-16; Ex. 58 at 308932 ("We anticipate the [11i] applications

6   division will continue to accelerate . . . . *We are under the impression that the first version had*

7   *considerable bugs and the most recent version is really gaining traction* . . . ."); Ex. 61 at 420588

8   ("Applications license growth of 66% solidly outpaced Street expectations in the 50-60% range.  The

9   *outperformance should also allay concerns about the viability of Oracle's applications business*

10  *and the relative immaturity of release* 11i . . . .).  Oracle's false 2Q01 applications growth sent a

11  deliberately misleading message that 11i was working, that its initial problems were behind it, and

12  that it would drive future earnings growth – myths busted by Oracle's 3Q01 earnings miss.

13         Oracle's inflated EPS also concealed from investors the negative effect that 11i and the

14  economy were having on Oracle's business.  Oracle's improper revenue recognition allowed it to

15  "beat the street" in 2Q01, "the only thing that matter[s]," according to Ellison. Ex. 12 at 204, 431;

16  Ex. J at 146:19-147:1; Ex. 64 at 38.  On the earnings call, Henley specifically related Oracle's 3Q01

17  EPS external projection to Oracle's fraudulent 2Q01 EPS result.  Ex. 1 at 03222.  In fact, Henley

18  specifically planned before the earnings call to "position" the analysts on the earnings call using the

19  manufactured 2Q01 EPS result.  Ex. 178 (Henley: "I think we should position the folks at the call

20  that historically Q3 isn't a lot more EPS than Q2.  [S]o a penny more per share would seem right.").

21  _____

22  [25]     *See also Montalvo v. Tripos, Inc.*, No. 4:03CV995SNL, 2005 U.S. Dist. LEXIS 22752, at *1
    (E.D. Mo. Sept. 30, 2005) (where a missed "financial milestone" caused a drop in stock price,
23  defendants' arguments that plaintiffs had not alleged a direct connection between a drop in stock
    price and the company's accounting fraud did not defeat plaintiffs' loss causation allegation);
24  *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, No. 04 C 1107, 2005 U.S. Dist.
    LEXIS 376, at *13 (N.D. Ill. Jan. 7, 2005) (disclosure of insider sales and lower guidance
25  sufficiently connected to accounting fraud for purposes of loss causation); *In re ICG Commc'ns Sec.
    Litig.*, No. 00-RB-1864 (BNB), 2006 U.S. Dist. LEXIS 6695, at *30 (D. Colo. Feb. 7, 2006)
26  ("announcements of substantially reduced earnings expectations and other serious problems with
    [defendant's] business" sufficient for loss causation because "[t]he law does not require the plaintiffs
27  to allege that [defendant] disclosed every fine detail of the alleged manipulation of [defendant's]
    revenue to establish that those manipulations caused the plaintiffs' losses")).

28

REPLY RE PLTFS' MOT FOR SUMMARY JUDGMENT AGAINST ELLISON - C-01-0988-SI          - 20 -

1   Analysts were projecting only $0.11 for 3Q01 and specifically raised their forecasts based on

2   Oracle's statements at the conference call.  Ex. 58 at 1 ("We are *increasing* our 3Q EPS estimate

3   *from $0.11 to $0.12* based on expectations for continued strong margin expansion and *applications*

4   *revenue growth*."); Ex. 179 at 021382 (projecting $0.11 for 3Q01 prior to Oracle's External Forecast

5   of $0.12).  Oracle's 2Q01 accounting manipulations allowed it both to convince the market that it

6   was seeing no effect from problems with 11i and the declining economy and also to credibly project

7   growth going forward.  Had Oracle disclosed its true 2Q01 financial results on December 14, 2000,

8   or had Ellison disclosed that Oracle had fraudulently inflated 2Q01 applications growth, as he was

9   required to do before he sold, the market would have understood the same thing that it understood on

10  March 1, 2001 – that the economy was negatively impacting Oracle and that 11i was neither driving

11  sales nor saving Oracle from the declining economy because it did not work.[26]

12       Defendants argue that plaintiffs fail to prove that the March 2 stock decline was related to

13  Company-specific factors.  Opp. at 44.  But Bjorn Steinholt's event study is reliable evidence that a

14  portion of the March 2, 2001 stock price decline was caused by defendants' fraud.  As explained in

15  detail in Plaintiffs' Opposition to Defendants' Revised *Daubert* Motion to Exclude Expert Opinions

16  and Testimony of Bjorn I. Steinholt ("Steinholt Opp."), in order to measure the market effect of the

17  March 2, 2001 stock price decline, Steinholt performed an event study using the NASDAQ 100, a

18  capitalization-weighted index of the 100 largest and most active non-financial companies listed on

19  the NASDAQ, including large technology companies.  Steinholt's analysis accounted for and

20  eliminated *both industry and market factors* and opined that plaintiffs' losses were proximately

21  caused by Company-specific factors.  Steinholt Opp. at 14-16; Ex. 180, ¶53.  Steinholt also

22  specifically reviewed the so-called peer group referred to by defendants' expert, Christopher James,

23

24

25  [26]       Citing *Corinthian*, 540 F.3d at 1064, Ellison argues that plaintiffs cannot prove loss causation

26  for their accounting allegations, taken alone.  Opp. at 38.  Unlike *Corinthian*, however, here
    defendants' accounting manipulations were not the entire fraud, but rather, a part of a larger scheme

27  to mask the negative effects of 11i problems and the declining economy on Oracle's business.
    *Corinthian*, 540 F.3d at 1063-64.

28

1   and determined that the use of the NASDAQ 100 produced superior results.[27]  Steinholt Opp. at 16;

2   Ex. 181.

3        Defendants provide no authoritative support that the NASDAQ 100 index is an improper

4   component of the event study.  Instead, defendants' argument is belied by their own submissions:

5   the Declaration of Stefan Boedeker in Support of Defendants' Opposition to Plaintiffs' Motion for

6   Class Certification (Dkt. #298), submitted by defendants in this case, relied entirely on the

7   NASDAQ 100 to measure the performance and price movement of Oracle during the Class Period in

8   comparison to companies similar to Oracle.  Ex. 182, ¶¶6-9.  Defendants' own authority confirms

9   that the "one factor" market model used by Steinholt, as opposed to a "multifactor" industry model,

10  is the appropriate model.  *See* Ex. 183 at 155-56 ("In practice the gains from employing multifactor

11  models for event studies are limited.").

12       In any event, defendants' expert conceded that even using his industry indices, the March 2

13  decline cannot be explained by market and industry forces alone, and that his calculation of residual

14  returns would result in greater damages than Steinholt's.  Further, that Oracle's competitors' stock

15  prices declined following defendants' March 1, 2001 announcement does not help defendants.  As

16  defendants and their expert admit, other software stocks declined ***in response*** to the new information

17  disclosed by Oracle on March 1, 2001 – not the other way around.  Ex. 184, ¶3c; Defendants'

18  Revised Motion for Summary Judgment at 43.

19       **D.      Ellison's Evidence Destruction Further Requires Summary Judgment**

20       Courts presume that a party who "'prevented production did so out of the well-founded fear

21  that the contents would harm him.'"  *Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos,*

22  *S.A.*, 728 F.2d 572, 575 (1st Cir. 1984).  Ellison's destruction of thousands of e-mails and over a

23  hundred hours of taped interviews was wholesale and willful.  The adverse inferences should not be

24  limited to Ellison's knowledge.  Rather, it should be inferred that the destroyed evidence contained

25  additional information adverse to Ellison.  Because, as the Court has found, "it would be quite

26  ───────────────────────

27  [27]     Six of the nine companies in the peer group identified by defendants' expert, James, are also
    in the NASDAQ 100 index used by Steinholt.  *See* Ex. 181.

28

1  difficult for plaintiffs to demonstrate how they were harmed by evidence to which they do not have

2  access," and because "the Court [will] presume[] that any additional e-mails that plaintiffs did not

3  receive could have supported plaintiffs' claims" (9/2/08 Order (Dkt. #1478) at 8, 10), Ellison's

4  limited interpretation must be rejected.  A party who destroys relevant evidence is "'more likely to

5  have been threatened'" by that evidence. *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991).

6  For this reason, courts have rejected the very limitation urged by Ellison:

7            Cromwell argues that even if Byrnie is entitled to an adverse inference, such
             an inference must be limited to giving the greatest weight possible to other existing
8            evidence favorable to [the party who destroyed the evidence].  However, the rule
             offered by Cromwell rewards those most thorough in the art of document shredding
9            since as the existing evidence of unlawful behavior dwindles, the deterrent force of
             the threat of an adverse inference fades as well.

10 *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 110 (2d Cir. 2001); *MOSAID Techs. Inc. v.*

11 *Samsung Elecs. Co.*, 224 F.R.D. 595, 600 (D.N.J.), *aff'd*, 348 F. Supp. 2d 332 (D.N.J. 2004)

12 ("[T]here is no basis for allowing the inference only if the evidence before the jurors is insufficient

13 to establish a fact.  Were that the case, defendants' spoliation would be rewarded rather than

14 punished . . . .").  Ellison's e-mails and the *Softwar* interviews are the most direct contemporary

15 evidence not only of Ellison's knowledge, but also of the facts he knew.

16        Ellison argues that the inference must be limited because of the amount of other evidence

17 produced in this case.  Opp. at 46.  But Ellison is not allowed to decide what evidence to produce.

18 This Court has already found that Ellison destroyed evidence relevant to this litigation.  The "lost"

19 deals at the end of 3Q01 provide a prime example.  Ellison specifically told the market at the end of

20 3Q01 that deals fell out in the last few days of the quarter because of the declining economy:

21           [A]nd I was involved in an awful lot of these deals and looking at them both during,
             you know, the closed cycle and after the fact, as a post mortem. . . .  It seemed to be
22           extremely broad based and caused by just a general lack of confidence in the
             economy . . . .
23

24 Ex. 115 at 050656.  *See also* Ex. 104 at 092615 ("So, again, I will reemphasize.  These were not

25 deals that we lost competitively.  These were not deals where they decided not to buy.  These are

26 literally deferrals because of economic uncertainty."); *id.* at 092601-02, 092608, 092610, 092612.

27 But when asked to provide reasons for the 182 deals that defendants claim were lost in February,

28 defendants have been able to answer for just eight. Ex. 119 at 4-13, 24. This amnesia is incredible.

1    For example, Ellison specifically told the market that many of the deals delayed as a result of the

2    economy were from Oracle's OSI telecom vertical.  Ex. 104 at 092608 ("There is no question that

3    telecom – where dot.coms are gone, telecom is (strapped).  And, yeah, that's the sector where we

4    saw people delayed where they could – absolutely.  Probably more so than most sectors.").  Yet,

5    defendants now have no memory and did not preserve any documents from OSI's telecom vertical,

6    which accounted for a large part of Oracle's 3Q01 miss.  Ex. 158.  The telecom vertical was headed

7    by four VPs, and RMs reported to these VPs.  *Id.*  Oracle did not preserve the files of a single

8    telecom VP or RM.  *Id.*  Not a single document has been produced from the files of any telecom

9    executive or employee.  *Id.*  Because defendants have spoliated Ellison's files and the files of every

10   member of Oracle's telecom vertical, all communications with Ellison relating to these critical lost

11   deals have been lost.  And OSI forecasting reports show that by January 29, almost all of the telecom

12   deals that OSI had reported "MUST close" for OSI to make its forecast were "not likely to close."[28]

13   Exs. 71, 73, 75-77.  The inference must be that the evidence destroyed by Ellison, who was involved

14   in "an awful lot" of the deals, contained information adverse to him.  Ex. 115 at 050656.  And

15   contrary to Ellison's assertions, as previously discussed, the directive is another prime example of

16   the prejudice caused by Ellison's spoliation.  *See supra*, n.14.  Defendants did not even preserve the

17   files of the OPI Finance Director, who Minton put in charge of working with Ellison to implement it.

18   *Id.*

19          These are just examples of defendants' wide-ranging evidence destruction.  Because, as this

20   Court noted, Ellison's spoliation has made it difficult (to a large extent, impossible) to know what

21   was destroyed, the adverse inference should be applied broadly.

22

23

24

25   _____

26   [28]      It is likely that many of these deals were "not likely to close" even earlier.  Oracle, however,
     has not produced any versions of this report for December or any earlier date in January (despite the
27   fact that this report has been produced throughout the first two months for other quarters).

28

1 | III.    CONCLUSION

2 |      For the foregoing reasons, plaintiffs' Motion should be GRANTED.

3 | DATED:  December 12, 2008           Respectfully submitted,

4 |                      COUGHLIN STOIA GELLER
                       RUDMAN & ROBBINS LLP

5 |                      MARK SOLOMON
                     DOUGLAS R. BRITTON

6 |

7 |

                             s/ MARK SOLOMON

8 |                          MARK SOLOMON

9 |                      655 West Broadway, Suite 1900
                     San Diego, CA  92101

10 |                      Telephone:  619/231-1058
                     619/231-7423 (fax)

11 |

                     COUGHLIN STOIA GELLER

12 |                        RUDMAN & ROBBINS LLP
                     SHAWN A. WILLIAMS

13 |                      WILLOW E. RADCLIFFE
                     ELI R. GREENSTEIN

14 |                      DANIEL J. PFEFFERBAUM
                     100 Pine Street, Suite 2600

15 |                      San Francisco, CA  94111
                     Telephone:  415/288-4545

16 |                      415/288-4534 (fax)

17 |                      COUGHLIN STOIA GELLER
                       RUDMAN & ROBBINS LLP

18 |                      STACEY M. KAPLAN
                     9601 Wilshire Blvd., Suite 510

19 |                      Los Angeles, CA  90210
                     Telephone:  310/859-3100

20 |                      310/278-2148 (fax)

21 |                      Lead Counsel for Plaintiffs

22 | S:\CasesSD\Oracle3\BRF00056149_SJ Reply.doc

23 |

24 |

25 |

26 |

27 |

28 |

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on December 12, 2008, I electronically filed the foregoing with the Clerk

3  of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7        I further certify that I caused this document to be forwarded to the following designated

8  Internet site at:  http://securities.csgrr.com/.

9        I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on December 12, 2008.

11

12                          s/ MARK SOLOMON
                              MARK SOLOMON

13

14                          COUGHLIN STOIA GELLER
                             RUDMAN & ROBBINS LLP

15                          655 West Broadway, Suite 1900
                          San Diego, CA  92101-3301

16                          Telephone:  619/231-1058
                          619/231-7423 (fax)

17

18                          E-mail:  marks@csgrr.com

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:01-cv-00988-SI

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111