# EXHIBIT 126

5 of 18 DOCUMENTS

Copyright 2001 Washington Service Associates, Inc.
U.S. Insider Trading Database

COMPANY: ORACLE CORP
TICKER: ORCL
CUSIP: 68389X10

Form 4

FILING-DATE: February 9, 2001
TRANSACTION-DATE: January 23, 2001

**LENGTH:** 29 words

**Filer/Addr/Relation * * * * * Transaction * * Shares * * * Price * * Holdings** ELLISON LAWRENCE J
  Option Sale  5,100,000     $31.64      N/A
REDWOOD CITY, CA 94065
CHIEF EXECUTIVE OFFICER

**LOAD-DATE:** February 14, 2001

# EXHIBIT 127

1

92040AS1.TXT

```
1   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
2              IN AND FOR NEW CASTLE COUNTY
3   IN RE ORACLE CORP.    :  CONSOLIDATED
    DERIVATIVE LITIGATION  -  C.A. No. 18751
4
5                    - - -
6                         Chancery Court Chambers
                          New Castle County Courthouse
7                         Wilmington, Delaware
                          Thursday, September 2, 2004
8                         9:00 a.m.
9                    - - -
10  BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.
11                   - - -
12       DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                    VOLUME I
13                   - - -
14
15
16
17
18
19
20
21
22             CHANCERY COURT REPORTERS
23      500 North King Street - Suite 11400
          Wilmington, Delaware 19801-3759
24              (302) 255-0525
```

02

```
1  APPEARANCES:
2            ROBERT D. GOLDBERG, ESQ.
             Biggs & Battaglia
                    Page 1
```

92040AS1.TXT

```
3                        JOSEPH J. TABACCO, JR., ESQ.
                         -and-
4                        NICOLE LAVALLEE, ESQ.
5                        ELIZABETH GUARNIERI, ESQ.
                         of the California Bar
6                        Berman, DeValerio, Pease,
                         Tabacco, Burt & Pucillo
7                        -and-
                         DARIO de GHETALDI, ESQ.
8                        of the California Bar
                         Corey, Luzaich, Pliska, de Ghetaldi
9                        & Nastari, LLP
                         -and-
10                       KAREN MORRIS, ESQ.
                         R. MICHAEL LINDSEY, ESQ.
11                       Morris and Morris LLC
                         -and-
12                       ROBERT B. WEISER, ESQ.
                         ROBIN WINCHESTER, ESQ.
13                       ERIC L. ZAGAR, ESQ.
                         of the Pennsylvania Bar
14                       Schiffrin & Barroway
                         for Plaintiffs
15                       KENNETH J. NACHBAR, ESQ.
                         Morris, Nichols, Arsht & Tunnell
16                       -and-
                         JAVIER H. RUBINSTEIN, ESQ.
17                       ALAN N. SALPETER, ESQ.
                         JOHN NADOLENCO, ESQ.
18                       of the Illinois Bar
                         Mayer, Brown, Rowe & Maw
19                       for the Individual Defendants
20                       ALLEN M. TERRELL, JR., ESQ.
                         Richards, Layton & Finger
21                       -and-
                         JORDAN ETH, ESQ.
22                       of the California Bar
                         Morrison & Foerster
23                       for Oracle Corporation
24                            Appearances (Cont'd)
```

03

```
1
2
3  APPEARANCES (Cont'd)
4
5            JAMES G. KREISSMAN, ESQ.
             of the California Bar
6            Simpson Thacher & Bartlett
             for the Special Litigation
             Committee of Nominal Defendant
                    Page 2
```

92040AS1.TXT
Oracle Corporation

```
7
8  Also Present:
9            JAMES MAROULIS, ESQ.
             Oracle In-house Counsel
10
11                   - - -
```

04

```
1            MR. NACHBAR:  Good morning, Your
2  Honor.  This is the time for the individual
3  defendants' motion for summary judgment in In Re
4  Oracle Corporation derivative litigation.  We thank
5  the Court for's hearing us.  With the Court's
6  permission, I'm going to divide the argument with
7  Mr. Salpeter of Mayer, Brown, Rowe & Maw.
8            THE COURT:  Good morning.
9            MR. NACHBAR:  Mr. Salpeter will
10 address primarily the factual issues; I'll address
                    Page 3
```

92040AS1.TXT

```
11 primarily the legal issues, although there will
12 probably be some spillover.  Also seated at our
13 counsel table is Javier Rubinstein and
14 John Nadolenco, both of who are with Mayer, Brown.
15 Before we begin, I believe some other counsel have
16 introductions to make.
17           MR. TERRELL:  Good morning, Your
18 Honor.  Also seated at counsel table with me is
19 Jordan Eth, counsel to Oracle, and from Oracle's
20 legal department, senior counsel, James Morrow.  And
21 on behalf of the special committee of the board of
22 directors, James Kreissman of the Simpson Thacher
23 firm.
24           MR. GOLDBERG:  Good morning, Your
```

05

```
1  Honor.  On behalf of plaintiffs, I would like to
2  introduce at plaintiffs' counsel table,
3  Joseph Tabacco from the firm of Berman, Devalerio,
4  Pease, Tabacco, Burt & Pucillo; Nicole Lavallee, also
5  of Berman, Devalerio.
6            Also seated at counsel table is
7  Mr. de Ghetaldi of the Corey, Luzich, Pliska,
8  deGhetaldi & Nastari law firm.  Miss Morris of
9  Morris & Morris, as well as R. Michael Lindsey.  And
10 we have Robert Weiser and Eric Zagar also of the
11 Schiffrin Barroway firm.
12           With Your Honor's permission, the
13 argument will be split by plaintiffs, with
14 Mr. Tabacco and Mr. de Ghetaldi splitting the
                    Page 4
```

92040AS1.TXT

15 argument.

16         THE COURT: Would it be helpful if we

17 did the shades? Okay.

18         I want to start with -- I don't want

19 to hear about the motion to strike.

20         Here's what we're going to do. You

21 can work on an order where the infamous de Ghetaldi

22 affidavit will be converted to plaintiffs' -- how

23 should I call this? --volume two of plaintiffs'

24 answering brief in opposition to the motion for

06

1 summary judgment.

2         Mr. de Ghetaldi shall file a simple

3 affidavit affirming that the charts that he attached

4 to the volume two of the answering brief in

5 opposition to this motion for summary judgment are

6 true and correct and are drawn from exhibits.

7         This was not the way to seek

8 additional pages. I don't want to go into it, but

9 it's clearly not an appropriate affidavit. I don't

10 have a problem with many of the charts and I don't

11 really believe the defendants do. But if you want

12 to -- if you want to explain summary charts and

13 you're not a fact witness, there's a place to do it,

14 and you're hired and your name appears on the brief.

15 And this is just clearly -- we had a call about the

16 length of the brief. This is clearly stuff that the

17 plaintiffs were hoping to put in a 200-page brief. I

18 only gave them -- I forget -- 90-some slight number

Page 5

---

92040AS1.TXT

19 like that, and then it ends up in what's called an

20 affidavit.

21         I read the affidavit carefully.

22 That's one of the wonderful things about motions to

23 strike like this. You know, once they're in, they're

24 in. I don't remember striking an expert report on

07

1 the law -- 75 pages from an expert on the law --

2 partnerships. We don't usually do that. But, you

3 know, I noted, too, the defendants, they sort of

4 accomplished their purpose. Because in order to deal

5 with the motion, I had to read the fellow's reviews

6 on the law anyway. I erased -- unfortunately, I

7 have an ability to erase what I don't want from my

8 mind.

9         That's how we'll approach that. And

10 then we'll focus -- the practical reality is, the

11 record would be incomplete. The plaintiffs have

12 relied so heavily on it, although I do want to

13 talk -- what I'd like to do at some point -- and I'll

14 raise this now. I think we should talk with the

15 lawyers and myself after the argument about new

16 developments. And I also have a few suggestions,

17 because I know you're all litigators and wish to

18 apply your trade. I might even actually show you

19 what the area around my desk looks like and suggest

20 to you all that next time that you wish to file

21 briefs you may want to think about -- well, we'll

22 talk about it later -- about how you work with

Page 6

---

92040AS1.TXT

23 documents.

24         Let's go on to the heart of the show.

08

1         MR. SALPETER: Your Honor, Alan

2 Salpeter for Larry Ellison and Jeff Henley. I'm the

3 lead off hitter today.

4         This is our motion for summary

5 judgment on behalf of Ellison and Henley. As Your

6 Honor knows, they're accused of insider trading in

7 the third quarter of 2001. As Your Honor also knows,

8 to make out a claim -- an insider trading claim under

9 Brophy -- if a cause of action still exists,

10 plaintiffs have to show Two things: first, that

11 Ellison and Henley possessed material, nonpublic

12 information -- that's the part I'm going to talk

13 about -- and second, that they sold their stock

14 because of or based upon the inside information.

15         We think the case really boils down

16 to one basic issue: did Ellison and Henley sell stock

17 in January of 2001 based on material, nonpublic

18 information? And that leads us to explore the

19 question of: what did they know when they sold their

20 stock in January of '01? We filed this motion

21 because we believe strongly that the material facts

22 surrounding the stock sales and the question of what

23 they knew when they sold, those issues are

24 undisputed. In our view, the material facts are

09

Page 7

---

92040AS1.TXT

1 undisputed about those sales and they're entitled to

2 judgment as a matter of law.

3         Now, I'm very mindful of the fact

4 that you've been through this record in detail at

5 least twice: once in connection with the SLC motion

6 to terminate; and, again, in connection with this

7 motion. So, I don't intend --

8         THE COURT: It seems like a slightly

9 different case.

10         MR. SALPETER: Yes. Different

11 issues. But many of the same documents --

12         THE COURT: Although, I was visited

13 by the past yesterday afternoon.

14         MR. SALPETER: Well, I'm looking

15 forward to seeing the pile in your office that you

16 described.

17         THE COURT: The Ninth Circuit's

18 opinion was like a tour down, what appears to be,

19 memory lane. We'll have to talk about that later, I

20 suppose.

21         MR. SALPETER: I take full

22 responsibility for some of the trees that were

23 knocked down in connection with your pile of paper.

24         What I want to do today is take four

010

1 snapshots of key dates. Before I do that, I want to

2 mention three sort of foundational and background

3 facts that we're going to be referring to time and

Page 8

92040AS1.TXT

4  time again. Obviously you know that the third
5  quarter guidance consisted of $.12 EPS, and it
6  consisted of a license revenue growth projection of
7  about 25 percent.
8           The second thing is that the guidance
9  was expressed in global terms -- in other words,
10  companywide. But we're going to be focusing on the
11  U.S. sales because that's what they're focusing on.
12  And when we focus on U.S. sales, we're talking about
13  the U.S. sales organization which has three pieces to
14  it.
15           Again, I know you know these names
16  but I just want to make sure we're working off the
17  same menu here: OSI, which sells the business
18  software to financial services, governmental and
19  educational markets; OPI, which sells to large
20  manufacturing companies; and NAS, which sells to sort
21  of all other North American customers.
22           And then the third background fact to
23  please keep in mind is that, when you start looking
24  at the U.S. sales numbers, $100 million of license

011

1  sales in the U.S. equates to $.01 a share EPS. That
2  will become important later. 100 million license
3  sales equals $.01 of EPS.
4           Now, I want to go back in time and,
5  with the help of some visuals and some video
6  excerpts, I want to focus on what Ellison and Henley
7  knew when they sold their stock in the third quarter
                    Page 9

92040AS1.TXT

8  of '01. Again, I think it's helpful to organize this
9  in four snapshots. The first snapshot is
10  December 14th, 2000. That's when they announced the
11  public guidance. And we're going to show that
12  when -- we're going to show what they were thinking
13  and what they knew and what they had been told when
14  they went into the quarter. That's the purpose of
15  the first snapshot.
16          The second snapshot is January 4th,
17  2001, the day that Henley sold his stock. And we're
18  going to look at what he knew on that date and we're
19  going to argue as hard as we can that it's undisputed
20  that he didn't possess any material nonpublic
21  information on that day.
22          The third snapshot is January 22nd to
23  31st. That's the ten-day period. And that's when
24  Ellison sold his Oracle stock. And, again, we're

012

1  going to make the same argument that he did not
2  possess material nonpublic information at the time
3  that he made those sales and he didn't believe or
4  even suspect that he was going to miss the quarterly
5  guidance.
6           I think it's important to say -- and
7  I'll probably say it more than you want to hear --
8  that there just isn't a shred of evidence here that
9  anyone at Oracle suspected that Oracle was going to
10  miss its guidance until the last three days of the
11  quarter. You talked about the reams of paper that
                    Page 10

92040AS1.TXT

12  you already have, and I guess more will be trotted
13  out today. Not one e-mail, not one memo, not one
14  conversation where anyone told -- anyone at Oracle
15  told Ellison or Henley that they feared they were
16  going to miss the quarter, not until the last three
17  days of February. So, that's the third snapshot --
18  the Ellison snapshot.
19          THE COURT: Well, you would admit
20  that throughout February the company's best estimate
21  is that it would fall short of the mark?
22          MR. SALPETER: No, I wouldn't admit
23  that. I admit some of the numbers declined.
24          THE COURT: Did you listen to the

013

1  month I referenced?
2          MR. SALPETER: You said in February?
3          THE COURT: Yeah.
4          MR. SALPETER: At the very end of
5  February --
6          THE COURT: No, throughout February.
7          The upside report -- you've impressed
8  upon me -- and it seems to me to be pretty clearly
9  clear -- that Miss Minton's estimate was the best
10  estimate of -- best predictor about how Oracle would
11  do in a quarter. Throughout February, those were
12  consistently below the guidance. They're
13  consistently below the guidance.
14          MR. SALPETER: They're not below the
15  guidance. They're not.
                    Page 11

92040AS1.TXT

16          THE COURT: 11.25 cents is not below
17  the guidance?
18          MR. SALPETER: When we get into the
19  end of February -- and we'll get to the actual
20  documents in a few minutes. But when we get to --
21  when we get to the end of February -- yeah, the last
22  three days of February -- we're within striking
23  distance on February 26th. We're still within
24  striking distance. We're under the guidance on

014

1  February 26th.
2          THE COURT: Okay. I guess we're
3  arguing about semantics here. But if the best
4  estimate is that you're going to earn 11.2 cents --
5          MR. SALPETER: I'm sorry. Go ahead.
6          THE COURT: Well, I believe it's
7  uncontradicted -- we can go through each of the -- go
8  through the upside book. It bounced around in early
9  February, but it was below 12 throughout February.
10          MR. SALPETER: Correct. On
11  February 5th, the upside report shows -- I don't know
12  if I'm looking at the same chart you are -- shows --
13          THE COURT: 11.29?
14          MR. SALPETER: Correct. Correct.
15  Still within striking distance --
16          THE COURT: That's a different point.
17          I'm just saying, when you mention the
18  fear or whatever -- Miss Minton was telling everybody
19  in February, you know, "My best estimate is we're
                    Page 12

92040AS1.TXT

20   going to fall somewhat short of the mark here."

21              Is that correct?

22              MR. SALPETER:  Yes.  Still within

23   striking distance, for all the reasons we'll talk

24   about -- the hockey-stick effect.

J15

1              THE COURT:  This is after the trading

2    ceased, I understand.

3              MR. SALPETER:  It is.  A week after.

4              So, the last snapshot I'm going to

5    use, Your Honor, is the last three days of February.

6    The last three days of February is where you see what

7    actually happened in the third quarter, and that, in

8    our view, shows that that's when the e-mail traffic

9    hits.  That's when people realize that the guidance

10   is not going to be met.

11             So, I want to go to the first

12   snapshot, the December 14, 2000 snapshot.  And

13   there's really two main points about December 14th.

14   The first point is that the guidance of $.12 a share

15   and the guidance of about 25 percent license revenue

16   growth was derived from forecasts that Ellison and

17   Henley got from Jennifer Minton.  Your Honor also

18   observed that she was the principal forecaster.  She

19   was head of the financial planning and analysis

20   group, and her forecast was given to Ellison and

21   Henley on December 11th, three days before the public

22   guidance.  That was in an upside report.

23             THE COURT:  Right.  These upside

Page 13

92040AS1.TXT

24   reports are distributed in advance of the upside

16

1    meeting, or the ENC?

2              MR. SALPETER:  Correct.

3              THE COURT:  And they're collected at

4    the end?

5              MR. SALPETER:  Collected at the end

6    of the meeting?

7              THE COURT:  Yes.

8              MR. SALPETER:  Yes.  That's my

9    understanding.  And my understanding is --

10             THE COURT:  Is that collection -- is

11   that applicable to Mr. Henley, too?  Does he get to

12   keep his?

13             MR. SALPETER:  I don't know the

14   answer to that, but I'll find out.

15             THE COURT:  This is -- before I

16   forget this question -- the so-called pipeline

17   reports?

18             MR. SALPETER:  Right.

19             THE COURT:  Is that a similar

20   practice?

21             MR. SALPETER:  I don't know the

22   answer, and I'll find out.  I think it is the same

23   practice.  Yeah, it is the same practice.

24             The upside report, of course, is the

17

Page 14

92040AS1.TXT

1    wrap up of the entire company forecast.  It's the

2    best that the company can do in forecasting.  So, the

3    two main points about December 14th are that the

4    guidance comes from Jennifer Minton's forecast.  And

5    in this case the upside was the December 11 upside

6    report.

7              The second big point about

8    December 14th is that the key financial indicators

9    showed that Oracle had been and still was performing

10   extremely well and it had incredible momentum going

11   into the third quarter.

12             Let me show you on this slide what

13   Henley and Ellison knew on December 14th.  They had

14   just come off two record quarters, and they had

15   record results in both the first quarter of '01 and

16   in the second quarter of '01.  Here's what had

17   happened.

18             In the first quarter of '01, Oracle

19   had broken records in five categories: earnings per

20   share up 100 percent; total revenue up 16 percent;

21   total license revenue up 27 percent; size of license

22   pipeline up 72 percent; and operating margins up

23   12 percent, when compared to the same quarter in

24   prior fiscal years.  It's a year-over-year, as the

r18

1    Oracle people call it.

2              In the second quarter of '01, Oracle

3    also broke a record in five categories: earnings per

Page 15

92040AS1.TXT

4    share up 3 percent; total revenue up 16 percent;

5    total license revenue up 24 percent; size of license

6    pipeline up 57 percent; and operating margins up

7    10 percent.  Again, compared with the same quarter

8    the prior year.

9              So, these first two quarters of

10   fiscal '01, Oracle had produced its best results in

11   history.  So, this gave Ellison and Henley confidence

12   going into the third quarter.  And their confidence

13   was bolstered further by the closing of the Covisint

14   deal.  The $60 million Covisint deal closed in early

15   December.  That was the largest deal in Oracle's

16   history.  And it was unusual for Oracle to close such

17   a large deal so early in the quarter.

18             Ellison and Henley's confidence about

19   the third quarter also is reaffirmed by the upside

20   report of December 11th, which is on the next

21   slide -- or at least a summary of it is.  We'll show

22   you the actual report in a minute.

23             The upside report showed 33 percent

24   projected license revenue growth versus the guidance

19

1    of about 25, and $.13 a share, which is a rounded off

2    number from 12.8 cents versus the $.12 public

3    guidance and 52 percent pipeline growth over the

4    third quarter the year before.

5              THE COURT:  I don't know when you're

6    going to do it, but both sides need to walk me

7    through a little bit of their take on this pipeline

Page 16

92040AS1.TXT

8 growth and conversion issue.

9          MR. SALPETER: We're going to do

10 that. If it's all right with you, I think it will

11 fit better in another place.

12          THE COURT: That's fine. And

13 Covisint fits into that?

14          MR. SALPETER: Yes. We will do that.

15          As you can see from this slide, the

16 guidance given on December 14th by Ellison and Henley

17 was completely consistent with and, in several cases,

18 less than the forecast that they got from

19 Jennifer Minton.

20          Now, it's important to digress for a

21 second and tell you that Ellison and Henley had every

22 reason to rely on Minton. She was excellent at

23 forecasting. It's undisputed that Oracle had never

24 missed one of her quarterly forecasts since she

020

1 started in that position in 1998. She had gotten it

2 right 14 straight times. Not a bad batting average.

3 Her forecast historically was the most accurate

4 prediction of Oracle's performance. Ellison and

5 Henley trusted her. They had every reason to trust

6 her.

7          Let's look at the next slide, which

8 is the actual upside report. You know, I think it's

9 worth taking a minute to talk about these columns.

10 These are misnomers. At least I think they're

11 misnomers. The column forecast -- the forecast

Page 17

92040AS1.TXT

12 column, that's the sales force's projection.

13          THE COURT: Right.

14          MR. SALPETER: The upside column is

15 Jennifer Minton's own adjustment. And the upside

16 doesn't really mean it's up every time. Sometimes

17 it's down. So, I think that's a misnomer. And the

18 potential column, that's Jennifer Minton's final

19 judgment, if you will, about the projection for the

20 quarters.

21          THE COURT: That's her best estimate.

22          MR. SALPETER: Exactly. That's her

23 most likely best estimate.

24          So here you just see the actual

021

1 document with the same numbers that I already

2 discussed. We're just using the call outs because

3 they're so hard to read. Minton's upside report also

4 reported -- in addition to these items -- also

5 reported on the pipeline growth. And it reported

6 52 percent bigger than the same time last year.

7 That's an actual number. That's actual pipeline

8 number.

9          In his deposition and in a clip

10 you're going to see in a few minutes, Larry Ellison

11 called this an astounding rate of growth. The

12 pipeline was huge. The question, of course, is --

13 and it's the one you were getting to a minute ago --

14 how much of that pipeline gets converted into real

15 business? And let me show you a chart which shows

Page 18

92040AS1.TXT

16 that if Oracle had converted this huge pipeline as

17 of -- the pipeline that we're looking at here is a

18 pipeline as of December 11th, 2000. If it had

19 converted this pipeline at the conversion rate that

20 it had achieved in the third quarter of '00 -- one

21 year before -- Oracle would have beaten its guidance

22 significantly.

23          THE COURT: So -- and the conversion

24 rate you're using there is what? Tell me how that

022

1 computation worked.

2          MR. SALPETER: We're taking the

3 conversion rate from the third quarter of '00.

4          THE COURT: For the entire quarter of

5 '00?

6          MR. SALPETER: Correct.

7          THE COURT: Applied to what?

8          MR. SALPETER: Applied to the

9 pipeline in the third quarter of '01, as of

10 December 11th, when the pipeline report was put out.

11          THE COURT: Okay. I guess what I'm

12 getting at -- it's sort of confusing to me.

13          How did -- what are the factors in

14 the equation to come up with a third quarter '00

15 conversion rate? What was the pipeline --

16          MR. SALPETER: How is the math done?

17          THE COURT: What was the pipeline

18 figure that was applied to it, recognizing -- if you

19 see this chart, for example; right?

Page 19

92040AS1.TXT

20          MR. SALPETER: Yes.

21          THE COURT: There are various

22 pipeline -- well, as I understand it, the pipeline

23 percentage would move throughout the quarter.

24          MR. SALPETER: The pipeline moves

023

1 throughout the quarter. In fact, it goes down during

2 the quarter as deals turn into -- as potential deals

3 turn into real deals and as deals fall away.

4          THE COURT: When you go back and take

5 that picture and say, "here's our pipeline conversion

6 rate for the third quarter of '00," do you take what

7 the pipeline -- what Jennifer Minton's pipeline

8 projection was as of the beginning of '00 and then

9 look at what ultimately happened at the end of third

10 quarter '00 and use that to come up with a pipeline

11 conversion?

12          MR. SALPETER: I think the answer is

13 yes, and yes to those questions. Yes. The answer is

14 yes to those two questions.

15          So, we're going to come back to this

16 slide a number of times. Again, we're putting

17 25 percent growth here. Really, as you know, the

18 guidance was about 25. Does about 25 mean 24, 23? I

19 mean, we can have a debate about that. For this

20 purpose we don't need to have that debated.

21          Let me just sum up December 14th for

22 a second. Coming off two record quarters, 60 million

23 Covisint transaction, we have Minton's upside report,

Page 20

92040AS1.TXT

24  which gives Ellison and Henley a lot of confidence.

024

1   And that's what they knew.  This is what they knew
2   going into the third quarter.  So now I'm going to
3   fast forward to the next snapshot, January 4.  That's
4   when Henley sold his stock.
5               Henley knew when he sold his stock on
6   January 4 that the upside reports continued to show
7   strong growth, and those reports indicated that
8   Oracle was going to meet or beat its guidance.
9   Specifically, the most recent upside report that
10  Henley had on January 4 was a December 25 upside
11  report.  And let's go to that one.
12              This is now December 25.  It's
13  amazing.  They put out a report on Christmas.
14              THE COURT:  As I said, visions of
15  Cratchit -- the female Cratchit and Larry Ellison and
16  Jeff Henley as Scrooge and Marley before the
17  reformation.
18              MR. SALPETER:  I'm not going to touch
19  that one.
20              Anyway, this is the upside report
21  prior to the Henley sale.  It shows actual pipeline
22  growth of 24 percent -- 34 percent.  Again, that's
23  versus the same quarter the year before.
24              And then in the next slide you see

025

Page 21

92040AS1.TXT

1   license revenue growth of 33 percent, again,
2   contrasted with the about 25.  And you see earning
3   per share of 12.7 cents.
4               THE COURT:  Okay.  Let's pause on
5   that point because your friends make much of it,
6   don't they?
7               MR. SALPETER:  They make much about
8   this one?
9               THE COURT:  I think so.  I think what
10  they make much of is the pipeline -- the fact that
11  the pipeline went from 52 to 34 in the two weeks
12  before Christmas.
13              MR. SALPETER:  Yeah, still --
14              THE COURT:  As the Oracle product
15  dropped off the Christmas shopping list.
16              MR. SALPETER:  Well, I think there's
17  an easy answer to that, which is there was still --
18  first of all, it's not an extreme departure.  There's
19  still plenty of pipeline to make --
20              THE COURT:  Tell me why it's not an
21  extreme departure.
22              MR. SALPETER:  Well, because there is
23  plenty of pipeline to make the guidance.  The
24  pipeline -- I mean, let's think about for a minute --

026

1   just dwell on the obvious here.  The pipeline is
2   33 percent more than it was the year before.
3               THE COURT:  Right.
4               MR. SALPETER:  When they converted
                    Page 22

92040AS1.TXT

5   the pipeline -- and we showed you the chart.  If they
6   convert the pipeline from the year before, they're
7   easily over the guidance.
8               THE COURT:  If they converted at the
9   rate the year before?
10              MR. SALPETER:  Right.  Conversion
11  rate the year before.
12              THE COURT:  What your friends say is
13  that what is unusual about this and that should have
14  triggered concern was the sharp decline between a
15  52 percent and 34 in a short period of time.
16              MR. SALPETER:  Well, for one thing,
17  in the first and second quarters of '01, Oracle got
18  off to a very, very slow start and either meet or
19  beat the quarter.  Because of the hockey-stick
20  effect, you can't draw any conclusion this early in
21  the quarter.  We don't even have December results yet
22  and we're in the first two months of the quarter.
23              We have a couple of graphics here
24  which demonstrate the sharp curve of that hockey

027

1   stick.  I know you heard a lot about the hockey stick
2   before, but the dramatic effect of it shows that you
3   cannot -- you cannot tell how the quarter is going
4   until you get to that third month.  The pipeline
5   always drops.
6               THE COURT:  Does it always drop?
7               MR. SALPETER:  It always drops.  It
8   dropped 21 percent in Q1 by week ten, and it had
                    Page 23

92040AS1.TXT

9   dropped 18 percent in Q3 by week ten.  So, there's
10  not -- the rate had dropped.  The rate of drop, if
11  you will, is not unusual at all for this time in the
12  quarter -- for this particular niche in time in the
13  quarter.  So, it's just not unusual.
14              THE COURT:  How about the magnitude?
15  I'm not that adept at math, but 52 to 34 is a more
16  sizable drop than 18 percent; right?
17              MR. SALPETER:  Yeah.  And Henley
18  testified that he thought that 52 percent number --
19  he discounted that number.  He took it with a grain
20  of salt when they made the guidance, to begin with.
21              And you're going to see some clips in
22  a few minutes from both Ellison and Henley who say
23  they were not concerned because, even at 33 percent
24  growth, it's still way above the forecasted license

028

1   revenue growth.
2               THE COURT:  What you're saying is,
3   when you apply the historical conversion rate from
4   the third quarter '00 to that 33 percent, you're well
5   above the guidance for revenue growth --
6               MR. SALPETER:  Yes.
7               THE COURT:  -- license revenue
8   growth?
9               MR. SALPETER:  Correct.  And when you
10  see the drop that occurred in other quarters, this is
11  not a warning sign.  This is not a red flag.
12              So, we're still on the January 4
                    Page 24

92040AS1.TXT

13 snapshot.  And I want to go to one piece of
14 contemporaneous evidence showing exactly what Henley
15 was thinking on January 4.
16          On January 4, Henley wrote out some
17 comments for a presentation that he was going to make
18 to the audit committee meeting of Oracle and its
19 directors which is going to occur a few days later.
20 He actually made these comments at the audit
21 committee.  I don't know that he made them in exactly
22 these words that he wrote out, but these were talking
23 points that he was going to make.
24          Let's put up the slide of Henley's

329

1 comments of January 4.  This is Henley talking now.
2          "At this point, all data since the
3 call point to more economic softening so there is
4 risk of slippage in deals."  There's the word
5 "softening."
6          "Offsetting this is stronger than
7 normal approval activity in December, the Covisint
8 deal already in, and checks with the three U.S. execs
9 saying they aren't as yet hearing of slippage from
10 their managers (although it's still early in the
11 quarter).  ...Net, net we still feel good about Q3
12 but the economy is a wildcard" -- he had said that
13 before, by the way -- "that nobody can fully predict
14 with 2 long months to go."
15          So, if we can get inside Jeff
16 Henley's head on January 4, that's what he was
                      Page 25

92040AS1.TXT

17 thinking.  And he said repeatedly in his deposition
18 that he never suspected that Oracle was going to miss
19 the guidance until the last few days of the quarter.
20          We now have the video excerpt of
21 Jeff Henley.
22          "Question:  Okay.  So let me -- I'm
23 not sure you answered my question.  My question was,
24 you referred here to the fact that you were not

Ц30

1 seeing a slowdown in the business yet.  Did you at
2 some point in Q3 feel that you were starting to see a
3 slowdown?
4          "Answer:  The last couple days of the
5 quarter and the last day of the quarter we definitely
6 saw a slowdown.  But until that point, no, I still
7 thought we were going to do 25 percent, which would
8 have been approximately the same as we did in the
9 second quarter.
10          "Question:  Okay.  And you mentioned
11 earlier that you did have some concerns because of
12 the market.
13          "Answer:  Absolutely.
14          "Question:  Okay.
15          "Answer:  But I think -- as I said
16 earlier, everything I could tell, from deep
17 interrogation to our sales executives, to looking to
18 what all our competitors announced in mid January for
19 their December actuals, which were strong, and what
20 they announced for their third quarter guidance,
                      Page 26

92040AS1.TXT

21 which continued to be strong, continuation of the
22 trend they had seen -- I attended Tom Siebel's
23 presentation at Morgan Stanley at the time I
24 presented.  He was nothing but bullish.  Got all the

Ц31

1 same questions:  What about the economy?  He kind of
2 echoed what we said.
3          "So I saw nothing from other software
4 executives that we competed with that said anything
5 different than what I saw.
6          "Question:  And is that true
7 throughout the entire quarter?
8          "Answer:  I believe so because we
9 typically report, compared to most of our
10 competitors, a month ahead.  So we were the first
11 person to see a report actuals.  They then reported
12 their actuals in March.  And my recollection is
13 almost all of them missed their quarter too.  And
14 they were all in a state of shock, as we were, at the
15 end of February."
16          To his credit, he acknowledges a
17 number of times in his deposition that actual
18 economic conditions concerned him.  He acknowledges
19 that.  And he testified that he went back to the
20 executive vice presidents, the people in charge of
21 each of the main business units and that -- to test
22 their earlier forecasts, and they reassured him that
23 they were still on track.
24          THE COURT:  Is it fair to say that
                      Page 27

92040AS1.TXT

Ц32

1 Mr. Henley is a more cautious person than
2 Mr. Ellison?
3          MR. SALPETER:  I would say, if you
4 watch these depositions as much as we have in the
5 last two weeks, you would draw that conclusion.
6          However --
7          THE COURT:  Or even from the calls.
8          MR. SALPETER:  Well, I think that
9 Larry Ellison is the optimist.  He believes what he
10 says.  And you're going to see some of the core
11 questions that he was asked in a few minutes.  And I
12 think, you know, they're different personalities.
13 They're different kinds of people.  And I think
14 together they make a formidable team.
15          I think it shows that -- I mean,
16 neither one of them doubted that they were going to
17 make the quarter.  They express it in different ways.
18 But neither one of them doubted it.  You'll see an
19 e-mail that we get to from Larry Ellison on
20 February 26th.  He still thinks there's a chance.
21          So, they came to the same conclusion,
22 perhaps from a different thought process.  Henley
23 talked a number of times about going back to the EVPs
24 and they continuously reassured him that they were on

Ц33

                      Page 28

9204OAS1.TXT

1 track. Let me show you a couple slides here.
2                    This is OSI. This is the forecast
3 for OSI. You see throughout December and throughout
4 January they're holding with that same forecast for
5 OSI. Then you see the little blip down, until the
6 collapse at the end of February. This is the EVP
7 forecast.
8                    THE COURT: When the forecast goes to
9 Miss Minton, how many days in advance of the upside
10 report?
11                   MR. SALPETER: I don't know that
12 there's a pattern. I don't know that it's always two
13 days before. I know that there's --
14                   THE COURT: I'm just saying, on the
15 25, when you see this sort of diminution, would the
16 unit heads have had a pretty good idea how the month
17 was closing out as they put this forecast together,
18 some sense of what they're --
19                   MR. SALPETER: We don't have the
20 actuals.
21                   THE COURT: I didn't say that.
22 Obviously, to put together the actuals -- I forget
23 when the actuals came out for February. I thought
24 they were February 8th.

J34

1                    MR. SALPETER: February 8th January's
2 actuals came out.
3                    THE COURT: I'm assuming you put the
4 actuals out on February 8th. It all feeds up from
Page 29

9204OAS1.TXT

5 the bottom, right? --and you have to close out a
6 quarter. I'm trying to get some sense of whether the
7 unit heads were obviously focusing on closing out the
8 month and reported up by the time they were supplied
9 the input from Miss Minton's February 5th upside
10 report.
11                   MR. SALPETER: I do not know the
12 exact timing. I know the process is as you described
13 it. It's a bottom up forecasting process. And the
14 forecasts come from the field into Oracle, up to the
15 executive vice presidents, then to Jennifer Minton.
16 I don't know if -- Jay -- well, Mr. Rubinstein
17 reminds me that the calls with the executive vice
18 presidents are on Thursdays and the upsides come out
19 on Mondays, generally speaking.
20                   So, you'll see the same pattern with
21 the other -- with NAS. Again, throughout December
22 and January, the EVP sticking with his forecast.
23 Then we have the blip down, and then we have the
24 severe drop at the end of the month. Similar

J35

1 pattern -- actually OPI. It turns out that OPI
2 actually beat the forecast.
3                    THE COURT: They're a very precise
4 unit, aren't they? That February 5th report, they --
5 they must have e-mailed customers and said, "We'll
6 cut a dollar off the software."
7                    MR. SALPETER: There's a lot of
8 negotiating that goes on in those last few days of
Page 30

9204OAS1.TXT

9 the month.
10                   THE COURT: But it looks like a gas
11 station.
12                   MR. SALPETER: So, again, to sum up
13 this January 4 snapshot of when Henley sold, this is
14 what he had. None of this is a material departure
15 from --
16                   THE COURT: OPI actually met its --
17 well, it had 2000 with the upside.
18                   MR. SALPETER: So to finish up
19 January 4, that's when Henley sold. He had no
20 indication that Oracle was going to miss the
21 guidance. And that's it. Full period, full stop.
22 That's what he knew on January 4.
23                   Now, I want to fast forward to the
24 Ellison sales. January 22 to 31. He sold 29 million

J36

1 shares of Oracle stock between January 22 and
2 January 31. So, I want to put the spotlight on that
3 ten-day period with the same question. What did
4 Ellison know from the time he started selling on
5 January 22 until the time he stopped on January 31?
6                    Let's take January 22nd, first. He
7 was seeing reports that still predicted that Oracle
8 would meet the public guidance. Let's put up -- this
9 is just a summary. The upside reports were still
10 showing that they would meet the public guidance.
11 And specifically, the January 22nd upside report
12 shows 29 percent forecasted revenue growth --
Page 31

9204OAS1.TXT

13 12.0 cents. I'm sorry. 12.06 cents earnings per
14 share, and 31 percent pipeline growth.
15                   The actual report is on this next
16 slide. Again, the same numbers. License revenue
17 growth of 29 percent and earnings per share, 12.06.
18                   I want to show you this earlier -- we
19 talked about this earlier, but I think it's worth
20 dwelling on here when we're in late January. I want
21 to point out, this chart is based on plaintiffs'
22 chart 53. These are plaintiffs' figures using
23 constant dollars.
24                   THE COURT: It shows how much you

J37

1 liked that affidavit.
2                    MR. SALPETER: That's right. That's
3 true.
4                    THE COURT: Mr. de Ghetaldi is
5 actually signing it at Borders.
6                    MR. de GHETALDI: Free for everyone
7 in this room.
8                    MR. SALPETER: So, these are their
9 figures. And they use constant dollars. If we used
10 actual dollars, the results would be more favorable
11 to our clients.
12                   So, we take their chart --
13                   THE COURT: But how was it done?
14                   MR. SALPETER: Well, we take the
15 25 percent growth --
16                   THE COURT: No. No. How did your
Page 32

9204OAS1.TXT
17 clients actually track this stuff? Constant dollars,
18 U.S. dollars or both?
19          MR. SALPETER: Both.
20          THE COURT: In terms of Miss Minton
21 preparing -- you know, when they showed -- show me
22 on -- let's look at the actual report. It's helpful
23 for me -- I've gone over these things, since I was
24 allowed to keep them. They weren't taken back from

038

1 me at the end of the meeting.
2          MR. SALPETER: We used constant
3 dollars in the upside reports -- in the Minton upside
4 reports.
5          THE COURT: The upside reports focus
6 on a constant dollar?
7          MR. SALPETER: Yeah. So, I think we
8 probably --
9          THE COURT: And this chart here is
10 constant dollars or U.S. dollars?
11          MR. SALPETER: This is constant
12 dollars.
13          THE COURT: It says USD at the
14 bottom. When I first looked at it, I wasn't sure if
15 it was Canadian dollars.
16          MR. SALPETER: You're right. It is
17 their chart and it is U.S. dollars.
18          THE COURT: And what would this look
19 like on constant dollars? Do you have a chart like
20 that?
               Page 33

9204OAS1.TXT
21          MR. SALPETER: I do not.
22          THE COURT: Okay.
23          MR. SALPETER: I do not.
24          THE COURT: It might be helpful --

039

1          MR. SALPETER: We can run that and
2 show you the comparison.
3          So, I mean, basically we go week by
4 week through the third quarter here. And we say that
5 if Oracle had the same conversion rate of the year
6 before and applied it here, we would meet the
7 guidance.
8          THE COURT: The only difference is
9 going to be some currency fluctuation probably?
10          MR. SALPETER: Exactly. Currency and
11 interest rate. You'll be -- in this particular
12 period, you'll be in the same ball park.
13          THE COURT: Low interest rate, low
14 inflation.
15          MR. SALPETER: Right. By the way,
16 week six on this chart is when Ellison started
17 selling. And it's really week nine. It's between
18 week eight and week ten when he stopped selling. So,
19 our point is, there's more than enough pipeline both
20 times to meet or beat the guidance if the actual
21 conversion rate was the same as it had been the year
22 before.
23          All right. What else did Ellison
24 know on January 22nd? Well, he knew the actual
               Page 34

9204OAS1.TXT
1 results from December because the actual results from
2 December were out. And what did those results tell
3 him? Well, I'm going to discuss with you in a minute
4 that first month's results don't count for a lot
5 because of the hockey-stick effect. But it's very
6 common for Oracle to get off to a slow start and have
7 a strong finish. That's what happened in the first
8 quarter. That's what happened in the second quarter.
9 And so the actual results from December I'm going to
10 put up here now, just because I want you to see them.
11 But I'm not saying that they're useful as a
12 predictor.
13          I'm sorry. This is -- I want to go
14 to --
15          THE COURT: I see that.
16          MR. SALPETER: That's the Garnick
17 flash report of the actuals. Right. That's the
18 Garnick flash report showing the actuals for
19 December.
20          THE COURT: It seems there is
21 agreement at Oracle -- I hope they changed the name
22 of the report, because throughout the depositions --
23 yeah, like this should be called the quarter-to-date
24 actuals and the other one can be best estimate. The

041

1 two top executives who basically find the names
               Page 35

9204OAS1.TXT
2 confusing --
3          MR. SALPETER: When I tell them you
4 said that, they may take the suggestion.
5          THE COURT: I think the subordinates
6 might want to read the depositions.
7          MR. SALPETER: I'm going to have them
8 read this transcript. That's for sure.
9          THE COURT: Flash reported.
10          MR. SALPETER: It's Flash Garnick.
11 It's not Flash Gordon.
12          THE COURT: Another picture of
13 Paris Hilton.
14          MR. SALPETER: Those are the actuals.
15 The applications growth is up 216 percent. That's in
16 large part because of Covisint. And the other
17 numbers are totally in line.
18          Let's go to the next slide. Here we
19 compare the guidance with the December actuals.
20 Obviously the most important one is the first one.
21 Applications growth is way up, for the reason I just
22 said, because of Covisint. Again, I want to be clear
23 about this. We're not saying Oracle can predict the
24 quarter from this first month of actuals because you

042

1 can't. All we're saying is, there's no red flag
2 here.
3          THE COURT: Well, this is
4 quarter-to-date '01 over quarter-to-date '00?
5          MR. SALPETER: No. This is -- I'm
               Page 36

92040AS1.TXT

6  not sure I'm following you.  This is the guidance --
7           THE COURT:  When you say total
8  license revenue growth -- and you got the guidance
9  about 25 percent?
10          MR. SALPETER:  That's the guidance.
11          THE COURT:  You've got an actual
12  month of the first month of the quarter.  So the
13  quarter-to-date at that point only has one month.
14  The 35 percent rate is the quarter-to-date growth of
15  license revenues for the third quarter of '01 over
16  what Oracle achieved in the same period in the third
17  quarter of '00?
18          MR. SALPETER:  Correct.
19          THE COURT:  How do you deal with your
20  friend's, you know, argument that, absent the event
21  in which you won a gold medal, you were out -- Oracle
22  was looking like they weren't making the finals in
23  the other events, which is the Covisint --
24          MR. SALPETER:  Looking at it without

043

1  Covisint?
2           THE COURT:  That's what they argue.
3  You might as well focus on that part of the argument.
4  If you want to sort of wait for them to do it -- I
5  bet they have done it before.
6           MR. SALPETER:  Yeah.  It's one of
7  their big arguments.  They say we should analyze the
8  whole thing without Covisint.
9           THE COURT:  What they're saying --
                    Page 37

92040AS1.TXT

14  early speech by Arnold.  "We can't have that in
15  America, material softening."
16          MR. SALPETER:  Well, let me go to the
17  slides.  Let's put up.
18          MR. TABACCO:  Arnold Schwarzenegger?
19          MR. SALPETER:  Yeah.  No, we don't
20  have Arnold doing either his body building or his
21  schtick.
22          In the first and second quarters of
23  '01, we got off -- Oracle got off to a painfully slow
24  start.  And even if you look at December and you take

045

1  out Covisint, you can't draw a conclusion because of
2  the severity of the hockey-stick effect.  What
3  Jennifer Minton looks at -- and she's testified about
4  this -- she looks at approval activity, she looks at
5  pipeline.  She doesn't actually -- she doesn't look
6  at the actual numbers.  And she says that in the clip
7  we're going to show you.  She doesn't look at month
8  one or month two actual numbers.
9           And Garnick in his deposition at page
10  35 said, the reason he even sliced and diced it that
11  way without Covisint was because it was unusually big
12  and it didn't happen very early in the quarter, and
13  most of the time these big deals happen at the end of
14  the quarter.
15          Jeff Henley testified in a blush that
16  we're going to show you that Covisint was one of the
17  rocks that Oracle relied upon in doing its guidance.
                    Page 39

92040AS1.TXT

10  yeah, that everybody recognizes was the biggest deal
11  in the company's history.  There had been other big
12  deals and that the company, including Mr. Garnick,
13  highlighted the results without Covisint.  And the
14  results of that -- Covisint may suggest other
15  implications.
16          MR. SALPETER:  Right.  I have several
17  answers for that.
18          No. 1, as I think you observed in
19  your opinion on the SLC -- the denial of the SLC
20  motion -- it was a real deal.  It had economic
21  substance, and it was properly recognized and
22  recorded in the third quarter.  So, it's a real deal.
23          So, to say let's pretend it didn't
24  happen just because it's big -- they have other big

U44

1  deals from time to time -- this was the biggest.  But
2  to say let's pretends it didn't happen I don't think
3  is analytically very helpful.
4           Secondly, even if you look at
5  December without Covisint -- if you look at it
6  without it -- you can't draw any conclusions about
7  missing or meeting the guidance.
8           THE COURT:  Yeah.  Let's focus on
9  that.  I think that's -- the argument your friends
10  make is that, you know, if you really look at what
11  they would call the normalized operation of the
12  company, there was, as they call it, material
13  softening.  Apparently they wrote this before the
                    Page 38

92040AS1.TXT

18          The December actuals, even without
19  Covisint, wouldn't tell you anything.  They don't
20  have predicted value.  We're going to see a number of
21  clips in a few minutes that say that.
22          Even Fischel -- when Ken Nachbar took
23  Professor Fischel's deposition, he said that  he
24  can't see anything dispositive or helpful about using

046

1  the first month, even without Covisint.  He can't
2  make a prediction.  He hasn't studied it.  He'd have
3  to think about it long and hard, and he doesn't even
4  know if he can come up with an answer.  So, that's
5  our basic response to Covisint.
6           You've seen a lot about the
7  hockey-stick effect.  But I want to spend a minute on
8  that because that's this whole point about the third
9  month is everything.  Let's put up slide 39.
10          This shows U.S -- this shows U.S.
11  license revenue and it shows how much of the
12  quarterly license sales come in the last week of the
13  quarter.  This is an average of all quarters in
14  fiscal '01.  So, on average, 54 percent of license
15  sales for the quarter occur in the last week.  More
16  than half in the last week.
17          Now, the hockey-stick effect is even
18  more pronounced in the United States license revenue
19  sales.  So, I want to compare worldwide to U.S., just
20  to give you a sense of how they compare.
21          The next slide shows that if you look
                    Page 40

92040AS1.TXT

22  at the global company -- the worldwide company -- on
23  average during '01, 69 percent of license revenue
24  sales occurred in the last month.  More than

U47

1  two-thirds in the last month.
2              THE COURT:  Now, for third quarter,
3  this is a less pronounced effect?
4              MR. SALPETER:  Well, it's versus
5  other quarters.
6              THE COURT:  Isn't that what your
7  friends say?
8              MR. SALPETER:  Slightly, I believe.
9              THE COURT:  It doesn't go to like 64
10  or something like that?
11              MR. SALPETER:  I think there's a
12  swing, but I don't think it's major.  Where there is
13  a major swing is when you look at U.S.
14              And if we go to slide 36, this is OSI
15  in the second quarter of '01.  80 percent in the last
16  month.  And then we show in the next one -- NAS --
17  79 percent of its sales in second quarter of '01.
18  79 percent in the last month.  And then the last one
19  is OPI.  90 percent in the last month.
20              So obviously in the third quarter of
21  '01, Oracle got off at a good start because of
22  Covisint.  Even if it had a slow start in months one
23  and two, the history shows us that it doesn't mean
24  you're going to miss the forecast.  And importantly,

Page 41

92040AS1.TXT

U48

1  for our purposes here, that's what Henley and Ellison
2  knew.
3              In the second quarter, the one just
4  before -- let's go back to 36.  They use these same
5  slides for a different purpose.  Look at these two
6  months on OSI:  11 percent and 9 percent.  So, I
7  guess, if I were Mr.'de Ghetaldi, I'd say, "Oh, my
8  God.  They knew they weren't going to make it."  And
9  yet they had a record quarter.
10              Now, let's go to the next one.
11  Again, we showed you this for a different purpose.
12  Now, I focus on the first two months:  9 percent and
13  12 percent.  Again, my friends at the plaintiffs' bar
14  would say that's a red flag.  That's a warning sign.
15              And then the next one is even more
16  pronounced:  4 percent.  Actually, it shouldn't --
17  4 percent, 6 percent.  So, very slow start followed
18  by a very, very strong finish.  Why does this matter?
19  Because Oracle turned in a record performance in that
20  quarter and it far exceeded the Oracle forecast,
21  despite the fact that they were off to a very, very
22  slow start, particularly in these U.S. business
23  units.
24              And the same pattern, by the way -- I

U49

1  can give you more -- the same pattern occurred in the

Page 42

92040AS1.TXT

2  first quarter of '01 and in the fourth quarter of
3  '00.  The hockey-stick effect is real and that stick
4  has a very sharp curve on it.
5              The bottom line is, they just haven't
6  come forward with evidence showing that Ellison knew
7  or believed they were going to fall short --
8  that Oracle was going to fall short of the guidance
9  in this January period.  So, at the beginning of the
10  January period -- for Ellison we're still focusing on
11  January 22 -- the undisputed facts are that he had no
12  red flags.  He had no material change from the
13  guidance, from what the market had been told.
14              Now I want to go to the end of the
15  period, January 31, take a snapshot of that, and then
16  I want to do the last three days.  So, let's go to
17  January 31.  Same question.  What did he know as of
18  January 31?  And he knew that Minton is still
19  forecasting that we would meet the guidance.
20              THE COURT:  That's not true.
21              MR. SALPETER:  Well, it is, if you
22  look at the numbers.
23              Let's go to the next slide.  If we
24  actually look at the numbers, 24 percent was the

050

1  license revenue growth.  I'm saying about 25 percent.
2  That 24 percent is about 25 percent.  Yes.  And I can
3  say that comfortably with a straight face.  And
4  knowing the hockey-stick effect, I can say that, yes,
5  we are still on target.  11.58 cents, I concede --

Page 43

92040AS1.TXT

6              THE COURT:  Wait a minute.  The
7  hockey-stick effect is taken into account by
8  Miss Minton in making her estimate; right?
9              MR. SALPETER:  Sure.  I mean she --
10              THE COURT:  She's assuming that the
11  company is going -- that the bulk of the pipeline
12  that is going to be converted is going to be
13  converted within the last week --
14              MR. SALPETER:  Per the history.
15              THE COURT:  Right.  So that the
16  hockey-stick effect really doesn't have any -- that's
17  always -- that's an assumption that always pervades
18  her estimates.  So that -- I'm saying, you know,
19  "about" is a good word for it.  But this is -- for
20  the first time she's got a down side to her "about,"
21  right?
22              MR. SALPETER:  Well --
23              THE COURT:  I mean, it's not -- it's
24  not 12.  It's rounded up.  And the about 25 is now --

051

1  you know, is 24.  We said about 25.  We didn't do 26,
2  we didn't do 25.
3              MR. SALPETER:  I agree with you that
4  24 is less than 25.  Whether 24 does not fit the
5  definition of about 25, I would debate that.
6              THE COURT:  Well, I would tend to
7  agree with you that it's hard to say that 24 is not
8  about 25, depending on what you're talking about, I
9  suppose.

Page 44

92040AS1.TXT

10           The question I have for you related
11 to this period is: is there any evidence that
12 Mr. Ellison -- that the trades that Mr. Ellison made
13 on -- I guess he made trades on the 29th. He
14 probably traded both before and after the EMC
15 meeting. He was probably trading during the ENC
16 meeting through Mr. Phillips -- not Mr. Phillips. I
17 forget the guy's name. His financial advisor.
18           MR. SALPETER: Philip Simon.
19           THE COURT: Is there any evidence
20 that the extent of those trades or anything about
21 them changed during the three days on the 29th and
22 30th?
23           MR. SALPETER: No. In fact, he's
24 selling beginning on the 22nd through the 31st.

052

1           THE COURT: He got an extension,
2 right, because he didn't -- his original approval was
3 to the 26th and then they extended -- he actually got
4 permission to trade in February but he said he didn't
5 want to do that. But there's nothing about the
6 extent or the pricing or anything that changes after
7 Miss Minton's January 29th upside report?
8           MR. SALPETER: That's correct. And
9 plaintiffs have not pointed to anything. They have
10 not seized on that, and I don't think there's
11 anything to seize on.
12           THE COURT: How did the approval
13 process work? It basically was just like -- did the
Page 45

92040AS1.TXT

14 broker send an e-mail to Mr. Ellison each day and
15 say --
16           MR. SALPETER: You're talking about
17 the clearance process or actual sales?
18           THE COURT: The approval through his
19 broker for trades.
20           MR. SALPETER: I mean, once Ellison
21 gave the order to sell, it was all carried out by his
22 broker.
23           THE COURT: Aren't there daily
24 reports or something like that? I thought there was

053

1 some sort of communication from the broker to
2 Mr. Ellison.
3           MR. SALPETER: His executive
4 assistant would be advised periodically of what had
5 occurred. But he was not monitoring it.
6           THE COURT: There's no evidence that
7 he like called up and said how did you do today?
8           MR. SALPETER: Nothing like that.
9 Not even a fifth cousin once removed. But his
10 assistant got e-mails confirming the trades.
11           THE COURT: From Mr. Simon confirming
12 this is how much we sold today at what price?
13           MR. SALPETER: Confirming the trades.
14 Right. A normal confirm.
15           THE COURT: I don't know what that
16 is.
17           MR. SALPETER: A form from the broker
Page 46

92040AS1.TXT

18 that says, "Today you sold." In your case and my
19 case it wouldn't say 5 million shares.
20           THE COURT: It really wouldn't.
21           MR. SALPETER: But I also --
22           THE COURT: The exhibit at the end of
23 it says $900 million. I can assure you, I might show
24 up occasionally here but only as a spectator.

054

1           MR. SALPETER: In addition to these
2 two indicators, we also had the pipeline. And the
3 pipeline was still very strong. And I don't think we
4 need to dwell on this again.
5           THE COURT: I think we should.
6           MR. SALPETER: The pipeline growth --
7           THE COURT: We can never get enough
8 of good pipeline stuff.
9           MR. SALPETER: Got a lot of pipeline
10 here still.
11           THE COURT: Talk about the historical
12 conversion of that number.
13           MR. SALPETER: Okay. Okay. We've
14 looked at this before. If we converted the pipeline
15 at these different points in time, we still had more
16 than enough.
17           THE COURT: Okay. And that's
18 confusing; right? Does U.S. dollars come in?
19           MR. SALPETER: I misspoke the first
20 time. But I think we got it right the second time
21 that this is U.S. dollars.
Page 47

92040AS1.TXT

22           THE COURT: Would the constant
23 dollars take it below?
24           MR. SALPETER: No, it would not. It

055

1 would not. And if you want us to, we'll run that
2 chart for you.
3           THE COURT: I would want you to run
4 it. I'm just trying to get at -- what you're saying
5 there is that Miss Minton, in her judgment that she
6 applied in providing her best estimate, was more
7 conservative than the prior year's conversion rate
8 would indicate? She in her own view believed to
9 convert less than that percentage --
10           MR. SALPETER: That's exactly what
11 I'm saying.
12           We're in late January. But we still
13 only have one month of actuals, even though we're in
14 late January. Obviously we don't have January
15 actuals yet.
16           THE COURT: What about what I read
17 yesterday? The flashback from the past. You know,
18 Mr. Oracle -- Mr. Oracle. Mr. Ellison -- it could be
19 Mr. Oracle, a superhero in the eyes of the software
20 community -- we can have a supersoftware community,
21 superhero package maybe to deal with, sell little
22 figurines -- but that he could just go online and
23 look at this. Any evidence in the record he was in
24 there sort of every day looking at the sales data?
Page 48

CS6

92040AS1.TXT

1       MR. SALPETER: Actually not. He
2 testified expressly when asked that question that he
3 did not. He was not all-knowing and all-powerful and
4 had instant detail about everything in the company,
5 despite reports to the contrary. There's nothing to
6 support that.
7       Now, what the plaintiffs do here is,
8 they point to the fact that in January
9 Jennifer Minton was reducing her upward adjustment to
10 her forecast of license revenue, and they say that
11 that should have led Ellison to question whether the
12 guidance was still valid. But that's not true
13 either, because the drop in license revenue growth
14 forecast and the decrease in her upward adjustment in
15 the January 29 upside report did not concern Ellison
16 because he still felt they were on track for the $.12
17 a share and the about 25 percent license revenue
18 growth.
19       We've heard already -- and we'll hear
20 some about how Henley and Ellison kept going
21 back to the EVPs and have them go back to their
22 customers. How firm is this business? How confident
23 are you in these forecasts? And they were
24 continuously given the word that the forecasts were

CS7

1 remaining the same. And we showed you the slides
2 where the forecasts remained the same throughout
                        Page 49

92040AS1.TXT

3 December and January.
4       Ellison explained in his deposition
5 that this drop in the upside simply indicated to him
6 that Oracle would beat its foremost by as much as he
7 initially thought in his head. And he didn't think
8 it was an indication that the business was softening
9 or that Oracle would miss its guidance.
10       So now I'd like to show you Larry
11 Ellison talking about this point.
12       "Question: Yes. Now, if you'll look
13 at the corresponding page on the January 29th upside
14 which is Bates No. 3609.
15       "Answer: Okay. Actually is right.
16 So here, the forecast has -- let me make sure I get
17 these in the right sequence, or I'm going to drive us
18 all crazy. Okay.
19       "So now, comparing the 15th to the
20 29th, which is in my staple fold -- okay. The
21 29th -- on actuals, the forecast has come down
22 $12 million, and the upside has come down
23 $50 million.
24       "Correct?

CS8

1       "Question: Yes.
2       "Answer: For a total reduction of
3 $62 million.
4       "Question: Right.
5       "Answer: Right.
6       "Question: Was -- was that a
                        Page 50

92040AS1.TXT

7 significant drop, in your view, from January 2001?
8       "Answer: Let me be very clear. It
9 was -- we still had plenty of pipeline and plenty of
10 forecast to make our number, so -- but we had
11 definitely dropped. It dropped $70 million.
12       "Question: Right.
13       "Answer: But we started out with
14 such a huge pipeline, so we had 52 percent -- you
15 know, we have this very, very large pipeline --
16       "Question: Right.
17       "Answer: -- that I still -- I
18 certainly believed at this time, even after this
19 report and after coming down the $70 million, I
20 certainly still believed that we were going to make
21 both our earnings per share guidance and our -- our
22 license growth guidance."
23       Now, in this next clip, Ellison makes
24 the point that it is not softening to believe that

CS9

1 you're not going to beat your forecasts by as much as
2 you thought you were going to beat it, and he uses
3 the sports analogy as well. We all remember this.
4       "Question: And you say that nothing
5 in this comparison caused you to believe that
6 Oracle's business was softening 3Q '01?
7       "Answer: No. That's correct.
8       "To be precise here, I think -- I
9 think I stated earlier that -- that I thought we were
10 going to blow the quarter out. I think at one point,
                        Page 51

92040AS1.TXT

11 it looked like we were going to do 16 cents a share
12 because of the huge upside that we had, and the huge
13 pipeline growth that we had. But that pipeline did
14 come down during the quarter.
15       "I think you characterize that as a
16 'softening' and I think I said that, well, I didn't
17 think we'd beat the number by as much as I originally
18 thought we'd beat the number by. And you used the
19 word 'softening." It's a kind of an interesting
20 choice of words.
21       "Early on, it looked like we might
22 actually do a 16-cent quarter, looking at all the
23 numbers. It was clear later on it wouldn't be
24 16 cents. I thought we'd still beat the number, but

CS60

1 not by as much.
2       "I just want to be precise about the
3 word. The word 'softening' has been used. I used it
4 two ways now, saying it wasn't softening and -- you
5 know, to just move that word aside and look at the
6 facts, I thought we were going to beat by a lot --
7 the number by a lot. Later on in the quarter, I
8 thought we'd beat the number by less than I thought
9 in the beginning.
10       "Question: Now that I'm thoroughly
11 confused. . .
12       "Answer: Did I do that?
13       "Question: Yeah, you did. Can you
14 tell me what your two definitions of 'softening' are?
                        Page 52

92040AS1.TXT

15     "Answer:  Well, the -- as long as we
16  still win the game, as long as we still beat the
17  number, as long as the business is still good, and as
18  long as it's still a record quarter, I wouldn't call
19  that a softening of the business.  It's a little
20  bit -- if you're playing a football game, and you
21  think you are going to win 35 to nothing, and you
22  only win 28 to nothing, that's not a terrible thing.
23  'Gee, I thought we were going to win by 35 to
24  nothing, but we only won by 28 to nothing.'  But does

061

1  that mean the team -- what -- you can ask, what went
2  wrong?  We only won by 35 (sic) to nothing."
3           "So it looked like we were going to
4  have a spectacular quarter.  I think my early
5  statements in the quarter was to the effect that our
6  pipelines were truly astounding, something like that.
7  Initial call.  Our pipeline growth was over 50
8  percent, which is astounding.  And I thought we had a
9  potential to have just an extraordinary quarter,
10  absolutely extraordinary quarter."
11           "And in fact, with historic
12  conversion ratio rates, that would have been earnings
13  per share in excess of 16 cents, which would have
14  been, by any measure, an extraordinary quarter."
15           "Question:  Right.
16           "Answer:  As the quarter progressed,
17  I thought our ability to deliver an extraordinary
18  quarter, a 16-cent quarter -- I mean, that was
                        Page 53

92040AS1.TXT

19  moderated.  I still thought we were going to have a
20  record quarter.
21           "We did have a record quarter,
22  actually.  We did have a record quarter.  But our
23  ability -- as the quarter wore on, I thought we no
24  longer had the chance of doing that 16 cents, that

062

1  extraordinary 16 cents."
2           THE COURT:  Is that actually true,
3  that if the 16 cent pipeline had been converted, it
4  would have been 16 --
5           MR. SALPETER:  If it had been
6  converted at the conversion rate from the same
7  quarter the year before?
8           THE COURT:  3Q '00?
9           MR. SALPETER:  The answer is yes.
10           THE COURT:  So, this is all just
11  semantics, right?
12           MR. SALPETER:  Yeah.
13           THE COURT:  I mean, the argument
14  is -- well, the second the Dolphins, I believe the
15  first year they won the Super Bowl they were
16  undefeated; is that correct?  Mr. Nachbar?  I believe
17  the next year that they won a Super Bowl.  I think
18  they won something like 12 games.  And then the next
19  year, still good to win the second Super Bowl, but I
20  think there were signs of softening.
21           MR. SALPETER:  All in the definition.
22  Right.
                        Page 54

92040AS1.TXT

23           THE COURT:  Not really.  I mean,
24  which is, you can be still a champion, but have

063

1  softened from your most formidable state.
2           MR. SALPETER:  The legal question is:
3  is there an extreme departure from one season to the
4  next season?  If you win a Super Bowl two years in a
5  row --
6           THE COURT:  All I'm saying -- you're
7  the fact guy today; right?
8           MR. SALPETER:  Right.
9           THE COURT:  You can still be the
10  champion, but you can be not as formidable as you
11  were the previous season.
12           MR. SALPETER:  I agree.
13           THE COURT:  That can be important,
14  right? --because to the extent that people care about
15  what happens the succeeding season, the fact that
16  you're more vulnerable can be important to somebody;
17  right?
18           MR. SALPETER:  Right.  Here there's
19  no softening because there's so much growth over the
20  year before.  All these year-over-year numbers,
21  whether it's 52 or 31, that means more growth than
22  the year before.  Same time the year before.
23           So, I mean, softening is their word,
24  right?

064                      Page 55

92040AS1.TXT

1           THE COURT:  One of the interesting
2  things here is, we're talking about what information
3  becomes material in light of an information mix in
4  the market that's been influenced by forward-looking
5  projections which are soft information.  So you start
6  with sort of -- you start with polenta and then what
7  makes the polenta materially unreliable.  That's a
8  semantic.  There's a lot of strange metaphor.  You
9  understand what I'm saying is that the mix here is
10  all about predictive information.
11           MR. SALPETER:  Right.
12           But as we parse through all this, I
13  think we have to keep our eye on the fact that the
14  public was told $.12 a share.  So, if Larry Ellison
15  in his head was thinking 16 -- oh, no, no, 15, 14 --
16  he never got below 12 during the time he sold the
17  stock.  So, as a legal matter -- and I know
18  Mr. Nachbar is going to talk about the law.  As a
19  legal matter, I don't see how you can say that's an
20  extreme departure, or, if you use the other standard
21  that's articulated, that it's likely to be a miss.  I
22  don't see either way, whichever standard you use.
23  And he says it better than I can.
24           I want to show you one other clip

065

1  from Jennifer Minton.  This is -- this has been
2  mentioned already by me and by the deposition
                        Page 56

92040AS1.TXT
3 witnesses that their confidence about the quarter and
4 their reason for thinking the guidance was still on
5 track was because they kept going back to the EVPs
6 and pushing them and testing them.  Here's what
7 Jennifer Minton said about that.
8            "Question:  If you could turn --
9 well, if you could turn to page 9.  The paragraph in
10 the middle of the page underneath the title 'Minton's
11 view of Q3 Fiscal Year '01,' the last sentence of
12 that paragraph reads.
13            'In fact, Minton stated that at this
14 time the sales executives were very bullish and
15 reported that they were not seeing any adverse impact
16 from the economy.'.
17            "Is that an accurate summary of what
18 you told the Special Litigation Committee?
19            "Answer:  I remember that during this
20 time period that there was a lot of press reports,
21 news articles, what have you, regarding the overall
22 macroeconomic environment.  And both Jeff and I were
23 continuously challenging the sales organization as to
24 whether or not they were seeing any impact of the

366

1 economy on our Q3 financial forecast.
2            "And, you know, they did not change
3 their forecasts significantly throughout the course
4 of the quarter until the very end of February."
5            So, Ellison is confident throughout
6 January -- throughout the completion of his sales
            Page 57

92040AS1.TXT
7 that -- and in fact, even into February, after the
8 January results come out, he's still confident about
9 the guidance.
10            And I want to show you an excerpt of
11 Ellison here where he's talking about the early
12 February period after the January actuals have come
13 out.
14            "Question:  By February 8th, 2001,
15 was the fact that Oracle's license revenue growth
16 rate in U.S. dollars was only 8 percent if you
17 factored out Covisint?
18            "Answer:  Is that -- was that your
19 question -- your question was?
20            "Question:  The question was, was
21 that a fact of concern to you about Oracle's ability
22 to meet its projections going forward?
23            "Answer:  Again, given the fact that
24 so much of our business is done in the third month of

067

1 a quarter, and even the last week -- the last week of
2 a quarter, we'd just come off a record-breaking
3 quarter where we were behind up until the last three
4 days, so was it -- was it a concern?  Did it make me
5 believe that we weren't going to make the quarter?
6 No, it didn't make me believe we weren't going to
7 make the quarter.  Our forecasts were still that we
8 were going to make our quarter and our pipeline was
9 still very strong.
10            "The fact is, Covisint was in.  The
            Page 58

92040AS1.TXT
11 transaction was in.  We were way ahead.  We had a
12 strong forecast, and we had a strong pipeline."
13            THE COURT:  Mr. Ellison is kind of an
14 imprecise guy; right?
15            MR. SALPETER:  Is that a question?
16            THE COURT:  Yeah.  I mean, the
17 forecasts that he was getting didn't predict that
18 they were going to make the guidance.
19            MR. SALPETER:  They didn't predict?
20 They had numbers in them.  You're talking about
21 January 29?
22            THE COURT:  I think you were in
23 February by then.
24            MR. SALPETER:  In February he had

368

1 actual January numbers.  Yeah, he was still -- he was
2 still on track.  He absolutely was still on track,
3 Your Honor.  There was no extreme departure from the
4 guidance.
5            THE COURT:  Wait a minute.  Now
6 you're lapsing into -- I mean, you like the Shaw
7 case.  We'll hear about the Shaw case.  I'm not
8 talking about this in the linguistics of federal
9 securities cases.  I'm talking about it in terms of
10 he got a number from his best predictor that said he
11 was going to miss.  He had that by the time the
12 February actuals were out.
13            MR. SALPETER:  By the time the
14 January actuals were out?
            Page 59

92040AS1.TXT
15            THE COURT:  Yes.  By the time that he
16 had the actuals from January.  We went over this
17 before.  I just want to make -- you know, because
18 Mr. Ellison said something in the call --
19            MR. SALPETER:  Are you talking about
20 the EPS that was below 11.5.
21            THE COURT:  And the license now was
22 not your straining about 25, you would admit, when
23 you get to the February 5th upside report; right?
24 And so -- all I'm saying is, he's a fairly imprecise

069

1 fellow, it strikes me.  You have to almost concede --
2 and for purposes of this motion -- when he gets on
3 the earnings call later on, the sort of last thing
4 anybody wants to do is make some announcement -- one
5 of the last things I assume an executive wants to do
6 is a pre announcement you're going to make the
7 earnings.  And he talks about being way ahead of
8 where they normally expected to be, or whatever, at
9 the end of January.
10            That just wasn't true; right?
11            MR. SALPETER:  No.  I mean --
12            THE COURT:  He may have believed it,
13 but it wasn't in fact true?
14            MR. SALPETER:  It was in fact true.
15 It is true that he was below the guidance numbers at
16 that point in time.  11.3 cents a share, even if
17 rounded, is not $.12 a share.
18            THE COURT:  But it's not in fact true
            Page 60

9204OAS1.TXT

19 when he said in -- it's not in fact true what he said
20 there. He may have believed it, but it was factually
21 an incorrect statement; right? --that he was being
22 advised as of early February that, you know, we were
23 going to make our numbers.
24             MR. SALPETER:  He still -- I mean --

070

1             THE COURT:  It's not a question of
2 belief.  I'm not going -- I'm not challenging his
3 essential truthfulness as a person.  I'm saying
4 that's not a precisely accurate statement, given his
5 possession of the Minton upside report of
6 February 5th.
7             MR. SALPETER:  As he said in his
8 answer, he's just been through the same process.
9             THE COURT:  All I'm saying is, the
10 statement he made wasn't about going through that
11 process.  The statement he made is what he was being
12 advised about projections --
13             MR. SALPETER:  The exact numbers are
14 the earnings per share forecast on February 5th is
15 11.29.
16             On February 12th, a week later, it's
17 back up to 11.58, which rounded off is $.12 a share.
18             So. if you stop the clock, which I
19 think is what you're doing in your question, if you
20 stop the clock at February 5th, he's a penny below
21 when you round it off.  But if you wait a week to
22 February 12th and you round it off, you're back to
Page 61

9204OAS1.TXT
23 $.12 a share.  And that ebb and flow, if you will,
24 for all the reasons we've been talking about, is not

071

1 unusual.
2             THE COURT:  I'm just going -- what
3 I'm trying to get at is, I get the sense that it's
4 sort of an impressionistic approach to his views
5 about the business.  He was on that call about the
6 pre announcement call where he says that the company
7 was, I guess, far ahead of where it normally would
8 be.  That just wasn't true, based on the actuals.
9             If you take December, January -- the
10 actual results -- the company was not far ahead of
11 where they would normally expect to be in order to
12 make the quarter.
13             MR. SALPETER:  Not far.
14             THE COURT:  And Mr. -- Mr. Henley in
15 his deposition said, "I think Larry's wrong.  He
16 probably believed it but he was just wrong."
17             MR. SALPETER:  Right.  I agree with
18 that.
19             So, when we get to the end of
20 January, which is obviously critical because of the
21 stock sales. by the time we're at the end of January,
22 he is still confident.  He does believe that the
23 guidance is going to be met.
24             Now, what do the plaintiffs do to

072

Page 62

9204OAS1.TXT

1 combat this?  They come back with basically -- at one
2 time they had Ray Lane who was -- who gave us an
3 affidavit and withdrew.  So, we don't have a witness,
4 other than Mr. de Ghetaldi, which you already dealt
5 with.
6             They come back with snippets.  They
7 come back with snippets of information from e-mails
8 where they try to manufacture material nonpublic
9 information.  One example that I want to show you is
10 an e-mail from David Winton.  He was in charge of
11 financing NAS and he wrote Jennifer Minton on
12 January 11th.  And the plaintiffs point to some
13 snippets in his e-mail, which they relied on very
14 heavily in the complaint, and now they kind of backed
15 off and virtually abandon it.
16             Let me show you the part they pointed
17 to.  By the way, Henley and Ellison never saw this
18 e-mail.  But this is what Winton says. "The pipe has
19 not grown as we had anticipated. Lack of big deals.
20 Drop in technology."  Which includes database and
21 tools. That's the part they point to.  But they
22 don't show you the rest of it, which is that the
23 Q4 -- the Q3 forecast of 346 million has not changed
24 but the upside or the best is revised down by

073

1 16.8 million to 360 million.  At this point I still
2 think we're tracking to end Q3 at 354, 355.
3             So, let's think about that for a
Page 63

9204OAS1.TXT
4 second.  He's saying on January 11th, I still think
5 we might beat, but I'm certainly not changing the 346
6 forecast.  He's not only sticking with it, he's
7 saying they may beat it by eight to $9 million.
8             Now, Ellison was asked about this
9 e-mail in his deposition, and he testified first that
10 he hadn't seen it before because he's not shown as a
11 recipient.  If we could actually see the e-mail.  But
12 they asked him to read it anyway.  Plaintiffs asked
13 him to read it, and they asked him whether it
14 concerned him.  And he testified that, if he had seen
15 it, it wouldn't have concerned him, because
16 ultimately Winton was sticking with the original
17 forecast.
18             Let's show that, please.
19             "Question: Okay.  That's essentially
20 what Mr. Winton said. was that there was a meeting on
21 January 9th of the NAS people, and he was reporting
22 to Jennifer Minton on what had been discussed at that
23 meeting.  So again. he indicates now, a month into
24 the quarter, that the pipe had not grown as

074

1 anticipated, and it was actually slightly down from
2 the end of December.
3             "Do you recall any discussion in the
4 Monday executive committee meetings about the -- an
5 ops review meeting that was held in NAS in January of
6 2001?
7             "I object to the form of the
Page 64

92040AS1.TXT

8  question.  The preamble to the question is
9  objectionable.  You may go ahead and answer.
10            THE WITNESS:  Okay.  The answer --
11  the answer is no.  But what he says here in the note
12  is he's not changing his forecast.  The forecast is
13  unchanged, and in fact, he thinks he's going to beat
14  the forecast.
15            "So, the substance is -- is there
16  going to be any change in the forecast?  No.  But he
17  doesn't think he's going to beat the forecast by as
18  much as he thought he was going to beat the forecast
19  before."
20            THE COURT:  Would that be softening?
21            MR. SALPETER:  There's another
22  snippet that they used in their opposition papers to
23  the summary judgment motion which I think is worth
24  calling him on.  The plaintiffs rely on a business

075

1  review called an ops review from a subunit inside NAS
2  called the general business group or unit, dated
3  January 9th.  And they pull out of this business
4  review 11 snippets of information discussing business
5  problems.  These are the ones that are the most
6  serious:  quality of customers declining; dramatic
7  decline in dotcom business; few big deals; deal sizes
8  are getting smaller and the best case forecast is
9  reduced.
10            Now, the way they present this in
11  their brief -- first of all, they list all 11 of them
                        Page 65

92040AS1.TXT

12  and then they make it sound like this is the entire
13  NAS unit -- business unit.
14            In fact, when you go to the next
15  slide, this is what they don't discuss from the
16  report.  That this was only a subunit, the general
17  business unit.  It wasn't the entire NAS.  And then
18  the bottom line is that they say they're going to
19  beat their current forecasts by $40 million.  So,
20  this is a classic case of pulling a document out of
21  context and presenting it in a way that is unfair.
22            There's a couple other e-mails I want
23  to show you.  There's one by Jim English.  The
24  plaintiffs have pulled a snippet out of an e-mail by

076

1  Jim English, who worked in the finance department of
2  OPI.  This, again, is an e-mail that Ellison and
3  Henley didn't see.
4            Plaintiffs nevertheless take a
5  snippet where Jim English says that his particular
6  business unit has a lot of pipe -- meaning
7  pipeline -- challenging clients.  And again, they
8  argue this is a red flag.  This is a warning sign.
9  But again, they don't show the punch line.
10            The punch line is, "We're holding at
11  our initial forecast of 150.  But I'll be a bit more
12  aggressive and say a value of 150 to 170."  So,
13  there are hints of concern in these e-mails.  There's
14  no doubt about it.  When you get to the bottom line,
15  you get to the punch line, they say they're sticking
                        Page 66

92040AS1.TXT

16  with their forecast.
17            One more e-mail.  Sarah Kopp.
18  Sarah Kopp worked in the finance department of OSI
19  and she wrote an e-mail on January 18th.  In her
20  e-mail she says there is 91 million in judgment at
21  Jay's level.  That's Jay Nussbaum.  He's the head of
22  this group.  To get to the 225 number -- and he gets
23  the attachment each week, so he's aware of the
24  difference.  My sense still is that we'll come out

077

1  around 210 as it stands today.  By the way, that's
2  the actual number that they came out with.
3            So, she's saying, I'm lowering my
4  forecast.  That's what she's saying here.  But again,
5  they don't show you the next part where it says,
6  "Jay Nussbaum just called me from the road.  Went
7  over his numbers with Larry.  He is still confident
8  at 225."
9            Now, this e-mail is significant, for
10  a couple reasons beyond what's on the face of it.
11  And perhaps the most important is that it explains
12  something about the forecasting process at Oracle.
13            We actually have a big board.  Can we
14  put that up for a second?  And we also have it up on
15  the screen.  I'm not going to spend a lot of time on
16  this, Your Honor.  I know you can't read all the
17  names.  But what it shows -- the point of the chart
18  is that the forecast gets formulated at the lower
19  levels and works its way up.  And at each level
                        Page 67

92040AS1.TXT

20  judgment is applied, first by the lower level
21  people -- the Sarah Kopps -- and then it works its
22  way up to the EVPs, who give their forecast to
23  Jennifer Minton, who then puts it in the upside
24  report and then gives it to Ellison and Henley.  It

078

1  just shows the layers of judgment.
2            All right.  So that concludes the
3  part with respect to Larry Ellison's sales in
4  January.
5            Now I want to take a very quick
6  snapshot of the last three days.
7            THE COURT:  Why don't we do this.  I
8  think we're at the normal break point.  Why don't we
9  take 15 minutes and come back at 11.
10            MR. SALPETER:  Thank you, Your Honor.
11            (Recess taken.)
12            MR. SALPETER:  Thank you, Your Honor.
13  You asked two questions earlier, which I -- to
14  continue the sports analogy -- I dropped the ball or
15  I didn't pick up the ball.
16            You asked about the upside reports
17  and the pipeline reports and what happens to them
18  after the executive management committee meetings.
19  They are gathered up and taken by the finance group
20  and they're kept, obviously, by the finance group.
21            So now what I would like to do to
22  finish up on my part of it is, I would like to do a
23  snapshot of the end of January at one of our charts
                        Page 68

92040AS1.TXT

24 and do the last three days of February, and then I'm

079

1 going to pass the ball -- to keep our sports
2 analogy -- to Mr. Nachbar, which hopefully will catch
3 it.
4           So, we're at the end of January.  I
5 want to show you a slide which compares the guidance
6 to the January 29th upside.  I think we've talked
7 about these numbers.  But I think, when you line them
8 up, they're still on track.  And Larry Ellison is
9 still bullish because the pipeline is 31 percent
10 greater than it was the year before.  And
11 Jennifer Minton had a track record of being
12 conservative on her projections.
13           So now -- now I'm going to go to the
14 last three days of February.  I really think the
15 inquiry should end at the end of January because
16 that's when the sales ended.  But I do think it's
17 worthwhile to take a quick look at the last three
18 days of February, because I think that shows that the
19 Oracle people did not think they were going to miss
20 and did not expect to miss until those last three
21 days.
22           Let's put up the next slide of the
23 last few days.  They were still within striking
24 distance.

080

Page 69

---

92040AS1.TXT

1           The next slide.  Now, here we got the
2 February 26th upside report.  No question that
3 license revenue growth -- forecasted license revenue
4 growth is now 20 percent and the EPS is 11.19.  We're
5 almost at the end of February.  But I want to make a
6 point about the 11.19 cents, the EPS figure of 11.19.
7 It's really only three-tenths of a penny short
8 because of the rounding procedure.
9           THE COURT:  Right.  Or it's really
10 only .81.  I mean, this is -- look, I understand
11 rounding.  You didn't say to the market, you know,
12 here's my rounding range.
13           MR. SALPETER:  Well, say it another
14 way.  Another way of looking at it, it's 30 more
15 million of sales -- of U.S. license sales.
16           THE COURT:  Has Oracle ever hit like
17 12 point -- what's Oracle do?  It rounds down?
18           MR. SALPETER:  Right.
19           THE COURT:  So it doesn't give any
20 decimal points?
21           MR. SALPETER:  No.  If it's 12.49,
22 then it's 12.
23           THE COURT:  Okay.
24           MR. SALPETER:  If it's 12.50 or $1,

081

1 it's rounded up.
2           So, let's just go quickly to the
3 actual upside report itself.  These are the numbers

Page 70

---

92040AS1.TXT

4 that we've looked at.  And let's go to the
5 pipeline -- last pipeline growth of 34 percent.  And
6 then these are the numbers we looked at just lifted
7 out of the reports themselves.
8           THE COURT:  The pipeline was actually
9 up?
10           MR. SALPETER:  Yeah.
11           THE COURT:  But Minton thought what
12 could be converted was down?
13           MR. SALPETER:  And this is what
14 Ellison said numerous times in his deposition had
15 given him confidence.  He always talks about the
16 pipeline, the pipeline, the pipeline.
17           There's another report in late
18 February which also gave some reason for optimism.
19 During the last five days of the quarter, Oracle
20 generates something called a big deal report.  And a
21 big deal is a deal over $500,000.  And the big deals
22 obviously can make or break the quarter.  And the big
23 deal report is generated every day of the last five
24 days of the quarter.  And you can see the third

082

1 quarter '01 collapse in this next slide.
2           Now, this shows that Oracle on the
3 morning of February 26th had closed 192 percent more
4 big deals in dollars than the same day the year
5 before.  Same day, third quarter of '00.  But two
6 days later Oracle was behind 1 percent of closing big
7 deals in dollars compared to the year earlier.  So to

Page 71

---

92040AS1.TXT

8 me that demonstrates fairly dramatically the
9 collapse.
10           THE COURT:  What was the dollar
11 value?  Covisint was 50 big deals; right?
12           MR. SALPETER:  Well, yeah.  But a big
13 deal can be five, 10 million, too.  A big deal is
14 anything over 500,000 or more.
15           THE COURT:  Right.  Covisint was the
16 equivalent of 120 big deals.
17           MR. SALPETER:  Yeah, if you use
18 500,000.  Right.
19           THE COURT:  I'm just trying to get a
20 sense -- okay.
21           MR. SALPETER:  I mean, not to put too
22 fine a point on it.  The big deals can put you over
23 fairly easily.  The next slide shows that.  The
24 dollar counterpart to this is in chart 30 of our

083

1 exhibits.
2           THE COURT:  Okay.
3           MR. SALPETER:  Chart 30 of our
4 compendium is the dollar equivalent of our
5 percentages.
6           Let's go to the next chart.  This is
7 the actual big deal reports from February 26th
8 compared to February 28th.  And the February 26th
9 part on the left shows that there's 834 million in
10 the big deal pipeline.  Again, we're talking about
11 trying to find another 31 million to get that

Page 72

92040AS1.TXT

12 three-tenths of a cent to get us to 11.5, which would
13 allow us legitimately to round off. But in any
14 event, you go from 834,000,00 three days before the
15 end of the quarter to 550 million two days later.
16 And the big deal license revenue growth goes from
17 40 percent on February 26th to 20 percent two days
18 later. So there's really no denying and no
19 disputing that there's a total collapse the last two
20 days of February and deals are falling out.
21 THE COURT: Tell me what these
22 figures mean -- this 834?
23 MR. SALPETER: It means that the
24 pipeline of big deals, which is included in the other

084

1 pipeline number that we're talking about -- this is a
2 subset of the pipeline report number, except it's
3 being looked at under the microscope of only deals
4 500,000 or more.
5 THE COURT: Remember I asked you, how
6 does Covisint factor into that?
7 MR. SALPETER: It's not. It's done
8 over --
9 THE COURT: Once it's done, it drops
10 out?
11 MR. SALPETER: I believe that's
12 right.
13 THE COURT: There was something in
14 the deposition that was confusing about that.
15 MR. SALPETER: I believe it drops
Page 73

92040AS1.TXT

16 out. I'll double check during the --
17 THE COURT: So that the 834 is not --
18 MR. SALPETER: It's deals where
19 there's what they say paper on the street, where
20 there's -- they're negotiating. They think they're
21 getting close to a contract.
22 THE COURT: But it doesn't include
23 any big deal which has already been documented.
24 MR. SALPETER: That's correct.

085

1 THE COURT: So, it would not -- it
2 would not include Covisint?
3 MR. SALPETER: Correct.
4 Now, I want to end this discussion
5 about the last three days of February with kind of a
6 common sense discussion here, and, that is, we have a
7 lot of e-mails in the last three days of the quarter.
8 I guess you can call them sort of "Oh, my God"
9 e-mails. Bad things are happening. And there's a
10 slide which I'm not going to go through, but I just
11 want to call your attention to it, which summarizes a
12 lot of these e-mails. I'm going to focus on a couple
13 of them. We can go through these and put a finer
14 point on it than I'm going to do now.
15 What it shows is that in each one of
16 the subunits inside the U.S. sales organization
17 people are revising their forecasts. Even when
18 they're revising them down drastically, Your Honor,
19 they still end up missing, except for that one we
Page 74

92040AS1.TXT

20 showed you.
21 What I'm trying to do here is convey
22 to you that there was a sense of genuine shock and
23 surprise. I'm going to pick one of these e-mails,
24 the Nick Classick e-mail as sort of the --

086

1 Nick Classick worked for George Roberts at NAS. His
2 e-mail is Defendant's Exhibit 104. In his e-mail he
3 tells his boss that he's going to reduce his
4 forecast, but you can almost feel his pain while he's
5 doing it. And this is Nick Classick to his boss
6 George Roberts.
7 "The past 6 days our forecast has
8 dropped to the point that I know that our
9 organization will have put John" -- which is John
10 Nugent -- "Oracle and yourself in a bad spot.
11 After netting everything thru Friday night, we will
12 off an add'l $10mm and are looking at a quarter number
13 in the low 50's. I am aware of the impact this news
14 has to Oracle and I am sorry that we have created
15 such a problem. This is my organization and I am
16 responsible for a forecast to you -- I failed.
17 George, you have been a great supporter for my team
18 and myself. In my 6 years with Oracle this is the
19 most difficult news I have had to deliver as a
20 forecast, especially this late in the quarter, is a
21 personal commitment and I have let you and Oracle
22 down. I am sorry."
23 THE COURT: Unfortunately,
Page 75

92040AS1.TXT

24 Mr. Roberts got to him before the original

087

1 hari-kari --
2 MR. SALPETER: This is the Oracle
3 form of hari-kari. "Oh, my God. It's my
4 responsibility." I give him credit for taking
5 responsibility.
6 George Roberts sends an e-mail to
7 Ellison and Henley at 1:30 in the morning. He
8 forwards this to Ellison and Henley -- the e-mail
9 that he got -- and here's what he says to the Oracle
10 executives. "On Friday John Nugent told me that he
11 had 10mm forecasted business fall out of the forecast
12 in the West area.
13 "I spent the weekend reviewing the
14 numbers, pipeline and upside deals to see if we could
15 still find a way to 320mm. However based on the
16 continual erosion of the pipeline and forecast this
17 quarter I am reducing my forecast by 20mm. This puts
18 the forecast at 300mm with a best case of 305mm."
19 Then Larry Ellison writes back to
20 Roberts. "John, do you think these deals
21 slipped into the fourth quarter or have they simply
22 disappeared?" And as it turns out, the forecast was
23 lowered and other forecasts were lowered as well.
24 NAS. You see, even when they lowered

088

Page 76

92040AS1.TXT

1 them the last three days, they didn't realize the
2 extent of the collapse. There was genuine shock and
3 surprise in the organization, in the field. You
4 know, if these e-mails had been written at the end of
5 January, there would be a totally different kind of
6 case here. But I think, from a common sense point of
7 view, the fact that these e-mails say what they say,
8 with the sort of shock and surprise element, and
9 they're all coming in those last three days, you
10 really do get a sense when you read them all -- and I
11 understand I've only shown you one trail here -- but
12 you really do get a sense that people are being
13 genuine, that they are surprised. They are shocked
14 that they're not going to make it. One of the
15 witnesses called the last few days of the quarter the
16 cardiac close. It looks like this time the heart
17 attack got to him.
18           So, to sum up. The last three days
19 of the quarter is pretty easy. First of all, it's
20 long after Ellison and Henley saw it. Second, they
21 did not know they were going to miss the guidance
22 until the last three days of the quarter. And they
23 didn't possess material nonpublic information at the
24 time they sold their stock.

089

1           And I think it's worth remembering --
2 and I'm going to close with this -- the public was
3 told $.12 a share. They weren't told that Larry
4 thought he was going to blow out the quarter. They
                    Page 77

92040AS1.TXT

5 weren't told that Larry thought maybe we'll do $.16 a
6 share. The public wasn't told that Larry thought he
7 would beat it. So, the $.12 a share is the
8 benchmark. That's what's out there.
9           So, each time Larry thinks to himself
10 or Jeff Henley thinks to himself, "Well, we're not
11 going to do 16; so long as they're not going below
12 12, there's nothing to tell the public" -- and this
13 whole business about softening -- this whole business
14 about softening -- what does it mean? If you're
15 still going to meet the number you put out there,
16 maybe you're softening from $.16 to $.12. But I
17 don't think that meets the standard. And I know I'm
18 not going to be the law man today, but that's not an
19 extreme departure from what the public has been told.
20           So with that, I'm going to pass the
21 baton to my friend Mr. Nachbar.
22           THE COURT: Thank you.
23           MR. NACHBAR: Thank you, Your Honor.
24 I would intend to cover three points made here today.

090

1 First, that Brophy should be abrogated; second, in
2 all events, Brophy is inapplicable here because there
3 was no trading on materially adverse information; and
4 finally, in all events, Brophy is a scienter-based
5 claim and there's no evidence to demonstrate
6 scienter.
7           Let's talk about Brophy first. It
8 was decided in 1949, as Your Honor knows.
                    Page 78

92040AS1.TXT

9 Thomas Kennedy, a confidential secretary, learned
10 that Cities Service was planning to purchase shares
11 in the market. He misappropriated that information.
12 He traded for his own account. I think we call that
13 front running now, although I don't think the term
14 was invented in 1949.
15           There was harm to the company. It's
16 now recognized, although it may not have been
17 recognized in 1949, that front running drives up the
18 price of the stock that the company wishes to
19 purchase. You may not be able to measure that
20 precisely -- how much did Mr. Kennedy's trades drive
21 up the stock? --but it certainly didn't help the
22 company. It certainly puts him in direct competition
23 with the company to purchase shares and therefore
24 hurts the company.

091

1           THE COURT: I take it the inference,
2 too, is that he knew that the company's trades are
3 going to -- I mean, it's a no-risk trade. If you
4 know somebody big is going to come behind you and
5 buy, you're almost certain to make a gain; right?
6           MR. NACHBAR: That was his hope and
7 his plan. I don't know how it worked out for him,
8 because the case doesn't, as they -- yes, that's
9 precisely right.
10           At this time there was no federal
11 securities remedy for Mr. Kennedy's wrongdoing, no
12 insider trading statute, no class action. In fact,
                    Page 79

92040AS1.TXT

13 no private right of action under 10(b)(5) in 1949,
14 therefore equity intervened to provide a remedy where
15 none otherwise existed.
16           The Diamond case in New York, decided
17 about 20 years later, pointed that out. It applied
18 Brophy and it expressly noted that, even in 1969,
19 there was an absence of a federal securities law
20 remedy. And as this Court recognized in
21 Goldman v. Isaacs, an awful lot has changed since
22 Brophy was decided.
23           First, as Your Honor knows, the
24 federal courts determined that there is a private

092

1 right of action under 10(b)(5). Second, the court
2 adopted -- or the courts -- the U.S. Supreme Court
3 actually adopted the fraud-on-the-market theory
4 enabling class actions for 10(b)(5) violations in
5 similar cases. And finally, Congress amended the
6 '34 Act to provide an express private right of action
7 for insider trading. So, unlike 1949, there's now a
8 full federal remedy for the type of conduct alleged
9 in Brophy.
10           THE COURT: Well, let's go through
11 those remedies a little bit. Brophy might be a good
12 example to use. Knowing what we now know or think we
13 know about markets, arguably Brophy's a case in which
14 the insider trading only injured the company, in the
15 sense that what Brophy knew was that the company was
16 going to make purchases. And so only if you're
                    Page 80

9204OAS1.TXT

17 saying that it was sort of in a weird way for
18 somebody, who was just ordinarily in the market that
19 day, it wasn't that they didn't know anything -- that
20 Brophy knew anything about the material prospects for
21 the company in terms of its operations or earning
22 potential, he simply knew the company was going to
23 come along behind him and buy. And I guess you could
24 make a theory that the public, whoever is in the

093

1 market that day, if they had the same information as
2 Brophy, they might have held off.
3            So, in that sort of case, what would
4 the remedy -- the federal remedy be that's available
5 to the company as a company? Brophy is a good case
6 where there probably is some discernible damage to
7 the company as an institution. Because it's the time
8 when it announces it's going to buy, it can
9 immediately begin buying at whatever price and
10 arguably somewhat different than what Brophy paid.
11           So what would the company's federal
12 remedy be?
13           MR. NACHBAR: I believe -- and I'm
14 not positive, because you don't see companies being
15 harmed that much, and that makes -- I'll get to that,
16 because Oracle wasn't harmed here. And it makes this
17 case different than Brophy in a sort of fundamental
18 way. But I think the company could have a 10(b)
19 action against Mr. Brophy. I don't believe -- again,
20 I'm not an expert. I would defer to others. I'm not
                    Page 81

9204OAS1.TXT

21 sure it would have an insider trading cause of action
22 under Section 28, but I believe it would have a
23 10(b)(5) action.
24           More importantly, though, the people

U94

1 who were on the other side of the trades for
2 Mr. Brophy, I believe, would have both an insider
3 trading and a 10(b)(5) action, because Mr. Brophy had
4 the very inside information that Your Honor talked
5 about. It's classic front running. You know,
6 somebody is going to make a tender offer and you
7 trade on inside information. It's the theory of the
8 Chiarella case and lots of others. It's pretty
9 garden variety. Here it wasn't a tender offer, it
10 was purchases, but to the same effect. It would tend
11 to drive the stock price up.
12           THE COURT: What would the SEC's
13 remedy be?
14           MR. NACHBAR: The SEC has a full
15 panoply of remedies, including civil penalties -- I
16 believe a triple damage penalty.
17           THE COURT: So they can get a
18 multiplier. Who gets the civil right? The
19 government takes it?
20           MR. NACHBAR: I assume it goes to the
21 United States treasury.
22           THE COURT: It's booked for the
23 Social Security trust fund but then --
24           MR. NACHBAR: If you can follow that
                    Page 82

9204OAS1.TXT

095

1 accounting, it will make the rest of these charts for
2 the federal government accounting seem very simple.
3 It will make that one over there seem like it's done
4 in crayon.
5            THE COURT: I always thought what I'm
6 going to do is start collecting these charts and I'm
7 going to get a company and we'll do Chancery -- get a
8 special revenues stream to make sort of Chancery
9 Court ties and take the litigation charts and put
10 them on civic ties.
11           MR. NACHBAR: I think, if you turned
12 that one vertically, it would be pretty nice.
13           THE COURT: The bottom part is pretty
14 nice.
15           MR. NACHBAR: So anyway, given these
16 changes in the legal landscape, this Court said in
17 Goldman v. Isaacs, "Let's stop and think. Does this
18 equitable remedy still make sense?" And I would
19 submit that the Brophy cause of action is not only no
20 longer necessary, indeed it's not appropriate, and
21 for several reasons.
22           THE COURT: And when you do that,
23 think about this scenario and how it plays into what
24 you're going to tell me, which is the possibility

096

                    Page 83

9204OAS1.TXT

1 that there are often situations in which people name
2 both the company as a defendant and the insiders.
3 And the extent to which the abrogation of Brophy
4 would adversely affect the ability of the company to
5 claim over against the insiders and say, you know, we
6 incurred $75 million in unnecessary costs or we had
7 to pay this judgment on account of your wrongdoing.
8 How would -- when you tell me -- think about that
9 scenario and how the legally --
10           MR. NACHBAR: I'll try do that. Let
11 me take it in the order and then I'll get to Your
12 Honor's --
13           THE COURT: As I said, it's sort of
14 at the back end, but it is a possible incidental harm
15 to the company that could be more than miniscule.
16           MR. NACHBAR: I start with Your
17 Honor's decision in RGC International against Greka,
18 which holds that equity does not normally intervene
19 when the party's conduct is closely regulated by law.
20 As we just saw, the situation in that regard has
21 changed rather dramatically since 1949. Therefore,
22 to the extent that persons trade on inside
23 information, the problem identified by the Court in
24 Cities Service and Brophy -- namely, that a

097

1 wrongdoing would go unpunished -- is surely not
2 something that people need worry about today.
3            Mr. Tabacco and Mr. Weiser and lots
4 of other people are not bashful about bringing
                    Page 84

92040AS1.TXT

5  10(b)(5) actions and 20(a) actions and all kinds of
6  other actions when they see wrongdoing.  So, there's
7  a very active plaintiffs' bar that has very complete
8  remedies to police that.  The notion that one of my
9  clients is going to be tried on inside information
10  and the world is going to be powerless to do anything
11  about it is not one that I stay up at night worrying
12  about.
13           Second, the Supreme Court's recent
14  holding in Tooley calls into serious question whether
15  a derivative action of this type is still
16  permissible.  As Your Honor knows, Tooley holds that
17  the derivative action is permissible only where the
18  plaintiff can allege injury to the corporation.  No
19  injury is really alleged here.  Unlike Brophy, where
20  there's at least a theoretical injury to the
21  corporation, Oracle wasn't worse off on February 1st
22  than on January 1st as a result of the trading by
23  Mr. Ellison or Mr. Henley.
24           Now, the plaintiffs will try to

098

1  bootstrap their way into harm by saying, "Well, it
2  exposed the corporation to 10(b) actions and other
3  types of litigation costs."  But that is a bootstrap.
4  If that's true, then the plaintiffs' bar can always
5  allege injury because they say, "Well, I can file a
6  lawsuit against the corporation and the corporation
7  can be liable."  The person who's liable here, if
8  there is liability, is Ellison and Henley or -- let

Page 85

13           The policy purpose for making the
14  company law is people shouldn't go around usurping
15  corporate opportunities and companies -- especially
16  public companies -- shouldn't worry that their top
17  executives are going to start trading on insider
18  information.  The way we're going to do that is, we
19  sort of look at the restitution agent, go beyond the
20  bounds of their duties to a principal, and we're
21  going to make them give back their trading profits.
22  With respect to the people who actually sold or
23  bought in the market, we're going to give them their
24  losses to make them whole.

0100

1           So, yeah, it is -- it's essentially a
2  double penalty, but it reflects a societal choice
3  that this is really particularly pernicious behavior
4  and then we'll even allow a triple damages award.
5  And how does the triple damage thing work with the
6  other federal remedy?
7           MR. NACHBAR:  There's an offset.
8           THE COURT:  Okay.  So the maximum --
9  putting all the federal remedies together -- the
10  maximum is the triple?
11           MR. NACHBAR:  That's correct.
12           THE COURT:  If you allow Brophy, you
13  would have the possibility for 400 percent?
14           MR. NACHBAR:  I guess that's right.
15           Your Honor articulated the societal
16  and policy reasons.  And Your Honor, you're in a

Page 87

92040AS1.TXT

9  me de-personalize because it's counterfactual.  Our
10  clients didn't trade on inside information.  But the
11  people who do trade on inside information are the
12  ones who are liable, and they're the defendants.
13           Finally, Section 20(a) of the '34 Act
14  expressly regulates insider trading and expressly
15  creates a cause of action for stockholders who
16  purchase shares while an insider sold shares, or
17  vice versa -- people on the other side of the
18  transaction.  Therefore, an equitable remedy is no
19  longer necessary.
20           But more significantly, perpetuation
21  of Brophy would create a conflict.  If insider
22  trading is proved, Section 20(a) expressly limits the
23  defendants' damage in a private cause of action to
24  his or her profit, gain or loss avoided as a result

099

1  of that transaction.  The statute thus contemplates
2  disgorgement to the persons on the other side of the
3  trade.
4           The Brophy cause of action
5  contemplates, I think, identical disgorgement, but to
6  the corporation.  Thus, Section 20(a) in Brophy
7  contemplates the exact same disgorgement but to two
8  different plaintiffs.
9           THE COURT:  Isn't the argument that
10  those things -- they're different policy purposes
11  that are to awards, and the measure of the awards are
12  the same.

Page 86

17  position to so rule at the end of some case -- not
18  this one, I would submit, because there was no
19  insider trading.  But some day Your Honor could rule
20  that way.  But certainly no court has ruled that way
21  yet.
22           You know, Brophy wasn't worried about
23  any type of double remedy because there was no
24  federal remedy.  In fact, they were worried about no

0101

1  remedy.  That's the whole reason that the equitable
2  cause of action was invented there.  We don't need it
3  anymore.
4           THE COURT:  I guess the Diamond case
5  came in at a little bit different time.  The Seventh
6  Circuit, they rejected this in part because of these
7  concerns; right?
8           MR. NACHBAR:  Correct.
9           But I would also submit, though, that
10  the double recovery -- the double civil recovery
11  would violate the purpose of Section 20(a), which
12  says the insiders -- inside trader's liability for
13  his insider trading would be limited to disgorgement
14  of his profit.  It doesn't say two times profit.  It
15  says it's a limit.  It's a statutory limit.  And to
16  say we're going to impose a state remedy on top of
17  that would simply be -- it's civil, so it's not
18  literally double jeopardy.  But it's sort of a civil
19  equivalent of double jeopardy.
20           So, for those reasons and principally

Page 88

92040AS1.TXT
21 because there is now a full federal remedy that
22 didn't exist at the time of Brophy, I think the
23 question that Chancellor Chandler asked in
24 Goldman v. Isaacs was a very astute question, and I

0102

1 think the answer to me is pretty obvious that equity
2 intervened in 1949 to create a remedy where none
3 existed. Now that remedy fully exists.
4           If you're writing on a clean slate
5 and there was no Brophy case and we had this full
6 insider trading regulation, it's 2004 and somebody
7 comes to Your Honor for the first time and says, "I
8 want to have a Brophy cause of action because all
9 this litigation in California isn't enough, we want
10 litigation in Delaware, too, on this issue," it would
11 astound me to think that a court would say, "Yes,
12 that's something that equity needs to intervene in,"
13 because I can't even complete the sentence of why
14 equity would intervene. There's a full legal remedy
15 and I think that's the answer to that question.
16           So, Brophy, we think, should be
17 abrogated.
18           THE COURT: Well, how does -- suppose
19 a company had stricter policies against trading than
20 the federal rules and an insider violated those
21 rules. How would -- how would the company pursue
22 that on a contractual basis?
23           MR. NACHBAR: I think it would be on
24 a contractual basis, because I don't know how else
Page 89

92040AS1.TXT
0103
1 the company could apply those rules, other than by
2 contract.
3           THE COURT: How about the idea of the
4 company being -- are there possible scenarios? --the
5 company itself would be found liable under the
6 federal rules -- the federal statutes -- for insider
7 trading by executives and could have a judgment
8 entered against it? And a way of which to seek some
9 sort of contribution or indemnity from the
10 insiders -- how would that work?
11           MR. NACHBAR: Not that I'm aware of.
12 Obviously, if the company failed to publish
13 information, they have got their own problems. But
14 if insiders, you know, had information that the
15 company wasn't required to disclose and they
16 improperly used that information -- again, this isn't
17 my principal area of expertise, but I don't see how
18 you get liability to the company.
19           THE COURT: If the company failed to
20 disclose material information -- say it's one of
21 these cases where there's a registration going on or
22 a secondary offering at the same time as the insider
23 trading and the company is held liable for failing to
24 disclose in the registration statement material

0104

1 information, and the determination about what was
Page 90

92040AS1.TXT
2 disclosed was made by the same people who traded and
3 were held liable for insider trading. Does the
4 federal law allow the company to seek contribution or
5 indemnity from them, or does the public policy -- I
6 seem to recall that there are federal policies that
7 limit that opportunity.
8           MR. NACHBAR: Your Honor, I
9 apologize. I'm going to have to defer on this. I
10 know that the in pari delicto defense has enjoyed an
11 up and down history, and I don't know if it's up now
12 or down now. I just don't know. But that is an
13 issue --
14           THE COURT: because that could
15 involve real harm there; right? I mean, if you're --
16 if the entity sort of faces direct liability for
17 behavior of the insiders, then that would be
18 corporate injury.
19           MR. NACHBAR: But the injury there
20 isn't the insiders trading. The injury there is
21 causing the company not to disclose, and perhaps
22 causing the company not to disclose for a selfish
23 purpose. So, I would think that in that case you
24 would have just a standard derivative claim. In

0105

1 fact, it would be the same if -- let's take two
2 hypotheticals: one is that Mr. Smith causes the
3 company not to disclose information because he wants
4 to sell, dump his stock, and then he'll disclose the
5 bad information.
Page 91

92040AS1.TXT
6           Hypothetical No. 2 is the exact same
7 conduct by Mr. Smith, but for a different purpose.
8 The company wants to complete an offering and he
9 thinks it would be good for the company to close its
10 public offering before the bad news comes out.
11           In either case, the harm is in
12 failing to disclose the information, the wrongdoing.
13 It's deliberate wrongdoing in my hypothetical by
14 Mr. Smith, and I think he could be held derivatively
15 liable for that without a Brophy claim. And his
16 motive -- if he acted intentionally -- his motive,
17 whether he did it so that he could dump stock or
18 whether the company could dump stock is irrelevant.
19 So, it's not an insider trading. It's not a Brophy
20 claim. It's just a garden variety derivative claim.
21 Deliberate wrongdoing.
22           THE COURT: It would be an
23 intentional violation of the law.
24           MR. NACHBAR: Correct. Exactly.

[106

1           So for Brophy or any other inside
2 trader regime to apply, there must be use of material
3 nonpublic information. And there is case law on what
4 materiality means, specifically for intraquarter
5 results, and that is the Shaw case which says that
6 there must be an extreme departure. And I think
7 there's a reason for that rule that I think
8 Your Honor hinted at.
9           I think Your Honor's phrase was, you
Page 92

92040AS1.TXT

10 start out with polenta. soft information. And that's
11 true. And the other side creates a strawman here.
12 They say, "Well, there are cases that hold that soft
13 information can be material." And we don't disagree
14 with that. You know, if Jennifer Minton had put out
15 an upside report, you know, on January 15 that said,
16 "You know, we no longer think we're going to make
17 $.12, we think we're going to make $.06," sure, that
18 would be an extreme departure from the growth that
19 Oracle had experienced -- that type of intraquarter
20 result. The change of projection would be material.
21           Similarly, if the hockey stick was
22 reversed here, if instead of getting nine, 10 or
23 12 percent in your first month, it would just be the
24 reverse for some reason and you got 90 percent in

U107

1 your first month and those results came in way under
2 estimate, those actual results theoretically, you
3 know, could be material.
4           THE COURT: Or even if you got --
5 even if you had sort of a more or less linear revenue
6 stream and your first month and a half was just
7 disastrous and you sort of knew weekly when you were
8 selling, then that could be material. Are you saying
9 that the base line -- I mean, the base line you have
10 to start with is the market estimate.
11           MR. NACHBAR: Absolutely.
12           THE COURT: And understand that that
13 is a soft estimate.
                    Page 93

18 materiality. You don't have different materiality
19 for different purposes -- and I think that's right --
20 because otherwise the plaintiffs are in a position of
21 saying you have to put out less information when you
22 are selling stock to the public and enticing them to
23 participate in a public offering. You need to put
24 out less money than when an insider is selling some

0109

1 of his shares in the market. I don't understand why
2 that would ever be the case.
3           So, for intraquarter results, because
4 they are, by definition, estimates and soft
5 information, there must be an extreme departure.
6 Now, I don't take extreme departure literally. I
7 mean, for instance, if Oracle -- you know, I don't
8 think Oracle has to be predicting a loss in order for
9 it to be material for a growing company like Oracle.
10 If you went, as I said before, from a $.12 cent per
11 share earning to a $.06, I think that would be an
12 extreme departure. But what's not an extreme
13 departure is these very marginal changes, even going
14 from $.12 to $.11. Obviously from $.12 to $.11 didn't happen
15 until after the trades were completed. But that's
16 not an extreme departure. Going from license revenue
17 growth rate of about 25 percent to 24 percent isn't a
18 departure at all. It's certainly not an extreme
19 departure.
20           Now, if you said we're going to have
21 no license growth rate here, you know, you could
                    Page 95

92040AS1.TXT

14           How did -- how does the safe harbor
15 for forward-looking statements play at all in this?
16 I take it there were the disclaimers and all that
17 kind of stuff in the beginning,
18           MR. NACHBAR: Sure.
19           I think -- to give the plaintiffs
20 their due, I think what they would say is, "Sure.
21 You don't have to meet your guidance and it's not a
22 guarantee that you're going to make $.12 or about
23 25 percent license growth." And so if the company
24 came to believe, as it did, that they were going to

0108

1 make $.11, they didn't need to put out a corrective
2 disclosure at that point because they were in a safe
3 harbor. All of that is true and undisputed, I think.
4           What the plaintiffs would say is
5 that, however, that doesn't give you license to
6 trade, you know, if you know that they're going to
7 miss the quarter.
8           THE COURT: Talk to me a little bit
9 about that view or that distinction between the
10 affirmative duty to hold out some sort of corrective
11 disclosure or -- I don't know if it's corrective,
12 predictive, alteration, and the duty not to trade.
13           MR. NACHBAR: I think that's exactly
14 where Shaw comes in. While Shaw was a company
15 disclosure registration statement case, there are
16 cases that cite it and other cases -- insider trading
17 cases -- that say there is one standard of
                    Page 94

92040AS1.TXT

22 argue about that -- whether that was an extreme
23 departure. I guess I wouldn't want to be on the
24 other side of that necessarily. But, you know, if

0110

1 the full quarter forecast was going to be flat, we
2 don't have anything like that here.
3           THE COURT: What is it you think --
4 if this were a case where affirmative disclosure was
5 called upon -- was called for -- if that was the
6 debate about it -- what point in time did the company
7 enter -- what do you understand your friends are
8 saying should have been told to the market?
9           MR. NACHBAR: That's a good question.
10 I really don't know. You know, we were talking about
11 that at the break.
12           Let's say we put out more disclosure.
13 What would it be? Well, all we told you before is we
14 expected $.12 of earnings and about 25 percent
15 license revenue growth. And what we expect today,
16 after massaging all the numbers and considering
17 everything that there is, is $.12 per share EPS and
18 about 25 percent license growth. I mean, that really
19 proves here that there was no material inside
20 information because there's nothing to disclose.
21           THE COURT: I guess you put out what
22 Mr. Ellison said, which is we -- when we gave our
23 estimate, we were more optimistic than we are now.
24 We remain -- our best estimate remains the same as it
                    Page 96

92040AS1.TXT

0111

1  was but our glasses are slightly less pink.
2           MR. NACHBAR: Yes.
3           And if Mr. Ellison had said or Oracle
4  had said back in December, you know, we're hoping to
5  make $.16 but, to be safe, we're predicting $.12, you
6  could argue whether there was an extreme departure.
7  And I would say there wasn't. But that's not what
8  happened.
9           The only thing they took up --
10  they're not required to tell the public anything.
11  They're not required to even make a forecast. But
12  they made a forecast. They had a practice of making
13  forecasts, although I don't know that they forecasted
14  the revenue growth. But they certainly forecasted
15  EPS in the past. And so they put out the forecast,
16  which was their best estimate. They tended to be a
17  little bit conservative.
18           THE COURT: How about the December
19  actuals? How did they report in their Q the actuals?
20  Did they do it by units and such?
21           MR. NACHBAR: Yes, I believe they do.
22           THE COURT: So is it like OPI and
23  OSI, can you tell, or is there just --
24           MR. NACHBAR: I think it's license

0112

1  and -- and applications, I think. I think
Page 97

92040AS1.TXT
2  Vice Chancellor Strine was asking about quarterly
3  results.
4           THE COURT: In a way, what we're
5  talking about is whether we should go from quarterly
6  reporting or monthly reporting or weekly reporting of
7  the companies. I mean, I'm serious. I think the
8  company played a game. The investors play the game.
9  Maybe we just ought to take a pulse -- you know, just
10  sort of daily check in and just let it run.
11           I'm being serious. 10-Qs are
12  documents with some dignity. They have a certain
13  format. And if the hardest information that you had
14  as of -- put aside Mr. Henley now -- as of the time
15  Mr. Ellison began trading was the December actuals --
16  you had actuals for December. And it would be
17  possible to, I guess, do something that looked like a
18  10-Q for December. I'm wondering what that would
19  have looked like, how-informative it would have been.
20  Or would you -- in order to be informative the way
21  the plaintiffs want it, would you do it in a
22  different format that broke it down on a unit basis?
23           MR. NACHBAR: Well, it wouldn't be
24  informative, and it's why it's not disclosed and it's

0113

1  why it's not required to be disclosed.
2           I will say that plaintiffs' position,
3  I think, taken to its extreme, is that Oracle sales
4  online -- the database -- shouldn't be password
5  protected. It ought to be a database that the whole
Page 98

92040AS1.TXT
6  world can tap into. Well, that's not the law and no
7  case suggests that.
8           The reason that first month actuals
9  are not material here, however, is because they have
10  no predictive value. Just because the first month is
11  off to a slightly slower start -- if it is -- and
12  here, whether it's off to a slow start or fast start
13  is whether you back out Covisint. If you back out
14  Covisint from this quarter, then maybe you need to
15  back out some other large deal from the prior quarter
16  that you're comparing it to. And you're then on a
17  slippery slope, and getting an apples-to-apples
18  comparison is going to be impossible.
19           But leaving that aside -- I mean,
20  let's say that hypothetically the first month here
21  was absolutely flat. No growth in any sector. It
22  was just flat. What would that tell you? It
23  wouldn't tell you anything. It would tell you that
24  you hadn't closed, you know, as many deals in the

0114

1  first month. It would tell you that if -- if you
2  didn't have a hockey stick and if you didn't have big
3  deals that were going to come in at the end, maybe
4  you'd be in jeopardy of not making your quarter. But
5  that's counterfactual. We know the hockey-stick
6  effect --
7           THE COURT: If you count Covisint's
8  half, if you just took it at half, where would the
9  average -- where would the percentage contribution of
Page 99

92040AS1.TXT
10  the first month have been typically for Oracle? Do
11  you know? Coming in with Covisint, I forget what
12  percentage of the revenues was made. I guess -- it's
13  complicated because we've got all these charts. You
14  got a number for revenue projection, 25 percent.
15           MR. NACHBAR: Right. That comes out
16  to 1.3 billion.
17           THE COURT: Okay. What percentage of
18  the 1.3 billion was achieved in December? Do you
19  remember?
20           MR. NACHBAR: A relatively small
21  percent. I think it was something like 14.5 percent.
22  I'm not positive.
23           THE COURT: Even with Covisint?
24           MR. NACHBAR: Somebody has just

0115

1  handed me a chart. And now the question is going to
2  be whether I can read it well enough to answer Your
3  Honor's question. It looks like December 2000 in
4  license revenue -- 22 percent of the total quarter
5  revenue was achieved in the first month.
6           THE COURT: That's the predicted.
7           MR. NACHBAR: No. That's the actual
8  revenue. If it's predicted, it would be slightly
9  less because the actual was slightly lower than the
10  predicted. Ball park: 20 percent.
11           THE COURT: And how much of that was
12  Covisint?
13           MR. NACHBAR: Covisint was 60 out of
Page 100

92040AS1.TXT

14  240.  But I think it wasn't all license.  I think
15  it's 50 million license, if I'm not mistaken, and
16  10 million other.  Or maybe it was 60 and 10.
17         THE COURT:  I guess I was getting at,
18  if you discounted Covisint but still counted it as
19  something, would it have been out of the range of
20  typical first quarter -- first month experiences for
21  Oracle?
22         MR. NACHBAR:  Absolutely.  You would
23  be -- you would be, I believe, somewhere between, you
24  know, in the 15 percent range.  I believe.

0116

1          THE COURT:  Even with the steep count
2   of Covisint?
3          MR. NACHBAR:  Right.  We can get the
4   exact number.
5          But here's the more important point,
6   I think.  That is -- and I asked this precise
7   question to the other side's expert.  You know, we're
8   here on summary judgment.  This is their opportunity
9   to present evidence.  This is their expert,
10  Professor Fischel, who Your Honor probably knows.
11  He's very well regarded, very renowned.  And I
12  specifically asked him this question.  I said, "If
13  you had the Garnick flash report, which was the first
14  quarter actuals -- the first month actuals -- and you
15  had the experience from the prior 22 quarters, could
16  you predict quarterly revenues?"  "They would be
17  between X and Y."  "Could you give me a range?"  And
           Page 101

22  if you back out Covisint, you start looking -- you
23  see this gap between what the first month of the
24  third quarter has traditionally produced.  There you

0118

1   go.
2          MR. NACHBAR:  Right.
3          But again, I specifically asked
4   Professor Fischel that question, because that really
5   is at the core of plaintiffs' analysis.  And I wanted
6   to test it.  So, I said to him, "Are third quarters
7   different than first, second and third quarters?"
8   And he said, "Yes, they are."
9          And I said, "Tell me how they're
10  different."  And he said, "14-1/2 percent of
11  quarterly revenues for the prior 22 quarters.  But
12  when I look at just the December's, it's -- I
13  forget -- 21 or 22 percent of revenues."
14         And I said, "Well, is that the result
15  of random chance or is there some reasons
16  statistically that you can prove that?"  And, you
17  know, he basically said he didn't know.  In fact, if
18  I can, I would like to read that testimony.
19         THE COURT:  Sure.  It would be
20  helpful to me if you -- if that's an important
21  deposition to read to get the actual Min-U-Script in
22  chambers.
23         MR. NACHBAR:  I will do that.
24         THE COURT:  It was lodged -- it
           Page 103

92040AS1.TXT

18  his answer was he didn't do that.  And I said, "Well,
19  could you do it?"  And he said, "I don't know.  I'd
20  have to think about it."
21         I asked our statistical expert
22  whether you could do that because I thought you
23  could.  And frankly, I thought, if you did it, it
24  would show a very big range because, you know, you're

0117

1   only expecting to make like one-seventh of your
2   revenues in your first month.  Therefore, my thought
3   was it would show a range of between $.08 a share and
4   $.50 a share and it would be meaningless.  I couldn't
5   find a statistician who could do that calculation.
6   And I think the reason for that is because the first
7   quarter -- the first month of the quarter is so small
8   and it's so driven -- the actual results -- by the
9   pipeline and the conversion of the pipeline and the
10  big deals that happen at the end of the month.
11         THE COURT:  How do you deal with your
12  friend's argument that the first month of the third
13  quarter tends to be more important than the first
14  month of the other three quarters?
15         MR. NACHBAR:  There's no evidence to
16  support that.
17         THE COURT:  Well, there is
18  statistical evidence.  They use a five-year average.
19  It changes, if you look.  But the five-year average
20  is that month one in Q3 contributed 21 percent, as
21  compared to like Q2 was 13 or 14 percent.  And that
           Page 102

0119

1   exists on LexisNexis lodged.
2          MR. NACHBAR:  We will send you a
3   copy.
4          This is page 94.  "Okay.  But
5   whatever these numbers are, you don't know if the
6   fact that third quarters averaged 21 percent in the
7   first month as opposed to 14.5 percent was the
8   results of random chance or some other factor, do
9   you?"
10         Objection.
11         "THE WITNESS:  I just calculated what
12  it was, not why it was that way.
13         "Question:  Right.  And so that could
14  be the effect of random chance; right?"
15         Objection.
16         "THE WITNESS:  I didn't investigate
17  why it was, so I guess it could be because of
18  anything.
19         "Question:  Right.  One of the things
20  it could be as a result of is random chance; right?"
21         "Answer:  Possibly, yes.
22         "Question:  And if you wanted to
23  determine whether it was the result of something
24  other than random chance, you could have done an

0120

1   analysis to determine that, couldn't you have?
2          "Answer:  I could imagine various
           Page 104

92040AS1.TXT

3 things that you could do if you really wanted to
4 answer that question as opposed to just using the
5 actual data, which is what I did.
6          "Question: Okay. So you don't know
7 if there's anything fundamentally different about
8 third quarters than any other quarter, right, because
9 you didn't analyze that?
10         "Answer: I didn't analyze that,
11 correct."
12         THE COURT: Well, that's true. I
13 guess what your friends are going to say is, it
14 doesn't really matter what -- it's a phenomena that's
15 persisted. I think they suggest -- or maybe I
16 suggest in my own mind -- to myself at some point --
17 that I can't recall that -- you know, that perhaps
18 the month gets a little bit of a boost because of the
19 national inclination of some buying organizations
20 that might close their fiscal year at the end of the
21 actual calendar year and there's a tendency on the
22 part of large organizations for people to dispose of
23 cash that's within their units, and probably not the
24 most disciplined way in the last couple weeks before

0121

1 the end of the year.
2          MR. NACHBAR: Well, that would
3 explain some boost in years prior to 2000, when there
4 were flush times in the Internet world. It would
5 also, I would suggest, explain -- we're speculating.
6 That's what we're doing now. They had an expert.
                    Page 105

92040AS1.TXT

11 software. They just can't fit it in in 2000 because
12 they spent everything they have to spend.
13         The other thing obviously in
14 December, lots of people are on vacation. So, you've
15 got the spending-money-by-year-end factor, which
16 drives things up. You have people on vacation that
17 drives things down. The point is this. We are just
18 speculating. There's no statistical analysis. None
19 was done. It could have been done. It wasn't.
20         So, we're not in a position, and the
21 plaintiffs, more importantly, aren't in a position to
22 say that third quarters were any different than any
23 other quarters. And I submit that there's reasons to
24 think that third quarter '00 would be different than

0123

1 third quarter '99, third quarter '98, third quarter
2 '97, because I think the economy was in a different
3 place.
4          THE COURT: In terms of that, I take
5 it -- I noted that the plaintiffs' charts change a
6 lot depending on year average. I guess the point to
7 make about the hockey-stick effect -- the five-year
8 average -- it was 60 percent in month three; two-year
9 average it's 64-1/2.
10         MR. NACHBAR: I think there's no
11 question that, to the extent a trend is discernible,
12 a trend is towards greater hockey-stick effect. I
13 think maybe the buyers were catching on that you
14 drive the best deal at the end of the quarter. But
                    Page 107

92040AS1.TXT

7 This is their opportunity to present evidence. They
8 didn't do it. So now we're speculating.
9          My speculation would be: sure, in
10 Decembers, other than prior Decembers, when people
11 were flush with cash, sure, then, in the holiday
12 spirit, and they said, "Let's by lots of licensing
13 software." But when they have no cash and they
14 already exceeded their budget, you're probably not
15 going to close a lot of deals in December 2000. I
16 mean, that's just where the economy was.
17         THE COURT: You're saying that the
18 economy was such that the buyers were skiddish
19 anyway, that they would have attended --
20         MR. NACHBAR: I'm saying more than
21 that. Definitely a lot of Internet companies had
22 revenue shortfalls.
23         THE COURT: Right. What I
24 understand, Internet companies are sort of out of the

0122

1 equation; right? Oracle is not gaining from them
2 because the dotcoms are gone. These are titans of
3 American industry, liken Enron. Enron was --
4          MR. NACHBAR: Even titans of American
5 enterprise -- we were in the middle of a recession.
6 You know, people, I would speculate -- again,
7 speculation -- I would speculate that lots of
8 companies had spent their budgets by the end of the
9 year. You know, the next year they're going to get a
10 new budget. They're still going to buy Oracle
                    Page 106

92040AS1.TXT

15 for whatever reason, what you see is more and more
16 sales in that last month.
17         THE COURT: If Oracle had achieved
18 what it actually achieved in December and January of
19 the third quarter of '01 and it achieved -- and then
20 hit 64-1/2 percent in the last month of the third
21 quarter '01, do you know where they would have been
22 against the market estimate?
23         MR. NACHBAR: I don't. And I'm not
24 sure where the 64-1/2 percent comes from.

0124

1          THE COURT: It comes from Strine
2 playing around with the back of envelopes when he
3 reads his charts. I did a thing -- I might ask you
4 all to sort of collaborate on that, because it seems
5 to be an important element of the plaintiffs' piece.
6          As I understand it, the longer the
7 average you use -- use with a five-year average for
8 this third quarter analysis -- the lower the
9 hockey-stick effect. The two-year average I think
10 was 64-1/2. I think the three-year average is
11 something, you know, like 63 or something.
12         What I'm saying is, if you took the
13 flash reports -- the end -- the early February flash
14 report that has the first two quarters, it gives you
15 a percentage of revenue that you get to date. I
16 forget what it was. Maybe it was 33 percent. I seem
17 to remember that as 33 percent. I was just wondering
18 what kind of gap it would produce if you did 64-1/2,
                    Page 108

92040AS1.TXT

19 or something like that, if there was any gap at all.
20         Your friends say, I believe, that you
21 had -- by the time the second so-called flash report
22 came in, it was clear that Oracle was going to have
23 to have a percentage of contribution to its final
24 revenues within the third month that had been

0125

1 achieved only once within the previous five years.  I
2 think that's what they said.
3         MR. NACHBAR:  The most recent third
4 quarter, in fact.  Yes.
5         THE COURT:  They would have to equal
6 what they did a year before.
7         MR. NACHBAR:  Right.  And there was
8 no reason to think that they couldn't.
9         This brings us to an important point.
10 None of these analyses were done by anyone at Oracle
11 at the time.  And I give the plaintiffs credit.  I
12 mean, they have sliced and diced the numbers and they
13 prepared lots of charts that are very creative, and
14 they're looking at things in ways that people didn't
15 look at them before.  But at the end of the day, it's
16 futile.  The reason it's futile is two reasons.
17         As a matter of law, what people
18 theoretically could have maybe figured out but didn't
19 isn't relevant to a scienter-based insider trading
20 case.  But more importantly, none of this information
21 would have alerted anybody to a likelihood that
22 you're going to miss the quarter.  And I would invite
              Page 109

92040AS1.TXT

1 was not fundamentally different in any way than the
2 first quarter or the second quarter.
3         The other thing that's on that chart
4 is upside is shown.  It's the blue line and the red
5 line.  The difference between them -- that's
6 potential and forecast.  The difference between them
7 is Jennifer Minton's upside.  And you'll see in every
8 quarter, I think, as the quarter progresses, that
9 upside narrows.  In some quarters it narrows more
10 quickly than in other quarters, but it always
11 narrows.  And there was nothing unusual about --
12         THE COURT:  I think what they're
13 saying is, there was some sort of harmonic
14 convergence happening.  The blue line, red line,
15 running, swimming increasingly together.  Almost like
16 the settlement of a going private.  It's that
17 beautiful.  It just brings the yellow line together
18 at the same time.
19         MR. NACHBAR:  It may be something
20 very akin to that, but I'd like to go back to the
21 law.  Because Shaw is one case and it says the
22 extreme departure -- there's no extreme departure
23 from prior experience here.  It's very, very, you
24 know, right in line with prior experience.

0128

1         Plus, the other cases that they talk
2 about that read on this, which are insider trading
              Page 111

92040AS1.TXT

23 Your Honor to look, for example, at plaintiffs'
24 chart 77.  It's also in the de Ghetaldi affidavit,

0126

1 Exhibit 21.  And that may be my favorite chart in the
2 whole case.  I like it because the plaintiffs
3 prepared it, so they can't accuse me of anything.
4 But it shows a pipeline in yellow at the top.  And it
5 shows how the pipeline behaved in not only the third
6 quarter of 2001 but some prior quarters.
7         Now, you can trace the first quarter
8 and second quarter of '01.  And does it look
9 identical to what the chart looks like for the third
10 quarter of '01?  No.  It's not identical.  But the
11 overall shape is pretty darn close.  What you see is,
12 you see a decline in the pipeline as the quarter
13 progresses.
14         Now, what you do see in the third
15 quarter is, you see a sharper drop in the first
16 couple of weeks; but that's only because it was so
17 high, to begin with.  As Mr. Salpeter explained, you
18 know, and that's why guidance was $.12 and not $.16.
19 People sort of discounted the 52 percent growth in
20 pipeline.
21         After that initial drop, though, you
22 see that the pipeline is essentially flat for several
23 weeks.  There wasn't some steady decline.  And the
24 overall decline in pipeline as the quarter progressed

0127                     Page 110

92040AS1.TXT
3 cases, are SEC against Smith and SEC against
4 Truong -- in the Truong case.  In order to make out
5 insider trading materiality, the government must show
6 that the defendants possessed information making it
7 likely that the company would miss its projection.
8 That was the standard.
9         In the SEC --
10 United States v. Smith -- not SEC.  I'm sorry.
11 United States v. Smith, the forecasts -- the
12 testimony there was that Mr. Smith knew that the
13 company was "not likely to meet its projections."  We
14 don't have anything like that here.  In fact, what
15 Mr. Ellison and Mr. Henley were being told is we are
16 going to meet our projections.
17         THE COURT:  How do you deal -- what
18 your friends press upon me is all these cases say
19 materiality is a mixed question of law and fact.  It
20 should be left to the trier of fact.
21         Then we one of my favorite cases is
22 the Cerberus standard, which imports into procedural
23 law the distinction between rationality and
24 reasonableness.  As I understand, rationality -- in

0129

1 the outer bounds of rationality, you're like one I.Q.
2 point away from Strine appointing a guardian of your
3 person, and reasonableness is some several more I.Q.
4 points and levels of judgment away from that.  But
5 you know, Cerberus impressed upon this Court that we
6 need to, you know -- you know, this Court was
              Page 112

92040AS1.TXT
7  reversed in that case, as you remember, because the
8  trial judge, who is now up on the Supreme Court, said
9  that he couldn't find factual reason that a
10 reasonable trier of fact could find for plaintiff.
11 He said that's all well and good, what a reasonable
12 juror might have done.  We're focused on rationality.
13 So, I've got that sort of epistamological issue.  I'm
14 trying to channel in head philosophers and
15 theologians to help me with that.
16             Where does this line -- when -- tell
17 me why there's no fact question?  Your two friends
18 are saying, "Look, you can look at this data all
19 kinds of different ways.  Your Honor you should look
20 him in the eye, get him on the stand and then make
21 this judgment."
22             MR. NACHBAR:  The reason that there's
23 no fact question here is -- there's two issues.  One
24 issue is: what's the legal standard?  What do you

0130

1  have to prove?
2             And then the second question is: what
3  evidence exists to prove it or not?  And, you know,
4  let me start with what you have to prove.  I mean,
5  again, the Truong and Shaw and SEC v. Smith case,
6  you've got to either prove an extreme departure,
7  which we clearly you don't have here, no matter how
8  many ways they slice and dice the evidence.  We don't
9  have that.
10             THE COURT:  Tell me the linguistics
Page 113

92040AS1.TXT
15 Is that -- as I read Shaw, that's because it's sort
16 of recognizing the soft information origins of the
17 correction.  Is that it?
18             MR. NACHBAR:  That's part of it.
19             Look, the other part is, we know that
20 as the quarter goes on -- you know, I don't know how
21 many total deals there are in the pipeline.  But
22 $1.3 billion, there's -- you know, you look at that
23 chart, all those sales people.  We're talking about
24 thousands -- maybe tens of thousands of deals or

0132

1  potential deals.  Every time one of those deals
2  closes, you're marginally more likely to make your
3  quarter.  And every time one of those deals -- you
4  know, somebody says I like IBM better.  You're
5  marginally less likely to make your quarter.  And so
6  it can't be that every time you lose a deal or gain a
7  deal there's material nonpublic information.  That
8  can't be the standard.
9             So, what it's got to be is an
10 abrogation -- is enough made deals or enough missed
11 deals so that you're going to have an extreme
12 departure.  You're no longer -- let's say Ellison was
13 buying instead of selling and he had information that
14 we're going to blow out the quarter.  I guess that
15 would be inside information, too.  You usually see it
16 on the selling side.
17             But it's the same thing in reverse.
18 If the abrogated missed deals were such that they
Page 115

92040AS1.TXT
11 of that.  The extreme departure -- I had it marked on
12 my desk.  An extreme departure from what?
13             MR. NACHBAR:  From expectation.
14             THE COURT:  You have to have
15 what? --facts demonstrating an extreme or
16 suggesting --
17             MR. NACHBAR:  I think you have to
18 have facts that, if true, would demonstrate an
19 extreme departure.
20             THE COURT:  And in what sense -- can
21 they be offered -- can it be soft information which
22 would suggest -- that's why I said we start from the
23 base line of soft information.  Is it a predictive --
24 a predictive statement of fact which could suggest an

E131

1  extreme departure?  If the pipeline had been -- had
2  been reduced from 53 percent to 10 percent --
3             MR. NACHBAR:  Correct.
4             THE COURT:  -- if based on that, you
5  know, that would suggest that some things were way
6  bad?
7             MR. NACHBAR:  Precisely.
8             THE COURT:  And that if you doubled
9  the historic conversion rate, you still would fall
10 materially short.  That, under Shaw, would clearly
11 be --
12             MR. NACHBAR:  That's correct.
13             THE COURT:  Why is Shaw right?  Why
14 isn't -- why does it have to be a market departure?
Page 114

92040AS1.TXT
19 indicated an extreme departure under Shaw, that could
20 be insider trading.
21             Now, under Smith and Truong, the
22 standard is perhaps more straightforward.  It's: is
23 there information indicating that it is likely -- not
24 marginally more possible on the fringe -- but likely

0133

1  that they're going to miss the guidance?
2             THE COURT:  "Miss."  And what do they
3  mean by "miss"?
4             MR. NACHBAR:  Not achieve the
5  guidance.
6             THE COURT:  How precise -- you know,
7  again, we're in -- one could suggest for Shaw, right,
8  that the idea is you're trying to -- let's take the
9  $.12.  We'll just assume the $.12 and the about 25
10 would move in the same range.  There's some band
11 within which it's not sensible as a matter of policy,
12 and it's really not about what we're thinking about
13 in terms of insider trading -- to be precluding
14 insiders from buying or selling.  And let's take a
15 real plaintiff-friendly approach to that.  Eleven to
16 13 seems to be a pretty tight band around 12.  And
17 we'll assume the revenues.  Within that band --
18 there's also cases where insiders buy.  So, you can
19 have extreme departure upwards.
20             I mean, if you had had -- if Minton's
21 best estimate started going to 17 and people started
22 buying stock, that could be equally troublesome, I
Page 116

9204OAS1.TXT

23 would assume, to investors. Then, when you get
24 outside this band is when -- is that what the extreme

0134

1 departure is about?
2           MR. NACHBAR: Yes.
3           THE COURT: If you start releasing
4 information because you've got a report that suggests
5 you're going to hit 12.8 and you're going to round up
6 to 13, or you're going to hit 11.4 and you're going
7 to round down to 11, we really don't know enough in
8 even most companies that rounding thing is going to
9 happen, and we'd be putting all kinds of noise out
10 into the market all the time that wouldn't be
11 particularly informative.
12          MR. NACHBAR: Correct.
13          THE COURT: What we're looking for is
14 some evidence. That's why I'm getting at this idea
15 of the unlikelihood that you're going to miss the
16 guidance. I don't know. I would take it in a way --
17 this is what I was pressing your friends. In a way,
18 you know, the best estimate the company had in
19 middle -- in, you know -- throughout February, was
20 the company was going to miss the guidance. It
21 doesn't mean that Mr. Ellison or Mr. Henley believed
22 that. But, I mean, everybody seems to agree that
23 Miss Minton was pretty good at her job, and her
24 numbers were there and her best estimate was there.

0135

Page 117

9204OAS1.TXT

1 We're going to miss the guidance; right?
2           MR. NACHBAR: Correct.
3           There are two different standards
4 here. Shaw says it's got to be an extreme departure.
5 And Shaw would say that $.11 or $.13 is not an
6 extreme departure from $.12. In fact, Shaw would
7 probably-say, you know, $.09 to $.14 isn't an extreme
8 departure. It's still growth. It's still a record.
9 You know, it's not an extreme departure.
10          The other cases -- Truong and
11 Smith -- talk about instances where there was
12 information making it likely that the company would
13 miss its projections, and those were substantial
14 misses on the facts of those cases. They weren't
15 missing by some rounding error.
16          THE COURT: How important was that
17 link? Is it a likelihood that the company is going
18 to materially deviate from its estimates or is it
19 simply --
20          MR. NACHBAR: I think we need -- yes.
21 I think the cases say that you have to materially
22 deviate. And even a $.01 miss probably isn't a
23 material miss. But -- and this is very important --
24 we can only judge what people knew and reasonably

0136

1 believed at the time that they traded here. And at
2 the time that they traded, it was simply not likely
3 that Oracle would miss its quarter. I mean, nobody
Page 118

9204OAS1.TXT

4 thought that.
5           THE COURT: That's why I asked the
6 question about how these reports were passed out. Is
7 there any evidence in the record that Mr. Ellison, in
8 particular, did any of these painstaking statistical
9 analyses of these reports?
10          MR. NACHBAR: No. Absolutely not.
11 No. Nor anybody else at Oracle. I mean, nobody
12 sat -- people paid attention to the pipeline, for
13 sure. You know, they were focused on pipeline rate
14 of growth versus forecast revenue rate of growth.
15 Nobody looked at, "Well, how did the pipeline behave
16 from the first week to the third week of the quarter
17 as opposed to the first week to the third week of the
18 quarter, you know, two quarters ago?" People didn't
19 do that. They didn't draw these graphs. If they
20 had, you know, plaintiffs wouldn't have had to
21 produce them.
22          THE COURT: But they did that sort of
23 some historical conversion of numbers in their head?
24          MR. SALPETER: Yes.

0137

1           THE COURT: And they would ask the
2 subordinates about how things were going; right?
3           MR. NACHBAR: Yes. But all of that
4 showed that you were well within the range to make
5 the quarter. Your pipeline was still, you know,
6 significantly above. You know, we say, well, it went
7 from 52 percent to 34 percent. Well, it was still
Page 119

9204OAS1.TXT

8 9 percent above the revenue growth forecast.
9           THE COURT: Well, on summary
10 judgment -- if your friends say -- like in
11 retrospect -- that might be something that you would
12 say in retrospect. That might have been something,
13 if you knew hindsight, that you might have jumped on.
14 But what you're saying is that you get summary
15 judgment as long as there's no evidence that a
16 rational person could find that either Ellison or
17 Henley in fact focused on that difference as any
18 kind -- anything that was troubling.
19          MR. NACHBAR: I would say that. But
20 in this particular case and on these particular
21 facts, I would go further and say that there's
22 nothing that anybody can focus on that shows that, as
23 of the end of December, when Ellison stopped trading,
24 it was -- end of January, when Ellison stopped

0138

1 trading -- that it was likely that Oracle was going
2 to miss its quarter.
3           THE COURT: How does 141 play into
4 this Brophy standard at all? What I mean by that is,
5 the ability to rely on reports of subordinates. I
6 take it, one of the things that you're saying to me
7 is that you've got these EMC meetings, and there's no
8 evidence that anybody at the EMC meeting rang the
9 alarm and said, "Larry, we ain't going to make it."
10 And there's no paper flow to that effect. And it's
11 all the opposite. If we're going to do this in sort
Page 120

92040AS1.TXT

12 of classic -- if this is a Delaware thing and this is
13 not -- you know, we're not stuck in federal code --
14 you know, why weren't they entitled to rely upon
15 that?
16            MR. NACHBAR:  I think they are.  And
17 I think that they, you know, got those reports in
18 order, obviously, to forecast Oracle's future
19 performance for a whole lot of reasons, one of which
20 was to know whether they would be in a position to
21 trade or not.  So I think they absolutely are allowed
22 to and did properly rely on those reports, and they
23 had been accurate, as Mr. Salpeter said, 14
24 consecutive times.  There was no reason to think that

0139

1 this wasn't going to be 15.
2            Let me turn, if I may, briefly, then,
3 to the scienter element.  The use of inside
4 information must be deliberate to gain a profit or
5 avoid a loss.  Courts look to numerous factors to
6 discuss scienter and assess scienter.  They look to
7 whether there's a normal pattern of trading, whether
8 somebody sells most of his shares or a significant
9 amount --
10            THE COURT:  You would agree for
11 Ellison this was not a normal pattern of trading?
12            MR. NACHBAR:  I would agree with
13 that.
14            The courts also look to whether there
15 are innocent reasons to selling and also the manner
                    Page 121

92040AS1.TXT

16 in which the sales are conducted.  And the evidence
17 here negates scienter.  Even if plaintiffs could
18 raise a genuine issue of material fact about whether
19 Ellison and Henley possessed material inside
20 information -- and I think they can -- they would
21 still have to show scienter.
22            The material fact about Henley's
23 sales of stock are in his affidavit.  Mr. Henley
24 explained that his selling of stock in 3Q '01 was

0140

1 part of a regular pattern to diversify.  He sold on a
2 regular basis.  He sold early in the year on a
3 regular basis.  The fact is testified to in
4 Mr. Henley's affidavit.  It's not contradicted.
5            And I'd like to show you two
6 paragraphs of the affidavit -- paragraphs 52 and 47.
7 I won't take the time to read them aloud.  They
8 simply attest to his prior sales and his pattern of
9 selling and his selling early in the year for tax
10 reasons uncontradicted.
11            THE COURT:  You sell in January
12 because then you defer your payment of tax on the
13 gains the longest.
14            MR. NACHBAR:  Precisely correct.
15 There's really nothing else to talk about when it
16 comes to Mr. Henley.  There's no contested fact.
17            THE COURT:  Why don't we do this,
18 then?  It's a good time, I think -- you can come up
19 and finish with Mr. Ellison and then we'll go to the
                    Page 122

92040AS1.TXT

20 plaintiffs.
21            Is it possible to take a 45 minute
22 lunch break?
23            MR. NACHBAR:  We're able to do that.
24            THE COURT:  Why don't we do that.

0141

1 And then we'll come back.  That way we'll try to get
2 out at a reasonable time.
3            MR. NACHBAR:  I don't have much
4 rebuttal.
5            THE COURT:  I want to make sure the
6 plaintiffs get a long period of time to tell their
7 story as well.
8            MR. NACHBAR:  Very well.
9            MR. TABACCO:  Thank you, Your Honor.
10            (Luncheon recess taken at 12:30 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
                    Page 123

92040AS1.TXT

24

0142

1            AFTERNOON SESSION
2            (Reconvened at 1:20 p.m.)
3            MR. NACHBAR:  Good afternoon, Your
4 Honor.  Let me briefly try to answer a few of the
5 questions that Your Honor asked that we found answers
6 to over the break.
7            First, I'm told, under the federal
8 securities laws, there would be a right of
9 contribution, if Oracle were liable because of some
10 wrongful act by Mr. Ellison or Mr. Henley -- more
11 generally, corporation director.  Second, some
12 mathematical computations.  The actual revenues for
13 January and February for license in 2001 were -- I'm
14 sorry, December and January, the first two months of
15 the quarter -- were 434 million.  If we assume that
16 35.5 percent of those revenues occurred in the first
17 two months and 64.5 percent were to occur in the last
18 month, what would the projection be?  The answer to
19 that is $1.22 billion, which was over 100 million
20 more, I think, than the actual result, and I think it
21 would round to 5.11 per share.
22            If you said 434 million in the first
23 two months of the quarter, and assume it was just
24 like the immediate prior third quarter where you had

0143

                    Page 124

92040AS1.TXT
1 .67 percent in the third quarter, it would come out
2 to 1.316 billion, where the actual projection was
3 1.310 billion. Almost dead on. And, of course, if
4 you use the average of the prior 22 quarters where
5 69 percent was achieved in the third quarter, you
6 would actually exceed projection.
7           Finally, Your Honor asked whether --
8 what the growth rate would be --
9           THE COURT: So, what you're saying
10 was, the first two were 33-1/2 percent of what was
11 projected was achieved?
12           MR. NACHBAR: That's essentially
13 right. Yes.
14           THE COURT: If I just take that and I
15 add 64-1/2, I'm at 98 percent of the forecast?
16           MR. NACHBAR: Correct.
17           Finally --
18           THE COURT: And I can do that at all
19 kinds of different percentages, even I can do that,
20 right?
21           MR. NACHBAR: Right.
22           THE COURT: If you did the 60 percent
23 five-year average, you're at 93.5 percent?
24           MR. NACHBAR: I think that math is

0144

1 correct. The point is that it's 434 million in the
2 first two months. And if you assume that the first
3 two months are 20 percent, you just divide that
              Page 125

92040AS1.TXT
8 sell and when he sold, and what he was going to do
9 with the money. It's undisputed that Mr. Ellison had
10 22 million options that were going to expire in
11 August 2001. He had only three windows left in which
12 to sell. His financial advisor, Philip Simon, had
13 been after him for some period of time to diversify.
14 Mr. Ellison did not like to sell Oracle stock. But
15 the 22 million options were going to expire if they
16 weren't exercised.
17           He couldn't sell the options and hold
18 the stock because he didn't have enough cash to pay
19 the huge income taxes that would be due upon
20 exercise. And I'd like to pause there. Your Honor
21 asked about pattern of trading. I'm not sure it
22 rises to the level of a pattern. But Mr. Ellison's
23 prior large sale of stock was in similar
24 circumstances in 1996 when he had a large number of

0146

1 options that were set to expire. He exercised them
2 and he sold shares.
3           THE COURT: Did he sell additional
4 shares at that point or just the option?
5           MR. NACHBAR: I'm not sure we know
6 that.
7           THE COURT: How do you deal with your
8 friend's view that Mr. Ellison was hedgy with the
9 SLC, wouldn't admit he was selling at a reduced debt,
10 and he went ahead and sold a slug more shares besides
11 the options, and that's inconsistent and reflects on
              Page 127

92040AS1.TXT
4 number by .2. If you assume it's 30 percent, you
5 divide 434 by .3, et cetera. You, too, can have fun
6 with numbers.
7           Finally, the Covisint transaction.
8 You asked what would the growth rate be if half of
9 Covisint were counted 30 percent; and, not
10 surprisingly, it comes out to 18 percent, because I
11 think it was 35 percent with a negative one without.
12 I thought it would be the average of those two. In
13 fact, it is. So, 18.1 percent is the answer. That's
14 the January --I'm sorry -- December '01 -- I'm
15 sorry -- December '00 compared to December '99
16 license revenues.
17           THE COURT: December '01 in fiscal
18 year terms; right?
19           MR. NACHBAR: Yes. It's December of
20 the '01 fiscal year, as compared to december of the
21 '00 fiscal year. I apologize if I confused you.
22           THE COURT: I just wanted the record
23 to be clear. It actually occurred in the year 2000,
24 but it was part of the next year's fiscal year.

0145

1           MR. NACHBAR: Correct. The next
2 thing I'd like to cover today is Larry Ellison's
3 trades and as addressing the scienter point.
4           The material facts concerning
5 Mr. Ellison's sales are also undisputed. They have
6 not been countered by plaintiffs. Mr. Ellison
7 explained why he sold, how he decided how much to
              Page 126

92040AS1.TXT
12 his candor, and I should draw some plaintiff
13 favorable inference at this stage?
14           MR. NACHBAR: I think there was some
15 inquisition in the questioning or the note taking. I
16 think the facts are clear.
17           THE COURT: Not a Simpson Thacher --
18           MR. NACHBAR: I don't mean to take a
19 shot at my friends. And it may have been actually
20 that it's the plaintiffs' characterization that's
21 unclear. But, in any event, I think the facts are
22 not disputed.
23           THE COURT: Just lawyers all around
24 are taking abuse.

0147

1           MR. NACHBAR: Mr. Ellison didn't like
2 to trade shares, but he did think, so long as he was
3 going to be in the market, he would use the
4 opportunity to try to sell 40 million shares; part of
5 it to pay taxes, but part of it to diversify and pay
6 down some debt. And I think, you know, it is
7 important to be clear about this. Mr. Ellison
8 correctly advised the SLC and later testified that he
9 did not enter the market because he needed to pay
10 down debt or wanted to diversify.
11           THE COURT: What you're saying is
12 that he needed to deal with this option situation.
13 He had one of three periods left to deal with the
14 option situation. While he was dealing with the
15 option situation, his broker had already been
              Page 128

92040AS1.TXT
16  advising him, you know, "Look, you've got this debt
17  out here.  You ought to take this out while you're
18  doing this."  And so the inspiration behind him
19  getting the market -- while he was there, he carried
20  this other secondary objective?
21              MR. NACHBAR:  That's precisely the
22  case.  Yes.
23              THE COURT:  Now, how much of the debt
24  was incurred buying rocks in Japan?  Those of us that

0148

1   watch 60 Minutes II all wonder about that.
2               MR. NACHBAR:  I missed that episode.
3               THE COURT:  You may want to get that.
4   It's an interesting -- we could have used it in the
5   prior SLC motion.  We could have had pictures of the
6   homes.  We could have done all that.  The boulders.
7   Quite lovely.  Everyone came from Japan, I believe.
8   That and the suggestion that your client flew an F-16
9   under the Golden Gate Bridge.
10              MR. NACHBAR:  Yeah, I heard about
11  that.  You know, I don't know if it's true or not.  I
12  wasn't there.  But in any event, Mr. Ellison, you
13  know, said, "If I'm going to be in the market" -- and
14  there is some adverse publicity obviously when
15  somebody in his position enters the market -- to
16  "perhaps I can use this as a time to achieve some of
17  these secondary objectives."  He wound up not selling
18  40 million shares.  He wound up selling approximately
19  29 million shares.
                Page 129

24              "Answer:  Of 2001, that's right.

0150

1               "Question:  Do you recall what -- how
2   many shares were in that block?
3               "Answer:  I think there was
4   22 million shares.
5               "Question:  Did -- what options --
6   what options did you have with your options.  What
7   alternative things could you have done in fiscal year
8   2001 with those expiring options?
9               "Answer:  Practically or
10  hypothetically?
11              "Question:  Practically speaking.
12              "Answer:  Okay.  I had three -- I
13  held the options for nine and a half years.  When the
14  options are granted, they're granted for a ten-year
15  period, and they just expire and become worthless.
16              "Question:  Right.
17              "Answer:  I had held the options for
18  nine and a half years.  So I had three remaining
19  windows to sell.  And so I was getting down to the
20  wire.  I had to sell those options.
21              "I could not sell and hold because
22  the tax -- you know, I would have paid -- had a huge
23  tax bill.  I would have had a huge amount of cash,
24  which I didn't have, you know, to pay that.  So
                Page 131

92040AS1.TXT
20              Ellison testified that he was going
21  to use the money, first, to pay the taxes and, after
22  that, to reduce debt and to diversify.  We've got
23  three clips from Mr. Ellison's deposition where he
24  discusses these issues.

0149

1               "Question:  You testified a little
2   while ago, I think, that Mr. Simon was, shall I say,
3   reminding you -- started reminding you at some
4   time -- or at some point that you had these options
5   that you needed to do something with.  Do you recall
6   when that was?
7               "Answer:  No.  He -- every time we
8   spoke.
9               "Question:  Do you recall when he
10  started reminding you?
11              "Answer:  I think Mr. -- I think
12  Philip, Mr. Simon, wanted me to diversify for some
13  time.  He's always thought I was taking too much of
14  a risk by holding on to my Oracle -- you know, to
15  just -- to not be diversified."
16              "Question:  Okay.  In the third
17  quarter of 2001 -- that is, Oracle's fiscal year
18  2001 -- did you have a block of options that were
19  expiring?
20              "Answer:  I had a large block of
21  options that were going to expire, I think, in
22  August.
23              "Question:  Of 2001?
                Page 130

92040AS1.TXT
1   practically, I could not buy and hold.  So, I had to
2   buy and then resell the options -- exercise and sell
3   the same day.
4               "So I had three windows, either Q3,
5   Q4 or Q1 of the following year, in those windows.  I
6   was enjoined from selling except during a window
7   which was after we announced, usually from the 15th,
8   20th of the first month -- I really had about
9   40-day -- of -- during the quarter -- you know, we
10  cannot sell in the last month of the quarter, is our
11  policy; we cannot sell before we announce our
12  results.  So practically, that gives you a four- or
13  five -- five-week period where you're actually
14  allowed to sell.
15              "Also you can't sell if there's
16  material inside information.  So, it was getting very
17  close.  If we were going to buy a company and we were
18  contemplating buying a company, just contemplating
19  buying a company, I would hold material inside
20  information, and I wouldn't be able to sell my
21  options.
22              "So, as we got down to the short
23  stroke -- I was literally out of time -- you know,
24  essentially out of time, and I had to go ahead and

0152

1   sell my -- sell my stock.
2               "Question:  Okay.  So exercising
3   holding wasn't an option for you?
4               "Answer:  I didn't have the cash to
                Page 132

92040AS1.TXT

5 do that.
6        "Question: All right.
7        "Answer: That required hundreds of
8 millions of dollars of cash to pay the taxes.
9        "Question: Which were due upon
10 exercise?
11        "Answer: Which were due upon
12 exercise, right.
13        "Question: That was a bad question.
14 That is, when you made the decision, whenever it was
15 that you made it, was it a decision to start trading
16 in January or simply a decision to start trading at
17 some point before the options expired?
18        "Answer: To start trading -- no, to
19 start trading in the current window.
20        "Question: All right.
21        "Answer: So I made a decision 'This
22 is as good a time as any.' We were off to a very,
23 very good start in December. We'd closed the largest
24 deal in our history and -- the triggering event, I

0153

1 suppose, was.
2        "We had a very strong pipeline; we
3 had closed the largest deal in our history; I had no
4 material inside information. All those things are
5 good. So this seemed like a very safe time to go
6 ahead and sell."
7        The testimony you just saw occurred.
8 It's unrebutted. It establishes why Ellison sold
               Page 133

92040AS1.TXT

9 when he did. It has not been contradicted at all.
10        Mr. Ellison was not selling his stock
11 to exploit material nonpublic information or to dump
12 shares before some anticipated-bad news.* He was
13 selling for entirely valid and personal reasons that
14 had nothing to do with Oracle or its financial
15 condition.
16        Indeed, Mr. Ellison's behavior was
17 completely inconsistent with plaintiffs' claims that
18 he was somehow dumping his stock ahead of bad news.
19 Ellison establishes careful criteria for his sales.
20 He mandated that no sale -- no stock be sold at less
21 than $30 per share. He mandated that his sales not
22 exceed more than 10 to 15 percent of his daily
23 volume -- of the stock's daily volume. He didn't
24 want to sell into February. Mr. Ellison discusses

0154

1 some of these criteria in the next clip.
2        "Question: Whose idea was it to set
3 a floor price?
4        "Answer: It was my idea.
5        "Question: To whom did you
6 communicate that idea?
7        "Answer: Philip Simon.
8        "Question: Anybody else?
9        "Answer: Not that I recall.
10        "Question: Why $30 a share?
11        "Answer: I thought it was a fair
12 value. Anything less than that I thought was was
               Page 134

92040AS1.TXT

13 fair value for Oracle stock. And I didn't want my
14 trading to push the stock down.
15        "So by setting a floor price, if I
16 stopped trading -- if my volume was pushing the stock
17 down and I got out of the market and stopped selling,
18 theoretically the natural dynamics of the market
19 would let the stock recover.
20        "Question: What did you believe the
21 fair market value of Oracle shares was at the time of
22 your trades in January 2001?
23        "Answer: Oh, that's a difficult
24 question, but more than $30 a share.

0155

1        "Question: And why?
2        "Answer: We had been trading at --
3 the stock had been as high as 46. We were -- had
4 just had two record quarters. Our business was
5 extremely strong. And so -- you know, so record
6 quarter, record quarter.
7        "Stock price had come down in the
8 face of two record quarters. So, it seemed odd to me
9 at the time -- it's more explainable now -- why the
10 stock would come down so much when we're doing so
11 well and our business is so strong and getting
12 better.
13        "And Q3 looked incredibly strong. We
14 had a pipeline growth in excess of 50 percent. I
15 mean, that's just extraordinary for a company our
16 size. So, it looked like -- and then we'd just
               Page 135

92040AS1.TXT

17 closed the largest deal in our history. So I thought
18 anything less than $30 a share was -- I didn't want
19 to sell.
20        "The other reason for $30 a share was
21 I just didn't want, you know, I didn't want my
22 selling to push the top price down. Already the fact
23 that it was public that I was selling wasn't a good
24 thing for the Oracle stock price.

0156

1        "I also asked that we limit the
2 volume -- our -- the volume that we sold to 10 or
3 15 percent. So I just didn't want to perturb the
4 market."
5        As we know, Mr. Ellison sold
6 approximately 2 percent of his holdings. The
7 29 million shares that he succeeded in selling was
8 11 million shares short of his goal. Mr. Ellison
9 discusses this next in, I believe, the last video
10 clip that I have.
11        "Question: Did you end up exercising
12 in January 2001 more or less options than you had
13 intended?
14        "Answer: We had set a target to sell
15 40 million shares of stock.
16        "Question: Okay.
17        "Answer: And we wanted to sell the
18 options first. And there were 22 million options.
19 And we were able to sell all of the options and
20 7 million additional shares beyond that. But we
               Page 136

92040AS1.TXT

21  never got to the 40 million share target."
22          Plainly, Mr. Ellison's acts were not
23  those with one trying to dump stock before it
24  plummeted.  If that were his motive, he wouldn't have

0157

1   set the $30 floor and he certainly would not have set
2   volume limits.  To the exact contrary.  He would have
3   sought to sell as many shares as possible.
4           Also, the circumstance that Your
5   Honor mentioned, I think, is important.  There was no
6   monitoring here.  If you look at a lot of the insider
7   trading cases, the defendants are calling their
8   broker, you know, every hour or twice a day and
9   "where do things stand?"  None of that happened here.
10  Those are the undisputed facts about Ellison's sales.
11  Neither Henley nor Ellison sold shares in order to
12  exploit inside information.  They didn't possess any
13  material --
14          THE COURT:  And Simon was on vacation
15  until June -- January 15th, or something like that?
16          MR. NACHBAR:  Yes.  He left for a
17  two-week vacation, I believe, on January 4th.  So, I
18  think he got back the 19th.
19          THE COURT:  The 19th.  And I think
20  over that weekend, the instruction was given to sell
21  shares.  And the sales began, I believe, on the 21st.
22          Let's not forget, too, that Ellison
23  was keeping 98 percent of his stock, and that had --
24  and this is hard to imagine -- a market value of

Page 137

---

92040AS1.TXT

0158

1   $50 billion.  I don't know how Mr. Terrell, even in
2   the early afternoon break, can hold on to that
3   number.
4           MR. NACHBAR:  Obviously doing
5   anything that would --
6           THE COURT:  The Richards' clients are
7   so well-heeled, Mr. Nachbar.  That's a mundane
8   figure.
9           MR. NACHBAR:  But obviously, doing
10  anything that would harm Oracle would harm
11  Mr. Ellison more than it would harm any other person
12  in the world.
13          So, put another way:  Jeff Henley and
14  Larry Ellison had legitimate personal reasons for
15  selling their stock that had nothing to do with
16  Oracle's business.  They acted honestly and
17  honorably.  There was no insider trading.  And as a
18  matter of law, plaintiffs have alleged no facts to
19  make out a Brophy claim.
20          Faced with these facts, the
21  plaintiffs sort of admit their failure of proof by
22  coming in and saying, "Well, this should be a no
23  scienter claim."  And, you know, there's no precedent
24  for that.  Goth v. Loft & Guttman --

0159

Page 138

---

92040AS1.TXT

1           THE COURT:  How about
2   Emerald Partners?
3           MR. NACHBAR:  I don't know that that
4   was an insider trading or Brophy type case.
5           THE COURT:  It's precedent for a no
6   scienter claim, though, isn't it?
7           MR. NACHBAR:  There may be certain
8   claims that -- you know, in Delaware law -- that
9   don't require scienter.  But there is no case
10  suggesting that a Brophy claim or an insider trading
11  claim can be prosecuted in the absence of scienter.
12          And I think it would be awful public
13  policy to -- I don't think Brophy should survive for
14  the reasons that I said.  But to expand it to say
15  that scienter shouldn't be required, I think, would
16  be awful public policy.  With the benefit of
17  hindsight, you can always see indications of
18  weakness.  Now that the season is over, I can see
19  that the Eagles lost the NFC championship because
20  their running and defense wasn't enough.  I thought
21  they were going to the Super Bowl.  I thought they
22  did.  With the benefit of hindsight, it's always
23  clear.
24          THE COURT:  One more year and we can

0160

1   become accomplished championships, what Buffalo is to
2   the Super Bowl.
3           MR. NACHBAR:  That's right.  Creeping
4   up on it.  Hopefully they have addressed some of

Page 139

---

92040AS1.TXT

5   those weaknesses, though.
6           THE COURT:  The penultimate losers.
7   Right.
8           MR. NACHBAR:  Well, I've got some
9   people from San Francisco here who aren't happy about
10  the change of wide receivers.
11          THE COURT:  He looks for the good in
12  green.
13          MR. NACHBAR:  But in any event, a
14  no-scienter rule would, as a practical matter, make
15  those who trade automatically liable if a company has
16  disappointing results, regardless of whether they
17  actually had or used nonpublic information regardless
18  of what they believed.
19          THE COURT:  Do you even have an
20  argument with the plaintiff?  I had asked them about
21  this.  There's federal law that says, you know, you
22  have to knowingly possess material inside
23  information.  And then if you knowingly possess it
24  and you trade, then the inference can be drawn that

0161

1   you traded because you possessed the material inside
2   information.  But that seems to be perfectly
3   sensible.
4           If you actually knowingly possess
5   material inside information and you trade, then
6   people ought to make the inference that, you know,
7   you possessed information that suggested that there
8   was a material deviation between the prevailing stock

Page 140

92040AS1.TXT

9  price and reality, and you were able to exploit that.
10  Is there any difference between a knowing -- that
11  standard -- isn't that a scienter-based standard
12  anyway?
13              MR. NACHBAR:  I think it is.
14              THE COURT:  You have to have
15  knowledge that you have material inside information
16  that's not public; right?
17              MR. NACHBAR:  Absolutely.
18              The plaintiffs don't say that, under
19  existing case law, they're entitled to a no-scienter
20  cause of action.  They're saying that the law should
21  be changed to give them that right.  Brophy clearly
22  is a scienter-based claim.  There's no question about
23  it.  Your Honor's opinion in Guttman clearly makes --
24              THE COURT:  How can I even do this?

0162

1  What would the idea be of the 102(b)(7) -- that it's
2  an improper personal benefit adversely obtained, that
3  it's sort of the -- it's like some sort of aspect of
4  the unfair -- entire fairness doctrine?
5              MR. NACHBAR:  You're asking the wrong
6  lawyer, Your Honor.  I'm not sure I can answer that.
7              But I do know that what they're
8  asking for has no precedent and has no policy to
9  commend it.  And not one case -- federal or state --
10  has ever even suggested, much less adopted, a rule
11  saying that you can be liable for insider trading.
12              THE COURT:  Aside the issue of a
Page 141

92040AS1.TXT

13  landmark decision.
14              MR. NACHBAR:  It would be a landmark
15  decision, that's for sure.
16              THE COURT:  Anything else before I
17  let your friends have a shot?
18              MR. NACHBAR:  No.
19              I mean, you know, I guess what I want
20  to leave with is that what are the final facts
21  regarding Ellison and Henley's sales of stock?  In
22  Henley's case it was part of a regular pattern of
23  trading activity at a time when he had no material
24  nonpublic information whatsoever.  That was even

0163

1  before the Garnick flash report.  There's just no
2  claim against him.
3              In Ellison's case, it was 2 percent
4  of his stock.  And clearly Ellison expected that
5  Oracle would meet its guidance.  He did not possess
6  or trade on the basis of material inside public
7  information.
8              You know, we can talk about the
9  standard of materiality back and forth, but there
10  simply is no case that says that it's material
11  public -- nonpublic information when you've put out
12  guidance of $.12 per share and you've got internal
13  reports and forecasts at the time you trade that
14  project that you're going to make $.12 per share.
15  That's exactly what he told the public.  It's exactly
16  what Jennifer Minton told him.  It's exactly what he
Page 142

92040AS1.TXT

17  believed.
18              And faced with that, the plaintiffs
19  come back with lots of snippets where they look at
20  this pattern of pipeline activity or changes in the
21  upside.  But when you look at those, again, it's all
22  consistent with past conduct of the business.  For
23  each one of these things, the answer is: been there,
24  done that, and we made our quarter.

0164

1              The pipeline fell in 1Q and 2Q 2001,
2  and both of those quarters exceeded the forecast.
3  There's simply no reason here to believe, and no
4  evidence, that Henley or Ellison actually believed
5  that Oracle wouldn't make its quarter.
6              We've had hundreds of thousands of
7  pages of documents that were produced.  Plaintiffs
8  were permitted to depose 21 different Oracle
9  witnesses, several of them more than once.  There are
10  no disputed facts and, on this record, defendants are
11  entitled to the entry of summary judgment in their
12  favor.
13              Thank you, Your Honor.
14              THE COURT:  Mr. Tabacco, are you
15  starting off?
16              MR. TABACCO:  No.  Mr. de Ghetaldi.
17              MR. de GHETALDI:  Can we have a
18  couple minutes to switch cords or the computer?
19              THE COURT:  Sure.  Why don't we just
20  stay and do that.
Page 143

92040AS1.TXT

21              MR. de GHETALDI:  Thank you, Your
22  Honor.
23              I want to start out by just reviewing
24  a few of the facets of these reports that were most

0165

1  difficult for me, and I wanted to make sure that some
2  of these points were clarified.
3              First of all, with the constant
4  dollar -- U.S. dollar figures in the upside
5  reports -- sometimes Oracle reports a figure in those
6  upside reports in both U.S. dollars and constant
7  dollars; sometimes they don't.
8              Now -- and sometimes, when it looks
9  like they're using constant dollars, they really
10  aren't.  And that will happen in the case of the
11  three or two of the three U.S. divisions.  They break
12  out the license revenue for each geographic division
13  on one page of the upside report and it indicates
14  that it's in budget rates.  But for OSI and OPI,
15  those rates are actually U.S. dollar rates, because
16  there's been no need to convert that income for -- to
17  compensate for the effect of currency valuations.
18              THE COURT:  Right.  The only
19  fluctuations for them are inflation because they're
20  not in Euros.  They're not in anything else.
21              MR. de GHETALDI:  Right.  And the
22  constant dollar compensation does not compensate for
23  inflation.
24              Then there is a small compensation
Page 144

92040AS1.TXT

0166

1   for NAS, because part of NAS's territory is Canada.
2   But it's not -- it's around 10 percent.
3           THE COURT:  In terms of what we're
4   talking about, this swing doesn't mean a whole lot?
5           MR. de GHETALDI:  Well, it can.  In
6   some quarters there's no swing at all.  In some
7   quarters the swing can go up to 6 percent -- I think
8   is the highest.  Well, it's very difficult to come up
9   with a formula to convert what they call constant
10  dollars or budget dollars to U.S. dollars because the
11  conversion changes every year in May.
12          THE COURT:  But in terms of what you
13  all have focused on are these three U.S. divisions.
14          MR. de GHETALDI:  We tried to focus
15  on U.S. dollars.
16          THE COURT:  Right.  And the
17  conversion -- the historical conversion rate and all
18  that kind of stuff?
19          MR. de GHETALDI:  Yes.  Now, that
20  brings up another point that I wanted to make.  The
21  earnings per share numbers that appear in the upside
22  reports are U.S. dollar numbers.  They do not report
23  earnings per share in constant dollar numbers.
24  Pipeline numbers, no matter where they appear or for

0167

1   what division given, are always U.S. dollar numbers.
            Page 145

92040AS1.TXT

2   So, there are times within the upside report where
3   there are comparisons of U.S. dollar pipeline numbers
4   to constant dollar revenue or forecast numbers.  So,
5   it gets a little confusing.
6           Another point that I did want to
7   clarify -- and there was conflicting testimony.  Some
8   of the witnesses, including, I think, Mr. Ellison
9   himself at one point said that the pipeline does not
10  include closed deals.  So, if a deal closes, such as
11  Covisint, it drops out.  But according to Miss Minton
12  and Mr. Henley, who come from the department that
13  generates these upside numbers -- I'm sorry, the
14  pipeline numbers -- they both said that closed deals
15  stay in.  So, the pipeline includes both deals that
16  have already closed and deals that could potentially
17  close.  So, I wanted to -- before I got into some of
18  these things --
19          THE COURT:  And so what drops out of
20  the pipeline?
21          MR. de GHETALDI:  That's a good
22  question.
23          The way I understand it is that, in
24  the tie board over there, the forecasting process

0168

1   starts with the local sales divisions.  They give the
2   forecast number.  The area vice presidents and then
3   the executive vice presidents add management judgment
4   to that.  That generates the forecast.  Separately
5   they follow every possible deal that they're
            Page 146

92040AS1.TXT

6   pursuing.  And there are reports that are 107 pages
7   long and in really fine print that track all those
8   reports.  They give them a win probability and they
9   assign a number to the amount that they think will
10  close.  And so that comes up from the actual
11  salespeople.  That's reviewed, to some extent, and
12  differently by the different area vice presidents and
13  executive vice presidents, and that process
14  eventually generates a pipeline number.
15          THE COURT:  Is there this possible
16  reconciliation of the testimony that might make
17  sense?  There's been a lot of discussion about the
18  conversion rate, the percentage of the pipeline that
19  actually gets converted into revenue in the third
20  quarter.
21          MR. de GHETALDI:  Right.
22          THE COURT:  I went into this, I
23  believe, with Mr. Salpeter before, which is how
24  Oracle generates that historical figure.  Where do

0169

1   they measure that?
2           I understood him to say you take the
3   pipeline at the beginning -- the estimated pipeline
4   at the beginning of the quarter and then, when you
5   get the actual result for the quarter, you go and
6   look at the percent -- you look at what was produced
7   and that's how you get your conversion rate.  Could
8   it be that Minton and Henley were saying, "Look,
9   Covisint doesn't drop out in terms of how we
            Page 147

92040AS1.TXT

10  calculate that.  Whatever our pipe was at that point,
11  at the beginning, you know, we don't drop deals when
12  we calculate the conversion rate."
13          Or I guess what I'm having a hard
14  time doing is, I thought the pipeline -- and I think
15  you even thought it at various stages of the case
16  was, you know, as things closed or dropped off, for
17  whatever reason, if it closed, it's a good reason to
18  drop out of the pipeline because it becomes actual
19  revenue.  If the pipeline is a forward-looking thing
20  of what's left there to be closed this quarter -- you
21  can even drop something out of the pipe not because
22  it's gone forever, but because you know now it's not
23  likely to close in Q3, it's likely to close in Q4.
24  And I'm just trying to get a sense of:  are you saying

0170

1   that every closed deal just stays in that pipe?  That
2   doesn't seem to make a lot of sense.
3           MR. de GHETALDI:  It doesn't.  But
4   that is the clear response that we got from
5   Mr. Henley and Miss Minton.
6           THE COURT:  But is my reading of
7   that -- is that possible in the context of the
8   questioning?  I remember reading -- I will tell you
9   all, I read the entirety of Mr. Ellison's deposition,
10  Mr. Henley's deposition and Miss Minton's
11  deposition -- both days, each day.  I read the whole
12  thing.  When I read that -- it wasn't clear to me
13  that they even -- that you all are speaking the same
            Page 148

92040AS1.TXT

14 language.

15         MR. de GHETALDI:  That was certainly
16 true with Mr. Ellison.  And by the end of that
17 dialogue, here's what I think was happening and why.
18 There are actually two kinds of conversion rates.
19 One is what I've come to call a forecast conversion
20 rate or a coverage rate.  That is forecast -- I'm
21 sorry -- yeah -- forecast divided by pipeline.
22 Completely forward-looking.  The other Oracle calls
23 an actual conversion rate, and that is one in
24 which -- in their pipeline reporting packages that

0171

1 come out every two weeks of the quarter -- they look
2 at the pipeline for the comparable week in the prior
3 year quarter and the actual dollar -- actual constant
4 dollar revenue that was generated in that prior
5 quarter, and they perform the same calculation.  But
6 the only thing that they're measuring there is the
7 accuracy of the pipeline from a prior year compared
8 to what they actually got; whereas, the forecast
9 conversion rate -- the forward-looking one -- they're
10 actually combining two forecasts: the license
11 forecast and the pipeline forecast, if you will.  So,
12 I think, by the end --
13         THE COURT:  I don't get that.  What
14 you're saying there is they take the pipeline -- the
15 estimated pipeline at that point in time.
16         MR. de GHETALDI:  Yes.
17         THE COURT:  They have their license
Page 149

92040AS1.TXT

18 market estimate, and then they solve for the
19 conversion rate necessary to meet the market
20 estimate --
21         MR. de GHETALDI:  No.
22         THE COURT:  No?
23         MR. de GHETALDI:  They have their
24 forecast.

0172

1         THE COURT:  Which forecast?
2         MR. de GHETALDI:  They look at both.
3 the upside reports -- they look at both.
4         THE COURT:  There's a lot of forecast
5 running around.  You've got a pipeline estimate.
6         MR. de GHETALDI:  Yes.  Let me
7 clarify that.  In the upside reports there is a
8 forecast number and a potential number.
9         THE COURT:  Right.
10         MR. de GHETALDI:  The potential is
11 what the finance department --
12         THE COURT:  I follow basically -- I
13 consider it sort of the unit level -- it's the unit
14 level number.
15         MR. de GHETALDI:  There's a big
16 difference.  And it's -- I'm glad you brought that
17 up.  It reminded me to be more clearer in the way I
18 use the words.  Because the division level forecasts
19 were in Q3 much lower.
20         And when I heard Mr. Salpeter going
21 through the e-mails in which he said, "Well, they're
Page 150

92040AS1.TXT

22 sticking to their forecast," that meant that they
23 were sticking to the division level forecast; not the
24 potential --

0173

1         THE COURT:  I understand that.  But
2 you would also agree that the record is undisputed
3 that, to the extent that there was a tendency at the
4 division level or unit level, it was to be overly
5 conservative.
6         MR. de GHETALDI:  I would disagree
7 with that.  And one of our charts -- I'll find it
8 very quickly.  One of our charts shows actually a
9 progression in time of the accuracy of the forecasts
10 at the division level compared to the company level.
11 And just let me get that.  I think that even
12 Miss Minton testified that she never looked at the
13 issue of how accurate her forecasts were at the
14 division level.
15         THE COURT:  Well, that's not what I'm
16 talking about here.  I'm not talking about whether on
17 a division-by-division thing -- I'm talking about
18 when you took the so-called forecast, which is the
19 aggregate of all the input from the sales units,
20 isn't it clear that --
21         MR. de GHETALDI:  On an aggregate,
22 yes.
23         THE COURT:  The sales units tended to
24 err on the conservative side.
Page 151

92040AS1.TXT

0174

1         MR. de GHETALDI:  And so did
2 Miss Minton, but not as conservative.
3         THE COURT:  What I'm saying is, it's a
4 rather important in a case like this in terms of
5 whether you said that they're red or yellow flags.
6 If one is being advised by people who have
7 traditionally and on an unbroken way have tended to
8 be conservative, that gives one less pause than if
9 you've got a salesperson who's disappointed you
10 several times on the high side; right?
11         MR. de GHETALDI:  I understand what
12 you're saying.  But if you look on the aggregate over
13 all of the United States, all of Asia Pacific, all of
14 Europe, Africa, Japan, then that's true.  But if you
15 look at -- and it's --
16         THE COURT:  This is what this case is
17 about.
18         MR. de GHETALDI:  Well, it is and it
19 isn't, because the major shortfalls occurred in NAS
20 and OSI.  And so one of the things that we thought
21 was necessary to do was to look at the accuracy of
22 the forecasts coming out of those divisions.  Because
23 those forecasts in Q3 were much lower than the
24 potential number that came out of the finance

0175

1 department.
Page 152

92040AS1.TXT

2    And so I'd refer the Court to chart
3  No. 20.  It's actually a series of pages covering
4  what little information we had going back to Q3 '00,
5  one upside report from Q2 '00.  And what this does --
6  it's hard to read.  It's dense.  But what it does is
7  it tracks the forecast against the actual monthly
8  results and the variance between the forecasts and
9  those results.
10    And I think that -- and I inserted
11  colors here.  The yellow shows the best, as between
12  forecast and potential, for all of the divisions for
13  that particular month; the orange shows the worst for
14  all of the three divisions for that particular month;
15  and the bold shows the best as between the potential
16  and the forecast for that particular month.
17    And if you just look at the yellows
18  and oranges, you'll see that the finance department
19  had a lot more yellows up until Q1 '01.  That is
20  about the time when the finance department and the
21  three U.S. divisions were about equal in their
22  accurate -- in their predicted accuracy of the
23  license revenue for those divisions.  By Q2, the
24  three divisions become more accurate than the finance

0176

1  department.
2    THE COURT:  On a divisional level?
3    MR. de GHETALDI:  On a divisional
4  level.
5    THE COURT:  Is there one shred of

Page 153

92040AS1.TXT

6  evidence in the record that Henley or Ellison dilated
7  on this divisional level of improvement?
8    MR. de GHETALDI:  There is
9  evidence -- and I will come to it -- that Ellison and
10  Henley at the Monday EMC meetings, drilled down --
11    THE COURT:  You're not answering my
12  questions.
13    MR. de GHETALDI:  I'm sorry.
14    THE COURT:  I understand they drilled
15  down and asked people what their forecasts were and
16  all that kind of stuff.  I'm saying, you have done an
17  incredibly -- you've done -- you have -- it is clear
18  to me -- spent far more hours with these upside
19  reports than Larry Ellison.  And you're not showing
20  me a chart that said in three particular divisions of
21  an international corporation there began to be -- and
22  there were in some quarters where the divisional
23  level forecasts were better predictors than
24  Miss Minton's.

0177

1    I'm just asking you: is there any
2  piece of evidence in the record that suggests that
3  Mr. Ellison or Mr. Henley ever did any kind of
4  analysis like that?
5    MR. de GHETALDI:  There's no direct
6  evidence of that.
7    THE COURT:  What's the indirect
8  evidence?
9    MR. de GHETALDI:  The indirect

Page 154

92040AS1.TXT

10  evidence is that they drilled down every month --
11  every week -- to see where the divisions were, how
12  well they were doing.
13    THE COURT:  Is there any evidence
14  they didn't do that in the previous quarters where
15  the divisional forecasts weren't as accurate?
16    MR. de GHETALDI:  No.
17    THE COURT:  They did it all the time?
18    MR. de GHETALDI:  I think so.
19    THE COURT:  In terms of this
20  variation, what's the trend in what the divisions
21  did?  Did they underestimate or overestimate?
22    MR. de GHETALDI:  They were -- well,
23  as the Court noticed, OPI was always most right on in
24  Q3.  I don't believe that there's no real trend --

0178

1  I'm sorry.  I take that back.
2    THE COURT:  In Q3 of '01.  I'm
3  talking about in -- over time, how many times did the
4  three divisions say -- forecast something that was in
5  excess of what they achieved?
6    MR. de GHETALDI:  I think I've got
7  charts on that, Your Honor, but I don't have the
8  answer on the tip of my tongue.
9    THE COURT:  Was there ever a quarter
10  where they forecast in excess of what they achieve?
11    MR. de GHETALDI:  Your Honor, I think
12  you will find those in graph form, the answer to that
13  question in graph form No. 16 for NAS, 18 for OPI

Page 155

92040AS1.TXT

14  and 14 for OSI.  And the yellow lines on these charts
15  show that -- show the actual results for those
16  division license --
17    THE COURT:  Is there anything on a
18  quarterly basis?  You all understand -- for reasons
19  focus a lot on month-to-month than there's any
20  evidence in the record that suggests that anybody was
21  an insider at Oracle did -- you know, I'm talking
22  about sort of how the sort of opening forecast of the
23  divisions, as opposed to, you know, the actual end of
24  the quarter.

0179

1    MR. de GHETALDI:  Well, you can
2  follow it from those charts, because they do move
3  over time through those small windows that we were
4  allowed to see.
5    MR. NACHBAR:  Your Honor, I apologize
6  for interrupting.  But chart 34 -- Defendants' chart
7  34 summarizes that information quarterly in tabular
8  form, if that's helpful.
9    MR. de GHETALDI:  As I was saying,
10  those charts summarize with the small window what we
11  were allowed to see historically.  And the only thing
12  I can do is refer the Court to the initial point for
13  each quarter to see.
14    THE COURT:  But is there any evidence
15  in the record that suggests that Mr. Henley or
16  Mr. Ellison should have suspected that the divisions
17  were being overly aggressive?

Page 156

92040AS1.TXT

18          MR. de GHETALDI: Yes. There's a lot
19 of evidence on that.
20          THE COURT: They should have -- in
21 that quarter, they should see these folks have blown
22 it past us before. And they're trying to do it
23 again, as opposed to having a tendency to hold back
24 and deliver.

0180

1          MR. de GHETALDI: In this quarter I
2 think that Mr. Ellison, with his 17 years of
3 experience, and Mr. Henley with his 14 or 15 or so
4 years of experience with this company, would have
5 seen this. Mr. Ellison testified -- Mr. Tabacco is
6 going to talk about this in more detail -- he
7 testified he remembered what happened in 1990 in the
8 last recession when they got into a lot of trouble.
9          THE COURT: You're saying this
10 retrospective microscopic examination is based on the
11 fact that he knew what happened. It's the sort of
12 thing that actual historians -- it's a debate among
13 historians whether you're allowed to do
14 counterfactual history. Henley -- tell me about
15 Henley, because you got a claim against him. That's
16 really the hardest; right?
17          MR. de GHETALDI: That's the hardest.
18          THE COURT: Why would Jeff Henley
19 have said what he said in that call in just two weeks
20 before? You know, Mr. Ghetaldi, they should have
21 had you. If they had you and you had done these
Page 157

22 books, you would have told them on December 14th,
23 we're not going to give any prediction. It's scary
24 out there. But that ain't what Jeff Henley did.

0181

1          He didn't strike me, from reading his
2 deposition -- it didn't strike me, frankly, given how
3 it worked -- done in terms of projecting it -- they
4 were quite that cavalier about these things. Why
5 would he do it and, then, two weeks later, you
6 know -- it's bazaar he doesn't.
7          MR. de GHETALDI: You know, Your
8 Honor, I frankly can't go inside his mind and give
9 you a reason.
10          THE COURT: Well, no, you have.
11 You've accused him of-purposeful wrongdoing.
12          MR. de GHETALDI: But you haven't
13 said what -- I do not know --
14          THE COURT: It's sort of an
15 inexplicably bizarre thing for a major officer of a
16 company, who is extremely wealthy, a company that
17 makes real profits, and the guys out in California
18 raise the money for them because you went to, you
19 know, you couldn't get into the lawyer that was the
20 venture capital firm, or you got into the PR firm
21 that then got you to the lawyer -- It wasn't one of
22 those companies. They actually made real working
23 products.
24          This guy, the CFO of the company,
Page 158

92040AS1.TXT

1 he's a multimillionaire. He knows the function in
2 the markets -- he's got to have credibility. He's
3 got a fair amount of credibility because they have
4 been doing pretty well. He knows the dotcoms. That
5 source of the business is going away. He knows the
6 economy is weakening, but he puts out a $.12 estimate
7 and license growth based on the information he knows.
8 But based on your examination of that, he should have
9 never done that, because most of the signs that
10 you're talking about were already present then;
11 right?
12          MR. de GHETALDI: Some of them
13 definitely were.
14          THE COURT: The dotcoms go away.
15          MR. de GHETALDI: Well, that's not
16 exactly correct. They started seeing the dotcoms go
17 away in Q4. That's when they started seeing it. Q4
18 of '00.
19          THE COURT: That's a while before
20 this; right?
21          MR. de GHETALDI: Oh. yes. In terms
22 of their measurement, which they conducted on
23 January 29th, the decline in the dotcom revenue for
24 the first two quarters fiscal year '01 was about

0183

1 8 percent -- $8 million. That dramatically changed
2 in Q3, as you'll see. The dotcom bust, as it was
Page 159

92040AS1.TXT

3 called at Oracle, didn't really truly hit until Q3.
4          THE COURT: Okay. Well, when did
5 they hit? When did they know -- what was the moment
6 when they should have fully realized that that was
7 just over?
8          MR. de GHETALDI: Well, they --
9 Mr. Henley has some interesting testimony on that
10 point. He told the market, on December 14th, Oracle
11 had seen no impact on their business because of the
12 economy.
13          THE COURT: To date.
14          MR. de GHETALDI: To date. Right.
15          THE COURT: But that was the overall
16 economy; right? That's not necessarily the same
17 as -- I mean, I wouldn't view the dotcoms as the
18 overall economy, or at least I would like to. I
19 don't think of them as the overall economy.
20          MR. de GHETALDI: Okay.
21          THE COURT: I'd rather think of those
22 artificial fruit-flavored things that you buy in the
23 movies as the overall economy than dotcom.
24          MR. de GHETALDI: This was an effect

0184

1 that we have documentation for the first time as of
2 January 9th, which is five days after Mr. Henley
3 traded. And that is the PowerPoint presentation that
4 Mr. Nugent gave at the NAS operations review.
5          THE COURT: Now, Mr. Henley wasn't
6 there, was he?
Page 160

92040AS1.TXT

7                    MR. de GHETALDI:  No, he wasn't.  But
8  a report went to him two days later about that.  I
9  acknowledge that this is after.  I just wanted to
10 tell the Court when it was that we first have
11 documentary evidence that they're seeing this.
12                    Now, when you look at this -- we've
13 already seen a very short summary of it and I plan to
14 show a little bit more.  But when you look at the
15 depth of these comments, one would have to believe
16 that this was something that was on their minds
17 before that.  And Mr. Roberts, who was the executive
18 vice president of NAS, said at his deposition that
19 this was a topic that came up at the MC meetings.  It
20 was not clear as to time --
21                    THE COURT:  I think that's
22 undisputed.  It was a topic of conversation within
23 Oracle before that quarter.
24                    What you're saying is, you've got to

0185

1  show that -- you've got to get to the point where
2  there's some sort of material -- you know, at the
3  very least -- material likelihood that they're going
4  to -- this would be duplicative.  It's like a
5  material adverse effect clause or whatever.  Material
6  likelihood that they're going to materially miss what
7  they told the market.  Right?
8                    MR. de GHETALDI:  Well --
9                    THE COURT:  There was a gap between
10 the division level estimates and Miss Minton's upside
Page 161

92040AS1.TXT

11 before the market estimate began.
12                    MR. de GHETALDI:  Yes.
13                    THE COURT:  And it was fairly strong,
14 wasn't it?
15                    MR. de GHETALDI:  Yes, it was.
16                    Now, I'm not going to speak on the
17 law, Your Honor, but it's my understanding that we do
18 not have to show that there was a material difference
19 between the information that they gave to the market.
20 What we need to show is a weakening in their business
21 that they were aware of and that caused greater risk
22 to their ultimate --
23                    THE COURT:  We'll talk about that.
24 Keep going with what they knew and when they knew it.

0186

1                    MR. de GHETALDI:  All right.
2                    THE COURT:  Has Mr. Ellison met
3  Mr. Nugent, by the way?
4                    MR. de GHETALDI:  I'm not sure.
5                    THE COURT:  He never met Mr. Minton.
6  He wasn't aware of the subordinate -- the superior
7  relationship.  So, he testified he never met
8  Mr. Minton ever, I think.
9                    MR. de GHETALDI:  Mr. Nugent.
10                   THE COURT:  I think Mr. Ellison said
11 he never melt Mr. Minton or he might --
12                    MR. de GHETALDI:  Winton.
13                    THE COURT:  Oh, Winton.  He met
14 Miss Minton.  He knew her well.  Mr. Winton -- is
Page 162

92040AS1.TXT

15 there any reason to believe Mr. Ellison was on more
16 familiar terms with Mr. Nugent?
17                    MR. de GHETALDI:  No.  Mr. Nugent was
18 an area vice president for NAS.
19                    So, I want to focus on a couple of
20 points about what it was that the defendants looked
21 at.  When he was first interviewed by the SLC in
22 2002, in May, Mr. Ellison told them that he relies
23 primarily on actual sales and pipeline data rather
24 than focusing on what he called the mood ring

0187

1  forecast.  But then in the second interview --
2                    THE COURT:  What year did the mood
3  ring -- was that '77?
4                    MR. de GHETALDI:  Right around there.
5                    The second interview, in late
6  September, 2002, the SLC specifically questioned him
7  about that comment.  And he said, well, he relies on
8  the actuals, but those numbers are of limited value
9  in evaluating the company's prospects of meeting
10 revenue and earnings targets because -- back to the
11 hockey stick.  At his deposition, Mr. Ellison told me
12 that he would look at how much has actually been sold
13 in order to forecast.  He also said that how much was
14 left to go was discussed at the weekly EMC meetings.
15                    There's been some argument by the
16 defendants that these actuals were not a total
17 Gestalt at these EMC meetings, and the evidence shows
18 they were very much a part of it.
Page 163

92040AS1.TXT

19                    THE COURT:  I guess I don't -- if you
20 ask anybody the same question 1,700 times -- and I'm
21 not saying you did that, but the SLC did.  When
22 Mr. Ellison was using the term "actuals" and things
23 like that, in some ways he was talking -- as I
24 understand it -- he was talking about the application

0188

1  of past experience to the current pipeline number and
2  saying -- because I think he said something like --
3  there was some point where he said, "That's not like
4  a projection, that's an actual thing."
5                    What he was talking about is, this is
6  what we've kind of historically taken down from a
7  pipeline of this size.  And so that he would take a
8  look at the pipeline and then he'd say, "You know,
9  what are we historically taking down of a pipeline?
10 I'm going to take that historical figure and I'm
11 going to look at what's in the pipeline and I'm,
12 you know, that's going to be my comfort zone."  And
13 then he said -- of course, you know, which I think is
14 perfectly obvious -- if you're off to a good start
15 and actually booked a sizable amount towards your
16 number -- for example, it makes perfect sense for
17 someone -- maybe I'm not a natural plaintiff's
18 lawyer, although I did some cases, but that makes
19 perfect sense for me to say we put a big one up on
20 the board.  That gives me a certain level of comfort.
21                    MR. de GHETALDI:  Makes sense to me,
22 too.
Page 164

92040AS1.TXT

23            THE COURT: Isn't that sort of -- he
24    has a very sort of impressionistic approach to these

0189

1    things, I glean.
2            MR. de GHETALDI: He gives that
3    impression.
4            THE COURT: You know, he -- wouldn't
5    you view him as sort of less -- sort of, you know,
6    compared to Minton and Henley who have, you know,
7    seem to be a fairly more rigorous look at things,
8    Ellison seems to --
9            MR. de GHETALDI: I think that
10    that -- I don't share that view, Your Honor. I
11    really don't. Part of the reason I say that is
12    because of information at this point I'm unable to
13    share because one of my sources is not an official
14    source.
15            But that aside, I think that
16    Mr. Ellison is an incredibly savvy businessman. I
17    think he's an incredibly savvy people person. He
18    took over the deposition room that had 15 lawyers in
19    it. It was like it was his audience. And he's very,
20    very good with people. He's very glib. He finds it
21    very easy to talk. He talked over his lawyers'
22    objections several times. He talked when there were
23    no questions pending several times. And I think that
24    there is more consciousness behind his veneer than

0190
                    Page 165

92040AS1.TXT

1    you might expect and might seek if you don't look
2    deeper.
3            And I did want to make the point
4    that, yes, he does look at these historical
5    conversion rates, how things compare. I think he
6    called those hard facts. But he also testified that
7    they looked at how much was left to go. And,
8    frankly, from reading the defendants' opening brief
9    and seeing some of the initial arguments on actual
10    effect that these folks never concentrated on actual
11    income, other than the Garnick flash reports, struck
12    me, as a modest businessman, as highly incredible. I
13    mean, at our partnership meetings, Your Honor, we sit
14    down, we talk about money. We talk about how much
15    has come in. We talk about how much is going to come
16    in, how much is likely to come in, how we did it
17    compared to last year.
18            THE COURT: But what evidence is
19    there of anything like a weekly P&L?
20            MR. de GHETALDI: Those reports were
21    oral. And they were -- and the source of the
22    report --
23            THE COURT: Isn't the key bottom line
24    number that forecast number?

0191

1            MR. de GHETALDI: I don't know why
2    they don't do that. If they don't do that or if they
                    Page 166

92040AS1.TXT

3    didn't give us those documents -- I don't know why.
4            THE COURT: I guess what I'm saying
5    is that the number that was put before the EMS every
6    week for each of the big divisions was their forecast
7    number, plus an adjustment by Miss Minton, plus a
8    pipeline number. It strikes me as unlikely -- I
9    mean, I'm sure there was a lot of discussion about
10    how you're doing. But you're trying to tell me
11    they'll do sort of a weekly -- like, this is what
12    came in last week?
13            MR. de GHETALDI: Yes. In the
14    division level forecasting packages for NAS, for OPI
15    and OSI, there are revenue numbers in those weekly
16    packages or biweekly -- biweekly.
17            THE COURT: Weekly revenue?
18            MR. de GHETALDI: Yes.
19            THE COURT: Of actuals?
20            MR. de GHETALDI: Yes, cumulative to
21    date for the quarter. They're there.
22            THE COURT: And who got that?
23            MR. de GHETALDI: The executive vice
24    presidents who were the persons who attended these

1192

1    executive management committee meetings on behalf of
2    their divisions.
3            THE COURT: Did Mr. Ellison ever get
4    that?
5            MR. de GHETALDI: No. As far as he
6    says, no. But it was --
                    Page 167

92040AS1.TXT

7            THE COURT: I don't know what you do
8    in your law firm. I mean, lawyers are very
9    interested in money. And I think revenues are maybe
10    a little bit different. But you're telling me that
11    the way these EMC meetings went down is that they
12    spent a lot of time on a weekly P&L, as opposed to
13    whether the forecast or the quarter has changed?
14            MR. de GHETALDI: They spent time on
15    different things, Your Honor. They spent time on
16    what deals were out there, what big deals do you
17    have, how certain are they to close, what's -- how is
18    your forecast looking, how certain of it are you, how
19    much money has come in so far.
20            THE COURT: Have you ever been --
21    have you ever worked in an enterprise with a
22    budget -- with a big budget?
23            MR. de GHETALDI: With a big budget?
24    No.

0193

1            THE COURT: I mean, I just -- I have.
2    At least I consider it big, not compared to
3    Larry Ellison's net worth. But an annual budget of
4    several billions of dollars. I just can't imagine
5    that the discussion with the CEO -- at least I never
6    had experience to witness -- that the discussion with
7    the chief executive with the unit heads responsible
8    was going to be about what they did that week as
9    opposed to some key benchmark, like what are you
10    going to do this quarter? Has your number changed?
                    Page 168

92040AS1.TXT

11 what are you going to do?  Is there any reason I
12 should be concerned?  And there's any evidence that that
13 was the kinds of questions.  What you see throughout
14 January is that the division level numbers don't
15 move.  Right?
16           MR. de GHETALDI:  In the upside
17 reports they do not.
18           THE COURT:  Well, where did they move
19 then?
20           MR. de GHETALDI:  They moved -- the
21 one that comes to mind is on the January 29th NAS
22 forecasting package.  That was that number.  That new
23 lower forecast appears in the February 5th upside
24 report.

0194

1           THE COURT:  Okay.  The lower
2 forecast.  But what was the forecast in January 29?
3           MR. de GHETALDI:  It was the same.  I
4 said the forecast in the upside report for January 29
5 was the same as it had been for the month.
6           THE COURT:  But the division level
7 forecast never changed in an entire month.
8           MR. de GHETALDI:  In the upside
9 report, that's true.
10           THE COURT:  That's what went to
11 Mr. Ellison and Mr. Henley.
12           MR. de GHETALDI:  But they
13 discussed --
14           THE COURT:  So, were these people
Page 169

92040AS1.TXT

19 made 10.7 cents.
20           THE COURT:  And if they had made --
21 if they had done what Miss Minton -- her adjustments
22 to it -- there wouldn't have been a material miss,
23 would there have been?
24           MR. de GHETALDI:  But we're talking

0196

1 about two different things.
2           THE COURT:  No.  Right.  That's why I
3 asked you the question about conservatism.
4           You're acting as if Ellison and
5 Henley should have come into it believing that what
6 they were likely to be told in a forecast by the
7 division level people, they would like to receive
8 something that was overly optimistic and that, as a
9 result of it being overly optimistic, would obviously
10 be silly for them to place any weight on
11 Miss Minton's upward adjustments of those when in
12 fact the uncontradicted record seems to suggest that,
13 if anything, the division level forecast tended to be
14 overly pessimistic, that Ms. Minton's -- as I think
15 you said before -- Miss Minton's upward adjustments
16 of those tended to still be ultimately too
17 pessimistic.
18           And what I'm getting is, you're
19 saying -- you've got an insider trading.  You've
20 accused two people -- it's a very serious thing to
21 accuse two people of.  You accused them of
22 intentional conscious wrongdoing.  If the best
Page 171

92040AS1.TXT

15 liars?  I guess what I'm getting at is:  you had
16 meetings and you had written advice that the top
17 executives of the corporation -- and there is a
18 forecast that's written, and it is used.  And what
19 you're telling me is that Mr. Nussbuam now on paper
20 was a lie --
21           MR. de GHETALDI:  I am not.
22           THE COURT:  And that what he told
23 Mr. Ellison in the meeting was, "That's my forecast
24 number.  My real number is forecast minus X."

0195

1           MR. de GHETALDI:  With all respect,
2 that is not what I'm saying.
3           THE COURT:  Tell me what you're
4 saying because it's confusing to me.
5           What you're trying to tell me is that
6 there's all this conversation and chatter among
7 people in a complex organization about the risk and
8 opportunities that they face in a challenging
9 economic environment.  And there's no question about
10 that.  There are concerns.  There's e-mails that
11 evidence concern.  They're at lower levels.  Most of
12 it isn't direct to Mr. Henley or Mr. Ellison.  But I
13 have no doubt that there were concerns on their minds
14 about dotcoms.  But throughout January, the division
15 forecast never changed.  And what you're trying to
16 tell me is that isn't somehow real or reliable.
17           MR. de GHETALDI:  Your Honor, if they
18 had made the division level forecast, they would have
Page 170

92040AS1.TXT

23 indicator of what the company was going to do does
24 not indicate a material miss, it does not indicate a

0197

1 miss of any kind until January 29 -- and even then it
2 would be a rounding up of to $.12 and it would be
3 24 percent, which I think on the revenue -- on the
4 license revenue -- which I do think is about
5 25 percent, just like I would think 26 percent would
6 be about 25 percent.  So, you're saying that they
7 should have just disregarded all this input based on
8 the fact that it wasn't real somehow.
9           MR. de GHETALDI:  I'm saying -- I
10 haven't gotten to say all the things I want to say.
11 What I'm saying is that there were a number of
12 indicators that indicated -- that showed downward
13 trends in a number of specific areas of the company.
14 What I want to do is get to those.
15           THE COURT:  Well, let's get to them.
16 Let's take into account -- maybe on the law to look
17 at 141.  Because I am interested in if Brophy -- if
18 Brophy has still got strength, whether 141 help is
19 relevant to here.
20           MR. de GHETALDI:  I want to make a
21 point about Covisint and how to analyze that.  I'll
22 discuss a few of the things that were then said on
23 both sides of the table about it.
24           The Covisint transaction was about

0198

Page 172

92040AS1.TXT

1 $60 million. Oracle's guidance was 1.3 billion. So,
2 we're looking at approximately 1/20th of that total
3 revenue -- that total license. The defendants said
4 in their opening brief that Oracle did not analyze
5 its prospects, excluding Covisint or any other deal.
6 Moreover, plaintiffs did not have any contemporaneous
7 evidence to support their contention that the market
8 view of Oracle's license revenue projection, as
9 including separate benchmarks for performance,
10 excluding the Covisint transaction, either within the
11 quarter or at its end. A number of documents -- of
12 Oracle's documents -- analyzed the Covisint
13 transaction by taking it out.
14         THE COURT: This is not a helpful
15 part of your -- for you. This is a semantical
16 discussion. Your friends are going to come back and
17 say, "We did look at -- it was an unusual
18 transaction. You look at what the growth was. What
19 we were talking about was, when we went to the
20 market, did we say we were going to make about
21 25 percent on top of Covisint? So, it would be about
22 25 percent, plus Covisint? No, we didn't. And what
23 we said was 12 percent per share; we didn't say plus
24 market, be happy. There's an additional $60 million

0199

1 from Covisint. We never did that. And when we were
2 thinking in our mind whether we were going to make
3 the quarter, we of course counted it." That's all
         Page 173

---

92040AS1.TXT

4 they're saying, I think.
5         MR. de GHETALDI: To me, they were
6 saying more than that. They're saying that they did
7 not exclude Covisint in order to analyze how well
8 they were doing. And the documents show that they
9 did. Their testimony shows that they did. And our
10 expert, Dr. Fischell, says that the market looked at
11 that.
12         THE COURT: Well, that's an
13 interesting -- Dr. Fischell thought that the market
14 believed they were going to make $.12 per share plus
15 $60 million?
16         MR. de GHETALDI: No. Dr. Fischell
17 said that analysts looked at what Oracle is doing
18 with and without Covisint. It's in paragraph 10 of
19 his affidavit.
20         THE COURT: I find this whole thing
21 mystifying. I think you're right. I concede that
22 there were documents that clearly looked at it
23 without Covisint. Your problem is, I think, that
24 what you're trying to show is, because they didn't

0200

1 hit the mark, they knew they weren't going to hit the
2 mark. So, people can play pretend on the
3 playground -- my three and my five year-old can play
4 pretend all they want within safe reason. But -- and
5 they may not destroy my property. But, you know,
6 it's real. Let's get over it, let's deal with the
7 fact that it's real.
         Page 174

---

92040AS1.TXT

8         I understand what you're saying.
9 They did look at it and it is an indicator. But
10 that's why I was asking about -- you've got to
11 account for something.
12         MR. de GHETALDI: Yes. Yes. But the
13 way I look at it is, you have a 5-gallon bucket and
14 you pour a quart of water in it. That's Covisint.
15 And you want to see if the bucket is filling up fast
16 enough to get it full in an hour. And my point is
17 simply that by taking Covisint out the way Oracle did
18 in its documents -- by the way, Mr. Henley said that
19 they did. Mr. Henley said that Mr. Garnick was
20 absolutely right on taking it out, and that
21 Mr. Henley would have told him to take it out and
22 analyze it without Covisint if he hadn't done it.
23 The reason is, they're looking to see how fast that
24 water is filling the other 19 quarts in that bucket.

0201

1 It has to get filled in an hour. That's the rate of
2 the revenue coming in. So, that's the only point I
3 wanted to make.
4         And Mr. Henley testified they were
5 off to a slow start in December, excluding Covisint.
6         THE COURT: And excluding Covisint,
7 the revenue was what?
8         MR. de GHETALDI: One percent.
9         THE COURT: Now, when you said
10 that -- we'll have to come back. 1 percent --
11         MR. de GHETALDI: One percent growth.
         Page 175

---

92040AS1.TXT

12         THE COURT: No one ever told Henley
13 and Ellison that, did they?
14         MR. de GHETALDI: It's in the Garnick
15 flash report.
16         THE COURT: I thought you said that
17 was a typo.
18         MR. de GHETALDI: It shows it at
19 6 percent.
20         THE COURT: Well, that matters;
21 right? I mean, you're assuming again that these
22 folks are dilated on this like you did. You picked
23 up an error. That's a pretty thin rule at which to
24 make --

0202

1         MR. de GHETALDI: Six percent when
2 you're giving guidance to 25?
3         THE COURT: That's 6 percent without
4 Covisint.
5         MR. de GHETALDI: Yes.
6         THE COURT: For the month?
7         MR. de GHETALDI: Yes.
8         THE COURT: How much did they make
9 towards the quarterly -- I think we went through this
10 before. Without Covisint, what was the license
11 revenue as against the total for this quarter?
12         MR. de GHETALDI: Without Covisint --
13 I know that December and January were 434. December
14 was 240. So that's 180 million.
15         THE COURT: For the number of 1.3.
         Page 176

92040AS1.TXT

```
16                MR. de GHETALDI:  1.3.
17           THE COURT:  So what's that?  About
18 14 percent?
19                MR. de GHETALDI:  I don't think it's
20 that high.  I have it in the charts.  I don't -- I
21 can't bring it to my head.
22           THE COURT:  I may ask you all to do
23 a joint chart.
24                MR. de GHETALDI:  I'd be happy to
```

0203

```
 1 work on that.
 2                MR. Tabacco just pointed out that
 3 Mr. Ellison in his deposition picked up the error on
 4 his own.  He noticed it.
 5                This is a slight and modified version
 6 of the chart.  What is shows is the December, January
 7 and combined revenues for these three U.S. divisions.
 8 I just wanted to focus on that.  Because, once again,
 9 NAS and OSI were the ones that took the big hit.
10 They were the ones that really drew down the license
11 revenue for Oracle by the end of the quarter.
12                You see NAS is bleak.  Negative
13 24 percent.  In December, negative 35 percent.  In
14 January, Covisint is not a factor here.
15                OPI.  There's a lot of growth.  If
16 you look at -- it's got 154 percent growth.  But they
17 only brought in $4 million.  That's because their Q3,
18 '00 was $2 million.
19                OSI.  Same sort of thing.  Negative
                           Page 177
```

92040AS1.TXT

```
20 81 percent in December and, by the end of January,
21 they have negative 17 percent.
22                U.S. divisions, January is negative.
23 By the end of January we've got 45 percent.
24                So, these are -- these, I think, are
```

0204

```
 1 the kinds of things, if you're tracking -- like
 2 Mr. Ellison said, they tracked at the MC meetings how
 3 much they had left to go.  This is the kind of thing
 4 that would come up in a conversation with the
 5 executive vice presidents of these divisions.
 6                THE COURT:  Would it come up on a
 7 weekly basis?
 8                MR. de GHETALDI:  Yes.
 9                THE COURT:  And what deposition
10 testimony indicates that on a weekly basis they
11 discussed, they said, "Oh, where are you at now,
12 what's your weekly P&L"?  And I'd like you to cite
13 and paper.
14                MR. de GHETALDI:  Paper?
15                THE COURT:  Well, if you don't have
16 it now -- but I mean, I actually want like -- and
17 paper.  What piece of paper would have gone to the
18 EMC and would have said that sort of thing?
19                MR. de GHETALDI:  I don't know that
20 any piece of paper was passed out at the EMC because
21 we weren't given any --
22                THE COURT:  Mr. Nussbaum -- is it
23 Sanderson?
                           Page 178
```

92040AS1.TXT

```
24                MR. de GHETALDI:  And Mr. Roberts.
```

0205

```
 1                THE COURT:  They just sandbagged
 2 Ellison and Henley; right?
 3                MR. de GHETALDI:  I'm not going to
 4 say that, Your Honor.
 5                THE COURT:  Why?  You've said that
 6 Ellison and Henley had dark hearts.  Why isn't -- why
 7 weren't these guys -- why didn't they just do the
 8 most awful thing that anyone can ever do to a boss?
 9 They should have clearly said to Mr. Ellison and
10 Mr. Henley, "We ain't going to make it."
11                MR. de GHETALDI:  I'm not sure how
12 they could have said they were going to make it.  I
13 don't know.
14                THE COURT:  So they couldn't have, in
15 good faith, been given the advice they were given?
16                MR. de GHETALDI:  I don't know, Your
17 Honor.
18                THE COURT:  They should have said,
19 "Jennifer is nuts.  Jennifer, we have mental health
20 benefits that give six counseling sessions.  Jennifer
21 has had a pretty good run here.  I don't know what
22 was in her egg nog at Christmas when she wrote that
23 report, but ever since then she's just nutty.  And
24 Larry and Jeff, this is crazy.  We ain't going to
                           Page 179
```

92040AS1.TXT

```
 1 make it.  And let's deal with it and figure out what
 2 to do."  There's no evidence they did anything like
 3 that; right?
 4                MR. de GHETALDI:  There's at least
 5 one of the executive vice presidents who are
 6 completely capable of saying something like that.
 7 We'll see him later on.  No, there's no evidence of
 8 that.
 9                THE COURT:  Right.  Which is --
10 you're telling me that nobody should have believed
11 they were going to make it.  But have you no evidence
12 that the key people advising Ellison and Henley ever
13 said anything to that effect?
14                MR. de GHETALDI:  Once again, Your
15 Honor, this is not the point that we're making.
16 We're not making --
17                THE COURT:  But it's an important
18 point for you to try to get me to prove.  I have to
19 figure out why it is that the two guys on top of this
20 acted with a dark heart, but everybody below them was
21 acting in good faith.  You're focusing on an
22 analysis, for the most part, were never done at the
23 time.
24                I've read the record carefully.  You
```

0207

```
 1 know, it is clear, for example, that the key thing
 2 that they're all focused on was the prior quarter --
 3 the same quarter of the prior year.  And they did run
                           Page 180
```

0206

92040AS1.TXT

 4 other numbers. But the reports look at that. They
 5 did the reports at the meeting.
 6           You know, you're telling me that no,
 7 not a head injured person would have believed that
 8 they would make this quarter. What I'm saying is,
 9 the sales unit -- I thought the natural incentive
10 system -- the last thing, I suppose, I would want to
11 do -- I have a hard time thinking that this isn't
12 what a rational -- a rational reasonable person -- I
13 think a rational person, the last thing they would
14 want to do is to deliver a forecast to their boss
15 that was materially under -- I mean, materially over
16 what they were going to be able to deliver.
17           MR. de GHETALDI: Once again, Your
18 Honor, I have to remind you that the forecasts, if
19 you add them up, come out to 10.7 cents. They don't
20 come out to $.12. The forecasts -- I'm not saying
21 that the forecasts were wrong or that they thought
22 that they were wrong. I think the point that the
23 forecasts generate the 10.7 cents DPS number is
24 something that needs to be kept sight of.

n208

 1           THE COURT: Miss Minton is the one
 2 who is the evil person here or the one who just
 3 didn't get it.
 4           MR. de GHETALDI: I don't think she
 5 did get it. I'm not saying that she was deliberately
 6 false in anything she did, but I think she was overly
 7 optimistic in this quarter.
                    Page 181

 8           THE COURT: In this quarter.
 9           MR. de GHETALDI: And I think that
10 there were a number of signs that should have
11 indicated that. She was also overly optimistic in Q3
12 '00.
13           THE COURT: So she missed in that
14 quarter.
15           MR. de GHETALDI: She was over --
16           THE COURT: She is missed high.
17           MR. De GETALDI: Yes.
18           THE COURT: And the divisions missed.
19           MR. de GHETALDI: I think she was
20 closer. I'll give her that. Can we show the video?
21 This is from the December 14th guidance call. It's
22 the transcript. Mr. Henley speaking. It says, "At
23 this point, we see no impact. We're slowing in
24 our -- we see no impact or slowing in our business

n209

 1 with regard to the economy."
 2           THE COURT: You think that was false?
 3           MR. de GHETALDI: To the extent that
 4 he did not say anything about the dotcom -- the small
 5 effect there -- and I do think that that was part of
 6 the overall economy.
 7           THE COURT: Do you think that's
 8 incomplete then or is that false? Was he supposed to
 9 do an overall -- if the price is at 52 and they just
10 closed Covisint, is that a false statement just
11 because the dotcom sector, which everybody knew,
                    Page 182

12 wasn't sort of thriving?
13           MR. de GHETALDI: Mr. Ellison later
14 on in the conference call, in response to a direct
15 question about the dotcoms, says that they had seen
16 some fall off in the dotcom business. So, this
17 statement, I think, is incomplete. I don't think
18 that it's accurate.
19           Okay. Could you go to the next
20 point, please. This is from Mr. Henley's affidavit
21 in this matter. He repeats that there's no slowing
22 in the business at all.
23           I again think that that's not quite
24 accurate.

0210

 1           THE COURT: Are you familiar with
 2 crew?
 3           MR. de GHETALDI: True?
 4           THE COURT: Crew. You know, when you
 5 row and there's, like, a five-minute team?
 6           MR. de GHETALDI: Right.
 7           THE COURT: If last year you
 8 completed the course in a minute and this year you
 9 completed the course in 54 seconds but one of your
10 crew, when you measured them individually wasn't
11 contributing as much as a year ago and you were asked
12 about how your team was doing, would it be false to
13 say, "I don't see any slowing of our team"?
14           MR. de GHETALDI: Yes. Because --
15           THE COURT: I would say that even
                    Page 183

16 though we're doing the course five seconds quicker,
17 I've got Tabacco in there and he -- frankly, he was
18 smoking something that sounds like his name instead
19 of working out this year, so he's off the game. And
20 even though de Ghetaldi and Weiser and Lindsey were
21 doing really well and overcompensating, we really had
22 to -- you've got to understand, Tabacco, he's not
23 what he was.
24           MR. de GHETALDI: I think so, Your

0211

 1 Honor, in this context.
 2           THE COURT: So, you really need --
 3 when you talk about something like this, you really
 4 need to kind of go pretty much segment by segment.
 5           MR. de GHETALDI: I think so.
 6           THE COURT: So I don't know what was
 7 going on in Asia at this time.
 8           MR. de GHETALDI: In Asia? I'm not
 9 sure.
10           THE COURT: How about Mexico?
11           MR. de GHETALDI: Mexico? I don't.
12           THE COURT: This is serious. You --
13 again, you are taking -- remember, they didn't
14 project NAS, OPI and OSI. They projected an
15 international corporation's results. And you're now
16 telling me that this is an incomplete statement about
17 slowing a business. So, you're saying at that
18 point -- you basically believe Henley misled the
19 market by projecting 25 percent growth into
                    Page 184

9204OAS1.TXT

20  December 14th.

21          MR. de GHETALDI:  No.

22          THE COURT:  Well then, if he didn't

23  mislead the market then and he was projecting

24  25 percent growth -- I don't know.  I guess

0212

1   25 percent growth strikes me as 25 percent faster

2   rather than 25 percent slower.  And everybody

3   realizes that you have -- at least I think that we

4   talk about investors being sort of relatively, you

5   know, sophisticated people.  We can understand that

6   virtually every business -- good or bad -- there are

7   segments that go up and down.  But what you're

8   looking at is the overall enterprise moving forward

9   in a positive or negative direction.

10          MR. de GHETALDI:  In part.  But when

11  you're looking at the core of Oracle's business,

12  which is what NAS, OPI and OSI was, that was

13  50 percent of their license business.

14          THE COURT:  What he was saying then

15  was false?

16          MR. de GHETALDI:  And NAS was about

17  25 percent of its license business.

18          THE COURT:  On December 14th, what he

19  was saying was false?

20          MR. de GHETALDI:  It was incomplete.

21  He did not -- I mean, if there is -- if there is --

22  he should have said -- this is not our case, though.

23  We're not saying anything about the truth or falsity

Page 185

9204OAS1.TXT

24  of these statements, Your Honor.  This is -- I'm

0213

1   trying to show here, as we go along, what was

2   happening at NAS -- what was happening at NAS in the

3   first couple of months of Q3.  And we're starting off

4   at a point in December when Mr. Henley is telling the

5   market that he's not seeing any slowing at all.

6           To me, he could have said, "A part of

7   our business was slowing.  We're seeing the effect of

8   the dotcoms," as he did at his deposition.  But this

9   is misleading to me, Your Honor.  I'm sorry.  Whether

10  I'm looking at it as a plaintiffs' lawyer or as a

11  defense lawyer, which I also do, this is misleading

12  to say, "I saw no slowing of our business at all,"

13  when he testified at his deposition that they saw the

14  dropoff of the dotcoms as far back as Q4 of '00.

15  That's the way I see it.

16          THE COURT:  And they had a record

17  quarter since then?

18          MR. de GHETALDI:  Yes.

19          THE COURT:  So it's back to the crew

20  analogy.  You have to tell -- somebody on the team is

21  slowing down.  You don't give a net -- you're not

22  given a net estimate to the market, you're given that

23  sort of particularized thing.

24          MR. de GHETALDI:  If we're going into

0214

Page 186

9204OAS1.TXT

1   sports analogy --

2           THE COURT:  It's not sports.  You're

3   talking about -- it's as if McDonald's next quarter

4   grows by 45 percent but their cobb salad goes down.

5           MR. de GHETALDI:  Their hamburger

6   goes down.  The core business goes down.

7           THE COURT:  What happens?  That's why

8   I asked you -- I'm asking you to tell me, can you

9   believe, based on what you know -- de Ghetaldi's

10  examination of this -- they should have never put out

11  that projection in December?

12          MR. de GHETALDI:  I'm not saying

13  that.

14          THE COURT:  Why?

15          MR. de GHETALDI:  Why should I?  I

16  don't believe it.  I don't believe that they

17  shouldn't have put out that projection in December.

18  I'm not saying that.

19          THE COURT:  Then tell me what

20  happened after that.  Let's not focus on this, then.

21  You do focus on it in your briefs and I'm trying to

22  figure out what's bad about it.  Tell me what

23  happened before Mr. Henley traded that -- you know --

24  that was so bad?

0215

1           MR. de GHETALDI:  Next.  Now, this is

2   part of the e-mail from Mr. Winton to Mr. Roberts.

3           THE COURT:  What's the date?

4           MR. de GHETALDI:  The date is

Page 187

9204OAS1.TXT

5   December 7th, 2000.

6           THE COURT:  I thought we were going

7   to do after that --

8           MR. de GHETALDI:  Well --

9           THE COURT:  So he should have read

10  this -- we're back to --

11          MR. de GHETALDI:  I'm not --

12          THE COURT:  When did he get this?

13          MR. de GHETALDI:  Mr. Henley, I

14  believe --

15          THE COURT:  Did he ever get it?

16          MR. de GHETALDI:  I'm not sure.

17  Again, this was something that was discussed at the

18  EMC meetings.

19          THE COURT:  This was discussed --

20  would have been discussed before he put out the

21  estimates?  That's what I mean.  He should have read

22  this and he should have never put that estimate out;

23  right?

24          MR. de GHETALDI:  I'm not saying

0216

1   that.

2           THE COURT:  Then why are you showing

3   it to me?

4           MR. de GHETALDI:  Because what I'm

5   showing you is NAS, at the beginning of December,

6   showing that they had fewer big deals, that the

7   results in the prior two quarters of fiscal year '01

8   had been boosted by big deals in both quarters.  NAS

Page 188

92040AS1.TXT

9  in Q3 had fewer big deals.  In fact, they had only
10  one, I think -- one that's greater than $5 million in
11  their pipeline that hasn't even been signed.  Last
12  year they said they had four.  And he says that the
13  growth comparisons are tougher, meaning that it's
14  going to be harder to grow, yet the company is
15  projecting a 25 percent growth companywide.  And here
16  one of the key divisions in their license business,
17  which brings in 25 percent of its license business,
18  is saying, "We're going to have a hard time growing."
19  He said that the NAS results took off last year in Q3
20  and continued into Q4.  He says that growth rates
21  will slow in the second half.
22          THE COURT:  In fairness to them, I
23  mean, they just said they're going to have a hard
24  time growing.  There was doubt that they might have

C217

1  been close to 0 percent growth rate every year.
2          MR. de GHETALDI:  If that's the way
3  the Court took what I said, I didn't mean that.  I
4  said it's going to be harder to grow.
5          THE COURT:  What's the estimate at
6  the bottom?
7          MR. de GHETALDI:  The estimate at the
8  bottom is that they grow -- well, he says they feel
9  the 31 percent target is achievable, but NAS -- and
10  forecast at that time -- 22 percent growth --
11          THE COURT:  Twenty-two percent for
12  NAS?
Page 189

92040AS1.TXT

17  doesn't that suggest at this point -- Henley doesn't
18  believe that there's any profound change in the
19  business, does he?
20          MR. de GHETALDI:  I think he's seeing
21  problems in the pipeline.
22          THE COURT:  I understand.  He marks
23  these things down.  He's -- this is -- here's an
24  assumption I make about me.  This is a complex

n219

1  organization.  Complex organizations have moving
2  parts.  They have risks, they have opportunities.
3  People focus on problems.  That's how they get to be
4  good at their jobs.  They look at little things and
5  they want to make sure they're right.  That doesn't
6  mean that they don't get a good night's sleep at
7  night over things.  You haven't given me one rational
8  reason why Jeff Henley would go on December 14th and
9  give the projections he did that he believed right --
10          MR. de GHETALDI:  I'm not trying to
11  say that on December 14th he didn't believe them.
12  I'm not trying to say that at all.
13          THE COURT:  Okay.  Well, I'm just
14  trying to -- I'm having a hard time following the
15  thread here.  Because if what you're telling me is
16  that there were risks of customers being lost, that
17  there were factors -- that this quarter -- and the
18  division is saying we're not entirely comfortable but
19  here's our estimate, that's fine.  Why don't we move
20  on to the trading period?  I'm still not kind of
Page 191

92040AS1.TXT

13          MR. de GHETALDI:  Yes.  The second
14  page says that the Q3 pipe is not where it needs to
15  be.  Based on conversion history, he wanted another
16  $120 million of license to feel statistically
17  comfortable to meet the Q3 budget.  The Q3 budget is
18  upwards of 30 percent.  So, he's talking about a
19  different goal there, and says, given past trends,
20  that general business and majors should add
21  incremental pipe during the next three weeks.  If
22  they do, we move up.  It's a mixed message here at
23  the beginning of December.
24          THE COURT:  But this predates the

0218

1  Henley call, and there's no evidence Henley received
2  that.
3          MR. de GHETALDI:  Right here.  Not
4  all upside reports were collected after the EMC
5  meetings.  This is a page of the December 8th upside
6  report with Mr. Henley's handwriting on it.
7          NAS.  No big deals in pipeline.
8  Although I'm not talking about OSI right now.  The
9  top note refers to OSI.  Check pipeline for
10  Jay Nussbaum.  Down a lot since this report.  COM --
11  communications -- is the big upside.  Sprint Verizon,
12  AT&T and Bellsouth.  So, we have --
13          THE COURT:  So this predates
14  Henley's?
15          MR. de GHETALDI:  Yes.
16          THE COURT:  How does that mean --
Page 190

92040AS1.TXT

21  catching what was the big signal that they were going
22  to miss.
23          MR. de GHETALDI:  Well, it's
24  difficult, Your Honor, because what I would prefer to

u220

1  do, if it's okay with the Court, is to cover
2  Mr. Ellison in a longer period first and then focus
3  in on Mr. Henley, if that's okay, because he
4  covered --
5          THE COURT:  That's fine.
6          MR. de GHETALDI:  In covering
7  Mr. Ellison, I'm going to cover all these indicators,
8  and the Court can -- and I'll return and show the
9  Court where they were at the time that Mr. Henley
10  traded and what we believe that Mr. Henley knew at
11  that time.  Is that all right?
12          THE COURT:  That's fine.
13          MR. de GHETALDI:  Thank you.  If we
14  could go to the next one.
15          Now, this is Mr. Winton's e-mail
16  about a month later on January 11th.  Mr. Winton was
17  head of finance.
18          THE COURT:  So this is clearly beyond
19  when Mr. Henley traded.
20          MR. de GHETALDI:  Yes.  And this is
21  Mr. Winton's summary of the NAS operations review
22  that took place in Boston on January 9th, 2001.
23          THE COURT:  And who were the
24  recipients of this e-mail?
Page 192

92040AS1.TXT

0221

1          MR. de GHETALDI:  This one went to
2  Jennifer Minton.  Jennifer Minton.  And I think it
3  also went to Mr. Roberts.  Mr. Roberts later
4  testified that these points were discussed at the EMC
5  meetings.
6          THE COURT:  The memo itself never
7  went to Henley at all.
8          MR. de GHETALDI:  Not as far as I
9  know.  And the operations review included PowerPoint
10  presentations from general business and from majors.
11  We know that.  We received the PowerPoint
12  presentation from general business.  We did not
13  receive the PowerPoint presentation from majors.
14  This is all we have about majors.
15          Majors is the division within
16  North American sales that sells to the biggest
17  companies in its customer base.  General business
18  sells to all of the other unassigned companies that
19  are not assigned to specific niches.  And general
20  business is the segment of NAS that primarily sold to
21  the dotcom companies.
22          So, just with that context, what
23  Mr. Minton summarizes had been reported at this
24  operations review.  The pipe had not grown as we had

0222

Page 193

92040AS1.TXT

1  anticipated.  In December he had anticipated the pipe
2  growing.  He's saying it hadn't.  It actually had
3  gone down slightly from December.  There's still a
4  lack of big deals.  There's actual drop in
5  technology.  He talks about a softening pipe, and
6  that both general business and majors expect to see a
7  slowdown in Q3 and Q4.
8          He says general business's dotcom
9  bubble has burst.  They expect to -- they expect to
10  be 30 to 40 million behind their original budgets in
11  technology.  All indications that the economy is
12  affecting this part of Oracle's business.
13          Also the change in the ASP model.
14  ASP is application service providers.  They have big
15  computers and they have applications on them and you
16  can sign up through the Internet to use their
17  applications.  Their change in the ASP model coupled
18  with the dotcom crash is impacting projected tech
19  results in that segment.
20          So, I'd like to go now to
21  Mr. Nugent's PowerPoint.
22          THE COURT:  Let's finish that.  What
23  is the projection?
24          MR. de GHETALDI:  Pardon me?

0223

1          THE COURT:  What's the projection
2  that comes out of that?
3          MR. de GHETALDI:  The projection that
4  comes out of that for NAS -- the forecast stays the

Page 194

92040AS1.TXT

5  same.
6          THE COURT:  What about today, given
7  the indications that they might even do a number
8  higher than that?
9          MR. de GHETALDI:  No.
10          THE COURT:  Are you sure?
11          MR. de GHETALDI:  NAS --
12          THE COURT:  Not on that one?
13          MR. de GHETALDI:  I don't think so.
14          THE COURT:  That's not the one where
15  they say, you know, "We're at 340, we think we're
16  going to go to 355"?
17          MR. de GHETALDI:  I don't think so,
18  Your Honor.
19          This is Mr. Nugent's PowerPoint
20  presentation that he gave about -- he says, I still
21  think we're tracking to end at 354 to 355.  If we get
22  this one big deal, it will go up to 360.  He does say
23  that.  I did remember that.  That's Exhibit 40.
24          Can you blow up, please, the top?

0224

1          So, this is part of a series on the
2  market observations.  Mr. Nugent talks about sluggish
3  economic outlook, that the companies are focusing
4  more on profits.  They're looking to reduce their
5  technology costs, and looking for single digit growth
6  in IT budgets.
7          THE COURT:  Where was this presented
8  again?

Page 195

92040AS1.TXT

9          MR. de GHETALDI:  In Boston, on
10  January 9th, 2001, to the executive vice president of
11  NAS and the other area vice presidents.
12          THE COURT:  Mr. Henley wasn't present
13  there and Mr. Ellison?
14          MR. de GHETALDI:  No.
15          Mr. Nugent is seeing CIOs on a
16  shorter leash.  And CEOs involved in purchasing, he
17  testified, meant longer deals.
18          If we could go to the next page.  The
19  next page.  I'm sorry.  The bottom half there.  Here
20  he's talking about the ASP model.  The fact what he
21  calls the loss of low-hanging dotcom fruit and
22  foresees 60 percent of these customers closing the
23  doors in that calendar year 2001.
24          Then the final market observation was

0225

1  that this is probably the worst.  Dotcoms drying up,
2  venture capital funding nonexistence.  The companies
3  purchasing are only purchasing development licenses,
4  which means a license for one or two people rather
5  than 100 or 200 companywide license.  That these
6  incubator companies are an endangered species list,
7  that there were a number of layoffs in 2000, survival
8  mode of 2001.
9          Okay.  Go on to the next one, please.
10          THE COURT:  Is this a new exhibit?
11          Let's pause here.  Let's take a
12  break.  We'll come back at 3:30.

Page 196

92040AS1.TXT

```
13              (Recess taken.)
14          THE COURT:  You may continue.
15          MR. de GHETALDI:  Thank you, Your
16  Honor.  We'll go to.
17              "Question:  Do you recall discussions
18  at the Executive Committee meetings about these types
19  of market observations, that is, sluggish economic
20  outlook and shifting IT budgets and reduction in the
21  use of outside consultants, and CIOs on a shorter
22  leash and the dot-com fishing hole drying up?
23              "Objection as to form."
24          MR. de GHETALDI:  I just wanted to
```

r226

```
1  let you know, Your Honor, this is George Roberts, who
2  was the executive vice president of NAS, and the
3  question was summarizing what was in Mr. Winton's
4  e-mail to him of January 11th.
5          THE COURT:  Right.  Here's my concern
6  right now.  That was impossibly difficult to hear.  I
7  don't know whether you can crank that up, whether
8  you've got an amplifier.  There's no way for the
9  reporter to get an accurate transcription of that at
10  that volume.  I think we ought to play it again and
11  see if you can do it louder.
12          Let me ask a question.  Do you have
13  the line -- do you know the lines you're going to be
14  using and things like that?
15          MR. de GHETALDI:  Yes.
16          THE COURT:  If you can give to the
                Page 197
```

```
21              92040AS1.TXT
21          "Answer:  I recall the discussions at
22  the EC about the dot-com, you know, revenue stream.
23          "Question:  All right.  And, that is,
24  the revenue stream decreasing?
```

0228

```
1          "Answer:  Yes.
2          "Question:  Okay.  Do you recall when
3  those discussions took place?
4          "Answer:  I don't know.
5          "Question:  Do you recall those
6  discussions taking place in the third quarter of
7  2001?
8          "Answer:  They could have taken place
9  in the third quarter.  They could have taken place in
10  the second quarter.  They could have taken place over
11  both quarters.  It would have been a topic of
12  discussion.  I can't nail down a specific time as far
13  as which quarter."
14          THE COURT:  That means he discussed
15  the dotcom issue; right?
16          MR. de GHETALDI:  Yes.
17          MR. TABACCO:  And now I'll go back to
18  Mr. Nugent's PowerPoint for a second.  The top,
19  here's what Mr. Nugent is saying or is forecasting
20  what happened in general business in the second half
21  of fiscal year '01 and fiscal year '02.  Mid teen
22  technology growth, no million dollar dotcom sales.
23  The average transaction lower than fiscal year '99
24  average.  And one of his action items was to alert
                Page 199
```

```
17              92040AS1.TXT
17  reporter for each of these excerpts -- you run a
18  tally and provide a paper copy with brackets around
19  it.  Then she can use those.
20              There's all kinds -- I forget how it
21  works, but I think the real record is actually what's
22  on the deposition.  But anyway, that can be inserted
23  in, especially if we have a disk of the deposition.
24          MR. de GHETALDI:  It would be easier
```

0227

```
1  to provide the Court with that.
2          THE COURT:  Provide the reporter.
3          MR. de GHETALDI:  This is from
4  Mr. Roberts' deposition, from page 69, line 23, to
5  page 70, line 24.
6          THE COURT:  If they can give you one
7  disk with the line things so you can pop it right
8  into the -- you guys can confirm.  If you want daily
9  transcript, you're going to have to do it fast.  Why
10  don't we do that.  We don't have to focus on the
11  volume.  We'll try to listen and get the numbers down
12  each time we do it.
13          MR. de GHETALDI:  "Do you recall
14  discussions at the Executive Committee meetings about
15  these types of market observations, that is, sluggish
16  economic outlook and shifting IT budgets and
17  reduction in the use of outside consultants and CIOs
18  on a shorter leash and the dotcom fishing hole drying
19  up?
20              "Objection to form.
                Page 198
```

92040AS1.TXT

0229

```
1  corporate.  I asked him whether he did that.  He said
2  that he did by telling Mr. Winton who was from the
3  corporate finance department.
4          THE COURT:  And what was the date of
5  this?
6          MR. de GHETALDI:  This, again, is
7  January 9th.
8          THE COURT:  And the document we just
9  dealt with with Mr. Winton to Minton?
10          MR. de GHETALDI:  January 11th,
11  summarizing, in part, this presentation.
12          THE COURT:  That's when he still told
13  them he felt that they would make 354 to 355?
14          MR. de GHETALDI:  He said it was
15  possible.
16          THE COURT:  I don't think he said it
17  was possible.  I think he said that he was lowering
18  the upside to 360 and that he thought that they were
19  on target to get the 354 to 355 and he maintained
20  their forecast at 340.  Is that a fair summary?
21          MR. de GHETALDI:  I believe it is.  I
22  don't have it in front of me.
23          THE COURT:  I just want to say, this
24  was factored in by Winton and then it went to Minton.
```

0230

```
1          MR. de GHETALDI:  Yes.  Focus on the
                Page 200
```

92040AS1.TXT

2 lower half of that, please.
3          THE COURT: What was his action?  He
4 wanted to sell more options?  What was that?  That
5 caught my eye.
6          MR. de GHETALDI: That didn't quite
7 get an explanation for that.
8          THE COURT: Sell my option?
9          MR. de GHETALDI: Here, Mr. Nugent
10 is --
11          THE COURT: Maybe you have the wrong
12 defendant.
13          MR. de GHETALDI: Maybe.
14          THE COURT: Maybe it's Nugent.
15          MR. de GHETALDI: One of the things
16 that -- one of the problems that they were having was
17 with the quality and stability of level I.  That's
18 the new applications release that comes out in the
19 summer of 2000.
20          One of his action items was to build
21 this reference base of customers who had it installed
22 so that they could tell people that it actually does
23 work for somebody.  He calls the decline in the
24 dotcom business dramatic.  A 30 percent of the dotcom

0231

1 companies they kept track of, the named dotcoms were
2 out of business.  Looking at a reduction, RMAs -- I
3 don't remember what that acronym is for that.
4 $40 million database.
5          THE COURT: Really major something.
                    Page 201

92040AS1.TXT

6          MR. de GHETALDI: And the $40 million
7 database shortfall in the west.  And 35 dotcom reps
8 at risk.  What he was saying there was that they had
9 too many salespeople for the business, and so they
10 had to do something.  One of the things he's
11 recommending is lowering their quotas without getting
12 rid of them.
13          I'm going to make this point again
14 later, but I did want to mention to the Court that
15 the Winton e-mail to Minton that resulted from this
16 meeting was one of the series of e-mails that
17 Jennifer Minton identified in her affidavit as being
18 the reason for lowering the upside in the upside
19 reports.  Those lowering upside, which I'll talk
20 about later, did not see a corresponding rise in
21 division level forecasts, which was something that
22 usually --
23          THE COURT: You're going to have to
24 help me understand how that exactly helps you, which

0232

1 is, to the extent that you've got the best estimator
2 taking seriously input from the divisional level and
3 factoring it into her estimates and still producing
4 estimates that exceed, meet, or do not materially
5 fall short of the market estimates, how precisely
6 does that help you?
7          MR. de GHETALDI: Well, Your Honor,
8 when you couple that fact with the fact that there
9 was no corresponding increase in forecast.  In the
                    Page 202

92040AS1.TXT

10 past, when Jennifer Minton had lowered her upside, it
11 was because the divisions had recognized deals as
12 becoming more certain to close -- that is, deals that
13 had been in her upside went into the division level
14 forecast.  So, you see, in all the preceding quarters
15 that we had data for, when the upside is lowered, the
16 forecast goes up.  Here we just see the upside coming
17 down.
18          THE COURT: And what evidence do you
19 have of anybody thought of that at the time?
20          MR. de GHETALDI: We have evidence
21 that Mr. Ellison -- direct evidence on that
22 particular point --
23          THE COURT: Look, you all have done
24 very important -- I mean, you have accused people of

0233

1 intentional wrongdoing.  And you're showing greater
2 information and it's reflecting greater conservatism
3 at the divisional level, which is then taken into
4 account by the best estimator who acts with greater
5 conservatism, still producing a bottom line estimate
6 to her superiors that says that they're going to
7 meet -- they're going to exceed, meet or not
8 materially fall short of the market estimates.  And
9 that's where I -- because in the past -- what she
10 should have realized that in the past they have
11 converged -- she's converged a bit downward when they
12 have come upward.  That if they're not coming upward
13 and in fact suggesting a bit more pessimism, then she
                    Page 203

92040AS1.TXT

14 needs to go down entirely to their level as opposed
15 to reducing her upside?
16          MR. de GHETALDI: I'm not saying
17 that, Your Honor.
18          THE COURT: What you said in the past
19 is that they sort of moved in -- what you're saying
20 is that they moved in opposite directions.  That as
21 the division level forecast crept up, as they
22 actually, you know, made things, that she would --
23 Miss Minton -- would have revised her thing -- her
24 upside -- she would revise downward so that she would

0234

1 move in a countercyclical direction to the division.
2          MR. de GHETALDI: Yes.
3          THE COURT: Suggesting that, for
4 history to repeat itself, what she should have been
5 doing now, as the divisions became more pessimistic,
6 was she should have become more optimistic; and that
7 the warning signal for Ellison and Henley is that, as
8 the divisions became more pessimistic, Minton didn't
9 become correspondingly more optimistic.  And the fact
10 that she provided a more conservative upside best
11 estimate to them should have triggered it.  Because
12 the two -- she was working in tandem with the signals
13 she was receiving from below rather than contrary.
14          MR. de GHETALDI: I don't agree with
15 that characterization.
16          THE COURT: Then tell me what the
17 characterization is, because I don't get it.
                    Page 204

92040AS1.TXT

18          MR. de GHETALDI: I'm trying to
19 explain.
20          THE COURT: You have -- you told me
21 that as the division forecasts went up, instead of
22 Minton going up correspondingly, she would reduce her
23 upside and become more pessimistic. So that there
24 was a tighter -- the two became closer by the

0235

1 divisions getting higher and Minton getting lower.
2          MR. de GHETALDI: They tended to
3 converge, yes.
4          THE COURT: Here, you actually had a
5 tendency towards convergence but in a way that you
6 find unusual.
7          MR. de GHETALDI: Yes.
8          THE COURT: In the sense that they
9 both became pessimistic rather than -- they became
10 more pessimistic rather than one becoming relatively
11 more optimistic and the other becoming relatively
12 more pessimistic.
13          MR. de GHETALDI: Yes.
14          THE COURT: So, what I'm saying is,
15 they converged. They converged; right?
16          MR. de GHETALDI: Yes.
17          THE COURT: In a more pessimistic
18 direction.
19          MR. de GHETALDI: Yes.
20          THE COURT: And leaving Minton's
21 forecast at a level throughout January was either to
                    Page 205

92040AS1.TXT

22 exceed, meet or not materially fall short of the
23 market estimate. But this was a red flag to Ellison
24 and to Henley because why? And I thought I fairly

0236

1 stated the only thing I could think of, which is
2 that, in the past, she had moved in a different
3 direction. She had matched increased optimism with
4 increased pessimism. So what you would have expected
5 here was for her to meet increased pessimism by
6 increased optimism and that was what was off.
7          MR. de GHETALDI: I think the Court
8 stated one half of the coin the right way. But the
9 converse I don't think we ever saw that in any of
10 these figures -- that is, with the division level
11 forecast becoming more pessimistic the upside
12 potential number is becoming more optimistic. I
13 don't think that that phenomenon occurs.
14          THE COURT: Right. So what you have,
15 as I said, you've got Miss Minton, from all
16 appearances, she has division level forecasts that do
17 not change.
18          MR. de GHETALDI: Right.
19          THE COURT: She has indications from
20 the divisions that what they think they can achieve
21 in excess of their base forecast is lower than they
22 had earlier indicated. She doesn't ignore that or
23 fail to reflect that to her superiors. She takes it
24 into account and gives her superiors her best
                    Page 206

92040AS1.TXT

0237

1 estimate, which resulted in a number which exceeds,
2 meets or does not materially fall short of the market
3 estimate.
4          And I'm asking you, in a case where
5 you're accusing people of intentional wrongdoing, who
6 received those forecasts from her, how that possibly
7 supports your case.
8          MR. de GHETALDI: Because it shows
9 declining trends in the business.
10          THE COURT: It does. But it also
11 shows a subordinate who is fatefully trying to take
12 into account information, and she's still telling the
13 bosses that they're on track to meet the market
14 estimates. And you have not one shred of paper or
15 evidence that Mr. Sanderson, Mr. Roberts, or
16 Mr. Nussbaum ever spoke up at those meetings and said
17 Minton was crazy.
18          MR. de GHETALDI: That's true.
19          THE COURT: So what's your evidence?
20          MR. de GHETALDI: What we have, Your
21 Honor, is a number of different declining trends. We
22 were starting to look at the first one. We're
23 looking at actual results. We're going to look at
24 forecasts, we're going to look at pipeline, we're

0238

1 going to look at conversion issues, both actual and
                    Page 207

92040AS1.TXT

2 forecast. And we're going to see differences --
3 negative differences -- in all of those trends in
4 Q3 '01. And so we're only just beginning here.
5          THE COURT: Well, let's get to what
6 actually went to Henley and Ellison. I've had -- I
7 understand these things and I read them in the
8 record. I want to get to the pipeline reports and
9 the upside reports.
10          MR. de GHETALDI: Let's, if I could,
11 first of all, show the Court just a few short clips
12 about actual results and Mr. Ellison's testimony
13 about those points. If we could start at that,
14 please.
15          This is from the first SLC interview
16 with Mr. Ellison in May of 2002. And in the
17 interview says that, "Ellison noted that the actual
18 sales numbers from Q3 FY '01, which were very strong
19 at that point in the quarter, indicated that the time
20 he sold was the perfect time to sell."
21          Go to the next.
22          "Answer: The individual sales
23 managers would know approximately how much we had
24 sold. So we'd have that information. Was it in the

0239

1 packets? No, it was not.
2          "Question: But it was something that
3 was discussed at the meeting?
4          "Answer: It was something -- how
5 much we had -- how much we had left to go, yes."
                    Page 208

92040AS1.TXT

6      The page and line there is 144, line
7   24, to 145, line 7. And what he says is that the
8   information was in the packets, but it was discussed.
9          Show the next one, please.
10          "Answer: I look at the actual size
11   of the pipe, the size of the pipeline and how much
12   has actually been sold."
13          So, two things that he looks at.
14          THE COURT: So what was sold as of
15   January 15th.
16          MR. de GHETALDI: As of January 15?
17   Not very much in NAS or OSI.
18          THE COURT: Let's talk about the
19   whole company.
20          MR. de GHETALDI: In my affidavit,
21   the last two charts show daily revenue figures for
22   Oracle. And they essentially show that the picture
23   was no brighter as they went through the quarter, as
24   they went through January, than what actually

0240

1   transpired. I'm not -- I'm not talking about the
2   packet of 88, I'm talking about the packet of 20
3   something that's attached to my affidavit. That set
4   of charts, for some reason, didn't make it through
5   the copy company into the large set. I apologize for
6   that.
7          Exhibits 29 and 30.
8          THE COURT: So what's the total as of
9   the time Mr. Ellison instructed Mr. Simon to start
Page 209

92040AS1.TXT

10   trading?
11          MR. de GHETALDI: This would be in
12   Exhibit 30. It would be somewhere between 116, and
13   122 million. I'm sorry. That's U.S. only. We were
14   not given the total company revenues on this data
15   basis. So, I couldn't summarize it.
16          THE COURT: How much did they make in
17   the first quarter -- I mean, the first month?
18          MR. de GHETALDI: The first month was
19   89 million for the U.S., according to this. So, they
20   were looking at only an additional 16 to 22.
21          THE COURT: 89 million for the
22   whole --
23          MR. de GHETALDI: For the U.S. in
24   December.

0241

1          THE COURT: Including or excluding
2   the covisint?
3          MR. de GHETALDI: This is slightly
4   off from the later figures that are contained in
5   Mr. Garnick's e-mail. This is more of a realtime
6   income stream for NAS: 30 million. It looks like
7   some of this got cut off. 62 million for OPI, and
8   3 million for OSI. Mr. Garnick was showing
9   96 million. So, there's a slight difference.
10          THE COURT: And what did they have by
11   January 15th?
12          MR. de GHETALDI: They had
13   approximately 25 to $30 million more.
Page 210

92040AS1.TXT

14          The information that was contained in
15   the division level forecasting packages where they
16   had revenues showed very small increments of actual
17   closed deals through the middle of the month --
18   actually smaller than shows up in the electronic data
19   that Oracle provided us recently, or just before
20   we filed the opposition.
21          THE COURT: And did anybody else
22   besides Mr. Ellison testify that they did it sort of
23   week-to-week P&L discussions?
24          MR. de GHETALDI: I believe that

0242

1   Mr. Henley did. I don't have the cite right in front
2   of me. I'll find it. I believe that Mr. Henley did,
3   as part of the regular ongoing discussions.
4          THE COURT: So, as of January 15th,
5   what percentage of the quarter's revenues -- the
6   projected revenues -- did they have?
7          MR. de GHETALDI: Well, they were
8   probably at about zero growth at that point or less.
9   I've tracked those numbers for these three divisions
10   in these charts.
11          THE COURT: I'm talking about the
12   company.
13          MR. de GHETALDI: I tracked it for
14   the company also.
15          THE COURT: Let's -- I know. I know
16   they're obsessing over the three divisions. They
17   should be proud of themselves that they're so
Page 211

92040AS1.TXT

18   important.
19          Ultimately, the management was told
20   that there would be about $1.3 billion in license
21   revenue growth in Oracle as an entity. And where was
22   the company at companywise on January 15th?
23          MR. de GHETALDI: Like I said, I
24   don't know, because we didn't get those numbers. But

0243

1   as of --
2          THE COURT: I think we went through
3   before, they had 180 out at December.
4          MR. de GHETALDI: 240.
5          THE COURT: I was going to give you
6   the X without any Covisint credit. They had 240
7   companywide as of the end of December; right?
8          MR. de GHETALDI: Yes.
9          THE COURT: And so where do you think
10   they were two weeks later?
11          MR. de GHETALDI: Well, they got 193
12   total in January.
13          THE COURT: So was it about half?
14          MR. de GHETALDI: I would say half.
15          THE COURT: So 85? So they had 325?
16          MR. de GHETALDI: 325.
17          THE COURT: So they needed about a
18   billion? They needed about a billion in the last
19   month to make it?
20          MR. de GHETALDI: Yeah. It's way
21   more than they had ever done.
Page 212

92040AS1.TXT

22       THE COURT: I mean, I thought that
23 they did more than they ever did -- they didn't -- I
24 thought they had a record quarter.

0244

1              MR. de GHETALDI: In Q2. That's the
2 best.
3              THE COURT: Not in Q3?
4              MR. de GHETALDI: No.
5              THE COURT: It wasn't the best Q3
6 they ever had?
7              MR. de GHETALDI: You're talking
8 about Q3 '01?
9              THE COURT: Yes.
10             MR. de GHETALDI: I don't know that.
11 I don't know the absolute numbers, whether or not it
12 was.
13             THE COURT: Okay. I guess what I'm
14 asking you is, what percentage -- well, I guess it's
15 just math into -- if you assume it's at 325 and they
16 had to do a billion three, so they had to have a
17 billion more, what percentage of the total would that
18 be?
19             MR. de GHETALDI: About 25 percent.
20             THE COURT: They have only gotten
21 about 25 percent?
22             MR. de GHETALDI: Right.
23             THE COURT: You're saying they had to
24 get 75 percent?

Page 213

92040AS1.TXT

0245

1              MR. de GHETALDI: I think the way I
2 figured it out in the affidavit was they were looking
3 for 70. That is above any of the historical results
4 that they had gotten in Q3.
5              THE COURT: I thought they needed,
6 according to your affidavit, 67-1/2. I could be
7 wrong about that. I wanted to get it right.
8              MR. de GHETALDI: Seventy sticks in
9 my mind. I can look.
10             THE COURT: I thought they actually
11 achieved 33-1/2 in the first two months. So, my
12 simple math was 100 minus 33-1/2 is 67-1/2.
13             MR. de GHETALDI: Sixty-seven
14 percent. You're right.
15             THE COURT: What you're saying is,
16 Mr. Ellison, when he said this thing about the actual
17 sales, it was off the mark. Even if the company was
18 within striking distance or could it have done it, he
19 had no reason to believe -- to be excessively
20 confident, based on the actual sales as of the middle
21 of January.
22             MR. de GHETALDI: Are you talking
23 about what he said to the analysts on March 1st?
24             THE COURT: No. I'm talking about

0246

1 what you were just suggesting about his focus on
2 actual sales data and his -- the deposition clip
Page 214

92040AS1.TXT

3 where -- or the SLC clip where he said, "Look, based
4 on what we sold to date, it seemed like a really safe
5 time to sell."
6              MR. de GHETALDI: That does not seem
7 correct.
8              THE COURT: But you're basing that on
9 his testimony that this sort of -- people regularly
10 discussed how they were actually doing at these EMC
11 meetings?
12             MR. de GHETALDI: Yes. Yes.
13             Also, if we could show the start at
14 the end of January video. Pause it before you start
15 it.
16             Let me just explain. The first cite
17 here is going to be a portion of the transcript of
18 the March 1st, 2001 analyst call where they pre
19 announce in which Mr. Ellison was asked two
20 significant questions. This is the first one. And
21 was actually asked by Mr. Phillips who is now
22 president of Oracle -- and Mr. Phillips asked, "As
23 you entered the third month of the quarter, were you
24 ahead of where you normally are or were you counting

0247

1 on far more than normal for the third Monday of the
2 quarter?"
3              And Mr. Ellison responds, "We were
4 well ahead of our numbers at the end of January. And
5 the pipeline looked terrific, you know, going into
6 February."
Page 215

92040AS1.TXT

7              If you could show Mr. Henley's
8 response to this at his deposition. It's page 333,
9 line 2 through 7.
10             "Answer: Today is. I don't think --
11 I think Larry was wrong. I think -- I think he
12 believed this when he said it. But I don't think,
13 based on the data we reviewed with you, that we
14 could -- that Larry was right to say that we were
15 ahead of the quarter after the first two months."
16             MR. de GHETALDI: And the data that
17 had been reviewed with him was the type of data that
18 I'm showing the Court, the type of data that was
19 available to Mr. Ellison.
20             THE COURT: Wait a minute. Again,
21 you're asking me the type of data -- the chart you
22 just gave me wasn't available to Mr. Ellison. And --
23             MR. de GHETALDI: I'm saying that the
24 type --

0248

1              THE COURT: And Garnick's report for
2 January wasn't available to Mr. Ellison at the time
3 he started trading either.
4              MR. de GHETALDI: That's true.
5              THE COURT: What you're telling me
6 is, because Ellison said that, "Yeah, we talked about
7 how everybody was actually doing," that that
8 translates into he did a calculation of the actual
9 sales of the company in a quarter-to-date as of
10 mid-January?
Page 216

92040AS1.TXT
```
11        MR. de GHETALDI: I believe that he
12 did.
13        THE COURT: You think he did that?
14        MR. de GHETALDI: Yes.
15        THE COURT: Based on what?
16        MR. de GHETALDI: Based on his
17 testimony. Based on the testimony that they looked
18 at where they were, how much they had to go.
19        THE COURT: How many sales units are
20 there?
21        MR. de GHETALDI: They're the U.S.
22 divisions. There's Europe, there's Asia Pacific,
23 there's Japan and -- yeah, there's about five.
24        THE COURT: Did they go through and
```

0249

```
1 then did somebody sit there with a green eye shade,
2 as it ticked out, and said, "We're behind"?
3        MR. de GHETALDI: I think that that
4 was certainly an important element of Mr. Ellison's
5 discussion with every executive vice president that
6 participated in those meetings. That yes --
7        THE COURT: So that was the key
8 bottom line; not, "Are you going to make your
9 number"?
10        MR. de GHETALDI: No. That was part
11 of it. I'm not ascribing such ultimate weight to
12 that one part of the financial picture. There are
13 other parts that we'll get to, but this is certainly
14 an important one.
                    Page 217
```

92040AS1.TXT
```
15        Now, Mr. Ellison actually --
16 Mr. Henley testified that Oracle -- well, let's see.
17 Hang on here for a second. I'd like to show the
18 Court now a rather short -- it's actually longer than
19 what I have here. Mr. Henley actually testified that
20 Oracle would apply the average historical
21 contribution of the first month to the quarter to
22 actual results to assess performance. That's exactly
23 what some of our analysis does. And so, I think,
24 they were tracked.
```

0250

```
1        THE COURT: Isn't the difficulty for
2 you that where it really falls off is January; right?
3        MR. de GHETALDI: December is bad.
4 January is also bad.
5        THE COURT: January is bad without
6 Covisint.
7        MR. de GHETALDI: January does not
8 have Covisint. But Covisint is still in the bucket.
9 And we're -- and we looked at it -- we looked at the
10 numbers, both with and without Covisint, taking
11 Covisint out of both the revenue actually achieved
12 and the forecast or the guidance or the potential,
13 just to see whether they were on track to make that
14 number, how close to the historical average they
15 were. And they were behind in all categories there.
16 They were -- they were much closer to coming out at
17 the forecast number than they were at coming out at
18 the potential number. And that's what these actual
                    Page 218
```

92040AS1.TXT
```
19 revenue results all point to, is that the division
20 level forecasts are more accurate than
21 Jennifer Minton's.
22        THE COURT: In that quarter.
23        MR. de GHETALDI: In that quarter.
24        THE COURT: How can you predict that
```

0251

```
1 in advance?
2        MR. de GHETALDI: I don't know that
3 you could.
4        THE COURT: Well, you have to. I
5 mean, to determine something that is material
6 information, you have to have some. "Gee, Minton's
7 been more accurate for the last whatever, but, you
8 know, we think this quarter she's going to be the one
9 that's wrong."
10        MR. de GHETALDI: I answered, I
11 think, a different question than you're asking. I
12 don't think that they could have anticipated that
13 Jennifer Minton would be wrong at some point in the
14 past. But I think there was a mounting body of
15 evidence, hard financial data. Mr. Ellison called
16 the actual results hard facts, hard data. He called
17 the pipeline notes hard facts, hard data. I'm going
18 to come to the pipeline in a minute. But that was
19 another one of these indicators that showed them that
20 their business was slowing, that it was going to be
21 more difficult for them to achieve growth -- the
22 growth that they forecast in these critical areas.
                    Page 219
```

92040AS1.TXT
```
23        In December, with Covisint, they took
24 in 18 percent of the guidance in actual revenue. If
```

0252

```
1 you take Covisint out of both sides of the equation,
2 it's 14 percent. The historical average was 21.
3        THE COURT: That's five-year average.
4 What's the two-year average?
5        MR. de GHETALDI: The two-year
6 average we calculated that at some point because
7 it's -- well, the two-year average was -- was it
8 64-1/2 percent? Is that what you said earlier?
9        THE COURT: For the last month, I
10 believe.
11        MR. de GHETALDI: For the last month.
12 And if you look at -- if you take -- actually, I
13 don't think I got full attribution for the
14 calculation that was presented by my friends. But
15 the calculation -- if you take December and January,
16 I think you end up with -- and look at that as 35-1/2
17 percent of some number, that number would be 1.23
18 billion, I believe, which is pretty much in line with
19 the forecast and the level of the guidance.
20        THE COURT: I take it here there's --
21 a two-year average for December would be 19 percent:
22 They were at -- what would you say? --18-1/2, and the
23 year before they had gotten 17?
24        MR. de GHETALDI: I think I was
```

0253
                    Page 220

92040AS1.TXT

1 fairly careful in pointing out the comparison to the
2 different averages.
3            Hopefully the new batteries will
4 solve the speaker problem a little bit.
5            So, if we go on to -- I know we've
6 already talked about the forecast.  I just wanted to
7 identify the specific e-mails, as Jennifer Minton
8 testified, that caused her to lower her upside.
9 Those were Mr. Winton's e-mail of January 11th.
10 That's Exhibit DC.  Those are the comparison
11 exhibits.  It stands for Delaware/California.  It's
12 DC48.  Mr. English's January 17th e-mail about OPI,
13 which is DC56.  Mr. Garnick's January 17th e-mail
14 about December results, which is DC108.  Mr. Kelly's
15 January 17th e-mail about NAS, which is DC61.  And
16 Sarah Kopp's January 18th e-mail about OSI, which is
17 DC77.  She testified that that was the string of
18 e-mails -- information in there -- that caused her to
19 lower the upside.
20            Now, the upside declines were
21 significant.  On January 15, the upside was lowered
22 from -- it was lowered about $65 million down from
23 160 million to about 95.  That's 40 percent.  And
24 most of that came out of the U.S. divisions.  I think

0254

1 in paragraph 55 in my affidavit I've got a chart that
2 deals -- details that.

Page 221

3            Then on January 29th, the upside was
4 low again.  This time by $$1 million down to 43.  And
5 that's down more than 50 percent over two weeks and,
6 again, most of it coming out of the U.S. divisions
7 and some of the U.S. divisions showing negative
8 upside.  And that, of course, caused the reduction
9 potential which resulted in the reduction of EPS
10 to 11.58 cents on January 29th.
11            Now, the rounding up, I want to just
12 briefly touch on that.  I know that we talked about
13 it in the brief.  But I want to bring it up.
14            In the December guidance call --
15 December 14th guidance call -- Mr. Henley made a
16 point of explaining that the 5.01 increase over
17 Q3 '00 -- I'm sorry -- Q2 '00 should be viewed with
18 the knowledge that there had been 22 for one stock
19 split.  He pointed out to the market that that would
20 have been a $.04 increase the year before.
21            Here, too, I find that same sort of
22 reasoning.  Even a one-half cent differential would
23 have been the equivalent of a $.02 difference in
24 stock price the year before.  But as Mr. Tabacco is

0255

1 going to explain, and as Mr. Henley agreed, the
2 market didn't just care about the bottom line EPS.
3            THE COURT:  It cared about the
4 revenue growth.  I was talking with my law clerks out
5 in the hallway at one of our breaks.  I think,
6 really, whether you make 11 or $.12 per share, you've

Page 222

92040AS1.TXT

7 seen $.12 a quarter -- you made $.12 each quarter,
8 making $.48 a year on a $35 stock, your better hope
9 it's a growth stock.  It ain't the best yield I've
10 ever seen.
11            MR. de GHETALDI:  So, I want to talk
12 about something that the defendants did not mention
13 in their discussion here, which is the dynamics of
14 the expenses in Q3 '01 and what was going on there.
15 I think the Court will recall that Oracle had been
16 touting the billion dollar savings it was going to
17 achieve through the internal use of this 11I program.
18            THE COURT:  11I pretty really much
19 dropped off the radar screen until the Ninth Circuit
20 dropped it back in my lap.  Your briefs did not.
21            MR. de GHETALDI:  We did not get a
22 lot of 11I information from the defendants until a
23 deposition of Mr. Nussbaum, which I'll show the Court
24 in a little bit, lead up to that somewhat.  There is

0256

1 some contradictory evidence about whether Oracle was
2 forecasting or experiencing increases in expenses in
3 Q3 '01 that would drive the margins up.
4            Both Mr. Henley and Mr. Ellison
5 testified that Oracle's expense forecast and actual
6 expenses were decreasing in Q3 '01.  But when
7 Mr. Ellison was shown that they weren't, he said
8 that, "well, they were really decreasing sequentially
9 from Q2 '01, not year-over-year from Q3 '00."  But
10 the chart will show you, which is taken from -- which

Page 223

11 is a summary portion of one of the other charts we've
12 given you.  Oracle's 10-Qs and 10-Ks show an actual
13 increase in expenses in Q3 '01, year-over-year and
14 sequentially.
15            And in addition to that, during
16 Mr. Nussbaum's deposition, we learned that the
17 problems with installing 11I at locations of major
18 customers before the product was really ready for the
19 big time led to very significant expense increases.
20            THE COURT:  Did he factor that into
21 his -- what he was telling his bosses?
22            MR. de GHETALDI:  Yes.  We'll see
23 what he told his bosses.  Yeah, he did.  He
24 absolutely did.  And he's a little bitter about

0257

1 actually the way that his bosses handled these
2 unforeseen expenses.
3            So, first of all, this is -- let's
4 see the first slide, which is from paragraph six of
5 Mr. Ellison's affidavit here.  He says in his
6 affidavit in support of his motion, he was optimistic
7 about going into Q3 '01 because Oracle's profit
8 margins were rising and he believed the softening
9 would not significant -- the market for business
10 software generally would not significantly hurt the
11 company's overall business.
12            Then in paragraph 27 of the same
13 document, he says that business in Q3 was becoming
14 more profitable because the margins were increasing;

Page 224

92040AS1.TXT

15  thus, even if there was some deal slippage, I believe
16  that margin increases driven by expense reductions
17  could overcome it.
18          Mr. Henley, in paragraph 18, says --
19  of his affidavit -- says as a result of cutting our
20  internal costs, Oracle's profit margins were rising.
21  And he also believed that a moderate softening in the
22  software market would not hurt the company's overall
23  business.
24          The defendants brief at page 20 says

0258

1   that many Oracle executives, including Ellison and
2   Henley, believed that any shortfall in revenue that
3   Oracle might suffer in Q3 as a result of any
4   macroeconomic softness would be more than offset by
5   continuing improvement in Oracle's margins.
6           So, at his deposition, I asked
7   Mr. Ellison about what he meant by his comments in
8   paragraph six of his affidavit.  And this is from
9   page 299, starting at line 15, through page 300, line
10  10.  These are all of the --
11          "Question:  In paragraph 6, in the
12  third sentence at the bottom of page 2 of Exhibit
13  107, the affidavit says, "We were coming off our best
14  quarter ever.  Oracle's profit margins were rising.
15          And that sentence is a little vague
16  as to the timing.  I'm not sure whether the timing
17  refers to Q2 or Q3  or--
18          "Answer:  Both.
                                Page 225

23  there's an increase.  So, his first response is to
24  say, "Well, Oracle wasn't very good at forecasting

0260

1   expenses."  And his second explanation is, "Well,
2   what he really meant was sequential increases, not
3   year-over-year."  So, let's look at this.
4           "Question:  In paragraph 6, in the
5   third sentence at the bottom of page 2 of Exhibit
6   107" -- pause it for a second.  I got out of order
7   here.  This is a further question about paragraph six
8   in which I asked him what weekly reports he looked at
9   to come to the conclusion that expenses were
10  decreasing.  And we can skip it.  What he actually
11  says is the upside reports the he got at the EMC
12  meetings.  And you can skip the next one which is the
13  upside report.  There it is.  14 percent.
14          Now, let's go to what he says on page
15  411, starting at line 14, to 413 at line 22.
16          "Question:  It looks to me -- and
17  tell me if I'm reading this correctly.  It looks to
18  me that -- like Oracle was forecasting not a
19  reduction in expenses but an actual increase in
20  expenses, virtually across the board for Q3 '01 over
21  Q3 '00.
22          Am I reading that right?
23          "Answer:  I'd have to look at the
24  actuals.  On expense forecasting, we are notoriously
                                Page 227

0261

19          "Question:  Both.
20          "Answer:  The profit margins were
21  just trending up.
22          "Question:  Okay.
23          "Answer:  So expenses were trending
24  down.  So we were spending -- our sales were going up

0259

1   while our expenses were going down, which is an
2   unusual thing for us.
3           "Question:  And it wasn't that your
4   expenses weren't rising as fast as your --
5           "Answer:  No.  Our expenses were
6   actually going down.  So our sales were rising, and
7   our expenses were actually going down.
8           "Question:  Okay."
9           The upside report for January 15th,
10  2000.
11          "Question:  You say towards the
12  bottom of page" --
13          MR. de GHETALDI:  The January 15th
14  upside report which I showed him, I guess -- is out
15  of order here -- shows a forecast at 14 percent
16  increase in expenses.  Both forecast and potential
17  number here are exactly the same.  So, I showed that
18  to him.  And then on pages 411, starting at line 14,
19  through 413 at page -- at line 22, I actually showed
20  him three.  I show him from December 8th.
21  December 15th -- I'm sorry -- January 15th and
22  January 29th.  And in seeing these he realizes that
                                Page 226

0262

1   bad at expense forecasting in the sense that we don't
2   pay enough attention to it, and the expense forecast
3   is usually high.  So, I'd be very interested to
4   actually see where the expenses came out, because we
5   have a terrible track record of not bothering to keep
6   the expense forecast up to date, knowing -- and we
7   almost -- as I say, we almost always beat expenses.
8   Just kind of routine thing within the management as
9   well.  Expense are this?  That can't be right.  We
10  just haven't scrubbed the expenses.
11          But, yes, you're reading correctly.
12          "Question:  All right.  So putting
13  aside what actually occurred at the end of the
14  quarter, the forecasts are showing increase in
15  expenses over the actuals from Q3 '00; right?
16          "Answer:  Yes.
17          "Question:  Given that margin depends
18  upon -- margin forecasting depends upon expense
19  forecasting, can you explain the basis for your
20  statement, then, that margins were going to be
21  improving based on decreasing expenses?
22          "Answer:  Our expense forecasting is
23  not very good.  I think we can just -- should just go
24  and look at what the actual expenses were in the

0262

1   quarter, and my recollection is they went down.  So,
2   we're just bad at -- we're just bad at expense
3   forecasting.                Page 228

92040AS1.TXT

```
 4          "Question:  okay.
 5          "Answer:  Easy enough to check.
 6          "Question:  All right.  It went up.
 7          "Answer:  It went up.  How much?
 8          "Question:  Seven percent.
 9          "Answer:  Seven percent
10  year-over-year?
11          "Question:  Yes."
12          Your Honor, what just happened is
13  that, when he said what really happened, what did
14  they really go up, and I looked down in the chart I
15  had and told him that they had gone up 7 percent.
16  7 percent.  Really.  And so this is where he says,
17  "Oh, well, what I really meant was they decreased
18  sequentially."
19          "Question:  In any case, the EPS
20  numbers on these three pages --
21          "Answer:  Slow down.
22          what were the -- what were the
23  sequential -- on the -- on the expense -- so they
24  went up 7 percent a year, every year?
```

0263

```
 1          "Question:  Yes.
 2          "Answer:  And do you know what the
 3  sequential was, the sequential quarter was?
 4          "Question:  What Q4 or Q2 was?
 5          "Answer:  Q2 was, sequential quarter?
 6          "Question:  No, I don't.
 7          "Answer:  Because I think that was
                                    Page 229
```

92040AS1.TXT

```
12  5 percent, I believe I have better margins.
13          MR. de GHETALDI:  That's true.  But
14  Mr. Ellison had said in paragraph 27 that the expense
15  for -- I'm sorry -- the margin increases that he was
16  seeing were being driven by expense reductions.
17          THE COURT:  Right.  I guess what I'm
18  getting at is how that tracks.  Because there's a
19  certain amount -- usually -- I mean, maybe it's
20  because I've done too many appraisal cases now.  You
21  get to the point in the appraisal case where the
22  petitioner gets asked, "How do you really project
23  7 percent perpetual growth when cap X went down to
24  zero in year three?  You're going to have -- you've
```

0265

```
 1  got to invest to make money.  Expenses -- there's
 2  often a buildup of expenses to deliver more product."
 3          MR. de GHETALDI:  Well, Oracle, like
 4  I said earlier, had been touting a billion dollar
 5  savings in expenses because of its internal adoption
 6  of 11i.
 7          THE COURT:  Do you think Henley and
 8  Ellison didn't believe what they were saying?  Do you
 9  think they were lying?
10          MR. de GHETALDI:  I don't know.
11          THE COURT:  Why would they say that?
12  What motive do they have to believe the sort of
13  secretly harbored belief that the margins were
14  getting worse but to tell the world it's getting
15  better?
                                    Page 231
```

92040AS1.TXT

```
 8  down.
 9          "While there's tremendous seasonality
10  in our license sales, there is not seasonality in our
11  expenses; right?  Because it's-mainly employees
12  expenses.  So, when I -- so I should be more precise.
13  So when I talk about expenses going down, usually I
14  mean -- I mean going down sequentially."
15          One point I would like to make before
16  I show the next slide, which is a chart showing -- a
17  truncated chart showing what happened with expenses
18  both year-over-year and sequentially.
19          During that clip, Mr. Ellison said --
20  made a big point of saying that Oracle was not very
21  good at forecasting expenses.  That's a direct
22  contradiction to what Mr. Henley said on page 26 of
23  his deposition where he says that Oracle was better
24  at forecasting expenses than a license revenue.
```

0264

```
 1          THE COURT:  Yeah.  I mean -- okay.
 2  That may be a contradiction.  But you ought to be
 3  better at forecasting expenses than you are in
 4  revenues.
 5          MR. de GHETALDI:  I would think.
 6          THE COURT:  Let me ask you a
 7  question.  Is it possible to have increasing expenses
 8  and better margins?
 9          MR. de GHETALDI:  Yes.
10          THE COURT:  I mean, if I achieve
11  30 percent sales growth and my expenses rise
                                    Page 230
```

92040AS1.TXT

```
16          MR. de GHETALDI:  Why is he telling
17  me here that the expenses were going down, when in
18  fact they were going up almost 15 percent in their
19  forecast?  I have no idea why --
20          THE COURT:  Again, it depends on how
21  you're thinking about it; right?
22          It is possible -- I mean, if they got
23  25 percent revenue growth and still sizable expense
24  growth, it's possible for your -- I don't know how
```

0266

```
 1  they move together.  But your margins could be
 2  increasing.
 3          MR. de GHETALDI:  As I said, yes.
 4  That is possible.  But in this particular
 5          THE COURT:  Your big picture
 6  perception, if you're maybe an overly eloquent person
 7  who needs to rethink one's corporate communication in
 8  deposition style is to start coming up with stuff,
 9  right, because it's a man who doesn't ever not have
10  an answer?
11          MR. de GHETALDI:  Well, Your Honor,
12  you're talking about -- I don't want to step on
13  Mr. Tabacco's toes.  This part of our discussion
14  sounds very much like there are conflicting
15  inferences that should be resolved.
16          THE COURT:  Actually, you're right.
17  If -- I guess what I don't get back to is sort of
18  tracing this back is, Miss Minton's upside report
19  contained expense increases.
                                    Page 232
```

92040AS1.TXT

20          MR. de GHETALDI:  Yes.
21          THE COURT:  And still throughout
22 January predicted that the company would either
23 exceed, meet or not materially fall short of a market
24 estimate.

0267

1          MR. de GHETALDI:  Yes.
2          THE COURT:  So, again, I'm just
3 having a hard time.  Everybody underneath them have
4 guys, none of them are waving the red flag at them.
5 So how does this support a claim based on intentional
6 wrongdoing?
7          MR. de GHETALDI:  I think that
8 Mr. Tabacco is going to explain -- he's going to tie
9 that together from the legal end and I'm really
10 trying to concentrate.
11          THE COURT:  I'm talking about facts
12 now.  What's the -- I mean, you've already disavowed
13 any intention to say that the EVPs or Minton were
14 dark-hearted people trying to mislead their
15 superiors.  Right?
16          MR. de GHETALDI:  Yes.
17          THE COURT:  So, would you admit that
18 they're all rational people in this room?  I'm not
19 talking about Ellison.
20          MR. de GHETALDI:  No, I'm not going
21 to admit that, Your Honor.  There is -- I think
22 there's a high degree of irrationality at that
23 company.  I do.  It's driven from the top down.  But
          Page 233

92040AS1.TXT

24 I do believe that.

0268

1          So, if we could see the next clip,
2 because it -- let me just give a little intro here.
3 Let's look at the chart.
4          THE COURT:  You know, there actually
5 is good social science on this.  What you're saying
6 is, we've got an irrational leader.  If you believe
7 that there's a tendency towards group, then it's
8 eventually all gone over the rails irrationally.
9          MR. de GHETALDI:  Let's look at the
10 chart briefly.  This is just to make the point that
11 the actual expenses -- well, this is actually
12 Mr. Henley.
13          THE COURT:  What a good moment.
14          MR. de GHETALDI:  We didn't do it on
15 purpose.  This is from Mr. Henley at page 26, line 2
16 to 13.  And this is where he says --
17          THE COURT:  He was actually telling
18 them this deal.
19          MR. de GHETALDI:  This is the smoking
20 gun, yeah.
21          "Question:  Okay.  And in terms of
22 estimating expenses, how much focus is placed on that
23 during a quarter?
24          "Answer:  Again, a lot of time is

0269

          Page 234

92040AS1.TXT

1 spent in the finance organization trying to
2 understand, you know, the expenses, the outlook for
3 the next three quarters.
4          "And we're reasonably accurate.
5 There's clearly -- you know, there's variances and
6 that sort of thing.  But typically we're better able
7 to estimate that than the revenues.
8          "Revenues, particularly license
9 revenues, are more volatile.  There's -- it's more
10 difficult to get your arms around that number."
11          Next is the chart.  If you can blow
12 that up.  I see a lot of red jnk.  Those are rising
13 expenses.  It's a negative number.  That's the way
14 that they show up in Oracle's upside reports.
15 Increased expenses are shown as a negative number.  I
16 had asked Mr. Ellison to confirm that and he did.
17          Just to make the point that both
18 year-over-year and sequentially expenses were rising.
19          Now, if we could see -- next, we're
20 going to see a rather long clip of Mr. Nussbaum.
21 Jay Nussbaum was the executive vice president of OSI,
22 Oracle Services Industries.  He's one -- I don't know
23 whether the Court recalls, but he's one of the
24 deponents that we had to fight to actually get.  It

0270

1 was the subject of a motion.  And he's no longer
2 employed by Oracle.  Pause it.
3          THE COURT:  He looks thrilled to be
          Page 235

92040AS1.TXT

4 at the deposition.
5          MR. de GHETALDI:  And I thought I was
6 in the room with Tony Soprano.  You'll see why.  But
7 I'm used to dealing with Italians so it didn't bother
8 me a whole lot.
9          THE COURT:  He's Italian?
10          MR. de GHETALDI:  He sounds like it.
11          THE COURT:  The name.
12          MR. de GHETALDI:  No, the man is
13 definitely German.
14          In this -- the conversation starts
15 off with problems with 11i and selling that to
16 customers, customer's dissatisfaction, and ultimately
17 an inability to sell the product at all.
18          And then, to add insult to injury,
19 there was some internal decisions made by Mr. Ellison
20 to require Mr. Nussbaum's division to pick up
21 $22 million of additional expenses that he got no
22 relief for, as he says, for going to BellSouth a loan
23 to fix the 11i product that had been installed there.
24          There is a slight gap in this, but

0271

1 that's where he takes a cell phone call.  He took
2 about a dozen cell phone calls during the deposition.
3 We tried to cut it out.  But the clip spans page 68,
4 line four.
5          THE COURT:  You were too afraid to
6 like --
7          MR. de GHETALDI:  I didn't want to
          Page 236

92040AS1.TXT
8  say no.

9           THE COURT:  You were afraid.

10          MR. de GHETALDI:  He's a lot bigger
11  than me.  It goes from 68, line four, to 71, line
12  two.  Okay.

13          "Question:  Okay.  If you could turn,
14  oh, it's second to last page of Exhibit 75.

15          "Answer:  Sure.  Okay.

16          "Question:  Could you explain the
17  comment on the bottom of that page underneath the
18  chart where it says, 'margin dollars and percent
19  falling behind plan in prior year due to investment
20  in Bell South'?

21          "Answer:  Yeah.  Do you want the
22  answer?

23          "Question:  Yes, please.

24          "Answer:  Bell South was a pioneer in

0272

1  the CRM product.  And what we delivered to them was
2  more of an erector set that hadn't been put together.
3  Because they were so good and generous to us to be an
4  early adopter, we tried to get development, along
5  with our consultants, to try and fix what they had
6  been shipped.  To do that, we found ourselves in an
7  embarrassing situation because we couldn't charge
8  them -- it would be as if I shipped you, if you
9  bought a brand new BMW and you got in the car and
10  there was no steering wheel.

11          "Question:  That bad?
                Page 237

16  all you want, but if you had shipped us the right
17  product and we didn't have to do this, we would not
18  have had to spend unbillable dollars in the tune of
19  20 some odd million dollars.

20          "Now, we had permission to do it
21  because that's a large amount of money that I
22  wouldn't have done on my own, so we got approval to
23  do it.

24          "Question:  Approval from whom?

0274

1           "Answer:  Larry Ellison, his
2  eminence."

3           THE COURT:  What were the
4  circumstances of Mr. Nussbaum's departure?

5           MR. GHETALDI:  I'm not sure.

6           THE COURT:  Tell me the point of
7  that.

8           MR. de GHETALDI:  The point of that
9  relates to two things.  One, it relates to the
10  problems that the sales divisions were having selling
11  this new flagship product 11I.  It didn't work.  The
12  applications forecasts for Q3 '01 was huge.  The
13  applications results were far below the forecast or
14  the potential.

15          THE COURT:  Okay.  That's neat stuff
16  that was a focus earlier in the case.  I didn't see
17  much of that in your brief.  Tell me what
18  Mr. Nussbaum was forecasting and what he was telling
19  Minton.  It's all well and good he didn't like the
                Page 239

92040AS1.TXT
12          "Answer:  Oh, it's worse.  So if you
13  had your BMW and the steering wheel was missing, you
14  might be a little concerned.  But if you opened up
15  and you didn't have an engine, you'd say whoa, this
16  is getting interesting.  And tires are going to
17  eventually be shipped.  And you'd like to drive the
18  car.

19          "Question:  Yeah.

20          "Answer:  And so you get a little
21  upset and you say to BMW, I want the mechanics at my
22  house, I want them to fix it.  They say fine, we need
23  to send 17 mechanics at $200 an hour.  And you say, I
24  don't get it.  I bought the car, didn't I expect to

0273

1  have all this working?  And the answer is yes.  Well,
2  why are you charging me for the repair on my, at my
3  house?

4           "So maybe I'm trying to make a little
5  humor of it, that's basically what Bell South was
6  telling us.  Well, how do you take a wonderful
7  account like Bell South and burden them with that
8  problem?  In all good faith they bought what we told
9  them what it was.  What we told them was, wasn't.

10          "And so we had to do that by building
11  it on site with the good help of the developers and
12  my consultants.  Well, that little effort cost me, of
13  unbillable labor, 21 or $22 million, which we didn't
14  get any relief for.  But which really -- that's why
15  the comment here is, you could look at these numbers
                Page 238

20  bonus, might be affected by the allocation of
21  $22 million in expenses.  But on a companywide basis,
22  it really doesn't matter where that money is spent.
23  What matters is there was some indication to higher
24  levels that they weren't going to make the market

0275

1  estimates because of it.

2           MR. de GHETALDI:  Well, Your Honor, I
3  think that $20 million chunk is a relevant piece of
4  information.  You might even call it material.
5  Because what we are looking at -- my friends talked about
6  $100 million in revenue.  The way that we tend to
7  look at it is $60 million in earned income which
8  factors in expenses.  So, if you've got $20 million
9  bringing down your $20 million of unexpected expenses
10  bringing down your income, then that's going to have
11  an effect on the bottom line.

12          THE COURT:  There's no doubt about
13  that.  If you took every bit of expense -- and I
14  focused solely on that and I focused on every lost
15  sale -- then Oracle would have a negative net value
16  and would have been in bankruptcy.  But this case is
17  not about the individual components of Oracle's
18  performance.  You've got to hang your hat on the idea
19  that there was material information that suggested a
20  deviation -- a material deviation -- from the market
21  estimates and why was it that 20 million wasn't taken
22  into account, and what Nussbaum was projecting up to
23  his superiors.
                Page 240

92040AS1.TXT

24          MR. de GHETALDI:  I'm sorry.  Why

0276

1  wasn't it?
2              THE COURT:  Was it?
3              MR. de GHETALDI:  He said it was
4  not -- he was given no relief.
5              THE COURT:  So if he was given no
6  relief, you're telling me he didn't put it in his
7  expense estimate?
8              MR. de GHETALDI:  It was corporate
9  who did -- I believe -- the expense estimate.
10  Because the expense estimates, Your Honor, are
11  exactly the same.  There's no -- one number.
12             THE COURT:  Do I have any evidence
13  that this wasn't taken into account?
14             MR. de GHETALDI:  I'm not sure what
15  you mean by, "taken into account."
16             THE COURT:  My point is, maybe
17  Nussbaum was upset because he got fired or whatever
18  happened to him.
19             When you call your boss, his eminence
20  on a deposition -- your former boss -- there's a
21  certain -- I would not call any of my former bosses,
22  even though they had titles -- some of them like
23  excellency -- I would not call him his eminence in a
24  deposition.  I wouldn't call his eminence, you know,

0277

Page 241

92040AS1.TXT

1  except at a party with him, in a small corner with
2  him.  So, it shows a certain amount of disdain that
3  he has for his former employer.  That's all nice.
4              And he may have felt bad that he got
5  stuck with 22 million that he felt should have gone
6  to the whole Oracle International because that's a
7  product that they were going to market
8  internationally.  And he's upset about that and he
9  may feel that he was treated unfairly and cashiered.
10             What's relevant here is, how did that
11  translate into what Nussbaum was telling Ellison and
12  Minton about what his division was going to do in
13  3Q '01?
14             MR. de GHETALDI:  Ellison knew that
15  there was $22 million of unexpected expenses.
16             THE COURT:  Unexpected as of when?
17             MR. de GHETALDI:  As of January 2001.
18             THE COURT:  Are you saying this
19  problem -- where's the evidence that this problem
20  first arose in January '01?  You don't just up and
21  ship off $22 million worth of work to Nashville or
22  wherever BellSouth resides.  What's the exhibit
23  number there?
24             MR. de GHETALDI:  Well, it's Exhibit

0278

1  75, which has the date -- it was within the time
2  before Mr. Ellison's --
3              THE COURT:  Right.  So how did it
4  affect anything?
                         Page 242

92040AS1.TXT

5              MR. de GHETALDI:  It's the copy of
6  the e-mail.  I'm sorry, it's February 14th.  I was
7  wrong.
8              THE COURT:  February 14th?
9              MR. de GHETALDI:  February 14th.
10  Yes.  This is something that had been going on for a
11  time.
12             THE COURT:  So when did Nussbaum get
13  around to revising the projections based on this?
14             MR. de GHETALDI:  I don't know, Your
15  Honor.
16             THE COURT:  Did he ever?
17             MR. de GHETALDI:  I don't know, Your
18  Honor.
19             THE COURT:  Why wouldn't he have?
20             MR. de GHETALDI:  I don't know how to
21  answer that.
22             THE COURT:  So there's no evidence in
23  this record at all that that affected the projections
24  that Mr. Ellison received before he started trading?

0279

1              MR. de GHETALDI:  I don't know that
2  it affected the projections, but it affected the
3  amount of expenses that Mr. Ellison said were
4  decreasing when in fact they were increasing.  And
5  one of the reasons that they were increasing was
6  because of the additional work that had to be
7  performed on 11i installations to get them running.
8              THE COURT:  So this was like -- was
                         Page 243

92040AS1.TXT

9  this a really deep fraud by Ellison?  He knew the
10  expenses were going up, he knew Minton didn't know
11  about it, he knew none of the unit heads at the
12  meetings or Miss Catz -- nobody else was telling him
13  that he knew they were going up.  And so it was
14  really the best scenario because he was getting
15  projections that showed that they were on track to
16  meet the market estimates.  He had that security
17  blanket and he could go out and execute these trades.
18             MR. de GHETALDI:  That is a
19  possibility.
20             THE COURT:  That's a possibility.  Is
21  it a rational possibility?
22             MR. de GHETALDI:  I believe it is.
23             THE COURT:  That's an inference a
24  rational fact finder can draw?

1280

1              MR. de GHETALDI:  I believe it is.
2              THE COURT:  In that moment of
3  rationality, why don't we pause for the day.  We're
4  going to come back tomorrow at 9:00 o'clock.  What I
5  would suggest we do, counsel, let's talk a little
6  bit.  We'll free the courtroom.  Why don't you come
7  down to the big conference room downstairs and we'll
8  just chat for a few minutes and then you can go.
9                      - - -
10             (Court adjourned at 5:00 o'clock
11  p.m.)
12                      - - -
                         Page 244

9204OAS1.TXT

13
14
15
16
17
18
19
20
21
22
23
24

Page 245

---

8D090341.TXT

281

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

IN RE ORACLE CORP.          : CONSOLIDATED
DERIVATIVE LITIGATION       : C.A. No. 18751

- - -

Chancery Courtroom No. 12A
New Castle County Courthouse
Wilmington, Delaware
September 3, 2004

- - -

BEFORE: HON. LEO E. STRINE, JR, Vice Chancellor.

- - -

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
VOLUME II

- - -

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525

282

1  APPEARANCES: ROBERT D. GOLDBERG, ESQ.
                  Biggs & Battaglia
2                     -and-
                  JOSEPH J. TABACCO, JR., ESQ.
3                 NICOLE LAVALLEE, ESQ.
                  ELIZABETH GUARNIERI, ESQ.
4                 of the California Bar
                              Page 1

---

8D090341.TXT

Berman, DeValerio, Pease,
5      Tabacco, Burt & Pucillo
                  -and-
6      DARIO de GHETALDI, ESQ.
       of the California Bar
7      Corey, Luzaich, Pliska, de Ghetaldi
       & Nastari, LLP
8                 -and-
       KAREN MORRIS, ESQ.
9      R. MICHAEL LINDSEY, ESQ.
       Morris and Morris LLC
10                -and-
       ROBERT B. WEISER, ESQ.
11     ROBIN WINCHESTER, ESQ.
       ERIC L. ZAGAR, ESQ.
12     of the Pennsylvania Bar
       Schiffrin & Barroway
13        for Plaintiffs

14     KENNETH J. NACHBAR, ESQ.
       Morris, Nichols, Arsht & Tunnell
15                -and-
       JAVIER H. RUBINSTEIN, ESQ.
16     ALAN N. SALPETER, ESQ.
       JOHN NADOLENCO, ESQ.
17     of the Illinois Bar
       Mayer, Brown, Rowe & Maw
18        for the Individual Defendants

19     ALLEN M. TERRELL, JR., ESQ.
       Richards, Layton & Finger
20                -and-
       JORDAN ETH, ESQ.
21     of the California Bar
       Morrison & Foerster
22        for Oracle Corporation

23
24
                                          283

1  APPEARANCES (Cont'd.)

2

3      JAMES G. KREISSMAN, ESQ.
       of the California Bar
4      Simpson Thacher & Bartlett
          for the Special Litigation
5          Committee of Nominal Defendant
           Oracle Corporation

6

7

8

9

10
                  Page 2

---

8D090341.TXT

11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                          284

1          MR. de GHETALDI: Good morning, Your

2  Honor.

3          THE COURT: Good morning.

4          MR. de GHETALDI: Good morning, Your

5  Honor. Thank you.

6          THE COURT: Before we start, are we

7  using more of the video clips?

8          MR. de GHETALDI: We have better

9  speakers.

10          THE COURT: I want to make sure we do

11  the same thing for Mr. Dawson that we did with

12  Ms. McGrellis. A lot of it was inaudible, or very

13  difficult, and I think we want to make sure we get the

14  page numbers and stuff, because -- and I think

15  Ms. McGrellis, she was unable to find some of the

16  clips yesterday. Please make sure you are responsive
                  Page 3

80090341.TXT

17  to her needs.
18              MR. de GHETALDI:  Okay.  We will be,
19  Your Honor.
20              Your Honor, we have identified eight
21  financial indicators that were declining.  I talked
22  about four of them yesterday.  The declining -- the
23  actual revenue, negative revenue growth, the
24  performance below historical averages, declining

285

1  upside and rising expenses.  We also briefly talked
2  about the pipeline, how that was behaving.  I wanted
3  to briefly go over that.  I know that we did cover it
4  somewhat.
5              I also wanted to talk about the
6  increasing forecast coverage ratios and some of the
7  trends in the historical pipeline conversion rates,
8  and narrowing growth cap.
9              The pipeline that the defendants
10  described on December 14th as astounding and very
11  exciting in the guidance call dropped from a growth
12  rate of 52 percent prior to the guidance call to
13  34 percent on December 25th.  So -- and as our chart
14  Number 76 shows, that decline was unprecedented in
15  terms of timing and in terms of size.  The --
16  Mr. Ellison testified that that growing pipeline is
17  indicative of a business that should also be growing.
18  And if that's true, then the converse of that should
19  be true:  If growth rate of the pipeline is declining,
20  then the growth rate of the company should also be
21  declining.
22              As our Charts Number 76 and 77 show,
                        Page 4

80090341.TXT

23  the Oracle's pipeline had historically tended to
24  maintain itself over the first two months of the

286

1  quarter before declining in the third.  Mr. Ellison
2  confirmed that in his testimony, when he said that the
3  pipeline often grew until the middle of the quarter.
4              There is some conflict in the
5  testimony between Mr. Henley and Mr. Ellison as to the
6  reliability of the pipeline in early December.
7  Mr. Henley testified that in -- paragraph 34 of his
8  affidavit that the pipeline became more reliable in
9  the second month.  In contrast, Mr. Ellison testified
10  at his deposition that the pipeline would have been,
11  to use his words, pretty clean by early December,
12  2000.
13              Another point I want to make about the
14  pipeline is that at the March --
15              THE COURT:  What did he mean by that?
16              MR. de GHETALDI:  What he meant was it
17  had been -- they use a term, "scrubbed," which they --
18  by which they mean they had gone through the deals in
19  the pipeline and cleaned out the ones that were not
20  likely to close.
21              THE COURT:  By early December?
22              MR. de GHETALDI:  That's what
23  Mr. Ellison said.
24              THE COURT:  When would it have been

287

1  dirty?
2              MR. de GHETALDI:  Pardon me?
                        Page 5

80090341.TXT

3              THE COURT:  I mean, clean -- I assume
4  the opposite of clean is dirty.  When would it be
5  dirty, then?
6              MR. de GHETALDI:  There would have
7  been deals in it that really shouldn't have been in
8  there.
9              THE COURT:  No.  When?
10             MR. de GHETALDI:  I don't know.  I
11  didn't ask --
12             THE COURT:  This testimony really
13  doesn't make any sense, does it, unless he just is
14  saying that, "Every week, it's clean.  Every week we
15  do a pipeline, it's equally clean."
16             MR. de GHETALDI:  No.  I think they do
17  look at the pipeline in -- in one quarter they look at
18  the pipeline for the next quarter, too.  They don't
19  just concentrate on the pipeline for the current
20  quarter.
21             THE COURT:  What he is saying is that
22  the pipeline for the current quarter is always clean?
23             MR. de GHETALDI:  Apparently.
24             THE COURT:  I'm saying it doesn't

288

1  really make sense, if he is talking about cyclically
2  through the quarter, for him to say that the -- I
3  mean, because it seems sort of counterintuitive to
4  think that the pipeline would be dirtier as you got
5  closer to the end of the quarter.  You would think you
6  would be the furthest away from having -- in a
7  business where you have all argued there was a hockey
8  stick effect.  You know, this is not a nonlinear
                        Page 6

80090341.TXT

9  industry.  Even in third quarters you acknowledge that
10  is the most important month, is the last month.
11             MR. de GHETALDI:  Yes.
12             THE COURT:  It seems to make very
13  little sense to think that the pipe is in the cleanest
14  condition early in the -- again, I understand this is
15  not a problem of your making.
16             MR. de GHETALDI:  I would tend to
17  agree with what you are saying.  I'm just saying what
18  he --
19             THE COURT:  What he said.
20             MR. de GHETALDI:  What he said.  So
21  then we get to the March 1st analysts' coverage call.
22  And there was a question right at the end of this.
23  This is -- we will find this at DC104, deposition
24  Exhibit 104.  Right at the end, on pages nine and ten

289

1  of that exhibit, the last question of the day,
2  somebody asked whether the pipeline growth had slowed
3  in Q3 '01.  And Mr. Ellison responded that it had not.
4  And Mr. Henley at that point abruptly terminated the
5  call, sort of hustled him off the stage.
6              THE COURT:  Well, I think he -- I
7  mean, he said something before he hustled him off.
8  Didn't he?
9              MR. de GHETALDI:  Yeah.
10             THE COURT:  He said, "Look, I'm on a
11  cell phone, and my boss is a talkative guy, and we are
12  trying to give you a preannouncement.  Let's talk
13  about this stuff when we have more time to get a
14  handle on it."
                        Page 7

80090341.TXT

15          MR. de GHETALDI: "When we have real
16  numbers." They already had the real numbers for the
17  pipeline by that time.
18          THE COURT: So you think Mr. Henley,
19  because he is a really smart guy, being on a cell
20  phone doing this, and there was some report that had
21  actual numbers, meant that he could -- he sort of did
22  a sort of statistical analysis of the previous
23  pipeline indicators in order -- and was just sort of
24  withholding from the analysts what he really knew?
                                                    290

1          MR. de GHETALDI: No. This is a much
2  simpler point than that. The point is that the
3  pipeline on December 11 was 52 percent. By
4  December 25th, it was 34 percent. By January 15th, it
5  was 31 percent. That is a simple decline in the
6  pipeline growth rate, which they both knew. And
7  Mr. Ellison responded with an incorrect answer, and
8  Mr. Henley abruptly terminated the call.
9          THE COURT: Right. I guess what I'm
10  saying is you look at -- in the year 2000, in the
11  autumn of 2000, the immediately preceding quarter,
12  there was a fairly stark drop off between the first
13  two pipeline reports and the next month's pipeline
14  report.
15          MR. de GHETALDI: That was in the
16  middle of the second month, I believe.
17          THE COURT: No. Well, I mean if you
18  -- no. September 11th, 2000, 56 percent pipeline
19  growth. September 18th, 2000, 56 percent.
20  September 25th, 43 percent.
                    Page 8

80090341.TXT

21          MR. de GHETALDI: Okay.
22          THE COURT: Right? What you really
23  are talking about here is in the two-week span, a drop
24  from 52 to 34.
                                                    291

1          MR. de GHETALDI: Yes.
2          THE COURT: But then a pipeline number
3  that remains within the ranges between 28 and 34
4  throughout the --
5          MR. de GHETALDI: Yes.
6          THE COURT: -- remainder of the
7  quarter.
8          MR. de GHETALDI: Yes.
9          THE COURT: In fact, popping up at the
10  end of the quarter. Right?
11          MR. de GHETALDI: Yes.
12          THE COURT: And you are saying that
13  that drop from 52 to 34 should have been a huge
14  warning signal to people who had seen the pipe in the
15  previous quarter drop from 56 to 43 in two weeks?
16          MR. de GHETALDI: Yes.
17          THE COURT: And what's the -- what's
18  the basis for that?
19          MR. de GHETALDI: It's the numbers,
20  Your Honor. It's something that was behaving
21  differently. It's something that they based their
22  guidance upon. It's something that they told the
23  market about.
24          THE COURT: What should they have done
                                                    292
1  -- what should they have done in Q -- the -- in the
                    Page 9

80090341.TXT

2  first quarter of '00?
3          MR. de GHETALDI: I have no idea.
4  That's not part of our case.
5          THE COURT: No. But I mean, this is
6  talking about red flags in this part of your case.
7  You are talking about signals. They had pipeline that
8  dropped from 81 percent to 41 percent at the beginning
9  of the last month. That's a drop of like a rock.
10          MR. de GHETALDI: But that is
11  something to be expected.
12          THE COURT: It is?
13          MR. de GHETALDI: Yes. Pipeline
14  always drops at the end of the quarter.
15          THE COURT: By half?
16          MR. de GHETALDI: It did, apparently,
17  in that month, in that quarter. But that is not --
18          THE COURT: Wait a minute. It dropped
19  50 percent. It didn't drop 50 percent -- pipeline
20  growth didn't drop 50 percent in the third quarter of
21  '01.
22          MR. de GHETALDI: No. It dropped
23  33 percent in the first two weeks of '01.
24          THE COURT: Right. But in the first
                                                    293
1  three weeks of the previous quarter, it dropped from
2  56 to 43. That is pretty -- and then it dropped from
3  56 to 41 within a couple weeks after that.
4          MR. de GHETALDI: 56 to --
5          THE COURT: I mean, we are talking
6  fairly -- the previous quarter, they started at 56.
7  They ended up at 34. The next quarter, they start at
                    Page 10

80090341.TXT

8  52 and they end up at 34.
9          MR. de GHETALDI: Talking about time,
10  Your Honor. I'm talking about --
11          THE COURT: You are really talking
12  about they should have -- this should have been a
13  Christmas -- with Santa's sleigh should have come a
14  huge market alert.
15          MR. de GHETALDI: It's one factor,
16  Your Honor. It's one factor that we have identified.
17  I mean, I don't want to focus -- I don't want to
18  pretend that we are focusing --
19          THE COURT: Is there any evidence that
20  people focused on this, in actuality, as a real
21  warning signal at Oracle?
22          MR. de GHETALDI: I can not say.
23          THE COURT: So there is no evidence?
24          MR. de GHETALDI: I can not say. I
                                                    294
1  can not think -- I can't think of any. Okay?
2          The next thing that I want to talk
3  about is the coverage ratio, the forecast coverage
4  ratio, and how it was behaving in Q3 '01.
5          What this shows, Your Honor, is the
6  average, by month, of the forecasted coverage ratios.
7  And recall that the coverage ratio is calculated by
8  dividing the forecast by the pipeline. And so a low
9  coverage ratio is better than a high one, because this
10  means for this point in Q1, the first month of Q1 --
11  that means there is approximately three deals -- $3
12  worth of deals in the pipeline for every dollar worth
13  of deals that is forecast.
                    Page 11

80090341.TXT

14              In contrast, by the first month of Q3,
15 we are up to a 45 percent coverage ratio in the first
16 month, which means that more deals have to come out of
17 this pipeline than in any other first month of the
18 quarters for which we were provided information. And
19 so the bottom graph breaks out the behavior of the
20 first month -- you can see the rise in coverage ratios
21 there -- and the behavior of the second month, and see
22 the rising coverage ratios there. And the third
23 month, the coverage ratios again are rising.
24              THE COURT: Is that -- to what extent
                                                      295

1 does that chart reflect a deepening of the hockey
2 stick effect?
3              MR. de GHETALDI: I don't think that
4 it does at all, because, like I said yesterday,
5 according to Mr. Henley and Ms. Minton, the pipeline
6 contains deals that are already closed. And the
7 forecast is the number that they -- where they take
8 into account what has actually been booked. So I
9 don't think that it reflects the hockey stick at all,
10 because it's something that -- what it --
11              THE COURT: Tell me why at the end of
12 every quarter it's at the absolute zenith.
13              MR. de GHETALDI: I think that's
14 because of the way that the pipeline behaves. I do
15 think that the pipeline is scrubbed as the quarter
16 goes along, that deals that are not likely to close
17 tend to fall out. So the pipeline number tends to
18 come down at the end of the quarter while the forecast
19 for the -- forecast number either tends to rise or
                          Page 12

80090341.TXT
20 tends to stay the same. Those two rates tend to
21 converge at the end of the quarter because of those --
22 because of those dynamics.
23              So we think that this is another one
24 of the indicators that was apparent from the -- this
                                                      296

1 information --
2              THE COURT: Did your expert find that
3 statistically significant?
4              MR. de GHETALDI: We did not ask our
5 expert to review that, Your Honor.
6              THE COURT: Because it doesn't look
7 like a very different pattern than prior quarters.
8              MR. de GHETALDI: Well, it's certainly
9 on the rise.
10              THE COURT: It is on the rise. And so
11 is the last -- so is the ratio at the end of each --
12 the prior quarters, they did it, right? Should the
13 alarm have rung? In the prior quarter, they should
14 have realized this, too. Right?
15              MR. de GHETALDI: Prior quarter,
16 Ms. Minton said they were very concerned, because it
17 ended up being more back-end loaded than usual. I
18 think that they were actually seeing this effect in
19 Q2. I think they got lucky.
20              THE COURT: What are companies to do?
21 What would you ideally have companies do? How much
22 did they sandbag their forward-looking estimates?
23              MR. de GHETALDI: I have no idea.
24 It's not any part of our case, Your Honor.
                          Page 13                      297

80090341.TXT
1              THE COURT: No. It really sort of is.
2 What you are -- I mean, it is. You are talking about
3 if people think -- you like that phrase from
4 Mr. Henley. You -- he said, "Wow, we are sort of in a
5 horse race. If I give a good faith estimate of where
6 I think I'm going to end up -- and even if I give
7 myself a little room for margin, but not a big one, I
8 wouldn't -- it would seem to me logical, then, that I
9 would find situations, in the normal ebb and flow of
10 complex human affairs, where I wasn't quite sure I was
11 going to hit the mark. Because I had given a pretty
12 good faith estimate that was pretty close to the
13 market -- it's not a warranty. I didn't tell the
14 market we were going to do 2 cents when we thought we
15 were going to do 12. I told them my people were
16 telling me we could do 13. I gave them 12."
17              You are saying, "Well, in the prior
18 quarter it was close, too." Well, so?
19              MR. de GHETALDI: I'm not sure I
20 understand the question, Your Honor.
21              THE COURT: The point is: You have
22 accused people of intentional wrongdoing, that they
23 went and they sold shares to exploit their knowledge
24 at the expense of the people for whom they were
                                                      298

1 fiduciaries.
2              MR. de GHETALDI: Yes.
3              THE COURT: So that's a bad thing to
4 do.
5              MR. de GHETALDI: Yes.
                          Page 14

80090341.TXT
6              THE COURT: It's purposeful
7 wrongdoing. It's evil, in our business lexicon. And
8 these people, they did it. They had the same
9 experience below what they had given the market?
10              MR. de GHETALDI: No.
11              THE COURT: They didn't?
12              MR. de GHETALDI: No. It's not. If
13 you look at --
14              THE COURT: Did they have upside
15 reports, ever, in the prior quarter that projected a
16 best estimate below what they had given the market?
17              MR. de GHETALDI: Your Honor, in the
18 prior quarter they did not have upside numbers that
19 came down without the forecast going up. That did not
20 happen in the prior quarter. None of the --
21              THE COURT: Did Minton's best estimate
22 ever fall short of the market estimate?
23              MR. de GHETALDI: Yes.
24              THE COURT: In the prior quarter?
                                                      299

1              MR. de GHETALDI: In the prior
2 quarter, yes. Her best estimate was short of what
3 they did.
4              THE COURT: So they should have
5 disclosed at that point? They should have made --
6              MR. de GHETALDI: I am not -- this is
7 not a disclosure case, Your Honor. We are not talking
8 about disclosure issues. We are talking about trading
9 on inside information. They are two completely
10 different animals.
11              THE COURT: So the materiality
                          Page 15

80090341.TXT

12  standard is different.
13          MR. de GHETALDI:  I'm not sure.
14  That's Mr. Tabacco's --
15          THE COURT:  You are not sure?  That's
16  good.  That helps.  Presentation will be fresh to you.
17          MR. de GHETALDI:  It will be a
18  learning experience.  All right.
19          Then the next point that I wanted to
20  talk about -- again, I'm going to be brief, because
21  this is something that I did cover yesterday.  And
22  that is the accuracy of the historical pipeline
23  conversion ratios, and how in Q3 -- I'm sorry -- in
24  fiscal year 2000, using the actual pipeline conversion
                                                    300

1  ratios from fiscal year '99, he could generate a
2  relatively accurate forecast, but in the first two
3  quarters of fiscal year 2001, using that same
4  methodology, the forecasting was --
5          THE COURT:  Is there any evidence that
6  anybody was as smart as you?
7          MR. de GHETALDI:  Yes.  Actually,
8  there is, Your Honor.  Mr. Henley testified that,
9  quote, "They would look painstakingly at previous
10  years and trends of second quarters, third quarters,
11  and all that sort of thing, to try to figure out, gee,
12  is this a reasonable conversion ratio based on
13  history?"  Mr. Ellison testified, "They would look
14  over a series of quarters and try to understand what
15  our historical conversion ratio is."  He also
16  testified that he "applied historical actual
17  conversion rate we had the previous two quarters."
                    Page 16

80090341.TXT

18          So yes, there is evidence that there
19  are people that are as smart as I am.
20          THE COURT:  No.  Actually, that
21  perceived that rather than focusing on the same month
22  in the same quarter of the prior year, that really
23  what you needed to look at was quarter to quarter,
24  now.  Did they come to that conclusion?  They looked
                                                    301

1  at all kinds of things.  I understand that.  You asked
2  them a thousand questions.  They answered it all.
3  There is paper.  But the reports they were getting had
4  a number in it.  It didn't have the second quarter
5  conversion rate.  It had the third quarter conversion
6  rate.
7          MR. de GHETALDI:  Right.  But they
8  testified that they did exactly what I just explained.
9          THE COURT:  They did.  They testified
10  to everything, because you asked them everything.
11  They testified that they looked at all these things
12  over time.  Each one, Minton, Ellison and Henley,
13  unprompted, said that their primary focus was, "What
14  did we do in the same quarter last year?"
15          They did look at other things.  But
16  what you are making now is a statement that you have
17  determined that the best predictor of intra -- or
18  quarter performance as of the beginning of the fiscal
19  year 2001 would have been to look at the same quarter
20  in the prior year; that that had previously been the
21  best predictor.  You now, after producing 87 charts
22  and spending more time with the upside reports for
23  this quarter than anybody at Oracle could conceivably
                    Page 17

80090341.TXT

24  have done and also performed their other duties at the
                                                    302

1  company, have concluded that that best predictor had
2  changed, and that looking at the data for the year
3  previous to third quarter '01 -- the now best
4  predictor of how things would come out was actually
5  what you did in the immediately prior quarter.
6          And what I'm asking directly is where
7  in the evidence is there somebody that did that
8  precise study and came to that conclusion?
9          MR. de GHETALDI:  There is no
10  evidence, that I know of, that somebody came to that
11  conclusion, but there is evidence --
12          THE COURT:  How long did it take you
13  to come to that conclusion?
14          MR. de GHETALDI:  There is evidence
15  that other people, including Mr. Ellison and
16  Mr. Henley, performed the same analysis.  If they
17  performed the same analysis, I would expect that they
18  would come to the same conclusion.
19          THE COURT:  Based on the conversion
20  rate in the second quarter of '01, what would they
21  have done with the pipeline as of Minton's
22  January 22nd upside report?
23          MR. de GHETALDI:  They would have come
24  out with a number that was very close to the forecast.
                                                    303

1  And if the Court will recall, the forecast numbers
2  generate about 10.7 cent EPS.
3          THE COURT:  What was the ratio for the
4  prior quarter?
                    Page 18

80090341.TXT

5          MR. de GHETALDI:  What was the ratio
6  for the prior quarter?
7          THE COURT:  The conversion rate or
8  whatever --
9          MR. de GHETALDI:  This chart shows the
10  accuracy of finding the -- I would also like to point
11  out in their opening brief and Ms. Minton's affidavit
12  she testified that they looked at all of the previous
13  quarters in the prior year and came out with some
14  numbers that were -- that they said -- I'm sorry --
15  were within the forecast.  The forecast, again, is not
16  the -- is not the potential.
17          THE COURT:  Right.  It's the unit
18  level projections.
19          MR. de GHETALDI:  Right.  This
20  information is in Charts 53, 54 and 55.  I will
21  concentrate on 55, because that is sort of the
22  summary.  And the third page of Exhibit 35 -- I'm
23  sorry -- 55 shows calculations with Q3 '01 forecasts
24  and Q3 '00 conversion rates at the top, and at the
                                                    304

1  bottom, Q3 '01 forecasts and Q2 '01 conversion rates.
2  You have got them for every two weeks of the first two
3  months.  And you can see the calculations and where it
4  comes out.  You can compare down at the bottom of the
5  page -- you can see how close the forecasts are to
6  using the historical conversion rates to the forecast.
7  You can see how far away those numbers are from the
8  guidance.  They are about $60 million off from the
9  guidance.
10          THE COURT:  Week 6 is what?
                    Page 19

8D090341.TXT

11      MR. de GHETALDI: Week 6, according to
12 their pipeline reporting package, is January 15th.
13      THE COURT: Okay. You are saying in
14 the pipeline -- you are using this to the pipeline?
15      MR. de GHETALDI: Yes. There -- I'm
16 sorry. The pipeline numbers for those weeks of those
17 quarters.
18      THE COURT: Okay. So that's the
19 pipeline. And then you use the conversion rate. What
20 conversion rate did you use?
21      MR. de GHETALDI: I used --
22      THE COURT: Your conversion rate
23 bounces around.
24      MR. de GHETALDI: Yes. This is a
                                                    305

1 conversion rate -- the pipeline reporting packages
2 contain two built-in errors. One is, as I explained
3 yesterday, that they use pipeline numbers which are in
4 U.S. dollars and actual results which are in constant
5 dollars. I used U.S. dollars to calculate -- that's
6 in the earlier two charts. I used U.S. dollars to
7 calculate the conversion rates.
8      THE COURT: Is that how the EMC did
9 it?
10      MR. de GHETALDI: No, it's not, Your
11 Honor.
12      THE COURT: It's not how they do it?
13 Then tell me how it comes out how they did it.
14      MR. de GHETALDI: Well, I didn't do
15 that calculation. But I can say that on -- and the
16 numbers are not available, because in the pipeline
                Page 20

8D090341.TXT

17 reporting packages, there is -- there is some kind of
18 an error in the Excel sheet that they used to generate
19 it.
20      If you examine the January 15th
21 pipeline reporting package, for example, it shows a
22 pipeline of $2.7 million. Then it purports to apply a
23 52 percent or a 51 percent conversion ratio to that,
24 and derives a forecast of $1.6 million, which is -- I
                                                    306

1 mean, just anybody can see that that is not half of
2 2.7.
3      THE COURT: Anybody can see it if in
4 the middle of a busy meeting about a lot of things
5 they actually sort of focused on that. For example,
6 is there a difference between the word "assess" and
7 "access"?
8      MR. de GHETALDI: Yes.
9      THE COURT: If that word were in a
10 document, used the same way incorrectly several times
11 and not picked up, could it be that smart and rational
12 people were still smart and rational but didn't focus
13 on that?
14      MR. de GHETALDI: That is a
15 possibility, Your Honor.
16      THE COURT: So could that be the
17 possibility here, that people really didn't pick that
18 up?
19      MR. de GHETALDI: Yes. That's one of
20 the reasons why summary judgment is not appropriate
21 here, because there are different possibilities.
22      THE COURT: So -- I mean, summary
                Page 21

8D090341.TXT

23 judgment is appropriate because you did an after-the-
24 fact analysis, that was never done by defendants at
                                                    307

1 the time, and you believe they should have picked up
2 what was on the actual things that were looked at as
3 an error?
4      MR. de GHETALDI: I believe they
5 should have picked up that one, Your Honor.
6      THE COURT: Should have? Is this a
7 care case?
8      MR. de GHETALDI: No, it's not, Your
9 Honor.
10      THE COURT: You don't know the ratio
11 in constant dollars. If you had used --
12      MR. de GHETALDI: The one they used
13 was apparently 51 percent.
14      THE COURT: If they used the prior
15 year --
16      MR. de GHETALDI: The one they used
17 was apparently 51 percent, instead of 48.
18      THE COURT: Okay. So if they split
19 the difference, where would they have come out? If
20 they had said, "Based on the de Ghetaldi standard,
21 that this has become -- historically, the prior
22 quarter of the prior year is the best way to look at
23 this, but we now -- we have got this really sharp guy
24 on staff, and he is saying we have to take a closer
                                                    308

1 look at what is currently going on. So why don't we
2 equally weight those?" How close to the mark would
                Page 22

8D090341.TXT

3 they have come?
4      MR. de GHETALDI: They would be
5 somewhere between the guidance and the forecast.
6      THE COURT: How far off of guidance
7 would they be?
8      MR. de GHETALDI: They would be -- I'm
9 not sure. I would have to do it on paper.
10      THE COURT: Pretty close?
11      MR. de GHETALDI: It would be close,
12 yes.
13      THE COURT: So -- so then -- the
14 question is -- "Let's halt trading because we have a
15 smart guy now that says we are going to have to take a
16 closer look at these results. He only has a couple
17 months of experience to show us, but he may be right.
18 And if at the end it turns out he's wrong and it was
19 really 52 percent, it's no big deal. We just halt the
20 trading."
21      MR. de GHETALDI: The next point.
22      THE COURT: Is that what they are
23 supposed to do?
24      MR. de GHETALDI: Your Honor, you are
                                                    309

1 making this personal. I don't appreciate it.
2      THE COURT: I'm not.
3      MR. de GHETALDI: You are.
4      THE COURT: Mr. De Ghetaldi, I'm not
5 making it personal. You are a very bright man. You
6 did a lot of bright analysis. You are pressing upon
7 me -- and maybe it's because you separated the
8 argument. You are the affiant. And you did all these
                Page 23

8D090341.TXT

9 analyses. You are not testifying at a witness, but
10 you sort of are. So I apologize if I mention your
11 name, but I can't not mention your name, because you
12 did all this stuff. You are not showing me stuff that
13 Mr. Henley did.
14        So I really do apologize if you are
15 taking it personally in that way. You are the one on
16 your team who put yourself in this. You filed a
17 27-page document. You said the personal knowledge you
18 used is you are the guy who was closest to this, and
19 you did all these financial examinations. You are
20 almost like an expert witness here. So I really do
21 apologize -- I sincerely do -- if you are taking it
22 personally. I won't mention your name at all, but if
23 you are going to -- you have made personal charges
24 against other people. And I have to examine the
                                                    310

1 validity of those. And when you are suggesting that
2 people should have done things, I need to know whether
3 they in fact did it, and what they did in comparison
4 to what you did.
5        So that's where I'm coming from. I
6 regret any personal insult you take from that. You
7 are a very bright guy. That's why I'm asking you all
8 these questions.
9        MR. de GHETALDI: Okay. I sensed a
10 note of sarcasm, which is what I reacted to.
11        THE COURT: It's a frustration.
12 Again, I asked the -- I asked you all before you wrote
13 your briefs -- and we had conferences about what I
14 understand the legal focus of a case like this to be,
                    Page 24

8D090341.TXT

15 which is on the information that was known to people,
16 and what they did with it in reality.
17        Now what you are saying is because
18 they had reams and reams of every possible piece of
19 data, and that they had various things, that they had
20 the ability to calculate things that you did. That
21 puts me in the position of having to ask you what they
22 in fact did and whether there is any basis to believe
23 they in fact did what you suggest they should have.
24        MR. de GHETALDI: I'm happy to answer
                                                    311

1 those questions.
2        THE COURT: That's what I have been
3 asking you.
4        MR. de GHETALDI: That's what I have
5 been answering, or trying to.
6        THE COURT: But it's also a point of
7 -- I really also in the business world have to know
8 that they had someone on their staff who had given
9 you the package -- right? What they would have in
10 fact done. And that's why I was asking you the
11 question about whether they might have split the
12 difference, and how that would have come out, and
13 whether that should have triggered on their part some
14 appropriate corporate response.
15        MR. de GHETALDI: And --
16        THE COURT: Because the law has to be
17 practical. Right?
18        MR. de GHETALDI: Yes. It does. And
19 what --
20        THE COURT: You wouldn't --
                    Page 25

8D090341.TXT

21        MR. de GHETALDI: I'm trying --
22        THE COURT: It hurts stockholders if
23 companies went around putting out false alerts all the
24 time.
                                                    312

1        MR. de GHETALDI: We are not asking
2 the company to go putting out alerts. We are talking
3 about not trading when they know that leading
4 indicators of their business are not performing the
5 way that they had in the past, not performing the way
6 that they should be. That's what we are saying.
7        Now, the final indicator is the growth
8 cap, which Mr. Lane had called the comfort gap, which
9 Mr. Henley called the growth gap.
10        THE COURT: There is Mr. Lane in the
11 case?
12        MR. de GHETALDI: No, he's not. I'm
13 mentioning that to let the Court know --
14        THE COURT: I don't need to hear it
15 from Mr. Lane unless he wants to put his name under
16 oath.
17        MR. de GHETALDI: That's fine. In
18 affidavits in support of this motion, both Mr. Henley
19 and Ms. Minton denied they ever heard of such a thing
20 or ever looked at such a relationship. That is a
21 relationship between the forecast growth and the
22 pipeline growth. At their depositions, both
23 defendants testified that they customarily looked at
24 that relationship. Mr. Ellison, in the first day of
                                                    313

1 his examination, volunteered that he did that.
                    Page 26

8D090341.TXT

2        THE COURT: Is there a possible
3 reconciliation that they really didn't think of it in
4 the words that you did?
5        MR. de GHETALDI: No, because they
6 said they never heard of such a thing or looked at
7 such a relationship. I think it's pretty clear.
8        THE COURT: Between the two factors?
9        MR. de GHETALDI: Yes. Mr. Ellison
10 testified that he might be concerned if the pipeline
11 was only growing a little faster than the forecasts.
12 And that is exactly what was happening, that very
13 early in the quarter, those numbers were coming
14 together. And this, we believe, based on the past
15 experience, was something that had happened only at
16 the end of the quarter, and not so early in the
17 quarter.
18        So this is another point that -- can
19 you show the gap chart, so we can see it graphically?
20        THE COURT: You are going to have to
21 think about how you are going to use your time.
22        MR. de GHETALDI: I'm almost done.
23        THE COURT: I want to give the
24 defendants a half hour.
                                                    314

1        MR. de GHETALDI: I'm almost done.
2        THE COURT: We will stop at 11:00.
3        MR. de GHETALDI: You can see the
4 pipeline growth, which is the yellow, was right at the
5 potential growth as of December 25th. There is no
6 difference there. And so there is no cushion there in
7 terms of deals falling out of the pipeline. They are
                    Page 27

80090341.TXT

8  going to have to get all of that growth that they are
9  seeing -- that they want out of the potential from the
10  growth that they are seeing in the pipeline.
11          So I just want to wrap up quickly.  I
12  would like to ask the Court to review, again, the
13  portions of our brief where we discuss the evolving
14  reasons for Mr. Ellison's sales, how he testifies at
15  one point that the options were the reason, but his
16  loans were not, and later he has different reasons,
17  Mr. Ellison's reasons, for the timing, where he
18  testifies at one point that tax issues were not
19  involved, and later they were, and when he told
20  Mr. Simon to sell.
21          I think that initially he, in the
22  second SLC interview -- he told the SLC that he told
23  -- that he decided to trade while Mr. Simon was away
24  on vacation, which was between January 5th and
                                                    315

1  January 19th.  Later on, that story evolved.  He tried
2  to push it back to December; that is, his decision to
3  trade.  So what I think is really the most compelling
4  reason for Mr. Ellison's trade -- and the timing is
5  absolutely critical -- is the Garnick January 17th
6  e-mail, two days -- two days before he told Mr. Simon,
7  when Mr. Simon returned from his trip to New Zealand,
8  to start trading the next week, January 19th.
9          THE COURT:  Why would Larry Ellison do
10  that?  Is it just the kind of reckless person who
11  makes -- I mean, sort of does risky things for fun,
12  that seem to be self-evidently stupid?
13          MR. de GHETALDI:  He did testify that
                    Page 28

14  he does take risks when the reward is big enough.  You
15  know, again, I can not get into his head, but he had
16  testified that he thought in early December, "Gee, we
17  are going to do 16 cents here.", That ceatainly wasn't
18  going to happen by the middle of January.  I mean,
19  even that drop in his own mind, I think, would have
20  been a material fact that should have prevented him
21  from trading.
22          THE COURT:  A drop in his own mind?
23          MR. de GHETALDI:  Yes.  You asked me
24  repeatedly about what I thought Mr. Ellison was
                                                    316

1  thinking.
2          THE COURT:  Right.
3          MR. de GHETALDI:  And that is one
4  thing that we do know that he was thinking, that it
5  dropped in his own mind from 16 cents to around 12 by
6  the middle of January.  So with that, I will turn it
7  over.
8          THE COURT:  I understand what you are
9  saying on that.  I want to repeat for you, because I
10  mean I -- it's important that you understand.  I feel
11  badly if you feel this was personalized.  You have to
12  understand that judges of this Court take very
13  seriously their obligation to read records, and to
14  examine them.  And ordinarily, the way I would be
15  talking about charts like this would be saying, you
16  know, "well, if Oracle had somebody like Doctor Blank
17  who had done this, what would they have done?"
18          MR. de GHETALDI:  I understand, Your
19  Honor.
                    Page 29

80090341.TXT

20          THE COURT:  You were in the role here,
21  almost, of an expert witness.  And as a result,
22  instead of you being able to come up here with the
23  distance, and me be able to refer to Professor
24  Fischell, or something like that -- you know, if Larry
                                                    317

1  Ellison were arguing this pro se, this would be a
2  fairly difficult thing for him to not take personally.
3          I want you to realize -- I think you
4  have a feeling, now, of what it's a little bit like to
5  be an actual defendant in a case, or an expert
6  witness, because that's how they get talked about.
7  It's not any insult.  It's because they put themselves
8  on the line as a witness.  I just want to say it's not
9  meant that way, and it's just the unique position you
10  have occupied among your friends on the plaintiff's
11  side.
12          MR. de GHETALDI:  Thank you, Your
13  Honor.  I do understand.
14          THE COURT:  Good morning, Mr. Tabacco.
15          MR. TABACCO:  Good morning, Your
16  Honor.  Nice to see you again.  I do appreciate the
17  indulgence.  I'm reminded, the few times that I have
18  been before this Court, indeed, the standard that is
19  required of the lawyers here, and the standard that
20  the Court sets in terms of the preparation.  I mean,
21  it really is quite extraordinary.  We are put to the
22  task.  We deserve to be, and I think that challenge
23  brings us back as lawyers.  I say that optimistically,
24  knowing that probably in the next 20 minutes I'll be
                                                    318
                    Page 30

80090341.TXT

1  sorry I said that.
2          But if I could kind of switch the
3  debate a bit, I fortunately am not in Mr. De
4  Ghetaldi's position, in that I did not do that
5  analysis.  We divided our argument a bit differently
6  than my friends on this side of the table.  I do not
7  have the -- Mr. Wachbar's steeped knowledge of
8  Delaware law.  But I bring, you know, to this
9  argument, at least, the experience that I have had for
10  a couple decades of doing this kind of litigation.
11          I'm just going to touch on -- kind of
12  do it in reverse, you know, really, what -- I want to
13  paint a picture of what the larger environment was,
14  that the considerations that were being done in EMC
15  meetings on Mondays were taking place -- what was the
16  backdrop of that?  I'm going to talk a bit about what
17  Doctor Fischell has done.  I'm going to remind us --
18  and talk about one of your favorite Supreme Court
19  cases -- on our role in summary judgment, and the
20  standards we face.
21          I think it's very difficult for all of
22  us as advocates, in the context of a trial court, to
23  keep in mind the reins that are required.  But I think
24  it is important.  And you know, with that, I just will
                                                    319

1  outline a couple of things.
2          Mr. Eth always reminds me that these
3  are my best facts, and I start with Mr. Ellison's
4  trade of $900 million; first time in five years;
5  extraordinary event, really, by any measure.  And you
                    Page 31

80090341.TXT

6  contrast that -- and undoubtedly, certainly, you have
7  taught us a lot about your knowledge of this record.
8  We are not going to get back into that level of detail
9  unless you need to, but there was no question that
10  what gets painted with Mr. Ellison, at least at the
11  top, is a man who is supremely in control of his
12  company.
13          As I talk about this, and I'm going to
14  keep an eye on the clock, so my friends have an
15  opportunity to respond -- I was thinking about what is
16  it like at the top, if I could possibly envision that.
17  I have the advantage of living relatively close to --
18  in Silicon Valley. You hear the legends and read
19  about the legends.
20          THE COURT: See the F-16?
21          MR. TABACCO: I haven't seen that. We
22  did point out from our office, when we took the
23  deposition, where his sailboat sailed. He is the
24  consummate competitor. He plays to win.

320

1          While we are not going to sit here --
2  I wouldn't want to deprive you of the opportunity to
3  make those judgments of him in person at trial. When
4  you ask those questions, which we are not going to be
5  able to respond to, about what are the motives, I
6  think you have to step back and understand where he
7  was in Silicon Valley at the time. And you know, when
8  you look at, again, the trades, I think Judge
9  Ferguson, just the other day, in the Ninth Circuit,
10  remarked about the fact that you can't just look at
11  the argument that's being made, that this is just

Page 32

80090341.TXT

12  2 percent of the sales.
13          Let's face it. It's $900 million. He
14  couldn't have gotten much more off than he did without
15  trashing the market. I think there is pretty good
16  evidence of that. And of course, Mr. Cooperman was
17  very strict, at least, about trying to discourage, if
18  not as a matter of policy at the time, the February
19  trade. You have trades that started January 22nd and
20  go right up to January 31st.
21          And just a slight spin on what Mr. --
22  what was said about my friends yesterday. I can't
23  remember who made the point. I think it was closer to
24  the eighth or ninth week of trading, not the sixth

321

1  week of trading, that those trades began. It's four
2  weeks before the shortest month of the year ends the
3  quarter.
4          Getting back to the standards here.
5  The moving party bears the burden of demonstrating the
6  absence of any material fact. Obviously, that is your
7  job. We hope we made it a tough job for you. We will
8  find out if we have.
9          THE COURT: The enormity of the record
10  on both sides has already made it at least a time-
11  intensive job, but -- it's interesting -- must be
12  interesting for you -- when you look at the P -- the
13  federal act practice. I can never say that. I get
14  PL. I always forget what comes next. The reform act,
15  or whatever they call it.
16          Most of the practice is now focused on
17  whether some complaint creates a strong inference of

Page 33

80090341.TXT

18  scienter. And what you are saying to me is I have got
19  essentially a procedural standard at the Rule 56
20  thing, that even if I have this enormous amount of
21  information, things like Larry Ellison saying silly
22  stuff -- I don't mean -- I mean, I take very seriously
23  what Mr. de Ghetaldi said at the end. But if Larry
24  Ellison -- if he thought they were going to hit 16 and

322

1  now it's a horse race to 12, you know, that's a fairly
2  big difference.
3          And so what you are saying is I have
4  got to -- that kind of stuff at this stage, I can't
5  sort of reconcile that, "This guy is just some sort of
6  loose talker"?
7          MR. TABACCO: I think you have to
8  balance it. It's all contextual. When we talk about
9  materiality, and is it going to be a bright line or is
10  it going be case by case, I'm clearly going to come
11  down on case by case. I think, hopefully, you will
12  agree to that standard, because materiality is by its
13  very nature: What happened, and when did it happen?
14  In fact, even this company -- I was thinking about
15  this when they talked about comparisons.
16          What makes this case so unique, and
17  perhaps why you don't see it often in this Court, is
18  it's pretty rare when we bring these serious charges.
19  These are serious charges. You made that point. I
20  couldn't agree more. You can not just cavalierly say
21  this guy just walked in and took $900 million that he
22  wasn't entitled to, unless you have some basis to do
23  that.

Page 34

80090341.TXT

24          Now, the difference, of course, is:

323

1  what was the environment in Q3 '01? You touched upon
2  that, your Honor. You recognized -- you obviously
3  have read the papers about this. But one of the
4  charts I have -- Mr. -- I have my own charts.
5          THE COURT: Charts are a very personal
6  thing.
7          MR. TABACCO: Very personal. I have a
8  chart of the -- as a professional courtesy, I showed
9  it to my friends, and they looked at it one second and
10  said, "You have a typo."
11          MR. SALPETER: But I said I wouldn't
12  object to it.
13          MR. TABACCO: This is the calendar.
14  If we need it, we have it. What this chart is is a
15  snapshot of the stock price movement during the --
16  essentially, during September 1st through March 31st.
17  We talked about the stock being close to historical
18  highs. And one of the things I will talk about in a
19  few minutes -- and I will go back, with your
20  permission -- is the volatility that is dramatically
21  represented by this graph. And it's important in
22  setting the stage. That is the total mix of
23  information. You at least consider the environment
24  and what was going on at that time.

324

1          One of the things that we made some
2  noise about is what happened to the stock on October
3  the 3rd, 2000? On October the 3rd, 2000 -- do we have
4  that? There is a little news article that reports

Page 35

80090341.TXT

 5  where Oracle stock suddenly dropped 9 percent in one
 6  day.  And what it was --
 7            THE COURT:  Henley had a bad day or
 8  something like that?
 9            MR. TABACCO:  Yeah.  He actually had
10  the flu.  But he apparently had bad body language.
11  It's not even bad; just less enthusiastic.  If it was
12  bad, it might have gone down even further.
13            THE COURT:  Should have been on one of
14  those NBA -- Laker girl, or something.  The Laker
15  girls had less enthusiastic body language last night,
16  signalling an end to the dynasty.
17            MR. TABACCO:  Clear warning sign.
18            What is the point of that?  The point
19  of that is that everything he said in there was pretty
20  upbeat.  He didn't say anything wrong.  He just said
21  it in a way that wasn't very convincing.  I mean, the
22  guy didn't feel well.  The stock drops 9 points.  It's
23  a nervous time.  In Silicon Valley, Mr. Ellison is
24  good friends with Steve Jobs, good friend with all the
                                                    325

 1  folks in that valley.  It's a closed community.  They
 2  watched as the dotcoms went meteorically up and
 3  meteorically down.  That happened in March of '00.
 4  Nine months earlier, you had the highest peak in the
 5  NASDAQ.  From March '00, it's really sliding down.
 6            The context of the third quarter '01
 7  was unquestionably a high degree of uncertainty.
 8  Doctor Fischell talks about -- I think it was my
 9  friend Mr. Nachbar that made the point about, "Well,
10  Oracle was kind of leading because they were among
                                                    Page 36

80090341.TXT

11  the -- ahead of time, they were leading the first
12  sales."  At paragraph 16, Doctor Fischell highlighted
13  a few of what I assume Oracle argued to Judge Walker
14  were the competitors' results in the immediate
15  preceding couple of weeks and months before that.
16            Ariba stock declined by 19 percent on
17  January 12th, following announcement of December
18  quarter sales were slightly below.  BEA Systems price
19  declined 13 percent on January 8th.  Cognos,
20  December 22nd, down 29 percent.  J.D. Edwards,
21  25 percent, December 21st.  Anybody, indeed --
22            THE COURT:  This was on the end of
23  those folks' quarter, previous quarter?
24            MR. TABACCO:  That's right.  They are
                                                    326

 1  reporting their results as they are coming up.
 2  Peoplesoft, obviously, we know that one.
 3            THE COURT:  A love match, really.
 4            MR. TABACCO:  That's right.
 5  January 31st.  And Siebel, which Oracle at least
 6  claims is a competitor, December 19th, declined more
 7  than 19 percent.  Credit Suisse noted concerns about
 8  moderating growth.  As an analyst's report.  It's
 9  not even a company disclosure.
10            And you know, those are the things
11  that these two gentlemen were aware of as they are
12  telling the market, "We are unaffected.  Everything is
13  on track.  Everything looks terrific."  They say it on
14  December the 14th.  They say it on January 7th.
15            I think the analogy here -- there is
16  always a danger with this, Your Honor.  It's either
                                                    Page 37

80090341.TXT

17  sports or cars.  I will try cars.  Oracle really was a
18  Ferrari.  It was piloted by a guy that goes full
19  throttle.  This car goes 140 miles an hour.  It's
20  blown past its competitors.  I mean, it's a
21  spectacularly successful company.
22            You only get there when you are a
23  driven person.  When you talk about the mentality of
24  the people that work for this pilot, our driver, you
                                                    327

 1  have to recognize that -- I don't know.  There is
 2  really no room for Scotty on the starship.  If you
 3  say, "Sorry, Captain.  I can't possibly do this," you
 4  are off.  You are off the ship.  There is no room for
 5  anybody, despite the impossible odds, to say to their
 6  boss, "We can't do it.  We are not going to make it."
 7            One of the concerns you expressed
 8  yesterday was, "Well, gee, how come no one was out
 9  there saying these things?"  If you look at the
10  history of Oracle -- that's what a trial is for -- we
11  will be able to demonstrate convincingly -- and
12  perhaps Mr. Nussbaum will help us -- that if you are a
13  nay-sayer, even when most of the time it works, it
14  could create an environment where there is some
15  distraction from what is reality.  I don't think it's
16  sufficient to say, "Well, gee, nobody was really, you
17  know, coming up with an e-mail that was saying, 'All
18  hell is breaking loose.'"
19            I'm painting a picture.
20            THE COURT:  I understand that.  But I
21  think the question -- it seems like, though, how --
22  even if the Ferrari driver was pretty intense, that
                                                    Page 38

80090341.TXT

23  the divisions had responded to that by being
24  conservative, so they didn't disappoint the Ferrari
                                                    328

 1  driver, and that Minton had a similar sort of approach
 2  to it.
 3            And I guess the question in terms of
 4  the law in this kind of thing:  Okay.  You might be in
 5  a high-risk business.  I think for a reasonable-
 6  investor standard, in terms of materiality, they had
 7  to know this was a risky business, and they were
 8  investing in the Ferrari, too.  And if the Ferrari had
 9  always made the hairpin turns, you know, the fact that
10  it had to make another one, does that turn into
11  something you have to ban trading on?
12            What if they had -- I don't know what
13  could have happened at that point in time in terms of
14  the economy.  It's difficult to turn around in the
15  economy.  What if they ended up making their number?
16            MR. TABACCO:  You know, depends -- it
17  would have depended how they made it.
18            THE COURT:  Assume they made it with
19  real -- I agree with you.  You are focused on what --
20  obviously, revenues matter in a growth company.  It's
21  not just a penny per share.  If they got a special
22  thing, that wouldn't matter.  But -- or that they did
23  like, you know, 24.2 percent license growth.
24            MR. TABACCO:  Right --
                                                    329

 1            THE COURT:  I mean -- and they halted
 2  trading.  Is that the idea, that, well, that was just
                                                    Page 39

80090341.TXT
3 the safe thing to do?  If it's a horse race -- if it's
4 going to be a horse race to meet your numbers,
5 companies generally ought to have a policy to halt
6 trading?
7            MR. TABACCO:  I think that's where --
8 I know -- I'm hopefully -- will try to address it.
9 The difference between an insider trading and a
10 disclosure case -- my friends rely upon Shaw.  I love
11 the First Circuit.  I grew up in Boston.  I don't
12 think you have to look at the Shaw standard.  Even
13 Shaw wasn't totally dismissed.  There were some things
14 that went on, digital equipment --
15            But I think there is actually more
16 lessons, that we can learn by looking at the case law,
17 that comes closer to home.  We have the Zirn case.
18 Zirn is a terrific case.  Zirn happens to be a
19 disclosure case, but in Zirn, the Delaware -- I think
20 it was the Delaware Supreme Court said you didn't --
21 "you talked about the dangers that your patent might
22 not be approved, but what you didn't mention at all is
23 that patent counsel thinks there is a terrific chance
24 it's going to be approved, and he is very optimistic."
330

1            If you talk about a standard in the
2 context of that case, again, fact specific, an opinion
3 of the lawyer, Mr. De Ghetaldi's lawyer -- in the
4 opinion of a lawyer, you have a material, according to
5 the Court, omission by not disclosing that.
6            So I think that we can look at cases
7 that are closer to home to get a feel for how this
8 fits into the context of this environment.
Page 40

80090341.TXT
9            THE COURT:  Would you agree the bench
10 mark for this type of case has got to be the gap that
11 there is -- there is an exploitable gap between what
12 the market has been told about the company's
13 expectations and the knowledge that the insider has?
14            What I mean by that -- think about
15 this.  Let's get back to Mr. Ellison, one of his
16 interesting statements, the 16 cents.
17            MR. TABACCO:  Yes.
18            THE COURT:  There wasn't anything for
19 him to explain.  He actually could have been injured
20 by that.  If he -- say actually the numbers -- Oracle
21 was going up to where they were going to hit 16 cents
22 and he was forced to sell his options in that period
23 to pay taxes.  I mean, he actually could have been
24 disadvantaged, in a weird way.  He actually knows,
331

1 "Look I'm selling into a market where I gave them 12
2 cent expectations, and I think it's going to be 16,
3 but my windows are closing and I have got to pay taxes
4 now."
5            We are all talking relative money.
6 When it gets into the billions, some of us have hard
7 times identifying with it.
8            MR. TABACCO:  We can move the decimal
9 point.
10            THE COURT:  Right.  Isn't really what
11 matters for the concerns that animate insider trading
12 policy, the exploitable gap between those people who
13 were trading in the market that day -- the information
14 they have about the company and what the insider has
Page 41

80090341.TXT
15 that is trading?
16            MR. TABACCO:  Well, I think that
17 that's the fear and that's the concern.  And I think
18 that actually, we don't have to look any further than
19 the Oracle trade policy itself.  We made that point in
20 our brief.  The Oracle trading policy sets a standard
21 that I'm sure my friends would argue is far beyond
22 what is required by law.  We think it should be
23 applicable in this case.  But when they talk about
24 materiality in the Oracle trading standard, obviously,
332

1 that is a deliberate, considered policy -- there is
2 no indication to the contrary -- that any information
3 that would be of interest to investors fits within
4 that definition of "material."
5            THE COURT:  Yeah.  That's a really --
6 that's a crazy definition, in the sense that --
7            MR. TABACCO:  I didn't write it.
8            THE COURT:  I mean, it's absolutely
9 crazy.  If I were a market analyst at Goldman Sachs, I
10 would say, "Ms. Minton, put me on the upside
11 distribution report.  This is really cool stuff, and I
12 will write great stuff every two weeks."  And -- I
13 mean, it clearly would be of interest.  Month to month
14 actuals for most companies would be of interest.
15 Right?
16            MR. TABACCO:  Well, I suppose, as you
17 said the other day.  Absurd example would be the
18 online -- my friends mentioned have online trading
19 available --
20            THE COURT:  I'm not so sure it would
Page 42

80090341.TXT
21 be absurd if we are zero -- I'm not saying this case
22 is about that, but this whole idea that everything is
23 an 8-K event -- somebody wore a really ugly tie, and
24 they are a key executive, and it suggests -- at a
333

1 fashion firm, and it suggests aesthetic
2 impoverishment, we better put it into an 8-K."  You
3 were pointing to somebody's tie?
4            MR. TABACCO:  No.  Our --
5            THE COURT:  Yeah.  Exactly.  You know
6 what I'm saying?  Isn't what you have to do in terms
7 of making it sensible -- this is where I'm trying to
8 get at -- the reason I'm focusing on what they would
9 have disclosed is because I think although it's not a
10 disclosure case, it's a useful kind of lens to look at
11 it, because what is it that they would have told the
12 market, had they been in a period where they were
13 making a secondary offering, or something like that?
14            As I understand when you might have to
15 disclose on an 8-K a monthly -- monthly results would
16 be when the total mix of information in the market as
17 of that time is essentially rendered materially
18 unreliable by an event of some kind, a development.
19 So if your first month was a complete disaster, and
20 you had gone and you had given estimates, you know --
21 you are the Dupont Company, and you know your revenue
22 is pretty much kind of month to month, and you
23 basically -- your sales have just -- your sales have
24 plummeted.  You have now got a product liability
334

1 judgment somewhere.
Page 43

8D090341.TXT

2          As I understand the way the law would
3   work, you know, if DuPont was doing something out in
4   the market where they were trading, it would trigger a
5   disclosure obligation. Right? And if they are
6   insiders, they would then have to a -- there would be
7   tangible facts that would contradict the market's
8   expectations. Right?
9          MR. TABACCO: I think -- and I
10  understand. You are trying to find out where in the
11  continuum to draw this line.
12          THE COURT: Right. What I'm concerned
13  about -- and that's why I pressed hard about it. I
14  understand Mr. Ellison might be a Ferrari driver, and
15  he says a lot of interesting things, which -- but this
16  is not the first time that they had received upside
17  reports that had been below their guidance, that it
18  had happened within the year, that though you guys
19  have done a good job focusing on softening, and things
20  like that, using legitimate historical ratios, you
21  know, rational people could and apparently did believe
22  they were on track to meet their numbers. The
23  question is how many indicators -- how do I fashion a
24  rule? How do I understand this? You have to address
                                          335

1   Brophy a little bit.
2          MR. TABACCO: Okay. Let me help you
3   with what the rule is. The rule has to be case by
4   case. That's not very helpful. Let me try to put a
5   finer point on that. Case by case in the context of
6   the environment that affects it.
7          In the patent case, the Zirn case,
                    Page 44

8D090341.TXT

8   obviously, you know, sometimes opinions are of no
9   weight. They are puffery. In the context of that
10  case, that was considered to be very significant. In
11  the context of this case, what were the analysts
12  focusing on?
13          The one thing that my friends never
14  talked about yesterday, and you touched on it briefly,
15  was the February 8th analyst's report by Mr. Phillips.
16  Mr. Phillips, who obviously was considered by
17  Mr. Ellison to be so good he hired him off the street
18  and brought him into the company. I don't think there
19  is a question of Oracle's view of his credibility.
20          He issues a strong buy on February the
21  8th. And what he says is -- and on that report --
22  everyone looks at Phillips, for Oracle. He was the
23  guy at that time, you know. There are others who were
24  known for other industries. There is no disparagement
                                          336

1   to those fellows. He says, "Strong buy, but I am --
2   there is a softening in the license revenue." We have
3   gone from -- what did he say? "I'm downgrading it to
4   17, but that -- no problem. We are still going to
5   make 12 cents a share."
6          The point of that is that the Ferrari
7   -- we are not talking about some lumbering Land Rover
8   that goes over a bump and you don't notice it. This
9   car is going 140 miles an hour, and the analysts are
10  asking him, "We notice you have gone from a four-lane
11  paved highway to a dirt road. Is that affecting your
12  ability to get there and maintain 140 miles an hour?"
13          The company is saying, "It's not
                    Page 45

8D090341.TXT

14  affecting us. Everything is great." All of a sudden,
15  there is a little pothole, and that pothole jars this
16  car. That is the kind of stock performance we are
17  talking about. We are not here to draw inferences.
18  You and I know that. We keep doing it, but we should
19  avoid it.
20          If we look at it in the context of
21  where Mr. Ellison was when he gets actual January 17th
22  December results, he says, "Where is the growth?" He
23  knows that his competitors, you know, as Mr. Fischell
24  points out, are dropping left and right. He hadn't
                                          337

1   traded a stock in five years. The compliance
2   department isn't really ready for him to step to. We
3   will talk about the fact that this trade didn't fall
4   within the guidelines of how they are supposed to do
5   things. We are not going to make a big deal about
6   that. He was supposed to get Mr. Henley's opinion, as
7   well as Mr. Cooperman.
8          THE COURT: Nobody got Henley.
9   Cooperman would sort of send some e-mail to Henley, if
10  somebody asked, and that's the way they did it?
11          MR. TABACCO: Yeah. That, to me, is
12  interesting, but it's a little -- it's certainly of
13  concern to a court in a state where the corporation --
14  and you really want to see compliance with procedures.
15  But we are not saying that is a linchpin of the case.
16  It's interesting.
17          Of course, Mr. Cooperman himself would
18  say he ordinarily would inquire of people what
19  information they had. He didn't ask Mr. Ellison.
                    Page 46

8D090341.TXT

20  Again, the thrust of that is that perhaps Mr. Ellison
21  gets treated a bit differently. It may be -- maybe
22  explains why, as part of the game of life, he --
23  another way to look at it -- I don't know if it's evil
24  as much as it is his perception: "It's mine. I'm
                                          338

1   going to take it." It seems to me, having not sold a
2   share of stock for five years, a rational fact-finder,
3   having incurred the whole panoply of information that
4   this hands-on executive has, could rationally conclude
5   that he should not have traded, because he knew that
6   they had just -- there was a pothole that was about to
7   hit the right front tire, or it had already hit the
8   right front tire.
9          THE COURT: As I understand, if he had
10  had Mr. Phillips' views on February 8th and he thought
11  Mr. Phillips was right, I agree with you that would
12  have been -- if Ms. Minton had said, "I'm..." -- if
13  she had given him that same thing -- that's not what
14  he was given. Right?
15          MR. TABACCO: No. But the Garnick
16  e-mail is telling him -- we didn't tell him to back --
17          THE COURT: He didn't know who Garnick
18  is. Right?
19          MR. TABACCO: He got the e-mail;
20  didn't he?
21          THE COURT: He got the e-mail. I
22  mean, he had the actuals. I mean, I think there is no
23  doubt that he did. I mean, he said that. But he also
24  got an upside report around the same time. Right?
                                          339
                    Page 47

BO090341.TXT

1 The 22nd, he got one; he got one the 15th; that both
2 show they were making their number.
3           MR. TABACCO: Right. That goes back
4 to my legal standard issue. We have got this. They
5 have got that. That's why at this stage I think there
6 has to be a balancing. I know that is a tough debate
7 for both sides.
8           THE COURT: That's what I'm trying to
9 think about. I have to formulate something sensible
10 here.
11           You have ten minutes to get to Brophy.
12 You probably want to do that. The market is thinking
13 12. It's thinking about 25. I think Mr. De Ghetaldi
14 was candid. I guess they hit 33-and-a-half in
15 December and January. When he got that e-mail on
16 January 17th, though, it was only about December. It
17 wasn't about all of January. Within historical
18 ratios, I mean, this was achievable at that time.
19           MR. TABACCO: I understand, Your
20 Honor. And again, I think that were this to be a
21 trial, I could -- perhaps this is the great debate
22 here today. In helping you craft a summary judgment
23 ruling, I think you have to give us, according to what
24 the Supreme Court of the state tells us, all
                                                  340

1 inferences at this stage in our favor. We can draw
2 the inference that the Garnick December news was the
3 pothole at 140 miles an hour. We can ask for that
4 inference now.
5           You obviously are not -- we suggest
                     Page 48

6 and hope that you permit us to draw that inference.
7 We think that is a fair inference. That is just one
8 fact. Some maybe come across better than others, but
9 it's not in isolation. It's not in isolation for the
10 most fundamental reason. This market is extremely
11 nervous. It's not the same market as third quarter
12 '00. Mr. Ellison watched the stock go from the peak
13 -- from 1996 to 2000, Mr. Ellison went from the
14 34th richest man in the world to the third richest
15 in the world, and he was closing on Gates. Who knows
16 why he didn't sell a share in five years? But I can
17 tell you every time the "Fortune" came out, he was
18 rising up the ranks, and by doing nothing but holding
19 his stock.
20           THE COURT: Where is he now?
21           MR. TABACCO: It's interesting. He
22 effectively was the last guy out at 30 bucks a share.
23 Look at that chart.
24           THE COURT: I'm wondering where he
                                                  341

1 is compared to 34.
2           MR. TABACCO: Terrible. He is now 16.
3 Can hardly make ends meet.
4           But you know, he was the last guy out.
5 And you know, maybe it's better to be lucky than smart
6 but that doesn't explain it. He is brilliant. He is
7 hands on. For 27 years, he is driving this Ferrari.
8 This is his company. He is entitled, in his view, to
9 that money. That's another way to look at this thing.
10 It's not -- is that a dark heart? I mean, it's a
11 serious allegation, but it's another way to recognize
                     Page 49

12 where this guy was coming from.
13           THE COURT: How about the expiration
14 of his options? I mean actually, in your brief -- I
15 mean, you must have enjoyed the moment where you
16 suggested he could let them lapse.
17           MR. TABACCO: You know, it's only
18 2 percent. It's 1 percent. Remember, he traded
19 29 million shares, 22 million --
20           THE COURT: He had all these plans to
21 give the money to Stanford.
22           MR. TABACCO: We will remind him of
23 that. Let's get to Brophy, unless -- this is great.
24 I'm sorry we don't have more time.
                                                  342

1           Brophy has been the law. It came out
2 in -- has been followed religiously since. There is
3 nothing -- you know, the Rule 10b-5 was adopted in
4 1942. It's not fair to say that there was suddenly
5 this new federal regulation. It's true that this has
6 evolved. 34 Act adopted Rule 10b-5 1942, seven years
7 before Brophy.
8           THE COURT: When was the private right
9 of action firmly established?
10           MR. TABACCO: When was it codified in
11 28? Four or five years ago.
12           THE COURT: I mean the --
13           MR. TABACCO: In terms of --
14           THE COURT: 10b-5, that was a post-war
15 development. Wasn't it?
16           MR. TABACCO: Yes. Whether it was
17 Diamond in '69 or thereafter in the seventies, I think
                     Page 50

18 obviously it was -- it's an
19 that they always had the ability to bring insider
20 trading.
21           THE COURT: They did, but in terms of
22 you and your friends in the plaintiffs' bar using
23 10b-5, was after Brophy. Wasn't it?
24           MR. TABACCO: No question about it. I
                                                  343

1 worked at one time for Abe Pomerantz. And I don't
2 know if Abe in the forties ever thought of that. I'm
3 sure he thought of it, but couldn't figure out how to
4 do it.
5           THE COURT: You have got -- it's an
6 unusual derivative suit in the sense -- I mean what
7 exactly is the harm to Oracle here?
8           MR. TABACCO: First off, we say that
9 is not an element, but I'm glad you asked. Were that
10 to be an additional requirement, it's -- really, it's
11 manifested by the fact that you have all these people
12 who -- we represent Oracle, and they represent Oracle.
13 They would tell us that it would be very bad if we
14 succeeded in demonstrating that their chairman
15 breached his fiduciary duty by trading on material
16 inside information; that even though they might not
17 have been selling or buying in the market and
18 therefore -- just to make it clear, under Blue Chip
19 Stamp, would not have a cause of action as a company
20 under the federal securities laws -- that nonetheless,
21 the reputational harm to the company, you know, could
22 be substantial. And that's so if we -- if we are
23 required to -- and we are not -- that would be the
                     Page 51

80090341.TXT
24 kind of harm. Maybe can't measure it in a cumulative
                                                    344

1 sense, dollar for dollar, but -- so I don't think that
2 is going to be an issue.
3            I think that just quickly on the
4 Brophy standard. We like the Oracle definition of --
5 we like their policy. If you have it, if you know it,
6 we are done.
7            THE COURT: Yeah. But do you have to
8 know that you have it?
9            MR. TABACCO: You have to know that
10 you have it.
11            THE COURT: Know that you have
12 something that would be considered material inside
13 information.
14            MR. TABACCO: Something that would be
15 material inside information. But you know, there is
16 the whole question of whether it was exclusive use. I
17 think the best tests are the ones articulated under
18 the series of SEC cases.
19            THE COURT: But they are scienter
20 based.
21            MR. TABACCO: That's a funny word.
22            THE COURT: It means an elicit state
23 of mind. It means that you know that you possess
24 information which gives you a trading advantage over
                                                    345

1 others, and what I believe Judge Posner was saying
2 was, "Come on. Just because your kid has some
3 liquidity issues, and you had some other reason to
4 trade, doesn't negate the fact that if you had this
                Page 52

80090341.TXT
5 reason, you had the additional reason that you -- you
6 knew you had an unfair advantage. That is sufficient
7 scienter."
8            It's not some strict liability thing
9 that if a court, after the fact, does a total
10 scientific -- I mean, here is breaking news from the
11 court of Delaware. May want to get the press in here.
12 I don't believe that's a scientific inquiry, the total
13 mix. And I would not want my -- anyone to medicate my
14 child based on science equivalent to judicial
15 determinations after the fact of what is material.
16            So I understand -- if what you are
17 saying is they have to have knowledge -- if I were to
18 infer on this motion that they had knowledge, that
19 they had material -- what would be defined as material
20 inside information, that the market did not possess,
21 that that would be sufficient evidence of scienter --
22            MR. TABACCO: We could then infer, as
23 the SEC cases do, that that was a motivating -- a
24 motivating -- perhaps not the only one. Mr. Ellison
                                                    346

1 tells all kinds of reasons, as you know, why he
2 traded. My mother said if you don't tell the truth,
3 you'll never remember it, so you'd better tell the
4 truth, because it always comes out the same. We heard
5 a number of stories from him as to why. No
6 inferences --
7            THE COURT: Right. He makes -- we
8 went through this. He makes a lot of statements.
9            MR. TABACCO: So I think if we had to
10 find an acceptable -- the lawyer in me says, "Let's go
                Page 53

80090341.TXT
11 no further than the New York trading policy." If I'm
12 unsuccessful in convincing you of that, I say let's
13 look at the SEC cases, the Adler case, the Eleventh
14 Circuit case, where there is a causal link and an
15 inference --
16            THE COURT: Brophy is clearly not some
17 manifestation of -- it's not like some predecessor to
18 Van Gorkom. Is it? It's clearly designed -- it's a
19 loyalty -- it's saying -- in that case, the guy traded
20 ahead of the company.
21            MR. TABACCO: Did he have knowledge?
22 Of course.
23            THE COURT: Scienter was obvious.
24 Right? You are trying to punish somebody -- it's in
                                                    347

1 the line of cases of Guth v. Loft.
2            MR. TABACCO: It is. First off, I
3 don't know -- I mean, certainly no basis to abrogate
4 Brophy. That would be giving away a fundamental duty
5 of the corporate executive to supervise. I read the
6 decision --
7            THE COURT: The question is: 10b-5 --
8 as I understand 10b-5 jurisprudence, one of the first
9 things you asked in an insider trading context: Is
10 the person a fiduciary?
11            MR. TABACCO: Yeah.
12            THE COURT: That's what triggers the
13 duty under federal law. So the continuation of Brophy
14 -- you were very candid about how Oracle -- it was
15 reputational. In a way, you are creating the injury.
16 Mr. Terrell and you should get in the room, and you
                Page 54

80090341.TXT
17 should not permit the injury by withdrawing the suit,
18 and I will give you an attorney fee for the benefit
19 created by not injuring the reputation of the company
20 by actually proving your case.
21            The only reason I'm saying that is
22 because the harm to people in these kind of
23 situations, the most direct harm, whoever the suckers
24 were who sold.
                                                    348

1            MR. TABACCO: I mean, it's the random
2 wheel of contemporaneous trader.
3            THE COURT: Right. It's whoever got
4 injured by being on the wrong side of the
5 informational gap. Brophy has the idea of -- one of
6 the things behind it, I think, is this public policy
7 idea. It's mentioned, I think, in Diamond, which is
8 corporations necessarily have to depend on their
9 fiduciaries, you know, to process information, to have
10 access to things that the public doesn't. We want to
11 send a strong message by saying, "If you do that, then
12 the company can take your trading profits back,
13 because the only reason you had access, the ability to
14 exploit that information gap, is because you work for
15 us."
16            And I think what Mr. Nachbar says,
17 "Okay. That might be a good and sensible policy.
18 It's been replicated at federal law in a huge way by
19 allowing trebling of damages."
20            MR. TABACCO: SEC only.
21            THE COURT: The SEC. The SEC, that's
22 -- they are not shy these days.
                Page 55

80090341.TXT

```
23              MR. TABACCO:  They are busy.
24              THE COURT:  Not as aggressive as the
                                                    349
```

```
 1  guy in New York --
 2              MR. TABACCO:  Back in the environment,
 3  it's 2001 that he does these trades, it's before a lot
 4  of the headlines coming out.  The same environment in
 5  2004 or 2005 may be different.
 6              THE COURT:  You admit there is the
 7  potential here to have -- with Brophy, to have a
 8  defendant hit -- you would have a trebling and offset
 9  at the federal level.  To max out at the federal
10  level, treble damages.  Then another 100 percent at
11  the state level.
12              MR. TABACCO:  You know, I do a fair
13  amount of antitrust law.  If you price fix, I go after
14  you federally based, a civil fine -- criminal fine
15  from the Justice Department.  I get treble damages
16  under the Sherman Act.  Then I go after you under the
17  Cartwright Act on behalf of all the indirect
18  purchasers.  This pales in comparison to that.
19              If it's demonstrated to be the
20  material fundamental breach that it is, it ought to be
21  deterred.  It's a fundamental -- the Loft case, it's
22  pretty fundamental.  And Oracle doesn't really have a
23  remedy under the federal statute.  It's just not
24  there.  Other people might or might not bring it.
                                                    350
```

```
 1              THE COURT:  Where does the civil
 2  penalty that the SEC -- do they take it from the
                        Page 56
```

80090341.TXT

```
 3  coffers?
 4              MR. TABACCO:  Yes.  I thought there
 5  was some effort by the SEC, wanting to get a piece of
 6  it for their own budget, to get this funding, but that
 7  never got past Congress.
 8              Contract claim, we think that is alive
 9  and viable.
10              THE COURT:  How am I supposed to
11  reconsider a decision by a California judge?
12              MR. TABACCO:  I think that the -- it
13  was on a demurrer.  He determined, based on the way
14  that motion was argued at the time, that he understood
15  it -- and we think incorrectly -- to be duplicative.
16  That is, the policy was duplicative --
17              THE COURT:  It's ultimately an
18  appealable order that he entered, dismissing this
19  allegation with prejudice.  Correct?
20              MR. TABACCO:  That's right.
21              THE COURT:  Second time he did it?
22              MR. TABACCO:  Was the first or second?
23  Second.  We have a three-strike law.
24              THE COURT:  I check my messages.
                                                    351
```

```
 1  Governor Schwarzenegger hadn't called me to name me to
 2  any vacancy on the California Supreme Court.  I guess
 3  I would have to be on the intermediate appellate court
 4  first.
 5              I mean seriously, you guys are
 6  prosecuting this case together in a joint effort.  I
 7  have heard two very able California lawyers from the
 8  plaintiffs' side, how in keeping with good principles
                        Page 57
```

80090341.TXT

```
 9  -- nobody burdened me with all the law of the case, or
10  whatever.  Just on your principles of comity, how
11  would I reconsider -- is it Judge Schwartz?
12              MR. TABACCO:  Judge Schwartz.
13              THE COURT:  How could I reconsider his
14  ruling and say, "You misunderstood this twice"?
15              MR. TABACCO:  You know, I think
16  because the contract claim arises under Delaware, you
17  know -- the law-of-the-case argument.
18              THE COURT:  Under Delaware law?
19              MR. TABACCO:  It's a contract claim.
20              THE COURT:  I thought it was a
21  California law claim.
22              MR. TABACCO:  I'm sorry.  My mistake.
23  You are right.  That's correct.  The law of the case
24  -- I understand the problem, the basic fundamental
                                                    352
```

```
 1  issue is that --
 2              THE COURT:  I'm not saying you are
 3  right or wrong.  I'm saying this is very dangerous
 4  precedent for us to set, where, you know, you all had
 5  motion practice before a judge with the identical
 6  claim.  You were all working together, which I
 7  applaud.  You had your fair shot here.  He has issued
 8  what will ultimately be an appealable order.  For me
 9  to reconsider it on a motion for summary judgment --
10  obviously, whatever order I put in place here would be
11  without prejudice to your right to get his ruling
12  overturned and pursue it there, but I just can't
13  imagine -- they then -- invites other judges in other
14  states to do the same thing to us.
                        Page 58
```

80090341.TXT

```
15              MR. TABACCO:  No.  I appreciate the
16  policy consideration.  I can extend an invitation.  We
17  understand the reluctance the Court would have.  It's
18  legitimate, given the comity.
19              THE COURT:  I also think you are
20  basically in privity.  I don't get the lack of privity
21  here between you and your friends in Delaware.  I
22  mean, who argued the motion there, one of your law
23  firms?  Mr. De Ghetaldi did.
24              On a contract basis, our state might
                                                    353
```

```
 1  be willing to get revenue to act in some way as an
 2  appellate court in California on corporate cases.
 3              MR. TABACCO:  I don't know.
 4              THE COURT:  We are very
 5  entrepreneurial.  You might want to take back --
 6  Governor Schwarzenegger has all kinds of interesting
 7  ideas.
 8              MR. TABACCO:  Particularly about
 9  lawyers.
10              THE COURT:  I thought the budget-
11  saving idea involving the animal shelters was
12  particularly interesting.
13              MR. TABACCO:  The land of the fruits
14  and nuts, Your Honor.  Just in closing, a couple quick
15  points.  I appreciate the fact -- I don't know if any
16  of us -- Mr. Salpeter is getting married tomorrow.
17              THE COURT:  Really?
18              MR. TABACCO:  I will take a minute
19  more.
20              THE COURT:  Had I known that, I would
                        Page 59
```

80090341.TXT

21 have -- we might have stayed -- he is probably in

22 trouble.

23           MR. SALPETER:  I said I wouldn't use

24 this as an excuse again.  When I asked Mr. Tabacco if

                                                    354

1 they could finish before noon, I said, "I will never

2 invoke this again."

3           THE COURT:  You are just going back to

4 Chicago?

5           MR. SALPETER:  Correct.  I'm fine.

6 Last night she said she still will go through with it

7 tomorrow.

8           MR. TABACCO:  We want that to get off

9 to a good start.

10           I hope to the extent you have been

11 able to put us through the tests, that you will

12 continue to do so for my colleagues.

13           After we left court yesterday

14 afternoon -- it was a very lively exchange.  You were

15 demonstrating your consummate knowledge of this record

16 and, at least as to some points, raising some hard

17 questions.  But I think, you know, as we look to a

18 practical resolution down the road, in whatever form

19 it comes, we, as litigators, will make a mistake if we

20 try to superimpose our judgment as to how you are

21 going to call things.  And that, I think, would be

22 something that, as we go forward, is always helpful to

23 keep in mind.

24           when they were up, we were listening

                                                    355

1 to it.  It just is Socratic method.  Mr. Goldberg, who

                  Page 60

---

80090341.TXT

2 says very few words, and will say none at the moment,

3 I talked to him briefly about it last night.  He says

4 I'm watching you and observing you.  It's true that

5 that process, that's how you get to the end result.

6 It's a wonderful thing.

7           THE COURT:  No.  I have to add, I

8 mean, my view of these things is I think these things

9 -- never give you a chance to respond to them.  And

10 this is the big leagues.  And you know, you guys have

11 done very well answering them, but there are a lot of

12 hard questions about this case.

13           MR. TABACCO:  There are.  I think the

14 way we would end is to say, "Think of the context.

15 Think of what was important to the market.  Think of

16 that Phillips report."

17           I commend to your reading -- I know

18 you have done it -- the uncontroverted testimony of

19 Doctor Fischell.  They didn't bring in an expert.

20 Mr. Nachbar said he didn't look at this particular

21 part of the December quarter.  But it's a wealth of

22 information.  I would love to go through it, if I had

23 ten minutes.  I'm not going to do it.  I know you read

24 it.  When you look at the conclusions that he draws

                                                    356

1 and the inferences he draws as an expert who has

2 looked at this field, that should be given great

3 weight, particularly since there is no countervailing

4 expert that comes back from the other side.

5           With that, Your Honor, I wish I had

6 more time.  It's a pleasure to see you.

7           THE COURT:  Thank you, Mr. Tabacco.

                  Page 61

---

80090341.TXT

8           MR. NACHBAR:  Your Honor, I'll be very

9 brief.  And it will facilitate things -- and I can

10 provide copies if you need them -- if you have the de

11 Ghetaldi affidavit and the first volume of plaintiffs'

12 charts.  I will provide copies if necessary.

13           THE COURT:  I have both.

14           MR. NACHBAR:  Excellent.  The first

15 point that I would like to address is the factual

16 question of whether Minton's forecasts were

17 conservative or not.  And plaintiffs have a very good

18 chart on that.  It's Chart 11.  If you flip to it you

19 will see that the blue line is the actual and the

20 potential is the red line.  That's what Jennifer

21 Minton was saying.  You can see that she is below

22 actual for every quarter shown here, you know, until

23 you get to the last quarter.  She was conservative.

24           This also addresses, I think, the

                                                    357

1 question -- and Chart 8 further addresses the

2 question.  Mr. de Ghetaldi said, "well, Jennifer

3 Minton missed in the third quarter of '00."

4           If you flip to Chart 8, you will see

5 columns, date, forecast EPS, potential EPS -- that is

6 Jennifer Minton -- and then actual EPS.  And you will

7 see that in the third quarter of fiscal year '00

8 Jennifer Minton's upside report, her potential EPS was

9 below actual EPS on each date indicated.  And I think

10 that is true throughout this exhibit.

11           THE COURT:  So that she tended to be

12 conservative?

13           MR. NACHBAR:  She tended to be

                  Page 62

---

80090341.TXT

14 conservative.  And she was also the most accurate.  I

15 mean, that's the historical trend.  Sure, at one

16 particular time, in one particular quarter, somebody

17 may have been more accurate, but all in all, on

18 balance, she was the most accurate.

19           We are told that the real problem here

20 was that Minton's upside reports were just wrong.  And

21 you know, we joked about her mental health, and you

22 know -- but the fact of the matter is if you look at

23 the January 29 upside report, that's the one that

24 projected making 12 cents a share, with rounding up.

                                                    358

1 It was 11.58.  It contains no upside adjustment at all

2 for the U.S.  The best place to look at that is de

3 Ghetaldi affidavit paragraph 55.

4           If you flip to the chart in there, it

5 shows declining license upsides in 3Q FY '01.  If you

6 look at 1/29, you will see NAS license upside is zero.

7 OPI license upside is 35 million.  OSI license upside

8 is negative 35 million.

9           THE COURT:  Okay.  I may be a little

10 bit lost here.  You are telling me 55?

11           MR. NACHBAR:  De Ghetaldi affidavit,

12 paragraph 55.

13           THE COURT:  Got you.  I was on the --

14 I'm mesmerized by the parties' various charts.

15           MR. NACHBAR:  I understand.  Page 24.

16           THE COURT:  I got you.

17           MR. NACHBAR:  If you look at those

18 columns, you will see as of 1/29 the total license

19 upside was 43 million, but that was all non-U.S.  If

                  Page 63

80090341.TXT

20 you look at the three U.S. divisions, zero 35,
21 negative 35. I can do that math in my head. That
22 nets out to zero.
23          The point is that Mr. de Ghetaldi said
24 forecast is what counted and you, know, Jennifer
                                              359

1 Minton was smoking something. Well, A, she wasn't
2 smoking something. She properly reduced her upside.
3 But B, more importantly, with zero -- zero U.S.
4 upside, she was still predicting that with rounding,
5 they would make their quarter.
6          I think the final factual point I have
7 is that margins actually did rise in the third quarter
8 of '01. They rose by 2 percent over the prior quarter
9 for the prior year, year over year. That is in slide
10 90.
11          Before I leave, I will give Your Honor
12 books of the slides. I know you don't have enough
13 paper. Complaining about that.
14          THE COURT: That will be good.
15          MR. NACHBAR: Would like to remedy
16 that. In sum, one year ago today I was putting the
17 finishing touches on a summary judgment brief.
18 Plaintiffs have had nearly a full year to uncover
19 evidence, a material fact showing that Mr. Henley or
20 Mr. Ellison believed that Oracle was likely to miss
21 its guidance. And that is the legal standard.
22          I think the Shaw case makes this
23 pretty clear. This is 82 Fed.2d at 1210. The
24 question that the Court asked is the following: "Is
                                              360

Page 64

80090341.TXT

1 there a sufficient probability that unexpectedly
2 disastrous quarter-to-date performance will carry
3 forward to the end of the quarter such that a
4 reasonable investor would likely consider the interim
5 performance important to the overall information
6 available?"
7          Now here, of course --
8          THE COURT: "Unexpectedly disastrous."
9          MR. NACHBAR: That's what I was going
10 to say. We didn't have any unexpectedly disastrous
11 anything. If you take Covisint into account, we were
12 ahead of forecasts. Even if you completely ignore
13 Covisint, we were just where we had been in prior
14 quarters, where we made the quarter. There was
15 nothing unexpectedly disastrous.
16          THE COURT: Go over that just a little
17 bit. I'll be sure to -- as scrupulous as I'm able
18 with this, but -- this will get to a larger question
19 about the sort of procedural standard.
20          As I understand it, with Covisint,
21 December was basically around the average of the
22 previous two Decembers in the same quarter. Wouldn't
23 matter. They are December. The previous two
24 Decembers. Is that right?
                                              361

1          MR. NACHBAR: I think it may have
2 actually been ahead, but I'm not positive.
3          THE COURT: Why does the figure
4 18-and-a-half stick in my head? Is that just wrong?
5          MR. NACHBAR: I'm not -- I think --

Page 65

80090341.TXT

6 I'm told it was 22 with Covisint.
7          THE COURT: 22 with Covisint, which
8 was actually a little bit ahead of prior Decembers.
9 And how do you deal with -- there seems to be some
10 sort of almost time lag in the way Ellison talks about
11 the quarter. Like, for example, what he said to
12 Phillips -- maybe it wasn't Phillips. Whoever he said
13 that on the analyst discussion on March 1st, would
14 have made a lot more intrinsic sense if he said,
15 "Coming out of the first month, where are we at?"
16          There seems to be a sort of lag. How
17 do you deal with that? What he said was -- didn't
18 make a whole lot of sense going into February.
19          MR. NACHBAR: I'm not sure it didn't.
20 I mean -- again, you know, they didn't ask, and I
21 don't know exactly what he meant. But I think if you
22 look at the actual results and the pipeline, they were
23 still ahead, even at the end of -- even at the end of
24 January, when they had the February results.
                                              362

1          Now, if you predict declining license
2 revenue --
3          THE COURT: We went through this
4 earlier. Mr. -- they weren't ahead. I mean, they
5 weren't ahead. They were slightly behind.
6          MR. NACHBAR: It depends what
7 conversion rate you assume for the remaining pipeline.
8          THE COURT: It does, but it also meant
9 on a monthly contribution you were talking about
10 equalling the high you had done for the last month.
11          MR. NACHBAR: Yes.

Page 66

80090341.TXT

12          THE COURT: So, I mean -- you had
13 Ms. Minton, who was the best predictor, saying you
14 were slightly behind.
15          MR. NACHBAR: I agree with that.
16          THE COURT: I don't think Mr. Henley
17 had the same state of optimism as of that point that
18 Mr. Ellison projected. Right?
19          MR. NACHBAR: No. I think that is
20 exactly right. I think Mr. Ellison, you know, really,
21 really believes in the Oracle product. He really,
22 really believes in the company. And I think he is
23 just more optimistic.
24          THE COURT: This is really the last
                                              363

1 point about which is -- is sort of: How do I deal
2 with this sort of message out of some of the Supreme
3 Court cases, which says, "Whatever the United States
4 Supreme Court might have said in their famous trilogy
5 of summary judgment cases is really not exactly what
6 we do in Delaware, and we have a sort of -- we like
7 trials, especially like trials in Chancery; especially
8 good to have the fact-finder go through it twice, you
9 know, even at this stage, because you might want to
10 shield things from a different fact-finder, like a
11 jury, by keeping..." -- I'm kidding.
12          Cerberus is not the first case in
13 which the Supreme Court said -- after a judge of this
14 Court had looked very closely at the record, the
15 Supreme Court then said -- sort of admonished the
16 Court: "This would have been a nice posttrial
17 opinion, but it wasn't."

Page 67

80090341.TXT
18              And Henley -- I should have asked
19 Mr. Tabacco, but -- I'm not sure why Henley is in the
20 case, really, at this point. I think that -- you
21 know, much weaker case as to him, clearly. And that
22 -- I mean, it still could have strong -- good enough
23 to go to trial, but it's much weaker than the case
24 against Ellison. I think your friends would admit
                                                    364
1 that. Mr. Ellison just said all kinds of stuff.
2              Even the idea that he went in thinking
3 it was at 16, if I have to credit that, he then talks
4 about how he calls everyone up, reads every piece of
5 information in the world, and he says a bunch of
6 things which aren't true. I mean, how does that -- I
7 have to factor that in to a standard where I have to
8 give every rational doubt to them.
9              MR. NACHBAR: I don't think it
10 matters. The reason it doesn't matter is because you
11 get back to the legal standard, and that is evidence
12 that whatever happened in the first month was going to
13 continue to happen, evidence that would make it likely
14 -- not remotely possible, or could possibly, you know,
15 under some theory happen -- likely that you are going
16 to miss the quarter. That is their burden. They have
17 to come forth with evidence.
18              THE COURT: But what they say is,
19 "Look, we are not talking in this context about
20 Jennifer Minton's rating, somebody else. We are
21 talking about Larry Ellison, who built this business,
22 who is extremely savvy."
23              I want to make clear on the record,
                    Page 68

80090341.TXT
24 because I just said Mr. Ellison said things that
                                                    365
1 weren't true, I didn't mean -- I don't want to suggest
2 that he meant them -- that he didn't believe them when
3 he said them, at any time. What I'm saying is they
4 turned out to be counterfactual. I think others of
5 the subordinates even said that. When people say
6 things loosely, at this stage, I have to take that
7 into account.
8              What your friends are saying are,
9 "Okay. You are right. There is a lot of information
10 that says, you know, he had the forecasts, other
11 things. But he was Larry Ellison, and he had thought
12 it was 16, he says." Now he is down getting advice
13 it's a lot -- it's different. He is seeing other
14 competitors in the marketplace struggle. You know, he
15 is the one who was in the best position to know that
16 it wasn't going to repeat itself. They weren't going
17 to pull this out. And why isn't that a rational
18 inference to draw from this record?
19              MR. NACHBAR: It's not a rational
20 inference to draw from this record because, first of
21 all, there is no showing of any material fact that was
22 possessed by Mr. Henley or Mr. Ellison that they
23 believed that Oracle was likely to miss the quarter.
24 There is just no evidence.
                                                    366
1              All right. So the plaintiffs accept
2 that. What they have done is they very creatively
3 sliced and diced information to try to create some
4 after-the-fact red flag. That's what they have tried
                    Page 69

80090341.TXT
5 to do. Since there is no evidence that the defendants
6 did any such slicing and dicing, I would submit the
7 slicing and dicing is legally irrelevant.
8              But if it is legally relevant, let's
9 look at it. Let's look at all the plaintiffs'
10 analyses, pipeline, upside, coverage ratio, growth
11 gap. They all evidence patterns that had occurred in
12 the past and did not cause Oracle to miss its
13 guidance. Every one of those. I mean, you looked at
14 the coverage ratio. If you look at the coverage ratio
15 where it was when Mr. Ellison traded, January 15,
16 January 22, January 29, it was exactly where it had
17 been in prior quarters, showing the exact same
18 pattern. It was increasing throughout the quarter.
19              You look at the pipeline. It
20 declined, as -- Your Honor already pointed it out. It
21 went from 81 percent to 50 percent. They say, "This
22 was different because this happened in the first two
23 weeks, and you know, in other quarters it was sort of
24 more plateaued the first two weeks and decreased in
                                                    367
1 weeks 5, 6 and 7."
2              So what? What the pipeline here shows
3 is there was an initial fall-off from 52 percent to
4 34 percent, and then it plateaued. By the time
5 Ellison traded, it hadn't gone down to 6 percent or
6 3 percent. It had leveled off. What that shows, I
7 think, and demonstrates, is the credibility of the
8 testimony of our witnesses, who said, "Look, you know,
9 we discounted the 52 percent pipeline growth. That
10 was astounding. For a company that had achieved our
                    Page 70

80090341.TXT
11 performance in the past, year over year, that was
12 incredible."
13              THE COURT: And when they said
14 something like astounding, they are talking about it
15 being astounding because the pipeline is measured over
16 the higher base of the previous year.
17              MR. NACHBAR: Right. They had a very
18 strong quarter the third quarter of last year. To be
19 up 52 percent from what had been an extremely strong
20 quarter was astounding. It was discounted.
21              That's why Jennifer Minton's initial
22 upside report was 13 cents. It wasn't 16 cents.
23 People didn't really believe that was likely. They
24 discounted it. It's what any rational business person
                                                    368
1 would do. If you look at the growth gap, it's always
2 positive. At no point is there insufficient license
3 -- insufficient pipeline growth to make the number.
4              THE COURT: Had it ever been negative?
5              MR. NACHBAR: Yes, it had been. It's
6 shown right on the chart. Absolutely. I believe it
7 was the fourth quarter of '00, it had actually turned
8 negative. They still made the quarter. So there was
9 nothing unusual here. There was no red flag. That's
10 the point.
11              Even with the benefit of hindsight,
12 even if you give them every benefit of the doubt and
13 you say, "Okay. Ellison is omniscient. He knew
14 everything there was to know. He studied all of
15 this..." -- all of which the evidence shows is
16 contrary to fact. But even if you take that
                    Page 71

8D090341.TXT

17 counterfactual and attribute it to him, at the end of
18 the day, there was no red flag here, period, full
19 stop.
20           Now the legal standard is not only
21 must there be a red flag, but there has to be a red
22 flag showing it is likely -- not just possible, but
23 likely -- that you are going to have a material miss.
24 Half a cent, fractional cents, that is probably not
                                                    369

1 material. But we don't have to reach that here.
2 There was simply no red flag, not contemporaneously,
3 not after the fact.
4           Plaintiffs, like the plaintiffs here,
5 they are really in the prospecting business. On the
6 basis of limited information, they pursue claims where
7 they have reason to think that the claims will
8 succeed. And sometimes, despite good faith belief
9 that the prospect is really going to be successful,
10 they drill a dry hole. This is one of those times.
11           The individual defendants' motion for
12 summary judgment, Your Honor, should be granted,
13 unless Your Honor has any further questions --
14           THE COURT: I don't.
15           MR. NACHBAR: I would like to hand up
16 the slides, if I may.
17           THE COURT: I want to say, on the
18 record, I really have enjoyed the arguments from both
19 sides. It's a pleasure to have arguments like this,
20 when counsel on both sides are so familiar with the
21 record, and adroit with it. And I appreciate your
22 patience with all my questions.
                                        Page 72

8D090341.TXT
3 Official Reporters for the Court of Chancery of the
4 State of Delaware, do hereby certify that the
5 foregoing pages numbered 3 through 371 contain a true
6 and correct transcription of the proceedings as
7 stenographically reported by us at the hearing in the
8 above cause before the Chancellor of the State of
9 Delaware, on the date therein indicated.
10           IN WITNESS WHEREOF we have hereunto set our
11 hands at Wilmington, this 10th day of September, 2004.
12
13
14                          _____
15                          Official Reporter
                            CSR No. 187-PS
16
17                          _____
18                          Official Reporter
                            CSR No. 108-PS
19
20
21
22
23
24

                Page 74

8D090341.TXT
23           Is everyone in the courtroom
24 associated with a party? Are you just watching?
                                                    370

1           A SPECTATOR: I'm a law clerk
2 candidate.
3           THE COURT: Welcome. You saw an
4 interesting argument and some very good lawyers. If
5 you could depart at this moment, I'd appreciate it.
6 No insult, but I want to talk to the parties alone. I
7 hope you enjoyed it. You will get your bar credit.
8           MR. NACHBAR: Your Honor, on behalf of
9 I think everyone in the room, it's certainly a
10 pleasure to argue a case in front of a judge who has
11 read the record, and understands it, and is as
12 diligent and knowledgeable as Your Honor has been. I
13 know the plaintiffs feel that way, as well.
14           THE COURT: Thank you. Let's go off
15 the record at this point.
16           (Recess at 10:58 a.m.)
17
18
19
20
21
22
23
24
                                                    371

1                   CERTIFICATE
2     We, WILLIAM J. DAWSON and DIANE G. MCGRELLIS,
                Page 73

# EXHIBIT 128

Expenses Based on FY01 - Basis
W/ No pulled out

**ORACLE
CONFIDENTIAL**

CA-ORCL 036623

ORACLE
CONFIDENTIAL

CA-ORCL 036624

Expenses Based on FY01 - Basis

11/14/03

REVENUE
Federal
State & Local
Higher Ed
Financial Services
Comm/Util
CRM
Service Ops
Total OSI Consulting

EXPENSE
Federal
State & Local
Higher Ed
Financial Services
Comm/Util
CRM
Service Ops
Total OSI Consulting

MARGIN
Federal
State & Local
Higher Ed
Financial Services
Comm/Util
CRM
Service Ops
Total OSI Consulting

MARGIN %
Federal
State & Local
Higher Ed
Financial Services
Comm/Util
CRM
Service Ops
Total OSI Consulting

EOY HEADCOUNT
Federal
State & Local
Higher Ed
Financial Services
Comm/Util
CRM
Service Ops
Total OSI Consulting



| LOB | Vertical | Act Jun | Act Jul | Act Aug | Act Q1 | Budget Q1 | Act Sep | Act Oct | Act Nov | Fcst Q2 | Budget Q2 | Fcst Dec | Fcst Jan | Fcst Feb | Fcst Q3 | Budget Q3 | Fcst Mar | Fcst Apr | Fcst May | Fcst Q4 | Budget Q4 | Fcst FY01 | Budget FY01 | % of Plan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SAL | 0.0 | 2.7 | 12.4 | 13.1 | 9.4 | 1.0 | 2.5 | 14.1 | 15.1 | 13.4 | 1.8 | 3.7 | 12.6 | 18.1 | 20.3 | 3.1 | 5.9 | 21.4 | 30.5 | 32.7 | 79.0 | 82.8 | 95.4% |
| | SAL (SD) | 1.2 | 3.5 | 3.7 | 8.3 | 6.6 | 2.5 | 3.5 | 7.4 | 13.5 | 10.9 | 3.5 | 3.5 | 4.7 | 11.8 | 14.3 | 5.9 | 5.9 | 7.6 | 19.5 | 26.5 | 50.4 | 58.2 | 86.6% |
| Total SAL | | 1.2 | 6.2 | 16.1 | 23.5 | 16.0 | 3.5 | 6.0 | 21.5 | 25.9 | 24.3 | 5.4 | 7.2 | 17.5 | 30.0 | 34.5 | 8.9 | 12.0 | 29.2 | 50.0 | 64.2 | 129.4 | 141.0 | 91.8% |
| | Federal | -1.6 | 0.6 | 9.6 | 8.6 | 19.2 | 0.5 | 6.0 | 11.6 | 18.1 | 31.6 | 3.0 | 6.0 | 20.8 | 29.8 | 41.5 | 5.0 | 10.0 | 35.0 | 50.0 | 77.2 | 138.6 | 160.6 | 62.8% |
| | Fed (SD) | 2.1 | 1.5 | 3.0 | 4.6 | 6.6 | 3.6 | 2.7 | 5.5 | 11.7 | 10.8 | 6.1 | 6.1 | 8.1 | 20.3 | 34.2 | 10.2 | 10.2 | 13.6 | 34.0 | 34.0 | 100.6 | 128.6 | 125.3% |
| Total Federal | | 0.6 | 2.1 | 11.4 | 13.2 | 25.7 | 4.1 | 8.7 | 17.1 | 29.8 | 42.4 | 9.1 | 12.0 | 28.9 | 50.0 | 50.7 | 15.2 | 20.2 | 48.6 | 84.0 | 103.6 | 178.1 | 227.5 | 78.3% |
| | Higher Ed Field | 0.1 | 3.1 | -1.8 | 1.4 | 4.3 | -0.1 | 0.0 | 9.4 | 9.3 | 7.1 | 1.0 | 2.0 | 7.0 | 10.0 | 10.7 | 1.1 | 2.3 | 7.9 | 11.3 | 17.3 | 32.0 | 18.0 | 84.1% |
| | Higher Ed (SD) | 0.5 | 1.3 | 0.8 | 2.3 | 2.7 | 0.3 | 0.7 | 2.9 | 4.1 | 4.4 | 1.8 | 1.8 | 2.4 | 6.0 | 5.8 | 2.0 | 2.0 | 2.7 | 6.8 | 10.7 | 18.2 | 23.3 | 81.9% |
| Total Higher Ed | | 0.6 | 4.3 | -1.2 | 3.7 | 7.0 | 0.7 | 0.7 | 12.2 | 13.4 | 11.5 | 2.8 | 3.8 | 9.4 | 16.0 | 18.1 | 3.2 | 4.3 | 10.6 | 18.0 | 28.0 | 51.1 | 41.5 | 83.1% |
| | Healthcare Field | 2.0 | 0.0 | 3.6 | 5.5 | 4.5 | -0.4 | 0.1 | 18.4 | 18.1 | 11.5 | 0.9 | 1.7 | 6.0 | 8.5 | 9.8 | 1.4 | 2.9 | 10.0 | 14.3 | 18.2 | 46.3 | 39.9 | 116.1% |
| | Healthcare (SD) | 0.2 | 0.2 | 1.3 | 1.8 | 1.8 | 0.4 | 0.3 | 3.8 | 4.6 | 2.7 | 0.8 | 0.8 | 1.0 | 2.2 | 3.1 | 1.1 | 1.1 | 1.5 | 3.8 | 4.0 | 12.6 | 13.6 | 92.3% |
| Total Healthcare | | 2.2 | 0.2 | 4.9 | 7.3 | 6.3 | 0.0 | 0.4 | 22.2 | 22.6 | 14.4 | 1.6 | 2.5 | 7.0 | 11.0 | 12.9 | 2.6 | 4.0 | 11.5 | 18.0 | 24.2 | 58.9 | 53.5 | 110.1% |
| | Fin. Serv. Field | 0.3 | 0.3 | 16.5 | 16.5 | 8.9 | -0.1 | 0.3 | 14.4 | 14.6 | 10.2 | 1.5 | 2.9 | 10.0 | 14.3 | 19.2 | 2.4 | 4.9 | 17.0 | 24.3 | 35.9 | 69.8 | 78.2 | 89.2% |
| | Fin. Serv. (SD) | 0.3 | 0.1 | 1.1 | 1.6 | 1.6 | -0.1 | -0.2 | 4.7 | 5.8 | 2.5 | 1.1 | 1.1 | 1.1 | 3.5 | 2.8 | 1.7 | 1.7 | 2.3 | 5.8 | 5.4 | 18.6 | 12.3 | 135.7% |
| Total Financial Services | | 0.3 | 0.3 | 17.4 | 18.0 | 10.4 | -1.2 | 0.2 | 19.1 | 20.4 | 17.0 | 2.5 | 4.0 | 11.6 | 18.0 | 22.0 | 4.2 | 6.6 | 19.3 | 30.0 | 41.0 | 88.4 | 90.5 | 93.5% |
| | Comm. Field | 7.0 | 1.8 | 11.6 | 20.3 | 19.1 | 6.4 | -1.0 | 10.6 | 16.0 | 11.9 | 6.0 | 12.0 | 42.0 | 60.0 | 41.3 | 7.5 | 15.0 | 52.5 | 75.0 | 76.9 | 171.3 | 143.0 | 119.7% |
| | Comm. (SD) | 0.6 | 0.8 | 7.2 | 8.5 | 4.5 | -1.1 | 1.1 | 4.2 | 7.1 | 7.1 | 6.0 | 6.0 | 6.0 | 18.0 | 8.0 | 7.5 | 7.5 | 10.0 | 25.0 | 35.4 | 60.4 | 30.0 | 201.4% |
| Total Communications | | 7.5 | 2.5 | 18.7 | 28.8 | 23.6 | 6.5 | 0.1 | 14.8 | 23.1 | 18.5 | 12.0 | 18.0 | 50.0 | 80.0 | 49.4 | 15.0 | 22.5 | 62.5 | 100.0 | 92.3 | 231.9 | 201.8 | 113.8% |
| | Util. Field | 1.6 | 0.1 | 6.9 | 8.6 | 6.3 | 2.2 | -0.5 | 13.9 | 15.6 | 8.6 | 1.8 | 3.5 | 12.3 | 17.5 | 7.5 | 1.8 | 3.5 | 12.3 | 17.5 | 59.2 | 59.2 | 30.0 | 197.3% |
| | Util (SD) | 0.1 | 0.3 | 1.0 | 1.4 | 1.4 | 0.2 | 0.9 | 1.0 | 2.1 | 2.0 | 0.8 | 0.8 | 1.0 | 2.5 | 2.4 | 0.8 | 0.8 | 1.0 | 2.5 | 4.5 | 8.5 | 10.2 | 82.8% |
| Total Utilities | | 1.7 | 0.4 | 7.9 | 10.0 | 4.7 | 2.4 | 0.4 | 14.9 | 17.7 | 7.6 | 2.5 | 4.3 | 13.3 | 20.0 | 9.7 | 2.5 | 4.3 | 13.3 | 20.0 | 47.7 | 67.7 | 40.2 | 168.2% |
| | Chd/Appt | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | N/A |
| | HQ Sales | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | N/A |
| | HQ OSD | 0.0 | 0.0 | 0.3 | 0.3 | 0.0 | 0.1 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.7 | 0.7 | 0.0 | N/A |
| | HQ Gen | 0.0 | 0.0 | 0.0 | 0.0 | -0.9 | 0.0 | 0.0 | 0.0 | 0.0 | -1.3 | 0.0 | 0.0 | 0.0 | 0.0 | -2.0 | 0.0 | 0.0 | 0.0 | 0.0 | -3.6 | 0.0 | -4.0 | 0.3% |
| Total License (w/out Comm (SD)) | | 14.1 | 16.1 | 76.7 | 106.9 | 92.8 | 17.5 | 13.9 | 121.9 | 153.3 | 154.1 | 35.8 | 51.7 | 137.6 | 225.0 | 197.3 | 51.5 | 73.7 | 194.8 | 320.0 | 367.8 | 805.2 | 810.0 | 99.4% |
| Total License (w/out Comm ISD) | | 12.9 | 14.7 | 68.1 | 93.7 | 83.8 | 13.7 | 11.8 | 108.2 | 133.7 | 137.8 | 27.3 | 43.1 | 124.7 | 199.0 | 180.0 | 40.4 | 62.6 | 180.0 | 283.5 | 336.5 | 735.4 | 715.4 | 93.5% |
| OSI Consulting | | 44.1 | 23.9 | 49.3 | 117.3 | 107.1 | 33.5 | 40.8 | 45.5 | 119.7 | 113.4 | 41.7 | 41.7 | 93.4 | 179.3 | 124.1 | 43.5 | 43.5 | 43.3 | 132.1 | 132.1 | 472.6 | 470.0 | 104.6% |
| Total OSI | | 58.2 | 40.0 | 128.0 | 224.2 | 190.7 | 50.9 | 54.6 | 167.4 | 272.9 | 251.1 | 77.5 | 93.4 | 179.3 | 261.1 | 298.5 | 84.9 | 117.2 | 238.3 | 416.0 | 469.4 | 1207.9 | 1200.0 | 99.0% |
| Total OSI-ISD | | 3.8 | 6.3 | 7.6 | 17.7 | 15.8 | 5.2 | 6.0 | 15.8 | 26.9 | 26.0 | 11.4 | 15.2 | 18.0 | 34.2 | 18.1 | 18.1 | 18.1 | 24.1 | 60.3 | 63.1 | 142.9 | 139.6 | 102.3% |
| Total Commercial ISD | | 1.2 | 1.4 | 0.9 | 3.5 | 9.2 | 3.8 | 2.1 | 13.7 | 19.6 | 14.2 | 8.6 | 8.6 | 11.4 | 26.0 | 16.3 | 11.1 | 11.1 | 14.8 | 34.5 | 31.3 | 89.8 | 60.8 | 147.6% |

ORACLE
CONFIDENTIAL

CA-ORCL 036625

EXPENSES

Expenses Based on FY01 - Basis

| LOB / Vertical | Act Jun | Act Jul | Act Aug | Act Q1 | Budget Q1 | Act Sep | Act Oct | Act Nov | Act Q2 | Budget Q2 | Fcst Dec | Fcst Jan | Fcst Feb | Fcst Q3 | Budget Q3 | Fcst Mar | Fcst Apr | Fcst May | Fcst Q4 | Budget Q4 | YTD Total | Budget FY01 | % of Plan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S&L | 2.2 | 4.0 | 5.2 | 11.5 | 8.9 | 2.5 | 2.6 | 6.3 | 11.4 | 10.1 | 4.0 | 4.0 | 5.4 | 13.4 | 10.6 | 5.0 | 5.3 | 6.7 | 16.6 | 15.3 | 52.9 | 45.0 | 117.5% |
| S&L ISD | 0.3 | 0.4 | 0.4 | 0.8 | 0.3 | 0.3 | 0.3 | 0.3 | 0.9 | 0.9 | 0.3 | 0.4 | 0.4 | 1.0 | 0.9 | 0.3 | 0.3 | 0.4 | 1.0 | 1.3 | 3.9 | 3.9 | 100.2% |
| Total S&L | 2.5 | 4.4 | 5.6 | 12.5 | 9.7 | 2.8 | 2.9 | 6.6 | 12.3 | 11.0 | 4.3 | 4.3 | 5.8 | 14.4 | 11.6 | 5.3 | 5.3 | 7.1 | 17.7 | 16.7 | 56.8 | 48.9 | 116.2% |
| Federal | 2.5 | 6.0 | 6.0 | 14.9 | 11.5 | 3.2 | 3.9 | 3.9 | 10.6 | 13.0 | 5.1 | 5.1 | 6.9 | 17.1 | 13.7 | 6.8 | 6.8 | 9.0 | 22.5 | 19.6 | 65.1 | 53.0 | 112.3% |
| Fed ISD | 0.3 | 0.4 | 0.4 | 1.0 | 0.9 | 0.3 | 0.3 | 0.3 | 1.1 | 1.0 | 0.3 | 0.3 | 0.4 | 1.0 | 1.0 | 0.3 | 0.3 | 0.4 | 1.1 | 1.5 | 4.2 | 4.3 | 97.7% |
| Total Federal | 2.8 | 6.4 | 6.4 | 15.9 | 12.3 | 3.5 | 4.3 | 3.8 | 11.6 | 14.0 | 5.5 | 5.5 | 7.3 | 18.2 | 14.7 | 7.1 | 7.1 | 9.4 | 23.6 | 21.2 | 69.3 | 62.3 | 111.2% |
| Higher Ed Field | 1.3 | 9.0 | -5.2 | 4.8 | 4.4 | 1.3 | 1.1 | 2.8 | 5.3 | 5.5 | 1.8 | 1.8 | 2.4 | 6.0 | 5.8 | 1.9 | 1.9 | 2.5 | 6.4 | 6.3 | 22.8 | 24.4 | 93.4% |
| Higher Ed ISD | 0.1 | 0.2 | 0.2 | 0.5 | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 | 0.1 | 0.2 | 0.2 | 0.5 | 0.5 | 0.2 | 0.2 | 0.2 | 0.5 | 0.8 | 2.0 | 2.0 | 87.5% |
| Total Higher Ed | 1.4 | 9.2 | -5.0 | 5.7 | 5.3 | 1.5 | 1.2 | 3.0 | 5.7 | 6.0 | 1.9 | 1.9 | 2.6 | 6.5 | 6.3 | 2.1 | 2.1 | 2.7 | 6.9 | 9.1 | 24.7 | 26.6 | 93.0% |
| Healthcare Field | 4.1 | -1.1 | 4.1 | 2.6 | 2.6 | 0.6 | 0.8 | 2.5 | 4.1 | 3.0 | 1.3 | 1.3 | 1.8 | 4.5 | 3.2 | 1.7 | 1.7 | 2.1 | 5.3 | 4.5 | 18.3 | 13.3 | 137.2% |
| Healthcare ISD | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.4 | 0.1 | 0.1 | 0.1 | 0.4 | 0.4 | 1.4 | 1.4 | 113.6% |
| Total Healthcare | 4.2 | -1.0 | 4.5 | 3.0 | 2.8 | 0.8 | 0.9 | 2.6 | 4.3 | 3.2 | 1.5 | 1.5 | 2.0 | 4.9 | 3.6 | 1.9 | 1.8 | 2.4 | 6.0 | 5.0 | 19.7 | 14.5 | 135.3% |
| Fin Serv Field | 1.1 | 1.8 | 2.5 | 5.3 | 5.3 | 1.2 | 1.2 | 3.3 | 5.5 | 6.0 | 1.9 | 1.9 | 2.5 | 6.3 | 6.4 | 2.5 | 2.5 | 3.3 | 8.2 | 9.2 | 25.3 | 26.9 | 94.1% |
| Fin Serv ISD | 0.1 | 0.2 | 0.4 | 0.4 | 0.2 | 0.1 | 0.0 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.3 | 0.3 | 0.3 | 0.1 | 0.1 | 0.3 | 0.4 | 0.4 | 1.2 | 1.1 | 109.9% |
| Total Financial Services | 1.2 | 1.9 | 2.8 | 5.7 | 5.5 | 1.3 | 1.2 | 3.3 | 5.7 | 6.3 | 2.0 | 2.0 | 2.6 | 6.6 | 6.6 | 2.6 | 2.6 | 3.4 | 8.5 | 9.6 | 26.6 | 28.0 | 94.8% |
| Comm Field | 2.2 | 2.9 | 6.3 | 11.4 | 10.5 | 2.3 | 2.0 | 5.9 | 10.2 | 12.5 | 5.7 | 5.7 | 7.6 | 19.0 | 13.1 | 6.7 | 6.7 | 8.9 | 22.2 | 19.6 | 63.0 | 55.7 | 113.0% |
| Comm ISD | 0.1 | 0.2 | 0.4 | 0.9 | 0.2 | 0.1 | 0.0 | 0.2 | 0.5 | 0.6 | 0.2 | 0.2 | 0.3 | 0.7 | 0.7 | 0.2 | 0.2 | 0.3 | 0.7 | 1.2 | 2.9 | 2.9 | 84.0% |
| Total Communications | 2.3 | 3.3 | 6.7 | 12.3 | 10.8 | 2.5 | 2.1 | 6.2 | 10.8 | 13.1 | 5.9 | 5.9 | 7.9 | 19.8 | 13.8 | 6.9 | 6.9 | 9.2 | 23.0 | 20.8 | 65.8 | 58.6 | 112.0% |
| Util Field | 0.3 | 0.4 | 0.0 | 0.3 | 2.1 | 1.0 | 0.6 | 1.2 | 2.8 | 1.8 | 1.4 | 1.4 | 1.9 | 4.8 | 0.2 | 1.5 | 1.5 | 1.9 | 4.9 | 1.7 | 7.7 | 7.9 | 177.6% |
| Util ISD | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.7 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.7 | 0.7 | 71.9% |
| Total Utilities | 0.3 | 0.4 | 0.6 | 1.3 | 2.2 | 1.0 | 0.6 | 1.2 | 2.8 | 1.9 | 1.5 | 1.5 | 2.0 | 4.9 | 2.1 | 1.5 | 1.5 | 2.0 | 5.0 | 2.3 | 14.2 | 8.6 | 164.3% |
| O&M/Apps | 1.2 | 2.8 | 1.3 | 5.3 | 3.3 | 1.8 | 1.7 | 4.9 | 3.8 | 4.0 | 1.4 | 1.4 | 5.3 | 5.3 | 4.0 | 1.6 | 1.6 | 2.2 | 4.0 | 2.3 | 20.8 | 16.8 | 124.3% |
| HQ Sales | 1.8 | 3.7 | 4.5 | 12.0 | 6.7 | 0.9 | 2.5 | 2.7 | 6.2 | 1.6 | 2.8 | 2.8 | 3.7 | 9.2 | 8.0 | 2.8 | 2.8 | 3.8 | 9.4 | 11.6 | 36.8 | 34.0 | 108.2% |
| ISD Infrastructure | 0.3 | 0.5 | 1.5 | 0.5 | 0.5 | 0.0 | 0.0 | 1.9 | 1.9 | 1.6 | 0.6 | 0.6 | 0.8 | 1.7 | 1.7 | 0.6 | 0.6 | 1.9 | 2.2 | 4.2 | 6.2 | 7.1 | 87.5% |
| HQ ISD | 0.3 | 0.8 | 1.5 | 2.0 | 2.0 | 0.5 | 0.5 | 0.9 | 1.8 | 2.4 | 0.7 | 0.7 | 2.2 | 2.4 | 2.4 | 0.9 | 0.9 | 1.2 | 3.0 | 3.5 | 9.6 | 10.2 | 93.8% |
| HQ Gov | 1.6 | 2.9 | 1.1 | 5.5 | 7.1 | 2.0 | 1.5 | 0.9 | 4.3 | 8.0 | 1.4 | 1.4 | 1.9 | 4.8 | 4.8 | 1.5 | 1.5 | 1.9 | 4.9 | 3.5 | 19.5 | 35.6 | 54.7% |
| Total License (v/Comm ISD) | 16.7 | 42.3 | 24.7 | 85.1 | 69.7 | 18.4 | 19.0 | 35.1 | 72.4 | 78.8 | 29.6 | 29.6 | 39.4 | 98.6 | 83.1 | 34.6 | 34.6 | 46.1 | 115.2 | 108.9 | 370.0 | 351.5 | 105.3% |
| Total License (w/out Comm ISD) | 16.4 | 41.6 | 23.5 | 81.5 | 67.0 | 18.7 | 32.7 | 35.1 | 69.4 | 76.0 | 28.5 | 28.5 | 38.1 | 95.2 | 80.0 | 33.5 | 33.5 | 44.7 | 111.8 | 115.3 | 357.8 | 338.3 | 105.8% |
| OSI Consulting | 27.6 | 30.3 | 30.7 | 88.6 | 83.9 | 32.2 | 34.2 | 35.1 | 101.4 | 86.7 | 32.6 | 32.8 | 32.8 | 98.5 | 90.9 | 33.5 | 33.5 | 33.5 | 100.5 | 98.2 | 388.9 | 359.8 | 108.1% |
| Total OSI | 44.3 | 72.6 | 55.4 | 173.6 | 153.6 | 50.5 | 53.1 | 70.2 | 173.8 | 165.5 | 62.4 | 62.4 | 72.3 | 197.1 | 174.1 | 68.1 | 68.1 | 79.6 | 215.7 | 218.0 | 759.0 | 711.3 | 106.7% |
| Total OSI ISD | 1.0 | 1.7 | 2.4 | 5.2 | 4.1 | 1.3 | 1.1 | 1.6 | 4.2 | 4.6 | 1.4 | 1.4 | 1.9 | 4.7 | 4.9 | 1.7 | 1.7 | 2.2 | 5.6 | 7.1 | 19.7 | 20.7 | 95.3% |
| Total Commercial ISD | 0.3 | 0.7 | 1.2 | 2.2 | 2.7 | 0.4 | 0.3 | 2.4 | 3.1 | 2.9 | 1.0 | 1.0 | 1.4 | 3.2 | 3.2 | 1.0 | 1.4 | 1.5 | 1.5 | | 5.5 | 5.4 | 101.7% |

ORACLE
CONFIDENTIAL

CA-ORCL 036626

HEADCOUNT



| LOB | Vertical | Act Jun | Act Jul | Act Aug | Bud Q1 | Act Sep | Act Oct | Fcst Nov | Avg Q2 | Bud Q2 | Fcst Dec | Fcst Jan | Fcst Feb | Avg Q3 | Bud Q3 | Fcst Mar | Fcst Apr | Fcst May | Avg Q4 | Bud Q4 | Avg FY01 | Budget FY01 | % of Plan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | S&L | 144 | 145 | 147 | 160 | 149 | 155 | 159 | 154 | 165 | 159 | 159 | 159 | 159 | 165 | 159 | 159 | 159 | 159 | 165 | 159 | 165 | 93.6% |
|  | S&L ISD | 32 | 33 | 32 | 32 | 30 | 29 | 31 | 30 | 30 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 30 | 31 | 30 | 103.8% |
| Total S&L |  | 176 | 178 | 179 | 188 | 179 | 184 | 190 | 184 | 195 | 190 | 190 | 190 | 190 | 195 | 190 | 190 | 190 | 190 | 195 | 190 | 195 | 93.6% |
|  | Federal | 195 | 198 | 198 | 197 | 190 | 186 | 183 | 186 | 210 | 183 | 183 | 183 | 183 | 210 | 183 | 183 | 183 | 183 | 210 | 187 | 210 | 89.0% |
|  | Fed ISD | 41 | 39 | 39 | 40 | 38 | 38 | 37 | 37 | 38 | 37 | 37 | 37 | 37 | 38 | 37 | 37 | 37 | 37 | 38 | 38 | 38 | 99.8% |
| Total Federal |  | 236 | 239 | 237 | 237 | 228 | 223 | 220 | 186 | 248 | 220 | 220 | 220 | 183 | 248 | 220 | 220 | 220 | 183 | 248 | 187 | 248 | 75.4% |
|  | Higher Ed Field | 77 | 79 | 79 | 80 | 77 | 73 | 70 | 70 | 83 | 70 | 70 | 70 | 70 | 88 | 70 | 70 | 70 | 70 | 88 | 88 | 88 | 83.5% |
|  | Higher Ed ISD | 17 | 17 | 16 | 17 | 14 | 14 | 15 | 15 | 14 | 15 | 15 | 15 | 15 | 14 | 15 | 15 | 15 | 15 | 14 | 14 | 14 | 109.5% |
| Total Higher Ed |  | 94 | 96 | 102 | 97 | 91 | 88 | 85 | 88 | 97 | 85 | 85 | 85 | 85 | 102 | 85 | 85 | 85 | 85 | 102 | 102 | 102 | 87.1% |
|  | Healthcare Field | 50 | 49 | 49 | 52 | 44 | 45 | 47 | 45 | 54 | 47 | 47 | 47 | 47 | 54 | 47 | 47 | 47 | 47 | 54 | 47 | 54 | 86.1% |
|  | Healthcare ISD | 2 | 7 | 8 | 8 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 90.7% |
| Total Healthcare |  | 52 | 56 | 49 | 60 | 53 | 54 | 56 | 54 | 63 | 56 | 56 | 56 | 56 | 63 | 56 | 56 | 56 | 56 | 63 | 55 | 63 | 86.8% |
|  | Fin. Serv. Field | 67 | 65 | 68 | 69 | 67 | 63 | 64 | 65 | 74 | 64 | 64 | 64 | 64 | 79 | 64 | 64 | 64 | 64 | 81 | 81 | 81 | 86.3% |
|  | Fin. Serv. ISD | 10 | 8 | 7 | 8 | 7 | 7 | 8 | 7 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 9 | 9 | 9 | 88.0% |
| Total Financial Services |  | 77 | 73 | 75 | 77 | 74 | 70 | 72 | 72 | 82 | 72 | 72 | 72 | 72 | 87 | 72 | 72 | 72 | 72 | 90 | 73 | 90 | 80.8% |
|  | Comm. Field | 151 | 139 | 135 | 142 | 131 | 125 | 126 | 127 | 147 | 126 | 126 | 126 | 126 | 151 | 126 | 126 | 126 | 126 | 151 | 130 | 151 | 86.3% |
|  | Comm. ISD | 18 | 19 | 18 | 18 | 20 | 19 | 19 | 19 | 20 | 19 | 19 | 19 | 19 | 20 | 19 | 19 | 19 | 19 | 22 | 19 | 22 | 85.6% |
| Total Communication |  | 169 | 158 | 153 | 160 | 150 | 144 | 145 | 146 | 167 | 145 | 145 | 145 | 145 | 173 | 145 | 145 | 145 | 145 | 173 | 149 | 173 | 86.2% |
|  | Util. Field | 19 | 30 | 32 | 27 | 34 | 34 | 34 | 34 | 36 | 34 | 34 | 34 | 34 | 37 | 34 | 34 | 34 | 34 | 37 | 32 | 37 | 86.4% |
|  | Util. ISD | 2 | 7 | 5 | 5 | 7 | 7 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 7 | 6 | 7 |  |
| Total Utilities |  | 21 | 37 | 37 | 32 | 41 | 41 | 40 | 40 | 43 | 40 | 40 | 40 | 40 | 44 | 40 | 40 | 40 | 40 | 44 | 38 | 44 | 86.4% |
|  | CRM/Apps | 77 | 75 | 72 | 74 | 73 | 73 | 73 | 73 | 76 | 75 | 75 | 75 | 75 | 76 | 75 | 75 | 75 | 75 | 75 | 76 | 76 | 97.7% |
|  | HQ-Sales | 135 | 138 | 143 | 139 | 143 | 144 | 140 | 142 | 155 | 140 | 140 | 140 | 140 | 160 | 140 | 140 | 140 | 140 | 160 | 140 | 160 | 87.7% |
|  | HQ-Serv | 34 | 34 | 34 | 50 | 34 | 34 | 34 | 34 | 45 | 34 | 34 | 34 | 34 | 45 | 34 | 34 | 34 | 34 | 45 | 45 | 45 | 75.8% |
|  | HQ-Gov | 102 | 78 | 77 | 89 | 76 | 78 | 79 | 78 | 116 | 79 | 79 | 79 | 79 | 116 | 79 | 79 | 79 | 79 | 121 | 81 | 121 | 66.9% |
| Total License (w/Comm ISD) |  | 1,161 | 1,157 | 1,167 | 1,232 | 1,240 | 1,133 | 1,135 | 1,136 | 1,278 | 1,135 | 1,135 | 1,135 | 1,135 | 1,301 | 1,135 | 1,135 | 1,135 | 1,135 | 1,317 | 1,112 | 1,331 | 83.3% |
| Total License (w/out Comm ISD) |  | 1,150 | 1,120 | 1,119 | 1,150 | 1,099 | 1,091 | 1,093 | 1,001 | 1,237 | 1,093 | 1,093 | 1,093 | 1,099 | 1,256 | 1,093 | 1,093 | 1,093 | 1,099 | 1,270 | 1,077 | 1,291 | 83.4% |
| OSI Consulting |  | 2,093 | 2,167 | 2,216 | 2,092 | 2,279 | 2,370 | 2,553 | 2,401 | 2,354 | 2,634 | 2,634 | 2,634 | 2,634 | 2,304 | 2,727 | 2,727 | 2,727 | 2,634 | 2,356 | 2,480 | 2,356 | 105.3% |
| Total OSI |  | 3,274 | 3,328 | 3,325 | 3,424 | 3,419 | 3,503 | 3,688 | 3,537 | 3,522 | 3,769 | 3,769 | 3,769 | 3,769 | 3,605 | 3,861 | 3,861 | 3,861 | 3,769 | 3,673 | 3,937 | 3,937 | 97.4% |
| Total OSI ISD |  | 124 | 125 | 121 | 127 | 116 | 115 | 117 | 116 | 127 | 117 | 117 | 117 | 117 | 127 | 117 | 117 | 117 | 117 | 127 | 118 | 127 | 93.2% |
| Total Commercial ISD |  | 32 | 41 | 38 | 41 | 41 | 42 | 42 | 35 | 41 | 42 | 42 | 42 | 36 | 43 | 42 | 42 | 42 | 36 | 47 | 35 | 40 | 87.3% |

ORACLE
CONFIDENTIAL

CA-ORCL 036627

NDCA-ORCL 038809