# EXHIBIT 152

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MASTER FILE NO. C-01-0988-SI

LOCAL 144 NURSING HOME PENSION FUND, UFCW LOCAL 56 RETAIL MEAT
PENSION FUND, DRIFTON FINANCE CORPORATION, AND ROBERT D.
SAWYER, et al.

vs.

ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY,
EDWARD J. SANDERSON

EXPERT REPORT

OF

D. PAUL REGAN, CPA, CFE

Initially Submitted:  MAY 25, 2007
Sworn:  OCTOBER 16, 2008

**Introduction**

The opinions expressed in this report are my present opinions subject to the following reservations.   Amendments or additions to this report may be required as a result of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and the testimony of any other witness in deposition or at trial.

## I.   The Nature of My Assignment

I have been retained, through my employer, Hemming Morse, Inc. ("HMI"), by Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for Plaintiffs, Local 144 Nursing Home Pension Fund, et al, to provide expert testimony regarding whether Oracle's revenue and earnings for the quarterly period ended November 30, 2000 ("2QFY01") were presented in accordance with Generally Accepted Accounting Principles ("GAAP"), and whether Oracle's financial statements were materially misstated.  Specifically, I have been asked to address the following:

1.   Oracle's accounting for unapplied cash and customer overpayments,[1] the use of unapplied cash within its Bad Debt Reserve, the relationship of the November 2000 Debit Memos to Oracle's unapplied cash activity in Q2FY01, and the related revenue and earnings impact.[2]

2.   Oracle's recognition of $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with Hewlett Packard ("HP").

## II.   Summary of Opinions

Oracle's financial statements for the quarterly period ended November 30, 2000 were not presented in accordance with GAAP.  Specifically, Oracle:

---

[1] The term customer overpayment includes instances of duplicate payments of an invoice, payments on amounts that were credited, paid amounts where all or portion of the arrangement was cancelled, payments of unnecessary tax, and other instances where customers paid Oracle in an amount that exceeded its related obligation.  Certain terms used herein are further defined in Appendix 1, a glossary from Oracle's Account's Receivable User's Guide.

[2] Oracle's fiscal year ends on May 31st.  November 30th represents the final date of Oracle's second fiscal quarter.  In this report, I have referred to the three months ended November 30, 2000 as "2QFY01."

1. Improperly utilized a series of debit memos to "apply" unapplied cash. These debit memos helped conceal Oracle's use of customer overpayments to overstate its Bad Debt Reserve by at least $20 million. The overstatement of the Bad Debt Reserve was eliminated by improperly increasing revenue and pre-tax earnings in the same amount in 2QFY01. This conduct enabled Oracle to overstate its Q2FY01 diluted earnings-per-share ("EPS") by $.01.

2. Improperly recognized $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with HP that failed to meet the criteria needed for this revenue to be properly recognized by Oracle. This conduct also enabled Oracle to overstate its Q2FY01 EPS by $.01.

3. Overstated its reported earnings-per-share of $0.11. Oracle's actual EPS should not have included the effects of the overstatement of earnings related to the transfer of customer overpayments into its Bad Debt Reserve, and separately the earnings related to the HP transaction. If Oracle had excluded either one of these transactions from its reported revenue and earnings, its EPS would have been $0.10.

4. Overstated its Customer Advances and Unearned Revenue by including customer overpayments and other unapplied cash in this balance. These amounts were a liability, such as Accounts Payable, that Oracle owed to its customers.

<u>Summary of Expert Qualifications</u>

1. I am a Certified Public Accountant, licensed in the State of California, and a Certified Fraud Examiner. I am currently the President and Chairman of Hemming Morse, Inc., CPAs, Litigation and Forensic Consultants, a 95 person accounting firm. Until July of 2004, I was the Director in charge of its litigation and forensic consulting practice. I had performed that responsibility for more than 29 years. My work in the accounting profession includes experience as an auditor and as a consultant. My expert qualifications, including my testimony in the last four years and the publications I have authored, are described in **Exhibit A** to this report.

2. I have been a Certified Public Accountant continuously since 1970. During these years I have worked on more than 500 complex litigation matters. Many of these have required an extensive analysis and determination of whether financial statements were presented in accordance with GAAP, including whether revenue was properly recognized in particular periods of those financial statements. I have performed these analyses for large and small companies in the private sector, as well as for public companies. These analyses have involved financial statements of entities across a diverse range of industries, including high technology, software, and leasing companies. I have testified as an expert in more than 70 trials and arbitrations and in more than 125 depositions. These cases were generally in state and federal courts in the United States.

3. I am a member of the California Society of Certified Public Accountants ("CalCPA"). I have served on its statewide Litigation Services Steering Committee since 1990 and I was its Chair during 2004 / 2005. This Steering Committee provides guidance to the more than 800 members of its four Operating Sections – (1) Business Valuation, (2) Economic Damages, (3) Fraud and (4) Family Law. For two and one-half years (through August of 1998), I was Chair of its 250-member Economic Damages Section. I served as Chair of the 28,000-member CalCPA during 2004 / 2005.

4. The American Institute of Certified Public Accountants ("AICPA") has a national Forensic and Litigation Services Subcommittee ("FLSS") (formerly the Litigation and Dispute Resolution Subcommittee ("LDRS")). From 1998 until July of 2001, I served as one of the nine members of this national committee. The FLSS oversees and provides guidance to the AICPA's 330,000 members in their practice as it relates to litigation consulting and dispute resolution. The FLSS also provides guidance and supervision to its subcommittees, which include Economic Damages, of which I was its Chairperson from 1999 to July 2001. I am presently a member of the AICPA's governing council.

5. My firm is being compensated for my review and analysis in this matter at my standard hourly rate, which is currently $525 per hour. Others have assisted me in my work and my firm is being compensated for their work at their standard hourly rates.

### III.   Evidence Considered

In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field.  A detailed listing of these sources is identified in **Exhibit B** to this report.

I have also relied upon my own professional judgment and expertise gathered during the almost 40 years I have been practicing public accounting and the more than 35 years that I have analyzed the accounting for financial transactions, the presentation of transactions in financial statements in accordance with GAAP, audits of financial statements, and transactions that are the subject of legal disputes.

### IV.   Detail of Opinions Regarding Oracle's Improper Accounting for Unapplied Cash and Customer Overpayments Associated with Debit Memos

1. For Q2FY01, Oracle inflated its revenue, which resulted in a material overstatement of earnings;

   - As a result of Oracle's improper transfer of customer overpayments, it's Bad Debt Reserve was inflated by at least $20 million in 2QFY01.

   - Based on this improper excess, Oracle improperly recorded a $20 million reduction to the balance of its Bad Debt Reserve.  The reduction of the Bad Debt Reserve resulted in a $20 million increase to Oracle's reported revenue and pre-tax earnings in 2Q01.

   - The $20 million increase enabled Oracle to report 2QFY01 earnings-per-share of $0.11.  If Oracle had reported earnings that were consistent with GAAP, its EPS would have been $0.10.

2. The 46,881 debit memos that Oracle processed during 2QFY01 allowed Oracle to conceal overpayments and unapplied cash from customers, and facilitated Oracle's improper transfer of customer overpayments to the Bad Debt Reserve.

- Receipts that were in the Bad Debt Reserve *and* "On Account" were outstanding and therefore available to Oracle collections personnel as potential credits or refunds to customers.  However, receipts that were "Applied" were not available to Oracle staff for potential credits or refunds to customers.

- The debit memo invoices which caused the cash receipts to become "Applied" were not bona-fide invoices, and Oracle's customers did not intend for their payments to be applied to the debit memos.  Oracle did not tell its customers about the debit memo invoices, and took steps to conceal and misrepresent them.

3. Oracle improperly classified customer overpayments and other unapplied cash receipts in its reported balance of Customer Advances and Unearned Revenue.

**The Problem of the Unapplied Cash Accumulation at Oracle**

4. At the beginning of 2QFY01, Oracle had accumulated at least $144 million of cash receipts from its customers that it was unable to apply to an invoice (*see* table in paragraph 9).[3]  Oracle attributed the majority of the unapplied cash to the following situations: a) the receipt is to be refunded; b) there is not enough information to determine where the receipt belonged; or c) the receipt pertains to a financed transaction or belongs in a GL account.[4]  One of Oracle's Collections Managers testified that this "large" balance of unapplied cash was a "very, very large problem, the biggest problem that anybody in collections or accounts receivable had."[5]  Jeff Henley, Oracle's Chief Financial Officer, acknowledged the Company's prior problems with unapplied cash.[6]

---

[3] Deposition of Michael Quinn, April 18, 2006, 158:11-18, "Q. And that's what you were testifying to earlier today, right, that there was a challenge due to accumulating cash partly from customer overpayments in Oracle's unapplied cash account, right? [A] The problem was an accumulation of items in unapplied cash."

[4] NDCA-ORCL 1885992-6020 at 1885996, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."

[5] Deposition of Ian Hatada, October 5, 2006, 78:20-25-79:9 "[A] Yes, it was large from the time I got there to the time I left. [Q] …I think you characterized it as a 'problem;' right? A. It was a very, very large problem, the biggest problem that anybody in collections or accounts receivable had."

[6] Deposition of Jeffrey Henley, November 16, 2006, 465:7-21"Q. And what was the cause of those problems?  A. Again, my recollection, as best I can tell, I think, was that the group over there that was in that department started falling behind and was not – were not staying up on top of the work, and it had – **there was a similar problem when I joined the company many years ago, which we cleaned up.  And so I was disappointed when I found out about it because here we were repeating sins of the past many years later.**  Q. And were there no internal controls in place  to ensure that that didn't happen again?  A. Again, there were a lot more controls in the company

5. A significant cause of the balance of unapplied cash was overpayments made by Oracle's customers. This situation was acknowledged by Oracle in its naming of account 25005 as "Customer Overpayments." These customer overpayments resulted from a variety of circumstances that were enabled by Oracle itself, and included:

- Oracle had a practice to <u>not</u> send credit memos[7] or account statements to its customers, unless those documents were explicitly requested by the customer.[8,&9] Oracle's practice caused customers to often be unaware of outstanding credits, resulting in overpayments.[10]

- Oracle's policy was to not issue a refund unless the customer made a specific request for one.[11] Even if the customer made such a request, Oracle would often deny the customer a refund if the customer had any other receivables outstanding or if Oracle had previously written off amounts as bad debt (typically via a credit memo).[12,13&14]

---

over the years, but – and certainly in the revenue recognition area, a number of controls. But in this case, there was a collections department, there was a manager, and **I don't think there was adequate supervision.** So there was some that – while there were controls, they fell behind."  (Emphasis added.)

[7] *See* Deposition of Tom Williams, June 7, 2006, 155:4-7.  *See also* Williams Deposition, Ex. 4 at NDCA-ORCL 048663.  Oracle's manual entitled *Oracle Receivable User's Guide*, Release 105C, March 1997, Volume I, defines a Credit Memo as "A document which partially or fully reverses an original invoice.  You can create credit memos through the Receivables, Enter Credit Memos form, or through AutoInvoice."  In other words, a Credit Memo is typically used to partially or fully offset the balances of outstanding or future invoices, or is utilized by the customer to obtain a refund, and generally results in a reduction to accounts receivable and revenue.

[8] Deposition of Greg Myers, May 23, 2006, 75:19-21, "We generally don't send statements to our customers unless they request them."

[9] PLF-ORC 000133, "Can we consider sending the Customers the system generated Credit Memos?  <u>Our practice of not sending Credit Memos</u> makes account reconciliation extremely difficult.  We send the invoice and often send a rebill, but <u>we never send the Credit Memo</u> that clears the original invoice and validates the rebill."  (Emphasis added.)

[10] NDCA-ORCL 1895745, e-mail from Molly Littlefield, "We actually have the unapplied cash. We never booked the order but the customer paid.  We want to book it or try to get upper management to agree that we should keep this money."

[11] Deposition of Raul Campos, March 28, 2006 126:15-25, "Q.  Right.  So – so once you did that – once you did some research and found that there was nothing – in circumstances where you found there was nothing to apply it to did you refund the customers?  A.  If the customer would request a refund.  Q.  What about if a customer didn't request a refund?  A.  It would remain unapplied.  Q.  Did you call customers to tell them, 'Hey, you have money unapplied.  Do you want it back?'  A.  No."  *See also* 128:17-129:12, "Q.  And did you or anyone at Oracle send letters to the customers saying, 'Hey, there are these items associated with you that are in our Unapplied Account?' …A.  I did not personally send any letters out and to my knowledge nobody else did either.  Q.  Did you call customers and tell them that they had money in On Account that is available for refund or anything like that?  A. No.  Q.  Do you know if anyone else did at Oracle?  A.  Not to my knowledge."

[12] *See* Deposition of Ian Hatada, October 5, 2006, 64:23-68:20, including for example, "At times we – we had to put together a request to the Accounts Receivable Department to refund, and at times those requests would be put on

6.   The use of the systematic practices described above caused Oracle's customers to pay duplicate and erroneous invoice amounts.[15]  The unapplied cash from customer overpayments were amounts Oracle owed to its customers.  These cash receipts were not amounts earned by Oracle, and it was not entitled to keep these funds.  However, Oracle's policies inhibited the refund process, and in November 2000 it covered up the audit trail within its internal records used to track customer overpayments (see discussion below regarding the November 2000 Debit Memo invoices).

7.   Customers that learned of Oracle's practice to not refund overpayments found it unacceptable.  For example, one of its customers, Household, wrote to Oracle:

> Two weeks ago we determined that an additional $178,346.77 in Household International and its affiliates' funds [were] being held by Oracle, but Household had not been previously advised.…Oracle's continued retention of Household funds, without communication as to the reason for the delay, is unacceptable.[16]

### Oracle's Misclassification of Customer Overpayments and Other Unapplied Cash

8.   Oracle had an obligation to either apply the unapplied cash to existing accounts receivable, or acting jointly with its customers, seek an appropriate alternative resolution of the overpayment.  For example, Oracle and the customer could have determined that the payment would be applied to another outstanding invoice or that the cash should be

---

hold for long periods of time, and the money would not go back to the client. Q.  Okay.  So was it determined that an item of unapplied cash needed to be refunded but the process was never implemented so the money never got refunded? Is that correct? [A] True. Q.  Even though the collectors determined that it was the customer's money and should go back to the customer, it was never refunded; was it? A. True. Q.  And that happened multiple times; didn't it? [A] Yes."  *See also*, 139:6-11, "It happened when Quinn had – advised us not to refund anything that was revenue impacting, and it happened when we got farther in to the project and found that there were a lot of items that truly needed to be refunded, and Tom Williams shut off the – the whole refunding of the project."

[13] NDCA-ORCL 1886317, e-mail from Molly Littlefield to various Oracle personnel entitled "Re: [Fwd: REFUND REQUEST/GE Power]," "All, I agree we should not rush into the refund at this point, but I wanted to just add a couple of points.  I believe the research that is provided on the refund is correct and we owe the customer this money."

[14] NDCA-ORCL 1865593-600, an Oracle representative provided Verizon a list of unapplied cash in response to an inquiry from a Verizon internal auditor.  Littlefield responded, "We probably should not have given them the list of unapplied but since we did we need to make them prove to us that the money is theirs."  Littlefield further responded, "[t]hey should be providing us the reasons for refunding.  We should not be researching for them.  If they want a refund then make them prove to us why?  Maybe I am missing something here but if they want the money shouldn't they tell us why?"

[15] *See* detailed reports supporting customer refunds, for example, NDCA-ORCL 1722665-82.  This report specifies a number of different origins for amounts that were refunded (*see* "Reason" column).

[16] HI000111.

refunded to the customer.    In the unlikely event that Oracle was ultimately unable to determine how to apply a particular payment that it received from a customer or that a refund was appropriate, it had a legal obligation to escheat the funds to the appropriate government entity.[17]

9.  There were at least three general ledger accounts where Oracle maintained the unapplied cash from customer receipts.  During 2QFY01, the balance of unapplied cash decreased $49.9 million (see table below):

---

[17] *See* for example NCDA-ORCL 1895998-99.  This letter from Oracle to JDS Uniphase ("JDS") in August 2004 indicates that Oracle was holding unapplied cash receipts from JDS.  Oracle provided JDS with three options as follows: "[1] Our Records Indicate that the Credits are in Error (Oracle should adjust their records as needed), [2] Issue a Refund of the Above Amount, or [3] Apply Above Amounts to Current Outstanding Invoices." JDS indicated that it desired a refund.  This letter indicates that Oracle understood the appropriate alternatives to employ to resolve the customer overpayments, including that it did not have a unilateral right to offset the overpayments against other amounts of its choosing, or to apply customer overpayments to debit memos as it did in November 2000.  Finally, this letter indicated that if Oracle did not receive a timely response to the letter, it would escheat the money to the state of California.  The individual states have laws requiring amounts to be escheated after certain periods of time that such payments are unclaimed.

| Account Name | Account # | Q2 Beginning Balance | Q2 Ending Balance | Change |
|---|---|---|---|---|
| Unapplied Cash | 12018[18] | $86.3M | $64.6M | $(21.8)M |
| Bad Debt Write Offs | 12601[19] | (15.7) | 4.4 | 20.0 |
| Customer Overpayments | 25005[20] | 73.6 | 25.4 | (48.2) |
| **Total** | | **$144.2M** | **$94.4M** | **$(49.9)M** |

10. For the reasons described below, Oracle's usage of both the 12601 and 25005 accounts was improper. In addition, the 12018 account should not have been utilized as an account to indefinitely retain payments from customers that Oracle was not able to assign to proper invoices.

11. I have also reviewed certain evidence to suggest that these balances of unapplied cash may have been larger. However, Oracle appears to have conducted "routine 'Q-end unapplied clean up' drills," in which it reduced unapplied cash by applying the receipts to other invoices without adequate review. [21]

*Customer overpayments and other unapplied cash receipts were improperly included in the 12601 account*

12. It was improper under GAAP to include unapplied cash in the 12601 account because that account was a component of Oracle's Bad Debt Reserve.[22&23]   Oracle did not have

---

[18] AA 000035, Accounts Receivable Variation Analysis as of November 30, 2000.

[19] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation Q2FY01. This account also was utilized for Bad Debt Write-offs, which offset the unapplied cash. *See also* NDCA-ORCL 104764-65 (identical to NDCA-ORCL 313945-46 below – 12601 Reserve Activity). This document identifies that, in total, the 12601 account included $29.2 million of unapplied cash ($24.356 million from June to November 2000 per 104764 and $4.875 million prior to that time per 104765). As of November 30, 2000, $20.8 million of this unapplied cash was transferred into the account during Q2FY01 (*see* discussion below). A total of $8.4 million of unapplied cash had been transferred into the account in earlier periods. Since the fluctuation of the account in the quarter was approximately equal to the total amount of transfers during Q2FY01, it appears that Oracle did not increase its Bad Debt Write-offs during the quarter, and the only significant impact was from the transfer of unapplied cash.

[20] AA 000040, Unearned Revenue Variation Analysis.

[21] NDCA-ORCL 1856278. E-mail from David Tejeda, an Oracle collections representative, noting "The application that I made to invoice 6057195 is definitely a misapplication. I'm not big on intentionally misapplying funds. However, being a Feb. 2001 application, I'm pretty sure I was involved in one of our routine 'Q-end unapplied clean up' drills, as we used to do on the final months of each Q back then. Please do unapply this payment, as I'm 99% sure it doesn't belong to invoice 6057195." (Emphasis added.)

[22] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation for Q2FY01 showing the inclusion of the 12601 account as a component of the Bad Debt Reserve.

rights of ownership with respect to the customer overpayments.  Therefore, it was not entitled to use these amounts to offset credit losses from unrelated transactions.

13. GAAP notes that the accounting for the impairment of an asset, such as accounts receivable, requires an accrual (i.e., a charge) to the income statement.[24]  Oracle's accounting for unapplied cash within the Bad Debt Reserve was inconsistent with GAAP and its own policy because there was no related charge to the income statement.[25]  The unapplied cash was either applicable to existing accounts receivable, in which case the amounts should have remained in 12018, or the amounts had been mistakenly remitted by Oracle's customers, and should have been included in an accounts payable account to be refunded to these customers.

*Customer overpayments and other unapplied cash were improperly presented in Customer Advances and Unearned Revenue*

14. Oracle's inclusion of unapplied cash in its 25005 account as a component of reported Customer Advances and Unearned Revenue was also improper.[26]  GAAP describes Unearned Revenues as "deposits and prepayments received for goods or services <u>to be provided</u>."[27]  Therefore, Oracle's balance sheet classification improperly represented that the amounts contained within 25005 would ultimately be recorded as revenue.  This was inaccurate because the unapplied cash was not future revenue, but instead represented amounts that should have been applied to the corresponding accounts receivable balance or returned to Oracle's customers.

---

[23] Deposition of Michael Quinn (Oracle's senior Credit & Collections executive), April 18, 2006, 197:12-24, "Q. And 12601, that was the number for an accounts receivable reserve? A.  Yes. Q.   And prior to November of 2002, money was being transferred between 25005 and 12601, right?  A.  That's my understanding, yes.  Q.   And those transfers impacted Oracle's balance sheet, right?  A.  Yes.  Q. And in what way?  A. It increased the reserve balance that was in the – that GL account, 12601."

[24] Statement of Financial Accounting Standards (FAS) No. 5 "Accounting for Contingencies," ¶ 8 "An estimated loss from a loss contingency . . . shall be <u>accrued</u> by a *charge to income*."  (Emphasis added.)  *See also*, ¶74, "The accrual of some loss contingencies may result in recording the impairment of the value of an asset rather than in recording a liability, for example, accruals for expropriation of assets or uncollectible receivables."

[25] *See* Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 68-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy.

[26] AA 000040, Variation Analysis as of November 30, 2000.

[27] Emphasis added.  *See* FASB Statement of Financial Accounting Concepts ("FASCON") No. 6 ¶ 197, "Elements of Financial Statements," which states, "Deposits and prepayments received for goods or services to be provided – 'unearned revenues,' such as subscriptions or rent collected in advance – likewise qualify as liabilities under the definition because an entity is required to provide goods or services to those who have paid in advance."

15. Furthermore, Oracle personnel have testified that the amounts within the 25005 "Customer Overpayments" account had generally been flagged for customer refund.[28] Therefore, the unapplied cash included within the Customer Overpayments account, and in particular all of the unapplied cash attributable to customer refunds, represented a <u>liability</u> of Oracle to its customers.   In my opinion, Oracle's accounting for unapplied cash as Customer Advances and Unearned Revenue misclassified this obligation.[29]

*Unapplied cash should have been included in Accounts Payable*

16. Accounts Payable is a liability.  In my opinion, at a minimum, Oracle should have reported unapplied cash receipts held in its 12601 and 25005 accounts within its reported balance of Accounts Payable.  Notably, when Oracle did issue customer refunds the payment was processed through account 20002, which was within Accounts Payable.[30]

17. This opinion is consistent with Oracle's "Unapplied Cash Clean-up" that began in October 2002.  At that time, Oracle refunded at least 117 unapplied cash receipts totaling approximately at least $5.1 million million to customers that had been improperly transferred to the 12601 account in connection with 2QFY01.[31]  Many of these refunds did not take place until Oracle's fiscal 2004.[32]  *See* further discussion below.

18. It is also worthwhile to note that Oracle sought to avoid providing its customers with refunds of their overpayments.   As part of this effort, Oracle offset customer overpayments against unrelated outstanding receivables.  Oracle also reversed prior credit

---

[28] Deposition of Michael Quinn, April 18, 2006, 97:9-19, "What's the difference between unapplied cash that would be in the liability account and unapplied cash that would be in an accounts receivable account?  A.  Generally speaking, it would be – the items in 25005 would be – actually, I'm sorry.  Let me answer the question.  The amounts that would be in a liability account would be generally something that are flagged to be refunded to a customer, payable to a customer."

[29] FASCON No. 6 ¶ 196, "Most liabilities presently included in financial statements qualify as liabilities under the definition in paragraph 35 because they require an entity to sacrifice assets in the future. Thus, accounts and notes payable, wages and salaries payable, long-term debt, interest and dividends payable, and similar requirements to pay cash so obviously qualify as liabilities that they need no further comment."

[30] NDCA-ORCL 1885992-6020 at 1885999, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."  *See also* Deposition of Michael Quinn, April 18, 2006, 102:2-6; Deposition of Gary Matuszak, August 1, 2006, 195:19-196:8, 197:17-198:13.

[31] NDCA-ORCL 1646567-70.  Number of cash receipts; *see* p.69, line 37, column F, totaling 117.  Amount; *see* p.67, line 16, column F, totaling $5,135,672.

[32] NDCA-ORCL 1624272, NDCA-ORCL 1534642-701; NDCA-ORCL 1058909, Debit Memo Script Output.

memos provided to customers, and applied the overpayments to fictitious revenue from "adjusted-up" invoices.[33&34]   This offsetting of assets and liabilities (such as another receivable and the liability to the customer for the overpayment) is improper except where a right of setoff exists.[35]   In my opinion, Oracle did not appear to have a right to offset.[36]

## Oracle's Improper Use of Debit Memos, Customer Overpayments and Other Unapplied Cash to Misstate Its Financial Statements in 2QFY01

19.   During 2QFY01, Oracle used its unapplied cash and customer overpayments for improper purposes in order to inflate its financial results.  To do this, Oracle recorded accounting entries that enabled it to account for $19.4 million of the unapplied cash as if these amounts were truly Oracle's assets.[37&38]   These accounting entries transferred

---

[33] In 2002, Oracle's reversal of the November 2000 Debit Memos resulted in more than $50 million of additional unapplied cash from customer overpayments, which Oracle had to "resolve" (*see* discussion below regarding the Unapplied Cash Clean-up).  One method utilized by Oracle involved the reversal of credit memos and then applying customer overpayments to the "adjusted up" invoices.  Specifically, if a credit memo had been previously issued to the customer, Oracle would reverse that credit memo, and simultaneously create an "adjusted-up" invoice by improperly assuming the original credit memo was in error.  This "adjusted-up" invoice was not sent to the customer, but was improperly created for the purpose of applying the customer overpayment to complete the reversal of the previous credit memo.  *See* Deposition of Ian Hatada, October 5, 2006, 93:20-94:17, "Typically we only adjusted up invoices if there was a credit memo on them….When – you know, as long as there was a credit memo done on the invoice, you could adjust up the invoice and take away the credit memo to apply…. [Q] So you reverse the previous credit memo that was applied that reduced the invoice; right?  A. Correct.  Q.  And how would you reverse a credit memo?  A. It would be a – a request to accounts receivable to reverse the credit, so, therefore, now the credit is no longer on the invoice, there's an outstanding amount.  It matches the amount that's in the unapplied, and, like I said, it was at that point a wash once you applied it."
[34] NDCA-ORCL 1889364-69, e-mail from Lilly Hao to Molly Littlefield.  Littlefield wrote "I think all the highlighted invoices for Pioneer should be adjusted up.  We have plenty of unapplied cash to pay for this money.  Once they are adjusted up I can easily apply money.  However, in some cases the customers have taken credits for these items and I think if we adjust them up to their normal dollar amount and I can apply the cash and then go back to them and tell them that the credits they took were not valid."
[35] APB Opinion No. 10, Omnibus Opinion – 1966, ¶ 7.
[36] FASB Interpretation (FIN) No. 39:  Offsetting of Amounts Related to Certain Contracts (an interpretation of APB Opinion No. 10 and FASB Statement No. 105).  GAAP notes that offsetting is only appropriate when all of the following conditions are met: 1) Each of two parties owes the other determinable amounts; 2) The reporting party has the right to set off the amount owed with the amount owed by other party); 3) The reporting party intends to set off; and 4) The right of setoff is legally enforceable.  In this case, Oracle included the unapplied cash in the 12601 or 25005 accounts when it could not determine how to apply the payment.  Accordingly, Oracle did not meet the criteria for offsetting.
[37] NDCA-ORCL 313945-46, supporting schedule to the "Report of the Special Litigation Committee of the Board of Directors of Oracle Corporation," Volume 1, November 22, 2002.  The total amount of the transfers to 12601 in 2QFY01 was $20.8 million.  However, as discussed below, Oracle calculated its Bad Debt Reserve as of the month immediately prior to quarter-end, which in this case was 10/31/00.  Therefore, for purposes of assessing the impact of the transfer of customer overpayments on Oracle's 2QFY01 earnings, it is necessary to determine the total

unapplied cash out of the Customer Overpayments account 25005 and into account 12601, which as noted above was a component of Oracle's Bad Debt Reserve.  As a result, these transfers (each of which was associated with a debit memo) also impacted revenue (*see* further discussion below).[39]

20. In total, during August and October of 2000, more than 1,900 customer overpayments were transferred by Oracle from the Customer Overpayments account to its Bad Debt Reserve.[40] This amount is specific to the transfers from the 25005 account in Q2FY01, however, I have reviewed evidence that indicates Oracle improperly accounted for other unapplied cash in this reserve account.[41&42]

21. As described above, Oracle misclassified customer overpayments in Account 25005 and Account 12601 (i.e. Unearned Revenue and the Bad Debt Reserve).   However, the

---

transfer activity in the three months ended 10/31/00.  These transfers totaled $19.4 million as follows; August 2000 - $3,562,206 and October 2000 - $15,819,640.  The addition of these amounts to 12601 in these periods is validated elsewhere.  *See* for example NDCA-ORCL 1607481, which is an Oracle document entitled "On Account/Receipt Write-off Summary."

[38] In addition, in earlier periods, Oracle had transferred $4.9 million into the Bad Debt Reserve (NDCA-ORCL 313946).  These earlier transfers also inflated the Bad Debt Reserve in 2QFY01.  NDCA-ORCL 313945-46.

[39] Deposition of Michael Quinn, April 18, 2006, 227:25-228:15.  "Did you prepare an update for the audit committee describing the impact of taking the unapplied cash receipts to the reserve to the audit committee?  A.  I'm assuming I did.  I can't recollect  actually putting it together….Did the process of taking unapplied cash to the reserve impact revenue in any of the eight quarters prior to October 2002?  A. Yes.  Q. And in what quarters?  A. I don't know.  Q.  And did you include that in your update?  A. Yes."

[40] NDCA-ORCL 1607784-822, Oracle's Miscellaneous Offset Reports for August and October 2000.  The August 2000 report includes 517 receipts (end row # 526 minus beginning row #10) and the October 2000 report includes 1387 receipts (end row #1397 minus beginning row #10).  Therefore, the total is approximately 1,900.

[41] NDCA-ORCL 3042910, e-mail from Neal Menon to various Oracle personnel dated November 6, 2000 regarding unapplied cash.  Menon identified $16.985 million of unapplied cash related to OCC (Oracle Credit Corporation).  Although he requests that Oracle's collection personnel assist in the application of this cash, he notes "Since we are approaching the end of the quarter, we would like to resolve these items as quickly as possible.  If there is no response by November 20, 2000, we will review the items and place them in our reserve account."  (Emphasis added.)

[42] *See* for example, Deposition of Michael Quinn, April 18, 2006, 205:16-206:11, "Q.  So these auto adjustments that we were talking about in Quinn No. 5 would increase the bad debt reserve?  A.  Correct.  Q.  Is that the only account that the auto adjustments would impact?  A.  Other than the unapplied account because it would be taken out of the unapplied account and put into the bad debt reserve account.  Q. Bad debt reserve account.  A.  The 12601. Q.  So – and what was the purpose of it?  A.  What was the purpose of what?  Q.  What was the purpose of these auto adjustments? A.  At some point you make an assessment as to how much effort you want to expend on a $25 item or a $250 item that's, you know, 75 days old, just as an example, or 180 days old, and it's to clean up and reduce the number of transactions that are out there sitting in unapplied cash."  *See also* the Deposition of Tom Williams, June 7, 2006, 178:19-179:2.  "Were there instances at Oracle where unapplied cash would be moved to 12601 for reasons that you have just articulated – either they are small dollar amounts, the difficulty in actually determining the proper placement or proper reconciliation would be too difficult?  Were there instances where those monies would be transferred to 12601?  A.  I believe the answer to that is, yes."

inclusion of the customer overpayments in its Bad Debt Reserve was particularly improper because activity in this account inflated Oracle's reported revenue and earnings. Oracle's transfers of unapplied cash violated Oracle's obligation to return the amounts related to overpayments to its customers and therefore were inconsistent with GAAP. Two years later during Oracle's "Unapplied Cash Clean-Up," (*see* related section of this report below) Oracle reversed this accounting.  Michael Quinn instructed Greg Myers, Oracle's Senior Accounts Receivable Manager, to "confirm that ALL ability to move anything to 12601…has been turned off."[43&44]

22. Although this was not the first time that Oracle transferred a portion of the overpayments to its Bad Debt Reserve, the transfers in 2QFY01 were the largest to that date.[45]

23. Oracle preserved at least $24 million of the transferred customer overpayments in the Bad Debt Reserve by marking them "On Account." [46&47]  Oracle began to use the On Account designation as part of the process to move unapplied cash to the 12601 account in August 2000.[48]  The On Account designation in the accounting system was a step in the process to move unapplied cash to the 12601 Account and prevented the money from

---

[43] NDCA-ORCL 1125473-74, e-mail from Michael Quinn to Greg Myers, Tom Williams and others dated October 21, 2002.

[44] The process to move customer overpayments from the 25005 account into the 12601 account required Oracle to record two new cash receipt entries. The first was a negative cash receipt in 25005 to remove the overpayment from that account.  The second was a positive cash receipt in 12601.  In both cases the offsetting entry was to cash. During the Unapplied Cash Clean-up, it was necessary to reverse both of these entries.  NDCA-ORCL 1885992-6020 at 1885998 and 1856020, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."  *See also* NDCA-ORCL 1727952-53, Step-by-Step Guide to Removing Misc Receipts from 12601.

[45] *See* NDCA-ORCL 313945-46, a supporting schedule for SLC Report.

[46] NDCA-ORCL 313945.  The $24 million included the $19.4 million transferred into the Bad Debt Reserve in 2QFY01.

[47] On Account was defined as "Payments where you intentionally apply all or part of the payment amount to a customer without reference to a debit item."  *See Oracle Receivables User's Guide*, Release 10SC, March 1997, Volume I, NDCA-ORCL 048672 and Deposition of Greg Myers, May 23, 2006, 54:10-14.

[48] NDCA-ORCL 1609375-76, November 14, 2002 e-mail from Greg Myers to Terry Elam, in response to the following question from Elam: "When I met with Buzz today he had a question about the 12601 account.  He wanted to know when we started using 'On Account' to reclass our unapplied to 12601."  Myers responded, "We started applying receipts to the 12601 account in August 2000 in the form of misc. receipt.  This stopped in December of 2000, and they resumed activity in Feb -01 via a cash receipts placed On Account after the updates were completed to the payment method."  (Emphasis added.)

being refunded to customers.[49]  The On Account status remained attached to the cash receipt until specific action was taken to remove them during the On Account Cleanup in 2QFY01.[50]

*The November 2000 Debit Memo Invoices*

24.  In a process that appears to have began in September 2000 and was executed in November 2000,[51] Oracle concealed these customer overpayments in its accounting system.  Oracle did so by "applying" each of the customer overpayments that had been inappropriately transferred to the Bad Debt Reserve to a series of new, but non-customer initiated, debit memo invoices (the "November 2000 Debit Memos").[52]

25.  The concealment of the customer overpayments via the November 2000 Debit Memos occurred in a three step process:[53]

    i.   The original cash receipt that had been marked On Account was changed to "Unapplied."[54]  This step was necessary to later enable the customer payment to be "Applied."

    ii.  A debit memo was created for the dollar amount of the cash receipt from the customer overpayment.

    iii. The Unapplied cash receipt was applied to the debit memo.

---

[49] Deposition of Greg Myers, April 12, 2005, 52:14-53:12, "Q.  Okay, so if a payment was On Account, it could mean that a payment was moved to directly offset an expense account?  A.  Well, the placing of the item On Account was just one step of maybe a couple additional steps.  It's a series of transactions.  So if we're going to – so narrow in on just the placing of the item On Account, that was to reference that the cash really should not be – no future activity should really happen against this payment in relation to moving this money to an open receivable.  I mean, it would – at that time, you know, prior to November 17th, meant as a signal for people in the system that the money – that something additional -- some additional transaction had occurred that meant not to, you know, touch this money, or don't touch this receipt in the way that we would use it for some other purpose."  (Emphasis added.)
[50] Deposition of Greg Myers, April 12, 2005, 76:3-8.
[51] *See* NDCA-ORCL 623757, e-mail from Dianna Ferguson to Sanjay Kumar dated September 20, 2000.
[52] Another $5 million in customer receipts that were transferred to the reserve in November 2000 were also applied to the Debit Memos.  NDCA-ORCL 1607834.
[53] Deposition of Greg Myers, April 12, 2005, 174.
[54] NDCA-ORCL 048682.  Definition of an Unapplied Payment: "The status of a payment for which you can identify the customer, but you have not applied or placed on account all or part of the payment."

26. As a result of the application of the debit memos to these overpayments, the cash receipts from customer overpayments were no longer identifiable as "unapplied" cash receipts.[55] This distinction was important because unapplied cash receipts composed the population of cash receipts normally considered by Oracle's collections personnel.[56]  Since the debit memos caused the overpayments to appear to be applied, Oracle's collections personnel were told, in effect, that the customer overpayments had been refunded or applied, and thus were not available to be refunded or applied to any other invoice.[57&58]  However, as explained below, when the November 2000 debit memos were reversed as part of the 2002 Unapplied Cash Clean Up, Oracle acknowledged that the money belonged to customers and began issuing refunds in 2003.[59]

27. As an example, an AR Aging Report as of October 31, 2000, which is consistent with the documents contemporaneously utilized by Oracle's collections personnel to resolve unapplied cash,[60] shows 14 payments totaling $178,346.77 from Household Finance that had not been applied.  Thirteen of these payments were dated *on or before* November 1994.[61]  As a result of this unapplied cash, Household's net balance due to Oracle was a negative $157,870.33.  Therefore, Oracle should have provided Household with a refund. After the application of the debit memo invoices, this same report as of November 30,

---

[55] Deposition of Ian Hatada, October 5, 2006, 127:18-129:2, including "the best description would just be that there was money in an account that was, you know, unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve."

[56] NDCA-ORCL 1885992-6020 at 1885997, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."  This document notes regarding the reversal of the 12601 unapplied cash amounts "[i]n an attempt to reclassify these items as unapplied and add them back to the population of items being resolved by collections…"

[57] NDCA-ORCL 1731158.  August 1, 2002 e-mail from Raul Campos to numerous Oracle personnel regarding a report entitled "Running Billing Histories," which, in part, identified how Oracle had applied customer payments. These reports would have shown customers that unapplied cash had been applied to debit memos.  "Before you [run] your next Bill History for your customer, please read the following.  Currently there are a ton of 'Debit Memo' #'s pulling up into customer's billing histories that appear to the customer as an invoice….The customer will believe these funds [are] available for a credit or refund, but actually these funds have already been refunded.  In order to prevent duplicate refunds or a lot of unnecessary research for you & me (mostly you), I ask you to do the following: After you run [you] billing History, export the report into excel & remove all of the debit #'s that start with '550' before you send it to the customer."

[58] NDCA-ORCL 1895918-22, "Debit Memos can be very tricky.  Especially all the ones created on Nov 18, 2000…. If we ever sent a customer a billing history these debit memos should never be included on it."

[59] See, *e.g.*, NDCA-ORCL 1722653-64, February 6, 2003 spreadsheet: "Amount to be refunded" at 1722664 is nearly $5 million.

[60] NDCA-ORCL 140457, the Aging report was sent by Oracle's Revenue Accounting Staff to the Collections management team.

[61] NDCA-ORCL 313988.

2000 does not show any of these 14 unapplied payments. Consequently, these unapplied cash payments from Household were no longer visible because they had been inappropriately applied to debit memos. As a result, the November 2000 report indicates that *Household owed* Oracle $24,150.85.[62] This finding is consistent with Oracle's issuance of a refund to Household in May 2002 in the exact amount identified above, $178,346.77.[63] The impact of the debit memos on the overpayments from Household is discussed in greater detail below.

28. The Household example shows that the November Debit Memos concealed and misrepresented the balance of unapplied cash and customer overpayments improperly withheld by Oracle from its customers. This example is consistent with Oracle's description of the purpose of the November 2000 Debit Memos to another one of its customers, "All invoices that start with '550' are actually debit memo #'s. These were created to clean up our unapplied account at that time. They were more than likely overpayments."[64]

29. As a result of the November 2000 Debit Memos, Oracle prevented customer overpayments from being refunded. In aggregate, Oracle created 46,881 debit memo invoices. Ultimately, two years later, the November 2000 Debit Memos related to customer overpayments maintained by Oracle in its Bad Debt Reserve were reversed.

## Oracle's Improper $20 Million Increase to Revenue and Pre-Tax Earnings in 2QFY01

30. Each time a customer overpayment was transferred to 12601 "Bad Debt Write-offs," its balance was credited. This credit entry had the effect of increasing Oracle's total Bad Debt Reserve. In fact, Oracle's reconciliation shows that after the 2QFY01 transfers of customer overpayments, the 12601 account actually increased the Bad Debt Reserve (i.e., had a $4.4 million <u>credit</u> balance). Over the course of 2QFY01, the account had a net

---

[62] NDCA-ORCL 313986.
[63] HI0000001-02. This check was in the same amount identified above, $178,346.77.
[64] PLF-ORC 001633. Fax from Raul Campos (Oracle) dated April 5, 2002.

change of $20 million from the end of the prior quarter, which closely tracked the transfer of the overpayments into the account.[65]

31. It is important to note that a bad debt write-off account such as Oracle's 12601 would typically be reflected as a debit balance.[66]  Indeed, Oracle's reserve reconciliation shows that the 12601 account did have a $15.7 million debit balance at the end of 1QFY01, and had had a debit balance for several years until 2QFY01 (*see* chart below of the ending balance of the 12601 account over the 10 quarters ended 2QFY01):



32. This movement of the account balance in 12601 from a debit balance at the end of 1QFY01 to a credit balance at the end of 2QFY01 was a signal of Oracle's improper accounting for customer overpayments.   It was the opposite balance of what an accountant would expect to encounter.   An accountant would expect that an account tracking write-offs of accounts receivable would remain in an overall debit position (i.e.,

---

[65] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation Q2FY01.
[66] A debit balance would stand in contrast to the other accounts included in Oracle's Bad Debt Reserve calculation. The explanation for this is consistent with the purpose of the account, which is that actual write-offs reduce the balance of the Bad Debt Reserve.

it tracked reductions to the reserve, which was a credit balance).  The Company could then replenish its reserve to the necessary level by crediting against the Bad Debt Write-offs account and debiting revenue as per Oracle's policy (*see* discussion below).

33. Each quarter Oracle prepared a Bad Debt Analysis utilizing a pre-defined methodology to calculate the required total balance of the Bad Debt Reserve.[67]  In 2QFY01, Oracle calculated that the balance of its Bad Debt Reserve needed to be $162.9 million.  This amount agrees to the "final version of the Bad Debt Analysis" that was provided to Williams and Oracle's Chief Accounting Officer, Jennifer Minton on December 8, 2000.[68]  In addition, this amount exactly agrees to the amount of the Bad Debt Reserve schedule included in Oracle's auditors' workpapers.[69]

34. Once the Bad Debt Analysis had been prepared, Oracle accounting personnel have testified that the Bad Debt Reserve was modified on a quarterly basis, and an offsetting accounting entry was recorded to revenue.[70]  This adjustment was recorded to increase or decrease the then-current reserve balance in Oracle's accounting system in line with the amount determined in the Bad Debt Analysis.

35. The table below depicts the calculation made by Oracle for purposes of its 2QFY01 reconciliation of the Bad Debt Reserve:

| *$ amounts in millions* | **Q2FY01** | **Ref** |
|---|---|---|

---

[67] *See* Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 140468-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy.

[68] NDCA-ORCL 1610858-989 at 1610859 and 1610872.  Note that most of these schedules are prepared as of October 31, 2000.  The schedule beginning at NDCA-ORCL 1610871 summarizes the earlier schedules in the package, including Bad Debt Reserve analyses for License (1610861), Consulting (1610863), Support (1610865), Education (1610867) and OCC (Oracle Credit Corporation)/Lease (1610869).

[69] AA 000035, Accounts Receivable Variation Analysis as of November 30, 2000.

[70] Deposition of Jennifer Minton, April 21, 2005,  143:7-12 "And if our bad debt reserve was – if our bad debt reserve was higher than what our requirement analysis told us that we needed, then we would adjust – we would reverse some of the revenues that we had recorded against the reserve during the current quarter."  143:25-144:10, "So I would always estimate a certain amount of revenues that were coming back because we knew that our returns – our monthly returns provision was higher than necessary….I mean, every quarter there is a bad debt reserve analysis."  216:19-25, "We would make a – do a bad debt reserve requirements analysis; and if it turned out that we had sufficient reserves based on our bad debt reserve requirements analysis, which was the same way that we'd reviewed the reserve for years, then the revenue would be given back to the field, and we would allocate it based on the relative revenues. . . ."  *See also* Deposition of Jennifer Minton, July 7, 2006, 184:17-21, "Does that make sense?  So we always write off everything against revenue rather than to the reserve…"

| $ amounts in millions | Q2FY01 | Ref |
|---|---|---|
| Balance of Bad Debt Reserve before the Q2FY01 Transfers | $163.5 | A |
| Transfer of Customer Overpayments into Reserve (August and October 2000) | $19.4 | B |
| Balance of Bad Debt Reserve after Transfer: | $182.9 | C |
| Required Reserve Adjustment (Increase to Revenue) | $(20.0) | D |
| Required Reserve per Bad Debt Analysis: | $162.9 | E |

36. To be clear, at the end of 2QFY01, the balance of Oracle's Bad Debt Reserve was, according to Oracle's accounting, required to be $162.9 million ("E" in the table above). Therefore, Oracle determined that it was necessary to record a $20.0 million adjustment ("D" in the table above) to reduce the reserve, thereby increasing revenue and pre-tax earnings by $20.0 million. The resulting increase to revenue and pre-tax earnings was directly enabled by the $19.4 million transfer of customer overpayments into the Bad Debt Reserve ("B" in the table above).

37. As presented in the table above, the unadjusted balance of Oracle's Bad Debt Reserve at the end of 2QFY01 was $182.9 million ("C" in the table above).[71] This balance included the $19.4 million increase from the transfer of the cash receipts from customer overpayments.  In other words, without the benefit of the improper transfer of the customer overpayments into the Bad Debt Reserve, Oracle's reserve would have been $163.5 million ($182.9M minus the $19.4M) and no adjustment would have been necessary.[72]

38. Accordingly, an adjustment was recorded to reduce the balance of the Bad Debt Reserve by $20,000,000.[73]  This adjustment to the Bad Debt Reserve resulted in an increase to reported revenue and pre-tax earnings in an identical amount.[74]

---

[71] NCDA-ORCL 1610987.  Bad Debt Reserve Reconciliation Q2FY01.  Prior to the $20.0 million adjustment the balance of the reserve was $162.9 million plus the $20.0 million.
[72] Deposition of Tom Williams, June 7, 2006, 124:23-125:1-2, "If there was a significant difference between the requirements and the reserve then an adjustment would be booked.  If it was not a significant difference then no adjustment would be booked."
[73] NDCA-ORCL 1610987 and NDCA-ORCL 140463.
[74] Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 140468-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy, "We charge both credit memos and write-offs directly against the current periods

**Oracle's Improper Accounting for Customer Overpayments and Unapplied Cash Related to the November 2000 Debit Memos Resulted in an Overstatement of 2QFY01 EPS by $0.01**

39. Oracle improperly reported EPS of $0.11 for 2QFY01. If Oracle had not made the improper $20.0 million adjustment to the Bad Debt Reserve, it would have reported EPS of $0.10, which would not have enabled Oracle to beat Wall Street expectations. In other words, Oracle's ability to beat expectations was partly attributable to its non-GAAP accounting for customer overpayments within the Bad Debt Reserve. The chart below illustrates this impact:

| Impact of Bad Debt Reserve Adjustment on Q2FY01 | Net Income ($M's) | EPS |
|---|---|---|
| As Reported by Oracle[75] | $622.8 | $0.11 |
| Reverse Bad Debt Reserve Adjustment (after-tax) [76] | (12.9) | (0.01) |
| GAAP | $609.9 | $0.10 |

40. In a September 1998 speech, then Securities and Exchange Commission ("SEC") Chairman Arthur Levitt noted "I recently read of one major U.S. company, that failed to meet its so-called 'numbers' by one penny, and lost more than six percent of its stock value in one day."[77] In August 1999, the SEC reiterated that a quantitatively small misstatement of a financial statement item may be material if it "masks a change in earnings or other trends" or if the "misstatement hides a failure to meet analysts' consensus expectations for the enterprise."[78]

---

revenue….Although we also reduce revenues for monthly additions to the bad debt and credit reserve, we avoid double counting…by adjusting the bad debt and credit reserve balance quarterly to its required balance, with a corresponding adjustment, upwards or downwards, to the current quarters revenues." (emphasis added) See also the journal entry demonstrating the adjustment to review at 140474 of this Oracle document.

[75] Oracle Form 10-Q for the quarter ended November 30, 2000, p.4.

[76] Oracle's effective tax rate in 2QFY01 was 35.5% ($343M/$966M), which was identical to the forecasted rate. After tax, the $20 million adjustment would have contributed approximately $12.9 million to Oracle's reported net income. Without this adjustment to the Bad Debt Reserve, Oracle's reported net income would have been $609.9 million. Accordingly, diluted EPS would have been $0.1038 or $0.10 on a rounded basis ($609.9/5,874,987 shares).

[77] Transcript of the "Numbers Game," by Arthur Levitt, NYU Center for Law and Business, New York, N.Y., September 28, 1998.

[78] Staff Accounting Bulletin ("SAB") No. 99 "Materiality" issued August 12, 1999. See Section M (1) – Assessing Materiality. In addition, SAB 99 notes, "Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself 'too blunt an instrument to be depended on' in considering whether a fact is material.

41. In this case, Oracle's EPS was $0.10, however, it reported EPS of $0.11.  In my opinion, this overstatement of reported EPS was material because it enabled Oracle to beat consensus earnings expectations of $0.10, and demonstrate a "strong" trend of earnings.[79&80]

**Beginning in October 2002, Oracle Conducted an "Unapplied Cash Cleanup" to Reverse the November 2000 Debit Memos, Remove the Improperly Transferred Cash Receipts from the Bad Debt Reserve, and Refund Overpayments to Customers**

42. Ultimately, in October 2002,[81] Oracle began the Unapplied Cash Clean-up. Oracle held a series of meetings to instruct its Collections Managers to "find a home" for tens of millions of dollars in newly unapplied cash and customer overpayments, many of which resulted from the reversal of November 2000 debit memos.[82&83]  Initially, the Unapplied Cleanup developed rapidly:[84]

---

When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material."

[79] NDCA-ORCL 005862-65 at 005863, Morgan Stanley, "How Suite It Is," by Charles Phillips, December 15, 2000, "***EPS - Oracle reported fiscal year Q2 2001 earnings per share of $0.11 vs. $0.06 last year and $0.10 consensus number***."  (Emphasis in original.)  Phillips also noted, "Given the Microsoft pre-announcement and generally bad news in the PC sector, the market may have trouble assessing whether Oracle's results are an aberration or a changing of the guard."

[80] NDCA-ORCL 005901-03, Lehman Brothers, "Oracle's Application Business Leads Solid Quarter," by Neil Herman, December 15, 2000, "Yesterday after the close, and contrary to the deep skepticism in the market, Oracle reported strong fiscal second quarter earnings of $0.11 per share, one penny above our and the consensus estimate of $0.10."

[81] Chan Deposition Ex. 12.

[82] Deposition of Ian Hatada, October 5, 2006, 38:24 -39:10, "That's part of my responsibilities as a collections manager, but the biggest thing that I was ever responsible for when it came to unapplied cash was the point of Michael Quinn and Greg Myers getting all of us collections managers together and letting us know that there was a problem with the unapplied cash, and we had a large amount of unapplied cash that was a lot larger than us collections managers had ever seen before, and it was our responsibility as quick as possible to clear this unapplied cash and find a home for this unapplied – the unapplied amounts."  (Emphasis added.)

[83] NDCA-ORCL 1125473-74, Deposition of Molly Venkataramana, April 13, 2005, 225:14-228:1, Deposition of Michael Quinn, April 18, 2006, 224:22-225:7.

[84] Deposition of Ian Hatada, October 5, 2006, 105:1-106:3, including "I'd say once we had that first meeting there was a meeting every couple days to discuss what Mike Quinn or what Jeff Henley wanted us to do moving forward with our action plans."  *See also* Deposition of Ian Hatada, October 10, 2006, 265:20-266:21, including "So did Mike Quinn ever say, 'We need to get these results to Jeff Henley?' [A] Yes, he did."

- On October 14, 2002 and again on October 18, 2002, Oracle called Special Meetings of its Finance and Audit Committee.[85&86]

- On October 21, 2002, Greg Myers wrote to Williams and Quinn that "The ability to move something into 12601 via misc receipt is no longer available to Collections," and that Oracle had instructed its Collections Managers to "stop placing items On Account."[87]

- According to the testimony and documents, the Clean-up also assessed the "revenue impact of the debit memos."[88]

43. The Unapplied Cash Clean-up lasted, at a minimum, until Oracle's FY2006.[89]  As part of the Unapplied Cash Clean-up, Oracle removed more than $50 million of cash receipts that had been inappropriately transferred into the Bad Debt Reserve from its Customer Overpayments account, including the transfers made in Q2FY01.[90]  Oracle also reversed the November 2000 Debit Memo items that had been applied to the customer overpayments transferred into the 12601 account.[91]

44. The Unapplied Cleanup resulted in a modification of Oracle's historical accounting for a large majority of the $45 million Oracle considered (note it appears that Oracle did not evaluate the entire population).[92]  After the unapplied cash receipts were removed from the Bad Debt Reserve,[93] their status was properly restored to "unapplied," which allowed

---

[85] NDCA-ORCL 3042931-33, Minutes of the Special Meeting of the Finance and Audit Committee of the Board of Directors, Oracle Corporation.
[86] NDCA-ORCL 3042933-34, Minutes of the Special Meeting of the Finance and Audit Committee of the Board of Directors, Oracle Corporation (the preliminary results were redacted).
[87] NDCA-ORCL 160921-25.
[88] Deposition of Michael Quinn, April 18, 2006, 227:25 to 228:15 (cited above) and PLF-ORC 000002.
[89] NDCA-ORCL 1886329-30, NDCA-ORCL 1894259, NDCA-ORCL 1846553, Deposition of Ian Hatada, October 10, 2006, 266:23-267:24, Deposition of Molly Venkataramana, April 13, 2006, 304:9-17.
[90] NDCA-ORCL 1646554
[91] NDCA-ORCL 1058909, Debit Memo Script Output.
[92] *See* for example, NDCA-ORCL 1646553-1647198 at 1646554.  I note that Oracle did not review nearly 9,000 cash receipts under $10,000 for approximately $14.4 million dollars, including more than 2,800 receipts for $4.5 million that appear directly related to the November 2000 Debit Memos.
[93] The removal of these amounts as a component of the Bad Debt Reserve would have had the opposite impact as the initial transfer of these amounts into the 12601 account.  For instance, in 2QFY01, the $19.4 million transfer-in of cash receipts into 12601 facilitated Oracle's adjustment to decrease the Bad Debt Reserve and increase revenue and

Oracle to use the cash for, 1) "hundreds" of customer refunds,[94] 2) escheatment to state governments, 3) application to newly "adjusted up" invoices,[95] or 4) keeping the cash, but reporting it as a contra-asset or liability in Oracle's books and records.[96]

45.  During the Unapplied Cash Cleanup, if Oracle found that a customer had invoices with prior credit memos equal to or greater than the overpayment, Oracle reversed the credit memo(s) by the amount of overpayment.[97&98]   Instead of refunding these customer overpayments, Oracle often "adjusted up" invoices and then applied the unapplied cash. Oracle justified this position, in part, because the overpayments were often for the same amount as credit memos.  However, as noted above, Oracle had a practice to not send credit memos to its customers. I also note that Oracle's process for issuing credit memos required approvals before the credit memo could be processed.[99]  In combination, it is to be expected that overpayments were equal to a credit memo, and Oracle failed to objectively evaluate the propriety of the original credit memo.[100&101]   In my opinion, Oracle did not have an adequate basis to conclude, in late 2002 or thereafter, that the original credit memos had been issued in error.[102]   In this manner, Oracle retained more than $11 million, including $5.3 million of cash receipts that had been transferred to the Bad Debt Reserve by November 30, 2000 (2Q01).[103]

---

pre-tax earnings.  On the other hand, it would have been necessary for Oracle to increase its Bad Debt Reserve and reduce its revenue as a result of the transfer-out of the unapplied cash receipts.

[94] Venkataramana, April 13, 2006, 250:9-11: Q: "Is it fair to say it was hundreds of refunds?  A: Yes."

[95] As described elsewhere in this report, Oracle increased the outstanding balance of an actual invoice by the amount of the recently unapplied cash, and then applied the cash.  It does not appear that Oracle informed its customers that it was using their cash in this manner.  NDCA-ORCL 1125473-74, NDCA-ORCL 1897651, Deposition of Raul Campos, March 28, 2006, 126:15-127:16.

[96] NDCA-ORCL 1646554, Deposition of Ian Hatada, October 10, 2006, 266:23-267:24; Deposition of Molly Venkataramana, April 13, 2006, 304:9-17.

[97] NDCA-ORCL 1727749-53 at 1727952-53, "Step-by-Step Guide to Removing Misc Receipts from 12601."

[98] According to Molly Venkataramana, "If a credit memo was found to be done incorrectly, and the customer had made a payment on that invoice, then the invoice would be adjusted up."  Deposition of Molly Venkataramana, April 13, 2006, 258:17-19, see also 289:4-17, 324:25-325:9.

[99] Approvals are discussed at NDCA-ORCL 140469 and also at PLF-ORC 000085.

[100] Deposition of Molly Venkataramana, April 13, 2006, 261:18-20: "Q: And did you guys discuss why those credit memos were not valid?  A:  I don't believe so, no."[100]

[101] See for example, NDCA-ORCL 1486082, comment by "Tyler:" "amt of credit exact amount on account, adjust up and apply. . ."

[102] NDCA-ORCL 1727979-91 at 1727985.  On October 25, 2002, in a summary memo to Minton, Williams and others, Oracle wrote that its process for credit memo approval "does not provide for an audit trail."

[103] NDCA-ORCL 1646567.

46. In my opinion, Oracle's actions during the Unapplied Cash Clean-up acknowledge its improper accounting during 2QFY01, including:

- The transfers of customer overpayments into the Bad Debt Reserve, which generated $20 million of revenue in Q2FY01 (via the removal of these amounts from the Bad Debt Reserve);

- The use of the debit memos to conceal the customer overpayments in the Bad Debt Reserve (via the reversal of the November 2000 Debit Memos); and

- The lack of an appropriate process to refund money (via Oracle's issuance of refunds more than two years after the money had been appropriated in the Bad Debt Reserve).

## Specific Examples of Oracle's Improper Accounting for Unapplied Cash and Use of Debit Memos

47. I have been provided with a script output that Oracle represents to contain a complete record of its accounting for customer related activity (e.g., invoices, payments, credit memos, and refunds) related to 926 of the November 17, 2000 debit memo invoices (the "Debit Memo Script Output").[104]   I have included below detailed examples of transactions within the Debit Memo Script Output that exhibit Oracle's improper accounting with respect to customer overpayments associated with debit memos.

*The Ameritrade Sevices ("Ameritrade") Overpayment*

48. The following timeline illustrates Oracle's impropriety with respect to Ameritrade:

- On October 22, 1999, Oracle received a cash receipt of $246,514.49 from Ameritrade.  According to Oracle, this receipt was a duplicate payment on invoice #1165172.  Oracle assigned #100958 to this receipt, and put the funds in Acct. 25005 (Customer Overpayments), as "Unapplied."

---

[104] NDCA-ORCL 1058909.  The Debit Memo Script Output includes transactions from September 1986 to May 2006.

- On August 5, 2000, Oracle transferred receipt #100958 from its Customer Overpayments account (25005) to its Bad Debt Reserve (12601).

- On August 25, 2000, Oracle changed the status of receipt #100958 from "Unapplied" (available for refund or credit to the customer) to "On Account" (which signaled Oracle staff to leave the receipt in the reserve).[105]

- On November 17, 2000, Oracle created debit memo invoice 55000390 for $246,514.49, which caused the status of the receipt to change from "On Account" to "Applied."

- On November 8, 2002, Oracle processed Credit Memo #7244611 for $246,514.49, and applied it to Debit Memo 55000390. This reduced the value of the debit memo to $0, and caused cash receipt #100958 for $246,514.49 to become Unapplied and once again, "visible" to Oracle's collections staff.

- On November 24, 2002, Oracle reversed the transfer of the receipt out of its Bad Debt Reserve and back to the Customer Overpayments account.

- In February 2003, Oracle refunded the $246,514.49 it had received in October 1999 to Ameritrade. The refund was approved by Mike Quinn and then by Brad Nelson, as "Duplicate payment of Invoice#1165172-please refund."[106] On February 19, 2003, Oracle created accounts payable invoice #AR5340971 and processed a refund check #1539062 for $246,514.49, which Ameritrade deposited.

*The Kforce.com Overpayment*

49. The following timeline illustrates Oracle's impropriety with respect to Kforce.com:

- In November 1999, one of Oracle's customers, Kforce.com, made an overpayment of $258,241.84.

---

[105] As described above, the receipt was On Account, it was still "visible" by Oracle staff as an outstanding Unapplied receipt.
[106] NDCA-ORCL 1485948-67 at 1485949, line 8.

- October 2000 – amount was transferred *from* Oracle's account 25005 "Customer Overpayments" *to* the Bad Debt Reserve Account 12601.[107]

- November 2000 – the overpayment was applied to a debit memo invoice.

- February 2001 – a portion of the overpayment, $92,333.41, was refunded.

- November 2002 – two years later, the debit memo transaction was reversed, and

- March 2003 – over three years after the payment was received, the remainder of the overpayment amount was finally refunded to Kforce.com as part of the 2002 Unapplied Cash Clean-up.

50. I believe that Oracle's conduct related to Ameritrade and Kforce.com demonstrates its improper mischaracterization of Customer Overpayments in the Bad Debt Reserve, concealment of the overpayments using the November 17, 2000 debit memo invoices, and its improper withholding of customer overpayments.

## Oracle's Refund to Household Demonstrates the Improper Application of the November 17, 2000 Debit Memos to Cash Receipts from Customer Overpayments

51. Based upon my review of the Debit Memo Script Output, and other supporting documents, it appears that Oracle's conduct related to debit memo overpayments from Household, one of its customers, demonstrates the impropriety of its retention of, and accounting for, cash receipts from customer overpayments.

### Analysis of Oracle's Accounting for the $76,645 Household Overpayment

52. Oracle withhheld this overpayment for over seven years, until 2002, when persistent efforts by Household were undertaken to finally obtain a refund of its cash. The table below summarizes the sequence of events surrounding the application of a debit memo

---

[107] Oracle personnel have testified that this transfer was improper. *See* Deposition of Tom Williams, June 7, 2006, 177:7-15, "Well, to answer your question – I mean, we went through the one example with the 12601. That was an example of where it should not have moved to 12601. But my assumption is that the collector, probably doing their best, couldn't figure out where it belonged and so transferred it to 12601. Obviously subsequent to that found out that that was not the correct entry. It was restored to unapplied cash and refunds were given to the customer."

on November 17, 2000 to an overpayment received from Household in 1994.[108]   The

letters in the 2nd column (i.e., "A") reference a related section below where the activity on

that particular date is further analyzed.   In those instances when there is no entry in the

table, there was no activity related to that particular event.

| Date | Significant Transaction Events and Oracle's Related Accounting | AR (Asset) *Entry* | AR *Balance* | Customer Over-payments (Liability) *Entry* | Customer Over-payments *Balance* |
|---|---|---|---|---|---|
| 10/26/94 | A – Oracle issues invoice. | $60,180 | $60,180 | | |
| 11/17/94 | B – Household makes a $76,645 payment.  Oracle records the overpayment. | $(60,180) | $0 | $(16,465) | $(16,465) |
| 11/17/94 | C – Household cancels the order.[109] | | | | |
| 1/1/95 | D – Oracle "unapplies" the remaining overpayment due to C. | $60,180 | $60,180 | $(60,180) | $(76,645) |
| 1/31/95 | E – Oracle issues a credit memo, and places the overpayment On Account. | $(60,180) | $0 | $0 | $(76,645) |
| 11/17/00 | F – Oracle "applies" a debit memo to Household's Overpayment. [110] | $0 | $0 | $0 | $(76,645) |
| 5/23/02 | G – Oracle reverses "E" and "F" and issues a refund. | $0 | $0 | $76,645 | $0 |

*A – Oracle Issues Invoice # 498798*

On October 26, 1994 Oracle issued a sales invoice to Household for $60,180,[111] resulting in an

Accounts Receivable balance of $60,180 due from Household. [112]

---

[108] As noted, this table summarizes the net impact of the accounting entries recorded by Oracle.  There were other accounting entries that were recorded to effect these transactions, however, the net accounting for these items remains as presented in the table.
[109] Oracle did not record any accounting entries until it responded to the cancellation in January 1995.
[110] There are a number of entries recorded to apply the Debit Memos to the overpayments, however, the net impact of the Debit Memos on this date is zero.
[111] NDCA-ORCL 776172-73, Invoice.
[112] NDCA-ORCL 1058909.

*B – Household Overpays Invoice # 498798*

Household made a payment on November 17, 1994 in the incorrect amount of $76,645.04.[113] Oracle applied the payment to invoice # 498798.[114]  The remaining unapplied portion of the cash receipt, $16,465.04, was recorded as a balance in the Customer Overpayments account 25005.

*C – Household Returned the Product and Cancelled the Order Underlying Invoice 498798*

Also on November 17, 1994, Household returned the product and cancelled the October 26th transaction.[115]

*D – Oracle Unapplies the Household Overpayment*

On January 1, 1995, pursuant to Household's cancellation of the order, Oracle unapplied the $60,180 payment from Household.  This transaction restored the balance of Accounts Receivable to $60,180, and increased the total Customer Overpayment balances by the same amount. Consequently, at this time, the Debit Memo Script Output demonstrates that the <u>entire</u> $76,645.04 overpayment from Household was recorded within the Customer Overpayments account 25005.

*E – Credit Memo # 528719 is Created to Formally Cancel Invoice # 498798 But Oracle Does Not Refund the Money to Household*

The credit memo formalizing Household's cancellation of the order was created on January 31, 1995.[116] This credit memo reversed the revenue from the October 26, 1994 sale and the related accounts receivable balance.   At this time, Oracle also designated the Household overpayment as On Account, which signaled to Oracle's collections personnel that this amount was not to be utilized.  Consistent with Oracle's practice, I have seen no evidence that Oracle sent this credit

---

[113] NDCA-ORCL 1058909.
[114] NDCA-ORCL 1058909.
[115] *See* Oracle Call Notes at NDCA-ORCL 649588-650316: "sw MARIE AND this has a rma 2042868 and the prod was returned 11/17, 2 inv already credited (support) Check 67021191 for 76k needs to be returned wil e-mail ar," "per rma #2044580 cust to get full refund and full amt to have sys cm gener ated."
[116] NDCA-ORCL 776162-63.

memo to Household.  At the time this credit memo was issued, Oracle should have refunded the entire receipt, which was an overpayment, to Household.

*F – Oracle Applied Debit Memo #55040598 to the Overpayment from Household.*

According to the script output, from January 1995 to November 2000, the $76,645.04 payment remained designated On Account, and could be seen by Oracle personnel as an unapplied cash payment from Household.  On November 17, 2000, the $76,645.04 balance in the Customer Overpayments account 25005 was applied to debit memo invoice # 55040598.[117]  As described above, after the cash receipt was applied to a debit memo, Oracle's personnel would no longer have been aware of this amount as unapplied and outstanding.[118]

*G – Oracle Reverses Debit Memo #55040598 and Finally Refunds Household's Overpayment*

Household engaged a third-party consultant, Profit Recovery Group ("PRG") to determine whether it had inadvertently made any incorrect overpayments to any of its vendors.  After conducting its research procedures, PRG concluded that Household had made 14 overpayments to Oracle totaling $178,346.77.  The $76,645.04 was identified as one of these overpayments.

PRG's process to obtain a refund included several examples of Oracle's resistance to refunding the cash receipts from the overpayments even though the amounts were maintained in Oracle's Customer Overpayments account.   Household's correspondence regarding this refund process demonstrates its frustration with Oracle (*see* paragraph 7).

Ultimately, the Household refund was approved by Tom Williams, Michael Quinn and others at Oracle.[119]  The date on the refund check provided to Household was May 23, 2002.[120]

Oracle Failed to Provide the SEC with Important Evidence Regarding the Household Refund

---

[117] NDCA-ORCL 776174, Oracle Debit Memo Invoice.
[118] *See* for example, NDCA ORCL 313986-88.  The debit memo invoice on November 17, 2000 caused the overpayment to be removed from the accounts receivable aging report.
[119] NDCA-ORCL 614018-614023.  *See also* e-mail from Tom Williams to Michael Quinn (with cc's) entitled "REFUND: Household Finance ($178,346.77)," NDCA-ORCL 1070329
[120] HI0000001-02.  This check was in the same amount identified above, $178,346.77.

53. In October 2003, Oracle made a presentation to the SEC, which had inquired with the company about allegations in the Second Amended Complaint. During its presentation to the SEC, Oracle presented evidence that the Household refund related to a corresponding debit memo had occurred on April 27, 1995 and its presentation materials did mention any subsequent refund activity.[121]   The evidence included a "screenshot," showing a check to Household for $76,645.04. However, according to Oracle's Debit Memo Script Output this refund did not occur.[122]

54. Instead, the Debit Memo Script Output and other evidence, including the May 2002 check, demonstrate that this Household payment was not refunded until May 2002. During the entirety of the time between January 1995 and May 2002, the overpayment from Household was improperly maintained by Oracle in its Customer Overpayments account 25005.

**Additional Opinions Regarding the November 2000 Debit Memo Transaction**

55. Other than my opinions, already expressed above, I do not offer an opinion about the total financial statement impact of the transactions relating to all $692 million from the 46,881[123] debit memo transactions in Q2FY01.

56. The primary reason for this is that Oracle produced a Debit Memo Script Output containing information relating to only 926 debit memos, or about 2% of the total debit memo transactions. Although the 926 debit memos comprise $535 million (77%) of the $692 million total dollar value of the 2QFY01 debit memo population, Oracle did not produce the full audit trail and source evidence concerning the other $157 million in debit memo transactions.

57. Furthermore, the evidence produced in connection with the 926 debit memos and the Debit Memo Script Output appears incomplete.[124]  For example,

---

[121] NDCA-ORCL 050209, 050221-30, "Presentation to the SEC Staff on Behalf of Oracle Corporation."  NDCA-ORCL 314031, Payment Overview screenshot.

[122] *Id*.  Oracle also provided incomplete information with respect to payments of $45,000 and $25,000 that were refunded to Household in May 2002.

[123] I further note that to the extent it exists, I was unable to review Debit Memo 55041671 because the data was not produced.  *See* NDCA-ORCL 282677.

- As noted above, the 926 debit memos were applied to $535 million of unapplied cash receipts.  However, this amount is a subset of Oracle's total cash received on these transactions.  The total receipts where some portion was later applied to one of the 926 debit memos exceeded $1.5 billion.  Therefore, there is more than $1 billion for which Oracle's script output shows receipt of cash, and their placement into customer overpayments account 25005 as "unapplied" cash, but does not show Oracle's subsequent accounting for this unapplied cash.[125]

- I understand that discovery of transfers from customer overpayments was limited to transfers to account 12601 (Bad Debt Write Offs); however, in the sample of 926 debit memo transactions, there are transfers from customer overpayments to other accounts that impact earnings that I was unable to review sufficiently to reach conclusions as to their propriety.[126]

- There are numerous "one-sided" journal entries (a debit without a corresponding credit or vice-versa).[127]

- Many wire transfers have dates that appear inaccurate.[128]  Oracle's former controller, Tom Williams, was unable to provide an explanation for this anomaly.[129]

- Certain apparently relevant tables were excluded from the Debit Memo Script Output, including:[130]

    i.  AR_APPROVAL_ACTION_HISTORY (Approval and change history for invoice adjustments);

---

[124] Although the Debit Memo Script Output appears incomplete, it yielded substantial useful information pertaining to the 2QFY01 debit memos.  For example, more than half of the transfers to account 12601 and significant details thereof were contained in the Debit Memo Script Output.  These general ledger details greatly assisted my review.
[125] NDCA-ORCL 1058909, Debit Memo Script Output.
[126] NDCA-ORCL 1058909.  *See*, e.g., Debit Memo 55003311, $223,770 transferred from customer overpayments to Interest Income (Account 60000) on November 5, 2000, Debit Memo 55045661, $100,000 transferred from customer overpayments to Conference Income (Account 53207) on October 1, 2000.
[127] *See* the Ameritrade example above.
[128] *See* Debit Memo 55003501 (KForce.com), which indicates that an incoming wire transfer dated February 3, 2000 was received by Oracle on November 15, 1999.
[129] Deposition of Tom Williams, June 7, 2006, 239:7-17.
[130] *Compare* Elam Deposition Ex. 18 (letter to Judge Infante from Peter Wald, *with* attached declaration of Terry Elam, regarding Oracle general ledger "Public Table List") to NDCA-ORCL 1058909 (Debit Memo Script Output).

    ii.  AR_MEMO_LINES_ALL (Standard memo lines for debit memos, on account credits, debit memo reversals, and chargebacks);

    iii.  GL_BALANCES (Account balances for both detail and summary accounts);

    iv.  GL_JE_LINES (Journal entry lines);

    v.  RA_CUSTOMER_TRX_ALL (Header-level information about debit memos, chargebacks, commitments and credit memos); and

    vi.  RA_CUSTOMER_TRX_LINES_ALL (Invoice, debit memo, chargeback, credit memo and commitment lines).

58. Additionally, I understand that more than 800,000 pages of documents relating to the 2QFY01 debit memos, the transfers of unapplied cash to the bad debt reserve in 2Q01, and the 2002 Unapplied Cash Clean Up were not produced until January and February 2007. At this time, nearly all of the depositions relied upon in my report had already been taken, including Jennifer Minton, Thomas Williams, Michael Quinn, Greg Myers, Molly Venkataramana, Terry Elam, Ryan Roberts, Julie Chan, Jason Sevier, Gary Matuszak, Sanjay Kumar, Raul Campos and Ian Hatada. It is my understanding that plaintiffs were not able to question these witnesses about most of the 800,000 pages of documents relating to the transfers, the financial impact and the ultimate resolution of the debit memo transactions.

59. There are indications of other transactions and documents related to 2QFY01 debit memos that were not made available which would have assisted my review. Set forth below are some examples:

- Documents suggest that there were more than 46,881 relevant debit memos. For instance, a listing of debit memos produced by defendants references at least 48,224 debit memos.[131] This indicates that there are at least several hundred other relevant debit memos I was unable to review, in addition to the approximately 46,000 discussed above.

---

[131] NDCA-ORCL 1482578-5581, NDCA-ORCL 048716, MOT 00078 (Debit Memo 55047106 for $200,000 to Motorola, dated December 21, 2000), PRG 29740 ($200,000 refund recovery in May 2002 from Oracle on behalf of Motorola).

- I understand from plaintiffs' counsel that approximately 2 boxes of Oracle audit and review workpapers from Arthur Andersen were not produced, except for 100 pages.  Based on my experience, the sections I would expect to see, but were not produced, include financial reporting and reporting support, revenue, expenses, Arthur Andersen's bad debt review analysis from 1Q01, 2Q01 and 3Q01,[132] portions of accounts receivable, portions of customer advances and unearned revenue accounts payable, contingent liabilities, partner memos, planning and summary engagement memos, and high level workpapers ordinarily found in what auditors know as the "General Binder."  These audit and review workpapers, to the extent they exist, may have assisted my review.

60.  As part of my analysis and opinions concerning Oracle's accounting for unapplied cash, customer overpayments and debit memos during 2Q01, I reviewed plaintiffs Revised Second Amended Complaint.  My understanding is that plaintiffs initially alleged that Oracle improperly recognized revenue and earnings of approximately $228 million in connection with the debit memo transactions in November 2000.  My understanding is that plaintiffs' allegation was based in part on a statistical extrapolation performed by a statistical expert.  I offer no opinion about that statistical extrapolation, and I do not conclude on the $228 million allegation because of the limitations on the data available for my review, set forth above.

61.  As a result, other than my opinions offered above, I am uncertain as to the overall financial statement impact of (1) the 926 debit memo transactions, (2) the 46,000+ 2Q01 debit memo transactions, and (3) which accounts of Oracle, other than account 12601, the 2Q01 debit memos impacted.  Because of these uncertainties, I have not reached an opinion regarding the full impact of the 2QFY01 Debit Memos beyond those already expressed in this report.

## V.  Detail of Opinions Regarding Oracle's Improper Accounting for Its Transaction with Hewlett Packard in 2QFY01

62. In my opinion:

---

[132] AA 00035, "see further discussion of reserves at B-15" (B-15 was not produced.)

a.  As of November 30, 2000, the HP transaction did not meet the criteria necessary under GAAP for revenue recognition.

b.  As a result, in 2QFY01, Oracle's revenue and pre-tax earnings were improperly inflated by $19.9 million.

c.  The improper revenue recorded by Oracle on this transaction enabled Oracle to report 2QFY01 EPS of $0.11.  If Oracle had reported earnings that were consistent with GAAP, its EPS would have been $0.10.[133]

**Summary of Oracle's "Round-Trip" Transaction with Hewlett Packard in 2QFY01, and the Improper Recognition of $19.9 million of License Revenue.**

63.  As 2QFY01 came to a conclusion on November 30, 2000, Oracle worked with HP in order to close a significant software and hardware "round-trip" or "swap" arrangement. In one of the many e-mails leading up to, and on, the last day of the quarter, Oracle noted "HP confirmed again today they're willing to do a Q2 CRM deal in some amount if we can pull together machine requirements into a binding PO and resolve the development issues we're working on....HP is willing to buy as much CRM from Oracle as we buy in [Hardware], Support and other requirements from HP."[134]

64.  In fact, the evidence, including an internal Oracle e-mail below, indicates that HP did not need the software that it purchased from Oracle at that time.

> Sandy/Frank:  HP confirmed today that they will try and pull the CRM portion of the order off providing we deliver what we have outlined in Development and Production systems.  **Since they (HP) don't need ALL the license users right now they are hedging on how big an order they will do until they see how**

---

[133] *See* the discussion of the materiality of this difference in the conclusion regarding the impact of the transfer of the customer overpayments to the Bad Debt Reserve and the related adjustment to Oracle's revenue.

[134] *See* NDCA-ORCL 055958 – Conway Snyder of Oracle, wrote an e-mail to Juan Jones, now Senior Vice President at Oracle, that included certain details leading up to the final execution of the Agreement between HP and Oracle, including the deal being contingent upon Oracle's commitment to purchase HP hardware.  The date of this original e-mail is not available as it pertained to e-mail history existing under an e-mail from Michael DeCesare to Edward Sanderson, Executive Vice President and Kurt Speck dated November 9, 2000. In fact, the e-mail from Snyder was forwarded twice that date to multiple individuals within Oracle including, Sanderson, DeCesare, Rocha, and Roberts.  (Emphasis added.)

**much production hardware Oracle comes back with.  If this turns out to be a large number we could get the entire order.**[135]

65. These negotiations were important to Oracle because as 2QFY01 neared completion, its revenues and EPS were just short of previously forecasted levels.[136]  The contemporaneous evidence demonstrates that the negotiations between the two companies on these arrangements involved their most senior executives including, Larry Ellison, Oracle's CEO and Safra Catz, Executive Vice President of Global Business Practices and Business Development, and Carly Fiorina, HP's CEO.  For example:

- Michael Rocha, Oracle's Executive Vice President, noted in an e-mail to Larry Ellison about Oracle's "25 million dollar opportunity (15m in CRM and 10m in technology)." Rocha wrote "Given the size of our software sales opportunity, you may want to agree that we'll purchase the (HP) hardware."[137]

- Ellison responded to Rocha in an e-mail on October 12, 2000, under the subject "Re: Carly Fiorina Meeting Update:" "Thanks for the update.  I will let you know how it goes. larry."[138]

- Mark Barrenechea wrote on November 11, 2000 to Ellison, Edward Sanderson, Executive Vice President, Micheal DeCesare, Oracle's Vice President of Sales – Western Region and others: "We have an opportunity to move a Q3 15M+ CRM order into Q2.  For this to occur we will need tight coordination between all the needed Oracle parties.  Because of this I am copying all the Oracle executives I believe need to be involved to make this happen….Provided HP has confidence

---

[135] NDCA-ORCL 055957, DeCesare wrote an e-mail dated November 9, 2000 (which included Conway's e-mail noted above) to three Oracle employees, including Sanderson, Frank Varasano, and Kurt Speck discussing the status of Oracle's then potential CRM deal with HP and the deal size being contingent upon Oracle's purchase of HP hardware.  (Emphasis added)

[136] NDCA-ORCL 410399-410415.  I have reviewed a series of forecast documents that appear to have been prepared by Oracle during the process to finalize its reported financial statements for Q2FY01.  These forecast document indicate that Oracle identified "potential" revenue of $2,640.5 million and EPS of $0.10 per share.  Ultimately, Oracle reported revenue of $2,659.5 million and EPS of $0.11 per share.  This difference of $19 million closely approximates the revenue related to the HP transaction recorded on the last day of Oracle's quarter.

[137] *See* NCDA-ORCL 028735-36.  The date of this original e-mail is not available as Oracle did not produce the original e-mail existing under an e-mail from Ellison to Rocha dated October 12, 2000. Ellison's e-mail contained the subject "Re: Carly Fiorina Meeting Update." In the e-mail, Ellison wrote: "Thanks for the update. I will let you know how it (the meeting) goes. larry"

[138] *See* NDCA-ORCL 028735.

that both companies have a common game plan on the development side and HP has confidence that Oracle is stepping up to all the hardware they feel we've already committed to purchase they have commited to move forward on the CRM order.  I believe we will need Larry to speak to Carly after we have the above needed documentation as a final step."[139]

- George Roberts, Oracle's Executive Vice President of North American Sales, wrote on November 30, 2000 to Catz, "I understand Larry (Ellison) and Carly (Fiorina) are discussing <u>their purchase of our products this quarter if we commit to purchase $20M - $30M of their product over the next 18-24 months.</u>"[140]

66. Sometime at the end of November or early December 2000, Oracle entered into the following round-trip arrangements with HP:

- Letter of Agreement (the "Oracle Purchase Commitment");
- Ordering Document and Onsite Support Services Exhibit (collectively the "HP Order Form"); and
- Oracle Lease Agreement (the "HP Term License Agreement").

67. For reasons discussed below, these agreements, unless explicitly noted, are collectively referred to hereafter, as "the HP Agreement."

68. SOP 97-2 provides the primary GAAP applicable to these transactions.[141]  SOP 97-2 states that an arrangement to sell software should not be recognized as revenue until *all* of the following criteria have been met:[142]

a. Persuasive evidence of an arrangement exists;

b. Delivery has occurred;

c. The vendor's fee is fixed or determinable; and

---

[139] *See* NDCA-ORCL 020850-51 (DeCesare Deposition, Ex. 5)
[140] *See* NDCA-ORCL 025018.
[141] The American Institute of Certified Public Accountants' (AICPA) Statement of Position No. 97-2, Software Revenue Recognition (SOP 97-2)
[142] SOP 97-2, ¶8 states: "[R]evenue should be recognized when all of the following criteria are met. (1) Persuasive evidence of an arrangement exists. (2) Delivery has occurred. (3) The vendor's fee is fixed or determinable. (4) Collectibility is probable." This treatment is only appropriate for software that does not require significant production, modification, or customization of software.  This issue is addressed separately, later in this report (*see* paragraph 111).

d.   Collectibility is probable.

69. Pursuant to the HP Agreement, Oracle recognized $19.9 million of revenue on the last day of 2QFY01, November 30, 2000.[143]   This transaction was Oracle's largest revenue transaction in that period.[144]

70. However, as of November 30, 2000, Oracle substantially failed to meet any of the revenue GAAP recognition criteria.   Accordingly, Oracle overstated revenue in the amount of $19.9 million in 2QFY01.   This conclusion is reached, in part by Oracle's improper evaluation of the following accounting issues:

a.   Date references on the transmission of the documents between HP and Oracle, as well as on the documents themselves, indicate that the HP Agreement had not been duly executed as of November 30, 2000. Therefore, persuasive evidence of an arrangement did not exist at November 30, 2000;

b.   The HP Agreement should have been recorded on a "net" basis vs. a "gross" basis.   Oracle should have offset fees totaling approximately $30 million received from HP against the $30 million guaranteed to HP related to the hardware purchases involved in the swap transaction.   In other words, the total agreement fees were fully round-tripped between Oracle and HP, and the transaction accounting should have been netted to $0;

c.   Oracle failed to deliver a fully functional version of 11i product prior to November 30, 2000;[145]

d.   Oracle failed to appropriately consider HP's 15 day acceptance right in evaluating its revenue recognition assessment.   In other words, until December 15, 2000, at the earliest, HP had the right to reject Oracle's software;

---

[143] The remainder of the $29.8 million fees pertained to undelivered services to be provided subsequent to November 30, 2000 was deferred.

[144] *See* NDCA-ORCL 010007

[145] Testimony in this matter indicates that Oracle may never have delivered a functional version of the 11i product to HP.  See discussion at paragraphs 111 through 117 below.

e.   Oracle failed to establish vendor specific objective evidence of fair value ("VSOE")[146] for certain undelivered elements under its 11 month term license arrangement with HP, which definitively precluded upfront revenue recognition;

f.   Oracle failed to consider $30 million in refund rights included within the HP Agreement in its assessment of collectibilty; and

g.   Oracle's subsequent granting of concessions indicated fees paid prior to the concessions were not fixed or determinable at the time of sale.

71. In light of these observations, the following table summarizes whether amounts due under the HP Agreement met the four GAAP criteria necessary to recognize revenue as of November 30, 2000:

| GAAP Revenue Recognition Criterion | Fail | Pass |
|---|---|---|
| Persuasive evidence of an arrangement exists | X | |
| Delivery has occurred | X | |
| The vendor's fee is fixed or determinable | X | |
| Collectability is probable | X | |

72. It is important to note that any *one* of the failures listed above would have prevented any gross revenue recognition prior to December 1, 2000. The presence of all of these matters provides further clarity to my opinion that Oracle's recognition of $19.9 million in revenue in 2QFY01 related to the HP Agreement was improper.

**Oracle executes the "swap" agreements with Hewlett Packard**

73. As stated above, Oracle entered into the following round-trip or "swap" arrangements with HP:

- Letter of Agreement (the "Oracle Purchase Commitment");

---

[146] Vendor specific objective evidence of fair value for any contractual element is limited to (i) the price charged when the element is sold separately; or (ii) for an element not yet being sold separately, the price established by management having the relevant authority (it must be probably that the price once established, will not change before the element is sold separately).

- Ordering Document and Onsite Support Services Exhibit (collectively the "HP Order Form"); and
- Oracle Lease Agreement (the "HP Term License Agreement").

74. A description of each is provided below to better highlight Oracle's improper revenue recognition treatment of the HP Agreement.

75. *Oracle Purchase Commitment*– This particular agreement was the subject of discussions between Ellison and Fiorina, among other executives of the companies, late in the evening of November 30, 2000 (*see* paragraph 64).  In fact, due to its large dollar value, it appears that a Special Meeting was convened to obtain the required approval from the Executive Committee of the Board of Directors of Oracle to enter into this agreement. The Executive Committee consisted of Ellison, Jeff Henley, who was Oracle's Chief Financial Officer, and Donald Lucas.  Lucas did not attend the November 30, 2000 Special Meeting.   Therefore, Ellison represented 50% of the voting authority at the Special Meeting, and the remaining authority was held by Henley.   The Executive Committee delegated relevant authority to Ellison when it gave him an "Approval of Purchase of Hardware and Services." Although Catz was not a member of the Executive Committee, she was present at the meeting on November 30, 2000.[147]  It was important for Oracle to hold this meeting because HP had made it clear that it would not purchase software from Oracle in 2QFY01 without the round-trip purchase of hardware from HP.

76. Among other obligations, this agreement committed Oracle to a non-refundable purchase commitment of $30 million in HP hardware.    Beginning on the effective date of the agreement, if Oracle failed to make hardware purchases of at least $15 million prior to both December 28, 2000 and September 30, 2001, it was required to pay HP a cash "cancellation fee" equal to the purchase volume shortfall for each respective period (not to exceed $15 million – collectively up to $30 million).

---

[147] NDCA-ORCL 044458, Minutes to the Special Meeting of the Executive Committee of the Board of Directors Oracle Corporation, November 30, 2000.  Ellison testified that there was only a "small list" of companies from which Oracle purchased both hardware and services.  Consequently, he believed that this approval related to HP (*see* Deposition of Larry Ellison, September 21, 2006, 515:10-19).

77. The cancellation fee was structured so that Oracle guaranteed that it would pay HP $30 million, effectively "round-tripping" monies paid by HP to Oracle in connection with its software purchase referred to in paragraph 79. Purchase order deadlines and payment due dates were contractually established for Oracle.  In the absence of meeting these commitments, a cancellation fee would become due. The following table summarizes these dates and amounts:

| Purchase Order Commitment Date | Purchase Payment Date | Cancellation Fee Payable Date | Potential Cancellation Fee |
|---|---|---|---|
| December 28, 2000 | June 15, 2001 | June 30, 2001 | $15,000,000 |
| September 30, 2001 | December 31, 2001 | January 31, 2002 | $15,000,000 |

78. Oracle also made the following other commitments to HP:

   a. Move 100% of its production data to HP UNIX servers by May 31, 2001;

   b. Move 100% of its CRM development servers to HP UNIX servers by November 1, 2001;

   c. Operate all CRM online services, the Oracle Store, the Oracle web-based customer interactions database, the Oracle defect management database, and The Oracle Platinum on HP UNIX services by November 1, 2001;

   d. Agreed that HP would be the exclusive provider to the Company for these services listed as long as HP provides adequate standards of products and services; and

   e. Complete a project plan and schedule with HP by January 31, 2001, to provide support to HP in parity with Sun Microsystems for a period of at least 3 years.

79. As elements of the HP Agreement, Oracle was required to determine the fair value of these obligations.  Since it is unlikely that Oracle had ever made similar commitments in the past, it is also unlikely that Oracle could have reasonably established the fair value of these commitments.

80. _The HP Order Form_ – The HP Order Form's stated effective date is November 30, 2000, which was the final day of Oracle's second quarter of fiscal 2001.  The HP Order Form included the following rights granted to HP by Oracle:

a.    Perpetual rights to a specified amount of seats of the Company's Customer Relationship Management Marketing, Sales, Service and Call Center Software ("CRM");

b.    License migration rights for certain specified existing licenses previously purchased by HP;

c.    Rights to one year of  support and update subscription services for both the newly purchased software licenses as well as those migrated under pre-existing arrangements with HP; and

d.    Rights to Oracle's Premium Technical Support Services, including up to 400 professional support service days to be provided to HP over a one year period.[148]

81. In exchange for these rights, HP was required to pay Oracle approximately $29.8 million.  However, there were no payment terms provided within the HP Order Form.  Payment terms are a critical component of the determination that fees are fixed or determinable in accordance with SOP 97-2.

82. This incremental purchase of software, support and services incorporates the terms of the Original Software License and Services Agreement ("Original SLSA") between HP and Oracle.  One of the most important contractual obligations established by the Original SLSA was an Acceptance Period.  Specifically, the Original SLSA stated:

> For each Program License for which delivery is required under this Agreement, Client [HP] shall have a 15 day Acceptance Period, beginning on the Commencement Date, in which to evaluate the

---

[148] NDCA-ORCL 260109-14, Oracle Ordering Document; HP0045-49.

Program.  During the Acceptance Period, Client [HP] may cancel the license by giving written notice to Oracle…[149]

83.  While several amendments were executed to the SLSA subsequent to its original execution date, including those under the November 2000 Agreements noted above, none appear to revoke this acceptance right. In regards to acceptance, SOP 97-2 states: "After delivery, if uncertainty exists about customer acceptance of the software, license revenue <u>should not be recognized</u> until acceptance occurs"[150]

84.  Therefore, it would not have been appropriate for Oracle to have recognized any revenue under the HP Agreement until the acceptance right had expired on approximately December 15, 2000, or HP had explicitly provided Oracle with its acceptance.  I have seen no evidence to suggest that HP accepted Oracle's software by 2QFY01.

85.  *HP Term License Agreement* – This agreement amended the HP Order Form by converting the perpetual license rights to an 11-month term. While the underlying products, support offerings, and services remained the same, HP's rights to the software products were limited to an 11-month term (vs. perpetual rights).  The HP Term License Agreement provided HP with several alternatives at the conclusion of the lease.[151]

86.  Software revenue recognition interpretations note that it is not possible to establish VSOE on a term license of less than 1 year.[152]  Specifically, the guidance states: "For time-based software licenses with a duration of one year or less, the fair value of the bundled PCS services is not reliably measured…."  Therefore, since it was not possible for Oracle to establish VSOE, it was improper for Oracle to recognize license fees upfront on

---

[149] NDCA-ORCL 258189.  The Original SLSA provides the following definitions: "Program" is defined as "the computer software in object code form owned or distributed by Oracle and specified on the [HP] Order Forms for which Client [HP] is granted a license pursuant to this Agreement; the applicable Documentation; and Updates"; "Commencement Date" is defined as "the date on which the Programs are delivered to Client [HP], or if no delivery is necessary, the Effective Date set forth on the relevant HP Order Form."  NDCA-ORCL 258187.  Effective Date: February 23, 1994.

[150] SOP 97-2, ¶ 20 (emphasis added).

[151] For example, one of the options enabled HP to reacquire ("revert back to") the perpetual rights stipulated under the HP Order Form (as noted above) in exchange for an additional fee of approximately $2.1 million due December 1, 2001. Other options included a) terminating the agreement and returning the software, b) extend the licenses and services for an additional period, or c) extending the license on a month-to-month basis.

[152] Technical Practice Aids ("TPA") 5100.53, Fair Value of PCS in a Short-Term Time-Based License and Software Revenue Recognition (TPA 53)

November 30, 2000.  In this case, ratable revenue recognition was required, and virtually no time had passed between the time the agreement was executed and the quarter had ended.

87. As noted above, the total fees on the HP Order Form were approximately $29.8 million, however, the relevant payment terms were not defined therein.  Nonetheless, the HP Term License Agreement amended the HP Order Form and provided for Oracle to be paid as follows: [153]

| Due Date | Amount |
|----------|--------|
| Net 30 | $3,000,000 |
| 1-Apr-01 | 13,402,685 |
| 1-Nov-01 | 13,402,685 |
| **Total** | **$29,805,370** |

**Oracle's execution of the arrangements above are concurrent and dependent upon one another and should be accounted for as a single arrangement under GAAP.**

88. Technical Practice Aid 5100.39, *Software Revenue Recognition for Multiple-Element Arrangements*, states that the existence of <u>any</u> of the following factors (which are not all-inclusive) may indicate that a group of contracts should be accounted for as a single arrangement:

---

[153] In light of this amendment, payments due under the HP Term License Agreement and the Oracle Purchase Commitment were due around the same time, indicating that payments due Oracle coincided with the performance of Oracle purchase of hardware under the Oracle Purchase Commitment.  The following table reflects the payment timing of each:

| Due Date | Fees Due Oracle Under Term License Agreement | Potential Cancellation Fee Payable to HP |
|----------|----------------------------------------------|------------------------------------------|
| Net 30 | $3,000,000 | N/A |
| 1-Apr-01 | $13,402,685 | N/A |
| 30-Jun-01 | N/A | $15,000,000 |
| 1-Nov-01 | $13,402,695 | N/A |
| 31-Jan-02 | N/A | $15,000,000 |
| **Totals** | **$29,805,380** | **$30,000,000** |

- The contracts or agreements are negotiated or executed within a short time frame of each other; . . . .

- The fee for one or more contracts or agreements is subject to refund or forfeiture or other concession if another contract is not completed satisfactorily . . . [or]

- Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement.[154]

89. Accordingly, based upon the following key indicators, the HP Agreement between HP and Oracle should be viewed as a single arrangement under GAAP:

| | Indicators (TPA 39) | Present | Not Present |
|---|---|---|---|
| 1 | The contracts or agreements are negotiated or executed within a short time frame of each other.[155] | X | |
| 2 | The different elements are closely interrelated or interdependent in terms of design, technology, or function. | | X |
| 3 | The fee for one or more contracts or agreements is subject to refund or forfeiture or other concession if another contract is not completed satisfactorily (*see* paragraphs 123 through 133 ). | X | |
| 4 | One or more elements in one contract or agreement are essential to the functionality of an element in another contract. | | X |
| 5 | Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement (*see* paragraph 90). | X | |

90. All of the agreements noted above appear to have been negotiated in contemplation of one another. That is to say, each of the agreements appears to have been and would only have been executed, providing all were signed.

91. Oracle itself noted in its "Revenue Recognition Review" summary of the HP transactions that the agreements were "signed concurrently."[156]   During depositions and within

---

[154] TPA 5100.39.
[155] All agreements appear to have effective dates of either November 30, 2000 or December 1, 2000, indicating they were executed within a short time frame of each other.

various e-mails, Oracle and HP employees further confirmed the inter-dependency of each arrangement:

 a. DeCesare, Oracle's Vice President of Sales closest to the negotiations, testified: "HP agreed that they would buy a huge CRM order for us, from Oracle, if in return Oracle flipped all of the production and development systems from Sun over to HP."  He further stated that the Oracle Purchase of Oracle licenses was **"absolutely"** dependent upon Oracle moving its development over to HP.[157]

 b. In an e-mail to Ellison, Sanderson and Catz, regarding the status of the software license sale, DeCesare noted: "Consistent with Larry's conversations with Carly, HP will expect a purchase order for the following amounts [$20 million].  They will expect this purchase order to be binding and commit Oracle to using the full amounts by the dates we promise."[158]

 c. Sanderson, characterized the negotiations in an October 2000 e-mail stating "we have a $25 [million] deal with hp this quarter that is dependent on putting details against larry's commitment [to have 100% of Oracle's data on HP hardware by June 2001]."[159]

 d. A copy of the executed Oracle Purchase Commitment contains handwritten notes by Sanderson, stating "THE REAL STORY" and "**Is this the way we are going to do deals.  Each has to buy something [from each other]!**"[160]

 e. Testifying as HP's person most knowledgeable about this transaction, Thomas Rathjens stated that the Onsite Support Services Exhibit simply "provides

---

[156] NDCA-ORCL 033958, Oracle USA Q2-FY01 Top 20 License Contracts Revenue Recognition Review.
[157] Deposition of Michael DeCesare, February 16, 2006, 59:18-21; 62:3-6.
[158] *See* NDCA-ORCL 020844, DeCesare Deposition, Ex. 3.  Ultimately, Oracle's purchase commitments were increased to $30 million.  *See* paragraph 77.
[159] *See* NDCA-ORCL 028737-38, Sanderson Deposition, Ex. 32.
[160] *See* NDCA-ORCL 020839 (emphasis added); Edward ("Sandy") Sanderson, Jr. Deposition, July 26, 2006, 521:10-14 wherein Sanderson acknowledges the handwritten notes to be his "Q. You see some handwriting on this document? A. Yes, I do. Q. Do you know whose handwriting it is? A. Looks like mine."

more detail"[161] to the HP Order Form, and the Lease Arrangement meant to convert the HP Order Form to a term license (from a perpetual license).[162]

92. Based upon the contemporaneous execution dates and the evident linked negotiations described above indicating that all agreements would only be executed collectively, the three agreements constitute a single arrangement under GAAP.  Accordingly, as noted above, these agreements are collectively referred to as "the HP Agreement."

**Evidence indicates that the HP Agreement lacked a valid business for HP other than to derive additional revenues.**

93. I have reviewed evidence that indicates that certain products sold under the HP Agreement lacked a valid business purpose.  This pattern suggests that those elements were sold solely to increase revenue.  This evidence includes the following examples:

    a. One HP employee, Sean Hickey, noted in an e-mail discussing a potential $13.1 million write-off of Oracle licenses, that the entire Oracle license purchase was merely an incentive for Oracle to help HP increase its revenue: "There were never any licenses that were purchased in the category of 'Expense category.  **These licenses were bought as an "incentive" for Oracle to help us increase HP's revenue.  They are probably most accurately categorized as a Headquarters SG&A expense, not IT."'** [163]

    b. Rathjens testified: "I don't know why HP bought additional licenses….  My opinion was we had enough licenses at the time, and did not feel, personally, that we needed additional licenses at that point in time."[164]

94. To support an assertion that a business purpose existed, there is an expectation that the products acquired would be deployed and utilized.  In fact, HP never implemented certain

---

[161] Deposition of Thomas Rathjens, June 30, 2006, 58:12.
[162] Deposition of Thomas Rathjens, June 30, 2006, 60:4-6.
[163] *See* HP 00020, Rathjens Deposition, Ex. 8 (emphasis added).
[164] Deposition of Thomas Rathjens, June 30, 2006, 118:194-21.

significant modules of the software.  Rathjens testified to his belief that the Inbound Call Center was never implemented[165] and acknowledged that HP didn't make a reasonable effort to implement the Mobile Sales or Incentive Compensation modules.[166]

95. HP's understanding about the implementation issues was shared by Oracle.  In fact, **when Ellison was asked during his deposition whether HP had successfully implemented the software being sold to it by or licensed to it by Oracle in Q2FY01, Ellison stated "I don't believe so."**[167]

96. Also, as discussed above, the HP Agreement required Oracle to pay substantial cancellation fees in the event that the round-trip purchases were not made.  The presence of the cancellation fees implied that the parties identified a risk that the products would not be deployed and utilized.

**Persuasive evidence of an arrangement *DOES NOT* exist at November 30, 2000.**

97. The first basic criterion that must be met prior to revenue recognition pertains to evidence of an arrangement.[168]  The table below addresses the areas where Oracle's accounting failed to appropriately consider GAAP relevant to this criterion:

| NO. | CRITERIA | INDICATE ANSWER | | | REF. |
| | | YES | NO | INDETERMINABLE | |
|---|---|---|---|---|---|
| 1.a | Was the contract duly signed prior to the end of the period? | | | √ | SOP 97-1, ¶17 |
| 1.b | Were reciprocating purchase and sales arrangements identified and properly evaluated? | | √ | | TPA 5100.38 |
| 1.c | Was the HP Agreement properly evaluated as either a monetary or non-monetary exchange under GAAP? | | √ | | APB 29, ¶2; EITF 86-29, ¶7 |

---

[165] Deposition of Thomas Rathjens, June 30, 2006, 76:22.
[166] Deposition of Thomas Rathjens, June 30, 2006, 98:6-10.
[167] Deposition of Larry Ellison, September 21, 2006, 516:20- 517:2.
[168] SOP 97-2, ¶17.

| | | INDICATE ANSWER | | | |
|---|---|---|---|---|---|
| NO. | CRITERIA | YES | NO | INDETERMINABLE | REF. |
| 1.d | Given the effective netting of cash between both HP and Oracle (i.e. net boot exchanged < 25% of the fair value of the assets exchanged), was the HP Agreement properly accounted for pursuant to the fair value provisions of TPA 46 and TPA 47? | | √ | | EITF 86-29; ¶ 7; TPA 5100.46; TPA 5100.47; EITF 86-29 |
| 1.e | Did the exchange of assets under the HP Agreement constitute a business purpose to support Oracle's revenue recognition treatment pursuant to the fair value provisions of TPA 47? | | √ | | TPA 5100.47; EITF 86-29 |

98. SOP 97-2 explicitly stipulates:[169]

> Even if all other requirements set forth in this SOP for the recognition of revenue are met (including delivery), revenue should not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists.

99. Gary Matuszak, Arthur Andersen's lead audit partner on the Oracle engagement and former member of the AICPA task force on initiatives pertaining to SOP 97-2, further acknowledged this revenue recognition requirement specific to Oracle:

> Q. So if there was a case where on the last day of the quarter Oracle did not have a signed contract from a customer for a software license as of the night on the last day of the quarter, would that preclude revenue recognition under the terms of the policy?...
>
> THE WITNESS [Matuszak]:  Generally, yes.[170]

100.    There is evidence to suggest that the HP Agreement was not duly executed by HP and Oracle until after November 30, 2000.   Specifically, despite the fact that certain of the portions of the HP Agreement bear an effective date of November 30, 2000, time

---

[169] SOP 97-2, ¶17.
[170] Gary Matuszak Deposition, August 1, 2006, 71:13-21.

stamped e-mails and faxes near midnight on that date detailing ongoing negotiations, as well as the following data, indicate that various contracts within the HP Agreement were not duly executed by such date:

a.  While including a stated effective quote expiration date of November 30, 2000,  the Onsite Support Services Exhibit to the HP Order Form,  contains a footer that notes "***HP onsite support 12/1/2000.***"  This date, typed into the agreement, indicates that the contract was not printed until December 1, 2000. Furthermore, the actual signatures on the contract are made without reference to a date and the only other indicators of the actual contract execution date are two fax dates and time stamps across the top and bottom of the signature page. Each show a date of December 1, 2000 and come from the same two fax machines noted below in paragraph 100b, HP HMCS and DMD.[171]

b.  The HP Order Form denotes a handwritten effective date of November 30, 2000.  However, the signature page contains the following fax header date and time stamps indicating the actual dual execution date of the HP Order Form may have been December 1, 2000 and not November 30, 2000 as was necessary to support Oracle's recognize recognition:[172]

(i)      November 30, 2000 at 11:53p.m. from the "Oracle Legal" fax machine;

(ii)     December 1, 2000 (the beginning of Oracle's fiscal Q3'2000) at 1:06 a.m. from the "HP HMCS" fax machine; and

(iii)    December 1, 2000 at 1:39a.m. from the "DMD" labeled fax machine.

c.  The HP Term License Agreement is silent as to the effective date of the arrangement.  Both signatures on the agreement are made without reference to a date.  In fact, the only indicators of the actual contract execution date are two fax date and time stamps across the top and bottom of the signature page

---

[171] *See* NDCA-ORCL 260009.
[172] *See* NDCA-ORCL 260004.

of the arrangement.  Each show a date of December 1, 2000 and come from the same two fax machines noted above in paragraph 100b, HP HMCS and DMD.[173]

101.     Based upon the information above, it appears that the HP Agreement was duly executed, **at the earliest**, on December 1, 2000.  Accordingly, it does not appear that persuasive evidence of an arrangement existed at November 30, 2000.  As a result, and without considering any other factors, no revenue should have been recognized until pervasive evidence of an arrangement existed. This would result in the reduction of $19.9 million in revenues for Oracle's 2QFY01.

**Oracle's revenue recognition analysis does not adequately support "gross" accounting.**

102.     As discussed in paragraph 92, the HP Agreement should be accounted for as a single arrangement. This treatment includes the round-trip payments of approximately $30 million **to and from** Oracle and HP.

103.     In May 2001, the SEC released a speech regarding revenue recognition in which it provided guidance to registrants related to the accounting for cross-payments and complex customer arrangements. Specifically, the SEC noted the following:

a.   "The [SEC] staff is concerned when it appears Company A has taken $1 million out of its left pocket only to receive that $1 million back in its right pocket, and wants to record the $1 million received in revenue."

b.   "The [SEC] staff questions how these types of 'round trip' arrangements result in revenue, and whether, in substance, they are sham transactions engineered solely to inflate the revenue line in the income statement."

c.   "[T]he company and its auditor should consider whether it is appropriate to report the related cash flows, revenues and costs on a gross or net basis."

---

[173] *See* NDCA-ORCL 260012.

104.     Oracle recorded the round-tripped monies due under the HP Agreement (approximately $30 million) as revenue or deferred revenue on a "gross" basis, assuming that approach to be appropriate under GAAP. However, I have seen no evidence to suggest that Oracle conducted an analysis pertaining to whether this accounting treatment was appropriate under GAAP.  Accordingly, I have conducted such an analysis below.

105.     To determine whether revenues should be reported on a "gross" or "net" basis, Oracle would have first determined whether the HP Agreement constituted a monetary or nonmonetary transaction under APB 29 and EITF 86-29.[174]

106.     However, irrespective of this determiniation, both APB 29 and EITF 86-29 clarify that Oracle should have accounted for the exchange using "fair value."

> Accounting for nonmonetary transactions should be based on the fair values of the assets (or services) involved which is the same basis as that used in monetary transactions.[175]

107.     This concept is expanded upon in TPA 47, which is specifically applicable to software vendors such as Oracle.  In order for Oracle to have properly recorded the exchange on a gross basis, this TPA states:

- The exchange should be recorded at fair value provided that the transaction has a business purpose;

- Fair value can be determined within reasonable limits (i.e., VSOE of software given up, or the value of the technology/products received, as if the software vendor had received or paid cash);[176] and

---

[174] Specifically, EITF 86-29 states: "The Task Force discussed an exchange of nonmonetary assets that would otherwise be based on recorded amounts but that also involves monetary consideration (boot) [i.e. cash exchanged, etc.].  The task force reached a consensus that the transaction should be considered monetary (rather than nonmonetary) if the boot is significant, and agreed that "significant" should be defined as at least 25 percent of the fair value of the exchange.  As a monetary transaction, both parties would record the exchange at fair value.  If the boot in a transaction is less than 25 percent, the pro rata gain recognition guidance in paragraph 22 of Opinion 29 should be applied by the receiver of boot, and the payer of boot would not recognize a gain.  The Task Force acknowledged that the ability to satisfactorily measure fair value is a prerequisite to the use of fair value."

[175] See APB 29, ¶18.

[176] VSOE (Vendor-Specific Objective Evidence of fair value) is defined in paragraph 10 of SOP 97-2 as either: (i) "The price charged when the same element is sold separately;" or (ii) "For an element not yet being sold separately, the price established by management having the relevant authority; it must be probable that the price, once established, will not change before the separate introduction of the element into the marketplace."

- The products received in the exchange are expected, at the time of the exchange, to be deployed and utilized, and the value ascribed to the transaction reasonably reflects such expected use.

108.     I have not identified evidence to suggest that the <u>fair value</u> of the assets exchanged pursuant to the HP Agreement was determined in accordance with GAAP. Specifically:

   a.  I have seen no evidence that Oracle had established VSOE (fair value) of its software, postcontract customer support ("PCS"), services, and other commitments sold/offered to HP in accordance with TPA 47.

   b.  I have seen no evidence that Oracle determined the fair value of those assets to be purchased from HP.

109.     As noted in paragraph 93, there are several indicators to suggest that HP did not need the software it purchased from Oracle and the only reason HP executed the HP Agreement was to generate additional revenue.   Therefore, there are real questions whether this transaction had a legitimate <u>business purpose</u>.

110.     In consideration of the fact that fair value does not appear to have been established, and the indication that a valid business purpose for the products exchanged under the HP Agreement did not exist, the gross basis of accounting applied by Oracle to the HP transaction, is not supportable under GAAP.

**<u>The delivery criterion *DOES NOT* appear to have been met at November 30, 2000.</u>**

111. The second basic criterion that must be met prior to revenue recognition pertains to delivery.[177]   The table below addresses the areas where Oracle's accounting failed to appropriately consider GAAP as it relates to delivery:

---

[177] SOP 97-2, ¶ 18.

| NO. | CRITERIA | INDICATE ANSWER | | | |
| | | YES | NO | INDETERMINABLE | REF. |
| --- | --- | --- | --- | --- | --- |
| 2.a | Has a fully functional software product, not requiring significant modification or customization, been delivered? | | √ | | SOP 97-2, ¶¶7-8, 22 |
| 2.b | If the contract is subject to customer acceptance, have acceptance criteria been met? | | √ | | SOP 97-2, ¶20 |
| 2.c | For all other elements (PCS, services, etc.) of the arrangement that have not been delivered as of the end of the period, does vendor specific objective evidence of fair value (VSOE) exist? | | √ | | SOP 97-2, ¶¶10, 12; TPA 5100.53 |
| 2.d | If VSOE does not exist for any undelivered element, has the Company appropriately deferred all revenue until that element is delivered or over the period in which an undelivered service or PCS element is delivered? | | √ | | SOP 97-2, ¶12; TPA 5100.53 |

112. Prior to the execution of the HP Agreement, there is evidence that suggests the products previously licensed by HP had not effectively been implemented into production. This fact is relevant because additional seats of these same products as well as newly released software were purchased under the HP Agreement.  Karen Montague of HP noted in an e-mail attachment to various HP employees, including Rathjens:

> [Several] CRM products have had significant delays due to quality issues that precluded HP from utilizing these applications in FY [Fiscal Year]'01 and into FY'02…
>
> **OTS** – Product lacked forecasting as well as the universal working queue linkage was non-functional.  HP used sales online telesales rep. Applications. 0% usage in FY'01

> **Marketing** – Many show stopper[178] patches are still outstanding. Product is still in pilot due to delay Ion bug fixes due to quality issues. 0% usage in FY'01
>
> **Mobile Sales** – Lack of wireless connectivity and poor security on disconnect mode caused delay in product rollout.  0% usage in FY'01…
>
> **Call Center** – 0% usage in FY'01 due to poor quality[179]

113. There is further evidence demonstrating that Oracle's software required significant customization prior to its implementation.  For example,  DeCesare commented on the significant level of effort required in connection with implementing Oracle's Software stating:

> [W]hen I sold an application deal, for the most part, it took between three and five service dollars to every one license dollar, and those service dollars were to configure, integrate and **customize.**[180]

114. Oracle released its E-Business Suite 11i (which included CRM) to the marketplace in May 2000.  At that time it was touted by the Company as an "out-of-the-box solution that manages the entire life-cycle of the 'campaign-to-order' process."[181]  Nonetheless, certain testimony and e-mails indicate that the software delivered to HP as of November 30, 2000 may have required significant production, modification or customization of the software.  For instance,

    a. DeCesare testified: "[CRM] products were heavily over marketed.… I read through the complaint and look [sic] at that statement by Mark Barrenechea in there.  It's not factual.  It's not true.  It does not operate as integrated out of the box.  That's – that's false…Customers like HP…were furious after they started implementations.  There's you know, quite a – quite a few examples of that."[182]

---

[178] DeCesare testified that a "showstopper" was "a piece of functionally that the customer requires that isn't currently in the product.  *See* footnote 188.
[179] *See* HP 00074.
[180] Deposition of Michael DeCesare, February 16, 2006, 48: 19-23 (emphasis added).
[181] NDCA-ORCL 020894-96, PR Newswire; Oracle Equips Marketers With Tools Needed for E-Business Success, May 24, 2000.
[182] Deposition of Michael DeCesare, February 16, 2006, 234:15-25 and 235:1-5 (emphasis added).

b. DeCesare, further testified: "**the functionality [HP] believed the product was supposed to have – it just fundamentally didn't have**…. Like HP was having problems about support-to-sales-force automation, marketing-to-sales-force automation and those types of things, in addition to problems with the rest of the ERP…. [T]he statement that it [Oracle 11i] is completely integrated out of the box is, in my opinion a false statement…. The concerns the customer is having were **lack of functionality in the CRM** and potential integration issues to the ERP side…. **I'm talking about things that were advertised as functionality that just didn't work in the product**."[183]

c. Rathjens, HP's 30b6 witness testified: "some of the software [modules purchased in the November 2000 CRM deal] was more mature than other modules…. [Others] lacked the functionality that HP stakeholders felt they needed to deploy it."[184]

d. Rathjens further acknowledged that Oracle's software required significant fixes and customizations: "[W]e had thousands things we were tracking, probably in the nature of 20,000…. [T]housands of bugs, thousands of change requests, thousands of configurations."[185]

e. In fact, in an e-mail from Julie Cullivan, Sales Consulting Director, to Sanderson, dated January 31, 2001, three months subsequent to the purported delivery of the CRM software to HP, specified that the product lines ordered by HP were still functionally deficient.[186]

---

[183] Deposition of Michael DeCesare, February 16, 2006, 257:19-20, 259:4-8, 262:10-12, 266:23-25, 267:3-4 (emphasis added).

[184] Deposition of Thomas Rathjens, June 30, 2006, 84:7-9, 85:15-16.

[185] Deposition of Thomas Rathjens, June 30, 2006, 101:21-22, 102:1-2.

[186] *See* NDCA-ORCL 296486. (1) E-mail Center – "E-mail Center scenarios do not consistently work nor can you even get them to all work together;" (2) Call Center – "Call Center Intelligence data and breadth of reports is inadequate;" (3) Telesales – "Screenpops only work with Customer Care – should work with Telesales…;" (4) Service – "Service only supports that a customer is calling about one, non-configured product [and]…does not recognize parties to a service contract, it only validates against the end customer of an install base product;" and (5) CRM (in general) – "Customers set up in CRM app do not always work or show up in ERP [and]…CANNOT SHOW A COMPLETE INTEGRATED CRM DEMO LET ALONE A COMPLETE EBIZ SUITE (CRM/ERP) INTEGRATED DEMO."

      f.   In another e-mail dated November 16, 2001, nearly 1 year following the effective date of the 2000 contract, Karen Montague of HP noted that the software was still not functioning properly [187]

115. On November 28, 2000, just two days prior to the purported delivery date, DeCesare noted: "HP has a critical go live in April 2001.  There have been 14 show stoppers that HP has raised of commitments Oracle needs to make to ensure those dates do not slip." DeCesare testified that a "showstopper" was "[a] piece of functionality that the customer requires that isn't currently in the product."[188] Rathjens of HP also affirmed this definition, testifying that a "showstopper" was "[s]ome piece of functionality that we wanted to see incorporated into the software."[189]

116. Based upon this understanding, the existence of even a single showstopper indicates that significant functionality did not exist in the product. Given that this e-mail was sent just two days prior to the purported effective date of the HP Agreement, it is unlikely that all 14 showstoppers had been delivered by November 30, 2000.

117. I have seen no evidence to suggest that Oracle considered these functionality shortfalls prior to the recognition of $19.9 million of revenue on November 30, 2000.  In light of the "showstoppers," the apparent complex integration and customization required and other functionality deficiencies, Oracle's upfront revenue recognition treatment was not in compliance with GAAP.

**The HP Agreement included a Term License, wherein certain undelivered elements lacked VSOE, therefore precluding the upfront recognition of revenue at November 30, 2000.**

---

[187] *See* HP 00062- 63.  (1) Regarding Telesales or OTS – "HP was having enough trouble getting the OTS software to work and decided to limit the OTS functionality to move into production in FY01 to just passing leads from OMO to OSO.  HP does not believe that the software will be ready until the 11.5.6 release is available fro Oracle and put into production at HP," (2) Regarding Inbound Call Center licenses – "Oracle did not deliver contractually on the licenses HP purchased, which were targeted for implementation by call center agents in conjunction with Sales Online," and (3) Regarding Sales Reps or OSO & Mobile Sales – "HP was informed in September'01 that the Mobile licenses do not include "wireless".  HP and Oracle have been discussing, throughout the year, wireless access because HP understood that the 9,045 Mobile licenses HP purchased [including those under the Agreement] included wireless."
[188] Deposition of Michael DeCesare, February 16, 2006, 72: 13-14.
[189] Deposition of Thomas Rathjens, June 30, 2006, 90: 22-23.

118. If VSOE does not exist for the allocation of revenue to the various elements of the arrangement, <u>all</u> revenue from the arrangement should be deferred until the earlier of the point at which, (a) such sufficient vendor-specific objective evidence does exist or (b) all elements of the arrangement have been delivered.[190]

119. There are certain instances wherein VSOE may not be established under GAAP. Specifically TPA 53 indicates that it is not possible to measure VSOE for term licenses with a duration of one year or less.[191]

120. The HP Agreement between Oracle and HP was an 11-month term license.  Bundled with that license were certain PCS service offerings.  As noted in paragraph 119, VSOE of fair value cannot be established for term licenses 1 year or less. Therefore, the total arrangement fee should have been recognized ratably over the license term, providing all other revenue recognition criteria had been satisfied.

121. Accordingly, I have concluded that the entirety of Oracle's upfront recognition of nearly $19.9 million as of November 30, 2000 was not in compliance with GAAP.

**<u>The fixed or determinable and collectability criteria <i>DO NOT</i> appear to have been met at November 30, 2000.</u>**

122. The table addresses the considerations under GAAP relevant to the evaluation of whether fees are collectible and fixed or determinable to substantiate revenue recognition applied:

**INDICATE ANSWER**

---

[190] SOP 97-2,¶12 makes the following relevant exception to this guidance: "If the only undelivered element is PCS, the entire fee should be recognized ratably [over the PCS period]."

[191] "For time-based [term] software licenses with a duration of one year or less, the fair value [VSOE] of the bundled PCS services is not reliably measured by reference to a PCS renewal rate.  The short time frame during which any unspecified upgrade provided under the PCS [postcontract customer support] agreement can be used by the licensee creates a circumstance whereby one cannot objectively demonstrate the VSOE of fair value of the licensee's right to unspecified upgrades.  Though a PCS service element may not be of significant value when it is provided in a short duration time-based license, SOP 97-2 does not provide for an exception from its provision that VSOE of fair value is required for each element of a multiple-element arrangement.  Consequently, when there is no VSOE of the fair value of PCS services included (bundled) in a multiple-element arrangement, even if the arrangement provides a short duration time-based software license, the total arrangement fee would be recognized under paragraph 12 [i.e. the entire fee should be recognized ratably over the license term]...."

| NO. | CRITERIA | YES | NO | INDETERMINABLE | REF. |
|---|---|---|---|---|---|
| 3 | ARE ALL PAYMENTS RECOGNIZED AS REVENUE CONSIDERED, COLLECTIBLE, FIXED OR DETERMINABLE IN ACCORDANCE WITH RELEVANT GAAP? | | √ | | SOP 97-2, ¶26 |
| 3.a | If a significant portion of the software license fee due after expiration of the license or more than 12 months after delivery, does the Company support its ability to successfully collect such fees without making concessions? | | √ | | SOP 97-2, ¶¶28-29 |
| 3.b | If any fees attributable to delivered elements are subject to forfeiture, refund, or other concession has the Company properly demonstrated its ability to meet the collectability criteria? | | √ | | SOP 97-2, ¶14 |

**Fees due under the HP Agreement appear to be subject to forfeiture or refund may not be deemed collectable under GAAP**

123. SOP 97-2 paragraph 14 states: "No portion of the fee (including amounts otherwise allocated to delivered elements) meets the criterion of collectability if the portion of the fee allocable to delivered elements is subject to forfeiture, refund, or other concession if any of the undelivered elements are not delivered.  In order for the revenue related to an arrangement to be considered not subject to forfeiture, refund, or other concession, management must intend not to provide refunds or concessions that are not required under the provisions of the arrangement."

124. All fees initially allocated to the term software license element and recognized at November 30, 2000 appear subject to forfeiture and/or refund. This is the result of the following two contractual terms under the HP Agreement:

    a.   All fees due under the HP Agreement are cancellable as stipulated under the acceptance provisions within the Original SLSA.

    b.   Oracle's binding commitment to pay $30 million to HP, regardless of whether it purchases HP products and services, may constitute an effective right of refund. If for example, Oracle does not purchase any hardware from HP through December 31, 2001, Oracle would be required to pay HP a "cancellation fee" of $30 million, in exchange, Oracle would receive zero value.

125. Based upon these provisions, to assert that fees recognized prior to November 30, 2000 are collectible would likely be inappropriate under GAAP.

**<u>Fees due under the HP Agreement appear to be subject to concession and may not be deemed fixed or determinable under GAAP</u>**

126. In addition to these collectability concerns, concessions granted before and after November 30, 2000 raise questions around the fixed or determinable nature of the fees due under the HP Agreement. SOP 97-2 paragraphs 27-28 state:

> Because a product's continuing value may be reduced due to the subsequent introduction of enhanced products by the vendor or its competitors, the possibility that the vendor still may provide a refund or concession to a credit-worthy customer to liquidate outstanding amounts due under the original terms of the arrangement increases as payment terms become longer.
>
> For the reason cited in paragraph 27, *any* extended payment terms in a software licensing arrangement may indicate that the fee is not fixed or determinable.

127. Under the HP Agreement, fees due Oracle were payable over an approximate 11 month period. While Oracle's standard payment terms are not defined within its 2001 Form 10-K, the existence of concessions granted subsequent to November 30, 2000 indicate fees due under the arrangement may not have been fixed or determinable.

128. As noted in paragraph 102 above, HP experienced various implementation problems with certain of the 1999 purchased CRM software. In an e-mail dated November 28, 2000,

DeCesare attaches an HP/Oracle Partnership Agreement wherein the following was noted:

> Over the past 8 weeks Oracle (Mike Decesare) and HP (Phil May....) have been working on a series of concessions that has been requested by HP before they move forward on the purchase of the additional CRM licenses…. Karen Montague currently has the order document. Highlights include…[$]921K has been deducted from the support [fee] to accommodate all the support related concessions HP raised…. An additional [$]828K has been deducted from the consulting services to accommodate all the consulting relate[d] concessions HP raised…[192]

129. The existence of past concessions, particularly with the same customer may be a strong indication that concession risk exists. Affirming the validity of this concession risk at November 30, 2000, in connection with the HP Agreement, nearly 13 months subsequent to its purported execution date, Oracle added the following programs to the 2000 HP Order Form free of charge:

| Perpetual Licenses: | Quantity | Not Included in HP Agreement** |
|---|---|---|
| *Internet Application Server Enterprise Edition Options:* | | |
| - Wireless Option | 9,826 | |
| | | |
| *Oracle E-Business Suite - Marketing:* | | |
| - Advanced Marketing Online | 1,375 | |
| - Marketing Intelligence | 1,375 | X |
| | | |
| *Oracle E-Business Suite - Sales:* | | |
| - TeleSales | 2,637 | |
| - Wireless Option for Sales | 9,826 | X |
| - Partners Online | 5,500 | X |
| - Sales Intelligence | 11,256 | X |
| | | |
| *Oracle E-Business Suite - Service:* | | |
| - Service Intelliigence | 1,650 | X |
| - Customer Intelligence | 85,000 | X |
| | | |
| *Application Technologies Interaction Center:* | | |

---

[192] *See* NDCA-ORCL 020845.

| Perpetual Licenses: | Quantity | Not Included in HP Agreement** |
|---|---|---|
| - Interaction Center Intelligence | 2,000 | X |
| | | |
| ** Marks in this column indicate new modules not part of the original HP Agreement | | |

130.     As noted in the table above, many of these rights not only expanded the number of licenses to products Oracle sold HP under the original HP Order Form, they also granted rights to newly specified modules not sold to HP.

131.     One specific instance of this involves the rights granted HP to the newly added Partner Online licenses. Rathjens of HP testimony elaborates on the granting of such rights subsequent November 30, 2000:

> [Other unspecified HP employees] and I felt that the Partner Online licenses [seats conceded] were part of the Oracle Sales Online licenses. And when Oracle came out with a new module called Partner Online[193], I felt we were entitled to – to those licenses and should not be paying additional license fees for those.[194]

132.     There is a key distinction to be made here in that granting rights to previously undelivered, newly specified modules (vs. modules specified under the original HP Order Form) free of charge, demonstrates that the fee committed to at November 30, 2000 was committed to assuming such modules would be delivered. Ironically, in a summary prepared by HP in connection with the ongoing implementation issues of Oracle's products, the following was noted:

> In November '00 Oracle Purchase[d] Partner Online (POL) licenses, which was verbally communicated to HP by Oracle to be included in Oracle's Sales Online product…The nature of the negotiation was that HP had purchased enough POL licenses to license the HP enterprise![195]

133. Given the underlying concession risk and the subsequent realization of these concessions, fees due under the original Order Form were not fixed or determinable.  Accordingly,

---

[193] Partner Online is purported to have been available during the winter of 2000/2001, subsequent to November 30, 2000.  *See* Rathjens Deposition, Ex. 9; HP 00008-12.
[194] Deposition of Thomas Rathjens, June 30, 2006, 113:18-22.
[195] *See* HP 00063.

revenue from such fees should have been deferred at November 30, 2000 until the earlier of the point at which (a) VSOE exists for all undelivered modules or (b) all modules have been delivered.

134. Based upon both the right of refund and concession risk at November 30, 2000, fees due Oracle appeared neither collectability or fixed or determinable as defined under SOP 97-2 at November 30, 2000. Accordingly, no revenue should have been recorded in accordance with GAAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of October, 2008, at San Francisco, California

Respectfully Submitted:

Signature:  _____

D. Paul Regan, CPA, CFE

# APPENDIX 1

## *Glossary*

Applied –  Payment in which you record the entire amount as settlement for one or more debit items.[196]

Credit memo – A document which partially or fully reverses an original invoice.[197]

Debit memo – Debit that you assign to your customer for additional charges that you want to collect.  You may want to charge your customers for unearned discounts taken, additional freight charges, taxes, and finance charges.[198]

Invoice – A document that you create in Oracle Receivables that lists amounts owed for the purchases of goods or services.  This document also lists any tax and freight charges.[199]

On Account  –  Payments where you intentionally apply all or part of the payment amount to a customer without reference to a debit item.  On account examples include prepayments and deposits.[200]

Unapplied payment – The status of a payment for which you can identify the customer, but you have not applied or placed on account all or part of the payment.  For example, you receive a check for $1,200 and you pay an open debit item for $1,000.  The remaining $200 is unapplied until you either apply the payment to a debit item or place the amount On Account.[201]

Unidentified payment – The status of a payment for which the customer is unknown. Receivables retains unidentified payments for you to process further.[202]

---

[196] NDCA-ORCL 048663-83, Oracle Receivables User's Guide, Release 10SC, March 1997, Glossary at 048658.
[197] *Id*. at 048663.
[198] *Id*. at 048665.
[199] *Id*. at 048670.
[200] *Id*. at 048672.
[201] *Id*. at 048682.
[202] *Id*. at 048682.

EXHIBIT 153

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MASTER FILE NO. C-01-0988-SI

LOCAL 144 NURSING HOME PENSION FUND,
UFCW LOCAL 56 RETAIL MEAT PENSION FUND,
DRIFTON FINANCE CORPORATION, AND ROBERT D. SAWYER, et al.

vs.

ORACLE CORPORATION, LAWRENCE J. ELLISON,
JEFFREY O. HENLEY, EDWARD J. SANDERSON

REBUTTAL REPORT

OF

D. PAUL REGAN, CPA, CFE

Initially Submitted:  JUNE 22, 2007
Sworn:  OCTOBER 16, 2008

## The Nature of My Assignment

I have been retained, through my employer, Hemming Morse, Inc., by Lerach Coughlin

Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs Local 144 Nursing Home Pension

Fund, et al., to provide expert testimony regarding whether Oracle's revenue and earnings for the

quarterly period ended November 30, 2000 ("2QFY01") were presented in accordance with

Generally Accepted Accounting Principles ("GAAP"), and whether Oracle's financial statements

were materially misstated.  I submitted my expert report on May 25, 2007.  The defendants'

experts also submitted reports at that time.  This rebuttal report responds to specific conclusions

reached by J. Duross O'Bryan as quoted or referenced below, and should be reviewed in

connection with my May 25, 2007 expert report.  I have incorporated the conclusions and

analyses of my prior report into this rebuttal report.

## Summary of My Expert Qualifications

My qualifications and hourly rate are included in my expert report dated May 25, 2007.

## Evidence Considered

The evidence I considered in this case is included in Exhibit B to my expert report dated May 25,

2007.  In addition, new evidence I have considered since that time is included in Exhibit A to this

response.  In particular, I have considered the Expert Report of J. Duross O'Bryan ("O'Bryan

Report"), which he presented on behalf of Oracle as described further below.

## Summary Response to Mr. O'Bryan's Expert Report

This rebuttal report contains the following principal conclusions, each of which is analyzed in

greater detail in a related section of this rebuttal report:

1.      Mr. O'Bryan's conclusion on materiality with respect to Oracle's Q2FY01 financial
        statements is incorrect and contrary to GAAP, including SAB 99,[1] because:

---

[1]      Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 99, Materiality
("SAB 99"), *see* my May 25, 2007 report at ¶ 40.

     a.  His analysis did not properly evaluate each misstatement individually and in the aggregate; and

     b.  He failed to consider certain important factors and evidence.

2.    Mr. O'Bryan's analysis of Oracle's Q2FY01 transfers to the Bad Debt Reserve is flawed in that:

     a.  He did not provide any details underlying his assertion that selected transfers were supportable beyond the two examples in his report.  Further, his conclusions related to the two examples rely on evidence developed by Oracle in 2003 rather than what was documented by Oracle contemporaneous to the transfers; and

     b.  He appears to have incorrectly assumed that Ernst & Young LLP ("E&Y") had developed certain conclusions about the 2QFY01 transfers, however, it does not appear that E&Y ever reviewed the transfers in 2Q01 and never reached those conclusions.

3.    Mr. O'Bryan's conclusion that the November 2000 Debit Memos had no financial statement impact is inaccurate.

## Mr. O'Bryan's Conclusion on Materiality With Respect to Oracle's 2QFY01 Financial Statements is Incorrect and Contrary to GAAP, Including SAB 99

Mr. O'Bryan's conclusion regarding the HP agreement in 2QFY01 is incorrect and lacks an independent and/or reliable analysis.

Mr. O'Bryan asserted that Oracle's $20.1 million transfer of unapplied cash to its Bad Debt Reserve in 2QFY01 was not material with respect to its financial statements.  In doing so, Mr. O'Bryan failed to consider certain relevant evidence, including:

1)  *Mr. O'Bryan failed to consider appropriate qualitative evidence, required under SAB 99, to properly conclude whether Oracle's 2QFY01 misstatements were material to its financial statements.*

A. Underline{Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision in the estimate.}

Mr. O'Bryan concluded that the known misstatements are incapable of precise measurement.[2]  However, it appears that he failed to consider the following:

- The transfer of customer overpayments was not the result of a subjective estimation process but rather a product of exact amounts improperly credited to Oracle's Bad Debt Reserve.  Ultimately these transfers enabled an increase of exactly $20,000,000 to Oracle's revenue and pre-tax earnings in 2QFY01;[3] and

- The improper recognition of revenue related to the HP agreement results from a violation of the accounting rules prescribed under GAAP and is also subject to precise measurement.[4]

Accordingly, the misstatement amounts do not require subjective judgments as each are able to be precisely measured under GAAP.  This factor proved particularly important for Oracle because as 2QFY01 neared completion, its revenues and EPS were just short of beating consensus analyst expectations.[5]  In my opinion, under these circumstances the misstatement was material.

---

[2] O'Bryan Report, p.39.

[3] *See* my report dated May 25, 2007, p.13, footnote 37.

[4] *See* my report dated May 25, 2007, p.34-35.

[5] As noted in my original report in footnote 136, I have reviewed a series of forecast documents that appear to have been prepared by Oracle during the process to finalize its reported financial statements for Q2FY01.  These forecast documents indicate that Oracle identified "potential" revenue of $2,640.5 million and EPS of $0.10 per share.  Ultimately, Oracle reported revenue of $2,659.5 million and EPS of $0.11 per share.  This difference of $19 million closely approximates the revenue related to the HP agreement recorded on the last day of Oracle's quarter [NDCA-ORCL

B.  Whether the misstatement masks a change in earnings or other trends.

Mr. O'Bryan noted "no evidence" of this issue.[6]  Therefore, it appears that he failed to consider the following evidence:

-   Leading up to Q2FY01, Oracle established a trend of beating analysts' estimated EPS consensus.  During the consecutive ten quarters preceding Q2FY01, Oracle announced EPS in excess of analysts' consensus nine times. During the single instance when Oracle merely met earnings (and revenue) consensus, the stock price fell 6%.

-   Oracle's failure to beat analysts' consensus EPS for 2QFY01 was masked from investors as a direct result of the misstatements at issue in this dispute. Specifically, the known misstatements facilitated Oracle's ability to beat Q2FY01 consensus analysts' expectations by one penny, artificially inflating EPS from $0.10 to $0.11.

---

410399-415].  In addition, the $20,000,000 adjustment that was recorded to reduce Oracle's Bad Debt Reserve was an element of "Corporate Adjustments" that was characterized as "Q2FY01 Upside," and included as an addition to Oracle's 2QFY01 revenue and EPS in Oracle's forecast.

[6] O'Bryan Report, p. 39.

These factors support my conclusion that the misstatement was material because it masked the change in Oracle's earnings trends and Oracle would not have beaten analyst consensus expectations without the misstatements.

C.   Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

Mr. O'Bryan concluded that the misstatements impacted all of Oracle's operations, as opposed to a singular segment or other significant portion of the business.[7] In reaching this conclusion, Mr. O'Bryan does not appear to have considered, at least, the following:

- The approximately $20 million misstatement related to the HP agreement distorted the Company's application business growth rates. Several of Oracle's analysts commented on Oracle's reported 66% applications business growth rate in 2Q01 as one of the highlights of the quarter.[8&9]  As growth rate

---

[7] O'Bryan Report, p.40, "The unapplied cash likely resulted from all of Oracle's operations, as opposed to a singular segment or other significant portion of the business."

[8] NDCA-ORCL 308884-85, Goldman Sachs, "*Oracle Reports Robust Apps Growth; Mgmt States Strong Business Outlook*," December 15, 2000, "Oracle delivered strong earnings, benefiting from: 1) growing traction in the application market fueling applications revenue growth of 66% (or 73% in local currencies). . . . Oracle emphasized that its key differentiation is its fully integrated suite of applications that installs relatively quickly, requiring minimal systems integration."  (Emphasis added.)

[9] NDCA-ORCL 420587-89, Deutsche Banc Alex. Brown, "*Oracle Corporation [ORC] 'Strong Buy' Oracle F2Q Delivers the Goods*," December 15, 2000, "A key part of Oracle's strong F2Q was the strength of the applications business and, more importantly, marquee customer wins with the 11i e-business suit.  Applications license growth of 66% solidly outpaced Street expectations in the 50%-60% range.  The outperformance should also allay concerns about the viability of Oracle's

expectations appeared to range between 50% - 60%, the incremental revenues improperly recognized under the HP arrangement facilitated Oracle's ability to exceed these estimates. Excluding the improper HP revenues, the Company's applications business growth rate would have dropped to 54%, which would have been 12% below the reported rate; and further, analysts indicated the importance of Oracle's "notable" win at HP to its 11i business.[10&11]

These factors support my conclusion that Mr. O'Bryan's opinion was erroneous and the misstatements at issue were material, using an appropriate SAB 99 based analysis.

D.  Whether the misstatement involves concealment of an unlawful transaction.

Mr. O'Bryan concludes, "[f]urthermore, there is no evidence that suggests that Oracle attempted to conceal these transactions."[12] However, he does not appear to consider at least the following:

---

applications business and the relative immaturity of release 11i following last quarter's decent, but slightly disappointing 42% growth." (Emphasis added.)

[10] NDCA-ORCL 420617-19, Thomas Weisel Partners LLC, "*66% Apps Growth Highlights In-Line Q2*," December 15, 2000, "Oracle made up for disappointing applications license sales in Q1 by posting 66% growth in Q2. Notable wins at American General, Hewlett Packard…highlighted solid demand for the company's 11i e-business suite. . . .  We project Oracle must hit 60% apps growth over the next five years to justify its current valuation." (Emphasis added.)

[11]  NDCA-ORCL 308890-93, Merrill Lynch, "*Oracle Systems: Q201: Steady As She Goes*," December 15, 2000, "Oracle began to show traction again in its applications business, and the company spoke confidently about improving its growth in applications through the remainder of FY01. The company noted 83 live customers on 11i and new wins with HP (thought to be a $20 mil deal), Qualcomm and Compaq. This will be an important factor for increased sponsorship of ORCL this spring." (Emphasis added.)

[12] O'Bryan Report, p. 40.

- The November 2000 debit memos concealed the fact that Oracle had a large amount of customer overpayments and unapplied cash that it should have refunded to customers or escheated.  Specifically, as set forth in my May 25, 2007 report, Oracle's creation of the debit memos allowed it to "apply" customer overpayments to the debit memos, making it look like an overpayment was actually applied to a legitimate invoice, which limited the ability of Oracle's customers to obtain refunds.[13]

- Oracle's usage of the debit memos for concealment purposes is also demonstrated by the fact that Oracle engaged in a "clean up" project beginning in October 2002 in which it reversed the November 2000 debit memos and refunded and escheated millions of dollars of debit memo overpayments that had been used to inflate the bad debt reserve in 2Q01.

These facts support my opinion that Mr. O'Bryan was incorrect when he concluded that "there is no evidence that suggests that Oracle attempted to conceal these transactions."

2)  *Mr. O'Bryan failed to independently analyze, or offer an opinion on, the materiality of the misstatement if the HP agreement also violated GAAP.*

Mr. O'Bryan concluded that the $20.1 million pre-tax earnings impact of Oracle's improper transfers of customer overpayments was quantitatively immaterial to its 2QFY01 financial statements.  In doing so, it appears that he failed to evaluate other known misstatements during Oracle's 2QFY01.  Specifically, it appears that Mr. O'Bryan failed to consider the impact on his materiality analysis of Oracle's $19.9 million overstatement of revenue and pre-tax earnings related to its agreement with Hewlett Packard.[14]  As a result, Mr. O'Bryan appears to have failed to consider that the aggregate

---

[13] *See* my report dated May 25, 2007 beginning at ¶ 26.

[14] While other second quarter misstatements, including the turnaround impact of prior period adjustments, may also impact an assessment of materiality, it is my understanding that Arthur

impact of these items was an overstatement of Oracle's 2QFY01, a) Net Income (after tax) by approximately 4%,[15] and b) application revenues of nearly 8%. Accordingly, Mr. O'Bryan's assessment of the quantitative impact of Oracle's known misstatements is incomplete.

3) ***Mr. O'Bryan failed to opine on whether Oracle's reported EPS of $0.11 was materially different than its actual EPS of $0.10.***

Mr. O'Bryan's analysis of materiality does not address that the misstatement enabled Oracle to increase its reported EPS from $0.10 to $0.11. This $0.01 increase enabled Oracle to beat consensus analyst expectations for the period. In this case, the misstatements allowed Oracle to round its reported EPS up to $0.11 instead of rounding it down to $0.10. However, Mr. O'Bryan limits his opinion to the increment of EPS that facilitated the rounding, rather than the outcome of the rounding (*i.e.*, beating analyst expectations).[16] Therefore, his materiality analysis is incorrect because it looks at the misstatement in a vacuum, without considering the total reported financial statement impact. This impact is also considered in my analysis of the SAB 99 factors above.

4) ***Mr. O'Bryan failed to acknowledge that the E&Y investigation was limited in scope and did not consider all of the relevant facts.***

Mr. O'Bryan's conclusion that the improper bad debt transfers in 2QFY01 were not material is based in part upon an analysis performed by E&Y, who replaced AA as Oracle's auditors in 2002. Specifically, Mr. O'Bryan states that:

---

Andersen LLP ("AA") did not produce a complete set of Q2FY01 working papers to enable a determination as to whether any such items existed. Regardless, Mr. O'Bryan failed to consider the possibility of these incremental misstatements in his analysis.

[15] In computing the incremental impact of all known misstatements, I have determined that the impact of any variable expense, such as commissions, related to the HP agreement on net income and EPS percentage changes would not impact the 4% EPS overstatement noted herein.

[16] O'Bryan Report, p.38, "This adjustment would reduce the Earnings Per Share calculation by just two-tenths of a cent. As such, this adjustment is not material from a quantitative sense…."

- "EY had to consider whether the transfers to Oracle's bad debt reserve during second quarter fiscal year 2001 created a material misstatement in Oracle's past financial statements."

- "EY concluded that these transfers from unapplied cash to bad debt reserve did not have a material impact to past financial statements."[17]

However, the evidence does not show that E&Y reached these conclusions.  First, there is no evidence that E&Y was asked to perform any procedures that would enable them to reach a conclusion regarding the propriety of the bad debt transfers in 2Q01.  Mr. O'Bryan does not cite any evidence that E&Y analyzed or even considered the impact of the bad debt transfers on Oracle's 2QFY01.  In fact, E&Y's designated witness under Fed. R. Civ. P. 30(b)(6), Alex Bender, testified that he was not familiar with account 12601, which is the relevant Bad Debt Reserve account, or transfers to this account.[18]

In addition, Mr. Bender testified that the "totality of the procedures performed by Ernst & Young" were documented in their memorandum entitled "Oracle Corporation – Agreed Upon Procedures with Respect to Debit memos to Account #25005 in November 2000."[19]  Mr. O'Bryan described this memorandum in detail in his report (*see* p.17).  This memorandum does not contain any indication that E&Y performed analyses of Oracle's transfer of customer overpayments to the Bad Debt Reserve.

---

[17] O'Bryan Report, p.41.

[18] Deposition of Alexander Bender, September 21, 2006, 179:18-180:20, including "Q. Do you know if Ernst & Young in the course of its review or engagement related to the debit memo transactions ever looked at the transfers to Account 12601?  A. No, I don't recall that specifically.  No.  Q.  Do you recall if they looked at the transfers to the bad-debt reserve?  A. For which period?  Q.  All.  A. I don't recall, no."  *See also* Bender at 202:12-18, "Q. Do you know when the transfer to Account 12601 happened?  [Objection] A. I'm not familiar with the account balance you just referenced and the transfers to that account."

[19]       *Id.* at 51:1-19, 79:1-80:1, and 179:18-180:20, including "Do you know if Ernst & Young would have documented any review of transfers to the bad-debt reserve with respect to its engagement related to the debit memos?  [Objection] A. If we would have done something, I believe we would have documented it, yes."  *See also* the related E&Y memorandum at E&Y 000143-46.

Further, I considered the possibility that E&Y developed an understanding of the transfer of customer overpayments to the Bad Debt Reserve in 2QFY01 via a review of the Report of Oracle's Special Litigation Committee ("SLC").  However, the SLC only analyzed transfers made to the Bad Debt Reserve in 3QFY01, which totaled $5 million.[20&21]  Mr. O'Bryan cites no independent evidence that E&Y or the SLC reviewed the impact of the transfers in 2QFY01.

It is also worthwhile to note that E&Y did not perform a quarterly review of Oracle's financial statements for 2QFY01, and did not issue any opinion with respect to Oracle's fiscal 2001 year.  Further, Mr. Bender testified that E&Y did not know or understand how Oracle recorded customer overpayments in fiscal 2001 because it did not audit Oracle.[22]  Therefore, it is not appropriate to assert that E&Y reached <u>any</u> conclusion regarding the propriety or materiality of the improper transfers to the bad debt reserve in 2QFY01.  Accordingly, it is unclear how Mr. O'Bryan determined that "E&Y's conclusions were consistent with [his] own" after his review of Mr. Bender's testimony.[23]

Similarly, there is no indication that E&Y performed any procedures related to the HP agreement.  There is also no evidence that AA, Oracle's external auditors in fiscal 2001, was provided with all of the information related to either of these misstatements.  In accordance with the requirements of Generally Accepted Auditing Standards, an auditor is required to evaluate the materiality of known and likely misstatements on an individual

---

[20] *See* SLC Report at NDCA-ORCL 295582.

[21] NDCA-ORCL 296433, "'The Committee discussed with Banker [E&Y Audit partner] that certain transfers from unapplied cash to the bad debt reserve had occurred in Q3 of FY 2001, but that the maximum amount of cash moved to the bad debt reserve in Q3 was approximately $5 million."

[22] Deposition of Alexander Bender, September 21, 2006, 209:6-13, "Q. Do you know if E&Y had an understanding based on its debit memo engagement of how Oracle recorded customer overpayments in fiscal 2001?  A. Not really, no.  We understood that customer repayments (sic) would be one of the items that would potentially go into the 'on account' status as part of 25005.  But since we didn't audit that period, I wouldn't know."

[23] *See* O'Bryan Report, p.31, Section D.

and on an <u>aggregated</u> basis.[24]  Since I am not aware of any evidence to suggest that Oracle's external auditors reviewed all evidence regarding Oracle's misstatements, his reliance on E&Y, AA, or a lack of restatement to conclude that the misstatements were not material is erroneous.[25]

In consideration of the evidence detailed above, I believe that Mr. O'Bryan's conclusions were incorrect.  Mr. O'Bryan failed to perform reasonable procedures and to evaluate appropriate and relevant evidence surrounding the misstatements of Oracle's Q2FY01 financial statements.  As demonstrated in the analyses above (and discussed in my May 25, 2007 report), it is my opinion as an accountant applying SAB 99 and AU 312, that the misstatements at issue in this matter were material.

**Mr. O'Bryan's Analysis of the Q2FY01 Transfers to the Bad Debt Reserve Is Flawed**

Mr. O'Bryan acknowledges that Oracle transferred $20.1 million of unapplied cash to its Bad Debt Reserve in 2QFY01.[26]  However, Mr. O'Bryan reviewed only $10.6 million of the 2QFY01 transfers to the Bad Debt reserve.  Within this sample, Mr. O'Bryan identified only $1.5 million of transfers that he believes were supportable.  Nonetheless, other than two examples, Mr.

---

[24] AU 312, "Audit Risk and Materiality in Conducting an Audit," ¶ 34.  AU 312 is explicitly incorporated into SAB 99.

[25] In addition, Mr. O'Bryan stated that it is reasonable to conclude that the SEC was satisfied with Oracle's accounting treatment with respect to the debit memos.  Mr. O'Bryan failed to cite any evidence or perform an independent assessment of the evidence provided to the SEC.  Further, as noted in my report dated May 25, 2007, Oracle failed to provide the SEC with complete information in its presentation (*see* p.31).  In addition, Oracle did not provide the SEC with evidence related to the transfer of customer overpayments to the Bad Debt Reserve or the improper revenue recognition on the HP agreement.  Therefore, it is not possible to conclude that the SEC would have been satisfied that Oracle's misstatements were immaterial.

[26] As discussed in my report, Oracle calculated its 2QFY01 Bad Debt Reserve as of October 31, 2000.  However, Mr. O'Bryan appears to have calculated Oracle's transfers to its Bad Debt Reserve based on the three months ended November 30, 2000.  For purposes of assessing the impact of the transfers to the Bad Debt Reserve on 2QFY01 pre-tax earnings, the transfers to the Bad Debt Reserve for the three months ended October 31, 2000 totaled $19.4 million, and the subsequent $20.0 million adjustment that increased revenue by reducing the reserve.

O'Bryan did not provide any detail of these transfers or the specific documents that he reviewed. Therefore, his conclusion is not supported in his report.

In the two examples of supportable transfers provided by Mr. O'Bryan, it was not until fiscal 2003 that Oracle ascertained that this amount of the transfers in October and November 2000 were appropriate.  The entries Oracle made in 2QFY01, which impacted its financial statements, needed to be based upon appropriate contemporaneous evidence gathered at the time the entries were made, not evidence identified two years later.  Further, even his example related to Caltrans assumes that Oracle did not initiate a second invoice to Caltrans related to the payment of $112,464.  While the collectors' notes state that "too much of concession was given to customer due to the customer sending in a payment," it is not clear from the documents that the original concession was inappropriate or, that the payment of $112,464 did not include a $91,254 customer overpayment.[27]

I also note that Mr. O'Bryan says that he "found some evidence which suggests that at least another $500,000 of the transfers were appropriate."[28]  However, Mr. O'Bryan did not provide any evidence or details concerning those items.  Therefore, Mr. O'Bryan's conclusions regarding this amount are not supported by his report.

Mr. O'Bryan further notes that Oracle took a "precautionary" measure to reverse these transfers.[29]  To be clear, Oracle's "precautionary" measures were taken approximately two years after the Q2FY01 transfers, and after plaintiffs had made their accounting allegations. Furthermore, Oracle's actions as part of a "clean-up" beginning in October-November 2002 involved a blanket reversal of the transfers of customer overpayments to the Bad Debt Reserve as well as the specific reversal of the related November 2000 Debit Memos.  This reversal indicates that during the entire time between the transfer and the reversal, Oracle's Bad Debt Reserve was overstated by the presence of these customer overpayments.  In addition to the $20

---

[27] Amount of the overpayment obtained from O'Bryan Report, p. 35-36.

[28] O'Bryan Report, p. 33.

[29] O'Bryan Report, p. 20.

million transfers in 2QFY01, Oracle transferred nearly $40 million in other periods that were part of the November 2002 blanket reversal.[30]  It does not appear that Mr. O'Bryan considered these facts in their totality.

**Mr. O'Bryan's Conclusion that the November 2000 Debit Memos Had No Financial Statement Impact Is Inaccurate**

Mr. O'Bryan's conclusion that the November 2000 debit memos had "no financial impact"[31] is flawed for several reasons.  First, as stated in my May 25, 2007 report, the debit memo transactions did have a financial impact by enabling Oracle to inflate its revenues and pre-tax earnings by at least $20 million in 2QFY01.  Mr. O'Bryan fails to recognize that the unapplied cash receipts which were improperly transferred to Oracle's bad debt reserve during and prior to 2QFY01 were also applied to the November 2000 debit memos.  As a result, Mr. O'Bryan's conclusions appear to be based on what happened on a single date (November 17, 2000), without taking into account the financial transactions that preceded the debit memos (such as the bad debt transfers) and occurred after the November 2000 debit memos (*i.e.*, credit memos and cash refunds), all of which had an impact on Oracle's financial statements.[32]

In reaching these conclusions, Mr. O'Bryan relied, in part, upon the testing performed by E&Y.[33] However, Mr. Bender who, as noted above was designated as E&Y's person-most-knowledgeable, stated that E&Y:

---

[30] *See* ¶ 43 of my report dated May 25, 2007.

[31] O'Bryan Report, p. 3, "Oracle's creation of and accounting for the over 46,000 debit memos processed on November 17, 2000 did not affect its financial statements in the second quarter of fiscal year 2001, or any other accounting period."

[32] As described in my report dated May 25, 2007, Oracle removed approximately $59.6 million that had been transferred into its Bad Debt Reserve (*see* ¶43).  Ultimately, these amounts were refunded, applied to adjusted invoices and amounts previously written-off, kept and escheated.  These funds had previously been maintained in Oracle's Bad Debt Reserve.

[33] O'Byran Report, p. 18, "As noted above, EY found no evidence that any revenue, or any other financial statement impact, was recorded as a result of the November 17, 2000 debit memo project."

- Did not look at the underlying transactions related to the debit memos, including unapplied cash items relating to debit memos that were transferred to the Bad Debt Reserve in 2QFY01.  In fact, E&Y only looked at the debit memo entries themselves.[34]

- Would not necessarily have detected improper prior increases to income related to the debit memos.  Specifically, E&Y did not look at Accounts 12601 or 25005 in 2QFY01, when a majority of the transfers of customer overpayments to the Bad Debt Reserve that effected Oracle's 2QFY01 results occurred.[35&36]

Further, Mr. O'Bryan's conclusions appear to be substantially premised upon testimony of current Oracle employee Greg Myers.  This is notable because many documents contradict and refute testimony made by Mr. Myers in his deposition. For example, Mr. O'Bryan referenced the testimony of Mr. Myers that stated regarding the On Account designation, "from an accounting perspective, there was an offsetting debit that cleared that credit from sitting in Oracle's balance sheet."[37]  However, to the extent that the On Account items had been transferred to the Bad Debt Reserve, the credit continued to be present on Oracle's balance sheet.  As a result, Mr. O'Bryan's reliance on Mr. Myers' testimony is inconsistent with Mr. O'Bryan's conclusion that $20.1 million was transferred to the Bad Debt Reserve in 2QFY01.

---

[34] Deposition of Alexander Bender, September 21, 2006, 182:2-9, including "Q. Do you know if it reviewed the receipts related to the debit memos?  A.  I don't believe we looked at that.  We looked at the journal entries to process the debit memos referred to here."  *See also* 184:1-185:14.

[35] *Id*. at 235:23-236:22, including "Q. And I just want to clarify.  I believe you previously stated Ernst & Young did not look at activity in September or October 2000 related to these debit memo transactions; is that correct?  [Objection] A. These – I'm sorry.  These debit memos were in November.  So did we look at Account 25005 in September and October?  The answer is no."  Bender's testimony also shows that E&Y did not review the transfers in August 2000.

[36]     *Id*. at 202:12-18 and 216:6-10, including "Q.  Do you know in connection with Ernst & Young's debit memo engagement whether or not it looked at transfers from accounts 25005 to 12601?  A.  As I indicated earlier, I don't recall doing that, no."

[37] *See* O'Bryan report, p.10, footnote 21.

**Mr. O'Bryan's Conclusion Regarding the HP Agreement in 2QFY01 Is Incorrect and Lacks an Independent and/or Reliable Analysis**

Mr. O'Bryan's Report did not provide an independent analysis of the documents, testimony or evidence surrounding the HP agreement.  He also failed to provide foundational evidence or a reliable methodology for independently assessing the propriety of the HP agreement under GAAP.  His conclusion is based entirely upon an unsupported assumption about what Oracle's auditor AA may have considered in 2001.  This conclusion disregards the fact that AA did not appear to review all information necessary to fully assess the propriety of Oracle's revenue recognition treatment of the HP agreement.  Therefore, Mr. O'Bryan's reliance on AA is misplaced, and his opinion on the HP agreement is incorrect.

Specifically, Mr. O'Bryan failed to perform any independent analysis of the facts and documents surrounding the HP deal, including, but not limited to: (i) the underlying source agreements between Oracle and HP, (ii) testimony of those involved in the negotiations and implementation of software sold to HP, including relevant deposition exhibits, (iii) correspondence within and between Oracle and HP surrounding the negotiated agreements and implementation matters identified (including e-mails and other documents), and (iv) the applicable GAAP standards and related interpretations, in place during Oracle's Q2FY01.  As stated in my May 25, 2007 report, the evidence shows that the HP agreement was improperly recognized in 2QFY01.

Mr. O'Bryan failed to consider evidence indicating AA was not provided with all information by Oracle necessary to conclude on the propriety of its revenue recognition treatment of the HP agreement

It also appears that Mr. O'Bryan failed to consider whether AA reviewed, or had access to, all the evidence necessary to properly conclude on Oracle's recognition of revenue on the HP agreement.  In fact, testimony during Gary Matuszak's[38] deposition demonstrates that certain relevant e-mails and documents surrounding the HP agreement (including negotiations pertaining to the contemporaneous sale of Oracle's software and its purchase of HP hardware) were not

---

[38] Gary Matuszak was AA's lead partner on the Oracle audit.

provided to AA.  In one example, Mr. Matuszak testified that he was unaware of the history of concessions that HP had requested before moving forward with the November 2000 agreement.[39&40]  As the existence of concessions either before or after the execution of a software license calls into question the fixed or determinable nature of fees due under an agreement, evidence such as this would have likely impacted AA's evaluation of revenue recognized under the HP agreement.  Mr. Matuszak also testified that he was not aware of several internal Oracle e-mails discussing the reciprocal nature of the deal and confirming that HP's software purchase was contingent on Oracle's purchase of HP hardware.[41]

In addition, as discussed in my May 25, 2007 report,[42] there were 14 "show stoppers" that HP believed would prevent them from being able to roll out Oracle's product.  Mr. Matuszak was not aware of these "show stoppers."[43]  As matters surrounding the functionality of the software sold to HP would impact an auditor's assessment as to whether Oracle had effectively satisfied the delivery requirement under GAAP to record revenue, this information would also have likely impacted AA's evaluation of revenue recognized under the HP agreement.  Mr. Matuszak

---

[39] Referring to the following excerpt from Deposition of Gary Matuszak, Exhibit 6 (NDCA-ORCL 020845) - an e-mail from Michael DeCesare, Oracle's Vice President of Sales –Western Region to various Oracle executives, including Larry Ellison, Chief Executive Officer, dated November 28, 2000, just two days prior to the purported execution of the HP agreement: "Over the past 8 weeks Oracle (Mike DeCesare) and HP (Phil May, Mike Griffith, Karen Montague, Mike Overly..) have been working on a series of concessions that has been requested by HP before they move forward on the purchase of the additional CRM licenses."

[40] Deposition of Gary Matuszak, August 1, 2000, 336:11-337:16; 338:19-25; 339:19-340:21.  "Q. Were you aware of any concessions that were what's written here, that there were concessions that HP was requesting before they move forward on the purchase in Q2? A. I've not seen this memo before and so…I'm not aware of these concessions."

[41] *See id.* at 328:21-330:5; 332:7-334:1.

[42] *See* my report dated May 25, 2007 beginning at ¶ 103.

[43] Deposition of Gary Matuszak, August 1, 2000, 345:20-25.

appeared to agree with this perspective, but acknowledged that AA did not perform this type of analysis.[44&45]

The evidence, as outlined in my report dated May 25, 2007, demonstrates that Oracle improperly recognized $19.9 million in revenue on November 30, 2000 relating to the HP agreement. Therefore, irrespective of AA's knowledge or consideration of the evidence, AA's conclusions as to the propriety of Oracle's Q2FY01 reported revenue was inaccurate. Accordingly, it continues to be my opinion that Oracle failed to recognize revenue under the HP Agreement in accordance with GAAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of October, 2008, at San Francisco, California.

Respectfully submitted:

Signature: _____

D. Paul Regan, CPA, CFE

_____

[44] *Id*. at 185:6-14, "Q. Okay.  So – but did you ever perform an analysis with respect to this [HP] deal as to whether the functionality promised to Hewlett-Packard actually worked? [Objection] A. That was not within the scope of our work."; *see also* 171:11-172:15.

[45] *Id*. at 186:6-187:1-10, "Q.  Would it change your analysis at all if you looked -- if the products listed on Oracle's available products list, if some of those hadn't even been developed yet, would that change your analysis if you knew that at the time? [Objection] A.  If there were unavailable products in the license agreement, that certainly would have been a factor we would have considered."

**EXHIBIT A**

<u>DOCUMENTS CONSIDERED</u>
<u>Supplemental to Exhibit B to Expert Report of D. Paul Regan, May 25, 2007</u>

1.      Expert Report of J. Duross O' Bryan

2.      AU 312, Audit Risk and Materiality in Conducting an Audit

EXHIBIT 154

**North America Finance Management Team  Meeting Minutes and Action Items**
*October 4 & 5, 2000*

### Global Reporting

- All lines of businesses except for License LOB have identified Global teams to lead the reporting requirements.. **Action: J.Minton** to assemble Global License  team as quickly as possible.
- Revisit the skill set requirement for DPOs. **Action: L.Garnick / R. Ronsse**
- Add Kent Kelly to DPO list to represent USA. **Action: I.Guner/R.Ronsse**
- Initial EDW implementation is scheduled for US only.  WW implementation schedule is not slotted for this fiscal year. Must be discussed during IT Steering Committee meeting. **Action: L.Garnick**
- EDW and US Datamart GAP study must be completed and reviewed by North America Fin Mgmt Team. **Action: R.Ronsse / K.Kelley**

### Career Development

- Training  -  Quite a few system upgrades are coming down the pike at the same time with no training scheduled or content is prepared.
  1. OSO - Patty McManus to lead the GPO role for OSO. Establish documentation for requirements, definitions, processes, receive LJE approval and prepare training.  Get input from J.English on education department's input for training. **Action: J.Minton / J.English** to get Patty on board to start the process.
  2. Internal systems -  All levels of finance staff need the training on using our own internal systems (ie OFA, Discoverer, OSA etc). **Action: I.Guner** to prepare and execute.
  3. Rev Rec Certification -  Have all finance staff to take the appropriate class via web. **Action: I.Guner** to forward the URL to FDs.
  4. Management Training - There is  a need for skill assessment and sequential list for training classes for career levels.  **Action: J.Minton to invite S.Charley** to the next meeting for presentation and guidance.
- Annual North America Finance Conference - Establish the first one around January time frame. Incorporate Discoverer training if possible.  **Action: I.Guner** to plan and execute.
- Oracle story - Each finance team member should have the knowledge of Henley's $1B savings video demo and presentation.  **Action: I.Guner** to send the URL to the FDs for distribution.

### OPS Review Specifics

- Purchase Requisition process for Subcontractors need to be reviewed. **Action: T.Ford / J.English**
- Feasibility study of EJS Consulting Comp Group to transfer to  C.Facey's comp group. **Action: J.English / C.Facey.**
- ISD Operations Group's charter requires further analysis and documentation. Assessment needed for number of staff requirement, the appropriate group where the function should reside, location etc. **Action: D.Winton**
- ISD location in Redwood Shores is an expensive model. **Action: J.Minton** to talk to G.Roberts / H.Koplow for Rocklin location.

### License  Management Reporting

- License specific proposal for KPIs, defintions, report design,  system assessment and documentation will be prepared before the IFC.  The proposals will be then discussed, and decided on for implementation during IFC. Assignments:
  1. Sales Capacity & Overassign - **C.Facey**
  2. Win / Loss - **D.Winton**
  3. Discount analysis - **N.Hooton / L.Garnick**
  4. Average Revenue and order per Rep - **J.English**

*There will be weekly conference calls on Wednesdays at 10:00 PST, starting with October 11th.*

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER     NDCA-ORCL 152353

EXHIBIT 155

# Procurement

## Approach
**DRAFT**

**Timing**
- Begin in FY99 starting with Workflow and Purchasing 2-way match
- Procurement e-transformation expected to be fully completed by FY01

**Ownership and resources**
- Global Process Owner (GPO) – Greg Tennyson VP Procurement, in charge of worldwide process standardization
- Divisional Process Owner (DPOs) in charge of regional process standardization.  DPOs work with GPO to ensure standard global process
- No additional resources

**Incentives**
- No incentives

**Change management**
- Catalog purchase request will only be processed if ordered online
- Easier ordering process by using online tools

Source:  Management Interviews

BAIN & COMPANY

SFR  FINAL-Book 28

This information s based on a sampling of Oracle data.  The samples vary in size and scope across divisions or regions at Oracle.
This information is not intended to provide conclusions about actual company savings.
This information is confidential and was prepared by Bain & Company, Inc. solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent.

**ORACLE CONFIDENTIAL**

NDCA-ORCL 100541

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

EXHIBIT 156

confidential: License Revenue Forecast Accuracy

**Subject: confidential: License Revenue Forecast Accuracy**
**Date:** Tue, 19 Sep 2000 06:49:51 -0700
**From:** Sandy Sanderson <sandy.sanderson@oracle.com>
**Organization:** Oracle Corporation
**To:** Sebastian J Gunningham <sebastian.gunningham@oracle.com>,
Frank Varasano <frank.varasano@oracle.com>,
"English,James" <JTENGLIS@US.ORACLE.COM>,
Cheryl <cheryl.mcdowell@oracle.com>

larry wants the evp's to do a better job of forecasting than we have in
the past. he says we continually understate where we are going to
land. this is typically true except for this last quarter. let's make
sure we factor in this historical perspective on our forecast calls.
how, i am not sure. but, let's make sure we atleast consider this
information.

for obvious reasons, pls don't forward this email due to sensitive info.

sandy

**Subject: License Revenue Forecast Accuracy**
**Date:** Mon, 18 Sep 2000 14:51:30 -0700
**From:** Lia Burke <lia.burke@oracle.com>
**Organization:** Oracle Corporation
**To:** "Ellison,Lawrence" <LELLISON@US.ORACLE.COM>,
"Catz,Safra" <SCATZ@US.ORACLE.COM>,
"Henley,Jeffrey" <JHENLEY@US.ORACLE.COM>,
Jennifer Minton <jminton@US.ORACLE.COM>,
"Roberts,George" <GROBERTS@US.ORACLE.COM>,
"Nussbaum,Jay" <JNUSSBAU@US.ORACLE.COM>,
"Sanderson,Edward" <ESANDERS@US.ORACLE.COM>,
"Bloom,Gary" <GBLOOM@US.ORACLE.COM>,
"Wohl,Ronald" <RWOHL@US.ORACLE.COM>, sgiacole@ch.oracle.com
**CC:** Ivgen Guner <iguner@US.ORACLE.COM>,
"Ronsse,Roberta" <RRONSSE@US.ORACLE.COM>

All,

Attached is an analysis I prepared for Jeff last week comparing the
license revenue forecast at various points over the past 5 quarters with
the actuals for that quarter. On average at the total company level our
final license revenue forecast is generally between 84% and 89% of our
final license revenues.

Please do not hesitate to contact me with any questions.

Regards,

| | Name: Forecasttrends.xls |
|---|---|
| Forecasttrends.xls | Type: Microsoft Excel Worksheet (application/vnd.ms-excel) |
| | Encoding: base64 |

CA-ORCL 025231

ORACLE CONFIDENTIAL

1

NDCA-ORCL 028211

confidential: License Revenue Forecast Accuracy

Lia Burke <lia.burke@oracle.com>
Director, Worldwide Finance
Visit us at http://www.oracle.com

CA-ORCL 025232

ORACLE CONFIDENTIAL

NDCA-ORCL 028212

# EXHIBIT 157

[Fwd: License Revenue Forecast Accuracy]

**Subject: [Fwd: License Revenue Forecast Accuracy]**
**Date:** Fri, 22 Sep 2000 13:58:31 -0400
**From:** Jay Nussbaum <Jay.Nussbaum@oracle.com>
Organization: Oracle Corporation
To: "Ford, Terrence" <TFORD@US.ORACLE.COM>

Terry, thought you'd be interested.

P

```
-------- Original Message --------
Return-Path: <lia.burke@oracle.com>
Received: from mailsun3.us.oracle.com (mailsun3.us.oracle.com
[130.35.62.244])by gmgw02.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP id
PAA03882;Mon, 18 Sep 2000 15:02:41 -0700 (PDT)
Received: from gmgw01.us.oracle.com (gmgw01.us.oracle.com
[130.35.61.190])by mailsun3.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP
id PAA05669;Mon, 18 Sep 2000 15:02:41 -0700 (PDT)
Received: from oracle.com
(dhcp-5op6-5op6-west-144-25-178-31.us.oracle.com [144.25.178.31])by
gmgw01.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP id PAA10906;Mon, 18
Sep 2000 15:02:41 -0700 (PDT)
Message-ID: <39C68E62.3B8D49A6@oracle.com>
Date: Mon, 18 Sep 2000 14:51:30 -0700
From: Lia Burke <lia.burke@oracle.com>
Organization: Oracle Corporation
X-Mailer: Mozilla 4.7 [en] (Win95; U)
X-Accept-Language: en
MIME-Version: 1.0
To: "Ellison,Lawrence" <LELLISON@US.ORACLE.COM>,"Catz,Safra"
<SCATZ@US.ORACLE.COM>,"Henley,Jeffrey" <JHENLEY@US.ORACLE.COM>,Jennifer
Minton <jminton@US.ORACLE.COM>,"Roberts,George"
<GROBERTS@US.ORACLE.COM>,"Nussbaum,Jay"
<JNUSSBAU@US.ORACLE.COM>,"Sanderson,Edward"
<ESANDERS@US.ORACLE.COM>,"Bloom,Gary"
<GBLOOM@US.ORACLE.COM>,"Wohl,Ronald" <RWOHL@US.ORACLE.COM>,
sgiacole@ch.oracle.com
CC: Ivgen Guner <iguner@US.ORACLE.COM>,"Ronsse,Roberta"
<RRONSSE@US.ORACLE.COM>
Subject: License Revenue Forecast Accuracy
Content-Type:
multipart/mixed;boundary="------------AB118B457B9859CCAF7B8A42"
```

All,

Attached is an analysis I prepared for Jeff last week comparing the
license revenue forecast at various points over the past 5 quarters with
the actuals for that quarter.  On average at the total company level our
final license revenue forecast is generally between 84% and 89% of our
final license revenues.

Please do not hesitate to contact me with any questions.

Regards,

| | Name: Forecasttrends.xls |
|---|---|
| Forecasttrends.xls | Type: Microsoft Excel Worksheet (application/vnd.ms-excel) |
| | Encoding: base64 |

CA-ORCL 038462
ORACLE CONFIDENTIAL

## LICENSE REVENUE FORECAST ACCURACY

### Q1FY00

| Constant $ (May 99) License | Actuals Q1FY00 | First Forecast Month 1 | First Forecast Month 2 | First Forecast Month 3 | Final Forecast Month 3 | Fcst as % of Actuals Month 1 | Fcst as % of Actuals Month 2 | Fcst as % of Actuals Month 3 | Final Fcst as % of Actuals Month 3 | Final Fcst vs Actuals $ Month 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | |
| OSI - Nussbaum | $ 70,496 | | $ 68,795 | $ 62,839 | $ 70,174 | nm | 98% | 89% | 100% | $ (322) |
| NAS - Roberts | 127,869 | | 99,549 | 118,415 | 119,021 | nm | 78% | 93% | 93% | (8,848) |
| OPI - Vzasano | 49,767 | | 40,998 | 40,559 | 40,441 | nm | 82% | 81% | 81% | (9,326) |
| LA - Sanderson | 23,021 | | 26,325 | 25,082 | 23,733 | nm | 114% | 100% | 103% | 712 |
| Europe - Giacoletto | 180,531 | | 183,624 | 173,991 | 172,660 | nm | 98% | 93% | 93% | (13,900) |
| APAC - Williams | 51,526 | | 49,657 | 51,437 | 51,047 | nm | 96% | 100% | 99% | (479) |
| Japan - Sano | 68,608 | | 64,310 | 63,553 | 63,630 | nm | 97% | 95% | 96% | (2,978) |
| Corporate Adjustments | 36,471 | | | 4,618 | 5,947 | nm | | 13% | 15% | (30,524) |
| **Total** | $ 612,528 | $  - | $ 533,759 | $ 548,582 | $ 546,661 | nm | 87% | 89% | 89% | $ (65,869) |

### Q2FY00

| Constant $ (May 99) License | Actuals Q2FY00 | First Forecast Month 1 | First Forecast Month 2 | First Forecast Month 3 | Final Forecast Month 3 | Fcst as % of Actuals Month 1 | Fcst as % of Actuals Month 2 | Fcst as % of Actuals Month 3 | Final Fcst as % of Actuals Month 3 | Final Fcst vs Actuals $ Month 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | |
| OSI - Nussbaum | $ 125,915 | $ 132,473 | $ 132,474 | $ 145,018 | $ 144,977 | 105% | 105% | 115% | 115% | $ 19,062 |
| NAS - Roberts | 197,813 | 130,866 | 133,694 | 138,587 | 151,694 | 68% | 68% | 70% | 77% | (46,119) |
| OPI - Varasano | 54,404 | 57,429 | 57,357 | 61,556 | 54,162 | 106% | 105% | 113% | 101% | 458 |
| LA - Sanderson | 33,507 | 36,345 | 35,088 | 34,579 | 34,566 | 108% | 105% | 103% | 103% | 1,059 |
| Europe - Giacoletto | 286,306 | 234,530 | 235,488 | 239,678 | 238,464 | 82% | 82% | 84% | 83% | (47,842) |
| APAC - Williams | 55,383 | 64,129 | 63,063 | 59,301 | 57,788 | 116% | 114% | 107% | 104% | 2,422 |
| Japan - Sano | 94,807 | 88,243 | 88,013 | 85,825 | 86,563 | 93% | 93% | 91% | 92% | (7,844) |
| Corporate Adjustments | 28,493 | | | 4,812 | 8,491 | nm | | 18% | 25% | (20,002) |
| **Total** | $ 874,610 | $ 747,005 | $ 749,207 | $ 758,783 | $ 775,805 | 85% | 86% | 87% | 89% | $ (98,903) |

### Q3FY00

| Constant $ (May 99) License | Actuals Q3FY00 | First Forecast Month 1 | First Forecast Month 2 | First Forecast Month 3 | Final Forecast Month 3 | Fcst as % of Actuals Month 1 | Fcst as % of Actuals Month 2 | Fcst as % of Actuals Month 3 | Final Fcst as % of Actuals Month 3 | Final Fcst vs Actuals $ Month 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | |
| OSI - Nussbaum | $ 188,953 | $ 130,000 | $ 130,000 | $ 129,981 | $ 130,009 | 69% | 69% | 69% | 69% | $ (58,944) |
| NAS - Roberts | 311,818 | 176,356 | 187,705 | 211,842 | 237,279 | 57% | 60% | 68% | 76% | (74,539) |
| OPI - Varasano | 83,272 | 49,992 | 69,700 | 69,085 | 70,029 | 60% | 84% | 84% | 84% | (13,243) |
| LA - Sanderson | 41,243 | 32,175 | 32,500 | 33,130 | 37,435 | 78% | 79% | 80% | 91% | (3,808) |
| Europe - Giacoletto | 279,644 | 262,100 | 262,844 | 263,316 | 267,153 | 94% | 94% | 94% | 96% | (12,491) |
| Japan - Sano | 86,798 | 79,965 | 59,850 | 58,684 | 59,603 | 90% | 90% | 87% | 85% | (7,195) |
| USA Sales & Operations | 80,453 | 84,347 | 79,587 | 79,587 | 75,448 | 105% | 95% | 95% | 94% | (5,005) |
| Corporate Adjustments | (2,668) | 5,350 | 5,348 | 609 | 90 | nm | nm | 7619% | 1125% | 87 |
| **Total** | $1,049,521 | $ 800,115 | $ 824,014 | $ 840,319 | $ 880,640 | 76% | 79% | 81% | 84% | $ (165,581) |

### Q4FY00

| Constant $ (May 99) License | Actuals Q4FY00 | First Forecast Month 1 | First Forecast Month 2 | First Forecast Month 3 | Final Forecast Month 3 | Fcst as % of Actuals Month 1 | Fcst as % of Actuals Month 2 | Fcst as % of Actuals Month 3 | Final Fcst as % of Actuals Month 3 | Final Fcst vs Actuals $ Month 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | |
| OSI - Nussbaum | $ 345,065 | $ 259,963 | $ 260,003 | $ 220,020 | $ 310,040 | 75% | 75% | 84% | 90% | $ (35,015) |
| NAS - Roberts | 323,431 | 385,489 | 387,599 | 420,572 | 434,484 | 74% | 74% | 81% | 83% | (89,947) |
| OPI - Varasano | 198,499 | 105,008 | 120,000 | 130,003 | 160,011 | 53% | 60% | 65% | 81% | (38,488) |
| LA - Sanderson | 70,474 | 50,000 | 53,628 | 54,101 | 57,925 | 71% | 76% | 77% | 82% | (12,549) |
| Europe - Giacoletto | 471,729 | 429,360 | 429,406 | 431,135 | 431,089 | 91% | 91% | 91% | 91% | (40,640) |
| APAC - Williams | 100,550 | 75,880 | 73,505 | 74,567 | 75,947 | 75% | 73% | 74% | 76% | (24,603) |
| Japan - Sano | 113,603 | 102,085 | 102,179 | 102,297 | 107,473 | 90% | 90% | 90% | 95% | (6,130) |
| USA Sales & Operations | 18 | | | (1) | (1) | nm | nm | nm | nm | (19) |
| Corporate Adjustments | 7,397 | 2,931 | 740 | (5,574) | (3,600) | 40% | 10% | nm | nm | (11,006) |
| **Total** | $1,600,766 | $1,409,696 | $1,429,550 | $1,500,410 | $1,575,279 | 77% | 78% | 82% | 86% | $ (255,477) |

**CA-ORCL 038463**
**ORACLE CONFIDENTIAL**

License

| LICENSE REVENUE FORECAST ACCURACY | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Q1FY01** | | | | | | | | | |
| Constant $ (May 00)<br>License | Actuals<br>Q1FY01 | First<br>Forecast<br>Month 1 | First<br>Forecast<br>Month 2 | First<br>Forecast<br>Month 3 | Final<br>Forecast<br>Month 3 | Fcst as %<br>of Actuals<br>Month 1 | Fcst as %<br>of Actuals<br>Month 2 | Fcst as %<br>of Actuals<br>Month 3 | Final Fcst as<br>% of Actuals<br>Month 3 | Final Fcst vs<br>Actuals $<br>Month 3 |
| Revenues | | | | | | | | | | |
| OSI - Nussbaum | $  106,907 | $  76,996 | $  76,996 | $  76,985 | $  76,985 | 72% | 72% | 72% | 72% | $ (29,922) |
| NAS - Roberts | 199,291 | 150,332 | 165,018 | 170,546 | 179,959 | 75% | 83% | 86% | 90% | (19,282) |
| OPI - Varesano | 40,622 | 55,000 | 55,000 | 55,000 | 52,500 | 135% | 135% | 135% | 128% | 11,378 |
| LA - Sanderson | 26,875 | 27,616 | 29,463 | 27,498 | 27,385 | 101% | 110% | 102% | 102% | 510 |
| UKI - Smith | 46,092 | 46,538 | 46,538 | 41,501 | 41,503 | 101% | 101% | 90% | 90% | (4,589) |
| Germany - Jaeger | 31,981 | 46,487 | 46,485 | 37,006 | 32,007 | 145% | 145% | 116% | 100% | 26 |
| France - Amiger | 31,037 | 19,519 | 21,129 | 24,122 | 26,257 | 63% | 68% | 78% | 85% | (4,780) |
| S. Europe - Benzano | 34,496 | 28,035 | 26,651 | 26,509 | 26,529 | 81% | 77% | 77% | 77% | (7,967) |
| N. Europe - Jarnick | 32,309 | 35,724 | 31,530 | 31,573 | 31,482 | 111% | 98% | 98% | 97% | (827) |
| ECEMEA - Gordon | 34,880 | 34,192 | 36,650 | 34,967 | 33,868 | 98% | 105% | 100% | 97% | (1,012) |
| APAC - Williams | 72,450 | 59,438 | 69,740 | 69,468 | 69,411 | 96% | 96% | 96% | 96% | (3,039) |
| Japan - Sano | 93,299 | 80,913 | 84,525 | 82,704 | 82,940 | 87% | 91% | 89% | 89% | (10,359) |
| USA Sales & Operations | 31 | - | - | 34 | 34 | nm | nm | 110% | 110% | 3 |
| Corporate Adjustments | 35,702 | - | (8,000) | (8,556) | (17,094) | nm | nm | nm | nm | (52,796) |
| Total | $ 627,693,482 | $  570,785 | $  681,702 | $  669,448 | $VS $ 685,308 | 86% | 87% | 86% | 82,2,2,02,0 ]304% | 304 Fcst $(21,056) |

CA-ORCL 038464<br>ORACLE CONFIDENTIAL

License

EXHIBIT 158

[The parties] shall treat documents, data compilations (including electronically recorded or stored data) ... that are relevant to the allegations, as if they were the subject of a continuing request for production of documents....

*See* 15 U.S.C. § 78u-4(b)(3)(C).

# SPOLIATION
## "SPEAKERS" DIRECT REPORTS AND LICENSE SALES ORGANIZATIONS



Lawrence J. Ellison, CEO

EXHIBIT 159

Q3 FY01 Week 3
December 19, 2000

ORACLE

$ in Thousands
Mike Field

| | License - Current Quarter | | | License - Year to Date | | | Consulting - Current Quarter | | | Consulting - Year to Date | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 FY00 | Q3 FY01 Forecast | Growth % | Q1 FY00 | Q3 FY01 Forecast | Growth % |
| **Total Revenue** | | | | | | | | | | | | |
| Federal | 41,055 | 50,000 | 22% | 114,160 | 95,091 | -48% | 41,115 | 44,995 | 8% | 118,660 | 129,298 | 9% |
| State and Local | 20,983 | 35,000 | 67% | 57,000 | 84,368 | 48% | 21,295 | 22,000 | 3% | 65,511 | 63,426 | -3% |
| Higher Education | 18,137 | 20,000 | 10% | 32,276 | 17,318 | 15% | 10,786 | 10,310 | -5% | 28,554 | 40,161 | 42% |
| Government (SD) | 140 | 0 | nm | 1,664 | 711 | nm | 19,223 | 30,704 | 60% | 61,359 | 84,003 | 37% |
| Healthcare | 6,638 | 15,000 | 126% | 23,364 | 44,906 | 92% | 943 | 1,415 | 273% | 3,059 | 7,470 | 141% |
| OSI Sales & HQ | 245 | 0 | nm | 230 | 693 | nm | 9,235 | 11,390 | 41% | 31,697 | 40,164 | 27% |
| Comm/Ind | 37,254 | 80,000 | 4% | 113,431 | 159,564 | 41% | (1,112) | 1,090 | nm | (663) | 2,901 | nm |
| Financial Services | 24,500 | 25,000 | 2% | 45,247 | 62,996 | 46% | | | | | | |
| SSI Infrastructure | 0 | 0 | nm | | | nm | | | nm | | | nm |
| **Total** | 198,951 | 225,000 | 19% | 385,355 | 484,685 | 26% | 101,550 | 120,513 | 28% | 308,201 | 356,464 | 19% |
| **Expenses** | | | | | | | | | | | | |
| Federal | 18,887 | 14,187 | 31% | 46,160 | 40,073 | 23% | 29,474 | 31,781 | 14% | 83,070 | 95,376 | 14% |
| State and Local | 10,282 | 15,125 | 47% | 31,615 | 40,073 | 27% | 17,411 | 30,057 | 15% | 55,203 | 54,125 | -3% |
| Higher Education | 4,380 | 7,052 | 33% | 18,731 | 18,093 | 17% | 6,356 | 11,830 | 87% | 21,976 | 32,398 | 47% |
| Government (SD) | 2,007 | 2,200 | 10% | 3,607 | 4,900 | 5% | 14,883 | 23,393 | 57% | 45,559 | 64,283 | 41% |
| Healthcare | 3,879 | 5,478 | 41% | 10,210 | 13,245 | 39% | 916 | 3,391 | 240% | 2,957 | 6,790 | 112% |
| OSI Sales & HQ | 19,453 | 19,588 | -3% | 53,609 | 57,410 | 8% | 7,092 | 9,105 | 31% | 22,033 | 25,685 | 17% |
| Comm/Ind | 12,655 | 31,715 | 72% | 35,149 | 52,300 | 49% | 1,718 | 2,210 | 28% | 11,165 | 14,095 | 28% |
| Financial Services | 5,835 | 7,667 | 41% | 7,607 | 18,736 | 15% | | | | | | |
| SSI Infrastructure | 0 | 1,900 | nm | | 4,132 | nm | | | | | | |
| **Total** | 72,491 | 98,612 | 34% | 203,127 | 255,844 | 25% | 77,861 | 103,660 | 33% | 243,554 | 293,555 | 21% |
| **Margin** | | | | | | | | | | | | |
| Federal | 27,166 | 31,813 | 17% | 76,769 | 48,917 | -36% | 11,641 | 10,900 | -6% | 34,683 | 33,637 | -3% |
| State and Local | 10,701 | 19,874 | 86% | 25,385 | 44,296 | 74% | 3,882 | 2,000 | -48% | 10,540 | 9,101 | -12% |
| Higher Education | 12,747 | 12,948 | 2% | 16,540 | 18,215 | 13% | 4,430 | 2,800 | -37% | 6,378 | 7,763 | 22% |
| Government (SD) | (1,411) | (2,250) | nm | (1,943) | (5,170) | nm | 4,960 | 7,400 | 71% | 15,400 | 19,220 | 25% |
| Healthcare | 2,759 | 9,522 | 245% | 13,145 | 31,458 | 139% | 27 | 313 | 1058% | 103 | 1,179 | 1060% |
| OSI Sales & HQ | (19,208) | (19,588) | nm | (53,384) | (57,410) | nm | 2,143 | 3,700 | 73% | 9,661 | 14,479 | 50% |
| Comm/Ind | 64,586 | 58,285 | -10% | 78,227 | 107,184 | 37% | (2,536) | (1,390) | nm | (11,791) | (12,355) | nm |
| Financial Services | 19,065 | 17,333 | -9% | 44,240 | 44,240 | 64% | | | | | | |
| SSI Infrastructure | 0 | (1,900) | nm | | (4,132) | nm | | | | | | |
| **Total** | 115,462 | 126,388 | 9% | 180,228 | 227,841 | 26% | 23,727 | 23,911 | 9% | 64,647 | 72,939 | 13% |
| **Margin %** | | | | | | | | | | | | |
| Federal | 66% | 64% | | 63% | 51% | | 28% | 24% | | 29% | 26% | |
| State and Local | 51% | 57% | | 45% | 53% | | 18% | 9% | | 16% | 14% | |
| Higher Education | 70% | 65% | | 51% | 50% | | 41% | 19% | | 23% | 19% | |
| Government (SD) | nm | nm | | nm | nm | | 23% | 24% | | 25% | 23% | |
| Healthcare | 42% | 63% | | 56% | 70% | | 3% | 9% | | 3% | 16% | |
| OSI Sales & HQ | nm | nm | | nm | nm | | 23% | 28% | | 30% | 36% | |
| Comm/Ind | 84% | 73% | | 69% | 67% | | nm | nm | | nm | nm | |
| Financial Services | 78% | 69% | | 62% | 70% | | | | | | | |
| SSI Infrastructure | nm | nm | | | nm | | | | | | | |
| **Total** | 61% | 56% | | 47% | 47% | | 23% | 20% | | 21% | 20% | |

ORACLE CONFIDENTIAL

NDCA-ORCL 096157

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

Q3 FY01 Week 3
December 19, 2000

$ in Thousands
(ISD in Field)

ORACLE®

| Product Forecast | License - Current Quarter | | | License - Year to Date | | | Q3 Target 30% Growth | License - Pipeline | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 FY00 | Q3 FY01 Forecast | Growth % | | Q3 FY00 Pipeline * | Q3 FY01 Pipeline | Pipeline growth % | Pipeline Cov Ratio Forecast |
| **Total Revenue** | | | | | | | | | | | |
| Federal | 41,035 | 50,000 | 22% | 114,160 | 95,083 | -17% | 53,371 | 89,825 | 69,561 | -23% | 72% |
| State and Local | 20,983 | 35,000 | 67% | 57,003 | 84,368 | 48% | 27,277 | 8,188 | 56,171 | -31% | 62% |
| Higher Education | 18,137 | 20,000 | 10% | 32,276 | 37,118 | 15% | 23,578 | 20,484 | 111,198 | 26% | 132% |
| Government (ISD) | 190 | 0 | -100% | 1,664 | 731 | | 247 | 49,062 | 74,534 | 52% | 0% |
| Healthcare | 6,638 | 15,000 | 126% | 23,564 | 44,996 | 92% | 8,629 | 23,202 | 19,381 | -16% | 77% |
| OSI Sales & HQ | 197 | 0 | nm | 230 | (61) | - | 256 | 0 | 0 | 0% | 0% |
| Comm/Util | 77,254 | 80,000 | 4% | 113,421 | 159,564 | 41% | 100,400 | 101,033 | 119,393 | 18% | 67% |
| Financial Services | 24,500 | 25,000 | 2% | 43,247 | 62,936 | 46% | 31,850 | 51,870 | 28,040 | -46% | 94% |
| ISD Infrastructure | 0 | | nm | 0 | 0 | nm | 0 | 30,132 | 50,048 | 66% | 0% |
| Total | 188,953 | 225,000 | 19% | 385,365 | 484,685 | 26% | 245,639 | 446,996 | 430,751 | -4% | 52% |
| **Technology Revenue** | | | | | | | | | | | |
| Federal | 39,733 | 40,745 | 0% | 103,934 | 78,939 | -24% | 51,653 | 84,499 | 50,349 | -40% | 79% |
| State and Local | 18,644 | 24,923 | 34% | 57,027 | 60,432 | 31% | 24,238 | 69,075 | 33,291 | -52% | 75% |
| Higher Education | 11,280 | 16,528 | 46% | 29,236 | 34,041 | 40% | 14,664 | 16,155 | 11,092 | -28% | 142% |
| Government (ISD) | 190 | 0 | -100% | 1,663 | 731 | -56% | 247 | 49,062 | 67,301 | 37% | 0% |
| Healthcare | 4,144 | 8,213 | 98% | 16,053 | 30,638 | 91% | 5,387 | 18,067 | 8,252 | -54% | 99% |
| OSI Sales & HQ | 197 | 0 | -100% | 198 | (61) | -131% | 256 | 0 | 0 | 0% | 0% |
| Comm/Util | 69,490 | 35,229 | -2% | 28,598 | 114,182 | 45% | 64,337 | 65,639 | 55,823 | -15% | 88% |
| Financial Services | 21,481 | 24,345 | -10% | 16,828 | 48,029 | 39% | 27,925 | 28,415 | 39,170 | -33% | 101% |
| ISD Infrastructure | nm | | nm | | | nm | | 28,443 | 50,008 | 78% | 0% |
| Total | 145,159 | 157,483 | 8% | 314,525 | 375,896 | 20% | 188,707 | 359,055 | 295,712 | -18% | 53% |
| **Applications Revenue** | | | | | | | | | | | |
| Federal | 1,322 | 10,715 | 675% | 19,296 | 16,144 | 58% | 1,718 | 5,326 | 10,957 | 258% | 54% |
| State and Local | 2,338 | 10,077 | 331% | 3,032 | 14,941 | 280% | 3,040 | 12,313 | 22,880 | 86% | 44% |
| Higher Education | 6,857 | 3,472 | 48% | 3,850 | 3,107 | -61% | 8,914 | 4,329 | 3,597 | -17% | 99% |
| Government (ISD) | 0 | 0 | nm | 1 | | 100% | | 0 | 2,233 | nm | 0% |
| Healthcare | 2,494 | 6,787 | 172% | 3,361 | 14,268 | 94% | 3,242 | 5,135 | 11,138 | 117% | 61% |
| OSI Sales & HQ | 0 | 0 | nm | 32 | | -100% | | 0 | 0 | 0% | 0% |
| Comm/Util | 27,764 | 31,271 | 13% | 33,821 | 45,382 | 30% | 36,093 | 35,394 | 63,972 | 80% | 49% |
| Financial Services | 3,020 | 5,565 | 84% | 6,418 | 14,937 | 133% | 3,925 | 23,455 | 2,760 | -99% | 76% |
| ISD Infrastructure | nm | | nm | | | nm | | 1,989 | 0 | -100% | nm |
| Total | 43,794 | 67,517 | 54% | 70,840 | 108,789 | 54% | 56,932 | 87,941 | 135,018 | 54% | 55% |

FW Forecast

Oracle Services Industries

**License Scenario Analysis**
(Q3 Current Week)

| | Worst | Most Likely | Best | JHN Forecast | Mgmt. Judgement |
|---|---|---|---|---|---|
| Federal | 25,000 | 38,000 | 45,000 | 50,000 | 17,000 |
| State and Local | 31,000 | 37,000 | 40,000 | 35,000 | (2,000) |
| Higher Education | 14,000 | 19,500 | 30,000 | 20,000 | 500 |
| Healthcare | 7,107 | 8,500 | 15,000 | 15,000 | 0 |
| OSI Sales & HQ | 20,000 | 30,000 | 50,000 | 80,000 | 31,678 |
| Comm/Util | | | | | |
| Financial Services | 12,000 | 17,200 | 20,000 | 25,000 | 7,971 |
| Total | 130,107 | 169,078 | 239,656 | 225,000 | 55,972 |

ORACLE CONFIDENTIAL

NDCA-ORCL 096158

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Q3 FY01 Week 3
December 19, 2000

ORACLE®

$ in Millions

| Consulting Bookings | Current Quarter | | | Q3 FY01 Book to Bill | Forecast Q3 FY01 Revenue | Q3 FY01 BACKLOG | YOY Backlog Growth |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Q3 FY00 Actual | Q3 FY01 Forecast | Growth % | | | | |
| Federal | $ 43.8 | $ 46.4 | 6% | 1.04 | 44.60 | 102.60 | -1% |
| State & Local | $ 20.9 | $ 30.3 | 45% | 1.38 | 22.00 | 77.90 | -13% |
| Higher Ed & Healthcare | $ 26.1 | $ 13.0 | -50% | 0.88 | 14.70 | 66.90 | 1% |
| Communication & Utilities | $ 19.5 | $ 35.0 | 80% | 1.14 | 30.70 | 136.80 | 26% |
| CRM/E-Commerce | $ - | $ - | - | - | 3.51 | - | - |
| Financial Services | $ 18.3 | $ 11.8 | -19% | 1.14 | 13.00 | 39.00 | 100% |
| Consulting Operations | $ - | $ - | - | - | 1.00 | - | - |
| Total OSI | $ 128.7 | $ 139.5 | 8% | 1.08 | 129.51 | 423.20 | 9% |

| Consulting Bookings | Year to Date | | | Forecast | |
| --- | --- | --- | --- | --- | --- |
| | Q3 FY00 Actual | Q3 FY01 Forecast | Growth % | Q3 FY01 Book to Bill | Q3 FY01 Revenue |
| Federal | $ 163.7 | $ 155.9 | -5% | 1.21 | 129.21 |
| State & Local | $ 65.1 | $ 75.4 | 16% | 1.19 | 63.43 |
| Higher Ed & Healthcare | $ 49.0 | $ 53.2 | 9% | 1.33 | 40.16 |
| Communication & Utilities | $ 103.3 | $ 103.4 | 0% | 1.23 | 84.00 |
| CRM/E-Commerce | $ 0.0 | $ - | -100% | 0.00 | 7.44 |
| Financial Services | $ 42.4 | $ 44.6 | 5% | | 40.16 |
| Consulting Operations | $ 0.7 | $ - | -100% | 0.00 | 2.06 |
| Total OSI | $ 424.3 | $ 432.6 | 2% | 1.18 | 366.46 |

Note : Booked to Bill ratios are as reported and do not reflect pullthrough. Billings are P&L revenue.

Oracle Service Industries

Consulting Bookings

ORACLE CONFIDENTIAL

NDCA-ORCL 096159

CONFIDENTIAL–SUBJECT
TO PROTECTIVE ORDER

Q4 FY01 – Projection
December 19, 2000

$ in Thousands
NDA or Field

ORACLE

### License

| | Current Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Q4 FY00 | Q4 FY01 Forecast | Growth % | FY00 FY | FY01 FY Forecast | Growth % |
| **Total Revenue** | | | | | | |
| Federal | 95,381 | 84,600 | -11% | 209,541 | 175,083 | -15% |
| State and Local | 63,193 | 50,000 | -21% | 170,186 | 134,348 | -21% |
| Higher Education | 20,145 | 18,000 | -11% | 57,422 | 55,118 | 5% |
| Government (SD) | | 0 | | 231 | 231 | |
| Healthcare | 16,993 | 18,000 | 12% | 39,367 | 62,906 | 60% |
| OSI Sales & HQ | 237 | 0 | | 1,522 | | |
| Comm/Util | 115,427 | 120,000 | 4% | 228,843 | 279,554 | 22% |
| Financial Services | 34,681 | 30,000 | -13% | 73,928 | 92,976 | 19% |
| SDI Infrastructure | | 0 | | 0 | | |
| **Total** | 345,055 | 320,000 | -7% | 730,419 | 804,683 | 10% |
| **Expenses** | | | | | | |
| Federal | 22,863 | 21,590 | 3% | 60,255 | 69,363 | 16% |
| State and Local | 13,831 | 17,661 | 28% | 45,521 | 57,714 | 27% |
| Higher Education | 5,604 | 6,909 | 23% | 21,140 | 21,272 | 18% |
| Government (SD) | 19,661 | 5,090 | -45% | 72,259 | 8,908 | -88% |
| Healthcare | 5,395 | 6,189 | 12% | 15,614 | 19,846 | 23% |
| OSI Sales & HQ | 3,195 | 19,685 | 497% | 8,902 | 73,085 | 765% |
| Comm/Util | 25,896 | 27,089 | 8% | 61,085 | 90,169 | 32% |
| Financial Services | 9,138 | 8,528 | -7% | 35,495 | 37,284 | 7% |
| SDI Infrastructure | | 1,090 | | 0 | 6,222 | |
| **Total** | 105,664 | 115,246 | 9% | 320,701 | 332,090 | 20% |
| **Margin** | | | | | | |
| Federal | 72,518 | 60,604 | -17% | 149,286 | 109,321 | -27% |
| State and Local | 49,370 | 32,339 | -34% | 74,155 | 76,634 | 3% |
| Higher Education | 14,542 | 11,131 | -23% | 31,081 | 28,846 | -4% |
| Government (SD) | (15,039) | (11,049) | nm | (77,558) | (8,677) | nm |
| Healthcare | 16,607 | 11,982 | | 23,754 | 43,640 | 83% |
| OSI Sales & HQ | (2,956) | (19,685) | nm | (7,450) | (73,156) | nm |
| Comm/Util | 89,527 | 92,911 | 3% | 167,758 | 199,395 | 19% |
| Financial Services | 25,541 | 21,472 | -16% | 55,282 | 65,712 | 25% |
| SDI Infrastructure | | (1,090) | | 0 | (6,222) | nm |
| **Total** | 239,390 | 204,254 | -14% | 419,628 | 472,595 | 3% |
| **Margin %** | | | | | | |
| Federal | 76% | 72% | | 71% | 61% | |
| State and Local | 78% | 65% | | 63% | 57% | |
| Higher Education | 72% | 62% | | 99% | 54% | |
| Government (SD) | nm | nm | | nm | nm | |
| Healthcare | 66% | 67% | | 60% | 69% | |
| OSI Sales & HQ | nm | nm | | nm | nm | |
| Comm/Util | 78% | 77% | | 73% | 71% | |
| Financial Services | 74% | 71% | | 75% | 71% | |
| SDI Infrastructure | nm | nm | | nm | nm | |
| **Total** | 69% | 64% | | 57% | 59% | |

### Consulting

| | Current Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Q4 FY00 | Q4 FY01 Forecast | Growth % | FY00 FY | FY01 FY Forecast | Growth % |
| **Total Revenue** | | | | | | |
| Federal | 43,300 | 47,407 | 9% | 162,363 | 177,008 | 9% |
| State & Local | 21,138 | 26,103 | 23% | 86,822 | 89,329 | 3% |
| Higher Ed & Healthcare | 11,821 | 13,505 | 14% | 40,175 | 53,661 | 34% |
| Communication & Utilities | 24,441 | 28,950 | 17% | 85,800 | 112,503 | 31% |
| CRM/E-Commerce | 873 | 4,129 | 372% | 3,932 | 11,559 | 194% |
| Financial Services | (3,314) | 15,999 | | 43,868 | 54,124 | 23% |
| Consulting Operations | (1,664) | (1,509) | nm | (7,729) | 3,561 | 23% |
| **Total** | 112,330 | 135,439 | 21% | 425,511 | 501,943 | 19% |
| **Expenses** | | | | | | |
| Federal | 31,545 | 14,610 | 10% | 115,515 | 130,186 | 13% |
| State & Local | 15,413 | 20,900 | 34% | 70,926 | 75,328 | 6% |
| Higher Ed & Healthcare | 7,942 | 10,800 | 36% | 29,918 | 43,198 | 44% |
| Communication & Utilities | 16,170 | 20,920 | 29% | 62,138 | 85,981 | 38% |
| CRM/E-Commerce | 715 | 2,912 | 303% | 3,674 | 8,152 | 149% |
| Financial Services | 8,008 | 16,704 | 27% | 30,042 | 35,883 | 19% |
| Consulting Operations | 4,041 | 3,090 | -26% | 15,406 | 13,495 | 14% |
| **Total** | 84,064 | 101,102 | 23% | 327,616 | 395,317 | 20% |
| **Margin** | | | | | | |
| Federal | 12,355 | 13,200 | 7% | 47,648 | 46,832 | 0% |
| State & Local | 5,358 | 5,200 | -4% | 15,896 | 14,301 | -10% |
| Higher Ed & Healthcare | 3,879 | 2,700 | -30% | 10,257 | 10,463 | 2% |
| Communication & Utilities | 8,262 | 7,200 | -7% | 23,663 | 26,520 | 14% |
| CRM/E-Commerce | 156 | 1,218 | 680% | 259 | 2,407 | 831% |
| Financial Services | 3,763 | 3,759 | 0% | 13,426 | 18,238 | 36% |
| Consulting Operations | (5,704) | (1,159) | nm | (13,426) | (13,935) | nm |
| **Total** | 28,216 | 32,337 | 14% | 92,911 | 105,226 | 13% |
| **Margin %** | | | | | | |
| Federal | 28% | 28% | | 29% | 26% | |
| State & Local | 26% | 20% | | 18% | 16% | |
| Higher Ed & Healthcare | 33% | 20% | | 26% | 24% | |
| Communication & Utilities | 34% | 27% | | 28% | 24% | |
| CRM/E-Commerce | 18% | 30% | | 7% | 21% | |
| Financial Services | 32% | 27% | | 31% | 34% | |
| Consulting Operations | nm | nm | | nm | nm | |
| **Total** | 25% | 24% | | 22% | 21% | |

ORACLE CONFIDENTIAL

CONFIDENTIAL–SUBJECT
TO PROTECTIVE ORDER

Q4 FY01 - Projection
December 19, 2000

ORACLE

$ in Thousands
(SD in Field)

| Product Forecast | License - Current Quarter | | | License - Year to Date | | | Q4 Target 10% Growth | License - Pipeline | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q4 FY00 | Q4 FY01 Forecast | Growth % | FY00 FY | FY01 FY Forecast | Growth % | | Q4 FY00 Pipeline * | Q4 FY01 Pipeline | Pipeline growth % | Pipeline Cov Ratio Forecast |
| **Total Revenue** | | | | | | | | | | | |
| Federal | $ 95,381 | $ 84,000 | -12% | $ 209,541 | $ 179,083 | -15% | $ 123,995 | $ 138,000 | $ 125,863 | -9% | 67% |
| State and Local | 63,183 | 50,000 | -21% | 120,186 | 134,368 | 12% | 82,138 | 190,000 | 161,719 | -15% | 31% |
| Higher Education | 20,145 | 18,000 | -11% | 50,422 | 53,118 | 5% | 26,189 | 62,000 | 35,903 | -42% | 50% |
| Government (ISD) | - | 0 | -100% | 231 | 731 | nm | 2 | 0 | 14,931 | nm | 0% |
| Healthcare | 16,603 | 18,000 | 12% | 39,367 | 62,906 | 60% | 20,804 | 54,000 | 64,979 | 20% | 28% |
| OSI Sales & HQ | 237 | 0 | nm | 1,901 | (611) | nm | 308 | 0 | 0 | 0% | 0% |
| Comm/Util | 115,423 | 120,000 | 4% | 228,843 | 279,564 | 22% | 150,049 | 190,000 | 99,861 | -47% | 120% |
| Financial Services | 34,681 | 30,000 | -13% | 77,928 | 92,976 | 19% | 45,506 | 44,000 | 26,239 | -40% | 114% |
| ISD Infrastructure | - | - | nm | - | - | nm | 0 | 0 | 6,800 | nm | 0% |
| **Total** | $ 345,655 | $ 320,000 | -7% | $ 730,419 | $ 806,685 | 10% | $ 448,571 | $ 678,000 | $ 536,291 | -21% | 60% |
| **Technology Revenue** | | | | | | | | | | | |
| Federal | $ 75,992 | $ 56,074 | -26% | $ 179,946 | $ 135,017 | -25% | $ 98,790 | $ 125,000 | $ 66,109 | -47% | 85% |
| State and Local | 57,768 | 34,461 | -40% | 110,840 | 105,330 | -6% | 75,099 | 163,000 | 91,041 | -44% | 38% |
| Higher Education | 14,891 | 9,336 | -37% | 39,101 | 43,407 | 11% | 19,339 | 47,000 | 13,164 | -70% | 66% |
| Government (ISD) | - | 0 | -100% | 199 | 731 | 268% | 2 | 0 | 12,934 | nm | 0% |
| Healthcare | 10,922 | 8,908 | -18% | 26,925 | 39,526 | 47% | 14,198 | 35,000 | 23,430 | -33% | 38% |
| OSI Sales & HQ | 237 | 0 | -100% | 1,900 | (61) | nm | 308 | 0 | 0 | 0% | 0% |
| Comm/Util | 59,227 | 55,617 | -6% | 137,824 | 169,960 | 23% | 76,955 | 129,000 | 30,420 | -76% | 183% |
| Financial Services | 27,992 | 17,314 | -38% | 64,820 | 65,313 | 1% | 36,389 | 25,000 | 12,580 | -50% | 138% |
| ISD Infrastructure | - | - | nm | - | - | nm | 0 | 0 | 6,800 | nm | 0% |
| **Total** | $ 247,030 | $ 181,787 | -26% | $ 561,554 | $ 557,683 | -1% | $ 321,138 | $ 524,000 | $ 257,380 | -51% | 71% |
| **Applications Revenue** | | | | | | | | | | | |
| Federal | $ 19,389 | $ 27,952 | 44% | $ 29,595 | $ 44,066 | 49% | $ 25,205 | $ 13,000 | $ 59,756 | 360% | 47% |
| State and Local | 5,415 | 15,507 | 188% | 9,347 | 30,538 | 227% | 7,040 | 27,000 | 70,798 | 162% | 22% |
| Higher Education | 5,254 | 8,664 | 64% | 13,320 | 11,711 | -12% | 6,830 | 15,000 | 21,762 | 45% | 40% |
| Government (ISD) | - | 0 | nm | 32 | 0 | -100% | - | 0 | 2,027 | nm | 0% |
| Healthcare | 5,682 | 9,117 | 79% | 12,443 | 23,380 | 88% | 6,606 | 19,000 | 41,549 | 119% | 22% |
| OSI Sales & HQ | 0 | 0 | nm | 1 | 0 | -100% | - | 0 | 0 | 0% | 0% |
| Comm/Util | 56,196 | 64,373 | 14% | 91,019 | 109,604 | 21% | 73,055 | 61,000 | 69,441 | 14% | 93% |
| Financial Services | 6,689 | 12,680 | 89% | 13,108 | 27,663 | nm | 8,694 | 19,000 | 13,609 | -28% | 92% |
| ISD Infrastructure | | | | | | nm | | | | nm | nm |
| **Total** | $ 98,625 | $ 138,213 | 41% | $ 168,865 | $ 247,002 | 46% | $ 127,433 | $ 154,000 | $ 278,011 | 81% | 50% |

License Scenario Analysis
(ISD, Current Week)

| | Worst | Most Likely | Best | JHN Forecast | Mgmt Judgement |
|---|---|---|---|---|---|
| Federal | | | | 84,000 | 84,000 |
| State and Local | | | | 50,000 | 50,000 |
| Higher Education | | | | 18,000 | 18,000 |
| Healthcare | | | | 18,000 | 18,000 |
| Comm/Util | | | | 120,000 | 120,000 |
| Financial Services | | | | 30,000 | 30,000 |
| **Total** | | | | 320,000 | 320,000 |

Oracle Service Industries

FY Forecast Q4

ORACLE CONFIDENTIAL

NDCA-ORCL 096161

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

# EXHIBIT 160

Q3 FY01 Week 5
January 9, 2001

ORACLE®

$ in Thousands
(SI) in Field

| | License - Current Quarter | | | License - Year to Date | | | Consulting - Current Quarter | | | Consulting - Year to Date | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 FY00 | Q3 FY01 Forecast | Growth % |
| **Total Revenue** | | | | | | | | | | | | |
| Federal | $ 41,055 | $ 50,000 | 22% | $ 114,160 | $ 95,083 | -17% | $ 42,080 | $ 44,691 | 6% | $ 121,538 | $ 129,208 | 6% |
| State and Local | 20,983 | 35,000 | 67% | 59,093 | 84,348 | 48% | 21,950 | 17,240 | -22% | 67,599 | 58,529 | -13% |
| Higher Education | 18,133 | 20,000 | 10% | 32,276 | 37,118 | 15% | 10,781 | 14,796 | 36% | 26,679 | 40,161 | 51% |
| Government (SI) | 1,410 | | | 1,664 | 3,231 | 92% | 19,303 | 10,390 | -46% | 63,258 | 84,003 | 33% |
| Healthcare | 6,638 | 15,000 | 126% | 23,364 | 44,906 | 92% | 1,399 | 3,513 | 151% | 4,264 | 7,439 | 74% |
| OSS (Sales & HQ) | 197 | 0 | | 210 | (93) | | 9,331 | 13,000 | 39% | 32,013 | 40,164 | 25% |
| CommOffd | 73,254 | 89,000 | -4% | 123,421 | 159,564 | 41% | (1,134) | 1,360 | nm | (1,770) | 2,141 | nm |
| Financial Services | 24,500 | 25,000 | 2% | 43,247 | 62,976 | 46% | | | | | | |
| ISD Infrastructure | 0 | 0 | nm | 0 | 0 | nm | | | | | | |
| **Total** | $ 188,953 | $ 225,000 | 19% | $ 385,165 | $ 486,685 | 26% | $ 103,310 | $ 124,713 | 21% | $ 313,601 | $ 361,664 | 15% |
| **Expenses** | | | | | | | | | | | | |
| Federal | 13,940 | 18,187 | 31% | 32,381 | 46,166 | 23% | 29,817 | 33,904 | 13% | 85,029 | 95,926 | 13% |
| State and Local | 10,592 | 15,326 | 43% | 31,618 | 40,497 | 27% | 17,698 | 18,800 | 6% | 54,124 | 53,128 | -2% |
| Higher Education | 5,103 | 7,012 | 31% | 13,217 | 18,301 | 17% | 6,353 | 11,985 | 87% | 19,455 | 32,394 | 67% |
| Government (SI) | 2,003 | 2,700 | 10% | 5,607 | 5,908 | 5% | 14,742 | 23,340 | 58% | 48,039 | 65,783 | 35% |
| Healthcare | 3,859 | 5,418 | 41% | 10,719 | 13,668 | 32% | 1,241 | 3,260 | 163% | 3,864 | 6,260 | 62% |
| OSS (Sales & HQ) | 19,062 | 19,285 | -3% | 53,094 | 57,440 | 8% | 7,117 | 9,397 | 31% | 22,161 | 23,885 | 10% |
| CommOffd | 12,658 | 21,315 | 72% | 18,189 | 52,290 | 49% | 1,155 | 2,081 | 80% | 9,667 | 14,295 | 48% |
| Financial Services | 5,415 | 7,543 | 41% | 16,267 | 18,718 | 15% | | | | | | |
| ISD Infrastructure | | 1,900 | nm | | 4,322 | nm | | | | | | |
| **Total** | $ 73,691 | $ 98,612 | 34% | $ 201,127 | $ 256,864 | 25% | $ 78,122 | $ 102,390 | 31% | $ 244,340 | $ 292,225 | 20% |
| **Margin** | | | | | | | | | | | | |
| Federal | $ 27,166 | $ 31,813 | 17% | $ 76,760 | $ 48,917 | -36% | $ 12,263 | $ 10,800 | -12% | $ 36,530 | $ 33,532 | -8% |
| State and Local | 10,391 | 19,674 | 86% | 26,535 | 44,296 | 14% | 4,331 | (1,560) | -140% | 11,475 | 5,401 | -53% |
| Higher Education | 12,747 | 12,948 | 2% | 16,540 | 18,715 | 17% | 4,428 | 2,800 | -37% | 7,223 | 7,263 | 7% |
| Government (SI) | (1,434) | (2,760) | nm | (3,934) | (5,174) | nm | 4,561 | 7,400 | 62% | 15,198 | 19,220 | 26% |
| Healthcare | 2,259 | 9,582 | 245% | 13,145 | 31,458 | 139% | 159 | 313 | 97% | 400 | 1,179 | 195% |
| OSS (Sales & HQ) | (19,550) | (19,204) | nm | (52,800) | (57,414) | nm | 2,213 | 3,700 | 67% | 9,852 | 14,439 | 47% |
| CommOffd | 64,596 | 58,285 | nm | 78,231 | 107,184 | 37% | (2,404) | (660) | nm | (11,533) | (12,184) | nm |
| Financial Services | 19,066 | 17,333 | -9% | 26,980 | 44,240 | 64% | | | | | | |
| ISD Infrastructure | 0 | (1,900) | nm | 0 | (4,322) | nm | | | | | | |
| **Total** | $ 115,462 | $ 126,388 | 9% | $ 190,238 | $ 227,841 | 26% | $ 25,248 | $ 22,413 | -11% | $ 69,261 | $ 69,439 | 0% |
| **Margin %** | | | | | | | | | | | | |
| Federal | 66% | 64% | | 67% | 51% | | 29% | 24% | | 30% | 26% | |
| State and Local | 51% | 57% | | 45% | 53% | | 15% | -10% | | 17% | 9% | |
| Higher Education | 70% | 65% | | 51% | 50% | | 41% | 19% | | 27% | 18% | |
| Government (SI) | nm | nm | | nm | nm | | 24% | 71% | | 24% | 23% | |
| Healthcare | 42% | 63% | | 56% | 70% | | 11% | 9% | | 9% | 16% | |
| OSS (Sales & HQ) | nm | nm | | nm | nm | | 24% | 28% | | 31% | 36% | |
| CommOffd | 84% | 73% | | 64% | 67% | | nm | nm | | nm | nm | |
| Financial Services | 78% | 69% | | 62% | 70% | | | | | | | |
| ISD Infrastructure | nm | nm | | nm | nm | | | | | | | |
| **Total** | 61% | 56% | | 49% | 47% | | 24% | 18% | | 22% | 19% | |

Oracle Service Industries

License/Consult

**ORACLE CONFIDENTIAL**

NDCA-ORCL 096174

CONFIDENTIAL–SUBJECT
TO PROTECTIVE ORDER

Q3 FY01 Week 5
January 9, 2001

ORACLE

$ in Thousands
USD in field

## Total Revenue

| Product Forecast | License - Current Quarter Q3 FY01 | Q3 FY01 Forecast | Growth % | License - Year to Date Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 Target 30% Growth | License - Pipeline Q3 FY00 Pipeline | Q3 FY01 Pipeline | Pipeline growth % | Pipeline Cov Ratio Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal | 41,555 | 50,000 | 22% | 114,160 | 95,083 | -17% | 53,371 | 89,825 | 61,272 | -32% | 82% |
| State and Local | 20,983 | 35,000 | 67% | 57,003 | 84,368 | 48% | 27,277 | 81,138 | 54,526 | -33% | 64% |
| Higher Education | 18,137 | 20,200 | 10% | 32,216 | 37,118 | 15% | 23,578 | 20,484 | 22,079 | 8% | 91% |
| Government ISD | 190 | 0 | -100% | 1,664 | 731 | - | 247 | 49,062 | 72,112 | 47% | 0% |
| Healthcare | 6,638 | 15,000 | 126% | 23,364 | 44,906 | 92% | 8,679 | 23,202 | 20,174 | -13% | 74% |
| OSI Sales & HQ | 197 | 0 | nm | 230 | (nil) | - | 256 | 0 | 0 | 0% | 0% |
| Comm/Util | 77,254 | 80,000 | 4% | 113,421 | 159,594 | 41% | 100,430 | 101,033 | 118,600 | 17% | 67% |
| Financial Services | 34,500 | 25,000 | 2% | 43,247 | 62,976 | 46% | 31,850 | 51,870 | 37,667 | -27% | 66% |
| ISD Infrastructure | | | nm | 0 | 0 | nm | 0 | 30,132 | 50,197 | 67% | 0% |
| **Total** | 188,953 | 225,000 | 19% | 385,385 | 484,685 | 26% | 245,639 | 446,596 | 436,827 | -2% | 52% |

## Technology Revenue

| Product Forecast | License - Current Quarter Q3 FY01 | Q3 FY01 Forecast | Growth % | License - Year to Date Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 Target 30% Growth | License - Pipeline Q3 FY00 Pipeline | Q3 FY01 Pipeline | Pipeline growth % | Pipeline Cov Ratio Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal | 39,733 | 41,226 | 4% | 83,413 | 102,941 | 23% | 51,653 | 84,499 | 45,510 | -46% | 91% |
| State and Local | 18,844 | 26,396 | 42% | 53,027 | 70,899 | 34% | 24,238 | 69,075 | 35,649 | -48% | 74% |
| Higher Education | 11,280 | 16,037 | 50% | 34,210 | 34,530 | 43% | 14,664 | 16,155 | 17,685 | 9% | 98% |
| Government ISD | 190 | 0 | -100% | 1,665 | 731 | -56% | 247 | 49,062 | 66,831 | 36% | 0% |
| Healthcare | 4,144 | 8,117 | 98% | 10,067 | 30,542 | 91% | 5,387 | 18,067 | 8,672 | -53% | 90% |
| OSI Sales & HQ | 197 | 197 | -100% | 106 | (nil) | -131% | 256 | 256 | 0 | 0% | 0% |
| Comm/Util | 49,690 | 49,962 | 0% | 74,594 | 114,915 | 46% | 64,331 | 65,639 | 56,750 | -14% | 87% |
| Financial Services | 21,461 | 20,033 | -4% | 36,928 | 49,278 | 34% | 27,925 | 28,415 | 20,618 | 4% | 70% |
| ISD Infrastructure | | | nm | | | nm | | 28,143 | 50,397 | 79% | 0% |
| **Total** | 145,159 | 162,163 | 12% | 314,525 | 391,276 | 21% | 188,707 | 359,035 | 310,874 | -13% | 52% |

## Applications Revenue

| Product Forecast | License - Current Quarter Q3 FY01 | Q3 FY01 Forecast | Growth % | License - Year to Date Q3 FY00 | Q3 FY01 Forecast | Growth % | Q3 Target 30% Growth | License - Pipeline Q3 FY00 Pipeline | Q3 FY01 Pipeline | Pipeline growth % | Pipeline Cov Ratio Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal | 1,322 | 8,771 | 564% | 14,706 | 14,670 | 44% | 1,718 | 5,326 | 15,762 | 196% | 56% |
| State and Local | 2,338 | 8,658 | 268% | 3,652 | 13,469 | 243% | 3,040 | 12,313 | 18,877 | 53% | 46% |
| Higher Education | 6,857 | 3,653 | -55% | 2,588 | 2,588 | -68% | 8,914 | 4,329 | 4,394 | 1% | 69% |
| Government ISD | 0 | 0 | nm | | | -100% | 247 | | 5,279 | nm | 0% |
| Healthcare | 2,494 | 6,853 | 176% | 7,361 | 14,364 | 95% | 3,242 | 5,135 | 11,749 | 129% | 59% |
| OSI Sales & HQ | | 0 | nm | | | -100% | | | 0 | 0% | 0% |
| Comm/Util | 27,764 | 30,454 | 10% | 35,973 | 44,619 | 28% | 36,093 | 35,394 | 61,551 | 75% | 49% |
| Financial Services | 3,020 | 3,340 | 43% | 6,418 | 13,608 | 113% | 3,925 | 23,455 | 9,248 | -65% | 54% |
| ISD Infrastructure | 0 | 0 | nm | | | nm | | 1,989 | 0 | -100% | nm |
| **Total** | 43,794 | 62,137 | 42% | 70,840 | 103,409 | 46% | 56,932 | 87,941 | 125,954 | 43% | 49% |

Oracle Service Industries

## License Scenario Analysis
GSD Current Week

| | Worst | Most Likely | Best | JHN Forecast | Mgmt. Judgement |
|---|---|---|---|---|---|
| Federal | 13,000 | 30,000 | 45,000 | 50,000 | 70,000 |
| State and Local | 25,000 | 28,000 | 33,000 | 35,000 | 35,000 |
| Higher Education | 7,500 | 10,000 | 15,000 | 15,000 | 15,000 |
| Healthcare | 1,000 | 5,500 | 10,000 | 15,000 | 6,500 |
| OSI Sales & HQ | | | | | |
| Comm/Util | 22,500 | 40,000 | 50,000 | 52,000 | 40,000 |
| Financial Services | 18,000 | 15,500 | 17,000 | 12,500 | 10,000 |
| **Total** | 97,000 | 132,000 | 189,400 | 225,000 | 93,000 |

TPL Format

ORACLE CONFIDENTIAL

NDCA-ORCL 096175

CONFIDENTIAL—SUBJECT
TO PROTECTIVE ORDER

Q3 FY01 Week 5
January 9, 2001

ORACLE

$ in Millions

| Consulting Bookings | Current Quarter | | | Forecast | | Q3 FY01 BACKLOG | YOY Backlog Growth |
|---|---|---|---|---|---|---|---|
| | Q3 FY00 Actual | Q3 FY01 Forecast | Growth % | Q3 FY01 Book to Bill | Q3 FY01 Revenue | | |
| Federal | $ 43.8 | $ 46.4 | 6% | 1.04 | 44.60 | 102.30 | -6% |
| State & Local | $ 20.9 | $ 25.3 | 21% | 1.48 | 17.10 | 56.80 | -16% |
| Higher Ed & Healthcare | $ 26.1 | $ 13.0 | -50% | 0.88 | 14.70 | 66.90 | 1% |
| Communication & Utilities | $ 19.5 | $ 35.0 | 80% | 1.14 | 30.70 | 136.80 | 25% |
| CRM/E-Commerce | $ - | $ - | - | | 3.51 | - | - |
| Financial Services | $ 18.3 | $ 14.8 | -19% | 1.14 | 13.00 | 39.00 | 96% |
| Consulting Operations | $ - | $ - | - | | 1.10 | - | - |
| Total OSI | $ 128.7 | $ 134.5 | 5% | 1.08 | 124.71 | 401.80 | 6% |

| Consulting Bookings | Year to Date | | | Forecast | |
|---|---|---|---|---|---|
| | Q3 FY00 Actual | Q3 FY01 Forecast | Growth % | Q3 FY01 Book to Bill | Q3 FY01 Revenue |
| Federal | $ 163.7 | $ 155.9 | -5% | 1.21 | 129.21 |
| State & Local | $ 65.1 | $ 70.4 | 8% | 1.20 | 58.53 |
| Higher Ed & Healthcare | $ 49.0 | $ 53.2 | 9% | 1.33 | 40.16 |
| Communication & Utilities | $ 103.3 | $ 103.4 | 0% | 1.23 | 84.00 |
| CRM/E-Commerce | $ 0.0 | $ - | -100% | 0.00 | 7.44 |
| Financial Services | $ 42.4 | $ 44.6 | 5% | | 40.16 |
| Consulting Operations | $ 0.7 | $ - | -100% | 0.00 | 2.16 |
| Total OSI | $ 424.3 | $ 427.6 | 1% | 1.18 | 361.66 |

Note : Booked to Bill ratios are as reported and do not reflect pullthrough.  Billings are P&L revenue.

Oracle Service Industries

Consulting Bookings

ORACLE CONFIDENTIAL

NDCA-ORCL 096176

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

Q4 FY01 - Projection
January 9, 2001

ORACLE®

$ in Thousands
(USD in Field)

**License - Current Quarter**

| | Q4 FY09 | Q4 FY01 Forecast | Growth % |
|---|---|---|---|
| **Total Revenue** | | | |
| Federal | $ 95,181 | $ 84,000 | -12% |
| State & Local | 63,183 | 50,000 | -21% |
| Higher Education | 20,145 | 18,000 | -11% |
| Government ISD | | 0 | |
| Healthcare | 16,603 | 18,000 | 12% |
| OSI Sales & HQ | 217 | 0 | |
| Comm/Util | 115,422 | 120,000 | 4% |
| SDI Infrastructure | 14,681 | 30,000 | -13% |
| | 0 | 0 | nm |
| **Total** | $ 345,055 | $ 320,000 | -7% |
| **Expenses** | | | |
| Federal | 22,663 | 21,936 | 3% |
| State & Local | 13,811 | 17,641 | 28% |
| Higher Education | 5,604 | 6,910 | 23% |
| Government ISD | 19,661 | 5,910 | 45% |
| Healthcare | 5,395 | 6,618 | 12% |
| OSI Sales & HQ | 3,295 | 19,053 | 497% |
| Comm/Util | 23,896 | 27,987 | 9% |
| Financial Services | 9,138 | 9,578 | 7% |
| SDI Infrastructure | | 1,500 | nm |
| **Total** | $ 103,664 | $ 115,246 | 5% |
| **Margin %** | | | |
| Federal | 75,518 | 60,604 | -17% |
| State & Local | 49,370 | 72,359 | -34% |
| Higher Education | 14,542 | 11,131 | -23% |
| Government ISD | (19,738) | (1,910) | nm |
| Healthcare | 10,609 | 11,582 | 13% |
| OSI Sales & HQ | (3,058) | (19,653) | nm |
| Comm/Util | 89,527 | 92,011 | 3% |
| Financial Services | 25,543 | 21,472 | -16% |
| SDI Infrastructure | 0 | (1,500) | nm |
| **Total** | $ 219,392 | $ 204,754 | -14% |
| **Margin %** | | | |
| Federal | 16% | 72% | |
| State & Local | 18% | 65% | |
| Higher Education | 72% | 62% | |
| Government ISD | nm | nm | |
| Healthcare | 64% | 67% | |
| OSI Sales & HQ | nm | nm | |
| Comm/Util | 78% | 77% | |
| Financial Services | 34% | 72% | |
| SDI Infrastructure | nm | nm | |
| **Total** | 69% | 64% | |

**License - Year to Date**

| | FY20 FY | FY01 FY Forecast | Growth % |
|---|---|---|---|
| **Total Revenue** | | | |
| Federal | $ 209,541 | $ 179,083 | -15% |
| State & Local | 125,186 | 139,388 | 12% |
| Higher Education | 52,412 | 55,118 | 5% |
| Government ISD | 231 | 231 | |
| Healthcare | 39,367 | 62,986 | 60% |
| OSI Sales & HQ | 1,901 | (41) | |
| Comm/Util | 228,843 | 279,264 | 22% |
| SDI Infrastructure | 77,928 | 92,976 | 19% |
| | | nm | |
| **Total** | $ 730,407 | $ 804,685 | 10% |
| **Expenses** | | | |
| Federal | 60,215 | 69,762 | 16% |
| State & Local | 45,431 | 57,534 | 27% |
| Higher Education | 21,340 | 25,372 | 18% |
| Government ISD | 72,135 | 3,902 | 25% |
| Healthcare | 15,614 | 19,546 | 25% |
| OSI Sales & HQ | 8,902 | 77,095 | 760% |
| Comm/Util | 61,085 | 80,169 | 13% |
| Financial Services | 25,405 | 27,364 | 7% |
| SDI Infrastructure | | 4,222 | nm |
| **Total** | $ 310,791 | $ 372,090 | 20% |
| **Margin %** | | | |
| Federal | 149,286 | 109,321 | -27% |
| State & Local | 74,735 | 76,854 | 3% |
| Higher Education | 31,081 | 29,846 | -4% |
| Government ISD | (71,924) | (4,171) | nm |
| Healthcare | 23,754 | 43,440 | 83% |
| OSI Sales & HQ | (7,401) | (77,136) | nm |
| Comm/Util | 167,758 | 199,195 | 19% |
| Financial Services | 52,523 | 65,712 | 25% |
| SDI Infrastructure | 0 | (0,222) | nm |
| **Total** | $ 419,618 | $ 432,595 | 3% |
| **Margin %** | | | |
| Federal | 71% | 61% | |
| State & Local | 62% | 55% | |
| Higher Education | 59% | 54% | |
| Government ISD | nm | nm | |
| Healthcare | 60% | 69% | |
| OSI Sales & HQ | nm | nm | |
| Comm/Util | 73% | 71% | |
| Financial Services | 67% | 71% | |
| SDI Infrastructure | nm | nm | |
| **Total** | 57% | 54% | |

**Consulting - Current Quarter**

| | Q4 FY09 | Q4 FY01 Forecast | Growth % |
|---|---|---|---|
| **Total Revenue** | | | |
| Federal | $ 44,565 | $ 47,900 | 7% |
| State & Local | 21,843 | 20,300 | -6% |
| Higher Ed & Healthcare | 11,821 | 13,500 | 14% |
| Communication & Utilities | | 26,500 | 16% |
| CRM/E-Commerce | 881 | 4,101 | 368% |
| Financial Services | 13,877 | 13,899 | 18% |
| Consulting Operations | (1,871) | 1,500 | nm |
| **Total** | $ 114,110 | $ 129,879 | 14% |
| **Expenses** | | | |
| Federal | 31,874 | 34,600 | 9% |
| State & Local | 15,891 | 17,600 | 11% |
| Higher Ed & Healthcare | 7,900 | 10,810 | 37% |
| Communication & Intihm | 16,072 | 20,500 | 25% |
| CRM/E-Customer | 3,186 | 2,891 | 143% |
| Financial Services | 8,042 | 10,701 | 27% |
| Consulting Operations | 3,241 | 3,900 | -1% |
| **Total** | $ 84,216 | $ 99,892 | 15% |
| **Margin %** | | | |
| Federal | 12,991 | 13,200 | 2% |
| State & Local | 5,953 | 2,000 | -51% |
| Higher Ed & Healthcare | 3,921 | 2,700 | -31% |
| Communication & Utilities | 8,443 | 6,000 | -5% |
| CRM/E-Customer | (311) | 1,238 | nm |
| Financial Services | 3,834 | 3,759 | -2% |
| Consulting Operations | (4,912) | (1,500) | nm |
| **Total** | $ 29,935 | $ 29,987 | 0% |
| **Margin %** | | | |
| Federal | 29% | 28% | |
| State & Local | 27% | 14% | |
| Higher Ed & Healthcare | 33% | 20% | |
| Communication & Utilities | 34% | 17% | |
| CRM/E-Commerce | 36% | 30% | |
| Financial Services | 12% | 27% | |
| Consulting Operations | nm | nm | |
| **Total** | 26% | 23% | |

**Consulting - Year to Date**

| | FY06 FY | FY01 FY Forecast | Growth % |
|---|---|---|---|
| **Total Revenue** | | | |
| Federal | $ 166,423 | $ 173,208 | 6% |
| State & Local | 85,442 | 79,029 | -13% |
| Higher Ed & Healthcare | 38,500 | 53,661 | 39% |
| Communication & Utilities | 87,773 | 112,303 | 28% |
| CRM/E-Commerce | 5,145 | 11,559 | 135% |
| Financial Services | 43,890 | 54,334 | 37% |
| Consulting Operations | (1,441) | 3,661 | nm |
| **Total** | $ 427,731 | $ 491,583 | 15% |
| **Expenses** | | | |
| Federal | 116,902 | 130,246 | 11% |
| State & Local | 72,015 | 70,728 | -2% |
| Higher Ed & Healthcare | 27,335 | 43,198 | 38% |
| Communication & Intihm | 64,111 | 85,583 | 33% |
| CRM/E-Commerce | 5,060 | 9,152 | 81% |
| Financial Services | 30,183 | 35,885 | 19% |
| Consulting Operations | 12,008 | 17,295 | 34% |
| **Total** | $ 328,553 | $ 392,117 | 19% |
| **Margin %** | | | |
| Federal | 49,521 | 46,932 | -4% |
| State & Local | 17,428 | 8,301 | -33% |
| Higher Ed & Healthcare | 11,145 | 10,463 | -6% |
| Communication & Utilities | 23,662 | 26,920 | 14% |
| CRM/E-Commerce | 84 | 2,407 | 2762% |
| Financial Services | 13,706 | 18,238 | 33% |
| Consulting Operations | (16,149) | (13,635) | nm |
| **Total** | $ 99,176 | $ 99,016 | 0% |
| **Margin %** | | | |
| Federal | 30% | 26% | |
| State & Local | 19% | 11% | |
| Higher Ed & Healthcare | 29% | 19% | |
| Communication & Utilities | 27% | 24% | |
| CRM/E-Commerce | 2% | 21% | |
| Financial Services | 31% | 34% | |
| Consulting Operations | nm | nm | |
| **Total** | 23% | 20% | |

ORACLE CONFIDENTIAL

NDCA-ORCL 096177

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

Q4 FY01 - Projection
January 9, 2001

ORACLE

$ in Thousands
(ISD in Field)

| Product Forecast | License - Current Quarter | | | | License - Year to Date | | | | Q4 Target 30% Growth | License Pipeline Snapshot | | | | | Pipeline Cov Rate Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q4 FY00 | Q4 FY01 Forecast | Growth % | Best | FY00 FY | FY01 FY Forecast | Growth % | | | Q4 FY00 Pipeline * | Q4 FY01 Pipeline | Pipeline growth % | | | |
| **Total Revenue** | | | | | | | | | | | | | | | |
| Federal | $ 95,381 | $ 84,000 | -12% | 34% | $ 209,541 | $ 179,083 | -15% | $ 123,595 | $ 138,000 | $ 128,046 | -7% | 66% |
| State and Local | 63,183 | 50,000 | -21% | 203% | 120,186 | 134,368 | 12% | 82,138 | 190,000 | 178,992 | -6% | 28% |
| Higher Education | 20,145 | 18,000 | -11% | 44% | 52,422 | 55,118 | 5% | 26,189 | 62,000 | 43,177 | -30% | 42% |
| Government ISD | 1 | 0 | -100% | | 231 | 731 | | 2 | 0 | 0 | nm | 0% |
| Healthcare | 16,003 | 18,000 | 12% | 70% | 39,367 | 62,906 | 60% | 20,804 | 54,000 | 65,313 | 21% | 28% |
| OSI Sales & HQ | 237 | | nm | nm | 1,901 | | | 308 | 0 | 0 | 0% | 0% |
| Comm/Util | 115,423 | 120,000 | 4% | 10% | 228,843 | 279,564 | 22% | 150,049 | 190,000 | 102,212 | -46% | 117% |
| Financial Services | 34,681 | 30,000 | -13% | 81% | 77,928 | 92,976 | 19% | 45,086 | 44,000 | 35,392 | -20% | 85% |
| ISD Infrastructure | | | nm | nm | | | nm | 0 | | 0 | nm | 0% |
| **Total** | $ 345,055 | $ 320,000 | -7% | 35% | $ 730,419 | $ 804,685 | 10% | $ 448,571 | $ 678,000 | $ 553,133 | -18% | 58% |
| **Technology Revenue** | | | | | | | | | | | | | | | |
| Federal | $ 75,992 | $ 58,115 | -24% | | $ 179,866 | $ 138,528 | -23% | $ 93,790 | $ 125,000 | $ 80,106 | -36% | 73% |
| State and Local | 57,768 | 33,553 | 42% | | 110,840 | 104,472 | -6% | 75,099 | 163,000 | 101,262 | -38% | 33% |
| Higher Education | 14,891 | 10,376 | -30% | | 39,101 | 44,996 | 15% | 19,359 | 47,000 | 20,574 | -57% | 52% |
| Government ISD | 1 | 0 | -100% | | 199 | 731 | 268% | 2 | 0 | 0 | nm | 0% |
| Healthcare | 10,922 | 9,366 | -14% | | 26,925 | 19,929 | 48% | 14,198 | 35,000 | 27,231 | -22% | 34% |
| OSI Sales & HQ | 237 | 0 | -100% | | 1,900 | | -103% | 308 | 0 | 0 | 0% | 0% |
| Comm/Util | 59,227 | 58,195 | -2% | | 137,824 | 171,134 | 25% | 76,595 | 129,000 | 36,292 | -72% | 160% |
| Financial Services | 27,992 | 17,301 | -36% | | 64,820 | 67,181 | 4% | 36,389 | 25,000 | 18,203 | -27% | 98% |
| ISD Infrastructure | | | nm | | | | nm | | | 0 | nm | 0% |
| **Total** | $ 247,030 | $ 187,629 | -24% | | $ 561,154 | $ 568,995 | 1% | $ 321,138 | $ 524,000 | $ 283,309 | -46% | 65% |
| **Application Revenue** | | | | | | | | | | | | | | | |
| Federal | $ 19,389 | $ 25,885 | 34% | | $ 29,595 | $ 40,555 | 37% | $ 25,205 | $ 13,000 | $ 47,940 | 269% | 54% |
| State and Local | 5,415 | 16,427 | 203% | | 9,347 | 29,896 | 220% | 7,040 | 27,000 | 77,790 | 188% | 21% |
| Higher Education | 5,254 | 7,524 | 44% | | 13,320 | 10,132 | -24% | 6,830 | 15,000 | 22,993 | 53% | 33% |
| Government ISD | 0 | 0 | nm | | 32 | | -100% | | 0 | 0 | nm | 0% |
| Healthcare | 5,082 | 8,611 | 70% | | 12,441 | 22,977 | 85% | 6,606 | 19,000 | 38,082 | 100% | 23% |
| OSI Sales & HQ | 0 | 0 | nm | | 0 | | nm | | 0 | 0 | 0% | 0% |
| Comm/Util | 56,196 | 61,805 | 10% | | 91,019 | 106,425 | 17% | 73,055 | 61,000 | 65,920 | 8% | 94% |
| Financial Services | 6,689 | 12,096 | 81% | | 13,108 | 25,795 | 97% | 8,696 | 19,000 | 17,189 | -10% | 70% |
| ISD Infrastructure | | 0 | nm | | | | nm | | | 0 | nm | 0% |
| **Total** | $ 98,025 | $ 132,271 | 35% | | $ 168,865 | $ 235,780 | 40% | $ 127,431 | $ 154,000 | $ 269,824 | 75% | 49% |

License Scenario Analysis
(ISD Current Week)

| | Worst | Most Likely | Best | JHH Forecast | Mgmt. Judgement |
|---|---|---|---|---|---|
| Federal | | | | $4,000 | $4,000 |
| State and Local | | | | 50,000 | 50,000 |
| Higher Education | | | | 18,000 | 18,000 |
| Government ISD | | | | 18,000 | 18,000 |
| Healthcare | | | | | |
| OSI Sales & HQ | | | | 120,000 | 120,000 |
| Comm/Util | | | | 30,000 | 30,000 |
| Financial Services | | | | | |
| **Total** | | | | 320,000 | 320,000 |

Oracle Service / Industries

FY01 Forecast.xls

ORACLE CONFIDENTIAL

NDCA-ORCL 096178

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

EXHIBIT 161

==Deborah Lange,== 04:02 PM 1/10/2001 -0800, [Fwd: Returned mail: Host unknown (Name server: how:

Date: Wed, 10 Jan 2001 16:02:51 -0800
From: Deborah Lange <Deborah.Lange@oracle.com>
Organization: Oracle Corporation
X-Mailer: Mozilla 4.7 [en] (Win95; U)
X-Accept-Language: en
To: cong@howsen-simon.com
Subject: [Fwd: Returned mail: Host unknown (Name server: howsen-simon.com: host
not found)]
X-RCPT-TO: <cong@howsen-simon.com>

Return-Path: <>
Received: from inet-smtp3.oracle.com (inet-smtp3.oracle.com [205.227.43.23])
    by gmgw02.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id PAA16198
    for <Deborah.Lange@oracle.com>; Wed, 10 Jan 2001 15:54:20 -0800 (PST)
Received: from localhost (localhost)
    by inet-smtp3.oracle.com (8.9.3/8.9.3) with internal id PAA06498;
    Wed, 10 Jan 2001 15:54:20 -0800 (PST)
Date: Wed, 10 Jan 2001 15:54:20 -0800 (PST)
From: Mail Delivery Subsystem <MAILER-DAEMON@oracle.com>
Message-Id: <200101102354.PAA06498@inet-smtp3.oracle.com>
To: <Deborah.Lange@oracle.com>
MIME-Version: 1.0
Content-Type: multipart/report; report-type=delivery-status;
    boundary="PAA06498.979170860/inet-smtp3.oracle.com"
Subject: Returned mail: Host unknown (Name server: howsen-simon.com: host not found)
Auto-Submitted: auto-generated (failure)

The original message was received at Wed, 10 Jan 2001 15:54:19 -0800 (PST)
from gmgw01.us.oracle.com [130.35.61.190]

    ---- The following addresses had permanent fatal errors ----
<cong@howsen-simon.com>

    ---- Transcript of session follows ----
550 <cong@howsen-simon.com>... Host unknown (Name server: howsen-simon.com: host not
found)
Reporting-MTA: dns; inet-smtp3.oracle.com
Received-From-MTA: DNS; gmgw01.us.oracle.com
Arrival-Date: Wed, 10 Jan 2001 15:54:19 -0800 (PST)

Final-Recipient: RFC822; cong@howsen-simon.com
Action: failed
Status: 5.1.2
Remote-MTA: DNS; howsen-simon.com
Last-Attempt-Date: Wed, 10 Jan 2001 15:54:19 -0800 (PST)
Return-Path: <Deborah.Lange@oracle.com>
Received: from gmgw01.oraclecorp.com (gmgw01.us.oracle.com [130.35.61.190])
    by inet-smtp3.oracle.com (8.9.3/8.9.3) with ESMTP id PAA06494;

CONFIDENTIAL
PS0624

NDCA-ORCL 043349

**Deborah Lange, 04:02 PM 1/10/2001 -0800, [Fwd: Returned mail: Host unknown (Name server: how:**

Wed, 10 Jan 2001 15:54:19 -0800 (PST)
Received: from oracle.com (dhcp-5op6-5op6-west-144-25-178-85.us.oracle.com
[144.25.178.85])
  by gmgw01.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id PAA00459;
  Wed, 10 Jan 2001 15:54:18 -0800 (PST)
Message-ID: <3A5CF664.345E46D8@oracle.com>
Date: Wed, 10 Jan 2001 15:55:16 -0800
From: Deborah Lange <Deborah.Lange@oracle.com>
Organization: Oracle Corporation
X-Mailer: Mozilla 4.7 [en] (Win95; U)
X-Accept-Language: en
MIME-Version: 1.0
To: "Simon, Philip B." <psimon@howson-simon.com>, cong@howsen-simon.com
Subject: Larry's option exercise
Content-Type: multipart/mixed;
  boundary="----------FE675909EC07894BF599DDCB"

Our general philosophy is "the earlier the better". It is obviously
Larry's call but there is a possible benefit to the company of
exercising in FY01 (April) rather than FY02 - if the stock option
deduction cause or increase an NOL then I want the ability to carry back
against FY99, if the deduction is in FY02 then I can only carry back as
far as FY00.

Many thanks, Deb

 Deborah.Lange3.vcf

 Deborah.Lange4.vcf

---

CONFIDENTIAL
PS0625

NDCA-ORCL 043350

EXHIBIT 162

Re: Trading Clearance

PLAINTIFF'S
EXHIBIT
43
Catz 3/23/07
PENGAD 800-631-6989

**Subject: Re: Trading Clearance**
**Date: Fri, 19 Jan 2001 14:10:06 -0800**
**From: "Safra A. Catz" <Safra.Catz@oracle.com>**
**To: Dan Cooperman <daniel.cooperman@oracle.com>.**

I just found out something so I don't think I should trade.

Dan Cooperman wrote:

> Safra,
>
> You have indicated to me your intention to engage in a same day
> exercise and sale of a portion of the vested options you hold. This
> note constitutes your clearance in accordance with Oracle's trading
> policy for executive officers and directors for your proposed
> transaction in Oracle stock, effective as of this date. This
> clearance is based on my understanding that either (i) there is at
> this time no material inside information which would, if known by you,
> make your trade improper or (ii) if there is such information, it has
> not been made known to you.
>
> Please note the following conditions to this clearance:
>
>   1. This clearance is effective only for the transaction for which
> you requested clearance. If you wish to make any other transaction,
> request another clearance for that trade. This clearance will expire
> at the close
> of the market seven calendar days from the date of this note. If you
> have not completed your transaction by that time, you must request and
> receive an additional clearance or extension prior to continuing.
>
>   2. If you should gain access to material, undisclosed information
> prior to effecting your transaction, DO NOT TRADE. If you are unsure,
> ask.
>
>   3. You should verify that you have had no opposing transactions in
> the last six months.
>
> Check with me or Barbara Wallace if you are unsure on any of these
> points.
>
> Print and save a copy of this clearance for your records.
>
> Dan
>
>

CA-ORCL 037259
ORACLE CONFIDENTIAL

NDCA-ORCL 039432

EXHIBIT 163



Employee Hierarchy

ORACLE *People*

Home  Calendar  Files  Login  Help

http://aria.us.oracle.com:7777/pls/oracle/?p=8000:3:3447755::NO::PERSON_ID:105:

Jeff Henley

Find:
Advanced Search
Edit My Information

Detail
Profile
Organization
Roles

**Lawrence J. Ellison**
Chairman and CEO
Directs: 17   Total: 19546

**Jeff Henley**
Chief Financial Officer and Executive Vice President
Directs: 10   Total: 1404

| Daniel Cooperman | Joelle Teresa Fitzgerald | Deborah A. Lange | Bruce M. Lange | Matthew Maverson | Kate L. McGee | Jennifer L. Minton | Sharon Montoya Bretz | Anil Vora | Joyce E. Westerdahl |
|---|---|---|---|---|---|---|---|---|---|
| Senior Vice President, General Counsel and Secretary | Senior Director, Investor Relations | Senior Vice President | Senior Vice President | Vice President Manufacturing & Distribution | Vice President of Corporate Affairs | Senior Vice President Corporate Controller | Executive Assistant | Vice President Oracle Financing Division | Senior Vice President Human Resources |
| Total: 74 | Total: 4 | Total: 30 | Total: 305 | Total: 41 | Total: 12 | Total: 737 | | Total: 53 | Total: 138 |

The data in this system was last refreshed on Wednesday February 27, 2002.
Where does this data come from?

Copyright © 2000 Oracle Corporation. All rights reserved.

2/27/2002 2:59 PM

ORACLE
CONFIDENTIAL

1 of 1

NDCA-ORCL 140446

CONFIDENTIAL–SUBJECT
TO PROTECTIVE ORDER

EXHIBIT 164

**Minutes of the Meeting
of the Finance and Audit Committee
of the Board of Directors
of Oracle Corporation**
January 5, 2001

A meeting of the Finance and Audit Committee (the "Committee") of Oracle Corporation was held on January 5, 2001, at the Company's World Headquarters, 500 Oracle Parkway, Redwood City, California.

1.   **ATTENDANCE AND QUORUM**

The following members of the Committee were present, constituting a quorum: Donald Lucas (Chairman of the Committee), Jeff Berg, and Michael Boskin. Also present were: Safra Catz, Executive Vice President; Daniel Cooperman, Senior Vice President, General Counsel & Secretary; Jeffrey Henley, Executive Vice President and Chief Financial Officer; Bruce Lange, Vice President and Treasurer; Deborah Lange, Vice President, Taxation; Annica Magnusson, Vice President and Director of Internal Audit; and Jennifer Minton, Senior Vice President and Corporate Controller.

2.   **APPROVAL OF MINUTES**

The Committee approved the minutes of the meeting held on October 13, 2000.

3.   **FINANCIAL RESULTS**

Jeff Henley and Bruce Lange made presentations to the Committee relating to results of operations and cash flows for the quarter and year ending November 30, 2000. Jeff Henley also commented on his outlook for the third quarter.

Bruce Lange updated the Committee on the information of the Liberate Trust, the existence of which will facilitate the holding and disposition of Oracle's holdings of Liberate shares.

4.   **INCOME TAXES**

Deb Lange made a presentation to the Committee relating to income taxes.

5.   **ARTHUR ANDERSEN LLP**

Gary Matuszak, Angelika Caicedo, and Guy Johnson from Arthur Andersen LLP joined the meeting and presented information about the results of their audit of the Company's financial statements for the quarter ending November 30, 2000. Gary Matuszak also presented on the SEC:s final ruling on auditor independence.

The Committee discussed Arthur Andersen's fees for non audit services for FY00.

ORACLE
CONFIDENTIAL

CA-ORCL 033510

Minutes of the Meeting
of the Finance and Audit Committee
of the Board of Directors
of Oracle Corporation
January 5, 2001

6.  **CORPORATE GIVING**

Rosalie Gann presented on how Oracle allocates its charitable contributions and how Oracle is performing compared to other high tech companies.  The Audit Committee asked Rosalie Gann to compile information indicating how much cash Oracle donates to charity annually, this number should also include money donated to purchase hardware.  In addition, Rosalie will estimate how much Oracle donates in free software by using the license list price and apply a reasonable discount to arrive at a net number.

7.  **VENTURE FUND INVESTMENTS**

Safra Catz presented on Oracle's investments in Venture Funds and discussed the valuation of these assets.

8.  **OTHER TOPICS**

The Committee discussed recent internal audits and the progress towards completion of the FY01 audit schedule.

9.  **EXECUTIVE SESSION**

Annica Magnusson left the room while the Committee held an Executive Session.


*[signature: Annica Magnusson]*

Annica Magnusson
Secretary of the Committee

**ORACLE
CONFIDENTIAL**

**CA-ORCL 033511**

NDCA-ORCL 036438

EXHIBIT 165

Airplane

**Subject: Airplane**
**Date:** Fri, 01 Jun 2001 15:27:19 -0700
**From:** Terri Mullen <Terri.Mullen@oracle.com>
**Organization:** Oracle Corporation
**To:** "Lange,Deborah" <DEBORAH.LANGE@oracle.com>

Hi Deb,

Here is the imputed income calculation for the period 1/1/01-3/31/01.

The response to Catherine Ong's e-mail to me (see below) is that there were no Oracle trips taken in December 2000 which would require us to impute income to Larry.

Catherine Ong wrote:

> *Deb Lange wanted to get the imputed income for the last quarter of 2000*
> *before year-end. I told her I would not have the information regarding all*
> *December trips until January. Thus, it was agreed that the calculations*
> *for the last quarter would cover trips from 10/1/00 - 11/30/00, and*
> *December trips would be included with the first quarter 2001 calculations.*
> *I am not sure if we are just delaying December trips until the*
> *following year, or we will have a month lag for each quarter going forward. I*
> *assume*
> *the first quarter 2001 would be 12/1/00 - 3/31/01 versus 12/1/00 -2/28/01.*

Terri

| | Name: ljeimpinc033101.xls |
|---|---|
| ljeimpinc033101.xls | **Type:** EXCEL File (application/msexcel) |
| | **Encoding:** base64 |

| Terri Mullen <Terri.Mullen@oracle.com> |
|---|

ORACLE CONFIDENTIAL

1

NDCA-ORCL 060991

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

EXHIBIT 166

Page 1 of 3

Date: 22 Dec 98 10:47:18 -0800
From: "SBLUM.US.ORACLE.COM" <SBLUM@us.oracle.com>
To: psimon@howson-simon.com
Subject: Re: Stock Donation and Stock Option Exercise
X-Orcl-Application: In-Reply-To:UNX02.US.ORACLE.COM:psimon@howson-simon.com's
message of 22-Dec-98 10:32
X-Mailer: Oracle InterOffice (version 4.1.2.12.0)

I will take it up to her right now..

thanks

Sandra L. Blum
Manager
Worldwide Shareholder Services
Corporate Treasury

Date: 22 Dec 98 10:32:01
From:"Philip B. Simon" <psimon@howson-simon.com>
To:"SBLUM.US.ORACLE.COM" <SBLUM@us.oracle.com>
Subject:Re: Stock Donation and Stock Option Exercise
Cc:"Carolyn S. Balkenhol" <cwuesten@us.oracle.com>, "Catherine H. Ong"
<cong@howson-simon.com>, Mary Jo Lloyd <mjlloyd@howson-simon.com>
Return-Path:<psimon@howson-simon.com>
Received:from mailsun2.us.oracle.com by usmail05 with SMTP (SMI-8.6/37.9) id
KAA07557; Tue, 22 Dec 1998 10:32:43 -0800
Received:from inet-user-gw-1.us.oracle.com by mailsun2.us.oracle.com with ESMTP (SMI-
8.6/37.8) id KAA29691; Tue, 22 Dec 1998 10:32:27 -0800
Received:from MAIL01 (mail.toast.net [206.244.186.11]) by inet-user-gw-1.us.oracle.com
(8.8.5/8.8.5) with ESMTP id KAA19471; Tue, 22 Dec 1998 10:30:32 -0800 (PST)
Received:from toast.howson-simon.com - 38.28.28.244 by toast.net with Microsoft
SMTPSVC; Tue, 22 Dec 1998 13:33:36 -0500
X-Sender:euc/hs.psimon@mail.toast.net
In-Reply-To:<199812221742.JAA13942@usmail05>
Message-ID:<044f336331816c8MAIL01@toast.net>
MIME-Version: 1.0
Content-Type:text/plain; charset=us-ascii
Content-Transfer-Encoding:7bit

Thanks, Sandra.

Query - what paperwork needs to be completed to exercise the options?  And
who will get the paperwork to Carolyn?  Can you get all the paperwork to
her today?

Philip

**PS0224**

file://C:\WINDOWS\TEMP\eudA213.htm

12/22/98

NDCA-ORCL 042989

•••••••••••••••••••••••••••••••••••

At 09:41 AM 12/22/98 -0800, you wrote:
>
>Phil,
>
>Thank you for the message. I will give Dan Juchau in Tax a heads up
>regarding
>the exercise of the options and the W-4.  I do not see any issue with this.
>
>I will also call Kim Clarke at Merrill today to touch base as to when the
>transfer will be executed.
>
>Thanks
>
>
>
>Sandra L. Blum
>Manager
>Worldwide Shareholder  Services
>Corporate Treasury
>
>Date: 21 Dec 98 17:55:32
>From:"Philip B. Simon" <psimon@howson-simon.com>
>To:Sandra Blum <sblum@us.oracle.com>
>Subject:Stock Donation and Stock Option Exercise
>Cc:"Matthew Ng @ Oracle Legal Dept." <MKNG@us.oracle.com>, "Carolyn S.
>Balkenhol" <cwuesten@us.oracle.com>, "Catherine H. Ong"
<cong@howson-simon.com>, Mary Jo Lloyd <mjlloyd@howson-simon.com>
>Return-Path:<psimon@howson-simon.com>
>Received:from mailsun3 by usmail05 with SMTP (SMI-8.6/37.9) id RAA09514;
Mon, 21 Dec 1998 17:54:51 -0800
>Received:from inet16.us.oracle.com by mailsun3 with ESMTP (SMI-8.6/37.9)
id RAA25752; Mon, 21 Dec 1998 17:54:50 -0800
>Received:from MAIL01 (mail.toast.net [206.244.186.11]) by
inet16.us.oracle.com (8.8.5/8.8.5) with ESMTP id RAA01666; Mon, 21 Dec 1998
17:54:08 -0800 (PST)
>Received:from toast.howson-simon.com - 38.28.28.226 by toast.net with
Microsoft SMTPSVC; Mon, 21 Dec 1998 20:54:08 -0500
>X-Sender:euc/hs.psimon@mail.toast.net
>Message-ID:<01e6a08540116c8MAIL01@toast.net>
>MIME-Version: 1.0
>Content-Type:text/plain; charset=us-ascii
>Content-Transfer-Encoding:7bit
>
>Dear Sandra:
>
>As per my voicemail message, Larry would like to do the following
>transactions before year end:
>
>1.  donate 200,000 Oracle shares (approx. $7.8m of value) to The Ellison

**PS0225**

NDCA-ORCL 042990

>Medical Foundation.  Matthew Ng has already given Oracle legal dept's
>tentative o.k. to this transfer.  Kim Clarke at Merrill Lynch will be
>handling the transfer.  Please note that The Ellison Medical Foundation
>plans to sell the shares immediately upon receipt of the donation from
>Larry.  The Ellison Medical Foundation is a private foundation (a tax
>exempt, nonprofit corporation).  I expect this transfer to occur tomorrow
>or Wednesday, depending upon how fast we can move the process along.
>
>2.  exercise stock options - probably about 265,000 options - from the lot
>expiring 8/1/2001; 7/31/91 NQ option grant; exercise price $1.351852/share.
> We're still working out the precise number of options to be exercised and
>should have this determined by tomorrow.  In the meantime, I'd like to get
>the paperwork going and to Carolyn for completion.  Also, we will want to
>file the W-4 as we've done in prior years to eliminate all income tax
>withholding.  We've worked with Deborah Lange in the past on this - so I
>don't think there'll be a problem to have no withholding.
>
>Thanks for your help on this, Sandra.  Let me know what else, if anything
>you need from me.
>
>Yours truly,
>
>Philip
>

PS0226

12/22/98

NDCA-ORCL 042991

EXHIBIT 167

# FAX

| | |
|---|---|
| **Date** | 12/26/95 |

**Number of pages including cover sheet** _____ 6

**TO:** <mark>Deborah Lange</mark>

**FROM:** Catherine H. Ong

Howson & Simon, CPA's

220 Montgomery Street, Suite 1041

San Francisco, California 94104

**Phone**

**Fax** 506-7115
**Phone**

**Phone** (415) 398-6772
**Fax** (415) 788-1935
**Phone**

**CC:**

**REMARKS:** ☐ Urgent    ☐ For your review    ☐ Reply ASAP    ☐ Please Comment

Here are the calculations showing that based upon the allowances claimed on the revised Forms W-4, no federal or California income tax withholdings would be required for the 12/31/95 payroll period which includes the supplemental income from the exercise of stock options.

If you have any questions, please give me a call.

*Faxed Federal + CA Forms W-4 + attachments for 12/31/95 payroll period. (4 pgs.)*

**PS0106**

NDCA-ORCL 042892

EXHIBIT 168

# FAX

| | |
|---|---|
| **Date** | 12/22/98 |
| **Number of pages including cover sheet** | 2 |

**TO:**   Sandra Blum

**FROM:**   Catherine H. Ong

Howson & Simon CPAs L.P.

101 Ygnacio Valley Road, Suite 310

Walnut Creek, California 94596

**Phone**

**Fax Phone**   (650) 633-2288

**Phone**   (925) 977-9060

**Fax Phone**   (925) 977-9064

**CC:**

**REMARKS:**   ☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please Comment

Here is the schedule of withholding calculations which Deborah Lange will want to review, along with the federal Form W-4 and the California Form DE 4.

Since we are not absolutely sure of today's closing price (does Oracle use the bid or the offer price?), please notify Carolyn directly as to the exact amount of medicare tax needed and she will write a separate check.  The stock certificate for the exercised shares can be delivered to Carolyn.

Thanks for all your help.

Attachment withheld
JXN

PS0218

EXHIBIT 169

Re LJE - imputed income from use of plane

**Subject: Re: LJE - imputed income from use of plane**
**Date:** Wed, 16 Aug 2000 16:48:34 -0700
**From:** Deborah Lange <Deborah.Lange@oracle.com>
**Organization:** Oracle Corporation
**To:** Amy Aves <amy.aves@oracle.com>

Thanks for the update.

Deb

Amy Aves wrote:

> Deb - Jeff has received six reimbursements of $720 each for personal training
> expenses in calendar year 2000.  Two of these payments have already been taxed,
> four have not.  Larry has not yet submitted receipts for three expense reports
> submitted in July, 1999.  These expense reports do contain personal training
> expenses, but have not been paid to Larry.
>
> Joe - we need consistency with Jeff's reports, please always fringe his personal
> training expenses.
>
> Tom Williams wrote:
>
> > amy--
> >
> > i know jeff has expensed his personal trainer, i don't remember seeing anything
> > on larry. can you run a detail of both of their expense reports to identify
> > these amounts? i seem to remember it being $600 or so each month.
> >
> > tom
> >
> > Deborah Lange wrote:
> >
> > > Don't know what the amounts are - they come from AP.
> > >
> > > Tom - could you please forward this to the person in charge of AP - we need
> > > to track amount reimbursed for Jeff and LJEs' trainers.
> > >
> > > Thanks, Deb
> > >
> > > Judy Wise wrote:
> > >
> > > > Deb,
> > > >
> > > > No amounts for physical trainers has been added to income for Jeff or
> > > > Larry.  Let me know what the amount is, and I will include with the other
> > > > fringe amounts.
> > > >
> > > > Judy
> > > >
> > > > Deborah Lange wrote:
> > > >
> > > > > The amount of income to be imputed to LJE is as follows:
> > > > >
> > > > > Q1 calendar 2000        $15,879.82
> > > > > Q2 calendar 2000        $ 1,496.66
> > > > >
> > > > > Don, I understand you are working with Payroll to determine how Larry
> > > > > will cover the tax on this income 0 given that he has no cash
> > > > > compensation at present - it may be necessary for him to write the
> > > > > company a check.

ORACLE CONFIDENTIAL

1

NDCA-ORCL 060962

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

Re: LJE - imputed income from use of plane

> > > > >
> > > > > PLease advise re resolution of the tax issue and confirm the income has
> > > > > been reported.
> > > > >
> > > > > Also can the Payroll Department please confirm that we are putting into
> > > > > income any amounts related to Oracle's payment for physical trainers -
> > > > > e.g. for Jeff Henley and Larry (none may have been claimed but I am
> > > > > checking anyway).
> > > > >
> > > > > Thanks, Deb

---

Deborah Lange <Deborah.Lange@oracle.com>
VP Tax
Finance & Administration
Tax Department

ORACLE CONFIDENTIAL

2

NDCA-ORCL 060963

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

# EXHIBIT 170

**From:** Deborah Lange
**Sent:** Thu, 24 Aug 2000 08:45:17 GMT
**To:** Philip B Simon
**CC:** Donald Scott
**BCC:**
**Subject:** LJE's stock options

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    NDCA-ORCL 378624

Philip,

I would like to have a chat re Larry's options, at your convenience.   We
are trying to estimate Oracle's tax position for fiscal years ending May
31, 2001 and 2002.  Please let me know suitable times next week.  My
schedule show the following open:
Tuesday    after 11:00
Wednesday after noon
Thursday 1- 4

best regards, Deb

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

```
begin:vcard
n:Lange;Deborah
x-mozilla-html:FALSE
org:Finance & Administration<A
HREF+"http://www.oracle.com/go/?&URL=http://www.oracle.com/"><imgsrc="http://ww.
oracle.com/signature/obanner.gif"></A>;Tax Department<A
HREF="http://www.oracle.com/go/?&URL=http://www.oracle.com/">
version:2.1
email;internet:Deborah.Lange@oracle.com
title:VP Tax
adr;quoted-printable:;;500 Oracle Parkway=0D=0AM/S 5OP6;Redwood
Shores;CA;94065;USA
fn:Deborah Lange
end:vcard
```

EXHIBIT 171

**From:** Bruce Lange
**Sent:** Wed, 14 Mar 2001 09:21:18 GMT
**To:** Safra Catz; Henley; Jeffrey
**CC:**
**BCC:**
**Subject:** Stock Buyback

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      NDCA-ORCL 227663

```
begin:vcard
n:Lange;Bruce
tel;fax:(650)506-7115
tel;work:(650)506-4118
x-mozilla-html:FALSE
adr:;;500 Oracle Parkway;Redwood Shores, CA 94065;;;
version:2.1
email;internet:bruce.lange@oracle.com
title:Corporate Treasurer
x-mozilla-cpt:;-2720
end:vcard
```

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

I've only got $125MM of buyback budgeted for Q4 and wanted to check how aggressively I should come out of the "starting blocks" when the quiet period ends next Tuesday. I'm assuming that this will be discussed at the next board meeting, by which time we should have a better handle on FY2002 cash flow as the FY2002 budget is worked on. Although the final picture won't be clear until the budget is closer to finished, we need to decide how much to purchase in the interim period before the board meeting and final budgets. Although the cash flow budget is still tentative, I have some preliminary data which should help the decision.

Unsurprisingly, cash flow will decline from earlier forecasts. The biggest change is from reduced tax benefit from option exercises and reduced earnings are also a big factor. We have approximately $2.3B of surplus liquidity today (The $2.3 billion excludes cash trapped in Europe and Japan as well as working cash for Asia and the Americas). This should grow by approximately $1.1 billion next quarter, and $4.2 billion in FY2002 before repurchases. So, we'll have $3.4 billion of surplus liquidity at end of FY2001, and $7.6 billion at end of FY2002. The cash flow is typically back end loaded and the majority of the $4.5 billion will happen in the second half. I used a conservative earnings assumption ($0.61), but each penny only helps by $59MM. So, even another $0.10 only helps the picture by $590MM.

The other change from previous discussions is that buyback is now VERY slightly accretive to earnings and adds one tenth of a penny per $1 billion of buyback.

I'd be conservative on the buyback next week until we have a clearer view on FY2001, and would only target $125MM for the quarter. That would be just $15MM per week until the Board meets and budgets are closer to finalized. That's just my view. Obviously, you Jeff and Larry will need to make the decision.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER      NDCA-ORCL 227665