# EXHIBIT 180

Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In Re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) | Master File No. C-01-0988-MJJ |
| ——————————————— | ) | |
| | ) ) | |
| This Document Relates To: | ) ) | |
| ALL ACTIONS | ) ) | |
| ——————————————— | ) | |

**EXPERT REPORT OF BJORN I. STEINHOLT, CFA**

**May 25, 2007**

## I.      INTRODUCTION AND QUALIFICATIONS

1.      I am a Principal at Financial Markets Analysis, LLC ("FMA"), an economic consulting and valuation firm with offices in San Diego, Princeton and Shanghai.  FMA provides financial analyses and related economic consulting services to various clients and has frequently been asked to prepare reports and expert testimony regarding the various economic issues that typically arise in securities class actions.

2.      I received a Master of International Business degree from the University of San Diego and a Bachelor of Science, Computer Science degree from California State University, Long Beach. I have earned the professional designation Chartered Financial Analyst awarded by the CFA Institute.  I have been retained on numerous occasions to provide my expert opinions relating to market efficiency, materiality, loss causation and damages in securities class actions similar to this litigation.  A summary of my background, and qualifications, as well as prior testimony, is attached as Exhibit A to this report.

3.      My compensation is based on the number of hours worked times my billable rate, currently $450 per hour.


## II.     OVERVIEW OF ASSIGNMENT

4.      I have been retained by plaintiffs' counsel to analyze and provide expert testimony regarding the economic issues related to market efficiency, materiality, loss causation, and the calculation of Section 10(b) damages suffered by purchasers of Oracle Corporation ("Oracle" or the "Company") common stock from December 14, 2000 to March 1, 2001 (the "Class Period").  In addition, I have been asked to analyze defendants' insider sales during the Class Period and calculate the related damages pursuant to Section 20A of the Securities Exchange Act of 1934.  My opinions

in this matter are based on my professional experience, as well as my review of a substantial amount of information, including:

(a)     Plaintiffs' [Proposed] Second Amended Complaint for Violation of the Federal Securitites Laws ("Complaint");

(b)     Deposition transcripts of defendants Lawrence Ellison and Jeffrey Henley;

(c)     Declaration of defendants' expert Stefan Boedeker dated July 27, 2005;

(d)     The public filings by Oracle with the United States Securities and Exchange Commission ("SEC");

(e)     Press releases issued by the Company and conference call transcripts during the relevant time period;

(f)     Securities analyst reports regarding Oracle and its industry issued during the relevant time period;

(g)     Contemporaneous media reports regarding Oracle and its industry issued during the relevant time period;

(h)     Price and volume data for Oracle common stock, as well as for the industry and market indices;

(i)     Oracle common stock ownership by reporting institutions during the Class Period from Thomson Financial;

(j)     Short interest in Oracle common stock during the Class Period from Bloomberg; and

(k)     Articles, court decisions and other relevant information cited in the text, or in footnotes to the text below.

*See* Appendix to the Expert Report of Bjorn I. Steinholt, CFA ("App.").

5.      This report is based on the evidence I have reviewed to date.  Additional information may be added or I may modify my conclusions based upon additional evidence or the opinions expressed by the defendants' experts.

6.      In the paragraphs below I will first discuss plaintiffs' allegations in this matter, and my assumptions regarding these allegations.  Second, I will discuss the basis for my opinion that the market for Oracle's common stock was impersonal, open, well developed, and efficient.  Third, I will discuss the basis for my opinion that the allegedly false and misleading statements were material (*i.e.*, they contained information that a reasonable investor would have wanted to consider prior to making an investment decision), and that they caused Oracle's common stock to trade at artificially inflated prices during the Class Period.  Fourth, I will discuss the basis for my opinion that Class members suffered economic losses as a result of the alleged fraud when the relevant truth was revealed.  Fifth, I will calculate the damages per share during the Class Period, also sometimes referred to as the inflation per share.  Sixth, I will analyze defendants' insider sales and calculate the related Section 20A damages.

## III.    ASSUMPTIONS

7.      For the purpose of my analysis, I have assumed that plaintiffs' allegations are true.  First, plaintiffs allege that Oracle's publicly-reported financial statements for the Second Quarter of fiscal 2001 were false and misleading when made.  More specifically, plaintiffs allege that Oracle artificially inflated its revenue and EPS results for the Second Quarter of fiscal 2001.  Defendants manipulated Oracle's unapplied cash and customer overpayments accounts in connection with the creation of 46,000 fictitious "debit memo" invoices in November 2000, thereby artificially materially inflating Oracle's revenue and earnings for the Second Quarter of Fiscal 2001.  Oracle further artificially materially inflated its revenue and earnings by improperly recognizing revenue on

a transaction with Hewlett Packard on the last day of the quarter, November 30, 2000.  As a result of the manipulation of the Company's financials, Oracle reported earnings per share of $0.11 for the Second Quarter 2001 that were inflated by, at least, 1 cent per share, thereby exceeding analysts' consensus expectations of $0.10 cents per share.

8.      Second, plaintiffs allege that defendants misrepresented the quality and capabilities of, and customer demand for Oracle's 11i Application Suite ("Suite 11i").  Among other things, plaintiffs allege that defendants falsely and repeatedly stated that Oracle's Suite 11i, first introduced in May of 2000, worked well and was pre-integrated and interoperable out-of-the-box.  Defendants also falsely stated that no systems integration was required, that the components of Suite 11i were literally plug and play, and that Suite 11i would manage all aspects of a customer's business.  Plaintiffs also allege that defendants misrepresented that Suite 11i would drive sales growth at Oracle and that customer acceptance of Suite 11i was high.  Defendants falsely projected 75% applications sales growth and 25% database sales growth for the Third Quarter of fiscal 2001. In reality, Suite 11i was beset with severe technical problems and defects, including integration problems, and required costly implementations to work.  These problems caused customers to delay and/or forego planned purchases from Oracle.  Plaintiffs further allege that the misapplication of customer cash and improper revenue recognition in the Second Quarter of fiscal 2001 allowed the Company to hide the slowdown in applications and database sales that resulted from the problems with Suite 11i.

9.      Third, plaintiffs allege that defendants falsely represented that the Company's sales would not be negatively impacted by the general economic slowdown during the Class Period. Instead, defendants falsely made and maintained financial guidance for the Third Quarter of fiscal 2001 – including that Oracle would continue to have sequential earnings per share growth and would report revenue of $2.9 billion based upon projected 75% applications sales growth and 25% database

- 4 -

sales growth – until the very end of the Class Period. Defendants' false representations were made despite a known decline in the United States economy that began in early summer 2000 and impacted Oracle's customers. The economic downturn caused Oracle's customers to cut information technology budgets, which in turn impacted sales at Oracle and caused Oracle to discount its products. Plaintiffs also allege that defendants knew of the impact of the economy on Oracle's business based upon defendants' use of an application to manage worldwide sales which gave defendants up to the minute information on the Company's global forecast and sales. After the Class Period, defendants admitted that the economy had a negative impact on the Third Quarter applications and database sales. Plaintiffs further allege that the improper revenue recognition in the Second Quarter of fiscal 2001 allowed the Company to hide the slowdown in applications and database sales that resulted from the downturn in the economy.

## IV.    MARKET EFFICIENCY

10.    For the past 35 years, the efficient capital market hypothesis ("ECMH") has held an important place in financial and economic theory.  The most commonly held form is known as the "semi-strong" form and holds that securities markets incorporate all available public information into the respective securities prices.  Consequently, in an efficient market, investors rely on the market price of a security to reflect all the available public information regarding that security.  The semi-strong form of the ECMH has been empirically validated in numerous studies.[1]

---

[1]    *See* Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, Vol. 25, Issue 2, at 383 (May 1970) (App. 1); Eugene F. Fama, "Market Efficiency, Long-Term Returns, and Behavioral Finance," *Journal of Financial Economics*, Vol. 49, at 283 (1998) (App. 2).

11.    The relevance of market efficiency for securities class action lawsuits, such as this one, relates to the fraud-on-the-market theory.  As explained in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988):

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available information regarding the company and its business. . . .  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . .  The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Id*. at 241-42 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).  *Basic* goes on to conclude:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id*. at 247.

12.    The fraud-on-the market theory relies on what is commonly called informational efficiency, *i.e.*, that the price of the relevant security reflects the available public information.  This price is a consensus price reflecting the market participants' consensus regarding fair value given the available public information.

## The *Cammer* Factors

13.    In *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), the court analyzed the legal criteria that should be met to show that shares of common stock traded in an efficient market.  First, the security should trade in an open market in which a large number of investors can buy or sell the security.  Second, it should trade in a developed market with a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available.  It usually,

but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes.)

14.     The *Cammer* Court provided five factors, often referred to as the *Cammer* factors, to test whether the market for a specific security is efficient.  The *Cammer* factors are as follows:

        (a)     Whether the security traded at a large weekly volume;

        (b)     Whether analysts followed and reported on the security;

        (c)     Whether the security had market makers and whether there was the potential for arbitrage activity;

        (d)     Whether the company was eligible to file SEC Form S-3; and

        (e)     Whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price.

In the paragraphs below I examine each of the *Cammer* factors individually.

Factor 1: Weekly Volume

15.     Trading volume is a good indicator of a well-developed market.  During the Class Period, Oracle had a reported trading volume of more than 2.5 billion shares with a dollar trading volume of more than $71.5 billion.  Average reported daily trading volume during the Class Period was almost 49 million shares with an average daily dollar volume of more than $1.3 billion.  *See* Exhibit B attached hereto.  The large amount of trading in Oracle's common stock during the Class Period supports my opinion that Oracle's common stock traded in an efficient market.

16.     One authority has suggested that "'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the

security is an efficient one; 1% would justify a substantial presumption.'"[2]  During the Class Period,

Oracle had approximately 5.6 billion shares outstanding.  On average, the weekly trading volume

during the Class Period was more than 4.3% of the outstanding shares, substantially above the

benchmarks used by some courts to justify a strong presumption of market efficiency.  *See* Exhibit C

attached hereto.


Factor 2: Analyst Coverage

17.    Analyst coverage of Oracle refers to securities analysts who followed Oracle and

wrote research reports on the Company for public consumption.  I have identified 38 different equity

analysts covering Oracle during 2000 and 44 during 2001.  *See* Exhibit D attached hereto.  These

firms included Goldman Sachs, Merrill Lynch Global Securities, Bear Stearns, Lehman Brothers,

Morgan Stanley Dean Witter, and Salomon Smith Barney, among many others.  The importance of

analyst coverage, as it relates to market efficiency, is two-fold.  First, it provides definitive evidence

that securities analysts in fact did monitor Oracle and provided investors with investment research on

the Company.  Second, it shows that there was enough demand from investors for research on Oracle

to provide an economic justification for doing the investment research on the Company.  The large

number of analysts covering Oracle supports my opinion that Oracle's common stock traded in an

efficient market.

---

[2]    *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988)).

Factor 3: Market Makers and Arbitrage

18.     The third *Cammer* factor relates to the number of firms making a market in Oracle's stock, and the existence of sophisticated investors, or arbitrageurs, who trade in the stock.  Below I will discuss the firms making a market in Oracle stock during the Class Period, the importance of the short position in Oracle stock, as well as evidence of a substantial presence of sophisticated investors who owned Oracle stock and would be available to analyze new information, trade on such information, and thereby ensure market efficiency.

19.     Market makers are responsible for matching investors' buy and sell orders. When an order imbalance occurs, market makers can increase demand for a stock by lowering the ask price, or increase supply of a stock by increasing the bid price.  As investors react to new information, this mechanism acts to ensure that the price of the security changes to reflect investors' collective interpretation of the new information.  Thus, new information becomes reflected in the price of the security.  Market makers provide a key function in making the market in a security efficient.  Because of the importance of market makers, a company is required to have at least two market makers in order to meet the listing requirements of the Nasdaq National Market System.

20.     During the December 2000 through March 2001 time period, Oracle had more than 475 firms acting as market makers for the Company.  *See* Exhibit E attached hereto.  A total of 109 of these firms handled orders totaling more than one million shares.  The large number of market makers ensured that the market mechanism enabling substantial trading in Oracle stock was available, and supports my opinion that Oracle's common stock traded in an efficient market.

21.     In addition, millions of Oracle's shares were available to be sold short, in other words, borrowed and sold in the hopes that they could be repurchased at a lower price at a later date.  Short selling enables investors to act on negative information about a company, even if they do not own shares in the company, and is often used by arbitrageurs.  In other words, short selling enables a

balance between positive and negative information to become reflected into the stock price.  During the Class Period, the short interest in Oracle's stock ranged from about 32.8 million shares to almost 56.2 million shares.  *See* Exhibit F attached hereto.  The large number of shares sold short also supports my opinion that Oracle's common stock traded in an efficient market.

22.     *Cammer* factor three specifically references the importance of investors who "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level," in other words, so-called sophisticated investors.  711 F. Supp. at 1287.  Sophisticated investors are able to quickly evaluate new information and understand its potential impact on the value of a security.  They can then take appropriate investment actions to profit from the information, which also changes the demand or supply for the security, thereby causing the new information to become reflected in the price of the security.  Institutional investors generally are considered to be sophisticated investors.  Consequently, I examined available information on institutional ownership of Oracle common stock during the Class Period.  This information is only available for certain large institutions on a quarterly basis, and is therefore not a complete list of all sophisticated investors who may have owned Oracle common stock during the Class Period.  However, evidence that the reporting institutions held a large number of shares is strong support that the market for that security is efficient.  At least 925 institutions owned Oracle common stock during the Class Period.  *See* Exhibit G attached hereto.  Specifically, as of December 31, 2000, these reporting institutions owned 2.2 billion shares, or approximately 40% of the Company's shares outstanding.  The large number of shares owned by sophisticated institutions also supports my opinion that Oracle's common stock traded in an efficient market.

Factor 4: Eligibility to File on Form S-3

23.     To be eligible to file Form S-3, a company has to be an SEC reporting company for 12 months, and have $75 million in voting stock held by non-affiliates.  Oracle easily met these benchmarks during the Class Period, and was eligible to file Form S-3.  Eligibility to file on Form S-3 is one factor the *Cammer* Court considered indicative of market efficiency.

Factor 5: Price Reaction to New Material Information

24.     The ultimate test of market efficiency is a stock's actual price reaction to unexpected new material information.  This test can be conducted by identifying a day when there was new material information disclosed about a company that investors would view as significantly negative or positive about the company's future prospects, and then examining the price movement following the announcement to determine whether or not the new information quickly became reflected in the company's common stock price.

25.     To test how Oracle's stock price responded to new, material information, I examined its stock price reaction following the Company's unexpected pre-announcement on March 1, 2001, that the Third Quarter 2001 results would come in below previous guidance and analysts' expectations.  This information was new, material and clearly negative, so one would expect that in an efficient market, Oracle's stock price would decline quickly to reflect the new negative information.  Following the pre-announcement, Oracle's stock price declined to a closing price of $16.88 per share on March 2, 2001, from a closing price of $21.38 per share on March 1, 2001, a price decline of $4.50 per share or more than 21% on volume of almost 225 million shares or almost 5 times the median volume during the Class Period.

26.     To test this price decline, I conducted an event analysis.  The objective of the event analysis was primarily to determine if the decline in Oracle's stock price on March 2, 2001, was

likely to have occurred as a result of the new information disclosed by the Company, rather than by chance.  Based on this event analysis, the March 2nd price decline was highly statistically significant at the 99% level of confidence.[3]  *See* Exhibit H attached hereto.  The quick response to new material information is strong evidence of market efficiency, and supports my opinion that Oracle's common stock traded in an efficient market.

27.     Based on the above, it is my opinion that the market in which Oracle common stock traded during the Class Period was impersonal, open, well developed, and efficient.


V.     **MATERIALITY**

28.     Material information is often defined as information that a reasonable investor would want to consider prior to making an investment decision.  In *Basic*, the Supreme Court quoted *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), which stated that a fact is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important'" in making an investment decision or if it would have "'significantly altered the "total mix" of information made available'" to the shareholder.[4]  The issues that are important to investors, *i.e.*, the information that reasonable investors would want to consider prior to making an investment decision, are usually factors that impact the value of an investment.  In general, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of such cash flows.  Securities analysts typically look at the earnings of a company as an indication of that

---

[3]     In statistics, a result is considered significant if it is unlikely to have occurred by chance only.  A stock price decrease (or increase) is defined as being statistically significant at the 90%, 95% or 99% level of confidence if it is greater than 90%, 95% or 99% of the price decrease (or increase) in a random sample, respectively, after adjusting for market factors.

[4]     *Basic*, 485 U.S. at 231-32 (quoting *TSC*, 426 U.S. at 449).

company's cash flows.  Consequently, a company's earnings and earnings growth are important factors considered when valuing the company.

29.     The future earnings, or cash flows, of a company are not known, and therefore they have to be estimated.  A key factor considered by reasonable investors estimating future earnings is a company's historical earnings.[5]  When a company reports new earnings, investors analyze these earnings and, if necessary, make adjustments to their forecasts of future earnings.  If a company reports earnings below expectations, investors will generally lower their forecasts of future earnings, reducing the value of the company, resulting in a decline in the stock price.  If a company reports earnings above expectations, investors will generally raise their forecasts of future earnings, increasing the value of the company, resulting in an increase in the stock price.

30.     In assessing what information a reasonable investor of Oracle would consider important it is helpful to have an understanding of the Company and its overall operation.  During the relevant time period, Oracle represented itself as the second largest software company in the world, with annual revenues exceeding $10 billion.  These revenues were derived from sales of application licenses, database licenses, and from services (including support, consulting and education).  The fastest growing segment, by far, was application revenues, and critical to the continued revenue growth was the success of Oracle's new Suite 11i.  At the beginning of the Class Period, a December 14, 2000 Bloomberg article (written prior to the announcement of Oracle's Second Quarter 2001 results later that day) noted that "[i]nvestors are looking to Oracle 11i, a suite

---

[5]     As explained by Nobel Laureate William F. Sharpe and Dr. Gordon J. Alexander, "[s]ince security analysis typically involves forecasting earnings per share, it is useful to examine the historical record to see how earnings per share have changed over time."  William F. Sharpe and Gordon J. Alexander, *Investments*, 515 (4th ed. Prentice Hall 1990) (App. 3).

of more than 100 programs, to fuel sales as Oracle's main database software matures and growth

slows." The article also noted the following:

> Oracle Corp., the world's second-largest computer-software maker, is expected to report higher fiscal second-quarter earnings, buoyed by sales of a new Internet-friendly suite of software for corporations.

> Net income for the quarter ended Nov. 30 is forecast to be 10 cents a share on sales of $2.7 billion, the average estimate of analysts polled by First Call/Thomson Financial. In the year-ago quarter, Oracle's profit was a split-adjusted 7 cents a share on sales of $2.3 billion.

> Investors are watching for signs that the Oracle 11i software suite, introduced in May, has taken off with customers. Chief Executive Larry Ellison has been pushing the package to companies looking to automate business tasks using the Web. Sales of Oracle 11i, which competes with products from Siebel Systems Inc. and SAP AG, disappointed investors in the quarter ended Aug. 31.

> \* \* \*

> Oracle shareholders are hoping to hear some good news after a string of technology companies have reduced their forecasts for the current quarter and next year. Compaq Computer Corp., Intel Corp. and Gateway Inc. all have said sales will fall short of expectations.

> \* \* \*

> The disappointing sales in that period, Oracle 11i's first full quarter on the market, raised concern that the product wasn't catching on and that full-year application sales wouldn't meet company targets of 50 percent to 100 percent growth.

> In the past month, Oracle executives including Ellison and Chief Financial Officer Jeffrey Henley have told investors that they expect applications to meet that goal, though they've declined to specifically discuss how Oracle 11i did during the November quarter.

> "We're having and going to have a great year," Ellison said on Monday. When asked about Oracle 11i sales during the quarter, he said, "a surprising number of companies have adopted the suite. And the suite is accelerating."

> \* \* \*

> Ellison has said that Oracle 11i can run virtually every important business function from processing payroll and completing human resources paperwork to running customer-call centers. Oracle was able to make its own business more

efficient by using the suite to run operations, generating more than $1 billion in cost savings.

App. 4.

31.     In my opinion, Oracle's Second Quarter 2001 earnings and growth, customer acceptance of its new Suite 11i, and the impact on Oracle of the slowing economy hurting so many other major technology firms, were key issues reasonable investors would look for in the earnings announcement and assess prior to making investment decisions regarding Oracle.  Each of these factors relates to the ability of Oracle to generate positive cash flows in future period, particularly the growth of Oracle's new Suite 11i, which in turn relates directly to the value of the Company.  Below I will discuss the allegedly false and misleading Second Quarter 2001 earnings announcement at the beginning of the Class Period.

32.     On December 14, 2000, after the market closed, Oracle announced in a press release its Second Quarter 2001 results for the quarter ending November 30, 2000.  A Bloomberg news report, also dated December 14, 2000, stated:

Oracle 2nd Qtr Net Rises 62%; Applications Sales Jump (Update 2)

. . . Oracle Corp., the world's No. 2 independent computer-software maker, said fiscal second-quarter earnings rose 62 percent, buoyed by sales of a new Internet-friendly suite of business programs.

Net income for the quarter ended Nov. 30 rose to $622.8 million, or 11 cents a share, from $384.5 million, or 6 cents, a year earlier. Sales jumped 15 percent to $2.66 billion from $2.32 billion.

Oracle, run by billionaire Larry Ellison, posted the better-than-expected results about 15 minutes before archrival Microsoft Corp., the No. 1 software maker, said sales and earnings will fall short of forecasts in the December quarter because of a slowdown in the personal-computer market. Intel Corp., Compaq Computer Corp. and Gateway Inc. have also said results will suffer.

Executives said the economic slump isn't affecting Oracle and is unlikely to do so in the future because most customers buy the software to help them use the Internet to cut costs and boost efficiency.

"When people are concerned about their expenses, we are an obvious alternative," Ellison said on a conference call. "The whole (idea behind Oracle 11i) is to start saving money fast."

Sales of the new Web-based Oracle 11i software suite reached $279 million for the quarter, jumping 66 percent from year-earlier applications sales. Sales of Oracle's database software, the company's best-selling product, rose 19 percent to $775 million.

App. 5.

33.     Also on December 14, 2000, Oracle held a conference call with analysts and investors to discuss the results.  During this conference call, Oracle's Chief Financial Officer Jeff Henley provided the following guidance for Oracle's Third Quarter 2001:

In terms of the – I guess, the outlook of the – for the coming quarter.  We have decided to continue to be a little more specific, in accordance with the new ideas, here, in the Full Disclosure.  So let me kind of go through some of the key assumptions.  The currency, at the current rates, will continue to be negative, although not as much.  So the rate that we estimate would be negative five percent in the third quarter, and negative three percent in the fourth quarter.  The – so the numbers I'm going to give you here, for database and applications include these negative amounts.  So for instance, in database, we're thinking, you know, 15-to-20.  You have to add five points to that, in terms of real (constant) dollar growth, or 20-to-25.  Applications, we're thinking 75, or potentially better.  You'd have to add five points to that.  So clearly, we think there's an opportunity to do better in the third quarter, based on the pipeline and a belief that we'll see growing momentum in our applications business, now that we're through this first six months.

*   *   *

In the area of per share, we think it would be 12 cents.  Now, again, that's based on some models, and I think most of the people's estimates are around that.  And also, just historically, the third quarter is slightly better than the second quarter.  That's the way, sequentially, it's worked, here.  And if you look back at the last three years, sequentially, the third quarter, split adjusted, has been one cent a share better than the second quarter.  So we did 11 cents in the second quarter.  So I would assume, 12 cents would be a reasonable number at this point.  I don't think history is going to be a lot different here.

App. 6 at 7-8.  Asked about the impact of corporate capital budgets on Oracle's business, Larry Ellison stated the following:

We're at the very high end of what they care about.  So my assumption is that that's why we're not seeing any [decrease] in our demand right now, is because we're

- 16 -

selling the kind of stuff that people need.  And they're not going to cut back on it, short of a crisis, I mean, we've definitely seen some slowdown in the dot-com space. But, again, that's being dwarfed by the traditional companies buying more this year than they were buying last year.

*Id*. at 19.

34.     On December 15, 2000, an analyst report by First Union Securities summarized Oracle's results as follows:

> ORCL Reports Apps Growth Above and Database Growth Below Expectations
>
> \*   \*   \*
>
> Oracle reported F2Q EPS $0.01 above $0.10 consensus estimate with year over year applications license revenue growth of 66% versus our estimate of 43%.
>
> Database license revenue growth was lower than expected at 19% versus our forecast for 20%, while deferred revenue declined to $1.05 billion versus $1.27 billion in F1Q due to seasonality in maintenance contracts.

App. 7 at 1.  Furthermore, a December 15, 2000 Bear Stearns' analyst report summarized Oracle's results relating to applications as follows:

> As we had hoped, applications growth came in between 60% and 70%, beating our official estimate of 50% which we believe was close to the street consensus.  The reason applications growth was so vital this quarter is that Oracle needs to establish some high-end reference accounts besides itself and establish a track record for getting 11i deployed in a timely manner.  We believe Oracle has made significant progress on both fronts and this should ensure a strong second half of FY-01.

App. 8 at 2.

35.     Following the earnings announcement, Oracle's common stock increased to a closing price of $28.56 per share on December 15, 2000, from a closing price of $27.50 per share the prior day, an increase of $1.06 per share or approximately 3.9% on volume of more than 120 million shares or almost 2.5 times the median volume during the Class Period.  This price increase was statistically significant at the 95% level of confidence. *See* Exhibit H attached hereto.  In my opinion, absent the allegedly inflated earnings reported and false Third Quarter 2001 guidance, Oracle's stock

- 17 -

price would not have increased as it did on December 15, 2001, following the Second Quarter earnings announcement.

36.     Following the December 14, 2000 earnings announcement, Oracle made numerous statements maintaining its guidance and asserting that the general economic slowdown was not negatively impacting its business, as demonstrated by the examples below.  According to a January 11, 2001, Bloomberg article, Company spokeswoman Stephanie Aas claimed that "Oracle has yet to see any signs that its business is being hurt by the economic slowdown or reported cuts to information-technology budgets." App. 9 at 1.  On February 7, 2001, First Union Securities reported in an analyst report that, according to CFO Jeff Henley, "Oracle is not seeing the effects of a slowing economy at this point," and that "[m]anagement reiterates guidance of 15-20% y/y database revenue growth and 75% y/y applications revenue growth for FQ301." App. 10 at 1.  On February 13, 2001, MarketWatch reported that an Oracle executive vice president, Sandy Sanderson, stated that Oracle's "pipeline around the database and applications business have never been stronger . . . [v]ery few customers are canceling contracts," and that "[i]n some ways . . . the tougher environment in technology may even be increasing sales at Oracle."  App. 11.  On February 21, 2001, Deutsche Bank Alex. Brown issued an analyst report stating that Oracle's "management still expects growth in applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters."  App. 12 at 2.  Even as late as March 1, 2001, the last day of the Class Period, BlueStone Capital issued an analyst report that stated that "[m]anagement indicated last week that Oracle had not experienced any slowdown in business this quarter," and that "Oracle's business continues to grow; the current pipeline is as strong as it has ever been, according to management." App. 13 at 1.

37.     In particular, on February 21, 2001, following a presentation by defendant Jeff Henley at the AppsWorld Conference, William Blair & Company issued an analyst report.  It stated:

According to Mr. Henley, business looks good. He was very bullish in the sessions. We want to quote a few of the things he said. In regard to applications growth, he said that, "The second half growth will be as good, or better, than the 69% growth posted in the first half." As for the economy, he commented that, "ORCL is not seeing an impact." He also stated that, "We are in spaces that are high ROI and it's not clear if we'll see much of an impact in our business due to the economy." In a related statement, he said, "The economy is a wild card, but unless there is a serious recession, we are not sure we'll see much of an impact." Clearly, his statements are bullish in regard to ORCL's current business.

App. 14.

38.     The above statements during the Class Period are examples of the types of representations made by the Company reaffirming its previous guidance regarding the Third Quarter 2001. In my opinion, these statements acted to maintain the inflation in Oracle's stock price.

39.     According to plaintiffs' allegations, the revenues and earnings reported by Oracle for the Second Quarter 2001 were inflated. Earnings per share, for example, were inflated by at least $0.01 per share, resulting in the Company beating analysts' consensus of $0.10 per share by reporting $0.11 per share. Furthermore, plaintiffs allege that Oracle's guidance for the Third Quarter of 2001 was false and misleading because the Company was, in fact, being impacted by the general economic slowdown, and because the Company's Suite 11i was experiencing severe development defects and integration problems resulting in delays, implementations costs and cancellations. In my opinion, the above alleged misrepresentations and omissions contained information that a reasonable investor would have wanted to consider prior to making an investment decision in Oracle common stock. Furthermore, it is my opinion that the alleged false financial results and the alleged misrepresentations and omissions caused Oracle's common stock to trade at artificially inflated prices during the Class Period.

## VI.    LOSS CAUSATION

40.     Loss causation relates to the question of whether an alleged fraud caused plaintiffs to suffer economic losses.   A key issue in determining loss causation in securities fraud cases, therefore, is whether the alleged misrepresentations and/or omissions were material, and, as a result, caused the price of the security to trade at artificially inflated levels during a class period.  Last year, in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court considered the issue of loss causation in securities cases.  The *Dura* opinion stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."[6]  One academic article provides the following, post-*Dura*, definition of loss causation:[7]

> Loss causation exists whenever fraud leads the stock price to be higher than it should be, the buyer pays "too much" for the stock, and the buyer is unable to recover that overpayment in the marketplace.

41.     It is commonly known that false and misleading information can artificially inflate investors' expectations regarding the future prospects of a company, thereby inflating that company's stock price.  The inflated expectations (as well as the price inflation) are then, generally, reduced, either by: (a) the company failing to meet the inflated expectations, or (b) a specific disclosure of the falsehood or misleading nature of the information at issue.  In this case, the relevant truth alleged by plaintiffs was revealed when the Company, after the market closed on March 1,

---

[6]     *Dura*, 544 U.S. at 343.

[7]     Madge S. Thorsen, Richard A. Kaplan and Scott Hakala, "Rediscovering the Economics of Loss Causation," *Journal of Business and Securities Law*, Vol. 6, Issues 1 & 2, Spring 2006, at 93, 95 (App. 15).

2001, admitted that it would not meet its previously stated Third Quarter 2001 guidance. The March

1, 2001 disclosure is discussed in greater detail below.

42.     On March 1, 2001, after the market had closed, Oracle finally admitted that its results

for the Third Quarter 2001 would fall far short of investors' expectations and prior guidance.

Specifically, Oracle stated that it now expected earnings per share for the Third Quarter 2001 of

$0.10 per share, rather than the Company's prior guidance of $0.12 per share, and blamed the U.S.

economy for the shortfall. The Company's press release stated:

> Oracle Announces Preliminary Third Quarter Earnings Results
>
> Oracle Earnings per share expected to be $0.10
>
> REDWOOD SHORES, Calif., March 1, 2001 -- Today, Oracle Corporation announced estimated earnings for its fiscal third quarter ended February 28, 2001, based upon preliminary financial results for the quarter. Preliminary third quarter results indicate earnings per share grew over 20% to $0.10 per share, up from $0.08 per share in Q3 last year (excluding investment gains). Operating margins improved to 33%, up from 31% in Q3 last year.
>
> Current estimates for the quarter, including a 4% negative currency impact, show license revenue grew approximately 6% and total revenue grew approximately 9%. Applications revenue growth is estimated at approximately 50%, and database revenue growth is estimated to be flat to slightly negative.
>
> "License growth was strong in the first two months of Q3, and our internal sales forecast looked good up until the last few days of the quarter," said Oracle CEO Larry Ellison. "However, a substantial number of our customers decided to delay their IT spending based on the economic slowdown in the United States. Sales growth for Oracle products in Europe and Asia Pacific remained strong. The problem is the US economy."
>
> "Oracle will provide more detailed fourth quarter financial guidance on the regularly scheduled conference call on March 15, 2001," said Oracle CFO Jeffrey O. Henley.

App 16.

43.     Following the Company's pre-announcement of its Third Quarter 2001 results,

Oracle's stock price declined to a closing price of $16.88 per share on March 2, 2001, from a closing

price of $21.38 per share on March 1, 2001, a price decline of $4.50 per share or more than 21% on

volume of almost 225 million shares or almost 5 times the median volume during the Class Period. This price decline was highly statistically significant at the 99% level of confidence. *See* Exhibit H attached hereto.

44.     The March 1, 2001 event substantially revealed the relevant truth regarding Oracle's true performance, as alleged in the Complaint, and therefore ends the Class Period.  However, on March 15, 2001, Oracle officially reported its Third Quarter 2001 earnings and provided further details about the earnings miss.  Specifically, the Company admitted that Suite 11i applications sales were substantially lower and database sales greater than that originally reported on March 1, 2001. The Company press release stated:

> Oracle Net Income Up 16%, Earnings Per Share $0.10
>
> Applications Sales Up 25%, Database Sales Up 6%
>
> 3,000 Customers Implementing 11i E-business Suite
>
> Today, Oracle Corporation announced that third quarter income increased 16% to $583 million or $0.10 per share, while revenue grew to $2.7 billion.  This compares to $2.4 billion in revenue, $503 million in net income, and $0.08 per share in Q3 last year, excluding extraordinary investment gains.  Application software sales increased 25% to $249 million while database software sales grew 6% to $823 million.  Service revenue increased 12% to $1.5 billion for the quarter.

App. 17 at 1.

45.     On March 16, 2001, CIBC World Markets issued an analyst report discussing Oracle's Third Quarter 2001 earnings miss.  It stated:

> On March 16, 2001, we are downgrading the shares of Oracle to Hold due to 1) the impact of the US economy, 2) concerns over acceptance of its e-business applications, and 3) management's lack of a proactive plan to get back on track.  We believe that the economy is only a partial explanation for their shortfall.
>
> Oracle reported 3QFY01 results in line with those pre-announced by management on 3/1/01 with revenues of $2.7B and EPS of $0.10.  License revenues of $1.13B were in line with our model, but databases were stronger than expected and applications were weaker than expected.  The 25% growth in applications revenues was particularly disappointing as applications were expected to be a major growth driver for the company.

> Management's lack of explanation and our conversations with customers and salespeople lead us to believe that the economy is not the only reason for the shortfall.  From our conversations, customers still desire best of breed solutions designed with the customer in mind versus a suite that may not be customizable or offering specific industry centric features.

App. 18 at 1.

46.     Given the highly statistically significant price decline associated with the revelation of the alleged truth disclosed after the market closed on March 1, 2001, it is my opinion that this disclosure reduced and/or eliminated the inflation in Oracle's common stock resulting from the alleged false and misleading statements and omissions.

## VII.    QUANTIFICATION OF DAMAGES PER SHARE

47.     In this section, I will first discuss the out-of-pocket methodology used to measure damages under Section 10(b) of the Securities Exchange Act of 1934.  Second, I will apply the out-of-pocket methodology to the facts in this case, and calculate the per-share damages.

### Section 10(b): Out-of-Pocket Methodology

48.     Damages in securities class actions are usually calculated using the out-of-pocket measure.  As noted in one frequently referenced academic article:[8]

> The most common method of calculating damages in Rule 10b-5 cases is the out-of-pocket measure.  This test fixes recovery as the difference between the purchase price and the value of the security at the date of purchase less the difference between the sale price and the value of the security at the date of sale.

---

[8]     Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.*, 883, 885 (June 1990) (App. 19).

49.     The procedure for calculating out-of-pocket damages is also discussed in *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335 (9th Cir. 1976) (Sneed, J., concurring).  It explains the process as follows:

> [I]t becomes necessary to establish, for the period between the date of the misrepresentations and the date of disclosure, data which when arranged on a chart will form, on the one hand, a "price line" and, on the other, a "value line."  The price line will reflect, among other things, the effect of the corporate defendant's wrongful conduct.  The establishment of these two lines will enable each class member purchaser who has not disposed of his stock prior to disclosure of the misrepresentations to compute his damages by simply subtracting the true value of his stock on the date of his purchase from the price he paid therefor.

*Id.* at 1344.

50.     As noted above, the key to calculating out-of-pocket damages is to determine the price at which the security would have traded absent the alleged fraud, also known as the value line.  The difference between the actual stock price and the value is commonly referred to as the inflation per share, or damages per share.  A commonly accepted methodology for calculating the value line is to use an event analysis to predict the stock price returns (% change in price) on fraud-related disclosure days.  The value line in fraud on the market cases is generally calculated using backcasting, *i.e.*, working backwards replacing the stock's actual return on the fraud-related disclosure days with the predicted returns, while using the stock's actual returns on all other days.  This methodology is described in one commonly used reference text as follows:[9]

> On disclosure dates only, this approach replaces actual returns with returns estimated from a market model.  The declines on the disclosure dates are thereby limited to those attributable to the fraud.

\* \* \*

---

[9]     Nicholas I. Crew, Patrick G. Goshtigian, Marnie A. Moore and Atulya Sarin, "Securities Act Violations: Estimation of Damages," *Litigation Services Handbook: The Role of the Financial Expert*, Ch. 17, at 12-13 (3rd ed. 2001) (App. 20).

With backcasting, the true-value line results from working backwards using the true returns and the security's actual price on the day after the class period ends. This price contains no effect of fraud and misrepresentations because the class period, by definition, ends with full disclosure.

51.     Below I apply my analysis of the evidence in this case to calculate out-of-pocket damages on a per share basis using the event study methodology discussed above.

<u>Section 10(b): Per Share Damage Analysis</u>

52.     The out-of-pocket measure of damages requires the calculation of the value line, *i.e.,* the price at which Oracle's stock would have traded during the Class Period absent the alleged fraud. The difference between the actual share price and the value line is the damages per share, often referred to as the inflation per share.  In this case, the value line is the price that Oracle's common stock would have traded at if the Company had reported its true financial results for the Second Quarter 2001, truthfully disclosed customer dissatisfaction with its Suite 11i as a result of the product defects and integration problems, and truthfully revealed the true impact of the economic slowdown on Oracle's revenues and earnings.  Had defendants provided complete and truthful disclosures during the Class Period, this would have been incorporated into Oracle's stock price from the very beginning of the Class Period, and Oracle's stock price would not have declined as it did when the relevant truth was revealed on March 1, 2001, as discussed above.  Also, had Oracle reported its true earnings per share for the Second Quarter 2001 of no more than $0.10 per share, this would, at best, have been in-line with investors' expectation, and Oracle's stock price would not have increased as it did on December 15, 2000.

53.     Using my event analysis, I calculated Oracle's predicted return on both December 15, 2000 and March 2, 2001.  For the purpose of measuring the market effect, I used the NASDAQ-100

index.[10]  The NASDAQ-100 index is a capitalization-weighted index of the 100 largest and most

active non-financial domestic and international issues listed on the NASDAQ.  The value line was

then calculated using the predicted returns for the fraud-related days (December 15, 2000 through

March 2, 2001), and the actual returns for all other days, as discussed above.  My calculation of the

value line is attached as Exhibit I.[11]  Below is a graph that shows Oracle's closing prices versus the

value line, *i.e.*, the price at which Oracle would have traded absent the alleged fraud.



---

[10]     This is the same index used by defendants' expert Stefan Boedeker to assess Oracle's price movements during the Class Period.  *See* Declaration of Stefan Boedeker in Support of Defendants' Motion for Class Certification, dated July 27, 2005 (App. 21).

[11]     It should be noted that the recoverable per share damages in Exhibit I is also limited by Section 21D(e) of the Securities Litigation Reform Act of 1995.

## VIII.   ANALYSIS OF DEFENDANTS' INSIDER SALES

54.      Plaintiffs' counsel has asked me to analyze the sale of Oracle shares by defendants Ellison and Henley, and to calculate the related Section 20A damages.  Based on my discussion with plaintiffs' counsel, it is my understanding that Section 20A damages are either calculated based on: a) the inflation/damages per share that existed on the date of the insider sales, or b) the losses avoided by the defendants by selling the shares during the Class Period, as opposed to selling the shares following the Third Quarter 2001 earnings announcement.  For the purpose of determining the sales price following the Third Quarter 2001 earnings announcement, I calculated the average closing price from March 16, 2001 through April 30, 2001 of $15.80 per share.  The first measure of Section 20A damages is therefore simply calculated as the number of shares sold multiplied with the inflation or damages per share on the day the shares were sold.  The second measure of damages is calculated as the difference between the actual sales price and $15.80 per share (average closing price from March 16, 2001 through April 30, 2001) on the day the shares were sold multiplied with the number of shares sold.

55.      During the Class Period, defendant Larry Ellison sold 29,084,576 Oracle shares for total proceeds of approximately $895 million.  Based on my calculation of damages per share in Exhibit J, public investors who purchased the Oracle shares from defendant Ellison overpaid for their shares by approximately $155 million.  By selling his shares in January of 2001, as opposed to waiting until after the Company reported its Third Quarter 2001 results, defendant Ellison avoided losses of approximately $435 million.[12]  Similarly, defendant Jeff Henley sold 1,000,000 Oracle shares for total proceeds of approximately $32.3 million.  Again, based on my calculation of

---

[12]      Loss avoided was calculated as the difference between the actual price per share received for the Oracle shares sold in January of 2001, less Oracle's average closing price following the Third Quarter 2001 announcement from March 16, 2001 through April 30, 2001.

damages per share in Exhibit J, public investors who purchased the Oracle shares from defendant Henley overpaid for their shares by almost $5.7 million.  By selling his shares in January of 2001, as opposed to waiting until after the Company reported its Third Quarter 2001 results, defendant Henley avoided losses of more than $16.5 million.  In total, public investors overpaid defendant Ellison and defendant Henley more than $160 million for their Oracle shares in January 2001. Furthermore, by selling their shares in January of 2001, as opposed to waiting until after the Company reported its Third Quarter 2001 results, defendant Ellison and defendant Henley avoided losses of approximately $451.8 million.

## VIII.   CONCLUSION

56.   Based on my review and analysis of the available information, as well as my professional experience, it is my opinion that:

- The market in which Oracle common stock traded during the Class Period was impersonal, open, well developed, and efficient.

- The allegedly false and misleading statements contained information that a reasonable investor would have wanted to consider prior to making an investment decision and caused Oracle's common stock to trade at artificially inflated prices during the Class Period.

- When the truth was disclosed, at least partially, on March 1, 2001, Oracle's stock price declined, causing Class members to suffer economic damages.

- I have quantified the damages per share associated with the alleged fraud during the Class Period, ranging from $3.11 per share to $6.03 per share, as shown in Exhibit I.

- I have calculated damages associated with the Oracle shares sold by defendants Ellison and Henley during the Class Period totaling more than $160 million, and losses avoided totaling approximately $451.8 million, as shown in Exhibit J.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 25th day of May, 2007, at San Diego, California.

Respectfully submitted,

BJORN I. STEINHOLT, CFA

# Exhibit A

# Bjorn I. Steinholt, CFA

Financial Markets Analysis, L.L.C
9909 Mira Mesa Boulevard, Suite 260, San Diego, CA 92131
Telephone: (858) 549-4900 • Facsimile: (858) 549-9317

---

## Employment History

- **2000 - Present    Financial Markets Analysis, LLC, San Diego, California**

*Founding Member.* Mr. Steinholt provides a broad range of capital markets consulting, including financial and economic analyses relating to mergers and acquisitions, initial public offerings, fairness opinions and private placements. His practice area includes the valuation of whole businesses, financial securities and intangible assets. Furthermore, he provides consulting relating to complex securities litigations.

- **1998 - 2000    Business Valuation Services, Inc., San Diego, California**

*Principal.* Mr. Steinholt provided valuations of businesses and financial securities, including common stock, warrants, options, preferred stock, debt instruments and partnership interests, of companies in a myriad of industries. In addition, he performed valuations of intangible assets such as patents, trademarks, software, customer lists, work force and licensing agreements. Mr. Steinholt provided financial and economic analyses for a variety of purposes relating to mergers and acquisitions, initial public offerings, fairness opinions, bank financing, financial reporting requirements, tax-related issues, general advisory services and shareholder disputes.

- **1990 - 1998    Princeton Venture Research, Inc., San Diego, California**

*Senior Vice President.* Mr. Steinholt was a co-manager of Princeton Venture Research's San Diego office where he provided various financial and economic analyses for venture capital, investment banking and consulting assignments, including shareholder disputes. Among other things, he helped identify and evaluate prospective emerging technology companies in need of venture capital funding. In addition, Mr. Steinholt performed financial analyses related to market, industry and company economics and provided business valuation services involving different types of securities, including derivative securities.

- **1988 - 1989    University of San Diego, San Diego, California**

*Research Assistant -- Graduate Fellow.* Mr. Steinholt assisted with research regarding the performance of international equity markets following the 1987 stock market crash. He also developed computer programs related to the portfolio theory, including risk minimization and portfolio optimization based on quadratic programming techniques.

**Testimony**

*In re: Qwest Communications Securities Litigation* (United States District Court for the District of Colorado), QwestDex Hearing, January 28, 2003.

*In re: CBT Group PLC Securities Litigation* (United States District Court, Northern District of California, San Jose Division), Deposition, November 5, 2003.

*In re: America West Securities Litigation* (United States District Court, District of Arizona), Deposition, October 28, 2004.

*In re: Howard Yue vs. New Focus* (Superior Court of the State of California, County of Santa Clara), Deposition, July 28, 2005 and August 9, 2005.

*In re: AB Liquidating Corp., fka Adaptive Broadband Corporation v. Ernst & Young, LLP* (American Arbitration Association), Arbitration, March 23, 2006.

*In re: AOL Time Warner, Inc. Securities and "ERISA" Litigation, Consolidated Opt-Out Action* (United States District Court, Southern District of New York), Deposition, September 28, 2006.

*In re: Ohio Public Employees Retirement System vs. Richard Parsons, et al.* (Court of Common Pleas of Franklin County, Ohio), Deposition, March 22, 2007.

**Formal Education**

- **Master of International Business**
  University of San Diego, 1989

- **Bachelor of Science, Computer Science Engineering**
  California State University, Long Beach, 1987

**Accreditations and Affiliations**

- **Chartered Financial Analyst**
  CFA Institute

- **Sivilingeniør** - (Norwegian graduate level engineering designation)
  University of Trondheim, Norway

- **Member, CFA Institute**

- **Member, Financial Analysts Society of San Diego**

# Exhibit B

## Oracle - Daily Volume

| Date | Closing Price | Volume | Dollar Volume |
|------|------|------|------|
| 12/14/2000 | $27.500 | 45,894,400 | $1,262,096,000 |
| 12/15/2000 | $28.563 | 120,004,000 | $3,427,614,250 |
| 12/18/2000 | $32.000 | 61,640,100 | $1,972,483,200 |
| 12/19/2000 | $30.625 | 58,653,700 | $1,796,269,563 |
| 12/20/2000 | $28.500 | 54,440,500 | $1,551,554,250 |
| 12/21/2000 | $29.500 | 46,719,700 | $1,378,231,150 |
| 12/22/2000 | $31.875 | 35,568,200 | $1,133,736,375 |
| 12/26/2000 | $30.938 | 20,589,500 | $636,987,656 |
| 12/27/2000 | $30.688 | 26,437,500 | $811,300,781 |
| 12/28/2000 | $31.063 | 25,053,600 | $778,227,450 |
| 12/29/2000 | $29.063 | 31,702,200 | $921,345,188 |
| 1/2/2001 | $26.375 | 46,281,000 | $1,220,661,375 |
| 1/3/2001 | $32.000 | 76,389,700 | $2,444,470,400 |
| 1/4/2001 | $32.563 | 57,584,400 | $1,875,092,025 |
| 1/5/2001 | $30.125 | 38,415,200 | $1,157,257,900 |
| 1/8/2001 | $29.938 | 40,644,600 | $1,216,797,713 |
| 1/9/2001 | $31.500 | 44,818,600 | $1,411,785,900 |
| 1/10/2001 | $32.750 | 64,627,400 | $2,116,547,350 |
| 1/11/2001 | $33.313 | 50,906,600 | $1,695,826,113 |
| 1/12/2001 | $32.313 | 40,234,100 | $1,300,064,356 |
| 1/16/2001 | $31.813 | 31,198,700 | $992,508,644 |
| 1/17/2001 | $33.250 | 52,535,000 | $1,746,788,750 |
| 1/18/2001 | $33.813 | 33,749,200 | $1,141,144,825 |
| 1/19/2001 | $34.563 | 50,227,100 | $1,735,974,144 |
| 1/22/2001 | $31.813 | 57,564,400 | $1,831,267,475 |
| 1/23/2001 | $31.484 | 42,545,700 | $1,339,525,837 |
| 1/24/2001 | $30.063 | 65,596,100 | $1,971,982,756 |
| 1/25/2001 | $29.938 | 60,995,500 | $1,826,052,781 |
| 1/26/2001 | $30.375 | 46,538,900 | $1,413,619,088 |
| 1/29/2001 | $30.438 | 33,397,000 | $1,016,521,188 |
| 1/30/2001 | $30.313 | 42,788,300 | $1,297,020,344 |
| 1/31/2001 | $29.125 | 46,144,400 | $1,343,955,650 |
| 2/1/2001 | $30.063 | 38,389,200 | $1,154,075,325 |
| 2/2/2001 | $27.750 | 38,655,400 | $1,072,687,350 |
| 2/5/2001 | $27.500 | 35,933,100 | $988,160,250 |
| 2/6/2001 | $27.625 | 28,746,300 | $794,116,538 |
| 2/7/2001 | $27.688 | 42,854,400 | $1,186,531,200 |
| 2/8/2001 | $27.125 | 41,775,000 | $1,133,146,875 |
| 2/9/2001 | $23.563 | 91,625,000 | $2,158,914,063 |
| 2/12/2001 | $23.000 | 51,901,400 | $1,193,732,200 |
| 2/13/2001 | $22.563 | 44,509,700 | $1,004,250,106 |
| 2/14/2001 | $25.000 | 41,247,400 | $1,031,185,000 |
| 2/15/2001 | $25.500 | 46,084,700 | $1,175,159,850 |
| 2/16/2001 | $24.000 | 40,632,200 | $975,172,800 |
| 2/20/2001 | $23.125 | 39,873,200 | $922,067,750 |

**Oracle - Daily Volume**

| Date | Closing Price | Volume | Dollar Volume |
|------|------|------|------|
| 2/21/2001 | $23.000 | 57,591,900 | $1,324,613,700 |
| 2/22/2001 | $23.375 | 54,073,600 | $1,263,970,400 |
| 2/23/2001 | $22.000 | 72,859,000 | $1,602,898,000 |
| 2/26/2001 | $23.188 | 44,847,400 | $1,039,899,088 |
| 2/27/2001 | $21.688 | 41,584,600 | $901,866,013 |
| 2/28/2001 | $19.000 | 62,362,300 | $1,184,883,700 |
| 3/1/2001 | $21.375 | 76,869,400 | $1,643,083,425 |
| Totals: | | 2,542,300,500 | $71,515,124,106 |
| Daily Averages: | | 48,890,394 | $1,375,290,848 |

*Source: Bloomberg*

Exhibit B                                                                                         Page 2

# Exhibit C

**Oracle - Weekly Volume**

| Date | Weekly Volume | Shares Outstanding (1) | % Traded |
|---|---|---|---|
| 12/15/2000 | 280,592,900 | 5,585,918,334 | 5.0% |
| 12/22/2000 | 257,022,200 | 5,585,918,334 | 4.6% |
| 12/29/2000 | 103,782,800 | 5,585,918,334 | 1.9% |
| 1/5/2001 | 218,670,300 | 5,585,918,334 | 3.9% |
| 1/12/2001 | 241,231,300 | 5,585,918,334 | 4.3% |
| 1/19/2001 | 167,710,000 | 5,585,918,334 | 3.0% |
| 1/26/2001 | 273,240,600 | 5,585,918,334 | 4.9% |
| 2/2/2001 | 199,374,300 | 5,585,918,334 | 3.6% |
| 2/9/2001 | 240,933,800 | 5,585,918,334 | 4.3% |
| 2/16/2001 | 224,375,400 | 5,585,918,334 | 4.0% |
| 2/23/2001 | 224,397,700 | 5,585,918,334 | 4.0% |
| 3/2/2001 | 449,752,500 | 5,585,918,334 | <u>8.1%</u> |
| | | Average: | 4.3% |

(1) as of 12/31/2000, per Oracle Form 10-Q filed on 1/16/2001

*Source: Bloomberg*

Exhibit C

**Exhibit D**

# Nelson's Directory
## of
# INVESTMENT
# RESEARCH
# 2001

## Volume II - U.S. Companies

*Section 1* .................. *U.S. Company Profiles/Analyst Coverage*
*Section 2* .................. *Index of U.S. Public Companies by Industry*
*Section 3* .................. *Index of U.S. Public Companies by City and State*
*Section 4* .................. *Master Alphabetic Index*

### LICENSE AGREEMENT

Read this license agreement before continuing to use this publication. Continuing to use this publication indicates your acceptance of the terms of this license agreement. This agreement is a legal contract between you, the user of this publication, and Nelson Information, governing your use of this publication. If you do not wish to agree to the terms of this License Agreement, stop using this publication and promptly return it to the place from where you obtained it. If you have any questions concerning this License Agreement, contact Nelson Information, 1 Gateway Plaza, Port Chester, NY 10573, or call 888-280-4864.

License: Nelson Information grants you the right of continued use of this publication as a reference source. In consideration thereof, you: (1) agree not to decompile, disassemble, rearrange, reorder, copy, extract, or otherwise use any of the information herein in the creation of any directory, database, reference source, or other compilation, without the express written permission of Nelson Information; and (2) acknowledge that a significant degree of originality was required and utilized in the creation of this publication.

### COPYRIGHT NOTICE

Nelson's Directory of Investment Research - 2001, (26th annual edition) is a proprietary product of Nelson Information and is protected by United States copyright laws as well as international treaties. All information in this publication has been obtained from sources considered to be reliable, but its accuracy and completeness cannot be guaranteed. Neither the information presented nor any opinion expressed constitutes a representation by us or a solicitation of the purchase or sale of any securities. The inclusion or omission of any firm or service herein shall not be deemed a recommendation by the publisher for or against the use thereof. Copyright © 2000/2001 Nelson Information, 1 Gateway Plaza, Port Chester, NY 10573. Data as of November 2000. Next revision, November 2001.

Volume I, II & III - ISSN: 0896-0135 ISBN: 1-891851-09-8 ................................. Price $650

Printed in the United States of America

**U.S. COMPANY PROFILES/ANALYST COVERAGE. . . . . . . . . . . .     SECTION 1**

COMPANY PROFILES

## Oracle Corp.

(ORCL - Nasdaq National Market)

500 Oracle Pkwy.                      650 506-7000
Redwood City, CA 94065        (fax) 650 506-7200
www.oracle.com

Oracle Corporation is the world's largest supplier of software for information management, and the world's second largest software company. With annual revenues of more than $6.0 billion, the company offers its database, tools and application products, along with related consulting, education, and support services, in more than 140countries around the world.

Chairman. . . . . . . . . . . . . . Lawrence J. Ellison, 55 (23 yrs)
CEO. . . . . . . . . . . . . . . . . . Lawrence J. Ellison, 55 (23 yrs)
President. . . . . . . . . . . . . . . Raymond J. Lane, 52 (8 yrs)
COO. . . . . . . . . . . . . . . . . . Raymond J. Lane, 52 (8 yrs)
SVP/Federal Division. . . . . . . . . . . . . . Jay Nussbaum
SVP/Oracle Consulting Group. . . . . . . . . Robert Shaw
Senior Vice President/Intercontinental Division . . .
. . . . . . . . . . . . . . . . . . . . . . . Pierre Carlo Falotti
Executive Vice President. . . . . . . . . . . . Gary Bloom, 40
CFO. . . . . . . . . . . . . . . . . . . . Jeffrey O. Henley, 54
Treasurer. . . . . . . . . . . . . . . . . . . . . . Bruce Lange
Controller. . . . . . . . . . . . . . . Thomas A. Williams, 47
Investor Relations. . . . . . . . . . . . . Catherine Buan
Corp. Communications. . . . . . . . . . Margaret Lasecke
Secretary. . . . . . . . . . . . . . . . Daniel Cooperman, 48
General Counsel. . . . . . . . . . . . . Daniel Cooperman, 48
Human Resources. . . . . . . . . . . . . . . . . Phil Wilson
Employee Benefits. . . . . . . Eliza Grover (Redwood Shores)
Planning & Devel. . . . . . . . . . . . . . . . . David Roux
Cash Management. . . . . . . . . . . . . . . . Mark Mohler
Risk Management. . . . . . . . . . . . . Leanne Snedeker
Real Estate. . . . . . . . . . . . . . . . . . . Susan Curran
Leasing. . . . . . . . . . . . . . . . . . . . . . . . Anil Vora
MIS. . . . . . . . . . . . . . . . . . . . . . . . Gerry Corvino

| Year | Sales ($000) | Net Inc ($000) | $ EPS |
|---|---|---|---|
| 5/2000 | 10,130,100 | | 0.34 |
| 5/1999 | 8,827,300 | | 0.22 |
| 5/1998 | 7,143,900 | | 0.16 |
| 5/1997 | 5,684,300 | | 0.14 |
| 5/1996 | 4,223,300 | | 0.11 |
| 5/1995 | | | 0.08 |
| 4-yr. Growth Rate | 24.4% | N.M. | |

Employees:               43,800
Shareholders:            8,396
Shares Outs.:            5,629,800,000
Market Val (Mil):        $139,338
Auditor:                 Arthur Andersen & Co.
Transfer Agent:          Bank of Boston

Equity Analyst Coverage:
Argus Research . . .Robert Becker                  212 425-7500
Atlantis Investment . . .Anne K. Anderson           973 263-2333
Banc of America Securities . . .Robert Austrian      415 627-2000
Bear, Stearns . . .Richard F. Scocozza              212 272-2000
William Blair & Co. . . .Laura J. Lederman           312 236-1600
BlueStone Capital Partners . . .Jean W. Orr          646 458-1100
Chase H&Q . . .James M. Pickrel                     415 439-3000
CIBC World Markets . . .Melissa B. Eisenstat         212 667-7000
Credit Suisse First Boston . . .Wendell H. Laidlay   415 836-7600
Deutsche Bank . . .James A. Moore                   415 617-2800
Dresdner Kleinwort Benson . . .Sanjiv G. Hingorani   212 429-3434
. . .Chung Chun                                      212 429-3434
A.G. Edwards . . .John J. Puricelli                  314 955-3000
First Albany Corp. . . .Mark Murphy                  212 273-7000
First Security Van Kasper . . .Robert Thoferneier     415 391-5600
Frost Securities . . .George Chandler                214 515-4400
Goldman Sachs . . .Richard G. Sherlund(★)            212 902-1000
H&R Block First Advisors . . .Steve Shepich          313 961-6666
Edward Jones . . .Art Russell                        314 515-2000
Josephthal & Co. . . .Bert Hochfeld                  212 907-4000
Lehman Brothers . . .Neil J. Herman(★)               212 526-7000
Merrill Lynch Global Securities
. . .Christopher C. Shakers(★)                       415 296-0150
Moors & Cabot Technology Research
. . .Edgar P. Bierderman                             415 981-2114
J.P. Morgan Securities . . .William Epifanio II      212 483-2323
Morgan Stanley Dean Witter
. . .Charles E. Phillips(★)                          212 761-4000
Morningstar . . .Joseph Beaulieu                     312 696-6000
Needham & Co. . . .Richard Davis                     617 457-0900
Pershing Div. of DLJ . . .Richard Jack               201 413-3093
PMG Capital . . .Jeff Van Rhee                       610 260-6200
PNC Advisors . . .Ruairi G. O'Neill                  215 585-8319
Prudential Securities Research
. . .Douglas J. Crook                                415 274-7931
Punk, Ziegel & Co. . . .Gary Abbott                  212 308-9494
Robertson Stephens . . .Eric B. Upin                 415 781-9700

## Oracle Corp. (continued)

Salomon Smith Barney . . .Gretchen Teagarden   415 951-1777
SG Cowen Securities Corporation
. . .Drew Brosseau                              617 946-3700
Standard & Poor's . . .Jonathan Rudy            212 438-2000
UBS Warburg . . .Andrew Roskill                 212 821-3000
Wit SoundView . . .James C. Mendelson           203 462-7200

## Oracle Corporation Japan

(4716 - Over the Counter)

4-1 Kioi Cho Chiyoda Ku                   81 3 5213-6666
Tokyo, Japan 102-0094
www.oracle.co.jp

The company is engaged in the production of computer software. The software produced are geared towards database management systems, application development tools, and decision making support tools.

President. . . . . . . . . . . . . . . . . . . Chikara Sano

Employees:               1,128
Transfer Agent:          Toyo Trust and Banking

Equity Analyst Coverage:
Commerzbank Securities . . .Yasuo Imanaka(★)   81 3 5293-9000
Credit Suisse First Boston . . .Carolina Stone  81 3 5404-9000
Goldman Sachs . . .Hiroshi Yamashina            81 3 3589-7000
HSBC Securities . . .Ben Wedmore                81 3 5203-3111
Lehman Brothers . . .Scott Foster               81 3 5571-7000
Merrill Lynch Global Securities
. . .Hitoshi Shin(★)                            81 3 3213-7000
Morgan Stanley Dean Witter
. . .Mitsuko Monta(★)                           81 3 5424-5300
Salomon Smith Barney . . .Nobuyuki Tsuboi(★)    81 3 5574-4750
UBS Warburg . . .Ken Segawa(★)                  81 20 7567-8000

## Oralabs Holding Corporation

(OLAB - Nasdaq SmallCap Securities)

2901 South Tejon St.                      303 783-9499
Englewood, CO 80110               (fax) 303 783-5759
www.orallabs.com

The company produces health and beauty care products.The company has a diverse line of goods that includes lip balm, sunblock, and cold and sore throat sprays.

Chairman. . . . . . . . . . . . . . . . . . . Gary H. Schlatter
CEO. . . . . . . . . . . . . . . . . . . . . . Gary H. Schlatter
President. . . . . . . . . . . . . . . . . . . Gary H. Schlatter
Technical Director/Orlabs Inc. . . . Christopher Farnworth
CFO. . . . . . . . . . . . . . . . . . . . Emile Red Jordan

Employees:               115
Transfer Agent:          Corporate Stock Transfer

Equity Analyst Coverage:
UBS Warburg . . .Ken Segawa(★)                 44 20 7567-8000

## Orange-co, Inc.

(OJ - New York Stock Exchange)

2020 U.S. Highway 17, South               863 533-0551
P.O. Box 2158                       (fax) 863 533-6826
Bartow, FL 33831-2158

Production of citrus fruit and the manufacturing and sale of bulk citrus juices, packaged frozen and shelf-stable juices, drinks and coffee for institutional markets, bulk frozen drink bases for bottlers of ready-to-drink products and citrus products. Also provides juice dispensing equipment, service and technical training to its food service customers.

Chairman. . . . . . . . . . . . . . . . . . . Ben Hill Griffin III
CEO. . . . . . . . . . . . . . . . . . . . . Ben Hill Griffin III
President. . . . . . . . . . . . . . . . . . Eugene C. Mooney
COO. . . . . . . . . . . . . . . . . . . . . Eugene C. Mooney
CFO. . . . . . . . . . . . . . . . . . . Dale A. Bruwelheide
Treasurer. . . . . . . . . . . . . . . . . Dale A. Bruwelheide
Controller. . . . . . . . . . . . . . . . . Dale A. Bruwelheide
Investor Relations. . . . . . . . . . . Dale A. Bruwelheide
Corp. Communications. . . . . . . . Dale A. Bruwelheide
Secretary. . . . . . . . . . . . . . . . . Dale A. Bruwelheide
Planning & Devel. . . . . . . . . . . . Eugene C. Mooney
Cash Management. . . . . . . . . . . Dale A. Bruwelheide

Employees:               250
Shareholders:            5,000
Legal Counsel:           Fowler, White, Gillen, Villareal and
                         Banker, PA
Auditor:                 KPMG Peat Marwick LLP

## Orange-co Inc. (continued)

Transfer Agent:          SunTrust Bank

No Analyst Coverage Reported

## Orapharma Inc

(OPHM - Nasdaq National Market)

732 Louis Drive                           215 956-2200
Warminster, PA 18974

New IPO: 03/09/00

The company manufactures pharmaceuticals. The pharmaceuticals are used in the treatment of oral diseases and disorders.

CEO. . . . . . . . . . . . . . . . . . . . Michael Kishbauch
President. . . . . . . . . . . . . . . . . Michael Kishbauch
CFO. . . . . . . . . . . . . . . . . . . . . James Ratigan
Secretary. . . . . . . . . . . . . . . . . . James Ratigan

Employees:               18
Auditor:                 Arthur Andersen LLP

Equity Analyst Coverage:
IPO Reporter . . .Stephen Lacey                   212 765-5311
IPO Value Monitor/IPO Alternative . . .Steven Tuen 212 233-0100
Robertson Stephens . . .Jay B. Silverman          212 319-8900
U.S. Bancorp Piper Jaffray . . .Peter L. Ginsberg 612 303-6440

## OraSure Technologies, Inc.

(OSUR - Nasdaq National Market)

8505 S.W. Creekside Pl.                   503 641-6115
Beaverton, OR 97008-7108         (fax) 503 643-2781
www.orasure.com

The Company is engaged in manufacturing, developing, and marketing medical devices and diagnostic products. The Company produces oral fluid collection devices for the life insurance industry and public health industries to detect HIV antibodies and oral fluid testing solutions for drug abuse testing.

Chairman. . . . . . . . . . . . . Roger L. Pringle, 58 (10 yrs)
CEO. . . . . . . . . . . . . . . . . . . . Robert D. Thompson
President. . . . . . . . . . . . . . . . . Robert D. Thompson
Chief Scientific Officer. . . . . . . . Richard George, (5 yrs)
CFO. . . . . . . . . . . . . . . . . Charles E. Bergeron, (6 yrs)
Investor Relations. . . . . . . . . Mary W. Hagen, (13 yrs)
Secretary. . . . . . . . . . . Andrew S. Goldstein, 49 (18 yrs)
Human Resources. . . . . . . . . . . . Maureen Megarity
MIS. . . . . . . . . . . . . . . . . . . Michael Dunton, (8 yrs)

| Year | Sales ($000) | Net Inc ($000) | $ EPS |
|---|---|---|---|
| 9/1999 | 10,100 | -3,200 | |
| 9/1998 | 9,800 | -1,900 | |
| 9/1997 | 9,400 | -4,100 | |
| 9/1996 | 5,600 | 1,100 | |
| 9/1995 | 2,900 | -10,500 | |
| 4-yr. Growth Rate | 38.6% | N.M. | |

Employees:               83
Shares Outs.:            16,700,000
Market Val (Mil):        $127
Legal Counsel:           Miller, Nash, Wiener, Hager &
                         Carlsen
Auditor:                 PricewaterhouseCoopers
Transfer Agent:          First Interstate Bank of Oregon

Equity Analyst Coverage:
OrbiMed Advisors . . .Carl L. Gordon               212 739-6400
. . .Michael Sheflery                              212 739-6400
Sidoti & Co. . . .L. Mitra Ramgopal                212 297-0001
Wm Smith Special Opp Rsch . . .Warrick Jervis      303 831-9696
Sturza's Medical Research . . .Evan Sturza         212 541-8200

*Nelson Information's Directory*
*of*

# INVESTMENT
# RESEARCH
# 2002

## Volume II - U.S. Companies

*Section 1*.................... *U.S. Company Profiles/Analyst Coverage*
*Section 2*.................... *Index of U.S. Public Companies by Industry*
*Section 3*.................... *Index of U.S. Public Companies by City and State*
*Section 4*.................... *Master Alphabetic Index*

**LICENSE AGREEMENT**

Read this license agreement before continuing to use this publication. Continuing to use this publication indicates your acceptance of the terms of this license agreement. This agreement is a legal contract between you, the user of this publication, and Nelson Information, governing your use of this publication. If you do not wish to agree to the terms of this License Agreement, stop using this publication and promptly return it to the place from where you obtained it. If you have any questions concerning this License Agreement, contact Nelson Information, 1 Gateway Plaza, Port Chester, NY 10573, or call 888-280-4864.

License: Nelson Information grants you the right of continued use of this publication as a reference source. In consideration thereof, you: (1) agree not to decompile, disassemble, rearrange, reorder, copy, extract, or otherwise use any of the information herein in the creation of any directory, database, reference source, or other compilation, without the express written permission of Nelson Information; and (2) acknowledge that a significant degree of originality was required and utilized in the creation of this publication.

**COPYRIGHT NOTICE**

Nelson Information's Directory of Investment Research - 2002, (27th annual edition) is a proprietary product of Nelson Information and is protected by United States copyright laws as well as international treaties. All information in this publication has been obtained from sources considered to be reliable, but its accuracy and completeness cannot be guaranteed. Neither the information presented nor any opinion expressed constitutes a representation by us or a solicitation of the purchase or sale of any securities. The inclusion or omission of any firm or service herein shall not be deemed a recommendation by the publisher for or against the use thereof. Copyright © 2001/2002 Nelson Information, 1 Gateway Plaza, Port Chester, NY 10573. Data as of November 2001. Next revision, November 2002.

Volume I, II & III -    ISSN: 0896-0135  ISBN: 1-891851-19-5 ................................................ Price $665

Printed in the United States of America

## U.S. COMPANY PROFILES/ANALYST COVERAGE. . . . . . . . . . . . SECTION 1

**Opus360 Corp.** *(continued)*

*No Analyst Coverage Reported*

### Oracle Corp.

(ORCL - Nasdaq National Market)

| | |
|---|---|
| 500 Oracle Pkwy | 650 506-7000 |
| Redwood City, CA 94065 | (fax) 650 506-7200 |
| www.oracle.com | |

Oracle Corporation is the world's largest supplier of software for information management, and the world's second largest software company. With annual revenues of more than $6.0 billion, the company offers its database, tools and application products, along with related consulting, education, and support services, in more than 140 countries around the world.

| | |
|---|---|
| Chairman. | Lawrence J. Ellison, 56 (24 yrs) |
| CEO. | Lawrence J. Ellison, 56 (24 yrs) |
| President. | Raymond J. Lane, 53 (9 yrs) |
| COO. | Raymond J. Lane, 53 (9 yrs) |
| SVP/Federal Division. | Jay Nussbaum |
| SVP/Oracle Consulting Group. | Robert Shaw |
| Senior Vice President/Intercontinental Division… | |
| | …Pierre Carlo Falotti |
| Executive Vice President. | Gary Bloom, 41 |
| CFO. | Jeffrey O. Henley, 55 |
| Treasurer. | Bruce Lange |
| Controller. | Thomas A. Williams, 48 |
| Investor Relations. | Catherine Buan |
| Corp. Communications. | Margaret Lasecke |
| Secretary. | Daniel Cooperman, 49 |
| General Counsel. | Daniel Cooperman, 49 |
| Employee Benefits. | Eliza Grover (Redwood Shores) |
| Planning & Devel. | David Roux |
| Cash Management. | Mark Mohler |
| Risk Management. | Leanne Snedeker |
| Real Estate. | Susan Curran |
| Leasing. | Anil Vora |
| MIS. | Gerry Corvino |

| Year | Sales ($000) | Net Inc ($000) | $ EPS |
|---|---|---|---|
| 5/2001 | 10,859,700 | 2,561,100 | 0.44 |
| 5/2000 | 10,130,100 | 6,296,800 | 0.34 |
| 5/1999 | 8,827,300 | 1,289,800 | 0.22 |
| 5/1998 | 7,143,900 | 813,700 | 0.16 |
| 5/1997 | 5,684,300 | 821,500 | 0.14 |
| 4-yr. Growth Rate | 17.6% | 32.9% | |

| | |
|---|---|
| Employees: | 42,927 |
| Shareholders: | 8,396 |
| Shares Outs.: | 5,558,900,000 |
| Market Val (Mil): | $82,939 |
| Auditor: | Arthur Andersen & Co. |
| Transfer Agent: | Bank of Boston |

| Institutional Owner | % Owned | $ Owned |
|---|---|---|
| Barclays Bank Plc | 3.2% | 2654.0 mil |
| Massachusetts Financial Service | 1.5% | 1244.1 mil |
| Barclays Bank PLC | 1.5% | 1244.1 mil |
| Fidelity Management & Research | 1.2% | 995.3 mil |
| Axa Financial | 0.8% | 663.5 mil |
| Other Institutional Owners | 36.1% | 29940.9 mil |
| Total 4557 Institutions | 44.3% | 36741.8 mil |

**Equity Analyst Coverage:**

| | |
|---|---|
| ABN AMRO Bank NV …George Godfrey | 212 258-1300 |
| Argus Research …Robert Becker | 212 425-7500 |
| Banc of America Securities …Robert Austrian | 415 627-2000 |
| Sanford C. Bernstein …Charles J. Di Bona II | 212 485-5800 |
| CIBC World Markets …Melissa B. Eisenstat | 212 667-7000 |
| Credit Suisse First Boston …Wendell H. Laidley | 415 836-7900 |
| Deutsche Bank …James Moore | 415 617-2800 |
| Dresdner Kleinwort Wasserstein | |
| …Sanjiv G. Hingorani | 212 429-3434 |
| A.G. Edwards & Sons …Mary E. O'Rourke | 314 955-3000 |
| First Albany Corp. …Mark Murphy | 415 856-2600 |
| Friedman, Billings, Ramsey …David Hilal | 703 312-9500 |
| Goldman Sachs …Rick G. Sherlund(★) | 212 902-1000 |
| WR Hambrecht + Co. …Richard Petersen | 415 551-8600 |
| H&R Block Fin'l. Advisors …Steve Shepich | 313 628-1200 |
| HSBC Securities …Robrecht Wouters | 44 20 7621-0011 |
| Investec PMG Capital …Jeffrey L. Van Rhee | 610 260-6200 |
| Edward Jones …Art Russell | 314 515-2000 |
| Lehman Brothers …Ned J. Herman(★) | 212 526-7000 |
| McDonald Investments …Peter R. Rubicam | 917 368-2200 |
| Merrill Lynch Global Securities | |
| …Christopher C. Shilakes(★) | 415 296-0150 |
| J.P. Morgan …Ian Morton | 415 439-3000 |
| Morgan Stanley Dean Witter | |
| …Charles E. Phillips(★) | 212 761-4000 |

---

**Oracle Corp.** *(continued)*

| | |
|---|---|
| Morningstar, Inc. …Joseph Beaulieu | 312 696-6000 |
| Needham & Co. …Richard Davis | 617 457-0900 |
| Nordea Securities …Morten Kiddelund Poulsen | 45 3 333-3333 |
| Pacific Crest Securities …Brendan Barnicle | 206 689-5680 |
| Parker/Hunter Inc. …Kimberly Caughey | 412 562-8000 |
| Pershing/Div. of DLJ …Richard Jack | 800 443-4342 |
| PNC Advisors …Ruan G. O'Neil | 215 585-8319 |
| Prudential Securities Research …Timothy Getz | 415 274-2200 |
| RBC Capital Markets …Cameron P. Steele | 415 633-8500 |
| Robertson Stephens …Eric B. Upin | 415 781-9700 |
| Salomon Smith Barney | |
| …Gretchen Teagarden(★) | 212 816-6000 |
| SG Cowen Securities Corporation Inc | |
| …Drew Brosseau | 617 946-3700 |
| SoundView Technologies Group | |
| …James C. Mendelson | 203 321-7200 |
| Standard & Poor's …Jonathan Rudy | 212 438-2000 |
| ThinkEquity Partners …Mark A. Verbeck | 415 512-2900 |
| …Tim Madda | 415 512-2900 |
| UBS Warburg …Kenneth J. Carey | 212 713-2000 |
| U.S. Bancorp Piper Jaffray …Jon Ekoniak | 650 838-1300 |
| H.C. Wainwright & Co. …Gary Abbott | 617 227-3100 |
| Thomas Weisel Partners …Robert Schwartz | 617 488-4100 |
| Wells Fargo Van Kasper …Robert Tholemeier | 212 792-4214 |
| William Blair & Co. …Laura J. Lederman | 312 236-1600 |

**Fixed Income Analyst Coverage:**

| | |
|---|---|
| Credit Suisse First Boston F.I. | |
| …Mark R. Altherr(★) | 212 325-2000 |

### Oracle Corporation Japan

(4716 - Over the Counter)

| | |
|---|---|
| 4-1 Kioi Cho Chiyoda Ku | 81 3 5213-6666 |
| Tokyo, Japan 102-0094 | |
| www.oracle.co.jp | |

The company is engaged in the production of computer software. The software products are geared towards database management systems, application development tools, and decision making support tools.

| | |
|---|---|
| President. | Chikara Sano |

| | |
|---|---|
| Employees: | 1,128 |
| Transfer Agent: | Toyo Trust and Banking |

**Equity Analyst Coverage:**

| | |
|---|---|
| Commerzbank Securities …Yasuo Imanaka(★) | 81 3 5293-9000 |
| Credit Suisse First Boston …Caroline Stone | 81 3 5404-9000 |
| Goldman Sachs …Hiroshi Yamashina | 81 3 3589-7000 |
| HSBC Securities …Ben Wedmore(★) | 81 3 5203-3111 |
| Lehman Brothers …Scott Foster | 81 3 5571-7000 |
| Merrill Lynch Global Securities …Hitoshi Shin | 81 3 3213-7000 |
| Morgan Stanley Dean Witter | |
| …Masaharu Miyachi(★) | 81 3 5424-5300 |
| Salomon Smith Barney …Thomas Rodes | 81 3 5574-4750 |
| UBS Warburg …Hiroko Sato | 81 3 5208-6000 |
| …Nobuyuki Tsuboi(★) | 81 3 5208-6000 |

### Orange-co, Inc.

(OJ - New York Stock Exchange)

| | |
|---|---|
| 2020 U.S. Highway 17, South | 863 533-0551 |
| P.O. Box 2158 | (fax) 863 533-6826 |
| Bartow, FL 33831-2158 | |

Production of citrus fruit and the manufacturing and sale of bulk citrus juices, packaged frozen and shelf-stable juices, drinks and coffee for institutional markets, bulk frozen drink bases for bottlers of ready-to-drink products and citrus products. Also provides juice dispensing equipment, service and technical training to its food service customers.

| | |
|---|---|
| Chairman. | Ben Hill Griffin III |
| CEO. | Ben Hill Griffin III |
| President. | Eugene C. Mooney |
| COO. | Eugene C. Mooney |
| CFO. | Dale A. Bruwelheide |
| Treasurer. | Dale A. Bruwelheide |
| Controller. | Dale A. Bruwelheide |
| Investor Relations. | Dale A. Bruwelheide |
| Corp. Communications. | Dale A. Bruwelheide |
| Secretary. | Dale A. Bruwelheide |
| Planning & Devel. | Eugene C. Mooney |
| Cash Management. | Dale A. Bruwelheide |

| | |
|---|---|
| Employees: | 250 |
| Legal Counsel: | Fowler, White, Gillen, Villareal and Banker, PA |
| Auditor: | KPMG Peat Marwick LLP |
| Transfer Agent: | SunTrust Bank |

---

**Orange-co Inc.** *(continued)*

*No Analyst Coverage Reported*

### Orapharma Inc

(OPHM - Nasdaq National Market)

| | |
|---|---|
| 732 Louis Drive | 215 956-2200 |
| Warminster, PA 18974 | (fax) 215 443-9531 |

The company manufactures pharmaceuticals. The pharmaceuticals are used in the treatment of oral diseases and disorders.

| | |
|---|---|
| CEO. | Michael Kishbauch |
| President. | Michael Kishbauch |
| CFO. | James Ratigan |
| Secretary. | James Ratigan |

| | |
|---|---|
| Employees: | 18 |
| Auditor: | Arthur Andersen LLP |

**Equity Analyst Coverage:**

| | |
|---|---|
| Robertson Stephens …Robert C. Hazlett III | 646 366-4000 |
| Salomon Smith Barney …Terence Sinclair | 44 20 7986-4000 |
| SG Securities …Sean Johnstone | 44 20 7762-4444 |
| U.S. Bancorp Piper Jaffray …Peter L. Ginsberg | 612 303-6440 |

### OraSure Technologies, Inc.

(OSUR - Nasdaq National Market)

| | |
|---|---|
| 150 Webster St | 610 882-1820 |
| Bethlehem, PA 18015-1389 | |
| www.orasure.com | |

The company is engaged in manufacturing, developing, and marketing medical devices and diagnostic products. The Company produces oral fluid collection devices for the life insurance industry and public health industries to detect HIV antibodies and oral fluid testing solutions for drug abuse testing.

| | |
|---|---|
| Chairman. | Roger L. Pringle, 59 (11 yrs) |
| CEO. | Robert D. Thompson |
| President. | Robert D. Thompson |
| Chief Scientific Officer. | Richard George, (6 yrs) |
| CFO. | Charles E. Bergeron, (7 yrs) |
| Investor Relations. | Mary W. Hagen, (14 yrs) |
| Secretary. | Andrew S. Goldstein, 50 (19 yrs) |
| Human Resources. | Maureen Haggerty |
| MIS. | Michael Durton, (9 yrs) |

| Year | Sales ($000) | Net Inc ($000) | $ EPS |
|---|---|---|---|
| 12/2000 | 28,800 | -12,700 | -0.17 |

| | |
|---|---|
| Employees: | 83 |
| Shares Outs.: | 37,000,000 |
| Market Val (Mil): | $387 |
| Legal Counsel: | Miller, Nash, Wiener, Hager & Carlsen |
| Auditor: | PricewaterhouseCoopers |
| Transfer Agent: | First Interstate Bank of Oregon |

| Institutional Owner | % Owned | $ Owned |
|---|---|---|
| WM Advisors, Inc. | 5.8% | 22.4 mil |
| Greenville Capital Mgmt, Inc. | 1.6% | 6.2 mil |
| Dimensional FD Advisors, Inc. | 1.4% | 5.4 mil |
| Gardner Lewis Asset Mgmt, Inc. | 1.2% | 4.6 mil |
| Emerald Advisers, Inc. | 1.1% | 4.3 mil |
| Other Institutional Owners | 10.2% | 39.4 mil |
| Total 74 Institutions | 21.3% | 82.3 mil |

**Equity Analyst Coverage:**

| | |
|---|---|
| Dougherty & Company …Aaron A. Lindberg | 612 338-1400 |
| OrbiMed Advisors …Carl L. Gordon | 212 739-6400 |
| Robertson Stephens …Wade H. King | 415 781-9700 |
| Sidoti & Co. …L. Mitra Ramgopal | 212 297-0001 |
| Wm Smith Special Opp Rsch …Andrew Sidoti | 303 831-9696 |
| Sturza's Equity Research …Evan Sturza | 212 541-8200 |
| UBS Warburg …Ricky Goldwasser | 212 713-2000 |
| Wells Fargo Van Kasper …Bud Leedom | 858 645-0550 |

---

**Exhibit E**

<HELP> for explanation.

N236 **Equity** **MKAC**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Market Maker Activity** | | | | | Page 1 /26 | | |
| ORACLE CORP | | Range 12/00- 3/01 | | Sort by T-Total | | | |
| **ID** | **Name** | **Total** | **%** | **Non-Block** | **%** | **Block** | **%** |
| 1) ISLD | Island Corporation | 280.345MLN | 6 | 279.748MLN | 11 | 597406 | 0 |
| 2)✳SBSH | CITIGROUP GLOBAL MARKETS IN | 279.614MLN | 6 | 140.487MLN | 5 | 139.126MLN | 8 |
| 3) MLCO | MERRILL LYNCH | 277.743MLN | 6 | 124.042MLN | 5 | 153.701MLN | 9 |
| 4) MSCO | MORGAN STANLEY & CO., INCOR | 268.178MLN | 6 | 100.826MLN | 4 | 167.352MLN | 10 |
| 5)✳GSCO | GOLDMAN SACHS | 265.035MLN | 6 | 77.421MLN | 3 | 187.614MLN | 11 |
| 6)✳FBCO | CREDIT SUISSE FIRST BOSTON | 252.689MLN | 6 | 82.822MLN | 3 | 169.867MLN | 10 |
| 7) MASH | | 246.576MLN | 6 | 226.632MLN | 9 | 19.944MLN | 1 |
| 8)✳INCA | INSTINET CORPORATION | 156.697MLN | 4 | 127.908MLN | 5 | 28.790MLN | 2 |
| 9)✳NITE | KNIGHT EQUITY MARKETS, L.P. | 153.891MLN | 4 | 135.362MLN | 5 | 18.529MLN | 1 |
| 10) RSSF | Robertson Stephens & Co. | 146.860MLN | 3 | 56.873MLN | 2 | 89.987MLN | 5 |
| 11)✳DBAB | DEUTSCHE BANK SECURITIES IN | 133.259MLN | 3 | 30.619MLN | 1 | 102.640MLN | 6 |
| 12)✳LEHM | LEHMAN BROTHERS INC | 127.398MLN | 3 | 37.374MLN | 1 | 90.024MLN | 5 |
| 13) WARR | UBS Warburg LLC | 114.549MLN | 3 | 39.236MLN | 1 | 75.313MLN | 4 |
| 14) MWSE | CHICAGO STOCK EXCHANGE | 109.262MLN | 3 | 87.489MLN | 3 | 21.772MLN | 1 |
| 15) SLKC | Spear Leeds & Kellogg Capit | 99.269MLN | 2 | 66.258MLN | 3 | 33.011MLN | 2 |
| 16)✳BEST | BEAR, STEARNS & CO. INC. | 85.639MLN | 2 | 37.220MLN | 1 | 48.419MLN | 3 |
| 17) ARCA | ARCHIPELAGO SECURITIES L.L. | 80.666MLN | 2 | 77.035MLN | 3 | 3630623 | 0 |
| 18) BRUT | BRUT, LLC | 75.960MLN | 2 | 59.408MLN | 2 | 16.553MLN | 1 |
| 19) NDBC | DEUTSCHE IXE, LLC | 73.964MLN | 2 | 44.773MLN | 2 | 29.190MLN | 2 |

✳ Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                          N236 Equity **MKAC**

| | Market Maker Activity | | | | Page 2 /26 | |
|---|---|---|---|---|---|---|

ORACLE CORP                          Range 12/00- 3/01      Sort by T-Total

| ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|
| 1) HRZG | | 72.154MLN | 2 | 59.247MLN | 2 | 12.907MLN | 1 |
| 2) NFSC | NATIONAL FINANCIAL SERVICES | 72.062MLN | 2 | 65.900MLN | 3 | 6162698 | 0 |
| 3) REDI | Redibook ECN LLC | 70.089MLN | 2 | 64.373MLN | 2 | 5716328 | 0 |
| 4) PRUS | PRUDENTIAL EQUITY GROUP, IN | 66.671MLN | 2 | 39.544MLN | 2 | 27.127MLN | 2 |
| 5) MONT | Banc of America Securities | 61.941MLN | 1 | 30.364MLN | 1 | 31.577MLN | 2 |
| 6) PERT | PERSHING TRADING COMPANY L. | 41.394MLN | 1 | 38.704MLN | 2 | 2689917 | 0 |
| 7) CANT | CANTOR FITZGERALD & CO. | 41.187MLN | 1 | 14.513MLN | 1 | 26.674MLN | 2 |
| 8) MADF | BERNARD L. MADOFF | 31.438MLN | 1 | 30.836MLN | 1 | 601936 | 0 |
| 9) BTRD | B-Trade Services LLC | 31.431MLN | 1 | 28.469MLN | 1 | 2962600 | 0 |
| 10) FCAP | | 30.883MLN | 1 | 15.442MLN | 1 | 15.440MLN | 1 |
| 11) DBKS | DEUTSCHE BANK SECURITIES IN | 30.543MLN | 1 | 9775536 | 0 | 20.767MLN | 1 |
| 12) PWJC | UBS FINANCIAL SERVICES INC. | 27.519MLN | 1 | 24.146MLN | 1 | 3372561 | 0 |
| 13)*CIBC | CIBC WORLD MARKETS CORPORAT | 25.624MLN | 1 | 11.950MLN | 1 | 13.674MLN | 1 |
| 14) FLTT | FLEET TRADING, A DIVISION O | 23.748MLN | 1 | 17.910MLN | 1 | 5837514 | 0 |
| 15)*COWN | COWEN & CO., LLC | 23.435MLN | 1 | 14.891MLN | 1 | 8543557 | 1 |
| 16) INGC | ING BARINGS FURMAN SELZ, LL | 20.938MLN | 1 | 13.887MLN | 1 | 7051534 | 0 |
| 17) SNDV | SOUNDVIEW TECHNOLOGY CORPOR | 20.439MLN | 1 | 10.080MLN | 0 | 10.359MLN | 1 |
| 18) RAMS | | 20.170MLN | 1 | 18.885MLN | 1 | 1285319 | 0 |
| 19) ANDV | ASSENT LLC | 19.201MLN | 0 | 18.715MLN | 1 | 485800 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                N236 **Equity** **MKAC**

```
           Market  Maker  Activity          Page 3 /26
ORACLE CORP                  Range 12/00- 3/01    Sort by T-Total
   ID   Name                    Total      %   Non-Block  %   Block       %
 1) COST  COASTAL SECURITIES L.P.   18.954MLN   0   18.701MLN  1   253205      0
 2) SHON  SCHONFELD SECURITIES, LLC 18.523MLN   0   18.219MLN  1   304300      0
 3) JPHQ  JPMSI                     17.871MLN   0   7146068    0   10.725MLN   1
 4) HRCO  HUBERMAN FINANCIAL INC.   14.342MLN   0   13.966MLN  1   375500      0
 5) WCAI                            13.740MLN   0   12.888MLN  1   851412      0
 6) SILK  SPEAR, LEEDS & KELLOGG, L.P 13.216MLN  0   12.987MLN  1   229600      0
 7) LEGG  LEGG MASON WOOD WALKER INC. 12.892MLN  0   9843338    0   3048916     0
 8) OLDE  H&R BLOCK FINANCIAL ADVISOR 12.344MLN  0   9964052    0   2379910     0
 9) RAJA  RAYMOND JAMES AND ASSOCIATE 11.804MLN  0   8818489    0   2985838     0
10) MDLD  MCDONALD INVESTMENTS INC.   10.766MLN  0   3315183    0   7450855     0
11)*JEFF  JEFFERIES & COMPANY, INC.   10.636MLN  0   4272829    0   6363295     0
12) JPMS  J.P. MORGAN SECURITIES INC. 10.517MLN  0   3691951    0   6825547     0
13)*PIPR  PIPER JAFFRAY & CO.         9987394    0   6430184    0   3557210     0
14)*WBLR  WILLIAM BLAIR & COMPANY L.L 9670814    0   5345724    0   4325090     0
15) AANA  ABN AMRO INCORPORATED/CHICA 9043364    0   4085598    0   4957766     0
16) HMQT  CHASE H & Q                 9043038    0   4040590    0   5002448     0
17) ONLI  HOLD BROTHERS ON-LINE INVES 7287216    0   7277216    0   10000       0
18)*TWPT  THOMAS WEISEL PARTNERS LLC  7089345    0   2581863    0   4507482     0
19) WIEN  WIEN SECURITIES             6961650    0   6961650    0   0           0
* Market maker volume is combined from multiple sources. See HELP for detail.
```

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity MKAC**

| ══════ Market Maker Activity ══════ | | Page 4 /26 | |
|---|---|---|---|

ORACLE CORP                        Range 12/00- 3/01    Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | ITGI | ITG INC. | 6834750 | 0 | 1212080 | 0 | 5622670 | 0 |
| 2)* | MPBS | AUTOMATED TRADING DESK BROK | 6476362 | 0 | 6455762 | 0 | 20600 | 0 |
| 3) | SUSQ | SUSQUEHANNA CAPITAL GROUP | 6324256 | 0 | 3353498 | 0 | 2970758 | 0 |
| 4) | SSIC | SCOTTRADE, INC. | 5523040 | 0 | 5443465 | 0 | 79575 | 0 |
| 5) | WATH | TD WATERHOUSE INVESTOR SERV | 5234783 | 0 | 5234783 | 0 | 0 | 0 |
| 6) | GKMC | Gerard Klauer Mattison & Co | 5163524 | 0 | 2128564 | 0 | 3034960 | 0 |
| 7) | CLYN | CARLIN EQUITIES CORP. | 5085182 | 0 | 3986282 | 0 | 1098900 | 0 |
| 8) | AXCS | ACCESS SECURITIES INC. | 4171306 | 0 | 2760606 | 0 | 1410700 | 0 |
| 9) | KCMO | SECURITY INVESTMENT CO. OF | 4057992 | 0 | 4015992 | 0 | 42000 | 0 |
| 10) | SWST | SOUTHWEST SECURITIES, INC. | 3679470 | 0 | 2639918 | 0 | 1039552 | 0 |
| 11) | WEDB | WEDBUSH MORGAN SECURITIES I | 3504583 | 0 | 2704383 | 0 | 800200 | 0 |
| 12) | WEED | WEEDEN & CO.L.P. | 3320504 | 0 | 1913004 | 0 | 1407500 | 0 |
| 13) | BARD | ROBERT W. BAIRD & CO. INCOR | 3287193 | 0 | 2868713 | 0 | 418480 | 0 |
| 14) | RBCD | RBC CAPITAL MARKETS CORPORA | 3167165 | 0 | 3541 | 0 | 3163624 | 0 |
| 15) | WSTI | Westfalia Investments Inc. | 3163500 | 0 | 3163500 | 0 | 0 | 0 |
| 16) | GFIN | GRANITE  FINANCIAL GROUP IN | 3001242 | 0 | 1695677 | 0 | 1305565 | 0 |
| 17) | FDCC | SPEAR, LEEDS & KELLOGG, L.P | 2699675 | 0 | 2605375 | 0 | 94300 | 0 |
| 18) | AGED | A. G. EDWARDS & SONS, INC. | 2312600 | 0 | 1871300 | 0 | 441300 | 0 |
| 19) | ADVS | ADVEST INC. | 2255329 | 0 | 1981328 | 0 | 274001 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

<HELP> for explanation.

N236 **Equity** **MKAC**

| **Market Maker Activity** | | Page 5 /26 | | | | | |
|---|---|---|---|---|---|---|---|
| ORACLE CORP | | Range 12/00- 3/01 | | Sort by T-Total | | | |
| ID | Name | Total | % | Non-Block | % | Block | % |
| 1) GLDS | SPEAR, LEEDS & KELLOGG, L.P | 2253382 | 0 | 2221982 | 0 | 31400 | 0 |
| 2) CWCO | CROWELL WEEDON AND CO. | 2141657 | 0 | 2121157 | 0 | 20500 | 0 |
| 3) GVRC | GVR COMPANY, LLC | 2067284 | 0 | 1893484 | 0 | 173800 | 0 |
| 4) REND | REYNDERS, GRAY & CO., INCOR | 2033600 | 0 | 11700 | 0 | 2021900 | 0 |
| 5) ISLD | Momentum Securities, Inc. | 2007200 | 0 | 2007200 | 0 | 0 | 0 |
| 6) OSTI | On-Site Trading Inc. | 1986000 | 0 | 1986000 | 0 | 0 | 0 |
| 7) GRUN | Gruntal & Co., Inc. | 1978817 | 0 | 1481593 | 0 | 497224 | 0 |
| 8) JANY | JANNEY MONTGOMERY SCOTT  LL | 1915818 | 0 | 1766878 | 0 | 148940 | 0 |
| 9) WPCO | DRESDNER KLEINWORT WASSERST | 1914788 | 0 | 605888 | 0 | 1308900 | 0 |
| 10) SMCO | Samco Trading Inc | 1899429 | 0 | 1387929 | 0 | 511500 | 0 |
| 11) JOSE | Josephthal Lyon & Ross | 1892148 | 0 | 1383458 | 0 | 508690 | 0 |
| 12) ALLN | ALLEN & COMPANY INCORPORATE | 1840599 | 0 | 1197209 | 0 | 643390 | 0 |
| 13) JBOC | NATIONAL CLEARING CORP. | 1687540 | 0 | 1640506 | 0 | 47034 | 0 |
| 14) NTRD | ONTRADE INC. | 1600505 | 0 | 1590505 | 0 | 10000 | 0 |
| 15) NEED | NEEDHAM AND CO. | 1594624 | 0 | 729162 | 0 | 865462 | 0 |
| 16) FCOL | | 1484306 | 0 | 1309306 | 0 | 175000 | 0 |
| 17) WLDC | WORLDCO, L.L.C. | 1478550 | 0 | 1081650 | 0 | 396900 | 0 |
| 18) CRNR | PROTRADER SECURITIES CORPOR | 1383700 | 0 | 1373700 | 0 | 10000 | 0 |
| 19) STEP | ST2 L.P. | 1311800 | 0 | 1311800 | 0 | 0 | 0 |

∗ Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

Case 3:01-cv-00988-SI   Document 1574-1   Filed 12/12/08   Page 52 of 333

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | FACT | FIRST ALBANY CAPITAL INC. | 1309861 | 0 | 539161 | 0 | 770700 | 0 |
| 2) | CHAS | CHARLES SCHWAB AND CO. INC. | 1276108 | 0 | 1276108 | 0 | 0 | 0 |
| 3) | TUCK | Tucker Anthony Inc. | 1269019 | 0 | 1078794 | 0 | 190225 | 0 |
| 4) | PRSQ | MERRILL LYNCH PROFESSIONAL | 1264700 | 0 | 1233200 | 0 | 31500 | 0 |
| 5) | FEDE | DETWILER, MITCHELL, FENTON& | 1240241 | 0 | 287970 | 0 | 952271 | 0 |
| 6) | WETH | WEATHERLY SECURITIES CORP. | 1219820 | 0 | 1075820 | 0 | 144000 | 0 |
| 7) | NMRA | NOMURA SECURITIES INTERNATI | 1155993 | 0 | 744300 | 0 | 411693 | 0 |
| 8) | DAWA | DAIWA SECURITIES AMERICA IN | 1118230 | 0 | 557200 | 0 | 561030 | 0 |
| 9) | JPMO | NOVA FUND LP | 1099358 | 0 | 1068558 | 0 | 30800 | 0 |
| 10) | VNDM | VANDHAM SECURITIES CORP. | 1093190 | 0 | 987890 | 0 | 105300 | 0 |
| 11) | CEUT | C.E. UNTERBERG, TOWBIN (A C | 1074454 | 0 | 472088 | 0 | 602366 | 0 |
| 12) | TAFT | CITADEL TRADING GROUP, L.L. | 1072800 | 0 | 1015900 | 0 | 56900 | 0 |
| 13) | OTAA | OTA LLC | 1060199 | 0 | 263899 | 0 | 796300 | 0 |
| 14) | JPTC | J.P. TURNER AND COMPANY L.L | 1031096 | 0 | 971096 | 0 | 60000 | 0 |
| 15) | MHMY | | 992855 | 0 | 780855 | 0 | 212000 | 0 |
| 16) | PERS | PERSHING LLC | 985776 | 0 | 944276 | 0 | 41500 | 0 |
| 17) | SSBS | STATE STREET GLOBAL MARKETS | 903352 | 0 | 78000 | 0 | 825352 | 0 |
| 18) | AGIS | AEGIS CAPITAL CORP. | 890459 | 0 | 869959 | 0 | 20500 | 0 |
| 19) | MKXT | Market XT (ECN) | 857977 | 0 | 857977 | 0 | 0 | 0 |

**Market Maker Activity** | Page 6 /26

ORACLE CORP                        Range 12/00- 3/01        Sort by T-Total

\* Market maker volume is combined from multiple sources. See HELP for detail.

<HELP> for explanation.                                    N236 **Equity MKAC**

| | **Market Maker Activity** | | | | | Page 7 /26 | |
|---|---|---|---|---|---|---|---|
| ORACLE CORP | | Range 12/00- 3/01 | | | Sort by T-Total | | |
| **ID** | **Name** | **Total** | **%** | **Non-Block** | **%** | **Block** | **%** |
| 1) FRAN | WM. V. FRANKEL & CO., INCOR | 854376 | 0 | 765176 | 0 | 89200 | 0 |
| 2) IBKR | INTERACTIVE BROKERS LLC | 844520 | 0 | 834220 | 0 | 10300 | 0 |
| 3) OGRU | OSCAR GRUSS & SON, INCORPOR | 841000 | 0 | 546100 | 0 | 294900 | 0 |
| 4) STAF | TD PROFESSIONAL EXECUTION, | 839123 | 0 | 819123 | 0 | 20000 | 0 |
| 5) FRSI | FROST SECURITIES, INC. | 837800 | 0 | 640500 | 0 | 197300 | 0 |
| 6) SNDS | SANDS BROTHERS AND CO. LTD | 837232 | 0 | 775232 | 0 | 62000 | 0 |
| 7) DAIN | RBC DAIN RAUSCHER INCORPORA | 831879 | 0 | 725279 | 0 | 106600 | 0 |
| 8) PCAP | PREFERREDTRADE, INC. | 822495 | 0 | 787495 | 0 | 35000 | 0 |
| 9) WGCO | CIBC WORLD MARKETS CORP./WG | 815592 | 0 | 3067 | 0 | 812525 | 0 |
| 10) DEMP | DEMPSEY & COMPANY, LLC | 810062 | 0 | 790082 | 0 | 20000 | 0 |
| 11) ELEC | ELECTRONIC TRADING GROUP, L | 784489 | 0 | 784489 | 0 | 0 | 0 |
| 12) DKNY | Dalton Kent Securities Grou | 726135 | 0 | 706135 | 0 | 20000 | 0 |
| 13) EXTT | EXT ELECTRONIC EXCHANGE TRA | 668600 | 0 | 668600 | 0 | 0 | 0 |
| 14) DRKW | DRESDNER KLEINWORT | 595192 | 0 | 218142 | 0 | 377050 | 0 |
| 15) PACS | PACIFIC CREST SECURITIES IN | 594010 | 0 | 170550 | 0 | 423460 | 0 |
| 16) NBSI | HARRIS NESBITT CORP. | 586661 | 0 | 83900 | 0 | 502761 | 0 |
| 17) DIRA | DIRECT ACCESS BROKERAGE SER | 585808 | 0 | 575808 | 0 | 10000 | 0 |
| 18) CYBR | CYBERTRADER, INC. | 575155 | 0 | 575155 | 0 | 0 | 0 |
| 19) NATY | NATCITY INVESTMENTS INC. | 559283 | 0 | 498483 | 0 | 60800 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

`<HELP>` for explanation.                                       N236 **Equity MKAC**

| | | Market Maker Activity | | | | | | Page 8 /26 |
|---|---|---|---|---|---|---|---|---|
| ORACLE CORP | | | Range 12/00- 3/01 | | Sort by T-Total | | | |
| ID | | Name | Total | % | Non-Block | % | Block | % |
| 1) NAIB | GLOBAL PARTNERS SECURITIES, | | 530508 | 0 | 427308 | 0 | 103200 | 0 |
| 2) AVTG | ADVANTAGE TRADING GROUP, IN | | 529339 | 0 | 399739 | 0 | 129600 | 0 |
| 3) BNPS | BNP PARIBAS BROKERAGE SERVI | | 528400 | 0 | 133400 | 0 | 395000 | 0 |
| 4) MPAC | MPAC CAPITAL PARTNERS L.P. | | 516735 | 0 | 516735 | 0 | 0 | 0 |
| 5) VKCO | First Security Van Kasper, | | 515575 | 0 | 390575 | 0 | 125000 | 0 |
| 6) CNET | CALIFORNIA NETWORK CAPITAL | | 491400 | 0 | 392800 | 0 | 98600 | 0 |
| 7) DLJP | PERSHING LLC | | 474700 | 0 | 18300 | 0 | 456400 | 0 |
| 8) QRCC | US CLEARING CORP DIV OF FLE | | 469920 | 0 | 200420 | 0 | 269500 | 0 |
| 9) SXXX | SUSSEX SECURITIES | | 468800 | 0 | 339400 | 0 | 129400 | 0 |
| 10) PUGS | PUGLISI & CO. | | 427600 | 0 | 339600 | 0 | 88000 | 0 |
| 11)*FBRC | FRIEDMAN, BILLINGS, RAMSEY | | 423414 | 0 | 253014 | 0 | 170400 | 0 |
| 12) AURT | Autranet Inc. | | 421015 | 0 | 168945 | 0 | 252070 | 0 |
| 13) MJSK | MILLER JOHNSON STEICHEN KIN | | 377932 | 0 | 367932 | 0 | 10000 | 0 |
| 14) NATL | NATIONAL SECURITIES CORP. | | 376175 | 0 | 143425 | 0 | 232750 | 0 |
| 15) WMBU | THE (WILSON) WILLIAMS FINAN | | 369600 | 0 | 352400 | 0 | 17200 | 0 |
| 16) ECUT | BNY BROKERAGE INC. | | 364128 | 0 | 86159 | 0 | 277969 | 0 |
| 17) GBIC | | | 341170 | 0 | 341170 | 0 | 0 | 0 |
| 18) REDW | REDWOOD BROKERAGE SERVICES | | 333000 | 0 | 304000 | 0 | 29000 | 0 |
| 19) AMET | AMERICAN THIRD MARKET CO., | | 298300 | 0 | 288300 | 0 | 10000 | 0 |

\* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity MKAC**

| | | **Market Maker Activity** | | | | Page 9 /26 |
|---|---|---|---|---|---|---|

ORACLE CORP                          Range 12/00- 3/01     Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | PURE | PURE TRADING INC. | 289542 | 0 | 289542 | 0 | 0 | 0 |
| 2) | AGII | | 287628 | 0 | 287628 | 0 | 0 | 0 |
| 3) | FANA | FIRST ANALYSIS SECURITIES C | 282050 | 0 | 282050 | 0 | 0 | 0 |
| 4) | HLLC | HOLLENCREST SECURITIES, LLC | 274970 | 0 | 111820 | 0 | 163150 | 0 |
| 5) | UNEX | UNX, INC. A DELAWARE CORPOR | 260688 | 0 | 260688 | 0 | 0 | 0 |
| 6) | WATL | A. B. WATLEY INC. (WATL) | 260300 | 0 | 35300 | 0 | 225000 | 0 |
| 7) | JCCO | JERICHO INVESTMENTS, LLC | 255342 | 0 | 223042 | 0 | 32300 | 0 |
| 8) | PXCO | PAX CLEARING CORPORATION | 252375 | 0 | 59300 | 0 | 193075 | 0 |
| 9) | ANOS | ABEL NOSER CORP. | 247900 | 0 | 140500 | 0 | 107400 | 0 |
| 10) | ATTN | ATTAIN-ECN | 242000 | 0 | 232000 | 0 | 10000 | 0 |
| 11) | SUTR | SUTRO AND CO. INC. | 236619 | 0 | 154929 | 0 | 81690 | 0 |
| 12) | CRTH | CORINTHIAN PARTNERS L.L.C. | 231820 | 0 | 231820 | 0 | 0 | 0 |
| 13) | SEAB | SEABOARD SECURITIES, INC. | 220436 | 0 | 220436 | 0 | 0 | 0 |
| 14) | ROBB | | 216400 | 0 | 216400 | 0 | 0 | 0 |
| 15) | MDWD | MIDWOOD SECURITIES | 214900 | 0 | 144300 | 0 | 70600 | 0 |
| 16) | RAGN | WELLS FARGO INVESTMENTS, LL | 208943 | 0 | 208943 | 0 | 0 | 0 |
| 17) | HLIQ | HULL TRANSACTION SERVICES, | 207900 | 0 | 112200 | 0 | 95700 | 0 |
| 18) | HSTL | | 204900 | 0 | 204900 | 0 | 0 | 0 |
| 19) | WITE | WITENBERG INVESTMENT COMPAN | 200900 | 0 | 900 | 0 | 200000 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                N236 Equity MKAC

| | | Market Maker Activity | | | | Page 10/26 | |
|---|---|---|---|---|---|---|---|

ORACLE CORP                         Range 12/00- 3/01      Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | BSSC | BEAR STEARNS SECURITIES COR | 199500 | 0 | 187000 | 0 | 12500 | 0 |
| 2) | PALC | PALI CAPITAL, INC. | 198600 | 0 | 63600 | 0 | 135000 | 0 |
| 3) | BLUE | Bluestone Capital Partners | 194022 | 0 | 163436 | 0 | 30586 | 0 |
| 4) | BURL | BURLINGTON CAPITAL MARKETS, | 178600 | 0 | 84600 | 0 | 94000 | 0 |
| 5) | INTD | INSTATRADE | 172400 | 0 | 172400 | 0 | 0 | 0 |
| 6) | WABR | WALL STREET ACCESS | 170400 | 0 | 86400 | 0 | 84000 | 0 |
| 7) | FPKI | FOX-PITT KELTON INC. | 168600 | 0 | 7600 | 0 | 161000 | 0 |
| 8) | PROR | MERRILL LYNCH PRO CLEARING | 162257 | 0 | 0 | 0 | 162257 | 0 |
| 9) | CIST | CAPITAL INSTITUTIONAL SERVI | 160000 | 0 | 16900 | 0 | 143100 | 0 |
| 10) | DONC | Donald & Co. Securities Inc | 159066 | 0 | 93066 | 0 | 66000 | 0 |
| 11) | MFIN | MONARCH FINANCIAL CORP. | 149800 | 0 | 149800 | 0 | 0 | 0 |
| 12) | CHIP | BLUE CHIP TRADING L.L.C. | 144070 | 0 | 144070 | 0 | 0 | 0 |
| 13) | GKNS | GKN SECURITIES CORP. | 139725 | 0 | 0 | 0 | 139725 | 0 |
| 14) | PLMA | PALOMA SECURITIES L P | 138900 | 0 | 138900 | 0 | 0 | 0 |
| 15) | SHMR | O'CONNOR & COMPANY LLC | 136570 | 0 | 10200 | 0 | 126370 | 0 |
| 16) | LYON | CALYON SECURITIES (USA) INC | 132000 | 0 | 132000 | 0 | 0 | 0 |
| 17) | FRGP | FORGE FINANCIAL GROUP, INC. | 128695 | 0 | 57695 | 0 | 71000 | 0 |
| 18) | IRON | IRONHORSE SECURITIES INC. | 127900 | 0 | 127900 | 0 | 0 | 0 |
| 19) | RCAP | ROTH CAPITAL PARTNERS, LLC | 122453 | 0 | 92453 | 0 | 30000 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

Bloomberg
TERMINAL

<HELP> for explanation.                                    N236 Equity **MKAC**

| | | Market Maker Activity | | | | Page 11/26 |

ORACLE CORP                    Range 12/00- 3/01      Sort by T-Total

| ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|
| 1) BISI | BOSTON INSTITUITIONAL | 122050 | 0 | 35350 | 0 | 86700 | 0 |
| 2) TNTO | TERRA NOVA TRADING | 121400 | 0 | 121400 | 0 | 0 | 0 |
| 3) DEMA | DEMATTEO MONESS LLC | 119000 | 0 | 119000 | 0 | 0 | 0 |
| 4) FNYS | FIRST NEW YORK SECURITIES C | 115900 | 0 | 115900 | 0 | 0 | 0 |
| 5) FLSC | FIRST LONDON SECURITIES COR | 114700 | 0 | 114700 | 0 | 0 | 0 |
| 6) ROCH | ROCHDALE SECURITIES LLC | 114300 | 0 | 24300 | 0 | 90000 | 0 |
| 7) NHAM | NORTH HAMPTON PARTNERS, L.P | 113000 | 0 | 113000 | 0 | 0 | 0 |
| 8) WELC | H.G. WELLINGTON & CO., INC. | 112650 | 0 | 21450 | 0 | 91200 | 0 |
| 9) QUKR | QUAKER SECURITIES INC. | 109315 | 0 | 109315 | 0 | 0 | 0 |
| 10) JONE | JONES AND ASSOCIATES INC. | 108600 | 0 | 28600 | 0 | 80000 | 0 |
| 11) ESAS | ESA Securities Inc | 100800 | 0 | 100800 | 0 | 0 | 0 |
| 12) VDMX | VAN DER MOOLEN SPECIALISTS | 100800 | 0 | 100800 | 0 | 0 | 0 |
| 13) BMUR | BREAN MURRAY AND CO. INC. | 95708 | 0 | 15708 | 0 | 80000 | 0 |
| 14) PBON | PREBON FINANCIAL PRODUCTS I | 93900 | 0 | 93900 | 0 | 0 | 0 |
| 15) SSCC | FIDUCIARY FINANCIAL SERVICE | 91300 | 0 | 6300 | 0 | 85000 | 0 |
| 16) CCMC | COMMERZBANK CAPITAL MARKETS | 91100 | 0 | 81100 | 0 | 10000 | 0 |
| 17) PASQ | DUPASQUIER & COMPANY INC. | 90500 | 0 | 48000 | 0 | 42500 | 0 |
| 18) EMXA | | 89100 | 0 | 79100 | 0 | 10000 | 0 |
| 19) MAPL | MAPLE SECURITIES U.S.A. INC | 85552 | 0 | 34843 | 0 | 50709 | 0 |

\* Market maker volume is combined from multiple sources. See HELP for detail.

&lt;HELP&gt; for explanation.                                          N236 **Equity MKAC**

| | **Market Maker Activity** | | | | | | Page 12/26 |
|---|---|---|---|---|---|---|---|

ORACLE CORP                        Range 12/00- 3/01    Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | ALST | All-Tech Investment Group I | 84100 | 0 | 84100 | 0 | 0 | 0 |
| 2) | MSCH | MAGNA SECURITIES CORP | 83408 | 0 | 53408 | 0 | 30000 | 0 |
| 3) | HOEN | ITG EXECUTION SERVICES, INC | 82240 | 0 | 14010 | 0 | 68230 | 0 |
| 4) | FANO | FANO SECURITIES LLC | 81400 | 0 | 31400 | 0 | 50000 | 0 |
| 5) | MSRO | MESIROW CAPITAL | 79703 | 0 | 62903 | 0 | 16800 | 0 |
| 6) | SEAS | Seaside Securities Inc. | 79200 | 0 | 47400 | 0 | 31800 | 0 |
| 7) | SHAW | D.E. SHAW SECURITIES, L.P. | 79000 | 0 | 79000 | 0 | 0 | 0 |
| 8) | TSGI | | 75300 | 0 | 2300 | 0 | 73000 | 0 |
| 9) | ERNS | INVESTEC (US) INCORPORATED | 69900 | 0 | 24100 | 0 | 45800 | 0 |
| 10) | LAZA | LAZARD FRERES AND CO. | 59625 | 0 | 19625 | 0 | 40000 | 0 |
| 11) | PULT | PULSE TRADING INC. | 59400 | 0 | 59400 | 0 | 0 | 0 |
| 12) | VCAP | VANGUARD CAPITAL | 59025 | 0 | 49025 | 0 | 10000 | 0 |
| 13) | DAVI | SHELBY CULLOM DAVIS & CO., | 58900 | 0 | 58900 | 0 | 0 | 0 |
| 14) | GHCC | GORDON HASKETT CAPITAL CORP | 55200 | 0 | 23100 | 0 | 32100 | 0 |
| 15) | ONEL | WILLIAM O'NEIL & COMPANY | 53900 | 0 | 53900 | 0 | 0 | 0 |
| 16) | TASN | Tasin & Co., Inc. | 53550 | 0 | 53550 | 0 | 0 | 0 |
| 17) | CUSR | CUTLER SECURITIES INC. | 52500 | 0 | 52500 | 0 | 0 | 0 |
| 18) | BNYN | BANYAN SECURITIES, LLC | 52200 | 0 | 52200 | 0 | 0 | 0 |
| 19) | SHTG | SHORELINE TRADING GROUP LLC | 50400 | 0 | 50400 | 0 | 0 | 0 |

✱ Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity** **MKAC**

| | | Market Maker Activity | | | | | Page 13/26 | |
|---|---|---|---|---|---|---|---|---|
| ORACLE CORP | | | Range 12/00- 3/01 | | Sort by T-Total | | | |
| ID | Name | | Total | % | Non-Block | % | Block | % |
| 1)*GROW | PACIFIC GROWTH EQUITIES, LL | | 50000 | 0 | 0 | 0 | 50000 | 0 |
| 2) WACM | Wachovia Securities Inc. | | 48600 | 0 | 10000 | 0 | 38600 | 0 |
| 3) LAMP | LAMPOST CAPITAL LLC | | 48200 | 0 | 21200 | 0 | 27000 | 0 |
| 4) PGON | PARAGON CAPITAL MARKETS | | 47722 | 0 | 33722 | 0 | 14000 | 0 |
| 5) ANDZ | ASSENT LLC | | 46800 | 0 | 46800 | 0 | 0 | 0 |
| 6) CNCP | CONSTITUTION CAPITAL CORP. | | 44700 | 0 | 44700 | 0 | 0 | 0 |
| 7) MCBT | MOORS AND CABOT INC. | | 44000 | 0 | 11200 | 0 | 32800 | 0 |
| 8) PENN | | | 43120 | 0 | 43120 | 0 | 0 | 0 |
| 9) STRO | STROME SECURITIES, L.P. | | 41700 | 0 | 41700 | 0 | 0 | 0 |
| 10) BKWD | BLACKWOOD SECURITIES | | 40200 | 0 | 40200 | 0 | 0 | 0 |
| 11) PFSI | PENSON FINANCIAL SERVICES, | | 38820 | 0 | 38820 | 0 | 0 | 0 |
| 12) STRE | Dahlman Rose Weiss, LLC | | 37300 | 0 | 37300 | 0 | 0 | 0 |
| 13) NTDB | National Discount Brokers | | 36400 | 0 | 36400 | 0 | 0 | 0 |
| 14) PRST | MERRILL LYNCH PRO CLEARING | | 35319 | 0 | 35319 | 0 | 0 | 0 |
| 15) BRDG | BRIDGE TRADING CO. | | 35200 | 0 | 21200 | 0 | 14000 | 0 |
| 16) USFA | U.S. Securities & Futures C | | 35072 | 0 | 35072 | 0 | 0 | 0 |
| 17) HRLD | HEARTLAND SECURITIES CORP. | | 34095 | 0 | 0 | 0 | 34095 | 0 |
| 18) KILN | KIRLIN SECURITIES INC. | | 33700 | 0 | 33700 | 0 | 0 | 0 |
| 19) PAMS | PACIFIC AMERICAN SECURITIES | | 32962 | 0 | 8762 | 0 | 24200 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity** **MKAC**

| | Market Maker Activity | | | | | Page 14/26 | |
|---|---|---|---|---|---|---|---|
| **ORACLE CORP** | | Range 12/00- 3/01 | | | Sort by T-Total | | |
| **ID** | **Name** | **Total** | **%** | **Non-Block** | **%** | **Block** | **%** |
| 1) DIRC | POINT DIREX SECURITIES, LLC | 32600 | 0 | 32600 | 0 | 0 | 0 |
| 2) YDBI | Your Discount Broker, Inc. | 32500 | 0 | 32500 | 0 | 0 | 0 |
| 3) DRIE | DRIEHAUS SECURITIES | 31700 | 0 | 21700 | 0 | 10000 | 0 |
| 4) UNEQ | UNITED EQUITIES COMPANY, LL | 31500 | 0 | 31500 | 0 | 0 | 0 |
| 5) CWEI | CANTOR WEISS AND FRIEDNER I | 30094 | 0 | 30094 | 0 | 0 | 0 |
| 6) MTCO | MILLER TABAK & CO. | 30000 | 0 | 30000 | 0 | 0 | 0 |
| 7) VIEW | VIEWTRADE SECURITIES, INC. | 29878 | 0 | 29878 | 0 | 0 | 0 |
| 8) ERCO | ESSEX RADEZ COMPANY | 29000 | 0 | 9000 | 0 | 20000 | 0 |
| 9) JSLP | JOSEPH STEVENS AND CO. L P | 28800 | 0 | 28800 | 0 | 0 | 0 |
| 10) YLPL | LINSCO/PRIVATE LEDGER CORP. | 28434 | 0 | 28434 | 0 | 0 | 0 |
| 11) MDSN | Madison Securities | 27910 | 0 | 27910 | 0 | 0 | 0 |
| 12) BWAY | Broadway Trading LLC | 27800 | 0 | 27800 | 0 | 0 | 0 |
| 13) RHCO | SUNTRUST CAPITAL MARKETS, I | 27231 | 0 | 27231 | 0 | 0 | 0 |
| 14) CFII | CONSOLIDATED FINANCIAL INVE | 26000 | 0 | 26000 | 0 | 0 | 0 |
| 15) CICF | CANACCORD CAPITAL (U.S.A.), | 25500 | 0 | 25500 | 0 | 0 | 0 |
| 16) BELL | First Liberty Investment Gr | 25200 | 0 | 25200 | 0 | 0 | 0 |
| 17) MWCC | MONNESS CRESPI HARDT AND CO | 25000 | 0 | 0 | 0 | 25000 | 0 |
| 18) BEJJ | BENJAMIN & JEROLD BROKERAGE | 23289 | 0 | 23289 | 0 | 0 | 0 |
| 19) MURC | BARRY W. MURPHY & CO. | 22875 | 0 | 11875 | 0 | 11000 | 0 |

\* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity** **MKAC**

| **Market Maker Activity** | | | | | | | Page 15/26 |
|---|---|---|---|---|---|---|---|

ORACLE CORP                          Range 12/00- 3/01     Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | LOUI | LOUIS CAPITAL MARKETS, LLC | 22800 | 0 | 22800 | 0 | 0 | 0 |
| 2) | CINN | NATIONAL STOCK EXCHANGE | 22400 | 0 | 0 | 0 | 22400 | 0 |
| 3) | USTS | UST Securities Corp. (ACTSV | 20640 | 0 | 4080 | 0 | 16560 | 0 |
| 4) | BIMI | BANCA IMI SECURITIES CORP. | 20000 | 0 | 0 | 0 | 20000 | 0 |
| 5) | NORC | NORTHERN CAPITAL SECURITIES | 20000 | 0 | 20000 | 0 | 0 | 0 |
| 6) | GESE | BNY BROKERAGE INC. | 18800 | 0 | 18800 | 0 | 0 | 0 |
| 7) | PELL | BENCHMARK-PELLINORE GROUP, | 17300 | 0 | 17300 | 0 | 0 | 0 |
| 8) | OLYM | NT SECURITIES LLC | 17000 | 0 | 17000 | 0 | 0 | 0 |
| 9) | LEBO | LEIGH BALDWIN & CO., LLC | 16460 | 0 | 16460 | 0 | 0 | 0 |
| 10) | LHFC | L.H. Friend & Company | 16400 | 0 | 0 | 0 | 16400 | 0 |
| 11) | PUNK | PUNK, ZIEGEL & COMPANY, L.P | 16300 | 0 | 16300 | 0 | 0 | 0 |
| 12) | STSS | SUCCESS TRADE | 14779 | 0 | 14779 | 0 | 0 | 0 |
| 13) | CRRT | CARRET SECURITIES, INC. | 14500 | 0 | 14500 | 0 | 0 | 0 |
| 14) | FECF | First Equity Corp. of Flori | 14500 | 0 | 14500 | 0 | 0 | 0 |
| 15) | MACC | MID-ATLANTIC CAPITAL CORP. | 14450 | 0 | 0 | 0 | 14450 | 0 |
| 16) | HERO | BERNARD HEROLD & CO. INC. | 14340 | 0 | 14340 | 0 | 0 | 0 |
| 17) | JANE | NASSAU STREET CAPITAL, LLC | 14200 | 0 | 14200 | 0 | 0 | 0 |
| 18) | GLIC | GLICKENHAUS | 14100 | 0 | 14100 | 0 | 0 | 0 |
| 19) | OING | OFTRING & COMPANY, INC. | 13750 | 0 | 13750 | 0 | 0 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 Equity **MKAC**

```
           Market  Maker  Activity              Page 16/26
ORACLE CORP                    Range 12/00- 3/01    Sort by T-Total
   ID    Name                  Total     %   Non-Block  %   Block     %
 1) ALEG                       13400     0   13400      0   0         0
 2) FCCP  FIRST CLEARING, LLC  13105     0   3105       0   10000     0
 3) VOSS                       12600     0   1600       0   11000     0
 4) PTRS  PETERS SECURITIES CO., LP  12100  0  12100    0   0         0
 5) JGUN  JOSEPH GUNNAR AND CO.  12000   0   2000       0   10000     0
 6) REFC  REFCO SECURITIES, LLC  11900   0  11900       0   0         0
 7) PILL  PILLBUG              11800     0   11800      0   0         0
 8) STAR  CGI INFORMATION SYSTEMS  11800  0  0          0   11800     0
 9) MAXI  MAX INTERNATIONAL BROKER/DE  11400  0  11400  0   0         0
10) HILL  HILL THOMPSON MAGID AND CO  11250  0  11250   0   0         0
11) FAST  FIRST ALLIED SECURITIES, IN  11000  0  200    0   10800     0
12) PSSL  AMARANTH SECURITIES L.L.C.  10800  0  10800   0   0         0
13) DSSI  PRESIDIO FINANCIAL SECURITI  10600  0  10600  0   0         0
14) SMMO  SMITH, MOORE & CO.   10000     0   10000      0   0         0
15) MURF  MURPHY AND DURIEU    10000     0   10000      0   0         0
16) TCEG  THE CONCORD EQUITY GROUP  10000  0  10000     0   0         0
17) BFFI  BERTHEL FISHER & COMPANY  9970  0   9970      0   0         0
18) FMSC  FIRST MONTAUK SECURITIES CO  9900  0  9900    0   0         0
19) GCAP  GLOBAL CAPITAL SECURITIES C  9800  0  9800    0   0         0
```
\* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity MKAC**

| | | **Market Maker Activity** | | | | | Page 17/26 | |
|---|---|---|---|---|---|---|---|---|
| ORACLE CORP | | Range 12/00- 3/01 | | | Sort by T-Total | | | |
| ID | Name | Total | % | Non-Block | % | Block | | % |
| 1) FOST | FOSTER SECURITIES | 9460 | 0 | 9460 | 0 | 0 | | 0 |
| 2) JADN | J. ALDEN ASSOCIATES, INC. | 9310 | 0 | 9310 | 0 | 0 | | 0 |
| 3) NEUB | NEUBERGER BERMAN, LLC | 9100 | 0 | 9100 | 0 | 0 | | 0 |
| 4) SPEN | SPENCER CLARKE L. P. | 8800 | 0 | 8800 | 0 | 0 | | 0 |
| 5) WBST | WEB STREET SECURITIES, INC. | 8500 | 0 | 8500 | 0 | 0 | | 0 |
| 6) NFGR | NATIONS FINANCIAL GROUP, IN | 8435 | 0 | 8435 | 0 | 0 | | 0 |
| 7) EQAL | EQUIBOND INC. | 8300 | 0 | 8300 | 0 | 0 | | 0 |
| 8) BHCS | FISERV SECURITIES, INC. | 8100 | 0 | 8100 | 0 | 0 | | 0 |
| 9) ASEL | TRADITION ASIEL SECURITIES | 8000 | 0 | 8000 | 0 | 0 | | 0 |
| 10) WINZ | WINCHESTER INVESTMENT SECUR | 7900 | 0 | 7900 | 0 | 0 | | 0 |
| 11) TCST | Tradecast Securities, Ltd. | 7700 | 0 | 7700 | 0 | 0 | | 0 |
| 12) PREC | PRECISION SECURITIES, LLC | 7500 | 0 | 7500 | 0 | 0 | | 0 |
| 13) MXXX | Millennium Securities Corp. | 7450 | 0 | 7450 | 0 | 0 | | 0 |
| 14) JLMS | SELF TRADING SECURITIES INC | 7442 | 0 | 7442 | 0 | 0 | | 0 |
| 15) IFCC | Interfirst Capital Corp. | 7425 | 0 | 7425 | 0 | 0 | | 0 |
| 16) FTBR | FOLIOFN INVESTMENTS, INC. | 7171 | 0 | 7171 | 0 | 0 | | 0 |
| 17) MOSS | MARKET MAKER OPTIONS STRATE | 7100 | 0 | 7100 | 0 | 0 | | 0 |
| 18) TIED | E*TRADE SECURITIES LLC | 7000 | 0 | 7000 | 0 | 0 | | 0 |
| 19) FORD | FORDHAM FINANCIAL | 7000 | 0 | 7000 | 0 | 0 | | 0 |

✻ Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity** **MKAC**

| | | Market Maker Activity | | | | | Page 18/26 | |
|---|---|---|---|---|---|---|---|---|
| ORACLE CORP | | Range 12/00- 3/01 | | | Sort by T-Total | | | |
| ID | Name | Total | % | Non-Block | % | Block | % | |
| 1) TDSC | TRACK DATA SECURITIES CORP. | 6800 | 0 | 6800 | 0 | 0 | 0 | |
| 2) TCCC | ABN AMRO INCORPORATED/CORRE | 6600 | 0 | 6600 | 0 | 0 | 0 | |
| 3) BKRT | BUCKMAN, BUCKMAN & REID, IN | 6500 | 0 | 6500 | 0 | 0 | 0 | |
| 4) PMKS | PMK SECURITIES AND RESEARCH | 6500 | 0 | 6500 | 0 | 0 | 0 | |
| 5) DATK | | 6321 | 0 | 6321 | 0 | 0 | 0 | |
| 6) SOLO | SOLOWEY AND CO. | 6100 | 0 | 6100 | 0 | 0 | 0 | |
| 7) RDNK | RAIKE FINANCIAL GROUP | 6000 | 0 | 6000 | 0 | 0 | 0 | |
| 8) TTMC | TEWKSBURY CAPITAL | 5900 | 0 | 5900 | 0 | 0 | 0 | |
| 9) JPRC | JPR CAPITAL | 5850 | 0 | 5850 | 0 | 0 | 0 | |
| 10) WNUT | WALNUT STREET SECURITIES, I | 5800 | 0 | 5800 | 0 | 0 | 0 | |
| 11) CREA | | 5700 | 0 | 5700 | 0 | 0 | 0 | |
| 12) LTCO | LADENBURG, THALMANN & CO. I | 5600 | 0 | 5600 | 0 | 0 | 0 | |
| 13) PSTG | PRESTIGE FINANCIAL CENTER, | 5200 | 0 | 5200 | 0 | 0 | 0 | |
| 14) ADSM | Adam Smith and Co. | 5000 | 0 | 5000 | 0 | 0 | 0 | |
| 15) SMHI | SANDERS MORRIS HARRIS INC. | 5000 | 0 | 5000 | 0 | 0 | 0 | |
| 16) IFSC | INTERCOASTAL FINANCIAL SERV | 5000 | 0 | 5000 | 0 | 0 | 0 | |
| 17) WPGC | ROBECO USA, L.L.C. | 5000 | 0 | 5000 | 0 | 0 | 0 | |
| 18) SUMT | SUMMIT BROKERAGE SERVICES, | 4900 | 0 | 4900 | 0 | 0 | 0 | |
| 19) ABLE | NATEXIS BLEICHROEDER INC. | 4800 | 0 | 4800 | 0 | 0 | 0 | |

✳ Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

`<HELP>` for explanation.

| | | Market Maker Activity | | | | | Page 19/26 | |
|---|---|---|---|---|---|---|---|---|
| ORACLE CORP | | Range 12/00- 3/01   Sort by T-Total | | | | | | |
| ID | Name | Total | % | Non-Block | % | Block | % | |
| 1) JANC | JANCO PARTNERS INC. | 4600 | 0 | 4600 | 0 | 0 | | 0 |
| 2) CCLS | COMPUTER CLEARING SERVICES | 4500 | 0 | 4500 | 0 | 0 | | 0 |
| 3) COHI | Collner Higgins & Co., Inc. | 4500 | 0 | 4500 | 0 | 0 | | 0 |
| 4) DSGI | DUPONT SECURITIES GROUP | 4500 | 0 | 4500 | 0 | 0 | | 0 |
| 5) GREY | SALOMON GREY FINANCIAL CORP | 4500 | 0 | 4500 | 0 | 0 | | 0 |
| 6) STLG | STERLING INVESTMENT SERVICE | 4400 | 0 | 4400 | 0 | 0 | | 0 |
| 7) CSCA | THE ADVISORS GROUP, INC. | 4380 | 0 | 4380 | 0 | 0 | | 0 |
| 8) KEAN | KEANE SECURITIES CO., INC. | 4200 | 0 | 4200 | 0 | 0 | | 0 |
| 9) HBCC | HIGHBRIDGE CAPITAL CORP. | 4200 | 0 | 4200 | 0 | 0 | | 0 |
| 10) BKST | BROOKSTREET SECURITIES CORP | 4175 | 0 | 4175 | 0 | 0 | | 0 |
| 11) PARI | BNP PARIBAS SECURITIES CORP | 4000 | 0 | 4000 | 0 | 0 | | 0 |
| 12) TATA | THORNES & ASSOCIATES, INC. | 3680 | 0 | 3680 | 0 | 0 | | 0 |
| 13) BDMK | | 3500 | 0 | 3500 | 0 | 0 | | 0 |
| 14) BLOW | HORNBLOWER AND WEEK | 3400 | 0 | 3400 | 0 | 0 | | 0 |
| 15) HLND | Highland Securities | 3310 | 0 | 3310 | 0 | 0 | | 0 |
| 16) MHMC | | 3275 | 0 | 3275 | 0 | 0 | | 0 |
| 17) CINV | Corporate Investments Group | 3264 | 0 | 3264 | 0 | 0 | | 0 |
| 18) BIDW | AMERITRADE NORTHWEST, INC. | 3200 | 0 | 3200 | 0 | 0 | | 0 |
| 19) SBRT | MURIEL SIEBERT AND CO. INC. | 3200 | 0 | 3200 | 0 | 0 | | 0 |

✱ Market maker volume is combined from multiple sources. See HELP for detail.

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2007 Bloomberg L.P.
G576-937-0 11-May-2007 18:48:46

**Bloomberg**
TERMINAL

<HELP> for explanation.                                   N236 Equity **MKAC**

| | | Market Maker Activity | | | | | Page 20/26 | |
|---|---|---|---|---|---|---|---|---|
| ORACLE CORP | | | Range 12/00- 3/01 | | Sort by T-Total | | | |
| ID | Name | Total | % | Non-Block | % | Block | % | |
| 1) RECO | RECOM SECURITIES, INC. | 3200 | 0 | 3200 | 0 | 0 | 0 | |
| 2) CVSI | | 3200 | 0 | 3200 | 0 | 0 | 0 | |
| 3) TIAD | TRIAD SECURITIES CORP | 3200 | 0 | 3200 | 0 | 0 | 0 | |
| 4) DDAY | Normandy Securities Inc. | 3000 | 0 | 3000 | 0 | 0 | 0 | |
| 5) PFCO | PARKER FINANCIAL CO | 3000 | 0 | 3000 | 0 | 0 | 0 | |
| 6) TKCO | TRAUTMAN WASSERMAN AND COMP | 3000 | 0 | 3000 | 0 | 0 | 0 | |
| 7) AMIS | American Investment Service | 3000 | 0 | 3000 | 0 | 0 | 0 | |
| 8) KOVS | KOVACK SECURITIES INC. | 3000 | 0 | 3000 | 0 | 0 | 0 | |
| 9) DBDM | MORGAN STANLEY DEAN WITTER | 2962 | 0 | 2962 | 0 | 0 | 0 | |
| 10) ASIC | | 2800 | 0 | 2800 | 0 | 0 | 0 | |
| 11) AFGI | ACCESS FINANCIAL GROUP | 2750 | 0 | 2750 | 0 | 0 | 0 | |
| 12) EFGI | EMPIRE FINANCIAL GROUP, INC | 2700 | 0 | 2700 | 0 | 0 | 0 | |
| 13) NDXT | NDX TRADING INC. | 2500 | 0 | 2500 | 0 | 0 | 0 | |
| 14) INGS | INGALLS AND SNYDER | 2500 | 0 | 2500 | 0 | 0 | 0 | |
| 15) MULE | MUELLER AND COMPANY | 2500 | 0 | 2500 | 0 | 0 | 0 | |
| 16) HOFR | HOEFER AND ARNETT INC. | 2400 | 0 | 2400 | 0 | 0 | 0 | |
| 17) RHIL | ROUND HILL SECURITIES, INC. | 2400 | 0 | 2400 | 0 | 0 | 0 | |
| 18) FINW | FINANCIAL WEST GROUP | 2200 | 0 | 2200 | 0 | 0 | 0 | |
| 19) NOYS | DAVID A. NOYES AND CO. | 2100 | 0 | 2100 | 0 | 0 | 0 | |

\* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                                    N236 **Equity MKAC**

| | **Market Maker Activity** | | | | | Page 21/26 | |
|---|---|---|---|---|---|---|---|

ORACLE CORP                    Range 12/00- 3/01    Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | JIMK | SUNSTATE EQUITY TRADING, IN | 2100 | 0 | 2100 | 0 | 0 | 0 |
| 2) | HCBR | HCFP BRENNER SECURITIES LLC | 2100 | 0 | 2100 | 0 | 0 | 0 |
| 3) | BAND | BROADBAND CAPITAL MANAGEMEN | 2000 | 0 | 2000 | 0 | 0 | 0 |
| 4) | RYAN | RYAN BECK & CO. | 2000 | 0 | 2000 | 0 | 0 | 0 |
| 5) | WSSS | WM SMITH SECURITIES INCORPO | 2000 | 0 | 2000 | 0 | 0 | 0 |
| 6) | PCHR | PRIME CHARTER LTD | 2000 | 0 | 2000 | 0 | 0 | 0 |
| 7) | RBLT | ROSENBLATT SECURITIES INC. | 2000 | 0 | 2000 | 0 | 0 | 0 |
| 8) | SUIC | STOCK USA, INC. | 1900 | 0 | 1900 | 0 | 0 | 0 |
| 9) | ICTI | INTERNATIONAL CORRESPONDENT | 1900 | 0 | 1900 | 0 | 0 | 0 |
| 10) | COSE | COSSE INTERNATIONAL SECURIT | 1812 | 0 | 1812 | 0 | 0 | 0 |
| 11) | LMKO | L.M. KOHN & COMPANY | 1810 | 0 | 1810 | 0 | 0 | 0 |
| 12) | ISRC | I S C Corp. | 1800 | 0 | 1800 | 0 | 0 | 0 |
| 13) | VMRU | VMR Capital Markets US -NQB | 1800 | 0 | 1800 | 0 | 0 | 0 |
| 14) | IMPC | IMPERIAL CAPITAL  LLC | 1700 | 0 | 1700 | 0 | 0 | 0 |
| 15) | WRIS | WESTPORT RESOURCES INVESTME | 1700 | 0 | 1700 | 0 | 0 | 0 |
| 16) | MERT | | 1600 | 0 | 1600 | 0 | 0 | 0 |
| 17) | CHES | | 1600 | 0 | 1600 | 0 | 0 | 0 |
| 18) | HULL | SLK-HULL DERIVATIVES, LLC | 1600 | 0 | 1600 | 0 | 0 | 0 |
| 19) | MGML | MILESTONE GROUP MANAGEMENT, | 1550 | 0 | 1550 | 0 | 0 | 0 |

✳ Market maker volume is combined from multiple sources. See HELP for detail.

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2007 Bloomberg L.P.
G576-937-0 11-May-2007 18:48:51

**Bloomberg**
TERMINAL

<HELP> for explanation.                                        N236 **Equity** **MKAC**

| | | Market Maker Activity | | | | | | Page 22/26 |
|---|---|---|---|---|---|---|---|---|

**ORACLE CORP**                     Range 12/00- 3/01      Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | MJWH | M. J. WHITMAN LLC | 1500 | 0 | 1500 | 0 | 0 | 0 |
| 2) | BUDS | STG SECURE TRADING GROUP, I | 1500 | 0 | 1500 | 0 | 0 | 0 |
| 3) | GURU | NEWBY AND COMPANY | 1500 | 0 | 1500 | 0 | 0 | 0 |
| 4) | CPMI | CAPITAL PORTFOLIO MANAGEMEN | 1500 | 0 | 1500 | 0 | 0 | 0 |
| 5) | CAIN | CARNEGIE INVESTOR SERVICES | 1500 | 0 | 1500 | 0 | 0 | 0 |
| 6) | ZOUL | N. B. ZOULLAS SECURITIES, I | 1400 | 0 | 1400 | 0 | 0 | 0 |
| 7) | SDBC | Summit Discount Brokerage | 1400 | 0 | 1400 | 0 | 0 | 0 |
| 8) | ICCP | INVESTORS CAPITAL CORPORATI | 1380 | 0 | 1380 | 0 | 0 | 0 |
| 9) | ISGC | SOLID ISG CAPITAL MARKETS I | 1350 | 0 | 1350 | 0 | 0 | 0 |
| 10) | KING | C. L. KING & ASSOCIATES, IN | 1340 | 0 | 1340 | 0 | 0 | 0 |
| 11) | WPAC | WHITE PACIFIC SECURITIES, I | 1300 | 0 | 1300 | 0 | 0 | 0 |
| 12) | NESS | NEW ENGLAND SECURITIES | 1280 | 0 | 1280 | 0 | 0 | 0 |
| 13) | GNLN | GUNNALLEN FINANCIAL INC. | 1220 | 0 | 1220 | 0 | 0 | 0 |
| 14) | PRDW | MERRILL LYNCH PRO CLEARING | 1217 | 0 | 1217 | 0 | 0 | 0 |
| 15) | EXCS | EXCEL SECURITIES & ASSOCIAT | 1200 | 0 | 1200 | 0 | 0 | 0 |
| 16) | ELSH | Elish & Elish Securities | 1100 | 0 | 1100 | 0 | 0 | 0 |
| 17) | DOMK | DOMINICK AND DOMINICK LLC | 1000 | 0 | 1000 | 0 | 0 | 0 |
| 18) | EQUI | EQUITRADE SECURITIES CORP. | 1000 | 0 | 1000 | 0 | 0 | 0 |
| 19) | GFSI | GLOBAL FINANCIAL SERVICES, | 1000 | 0 | 1000 | 0 | 0 | 0 |

✱ Market maker volume is combined from multiple sources. See HELP for detail.

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2007 Bloomberg L.P.
G576-937-0 11-May-2007 18:48:53

**Bloomberg**
TERMINAL

<HELP> for explanation.                                          N236 **Equity MKAC**

| | | | | Market Maker Activity | | | | Page 23/26 | |
|---|---|---|---|---|---|---|---|---|---|
| ORACLE CORP | | | Range 12/00- 3/01 | | | Sort by T-Total | | | |
| ID | Name | | Total | % | Non-Block | % | Block | | % |
| 1) MVST | MICROVEST SECURITIES CORP. | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 2) STSI | SPENCER TRASK VENTURES, INC | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 3) SUNG | Sunlogic Securities Inc. | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 4) IPRO | | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 5) EDGE | EDGETRADE.COM INC. | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 6) CIRI | CAMBRIDGE INVESTMENT RESEAR | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 7) INPD | INTREPID SECURITIES, INC. | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 8) RMPI | RICHARDS, MERRILL & PETERSO | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 9) SLSS | SLS Securities Company | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 10) BTAB | DB ALEX BROWN, LLC | | 1000 | 0 | 1000 | 0 | 0 | | 0 |
| 11) MWTI | Market Wise Securities, LLC | | 900 | 0 | 900 | 0 | 0 | | 0 |
| 12) WDCO | WILSON DAVIS AND CO. INC. | | 900 | 0 | 900 | 0 | 0 | | 0 |
| 13) QUIN | PARK FINANCIAL GROUP, INC. | | 900 | 0 | 900 | 0 | 0 | | 0 |
| 14) TRRT | TRADERIGHT SECURITIES | | 900 | 0 | 900 | 0 | 0 | | 0 |
| 15) BNBB | BELLAMAH, NEUHAUSER & BARRE | | 850 | 0 | 850 | 0 | 0 | | 0 |
| 16) BCHW | BIRCHWOOD SECURITIES CORP | | 844 | 0 | 844 | 0 | 0 | | 0 |
| 17) BLCK | JAMES I. BLACK & COMPANY | | 800 | 0 | 800 | 0 | 0 | | 0 |
| 18) MSIM | MICHIGAN SECURITIES, INC. | | 700 | 0 | 700 | 0 | 0 | | 0 |
| 19) TDSI | TD SECURITIES (USA) INC. | | 700 | 0 | 700 | 0 | 0 | | 0 |

\* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.                          N236 **Equity MKAC**

| **Market Maker Activity** | | | | | | Page 24/26 |

ORACLE CORP                     Range 12/00- 3/01      Sort by T-Total

| | ID | Name | Total | % | Non-Block | % | Block | % |
|---|---|---|---|---|---|---|---|---|
| 1) | EDFM | MAN SECURITIES INC. | 650 | 0 | 650 | 0 | 0 | 0 |
| 2) | MOKE | MORGAN KEEGAN | 600 | 0 | 600 | 0 | 0 | 0 |
| 3) | FRWE | Freeman Welwood and Co., In | 600 | 0 | 600 | 0 | 0 | 0 |
| 4) | BOSC | BOENNING AND SCATTERGOOD IN | 500 | 0 | 500 | 0 | 0 | 0 |
| 5) | FSWC | FIRST SOUTHWEST CO. | 500 | 0 | 500 | 0 | 0 | 0 |
| 6) | SIDP | Sydney Prevor & Co., Inc. | 500 | 0 | 500 | 0 | 0 | 0 |
| 7) | USTC | U.S. TRADING CORP. | 500 | 0 | 500 | 0 | 0 | 0 |
| 8) | GSTS | B.C. ZIEGLER AND COMPANY / | 500 | 0 | 500 | 0 | 0 | 0 |
| 9) | ITCC | C G MATON FINANCIAL SERVICE | 500 | 0 | 500 | 0 | 0 | 0 |
| 10) | CRTC | CRT CAPITAL GROUP LLC | 500 | 0 | 500 | 0 | 0 | 0 |
| 11) | CSCS | CSC SECURITIES LTD. | 500 | 0 | 500 | 0 | 0 | 0 |
| 12) | CUMB | CUMBERLAND BROKERAGE CORPOR | 500 | 0 | 500 | 0 | 0 | 0 |
| 13) | EHSJ | E.H. SMITH JACOBS & CO., IN | 500 | 0 | 500 | 0 | 0 | 0 |
| 14) | TAEP | TRUST ADVISORS EQUITY PLUS | 500 | 0 | 500 | 0 | 0 | 0 |
| 15) | BHFS | PERSHING LLC  ( BHFS ) | 480 | 0 | 480 | 0 | 0 | 0 |
| 16) | HEZZ | HEATHER AGENCY, INC. | 400 | 0 | 400 | 0 | 0 | 0 |
| 17) | COLS | COLONIAL SECURITIES, INC. | 400 | 0 | 400 | 0 | 0 | 0 |
| 18) | COMA | COHMAD SECURITIES CORP | 400 | 0 | 400 | 0 | 0 | 0 |
| 19) | SFGC | SOMERSET FINANCIAL GROUP IN | 400 | 0 | 400 | 0 | 0 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

<HELP> for explanation.

N236 **Equity** **MKAC**

| | **Market Maker Activity** | | | | | Page 25/26 | |
|---|---|---|---|---|---|---|---|
| ORACLE CORP | | Range 12/00- 3/01 | | Sort by T-Total | | | |
| ID | Name | Total | % | Non-Block | % | Block | % |
| 1) ETAI | EQUITY TRUST ADVISORS, INC. | 350 | 0 | 350 | 0 | 0 | 0 |
| 2) MDBI | Midwest Discount Brokers In | 300 | 0 | 300 | 0 | 0 | 0 |
| 3) RHIC | R H INVESTMENT CORPORATION, | 250 | 0 | 250 | 0 | 0 | 0 |
| 4) MDCP | MADISON CAPITAL ASSOCIATES, | 200 | 0 | 200 | 0 | 0 | 0 |
| 5) NVST | INVESTIN SECURITIES CORP | 200 | 0 | 200 | 0 | 0 | 0 |
| 6) POND | POND EQUITIES | 200 | 0 | 200 | 0 | 0 | 0 |
| 7) SPCC | SECURITIES INVESTMENT PLANN | 200 | 0 | 200 | 0 | 0 | 0 |
| 8) TRWN | T.R. WINSTON & COMPANY, LLC | 200 | 0 | 200 | 0 | 0 | 0 |
| 9) BZTN | ALLIANT SECURITIES, INC., T | 200 | 0 | 200 | 0 | 0 | 0 |
| 10) HDLY | J J B HILLIARD W L LYONS | 200 | 0 | 200 | 0 | 0 | 0 |
| 11) LOBR | LOEB PARTNERS CORPORATION/R | 200 | 0 | 200 | 0 | 0 | 0 |
| 12) RSEC | ROTHSCHILD LIEBERMAN LTD. | 200 | 0 | 200 | 0 | 0 | 0 |
| 13) SGAM | SEASONGOOD & MAYER | 200 | 0 | 200 | 0 | 0 | 0 |
| 14) STEQ | SUNTRUST CAPITAL MARKETS, I | 200 | 0 | 200 | 0 | 0 | 0 |
| 15) CART | CARTY AND CO. INC. | 175 | 0 | 175 | 0 | 0 | 0 |
| 16) RHUT | Royal Hutton Securities Cor | 125 | 0 | 125 | 0 | 0 | 0 |
| 17) AMPM | AM CAPITAL LLC | 100 | 0 | 100 | 0 | 0 | 0 |
| 18) MIST | SHARE KING, LLC | 100 | 0 | 100 | 0 | 0 | 0 |
| 19) FJMC | BOENNING AND SCATTERGOOD IN | 100 | 0 | 100 | 0 | 0 | 0 |

* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

Case 3:01-cv-00988-SI   Document 1574-1   Filed 12/12/08   Page 72 of 333

## Market Maker Activity                    Page 26/26

| | ORACLE CORP | | Range 12/00- 3/01 | Sort by T-Total | | | |
|---|---|---|---|---|---|---|---|
| ID | Name | Total | % | Non-Block | % | Block | % |
| 1) OKRI | OAK RIDGE INVESTMENTS | 100 | 0 | 100 | 0 | 0 | 0 |
| 2) REID | REID AND ASSOCIATES | 100 | 0 | 100 | 0 | 0 | 0 |
| 3) CRDL | CARDINAL INVESTMENTS, INC. | 100 | 0 | 100 | 0 | 0 | 0 |
| 4) HNMI | | 100 | 0 | 100 | 0 | 0 | 0 |
| 5) MKVA | MERRIMACK VALLEY INVESTMENT | 100 | 0 | 100 | 0 | 0 | 0 |
| 6) REAV | W.H. REAVES & CO. | 100 | 0 | 100 | 0 | 0 | 0 |

\* Market maker volume is combined from multiple sources. See HELP for detail.

**Bloomberg**
TERMINAL

# Exhibit F

<HELP> for explanation.                                N236 **Equity** SI
Enter all values and hit <GO> or # <PAGE> for table.
**SHORT INTEREST:**      ORCL US   $   Oracle Corp
                                                        PAGE  2 OF  2

| Date  | Short Interest | Close   | Avg D Vol | Short Interest Ratio |
|-------|----------------|---------|-----------|----------------------|
| 03/01 | 33790708       | 14.98   | 65.58MLN  | .52                  |
| 02/01 | 32822685       | 19.00   | 47.18MLN  | .70                  |
| 01/01 | 48624664       | 29.125  | 46.53MLN  | 1.05                 |
| 12/00 | 56172300       | 29.0625 | 54.61MLN  | 1.03                 |

**Bloomberg**
TERMINAL

# Exhibit G

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| 1838 INVESTMENT ADVISORS, LLC | 6,534,276 | 6,486,001 | 10,456,091 | 10,881,186 |
| 1ST SOURCE INV ADVISORS, INC. | 57,828 | 57,728 | 68,878 | 65,228 |
| 3BRIDGE CAPITAL LLC | 0 | 143,910 | 144,410 | 148,455 |
| A R ASSET MANAGEMENT, INC. | 0 | 25,600 | 45,600 | 45,600 |
| A. MONTAG & ASSOCIATES | 20,450 | 10,225 | 20,375 | 21,725 |
| A. R. SCHMEIDLER & CO, INC. | 72,300 | 37,500 | 14,780 | 0 |
| A.G. EDWARDS & SONS, INC. | 0 | 214,067 | 0 | 0 |
| AAL CAPITAL MANAGEMENT CORP. | 667,048 | 682,748 | 710,348 | 2,795,648 |
| ABERDEEN AMERICA, INC. | 1,212 | 1,212 | 1,212 | 1,212 |
| ABERDEEN ASSET MANAGERS LTD. | 1,328,232 | 620,300 | 30,000 | 1,212,000 |
| ABERDEEN ASSET MGMT(EDINBURGH) | 863,148 | 851,448 | 860,538 | 442,100 |
| ABN AMRO ASSET MGMT (USA) INC. | 1,463,346 | 910,206 | 908,786 | 423,785 |
| ABN AMRO NORTH AMER NEWCO INC | 14,908 | 639,303 | 1,954,918 | 2,298,966 |
| ABNER HERRMAN&BROCK ASSET MGMT | 140,920 | 10,600 | 242,150 | 35,275 |
| ACADIA TRUST, N.A. | 0 | 10,606 | 10,356 | 10,906 |
| ACADIAN ASSET MANAGEMENT, INC. | 0 | 8,000 | 34,600 | 28,500 |
| ACG MANAGEMENT, L.P. | 0 | 0 | 0 | 100,000 |
| ADAMS EXPRESS COMPANY | 1,180,000 | 1,180,000 | 1,180,000 | 1,180,000 |
| ADAMS HARKNESS, INC. | 70,016 | 0 | 2,200 | 2,200 |
| ADELL HARRIMAN& CARPENTER INC. | 0 | 1,022,273 | 1,040,745 | 1,027,587 |
| ADVANCE CAPITAL MGMT, INC. | 60,100 | 89,600 | 89,600 | 108,100 |
| ADVANCED INVESTMENT MGMT, INC. | 152,440 | 151,565 | 66,212 | 23,784 |
| ADVANCED INVESTMENT PTNR LLC | 874,800 | 849,100 | 798,700 | 671,340 |
| ADVANTUS CAPITAL MGMT, INC. | 2,014,934 | 1,325,952 | 1,298,948 | 943,510 |
| ADVEST GROUP INC | 235,738 | 363,921 | 369,047 | 398,377 |
| ADVEST TRUST COMPANY | 14,662 | 20,207 | 0 | 21,048 |
| ADVISORY RESEARCH, INC. | 17,478 | 17,921 | 19,833 | 20,711 |
| AFTON CAPITAL MGMT, L.L.C. | 18,500 | 27,500 | 16,500 | 0 |
| AIC ASSET MANAGEMENT, LLC | 0 | 0 | 0 | 164,800 |
| AIM MANAGEMENT GROUP, INC. | 40,319,600 | 38,895,431 | 29,062,188 | 23,822,398 |
| AKRE CAPITAL MANAGEMENT, LLC | 0 | 13,000 | 0 | 0 |
| ALBION FINANCIAL GROUP | 171,490 | 63,950 | 60,782 | 64,882 |
| ALERUS FINANCIAL, N.A. | 221,288 | 212,176 | 213,679 | 212,932 |
| ALGEMEEN BURGERLIJK PENSIOENF. | 0 | 0 | 0 | 1,586,959 |
| ALLEGIANT INVT COUNSELORS | 316,564 | 202,091 | 202,060 | 224,660 |
| ALLEN ARCHIE G JR | 5,880 | 1,680 | 3,880 | 3,880 |
| ALLEN HOLDING INC | 0 | 0 | 0 | 0 |
| ALLIANZ DRESDNER ASSET MGMT AM | 7,002,496 | 2,183,839 | 2,317,674 | 1,584,092 |
| ALLIED IRISH BANKS PLC | 1,599,318 | 1,224,700 | 1,192,294 | 1,873,812 |
| ALLSTATE LIFE INSURANCE | 98,800 | 124,700 | 87,500 | 72,400 |
| ALLSTATE PENSION PLAN | 179,100 | 221,600 | 196,800 | 138,400 |
| ALLSTATE RETIREMENT PLAN | 389,920 | 503,320 | 447,320 | 323,620 |
| ALTA CAPITAL MANAGEMENT, LLC | 8,150 | 0 | 0 | 0 |
| AMALGAMATED BANK OF NEW YORK | 1,942,136 | 2,014,836 | 1,953,636 | 1,882,936 |
| AMARILLO NATIONAL BANK | 23,490 | 23,700 | 23,733 | 23,733 |
| AMCORE INVT GROUP N A | 496,714 | 458,389 | 259,061 | 296,033 |
| AMELIA PEABODY FOUND | 60,000 | 50,000 | 10,000 | 20,000 |
| AMERICAN CENT INVESTMENT MGMT. | 40,348,000 | 21,402,000 | 10,643,900 | 24,583,231 |
| AMERICAN FUND ADVISORS, INC. | 1,600,600 | 1,627,350 | 1,042,500 | 1,044,400 |
| AMERICAN GENERAL CORPORATION | 6,943,900 | 17,520 | 6,047,935 | 4,817,555 |
| AMERICAN INTL GROUP INC | 6,316,864 | 1,119,650 | 862,920 | 827,210 |
| AMERICAN NATL TR & INV MGMT CO | 29,702 | 13,237 | 0 | 0 |
| AMERINDO INVESTMENT ADVR INC. | 0 | 0 | 0 | 5,000 |
| AMERISERV TR & FINL SERV CO | 0 | 72,043 | 0 | 0 |
| AMERISTOCK CORPORATION | 0 | 0 | 1,346 | 671 |
| AMICA MUTUAL INSURANCE COMPANY | 701,590 | 694,924 | 694,924 | 694,924 |
| AMICA PENSION FD BD TR | 194,930 | 181,596 | 181,596 | 181,596 |
| AMSOUTH BANCORPORATION | 1,231,470 | 1,436,552 | 1,441,204 | 879,376 |
| ANALYTIC INVESTORS, INC. | 318,134 | 360,128 | 56,246 | 754,160 |
| ANALYTIC/TSA INVESTORS, INC. | 90,932 | 0 | 0 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| ANGELO, GORDON & CO., L.P. | 0 | 40,000 | 92,000 | 0 |
| AON ADVISORS, INC. | 20,000 | 14,000 | 14,000 | 0 |
| APPLETON PARTNERS, INC. | 127,160 | 127,310 | 128,810 | 107,263 |
| ARBOR CAPITAL MGMT, L.L.C. | 590,000 | 0 | 0 | 0 |
| ARCADIA INVESTMENT MGMT CORP. | 451,658 | 463,438 | 469,338 | 533,688 |
| ARCHERY CAPITAL, LLC | 126,000 | 0 | 0 | 0 |
| AREA TRUST COMPANY | 0 | 0 | 0 | 91,388 |
| ARGENT CAPITAL MANAGEMENT, LLC | 6,828 | 0 | 13,311 | 10,895 |
| ARK ASSET MANAGEMENT CO, INC. | 2,619,200 | 239,703 | 346,503 | 392,003 |
| ARMSTRONG SHAW ASSOC, INC. | 0 | 0 | 21,600 | 21,600 |
| ARNHOLD&S.BLEICHROEDER ADVISER | 0 | 0 | 0 | 0 |
| ARONSON + JOHNSON + ORTIZ L.P. | 480,000 | 420,100 | 0 | 0 |
| ARTHUR KARAFIN INV ADVISERS IN | 0 | 0 | 83,700 | 0 |
| ARVEST TRUST COMPANY, N.A. | 315,268 | 317,768 | 315,928 | 312,028 |
| ASB CAPITAL MANAGEMENT, INC. | 0 | 269,144 | 266,919 | 2,008,191 |
| ASHFIELD & CO., INC. | 791,412 | 735,568 | 772,047 | 758,071 |
| ASHLAND MANAGEMENT, INC. | 1,389,574 | 1,357,232 | 1,378,852 | 1,427,828 |
| ASSET ADVR CORPORATION | 4,170 | 2,620 | 2,620 | 2,620 |
| ASSET MANAGEMENT, INC. (MD) | 120,762 | 121,670 | 130,070 | 132,655 |
| ASSET MGMT GROUP OF BK OF HI | 536,152 | 181,002 | 466,375 | 552,033 |
| ASSOCIATED BANC-CORP | 685,902 | 525,962 | 1,160,924 | 1,267,379 |
| ASSURANT ASSET MANAGEMENT | 367,200 | 184,500 | 179,300 | 0 |
| ATLANTA CAPITAL MGMT CO L.L.C. | 3,698,200 | 3,649,465 | 4,010,445 | 4,184,140 |
| ATLANTIC CAPITAL MGMT, LLC | 8,250 | 0 | 0 | 0 |
| ATLANTIC STEIN ROE INV COUNSEL | 0 | 0 | 139,828 | 180,167 |
| ATLANTIC TRUST ADVISORS, INC. | 21,390 | 15,500 | 13,300 | 16,000 |
| AUGUSTINE ASSET MGMT, INC. | 792,940 | 682,911 | 647,711 | 647,711 |
| AUXIER ASSET MANAGEMENT LLC | 0 | 27,560 | 25,700 | 25,500 |
| AVATAR INVESTORS ASSOC CORP | 253,124 | 0 | 0 | 579,194 |
| AXA FINANCIAL, INC. | 94,753,172 | 85,392,421 | 70,260,322 | 41,475,716 |
| AXE-HOUGHTON ASSOCIATES, INC. | 612,800 | 603,700 | 603,700 | 603,700 |
| AYCO COMPANY, L.P. | 21,006 | 23,541 | 41,378 | 25,712 |
| AYRSHIRE ASSOCIATES, INC. | 414,982 | 424,086 | 0 | 275,706 |
| BABSON CAPITAL MGMT L.L.C. | 583,856 | 1,358,146 | 1,367,030 | 1,551,970 |
| BABSON-UNITED INVT ADVS | 69,340 | 72,740 | 80,290 | 118,912 |
| BACK BAY ADVISORS, L.P. | 114,900 | 103,900 | 0 | 0 |
| BADGLEY, PHELPS & BELL, INC. | 0 | 15,825 | 14,525 | 13,925 |
| BAHL & GAYNOR, INC. | 124,000 | 126,050 | 128,100 | 124,300 |
| BAILARD, INC. | 200,736 | 204,361 | 204,127 | 91,711 |
| BAILLIE GIFFORD & CO. | 0 | 0 | 2,150 | 2,150 |
| BAINCO INTL INVESTORS, LLC | 16,850 | 22,650 | 210,290 | 125,210 |
| BAIRD INVESTMENT MANAGEMENT | 144,608 | 237,137 | 1,243,532 | 1,653,493 |
| BAKER BOYER INV MGMT & TR SERV | 84,850 | 124,820 | 122,945 | 131,645 |
| BAKER INVESTMENT GROUP LLC | 0 | 220,000 | 210,300 | 393,000 |
| BALDWIN BROTHERS INC. | 885,458 | 832,011 | 723,630 | 714,130 |
| BANCORPSOUTH, INC | 18,800 | 0 | 15,200 | 0 |
| BANK IRELAND ASSET MGMT LTD. | 7,426 | 7,226 | 0 | 10,348 |
| BANK NY TRUST CO FL, N.A. | 19,500 | 20,152 | 22,052 | 23,352 |
| BANK OF AMERICA CORPORATION | 24,209,050 | 18,947,997 | 18,770,431 | 18,919,056 |
| BANK OF OKLAHOMA, N.A. | 0 | 0 | 640,196 | 0 |
| BANK OF THE WEST | 5,700 | 0 | 0 | 0 |
| BANK ONE CORPORATION | 19,088,386 | 10,694,043 | 11,257,713 | 10,823,022 |
| BANKERS TRUST COMPANY (IOWA) | 30,500 | 38,830 | 43,780 | 43,680 |
| BANKMONT FINANCIAL CORP | 1,027,940 | 1,002,753 | 1,081,428 | 1,093,977 |
| BARCLAYS BANK PLC | 169,113,720 | 168,483,410 | 172,772,731 | 177,047,030 |
| BARCLAYS BK PLC-NY BRANCH | 0 | 146,200 | 215,000 | 178,770 |
| BARING ASSET MANAGEMENT, INC. | 3,960,400 | 4,219,800 | 5,347,000 | 22,900 |
| BARRETT ASSOCIATES, INC. | 935,872 | 1,093,037 | 1,124,490 | 0 |
| BAXTER INVESTMENT MANAGEMENT | 7,820 | 0 | 0 | 0 |
| BAY ISLE FINANCIAL LLC | 56,560 | 55,985 | 57,275 | 54,705 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| BB&T ASSET MANAGEMENT, INC. | 168,036 | 170,866 | 160,072 | 149,368 |
| BB&T TRUST COMPANY | 41,006 | 133,668 | 132,652 | 138,166 |
| BEACON ASSET MANAGEMENT, LLC | 13,400 | 0 | 0 | 0 |
| BEACON FIDUCIARY ADVISORS INC. | 680,296 | 0 | 649,783 | 661,883 |
| BEACON INVESTMENT COMPANY | 26,008 | 51,530 | 53,228 | 42,520 |
| BEAR STEARNS ASSET MGMT, INC. | 15,800 | 50,000 | 0 | 0 |
| BEAR, STEARNS & CO. INC. | 2,098,808 | 2,555,211 | 3,192,277 | 3,362,684 |
| BEATY HAYNES & ASSOC, INC. | 346,376 | 338,646 | 338,371 | 357,471 |
| BECKER CAPITAL MGMT, INC. | 6,280 | 9,540 | 0 | 0 |
| BEDELL INVT COUNSELING, LLC | 0 | 90,502 | 0 | 0 |
| BEESE, FULMER INVT MGMT, INC. | 0 | 0 | 0 | 10,250 |
| BEL AIR INVT ADVISORS, LLC | 251,140 | 0 | 123,932 | 113,142 |
| BENEFIT CAPITAL MGMT CORP | 378,000 | 696,700 | 676,700 | 0 |
| BENHAM & GREEN CAP MGMT, LLC | 0 | 70,645 | 86,634 | 96,424 |
| BENJ A SMITH & ASSOCIATES LTD | 0 | 20,340 | 69,440 | 83,030 |
| BENNICAS AND ASSOCIATES | 371,252 | 355,852 | 341,187 | 317,047 |
| BERGER LLC | 352,680 | 1,079,840 | 956,090 | 433,230 |
| BERKELEY CAPITAL MGMT LLC | 420 | 1,100 | 400 | 600 |
| BESSEMER GROUP INC | 4,670,662 | 136,012 | 150,770 | 134,153 |
| BETHLEHEM STEEL CORP PENS TR | 2,120,000 | 2,120,000 | 2,120,000 | 2,120,000 |
| BIRINYI ASSOCIATES, INC. | 133,828 | 122,428 | 82,798 | 56,148 |
| BISHOP STR CAPITAL MANAGEMENT | 188,948 | 253,360 | 403,050 | 268,655 |
| BISHOP STR CAPITAL MGMT CORP | 0 | 0 | 95,980 | 0 |
| BJURMAN, BARRY & ASSOCIATES | 0 | 183,620 | 120 | 0 |
| BKF ASSET MANAGEMENT, INC. | 12,000 | 19,100 | 22,300 | 22,300 |
| BLACKHILL CAPITAL, INC. | 0 | 8,000 | 8,000 | 8,000 |
| BLACKROCK FINL MGMT (SSR&M) | 4,069,170 | 4,143,200 | 80,037 | 0 |
| BLACKROCK INC | 2,220,488 | 2,196,388 | 3,463,928 | 2,844,248 |
| BNK-ASSET MGMT PARTNERS, INC. | 12,000 | 0 | 0 | 0 |
| BNP PARIBAS ARBITRAGE SNC | 1,672,296 | 3,191,305 | 2,886,630 | 3,901,040 |
| BNP PARIBAS ASSET S.A.S. | 1,044,900 | 1,288,800 | 3,402,990 | 3,721,190 |
| BNY ASSET MANAGEMENT | 2,109,784 | 2,052,194 | 1,991,927 | 1,989,204 |
| BOONE COUNTY NATIONAL BANK | 17,856 | 28,421 | 35,926 | 37,456 |
| BOSTON ADVISORS, LLC | 35,758 | 28,358 | 39,938 | 38,908 |
| BOSTON FINL MANAGEMENT, INC. | 17,000 | 0 | 17,200 | 0 |
| BOSTON TRUST & INVT MGMT CO. | 340,926 | 0 | 0 | 0 |
| BOWLING PORTFOLIO MGMT, L.L.C. | 11,000 | 10,000 | 10,000 | 10,000 |
| BOWMAN CAPITAL MGMT L.L.C. | 8,738,000 | 7,138,000 | 8,568,500 | 11,223,900 |
| BOWMAN FINL MGMT CO., INC. | 149,636 | 154,047 | 154,329 | 151,699 |
| BOYS, ARNOLD & COMPANY, INC. | 24,676 | 29,753 | 34,433 | 36,783 |
| BP PLC | 560,000 | 525,000 | 615,000 | 615,000 |
| BPI GBL ASSET MANAGEMENT LLC | 0 | 875,700 | 0 | 200,200 |
| BRADFORD CAPITAL, L.L.C. | 0 | 205,000 | 0 | 0 |
| BRADLEY FOSTER & SARGENT INC. | 57,404 | 51,554 | 51,736 | 48,016 |
| BRANDYWINE TRUST COMPANY | 0 | 91,800 | 109,991 | 109,991 |
| BREMER TRUST, N.A. | 0 | 147,965 | 132,890 | 134,940 |
| BRENNAN, JOHN F. | 0 | 300,000 | 0 | 475,000 |
| BRIDGES INVESTMENT MGMT INC | 0 | 9,000 | 0 | 0 |
| BRIDGES INVT COUNSEL, INC. | 103,018 | 104,048 | 106,468 | 103,368 |
| BRIDGEWAY CAPITAL MGMT, INC. | 10,568 | 11,368 | 11,368 | 0 |
| BROADMARK ASSET MGMT, LLC | 0 | 0 | 71,000 | 64,300 |
| BROWN BROTHERS HARRIMAN & CO | 100,220 | 634,088 | 314,404 | 246,585 |
| BROWN CAPITAL MANAGEMENT, INC. | 979,766 | 2,593,841 | 2,616,241 | 3,077,941 |
| BRUCE BENT ASSOCIATES, INC. | 0 | 0 | 0 | 257,800 |
| BRUNDAGE, STORY AND ROSE, LLC | 41,520 | 51,468 | 49,420 | 20,692 |
| BRYN MAWR TRUST COMPANY | 46,160 | 63,760 | 75,360 | 114,050 |
| BTI FINANCIAL GROUP | 40,394 | 47,074 | 56,200 | 74,501 |
| BUCKHEAD CAPITAL MGMT, L.L.C. | 0 | 24,744 | 16,944 | 20,744 |
| BUFKA & RODGERS L.L.C. | 31,152 | 35,952 | 35,952 | 35,952 |
| BULL DOG CAPITAL MGMT, L.L.C. | 140,000 | 0 | 50,000 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| BUNKER CAPITAL, L.L.C. | 0 | 0 | 197,276 | 196,489 |
| BURKE & HERBERT BK & TRUST CO. | 11,600 | 11,600 | 11,600 | 11,600 |
| BURNEY & CO. | 233,822 | 201,098 | 186,462 | 195,328 |
| BURNHAM ASSET MANAGEMENT CORP | 6,448 | 0 | 0 | 73,255 |
| BURNHAM, SULLIVAN & ASSOCIATES | 79,564 | 102,309 | 146,673 | 210,125 |
| BURROUGHS HUTCHINSON, INC. | 85,982 | 88,442 | 88,092 | 86,942 |
| BUTLER WICK ASSET MANAGEMENT | 6,350 | 30,200 | 31,300 | 35,750 |
| C. BLAIR ASSET MGMT, L.P. | 0 | 529,600 | 0 | 293,200 |
| C. M. BIDWELL & ASSOC, LTD. | 28,600 | 0 | 0 | 0 |
| C.S. MCKEE INVESTMENT MANAGERS | 376,100 | 0 | 0 | 0 |
| CADINHA & CO., L.L.C. | 22,440 | 11,870 | 0 | 0 |
| CALIFORNIA PUBLIC EMP RET SYS | 22,637,360 | 21,828,160 | 22,699,650 | 21,308,940 |
| CALIFORNIA STATE TEACH RET SYS | 17,286,944 | 17,285,464 | 17,092,454 | 16,688,064 |
| CAMELOT MANAGEMENT CORPORATION | 250,000 | 918,400 | 0 | 500,725 |
| CAMPBELL NEWMAN ASSET MGMT INC | 681,128 | 579,674 | 253,594 | 280,989 |
| CANANDAIGUA NATL BK & TRUST CO | 204,834 | 205,696 | 233,388 | 243,618 |
| CANYON CAPITAL ADVISORS, LLC | 0 | 0 | 20,000 | 20,000 |
| CAPE ANN SAVINGS BANK | 0 | 0 | 0 | 1,575 |
| CAPE COD BK & TRUST CO, N.A. | 10,238 | 10,478 | 11,478 | 11,378 |
| CAPITAL ADVISORS, INC. (OK) | 9,580 | 9,720 | 0 | 0 |
| CAPITAL CITY TRUST COMPANY | 76,488 | 85,410 | 97,980 | 89,894 |
| CAPITAL COUNSEL LLC | 6,348 | 0 | 0 | 0 |
| CAPITAL GUARDIAN TRUST COMPANY | 28,510 | 32,672 | 96,672 | 102,056 |
| CAPITAL INV SERV AMER, INC. | 115,800 | 181,220 | 194,032 | 190,432 |
| CAPITAL MANAGEMENT ASSOC, LLC | 12,220 | 11,810 | 0 | 8,145 |
| CAPITAL MANAGEMENT CORPORATION | 219,268 | 106,634 | 139,734 | 135,434 |
| CAPITAL RESEARCH & MGMT CO | 12,300,000 | 20,425,000 | 46,043,000 | 56,173,000 |
| CAPITAL WEST ASSET MGMT, LLC | 6,000 | 6,900 | 115 | 0 |
| CAPSTONE ASSET MANAGEMENT CO | 822,080 | 827,436 | 840,103 | 789,474 |
| CARNEGIE CAPITAL ASSET MGMT CO | 0 | 0 | 196,086 | 177,611 |
| CARRET ASSET MANAGEMENT, LLC | 519,140 | 0 | 0 | 621,557 |
| CASTLEARK MANAGEMENT, L.L.C. | 296,200 | 0 | 0 | 100,000 |
| CATAWBA CAPITAL MGMT, INC. | 32,000 | 12,300 | 30,648 | 32,548 |
| CATERPILLAR INVT MGMT LTD. | 149,420 | 145,820 | 145,820 | 145,820 |
| CAXTON ASSOCIATES, L.L.C. | 737,000 | 195,466 | 0 | 0 |
| CAZENOVE CAPITAL MGMT LIMITED | 0 | 0 | 815,235 | 645,935 |
| CCM INVESTMENT ADVISERS, LLC | 98,000 | 97,855 | 103,450 | 117,295 |
| CCM PTNR | 78,158 | 82,038 | 84,238 | 84,238 |
| CDC INVESTMENT MANAGEMENT CORP | 101,800 | 93,100 | 50,700 | 27,600 |
| CEDARPOINT CAPITAL MGMT, INC. | 6,600 | 0 | 0 | 0 |
| CENTRAL CAROLINA BK & CO, N.A. | 346,106 | 347,276 | 351,631 | 351,101 |
| CENTRAL TRUST BANK | 18,252 | 21,610 | 42,285 | 42,415 |
| CENTURA BANK | 145,550 | 146,750 | 132,210 | 137,860 |
| CFBD I, LLC | 200,000 | 0 | 0 | 0 |
| CGNU PLC (UK) | 0 | 0 | 0 | 589,905 |
| CHAPMAN CAPITAL MGMT, INC. | 158,600 | 75,800 | 0 | 10,200 |
| CHARLES D. HYMAN & CO. | 0 | 0 | 0 | 11,400 |
| CHARLES SCHWAB INVT MGMT, INC. | 7,658,904 | 7,598,564 | 7,595,224 | 7,871,949 |
| CHARLES STEWART MOTT FOUND | 300,000 | 370,000 | 370,000 | 370,000 |
| CHARTER TRUST COMPANY | 0 | 0 | 31,895 | 30,765 |
| CHAS.P.SMITH& ASSOC P.A. CPA S | 701,764 | 742,220 | 722,131 | 749,506 |
| CHASE INVESTMENT COUNSEL CORP | 721,860 | 414,040 | 0 | 0 |
| CHASE MANHATTAN CORP | 15,063,812 | 0 | 0 | 0 |
| CHEMUNG CANAL TRUST COMPANY | 7,400 | 14,548 | 16,148 | 19,548 |
| CHESAPEAKE ASSET MGMT, LLC | 75,000 | 36,700 | 36,700 | 36,700 |
| CHESWICK INVESTMENT CO, INC. | 72,254 | 77,254 | 73,554 | 66,504 |
| CHICAGO EQUITY PARTNERS, LLC | 3,735,134 | 3,898,644 | 2,803,224 | 3,064,759 |
| CHILTON CAPITAL MGMT, L.P. | 0 | 53,580 | 0 | 0 |
| CHILTON INVESTMENT CO., INC. | 0 | 0 | 0 | 200,000 |
| CHITTENDEN CORP | 240,630 | 275,258 | 288,003 | 343,808 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| CHUBB ASSET MANAGERS, INC. | 160,000 | 60,000 | 60,000 | 60,000 |
| CHURCH CAPITAL MANAGEMENT INC. | 0 | 0 | 0 | 10,325 |
| CIBC WORLD MARKETS CORP. | 1,958,012 | 2,317,840 | 1,860,162 | 1,869,585 |
| CITADEL INVESTMENT GRP, L.L.C. | 68,634 | 266,344 | 202,910 | 1,435,787 |
| CITIGROUP INC | 38,498,470 | 38,027,904 | 44,394,035 | 43,538,056 |
| CITIZENS ADVISERS, INC. | 0 | 951,860 | 909,560 | 0 |
| CITIZENS BANK OF RHODE ISLAND | 406,138 | 0 | 0 | 0 |
| CITIZENS BK WEALTH MGMT, N.A. | 49,082 | 48,492 | 52,680 | 52,680 |
| CITY CAPITAL INC | 9,192 | 9,192 | 0 | 0 |
| CITY NATL ASSET MGMT, INC. | 94,388 | 101,316 | 95,243 | 103,548 |
| CLIFFORD ASSOCIATES | 6,260 | 0 | 250,948 | 262,308 |
| CLOVER CAPITAL MGMT, INC. | 10,596 | 0 | 0 | 0 |
| COATUE MANAGEMENT, LLC | 0 | 46,000 | 0 | 529,000 |
| COBALT CAPITAL MGMT, INC. | 0 | 20,000 | 0 | 0 |
| COBBLESTONE CAP ADVISORS L.L.C | 311,972 | 389,762 | 435,767 | 459,862 |
| COEN & DENSMORE, INC. | 54,820 | 0 | 0 | 0 |
| COGAN JOHN F JR TRUSTEE | 0 | 0 | 1,100 | 1,100 |
| COHEN KLINGENSTEIN& MARKS INC. | 20,048 | 20,048 | 0 | 6,126,034 |
| COHO PARTNERS, LTD. | 0 | 73,196 | 83,296 | 82,696 |
| COLDSTREAM CAPITAL MGMT, INC. | 18,950 | 103,625 | 115,853 | 125,722 |
| COLLEGE RETIRE EQUITIES | 59,645,130 | 55,061,195 | 54,306,382 | 56,735,582 |
| COLLEGE RETIREMENT EQUITIES FD | 102,632 | 118,574 | 199,351 | 151,393 |
| COLONY GROUP, LLC | 234,848 | 227,107 | 216,717 | 223,277 |
| COLORADO STATE BANK AND TRUST | 16,146 | 15,096 | 15,296 | 14,896 |
| COLUMBIA FUNDS MGMT CO | 1,673,000 | 1,333,100 | 0 | 0 |
| COLUMBIA MGMT ADVISORS INC.(CO | 612,520 | 499,600 | 536,900 | 587,900 |
| COLUMBIA MGMT ADVISORS INC.(CR | 0 | 0 | 5,200 | 535,200 |
| COLUMBIA MGMT ADVISORS INC.(OR | 2,414,760 | 1,995,240 | 2,287,365 | 830,500 |
| COLUMBIA MGMT ADVISORS INC.(ST | 2,368,434 | 350,914 | 228,200 | 261,600 |
| COLUMBIA PARTNERS L.L.C.INV MG | 780,078 | 631,213 | 643,593 | 628,960 |
| COLUMBIA TRUST CO | 337,600 | 305,300 | 0 | 0 |
| COLUMBUS CIRCLE INVESTORS | 1,321,800 | 0 | 0 | 0 |
| COMERICA INC | 4,212,928 | 4,271,583 | 4,404,108 | 4,503,035 |
| COMMERCE BANCSHARES INC | 2,546,780 | 2,562,816 | 2,646,243 | 2,025,643 |
| COMMUN TRUST & INVESTMENT CO | 27,820 | 30,560 | 36,050 | 34,105 |
| COMPASS BANCSHARES INC | 26,360 | 26,160 | 26,540 | 40,140 |
| CONCORD ASSET MANAGEMENT, LLC | 0 | 0 | 0 | 0 |
| CONDOR CAPITAL MGMT, INC. | 240,166 | 264,880 | 289,708 | 297,973 |
| CONGRESS ASSET MANAGEMENT CO | 1,093,584 | 754,399 | 0 | 0 |
| CONNABLE ASSOCIATES INC. | 294,088 | 295,588 | 325,496 | 326,991 |
| CONNING ASSET MANAGEMENT CO | 537,044 | 521,480 | 542,146 | 542,246 |
| CONSECO INC | 93,120 | 0 | 0 | 0 |
| COOLIDGE, FRANCIS L | 7,120 | 6,920 | 0 | 0 |
| COPPER MOUNTAIN TRUST COMPANY | 63,698 | 51,896 | 0 | 0 |
| COURIER CAPITAL CORPORATION | 0 | 41,844 | 0 | 0 |
| COWEN & CO., LLC | 681,040 | 674,679 | 1,566,148 | 1,255,798 |
| CRAMER ROSENTHAL MCGLYNN, LLC | 25,094 | 0 | 0 | 0 |
| CRAWFORD INVT COUNSEL INC. | 26,842 | 14,678 | 0 | 0 |
| CREDIT SUISSE ASSET MGMT LLC(U | 3,707,330 | 2,521,720 | 2,590,251 | 2,494,226 |
| CREDIT SUISSE SECS (USA) LLC | 782,820 | 391,130 | 396,366 | 607,022 |
| CROFT-LEOMINSTER, INC. | 20,228 | 0 | 0 | 0 |
| CROSSLINK CAPITAL, INC. | 10,000 | 0 | 0 | 0 |
| CROWN ADVR INTL LTD. | 0 | 44,000 | 44,000 | 44,000 |
| CSI CAPITAL MANAGEMENT, INC. | 76,934 | 73,634 | 73,634 | 92,184 |
| CYPRESS ASSET MANAGEMENT, INC. | 10,950 | 11,050 | 18,300 | 20,400 |
| CYPRESS CAPITAL GROUP, INC. | 48,084 | 40,775 | 48,076 | 44,256 |
| CYPRESS FUNDS L.L.C. | 0 | 0 | 0 | 0 |
| D. E. SHAW & CO., L.P. | 0 | 97,300 | 0 | 0 |
| D. L. CARLSON INVT GRP, INC. | 63,108 | 87,708 | 88,808 | 88,608 |
| DAI-ICHI MUTUAL LIFE INSUR CO | 3,756,282 | 2,259,533 | 1,901,317 | 1,870,378 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---:|---:|---:|---:|
| DANFORTH ASSOCIATES, INC. | 118,644 | 116,018 | 107,236 | 106,867 |
| DARRELL & KING | 0 | 0 | 0 | 26,600 |
| DASSORI F DAVIS JR | 15,956 | 15,956 | 15,500 | 15,500 |
| DAVENPORT & COMPANY, L.L.C. | 60,552 | 55,207 | 85,317 | 86,817 |
| DAVID VAUGHAN INVTS, INC. | 20,676 | 20,486 | 26,486 | 28,286 |
| DAVID WENDELL ASSOCIATES, INC. | 0 | 15,900 | 23,800 | 30,800 |
| DAVIDSON & GARRARD, INC. | 192,444 | 202,359 | 256,838 | 328,107 |
| DAVIDSON CAPITAL MANAGEMENT | 122,364 | 123,362 | 106,564 | 124,264 |
| DAVIDSON INVT ADVISORS, INC. | 17,620 | 0 | 0 | 0 |
| DAVIS HAMILTON JACKSON | 1,708,436 | 1,823,881 | 1,933,011 | 1,962,701 |
| DE GARMO& KELLEHER INV COUNSEL | 0 | 0 | 0 | 0 |
| DEARDEN MAGUIRE WEAVER&BARRETT | 409,168 | 399,140 | 384,461 | 352,362 |
| DEERE & COMPANY | 528,000 | 726,900 | 726,900 | 726,900 |
| DELAWARE MANAGEMENT CO | 2,400,600 | 2,367,550 | 2,571,100 | 3,502,400 |
| DELTA CAPITAL MGMT, L.L.C. | 8,550 | 0 | 0 | 0 |
| DELTEC ASSET MGMT, L.L.C. | 12,100 | 2,300 | 1,800 | 2,100 |
| DENVER INVESTMENT ADVR LLC | 105,006 | 107,806 | 115,391 | 125,416 |
| DEPRINCE, RACE & ZOLLO, INC. | 16,000 | 8,800 | 13,800 | 0 |
| DERBY AND COMPANY, INC. | 0 | 0 | 0 | 0 |
| DEUTSCHE BK AKTIENGESELLSCHAFT | 72,256,084 | 71,548,260 | 71,027,418 | 72,363,804 |
| DEUTSCHE INV MGMT AMERICAS INC | 33,537,512 | 23,886,439 | 28,719,814 | 24,558,248 |
| DEWEY SQUARE INVESTORS CORP | 5,200 | 0 | 0 | 0 |
| DIAMOND CAP MANAGMENT INCORPOR | 180,000 | 281,200 | 122,300 | 106,600 |
| DILLON & ASSOCIATES, INC. | 0 | 53,250 | 108,725 | 146,490 |
| DIMENSIONAL FD ADVISORS, INC. | 1,492,200 | 1,504,800 | 1,489,100 | 1,592,948 |
| DISCIPLINED GR INVESTORS, INC | 878,600 | 857,650 | 849,150 | 850,600 |
| DISCIPLINED INV ADVISORS, INC. | 166,850 | 162,250 | 164,150 | 161,650 |
| DIXON, HUBARD & FEINOUR, INC. | 12,872 | 16,300 | 16,300 | 16,330 |
| DKR CAPITAL, INC. | 0 | 0 | 75,900 | 0 |
| DLIBJ ASSET MGMT CO., LTD. | 1,427,872 | 1,029,957 | 1,261,419 | 1,204,332 |
| DNB NOR ASSET MGMT, INC. (US) | 2,555,350 | 3,033,560 | 4,303,650 | 4,551,080 |
| DOERGE & SMITH PRIV ADVR, LLC | 0 | 0 | 6,540 | 10,490 |
| DOMINICK & DOMINICK LLC | 129,380 | 151,560 | 204,900 | 204,890 |
| DOUGLAS C. LANE & ASSOC, INC. | 278,958 | 189,794 | 180,486 | 170,238 |
| DOUGLAS, NOYES & COMPANY | 0 | 22,950 | 60,100 | 17,150 |
| DOWLING & YAHNKE, INC. | 0 | 58,170 | 61,220 | 73,547 |
| DREMAN VALUE MGMT, L.L.C. | 0 | 0 | 2,148,690 | 2,192,780 |
| DRESDNER BANK AG | 3,683,906 | 4,004,918 | 4,350,470 | 5,862,322 |
| DUFF & PHELPS INVT MGMT CO | 36,750 | 36,750 | 137,015 | 28,660 |
| DUNCAN-HURST CAP MGMT, L.P. | 247,572 | 0 | 0 | 0 |
| DUNCKER, STREETT & CO., L.L.C. | 24,584 | 22,664 | 0 | 25,064 |
| DUPONT CAPITAL MANAGEMENT CORP | 2,111,732 | 2,008,632 | 2,306,032 | 2,168,032 |
| DUQUESNE CAPITAL MGMT, L.L.C. | 400,000 | 0 | 0 | 0 |
| EAGLE ASSET MANAGEMENT, INC. | 394,030 | 236,050 | 25,750 | 433,411 |
| EAGLE GLOBAL ADVISORS, LLC | 0 | 64,609 | 65,534 | 68,500 |
| EARNEST PARTNERS, LLC | 548,400 | 548,400 | 535,400 | 261,400 |
| EASTERN INVESTMENT ADVISERS | 0 | 460,224 | 441,569 | 447,034 |
| EATON VANCE MANAGEMENT, INC. | 3,925,846 | 3,679,235 | 3,682,125 | 3,706,625 |
| EDEN CAPITAL MANAGEMENT INC. | 0 | 0 | 20,000 | 0 |
| EDGEWOOD MANAGEMENT COMPANY | 667,844 | 754,116 | 610,634 | 888,146 |
| EDWARD JONES TRUST COMPANY | 107,542 | 123,772 | 139,007 | 157,295 |
| ELEFANTE, MICHAEL B | 0 | 13,748 | 10,200 | 10,200 |
| ELLIOTT & ASSOCIATES, INC. | 170,300 | 169,018 | 168,694 | 182,728 |
| ELLIOTT INTL CAP ADVISORS INC. | 604,900 | 0 | 55,550 | 150,000 |
| EMERSON INVESTMENT MGMT, INC. | 50,000 | 49,570 | 57,570 | 73,230 |
| ENDEX CAPITAL MANAGEMENT, LLC | 169,800 | 69,126 | 69,126 | 69,126 |
| ENGEBRETSON CAPITAL MGMT, INC. | 70,100 | 90 | 90 | 90 |
| ENGEMANN ASSET MANAGEMENT | 12,787,690 | 12,725,854 | 13,527,127 | 13,305,878 |
| ENTRUST PTNR LLC | 0 | 0 | 87,000 | 0 |
| ENTRUST PTNR OFFSHORE LLC | 0 | 0 | 13,000 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| EOS PARTNERS, L.P. | 100,000 | 0 | 0 | 0 |
| EQUINOX CAPITAL MGMT, LLC | 36,600 | 0 | 0 | 0 |
| EQUITRUST INV MGMT SERV, INC. | 72,540 | 72,540 | 77,433 | 94,533 |
| ESSEX INV MGMT CO.L.L.C.(BURRI | 843,460 | 966,209 | 1,087,823 | 1,114,933 |
| ESSEX INVT MGMT CO., L.L.C. | 481,448 | 0 | 0 | 0 |
| ESTABROOK CAPITAL MGMT, L.L.C. | 27,920 | 28,020 | 30,060 | 34,210 |
| EUROPEAN INVESTORS INC. | 71,800 | 74,600 | 119,700 | 122,900 |
| EXCALIBUR MANAGEMENT CORP | 14,100 | 0 | 0 | 0 |
| EXIS CAPITAL, L.L.C. | 90,000 | 0 | 130,000 | 0 |
| EXXONMOBIL INVESTMENT MGMT | 1,006,614 | 992,078 | 1,100,427 | 1,083,627 |
| F. L. PUTNAM INVT MGMT CO. | 5,080 | 0 | 0 | 0 |
| F. N. B. INVESTMENT ADVR | 79,126 | 81,036 | 94,772 | 124,506 |
| FACTORY MUTUAL INSURANCE CO | 3,357,720 | 3,357,720 | 2,032,720 | 2,062,720 |
| FAIRFIELD RESEARCH CORP. | 199,972 | 197,641 | 160,655 | 141,725 |
| FARMERS & MECHANICS NATL BK | 7,880 | 8,280 | 0 | 0 |
| FARR, MILLER & WASHINGTON, LLC | 21,400 | 19,200 | 19,240 | 19,640 |
| FARRELL-SL INVT MGMT INC. | 173,780 | 172,820 | 201,070 | 102,890 |
| FEDERATED INVESTORS, INC. | 3,494,518 | 2,705,118 | 2,887,268 | 2,950,468 |
| FERGUSON WELLMAN CAP MGMT INC. | 25,312 | 22,065 | 0 | 557,708 |
| FIDELITY INTL LTD | 5,349,820 | 6,106,821 | 1,638,271 | 1,524,680 |
| FIDELITY MANAGEMENT & RESEARCH | 123,326,248 | 141,637,518 | 80,922,499 | 7,714,239 |
| FIDUCIARY ASSET MGMT, LLC | 689,732 | 614,982 | 559,017 | 548,826 |
| FIDUCIARY MGMT ASSOC, LLC | 0 | 58,100 | 0 | 0 |
| FIDUCIARY TRUST COMPANY | 197,452 | 199,782 | 205,282 | 206,102 |
| FIDUCIARY TRUST COMPANY INTL | 2,749,926 | 6,026,393 | 7,113,397 | 0 |
| FIFTH THIRD ASSET MGMT (MI) | 633,584 | 653,817 | 675,819 | 684,550 |
| FIFTH THIRD BANK | 12,600 | 13,000 | 21,250 | 28,150 |
| FIFTH THIRD INVESTMENT ADVR | 805,250 | 840,408 | 958,782 | 6,885,203 |
| FINANCIAL COUNSELORS, INC. | 108,824 | 100,985 | 184,513 | 179,760 |
| FINANCIAL INFORMATION NETWORK | 669,704 | 632,402 | 625,106 | 637,454 |
| FINANCIAL MGMT ADVISORS, LLC | 4,000 | 0 | 0 | 0 |
| FINANCIAL PTNR CAP MGMT, INC. | 11,700 | 11,000 | 12,300 | 0 |
| FIRST AMERICAN TRUST CO NA | 320,308 | 330,053 | 341,053 | 383,205 |
| FIRST CITIZENS BK & TRUST CO | 1,996,658 | 0 | 1,822,970 | 1,993,347 |
| FIRST COMMONWEALTH FINL CORP. | 55,650 | 57,750 | 56,550 | 61,350 |
| FIRST COMMUN BK N.A.&FINL SERV | 116,812 | 120,528 | 123,135 | 122,860 |
| FIRST FINL CAP ADVISORS L.L.C. | 26,722 | 30,946 | 33,168 | 35,002 |
| FIRST INTERSTATE BANK | 83,190 | 89,340 | 76,990 | 79,225 |
| FIRST INV MANAGEMENT CO, INC. | 593,200 | 520,300 | 641,200 | 1,256,200 |
| FIRST MANHATTAN COMPANY | 12,060 | 11,860 | 12,250 | 13,274 |
| FIRST MIDWEST TRUST COMPANY | 214,664 | 223,884 | 246,152 | 230,462 |
| FIRST NATIONAL BANK OF OMAHA | 14,660 | 14,160 | 13,910 | 13,360 |
| FIRST NATL BK CHESTER COUNTY | 12,410 | 12,860 | 13,485 | 20,908 |
| FIRST NIAGARA INV ADVISORS INC | 192,130 | 170,020 | 162,050 | 167,580 |
| FIRST QUADRANT L.P. | 2,379,200 | 1,897,800 | 1,557,000 | 384,600 |
| FIRST SECURITY CORP/UTAH | 999,534 | 1,021,237 | 1,056,486 | 0 |
| FIRST ST INVESTMENTS (UK) LTD. | 11,360 | 0 | 0 | 0 |
| FIRST TENNESSEE NATIONAL CORP | 183,642 | 187,880 | 180,900 | 194,652 |
| FIRST TRUST ADVR L.P. | 0 | 0 | 88,924 | 88,028 |
| FIRST TRUST PORTFOLIOS L.P. | 81,484 | 96,417 | 0 | 0 |
| FIRST VIRGINIA BANK | 129,098 | 138,998 | 140,348 | 138,148 |
| FIRSTAR CORPORATION | 2,759,320 | 2,964,265 | 0 | 0 |
| FIRSTHAND CAPITAL MGMT, INC. | 1,664,956 | 1,797,666 | 1,769,723 | 1,523,536 |
| FIRSTMERIT BANK, N.A. | 269,754 | 287,404 | 299,794 | 279,000 |
| FIRSTTRUST INDIANA | 0 | 45,290 | 37,680 | 40,460 |
| FISHER INVESTMENTS | 25,972 | 201,779 | 21,049 | 16,162 |
| FLEET BOSTON CORPORATION | 4,325,740 | 4,395,450 | 3,517,196 | 3,304,317 |
| FLORIDA STATE BD ADMINISTRATIO | 9,587,648 | 11,274,048 | 10,925,548 | 10,946,548 |
| FOLGER NOLAN FLEMING DOUGLAS | 6,770 | 0 | 24,520 | 25,990 |
| FORSTMANN-LEFF ASSOC, L.L.C. | 188,600 | 272,600 | 670,300 | 657,300 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| FORT HILL CAPITAL, L.L.C. | 6,000 | 0 | 0 | 0 |
| FORT WA INVT ADVISORS, INC. | 394,420 | 54,070 | 49,328 | 31,328 |
| FORTIS INVESTMENTS (US) | 3,492,182 | 1,099,268 | 568,263 | 143,700 |
| FOXHALL CAPITAL MGMT, INC. | 22,786 | 28,511 | 26,000 | 45,692 |
| FRANKLIN RESOURCES INC | 2,591,820 | 1,868,620 | 708,120 | 6,490,684 |
| FRED ALGER MANAGEMENT INC. | 8,552,370 | 7,785,435 | 6,136,455 | 0 |
| FREEDOM CAP MGMT L.L.C.(BOSTON | 436,940 | 327,175 | 330,285 | 282,320 |
| FREEMAN ASSOC INV MGMT, L.L.C. | 669,000 | 503,700 | 526,300 | 605,900 |
| FREESTONE CAPITAL MGMT INC. | 0 | 4,110 | 0 | 0 |
| FROLEY, REVY INVT CO INC. | 5,300 | 0 | 0 | 0 |
| FRONT BARNETT ASSOC L.L.C. | 36,868 | 16,746 | 26,321 | 29,660 |
| FRONTIER CAPITAL MGMT CO, LLC | 5,200 | 98,100 | 137,800 | 0 |
| FROST NATIONAL BANK | 166,918 | 181,989 | 268,898 | 313,656 |
| FRYE-LOUIS CAPITAL MGMT, INC. | 417,716 | 427,815 | 458,812 | 435,767 |
| FULTON BREAKEFIELD BROENNIMAN | 13,870 | 9,198 | 0 | 0 |
| FULTON FINANCIAL ADVR | 40,256 | 65,092 | 70,815 | 143,810 |
| FUND ASSET MANAGEMENT | 232,880 | 16,500 | 16,500 | 38,600 |
| G.W. & WADE, INC. | 0 | 48,614 | 50,344 | 0 |
| G.W. HENSSLER & ASSOC, LTD. | 214,924 | 199,798 | 48,448 | 44,305 |
| GABRIEL CAPITAL CORPORATION | 817,728 | 0 | 809,790 | 1,238,668 |
| GALLEON MANAGEMENT L.P. | 1,330,000 | 200,000 | 820,000 | 191,200 |
| GAM USA, INC. | 2,024 | 2,024 | 2,024 | 9,822 |
| GAMBLE, JONES, MORPHY & BENT | 476,482 | 481,111 | 497,547 | 516,976 |
| GANNETT WELSH & KOTLER, LLC | 949,330 | 956,030 | 891,310 | 923,620 |
| GARDNER LEWIS ASSET MGMT, L.P. | 0 | 0 | 0 | 0 |
| GARDNER RUSSO & GARDNER | 2,200 | 2,340 | 1,740 | 2,740 |
| GARRETT NAGLE & CO., INC. | 400 | 0 | 0 | 0 |
| GARRISON INST ASSET MGMT, INC. | 311,662 | 281,804 | 292,665 | 328,965 |
| GARTMORE GLOBAL ASSET MGMT LTD | 2,895,446 | 5,733,562 | 5,182,600 | 2,762,992 |
| GARTMORE MUT FD CAPITAL TRUST | 2,555,516 | 3,096,595 | 3,086,195 | 701,536 |
| GATEWAY INVT ADVISERS, L.P. | 1,018,208 | 979,564 | 1,069,910 | 1,016,444 |
| GBL STRAT FINANCIAL INC. | 371,080 | 134,440 | 0 | 1,676,200 |
| GE ASSET MANAGEMENT INC | 1,468,178 | 1,499,113 | 0 | 0 |
| GEEWAX, TERKER & COMPANY | 4,718,020 | 4,974,760 | 0 | 0 |
| GENERAL ELECTRIC COMPANY | 15,600 | 0 | 3,682,394 | 3,680,291 |
| GENERAL MOTORS ASSET MGMT | 496,200 | 518,700 | 511,800 | 507,300 |
| GENERAL RE-NEW ENGLAND ASSET M | 73,700 | 75,000 | 75,120 | 75,320 |
| GENESIS CAPITAL MGMT, L.L.C. | 0 | 28,940 | 0 | 0 |
| GLENMEDE TRUST COMPANY | 1,157,828 | 1,667,955 | 1,604,775 | 1,633,023 |
| GLENS FALLS NATL BK & TRUST CO | 118,338 | 148,238 | 145,738 | 162,963 |
| GLICKENHAUS & COMPANY | 134,400 | 150,700 | 98,900 | 0 |
| GLOBALT INVESTMENTS | 1,036,876 | 879,661 | 954,811 | 554,391 |
| GLOBEFLEX CAPITAL, L.P. | 90 | 95 | 21,475 | 0 |
| GODSEY & GIBB ASSOCIATES | 5,456 | 0 | 0 | 0 |
| GOFEN AND GLOSSBERG, L.L.C. | 181,778 | 180,782 | 165,486 | 169,336 |
| GOLDEN CAPITAL MGMT, L.L.C. | 0 | 41,200 | 89,500 | 90,750 |
| GOLDMAN SACHS & COMPANY | 32,990,998 | 44,244,518 | 45,053,207 | 41,874,540 |
| GRACE, NICHOLAS A | 8,450 | 8,450 | 0 | 0 |
| GRANTHAM MAYO VAN OTTERLOO&CO. | 4,418,904 | 3,656,304 | 3,135,904 | 2,820,004 |
| GRASSI INVESTMENT MGMT, L.L.C. | 0 | 198,379 | 201,744 | 224,414 |
| GREAT COMPANIES, LLC | 0 | 0 | 0 | 196,094 |
| GREAT LAKES ADVISORS, INC. | 0 | 0 | 0 | 70 |
| GREAT-WEST LIFE & ANNTY INS CO | 1,222,680 | 1,205,620 | 1,136,804 | 1,045,163 |
| GREENBERG-SUMMIT PARTNERS, LLC | 330,000 | 0 | 44,711 | 0 |
| GREENLEAF TRUST | 0 | 0 | 13,850 | 15,000 |
| GRIES FINANCIAL LLC | 0 | 181,310 | 188,300 | 83,500 |
| GRIFFIN ASSET MANAGEMENT, LLC | 0 | 278 | 0 | 0 |
| GROESBECK INVT MGMT CORP. | 1,200 | 600 | 600 | 0 |
| GROUPAMA ASSET MANAGEMENT | 6,560 | 0 | 6,791,743 | 6,954,520 |
| GRUBER&MCBAINE CAP MGMT L.L.C. | 0 | 0 | 1,000 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| GRUNTAL & CO., L.L.C. | 0 | 0 | 0 | 79,201 |
| GRYPHON CAPITAL MGMT, L.L.C. | 0 | 56,569 | 0 | 0 |
| GUARANTY TRUST COMPANY OF MO | 139,520 | 151,217 | 136,714 | 134,274 |
| GUARDIAN INVESTOR SERV CORP | 4,145,056 | 4,145,056 | 3,336,156 | 2,086,033 |
| H. G. WELLINGTON & CO., INC. | 421,678 | 420,678 | 431,778 | 399,088 |
| HABERER REGISTERED INV ADVR IN | 12,262 | 11,874 | 0 | 0 |
| HAKER ZELLMER INVT MGMT INC | 0 | 0 | 27,424 | 29,496 |
| HAMMER ROY A ESQ | 6,900 | 6,900 | 11,900 | 15,800 |
| HANCOCK BANK TRUST DEPT | 10,832 | 21,232 | 18,512 | 5,822 |
| HANGAR 4 PARTNERS, L.L.C. | 0 | 13,000 | 0 | 0 |
| HANSBERGER GBL INVESTORS INC.( | 0 | 0 | 0 | 0 |
| HARBOR ADVISORY CORPORATION | 96,482 | 95,238 | 94,338 | 101,538 |
| HARDESTY CAPITAL MGMT CORP. | 474,528 | 521,214 | 553,622 | 566,565 |
| HARDING, LOEVNER MGMT, L.P. | 94,600 | 106,700 | 168,080 | 186,520 |
| HAROLD C. BROWN & CO., LLC | 34,558 | 35,303 | 35,303 | 33,428 |
| HARRIS ASSOCIATES L.P. | 0 | 0 | 13,900 | 14,500 |
| HARRIS BRETALL SULLIVAN&SMITH | 0 | 0 | 14,320 | 15,095 |
| HARTFORD INVT MGMT CO, INC. | 1,911,256 | 1,976,056 | 2,520,416 | 2,482,006 |
| HARTLINE INVESTMENT CORP | 377,706 | 308,591 | 304,128 | 307,521 |
| HARVARD MANAGEMENT CO, INC. | 2,298,424 | 2,298,424 | 2,323,424 | 2,323,424 |
| HARVEST CAPITAL MGMT, INC. | 133,470 | 145,645 | 150,093 | 163,043 |
| HARVEY CAPITAL MANAGEMENT INC. | 0 | 203,600 | 232,100 | 239,000 |
| HAVERFORD TRUST COMPANY | 130,936 | 77,168 | 74,668 | 61,602 |
| HBK INVESTMENTS, L.P. | 0 | 0 | 0 | 0 |
| HEARTLAND CAPITAL MGMT, INC. | 1,244,840 | 1,183,793 | 1,376,413 | 1,460,071 |
| HENDERSON FUND MANAGEMENT PLC | 0 | 0 | 0 | 0 |
| HERITAGE FINL MANAGEMENT LLC | 0 | 33,000 | 0 | 0 |
| HERITAGE INVESTORS MGMT CORP. | 5,178 | 5,988 | 7,588 | 17,002 |
| HERMES PENSION MANAGEMENT LTD. | 1,020,284 | 940,482 | 940,482 | 1,231,992 |
| HESTER CAPITAL MGMT, L.L.C. | 0 | 417,518 | 396,786 | 396,486 |
| HIBERNIA NATIONAL BANK (LA) | 120,178 | 147,338 | 243,453 | 281,723 |
| HIGH POINT BK & TRUST COMPANY | 0 | 0 | 0 | 40,487 |
| HIGH ROCK ASSET MGMT LLC | 0 | 0 | 816,500 | 0 |
| HIGHLAND CAPITAL MGMT CORP. | 0 | 7,518 | 0 | 0 |
| HINTZ HOLMAN & ROBILLARD INC. | 1,380,580 | 1,032,780 | 765,989 | 765,989 |
| HOTCHKISS ASSOCIATES, LLC | 76,596 | 78,396 | 0 | 104,396 |
| HOWARD HUGHES MEDICAL INSTITUT | 290,000 | 480,000 | 540,000 | 540,000 |
| HOWE AND RUSLING, INC. | 5,400 | 9,648 | 0 | 0 |
| HSBC BANK USA | 42,064 | 42,064 | 0 | 0 |
| HSBC HOLDINGS PLC | 5,147,820 | 6,196,885 | 5,282,728 | 5,390,142 |
| HUGHES INVESTMENT MGMT, INC. | 26,800 | 9,600 | 9,600 | 8,100 |
| HUNTINGTON PRIVATE FINL GROUP | 586,726 | 580,756 | 619,249 | 669,865 |
| HUNTLEY THATCHER ELLSWORTH INC | 73,910 | 74,495 | 73,385 | 73,610 |
| HUSIC CAPITAL MANAGEMENT | 649,268 | 0 | 0 | 0 |
| HUTCHENS INVESTMENT MGMT, INC. | 96,386 | 82,416 | 13,206 | 182,152 |
| HVB CAPITAL MANAGEMENT, INC. | 2,140 | 1,600 | 600 | 600 |
| I. G. INVESTMENT MGMT, LTD. | 936,500 | 942,640 | 1,210,200 | 1,545,700 |
| IBM RETIREMENT FUNDS | 2,989,594 | 2,990,482 | 3,157,934 | 3,218,294 |
| ICC CAPITAL MANAGEMENT, INC. | 2,100 | 3,900 | 9,350 | 11,650 |
| ICM ASSET MANAGEMENT, INC. | 200,620 | 178,150 | 145,386 | 121,486 |
| INDEPENDENCE INVESTMENT, LLC | 8,077,600 | 6,931,744 | 4,063,600 | 5,673,100 |
| INDEPENDENT INVESTORS, INC. | 393,832 | 385,832 | 372,064 | 370,064 |
| ING FINANCIAL MARKETS LLC | 25,280 | 26,342 | 0 | 0 |
| ING INVESTMENT MGMT CO. (CT) | 11,366,064 | 11,883,694 | 14,133,044 | 9,529,279 |
| ING INVESTMENT MGMT CO. (GA) | 306,292 | 362,917 | 294,292 | 260,592 |
| ING INVESTMENT MGMT CO. (NY) | 990,568 | 1,359,000 | 1,340,300 | 1,234,503 |
| ING INVESTMENTS, LLC | 1,156,100 | 536,117 | 319,245 | 1,388,492 |
| ING INVT MGMT (NETHERLANDS) | 121,492 | 189,092 | 164,852 | 138,887 |
| ING LEXINGTON MANAGEMENT CORP | 0 | 0 | 182,533 | 191,000 |
| ING PILGRIM QUANTITATIVE MGMT | 0 | 0 | 0 | 17,250 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| INGALLS&SNYDER LLC(ASSET MGMT) | 41,970 | 46,915 | 59,030 | 74,130 |
| INNOVEST CAPITAL MGMT INC. | 174,000 | 154,000 | 156,700 | 114,600 |
| INSIGHT CAP RES & MGMT, INC. | 367,822 | 370,475 | 243,787 | 238,426 |
| INTEGRA BANK, N.A. | 32,682 | 38,977 | 48,106 | 34,863 |
| INTEL CORPORATION | 1,206,384 | 1,206,384 | 1,441,984 | 1,649,584 |
| INTREPID CAPITAL ADVISORS, LLC | 0 | 18,100 | 0 | 0 |
| INTREPID CAPITAL MGMT, INC | 0 | 39,500 | 0 | 0 |
| INTREPID FUND MANAGEMENT, LLC | 0 | 42,400 | 0 | 0 |
| INVERNESS COUNSEL, INC. | 19,000 | 20,500 | 14,300 | 12,300 |
| INVESCO CAPITAL MGMT INC. | 20,684,230 | 17,865,036 | 17,024,799 | 27,894,676 |
| INVESCO FUNDS GROUP, INC. | 2,947,200 | 3,692,140 | 4,576,370 | 3,797,640 |
| INVESCO-NATL ASSET MGMT CORP | 2,721,240 | 3,007,536 | 5,094,356 | 0 |
| INVESTORS ASSET MGMT, INC. | 0 | 0 | 0 | 0 |
| INVESTORS MGMT SERVICES, INC. | 26,700 | 27,000 | 28,500 | 27,400 |
| IPS ADVISORY, INC. | 81,000 | 81,000 | 80,700 | 0 |
| IRONWOOD CAPITAL MGMT LLC | 0 | 10,360 | 10,360 | 10,760 |
| ISIS ASSET MGMT PLC(SCOTLAND)_ | 2,063,320 | 2,009,415 | 2,264,355 | 0 |
| J A GLYNN & CO | 500,108 | 270,493 | 233,744 | 180,274 |
| J. & W. SELIGMAN & CO., INC. | 2,497,710 | 3,301,600 | 1,336,535 | 1,304,760 |
| J. BUSH & CO., INC. | 599,552 | 563,792 | 0 | 414,732 |
| J. M. FORBES & CO. | 0 | 0 | 0 | 0 |
| J. W. BURNS & COMPANY | 10,712 | 11,350 | 10,550 | 10,550 |
| J.J.B.HILLIARD W.L. LYONS INC. | 133,192 | 0 | 0 | 0 |
| J.L. BERKOWITZ & CO, L.L.C. | 80,000 | 0 | 0 | 0 |
| J.P MORGAN CHASE & CO. | 27,447,160 | 49,650,328 | 40,807,120 | 43,803,237 |
| JACOBS & CO. | 7,248 | 8,496 | 0 | 0 |
| JACOBS LEVY EQUITY MGMT, INC. | 4,549,920 | 3,660,780 | 1,353,740 | 402,440 |
| JAMES C.EDWARDS ASSET MGMT INC | 135,564 | 123,564 | 123,564 | 123,564 |
| JAMES INVESTMENT RESEARCH INC. | 38,010 | 39,100 | 750 | 0 |
| JAMISON, EATON & WOOD, INC. | 98,076 | 0 | 0 | 0 |
| JANUS CAPITAL MANAGEMENT LLC | 9,920,462 | 4,236,585 | 7,709,740 | 5,640,746 |
| JAY A. FISHMAN, LTD. | 1,644,482 | 1,614,049 | 1,584,576 | 1,602,325 |
| JENNISON ASSOCIATES LLC | 86,400 | 1,021,100 | 1,201,300 | 18,325,257 |
| JENSEN INVESTMENT MGMT, INC. | 2,400 | 5,170 | 5,170 | 5,170 |
| JLB & ASSOCIATES, INC. | 403,664 | 378,814 | 360,814 | 407,954 |
| JMG CAPITAL MANAGEMENT, L.L.C. | 0 | 73,286 | 0 | 0 |
| JOHN G. ULLMAN & ASSOC, INC. | 20,400 | 34,850 | 55,625 | 57,645 |
| JOHN HANCOCK FINL SERV, INC. | 2,892,454 | 2,826,462 | 2,003,133 | 1,531,198 |
| JOHN P. O BRIEN INVT MGMT INC. | 152,116 | 151,476 | 151,476 | 151,476 |
| JOHN W. BRISTOL & CO, INC. | 0 | 667,962 | 2,135,819 | 2,224,950 |
| JOHNSON INVT COUNSEL, INC. | 21,354 | 21,374 | 40,188 | 46,733 |
| JOHNSTON, LEMON & CO., INC. | 15,248 | 12,200 | 19,650 | 22,050 |
| JOSEPH PARKER & COMPANY, INC. | 142,240 | 141,640 | 141,640 | 140,920 |
| JULIUS BAER INVT MGMT LLC | 0 | 900 | 0 | 700 |
| JUNDT ASSOCIATES, INC. | 0 | 50,000 | 0 | 0 |
| JURIKA & VOYLES, L.P. | 0 | 0 | 20,192 | 21,692 |
| K CAPITAL PARTNERS, L.L.C. | 0 | 0 | 335,000 | 0 |
| KANALY TRUST COMPANY | 361,348 | 360,838 | 471,533 | 608,253 |
| KANAWHA CAPITAL MGMT, LLC | 144,578 | 139,548 | 141,338 | 147,633 |
| KAYNE ANDERSON RUDNICK INV MGM | 3,149,320 | 1,562,787 | 1,650,319 | 3,214,384 |
| KBSH CAPITAL MANAGEMENT INC. | 0 | 0 | 0 | 0 |
| KCM INVESTMENT ADVR | 41,680 | 35,809 | 71,775 | 76,125 |
| KELLER GRP INVT MGMT, INC. | 571,362 | 591,872 | 582,481 | 562,191 |
| KELMOORE INVESTMENT CO., INC. | 276,200 | 370,700 | 400,900 | 648,400 |
| KEN ROBERTS INVT MGMT, INC. | 82,540 | 83,278 | 290,813 | 309,909 |
| KENTUCKY TEACH RETIREMENT SYS | 2,055,572 | 2,087,472 | 1,679,272 | 2,239,272 |
| KEYBANC CAPITAL MARKETS | 12,600 | 0 | 0 | 0 |
| KEYBANK NATIONAL ASSOCIATION | 8,417,014 | 7,970,341 | 8,611,965 | 8,561,898 |
| KEYDEL, FREDERICK R., TRUSTEE | 94,328 | 94,328 | 94,328 | 94,328 |
| KEYSTONE FINANCIAL INC. | 42,256 | 0 | 0 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| KIRKBRIDE ASSET MGMT, INC. | 166,338 | 126,629 | 151,679 | 158,863 |
| KLINGENSTEIN FIELDS&CO. L.L.C. | 9,848 | 7,800 | 0 | 0 |
| KMF ADVISERS, L.L.C. | 200,000 | 200,000 | 0 | 500,000 |
| KNIGHTS OF COLUMBUS | 13,400 | 108,200 | 195,900 | 270,200 |
| KNOWLTON STANLEY | 12,600 | 0 | 0 | 0 |
| KOBRICK CAPITAL MANAGEMENT | 78,400 | 0 | 0 | 0 |
| KOBRICK FUNDS LLC | 197,400 | 22,400 | 495,600 | 416,900 |
| KORNREICH JOHN | 0 | 0 | 35,000 | 50,000 |
| L. ROY PAPP & ASSOCIATES, LLP | 24,720 | 27,320 | 28,920 | 29,400 |
| LAIRD NORTON TRUST COMPANY | 19,018 | 35,020 | 36,940 | 44,096 |
| LAKE FOREST CAPITAL MGMT CO. | 47,040 | 46,415 | 49,615 | 0 |
| LAKEPOINT INV PARTNERS, L.L.C. | 186,250 | 170,524 | 131,924 | 127,524 |
| LASALLE BANK | 2,403,818 | 1,979,714 | 1,812,388 | 1,888,413 |
| LAWRENCE W. KELLY & ASSOC INC. | 0 | 0 | 12,000 | 12,000 |
| LAWRENCE, EDWARD P | 18,150 | 9,175 | 17,850 | 18,550 |
| LAZARD FRERES & COMPANY LLC | 2,564,562 | 1,074,797 | 1,207,432 | 881,678 |
| LEDYARD NATIONAL BANK | 20,012 | 35,732 | 75,057 | 82,957 |
| LEE MUNDER INVESTMENTS LTD/FLA | 6,448 | 7,648 | 0 | 0 |
| LEGACY SOUTH, INC. | 0 | 0 | 213,520 | 310,470 |
| LEGAL & GENERAL GROUP PLC | 4,261,894 | 4,711,805 | 5,046,847 | 5,313,741 |
| LEGG MASON INC | 2,842,282 | 3,506,881 | 3,759,986 | 4,947,577 |
| LEHMAN BROTHERS INC. | 827,486 | 575,501 | 2,118,911 | 1,681,324 |
| LEHRER MANAGEMENT CO., INC. | 52,148 | 0 | 0 | 0 |
| LEONETTI AND ASSOCIATES, INC. | 464,750 | 209,850 | 150,850 | 0 |
| LIBBIE AGRAN FINL SERVICES | 244,800 | 276,675 | 277,180 | 276,180 |
| LIBERTY MUTUAL INS CO | 800 | 0 | 0 | 0 |
| LIBERTY RIDGE CAPITAL, INC. | 4,179,000 | 0 | 200,000 | 0 |
| LILLEY & COMPANY | 121,272 | 132,102 | 153,082 | 163,518 |
| LINCOLN EQUITY MGMT, L.L.C. | 34,123,000 | 31,498,000 | 32,160,900 | 13,083,300 |
| LINDNER ASSET MANAGEMENT, INC. | 131,800 | 88,700 | 117,700 | 86,900 |
| LIPPER, KENNETH | 0 | 85,100 | 77,500 | 0 |
| LOEB ARBITRAGE MGMT INC | 5,000 | 0 | 0 | 0 |
| LOGAN CAPITAL MANAGEMENT, INC. | 120,612 | 103,614 | 96,314 | 94,379 |
| LOKKEN, CHESNUT & CAPE, INC. | 0 | 57,767 | 78,387 | 0 |
| LONDON PACIFIC ADVR | 7,948 | 21,459 | 57,213 | 99,515 |
| LOOMIS, SAYLES & COMPANY, L.P. | 542,504 | 1,838,899 | 138,467 | 43,367 |
| LORAIN NATIONAL BANK | 0 | 268,026 | 256,746 | 256,346 |
| LORD, ABBETT & CO. LLC | 4,003,604 | 96,676 | 102,118 | 112,504 |
| LORING WOLCOTT&COOLIDGE FIDUCI | 180,646 | 445,926 | 609,912 | 680,999 |
| LOTSOFF CAPITAL MANAGEMENT | 0 | 21,688 | 25,028 | 27,395 |
| LOWE BROCKENBROUGH & CO, INC. | 555,362 | 459,446 | 542,689 | 759,119 |
| LOWELL, WILLIAM A | 104,000 | 64,000 | 104,000 | 104,000 |
| LSV ASSET MANAGEMENT | 0 | 0 | 0 | 9,900 |
| LUTHER KING CAPITAL MGMT CORP. | 1,712,874 | 1,637,994 | 1,367,728 | 1,237,860 |
| LYNCH & ASSOCIATES, INC. | 78,962 | 81,277 | 83,637 | 88,387 |
| LYON STR ASSET MGMT CO | 912,578 | 908,318 | 931,118 | 916,348 |
| LYON, STUBBS & TOMPKINS INC. | 295,500 | 295,390 | 15,590 | 13,590 |
| M. A. GREENWOOD & ASSOC, INC. | 7,348 | 7,498 | 15,590 | 10,292 |
| MACKAY SHIELDS LLC | 11,874,852 | 11,935,132 | 14,539,932 | 12,816,652 |
| MACKENZIE FINANCIAL CORP | 202,194 | 0 | 55,881 | 260,636 |
| MAIN LINE TRUST COMPANY | 813,464 | 821,354 | 832,884 | 833,156 |
| MAINE BANK CORPORATION | 5,548 | 6,548 | 8,014 | 0 |
| MAINSTREAM INVT ADVISERS LLC | 10,000 | 0 | 0 | 0 |
| MANAGERS INVESTMENT GROUP LLC | 106,600 | 130,200 | 155,780 | 181,980 |
| MANNING & NAPIER ADVISORS INC. | 64,256 | 105,840 | 98,701 | 98,701 |
| MANUFACTURERS & TRADERS TRUST | 329,366 | 367,294 | 380,004 | 389,295 |
| MARCO INVESTMENT MGMT, L.L.C. | 273,018 | 282,650 | 300,355 | 294,225 |
| MARK MORRIS | 2,840,946 | 2,604,579 | 2,252,743 | 1,721,919 |
| MARSHALL & ILSLEY CORP | 197,942 | 203,448 | 213,849 | 205,701 |
| MARSHFIELD ASSOCIATES | 5,080 | 0 | 0 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| MARSICO CAPITAL MGMT, L.L.C. | 12,382,630 | 0 | 0 | 0 |
| MARTIN & COMPANY, L.P. | 288,492 | 311,082 | 332,607 | 360,857 |
| MARTIN CURRIE INC | 42,000 | 0 | 36,500 | 14,000 |
| MARTIN CURRIE INVT MGMT LTD. | 64,000 | 0 | 109,100 | 109,100 |
| MARTINGALE ASSET MGMT, L.P. | 78,000 | 66,500 | 0 | 0 |
| MARVIN & PALMER ASSOC, INC. | 931,200 | 0 | 373,800 | 0 |
| MASTRAPASQUA ASSET MGMT, INC. | 3,016,480 | 3,572,519 | 3,957,904 | 4,027,459 |
| MB FINANCIAL BANK | 47,000 | 0 | 0 | 0 |
| MB INVESTMENT PTNR | 951,280 | 951,826 | 952,784 | 889,084 |
| MCCORMACK ADVR INT L, L.L.C. | 64,200 | 54,140 | 50,540 | 83,640 |
| MCDONALD & CO SECURITIES | 272,036 | 210,080 | 111,600 | 107,415 |
| MCGAHAN GREENE MCHUGH CAP MGMT | 662,600 | 698,300 | 698,300 | 698,300 |
| MCGARR CAPITAL MGMT CORP. | 0 | 0 | 96,000 | 54,900 |
| MCGLINN CAPITAL MGMT, INC. | 0 | 216,200 | 344,800 | 326,000 |
| MCKINLEY CAPITAL MGMT, INC. | 656,132 | 767,406 | 673,705 | 0 |
| MCMILLION CAPITAL MGMT, INC. | 67,420 | 94,222 | 113,005 | 0 |
| MCRAE CAPITAL MANAGEMENT, INC. | 25,660 | 32,460 | 32,260 | 30,280 |
| MDT ADVISERS | 507,000 | 321,400 | 0 | 0 |
| MEAG NEW YORK CORPORATION | 169,800 | 0 | 169,800 | 607,000 |
| MECHANICS BK INVT MGMT & TRUST | 91,902 | 81,982 | 71,958 | 61,942 |
| MEEDER ASSET MANAGEMENT | 25,800 | 25,000 | 26,500 | 22,850 |
| MELLON BANK NA | 45,928,018 | 48,291,986 | 46,425,759 | 35,338,338 |
| MELLON PRIV WEALTH MGMT (PGIA) | 0 | 0 | 77,600 | 265,400 |
| MELLON PRIV WEALTH MGMT(THE AR | 13,840 | 14,370 | 13,790 | 14,190 |
| MENOYO, ERIC F TRUSTEE | 0 | 8,000 | 0 | 0 |
| MERCANTILE BANKSHARES CORP | 359,832 | 227,324 | 267,185 | 328,062 |
| MERCANTILE NATIONAL BANK OF IN | 0 | 0 | 23,000 | 20,250 |
| MERIDIAN MANAGEMENT COMPANY | 184,564 | 198,989 | 222,189 | 232,439 |
| MERITAGE PORTFOLIO MANAGEMENT | 108,680 | 104,669 | 121,639 | 119,174 |
| MERRILL LYNCH & CO INC | 7,057,618 | 8,817,534 | 8,962,532 | 8,971,615 |
| MERRILL LYNCH INV MANAGERS CO. | 968,030 | 1,042,000 | 1,093,440 | 1,173,270 |
| MERRILL LYNCH INV MANAGERS(NJ) | 16,564,616 | 19,649,265 | 15,331,129 | 17,822,633 |
| MERRILL LYNCH INV MANAGERS(UK) | 1,498,906 | 1,696,174 | 2,769,856 | 2,549,952 |
| MESIROW FINL INVT MGMT, INC. | 126,200 | 118,180 | 254,600 | 343,320 |
| METROPOLITAN LIFE INS CO. (US) | 3,494,112 | 3,454,715 | 3,411,156 | 3,477,911 |
| MFC GLOBAL INVESTMENT MGMT | 964,734 | 778,130 | 924,882 | 878,713 |
| MFC GLOBAL INVT MGMT USA LTD | 90,932 | 649,721 | 817,161 | 805,683 |
| MFM INTL | 0 | 0 | 127,790 | 0 |
| MFS INVESTMENT MANAGEMENT | 141,062,404 | 134,076,225 | 114,963,625 | 117,046,689 |
| MICHIGAN NATIONAL BANK | 581,048 | 676,544 | 719,200 | 516,940 |
| MIDAS MANAGEMENT CORPORATION | 54,400 | 13,700 | 0 | 0 |
| MID-CONTINENT CAPITAL, L.L.C. | 143,610 | 41,225 | 41,219 | 0 |
| MIDDLETON & COMPANY, INC. | 225,332 | 225,697 | 216,644 | 192,904 |
| MILBANK WINTHROP & CO. | 64,728 | 64,728 | 64,728 | 64,728 |
| MILLENNIUM MANAGEMENT, L.L.C. | 0 | 623,255 | 0 | 0 |
| MILLER/HOWARD INVTS, INC. | 13,068 | 0 | 0 | 0 |
| MISSOURI STATE EMP  RETIRE SYS | 729,788 | 724,988 | 702,188 | 702,188 |
| MITCHELL SINKLER & STARR | 2,300 | 0 | 0 | 2,020 |
| MMA CAPITAL MANAGEMENT | 0 | 0 | 93,000 | 164,850 |
| MONARCH CAPITAL MGMT, INC. | 0 | 0 | 0 | 0 |
| MONARCH INVT ADVISORS, LLC | 35,066 | 30,024 | 0 | 0 |
| MONETARY MGMT GROUP, INC. | 0 | 70,425 | 46,875 | 44,725 |
| MONETTA FINL SERVICES INC. | 12,000 | 8,000 | 0 | 0 |
| MONTAG & CALDWELL, INC. | 128,024 | 10,733,490 | 10,707,401 | 20,386,905 |
| MONTANA BOARD OF INVESTMENTS | 686,000 | 936,000 | 1,286,000 | 0 |
| MONTGOMERY ASSET MGMT, LLC | 1,153,878 | 350,250 | 378,500 | 449,600 |
| MONUMENT ADVISORS, LTD. | 61,552 | 0 | 0 | 0 |
| MOODY NATIONAL BANK | 6,400 | 0 | 0 | 0 |
| MOODY, LYNN & CO. | 105,160 | 60,296 | 51,286 | 46,686 |
| MOORE CAPITAL ADVISERS | 119,600 | 0 | 0 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| MOORE CAPITAL MANAGEMENT, INC. | 469,200 | 0 | 0 | 0 |
| MORGAN ASSET MANAGEMENT, INC. | 8,160 | 8,960 | 0 | 0 |
| MORGAN DEMPSEY CAP MGMT, LLC | 7,540 | 8,930 | 0 | 0 |
| MORLEY FUND MANAGEMENT LTD. | 0 | 0 | 325,400 | 0 |
| MORSE WILLIAMS & COMPANY, INC. | 0 | 7,200 | 14,050 | 0 |
| MPI INVESTMENT MGMT, INC. | 19,244 | 15,688 | 14,530 | 14,355 |
| MSDW & COMPANY | 57,792,164 | 43,066,546 | 33,887,854 | 42,131,149 |
| MT. AUBURN MANAGEMENT | 3,285,000 | 3,123,000 | 0 | 0 |
| MUNDER CAPITAL MANAGEMENT | 6,656,870 | 6,954,411 | 9,854,665 | 7,805,176 |
| MURPHY CAPITAL MGMT, INC. | 43,770 | 123,495 | 123,844 | 121,994 |
| MURRAY JOHNSTONE INTL LTD | 40,386 | 233,121 | 0 | 0 |
| MUTUAL AMER CAPITAL MGMT CORP. | 714,688 | 600,889 | 559,218 | 765,084 |
| MUTUAL LIFE INS CO N.Y. | 137,800 | 81,900 | 102,100 | 102,200 |
| NATIONAL BK INDIANAPOLIS CORP | 17,468 | 18,578 | 5,573 | 6,345 |
| NATIONAL CITY CORPORATION | 2,230,708 | 2,027,598 | 2,694,506 | 3,057,868 |
| NATIONAL FIDUCIARY SERV N.A. | 147,020 | 130,870 | 111,495 | 101,610 |
| NATIONAL INVT SERVICES, INC. | 263,200 | 0 | 0 | 0 |
| NATIONAL LIFE INSURANCE CO | 320,338 | 276,836 | 265,031 | 218,356 |
| NATIONAL PENN INVESTORS TR CO | 188,388 | 199,885 | 166,182 | 169,480 |
| NATIONWIDE MUTUAL INS CO | 115,200 | 133,199 | 133,199 | 0 |
| NATL COMMERCE BANCORP | 226,254 | 71,620 | 54,275 | 55,275 |
| NAVELLIER & ASSOCIATES INC. | 119,728 | 119,934 | 0 | 0 |
| NAVELLIER MANAGEMENT INC | 133,890 | 46,460 | 0 | 0 |
| NBT BANK N.A. | 88,952 | 83,942 | 84,392 | 89,442 |
| NCM CAPITAL MGMT GROUP, INC. | 1,739,094 | 2,155,344 | 2,213,219 | 2,278,919 |
| NELSON CAPITAL MANAGEMENT | 376,602 | 419,874 | 463,520 | 661,920 |
| NELSON, BENSON & ZELLMER, INC. | 28,250 | 26,400 | 25,700 | 61,840 |
| NETFOLIO | 9,076 | 9,579 | 0 | 0 |
| NEUBERGER BERMAN, LLC | 2,467,980 | 2,209,184 | 1,615,304 | 509,262 |
| NEVILLE, RODIE & SHAW, INC. | 19,800 | 19,281 | 18,881 | 18,481 |
| NEW MEXICO EDU RETIREMENT BD | 678,000 | 678,000 | 767,900 | 757,900 |
| NEW YORK LIFE INV MGMT SECS IN | 2,728,340 | 2,358,802 | 2,262,785 | 2,242,269 |
| NEW YORK LIFE INVT MGMT Q.E.D. | 0 | 94,839 | 216,776 | 186,019 |
| NEW YORK STATE COMMON RET SYS | 18,895,608 | 18,991,148 | 16,324,448 | 15,795,098 |
| NEXT CENTURY GR INVESTORS, LLC | 0 | 0 | 0 | 9,710 |
| NICHOLAS ADVISORS, INC. | 12,000 | 12,000 | 0 | 12,000 |
| NICHOLAS COMPANY, INC. | 1,180,000 | 1,517,000 | 44,100 | 1,134,100 |
| NICHOLAS-APPLEGATE CAP MGMT LL | 9,183,928 | 5,001,560 | 6,126,354 | 2,156,112 |
| NIPPON LIFE INSURANCE COMPANY | 7,452,772 | 5,481,973 | 5,519,929 | 4,771,411 |
| NISA INVT ADVISORS, L.L.C. | 690,848 | 709,948 | 605,448 | 726,848 |
| NOMURA ASSET MGMT CO., LTD. | 544,736 | 1,050,936 | 1,367,836 | 1,511,109 |
| NOMURA ASSET MGMT U.S.A. INC. | 0 | 0 | 206,000 | 264,500 |
| NOMURA SECURITIES CO., LTD. | 3,314,514 | 4,057,001 | 4,077,908 | 4,458,387 |
| NORRIS, PERNE & FRENCH LLP | 28,264 | 27,646 | 30,196 | 34,196 |
| NORTH AMERICAN MGMT CORP. | 400 | 12,900 | 46,900 | 400 |
| NORTH STAR ASSET MGMT INC. | 10,706 | 13,106 | 18,136 | 24,386 |
| NORTHEAST INVESTMENT MGMT | 414,414 | 342,223 | 277,444 | 183,744 |
| NORTHEAST INVESTORS GROWTH FD | 236,800 | 205,800 | 136,800 | 0 |
| NORTHERN CAPITAL MGMT, LLC | 484,742 | 46,020 | 41,970 | 721,070 |
| NORTHERN TRUST COMPANY OF CT | 755,192 | 384,800 | 472,700 | 369,510 |
| NORTHERN TRUST CORP | 7,076,746 | 7,247,023 | 7,417,554 | 7,894,079 |
| NORTHSTAR ASSET MANAGMENT LLC | 0 | 8,718 | 0 | 0 |
| NORTHSTAR INVT ADVISORS, LLC | 53,870 | 57,590 | 38,095 | 18,500 |
| NORTHWESTERN INVT MGMT CO. | 1,265,000 | 1,570,200 | 1,570,200 | 0 |
| NORTHWESTERN MUTUAL INVT | 2,290,800 | 2,417,500 | 2,372,700 | 1,975,800 |
| NUMERIC INVESTORS, L.P. | 86,800 | 204,600 | 211,700 | 131,900 |
| NWI MANAGEMENT, L. P. | 0 | 0 | 0 | 30,000 |
| NYLIM EQUITY INVESTORS | 149,400 | 0 | 0 | 0 |
| OAK ASSOCIATES, LTD. | 0 | 0 | 0 | 0 |
| OAKWOOD CAPITAL MANAGEMENT LLC | 239,958 | 247,638 | 142,808 | 149,488 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| OCEAN FUND ADVISORS, L.L.C. | 313,640 | 177,820 | 0 | 0 |
| OFFITBANK | 16,860 | 22,665 | 27,941 | 25,650 |
| OFI INST ASSET MGMT, INC. | 805,800 | 882,200 | 325,500 | 269,600 |
| OHIO NATIONAL LIFE INS | 90,400 | 91,685 | 96,210 | 98,710 |
| OHIO PUBLIC EMP RETIREMENT SYS | 8,749,332 | 8,675,404 | 9,740,215 | 10,119,779 |
| OLD DOMINION CAP MGMT, INC. | 0 | 28,910 | 58,940 | 73,205 |
| OLD MUT ASSET MANAGERS(UK)LTD. | 1,230,816 | 1,209,516 | 1,150,516 | 1,107,118 |
| OLD NATIONAL TR COMPANY | 46,350 | 42,958 | 43,558 | 43,700 |
| ONE VALLEY BANK, N.A. | 42,568 | 0 | 0 | 0 |
| ONEBEACON ASSET MGMT, INC. | 896,600 | 834,400 | 400,000 | 434,400 |
| ONYX CAPITAL MANAGEMENT, LLC | 32,600 | 0 | 121,100 | 0 |
| OPPENHEIMER ASSET MGMT INC. | 89,150 | 11,165 | 10,865 | 11,465 |
| OPPENHEIMERFUNDS, INC. | 19,812,600 | 18,221,020 | 11,298,770 | 11,109,410 |
| OPTIMUM INVESTMENT ADVR | 23,544 | 11,572 | 13,472 | 0 |
| OPUS INVESTMENT MANAGEMENT | 483,592 | 458,392 | 434,792 | 362,392 |
| ORLEANS CAPITAL MGMT CORP | 153,600 | 78,878 | 109,778 | 111,370 |
| OSBORNE PTNR CAPITAL MGMT LLC | 262,900 | 247,850 | 238,650 | 185,450 |
| OSCAR CAPITAL MANAGEMENT, LLC | 148,800 | 194,885 | 102,630 | 132,870 |
| P. J. SCHMIDT INVT MGMT, INC. | 0 | 0 | 0 | 17,030 |
| PACIFIC ASSET MGMT LLC | 0 | 10,000 | 0 | 0 |
| PACIFIC INCOME ADVISERS, INC. | 38,250 | 25,600 | 0 | 0 |
| PADCO ADVR II, INC | 772,640 | 662,200 | 440,700 | 730 |
| PADCO ADVR INC | 3,511,708 | 3,180,128 | 2,759,321 | 2,834,435 |
| PALADIN INVESTMENT ASSOCIATES | 89,500 | 87,140 | 116,665 | 116,665 |
| PALANTIR CAPITAL, INC. | 0 | 0 | 0 | 350,000 |
| PALISADE CAPITAL MGMT, L.L.C. | 0 | 0 | 0 | 25,470 |
| PALOMA PTNR MANAGEMENT COMPANY | 12,000 | 128,600 | 422,119 | 23,658 |
| PANAGORA ASSET MANAGEMENT INC. | 2,288,492 | 2,806,792 | 3,229,228 | 3,298,728 |
| PARADIGM ASSET MGMT CO, LLC | 123,200 | 142,100 | 168,500 | 172,600 |
| PARAGON INVESTMENT MGMT INC. | 11,200 | 11,200 | 13,725 | 15,600 |
| PARAMETRIC PORTFOLIO ASSOC | 0 | 0 | 0 | 1,514,578 |
| PARK NATIONAL BANK | 65,476 | 70,086 | 75,775 | 68,813 |
| PARKER CARLSON & JOHNSON | 42,850 | 43,100 | 36,720 | 14,800 |
| PARSONS CAPITAL MGMT, INC. | 126,310 | 131,735 | 128,029 | 125,179 |
| PARTHENON LLC | 2,948 | 2,548 | 2,638 | 3,333 |
| PATTEN & PATTEN, INC. | 51,328 | 0 | 110,018 | 139,443 |
| PAUL J. SCHUPF ASSOCIATES | 124,800 | 0 | 0 | 0 |
| PAUL J.SHEEHAN& ASSOC INC._NLE | 31,734 | 27,286 | 21,041 | 21,021 |
| PAYDEN & RYGEL INVT COUNSEL | 8,000 | 8,000 | 20,000 | 12,000 |
| PEKIN SINGER STRAUSS ASSET MGM | 6,720 | 0 | 0 | 0 |
| PENINSULA ASSET MGMT, INC. | 424,484 | 397,599 | 345,725 | 331,370 |
| PENN DAVIS MCFARLAND, INC. | 5,708 | 0 | 0 | 0 |
| PENN MUTUAL LIFE INSURANCE CO | 0 | 58,110 | 53,930 | 148,809 |
| PENNSYLVANIA PUBLIC SCH EMP RE | 5,054,554 | 5,572,654 | 3,662,677 | 3,052,572 |
| PEOPLES MUTUAL HOLDINGS | 257,036 | 281,324 | 304,263 | 286,913 |
| PEREGRINE CAPITAL MGMT, INC. | 3,025,000 | 4,192,400 | 5,198,700 | 0 |
| PERGAMENT ADVISORS, L.L.C. | 0 | 0 | 0 | 53,000 |
| PERRY CORP | 38,400 | 0 | 0 | 85,000 |
| PETER B. CANNELL & CO. INC. | 12,000 | 12,000 | 12,000 | 12,000 |
| PETERSEN FLYNN & DINSMORE INC. | 200 | 3,348 | 2,100 | 4,100 |
| PETROS ADVR LLC | 0 | 0 | 75,000 | 0 |
| PETTYJOHN COMPANY | 0 | 21,250 | 0 | 0 |
| PGB TRUST & INVESTMENTS | 0 | 0 | 30,263 | 32,213 |
| PHILADELPHIA INVT MGMT CO | 85,180 | 83,440 | 83,230 | 83,920 |
| PHILIP V. SWAN ASSOCIATES, LLC | 11,576 | 11,568 | 11,068 | 12,468 |
| PHILLIPS & DREW FD MGMT LTD | 1,976,012 | 1,017,813 | 1,051,487 | 1,516,823 |
| PHOENIX HOME LIFE MUT INS CO | 398,900 | 406,500 | 384,800 | 572,100 |
| PHOENIX/ZWEIG ADVISERS LLC | 543,600 | 578,300 | 611,100 | 530,900 |
| PILGRIM FUNDS TRUST | 0 | 0 | 160,392 | 0 |
| PILLAR POINT CAP MGMT, INC. | 113,248 | 105,248 | 105,248 | 105,248 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| PILLAR POINT EQUITY MGMT, LLC | 24,400 | 25,000 | 25,000 | 25,000 |
| PINE CAPITAL MGMT INC | 55,206 | 49,246 | 51,666 | 50,518 |
| PINNACLE ASSOCIATES LTD. | 0 | 19,556 | 35,730 | 37,203 |
| PINNACLE MGMT & TRUST CO. | 14,400 | 32,600 | 35,250 | 43,750 |
| PIONEER INVESTMENT MGMT, INC. | 1,905,800 | 2,896,050 | 5,618,450 | 6,013,450 |
| PITCAIRN GROUP L P | 0 | 0 | 0 | 0 |
| PITTENGER & ANDERSON, INC. | 176,314 | 0 | 0 | 203,389 |
| PNC FINL SERVICES GROUP INC | 7,397,284 | 7,708,706 | 8,360,535 | 9,334,761 |
| PORTFOLIO ADVISORY SERV, INC. | 0 | 82,770 | 0 | 0 |
| PORTOLA GROUP, INC. | 134,252 | 160,301 | 122,441 | 920,699 |
| PPM AMERICA, INC. | 737,502 | 963,996 | 638,091 | 587,501 |
| PRESERVATION CAPITAL MGMT | 175,948 | 174,488 | 174,488 | 174,558 |
| PRINCETON CAPITAL MGMT, INC. | 67,230 | 64,780 | 64,480 | 61,750 |
| PRINCIPAL FINANCIAL GROUP INC | 5,474,360 | 7,480,303 | 6,988,221 | 7,059,612 |
| PRIVATE ASSET MANAGEMENT, INC. | 761,622 | 798,327 | 817,146 | 811,432 |
| PRIVATE CAP MGMT, INC. (MN) | 0 | 27,100 | 58,800 | 59,900 |
| PROFESSIONAL ADVR SERV, INC. | 267,614 | 341,390 | 378,310 | 390,981 |
| PROVIDENT FINANCIAL ADVR | 264,908 | 297,382 | 183,196 | 94,067 |
| PROVIDENT INVESTMENT MGMT, LLC | 384,800 | 274,800 | 274,800 | 274,800 |
| PROVIDENT INVT COUNSEL, INC. | 3,840,240 | 3,634,910 | 2,847,555 | 5,100 |
| PRUDENTIAL EQUITY GROUP, LLC | 4,798,732 | 4,031,269 | 3,580,026 | 3,945,967 |
| PRUDENTIAL INSUR CO OF AMERICA | 14,248,928 | 12,191,619 | 13,187,073 | 11,923,778 |
| PUBLIC EMP  RETIREMENT ASSN CO | 6,143,800 | 5,840,400 | 5,769,100 | 5,678,100 |
| PUTNAM INVESTMENT MGMT, L.L.C. | 71,560,770 | 37,175,387 | 14,845,569 | 19,173,135 |
| QCI ASSET MANAGEMENT INC. | 6,620 | 176,200 | 212,170 | 260,230 |
| QUAKER PTNR LLC | 22,600 | 0 | 0 | 0 |
| QUEST INVESTMENT MGMT, INC. | 496,270 | 8,000 | 21,140 | 0 |
| QUINTUS ASSET MANAGEMENT, INC. | 8,412 | 8,163 | 0 | 0 |
| QWEST ASSET MANAGEMENT CO. | 1,926,648 | 1,843,427 | 1,738,508 | 1,738,508 |
| R. ELIOT KING & ASSOC, INC. | 12,148 | 12,148 | 12,148 | 12,148 |
| R. H. BLUESTEIN & COMPANY | 712,410 | 811,905 | 668,585 | 0 |
| R. M. DAVIS, INC. | 237,780 | 258,573 | 270,798 | 321,003 |
| RADIANT CAPITAL MGMT, L.L.C. | 118,468 | 118,468 | 0 | 0 |
| RAINIER INVESTMENT MGMT, INC. | 1,799,550 | 1,868,825 | 1,474,525 | 821,325 |
| RAMPART INVT MGMT CO., INC. | 0 | 0 | 0 | 22,550 |
| RAYMOND JAMES & ASSOC, INC. | 105,682 | 122,974 | 80,511 | 61,140 |
| RAYMOND JAMES TRUST COMPANY | 25,596 | 25,526 | 29,576 | 30,105 |
| RAYNER ASSOCIATES, INC. | 193,690 | 200,855 | 138,160 | 92,860 |
| RBC CAPITAL MARKETS (US) | 77,120 | 90,485 | 190,441 | 295,032 |
| RCM CAPITAL MANAGEMENT LLC | 19,880,314 | 17,130,332 | 19,127,891 | 15,842,141 |
| REGIONS FINANCIAL CORP | 954,070 | 970,654 | 911,939 | 851,266 |
| REINHART&MAHONEY CAP MGMT INC. | 34,860 | 0 | 47,854 | 41,464 |
| RENAISSANCE INVESTMENT MGMT | 0 | 249,884 | 330,092 | 310,516 |
| RENAISSANCE TECHNOLOGIES CORP. | 1,461,200 | 25,600 | 0 | 0 |
| RENBERG CAPITAL MGMT, INC. | 101,400 | 100,500 | 100,000 | 100,000 |
| RESOURCE TRUST COMPANY | 65,554 | 66,952 | 99,727 | 103,647 |
| RETIREMENT CAP ADVISORS, INC. | 0 | 180,677 | 204,336 | 217,144 |
| RHO CAPITAL PARTNERS, INC. | 26,600 | 0 | 0 | 0 |
| RICE HALL JAMES & ASSOC, LLC | 0 | 0 | 0 | 0 |
| RICHARDS & TIERNEY, INC. | 96,600 | 99,700 | 73,700 | 62,700 |
| RIGEL CAPITAL, LLC | 9,200 | 7,400 | 0 | 0 |
| RIGGS BANK N A | 204,520 | 209,135 | 307,680 | 227,407 |
| RITTENHOUSE ASSET MGMT, INC. | 8,688,636 | 8,828,671 | 9,325,018 | 10,034,093 |
| RIVERBRIDGE PARTNERS, LLC | 0 | 0 | 0 | 0 |
| RIVERROCK CAPITAL MGMT, LP | 0 | 200,000 | 0 | 0 |
| RIVERSOURCE INVESTMENTS, LLC | 26,718,670 | 24,564,725 | 19,200,041 | 6,585,817 |
| RNC GENTER CAPITAL MANAGEMENT | 906,936 | 869,658 | 865,923 | 720,898 |
| ROBERT BENDER & ASSOCIATES | 1,315,464 | 1,338,409 | 1,274,559 | 1,251,530 |
| ROBERTS, GLORE & CO., INC. | 25,058 | 23,258 | 18,550 | 17,330 |
| ROCHDALE INVESTMENT MGMT LLC | 16,904 | 32,352 | 51,784 | 49,081 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| ROCKEFELLER FINL SVCS | 200,900 | 204,550 | 539,500 | 731,550 |
| ROCKLAND TRUST COMPANY | 45,792 | 43,094 | 43,494 | 41,094 |
| ROGER H. JENSWOLD & CO, INC. | 353,990 | 383,188 | 764,648 | 753,918 |
| ROLL & ROSS ASSET MGMT, L.P. | 0 | 0 | 0 | 38,700 |
| RORER ASSET MANAGEMENT LLC | 0 | 0 | 30,170 | 0 |
| ROSENBLUM-SILVERMAN-SUTTON INC | 29,138 | 16,338 | 0 | 0 |
| ROTHSCHILD ASSET MGMT, INC. | 0 | 0 | 0 | 0 |
| ROTHSCHILD INVESTMENT CORP | 152,020 | 275,988 | 288,561 | 305,590 |
| ROULSTON & COMPANY, INC. | 15,000 | 16,200 | 16,360 | 36,432 |
| ROXBURY CAPITAL MGMT, L.L.C. | 11,596,132 | 12,125,968 | 12,257,517 | 12,932,433 |
| ROYAL BK OF SCOTLAND GROUP PLC | 138,538 | 899,759 | 818,322 | 912,367 |
| RTE ASSET MANAGEMENT | 158,308 | 75,508 | 66,495 | 75,101 |
| RUSSELL INVESTMENT GROUP (US) | 7,041,174 | 4,583,755 | 2,849,495 | 4,410,239 |
| S & T BANK | 1,600 | 1,600 | 1,600 | 4,632 |
| S SQUARED TECHNOLOGY CORP. | 0 | 0 | 157,200 | 87,200 |
| S.A.C. CAPITAL MGMT, L.L.C. | 0 | 0 | 0 | 0 |
| SABAL INVESTMENT MGMT CO. | 78,732 | 52,958 | 23,983 | 0 |
| SAFECO CORPORATION | 17,800 | 817,800 | 1,452,800 | 1,310,200 |
| SALEM INVT COUNSELORS, INC. | 12,150 | 20,010 | 23,710 | 31,310 |
| SAN FRANCISCO SENTRY INVT GRP | 4,000 | 5,500 | 6,250 | 6,250 |
| SAND HILL ADVISORS, INC. | 8,100 | 8,100 | 55,012 | 58,512 |
| SANDLER CAPITAL MANAGEMENT | 0 | 0 | 414,000 | 0 |
| SANDS CAPITAL MANAGEMENT, LLC | 6,760 | 0 | 0 | 11,105 |
| SANFORD C BERNSTEIN & CO INC | 5,411,492 | 0 | 0 | 0 |
| SANTA BARBARA ASSET MANAGEMENT | 18,218 | 10,430 | 0 | 12,563 |
| SANTA BARBARA BANK & TRUST | 0 | 212,488 | 211,538 | 0 |
| SARATOGA CAPITAL MGMT, LLC | 0 | 187,300 | 78,300 | 179,800 |
| SAYBROOK CAPITAL CORPORATION | 0 | 13,500 | 58,500 | 58,500 |
| SCHRODER INV MGMT GROUP | 6,825,724 | 5,634,643 | 5,455,089 | 4,681,805 |
| SCOUT CAPITAL MANAGEMENT, LLC | 0 | 62,500 | 0 | 0 |
| SEARS INVESTMENT MANAGEMENT CO | 201,400 | 176,900 | 0 | 0 |
| SEAWARD MANAGEMENT CORP. | 432,584 | 421,836 | 437,654 | 436,172 |
| SECURITIES MGMT & RES, INC. | 109,000 | 109,250 | 162,550 | 480,150 |
| SECURITY ASSET MANAGEMENT INC. | 19,600 | 0 | 19,100 | 0 |
| SECURITY MANAGEMENT CO, LLC | 1,180,460 | 1,127,260 | 1,096,060 | 1,091,260 |
| SECURITY NATIONAL BANK | 14,200 | 14,800 | 15,400 | 15,800 |
| SECURITY NATIONAL BANK OF SD | 13,890 | 13,890 | 13,890 | 13,800 |
| SECURITY NATL BK SIOUX CITY IA | 0 | 0 | 0 | 15,190 |
| SEGALL BRYANT&HAMILL INV COUNS | 11,628 | 63,278 | 81,868 | 117,862 |
| SEMINOLE CAP PARTNERS, L.P. | 0 | 164,420 | 150,920 | 150,920 |
| SENA WELLER ROHS WILLIAMS, LLC | 194,496 | 199,626 | 195,067 | 188,967 |
| SENECA CAPITAL MGMT, L.L.C. | 668 | 1,359,733 | 0 | 0 |
| SENTINEL TRUST COMPANY, LBA | 46,600 | 74,600 | 28,000 | 28,000 |
| SENTRY INVESTMENT MGMT, INC. | 222,000 | 222,000 | 270,600 | 291,700 |
| SHAPIRO ROBERT N | 13,700 | 13,500 | 0 | 0 |
| SHIKIAR ASSET MANAGEMENT, INC. | 125,900 | 62,800 | 68,900 | 17,100 |
| SIGMA MANAGEMENT SERVICES INC | 334,006 | 343,851 | 343,141 | 359,026 |
| SIMMONS FIRST TRUST CO N.A. | 45,360 | 55,782 | 65,482 | 133,571 |
| SIMMS CAPITAL MANAGEMENT, INC. | 1,117,512 | 863,266 | 880,969 | 0 |
| SIRACH CAPITAL MGMT, INC. | 2,019,970 | 1,307,743 | 801,858 | 0 |
| SIT INVESTMENT ASSOC, INC. | 1,748,982 | 1,961,182 | 1,995,032 | 1,594,832 |
| SKBA CAPITAL MANAGEMENT LLC | 8,100 | 0 | 0 | 0 |
| SMC CAPITAL, INC. | 0 | 0 | 10,100 | 11,800 |
| SMITH ASSET MGMT GROUP, L.P. | 447,486 | 33,310 | 0 | 0 |
| SMITHBRIDGE ASSET MGMT, INC. | 12,648 | 12,648 | 12,248 | 0 |
| SMOOT, MILLER, CHENEY & CO. | 31,600 | 31,600 | 35,625 | 19,425 |
| SNYDER, JENNIFER C | 0 | 0 | 3,000 | 5,800 |
| SOROS FUND MANAGEMENT, LLC | 49,900 | 0 | 0 | 0 |
| SOUTHEASTERN TRUST COMPANY | 173,598 | 173,083 | 188,584 | 198,529 |
| SOUTHTRUST ASSET MANAGEMENT CO | 8,278 | 8,928 | 0 | 10,250 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| SPARROW CAPITAL MGMT, INC. | 205,120 | 34,802 | 20,850 | 0 |
| SSI INVESTMENT MANAGEMENT INC. | 3,480 | 54,500 | 13,640 | 7,695 |
| ST. PAUL TRAVELERS | 900,316 | 847,496 | 733,396 | 684,086 |
| STACEY BRAUN ASSOCIATES, INC. | 355,930 | 0 | 0 | 0 |
| STANDARD LIFE INVESTMENTS LTD. | 0 | 3,253,578 | 3,470,183 | 4,206,384 |
| STANDISH MELLON ASSET MGMT CO | 17,420 | 17,420 | 17,000 | 17,000 |
| STARBUCK, TISDALE & ASSOCIATES | 114,460 | 123,982 | 127,380 | 126,428 |
| STATE BK&(&ASSET MANGEMENT DIV | 97,236 | 25,345 | 150,065 | 372,565 |
| STATE FARM MUT AUTOMOBILE INS | 4,056,800 | 4,092,000 | 4,092,000 | 4,092,000 |
| STATE OF MICH STATE TREASURER | 8,273,092 | 9,714,692 | 12,042,392 | 12,308,703 |
| STATE OF WI INVESTMENT BOARD | 877,400 | 831,300 | 915,700 | 1,562,300 |
| STATE STR CORPORATION | 101,075,542 | 105,864,940 | 106,701,679 | 112,665,168 |
| STATE TEACH RETIREMENT SYS OH | 10,739,184 | 10,811,984 | 10,955,726 | 11,166,926 |
| STEELE INVT COUNSEL, LTD. | 79,740 | 59,980 | 0 | 61,505 |
| STEINBERG GBL ASSET MGMT, LTD | 46,034 | 35,409 | 52,029 | 45,934 |
| STEPHENS CAPITAL MANAGEMENT | 58,380 | 48,375 | 101,245 | 110,339 |
| STEPHENS INC. | 0 | 500 | 500 | 9,850 |
| STERLING CAPITAL MGMT, LLC | 5,800 | 5,650 | 0 | 0 |
| STERNE AGEE ASSET MGMT, INC. | 19,842 | 18,107 | 16,407 | 0 |
| STEVEN CHARLES CAPITAL LTD. | 13,696 | 15,896 | 15,204 | 14,296 |
| STEVENSON CAPITAL MGMT, INC. | 26,000 | 22,300 | 136,800 | 141,100 |
| STEWARD CAPITAL MANAGEMENT | 136,900 | 138,316 | 128,981 | 125,316 |
| STEWART AND PATTEN CO., L.L.C. | 5,648 | 0 | 0 | 14,008 |
| STIFEL NICOLAUS INVT ADVR | 10,430 | 78,312 | 63,049 | 75,821 |
| STOCK YARDS BK & TRUST COMPANY | 141,742 | 142,349 | 144,122 | 182,582 |
| STONEBRIDGE CAPITAL MGMT, INC. | 79,712 | 90,849 | 90,549 | 121,449 |
| STRALEM & COMPANY, INC. | 176,800 | 177,800 | 179,200 | 170,600 |
| SUFFOLK CAPITAL MGMT, LLC | 910,400 | 893,000 | 893,000 | 1,585,000 |
| SUMITOMO LIFE INSURANCE CO. | 847,800 | 1,014,794 | 542,302 | 602,115 |
| SUMMIT BANK | 153,198 | 111,994 | 0 | 0 |
| SUMMIT CAPITAL MGMT, L.L.C. | 0 | 0 | 0 | 51,000 |
| SUMMIT INVT PARTNERS, L.L.C. | 160,796 | 159,884 | 165,819 | 178,621 |
| SUN LIFE FINL SERVICES CANADA | 302,800 | 401,300 | 1,318,480 | 235,400 |
| SUNTRUST BANKS INC | 4,570,282 | 5,280,124 | 3,251,650 | 3,290,270 |
| SUSQUEHANNA BANCSHARES INC | 0 | 0 | 0 | 44,948 |
| SWARTHMORE GROUP, INC. | 0 | 0 | 0 | 24,200 |
| SWISS RE ASSET MGMT(AMERICAS)I | 415,000 | 188,000 | 0 | 0 |
| SYMPHONY ASSET MGMT, L.L.C. | 0 | 0 | 0 | 0 |
| SYNOVUS INVT ADVISORS, INC. | 519,490 | 528,409 | 507,906 | 526,166 |
| SYSTEMATIC FINL MGMT, L.P. | 0 | 0 | 0 | 12,000 |
| T. LEAVELL & ASSOCIATES, INC. | 11,300 | 12,700 | 14,900 | 15,500 |
| T. ROWE PRICE ASSOCIATES, INC. | 34,777,488 | 27,052,818 | 19,729,678 | 13,355,842 |
| TALON ASSET MANAGEMENT, INC. | 28,000 | 0 | 0 | 18,000 |
| TARGET INVESTORS, INC. | 0 | 7,795 | 30,044 | 30,175 |
| TCW ASSET MANAGEMENT COMPANY | 41,146 | 48,282 | 84,184 | 80,398 |
| TCW COWEN ASSET MANAGEMENT | 0 | 9,150 | 0 | 0 |
| TD ASSET MANAGEMENT INC. | 2,456,760 | 3,398,034 | 2,795,828 | 2,138,386 |
| TD BANKNORTH WEALTH MGMT GROUP | 15,562 | 22,443 | 25,871 | 33,871 |
| TEACHER RETIREMENT SYS OF TX | 16,368,000 | 16,878,000 | 17,015,000 | 17,421,000 |
| TEACHERS ADVR INC | 1,982,046 | 2,069,373 | 2,283,820 | 2,351,666 |
| TEMPEST INVT COUNSELORS, INC. | 6,670 | 0 | 0 | 0 |
| TERRE HAUTE FIRST NATIONAL BK | 40,936 | 43,186 | 51,411 | 66,661 |
| TERRY MCDANIEL & COMPANY | 24,278 | 22,388 | 35,128 | 36,153 |
| THIRD AVENUE MANAGEMENT LLC | 0 | 0 | 150 | 0 |
| THOMAS WHITE ASSET MANAGEMENT | 72,990 | 66,160 | 0 | 0 |
| THOMPSON RUBINSTEIN INV MGMT I | 42,780 | 42,780 | 45,780 | 54,280 |
| THRIVENT ASSET MANAGEMENT, LLC | 2,570,160 | 2,579,860 | 2,953,090 | 3,116,990 |
| THRIVENT FINL FOR LUTHERANS | 413,000 | 326,000 | 142,200 | 314,200 |
| TIFF ADVISORY SERVICES, INC. | 0 | 0 | 42,400 | 33,900 |
| TIFFANY CAPITAL ADVISORS, INC. | 220,000 | 0 | 0 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| TIMESSQUARE CAPITAL MGMT, LLC | 2,618,612 | 2,525,312 | 2,454,612 | 2,437,712 |
| TOBIAS, SETH | 0 | 0 | 15,000 | 0 |
| TOCQUEVILLE ASSET MGMT LP | 0 | 0 | 0 | 11,900 |
| TODD INVESTMENT ADVISORS, INC. | 0 | 0 | 0 | 0 |
| TOKIO MARINE ASSET MGMT NY CO. | 0 | 277,000 | 152,000 | 213,000 |
| TOMPKINS TRUSTCO INC | 48,200 | 54,050 | 62,700 | 70,447 |
| TOTH FINANCIAL ADVISORY CORP | 0 | 0 | 204,676 | 203,909 |
| TOWER ASSET MANAGEMENT, L.L.C. | 0 | 136,105 | 112,870 | 115,820 |
| TOWER BANK & TRUST COMPANY | 0 | 5,100 | 0 | 0 |
| TPK ASSET MANAGEMENT, INC. | 0 | 0 | 0 | 0 |
| TRAIN BABCOCK ADVR LLC | 38,796 | 42,306 | 38,496 | 40,106 |
| TRAINER WORTHAM & CO. INC. | 37,988 | 381,323 | 354,720 | 344,811 |
| TRANSAMERICA INV MGMT LLC(WEST | 134,380 | 145,930 | 297,603 | 0 |
| TRANSAMERICA INVT MGMT, LLC | 191,002 | 176,102 | 180,590 | 198,590 |
| TRELLUS MANAGEMENT CO., LLC | 0 | 75,000 | 0 | 0 |
| TREVOR STEWART BURTON&JACOBSEN | 156,070 | 127,295 | 86,195 | 76,395 |
| TRILLIUM ASSET MGMT CORP. | 251,374 | 269,057 | 325,477 | 363,050 |
| TRUST COMPANY OF CONNECTICUT | 96,770 | 122,910 | 133,080 | 149,844 |
| TRUST COMPANY OF OKLAHOMA | 7,800 | 10,900 | 10,000 | 8,700 |
| TRUST COMPANY OF TOLEDO, NA | 47,800 | 24,400 | 15,200 | 29,700 |
| TRUST&FIDUCIARY MGMT SERV INC. | 0 | 0 | 0 | 44,140 |
| TRUSTCO BANK N.A. | 90,060 | 98,210 | 98,010 | 67,500 |
| TRUSTMARK NATIONAL BANK | 200,680 | 184,845 | 149,820 | 152,020 |
| TRW INVESTMENT MGMT CO_NLE | 346,800 | 343,400 | 293,500 | 22,100 |
| TUCKER ANTHONY SUTRO | 0 | 0 | 495,534 | 486,413 |
| TUDOR INVESTMENT CORPORATION | 0 | 850,000 | 0 | 0 |
| TUPELO CAPITAL MGMT, L.L.C. | 312,000 | 0 | 0 | 0 |
| TURNER INVT PARTNERS, INC. | 2,820,560 | 0 | 0 | 2,490,390 |
| TWIN CAPITAL MANAGEMENT, INC. | 297,940 | 204,160 | 340,500 | 193,330 |
| U. S. GLOBAL INVESTORS, INC. | 43,272 | 23,272 | 23,272 | 23,272 |
| U.S. BANCORP | 6,836,292 | 6,974,188 | 9,100,842 | 10,041,980 |
| UBS AG NEW YORK BRANCH | 0 | 68,810 | 53,495 | 51,050 |
| UBS AMERICAS INC | 6,587,686 | 5,602,062 | 5,321,643 | 8,751,648 |
| UBS GBL ASSET MGMT(AMERICAS)IN | 4,866,600 | 4,085,700 | 4,170,900 | 4,555,400 |
| UBS O CONNOR, L.L.C. | 0 | 0 | 333,000 | 42,500 |
| UBS SECURITIES LLC | 6,972,348 | 2,058,830 | 6,278,590 | 13,244,842 |
| UMB BANK N A | 466,036 | 474,523 | 508,574 | 711,945 |
| UNION HERITAGE CAP MGMT L.L.C. | 0 | 125,900 | 128,000 | 151,000 |
| UNION PLANTERS BANK, NA | 145,804 | 172,744 | 240,947 | 239,704 |
| UNIONBANCAL | 1,679,258 | 1,237,947 | 1,407,388 | 1,014,239 |
| UNITED BANK, INC. | 153,144 | 161,300 | 170,730 | 0 |
| UNITED MANAGEMENT COMPANY, LLC | 145,698 | 246,800 | 329,000 | 344,700 |
| UNITED NATL BK & TRUST | 295,696 | 256,328 | 250,408 | 252,029 |
| UNITEDTRUST BANK (NJ) | 56,068 | 0 | 48,432 | 45,184 |
| UNIVERSITY TX INVT MGMT CO | 0 | 0 | 134,232 | 108,832 |
| UNIVEST NATL BK & TR SOUDERTON | 9,300 | 17,460 | 16,860 | 16,960 |
| USAA INVESTMENT MANAGEMENT CO | 3,814,002 | 3,596,070 | 4,160,152 | 4,283,613 |
| VALUE LINE INC. | 933,400 | 1,166,100 | 935,100 | 735,200 |
| VAN ECK ASSOCIATES CORPORATION | 0 | 0 | 10,000 | 10,000 |
| VAN WAGONER CAPITAL MGMT, INC. | 85,300 | 0 | 0 | 0 |
| VANGUARD GROUP, INC. | 90,322,928 | 89,296,040 | 89,403,891 | 90,027,064 |
| VANTAGE INVT ADVISORS, INC. | 237,590 | 23,640 | 0 | 0 |
| VAUGHAN NELSON INVT MGMT, L.P. | 1,329,796 | 1,268,006 | 1,253,206 | 1,501,507 |
| VENTURE SECURITIES CORPORATION | 0 | 0 | 0 | 0 |
| VERIZON INVESTMENT MGMT CORP | 2,229,032 | 2,252,689 | 5,458,896 | 5,420,896 |
| VESTOR CAPITAL CORPORATION | 0 | 12,438 | 0 | 10,580 |
| VICTORY NEWBRIDGE CAPITAL MGMT | 0 | 126,772 | 118,220 | 164,395 |
| VICTORY SBSF CAPITAL MGMT | 0 | 0 | 4,322 | 0 |
| VIEWPOINT INVESTMENT PTNR | 0 | 20,000 | 0 | 0 |
| VIRGINIA INVESTMENT COUNSELORS | 11,604 | 10,604 | 10,904 | 0 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| VIRGINIA RETIREMENT SYS | 855,720 | 856,920 | 1,134,620 | 1,106,420 |
| VMF CAPITAL, L.L.C. | 170,980 | 89,230 | 143,040 | 150,430 |
| VONTOBEL ASSET MGMT, INC. | 0 | 16,870 | 0 | 0 |
| VOYAGEUR ASSET MANAGEMENT INC. | 608,300 | 629,600 | 730,714 | 1,281,557 |
| WACHOVIA BANK N.A. | 803,436 | 829,398 | 786,543 | 824,701 |
| WACHOVIA CORPORATION | 14,435,628 | 13,414,764 | 13,313,123 | 11,742,541 |
| WADDELL & REED INVT MGMT CO | 0 | 0 | 0 | 0 |
| WAFRA INVT ADVISORY GRP, INC. | 242,000 | 219,500 | 320,455 | 358,800 |
| WAGNER CAPITAL MANAGEMENT CORP | 0 | 0 | 214,405 | 0 |
| WAGNER INVESTMENT MGMT, INC. | 69,120 | 89,167 | 109,867 | 114,267 |
| WAKLEY & ROBERTON, INC. | 134,098 | 134,248 | 135,508 | 127,208 |
| WALL STR ASSOCIATES | 10,000 | 0 | 0 | 0 |
| WALNUT ASSET MANAGEMENT LLC | 0 | 0 | 17,956 | 20,156 |
| WARING, BAYARD D | 11,000 | 11,000 | 1,000 | 1,000 |
| WASHINGTON TRUST BANK | 81,190 | 67,450 | 40,157 | 25,996 |
| WASHINGTON TRUST CO. | 73,338 | 77,861 | 74,553 | 72,828 |
| WATERS, PARKERSON & CO., INC. | 0 | 48,265 | 97,865 | 108,265 |
| WATSON, STEPHEN T | 0 | 40,000 | 0 | 50,000 |
| WAYNE HUMMER ASSET MGMT CO. | 204,800 | 244,529 | 210,800 | 204,800 |
| WCM INVESTMENT MGMT, INC. | 259,422 | 263,632 | 273,867 | 214,054 |
| WEBER FULTON&FELMAN INV COUNSE | 87,096 | 94,099 | 31,273 | 147,505 |
| WEDGE CAPITAL MGMT, L.L.P. | 3,600 | 5,000 | 5,000 | 19,300 |
| WEDGEWOOD INVESTORS, INC. | 123,438 | 109,438 | 51,580 | 48,060 |
| WEINTRAUB CAPITAL MGMT, LLC | 220,000 | 20,000 | 0 | 0 |
| WEISS, PECK & GREER INVTS | 2,203,070 | 1,733,575 | 1,717,025 | 1,624,770 |
| WELCH & FORBES LLC | 204,042 | 50,134 | 78,828 | 100,528 |
| WELCH CAPITAL PARTNERS, L.L.C. | 0 | 0 | 11,300 | 11,300 |
| WELLINGTON MANAGEMENT CO, LLP | 5,558,844 | 6,833,564 | 20,624,914 | 25,873,468 |
| WELLS CAPITAL MANAGEMENT INC. | 746,480 | 159,000 | 1,400,115 | 0 |
| WELLS CAPITAL MGMT (STRONG) | 4,559,520 | 2,117,748 | 700,115 | 2,207,440 |
| WELLS FARGO & (NORWEST CORP) | 38,120 | 31,337 | 76,158 | 10,367,853 |
| WELLS FARGO BANK ARIZONA, N.A. | 21,350 | 21,520 | 18,330 | 0 |
| WELLS FARGO BANK INDIANA, N.A. | 170,196 | 169,646 | 196,896 | 0 |
| WELLS FARGO BANK IOWA, N.A. | 139,124 | 176,440 | 254,306 | 0 |
| WELLS FARGO BANK MI, N.A. | 0 | 0 | 179,945 | 0 |
| WELLS FARGO BANK MN, N.A. | 1,058,316 | 1,125,575 | 1,298,307 | 0 |
| WELLS FARGO BANK MONTANA N.A. | 17,060 | 24,970 | 27,460 | 0 |
| WELLS FARGO BANK NE, N.A. | 3,800 | 5,650 | 9,550 | 0 |
| WELLS FARGO BANK NEVADA N.A. | 16,850 | 8,650 | 0 | 0 |
| WELLS FARGO BANK OF SD, N.A. | 29,380 | 59,375 | 64,150 | 0 |
| WELLS FARGO BANK TEXAS, N.A. | 389,694 | 211,694 | 232,379 | 0 |
| WELLS FARGO BANK WEST NA | 114,648 | 133,605 | 149,235 | 0 |
| WELLS FARGO BANK WI, N.A. | 39,550 | 33,400 | 42,130 | 0 |
| WELLS FARGO BANK WYOMING NA | 0 | 7,560 | 0 | 0 |
| WELLS FARGO BANK, N.A. | 7,714,886 | 7,160,786 | 9,035,287 | 0 |
| WELLS FARGO INVESTMENTS LLC | 67,244 | 75,119 | 86,299 | 157,064 |
| WENTWORTH HAUSER& VIOLICH INC. | 8,908 | 16,650 | 0 | 13,800 |
| WESBANCO BANK INC. | 65,032 | 66,232 | 67,612 | 70,351 |
| WESTBOURNE CAPITAL MGMT, LLC | 244,850 | 233,546 | 238,250 | 110,100 |
| WESTERN PAC INV ADVISERS INC. | 0 | 0 | 12,707 | 24,263 |
| WESTFIELD CAPITAL MGMT CO, LLC | 0 | 0 | 409,650 | 44,000 |
| WESTON ASSET MANAGEMENT INC. | 0 | 80,006 | 85,656 | 94,256 |
| WESTON CAPITAL MANAGEMENT INC. | 105,074 | 102,274 | 74,324 | 83,304 |
| WESTPEAK GLOBAL ADVISORS, L.P. | 1,664,212 | 1,866,812 | 2,714,112 | 1,786,672 |
| WESTPORT RESOURCES MGMT, INC. | 35,696 | 34,526 | 35,326 | 29,246 |
| WESTRIDGE CAPITAL MGMT INC. | 34,450 | 33,970 | 0 | 0 |
| WESTWAY CAPITAL LLC | 350,184 | 148,000 | 0 | 0 |
| WESTWOOD MANAGEMENT CORP (IL) | 720,600 | 20,000 | 0 | 0 |
| WESTWOOD MANAGEMENT CORP. (TX) | 10,656 | 0 | 0 | 0 |
| WHITE OAK CAPITAL MGMT, INC. | 149,780 | 142,280 | 141,185 | 374,140 |

**Oracle - Ownership by Reporting Institutions**

| Owner Name | 30-Sep-00 | 31-Dec-00 | 31-Mar-01 | 30-Jun-01 |
|---|---|---|---|---|
| WHRS INVESTMENT MGMT, INC. | 136,590 | 87,602 | 106,412 | 110,472 |
| WILBANKS SMITH&THOMAS ASSET MG | 1,208,904 | 979,247 | 743,463 | 765,791 |
| WILLIAM BLAIR & CO, L.L.C. | 2,248,586 | 2,141,818 | 1,895,388 | 1,689,382 |
| WILLIAM D. WITTER, INC. | 11,578,906 | 11,535,727 | 10,990,144 | 10,567,524 |
| WILLIAM G.DOOLITTLE INV COUNSE | 7,350 | 0 | 0 | 0 |
| WILLIAMS, JONES & ASSOC, INC. | 11,100 | 22,800 | 22,600 | 24,350 |
| WILMINGTON TRUST INVT MGMT LLC | 43,050 | 45,350 | 47,950 | 51,100 |
| WILSHIRE ASSOC INC | 3,962,848 | 2,350,836 | 1,546,531 | 1,403,643 |
| WINDHAM CAPITAL MANAGEMENT | 204,214 | 198,474 | 224,676 | 114,990 |
| WINDSOR FINANCIAL GROUP, LLC | 0 | 7,950 | 0 | 14,138 |
| WINSLOW CAPITAL MGMT, INC. | 211,300 | 193,800 | 120,000 | 124,190 |
| WISCONSIN ASSET MGMT, LLC | 14,300 | 10,100 | 10,500 | 0 |
| WISCONSIN CAPITAL MGMT, L.L.C. | 331,800 | 152,100 | 106,698 | 72,098 |
| WM ADVISORS, INC. | 480,000 | 480,000 | 1,145,000 | 1,239,600 |
| WOODFORD CAPITAL MGMT, LLC | 260,800 | 185,600 | 192,800 | 259,350 |
| WOODMONT INVT COUNSEL LLC | 0 | 311,797 | 333,216 | 338,349 |
| WOODSIDE ASSET MGMT, INC. | 115,430 | 106,790 | 15,000 | 15,000 |
| WOODSTOCK CORPORATION | 887,692 | 918,304 | 957,744 | 959,769 |
| WORLD ASSET MANAGEMENT | 6,107,534 | 6,048,184 | 6,110,882 | 5,712,523 |
| WRIGHT INVESTORS  SERVICE INC. | 804,408 | 761,794 | 752,306 | 744,126 |
| WWW ADVISORS, INC. | 0 | 0 | 30,000 | 0 |
| YELLOWSTONE PTNR LLC | 0 | 49,382 | 31,858 | 29,158 |
| YMCA RETIREMENT FUND | 330,000 | 340,000 | 375,000 | 370,000 |
| ZACKS INVESTMENT MGMT, INC. | 97,420 | 88,010 | 0 | 152,560 |
| ZELIFF WALLACE JACKSON INV COU | 0 | 14,384 | 13,963 | 12,463 |
| ZEVENBERGEN CAPITAL INVTS LLC | 1,236,500 | 0 | 0 | 0 |
| ZIONS FIRST NATIONAL BANK | 66,690 | 69,476 | 66,695 | 130,986 |
| ZWEIG-DIMENNA ASSOCIATES, INC. | 2,261,200 | 99,600 | 0 | 0 |
| TOTAL: | 2,385,406,564 | 2,236,182,222 | 2,140,707,794 | 2,060,275,921 |

Source: Thomson Financial

# Exhibit H

# Oracle - Regression Analysis

**SUMMARY OUTPUT**

| *Regression Statistics* | |
| --- | --- |
| Multiple R | 72.31% |
| Adjusted R Square | 52.10% |
| Standard Error | 3.49% |
| Observations | 254 |

| | *Coefficients* | *Standard Error* | *t Stat* | *P-value* |
| --- | --- | --- | --- | --- |
| Intercept | 0.0027 | 0.0022 | 1.23 | 0.22 |
| NASDAQ 100 | 1.0535 | 0.0634 | 16.62 | 0.00 |

Notes:

Dependent variable: Oracle daily returns

Independent variable: NASDAQ-100 daily returns

Control Period:  12/13/99 through 12/13/00

# Oracle - Regression Analysis

(Beta=1.05, t-Statistic=16.6, R-squared=52.1%, Control Period: 12/14/1999 through 12/13/2000)

| | Oracle Corporation | | | NASDAQ 100 | | Daily Analysis | | |
| | Reported | Closing | | | | Predicted | Residual | |
| Date | Volume | Price | % Change | Index | % Change | Return | Return | t-Statistic (1) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 12/14/2000 | 45,894,400 | $27.50 | -3.08% | 2,639.3 | -3.99% | -3.93% | 0.85% | 0.24 |
| 12/15/2000 | 120,004,000 | $28.56 | 3.86% | 2,549.5 | -3.40% | -3.31% | 7.18% | 2.06 |
| 12/18/2000 | 61,640,100 | $32.00 | 12.04% | 2,543.1 | -0.25% | 0.00% | 12.03% | 3.45 |
| 12/19/2000 | 58,653,700 | $30.63 | -4.30% | 2,399.6 | -5.64% | -5.67% | 1.38% | 0.40 |
| 12/20/2000 | 54,440,500 | $28.50 | -6.94% | 2,210.3 | -7.89% | -8.04% | 1.10% | 0.32 |
| 12/21/2000 | 46,719,700 | $29.50 | 3.51% | 2,224.8 | 0.66% | 0.96% | 2.55% | 0.73 |
| 12/22/2000 | 35,568,200 | $31.88 | 8.05% | 2,436.3 | 9.50% | 10.28% | -2.23% | (0.64) |
| 12/26/2000 | 20,589,500 | $30.94 | -2.94% | 2,404.6 | -1.30% | -1.10% | -1.84% | (0.53) |
| 12/27/2000 | 26,437,500 | $30.69 | -0.81% | 2,460.2 | 2.31% | 2.71% | -3.51% | (1.01) |
| 12/28/2000 | 25,053,600 | $31.06 | 1.22% | 2,464.6 | 0.18% | 0.46% | 0.76% | 0.22 |
| 12/29/2000 | 31,702,200 | $29.06 | -6.44% | 2,341.7 | -4.99% | -4.99% | -1.45% | (0.42) |
| 1/2/2001 | 46,281,000 | $26.38 | -9.25% | 2,128.8 | -9.09% | -9.31% | 0.06% | 0.02 |
| 1/3/2001 | 76,389,700 | $32.00 | 21.33% | 2,528.4 | 18.77% | 20.05% | 1.28% | 0.37 |
| 1/4/2001 | 57,584,400 | $32.56 | 1.76% | 2,460.0 | -2.70% | -2.58% | 4.34% | 1.24 |
| 1/5/2001 | 38,415,200 | $30.13 | -7.49% | 2,267.9 | -7.81% | -7.96% | 0.48% | 0.14 |
| 1/8/2001 | 40,644,600 | $29.94 | -0.62% | 2,281.5 | 0.60% | 0.90% | -1.53% | (0.44) |
| 1/9/2001 | 44,818,600 | $31.50 | 5.22% | 2,311.4 | 1.31% | 1.65% | 3.57% | 1.02 |
| 1/10/2001 | 64,627,400 | $32.75 | 3.97% | 2,413.7 | 4.43% | 4.93% | -0.96% | (0.28) |
| 1/11/2001 | 50,906,600 | $33.31 | 1.72% | 2,524.3 | 4.58% | 5.10% | -3.38% | (0.97) |
| 1/12/2001 | 40,234,100 | $32.31 | -3.00% | 2,506.1 | -0.72% | -0.49% | -2.51% | (0.72) |
| 1/16/2001 | 31,198,700 | $31.81 | -1.55% | 2,470.7 | -1.41% | -1.22% | -0.33% | (0.09) |
| 1/17/2001 | 52,535,000 | $33.25 | 4.52% | 2,558.7 | 3.56% | 4.02% | 0.50% | 0.14 |
| 1/18/2001 | 33,749,200 | $33.81 | 1.69% | 2,670.5 | 4.37% | 4.87% | -3.18% | (0.91) |
| 1/19/2001 | 50,227,100 | $34.56 | 2.22% | 2,655.7 | -0.55% | -0.31% | 2.53% | 0.73 |
| 1/22/2001 | 57,564,400 | $31.81 | -7.96% | 2,643.1 | -0.47% | -0.23% | -7.73% | (2.22) |
| 1/23/2001 | 42,545,700 | $31.48 | -1.03% | 2,730.1 | 3.29% | 3.73% | -4.76% | (1.37) |
| 1/24/2001 | 65,596,100 | $30.06 | -4.52% | 2,726.5 | -0.13% | 0.13% | -4.65% | (1.33) |
| 1/25/2001 | 60,995,500 | $29.94 | -0.42% | 2,595.9 | -4.79% | -4.78% | 4.36% | 1.25 |
| 1/26/2001 | 46,538,900 | $30.38 | 1.46% | 2,631.8 | 1.38% | 1.73% | -0.27% | (0.08) |
| 1/29/2001 | 33,397,000 | $30.44 | 0.21% | 2,694.5 | 2.38% | 2.78% | -2.58% | (0.74) |
| 1/30/2001 | 42,788,300 | $30.31 | -0.41% | 2,686.1 | -0.31% | -0.06% | -0.35% | (0.10) |

# Oracle - Regression Analysis

(Beta=1.05, t-Statistic=16.6, R-squared=52.1%, Control Period: 12/14/1999 through 12/13/2000)

| | Oracle Corporation | | | NASDAQ 100 | | Daily Analysis | | |
|---|---|---|---|---|---|---|---|---|
| Date | Reported Volume | Closing Price | % Change | Index | % Change | Predicted Return | Residual Return | t-Statistic (1) |
| 1/31/2001 | 46,144,400 | $29.13 | -3.92% | 2,593.0 | -3.47% | -3.38% | -0.53% | (0.15) |
| 2/1/2001 | 38,389,200 | $30.06 | 3.22% | 2,607.2 | 0.55% | 0.84% | 2.37% | 0.68 |
| 2/2/2001 | 38,655,400 | $27.75 | -7.69% | 2,472.2 | -5.18% | -5.19% | -2.51% | (0.72) |
| 2/5/2001 | 35,933,100 | $27.50 | -0.90% | 2,467.3 | -0.20% | 0.06% | -0.96% | (0.28) |
| 2/6/2001 | 28,746,300 | $27.63 | 0.45% | 2,473.2 | 0.24% | 0.52% | -0.07% | (0.02) |
| 2/7/2001 | 42,854,400 | $27.69 | 0.23% | 2,409.7 | -2.57% | -2.44% | 2.67% | 0.76 |
| 2/8/2001 | 41,775,000 | $27.13 | -2.03% | 2,355.7 | -2.24% | -2.09% | 0.06% | 0.02 |
| 2/9/2001 | 91,625,000 | $23.56 | -13.13% | 2,261.8 | -3.99% | -3.93% | -9.20% | (2.64) |
| 2/12/2001 | 51,901,400 | $23.00 | -2.39% | 2,286.9 | 1.11% | 1.44% | -3.82% | (1.10) |
| 2/13/2001 | 44,509,700 | $22.56 | -1.90% | 2,208.4 | -3.43% | -3.35% | 1.44% | 0.41 |
| 2/14/2001 | 41,247,400 | $25.00 | 10.80% | 2,305.8 | 4.41% | 4.92% | 5.89% | 1.69 |
| 2/15/2001 | 46,084,700 | $25.50 | 2.00% | 2,371.0 | 2.83% | 3.25% | -1.25% | (0.36) |
| 2/16/2001 | 40,632,200 | $24.00 | -5.88% | 2,212.5 | -6.69% | -6.78% | 0.89% | 0.26 |
| 2/20/2001 | 39,873,200 | $23.13 | -3.65% | 2,095.1 | -5.31% | -5.32% | 1.68% | 0.48 |
| 2/21/2001 | 57,591,900 | $23.00 | -0.54% | 2,058.5 | -1.75% | -1.57% | 1.03% | 0.30 |
| 2/22/2001 | 54,073,600 | $23.38 | 1.63% | 2,032.4 | -1.27% | -1.07% | 2.70% | 0.77 |
| 2/23/2001 | 72,859,000 | $22.00 | -5.88% | 2,056.1 | 1.16% | 1.49% | -7.38% | (2.12) |
| 2/26/2001 | 44,847,400 | $23.19 | 5.40% | 2,097.6 | 2.02% | 2.40% | 3.00% | 0.86 |
| 2/27/2001 | 41,584,600 | $21.69 | -6.47% | 1,964.5 | -6.35% | -6.42% | -0.05% | (0.01) |
| 2/28/2001 | 62,362,300 | $19.00 | -12.39% | 1,908.3 | -2.86% | -2.74% | -9.65% | (2.77) |
| 3/1/2001 | 76,869,400 | $21.38 | 12.50% | 1,968.0 | 3.13% | 3.56% | 8.94% | 2.56 |
| 3/2/2001 | 224,088,800 | $16.88 | -21.05% | 1,881.3 | -4.40% | -4.37% | -16.68% | (4.78) |
| 3/5/2001 | 51,544,000 | $17.00 | 0.74% | 1,916.7 | 1.88% | 2.25% | -1.51% | (0.43) |
| 3/6/2001 | 57,448,400 | $17.63 | 3.68% | 1,976.3 | 3.11% | 3.55% | 0.13% | 0.04 |
| 3/7/2001 | 52,486,500 | $18.63 | 5.67% | 1,996.2 | 1.01% | 1.33% | 4.34% | 1.25 |
| 3/8/2001 | 40,342,100 | $17.50 | -6.04% | 1,938.2 | -2.91% | -2.80% | -3.24% | (0.93) |
| 3/9/2001 | 58,409,900 | $16.38 | -6.43% | 1,813.0 | -6.46% | -6.53% | 0.10% | 0.03 |
| 3/12/2001 | 66,843,000 | $15.19 | -7.25% | 1,680.6 | -7.30% | -7.42% | 0.17% | 0.05 |
| 3/13/2001 | 57,981,600 | $16.94 | 11.52% | 1,789.7 | 6.49% | 7.11% | 4.42% | 1.27 |
| 3/14/2001 | 52,862,100 | $16.06 | -5.17% | 1,745.1 | -2.49% | -2.36% | -2.81% | (0.81) |
| 3/15/2001 | 77,834,800 | $14.69 | -8.56% | 1,697.9 | -2.70% | -2.58% | -5.98% | (1.72) |

# Oracle - Regression Analysis

(Beta=1.05, t-Statistic=16.6, R-squared=52.1%, Control Period: 12/14/1999 through 12/13/2000)

| Date | Oracle Corporation | | | NASDAQ 100 | | Daily Analysis | | |
| | Reported Volume | Closing Price | % Change | Index | % Change | Predicted Return | Residual Return | t-Statistic (1) |
|---|---|---|---|---|---|---|---|---|
| 3/16/2001 | 89,327,700 | $14.06 | -4.26% | 1,647.5 | -2.97% | -2.86% | -1.40% | (0.40) |
| 3/19/2001 | 50,443,200 | $15.44 | 9.78% | 1,730.5 | 5.03% | 5.57% | 4.20% | 1.21 |
| 3/20/2001 | 65,545,100 | $14.38 | -6.88% | 1,614.5 | -6.70% | -6.79% | -0.09% | (0.03) |
| 3/21/2001 | 50,574,600 | $14.75 | 2.61% | 1,605.0 | -0.58% | -0.35% | 2.96% | 0.85 |
| 3/22/2001 | 63,980,900 | $15.50 | 5.08% | 1,701.9 | 6.03% | 6.63% | -1.54% | (0.44) |
| 3/23/2001 | 72,068,300 | $15.88 | 2.42% | 1,705.0 | 0.18% | 0.46% | 1.96% | 0.56 |
| 3/26/2001 | 34,392,600 | $15.69 | -1.17% | 1,676.9 | -1.65% | -1.47% | 0.30% | 0.09 |
| 3/27/2001 | 43,943,800 | $16.65 | 6.12% | 1,735.7 | 3.51% | 3.96% | 2.16% | 0.62 |
| 3/28/2001 | 46,438,000 | $15.10 | -9.31% | 1,602.2 | -7.69% | -7.83% | -1.48% | (0.42) |
| 3/29/2001 | 54,250,500 | $14.52 | -3.84% | 1,563.1 | -2.44% | -2.30% | -1.54% | (0.44) |
| 3/30/2001 | 36,956,100 | $14.98 | 3.17% | 1,573.3 | 0.65% | 0.95% | 2.22% | 0.64 |

(1) A negative residual return is considered statistically significant at the 95% confidence level if it has a t-statistic of -1.65 or less using a one tailed test.  Conversely, a positive residual return is considered statistically significant at the 95% confidence level if it has a t-statistic of + 1.65 or greater using a one tailed test.

# Exhibit I

## Oracle vs Value Line



Exhibit I

Page 1

**Oracle - Calculation of the Value Line**

| Date | Oracle Corporation | | NASDAQ 100 | | Predicted Return | Value Line % Change | Value Line | Inflation or Damages per Share | 90-day Moving Average (1) |
|---|---|---|---|---|---|---|---|---|---|
| | Price | % Change | Value | % Change | | | | | |
| 12/1/2000 | $26.44 | -0.24% | 2,549.7 | 1.72% | | | | | |
| 12/4/2000 | $28.19 | 6.62% | 2,554.4 | 0.18% | | | | | |
| 12/5/2000 | $31.50 | 11.75% | 2,852.9 | 11.68% | | | | | |
| 12/6/2000 | $30.19 | -4.17% | 2,743.7 | -3.83% | | | | | |
| 12/7/2000 | $28.31 | -6.21% | 2,719.9 | -0.87% | | | | | |
| 12/8/2000 | $30.06 | 6.18% | 2,895.4 | 6.45% | | | | | |
| 12/11/2000 | $31.94 | 6.24% | 2,972.9 | 2.68% | | | | | |
| 12/12/2000 | $30.75 | -3.72% | 2,863.2 | -3.69% | | | | | |
| 12/13/2000 | $28.38 | -7.72% | 2,748.9 | -3.99% | | | | | |
| 12/14/2000 | $27.50 | -3.08% | 2,639.3 | -3.99% | | | | $24.39 | $3.11 |
| 12/15/2000 | $28.56 | 3.86% | 2,549.5 | -3.40% | **-3.31%** | **-3.31%** | $23.58 | $4.98 |
| 12/18/2000 | $32.00 | 12.04% | 2,543.1 | -0.25% | | 12.04% | $26.42 | $5.58 |
| 12/19/2000 | $30.63 | -4.30% | 2,399.6 | -5.64% | | -4.30% | $25.28 | $5.34 |
| 12/20/2000 | $28.50 | -6.94% | 2,210.3 | -7.89% | | -6.94% | $23.53 | $4.97 |
| 12/21/2000 | $29.50 | 3.51% | 2,224.8 | 0.66% | | 3.51% | $24.35 | $5.15 |
| 12/22/2000 | $31.88 | 8.05% | 2,436.3 | 9.50% | | 8.05% | $26.31 | $5.56 |
| 12/26/2000 | $30.94 | -2.94% | 2,404.6 | -1.30% | | -2.94% | $25.54 | $5.40 |
| 12/27/2000 | $30.69 | -0.81% | 2,460.2 | 2.31% | | -0.81% | $25.33 | $5.35 |
| 12/28/2000 | $31.06 | 1.22% | 2,464.6 | 0.18% | | 1.22% | $25.64 | $5.42 |
| 12/29/2000 | $29.06 | -6.44% | 2,341.7 | -4.99% | | -6.44% | $23.99 | $5.07 |
| 1/2/2001 | $26.38 | -9.25% | 2,128.8 | -9.09% | | -9.25% | $21.77 | $4.60 |
| 1/3/2001 | $32.00 | 21.33% | 2,528.4 | 18.77% | | 21.33% | $26.42 | $5.58 |
| 1/4/2001 | $32.56 | 1.76% | 2,460.0 | -2.70% | | 1.76% | $26.88 | $5.68 |
| 1/5/2001 | $30.13 | -7.49% | 2,267.9 | -7.81% | | -7.49% | $24.87 | $5.26 |
| 1/8/2001 | $29.94 | -0.62% | 2,281.5 | 0.60% | | -0.62% | $24.71 | $5.22 |
| 1/9/2001 | $31.50 | 5.22% | 2,311.4 | 1.31% | | 5.22% | $26.00 | $5.50 |
| 1/10/2001 | $32.75 | 3.97% | 2,413.7 | 4.43% | | 3.97% | $27.04 | $5.71 |
| 1/11/2001 | $33.31 | 1.72% | 2,524.3 | 4.58% | | 1.72% | $27.50 | $5.81 |
| 1/12/2001 | $32.31 | -3.00% | 2,506.1 | -0.72% | | -3.00% | $26.68 | $5.64 |
| 1/16/2001 | $31.81 | -1.55% | 2,470.7 | -1.41% | | -1.55% | $26.26 | $5.55 |
| 1/17/2001 | $33.25 | 4.52% | 2,558.7 | 3.56% | | 4.52% | $27.45 | $5.80 |
| 1/18/2001 | $33.81 | 1.69% | 2,670.5 | 4.37% | | 1.69% | $27.91 | $5.90 |

Exhibit I

## Oracle - Calculation of the Value Line

| Date | Oracle Corporation Price | % Change | NASDAQ 100 Value | % Change | Predicted Return | Value Line % Change | Value Line | Inflation or Damages per Share | 90-day Moving Average (1) |
|---|---|---|---|---|---|---|---|---|---|
| 1/19/2001 | $34.56 | 2.22% | 2,655.7 | -0.55% | | 2.22% | $28.53 | $6.03 | |
| 1/22/2001 | $31.81 | -7.96% | 2,643.1 | -0.47% | | -7.96% | $26.26 | $5.55 | |
| 1/23/2001 | $31.48 | -1.03% | 2,730.1 | 3.29% | | -1.03% | $25.99 | $5.49 | |
| 1/24/2001 | $30.06 | -4.52% | 2,726.5 | -0.13% | | -4.52% | $24.82 | $5.24 | |
| 1/25/2001 | $29.94 | -0.42% | 2,595.9 | -4.79% | | -0.42% | $24.71 | $5.22 | |
| 1/26/2001 | $30.38 | 1.46% | 2,631.8 | 1.38% | | 1.46% | $25.08 | $5.30 | |
| 1/29/2001 | $30.44 | 0.21% | 2,694.5 | 2.38% | | 0.21% | $25.13 | $5.31 | |
| 1/30/2001 | $30.31 | -0.41% | 2,686.1 | -0.31% | | -0.41% | $25.02 | $5.29 | |
| 1/31/2001 | $29.13 | -3.92% | 2,593.0 | -3.47% | | -3.92% | $24.04 | $5.08 | |
| 2/1/2001 | $30.06 | 3.22% | 2,607.2 | 0.55% | | 3.22% | $24.82 | $5.24 | |
| 2/2/2001 | $27.75 | -7.69% | 2,472.2 | -5.18% | | -7.69% | $22.91 | $4.84 | |
| 2/5/2001 | $27.50 | -0.90% | 2,467.3 | -0.20% | | -0.90% | $22.70 | $4.80 | |
| 2/6/2001 | $27.63 | 0.45% | 2,473.2 | 0.24% | | 0.45% | $22.81 | $4.82 | |
| 2/7/2001 | $27.69 | 0.23% | 2,409.7 | -2.57% | | 0.23% | $22.86 | $4.83 | |
| 2/8/2001 | $27.13 | -2.03% | 2,355.7 | -2.24% | | -2.03% | $22.39 | $4.73 | |
| 2/9/2001 | $23.56 | -13.13% | 2,261.8 | -3.99% | | -13.13% | $19.45 | $4.11 | |
| 2/12/2001 | $23.00 | -2.39% | 2,286.9 | 1.11% | | -2.39% | $18.99 | $4.01 | |
| 2/13/2001 | $22.56 | -1.90% | 2,208.4 | -3.43% | | -1.90% | $18.63 | $3.94 | |
| 2/14/2001 | $25.00 | 10.80% | 2,305.8 | 4.41% | | 10.80% | $20.64 | $4.36 | |
| 2/15/2001 | $25.50 | 2.00% | 2,371.0 | 2.83% | | 2.00% | $21.05 | $4.45 | |
| 2/16/2001 | $24.00 | -5.88% | 2,212.5 | -6.69% | | -5.88% | $19.81 | $4.19 | |
| 2/20/2001 | $23.13 | -3.65% | 2,095.1 | -5.31% | | -3.65% | $19.09 | $4.03 | |
| 2/21/2001 | $23.00 | -0.54% | 2,058.5 | -1.75% | | -0.54% | $18.99 | $4.01 | |
| 2/22/2001 | $23.38 | 1.63% | 2,032.4 | -1.27% | | 1.63% | $19.30 | $4.08 | |
| 2/23/2001 | $22.00 | -5.88% | 2,056.1 | 1.16% | | -5.88% | $18.16 | $3.84 | |
| 2/26/2001 | $23.19 | 5.40% | 2,097.6 | 2.02% | | 5.40% | $19.14 | $4.05 | |
| 2/27/2001 | $21.69 | -6.47% | 1,964.5 | -6.35% | | -6.47% | $17.90 | $3.78 | |
| 2/28/2001 | $19.00 | -12.39% | 1,908.3 | -2.86% | | -12.39% | $15.69 | $3.31 | |
| 3/1/2001 | $21.38 | 12.50% | 1,968.0 | 3.13% | | 12.50% | $17.65 | $3.73 | |
| 3/2/2001 | $16.88 | -21.05% | 1,881.3 | -4.40% | **-4.37%** | **-4.37%** | $16.88 | | $16.88 |
| 3/5/2001 | $17.00 | 0.74% | 1,916.7 | 1.88% | | | | | $17.00 |
| 3/6/2001 | $17.63 | 3.68% | 1,976.3 | 3.11% | | | | | $17.63 |

Exhibit I

**Oracle - Calculation of the Value Line**

| Date | Oracle Corporation | | NASDAQ 100 | | Predicted Return | Value Line % Change | Value Line | Inflation or Damages per Share | 90-day Moving Average (1) |
| | Price | % Change | Value | % Change | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3/7/2001 | $18.63 | 5.67% | 1,996.2 | 1.01% | | | | | $18.63 |
| 3/8/2001 | $17.50 | -6.04% | 1,938.2 | -2.91% | | | | | $17.50 |
| 3/9/2001 | $16.38 | -6.43% | 1,813.0 | -6.46% | | | | | $16.38 |
| 3/12/2001 | $15.19 | -7.25% | 1,680.6 | -7.30% | | | | | $15.19 |
| 3/13/2001 | $16.94 | 11.52% | 1,789.7 | 6.49% | | | | | $16.94 |
| 3/14/2001 | $16.06 | -5.17% | 1,745.1 | -2.49% | | | | | $16.06 |
| 3/15/2001 | $14.69 | -8.56% | 1,697.9 | -2.70% | | | | | $14.69 |
| 3/16/2001 | $14.06 | -4.26% | 1,647.5 | -2.97% | | | | | $14.06 |
| 3/19/2001 | $15.44 | 9.78% | 1,730.5 | 5.03% | | | | | $15.44 |
| 3/20/2001 | $14.38 | -6.88% | 1,614.5 | -6.70% | | | | | $14.38 |
| 3/21/2001 | $14.75 | 2.61% | 1,605.0 | -0.58% | | | | | $14.75 |
| 3/22/2001 | $15.50 | 5.08% | 1,701.9 | 6.03% | | | | | $15.50 |
| 3/23/2001 | $15.88 | 2.42% | 1,705.0 | 0.18% | | | | | $15.88 |
| 3/26/2001 | $15.69 | -1.17% | 1,676.9 | -1.65% | | | | | $15.69 |
| 3/27/2001 | $16.65 | 6.12% | 1,735.7 | 3.51% | | | | | $16.65 |
| 3/28/2001 | $15.10 | -9.31% | 1,602.2 | -7.69% | | | | | $15.10 |
| 3/29/2001 | $14.52 | -3.84% | 1,563.1 | -2.44% | | | | | $14.52 |
| 3/30/2001 | $14.98 | 3.17% | 1,573.3 | 0.65% | | | | | $14.98 |
| 4/2/2001 | $15.32 | 2.27% | 1,516.6 | -3.60% | | | | | $15.32 |
| 4/3/2001 | $13.25 | -13.51% | 1,399.1 | -7.75% | | | | | $13.25 |
| 4/4/2001 | $13.66 | 3.09% | 1,370.8 | -2.02% | | | | | $13.66 |
| 4/5/2001 | $14.74 | 7.91% | 1,519.1 | 10.82% | | | | | $14.74 |
| 4/6/2001 | $13.86 | -5.97% | 1,448.2 | -4.67% | | | | | $13.86 |
| 4/9/2001 | $14.05 | 1.37% | 1,481.2 | 2.28% | | | | | $14.05 |
| 4/10/2001 | $14.97 | 6.55% | 1,597.9 | 7.88% | | | | | $14.97 |
| 4/11/2001 | $15.53 | 3.74% | 1,647.4 | 3.10% | | | | | $15.53 |
| 4/12/2001 | $15.82 | 1.87% | 1,714.3 | 4.06% | | | | | $15.82 |
| 4/16/2001 | $15.96 | 0.88% | 1,650.2 | -3.74% | | | | | $15.96 |
| 4/17/2001 | $16.22 | 1.63% | 1,671.5 | 1.29% | | | | | $16.22 |
| 4/18/2001 | $17.92 | 10.48% | 1,830.8 | 9.53% | | | | | $17.92 |
| 4/19/2001 | $20.32 | 13.39% | 1,953.3 | 6.69% | | | | | $20.32 |
| 4/20/2001 | $19.75 | -2.81% | 1,933.6 | -1.01% | | | | | $19.75 |
| 4/23/2001 | $17.15 | -13.16% | 1,811.9 | -6.29% | | | | | $17.15 |

Exhibit I

**Oracle - Calculation of the Value Line**

| Date | Oracle Corporation Price | Oracle Corporation % Change | NASDAQ 100 Value | NASDAQ 100 % Change | Predicted Return | Value Line % Change | Value Line | Inflation or Damages per Share | 90-day Moving Average (1) |
|---|---|---|---|---|---|---|---|---|---|
| 4/24/2001 | $16.97 | -1.05% | 1,762.2 | -2.74% | | | | | $16.97 |
| 4/25/2001 | $17.25 | 1.65% | 1,814.3 | 2.96% | | | | | $17.25 |
| 4/26/2001 | $16.90 | -2.03% | 1,763.3 | -2.81% | | | | | $16.90 |
| 4/27/2001 | $17.15 | 1.48% | 1,810.5 | 2.67% | | | | | $17.15 |
| 4/30/2001 | $16.16 | -5.77% | 1,855.2 | 2.47% | | | | | $16.16 |
| 5/1/2001 | $16.04 | -0.74% | 1,919.0 | 3.44% | | | | | $16.04 |
| 5/2/2001 | $17.17 | 7.04% | 1,962.4 | 2.26% | | | | | $17.17 |
| 5/3/2001 | $16.45 | -4.19% | 1,877.8 | -4.31% | | | | | $16.45 |
| 5/4/2001 | $17.09 | 3.89% | 1,923.8 | 2.45% | | | | | $17.09 |
| 5/7/2001 | $16.87 | -1.29% | 1,895.4 | -1.48% | | | | | $16.87 |
| 5/8/2001 | $17.04 | 1.01% | 1,929.2 | 1.78% | | | | | $17.04 |
| 5/9/2001 | $17.06 | 0.12% | 1,876.9 | -2.71% | | | | | $17.06 |
| 5/10/2001 | $16.39 | -3.93% | 1,838.3 | -2.05% | | | | | $16.39 |
| 5/11/2001 | $15.90 | -2.99% | 1,821.2 | -0.93% | | | | | $15.90 |
| 5/14/2001 | $16.04 | 0.88% | 1,795.1 | -1.44% | | | | | $16.04 |
| 5/15/2001 | $15.93 | -0.69% | 1,796.8 | 0.10% | | | | | $15.93 |
| 5/16/2001 | $16.40 | 2.95% | 1,899.5 | 5.71% | | | | | $16.40 |
| 5/17/2001 | $16.12 | -1.71% | 1,925.1 | 1.35% | | | | | $16.12 |
| 5/18/2001 | $16.28 | 0.99% | 1,927.7 | 0.13% | | | | | $16.28 |
| 5/21/2001 | $18.10 | 11.18% | 2,052.6 | 6.48% | | | | | $18.10 |
| 5/22/2001 | $17.58 | -2.87% | 2,042.9 | -0.47% | | | | | $17.58 |
| 5/23/2001 | $16.83 | -4.27% | 1,957.6 | -4.18% | | | | | $16.83 |
| 5/24/2001 | $17.30 | 2.79% | 2,003.4 | 2.34% | | | | | $17.30 |
| 5/25/2001 | $16.51 | -4.57% | 1,960.7 | -2.13% | | | | | $16.51 |
| 5/29/2001 | $15.61 | -5.45% | 1,873.5 | -4.45% | | | | | $15.61 |
| 5/30/2001 | $14.51 | -7.05% | 1,779.0 | -5.05% | | | | | $14.51 |
| 5/31/2001 | $15.30 | 5.44% | 1,799.9 | 1.17% | | | | | |

(1) the 90-day moving average is used to calculate the statutory limitation on damages per Section 21D(e)
     of the Securities Litigation Reform Act of 1995.

Exhibit I                                                                                                                 Page 5

# Exhibit J

## Oracle - Analysis of Insider Sales

| Date | Shares Sold | Sales Price | Actual Proceeds | Damages per Share (1) | Aggregate Damages | Loss Avoided per Share (2) | Aggregate Loss Avoided |
|---|---|---|---|---|---|---|---|
| **_Larry Ellison:_** | | | | | | | |
| 1/22/2001 | 3,100,000 | $32.010 | $99,231,000 | $5.55 | $17,205,000 | $16.21 | $50,251,000 |
| 1/23/2001 | 5,100,000 | $31.640 | $161,364,000 | $5.49 | $27,999,000 | $15.84 | $80,784,000 |
| 1/24/2001 | 4,900,000 | $30.730 | $150,577,000 | $5.24 | $25,676,000 | $14.93 | $73,157,000 |
| 1/25/2001 | 3,825,000 | $30.140 | $115,285,500 | $5.22 | $19,966,500 | $14.34 | $54,850,500 |
| 1/26/2001 | 4,225,000 | $30.090 | $127,130,250 | $5.30 | $22,392,500 | $14.29 | $60,375,250 |
| 1/29/2001 | 1,082,000 | $30.030 | $32,492,460 | $5.31 | $5,745,420 | $14.23 | $15,396,860 |
| 1/29/2001 | 815,000 | $30.220 | $24,629,300 | $5.31 | $4,327,650 | $14.42 | $11,752,300 |
| 1/29/2001 | 1,500,000 | $30.490 | $45,735,000 | $5.31 | $7,965,000 | $14.69 | $22,035,000 |
| 1/30/2001 | 352,000 | $30.540 | $10,750,080 | $5.29 | $1,862,080 | $14.74 | $5,188,480 |
| 1/30/2001 | 1,560,000 | $30.440 | $47,486,400 | $5.29 | $8,252,400 | $14.64 | $22,838,400 |
| 1/30/2001 | 25,576 | $30.250 | $773,674 | $5.29 | $135,297 | $14.45 | $369,573 |
| 1/30/2001 | 1,000,000 | $30.830 | $30,830,000 | $5.29 | $5,290,000 | $15.03 | $15,030,000 |
| 1/30/2001 | 300,000 | $30.210 | $9,063,000 | $5.29 | $1,587,000 | $14.41 | $4,323,000 |
| 1/31/2001 | 1,300,000 | $30.350 | $39,455,000 | $5.08 | $6,604,000 | $14.55 | $18,915,000 |
| | 29,084,576 | | $894,802,664 | | $155,007,847 | | $435,266,363 |
| **_Jeff Henley:_** | | | | | | | |
| 1/4/2001 | 206,228 | $32.310 | $6,663,227 | $5.68 | $1,171,375 | $16.51 | $3,404,824 |
| 1/4/2001 | 793,772 | $32.310 | $25,646,773 | $5.68 | $4,508,625 | $16.51 | $13,105,176 |
| | 1,000,000 | | $32,310,000 | | $5,680,000 | | $16,510,000 |
| **_Total Ellison & Henley:_** | | | | | | | |
| January 2001 | 30,084,576 | | $927,112,664 | | $160,687,847 | | $451,776,363 |

(1) damages per share from Exhibit I.
(2) loss avoided per share is defined as the difference between the sales price per share and Oracle's average closing
    price per share from March 16, 2001 through April 30, 2001 of $15.80 per share.

Exhibit J

EXHIBIT 181

Exhibit M

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In Re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) | Master File No. C-01-0988-MJJ |
| ———————————————— | ) ) ) | |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS | ) ) ) | |
| ———————————————— | ) | |

**REBUTTAL REPORT OF BJORN I. STEINHOLT, CFA**

**June 22, 2007**

## I.     INTRODUCTION

1.     I have been retained by plaintiffs' counsel to analyze and provide expert testimony regarding the economic issues related to market efficiency, materiality, loss causation, and the calculation of Section 10(b) damages suffered by purchasers of Oracle Corporation ("Oracle" or the "Company") common stock from December 14, 2000 through March 1, 2001 (the "Class Period"). In addition, I have been asked to analyze defendants' insider sales during the Class Period and calculate the related damages pursuant to Section 20A of the Securities Exchange Act of 1934.  On May 25, 2007, I submitted an expert report in this matter in which I provided my analyses of the above issues, including the quantification of damages resulting from the March 2, 2001 decline in Oracle's stock price ("May 2007 Report").

2.     I have now been asked to review and discuss an expert report by Mr. Christopher James ("James Report") submitted on behalf of defendant Oracle and the individual defendants Lawrence J. Ellison, Jeffrey O. Henley and Edward J. Sanderson.  Below I discuss Mr. James' analysis of (a) materiality, and (b) Oracle's March 2, 2001 stock price decline.

## II.    MATERIALITY

3.     In my May 2007 Report, I analyzed whether the alleged misrepresentations and omissions would have been important to reasonable investors, *i.e.*, whether the information misrepresented or omitted would be information that reasonable investors would have wanted to consider prior to making an investment decision.  This is different than Mr. James' materiality analysis which focuses on whether the misrepresentations or omissions "significantly change[d] the total mix of information," and then claims that in the absence of a statistically significant upward price movement "the market [would] not consider these statements to be material."  (James Report, ¶43.)  It is important to fully understand Mr. James' alternative approach to assess materiality, and specifically the limitations of his approach.  Consequently, below, I will first discuss the limitation

of using Mr. James' approach to assess materiality.  Second, I will compare Mr. James' event analysis with my own and explain why my event analysis is superior to Mr. James' analysis when assessing statistical significance, specifically with respect to Oracle's December 15, 2000 price increase.

Limitation of Mr. James' Approach to Assess Materiality

4.      The difference between Mr. James' materiality analysis and my own can be demonstrated through a simplified hypothetical.  Let's assume that a company falsely reports earnings of $1 per share when it, in fact, should have reported 50 cents per share, and that investors used these earnings to forecast the company's future earnings.  In this simplified hypothetical, the company's stock price would trade at a higher level after falsely reporting earnings of $1 per share than where it would have traded if the company had truthfully reported earnings of only 50 cents per share.  Consequently, the misrepresentation was material.

5.      Mr. James' approach to assessing materiality, however, would not focus on the difference between reporting false earnings of $1 per share versus reporting truthful earnings of 50 cents per share.  Instead, Mr. James' approach would focus on whether the false earnings of $1 per share were significantly different than investors' expectations.  (James Report, ¶15.)  In other words, the prior day's stock price (reflecting investors' expectations) would be compared with the stock price following the earnings announcement (reflecting the false $1 earnings per share).  At no time would the magnitude of the overstated earnings be analyzed.  This means that if investors expected the company to report earnings of $1 per share, and the company reported false earnings of $1 per share, the stock price would not increase, leading Mr. James to concluded that "the market did not consider [the reported $1 earnings per share] to be material."  (James Report, ¶43.)  This type of analysis will only demonstrate materiality if the misrepresentation changed investors' assessment of

future cash flows **relative to prior expectations**.  The limitation of Mr. James' approach is explained as follows in one paper:

> For example, suppose a company was expected to earn fifty cents a share but actually only earned forty cents.  If the company falsely announced earnings of forty-five cents, the market will be disappointed and the stock price will fall, even though the company has overstated its earnings.  Thus, stock price evidence to support an allegation of loss causation based on an inflated purchase price will only be readily available in cases where the defendant makes an affirmative misstatement relative to market expectations.[1]

6.      Clearly, in the above examples, a reasonable investor would have wanted to consider the company's true earnings, as opposed to the artificially inflated earnings, prior to making an investment decision.  Furthermore, it would be incorrect to conclude that simply because there was no increase in the stock price, investors would have viewed the overstated earnings as immaterial. Sometimes false and misleading statements simply maintain inflation in the stock price, they do not necessarily cause an increase in inflation.  Mr. James' analysis of materiality, therefore, is of limited benefit.

Mr. James' Event Analysis

7.      As discussed above, materiality can be demonstrated using an event analysis when the misrepresentations caused investors to change their assessment of future cash flows relative to prior expectations, resulting in an increase in price.  Specifically, an event analysis can be used to assess statistical significance of the price increase.  In statistics, a result is considered significant if it is unlikely to have occurred by chance only.  While Mr. James' event analysis is similar to my own, I disagree with his conclusion regarding the statistical significance of Oracle's stock price reaction on December 15, 2000, following the Company's announcement of its Second Quarter 2000 results.

---

[1]      David Tabak, "Loss Causation and Damages in Shareholder Class Actions: When It Takes Two Steps to Tango," NERA Working Paper, May 2004, attached hereto as Exhibit A.

Mr. James calculates that Oracle's price increase on December 15, 2000, net of market and industry factors, was 6.8%, which translates into an increase in Oracle's market value of more than $10 billion.[2]  (James Report, Exhibit 5.)  However, presumably based on his event analysis, Mr. James claims that this price increase was not statistically significant.  (James Report, Exhibit 7, ¶8.)  This is inconsistent with my event analysis that demonstrates that the December 15 price increase, indeed, was statistically significant at the 95% confidence level (t-statistic equal to 2.06).  Below, I first discuss the fact that even Mr. James' event analysis demonstrates that the December 15, 2000 price increase was statistically significant at the 95% level using a one-tailed test.[3]  Second, I discuss why Mr. James' event study is inferior to my own event analysis, based on objective statistical measures such as the adjusted r-squared, standard error or t-statistic.

8.      In order to assess statistical significance, the t-statistic is first calculated.  If one is testing for a statistically significant price increase using a one-tailed test, consistent with plaintiffs' allegations, a t-statistic of 1.65 or greater would be characterized as statistically significant at the 95% level.  In layman's terms, this means that a market adjusted price increase of this magnitude or greater would only be expected to occur 5% of the time in a random sample.  Mr. James' does not provide the t-statistic for December 15, 2000, which is the relevant statistic used to assess statistical significance.  Rather, Mr. James simply claims that the price decline was not statistically significant.  (James Report, Exhibit 7, ¶8.)  As a result, I duplicated Mr. James' event analysis and determined that, using his regression model, the t-statistic for December 15, 2000, was 1.76, or greater than the 1.65 benchmark discussed above, *i.e.*, the December 15, 2000 price increase, using Mr. James' own

---

[2]      (5.5 billion shares) x (6.8% residual return) x ($27.50 per share) = $10.4 billion.

[3]      A one-tailed test is used to test for large price increases only (or large decreases only), while a two-tailed test is used to test for large price movements in either direction.  Mr. James' analysis tests for large price increases, consequently, a one-tailed test is appropriate.  (James Report, ¶3.b.)

analysis, was statistically significant at the 95% level using a one-tailed test.  In other words, a price increase of this magnitude would be expected to occur less than 5% of the time randomly, *i.e.*, the December 15 price increase was a price increase unlikely to have occurred simply by chance.

9.      It should also be noted that the confidence level used to determine statistical significance varies depending upon the context.  The benchmark used to determine whether an event study is suitable for academic publication – generally the 95% level – nonetheless may not be the appropriate level for civil or criminal litigation.  A court certainly would not convict a defendant in a criminal case solely based on an observed result that had a 5% probability of occurring simply by chance.  Similarly, a sufficient confidence level in civil litigation, where plaintiffs only have to prove their case by a preponderance of the evidence, may be much lower than the 95% level.  For example, the 90% level of confidence would also be of interest when assessing the level of materiality, as there is, to my knowledge, no absolute benchmark in civil proceedings, as discussed in a commonly used reference text below:

> It is not clear what level of statistical significance corresponds to a legal definition of materiality.  As Mitchell and Netter point out, the 95 percent confidence level is commonly used, while the 90 percent and 99 percent levels are also options.  There is no definite case law on how statistical confidence levels relate to burden of proof in civil (or criminal) litigation.  With an event study, however, courts can quantify the level of materiality, compare it across cases, and assess it using professional standards from the economic literature. [4]

10.      Mr. James calculated the t-statistic for the December 15, 2000 price increase to be 1.76, which is less than the t-statistic of 2.06 in my May 2007 Report.  This difference is a result of different regression models.  To determine which regression model is superior, it is common to compare the adjusted r-squared of the regression models, or the proportion of variability in a data set

---

[4]      David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (3d ed. 2001), attached hereto as Exhibit B.

that is accounted for by the statistical model.  In this case, the adjusted r-squared of my regression model is 52%, much greater than the adjusted r-squared of Mr. James' regression model of only 43%.  This suggests that my regression model is superior to that of Mr. James.  The higher adjusted r-squared in my regression model also corresponds to a lower standard error in my model of 3.49%, versus a much higher standard error in Mr. James regression model of 3.8%.  Furthermore, the t-statistic associated with the independent variable in my regression model (the NASDAQ 100 index) is greater than 16, versus only 5.5 and 3.1 in James' regression model for the CRSP Value-Weighted NYSE/AMEX/NASDAQ index returns and Mr. James' industry index, respectively.  Again, this also suggests that my regression model is superior to that of Mr. James.  Based on the above, it is my opinion that my regression model is superior to that of Mr. James.  As noted in one commonly used reference text:

> When the estimation regression is run, one of the statistics generated is the adjusted R-squared.  This statistic measures the strength of the fraction of the variability of the variable being explained by the combined set of independent variables (the market and industry indices) used to do the explaining.  The higher this statistic, the larger the portion of the variability explained.  Another relevant statistic is the t-statistic associated with each independent variable; this statistic measures the strength of the individual independent variable's correlation with the company's stock price.  The farther the t-statistic is from zero, the stronger the relation.  While one should not use either the adjusted R-squared or t-statistics as a blind measure for the comparison of the explanatory power of different indices, an expert should be prepared to provide these statistics.  Moreover, if the expert chooses one index with less statistical explanatory power than a second index, he or she should be prepared to defend this choice.[5]

11.    Based on the above, it is my opinion that Oracle's announcement of its Second Quarter Fiscal 2001 results, including defendants' commentary, caused a statistically significant price increase, at the 95% level, in the Company's common stock on December 15, 2000.

---

[5]      Ibid.

### III.    Oracle's March 2, 2001 Price Decline

12.    Mr. James concedes that the price decline in Oracle's common stock on March 2, 2001, following the Company's pre-announcement of its Third Quarter Fiscal 2001 results, was statistically significant.  (James Report, ¶49.)  In other words, this price decline was not explained by Mr. James' market and industry indices.  In fact, the residual return calculated by Mr. James of -16.76% for March 2, 2001 is slightly smaller than the residual return calculated by me of -16.68%, and would therefore result in greater damages than those calculated in my May 2007 Report.

13.    Mr. James also opines that, on March 2, 2001, "Oracle's stock price fell in reaction to its earnings and revenue miss for the quarter which had current and future cash flow implications." (James Report, ¶3.c.)  I agree.  It therefore logically follows that, had investors been informed earlier about Oracle's inability to meet the revenue and earnings expectations for the Third Quarter Fiscal 2001, the Company's stock price would also have declined earlier, rather than on March 2, 2001. The critical issue in this case is whether Oracle, internally, was aware of the issues that ultimately caused it to miss investors' revenue and earnings expectations, and whether the Company had a duty to disclose this to investors earlier than it did.  According to plaintiffs' allegations, the Company, rather than disclosing the problems that ultimately caused it to miss revenue and earnings expectations, concealed these problems by: (a) reporting inflated revenues and earnings for the Second Quarter Fiscal 2001, (b) misrepresenting the quality and capabilities of, and customer demand for Oracle's 11i Application Suite ("Suite 11i"), (c) providing false financial projections for the Third Quarter Fiscal 2001, including forecasting earnings per share ("EPS") of 12 cents, database sales growth of 25% and applications sales growth of 75%, and (d) representing that the Company would not be negatively impacted by the economic slowdown and reduced IT spending.  For my purposes, I assumed that plaintiffs' allegations are true, and, consequently, I concluded that the price decline on March 2, 2001 relates directly to plaintiffs' allegations.

14.     Mr. James, on the other hand, reviews each of the allegations individually and effectively argues that none of them account for the decline in Oracle's stock price on March 2, 2001. (James Report, ¶3.)  It should be noted that it does not appear that any of Mr. James' opinions are based on an actual review of any internal documents.  Therefore, Mr. James is incapable of opining on what the defendants knew about the problems that ultimately caused the Company to miss investors' revenue and earnings expectations for the Third Quarter Fiscal 2001.  Regardless, below I will review and discuss each of Mr. James' arguments.

False Second Quarter Fiscal 2001 Results

15.     According to plaintiffs' allegations, Oracle reported inflated Second Quarter Fiscal 2001 results.  More specifically, plaintiffs allege that Oracle artificially inflated its revenue and EPS results for the Second Quarter Fiscal 2001.  Defendants manipulated Oracle's unapplied cash and customer overpayments accounts in connection with the creation of 46,000 fictitious "debit memo" invoices in November 2000, thereby artificially materially inflating Oracle's revenue and earnings for the Second Quarter Fiscal 2001.  I understand that plaintiffs also intend to prove that Oracle further artificially materially inflated its revenue and earnings by improperly recognizing revenue on a transaction with Hewlett Packard on the last day of the quarter, November 30, 2000.  As a result of the allegedly false financials, Oracle reported EPS of $0.11 for the Second Quarter Fiscal 2001 that were inflated by, at least, 1 cent per share, thereby exceeding analysts' consensus expectations of $0.10 cents per share by 1 cent per share.

16.     Mr. James argues that "Oracle's stock price decline on March 2, 2001 was not caused by the disclosure of information related to alleged accounting errors in 2QFY01."  (James Report, ¶3.h.)  The relevant issue, however, is whether the allegedly false and misleading earnings reported misled investors as to Oracle's true financial performance during Second Quarter Fiscal 2001, and, thereby, concealed the issues that later caused the Company to miss investors' revenue and earnings

expectations for the Third Quarter Fiscal 2001.  If so, plaintiffs' allegations would relate to the Company failing to meet the inflated revenue and earnings expectations.  For my purposes, I have assumed that plaintiffs will be able to prove their allegations that Oracle's publicly reported Second Quarter Fiscal 2001 results were false and misleading as discussed above.

Suite 11i Product Issues

17.    Plaintiffs allege that defendants misrepresented the quality and capabilities of, and customer demand for, Oracle's Suite 11i.  Among other things, plaintiffs allege that defendants falsely and repeatedly stated that Oracle's Suite 11i, first introduced in May of 2000, worked well and was pre-integrated and interoperable out-of-the-box.  Defendants also falsely stated that no systems integration was required, that the components of Suite 11i were literally plug-and-play, and that Suite 11i would manage all aspects of a customer's business and help reduce costs in a declining economy.  Plaintiffs also allege that defendants misrepresented that Suite 11i would drive sales growth at Oracle and that customer acceptance of Suite 11i was high. Defendants falsely projected 75% applications sales growth and 25% database sales growth for the Third Quarter Fiscal 2001. In reality, Suite 11i was beset with severe technical problems and defects, including integration problems, and required costly implementations to work.  These problems caused customers to suffer from implementation delay and/or to forego or delay planned purchases from Oracle.  Plaintiffs further allege that the misapplication of customer cash and improper revenue recognition in the Second Quarter Fiscal 2001 allowed the Company to hide the slowdown in applications and database sales that resulted from the problems with Suite 11i.

18.    Mr. James argues that financial analysts "did not attribute the earnings miss announced on March 1, 2001 to any integration or interoperability problems with Suite 11i or to any new information regarding product quality issues about Suite 11i."  (James Report, ¶3.f.)  First, the real issue is whether, as plaintiffs allege, lack of customer acceptance of Suite 11i, and thus strong

applications sales growth, was one reason why Oracle failed to meet investors' revenue and earnings expectations on March 1, 2001, and whether these problems were known by the Company and should have been disclosed prior to the end of the Class Period.  If so, the March 2, 2001 price decline directly relates to plaintiffs' allegations.  Second, analysts were, in fact, concerned that a portion of the revenue and earnings miss was due to lack of acceptance of the Company's e-business applications.[6]  Third, while analysts were aware of anecdotal accounts of problems with Suite 11i, they would not have a full understanding of its impact on Oracle's results.[7]  Oracle, on the other hand, claimed to have up to the minute information regarding its sales and forecasts.  Thus, the evidence simply does not support the assertion that analysts and investors fully understood the impact of the product problems on the demand for Oracle's 11i Suite prior to the March 1, 2001 disclosure.  For my purposes, I have assumed that plaintiffs will be able to prove their allegations that Oracle knew, but concealed, that customer acceptance of Suite 11i was lacking due, at least in part, to the problems discussed above.

---

[6]     The March 16, 2001 CIBC World Markets analyst report stated: "Management's lack of explanation and our conversations with customers and salespeople lead us to believe that the economy is not the only reason for the shortfall.  From our conversations, customers still desire best of breed solutions designed with the customer in mind versus a suite that may not be customizable or offering specific industry centric features."  The March 16, 2001 Banc of America Securities analyst report stated: "Are Oracle's problems entirely the economy?  We do not think so. . . .  On the application side, especially in light of Oracle's weaker than expected 3Q application growth, we believe the economy may only explain 20-30% of the weakness.  The rest, in our view, is a result of the product set not yet reaching a competitive level of functionality, relative to best-of-breed vendors." (James Report, Ex. 3.)

[7]     *See*, for example, the February 23, 2001 US Bancorp Piper Jaffray analyst report that stated "discussions with customers and partners also highlighted the fact that product bugs and execution challenges remain," but still concluded that "[d]emand for Oracle's 11i e-Business Suite is growing, and is beginning to drive additional momentum within its application business."  (James Report, Ex. 3.)

Economic Downturn and Reduced Corporate IT Spending

19.     Plaintiffs also allege that defendants falsely represented that the Company's sales would not be negatively impacted by the general economic slowdown during the Class Period. Defendants' false representations were made despite a known decline in the United States economy that began in early summer 2000 and impacted Oracle's customers. The economic downturn caused Oracle's customers to cut information technology budgets, which in turn impacted sales at Oracle and caused Oracle to discount its products. Plaintiffs also allege that defendants knew of the impact of the economy on Oracle's business based upon defendants' use of an application to manage worldwide sales which gave defendants up to the minute information on the Company's global forecast and sales. After the Class Period, defendants admitted that the economy had a negative impact on the Third Quarter applications and database sales.

20.     Mr. James claims that the impact of the economic downturn on Oracle was "sudden and sharp."  (James Report, ¶3.f.)  Mr. James does not appear to have reviewed any internal documents to determine whether or not his claim is true and plaintiffs' allegations wrong.  He appears to ignore that several other large technology companies reduced their financial guidance due to economic factors much earlier than Oracle.  Despite the reduced financial guidance of other large technology firms, Oracle represented that "the economic slump isn't affecting Oracle and is unlikely to do so in the future because most customers buy the software to help them use the Internet to cut costs and boost efficiency."[8]  Apparently as a result of the Company's representations regarding cost

---

[8]     *Bloomberg*, "Oracle 2nd-Qtr Net Rises 62%; Applications Sales Jump (Update2)," December 14, 2000 (May 2007 Report, App. 5.)

savings, some analysts were surprised about the sales delays regarding applications.[9]   For my

purposes, I have assumed that plaintiffs will be able to prove their allegations that Oracle concealed

and misrepresented the impact of the slowing economy and reduced IT spending on the Company's

performance prior to the March 1, 2001 disclosure.

Defendants' Specific Financial Projections

21.      Plaintiffs also allege that defendants falsely made and maintained financial guidance

for the Third Quarter Fiscal 2001 – including that Oracle would continue to have sequential EPS

growth and would report revenue of $2.9 billion based upon projected 75% applications sales growth

and 25% database sales growth.   During the Class Period, Oracle made numerous statements

maintaining its guidance and asserting that the general economic slowdown was not negatively

impacting its business, as demonstrated by the examples below.  According to a January 11, 2001

*Bloomberg* article, Company spokeswoman Stephanie Aas claimed that "Oracle has yet to see any

signs that its business is being hurt by the economic slowdown or reported cuts to information-

technology budgets." (May 2007 Report, App. 9 at 1.)  On February 7, 2001, First Union Securities

reported in an analyst report that, according to CFO Jeff Henley, "Oracle is not seeing the effects of

a slowing economy at this point," and that "[m]anagement reiterates guidance of 15-20% y/y

database revenue growth and 75% y/y applications revenue growth for FQ301." (May 2007 Report,

App. 10 at 1.)  On February 13, 2001, MarketWatch reported that an Oracle executive vice president,

Sandy Sanderson, stated that Oracle's "pipeline around the database and applications business have

never been stronger . . . [v]ery few customers are canceling contracts," and that "[i]n some ways . . .

the tougher environment in technology may even be increasing sales at Oracle." (May 2007 Report,

---

[9]      The March 2, 2001 Needham & Co. analyst report stated:  "We find these delays remarkable given the fact that the deployments were likely to produce rapid paybacks (particularly for e-business applications, in our view)."  (James report, Ex. 3.)

App. 11.)  On February 21, 2001, Deutsche Bank Alex. Brown issued an analyst report stating that Oracle's "management still expects growth in applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters." (May 2007 Report, App. 12 at 2.)  Even as late as March 1, 2001, the last day of the Class Period, BlueStone Capital issued an analyst report that stated that "management indicated last week that Oracle had not experienced any slowdown in business this quarter," and that "Oracle's business continues to grow; the current pipeline is as strong as it has ever been, according to management." (May 2007 Report, App. 13 at 1.)  In particular, on February 21, 2001, following a presentation by defendant Jeff Henley at the AppsWorld Conference, William Blair & Company issued an analyst report.  It stated:

> According to Mr. Henley, business looks good.  He was very bullish in the sessions. We want to quote a few of the things he said.  In regard to applications growth, he said that, "The second half growth will be as good, or better, than the 69% growth posted in the first half."  As for the economy, he commented that, "ORCL is not seeing an impact."  He also stated that, "We are in spaces that are high ROI and it's not clear if we'll see much of an impact in our business due to the economy."  In a related statement, he said, "The economy is a wild card, but unless there is a serious recession, we are not sure we'll see much of an impact."  Clearly, his statements are bullish in regard to ORCL's current business.

(May 2007 Report, App. 14.)

22.    Mr. James does not specifically address the allegations relating to Oracle's specific financial guidance regarding its Third Quarter 2001, nor that the financial guidance was reaffirmed throughout the Class Period, thereby maintaining its inflationary impact on Oracle's stock price. However, as discussed above, it was the Company's failure to meet these specific financial projections that caused Oracle's stock price to decline on March 2, 2001.  Consequently, these allegations are directly related to investors' losses resulting from the March 2, 2001 price decline.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 22nd day of June, 2007, at San Diego, California.

Respectfully submitted,

BJORN I. STEINHOLT, CFA

# Exhibit A

May 2004

**LOSS CAUSATION AND DAMAGES IN SHAREHOLDER CLASS
ACTIONS:  WHEN IT TAKES TWO STEPS TO TANGO**

*by David Tabak*



N E R A
Economic Consulting

Marsh & McLennan Companies

# Loss Causation and Damages in Shareholder Class Actions:
## When It Takes Two Steps to Tango

David Tabak[*]

There is currently a split among the circuits on the requirements to plead loss causation in shareholder class actions. Some circuits require plaintiffs to plead that there was a price decline associated with the fraud or its disclosure, while others require plaintiffs to plead only that the stock price was inflated at the time of purchase. We argue that the resolution of the issue affects not only how loss causation must be pled, but also the measurement of damages. Moreover, consideration of the analyses in damage calculations may inform the question of the requirements for pleading loss causation.

## I. INTRODUCTION

In a simple case where proximate cause is a consideration, the time when a plaintiff is harmed is clear. For example, if D drops a bowling ball on P's foot, the harm to P occurs when the bowling ball hits her foot. On the other hand, a debate about the time of the harm exists in securities law because the harm to a purchaser of a security whose price is inflated above its true value arguably occurs in two steps. Suppose that XYZ is a company that issues a falsely positive statement about its profitability. The market believes this false news and the price of XYZ's stock rises. P then purchases the stock at an inflated price, say paying $50 a share for a stock that is really worth only $10 a share. Later, the falsity of XYZ's statement is revealed and XYZ's stock price falls to $10. The question then is when is P harmed.

One school of thought is that P is harmed when she pays $50 for a share worth $10. This school argues that loss causation depends on whether the price of the stock P purchased was higher than its true value due to false statements or omissions of information required to be disclosed by defendants. The other school argues that the loss is caused when the truth is revealed and the stock price falls, so that the value of what P holds and could sell drops from $50 to $10.

---

[*] Vice President, NERA Economic Consulting. I thank Tsvetan Beloreshki, Darren Klein, Ben Rosenberg, and members of NERA's securities and finance practice for comments on earlier drafts of this paper.

**NERA**
Economic Consulting

- 2 -

The prior example may seem academic, as there is a $40 loss in each case. But, now, consider the following. P purchases 100 shares of stock in an ocean liner for $50 apiece. On its maiden voyage, the ship, which was known to be uninsured, hits an iceberg and sinks. The company goes bankrupt and P's stock has no value. Later, it is revealed that the company had been inflating its projected customer base, so that the stock was not really worth $50 when P made her purchase. The question is then whether P has a claim for a loss due to the fraud. The first school would argue that 100 shares would have cost P less than $5,000, and thus she has suffered a loss due to her overpayment. The second would maintain that P would have lost her entire $5,000 investment in the company anyway, and thus has suffered no additional loss due to the fraud.[1,2]

In this paper, we argue that both steps – overpayment on purchase and a price decline due to the fraud or its disclosure[3] – are generally needed for a plaintiff to have a damage claim. If a plaintiff fails to purchase the stock in question while its price is inflated, she has no standing to bring a suit. In addition, if the plaintiff purchases and resells a share, she has no damage claim if the effect of the misrepresentation on the stock price was unchanged between the time of purchase and the time of sale: if the plaintiff overpaid by $40 on purchase and then sold her share and received $40 in excess proceeds (proceeds above the true value of the stock), on net she has not been harmed by the fraud. Thus, for a plaintiff to have a damage claim, she will ultimately have to prove both that she purchased the stock at an inflated price and that the effect of the fraud declined between the times of her purchase and her sale.

In Part II, we discuss how the loss causation concept has been applied in cases of securities fraud. Because the relevant cases deal with pleading loss causation, our discussion will generally center on this issue, leaving aside questions about whether plaintiffs will be able to prove their allegations. Assuming that plaintiffs must plead all necessary elements of their

---

[1] One way to view the dispute, though this does not appear in case decisions, is whether P was attempting to buy 100 shares or $5,000 worth of stock.

[2] If one replaces iceberg with Internet crash, this is essentially the reasoning given in *Merrill Lynch & Co. Research Reports Securities. Litig.* (SDNY, June 30, 2003).

[3] For simplicity, we sometimes simply refer to a price decline. It should be understood that for purposes of showing a loss or calculating damages, the only relevant price movements are those caused by a change in the level of inflation in the stock.

case and need not make any allegations that must not ultimately proven, we can focus on the role of loss causation without worrying about the level of proof for plaintiffs' allegations. In Part III, we argue that for a loss causation pleading requirement to be meaningful for most cases, plaintiffs would have to explicitly argue that the price of the stock they purchased declined as a result of the fraud and at least implicitly allege that there was an inflation at the time of purchase. We further argue, in Part IV, that these requirements have an impact on the measurement of damages. Part V concludes.

## II.   LOSS CAUSATION IN SECURITIES FRAUD

To understand proximate cause in securities fraud, it is helpful to review the pleading requirements for a class action complaint. The case is premised on a misrepresentation by defendants, meaning a false statement or a failure to disclose information required to be disclosed. The most common allegation is an overpricing due to falsely positive information or the omission of negative information. Plaintiffs have typically been required to plead some version of the following: "(1) defendants made a false statement or omission with regard to a material fact; (2) in connection with the purchase or the sale of a security; (3) with scienter; (4) upon which plaintiffs reasonably relied; and (5) that proximately caused the alleged loss."[4]

Shareholder class actions grew significantly after the Supreme Court's *Basic v. Levinson*[5] decision, which provided plaintiffs with a rebuttable presumption of reliance if the stock traded in an efficient market. The reasoning was that if the market is efficient, informed traders are aware of public information and set prices accordingly. Consequently, individual investors do not need to scrutinize all public information in making their investment decisions; instead they can reasonably presume that the stock price already reflected that information. Plaintiffs were no longer required to show that they had read a document with the misstatement or that should have contained the omitted information.

---

[4] *Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933 (9th Cir. 2003), citing *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).

[5] 485 U.S. 224 (1988).

- 4 -

The 1995 Private Securities Litigation Reform Act ("PSLRA") explicitly added in a requirement that plaintiffs prove loss causation.  Specifically, it required that "In any private action arising under this title, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages."

In the last few years, a split has developed among the circuits as to what plaintiffs must do to plead loss causation.  As noted above, one argument is that the loss occurs when the plaintiff pays too much for her shares, while the alternative view is that the loss occurs when the stock price declines.  Currently two circuits hold that plaintiffs *do not* have to argue that the fraud or its disclosure caused a price decline but have to plead only that there was a difference between the market price and the stock's true value (a "purchase price disparity").  The Eighth Circuit made such a ruling in *Gebhardt v. ConAgra Foods, Inc*., 335 F.3d 824 (8th Cir. 2003) ("Our finding of materiality allows the plaintiffs to invoke the fraud-on-the-market theory and assume that the misrepresentations inflated the stock's price. Paying more for something than it is worth is damaging. Thus, the plaintiffs adequately pleaded their case for damages.") Similarly, in *Broudo v. Dura Pharmaceuticals, Inc*., 339 F.3d 933 (9th Cir. 2003), the Ninth Circuit held that "loss causation does not require pleading a stock price drop following a corrective disclosure or otherwise. It merely requires pleading that the price at the time of purchase was overstated and sufficient identification of the cause."

On the other side, in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003), the Second Circuit held that "Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of NETV securities."  It explicitly rejected the purchase-only pleading requirement, noting that "Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement."  Two other circuits earlier held that plaintiffs must show that the fraud or its disclosure caused a price decline.  The Third Circuit, in *Semerenko v. Cendant Corp*., 223 F.3d 165 (3d Cir. 2000), stated, "Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an

- 5 -

economic loss attributable to that misrepresentation."  Similarly, the Eleventh Circuit in *Robbins v. Koger Props, Inc*., 116 F.3d 1441 (11th Cir. 1997) held,  "Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."

## III.   PLEADING LOSS CAUSATION

To analyze the varying interpretations of loss causation, we consider the implications of different scenarios regarding what plaintiffs must plead to satisfy the loss causation requirement of the PSLRA.  Here we focus on fraud-on-the-market class actions, which account for the bulk of securities fraud cases, and in particular the interaction between the economic measurement of price inflation or movements and proof of loss causation.[6]

### A. Purchase Price Disparity

One concern with pleading loss causation by only showing an inflated price on purchase is that many plaintiffs can make such a pleading even though they actually suffered no loss as a result of the fraud.  Consider an "in-and-out" plaintiff, or an investor who both purchased and sold a stock at an inflated price.  For simplicity, suppose the amount of the inflation is constant, with the stock trading at $50 when it should be trading at $10.  This hypothetical plaintiff bought a share of stock for $50 and sold it for $50, breaking even in the process.  Had there been no fraud, the plaintiff would have purchased the stock for $10 and sold it for $10, again breaking even.[7]  If loss causation requires only inflation on purchase, there is no reason that this in-and-out plaintiff who suffered no loss could not satisfy this pleading standard by claiming, and perhaps even proving, that the stock was overpriced at the time of purchase.[8]

---

[6] One area we do not consider is whether the use of a purchase price-inflation standard results in a conflating of transaction causation and loss causation, as argued by David M. Brodsky and Jeff G. Hammel, "The Fraud on the Market Theory and Securities Fraud Claims," *New York Law Journal*, Vol. 230 - No. 82, October 24, 2003.

[7] One could also argue that with $50 the plaintiff could have bought 5 shares of stock at $10, but still would have sold those shares for an aggregate amount of $50.

[8] The *Semerenko* court noted this, stating, "In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price."

- 6 -

A second concern with pleading only a purchase price disparity is that the pleading may be superfluous.  For a fraud-on-the-market case, plaintiffs have already pled that defendants made a misrepresentation with regard to a material fact and that the stock traded in an efficient market.  Plaintiffs may now claim that "this statement (omission) caused the stock to trade at an artificially high price."  In most cases, this phrase, or something like it, would be sufficient to plead loss causation under the requirement that plaintiffs plead an inflated price at purchase.[9]

To support an allegation of a purchase price disparity by more than claiming that the misrepresentation was material, plaintiffs typically must present evidence of the effect of the misrepresentation on the stock price.  Because one would not expect the stock price to move when defendants did not make a statement, so there is no reason to examine the stock price at the time of an alleged omission.  An alternative way of showing the effect of the omission is by examining the stock price when the information was finally disclosed, but this simply brings back the price-decline interpretation of loss causation.

If the case involves a misstatement, plaintiffs may be able to show that the stock price moved up in response to the false information.  Unfortunately, this is not always even possible.  For example, suppose a company was expected to earn fifty cents a share but actually only earned forty cents.  If the company falsely announces earnings of forty-five cents, the market will be disappointed and the stock price will fall, even though the company has overstated its earnings.  Thus, stock price evidence to support an allegation of loss causation based on an inflated purchase price will only be readily available in cases where the defendant makes an affirmative misstatement relative to market expectations.

The foregoing analysis argues that if one accepts that it is necessary to plead a purchase price disparity without reference to a price decline at disclosure, in most fraud-on-the-market cases the pleading need not go beyond alleging the materiality of the false or omitted

---

[9] For example, for its Section 10(b) claims, the Amended Complaint in *Clive T. Miller v. Apropos Technology, Inc., et al.* (USDC NDIL Eastern Division, Civil Action No. 01 C8406) alleges that the "omission from the Registration Statement of the material facts identified in … this Complaint caused the offering price of Apropos common stock on the offering to be higher than the offering price would have been had the true facts … been disclosed to the investing public," (¶114) and "The Registration Statement remained on file with the SEC after the offering … [and] thereby caused the market price of Apropos common stock on the NASDAQ market after the Offering to be artificially inflated" (¶115).  The Amended Complaint made no reference to a price decline.

information.[10]  In a limited number of cases, one could require plaintiffs to show that a release of false information raised a stock price.[11]  Because this cannot be a universal or near-universal requirement, it seems more reasonable that in those cases where one would expect a stock price rise, defendants could rebut the pleading of loss causation by showing that the misstated information did not affect the stock price.[12]

One way to address these concerns is to require plaintiffs to also plead that the stock price was not as inflated at the time of sale.  As discussed in the following subsection, this would make the loss causation pleading meaningful and prevent in-and-out plaintiffs from alleging a loss if there was no price decline due to the fraud or its disclosure.

## B.  Fraud-Induced Price Decline

Suppose that, following the Second, Third, and Eleventh Circuits, to properly plead loss causation, a plaintiff has to plead that there was a price decline as a result of the fraud or its revelation.  Does this avoid the problems with the other pleading standard?

The first problem with the purchase inflation pleading standard was that in-and-out purchasers could plead loss causation even though they actually suffered no loss.  We must therefore ask whether a similar problem exists under the disclosure pleading standard.  Because retention plaintiffs necessarily hold through the price decline, if their allegations hold true, they will have a valid damage claim.  In-and-out plaintiffs, however, cannot plead a loss based on that decline.  There are then two possibilities.

First, in-and-out plaintiffs can provisionally be allowed to be in the class because part of the class has made a showing that there could be a loss associated with defendants' actions.  Including in-and-out plaintiffs presents minimal additional costs at this stage and preserves

---

[10] Though this would not wholly vitiate the loss causation requirement of the PSLRA, it would severely diminish its impact due to the limited number of cases where it would require anything beyond the previous pleading requirements.  To the extent that this would render the loss causation section insignificant, it arguably goes against established precedent.  See, e.g., *Duncan v. Walker*, 533 U.S. 167, 174 (2001) at 174.

[11] One study estimated that 51% of post-PSLRA cases are accounting cases, in which one might not expect a price increase at the time of the misstatement.  (Todd S. Foster, Frederick C. Dunbar, Denise N. Martin, Vinita M. Juneja, and Lucy P. Allen, "Recent Trends VII: PSLRA Six Years Later," *NERA Economic Consulting* (2002).)

[12] See, for example, *Zonagen Inc. Securities Litigation*, USDC for the Southern District of Texas (Civil Action No. H-98-0693) opinion dated June 13, 2003.

- 8 -

their ability to receive compensation if they are later able to prove that they suffered a loss. While one could argue that by similar reasoning in-and-out plaintiffs should initially be part of the class under a purchase inflation pleading standard, the arguments are not truly parallel. Under the price-decline standard, an in-and-out plaintiff *has not yet* satisfied the loss causation pleading standard herself and still must make that showing before she can claim a damage. Thus, some plaintiffs would be allowed in the class but could later be dropped if they fail to prove a loss. This is actually common practice today, as most shareholder class actions start with claims for all purchasers, even though many in-and-outs ultimately have no damage claim. Under the purchase price disparity standard, there is the false conclusion that an in-and-out plaintiff *has affirmatively* satisfied the loss causation requirement, when she may have no damages even if the allegations are proven true. In addition, if the in-and-out plaintiff has (falsely) satisfied the standard, how can she later be required to prove that she actually suffered a loss except under a different test? If so, one should ask what would that test is, and why it should not be pled at the start of the case.

This brings us to the second possibility for dealing with in-and-out plaintiffs under the price-decline standard. They could be required to argue that there was a price decline related to the fraud or its disclosure at one or more points over which they held their shares (i.e., between the time they were "in" on purchase and "out" on sale). There is something appealing to this because it puts the in-and-out plaintiffs on the same footing as the retention plaintiffs, being required to show a price decline that caused them a loss. The drawback is that over the course of discovery plaintiffs may conclude that a price decline in the middle of the class period that they did not originally believe was related to the fraud in fact was a product of the fraud. Under those circumstances, in-and-out plaintiffs who were previously unable to satisfy the loss causation pleading standard should be able to reenter the class. While this could be a reasonable outcome, it may lead to concerns about whether in-and-outs initially excluded from the class should file their own suits before the statute of limitations runs out or save that expense and hope that they will ultimately be a part of the class.

In either case, under the price-decline standard, the question concerns the timing of when in-and-out plaintiffs must prove that they suffered a loss, rather than the possibility of

- 9 -

following a false or unworkable presumption.  For that reason, while there may be some issues in following a disclosure pleading standard, they pale in comparison with the problems that arise under a purchase inflation pleading standard.

The second problem with the purchase price disparity standard was that the pleading requirement was often gratuitous once a plaintiff pled that the misstated or omitted information was material.  This is not a problem under the price decline pleading standard.  No matter what has been pled about the materiality of the information at the time of purchase, pleading a price decline involves a different set of facts: plaintiffs generally have to state what the price was before disclosure and what it was afterward.  This would make the loss causation pleading meaningful because if there was no price decline, plaintiffs would be unable to satisfy this requirement.  In some cases, the requirement would be easily satisfied, such as when there is a large decline after a disclosure.  In others, the requirement would be difficult, though not necessarily impossible, to satisfy, such as if the price decline is small, so that it may be just a chance movement, or occurs at a time other than immediately following a known disclosure.[13]

Finally, we ask whether plaintiffs can plead a loss based on a price decline even if they have not overpaid on purchase.  Obviously if the stock price was not inflated until after a plaintiff made her purchase, she may hold through a price decline associated with a disclosure but not have a valid damage claim because she never overpaid for her stock.  However, because plaintiffs must allege that their purchase was based on a prior material misrepresentation, they will necessarily plead a purchase price disparity.  Because the disclosure must relate to the misstated or omitted information, if the disclosure caused a price decline it will generally be the case that the stock price was inflated at the time of the misstatement or omission.  Barring a counter-argument by defendants, in most cases one could reasonably assume that if a the correction of a misrepresentation caused a price decline, the stock price was inflated from the time of that misrepresentation.  Thus, pleading a price decline based on a fraud or its disclosure essentially entails pleading a prior purchase price disparity or inflation.

---

[13] In particular, plaintiffs may argue that the information leaked to the market or that the fraud caused the company to underperform during the class period.  We do not consider the level of proof that should be required to support such an allegation.

- 10 -

## IV.   IMPLICATIONS FOR DAMAGES

We now ask whether the different loss causation pleading requirements have implications for the calculation of damages.  As the Fourth Circuit noted, "We, along with other courts, use the terms 'injury' and 'damages,' as well as 'loss' and 'harm,' interchangeably to refer to the actual pecuniary loss that a private plaintiff must establish to prove liability in a Rule 10b-5 case."[14] (Internal citations omitted.)   Thus, to the extent that decisions affect the definition of loss causation, they should also affect the measure of damages.   Were that not true, one could find the strange scenarios where a plaintiff had proven a loss due to defendants' actions but had no damages, or had proven damages but not suffered a loss.

### A.  Damage Calculations Under Different Loss Causation Standards

Damages in securities fraud cases are typically calculated under the out-of-pocket measure, meaning the inflation at purchase less the amount of inflation at sale.[15] For retention plaintiffs, it is generally assumed that there was no inflation after the end of the class period, so there is no offset to the purchase inflation.

To examine how the different loss causation requirements affect the calculation of damages, we start with a simple example where those requirements do not affect the damage calculation and then proceed to examples where there should be an interaction between the requirements for showing loss causation and the damage calculation.

First, consider a plaintiff who purchases a share of XYZ Corporation for $50.  Suppose that XYZ's stock price remains at $50 until a disclosure of a prior misrepresentation is made, causing the stock price to fall to $10.  Also assume that the magnitude of the fraud did not change or interact with other information, so that the stock had a true value of $10 throughout the class period.  The inflation at purchase was then $40, exactly the same as the price decline

---

[14] *Miller v. Asensio & Company.*  (Appeal from USDC for South Carolina, at Charleston, CA-99-1861-2-18)

[15] In footnote 5 of *Robbins v. Koger*, the Eleventh Circuit argues that the "proper measure of damages uses the out-of-pocket rule."  Interestingly, while noting that damages calculations require the removal of causes for the price movement unrelated to the fraud, as distinguished from loss causation, for which "a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value," the court notes, "Proof of damages under the out-of-pocket rule is not proof of loss causation." (Internal citations omitted.)  The court does not make clear how the fraud could have caused a price decline, and hence damages, yet not have caused a loss.

at the disclosure.  A retention plaintiff then has a claim of $40, representing either how much she overpaid on purchase or how much she lost at the disclosure.

Next, consider an example where the stock price declines from $50 to $0 (e.g., the ocean liner's company goes bankrupt when the ship hits an iceberg) before there is a disclosure of the fraud.  Again, assume that at the time of purchase, the true value of the stock was $10. Under the purchase-inflation requirement, the damage claim is $40.  Under the price-decline requirement, plaintiffs will not be able to show a loss, because the stock price has already fallen to zero before there was any disclosure of the fraud, and for this requirement, the proper damage claim is zero; if not, we would have the strange situation where plaintiffs have a damage without having suffered a loss.  In this case, the definition of loss causation clearly affects the measure of damages.

Now consider a more complicated example.  Suppose the investor again pays $50 for a share of stock of XYZ Corporation, a furniture maker.  Over the next year, the furniture industry's fortunes decline so that XYZ's stock falls from $50 to $30.  Later, it is revealed that XYZ had overstated its previous financials and its stock was worth only 20% as much as believed, meaning that it was worth $10 at the time of the investor's purchase and $6 after the industry decline.  The investor sues, arguing that she overpaid by $40, based on the inflation at the time of purchase.  The company responds that even if that is true, the fraudulent financials were not the proximate cause of all of the investor's loss because the stock price fell from $50 to $30 due to events unrelated to the fraud.  The company argues that the investor's damage claim should equal the $24 price decline at the time of disclosure.

This example shows that the measure of damages is intimately tied in with the standard for loss causation.  If loss causation means that the price was inflated at the time of purchase, damages equal the amount by which the price exceeds the true value at purchase (purchase inflation) less any inflation at the time of sale.  In the above example, this would correspond to a claim of $40 for retention purchasers.

- 12 -

If loss causation means that there was a price decline on disclosure, damages equal the portion of the price decline caused by the misstated or omitted information at the time of purchase.[16]  In the above example, this would correspond to a claim of $24.

Finally, if loss causation means both a purchase inflation and a price decline on disclosure, damages should equal the *minimum* of the inflation at the time of purchase and the portion of the price decline attributable to the misstatements and omissions at the time of purchase.  In the example we have been using, this would correspond to the $24 price decline. A different example, however, shows not only that the alternative result is possible, but that failing to limit damages to the inflation at purchase can result in plaintiffs receiving a damage claim that is larger than the total amount that they paid for the stock.

Suppose that at the time of purchase, a stock trades at $16 even through the true value is only $10, again due to some misstatement by defendants.  Suppose that the industry does well after the misstatement, such that the stock's price triples to $48 while the true value triples to $30.  After this, there is a disclosure of the misstated information, causing the stock price to decline by $18 from $48 to the true value of $30.  The overpayment at purchase is $6 and the price decline at the time of disclosure is $18.

If the damage is the $18 price decline, plaintiffs would have a claim larger than the amount of their purchase.  Such a result would require a different theory than the out-of-pocket measure used in securities fraud cases.  In fact, if a sufficient number of retention shares are purchased early in the class period (when the price was $16), the sum of the $18 damage claims from those purchases can exceed the company's inflated market capitalization at that time. Beyond departing from the out-of-pocket standard, this conclusion may violate the actual damages provision of the 1934 Securities Exchange Act[17], which is often interpreted to limit damages to the difference between what the plaintiff paid for her shares and what she sold them for, since the claim is even larger than the purchase price.

---

[16] For example, if defendants made two equal-sized misstatements, a retention plaintiff who purchased after both misstatements would get a claim equal to the full price decline, while a retention plaintiff who purchased after the first misstatement would only have a claim for half of the price decline.

- 13 -

## B. Arguments For and Against a "Minimum Damage" Calculation

As discussed above, to satisfy both requirements – limiting damages to the amount of overpayment (to prevent pre-class period purchasers from having a claim) and limiting damages to the price decline caused by the fraud (to prevent a plaintiff who buys and sells at the same inflation from having a claim) – the damage claim should equal to the *lower* of the purchase inflation and the price decline due to the misrepresentations at the time of purchase. Using the minimum of these two measures results in lower average damages than using either measure alone. While this may be unfair to plaintiffs,laws are not always designed to be fair. In particular, the PSLRA itself explicitly limits the damages for plaintiffs who hold more than 90 days after a disclosure to the difference between their purchase price and the average price over that 90-day period.[18] If the plaintiff in the above example purchased the stock at $16 and held it for 90 days after the disclosure while the price remained at $18, this provision would eliminate her claim. There is no adjustment, however, if the stock price falls over the 90-day period, so that if that average price is $1, a plaintiff who paid $16 may not argue for a $15 claim. The history of the PSLRA shows that this provision was designed to limit plaintiffs' damage claims.[19] Thus, it would not be inconsistent with the intent of the PSLRA for one of its provisions, in this case the loss causation requirement, to limit plaintiffs' damage claims.[20]

Finally, there is another reason not to use purchase inflation as the sole measure of damages, but to limit the claims to the price decline at disclosure caused by the fraud existing at the time of purchase. Suppose the stock price declined over the course of the class period.

---

[17] Section 28 (a) ("… no person permitted to maintain a suit for damages under the provisions of this title shall recover … a total amount in excess of his actual damages on account of the act complained of.")

[18] "… the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." A similar limitation applies to plaintiffs who sell during the 90-day period.

[19] While there is history on the justification for this limitation, the actual limitation does not accord with either the standard damage calculations or even the effects of the bounce-back in prices that the Congress discussed. On theoretical grounds, the limitation is not structured logically.

[20] For an intriguing argument on why corporate law has developed to include more pro-business provisions, see Ronald Chen and Jon Hanson, *The Illusion of Law: The Legitimating Schemas of Modern Policymaking and Corporate Law*, 103 MICH. L. REV. 1 (forthcoming 2004).

- 14 -

Unless this price decline was caused by disclosures, the plaintiff would have lost part of her investment even if there had been no fraud.  In particular, let us return to the example where XYZ's stock fell from $50 to $30 before any disclosure and then fell to $6 after the disclosure because in truth the stock was worth only 20% of the market price.  Suppose further that the stocks of the other companies in the industry also declined by 40%.  Providing the plaintiff with a $40 recovery (80% of the $50 purchase price) for investing in XYZ would limit her post-litigation loss to $4, since the $50 investment would ultimately yield $6 in stock and a $40 recovery.   The plaintiff's net loss would then be only 8% of her investment, meaning that she would have done better by investing in a fraudulent company than by investing in an otherwise identical non-fraudulent company in which she would have suffered a 40% loss.  Such an outcome makes the securities fraud laws a form of insurance: if an investor is "lucky" enough to buy a fraud-affected stock before a market decline, she may be able to recover some or all of her market-related losses, while she would not have such a recovery if there was no fraud.  Various cases argue that having the securities laws provide such insurance is inappropriate. (E.g., *Carlton v. Franklin* 1990 U.S. App. LEXIS 12946 (4th Cir. Aug. 2, 1990)).  This also seems to violate at least the spirit of the loss causation requirement that the damages sought be due to losses caused by the fraud, instead of losses caused by broader market forces.

## C.    Conclusion

This section does not attempt to conclude how the debate on loss causation should be resolved.  In particular, it makes no analysis of how the law on loss causation should be written, or how considerations such as deterrence of wrongdoing and compensation of victims should be balanced.  Instead, we argue that if a plaintiff has a damage claim if and only if she has suffered a loss, then there are certain logical relationships between whatever definition of loss causation is accepted and the corresponding measure of damages.

Of course, courts have not always insisted on logic in the settlement of shareholder class actions.  For example, in *In re Cendant Corp. Litig.*, 264 F.3d 201, 250 (3rd Cir. 2001), the Court threw out the damage claims of those who bought and sold before a disclosure, but allowed varying claims for retention plaintiffs based on when they purchased.  Thus, a price decline before a disclosure was not considered sufficient to be the basis for a damage claim by

NERA
Economic Consulting

- 15 -

itself, but that decline was considered part of the damage claim of retention plaintiffs. The inconsistency can be seen by noting how a completely offsetting pair of transactions can affect a damage claim. Suppose the inflation fell from $40 to $24 before a disclosure reduced the inflation to zero. Under the reasoning of the *Cendant* court, an investor who purchased at the $40 inflation and sold when the inflation was $24 has no damage claim, presumably because she would still have suffered the same loss had there been no fraud. A retention plaintiff who purchased at the $24 inflation has a claim of $24 and a retention plaintiff who purchased at the $40 inflation has a claim of $40. Now suppose that this last investor sold the share she bought at the $40 inflation when the inflation was $24 and immediately purchased another share at the same price and the same $24 inflation. Those last two transactions completely offset each other: the investor sold and purchased a share at the same price and inflation. However, if we match the investor's transactions chronologically, she now has two different claims for two different shares, one for the in-and-out share purchased at the $40 inflation and sold at the $24 inflation, and the second for the retention share bought at the $24 inflation. Under the reasoning of the *Cendant* court, there is no claim for the first share and a $24 claim for the second. Thus, the perfectly offsetting transactions reduce the damage claim from $40 to $24.

This contradiction would be avoided if damages were limited to the disclosure-related price decline. With no disclosures in the middle of the class period, damages would equal the $24 price effect of the disclosure, whether a share was purchased at a $40 inflation or a $24 inflation.[21] The pair of offsetting transactions would not affect damages, as the in-and-out share created would have no damage claim and there would still be just one retention share.[22]

---

[21] In fact, because the plan of allocation approved by the *Cendant* court had a build-up feature based on the extent of the accounting fraud, the share purchased earlier could have a smaller claim. While not relevant to the instant discussion, the build-up is an example a court's recognition of the reasoning behind the earlier discussion about limiting damages to the *portion* of the price decline related to the fraudulent information at the time of purchase.

[22] To maintain consistency, if there was an increase in inflation between the first purchase and the sale, the in-and-out share should be accorded a negative damage that would offset the damage claim from the other purchase.

- 16 -

## V.    CONCLUSION

The 1995 Private Securities Litigation Reform Act made explicit the loss causation element of shareholder class actions but did not state what plaintiffs must plead to satisfy that requirement.  Recently, a split has developed among the circuits about whether plaintiffs must plead a price decline related to the fraud, or whether they must plead only a purchase inflation. Because the latter pleading is often trivial, one can argue that plaintiffs should have to plead a price decline related to the fraud.  Moreover, if plaintiffs have to plead either only a purchase inflation or only a later price decline, some investors will "successfully" plead loss causation without having suffered a loss.  Thus, there is a logical argument for plaintiffs to plead both a purchase inflation and a later price decline, though pleading a purchase inflation may be implicit in pleading an efficient market and a material misrepresentation prior to purchase.

Whatever loss causation standard is accepted should have implications for the measurement of damages.  A purchase-inflation-only standard leads to a result inconsistent with current out-of-pocket method of calculating damages, potentially allowing an investor to claim more than what she spent on the stock.  It would also be contrary to the intent of a requirement meant to increase the burden on plaintiffs if it increased damages.  If plaintiffs also have to plead a price decline, damages should equal the lower of purchase inflation and the price decline resulting from that inflation.  While this may not have been an explicit intent of the PSLRA, it would be consistent with a portion fn that law that limits damage claims. Finally, that damage measure would be logically consistent with the two necessary parts of the loss causation pleading requirement.

**Exhibit B**

# LITIGATION SERVICES HANDBOOK

## The Role of the Financial Expert

Third Edition

**Edited by**

**ROMAN L. WEIL**

**MICHAEL J. WAGNER**

**PETER B. FRANK**



## JOHN WILEY & SONS, INC.

**New York  •  Chichester  •  Weinheim  •  Brisbane  •  Singapore  •  Toronto**

CHAPTER **19**

# MATERIALITY AND MAGNITUDE: EVENT STUDIES IN THE COURTROOM

### David I. Tabak, PhD
### Frederick C. Dunbar, PhD

## CONTENTS

19.1  Introduction and Background  19.1
   (a)  Overview of the Event Study Technique  19.2
   (b)  Materiality  19.3
   (c)  Magnitude  19.3
19.2  Performing the Basic Event Study  19.4
   (a)  Identifying the Event  19.4
   (b)  The Event Window  19.4
   (c)  Controlling for Market and Industry Effects  19.5
   (d)  Estimating the Effects of the Event  19.6
19.3  Are Event Studies Really Science under *Daubert*?  19.6
   (a)  The *Daubert* Decision  19.6
   (b)  Are Event Studies Objective?  19.7
   (c)  Applying the *Daubert* Factors  19.8
19.4  Deciding on Materiality  19.9
   (a)  Standard for Materiality  19.9
   (b)  Other Price Reaction Methodologies  19.9
   (c)  Changing Levels of Materiality  19.10

19.5  Measuring Lost Profits  19.11
   (a)  Lost Profits Calculations Based on Projections  19.11
   (b)  Lost Profits Calculations Based on Future Events  19.12
19.6  Recent Literature and Case Law  19.12
19.7  Do Event Studies Accurately Measure Loss to the Corporation?  19.13
   (a)  Stock Market Anomalies  19.13
   (b)  Bias from Litigation Expectations  19.14
   (c)  Whose Loss Does an Event Study Measure?  19.15
   (d)  Do Event Studies Capture All Components of a Loss?  19.15
   (e)  Tax Effects  19.16
19.8  Conclusion  19.16

NOTES  **19.17**

LIST OF CASES  **19.22**

**19.1  INTRODUCTION AND BACKGROUND.**  The Supreme Court's *Daubert* ruling[1] has led to increased scrutiny of expert testimony in the courtroom. This scrutiny has generated a need for analyses that, to the extent possible, are testable, supported by published literature, have a "known or potential rate of error," and

   The authors would like to thank Denise Martin for research on the *Daubert* decision, Lucy Allen for research on the use of event studies in damages studies, and Louis Guth and Christoph Muelbert for many helpful comments on earlier drafts of this chapter.

follow procedures derived from objective standards, rather than from an expert's own potentially subjective opinions or beliefs.

Courts can screen an event study of a security's price, typically the measurement of a stock price's movement in response to a specific event or announcement, for admissibility with straightforward application of the *Daubert* factors. Courts have admitted testimony based on correctly done event studies but excluded testimony based on an infirm event study.[2] Although commonly used in securities litigation, their use in other commercial litigation is less common, but increasing.[3]

Here, we argue that a properly conducted event study can help in litigation outside the field of securities law, and that event studies are often applied in a crude or unscientific manner within securities litigation.[4] This chapter discusses how experts can use event studies to measure the impact of two different types of events. First, we look at revelations of securities fraud, where event studies are already common, though often nonrigorous. Second, we examine the measurement of the effect of offending actions on a plaintiff's future profits, an area in which the use of event studies is less common.

We also compare the event study to other methodologies for measuring the importance and size of an outside event on a company, and examine the conditions under which properly conducted event studies provide more objective and accurate measurements of the effects of these events on the company. We describe the event study technique and the two items that stock price changes let us measure, materiality and magnitude, as well as their relevance to the determinations of liability and damages in a litigation context.

**(a) Overview of the Event Study Technique.**    Event studies of the type used in litigation rely on two well-accepted principles: first, the semi-strong version of the Efficient Market Hypothesis, which states that stock prices in an actively traded security reflect all publicly available information and respond quickly to new information;[5] second, the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow.[6] Consequently, the stock price impacts of an event can reveal the effects of the event on future cash flows if the following four conditions are present:

1. The event is a well-defined news item or series of items.
2. The times that the news reaches the market are known.
3. There is no reason to believe that the market anticipated the news.
4. It is possible to isolate the effect of the news from market, industry, and other firm-specific factors simultaneously affecting the firm's stock price.

The procedure for performing an event study has several well-defined steps.

First, one estimates a predicted stock price return, or percentage change, from the day before the news reaches the market to the day the stock price assimilates the news. In doing this estimation, one uses a model that takes into account market and industry effects on stock price returns. One can do this for several dates, not necessarily consecutive.

Next, the analyst subtracts the predicted return from the actual return to compute the so-called *abnormal return.* If the abnormal return is calculated as the sum of individual abnormal returns over a number of periods (usually individual trad-

ing days), the difference between the actual and predicted returns summed over all these periods is called the *cumulative abnormal return* (or *CAR*).

Typically, the predicted return does not exactly equal the actual return even when no event has occurred. To decide whether the difference between the actual and the predicted return (the CAR) results merely from chance, one tests the CAR for statistical significance, as described in section 19.4 (a).

The final step, if necessary, involves computing the relevant magnitude of the event. To do this, one calculates the change in stock price or capitalized value of the firm implied by the estimated CAR and thus attributable to the event in question.

Because of its wide acceptance, the existence of standards governing its operation, the known rate of error and the ability to test hypotheses, the event study technique provides a good example of scientific evidence. Furthermore, these same factors mean that a court can screen any particular event study under the *Daubert* guidelines to determine its admissibility as the basis for expert testimony.

**(b) Materiality.**   An event study can help measure the materiality of the event under consideration. While all can agree that an event is material if it is important, this begs the question of how to measure importance. We can consider several measures suggested by Mitchell and Netter in their examination of the role of financial economics in litigation. They note three such measures: reasonable investor, probability/magnitude, and market impact.[7] Unfortunately, these imprecise standards require subjective determinations that vary from case to case. For example, how should a trier of fact determine what a reasonable investor would consider material? One could ask a long-time investor to serve as an expert on materiality, and while this does provide useful insight, the results are necessarily subjective and could vary from case to case.[8] Standardization over different cases could come only from a careful reading of the case law and would be followed by disputes about the similarity or difference between the case at bar and cited precedents. Instead, using the tools of financial economics, one can measure materiality as the probability that a stock price movement resulted from chance and not from the news about a particular event.[9] One can quantify materiality with an event study in a manner comparable across cases and events.

**(c) Magnitude.**   Event studies can also measure the size of a stock price movement as the basis for a damages calculation. For example, in cases of securities fraud, experts commonly measure changes in the alleged inflation in a stock price by the movement in that stock price in the wake of a corrective disclosure, after controlling for market, industry, and other company-specific influences.[10] This results from the disclosure's removing the inflation, and an event study measures the change in inflation in the stock at the time of the disclosure. Often, courts find that this is the best estimate of the inflation per share if the defendant had a duty to disclose the same information that the corrective disclosure revealed. As a result, an event study is a common method that serves as the basis for quantifying damages in securities fraud cases.[11]

Consider a different litigation setting where the plaintiff is a firm suing for lost profits due the company.[12] According to economic theory, there are circumstances in which damages can be measured by the change in the stock price caused by the defendant's conduct multiplied by the number of shares outstanding.[13] This is true

because stock prices are the market's estimate of the present value of future cash flows.[14] Equivalently, stock prices are the market's estimate of a company's net liquid assets plus the present value of future profits from the operating assets.[15] Consequently, when there is an unexpected change in assets, liabilities, or expected future profits, this will show up as a change in the stock price. To the extent that the defendant's actions giving rise to liability negatively impact the company's financial well-being, the stock price will decline by the market's estimation of the present value of the harm that the company has suffered.

Though not common in litigation, case law supports this proposition. For example, consider a situation where a business files a suit claiming that another party's illegal actions have damaged it and reduced the company's value or worth. Courts have supported the use of market value to determine the value of a company.[16] Thus, it naturally follows that the portion of the change in the enterprise's market value that can be attributed to the defendant, as measured by a careful event study, is a proper measure of the change in corporate value, that is, damages, in this case.

## 19.2   PERFORMING THE BASIC EVENT STUDY

**(a) Identifying the Event.**   Many texts discuss how to perform an event study.[17] While there are some differences in exposition, authors agree on the necessary steps and general procedures. First, one must identify the event or events to be studied. In securities fraud cases, the events of interest usually include all the alleged disclosures of fraud, the dates of the fraudulent statements, or both. When one is measuring lost profits, the relevant dates would be those dates on which the public received information about the alleged wrongful act.

**(b) The Event Window.**   Next, we establish the event windows. *Event windows* are the periods over which stock price movements are calculated. Generally, these windows begin immediately before an announcement and conclude shortly thereafter. When it is unlikely that the news of an announcement was leaked beforehand, one typically would start the event window at the end of the trading day before the announcement was made. When there is a reasonable possibility that the information reached the market before a formal announcement, the event window may be extended back to include the potential leakage.[18] The end of the event window is somewhat more arbitrary. In securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement. The most recent academic pronouncement expresses support for the shorter one-day or two-day window, though it recognizes that in practice, analysts often use longer windows.[19] Occasionally, there is another news announcement, or confounding event, within the event window. When this occurs, the event window is often cut short so that it does not include the effects of the confounding event.

The longer the event window, the more likely it incorporates all of the prior leakage and the market's ongoing adjustment to the news, but also the more likely it picks up other effects unrelated to the event under consideration. Deciding on the length of the event window is thus one of the most important considerations in performing an event study.[20]

**(c) Controlling for Market and Industry Effects.**   Once the event windows have been established, the analyst next calculates the relations between the company's stock and an index or indices that proxy for outside forces such as market and industry effects. These relations will later be used to remove those market and industry effects from the price movement observed in the event window.[21] One finds these relations by running a regression of the company's stock price on a market or industry index, or both, over a period of time labeled an estimation window.[22] Here, the analyst must make two additional decisions. First, over what period should the regression be run? This period is called the *estimation window*. And, second, which market or industry indices should be used to control for outside influences on the company's stock price?

In regard to the first question, one would typically like to use an estimation window close to the event because the relation between the company's stock and an index changes over time. Therefore, the closer the estimation window is to the event, the more relevant the estimated relation will be. Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window. The most common choice places the estimation window before the event.[23] Analysts sometimes place the estimation window after the event window or split the estimation window to cover periods before and after the event window. When the analysis studies multiple events, the estimation window may cover the periods around the event windows, including the period(s) between event windows. The estimation window is often placed at one of these locations rather than before the event window because of a lack of relevant prior trading history (for example, because the event window comes shortly after an IPO or change in regulatory environment).[24]

In addition to determining the placement of the estimation window, the analyst must also determine the length of that window. Again a tradeoff applies: the longer the estimation window is, the more data there will be, implying a more accurate regression. On the other hand, the farther the estimation window stretches from the event window, the less the estimated relation between the stock price and the market index is likely to represent the underlying relation during the event window.

A second decision the analyst must make is which market and/or industry indices to use to control for outside influences on the company's stock price. When deciding which indices to use, the analyst should consider both the source of the index and the relation between movements of the company's stock price and the index during the estimation window.

A good index can be

- a standard index (say one developed by Standard & Poor's), or
- one that was constructed based on comparable companies listed in analyst reports or public filings, or
- one based on selecting all companies that meet certain objective criteria (e.g., market capitalization within 10 percent of the pre-event market capitalization of the company being studied).

On the other hand, an index is suspect when the expert chooses the companies in the index without objective criteria.

The second consideration in selecting an index relates to how the company's stock price movements relate to those of the index during the estimation window.

When the estimation regression is run, one of the statistics generated is the adjusted $R$-squared.[25] This statistic measures the strength of the fraction of the variability of the variable being explained by the combined set of independent variables (the market and industry indices) used to do the explaining. The higher this statistic, the larger the portion of the variability explained. Another relevant statistic is the $t$-statistic associated with each independent variable; this statistic measures the strength of the individual independent variable's correlation with the company's stock price. The farther the $t$-statistic is from zero, the stronger the relation. While one should not use either the adjusted $R$-squared or $t$-statistics as a blind measure for the comparison of the explanatory power of different indices, an expert should be prepared to provide these statistics.[26] Moreover, if the expert chooses one index with less statistical explanatory power than a second index, he or she should be prepared to defend this choice.[27]

**(d) Estimating the Effects of the Event.**    The choice of the event window and indices used to predict the stock price over the estimation window provide the basic ingredients for the analytical steps of the event study. The estimated relations from the regression during the estimation window are applied to control for market and industry movements in the event window. The predicted return is then compared to the actual return in the event window, with the difference representing the abnormal or excess return. This return, multiplied by the company stock price, provides an estimate of the per-share dollar effect of the event being studied.[28]

Finally, note that the abnormal return would include the effects of the event being studied as well as any other company-specific news or events (if any) that occur in the event window. Whenever possible, the analysis should disentangle the effects of these events. The procedure for doing so depends on the available data and the nature of the other event(s) in the window. For example, if the event coincided with an earnings announcement, the effects of the latter could be removed by estimating the stock price's response to earnings surprises and applying the measured relation to the announcement within the event window. Though this would not perfectly remove the effects of the earnings announcement, the remaining abnormal return would be a much better estimate of the effect of the event for which the window was constructed. After removing the effects of these other events, materiality tests have to be adjusted to account for both the magnitudes of these events and the uncertainty surrounding the estimates of those magnitudes.[29]

## 19.3    ARE EVENT STUDIES REALLY SCIENCE UNDER *DAUBERT*?

**(a) The *Daubert* Decision.**    In 1993, the Supreme Court reviewed a standard on the admissibility of expert testimony stated in *Frye v. United States* (1923). *Frye* set a standard that an expert's methodology must be "generally accepted" in the scientific community to be admissible. In its 1993 ruling in *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court expanded the admissibility standard set forth in *Frye* to allow potentially new though reliable techniques that had not yet achieved peer review. In its 1999 ruling in *Kumho Tire Co. v. Carmichael*, the Supreme Court clarified that the *Daubert* criteria apply to "all expert testimony."

The plaintiffs in the *Daubert* case, a products-liability action, sought to establish a causal link between the ingestion of a prescription drug during pregnancy and

the subsequent delivery of children with birth defects. Consequently, the Court's decision focused on scientific rather than economic testimony.

The Court found that the basic rule is that "all relevant evidence is admissible."[30] According to the Court, relevant evidence must "assist the trier of fact to understand the evidence or determine a fact in issue."[31]

The Supreme Court also limited the *Daubert* analysis to "scientific" knowledge, which it defined as based on the scientific method. The evidence must meet the same standards of all evidence by being "not only relevant, but reliable." In the scientific context, reliable evidence is "based upon scientific validity."[32] A federal district court in the Sixth Circuit has expanded the *Daubert* framework beyond scientific testimony, to include technical and other specialized knowledge.[33]

The *Daubert* Court admonished against proffering testimony that was based on "unsupported assertion" or "subjective belief" and provided guidance by noting four factors that should be considered to assist in this inquiry:

1. whether the theory or technique can be (and has been) tested;
2. whether the technique or theory has been subjected to peer review and publication;
3. the known or potential rate of error and standards controlling the technique's operations; and
4. whether the theory or technique has been generally accepted by the scientific community.[34]

After the Supreme Court sent the case back to the Court of Appeals for the Ninth Circuit, that court suggested a fifth factor: whether the methodology was created solely for purposes of litigation.[35] The Sixth Circuit apparently also considers this factor important.[36]

**(b) Are Event Studies Objective?**   We now take a moment to consider the effects of the choices discussed in the previous section to see if they would withstand being called "subjective belief" or "unsupported assertion" under *Daubert*. If the calculation is to take into consideration the specifics of a particular case, some common sense must be added to the science because several considerations determine the proper methodology for running an event study.[37]

The foregoing does not imply that one cannot use a standard procedure. In fact, it is often useful to do so when one is running a number of event studies for different firms (for example, if one wanted to look at how the average firm responded to a certain type of announcement). In that situation, it is common to establish a standard price reaction methodology both for ease of analysis and to prevent the possibility that choosing different methodologies for different events biased, or even determined, the overall result. When combining multiple event studies to determine how stock prices respond to events, it is not necessary to find a procedure that provides the best estimate for each firm or event individually; instead, with a large number of events being combined, errors in one event will, at least to some degree, cancel those in another.

When looking at the particular firm and events at issue in a lawsuit, however, it may be preferable to tailor the event study to the special circumstances at hand. As discussed above, in performing an event study there are at least three choices that

feature prominently in the analyst's mind: (1) the time frame for the measurement of the price reaction; (2) the time frame for estimating the relation between the stock and the market, both in terms of length of period and when the period should be relative to the event under consideration; and (3) which index or indices should be used to control for market and/or industry effects.

The effects of the different choices will naturally vary from case to case. Generally, though, the choice of index and estimation window will likely have a relatively minor impact.[38] On the other hand, the choice of the time frame for measuring the price reaction (the event window) would be expected to lead to greater variability.

Even so, once the analyst makes these choices, the analysis is completely objective, in that another expert would be able to replicate it. That is, if one specified an index, an estimation window, and an event window, any two experts would come up with the same measurement for the price reaction.[39] This means that if one expert presents a result based on an event study, an opposing expert can check for errors in the underlying calculations. The opposing expert can also test what would happen if the first expert changed any of the assumptions. This allows the opposing expert to discover which assumptions, if any, are innocuous because changing them has no significant effect on the results. (For example, adjusting for market movements with the S&P 500 and with the Nasdaq Composite Index is likely to produce similar results if the indices moved similarly in the event window.) Conversely, the opposing expert can identify which assumptions, if any, drive the first expert's result and focus the debate on those points. (For example, if the price reaction is large after two days but the price returns to its original level after five days, the debate can focus on how long it took for the market to absorb all of the effects of the relevant event.)

In most cases, objective measures can aid in evaluating the choices. For example, as discussed above, comparing the adjusted $R$-squared from one estimating regression to the next provides information that can help in deciding which better explains the stock price's movements.[40] In deciding the proper price reaction period, one could go with accepted standards in the literature or in litigation. Alternatively, one could use a proxy for materiality, such as trading volume or number of news stories relating to the event, in deciding over what period of time the stock was still responding to an event.

**(c) Applying the *Daubert* Factors.**   The event study technique satisfies the four factors to be used in determining the admissibility of expert testimony as described by the Court.

1. Can the theory or technique be tested? The choices available to the analyst involving the index and estimation window are testable using statistics that are computed when the analyst performs a regression analysis of the firm's stock price return on the return of an index. The choice of event window may be tested using approaches mentioned above, although it may instead be based on convention (that is, the analyst can use a one- or two-day window supported by the literature rather than doing a separate analysis for each event study to determine *de novo* the length of the window most appropriate for the individual event under consideration).

Document metadata

2. Has the technique or theory been subjected to peer review and publication? By now, hundreds of peer-reviewed articles have applied the event study methodology, including many that focus specifically on methodological considerations.

3. Does the technique have a known or potential rate of error and standards for controlling its operations? The error associated with either a test of materiality or the measurement of the size of the event is a statistic that can be estimated with each application; moreover, the academic literature provides guidance on proper application of the technique.

4. Has the scientific community generally accepted the theory or technique? The scale of publications alone shows that the technique has gained general acceptance.

## 19.4   DECIDING ON MATERIALITY

**(a) Standard for Materiality.**   In determining materiality, statistical analysis can provide information on the likelihood that the price movement was due solely to chance. Formally, a materiality test provides a statistical answer to the question: How likely is it that the observed stock price movement in the event window could have occurred if there were no event influencing stock prices in that window? For example, if an event is material at the 5 percent level, this means that there is only a 5 percent likelihood that the abnormal return (or the stock price movement once one controls for market, industry, and other effects) could have been caused by the stock's normal random price fluctuations. Alternatively, we can say that we are 95 percent confident that the abnormal return is greater than what would be expected based on the stock's normal random price fluctuations.

It is not clear what level of statistical significance corresponds to a legal definition of materiality. As Mitchell and Netter point out, the 95 percent confidence level is commonly used, while the 90 percent and 99 percent levels are also options. There is no definitive case law on how statistical confidence levels relate to burden of proof in civil (or criminal) litigation. With an event study, however, courts can quantify the level of materiality, compare it across cases, and assess it using professional standards from the economics literature.

**(b) Other Price Reaction Methodologies**

*(i) Simple Price Reaction.*   Occasionally, expert reports will contain a conclusion on materiality based on the observation that the stock price reacted to an event and, relying solely on the expert's background and judgment, this price reaction was material. Absent more, such an opinion would fail the Court's admonishment to avoid "unsupported assertion" and "subjective belief." Besides obviously not satisfying the factors laid down for scientific evidence (including testability, known rate of error, standards for operation of the technique, and general acceptability), the approach fails to consider the other potential influences on the stock price over the time period the price was observed to be falling. This alone would make the proffered opinion run afoul of *Executive Telecard.*

*(ii) Net-of-Market Price Reaction.*    A somewhat more sophisticated, and common, methodology designed to take account of other influences on price reactions is to simply measure so-called net-of-market movements. This is done, for example, by first computing the average price of a security over the five days before an event and the average price over the five days after the event. The percentage change in these two averages is then compared to the percentage change of a market or industry index over the same period of time.

This methodology has at least two flaws. First, this form of price reaction implicitly assumes that the stock moves one-for-one with the market or the chosen industry index. One can, and should, test this assumption with, say, a regression analysis to measure the relation between the security and the index. The regression would supply a beta or a coefficient showing how much the stock moved with the index, and a *t*-statistic on that coefficient, showing the statistical significance of that relation. If the beta is statistically different from one, it would be difficult to see why one would throw out the empirical results in favor of the generic alternative.[41] A second problem with the net-of-market methodology is that it does not allow for the most accurate determination of materiality. Because the assumed one-for-one relation between the stock and the market or industry index is generally not statistically the best estimate, the estimated abnormal returns with this approach may also not be a best estimate statistically, and a materiality test is not as powerful as it otherwise could be.[42]

When used by itself, the net-of-market adjustment would appear to fail some of the *Daubert* criteria. First, a simple net-of-market calculation has no known rate of error (in part because the analyst never computes the standard deviation of the average five-day return). Second, its support in the academic literature is generally limited to studies that focus on many firms, where running multiple market model regressions may be cumbersome. Finally, because a net-of-market model provides no test for the goodness-of-fit of the market or industry index (i.e., an adjusted *R*-squared or any other residual analysis is never computed), the choice of index is more subjective than when such a statistic is used to evaluate the appropriateness of different indices. None of the above is meant to say that net-of-market models are useless or necessarily wrong; rather, they are dominated by regression analysis and should not be used unless other choices add error or are infeasible. For example, if a company goes public and then stops trading all within an extremely short time frame, the lack of trading data may make the regression results unreliable.

**(c) Changing Levels of Materiality.**    A final issue pertaining to materiality arises when the cumulative price reaction moves in and out of materiality as time passes. For example, if a stock drops by a large amount on the day of an announcement, the one-day reaction may be significant. However, a rebound on the next day may cause the two-day price reaction to be not material, while another drop on the third day may cause the three-day price reaction to regain its status as a material event. In general, one needs to look at why the level of materiality changes over the price reaction window. If new information comes into the market that is not relevant to the instant case, then the analysis should remove the effects of this new information in considering the materiality of the event under examination. In addition, one would want to see whether the changes in materiality result from the market's reevaluating the importance of the initial event or information, something that one can often deduce from contemporaneous news stories or analyst reports.

As a general matter, the potential for stock market overreaction is now generally accepted as a factor in stock market behavior.[43] Though there remains some dispute over long-term overreaction, short-term price reversal after unconditional price declines has been detected in large samples of stock prices. This means that if the price initially declines after an event and if, say on the second day, the price returns to a level that makes the event not material with no intervening news event, then there is justification for assuming short-term overreaction. The analyst would be hard pressed to make a finding that the event was material under this fact pattern.

## 19.5  MEASURING LOST PROFITS.

This section examines how an event study compares to other methodologies for measuring lost profits.[44]

### (a) Lost Profits Calculations Based on Projections.

Experts often calculate lost profits by measuring changes in future profit estimates using data from before and after some specific action by the defendant that harmed the plaintiff. For example, suppose that before an allegedly tortious event occurred, analysts projected that Prospects, Ltd. would have profits of $5 million in each of the next five years. Further suppose that following the event, analysts projected that Prospects' profits would be $1 million for the next three years and $2 million for the following two years. Prospects has therefore been harmed, in the analysts' view, by the present value of $4 million for each of the next three years plus $3 million for each of the two years after that. Prospects' harm would also include effects that would be measured by the changes in projections that could have been made for periods more than five years in the future.

Note that this form of measurement does not depend on the actual realization of profits. Instead, it concerns changes in the expectation of future profits at the time of an event. In that sense, it is quite similar to an event study, in which stock prices before and after the event are the market's projections of future profits or cash flows.

Thus, the principal question that arises here is which set of projections to use, those assumed by the market in setting stock prices, or some other set of projections from a different source. In deciding this issue, one criterion is the degree of objectivity in the two measures. The event study is based primarily on market conditions, or on values set by investors only concerned with obtaining the proper value for their purchases and sales, and not by parties interested in the outcome of the litigation. Investors have incentives to set the price correctly because they invest their own money. If the market believes that a stock is underpriced relative to the company's value, investors will place orders to buy the stock, driving its price up; similarly, if the market consensus is that a company's stock is overpriced, sell orders will drive the stock price down.

In an examination of expected lost profits based on the change in analyst or expert projections surrounding the allegedly tortious act, the results will naturally depend on the projections used. Often, there is a large range of projections for profits from the company and analysts for the short term. If one goes out more than a few years, there are often no projections or only internal company projections. And at some point, there are generally not even company projections. Thus, for events likely to have a long-term impact on profits, the expert must create projections in the litigation. Even if the expert attempts to be completely objective,

this often involves a large degree of subjectivity.[45] Moreover, even when projections are available, the expert must decide which one or ones to use.

If done carefully, the use of analyst projections to calculate lost profits is likely to satisfy the *Daubert* criteria, though perhaps not as well as an event study would. In an event study, one uses stock prices, figures that are accepted by all to be what they represent: the market's current valuation of a company's equity. In looking at projections, the question arises as to which set of projections to use. If one uses projections from the same disinterested analysts both before and after the tortious event, there is likely to be little objection about subjectivity (provided, of course, that one does not select only those analysts who viewed the event as especially large or small). If the expert uses projections from one of the interested parties, such as the plaintiff company, or makes his or her own estimates of what projections should have been before and after the tortious event, then subjectivity becomes a serious concern.

**(b) Lost Profits Calculations Based on Future Events.**   Lost profits are also often calculated by comparing actual results to projections made at or immediately before the alleged business interference. This section compares the calculation of lost profits using this methodology to the calculation of lost profits through the use of an event study.

Let us return to the example of Prospects, Ltd., which was expected to have $5 million in profits in each of the five years immediately following the tortious event. Suppose that its actual profits were $1 million in the first year and $3 million in each of the next four years. Prospects' damages claim would then include $4 million in lost profits from the first year and $2 million in lost profits from each of the subsequent years. These values would then be expressed in present value terms, or adjusted for prejudgment interest. In addition, the company would still have a claim for any lost profits occurring more than five years from the time of the wrong.

The most important difference between the methodologies is that an event study (or a comparison of changes in projections as discussed in the previous section) is an ex ante analysis, while an examination of actual results is an ex post analysis.

**19.6   RECENT LITERATURE AND CASE LAW.**   The question of whether experts can use the stock (and debt) market value of a firm to value the underlying asset has been answered affirmatively by both appraisers and the courts. In the legal context, the so-called stock and debt approach to valuation has been advocated primarily for railroad and utility properties, but applies to firms in other industries.[46] Indeed, a textbook on corporate valuation devotes an entire chapter to the approach without limitation to type of firm or industry.[47]

Adherents to the approach make the claim that "[w]here data to make possible a stock and debt valuation are available, it is best to go no further."[48] With regard to the objectivity of the approach, "[t]he stock and debt method avoids overreliance on the judgment or expectations of a single individual (the appraiser) about the future prospects of the firm, substituting instead the consensus view of many market participants—all of whom, as we have said, have a strong interest in making accurate forecasts."[49]

The stock and debt approach to appraisal has been accepted by both regulatory bodies and courts.[50] A circuit court decision, *Mills v. Electric Auto-Lite Co.*, used language that virtually mirrored the professional literature.[51] The court held that to determine the worth of a company "when market value is available and reliable, other factors should not be utilized. . . . Although criteria such as earnings and book value are an indication of actual worth, they are only secondary indicia. In a market economy, market value will always be the primary gauge of an enterprise's worth."

Furthermore, another court recognized the distinction between the projections made by analysts and those implicitly made by the market: "self-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument. Astute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and bankruptcy judges."[52]

It follows from these citations that the change in capitalization of the company accurately measures a change in the worth of a company. Such change in worth, of course, can come from the present discounted value of the future stream of cash flows lost by the actions of a defendant. As such, the appraisal and valuation methods that support determining the value of a company by using the market value of stock and debt would also support determining the value of a company before and after the wrongful act of a defendant. The event study method measures this change in valuation.

## 19.7 DO EVENT STUDIES ACCURATELY MEASURE LOSS TO THE CORPORATION?

We next ask whether the event study is a reliable measure of damages. This includes a discussion of the issue of whether the technique really measures the loss to the corporation instead of, for example, the loss to shareholders.

**(a) Stock Market Anomalies.** A violation of the efficient market hypothesis means that stock prices may not reflect fundamental values at every moment, which, in turn, means that the prices do not always equate to the present discounted value of future dividends. Over the years following the stock market crash of 1987, there developed an academic literature that found a variety of anomalies in stock price behavior and that, when taken as a whole, has probably led economists to have less faith in the efficient market hypothesis than they had in the 1970s.[53]

We do not wish to overturn the presumption accorded the efficient market hypothesis in *Basic v. Levinson*.[54] Rather, we should view the efficient market hypothesis as a presumption that can be disproved for a particular security in a particular time frame. The same literature that has focused on stock market anomalies has also provided analysts with the tools to diagnose the patterns of a stock price to determine whether its behavior is anomalous.

Although it is not the purpose of this chapter to review either the stock market efficiency literature or the adjustments to the event study technique that might be called for if an anomaly exists, we mention a few issues that might arise that could affect the event analysis.[55]

*(i) Volatility.* Financial economists studied stock market volatility well before the late 1990s.[56] Their principal finding was that the volatility of stock prices likely exceeds

that justified by the variance of dividends. This means that there is no guarantee that stock prices will reflect fundamental value. This being said, these findings by themselves did not lead to professional rejection of the efficient market hypothesis—it was still treated as a presumption for any individual stock or stock market index.

By itself, volatility does not mean that the event study technique is worse than other methods of valuation. The reason for this is that it can be shown that virtually any asset returning a cash flow is likely to be volatile. For example, Paul Samuelson has shown that stock prices following what appears to be a random walk could be based on fundamental values and, in a later article, that the price of land could be a stochastic process much as stock prices appear to be.[57] In both cases, the source of the variation in prices is similar: for stock prices, dividends are a stochastic process because earnings themselves contain a stochastic component; for land prices, rents may also contain a stochastic component. This means, of course, that lost profits (damages) to the underlying asset will themselves be volatile. We should not be surprised, then, that event studies (measuring, as they do, the present discounted value of the lost profits) have some statistical error associated with them though they are generally unbiased. The test statistics typically computed when performing an event study help in assessing the dimensions of this error.

*(ii) Speculative Bubbles.*   In light of the behavior of both the market and individual stocks since 1987, there has grown theoretical literature to show how speculative bubbles can form.[58] These theories show that in speculative markets where there are both informed and uninformed traders, it may be rational for the informed traders to follow the uninformed in a price trend away from fundamental value. If the theory is true, there is no mechanism that, in the short term, causes stock prices to equal the value of their underlying assets. Such an overpriced stock has the unfortunate tendency to crash when the bubble bursts. The bursting of the bubble can occur at the same time as, indeed be precipitated by, the event being analyzed to compute damages. Consequently, the price drop unadjusted for the speculative bubble likely mismeasures damages. The effect of this condition has been noted in the legal literature with reference to shareholder class actions.[59] Fortunately, there are diagnostics that can be used to ascertain whether there appears to be a speculative bubble and, if so, whether other techniques are available to measure the lost profits.[60]

**(b) Bias from Litigation Expectations.**   Event studies are biased toward finding a price drop that is too small because of the market's expectation of a possible recovery through the legal system. To see this, suppose a company lost $1 million in future profits and was expected to sue and recover the million dollars and appropriate interest, but at the expense of $300,000 of legal fees. Then the price reaction observed in the market would reflect only the $300,000 net loss. If this were successfully used as the basis for a damages calculation at trial, the company would receive only the $300,000 of legal fees but not compensation for its actual loss of $1 million in future profits. At the extreme, if the market expected the company to recover lost profits plus punitive damages, or treble damages, its stock price could go up as a result of the malfeasance. Consequently, interpreting the event study re-

sults requires care. Still, because this bias serves to make price reactions show a smaller drop than that due to the defendant's act alone, an event study can still serve to show the minimum damages caused by that act.

**(c) Whose Loss Does an Event Study Measure?**   One of the potential objections one may make to an event study is that it is measuring the wrong damages. Because an event study looks at the value of a corporation's shares, some may argue that one is measuring the loss suffered by shareholders and not by the corporation itself. This leads to the question of whether the event study is measuring the proper damages for use in corporate litigation.

The first answer is that this is a fair criticism of any measure of damages to a corporation. Suppose that Prospects' factory burns down in an apparently accidental fire on February 1, and that Prospects has no insurance to cover the loss. Further suppose that on March 1 it is suddenly revealed that the fire was not an accident but instead was set by agents of a competitor, Ruthless Corp. Last, suppose that on March 1, Prospects sues Ruthless and that everyone believes that Prospects will recover the cost of rebuilding the factory plus any lost profits, however measured, as a result of the arson. We now ask: Who wins and who loses?

In theory, if the damages payment is truly comprehensive, covering all manner of costs and legal fees, loss of competitive position, and so forth, and assuming no punitive damages are awarded, Prospects will be left exactly as well off as if there had been no fire. On March 1, its stock price would therefore recover to where it was on February 1, once one adjusts for market and other forces in the interim. Shareholders on February 1 who held through March 1 have seen a temporary drop in the value of their holdings but are unaffected at the end of the day. February 1 shareholders who sold before March 1 are worse off, because they sold their shares at a time when the price was unduly low. Conversely, investors who purchased between February 1 and March 1 benefit when their shares of Prospects appreciate in value on March 1. But note that this is true no matter how the damages to Prospects are measured, whether it is by the change in its share price or a discounted cash flow model of lost profits. Simply put, under the current legal system, investors who hold shares at the time of a bad act are damaged, while those who hold at the time of an unexpected recovery are benefited.[61] As such, because the change in stock price is simply a *measure* of the damages to Prospects, in the same way that a discounted valuation of lost profits is such a measure, concerns about winners and losers are not specific to the event study methodology.

**(d) Do Event Studies Capture All Components of a Loss?**   Another argument against event studies is that by focusing on a small period of time, an event study does not provide a complete characterization of the effects of a wrongful act. To answer this, let's create an example where the case at bar involves some defamatory statements made by Ruthless against Prospects. Also, suppose that Prospects' stock price falls at the time that the statements are made. One could then ask whether changes in the public's views of the credibility of those statements shouldn't change the damages estimate from the libel. This possibility can be addressed in an event study by looking for changes in the perception of the libelous statements and measuring the effects that those changes in perceptions had on the stock price. For example, if there were a public retraction by Ruthless, one would want to offset the drop in

Prospects' stock price in the event window corresponding to the original libel by the rebound, if any, in an event window corresponding to the retraction.

Again, however, this criticism does not apply solely to event studies. Suppose that an expert was measuring damages by looking at the decline in expected future income. Suppose further that the original libel caused a permanent 30 percent drop in Prospects' sales, perhaps because consumers were misled into believing that Prospects was marketing an unsafe product. If the retraction caused sales to rebound to within 10 percent of their previous level, this information would also have to be incorporated into measures of discounted lost cash flows.[62] Therefore, to the extent that new information affects continuing results, *any* measure of lost profits that does not purport to measure expected lost profits solely at the time of the original bad act must take this new information into account.

**(e) Tax Effects.**    The discounted cash flows measured by stock prices reflect free cash flow available to stockholders that, of course, are after tax. This creates the need for an adjustment to the event study measure of damages. Because damages awards are usually taxable, the convention has arisen that lost profit damages are awarded on a pretax basis. Fortunately, the adjustment to the event study magnitude to remove tax effects is rather simple; in most instances, it can be accomplished by dividing the event study result by one minus the marginal income tax rate of the corporation.

**19.8  CONCLUSION.**    We have seen that event studies can be useful in quantifying damages in cases ranging from securities fraud to other commercial litigation requiring the calculation of lost profits. In some areas, such as securities fraud, stock price reactions are already a standard method for quantifying damages. In such cases, the overarching question is how to perform the most accurate price reaction. This entails developing a model that accounts for market and industry effects. It also entails explicitly testing for the materiality of stock price movements. When this is done, we have a damages calculation that is based on economic literature and that, given the results of the materiality test, has a known rate of error. In this manner, one can perform a damages calculation that meets the *Daubert* criteria for admission as expert testimony. A failure to perform these analyses when possible would mean that the analysis is not in accordance with the literature and has an unknown rate of error.[63]

In comparison to many other methods of calculating lost profits, the measurement of stock price reactions has the benefit of being based on numbers that, being determined by the collective decisions of all investors in the market, are both objective and present a consensus, rather than an idiosyncratic, viewpoint. While the measurement of stock price reactions will inevitably incorporate some degree of choice on the part of the analyst, the degree of subjectivity in these choices is usually low.[64] This contrasts with the situation where an analyst has to choose some set of projections and then decide how to discount those projections back in time, to say nothing of the subjectivity involved in making new projections for the purposes of litigation.

When using stock price movements to measure lost profits, one employs a methodology that is supported by the academic literature, is completely replicable, has a measurable rate of error, and uses a minimal number of variables. By con-

trast, an analyst creating projections of future profits is engaging in a process that may not be replicable by others; while other experts can create their own projections, there is often no reason to believe that they would match those of the original analyst. When several independent sources of profits are available, a study of lost profits using projections requires deciding which projection(s) to use and how to discount the cash flows envisioned in those projections.

None of the foregoing discussion is meant to say that other analyses are not useful, or even necessary at times. When a company is not publicly traded, there would be no stock price data that one can use for an event study, and other methodologies often have to be employed.[65] In addition, other assumptions underlying the appropriateness of the technique, such as the efficient market hypothesis, may not be valid in any individual application requiring either adjustments to the results or abandonment of the method altogether.

Moreover, an event study and another methodology such as a discounted cash flow analysis can be used in conjunction as a test of the robustness of the damages calculation. If the two yield similar results, one can feel more confident in the final figure. If the results differ materially, then the expert should look for errors in both studies by considering the reliability of the data underlying each, the uncertainty surrounding any assumptions made in each analysis, and sources of error such as those discussed in this chapter. If both methodologies still seem reasonable, the expert can use the two results to establish a likely range for alleged damages.

An event study provides an objective methodology for calculating the magnitude of damages and the materiality of the event that may have caused damages. In general, other methodologies for calculating damages do not provide a measure of materiality, other than the simple observation that calculated damages are large, small, or zero. By using the statistical tools that are the basis for event studies, an expert can provide not only a measure of damages based on objective data and calculations but also a statistically accepted means of testing the materiality of this measurement.

## NOTES

1. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

2. *In re Executive Telecard, Ltd. Securities Litigation*, 94 Civ. 7846 (CLB) (S.D.N.Y. 1997). See also *In re Seagate Technology II Securities Litigation*, C-89-2498(A)-VRW (N.D. Cal.), in which the court accepted some of the defendants' event studies and dismissed certain claims on that basis, but ruled that the defendants' other event studies were inadequate and denied their request for summary judgment with regard to those issues. The court also found the plaintiffs' event studies lacking and therefore denied a cross-motion for summary judgment. Also, see *Goldkrantz v. Griffin*, QBS: 02760800 (S.D.N.Y. 1999), in which the court granted summary judgment based on the plaintiffs' failure to contest the defendants' event study analysis.

3. With regard to securities litigation, see, for example, Janet C. Alexander, "The Value of Bad News," *UCLA Law Review*, Vol. 41, No. 6, 1994, pp. 1421–69; Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38, November 1982, pp. 1–20; Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of *Basic v. Levinson*," 77 *Virginia Law Review Association* 1017 (1991), pp. 1021–28; A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997, pp. 13–39; and Mark L. Mitchell and Jeffry

M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, February 1994, pp. 545–90.

4. The use of an event study to measure the magnitude of an event is certainly not new. See, for example, Mark P. Kritzman, "What Practitioners Need to Know About Event Studies," *Financial Analysts Journal*, November–December 1994. ("Aside from tests of market efficiency, event studies are valuable in gauging the magnitude of an event's impact.") For a recent application, see Jay Dial and Kevin J. Murphy, "Incentives, Downsizing, and Value Creation at General Dynamics," *Journal of Financial Economics*, March 1995.

5. Richard A. Brealey and Stewart C. Myers, *Fundamentals of Corporate Finance*, New York: McGraw-Hill, 1995, p. 306.

6. Brealey and Myers, 1995, Chapter 4.

7. Arnold S. Jacobs, "Litigation and Practice Under Rule 10b-5," cited in Mark L. Mitchell and Jeffry M. Netter, *op. cit.*

8. Recognizing this problem, the court in *Feit v. Leasco Data Processing Equipment Corp.*, 332 F. Supp. 544, 586 (E.D.N.Y. 1971), confronted with determining the materiality of an omission from a proxy statement, suggested drawing a scientific sample of investors to determine how they might have voted if the truth had been known. To our knowledge, this approach to materiality has never been attempted.

9. Intuitively, if an event is material to investors, it should move stock prices, and if it is not material, it should not affect stock prices. By examining whether the stock price change is different from random movements that occur on days when there is no news, we can determine whether investors felt that the event under consideration was material. As an example, Mitchell and Netter state that "[t]he SEC recently began to use stock price evidence to show materiality in securities fraud cases, especially insider trading cases." Also, from the same paper, "Statistical tests of significance are useful both in establishing materiality and in calculating disgorgement. A finding that a stock return associated with the release of information is large enough that it is unlikely that the return occurred by chance is strong evidence that the information was important." Of course, this is relevant only for potentially large events. An announcement that someone had stolen a $20 bill from a Sears cash register would likely not have any material effect on Sears' stock price.

10. See, for examples, the Alexander and MacKinlay articles cited in note 3 above. Note that in the vocabulary of securities litigation, the inflation in a stock price is the difference between the market price of the stock and the price it would have traded at had there been no misrepresentation or omission of public information. This use of inflation is not to be confused with its traditional economics usage referring to overall price level rate of change.

11. It is, however, not the only way to compute damages. Sometimes a fundamental analysis is appropriate. Also, the expected change in the stock price based on a sample of stock price changes in response to similar events may be used. Which approach is best will depend on circumstances relating to the allegations in the complaint and the reliability of the various types of estimates given the available data.

12. The distinction between a firm and its shareholders is a legal artifact and ignores certain economic ambiguities. For example, in economics it is theoretically possible for the current shareholders to be the firm, whereas under the law the firm is a distinct person. Presumably, this legal distinction is necessary to allow the firm to have access to the courts on behalf of the shareholders, thereby reducing the inefficiencies that would occur if the shareholders themselves had to perform the legal duties of the firm.

13. This is strictly true only if common equity is the sole source of financing. When the company has also issued debt and/or other forms of equity, lost profits would be measured by summing the changes in the market value of all of the outstanding financing sources (e.g., number of shares times the share price movement plus the number of bonds times the bond price movement). When the company does not face any serious threat of default on its senior obligations, the change in the market value of its common stock should serve as a good proxy for the change in the total capitalized value of the firm.

14. But note an exception due to the bias from the recovery from future litigation discussed in section 19.7(b).

15. The stock market's assessment would be on an after-tax basis taking account of litigation expenses and contingent claims. The effects of these issues on damages assessment using stock prices are discussed in more detail in section 19.7.

16. See section 19.6.

17. See, for example, MacKinley, *op. cit.* for a description.

18. It is also possible to look at intraday trading to get a tighter event window. This is especially useful if before the news announcement there was a large change in the stock price that one believes was caused by other events. Use of intraday prices, however, entails several difficulties. Among these are calculating movements of the market or industry index over the same time period and adjusting materiality tests to account for the nonstandard event window. A suggested approach for determining the length of an intraday event window is in S. C. Hilmer and P. L. Yu, "The Market Speed of Adjustment to New Information," *Journal of Financial Economics*, Dec. 1979. See also S. J. Chang and Son Nan Chen, "Stock Price Adjustment to Earnings and Dividend Surprises," *Quarterly Review of Economics and Business*, Spring 1989.

19. See MacKinlay, note 3.

20. As with other expert decisions, it is helpful to have some rationale for the length of the event window chosen. For example, one can employ a standard period over different cases, cutting short the window when new information reaches the public. Alternatively, one can look at some other indicator of materiality, such as trading volume or the quantity of news coverage, to decide the period in which the market was reacting to the new information.

21. While some analysts perform crude event studies without adjusting for market effects, the literature nearly uniformly argues that a market adjustment is desirable. Moreover, relevant case law, such as In re Executive Telecard Ltd. Securities Litigation, states that in measuring stock price declines, one must eliminate "that portion of the price decline that is the result of forces unrelated to the wrong."

22. A regression is a statistical tool used to estimate the relation between one or more variables (here, the market and/or industry index) and another variable (the stock price of a particular company). An early, but still useful, discussion is provided in Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, May 1980.

23. In securities fraud cases, estimation windows are often placed before the beginning of the alleged class period, even if the only event measured is at the end of the period. This is likely done so that the estimation window would cover a "clean" period that could not have been tainted by any alleged stock price inflation. There is often no theoretical basis for doing so, because the concern about a "clean" period actually relates to the possibility that the estimation of the relation between the stock and the index is contaminated by the effects of the event being studied. That is, one does not want any overlap between the estimation window and the event window. Depending on the nature of the alleged stock price manipulation, there may be no statistical basis for excluding prices during the period of alleged manipulation from the estimation window.

24. Michael Salinger ("Value Event Studies," *Boston University School of Management Working Paper*, 1991) provides a theoretical discussion on whether to place the estimation window before or after the event window. However, see note 38 on his conclusion that such methodological choices are generally irrelevant for short event windows.

25. The adjusted R-squared should not be confused with the [unadjusted] R-squared. The R-squared is a simple measurement of the explanatory power of the independent variables. The adjusted R-squared penalizes the use of additional independent variables to account for the possibility that any additional explanatory power that these variables bring to the overall regression is due solely to chance.

26. Sometimes, the expert will use a multifactor model to predict the stock price. This is a model that has more than one index in it, such as the S&P 500 and an industry index; see MacKinlay, *op. cit.* If the analyst tries a number of multifactor models and ultimately chooses

a model with only one index, then the expert may have to support this decision with the relevant statistical test.

27.  There are various reasons for not simply choosing the index with the strongest statistical properties. One would be if it were known that there was a change in the operating characteristics or competitive environment facing members of one index between the estimation and event windows. Also, there are other considerations involved in comparing statistics from different estimation windows, most notably that a good index from an estimation period near the event window may be preferable to an index with more explanatory power in an estimation period further from the event window.

28.  There is a question about whether to apply the abnormal return to the stock price at the beginning or end of the event window. This question essentially turns on whether the event occurs first, followed by market effects, or whether market effects come first, followed by the event. As an example, suppose that a stock price drops from $20 to $9 during an event window in which the predicted return was −10%. If we apply the predicted return first, the stock would have been expected to drop to $18, and then it fell by an additional $9 as a result of the event. Alternatively, one could say that the stock fell by $10 as a result of the event, reaching a level of $10, and then fell an additional 10% due to market forces, to reach its final level of $9. The difference is generally not important when market movements are small. In general, one would want to consider when in the event window the effects of the event were more likely to have been felt.

29.  See, for example, Katherine Schipper, Rex Thompson, and Roman L. Weil, "Disentangling Interrelated Effects of Regulatory Changes on Shareholder Wealth: The Case of Motor Carrier Deregulation," *Journal of Law and Economics,* Vol. 30, April 1987, pp. 67–100.

30.  Fed. R. Evid. 402, as cited in *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.,* 925 F. Supp. 1247, 1251 (S.D. Ohio 1996).

31.  Fed. R. Evid. 702, as cited in *Ohio ex rel. Montgomery,* 925 F. Supp. at 1251.

32.  *Daubert,* 113 S. Ct. at 2795.

33.  *Ohio ex rel. Montgomery,* 925 F. Supp. at 1251.

34.  *Daubert,* 113 S. Ct. at 2795.

35.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995).

36.  *Smelser v. Norfolk Southern Railway Co.,* 105 F.3d 299, 303 (6th Cir. 1997).

37.  Still, at least one court has ruled that in examining how events affected stock prices, "available techniques of proof such as econometric modeling are sufficiently demanding of internal consistency as to reduce the opportunity for such manipulation of data." *In re LTV Securities Litigation* (88 F.R.D. 134). Such a statement certainly could not be made about analyses where the analyst has the freedom to essentially make up one or more inputs to the calculation based on nothing more than a claim that those inputs are reasonable.

38.  In a seminal article ("Measuring Security Price Performance," *Journal of Financial Economics,* 1980), Stephen J. Brown and Jerold B. Warner state that "a simple methodology based on the market model performs well under a wide variety of conditions." In discussing this and a later paper by the same authors, Michael Salinger, *op. cit.,* states that the previous authors' "results tended to be robust to the methodological alternatives." Salinger further states, "There is a schizophrenia in the event study literature between a very close attention to methodology and the view that for events of any importance, methodology is unlikely to matter a great deal. The latter view is probably quite appropriate when news is revealed over a brief, identifiable interval." "Measuring Security Price Performance," *Journal of Financial Economics* 8 (1980), pp. 205–58.

39.  To be entirely correct, one would also have to specify several other minor choices, such as whether to use logarithmic or percentage returns and whether returns are measured daily or over some other period of time.

40.  Of course, one must still use common sense in interpreting these results. For instance, if a company moves from an environment characterized by a high degree of government regulation to one of low regulation, there would be reasons to potentially challenge the use of a regression from one period to account for market movements in the other.

41. The net-of-market methodology also assumes that the constant term from the regression, or alpha, equals zero. References to an assumed beta of one should be considered to include this second assumption as well. We do not independently criticize the assumption that alpha is set equal to zero over the event window. Given an accurate estimate of beta, it is possible for reasonable analysts to perform the analysis with different estimates of alpha than what would be produced from a market model regression. One assumption, for example, is to compute an estimate based on the formula given by the Capital Asset Pricing Model; this formula would produce a value of alpha equal to zero whenever beta equals one. In practice, different reasonable estimates of the value of alpha generally do not make a noticeable difference in the expert's findings.

42. If betas are symmetrically distributed around one, the materiality test would be unbiased but not efficient. This means (1) that excessively positive and excessively negative returns would roughly balance over numerous observations but (2) that other tests were more likely to give the correct answer on any one individual case.

43. See Werner F. M. DeBondt, "Stock Price Reversals and Overreaction to New Events: A Survey of Theory and Evidence," 1989; Rui M. C. Guimaraes, Brian G. Kingsman and Stephen J. Taylor, eds., *A Reappraisal of the Efficiency of Financial Markets*, Berlin: Springer-Verlag. Much of the evidence is from the research of Paul Zarowin, including his 1989 article "Short-Run Market Overreaction: Size and Seasonality Effects," *The Journal of Portfolio Management*, Spring, pp. 26–29. See also M. Bremer and Richard Sweeney, "The Information Content of Extreme Daily Rates of Return," *Claremont McKenna College Working Paper*, 1987, later published in the *Journal of Finance*.

44. For more detail on some of the alternative methods, see, for example, Carroll B. Foster, Robert R. Trout, and Patrick A. Gaughan, "Losses in Commercial Litigation," *Journal of Forensic Economics* Vol. 6, No. 3, 1993, pp. 179–96. This paper discusses some of the means of measuring lost profits based on projections and accounting statements. Interestingly, while the authors say that the methodology they describe "is conceptually similar to the situation where a plaintiff suffered a loss of a passive investment, such as a securities fraud case," they do not appear to consider whether the event study methodologies of securities fraud cases could be applied to measuring lost profits in a commercial setting.

45. For a series of simple examples on how the same data can lead to extreme variations in lost profits, see Robert L. Dunn, *Recovery of Damages for Lost Profits*, 1992, pp. 459–70. ("The point made is that, depending on the approach taken, great variations in projections will result.")

46. See, for example, Richard R. Simonds, "Public Utility Valuation Methods: Theoretically Equivalent But Not Redundant," *Property Tax Journal*, September 1992, pp. 289–300.

47. Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, Irwin Prof. Publishing, 1993.

48. Steven H. Hanke and Stephen J. K. Walters, "Recent Controversies in the Valuation of Utility Properties," *Public Utilities Fortnightly*, July 21, 1988, p. 24.

49. *Id.* at 23.

50. "Court Declines Review in Five Cases, Including Three Involving Rail Property," *BNA Washington Insider*, June 6, 1995.

51. *Elmer E. Mills and Louis Susman v. The Electric Auto-Lite Co. et al.*, 552 F.2d 1239, 1247 (1997).

52. *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987).

53. Recent financial press commentaries on the volatility, previously high values, and rapid collapse of many Internet stocks represent another event that should lead to investigation of stock market anomalies.

54. *Basic v. Levinson*, 485 U.S. 224, 247 (1988).

55. We omit here mention of stock price overreaction, which was discussed in section 19.4.

56. For a review, see Stephen F. LeRoy, "Efficient Capital Markets and Martingales," *Journal of Economic Literature*, Vol. XXVII, 1989, pp. 1583–621.

57. Paul A. Samuelson, "Proof That Properly Discounted Present Values of Assets Vibrate Randomly," *The Bell Journal of Economics and Management Science,* Vol. 4, No. 2, 1973, pp. 369–74; and "Stochastic Land Valuation: Total Return as Martingale Implying Price Changes a Negatively Correlated Walk," *Paul A. Samuelson's Collected Scientific Papers,* Vol. 5, Cambridge: MIT Press, 1986.

58. See, for example, J. Bradford DeLong, Andrei Shleifer, Lawrence H. Summers, and Robert J. Waldmann, "Positive Feedback Investment Strategies and Destabilizing Rational Speculation," *Journal of Finance,* Vol. 45, No. 2, 1990, pp. 379–95.

59. Baruch Lev and Meiring Devilliers, "Stock Price Crashes and 10b-5 Damages: A Legal, Economic, and Policy Analysis," *Stanford Law Review,* November 1994.

60. *Ibid* at p. 35.

61. In some ways this is clearly unfair, as there has been a transfer of wealth from one set of shareholders to another as a result of an illegal act in which neither group knowingly participated. An alternative view is that when investors buy and sell shares, they are trading in the company's fortunes, including expected gains and losses from legal actions and certain illegal acts affecting the company's value.

62. One advantage of event studies here is that if the changes in the perception of the libel occur at discrete times, these effects can be captured by using readily available stock market data. Directly measuring the changes in expected income at various points in time would require a large set of contemporaneous projections.

63. While the actual rate of error is not known without the materiality test, if the stock is simply assumed by the expert to move one-for-one with the market, we can be sure that the rate of error is higher than if the relation between market and stock movements used in the damages calculation is based on statistical analysis.

64. The general attitude toward event studies may be best summed up by Glenn V. Henderson, Jr., "Problems and Solutions in Conducting Event Studies," *Journal of Risk and Insurance* 57(2), June 1990: "The event study is a classic design. Classic designs are simple and elegant, and above all else, functional. The event study has become a classic because it works. It can be used under less than perfect conditions and still produce reliable results."

65. In a case where a private company went through with an initial public offering after suffering some harm, data on the actual offering price can be compared to a previously expected offering price to perform a basic event study. Appropriate market and industry adjustments to the expected offering price can be made based upon the stock's post-offering behavior.

## LIST OF CASES

*Basic Inc. v. Levinson,* 485 U.S. 224, 247 (1988)

*In re Central Ice Cream Co.,* 836 F. 2d 1068 (7th Cir. 1987)

*Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S. Ct. 2786 (1993)

*In re Executive Telecard, Ltd. Securities Litigation,* 94 Cir. 7846 (CLB) (S.D.N.Y. 1997)

*Feit v. Leasco Data Processing Equipment Corp.,* 332 F. Supp. 544, 586 (E.D.N.Y. 1971)

*Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923)

*Goldkrantz v. Griffin* (S.D.N.Y. 1999)

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167 (1999)

*In re LTV Securities Litigation,* 88 F.R.D. 134, 149 (1980)

*Mills v. Electric Auto-Lite Co.,* 552 F. 2d 1239, 1247 (1977)

*Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.,* 925 F. Supp. 1247, 1251 (S.D. Ohio 1996)

*In re Seagate Technology II Securities Litigation,* C-89-2498(A)-VRW (N.D. Cal.)

*Smelser v. Norfolk Southern Railway Co.,* 105 F. 3d 299, 303 (6th Cir. 1997)

EXHIBIT 182

Exhibit J

1   MAYER, BROWN, ROWE & MAW LLP
    Donald M. Falk (SBN 150256)
2   Lee H. Rubin (SBN 141331)
    Shirish Gupta (SBN 205584)
3   Two Palo Alto Square, Suite 300
    Palo Alto, California 94306
4   Telephone:     (650) 331-2000
    Facsimile:     (650) 331-2060
5   lrubin@mayerbrownrowe.com

6   MAYER, BROWN, ROWE & MAW LLP
    Alan N. Salpeter (admitted *pro hac vice*)
7   Javier Rubinstein (admitted *pro hac vice*)
    Vincent P. Schmeltz III (admitted *pro hac vice*)
8   71 South Wacker Drive
    Chicago, IL  60606
9   Telephone:     (312) 782-0600
    Facsimile:     (312) 701-7711
10  jrubinstein@mayerbrownrowe.com

11  Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
    J. ELLISON, JEFFREY O. HENLEY, AND EDWARD J. SANDERSON
12
    ORACLE CORPORATION
13  Dorian Daley (SBN 129049)
    James C. Maroulis (SBN 208316)
14  500 Oracle Parkway
    Mailstop 5OP7
15  Redwood Shores, California 94065
    Telephone:     (650) 506-5200
16  Facsimile:     (650) 506-7114
    jim.maroulis@oracle.com
17
    Attorneys for Defendant ORACLE CORPORATION
18

19
                    **UNITED STATES DISTRICT COURT**
20      **NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION**

21  IN RE ORACLE CORPORATION          Case No. C-01-0988-MJJ (JCS)
    SECURITIES LITIGATION             (Consolidated)
22
                                      **DECLARATION OF STEFAN BOEDEKER**
23                                    **IN SUPPORT OF DEFENDANTS'**
                                      **OPPOSITION TO PLAINTIFFS' MOTION**
24                                    **FOR CLASS CERTIFICATION**

25                                    Date:      September 13, 2005
    This Documents Relates To:        Time:      9:30 a.m.
26                                    Place:     Courtroom 11
    ALL ACTIONS.                                 Honorable Martin J. Jenkins
27

28

────────────────────────────────────────────

## DECLARATION OF STEFAN BOEDEKER

I, STEFAN BOEDEKER, declare and state that:

1.      I am the Managing Director of the Economics and Statistics practice at Navigant Consulting ("Navigant"), a specialized independent consulting firm providing litigation, financial, healthcare, energy, and operational consulting services to government agencies, legal counsel, and large companies.  My office is located at 633 West 5th Street, 60th Floor, Los Angeles, CA 90071.  Prior to joining Navigant, I held partner level positions at Deloitte & Touche LLP, PricewaterhouseCoopers LLP, and Arthur Andersen LLP.  I was responsible for the Economics and Statistics practice at all three firms.  I also worked as a statistician for the German Government for three years before moving to the United States to attend graduate school.

2.      I am an economist and a statistician.  I received a Bachelor of Science in Statistics and a Bachelor of Arts in Business Administration from the University of Dortmund in Dortmund, Germany in 1986.  I received a Masters of Science in Statistics from the University of Dortmund in 1988 and a Masters of Arts in Economics from the University of California, San Diego in 1992.  I also finished all of the Ph.D. requirements in Economics at the University of California, San Diego except for my dissertation.  My work focuses on the application of economic, statistical, and financial models to a variety of areas, such as providing solutions to business problems, supporting complex litigation, and drafting economic impact studies.  As head of the Economics and Statistics practice at Navigant, I have performed analysis on stock return data on numerous occasions in both litigation and research contexts.  A copy of my curriculum vitae is attached as Appendix A to my Declaration.

3.      I have been retained by counsel for Defendants Oracle Corporation ("Oracle"), Lawrence J. Ellison, Jeffrey O. Henley, and Edward J. Sanderson (collectively "Defendants") to assist in analyzing: (1) Plaintiffs' methodology for identifying and segregating the claimed price

effects of Oracle's alleged misleading statements; (2) trading in Oracle securities during the proposed class period (December 14, 2000 through March 1, 2001) by putative class representatives Local 144 Nursing Home Pension Fund (now known as 1199 SEIU Greater New York Pension Fund), Drifton Finance Corporation, Robert D. Sawyer, Dzung Chu, and Ryan Kuehmichel; and (3) the prevalence of certain types of securities traders in the putative class.

4.     In preparing my Declaration, I reviewed the information set forth in Appendix B. The relevant portions of the trading records and deposition transcripts I reviewed can be found as exhibits to the Declaration of Vincent P. Schmeltz III in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

I.     **PLAINTIFFS HAVE OFFERED NO METHODOLOGY FOR IDENTIFYING, SEGREGATING, AND MEASURING THE CLAIMED PRICE EFFECTS OF ORACLE'S ALLEGED MISLEADING STATEMENTS.**

5.     Plaintiffs have at various times suggested that the fraud they allege caused Oracle's stock price to drop $2.62, "nearly $4," or "50% from its Class Period high of $35."[1] Plaintiffs, however, have not offered any methodology to identify, segregate, and measure, on a class-wide basis, any price effect of the alleged fraud. That it would even be possible to do so cannot be assumed in this case.

A.     **Oracle Stock Price Returns Mirrored Those Of The NASDAQ-100.**

6.     It is a well established principle of financial economics that any effort to identify, segregate, and measure the price effect of an alleged fraud must control for market-driven price movements unrelated to the alleged fraud. But during the proposed class period, Oracle's stock

---

[1] Revised Second Amended Complaint, ¶ 75; Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Motion for Class Certification and Corrected Memorandum in Support Thereof in Light of *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, at 5.

2

price movements generally mirrored those of the broader market as measured by the NASDAQ-100, an index of stock performance for companies similar to Oracle.

7. The NASDAQ-100 Composite Index measures the performance of the 100 largest non-financial firms (by market capitalization) listed on the NASDAQ Stock Market. The Index predominantly reflects the performance of high technology companies like Oracle. Exhibit 1 shows the daily opening and closing prices for the NASDAQ-100 Index and for Oracle stock during the four months that encompass the proposed class period.

8. During the proposed class period—from the December 14, 2000 open to the March 1, 2001 close—Oracle's stock performance roughly matched that of the NASDAQ-100 index. Oracle's stock price fell 26.9%, while the NASDAQ-100 Index fell 28.3%.

9. Indeed, within the proposed class period Oracle's stock generally followed the NASDAQ-100 as it rose and fell. At the start of the proposed class period, the NASDAQ-100 stumbled after heavily weighted component Microsoft reported an earnings shortfall.[2] But within a week, Oracle stock and the NASDAQ-100 were trading largely in tandem. From the December 19 close to the January 19 close, when Oracle's stock price peaked, Oracle's stock price rose 12.9% while the NASDAQ-100 rose 10.7%. The NASDAQ-100 peaked five days later on January 24, and from that date's close through the March 1 close Oracle's stock dropped 28.9% while the NASDAQ-100 fell 27.8%.

10. Given that Oracle's stock price largely moved in tandem with the broader market during the proposed class period, one cannot assume that Plaintiffs will be able to identify, segregate, and measure price effects of the alleged fraud on a class-wide basis.

---

[2] *See, e.g.,* "Microsoft Under $50; Shares Fall $6.31, Taking NASDAQ, Dow Down with Them" *Seattle Times,* 16 December 2000 (Appendix C, Tab 1). I have compiled this article and the other publicly-available documents cited in this declaration in Appendix C.

3

B.   **There Is No Obvious Relationship Between Oracle Stock Price Movements And The Alleged Fraud.**

11.    Another well-accepted principle of financial economics is that any effort to identify, segregate, and measure the price effect of an alleged fraud must control for price movements resulting from events unrelated to the fraud.  The need to do so in this case—and the difficulty of the task—is confirmed by examining price movements on just a few days of the proposed class period.

12.    Plaintiffs allege that on February 8, 2001, two analyst reports communicated to the public false or misleading statements made by Oracle management regarding Oracle's financial projections for the quarter ending February 28, 2001 and the effect of a general economic downturn on Oracle's results.[3]  But February 8, Oracle's stock price fell $.57 (2.0%) from the previous day close and remained essentially unchanged relative to the NASDAQ-100, which fell 2.2%.  No inflation from the alleged misstatements is apparent.

13.    Plaintiffs allege that on February 9, 2001, an Oracle spokesperson made false and misleading statements about the prospects for Oracle's earnings growth, the contribution of Suite 11i sales to that growth, and the effect of the economic slowdown on Oracle.[4]  That same day, however, an analyst published a report maintaining a "strong buy" recommendation, but opining that the demise of Oracle's dot-com customers would limit Oracle's earnings growth.[5]  Oracle's stock price fell $3.56 (13.1%) from the previous day's close.  In these circumstances, I see no easy way to confidently attribute a price impact to the alleged misstatements of February 9.

---

[3] Revised Second Amended Complaint, ¶ 65(a), (b).

[4] Revised Second Amended Complaint, ¶ 65(c).

[5] Morgan Stanley Dean Witter, "Oracle: Getting Through Q3 in Good Shape," 9 February 2001 (Appendix C, Tab 2).

4

14.     On January 3, 2001, Oracle's stock experienced its greatest one day gain of the proposed class period, when it rose $5.63 (21.3%) above the previous day's close. Plaintiffs allege no false or misleading statement on January 3. Rather than being the result of the alleged fraud, the gains are more likely attributable to an unexpected Federal Reserve interest rate cut.[6]

15.     On February 2, 2001, Oracle's stock price fell $2.31 (7.7%) from the previous day's close. Plaintiffs claim no revelation of the alleged fraud on February 2. It is unclear to what the losses might be attributable, but there is no reason to believe they are attributable to the alleged fraud.

16.     These few examples show that identifying, segregating, and measuring the price effect of the alleged fraud will require disentangling confounding information and controlling for movements in the broader market and numerous industry- and company-specific events unrelated to the fraud. There is no reason to assume that Plaintiffs will develop a methodology capable of doing so on a class-wide basis.

## II.     TRADING PRACTICES OF PUTATIVE CLASS REPRESENTATIVES

### A.     1199 SEIU Greater New York Pension Fund

17.     As deposition testimony has revealed, 1199 SEIU Greater New York Pension Fund ("1199 SEIU") conferred complete investment discretion over its funds to investment management firms.[7] During the proposed class period, one of those investment management firms, Turner Investment Partners ("Turner"), purchased Oracle stock on 1199 SEIU's behalf. Exhibit 2 shows Turner's transactions in Oracle securities on behalf of 1199 SEIU during the proposed class period.

---

[6] On the same day, the NASDAQ-100 appreciated 18.8%. Mark Lewis, "Trader Wrapup: Rate Cut Boosts Tech, Banks," *Forbes.com*, 3 January 2001 (Appendix C, Tab 3).

[7] *See* Deposition of Robert Turner, at 43-48, and Deposition of Gregg O'Keefe, at 45-46.

18.     Turner's transaction history indicates that it followed a "buy and hold" investment strategy for 1199 SEIU's assets.  The buy and hold strategy is a passive investment strategy.  Buy and hold investors generally seek to capitalize on long-term appreciation and thus ignore short-term fluctuations in either the stock market or the economy as a whole.[8]

**B.     Ryan Kuehmichel**

19.     Ryan Kuehmichel purchased Oracle stock and sold "short call options" on Oracle stock during the proposed class period.  Exhibit 3 shows Kuehmichel's transactions in Oracle securities during the class period, and related transactions.

20.     A "short call option" is a type of "derivative" security, the value of which depends on the performance of an underlying security.  A "call option" gives the holder of the option the right—but not the obligation—to buy a specified number of shares before a specified date (the "expiration date"), at a specified price (the "strike price").  When a trader sells (or "writes") a call option, he or she opens up a "short call option" position.  This is a "short position" because the person writing the call option contract can expect to gain on the transaction if the price of the underlying security *declines*.  Conversely, the holder of the option (the "optionee") can expect a gain on the transaction only if the price of the underlying security increases.  If the market price of the underlying security rises above the strike price, the optionee can exercise the option by requiring the option writer to sell the underlying security for the strike price.[9]

21.     Kuehmichel sold short call options to "hedge"—*i.e.* reduce the risk of adverse price movement in—his Oracle stock purchases and to make short-term profits from the *declining*

---

[8] *See*, generally, Frank Reilly and Keith Brown, *Investment Analysis and Portfolio Management*, Thomson South-Western, 2003, at 653-654, 809 (Appendix C, Tab 4).

[9] *See*, generally, John Hull, *Options, Futures, and Other Derivatives*, Fourth Edition, Prentice-Hall, 2000, at 5-9, 151-166 (Appendix C, Tab 5); Reilly and Brown, *Investment Analysis and Portfolio Management*, at 868-869 (Appendix C, Tab 6).

6

share price of Oracle stock.  Selling short call options earned Kuehmichel a profit of $12,063 over the proposed class period, an amount that quite possibly exceeds any losses he suffered on his Oracle stock purchases as a result of the alleged fraud.

### C.    Robert Sawyer

22.    Robert Sawyer bought and sold large quantities of Oracle stock on a near-daily basis for most of the proposed class period and on one occasion sold call options on Oracle stock. Sawyer's deposition testimony indicates that he intended to pursue a buy and hold strategy, but he frequently had to sell to satisfy or avert margin calls.[10]  Exhibit 4 lists Sawyer's transactions in Oracle securities during the proposed class period.

23.    During the proposed class period, Sawyer sold 41,600 more shares of Oracle stock than he purchased.  Any stock price inflation during the proposed class period, therefore, would almost certainly have benefited Sawyer, on balance.  Accordingly, it is highly unlikely that Sawyer suffered any injury as a result of the alleged fraud.

### D.    Dzung Chu

24.    Dzung Chu—and his wife—bought and sold Oracle stock during the proposed class period.[11]  Exhibit 5 lists the Chus' transactions in Oracle securities.

25.    Chu testified at his deposition that he and his wife followed different investment strategies in trading Oracle stock.[12]  Consistent with that testimony, the Chus' trading records

---

[10] "Margin traders" purchase securities with borrowed money.  If the shares in the margin trader's portfolio decrease in value, the investor's equity relative to borrowings similarly falls. *See,* generally, Reilly and Brown, *Investment Analysis and Portfolio Management*, at 127-130 (Appendix C, Tab 7).  A "margin call" occurs when the brokerage requires the margin trader to sell shares in order to re-balance equity and borrowings.  Margin calls can force a trader to sell shares, regardless of his belief in the fundamental value of those shares.  *See* Deposition of Robert Sawyer, at 68, 109, 138-39, 148-51.

[11] Chu and his wife, Thanhnhan Nguyen JT Ten, had a joint investment account.  *See* Deposition of Dzung Chu, at 155.

exhibit two different trading strategies: "swing trading" and "position trading." A swing trader, like a "day trader," trades securities on very short-term price momentum.  While day traders hold a stock anywhere from a few seconds to a few hours, swing traders hold stocks for several days, if necessary, to capture a gain from market movement.[13]  As is the case with day traders, swing traders often use technical analyses to identify stocks.  These traders are not interested in the fundamental value of a stock or the integrity of its market price, but rather, in the stock's short-term pricing trends and trading patterns.

26.     Like swing trading, position trading is an "active" investment strategy, involving ongoing buying and selling of stock in order to exploit near-term price momentum.  Position traders, however build positions in securities and have slightly longer investment horizons.[14]

27.     My analysis indicates that the majority of the Chus' trading in Oracle—and in other companies' stocks—exhibits swing trading characteristics.  The Chus often purchased shares on one day and sold them the next trading day.  Exhibit 6 graphs the frequency of the Chus' trades.

**E.     Drifton Finance Corporation**

28.     Drifton Finance Corporation ("Drifton") bought and sold put and call options on Oracle stock and bought Oracle stock to satisfy exercised put options during the proposed class period.  Drifton did so, it appears, pursuant to a "short strangle" option trading strategy.  Exhibit 7

---

(… cont'd)

[12] According to Chu, his wife had a habit of buying a stock one day and selling the stock the next day, *id.* at 156-57, while he preferred to hold stock in "good companies" a little longer.  *See id.* 167-69.

[13] *See* Alpesh Patel, "Have You Nerves of Steel? Then You Might Profit From Swing Trading Just as I do," *Financial Times*, 31 August 2002 (Appendix C, Tab 8).

[14] *See, generally,* David Brown and Kassandra Bentley, *All About Stock Market Strategies*, McGraw-Hill 2002, at 172 (Appendix C, Tab 9).

8

lists Drifton's transactions in Oracle securities during the class period and related transactions before and after the proposed class.

29.    I have described a "call option" above.  A "put option" follows the converse pattern—it gives the holder the right to **sell** a certain quantity of an underlying security to the writer of the option, at the strike price, up to the option's expiration date.[15]  In a "short strangle," as long as the stock price remains between the strike prices of the put and call options until expiration, neither option will be exercised and the option writer will realize his maximum profit (*i.e.*, the premium earned from the sale of both options).[16]  However, if the price of the underlying security moves above the call option strike price or below the put option strike price, the option writer stands to lose money.  In that situation, the option writer has two alternatives: (1) allow the option to be exercised (which would require the option writer to sell at a below-market price or buy at an above-market price); or (2) repurchase the option in order to prevent the optionee from exercising the rights to the underlying security.[17]

30.    Drifton wrote options (1) prior to the proposed class period with expiration dates during the proposed class period; (2) during the proposed class period with expiration dates during the proposed class period; and (3) during the proposed class period with expiration dates after the proposed class period.  If one believes plaintiffs' claim that the alleged fraud caused

---

[15] For example, if Drifton wrote a put option on Oracle common stock with a strike price of $25 per share and the Oracle share price dropped below the strike price between the purchase date and the expiration date, the optionee could require Drifton to purchase the stock from her at $25 per share.  If the Oracle share price remained above the strike price throughout the term of the option, the writer would realize a gain equal to the original option premium, provided the writer did not buy back the put option before the expiration date.  *See,* generally, Hull, *Options, Futures, and Other Derivatives,* at 5-9, 151-166 (Appendix C, Tab 5); Reilly and Brown, *Investment Analysis and Portfolio Management,* at 868-869 (Appendix C, Tab 6).

[16] *See* Deposition of Jacques Fuhrer, at 308.

[17] *See,* generally, Anthony Saliba, *The Options Workbook,* Dearborn Trade, 2001, at 107-111 (Appendix C, Tab 10).

9

Oracle's stock price to be higher than it otherwise would have been during the proposed class period, the alleged fraud potentially affected returns on each group of options.

31.     For all of the options in the first group, Oracle's stock price remained above put option strike prices and below call option strike prices.  If anything, therefore, the alleged fraud— and the alleged resulting price inflation—benefited Drifton with respect to these options by keeping Oracle's stock price above the put option strike prices.

32.     The potential impact of the alleged fraud on the options in the second group is less certain.  Before the expiration dates, Oracle's stock price fell below the strike price for some, but not all, of the put options that Drifton wrote (meaning that Drifton had to either buy back those options or allow option holders to exercise those options).  But if the inflationary price effect of the alleged fraud when Oracle's stock price fell below the strike prices was the same as or greater than when Drifton wrote the options, any losses are attributable to price movements unrelated to the alleged fraud.  And, of course, Plaintiffs have offered no view on and no method to determine whether the alleged fraud's price effect increased, decreased, or stayed the same between when Drifton wrote put options and when Oracle's stock price fell below the strike prices for those options.

33.     For the third group of options, Oracle's stock price fell below all of the put option strike prices before the expiration dates.  To the extent that this resulted from a decrease in the inflationary price effect of the alleged fraud (because of a revelation of the alleged fraud or otherwise), however, it benefited Drifton by preventing Oracle's stock price from exceeding the strike prices on call options Drifton sold during the proposed class period.  In other words, the alleged fraud would have allowed Drifton to realize gains on the call options it wrote.  Those gains must be set off against any losses on the put options Drifton wrote that resulted from the

10

alleged fraud. The net impact of the alleged fraud on the third group of Drifton option trades is thus uncertain.

34. Calculating the impact, if any, of the alleged fraud on Drifton's option and related trading would be no simple task and would be subject to dispute. One would have to first construct a but-for-the-alleged-fraud stock price for every actual stock price during the proposed class period. Next one would have to use that price to construct but-for-the-alleged-fraud option prices for every combination of strike price and expiration date that traded during the proposed class period. Then one would have to determine at what combinations of strike prices and expiration dates Drifton would have traded options in the absence of the alleged fraud, in light of the but-for stock and option prices. Finally, one would have to compare the returns of Drifton's hypothetical options trading to those of its actual trading. Plaintiffs have offered no methodology for undertaking this analysis, and there is no reason to believe they will be able to do so.

## III. THE PUTATIVE CLASS INCLUDES MANY TRADERS WHO TRADED WITHOUT REGARD FOR THE INTEGRITY OF ORACLE'S STOCK PRICE.

### A. Program Traders

35. Of the 4.1 billion publicly-available shares, approximately 2.3 billion, or 56% of the float, were held by institutional investors at the beginning of the class period.[18] Exhibit 8 shows the reported holdings of institutional investors as of September 30, 2000; December 31, 2000; and March 31, 2001. As this exhibit demonstrates, between September 30, 2000 and December 31, 2000, 479 institutions increased their holdings of Oracle stock by 169.7 million shares in total. Between December 31, 2000 and March 31, 2001, 482 institutions increased their holdings of Oracle stock by 171.5 million shares in total.

_____

[18] The float is calculated as the shares outstanding (5.58 billion), less insider holdings (1.45 billion).

11

36.     Many institutions engage in "program trading."[19]  "Program trading" refers to a trading system that uses computer programs to execute trades automatically upon the occurrence of a certain event (*e.g.*, a stock falling below a certain percentage of a portfolio).[20]  "Program traders" do not consider the underlying fundamentals of a stock—such as profit or revenue growth—when increasing or decreasing their position in a particular stock.  Instead, they make trades in order to satisfy some predetermined criteria.  Here, one of the firms that traded on behalf of 1199 SEIU (although not in the proposed class period), Congress Asset Management, exhibited the characteristics of a "program trader" when it purchased Oracle common stock in order to keep Oracle at 2.5% of 1199 SEIU's total holdings.[21]   Given the prevalence of institutions among Oracle's shareholders, it is likely that many of the transactions in Oracle stock during the class period were program trades.

**B.     Day and Swing Traders**

37.     During the class period, Oracle stock traded on high volume and with considerable volatility.  Volume averaged 49 million shares per day, and the price moved, on average, 7.6% between its high and low during each trading session.

38.     This share turnover and price volatility indicates that meaningful numbers of active, short-term traders, like the day traders and swing traders I have already discussed, traded Oracle stock during the proposed class period.  Such traders purchased and sold Oracle stock without regard for the company's fundamentals or the integrity of its stock price.  Rather, such traders purchased and sold in reliance on short-term momentum.

---

[19] *See, e.g.,* Thomson Financial, "Program Trading – A Bit of Clarity," June 2005 (Appendix C, Tab 11).

[20] *See, e.g.,* Richard A. Booth, "The Uncertain Case For Regulating Program Trading," *Columbia Business Law Review* 1, 1-17, 1994 (Appendix C, Tab 12).

[21] *See* Deposition of Gregg O'Keefe at 84-88.

12

### C. Short Sellers

39.     A "short seller" is a type of trader who sells borrowed stock at the market price. The short seller expects that the market price will decline so that she can repay the borrowed stock, or "cover the short," with stock purchased at a future, lower price.  The premise behind short selling is that the market price overstates the true value of the stock.  And the timing of covering purchases depends on the relationship of the short sale price to the market price, not whether either reflects the fundamental value of the stock.[22]

40.     Exhibit 9 is a table showing the short interest in Oracle stock (*i.e.* the number of shares shorted) as of the 15th of each month during the proposed class period.  As this exhibit demonstrates, on December 15, 2000 short interest in Oracle stock stood at 56.2 million.  Short interest fell to 48.6 million by January 15, 2001 and continued down to 32.8 million on February 15, before rising slightly to 33.8 million on March 15.  These changes in short interest demonstrate that a significant number of purchasers during the proposed class period were short sellers purchasing Oracle stock to cover shorts, especially between December 15 and February 15, when traders covered at least 23.4 million short sales.

### IV.    CONCLUSION

41.     Three conclusions emerge from the analyses presented in this report.  First, Plaintiffs have offered no methodology for identifying, segregating, and measuring the claimed price effects of Oracle's alleged misleading statements, and there is no reason to assume they will be able to do so.  Second, the putative class members pursued disparate trading strategies, some of which cast doubt on whether they relied on the integrity of market prices or suffered injuries as a result of the alleged fraud and whether their reliance or injury could be assessed on a class-wide

---

[22] *See,* generally, Reilly and Brown, *Investment Analysis and Portfolio Management*, at 126 (Appendix C, Tab 13).

13

basis. Third, the proposed class likely contains numerous traders who traded Oracle stock without regard for the integrity of market prices.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate and that this Declaration was executed on July 27, 2005 in Los Angeles, California.

/s/ Stefan Boedeker
Stefan Boedeker
Managing Director
Navigant Consulting

*Filer's Attestation: Pursuant to General Order No. 45, Section X(B), Shirish Gupta hereby attests that the signatory's concurrence in the filing of this document has been obtained.*

**DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

EXHIBIT 183

Exhibit S



Econometrics
Financial
Markets

John Y. Campbell

Copyright © 1997 by Princeton University Press
Published by Princeton University Press, 41 William Street,
Princeton, New Jersey 08540
In the United Kingdom: Princeton University Press, Chichester,
West Sussex

All Rights Reserved

**Library of Congress Cataloging-in-Publication Data**

Campbell, John Y.
        The econometrics of financial markets / John Y. Campbell, Andrew
W. Lo, A. Craig MacKinlay.
              p.   cm.
        Includes bibliographical references and index.
        ISBN 0-691-04301-9 (cloth  : alk. paper)
        1. Capital market—Econometric models.   I. Lo, Andrew W. (Andrew
Wen-Chuan).   II.  MacKinlay, Archie Craig, 1955–    .  III.  Title.
HG4523.C27   1997
332′.09414—dc20                                                                     96–27868


This book was composed in ITC New Baskerville with LaTeX by Archetype Publishing Inc.,
15 Turtle Pointe Road, Monticello, IL 61856.

Princeton University Press books are printed on acid-free paper and meet the guidelines for
permanence and durability of the Committee on Production Guidelines for Book Longevity
of the Council on Library Resources.

Second printing, with corrections, 1997

http://pup.princeton.edu

Printed in the United States of America

10   9   8   7   6

ISBN-13: 978-0-691-04301-2

ISBN-10: 0-691-04301-9

# 4

# Event-Study Analysis

Economists are frequently asked to measure the effect of an economic event on the value of a firm. On the surface this seems like a difficult task, but a measure can be constructed easily using financial market data in an event study. The usefulness of such a study comes from the fact that, given rationality in the marketplace, the effect of an event will be reflected immediately in asset prices. Thus the event's economic impact can be measured using asset prices observed over a relatively short time period. In contrast, direct measures may require many months or even years of observation.

The general applicability of the event-study methodology has led to its wide use. In the academic accounting and finance field, event-study methodology has been applied to a variety of firm-specific and economy-wide events. Some examples include mergers and acquisitions, earnings announcements, issues of new debt or equity, and announcements of macroeconomic variables such as the trade deficit.[1] However, applications in other fields are also abundant. For example, event studies are used in the field of law and economics to measure the impact on the value of a firm of a change in the regulatory environment,[2] and in legal-liability cases event studies are used to assess damages.[3] In most applications, the focus is the effect of an event on the price of a particular class of securities of the firm, most often common equity. In this chapter the methodology will be discussed in terms of common stock applications. However, the methodology can be applied to debt securities with little modification.

Event studies have a long history. Perhaps the first published study is Dolley (1933). Dolley examined the price effects of stock splits, studying nominal price changes at the time of the split. Using a sample of 95 splits

---

[1] We will further discuss the first three examples later in the chapter. McQueen and Roley (1993) provide an illustration using macroeconomic news announcements.
[2] See Schwert (1981).
[3] See Mitchell and Netter (1994).

from 1921 to 1931, he found that the price increased in 57 of the cases and the price declined in only 26 instances. There was no effect in the other 12 cases. Over the decades from the early 1930s until the late 1960s the level of sophistication of event studies increased. Myers and Bakay (1948), Barker (1956, 1957, 1958), and Ashley (1962) are examples of studies during this time period. The improvements include removing general stock market price movements and separating out confounding events. In the late 1960s seminal studies by Ball and Brown (1968) and Fama, Fisher, Jensen, and Roll (1969) introduced the methodology that is essentially still in use today. Ball and Brown considered the information content of earnings, and Fama, Fisher, Jensen, and Roll studied the effects of stock splits after removing the effects of simultaneous dividend increases.

In the years since these pioneering studies, several modifications of the basic methodology have been suggested. These modifications handle complications arising from violations of the statistical assumptions used in the early work, and they can accommodate more specific hypotheses. Brown and Warner (1980, 1985) are useful papers that discuss the practical importance of many of these modifications. The 1980 paper considers implementation issues for data sampled at a monthly interval and the 1985 paper deals with issues for daily data.

This chapter explains the econometric methodology of event studies. Section 4.1 briefly outlines the procedure for conducting an event study. Section 4.2 sets up an illustrative example of an event study. Central to any event study is the measurement of the abnormal return. Section 4.3 details the first step—measuring the normal performance—and Section 4.4 follows with the necessary tools for calculating the abnormal return, making statistical inferences about these returns, and aggregating over many event observations. In Sections 4.3 and 4.4 the discussion maintains the null hypothesis that the event has no impact on the distribution of returns. Section 4.5 discusses modifying the null hypothesis to focus only on the mean of the return distribution. Section 4.6 analyzes of the power of an event study. Section 4.7 presents a nonparametric approach to event studies which eliminates the need for parametric structure. In some cases theory provides hypotheses concerning the relation between the magnitude of the event abnormal return and firm characteristics. In Section 4.8 we consider cross-sectional regression models which are useful to investigate such hypotheses. Section 4.9 considers some further issues in event-study design and Section 4.10 concludes.

## 4.1 Outline of an Event Study

At the outset it is useful to give a brief outline of the structure of an event study. While there is no unique structure, the analysis can be viewed

as having seven steps:

1. *Event definition.* The initial task of conducting an event study is to define the event of interest and identify the period over which the security prices of the firms involved in this event will be examined—the *event window.* For example, if one is looking at the information content of an earnings announcement with daily data, the event will be the earnings announcement and the event window might be the one day of the announcement. In practice, the event window is often expanded to two days, the day of the announcement and the day after the announcement. This is done to capture the price effects of announcements which occur after the stock market closes on the announcement day. The period prior to or after the event may also be of interest and included separately in the analysis. For example, in the earnings-announcement case, the market may acquire information about the earnings prior to the actual announcement and one can investigate this possibility by examining pre-event returns.

2. *Selection criteria.* After identifying the event of interest, it is necessary to determine the selection criteria for the inclusion of a given firm in the study. The criteria may involve restrictions imposed by data availability such as listing on the NYSE or AMEX or may involve restrictions such as membership in a specific industry. At this stage it is useful to summarize some characteristics of the data sample (e.g., firm market capitalization, industry representation, distribution of events through time) and note any potential biases which may have been introduced through the sample selection.

3. *Normal and abnormal returns.* To appraise the event's impact we require a measure of the abnormal return. The abnormal return is the actual *ex post* return of the security over the event window minus the normal return of the firm over the event window. The normal return is defined as the return that would be expected if the event did not take place. For each firm $i$ and event date $\tau$ we have

$$\epsilon_{i\tau}^* = R_{i\tau} - \mathrm{E}[R_{i\tau} \mid X_\tau], \qquad (4.1.1)$$

where $\epsilon_{i\tau}^*$, $R_{i\tau}$, and $\mathrm{E}(R_{i\tau})$ are the abnormal, actual, and normal returns, respectively, for time period $t$. $X_\tau$ is the conditioning information for the normal performance model. There are two common choices for modeling the normal return—the *constant-mean-return model* where $X_\tau$ is a constant, and the *market model* where $X_\tau$ is the market return. The constant-mean-return model, as the name implies, assumes that the mean return of a given security is constant through time. The market model assumes a stable linear relation between the market return and the security return.

4. *Estimation procedure.* Once a normal performance model has been se-
   lected, the parameters of the model must be estimated using a subset
   of the data known as the *estimation window.* The most common choice,
   when feasible, is to use the period prior to the event window for the esti-
   mation window. For example, in an event study using daily data and the
   market model, the market-model parameters could be estimated over
   the 120 days prior to the event. Generally the event period itself is not
   included in the estimation period to prevent the event from influencing
   the normal performance model parameter estimates.

5. *Testing procedure.* With the parameter estimates for the normal perfor-
   mance model, the abnormal returns can be calculated. Next, we need
   to design the testing framework for the abnormal returns. Important
   considerations are defining the null hypothesis and determining the
   techniques for aggregating the abnormal returns of individual firms.

6. *Empirical results.* The presentation of the empirical results follows the
   formulation of the econometric design. In addition to presenting the
   basic empirical results, the presentation of diagnostics can be fruitful.
   Occasionally, especially in studies with a limited number of event obser-
   vations, the empirical results can be heavily influenced by one or two
   firms. Knowledge of this is important for gauging the importance of
   the results.

7. *Interpretation and conclusions.* Ideally the empirical results will lead to
   insights about the mechanisms by which the event affects security prices.
   Additional analysis may be included to distinguish between competing
   explanations.

## 4.2 An Example of an Event Study

The Financial Accounting Standards Board (FASB) and the Securities Ex-
change Commission strive to set reporting regulations so that financial state-
ments and related information releases are informative about the value of
the firm. In setting standards, the information content of the financial dis-
closures is of interest. Event studies provide an ideal tool for examining the
information content of the disclosures.

In this section we describe an example selected to illustrate the event-
study methodology. One particular type of disclosure—quarterly earnings
announcements—is considered. We investigate the information content of
quarterly earnings announcements for the thirty firms in the Dow Jones
Industrial Index over the five-year period from January 1989 to December
1993. These announcements correspond to the quarterly earnings for the
last quarter of 1988 through the third quarter of 1993. The five years of
data for thirty firms provide a total sample of 600 announcements. For

each firm and quarter, three pieces of information are compiled: the date of the announcement, the actual announced earnings, and a measure of the expected earnings. The source of the date of the announcement is Datastream, and the source of the actual earnings is Compustat.

If earnings announcements convey information to investors, one would expect the announcement impact on the market's valuation of the firm's equity to depend on the magnitude of the unexpected component of the announcement. Thus a measure of the deviation of the actual announced earnings from the market's prior expectation is required. We use the mean quarterly earnings forecast from the Institutional Brokers Estimate System (I/B/E/S) to proxy for the market's expectation of earnings. I/B/E/S compiles forecasts from analysts for a large number of companies and reports summary statistics each month. The mean forecast is taken from the last month of the quarter. For example, the mean third-quarter forecast from September 1990 is used as the measure of expected earnings for the third quarter of 1990.

In order to examine the impact of the earnings announcement on the value of the firm's equity, we assign each announcement to one of three categories: good news, no news, or bad news. We categorize each announcement using the deviation of the actual earnings from the expected earnings. If the actual exceeds expected by more than 2.5% the announcement is designated as good news, and if the actual is more than 2.5% less than expected the announcement is designated as bad news. Those announcements where the actual earnings is in the 5% range centered about the expected earnings are designated as no news. Of the 600 announcements, 189 are good news, 173 are no news, and the remaining 238 are bad news.

With the announcements categorized, the next step is to specify the sampling interval, event window, and estimation window that will be used to analyze the behavior of firms' equity returns. For this example we set the sampling interval to one day; thus daily stock returns are used. We choose a 41-day event window, comprised of 20 pre-event days, the event day, and 20 post-event days. For each announcement we use the 250-trading-day period prior to the event window as the estimation window. After we present the methodology of an event study, we use this example as an illustration.

## 4.3 Models for Measuring Normal Performance

A number of approaches are available to calculate the normal return of a given security. The approaches can be loosely grouped into two categories—statistical and economic. Models in the first category follow from statistical assumptions concerning the behavior of asset returns and do not depend on

any economic arguments. In contrast, models in the second category rely on assumptions concerning investors' behavior and are not based solely on statistical assumptions. It should, however, be noted that to use economic models in practice it is necessary to add statistical assumptions. Thus the potential advantage of economic models is not the absence of statistical assumptions, but the opportunity to calculate more precise measures of the normal return using economic restrictions.

For the statistical models, it is conventional to assume that asset returns are jointly multivariate normal and independently and identically distributed through time. Formally, we have:

*(A1) Let $\mathbf{R}_t$ be an $(N \times 1)$ vector of asset returns for calendar time period $t$. $\mathbf{R}_t$ is independently multivariate normally distributed with mean $\mu$ and covariance matrix $\Omega$ for all $t$.*

This distributional assumption is sufficient for the constant-mean-return model and the market model to be correctly specified and permits the development of exact finite-sample distributional results for the estimators and statistics. Inferences using the normal return models are robust to deviations from the assumption. Further, we can explicitly accommodate deviations using a generalized method of moments framework.

### 4.3.1 Constant-Mean-Return Model

Let $\mu_i$, the $i$th element of $\mu$, be the mean return for asset $i$. Then the constant-mean-return model is

$$R_{it} = \mu_i + \xi_{it} \tag{4.3.1}$$
$$\mathrm{E}[\xi_{it}] = 0 \qquad \mathrm{Var}[\xi_{it}] = \sigma_{\xi_i}^2,$$

where $R_{it}$, the $i$th element of $\mathbf{R}_t$, is the period-$t$ return on security $i$, $\xi_{it}$ is the disturbance term, and $\sigma_{\xi_i}^2$ is the $(i, i)$ element of $\Omega$.

Although the constant-mean-return model is perhaps the simplest model, Brown and Warner (1980, 1985) find it often yields results similar to those of more sophisticated models. This lack of sensitivity to the model choice can be attributed to the fact that the variance of the abnormal return is frequently not reduced much by choosing a more sophisticated model. When using daily data the model is typically applied to nominal returns. With monthly data the model can be applied to real returns or excess returns (the return in excess of the nominal riskfree return generally measured using the US Treasury bill) as well as nominal returns.

### 4.3.2 Market Model

The market model is a statistical model which relates the return of any given security to the return of the market portfolio. The model's linear specification follows from the assumed joint normality of asset returns.[4] For any security $i$ we have

$$R_{it} = \alpha_i + \beta_i R_{mt} + \epsilon_{it} \qquad (4.3.2)$$

$$E[\epsilon_{it}] = 0 \qquad Var[\epsilon_{it}] = \sigma^2_{\epsilon_i},$$

where $R_{it}$ and $R_{mt}$ are the period-$t$ returns on security $i$ and the market portfolio, respectively, and $\epsilon_{it}$ is the zero mean disturbance term. $\alpha_i$, $\beta_i$, and $\sigma^2_{\epsilon_i}$ are the parameters of the market model. In applications a broad-based stock index is used for the market portfolio, with the S&P500 index, the CRSP value-weighted index, and the CRSP equal-weighted index being popular choices.

The market model represents a potential improvement over the constant-mean-return model. By removing the portion of the return that is related to variation in the market's return, the variance of the abnormal return is reduced. This can lead to increased ability to detect event effects. The benefit from using the market model will depend upon the $R^2$ of the market-model regression. The higher the $R^2$, the greater is the variance reduction of the abnormal return, and the larger is the gain. See Section 4.4.4 for more discussion of this point.

### 4.3.3 Other Statistical Models

A number of other statistical models have been proposed for modeling the normal return. A general type of statistical model is the *factor model*. Factor models potentially provide the benefit of reducing the variance of the abnormal return by explaining more of the variation in the normal return. Typically the factors are portfolios of traded securities. The market model is an example of a one-factor model, but in a multifactor model one might include industry indexes in addition to the market. Sharpe (1970) and Sharpe, Alexander, and Bailey (1995) discuss index models with factors based on industry classification. Another variant of a factor model is a procedure which calculates the abnormal return by taking the difference between the actual return and a portfolio of firms of similar size, where size is measured by market value of equity. In this approach typically ten size groups are considered and the loading on the size portfolios is restricted

---

[4] The specification actually requires the asset weights in the market portfolio to remain constant. However, changes over time in the market portfolio weights are small enough that they have little effect on empirical work.

to unity.  This procedure implicitly assumes that expected return is directly related to the market value of equity.

In practice the gains from employing multifactor models for event studies are limited.  The reason for this is that the marginal explanatory power of additional factors beyond the market factor is small, and hence there is little reduction in the variance of the abnormal return.  The variance reduction will typically be greatest in cases where the sample firms have a common characteristic, for example they are all members of one industry or they are all firms concentrated in one market capitalization group.  In these cases the use of a multifactor model warrants consideration.

Sometimes limited data availability may dictate the use of a restricted model such as the *market-adjusted-return model*.  For some events it is not feasible to have a pre-event estimation period for the normal model parameters, and a market-adjusted abnormal return is used.  The market-adjusted-return model can be viewed as a restricted market model with $\alpha_i$ constrained to be 0 and $\beta_i$ constrained to be 1.  Since the model coefficients are prespecified, an estimation period is not required to obtain parameter estimates.  This model is often used to study the underpricing of initial public offerings.[5] A general recommendation is to use such restricted models only as a last resort, and to keep in mind that biases may arise if the restrictions are false.

### 4.3.4 Economic Models

Economic models restrict the parameters of statistical models to provide more constrained normal return models.  Two common economic models which provide restrictions are the Capital Asset Pricing Model (CAPM) and exact versions of the Arbitrage Pricing Theory (APT).  The CAPM, due to Sharpe (1964) and Lintner (1965b), is an equilibrium theory where the expected return of a given asset is a linear function of its covariance with the return of the market portfolio.  The APT, due to Ross (1976), is an asset pricing theory where in the absence of asymptotic arbitrage the expected return of a given asset is determined by its covariances with multiple factors.  Chapters 5 and 6 provide extensive treatments of these two theories.

The Capital Asset Pricing Model was commonly used in event studies during the 1970s.  During the last ten years, however, deviations from the CAPM have been discovered, and this casts doubt on the validity of the restrictions imposed by the CAPM on the market model.  Since these restrictions can be relaxed at little cost by using the market model, the use of the CAPM in event studies has almost ceased.

Some studies have used multifactor normal performance models motivated by the Arbitrage Pricing Theory.  The APT can be made to fit the

---

[5] See Ritter (1990) for an example.

Time Line:



$$\tau$$

*Figure 4.1. Time Line for an Event Study*

cross-section of mean returns, as shown by Fama and French (1996a) and others, so a properly chosen APT model does not impose false restrictions on mean returns. On the other hand the use of the APT complicates the implementation of an event study and has little practical advantage relative to the unrestricted market model. See, for example, Brown and Weinstein (1985). There seems to be no good reason to use an economic model rather than a statistical model in an event study.

## 4.4 Measuring and Analyzing Abnormal Returns

In this section we consider the problem of measuring and analyzing abnormal returns. We use the market model as the normal performance return model, but the analysis is virtually identical for the constant-mean-return model.

We first define some notation. We index returns in event time using $\tau$. Defining $\tau = 0$ as the event date, $\tau = T_1 + 1$ to $\tau = T_2$ represents the event window, and $\tau = T_0 + 1$ to $\tau = T_1$ constitutes the estimation window. Let $L_1 = T_1 - T_0$ and $L_2 = T_2 - T_1$ be the length of the estimation window and the event window, respectively. If the event being considered is an announcement on a given date then $T_2 = T_1 + 1$ and $L_2 = 1$. If applicable, the post-event window will be from $\tau = T_2 + 1$ to $\tau = T_3$ and its length is $L_3 = T_3 - T_2$. The timing sequence is illustrated on the time line in Figure 4.1.

We interpret the abnormal return over the event window as a measure of the impact of the event on the value of the firm (or its equity). Thus, the methodology implicitly assumes that the event is exogenous with respect to the change in market value of the security. In other words, the revision in value of the firm is caused by the event. In most cases this methodology is appropriate, but there are exceptions. There are examples where an event is triggered by the change in the market value of a security, in which case

EXHIBIT 184

Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

—————————————————————————)
IN RE ORACLE CORPORATION ) MASTER FILE NO:
SECURITIES LITIGATION ) C001-0988-MJJ
—————————————————————————)

**EXPERT REPORT OF CHRISTOPHER M. JAMES**

# Expert Report of Christopher M. James

I.      Qualifications ............................................................................................................... 1
II.     Assignment ................................................................................................................... 1
III.    Summary of Opinions .................................................................................................. 2
IV.     Oracle and the Software Industry ............................................................................... 5
        A.  Oracle's Company Background ........................................................................... 5
        B.  Oracle's Suite 11i ............................................................................................... 6
V.      Summary of Allegations .............................................................................................. 8
VI.     Assessing the Materiality of Information on Oracle's Stock Price in an Efficient Market ... 9
        A.  The Role of Information on Stock Prices in Efficient Markets ......................... 9
        B.  Measuring the Materiality of New Information Using an Event Study ......................... 10
VII.    Analysis of Market Awareness of Suite 11i Product Quality Issues ..................................... 12
VIII.   Analysis of the Materiality of Alleged False and Misleading Statements ........................... 28
IX.     Analysis of the Market's Response to Oracle's Announcement on March 1, 2001 ........... 30
        A.  The Information Content and Market Response to Oracle's March 1, 2001
            Announcement ........................................................................................................... 31
        B.  The 3QFY01 Pre-Announcement Was a Harbinger of the Deteriorating Industry
            Outlook ...................................................................................................................... 37
X.      Analysis of the Market's Response to Oracle's Announcement on March 15, 2001 .......... 45
XI.     Analysis of Allegations that Oracle Saved $1 Billion Using E-Business Suite ................. 50
XII.    Analysis of Allegations that Oracle Falsely Reported 2QFY01 Earnings and Revenue ..... 51

## I.        Qualifications

1.        I am the William H. Dial / SunBank Eminent Scholar in Finance and Economics and Professor of Finance at the University of Florida.  Prior to joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan.  I have also held positions at the Federal Reserve Bank of San Francisco, the Federal Deposit Insurance Corporation, and the Treasury Department.  My academic research has been in the areas of securities pricing, corporate finance, and financial institutions.  I have published numerous articles on the relationship between securities prices and financial and accounting information.  I served on the Board of Directors and the Advisory Board to SunTrust Bank of Florida between 1989 and 2005.  I also serve on the editorial boards of four scholarly journals including the *Journal of Financial Economics*.  I served as an associate editor of the *Journal of Finance* from 1988 through 2000 and as editor of the *Journal of Financial Intermediation* from 1988 through 1999.  I have also provided consulting services to a number of government agencies and corporate entities.  A copy of my curriculum vitae is attached as Exhibit 1.  A list of my deposition and trial testimony over the past four years is included in Exhibit 2.  I am being compensated for my time and services on an hourly basis.  I am charging my regular hourly rate of $700.

## II.       Assignment

2.        I have been asked by counsel for Oracle Corporation ("Oracle") and Lawrence J. Ellison, Jeffrey O. Henley, and Edward J. Sanderson to examine Oracle's stock price behavior, particularly during the period from December 14, 2000 to March 1, 2001 ("Class Period"); to assess the materiality of alleged false and misleading statements identified in the Revised Second

Amended Complaint dated December 9, 2002 ("Complaint") and certain Second Supplemental

Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007

("Plaintiffs' Contention Responses");[1] to determine whether or not the market attributed Oracle's

earnings miss for its third quarter of its fiscal year 2001 ending February 28, 2001 ("3QFY01")

to allegations regarding the integration and interoperability of E-Business Suite Version 11i

("Suite 11i"); to determine whether Oracle's announcements on March 1, 2001 or March 15,

2001 revealed any new information related to the product quality of Suite 11i not previously in

the total mix of information; to determine whether Oracle's 3QFY01 earnings miss was related

to the alleged disclosure of information related to Oracle's savings from its use of E-Business

Suite; to determine whether Oracle's 3QFY01 earnings miss was related to the alleged false

earnings and revenue information Oracle reported for its second quarter of fiscal year 2001

ending November 30, 2000 ("2QFY01"); and to respond to opinions offered by Plaintiffs'

expert(s).  A list of documents I have relied upon in forming my opinions is attached hereto as

Exhibit 3.  My work in this matter is ongoing.


III.    **Summary of Opinions**

3.      Below is a summary of my opinions in this matter.  The bases for each opinion

are detailed in the sections that follow.

           a.  I understand that under Plaintiffs' theory of how the 3QFY01 earnings
               miss relates to alleged Suite 11i shortcomings, potential Suite 11i
               customers knew of the alleged shortcomings and decided on that basis

---

[1] Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 is the exemplar response I use when citing paragraph numbers.  I understand that the significance of Plaintiffs' failure to identify these issues in their Complaint is a legal matter.  In addressing these unpled issues, I am expressing no opinion about the legal significance of Plaintiffs' failure to allege these issues in the Complaint.

not to purchase or to delay purchase, while financial market participants were not aware of these alleged shortcomings prior to March 1, 2001. I find that market participants, including the public press, financial analysts, industry analysts, and market analysts recognized that Oracle's "suite" strategy for competing in the enterprise software market was risky. Moreover, I find that market participants were aware that customers of Suite 11i experienced implementation-related difficulties and complained about "bugs" in Suite 11i and the number of patches needed to fix bugs or enhance functionality.

b.   The Complaint and Plaintiffs' Contention Responses allege that certain statements were false and misleading. My event study revealed no statistically significant stock price increases associated with these statements. The lack of a significant stock price increase suggests that the statements identified by Plaintiffs were not considered as new or did not alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

c.   On March 1, 2001, after the market closed, Oracle announced that it would miss financial analysts' earnings expectations for 3QFY01. On March 2, 2001 Oracle's stock price fell 21.05 percent. Oracle's stock price fell in reaction to its earnings and revenue miss for the quarter which had current and future cash flow implications. The evidence I have reviewed indicates that the market attributed Oracle's earnings miss to the impact of the economy-wide slowdown on the enterprise software sector. In my opinion, Oracle's miss provided the market with new material information about the impact of the economy on the enterprise software industry, and it was this news that caused the stock prices of Oracle and all of its industry peers to decline on March 2, 2001.

d.   The market was aware that Oracle's license revenues were concentrated in the last few days of each quarter (back-end loaded). Given this pattern of revenues, investors knew that the difference between Oracle's guidance and the realized revenue or EPS numbers was very sensitive to Oracle's ability to convert leads into sales in the last days of the quarter. Analysts commented that the impact of the economy-wide slowdown on the enterprise software sector would not have been reflected in Oracle's revenues until the last few days of the quarter, or just prior to Oracle's March 1, 2001 announcement. Analysts did not attribute the earnings miss to flaws or shortcomings in Oracle's forecasting models.

e.   Oracle was the bellwether, or leading indicator, of the enterprise software industry. Because of when Oracle's fiscal year ended, Oracle was the first firm among its industry peers to report financial results that included the critical month of February 2001, the month that ex-post showed the first evidence of the impact of the economy-wide slowdown on the enterprise software sector. Consistent with Oracle being a

bellwether of the sector, financial analysts revised their outlook for Oracle's competitors following Oracle's March 1, 2001 announcement. Moreover, up until late-February 2001, Oracle's competitors had been reporting positive earnings results. Following Oracle's earnings miss, many of its competitors experienced similar or worse earnings surprises. Furthermore, by the end of June 2001, nearly all competitors had negative earnings surprises.

f.   The evidence that I have reviewed supports the view that Oracle's earnings miss was a result of the sudden and sharp impact of the economic slowdown on the enterprise software industry. The evidence does not indicate that the market considered Oracle's 3QFY01 earnings miss to have revealed any previously undisclosed problems with Suite 11i. Like nearly all new enterprise software programs, Suite 11i had bugs, but this was widely known throughout the Class Period. Financial analysts understood that Suite 11i was a new and bold product and did not attribute the earnings miss announced on March 1, 2001 to any integration or interoperability problems with Suite 11i or to any new information regarding product quality issues about Suite 11i that was not part of the total mix of information available to market participants prior to the March 1, 2001 announcement.

g.   In my opinion, Oracle's stock price decline on March 2, 2001 was not caused by the disclosure of information related to Oracle's savings from its use of E-Business Suite. I find nothing in the March 1, 2001 or March 15, 2001 announcements that corrected any prior statements on such cost savings. I also find no mention of a billion-dollar savings in any of the financial analyst reports or public press that I have reviewed in connection with Oracle's 3QFY01 earnings miss announced on March 1, 2001 and on March 15, 2001.

h.   In my opinion, Oracle's stock price decline on March 2, 2001 was not caused by the disclosure of information related to alleged accounting errors in 2QFY01. I find no evidence supporting any argument advanced in the Complaint or Plaintiffs' Contention Responses that links the 3QFY01 miss in earnings and revenues or the stock price decline on March 2, 2001 to the alleged 2QFY01 overstatement of earnings and revenues. I also find no mention of potentially erroneous revenues reported in 2QFY01 in any of the financial analyst reports or public press that I have reviewed in connection with Oracle's 3QFY01 earnings miss announced on March 1, 2001 and on March 15, 2001. Thus, I find no evidence that the market viewed the 3QFY01 earnings miss as having anything to do with allegedly improper accounting reported in 2QFY01 results.

**IV.     Oracle and the Software Industry**

A.     *Oracle's Company Background*

4.      Prior to and during the Class Period, Oracle was a "leading supplier of software

for information management."[2]  Oracle's software products include systems software and

internet business applications software.[3]  Systems software includes database management

software and development tools that allow users "to create, retrieve and modify the various types

of data stored in a computer system."[4]  Internet business applications allow "users to access

information or use the applications through a simple Internet browser on any client computer,

and automates the performance of specific business data processing functions," including

financial management, procurement, project management, human resource management, supply

chain management, and customer relationship management.[5]

5.      During the Class Period, Oracle reported license revenues from systems software

("database revenue") and from business applications ("applications revenue").[6]  Prior to the

Class Period, in its fiscal year 2000 ("FY00"), ending May 31, 2000, Oracle reported database

revenue of $3.392 billion (79 percent of total license revenue) and applications revenue of $923

million (21 percent of total license revenue).[7]  Following the Class Period, in its fiscal year 2001

("FY01"), ending May 31, 2001, Oracle reported database revenue of $3.562 billion (78 percent

of total license revenue) and applications revenue of $1.022 billion (22 percent of total license

---

[2] Oracle 10-K for the year ending May 31, 2000 filed on August 28, 2000 ("2000 10-K").
[3] Ibid.
[4] Ibid.
[5] Ibid.
[6] Ibid.
[7] Oracle Corporation Q4 Fiscal 2001 Supplemental Analysis
(http://www.oracle.com/corporate/investor_relations/Q401AS.pdf).

revenue).  Between FY00 and FY01, database revenue grew by 5 percent and applications

revenue grew by 11 percent.[8]

B.     *Oracle's Suite 11i*

6.      During the Class Period, Oracle offered Suite 11i.[9]  Oracle described Suite 11i as

an integrated suite of Internet business applications.[10]  Suite 11i included a set of Enterprise

Resource Planning ("ERP"), Supply Chain, and Customer Relationship Management ("CRM")

software applications.[11]  On May 24, 2000, Oracle released the "entire E-Business Suite…adding

Customer Relationship Management (CRM) and Order Management components to the already

available 11i financials, human resources, manufacturing, procurement, projects and supply

chain offerings."[12]

7.      Suite 11i was "the first applications suite in the industry that [supported] all key

business functions across the extended enterprise."[13]  Certain industry experts viewed the

integration of ERP and CRM as a significant step in improving organizational efficiency.[14]  The

alternative concept was "to piece together 'best-of-breed' offerings from various vendors" of

ERP and CRM applications.[15]  This alternative was viewed by some analysts as a complex, time-

consuming, and expensive undertaking, as applications from disparate vendors often used

different platforms and file structures, and to make these programs work together required that

---

[8] Ibid.
[9] 2000 10-K.  Oracle released updates of Suite 11i during the Class Period.  Collectively, I refer to these as Suite 11i.
[10] Ibid.
[11] Ibid.
[12] "Oracle Ships 11i, Industry's First Integrated E-Business Suite," Oracle Press Release, May 24, 2000.
[13] "The Oracle(R) E-Business Suite Wins the Intelligent Enterprise Readers' Choice Award," *PR Newswire*,
November 2, 2000, 8:03 AM.  Unless specifically noted otherwise, all time stamps mentioned in this report are
Eastern Time.
[14] "Oracle's 11i Claims Territory on ERP/CRM Integration," Gartner Dataquest, October 13, 1999.
[15] BlueStone Capital, September 8, 2000.

communications between the programs be in a form that each could understand.[16]  Generally, the

trade-off, at least initially, was perceived to be that individual applications within Suite 11i may

not offer as much functionality as did the prevailing "best-of-breed" applications, but that

implementation costs would be reduced relative to implementing a comparable set of stand-alone

applications.[17]

8.      With best-of-breed applications on one end of the product spectrum and suites on

the other, Oracle positioned Suite 11i as a suite offering.  While it was not the only suite product

on the market, Oracle positioned Suite 11i as the first "integrated and comprehensive suite of e-

Business applications."[18]  Oracle claimed that "Oracle E-Business Suite 11i provides out-of-the-

box integration of e-Business applications throughout the extended enterprise from customers

and partners to suppliers."[19]  After its May 2000 release, analysts recognized Suite 11i as being

firmly positioned among suite offerings.  For example, Gartner Research reported that Oracle

"has the broadest and most tightly integrated front- to back-office offering."[20]  Analyst reports

also indicated that both customers and analysts considered Suite 11i to be integrated and

interoperable.  For example:

---

[16] "Integrated Suite vs. Best-of-Breed:  Oracle Says it Has the Answer," AMR Research, December 6, 2000 and
BlueStone Capital, September 8, 2000.

[17] I note that there was disagreement among financial analysts in terms of the cost savings from the suite concept.
For example, "Analysts acknowledge that 11i is comprehensive and well-integrated, but dismiss the notion that
competing apps are necessarily more costly and time-consuming.  'If you aren't an existing Oracle customer, it's not
clear that Oracle is offering a cheaper deal than assembling the same kind of result from various vendors' products
that tie into what you already have,' Forrester Group analyst Laurie Orlov says….  Also, analysts say, Oracle 11i
may not be more attractive for non-Oracle companies that would have to dump their back-office systems or for
existing Oracle customers who would be forced to upgrade from an older version of Oracle software." ("Oracle
Ships All-In-One E-Business Suite – But Applications May Not Necessarily Be the Answer For All Companies, "
*Information Week*, May 29, 2000)

[18] "Oracle Ships 11i, Industry's First Integrated E-Business Suite," Oracle Press Release, May 24, 2000.

[19] Ibid.

[20] "Oracle 11i CRM:  Better But Not the Best," GartnerGroup, July 10, 2000.

**Goldman Sachs:**  Customers we are talking to like integration (one data model, one programming language, one vendor for support, one upgrade cycle, less integration work, quicker implementation, etc.)[21]

**Gartner:**  Oracle is focusing its marketing on synergies given by tight integration between its front-office modules and back-office applications.  This integration is because: 1) most code has been written in-house by the same developers, 2) the functionality acquired through acquisition has been reworked by Oracle into a single schema/data model and 3) the modules use a common workflow subsystem.[22]

## V.    Summary of Allegations

9.    Plaintiffs allege that Oracle's stock price was inflated because of alleged false and misleading statements related to:  (1) the integration and interoperability of Suite 11i; (2) guidance for 3QFY01; (3) earnings and revenues reported for 2QFY01; and (4) the effect of the economy on Oracle's business.[23]  Five of the dates listed in the Complaint relate to alleged false and misleading statements concerning Suite 11i (December 14, 2000, December 15, 2000, January 8, 2001, February 6, 2001, and February 21, 2001).[24]

10.    Plaintiffs' Contention Responses add new statements alleged to be false and misleading to those mentioned in the Complaint.[25]  Specifically, the Contention Responses identify three additional dates of alleged false and misleading statements during the Class Period (January 20, 2001, January 24, 2001, and February 13, 2001) and one prior to it (December 5, 2000).[26]

---

[21] Goldman Sachs, November 3, 2000, 9:31 AM.
[22] "Oracle 11i CRM:  Better But Not the Best," GartnerGroup, July 10, 2000.
[23] Complaint ¶¶35-75.
[24] Complaint ¶¶50, 51, 58, 63, and 68.
[25] There is one statement that the Complaint alleges to be false and misleading but which the Plaintiffs' Contention Responses do not identify.  See the alleged misstatement identified in the Complaint at ¶51 (December 15, 2000).
[26] Plaintiffs' Contention Responses, p. 7, ¶1, p. 9, ¶¶8, 10, and p. 11, ¶15.

11.     In addition to identifying alleged false and misleading statements, the Complaint alleges that Oracle knew that Suite 11i was "broken"[27] and "did not work."[28]  The Complaint alleges that the market learned the truth on March 1, 2001 and alleges there was a post Class Period admission on March 15, 2001.[29]

## VI.     Assessing the Materiality of Information on Oracle's Stock Price in an Efficient Market

12.     An event study is a widely used and objective methodology to determine whether a particular statement or disclosure is associated with a significant change in the total mix of information.[30]  In this section, I explain the theoretical underpinnings and my application of an event study in the present matter.

### A.     The Role of Information on Stock Prices in Efficient Markets

13.     In an efficient market, the price of a security reflects its fundamental value, that is, the present value of its expected future cash flows discounted at the appropriate risk adjusted rate.[31]  Moreover, in an efficient market, securities prices react quickly to new information that investors view as having a material impact on the value of a firm's stock.  New information is material if it leads to a significant revision in investors' expectations about future expected cash flows or risks associated with future cash flows.

---

[27] Complaint ¶72.
[28] Complaint ¶82.
[29] Complaint ¶¶74 and 76.
[30] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill/Irwin 8th Ed., 2006, Chapter 13.  Brown, Stephen J. and Jerold B. Warner, "Using Daily Stock Returns:  The Case of Event Studies," *Journal of Financial Economics*, Volume 14, Issue 1, March 1985, pp. 3-31.  I have used event studies extensively in my own published research.
[31] Fama, Eugene F., *Foundations of Finance:  Portfolio Decisions and Securities Prices*, Basic Books, Inc. Publishers, June 1976, Chapter 5, pp. 133, 138.

14.     For information to affect stock prices in an efficient market, this information must be made available to market participants.  In the present matter, I found that financial analysts, the public press, and industry and market analysts developed independent analyses of Oracle's strategic positioning and its expected performance within the industry.  For example, during the Class Period, 31 separate financial analysts from different brokerage houses covered Oracle.[32] Oracle was mentioned in at least 3,021 articles covered by the Dow Jones News Wires, Bloomberg, and Reuters during the Class Period, a rate of almost 60 articles per trading day during the Class Period.  Oracle's products were also reviewed on multiple occasions by both industry and market analysts including AMR Research, BlueStone Capital, Forrester, Gartner Research, and Morgan Stanley.  The degree to which financial analysts, the public press, industry analysts, and market experts scrutinized Oracle suggests that any new information would have been quickly incorporated into the stock price.

B.     *Measuring the Materiality of New Information Using an Event Study*

15.     To assess the materiality of information, I reviewed the information contained in the alleged false and misleading statements and the information released on days in which Plaintiffs allege the market learned the truth in the context of the total mix of information available to the market and analyzed whether the information was material by examining the stock price response (stock return) when the information was released.  Because stock prices reflect market, industry, and company-specific information, it is necessary to extract the market- and industry-related portions of stock returns to isolate the part that may be related to new company-specific information.  Once the market and industry effects are controlled for, standard

---

[32] First Call reported 31 financial analysts or brokers in its calculation of its consensus forecasts on January 31, 2001.

statistical tests can be used to determine whether the remaining ("residual") return is significant. A significant residual return may indicate the arrival of new, material, company-specific information in the marketplace.

16.     To control for market and industry effects, the finance literature relies on a standard statistical methodology called regression analysis.  A regression allows the researcher to partition an individual stock return into three components:  (1) the part of the return associated with the movement in the market portfolio; (2) the part associated with the movement in the industry portfolio; and (3) the part not explained by either the market or industry return that may indicate the introduction of new firm-specific information.[33]

17.     Financial economists use the stock returns of a set of firms that market participants view as competitors or peers as one way to account for industry factors.  In the present matter, I identified competitors or peers of Oracle by reviewing reports covering Oracle or its industry of All-Star financial and industry analysts published from December 14, 2000 through March 2, 2001.[34]  Based on this review, I identified nine firms that All-Star financial analysts considered to be Oracle's industry competitors or peers:  Ariba, BEA Systems, Commerce One, IBM, i2 Technologies, Microsoft, PeopleSoft, SAP, and Siebel.  Using the stock prices of these firms, I constructed an equally-weighted index of stock returns, which I will refer to as the "Industry Index."

---

[33] That part not explained by the industry or market return may also reflect the impact of new market or industry information not captured by the historical covariation between these factors and the company's stock return.
[34] All-Star financial analyst reports are identified using *Institutional Investor's* All-Star financial analyst rankings for the period 1999 to 2001.

18.     Next, following the discussion outlined above I estimated a linear regression model relating Oracle's daily stock returns to daily returns of the Center for Research on Securities Prices (CRSP) market index and the Industry Index.  The CRSP market index is a value-weighted index constructed by CRSP at the University of Chicago and consists of all firms trading on the NYSE, AMEX, and NASDAQ markets.

19.     I estimated the regression model over the period from December 8, 1999 to December 8, 2000.  Using the parameter estimates from the model, I calculated Oracle's residual return on each day during the Class Period, as well as on March 2, 2001 and March 16, 2001. The event study model and the residual returns during the Class Period (including March 2, 2001 and March 16, 2001) are given in Exhibits 4 and 5.

20.     Finally, to determine whether or not a significant residual return relates to Plaintiffs' allegations, I considered the extent to which the alleged false and misleading statement or alleged corrective disclosure provided new information, if any, relative to the total mix of information available to the market, whether any additional news was released on the same day, and the extent to which the new additional information released, if any, relates to Plaintiffs' allegations.

## VII.    Analysis of Market Awareness of Suite 11i Product Quality Issues

21.     In the previous section, I described the role of information in determining Oracle's stock price in an efficient market.  I understand that one tenet of Plaintiffs' damage claims is that customers and potential customers were aware of alleged Suite 11i product quality issues.  Without awareness on the part of customers and potential customers, Suite 11i product

quality could not have contributed to the earnings miss announced on March 1, 2001 as alleged

by Plaintiffs.  However, if as Plaintiffs allege, Oracle's statements regarding Suite 11i artificially

inflated Oracle's stock price, it must also be the case that the *market* was *unaware* of alleged

product quality concerns.[35]  According to Plaintiffs, the market did not become aware of these

concerns until March 1, 2001, the day Oracle pre-announced its earnings miss for 3QFY01.[36]

22.     From this discussion, it is apparent that one must consider what information, if

any, the market had regarding potential customer concerns about Suite 11i during the Class

Period.  Because financial, industry, and market analysts (collectively referred to as analysts) had

the opportunity to interact with customers and potential customers (including at user group

meetings) and given the recent launch of Suite 11i, I would expect analysts to discuss any

significant product quality issues that were raised by customers and potential customers.

Moreover, analysts had incentives to make additional independent inquiries to learn about

customer experiences and potential customer plans regarding Suite 11i.

23.     My review of public press filings and analyst reports reveals substantial

commentary about Suite 11i on a number of dimensions prior to and throughout the Class Period.

Specifically, the public press, financial analysts, industry analysts, and market analysts (1)

recognized that Oracle's strategic decision to compete in the enterprise software market by

offering a suite of integrated back-office and front-office applications versus developing best-of-

breed applications was visionary but risky; (2) attributed in part the implementation-related

difficulties experienced by early adopters of Suite 11i to product quality problems; (3)

---

[35] Plaintiffs have articulated no theory of how potential customers could have become informed about alleged Suite 11i shortcomings without financial analysts and other stock market participants also finding out (prior to March 1, 2001).

[36] The term "pre-announcement" distinguishes Oracle's March 1, 2001 statements based on preliminary financial results from the announcement of actual financial results on March 15, 2001.

commented extensively on Suite 11i's functionality, quality, and Oracle's ability to attract referenceable customers and gain traction in the market; and (4) recognized that Suite 11i gained traction in the enterprise software market and generated significant revenues for Oracle prior to, during, and after the Class Period.  Overall my review indicates that market participants were aware of the product quality issues described in the Complaint and in Plaintiffs' Contentions Responses during the Class Period.

24.     The public press, financial analysts, industry analysts, and market analysts recognized that Oracle's strategic decision to compete in the enterprise software market by offering a suite of integrated back-office and front-office applications versus developing best-of-breed applications was visionary but risky.  In particular, the market interpreted the launch of Suite 11i ERP and CRM applications software as the culmination of at least two key strategic business decisions:  (1) the decision to compete in the enterprise software applications industry by offering a suite of products as opposed to competing with the best-of-breeds; and (2) the decision of the timing of the launch of Suite 11i.

25.     During a meeting of the Oracle Applications User Group ("OAUG") in September 1999, Oracle announced its vision of the Suite 11i applications it was developing.[37] Oracle stated that Suite 11i ERP applications would not be available until the first calendar quarter of 2000 and that its Suite 11i CRM applications would not be available until the second calendar quarter of 2000.[38]  Oracle also stated:

> **PR Newswire:**  Oracle Applications Release 11i also encompasses both Oracle's leading enterprise resource planning (ERP) and customer relationship

---

[37] "Oracle's 11i Claims Territory on ERP/CRM Integration," Gartner Dataquest, October 13, 1999.
[38] "Oracle Announces Oracle(R) Applications Release 11i," *PR Newswire*, September 27, 1999, 3:15 PM.

management (CRM) applications.  Unlike competing offerings, only Oracle Applications provides out-of-the-box integration between these application families.  This integration allows companies to manage the entire cycle from customer interactions, through order management, transaction and supply chain management, to fulfillment, billing and customer support.  Typically, users of other ERP and CRM systems must engage [in] extremely costly and lengthy implementation projects to achieve even a minimal degree of integration.  Projects such as these can often run into the millions and tens of millions of dollars.[39]

26.    As of the date of this announcement at the September 1999 OAUG meeting, Oracle's Suite 11i was not yet available to customers.  However, Oracle reported that "beta customers are responding enthusiastically to the advanced functionality and improved user interface in the upcoming Oracle Applications Release 11i."[40]  Following a subsequent OAUG meeting in April 2000, AMR Research reported that Oracle had nineteen "early adopter customers" utilizing certain Suite 11i applications in an Oracle-hosted environment.[41]

27.    Oracle released Suite 11i "six months later than its first projected release date of November 1999."[42]  On May 24, 2000, Oracle announced that it had shipped the first version of Suite 11i containing both ERP and CRM applications to customers.[43]

28.    Between September 27, 1999 and through the end of the Class Period, the public press, financial analysts, industry analysts, and market analysts commented extensively on Oracle's strategic decision to compete in the enterprise software market by offering a suite of integrated back- and front-office applications versus developing best-of-breed applications and on the product quality issues related to Suite 11i.  Exhibit 6 contains excerpts from the public press, financial analysts, industry analysts, and market experts related to Suite 11i.

---

[39] Ibid.
[40] "Oracle(R) Release 11i Wins Beta Customer Accolades," *PR Newswire*, September 27, 1999, 3:16 PM.
[41] "Oracle Users Meet and Consider Release 11i," AMR Research, May 1, 2000.
[42] "An Oracle ERP Report Card," Gartner, Inc., December 4, 2000.
[43] "Oracle Ships 11i, Industry's First Integrated E-Business Suite," Oracle Press Release, May 24, 2000.

29.     For example, following Oracle's announcement on September 27, 1999, a report by Gartner, Inc. Dataquest reported that Oracle had positioned Suite 11i as "a breakthrough in enterprise applications by offering tight ERP and CRM integration 'out of the box'."[44]  The report also stated that Oracle had never previously used the ERP/CRM integration message "as a loud, primary marketing message" and interpreted the message as a signal of Oracle's desire to be the "first to jump with both feet onto the integrated enterprise applications bandwagon."[45] The same report cautioned that while it gave Oracle the "thumbs-up for pouncing on an opportunity to present a clear message," it questioned Oracle's ability to deliver given its "somewhat less-than-sterling past performances."[46]

30.     Following the April 2000 OAUG meeting, AMR Research stated that Oracle's strategy in the applications software market was "to be the integrated suite for all your e-business needs."[47]  The same report also cautioned that Oracle's success in this strategy was not certain:

> **AMR Research:**  The reality is that this is the vision, but there are only a few vendors that have been successful at implementing it.  It is not easy to make this happen, which is why many times companies turn to the best-of-breed vendor. Users know best-of-breed vendors have the functionality they need and will be able to deliver a system that completely covers a particular business process.  As you look at the complexities of an organization today and the amount of money spent in the last few years on integration, it would seem that the world is ready for another integrated suite success story.  Oracle has the vision, the question yet to be answered is whether or not it will be able to deliver.[48]

31.     Analysts and the public press also shared concern for Oracle's ability to succeed in implementing its strategic decision to compete in the enterprise software market by offering a suite of products.  For example:

---

[44] "Oracle's 11i Claims Territory on ERP/CRM Integration," Gartner Dataquest, October 13, 1999.
[45] Ibid.
[46] Ibid.
[47] "Integrated Suite vs. Best-of-Breed:  Oracle Says It Has the Answer," AMR Research, December 6, 2000.
[48] Ibid.

**Morgan Stanley:**  Based on history, suites win if they provide 70% of the functionality of the best of breed products in each segment.  That's a big "if" and the suite has to evolve at a pace competitive with the overall market.  The suites need to lead one or two product segments to have a beachhead into accounts. After that, the high cost of integration, volume pricing, common support, and a desire for consistent technology standards generally pushes buyers toward the suite if it starts to approach functional parity with the rest of the market.[49]

**Morgan Stanley:**  Oracle 11i is a new suite that combines the functionality of financials, HR and CRM with exchange infrastructure software.  Rather than going head-to-head with the competition on a feature list, Oracle is pitching the ease of implementation and time-to-market advantages of this suite.  This may be a winning strategy if the obstacles to integrating point products are significant. No other company is taking this all-in-one approach and the barriers to entry are extremely high given the complexity of the software.[50]

**Computer Dealer News:**  According to one analyst, however, expecting global companies to move all their corporate information into one or two databases is unrealistic.

"Most global firms are built up through mergers and acquisitions. And in that sort of scenario, the type of data consolidation Oracle is propounding seems like a pipe dream," said Josh Greenbaum, a principal with Enterprise Application Consulting in [Berkeley], Calif.[51]

**Deutsche Banc:**  While its broad footprint and out-of-the-box integration are the keys to its positioning and message, we caution that some 11i modules still may fall short on functionality compared with best-of-breed rivals.  This could prove challenging in head-to-head competition.[52]

32.     In addition to recognizing that Oracle's new strategy would face competition from best-of-breed vendors, financial analysts also commented on other challenges that Oracle would encounter as a result of its strategic decision to compete in the enterprise software marketplace with a suite-based product.  For example, one financial analyst commented that the Suite 11i product launch faced significant execution risk as it would require Oracle to address concerns

---

[49] Morgan Stanley Dean Witter, May 12, 2000, 1:20 PM.
[50] Morgan Stanley Dean Witter, June 21, 2000.
[51] "E-Business Suite Mixes CRM, ERP," *Computer Dealer News*, Vol. 16, Issue 14, July 14, 2000.
[52] Deutsche Banc Alex. Brown, September 15, 2000, 6:03 AM.

"unique" to the enterprise business software market.[53]  The financial analyst went on to express

concern over (1) Oracle's ability to train its sales force for the unique challenges faced in selling

to the CEO and CFO as opposed to the IT professional; (2) Oracle's ability to develop

referenceable customers in order to drive sales force momentum; and (3) Oracle's ability to

deepen product functionality in order for the benefits of the suite concept to outweigh the

advantages of the best-of-breed approach.[54]

33.     Prior to and throughout the Class Period, the public press, financial analysts,

industry analysts, and market analysts reported on product quality issues related to Suite 11i and

their impact on the customer.  Published reports included statements regarding the number of

bugs found in various Suite 11i applications, the number of Suite 11i patches Oracle issued,

Suite 11i's stability, the degree of functionality of various Suite 11i applications compared to

best-of-breed applications, and the degree of difficulty customers experienced in implementing

and integrating Suite 11i applications into their businesses.

34.     For example, as early as the October 2000 OAUG meeting, customers commented

on the fact that the initial versions of Suite 11i required "a large number of patches," were

"buggy," and suffered "major problems."[55]  Customers also recounted the challenges they faced

in the upgrade process and what they perceived as a lack of support from Oracle during this

process.[56]  Many of these sentiments were repeated in an article published by *Computerworld* on

October 30, 2000 which also quoted an OAUG board member as saying the software "is not

---

[53] Robertson Stephens, November 8, 2000, 1:40 PM.
[54] Ibid.
[55] Transcript of October 24, 2000 OAUG Fall Conference Q&A Session.
[56] Ibid.

ready for prime time."[57]  This article also reported that "[s]everal attendees said Oracle has

released about 5,000 patches that for [*sic*] 11i."[58]  Notwithstanding these comments, the article

stated that "[n]ot all user experiences have been negative.  The new installations seem to be

going more smoothly than the upgrades, said observers."[59]

35.    Prior to the end of the Class Period, the total mix of information included several

additional discussions of the functionality and quality of Suite 11i.  For example:

> **Gartner:**  Challenges:  [Suite 11i] does not have the deepest functions and has
> few references.  Despite significant improvements on CRM 3i, Oracle cannot
> claim to have the deepest functionality in any of its modules when compared with
> the best-of-breed vendors….  It is unlikely that Oracle will provide leading-edge
> functions within the next five years due to the slow speed of large-scale
> development….[60]

> **Deutsche Banc:**  While its broad footprint and out-of-the-box integration are the
> keys to its positioning and message, we caution that some 11i modules still may
> fall short on functionality compared with best-of-breed rivals. This could prove
> challenging in head-to-head competition.[61]

> **Paine Webber:**  And we've seen some anecdotal evidence of customers that
> could not see demonstrations of certain modules of the suite because of various
> reasons, such as that module had not yet been ported to a particular OS or simply
> because of bug fixes – not unusual occurrences in the introduction of a new
> software product….[62]

> **ZDWire:**  The company is going to wait until early next year before proceeding
> with the full installation of the 11i applications.  Having heard of other sites'
> implementation problems, such as multiple software patches and long processing
> times, Gordon opted to wait for the new package to work out the kinks.

> "It just makes sense to wait until it comes out," Gordon said. "It's common
> business sense to let others make the mistakes. Any new product is going to have
> its sets of glitches."

---

[57] "Users Vent Frustration over Oracle CRM/ERP Upgrades," *Computerworld*, October 30, 2000.
[58] Ibid.
[59] Ibid.
[60] "Oracle 11i CRM:  Better But Not the Best," GartnerGroup, July 10, 2000.
[61] Deutsche Banc Alex. Brown, September 15, 2000, 6:03 AM.
[62] Paine Webber, September 15, 2000.

…
Alliance Coal LLC, a mining company based in Tulsa, Okla., has also heard implementation horror stories and is waiting as long as it can to install 11i.  An Oracle shop since 1997 and among the first to use Oracle's payroll application, Alliance runs Version 10.7 of the application.

Geoff Goolsbay, ITS manager for application services at Alliance, said he would like to wait until the 11i suite stabilizes but is being pressed into installing it early next year.  The company uses the Oracle Payroll application, and Oracle has told Goolsbay there will be no end-of-year patches for the product next year.  That means Alliance must upgrade to 11i by December of next year, or it will be unable to produce such documents as W-2 tax forms.  That also means two major upgrades:  first to Version 11, then 11i.

"Oracle publishes a 10.7-to-11 change document, and an 11-to-11i change document, but what they don't give you is a 10.7-to-11i document.  That is amazing to me," Goolsbay said.[63]

**Goldman Sachs:**  First, we would like to address the substantive issues, putting Release 11i issues in perspective.  We believe the release was buggy, but consistent with other major new releases.  Oracle needs more reference accounts to help sell it, but there do not appear to be any 'show-stopper' issues surfacing at this point in our checkings.…

…We believe many customers will be influenced as more reference sites report back that the product works as advertised and bugs reports appear to be addressed by the minor new releases.[64]

**Business Wire:**  Quality was among the key issues voiced by participants.  Questions were posed about the testing process, as well as how regional problems were reported to Redwood Shores.…[65]

**Gartner:**  A primary source of Oracle's struggle to deploy r.11i has been product quality problems that appear worse than its competitors', because of Oracle's release deployment strategy....[66]

**Reuters:**  We believe Oracle's 11i e-business suite continues to have bugs, thereby limiting the number of notable customer references for the new product.[67]

**Bloomberg:**  Recently, Oracle rolled out software for managing sales and customer service operations; the software didn't work as well as the company

---

[63] "Oracle," eWeek from *ZDWire*, Vol. 1740, October 1, 2000.
[64] Goldman Sachs, November 3, 2000, 9:31 AM.
[65] "OAUG Offers Asia/Pacific Users Chance to Ask Oracle," *Business Wire*, November 15, 2000, 11:03 AM.
[66] "An Oracle ERP Report Card," Gartner, Inc., December 4, 2000.
[67] "USA:  Oracle Expected to Post Solid Q2 Results Thursday," *Reuters News*, December 12, 2000.

promised, said Rod Johnson, an analyst at AMR Research Inc. in Boston.  "They brought the product to market too soon," he said.  "There are significant quality issues."[68]

**Computerworld:**  OAUG users have been clamoring for support when upgrading to Oracle's new E-Business Suite 11i software from previous versions.

Rosentrater said that until her company can get 11i up and running safely, she "cannot reap the benefits of the 'new world' of e-business" that Oracle plans to showcase at AppsWorld.[69]

**Deutsche Banc:**  A few shortfalls of the 11i suite as noted by another Big Five consultant.  The first release of 11i was somewhat unstable with a large number of code patches required. 11i is now in release 3 (shipped at the end of January).  Also, a trade-off of purchasing a full suite is reduced leverage in price negotiations from engaging fewer vendors than in a comparable best-of-breed bake-off.[70]

**Punk, Ziegel:**  Another interesting observation that we have made has to do with the mixed perceptions of Applications 11i.  The Applications 11i suite was officially released several months ago, but software bugs hampered its adoption…. While we have not been able to check with all 180 of the live customers, we have spoken to four of them.  Of these four, three were integrator partners and one was a division of a large company.  All of these customers had severe difficulties with their implementations.  In fact, one of them was implementing 30 seats in one office on a Sun Solaris platform and they found Oracle's advice to be incorrect and had to work around the "fixes" that Oracle provided directly.  While this was the worst report, in our opinion, it gives us some cause for concern, especially where the Company is guiding analysts to 60-plus percent license revenue growth rates for the next few quarters.  However, to be fair, we did talk to a number of customers who are currently implementing the software and were making satisfactory progress by their own accounts.  On balance, the best we can say is that we are getting mixed signals on Applications 11i, which gives us another cause for caution.[71]

**CIBC:**  It appears that existing Oracle 10.7 customers are delaying their upgrade to 11i for two reasons:  1) the migration from 10.7 to 11i is a huge implementations effort and 2) the current version of 11i is noted to have many bugs (close to 5,000)....[72]

---

[68] "PeopleSoft CEO's Discipline Spurs Rebound at Software Maker," *Bloomberg News*, December 26, 2000, 9:55 AM.

[69] "Expectations Divided on Oracle's AppsWorld," *Computerworld*, February 19, 2001.

[70] Deutsche Banc Alex. Brown, February 21, 2001, 6:04 AM.

[71] Punk, Ziegel & Co., February 21, 2001, 8:56 AM.

[72] CIBC World Markets Corp., February 23, 2001, 7:36 AM.

**U.S. Bancorp:** …[D]iscussions with customers and partners also highlighted the fact that product bugs and execution challenges remain, which will need to be overcome in order for Oracle to become an applications leader....[73]

**AMR Research:** Oracle's application history has been checkered at best. The company has a legacy of shipping software to early adopters and relying on them to shed the blood, sweat, and tears necessary to debug the system and make it reliable. Examples of this can be found in each of Oracle's major application releases. For instance, Oracle 11i was rushed to the market much later than promised, with many gaps and bugs in the code. Newer applications, namely the SCP and CRM modules and the rewritten order-entry functions now encompassing greater functional scope and called order management, also exhibited poor quality.

…

After a 10-month struggle to get the application suite stable, Oracle is finally delivering a product that can be used as the backbone. With more than 180 customers now live on the e-business suite and 2,500 ongoing implementations, Oracle clearly has sold its customers on the belief that it will indeed get it right. Now the real work begins.

…

Customers must be aware that parts of the application suite are initial releases and come with all of the expected functional gaps and implementation issues….[74]

**SG Cowen:** Even though Oracle developers have made some progress since the initial release of 11i, our channel checks suggest that gaps continue to exist in CRM, and that the software is very difficult to integrate, even with other Oracle applications. Additionally, we have heard from numerous sources that certain modules are noticeably slow and riddled with error messages.…[75]

36.     The fact that the market was aware of the product quality concerns expressed by customers is not surprising given the role that information providers like financial analysts play in efficient markets. According to *Institutional Investor*, investors value industry knowledge above all other attributes of a financial analyst:

**Institutional Investor:** If an analyst doesn't know his stuff, who cares if he's readily accessible? For the fourth year running, major institutions rate industry knowledge as the single most important attribute of an equity analyst.[76]

---

[73] U.S. Bancorp Piper Jaffray, February 23, 2001, 7:56 AM.
[74] "Alert on Enterprise Management," AMR Research, February 27, 2001.
[75] SG Cowen Securities Inc., February 28, 2001.
[76] "The All-America Research Team: The Best Analysts of the Year," *Institutional Investor*, October 2001.

37.     Consistent with this idea, lead financial analysts following Oracle during the

Class Period visited trade shows.[77]  Financial analysts commented on feedback received from

customers and potential customers at OAUG meetings.  For example:

> **Computerworld:**  During sessions at the Oracle Applications Users Group
> (OAUG) conference here, attendees complained about a lack of reliable
> information about the status of the applications, a flurry of bug-fix patches,
> malfunctioning modules and the difficulty in getting help from Oracle Corp.'s
> customer service organization.  Several attendees said Oracle has released about
> 5,000 patches that for [*sic*] 11i.[78]

> **Computerworld:**  Expectations Divided on Oracle's AppsWorld
> …
> But if Oracle's European AppsWorld, held last week in Paris, is any indication,
> the show won't get high marks from Beth Barling, an analyst at AMR Research
> Inc. in Boston.
> …
> OAUG users have been clamoring for support when upgrading to Oracle's new E-
> Business Suite 11i software from previous versions.[79]

> **U.S. Bancorp:**  …[D]iscussions with customers and partners also highlighted the
> fact that product bugs and execution challenges remain, which will need to be
> overcome in order for Oracle to become an applications leader….

> …During the conference we heard complaints from customers regarding previous
> releases.  While the product will never be perfect, if there is not a highly satisfied
> group of early 11i reference customers, Oracle's momentum could be stopped in
> its tracks.[80]

38.     Financial analysts covering enterprise software companies also contacted

customers in order to better understand the companies they followed.[81]  Financial analysts

performed their own due diligence by contacting Suite 11i customers in order to better

---

[77] Ibid.
[78] "Users Vent Frustration over Oracle CRM/ERP Upgrades," *Computerworld*, October 30, 2000.
[79] "Expectations Divided on Oracle's AppsWorld," *Computerworld*, February 19, 2001.
[80] U.S. Bancorp Piper Jaffray, February 23, 2001, 7:56 AM.
[81] Ibid.

understand the degree of customer satisfaction with the product and thus the extent to which

Suite 11i was gaining traction.  For example:

> **Paine Webber:**  And we've seen some anecdotal evidence of customers that could not see demonstrations of certain modules of the suite because of various reasons, such as that module had not yet been ported to a particular OS or simply because of bug fixes – not unusual occurrences in the introduction of a new software product....[82]

> **Needham:**  Conversations with several (e.g.- dozens) of potential and current users of Oracle 11i [indicate] to us that time to market considerations have been an important selling point for 11i....[83]

> **Goldman Sachs:**  We have been checking with users and will not be done for another week or so, but on a preliminary basis it appears to us that there are no 'show stopper' issues.  The number of live sites is now reported to be 43, up from 27 at the analyst meeting a month ago.  We believe there are about 300 new customers and installed base users upgrading to Release 11i now.  There have been a lot of bugs reported, an issue raised at the recent user group meeting, but this does not appear to be different from other major releases of Oracle software.[84]

> **William Blair:**  Our field checks support this view.  We have spoken to representatives from the Big Five consulting firms who echo the view that Oracle's applications business is gaining momentum.  Specifically, they are seeing Oracle in the running for almost every big enterprise resource planning (ERP) deal, whereas in the past they saw only SAP (SAP $37.50) in the queue for every large deal -- Oracle is gaining share from SAP.  Interestingly, they also have seen some customers choose to put in Oracle and remove their SAP and Baan installations.  As for newer applications, the consulting firms have commented quite favorably on Oracle's e-procurement and field service applications.  On the subject of the stability of 11i, they say that the release is no more "buggy" than any other major product introduction (except for the order management module, which apparently has more bugs).[85]

> **CIBC:**  Our discussions with systems integrators indicated that customer[s] are delaying the upgrade from 10.7 to 11i, due to the scale of the conversion as well as the instability of early releases of 11i.  The company released a new version of

---

[82] Paine Webber, September 15, 2000.
[83] Needham & Co., September 15, 2000, 9:31 AM.
[84] Goldman Sachs, November 3, 2000, 9:31 AM.
[85] William Blair & Co., December 15, 2000.

the product, which addresses the stability issue.  However, we believe this to be a near-term risk in its application sales.[86]

**SG Cowen:**  Even though Oracle developers have made some progress since the initial release of 11i, our channel checks suggest that gaps continue to exist in CRM, and that the software is very difficult to integrate, even with other Oracle applications.  Additionally, we have heard from numerous sources that certain modules are noticeably slow and riddled with error messages.…[87]

39.     Because of the level of their understanding of the enterprise software market and Oracle's strategic position within this market, financial analysts also recognized and commented on the specific challenges that enterprise software companies like Oracle would face in an economic downturn.  Given that choosing Suite 11i might involve a substantial and discretionary outlay of money, some financial analysts viewed Oracle's applications business as very sensitive to the economy and its impact on the enterprise software sector.  For example:

**Dain Rauscher:**  Oracle's results reflect the continuing slowdown in IT spending and reflect the "buy only what you absolutely need now" mentality.  We believe that Oracle's Suite selling strategy fared poorly in this environment, since the Suite's high cost probably appeals more to a high IT spending environment.[88]

40.     Notwithstanding the concerns about Suite 11i that were known to the market prior to and during the Class Period, the market was also aware of favorable information about Suite 11i.  For example:

**PR Newswire:**  Oracle Corp.  (Nasdaq: ORCL), the largest provider of software for e-business, today announced that the Oracle(R) E-Business Suite has swept the 2000 Intelligent Enterprise Readers' Choice Awards.  Oracle received top honors from Intelligent Enterprise readers in the categories of CRM, ERP/Packaged Corporate Application and Supply Chain Management.  This year's awards marks Oracle's third consecutive and affirms Oracle's position as the leading provider of software for e-business.

---

[86] CIBC World Markets Corp., February 23, 2001, 7:36 AM.
[87] SG Cowen Securities, Inc., February 28, 2001.
[88] Dain Rauscher Wessels, March 2, 2001 (analyst report on BEA Systems).

"The clean sweep for the Oracle E-Business Suite in Intelligent Enterprise's prestigious Readers' Choice Award is a clear indicator that the market is looking for a complete suite of integrated applications," said Jeremy Burton, senior vice president, product and services marketing, Oracle.  "Only Oracle delivers a true e-business suite, and we are proud to be recognized for this unique and powerful offering by Intelligent Enterprise readers."[89]

**PR Newswire:**  Oracle Corp.  (Nasdaq: ORCL), the largest provider of software for e-business, has been awarded the "ERP Software Product of the Year" at the Data News Awards for Excellence, a top event in the information technology (IT) industry in Belgium.  Data News readers overwhelmingly recognized Oracle as the best enterprise resource platform (ERP) platform over both SAP and PeopleSoft.  The selection criteria was based on product innovation and the product vendor's ability to execute on its vision.  Oracle's(R) E-Business Suite 11i provides out-of-the-box integration of applications that allow e-businesses to easily connect with their customers, partners, and suppliers.  Companies can completely automate their enterprise, from marketing and Web selling, all the way through to procurement and the Internet supply chain.[90]

**PR Newswire:**  Oracle has been awarded the Info Exame Award for "The Product of the Year" in the application software category.  The Oracle(R) E-Business Suite was selected for its fully integrated suite of front-and back-end office applications. Info Exame is the largest IT publication in Brazil, and the Info Exame 2000 awards honors the top companies and products in 65 categories, including hardware, software, communications and the Internet, for their innovation in the age of the Internet.[91]

41.     Suite 11i also gained traction in the market.  The public press, financial analysts,

industry analysts, and market analysts commented on these gains.  For example:

**Salomon Smith Barney:**  However, over the past 6 months, the market is becoming slightly more competitive as offerings from Oracle (as part of its 11i suite), Clarify (FrontOffice version 9.0 was released in 2Q00 and a new release is scheduled for 4Q00) and Vantive (version 8.0 was released in 3Q00) are attempting to increase their traction in the market. As of 3Q00, Siebel commented

---

[89] "The Oracle E-Business Suite Wins the Intelligent Enterprise Readers' Choice Award," *PR Newswire*, November 2, 2000, 8:03 AM.
[90] "Oracle Outshines SAP and PeopleSoft in Data News Awards for Excellence 2000," *PR Newswire*, November 28, 2000, 11:51 AM.
[91] "Oracle Receives Info Exame 2000 Award for 'Product of the Year'," *PR Newswire*, December 27, 2000, 9:00 AM.

that it saw Clarify and Vantive in approximately 5% of deals, Oracle in 6% of its deals, and SAP in approximately 4% of its deals.[92]

**HSBC:**  Oracle sees no slowing in its business as its product cycle gets better (11i applications suite is finding acceptance in the market, also in the very high end of the market).[93]

**Deutsche Banc:**  Applications 11i Gaining Momentum.  Oracle's new 11i e-business suite appears to be gaining significant traction.  83 11i customers are live with roughly 100 in late-stage implementation.  We learned of several large (8-figure), marquee customer wins in the quarter including JDS Uniphase, Compaq, Sun Microsystems, and Agilent Technologies.[94]

**Banc of America:**  E-Business Suite 11i gaining traction.  Oracle's E-Business Suite 11i has established a foothold in the enterprise market....  In addition, 11i seems to now be reaching a critical mass of reference customers....[95]

42.     At the start of the Class Period, the fact that Suite 11i had had two quarters of significant sales since its introduction on May 19, 2000 was also part of the total mix of information regarding Suite 11i.  For example, the market knew that for its first quarter of fiscal year 2001 (1QFY01), ending on August 31, 2000, Oracle's applications revenue was $156 million, a 42 percent increase from the same quarter a year prior (1QFY00).[96]  Similarly, the market knew that for 2QFY01 (the quarter ending November 30, 2000), Oracle's applications revenue was $279 million, a 66 percent increase from the same quarter a year prior (2QFY00).[97]  Analysts commented directly on these gains in their reports.  For example:

**Lehman Bros.:**  Application license revenue, however, surprised to the upside, posting 66% year-over-year growth to $279 million, surpassing our 60% modeled

---

[92] Salomon Smith Barney, December 14, 2000 (analyst report on Seibel).

[93] HSBC Global Research, December 15, 2000 (analyst report on SAP).

[94] Deutsche Banc Alex. Brown, December 14, 2000.

[95] Banc of America Securities, December 15, 2000.

[96] "Oracle Reports Net Income Up 111%, Earnings Per Share $0.17," Oracle Press Release, September 14, 2000, 11:19 AM.

[97] "Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19%," Oracle Press Release, December 14, 2000, 1:00 AM.

growth estimate while conquering the market skepticism about the merits of 11i….[98]

**Deutsche Banc:**  A key part of Oracle's strong F2Q was the strength of the applications business and, more importantly, marquee customer wins with the new 11i e-business suite.  Applications license growth of 66% solidly outpaced Street expectations in the 50-60% range.  The out performance should also allay concerns about the viability of Oracle's applications business and the relative immaturity of release 11i following last quarter's decent, but slightly disappointing 42% growth….[99]

**Salomon Smith Barney:**  Applications revenue exceeded our estimate of $258 million as a result of traction in the applications business occurring sooner than expected.[100]

## VIII.   Analysis of the Materiality of Alleged False and Misleading Statements

43.     Plaintiffs identify a number of dates on which they allege that Oracle made false and misleading statements.  I have analyzed Oracle's stock returns on these dates (as well as the stock prices of Oracle's industry peers) and find no statistically significant positive stock returns associated with the alleged false and misleading statements identified by Plaintiffs.  The lack of any statistically significant positive price movement indicates that the alleged misstatements did not significantly change the total mix of information and thus the market did not consider these statements to be material as alleged by Plaintiffs.

44.     The Complaint alleges that Oracle made false and misleading statements on approximately eleven separate dates.  These statements and other news released on these days are provided in Exhibit 7.  Five of the dates listed in the Complaint relate to alleged false and

---

[98] Lehman Brothers, December 15, 2000.
[99] Deutsche Banc Alex. Brown, December 15, 2000.
[100] Salomon Smith Barney, December 15, 2000.

misleading statements concerning Suite 11i (December 14, 2000, December 15, 2000, January 8, 2001, February 6, 2001, and February 21, 2001).[101]

45.     If, as the Complaint alleges, these statements were new and had a material impact on how investors valued Oracle, I would expect there to be positive and statistically significant stock returns on the days the statements were made.  My event study reveals no statistically significant positive stock return on any of the eleven dates listed in the Complaint.  The lack of any statistically significant positive price movement indicates that the alleged misstatements did not significantly change the total mix of information and thus the market did not consider these statements to be material as alleged by Plaintiffs.[102]

46.     In Plaintiffs' Contention Responses, Plaintiffs identify three additional dates during the Class Period on which they allege Oracle made false and misleading statements: January 20, 2001, January 24, 2001, and February 13, 2001.  Exhibit 7 also addresses these dates.  My event study reveals no statistically significant positive stock return on two of these three dates.  The February 13, 2001 statement is coincident with a positive and statistically significant residual return on February 14, 2001.  However, as I discuss in Exhibit 7, other news is more plausibly the cause of the positive return.  The observed returns and the information entering the market suggest that the alleged false and misleading statements identified in Plaintiffs' Contention Responses were not considered as new or did not significantly alter the

---

[101] Complaint ¶¶50, 51, 58, 63, and 68.
[102] I evaluated other news occurring on those dates to determine whether the alleged inflationary statements might have been made contemporaneously with offsetting bad news.

total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.[103]

## IX.    Analysis of the Market's Response to Oracle's Announcement on March 1, 2001

47.    As stated previously, Plaintiffs allege that Oracle's stock price was inflated due to the alleged false and misleading statements identified in the Complaint and Plaintiffs' Contention Responses.[104]  Oracle's stock price fell on March 2, 2001 in reaction to Oracle's 3QFY01 earnings and revenue miss, which had current and future cash flow implications.  The evidence I have reviewed indicates that investors attributed Oracle's earnings miss to a sudden and sharp slowdown in the economic conditions facing enterprise software firms.  In my opinion, Oracle's miss provided the market with new material information about the economic conditions facing enterprise software firms, and it was news about the economic conditions that caused the stock prices of Oracle and all of its industry peers to decline on March 2, 2001.  My analysis also reveals that Oracle was considered the bellwether, or leading indicator, of the enterprise software industry by the market.  Because of when Oracle's fiscal year ended, Oracle was the first firm among its peers to report financial results that included the critical month of February 2001, the month that Oracle said it witnessed a reduction in its conversion rate relative to historical rates and that marked the beginning of a series of disappointing financial results and subsequent stock price declines across Oracle and its peer firms.  I find no evidence that Oracle's announcement on March 1, 2001 revealed to the market any new information on the integration or interoperability of Suite 11i as alleged by Plaintiffs.  Moreover, financial analysts did not

---

[103] I evaluated other news occurring on those dates to determine whether the alleged inflationary statements might have been made contemporaneously with offsetting bad news.

[104] Complaint ¶¶35-75 and Plaintiffs' Contention Responses ¶¶2-24.

attribute the earnings miss announced on March 1, 2001 to any integration or interoperability problems or to any product quality problems with Suite 11i that were not already part of the total mix of information during the Class Period.

A.    *The Information Content and Market Response to Oracle's March 1, 2001 Announcement*

48.    On March 1, 2001, the day after its quarter ended, Oracle announced (after the market had closed) preliminary results for its 3QFY01, the quarter ending February 28, 2001. According to its press release, Oracle reported preliminary EPS of $0.10 for 3QFY01.[105]  Oracle also reported that license revenue grew at approximately 6 percent with applications revenue growth estimated at approximately 50 percent and database revenue growth estimated to be flat to slightly negative.  Prior to the announcement, Oracle had stated guidance ("3QFY01 guidance") for license revenue growth of 25 percent, applications revenue growth of 75 percent, database revenue growth of 15 percent, and EPS of $0.12.[106]

49.    Following this announcement, Oracle's stock price fell by 21.05 percent on March 2, 2001.  The residual return was –16.76 percent, as shown in Exhibit 5.  This residual return is statistically significant and is consistent with Oracle's announcement on March 1, 2001 being material to the market.  While the results were disappointing relative to market expectations, Oracle's revenues increased 9 percent and operating income increased 20 percent.[107]  As one financial analyst commented on March 2, 2001:

---

[105] "Oracle Announces Preliminary Third Quarter Earnings Results," Oracle Press Release, March 1, 2001, 6:00 AM.

[106] Oracle's 2QFY01 Conference Call Transcript, December 14, 2000, 5:30 PM

[107] Oracle's 3QFY01 Conference Call Transcript, March 1, 2001, 5:30 PM and  "Oracle Announces Preliminary Third Quarter Earnings Results," *PR Newswire*, March 1, 2001, 4:55 PM.

> **Morgan Stanley:**  It's a miss but not a financial disaster:
>
> - Oracle made $900 million in operating profits in the quarter.  This is a real business.
>
> - Revenue of $2.67 billion was 5% below our $2.75 billion estimate – not 25% below like some other pre-announcements.
>
> - The company booked $1.1 billion in license revenue instead of our $1.2 billion estimate – so most deals closed.[108]

50.     Oracle attributed the disappointments in EPS and the rate of growth in revenue relative to previous guidance to an unexpected decline in the conversion rate at the end of the quarter resulting from a downturn in the economic outlook for the enterprise software industry. The company reported that several of the deals that failed to convert were with telecommunication companies and dot-com companies, but that across the board companies were reluctant to close deals as the quarter ended.[109]  Oracle said that deals close to being signed were pushed off by high-level executives at customer firms.  Those executives decided to delay their IT spending due to their growing concerns over an impending slowdown in the U.S. economy.

> **PR Newswire:**  [A] substantial number of our customers decided to delay their IT spending based on the economic slowdown in the United States….[110]
>
> **Oracle's 3QFY01 Conference Call Transcript:**  And really what happened is all -- a bunch of deals were already approved at the mid-high level, you know, at the Vice President or Senior Vice President level.  Once it got up to the CFO, CEO level they were pushed off.[111]

51.     Several financial analysts reporting on Oracle also attributed the miss to an industry-wide downturn in the demand for enterprise software.  For example:

---

[108] Morgan Stanley Dean Witter, March 2, 2001, 8:19 AM.
[109] Oracle's 3QFY01 Conference Call Transcript, March 1, 2001, 5:30 PM.
[110] "Oracle Announces Preliminary Third Quarter Earnings Results," *PR Newswire*, March 1, 2001, 4:55 PM.
[111] Oracle's 3QFY01 Conference Call Transcript, March 1, 2001, 5:30 PM.

**CSFB:**  Although bad news for Oracle, we believe the announcement is a problem relating to the economy and not one inherent to the company….  The software segment is the last of the Technology sectors to warn of lowered expectations and Oracle will not be alone.  It is interesting that it appears delays in spending are occurring at top corporate levels at this point and are not yet institutionalized.  It may also be a way for Oracle's customers to save earnings in what will turn out to be a weak quarter….[112]

**Goldman Sachs:**  We believe this will be a negative catalyst for the broader software sector and have reduced ratings on a number of stocks as a result.  This follows estimate changes for a broad range of technology stocks earlier this week as evidence of a deteriorating economy continues to build.[113]

**Merrill Lynch:**  We believe that Oracle's difficulties could have a strong negative impact on the entire sector today, although general technology fears have driven many premium valuations lower in the space.  We believe it may take several months for investors to begin to anticipate improved growth in 2002, so the group may trade in line with the overall tech market over the near term….[114]

**PMG Capital:**  Although some may doubt the validity of this explanation from management, we have noted that this is likely exactly the way a belt tightening would be executed.  There is little reason to believe senior management at customers would tip their hand to lower level employees regarding frozen IT budgets until the moment of truth when the contract has to be signed.[115]

**Needham:**  Following two above budget months, business simply did not close in February. Projects that had been approved at the Senior VP level were delayed when they reached the CFO or CEO's desk.  The response from the companies was that the firms wanted to wait to see what happened in the economy.

We believe these delays reflect the severity, breadth and depth of economic uncertainty in the United States….

We do not believe ORCL's [results] were self-inflicted.  Oracle was truly on a roll.  Our field checks confirmed management's commentary that both December and January results were strong (and above budget).  The company's applications solution stack was maturing and appeared set to enter the tornado of growth.  Oracle did not lose these deals to competitors – the business was won, but the deals did not close.  It is all but impossible for this turn of events to be good news for other enterprise software firms.[116]

---

[112] Credit Suisse First Boston, March 5, 2001.

[113] Goldman Sachs, March 2, 2001, 7:38 AM.

[114] Merrill Lynch, March 2, 2001.

[115] PMG Capital, March 6, 2001, 7:35 AM.

[116] Needham & Co., March 2, 2001, 10:07 AM.

52.     If, as Plaintiffs allege, Oracle's miss was attributable, in part, to previously unknown integration or interoperability problems with Suite 11i, I would expect financial analysts and other market participants to discuss these problems in the context of the earnings and revenue miss.  None of the reports that I reviewed attributed the miss to any integration or interoperability problems with Suite 11i (as alleged in the Complaint) or to any new information regarding product quality issues related to Suite 11i (as alleged in the Complaint and Plaintiffs' Contention Responses) that were not part of the total mix of information during the Class Period. This finding is consistent with the evidence discussed in Section VII that the market was aware of potential customers' concerns regarding the product quality of Suite 11i prior to the announcement on March 1, 2001.

53.     Plaintiffs also allege that "it was known throughout the Company that sales were declining in the second half of 2000 due to the slowing economy,"[117] that "3Q01 [f]orecasts [w]ere [o]verstated,"[118] and that on March 15, 2001, Oracle "conveniently claimed that the 'cracks' did not really begin to show until the last four days of the quarter...."[119]  If Oracle's explanation that its earnings miss was not known or knowable until the very end of the quarter was as incredible as Plaintiffs allege, I would expect financial analysts to have questioned Oracle's forecasting methods following its announcement on March 1, 2001.

54.     I find no evidence that analysts questioned the integrity of Oracle's forecasting methods in my review of the market's response to Oracle's miss.  My review of public press filings and financial analyst reports reveals that the market perceived Oracle's license revenues

---

[117] Complaint ¶48.
[118] Ibid.
[119] Complaint ¶77.

as being concentrated in the last few days of each quarter (back-end loaded).  Given this pattern

of revenues, financial analysts knew that the differences between Oracle's guidance and the

realized revenue or EPS numbers were very sensitive to Oracle's ability to convert leads into

sales in the last days of the quarter.  As a result, financial analysts realized that the impact of the

economy-wide slowdown on the enterprise software sector would not be reflected in Oracle's

revenues until the last few days of the quarter, or just prior to Oracle's March 1, 2001

announcement.

55.    The public press, financial analysts, and industry analysts commented on the fact

that the outcome of Oracle's financial results for a quarter was resolved only at the end of the

quarter prior to and following Oracle's March 1, 2001 pre-announcement.  For example,

> **Morgan Stanley:**  The pattern of spending in 2001 will be more **back end loaded** than this year.[120]
>
> **Deutsche Banc:**  PERSPECTIVE ON THE MACRO ENVIRONMENT. According to management, it has yet to see macro-related weakness in its business.  That said, **the full impact of the current macro environment may not be evident until the end of the quarter, as revenue is typically back-end loaded for Oracle.**[121]
>
> **First Union:**  While the sales pipeline apparently shows no signs of weakness at this point, **we note the next several weeks will be critical for the company as many potential customers will likely make decisions to buy or defer purchase during the activity-intense final weeks** of FQ3....[122]
>
> **William Blair:  Even so, Oracle still has business to close given the back-end-loaded nature of its business-it books between 50%-75% of its license revenue in the last month of the quarter (particularly in the last week).  We will continue to monitor the close of Oracle's quarter**.[123]

---

[120] Morgan Stanley Dean Witter, December 20, 2000 (emphasis added).
[121] Deutsche Banc Alex. Brown, February 8, 2001, 6:04 AM (emphasis added).
[122] First Union Securities, Inc., February 8, 2001, 9:36 AM (emphasis added).
[123] William Blair & Co., February 22, 2001, 8:01 AM (emphasis added).

**The Wall Street Journal:**  Q:  Several analysts downgraded their ratings on the stocks of certain software companies, saying their earnings were "back-end loaded."  What does this mean and why would it affect the stocks negatively?...
A:  **A company whose results are back-end loaded is one that generates most of its sales toward the end of a period.  This makes it difficult to get a sense of how a company is performing until the very end of its quarter, or its year.**  Such reduced predictability -- what Wall Street denizens call "visibility" -- is less of a concern when the economy is booming, but it can be worrisome when results begin to falter.

Companies that sell software to other companies are a prominent example.  Morgan Stanley analyst Chuck Phillips says "most of these companies make money about eight days a year."  That means that although salespeople work all quarter to sell software, they generally deal with midlevel executives at client companies.

Ultimately, however, most major purchases must be approved at a more senior level.  These approvals often happen at the end of a quarter.

Consider the world's second-largest software maker, Oracle, which warned recently that results for its quarter ended in February would fall below expectations.  Oracle Chairman Lawrence Ellison had predicted all quarter that Oracle's results would be spared the broader downturn.  His confidence presumably was based in part on the success his sales force was expecting on deals being negotiated with clients.  But when it came to signing off on those deals at the end of the quarter, Mr.  Ellison says many senior executives -- unsure of what the downturn meant for their own businesses -- balked.  Mr.  Ellison says he thinks those contracts will be signed -- but that they didn't happen in time for Oracle to include them in its most recent results.[124]

56.      In their response to Oracle's pre-announcement on March 1, 2001, financial

analysts commented on the fact that the impact of the economy-wide slowdown on the enterprise

software sector would not be reflected in Oracle's revenues until the last few days of the quarter.

For example:

**Banc of America:**  Our Theme:  When Push Comes to Shove in an Uncertain Economy, Some Buyers Will Balk.  A great percentage of sales occur in the third month of each quarter, with a surprisingly high percentage in the final days.  Customer behavior is only revealed at the very end of each quarter, making forecasting results in this sector more difficult than many.  We continue to believe

---

[124] "Playing The Net," *The Wall Street Journal Sunday*, March 11, 2001 (emphasis added).

(and Oracle's shortfall seems to bear this out) that at the 11th hour, in an uncertain economy, some technology buyers will defer their purchases.  No one was ever fired (that we know of) for waiting an extra quarter to buy some software.  We believe this uncertainty will continue to [affect] enterprise software sector fundamentals and, correspondingly, stock prices therein.[125]

**Lehman Bros.:**  What about Other Software Companies?

Clearly, the magnitude of Oracles miss combined with its commentary that CEOs, CIOs and CFOs decided, at a minimum, to delay deals given the current state of economic uncertainty, casts a pretty big shadow over the health of the entire software industry.  Specifically, we believe that companies that sign very large deals, particularly at the end of quarters, are most at risk of facing very ugly surprises at the end of any given quarter.  In general, applications companies tend to rely most heavily on such transactions.  As a result, we would be most cautious on the enterprise applications software space as a whole….[126]

B.    *The 3QFY01 Pre-Announcement Was a Harbinger of the Deteriorating Industry Outlook*

57.    My analysis reveals that the market viewed Oracle's announcement on March 1, 2001 as a harbinger of the sudden deterioration in the economic conditions facing enterprise software companies.  This conclusion is based on the following facts:  (1) Oracle's February fiscal quarter resulted in Oracle being the first among its peers in the Industry Index to report results for this period; (2) the stock prices of other companies in the enterprise software industry declined in response to Oracle's announcement; (3) Oracle's announcement was followed by financial analysts revisiting their models and revising downward their earnings estimates of Oracle's industry peers; (4) in the quarter prior to Oracle's announcement, companies in the enterprise software industry generally reported earnings that exceeded market expectations and in some cases were record setting; and (5) in the quarter following Oracle's announcement, companies generally reported earnings that missed or just met market expectations.

---

[125] Banc of America Securities, March 2, 2001.
[126] Lehman Brothers, March 2, 2001, 7:15 AM.

58.     Oracle was the first company among its peers in the enterprise software industry to report the results of operations that included the critical month of February 2001, because of its particular fiscal year (see Exhibit 8).  The fact that Oracle was the first to report disappointing revenue and earnings was noted by financial analysts:

> **Salomon Smith Barney:**  If Oracle is seeing a deferral of this magnitude, we believe the Company's shortfall is an omen for other names in our universe. **Given that Oracle has a February-quarter end, and the slow down only began to affect the company during the later portion of February, we believe other applications vendors may face difficulty in March and could have a hard time meeting expectations**.[127]

> **Banc of America:**  We believe this will bode poorly for Oracle shares and the software sector in today's trading and over the coming months.  With yesterday's announcement, <u>Oracle is the first enterprise software company since the economy weakened to report a shortfall or reduced guidance</u>.[128]

59.     In general, analysts interpreted Oracle's earnings miss as consistent with the view that the industry had taken a sudden and dramatic turn for the worse.  For example:

> **Banc of America:  Economic slowing has become an economic "shock"** *a la* **Y2K.**  To reiterate our point of view:  e-business software vendors are insulated but not at all immune from economic slowing, particularly as a rapid and volatile macroeconomic slowing such as we are now experiencing is perceived as a "shock" by Global 1000 executives.  Today's interruption of demand and buying [patterns] is reminiscent of the 1998-1999 impact of the Y2K effect.[129]

> **Morgan Stanley:**  This [downturn] is worse than past downturns **in the suddenness and severity**.  However we don't necessarily buy the argument this downturn will be short in duration.  A shock to the system of this magnitude is only repaired by time.  All software purchases are discretionary and managements will only regain confidence to buy technology products when they see stabilization and an upturn in their own business prospects.  Experience says recoveries take longer than we think, although the rewards on the other end can be substantial.[130]

---

[127] Salomon Smith Barney, March 2, 2001, 7:50 AM (emphasis added).
[128] Banc of America Securities, March 2, 2001 (emphasis in original).
[129] Banc of America Securities, March 2, 2001 (emphasis added).
[130] Morgan Stanley Dean Witter, March 2, 2001 (emphasis added).

**Morgan Stanley:**  Both the integrators and software sales reps are saying buyers were frozen like deer in headlights during February and March.  The rapidity of the decline in financial markets, the economy, and in the fundamentals of their own businesses startled even the most steel-nerved IT managers.  **Several CIOs who attended our CIO conference last year and heard our economists talk about the coming recession have since called and said they still were surprised at the suddenness of the change**; all the gloomy talk didn't really resonate back in December at the conference, but it did by February.[131]

60.     I examined the stock price reaction of other companies in the enterprise software sector to Oracle's announcement to see if their stock price reaction was consistent with Oracle's statement that the earnings and revenue growth miss resulted from a sudden downturn in the economic conditions facing the enterprise software industry.  In particular, if Oracle's miss were attributable to company-specific product problems, then I would expect no significant negative stock price reactions among Oracle's competitors.[132]  If, on the other hand, Oracle's miss was viewed by the market as new evidence of a sudden and unexpected deterioration in economic conditions, then I would expect that Oracle's announcement would be associated with a decline in the stock prices of competing firms.

61.     Exhibit 9 shows the change in stock price of Oracle's competitors in the Industry Index.  As shown, all of Oracle's competitors' stock prices were down on March 2, 2001.  To put this in perspective, consider that, absent new, material news related to the market or the industry, the probability that all of Oracle's competitors' stock residual returns would be down on the same day is less than 1 percent.[133]  My analysis also reveals that 4 out of 9 of Oracle's competitors in the Industry Index experienced statistically significant negative residual returns

---

[131] Morgan Stanley Dean Witter, April 17, 2001 (emphasis added).

[132] Foster, George, "Intra-Industry Information Transfers Associated with Earnings Releases," *Journal of Accounting and Economics*, Vol. 3, December 1981, pp. 201-232.

[133] For this calculation, I assume that stock residual returns follow a random walk and may be up or down on any given day with equal probability.  See Brealey, Richard A., Stewart C. Myers, and Allan J. Marcus, *Principles of Corporate Finance*, McGraw-Hill/Irwin, 3rd Ed., p. 350.  The probability that 9 separate stocks are all down on the same day is equal to 0.20 percent: (0.5)* (0.5)*(0.5)*(0.5)*(0.5)*(0.5)*(0.5)*(0.5)*(0.5) equals 0.20 percent.

on March 2, 2001.[134] Additional analysis reveals that the Industry Index experienced a statistically significant residual return of –11.54 percent on March 2, 2001.[135] These facts are consistent with Oracle's miss being viewed by the market as a harbinger of the effects of deteriorating economic conditions on the enterprise software industry.

62.     Exhibit 10 shows the change in the stock price of Oracle and the companies in the Industry Index between March 1, 2001 and April 3, 2001, a day following the earnings pre-announcements of several enterprise software firms with March fiscal quarters.  Following Oracle's announcement on March 1, 2001, its stock price continued to decline as did the stock prices of other companies in the Industry Index.  Between March 1, 2001 and April 3, 2001, Oracle's stock price declined 38.01 percent.  Over the same period, the stock price of the median firm in the Industry Index declined 44.11 percent.  Five firms (Ariba, BEA Systems, Commerce One, I2 Technologies, and Siebel) declined by more than Oracle.

63.     Because Oracle's pre-announcement served as a warning to the market, many financial analysts took the opportunity to review or update their models for other companies in the enterprise software industry.  For example:

> **Robertson Stephens:**  Oracle's Q3 (ending February) miss **supports our hypothesis that CY:Q1 is going to be a particularly weak quarter for enterprise software**….[136]
>
> **Robertson Stephens:**  While our checks indicate that sales pipelines continue to be relatively strong and many deals have even been committed to particular

---

[134] I estimate a market model using the value-weighted CRSP NYSE/AMEX/NASDAQ for each of Oracle's competitors over the period December 8, 1999 to December 8, 2000.  Using the parameter estimates from the model, I calculated residual returns for March 2, 2001.

[135] I estimate a market model using the value-weighted CRSP NYSE/AMEX/NASDAQ for each of Oracle's competitors over the period December 8, 1999 to December 8, 2000.  Using the parameter estimates from the model, I calculated residual returns for March 2, 2001.

[136] Robertson Stephens, March 2, 2001 (analyst report on Seibel) (emphasis added).

software vendors, **nervous executives are refusing to write the checks until they gain better insight about the economy and the prospects for their own businesses in 2001....**[137]

**Deutsche Banc:**  We are previewing 1Q earnings results for the enterprise software companies we follow.  Many software vendors with February quarter end (Oracle, TIBCO Software, and Cognos) have already pre-announced negative results.  **More importantly, we do not expect to see a quick recovery in IT spending in the month of March.  Many vendors are seeing heavily backend weighted quarters, and we believe probability for negative pre-announcements in the first week of April is high (particularly for companies with large deals and lengthy implementation cycles).  Other risks include downward revisions in estimates and deteriorating balance sheets.**[138]

**Robert Baird:**  Big deals are being deferred, pressuring average deal sizes lower.  **When push comes to shove, senior managements in a variety of industries have flinched on large multi-million dollar deals either opting to defer the capital expenditure or commit to a smaller and simpler installation.**  This phenomena became evident in February with Oracle (ORCL - $15.32) missing its 3Q01-Feb. and has spread across the entirety of the B2B space.  The reduction in average deal size will force software vendors to adjust their sales pitch towards small deals with rapid ROI with added pricing pressure due to intense competition.[139]

**UBS Warburg:**  When asked about the current quarter, i2 CEO Sidhu said the economic environment is getting increasingly difficult.  **This comes on the heels of reports from other software vendors in recent weeks, including Oracle, Ariba, and Commerce One, saying that business is more challenging.  We believe that this quarter may be more back-end loaded than usual for i2 as large IT deals are requiring approval from higher level management.**  Companies' CEOs and CFOs seem more focused on their current quarter's P&L and even high ROI software purchases are being scrutinized as to the immediate effect on current quarter earnings.[140]

64.     Moreover, the evidence I reviewed demonstrates that financial analysts generally revised downward their outlook for companies in the enterprise software industry in response to Oracle's announcement.  For example:

---

[137] Robertson Stephens, April 11, 2001 (emphasis added).

[138] Deutsche Banc Alex. Brown, March 17, 2001 (analyst report on Ariba) (emphasis added).

[139] Robert Baird, April 3, 2001 (footnote within quotation omitted) (analyst report on Ariba) (emphasis added).

[140] UBS Warburg, March 12, 2001 (analyst report on i2 Technologies) (emphasis added).

**Epoch:**  We are trimming our estimates for Ariba in the wake of Oracle's lackluster 3Q, which we see as a leading indicator of the difficulties that applications companies might face closing sales at the end of March….[141]

**Morgan Stanley:**  We are downgrading [BEA Systems] from Outperform to Neutral…The downgrade comes on the back of Oracle's negative preannouncement.[142]

**Deutsche Banc:**  We are downgrading our rating on Commerce One to Market Performer from Buy.  We have been cautious on Commerce One and others in the B2B software space over the past few months given the effects of the macroeconomic slowdown….

Overall, we believe recent shortfalls at B2B software leaders including Oracle, Ariba, and i2 bode poorly for Commerce One and the outlook for this space over the next several quarters.  Weak IT spending, delayed decisions and lengthening sales cycles are likely to impair visibility for the foreseeable future.[143]

**Epoch:**  We are trimming our estimates for [i2 Technology] in the wake of Oracle's lackluster 3Q, which we see as a leading indicator of the difficulties that applications companies might face closing sales at the end of March….[144]

**SG Cowen:**  We're trimming our estimates for [Microsoft's] F01-02 to reflect the increasing soft IT spending backdrop.  Recent misses by other industry leaders like Sun, Oracle, Intel, Yahoo! and Gateway reveal continued weakening in IT spending plans that will be hard for Microsoft to avoid….[145]

65.     In some cases, financial analysts commented on the need to reassess multiple

firms in the enterprise software industry in light of Oracle's 3QFY01 results:

**Morgan Stanley:**  [W]e have systematically lowered the ratings on all [14] of the remaining Outperform rated software companies to a Neutral rating.  Oracle's missed results is a clear indicator that software purchases will be dampened by the US economy and we have lowered our expectations for our coverage universe accordingly.[146]

**Robertson Stephens:**  With an increasingly challenging economic environment for enterprise software sales (highlighted by Oracle's FQ3:01 shortfall – where

---

[141] Epoch Partners, March 2, 2001 (analyst report on Ariba).
[142] Morgan Stanley Dean Witter, March 2, 2001 (analyst report on BEA Systems).
[143] Deutsche Banc Alex. Brown, April 3, 2001 (analyst report on Commerce One).
[144] Epoch Partners, March 2, 2001 (analyst report on i2 Technologies).
[145] SG Cowen Securities, Inc., March 12, 2001 (analyst report on Microsoft).
[146] Morgan Stanley Dean Witter, March 2, 2001, 8:19 AM.

the company posted only 25% yr/yr growth in applications as compared to its original guidance of 75% yr/yr growth), we believe that even the best positioned business software companies are increasingly vulnerable to a major retrenchment in IT spending.  As a result, we are taking a first cut at lowering earnings estimates for Ariba, Commerce One, and i2 – yet, are cognizant of the fact that, depending on the severity and duration of the current economic downturn, additional downward revisions may be in order.[147]

**Banc of America:**  Action:  Lowering pan-coverage estimates AND ratings as well.  For the second time this week we are lowering our coverage-wide 2001-2002 revenue estimates by 5-10%.  A comparable or slightly more modest reduction of earnings also results.  **More importantly, we are lowering the investment rating on most Strong Buy-rated stocks to Buy (Ariba, Aspen, Commerce One, Manugistics and Siebel) to pay further homage to the macroeconomic impairment**, and lowering Oracle from a Buy to a Market Performer Rating.  Oracle's CY01E earnings growth may slow to 0-15% yr/yr, meriting downgrade.[148]

**CSFB:**  Our new rating reflects how we would stratify the risk level associated with each of the company's estimates rather than an actionable recommendation.

We are lowering ratings on 12 companies - ACTU ($15 3/16) Buy from Strong Buy, ARTG ($28 5/16) Buy from Strong Buy, CMRC ($18 1/16) Buy from Strong Buy, DCTM ($22 1/2) Hold from Buy, EPNY ($16 11/16) Buy from Strong Buy, ITWO ($27 9/16) Buy from Strong Buy, ONXS ($9 3/8) Hold from Buy, PSFT ($34) Hold from Buy, RETK ($19 7/8) Buy from Strong Buy, SEBL ($44 5/8) Buy from Strong Buy, SLTC ($7 11/16) Buy from Strong Buy, VIGN ($6 3/8) Hold from Strong Buy.[149]

66.     These financial analysts foretold the outcome for those companies with March fiscal quarters.  In April 2001, Morgan Stanley "counted 54 negative software company preannouncements with an average revenue shortfall of 20%."[150]  (Oracle's revenue miss for 3QFY01 was 7.5 percent.)  In discussing the preannouncements that followed Oracle's March 1, 2001 announcement, the same analyst commented:

**Morgan Stanley:**  They call it Stormy Monday but Tuesday's just as bad.  At least that's how the famous blues song goes but let's hope for a little let up on

---

[147] Robertson Stephens, March 16, 2001 (analyst report on Ariba).
[148] Banc of America Securities, March 2, 2001 (emphasis added).
[149] Credit Suisse First Boston, March 2, 2001 (analyst report on Commerce One).
[150] Morgan Stanley Dean Witter, April 17, 2001.

Tuesday after a Bloody Monday of pre-announcements – a record 8 enterprise software companies in one day.  Including five companies that pre-announced last month, a total of 13 enterprise software companies have fallen on their swords.  It's been that kind of party.

The maiden round of pre-announcements in the enterprise software sector saw a median revenue shortfall of 23%.…  Five of the 13 companies announced layoffs while the remainder left the option open as they replan their business.

The smallest miss was at i2 Technology (-1.9%) which came in better than investors had feared although posting the incremental revenue will make June that much more difficult.  Oracle had the second smallest revenue miss (-7.5%) but the smallest earnings miss and was by far the most profitable.  The largest miss was at Ariba which missed the top line by 38% compared to our estimate and 49% relative to company guidance.  The miss was expected but the magnitude more severe than consensus estimates.

Most of the shortfalls were expected given the environment.  Oracle had the misfortune of being the first large cap software company to pre-announce given its February quarter end.  Consequently many pointed to product transition issues, the absence of Ray Lane, and a host of other problems for the miss.  As the announcements start to mount, the economy seems to be taking over as the dominant factor in most cases.  In Ariba's case, there are market saturation questions that contributed to the size of the miss.[151]

67.     The fact that Oracle's announcement alerted market participants to the sudden change in the outlook for the industry is also evident when one considers the fact that (1) prior to Oracle's announcement on March 1 and as late as February 22, 2001, Oracle's peer companies generally reported earnings that not only met or exceeded the market's expectations but also were in several instances record-setting, and (2) following Oracle's announcement, peer companies generally reported earnings that were below the market's expectations or at best met the market's expectations.

68.     Exhibit 8 illustrates that out of nine companies in the Industry Index, eight companies reported earnings that exceeded market expectations for the quarter prior to Oracle's

---

[151] Morgan Stanley Dean Witter, April 3, 2001.

announcement on March 1, 2001.  Moreover, Oracle's competitors reported earnings or revenues that were record-setting as late as February 23, 2001.  For example:

> **Ariba Press Release:**  Ariba First Internet B2B to Report Profit[152]
>
> **i2 Technologies Press Release:**  i2 First e-Business Solutions Provider to Top $1 Billion in Annual Revenues with Announcement of Record Quarterly Revenues and Earnings[153]
>
> **Commerce One Press Release:**  Commerce One Reports Record Fourth Quarter and Full Year 2000 Results[154]
>
> **PeopleSoft Press Release:**  PeopleSoft Announces Record Financial Results[155]
>
> **BEA Systems Press Release:**  BEA Reports Record Fourth Quarter and Fiscal Year Financial Results[156]

69.    Exhibit 8 also reveals that five of the nine companies reported earnings that either were below or just met the market's expectation for the quarter following Oracle's March 1, 2001 announcement.  Finally, during the June 30, 2001 quarter, seven firms in the group missed the market's earnings expectations.

## X.    Analysis of the Market's Response to Oracle's Announcement on March 15, 2001

70.    The Complaint alleges that Oracle's March 15, 2001 announcement was a "post Class Period admission."[157]  On March 15, 2001, Oracle announced the final breakdown of revenue growth between database revenue and applications revenue that differed from the breakdown provided in the preliminary announcement on March 1, 2001.  My analysis reveals

---

[152] "Ariba First Internet B2B to Report Profit," Ariba Press Release, January 11, 2001.
[153] "i2 First e-Business Solutions Provider to Top $1 Billion in Annual Revenues with Announcement of Record Quarterly Revenues and Earnings," i2 Technologies Press Release, January 17, 2001.
[154] "Commerce One Reports Record Fourth Quarter and Full Year 2000 Results," Commerce One Press Release, January 18, 2001.
[155] "PeopleSoft Announces Record Financial Results," PeopleSoft Press Release, January 30, 2001.
[156] "BEA Reports Record Fourth Quarter and Fiscal Year Financial Results," BEA Systems Press Release, February 22, 2001.
[157] Complaint ¶76.

that following Oracle's announcement on March 15, 2001 (1) the market continued to view Oracle's miss as resulting from the sudden deterioration in the economic conditions facing the enterprise software industry, (2) some financial analysts expressed concern for Oracle's competitive position vis-à-vis other best-of-breed providers of enterprise software, and (3) financial analysts did not view the earnings or revenue miss as providing any new information regarding integration or interoperability or product quality issues about Suite 11i that had not been previously known to the market.  I find no evidence that the stock price reaction following the March 15, 2001 announcement resulted from new information entering the market regarding integration- or interoperability-related Suite 11i issues as alleged in the Complaint.

71.     After close of market on March 15, 2001, Oracle reported actual 3QFY01 EPS of $0.10 and revenues of $2.7 billion for 3QFY01.[158]  Actual EPS and total revenues released on March 15, 2001 were in line with the preliminary estimates issued on March 1, 2001.  Thus, Oracle also confirmed that EPS for the quarter was $0.10 and that license revenue grew 6 percent.[159]

72.     However, in contrast to the preliminary estimate provided in the prior announcement, Oracle reported that database revenues grew by 6 percent (compared to the preliminary flat growth or slight decline reported on March 1, 2001) and that applications revenues had grown by 25 percent (compared to preliminary growth of 50 percent reported on March 1, 2001).  As reported in the realized financials on March 15, 2001, database revenue was down 8 percent and applications revenue was down 29 percent from their respective 3QFY01 guidance.

---

[158] Oracle's 3QFY01 Conference Call Transcript, March 15, 2001, 5:30 PM.
[159] Ibid. and Oracle's 3QFY01 Conference Call Script, March 15, 2001.

73.     Following this announcement, Oracle's stock price fell by 4.26 percent on March 16, 2001, while the Industry Index fell by 3.86 percent.  The residual return from my event study was –0.18 percent.  This residual return was not statistically significant.  Taken as a whole, the March 15, 2001 announcement was not material to the market.  The fact that Oracle's stock return on March 15, 2001 was similar to the return of the Industry Index is inconsistent with Plaintiffs' argument in the Complaint that the March 15, 2001 announcement provided the market with new material information regarding integration, interoperability, or product quality problems pertaining to Suite 11i that were not previously known to the market.

74.     Following the March 15, 2001 announcement, many financial analysts stressed the continuing uncertainty regarding the current economic environment.[160]  A few financial analysts suggested that the earnings miss may have resulted in part from Oracle-specific factors.  These financial analysts attributed the disappointment in Suite 11i revenues to the desirability of the suite concept relative to the best-of-breeds and the deeper functionality of best-of-breeds relative to Suite 11i.  For example:

> **Banc of America:**  We continue to believe the economy is only one of several factors that are pressuring the company currently.  On the database side, we believe the economy explains perhaps 70-80% of the weakness, with the remainder due to company-specific woes (possible market share loss and dot-com impact?).  On the applications side, especially in light of Oracle's weaker than expected 3Q applications growth, we believe the economy may only explain 20-30% of the weakness.  **The rest, in our view, is a result of the product set not yet reaching a competitive level of functionality, relative to best-of-breed vendors.  The litmus test for Oracle's applications business is in 15-30 days when applications software companies report their March quarters.  If results are weak, it's probably good news for Oracle (Oracle's apps weakness**

---

[160] Even before Oracle's March 15 announcement, a Banc of America Securities financial analyst report from March 15, 2001 acknowledged the continuing deterioration in the economy: "Economic environment that hurt Oracle's February quarter in merely 'its final days' continues to worsen, prompting further trimming of [our] growth estimates [for Oracle revenues]."

**is due more to industry weakness); if they're strong, it's bad news (apps business is losing share).**[161]

**CIBC:**  On March 16, 2001, we are downgrading the shares of Oracle to Hold due to 1) the impact of the US economy, 2) concerns over acceptance of its e-business applications, and 3) management's lack of a proactive plan to get back on track.  We believe that the economy is only a partial explanation for their shortfall.

…The 25% growth in applications revenues was particularly disappointing as applications were expected to be a major growth driver for the company.

**…From our conversations, customers still desire best of breed solutions designed with the customer in mind verses a suite that may not be customizable or offering specific industry centric features.**
…
Applications not selling because of the product not the budget.… [W]e believe that there are as many product issues slowing sales as economic factors.

In speaking with Oracle salespeople, we have heard repeatedly, that they are having difficulty competing with Siebel Systems for CRM and i2 Technologies for supply chain.  With that knowledge it becomes clear why Oracle does want to sell the suite because it is having a difficult time when you compare one of the modules to a company that specializes in that application like an i2.  Even at App[s]World, management stated, "**our [11i] application suite may not give you everything that you want, but it will give you everything you need.**"

**This leads to our conclusion that people will continue to choose a best of breed [solution] over a suite even if the implementation is faster.  These solutions are critical and rapid implementation does not make them better products than their competitors.**[162]

75.     Some financial analysts suggested that the earnings miss resulted, in part, due to the fact that purchases of suites of enterprise software faced heightened sensitivity to economic downturns relative to purchases of best-of-breed applications.  According to some financial analysts, the downturn in the economy revealed that high-level executives were more sensitive to purchases of new large-ticket enterprise software solutions relative to smaller-ticket enterprise solutions for legacy programs.  For example:

---

[161] Banc of America Securities, March 16, 2001 (emphasis added).  Exhibit 10 shows how competitors fared.
[162] CIBC World Markets Corp., March 16, 2001 (emphasis added).

**Josephthal:**  We have issues with their contention that the integrated suite strategy is a clear winner versus the best-of-breed approach.  Their contention should be viewed in light of the fact that many of their applications deals were deferred, while many best-of-breed vendors have performed well in recent quarters – as Verity has demonstrated, and as we expect Manugistics will do also.  **In our view, the strategy of selling large, integrated suites will meet with greater challenges in a troubled economy**, and may not track as well versus competitors such as i2, e.piphany, and Siebel Systems.  To put it plainly – high cost brings high level scrutiny.

We have further adjusted our estimates to a level that is inline with the guidance given.  It is our view that management has set guidance at a level that they are reasonably [confident] that they can meet or beat without great difficulty...[163]

**Morgan Stanley:**  In tougher times buyers gravitate to conservative IT investments which translate to smaller, incremental investments in existing infrastructure.  Upgrades, capacity expansions, and maintenance investments fit under the radar screen.  Companies like Veritas and Computer Associates selling additional capacity expansion for existing operational infrastructure (backup, job scheduling, etc) have an advantage.

At the other extreme, high profile new projects that involve more risk and uncertainty as to ROI and don't affect existing business critical applications can wait.  The payback on these new projects is normally over several years and waiting a month, a quarter, or several quarters doesn't impact the business materially.  Most software purchases are discretionary in the short term.  Software purchases are opportunistic in the sense that the customer is embarking on a new project with the goal of improving productivity, increasing efficiency, reducing costs, or some other laudable goal.  But the goal normally isn't to keep the lights on – that's done by legacy applications.  Ironically, only when new applications get into production and are well on their way to becoming legacy applications do they become mission critical. [164]

76.     Plaintiffs allege that Oracle's 3QFY01 disappointment showed investors that

Suite 11i was "broken" and "did not work."[165]  If such allegations were true, one would expect

Oracle's Suite 11i licensing revenues to plummet after the 3QFY01 miss was announced and the

---

[163] Josephthal and Co., March 16, 2001 (emphasis added).
[164] Morgan Stanley Dean Witter, April 3, 2001.
[165] Complaint ¶¶72, 82.

market became aware of this alleged fact.  In fact, in the following quarter (4QFY01),
applications revenue grew by 36 percent to $338 million.[166]

## XI.      Analysis of Allegations that Oracle Saved $1 Billion Using E-Business Suite

77.      Plaintiffs allege that certain statements about cost savings Oracle enjoyed from
implementing E-Business Suite were false and misleading.  For example, Plaintiffs allege the
following statements were false and misleading:

> **Plaintiffs' Contention Responses:**  Using its own suite of e-business
> applications, Oracle beat the goal set by cofounder and CEO Lawrence J. Ellison
> – cut one billion in costs in one year – passing the billion dollar savings mark
> before the year was up.[167]

> **Complaint:**  We were the first Company to use this eBusiness suite and in the
> very first year we put it in, we saved $1 billion.[168]

78.      In my opinion, Oracle's stock price decline on March 2, 2001 was not caused by
the disclosure of information related to Oracle's savings from its use of E-Business Suite.  I saw
nothing in the March 1, 2001 or March 15, 2001 announcements that corrected any prior
statements on such cost savings.  I also find no mention of a billion-dollar savings from the E-
Business suite in any of the financial analyst reports or public press that I have reviewed in
connection with Oracle's 3QFY01 earnings miss announced on March 1, 2001 and on March 15,
2001.

---

[166] Oracle Corporation Q4 Fiscal 2001 Supplemental Analysis
(http://www.oracle.com/corporate/investor_relations/Q401AS.pdf).
[167] Plaintiffs' Contention Responses, p. 7, ¶1.  This statement was issued *before* the Class Period.  The source cited
in Plaintiffs' Contention Responses is "Find Out About Oracle Corporation's Billion Dollar Savings Story On The
E-Business Network," Oracle Press Release, December 5, 2000.
[168] Complaint, ¶68.  The Complaint points to a February 21, 2001 statement by Larry Ellison at the New Orleans
AppsWorld conference.  Since the statement is not in bold in the Complaint, it is not clear that Plaintiffs allege it to
be false and misleading.  However, the Complaint ¶69 states, "In addition, Ellison claimed that the Company had
saved $1 billion by implementing its own 11i software internally.  But, many witnesses…stated Ellison's claim was
just a Wall Street marketing gimmick and that the 11i suite didn't work internally any better than externally.
Instead, these witnesses stated the major portion of the savings came from firing more than 2,000 employees."

**XII.    Analysis of Allegations that Oracle Falsely Reported 2QFY01 Earnings and Revenue**

79.    In my opinion, Oracle's stock price decline on March 2, 2001 was not caused by the disclosure of information related to alleged accounting errors in 2QFY01.  It is my understanding that Oracle has not announced any restatement of financial results or that it would be required to restate past financials to correct the alleged accounting errors.  In my review of analyst reports and public press, I have not seen any evidence of a disclosure during the class period related to alleged accounting errors during 2QFY01.

80.    The Complaint alleges that Oracle's announcement on December 14, 2000 of $2.66 billion in revenues and $0.11 per share for 2QFY01 was false and misleading.[169]  The Complaint alleges that Oracle overstated 2QFY01 revenues and earnings by executing "more than 46,000 sham invoice transactions" and consequently "improperly recognized [$228 million in] revenue from past customer credits and overpayments it had held in reserve without informing its customers."[170]  According to the Complaint, "the improper conversion of more than $228 million of customer cash 'On Account' to revenue" in 2QFY01 was done "to disguise the slowdown in product sales...and falsely report revenue and earnings growth and thus maintain its streak of 11 straight quarters of EPS growth."[171]  The Complaint alleges, "Without the sham revenues, however, Oracle would only have earned $0.085 per share" for 2QFY01.[172]

81.    Plaintiffs' Contention Responses also allege that "Oracle used customer overpayments and unapplied cash by, inter alia, improperly transferring the funds to a bad debt

---

[169] Complaint ¶35.  Plaintiffs' accounting allegations are in Complaint ¶¶8, 35-36.
[170] Complaint ¶8.
[171] Complaint ¶36.
[172] Complaint ¶8.

reserve account (which inflated revenue, net income and EPS) and various other revenue and expense accounts (which also inflated revenue, net income and EPS)."[173]  It is my understanding that the amount allegedly transferred improperly during 2QFY01 was approximately $20.1 million.

82.    I find no evidence supporting any argument advanced in the Complaint or Plaintiffs' Contention Responses that links the 3QFY01 miss in earnings and revenues or the stock price decline on March 2, 2001 to the alleged 2QFY01 overstatement of earnings and revenues.[174]  I also find no mention of potentially erroneous revenues reported in 2QFY01 in any of the financial analyst reports or public press that I have reviewed in connection with Oracle's 3QFY01 earnings miss announced on March 1, 2001 and on March 15, 2001.  Thus, I find no evidence that the market viewed the 3QFY01 earnings miss as having anything to do with allegedly improper accounting of 2QFY01 results.

---

[173] Plaintiffs' Contention Responses, p. 21.

[174] I understand that if the $20.1 million in transfers in 2QFY01 had not been made, then Oracle would have earned $0.1038/share, as opposed to $0.1060/share.  Of course, this presumes that the full $20.1 million in transfers was improper, which I do not understand to be the case.  In any event, even if Oracle had reported $0.10/share as opposed to $0.11/share, financial analysts would have calculated any change in earnings per share with greater precision than simply rounding to the nearest penny per share, and therefore would have viewed the difference in EPS as being $0.0022, and not $0.01/share.  See, for example, Table 1 in Banc of America Securities, December 15, 2000.

Executed on this _25th_ day of _MAY_ in 2007 in _GAINESVILLE, FL._ .

_____
Christopher M. James

# Exhibit 1
# CURRICULUM VITAE

**NAME:**              Christopher M. James

**CURRENT
POSITION:**          William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida

**ADDRESS:**          Department of Finance, Insurance, and Real Estate, Graduate School of Business, University of Florida, PO Box 117168, Gainesville, FL 32611
E-mail: christopher.james@cba.ufl.edu

**TELEPHONE:**      Office:    352-392-3486
Home:    352-336-2765

**EDUCATION:**      B.A.       Michigan State University, 1973
M.B.A.    University of Michigan (Finance), 1977
Ph.D.     University of Michigan (Economics: Industrial Organization, Finance), 1978

**RESEARCH/
TEACHING
INTERESTS:**         Corporate Strategy, Corporate Finance and Financial Institutions

**TEACHING/
RESEARCH
EXPERIENCE:**       William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida, 1989-present

Visiting Professor, University of New South Wales, 1995

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988

Visiting Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978

Consultant, FDIC, 1988-1991

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

**PAPERS AND
PUBLICATIONS:**

"The Technology of Risk and Return, Comment," <u>American Economic Review</u>, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," <u>Journal of Financial and Quantitative Analysis</u>, December, 1981.

"An Analysis of Bank Loan Rate Indexation," <u>Journal of Finance</u>, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann), <u>Journal of Finance</u>, December, 1982.

"Pricing Alternatives for Loan Commitments:  A Note," <u>Journal of Bank Research</u>, Winter, 1983.

"An Analysis of Intra-Industry Differences in the Effect of Regulation:  The Case of Deposit Rate Ceilings," <u>Journal of Monetary Economics</u>, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?" (with R.O. Edmister), <u>Journal of Portfolio Management</u>, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), <u>Journal of Finance</u>, September, 1983.

"Regulation and the Determination of Bank Capital Changes:  A Note," (with J.K. Dietrich), <u>Journal of Finance</u>, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency:  The Case of Bank Holding Company Acquisitions," <u>Journal of Law and Economics</u>, April 1984, Abstracted in <u>Regulation</u> as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery), <u>Journal of Finance</u>, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," (with M.J. Flannery), <u>Journal of Money, Credit and Banking</u>, November, 1984, Presented at the American Finance Association meetings in San Francisco, December, 1983.

"The Effects of Government Regulatory Agencies on Organizations in High Technology and Woods Products Industries," (with G. Ungson and B. Spicer), <u>Academy of Management Journal</u>, 1985.

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," (with S. Koreisha and M. Partch), Journal of Finance, December, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," (with J. Brickley), Journal of Financial Economics, July, 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure:  The Case of Banking," (with J. Brickley), Journal of Law and Economics, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market:  The Case of Banking," (with P. Wier), Journal of Political Economy, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier), Journal of Monetary Economics, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," Journal of Financial Economics, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," Journal of Monetary Economics, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," Carnegie Rochester Conference Series on Public Policy, April, 1989.

"Heterogeneous Creditors and the Market Value of Bank LDC Loan Portfolios," Journal of Monetary Economics, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), Journal of Financial Economics, November, 1990.

"The Losses Realized in Bank Failures," Journal of Finance, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," Journal of Finance, December, 1992.

"Management and Organizational Changes in Banking:  A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), Carnegie Rochester Conference Series on Public Policy, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), Journal of Financial Economics, February, 1993.

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), Journal of Corporate Finance, April, 1994.

"When Do Banks Take Equity in Debt Restructurings?" <u>Review of Financial Studies</u>, Winter, 1995.

"CEO Compensation and Bank Risk:  Is Compensation Structured in Banking Structured to Promote Risk-Taking?" (with J. Houston), <u>Journal of Monetary Economics</u>, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress," <u>Journal of Finance</u>, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims," (with J. Houston), <u>Journal of Finance</u>, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking," (with J. Houston and D. Marcus), <u>Journal of Financial Economics</u>, November, 1997.

"Do Bank Internal Capital Markets Promote Lending?" (with J. Houston), <u>Journal of Banking and Finance</u>, November, 1998.

"Where Do Merger Gains Come From?  Bank Mergers from the Perspective of Insiders and Outsiders," (with J. Houston and M. Ryngaert)**,** <u>Journal of Financial Economics</u>, May, 2001.

"Do Relationships Have Limits?   Banking Relationships, Financial Constraints and Investment," (with J. Houston), <u>Journal of Business</u>, July, 2001.

"Do Banks Provide Financial Slack?" (with C. Hadlock), <u>Journal of Finance</u>, June, 2002.

**"**What a Difference a Month Makes:  Stock Analyst Valuations Following Initial Public Offerings," (with J. Karceski and J. Houston), <u>Journal of Financial and Quantitative Analysis</u>, March 2006, Presented at Hong Kong Corporate Finance Conference, December, 2003.

"The Strength of Analyst Coverage Following IPO's," (with J. Karceski), forthcoming, <u>Journal of Financial Economics</u>, 2006, Presented at 2005 American Finance Association Meetings.

"Investor Monitoring and Differences in Mutual Fund Performance," (with J. Karceski), forthcoming, <u>Journal of Banking and Finance</u>, 2006, Presented at 2001 American Finance Association Meetings.

"Banks and Bubbles:  How Good are Bankers at Spotting Winners?" (with L. Gonzalez), forthcoming, <u>Journal of Financial Economics</u>, 2006.

**CURRENT
RESEARCH:**          "The Information Content of Bank Loan Covenants", With Cem Demiroglu work in progress.

"The Effects of Leverage on Operating Performance:  An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown), working paper.

**OTHER PAPERS AND
PUBLICATIONS:**      "Are Banks Still Special?  New Evidence in the Corporate Capital-Raising Process," (with D. Smith), <u>Journal of Applied Corporate Finance</u>, Winter, 2000.

"Why Are Value Enhancing Mergers In Banking So Hard to Find?   A Discussion of 'Is the Bank Merger Wave of the 90's Efficient' Lessons from Nine Case Studies,'" Kaplan, Steven (ed.), <u>Mergers and Productivity</u>, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano," <u>Journal of Banking and Finance</u>, 23, 1999, 286-290.

"Using Internal Capital Markets to Lower Capital Costs in Banking," (with J Houston), <u>Journal of Applied Corporate Finance</u>, Summer, 1998.

Discussion of  "Financial Institutions and Regulations:  The Dilemma in a Deregulated World," <u>Proceedings from Riksbank Conference:  Forces for and Implications of Structural Changes in the Financial Sector</u>, June, 1997.

"Evolution of Extinction:   Where are Banks Headed," (with J. Houston), <u>Journal of Applied Corporate Finance</u>, Summer, 1996.

"RAROC at Bank of America:  From Theory to Practice, <u>Journal of Applied Corporate Finance</u>, Summer, 1996.

"Bank Equity Positions in Distressed Firms," Saunders, Anthony and Ingo Walter (ed.), <u>Universal Banking:  Financial System Design Reconsidered</u>, (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One," (with C. Smith), <u>Journal of Applied Corporate Finance</u>, Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," (with D. Brown and M. Mooradian), Altman, Edward (ed.), <u>Bankruptcy and Distressed Restructurings:  Analytical Issues and Investment Opportunities</u>, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), <u>Journal of Applied Corporate Finance</u>, 1994.

"Studies in Financial Institution," (with C. Smith), <u>Commercial Banks</u>, 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee on Banking, Housing and Urban Affairs – 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," Journal of Accounting, Auditing, and Finance, Spring, 1989.

"The Incidence of Mispriced Deposit Insurance," Presented at 1989 American Economic Association Meetings.

"Are Bank Loans Different? Some Evidence From the Stock Market," (with P. Wier), Journal of Applied Corporate Finance, Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

Discussion of "The Search for Financial Stability:  The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," (with P. Wier), Proceedings of a Conference on Bank Structure and Competition, May, 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May, 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May, 1987.

"An Economic Analysis of Interindustry Acquisitions of Thrift Institutions," Report prepared for the Office of the Comptroller of the Currency, February, 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.

**SERVICE**

**ACTIVITIES:**          Associate Editor:  Journal of Banking and Finance, 1999-2001.

Associate Editor:  Journal of Financial Economics, 1993-present.

Associate Editor:  Journal of Financial Services Research, 1989-present.

Associate Editor:  Journal of Managerial and Decision Economics, 1988-present.

Associate Editor:  Journal of Finance, 1988-2000.

Co-Editor:  Journal of Financial Intermediation, 1988-1999.

Associate Editor:  Journal of Financial and Quantitative Analysis, 1982-1984.

Academic Board:  Turnaround Management Association, 1990-2002.

Editorial Board:  Federal Reserve Bank of New York:  Economic Review, 1997-present.

Reviewer:  Journal of Finance; Journal of Money, Credit and Banking; Journal of Financial Economics; Journal of Financial Management; Journal of Banking and Finance; Journal of Business and Economics; Journal of Monetary Economics; American Economic Review; Journal of Political Economy; Review of Financial Studies; Journal of Corporate Finance; Journal of Law and Economics; Journal of Accounting and Economics.

Program Committee:  Financial Management Association, Western Finance Association, American Finance Association, and European Finance Association.

**CONSULTING/EXECUTIVE EDUCATION ACTIVITIES:**

Board of Directors/Chairman, ID$^2$, Inc.

Advisory Board, SunTrust Bank.

Independent Distribution Consultant, Janus Funds

Consultant, Federal Reserve Bank of New York, 1997, 2004.

Consultant, Federal Reserve Board of Governors, 1995, 1998.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Board of Directors, SunTrust Banks, 1989-2001.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets, Workout Lending.

Instructor, Bank Board of Directors School:  Workout Lending.

Instructor, Swiss National Bank, Gerzensee, Switzerland, Bank Safety and Soundness Regulation.

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

Expert Witness:  Cases involving antitrust, portfolio management, securities valuation, bank management, valuation, and regulatory matters.

Consultant:   Product pricing, valuation, portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management.

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds.

Consultant to the FDIC, Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member:  Research Committee:  Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.


**AWARDS:**              Valedictorian, Michigan State University, 1973.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000.

# Exhibit 2
# Prior Testimony of Dr. Christopher M. James
# In the Previous Four Years

*Sterling Savings Association, Sterling Financial Corporation v. United States of America*, No. 95-829C, United States Court of Federal Claims, deposition, 2001, 2002, and 2004

*KA Investments v. Number Nine Visual Technology Corp.,* No. 00 CV 10966 DPW, U.S. District Court, District of Massachusetts, deposition and trial testimony, 2003.

*In Re A.T. Cross Securities Litigation,* No. 00 203 ML, U.S. District Court, District of Rhode Island, deposition, 2003.

*Long Island Savings Bank, FSB, and The Long Island Savings Bank of Centereach FSB, v. United States of America*, No. 92-517C, United States Court of Federal Claims, deposition, 1999-2000, 2003.

*LaSalle Talman Bank, F.S.B., v. United States of America*, No. 92-652C, United States Court of Federal Claims, deposition and trial testimony, 1998-1999, 2004.

*Smith v. Arthur Andersen et al*., No. CIV-01-218-PHX-PGR, United States District Court for the District of Arizona, deposition, 2003.

*Land Development, Ltd. v. Arvida Managers-II, Inc*., No. 96-0062-CA-15-N, The Circuit Court in and for the Eighteenth Judicial Circuit, Seminole County, Florida, deposition, 2003.

*PSINet Consulting Solutions Holdings, Inc., et al*., No. 01-14916, United States Bankruptcy Court for the Southern District of New York, deposition, 2003, trial testimony, 2004.

*AT&T Corp. Securities Litigation*, No. 01-CV-1883, United States District Court for the District of New Jersey, deposition, 2004.

*RaboBank vs. Coopers & Lybrand*, No. 312318, Superior Court of the State of California County of San Francisco, deposition, 2004.

*Citizens Federal Bank, FSB, et al., v. United States*, No. 92-656C, United States Court of Federal Claims, deposition and trial testimony, 2004.

*Marriott International, Inc*., No. 50-T-168-00171-2, International Centre for Dispute Resolution American Arbitration Association, arbitration testimony, 2004.

*James Marcelli v. Bank One Trust Company,* AAA Case No. 77 148 00154 03 DEAR, arbitration testimony, 2004.

*Texas First National bank v. Kenneth Wu,* et al,. No. H-01-2661, United States District Court for the Southern District of Texas, Houston Division, deposition and trial testimony, 2004.

*Hechinger Investment Company of Delaware v. Chase Manhattan Bank*, No. 00-840-RRM, United States District Court for the District of Delaware, deposition, 2004.

*American Capital Corporation and Transcapital Financial Corporation*, *v. U.S*., No. 95-523C, United States Court of Federal Claims, deposition and trial testimony, 2004.

*Wyeth Pharmaceuticals*, No. C-1-01-704, United States District Court for the Southern District of Ohio Western Division, deposition, 2004.

*WorldCom Securities Litigation*, No. 02 Civ. 3288 (DLC), United States District Court Southern District of New York, deposition, 2004.

*Furstenau, et al. v. AT&T Corp., et al.,* No: 02-CV-5409, United States District Court for the District of New Jersey, deposition, 2005.

*Truserv Corporation v. Ernst & Young LLP*, No. 51-Y-181-01333-02, deposition, 2004, arbitration testimony, 2005.

*Allegheny Health, Education and Research Foundation v. PriceWaterhouseCoopers*, No. 00-684, United States District Court for the Western District of Pennsylvania, deposition, 2005.

*Torchmark Corporation, v. KPMG Peat Marwick LLP, et al.,* No. CV-03-3315, Circuit Court of the Tenth Judicial Circuit, in and for Jefferson County Alabama, deposition, 2005.

*Cisco Systems, Inc*., No. C-01-20418-JW(HRL), United States District Court Northern District of California San Jose Division, deposition, 2006.

*Williams Securities Litigation*, No. 02-CV-72-SPF-FHM, United States District Court for the Northern District of Oklahoma, deposition, 2006.

*Asche Transportation Services v. Ernst & Young, LLP*, No. 51-107-Y-01237 04, American Arbitration Association, arbitration testimony, 2006.

*Granite Management Corporation v. United States of America,* No. 95-515C, United States Court of Federal Claims, trial testimony, 2006.

*Adams Golf, Inc. Securities Litigation*, C.A. No. 99-371 KAJ, United States District Court District of Delaware, deposition, 2006.

*Enron Corporation Securities Litigation,* MDL Docket No. 1446, United States District Court, Southern District of Texas, Houston Division, deposition, 2006.

*Regents of the University of California, et al. vs. Parsons, et al.*, LA Super. Ct. No. BC293848,

2007.

*California Public Employees' Retirement System vs. AOL Time Warner, Incorporated*, Sacramento Super. Ct. No. 03AS04015, 2007.

*California State Teachers' Retirement System, vs.  AOL Time Warner, Incorporated*, S.F. Super. Ct. No. CGC-03-422609, 2007.

*Water and Power Employees' Retirement System, et al. v. AOL Time Warner Inc.*, et al., L.A. Super. Ct. No. BC346081, 2007.

*Ohio Public Employees' Retirement System, et al. vs. Richard D. Parsons, R.E. Ted Turner, et al.*, Case No. 03CVHO7-7932, 2007.

*J. Gregg Pritchard, as Trustee of the D.I.C. Creditors' Trust, vs. Ernst & Young LLP*, Case No. 71 107 Y 00572 05, 2007.

*AIG Retirement Services, Inc. (formerly known as SunAmerica Inc.), Plaintiff, vs. Altus Finance S.A., et al., Defendants*.  No. CV 05-1035-JRW (CWx), deposition, 2007.

*Barry Van Roden, et al. v. Genzyme Corporation, et al*., No. 03 Civ. 4014 (LLS), United States District Court Southern District of New York, deposition, May 2007.

# Exhibit 3
# DOCUMENTS RELIED UPON

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |

## Legal Documents

Revised Second Amended Complaint

December 9, 2002

Robert D. Sawyer's Second Supplemental Responses to
Defendants' Second Set of Interrogatories to Plaintiffs

January 31, 2007

## Academic Literature

Brealey, Richard A., Stewart C. Myers, and Allan J. Marcus,
*Principles of Corporate Finance*, McGraw-Hill/Irwin, 3rd Ed.,
2001

Brealey, Richard A., Stewart C. Myers, and Franklin Allen,
*Principles of Corporate Finance*, McGraw-Hill/Irwin, 8th Ed.,
2006

Brown, Stephen J. and Jerold B. Warner, "Using Daily Stock
Returns:  The Case of Event Studies," *Journal of Financial
Economics*, Volume 14, Issue 1, March 1985

Fama, Eugene F., *Foundations of Finance:  Portfolio Decisions and
Securities Prices*, Basic Books, Inc. Publishers, June 1976

Foster, George, "Intra-Industry Information Transfers Associated
with Earnings Releases," *Journal of Accounting and Economics*,
Vol. 3, December 1981

## SEC Filings

Oracle 10-K for the year ending May 31, 2000
filed on August 28, 2000

Oracle Corporation Q4 Fiscal 2001 Supplemental Analysis
(http://www.oracle.com/corporate/investor_relations/Q401AS.pdf)

## Conference Call Transcripts

| Oracle's 2QFY01 Conference Call Transcript | *NDCA-ORCL 296261-93* | December 14, 2000 |
| Oracle's 3QFY01 Conference Call Transcript | *NDCA-ORCL 419609-26* | March 1, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| Oracle's 3QFY01 Conference Call Script | *NDCA-ORCL 307101-10* | March 15, 2001 |
| Oracle's 3QFY01 Conference Call Transcript | *NDCA-ORCL 399179-218* | March 15, 2001 |
| **Analyst Reports** | | |
| Morgan Stanley Dean Witter | *NDCA-ORCL 308710-6* | May 12, 2000 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 308754-9* | June 8, 2000 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 1051488-91* | June 21, 2000 |
| BlueStone Capital | | September 8, 2000 |
| Deutsche Bank Alex. Brown | *NDCA-ORCL 420254-7* | September 15, 2000 |
| Goldman Sachs | *NDCA-ORCL 308839-41* | September 15, 2000 |
| Lehman Brothers | *NDCA-ORCL 420261-4* | September 15, 2000 |
| Needham & Co. | *NDCA-ORCL 420321-3* | September 15, 2000 |
| Paine Webber | *UBS 00053-5* | September 15, 2000 |
| Punk, Ziegel & Co. | *NDCA-ORCL 420299-300* | September 15, 2000 |
| Robertson Stephens | *NDCA-ORCL 308832-7* | September 15, 2000 |
| Montgomery Securities | *NDCA-ORCL 421238-9* | October 3, 2000 |
| Merrill Lynch | *NDCA-ORCL 421199-201* | October 4, 2000 |
| Goldman Sachs | *NDCA-ORCL 308851-3* | November 3, 2000 |
| Robertson Stephens | *NDCA-ORCL 419950-5* | November 8, 2000 |
| Salomon Smith Barney | *NDCA-ORCL 420037-9* | November 20, 2000 |
| Chase H&Q | *JPM 00026-35* | November 29, 2000 |
| Robertson Stephens | *NDCA-ORCL 420346-51* | December 6, 2000 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| JP Morgan | *NDCA-ORCL 308880-2* | December 12, 2000 |
| Deutsche Banc Alex. Brown | | December 14, 2000 |
| Lehman Brothers | *NDCA-ORCL 005908-9* | December 14, 2000 |
| Banc of America Securities | *NDCA-ORCL 308967-72* | December 15, 2000 |
| Credit Suisse First Boston | *NDCA-ORCL 308895-900* | December 15, 2000 |
| Deutsche Banc Alex. Brown | *NDCA-ORCL 420587-9* | December 15, 2000 |
| FAC Equities | *NDCA-ORCL 308920-25* | December 15, 2000 |
| Goldman Sachs | *NDCA-ORCL 308884-5* | December 15, 2000 |
| JP Morgan | *NDCA-ORCL 420607-9* | December 15, 2000 |
| Lehman Brothers | *NDCA-ORCL 308916-8* | December 15, 2000 |
| Merrill Lynch | *NDCA-ORCL 308890-3* | December 15, 2000 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 308902-10* | December 15, 2000 |
| Punk, Ziegel & Co. | *NDCA-ORCL 308887-8* | December 15, 2000 |
| Robertson Stephens | *NDCA-ORCL 420566-71* | December 15, 2000 |
| Salomon Smith Barney | *NDCA-ORCL 308931-4* | December 15, 2000 |
| William Blair & Co. | *WBC 0032-3* | December 15, 2000 |
| Credit Suisse First Boston | *CSFB 000078-81* | December 19, 2000 |
| Salomon Smith Barney | *NDCA-ORCL 309063-7* | January 10, 2001 |
| Merrill Lynch | | January 17, 2001 |
| Thomas Weisel Partners | *TWP 0072-9* | January 17, 2001 |
| William Blair & Co. | *NDCA-ORCL 309069-71* | January 17, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| Robertson Stephens | *NDCA-ORCL 005758-63* | January 18, 2001 |
| PNC Advisors | | January 23, 2001 |
| Banc of America Securities | *BOA 01071-4* | February 7, 2001 |
| SG Cowen Securities, Inc. | *SG 0170-93* | February 7, 2001 |
| U.S. Bancorp Piper Jaffray | | February 7, 2001 |
| Deutsche Banc Alex. Brown | *NDCA-ORCL 141791-3* | February 8, 2001 |
| First Union Securities, Inc. | *NDCA-ORCL 091531-3* | February 8, 2001 |
| Goldman Sachs | *NDCA-ORCL 309127-8* | February 8, 2001 |
| Goldman Sachs | | February 9, 2001 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 430568-75* | February 9, 2001 |
| Lehman Brothers | | February 12, 2001 |
| Lehman Brothers | | February 14, 2001 |
| Banc of America Securities | *BOA 00105-8* | February 21, 2001 |
| Deutsche Bank Alex. Brown | *NDCA-ORCL 419986-9* | February 21, 2001 |
| Punk, Ziegel & Co. | *NDCA-ORCL 309130-1* | February 21, 2001 |
| Salomon Smith Barney | *NDCA-ORCL 091457-61* | February 21, 2001 |
| SG Cowen Securities, Inc. | *NDCA-ORCL 091454-6* | February 21, 2001 |
| William Blair & Co. | *NDCA-ORCL 419993-6* | February 22, 2001 |
| CIBC World Markets Corp. | *NDCA-ORCL 309144-50* | February 23, 2001 |
| U.S. Bancorp Piper Jaffray | *NDCA-ORCL 420004-6* | February 23, 2001 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 277071-84* | February 26, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| SG Cowen Securities, Inc. | | February 28, 2001 |
| Deutsche Banc Alex. Brown | | March 1, 2001 |
| Banc of America Securities | *BOA 02688-703* | March 2, 2001 |
| Credit Suisse First Boston | *NDCA-ORCL 091394-5* | March 2, 2001 |
| Goldman Sachs | *NDCA-ORCL 091368-9* | March 2, 2001 |
| Lehman Brothers | *NDCA-ORCL 091384-6* | March 2, 2001 |
| Merrill Lynch | | March 2, 2001 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 091344-50* | March 2, 2001 |
| Needham & Co. | *NDCA-ORCL 309196-8* | March 2, 2001 |
| Salomon Smith Barney | *NDCA-ORCL 091361-3* | March 2, 2001 |
| UBS Warburg (US) | *NDCA-ORCL 309161-4* | March 2, 2001 |
| Credit Suisse First Boston | *CSFB 000075-7* | March 5, 2001 |
| PMG Capital | *NDCA-ORCL 309204-5* | March 6, 2001 |
| Banc of America Securities | *BOA 02704-8* | March 15, 2001 |
| A.G. Edwards & Sons, Inc. | *NDCA-ORCL 107520-2* | March 16, 2001 |
| Banc of America Securities | *BOA 02709-16* | March 16, 2001 |
| CIBC World Markets Corp. | *NDCA-ORCL 309244-54* | March 16, 2001 |
| Josephthal and Co. | *NDCA-ORCL 107465-7* | March 16, 2001 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 147951-9* | March 16, 2001 |
| Banc of America Securities | | April 5, 2001 |
| Robertson Stephens | *NDCA-ORCL 107418-24* | April 11, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| Banc of America Securities | | May 30, 2001 |

**<u>Industry Reports</u>**

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| Morgan Stanley Dean Witter | | December 18, 2000 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 308974-9049* | December 20, 2000 |
| Morgan Stanley Dean Witter (Enterprise Software – CIO Outlook 2001 – Conference Summary) | | December 21, 2000 |
| Morgan Stanley Dean Witter (Technology: Enterprise Software – Softnotes) | | December 21, 2000 |
| Morgan Stanley Dean Witter | | January 3, 2001 |
| Morgan Stanley Dean Witter (Technology: Enterprise Software – CIO Outlook for 2001 – Conference Summary) | | January 4, 2001 |
| Morgan Stanley Dean Witter (Technology: Enterprise Software – Software: What Happened & What to Do From Here) | | January 4, 2001 |
| Morgan Stanley Dean Witter (Enterprise Software – Summary of Internet, Software and Networking Conference) | | January 22, 2001 |
| Morgan Stanley Dean Witter (Enterprise Software Infrastructure – Internet, Software & Networking Conference) | | January 22, 2001 |
| Morgan Stanley Dean Witter | | February 9, 2001 |
| Salomon Smith Barney | *NDCA-ORCL 091488-92* | February 12, 2001 |
| Morgan Stanley Dean Witter | | February 21, 2001 |
| Morgan Stanley Dean Witter | | March 2001 |
| Morgan Stanley Dean Witter | *NDCA-ORCL 179622-75* | April 3, 2001 |
| Morgan Stanley Dean Witter | | April 17, 2001 |

**<u>Market Reports</u>**

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| Gartner Dataquest | | October 13, 1999 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| AMR Research | | May 1, 2000 |
| GartnerGroup | *NDCA-ORCL 308584-5* | July 10, 2000 |
| AMR Research | *NDCA-ORCL 308590-5* | September 5, 2000 |
| Gartner, Inc. | | December 4, 2000 |
| AMR Research | | December 6, 2000 |
| AMR Research | *NDCA-ORCL 308619-24* | February 27, 2001 |
| Giga Information Group | | March 5, 2001 |
| Giga Information Group | | March 8, 2001 |
| Forrester Research, Inc. | | March 19, 2001 |
| Gartner, Inc. | | March 23, 2001 |

## **Competitor Reports**

| | | |
|---|---|---|
| Chase H&Q (analyst report on PeopleSoft) | | December 13, 2000 |
| Salomon Smith Barney (analyst report on Seibel) | | December 14, 2000 |
| HSBC Global Research (analyst report on SAP) | | December 15, 2000 |
| CIBC World Markets (analyst report on Siebel) | | January 24, 2001 |
| Oppenheimer Research (analyst report on SAP) | | January 25, 2001 |
| Credit Suisse First Boston (analyst report on Commerce One) | | March 2, 2001 |
| Dain Rauscher Wessels (analyst report on BEA Systems) | | March 2, 2001 |
| Epoch Partners (analyst report on Ariba) | | March 2, 2001 |
| Epoch Partners (analyst report on i2 Technologies) | | March 2, 2001 |
| Morgan Stanley Dean Witter (analyst report on BEA Systems) | | March 2, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| Robertson Stephens (analyst report on Seibel) | | March 2, 2001 |
| U.S. Bancorp Piper Jaffray (analyst report on Seibel) | | March 2, 2001 |
| Robertson Stephens (analyst report on PeopleSoft) | | March 12, 2001 |
| SG Cowen Securities, Inc. (analyst report on Microsoft) | | March 12, 2001 |
| UBS Warburg (analyst report on i2 Technologies) | | March 12, 2001 |
| Robertson Stephens (analyst report on Ariba) | | March 16, 2001 |
| Salomon Smith Barney (analyst report on PeopleSoft) | | March 16, 2001 |
| Deutsche Bank Alex. Brown (analyst report on Ariba) | | March 17, 2001 |
| Deutsche Bank Alex. Brown (analyst report on Commerce One) | | April 3, 2001 |
| Robert Baird (analyst report on Ariba) | | April 3, 2001 |

## Public Press

*Institutional Investor* All-America Research Team publications for the years 1999 – 2002

| | | |
|---|---|---|
| "Oracle Announces Oracle(R) Applications Release 11i," *PR Newswire* | | September 27, 1999 |
| "Oracle(R) Release 11i Wins Beta Customer Accolades," *PR Newswire* | | September 27, 1999 |
| "The 1999 All-America Research Team," *Institutional Investor* | | October 1999 |
| "Oracle's Talking Should You Be Listening? -- The Company's Applications Strategy Almost Faltered, But Its Message Is Now Getting Through," *InformationWeek* | | February 7, 2000 |
| "Oracle Marketing on Tap," *InfoWorld* | | May 22, 2000 |
| "Oracle Ships All-In-One E-Business Suite -- But Applications May Not Necessarily Be the Answer for All Companies," *Information Week* | | May 29, 2000 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| "Lend a Hand," Smart Partner from *ZDWire* | | June 19, 2000 |
| "Oracle Application Sales Up 61%, CRM Sales Up 161% Adjusted Net Income Up 76%, Operating Margin Reaches 41%," *PR Newswire* | | June 20, 2000 |
| "Applied Digital Solutions Selects Oracle Over Siebel for Customer Relationship Management Solution," *PR Newswire* | | June 22, 2000 |
| "System Integrators Applaud Oracle E-Business Suite," *PR Newswire* | | June 29, 2000 |
| "E-Business Suite Mixes CRM, ERP," *Computer Dealer News* | | July 14, 2000 |
| "Oracle Furnishes OfficeFurniture.com for E-Business Success," *PR Newswire* | | September 27, 2000 |
| "Oracle," eWeek from *ZDWire* | | October 1, 2000 |
| "The 2000 All-America Research Team," *Institutional Investor* | | October 2000 |
| "Oracle E-Business Suite Draws Cautious Interest -- Users Are Intrigued by the Package But Wary about Implementing It," *InformationWeek* | | October 16, 2000 |
| "I2's Third Quarter Revenues Grow 118 Percent to $320 Million," *Business Wire* | | October 17, 2000 |
| "IBM Announces Third-Quarter 2000 Results; 3Q00 EPS Increased 20%, Excluding 1999 Items," *Business Wire* | | October 17, 2000 |
| "PeopleSoft Announces Record Quarterly Revenue; License Revenues Increase 100 Percent," *Business Wire* | | October 17, 2000 |
| "Ariba Vows to Turn Profit as 4th-Quarter Core Results Top Estimates," *Dow Jones Business News* | | October 18, 2000 |
| "Microsoft Announces Strong Results Driven by Windows 2000 Professional and Windows Me," *PR Newswire* | | October 18, 2000 |
| "Commerce One Reports Record Third Quarter 2000 Results; Revenues Increase 987% To $112.7 Million; Net Operating Loss Per Share Of $0.09 Billioneats [*sic*] Estimates," *Business Wire* | | October 19, 2000 |
| "SAP Reports Third Quarter Results," *Business Wire* | | October 19, 2000 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| "Oracle Applications Users Look for More Help on Upgrades," *InfoWorld Daily News* | | October 20, 2000 |
| "Siebel Systems Reports Revenue and Earnings for the Quarter Ended September 30, 2000; Q3 2000 Revenue Increases 131 Percent over Q3 1999," *Business Wire* | | October 24, 2000 |
| "Users Vent Frustration over Oracle CRM/ERP Upgrades," *Computerworld* | *NDCA-ORCL 141734-6* | October 30, 2000 |
| "The Oracle E-Business Suite Wins the Intelligent Enterprise Readers' Choice Award," *PR Newswire* | | November 2, 2000 |
| "Market Talk:  Oracle Talk Likely to Heat Up Down the Road," *Dow Jones News Service* | | November 6, 2000 |
| "BEA Systems' Third-Quarter Report Beats Forecast," *Reuters News* | | November 14, 2000 |
| "OAUG Offers Asia/Pacific Users Chance to Ask Oracle," *Business Wire* | | November 15, 2000 |
| "Oracle Outshines SAP and PeopleSoft in Data News Awards for Excellence 2000," *PR Newswire* | | November 28, 2000 |
| "Tales of the Tape:  Oracle To Speak; What Will It Say?" *Dow Jones News Service* | | December 4, 2000 |
| "Find Out About Oracle Corporation's Billion Dollar Savings Story on the E-Business Network," *PR Newswire* | | December 5, 2000 |
| "USA:  Oracle Expected to Post Solid Q2 Results Thursday," *Reuters News* | | December 12, 2000 |
| "USA: Oracle Expected to Post Solid Q2 Results Thursday," *Reuters News* | | December 12, 2000 |
| "Oracle 2nd-Qtr Net Rises 62%; Applications Sales Jump," *Bloomberg News* | | December 14, 2000 |
| "Oracle Corporation Executive to Interview on RadioWallStreet.com on December 15, 2000," *Bloomberg News* | | December 14, 2000 |
| "Oracle Net Income Up 62%, Earnings Per Share $0.11 Application Sales Up 66%, Database Sales Up 19%," *PR Newswire* | | December 14, 2000 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| "Smartmoney.com:  The Next Big Thing in Tech?" *Dow Jones News Service* | | December 14, 2000 |
| "Artesyn Loses 34.05% on News of Earnings Warning," *CCN Disclosure* | | December 15, 2000 |
| "Oracle Corp. Cut To 'Market Perform' at Punk, Ziegel," *Bloomberg News* | | December 15, 2000 |
| "Oracle Shares Rises after Reporting Higher 2nd-Quarter Profit," *Bloomberg News* | | December 15, 2000 |
| "PeopleSoft CEO's Discipline Spurs Rebound at Software Maker," *Bloomberg News* | | December 26, 2000 |
| "PeopleSoft CEO's Discipline Spurs Rebound at Software Maker," *Bloomberg News* | | December 26, 2000 |
| "Oracle Receives Info Exame 2000 Award for 'Product of the Year'," *PR Newswire* | | December 27, 2000 |
| "Supply Strategy - What to Outsource and Where," *Irish Marketing Review* | | January 1, 2001 |
| "Oracle Charges Toward the Top of the Business Intelligence Rankings," *PR Newswire* | | January 2, 2001 |
| "UPDATE 2-SAP Surges After Better Than Expected Q4 Results," *Reuters News* | | January 8, 2001 |
| "Ariba First-Quarter Results Beat Forecasts," *Reuters News* | | January 11, 2001 |
| "Oracle CFO Says He Plans to Sell $33 Mln in Stock," *Bloomberg News* | | January 11, 2001 |
| "Oracle Japan's 1st-Half Profit Likely Rose as Sales Surged," *Bloomberg News* | | January 11, 2001 |
| "I2 Fourth Quarter Earnings Top Expectations," *Reuters News* | | January 17, 2001 |
| "IBM Fourth Quarter Earnings Beat Expectations," *Reuters News* | | January 17, 2001 |
| "Oracle Ups Capabilities In Marketplace Race," Interactive Week from *ZDWire* | | January 17, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| "Commerce One's 4th-Quarter Net Loss Widened But Revenue Soared," *Dow Jones Business News* | | January 18, 2001 |
| "Microsoft Q2 Earnings Meet Expectations," *Reuters News* | | January 18, 2001 |
| "The *TSC* Streetside Chat: Oracle's Executive Vice President Sandy Sanderson Jr.," *TheStreet.com* | | January 20, 2001 |
| "SAP Turns Corner With 4Q But US Still Troubled Patch," *Dow Jones International News* | | January 23, 2001 |
| "UPDATE 1-Siebel Q4 Earnings Jump As Revenues More Than Double," *Reuters News* | | January 23, 2001 |
| "Oracle CEO Ellison Loses Voice, Misses 2 Public Talks in a Week," *Bloomberg News* | | January 24, 2001 |
| "PeopleSoft Posts 4th-Quarter Earnings Above Analysts' Estimates," *Dow Jones Business News* | | January 30, 2001 |
| "Oracle Shares Fall on Concern Earnings Outlook May Turn Grim," *Bloomberg News* | | February 9, 2001 |
| "USA:  Oracle Shares Shed Value on Analyst Report," *Reuters News Service* | | February 9, 2001 |
| "Goldman Conference:  Its Stock Weak, Oracle Talks of Strong Business," *TheStreet.com* | | February 13, 2001 |
| "Goldman Survey:  IT Spending To Grow 5%-10% This Year," *Dow Jones News Service* | | February 13, 2001 |
| "Oracle Sales Team Sees No Slowdown," Market Watch | | February 13, 2001 |
| "Goldman Sachs Conference," *TheStreet.com* | | February 14, 2001 |
| "Expectations Divided on Oracle's AppsWorld," *Computerworld* | *NDCA-ORCL 307662-63* | February 19, 2001 |
| "Larry Ellison, Chairman and CEO, Oracle Corporation Keynotes and Press Q&A Oracle AppsWorld, New Orleans," *PR Newswire* | | February 21, 2001 |
| "Oracle AppsWorld:  Ellison Says Hands Off Our Apps," *InfoWorld Daily News* | | February 21, 2001 |
| "BEA Fourth Quarter Beats Wall Street Expectations," *Reuters News* | | February 22, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| "Oracle Announces Preliminary Third Quarter Earnings Results," *PR Newswire* | | March 1, 2001 |
| "Playing The Net," *The Wall Street Journal* | | March 11, 2001 |
| "Apps Made Easy? -- Getting Enterprise Applications to Work Properly is Tough to Do.  Oracle's Been Part of the Problem–Now it's Pitching a Solution." *InformationWeek* | | March 12, 2001 |
| "Oracle's Third-Quarter Results Meet Expectations," *Reuters News* | | March 15, 2001 |
| "Ariba Warns of Q2 Loss, To Cut One-Third of Work Force," *Reuters News* | | April 2, 2001 |
| "UPDATE 1-Commerce One Lowers First-Quarter Outlook," *Reuters News* | | April 4, 2001 |
| "UPDATE 1-Commerce One Lowers First-Quarter Outlook," *Reuters News* | | April 4, 2001 |
| "UPDATE 2-Siebel Q1 Results Delight, Layoffs, Outlook Haunt," *Reuters News* | | April 18, 2001 |
| "UPDATE 2-Software Firm i2 First Quarter Meets Expectations," *Reuters News* | | April 18, 2001 |
| "IBM Stock Jumps after Solid Results, Steady Outlook," *Reuters News* | | April 19, 2001 |
| "Microsoft Posts 2.8% Increase in 3rd-Quarter Profit, Tops Revenue Estimates," *Dow Jones Business News* | | April 19, 2001 |
| "SAP Q1 Beats Expectations," *Reuters News* | | April 19, 2001 |
| "UPDATE 2-Commerce One Q1 Net Falls, Revenues Jump," *Reuters News* | | April 20, 2001 |
| "UPDATE 3-Ariba Loss Widens on Weaker IT Spending," *Reuters News* | | April 20, 2001 |
| "UPDATE 2-Peoplesoft Beats Street, Reiterates Forecast," *Reuters News* | | April 25, 2001 |
| "BEA Systems' 1st-Quarter Core Profit Beats Target, Revenue Soared 67%," *Dow Jones Business News* | | May 15, 2001 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| "Oracle Shares Surge 13% Following 4th-Quarter Results, Upbeat Outlook," *Dow Jones Business News* | | June 19, 2001 |
| "Commerce One Sees 2Q Rev $100m to $120m," *Dow Jones News Service* | | June 29, 2001 |
| "i2 Technologies Sees Worse-Than-Expected 2nd-Quarter Loss," *Dow Jones Business News* | | July 3, 2001 |
| "i2 Announces Second Quarter 2001 Results; First Half 2001 Total Revenues Grow 39% to $598 Million," *Business Wire* | | July 18, 2001 |
| "IBM Announces Second-Quarter 2001 Results - 2Q01 EPS Increased 8%," *Business Wire* | | July 18, 2001 |
| "Siebel Systems Reports Revenue and Earnings for the Quarter Ended June 30, 2001; Q2 2001 Revenues Increase 38 Percent over Q2 2000," *Business Wire* | | July 18, 2001 |
| "Ariba Beats First Call Revenue and Earnings Estimates," *PR Newswire* | | July 19, 2001 |
| "Commerce One Reports Second Quarter 2001 Results; Revenues Increase 61% Year over Year to $101 Million; Net Operating Loss Per Share of $.31," *Business Wire* | | July 19, 2001 |
| "Microsoft Issues 1st-Quarter Warning, Raises Fiscal 2002 Outlook," *Dow Jones Business News* | | July 19, 2001 |
| "SAP's 2nd-Quarter Net Profit Soared 78%, Topping Market Expectations," *Dow Jones Business News* | | July 19, 2001 |
| "PeopleSoft's 2nd-Quarter Net Income Tripled, Issues Positive Outlook," *Dow Jones Business News* | | July 24, 2001 |
| "The All-America Research Team: The Best Analyst of the Year," *Institutional Investor* | | October 2001 |

## Press Releases

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|
| "Oracle Ships 11i, Industry's First Integrated E-Business Suite," Oracle Press Release | *NDCA-ORCL 306830-32* | May 24, 2000 |
| "Oracle Reports Net Income Up 111%, Earnings Per Share $0.17," Oracle Press Release | | September 14, 2000 |

Exhibit 3

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |
| "Find Out about Oracle Corporation's Billion Dollar Savings Story on the E-Business Network," Oracle Press Release | | December 5, 2000 |
| "Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19%," Oracle Press Release | | December 14, 2000 |
| "Ariba First Internet B2B to Report Profit," Ariba Press Release | *NDCA-ORCL 307579-82* | January 11, 2001 |
| "i2 First e-Business Solutions Provider to Top $1 Billion in Annual Revenues with Announcement of Record Quarterly Revenues and Earnings," i2 Technologies Press Release | *NDCA-ORCL 307588-91* | January 17, 2001 |
| "Commerce One Reports Record Fourth Quarter and Full Year 2000 Results," Commerce One Press Release | *NDCA-ORCL 307607-09* | January 18, 2001 |
| "PeopleSoft Announces Record Financial Results," PeopleSoft Press Release | *NDCA-ORCL 307643-47* | January 30, 2001 |
| "BEA Reports Record Fourth Quarter and Fiscal Year Financial Results," BEA Systems Press Release | *NDCA-ORCL 307665-70* | February 22, 2001 |
| "Oracle Announces Preliminary Third Quarter Earnings Results," Oracle Press Release | | March 1, 2001 |

## Data Sources

Various company stock data, *CRSP*, 12/8/99 – 4/3/01

Various company stock data, *Bloomberg*, 12/7/99 – 4/3/01

Various company data, *First Call*, 7/31/00 – 7/24/01

## Miscellaneous

| | | |
| --- | --- | --- |
| Transcript of OAUG Fall Conference Q&A Session | *NDCA-ORCL 308421-32* | October 24, 2000 |

# Exhibit 4
# Oracle Corporation
# Regression Model

[Oracle's Return] = 0.00 + 1.49 × (Market Return) + 0.30 × (Industry Index Return)

"Market" is the value weighted CRSP Index; index includes dividends.

"Industry Index" is an equal-weighted index of the companies listed as Oracle's competitors in analyst reports during the class period (12/14/00 – 3/2/01) by *Institutional Investor*'s "All Star" analysts from 1999 – 2001. This includes reports from Morgan Stanley Dean Witter, Salomon Smith Barney, Merrill Lynch, Lehman Brothers, Goldman Sachs, Donaldson, Lufkin and Jenrette, PaineWebber, Credit Suisse First Boston, and Deutsche Bank Alex. Brown. The index is composed of: Ariba, BEA Systems, Commerce One, IBM, i2 Technologies, Microsoft, PeopleSoft, SAP, and Siebel Systems.

Oracle's Return was regressed on the Market Return and Industry Index Return during the period 12/8/99 – 12/8/00.

# Exhibit 5
# Oracle Corporation
# Regression Results
## 12/5/00, 12/14/00 – 3/2/01, 3/16/01

Source:  Plaintiffs' Revised Second Amended Complaint; Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007;  *CRSP*; *Bloomberg*

| Date[1] | Oracle Closing Stock Price | Oracle Volume | Oracle Return | CRSP Value-Weighted NYSE/ /AMEX/NASDAQ Index Return[2] | Industry Index Return[3] | Oracle Residual Return[4] |
|---|---|---|---|---|---|---|
| 12/5/00 †† | $31.50 | 61,097,198 | 11.75% | 4.53% | 18.08% | -0.68% |
| 12/14/00 | $27.50 | 46,970,309 | -3.08% | -1.69% | -4.50% | 0.61% |
| 12/15/00 † | $28.56 | 121,911,009 | 3.86% | -1.77% | -1.65% | 6.80% |
| 12/18/00 | $32.00 | 62,720,946 | 12.04% | 0.54% | -0.52% | 11.20% * |
| 12/19/00 | $30.63 | 59,781,543 | -4.30% | -1.59% | -7.73% | 0.22% |
| 12/20/00 | $28.50 | 55,415,847 | -6.94% | -3.52% | -12.97% | 2.04% |
| 12/21/00 | $29.50 | 47,469,153 | 3.51% | 0.54% | 1.80% | 1.96% |
| 12/22/00 | $31.88 | 35,981,206 | 8.05% | 3.02% | 12.54% | -0.44% |
| 12/26/00 | $30.94 | 20,932,080 | -2.94% | 0.55% | -1.43% | -3.52% |
| 12/27/00 | $30.69 | 26,881,968 | -0.81% | 1.39% | 4.92% | -4.57% |
| 12/28/00 | $31.06 | 25,472,874 | 1.22% | 0.94% | 3.09% | -1.31% |
| 12/29/00 | $29.06 | 32,581,781 | -6.44% | -1.13% | -6.61% | -2.95% |
| 1/2/01 | $26.38 | 47,962,262 | -9.25% | -3.43% | -14.40% | 0.03% |
| 1/3/01 | $32.00 | 77,869,344 | 21.33% | 5.29% | 18.94% | 7.51% * |
| 1/4/01 | $32.56 | 58,841,811 | 1.76% | -1.18% | -5.85% | 5.10% |
| 1/5/01 | $30.13 | 39,575,870 | -7.49% | -2.88% | -8.92% | -0.69% |
| 1/8/01 | $29.94 | 41,289,478 | -0.62% | -0.34% | 4.19% | -1.58% |
| 1/9/01 † | $31.50 | 47,108,840 | 5.22% | 0.49% | 3.41% | 3.26% |
| 1/10/01 † | $32.75 | 65,553,294 | 3.97% | 1.38% | 8.66% | -0.91% |
| 1/11/01 | $33.31 | 51,501,266 | 1.72% | 1.50% | 6.93% | -2.81% |
| 1/12/01 † | $32.31 | 40,596,412 | -3.00% | -0.35% | -5.65% | -0.96% |
| 1/16/01 | $31.81 | 31,526,839 | -1.55% | 0.62% | 0.27% | -2.75% |
| 1/17/01 | $33.25 | 52,914,600 | 4.52% | 0.45% | 4.13% | 2.40% |
| 1/18/01 | $33.81 | 34,575,809 | 1.69% | 1.23% | 1.49% | -0.78% |
| 1/19/01 | $34.56 | 50,477,762 | 2.22% | -0.41% | 5.34% | 1.01% |
| 1/22/01 †† | $31.81 | 61,727,046 | -7.96% | 0.03% | -0.15% | -8.15% * |
| 1/23/01 | $31.48 | 43,138,415 | -1.03% | 1.58% | 3.27% | -4.57% |
| 1/24/01 | $30.06 | 66,124,591 | -4.52% | 0.33% | 3.21% | -6.17% |
| 1/25/01 †† | $29.94 | 62,750,364 | -0.42% | -0.76% | -3.92% | 1.70% |
| 1/26/01 | $30.38 | 46,914,779 | 1.46% | -0.07% | 1.42% | 0.94% |
| 1/29/01 | $30.44 | 34,262,438 | 0.21% | 0.90% | 1.50% | -1.78% |
| 1/30/01 | $30.31 | 43,418,049 | -0.41% | 0.66% | -1.19% | -1.22% |
| 1/31/01 | $29.13 | 47,153,752 | -3.92% | -0.67% | -5.66% | -1.40% |
| 2/1/01 | $30.06 | 39,157,456 | 3.22% | 0.38% | 1.19% | 2.09% |

# Exhibit 5
# Oracle Corporation
# Regression Results
# 12/5/00, 12/14/00 – 3/2/01, 3/16/01

Source:  Plaintiffs' Revised Second Amended Complaint; Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007;  *CRSP*; *Bloomberg*

| Date[1] | Oracle Closing Stock Price | Oracle Volume | Oracle Return | CRSP Value-Weighted NYSE/ /AMEX/NASDAQ Index Return[2] | Industry Index Return[3] | Oracle Residual Return[4] |
|---|---|---|---|---|---|---|
| 2/2/01 | $27.75 | 39,123,588 | -7.69% | -1.86% | -5.85% | -3.34% |
| 2/5/01 † | $27.50 | 36,235,783 | -0.90% | 0.21% | 2.10% | -2.04% |
| 2/6/01 † | $27.63 | 29,071,945 | 0.45% | 0.05% | -0.22% | 0.25% |
| 2/7/01 † | $27.69 | 45,975,655 | 0.23% | -0.88% | -3.80% | 2.49% |
| 2/8/01 † | $27.13 | 42,658,386 | -2.03% | -0.65% | -3.57% | -0.17% |
| 2/9/01 † | $23.56 | 92,325,965 | -13.13% | -1.43% | -5.88% | -9.42% * |
| 2/12/01 | $23.00 | 52,556,111 | -2.39% | 1.04% | -0.46% | -3.98% |
| 2/13/01 †† | $22.56 | 44,856,655 | -1.90% | -0.87% | -3.44% | 0.24% |
| 2/14/01 | $25.00 | 41,747,072 | 10.80% | -0.01% | 5.45% | 8.97% * |
| 2/15/01 | $25.50 | 46,406,202 | 2.00% | 0.90% | 2.57% | -0.31% |
| 2/16/01 | $24.00 | 40,835,148 | -5.88% | -2.06% | -4.43% | -1.66% |
| 2/20/01 | $23.13 | 40,654,394 | -3.65% | -1.88% | -7.03% | 1.09% |
| 2/21/01 † | $23.00 | 58,267,759 | -0.54% | -1.84% | -1.03% | 2.31% |
| 2/22/01 † | $23.38 | 54,516,728 | 1.63% | -0.45% | -3.37% | 3.13% |
| 2/23/01 † | $22.00 | 73,446,841 | -5.88% | -0.39% | -2.03% | -4.88% |
| 2/26/01 | $23.19 | 46,023,689 | 5.40% | 1.92% | 5.61% | 0.64% |
| 2/27/01 | $21.69 | 41,995,218 | -6.47% | -1.14% | -9.85% | -1.97% |
| 2/28/01 | $19.00 | 62,821,560 | -12.39% | -1.37% | -3.42% | -9.50% * |
| 3/1/01 | $21.38 | 77,833,283 | 12.50% | 0.04% | 4.51% | 10.88% * |
| 3/2/01 | $16.88 | 225,557,425 | -21.05% | -0.49% | -12.35% | -16.76% * |
| 3/16/01 | $14.06 | 92,647,788 | -4.26% | -2.08% | -3.86% | -0.18% |

Note:

[1] A cross-mark (†) indicates the impact day of a complaint date.  A double cross-mark (††) indicates the impact day of a "contention response" date.

[2] Index includes dividends.

[3] The Industry Index is an equal-weighted index composed of: Ariba, BEA Systems, Commerce One, IBM, i2 Technologies, Microsoft, PeopleSoft, SAP, and Siebel Systems.

[4] Residuals obtained using the regression model: [Oracle Corp.'s Return] = 0.00 + 1.49 × (Market Return) + 0.30 × (Peer Index Return).  Regression period is 12/8/99 – 12/8/00.  A star (*) indicates that the residual return is significant at the 95% confidence level.

# Exhibit 6
## Selected Quotes Regarding Suite 11i
Source:  Public Press [1]; Financial Analyst Reports [2,3]; Industry Analyst Reports [4];
Market Analyst Reports [5]

And while Oracle wins points for the strategy it's set, Meta Group's Bonadio says the vendor has yet to deliver all that's needed.  "If you look behind the strategy and the vision and the marketing, you're going to find a good amount of holes in the products," he says.  Oracle simply may not have the maturity and depth of more-established CRM vendors such as Siebel and Clarify.  For instance, Oracle's call center is missing several key pieces, including blended call support and predictive dialing.  Other analysts say Oracle's marketing-campaign-management component is weak.  And Oracle needs to do a better job integrating the pieces of its CRM suite, many of which are the result of a 1999 buying spree.

Also, Oracle 11i's delivery date has slipped about six months to May or June because the CRM components aren't completed.  That date won't slip any further, promises senior VP Mark Barrenechea, Oracle's head of CRM development-June is the final deadline.  There had better not be any more delays-executing on Oracle 11i is vital if the company wants to prove that it's not all talk.  Oracle, says Bonadio, "has got so much riding on 11i that it's not even funny."

*InformationWeek*, Vol. 772, February 7, 2000 (public press)

Although industry observers applaud the business value of the 11i software, others say that a best-of-breed approach is still a viable option in lieu of evidence that Oracle's approach, which is to keep applications on a single server and provide users with Web access, can work.
…
Although Oracle is ahead of its ERP and CRM competitors as far as vision is concerned, the 11i suite, including Oracle Marketing, "hasn't been tested in the field yet," said Steve Bonadio, an analyst at Meta Group, based in Stamford, Conn.  The vendor has not been able to provide customer references for 11i in spite of a fairly persuasive business value proposition, Bonadio said.  "We're not convinced that it works," he said.

*InfoWorld*, Vol. 22, Issue 21, May 22, 2000 (public press)

Analysts acknowledge that 11i is comprehensive and well-integrated, but dismiss the notion that competing apps are necessarily more costly and time-consuming.  "If you aren't an existing Oracle customer, it's not clear that Oracle is offering a cheaper deal than assembling the same kind of result from various vendors' products that tie into what you already have," Forrester Group analyst Laurie Orlov says.

Also, analysts say, Oracle 11i may not be more attractive for non-Oracle companies that would have to dump their back-office systems or for existing Oracle customers who would be forced to upgrade from an older version of Oracle software.

*InformationWeek*, Vol. 788, May 29, 2000 (public press)

Based on history, suites win if they provide 70% of the functionality of the best of breed products in each segment.  That's a big "if" and the suite has to evolve at a pace competitive with

the overall market.  The suites need to lead one or two product segments to have a beachhead into accounts.  After that, the high cost of integration, volume pricing, common support, and a desire for consistent technology standards generally pushes buyers toward the suite if it starts to approach functional parity with the rest of the market.

> Morgan Stanley Dean Witter, May 12, 2000, 1:20 PM (analyst report on Oracle)

Even for existing Oracle application customers, rolling out a new application across multiple modules and locations can be challenging.  Networks and databases have to be upgraded.  Tracking net changes across development, test, staging and production environments for a single application can be complex.  Marketers and developers tend to gloss over this unglamorous work but these features are critical to the user experience.

> Morgan Stanley Dean Witter, June 8, 2000, 8:19 AM (analyst report on Oracle)

Oracle 11i is a new suite that combines the functionality of financials, HR and CRM with exchange infrastructure software.  Rather than going head-to-head with the competition on a feature list, Oracle is pitching the ease of implementation and time-to-market advantages of this suite.  This may be a winning strategy if the obstacles to integrating point products are significant.  No other company is taking this all-in-one approach and the barriers to entry are extremely high given the complexity of the software.

> Morgan Stanley Dean Witter, June 21, 2000 (analyst report on Oracle)

"Applied Digital is growing rapidly and it will be critical for us to understand our customers and their entire set of needs without doubling or tripling our internal infrastructure," said Richard J. Sullivan, Chairman and CEO of Applied Digital.  "The Oracle E-Business Suite is allowing us to pull together our business units onto a single system that will enable us to operate with enhanced efficiency.  This will give us the ability to better service our customers, while increasing our profitability by clearly identifying cross-sell and up-sell opportunities."

> *PR Newswire*, June 22, 2000, 12:16 PM (public press)

"The integration of Oracle's E-Business Suite 11i applications enables us to provide customers of every size with exceptional functionality for complete accelerated web-based solutions," said Richard Hymer, vice president, Cap Gemini Ernst & Young U.S., LLC.

"We fully embrace Oracle's comprehensive E-business Suite as it extends perfectly our own E-business strategy and vision for the future," said Aysin Nevill, managing director in charge, KPMG Consulting LLC.  "KPMG plans to advance our long-standing partnership with Oracle by expanding our existing practice areas to create a global Oracle E-business practice based on this technology."

"The new economy building up around emarkets and extended ERP will allow PricewaterhouseCoopers, as a leading implementor of Oracle Applications, to capitalize on the exciting potential of the Oracle 11i E-Business Suite," said Carlos Versteele, Global Leader, PricewaterhouseCoopers Oracle Practice.

*PR Newswire*, June 29, 2000, 12:16 PM (public press)

Challenges:  [Oracle 11i] does not have the deepest functions and has few references.  Despite significant improvements on CRM 3i, Oracle cannot claim to have the deepest functionality in any of its modules when compared with the best-of-breed vendors.  Functional gaps remain; for example, the ability to push Web pages to a customer will be in the next release and field sales functions use offline Web folders.  Moreover, there are some platform limitations in the use of CRM 11i…the most serious being that the CRM functions cannot yet be run independently of the traditional Oracle back-office….  It is unlikely that Oracle will provide leading-edge functions within the next five years due to the slow speed of large-scale development.  However, enterprises that are looking for a commodity front-office solution that is fully integrated with ERP will find Oracle to be a good option.

Gartner, Inc., July 10, 2000 (market report)

According to one analyst, however, expecting global companies to move all their corporate information into one or two databases is unrealistic.

"Most global firms are built up through mergers and acquisitions. And in that sort of scenario, the type of data consolidation Oracle is propounding seems like a pipe dream," said Josh Greenbaum, a principal with Enterprise Application Consulting in Berekeley [*sic*], Calif.

Jarvis, however, said Oracle itself is implementing this consolidation strategy with great success. "We initially had 43 data centers across the world.  We'll soon have just two:  in San Francisco and Colorado."

But cultural resistance to such consolidation can be huge.

"We actually had to send somebody to Canada, just to shut down the Canadian centre.  It was like we were closing the Queen's computers."

*Computer Dealer News*, Vol. 16, Issue 14, July 14, 2000 (public press)

Oracle CRM 11i Underscores Advantages of Integrated Front and Back Offices
…
Oracle Corporation's products don't always warrant the exclamation point the company sticks at the end of their titles.  Oracle left the gimmick off of its *CRM 11i* product, but it's one of the few times that the emphasis is deserved.  CRM is woven into the *Oracle 11i* product suite, which uses shared customer product, price, and order data.  Benefits are found throughout the system, bubbling up from sound fundamentals, including a customer model that understands not only business roles such as customer, distribution partner, and supplier but other entities as well.  The system tracks customer customer [*sic*] locations the way it does customers.  For example. a window manufacturer can market to the new owners of a house known to need replacement windows.
…
Installation has been designed with speed in mind:  The company claims the installation process

takes one hour if the customer has the entire planning process prepared for APS. There is out-of-box integration with *Oracle 10.7* and *11.0* applications, but customers currently bear the burden to write their own integration routines to non-oracle applications.

<div align="right">AMR Research, September 5, 2000 (market report)</div>

While its broad footprint and out-of-the-box integration are the keys to its positioning and message, we caution that some 11i modules still may fall short on functionality compared with best-of-breed rivals. This could prove challenging in head-to-head competition.

<div align="right">Deutsche Bank Alex. Brown, September 15, 2000, 6:03 AM (analyst report on Oracle)</div>

We believe that this [1QFY01] growth rate reflects somewhat slower traction in the market for Oracle 11i applications, which may be due to the seasonally slow nature of the August quarter, time required to develop sales and marketing support, and training for its system integrator partners. We believe it will be critical for Oracle to build a larger referenceable customer base (currently approximately 20 have gone live on release 11i) and secure support from the big five systems integrators to add sales leverage and convert its strong pipeline. Oracle's end-to-end, integrated product should offer strategic advantages over the long-term, but traction may take a bit longer and may imply that best-of-breed vendors such as i2, Siebel, CommerceOne, and Ariba may have longer to broaden their product lines before Oracle efforts to improve functionality and gain market traction materializes.

<div align="right">Goldman Sachs, September 15, 2000, 8:31 AM (analyst report on Oracle)</div>

Applications Growth Disappointing, but Poised for Re-acceleration

Having expected 60+% growth, we were disappointed in the first quarter applications revenue, which only jumped 42%. We believe it is important to emphasize, however, that Oracle's 11i product line is a new release and that such releases typically require up to six months to gain momentum in the marketplace. This is rooted both in the length of the softwares sales cycle and the need to train both technical and sales people on the nuances of the new product. Not all news on the applications side was bad and we expect a big second quarter as Oracle builds customer references, completes the retraining of its staff and capitalizes on a very strong pipeline. We are encouraged that Oracle appears to be having success selling its entire e-business suite. Customer wins during the quarter include Agilent Technologies, Viant, New America Marketing and MyFamily.com. In addition, JDA Uniphase became an Oracle CRM customer during the quarter. Already 20 firms are currently live on the 11i e-business suite and will likely serve as references that we expect to translate into significantly better results in the second quarter. We are also encouraged to see name-brand companies like Booz Allen, McGraw Hill and GE Medical on the list of firms who are using the newly released OracleSalesOnline hosted SFA product. Ironically, despite the first quarter shortfall, our confidence in Oracle's applications business has only improved. As such, we are increasing our second quarter applications estimate….

<div align="right">Lehman Brothers, September 15, 2000, 6:43 AM (analyst report on Oracle)</div>

We believe 2001 will be a great year for the firm.  The major new product release of 11i gives the firm virtually crystal clear visibility into earnings into May, in our view.  After May 2001, however, we believe Oracle will have to work a [*sic*] harder to maintain momentum.  Our reasoning is this. Conversations with several (e.g.- dozens) of potential and current users of Oracle 11i indicates [*sic*] to us that time to market considerations have been an important selling point for 11i.  Put simply, CIO's, whose jobs may be on the line if a project does not get up on time, are opting for the "safe" choice of Oracle because it can be installed quickly and the system is pre-tested to be stable. We believe the near panic state of demand will begin to diminish sometime around mid-2001.

> Needham & Co., September 15, 2000, 9:31 AM (analyst report on Oracle)

But Oracle is putting its money where its mouth is, and raising applications expectations far the remainder of the fiscal year from 40% previously to 50%, and offers that upside could be as high as 100%.  The big picture, strategic-oriented sale of the 11i suite is vastly different than selling a point solution on a feature-by-feature basis.  And we've seen some anecdotal evidence of customers that could not see demonstrations of certain modules of the suite because of various reasons, such as that module had not yet been ported to a particular OS or simply because of bug fixes – not unusual occurrences in the introduction of a new software product.…

…Nevertheless, investors are apt to view with disappointment Oracle's applications performance, particularly against peers like Ariba, Siebel, and i2, which are seeing better growth and carry comparable valuations as Oracle.  The issue is not can Oracle grow the business, or can it compete, but can they grow as fast as investors expect in order to justify the stock's valuation – otherwise, investors are better off shifting their portfolios more in favor of a basket of B2B eCommerce stocks.  We continue to see Oracle as favorably positioned for the Internet, and see Oracle's applications business bouncing back behind the strength of the burgeoning market opportunity, but expect the stock to be under pressure near term as investors await visibility to the magnitude of the success of 11i.

> Paine Webber, September 15, 2000 (analyst report on Oracle)

Since the release of Applications lli tends to involve bigger engagements, it is experiencing longer sales cycles as it is a more strategic decision than past application cycles. And, the training of integrator partners took place in the first-quarter and is continuing into 42, which had a somewhat muting effect on these product sales because of the minimal number of people trained to implement the Suite. Nonetheless, reported license growth of 31%, 898, and 33% in the Americas, EMEA, and Asia/Pacific reflects growth rates with which we are comfortable. And, for the entire year, we are modeling application growth of 46%, which is slightly more conservative than Management's guidance for 50% growth.

> Punk, Ziegel & Co., September 15, 2000, 8:52 AM (analyst report on Oracle)

Given the need to educate Oracle's sizable sales force, partner channel, and prospective customer base on 11i, we believe it will take time to generate sales momentum for the new product.  In addition, selling a broad suite of applications to high-level business buyers (CEOs, CFOs, and

COOs) is very complex and software businesses are typically characterized by back-end loaded, lumpy quarters as a result.

> Robertson Stephens, September 15, 2000, 8:59 AM (analyst report on Oracle)

"The Oracle E-Business Suite is allowing us to operate quickly and effectively, making it possible for us to compete with large competitors," said Eric Wilson, chief technical officer of OfficeFurniture.com.  "Unlike the combination of PeopleSoft and Siebel, the flexibility of the integrated Oracle E-Business Suite allows us to modify the applications to conform to our business practices and our business needs.  And, the tight integration between front and back-office operations has allowed us to have better visibility into our operations and customer activities, which in turn allows us to better service our customers."

> *PR Newswire*, September 27, 2000, 12:19 PM (public press)

In four months, Oracle was able to install Version 11.0.3 of its applications suite an interim stage on the way to 11i and the juice company went live with it in March, said Lee Gordon, IT manager for Nantucket.

The company is going to wait until early next year before proceeding with the full installation of the 11i applications.  Having heard of other sites' implementation problems, such as multiple software patches and long processing times, Gordon opted to wait for the new package to work out the kinks.

"It just makes sense to wait until it comes out," Gordon said. "It's common business sense to let others make the mistakes. Any new product is going to have its sets of glitches."
…
Alliance Coal LLC, a mining company based in Tulsa, Okla., has also heard implementation horror stories and is waiting as long as it can to install 11i.  An Oracle shop since 1997 and among the first to use Oracle's payroll application, Alliance runs Version 10.7 of the application.

Geoff Goolsbay, ITS manager for application services at Alliance, said he would like to wait until the 11i suite stabilizes but is being pressed into installing it early next year.  The company uses the Oracle Payroll application, and Oracle has told Goolsbay there will be no end-of-year patches for the product next year.  That means Alliance must upgrade to 11i by December of next year, or it will be unable to produce such documents as W-2 tax forms.  That also means two major upgrades: first to Version 11, then 11i.

"Oracle publishes a 10.7-to-11 change document, and an 11-to-11i change document, but what they don't give you is a 10.7-to-11i document.  That is amazing to me," Goolsbay said.

> eWeek from *ZDWire*, Vol. 1740, October 1, 2000 (public press)

We continue to believe that Oracle's e-business suite approach will garner Oracle increasing success in the applications arena and help this line of business grow from a low -8% of revenue to -20% or more over the coming years.  Functionality in individual applications areas still lags most Tier 1 competitors such as Siebel and Ariba, for example, but (1) Oracle should

substantially narrow the spread over the coming quarters, (2) smaller Tier 2 applications vendors are showing signs of weakness and this bodes well for Oracle solidifying its place at the Tier 1 table, and (3) Oracle's e-business application suite approach will win favor with large segments of the market, we believe, just as Home Depot and Wal-Mart have succeeded with their one-stop-shopping strategies in their respective markets.

<div align="right">Montgomery Securities, October 3, 2000, 10:32 AM (analyst report on Oracle)</div>

Applications 11i remained a primary focus of the meeting, although it contributes only 20% of current license revenues.  Investors view the applications business as a primary growth engine for future revenue acceleration, so it receives particular scrutiny despite its size.  We believe the applications suite is well positioned as a one-stop shop, but investors are waiting to assess the company's execution on the applications ramp-up, driven by increased sales training, improved demos of the new products and a build out of reference customers beyond the early adopters like Agilent.  We expect 11i revenue growth to be more pronounced in 2H FY0l as these drivers fall into place.

<div align="right">Merrill Lynch, October 4, 2000, 7:05 AM (analyst report on Oracle)</div>

When Oracle E-Business Suite 11i finally rolled out in May after numerous delays, there was a surge of interest among IT departments across the nation-but interest and implementation don't always go hand in hand.  The prospect of adopting a set of linked online application modules from a single vendor that could knit together financials, databases, customer-relationship management, enterprise resource planning, supply-chain planning, and order management is both alluring and daunting.

As a result, companies are being cautious about implementing 11i. According to Gartner Group analyst Timothy Tow, only about 300 companies are implementing 11i right now, and many are doing partial upgrades from Oracle's earlier enterprise applications.
…
ZapMedia recently placed its first 11i financial apps online.  "We had a very aggressive timetable when we started this project, and our expectation was that there would be challenges with any big ERP package," Whitehead says.  "There have been issues, but we worked through them with Oracle-they've been very responsive."

Whitehead says phase two of the project is imminent.  "We have some further modules to implement that relate to our business processes, such as working with our business partners and paying them on a timely basis," he says.  But based on its experience so far, ZapMedia expects 11i to be fully online before the company's portal debut.

Just getting to the launching pad can be a painstaking process for some would-be 11i implementers, however.  John Parker, an independent Oracle consultant with the British Connection Ltd., is preparing well in advance of "11i-Day" at Merrill Corp., a printing and document services company in St. Paul, Minn.  "It's going to be a savage kind of approach-painful and fun all at once," he says of the company's upcoming rollout, which may not even start until January.

Already a longtime user of Oracle databases and financials applications, Merrill hopes to have parts of the 11i suite fully implemented within 12 to 18 months, although it may happen faster. Parker says Merrill will upgrade on the financials side and may be interested in some of 11i's self-service modules, a category that includes Oracle Web Customers, Oracle Web Employees, and Oracle Web Suppliers.  These modules permit authorized users-internal and external-to access data and functions within the company's system, and can be configured to automate processes such as order entry or checking benefits information.  "Our focus is the core financials at this point," he says, adding that "you always need to watch out for scope creep with something like this."

…

Tow does point out, though, that 11i's new supply-chain, order-management, and other E-business modules aren't quite as strong as competing standalone products.  "Oracle likes to claim that they do everything, but you have to look into detail as to what they really can do," he says. "The back-office suite is mature, but things like the sales-force automation tools are still new." For example, he cites 11i's weak links for mobile and wireless communications as compared with E-business products from rivals such as Clarify and Vignette Corp.

"Oracle isn't quite there yet," maintains Chuck Phillips, managing director of Morgan Stanley Dean Witter & Co.  "It will be hard to span all the categories from office to back office.

It's hard to be good at two or three of those, let alone all of them."

*InformationWeek*, Vol. 808, October 16, 2000 (public press)

Migration issues surrounding the new set of ERP (enterprise resource planning) and CRM (customer relationship management) applications that Oracle shipped earlier this year are expected to take center stage at next week's fall conference of the independent Oracle Applications Users Group (OAUG), which kicks off Sunday in Honolulu.

Oracle claims that its E-Business Suite Release 11i software, which became fully available in May, offers corporate users beefed-up applications for tasks such as processing orders and managing interactions with customers.  The Redwood Shores, Calif.-based company plans to stop providing free support for most of the earlier versions of its applications at the end of next year.

…

But according to officials at the Atlanta-based OAUG, some current users still on earlier greenscreen application releases are worried that they are not ready to make the leap to the Web-based 11i and want Oracle to lend a hand with their migrations.

Bugs in the 11i software will be a big issue for users attending next week's conference, said Karen Gilbert, an OAUG board member who works at Dallas-based consulting firm Computer Systems Authority.  Gilbert said she has two clients that have been unsuccessfully testing 11i's payroll application while casting wary eyes at the 2001 deadline.  "You can go live without a lot of things working, but not payroll," she noted.

Oracle and its business partners are offering 11i-bound users round-the-clock support and fixes to any bugs that might arise, said Allan Snyder, senior vice president of support at Oracle.  And users who do not complete moves to 11i in time will be able to buy continued support for Release 10.7 and below of the applications, he added.

Another key issue is training.  Mark Linton, another OAUG board member, said users are concerned that there are not enough resources coming from Oracle to help them learn all the nuances of Release 11i.

Gilbert agreed, claiming that even Oracle's own support staff isn't adequately trained on 11i. "Oracle is offering very little in classes for the new release," she said.

A third big issue is a new customer service model announced recently by Oracle that phases out the lowest and least expensive level of service that users could buy, called "bronze."  The cost for bronze-level users will now be higher, and that will cause a "nasty shock" to them when they have to renew their service contracts, Gilbert said.

*InfoWorld Daily News*, October 20, 2000, 8:03 PM (public press)


Users Vent Frustration Over Oracle CRM/ERP Upgrades

'Not ready for prime time' among complaints at conference

Oracle users last week expressed frustration over problems with upgrading to Oracle's new E-Business Suite 11i software.

During sessions at the Oracle Applications Users Group (OAUG) conference here, attendees complained about a lack of reliable information about the status of the applications, a flurry of bug-fix patches, malfunctioning modules and the difficulty in getting help from Oracle Corp.'s customer service organization.  Several attendees said Oracle has released about 5,000 patches that for [*sic*] 11i.

The software "is not ready for prime time," said Donna Rosenstrater, an OAUG board member who works at San Jose-based electronics contract manufacturer Sanmina Corp.
…
Karen Gilbert, an OAUG director who works at Dallas-based consulting firm Computer Systems Authority, said the general rule of thumb among users is that it takes about seven days to go live with 11i, whereas most companies typically have just a weekend to implement an upgrade.

Gilbert also claimed that Oracle's own support staff hasn't been properly trained on the workings of the 11i suite.

Oracle's applications unit needs to start performing triage by stopping new-product development work and focusing resources on helping users get through their upgrades, she said.

Not all user experiences have been negative.  The new installations seem to be going more smoothly than the upgrades, said observers.

For example, Pella Corp., a window and door manufacturer in Pella, Iowa, went live with 11i's financial modules after spending 17 weeks installing the software.

"Slowly but surely, we're rolling out 11i," said Pella Vice President and CIO Steve Printz.

Jeremy Burton, senior vice president of products and services at Oracle, said only 43 companies have gone live with 11i applications thus far.

But, he said, it doesn't take as long to implement the new Oracle applications as it does to install ERP systems from rival vendors.

*Computerworld*, October 30, 2000 (public press)

Oracle Corp. (Nasdaq: ORCL), the largest provider of software for e-business, today announced that the Oracle(R) E-Business Suite has swept the 2000 Intelligent Enterprise Readers' Choice Awards. Oracle received top honors from Intelligent Enterprise readers in the categories of CRM, ERP/Packaged Corporate Application and Supply Chain Management. This year's awards marks Oracle's third consecutive and affirms Oracle's position as the leading provider of software for e-business.

"The clean sweep for the Oracle E-Business Suite in Intelligent Enterprise's prestigious Readers' Choice Award is a clear indicator that the market is looking for a complete suite of integrated applications," said Jeremy Burton, senior vice president, product and services marketing, Oracle. "Only Oracle delivers a true e-business suite, and we are proud to be recognized for this unique and powerful offering by Intelligent Enterprise readers."

*PR Newswire*, November 2, 2000, 8:03 AM (public press)

First, we would like to address the substantive issues, putting Release 11i issues in perspective. We believe the release was buggy, but consistent with other major new releases. Oracle needs more reference accounts to help sell it, but there do not appear to be any 'show-stopper' issues surfacing at this point in our checkings. There are now 43 live sites, up from 27 a month ago. Second [Oracle] will not overwhelm i2 or Siebel with this release, best of breed vendors are likely to continue to capture the high end of the market…. Oracle will see early success more in the mid-market, with several larger accounts as notable wins….

Perhaps the biggest substantive issue of controversy for Oracle is the market acceptance of the new release of its strategically important applications suite, Release 11i. We have been checking with users and will not be done for another week or so, but on a preliminary basis it appears to us that there are no 'show stopper' issues. The number of live sites is now reported to be 43, up from 27 at the analyst meting a month ago. We believe there are about 300 new customers and installed base users upgrading to Release 11i now. There have bean a lot of bugs reported, an issue raised at the recent user group meeting, but this does not appear to be different from other major releases of Oracle software.

HP is implementing Oracle's CRM product and will go into pilot in December, and are happy with the Release 2 of 11i, which fixed many of the bugs reported to date. JDS Uniphase is

implementing the broader e-business suite, but will not implement much of 11i until it completes the rollout of 11.03 next year.  It does not require the features of Siebel or i2 at this time.  Other large customers expected to roll out Oracle applications include Lucent, Bell South, Agilent, and divisions of GE.  We expect that most of the early adopters of 11i will be mid-market vendors, customers that do not require the best of breed functionality and want quicker implementations associated with an integrated solution.

We believe that maybe 10% of Oracle's applications customers will upgrade to Release 11i by the end of the February quarter, with an accelerating rate of adoption to follow after it appears that most of the early bugs have been addressed with subsequent minor updates.  Customers we are talking to like integration (one data model, one programming language, on[e] vendor for support, one upgrade cycle, less integration work, quicker implementation, etc).  Oracle sells integration and flexible Internet architecture, and does not typically engage in a feature by feature comparison with the best of breed vendors.  We continue to believe the high end belongs to the best of breed vendors and it will take Oracle time to move up market, but not all of the high end requires best of breed.

We also note that much of Oracle's success with 11i has been leveraging off of its financials and related ERP suite, not lead by the CRM or SCM modules.  Release 11i integrates in these modules for the first time.  We believe there is the opportunity to pull along CRM and SCM solutions with the ERP modules and begin to position as a broader e-business suite vendor.

A large fruit juice vendor in the Northeast reports 6 month time implementing 11.0 and expects to take 2-3 months implementing 11i.  The vendor was aware of 11i upcoming functionality and Internet architecture in selecting Release 11 but will wait a while before implementing 11i.  We believe many customers will be influenced as more reference sites report back that the product works as advertised and bugs reports appear to be addressed by the minor new releases.

Goldman Sachs, November 3, 2000, 9:31 AM (analyst report on Oracle)

Although Oracle has an established franchise in the database market, we believe the company faces entrenched competition in the applications space, as well as a number of execution and product roll-out challenges associated with the June release of the 11i application suite.  We believe applications represent a unique market with different products, buyers, and competitors than in databases.  Over the next several quarters, Oracle must train the sales force to sell 11i applications, launch a new calling effort targeting different buyers (buyers of applications are business people, while databases are typically purchased by IT professionals), build the pipeline, win new business, develop 11i customer references, and deepen the product functionality.  We believe Oracle must execute well in these areas on an intensely competitive playing field where entrenched, best-of-breed vendors continue to capture significant market share, particularly in the areas of CRM, supply chain collaboration, and B2B eCommerce.  And Oracle will have to perform without the contribution of Ray Lane, who left the company in July.

Given the difficulty of executing on all of these fronts, the competitive nature of the applications space, and the company's relatively weak performance in applications to date, we believe there is more risk to F2001 numbers than there may appear….

Oracle faces significant execution risk as it launches a major new product cycle

We believe the recent release of the 11i application suite introduces significant execution risk over the next 3-4 quarters as Oracle addresses the challenges of a new product cycle, including the following:

 * Train sales force and build 11i pipeline although Oracle has an established franchise in the database market, applications represent a unique market with different products, buyers, and sales cycles and more entrenched competitors than in databases.  The company trained its sales people on 11i over the summer after the June release, indicating that the company is still in the early stages of the sales cycle, which typically lasts 6-9 months in the software industry.  In addition, the buyers of applications are different than buyers of databases (buyers of applications are business people, such as the CEO or CFO versus IT professionals who typically purchase databases) resulting in new calling efforts by the sales force.…

* Develop referenceable customers where Oracle will have to successfully implement a number of 11i customers in order to build a franchise in applications and drive sales growth moving forward.…

* Deepen product functionality where we believe Oracle must develop enough functionality in each application area for the benefits of an integrated suite to outweigh the advantages of best-of-breed solutions.  Today, software projects are typically awarded to vendors best suited to solving specific problems resulting in stronger performance from best-of-breed players, such as Siebel, Ariba, CommerceOne, and i2.  Although spending decisions have increasingly been elevated to senior management levels as software has become more strategic to the business, we believe it will take several more years before companies embrace the concept of a suite of applications particularly in the absence of a single vender providing robust functionality in all areas.…

Although Oracle articulates a powerful case for the application suite over best-of-breed solutions, we believe this vision will be difficult to achieve in the near future given the challenges of developing superior products in every applications area, staying ahead of the innovation curve, and ripping out existing systems.…

<div style="text-align:center">Robertson Stephens, November 8, 2000, 1:40 PM (analyst report on Oracle)</div>

Quality was among the key issues voiced by participants.  Questions were posed about the testing process, as well as how regional problems were reported to Redwood Shores.  Oracle offered assurances that the 11i product in particular goes through multiple "waves" of testing.  In addition Oracle confirmed that the company is its own customer, using the products across its own enterprise and is racing to make it better.

<div style="text-align:center">*Business Wire*, November 15, 2000, 11:03 AM (public press)</div>

As the eBuisness [*sic*] Suite is the main contributor to applications revenue going forward, we are still cautious about Oracle's new sales strategy as it relates to the applications division.  We are believers in the eBusiness Suite; however, we remain cautious regarding growth in the

applications division in the imminent quarter.  We believe the sales force will not be fully trained to effectively sell the eBusiness Suite until the latter portion of the year.

> Salomon Smith Barney, November 20, 2000, 6:36 PM (analyst report on Oracle)

Oracle Corp.  (Nasdaq: ORCL), the largest provider of software for e-business, has been awarded the "ERP Software Product of the Year" at the Data News Awards for Excellence, a top event in the information technology (IT) industry in Belgium.  Data News readers overwhelmingly recognized Oracle as the best enterprise resource platform (ERP) platform over both SAP and PeopleSoft.  The selection criteria was based on product innovation and the product vendor's ability to execute on its vision.  Oracle's(R) E-Business Suite 11i provides out-of-the-box integration of applications that allow e-businesses to easily connect with their customers, partners, and suppliers.  Companies can completely automate their enterprise, from marketing and Web selling, all the way through to procurement and the Internet supply chain.

> *PR Newswire*, November 28, 2000 (public press)

Demand for the new 11i applications business suite appears to be building on schedule as the company works out the bugs and issues patches that are the normal course of progress for a new release.  We talked to a number of customers currently running 11i and received positive reviews on its performance and functionality.  Given the building interest for 11i, as well as the run rate business for expansion of the current releases within the installed base, we feel that the company will report 52% or greater revenue growth in the applications business.

> Chase H&Q, November 29, 2000 (analyst report on Oracle)

With release 11i, Oracle has shifted from a best-of-breed (BOB) to a "we can do it all" approach to both applications and infrastructure delivery for enterprise resource planning (ERP), ERP-complementary applications and e-business functionality.  At Gartner's U.S. Fall Symposium, we presented a report card on r.11i for ERP.  As of August 2000, Oracle received a grade of B+ for its vision and a D+ for execution.  The latter mark was upgraded to a B– in November 2000.

Execution:  The marks we gave Oracle in our August 2000 evaluation have improved since then; however, they still reflect Oracle's struggle to deliver Oracle Applications r.11i.  The mark of D+ for r.11i ERP execution (which we published in the August 2000 report card) reflected the following:  1) Oracle had released 11i six months later than its first projected release date of November 1999; 2) Oracle was not able to deliver any production references for 11i beyond the financial modules; and 3) the adoption of 11i was very slow, with all modules still not available.  We have since raised Oracle's execution score to B– overall, with marks of B+ for business execution and C– for product execution, as Oracle has delivered some limited production references for Oracle 11i and has released its FY00 financial results for its applications.  Oracle's applications business has grown by 42 percent year-over-year, showing strong growth in a weak ERP market.  Oracle has effectively leveraged its e-business message to consistently draw it into larger deals that once would have been SAP's exclusive territory.  In addition, r.11i's financial accounting modules have stabilized to the extent that we are comfortable recommending them to enterprises that match Oracle's functional capability and strategic direction.

Summarizing the November 2000 results, Oracle has received the following grades for its ERP applications:

Vision — B+

Execution — (C– and B+) = B–

…

On the product side, early reports from clients demonstrate that r.11i ERP components other than financials remain unproven.  Components such as Manufacturing and Order Management have not been fully deployed (thus, there is no track record), often because the code has come with quality problems that have halted deployment progress.  Client feedback has also revealed that, through at least September 2000, Oracle was consistently unable to demonstrate Oracle 11i in sales situations, because of technical difficulties.  A primary source of Oracle's struggle to deploy r.11i has been product quality problems that appear worse than its competitors', because of Oracle's release deployment strategy.  Gartner believes that the Oracle strategy relies on users performing stress testing during what Oracle considers "general availability," an exercise that Oracle's competitors perform as part of an extended beta or an early adopters program.  Hence, until r.11i is more widely deployed, including by Oracle itself (Oracle will not fully move to r.11i internally until the end of 2000), 11i as a complete ERP suite remains suitable primarily for risk-tolerant, early-adopter-oriented enterprises.

<div align="right">Gartner, Inc. December 4, 2000 (market report)</div>

There's also mounting concern that Oracle's much-touted e-business suite, 11i, which disappointed investors in the August quarter, may once again fail to live up to some high expectations.  In recent research notes, several analysts have cautioned that, while many customers are evaluating 11i, it probably won't gain much traction in the marketplace for some time.

Ellison, who has been preaching the merits of a single, integrated suite of Web software that handles everything from human resources to e-marketplaces at every public appearance this year, is undaunted.  "Even if individual (software) elements are fantastic, when you glue them together, you have a mongrel; a Frankenstein's monster – it's alive but not often," he said at the investor conference last week.

Henley took a somewhat different stance.  While reiterating his prior guidance, he acknowledged "maybe we won't have the enormous success we think we'll have" with 11i, but Oracle will still compete with its niche rivals.

<div align="right">*Dow Jones News Service*, December 4, 2000, 7:00 PM (public press)</div>

Although we believe Oracle could deliver solid November quarter results, we remain cautious on the stock based on company and market-related factors, including the following:

1) Limited track record and customer base in applications which will take several more quarters to build given that 11i was released in June and represents a major new product cycle in a market that is unique from the company's core database business.  Over the next several quarters, Oracle

must train the sales force to sell 11i applications, launch a new calling effort targeting different buyers (buyers of applications are business people, while databases are typically purchased by IT professionals), build the pipeline, win new business, develop 11i customer references, and deepen the product functionality.  We believe Oracle must execute well in these areas on an intensely competitive playing field where entrenched, best-of-breed vendors continue to capture significant market share, particularly in the higher growth areas of CRM, supply chain collaboration, and B2B eCommerce.  We believe applications represent the next engine of revenue growth and margin expansion for the company marking a major transition in the business from databases to applications.

2) Seasonal weakness in the February quarter where it is more difficult to close deals in the first few months of the year in the software industry following seasonally stronger demand at year-end.  In addition, if additional economic data indicate slowing in 2001, we believe sales cycles could lengthen and spending soften for major software implementations potentially compounding the effects of seasonal weakness and impacting Oracle's ability to deliver on Street expectations, in our opinion.

<div align="center">Robertson Stephens, December 6, 2000, 12:37 AM (analyst report on Oracle)</div>

We believe Oracle's 11i e-business suite continues to have bugs thereby limiting the number of notable customer references for the new product.  We continue to expect most large customers will wait another 2 quarters, or so, before purchasing the product, as confirmed by Oracle at its last analyst meeting.

<div align="center">JP Morgan, December 12, 2000, 8:17 AM (analyst report on Oracle)</div>

"We believe Oracle's 11i e-business suite continues to have bugs, thereby limiting the number of notable customer references for the new product.  We continue to expect most large customers will wait another two quarters, or so, before purchasing the product, as confirmed by Oracle at its last analyst meeting," JP Morgan analyst William Epifanio wrote in a research note.

<div align="center">*Reuters News*, December 12, 2000, 11:24 PM (public press)</div>

Many customers and integrators indicated that CRM remains the #1 priority for IT spending….

Applications 11i Gaining Momentum.  Oracle's new 11i e-business suite appears to be gaining significant traction.  83 11i customers are live with roughly 100 in late-stage implementation.  We learned of several large (8-figure), marquee customer wins in the quarter including JDS Uniphase, Compaq, Sun Microsystems, and Agilent Technologies.

<div align="center">Deutsche Bank Alex. Brown, December 14, 2000 (analyst report on Oracle)</div>

However, over the past 6 months, the market is becoming slightly more competitive as offerings from Oracle (as part of its 11i suite), Clarify (FrontOffice version 9.0 was released in 2Q00 and a new release is scheduled for 4Q00) and Vantive (version 8.0 was released in 3Q00) are attempting to increase their traction in the market.  As of 3Q00, Siebel commented that it saw

Clarify and Vantive in approximately 5% of deals, Oracle in 6% of its deals, and SAP in approximately 4% of its deals.

> Salomon Smith Barney, December 14, 2000 (analyst report on Siebel)

E-Business Suite 11i gaining traction.  Oracle's E-Business Suite 11i has established a foothold in the enterprise market….  In addition, 11i seems to now be reaching a critical mass of reference customers….

> Banc of America Securities, December 15, 2000 (analyst report on Oracle)

The main risks we perceive in owning Oracle shares are:  1) license revenue growth has been very volatile (susceptible to large deals) and thus difficult to project accurately; 2) sales force closure rates have varied widely in the recent past; 3) execution in the applications business could depend upon continued rapid growth in Oracle's new front-office applications.

> FAC Equities, December 15, 2000, 8:25 AM (analyst report on Oracle)

Oracle sees no slowing in its business as its product cycle gets better (11i applications suite is finding acceptance in the market, also in the very high end of the market)…

> HSBC Global Research, December 15, 2000 (analyst report on SAP)

The company contributes the strength to the success of its ebusiness suite 11i versus best-of-breed competition.  Management believes customers are favoring the fully integrated suite, versus piecing together different systems from different vendors.  We remain skeptical of this assertion, especially at the high end of the market….

> JP Morgan, December 15, 2000, 8:27 AM (analyst report on Oracle)

The first version of 11i had the bugs that all new releases of this size usually have, but 11.03 was released in November to resolve those issues.

> Morgan Stanley Dean Witter, December 15, 2000 [repeated 12/21/00] (analyst report on Oracle)

We believe the build-out of the applications business represents a major transition for the company and carries a fair amount of near-term risk where the intensely competitive landscape, a major new product roll-out (the 11i application suite was released in June), Oracle's historically mediocre performance in this area, and recent management departures pose significant challenges for the company.

> Robertson Stephens, December 15, 2000, 8:36 AM (analyst report on Oracle)

We anticipate the applications division will continue to accelerate given that the company has exhibited significant traction since the release of Version 2 of its eBusiness Suite in October. We are under the impression that the first version had considerable bugs and the most recent version is really gaining traction in only a matter of months.  The combination of referencable

[*sic*] customers from the newest version functional product dews and a sales force trained on the eBusiness Suite should propel growth in the applications division going forward.

Salomon Smith Barney, December 15, 2000, 7:58 AM (analyst report on Oracle)

This quarter's result indicates that Release 11i is gaining momentum in the marketplace.  Our field checks support this view.  We have spoken to representatives from the Big Five consulting firms who echo the view that Oracle's applications business is gaining momentum.  Specifically, they are seeing Oracle in the running for almost every big enterprise resource planning (ERP) deal, whereas in the past they saw only SAP (SAP $37.50) in the queue for every large deal– Oracle is gaining share from SAP.  Interestingly, they also have seen some customers choose to put in Oracle and remove their SAP and Baan installations.  As for newer applications, the consulting firms have commented quite favorably on Oracle's e-procurement and field service applications.  On the subject of the stability of 11i, they say that the release is no more "buggy" than any other major product introduction (except for the order management module, which apparently has more bugs).

William Blair & Co., December 15, 2000 (analyst report on Oracle)

Recently, Oracle rolled out software for managing sales and customer service operations; the software didn't work as well as the company promised, said Rod Johnson, an analyst at AMR Research Inc. in Boston.  "They brought the product to market too soon," he said.  "There are significant quality issues."

*Bloomberg News*, December 26, 2000, 9:55 AM (public press)

Oracle has been awarded the Info Exame Award for "The Product of the Year" in the application software category.  The Oracle(R) E-Business Suite was selected for its fully integrated suite of front-and back-end office applications.  Info Exame is the largest IT publication in Brazil, and the Info Exame 2000 awards honors the top companies and products in 65 categories, including hardware, software, communications and the Internet, for their innovation in the age of the Internet.

*PR Newswire*, December 27, 2000, 9:00 AM (public press)

A recent example is the enterprise-software market, where Oracle's decision to develop its own integrated e-business suite of applications has so far proved to be much more successful that SAP's strategy of outsourcing to 'best-in-breed' suppliers such as i2 for supply chain, Clarify for support, and Commerce One for exchanges….

*Irish Marketing Review*, Vol. 14, Issue 2, January 1, 2001 (public press)

The days are numbered for best of breed business intelligence solutions.  Oracle's (Nasdaq: ORCL) integrated business intelligence solution based on Oracle9i(TM) is winning an ever-increasing group of admirers.  In this year's DM Review 100, a reader-selected listing of the top vendors in the business intelligence industry, Oracle climbed to a No. 3 ranking from last year's No. 4 position.

*PR Newswire*, January 2, 2001, 8:00 AM (public press)

Oracle reiterates two value propositions for the suite solution versus a "best-of-breed" approach:

* The suite provides a single view of the customer across the enterprise by incorporating a single data model.

*The suite is pre-integrated and fully interoperable out of the box, helping to lower consulting costs and time-to-value.

Salomon Smith Barney, January 10, 2001 (analyst report on Oracle)

The features are aimed at presenting large corporations with a fully integrated offering that can be expanded as they move more of their operations online.  The focus on integration is also seen as a step by Oracle to stem some of the criticism it has faced over the lack of features and functionality in its e-procurement offering, as compared to the platforms of chief rivals Ariba and Commerce One.
…
Oracle's latest product releases are clearly aimed at showing it can play the integration game better than its competitors.

Interactive Week from *ZDWire*, January 17, 2001 (public press)

At Oracle's B2B Collaboration day yesterday, the company rolled out a line of four exchange applications (Exchange Marketplace, Product Development Exchange, Supply Chain Exchange and Transportation Exchange), introduced an Exchange Partner Initiative and highlighted its "eHub," or B2B architecture.  The company views the new technology as an extension of its 11i e-business suite.  Specifically, the new exchange apps are designed to provide collaborative environments outside the four walls of an enterprise, whereas 11i value is principally delivered inside the enterprise.  Value is derived from reduced product development cycle times, eliminated supply chain waste and reduced procurement and logistics costs.  The lack of integration required among Oracle applications was a theme highlighted by management and echoed by a moderated panel of three marketplace customers.

Thomas Weisel Partners, January 17, 2001 (analyst report on Oracle)

Reinforcing the Need for Integration

One-stop shopping and integration is a consistent theme in Oracle's product and sales strategy.  Since the release of its 11i applications suite in May, Oracle has stressed the benefits of an integrated suite; that its individual application components all work together, eliminating the need for integration.  Oracle argues that it makes more sense to buy its suite than to purchase piece parts from other vendors and incur the time and cost of interconnecting them.

William Blair & Co., January 17, 2001, 10:47 AM (analyst report on Oracle)

The 11i application suite was launched only a few quarters ago and Oracle is still building the sales pipeline, implementing new customers, working to develop 11i customer references, and deepening the product functionality (the transportation exchange, for example, will not be released until the spring).  Although we were pleased that three companies participated in a customer panel at the B2B Collaboration event this week, they were relatively young businesses (each was founded in either 1999 or 2000).  Moving forward, we will be looking for enterprise-wide, Fortune 500-caliber customer implementations and references as evidence of Oracle s ability to gain significant traction with 11i.

<div align="right">Robertson Stephens, January 18, 2001, 12:28 AM (analyst report on Oracle)</div>

ORCL's fully integrated e-commerce solution, encompassing database, application server, customer relationship, supply chain management, and enterprise resource planning software products, provides a compelling and cost-effective alternative to the array of best-of-breed competing point solutions available.

<div align="right">PNC Advisors January 23, 2001 (analyst report on Oracle)</div>

We consider the 44% growth rate for the space forecasted by IDC from last year's $4.5 billion to $6.5 billion this year on target or perhaps a little high due to economic conditions.

<div align="right">CIBC World Markets, Corp., January 24, 2001 (analyst report on Siebel)</div>

| Company | Product/Functionality | Comment |
|---|---|---|
| ... | | |
| Oracle (ORCL, Nasdaq) | Good ERP suite (#2 after SAP); CRM functionality. Stresses ability to offer an all-in one solution. | All-in-one solution should be available from end-Q1 2001 (at the earliest).  No joint development and no pre-configured solution. |
| SAP (SAPG, Deutsche Boerse) | Very strong ERP solution (market leader); a picking-up speed SCM solution (#2 after i2); a new CRM solution. | To combat shortcomings – reselling agreement with Clarify (CRM). Joint development with Commerce One (e-marketplaces) – a joint solution in the market since end Q3 2000. |
| ... | | |

<div align="right">Oppenheimer Research, January 25, 2001 (analyst report on SAP)</div>

Mark Barrenechea, Oracle's Senior Vice President of CRM products, delivered a typically positive presentation at BAS' Tech conference today.  He continued to espouse the benefits of Oracle's suite-based product strategy over competitors' "best of breed" approach.  Oracle believes its suite-based approach will be more cost effective for companies than an integrated

"best of breed" approach, because it requires less integration work.

…

11i e-Business Applications Suite making progress.  Oracle's 11i e-Business Suite continues to make progress.  Version 3 is now generally available with version 4 "freezing code" this Friday and expected lo be released within the next 60 days.  The 11i suite now has roughly 200 live customers with 2,000 implementations underway.  Oracle itself is now running at least seven application modules from the 11i suite internally, including modules for marketing, sales, sales compensation, contracts, financials, telesales, and support.  Oracle believes its competitive advantages include integration, scalability, globalization, total cost of ownership, a unified data model, and the ability to manage integrated business flows.

<div align="right">Banc of America Securities, February 7, 2001 (analyst report on Oracle)</div>

With the release of 11i, Oracle has promised a suite of products that the company claims will contend with best-of-breed enterprise software providers.  To date, progress has been mixed, as nearly two-thirds of the entire suite is new (CRM, SCM and procurement).  Thus, it could take some time before 11i gains traction because new product offerings typically take 6-18 months to generate market interest....

<div align="right">SG Cowen Securities, Inc., February 7, 2001 (analyst report on Oracle)</div>

Oracle aggressively pushes the products in suite form, but will also sell applications as stand-alone components.  The Company's differentiable value proposition comes in being able to offer an integrated suite of products (versus stand-alone players such as Siebel, i2 and Ariba).  Benefits include lower near-term systems integration costs, a more fluid working unit of commonly architected applications, and reduced training, integration, and maintenance costs in the longer term.  Moreover the Company offers the applications server and database products that the other suite providers (SAP, PeopleSoft, and Lawson) cannot provide.

We are only cautiously optimistic that the suite approach will work in the near term.  Most companies have a number of disparate applications already in place and are only looking to add-on new functionality.  They do not want to scrap their millions of dollars invested in software and training (in some cases hundreds of millions of dollars) and replace them with a new product.  We believe the suite approach is a long-term vision and sales proposition that many companies may not pursue at this time.  Nonetheless, it is a compelling long-term solution, and a wise move for an existing Oracle customer or a new company starting out fresh.

<div align="right">U.S. Bancorp Piper Jaffray, February 7, 2001, 5:26 PM (analyst report on Oracle)</div>

Oracle 11i continues to gain momentum despite the weakening macro environment.  Oracle got the message right – companies are responding to and intrigued by the one stop shopping and pre-integrated application suite.  The need to reduce complexity and accommodate change more easily argues for a unified application suite.  A number of early wins such as JDS Uniphase, GE Aircraft Engines, ACT Manufacturing, Rockford Inc, UPS, and Bellsouth are starting to go live with the product.  A few like JDS Uniphase have purchased the entire suite.  Millipore, Hitachi, and Cummings Engine are rolling out the advanced planning and scheduling projects.  The references are building but not without a lot of work.  The growing pains of a new code base are

evident in early bug counts and stability issues but the company seems to be working through these issues as expected.

… ERP is doing the best, as we expected, given the rebound in that market while supply chain is receiving surprising initial interest.  CRM is still bumping along but hasn't broken out yet from what we can tell – people are still demanding more features, better performance, and richer support for disconnected clients.

<div align="right">Morgan Stanley Dean Witter, February 9, 2001 (analyst report on Oracle)</div>

Expectations Divided on Oracles' AppsWorld

But if Oracle's European AppsWorld, held last week in Paris, is any indication, the show won't get high marks from Beth Barling, an analyst at AMR Research Inc. in Boston.

"Oracle admitted that Paris was a dry run for New Orleans, and from our perspective, dry was the word," she said.  "[There was] little news or vision beyond a barrage of marketing messages that were already well known."
…
OAUG users have been clamoring for support when upgrading to Oracle's new E-Business Suite 11i software from previous versions.

Rosentrater said that until her company can get 11i up and running safely, she "cannot reap the benefits of the 'new world' of e-business" that Oracle plans to showcase at AppsWorld.

<div align="right"><em>Computerworld</em>, February 19, 2001 (public press)</div>

We believe Oracle could have a compelling message if its applications can deliver functionality close to that of its best-of-breed competitors.  They are not there yet.

<div align="right">Banc of America Securities, February 21, 2001 (analyst report on Oracle)</div>

A few shortfalls of the 11i suite as noted by another Big Five consultant.  The first release of 11i was somewhat unstable with a large number of code patches required. 11i is now in release 3 (shipped at the end of January).  Also, a trade-off of purchasing a full suite is reduced leverage in price negotiations from engaging fewer vendors than in a comparable best-of-breed bake-off.

<div align="right">Deutsche Bank Alex. Brown, February 21, 2001, 6:04 AM (analyst report on Oracle)</div>

New Orleans – Stop modifying Oracle applications.  Stop complementing Oracle applications with third-party software.  Stop building applications in-house.  That's the message from Oracle's Chairman and CEO Larry Ellison to Oracle customers.

"Let us finish our software.  Don't do it for us," Ellison said during a keynote at the Oracle AppsWorld developer's conference here.
…
Describing a fundamental change for Oracle's relationship with its customers, Ellison said e-

business processes must become more standardized and simplified, and to do so customers should trust and rely on Oracle.

Business software patched together with applications from a variety of vendors will not work as well and is less cost-effective than using an integrated suite from a single vendor, such as Oracle's own 11i ERP (enterprise resource planning) suite, Ellison said.

Ellison said Oracle's 11i applications suite lets customers use the Internet to meet 70 percent to 85 percent of their business needs without the need to make software code changes.  Oracle's service crew can tweak and modify the applications to meet the rest of the customers' needs.

"It's a new way of working together, and it means we need to do a better job of understanding your business," Ellison said.

Businesses "are better off with an 80 percent solution in place in six months than fantasizing about a 100 percent solution complete in 2 years after writing a lot of code," Ellison said, referring to companies that build these applications in-house.

Customers get trapped behind old, heavily modified versions of Oracle software, making upgrades difficult, time-consuming, and expensive.  Ellison wants customers to rely on Oracle's services.

"We have more than 100 percent of what you need.  We don't have 100 percent of what you want," Ellison said.

*InfoWorld Daily News*, February 21, 2001, 9:27 PM (public press)

In a word, Oracle's message can be summed up as "integration."  This message continues to be popular and it is hitting two distinct types of customer audiences.

Large organizations, principally the Fortune 100 companies and certain parts of the federal government, are buying into the notion of using the Internet to streamline costs….  However, these large deals come and go if the economy stays uncertain, we believe these types of deals may sit on the horizon for a prolonged period.

Ironically, as Oracle is quick to point out, its software brings a high ROI, which would be of extreme interest to large companies during poor economic conditions.  As such, one might expect Oracle's application message to resonate even louder when times are bad.

Unfortunately, we believe the opposite is the case because implementation periods span multiple years….  However, it's a real lot of money that these Fortune 100 companies are looking at spending (upwards of $100 million in some cases) with Oracle and if the economic environment continues to be weak, we wouldn't be surprised to see some of these prospective customers wait a quarter or two (or more) before they get on board.  Even capital spending gets cut in bad environments.
…
Another interesting observation that we have made has to do with the mixed perceptions of

Applications 11i.  The Applications 11i suite was officially released several months ago, but software bugs hampered its adoption…. While we have not been able to check with all 180 of the live customers, we have spoken to four of them.  Of these four, three were integrator partners and one was a division of a large company.  All of these customers had severe difficulties with their implementations.  In fact, one of them was implementing 30 seats in one office on a Sun Solaris platform and they found Oracle's advice to be incorrect and had to work around the "fixes" that Oracle provided directly.  While this was the worst report, in our opinion, it gives us some cause for concern, especially where the Company is guiding analysts to 60-plus percent license revenue growth rates for the next few quarters….  On balance, the best we can say is that we are getting mixed signals on Applications 11i, which gives us another cause for caution.

<div align="right">Punk, Ziegel & Co., February 21, 2001, 8:56 AM (analyst report on Oracle)</div>

[W]e believe certain pieces of the company's suite offering have gaps (mainly particular CRM modules) that need to be filled.  This should come as no surprise however, and is currently cause for little concern, as Oracle has typically marketed its software aggressively ahead of product functionality.

<div align="right">SG Cowen Securities, Inc., February 21, 2001, 8:55 AM (analyst report on Oracle)</div>

Our discussions with systems integrators indicated that customer[s] are delaying the upgrade from 10.7 to 11i, due to the scale of the conversion as well as the instability of early releases of 11i.  The company released a new version of the product, which addresses the stability issue.  However, we believe this to be a near-term risk in its application sales.

…

It appears there is increasing customer interest in the benefits provided by Oracle's e-business suite of applications, 11i.  However, we think it is unlikely that enterprise customers will abandon the best-of-breed mentality.  Customers we surveyed find the value proposition of a suite intriguing since it promises lower integration and maintenance costs.  However, they are not willing to sacrifice incremental functionality in lieu of the "promised" lowered costs.  In addition, enterprise customers have already made major investments in e-business applications over the past year.  The majority of these customers are just beginning to implement and reap the benefits of these systems, and are unlikely to scrap their recent purchases in order to benefit from a suite.

…

Based on our discussions with SI's, we believe the upgrade cycle from version 10.7 to 11i could be delayed for roughly one quarter.  It appears that existing Oracle 10.7 customers are delaying their upgrade to 11i for two reasons:  1) the migration from 10.7 to 11i is a huge implementations effort and 2) the current version of 11i is noted to have many of bugs (close to 5,000).  Oracle has addressed the technical issues with release 3.0 of 11i, and SI's expect the upgrade cycle to ramp in the second half of the year as a result.  Another catalyst for an increase in the migration to 11i is the company's plan to stop support of version 10.7 starting in December 2002.  The second half ramp in application sales is consistent with management's previous comments.  We think that the delays in the upgrade cycle pose a near-term risk for application sales.

…

Management also provided further details on the progress of 11i.  Currently there are 180

customers are [*sic*] live on 11i with over 2,500 implementations in process.  The company continues its development efforts in delivering more robust product.  Approximately 45% of 11i is comprised of new modules.  Management also sees strong demand in the areas of CRM and SCM.

<div align="right">CIBC World Markets, Corp., February 23, 2001, 7:36 AM (analyst report on Oracle)</div>

…[D]iscussions with customers and partners also highlighted the fact that product bugs and execution challenges remain, which will need to be overcome in order for Oracle to become an applications leader….

…During the conference we heard complaints from customers regarding previous releases.  While the product will never be perfect, if there is not a highly satisfied group of early 11i reference customers, Oracle's momentum could be stopped in its tracks.

<div align="right">U.S. Bancorp Piper Jaffray, February 23, 2001, 7:56 AM (analyst report on Oracle)</div>

11i Is Typical of Oracle Application Releases

Oracle's application history has been checkered at best.  The company has a legacy of shipping software to early adopters and relying on them to shed the blood, sweat, and tears necessary to debug the system and make it reliable.  Examples of this can be found in each of Oracle's major application releases.  For instance, *Oracle 11i* was rushed to the market much later than promised, with many gaps and bugs in the code.  Newer applications, namely the SCP and CRM modules and the rewritten order-entry functions now encompassing greater functional scope and called order management, also exhibited poor quality.

…

The lack of referenceable customers has not lessened the demand for the new *11i* suite.  In fact, Oracle's application license business has grown impressively each quarter since the launch of *11i*.  Oracle's vision is compelling and deserves attention, but the company cannot continue to use its installed base as a step in its release testing process.  Users also suffered when they went looking for technical/functional documentation and support for the new application suite.  Frustration mounted when they found a lack of people knowledgeable about the new applications in the Oracle support organization.  But the holes are starting to get patched.  In late January, Oracle released the long-anticipated version *11i.3*.  Given the feedback from users and implementation partners this is the most stable and complete version of the application suite.  Most early adopters are opting to reinstall their current instances of *11i* and intend to roll out the *11i.3* as the production instance.  Companies getting the most success from their implementations are those that deploy on the Sun platform, the development box used by Oracle.

After a 10-month struggle to get the application suite stable, Oracle is finally delivering a product that can be used as the backbone.  With more than 180 customers now live on the e-business suite and 2,500 ongoing implementations, Oracle clearly has sold its customers on the belief that it will indeed get it right.  Now the real work begins.

…

Customers must be aware that parts of the application suite are initial releases and come with all of the expected functional gaps and implementation issues….

> AMR Research, February 27, 2001 (market report)

Even though Oracle developers have made some progress since the initial release of 11i, our channel checks suggest that gaps continue to exist in CRM, and that the software is very difficult to integrate, even with other Oracle applications.  Additionally, we have heard from numerous sources that certain modules are noticeably slow and riddled with error messages….

> SG Cowen Securities, Inc., February 28, 2001 (analyst report on Oracle)

Oracle's results reflect the continuing slowdown in IT spending and reflect the "buy only what you absolutely need now" mentality.  We believe that Oracle's Suite selling strategy fared poorly in this environment, since the Suite's high cost probably appeals more to a high IT spending environment….  [BEAS] products are less expensive and thus less likely to be impacted than large ticket items like Oracle's Suite….

> Dain Rauscher Wessels, March 2, 2001 (analyst report on BEA Systems)

…[It] seems particularly puzzling to attribute a $200M shortfall to the last couple of days of the quarter to a change in the economic environment.

…We also believe that the weakness in Oracle's applications business is because the company's applications are not yet ready for prime time.  At Oracle's applications conference last week, we learned that over 200 patches had been developed for the CRM product for the latest version.  Furthermore, many customers we have talked with indicated that although the CRM product showed promise, the SCM products are not even on the radar.  Although [f]eedback from these customers suggested that they were impressed with the idea of a fully integrated suite, we were unable to find any that had fully integrated and gone live on the suite….

> UBS Warburg (U.S.), March 2, 2001, 7:25 AM (analyst report on Oracle)

As for the lack of customer successes, we must consider the timing and stability of the software.  Oracle Applications Release 11i was announced for general availability in May 2000.  The 11i release includes certain functionality, such as self-service and financials globalization, that facilitates some of the savings opportunities discussed previously.  At the AppsWorld conference, Oracle reported 180 customers live on various components of 11i and another 1,500 customers in the process of implementing the software.  As the software rolled out last year, it became apparent the applications were buggy, delaying implementations until the software stabilized.  Customer experience indicates that the applications are more stable now and actual customer success stories are becoming more apparent.  Some early 11i success stories were offered at the conference, such as Compaq's initial rollout of e-procurement.

> Giga Information Group, March 5, 2001 (market report)

Oracle's momentum in selling its e-business application suite is slowing — and not just because of current economic conditions. In Giga's opinion, the high growth that Oracle's applications business has experienced during the past year is not sustainable as its reputation and competitors catch up.

Oracle reported reduced preliminary earnings estimates on March 1 for its third quarter and attributed the reduction to a slowdown in the United States economy. The economic conditions apparently resulted in deferred deals for both the database and applications products. This announcement sent Oracle and other software stocks reeling the following day. Oracle said its applications business grew in the third quarter at a rate of 50 percent — still substantial, but less than earlier predictions of 75 percent to 100 percent growth.

Oracle's 11i application products, announced in May 2000, are still maturing and stabilizing. The company has been releasing patches to correct myriad bugs within the software, and some of the functionality promised in 11i is being released incrementally as minor upgrades. Customer experience has been mixed, and only 180 out of thousands of customers are currently live with 11i products. While Oracle is eager to tout its own success in deploying 11i, customer success stories are relatively scarce…. These issues may well be impacting the momentum of Oracle in the marketplace.

…While competitors have their own strengths and weaknesses, it is a stretch to argue that Oracle is the most complete and integrated product available.…

…Giga believes that Oracle will not sustain the current level of applications growth due to the aforementioned issues related to product stability, architecture and competition.

<div align="right">Giga Information Group, March 8, 2001 (market report)</div>

PeopleSoft 8 represents a broad application suite – positioning the company squarely in the battle against Oracle and SAP, who recently launched similarly broad solutions (Oracle 11i and mySAP.com)…. Although we believe this concept will take time to gain traction in the market…it is likely to prove compelling among senior level executives (who are increasingly the key decision makers) longer term, in our opinion.

<div align="right">Robertson Stephens, March 12, 2001 (analyst report on PeopleSoft)</div>

Earlier this year, Oracle delivered the third version of its 11i applications suite, known as 11.5.3, for Unix computers and for Windows. Previous releases of the 10-month-old suite required a staggering 5,000 software patches-and an amazing degree of patience from early adopters.

…"No software is perfect in its early release, but it took seven months to resolve these problems," Young says.

Oracle officials don't deny there were bugs in 11i but contend bigger problems are caused when customers tinker with the apps. "We've got some very large customers who are doing 11i implementations with a huge amount of modification, and they're horribly frustrated," Ellison said in his keynote address at the Oracle AppsWorld conference in New Orleans last month."

…
"But missing functionality and those software bugs in the first release of 11i and the subsequent 11.5.2 version could also be costing Oracle potential business.  Walter Stokes, lead database administrator for EDS's Oracle application service provider offering, is advising ASP clients not to upgrade to 11i until EDS can evaluate 11.5.3.  The earlier releases are "the buggiest software I've ever seen come out of Oracle," Stokes says.  Oracle's CRM module has been particularly problematic, he says, requiring up to 100 patches for one customer."
…
"Compaq isn't doing that.  It's integrating Oracle's iProcurement application with SAP financial and PeopleSoft HR apps.  Each excels at different things, Box says, with Oracle taking the lead in purchasing-intelligence capabilities for generating reports and analyses on spending."

*InformationWeek*, Vol. 828, March 12, 2001 (public press)

Only 25% growth [in applications] compared to guidance of 50-100% in an area that Oracle is pushing hard is a significant miss.  Yes, some of this is probably from economic pressures and budget constraints, but there also may be some backlash or saturation of customers that want a quick out-of-the-box software suite.  The problem here is that visibility continues to be very poor.

A.G. Edwards & Sons, Inc., March 16, 2001, 8:15 AM (analyst report on Oracle)

We continue to believe the economy is only one of several factors that are pressuring the company currently.  On the database side, we believe the economy explains perhaps 70-80% of the weakness, with the remainder due to company-specific woes (possible market share loss and dot-com impact?).  On the applications side, especially in light of Oracle's weaker than expected 3Q applications growth, we believe the economy may only explain 20-30% of the weakness. The rest, in our view, is a result of the product set not yet reaching a competitive level of functionality, relative to best-of-breed vendors.  The litmus test for Oracle's applications business is in 15-30 days when applications software companies report their March quarters.  If results are weak, it's probably good news for Oracle (Oracle's apps weakness is due more to industry weakness); if they're strong, it's bad news (apps business is losing share).

Banc of America Securities, March 16, 2001 (analyst report on Oracle)

On March 16, 2001, we are downgrading the shares of Oracle to Hold due to 1) the impact of the U.S. economy, 2) concerns over acceptance of its e-business applications, and 3) management's lack of a proactive plan to get back on track.  We believe that the economy is only a partial explanation for their shortfall.

…The 25% growth in applications revenues was particularly disappointing as applications were expected to be a major growth driver for the company.

…From our conversations, customers still desire best-of-breed solutions designed with the customer in mind verses a suite that may not be customizable or offering specific industry centric features.

…Applications not selling because of the product not the budget.…  [W]e believe that there are as many product issues slowing sales as economic factors.

In speaking with Oracle salespeople, we have heard repeatedly, that they are having difficulty competing with Siebel Systems for CRM and i2 Technologies for supply chain.  With that knowledge it becomes clear why Oracle does want to sell the suite because it is having a difficult time when you compare one of the modules to a company that specializes in that application like an i2.  Even at AppsWorld, management stated, "our [11i] application suite may not give you everything that you want, but it will give you everything you need."

This leads to our conclusion that people will continue to choose a best-of-breed solutions [*sic*] over a suite even if the implementation is faster.  These solutions are critical and rapid implementation does not make them better products than their competitors.

<div align="right">CIBC World Markets, Corp., March 16, 2001, 7:36 AM (analyst report on Oracle)</div>

We have issues with their contention that the integrated suite strategy is a clear winner versus the best-of-breed approach.  Their contention should be viewed in light of the fact that many of their applications deals were deferred, while many best-of-breed vendors have performed well in recent quarters – as Verity has demonstrated, and as we expect Manugistics will do also.  In our view, the strategy of selling large, integrated suites will meet with greater challenges in a troubled economy, and may not track as well versus competitors such as i2, e.piphany, and Siebel Systems.  To put it plainly – high cost brings high level scrutiny.

We have further adjusted our estimates to a level that is inline with the guidance given.  It is our view that management has set guidance at a level that they are reasonably confidant [*sic*] that they can meet or beat without great…

<div align="right">Josephthal and Co., March 16, 2001, 2:18 PM (analyst report on Oracle)</div>

[C]onfirmation that the downturn was caused by the weak economy.

…The trade press continues to pick at Oracle's product rollout and bug fixes, but the patches and fixes are a necessary part of the process and no other vendors have rolled out a product of this magnitude in one product release.

<div align="right">Morgan Stanley Dean Witter, March 16, 2001 (analyst report on Oracle)</div>

Oracle has stooped to a new low – blaming its unhappy 11i apps customers for doing too much customization.  Meanwhile, sales are off and the 11i bug list has passed the 5,000-item mark.  Forrester's recommendation?  Less blame and more customer support.
…
Oracle backed itself into a defensive corner all last week: facing a class action shareholder lawsuit for overhyping [*sic*] its apps business, claiming surprise at its own weak apps sales growth, and warning that things could get worse before they get better.…

<div align="right">Forrester Research, Inc., March 19, 2001 (market report)</div>

As many IT vendors have, Oracle blamed the economic slowdown in the United States for affecting its business, with many enterprises deferring purchases.  However, several factors unique to Oracle — including database pricing, 11i quality and the suite approach to selling applications — may make recovery from the economic downturn more difficult.

…

Oracle 11i, the enterprise application suite, has seen limited adoption since its release in May 2000 due partly to inconsistent product quality and Oracle's emphasis on the application suite in its entirety.…

<div align="right">Gartner, Inc., March 23, 2001 (market report)</div>

Lowering Estimates as Applications Software Market is Even Worse than We Thought.

Maintain Market Performer Rating.

Lowering Estimates As Apps Companies Hit the Wall.  In light of the worst "preannounce season" the applications software market has seen, we're lowering our estimates for Oracle for F4Q01 (May) and FY02.  Bear in mind that the shortfalls of applications companies signal tougher times for Oracle on two counts:  (1) they demonstrate more difficult markets for Oracle's competitive applications and (2) they reflect a weaker database market as databases are sold with third-party applications 50% of the time.

…

Near-term factors should continue to constrain Oracle's growth.  We believe several factors will continue to constrain Oracle's growth for the foreseeable future.  These are outlined in Figure 1 below.  The demise of the dot com generation (in addition to directly affecting software sales) has caused less urgency among Fortune 500 companies seeking to remain competitive on the Internet.  In addition, the weakening economy will continue to generally cause delays/hesitation among corporate IT buyers.

…

Finally, Oracle's applications remain roughly 25% functionally competitive, overall, with best-of-breed applications.  In our view, Oracle's suite-based product marketing message will really take hold (and Oracle's products will take share) only when Oracle's products offer at least 50% the functionality of best of-breed vendors.  We believe Oracle's applications are not yet there.

<div align="right">Banc of America Securities, April 5, 2001 (analyst report on Oracle)</div>

Applications vendors promoting non-Oracle databases.  Oracle once promoted third-party software vendors such as i2 (whose product Oracle actually sold not too long ago) and PeopleSoft for the pull-through database revenues that application sales generate.  Today, as it has for 1-2 years, Oracle competes and markets its own applications so vociferously that the worlds largest third-party e-business applications software vendors such as Siebel, SAP and i2 regularly "push" DB2 at the expense of Oracle.  Given such third-party-related database revenues contribute up to 50% of Oracle's total, Oracle's own push into applications has impaired database growth on the margin.

…

Anniversary of the dot com bubble.  Last year saw a frenzy of IT-centric capital spending as the

Fortune 500 sought to fend off the threat—real or imagined—of Internet startups.  The bursting of the Internet bubble caused only modest dot com revenue shortfalls *per se* for Oracle, but the resulting slowdown in spending by the Fortune 500 has been significant even prior to the current economic slowdown.  An example of this phenomenon can be seen with Charles Schwab, one of the financial sector's largest Oracle database users, who surely built up tremendous on-line trading and account access capacity in response to the threat from the likes of Datek, Ameritrade, E*Group, etc.  Irrespective of the sell-off in the NASDAQ or the slowing of the economy, Schwab surely has slowed its Oracle 7/8 database capacity growth with the progressive elimination of the Internet threat.

…

Oracle's e-business suite yet to gain full traction vs. best-of-breed.  Despite spot-on marketing and last year's Wall Street buy-in, Oracle's applications in critical areas including sales automation/customer management and supply chain management have yet to hold share versus best of- breed solutions.  We've estimated that once Oracle's applications in such areas achieve 50-75% functional equivalence with their best-of-breed competitors, Oracle will hold or gain market share, aided by the potency of their suite approach.  Although it's tough to quantify their competitiveness with precision, we still feel Oracle's applications away from core ERP areas have yet to achieve sufficient competitiveness.

Applications sector in general very tough of late.  Some 9 of 10 application software companies experienced the toughest deal-closing quarters in recent memory in February and March, with Oracle no exception.  While the environment appears somewhat better through parts of April and May (see our note from the AMR conference last week), we expect the coming final days of May to remain very challenging.

…

Suite approach ultimately will grow share.  We're convinced that a suite-approach to enterprise applications will ultimately sustain better market shares thanks to its many advantages, including unified data models, common architectures and most folks' simple preference for one-stop-shop solutions wherever possible.  As hosted business applications gain further technological viability (scalability, security, functionality, etc.) Oracle will make great headway.  We expect Oracle's progress in applications and e-business suites will surface within 1-2 years at the very most.  Moreover, Oracle's applications are steadily becoming more competitive in their own right.  We were recently impressed, for example, with Oracle's latest CRM product release, which appeared substantially improved and better embraced by mid-sized third-party systems integrators with whom we spoke.

Banc of America Securities, May 30, 2001 (analyst report on Oracle)

Note:
[1] Select Public Press
[2] Select Oracle Financial Analyst Reports
[3] Select Financial Analyst Reports from Oracle's Competitors
[4] Select Morgan Stanley Industry Analyst Reports
[5] Select Forrester Research, Giga Information Group, AMR Research, and Gartner Market Analyst Reports

# Exhibit 7
# Oracle Corporation
# Summary of Complaint and Contentions Days

1.      Complaint ¶¶35-75 comprise the statements during the Class Period that Plaintiffs allege to be false and misleading.  Plaintiffs have also put forth Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs ("Plaintiffs' Contention Responses").[1] Plaintiffs' Contention Responses add additional statements alleged to be false and misleading to those mentioned in the Complaint.  Specifically, the Contention Responses identify three additional dates of alleged false and misleading statements during the Class Period (January 20, 2001, January 24, 2001, and February 13, 2001) and one prior to it (December 5, 2000).

2.      In this exhibit, I consider each such statement and the market reaction, if any, to the statement.  Headings indicate the source and date(s) of the alleged misstatement(s) as well as provide a generalized characterization of the alleged falsity in the statement, e.g., whether the alleged misstatement(s) concern Suite 11i integration, guidance/economy/demand, or the accounting of 2QFY01 financial results ("2QFY01 accounting").

---

[1] Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 is the exemplar response I use when citing paragraph numbers.  I understand that the significance of Plaintiffs' failure to identify these issues in their Complaint is a legal matter.  In addressing these unpled issues, I am expressing no opinion about the legal significance of Plaintiffs' failure to allege these issues in the Complaint.

**A.     Complaint Days**

**December 14-15, 2000 (Complaint ¶¶35, 45-50)**
**(2QFY01 accounting, guidance/economy/demand, Suite 11i integration)**

3.     The Complaint points to a number of statements made by Oracle on December 14, 2000 after close of market and during trading hours on December 15, 2000.  In particular, the Complaint alleges that statements contained in Oracle's December 14, 2000 press release were false and misleading.[2]  This press release was made available to the market after close of trading on December 14.  The Complaint also identifies alleged misstatements made during Oracle's conference call with analysts on December 14 that began at 5:30 PM eastern time (after close of market) and several alleged misstatements quoted in the public press on the following day, December 15.[3]

4.     The Complaint alleges that Oracle's press release contained false and misleading statements regarding its 2QFY01 financial results.[4]  (The Complaint uses boldface to indicate which parts of statements it alleges to be false and misleading.  The Complaint's use of boldface is reproduced in this exhibit.)

> 12/14/00:  *Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales up 66%, Database Sales Up 19%*…
>
> *Today, Oracle Corporation announced that second quarter net income increased 62% to $623 million, or $0.11 per share, while revenue grew to $2.7 billion*.[5]

---

[2] Complaint ¶35.
[3] "Oracle Net Income Up 62%, Earnings Per Share $0.11, Application Sales Up 66%, Database Sales Up 19%," *PR Newswire*, December 14, 2000, 4:05 PM.  Unless specifically noted otherwise, all time stamps mentioned in this report are Eastern Time.
[4] Complaint ¶35.
[5] Ibid.

5.      The Complaint also describes a number of Oracle's statements on December 14-15 as "false" in suggesting "the slowing of the overall economy would not hurt Oracle's third quarter financial results."[6]

> 12/14/00:  *At this point, we see no impact or slowing in our business.  We have seen no slowing of our business*.[7]

> 12/14/00:  *The economy is slowing…. It's just not having a negative impact on our business*.[8]

> 12/15/00:  *[T]he economy right now even though it's slowing doesn't seem to be affecting us.  We see no difference in demand for our upcoming third fiscal quarter*.[9]

> 12/15/00:  *The economic slowdown isn't hurting Oracle, said Oracle Chief Executive Larry Ellison, because the company has spent the past three years updating its product line to focus on software that helps companies use the Internet to cut costs and boost efficiency*.[10]

6.      The Complaint also alleges that statements made during the December 14 conference call relating to the 3QFY01 guidance were false and misleading.[11]

> 12/14/00:  [S]o the numbers I'm going to give you here, *for database*…we're thinking, you know, 15-to-20.  You would have to add five points to that, in terms of real (constant) dollar growth, or *20-to-25*.  Applications, we're thinking *75, or potentially better*.  You'd have to add five points to that.

> *    *    *

> *So I would assume, 12 cents would be a reasonable number at this point.  I don't think history is going to be a lot different, here.*

---

[6] Complaint ¶45.

[7] Ibid.

[8] Ibid.  This was reported in "Oracle 2nd-Qtr Net Rises 62%; Applications Sales Jump," *Bloomberg News*, December 14, 2000, 5:45 PM.

[9] Complaint ¶45.  According to the *Business Wire* article, "Oracle Corporation Executive to Interview on RadioWallStreet.com on December 15, 2000," December 14, 2000, 5:44 PM:  "Tomorrow, on RadioWallStreet.com, Oracle Corporation's (NASDAQ:ORCL) Executive Vice President/CFO Jeffrey Henley will be interviewed.  This event will be broadcast Friday, December 15, 2000 at 12:00 PM Eastern Standard Time."

[10] Complaint ¶45.  This was reported in "Oracle Shares Rises after Reporting Higher 2nd-Quarter Profit," *Bloomberg News*, December 15, 2000, 9:03 AM.

[11] Complaint ¶46.

* * *

*The good news about applications, this quarter, is that every part of the little sub-markets that we're in, we're strong.  And every geography, (we're) strong, Europe, Asia, U.S.  So there's nothing that we–no weakness in our applications business and the pipelines at every one of these geographies looks astounding for this next quarter*.[12]

7.      Finally, the Complaint alleges two Oracle statements made on December 14-15 were false and misleading regarding Suite 11i.[13]

> 12/14/00:  *[Y]ou can buy our complete E-Business Suite, where all the pieces are designed and engineered to fit together, and no systems integration is required.  It's up and running in months.  You get the savings in months.  It costs you less, and it takes less time to install*.[14]
>
> 12/15/00:  *There's no systems integration required.  No software modifications required to use our E-Business Suite*.[15]

8.      In an efficient market as alleged in the Complaint, any new information in the statements cited above would have impacted Oracle's stock price on December 15.  Oracle's residual return of 6.8 percent on December 15 was not statistically significant.  The lack of a significant stock price increase suggests that the statements identified by Plaintiffs in the Complaint ¶¶35, 45-50 were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

9.      Further evidence that these statements were not viewed as new to the market results from the fact that prior to December 14 and 15, Oracle had repeatedly made statements regarding the integration of Suite 11i that were similar to those made on December 14 and 15.  For example, upon release, Oracle described Suite 11i as follows:

---

[12] Ibid.
[13] Complaint ¶¶50-51.
[14] Complaint ¶50.  This statement was made by Ellison in the conference call after close of market on December 14, 2000.
[15] Complaint ¶51.

> [T]he industry's first fully-integrated e-Business applications suite…Oracle E-Business Suite 11i provides out-of-the-box integration of e-Business applications throughout the extended enterprise from customers and partners to suppliers.  This allows companies to completely automate their e-Businesses from web selling and marketing, all the way through to Internet supply chain and procurement.[16]

10.      Statements regarding Suite 11i integration were repeated in the public press many times.  For example, on June 20, 2000 Larry Ellison is quoted as saying "[o]ur e-Business suite is the first complete and integrated set of applications that automate all aspects of a business….  [C]ustomers can buy the Oracle e-Business suite, where all the applications already work together – on the Internet."[17]  Again on June 15, 2000, Juliette Sultan, VP of Oracle's CRM Product Strategy, reportedly stated:

> [T]he newly introduced Oracle E-Business Suite is the company's first 100 percent ERP/CRM integrated suite of applications.  Sultan says the suite, 44 modules in all, gives customers soup-to-nuts integration of everything from the front office to a Web marketing plan.  'The main message we're trying to give people is that this is the same product, but totally integrated; the same technology stack, same organization, same database.'[18]

11.      Other news entering the market between close of market on December 14 and close on December 15 included Microsoft's announcement of missing earnings (news unfavorable to Oracle but captured to some extent in the Industry Index) and IBM's chairman and chief executive saying that the next wave of e-business is only beginning to gather force and everyone from traditional software makers like SAP and Oracle to relative newcomers like BEA Systems and Ariba will all gain from this new way of doing business (a statement that, if new information and if it had any effect on Oracle, would be favorable to Oracle).[19]  In addition,

---

[16] "Oracle Ships 11i, Industry's First Integrated E-Business Suite," Oracle Press Release, May 24, 2000.

[17] "Oracle Application Sales Up 61%, CRM Sales Up 161%, Adjusted Net Income Up 76%, Operating Margin Reaches 41%," *PR Newswire*, June 20, 2000, 8:25 PM.

[18] "Lend a Hand," Smart Partner from *ZDWire*, June 19, 2000, Vol. 0323.

[19] "Smartmoney.com:  The Next Big Thing in Tech?," *Dow Jones News Service*, December 14, 2000, 2:08 PM.

Oracle was downgraded to "market perform" from "buy" by analyst Gary E. Abbott at Punk, Ziegel & Company.[20]

12.    Setting aside the repeated statements regarding Suite 11i integration (which I conclude did not significantly alter the total mix of information), the remaining statements alleged to be false and misleading – Oracle's 2QFY01 results, Oracle's issuance of 3QFY01 guidance, and Oracle's guidance/economy statements – were not offset by notable bad news beyond the Microsoft earnings miss (the effect of which should be captured in the return of the Industry Index).

**January 8, 2001 (Complaint ¶58)**
**(Suite 11i integration, guidance/economy/demand)**

13.    The Complaint alleges Oracle repeated false and misleading statements on January 8, 2001 regarding Suite 11i.  These statements were reported to have been made to an analyst during an interview on January 9, 2001.[21]

> 1/9/01:  *The suite is pre-integrated and fully interoperable out of the box*, helping to lower consulting costs and time-to-value.
>
> *   *   *
>
> *Oracle sees robust demand for both its database and applications business.* Specifically, *Sanderson noted demand for ERP is surprisingly robust* while advanced planning and scheduling, CRM, and SCM products are also performing well.  *Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets.  Sanderson noted two trends driving demand for databases is demand for the 11i applications that*

---

[20] "Oracle Corp. Cut To 'Market Perform' at Punk, Ziegel," *Bloomberg News*, December 15, 2000, 9:22 AM.  The analyst cited the weakening economy and strong competition (December 15, 2000 Punk Ziegel analyst report).

[21] A Salomon Smith Barney report on Wednesday, January 10, 2001 at 7:05 AM describes Sanderson's visit as happening "on Tuesday," which would be January 9, not January 8, as the Complaint ¶58 alleges.  In Plaintiffs' Contention Responses, p. 8, ¶7, Plaintiffs allege the date of the statement was January 9, 2001, which is consistent with what the Salomon Smith Barney report says.

> *are typically bundled with the database as well as applications of other vendors that rely on the functionality of the Oracle database.*[22]

14.     Oracle had a residual return of 3.3 percent on January 9 (when the statements were reportedly made) and –0.9 percent on January 10, when the Salomon report published the statements.  Neither return is statistically significant.  Other news entering the market between close of market on January 8 and close on January 10 was either neutral or positive.  The lack of a significant stock price increase suggests that the statements identified by Plaintiffs in Complaint ¶58 were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

**January 11, 2001 (Complaint ¶60)**
**(guidance/economy/demand)**

15.     The Complaint alleges that on January 11, 2001, Oracle repeated a false statement that the economy was not affecting it.[23]  These statements were reported to the market after the close in a *Bloomberg News* article at 5:40 PM.[24]

> 1/11/01:  Company spokeswoman Stephanie Aas today said *Oracle has yet to see any signs that its business is being hurt by the economic slowdown* or reported cuts to information-technology budgets.
>
> "Obviously the economy is a wild card.  So if we went into a recession or there is a sharp downturn (in the economy), we could be impacted....  *But we're not seeing it now*."[25]

16.     Since this news was reported after market hours on January 11, I examined the stock price return on the next business day.  On January 12, Oracle's residual return of –1.0 percent was not statistically significant.  Other news entering the market between close of market

---

[22] Complaint ¶58.
[23] Complaint ¶60.
[24] "Oracle CFO Says He Plans to Sell $33 Mln in Stock," *Bloomberg News*, January 11, 2001, 5:40 PM.
[25] Complaint ¶60.

on January 11 and close on January 12 was either neutral or positive.  This news included that Oracle's subsidiary in Japan would probably report rising profits for the first half of its fiscal year.[26]  The lack of a significant stock price increase suggests that the statements identified by Plaintiffs in Complaint ¶60 were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

**February 6, 2001 (Complaint ¶63)**
**(Suite 11i integration)**

17.    The Complaint alleges Oracle made false and misleading statements "[o]n or about February 6, 2001…specifically concerning Oracle's CRM module in its technical WhitePaper written by Mark Barrenechea."[27]

> On or about 2/6/01:  ***Oracle's CRM suite is both complete and integrated....  No systems integration is required to install the Oracle CRM suite***.
>
> ***In fact, systems integration labor usually runs many times the cost of the software or the hardware needed to run the system - and the customer gets to pay for it.  To install the Oracle CRM suite, no systems integration is required. And because the CRM suite consists of true Internet applications, every application works in every country, every major language, and every major currency***.[28]

18.    I understand there is some dispute as to whether the white paper was actually published or not.  In any event I cannot determine the exact timing that this information reached the market (if it did so at all); therefore, I have examined the stock price return on February 6, as well as the surrounding trading days, February 5 and February 7.  Oracle had residual returns of –2.0 percent, 0.3 percent, and 2.5 percent on February 5, 6, and 7, respectively.  None of these returns is statistically significant.  Other news entering the market between close of market on

---

[26] "Oracle Japan's 1st-Half Profit Likely Rose as Sales Surged," *Bloomberg News*, January 11, 2001, 9:05 PM.
[27] Complaint ¶63.
[28] Ibid.

Friday, February 2 and close on February 7 was either neutral or positive.  The lack of a

significant stock price increase suggests that the statements identified by Plaintiffs in Complaint

¶63 were not considered as new or did not significantly alter the total mix of information in such

a way as to inflate the value of Oracle's stock as Plaintiffs allege.

**February 7, 2001 (Complaint ¶65)**
**(guidance/economy/demand)**

19.     The Complaint alleges that "[o]n February 7, 2001, analyst First Union Securities,

Inc. visited Oracle headquarters and met with Oracle Management, including defendant Henley.

During that meeting, Henley falsely stated that:  (1) Oracle was not seeing the effects of the

economy; (2) database revenue would grow 15%-20% year-over-year; (3) applications revenue

would grow 75% year-over-year; (4) the applications sales and revenue pipeline were strong."[29]

> 2/8/01:  On February 7th, we met with management of Oracle, including CFO Jeff
> Henley at Oracle Headquarters.  We note the following points regarding our
> meeting:
>
> *   *   *
>
> * ***Oracle is not seeing the effects of a slowing economy at this point***, but next
> several weeks will be critical.
>
> *   *   *
>
> * ***Management reiterates guidance of 15-20% y/y database revenue growth and
> 75% y/y applications revenue growth for FQ301***.[30]

20.     The Complaint further alleges that "[o]n February 7, 2001, Deutsche Banc Alex.

Brown also visited Oracle headquarters and spoke with defendant Henley and Oracle

---

[29] Complaint ¶65.
[30] Ibid.  This was reported in First Union Securities, Inc., February 8, 2001.

management for a mid-quarter update."[31]  During the meeting, Oracle allegedly made the

following false statements:

> 2/8/01:  VISIT WITH MANAGEMENT.  Yesterday, we checked in with Oracle for a mid-quarter update with CFO Jeff Henley and VPs in the server and applications development organizations.
>
> PERSPECTIVE ON THE MACRO ENVIRONMENT.  *According to management, it has yet to see macro-related weakness in its business*....
>
> ... *Barring a severe economic downturn, management sees continued growth driven by strong demand* in key segments such as supply chain, customer relationship management and collaboration.
>
> NO CHANGE TO OUTLOOK, RECENT GUIDANCE.  *Mr. Henley reiterated that the company's outlook and guidance were unchanged for F3Q'O1 (Feb)*.[32]

21.     Oracle had a residual return of –0.2 percent on February 8.  This return is not

statistically significant.  Other news entering the market between close of market on Wednesday,

February 7 and close on February 8 was either neutral or positive.  The lack of a significant stock

price increase suggests that the statements identified by Plaintiffs in Complaint ¶65 were not

considered as new or did not significantly alter the total mix of information in such a way as to

inflate the value of Oracle's stock as Plaintiffs allege.


**February 9, 2001 (Complaint ¶65)**
**(guidance/economy/demand)**

22.     The Complaint alleges that on February 9, 2001 Oracle issued an allegedly false

and misleading statement "concerning the effect of the slowdown in the economy on Oracle

projections conveyed to the market."[33]

---

[31] Complaint ¶65.
[32] Complaint ¶65.  This was reported in Deutsche Banc Alex. Brown, February 8, 2001.
[33] Complaint ¶65.

2/9/01:  Oracle is still upbeat about its prospects for earnings growth, which will be fueled by a new suite of Internet-friendly business software dubbed Oracle 11i spokeswoman Jennifer Glass said.

*"We haven't changed our projections at all," Glass said.  "This slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy."*[34]

23.    Oracle had a residual return of –9.4 percent on February 9.  This return is statistically significant.  However, the stock movement is contrary to the Complaint's allegations regarding inflation.  Other news entering the market between close of market on February 8 and close on February 9 includes "investor concern that the…software maker's earnings could suffer as economic growth slows"[35] and news that "an analyst pared his third-quarter growth forecast for the database software giant's core business due to the demise of several Internet firms it supplied last year."[36]  The lack of a significant stock price increase suggests that the statements identified by Plaintiffs in Complaint ¶65 were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

**February 21, 2001 (Complaint ¶68)**
**(Suite 11i integration)**

24.    The Complaint alleges that on February 21, 2001 defendant Ellison gave a keynote address at the Oracle AppsWorld Conference in New Orleans in which he made alleged false statements "concerning the implementation and integration of the 11i suite."[37]

---

[34] Complaint ¶65.  This was reported in "Oracle Shares Fall on Concern Earnings Outlook May Turn Grim," *Bloomberg News*, February 9, 2001, 3:25 PM.
[35] "Oracle Shares Fall on Concern Earnings Outlook May Turn Grim," *Bloomberg News*, February 9, 2001, 3:25 PM.
[36] "USA:  Oracle Shares Shed Value on Analyst Report," *Reuters News Service*, February 9, 2001.
[37] Complaint ¶68.

2/21/01:  We were the first company to use this eBusiness suite and in the very first year we put it in, we saved $1 billion.

\*   \*   \*

In fact, we recommend that you start with, you try a component of the suite and then you add it in.  Now the nice thing is it's like Lego blocks.  Once you have one piece in, ***the other pieces just snap together.  There's no systems integration required.  The key thing is, you can install just one piece and then again install another piece.  No systems integration.  You just basically turn it on or snap it together.... Plug and play.  It is absolutely, all the pieces within the suite are literally plug and play***.[38]

25.    Oracle had a residual return of 2.3 percent on February 21.  The return is not statistically significant.  Other news entering the market between close of market on February 20 and close on February 21 was either neutral or positive.  The lack of a significant stock price increase suggests that the statements identified by Plaintiffs in Complaint ¶68 were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

**February 21-23, 2001 (Complaint ¶¶70-71)**
**(Suite 11i integration, guidance/economy/demand)**

26.    The Complaint alleges, "On February 21-23, 2001, Ellison and Henley met with analysts, money and portfolio managers, institutional investors and large Oracle shareholders at the AppsWorld Conference in New Orleans, Louisiana to discuss Oracle's 3Q results, its business and its prospects."[39]  During these meetings, Oracle allegedly falsely stated that:

Oracle would report EPS for 3Q01 of $0.12.

Oracle would report Q3 revenue of $2.9 billion.

---

[38] Ibid.  Ellison's speech at AppsWorld was apparently given from 2:00-3:00 PM ET on February 21, 2001.  "Larry Ellison, Chairman and CEO, Oracle Corporation Keynotes and Press Q&A Oracle AppsWorld, New Orleans," *PR Newswire*, February 21, 2001, 8:02 AM.
[39] Complaint ¶70.

Oracle was not seeing an impact on its results due to the slowdown in the United States economy.[40]

27.    A Deutsche Bank report dated February 21, 2001 also included a statement the Complaint attributes to Henley:

> 2/21/01:  CFO Jeff Henley gave a brief presentation to the financial community, but offered no commentary on the current quarter (company is in its quiet period) and no change to guidance.  ***Management still expects growth in the applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters***.[41]

28.    Oracle had a residual return of 2.3 percent, 3.1 percent, and –4.9 percent on 2/21/01, 2/22/01, and 2/23/01, respectively.  None of these returns are statistically significant. Other news entering the market between close of market on February 20 and close on February 23 was either neutral or positive.  The lack of a significant stock price increase suggests that the statements identified by Plaintiffs in Complaint ¶¶70-71 were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

## B.    *Plaintiffs' Contention Responses*

**December 5, 2000 (Plaintiffs' Contention Responses, p. 7, ¶1)**
**(cost savings related to Oracle's Suite 11i implementation)**

29.    In Plaintiffs' Contention Responses, Plaintiffs allege that a statement made by Glass and reported in Oracle's press release on December 5, 2000 (prior to the Class Period) was false and misleading.

---

[40] Ibid.
[41] Complaint ¶71.  This was reported in Deutsche Banc Alex. Brown, February 21, 2001.

> Using its own suite of e-business applications, Oracle beat the goal set by cofounder and CEO Lawrence J. Ellison – cut one billion in costs in one year – passing the billion dollar savings mark before the year was up.[42]

30.     Oracle had a residual return of –0.68 percent on December 5.  The return is not statistically significant.  Other news entering the market between close of market on December 4 and close on December 5 was either neutral or positive.  The lack of a significant stock price increase suggests that the statements identified in Plaintiffs' Contention Responses, p. 7, ¶1 were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

**January 20, 2001 (Plaintiffs' Contention Responses, p. 9, ¶8)**
**(guidance/economy/demand)**

31.     In Plaintiffs' Contention Responses, Plaintiffs allege that a statement attributed to Sanderson and published on January 20, 2001 was false and misleading.

> 1/20/01:  You know, it's a big hill to climb.  Every year we climb that hill.  I expect we'll do it again.  Our pipelines are strong, and we're well-positioned from a products perspective, so it's all about execution.[43]

32.     Oracle had a residual return of –8.15 percent on January 22.  The return was statistically significant.  (From the context of the article, the interview may have happened on January 16, 2001, at Oracle's "B2B Day."  I was not able to identify any other press stories covering the interview.)  Other news entering the market between close of market on January 19 and close on January 22 was either neutral or positive.  I conclude that the published statement alleged in Plaintiffs' Contention Responses, p. 9, ¶8 did not materially alter the mix of information in the market as alleged by Plaintiffs.

---

[42] Plaintiffs' Contention Responses, p. 7, ¶1.  This was reported in "Find Out About Oracle Corporation's Billion Dollar Savings Story on the E-Business Network," *PR Newswire*, December 5, 2000, 9:30 AM.
[43] Plaintiffs' Contention Responses, p. 9, ¶8.  This was reported in "The *TSC* Streetside Chat: Oracle's Executive Vice President Sandy Sanderson Jr.," *TheStreet.com*, January 20, 2001, 8:30 AM.

**January 24, 2001 (Plaintiffs' Contention Responses, p. 9, ¶10)**
**(laryngitis)**

33.     In Plaintiffs' Contention Responses, Plaintiffs allege that a statement made by

Glass and reported in Bloomberg on January 24, 2001 was false and misleading.

> 1/24/01:  Oracle Corp. Chief Executive Larry Ellison canceled plans to appear on
> a PBS television program that was to be taped today, because he is suffering from
> severe laryngitis.[44]

34.     Oracle had a residual return of 1.70 percent on January 25.  The return is not

statistically significant.  Frankly, I do not see how this statement relates to the rest of Plaintiffs'

allegations.  The lack of a significant stock price increase suggests that the statements identified

in Plaintiffs' Contention Responses, p. 9, ¶10 were not considered as new or did not significantly

alter the total mix of information in such a way as to inflate the value of Oracle's stock as

Plaintiffs allege.


**February 13, 2001 (Plaintiffs' Contention Responses, pp. 11-12, ¶¶15-17)**
**(guidance/economy/demand)**

35.     In Plaintiffs' Contention Responses, Plaintiffs allege that certain statements made

by Oracle's Sandy Sanderson at the Goldman Sachs Technology Investment Symposium in La

Quinta, California on February 13, 2001 were false and misleading:

> 2/13/01:  (a) As an example, (Sanderson) said one recent deal he's involved in
> wasn't scheduled to close until Oracle's fourth quarter, which ends in May.
> Instead, that deal should now close shortly.
>
> (b) "I met with the COO and he decided he wanted to do it in February (instead of
> May)," Sanderson said.
>
> (c) Sanderson said its database and application software business are [*sic*] strong.

---

[44] Plaintiffs' Contention Responses, p. 9, ¶10.  This was reported in "Oracle CEO Ellison Loses Voice, Misses 2
Public Talks in a Week," *Bloomberg News,* January 24, 2001, 5:24 PM.

(d) "Actually, our pipelines around applications and database have never been stronger," Sanderson said.[45]

2/13/01:  For example, in the sales area, in the sales automation area, I can now – Larry can look at, for example, our forecast on a global basis, our forecast around the world up to the minute at any level of detail that you want to see.... And if we go back in five minutes later and look at what our forecast is, it's different. Because some rep around the world has changed the forecast.  Now I can see every deal out there that my reps around the world are working.[46]

2/13/01:  Q. Sandy, I'm curious about this new sales forecasting you have, how that's working.
A. It's working great.
Q. As you get together every week and sort of roll up your numbers, the economy – what's the sense, what are you hearing from the field in terms of how – the economy and sales cycles, anything changing there?
A. We're actually – I guess I'd start out by saying that our pipelines are – at application and database have never been stronger.  And that continues to be the case.[47]

36.     Oracle had a residual return of 0.24 percent on February 13, 2001, which is not statistically significant.  Other news entering the market on February 13 included information related to Oracle's hosting of AppsWorld Paris in France and Goldman Sachs released the results of an IT survey it had commissioned.  AppsWorld Paris received several favorable mentions in the public press late in the trading day on February 13, 2001.  The Goldman Sachs survey revealed IT managers showed continuing purchase interest for Oracle's software as well as for the enterprise software of certain Oracle competitors.[48]  The study concluded that "IT managers continue to buy from the recognized leaders."[49]  Thus, other news that entered the market between close of market on February 12 between close of market on February 13 was generally neutral or positive.  The lack of a significant stock price increase suggests that the statements

---

[45] Plaintiffs' Contention Responses, pp. 11-12, ¶15.  This was reported in "Goldman Conference:  Its Stock Weak, Oracle Talks of Strong Business," *TheStreet.com*, February 13, 2001, 6:44 PM.  The quotations in the article from *TheStreet.com* were taken from Sanderson's speech, which ended no later than 4:30 PM.
[46] Plaintiffs' Contention Responses, pp. 11-12, ¶16.
[47] Plaintiffs' Contention Responses, pp. 11-12, ¶17.
[48] "Goldman Survey:  IT Spending To Grow 5%-10% This Year," *Dow Jones News Service*, February 13, 2001, 9:29 PM.
[49] Ibid.

identified in Plaintiffs' Contention Responses, pp. 11-12, ¶¶15-179, were not considered as new or did not significantly alter the total mix of information in such a way as to inflate the value of Oracle's stock as Plaintiffs allege.

**Exhibit 8**
**Earnings Results vs. Analysts' EPS Consensus Mean Forecast**
Source: *Factiva;* First Call



Note: Dates in parentheses indicate that a company pre-announced on that date; all other dates are earnings announcements.  SAP's First Call EPS consensus data is not reliable and was excluded from this table.  Based on press reports, SAP missed EPS estimates for the quarter ending on 9/30/00 and beat EPS estimates for the following 3 quarters.
[1] For fiscal quarters ending before 3/1/01, actual results compared to analysts' EPS consensus mean forecast two months before the end of the fiscal quarter; for fiscal quarters ending after 3/1/01, actual results compared to analysts' EPS consensus mean forecast as of 1/31/01.  Data provided by First Call.

# Exhibit 9
# Competitors in the Industry Index
# Stock Price Return on 3/2/01

Source:  *CRSP*; *Bloomberg*; Analyst Reports

| Company | 3/2/01 Return |
|---------|--------------|
| 1. Ariba | -14.65% |
| 2. BEA Systems | -16.02% |
| 3. Commerce One | -14.19% |
| 4. i2 Technologies | -10.66% |
| 5. IBM | -3.54% |
| 6. Microsoft | -4.50% |
| 7. PeopleSoft | -20.55% |
| 8. SAP | -7.95% |
| 9. Siebel | -19.08% |
| Median | -14.19% |
| Average | -12.35% |



**Exhibit 10**
**Oracle Corporation**
**Closing Stock Price vs. Industry Index[1]**
**3/1/01 – 4/3/01**
Source: *CRSP; Bloomberg*

Note:

[1] The Industry Index is pegged to Oracle Corporation's closing stock price on 3/1/01, $21.375.  The Industry Index is an equal-weighted index composed of:  Ariba, BEA Systems, Commerce One, IBM, i2 Technologies, Microsoft, PeopleSoft, SAP, and Siebel Systems.