# EXHIBIT X

120

```
1   00120:01   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2        02          IN AND FOR THE COUNTY OF SAN MATEO
3        03                  ---oOo---
4        04   COORDINATION PROCEEDING
5        05
6        06
7        07              PROCEEDING NO. 4180
8        08   THIS DOCUMENT RELATES TO:
9        09   ALL ACTIONS
10       10
11       11
12       12       DEPOSITION OF JENNIFER L. MINTON
13       13          Thursday, April 1, 2004
14       14          Volume II (Pages 120 - 231)
15       15
16       16   CONFIDENTIAL PURSUANT TO A PROTECTIVE ORDER APPROV
17       17   CONFIDENTIAL, AND THE CONTENTS ARE NOT TO BE REVEAL
18       18   ORDER OF THE COURT OR BY AGREEMENT OF THE PARTIES
19       19
20       20
21       21   CSR NO. 6438
22       22
23       23           ROBERT BARNES ASSOCIATES
24       24           760 Market Street, Suite 844
25       25             Phone:  (415)788-7191
```

121

```
1   00121:01   IN THE COURT OF CHANCERY OF THE STATE OF DELAWA
2        02          IN AND FOR NEW CASTLE COUNTY
3        03
4        04   IN RE ORACLE CORPORATION
5        05   DERIVATIVE LITIGATION
6        06   _____/
7        07
8        08
9        09
10       10
11       11
12       12
13       13
14       14
15       15
16       16
17       17
18       18
19       19
20       20
21       21
22       22
23       23
24       24
25       25
```

122

```
1   00122:01          A P P E A R A N C E S
2        02
3        03   FOR CALIFORNIA PLAINTIFFS:
4        04       BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
5        05       425 California Street, Suite 2025
6        06       (415)433-3200
7        07   AND
8        08       McMANIS, FAULKNER & MORGAN
9        09       50 West San Fernando Street
10       10       San Jose, CA  95113
11       11   AND
12       12       COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI
13       13       700 El Camino Real
14       14       (650)871-5666
15       15
16       16   FOR THE DELAWARE PLAINTIFFS:
17       17       SCHIFFRIN & BARROWAY
18       18       Three Bala Plaza East, Suite 400
19       19       (610)667-7706
20       20
21       21
22       22
23       23
24       24
25       25
```

123

```
1   00123:01       A P P E A R A N C E S (continued)
2        02
3        03   FOR ORACLE CORPORATION AND THE WITNESS:
4        04       MORRISON & FOERSTER
5        05       425 Market Street
6        06       (415)268-7126
7        07
8        08   FOR ORACLE CORPORATION:
9        09       ORACLE CORPORATION
10       10       500 Oracle Parkway
11       11       (650)506-9221
12       12
13       13   FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY:
14       14       MAYER, BROWN, ROWE & MAW
15       15       350 South Grand Avenue, 25th Floor
16       16       (213)229-9500
17       17
18       18   ALSO PRESENT:  Andrew Martin, Videographer
19       19
20       20
21       21   TAKEN AT:
22       22       BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
23       23       San Francisco, CA  94104
24       24
25       25                  ---oOo---
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

124

```
1   00124:01                I N D E X
2        02
3        03  DEPOSITION OF JENNIFER L. MINTON
4        04
5        05  EXAMINATION BY:                      PAGE
6        06     MR. DE GHETALDI (Resumed)          126
7        07     AFTERNOON SESSION                  183
8        08
9        09  DC EXHIBITS
10       10  238  E-mails, CA-ORCL 032260-63, 4 pages    126
11       11  239  Interview Of Jennifer Minton, 13 pages  178
12       12  240  Oracle Q3 FY01 Management Summary -
13       13       CA-ORCL 004802-10, 9 pages        204
14       14  241  Oracle Q3 FY01 Management Summary -
15       15       Week 6, CA-ORCL 030883-904, 23 pages  205
16       16  242  Oracle Q3 FY01 Management Summary -
17       17       CA-ORCL 004780-801, 22 pages      206
18       18  243  Affidavit Of Jennifer Minton In
19       19       Judgment, 16 pages               210
20       20
21       21           ---o0o---
22       22
23       23
24       24
25       25
```

125

```
1   00125:01          BE IT REMEMBERED that, pursuant to
2        02  Continuation and on Thursday, April 1, 2004, commencing
3        03  at the hour of 9:09 a.m., before me, HOLLY MOOSE, CSR
4        04  No. 6438, a Certified Shorthand Reporter in the State of
5        05  California, there personally appeared
6        06
7        07               JENNIFER L. MINTON,
8        08
9        09  called as a witness by the Plaintiffs, who, having been
10       10  previously sworn, was examined and testified as
11       11  hereinafter set forth:
12       12
13       13
14       14
15       15           ---o0o---
16       16
17       17
18       18
19       19
20       20
21       21
22       22
23       23
24       24
25       25
```

126

```
1   00126:01  PROCEEDINGS                  9:09 A.M.
2        02
3        03       THE VIDEOGRAPHER:  This is the beginning of
4        04  Volume II, videotape 1 in the continuing deposition of
5        05  Jennifer Minton in the matter of Coordination Proceeding
6        06  Special Title Oracle Cases and In Re Oracle Cases.
7        07  Today's date is April 1, 2004.  The time is 9:09 a.m.
8        08       There being no new counsels present and unless
9        09  there are objections, we'll go on the record.
10       10  Everything remains the same as stated on Volume I, tape
11       11 1.  We're on the record.
12       12       MR. DE GHETALDI:  Thank you.
13       13       Good morning.
14       14       THE WITNESS:  Good morning.
15       15       MR. DE GHETALDI:  I'd like to have this
16       16  document marked as next in order.
17       17       MS. LAVALLEE:  238.
18       18       MR. DE GHETALDI:  238.
19       19       (DC Exhibit No. 238
20       20       marked for identification).
21       21           EXAMINATION RESUMED BY
22       22       MR. DE GHETALDI:  Q.  Have you had a chance to
23       23  review Exhibit 238?
24       24       A.  Yes.
25       25       Q.  Do you recall the issues that were under
```

127

```
1   00127:01  discussion in the e-mail string that makes up Exhibit
2        02  238?
3        03       A.  Not entirely.  Partially.
4        04       Q.  Can you tell me what you do recall about those
5        05  issues.
6        06       A.  There was a SWAT team that was headed up by
7        07  this -- I think it was -- let me find the name in here
8        08  again -- by Rosser.  And he reported in to Mark
9        09  Barrenechea, who was a CRM development product VP --
10       10  or -- I think he was a VP.  He could have been an EVP.
11       11       Q.  What is a SWAT team?
12       12       A.  It was a special team focused on selling and
13       13  marketing the CRM suite of applications.
14       14       THE REPORTER:  CRM what?
15       15       THE WITNESS:  CRM suite of applications.  And
16       16  what they were trying to do is issue comp plans for this
17       17  group that was tied to the CRM revenue.
18       18       MR. DE GHETALDI:  Okay.
19       19       Q.  What are the -- do you recall anything about
20       20  the quotas that are being discussed in these e-mails?
21       21  CRM quotas, that is.
22       22       A.  It was the target that they were trying to get
23       23  their folks to deliver on.
24       24       Q.  All right.  Do you recall why Mr. Barrenechea
25       25  was apparently targeting a quota that was well under the
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

128

1 00128:01 corporate budget number?

2 02    MR. ETH: Objection. Vague, misstates the

3 03 document.

4 04    MR. DE GHETALDI: Q. I'm looking at the first

5 05 sentence in Christian Facey's e-mail to you on the first

6 06 page of Exhibit 238 when I ask that question.

7 07    Can you repeat the question.

8 08    Q. Yes. Do you recall why Mr. Barrenechea was

9 09 apparently targeting a quota that was well under the

10 10 corporate budget number?

11 11    A. No.

12 12    Q. I'm handing you a document that was previously

13 13 marked as Exhibit 48. Do you recall receiving Exhibit

14 14 48?

15 15    A. Yes.

16 16    Q. Is Exhibit 48 one of the documents that you

17 17 reviewed in preparation for your deposition?

18 18    A. I believe I reviewed this in connection with

19 19 my affidavit.

20 20    Q. This e-mail relates to the NAS division,

21 21 correct?

22 22    A. Correct.

23 23    Q. And do you know what Mr. Winton was referring

24 24 to when he said "We finished the ops reviews this

25 25 afternoon"?

129

1 00129:01    A. Organizations tend to have operation reviews.

2 02 So in an operations review, it's not uncommon for them

3 03 to review the forecast. So I think that's what he was

4 04 referring to.

5 05    Q. He makes three numbered points. The first one

6 06 was that,

7 07    "The pipe had not grown as we had

8 08    anticipated. We're actually slightly down

9 09    from December end reporting."

10 10    Did you discuss that issue with Mr. Winton at

11 11 all after receiving this e-mail?

12 12    A. I don't recall.

13 13    Q. Was that issue discussed at any of the EMC

14 14 meetings in January of 2001?

15 15    A. I don't recall.

16 16    Q. Is that the type of issue that would be

17 17 discussed at an EMC meeting?

18 18    A. Yes.

19 19    Q. The second point that he makes is,

20 20    "Lack of big deals. Unlike Q1 and Q2,

21 21    we have few big deals in best case that

22 22    could drive us past the 360 million line."

23 23    Did you discuss that point with Mr. Winton

24 24 after receiving this e-mail?

25 25    A. Not that I recall.

130

1 00130:01    Q. Did you discuss point 1 or point 2 with

2 02 Mr. Roberts after receiving this e-mail?

3 03    A. Not that I recall.

4 04    Q. Do you recall whether Mr. Winton's second

5 05 point was discussed at any of the EMC meetings in

6 06 January 2001?

7 07    A. Not that I recall.

8 08    Q. Is point number 2 the type of issue that would

9 09 have been discussed at an EMC meeting?

10 10    A. Yes.

11 11    Q. Then in point number 3 he says,

12 12    "Drop in technology. As reflected in

13 13    the softening pipe, both general business

14 14    and majors see a slowdown in both Q3 and

15 15    Q4."

16 16    Did you discuss that point with Mr. Winton

17 17 after receiving this e-mail?

18 18    A. I don't recall if I discussed this meeting at

19 19 all with Mr. Winton.

20 20    Q. Did you discuss that point with Mr. Roberts

21 21 after receiving this e-mail?

22 22    A. I do not remember if I discussed this e-mail

23 23 with George Roberts.

24 24    Q. Okay. Do you recall whether the point that

25 25 both general business and majors see a slowdown in

131

1 00131:01 technology in both Q3 and Q4 was an issue that was

2 02 discussed at any of the EMC meetings in January of 2001?

3 03    A. I honestly do not recall.

4 04    Q. Would that be the type of issue that would be

5 05 discussed at an EMC meeting?

6 06    A. Yes.

7 07    Q. Mr. Winton continues,

8 08    "General business's dot-com bubble has

9 09    burst. They expect the west to end the

10 10    year 30 or 40 million below" -- "or behind

11 11    their original budget for technology."

12 12    Do you recall discussing that issue with

13 13 Mr. Roberts after receiving this e-mail?

14 14    A. I do not recall discussing this e-mail with

15 15 Mr. Roberts or with Mr. Winton.

16 16    Q. Okay. I'm asking about the issue --

17 17    A. Any -- any content in this e-mail.

18 18    Q. Okay. Do you recall whether the fact that

19 19 general business's dot-com bubble has burst was

20 20 discussed at any of the EMC meetings in January of 2001?

21 21    MR. NADOLENCO: Objection. Asked and

22 22 answered.

23 23    MR. ETH: Well, and objection -- objection to

24 24 form.

25 25    THE WITNESS: I do not recall if this was

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

132

1  00132:01 discussed at an EMC meeting during January of 2001.
2  02    MR. DE GHETALDI:  Q.  Is that the type of
3  03 issue that would have been discussed at an executive
4  04 committee meeting?
5  05    A.  Yes.
6  06    Q.  Then Mr. Winton continues,
7  07    "Majors sees a slowdown in spending
8  08 along with smaller deal sizes."
9  09    MR. ETH:  Objection.  Says "spend."
10 10    MR. DE GHETALDI:  You're right.
11 11    MR. ETH:  Okay.
12 12    MR. DE GHETALDI:  Q.  Did you discuss that
13 13 point with either Mr. Winton or Mr. Roberts after
14 14 receiving this e-mail?
15 15    A.  I do not recall discussing this e-mail with
16 16 Mr. Roberts or with Mr. Winton.
17 17    Q.  Do you recall whether the fact that NAS's
18 18 majors division was seeing a slowdown in spending along
19 19 with smaller deal sizes was discussed at any of the
20 20 executive committee meetings in January 2001?
21 21    MR. ETH:  Objection.  Lack of foundation.
22 22    THE WITNESS:  I do not recall.
23 23    MR. DE GHETALDI:  Q.  Is that the type of
24 24 issue that would commonly be discussed at an executive
25 25 committee meeting?

133

1  00133:01    A.  We would commonly discuss forecast issues at
2  02 an EC meeting.
3  03    Q.  Such as slowdown seen by an executive vice
4  04 president?
5  05    MR. ETH:  Objection.  Lack of foundation.
6  06    THE WITNESS:  As I said, we would have
7  07 discussed issues relating to the forecast at an EC
8  08 meeting.
9  09    MR. DE GHETALDI:  Q.  Okay.  Then Mr. Winton
10 10 continues that "the change in the ASP model for generic
11 11 tech hosting licenses."
12 12    Do you know what the ASP model for generic
13 13 tech hosting licenses Mr. Winton is referring to is?
14 14    A.  I don't recall.
15 15    Q.  Do you know what ASP stands for?
16 16    A.  I'm sorry, I don't recall.
17 17    Q.  Mr. Winton says that,
18 18    "The change in the ASP model for
19 19 generic tech hosting licenses coupled with
20 20 the dot-com crash is impacting the
21 21 projected tech results in that segment."
22 22    Did you discuss that issue with Mr. Winton or
23 23 Mr. Roberts after receiving this e-mail?
24 24    MR. ETH:  Objection.  Asked and answered.
25 25    THE WITNESS:  I do not recall.

134

1  00134:01    MR. DE GHETALDI:  Q.  Do you recall whether
2  02 that issue was discussed at any of the EMC meetings in
3  03 January of 2001?
4  04    A.  I do not recall.
5  05    Q.  And again, that would be the type of issue
6  06 that would commonly be discussed at an EMC meeting?
7  07    A.  Forecasting issues would be commonly discussed
8  08 at an EC meeting.
9  09    Q.  I'm going to hand you a document that was
10 10 previously marked as Exhibit 56.  Have you had a chance
11 11 to review Exhibit 56?
12 12    A.  I've reviewed this.
13 13    Q.  Is Exhibit 56 one of the documents that you
14 14 reviewed in preparation for your deposition?
15 15    A.  Yes.
16 16    Q.  Do you recall asking Mr. English for a
17 17 forecast summary for OPI in mid January 2001?
18 18    A.  I had frequently asked both Jim English, Sarah
19 19 Kopp and David Winton to provide me their own
20 20 independent assessment of the forecast.  I did not want
21 21 to have them repeat to me what they thought -- what the
22 22 EVPs were reporting to Larry in the EMC; I wanted them
23 23 to give me their own unbiased independent view as to
24 24 what the forecast results were.  And this is the type of
25 25 e-mail that I would get back with their independent

135

1  00135:01 thinking.
2  02    Q.  How often did you ask them for the source of
3  03 summaries?
4  04    A.  I don't recall how frequently.
5  05    Q.  Can you approximate for me how many times in a
6  06 quarter?
7  07    A.  I'm sorry, I do not recall.
8  08    MR. DE GHETALDI:  Time out.
9  09    THE VIDEOGRAPHER:  Off the record, 9:26 a.m.
10 10    (Recess taken.)
11 11    THE VIDEOGRAPHER:  On the record, 9:28 a.m.
12 12    MR. DE GHETALDI:  Q.  Let's try this:  You
13 13 said that you had frequently asked Mr. English and
14 14 Ms. Kopp and Mr. Winton to provide you with independent
15 15 assessments of the forecast.  What did you mean by
16 16 "frequently"?
17 17    A.  When they started to report in to me, which I
18 18 believe was somewhere, you know, around this time period
19 19 within a 12-month band, they -- they had originally
20 20 worked with the sales organization and reported to the
21 21 sales EVPs.  And I wanted them to become more
22 22 independent and more mindful of the forecast and making
23 23 sure that they weren't just parroting whatever was being
24 24 said.
25 25    So, you know, once they started reporting to

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

136

1  00136:01  me, after that point in time, even up through current
2  02  day, I have them provide me with their own independent
3  03  assessment of what they think the forecast is.
4  04       So as an example, Sarah Kopp once or twice a
5  05  quarter even today will send me an e-mail note with her
6  06  own views as to what we think -- or what she thinks the
7  07  organization will deliver in a given quarter.
8  08    Q.  All right.  So do you think that that -- a
9  09  similar schedule was followed back in the third quarter
10 10  of 2001?
11 11    A.  I was very interested in hearing their own
12 12  independent views, so it would be reasonable to presume
13 13  that I asked them to provide me more than once what
14 14  their thoughts were on the forecast.
15 15    Q.  Mr. Winton testified that he sent you monthly
16 16  reports.  Does that sound about right?
17 17    A.  I don't recall the frequency.
18 18    Q.  When Ms. Kopp said in Exhibit 56, "We have a
19 19  lot of pipe at challenging clients" --
20 20    A.  Where is that exhibit?
21 21       MR. ETH:  You're mixing it up.  It's English.
22 22 You said "Kopp."
23 23       MR. DE GHETALDI:  I'm sorry, Mr. English.
24 24 Thanks.
25 25    Q.  Mr. English said that OPI had a lot of pipe at

137

1  00137:01  challenging clients.  Did you discuss that statement
2  02  with him?
3  03    A.  I don't recall if I discussed this e-mail note
4  04  with him.
5  05    Q.  Do you recall whether you discussed it with
6  06  Mr. Sanderson?
7  07    A.  I do not recall if I discussed it with
8  08  Mr. Sanderson.
9  09    Q.  Do you recall whether the contents of this
10 10  e-mail, Exhibit 56, were discussed at any executive
11 11  committee meetings in the third quarter of 2001?
12 12    A.  I do not recall whether this was discussed at
13 13  any EC meeting.
14 14    Q.  When Mr. English says "One AVP talked of
15 15  starting to see indications of client delays on
16 16  decisions," did you make any effort to determine which
17 17  AVP he was talking about?
18 18    A.  Not that I recall.
19 19    Q.  Mr. English says that he analyzed upside deals
20 20  by win probability.  Do you see that section about three
21 21  quarters of the way down?
22 22    A.  Mm-hm.
23 23    Q.  Was there a program that allowed that type of
24 24  analysis to be done, an automated program of some kind?
25 25    A.  Do you recall the reports that we looked at

138

1  00138:01  yesterday that came out of OSO?
2  02    Q.  Yes.
3  03    A.  I -- he would be looking at that type of
4  04  information.
5  05    Q.  All right.  Was there a query that could be
6  06  run in OSO to sort to -- for deals with upsides of
7  07  40 percent probability or greater?
8  08    A.  I believe what they were doing was downloading
9  09  data from OSO into Excel.  And in Excel, they could sort
10 10  it in any fashion they so desired.
11 11    Q.  I see.  Now I'm going to hand you a document
12 12  that was marked as Exhibit 78.
13 13       Have you had a chance to review Exhibit --
14 14    A.  Yes.
15 15    Q.  -- 78?
16 16    A.  Yes.
17 17    Q.  You say at the beginning that Mr. Ellison made
18 18  it clear to everyone at the EMC meeting this week that
19 19  the license revenue growth target for this year and next
20 20  is 30 percent.  What sort of target was that?  I'm not
21 21  sure that I -- can you explain to me what Mr. Ellison
22 22  was talking about when he said this.
23 23    A.  He was --
24 24       MR. NADOLENCO:  Objection -- I apologize.
25 25  Objection.  Lacks foundation.

139

1  00139:01       THE WITNESS:  He's establishing a goal for the
2  02  sales organization to work towards.
3  03       MR. DE GHETALDI:  Q.  Was that 30 percent in
4  04  constant dollars or actual rates?
5  05       MR. NADOLENCO:  Same objection.
6  06       THE WITNESS:  It would have been in constant
7  07  dollars.
8  08       MR. DE GHETALDI:  Q.  That was the same amount
9  09  of growth that Oracle had given guidance for for license
10 10  revenue in December of 2000, correct?
11 11       MR. ETH:  Objection.  Misstates the record.
12 12       THE WITNESS:  I'd have to look back at the
13 13  actual document.  I thought it was 25 percent.
14 14       MR. DE GHETALDI:  Q.  For U.S.  I think it's
15 15  30 --
16 16    A.  No.  Well, we don't -- we don't -- we
17 17  don't give guidance by division.
18 18    Q.  I meant U.S. dollars -- or actual rates and
19 19  30 percent in constant dollars, I think was the guidance
20 20  that was given.
21 21       Now I'm going to hand you a document that was
22 22  previously marked as Exhibit 77.
23 23    A.  Is there a second page to this?
24 24    Q.  That was going to be one of my questions.
25 25    A.  Says "1 of 2."

140

```
1   00140:01   Q.  I understand.  And this is the way that we
2   02   received it.  And so one of the questions that I would
3   03   have is where would you look to try and find the second
4   04   page of this e-mail?
5   05   A.  Where would I look?
6   06   Q.  Yeah.
7   07   A.  I've already provided everything to legal that
8   08   I had.
9   09   Q.  So it's your belief that -- do you recognize
10  10   the handwriting on this document?
11  11   A.  Yes.
12  12   Q.  Is it yours?
13  13   A.  Yes.
14  14   Q.  And it would be your belief that you provided
15  15   both pages of this document to legal?
16  16   A.  Well, it could have been that I only kept the
17  17   first page since it had all the key data that I needed.
18  18   Q.  How do you know that there was nothing on the
19  19   second page in terms of key data?
20  20   A.  Well, all the key data that I would look for
21  21   is right here on the first page.
22  22   Q.  Where you wrote "75 percent confidence level"
23  23   under Mr. Nussbaum's forecast number, what did you mean
24  24   by that?
25  25   A.  These look to be notes that I had taken.  I
```

141

```
1   00141:01  don't know.  I do not recall.
2   02   Q.  It appears that there is $91 million in
3   03   management judgment contained in the $225 million
4   04   forecast.  Is that the way that you read this document's
5   05   contents?
6   06   A.  Yes.
7   07   MR. ETH:  Object -- well--
8   08   THE WITNESS:  Sorry.
9   09   MR. ETH:  Object.  That's not what it says,
10  10   but ...
11  11   Go ahead.
12  12   MR. DE GHETALDI:  Q.  Is that your
13  13   understanding of what this document says?
14  14   A.  Yes.
15  15   Q.  Okay.  Is 91 million out of 225 million a
16  16   relatively high level of management judgment to be
17  17   included in a forecast?
18  18   MR. NADOLENCO:  Object to form.
19  19   THE WITNESS:  Not considering the amount of
20  20   large deals that they had in play.
21  21   MR. DE GHETALDI:  Q.  Would the amount of
22  22   large deals that OSI had in play indicate a greater risk
23  23   for achieving their forecast?
24  24   MR. NADOLENCO:  Same objection.
25  25   THE WITNESS:  The amount of deals that they
```

142

```
1   00142:01  had in play would not indicate a greater risk.
2   02   MR. DE GHETALDI:  Q.  Do you know what
3   03   Ms. Kopp meant when she said that Mr. Nussbaum was still
4   04   confident in the $225 million forecast as long as none
5   05   of the very large opportunities dropped out?
6   06   A.  He believed that he would meet his forecast,
7   07   assuming that he would be able to close a number of the
8   08   large deals that he had in his pipeline.
9   09   Q.  Was she saying that he needed to close all of
10  10   the large deals in the pipeline?
11  11   MR. NADOLENCO:  Objection.  Lacks foundation.
12  12   THE WITNESS:  No.  She summarized here some of
13  13   the deals that they needed to have close in order to
14  14   achieve the forecast.
15  15   MR. DE GHETALDI:  I don't know if you can find
16  16   Exhibit 150 in that stack you have there.
17  17   THE WITNESS:  Do you have a picture of ...
18  18   MR. DE GHETALDI:  Yeah, it's the
19  19   December 12th e-mail from Mr. Henley.
20  20   (Inaudible discussion).
21  21   MR. DE GHETALDI:  Q.  In the middle of the
22  22   first paragraph, Mr. Henley says,
23  23   "Based on strong applications
24  24   momentum, 30 percent constant dollar total
25  25   license growth seems like a reasonable
```

143

```
1   00143:01  target for the second half."
2   02   Do you see that?
3   03   A.  Yes, I do.
4   04   Q.  So do you -- does that refresh your memory as
5   05   to whether Oracle gave guidance of 30 percent license
6   06   revenue growth in constant dollars for Q3 2001?
7   07   A.  We give revenue growth estimates in U.S.
8   08   dollars, but we also indicate what currency effect that
9   09   there may be.
10  10   Q.  My question was does that refresh your
11  11   recollection as to the guidance that Oracle gave for
12  12   license revenue growth in constant dollars?
13  13   A.  We gave Q3 current exchange rates, it looks
14  14   like negative five percent.  So if we had given a 25
15  15   percent in U.S. dollars and the currency was negative,
16  16   then that would have been 30 percent constant.
17  17   Q.  All right.  Now I'm going to hand you a copy
18  18   of Exhibit 49.  Do you recall receiving Exhibit 49?
19  19   A.  Yes.
20  20   Q.  Is Exhibit 49 one of the documents that you
21  21   reviewed in preparation for your deposition?
22  22   A.  Yes.
23  23   Q.  All right.  Do you recall whether the contents
24  24   of Exhibit 49 were discussed at the January 29th, 2001
25  25   executive committee meeting?
```

144

00144:01  A.  I do not recall.
02      Q.  Is the contents of Exhibit 49 the type of
03  material that would have been discussed at an executive
04  committee meeting?
05      A.  Yes.
06      Q.  Technology that is -- or what is -- what
07  products make up the tech business that Mr. Winton is
08  discussing?
09          MR. NADOLENCO:  Objection to the extent it
10  lacks foundation.
11          THE WITNESS:  We break out our license revenue
12  between applications and technology.  So technology
13  includes, as an example, database and application
14  server, any nonapplication-based revenues.
15          MR. DE GHETALDI:  Q.  As a percentage of NAS's
16  license business, can you estimate for me what the split
17  between technology and applications was in fiscal year
18  2001, just on average?
19      A.  I don't recall.
20      Q.  Do you recall whether NAS -- NAS's license
21  business was predominantly technology as opposed to
22  applications?
23      A.  I don't recall.
24      Q.  Going back to the one-page Exhibit 77, which
25  is the Sarah Kopp e-mail, do you have a practice of

145

00145:01  saving e-mails that you receive, or do you have a
02  practice of deleting them?
03          MR. NADOLENCO:  Objection.  Compound.
04          THE WITNESS:  I save some and I delete others.
05          MR. DE GHETALDI:  Q.  Do you know whether
06  Exhibit 77 is the type of e-mail that you would have a
07  tendency to save or delete?
08      A.  I cannot characterize what type of e-mails I
09  might have save or delete.  It would be a decision that
10  I would make at that point in time.
11      Q.  Do you still have e-mails on any of your
12  computers dating back to 2001?
13          MS. SEGAL:  Object to form.
14          THE WITNESS:  All of my e-mails that I had
15  have been provided to legal.
16          MR. DE GHETALDI:  Q.  In electronic form or in
17  paper form or both?
18      A.  I believe they took electronic.  And if I had
19  any hard copies, it would have taken hard copy -- hard
20  copy e-mails as well.
21      Q.  Okay.  Now I'm going to hand you a document
22  that was previously marked as Exhibit 73.  Do you
23  recognize the handwriting on Exhibit 73?
24      A.  I would be speculating, but I do believe it
25  would be Roberta Ronsse's.  But I can't certain.

146

00146:01  Q.  In the center of the first page of Exhibit 73
02  down towards the bottom, there's a handwritten note that
03  says "Footnote pipeline without Covisint."
04          Do you see that?
05      A.  Mm-hm.
06      Q.  Do you recall discussions in the third quarter
07  of 2001 on how to treat the Covisint deal in the
08  forecast?
09      A.  I don't understand precisely what you're
10  getting at.
11      Q.  Well, do you recall discussions about taking
12  Covisint out of a particular pipeline number?
13      A.  As indicated in Jim English's e-mail -- and
14  I -- you know, they did take it out in trying to come up
15  with the projected license revenues when applying the
16  historical conversion rates.
17      Q.  Do you know why they did that?
18      A.  I would think to be more conservative.  If I
19  may give an example ...
20      Q.  Yes.
21      A.  If you have a pipeline of a hundred and your
22  historical conversion rate was 50, then you would
23  predict your license revenues to be 50.
24          So if you included pipeline of -- if you
25  included Covisint in your pipeline and multiplied by

147

00147:01  the same amount, it would have given you a higher
02  pipeline number.  So because it was such a large and --
03  unusually large -- largest deal we've ever done, I
04  believe they took it out in coming up with their
05  predictions of the license revenues for the quarter.
06      Q.  All right.
07      A.  Otherwise it would have overstated their
08  predictive results.
09      Q.  Okay.  Now I'm going to hand you a document
10  that was previously marked as Exhibit 142.  Does Exhibit
11  140 -- or do you recognize Exhibit 142?
12      A.  Yes.
13      Q.  Can you tell me what it is, please.
14      A.  It is an upside analysis.  Based on the date,
15  it was the upside analysis prepared on December 11th.
16      Q.  Was this Exhibit 142 the upside analysis that
17  was used to arrive at Oracle's guidance figures that
18  were given on December 14th?
19      A.  As I stated yesterday, investor relations
20  would come up with their own model and we would come up
21  with ours.  So I do not know if we relied more heavily
22  on this one versus the investor relations ones.  They
23  may have been a little bit different.
24      Q.  But it was used in the process?
25      A.  It was considered -- it was considered.

148

```
1   00148:01   Q.  All right.  Is -- can you tell whether Exhibit
2   02  142 is a complete upside report?
3   03      A.  Yes.
4   04      Q.  That is, it is complete?
5   05      A.  Yes.
6   06      Q.  Okay.  If you can find Exhibit 232 in -- in
7   07  that stack.  It was probably --
8   08      A.  Can you show me what it looks like.
9   09      Q.  It was one of the first things that we looked
10  10  at yesterday.  It's the e-mail with the upside report
11  11  attached.
12  12          (Inaudible discussion).
13  13      MR. DE GHETALDI:  Q.  And if you can turn
14  14  towards the back -- in fact, the second to last page,
15  15  with Bates number 25540.
16  16      A.  Mm-hm.
17  17      Q.  It's the page titled "External Product
18  18  Revenues."
19  19      A.  Mm-hm.
20  20      Q.  I don't see that -- or a comparable page in
21  21  Exhibit 142.
22  22      A.  If you please go to 22 -- 2990.
23  23      Q.  Yes.
24  24      A.  See how we have technology and total
25  25  applications?
```

149

```
1   00149:01   Q.  Yes.
2   02      A.  That would be similar to the one that you're
3   03  pointing to, which is in a different format.
4   04      Q.  All right.  Do you know -- do you recall there
5   05  being a decision to stop including breakouts for ERP and
6   06  CRM and server and tools in the upside reports and
7   07  simply separate them between technology and
8   08  applications?
9   09      A.  I don't recall a specific event.
10  10      Q.  Okay.  Now, these upside reports, the one with
11  11  Exhibit 232 was -- was e-mailed.  And I think you said
12  12  yesterday that that was not something that you usually
13  13  did.
14  14      A.  Correct.
15  15      Q.  All right.  And they were usually handed out
16  16  at the EMC meetings themselves or distributed just prior
17  17  to the EMC meetings?
18  18      A.  We generally distributed them at the EC
19  19  meetings, as best as I recall.
20  20      Q.  Okay.  Did anybody get advance copies before
21  21  the meetings?
22  22      A.  At times I would provide Jeff Henley with a
23  23  copy of the upside report before the EC meeting.
24  24      Q.  Did -- or were different versions of the
25  25  upside report distributed to different persons at the
```

150

```
1   00150:01  executive committee meeting?  In other words, did some
2   02  people get some of the pages but not others?
3   03      A.  I don't recall what we were doing back then,
4   04  but I can tell you today we do not give the entire
5   05  package to anybody other than Larry Ellison, Safra Catz,
6   06  Chuck Phillips, Jeff Henley and myself.  And sales, if
7   07  they're even there.  They're generally participating via
8   08  telephone.
9   09          But the development guys only get the license
10  10  page that shows their product revenues forecast and the
11  11  page that's -- the next page as well that shows the
12  12  license expense and margin.
13  13      Q.  Okay.
14  14      A.  We had a practice of not wanting everybody to
15  15  see our total revenues and earnings estimates at the EC
16  16  meetings.
17  17      Q.  What was the reason for that practice?
18  18      A.  They didn't --
19  19      MR. NADOLENCO:  Objection -- I apologize.
20  20  Objection to the extent it lacks foundation.
21  21      THE WITNESS:  We felt that they didn't have a
22  22  need to know.
23  23      MR. DE GHETALDI:  Q.  Did you not trust the
24  24  participants at these executive committee meetings?
25  25      MR. ETH:  Objection.  Vague, argumentative.
```

151

```
1   00151:01      MR. NADOLENCO:  And compound.  There's more
2   02  than one participant, right?
3   03      THE WITNESS:  It's not a matter of trust.  It
4   04  in essence protects them.  What they don't know won't
5   05  hurt them.
6   06      MR. DE GHETALDI:  Q.  How could knowing the
7   07  contents of an upside report hurt any of the
8   08  participants at an executive committee meeting?
9   09      A.  You would not want them to have information
10  10  that they might inadvertently tell somebody else about.
11  11  That's what I mean about what they don't know won't hurt
12  12  them.  So for example, somebody in charge of marketing
13  13  does not need to know what the financial results are
14  14  forecasted to be for the entire quarter.
15  15      Q.  What would -- well, I guess I'm not
16  16  understanding the problem with sharing this information
17  17  among the highest level of Oracle's management.  I --
18  18  I -- can you explain what the problem is with sharing
19  19  that information?  I mean, I assume that the people that
20  20  attend these meetings are the highest levels of Oracle's
21  21  management.  Am I right?
22  22      MR. ETH:  Is that the question?
23  23      MR. DE GHETALDI:  Yeah.
24  24      MR. ETH:  Okay.
25  25      THE WITNESS:  Yes, they are the executive --
```

152

```
1   00152:01 or executive officers of the company.  But some may only
2        02 be senior vice presidents.
3        03        MR. DE GHETALDI:  Q.  Was it your belief that
4        04 information in these upside reports can be misused?
5        05        MR. ETH:  Objection.  Asked and answered.
6        06        THE WITNESS:  No.  Let me rephrase that.
7        07 Intentionally misused?  Can you ask the question again.
8        08 I want to make sure I respond correctly.
9        09        MR. DE GHETALDI:  Q.  Right.  My question was
10       10 whether it was your belief that information in these
11       11 upside reports could be misused by any of the
12       12 participants at the executive committee meetings.
13       13     A.  Unintentionally misused was a concern, yes.
14       14     Q.  And --
15       15     A.  On my behalf.
16       16     Q.  Right, that's fine.  How did you feel that
17       17 this information could be unintentionally misused?
18       18        MR. NADOLENCO:  Objection.  Asked and
19       19 answered.
20       20        THE WITNESS:  In the event they inadvertently
21       21 shared the financial forecast with somebody who should
22       22 not have had any reason to be apprised of it.
23       23     Q.  THE DE GHETALDI:  Okay.  Why don't we take a
24       24 break.
25       25        THE WITNESS:  Sure.
```

153

```
1   00153:01        THE VIDEOGRAPHER:  Off the record, 10:04 a.m.
2        02     (Recess taken).
3        03        THE VIDEOGRAPHER:  On the record, 10:24 a.m.
4        04        MR. DE GHETALDI:  Q.  If you could turn to the
5        05 fifth page of Exhibit 142, with Bates number 2990,
6        06 please.
7        07     (Discussion off the record).
8        08        THE WITNESS:  Here we go.
9        09        MR. DE GHETALDI:  Q.  The upside -- I'd like
10       10 to talk about the upside numbers there in that column.
11       11     A.  What page are you on?  I'm sorry.
12       12     Q.  It's Bates number 2990.
13       13     A.  Okay.
14       14     Q.  Now, do you consider the upside numbers for
15       15 the -- that are shown in that column there as within the
16       16 normal range as compared to the forecast numbers?
17       17     A.  I would not make that analysis.  I don't know
18       18 how you define a normal range.  I would never view it in
19       19 those terms.
20       20     Q.  All right.  Well, I -- I -- I would be asking
21       21 about what you would consider to be a normal range, not
22       22 what -- not how I would define it.
23       23        MS. SEGAL:  So what's the question?
24       24        MR. DE GHETALDI:  Q.  Do you consider the
25       25 upside numbers that are shown in that column within the
```

154

```
1   00154:01 normal range as compared to the forecast numbers?  Are
2        02 they high or low historically, or do you have any sense
3        03 of that?
4        04     A.  I don't have a sense of that.  I look at each
5        05 quarter on its own.
6        06     Q.  Except to the extent that you look at
7        07 historical conversion rates.
8        08     A.  What's your question?
9        09     Q.  Well, you say that you look at each quarter on
10       10 its own.  Is that completely true?
11       11     A.  I don't look at my upside numbers in one
12       12 quarter and compare them to my upside numbers in another
13       13 quarter.  That is what I'm trying to convey.
14       14     Q.  All right.  As the quarter progresses, would
15       15 you expect that your potential number and the field's
16       16 forecast numbers would tend to come together?
17       17     A.  Towards the end of the quarter, yes.
18       18     Q.  All right.  And as a quarter progresses, would
19       19 you expect --
20       20     A.  Can I step back.  I would expect the final
21       21 results to approximate my upside amounts, the potential
22       22 amounts, that is.
23       23     Q.  The final results?
24       24     A.  Mm-hm.
25       25     Q.  The actual results?
```

155

```
1   00155:01     A.  Correct.
2        02     Q.  Okay.  But I was asking about the field
3        03 forecast numbers.  My question was would you expect your
4        04 potential numbers and the field forecast numbers to come
5        05 together as a quarter progresses?
6        06     A.  If the field was increasing their forecast
7        07 throughout the quarter, I would likely decrease the
8        08 upside amounts during the quarter so that net -- I guess
9        09 I don't really understand your question.
10       10     Q.  I'm trying to get a sense of your recollection
11       11 of historical trends, in particular the behavior of the
12       12 field's forecast numbers and your potential numbers as a
13       13 quarter progresses, and whether you recall those numbers
14       14 tending to come together as a quarter progresses.
15       15     A.  What do you mean, come together?
16       16     Q.  Become closer numerically.
17       17     A.  There -- there could be times when the field
18       18 would increase their forecast during the quarter.  I
19       19 would consider any increases in a forecast when arriving
20       20 at my upside adjustment at that stage of the quarter.
21       21 So my upside adjustments could go down as a consequence
22       22 if they increase their forecast.  So, you know, it just
23       23 depended quarter to quarter and how the field revised
24       24 their adjustments.
25       25     Q.  On this particular page, NAS is showing a
```

156

1  00156:01 pipeline growth for total license of 97 percent.  Do you
2  02 see that?
3  03    A.  Yes.
4  04    Q.  But they're only forecasting a 12-percent
5  05 increase in revenue.  Do you see that?
6  06    A.  Yes.
7  07    Q.  Was that a dis -- were those numbers
8  08 disproportionate, in your opinion?
9  09        MR. ETH:  Objection.  Vague.
10  10        THE WITNESS:  The pipeline growth does not --
11  11 is not necessarily tied to the forecast growth.
12  12        MR. DE GHETALDI:  Q.  Do you recall your
13  13 analysis of those two growth figures at the time --
14  14    A.  I would have --
15  15    Q.  -- that you prepared --
16  16    A.  My analysis would have been applying the
17  17 historical conversion rate to the current quarter
18  18 pipeline to arrive at an estimated license number.
19  19        Again, it was our common practice to evaluate
20  20 historical conversion rates and apply it to current
21  21 quarter pipeline rates -- or current quarter pipeline
22  22 amounts to determine what we felt the license revenues
23  23 might be for the quarter.
24  24    Q.  Do you recall discussions at the
25  25 December 11th EMC meeting about the fact that both OSI

157

1  00157:01 and NAS were forecasting 11 and 18 percent below the
2  02 targeted 13 -- or 30 percent growth figure?
3  03    A.  Where are you getting your numbers?
4  04    Q.  Well, the targeted license revenue growth
5  05 figure was 30 percent, correct?
6  06    A.  That was Larry's targeted 30 percent growth.
7  07    Q.  And that was also the --
8  08    A.  That was the goal he established for the
9  09 field.
10  10    Q.  Yes.  And that was also the guidance that was
11  11 given to the public, correct?
12  12        MR. ETH:  Objection.  Vague.
13  13        THE WITNESS:  The guidance given to the public
14  14 was 25 percent in reported dollars with an estimated
15  15 conversion rate -- negative -- sorry -- currency effect
16  16 of five points.
17  17        MR. DE GHETALDI:  Q.  Thirty percent, right?
18  18    A.  Correct.
19  19    Q.  And the numbers here on this page that we're
20  20 looking at are constant dollars numbers, right?
21  21    A.  Correct.
22  22    Q.  So my question was do you recall discussions
23  23 at the December 11th, 2000 executive committee meeting
24  24 about the fact that OSI was forecasting only 19 percent
25  25 growth?

158

1  00158:01    A.  I do not recall any specific discussions;
2  02 however, it would be reasonable to assume that we
3  03 discussed the forecast.
4  04    Q.  And would the same be true for the fact that
5  05 NAS was only forecasting a 12-percent growth?
6  06    A.  Again, I do not recall any details of the
7  07 discussions that were held at the EMC meeting; however,
8  08 we would clearly discuss the forecast 'cause that's a
9  09 standing agenda item.
10  10    Q.  In arriving at an upside number, would it be
11  11 unusual for you to review particular deal information
12  12 from the spreadsheets with the best and the worst case
13  13 scenarios and include a particular deal in your upside
14  14 number that an executive vice president had not included
15  15 in a forecast?
16  16    A.  It would be possible that we would have
17  17 included a deal in the upside numbers that was not
18  18 included in the executive's underlying commit forecast.
19  19    Q.  All right.  Do you recall doing that in the
20  20 third quarter of 2001?
21  21    A.  I do not recall the specifics as to how I
22  22 arrived at the upside amounts in Q3 FY '01.
23  23    Q.  All right.  Now I'm going to hand you a
24  24 document that was previously marked as Exhibit 1 --
25  25    A.  Sorry.

159

1  00159:01    Q.  -- 133.  Do you recognize Exhibit 133?
2  02    A.  This is an upside report.  Based on the date,
3  03 the file name was as of January 15th.
4  04    Q.  2001?
5  05    A.  Yes.
6  06    Q.  If you could compare the first pages of
7  07 Exhibit 142 and 133, please.  It appears that -- I want
8  08 to make sure that I'm reading this correctly -- the
9  09 pipeline growth percentages had declined from 52 percent
10  10 as of December 11th to 34 percent as of
11  11 January 15th.
12  12    A.  That is correct.
13  13    Q.  Would that fact have been something that would
14  14 have been discussed at an executive committee meeting,
15  15 that sort of trend?
16  16        MR. ETH:  Objection.  Vague.
17  17        THE WITNESS:  That trend I don't recall being
18  18 discussed at an executive committee meeting.
19  19        MR. DE GHETALDI:  Q.  Would trends through --
20  20 trends in pipeline growth percentages as a quarter
21  21 progressed have -- be the type of subject that would be
22  22 discussed at an EMC meeting?
23  23    A.  I do not recall discussing the trends of
24  24 pipeline -- of pipeline growth rates throughout a
25  25 quarter at an EC meeting.

160

```
1   00160:01    Q.  If you could turn, please, to the page with
2       02  Bates number 3345 in Exhibit 133.  And at the same time,
3       03  turn to the same page that we were looking at at Bates
4       04  number 2990 in Exhibit 142.
5       05          It appears as though there were reductions in
6       06  your upside numbers for both OSI and NAS in total
7       07  license technology and applications.  Am I reading these
8       08  charts correctly?
9       09    A.  Can you repeat the question.  You see what?  I
10      10  was looking at the first section --
11      11    Q.  Well, let's take it one by one.
12      12    A.  Can I just take a moment to explain to you how
13      13  this works?
14      14    Q.  Yes.
15      15    A.  Okay.  The numbers up here where it's got the
16      16  upside amounts --
17      17    Q.  Yes.
18      18    A.  -- those are allocated to technology and to
19      19  applications pro rata, based on the underlying forecast
20      20  that was submitted by the field.  So those are
21      21  calculated numbers, the splits.
22      22    Q.  They're calculated?
23      23    A.  Correct.
24      24    Q.  Can you explain how the calculation was made.
25      25    A.  Well, generally speaking, what we would do
```

161

```
1   00161:01  is -- although it doesn't look like that's -- well,
2       02  normally what we would do is we would take the
3       03  technology number as a percentage of the total --
4       04    Q.  Mm-hm.
5       05    A.  -- this is the forecast as a percentage of
6       06  their forecast -- and multiply it by the upside amount
7       07  to arrive at the split of the upside between the two
8       08  license revenue components: technology and applications.
9       09    Q.  So in other words, you didn't do a specific
10      10  analysis down to -- for deriving an upside number for
11      11  technology and then do a separate analysis in order to
12      12  arrive at an upside number for applications?
13      13    A.  Well, we could have.  There was a point in
14      14  time when we did try and do it along those lines.
15      15    Q.  Mm-hm.
16      16    A.  And actually, as I look at this, it doesn't
17      17  look like it's allocating the revenue in proration to
18      18  the forecast.  So that may have indeed been the case at
19      19  that point in time.
20      20    Q.  All right.
21      21    A.  I can tell you today we just take the upside
22      22  amount and allocate it based on the submitted forecast
23      23  by product.
24      24    Q.  Okay.  Do you recall why you dropped your
25      25  upside number for OSI total license from 25 million to
```

162

```
1   00162:01  zero between December 11th and January 15th?
2       02    A.  I don't recall specifically why I dropped it.
3       03  But it could have been based on a revised upside
4       04  analysis, given that the pipeline went down from the
5       05  beginning of the quarter.
6       06          Again, when we derived our upside amounts, it
7       07  was based on our conversion rate analyses, as well as
8       08  any information that I may have come by, either through
9       09  discussions at EC meetings or through discussions with
10      10  staff or through e-mails.
11      11          But I do not recall how and what the rationale
12      12  was as to how I came up with the upside amounts at one
13      13  point versus another point in the quarter.
14      14    Q.  It does look like the pipeline for OSI total
15      15  license declined by about $120 million over that span.
16      16    A.  That is correct.
17      17    Q.  So do you think that that would be -- or would
18      18  have been at least part of the reason for the decline in
19      19  the upside number?
20      20    A.  It would have been a consideration.  But it's
21      21  also very normal for the pipeline to decline during the
22      22  course of the quarter.
23      23    Q.  All right.  Is it normal for pipeline to
24      24  consistently decline from day one to quarter end?
25      25    A.  We take pictures of the pipeline when we do
```

163

```
1   00163:01  our regular forecast.  And it's a very consistent trend
2       02  that the pipeline would go down because as you work on
3       03  your deals throughout the course of the quarter, some
4       04  deals solidify and others do not, or they -- and they
5       05  might get pushed out into a subsequent quarter.  So it's
6       06  not uncommon for pipeline to go down during the course
7       07  of a quarter.
8       08    Q.  Well, my question was whether it was common
9       09  for pipeline to decrease throughout the entire quarter,
10      10  from day one to the final day, as opposed to showing an
11      11  increase at the beginning of a quarter followed by a
12      12  decline to the end.
13      13    A.  It depended.  It was not necessarily --
14      14  generally speaking, it would decline.  However, there
15      15  have been situations where the sales organization met
16      16  with their team and reviewed the pipeline, reviewed the
17      17  detailed deals that made up the pipeline.  And they
18      18  could have increased or decreased their pipeline as a
19      19  result of those reviews.
20      20    Q.  If we look at the numbers for NAS, it looks
21      21  like license -- total license revenue upside number
22      22  declined from $50 million on December 11th to
23      23  $14 million on January 15th.  Am I reading that
24      24  correctly?
25      25    A.  Correct.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

164

1  00164:01   Q.  Okay.  The pipeline, however, declined only
2  02  $17 million or so, $16 million.  Am I reading that
3  03  correctly?
4  04   A.  It declined from 842 to 825, I think it says
5  05  here.  It's difficult to read.
6  06   Q.  Yeah.  So much -- so there's a decline there,
7  07  but it's not as great as the decline that we looked at
8  08  for OSI's pipeline for the same period.
9  09      I'm just trying to get a sense of the relative
10 10  importance of declining pipeline for -- in your upside
11 11  analysis.  And it looks like there was a much greater
12 12  decline in the OSI pipeline than NAS, but the NAS
13 13  pipe -- or the NAS upside declined much more
14 14  significantly than the OSI.
15 15   A.  It declined less.
16 16   Q.  Declined less?
17 17   A.  The NAS?
18 18   Q.  Yeah.
19 19   A.  Declined less than OSI.
20 20   Q.  $36 million as opposed to 25, the upside?
21 21   A.  Oh, you're referring to the upside.
22 22   Q.  Yeah.
23 23   A.  Again, you can't look at one organization
24 24  versus another.
25 25   Q.  You have to just look at the individual

165

1  00165:01  organizations?
2  02   A.  Correct.
3  03   Q.  Prior to Q3 2001, do you recall your upsides
4  04  ever being negative?
5  05   A.  My upside numbers have been positive and
6  06  negative over the course of several years.
7  07   Q.  The upside reports that you turned over to the
8  08  legal department, how far back in time did those go; do
9  09  you recall?
10 10   A.  I don't recall.
11 11   Q.  Well, was it back to the time when you started
12 12  doing upside reports?
13 13   A.  I provided whatever was requested.  I do not
14 14  recall the dates.
15 15   Q.  Do you recall whether you provided them back
16 16  five years in time?
17 17   A.  I do not recall.  I provided whatever was
18 18  requested.
19 19   Q.  Do you still have copies of historical upside
20 20  reports?
21 21   A.  I personally don't have copies.
22 22   Q.  Are they available electronically?
23 23   A.  All copies of the upside reports were provided
24 24  to legal.  Hard copies would -- I just don't have any
25 25  more hard copies.

166

1  00166:01   Q.  I asked about electronic copies.
2  02   A.  I don't know where the electronic copies would
3  03  be other than within legal.  They might be on the
4  04  corpfin server.
5  05   Q.  And what is that?
6  06   A.  As we discussed yesterday, it's the server
7  07  that the corporate finance group uses.
8  08   Q.  In the third quarter of 2001, did you have a
9  09  belief that the executive vice presidents of the U.S.
10 10  divisions had a tendency to sandbag?
11 11   A.  I believe -- I believe that the U.S. EVPs had
12 12  a tendency to sandbag not just in Q3, but in prior
13 13  quarters as well.
14 14   Q.  Was one worse than the others?
15 15   MS. SEGAL:  Object to form.
16 16   THE WITNESS:  In my opinion -- and I don't
17 17  know if this is fact, but my impression was that Jay
18 18  Nussbaum was worse than the others.
19 19   MR. DE GHETALDI:  Can we go off the record.
20 20   THE VIDEOGRAPHER:  Off the record, 10:52 a.m.
21 21   (Brief interruption.)
22 22   THE VIDEOGRAPHER:  On the record, 11:08 a.m.
23 23   MR. DE GHETALDI:  Q.  I think before the break
24 24  that we were talking about the EVPs having a tendency to
25 25  sandbag.  And I'm wondering whether you factored that

167

1  00167:01  tendency into your upside analysis.
2  02   A.  One of the reasons why we had the upside
3  03  analysis was because they forecasted below the actual
4  04  results that they delivered.
5  05   Q.  Do you know whether there was a reason for
6  06  that tendency?
7  07   A.  My impression is that they felt that they were
8  08  a hero if they delivered revenue in excess of their
9  09  committed forecast.
10 10   Q.  Did you have any impression that they were
11 11  fearful of what might happen if they did not deliver
12 12  revenue at the level of their committed forecast?
13 13   A.  No.
14 14   Q.  Although this isn't a marked copy, I'll put
15 15  the number on.  This is a copy of a document that was
16 16  marked as Exhibit 153.
17 17   A.  Do you want me to go to a certain page?
18 18   Q.  Well, before we do that, I'd like to go back
19 19  and just ask one more question about -- about the
20 20  sandbagging and how that -- how you analyzed that or
21 21  factored that into your upside analysis.
22 22      Do you have a particular methodology for that,
23 23  or how did you do it?
24 24   A.  Again, I would evaluate the historical
25 25  conversion trends, apply those to the pipeline, and that

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

168

1  00168:01 would be one data point. I would also get other data
2  02 points in through discussions with the finance
3  03 individuals that supported the sales organization. I
4  04 would also hear discussions at EC meetings.
5  05       And all of that information together helped me
6  06 to form my judgment in terms of deciding what upside
7  07 amounts I would include in an upside report. It's an
8  08 art, not a science.
9  09    Q.   Okay. If you could turn to the same page that
10 10 we've been talking about, that is -- in this Exhibit 153
11 11 you'll find it as Bates number 3352.
12 12    A.   Mm-hm.
13 13    Q.   It looks to me like there were no changes in
14 14 the upside numbers here. Am I reading that correctly?
15 15       MR. ETH: Objection. Vague. Changes from
16 16 what --
17 17       MR. DE GHETALDI: Well, changes from
18 18 January 15th.
19 19       MR. ETH: Okay.
20 20       THE WITNESS: That would be correct.
21 21       MR. DE GHETALDI: Q.   These reports are only a
22 22 week apart, yet they are in the second month of Q3. Do
23 23 you recall a reason for the deviation from the normal
24 24 schedule that we talked about yesterday?
25 25    A.   Well --

169

1  00169:01       MR. ETH: Objection -- hold on. Objection.
2  02 Misstates testimony, vague.
3  03       THE WITNESS: The forecast process -- the
4  04 process is sent every two weeks in the first two
5  05 months of a quarter and then every week in the third
6  06 month of a quarter.
7  07       If there was an EC meeting held in between the
8  08 forecast weeks, we would print out the previous week's
9  09 forecast and bring that to the EC meeting. So for
10 10 example, if the 15th was a forecast week and the
11 11 22nd was not, it would be reasonable to assume that we
12 12 would just print out the prior week's upside report and
13 13 bring that to an EC meeting.
14 14       And if there was any information that was
15 15 provided to us in that week since the EC meeting through
16 16 the next EC meeting, any changes would have been
17 17 reflected in that report.
18 18       MR. DE GHETALDI: Q.   So for example, the
19 19 pipeline numbers show some decline between
20 20 January 15th and January 22nd; is that correct?
21 21    A.   In total, the pipeline declined from 2,000,691
22 22 to 2,000,649.
23 23    Q.   So there was some decline, right?
24 24    A.   Correct.
25 25    Q.   So that would be an example of the type of new

170

1  00170:01 information that would be included in this -- the upside
2  02 report for the executive committee meeting that there
3  03 was not a forecast week?
4  04    A.   Yes, it would be an example.
5  05    Q.   I also notice that there are footnotes in
6  06 the -- on this page on the January 22nd upside report
7  07 that deal with the Covisint transaction and what OPI's
8  08 numbers would be like if you took out the Covisint
9  09 numbers.
10 10    A.   That is correct.
11 11    Q.   Do you recall why those footnotes were added
12 12 to this upside report?
13 13    A.   Because we wanted to see -- I believe it was
14 14 because we wanted to see how OPI or Sandy Sanderson's
15 15 business was performing without the Covisint deal. It
16 16 was very well known that Safra Catz was very involved
17 17 with the Covisint deal, more so than the sales
18 18 organization within OPI.
19 19    Q.   So is it your recollection that this is
20 20 something that Safra Catz wanted to see?
21 21    A.   No, I didn't say that.
22 22    Q.   Oh. Do you recall discussions at the
23 23 January 22nd executive committee meeting about OPI's
24 24 numbers without the Covisint transaction?
25 25    A.   I do not recall any specific discussions at

171

1  00171:01 any of the EC meetings. We did, however, always discuss
2  02 the forecast. It was a standing agenda item.
3  03    Q.   Why did you want to see how OPI -- OPI's
4  04 business was doing without the Covisint transaction?
5  05    A.   The OPI business was very large-deal centric.
6  06 And it was -- they also had a number of people in that
7  07 sales organization. And they did not have enough volume
8  08 of smaller deals to support the size of their
9  09 organization.
10 10       So I believe at this point in time we were
11 11 trying to evaluate whether or not they needed to resize
12 12 the sales -- the number of salespeople that was in the
13 13 OPI organization.
14 14    Q.   On the second page of Exhibit 153 is the page
15 15 with Bates -- Bates -- Bates number 3549. The row for
16 16 total operating expenses, do you see that?
17 17    A.   Mm-hm.
18 18    Q.   I want to make sure that I'm reading this
19 19 correctly. Is this chart showing that there was a
20 20 forecast that expenses were going to grow 13 percent
21 21 over Q3 '00?
22 22    A.   Yes.
23 23    Q.   And the potential number was showing a
24 24 14-percent growth in expenses over Q3 '00?
25 25    A.   That's correct.

172

00172:01   Q.  And in the upside column, I also see that
02  there are upside numbers for expenses.  Did -- did you
03  prepare those expense upside numbers using the same
04  methodology that you prepared the revenue upside
05  numbers?
06     A.  The license upside number, if I recall
07  correctly, is 15 percent of the upside number for
08  license, which was our estimate of the incremental
09  amount of sales commissions expenses that would be paid.
10     Q.  So the license expense upside number is simply
11  a percentage of the license revenue upside number.
12     A.  Generally speaking, it was a percentage.
13  There could have been additional input.  If I had a
14  calculator, I could recalculate for you and let you know
15  if it was 15 percent.  But I don't have one.
16     Q.  It looks close to 15.
17     A.  It looks close, right.
18        MR. DE GHETALDI:  All right.  I think we only
19  have a short time on the tape, so let's take a quick
20  break to switch tapes.
21        THE VIDEOGRAPHER:  This is the end of Volume
22  II, tape 1 in the deposition of Jennifer Minton on
23  April 1, 2004, the time 11:21 a.m.  We're off the
24  record.
25        (Recess taken.)

173

00173:01      THE VIDEOGRAPHER:  This is the beginning of
02  Volume II, tape 2 in the deposition of Jennifer Minton
03  on April 1, 2004, the time 11:26 a.m.  We are on the
04  record.
05        MR. DE GHETALDI:  Q.  I'd like to go back just
06  a little bit when we were talking about these footnotes
07  on the page with Bates number 3552 in Exhibit 153.
08        I believe that there -- you were saying that
09  there was discussion about whether OPI needed to reduce
10  the number of salespeople that it had because the
11  number -- or the volume of deals didn't seem to support
12  the number of salespeople at that time.
13        Had the number of OPI's deals been greater in
14  the past than they were in Q3 '01?
15     A.  Can I clarify my earlier statement?
16     Q.  Sure.  Sure.
17     A.  What I meant to say was the volume of smaller
18  transactions.  So -- and I think it's best if I could
19  illustrate through an example.
20     Q.  Yes.
21     A.  So let's assume that OPI had ten deals that
22  were under $500,000, ten deals that were large deals
23  that made up 80 percent of their forecast.  That in
24  total would be -- did I say ten and ten?
25     Q.  Yes.

174

00174:01      A.  -- 20 deals, right?  But if they had a sales
02  force of 40 people, then clearly not all 40 sales reps
03  were producing deals, right?
04        So the large deals tended to mask the fact
05  that not all of their sales reps were productive.  So
06  when I spoke about volume, I meant volume of smaller
07  deals.
08     Q.  Okay.
09     A.  Does that make sense?
10     Q.  Yes, it does.
11     A.  Okay.
12     Q.  And that's helpful.  Was the number of smaller
13  deals in OPI greater in the past than it was in Q3 '01?
14     A.  I don't recall the specifics, but I do recall
15  that there was conversation that their large deals
16  masked the fact that they did not have -- that they had
17  too many -- it masked the fact that they did not have
18  very productive sales reps in that organization.
19        In other words, their margins could have been
20  even higher if they reduced their headcount because the
21  number of heads that they had did not support the number
22  of deals they were transacting.
23     Q.  I see.  On page with Bates number 3553 and
24  3554, there are also footnotes about --
25     A.  This is 153?

175

00175:01   Q.  Yes.
02     A.  Okay.
03     Q.  There are also footnotes that detail OPI's
04  numbers without the $60 million Covisint deal.
05     A.  That is correct.
06     Q.  Were those included for the same reason as the
07  three footnotes on page 3552?
08     A.  Yes.  One is showing the quarter to date.  So
09  3553 is showing the quarter to date and 3554 is showing
10  the year to date license revenue growth rates without
11  the Covisint deal.
12     Q.  Do you recall whose idea it was to include
13  those footnotes?
14     A.  No, I do not.
15     Q.  Now I'm going to hand you a copy of a document
16  that was previously marked as Exhibit 134.
17     A.  Was there a particular page?
18     Q.  Yeah, if you could turn to page 3612, that's
19  similar to the pages that we've been looking at.
20        Now, there are changes here in the upside
21  numbers on January 29th from the upside numbers on
22  January 22nd.  And just so that I'm clear about
23  January 22nd, were you saying that when you prepared
24  the upside report for January 22nd, you didn't do a
25  new upside analysis but included financial information

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

176

1   00176:01  that had -- hard financial data that had changed, such
2   02  as the pipeline data?
3   03      A.  What I was trying to say was that if it wasn't
4   04  a forecast week, that we would print out the same upside
5   05  analysis that was presented in the following -- or in
6   06  the preceding week, excuse me.
7   07      Q.  Yes.
8   08      A.  And if there was any information that came to
9   09  our attention, we would have reflected that in the most
10  10  current -- in that week's upside analysis.
11  11      Q.  I see.  Now, contrasting the upside numbers on
12  12  January 29th and the upside numbers on January 22nd,
13  13  there -- am I reading it correctly for OSI's total
14  14  license number, there was a negative 35 million upside
15  15  number?
16  16      A.  That is correct.
17  17      Q.  Do you recall the reason for -- the reason
18  18  that you arrived at that negative $35 million upside
19  19  number?
20  20      A.  I do not recall the specifics.
21  21      Q.  In general do you recall anything?
22  22      A.  I do not recall.
23  23      Q.  There's also a decline in the NAS upside
24  24  number for total license from $14 million to zero; is
25  25  that correct?

177

1   00177:01      A.  That is correct.
2   02      Q.  Do you recall anything about the reasons for
3   03  your decision to reduce that upside number?
4   04      A.  No, I do not.
5   05      Q.  Do you recall whether the e-mails from mid
6   06  January 2001 that we looked at earlier from the finance
7   07  people had anything to do with the -- these declining
8   08  upside numbers?
9   09      MR. NADOLENCO:  Objection.  Asked and
10  10  answered.
11  11      THE WITNESS:  I do not recall.
12  12      MR. DE GHETALDI:  Q.  Do you recall any
13  13  discussions at the executive committee meeting about the
14  14  fact that by January 29th, the potential growth
15  15  percentage was only one percent?
16  16      MR. ETH:  Wait a minute.
17  17      MR. DE GHETALDI:  For -- I'm sorry, for OSI
18  18  total license.
19  19      MR. ETH:  Okay.
20  20      THE WITNESS:  I do not recall the specifics of
21  21  any EC meetings held on January 29th.
22  22      MR. DE GHETALDI:  Q.  Do you recall any
23  23  discussions at any executive committee meeting in
24  24  December or January of Q3 '01 regarding the fact that
25  25  the forecasts for OSI and NAS total license were less

178

1   00178:01  than the targeted 30 percent growth number?
2   02      A.  I do not recall the specifics of any
3   03  discussion at any EC meeting.  As I stated before, the
4   04  forecast was a standing agenda item at every EC meeting.
5   05  So we clearly discussed the forecast, but I do not
6   06  recall any of the specifics.
7   07      MR. DE GHETALDI:  I'd like to have this marked
8   08  as next in order, please.
9   09      (DC Exhibit No. 239
10  10      marked for identification.)
11  11      MR. DE GHETALDI:  Q.  Have you seen Exhibit
12  12  239 before today?
13  13      A.  Yes, I have.
14  14      Q.  Is this one of the documents that you reviewed
15  15  in preparation for your deposition?
16  16      A.  Yes, it is.
17  17      Q.  When was the first time you saw Exhibit 239?
18  18      A.  I don't recall exactly.
19  19      Q.  Well, was it within the last month?
20  20      A.  I saw this document yesterday -- not
21  21  yesterday, but the day before -- as an example.  But I
22  22  don't recall if I saw it before then.
23  23      Q.  In reviewing Exhibit 239 -- I assume that you
24  24  did read the whole thing, correct --
25  25      A.  Yes, I did.

179

1   00179:01      Q.  -- did you notice anything that did not
2   02  accurately reflect what you told the Special Litigation
3   03  Committee in June of 2002?
4   04      A.  Yes, I did.
5   05      Q.  And can you point out those areas, if there's
6   06  more than one.
7   07      MR. ETH:  Well, objection.  Calls for a
8   08  narrative.  I mean, do you want her --
9   09      MR. DE GHETALDI:  Maybe.
10  10      MR. ETH:  Do you want to lead her through
11  11  various things?
12  12      MR. DE GHETALDI:  Well, no, I --
13  13      MR. ETH:  Okay.  The ones she can remember
14  14  right now.
15  15      MR. DE GHETALDI:  Yeah.
16  16      THE WITNESS:  Well, off the top of my head, I
17  17  was not an account manager.
18  18      MR. DE GHETALDI:  Q.  All right.  Anything
19  19  else?
20  20      A.  I'd have to read the document again.
21  21      Q.  All right.  If you could turn to page 4,
22  22  please.  At the top of the page, the first paragraph
23  23  looks like there's a discussion about the forecasting
24  24  process and the methodology.  And it said,
25  25      "For examples, Minton noted," number

180

```
1   00180:01  one, "licensing forecasts have always
2     02    relied on weighted pipeline data and
3     03    historical conversion rate information."
4     04      Where -- can you tell me what weighted
5     05  pipeline data is.
6     06    A.  Do you recall the report that we looked at
7     07  yesterday --
8     08    Q.  The --
9     09    A.  -- where there were deals and there were ...
10    10    Q.  Yes.
11    11    A.  That is what we're referring to, when you take
12    12  the summation of all of your deals, the total dollar
13    13  value, and you weight it by the estimated probability
14    14  that that deal will close.
15    15    Q.  Just so that I confirm that my memory is
16    16  accurate, as an example, I'm showing you page Bates
17    17  number 25220 from Exhibit 21 and ask if that's the type
18    18  of report that you were just referring to.
19    19    A.  It is a -- yes, it's the type of report.
20    20    Q.  All right.  And as to the historical
21    21  conversion rate information, where -- what would the
22    22  source of that information be?
23    23    A.  Do you remember the license pipeline analysis?
24    24    Q.  Yes.  Just let me see if I can find that.  I'm
25    25  showing -- are you referring to the document -- the type
```

181

```
1   00181:01  of document shown in Exhibit 112 that's titled "Pipeline
2     02  Reporting Package"?
3     03    A.  Yes, I am.
4     04    Q.  Okay.  In the second paragraph on page 4, the
5     05  summary says,
6     06      "Generally Minton spends approximately
7     07    three to four hours per week on
8     08    forecasting, with the exception of the last
9     09    week of any given quarter."
10    10      Does that accurately reflect what you told the
11    11  Special Litigation Committee about how much time you
12    12  spend per week on forecasting?
13    13    MR. NADOLENCO:  Object to the form.
14    14    THE WITNESS:  Can you repeat the question.
15    15    MR. DE GHETALDI:  Q.  Does that accurately
16    16  reflect what you told the Special Litigation Committee
17    17  about how much time you spend per week on forecasting?
18    18    A.  I'm not sure if the total hours are correct,
19    19  but more or less the process and the description of the
20    20  conference calls and so forth is correct.
21    21    Q.  What about the total hours is incorrect?
22    22    A.  I said I don't recall if that is what I said.
23    23    Q.  Did you spend approximately three to four
24    24  weeks -- or three to four hours per week on forecasting
25    25  in fiscal year 2001?
```

182

```
1   00182:01    A.  I would spend on Thursdays roughly, let's say,
2     02  an hour on a forecast call.  I would spend roughly, you
3     03  know, anywhere from half-hour to an hour on the forecast
4     04  call.  I would spend some time analyzing upside reports
5     05  and making -- having discussions with folks.
6     06      It's hard for me to say that it was always
7     07  three to four hours, but it's not out of line.  It could
8     08  have been less.
9     09    Q.  Okay.  I'm just asking whether that
10    10  approximation was -- appears accurate to you.
11    11    A.  It could have been less, could have been a
12    12  little more.
13    13    Q.  Did you regularly have discussion with
14    14  particular folks in deriving your upside numbers?
15    15    A.  Again, I would speak with all the sales
16    16  individuals, the sales executives on the forecast calls,
17    17  along with their finance representatives.  I would speak
18    18  with Ivgen Guner.  At times I would discuss it with Jeff
19    19  Henley.  There were -- more or less the same individuals
20    20  that I've already told you about.
21    21    Q.  All right.  If you could turn to page 5,
22    22  please.
23    23      Can we go off the record.
24    24    THE VIDEOGRAPHER:  Off the record, 11:47 a.m.
25    25      (Lunch recess from 11:47 to 12:47).
```

183

```
1   00183:01  AFTERNOON SESSION            12:58 P.M.
2     02    THE VIDEOGRAPHER:  On the record, 12:58 p.m.
3     03    EXAMINATION RESUMED BY
4     04    MR. DE GHETALDI:  Q.  If you could turn to
5     05  page 5 of Exhibit 239, please.  In the first full
6     06  paragraph there that talks about sources of information
7     07  for adjustments to the upside report, do you see that
8     08  paragraph?
9     09    A.  Yes.
10    10    Q.  Is that an accurate summary of what you told
11    11  the SLC about that particular topic, that paragraph
12    12  there?
13    13    A.  The big deal reports from Loren Mahan are not
14    14  used for preparing information for the upside report,
15    15  nor are the flash reports used.
16    16      Again, as I've stated before, the primary
17    17  sources of information that I would use were the
18    18  pipeline trend analyses and conversations with my staff
19    19  or on forecast calls and the like.
20    20    Q.  All right.  Is that an accurate summary,
21    21  though, of what you told the Special Litigation
22    22  Committee?
23    23    A.  I don't recall precisely what I told the
24    24  litigation committee.  This is their interpretation of
25    25  the discussion.
```

184

1  00184:01   Q.  Okay.  Was this one of the inaccuracies that
2  02  you had noticed, that is, the inclusion of flash reports
3  03  and big deal reports and the sources of information to
4  04  your adjustments to the upside reports?
5  05     A.  Yes.
6  06     Q.  Point number 3 says trend analyses conducted
7  07  by your staff.  What trend analyses were you referring
8  08  to there?
9  09     A.  Conversion trend analyses.
10  10     Q.  Pipeline conversion?
11  11     A.  Yeah.
12  12     Q.  All right.  Any other trends analyses other
13  13  than that?
14  14     A.  No.
15  15     Q.  No, okay.  If you could turn to page 6, the
16  16  last full paragraph, the second to last sentence of that
17  17  paragraph reads,
18  18       "At the end of each month, she
19  19    incorporates the actual results from these
20  20    areas into her calculations for the
21  21    remaining forecast for the quarter."
22  22       Is that an accurate summary of what you told
23  23  the Special Litigation Committee?
24  24     A.  May I explain what I told the litigation
25  25  committee?

185

1  00185:01   Q.  Sure.
2  02     A.  So at the beginning of a quarter, you start
3  03  with a forecast.  At the conclusion of the first month
4  04  of a quarter -- and we -- and by the way, we forecast
5  05  month 1, month 2, month 3.  At the beginning of a
6  06  quarter, each of those months are forecast.  At the end
7  07  of month 1, when you're -- when you've finalized your
8  08  financial results for that period, we would replace the
9  09  forecast for that month with the actuals.  So you would
10  10  have one month of actuals, two months of forecast.
11  11       And at the end of month 2, we would replace
12  12  month 2's forecast with month 2 actuals.  So you would
13  13  have two months of actuals, one month of forecast.
14  14     Q.  Did you do that for consulting, support and
15  15  education revenue?
16  16     A.  That was for all revenue and expenses.
17  17     Q.  Including license?
18  18     A.  Including license.
19  19     Q.  Okay.  Where did -- were reports prepared that
20  20  showed the monthly forecast and the monthly actuals?
21  21     A.  We didn't look at the reports, but they were
22  22  contained within OFA, the Oracle Financial Analyzer
23  23  system.
24  24     Q.  So that was information that you considered in
25  25  preparing your upside reports?

186

1  00186:01     MR. ETH:  Objection.  Asked and answered.
2  02       THE WITNESS:  I evaluate what I think the
3  03  license forecast is going to be, based on the
4  04  discussions that I have and all the analyses that are
5  05  performed, as previously discussed.  The difference
6  06  between what I think it's going to be versus what the
7  07  forecast is, as submitted by the field, would be the net
8  08  upside adjustment.
9  09       MR. DE GHETALDI:  Q.  All right.  Part of the
10  10  information that you considered, then, was the actual
11  11  monthly results?
12  12     A.  No, I considered the forecast.  I did not look
13  13  at what the individual actual results were in a given
14  14  quarter.  I looked at the forecast.
15  15     Q.  I guess I'm confused.  In OFA, the forecasts
16  16  are broken down by month for license, consulting,
17  17  support and education, correct?
18  18     A.  In OFA, the forecast is broken down by month
19  19  for all lines of businesses, both revenue and expenses.
20  20     Q.  Okay.  Are the forecasts also broken down by
21  21  month by organization, sales organization?
22  22     A.  Every sales organization submits their
23  23  forecast by month.
24  24     Q.  And then when the actual results come in for a
25  25  month, OFA -- or the information in OFA shows the actual

187

1  00187:01  results for the month instead of the forecast?
2  02     A.  We replace month 1 forecast with month 1
3  03  actual results.  The reports that we get out of the
4  04  system for purposes of doing our quarterly forecasting
5  05  is quarterly information; it is not monthly information.
6  06     Q.  In the third quarter of 2001, did you consider
7  07  the actual results that were shown in OFA in arriving at
8  08  an upside number?
9  09       MR. ETH:  Objection.  Asked and answered.
10  10       THE WITNESS:  I will state it for the record
11  11  one more time.  I looked at the forecast.  The forecast
12  12  may have included, after month 1 was completed, month 1
13  13  actual results.  So it's -- month 1 and month 2 and
14  14  month 3 are forecasted at the beginning of a quarter.
15  15       MR. DE GHETALDI:  Yes.
16  16       THE WITNESS:  The forecast is revised
17  17  throughout the course of the quarter to copy actuals
18  18  into month 1 when month 1 is complete.  It's then copied
19  19  into month 2 when month 2 is complete.
20  20       The sales organization will adjust any month
21  21  that has not yet been adjusted -- that has not yet been
22  22  reported as actuals to include their total forecast for
23  23  the quarter.
24  24       I derive what I think is going to be the
25  25  license forecast.  I back out their forecast to come up

188

1  00188:01 with the upside amount.  And I'm always looking at
2      02 quarterly totals; I'm not looking at individual monthly
3      03 results.
4      04      MR. DE GHETALDI:  Q.  If you could turn to
5      05 page 8, please.  In that first paragraph, the first
6      06 sentence reads,
7      07      "Minton noted that she was a bit
8      08      nervous entering into Q3 FY '01 because Q2
9      09      FY '01, while very successful, had been
10     10      even more back-end-loaded than usual."
11     11      Is that an accurate reflection of what you
12     12 told the SLC?
13     13   A.  Yes.
14     14   Q.  What did you mean by Q2 being even more
15     15 back-end-loaded than usual?
16     16   A.  We had a significant number of large deals
17     17 that were closed on the very last day of the quarter.
18     18   Q.  So were you nervous in Q2 itself about being
19     19 able to meet your numbers?
20     20   A.  In Q2 there were a number of large deals at
21     21 play.  And it wasn't until the very end of the quarter
22     22 that we had any certainty that we were going to make the
23     23 quarter -- quarterly predicted results.  We refer to
24     24 that as the cardiac close.
25     25   Q.  That particular quarter?

189

1  00189:01   A.  No, just the fact that when it's so
2      02 back-end-loaded and they have large deals, it's very
3      03 difficult to know whether or not you're going to make
4      04 the forecast until the very last day of the quarter.
5      05 That's that hockey stick effect I was telling you about.
6      06   Q.  Yes.  The last sentence of that particular
7      07 paragraph on page 8 says,
8      08      "Minton further noted that the holiday
9      09      season which falls in Q3 of Oracle's fiscal
10     10      year is not good for its business."
11     11      Is that an accurate summary of what you told
12     12 the Special Litigation Committee?
13     13   A.  I would have told them that the December
14     14 period for Christmas and New Year's is generally not our
15     15 strongest month within that quarter.
16     16   Q.  Have you ever conducted an analysis to
17     17 determine whether or not there was factual support for
18     18 the belief that you just expressed?
19     19   A.  I do not recall conducting an analysis on
20     20 December results itself.  However, I do recall you
21     21 showing me an analysis that we did which made me --
22     22 refreshed my memory of a long gone -- long-standing
23     23 analysis that we did that did show the monthly
24     24 distribution within a quarter.
25     25   Q.  Would it surprise you if I told you that

190

1  00190:01 December, as the first month of the quarter, had a
2      02 higher average contribution to the total quarterly
3      03 revenue than any other first month of Oracle's quarters?
4      04   A.  Given that we closed the Covisint deal, which
5      05 was a $60 million transaction, if that is factually
6      06 correct, it would not surprise me.
7      07   Q.  Well, I'm not talking about just the third
8      08 quarter of 2001.  I'm talking about the six years prior
9      09 to that, the historical averages show that December
10     10 contributed 21 percent, on average, to the quarter's
11     11 revenue, which was significantly higher than any other
12     12 first month of the other three quarters' contribution.
13     13      MR. ETH:  Objection.  Lack of foundation,
14     14 vague.
15     15      MR. DE GHETALDI:  Q.  Does that surprise you?
16     16   A.  I don't know if it does or not.
17     17   Q.  Well --
18     18   A.  I haven't studied those numbers.  It's more of
19     19 an impression that I'm giving you is that the holiday
20     20 season would -- would impact people's productivity.
21     21   Q.  Well, do you have any impression of -- of how
22     22 the fiscal years used by Oracle's customers might impact
23     23 the -- Oracle's revenues in December?
24     24   A.  No.
25     25   Q.  In other words, if a significant percentage of

191

1  00191:01 Oracle's customers used calendar years for their fiscal
2      02 years, would you not expect those customers to tend to
3      03 make purchases in the last month of their year if they
4      04 were going to be making them?
5      05      MR. ETH:  Objection.  Calls for speculation.
6      06      THE WITNESS:  I have no basis for a comment on
7      07 that.
8      08      MR. DE GHETALDI:  All right, that's fine.
9      09   Q.  Were you aware in Q2 fiscal year 2001 that
10     10 September's revenues showed negative growth over the
11     11 September in the prior year?
12     12   A.  I don't recall.
13     13   Q.  Were you aware that October's revenues showed
14     14 negative growth over October of the prior year?
15     15   A.  I don't recall if it showed negative growth.  I
16     16 do recall it was a very slow start month 1 and 2.
17     17 That's why it was back-end-loaded.
18     18   Q.  If you could turn -- well, if you could turn
19     19 to page 9.  The paragraph in the middle of the page
20     20 underneath the title "Minton's View Of Q3 Fiscal Year
21     21 '01," the last sentence of that paragraph reads,
22     22      "In fact, Minton stated that at the
23     23      time sales executives were very bullish
24     24      and reported that they were not seeing any
25     25      adverse impact from the economy."

192

```
1   00192:01      Is that an accurate summary of what you told
2   02 the Special Litigation Committee?
3   03      A.  I remember that during this time period that
4   04 there was a lot of press reports, news articles, what
5   05 have you, regarding the overall macroeconomic
6   06 environment.  And both Jeff and I were continuously
7   07 challenging the sales organization as to whether or not
8   08 they were seeing any impact of the economy on our Q3
9   09 financial forecast.
10  10      And, you know, they did not change their
11  11 forecasts significantly throughout the course of the
12  12 quarter until the very end of February.
13  13      Q.  Well, didn't -- didn't you observe that
14  14 Mr. Sanderson was hesitant on -- in the January calls?
15  15      A.  I don't recall.
16  16      Q.  What about Mr. Winton's January 2001 e-mail
17  17 that we looked at; didn't you -- or did you associate
18  18 the trends that he was discussing in that e-mail to you
19  19 with the macroeconomic climate?
20  20      MR. ETH:  Objection.  Vague.
21  21      THE WITNESS:  Again, they did not revise their
22  22 forecast.
23  23      MR. DE GHETALDI:  Q.  I understand.  My
24  24 question was whether you associated Mr. Winton's
25  25 January 11th, 2001 e-mail and the points that it
```

193

```
1   00193:01 raised with the macroeconomic downturn that you were
2   02 talking about.
3   03      A.  I don't recall.  We continuously challenged
4   04 the sales executives, and they weren't -- they were not
5   05 bringing down their sales forecast.
6   06      Q.  Do you recall challenging Mr. Roberts with the
7   07 points that Mr. Winton raised?
8   08      A.  I don't recall.
9   09      Q.  Well, do you recall how you were challenging
10  10 them?
11  11      A.  By asking the sales guy -- the finance guys
12  12 that were supporting the sales folks -- the sales force
13  13 to provide me with their own independent views of the
14  14 forecast.
15  15      I was trying to get another data point to
16  16 ensure that they concurred with the forecasts that were
17  17 being put forth by the sales executives.
18  18      And there was a lot of discussion in general
19  19 about, you know, the overall economic environment.
20  20 There was a belief that the tech sector, while there was
21  21 pressure in the tech sector, it was more in the hardware
22  22 side versus the software side.
23  23      Q.  By January 29th, with Mr. Winton's dot-com
24  24 analysis, did you observe pressure in the software side?
25  25      MR. ETH:  Objection.  Compound.
```

194

```
1   00194:01      THE WITNESS:  Mr. Winton's analysis pointed to
2   02 the fact that there was a slowdown in the dot-com sector
3   03 of the -- of the general business market.
4   04      MR. DE GHETALDI:  Q.  That was pretty severely
5   05 cutting into general business's revenues, right?
6   06      MR. NADOLENCO:  Object.
7   07      MR. ETH:  Objection to form.
8   08      THE WITNESS:  If I -- can I look at his
9   09 analysis?
10  10      MR. DE GHETALDI:  Sure.  Sure.
11  11      THE WITNESS:  I think his analysis showed the
12  12 Q3 and the Q4 forecast.
13  13      MR. DE GHETALDI:  Q.  Might want to look at
14  14 it.
15  15      A.  Yeah, he was showing that they still had the
16  16 forecast of 234 for the full year and that there was a
17  17 slowdown in the dot-com space.  I don't know how much of
18  18 this was -- 234 -- it's 234 out of -- or I should say
19  19 there was 51 in Q3 in the dot-com space out of 241.
20  20      Q.  Well, the -- if you could pass that back,
21  21 please.  Thank you.
22  22      A.  Which one is it?
23  23      Q.  49.  I think this is actually for all of NAS.
24  24 And you can confirm that by looking at the upside --
25  25      A.  This is technology and not applications.
```

195

```
1   00195:01      Q.  Yes, but for all of NAS, not just general
2   02 business.
3   03      A.  That would be correct.
4   04      Q.  Okay.  And that was showing negative growth
5   05 over the prior year.
6   06      A.  That is correct.
7   07      Q.  And --
8   08      A.  In the dot-com space.
9   09      Q.  In the dot-com space.  And -- no, for the --
10  10 all of technology.  It was negative 54 percent growth
11  11 for dot-com, negative six percent for all of technology
12  12 in NAS.
13  13      MR. ETH:  Objection.  Vague.
14  14      MS. SEGAL:  What's your question, Dario?
15  15      MR. DE GHETALDI:  We're talking about what the
16  16 numbers show and trying to establish that before we go
17  17 on.
18  18      MR. ETH:  The document speaks for itself.
19  19      MS. SEGAL:  I don't think there is a question
20  20 pending.  I think you're reading from the document.
21  21      MR. DE GHETALDI:  Well, I said that was
22  22 showing negative growth over the prior year, and
23  23 Ms. Minton said in the dot-com space, and I was trying
24  24 to determine whether it was just in the dot-com or
25  25 whether it was also in technology in all of NAS.
```

196

```
1   00196:01    THE WITNESS: It was in technology as well.
2   02  So it was minus six percent.
3   03      MR. DE GHETALDI: Right.
4   04      Q.  Did you associate that negative growth with
5   05  macroeconomic trends?
6   06      A.  I don't recall.
7   07      Q.  Do you recall --
8   08      A.  It's interesting to see, though, if you notice
9   09  their applications revenue is growing 103 percent and
10  10  their total -- -- their total revenue was still growing
11  11  12 percent.
12  12      Q.  Yes.  And 12 percent was less than the
13  13  30 percent that guidance was given for, right?
14  14      A.  But that's one division out of the entire
15  15  company.
16  16      Q.  Do you recall telling the Special Litigation
17  17  Committee that you remember -- that you recalled
18  18  Mr. Sanderson being hesitant on the January calls?
19  19      A.  I don't recall at the moment.
20  20      Q.  If you could turn to page 12, please.  Under
21  21  the section "stock sales," it said -- this reads,
22  22      "Minton has not sold any stock,"
23  23  quote, "for a long time,"  end quote.  "She
24  24  did not sell any stock in 2001.  She
25  25  recalls that in early January, she was
```

197

```
1   00197:01    sufficiently nervous about the economy that
2   02  she wanted to sell some Oracle stock."
3   03      Q.  Is that an accurate reflection of what you
4   04  told the Special Litigation Committee?
5   05      A.  They have it a little bit wrong in that it was
6   06  my husband who was sufficiently nervous.  He was the one
7   07  who insisted that I sell stock.
8   08      Q.  Do you recall telling that to the Special
9   09  Litigation Committee?
10  10      A.  Yes, I do.
11  11      Q.  The paragraph continues, "She recalls
12  12  sending an e-mail to Henley for clearance
13  13  to trade sometime in early January, but she
14  14  did not recall receiving a response to her
15  15  request; therefore, she never traded."
16  16      Is that an accurate reflection of what you
17  17  told the Special Litigation Committee?
18  18      A.  Yes, it is.
19  19      Q.  Okay.  Have you searched for that -- a copy of
20  20  that e-mail?
21  21      A.  I did, and I did not find it.
22  22      Q.  It says --
23  23      A.  I did not copy myself on it was the reason why
24  24  I did not find it.
25  25      Q.  What e-mail program were you using in Q3 2001?
```

198

```
1   00198:01    A.  Oracle's.
2   02      Q.  Well, was it based on Netscape or Outlook; do
3   03  you recall?
4   04      A.  Netscape.
5   05      Q.  Didn't it automatically save e-mails that you
6   06  had sent to a sent folder?
7   07      A.  Yes, but I would periodically clean the sent
8   08  folder out.
9   09      Q.  Do you recall cleaning the sent folder out
10  10  between January of 2001 and March of 2001?
11  11      A.  If I recall correctly, the sent folder had a
12  12  number of days where it automatically cleansed itself.
13  13      Q.  Do you recall how many days that was?
14  14      A.  No, I don't.
15  15      Q.  The paragraph continues, "She recalls
16  16  Sanderson wanting to trade in the same time
17  17  frame.  Minton interpreted this as
18  18  Sanderson sharing her concerns about the
19  19  macroeconomic climate."
20  20      Is that an accurate reflection of what you
21  21  told the Special Litigation Committee?
22  22      A.  It's here.  I don't recall saying it, but it's
23  23  here.  I do -- I do remember thinking that he was going
24  24  to sell shares around that time period.
25  25      Q.  When you learned that Mr. Ellison was going to
```

199

```
1   00199:01    sell shares, did you interpret that as him sharing your
2   02  concerns about the macroeconomic climate?
3   03      MR. NADOLENCO:  Objection.
4   04      THE WITNESS: Not at all.
5   05      MR. NADOLENCO:  I'm sorry.  Objection.
6   06  Assumes facts not in evidence.
7   07      MR. ETH:  Lack of foundation.
8   08      MR. DE GHETALDI:  Q.  And the paragraph end,
9   09  "She said that she would have been
10  10  comfortable selling in January because she
11  11  had no material inside information about
12  12  the company and its Q3 prospects."
13  13      Is that an accurate reflection of what you
14  14  told the Special Litigation Committee?
15  15      A.  I'm sorry, where are you?
16  16      Q.  The last sentence of the first full paragraph
17  17  of page 12 of Exhibit 239.
18  18      A.  I don't see what you just read there, sorry.
19  19  Can you please read what you read again.
20  20      Q.  "She said that she would have been
21  21  comfortable selling in January because she
22  22  had no material inside information about
23  23  the company and its Q3 prospects."
24  24      A.  That is correct.
25  25      Q.  Is that an accurate reflection of what you
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

200

```
1   00200:01  told the Special Litigation Committee?
2   02    A.  Yes.
3   03    Q.  In January of 2001, you were privy to all of
4   04  the information in the upside reports, correct?
5   05    A.  Correct.
6   06    Q.  And you did not believe that there was
7   07  anything in those upside reports that was material
8   08  inside information; is that right?
9   09    A.  That's correct.
10  10    Q.  If that's the case, then I -- I still don't
11  11  understand the concern about sharing that information
12  12  with people at the executive committee meetings.
13  13        MR. ETH:  Objection.  Asked and answered
14  14  several times.
15  15        MR. NADOLENCO:  And form.
16  16        MS. SEGAL:  What is the question?
17  17        MR. NADOLENCO:  Yeah, is it your lack of
18  18  understanding?  You want her to confirm that?
19  19        MR. DE GHETALDI:  Maybe I should rephrase the
20  20  question.  My wife confirms that all the time and I
21  21  don't need additional confirmation, trust me.
22  22    Q.  Why was it not a problem for you to have that
23  23  information and a problem for other people who attended
24  24  the executive committee to have that information?
25  25        MR. ETH:  Objection.  Asked and answered.
```

201

```
1   00201:01        THE WITNESS:  I am the chief accounting
2   02  officer and I was responsible for pulling together the
3   03  forecast.  So obviously I would need to have access to
4   04  that financial information.  Other individuals did not
5   05  have a need to know.
6   06        MR. DE GHETALDI:  Q.  Do you recall telling
7   07  the Special Litigation Committee that at the end of
8   08  January 2001 you were nervous about the microeconomic
9   09  environment?
10  10        MR. ETH:  Are you looking at a page or --
11  11        MR. DE GHETALDI:  No.
12  12        MR. ETH:  Are you looking at a page?
13  13        MR. DE GHETALDI:  No.
14  14        MR. ETH:  Oh, okay, I'm sorry.
15  15        THE WITNESS:  Can you repeat the question.
16  16        MR. DE GHETALDI:  Q.  Do you recall telling
17  17  the Special Litigation Committee that at the end of
18  18  January 2001 you were nervous about the microeconomic
19  19  environment?
20  20    A.  I probably told them that I was -- had
21  21  concerns about the macroeconomic environment.
22  22    Q.  I said micro.
23  23    A.  Oh, micro.  Sorry.  No.  It would have been
24  24  macro.
25  25        MR. ETH:  Dario, can we just take one minute.
```

202

```
1   00202:01        MR. DE GHETALDI:  Yes.
2   02        MR. ETH:  I had too much iced tea.  I'll be
3   03  right back.
4   04        MR. DE GHETALDI:  All right.
5   05        THE VIDEOGRAPHER:  Off the record, 1:31 p.m.
6   06        (Recess taken).
7   07        THE VIDEOGRAPHER:  On the record, 1:41 p.m.
8   08        MR. DE GHETALDI:  Q.  What are run rates?
9   09    A.  Run rates?
10  10    Q.  Yeah.
11  11    A.  Can you put it in context for me, please.
12  12    Q.  Well, are run rates of an organization
13  13  something that you look at during the forecasting
14  14  process?
15  15    A.  I'm having a hard time putting the term "run
16  16  rate" -- defining it.  Sounds familiar, but I can't
17  17  quite put my finger on it.
18  18    Q.  Well, did you tell the Special Litigation
19  19  Committee that you look at run rates of an organization
20  20  so -- to see if there is any cushion in the forecast?
21  21    A.  It still is not intuitive to me.
22  22    Q.  Okay.  If you could dig out Exhibits 110 and
23  23  108, please.  Those are the two Garnick flash reports.
24  24        MR. ETH:  Are those from yesterday?
25  25        MR. DE GHETALDI:  Yeah.
```

203

```
1   00203:01        THE WITNESS:  108 and ...
2   02        MR. DE GHETALDI:  110.
3   03        THE WITNESS:  110.  Yep.
4   04        MR. DE GHETALDI:  Q.  It looks like the
5   05  recipients of these flash reports are the executive vice
6   06  presidents, is that right, for the most part?
7   07    A.  I believe they're missing a few.  But they
8   08  would be members of the EC meeting -- of the executive
9   09  management committee.
10  10    Q.  Was there a time when these monthly revenue
11  11  results were not distributed to such a wide audience?
12  12    A.  Yes.
13  13    Q.  Do you recall when the audience was expanded?
14  14    A.  I thought you were asking a different
15  15  question.  So we would share this in month 1 and month
16  16  2, but month 3 we would not share with them the actual
17  17  monthly results.  So maybe I misunderstood your
18  18  question.
19  19    Q.  Do you recall a time when Mr. Ellison
20  20  wanted -- do you recall a time when the recipients of
21  21  these monthly results were limited to you and Mr. Henley
22  22  and Safra Catz and Mr. Ellison?
23  23    A.  Yes.
24  24    Q.  Okay.  Do you recall when that audience was
25  25  expanded?
```

204

1  00204:01   A.  I don't recall precisely when Larry wanted us
2  02 to expand it, but he did ask that we do that.
3  03    Q.  Do you recall whether it was in fiscal year
4  04 2001?
5  05    A.  I don't recall when.
6  06    Q.  Do you recall him saying why he wanted the
7  07 audience expanded?
8  08    A.  He was attempting to generate competition.
9  09    Q.  Do you recall him saying how he thought that
10  10 would result from sharing the numbers in these reports?
11  11    A.  Waiting for an objection. Figured I'd wait a
12  12 few minutes.
13  13        He -- he felt that if they -- that it would be
14  14 healthy competition for them to see each other's revenue
15  15 performance.
16  16    MR. DE GHETALDI:  I'd like to have this
17  17 document marked as next in order, which I believe is
18  18 240.
19  19    (DC Exhibit No. 240
20  20        marked for identification).
21  21    MR. DE GHETALDI:  Q.  Have you ever seen
22  22 Exhibit 240 before today?
23  23    A.  I'm sure I've seen a report similar to this.
24  24 Not sure if I've seen this exact one.
25  25    Q.  Okay.  Who prepares this kind of report?

205

1  00205:01   A.  It would come out of the corporate financial
2  02 planning and analysis group.
3  03    Q.  Do you know who within that group was
4  04 responsible for preparing this type of report?
5  05    A.  Ivgen Guner was responsible for that
6  06 organization.  So somebody, more likely than not, that
7  07 reported to her would have prepared it.
8  08    Q.  All right.  Do you know the persons to whom
9  09 this type of report was distributed in fiscal year 2001?
10  10    A.  I'm not certain that we actually distributed
11  11 it, quite frankly.  We may have distributed it at an EMC
12  12 meeting, but I really don't recall.
13  13    MR. DE GHETALDI:  I'd like to have this
14  14 document marked as next in order, which I believe is
15  15 241.
16  16    (DC Exhibit No. 241
17  17        marked for identification).
18  18    MR. DE GHETALDI:  Q.  Have you ever seen the
19  19 type of report exemplified by Exhibit 241 before today?
20  20    A.  Yes.
21  21    Q.  Would this be a type of report that was
22  22 prepared by Ivgen Guner's group?
23  23    A.  This is the management summary downloaded
24  24 directly from Oracle Financial Analyzer.  That would
25  25 have been prepared by somebody in Ivgen Guner's group.

206

1  00206:01   Q.  Do you know to whom types of reports
2  02 exemplified by Exhibit 241 were distributed?
3  03    A.  These reports were generally used to assist in
4  04 the preparation of these upside reports.
5  05    Q.  I see.
6  06    A.  I really -- if I recall correctly, I don't
7  07 believe that this report or the headcount report was
8  08 actually distributed.  It was generally the upside
9  09 reports that were brought to the EC meetings and
10  10 distributed.
11  11    MR. DE GHETALDI:  And if I could have this one
12  12 marked as the next in order, which I believe is 242.
13  13    (DC Exhibit No. 242
14  14        marked for identification).
15  15    MR. DE GHETALDI:  Q.  Have you ever seen the
16  16 type of report exemplified by Exhibit 242 before?
17  17    A.  Yes.
18  18    Q.  Is this a report that's similar to Exhibit
19  19 241, with the difference being that one is in U.S.
20  20 dollars and one is in constant dollars?
21  21    A.  Yes.
22  22    Q.  Okay.  And 242 is, again, something that you
23  23 used to assist you in the preparation of the upside
24  24 reports?
25  25    A.  Yes.

207

1  00207:01   Q.  Do you know the production schedule for the
2  02 types of reports that are exemplified by Exhibit 240,
3  03 241 and 242; that is, how often were they prepared?
4  04    A.  These reports would have been printed out to
5  05 prepare the upside analysis.
6  06    Q.  Well, I note that each of these three were --
7  07 are dated January 22nd.
8  08    A.  Mm-hm.
9  09    Q.  And we looked at an upside report that was
10  10 also dated January 22nd.  So were these something --
11  11 did these have the most current information as of the
12  12 morning of the executive meetings?
13  13    A.  Yeah.  May I show you how they tie into one
14  14 another?
15  15    Q.  Yes.
16  16    A.  Okay.  If you go to Exhibit 153 and go to the
17  17 very -- the second page.
18  18    Q.  153.
19  19    A.  It's the upside analysis for 1/22.
20  20    Q.  Got it.
21  21    A.  All right.  I'll just use one number.
22  22    Q.  Yes.
23  23    A.  Our favorite topic, license revenues.  If you
24  24 look at the forecast in the Exhibit 242 --
25  25    Q.  Yes.

208

1  00208:01   A.  -- you see a forecast of 1,253,433.
2  02    Q.  Yes.
3  03    A.  If you go to the upside analysis -- and this
4  04  is, again, the forecast at actual rates or reported
5  05  rates -- you see the same number there under "forecast"?
6  06    Q.  Yes.
7  07    A.  Okay.  Now, your upside analysis, if you go to
8  08  the very next page, and then if you go to the Exhibit
9  09  No. 241, which is the management summary in constant
10  10  dollars, you see the license forecast of 1,264,597?
11  11    Q.  Yes.
12  12    A.  Is that the same number that you see on the
13  13  upside analysis on page -- on the third page in,
14  14  referring to page 3550?
15  15    Q.  Yes.
16  16    A.  So these were the source reports coming out of
17  17  OFA.
18  18    Q.  Well, do you know why the numbers for
19  19  consulting and support -- or the numbers for consulting,
20  20  at least, are different?  Consulting revenue, forecast.
21  21    A.  No, I don't.  Appears to be a typo.
22  22    Q.  They should be the same; is that your
23  23  understanding?
24  24    A.  I think they should be the same.
25  25    Q.  Okay.  I'm going to hand you a copy of a

210

1  00210:01    Skipping the first sentence of that paragraph,
2  02  the summary reads,
3  03    "When asked about clearance for this
4  04  contemplated stock sale, Minton stated that
5  05  she had sent an e-mail to Henley requesting
6  06  clearance for her planned trades.  She
7  07  vaguely recalled receiving her clearance
8  08  from Cooperman."
9  09    Do you recall sending Mr. Cooperman an e-mail
10  10  asking for clearance?
11  11    A.  I did not send Dan Cooperman an e-mail asking
12  12  for clearance.  I waited until -- I was -- I waited -- I
13  13  was going to wait until I got clearance from Jeff, but I
14  14  never got clearance from Jeff.
15  15    Q.  So as you sit here today, it's your
16  16  recollection that you did not ask Mr. Cooperman for
17  17  clearance?
18  18    A.  That's correct.
19  19    MR. DE GHETALDI:  Now I'd like this next
20  20  document marked as next in order, which I believe is
21  21  243.
22  22    (DC Exhibit No. 243
23  23    marked for identification.)
24  24    MR. DE GHETALDI:  Q.  Have you seen Exhibit
25  25  243 before today?

209

1  00209:01  document that was previously marked as Exhibit 31.  I
2  02  don't have a copy of the marked --
3  03    Q.  Do you want to keep all these separate?
4  04    A.  Oh, no, that's fine.  I don't have a copy of
5  05  the marked exhibit, but that ... have you seen Exhibit
6  06  31 before today?
7  07    A.  Yes, I have.
8  08    Q.  Was this one of the documents that you
9  09  reviewed in preparation for your deposition?
10  10    A.  Yes, it was.
11  11    Q.  Do you recall noting any inaccuracies in
12  12  Exhibit 32 [sic]?
13  13    A.  I did not review this in its entirety, so ...
14  14  I'd have to do that.
15  15    Q.  Do you recall when the first time you saw
16  16  Exhibit 32 was?
17  17    MR. NADOLENCO:  31?
18  18    MR. DE GHETALDI:  31.  Thank you.
19  19    THE WITNESS:  I definitely remember seeing it
20  20  a couple of days ago.  I don't recall if I saw it before
21  21  then.
22  22    MR. DE GHETALDI:  Q.  If you could turn to
23  23  page 12, please.  At the bottom of the page, there's a
24  24  section on -- that's titled "Minton's Contemplated Stock
25  25  Sale In January 2001."

211

1  00211:01    A.  Yes.
2  02    Q.  Is this one of the documents that you reviewed
3  03  prior to your deposition?
4  04    A.  Yes.
5  05    Q.  If you could turn, please, to page 9,
6  06  paragraph 25.  It begins -- or it reads,
7  07    "During Q3 '01, upside adjustments,
8  08    included information based on e-mails
9  09    received from David Winton on
10  10    January 11th, 2001, James English on
11  11    January 17th, 2001, Larry Garnick on
12  12    January 17th, 2001, and Sarah Kopp on
13  13    January 18th, 2001, among many other
14  14    e-mails and reports I received throughout
15  15    the quarter."
16  16    Is that an accurate statement?
17  17    A.  Yes.
18  18    Q.  If you can find Exhibit 108, which is
19  19  Mr. Garnick's January 17th, 2001 e-mail which was
20  20  marked as Exhibit 108.  Is that the e-mail that you were
21  21  referring to in paragraph 25?
22  22    A.  Yes, Wednesday, January 17th.
23  23    Q.  What in this particular e-mail -- what
24  24  information in this particular e-mail did you use to
25  25  base your upside adjustments in Q3 '01?

212

1  00212:01   A.  It was just data point.  But I don't recall
2   the specifics of how I determined my upside adjustments.
3   03     Q.  If you can locate Exhibits 48, 56 and 77.
4   04 They're all one-page e-mails, if that helps.
5   05     A.  It won't.
6   06       MR. ETH:  Are they from today or yesterday?
7   07       MR. DE GHETALDI:  Yesterday, I believe.
8   08       MR. ETH:  I don't know -- I don't know if
9   09 yesterday's are in this pile.
10  10       MR. DE GHETALDI:  They are.
11  11       MR. ETH:  They are?
12  12       MR. DE GHETALDI:  Yeah.
13  13       MR. ETH:  Okay.
14  14       MR. DE GHETALDI:  Or they should be.  There's
15  15 one.
16  16       MR. NADOLENCO:  You have them?
17  17       THE WITNESS:  Yeah I do.
18  18       MR. DE GHETALDI:  Okay, good.
19  19     Q.  Let's start with Exhibit 48.  Is that the
20  20 e-mail from David Winton dated January 11th, 2001 that
21  21 you were referring to in paragraph 25 of Exhibit 243?
22  22     A.  Yes.
23  23     Q.  Do you know what information included in
24  24 Exhibit 48 you used to generate your upside adjustments
25  25 in Q3 '01?

213

1  00213:01   A.  Are you -- which particular upside report?
2   02     Q.  Well, I mean, it -- I don't know.  You say
3   03 here "upside adjustments -- during Q3 '01, upside
4   04 adjustments included information based on these
5   05 particular e-mails.  Which upside adjustments did you
6   06 mean?
7   07     A.  Obviously anything that happened after the
8   08 date of the e-mail --
9   09     Q.  Okay.
10  10     A.  -- versus prior thereto.
11  11     Q.  Okay.  Do you recall in any more detail which
12  12 particular upside adjustments you were referring to in
13  13 your affidavit?
14  14     A.  No, I do not.
15  15     Q.  Do you know which information contained in
16  16 Exhibit 48 you used to make the upside adjustments that
17  17 you were referring to in paragraph 25?
18  18     A.  Again, I do not recall the specifics of how I
19  19 arrived at the upside amounts.
20  20     Q.  If you could turn to Exhibit 56.  It's the
21  21 English e-mail.
22  22     A.  Mm-hm.
23  23     Q.  Is Exhibit 56 the English e-mail dated
24  24 January 17th, 2001 that you were referring to in
25  25 paragraph 25?

214

1  00214:01   A.  Yes, it is.
2   02     Q.  Okay.  Do you recall what information
3   03 contained in Exhibit 56 you used to derive your upside
4   04 adjustments that you were referring to in paragraph 25?
5   05     A.  In this e-mail, as well as this e-mail, as
6   06 well as -- well, these first two e-mails, since it's the
7   07 ones that we talked about, I would have looked at the
8   08 forecast that they had said that they were going to
9   09 stick with, as well as their upside, as well as their
10  10 downside.  I would have evaluated it all.
11  11     Q.  And if you could turn to Exhibit 77, which is
12  12 the Sarah Kopp e-mail.
13  13     A.  Mm-hm.
14  14     Q.  Is Exhibit 77 the Sarah Kopp e-mail dated
15  15 January 18th, 2001 that you were referring to in
16  16 paragraph 25?
17  17     A.  Yes.
18  18     Q.  And do you recall what information contained
19  19 in that e-mail you were basing your upside adjustments
20  20 that you referred to in paragraph 25?
21  21     A.  I would have considered all of it.
22  22     Q.  If you could look at paragraph 28 at the
23  23 bottom of page 9 of Exhibit 243.
24  24     A.  Mm-hm.
25  25     Q.  You say, "As a historical matter,

215

1  00215:01   before Q3 '01 the potential forecast, which
2   02 include [sic] upside adjustments, proved to
3   03 be our most accurate forecast."
4   04     I'd just like you to clarify me -- clarify for
5   05 me, please, which potential forecast were you talking
6   06 about?  Are you talking about the potential
7   07 forecast for total revenue?
8   08     A.  In the upside analysis, there's the column
9   09 "forecast," "upside" and "potential."
10  10     Q.  Yes.
11  11     A.  It's that column, "potential."
12  12     Q.  All right.  For all of the figures within that
13  13 column?  That is, for --
14  14     A.  For revenue.
15  15     Q.  For revenue.
16  16     A.  For license revenues is what I'm referring to
17  17 here.
18  18     Q.  License revenues, okay.  Thank you.  That's --
19  19 I just wanted that clarified.
20  20     And where you say "As a historical matter,
21  21 before Q3 '01" in paragraph 28, how long a historical
22  22 period are you talking about there?
23  23     A.  As discussed yesterday, I don't recall
24  24 exactly, but clearly in the 12 to 24 months -- and I'm
25  25 guessing on the latter part, 24 months -- prior -- or I

216

1    00216:01 should say -- put it in terms of quarters -- or a
2    02 year -- the last year, as well as probably in the last
3    03 two years prior to this point, our forecasts were far
4    04 more predictive of the actual outcome of the quarter.
5    05 That is my recollection.
6    06    Q.  Okay.  And you say that they are far more
7    07 accurate than the unadjusted forecasts submitted by the
8    08 senior sales personnel when compared to the actual
9    09 results for the quarter.
10   10    A.  Mm-hm.
11   11    Q.  Are you talking about the cumulative forecasts
12   12 submitted by the senior sales personnel, or are you
13   13 talking about comparison of your potential forecast
14   14 compared to the unadjusted forecasts submitted by
15   15 individual senior sales personnel?
16   16    A.  In total, on a consolidated basis, my upside
17   17 numbers generally were more accurate than the numbers
18   18 that were presented -- or provided by the senior sales
19   19 folk.
20   20    THE REPORTER:  Senior sales what?
21   21    THE WITNESS:  Folk.  EVPs, sorry.
22   22    MR. DE GHETALDI:  Q.  If you could turn to
23   23 page 7, please.  In the middle of paragraph 20, it says,
24   24    "Upside reports are regularly prepared
25   25 each Friday and circulated weekly to

217

1    00217:01 certain members of the executive management
2    02    committee, including Ellison, Henley and
3    03    Catz, on Monday mornings."
4    04    Is that an accurate statement?
5    05    A.  Yes.
6    06    Q.  So upside reports are prepared every week?
7    07    A.  If we -- as I explained to you before, if
8    08 there wasn't a forecast week, we would print out the
9    09 previous week's upside report and bring it to the EC
10   10 meeting.  And if by chance there were any known
11   11 adjustments to the forecast that were not -- you know,
12   12 that came in between the submitted forecast, then we
13   13 would reflect them in those reports.
14   14    Q.  And the types of changes that would be
15   15 reflected in those reports would include changes in
16   16 pipeline as well as forecast, correct?
17   17    A.  If we were advised that there was a change.
18   18    Q.  Would those reports receive new dates or would
19   19 they simply carry over the last upside report's dates
20   20 and have different numbers?
21   21    A.  We had a practice of saving the file based on
22   22 the date.  So they would have had a different date if
23   23 they were adjusted.
24   24    Q.  Okay.  And that sentence that I read says that
25   25 these reports were circulated to certain members of the

218

1    00218:01 executive management committee on Monday mornings.
2    02 Those executive management committee meetings took place
3    03 in the afternoons on Mondays, right?
4    04    A.  They started whenever Larry got there.  So he
5    05 would sometimes show up at 11; he would sometimes show
6    06 up at 11:30; he could show up at noon, or he could show
7    07 up not at all.  11 is still in the morning.
8    08    Q.  Yes, it is.  When were they -- did they have a
9    09 regularly scheduled start time?  I mean, given that Mr.
10   10 Ellison --
11   11    A.  On my calendar I believe I have it from 11 to
12   12 3.
13   13    Q.  Okay.  Did Mr. Ellison appear to you, during
14   14 the executive committee meetings, to pay much attention
15   15 to your upside reports?
16   16    MR. NADOLENCO:  Objection to form.
17   17    THE WITNESS:  Larry had a practice of wanting
18   18 to hear directly from the sales EVPs themselves as to
19   19 what their forecast was.  He felt that they should be
20   20 able to speak to their own forecast.  So he would
21   21 occasionally refer to the hard copy report, but
22   22 generally speaking, he has a dialogue every EC meeting
23   23 with the sales EVPs on their forecast.
24   24    MR. DE GHETALDI:  Q.  Did he generally have a
25   25 dialogue with you on your upside adjustments at these

219

1    00219:01 executive committee meetings?
2    02    A.  We may have discussed them during the meeting
3    03 at certain times.  But I cannot recall a specific
4    04 meeting when we did.
5    05    Q.  Okay.  My question was whether he generally
6    06 had a dialogue with you about your numbers the way he
7    07 did with the executive vice presidents about their
8    08 numbers.
9    09    A.  No.  He generally speaks directly to the
10   10 executive sales VPs.
11   11    Q.  At any -- well ... in -- if you could look in
12   12 Exhibit 243, still on page 7, but up in paragraph 19.
13   13 In the middle of that paragraph, it -- the affidavit
14   14 says,
15   15    "In all of this time, I've never known
16   16 of or relied on a," quote, "comfort gap,"
17   17 end quote, "between license revenue growth
18   18 percentages and pipeline growth
19   19 percentages, as defined by plaintiffs in
20   20 paragraph 58 of their second amended
21   21 complaint, as an indicator of Oracle's
22   22 financial performance."
23   23    Do you see that there?
24   24    A.  Mm-hm.
25   25    Q.  Have you ever heard of something called a

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

220

1  00220:01  revenue gap?

2   02      MR. NADOLENCO:  Objection to form.  Vague.

3   03      THE WITNESS:  I don't recall hearing of

4   04  anything called a revenue gap.

5   05      MR. DE GHETALDI:  Q.  Do you recall seeing

6   06  revenue gap as a part of Oracle's pipeline reporting

7   07  packages?

8   08      A.  I don't understand the question.

9   09      Q.  Do you recall that Oracle's pipeline reporting

10  10  packages contained a page titled "Revenue Gap" that

11  11  analyzed the difference between the license revenue

12  12  growth percentages and the pipeline growth

13  13  percentages --

14  14      A.  May I refer to the document?

15  15      Q.  -- in fiscal year -- in fiscal year 2001?

16  16      A.  May I refer to the document?

17  17      Q.  Yes.  It's not on this one, but I can find one

18  18  for you.  Take a break and we'll find one for you.  It's

19  19  a different one -- it's a different one.

20  20      A.  I don't recall one.  We have -- this is the

21  21  report that my group would produce.  And there is no

22  22  revenue gap on this report.

23  23      Q.  That's true.  And I'll -- we'll take a break

24  24  and I'll find one for you when we take a break.  Just a

25  25  couple minutes.  And we're still going to meet our 3:00

221

1  00221:01  time.

2   02      If you could turn, please, to page 11 in

3   03  Exhibit 243.  In the second sentence of paragraph 32, it

4   04  reads,

5   05      "Pipeline data represents the total

6   06  value of license deals that the sales

7   07  organization reasonably believes will close

8   08  in a given quarter."

9   09      Is that an accurate definition of what the

10  10  pipeline includes?

11  11      A.  It could be better.

12  12      Q.  Okay.  How?  How would you improve it?

13  13      A.  I would say that the sales organization is

14  14  working on in a given quarter.

15  15      Q.  Right.  This sentence is a little too strong,

16  16  I think, would you agree, in use of the phrase

17  17  "reasonably believes will close"?

18  18      A.  I agree.

19  19      Q.  Okay.

20  20      MR. NADOLENCO:  Dario?

21  21      MR. DE GHETALDI:  Yes.

22  22      MR. NADOLENCO:  I notice that the word

23  23  "decline" is written on here.  Is that something your --

24  24  your team did?

25  25      MR. DE GHETALDI:  I have no idea.

222

1  00222:01      MR. NADOLENCO:  Okay.

2   02      MR. DE GHETALDI:  I really don't.  I saw that

3   03  too.  It just shows that there is a decline.

4   04      Q.  Then if you could turn, please, to the next

5   05  page, 12, in paragraph 33.  Right in the middle of the

6   06  page there's a sentence that reads,

7   07      "Ultimately, Oracle's conversion rate

8   08  for Q3 '01 proved to be dramatically lower

9   09  than it had been in previous years" -- or

10  10  "in prior periods," I'm sorry.

11  11      Do you see that?

12  12      A.  Yes, I do.

13  13      Q.  Can you explain for me how the conversion rate

14  14  that you are referring to here would be calculated.  We

15  15  talked about several conversion rates over the last two

16  16  days, and I'm just wondering if this is one of those or

17  17  a different one.

18  18      A.  It's the pipeline conversion rate.

19  19      Q.  At what point in time?

20  20      A.  I'd have to go back and look at the data, but

21  21  I presume that it would be through the entire period,

22  22  based on the next statement.

23  23      MR. DE GHETALDI:  All right.  Well, we have

24  24  just a few minutes left on the tape.  Why don't we take

25  25  the opportunity to take our last break of the day, and

223

1  00223:01  we'll come back and finish.

2   02      THE VIDEOGRAPHER:  This is the end of Volume

3   03  II, tape 2 in the deposition of Jennifer Minton on

4   04  April 1, 2004, the time, 2:25 p.m.  We're off the

5   05  record.

6   06      (Recess taken).

7   07      THE VIDEOGRAPHER:  This marks the beginning of

8   08  Volume II, tape 3 in the deposition of Jennifer Minton

9   09  on April 1, 2004, the time, 2:36 p.m.  We are on the

10  10  record.

11  11      MR. DE GHETALDI:  Q.  I've handed you a copy

12  12  of Exhibit 138.  And during the break I asked you to

13  13  turn to page 11 there.

14  14      Do you recognize the type of calculation that

15  15  is being made on this page to derive the numbers in the

16  16  column on the far right-hand side that are titled

17  17  "Growth Cap"?

18  18      A.  I don't recognize this page at all.  I do not

19  19  recall that we ever did this.  Obviously it was in the

20  20  package, but I just don't remember seeing it.

21  21      Q.  Okay.  Going back to Exhibit 243.  And please

22  22  turn to page 15.  The second sentence reads, "Throughout

23  23  January 2001, however" --

24  24      A.  Which paragraph?

25  25      Q.  Oh, I'm sorry, paragraph 44.

224

```
1   00224:01   A.  Okay.
2   02     Q.  The second sentence reads, "Throughout
3   03   January 2001, however, our forecast
4   04   consistently showed that we would achieve
5   05   our public projections."
6   06      Do you see that?
7   07     A.  Mm-hm.
8   08     Q.  What forecast are you referring to in that
9   09   sentence?
10  10     A.  I believe I was referring to our EPS.
11  11     Q.  And similarly, then, the public projections
12  12   would be the public projections for EPS only?
13  13     A.  That's what I believe I was referring to, yes.
14  14     Q.  It is true, is it not, that the forecast for
15  15   license by January 29th were below the 30 percent
16  16   constant dollar guidance?
17  17     MR. ETH:  Objection to form.
18  18     THE WITNESS:  The actuals, as you can see on
19  19   page 11, the license revenue was 24 percent, just one
20  20   point away from 25 percent.
21  21     MR. DE GHETALDI:  The --
22  22     THE WITNESS:  But again, this did not give me
23  23   any rise for concern, given that we have very
24  24   back-ended-loaded -- or back-loaded quarters.
25  25     MR. DE GHETALDI:  Q.  According to the
```

225

```
1   00225:01  January 29th upside report that's Exhibit 134, the
2   02   forecast for license revenue was 23 percent, and the
3   03   potential forecast --
4   04     A.  No, that's not correct.  If you look here on
5   05   the actuals, license was 24 percent.
6   06     Q.  I was talking about the budget rate, the
7   07   constant dollar numbers.  That was what my question was
8   08   about.
9   09     A.  What is your question?
10  10     MR. ETH:  Where are you reading?
11  11     MR. DE GHETALDI:  I'm looking at the upside
12  12   report for January 29th, which is Exhibit 134.  And
13  13   I'm looking at page with Bates number 3610.
14  14     Q.  And it shows that the forecast growth for
15  15   license revenue was 23 percent and the potential growth
16  16   for license revenue was 27 percent as of that date,
17  17   correct?
18  18     A.  That is correct.
19  19     Q.  And you were not referring to those numbers,
20  20   then, in paragraph 44 of Exhibit 243; is that correct?
21  21     A.  Correct.  I was referring to the actuals.
22  22     Q.  Just for EPS?
23  23     A.  We only calculate EPS in actuals.
24  24     Q.  I just want to make sure that the record is
25  25   clear that in the second sentence of Exhibit 40 --
```

226

```
1   00226:01  paragraph 44 of Exhibit 243 that the forecast that you
2   02   are referring to was only the forecast for EPS and not
3   03   the forecast for license revenue.
4   04     A.  Correct.
5   05     Q.  Did the implementation of OSO have an effect
6   06   on the number of deals that appeared in Oracle's
7   07   pipeline figures?
8   08     A.  The implementation of OSO.
9   09     Q.  Yeah.
10  10     A.  No, it's not the implementation of OSO that
11  11   impacts the way that the pipeline figures are shown.
12  12     Q.  What was it, if anything?
13  13     A.  Well, it's what data is put into OSO by the
14  14   sales organization.
15  15     Q.  I see.  Did -- are you aware of any study that
16  16   was done to determine whether the method of data
17  17   inputting -- or the method of putting data into OSO
18  18   affected the pipeline figures?
19  19     A.  From time to time, there would be instances
20  20   where salesmen -- sales reps would not properly
21  21   characterize their opportunities in OSO.
22  22     Q.  Okay.  My question was whether there was
23  23   any -- whether you're aware of any study that quantified
24  24   the effect of the use of OSO on the pipeline numbers.
25  25     A.  I'm not aware of a study.
```

227

```
1   00227:01   Q.  I know you're confused by the question.  Let
2   02   me just see if I can find my reason for asking it.  If
3   03   you could locate Exhibit 239, which is your initial
4   04   interview.
5   05     A.  Page number, please.
6   06     Q.  Bottom of page 8 and continuing on to the top
7   07   of page 9, where it says,
8   08      "Minton explained that an accurate
9   09   comparison of the pipeline between Q3 FY
10  10   '01 and Q3 FY '00 was not possible because
11  11   OSO was not used consistently across time
12  12   in FY '00.  She explained that OSO rolled
13  13   out slowly worldwide, but that by Q3 FY '01
14  14   it was almost complete.  She noted that as
15  15   a result of more deals being captured
16  16   electronically in the pipeline, the
17  17   conversion ratio numbers were dropping
18  18   slightly."
19  19      And my question referred to this section of
20  20   your interview summary and caused me to ask whether
21  21   you're aware of any studies that had been done that
22  22   quantified the difference between the way that deals
23  23   were entered in -- prior to the implementation of OSO
24  24   and after the implementation of OSO.
25  25     A.  I'm not aware of a study that analyzed that.
```

228

```
 1   00228:01   Q.  Is it your understanding that the effect on
 2   02   the conversion ratio numbers was only slight?
 3   03      A.  I don't recall.  But if we're capturing more
 4   04   of the pipeline and your pipeline value goes up, then
 5   05   your conversion ratio would go down if your forecast was
 6   06   held steady.  It's a simple mathematical calculation.
 7   07      Q.  Yes.  And my question went to the degree of
 8   08   the effect on the conversion ratio.  And I understand
 9   09   the mathematics of it.  I'm just wondering what your
10   10   sense of the degree of that effect was.
11   11      A.  I don't recall.
12   12      MR. DE GHETALDI:  All right.  Well, that'll do
13   13   it, with the usual understanding that the parties have
14   14   differing views on whether we'll be back or not.
15   15      MR. ETH:  That's fine.
16   16      THE VIDEOGRAPHER:  At the end of Volume II,
17   17   tape 3, this concludes today's deposition of Jennifer
18   18   Minton.  The original videotapes will be retained by Dan
19   19   Mottaz Video Productions LLC at 182 Second Street, Suite
20   20   202, San Francisco, California, 94105, telephone
21   21   415-624-1300.  The time is 2:49 p.m.  We're off the
22   22   record.
23   23      (Deposition concluded at 2:49 p.m.)
24   24
25   25         ---o0o---
```

229

```
 1   00229:01      CERTIFICATE OF WITNESS
 2   02
 3   03
 4   04
 5   05      I, the undersigned, declare under penalty of
 6   06   perjury that I have read the foregoing transcript and I
 7   07   have made any corrections, additions or deletions that I
 8   08   was desirous of making; that the foregoing is a true and
 9   09   correct transcript of my testimony contained therein.
10   10   EXECUTED this _____ day of _____,
11   11   200_, at _____, _____.
12   12
13   13
14   14
15   15
16   16
17   17      _____
18   18         Signature of Witness
19   19
20   20
21   21
22   22
23   23
24   24
25   25
```

230

```
 1   00230:01      REPORTER CERTIFICATE
 2   02      I hereby certify that the witness in the
 3   03   foregoing deposition was by me duly sworn to testify to
 4   04   the truth, the whole truth and nothing but the truth in
 5   05   the within-entitled cause; that said deposition was
 6   06   taken at the time and place herein named; that the
 7   07   deposition is a true record of the witness's testimony
 8   08   as reported to the best of my ability by me, a duly
 9   09   certified shorthand reporter and a disinterested person,
10   10   and was thereafter transcribed under my direction into
11   11   typewriting by computer; that the witness was given an
12   12   opportunity to read and correct said deposition and to
13   13   subscribe the same.  Should the signature of the witness
14   14   not be affixed to the deposition, the witness shall not
15   15   have availed himself or herself of the opportunity to
16   16   sign or the signature has been waived.
17   17      I further certify that I am not interested in
18   18   the outcome of said action, nor connected with, nor
19   19   related to any of the parties in said action, nor to
20   20   their respective counsel.
21   21      IN WITNESS WHEREOF, I have hereunto set my
22   22   hand this 16th day of April, 2004.
23   23
24   24      _____
25   25
```

231

```
 1   00231:01      ROBERT BARNES ASSOCIATES
 2   02      San Francisco, California  94102
 3   03
 4   04      Date:  4/17/04
 5   05   TO:  JENNIFER L. MINTON
 6   06      JORDAN ETH, ESQ.
 7   07      San Francisco, CA  94105
 8   08
 9   09   SPECIAL TITLE (RULE 1550(B))
10   10   Deposition taken April 1, 2004
11   11   Dear JENNIFER L. MINTON:
12   12   The original transcript of your deposition taken in the
13   13   at this office for your reading, correcting and signing.
14   14   copy.  Please notify this office and all counsel in
15   15   deposition transcript.
16   16   Your rights regarding signature of this deposition are
17   17   original deposition transcript will be sealed in
18   18
19   19   transcript of your deposition, please contact this
20   20   Friday, to make an appointment.
21   21
22   22      Sincerely,
23   23
24   24      CSR No. 6438
25   25   cc:  All counsel
```

EXHIBIT Y

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

1

```
 1   00001:01   SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2   02              COUNTY OF SAN MATEO
 3   03                    --o0o--
 4   04   Coordination Proceeding
 5   05   Special Title (Rule 1550(b))
 6   06   ORACLE CASES              Judicial Council
 7   07      -vs-              Coordination
 8   08   Proceeding           No. 4180
 9   09   _____/
10   10   This Document Relates To:
11   11   ALL ACTIONS
12   12   _____/
13   13
14   14
15   15      VIDEOTAPED DEPOSITION OF SARAH KOPP
16   16         Thursday, February 19, 2004
17   17                  --o0o--
18   18
19   19
20   20
21   21
22   22
23   23
24   24
25   25
```

2

```
 1   00002:01   IN THE COURT OF CHANCERY OF THE STATE OF DELAWAI
 2   02              IN AND FOR NEW CASTLE COUNTY
 3   03
 4   04
 5   05   _____
 6   06   IN RE ORACLE CORP.    )     Consol. C.A. No.
 7   07   18751
 8   08   DERIVATIVE LITIGATION   )    CONFIDENTIAL
 9   09   _____)    FILED UNDER SEAL
10   10
11   11
12   12
13   13
14   14
15   15
16   16
17   17
18   18
19   19
20   20
21   21
22   22
23   23
24   24
25   25
```

3

```
 1   00003:01               --o0o--
 2   02           A P P E A R A N C E S
 3   03
 4   04   FOR THE PLAINTIFFS:
 5   05      BERMAN DEVALERIO PEASE TABACCO BURT &
 6   06      BY:  NICOLE LAVALLEE, ESQ.
 7   07      Suite 2025
 8   08      415/433-3200
 9   09      COREY, LUZAICH, PLISKA, DE GHETALDI &
10   10      BY:  JERRY E. NASTARI, ESQ.
11   11      P.O. box 669
12   12      650/871-4144
13   13      McMANIS FAULKNER & MORGAN
14   14      50 West San Fernando Street
15   15      San Jose, California 95113
16   16
17   17
18   18      BY:  ANNA ERICKSON WHITE, ESQ.
19   19      Palo Alto, California 94304-0792
20   20
21   21
22   22      BY:  JOHN NADOLENCO, ESQ.
23   23      25th Floor
24   24      213/229-5173
25   25
```

4

```
 1   00004:01   APPEARANCES (Continued)
 2   02
 3   03
 4   04   FOR THE DEFENDANT ORACLE:
 5   05      ORACLE CORPORATION
 6   06      500 Oracle Parkway
 7   07      Redwood Shores, California
 8   08
 9   09
10   10                --o0o--
11   11
12   12
13   13
14   14
15   15
16   16
17   17
18   18
19   19
20   20
21   21
22   22
23   23
24   24
25   25
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

5

```
 1   00005:01           --o0o--
 2       02
 3       03
 4       04  EXAMINATION BY:                    Page
 5       05       Afternoon session ............... 144
 6       06
 7       07
 8       08
 9       09
10       10
11       11
12       12
13       13
14       14
15       15
16       16
17       17
18       18
19       19
20       20
21       21
22       22
23       23
24       24
25       25
```

7

```
 1   00007:01  Exhibit                      Page
 2       02
 3       03  77   Confidential - Email dated  ..... 246
 4       04       Jennifer Minton, Subject:  OSI
 5       05       0109623, one page.
 6       06  78   Confidential - Email dated  ..... 264
 7       07       Ivgen Guner, Subject:  Re:
 8       08       CA-ORCL 037133 through 037134,
 9       09
10       10       emails, first dated 1/30/01
11       11       Ellison, Subject:  Projects 11i
12       12       Bates-stamped CA-ORCL 031405
13       13
14       14       Summary, Bates-stamped CA-ORCL
15       15
16       16       Forecast FY01 Q3 Forecast as of
17       17       CA-ORCL 036519 through 036526,
18       18
19       19       Forecast FY01 Q3 Forecast as of
20       20       CA-ORCL 036527 through 036534,
21       21
22       22       Forecast FY01 Q3 Forecast as of
23       23       CA-ORCL 036535 through 036542,
24       24
25       25
```

6

```
 1   00006:01           --o0o--
 2       02           E X H I B I T S
 3       03
 4       04
 5       05       Industries FY01 - Q3 Big Deal
 6       06       ORCL 0128255, one page.
 7       07  71   Confidential - Email dated  ..... 135
 8       08       multiple recipients, with
 9       09       Deals Schedules, Bates-stamped
10       10       CA-ORCL 025355, 15 pages.
11       11  72   Confidential - Americas  ........ 146
12       12       CA-ORCL 004811 through 004816,
13       13
14       14       Forecast Package, Bates-stamped
15       15       six pages.
16       16  74   Confidential - Big deal  ........ 204
17       17       037116 through 037117, two
18       18
19       19       2/14/01 from Sarah Kopp to
20       20       Projections, Bates-stamped ORCL
21       21       pages.
22       22  76   Confidential - Two pages from  .. 232
23       23       2/14/00 and 2/21/00,
24       24       0122139, two pages.
25       25
```

8

```
 1   00008:01  Exhibit                      Page
 2       02
 3       03  84   Confidential - OSI Consulting  .. 278
 4       04       16-Jan-01, Bates-stamped
 5       05       10 pages.
 6       06  85   Confidential - OSI Consulting  .. 278
 7       07       30-Jan-01, Bates-stamped
 8       08       10 pages.
 9       09  86   Confidential - Oracle Service  .. 289
10       10       Summary, Bates-stamped CA-ORCL
11       11       pages.
12       12  87   Confidential - Oracle Service  .. 292
13       13       Summary, Bates-stamped CA-ORCL
14       14       pages.
15       15  88   Confidential - Q2 FY01  ......... 293
16       16       37260 and 37261, two pages.
17       17  89   Confidential - Q2 FY01  ......... 294
18       18       37262 through 37264, three
19       19
20       20       Forecast, Bates-stamped CA-ORCL
21       21       pages.
22       22  91   Confidential - Q2 FY01  ......... 294
23       23       37270 through 37272, three
24       24
25       25
```

9

```
 1   00009:01 Exhibit                    Page
 2      02
 3      03  92   Confidential - Q2 FY01 ......... 294
 4      04      37273 and 37274, two pages.
 5      05  93   Confidential - Q3 FY01 Week 1,  . 297
 6      06      CA-ORCL 037275 through 037279,
 7      07
 8      08      December 19, 2000,
 9      09      through 037284, five pages.
10      10  95   Confidential - Q3 FY01 Week 5,  . 307
11      11      CA-ORCL 037285 through 037289,
12      12
13      13      January 16, 2001, Bates-stamped
14      14      five pages.
15      15  97   Confidential - Q2 FY04 Week 12,  310
16      16      Bates-stamped CA-ORCL 037295
17      17
18      18      November 28, 2000,
19      19      through 037304, five pages.
20      20  99   Confidential - FY01 Q3 Forecast  314
21      21      0128256, one page.
22      22          --o0o--
23      23
24      24
25      25
```

10

```
 1   00010:01     BE IT REMEMBERED on Thursday,
 2      02  February 19, 2004, at the hour of 9:28 a.m. thereof
 3      03  at the law offices of Berman DeValerio Pease Tabacco
 4      04  Burt & Pucillo, 425 California Street, 21st Floor,
 5      05  San Francisco, California, before me, HEIDI J.
 6      06  RYDER, Deposition Officer, Certified Shorthand
 7      07  Reporter in and for the State of California, there
 8      08  personally appeared
 9      09
10      10          SARAH KOPP,
11      11
12      12  called as a witness by the Plaintiff herein, who,
13      13  having been first sworn by me, was thereupon
14      14  examined as is hereinafter set forth.
15      15
16      16          --o0o--
17      17       P R O C E E D I N G S
18      18          --o0o--
19      19
20      20       THE VIDEOGRAPHER:  Good morning.
21      21       This marks the beginning of Volume 1 in
22      22  the deposition of Sarah Kopp In Re The Oracle
23      23  Corporation Derivative Litigation in Superior Court
24      24  for the State of California, County of San Mateo,
25      25  Judicial Counsel Coordination Proceeding Number
```

11

```
 1   00011:01 4180, and in the Court of Chancery for the State of
 2      02  Delaware in and for New Castle County, Case Number
 3      03  18751.
 4      04       Today's date is February 19, 2004.  The
 5      05  time is 9:29.  The location of this deposition is
 6      06  Berman DeValerio, 425 California Street, 21st Floor,
 7      07  San Francisco, California.
 8      08       This deposition was noticed by plaintiff.
 9      09  The videotape is being produced on behalf of the
10      10  same.  The video operator is Steve Marques, a
11      11  California Notary Public for the County of Santa
12      12  Clara, employed by Dan Mottaz, Video Productions,
13      13  LLC, 182 Second Street, Suite 202, San Francisco,
14      14  California 94105, 415/624-1300.
15      15       Would counsel present please identify
16      16  themselves and state whom their represent.
17      17       MS. LAVALLEE:  Nicole Lavallee, Berman
18      18  DeValerio for California plaintiffs.
19      19       MR. NASTARI:  Jerry Nastari for
20      20  California plaintiffs.
21      21       MR. NADOLENCO:  John Nadolenco of Mayer
22      22  Brown Rowe & Maw on behalf of individual defendants
23      23  Larry Ellison and Jeff Henley.
24      24       MS. WHITE:  Anna Erickson White, Morrison
25      25  & Foerster, on behalf of Oracle Corporation.
```

12

```
 1   00012:01     THE VIDEOGRAPHER:  If there are no
 2      02  stipulations, the reporter may administer the oath.
 3      03
 4      04          EXAMINATION
 5      05
 6      06  BY MS. LAVALLEE:
 7      07   Q.  Good morning, Ms. Kopp.
 8      08       My name is Nicole Lavallee.  I am the
 9      09  attorney representing plaintiffs in a derivative
10      10  litigation involving Larry Ellison and Jeff Henley.
11      11       Can you state your full name for the
12      12  record, please.
13      13   A.  Sarah Jane Kopp.
14      14   Q.  Okay.  Can you give me your business
15      15  address, please.
16      16   A.  Where I am, 1910 Oracle Way, Reston,
17      17  Virginia.
18      18   Q.  Okay.
19      19       Ms. Kopp, have you ever been deposed
20      20  before?
21      21   A.  No, I have not.
22      22   Q.  Okay.
23      23       It's a fairly -- I'm sure your counsel
24      24  has explained the process, but it's a fairly
25      25  straightforward process.
```

13

```
00013:01     But I just want to make sure that you
02  understand that everything you say is being said
03  under oath and can be used in a court proceeding,
04  either a trial or in other submissions to the court.
05       Do you understand that?
06  A.  I do.
07  Q.  Thank you.
08       Before we start, I'd just like to give a
09  few -- just run through a few general instructions
10  just so we're clear.  And it's also good just to
11  remember some of these guidelines.
12  A.  Okay.
13  Q.  As you are aware, the court reporter is
14  sitting here and transcribing all that is said
15  during the deposition.
16       One of the things to bear in mind and
17  it's important for all of us to remember that,
18  including myself, is that we need to let the -- one
19  person finish reading their -- what they have to say
20  before starting.
21       So I'll try not to cut you off.  And
22  also, I know it's difficult, but also if you'll try
23  to bear that in mind, that will be helpful.
24       As well, the court reporter can only
25  transcribe spoken words.  So to the extent you have
```

14

```
00014:01  a response, a nod or a shake won't suffice, you
02  actually have to give an oral, verbal response.
03       And then also, Ms. Kopp, if at any time
04  you'd like to take a break, just please let me know.
05  The only thing I would ask if there's a question
06  pending or possibly a line of questioning, I'd like
07  to complete -- I'd like to do that before we take a
08  break.
09       But at any time if you need a break, you
10  are free to do so.
11  A.  Okay.
12  Q.  Just let me know.
13  A.  Okay.
14  Q.  And as well, if I ask a question that you
15  really don't understand, please just let me know.
16  I'm more than happy to rephrase and clarify
17  anything, and maybe we can have a better
18  understanding as to what the question is.
19  A.  Okay.
20  Q.  And as well, at this deposition I don't
21  want you to guess or speculate.  I'd like you to
22  give your -- an answer to the best of your
23  knowledge.  And an educated guess or educated
24  response might be appropriate, but I don't want you
25  to speculate or guess.
```

15

```
00015:01  A.  Right.
02  Q.  Thank you.
03       I think that's pretty much it.  If
04  anything comes up, I'll -- throughout the
05  deposition, I might just talk about that.
06  A.  Okay.
07  Q.  Ms. Kopp, are you currently employed by
08  Oracle Corporation?
09  A.  I am.
10  Q.  And when were you first -- when did you
11  first start working for Oracle?
12  A.  May of 1989.
13  Q.  And has your position changed between
14  1989 and today?
15  A.  Many times, yes.
16  Q.  Okay.
17       And have you been consistently employed
18  by Oracle from 1989 through today?
19  A.  Yes.
20  Q.  Okay.
21       Starting with the 1989, can you just run
22  through the various positions that you've held at
23  Oracle?
24  A.  Sure.
25       I started as a billing clerk in the
```

16

```
00016:01  consulting organization.  Which was an
02  administrative function.
03       Later, when the consulting organization
04  in the government sector grew large enough, I was
05  the first financial analyst for that group.
06       Moved my way to finance manager for that
07  same group.
08  Q.  Ms. Kopp, what year was that, about?  I
09  don't mean to interrupt, but if you could just give
10  me some time frame as you respond.
11  A.  I believe I was a financial analyst
12  around the 1991, earlier 1991.
13       I don't recollect when I was promoted to
14  a finance manager.
15  Q.  Okay.
16  A.  Remaining in the same role as the group
17  grew, I was supporting the same organization, but
18  the group grew and my responsibilities grew as a
19  result.
20       So I stayed with the government
21  consulting group until the mid-'90s.  And, again,
22  I'm not exactly sure what year it was.
23  Q.  Okay.
24  A.  But I -- Oracle changed some focus and
25  created global verticals supporting some of the
```

17

1  00017:01 commercial sectors.  And one of those was financial
2  02 services.
3  03      And I went to -- accepted a job to
4  04 support the financial services vertical and left the
5  05 government group at that point.
6  06      I -- somewhere in the '96-'97 sort of
7  07 time frame.
8  08   Q.  Uh-huh.
9  09      And then after that, is that a position
10 10 you held consistently from then to the present?
11 11   A.  No.
12 12      About a year later, the concept of the
13 13 global verticals went away from Oracle.  It was
14 14 something that we moved away from as a company.
15 15      And Steve Perkins, who was running the
16 16 financial services vertical, went to run the OSI
17 17 division under Jay Nussbaum and asked me to join
18 18 him.
19 19      So I returned to the government sector at
20 20 that point.
21 21   Q.  And do you recall when that was?
22 22   A.  Well, again, it was about a year later.
23 23   Q.  Okay.
24 24   A.  Still -- still in the '90s sometime.
25 25   Q.  And how long did you remain at the

18

1  00018:01 government department at that period; do you
2  02 remember?
3  03   A.  I stayed in much the same position until
4  04 about three and a half years ago.
5  05   Q.  Three and a half years ago would bring us
6  06 exactly to --
7  07   A.  Sort of to the fall of our second fiscal
8  08 quarter.
9  09   Q.  Of which year?
10 10   A.  Of 2001.
11 11   Q.  Okay.
12 12   A.  So it was the fall of 2000, our fiscal
13 13 2001.
14 14   Q.  And at that time what position did you
15 15 take?
16 16   A.  At that time the finance organization was
17 17 moved under the controller's organization instead of
18 18 reporting up through line of business as it had
19 19 been, and a position became opening supporting the
20 20 OSI group as finance director.
21 21      And that was the role that I interviewed
22 22 for and earned in October of 2000.
23 23   Q.  And was that a newly created position or
24 24 did somebody leave that position?
25 25   A.  No, Terry Ford had previously been in

19

1  00019:01 that position.  And he chose at that point to run
2  02 operations for Jay Nussbaum for OSI as opposed to
3  03 being in finance, so it was his role that I
4  04 interviewed for.
5  05   Q.  And do you know why he chose to make that
6  06 change?
7  07   A.  No, I do not.
8  08   Q.  All right.
9  09      And you maintain that position as finance
10 10 director for the OSI division; is that correct?
11 11   A.  Uh-huh.
12 12   Q.  From Q2 financial year '0- -- financial
13 13 year 2001 until what time?
14 14   A.  Well, there have been a number of
15 15 reorganizations.  I technically still have that
16 16 role, but I have an expanded role as well.  The OSI
17 17 as it existed at that point no longer exists.  It
18 18 has now been split into the GEH division, which is
19 19 only the government piece of OSI, the commercial
20 20 entities moved back into North America Sales.
21 21      And I now have responsibility through a
22 22 number of reorganizations for GEH, North America
23 23 Sales, as well as North America Consulting.
24 24   Q.  And at what point in time did your roles
25 25 switch because of the change --

20

1  00020:01 (Reporter interruption.)
2  02 BY MS. LAVALLEE:
3  03   Q.  -- change in the structure, the
4  04 organizational structure?
5  05   A.  It actually switched a couple of times
6  06 largely because of restructuring in the company.
7  07      So at the end of the second fiscal
8  08 quarter of '02, Jay Nussbaum left the company.  And
9  09 George Roberts took over the telecommunications,
10 10 utilities, and financial services pieces of OSI.
11 11      And the consulting piece of OSI moved
12 12 under Keith Block with the rest of commercial.  And
13 13 at that point in time, Mr. Block asked me to support
14 14 the entire consulting organization under him.
15 15      And my manager at the time, Jennifer
16 16 Minton, asked me to continue to support the
17 17 government education and health piece.
18 18      So in December of 2001, I -- I had
19 19 control of the GEH business as well as the
20 20 consulting business, but not the commercial sales
21 21 business.
22 22   Q.  Okay.
23 23      Is it fair to say, though, that in Q3
24 24 2001, you maintained the position of finance
25 25 director for the OSI division.

21

```
1   00021:01   A.   Yes.
2   02   Q.   Throughout that entire period?
3   03   A.   Yes.
4   04   Q.   Okay.
5   05        And we have been talking about OSI.
6   06   Maybe we can get -- if you could just give me an
7   07   explanation of what that stands for.
8   08   A.   Oracle Service Industries.
9   09   Q.   Okay.
10  10        And is that division OSI, does it have
11  11   any subdivisions or --
12  12   MS. WHITE:  Objection.  Form.
13  13   BY MS. LAVALLEE:
14  14   Q.   Okay.  Let me ask a different question.
15  15        Is there a consulting component -- was
16  16   there a consulting component to OSI in Q3 2001?
17  17   A.   Yes.
18  18   Q.   Okay.
19  19        Were there any other components or
20  20   divisions to OSI during that third quarter of 2001?
21  21   A.   I'm not sure I understand the question.
22  22   Q.   Okay.
23  23        When -- okay.  When you answered that
24  24   there was a consulting portion to OSI, what do you
25  25   call that consulting as opposed to -- the consulting
```

22

```
1   00022:01   portion of OSI, what would you call that internally
2   02   at Oracle?
3   03   MS. WHITE:  Objection.
4   04   BY MS. LAVALLEE:
5   05   Q.   Is it a division?
6   06   A.   It was OSI consulting.  I mean, I still
7   07   am not sure I understand what you mean.
8   08   Q.   Okay.
9   09        What type of products were sold through
10  10   the OSI division of Oracle during Q3 2001?
11  11   MR. NADOLENCO:  Objection to form.
12  12   THE WITNESS:  I still don't understand
13  13   what you mean, I'm sorry.
14  14   MS. LAVALLEE:  No, that's fine.  That's
15  15   fine.
16  16   THE WITNESS:  The consulting group does
17  17   not sell products.
18  18        The license group sold products.
19  19        So there was a consulting and license
20  20   component, if that's what you mean.
21  21   BY MS. LAVALLEE:
22  22   Q.   Okay.  That's my question.
23  23        Maybe I was asking something more narrow
24  24   than I thought I was.
25  25        So OSI was -- had a licensing component
```

23

```
1   00023:01   and consulting component?
2   02   A.   Yes.
3   03   Q.   Okay.
4   04        And we're talking now during Q3 of 2001;
5   05   is that correct?
6   06   A.   Of fiscal 2001, yes.
7   07   Q.   Okay.  And were there any other
8   08   components to OSI during that period?
9   09   A.   No.
10  10   Q.   Okay.  What were the other groups that
11  11   were at the same level at OSI at Oracle during the
12  12   third quarter of 2001?
13  13   MS. WHITE:  Objection form.
14  14   MR. NADOLENCO:  Join.
15  15        And, Nicole, can we have the same
16  16   stipulation as before, that the individual
17  17   defendants join in any objections made by Oracle's
18  18   counsel, unless otherwise noted?
19  19   MS. LAVALLEE:  Yes, we can.
20  20   MR. NADOLENCO:  Thanks.
21  21   THE WITNESS:  I'm not sure I understand
22  22   what you mean by "at the same level."
23  23   BY MS. LAVALLEE:
24  24   Q.   Okay.
25  25        OSI would be -- what would you refer to
```

24

```
1   00024:01   that as, a division of Oracle?
2   02        What's the terminology you refer to?
3   03   A.   Probably, yes.
4   04   Q.   Okay.
5   05        Were there other divisions of Oracle at
6   06   that time, Q3 2001?
7   07   A.   Yes.
8   08   Q.   Okay.
9   09        What were those?
10  10   A.   Within North America or globally?
11  11   Q.   Why don't we start with North America.
12  12   A.   Within North America at that time there
13  13   was OSI.
14  14        There was North America Sales.
15  15        There was Oracle Product Industries.
16  16        OPI.
17  17        And there was Commercial Consulting.
18  18   Q.   Thank you.
19  19        And you may have covered this somewhat
20  20   when we spoke earlier when you gave a summary of
21  21   your different positions, but can you tell me who
22  22   you reported to during Q3 2001?
23  23   A.   During Q3 of fiscal 2001 I reported to
24  24   Jennifer Minton.
25  25   Q.   Did you report to anybody else or was
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

25

```
 1  00025:01 that your sole report?
 2   02    A.   That was my manager, yes.
 3   03    Q.   Okay.
 4   04         And can you tell me how often you spoke
 5   05  with Jennifer Minton during the third quarter of
 6   06  2001?
 7   07    A.   It would vary.  I mean, I couldn't say it
 8   08  was the same number of times every week.
 9   09    Q.   Uh-huh.
10   10         Were there any regularly scheduled
11   11  meetings that you had with her during the third
12   12  quarter of 2001?
13   13    A.   Not that I recall.
14   14    Q.   Okay.
15   15         Did Ms. Minton have any staff meetings at
16   16  which you would attend regularly during the third
17   17  quarter of 2001?
18   18    A.   She had scheduled staff meetings.  They
19   19  weren't always regular.
20   20         I don't think I could remember exactly
21   21  when they were, but there were a few.  I don't know
22   22  how many.
23   23    Q.   Okay.
24   24         And during these staff meetings that were
25   25  held during 2000 -- third quarter of 2001, who would
```

26

```
 1  00026:01 attend those meetings?
 2   02    A.   They were over the phone, so we wouldn't
 3   03  attend in person.
 4   04    Q.   Uh-huh.
 5   05    A.   I don't remember exactly.  It would have
 6   06  been her direct reports at the time.  But I don't
 7   07  remember all of them.
 8   08    Q.   Okay.
 9   09         And were her direct reports primarily the
10   10  finance directors, people who held the same position
11   11  as you, but in other divisions, or were there other
12   12  people as well?
13   13    A.   There were other people as well.
14   14    Q.   You mentioned that these meetings were
15   15  held by phone.
16   16         Were there any materials that
17   17  disseminated prior to these meetings for the purpose
18   18  of the meeting?
19   19    A.   Not that I recall.
20   20    Q.   Okay.
21   21         Were there any meetings -- documents that
22   22  were provided at the time of the meeting?  Although
23   23  that may be difficult by phone, but generally.
24   24         It maybe the same question, in essence,
25   25  but were there any materials that you had that were
```

27

```
 1  00027:01 disseminated for the purposes of the meeting, I
 2   02  guess is my question?
 3   03    A.   Not that I recall.
 4   04    Q.   Okay.
 5   05         Were there any documents that were
 6   06  prepared as a result of these staff meetings?
 7   07    A.   Not that I recall.
 8   08    Q.   Okay.
 9   09         Do you recall how many staff meetings
10   10  occurred during third quarter of 2001?
11   11    A.   No.
12   12    Q.   Do you know whether they occurred
13   13  monthly?
14   14    A.   No, I don't.
15   15    Q.   Okay.
16   16         Do you -- can you estimate whether or not
17   17  it was more than once a month or less frequently
18   18  than that?
19   19    A.   It was likely once or more a month.
20   20    Q.   Okay.
21   21         And did you take notes at these meetings?
22   22    A.   I don't remember.
23   23    Q.   And if you did take notes, what form
24   24  would they take?
25   25         Do you type things in your computer?  Do
```

28

```
 1  00028:01 you handwrite your notes generally?
 2   02    A.   If I took notes, it would have just been
 3   03  just scribbled down on a pad of paper, something I
 4   04  needed to take action on.
 5   05    Q.   Okay.
 6   06         What were the purpose of these meetings?
 7   07    A.   Just general staff meetings.  I mean,
 8   08  touch base with her -- with her direct reports.
 9   09    Q.   Okay.
10   10         And generally, what types of subjects did
11   11  you discuss during these meetings during the third
12   12  quarter of 2001?
13   13    A.   I honestly don't remember.
14   14    Q.   Were they personnel issues or staffing
15   15  issues, that type of matter?
16   16    A.   Generally.
17   17    Q.   Okay.
18   18         Were forecasting matters discussed at
19   19  these meetings?
20   20    A.   No.
21   21    Q.   Okay.
22   22         Were actual results discussed at these
23   23  meetings?
24   24    A.   No.
25   25    Q.   Who were your direct reports during Q3
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

29

```
1   00029:01 2001?
2   02    A.   I don't remember exactly.
3   03    Q.   Okay.
4   04    A.   There was a lot going on back then.
5   05    Q.   Okay.
6   06         Actually, before we continue along that
7   07 line of questioning, I wanted to go back to one
8   08 matter.
9   09         You mentioned that you communicated with
10  10 Jennifer Minton during the third quarter of 2001.
11  11         That's a fair statement, correct?
12  12    A.   Correct.
13  13    Q.   Generally, how would you communicate with
14  14 Ms. Minton?
15  15    A.   Either by phone or email.
16  16    Q.   Okay.
17  17         And generally, did you speak to
18  18 Ms. Minton by phone on a weekly basis, on a daily
19  19 basis, if you can give me some idea?
20  20    A.   It wouldn't have been daily.  Likely
21  21 weekly.
22  22    Q.   All right.
23  23         And usually when you spoke with
24  24 Ms. Minton, was there somebody else on the line,
25  25 other than these staff meetings, or were they just
```

30

```
1   00030:01 one-on-one conversations?
2   02    A.   One-on-one conversations.
3   03    Q.   Okay.
4   04         And did you ever make notes of those
5   05 conversations?
6   06    A.   Not that I remember.
7   07    Q.   Okay.
8   08         What were the purposes of those
9   09 conversations generally.
10  10    A.   I don't think I could generalize.
11  11    Q.   Okay.
12  12         Can you tell me the types of
13  13 discussions -- type of subjects that you would cover
14  14 with Ms. Minton during your phone conversations
15  15 during the third quarter of 2001?
16  16    A.   Personnel.
17  17         Structure of the -- of my organization
18  18 likely.
19  19         We would discuss forecast later in the
20  20 quarter.
21  21         But generally, it was personnel kinds of
22  22 things.
23  23    Q.   Okay.
24  24         When you say --
25  25    A.   I'm sorry, I thought I had that shut off.
```

31

```
1   00031:01    Q.   No problem.
2   02         Do you need a moment?
3   03    A.   No, I apologize.
4   04    Q.   Not a problem.
5   05         You mentioned that you would occasionally
6   06 discuss forecasting -- forecasting issues during
7   07 some of your conversations with Ms. Minton later in
8   08 the quarter.
9   09         What do you mean by that?
10  10    A.   As action would happen against the
11  11 forecast, as items would close, as more status was
12  12 known, we would have discussions.  So that never
13  13 occurred until later in the quarter.
14  14    Q.   Okay.
15  15         By "later in the quarter," what do you
16  16 mean?  What type of time frame are you speaking of?
17  17    A.   Generally the last couple of weeks.
18  18    Q.   Okay.
19  19         And during the first month of each
20  20 quarter -- or, strike that.  Let me ask a later
21  21 question.
22  22         During the December 2000 time frame, do
23  23 you recall whether you had any conversations by
24  24 phone with Ms. Minton regarding forecasting issues?
25  25    A.   I don't recall.
```

32

```
1   00032:01    Q.   Okay.
2   02         And same question for January 2001?
3   03    A.   I was reminded of one yesterday, so --
4   04 normally I wouldn't have recalled one, but evidently
5   05 there was a conversation or at least an email
6   06 between us in January.
7   07    Q.   Okay.
8   08         All right.  Let me just step back,
9   09 because actually there is one line of questions I
10  10 didn't ask you.
11  11         Did you discuss this deposition with
12  12 anybody prior to today?
13  13    A.   Anybody at all?
14  14    Q.   Anybody at all.
15  15    A.   Just the attorneys.
16  16    Q.   Okay.
17  17         And by "the attorneys," who are you
18  18 referring to?
19  19    A.   Anna and Lauren Segal.
20  20    Q.   And Lauren Segal.  Thank you.
21  21         And when did you have those discussions
22  22 with Ms. Segal and with Ms. -- with Anna?
23  23    A.   Yesterday.
24  24    Q.   Okay.
25  25         And how long -- was that an in-person
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

33

1  00033:01  meeting?
2  02    A.  Yes.
3  03    Q.  Okay.
4  04        And how long did that meeting last?
5  05    A.  Roughly six hours.
6  06    Q.  Okay.
7  07        And was there anybody else present during
8  08 that meeting?
9  09    A.  On and off, Jina Kim.
10  10   Q.  Okay.
11  11       Do you know who Jina Kim is?
12  12   A.  She works with Anna, I understand.
13  13   Q.  Okay, okay.
14  14       And during that meeting, did you review
15 15 any documents?
16  16   A.  I did.
17  17   Q.  Okay.
18  18       Do you know what those documents were
19 19 that you reviewed?
20  20       MS. WHITE:  Objection, to the extent that
21 21 asks for disclosure of attorney/client
22 22 communications.
23 23 BY MS. LAVALLEE:
24  24   Q.  Okay.
25  25       Let me -- let me move away from that.

34

1  00034:01 Let me ask you a different question.
2  02       MR. NASTARI:  I'm sorry, the objection is
3  03 what?
4  04       MS. WHITE:  It's privileged to the extent
5  05 of that -- I mean, to the extent she is asking for
6  06 documents that did not refresh her recollection.
7  07       MR. NASTARI:  I don't necessarily agree
8  08 with you.  If you showed her documents in
9  09 preparation for deposition, we are entitled to
10  10 identification of those documents.
11  11       MS. LAVALLEE:  Well, let me ask a
12 12 different question and we can resolve this.
13  13   Q.  Ms. Kopp, did you review any documents in
14 14 preparation for today's meeting?
15  15   A.  I did.
16  16   Q.  Okay.  What documents were those?
17  17       MS. WHITE:  Same objection.
18  18       THE WITNESS:  I don't remember all of
19 19 them.
20 20 BY MS. LAVALLEE:
21  21   Q.  Okay.
22  22       Can -- do you remember any of them?
23  23   A.  I remember a couple of them.
24  24   Q.  Okay.
25  25       Can you tell me which those were?

35

1  00035:01   A.  I reviewed forecast packages that I had
2  02 prepared.
3  03       I reviewed a document that I had prepared
4  04 for the previous interview.
5  05       And I reviewed a couple of pipeline big
6  06 deal submission reports.  We call them big deal
7  07 summaries.
8  08   Q.  And anything else?
9  09   A.  I saw a couple of reports that I had not
10 10 prepared myself that I am not sure who prepared
11 11 them.
12 12   Q.  Okay.
13 13       And do you recall what those reports
14 14 were?
15 15   A.  They were just general summaries of
16 16 forecasts at different periods in time.
17 17   Q.  Okay.
18 18       And by "different periods of time," do
19 19 you recall what periods of time we are talking
20 20 about?
21 21   A.  Not specifically.
22 22   Q.  Generally, were they for the third
23 23 quarter of 2001?
24 24   A.  Yes.
25 25   Q.  Did they encompass any other periods to

36

1  00036:01 your recollection?
2  02   A.  I don't know if I remember.
3  03   Q.  All right.
4  04       Now, you mentioned something about a
5  05 previous interview.
6  06       Can I actually have her answer where she
7  07 described the documents she received read back,
8  08 please?  Documents she reviewed?
9  09       (Record read as follows:
10 10           A.  "I saw a couple of
11 11          reports that I had not
12 12          prepared myself that I am
13 13          not sure who prepared
14 14          them.")
15 15       MS. LAVALLEE:  Prior to that, the
16 16 response part to that.
17 17       (Record read as follows:
18 18           A.  "I reviewed forecast
19 19          packages that I had
20 20          prepared.
21 21          "I reviewed a document
22 22          that I had prepared for the
23 23          previous interview.
24 24          "And I reviewed a couple
25 25          of pipeline big deal

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

37

```
1    00037:01        submission reports.  We call
2    02             them big deal summaries.")
3    03  BY MS. LAVALLEE:
4    04   Q.   All right.
5    05        Ms. Kopp, you mentioned that you reviewed
6    06  documents that you prepared for the prior interview.
7    07        Can you explain what you are talking
8    08  about, please?
9    09   A.   I'm talking about the interview with
10   10  Morrison & Foerster for -- I'm not sure it's even
11   11  for the same thing.
12   12        I had created a one-page spreadsheet for
13   13  them.
14   14   Q.   Okay.
15   15        MS. WHITE:  Can I -- can I just clarify?
16   16  I think you are getting your law firms
17   17  mixed up, because I am with Morrison & Foerster.
18   18        THE WITNESS:  Sorry, I messed it up
19   19  again.
20   20        MS. LAVALLEE:  That's okay.
21   21        THE WITNESS:  Maybe I should just say --
22   22  her name's gone out of my head, the woman I
23   23  interviewed with.
24   24  BY MS. LAVALLEE:
25   25   Q.   Do you recall what the purpose of the
```

38

```
1    00038:01  interview was?
2    02   A.   Not precisely, just that I was being
3    03  asked about -- about the third quarter of fiscal
4    04  '01.
5    05   Q.   Okay.
6    06        And was it somebody who represented
7    07  the -- something called the Special Litigation
8    08  Committee?
9    09   A.   Yes, that was it.  That was it.
10   10        (Reporter interruption.)
11   11  BY MS. LAVALLEE:
12   12   Q.   Okay.
13   13        And other than the meeting you had
14   14  yesterday with your counsel, and counsel for Oracle,
15   15  did you discuss this deposition with anybody else?
16   16   A.   No.
17   17   Q.   All right.
18   18        Ms. Kopp, we were talking earlier
19   19  regarding your communications by phone with
20   20  Ms. Minton.  And I believe you had stated earlier
21   21  that you had also had communications with Ms. Minton
22   22  by email during the third quarter of 2001.
23   23        Is that correct?
24   24   A.   That's correct.
25   25   Q.   Okay.
```

39

```
1    00039:01        And how frequently were your
2    02  communications by email with Ms. Minton?
3    03        MS. WHITE:  Objection.  Form.
4    04        THE WITNESS:  Depends on what point in
5    05  the quarter and what the email was about.
6    06  BY MS. LAVALLEE:
7    07   Q.   Okay.  Well, let me ask a different
8    08  question then.
9    09        During the first month of Q3 2001, did
10   10  you communicate with Ms. Minton by email?
11   11   A.   Likely.
12   12   Q.   Okay.
13   13        Do you recall any specific emails?
14   14   A.   No, I don't.
15   15   Q.   Okay.
16   16        Generally, what -- what would have been
17   17  the nature of the communications you would have with
18   18  Ms. Minton in the first quarter -- during the first
19   19  month of the third quarter of fiscal year 2001?
20   20   A.   I can't even speculate generally from
21   21  that long ago.
22   22   Q.   Okay.
23   23        And I believe that during our prior
24   24  discussions you mentioned that you recalled one
25   25  specific conversation in January, because your
```

40

```
1    00040:01  recollection was refreshed by some documents you
2    02  have recently reviewed.
3    03        What conversation or meeting were you
4    04  talking about there?
5    05   A.   I do not know what the meeting was.
6    06        I saw a reference to a meeting that I
7    07  assumed was a meeting in an email that I had sent
8    08  her.
9    09   Q.   Okay.
10   10        And do you -- well, what -- what did the
11   11  reference --
12   12        Did the reference give any details
13   13  regarding the time of the meeting or --
14   14   A.   No.
15   15   Q.   Okay.
16   16        And do you recall, other than that email,
17   17  any other emails that you may have sent to or
18   18  received from Ms. Minton during January 2001?
19   19   A.   No.
20   20   Q.   And do you recall the -- actually, strike
21   21  that.
22   22        Now, you mentioned earlier that you don't
23   23  recall precisely who your direct reports were during
24   24  the third quarter of 2001.  Correct?
25   25   A.   Correct.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

41

```
1  00041:01     Q.  Okay.
2    02          What level employee, what would be the
3    03  title of the employees who would report directly to
4    04  you during 3Q 2001?
5    05     A.  Finance directors.
6    06     Q.  And there were more than one finance
7    07  directors during the third quarter 2001?
8    08     A.  Yes.
9    09     Q.  Okay.
10   10          And did they represent different
11   11  divisions or different areas of the company?  Why
12   12  were there more than one?
13   13     A.  They represented what we called verticals
14   14  within OSI, the business units.
15   15     Q.  Okay.
16   16          How many verticals were there during Q3
17   17  2001?
18   18     A.  Seven, not including consulting.
19   19     Q.  Okay.
20   20     A.  Which would have been separate.
21   21     Q.  Would the consulting -- the finance
22   22  director for the consulting division also report
23   23  directly to you?
24   24     A.  Yes.
25   25     Q.  Okay.
```

42

```
1  00042:01          And how many were there for consulting;
2    02  do you know?
3    03     A.  Just one.
4    04     Q.  And do you recall who -- okay.  Well, let
5    05  me ask a different question.
6    06          Is it then fair to say there were roughly
7    07  eight finance directors who reported to you directly
8    08  during Q3 2001?
9    09     A.  I believe the finance director for one of
10   10  the divisions also had the consulting division,
11   11  so . . .
12   12     Q.  Okay.  So there may have been seven then?
13   13     A.  Yeah, uh-huh.
14   14     Q.  All right.
15   15          And do you recall who any of these seven
16   16  people were?
17   17     A.  Yes.
18   18     Q.  And who would that be?
19   19     A.  John Bacak was one.
20   20     Q.  Uh-huh.
21   21     A.  Courteney Jung was one.
22   22          Alex SanJuan
23   23     Q.  Uh-huh.
24   24     A.  And I don't remember the rest.
25   25          We were shifting at that time.  I was
```

43

```
1  00043:01  newly involved, so we were looking at the
2    02  organization to see if we could get some efficiency
3    03  out of it.
4    04          I don't recall exactly how many were on
5    05  board at that point.
6    06     Q.  Okay.
7    07          And when you say you were "looking at the
8    08  organization," what do you mean?
9    09     A.  Having been newly put in that role by
10   10  Jennifer, she was under the impression that we had
11   11  too many senior level people within finance and that
12   12  we could consolidate some of those roles and save --
13   13  you know, save some money, gain some efficiencies.
14   14     Q.  Okay.
15   15          And did you have discussions with her
16   16  regarding the purpose in doing that?
17   17     A.  Yes.
18   18     Q.  Okay.
19   19          And did she communicate other than --
20   20  anything other than the general need or desire to
21   21  have a more efficient -- have it run more
22   22  efficiently?
23   23          Did she communicate any reason why she
24   24  wanted to do that?
25   25     A.  That we -- OSI had been out of line with
```

44

```
1  00044:01  the other groups; that we had -- per head, for the
2    02  revenue that it was generating, had too many senior
3    03  finance people.
4    04     Q.  And how long did it take to effectuate
5    05  that streamlining?
6    06     A.  I don't remember.
7    07     Q.  Do you know if it was completed during
8    08  the third quarter of 2001?
9    09     A.  I don't believe it was.
10   10     Q.  Did that take up a significant portion of
11   11  your time, effectuating the concept of streamlining
12   12  during the third quarter of 2001?
13   13          MR. NADOLENCO:  Objection to form.
14   14  BY MS. LAVALLEE:
15   15     Q.  Do you understand the question?
16   16     A.  I do.
17   17     Q.  Okay.
18   18     A.  No.
19   19     Q.  I'm sorry?
20   20          (Reporter interruption.)
21   21          THE WITNESS:  It did not.
22   22  BY MS. LAVALLEE:
23   23     Q.  Did you can you explain to me what your
24   24  responsibilities were during the third quarter of
25   25  2001?
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

45

1  00045:01   A.   During the third quarter of fiscal 2001,
2  02  I had responsibility for forecasting, for
3  03  preparation of -- or supervisory role in preparation
4  04  of financial analysis for compensation-related
5  05  issues.
6  06   Q.   Anything else?
7  07   A.   For the beginning of budgeting for the
8  08  upcoming fiscal year, for fiscal '02.
9  09   Q.   Uh-huh.
10  10   Anything else that you can think of?
11  11   A.   Most things fall under one of those.
12  12   Q.   Okay.
13  13   You mentioned that you were involved in
14  14  budgeting for the upcoming quarter in the third
15  15  quarter of fiscal year 2001.
16  16   Were you involved -- is that correct?
17  17   A.   No.
18  18   I think what I said was I was responsible
19  19  for the starting of the budgeting process for the
20  20  upcoming year.
21  21   Q.   Okay.
22  22   A.   Fiscal '02.
23  23   Q.   Okay.
24  24   And were you actually involved in that
25  25  same process for fiscal year 2001 at a prior time?

46

1  00046:01   MS. WHITE: Objection.  Form.
2  02  BY MS. LAVALLEE:
3  03   Q.   Do you understand my question?
4  04   A.   I think so.
5  05   Q.   Okay.
6  06   Let me ask another question.  You seem a
7  07  little uncertain.
8  08   You mentioned you were involved in just
9  09  starting the budgeting process for fiscal year 2002.
10  10   Were you -- did you have --
11  11   Did you have similar involvement for the
12  12  budgeting or commencement of the budgeting process
13  13  for fiscal year 2001?
14  14   A.   Not the same level.  I was in a different
15  15  role then, so not at the OSI level.
16  16   Q.   Okay.
17  17   And what was your role in budgeting for
18  18  fiscal year 2001?
19  19   A.   For fiscal year 2001, was pushing down
20  20  targets to the federal and financial services groups
21  21  only.
22  22   Q.   Okay.
23  23   Can you explain for me what the term
24  24  "pushing down targets" mean?
25  25   A.   Targets had been assigned already at a

47

1  00047:01  higher level.
2  02   We were given targets and asked to build
3  03  budgets to support those targets or bridge gaps
4  04  between the targets.
5  05   Q.   And what do you mean by "build gaps
6  06  between targets"?
7  07   A.   "Bridge gaps."
8  08   Q.   "Bridge gaps," I apologize.
9  09   What do you mean by that?
10  10   A.   I mean if we are given a target, we build
11  11  up to the best of our ability from the understanding
12  12  of the sales managers what the capabilities are of
13  13  the division, and determine whether the targets that
14  14  have been pushed down are reasonable.
15  15   Q.   Okay.
16  16   And what -- for what division of Oracle
17  17  did you have this role in connection with the
18  18  budgeting process for fiscal year 2001?
19  19   A.   For federal financial services and for
20  20  consulting, for OSI consulting.
21  21   Q.   Was there any back and forth between the
22  22  division heads and the people setting the targets in
23  23  terms of what an appropriate target was, during the
24  24  budgeting process for fiscal year 2001?
25  25   MS. WHITE: Objection.  Form.

48

1  00048:01  BY MS. LAVALLEE:
2  02   Q.   Do you understand my question?
3  03   A.   I do understand the question.
4  04   But I wouldn't have had knowledge of
5  05  anything outside of my area.
6  06   Q.   Okay.
7  07   So your area wasn't -- did not involve
8  08  actually the setting of the target or any
9  09  negotiation about the appropriateness of the target
10  10  or the --
11  11   A.   No.
12  12   Q.   Okay.  Thank you.
13  13   A.   No.
14  14   MS. WHITE: It's important to let her
15  15  finish her question, it gives a clear record.
16  16   THE WITNESS: Okay, okay.
17  17  BY MS. LAVALLEE:
18  18   Q.   And when did you start the budgeting
19  19  process for fiscal year 2002?
20  20   A.   I don't remember exactly.
21  21   Q.   Do you have any idea generally what month
22  22  that would have been in?
23  23   A.   Generally that month -- generally it
24  24  starts during January or February.
25  25   Q.   And during January or February 2001, what

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

49

```
1   00049:01 was your role in the budget process for fiscal year
2   02 2002?
3   03    A.   At that time, we would project forward
4   04 our forecast for the current quarter and for the
5   05 final quarter of the current fiscal year, and
6   06 estimate a reasonable growth target and
7   07 profitability target for the upcoming year.
8   08    Q.   Do you recall what -- what growth target
9   09 you were projecting for fiscal year 200 -- I'm
10  10 sorry, for the fourth quarter of 2001 in the
11  11 January/February 2001 time frame?
12  12        MS. WHITE:  Objection.  Form.
13  13        THE WITNESS:  No, I don't recall.
14  14 BY MS. LAVALLEE:
15  15    Q.   Do you recall generally whether or not it
16  16 was -- you were targeting a growth for OSI for Q4
17  17 2001?
18  18        MS. WHITE:  Objection.  Form.
19  19        THE WITNESS:  I don't understand what you
20  20 mean, so --
21  21 BY MS. LAVALLEE:
22  22    Q.   Okay, that's fair.
23  23        Do you recall whether or not the company
24  24 was projecting that there would be growth for the
25  25 fourth quarter of 2001 in the month of January or
```

50

```
1   00050:01 February 2001?
2   02        MS. WHITE:  Objection.  Form.
3   03        THE WITNESS:  Growth over --
4   04 BY MS. LAVALLEE:
5   05    Q.   Year over year?
6   06    A.   So from Q4 of '00 to Q4 of '01, no, I
7   07 don't recall.
8   08    Q.   Okay.
9   09        When you referred to "growth" earlier,
10  10 what did you mean by that?  What kind of comparison
11  11 were you talking about?
12  12    A.   Year over year.
13  13    Q.   Okay.
14  14        Is that generally how the finance group
15  15 or you in your capacity at Oracle looked at growth
16  16 rates?
17  17    A.   Typically.
18  18    Q.   And why was that?  Why was that the
19  19 standard; do you know?
20  20    A.   No, I don't know.
21  21    Q.   Okay.
22  22        And you say "typically," were there
23  23 exceptions to that?
24  24    A.   Occasionally we'll look at sequential
25  25 growth, which is one quarter over the previous
```

51

```
1   00051:01 quarter, but not very frequently.
2   02    Q.   Okay.
3   03        And why, in what instances would you
4   04 choose to look at sequential growth?
5   05    A.   I actually didn't.
6   06        But I have seen reports where other
7   07 organizations had tracked that as a metric.
8   08    Q.   Okay.
9   09        And do you recall what organizations they
10  10 were?
11  11    A.   NAS, North America Sales.
12  12    Q.   Okay.
13  13        And are you speaking now specifically
14  14 about third quarter 2001 or just generally?
15  15    A.   Just generally.
16  16    Q.   Okay.
17  17        And do you have any understanding as to
18  18 why they were looking at sequential growth?
19  19    A.   No I don't.
20  20    Q.   But you, yourself, in terms of your
21  21 capacity as finance director of OSI did not look at
22  22 growth rates sequentially from quarter to quarter.
23  23        Is that correct?
24  24    A.   That's correct.
25  25    Q.   And who did you deal with when you --
```

52

```
1   00052:01        Who did you work with in your
2   02 responsibilities for the budgeting process for
3   03 fiscal year 2001?
4   04        MS. WHITE:  Objection.  Form.
5   05        MS. LAVALLEE:  Strike that.  Let me
6   06 ask --
7   07        That's not the question I wanted to ask.
8   08    Q.   Who did you work with in working on the
9   09 budgeting process for fiscal year 2002?
10  10    A.   Many people.
11  11    Q.   Okay.  That's fair.
12  12        Can you explain to me what the budgeting
13  13 process was at -- in this January 2001 time frame
14  14 for fiscal year 2002?
15  15    A.   I couldn't say January specific, because
16  16 again, I'm not sure that it started in January or
17  17 February.
18  18    Q.   Okay.
19  19        Well, can you answer that question for
20  20 both January and February then?
21  21    A.   Certainly.
22  22        At that time there would have been just
23  23 very high level discussions taking place between me,
24  24 Jay Nussbaum, and Terry Ford, his operations lead
25  25 then.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

53

1  00053:01    (Reporter interruption.)
2  02 BY MS. LAVALLEE:
3  03    Q.  And anybody else?
4  04    A.  Not that I remember.
5  05    Q.  Was Ms. Minton involved in this process?
6  06    A.  Not at that point.
7  07    Q.  Okay.
8  08       And can you explain for me what these
9  09 high level discussions involved during the
10 10 January/February time frame?
11 11    A.  Not exactly.
12 12    Q.  Can you generally tell me what you mean
13 13 by "high level discussions"?
14 14    A.  At that point we would be looking at what
15 15 we were going to need to prepare later for budgets,
16 16 what Jay would think a reasonable kind of growth
17 17 rate would be, and we'd likely just model a couple
18 18 of scenarios for him.
19 19       Those are very early planning stages.
20 20    Q.  Okay.
21 21       And was there any communications other
22 22 than the high level discussions, were there any --
23 23 strike that.
24 24       Other than these high level discussions,
25 25 were you involved in any other tasks for the

54

1  00054:01 budgeting of fiscal year 2002 in the
2  02 January/February 2001 time frame?
3  03    A.  Not that I recall.
4  04    Q.  In terms of these high level discussions,
5  05 were there -- was there ever any input or
6  06 communications with the division level salespeople
7  07 or their managers?
8  08    A.  I don't think so.
9  09    Q.  Did you ever have any communications with
10 10 Mr. Henley in the third quarter of 2001 regarding
11 11 budgeting, either for fiscal -- well let's start
12 12 with fiscal year 2001?
13 13    A.  In the third quarter?
14 14    Q.  Yes.
15 15    A.  No, I did not.
16 16    Q.  Okay.  And maybe my question wasn't clear
17 17 so I'm going to ask it -- phrase it slightly
18 18 differently.
19 19       Did you ever have any discussions with
20 20 Mr. Henley regarding any budget rates, targets, or
21 21 numbers for fiscal year 2001 during the --
22 22    A.  No.
23 23    Q.  -- third quarter of 2001?
24 24    A.  No.
25 25    Q.  Okay.

55

1  00055:01       And did you ever have discussions
2  02 regarding this subject with Ms. Minton during the
3  03 2000 -- third quarter of 2001?
4  04    MS. WHITE:  Objection.  Form.
5  05    THE WITNESS:  Other than -- other than
6  06 timelines, no.
7  07 BY MS. LAVALLEE:
8  08    Q.  Okay.
9  09       And what do you mean by "timelines"?
10 10    A.  During that time frame is when we are
11 11 usually told what our deadlines are going to be for
12 12 preparation of budgets.
13 13       So to the extent that she would have
14 14 communicated to us those deadlines, we would have
15 15 talked.  We would not have talked about specific
16 16 targets at that point.
17 17    Q.  Okay.  And actually, maybe my question
18 18 wasn't clear.
19 19       I'm speaking now in terms of budget
20 20 numbers for fiscal year 2001.
21 21       So what I was -- what I'm asking is
22 22 whether or not you had any communications regarding
23 23 budget numbers or targets for fiscal year 2001 in
24 24 the third quarter of 2001.
25 25    MS. WHITE:  Objection.  Form.

56

1  00056:01 BY MS. LAVALLEE:
2  02    Q.  Do you understand my question?
3  03    A.  Yes, I do.
4  04    Q.  All right.
5  05    A.  Not specifically.
6  06    Q.  Okay.
7  07       And generally, do you recall any such
8  08 discussions?
9  09    A.  I recall a discussion about reporting
10 10 budget numbers.  But not about the substance of the
11 11 numbers themselves.
12 12    Q.  Okay.
13 13       And what was your -- was this one
14 14 communication that you are speaking now of regarding
15 15 the reporting of budgeting numbers?
16 16    A.  I don't remember exactly when it took
17 17 place.
18 18    Q.  Okay.
19 19       And are you --
20 20    A.  But I believe there was a discussion.
21 21    Q.  Okay.
22 22       And do you recall what the discussion was
23 23 about?
24 24    A.  It was on the format of a reporting
25 25 package.

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

57

```
1    00057:01    Q.   Do you recall any details regarding that
2    02   discussion?
3    03       A.   Only that we were changing the format of
4    04   the package to reflect year-over-year growth.
5    05       Q.   And when you refer to "package," what
6    06   package are you talking about?
7    07       A.   The North America license package.  We
8    08   call it the "green book."
9    09       Q.   Okay.
10   10           And how were you changing the format?
11   11       A.   We were changing the format to show
12   12   actual results in terms of prior year growth as
13   13   opposed to in terms of budget.
14   14       Q.   And what was your role in the decision
15   15   making for that change?
16   16       A.   I had no role, no decision.
17   17       Q.   Do you know who made the decision to
18   18   change the formatting?
19   19       A.   I don't know ultimately who did.
20   20           We were told by Jennifer to make the
21   21   change.
22   22       Q.   Okay.
23   23           And do you know why that change was
24   24   effectuated?
25   25       A.   We were told that the budget was not
```

58

```
1    00058:01   relevant.  It was not a relevant factor to be
2    02   measured for the -- for purposes of the package.
3    03       Q.   And do you know why it was not relevant?
4    04       A.   No, I don't.
5    05       Q.   Was there a change in the budgeting
6    06   process at that time?
7    07           MS. WHITE:  Objection.  Form.
8    08   BY MS. LAVALLEE:
9    09       Q.   Or -- let me ask a different question.
10   10           Was there a change in the budgeting
11   11   process from fiscal year 2001 and fiscal year 2002?
12   12           MS. WHITE:  Objection.  Form.
13   13           THE WITNESS:  I wouldn't know.
14   14   BY MS. LAVALLEE:
15   15       Q.   Okay.
16   16           Ms. Kopp, did you review the summary that
17   17   was prepared by the Special Litigation Committee of
18   18   their meeting with you?
19   19       A.   I did.
20   20       Q.   Okay.
21   21           And when was the first time you reviewed
22   22   that?
23   23       A.   Tuesday of this week.
24   24       Q.   Okay.
25   25           And had you -- that was the first time
```

59

```
1    00059:01   you ever reviewed the package, the summary?
2    02       A.   Yes.
3    03       Q.   Okay.
4    04           And did it accurately reflect your
5    05   discussions with the Special Litigation Committee?
6    06       A.   For the most part.
7    07           There were a couple of areas that didn't,
8    08   to my recollection, accurately reflect it.
9    09       Q.   Okay.
10   10           And do you recall right now what those
11   11   areas were?
12   12       A.   It would be easier for me to -- I could
13   13   point them out in the document.
14   14       Q.   Okay.
15   15           We'll probably get to that.
16   16       A.   Okay.
17   17       Q.   Let me just continue where we're at here.
18   18           Do you recall specifically telling SLC
19   19   that the budgeting process for fiscal year 2001 was
20   20   different -- actually, let me ask a different
21   21   question.
22   22           Can you explain to me what the difference
23   23   between the budget rate that -- actually, let me ask
24   24   a different question.
25   25           When a budget is prepared and is
```

60

```
1    00060:01   finalized, what do you call the numbers that --
2    02   well, the revenue numbers for a particular -- for
3    03   example, the license division for OSI, do you recall
4    04   that a target or do you call it a forecast, the
5    05   projected number?
6    06           MS. WHITE:  Objection.  Form.
7    07   BY MS. LAVALLEE:
8    08       Q.   Do you understand my question?
9    09       A.   If you are talking about the budget.
10   10       Q.   Yes.
11   11       A.   Because you said two things, you said the
12   12   projected number.  And the projected number and the
13   13   budget aren't necessarily the same thing.
14   14       Q.   Okay.
15   15       A.   So if you're just -- if you're talking
16   16   about the budget, the budget we refer to
17   17   interchangeably as target.
18   18       Q.   Okay.  So the budget number and the
19   19   target number are the same thing?
20   20       A.   Typically.
21   21       Q.   Okay.
22   22           How -- is it fair to say that the budget
23   23   number and the forecast number are two different
24   24   things?
25   25       A.   Yes.
```

61

```
1   00061:01   Q.  Okay.
2   02        And the budget numbers finalize generally
3   03   for -- let me ask a different question.
4   04        For fiscal year 2001, are budget numbers
5   05   compiled or finalized for each quarter of the
6   06   upcoming year, for the fiscal 2001 year?
7   07   A.  I'm not sure I understand the question.
8   08   Q.  Okay.
9   09        When there are budget targets that are
10  10   set, are they set for each quarter of the fiscal
11  11   year or for the year as a whole?
12  12   A.  Each quarter.
13  13   Q.  Okay.
14  14        And how is the -- you said earlier that
15  15   the budget or the target number is different from
16  16   the forecasting number, correct?
17  17   A.  Generally.
18  18   Q.  Okay.
19  19        And how is the forecast number compiled
20  20   for each quarter?
21  21        And if that's not a fair question, please
22  22   tell me why.
23  23        MR. NADOLENCO:  Objection.  Form.
24  24        THE WITNESS:  You would have to be more
25  25   specific in terms of are we talking about consulting
```

62

```
1   00062:01   or license, and what time period are we talking
2   02   about?
3   03   BY MS. LAVALLEE:
4   04   Q.  Okay.
5   05        Is there -- when the budget is prepared
6   06   for the fiscal year, is -- or when the budget was
7   07   prepared for fiscal year 2001, was there a budget
8   08   for both license and for consulting for OSI?
9   09   A.  Yes.
10  10   Q.  Okay.
11  11        During fiscal year 2003, was there any
12  12   comparison made of the budget over the target number
13  13   for OSI for either license or consulting with the
14  14   forecast number?
15  15        MS. WHITE:  Objection.  Form.
16  16        MR. NADOLENCO:  And, Counsel, did you say
17  17   "fiscal 2003"?  Did you mean to say "fiscal 2003"?
18  18        MS. LAVALLEE:  No, I did not.
19  19        THE WITNESS:  Okay, that was what --
20  20   BY MS. LAVALLEE:
21  21   Q.  Okay.  Let me rephrase my question then.
22  22        I'm talking about fiscal year 2001.  And
23  23   in the third quarter of fiscal 2001, was any
24  24   comparison made between the budget or target rate
25  25   for OSI, either license or consulting or both
```

63

```
1   00063:01   together, with the forecast for OSI?
2   02        MS. WHITE:  Objection.  Form.
3   03        THE WITNESS:  I wouldn't know if -- where
4   04   they were.  I mean, there may have been.
5   05   BY MS. LAVALLEE:
6   06   Q.  Okay.
7   07        So you personally did not compare the
8   08   two -- the budget with the forecast numbers?
9   09   A.  I don't recall.
10  10   Q.  Okay.
11  11        Do you recall whether or not there was
12  12   any difference between the budget and forecast
13  13   number for the fiscal year -- for the third quarter
14  14   fiscal year 2001?
15  15   A.  No.
16  16   Q.  Okay.
17  17        THE VIDEOGRAPHER:  The time is
18  18   We are off the record.
19  19        (Break taken.)
20  20        THE VIDEOGRAPHER:  The time is 10:37.
21  21        On the record.
22  22   BY MS. LAVALLEE:
23  23   Q.  Ms. Kopp, did you discuss your deposition
24  24   with anybody during the break today?
25  25   A.  No.
```

64

```
1   00064:01   Q.  Okay.
2   02        Do you recall -- actually, what I'm going
3   03   to is I'm going to read a passage that was in the
4   04   SLC summary.  And can you tell me --
5   05        Well, I'll ask some follow-up questions
6   06   after.
7   07        "Kopp stated that sometime
8   08        in the middle of FY 2001,
9   09        Ellison realized that Oracle
10  10        was not going to reach its
11  11        budgeted numbers for that
12  12        year.  And instead of
13  13        rebudgeting, Ellison
14  14        directed personnel to report
15  15        results versus the prior
16  16        fiscal year as opposed to
17  17        versus budget for current
18  18        year.  She added that Oracle
19  19        forecasted below budget for
20  20        much of FY 2001."
21  21        Ms. Kopp, do you recall this testimony?
22  22        MR. NADOLENCO:  Objection to form.
23  23        MS. WHITE:  Same objection.
24  24   BY MS. LAVALLEE:
25  25   Q.  You can answer the question, if you
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

65

```
1   00065:01 understand it.
2   02    A.  I recall the testimony in general.
3   03    Q.  Okay.
4   04    A.  I don't recall that particular statement.
5   05    Q.  Okay.
6   06        Do you -- do you believe that that
7   07 statement accurately reflects your discussion with
8   08 the SLC?
9   09    A.  No, not at the time I don't.
10  10        My recollection was what I had told you
11  11 previously.
12  12    Q.  Okay.
13  13    A.  That it was -- we were told the budget
14  14 was irrelevant.
15  15        I do not recall making the statement that
16  16 it was because we were behind budget or even that we
17  17 were behind budget.
18  18    Q.  Okay.
19  19        And do you recall -- well, do you have
20  20 any basis to believe that the statement is
21  21 inaccurate?
22  22        MR. NADOLENCO:  Objection.  Form.
23  23        MS. WHITE:  Objection.  Form.
24  24 BY MS. LAVALLEE:
25  25    Q.  Can you answer the question?
```

66

```
1   00066:01   A.  I don't know.
2   02    Q.  Sitting here today, you do not recall
3   03 whether there was a reason provided for why the
4   04 budgeting was changed; is that correct?
5   05    A.  The reason --
6   06        MS. WHITE:  Wait.
7   07        Objection.  Form.
8   08        THE WITNESS:  The reason provided was
9   09 that the budget was irrelevant.
10  10 BY MS. LAVALLEE:
11  11    Q.  Okay.
12  12        And you don't -- do you recall whether or
13  13 not any other additional detail was provided at that
14  14 time?
15  15    A.  No.
16  16    Q.  Let me read you another passage from the
17  17 summary of the SLC interview.
18  18        "Kopp noted that the
19  19        budgeting process for the
20  20        current fiscal year (FY
21  21        2003) is different than in
22  22        years past.  She stated that
23  23        in prior years, the budget
24  24        was formulated in a top-down
25  25        fashion based on targeted
```

67

```
1   00067:01        growth rates.
2   02        "She emphasized that
3   03        current budget is much" --
4   04        pardon me, "is more
5   05        realistic in terms of
6   06        achievable revenue and
7   07        margin targets in light of
8   08        the downturn in the
9   09        economy."
10  10        Ms. Kopp, do you believe that that
11  11 passage accurately reflects your discussions with
12  12 the SLC?
13  13    A.  Yes.
14  14    Q.  And do you believe that to be a true
15  15 statement, what is stated in this passage?
16  16    A.  I do.
17  17    Q.  Can you explain to me what you referred
18  18 to when you said that "the budget was formulated in
19  19 a top-down fashion based on targeted growth rates"?
20  20    A.  My understanding of previous budget
21  21 submissions were that the budget targets were set at
22  22 a higher level.
23  23        And the ones that we were doing for the
24  24 upcoming year, for fiscal '03, we were given no
25  25 targets.  We were just told to come in with what we
```

68

```
1   00068:01 thought made sense.
2   02    Q.  Okay.
3   03        And do you personally believe that the
4   04 current budget is more realistic in terms of
5   05 achievable revenue in margin targets in light of the
6   06 downturn in the economy?
7   07        MS. WHITE:  Objection.  Form.
8   08        THE WITNESS:  When you say "the current
9   09 year," are you talking about fiscal '03?
10  10 BY MS. LAVALLEE:
11  11    Q.  Correct.
12  12    A.  It's hard to say.
13  13    Q.  Okay.
14  14        Do you recall making this statement to
15  15 the SLC?
16  16    A.  I do.
17  17    Q.  Okay.
18  18        And can you tell me what you meant by
19  19 this statement?
20  20    A.  I meant that -- not necessarily that they
21  21 are more achievable, but in the eyes of the people
22  22 setting the targets, they were more achievable.
23  23    Q.  And who are those people in terms -- "the
24  24 people setting the targets," what do you mean by
25  25 that?
```

69

1  00069:01    A.  They would have been -- at that point,
2  02  they would have been Mr. Nussbaum, Mr. Roberts, the
3  03  leads reporting in to Larry.
4  04    Q.  Do you know who made that change in the
5  05  budgeting process for fiscal year 2003?
6  06    MS. WHITE:  Objection.  Form.
7  07    THE WITNESS:  No, I don't.
8  08  BY MS. LAVALLEE:
9  09    Q.  Can you tell me what -- actually, let me
10  10  ask a different question.
11  11    You discussed -- we discussed earlier
12  12  some of your responsibilities in Q3 2001.  And I
13  13  believe that you indicated that you were involved in
14  14  the supervising and the preparation of financial
15  15  analysis.
16  16    Is that correct?
17  17    A.  That's correct.
18  18    Q.  Okay.
19  19    What do you mean by "financial analysis"?
20  20    A.  Reporting against prior year, reporting
21  21  data, extracting data from our internal systems and
22  22  generating reports of that data.
23  23    Q.  Okay.
24  24    And can you tell me what regular reports
25  25  were generated for OSI during Q3 2001 for the

70

1  00070:01  forecasting process?
2  02    A.  For the forecasting process?
3  03    Q.  (Nods head.)
4  04    A.  There was a forecast package --
5  05    Q.  Yes.
6  06    A.  -- for Mr. Nussbaum.
7  07    There was a -- what we called a big deals
8  08  breakdown, which was a listing of deals greater than
9  09  500 k.
10  10    Q.  Anything else?
11  11    A.  Not on a regular basis that I recall.
12  12    Q.  Okay.
13  13    Were there any -- do you recall any other
14  14  reports ever prepared in fiscal year 2000 -- 2001,
15  15  the third quarter?
16  16    A.  By me?
17  17    Q.  By anybody for OSI forecasting.
18  18    MS. WHITE:  Objection.  Form.
19  19    THE WITNESS:  I wouldn't know all of
20  20  the --
21  21  BY MS. LAVALLEE:
22  22    Q.  Okay.
23  23    Can you tell me which ones you are aware
24  24  of?
25  25    A.  There was an Americas Forecast Package

71

1  00071:01  that consolidated the data of the groups.
2  02    Q.  Uh-huh.
3  03    Anything else?
4  04    A.  Not that I am aware of.
5  05    Q.  Okay.
6  06    And the forecast package for
7  07  Mr. Nussbaum, was that something that you prepared
8  08  or oversaw the preparation of?
9  09    A.  Is that an either or question is it --
10  10    Q.  Okay.  Let me -- let me break that down
11  11  then.
12  12    Did you prepare the forecast package for
13  13  Mr. Nussbaum in the third quarter of 2001?
14  14    A.  Someone on my staff did.
15  15    Q.  Okay.  Who was that person?
16  16    A.  Fred Avila, A-v-i-l-a.
17  17    Q.  And how frequently was a forecast package
18  18  prepared during the third quarter of 2001?
19  19    A.  To the best of my recollection, it
20  20  followed the forecast cycle, the corporate forecast
21  21  schedule, which was once every other week the first
22  22  two months of a quarter, and once a week the last
23  23  month of a quarter.
24  24    Q.  And followed -- you said follow the
25  25  corporate schedule or forecast schedule.

72

1  00072:01    Was it prepared in -- well, was it
2  02  prepared on a particular day?
3  03    A.  I don't remember.
4  04    Q.  Okay.
5  05    And you said it was prepared for
6  06  Mr. Nussbaum, what did you mean by that?
7  07    A.  I mean I prepared the package for him.
8  08    Q.  Okay.
9  09    What data was -- was the data used to
10  10  compile those reports?
11  11    MS. WHITE:  Objection.  Form.
12  12  BY MS. LAVALLEE:
13  13    Q.  Can you answer the question?
14  14    A.  It came from our financial analyzer
15  15  system, which captures P and L data, revenue expense
16  16  head count.
17  17    And it came from Oracle Sales Online
18  18  which captures the deal information.
19  19    Q.  Okay.
20  20    And you referred to "P and L," what do
21  21  you mean by that?
22  22    A.  I mean raw revenue and expense data and
23  23  head count.
24  24    Q.  Okay.
25  25    And did it come from any other sources,

73

```
1   00073:01 the material, the data they used to prepare the
2   02 forecast package for Mr. Nussbaum during the third
3   03 quarter of 2001?
4   04    A.   Not that I recall.
5   05    Q.   And was it Mr. Avila who actually
6   06 obtained the information from Oracle -- Oracle
7   07 financial analyst program?
8   08    A.   It would have been Fred or he had someone
9   09 working for him at the time named Shane Gorman --
10  10    Q.   Uh-huh.
11  11    A.   -- who may have actually done the data
12  12 extraction.
13  13    Q.   Okay.
14  14        And was -- is the Oracle financial
15  15 analyzer also referred to as OFA?
16  16    A.   Yes, it is.
17  17    Q.   Okay.
18  18        And is that something that you personally
19  19 had access to?
20  20    A.   Yes.
21  21    Q.   And did you personally access information
22  22 on that system directly yourself during the third
23  23 quarter of 2001?
24  24    A.   I don't remember.
25  25    Q.   As a matter of course, during a quarter
```

74

```
1   00074:01 would you personally do that, generally?
2   02    A.   No.
3   03    Q.   And did Mr. Avila obtain the information
4   04 from the OSO system -- you referred, actually,
5   05 earlier to the Oracle Sales Online system.
6   06        Is that known as the OSO?
7   07    A.   Yes.
8   08    Q.   Okay.
9   09        And did he personally obtain the data
10  10 from the OSO system?
11  11    MR. NADOLENCO:   Objection to form.
12  12    THE WITNESS:   Either he or Shane would
13  13 have.
14  14 BY MS. LAVALLEE:
15  15    Q.   Okay.
16  16        And did you personally have access to the
17  17 OSO system?
18  18    A.   Yes.
19  19    Q.   Okay.
20  20        And did you personally during the third
21  21 quarter of 2001, access that system online directly?
22  22    A.   Yes, I did.
23  23    Q.   Okay.
24  24        And did you do that routinely during the
25  25 third quarter fiscal 2001?
```

75

```
1   00075:01    A.   I'm not sure what you mean by
2   02 "routinely."
3   03    Q.   Okay.
4   04        Did you do that on more than one occasion
5   05 during third quarter fiscal year 2001?
6   06    A.   Yes.
7   07    Q.   Okay.
8   08        And did you do that for a specific
9   09 purpose every time?
10  10    MS. WHITE:   Objection.  Form.
11  11    THE WITNESS:   No.
12  12 BY MS. LAVALLEE:
13  13    Q.   Okay.
14  14        Did you do that randomly or was there a
15  15 set time during the course of the quarter when you
16  16 would access information on the OSO?
17  17    A.   Randomly.
18  18    Q.   Can you tell me what for forecast data is
19  19 contained on the OSO system?
20  20    A.   I couldn't say everything.
21  21    Q.   What you're aware of?
22  22    A.   Customer name.
23  23        A description of the opportunity.
24  24        There is an opportunity number.
25  25        A close date.
```

76

```
1   00076:01        There is a product categorization.
2   02        There is a sales group and a sales rep.
3   03    Q.   Anything else?
4   04    A.   Not off the top of my head.
5   05    Q.   Okay.
6   06        And when you refer to "opportunity
7   07 number," what does that mean?
8   08    A.   When an opportunity is entered into the
9   09 system, there is a unique opportunity number that is
10  10 generated by the system to identify that
11  11 opportunity.
12  12    Q.   Okay.
13  13        So it's basically each separate
14  14 opportunity has its own distinct number; is that
15  15 correct?
16  16    A.   That's correct.
17  17    Q.   And how frequently were the forecast
18  18 packages -- oh, strike that, I think we covered
19  19 that.
20  20        What information was contained on the
21  21 forecast package from Mr. Nussbaum during the third
22  22 quarter of 2001?
23  23    A.   There was a license --
24  24    MS. WHITE:   Objection.  Form.
25  25    THE WITNESS:   There was a license and
```

77

1   00077:01 consulting revenue, and expense and margin forecast,
2   02  as well as a breakdown of the license forecast
3   03  between applications and technology revenue, and the
4   04  pipeline between applications and technology
5   05  pipeline.
6   06       And there was a page covering consulting
7   07  projected bookings.
8   08 BY MS. LAVALLEE:
9   09   Q.   And what do you mean by "projected
10  10 bookings"?
11  11   A.   Forecasted consulting engagements to be
12  12 booked.
13  13       Not revenue to the company, because it's
14  14 measured differently in consulting, but funding for
15  15 projects.
16  16   Q.   Okay.  Thank you.
17  17       Who else received -- did you personally
18  18 receive the forecast package from Mr. Nussbaum
19  19 during the third quarter 2001?
20  20   A.   I did.
21  21   Q.   Okay.  And you reviewed that?
22  22   A.   I did.
23  23   Q.   And who was that forecast package
24  24 disseminated to during the third quarter of 2001?
25  25   A.   Jay Nussbaum and Terry Ford.

78

1   00078:01   Q.   Anybody else?
2   02   A.   Not that I remember.
3   03   Q.   Okay.
4   04       And you mentioned the big deals breakdown
5   05 report; is that correct?
6   06   A.   Uh-huh.
7   07   Q.   Okay.
8   08       Who prepared that report?
9   09   A.   Fred Avila.
10  10   Q.   Okay.
11  11       And that was at your direction as well?
12  12   A.   It was.
13  13   Q.   All right.
14  14       And what -- what -- where was the data
15  15 obtained that formed the basis of the information
16  16 contained in this report during the third quarter of
17  17 2001?
18  18   A.   OSO.
19  19   Q.   Anywhere else?
20  20   A.   So there was a period of time where we
21  21 add comments to that spreadsheet, a comment column,
22  22 a status column.
23  23   Q.   Uh-huh.
24  24   A.   And that information was generally
25  25 obtained not out of the system, but via

79

1   00079:01 conversations.
2   02   Q.   Okay.
3   03       And conversations with who?
4   04   A.   Generally with -- between my finance
5   05 directs and the division leads under Jay.
6   06   Q.   And do you know who those division leads
7   07 were for Q3 2001?
8   08   A.   For federal and financial services, they
9   09 were Steve Perkins.
10  10       Jim O'Neill was running
11  11 telecommunications and utilities.
12  12       I don't remember who was running state
13  13 and local at that time.
14  14       Joe Duffy was running higher education
15  15 and health care.
16  16   Q.   Okay.
17  17       And they then provided the information to
18  18 Ms. Avila and he put it on the report.
19  19       Is that correct?
20  20   A.   That's correct.
21  21   Q.   Okay.
22  22       Let me step back and ask a question about
23  23 the forecast package for Mr. Nussbaum.
24  24       How do you provide that forecast package
25  25 to Mr. Nussbaum.

80

1   00080:01   A.   Electronically via email, and in paper
2   02 form.
3   03   Q.   Okay.
4   04       And did you maintain either email or hard
5   05 copies of these reports personally?
6   06   A.   I maintained electronic copies.
7   07   Q.   Okay.
8   08       And where did you maintain these?
9   09   A.   On my hard drive.
10  10   Q.   Anywhere else?
11  11   A.   No.
12  12   Q.   Okay.
13  13       And did you ever discuss the -- these
14  14 forecast package or the contents thereof with
15  15 Mr. Nussbaum after providing him with the package?
16  16   A.   Yes.
17  17   Q.   Okay.
18  18       And did you do that -- how did you do
19  19 that?
20  20   A.   It varied.
21  21   Q.   It varied.  Okay.
22  22       Did you have telephonic conversations
23  23 regarding material with Mr. Nussbaum?
24  24   A.   No.
25  25   Q.   Did you have one-on-one conversations

81

| | | |
|---|---|---|
| 1 | 00081:01 | with Mr. Nussbaum regarding the forecast packages? |
| 2 | 02 | A.   Yes. |
| 3 | 03 | Q.   And how often did you have such |
| 4 | 04 | communications with Mr. Nussbaum? |
| 5 | 05 | A.   Infrequently. |
| 6 | 06 | Q.   By "infrequently," do you mean -- did you |
| 7 | 07 | have -- let me ask a different question. |
| 8 | 08 | Did you have a conversation with |
| 9 | 09 | Mr. Nussbaum after each forecast package or only |
| 10 | 10 | after some during the third quarter of 2001? |
| 11 | 11 | A.   Only after some. |
| 12 | 12 | Q.   Okay. |
| 13 | 13 | And do you recall which ones today? |
| 14 | 14 | A.   No. |
| 15 | 15 | Q.   And do you recall the substance of any of |
| 16 | 16 | those communications for the forecast packages that |
| 17 | 17 | were generated and disseminated in the third quarter |
| 18 | 18 | of fiscal year 2001? |
| 19 | 19 | A.   Not specifically. |
| 20 | 20 | Q.   Do you recall generally any of those |
| 21 | 21 | discussions? |
| 22 | 22 | A.   No. |
| 23 | 23 | Q.   Would anybody else have been present |
| 24 | 24 | during those discussions during the third quarter |
| 25 | 25 | fiscal year 2001? |

82

| | | |
|---|---|---|
| 1 | 00082:01 | A.   Terry Ford may have been present. |
| 2 | 02 | Q.   Anybody else? |
| 3 | 03 | A.   No. |
| 4 | 04 | Q.   Okay.  Back to the deal -- big deal |
| 5 | 05 | breakdown -- big deals breakdown report. |
| 6 | 06 | How frequently were those prepared during |
| 7 | 07 | the third quarter of fiscal year 2001? |
| 8 | 08 | A.   Same frequency as the forecast package. |
| 9 | 09 | Q.   Okay. |
| 10 | 10 | And by that you mean for the first two |
| 11 | 11 | months they were prepared biweekly, and then the |
| 12 | 12 | third month of the quarter they were prepared |
| 13 | 13 | weekly? |
| 14 | 14 | A.   That's right. |
| 15 | 15 | Q.   Okay. |
| 16 | 16 | And who were those reports disseminated |
| 17 | 17 | to once they were prepared? |
| 18 | 18 | A.   The big deals breakdown went to Jay |
| 19 | 19 | Nussbaum, Terry Ford, and corporate finance. |
| 20 | 20 | Q.   And who was corporate -- who do you mean |
| 21 | 21 | when you say "corporate finance"? |
| 22 | 22 | A.   At that time we sent them to Roberta |
| 23 | 23 | Ronsee. |
| 24 | 24 | Q.   Anybody else? |
| 25 | 25 | A.   No. |

83

| | | |
|---|---|---|
| 1 | 00083:01 | Q.   And did you ever participate in any |
| 2 | 02 | communications regarding the big deal breakdown |
| 3 | 03 | report or the data contained thereon with anybody |
| 4 | 04 | after they were prepared? |
| 5 | 05 | MS. WHITE:   Objection.  Form. |
| 6 | 06 | BY MS. LAVALLEE: |
| 7 | 07 | Q.   During the third quarter of 2001? |
| 8 | 08 | A.   Yes. |
| 9 | 09 | Q.   And who would you have communicated with |
| 10 | 10 | during the third quarter of 2001 regarding these big |
| 11 | 11 | deal reports? |
| 12 | 12 | A.   Again, Jay Nussbaum, Terry Ford.  They |
| 13 | 13 | were part of the same package in his mind. |
| 14 | 14 | Q.   Okay. |
| 15 | 15 | So you would have discussions regarding |
| 16 | 16 | both this big deal report and the forecasting |
| 17 | 17 | package at the same time? |
| 18 | 18 | (Reporter interruption.) |
| 19 | 19 | BY MS. LAVALLEE: |
| 20 | 20 | Q.   The forecasting package report; is that |
| 21 | 21 | correct? |
| 22 | 22 | A.   Yes. |
| 23 | 23 | Q.   Okay. |
| 24 | 24 | And would there have been anybody else |
| 25 | 25 | present other than Mr. Nussbaum and possibly |

84

| | | |
|---|---|---|
| 1 | 00084:01 | Mr. Ford? |
| 2 | 02 | A.   No. |
| 3 | 03 | Q.   Did you ever discuss these packages, |
| 4 | 04 | either the big deal report or the forecasting |
| 5 | 05 | package, with Ms. Minton during the third quarter of |
| 6 | 06 | 2001? |
| 7 | 07 | A.   Yes. |
| 8 | 08 | Q.   Okay. |
| 9 | 09 | And when would you have discussed those |
| 10 | 10 | with her? |
| 11 | 11 | A.   Near the end of the quarter. |
| 12 | 12 | Q.   Did you ever discuss these packages |
| 13 | 13 | during the first month of fiscal year -- of the |
| 14 | 14 | third quarter of fiscal year 2001 with Ms. Minton? |
| 15 | 15 | A.   Not that I remember. |
| 16 | 16 | Q.   Did you ever discuss either of these |
| 17 | 17 | reports during -- with Ms. Minton during the January |
| 18 | 18 | 2001 time frame? |
| 19 | 19 | A.   Again, I was reminded that I had at least |
| 20 | 20 | once. |
| 21 | 21 | Q.   Okay. |
| 22 | 22 | And what document was it that recall -- |
| 23 | 23 | refreshed your recollection about this meeting? |
| 24 | 24 | A.   An email. |
| 25 | 25 | Q.   Okay. |

85

```
1   00085:01      And what does this email say?
2   02      MS. WHITE:  Objection.  Form.
3   03 BY MS. LAVALLEE:
4   04   Q.  Do you recall?
5   05   A.  Not verbatim.
6   06   Q.  Okay.  Generally the substance of the
7   07 email?
8   08   A.  Generally reiterating the current
9   09 forecast and Jay's confidence in it, along with a
10  10 breakdown by region of where that forecast was
11  11 expected to book.
12  12   Q.  Okay.
13  13      And do you recall the date of that email?
14  14   A.  This is the middle of January.
15  15   Q.  And would anybody else have been present
16  16 during meeting -- meetings with Ms. Minton regarding
17  17 either the big deal reports or the forecast package
18  18 in the third quarter of 2001?
19  19   A.  Can we step back a minute?
20  20   Q.  Sure.
21  21   A.  So there is a -- there is a forecast call
22  22 in which a number of people are present.  And all of
23  23 those things are discussed.
24  24   Q.  Okay.
25  25   A.  If you are speaking of conversations
```

86

```
1   00086:01 between Jennifer and myself, no, no one else
2   02 necessarily would have been present.
3   03   Q.  Okay.
4   04      Let's go to that forecasting call.
5   05      When did that occur?
6   06   A.  On the same forecast schedule as before,
7   07 biweekly, the first two months weekly, the last
8   08 month on Thursdays at 1:00 p.m Pacific.
9   09   Q.  And you participated during that call,
10  10 obviously?
11  11   A.  Yes.
12  12   Q.  And who else participated in that call;
13  13 do you know, during the third quarter fiscal year
14  14 2001?
15  15   A.  Invited to the call, not always
16  16 participating, Jay.
17  17   Q.  Mr. Nussbaum?
18  18   A.  Mr. Nussbaum was on the distribution.
19  19 Along with George Roberts.
20  20      Sandy Sanderson.
21  21      And at that time I believe Frank
22  22 Varasano.
23  23   Q.  Anybody else?
24  24   A.  Jennifer Minton.
25  25      Ivgen Guner.
```

87

```
1   00087:01      The finance people supporting George
2   02 Roberts, Sandy Sanderson, and Frank Varasano.
3   03      Jeff Henley was invited.
4   04   Q.  Was anybody else invited to these
5   05 meetings during the third quarter fiscal year 2001?
6   06   A.  Safra Catz.
7   07      And Larry was always invited to the call,
8   08 but rarely showed up.
9   09   Q.  And by "Larry," you mean?
10  10   A.  Ellison.
11  11      I apologize.
12  12   Q.  No problem.  Just want to have a clear
13  13 record.
14  14      Were there any materials that were
15  15 disseminated prior to this forecasting -- these
16  16 forecasting calls in the third quarter fiscal year
17  17 2001?
18  18   A.  Yes.
19  19   Q.  What materials were those?
20  20   A.  There was an Americas Forecast Package
21  21 distributed.
22  22   Q.  And do you know who the distri- -- who
23  23 those Americas Forecast Packages were distributed
24  24 to?
25  25   A.  No, I don't.
```

88

```
1   00088:01   Q.  You, though, received one?
2   02   A.  I'm not certain whether I received it or
3   03 Jay did and I received it as a result, but . . .
4   04   Q.  You generally received the Americas --
5   05      (Reporter interruption.)
6   06 BY MS. LAVALLEE:
7   07   Q.  You generally received the Americas
8   08 Forecast in connection with or in anticipation of
9   09 the Thursday forecasting calls during the third
10  10 quarter fiscal year 2001?
11  11   A.  Yes.
12  12   Q.  Did you take notes at these meetings, at
13  13 these forecasting calls in the third quarter fiscal
14  14 year 2001?
15  15   A.  No.
16  16   Q.  Were these conducted by telephone?
17  17   A.  Yes.
18  18   Q.  Okay.  Well, when you -- were you present
19  19 with anybody else when you attended these calls?
20  20   A.  Occasion- --
21  21      MR. NADOLENCO:  Objection.  Form.
22  22      THE WITNESS:  Sorry.
23  23      Occasionally, with Mr. Nussbaum.
24  24 BY MS. LAVALLEE:
25  25   Q.  Okay.
```

89

```
1   00089:01      And did Mr. Nussbaum take notes at
2   02  these -- during these calls?
3   03   A.  No.
4   04   Q.  Okay.
5   05      Are you aware whether or not anybody else
6   06  took notes during these calls?
7   07   A.  I'm not aware.
8   08   Q.  Were there any agendas printed for these
9   09  calls?
10  10   A.  Not that I saw.
11  11   Q.  Okay.
12  12      And were any materials disseminated as a
13  13  result of these calls?
14  14   A.  I don't know.
15  15   Q.  Do you recall the discussions at any of
16  16  these forecasting calls during the third quarter of
17  17  fiscal year 2001?
18  18   A.  Not specifically.
19  19   Q.  Do you recall generally what was
20  20  discussed during these calls in that time frame?
21  21   A.  Well, the same thing, the general
22  22  discussion on the call is always the forecast, the
23  23  status of the forecast.
24  24   Q.  Okay.
25  25      And do you recall specifically what
```

90

```
1   00090:01  anybody may have said during the -- about the
2   02  forecast for Q3 2001 during any of these calls?
3   03   A.  No.
4   04   Q.  After these forecasting calls, did you
5   05  communicate or discuss the substance of what was
6   06  discussed during these calls with anybody else?
7   07   A.  No.
8   08   Q.  Did you ever have follow-up with
9   09  Mr. Nussbaum regarding any matters that were
10  10  discussed during the Thursday calls in the third
11  11  quarter of 2001?
12  12   A.  I don't remember.
13  13   Q.  How did you generally communicate with
14  14  your direct reports during the third quarter fiscal
15  15  2001?
16  16      MS. WHITE:  Objection.  Form.
17  17      THE WITNESS:  Face to face.
18  18  BY MS. LAVALLEE:
19  19   Q.  Okay.
20  20      Did you communicate by email at all with
21  21  them during that period of time?
22  22   A.  Likely.
23  23      I don't recall any specifics.
24  24   Q.  Okay.
25  25      Do you have -- do you recall the
```

91

```
1   00091:01  specifics of any of the meetings you had with your
2   02  direct reports in the third quarter fiscal year 2001
3   03  regarding forecasting dis- -- forecasting issues?
4   04   A.  No.
5   05   Q.  Did you schedule any --
6   06      Did you have regularly scheduled meetings
7   07  with any of your direct reports or all of your
8   08  direct reports during the third quarter fiscal year
9   09  2001?
10  10      MR. NADOLENCO:  Objection to form.
11  11      THE WITNESS:  I don't remember.
12  12      I subsequently set up one-on-one meetings
13  13  for, you know, personnel reasons, but I don't recall
14  14  when I set those up.
15  15  BY MS. LAVALLEE:
16  16   Q.  Okay.
17  17      But those were not related to forecasting
18  18  issues; is that correct?
19  19   A.  That's correct.
20  20   Q.  Can you explain for me what your role
21  21  exactly is in terms of the forecasting process, or
22  22  what it was during third quarter of 2001, please?
23  23   A.  During that time frame, it was to
24  24  supervise the aggregation of data that was collected
25  25  in our systems and present it to Mr. Nussbaum.
```

92

```
1   00092:01   Q.  Okay.
2   02      And other than compiling or aggregating
3   03  that data, was -- did you have any other roles in
4   04  connection with the forecasting process in the third
5   05  quarter of 2001?
6   06   A.  Periodic updates to Jennifer Minton later
7   07  in the quarter as to status.
8   08   Q.  And by "later in the quarter," what time
9   09  frame are you speaking of?
10  10   A.  Generally the last two weeks.
11  11   Q.  And other than that, did you have any
12  12  other roles in the forecasting process in the third
13  13  quarter of 2001?
14  14   A.  No.
15  15   Q.  And what do you mean exactly by
16  16  "compiling or aggregating data"?
17  17   A.  Well, the sales reps enter the data into
18  18  OSO.
19  19      The financial analysts enter the forecast
20  20  into OFA.
21  21      So by aggregating the data, I mean since
22  22  I don't create it myself, we would download
23  23  information from those systems, reformat it in such
24  24  a way that it was more user friendly to
25  25  Mr. Nussbaum.
```

93

```
1    00093:01    Q.   Okay.
2    02          And did you engage in any analysis of
3    03   this data for him as well, or was it simply just
4    04   compiling and aggregating the data for him?
5    05    A.   I did some analysis.
6    06          I was reminded yesterday of a
7    07   presentation I made for a senior staff meeting of
8    08   his where I had done some analysis.
9    09    Q.   And when did that senior staff meeting
10   10   occur; do you know?
11   11    A.   It was the middle of February.  I don't
12   12   remember the date.
13   13    Q.   Okay.
14   14          And who was present at that meeting?
15   15    A.   It would have been Mr. Nussbaum's direct
16   16   reports and myself.
17   17    Q.   Okay.
18   18          And what was your presentation about?
19   19    A.   It was about the current quarter
20   20   forecast.
21   21    Q.   Was this a regular senior staff meeting
22   22   that occurred regularly?
23   23    A.   There was a schedule set up that they
24   24   were intended to be held monthly.
25   25          Occasionally they were cancelled.
```

94

```
1    00094:01    Q.   Okay.
2    02          And are you generally invited to this
3    03   meeting?
4    04    A.   Yes, I am.
5    05    Q.   Okay.
6    06          Do you know if one took place in December
7    07   of 2000?
8    08    A.   I don't know.
9    09    Q.   But they were monthly, correct,
10   10   generally?
11   11    A.   They were scheduled monthly, but were
12   12   cancelled from time to time.
13   13    Q.   Okay.
14   14          And other than Mr. Nussbaum and his
15   15   direct reports and yourself, was there anybody else
16   16   present during these meetings?
17   17    A.   I believe at that time the woman in
18   18   charge of human resources did not report directly to
19   19   Mr. Nussbaum, but reported to human resources, so
20   20   she would have been there as well.
21   21    Q.   Okay.
22   22          And do you recall who that was during the
23   23   third quarter of 2001?
24   24    A.   It was Alicia Brown.
25   25    Q.   And did everybody make presentations
```

95

```
1    00095:01   during this meeting?
2    02    A.   No.
3    03    Q.   And who made, generally during the third
4    04   quarter of 2001, made presentations at those
5    05   meetings?
6    06    A.   I don't remember other than myself.
7    07    Q.   Okay.
8    08          And was this meeting a face-to-face
9    09   meeting?
10   10    A.   Yes.
11   11    Q.   Were there -- was there an agenda for
12   12   this meeting in the third quarter -- let me rephrase
13   13   my question.
14   14          Was there generally an agenda prepared
15   15   for these scheduled meetings in the third quarter of
16   16   2001?
17   17    A.   Yes, there was.
18   18    Q.   Did you receive a copy of these agendas?
19   19    A.   Yes.
20   20          And did you maintain copies of these
21   21   agendas?
22   22    A.   No.
23   23    Q.   And how did you receive those agendas?
24   24    A.   Via email.
25   25    Q.   And who sent them to you?
```

96

```
1    00096:01    A.   Charles Kendig.
2    02    Q.   And who is Mr. Kendig?
3    03    A.   He was the vice-president of quality,
4    04   reporting to Jay and responsible for facilitating
5    05   those meetings.
6    06    Q.   Okay.
7    07          That was his whole role?
8    08    A.   No.
9    09          MS. WHITE:  Is that the job you want?
10   10          THE WITNESS:  No, but part of it.
11   11          MS. LAVALLEE:  I don't know.
12   12    Q.   And were there any presentation packages
13   13   or any materials disseminated either prior to or
14   14   during this meeting, during the third quarter of
15   15   2001?
16   16    A.   I don't remember.
17   17    Q.   Did you personally prepare presentation
18   18   materials for your presentations during the third
19   19   quarter 2001 for these meetings?
20   20    A.   Yes.
21   21    Q.   Okay.
22   22          And did you prepare them on your
23   23   computer?
24   24    A.   Yes.
25   25    Q.   Okay.
```

97

```
1   00097:01      And did you maintain copies of these?
2   02      A.   Some of them.
3   03      Q.   Did you maintain -- how do you maintain
4   04 copies of these?
5   05      A.   Electronically.
6   06      Q.   Do you keep hard copies as well?
7   07      A.   No.
8   08      Q.   Do you generally keep hard copies when
9   09 you get the materials that you use during a quarter?
10  10      A.   No.
11  11      Q.   Do you maintain things generally just on
12  12 your computer or on the network?
13  13      A.   Yes.
14  14      Q.   Do you use a laptop?
15  15      A.   Yes, I do.
16  16      Q.   And did you use a laptop during the third
17  17 quarter of 2001?
18  18      A.   Yes, I did.
19  19      Q.   Okay.
20  20           Were you ever asked to provide documents
21  21 that related to the third quarter of 2001 in
22  22 connection with any lawsuit?
23  23      A.   Yes.
24  24      Q.   Okay.
25  25           And did you ever provide such materials
```

98

```
1   00098:01 or documents?
2   02      A.   Yes, I did.
3   03      Q.   Okay.
4   04           How -- did you personally look for these
5   05 documents and provide them, or was it somebody else
6   06 who did that on your behalf?
7   07      A.   I did.
8   08      Q.   Okay.
9   09           And did you search your laptop as well as
10  10 your computer at the office?
11  11      A.   I only had one, yes.
12  12      Q.   Okay.  That's fair.
13  13           So you used a laptop at your desk in your
14  14 office?
15  15      A.   That's correct.
16  16      Q.   Okay.
17  17           And were you asked on more than one
18  18 occasion to produce documents in connection with a
19  19 lawsuit involving the third quarter fiscal year
20  20 2001?
21  21      A.   I'm confused by the question.
22  22      Q.   Okay.  Let me rephrase it then.
23  23           Thank you.
24  24           You have mentioned earlier that you were
25  25 asked to produce documents or provide copies of
```

99

```
1   00099:01 documents for lawsuit or lawsuits relating to the
2   02 time period of Q3 2001.
3   03           Did that occur on more than one occasion?
4   04      A.   Yes.
5   05      Q.   Okay.
6   06           Do you recall when that occurred?
7   07      A.   I don't recall exactly.
8   08      Q.   Okay.
9   09           Do you recall generally the first time
10  10 that occurred?
11  11      A.   No.
12  12      Q.   Was it last year or the year before; do
13  13 you recall?
14  14      A.   Last year, I think.
15  15      Q.   Okay.
16  16           And do you recall when the second time
17  17 was?
18  18      A.   No.
19  19      Q.   Was it that -- this year; do you believe?
20  20      A.   Probably it was still last year.
21  21      Q.   Okay.
22  22           Was there a third time or was it only two
23  23 times?
24  24      A.   There were a couple of requests for data
25  25 that I believe I had already provided.
```

100

```
1   00100:01      But I did receive a couple of follow-on
2   02 emails to which I attached, I believe, the same
3   03 information I had already provided.
4   04      Q.   Okay.
5   05      A.   Just to clarify.
6   06      Q.   Okay.
7   07           How did you search your laptop for this
8   08 data when you were requested to do so?
9   09      MS. WHITE:  Objection.  Form.
10  10 BY MS. LAVALLEE:
11  11      Q.   How did you go about doing that?
12  12      A.   I have a folder set up.  I have a
13  13 forecasts folder set up under an OSI directory.
14  14      Q.   Okay.
15  15           And you searched those folders?
16  16      A.   That's correct.
17  17      Q.   Okay.
18  18           And what about four email, what was your
19  19 process in searching the emails?
20  20      A.   I didn't have any emails from that time
21  21 period.
22  22      Q.   Okay.
23  23           And what operating system do you use for
24  24 your email?
25  25      A.   Today?
```

101

```
1   00101:01    Q.   Well, actually that's a good question.
2   02 Let me --
3   03         Has it changed from Q3 2001 to today?
4   04         MR. NADOLENCO:  Objection to form.
5   05         THE WITNESS:  Yes.
6   06 BY MS. LAVALLEE:
7   07    Q.   Okay.
8   08         Which system do you use today?
9   09    A.   I use Netscape 7.1.
10  10    Q.   Okay.
11  11         And do you -- what system did you use in
12  12 Q3 2001?
13  13    A.   I don't remember.
14  14    Q.   Okay.
15  15         Is your laptop that you use today the
16  16 same as the one you used in Q3 2001?
17  17    A.   No.
18  18    Q.   Okay.
19  19         What happened to the computer that you
20  20 were using in Q3 2001?
21  21    A.   I believe it's been retired.  I'm
22  22 honestly not sure.
23  23         It blew up at some point.
24  24    Q.   Do you know what happens when a computer
25  25 retires?
```

102

```
1   00102:01         Do you know what happens to a computer
2   02 when it retires at Oracle?
3   03         MR. NADOLENCO:  It goes to the computer
4   04 hall of fame.
5   05         MS. WHITE:  Computer cemetery.
6   06 BY MS. LAVALLEE:
7   07    Q.   You don't know?
8   08    A.   No, I don't know.
9   09    Q.   Okay.  And did you --
10  10         Was your data from your Q3 2001 computer
11  11 converted into your new computer when you had a new
12  12 computer to replace that one?
13  13         MS. WHITE:  Objection.  Form.
14  14         THE WITNESS:  I believe it was.
15  15 BY MS. LAVALLEE:
16  16    Q.   Okay.
17  17         And do you know who did that for you?
18  18    A.   Not by name.
19  19         Someone in our technical support group.
20  20    Q.   Okay.
21  21         And did you have any involvement in that
22  22 process?
23  23    A.   No.
24  24    Q.   Okay.  And when you were asked to obtain
25  25 data, then you searched the data that you currently
```

103

```
1   00103:01 -- the data from the computer you currently use; is
2   02 that correct?  Or you were using at the time of the
3   03 request, is that correct?
4   04    A.   That's correct.
5   05    Q.   And did you search any other files other
6   06 than the computer?
7   07         I'm sorry, let me -- let me clarify my
8   08 question.
9   09         When you were requested to provide data
10  10 or documents in connection with some pending
11  11 lawsuits involving the time frame Q3 2001, did you
12  12 search anything other than the laptop that you
13  13 had -- that you were using at that time?
14  14    A.   No.
15  15    Q.   Okay.
16  16         Do you have an assistant?
17  17    A.   Do I have an assistant today?
18  18    Q.   Correct.
19  19    A.   Yes.
20  20    Q.   Okay.
21  21         And did you have an assistant during Q3
22  22 2001?
23  23    A.   I think so.
24  24    Q.   Okay.
25  25         Would this be the same person today as it
```

104

```
1   00104:01 was in 2003, if that person --
2   02    A.   2001 you mean?
3   03    Q.   2001.
4   04    A.   No.
5   05    Q.   Okay.
6   06         And who is it today?
7   07    A.   Rachel McMurrer.
8   08    Q.   Okay.
9   09         And so I take it at some point around
10  10 2001, you did for the first time get an assistant;
11  11 is that correct, or sometime shortly after?
12  12    A.   Sometime in that time frame.
13  13    Q.   All right.
14  14         And who was the first assistant you had
15  15 then in that time frame?
16  16    A.   Sandra Basurto.
17  17    Q.   Did she ever maintain files for you?
18  18    A.   No.
19  19    Q.   Okay.
20  20         Let's go back to the senior staff
21  21 meetings and the presentations that you gave.
22  22         Do you know if anybody took notes during
23  23 those meetings, during this the third quarter of
24  24 2001?
25  25    A.   I don't know.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

105

```
1   00105:01   Q.  Okay.
2   02          Did you personally take notes during
3   03   that -- during those meetings in the Q3 time frame?
4   04   A.  Occasionally.
5   05   Q.  Okay.
6   06          And did you maintain those notes?
7   07   A.  No.
8   08   Q.  Okay.
9   09          What did you do with those notes?
10  10   A.  Probably threw them away.
11  11   Q.  Okay.
12  12          I take it your presentation wasn't
13  13   videotaped as it is being here, videotaped today?
14  14   A.  No.
15  15   Q.  Was it a fairly informal meeting?
16  16   A.  In what sense?
17  17   Q.  Well, was it a very structured meeting in
18  18   terms of the agenda?
19  19   A.  Yes.
20  20   Q.  Okay.
21  21          And was it Mr. Nussbaum who conducted the
22  22   meeting?
23  23   A.  At times.
24  24   Q.  Okay.
25  25          And do you recall if such a meeting took
```

106

```
1   00106:01   place in February 2001?
2   02   A.  I do now.
3   03   Q.  Okay.
4   04          And do you recall if one took place in
5   05   January 2001?
6   06   A.  I do not.
7   07   Q.  Okay.
8   08          How were you notified of these meetings?
9   09   A.  Via email.
10  10   Q.  Subsequent to these senior -- was it
11  11   senior staffing meetings, is that what they were
12  12   called?
13  13   A.  They were called senior staff meetings.
14  14   Q.  Senior staff meetings.
15  15          Subsequent to any of these senior staff
16  16   meetings that occurred in the 2003 time frame, did
17  17   you have meetings or discussions with anybody
18  18   regarding the substance of what was discussed at
19  19   these meetings?
20  20          MS. WHITE:  Objection.  Form.
21  21          The "2003" again.
22  22          MS. LAVALLEE:  Oh, thank you.
23  23   Q.  During the 2001 time frame, in the third
24  24   quarter of 2001, did you ever have any discussions
25  25   after these meetings regarding the substance of
```

107

```
1   00107:01   these senior staff meetings?
2   02   A.  I don't remember.
3   03   Q.  Can you explain for me the process by
4   04   which you did the compilation or aggregation of data
5   05   from Mr. Nussbaum in the third quarter of 2003 --
6   06   2001?
7   07   A.  Not exactly.
8   08          Again, I had other people compile it for
9   09   me to review.
10  10   Q.  Okay.
11  11          Was there a process in terms of what you
12  12   received, what you then did with that data and so
13  13   forth?
14  14          Did you have a standard procedure in how
15  15   you compiled these -- this data?
16  16          MS. WHITE:  Objection.  Form.
17  17          THE WITNESS:  Generally.
18  18   BY MS. LAVALLEE:
19  19   Q.  Okay.
20  20          Can you explain generally what that was?
21  21   A.  The information was downloaded from the
22  22   systems, OFO -- OFA and OSO.
23  23          Put into spreadsheet Excel format.
24  24          Comments on the status of the deals from
25  25   OSO was added by my finance directs.
```

108

```
1   00108:01          And then we pulled everything together as
2   02   sort of one package and submitted the big deals
3   03   summary to corporate, and the rest of the package to
4   04   Jay and Terry.
5   05   Q.  Okay.
6   06          And can you explain for me the time
7   07   involvement of this process?
8   08          Did you start on a particular day of the
9   09   week and then continue and prepare and submit the
10  10   report for a particular day?
11  11   A.  Generally -- generally started on Monday.
12  12          Generally submitted by Wednesday night.
13  13   Q.  Okay.
14  14          When you received the data and saw
15  15   comments on status of particular deals, did you ever
16  16   communicate with anybody regarding these comments
17  17   during the third quarter of 2001?
18  18   A.  I don't remember.
19  19   Q.  Is this forecasting process that you
20  20   undertook in Q3 2001 similar to the process that you
21  21   currently engage in today in the forecasting
22  22   process?
23  23   A.  Similar.
24  24          Certainly not the same.
25  25   Q.  Okay.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

109

```
1  00109:01    Would it have been unusual for you to
2    02  talk to somebody regarding the comments on the
3    03  status of a deal?
4    04    A.  Only if there were none.
5    05    Q.  Okay.
6    06    A.  So occasionally people would leave those
7    07  blank or comment would be unavailable, and at that
8    08  point I would have to call somebody and ask why they
9    09  had left it blank.
10   10    Q.  Okay.
11   11    A.  But I didn't challenge the comments, if
12   12  that's what you mean.
13   13    Q.  Okay.  No, that wasn't actually my
14   14  question.
15   15       My question was just simply did you have
16   16  any discourse regarding these comments?
17   17    A.  No.
18   18    Q.  Okay.
19   19       MS. WHITE:  Do you want to take a break?
20   20       MS. LAVALLEE:  Yeah, I would like to take
21   21  a few minutes' break.
22   22       THE VIDEOGRAPHER:  This concludes
23   23  videotape number one to Volume 1 in the deposition
24   24  of Sarah Kopp.
25   25       The time is
```

110

```
1  00110:01  record.
2    02       (Break taken.)
3    03       THE VIDEOGRAPHER:  This marks the
4    04  beginning of videotape number two, Volume 1, in the
5    05  deposition of Sarah Kopp.
6    06       The time is
7    07       We are on the record.
8    08  BY MS. LAVALLEE:
9    09    Q.  Ms. Kopp, thanks for bearing with us here
10   10  today in this depo.
11   11       But I have -- the question, which I may
12   12  have asked you a little earlier but I'm not sure I
13   13  covered it so I just want to be sure, did I ask you
14   14  what -- let me just ask my question.
15   15       Did -- were there any other reports --
16   16  were there any reports disseminated in anticipation
17   17  of the Thursday forecasting call?
18   18    A.  Yes.
19   19    Q.  Okay.
20   20       What were those, or what was that report?
21   21    A.  The only one I know of was an Americas
22   22  Forecast Package.
23   23    Q.  Okay.
24   24       And who prepared the Americas Forecast
25   25  Package?
```

111

```
1  00111:01    A.  I don't know.
2    02    Q.  Okay.
3    03       Was that -- what department was it
4    04  generated out of; do you know?
5    05    A.  Corporate finance.
6    06    Q.  And do you know who is in charge of
7    07  corporate finance, or who was in charge of corporate
8    08  finance in third quarter of fiscal year 2001?
9    09    A.  For that process, Ivgen Guner.
10   10    Q.  Other than the reports that we discussed
11   11  earlier, were there any reports that you received
12   12  that compiled information data from the OSO system
13   13  during the third quarter of 2001?
14   14    A.  Not that I remember.
15   15    Q.  Okay.
16   16       And other than the reports that we have
17   17  discussed here already this morning, were there any
18   18  reports that you received that contained the
19   19  information from the OFA system during the third
20   20  quarter fiscal year 2001?
21   21       MS. WHITE:  Objection.  Form.
22   22  BY MS. LAVALLEE:
23   23    Q.  Are you having trouble with the question?
24   24    A.  Yes.
25   25    Q.  Why is that?
```

112

```
1  00112:01    A.  Our reporting packages that are created
2    02  contain data that is pulled from OFA.
3    03    Q.  Okay.
4    04    A.  So I wasn't -- they weren't personally
5    05  distributed just to me.
6    06    Q.  Okay.
7    07    A.  It was --
8    08    Q.  Okay.
9    09       Other than those reports, were there any
10   10  reports that you received during the third quarter
11   11  of fiscal year 2001 that contained data pulled from
12   12  the OFO -- or OFA system?
13   13    A.  There may have been.
14   14    Q.  Okay.
15   15       And what other types of reports did you
16   16  generally receive in Q3 2001?
17   17    A.  Out of that system?
18   18    Q.  Generally, regardless of whether it came
19   19  from that system?
20   20       (Reporter interruption.)
21   21       THE WITNESS:  Generally, we would look at
22   22  our expense analysis in terms of forecasting.  So as
23   23  actual data for expenses came in, we would check to
24   24  see if our run rates were looking accurate for the
25   25  end of quarter expense forecast.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

113

```
 1  00113:01 BY MS. LAVALLEE:
 2     02    Q.   Okay.
 3     03         And when you say you would check that
 4     04  information, is that you would -- somebody would
 5     05  prepare a report and you would examine it from the
 6     06  report, or was it a different process that?
 7     07    A.   That would be the process.
 8     08    Q.   Okay.
 9     09         And what was the title of the report that
10     10  would -- you would use to check this information?
11     11    A.   It had no title.
12     12    Q.   Okay.
13     13         What information was contained
14     14  specifically on this report?
15     15    A.   It would have been expenses by account,
16     16  such as salaries, benefits, facilities, those kinds
17     17  of things, and head count.
18     18         So we would look at -- for example,
19     19  during that quarter we would look at December actual
20     20  salary expense and compare it to January and
21     21  February forecasted salary expense.
22     22    Q.   Okay.
23     23         And who was it who prepared these reports
24     24  during the third quarter fiscal year 2001?
25     25    A.   It would have been Fred Avila or Shane
```

114

```
 1  00114:01 Gorman.
 2     02    Q.   Okay.
 3     03         And how did you receive these reports?
 4     04    A.   Generally, electronically.
 5     05    Q.   You say "generally," were there
 6     06  exceptions to this?
 7     07    A.   I don't remember.
 8     08    Q.   Do you recall ever receiving hard copies
 9     09  of these?
10     10    A.   Not that I remember, but I could have.
11     11    Q.   Okay.
12     12         And what did you do with them when you
13     13  received this information electronically?
14     14    A.   In a spreadsheet form, I would usually go
15     15  in and plug in numbers of my own to -- if they -- if
16     16  I believed that the forecast needed to be changed in
17     17  terms of expenses and run rates.
18     18    Q.   Okay.
19     19         And was this -- maybe I need -- maybe you
20     20  can explain this for me.
21     21         Was this a report that was -- well,
22     22  actually, let me ask a preliminary question.
23     23         Where was the data obtained to form the
24     24  basis of this report?
25     25    A.   OFA.
```

115

```
 1  00115:01    Q.   Okay.
 2     02         And was this a report that was generated
 3     03  directly from OFA or is it something else?
 4     04    MS. WHITE:  Objection.  Form.
 5     05         THE WITNESS:  It would have been data
 6     06  that was downloaded from OFA and loaded into Excel.
 7     07  BY MS. LAVALLEE:
 8     08    Q.   Okay.
 9     09         So a separate report was generated on
10     10  Excel from data obtained from OFA; is that correct?
11     11    A.   Yes.
12     12    Q.   Okay.  And it would have been Mr. Avila
13     13  or the other -- I forgot the other person's name.
14     14    A.   Shane.
15     15    Q.   -- Shane, who would have prepared this
16     16  Excel sheet; is that correct?
17     17    A.   That's correct.
18     18    Q.   Okay.
19     19         And you then would have access to the
20     20  Excel sheet and could add your own judgment or
21     21  determinations to the data contained in that sheet.
22     22         Is that correct?
23     23    MR. NADOLENCO:  Objection to form.
24     24  BY MS. LAVALLEE:
25     25    Q.   Am I misstating your testimony or
```

116

```
 1  00116:01  mischaracterizing it?
 2     02    MR. NADOLENCO:  It's just that "judgment"
 3     03  kind of had a term of art on some reports.
 4     04  BY MS. LAVALLEE:
 5     05    Q.   Sure.  Sure.
 6     06         Can you please tell me is that accurate?
 7     07    A.   I could -- I could look at it for what I
 8     08  would perceive to be inaccuracies if they existed.
 9     09    Q.   Okay.
10     10         And after you completed looking at this
11     11  report, what was done with the report?
12     12    A.   Generally, it would have been distributed
13     13  to my directs if I had questions about their expense
14     14  forecast at their level.
15     15    Q.   Okay.
16     16    A.   That's really it.
17     17    Q.   Okay.
18     18         So you used it as a tool to check what
19     19  your direct reports were doing; is that correct?
20     20    A.   Yeah, in a matter of speaking.  Yes.
21     21    Q.   Okay.
22     22         And was it something that you then in
23     23  turn shared with your superiors, either Mr. Nussbaum
24     24  or somebody else?
25     25    A.   Not likely.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

117

```
1   00117:01    Q.  Okay.
2   02          And did you compare the expense forecast
3   03  to the budget forecast -- I'm sorry, to the budget
4   04  expense at any point in time during the third
5   05  quarter of 2001?
6   06    A.  I don't remember.
7   07    Q.  Okay.
8   08          Is that something you would normally do?
9   09    A.  Typically.
10  10    Q.  Okay.
11  11          And what would be the purpose in doing
12  12  that?
13  13    A.  To validate if we had set average
14  14  salaries correctly or if we were over or under our
15  15  head count that we had anticipated we would need.
16  16    Q.  Right.
17  17          And generally in 2000, in the fiscal year
18  18  2000, were you on target in terms of your budget
19  19  rates for expenses during throughout that year?
20  20    MS. WHITE:  Objection.  Form.
21  21    THE WITNESS:  In fiscal 2000?
22  22  BY MS. LAVALLEE:
23  23    Q.  Yes.
24  24    A.  I don't know.
25  25    Q.  Okay.
```

118

```
1   00118:01    Do you recall any quarter in particular
2   02  about 2000, fiscal year 2000?
3   03    A.  No, I don't.
4   04    Q.  Okay.
5   05          And do you recall about 2001?
6   06    MR. NADOLENCO:  Objection to form.
7   07    THE WITNESS:  Do I recall what about --
8   08  BY MS. LAVALLEE:
9   09    Q.  Okay.
10  10          Do you recall how the budget expenses
11  11  compared with the actual expenses or -- during
12  12  fiscal year 2001, either the first or second or
13  13  third quarter?
14  14    MS. WHITE:  Objection to form.
15  15    THE WITNESS:  No, I don't.
16  16  BY MS. LAVALLEE:
17  17    Q.  Okay.  Okay.
18  18          We were talking about reports that you
19  19  received, other than reports we had already
20  20  discussed today.
21  21          And you had mentioned the expense
22  22  analysis reports.  And we just had that
23  23  conversation.
24  24          Were there any other reports, other than
25  25  that and ones we've previously discussed, that you
```

119

```
1   00119:01  would have received in Q3 2001?
2   02    A.  I don't remember.
3   03    Q.  Were there any reports that dealt with
4   04  pipeline data that you received in Q3 2001?
5   05    MS. WHITE:  Objection to form.
6   06    THE WITNESS:  Other than what we already
7   07  discussed?
8   08  BY MS. LAVALLEE:
9   09    Q.  Yes.
10  10    A.  We did a periodic pipeline download
11  11  report, just a one-page summary of pipeline.
12  12    Q.  And by "we," who are you referring to?
13  13    A.  I'm sorry, Fred.
14  14    Q.  Okay.
15  15          And where was the data for that report
16  16  obtained?
17  17    A.  From OSO.
18  18    Q.  Okay.
19  19          And was this a regular report that was
20  20  generated throughout the quarter?
21  21    A.  Yes.
22  22    Q.  Okay.
23  23          And how frequently was this report
24  24  generated?
25  25    A.  I believe with the same frequency as the
```

120

```
1   00120:01  forecast package.
2   02          But I'm not certain about that.
3   03    Q.  Okay.
4   04          And I may not have asked the same
5   05  question with respect to the expense analysis, but
6   06  how frequently was that prepared in the third
7   07  quarter 2001?
8   08    A.  It was not a regular report, it was ad
9   09  hoc.
10  10    Q.  Okay.
11  11          Do you recall how many times you had that
12  12  report generated, the expense analysis report
13  13  generated during Q3 2001?
14  14    A.  No, I don't.
15  15    Q.  Do you know if it was more or less
16  16  frequent than the prior quarter?
17  17    MS. WHITE:  Objection to form.
18  18    THE WITNESS:  No, I don't.
19  19  BY MS. LAVALLEE:
20  20    Q.  And what information specifically is
21  21  contained on the periodic pipeline download report
22  22  that you referred to before?
23  23    A.  Just subtotals of pipeline numbers, no
24  24  deal data.
25  25          It was pipeline broken down by vertical
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

121

1   00121:01 and between apps and tech, just total number.
2   02   Q.   Okay.
3   03        And were there any comparison from year
4   04 over year or subsequent quarters or consecutive
5   05 quarters, or any comparison like that?
6   06   A.   I don't think so.
7   07   Q.   Was there any conversion rate data or
8   08 figures contained there in that report?
9   09        MS. WHITE:  Objection to form.
10  10        THE WITNESS:  I don't remember.
11  11 BY MS. LAVALLEE:
12  12   Q.   Okay.
13  13        Do you know what I mean by "conversion"?
14  14   A.   No, I do.
15  15   Q.   Okay.  Can you explain to me what a
16  16 conversion rate is?
17  17   A.   It is the percentage of your pipeline
18  18 that you would need to convert into revenue in order
19  19 to make your forecast.
20  20   Q.   Is that something you examined generally
21  21 in your capacity as finance director for Oracle?
22  22        MS. WHITE:  Objection as to form.
23  23        THE WITNESS:  During that quarter, yes.
24  24 BY MS. LAVALLEE:
25  25   Q.   Okay.

122

1   00122:01        And why do you examine the conversion
2   02 rate figure?
3   03   A.   Why?
4   04   Q.   (Nods head.)
5   05   A.   It can be an indicator of how reasonable
6   06 a forecast is.
7   07   Q.   And what do you look for to determine
8   08 whether a forecast is reasonable when you look at
9   09 the conversion ratio or rate?
10  10        MS. WHITE:  Objection to form.
11  11        THE WITNESS:  At that time or generally?
12  12 Because it's not always the same.
13  13 BY MS. LAVALLEE:
14  14   Q.   Okay.
15  15        And why is it not always the same, can
16  16 you explain that for me?  Maybe I can better phrase
17  17 my question then.
18  18   A.   Because of the market fluctuation that we
19  19 experience, the trends in conversion rates didn't
20  20 stay the same.
21  21   Q.   Okay.
22  22   A.   So . . .
23  23   Q.   And then tell me what you looked for in
24  24 terms of conversion rate to determine whether
25  25 forecast was reasonable in, let's start with fiscal

123

1   00123:01 year 2000.
2   02   A.   I wasn't look at conversion rates in
3   03 fiscal year 2000.
4   04   Q.   When did you first start looking at
5   05 conversion rates?
6   06   A.   Probably in the end of the second
7   07 quarter, the beginning of third quarter 2001.
8   08   Q.   Okay.
9   09        And during that time frame, what were you
10  10 looking at in terms of conversion rate to determine
11  11 whether forecast was reasonable?
12  12        MS. WHITE:  Objection to form.
13  13        THE WITNESS:  At that time I was looking
14  14 at comparisons to prior year.
15  15 BY MS. LAVALLEE:
16  16   Q.   Okay.
17  17        And were you looking at comparisons to
18  18 prior year or years, I wasn't sure I heard?
19  19   A.   Year.
20  20   Q.   Okay.
21  21        So you would look at the conversion year
22  22 for fiscal -- the third quarter fiscal year 2000
23  23 when you are examining the forecast for fiscal
24  24 year -- third quarter fiscal year 2001.
25  25        Is that correct?

124

1   00124:01        MR. NADOLENCO:  Objection.  Misstates the
2   02 testimony.
3   03        MS. WHITE:  Objection to form.
4   04 BY MS. LAVALLEE:
5   05   Q.   Did I misstate your testimony?
6   06   A.   I'm not sure.
7   07   Q.   Okay.
8   08        MR. NADOLENCO:  The reason I object is
9   09 you went back to fiscal year 2000.  I thought you
10  10 were talking to her about 2001.
11  11 BY MS. LAVALLEE:
12  12   Q.   Okay.  Let me ask you another question
13  13 just so we're clear.
14  14        When you -- what -- what year did you
15  15 look at or what period did you look at to -- when
16  16 you were looking at the forecast for Q3 2001 to
17  17 determine if that was reasonable?
18  18   A.   In terms of conversion rate?
19  19   Q.   In terms of conversion rate.
20  20   A.   I looked at the year immediately previous
21  21 to that, which would have been Q3 of fiscal 2000.
22  22   Q.   Okay.  Thank you.
23  23        And what specifically would you look at,
24  24 can you just explain that for me?
25  25        MS. WHITE:  Objection as to form.

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

125

```
1   00125:01       THE WITNESS:  We would look at like month
2   02  pipeline related to the forecast.
3   03       So you would have to compare pipeline at
4   04  the same period of time in the previous quarter --
5   05  or previous year.
6   06  BY MS. LAVALLEE:
7   07   Q.   Okay.
8   08       And did you look specifically at a
9   09  monthly period or did you look weekly period?
10  10   A.   It would have been -- well, we were
11  11  looking at pipeline, we would refer to month one
12  12  pipeline.
13  13   Q.   Uh-huh.
14  14   A.   But that meant generally week two of
15  15  month one.
16  16   Q.   Okay.
17  17       And why was it important to compare the
18  18  same period year over year when you are talking
19  19  about conversion rates?
20  20   A.   Because the pipeline fluctuates
21  21  throughout the quarter.
22  22   Q.   Okay.
23  23       So would it be reasonable to compare, for
24  24  example, the last week of the quarter conversion
25  25  rate to the conversion rate of the third week of the
```

126

```
1   00126:01  quarter?
2   02   A.   No.
3   03   Q.   Okay.
4   04       Would it be fair to look at, say, the
5   05  actual conversion rate, the final conversion rate
6   06  and compare that to a conversion rate during the
7   07  second week of the quarter?
8   08       MS. WHITE:  Objection to form.
9   09       THE WITNESS:  Yeah, you'd have to define
10  10  the "final conversion rate," because the conversion
11  11  rate would have to be based on a pipeline at a
12  12  particular point in time.  Final conversion rate
13  13  would be 100 percent.
14  14  BY MS. LAVALLEE:
15  15   Q.   Okay.  So that has no meaning?
16  16   A.   Exactly.
17  17   Q.   Okay.
18  18       And how does -- you say that the
19  19  conversion rate will fluctuate throughout quarter;
20  20  is that correct?
21  21   A.   That's correct.
22  22   Q.   Okay.
23  23       And how does it fluctuate, can you
24  24  explain that to me?
25  25   A.   Yes.
```

127

```
1   00127:01       As -- as the -- as deals are closed
2   02  throughout the quarter or as deals are moved out
3   03  throughout the quarter to future quarters, the
4   04  pipeline will decline throughout the quarter as the
5   05  closed -- as the closed deals increase.
6   06   Q.   Okay.
7   07   A.   At the end of the quarter being the same
8   08  number.
9   09   Q.   Okay.
10  10       And does pipeline generally include
11  11  closed deals or once a deal is closed is it excluded
12  12  from the pipeline?
13  13   A.   It generally includes them.
14  14   Q.   Okay.
15  15       Let's choose the first month of the
16  16  quarter.  Generally, what type of conversion rate do
17  17  you look for to determine if a forecast is
18  18  reasonable -- or, let me rephrase my question.
19  19       During the Q3 2001 for -- in the first
20  20  December -- the first month of the quarter, what
21  21  type of conversion rate would you expect to see to
22  22  feel comfortable that the forecast was reasonable?
23  23       MS. WHITE:  Objection to form.
24  24       THE WITNESS:  I don't remember.  It would
25  25  have related to prior year, and I don't remember
```

128

```
1   00128:01  what that was.
2   02  BY MS. LAVALLEE:
3   03   Q.   Okay.
4   04       What type of -- do you recall --
5   05       Do you recall what your conclusion was
6   06  regarding the forecast and its reasonableness in
7   07  light of the prior year conversion rate during
8   08  December 2001?
9   09       MS. WHITE:  Objection to form.
10  10  BY MS. LAVALLEE:
11  11   Q.   I'm just -- strike that.
12  12       During December 2000, let me clarify.
13  13       MS. WHITE:  Same objection.
14  14       THE WITNESS:  The conclusion I drew in
15  15  December?
16  16  BY MS. LAVALLEE:
17  17   Q.   Yes.
18  18       Regarding the forecast at that period of
19  19  time.
20  20   A.   No, I don't.
21  21   Q.   Okay.
22  22       And do you recall what conclusions you
23  23  may have drawn in January of 2001 regarding the
24  24  forecast based on historical conversion rate?
25  25   A.   No, I don't.
```

129

```
1   00129:01   Q.  Okay.
2   02        And do you recall for February 2001,
3   03   whether you drew any conclusions regarding the
4   04   forecast based on historical conversion rates?
5   05   A.  Yes, I do now.
6   06   Q.  Okay.
7   07        And why do you recall that for February
8   08   2000 right now?
9   09   A.  Having reviewed the presentation I did
10  10   for the senior staff meeting yesterday.
11  11   Q.  Okay.
12  12        And do you recall -- well, what was your
13  13   conclusion at that point?
14  14   A.  That the forecast was reasonable.
15  15   Q.  And when you are talking about forecast,
16  16   is there one forecast at Oracle or are there
17  17   different forecast numbers for a particular
18  18   division?
19  19   A.  I'm not sure I understand what you mean.
20  20   Q.  Okay.
21  21        Is there -- when you are talking about
22  22   the forecast number, are you talking about a number
23  23   that includes management judgment?
24  24   A.  Yes.
25  25   Q.  Okay.
```

130

```
1   00130:01        And what is "management judgment"?
2   02   A.  Management judgment is -- refers to the
3   03   difference between what a subordinate forecast
4   04   contains and what the senior forecast contains.
5   05   Q.  Okay.
6   06        And who would be applying judgment to
7   07   forecast for OSO during Q3 2001?
8   08   MS. WHITE:  Objection.  Form.
9   09        I think you meant "OSI."
10  10   BY MS. LAVALLEE:
11  11   Q.  Oh, yes, please.  Let me restate my
12  12   question.
13  13        Who would have applied management
14  14   judgment to forecast during Q3 2001 for OSI?
15  15   A.  Any manager can apply judgment, so I
16  16   wouldn't know anyone -- you know, everyone who may
17  17   have applied judgment.  Subordinate forecasts would
18  18   still be a judgment call.
19  19   Q.  Okay.  Okay.
20  20        So am I to understand that the field
21  21   salespeople might come up with a forecast number and
22  22   their management and their managers may apply
23  23   judgment to that, and then that goes up the chain of
24  24   command until it hits Jay Nussbaum, for example?
25  25   A.  That's possible, judgment in either
```

131

```
1   00131:01   direction.
2   02   Q.  Okay.
3   03        And did you apply management judgment to
4   04   forecasts for OSI during Q3 2001?
5   05   A.  Did I?
6   06   Q.  Yes.
7   07   A.  No.
8   08   Q.  Did anybody in your department or any of
9   09   your direct reports apply judgment?
10  10   A.  No.
11  11   Q.  And who are you aware applied judgment to
12  12   OSI numbers?
13  13        I mean, you said earlier that you
14  14   couldn't identify everybody who did.  Can you
15  15   identify somebody who definitely did apply judgment
16  16   to forecast numbers --
17  17        (Reporter interruption.)
18  18   BY MS. LAVALLEE:
19  19   Q.  -- for OSI during Q3 2001?
20  20   A.  Jay Nussbaum did.
21  21   Q.  Anybody else?
22  22   A.  Not that I am aware of.
23  23   Q.  All right.
24  24        And we were going through a series of
25  25   reports that you received during Q3 2001.  And we
```

132

```
1   00132:01   spoke about a series of them early this morning, and
2   02   then we talked about the expense analysis report and
3   03   the periodic pipeline download report.
4   04        Were there any other reports that you
5   05   reviewed during Q3 2001?
6   06   A.  I couldn't say.  Nothing standard.
7   07   Q.  Okay.
8   08        I would like to mark as DC 70.
9   09        (Exhibit 70 marked.)
10  10   MS. SEGAL:  We can go back on the record.
11  11        Sorry.
12  12   MS. LAVALLEE:  Are we back on?  Okay.
13  13   Q.  Ms. Kopp, can you take a moment and look
14  14   at this document.  And then when you've had a chance
15  15   to review it, please identify what this is for me.
16  16        (Pause in proceedings for document review.)
17  17   THE WITNESS:  It appears to be a
18  18   comparison between both of the forecasted and best
19  19   amounts for big deals in comparison to what closed
20  20   at the end of that Q301.
21  21   BY MS. LAVALLEE:
22  22   Q.  Okay.
23  23        And just for the record, this document is
24  24   Bates-stamped ORCL 0128255.
25  25        And it is titled:  "Oracle Service
```

133

```
1   00133:01 Industries FY01 - Q3 Big Deal Analysis."
2   02      Ms. Kopp, can you tell me who prepared
3   03 this document?
4   04   A.  I'm not sure.
5   05   Q.  Have you ever seen this document before
6   06 today?
7   07   A.  Yes.
8   08   Q.  Okay.
9   09      And when did you see this document
10  10 before?
11  11   A.  Yesterday.
12  12   Q.  Okay.
13  13      And was that the first time you have seen
14  14 this document?
15  15   A.  I'm sorry, Tuesday.
16  16   Q.  Okay.
17  17      And was this the first time -- was
18  18 Tuesday the first time you've ever seen this
19  19 document?
20  20   A.  I'm not sure.
21  21   Q.  Okay.
22  22      And do you recall ever seeing documents
23  23 of this type, not specifically this one, but of this
24  24 type prior to Tuesday?
25  25   A.  No.
```

135

```
1   00135:01 they were referring to.
2   02 BY MS. LAVALLEE:
3   03   Q.  Okay.
4   04      Now, we discussed earlier big deal
5   05 analysis.  And is that something that you prepared
6   06 for Mr. Nussbaum?
7   07   A.  Prepared or supervised its preparation,
8   08 yes.
9   09   Q.  Okay.
10  10      Was there only one big deal report that
11  11 you prepared or supervised during the Q3 2001?
12  12      MR. NADOLENCO:  Objection.  Asked and
13  13 answered.
14  14 BY MS. LAVALLEE:
15  15   Q.  You can answer the question.
16  16   A.  Yes.
17  17      MS. LAVALLEE:  Okay.
18  18      I would like the mark as Exhibit 71, a
19  19 document Bates-stamped CA-ORCL 025341 through -355.
20  20      (Exhibit 71 marked.)
21  21 BY MS. LAVALLEE:
22  22   Q.  Ms. Kopp, can you take a look at this
23  23 document.
24  24      And then when you have had a moment to
25  25 review it, identify it for me, please?
```

134

```
1   00134:01   Q.  Do you know whose handwriting is on this
2   02 document?
3   03   A.  No, I do not.
4   04   Q.  Ms. Kopp, I'd like to read you an excerpt
5   05 from the summary of the SLC interview.
6   06      It states on page 8:
7   07      "In addition, Kopp
8   08      provided a big deal analyses
9   09      report that she regularly
10  10      prepared for Jay Nussbaum
11  11      (ORCL 1285266 attached
12  12      hereto as Exhibit C)."
13  13      And I'll represent to you that this is
14  14 actually the document that was attached as Exhibit C
15  15 to the SLC report.
16  16      Ms. Kopp, do you believe that to be an
17  17 accurate statement?
18  18   A.  No.
19  19   Q.  Okay.
20  20      What was specifically the document that
21  21 you regularly prepared that they were referring to
22  22 in this text?
23  23      Is there such a document?
24  24      MS. WHITE:  Objection to form.
25  25      THE WITNESS:  I don't know exactly what
```

136

```
1   00136:01 (Pause in proceedings for document review.)
2   02      THE WITNESS:  That's the Americas
3   03 Forecast packet and big deals breakdown, or big
4   04 deals summary.
5   05 BY MS. LAVALLEE:
6   06   Q.  Okay.
7   07      I'm sorry, can I have the answer read
8   08 back, please?
9   09      (Record read as follows:
10  10      A.  "That's the Americas
11  11      Forecast packet and big
12  12      deals breakdown, or big
13  13      deals summary.")
14  14 BY MS. LAVALLEE:
15  15   Q.  Okay.  And when you say "big deals
16  16 summary," is that the document that you were
17  17 referring to that you prepared for Mr. Nussbaum or a
18  18 different document?
19  19   A.  It's the same document.
20  20   Q.  Okay.  By the way, did you prepare that
21  21 document for Mr. Nussbaum for any particular
22  22 purpose?
23  23      MS. WHITE:  Objection to form.
24  24 BY MS. LAVALLEE:
25  25   Q.  During Q3 2001?
```

137

```
1   00137:01   A.  It was required by corporate finance.
2   02   Q.  Okay.
3   03       Do you know what --
4   04   A.  So, yes.
5   05   Q.  Oh, sorry.
6   06       Do you know what purpose Mr. Nussbaum
7   07  used that document, for what purpose he used that
8   08  document during Q3 2001?
9   09   A.  No.
10  10   Q.  Okay.
11  11       Do you know if he ever discussed it with
12  12  any of his superiors?
13  13   A.  I don't know.
14  14   Q.  Okay.
15  15       And when you refer to the "big deal
16  16  summary," can you identify for me by looking at the
17  17  Bates numbers on the bottom of the page, which
18  18  portion of this report you are referring to?
19  19   A.  O25346.
20  20       Just the OSI portion or the whole thing?
21  21   Q.  The whole thing would be helpful.
22  22   A.  Then it would be all the way through the
23  23  end, through -355.
24  24   Q.  Okay.  And the OSO ends at -49; is that
25  25  correct?
```

138

```
1   00138:01   MS. WHITE:  Objection to form.
2   02       "OSI" again?
3   03  BY MS. LAVALLEE:
4   04   Q.  OSI, yes.
5   05   A.  That's correct.
6   06   Q.  Okay.
7   07       And is this the form that you generally
8   08  received the forecasting packages in?
9   09       MS. WHITE:  Objection to form.
10  10  BY MS. LAVALLEE:
11  11   Q.  Let me ask a different question.
12  12       Did you generally receive these Americas
13  13  Package and big deals schedules by way of email from
14  14  Lia Burke?
15  15   A.  By way of email.
16  16       I don't know that it was always from Lia
17  17  Burke.
18  18   Q.  Okay.
19  19       But you always received them by way of
20  20  email?
21  21   A.  Right.
22  22   Q.  Okay.
23  23       And when you received this email, what
24  24  did you do with it or when -- yes.
25  25       When you received this email attached to
```

139

```
1   00139:01  the Americas Forecast and big deal summary
2   02  schedules, what did you do with it?
3   03       MS. WHITE:  Objection to form.
4   04  BY MS. LAVALLEE:
5   05   Q.  And I'm referring now specifically to the
6   06  third quarter of 2001.
7   07   A.  I would have downloaded the attachments
8   08  to my hard drive.
9   09   Q.  Okay.
10  10       And would you have saved them in email as
11  11  well?
12  12   A.  Likely not.
13  13   Q.  Is it your practice to delete emails as
14  14  routinely as you receive them?
15  15   A.  With large attachments, yeah.  It clogs
16  16  up my box.
17  17   Q.  Do you put them in any folders or files
18  18  or download emails generally to your hard drive?
19  19   A.  No, I don't.
20  20   Q.  Ms. Kopp, is there a term or a document
21  21  or term of art at Oracle called "opportunity
22  22  sheets?"
23  23   A.  An opportunity worksheet.
24  24   Q.  Can you explain for me what that is?
25  25   A.  Having never used one, it's -- it's a
```

140

```
1   00140:01  tool for a sales rep within OSO.  My best
2   02  understanding is that it is a module within OSO that
3   03  allows a rep to add a worst forecast and best
4   04  estimate on a deal.
5   05   Q.  Okay.
6   06       And is that a module that was used during
7   07  Q3 2001?
8   08   A.  Sporadically.
9   09   Q.  Okay.
10  10       And why do you say "sporadically"?
11  11   A.  It was newer functionality and during
12  12  that quarter, the reps were becoming familiar with
13  13  the functionality.
14  14   Q.  Okay.
15  15       And were the reps from the OSI division
16  16  sporadically using this function during Q3 2001?
17  17   A.  To my knowledge, yes.
18  18   Q.  Were reports of opportunity worksheets
19  19  printed and circulated, to your knowledge?
20  20   A.  Not specifically.
21  21       The information in them was subsequently
22  22  added, I believe, to the big deals summary.
23  23       And the big deals summary format changed
24  24  quite a bit during that time frame.
25  25       So I don't remember exactly when.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

141

```
1   00141:01    Q.   Okay.
2   02              And what do you mean that it changed
3   03   during that time frame?
4   04       A.   I mean the columns and the data points
5   05   that were in the summary, the actual format of the
6   06   summary changed a number of times during that
7   07   quarter.
8   08       Q.   Okay.
9   09              And do you know why that is?
10  10       A.   The finance functions had just moved
11  11   globally from the local lines of business to
12  12   corporate finance.
13  13              And I believe that Jennifer was --
14  14   Jennifer Minton was trying to get an ideal format
15  15   together.  So it was a new process working out the
16  16   kinks, I would say.
17  17       Q.   Okay.
18  18              And was that something that was going on
19  19   exclusively at OSO -- OSI or also at NAS and OPI?
20  20       A.   Also at NAS and OPI.
21  21       Q.   And do you know during what period of
22  22   time those changes were being made?
23  23       A.   I know it started in November of 2000.  I
24  24   don't recall when the final format was settled.
25  25       Q.   Okay.
```

143

```
1   00143:01         How long had you been reporting to -- oh,
2   02   strike that.
3   03              Actually, what is your relation -- what
4   04   was your relationship in terms of reporting with
5   05   Mr. Nussbaum in Q3 2001?
6   06       A.   I did not report to him.
7   07              I was responsible for his territory, but
8   08   I did not report to him in any fashion.
9   09       Q.   Okay.
10  10              Had you previously reported to
11  11   Mr. Nussbaum?
12  12       A.   Not directly.
13  13       Q.   Okay.
14  14              Had you previously worked with
15  15   Mr. Nussbaum, prior to the time that your job task
16  16   changed or your job title changed at the end of
17  17   2000?
18  18       A.   Not directly.
19  19       Q.   Is there a term of art at Oracle for --
20  20   is the term "forecast sheet" a term of art at
21  21   Oracle?
22  22       A.   No.
23  23       Q.   Okay.
24  24              Have you ever heard of that phrase?
25  25       A.   No.
```

142

```
1   00142:01         Do you know if it was in Q3 2001?
2   02       A.   No, I don't.
3   03       Q.   Was there a reason why these -- this
4   04   particular report was being changed during that
5   05   period of time?
6   06       MS. WHITE:  Objection to form.
7   07       THE WITNESS:  I don't know.
8   08   BY MS. LAVALLEE:
9   09       Q.   You never had a discussion with
10  10   Ms. Minton or anybody else regarding the reason why
11  11   you were doing that or Oracle was doing that?
12  12       A.   I don't remember.
13  13       Q.   Is that something that generally is part
14  14   of your job you would be aware of?
15  15       MR. NADOLENCO:  Objection to form.
16  16       THE WITNESS:  Generally, I would know why
17  17   she would want to make a change in something.
18  18   BY MS. LAVALLEE:
19  19       Q.   Right.
20  20              But you just don't -- you don't recall
21  21   today, it has been a couple years?
22  22       A.   Yeah.
23  23              And I had reported to her for a month at
24  24   that point, so I didn't know her style.
25  25       Q.   Right, right.
```

144

```
1   00144:01    I saw it in the transcript, but I don't
2   02   know what they meant by that.
3   03       Q.   Okay.
4   04              So -- and when you referred to
5   05   "transcript," are you talking about the summary of
6   06   the interview by the SLC of you?
7   07       A.   Yes.
8   08       Q.   That was another inaccuracy?
9   09       A.   Yes.
10  10       MS. LAVALLEE:  Why don't we break at this
11  11   point for lunch.
12  12       THE VIDEOGRAPHER:  The time is 12:12.
13  13       Off the record.
14  14       (Lunch recess taken.)
15  15   AFTERNOON SESSION
16  16       THE VIDEOGRAPHER:  The time is 1:28.
17  17       On the record.
18  18
19  19          EXAMINATION
20  20
21  21   BY MS. LAVALLEE (Resumed):
22  22       Q.   Good afternoon, Ms. Kopp.
23  23       A.   Hi.
24  24       Q.   Before we left we were discussing a
25  25   document that we marked Exhibit Number 71, which was
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

145

00145:01  an email with an attachment.
02      The subject is "Americas Forecast
03 Package."
04      Ms. Kopp, I believe you testified that --
05 well, actually, let me ask you a question.
06      Did you receive this email and attachment
07 on or about the date November 22nd, 2000?
08   A.   I must have.  I am on the distribution,
09 so I must have.
10   Q.   Okay.
11      And did you receive similar reports at
12 various points during Q3 2001?
13   A.   Yes.
14   Q.   Okay.
15      I think you testified that you were not
16 sure whether or not you --
17      You always received them by email, but
18 you are not certain whether you received them from
19 Lia Burke.
20      Is that correct?
21   A.   That's correct.
22   Q.   Okay.
23      Was there always a cover email with this
24 document?
25   A.   I'm sorry?

146

00146:01   Q.   Was there always a cover email enclosing
02 the document; do you recall, during Q3 2001?
03   A.   I don't recall.
04   Q.   Was this document or the attachment to
05 this email discussed subsequently to the sending of
06 the email during Q3 2001?
07      MS. WHITE:  Objection as to form.
08      THE WITNESS:  Yeah, I don't know what you
09 mean "discussed."  On the call that it was prepared
10 for, or --
11 BY MS. LAVALLEE:
12   Q.   Okay.  Let me ask a different question
13 then.
14      Well, actually, let me just ask something
15 totally different.
16      I would like the mark as Exhibit 72, a
17 document Bates-stamped CA-ORCL 004811.
18      (Exhibit 72 marked.)
19 BY MS. LAVALLEE:
20   Q.   And Ms. Kopp, if you could take a look at
21 this document.  And then identify it for me after
22 you have had an opportunity to review it.
23   A.   It's the Americas Forecast Package again.
24   Q.   And did you receive this document in
25 connection with your duties at Oracle Corporation on

147

00147:01  or about January 22nd, 2001?
02   A.   I don't know.
03   Q.   Okay.
04   A.   I assume I did, but I don't know.
05   Q.   You normally receive them, and you have
06 no reason to believe that you didn't receive this
07 one?
08   A.   That's correct.
09   Q.   Ms. Kopp, can you tell me whose
10 handwriting is on various pages on this document?
11   A.   They are illegible on this doc- -- I mean
12 on my copy.
13   Q.   Okay.
14      Can you tell if they might have been
15 yours?
16   A.   I can't tell.  I mean, I can't read them
17 at all.
18   Q.   Okay.
19      Do you know how you received this
20 particular document, if you know, in January 2001?
21   A.   It would have been electronically.
22   Q.   And I believe you testified that you
23 would have opened this document and saved it to your
24 computer.
25      Is that correct?

148

00148:01   A.   That's correct.
02   Q.   Okay.
03      And when you say you save something to
04 the computer, where would you save this?
05   A.   Into a directory marked "Americas."  I
06 think it was just marked "Americas" under my
07 forecast tab.
08   Q.   And was this something that was on your
09 hard drive?
10   A.   Yes, it was.
11   Q.   Okay.
12      And would you say -- did you routinely
13 save documents on the network as well?
14   A.   No.
15   Q.   Do you ever save documents on the
16 network?
17   A.   No.
18   Q.   Is there a network at Oracle Corporation?
19   A.   Yes.
20   Q.   So you have a tab called "Forecast" under
21 your -- on your hard drive with your computer in the
22 office?
23   A.   I have a number of them.
24   Q.   A number of them.
25      And what are the different tabs relating

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

149

```
1   00149:01  to forecast on your system?
2   02    A.   Well, it would be hierarchical, so I have
3   03   a tab called "OSI."
4   04         Within that tab I have -- within that
5   05   folder, I have a folder called "Forecast."
6   06    Q.   Any others relating to forecast?
7   07    A.   More current ones for the current
8   08   organizations.
9   09         So since OSI is no longer in existence, I
10  10   have those same tabs now for North America Sales and
11  11   for North America Consulting.
12  12    Q.   Okay.
13  13         And are there subfolders underneath the
14  14   folder called "Forecast"?
15  15    A.   Currently, yes.
16  16    Q.   Okay.
17  17         And were there during Q3 subfolders under
18  18   the tab or folder called "Forecast" under OSI?
19  19    A.   Yes.
20  20    Q.   What were those subfolders in Q3 2001?
21  21    A.   They are -- assuming I haven't changed
22  22   them, I know what they are today.
23  23    Q.   Okay.
24  24         And do you have any understanding as to
25  25   whether or not you may have changed them since Q3
```

150

```
1   00150:01  2001?
2   02    A.   Given that OSI no longer exists as it did
3   03   before, it's possible.  I may have rearranged the
4   04   folders after that group closed down and I cleaned
5   05   out my files, yeah.
6   06    Q.   Do you know if your computer is backed up
7   07   by Oracle?
8   08    A.   I don't know.
9   09    Q.   We spoke earlier about the fact that
10  10   you -- the computer you were using in Q3 2001 was
11  11   retired.
12  12         And we talked briefly about the fact
13  13   somebody may have transferred the data from that
14  14   computer to your computer.
15  15         Do you know for a fact that that
16  16   occurred, the transfer of information?
17  17    A.   Yes.
18  18    Q.   Okay.
19  19         And did you give directions as to which
20  20   information you wanted to transfer?
21  21    A.   Yes.
22  22         I was told to move all of my files under
23  23   my data, and that entire directory was moved.
24  24    Q.   Okay.
25  25         And do you know if it was moved anywhere
```

151

```
1   00151:01  else as well?
2   02    A.   No, I don't.
3   03    Q.   Do you have any particular expertise in
4   04   computers?
5   05    A.   No.
6   06    Q.   Okay.  Me neither.
7   07         What is your educational background on
8   08   finance?
9   09    A.   On finance?
10  10    Q.   Uh-huh.
11  11    A.   Not a great degree.
12  12         My -- my college experience was with a
13  13   more general marketing background, so I didn't have
14  14   a lot of education in finance specific.
15  15    Q.   Okay.
16  16         Nothing formal?
17  17    A.   No.
18  18    Q.   Okay.
19  19         I would like to turn your attention back
20  20   to Exhibit Number 72, please.
21  21    A.   Uh-huh.
22  22    Q.   And if I could ask you to turn to the
23  23   second page, which is Bates-stamped 004812.
24  24    A.   Uh-huh.
25  25    Q.   And there is several headers here.
```

152

```
1   00152:01       Can you from left to right just identify
2   02   and explain what each of these headings represent,
3   03   please, starting at "Q301 Forecast"?
4   04    A.   "Q301 Forecast" would be the current
5   05   forecast as of that week.
6   06    Q.   And who sets the forecast for OSI, or did
7   07   at the time -- at the time of this document?
8   08    A.   Jay Nussbaum.
9   09    Q.   And I believe you testified earlier that
10  10   you didn't really have any involvement in the
11  11   establishment of this forecast.
12  12         Is that correct?
13  13    A.   That's correct.
14  14    Q.   Okay.
15  15         Can you continue for the next column,
16  16   please?
17  17    A.   Sure.
18  18         "Prior week forecast," I don't know if
19  19   that means the prior week physically or the prior
20  20   forecast week.
21  21    Q.   Okay.
22  22    A.   Since those are, you know, on a schedule.
23  23    Q.   Correct.
24  24    A.   "Variance from prior week," if there is
25  25   any, would be reflected in the next column.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

153

```
1   00153:01   Q.  Right.
2   02    A.  "Growth verse prior year percentage,"
3   03  would be the growth over the prior quarter -- or
4   04  prior year same quarter.
5   05    Q.  Okay.
6   06        And why is that figure reflected in this
7   07  document; if you know?
8   08    A.  It was considered to be relevant.
9   09    Q.  And why is that considered to be
10  10  relevant?
11  11    A.  Because the market generally looks at
12  12  those type of growth patterns.
13  13    Q.  Okay.
14  14        And -- okay.
15  15        The next column, please?
16  16    A.  I don't know what the next column is, to
17  17  be honest with you.  I didn't the create the
18  18  documents.
19  19        I assume it's a 30 -- since it says "30
20  20  percent growth," that it is imputed based on the
21  21  prior year, and that it's a 30 percent uplift from
22  22  the prior Q3.
23  23    Q.  Okay.
24  24        And the heading above that says "Target."
25  25        Would -- would it be your understanding
```

154

```
1   00154:01  that that might related to the budget?
2   02    A.  I don't know.
3   03    Q.  Okay.
4   04        And the next section is -- a large
5   05  caption called "Pipeline."
6   06        Can you read the headings under there
7   07  starting with "Q301 Pipeline"?
8   08    A.  Uh-huh.
9   09        The "Q3 FY01 Pipeline" would be the
10  10  pipeline as of that week, which was week eight of
11  11  the quarter.
12  12        The second one, "Prior week pipeline,"
13  13  again likely refers to the prior forecast week as
14  14  opposed to the prior physical week.
15  15        "Variance from prior week" is a
16  16  difference between the two.
17  17        The "Pipeline conversion ratio" is the
18  18  forecast over -- the current forecast over the
19  19  current pipeline.  So it's an imputed number that
20  20  says that we would need to convert 53 percent of
21  21  that pipeline to earn that forecast.
22  22    Q.  Okay.
23  23        And we spoke earlier about looking at the
24  24  conversion ratio and then looking at historical
25  25  data, and comparing the two.
```

155

```
1   00155:01        Is this the type of figure that you would
2   02  use in that computation and analysis?
3   03    A.  Yes.
4   04    Q.  Okay.
5   05        And do you see anywhere in this document
6   06  the data which would permit you to make the analysis
7   07  that you discussed earlier regarding the conversion
8   08  rate and compared to historical conversion rates?
9   09    A.  No.
10  10    Q.  Okay.
11  11        When you did those analyses, what
12  12  documents did you obtain that information from to
13  13  make that analysis?
14  14        MS. WHITE:  Objection to form.
15  15        THE WITNESS:  I don't recall.
16  16  BY MS. LAVALLEE:
17  17    Q.  Okay.
18  18    A.  Yeah, I don't know -- I don't recall
19  19  where we got the prior year data.
20  20    Q.  Okay.
21  21        Do you recall if it was from an actual
22  22  report or whether it was from the forecasting system
23  23  online?
24  24    A.  I don't recall.
25  25    Q.  Okay.
```

156

```
1   00156:01        What databases at Oracle exist that
2   02  tracks forecasting type data?
3   03        MR. NADOLENCO:  Objection to form.
4   04        THE WITNESS:  At Oracle?
5   05  BY MS. LAVALLEE:
6   06    Q.  Yes.
7   07        And let me rephrase my question to
8   08  clarify the time period.
9   09        What databases exist at Oracle that
10  10  tracks -- or that contains information regarding
11  11  forecast type data during Q3 2001?
12  12        MR. NADOLENCO:  Same objection.
13  13        THE WITNESS:  I can only answer to the
14  14  ones I know of.  There may be others.
15  15  BY MS. LAVALLEE:
16  16    Q.  Okay.
17  17        Which are the ones you are aware of?
18  18    A.  Oracle financial analyzer is the only
19  19  official forecast system that I am aware of.
20  20    Q.  Uh-huh.
21  21        And were there other systems that
22  22  actually contain data, forecasting-type data, for
23  23  example, the deal data or forecast information other
24  24  than that might be an official forecasting database?
25  25        MS. WHITE:  Objection as to form.
```

Kopp, Sarah (Vol. 01) - 02/19/2004   2/19/2004   4:50:00 PM

157

```
1   00157:01      THE WITNESS:  Yes.
2   02             OSO for the deal information.
3   03   BY MS. LAVALLEE:
4   04        Q.   Uh-huh.
5   05             Anything else?
6   06        A.   I'm not sure of any others, no.
7   07        Q.   Okay.
8   08             And what about databases that contain
9   09   actual results at any point during a quarter, what
10  10   databases exist at Oracle or existed at Oracle
11  11   during the Q3 fiscal 2001 time frame?
12  12        MS. WHITE:  Objection as to form.
13  13        THE WITNESS:  Any number of them.
14  14             So in terms of reporting, OFA, as I had
15  15   said before, would be where we would pull the
16  16   official results.
17  17             But any system such as a general ledger
18  18   would have -- would be closed out officially at the
19  19   end of each accounting period.
20  20   BY MS. LAVALLEE:
21  21        Q.   Okay.
22  22             And now speaking primarily regarding
23  23   mid-results, closed deals, and that type of
24  24   information, that -- during the quarter, not
25  25   necessarily at the end of the quarter, what types of
```

158

```
1   00158:01   forecasting systems are you aware of that existed to
2   02   track that type of data during Q3 2001?
3   03        MS. WHITE:  Objection as to form.
4   04        THE WITNESS:  Forecasting systems?
5   05   BY MS. LAVALLEE:
6   06        Q.   Or, actually, let me rephrase that.
7   07             What systems are you aware of that
8   08   existed in Q3 2001 that contained information
9   09   regarding actual results during the quarter?
10  10        A.   Revenue results or -- I mean --
11  11        Q.   Any -- let's start with revenue results.
12  12        A.   Okay.
13  13             Revenue results for which lines of
14  14   business?
15  15        Q.   Any that you are aware of.
16  16        A.   Okay.
17  17             Order entry was where our contracts were
18  18   actually entered.
19  19        Q.   Is that the actual title of that system?
20  20        A.   At that time, order entry was the name of
21  21   the system.
22  22        Q.   And what is it currently called?
23  23        A.   I'm not sure.
24  24        Q.   Okay.
25  25             And what system -- what division owns
```

159

```
1   00159:01   that system or runs that system; do you know?
2   02        A.   Contracts.
3   03        Q.   Okay.
4   04             Any others for revenue during Q3 2001?
5   05        A.   Project accounting for consulting
6   06   revenue.
7   07        Q.   And what type of data is contained on
8   08   that?
9   09        A.   Project accounting has the funded
10  10   projects and the billable hours of the consultants,
11  11   expenses, those kinds of things that are billed to
12  12   our customers.
13  13        Q.   Okay.
14  14             And that's something that existed in
15  15   Q3 2001?
16  16        A.   Yes, it did.
17  17        Q.   Okay.
18  18             Is that something that exists today?
19  19        A.   Yes, it is.
20  20        Q.   Okay.
21  21             And is the term "own a system," is that a
22  22   term of art at Oracle, the division owns a system?
23  23        A.   Not really.
24  24        Q.   Okay.
25  25             Then tell me which department or division
```

160

```
1   00160:01   of Oracle handled the project accounting system that
2   02   you just referred to.
3   03        A.   It would have been the revenue accounting
4   04   group.
5   05        Q.   And what is the purpose of that group?
6   06        A.   To book consulting orders, fund them in
7   07   the system, generate the invoices.
8   08        Q.   Okay.
9   09             Any other system that would track or
10  10   contain actual revenue data throughout the quarter?
11  11        A.   In other lines of business, but I don't
12  12   know what they were.
13  13        Q.   Okay.
14  14        A.   Education and support, I don't know where
15  15   that revenue sat.
16  16        Q.   Okay.
17  17             And in terms of OSO, are those the only
18  18   two that you are aware of?
19  19        MS. WHITE:  Objection as to form.
20  20   BY MS. LAVALLEE:
21  21        Q.   Actually -- well, are you aware of any
22  22   others than the -- other than the ones you've just
23  23   discussed that would cover revenue, actual revenue
24  24   results for OSO -- OSI?
25  25             I have a hard time with that one.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

161

1  00161:01    A.  There was a -- there was some kind of
2    02  email thing that came out.  It was a custom tool
3    03  called Revenue Manager.
4    04    Q.  And what is that?
5    05    A.  It was an email-generated thing that just
6    06  sort of showed what -- what revenue was being posted
7    07  into receivables.
8    08    Q.  Okay.
9    09    A.  On sort of a daily basis, we would
10    10  reconcile against that.
11    11    Q.  Okay.
12    12        And who was it who ran that system?
13    13    A.  I don't know.
14    14        I don't even know that it was a system.
15    15    Q.  Okay.
16    16        And who uses -- used that, for the lack
17    17  of a better word, system or Revenue Manager program?
18    18    A.  A lot of people.
19    19        You know, a cost center owner.  It was at
20    20  the cost center level so the person who owned a cost
21    21  center.
22    22        People were generally granted access to
23    23  it for whatever they have responsibility over.
24    24    Q.  Okay.
25    25        And is that simply a management level

162

1  00162:01  tool?
2    02        Is that a question you can answer?
3    03    A.  Yeah, I don't know.
4    04    Q.  All right.
5    05    A.  It could be.
6    06    Q.  Okay.
7    07        And are you aware of any other systems
8    08  that would have tracked or contained data relating
9    09  to actual revenue results for OSI during Q3 2001?
10    10    A.  No.
11    11    Q.  Are you aware of any other systems other
12    12  than the ones you've just discussed that would have
13    13  contained revenue information or actual revenue
14    14  information for any of the divisions, other than OSI
15    15  during the third quarter of 2001?
16    16    MS. WHITE:  Objection as to form.
17    17    THE WITNESS:  No.
18    18  BY MS. LAVALLEE:
19    19    Q.  Have you ever heard of a system called
20    20  Americas Data Manager?
21    21    A.  No.
22    22    Q.  Have you ever used any of the three
23    23  systems, the -- well, actually, let me just ask
24    24  about the order entry system that you discussed.
25    25        Is that a system you have used?

163

1  00163:01    A.  No, it is not.
2    02    Q.  Okay.
3    03        How about the Revenue Manager?
4    04    A.  Revenue Manager can't be used, it's an
5    05  alert.
6    06    Q.  Okay.
7    07    A.  It's not -- you can't do anything with
8    08  it.
9    09    Q.  Okay.
10    10    A.  It's not a file, it's -- yeah.
11    11    Q.  Can you explain to me what -- give me a
12    12  little more detail because I'm not quite sure I
13    13  understand it then.
14    14    MS. WHITE:  Objection as to form.
15    15  BY MS. LAVALLEE:
16    16    Q.  It's not a system so you can't go online
17    17  and look at the data.
18    18        Is it data that's just disseminated by
19    19  some office or division of Oracle?
20    20    A.  It's generated out of -- the data is
21    21  pulled from other systems, and I don't know which
22    22  ones.
23    23    Q.  Okay.
24    24    A.  It is an alert that comes in email form,
25    25  but can't be manipulated in any way.  It's already

164

1  00164:01  made.  It just shows a list of numbers, that's all.
2    02    Q.  Okay.
3    03        And have you ever received one of these?
4    04    A.  Yes, I have.
5    05    Q.  Okay.
6    06        And do you routinely receive them?
7    07    A.  Did I?
8    08    Q.  During --
9    09    A.  It's been disabled, so . . .
10    10    Q.  Did you during Q3 2001 routinely receive
11    11  these email alerts relating to the Revenue Manager?
12    12    A.  Yes.
13    13    Q.  Okay.
14    14        And can you explain to me what this would
15    15  look like when you received the email?
16    16    A.  Yeah.
17    17        It would have -- at that time, I would
18    18  have been looking at a summary of OSI.  It would
19    19  have columns for license consulting, education and
20    20  support, and then total revenues.
21    21        And then the rows would be the business
22    22  units.
23    23        And then it would just have a total
24    24  dollar number.
25    25    Q.  Okay.

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

165

```
1   00165:01      Any other information contained on that?
2   02    A.  No.
3   03    Q.  Okay.
4   04        Have we looked at any document that
5   05 reflects that?
6   06    A.  No.
7   07    Q.  Okay.
8   08        And normally is there a set distribution
9   09 list for these things, or is it sent to specific
10  10 people for different purposes?
11  11    A.  There was a distribution.  I don't know
12  12 who managed it.
13  13    Q.  And do you know anybody other that
14  14 yourself who is on that list?
15  15    A.  Yeah.
16  16        I mean, my entire finance team and anyone
17  17 who had responsibility for a revenue-generating cost
18  18 center was authorized to receive it for their area.
19  19    Q.  Okay.
20  20        And what did you use that data for?
21  21    A.  To track -- it was sort of a two-day
22  22 delay track of what was -- what revenue was being
23  23 recorded --
24  24    Q.  Okay.
25  25    A.  -- in receivables.
```

166

```
1   00166:01      It wasn't real-time by any -- by any
2   02 stretch of the imagination.  It was delayed.
3   03    Q.  Okay.
4   04        Is two days -- I mean, you say it wasn't
5   05 real-time by any stretch.  Is two days an unusually
6   06 long period of time for a report to actually track
7   07 the information?  Is two-day-old information stale?
8   08        MR. NADOLENCO:  Objection.
9   09        Sorry.
10  10 BY MS. LAVALLEE:
11  11    Q.  You can answer the question.
12  12        MR. NADOLENCO:  Then, objection to form.
13  13        THE WITNESS:  At the end of a quarter,
14  14 two days is far too long of a time.
15  15 BY MS. LAVALLEE:
16  16    Q.  Okay.
17  17        And is this an alert, an email alert,
18  18 something that would be sent throughout the quarter
19  19 or something that was only sent at the end of the
20  20 quarter?
21  21    A.  Sent throughout the quarter.
22  22    Q.  And throughout the quarter is two-day-old
23  23 information -- is that something you would describe
24  24 as stale?
25  25
```

167

```
1   00167:01      MS. WHITE:  Objection as to form.
2   02        MR. NADOLENCO:  Objection.
3   03        THE WITNESS:  Not during the middle of
4   04 the quarter.
5   05 BY MS. LAVALLEE:
6   06    Q.  Do you -- just a second.
7   07        Is this -- are the emails alert from the
8   08 Revenue Manager something that Jennifer Minton would
9   09 have received during Q3 2001?
10  10    A.  I don't know.
11  11    Q.  Was it something that Mr. Nussbaum
12  12 received in Q3 2001?
13  13    A.  I don't think so.
14  14    Q.  Okay.
15  15        Was it something that any of the senior
16  16 vice-presidents would have received?
17  17    A.  I don't know.
18  18    Q.  How about the executive vice-presidents?
19  19    A.  I don't know.
20  20    Q.  Okay.
21  21        And how about Mr. Ellison or Mr. Henley?
22  22    A.  I don't know.
23  23    Q.  And what did you do with these emails
24  24 alerts once you received them?
25  25    A.  That depends on what time of the quarter.
```

168

```
1   00168:01    Q.  In the first month of Q3 2001, what would
2   02 you have done with the email alerts at that time?
3   03    A.  I would have checked for anything that
4   04 looked out of line, like some huge negative or
5   05 something that didn't belong there, and then just
6   06 delete them.
7   07    Q.  Okay.
8   08        Did you ever save them?
9   09    A.  No.
10  10    Q.  And I actually misspoke earlier.  I was
11  11 inquiring about something called Americas Data Mart
12  12 and I may have misspoken and said "Americas Data
13  13 Manager."
14  14        Are you aware of any system called
15  15 Americas Data Mart that exists or that used to exist
16  16 at Oracle?
17  17    A.  Yes.
18  18    Q.  Okay.
19  19        And what is that system, can you tell me?
20  20    A.  I don't know exactly.  I've never
21  21 accessed it.
22  22    Q.  Okay.
23  23        And do you know generally what its
24  24 purpose is?
25  25    A.  It was a data warehouse of a lot of data
```

169

```
1    00169:01  points. I don't know exactly which ones.
2    02    Q.   Was it relating to actual sales or
3    03  something else?
4    04    A.   I don't know.
5    05    Q.   Do you know who at Oracle would use this
6    06  data?
7    07    A.   No.
8    08    Q.   Do you know what department actually ran
9    09  the system or was responsible for it?
10   10    A.   No.
11   11         It was a custom, it wasn't a product of
12   12  ours.
13   13    Q.   Was it something that was used by OSI; do
14   14  you know?
15   15    A.   I don't know.
16   16    Q.   Do you know who we could speak to, to
17   17  determine what this system is?  Who at Oracle would
18   18  know?
19   19    A.   What Data Mart was?
20   20    Q.   Yeah.
21   21    A.   I'm not sure anyone who is still here.
22   22    Q.   And why do you say that?
23   23    A.   Well, I do know of one person who used
24   24  it, but she is no longer with the company.
25   25    Q.   And who was that?
```

170

```
1    00170:01    A.   Roberta Ronsee in the corporate finance,
2    02  I believe she used it.
3    03    Q.   Okay.
4    04         And who has taken over her position?
5    05    A.   I don't know.
6    06    Q.   And do you know when she left?
7    07    A.   No.
8    08    Q.   Has she been gone more than a year?
9    09    A.   I think so.
10   10    Q.   Okay.
11   11         And do you know why she used the system?
12   12    A.   No.
13   13    Q.   Do you know who she provided data to from
14   14  the system?
15   15    A.   No, I don't.
16   16    Q.   Do you know what the exact title of the
17   17  system is?
18   18    A.   It was called Americas Data Mart.
19   19    Q.   Okay.
20   20         And was this an online system?
21   21    A.   I think so.
22   22    Q.   Do you know during what period of time it
23   23  was used?
24   24    A.   No, I don't.
25   25    Q.   So you have never seen any report from
```

171

```
1    00171:01  this system or access to the system.  Correct?
2    02    A.   I wouldn't know if there was a report
3    03  that was populated from that system.
4    04    Q.   Okay.
5    05         Do you know where at Oracle the system --
6    06  well, let me ask a different question.
7    07         You said it's no longer in use; is that
8    08  correct.
9    09    A.   That's correct.
10   10    Q.   Okay.
11   11         And what do you base that -- your
12   12  understanding on that on?
13   13         I mean, why do you believe it's no longer
14   14  in use?
15   15    A.   Because it doesn't exist anymore, it was
16   16  decommissioned.
17   17    Q.   Okay.
18   18         And how do you know it was
19   19  decommissioned?
20   20    A.   Because we have a system now that was
21   21  built to replace it.
22   22    Q.   And what is that system?
23   23    A.   It's called EDW, Enterprise Data
24   24  Warehouse.
25   25    Q.   Okay.
```

172

```
1    00172:01         And do you have access to that system?
2    02    A.   I do.
3    03    Q.   And do you use that system today?
4    04    A.   No, I don't.
5    05    Q.   Have you ever used that system?
6    06    A.   No.
7    07    Q.   Okay.
8    08         And what data is contained on that
9    09  system?
10   10    A.   I don't know all of the data elements.
11   11    Q.   Do you know any of them?
12   12    A.   Revenue.
13   13    Q.   Anything else?
14   14    A.   I think revenue at a product level, so
15   15  not by specific product, but at a summary product
16   16  level between applications and technology.
17   17    Q.   Okay.
18   18         And is that divided by division at Oracle
19   19  by OSI or NAS, or equivalent level divisions that
20   20  exist today?
21   21    A.   Yes.
22   22    Q.   And do you know who uses that system
23   23  today?
24   24    A.   I don't know everybody that uses that
25   25  system.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

173

```
1   00173:01    Q.   Who do you know who does?
2   02     A.   The financial analysts.
3   03     Q.   Uh-huh.
4   04          Anybody else?
5   05     A.   I don't know of other people.
6   06     Q.   Do you know whether or not anybody at the
7   07   senior vice-president level uses this system?
8   08     A.   I would doubt it.
9   09     Q.   Okay.
10  10          And do you know whether or not reports
11  11   are generated from this system?
12  12     A.   I believe they are.
13  13     Q.   Okay.
14  14          And do you know what reports are
15  15   generated from the system?
16  16     A.   No, I don't.
17  17     Q.   Have you -- do you have any understanding
18  18   as to whether or not you've received reports that
19  19   may have contained information generated from this
20  20   system?
21  21     A.   I have.
22  22     Q.   You have.
23  23          And which reports have you received that
24  24   you believe contains data from this system?
25  25     A.   I don't know that it's a report.
```

174

```
1   00174:01      I received a -- what I would call a data
2   02   dump from that system.  It just has a number of
3   03   pieces of data about historical actuals from a
4   04   particular month.
5   05          I don't know that it has a report name.
6   06     Q.   Okay.
7   07          And is that something you routinely
8   08   receive or is that something you received on more
9   09   than one occasion?
10  10     A.   I don't routinely receive it.
11  11     Q.   And did you receive it on more than one
12  12   occasion in the past or just one?
13  13     A.   I did.
14  14     Q.   More than one?
15  15     A.   More than one.
16  16     Q.   And during what period of time was that?
17  17     A.   It was last year.
18  18     Q.   Can you be more specific than "last
19  19   year"?
20  20     A.   It was Q3 of fiscal '03, and Q4 of fiscal
21  21   '03.
22  22     Q.   Okay.
23  23          That was one occasion?
24  24     A.   No, those were -- those were separate
25  25   occasions combined.
```

175

```
1   00175:01    Q.   Okay.
2   02          And for what purpose did you receive this
3   03   data on those two occasions?
4   04     A.   I was looking at customer -- I was
5   05   aggregating customer data.  We were attempting to do
6   06   some industry analysis.
7   07     Q.   Okay.
8   08          And can you be more specific, "industry
9   09   analysis," what does that mean?
10  10     A.   We were attempting to classify our
11  11   customers by industry.
12  12     Q.   Okay.
13  13          Why were you doing that?
14  14     A.   We were trying to do some analysis for a
15  15   sales group focused by industry.
16  16     Q.   And other than that, those two instances
17  17   of data dump that you've just referred to, are you
18  18   aware of other instances where you received
19  19   information from the EDW system?
20  20     A.   Not directly.
21  21     Q.   And indirectly?
22  22     A.   Well, EDW is now what's used to reconcile
23  23   the numbers as they are coming in.  It is
24  24   essentially a rev manager replacement, only there's
25  25   no alert.
```

176

```
1   00176:01    Q.   Okay.
2   02          And what you do you mean by "reconcile
3   03   revenue"?
4   04     A.   Oracle Sales Online is a forecasting
5   05   tool.
6   06     Q.   Right.
7   07     A.   If deals are marked in OSO as one, the
8   08   only way to reconcile to find out if the revenue was
9   09   actually hitting the GL is to see it in EDW.
10  10     Q.   Okay.
11  11     A.   So it's a reconciling tool between what
12  12   we are told is in and what's actually in.
13  13     Q.   Okay.
14  14          And any other purpose for the -- or --
15  15   well, let me ask a different question.
16  16          Does this data serve any other purpose
17  17   other than the one you just described?
18  18     A.   Not to me.
19  19     Q.   To other people, are you aware?
20  20     A.   I don't know.
21  21     Q.   We were just talking about a variety of
22  22   systems that track actual results for revenues for
23  23   the different divisions of Oracle during the Q3 2001
24  24   and some later period as well.
25  25          Are there other systems that you were
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

177

```
1   00177:01  aware of -- that you are aware of that tracked
2   02  actual results during Q3 2001 at Oracle?
3   03       MR. NADOLENCO:  Counsel, let me object to
4   04  the prelude to your question.
5   05       I don't think we were talking about a
6   06  variety of systems that we're discussing actual
7   07  results for in Q301.  We were just talking about
8   08  stuff that's related to Q303.
9   09       But other than the prelude, you can reask
10  10  the question.
11  11       MS. LAVALLEE:  All right.  Well, what --
12  12       MR. NASTARI:  It did include that, you
13  13  just finished talking about Data Mart.  That was --
14  14       MR. NADOLENCO:  Well, no, I thought we
15  15  were talking about Enterprise Data Warehouse just
16  16  now.
17  17       MS. LAVALLEE:  We were talking about a
18  18  variety of different systems, not only that one.
19  19       MS. WHITE:  At different times.
20  20       MS. LAVALLEE:  And I would ask that
21  21  counsel restrain your objections to just providing
22  22  the objection, and we don't need speaking objections
23  23  and they are not permitted.
24  24       MR. NADOLENCO:  Well, nor is giving an
25  25  inaccurate summary of what was --
```

178

```
1   00178:01       MS. LAVALLEE:  No, the witness is here to
2   02  tell me if it's inaccurate.
3   03       MR. NASTARI:  Your co-counsel just
4   04  disagreed with your interpretation of the question.
5   05       MS. WHITE:  That's not true at all.
6   06       MR. NADOLENCO:  And she is free to if she
7   07  would like to.
8   08       MS. LAVALLEE:  All right.  Well, your
9   09  objection has been noted, thank you.
10  10       THE WITNESS:  Would you repeat the
11  11  question, please?
12  12       MS. LAVALLEE:  Yes, I will.
13  13       Actually, can I have my last question
14  14  read back, please, because now I don't remember.
15  15       (Record read as follows:
16  16       Q.  "We were just talking
17  17       about a variety of systems
18  18       that track actual results
19  19       for revenues for the
20  20       different divisions of
21  21       Oracle during the Q3 2001
22  22       and some later period as
23  23       well.
24  24       Are there other systems
25  25       that you were aware of --
```

179

```
1   00179:01       that you are aware of that
2   02       tracked actual results
3   03       during Q3 2001 at Oracle?")
4   04       THE WITNESS:  I still would need to know
5   05  what kind of results you mean.
6   06       So our human resources database would
7   07  capture final head count of that period of time.
8   08       Every accounting system would capture the
9   09  final, you know, payroll accounts.
10  10       But I mean, I couldn't speak to every
11  11  system.
12  12  BY MS. LAVALLEE:
13  13       Q.  Sure.
14  14       Okay, let me ask a different question.
15  15       In terms of actual revenue or actual
16  16  sales results figures, throughout the period of time,
17  17  I'm not speaking of final results -- can you tell me
18  18  other than the systems we've already discussed, what
19  19  systems you know of that contained such actual sales
20  20  results during Q3 2003 -- 2001, pardon me?
21  21       A.  There are no more that I can think of.
22  22       Q.  And what types of reports did you receive
23  23  in Q3 2001 that tracked actual result figures?
24  24       A.  My team performed reconciliations where
25  25  they would show me what deals had been closed as per
```

180

```
1   00180:01  the sales team, versus what was currently reflected
2   02  in rev manager and what was still open or pending or
3   03  being reconciled.  Those kind of things.
4   04       Q.  Okay.
5   05       And did that information that they shared
6   06  with you, did that take a particular form during
7   07  Q3 2001?
8   08       A.  It would be an Excel spreadsheet.
9   09       Q.  Okay.
10  10       And can you tell me more specifically
11  11  what information would have been contained in those
12  12  Excel sheets during 3 -- Q3 2001, please?
13  13       A.  They would have had a listing of deals
14  14  that were pending closure or closed.
15  15       Q.  So specific, actual specific deals
16  16  identified by name?
17  17       A.  Not all of them.
18  18       We would close out each month.  So there
19  19  would be a balance forward of what was already
20  20  considered to be reconciled and posted to the books.
21  21       Q.  Okay.
22  22       And what did you do with these Excel
23  23  sheets when you received them?
24  24       A.  Just reviewed them, they were
25  25  informational.
```

181

```
1   00181:01    Q.  Did you forward them on to anybody else?
2   02      A.  No.
3   03      Q.  Did you discuss the information contained
4   04  on those sheets with anyone?
5   05      A.  I likely discussed it with the same
6   06  person who submitted it to me in terms of clarifying
7   07  data at times.
8   08      Q.  Anybody else?
9   09      A.  No.
10  10      Q.  Okay.
11  11          Other than those Excel spreadsheets that
12  12  would have been prepared by your direct reports,
13  13  were there other reports that you received that
14  14  contained actual sales results during Q3 2001?
15  15      A.  Not that I recall.
16  16      Q.  Okay.
17  17          And what about for expense, actual
18  18  expense recordings or actual expenses incurred
19  19  throughout the quarter.
20  20          Did you receive any reports regarding
21  21  that type of information during Q3 2001?
22  22      A.  When I asked for them.
23  23      Q.  And who do you ask this information from?
24  24      A.  It would have been Fred Avila or Shane
25  25  Gorman.
```

182

```
1   00182:01    Q.  And where would they obtain this
2   02  information?
3   03      A.  OFA.
4   04      Q.  Anywhere else?
5   05      A.  Likely not.
6   06      Q.  Okay.
7   07          We discussed a variety of systems at
8   08  Oracle that existed Q3 2001, as well as some that
9   09  existed later, that tracked actual sales-type
10  10  information.
11  11          Can you tell me what systems existed that
12  12  tracked actual expenses throughout a quarter and not
13  13  at the end of the quarter, but -- not exclusively at
14  14  the end of the quarter, but actual information as it
15  15  occurred during the quarter?
16  16          MR. NADOLENCO:  Objection to form.
17  17          THE WITNESS:  I wouldn't know all of
18  18  them.
19  19  BY MS. LAVALLEE:
20  20      Q.  Can you identify some of them?
21  21      A.  Sure.
22  22          Payroll.
23  23      Q.  Uh-huh.
24  24          Anything else?
25  25      A.  Accounts payable.
```

183

```
1   00183:01    Q.  Anything else?
2   02      A.  It's hard for me to think off the spot.
3   03      Q.  Sure.
4   04      A.  I'm not sure where all the expense
5   05  results came from.
6   06          Payable and accounts receivable certainly
7   07  would have -- accounts payable, rather, and payroll
8   08  would have been the primary ones.
9   09      Q.  Okay.
10  10          And you can't think of anything else
11  11  right now?
12  12      A.  No.
13  13      Q.  Okay.
14  14          It's been a while, I can understand that.
15  15  A lot of questions coming at you as well.
16  16          The -- you mentioned that Fred Avila and
17  17  his assistant -- was it his assistant, the other
18  18  gentleman?
19  19      A.  Yes.
20  20      Q.  -- may have prepared reports for you
21  21  regarding the actual expenses throughout the quarter
22  22  during Q3 2001.
23  23          What form did that reporting to you take?
24  24      A.  Excel.
25  25      Q.  Excel.
```

184

```
1   00184:01        And do those Excel sheets have a title?
2   02      A.  No.
3   03      Q.  And how regularly did they provide you
4   04  with this information?
5   05      A.  Maybe two or three times in a quarter.
6   06      Q.  Okay.
7   07          And what did you do with this sheet,
8   08  Excel sheet or data when you received it?
9   09      A.  Validate it to make sure that the
10  10  forecast that we had in for expenses was reasonable
11  11  based on the actual so far.
12  12          (Reporter interruption.)
13  13  BY MS. LAVALLEE:
14  14      Q.  And how did you do that?
15  15      A.  Well, as I stated earlier, if we had
16  16  salary expense of a certain amount in December and
17  17  the head count was the same in January, it would be
18  18  likely that the salary expense would be similar in
19  19  January.
20  20          Those kinds of things.
21  21      Q.  Okay.
22  22          And what did you do with that data after
23  23  looking at it, making your analysis?
24  24      A.  Question my directs if there was anything
25  25  out of line in their forecast, to ensure that I
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

185

```
1   00185:01 understood if there was anything that would look
2      02 different.
3      03   Q.   Okay.
4      04        And did you discuss it with anybody else?
5      05   A.   No.
6      06   Q.   Okay.
7      07        Did you forward this information to
8      08 anybody else?
9      09   A.   The reconciling information?
10     10        No.
11     11   Q.   Or the Excel spreadsheet?
12     12   A.   No.
13     13   Q.   Okay.
14     14        All right.
15     15        Back to Exhibit 72, please.
16     16        If I could draw your attention again to
17     17 the second page of this document which is
18     18 Bates-stamped 004812.
19     19        And we were going through the columns on
20     20 the very top right.  And I believe we stopped at --
21     21 we were discussing pipeline conversion ratio and the
22     22 next column says:  "Growth versus PY percent."
23     23        Do you know what that means?
24     24   A.   I -- I believe it means pipeline growth
25     25 over prior year, but prior year is not represented
```

186

```
1   00186:01 on here so I couldn't validate that that's accurate.
2      02   Q.   Okay.
3      03        And for -- do you know for what reason
4      04 this information was examined in this report?
5      05        MS. WHITE:  Objection as to form.
6      06        THE WITNESS:  No, I don't.
7      07 BY MS. LAVALLEE:
8      08   Q.   Okay.
9      09        Is that information that you would have
10     10 looked at in your capacity as finance director for
11     11 OSI during Q3 2001?
12     12   A.   We typically looked at pipeline growth.
13     13   Q.   And for what reason did you look at that?
14     14   A.   To know how much we were growing the
15     15 pipeline, I guess.
16     16        I don't have a better reason than that.
17     17   Q.   Okay.
18     18        What would you be looking at in terms of
19     19 this percentage figure, what would you be looking
20     20 for?  What type of analysis would you form in
21     21 looking at this figure?
22     22        MS. WHITE:  Objection as to form.
23     23        THE WITNESS:  I don't have a specific set
24     24 of analyses.  We would just be looking at the growth
25     25 itself to ensure that we do have sufficient
```

187

```
1   00187:01 pipeline.
2      02 BY MS. LAVALLEE:
3      03   Q.   Okay.
4      04        And would you be comparing this
5      05 percentage figure to any other number?
6      06   A.   Potentially.  I mean, nothing pops out
7      07 right now.  But yeah, potentially we would be
8      08 looking at that in relation to other growth figures.
9      09   Q.   Would you be looking at it in terms of
10     10 other -- is this a --
11     11        Does this percentage figure contain
12     12 historical data in it?  Is it a comparison that
13     13 involves comparison to a prior period?
14     14   A.   It looks like it, yes.
15     15   Q.   Okay.
16     16        And what prior period do you -- would
17     17 you -- do you believe that this type of figure would
18     18 correlate to?
19     19   A.   I believe it would correlate to the prior
20     20 Q3, so Q3 of 2000 -- 2000.
21     21   Q.   Okay.  Let me see if I can give you an
22     22 example.
23     23        For example, okay, you said that you
24     24 would compare this type of growth percentage figure
25     25 to other types of data.
```

188

```
1   00188:01        Would you compare it, for example, to
2      02 revenue growth?
3      03   A.   Yes.
4      04   Q.   Okay.
5      05        And why would you do that?
6      06   A.   We would look to see if the two were --
7      07 looked reasonable.
8      08   Q.   And what would determine whether they
9      09 looked reasonable?
10     10   A.   We would see if they were
11     11 significantly -- a significant departure between the
12     12 two.
13     13   Q.   Okay.
14     14   A.   And then look to explain that if they
15     15 were.
16     16   Q.   Okay.
17     17        And what would constitute a significant
18     18 departure?  Can you give me an example that I can
19     19 sort of visualize?
20     20   A.   No.
21     21        I mean, it would depend on the situation,
22     22 what would be considered significant.
23     23   Q.   Okay.
24     24        Are you looking generally for the
25     25 pipeline growth to correlate in the same way as the
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

189

```
1   00189:01 revenue growth, for example?
2   02   A.   In general.
3   03        There are situations that would change
4   04 that, for example, if you had a monstrous
5   05 transaction in the prior year, your statistics would
6   06 be thrown off.
7   07        So it's not always an indicator.
8   08   Q.   Okay.
9   09        And -- and so a monstrous transaction can
10  10 affect the growth -- the actual figures that you
11  11 would look at in calculating growth?
12  12   A.   Sure.
13  13        It's a factor, but not the only one.
14  14   Q.   Okay.
15  15        So how would you -- how would you then
16  16 look at it if you had -- if you were faced with that
17  17 problem in terms of having a monstrous transaction
18  18 that could affect the growth percentage from a
19  19 historical figure --
20  20        (Reporter interruption.)
21  21 BY MS. LAVALLEE:
22  22   Q.   -- affect the growth figure from our
23  23 prior quarter, for example?
24  24        MS. WHITE:  Objection.  Form.
25  25        THE WITNESS:  We may opt to restate it.
```

190

```
1   00190:01        We may opt to show it in a number of
2   02 different ways to say, you know, if we hadn't booked
3   03 some huge transaction last year then our normalized
4   04 results would have been X, and then do a comparison
5   05 that way.
6   06 BY MS. LAVALLEE:
7   07   Q.   Okay.
8   08   A.   Any number of ways.
9   09   Q.   Okay.  That's one example?
10  10   A.   That would be one example.
11  11   Q.   Okay.
12  12        And by "restating," can you explain to me
13  13 what you would do there?  I'm not sure I understand.
14  14   A.   We would pull the anomaly out of the
15  15 previous results in order to normalize them.
16  16   Q.   Okay.
17  17   A.   If there was an anomaly.
18  18   Q.   Because that anomaly, that transaction
19  19 would not be reflected with the general growth of
20  20 the company, so you would try to get a better sense
21  21 of the general growth by taking that transaction
22  22 out.
23  23        Am I correctly understanding you?
24  24        MS. WHITE:  Objection as to form.
25  25        THE WITNESS:  Yes.
```

191

```
1   00191:01 BY MS. LAVALLEE:
2   02   Q.   Okay.
3   03        And you mentioned that that was one way
4   04 you might try to factor this in, in your
5   05 understanding of the growth and comparison with the
6   06 historical figures.
7   07        What's another way you might look at it?
8   08   A.   Any number of ways.
9   09        We might -- if it was out of whack, we
10  10 might look at the pipeline to see if there was some
11  11 anomaly in the way the pipeline was being reported.
12  12   Q.   Uh-huh.
13  13   A.   Again, we were on a new system, and so
14  14 there were a number of times where we would look at
15  15 the pipeline to see if everything was rolling up
16  16 correctly, or something like that.
17  17   Q.   Okay.
18  18        And what do you mean by "rolling up
19  19 correctly"?
20  20   A.   It is a hierarchical system.  And
21  21 pipeline is connected to a sales group.
22  22        If the sales group is not accurately
23  23 connected to the right ultimate owner, that pipeline
24  24 could be missed altogether out of the system.
25  25        It is all hierarchical and it's all
```

192

```
1   00192:01 connected to reps.
2   02   Q.   Okay.  That was -- I need to understand
3   03 that.
4   04        (To the Reporter)  Could you please read
5   05 back that answer?
6   06        (Record read as follows:
7   07             A.  "It is a hierarchical
8   08        system.  And pipeline is
9   09        connected to a sales group.
10  10             "If the sales group is not
11  11        accurately connected to the
12  12        right ultimate owner, that
13  13        pipeline could be missed
14  14        altogether out of the
15  15        system.
16  16             "It is all hierarchical
17  17        and it's all connected to
18  18        reps."
19  19        MS. LAVALLEE:  Okay.  I'm not getting
20  20 that, so let's -- I need a break at this point.  Do
21  21 you want to take five minutes?
22  22        THE VIDEOGRAPHER:  This marks the end of
23  23 videotape number two to Volume 1 in the deposition
24  24 of Sarah Kopp.
25  25        The time is 2:17.  We are off the record.
```

193

```
1    00193:01        (Break taken.)
2    02        THE VIDEOGRAPHER:  This marks the
3    03  beginning of videotape number three to Volume 1 in
4    04  the deposition of Sarah Kopp.
5    05        The time is 2:30.  We are on the record.
6    06  BY MS. LAVALLEE:
7    07    Q.    Before we left for break, there was a
8    08  question and an answer.  And I actually am not quite
9    09  sure I understand your response.
10   10        Would you like to have the question and
11   11  answer read back, and then if you can elaborate what
12   12  you meant by your answer for me?
13   13    A.    Sure.
14   14        MS. LAVALLEE:  Okay.  Can I have that
15   15  read back, please?
16   16    (Record read as follows:
17   17        Q.  "Okay.  And what do
18   18        you mean by "rolling up
19   19        correctly"?
20   20        A.  "It is a hierarchical
21   21        system.  And pipeline is
22   22        connected to a sales group.
23   23        "If the sales group is not
24   24        accurately connected to the
25   25        right ultimate owner, that
```

194

```
1    00194:01        pipeline could be missed
2    02        altogether out of the
3    03        system.
4    04        "It is all hierarchical
5    05        and it's all connected to
6    06        reps."
7    07  BY MS. LAVALLEE:
8    08    Q.    I'm truly -- I don't understand what you
9    09  are saying there.
10   10        Can you explain that for me in other
11   11  words, please?
12   12    A.    Certainly.
13   13        Opportunities are entered in at the sales
14   14  rep level.  They are aggregated or rolled up at a
15   15  sales manager level.
16   16        The sales managers are aggregated or
17   17  rolled up at the area vice-president level,
18   18  et cetera, et cetera.
19   19    Q.    Okay.
20   20    A.    Until you get all the way up to, in my
21   21  case at that point in time, Jay Nussbaum.
22   22    Q.    Uh-huh.
23   23    A.    If a change in the hierarchy would have
24   24  taken place or have been missed, it would be
25   25  possible -- it is one alternative of things we might
```

195

```
1    00195:01  look at if anything ever looked out of line, that it
2    02  would be possible that there might be a problem with
3    03  the pipeline data itself.
4    04    Q.    Okay.  I think I understand.
5    05        Thank you for clarifying that.
6    06    A.    Sure.
7    07    Q.    In going back to page -4812 in Exhibit
8    08  72, the last column we were just discussing was
9    09  "Growth versus PY percentage."
10   10        I think we talked generally what this is
11   11  about, but I just want to clarify and I will tell
12   12  you what my understanding is, and you can tell me if
13   13  I'm correct, that this represents the figure Q3
14   14  several columns before, four columns before says Q3
15   15  FY01 pipeline.  And it's that number compared to
16   16  what the Q3 FY00 pipeline was.
17   17        Is that correct?
18   18        MS. WHITE:  Objection as to form.
19   19        THE WITNESS:  That's my -- that is what
20   20  it customarily would be.  Again, the OO pipeline is
21   21  not published, so it's impossible the validate.
22   22  BY MS. LAVALLEE:
23   23    Q.    Okay.
24   24        And when we look at the conversion,
25   25  pipeline conversion ratio which is just prior to
```

196

```
1    00196:01  that, these numbers for OSI is 53 percent.
2    02        What does that convey to you?
3    03        MS. WHITE:  Objection as to form.
4    04        THE WITNESS:  It doesn't necessarily
5    05  convey anything to me.
6    06  BY MS. LAVALLEE:
7    07    Q.    Okay.
8    08        But what does the 53 percent represent?
9    09    A.    It --
10   10    Q.    What does it represent in terms of the
11   11  deals that need to be closed versus the forecast?
12   12        MS. WHITE:  Objection.  Asked and
13   13  answered.
14   14        THE WITNESS:  It means that 53 percent of
15   15  the revenue associated with that pipeline would need
16   16  to close.
17   17  BY MS. LAVALLEE:
18   18    Q.    Okay.
19   19        And did you have any understanding during
20   20  Q3 2001 what a favorable conversion ratio would be
21   21  at -- during week three of that quarter?
22   22    A.    Do you mean during week eight?
23   23    Q.    During week eight, thank you.
24   24    A.    No, I don't.
25   25    Q.    Okay.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

197

```
1   00197:01      And in order to figure that out, you
2   02  would need to actually look at last -- the prior
3   03  year's conversion ratio at that time?
4   04    A.  Yes, I would.
5   05    Q.  Okay.
6   06        And you would look precisely at the
7   07  conversion ratio of that same week eight in the 2000
8   08  fiscal year.
9   09        Correct?
10  10    A.  Assuming we had that data available, yes.
11  11    Q.  If I could ask you to turn to the next
12  12  page, which is Bates-stamped 004813.
13  13        And the box on the left is titled "OSI."
14  14        Can you explain for me what the different
15  15  columns represent in that box?
16  16    A.  Sure.
17  17        The first column is the "Forecast Week."
18  18  That ties to the corporate forecast schedule.
19  19        The next three columns are the pipeline."
20  20        The first is "Applications pipeline."
21  21        The second, "Technology pipeline."
22  22        The "Total" would be the combination of
23  23  the two.
24  24        "Cumulative percent change" is a
25  25  week-to-week change.
```

198

```
1   00198:01      I'm assuming it is, given that the first
2   02  week of each quarter shows zero in that column.
3   03    Q.  Okay.
4   04        So you are assuming that rather than
5   05  comparing their week eight figures to -- or the
6   06  figures for each of the weeks -- the equivalent week
7   07  number for the prior year, that it's actually
8   08  comparing them to the prior reporting week?
9   09    A.  Yeah.
10  10        If I had a calculator I could validate
11  11  that, but it certainly appears that way as a
12  12  cumulative.
13  13    Q.  Okay.
14  14        And if I could ask you to just look down
15  15  at the "Q3" box, the numbers for Q3 week two and
16  16  four on the "Apps pipeline" dollar amount.
17  17    A.  Uh-huh.
18  18    Q.  There is a big drop there between week
19  19  two from 272.6 million to week four, 71.2 million.
20  20    A.  Uh-huh.
21  21    Q.  Do you have any understanding as to why
22  22  there was such a drop during those two weeks, during
23  23  those two reporting weeks?
24  24    A.  No, I do not.
25  25    Q.  Okay.
```

199

```
1   00199:01      Does that appear to you to be an unusual
2   02  drop?
3   03    A.  Yes.
4   04    Q.  Okay.
5   05        And what would you have done to -- to --
6   06  if you had -- if you noticed that drop, is there
7   07  something you would have done during Q3 2001?
8   08        MR. NADOLENCO:  Objection to form.
9   09        THE WITNESS:  I would have investigated
10  10  the data.
11  11        To me, that looks like an error.
12  12  BY MS. LAVALLEE:
13  13    Q.  Okay.
14  14    A.  Because it came back up again, so it
15  15  looks wrong.
16  16    Q.  Okay.
17  17        And did it come back up to where you
18  18  would expect it to be?
19  19        MS. WHITE:  Objection as to form.
20  20  BY MS. LAVALLEE:
21  21    Q.  I mean in week six, it came back up to
22  22  126.0, which is a little less than half of where it
23  23  was at week two.
24  24    A.  But more than it was the prior two
25  25  quarters, so I think that's reasonable, yeah.
```

200

```
1   00200:01      Week eight of the prior two quarters are
2   02  both lower than that number.
3   03    Q.  Week six, we are looking at week six now.
4   04    A.  Okay.  Okay.
5   05        So it's close to Q2 over Q1.  Not
6   06  unusual.
7   07    Q.  Okay.
8   08        It's -- okay.  It's close in a dollar
9   09  sense, right?
10  10    A.  That's right.
11  11    Q.  If I could turn your attention to the
12  12  last page of this document, which is Bates-stamped
13  13  CA-ORCL 004816.
14  14        And can you tell me what data is
15  15  reflected on this page, generally?
16  16    A.  This is the Q4 forecast.  So the future
17  17  quarter forecast.
18  18    Q.  Okay.
19  19        And was it customary to start looking at
20  20  the forecast for the next quarter in roughly week
21  21  eight of the current quarter?
22  22    A.  I don't remember which week exactly.  But
23  23  we typically had a page reflecting one quarter out.
24  24    Q.  Okay.
25  25    A.  It was not focused on very much at that
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

201

```
 1   00201:01  point, but it was there.
 2   02      Q.   Okay.
 3   03          And can you tell me what type of growth
 4   04   you were projecting for OSI total license revenue
 5   05   for Q400 -- Q401?
 6   06      A.   According to this, negative 7.
 7   07          I don't remember it independently, but
 8   08   according to this it was negative 7 for the license.
 9   09      Q.   Okay.
10   10          And do you have any understanding as to
11   11   why you were expecting or projecting negative growth
12   12   for Q401 at that time?
13   13          MS. WHITE:  Objection as to form.
14   14   BY MS. LAVALLEE:
15   15      Q.   Actually, let me rephrase my question.
16   16          Do you have any understanding as why
17   17   Oracle was projecting negative 7 percent growth for
18   18   OSI as of January 22nd, 2001 for Q4 2001?
19   19          MS. WHITE:  Same objection.
20   20          THE WITNESS:  No, I don't.
21   21   BY MS. LAVALLEE:
22   22      Q.   Okay.
23   23          And would you have had any input or
24   24   participation in the determination of what Q4 growth
25   25   would have been at this point in the quarter?
```

202

```
 1   00202:01  A.   No.
 2   02      Q.   Do you know who would have?
 3   03      A.   Mr. Nussbaum and his direct reports.
 4   04      Q.   Did you have any discussions with anybody
 5   05   in January regarding Q401 projections?
 6   06      A.   Not that I remember.
 7   07          MS. LAVALLEE:  I would like to mark as
 8   08   Exhibit Number 73, a document Bates-stamped CA-ORCL
 9   09   004614.
10   10          (Exhibit 73 marked.)
11   11   BY MS. LAVALLEE:
12   12      Q.   Ms. Kopp, if I could ask you to take a
13   13   look at this document and then identify it.
14   14          And I'll just state for the record that
15   15   it is -- actually, I may have already identified the
16   16   Bates range.  It's CA-ORCL 004614 through -4619.
17   17          Ms. Kopp, can you identify this document
18   18   for me?
19   19      A.   It's the Americas Forecast Package.
20   20      Q.   For week six of Q3?
21   21      A.   For week six of Q3.
22   22      Q.   All right.
23   23          And was this a document that you believe
24   24   that you would have received in the normal course of
25   25   your duties, shortly after January 15th, 2001, or on
```

203

```
 1   00203:01  January 15th, 2001?
 2   02      A.   Likely, yes.
 3   03      Q.   Okay.
 4   04          Ms. Kopp, there is some writing on this
 5   05   document as well.
 6   06          Can you identify for me whose handwriting
 7   07   this may be?
 8   08      A.   No.
 9   09      Q.   I assume -- is it fair to say that it's
10   10   not your handwriting on any of the pages of this
11   11   document?
12   12      A.   Not my handwriting.
13   13      Q.   If I could turn your attention to the
14   14   last page of this document, -4619.
15   15          I believe this also refers to projections
16   16   for Q4 financial year '01.
17   17          Is that correct?
18   18      A.   That's correct.
19   19      Q.   Okay.
20   20          And am I reading this correct to say that
21   21   OSI -- the company was projecting negative 7 percent
22   22   growth for fiscal year '02 -- I'm sorry, for the
23   23   fourth quarter of fiscal year '01 for OSI?
24   24      A.   Yes.
25   25      Q.   Okay.  I'm finished with that document.
```

204

```
 1   00204:01  Ms. Kopp, are any of the documents we've
 2   02   reviewed thus far, documents that you reviewed prior
 3   03   to this deposition in connection with preparation
 4   04   for this deposition?
 5   05      A.   Just one.
 6   06      Q.   Which one is that?
 7   07      A.   0128255 is the first one.
 8   08      Q.   Okay.  Thank you.
 9   09          I'd like to mark as Exhibit Number 74, a
10   10   document Bates-stamped CA-ORCL 037116 through -117.
11   11          (Exhibit 74 marked.)
12   12   BY MS. LAVALLEE:
13   13      Q.   Ms. Kopp, if I could ask you to take a
14   14   look at this document.
15   15          And after you have had a chance to review
16   16   it, just identify for record what it is.
17   17          (Pause in proceedings for document review.)
18   18          THE WITNESS:  This is the big deal
19   19   summary.
20   20   BY MS. LAVALLEE:
21   21      Q.   Okay.
22   22          And we talked about the big deal summary
23   23   before.  Is this something that was prepared at your
24   24   direction and supervision?
25   25          Is that what you were referring to?
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

205

1  00205:01   A.   Yes.

2    02    Q.   Okay.

3    03        You hesitated.  Did I get that wrong in

4    04  any way?

5    05    A.   Well, they are prepared really at the

6    06  direction of Jennifer Minton.

7    07        But -- yes, the one for OSI is prepared

8    08  at my direction, but because she needs it.  So that

9    09  was my only hesitation.

10    10    Q.   Okay.  Thanks for the clarification, that

11    11  makes sense.

12    12        All right.  And this is a document that

13    13  relates to OSI.  Is that correct?

14    14    A.   It appears to, yes.

15    15    Q.   Okay.

16    16        And can you tell me what period of time

17    17  this document relates to?

18    18        MR. NADOLENCO:  Objection to form.

19    19        THE WITNESS:  It's not labeled.

20    20  BY MS. LAVALLEE:

21    21    Q.   All right.

22    22    A.   There's no date on it at all.

23    23    Q.   Okay.

24    24        Can you identify for me what the

25    25  different columns represent?

206

1  00206:01        And I think there's -- there is actually

2    02  some headings on them at the very top.

3    03    A.   I don't see the top headings other than

4    04  "Opportunity" and "O1/29."

5    05    Q.   And then "Comments"?

6    06    A.   Oh, and "Comments," I'm sorry.

7    07    Q.   Okay.

8    08        And "Opportunity," what does that refer

9    09  to?

10    10    A.   That means the opportunity value.

11    11    Q.   All right.

12    12        If I could have you explain what

13    13  "opportunity value" means, please.

14    14    A.   The revenue value of the opportunity.

15    15  For example -- and it's expressed in millions.  So

16    16  0.8 being $800,000.

17    17    Q.   Okay.  Thank you.

18    18        And this report, again, refers to the

19    19  deals that are considered big deals.  And if I'm

20    20  correct, it's my understanding that that relates to

21    21  deals valued at over 500,000 form OSI during this

22    22  period of time?

23    23    A.   500,000 or higher.

24    24    Q.   Or higher.

25    25        Okay.  And the "01/29," what does that

207

1  00207:01  represent?

2    02    A.   Looks like a date.

3    03    Q.   Okay.

4    04        And that would -- do you have any

5    05  understanding as to whether or not this document

6    06  relates to Q3 2001?

7    07    A.   It looks as if it does.

8    08    Q.   Okay.  And what do you base that

9    09  statement on?

10    10    A.   On some of the deals that are in here and

11    11  the 210 and 225 numbers there.  225 that's written,

12    12  the 210 that's up at the top.

13    13    Q.   Do you remember those forecast figures

14    14  from 2003?

15    15    A.   I do now.

16    16    Q.   2001, I apologize.

17    17    A.   Sorry, Q3.

18    18        I do now.

19    19    Q.   Okay.

20    20        And that is, again, because your

21    21  recollection was refreshed by a document you saw on

22    22  Tuesday?

23    23    A.   Yesterday.

24    24    Q.   Yesterday.  Okay.

25    25        Okay.

208

1  00208:01        There is some handwriting on this

2    02  document.  And if I'm not mistaken it appears to be

3    03  handwriting by several different people.

4    04        But maybe can you tell me if you can

5    05  identify any of this handwriting on this document?

6    06    A.   None of it.

7    07    Q.   Okay.

8    08        And can you read for me, though, the --

9    09  there seems to be some form of chart that was

10    10  created on the -- sort of the bottom left of the

11    11  document in handwriting.

12    12        And if I'm not mistaken, there's three

13    13  columns and the second column says "this week," then

14    14  "prior week," and then "change."

15    15        And then below that there's figures for

16    16  "field," "management" and "total forecast."

17    17        Does that appear to be correct to you?

18    18    A.   That's what it looks like.

19    19    Q.   Okay.

20    20        And if I'm not mistaken, there was no

21    21  management judgment for the prior year week, but

22    22  80 million -- or 8 -- actually, can you tell me

23    23  what -- I mean that 80 figure represents millions

24    24  you believe, or what?

25    25    A.   I believe it represents millions, but I

Kopp, Sarah (Vol. 01) - 02/19/2004   2/19/2004   4:50:00 PM

209

1   00209:01  don't think the prior week notation is accurate.
2   02   Q.   Okay.  You don't think that's accurate.
3   03        You think there might have been
4   04  management judgment for the prior week as well?
5   05        (Reporter interruption.)
6   06  BY MS. LAVALLEE:
7   07   Q.   -- judgment for the prior week as well,
8   08  you believe?
9   09   A.   I believe.
10  10   Q.   Okay.
11  11        And what do you base that on?
12  12   A.   Yesterday's review of the forecast
13  13  packages.
14  14   Q.   Okay.
15  15        Again, you have no idea whose handwriting
16  16  this is?
17  17   A.   No.
18  18   Q.   Okay.
19  19        Can you explain for me what the term
20  20  "management judgment" means?
21  21   A.   It means -- it's the difference between
22  22  what a forecast is rolling up to from a person's
23  23  direct reports, or any person's direct reports, and
24  24  that person's own forecast.
25  25   Q.   Okay.

210

1   00210:01   A.   They can go in either direction.
2   02   Q.   Okay.
3   03        Do you know how Mr. Nussbaum generates
4   04  his management judgment figure?
5   05   A.   No.
6   06   Q.   Have you worked for Mr. Nussbaum for --
7   07  well, let me ask this.
8   08        Mr. Nussbaum, is he currently with the
9   09  company?
10  10   A.   No.
11  11   Q.   Okay.
12  12        When did he leave?
13  13   A.   The end of November fiscal year 2002.
14  14   Q.   Okay.
15  15        Did you have a sense as to whether
16  16  Mr. Nussbaum was conservative or aggressive in his
17  17  management judgment?
18  18   A.   This was my first quarter supporting him
19  19  at that level, so I had no personal experience with
20  20  it.
21  21   Q.   Was there some general understanding
22  22  within OSI or the company as to how -- whether he
23  23  was aggressive or conservative in his projections
24  24  for management judgment?
25  25   A.   Based on my understanding there was a

211

1   00211:01  sense that he was conservative.
2   02   Q.   Okay.
3   03        And what do you base that understanding
4   04  on?
5   05   A.   I don't have an exact recollection, but
6   06  my sense was that we had in OSI as a group, beat our
7   07  forecast for a number of subsequent quarters.
8   08        I don't have the exact figures on that,
9   09  but that was my sense at that point.
10  10   Q.   Subsequent quarters?
11  11   A.   I'm sorry, previous quarters.  Previous
12  12  quarters.
13  13   Q.   Okay.
14  14        And that was your understanding in Q3
15  15  2001?
16  16   A.   That's right.
17  17   Q.   Okay.
18  18        Was the management judgment figure
19  19  something that you discussed with people in OS- --
20  20  during Q3 2001?
21  21   A.   People?
22  22   Q.   Anybody at Oracle?
23  23   A.   Yes.
24  24   Q.   Okay.
25  25        Who would you discuss management judgment

212

1   00212:01  with?
2   02   A.   I would have discussed it with Jay
3   03  himself.
4   04        Possibly with Terry Ford, his ops lead.
5   05        And Jennifer Minton.
6   06   Q.   How frequently would you discuss
7   07  management judgment in the first month of the
8   08  quarter?
9   09        MS. WHITE:  Objection as to form.
10  10  BY MS. LAVALLEE:
11  11   Q.   In Q3 2001?
12  12        MS. WHITE:  Same objection.
13  13        THE WITNESS:  Likely at the same -- at
14  14  the preparation of the forecast package, so with the
15  15  same intervals where we would prepare a forecast
16  16  package.
17  17        Assuming I had an opportunity to speak
18  18  with Jay, which was not every time, so . . .
19  19  BY MS. LAVALLEE:
20  20   Q.   Okay.
21  21        He was a busy guy?
22  22   A.   Quite.
23  23   Q.   You were busy as well, I imagine.
24  24        Did you operate out of Redwood Shores'
25  25  offices during Q3 2001?

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

213

00213:01   A.   No.
02   Q.   Where did you operate out of?
03   A.   Reston, Virginia.
04   Q.   Pardon me?
05   A.   Reston, Virginia.
06   Q.   Okay.
07        Are you located there now?
08   A.   I am.
09   Q.   Okay.  And where would you --
10        MS. SEGAL:  Spared you a trip.
11        MS. LAVALLEE:  Actually, it's a little
12   unfortunate looking at the weather today.
13   Q.   Where was Mr. Nussbaum's office in Q3
14   2001?
15   A.   Also Reston, Virginia.
16   Q.   Okay.
17        How large is that office -- was that
18   office in Q3 2001?
19   A.   Under oath, I don't know.
20   Q.   Generally?
21   A.   I don't have the vaguest idea.
22        I think there are about 600 people there.
23   Q.   Wow, that's a pretty big office.
24   A.   Yeah.
25        I believe it was the second biggest

214

00214:01  Oracle office at the time.
02   Q.   Okay.
03        All right.  I'd like to mark as Exhibit
04   Number 75, a document Bates-stamped C0 -- I'm sorry,
05   ORCL 0109642.
06        (Exhibit 75 marked.)
07   BY MS. LAVALLEE:
08   Q.   Ms. Kopp, if I can ask you to take a look
09   at this document.
10        And then identify it for me when you have
11   had a chance to look at it.
12   A.   It's an email from me to Jennifer Minton,
13   followed by a copy of a presentation that I
14   prepared.
15   Q.   Okay.
16        And is this email dated February 14th,
17   2001?
18   A.   Yes, it is.
19   Q.   And was this the email that you referred
20   to earlier that you said refreshed your recollection
21   regarding some data from Q3 2001?
22   A.   It's one of them.
23   Q.   Okay.
24        What were the other documents that
25   refreshed your recollection regarding Q3 data?

215

00215:01        MS. WHITE:  Objection.  Asked and
02   answered.
03        THE WITNESS:  There were a number of
04   emails that I was shown.  And a number of forecast
05   files that I was shown.
06   BY MS. LAVALLEE:
07   Q.   Okay.  All right.
08        Can you tell me what this -- the
09   attachment to this email represents?
10   A.   It ways Power Point presentation that I
11   gave at a senior staff meeting.
12   Q.   And you had referred earlier today to
13   senior staff meetings held by Mr. Nussbaum.
14        Is this a presentation for that type of
15   meeting that we discussed earlier?
16   A.   Yes.
17   Q.   And was this email a standard email that
18   you routinely sent to Ms. Minton?
19        MS. WHITE:  Objection as to form.
20   BY MS. LAVALLEE:
21   Q.   Let me rephrase the question.
22        Well, first of all, did you indeed send
23   this email to Ms. Minton on February 14th, 2001?
24   A.   Yes.
25   Q.   Okay.

216

00216:01        And did you routinely send Ms. Minton any
02   mail that contained the type of information
03   contained in here?
04   Q.   During that quarter?
05   A.   Yes.
06   A.   Not routinely.
07        But nearing the end of the quarter, yes.
08   Q.   Okay.
09        Did you send any similar emails in the
10   first month of the quarter?
11   A.   I don't think so.
12   Q.   Okay.
13        And during the second month of the
14   quarter?
15        MS. WHITE:  Objection as to form.
16        THE WITNESS:  At least one.
17   BY MS. LAVALLEE:
18   Q.   Okay.
19        And why do you say at least one?
20   A.   Because I was shown it yesterday.  I
21   don't have any recollection of any others or that
22   one, but I was shown it yesterday.
23   Q.   Do you have any reason to believe that
24   that was the only one you sent in January 2001?
25   A.   Yes.

217

```
1    00217:01    Q.   And what is that?
2    02    A.   I don't typically send them at that point
3    03    in the quarter.
4    04    Q.   Okay.
5    05         And when you sent this email, what would
6    06    you have done with the email afterwards?
7    07    A.   This email, I probably would have saved
8    08    it in an email folder for some period of time, but I
9    09    don't -- maybe six months.
10   10    Q.   Is this something you would have
11   11    downloaded to your hard drive or to the network?
12   12    A.   No.
13   13    Q.   That wasn't your practice?
14   14    A.   No, it was not.
15   15    Q.   Okay.
16   16         Did you forward this email to anybody
17   17    other than Ms. Minton?
18   18    A.   I don't think so, no.
19   19    Q.   Did you yourself prepare the Power Point
20   20    presentation attached?
21   21    A.   Yes, I did.
22   22    Q.   Okay.
23   23         And did anybody assist you in gathering
24   24    the data that formed the basis for this, the data
25   25    contained on this presentation package?
```

218

```
1    00218:01    A.   The spreadsheet data is out of my -- a
2    02    lot of it is out of my forecast packet which that
3    03    would have been prepared by Fred.  I would have just
4    04    copied and pasted it in.
5    05         The data itself, yes.
6    06    Q.   Okay.
7    07         And the forecast package was something
8    08    that, if I remember correctly, Fred would have
9    09    prepared for you and you reviewed?
10   10    A.   Uh-huh.
11   11    Q.   And that was not something that you
12   12    generally forwarded on to other people; is that
13   13    correct?
14   14    A.   That's correct.
15   15    Q.   If I could draw your attention down to
16   16    the first full paragraph after the chart on the
17   17    first page of the email, and the last sentence says:
18   18         "I believe we will come in
19   19         somewhere between 210 and
20   20         220, but there is such a
21   21         huge swing in the number
22   22         that it is difficult to
23   23         pinpoint with only 34
24   24         million booked as today."
25   25    A.   Uh-huh.
```

219

```
1    00219:01    Q.   Did I accurately read generally what's in
2    02    your email here?
3    03    A.   Yes.
4    04    Q.   Okay.
5    05         And what was the significance of the fact
6    06    there was only $34 million worth of revenue booked
7    07    as of that date?
8    08    MS. WHITE:  Objection as to form.
9    09    THE WITNESS:  No real significance.
10   10         But without having any of the large deals
11   11    booked, you know, we still had to -- we still had to
12   12    get them in the door.
13   13         So there's no real significance to the
14   14    amount, other than -- a signature is a signature.
15   15    If it's not signed, it's not in the door, so . . .
16   16    BY MS. LAVALLEE:
17   17    Q.   Right, right.
18   18         You said there were no big deals signed.
19   19    Do you have any understanding as to whether any big
20   20    deals had been signed yet for that quarter at that
21   21    point in time?
22   22    A.   I don't know.
23   23    Q.   Okay.
24   24         The handwriting on this document, is that
25   25    your handwriting?
```

220

```
1    00220:01    A.   No, it's not.
2    02    Q.   Okay.
3    03         And there's handwriting in some of the
4    04    presentation materials as well.  Can you tell me if
5    05    any of that is your handwriting?
6    06         There's not that much in it, but . . .
7    07    A.   Let me see.
8    08         No.
9    09    Q.   Do you have any understanding as to whose
10   10    handwriting any of this is?
11   11    A.   No, I don't.
12   12    Q.   Did you have any discussions regarding
13   13    this data other than at the presentation you gave at
14   14    the senior staff meeting on February 13th, 2001?
15   15    A.   I'm not sure I understand your question.
16   16    Q.   Okay.
17   17         Is it correct to say that you actually
18   18    gave a presentation at the senior staff meeting on
19   19    or about February 13, 2001?
20   20    A.   That's correct.
21   21    Q.   Okay.
22   22         And other than that actual presentation,
23   23    did you have any communication regarding the data
24   24    contained in either the email and/or the
25   25    presentation materials, other than these materials
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

221

```
1   00221:01  themselves with anybody at Oracle?
2   02    A.   So other than my sending the presentation
3   03  to Jennifer?
4   04    Q.   Correct.
5   05    A.   No.
6   06    Q.   Okay.
7   07         It's your recollection --
8   08    A.   Not -- not that I recall.
9   09    Q.   Okay.
10  10         And where did you obtain the data to
11  11  form -- the data that is contained in your
12  12  presentation package?  What were the sources that
13  13  you used to compile the information in there?
14  14         MS. WHITE:  Objection as to form.
15  15         THE WITNESS:  I would have to answer
16  16  separately for each chart.  I don't . . .
17  17  BY MS. LAVALLEE:
18  18    Q.   Okay.  Well, let's do that then.
19  19         Let's turn to the first page after the
20  20  cover page, which is Bates-stamped 019 -- no, I
21  21  apologize.
22  22         0109645.
23  23    A.   -45?
24  24    Q.   -45.
25  25    A.   Oh, the agenda.
```

222

```
1   00222:01  Q.   Yeah.
2   02    A.   Okay.
3   03    Q.   You got to start somewhere.
4   04    A.   All right.
5   05    Q.   Is this --
6   06         I mean, did you use any data from any
7   07  source to compile this?
8   08    A.   No.
9   09    Q.   Okay.
10  10         The second line of the agenda states:
11  11         "Key Statistical
12  12         Indicators."
13  13         What were you referring to there?
14  14    A.   I was referring to the two items below
15  15  it:
16  16         "Historical Pipeline
17  17         Conversion" and "Pipeline
18  18         growth."
19  19    Q.   Okay.
20  20         And why do you refer to these as key
21  21  statistical indicators?
22  22    A.   Historically they had been indications of
23  23  how we would do.
24  24    Q.   Okay.
25  25         And the next line says:
```

223

```
1   00223:01        "Forecast in OSO versus
2   02         Potential Outcome."
3   03         What does that mean?
4   04    A.   I have to look at it.
5   05    Q.   Take your time.
6   06    A.   It's likely referring to what was in the
7   07  system, what had been tracked in OSO versus what we
8   08  were forecasting.
9   09    Q.   Okay.
10  10         If I could ask you to turn to the next
11  11  page.
12  12    A.   Uh-huh.
13  13    Q.   Page -46 says:
14  14         "Historical conversion
15  15         rates from pipeline in first
16  16         month of each quarter would
17  17         indicate 200 million --
18  18    (Reporter interruption.)
19  19  BY MS. LAVALLEE:
20  20    Q.   (Reading):
21  21         -- "200 million plus is
22  22         attainable," dot, dot, dot,
23  23         "but we have a long way to
24  24         go in 12 days," exclamation
25  25         mark.
```

224

```
1   00224:01        Do you have any understanding of what you
2   02  were talking about there?
3   03    A.   Yes.
4   04         I was looking at the conversion rate from
5   05  the third quarter of '00 and comparing it to the
6   06  current third quarter in our forecast.
7   07         I don't have the exact numbers in front
8   08  of me.
9   09         I mean, I have -- I have this here, but I
10  10  don't have exactly what the pipeline was.
11  11         So this would have been the pipeline on
12  12  one axis, and the quarterly conversion rate based on
13  13  first month pipe on the other axis.
14  14    Q.   Okay.
15  15         And then what about the -- in the next
16  16  few pages, is that material contained anywhere
17  17  there?
18  18    A.   Yes.
19  19         Well, so -- no, the first page that we
20  20  were looking at is talking about first month pipe.
21  21    Q.   Okay.
22  22    A.   The next page is talking about pipeline
23  23  for the same week, which we're -- if we're talking
24  24  about February 13th was certainly a different week.
25  25    Q.   Okay.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

225

```
 1  00225:01   Can -- focusing then on page -46, I'm not
 2  02  sure I understand what you were comparing there.
 3  03      Can you explain that for me?
 4  04   A.  I can't see the "actuals" line.  It's not
 5  05  showing up well.
 6  06      But I would have been comparing Q300 42
 7  07  percent, and Q301 48 percent, that 48 percent
 8  08  being -- I can see the dot at least north of 200
 9  09  somewhere.
10  10   Q.  Okay.
11  11      What does 42 percent for Q300 represent?
12  12   A.  It represents the conversion rate based
13  13  on the first month pipeline --
14  14   Q.  Okay.
15  15   A.  -- from that quarter.
16  16   Q.  Okay.
17  17      So am I to understand then that the dot
18  18  representing -- on the line representing actuals,
19  19  represents the actuals in sales for Q3 2000, the dot
20  20  above 42 percent.
21  21      And then the dot above Q301, that's a
22  22  little above 400,000 as well --
23  23   A.  Do you mean 200,000?
24  24      Which dot are you looking at?
25  25   Q.  Well, actually, I'm looking at the top
```

226

```
 1  00226:01  one.
 2  02   A.  The pipeline.  You're looking at
 3  03  pipeline.
 4  04   Q.  Okay, that's pipeline.
 5  05      The top one with the solid is the
 6  06  pipeline.
 7  07      And then the actuals are the actual
 8  08  revenue figures?
 9  09   A.  Yes.
10  10   Q.  Okay.
11  11      And why did you look at the actual
12  12  revenue figures from month one, what was the
13  13  significance of that?  How was that helpful?
14  14   A.  That's not the actual revenue from month
15  15  one, that's actual revenue for the quarter end
16  16  measured against the first quarter pipeline.
17  17      So earlier I said the conversion rate is
18  18  a different number, depending on what month pipe you
19  19  are looking at.
20  20      So what I was doing here in these two
21  21  pages is checking the conversion rate from two
22  22  different points in time.
23  23   Q.  Okay.  Okay.
24  24      And -- but on the first page here where
25  25  you're comparing the pipe -- the conversion rate
```

227

```
 1  00227:01  from one period -- from which period to which
 2  02  period, I'm not sure I follow.
 3  03   A.  Okay.
 4  04      So the actuals are the same in both
 5  05  instances.
 6  06   Q.  Okay.
 7  07   A.  It is the end of quarter actual revenue.
 8  08   Q.  Okay.
 9  09   A.  We don't track the actuals mid-quarter
10  10  like that, mid-month like that.
11  11   Q.  Okay.
12  12      But you don't have any end of quarter
13  13  results for Q301 yet, right?
14  14   A.  No, I don't.  I have a -- I have plugged
15  15  in the forecast.
16  16   Q.  I see.  Okay.
17  17   A.  You can see where the dot is.  It's right
18  18  at 2 -- it's either at the 210 or 225, I can't
19  19  tell from the chart.  But it's north of 200 anyway.
20  20   Q.  Okay.
21  21      And then what conversion rate were you
22  22  using?
23  23   A.  That's a -- that would -- that showed a
24  24  48 percent conversion rate.
25  25   Q.  Okay.
```

228

```
 1  00228:01   I get it.
 2  02      Now on the next page -47, can you tell me
 3  03  what your first sentence -- well, let me read it.
 4  04      "Q3 FY00 Conversion Rate
 5  05      on Pipeline" --
 6  06   (Reporter interruption.)
 7  07  BY MS. LAVALLEE:
 8  08   Q.  (Reading:)
 9  09      "Q3 FY00 Conversion Rate
10  10      on Pipeline for same week
11  11      with 61 percent; applied to
12  12      FY01 would result in $217
13  13      million."
14  14      Is that a correct reading of it?
15  15   A.  That's correct.
16  16   Q.  Okay.
17  17      Now, what were you talking about there?
18  18  Can you explain that for me?
19  19   A.  Sure.
20  20      Given that the chart below shows the
21  21  current conversion rate based on that week, February
22  22  13th, okay, what I was saying is based on the
23  23  February 13th-ish week the prior year, and those
24  24  actuals, the conversion rate at that point a year
25  25  ago was 61 percent.  Whereas the conversion rate in
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

229

1  00229:01  the current quarter is 59 percent.
2  02    Q.  Uh-huh.
3  03    A.  If I were to apply the 61 percent to the
4  04  current pipeline, which was 355 million, the
5  05  forecast would actually have been 217 million as
6  06  opposed to the 210.
7  07    Q.  Okay.
8  08    MS. LAVALLEE:  All right.  Let's take a
9  09  few-minute break.
10  10    THE VIDEOGRAPHER:  The time is 3:11.
11  11  We are off the record.
12  12    (Break taken.)
13  13    THE VIDEOGRAPHER:  The time is 3:23.
14  14  We are on the record.
15  15  BY MS. LAVALLEE:
16  16    Q.  Ms. Kopp, we were just talking about
17  17  Exhibit Number 75.  And you have stated on that page
18  18  that the conversion rate for Q300 was 61 percent.
19  19    Actually, can you tell me what is a
20  20  conversion rate as opposed to -- or a coverage rate
21  21  as opposed to conversion rate.
22  22    A.  A coverage rate?
23  23    Q.  Yeah.
24  24    Or a coverage ratio, do you have an
25  25  understanding as to what that means?

230

1  00230:01    A.  I have an understanding what it means, I
2  02  didn't typically use it.
3  03    Q.  Okay.
4  04    A.  People would speak in terms of a 2X or 3X
5  05  coverage rate, which meant that they had two times
6  06  or three times the pipeline to forecast.
7  07    Q.  Okay.
8  08    A.  Conversion is sort of the opposite.
9  09    Q.  Is it -- are the numbers correlated in
10  10  any way?
11  11    A.  They would be.
12  12    Q.  Okay.
13  13    A.  They would be.
14  14    Q.  Would one be a fraction of --
15  15    A.  One would be the opposite of the other,
16  16  really.
17  17    Q.  Okay.
18  18    Is there anything on this document that
19  19  shows -- well, actually let me step back.
20  20    You say here that the conversion ratio --
21  21  rate for pipeline for the same week in Q300 was 61
22  22  percent.
23  23    If I were to show you a document that
24  24  shows conver- -- coverage ratios, could you tell me
25  25  if that seems -- that shows coverage ratios for

231

1  00231:01  Q3001, can you tell me whether that's consistent
2  02  with the 61 percent that you were working under?
3  03    MR. NADOLENCO:  Objection to form.
4  04    MS. WHITE:  Yeah, same objection.
5  05  BY MS. LAVALLEE:
6  06    Q.  Do you understand my question?
7  07    A.  You said "001."
8  08    Q.  Oh, thanks.
9  09    A.  So 00 60-- I --
10  10    Q.  Okay.  Let me rephrase my question.
11  11    I'm going to show you -- have you ever
12  12  heard of a document called the "upside report"?
13  13    A.  I've heard of it.
14  14    Q.  Okay.
15  15    It's not a document you routinely used?
16  16    A.  No.
17  17    Q.  Okay.
18  18    Was it a document that you ever receive
19  19  copies of?
20  20    A.  No.
21  21    Q.  Okay.
22  22    I'd like to show you two excerpts from
23  23  two different upside reports that were produced by
24  24  the SLC in connection with their report dated
25  25  November 2002.

232

1  00232:01    And I'll represent to you that these are
2  02  excerpts from what they represent to be the upside
3  03  report for February 14th, 2000.
4  04    And the upside report -- first page is
5  05  for February 14, 2000, and the second page is for
6  06  February 21st, 2000.
7  07    A.  2000?
8  08    Q.  Correct.
9  09    And I will mark this as Exhibit 75 -- 76.
10  10    (Exhibit 76 marked.)
11  11  BY MS. LAVALLEE:
12  12    Q.  The dates aren't on these documents, but
13  13  this was as presented by the SLC and represented to
14  14  be portions of the upside report or excerpts from
15  15  the upside report for those dates identified.
16  16    A.  Uh-huh.
17  17    Q.  Can you tell me whether you see on the
18  18  first page the pipeline conversion ratio figures on
19  19  the right?
20  20    A.  I see it.
21  21    Q.  Okay.
22  22    And do you see that for OSI?
23  23    A.  I do.
24  24    Q.  Okay.
25  25    Can you tell me whether or not there is a

233

```
 1   00233:01  relationship between that coverage ratio and the
 2        02   conversion rate that you were looking at for
 3        03   Q3 FY00?
 4        04        MS. WHITE:  Objection.  Lacks foundation.
 5        05        THE WITNESS:  I don't think I can do the
 6        06   math in my head.
 7        07        I can tell what you this means.
 8        08   BY MS. LAVALLEE:
 9        09   Q.   Okay.
10        10        Let me give you a calculator.
11        11   A.   Well, part of the problem here is that
12        12   the number I'm referring to in my presentation
13        13   refers to a final Q3 result.  And this is based on a
14        14   Q3 forecast.
15        15   Q.   Okay.
16        16        So can you explain to me the difference?
17        17   A.   This was the forecast as of -- I don't
18        18   know, whatever date you told me.
19        19   Q.   Right.  February -- I'll tell you again.
20        20        It's February 14, 2000.
21        21   A.   Right.
22        22        That's not a final number, that's a
23        23   forecast.
24        24   Q.   Okay.
25        25   A.   I don't know what the final revenue was
```

235

```
 1   00235:01  not the same thing.
 2        02   Q.   Okay.
 3        03   A.   You are talking about a coverage ratio
 4        04   for the pipeline of the same week, I will agree with
 5        05   you there.
 6        06   Q.   Okay.
 7        07   A.   But you are talking about a forecast as
 8        08   of that week, not what at that final number was.
 9        09   Q.   I see.
10        10        Okay, that makes sense to me.
11        11   A.   Okay.
12        12   Q.   Okay, thank you.
13        13   A.   Uh-huh.
14        14        MS. LAVALLEE:  Can I have the last answer
15        15   read back?
16        16   (Record read as follows:
17        17        A.  "You are talking about
18        18        something that's not the
19        19        same thing.  You are talking
20        20        about a coverage ratio for
21        21        the pipeline of the same
22        22        week, I will agree with you
23        23        there.  But you are talking
24        24        about a forecast as of that
25        25        week, not what at that final
```

234

```
 1   00234:01  for that quarter based on this.
 2        02   Q.   Okay.
 3        03        And what -- then can you explain to me
 4        04   what numbers you were looking at on page -47?
 5        05        How is that different from what you were
 6        06   looking at?
 7        07        MS. WHITE:  Objection as to form.
 8        08        (Pause in proceedings for document review.)
 9        09        THE WITNESS:  Again, on this page, I
10        10   don't see the actual Q3 FY00 result.
11        11        All I'm saying -- all I'm talking about
12        12   is 61 percent conversion, but I'm not actually
13        13   showing the data on here.
14        14   BY MS. LAVALLEE:
15        15   Q.   Right.
16        16        But you were talking about a 61 percent
17        17   conversion rate for the same week, which would be
18        18   the week of February 13, 2001.
19        19        Is that correct?
20        20   A.   Right.
21        21        But I'm talking about a conversion rate
22        22   on the pipeline from that week to the actuals for
23        23   the end of the quarter.
24        24   Q.   Okay.
25        25   A.   You are talking about something that's
```

236

```
 1   00236:01        number was.")
 2        02   BY MS. LAVALLEE:
 3        03   Q.   Okay.
 4        04        So in your -- on your page -47, you were
 5        05   comparing the conversion rate for a particular week
 6        06   mid-quarter, to the actual results at the end of the
 7        07   quarter.
 8        08        Is that what you were doing for the
 9        09   historical figure?
10        10   A.   No.
11        11        For the historical figure I was taking
12        12   the actual results for the third quarter of '00 --
13        13   Q.   Right.
14        14   A.   -- against the pipeline for the week of
15        15   February 14th.
16        16   Q.   Okay.
17        17   A.   Okay.
18        18   Q.   Yeah, that's fair.
19        19        Okay.  If I can turn your attention to
20        20   page -49, which is a couple pages beyond.
21        21        Can you explain to me what you meant by:
22        22        "The GAP between this
23        23        target and the forecast
24        24        coming from businesses is
25        25        getting smaller..."?
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

237

00237:01    A.   I would be saying that the management
02  judgment is lower than it had been previously.
03    Q.   Okay.
04        And what did you mean by:
05            "We're still pushing an
06            attainment that is higher
07            than the current 'best'
08            case, but have a have a
09            number of deals not included
10            in the forecasted number."
11    A.   So the forecasts that are coming up from
12  Jay's directs do not include some of the very large
13  deals that they didn't feel comfortable committing
14  to.
15    Q.   Okay.
16    A.   So those are over and above their
17  forecasted numbers.
18    Q.   Okay.
19    A.   That's what I would have meant.
20    Q.   Yeah.
21        And what does "We're still pushing an
22  attainment," what does that mean?
23    A.   "That is higher than the current 'best'
24  case."
25        I was just -- it's a creative way of

238

00238:01  saying the same thing again.  It was a creative way
02  of saying that the forecast that we have is higher
03  than the current best case.
04    Q.   All right.
05        And the next page, page -50, reads:
06            "So far we have 34 million
07            booked; so 170 million to go
08            in just over two weeks.
09            Forecast build up by deals,
10            from committed to long-shot
11            shows larger gap in commit,
12            to be backed up by upside."
13        What did you mean here?
14    A.   It means I think the same thing as what I
15  said earlier.  It means that there are a number of
16  deals or were a number of deals at that time that
17  were not being committed to by the business and were
18  not reflected in the forecast, and the upside from
19  those deals was expected to fill in the gap.
20    Q.   Okay.
21        And in particular the phrase that the
22  "committed to long-shot shows larger gap in commit,"
23  what does that mean, "larger gap in commit"?
24        I'm not sure I understand.
25    A.   I don't know exactly.

239

00239:01    Q.   Were you comparing --
02    A.   I -- can I look at the previous page,
03  because I may have been comparing to the last thing
04  I was saying.
05    Q.   Okay.
06    A.   So -- yeah, that's it.
07        So the gap on this page is 58 million.
08    Q.   Uh-huh.
09    A.   From the large deals.
10    Q.   Right.
11    A.   It looks like this is a comparison of
12  large.
13        And then the next one is 90 million.
14        So I was comparing it to the prior page
15  or prior slide --
16    Q.   Okay.
17    A.   -- in the presentation.
18    Q.   And the prior slide, I mean, what is the
19  difference between the two slides, just so I'm
20  clear?
21    A.   Well, it -- so -- okay.
22        There are -- when I was talking earlier
23  about the opportunity worksheets where the reps
24  actually go in and fill out opportunity worksheets,
25  this says "Forecast build up by deals," which means

240

00240:01  when we were talking about management judgment,
02  there was management judgment at Jay's level and
03  there may have been management judgment at other
04  levels.
05        So that's the difference there.
06    Q.   Okay.  And which is which, just so I'm
07  clear?
08    A.   The management judgment at Jay's level
09  would be the 58 million.
10    Q.   Which is on page -49?
11    A.   Which is on page -49.
12    Q.   Uh-uh.
13    A.   The management judgment in total on deals
14  is the 90 million.
15    Q.   I see.
16        And do you recall as you are sitting
17  today -- here today whether or not having closed
18  only 34 million in deals at that point in the period
19  would have been -- would have been something that
20  would have made you nervous?
21        MR. NADOLENCO:  Objection to form.
22        THE WITNESS:  No.
23        (Reporter interruption.)
24  BY MS. LAVALLEE:
25    Q.   Okay.

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

241

1  00241:01      And is your answer no, it wouldn't have
2  02  made you nervous, or no, you just don't know sitting
3  03  here how you would have felt at that time?
4  04      A.   No, I don't believe it would have made me
5  05  nervous.
6  06      Q.   Okay.
7  07      And why is that?
8  08      A.   It's typical.  We close most of our
9  09  business in the last two weeks of a quarter.
10  10      Q.   Okay.
11  11      And OSI has both a license and a
12  12  consulting component; is that correct?
13  13      A.   That's correct.
14  14      Q.   Okay.
15  15      And was one of those -- was licensing or
16  16  consulting a more stable business and more
17  17  predictable in terms of forecasting?
18  18      MR. NADOLENCO:  Objection to form.
19  19      THE WITNESS:  Typically consulting is --
20  20  is easier to forecast.
21  21  BY MS. LAVALLEE:
22  22      Q.   Okay.
23  23      And is there a difference in terms of
24  24  ability to forecast by deal size?
25  25      And what I mean by that is, is it easier

242

1  00242:01  to forecast the closing of big deals versus small
2  02  deals or vice versa?
3  03      Is there any relationship there?
4  04      MR. NADOLENCO:  Objection to form.
5  05      THE WITNESS:  I wouldn't know.
6  06  BY MS. LAVALLEE:
7  07      Q.   Okay.
8  08      Prior to Q3 2001 -- actually, let me
9  09  rephrase that.
10  10      Prior to changing positions in the fall
11  11  of 2000, were you involved in the forecasting
12  12  process for OSI at any level or for any division of
13  13  OSI?
14  14      A.   Yeah, for division.  For a couple of
15  15  Division.
16  16      Q.   Okay.
17  17      And those were the divisions that you
18  18  worked for, and we went through them earlier today,
19  19  right?
20  20      A.   That's correct.
21  21      Q.   Okay.
22  22      Do you have any recollection of the
23  23  specific deals that you --
24  24      Actually, let me rephrase that.  Let me
25  25  ask you to turn to page -52 of this document.

243

1  00243:01      Do you have any recollection as to what
2  02  your understanding at the time that you prepared
3  03  this presentation of the status of any of these
4  04  particular potential deals?
5  05      A.   No, not at that time.
6  06      Q.   Okay.
7  07      Do you have any understanding as to
8  08  whether the telecom -- telecommunications business
9  09  was suffering any problems in this time frame?
10  10      MR. NADOLENCO:  Objection to form.
11  11      MS. WHITE:  Same objection.
12  12      THE WITNESS:  No.
13  13  BY MS. LAVALLEE:
14  14      Q.   Okay.
15  15      On the left-hand side it says "Area."  It
16  16  says: "Healthcare, Comms, S&L, Financial Services."
17  17      Is that correct?
18  18      A.   That's correct.
19  19      And "Federal."
20  20      What does "Comms" represent?
21  21      A.   Communications and utilities.
22  22      Q.   Okay.
23  23      Did you have any role in dealing with
24  24  these potential clients or actual clients in Q3
25  25  2001?

244

1  00244:01      MS. WHITE:  Objection as to form.
2  02      THE WITNESS:  No, I didn't.
3  03  BY MS. LAVALLEE:
4  04      Q.   Okay.
5  05      That would have been the sales force?
6  06      A.   That's correct.
7  07      Q.   On page -53, at the end of the document
8  08  states:
9  09      "Attainment of 210 million
10  10      for Q3 would result in Q4
11  11      target of 479 million to
12  12      achieve 30 percent growth
13  13      for year FY01."
14  14      Can you tell me what you meant by this
15  15  statement?
16  16      A.   I can only -- I would have to guess.
17  17      Q.   Okay.
18  18      You don't have any recollection of what
19  19  you meant at the time?
20  20      A.   Well, I know what it means
21  21  mathematically.
22  22      It appears that there was a target set
23  23  out there of 30 percent.  And I was stating
24  24  mathematically what we would need to -- what we
25  25  would need to achieve in the fourth quarter to get

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

245

```
1   00245:01  there, assuming we did 210 in the third quarter.
2   02    Q.  Okay.
3   03        And when you say there was a target out
4   04  there for Q -- a target out there, what target would
5   05  you be referring to?
6   06    MS. WHITE:  Objection as to form.
7   07    THE WITNESS:  I don't know.
8   08  BY MS. LAVALLEE:
9   09    Q.  Okay.
10  10        Could it be the budget target?
11  11    A.  I don't think so.
12  12    Q.  Okay.
13  13        And why do you say that?
14  14    A.  Because we have seen a number of
15  15  documents where a 30 percent number is inserted in
16  16  there as if it were set somewhere.
17  17        But that was -- I don't recall that being
18  18  the budget.
19  19    Q.  Okay.
20  20        Do you recall what the budget was?
21  21    A.  No, I don't.
22  22    Q.  The next page -54, -55, and -56, am I
23  23  correct in understanding that this relates to the
24  24  consulting component of OSI, these three pages?
25  25    A.  Yes.
```

246

```
1   00246:01    Q.  Okay.
2   02        I would like to mark as Exhibit 75 -- 77,
3   03  a document Bates-stamped C -- I'm sorry, ORCL
4   04  0109623.
5   05    (Exhibit 77 marked.)
6   06  BY MS. LAVALLEE:
7   07    Q.  Ms. Kopp, if I can ask you to look at the
8   08  document.
9   09        And then identify after you have had a
10  10  chance to look at it what it represents.
11  11    A.  It's an email from me to Jennifer Minton
12  12  including some forecast data.
13  13    Q.  Okay.
14  14        And did you indeed send this email to
15  15  Jennifer Minton in your capacity as finance director
16  16  for OSI in Q3 2001, on or about January 18th, 2001?
17  17    A.  I must have, yes.
18  18    Q.  Okay.
19  19        At the very bottom left it indicates page
20  20  1 of 2.
21  21        Is it your understanding that this email
22  22  would have contained two pages?
23  23    A.  Only based on that.
24  24    Q.  Okay.  And does the last sentence on
25  25  page -- on that one page indicate that the text
```

247

```
1   00247:01  probably continued on a second page?
2   02    A.  Yes, it does.
3   03    Q.  Okay.  And from the very top it says:
4   04        "I have attached
5   05        package" --
6   06        "Jennifer, I have attached
7   07        the package I provided" --
8   08  "I provide to Jay so that
9   09        you can see by vertical what
10  10        the pipeline conversion and
11  11        judgment are to get to this
12  12        forecast."
13  13        Is it your understanding based on this
14  14  sentence that there was an attachment to this email?
15  15    A.  Yes.
16  16    Q.  Okay.  Do you know what that attachment
17  17  was?
18  18    A.  It would have been the Jay forecast
19  19  package.
20  20    (Reporter interruption.)
21  21        THE WITNESS:  We called it the "Jay
22  22  package."
23  23  BY MS. LAVALLEE:
24  24    Q.  Okay.
25  25        And did it have a specific title on this
```

248

```
1   00248:01  document?
2   02    A.  I don't remember the exact title.
3   03    Q.  Okay.
4   04        Is this a document that we discussed
5   05  earlier; do you recall.
6   06    A.  I don't think we have.
7   07    Q.  Okay.
8   08        Can you tell me what -- well, first of
9   09  all, let me ask:
10  10        Who prepared the Jay forecast?
11  11    A.  Let me back up a second.
12  12    Q.  Yes.
13  13    A.  We haven't discussed it in the context of
14  14  the exhibits.
15  15    Q.  Oh, I'm sorry.
16  16    A.  This is the weekly forecast package that
17  17  I provided to Jay.  So yes, we've discussed it in
18  18  that context.
19  19    Q.  Earlier in the --
20  20    A.  Yeah.  I thought -- I was thinking in
21  21  terms of looking at it.  We haven't actually looked
22  22  at one.
23  23        But we -- this is package that I prepared
24  24  for him every forecast period.
25  25    Q.  Okay.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

249

```
1   00249:01      So it is something we discussed earlier
2   02 today?
3   03      A.  Yes, it is.
4   04      Q.  Okay.
5   05          There's some handwriting on this
6   06 document.
7   07          Can you tell me whose handwriting that
8   08 is?
9   09      A.  I don't know.
10  10      Q.  Okay.
11  11          It's not your handwriting?
12  12      A.  No, it's not.
13  13      Q.  Do you know if it's Jay's handwriting?
14  14      A.  No.
15  15      Q.  Do you know if it's Ms. Minton's
16  16 handwriting?
17  17      A.  I don't know.
18  18      Q.  And it states in here:
19  19          "Again, I'm including my
20  20          projection based on
21  21          discussions with his direct"
22  22      -- "his directs."
23  23          Do you see that?
24  24      A.  Uh-huh.
25  25      Q.  Did you normally have conversations with
```

250

```
1   00250:01  Jay's directs?
2   02      A.  No.
3   03      Q.  Okay.
4   04          Do you recall having discussions with
5   05 them during this time frame?
6   06      A.  I don't recall it specifically, no.
7   07      Q.  But based on this, you believe that that
8   08 occurred?
9   09      A.  Yes.
10  10      Q.  Okay.
11  11          And who were Jay's directs during this
12  12 period?
13  13      A.  Steve Perkins, Jim O'Neill, Joe Duffy.
14  14          Again, I can't remember who had state and
15  15 local at that point.
16  16      Q.  Okay.
17  17          And do you know why you had discussions
18  18 with them during this particular period?
19  19      A.  Well, based on the second sentence, I say
20  20 he just called me from the road.
21  21          So it appears that I was pulling
22  22 something together and he was unavailable.
23  23      Q.  Okay.
24  24          So you think it was because he was
25  25 unavailable?
```

251

```
1   00251:01      A.  Yes.
2   02          Normally I did not go around Jay to his
3   03 directs.
4   04      Q.  Okay.
5   05          And you don't have any understanding that
6   06 it could have been for any other reason?
7   07      A.  It wouldn't have been for any other
8   08 reason.
9   09      Q.  Okay.
10  10          And it states here that you are including
11  11 your projection based on your discussions.
12  12          Is it normal -- what do you mean by your
13  13 projection?
14  14      A.  Jennifer likes us to provide her with
15  15 what we really think independent of what our
16  16 business leader thinks.
17  17      Q.  Okay.
18  18          And do you routinely do you that during
19  19 Q3 2001?
20  20      A.  Mostly at the end of the quarter.
21  21          But I think -- this must have been the
22  22 first time because it was fairly early.  It must
23  23 have been the first time in the quarter that I had
24  24 done that.
25  25      Q.  Okay.  Okay.
```

252

```
1   00252:01      And is that a practice that's carried out
2   02 today, you providing your input on projections to
3   03 Ms. Minton?
4   04      A.  Yes, it is.
5   05      Q.  And your role did change roughly around
6   06 Q3 2001.
7   07          Had you ever done that type of thing in
8   08 the past?
9   09      A.  No, I hadn't.
10  10      Q.  Was that because your role change or your
11  11 new job description, or was it because it was a new
12  12 practice that was implemented?
13  13      A.  Probably all three.
14  14      Q.  Okay.
15  15          The next paragraph says:
16  16          "He would like the sit in
17  17          tomorrow..."
18  18          What was he referring to about the next
19  19 day, Friday; do you know?
20  20      A.  I don't know.
21  21      Q.  Okay.
22  22          Is there a regular meeting that's held on
23  23 Fridays?
24  24      A.  No, there isn't.
25  25          I should say there wasn't at that time.
```

253

1  00253:01   Q.   Okay.
2  02         So you have no recollection or
3  03  understanding as to what you were referring to
4  04  there?
5  05   A.   No.
6  06   Q.   The second sentence -- well, the second
7  07  paragraph says:
8  08         "He is still confident in
9  09         the 225, as long as none of
10  10        the very large opportunities
11  11        drop out."
12  12   (Reporter interruption.)
13  13  BY MS. LAVALLEE:
14  14   Q.   What did you mean by this sentence?
15  15   A.   I meant that he is including in his 225,
16  16  a number of very large transactions.  Any one of
17  17  which could make a change.
18  18   Q.   Okay.
19  19         And are those transactions the ones that
20  20  are listed below?
21  21   A.   They are some of the ones listed below.
22  22   Q.   Okay.
23  23         So there were others, you believe?
24  24   A.   There were likely others.
25  25         I can't guarantee these are all of them.

254

1  00254:01  But they are likely the larger ones.
2  02   Q.   Okay.
3  03         The -- right below the chart there's a
4  04  phrase that reads:
5  05         "There is $91 million in
6  06         judgment at Jay's level to
7  07         get to the 225 number and he
8  08         gets the attached from me
9  09         each week so he is aware of
10  10        the difference."
11  11        Do you know what are you talking about in
12  12  terms of the attachment?
13  13   A.   The same thing, it would have been the
14  14  forecast package --
15  15   Q.   Okay.
16  16   A.   -- I referred to up there.
17  17   Q.   I'm sorry.  Okay.
18  18        And do you know what you meant by this
19  19  sentence?  What did you mean by this sentence?
20  20   A.   I meant that Jay is aware that there is
21  21  91 million of judgment included in his $225 million
22  22  number.
23  23   Q.   Okay.
24  24        What did you mean by the phrase:  "...so
25  25  he is aware of the difference"?

255

1  00255:01   A.   I would have meant the difference between
2  02  the forecast that's coming up from his directs and
3  03  what he is submitting.
4  04   Q.   Okay.
5  05         And the next paragraph reads:
6  06         "Conversion rates across
7  07         the board (except S&L) are
8  08         North of 50 percent; Federal
9  09         would have to close 62
10  10        percent of," and then we
11  11        lose the rest of the text.
12  12   A.   Uh-huh.
13  13   Q.   What were you discussing there; do you
14  14  know?
15  15   A.   I was talking about pipeline conversion.
16  16   Q.   Uh-huh.
17  17        And why were you raising that here?
18  18   A.   I can only -- she must have asked me for
19  19  it.
20  20   Q.   Okay.
21  21        And do you think that this was being sent
22  22  to Ms. Minton in response for a request that she
23  23  made?
24  24   MS. WHITE:   Objection as to form.
25  25   THE WITNESS:   Perhaps, given it looks as

256

1  00256:01  though there was some meeting to take place, it
2  02  looks like this was in preparation for that.
3  03  BY MS. LAVALLEE:
4  04   Q.   Okay.
5  05        And again, you don't have any idea what
6  06  that meeting would be?
7  07   A.   No, I don't.
8  08   Q.   I assume, then, that you have no idea who
9  09  would have been present at that meeting or if it
10  10  actually occurred?
11  11   A.   No, I don't.  Sorry.
12  12   Q.   Was it usual for you to provide this type
13  13  of data to Ms. Minton?
14  14   MS. WHITE:   Objection as to form.
15  15   THE WITNESS:   Not at this point in the
16  16  quarter.
17  17  BY MS. LAVALLEE:
18  18   Q.   But later in the quarter you would
19  19  provide her with this type of information?
20  20   A.   Yes.
21  21   Q.   What would you have done after sending
22  22  this email to Ms. Minton?
23  23   MS. WHITE:   Objection as to form.
24  24  BY MS. LAVALLEE:
25  25   Q.   I'm sorry, you were giving me a blank

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

257

```
1   00257:01 look.
2   02      Let me ask my question again.
3   03      What would you have done with this email
4   04 on your system after having sent it to Ms. Minton?
5   05   A.  I may have saved it for some period of
6   06 time.
7   07   Q.  And if you saved it, where would you have
8   08 saved it?
9   09   A.  In an email folder.
10  10   Q.  Okay.
11  11      And is it something you would have
12  12 downloaded to your hard drive or to the network?
13  13   A.  No.
14  14   Q.  Would you have printed a copy of it?
15  15   A.  I don't think so.
16  16   Q.  And would you have forwarded it to Jay
17  17 Nussbaum?
18  18   A.  I may have.
19  19   Q.  Okay.
20  20      And would you have forwarded it to
21  21 anybody else?
22  22   A.  I don't think so, no.
23  23   Q.  Did you ever communicate with Mr. Ellison
24  24 during Q3 2001?
25  25   A.  Not that I recall.
```

258

```
1   00258:01   Q.  Okay.
2   02      Did you -- do you communicate with him
3   03 today?
4   04      MS. WHITE:  Objection as to form.
5   05      THE WITNESS:  Regarding what?
6   06 BY MS. LAVALLEE:
7   07   Q.  Regarding business at Oracle?
8   08   A.  Twice a year there is a budget review
9   09 meeting.
10  10      I mean, I don't speak to him regularly,
11  11 you know.
12  12   Q.  But you speak to him in the context of
13  13 these budget meetings?
14  14   A.  If I am asked a question only.
15  15   Q.  Okay.
16  16   A.  I'm present.  The question is directed at
17  17 me, I answer it.  But that doesn't happen very
18  18 often.
19  19   Q.  Fair enough.
20  20      Do you communicate with Mr. Ellison --
21  21 or, let me ask another question.
22  22      Were you -- did you participate in any
23  23 other meetings during Q -- or in any meetings during
24  24 Q3 2001 either by telephone, in person, or by some
25  25 other means, where Mr. Ellison was present in
```

259

```
1   00259:01 Q3 2001?
2   02   A.  Not that I remember.
3   03   Q.  And do you -- did you regularly
4   04 communicate with -- or did you -- strike that.
5   05      Did you communicate with Mr. Henley
6   06 during 2001 third quarter?
7   07   A.  I don't think so.
8   08   Q.  Okay.
9   09      And were you present at any meetings at
10  10 which Mr. Henley was also present, either by phone,
11  11 by video, in person, in Q3 2001?
12  12   A.  I believe he was on some of the forecast
13  13 calls.
14  14      I don't recall which ones he attended.
15  15   Q.  Were those the only meetings that you
16  16 would have attended where he may have been present?
17  17   A.  Yes.
18  18   Q.  And did you ever communicate by email
19  19 with Mr. Henley during Q3 2001?
20  20   A.  No.
21  21   Q.  And did you ever communicate with
22  22 Mr. Ellison during Q3 2001 by email?
23  23   A.  No.
24  24   Q.  Did you ever communicate by telephone
25  25 with Mr. Ellison during Q3 2001?
```

260

```
1   00260:01      MS. WHITE:  Objection as to form.
2   02      THE WITNESS:  I don't remember if he was
3   03 on any of the forecast calls either.
4   04 BY MS. LAVALLEE:
5   05   Q.  Okay.
6   06      Other than the forecast calls?
7   07   A.  No.
8   08   Q.  And other than the forecast calls, did
9   09 you communicate with Mr. Henley during Q3 2001 --
10  10      MS. WHITE:  Objection asked and answered.
11  11 BY MS. LAVALLEE:
12  12   Q.  -- by phone?
13  13   A.  No.
14  14   Q.  Okay.
15  15      Do you know when any of the deals listed
16  16 on Exhibit 77 actually entered the pipeline for OSI?
17  17      MS. WHITE:  Objection as to form.
18  18      THE WITNESS:  No, I don't know.
19  19 BY MS. LAVALLEE:
20  20   Q.  Would there be any way for you to figure
21  21 that out?
22  22   A.  I'm not sure.
23  23   Q.  If you were in your office, do you have
24  24 any means to actually look that information up?
25  25   A.  I believe -- I believe there is an
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

261

```
1   00261:01 initial entry point in OSO that would show the date
2   02  an opportunity was created.
3   03  Q.  Okay.
4   04  A.  That doesn't necessarily mean that's when
5   05  it was forecasted or when a value was placed on it.
6   06      It just means the name of the opportunity
7   07  was created on a certain date.
8   08      And I believe it holds that.
9   09  Q.  Okay.
10  10      And do you access OSO -- I may have asked
11  11  you this question before.  But if I did, if you
12  12  could bear with me and please answer the question
13  13  again.
14  14      Do you today presently access OSO in
15  15  connection with your duties at Oracle?
16  16  A.  I do.
17  17  Q.  Okay.
18  18      Is it your understanding that this
19  19  historical data is contained on OSO?
20  20  A.  No.
21  21      MS. WHITE:  Objection as to form.
22  22 BY MS. LAVALLEE:
23  23  Q.  I'm sorry, can you repeat your answer?
24  24  A.  It's not an accurate historical measure.
25  25  Q.  Okay.
```

262

```
1   00262:01      And why do you say that?
2   02  A.  Because it's not an accounting system.
3   03 It's a pipeline system.
4   04  Q.  Okay.
5   05      And --
6   06  A.  It's not meant to house actuals, is my
7   07 point.
8   08  Q.  "Actuals."  Okay.
9   09      So by that you mean that if a deal is
10  10  closed, it ceases to exist on that system?
11  11  A.  No, it exists, but there's no check and
12  12  balance in place that the amount that it shows
13  13  closed for in OSO is really what it closed for.
14  14  Q.  I see.
15  15  A.  Or anything, we don't use OSO as an
16  16 actuals reporting system.
17  17  Q.  Okay.  I understand.
18  18      So the data is there, but you have no way
19  19 of determining whether or not it is -- what's on
20  20  there is consistent with whether the deal closed or
21  21 what it closed for --
22  22      MS. WHITE:  Objection.
23  23 BY MS. LAVALLEE:
24  24  Q.  -- is that correct?
25  25      MS. WHITE:  Objection as to form.
```

263

```
1   00263:01 BY MS. LAVALLEE:
2   02  Q.  Please tell me if I'm wrong.
3   03  A.  Yeah, that's correct.
4   04      It's a sales forecasting pipeline system.
5   05 It is not intended to be an accounting system.
6   06  Q.  Okay.
7   07      Does it serve any other purpose other
8   08 than forecasting, to your knowledge?
9   09  A.  I think we do -- we attempt to do some
10  10 win/loss reporting off of it.  But it -- you know.
11  11  Q.  Okay.
12  12      And what do you mean by "win/loss"?
13  13  A.  We capture now, we didn't then, but we
14  14 are now expected to capture -- the sales force, I
15  15 should say, is expected to capture competitor data
16  16 on their system.
17  17  Q.  Okay.
18  18      Excuse me.
19  19      But at the time in Q3 2001, you were not
20  20 tracking that type of information; is that correct?
21  21      (Reporter interruption.)
22  22      THE WITNESS:  That's correct.
23  23 BY MS. LAVALLEE:
24  24  Q.  Is it fair to say the company was not
25  25 tracking at all or simply not tracking it on OSO?
```

264

```
1   00264:01      MS. WHITE:  Objection as to form.
2   02      THE WITNESS:  I don't know if the company
3   03 was tracking it at all.
4   04 BY MS. LAVALLEE:
5   05  Q.  Okay.  It wasn't something --
6   06  A.  We were not tracking it in OSO.
7   07  Q.  Thank you.  Sorry to interrupt.
8   08  A.  That's okay.
9   09      (Pause in proceedings for document review.)
10  10      MS. LAVALLEE:  I would like to mark as
11  11 Exhibit 78, a document Bates-stamped 037133 through
12  12 -34.
13  13      (Exhibit 78 marked.)
14  14 BY MS. LAVALLEE:
15  15  Q.  And Ms. Kopp, if I could ask you to take
16  16 a look at the document.
17  17      And then when you've had the chance to
18  18 review it, please identify it for the record.
19  19      (Pause in proceedings for document review.)
20  20      THE WITNESS:  It's an email from Jennifer
21  21 Minton to Ivgen Guner, with copies to myself, Jim
22  22 English, Dave Winton, and Larry Garnick.
23  23 BY MS. LAVALLEE:
24  24  Q.  Do you believe that you received this
25  25 email on or about January 18, 2001 in connection
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

265

```
 1  00265:01  with your duties at Oracle?
 2  02    A.   I must have.
 3  03    Q.   Okay.
 4  04         Can you tell me what general subject this
 5  05  email relates to, and if it's more than one what
 6  06  they are?
 7  07         MR. NADOLENCO:  Objection to form.
 8  08         THE WITNESS:  It looks as though she is
 9  09  responding to an email from Ivgen, so . . .
10  10  BY MS. LAVALLEE:
11  11    Q.   I'm sorry.
12  12    A.   Well, Ivgen's email is concerning a
13  13  number of different topics.
14  14         And Jennifer's note is really only
15  15  addressing one target.
16  16    Q.   Okay.
17  17         And which target is she addressing?
18  18    A.   I mean one issue.
19  19         She seems to be addressing the budget
20  20  item, because the only question that I see in here
21  21  is:
22  22         "We must send them out as
23  23         soon as possible.  Any
24  24         feedback from the EC?
25  25         Please let Larry and I know
```

266

```
 1  00266:01        how to proceed."
 2  02         So that appears to be the only question
 3  03  Ivgen had asked.  So it looks as though that's the
 4  04  question that she's answering.
 5  05    Q.   Okay.
 6  06         And by "EC," what is -- what did Ivgen
 7  07  Guner mean there?
 8  08    A.   Executive committee.
 9  09    Q.   Okay.
10  10         And they were asking for feedback about
11  11  the targets for the budget for what period?
12  12         MS. WHITE:  Objection as to form.
13  13         THE WITNESS:  I don't know.
14  14  BY MS. LAVALLEE:
15  15    Q.   Okay.
16  16         Was it standard for you to receive this
17  17  type of email regarding feedback from -- on these
18  18  subjects?
19  19         MS. WHITE:  Objection as to form.
20  20         THE WITNESS:  No.
21  21  BY MS. LAVALLEE:
22  22    Q.   So in Ms. Minton's response to Ivgen
23  23  Guner, it states:
24  24         "All -- LJE made it clear
25  25         to everyone at the EMC this
```

267

```
 1  00267:01        week that the license
 2  02         revenue growth target for
 3  03         this year and next is 30
 4  04         percent."
 5  05         Do you have any idea who she meant by
 6  06  "LJE"?
 7  07    A.   I -- it would have to be Larry Ellison.
 8  08  There is only one LJE in all caps at Oracle.
 9  09    Q.   All right.
10  10         And is it normal for you to get that
11  11  particular type of feedback?
12  12         MS. WHITE:  Objection to form.
13  13         THE WITNESS:  I'm not sure what you mean
14  14  by "normal."
15  15  BY MS. LAVALLEE:
16  16    Q.   Okay.
17  17         Did you routinely receive feedback from
18  18  EMC meetings?
19  19    A.   No.
20  20    Q.   All right.
21  21         In the email from Ivgen Guner to Jennifer
22  22  it says under North America Pack:
23  23         "I left eight copies of
24  24         North America License" --
25  25         (Reporter interruption.)
```

268

```
 1  00268:01  BY MS. LAVALLEE:
 2  02    Q.   (Reading)
 3  03         -- "of North America
 4  04         License Executive Package
 5  05         (Green Book) with Larry for
 6  06         you to distribute to
 7  07         William, Cheryl, et cetera."
 8  08         Do you see that?
 9  09    A.   Uh-huh.
10  10    Q.   Do you know who "William, Cheryl" is?
11  11         MS. WHITE:  Objection as to form.
12  12         THE WITNESS:  I would have to speculate.
13  13  BY MS. LAVALLEE:
14  14    Q.   Okay.
15  15         Do you know what the "green book" is?
16  16    A.   Yes, I do.
17  17    Q.   What is that?
18  18    A.   It's the North America License Reporting
19  19  Package.
20  20    Q.   Okay.
21  21         All right.  That's a good response.
22  22         Can you tell me what that -- what
23  23  material is contained in there?
24  24         MS. WHITE:  Objection as to form.
25  25         THE WITNESS:  At that period in time?
```

269

1  00269:01 BY MS. LAVALLEE:
2   02    Q.   I'm sorry, what?
3   03    A.   At that time period in time?
4   04    Q.   Yes, please.
5   05    A.   It would have been the second quarter
6   06 packet, since the third quarter was still under way.
7   07       And it would have had second quarter
8   08 financial actuals.
9   09    Q.   Okay.  Thank you.
10  10       And by "Larry," does that sentence also
11  11 refer to Mr. Ellison?
12  12    A.   I don't think so.
13  13    Q.   Okay.
14  14       So you think that's a different person
15  15 there?
16  16    A.   I think that's Larry Garnick who was
17  17 copied on the message and sat relatively close.  I
18  18 think they all sat close together at work, so . . .
19  19    Q.   Okay.
20  20    A.   That's what I believe she meant.
21  21    Q.   Under the "Budget" heading, it says:
22  22       "To follow-up on my voice
23  23       mail from last night - The
24  24       field is getting concerned
25  25       about the targets.  We must

270

1  00270:01       send them out as soon as
2   02       possible."
3   03       Again, do you have any idea -- I'm not
4   04 sure when we were talking about targets earlier, I
5   05 just want to make sure that we're covering the right
6   06 issue.
7   07       Do you have any idea what is meant by
8   08 "targets" in this phrase?
9   09       MS. WHITE:  Objection as to form.
10  10       THE WITNESS:  No.
11  11 BY MS. LAVALLEE:
12  12    Q.   The next sentence says:
13  13       "Also, since the targets
14  14       are almost a month late, and
15  15       the review meetings are
16  16       pushed out a week, the field
17  17       is asking for an extension
18  18       to the submission deadline."
19  19       Do you have any idea what is being
20  20 discussed there?
21  21       MS. WHITE:  Objection as to form.  Lacks
22  22 foundation.
23  23       THE WITNESS:  No.
24  24 BY MS. LAVALLEE:
25  25    Q.   Under "Forecast," that heading, do you

271

1  00271:01 see that?
2   02    A.   Yes.
3   03    Q.   Okay.
4   04       There is a sentence that reads:
5   05       "There is a scheduled
6   06       forecast call this Thursday.
7   07       Roberta will prepare the
8   08       package as usual [sic]."
9   09       Do you have any understanding as to
10  10 whether this refers to the Thursday forecasting
11  11 calls that we've been discussing here today?
12  12    A.   It appears to.
13  13    Q.   Okay.
14  14       And do you have any idea what package
15  15 they are referring to there?
16  16       MS. WHITE:  Objection as to form.
17  17       THE WITNESS:  It would be the Americas
18  18 Forecast Package we reviewed earlier.
19  19 BY MS. LAVALLEE:
20  20    Q.   Okay.
21  21       And then below that there is a heading
22  22 called "N-A-M-T Call next week."
23  23       Do you know what -- do you know what
24  24 "N-A-M-T" stands for?
25  25    A.   Yes.

272

1  00272:01       North America Management Team, refers to
2   02 Jennifer's team.
3   03    Q.   Okay.
4   04       And do you know -- are you a member of
5   05 that team?
6   06    A.   I was a member of that team at that time.
7   07    Q.   Okay.
8   08       And do you know what the call that is
9   09 being referred to there was about?
10  10    A.   It would have been one of her staff calls
11  11 I referred to earlier.
12  12       No specific agenda, no.
13  13    Q.   Okay.
14  14       I would like to mark as Exhibit 79, a
15  15 document Bates-stamped CA-ORCL 031405 through -07.
16  16       (Exhibit 79 marked.)
17  17 BY MS. LAVALLEE:
18  18    Q.   I apologize, Ms. Kopp.
19  19       Can you take a look at this document and
20  20 identify it for the record, please?
21  21       (Pause in proceedings for document review.)
22  22       MR. NADOLENCO:  Objection to the extent
23  23 it lacks foundation.
24  24 BY MS. LAVALLEE:
25  25    Q.   Can you identify the document for the

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

273

```
 1  00273:01  record, please?
 2  02     A.   It's an email Safra has forwarded to --
 3  03  hold on.
 4  04         Sandy Sanderson has forwarded to Safra
 5  05  Catz, that she then forwarded to Larry Ellison, of
 6  06  mine, to what were the consulting leads and their
 7  07  finance support people in January of 2001 on the
 8  08  status of our internal upgrade to 11i project
 9  09  accounting.
10  10     Q.   Okay.
11  11         And what was your involvement in this
12  12  project upgrade?
13  13     A.   I was the global process owner at the
14  14  time for the project's process and the migration of
15  15  the business processes surrounding project
16  16  accounting.
17  17     Q.   Okay.
18  18         And what was the upgrade?  Can you
19  19  explain to me what the upgrade was about and what it
20  20  related to?
21  21     A.   Sure.
22  22         Oracle internally up -- migrated its
23  23  applications to 11i on or about January 1st of 2001.
24  24     Q.   Okay.
25  25     A.   And at that time, each of the leads were
```

274

```
 1  00274:01  responsible for producing status reports.
 2  02     Q.   Okay.
 3  03         So that's what this relates to, right?
 4  04     A.   Huh.
 5  05         MS. LAVALLEE:  I would like to mark as
 6  06  Exhibit Number 80, a document Bates-stamped CA-ORCL
 7  07  033037 through -38.
 8  08         (Exhibit 80 marked.)
 9  09  BY MS. LAVALLEE:
10  10     Q.   Ms. Kopp, if you can take a look at the
11  11  document, review it, and then tell me what it is.
12  12         (Pause in proceedings for document review.)
13  13         THE WITNESS:  It's another big deal
14  14  summary.
15  15  BY MS. LAVALLEE:
16  16     Q.   Is it different from the big deal
17  17  summaries we have been discussing here today?
18  18         MR. NADOLENCO:  Objection to form.
19  19         THE WITNESS:  The summary, as I said
20  20  earlier, changed formats a number of times during
21  21  the quarter.
22  22         It's the same report, only in a slightly
23  23  different format.
24  24  BY MS. LAVALLEE:
25  25     Q.   Okay.  Have we seen another similar
```

275

```
 1  00275:01  report in a different format today?
 2  02     A.   Yes.
 3  03     Q.   Can you point out which one it is,
 4  04  please?
 5  05     A.   In Exhibit 71.
 6  06         -2346 through the end.
 7  07     Q.   Okay.
 8  08         So am I to understand that once one
 9  09  form -- once you used one form, you didn't use the
10  10  other form?
11  11         It was like you consecutively changed
12  12  formats, or were multiple forms used at one time?
13  13     A.   There may have been a period where there
14  14  was more than one version of the same report.
15  15         But not for any long period of time.
16  16     Q.   Okay.
17  17     A.   The idea was just to have one big deal
18  18  summary a week or a forecast period.
19  19     Q.   Okay.
20  20         And is this a -- again, is this -- the
21  21  big deal summary is something that was prepared at
22  22  your direction or under your supervision, correct?
23  23     A.   That's correct.
24  24     Q.   Okay.
25  25         And when you received these documents,
```

276

```
 1  00276:01  did you retain them --
 2  02         Or how did you receive this, let me ask
 3  03  you that first?
 4  04     A.   Electronically through email.
 5  05     Q.   From whom?
 6  06     A.   From Fred Avila or Shane Gorman.
 7  07     Q.   Okay.
 8  08         And when you received these big deal
 9  09  summaries in this form, what did you do with them?
10  10     A.   Save them to my computer disk, the hard
11  11  disk.
12  12     Q.   Okay.
13  13         And by there, you mean your actual hard
14  14  drive on your laptop as opposed to the network; is
15  15  that correct?
16  16     A.   That's correct.
17  17     Q.   You never saved them on the network?
18  18     A.   Never.
19  19     Q.   Was there a reason why you never saved
20  20  things on the network?
21  21     A.   Didn't know how.
22  22         I mean, it wasn't anything that ever
23  23  occurred to me to do, really.
24  24     Q.   Okay.
25  25     A.   I had my own directories, I saved it in
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

277

```
1   00277:01 my own directories.
2   02    Q.   Okay.
3   03    A.   Just never something . . .
4   04    Q.   Were you hooked up to the network on your
5   05 laptop?
6   06    A.   I'm not sure that I even was hooked up to
7   07 anyplace that I could save anything, if that's what
8   08 you mean by "network."
9   09    Q.   Okay.
10  10         But you had email, was your email through
11  11 the network at Oracle?
12  12    A.   Yes.
13  13    Q.   Do you know?
14  14    A.   Yes.
15  15    Q.   Okay.
16  16         Were you able to access OSO from your
17  17 laptop?
18  18    A.   Yes.
19  19    Q.   And what about OFA?  Were you able to
20  20 access that from your laptop during Q3 2001?
21  21    A.   Yes.
22  22    Q.   Were you able to access any other online
23  23 directories or databases during Q3 2001?
24  24    A.   Project accounting.
25  25    Q.   And again, what is "project accounting"?
```

278

```
1   00278:01    A.   It is the system we use to bill -- to
2   02 collect our time and bill our customers for
3   03 consulting.
4   04    Q.   Okay.
5   05         Were there any other databases that you
6   06 were able the access from your computer at Oracle
7   07 during Q3 2001?
8   08    A.   I don't remember.
9   09         MS. LAVALLEE:  Okay.  I would like to
10  10 mark as Exhibit 81, 82, 83, 84, and 85, five
11  11 separate reports.
12  12         MS. SEGAL:  If we're going to be going
13  13 through a lot of documents, do you think we should
14  14 take a break first?
15  15         MS. LAVALLEE:  If you would like to take
16  16 a break, that's fine.
17  17         THE VIDEOGRAPHER:  This is the end of
18  18 videotape number three to Volume 1, deposition of
19  19 Sarah Kopp.
20  20         The time is 4:17.
21  21         We are off the record.
22  22         (Break taken.)
23  23         (Exhibits 81 through 85 marked.)
24  24         THE VIDEOGRAPHER:  This marks the
25  25 beginning of tape number four to Volume 1 in the
```

279

```
1   00279:01 deposition of Sarah Kopp.
2   02         The time is 4:30.
3   03         We are on the record.
4   04 BY MS. LAVALLEE:
5   05    Q.   Ms. Kopp, I have just marked five
6   06 documents as Exhibits 81 through 85.
7   07         Eighty-one is Bates-stamped CA-ORCL
8   08 036512 [sic] through -526.
9   09         MR. NADOLENCO:  Nicole, hold on.  Let us
10  10 these -- because we're going to have to renumber
11  11 these.
12  12         MS. LAVALLEE:  Oh, I'm sorry.
13  13         MS. WHITE:  It's not your fault.
14  14         MS. LAVALLEE:  I wonder whose fault it
15  15 is?
16  16         MR. NASTARI:  I object to the
17  17 implication.
18  18         MS. LAVALLEE:  Let me know when you are
19  19 all set.
20  20         MS. WHITE:  Okay.  We're almost there.
21  21         MR. NADOLENCO:  All right.
22  22         MS. WHITE:  Okay.
23  23 BY MS. LAVALLEE:
24  24    Q.   All right.  Exhibit Number 82 is CA-ORCL
25  25 036527 through -34.
```

280

```
1   00280:01         Exhibit Number 83 is CA-ORCL 036535
2   02 through 06 -- 36524.
3   03         THE WITNESS:  -542.
4   04         MS. LAVALLEE:  -542, thank you.
5   05         And Exhibit Number 84 is CA-ORCL 036543
6   06 through -552.
7   07         Exhibit 85 is CA-ORCL 036553 through
8   08 -562.
9   09    Q.   Ms. Kopp, do you have a copy of each of
10  10 these documents?
11  11    A.   Yes.
12  12    Q.   All right.
13  13         If you could take a moment to look at
14  14 each of these documents, and then identify for the
15  15 record one by one what each document is.
16  16         We can start with actually Exhibit 81.
17  17    A.   Okay.
18  18         MR. NADOLENCO:  I also got a -- I
19  19 apologize for interrupting.  I got one that ends in
20  20 -519.
21  21         MS. WHITE:  That was the first one.
22  22         MS. LAVALLEE:  Keep up with us, John.
23  23         THE WITNESS:  Well, you had said -512.
24  24 It's -519.
25  25         MR. NADOLENCO:  Okay, I apologize.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

281

```
1   00281:01       THE WITNESS:  Okay.
2   02       So 81?
3   03       MS. LAVALLEE:  Yes.
4   04       THE WITNESS:  Is the OSI consulting
5   05  forecast for FY01 Q3 as of the 5th of December '00.
6   06  BY MS. LAVALLEE:
7   07   Q.   Okay.
8   08       And is this a document that you received
9   09  during Q3 2000 -- I'm sorry.
10  10       During Q3 fiscal year 2001?
11  11   A.   Yes.
12  12   Q.   And does this entire document relate to
13  13  OSI consulting?
14  14   A.   Yes, it does.
15  15   Q.   Okay.
16  16       I'd just like to draw your attention to a
17  17  number of the different headings and ask you to
18  18  explain what they relate to.
19  19   A.   Uh-huh.
20  20   Q.   In this, I guess it's the third block
21  21  from the left on the first page of the document, the
22  22  header says:  "Q3 percentage of Plan."
23  23       Do you have an understanding of what is
24  24  referred to there by "Plan"?
25  25   A.   Generally that means budget.
```

282

```
1   00282:01   Q.   All right.
2   02       And the next one reads:  "Q3 YOY Growth."
3   03       Do you know what that refers to?
4   04   A.   Year over year.
5   05   Q.   And the next block is:  "Note, At Risk"
6   06  and "Upside."
7   07       Do you have any understanding as to what
8   08  those refer to?
9   09   A.   "At Risk" refers to places where we are
10  10  doing work but no -- but don't have the purchase
11  11  order signed yet.  So the potential of not being
12  12  able to recognize that work.
13  13   Q.   Okay.
14  14   A.   "Upside" would be places where we could
15  15  potentially improve the forecast for any number of
16  16  reasons.
17  17   Q.   Okay.
18  18       And below on the left, very far left at
19  19  the very bottom there's two boxes.  One says
20  20  "Bookings," and one says "Backlog."
21  21       Can you tell me what "Bookings" refer to?
22  22   A.   Bookings are new funding, I guess,
23  23  documents for consulting.  It is not revenue, it is
24  24  funding of consulting engagement.
25  25   Q.   Okay.
```

283

```
1   00283:01       And what does "Backlog" refer to?
2   02   A.   That means the total amount of funded
3   03  projects that we have.
4   04   Q.   All right.  If I can turn your -- have
5   05  you turn your attention to the next page, -520.
6   06   A.   Uh-huh.
7   07   Q.   And there are a number of boxes on the
8   08  very left-hand side.
9   09       The first one is:  "Utilization CO&CI)."
10  10       Do you know what that phrase refers to?
11  11   A.   Yes.
12  12       It is utilization.  "CO" means client
13  13  billable.
14  14       "CI" means internal billable.
15  15   Q.   Okay.
16  16       Okay.
17  17       MR. NADOLENCO:  We know what those mean,
18  18  don't we?
19  19       MS. LAVALLEE:  Yes.
20  20   Q.   Can you explain what "client billable"
21  21  means?
22  22   A.   "Client billable" means the time is being
23  23  utilized against a funded project for an external
24  24  customer.
25  25   Q.   Okay.
```

284

```
1   00284:01       And what does "internal billable" mean?
2   02   A.   Generally means that consultant is being
3   03  loaned to another organization within Oracle, and we
4   04  are either receiving revenue or cost relief for
5   05  loaning that consultant.
6   06   Q.   Okay.
7   07       And there's percentages.  If you just
8   08  follow across the column there, there are some
9   09  percentages.
10  10       What do those relate to?  I'm not quite
11  11  sure I understand.
12  12   A.   Which percentages?
13  13   Q.   The first one under "Actual," can you
14  14  explain what that one, the 71.0?
15  15   A.   71.0 percent is the actual internal and
16  16  external billable utilization for the first quarter
17  17  of fiscal '01.
18  18       So 71 percent of their time that they
19  19  entered was billable in some fashion.
20  20   Q.   I see.  Thank you.
21  21       If you follow the boxes down, the third
22  22  one says:  "Capacity Days."
23  23       Do you have an understanding as to what
24  24  that refers to?
25  25   A.   Yeah.
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

285

```
1  00285:01    That's the number of billable consultants
2  02  that we have on board, times the number of available
3  03  days in that quarter.
4  04    Q.    I see.
5  05         And: "CO Days"?
6  06    A.    The number of billable days in that
7  07  quarter being -- well, either actual or forecast.
8  08    Q.    That relate to external billing?
9  09    A.    Yeah.
10 10         The CO ones would be external billable
11 11  days.
12 12    Q.    And the CI would be internal billables?
13 13    A.    That's right.
14 14    Q.    Okay.
15 15         The second to the last page 36525, refers
16 16  to on the top left:  "Revenue Forecast with
17 17  Deadweel"?
18 18    A.    It's actually "Dead week."
19 19    Q.    "Dead week."
20 20         What does that refer to?
21 21    A.    So the dead week in a quarter is the
22 22  difference between the project accounting bills on a
23 23  445 schedule, four weeks, four weeks, five weeks,
24 24  ending on a Friday always.
25 25    Q.    Uh-huh.
```

286

```
1  00286:01   A.    It's the difference between the actual
2  02  calendar month end and the cutoff of the system for
3  03  tracking the time.
4  04    Q.    I see.
5  05    A.    We used to call it the dead week.
6  06    Q.    And you don't call it that anymore?
7  07    A.    No.
8  08    Q.    What do you call it now?
9  09    A.    I don't know what we call it now, but we
10 10  don't call it that.
11 11    Q.    Was it causing some consternation at the
12 12  company?
13 13    A.    No.  No, not really.
14 14    Q.    All right.
15 15         And can you just identify for the record
16 16  Exhibit Number 82 then?
17 17    A.    It appears to be the same package for the
18 18  19th of December.  So two weeks later.
19 19    Q.    And is this also something that you
20 20  received in your capacity as senior director -- or
21 21  finance director for OSI in Q3 2001?
22 22    A.    Yes.
23 23    Q.    And Exhibit Number 83?
24 24    A.    The same package dated the 9th of
25 25  January, '01.
```

287

```
1  00287:01   Q.    All right.
2  02         And again, is this a package that you
3  03  received in your capacity as finance director for
4  04  OSI for Q301?
5  05    A.    Yes.
6  06    Q.    Exhibit Number 84, please?
7  07    A.    The same package dated January 16th, '01.
8  08    Q.    Okay.
9  09         Was this also a package that you received
10 10  in your capacity as finance director for OSI during
11 11  Q3 2001?
12 12    A.    Yes.
13 13    Q.    And Exhibit 85, can you identify that for
14 14  the record, please?
15 15    A.    It's the same package again as of
16 16  January 30th of '01.
17 17    Q.    And who was it who included the comments
18 18  under "Variance/Risk Explanation"?
19 19    A.    Who typed them in or where did they --
20 20    Q.    Who -- what was the source of that
21 21  information?
22 22    A.    It varied.
23 23    Q.    Okay.
24 24         And who collected that information?
25 25    A.    Courteney Jung.
```

288

```
1  00288:01   Q.    And she -- is that a woman?
2  02    A.    Yes.
3  03    Q.    And she collected that information from
4  04  what sources?
5  05    A.    I don't know.
6  06    Q.    All right.
7  07         Is Exhibit 85 also a document you would
8  08  have received in your capacity as finance director
9  09  for OSI during the third quarter of 2001?
10 10    A.    Yes.
11 11    Q.    Were these documents that you forwarded
12 12  to anybody else during Q3 2001?
13 13    A.    They would have gone to Steve Perkins,
14 14  who was running consulting at that time for OSI.
15 15    Q.    Anybody else?
16 16    A.    Not that I recall.
17 17    Q.    All right.
18 18         And can you tell by the dates of the five
19 19  exhibits that we have just looked at, whether or not
20 20  any additional ones would have been prepared for the
21 21  third quarter of 2001?
22 22    A.    They likely would have.
23 23    Q.    All right.
24 24         What did you personally do with these
25 25  documents, with these reports after you received
```

289

```
1   00289:01  them in Q3 2001?
2   02    A.   The Excel files I would save to my
3   03  computer hard disk.
4   04    Q.   All right.
5   05         And would you have printed them as well?
6   06    A.   I may have printed them at the time.
7   07    Q.   Would you have kept those printouts?
8   08    A.   No.
9   09    Q.   And would you have done anything else
10  10  with them?
11  11    A.   No.
12  12         (Pause in proceedings for document review.)
13  13    MS. LAVALLEE:  All right.  I would like
14  14  to mark as Exhibit 86, a document Bates-stamped
15  15  CA-ORCL 036623 through -27.
16  16    (Exhibit 86 marked.)
17  17  BY MS. LAVALLEE:
18  18    Q.   Ms. Kopp, if you could take a look at
19  19  this document.
20  20         And after you have had a chance to review
21  21  it, please identify it for the record.
22  22    A.   It is a Q2 fiscal '01 forecast package,
23  23  not of my -- I didn't prepare it.
24  24    Q.   You did not prepare this one?
25  25    A.   No.
```

290

```
1   00290:01   Q.   And how do you know that?
2   02    A.   How do I know that I didn't prepare it?
3   03    Q.   (Nods head.)
4   04    A.   It's not my format, it's my predecessor's
5   05  format.
6   06    Q.   Okay.
7   07         And your predecessor was?
8   08    A.   Terry Ford.
9   09    Q.   All right.
10  10         And do you know what the purpose of this
11  11  document was for, this report?
12  12    A.   This was the old forecast package, the
13  13  old format.  The same package I created, only in a
14  14  different format.
15  15    Q.   And do you know how many of these
16  16  Mr. Ford prepared in Q3 2001?
17  17    MS. WHITE:  Objection as to form.  Lacks
18  18  foundation.
19  19    THE WITNESS:  In Q3?
20  20    MS. LAVALLEE:  Yes.
21  21    THE WITNESS:  None.  This is from Q2.
22  22  BY MS. LAVALLEE:
23  23    Q.   I see.
24  24         And what was the purpose of these
25  25  reports?
```

291

```
1   00291:01   MS. WHITE:  Objection as to form.
2   02    THE WITNESS:  At what point in time?
3   03  BY MS. LAVALLEE:
4   04    Q.   At the point they were created.
5   05    A.   They were --
6   06    MR. NADOLENCO:  Objection as to form.
7   07    THE WITNESS:  -- an accounting of the
8   08  forecast.
9   09  BY MS. LAVALLEE:
10  10    Q.   All right.
11  11         And what was -- you indicated that you
12  12  prepared a similar form document -- report in a
13  13  different form when you took over as finance
14  14  director for OSI.
15  15         Is that correct?
16  16    A.   Same type of report.
17  17    Q.   Same type of report.
18  18         And what was yours called?
19  19    A.   It was the forecast package we've already
20  20  discussed.
21  21    Q.   And do you know who this document -- who
22  22  this report was disseminated to?
23  23    A.   No, I don't.
24  24    Q.   Do you know with what frequency these
25  25  reports were created during Q -- during fiscal year
```

292

```
1   00292:01  2001?
2   02    A.   During the entire fiscal year?
3   03    Q.   During the period of time during which
4   04  they were actually created, the beginning of the
5   05  quarter -- the year.
6   06    A.   Likely on the same forecast schedule as
7   07  the corporation had.
8   08    Q.   Okay.
9   09         I would like to mark as Exhibit 87, a
10  10  document Bates-stamped CA-ORCL 036618 through -622.
11  11    (Exhibit 87 marked.)
12  12  BY MS. LAVALLEE:
13  13    Q.   Ms. Kopp, can you take a look at this
14  14  document and then identify it for the record,
15  15  please?
16  16    (Pause in proceedings for document review.)
17  17    THE WITNESS:  It, again, is a second
18  18  quarter of fiscal '01 forecast package.
19  19  BY MS. LAVALLEE:
20  20    Q.   Same type of report as the prior exhibit?
21  21    A.   Yes.
22  22    Q.   Was this one that was prepared by
23  23  Mr. Ford?
24  24    A.   Prepared for Mr. Ford?
25  25    Q.   Prepared for Mr. Ford?
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

293

```
1   00293:01   A.  Yes.
2   02    Q.  Okay.
3   03       And it was not prepared under your
4   04 direction?
5   05    A.  No.
6   06    MS. LAVALLEE:  I would like to mark as
7   07 Exhibit Number 88 -- actually, this is first in a
8   08 series of documents that were produced to plaintiffs
9   09 that I actually received by mail yesterday in my
10  10 office.
11  11       And what I will do is actually mark
12  12 sequentially the five reports.  I'll mark them 88,
13  13 89, 90, 91, 92.
14  14    MR. NADOLENCO:  Uh-oh, this is where I
15  15 got lost last time.
16  16    MS. WHITE:  I know.  Get ready.
17  17    MR. NADOLENCO:  We'll have to do it step
18  18 by step.
19  19       (Exhibit 88 marked.)
20  20    MS. LAVALLEE:  And this one is 89.
21  21       And for the record, 89 was CA-ORCL 37262
22  22 through -64.
23  23       And going back, 88 was CA-ORCL 37260,
24  24 -61.
25  25       Exhibit 90 will be CA-ORCL 37265 through
```

294

```
1   00294:01 -69.
2   02       (Exhibits 89 and 90 marked.)
3   03    MS. LAVALLEE:  Exhibit 70 [sic] will
4   04 be -- I'm sorry, Exhibit 91 will be CA-ORCL 37270
5   05 through -272.
6   06       (Exhibit 91 marked.)
7   07    MS. LAVALLEE:  Exhibit 92 will be
8   08 document Bates-stamped CA-ORCL 3723 -- I'm sorry,
9   09 37273 through 274.
10  10       (Exhibit 92 marked.)
11  11 BY MS. LAVALLEE:
12  12    Q.  Ms. Kopp, can you take a look at the
13  13 document we marked Exhibit 88.
14  14       And identify the document for the record,
15  15 please.
16  16    A.  It is a big deal summary from the second
17  17 quarter of fiscal  01.
18  18    Q.  And was this a document that was prepared
19  19 at your direction or under your supervision?
20  20    A.  I don't think so.
21  21    Q.  All right.
22  22       Can you take a look although Exhibit
23  23 Number 89, please.
24  24       And identify it for the record.
25  25    A.  It is also a big deal summary for the
```

295

```
1   00295:01 second quarter of fiscal '01.
2   02    Q.  And was the this a document that was
3   03 prepared at your direction or under your
4   04 supervision?
5   05    A.  I don't believe so.
6   06    Q.  Okay.
7   07       And do you have any understanding as to
8   08 who -- as to whether this was prepared at Mr. Ford's
9   09 direction or under his supervision?
10  10    A.  We were in transition at this time, so
11  11 I'm not exactly certain when -- what week we
12  12 switched over.  So it was likely at his.
13  13    Q.  All right.
14  14       Can you identify the record -- for the
15  15 record Exhibit Number 90, please?
16  16    A.  It is also a big deal summary from the
17  17 second quarter of fiscal '01.
18  18    Q.  And do you have any understanding as to
19  19 for whom this report was prepared or under whose
20  20 supervision?
21  21    A.  No.  It's not dated, no.
22  22    Q.  Is it dated on the top, or am I looking
23  23 at it wrong?
24  24    A.  No.
25  25       The previous one had a -- had an Excel
```

296

```
1   00296:01 file at the top that contained a date.  This one
2   02 doesn't.
3   03    Q.  Okay.
4   04       Just so we are clear, we are looking
5   05 at -- currently looking at 37265?
6   06    A.  Right.
7   07    Q.  Okay.
8   08       And can you identify for the record
9   09 Exhibit 91, please?
10  10    A.  It is also a big deal summary from Q2 of
11  11 fiscal '01.
12  12    Q.  Do you have any understanding whether
13  13 this was prepared at your direction or under your
14  14 supervision?
15  15    A.  No.
16  16       Again, it's not dated.  I have no idea
17  17 when it was done.
18  18    Q.  Can you identify Exhibit Number 92,
19  19 please?
20  20    A.  It is also a big deal summary from the
21  21 second quarter of fiscal  01.
22  22    MS. LAVALLEE:  I would like to mark as
23  23 Exhibit Number 93, first in a series of documents
24  24 that were actually sent to our office after the
25  25 close of business by fax yesterday by Oracle
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

297

```
1   00297:01 counsel.
2   02       And obviously we have not had an
3   03   opportunity to review these documents and reserve
4   04   our right to bring the witness back.
5   05       MS. WHITE:  No, we can stay here as late
6   06   as you want tonight, but she is not going to come
7   07   back from Virginia for that.
8   08       MS. LAVALLEE:  You stated your position
9   09   on the record, that's fine.
10  10       MS. WHITE:  Uh-huh.
11  11       (Exhibit 93 marked.)
12  12       MS. LAVALLEE:  And this Exhibit Number 93
13  13   is a document Bates-stamped CA-ORCL 037275 through
14  14   -279.
15  15   Q.   Ms. Kopp, can you take a look at this
16  16   document and then identify it for the record,
17  17   please.
18  18   A.   This is the Jay forecast package that I
19  19   was referring to.  It is my format.
20  20   Q.   I see.
21  21       So this is a document that you did
22  22   prepare on or about December 14 -- I mean, excuse
23  23   me, on or about December 4, 2000, or that was
24  24   prepared at your direction or under your supervision
25  25   at that time?
```

298

```
1   00298:01 A.   Yes.
2   02   Q.   Does this -- this document relates to
3   03   both licensing and consulting; is that correct?
4   04   A.   That's right.
5   05   Q.   All right.
6   06       On the left of the first page of the
7   07   document, there is an annotation:  "ISD in Field."
8   08       What does that refer to?
9   09   A.   It means that the revenue projection for
10  10   what was then called ISD, the Internet Services
11  11   Division, which is now called Oracle Direct, is
12  12   reflected in each of the separate group numbers as
13  13   opposed to being reflected on its own.
14  14   Q.   Okay.
15  15       And was that a change in procedure?
16  16   A.   Yes.
17  17   Q.   And when did Oracle start reflecting that
18  18   data differently?
19  19   A.   I don't recall.
20  20   Q.   Was it in the third quarter of 2001?
21  21   A.   No.
22  22   Q.   Was it prior to that period?
23  23   A.   Yes.
24  24   Q.   Can I ask you to turn your attention to
25  25   page 2, Bates-stamped -276.
```

299

```
1   00299:01 A.   Uh-huh.
2   02   Q.   Can you explain for me what the meaning
3   03   of the box at the bottom where it states:  "License
4   04   Scenario Analysis OSO:  Current Week," what that
5   05   refers to, that information in that box?
6   06   A.   That's information that is pulled
7   07   directly out of OSO.  It's the forecast information
8   08   for each of the verticals under OSI.
9   09   Q.   Okay.
10  10   A.   And it's pulled exactly from the system.
11  11   So it's missing data.
12  12   Q.   What data would it be missing?
13  13   A.   In this instance, it's missing state and
14  14   local, indicating they hadn't submitted anything
15  15   yet.
16  16   Q.   Okay.
17  17   A.   It's incomplete, is what I am getting at.
18  18   Q.   And can you explain the correlation
19  19   between this information and the information above
20  20   under --
21  21       MS. WHITE:  Objection to form.
22  22   BY MS. LAVALLEE:
23  23   Q.   -- "Total Revenue" in the first box on
24  24   the left-hand side there?
25  25   A.   The first box on the left-hand side is
```

300

```
1   00300:01 "Prior Year."
2   02   Q.   Okay.
3   03       I guess I'm encompassing more than the
4   04   first box.
5   05       The second column, then, of that box.
6   06   A.   The seconds box would have been the
7   07   forecast that we submitted at Jay Nussbaum's level
8   08   for OSI.
9   09   Q.   Okay.
10  10   A.   The box at the bottom is what is
11  11   submitted by his directs in OSO.
12  12   Q.   Okay.
13  13       And is the difference between these two
14  14   simply Jay Nussbaum's management judgment, or are
15  15   there other things that would affect these numbers
16  16   and make them different?
17  17       MS. WHITE:  Objection as to form.
18  18       THE WITNESS:  In this instance, there is
19  19   more because one of the groups hadn't entered
20  20   anything at all.
21  21   BY MS. LAVALLEE:
22  22   Q.   Okay.
23  23       And other than that fact, would there be
24  24   anything other than Mr. Nussbaum's judgment that
25  25   would explain the difference between the values set
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

301

```
 1  00301:01  forth in those two boxes?
 2     02     MS. WHITE:  Objection as to form.
 3     03         THE WITNESS:  Generally not.
 4     04  BY MS. LAVALLEE:
 5     05     Q.  And on the boxes at the bottom that we've
 6     06  just been discussing there's a heading called
 7     07  "Worst," and one called "Most Likely," and then one
 8     08  "Best."
 9     09         Can you explain to me what each of these
10     10  mean?
11     11     A.  "Worst" case is -- I don't know how to
12     12  describe a worst case forecast.
13     13         It's what they would consider to be the
14     14  safe -- you know, we won't do worse than this
15     15  forecast.
16     16     Q.  Uh-huh.
17     17     A.  "Likely" is as stated, the likely
18     18  forecast.
19     19         "Best" case is what they would think to
20     20  be their best case.
21     21     Q.  Is there -- is it usual to see that much
22     22  of a discrepancy between the -- either the worst,
23     23  most likely, or best case numbers from the field and
24     24  Mr. Nussbaum's forecast number?
25     25         MR. NADOLENCO:  Objection to form.
```

302

```
 1  00302:01         THE WITNESS:  This was the first time we
 2     02  ever reported this.  It was a new packet, and it was
 3     03  the first week of a new quarter.
 4     04         So in this instance, I would say it's not
 5     05  unusual.
 6     06  BY MS. LAVALLEE:
 7     07     Q.  Okay.
 8     08         And that is because it's the first week
 9     09  or -- I'm not sure I understand why you would say
10     10  that.
11     11     A.  It's because -- two reasons.  It's the
12     12  first week of the quarter.  I don't know how closely
13     13  anyone has looked at that number.
14     14         And in this instance, we had never
15     15  reported this data out of OSO previously.  And so
16     16  that the data that's in there at that point in time
17     17  may or may not have been very accurate at that
18     18  point.
19     19     Q.  Okay.
20     20         And by -- when you are referring to the
21     21  data that you've never included before in these
22     22  types of reports, or Oracle has never included in
23     23  these reports in the past, which data specifically
24     24  are you referring to?
25     25     A.  What I'm referring to specifically is a
```

303

```
 1  00303:01  worst, most likely, and best forecast submitted in
 2     02  OSO at the level of Jay's direct reports.
 3     03     Q.  Okay.  Thank you.
 4     04         And that's what this box at the bottom
 5     05  represents?
 6     06     A.  That's what that is.
 7     07     Q.  Okay.
 8     08         If I can turn your attention to the next
 9     09  page, page -277.
10     10     A.  Uh-huh.
11     11     Q.  If you could explain for me the box on
12     12  the very right-hand side that refers to "Q3 FY01
13     13  Backlog," can you explain what that refers to?
14     14     A.  That is the funded consulting projects
15     15  that exist as of Q3 FY01.  Would have been a
16     16  projection of the backlog as of the end of the
17     17  quarter, based on that bookings forecast.
18     18     Q.  Okay.
19     19         And the next page, -278, can you explain
20     20  for me what the general data contained in here
21     21  refers to?
22     22     A.  This would have been a look ahead at the
23     23  Q4 FY01 projection as of that time frame.
24     24     Q.  Okay.
25     25         I'd like to mark as Exhibit Number 94, a
```

304

```
 1  00304:01  document Bates-stamped CA-ORCL 037280 through -284.
 2     02         (Off the record.)
 3     03         (Exhibit 94 marked.)
 4     04  BY MS. LAVALLEE:
 5     05     Q.  Ms. Kopp, can I ask you to take a look at
 6     06  this document.
 7     07         When you have had a chance to look at it,
 8     08  please identify it for the record.
 9     09         (Pause in proceedings for document review.)
10     10         THE WITNESS:  This is also one of my Q3
11     11  forecast packages for Jay Nussbaum.
12     12  BY MS. LAVALLEE:
13     13     Q.  And this is a document that was prepared
14     14  at your direction on or about December 19th, 2000?
15     15     A.  That's right.
16     16     Q.  If I could turn your attention to the
17     17  second page of this document, the document
18     18  Bates-stamped 37281.
19     19         There is a box similar to the last one
20     20  but slightly different.
21     21         And can you explain for me the difference
22     22  here?
23     23     A.  The difference in which box?
24     24     Q.  The bottom on the left, the "Licensed
25     25  Scenario Analysis," there is a couple extra columns
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

305

```
 1  00305:01 that I did not see in the prior exhibit.
 2   02   A.   Right.
 3   03        In order to make it more clear, what we
 4   04 were comparing -- as you noticed it was confusing in
 5   05 the prior exhibit, so to make it more clear we
 6   06 pulled the forecast down from the top to show the
 7   07 direct comparison between the forecast being
 8   08 submitted and what was captured in OSO.
 9   09   Q.   Okay.
10   10        So the management judgment on the
11   11 right-hand side refers to Mr. Nussbaum's management
12   12 decision -- judgment.
13   13   A.   That's right.
14   14   Q.   And that combined with the "most likely"
15   15 figure is what provided the forecast.
16   16        Is that correct?
17   17   A.   That's correct.
18   18   Q.   The Jay Nussbaum forecast I should say,
19   19 right?
20   20   A.   That's right.
21   21   Q.   If I could turn your attention to the
22   22 last page of this exhibit, -284, this again refers
23   23 to fourth quarter fiscal year 2001 projections; is
24   24 that correct?
25   25   A.   That's right.
```

306

```
 1  00306:01   Q.   All right.
 2   02        And there is a similar box at the bottom
 3   03 regarding -- which contains Mr. Nussbaum's
 4   04 management judgment as well as a forecast.
 5   05   A.   Uh-huh.
 6   06   Q.   Who compiles the actual forecast number
 7   07 that -- above that does not contain the management
 8   08 judgment, or where is that information derived from?
 9   09   A.   There is no forecast on here without
10   10 management judgment.
11   11        I don't know what you are talking about.
12   12   Q.   Okay.  Maybe I misspoke.
13   13        There is a second column that says:  "Q4
14   14 Fiscal Year 01 Forecast."
15   15   A.   Uh-huh.
16   16   Q.   And there is a total revenue for OSI,
17   17 license for OSI figure that I believe is 320,000?
18   18   A.   Million.
19   19   Q.   Million.  Thank you.
20   20        And that is Mr. Nussbaum's forecast then;
21   21 is that correct?
22   22   A.   That's correct.
23   23   Q.   Okay.
24   24        So that number is comprised of
25   25 Mr. Nussbaum's judgment as to what the projections
```

307

```
 1  00307:01 for that quarter would be; is that correct?
 2   02   A.   For our future quarter, yes.
 3   03        MS. LAVALLEE:  I would like to mark as
 4   04 Exhibit Number 95, a document -- again, this is in
 5   05 the series of documents that we received yesterday
 6   06 at the close of business by fax -- CA-ORCL 037285
 7   07 through -289.
 8   08        (Exhibit 95 marked.)
 9   09 BY MS. LAVALLEE:
10   10   Q.   Ms. Kopp, can you take a look at this
11   11 document.
12   12        When you have had a chance to review it,
13   13 please identify it for the record.
14   14   A.   It's the same as the other two packages,
15   15 only for week five of the third quarter of fiscal
16   16 '01.
17   17   Q.   If I could turn your attention to page 2
18   18 of this document, which is Bates-stamped -286.
19   19   A.   Uh-huh.
20   20   Q.   At the very bottom again there is the
21   21 forecast number, plus the breakdown as to what
22   22 represents Mr. Nussbaum's management judgment, as
23   23 well as what represents the field most likely
24   24 scenario.
25   25        Correct?
```

308

```
 1  00308:01   A.   That's correct.
 2   02   Q.   Okay.
 3   03        If I could ask you to compare this box to
 4   04 the box from the Week 3, which is the prior
 5   05 reporting week for that time frame.  Right?
 6   06   A.   Yes.
 7   07   Q.   And if I compare them, the --
 8   08 Mr. Nussbaum's forecast is 225, 225 million in both
 9   09 instances.
10   10        However, the most likely from the field
11   11 has dropped from 169,028 million to 132 million.
12   12        Is that correct?
13   13   A.   That's correct.
14   14   Q.   So the management judgment was just
15   15 simply increased and -- to bring the forecast to the
16   16 same number; is that correct?
17   17        MS. WHITE:  Objection as to form.
18   18        Calls for speculation.
19   19        THE WITNESS:  The forecast remained the
20   20 same.
21   21 BY MS. LAVALLEE:
22   22   Q.   And then management judgment increased.
23   23        Correct?
24   24   A.   As a result, that's the formula, yeah.
25   25        MS. LAVALLEE:  I would like to mark as
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

309

```
 1  00309:01 Exhibit Number 96, a document Bates-stamped CA-ORCL
 2   02 037290 through -294.
 3   03     (Exhibit 96 marked.)
 4   04     MS. WHITE:  Are we on 96?
 5   05     MS. LAVALLEE:  Yes.
 6   06     Q.  Ms. Kopp, can you take a look at the
 7   07 document.
 8   08         When you have had an opportunity to
 9   09 review it, please identify what the document is for
10   10 me.
11   11     (Pause in proceedings for document review.)
12   12         THE WITNESS:  It's another Q301 forecast
13   13 package of mine for Week 7.
14   14 BY MS. LAVALLEE:
15   15     Q.  And, again, this was prepared under your
16   16 supervision on or about January 16, 2001.
17   17     Is that correct?
18   18     A.  That's correct.
19   19     Q.  Again, just so I'm clear, the -- you had
20   20 indicated earlier that the data that's put into this
21   21 report, there's a couple of days' lag between the
22   22 time the data is actually obtained from OFA and OSO.
23   23     Is that correct?
24   24     A.  That's correct.
25   25     Q.  Okay.
```

310

```
 1  00310:01         And do you recall what the lag time
 2   02 period between the time the data is actually
 3   03 obtained from the system, and the time this report
 4   04 is generated and presented to Mr. Nussbaum?
 5   05     A.  About two days.
 6   06     Q.  If I can turn your attention to the
 7   07 second page, page Bates-stamped -291.
 8   08         There is some difference to this format
 9   09 again.
10   10         Can you explain the difference for me?
11   11     A.  I'm just showing the management judgment
12   12 in two places, so that we can see the judgment
13   13 against not just the most likely case, but against
14   14 the worst and best case as well.
15   15     Q.  Okay.
16   16         I would like to mark as Exhibit Number
17   17 97, a document Bates-stamped CA-ORCL 037295 through
18   18 -299.
19   19     (Exhibit 97 marked.)
20   20 BY MS. LAVALLEE:
21   21     Q.  Ms. Kopp, can you take a look at the
22   22 document.
23   23         And when you have had an opportunity to
24   24 review it, please identify it for the record.
25   25     (Pause in proceedings for document review.)
```

311

```
 1  00311:01         THE WITNESS:  This is a forecast for the
 2   02 second quarter of -- it says "FY04."  That can't be
 3   03 right.
 4   04 BY MS. LAVALLEE:
 5   05     Q.  Possibly a typo?
 6   06     A.  That can't be right.  That must be a
 7   07 typo, yeah.
 8   08         I'm not making forecasts that look like
 9   09 this now.
10   10     Q.  Are your forecasts lower now?
11   11     A.  Are my forecasts lower now?
12   12         Different format is what I meant.
13   13     Q.  Okay.  All right.
14   14         Well, there is a date below it that
15   15 indicates November 22nd, 2000 [sic].  So --
16   16     A.  Where?
17   17         MS. WHITE:  November 21st, 2000.  Right
18   18 under there.
19   19         THE WITNESS:  Oh, there it is.
20   20         Okay, I see.
21   21 BY MS. LAVALLEE:
22   22     Q.  So do you believe that this is a report
23   23 for that time frame?
24   24     A.  Yes, I do.
25   25     Q.  All right.
```

312

```
 1  00312:01         Was this around the time that you started
 2   02 as finance director for OSI?
 3   03     A.  Yeah.  I was experimenting with formats,
 4   04 so, yeah.
 5   05         I don't remember if this is the first one
 6   06 I did, but in that time frame.
 7   07     Q.  There seems to be some -- on page -297,
 8   08 some pipeline data.
 9   09         Is that correct, on this particular
10   10 report?
11   11     A.  That's right.
12   12     Q.  Okay.
13   13         I don't believe that this similar data
14   14 appears on the reports that you prepared or that
15   15 were prepared at your direction for either the
16   16 December 2000 or January 2001 time frame that we've
17   17 just looked at.
18   18         Is that correct?
19   19     A.  That's correct.
20   20     Q.  And you made a decision at some point in
21   21 time to remove that data from this report?
22   22     A.  Yes.
23   23         This report is almost identical to the
24   24 Americas Forecast Pack that I modeled it after.  And
25   25 we subsequently removed the pipeline trending data
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

313

```
1   00313:01 off of it.
2   02    Q.   And why was -- why was that?
3   03    A.   I don't recall.
4   04    Q.   And do you know who made the decision to
5   05 remove that data?
6   06    A.   Likely, I did.
7   07    Q.   Okay.
8   08        And this data is similar to the Americas
9   09 Forecast data you indicated, right?
10  10    A.   It's the same format.
11  11    Q.   Okay.
12  12        And you are referring now to the pipeline
13  13 data?
14  14    A.   Uh-huh.
15  15    Q.   Okay.
16  16        And the last in the series of documents
17  17 that were sent to us last night is a document
18  18 Bates-stamped CA-ORCL 037300 through -304.
19  19        And I'll mark that 98.
20  20        (Exhibit 98 marked.)
21  21 BY MS. LAVALLEE:
22  22    Q.   Ms. Kopp, can you take a look at the
23  23 document that we've just stamped -- or exhibit we've
24  24 just marked as Exhibit Number 98, and then tell me
25  25 what it is?
```

314

```
1   00314:01    (Pause in proceedings for document review.)
2   02        THE WITNESS:  It's a Q2 forecast package
3   03 for fiscal '01, Week 13, dated November 28th of
4   04 2000.
5   05 BY MS. LAVALLEE:
6   06    Q.   And again, this is your report that's
7   07 prepared at your direction?
8   08    A.   That's right.
9   09        MS. LAVALLEE:  I would like to mark as
10  10 Exhibit Number 99, a document Bates-stamped ORCL
11  11 0128206, and it is a single-page document.
12  12        (Exhibit 99 marked.)
13  13 BY MS. LAVALLEE:
14  14    Q.   Ms. Kopp, can you take a look at this
15  15 document.
16  16        And when you have had a chance to review
17  17 it, identify it for the record, please.
18  18        (Pause in proceedings for document review.)
19  19        THE WITNESS:  It's a document I created
20  20 for Lynn Neuner for the -- I keep remembering the
21  21 name -- forgetting the name of that other interview.
22  22 But I --
23  23 BY MS. LAVALLEE:
24  24    Q.   The Special Litigation?
25  25    A.   Yes, the SLC interview.
```

315

```
1   00315:01    I prepared it for her as we sat and
2   02 talked in my office.
3   03    Q.   Okay.
4   04        And you actually prepared it on your
5   05 computer during that interview meeting?
6   06    A.   I did.
7   07    Q.   And what information did you use to
8   08 generate this report at that time?
9   09    A.   I would have taken the information
10  10 directly from the forecast packages we just
11  11 reviewed --
12  12    Q.   Okay.
13  13    A.   -- and pulled pieces of that data into
14  14 this.
15  15    Q.   Okay.
16  16        And would you -- were you looking at
17  17 actual hard copies of the forecast?
18  18    A.   I would have been looking at it online
19  19 and just selected and pasted it over from Excel,
20  20 rather than re-key it.
21  21    Q.   All right.
22  22        And is it your recollection that your
23  23 interview took place on or about July 30th, 2002?
24  24        Does that sound right?
25  25    A.   Based on the transcript, yes.
```

316

```
1   00316:01    Q.   You don't have any reason to believe that
2   02 it took place on a different day?
3   03    A.   No.
4   04    Q.   So if I understand you correctly, you
5   05 actually went on -- was it your computer on your
6   06 files on your computer to extract the data to
7   07 compile this chart?
8   08    A.   Yes.
9   09    Q.   If I could ask you to refer back to the
10  10 last, I believe it's five exhibits that were your
11  11 forecast packages.
12  12        Can you tell me by looking at these
13  13 whether there are additional packages that you had
14  14 prepared during Q3 2001?
15  15    A.   There would have been others.
16  16    Q.   There would not have been others?
17  17    A.   There would have been others.
18  18    Q.   Okay.
19  19        And why do you say that?
20  20    A.   Because these stop at -- I believe they
21  21 stop at January 16th, if I have it right, Week 7 of
22  22 the quarter.
23  23    Q.   Okay.
24  24        And when would the next one have
25  25 appeared?
```

317

```
1   00317:01    A.   Two weeks after that for Week 9.
2   02      Q.   And that would have been what date?
3   03           MS. WHITE:  Objection as to form.
4   04           THE WITNESS:  January 30th.
5   05  BY MS. LAVALLEE:
6   06      Q.   Do you know if you still have that report
7   07  on your system, your computer at the office?
8   08      A.   I don't know.
9   09           MS. LAVALLEE:  Okay.  I would like to
10  10  just take a moment, a few minutes' break, and
11  11  see where we're at.  And then we can try to wrap
12  12  things up as soon as we can.
13  13           Before we go off the record, I'd like to
14  14  request, obviously, that we -- and I'll follow this
15  15  up with a letter -- that we obtain all copies of all
16  16  missing reports that we have discussed today.  And
17  17  I'll follow up with a letter so you know --
18  18           MS. WHITE:  I think you need to follow-up
19  19  with a letter because I have no idea what you mean
20  20  by "all missing reports."
21  21           MS. LAVALLEE:  Well, for example, this
22  22  one that we just discussed.  And I'll follow-up with
23  23  a letter.
24  24           MS. WHITE:  We can talk about it off
25  25  record.
```

318

```
1   00318:01        There isn't one, but we can talk about
2   02  it.
3   03           MS. LAVALLEE:  Okay.
4   04           THE VIDEOGRAPHER:  The time is 5:24.
5   05           We are off the record.
6   06           (Break taken.)
7   07           THE VIDEOGRAPHER:  The time is 5:33.
8   08           We are on the record.
9   09  BY MS. LAVALLEE:
10  10      Q.   Ms. Kopp, I just have one or two more
11  11  questions and then we'll be complete for the day.
12  12           Let me ask you to think back to your
13  13  discussions with the SLC.
14  14           Do you recall discussing anything
15  15  regarding the Bell South deal that was something in
16  16  the pipeline in Q3 2001?
17  17      A.   I don't recall discussing the license
18  18  deal.
19  19      Q.   Okay.
20  20           Do you recall anything about a revenue
21  21  recognition issue regarding that deal?
22  22      A.   Yes, I do.
23  23      Q.   Can you explain to me what the issue
24  24  there was?
25  25      A.   The issue there was that the licenses we
```

319

```
1   00319:01  had sold were being significantly customized by the
2   02  consulting organization.
3   03           And per revenue recognition rules, we
4   04  don't recognize revenue on licenses that are not in
5   05  use or not able to be in use right away.
6   06      Q.   Was there a situation where revenue was
7   07  recognized and then had to be reversed?
8   08      A.   Yeah.
9   09           It was recognized and reversed within the
10  10  same week --
11  11      Q.   Okay?
12  12      A.   -- I believe.
13  13      Q.   All right.
14  14           And where was it recognized?
15  15           MS. WHITE:  Objection as to form.
16  16  BY MS. LAVALLEE:
17  17      Q.   You indicated that it was recognized.
18  18  And by that, what do you mean?
19  19      A.   The end of the quarter, the orders are
20  20  booked into the order entry system.
21  21      Q.   Uh-huh.
22  22      A.   And in the days following and post
23  23  quarter they are reviewed by the revenue recognition
24  24  organization before they are -- before they are, you
25  25  know, booked as final revenue.
```

320

```
1   00320:01      Q.   Okay.
2   02           At that point in time, it's your
3   03  understanding that at that point in time the revenue
4   04  that had been initially recognized was reversed?
5   05      A.   That's correct.
6   06      Q.   And are you speaking now before the final
7   07  financial statements were prepared by the company
8   08  provided to -- well, prepared by the company and
9   09  finalized by the company?
10  10      A.   For the third quarter?
11  11      Q.   For the third quarter.
12  12      A.   Yes.
13  13           MS. LAVALLEE:  Ms. Kopp, those are the
14  14  only questions I have for today.
15  15           And, again, we reserve our right to bring
16  16  this witness back.
17  17           MS. WHITE:  You understand my position on
18  18  that.
19  19           MS. LAVALLEE:  Correct.
20  20           THE VIDEOGRAPHER:  Okay.  This concludes
21  21  Volume 1 of the deposition of Sarah Kopp.
22  22           The time is 5:36.
23  23           We are off the record.
24  24           (Time noted:  5:36 p.m.)
25  25
```

Kopp, Sarah (Vol. 01) - 02/19/2004  2/19/2004  4:50:00 PM

321

```
1   00321:01         CERTIFICATE OF WITNESS
2        02
3        03
4        04      I, SARAH KOPP, the undersigned, declare
5        05   under penalty of perjury that I have read the
6        06   foregoing transcript, and I have made any
7        07   corrections, additions, or deletions that I was
8        08   desirous of making, that the foregoing is a true and
9        09   correct transcript of my testimony contained
10       10   therein.
11       11
12       12   EXECUTED THIS _____ day of _____,
13       13   20____, at _____,_____.
14       14
15       15
16       16
17       17      _____
18       18         Signature of Witness
19       19
20       20
21       21
22       22
23       23
24       24
25       25
```

322

```
1   00322:01  COUNTY OF SAN FRANCISCO )
2        02   STATE OF CALIFORNIA     )
3        03
4        04         REPORTER'S CERTIFICATE
5        05      I, HEIDI J. RYDER, a Certified Shorthand
6        06   Reporter, licensed by the State of California and
7        07   empowered to administer oaths and affirmations
8        08   pursuant to Section 2093(b) of the Code of Civil
9        09   Procedure, do hereby certify:
10       10      That the witness, SARAH KOPP, was present
11       11   at the time and place herein set forth and was by me
12       12   sworn to testify as to the truth; that the said
13       13   proceedings were recorded stenographically by me and
14       14   were thereafter transcribed by me via
15       15   computer-assisted transcription; that the foregoing
16       16   deposition is a true record of the proceedings which
17       17   then and there took place; that I am a disinterested
18       18   person to said action.
19       19
20       20      IN WITNESS WHEREOF, I have subscribed my
21       21   name on February 29, 2004.
22       22
23       23
24       24
25       25      HEIDI J. RYDER, CSR 10053
```

# EXHIBIT Z

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

**1**

```
1  00001:01  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2     02        IN AND FOR THE COUNTY OF SAN MATEO
3     03
4     04  COORDINATION PROCEEDING
5     05  (RULE 1550(b)),
6     06        ORACLE CASES
7     07              PROCEEDING NO. 4180
8     08  THIS DOCUMENT RELATES TO:
9     09  ALL ACTIONS
10    10
11    11
12    12        Videotaped Deposition of
13    13        EDWARD J. SANDERSON, JR.
14    14        Tuesday, March 9, 2004
15    15
16    16
17    17
18    18  Reported by
19    19  CSR 6862
20    20
21    21
22    22
23    23        ROBERT BARNES ASSOCIATES
24    24        760 Market Street, Suite 844
25    25        Phone (415) 788-7191
```

**2**

```
1  00002:01  IN THE COURT OF CHANCERY OF THE STATE OF DELAWA
2     02        IN AND FOR NEW CASTLE COUNTY
3     03
4     04
5     05  IN RE ORACLE CORP.        CONSOLIDATED C.A.
6     06  _____/
7     07
8     08
9     09
10    10        Videotaped Deposition of
11    11        EDWARD J. SANDERSON, JR.
12    12        Tuesday, March 9, 2004
13    13
14    14
15    15
16    16
17    17
18    18  Reported by
19    19  CSR 6862
20    20
21    21
22    22
23    23        ROBERT BARNES ASSOCIATES
24    24        760 Market Street, Suite 844
25    25        Phone (415) 788-7191
```

**3**

```
1  00003:01           APPEARANCES
2     02
3     03  For California Plaintiffs:
4     04        COREY, LUZAICH, PLISKA, DE GHETALDI &
5     05        BY:  DARIO DE GHETALDI
6     06        700 El Camino Real
7     07        Millbrae, California  94030
8     08
9     09        PUCILLO
10    10        425 California Street, Suite 2025
11    11        (415) 433-3200
12    12        McMANIS FAULKNER & MORGAN
13    13        50 West San Fernando Street
14    14        San Jose, California  95113
15    15
16    16  For the Individual Defendants Ellison and Henley:
17    17        MAYER, BROWN, ROWE & MAW LLP
18    18        350 South Grand Avenue, 25th Floor
19    19        (213) 229-9500
20    20
21    21
22    22        BY:  PAUL H. GOLDSTEIN
23    23        Palo Alto, California  94304-1018
24    24
25    25
```

**4**

```
1  00004:01        LAUREN SEGAL, Managing Counsel
2     02        500 Oracle Parkway
3     03        Redwood Shores, California  94065
4     04
5     05  The Videographer:
6     06        JOANNA LENN
7     07
8     08
9     09
10    10
11    11
12    12
13    13
14    14
15    15
16    16
17    17
18    18
19    19
20    20
21    21
22    22
23    23
24    24
25    25
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

5

1  00005:01              I N D E X

2    02                        Page

3    03

4    04

5    05

6    06

7    07

8    08  Q3Week6b (CA-ORCL012628 through

9    09

10   10  Q3Week7 (CA-ORCL012651 through

11   11

12   12   and attachments (ORCL0003548-ORCL0003564)

13   13  154  Q3 FY01 Week 6, January 15, 2001, Oracle  140

14   14    ORCL0107578)

15   15  155  Email, Lane to lellison@us.oracle.com,   145

16   16    CA-ORCL031317)

17   17  156  Email thread, Sanderson to Gunningham,   150

18   18    CA-ORCL025235)

19   19  157  Email thread, Sanderson to Thimot,       153

20   20

21   21   12/1/00, and attachment (CA-ORCL024971

22   22

23   23    (CA-ORCL032294 through CA-ORCL032295)

24   24  160  Email, Thimot to esanders@us.oracle.com,  162

25   25

7

1  00007:01    BE IT REMEMBERED that, pursuant to the laws

2   02  governing the taking and use of depositions, and on

3   03  Tuesday, March 9, 2004, commencing at 9:55 a.m.

4   04  thereof, at the law offices of Berman DeValerio

5   05  Pease Tabacco Burt & Pucillo, 425 California Street,

6   06  Suite 2025, San Francisco, California, before me,

7   07  JOHN WISSENBACH, a Certified Shorthand Reporter in

8   08  the State of California, personally appeared

9   09      EDWARD J. SANDERSON, JR.,

10  10  called as a witness by the Plaintiffs, who, being by

11  11  me first duly sworn, was examined and testified as

12  12  is hereinafter set forth.

13  13          ---oOo---

14  14

15  15

16  16

17  17

18  18

19  19

20  20

21  21

22  22

23  23

24  24

25  25

6

1  00006:01  161  Email, Sanderson to opi_us@oracle.com,   163

2   02

3   03

4   04

5   05

6   06

7   07

8   08

9   09

10  10

11  11

12  12

13  13

14  14

15  15

16  16

17  17

18  18

19  19

20  20

21  21

22  22

23  23

24  24

25  25

8

1  00008:01    THE VIDEOGRAPHER:  Good morning.  This

2   02  marks the beginning of Volume I in Video -- and

3   03  Videotape Number 1 in the deposition of Edward J.

4   04  Sanderson, Jr. in the matter of -- in the matters of

5   05  Coordination Proceeding Special Title, Oracle Cases,

6   06  in the Superior Court of the State of California,

7   07  County of San Mateo, Judicial Council Coordination

8   08  Proceeding Number 4180, and In Re Oracle Corp.

9   09  Derivative Litigation, in the Court of Chancery of

10  10  the State of Delaware, in and for New Castle County,

11  11  Consolidated Case Number 18751.

12  12      Today's date is March 9th, 2004, and the

13  13  time is 9:55.  The location of this deposition is

14  14  425 California Street, Suite 2025, San Francisco,

15  15  California.  The deposition was noticed by counsel

16  16  for plaintiffs, and the videotape is being produced

17  17  on behalf of same.  The video operator is Joanna

18  18  Lenn, a California notary public for the County of

19  19  San Francisco, employed by Dan Mottaz Video

20  20  Productions LLC, 182 Second Street, Suite 202, San

21  21  Francisco, California 94105, (415) 624-1300.  The

22  22  court reporter is John Wissenbach, with Robert

23  23  Barnes Associates.

24  24      Would counsel present please identify

25  25  themselves and state whom they represent.

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

9

1  00009:01   MR. DE GHETALDI:  I'm Dario de Ghetaldi,
2  02  representing the California plaintiffs.
3  03      MS. LAVALLEE:  Nicole Lavallee, of Berman,
4  04  DeValerio, representing the California plaintiffs.
5  05      MS. RIDDLE:  Amanda Riddle, representing
6  06  California plaintiffs.
7  07      MS. KAUSHIK:  Tara Kaushik, McManis
8  08  Faulkner & Morgan, representing the California
9  09  plaintiffs.
10  10      MR. NADOLENCO:  John Nadolenco, of Mayer,
11  11  Brown, Rowe & Maw, representing individual
12  12  defendants Larry Ellison and Jeff Henley.
13  13      MS. SEGAL:  Lauren Segal, from Oracle
14  14  Corporation, for Oracle Corporation.
15  15      MR. GOLDSTEIN:  Paul Goldstein, Morrison &
16  16  Foerster, for Oracle Corporation.
17  17      THE VIDEOGRAPHER:  If there are no
18  18  stipulations, the court reporter may administer the
19  19  oath.
20  20      EDWARD J. SANDERSON, JR.,
21  21  having been first duly sworn, testified as follows:
22  22      EXAMINATION BY MR. DE GHETALDI:
23  23   Q.  Good morning, Mr. Sanderson.
24  24   A.  Good morning.
25  25   Q.  Have you ever had your deposition taken

10

1  00010:01  before?
2  02   A.  One time.
3  03   Q.  Okay.  When was that?
4  04   A.  About nine or ten years ago.
5  05   Q.  All right.  I'm going to go over a couple
6  06  of ground rules, to -- just to make sure that you
7  07  understand the process and we get --
8  08   A.  That would be great.
9  09   Q.  -- the best record possible.  The first
10  10  thing that I would ask that you do is, even though
11  11  this is being videotaped, for the sake of the court
12  12  reporter try and wait until I've finished my
13  13  question before you answer.  I'll try and do the
14  14  same with my questions and your answers.  And I'd
15  15  also ask that instead of using nods of the head or
16  16  sounds to indicate yes or no, to -- that you
17  17  actually use those words.  Is --
18  18   A.  Right.
19  19   Q.  Okay?  And then this deposition is going to
20  20  be prepared or transcribed into a booklet form.
21  21  You'll be given that booklet to review, and you will
22  22  be able to make corrections or additions to your
23  23  testimony.  But I want you to understand that if you
24  24  do do that and if this case does go to trial, then
25  25  the -- the lawyers will be able to comment on those

11

1  00011:01  changes or corrections that you've made.  Do you
2  02  understand?
3  03   A.  Sure.  Sure.
4  04   Q.  Okay.  This -- we try and go, in these
5  05  depositions, for about an hour at a time, and we'll
6  06  take a break.  If, at any time, you want to take a
7  07  break, just let me know.  And there's no problem
8  08  with that.  We can -- you know, we're happy to
9  09  accommodate you there.
10  10      If, at any time during the deposition, I
11  11  ask a question that you don't understand, please let
12  12  me know, and I will be happy to ask it again.
13  13   A.  I will.
14  14   Q.  All right.  And if you do answer a
15  15  question, I'm going to assume that you did
16  16  understand it.  Okay?
17  17   A.  That's correct.
18  18   Q.  All right.  Now, are you represented by an
19  19  attorney at this deposition?
20  20   A.  Yes.
21  21   Q.  Who is that?
22  22   A.  Paul Goldstein, sitting to my left.
23  23   Q.  All right.  Have you had discussions with
24  24  anyone in preparation for this deposition?
25  25   A.  Yes.

12

1  00012:01   Q.  How many discussions?
2  02   A.  One.
3  03   Q.  When was that?
4  04   A.  Yesterday.
5  05   Q.  And how long was that?
6  06   A.  Probably about four hours.
7  07   Q.  Who was present?
8  08   A.  The two to my left, Lauren Segal and Paul
9  09  Goldstein.
10  10   Q.  All right.  Did you review any documents in
11  11  preparation for this deposition?
12  12   A.  Yes.
13  13   Q.  What did you review?
14  14   A.  My special litigation committee write-up,
15  15  testimony, and the attachments that came with that,
16  16  and a few other exhibits in that -- from that
17  17  special testimony, as well.  That's what I recall at
18  18  this point from yesterday.
19  19   Q.  All right.  Do you recall any specific
20  20  documents that you looked at?
21  21   A.  I recall one that was a summary, I think,
22  22  of the December 2000 quarter-to-date results for
23  23  license.  I saw one that Jim English had written to
24  24  Jennifer Minton, that I'd not seen before.  I saw a
25  25  memo that I'd written about some programs that we

13

```
1    00013:01  were launching within the Oracle Product Industries,
2    02  OPI.  At this point that's what I recall.
3    03      Q.  All right.  I'm just curious.  When you
4    04  reviewed the summary of your interview with the SLC,
5    05  did you review it in a -- volume with other
6    06  interview summaries, or was it provided to you
7    07  separate?
8    08      A.  It was separate.
9    09      Q.  All right.  When did you first start
10   10  working at Oracle?
11   11      A.  In July of 1995.
12   12      Q.  You -- and prior to Oracle, where had you
13   13  worked?
14   14      A.  In what time period?
15   15      Q.  The prior ten years.
16   16      A.  Prior ten years.  Prior to Oracle I worked
17   17  at Unisys Corporation for about a year and a half.
18   18  Prior to that I worked at McKinsey & Company for six
19   19  years.  And prior to that I was with a small
20   20  start-up known as the Information Consulting Group,
21   21  that was ultimately acquired by McKinsey about six
22   22  months after we started.  And prior to that I was
23   23  with what then was Arthur Andersen and Company.  I
24   24  was on the consulting side.
25   25      Q.  Were you a partner at Arthur Andersen?
```

14

```
1    00014:01      A.  Yes, I was.
2    02      Q.  Okay.  Was your first job at Oracle?
3    03      A.  I --
4    04          MR. GOLDSTEIN:  Sorry.
5    05          THE WITNESS:  I was the senior vice
6    06  president for Americas consulting.
7    07  BY MR. DE GHETALDI:
8    08      Q.  Can you describe your job responsibilities
9    09  in that position.
10   10      A.  I had -- I had responsibility for the
11   11  United States and Canada consulting for all
12   12  industries except for federal and state and local.
13   13      Q.  So in other words, excluding
14   14  governmental consulting?
15   15      A.  Yes.  That's correct.
16   16      Q.  All right.  And you were responsible for
17   17  consulting within Oracle's various Americas
18   18  divisions?  Is that a fair way of saying it?
19   19      A.  When you say --
20   20      Q.  Or was --
21   21      A.  -- "America's divisions," what does that
22   22  mean?
23   23      Q.  Or was consulting -- okay.  Americas
24   24  divisions, I mean OSI, NAS, and OPI.
25   25      A.  At that point we did not have OPI.
```

15

```
1    00015:01      Q.  All right.
2    02      A.  We had not verticalized.  And so I had --
3    03  and so OSI/OPI did not exist.
4    04      Q.  All right.
5    05      A.  And I assume when you say OSI, you mean
6    06  Oracle Services Industries.
7    07      Q.  Yes.
8    08      A.  So that -- they didn't exist.  So I had
9    09  consulting responsibilities for all industries other
10   10  than federal and state and local government.
11   11      Q.  All right.  When did the Americas
12   12  verticalize?
13   13      A.  I don't recall specifically.
14   14      Q.  Can you give me an estimate, approximation?
15   15      A.  I would say approximately -- July '95 --
16   16  probably around the -- June of '97.  But that would
17   17  be a guess.
18   18      Q.  Okay.  What was your next position after
19   19  senior VP of Americas Consulting?
20   20      A.  I continued to be responsible for -- as
21   21  senior vice president for Americas Consulting.  And
22   22  I took on -- actually, my responsibilities changed.
23   23  They diminished, theoretically.  Or they diminished.
24   24  I no longer had responsibility for OPI consulting
25   25  when -- when we created that vertical, but I also
```

16

```
1    00016:01  picked up, probably in -- my guess is a year later,
2    02  July of '98 -- June of '98 -- and, again, that's an
3    03  approximization -- approximation -- I picked up
4    04  responsibility for Latin America sales.
5    05      Q.  Okay.  How long did you continue with that
6    06  group of responsibilities?
7    07      A.  Until I left Oracle.
8    08      Q.  Okay.  Did you acquire any additional
9    09  responsibilities at any point?
10   10      A.  Yes.  In July of 2000, I took -- Larry
11   11  asked me to take responsibility for Oracle Product
12   12  Industries sales and consulting, or OPI.
13   13      Q.  Were you also responsible for NAS
14   14  consulting at that --
15   15      A.  Yes.
16   16      Q.  -- time?  All right.
17   17          When did you become responsible for NAS
18   18  consulting, or had you been all along?
19   19      A.  I had been all along.
20   20      Q.  All right.  And you left in September of
21   21  2001?
22   22      A.  September 7th, 2001 was my last day as an
23   23  active employee.  I -- as an active employee.
24   24      Q.  Okay.  Why did you leave?
25   25      A.  For personal reasons.
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

17

```
1  00017:01   Q. Was it your decision to leave?
2   02    A. Yes, it was.
3   03    Q. Okay.
4   04    A. I had a medical issue.
5   05    Q. Okay.
6   06    A. I had a heart problem.
7   07    Q. Oh. Yeah, I -- okay. Thank you.
8   08    Tell me about OPI. What -- you said it
9   09 was a -- it was verticalized at some point in the
10  10 late nineties. What did you mean by that?
11  11    A. Well, the Americas was verticalized in the
12  12 late nineteen nineties. And it was divided up into
13  13 two major industry groups. I'd actually chunk it up
14  14 into four pieces: Oracle Services Industries,
15  15 Oracle Product Industries, major accounts, and
16  16 general business.
17  17    Q. Okay.
18  18    A. That's how we reorganized it. So some of
19  19 it was industry, and some of it was size of account.
20  20    Q. All right. Okay. What industry did OPI
21  21 cover?
22  22    A. It was a sector, is the way we thought
23  23 about it, Dario, and a sector would -- meaning
24  24 multiple industries.
25  25    Q. Okay.
```

18

```
1  00018:01   A. So it included high-tech, automotive,
2   02 process manufacturing, consumer packaged goods
3   03 industries, were probably the major industries
4   04 there.
5   05    Q. Okay.
6   06    A. It also included aerospace and defense.
7   07    Q. How would you describe the relative size of
8   08 deals in OPI compared to either OSI or NAS within
9   09 the -- oh, the 2000 to 2001 time frame?
10  10    MR. NADOLENCO: Object to the form.
11  11    THE WITNESS: What do you -- what do you
12  12 mean by "size of the deals"?
13  13 BY MR. DE GHETALDI:
14  14    Q. Dollar amount.
15  15    A. In -- I'm going to chunk it up into two
16  16 pieces.
17  17    Q. Okay.
18  18    A. Contrasting it against major accounts and
19  19 general business and then compared to OSI.
20  20    Q. All right.
21  21    A. And you're asking specifically about OPI --
22  22    Q. Right.
23  23    A. -- is that correct?
24  24    And when you're saying 2000, also, I did
25  25 not take responsibility for OPI until July of 2000,
```

19

```
1  00019:01 so I can only speak from that point on --
2   02    Q. That's fair.
3   03    A. -- until I left.
4   04    Against general business and major
5   05 accounts, the deals tended to be larger --
6   06    Q. Okay.
7   07    A. -- frequently.
8   08    Q. And -- and I asked about deals, and maybe I
9   09 should have specified license deals. Is that the
10  10 way you understood the question?
11  11    A. Yes, that's correct.
12  12    Q. Okay. And so that would exclude services,
13  13 like consulting.
14  14    A. Correct.
15  15    Q. All right. How about -- how would you
16  16 describe the comparison of the size of OPI license
17  17 deals in, let's say, fiscal year 2001 to the size of
18  18 license deals in OSI during that same period?
19  19    A. I would say they were approximately
20  20 equivalent, with the exception of one deal.
21  21    Q. All right. And that one deal was?
22  22    A. Covisint.
23  23    Q. All right. And you say "Covisint"? I'm
24  24 not -- we -- it's been hard to get an agreement
25  25 on -- on how you say that word, and I'm just
```

20

```
1  00020:01 wondering how you say it.
2   02    A. You mean "Covisint" versus "Covisint"?
3   03    Q. Right, yeah.
4   04    A. I -- I -- I would call it "Covisint,"
5   05 but --
6   06    Q. Okay.
7   07    A. I'm not sure --
8   08    Q. That's --
9   09    A. -- it's ultimately that important.
10  10    Q. I don't know either. All right.
11  11    Now, in fiscal year 2001, was OPI divided
12  12 up into subgroups in any way?
13  13    A. The answer is yes. But if you could be
14  14 more specific in your question, I'd be glad to
15  15 answer it.
16  16    Q. Okay. Well, how was it divided up?
17  17    A. Are you talking about by industry? Are you
18  18 talking about sales support? Or would -- is the
19  19 answer yes?
20  20    Q. All right. All right. Was it divided up
21  21 by industry?
22  22    A. Yeah.
23  23    Q. Okay. How?
24  24    A. Yes.
25  25    We had -- we chunked it up in some cases by
```

21

```
1   00021:01  industry and then in some cases by account and then
2    02  in some cases several industries.  Let me give you
3    03  an example.  For example, we had all automotive, all
4    04  automotive accounts, together.  And that tended to
5    05  work well, because most of the automotive accounts
6    06  were located in the Detroit area.  So it kind of had
7    07  a geographic focus as well as an industry focus.  So
8    08  that would be an example where we had people
9    09  selling.  And I'm talking just now sales
10   10  organization.
11   11      Q.  Right.
12   12      A.  Focused on automotive.
13   13          The second example that we might segment it
14   14  by is, General Electric was a very major customer,
15   15  and as you probably know, General Electric is really
16   16  a portfolio of companies, all the way from financial
17   17  services to automotive and electric engines and
18   18  things of that nature.  So we had one team focused
19   19  on General Electric.
20   20          And then other areas where we would have an
21   21  amalgam of industries -- for example, in the Bay
22   22  Area we certainly have, as you know, a high presence
23   23  of high-tech.  The Gap is also here.  And, by the
24   24  way, one of the other industries that we had
25   25  within -- within OPI is retail, going back to an
```

22

```
1   00022:01  earlier question.
2    02          So the sales organization would tend to be
3    03  divided into those three kinds of segments that I
4    04  just described.
5    05      Q.  Okay.  So amalgam -- just -- just to
6    06  summarize, GE was one of the --
7    07      A.  One sales group.
8    08      Q.  One sales group.  Then automotive was
9    09  another sales group.
10   10      A.  Correct.
11   11      Q.  And then sort of everything else, that you
12   12  called an amalgam of industries, was in the third?
13   13      A.  Yeah.  And it was more based on geography.
14   14  You -- you would have people, for example, in -- in
15   15  the Bay Area.  Some would focus exclusively on
16   16  high-tech.  But because you had Gap here, as well,
17   17  using that client as an example, we would have
18   18  people focusing on that industry as well.
19   19          The -- and if they had Gap, they might
20   20  focus, for example, on Safeway as well.  But you --
21   21  we didn't divide the Bay Area OPI office into
22   22  subindustries.  We basically served it as a
23   23  geographic area focusing on those industries that I
24   24  just mentioned.  In Texas, for example, in Houston,
25   25  there -- that was where we had our oil and gas
```

23

```
1   00023:01  practice, which would be another industry you
2    02  could add on --
3    03      Q.  Okay.
4    04      A.  -- to OPI.
5    05          So in some cases -- that third example,
6    06  Dario, is largely driven by geographic -- geography
7    07  and the industries that tend to center in those --
8    08  in that area.
9    09      Q.  Okay.  Well, how many geographic centers
10   10  did you have, then, during fiscal year 2001?
11   11      A.  I don't recall.
12   12      Q.  Okay.  Well, there's Bay Area.
13   13      A.  Right.
14   14      Q.  Texas.
15   15      A.  Right.  Seattle.
16   16      Q.  Seattle.  Okay.
17   17      A.  L.A.  Chicago.  Detroit.  I would say New
18   18  England.  And I'd probably say Southeast.
19   19      Q.  Okay.
20   20      A.  But all very industry focused.
21   21      Q.  Based on whatever industry was in the
22   22  particular geographic region?
23   23      A.  Yes, as long as it fell in the definition
24   24  of OPI.
25   25      Q.  Okay.
```

24

```
1   00024:01      A.  The named accounts for OPI.
2    02      Q.  Okay.  Now, did you have persons in charge
3    03  of those geographic centers?
4    04      A.  Yes.
5    05      Q.  Okay.  Do you recall who those persons were
6    06  in -- in fiscal year 2001?
7    07      A.  We had three areas that these offices would
8    08  roll up to --
9    09      Q.  Okay.
10   10      A.  -- within OPI:  East, Central, and West.
11   11      Q.  All right.
12   12      A.  And the answer's yes.
13   13      Q.  Okay.  In -- and -- and the heads of those
14   14  geographic regions reported to you?
15   15      A.  Correct.
16   16      Q.  All right.  Now, who in --
17   17      A.  In the period -- in the period from July
18   18  2000 until the end of Q3 FY '01.  I made a change in
19   19  Q4 --
20   20      Q.  All right.
21   21      A.  -- FY '01.
22   22      Q.  So during the first three quarters, then,
23   23  of fiscal year 2001?
24   24      A.  Correct.
25   25      Q.  Less one month in the first?
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

25

```
1  00025:01   A. (Witness nods head.)
2  02    Q. Okay.  So -- so who was in charge of the
3  03 East during that time?
4  04    A. Steve McLaughlin.
5  05    Q. Who was in charge of the Central during
6  06 that time?
7  07    A. Tom Thimot.
8  08    Q. And who was in charge of the West during
9  09 that time?
10 10    A. Mike DeCesare.
11 11       Now, to answer the question completely,
12 12 Thimot left during this period of time, so I made a
13 13 change in Central upon his departure.
14 14    Q. Okay.  Did you replace him with somebody in
15 15 Q3?
16 16    A. I don't recall specifically when he left.
17 17 But when he did leave, I put two people in charge.
18 18    Q. Okay.  Do you recall why he left?
19 19    A. Yes, I do.
20 20    Q. Why?
21 21    A. Tom was very entrepreneurial, and was --
22 22 had aspirations to be a CEO of a company, regardless
23 23 of the size.  And at that point, when he left, there
24 24 were a number of start-ups being created, and he was
25 25 attracted by one and left the company.
```

27

```
1  00027:01 general business, those were subgroups of NAS at the
2  02 time, right?
3  03    A. They were parallel organizations to the NAS
4  04 sales organization.
5  05    Q. Okay.  Parallel consulting organizations?
6  06    A. Correct.
7  07    Q. All right.  You said a service line group.
8  08 What's -- can you explain what that was?
9  09    A. In consulting, you have organizations that
10 10 are focused on geographies or industry -- accounts
11 11 within those geographies or industries, but you also
12 12 want to have a strong practice, for example, around
13 13 applications, technology.  It could be even
14 14 something as specific as systems performance.  And
15 15 so -- and it might be, also, methodology, how we
16 16 actually do our work, that would apply to all these
17 17 other practices.  It was much more efficient to have
18 18 a service line practice, a small group that had
19 19 responsibility for developing, for example, the
20 20 methodology that would be used by all those other
21 21 operational practices.  And that was the scope of
22 22 service lines.
23 23    Q. Okay.  Do you recall who was in charge of
24 24 the various consulting groups during the first three
25 25 quarters of fiscal year 2001?
```

26

```
1  00026:01    Q. Okay.  Now, we've been talking about --
2  02 we've been talking about the license business and
3  03 how that was structured.  Can you explain to me the
4  04 structure of the consulting business that you had
5  05 charge of?
6  06    A. Yes.  During what period of time?
7  07    Q. Well, during the first three quarters of
8  08 fiscal year 2001.
9  09    A. We had East, Central, and West, Canada,
10 10 Latin America, and I also had a service line group.
11 11 And I think that was it.
12 12    Q. All right.  By the way, going back to Steve
13 13 McLaughlin and --
14 14    A. Dario, could I go back for a second?  I --
15 15    Q. Sure.
16 16    A. -- apologize.  And also OPI consulting.
17 17    Q. Oh, okay.  So within consulting there was
18 18 East, Central, West, Canada, Latin America, and OPI
19 19 consulting?
20 20    A. Yes, under my responsibility.  East,
21 21 Central, West focused on major accounts and general
22 22 business consulting.  OPI consulting focused on OPI.
23 23 And as you might imagine, Canada and Latin America
24 24 focused on their respective geographies.
25 25    Q. Right.  And -- and when you say majors and
```

28

```
1  00028:01    A. I believe so.
2  02    Q. Okay.  How about starting with East?
3  03    A. Keith Block.
4  04    Q. Okay.  And Central?
5  05    A. Brad Scott.
6  06    Q. West?
7  07    A. Gary Simler.
8  08    Q. Canada?
9  09    A. Michel Lozeau.  L-O-Z-E-A-U.  He -- Dario,
10 10 he did leave at some point, and I don't recall
11 11 exactly when.  But he was the -- the one that I
12 12 recall that was there.
13 13    Q. Okay.  That's fine.  And Latin America?
14 14    A. Luis Meisler.  L-U-I-S, M-E-I-S-L-E-R.
15 15    Q. And how about OPI consulting?
16 16    A. Chuck Linn, L-I-N-N.
17 17    Q. And the service line group?
18 18    A. Valerie Borthwick.  That's my best -- to
19 19 the best of my recollection, that's who was
20 20 responsible.
21 21    Q. Okay.
22 22    A. I made some changes along the way, but I
23 23 think that's pretty representative.
24 24    Q. All right.  That's helpful.  Now, during
25 25 the first three quarters of 2001, did -- did you
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

29

```
1   00029:01   have any responsibility for the forecasting process?
2   02   A. Yes.
3   03   Q. Can you identify for me what -- what you
4   04   felt to be the most important source of data in --
5   05   in creating a forecast.
6   06   A. Source of data?
7   07   Q. Yeah.
8   08   A. Data?
9   09      It would be the account managers and the
10  10   regional managers in the field.
11  11   Q. Okay. And what type of data did you
12  12   consider to be the most important to you in your
13  13   forecasting?
14  14   A. They would -- the most important was the
15  15   information around account, what the opportunity
16  16   was, whether it was applications or technology, or
17  17   both, and what -- the dollar amount that was
18  18   associated with that, that deal.
19  19   Q. Okay.
20  20   A. And I'm talking strictly license right now,
21  21   which I believe is what you're asking.
22  22   Q. Right. It is. Because you didn't
23  23   really -- or did you do forecasting in the same way
24  24   for consulting as you did for license?
25  25   A. Absolutely, yes.
```

30

```
1   00030:01   Q. Okay. So then let's concentrate on -- on
2   02   license, and then we'll get to consulting later.
3   03   A. Okay.
4   04   Q. So there were the -- the deals, then, or
5   05   the -- the opportunities, I think you called them,
6   06   and within the opportunities there were two
7   07   important pieces of data: what type of deal it was
8   08   going to be and the amount? Is that --
9   09   A. That's correct.
10  10   Q. -- fair?
11  11   A. That's correct.
12  12   Q. Okay. Did -- did you look at the -- the
13  13   account manager's estimation of the strength of the
14  14   deal; that is, the likelihood that the deal would
15  15   close?
16  16   A. Yes.
17  17   MR. GOLDSTEIN: Objection to form.
18  18   BY MR. DE GHETALDI:
19  19   Q. And how -- how did those sorts of criteria
20  20   fit into -- into your forecasting model?
21  21   MR. GOLDSTEIN: Objection to form.
22  22   MR. NADOLENCO: Join.
23  23   BY MR. DE GHETALDI:
24  24   Q. Could --
25  25   MR. NADOLENCO: Dario, I'm sorry. Can we
```

31

```
1   00031:01   just have the regular stipulation, that the
2   02   individual defendants are deemed to join in all the
3   03   objections with Oracle's counsel?
4   04   MR. DE GHETALDI: Oh, sure.
5   05   MR. GOLDSTEIN: Thank you.
6   06   MS. SEGAL: So agreeable.
7   07   THE WITNESS: Could -- could we also get
8   08   clarity, for me, obviously, not for the other folks
9   09   in the room, that when there is an objection to
10  10   form -- what does that change for me?
11  11   BY MR. DE GHETALDI:
12  12   Q. It changes nothing for you. You -- you go
13  13   ahead and answer the question. The only time that
14  14   you don't answer a question is if you're instructed
15  15   not to answer, by -- by your lawyer. Okay?
16  16   A. Okay.
17  17   MR. GOLDSTEIN: That's correct.
18  18   THE WITNESS: Thank you.
19  19   BY MR. DE GHETALDI:
20  20   Q. All right.
21  21   A. If you'll repeat the question.
22  22   Q. Okay. I'll try. It was one of those that
23  23   kind of --
24  24   MR. GOLDSTEIN: It was objectionable.
25  25   BY MR. DE GHETALDI:
```

32

```
1   00032:01   Q. -- fell out of my mouth and --
2   02   MR. GOLDSTEIN: It was objectionable as to
3   03   form.
4   04   BY MR. DE GHETALDI:
5   05   Q. -- landed on the table and flopped around,
6   06   and people laughed at it. You know, that happens.
7   07   All right.
8   08      My question was, how did those sorts of
9   09   criteria fit into your forecasting model. And by --
10  10   what I meant by that was, how did you evaluate the
11  11   account manager's estimations of the likelihood that
12  12   certain deals would close?
13  13   A. I would look -- one, we would segment the
14  14   deals into three categories: worst case, most
15  15   likely, and best case. So I would look to see where
16  16   the account manager and the regional manager, and
17  17   subsequently the AVP, the assistant vice president,
18  18   would put those deals. That was one basis.
19  19   Secondly, it would be through discussions with the
20  20   account manager on some deals. It would be similar
21  21   kind of discussion that I may or may not have with
22  22   the regional manager or the assistant vice president
23  23   on those deals, as well. It may also, third, be
24  24   just from my discussions personally with the client.
25  25   Q. All right. Now, you mentioned a couple of
```

33

1    00033:01  terms.  Let me ask you about them, just before we --
2    02    A.  Sure.
3    03    Q.  -- go on.  You mentioned account manager,
4    04  that -- and I was using that term.  What exactly was
5    05  an account manager in OPI during the first three
6    06  quarters of 2001?
7    07    A.  The account manager was a -- a -- an
8    08  individual who had responsibility for a specific
9    09  account.  And an account would be Hewlett-Packard --
10   10    Q.  Okay.  All right.
11   11    A.  -- for example.
12   12    Q.  And -- now, how about a regional manager?
13   13    A.  Regional manager would be the manager
14   14  responsible for a set of account managers.
15   15    Q.  All right.  And -- and they would be the
16   16  persons in charge of those various regional offices
17   17  that you identified earlier?
18   18    A.  Correct.
19   19    Q.  Okay.  And then the assistant vice
20   20  president, the AVP, I think, right?
21   21    A.  Correct.
22   22    Q.  Can you describe the responsibilities of
23   23  those -- those folks?
24   24    A.  They would have responsibilities for a
25   25  group of regional managers underneath them.

34

1    00034:01    Q.  All right.  And so Steve McLaughlin and
2    02  Mr. -- and Tom Thimot --
3    03    A.  "Thimot."
4    04    Q.  -- "Thimot" --
5    05    A.  The T is silent.
6    06    Q.  -- and Mike DeCesare, those -- those were
7    07  assistant vice presidents?
8    08    A.  That's correct.
9    09    Q.  All right.  And the same for Keith Block
10   10  and Brad Scott, Gary Simler, that -- that list?
11   11    A.  Yeah.  Correct.  And I believe I misspoke.
12   12  I believe AVP -- it's been three years --
13   13    Q.  Yeah.
14   14    A.  -- now.  I believe AVP actually stood for
15   15  "area," not "assistant."
16   16    Q.  Okay.
17   17    A.  Area vice president.
18   18    Q.  Okay.
19   19    Q.  And could you repeat your question again on
20   20  the consulting side?
21   21    Q.  Right.  So my question was, were Keith
22   22  Block, Brad Scott, Gary Simler, Michel Lozeau, Luis
23   23  Meisler, Chuck Linn, and Valerie Borthwick all area
24   24  vice presidents?
25   25    A.  I would have to look.  I did make, I

35

1    00035:01  believe at that point, Valerie Borthwick responsible
2    02  for the service lines, and at some point I made
3    03  Keith Block responsibility -- responsible for North
4    04  America consulting.  And when he took that over,
5    05  meaning that he had responsibility for East,
6    06  Central, West, and Canada, he became a senior -- I
7    07  promoted him to senior vice president as well.
8    08    Q.  Okay.  So, getting back to the -- the
9    09  forecasting process, an account manager would talk
10   10  to a customer and get a lead on a possible deal,
11   11  begin discussions with a customer about a possible
12   12  deal, okay?  Is that -- that's --
13   13    A.  That was not always the case.  But that was
14   14  typically the case.
15   15    Q.  All right.  Now, at -- at what point would
16   16  the account manager -- or would the opportunity,
17   17  that is, get to a point where the account manager
18   18  put the deal into the system, so to speak?
19   19    A.  And when you say "the system," what
20   20  system --
21   21    Q.  Well --
22   22    A.  -- are you referring to?
23   23    Q.  I'm not referring to a specific computer
24   24  system.  But at what point would an account manager
25   25  report to someone else that "Here's a potential deal

36

1    00036:01  that -- that we're looking at"?
2    02    MR. GOLDSTEIN:  Objection to form.
3    03    THE WITNESS:  It -- the account manager
4    04  would introduce a deal based on their experience
5    05  when they felt that it was -- there was some
6    06  legitimacy to the opportunity.
7    07 BY MR. DE GHETALDI:
8    08    Q.  Okay.
9    09    A.  But that was an individual judgment -- an
10   10  individual judgment, but fairly consistent.
11   11    Q.  Did you have meetings of these account
12   12  managers to discuss when an opportunity gained
13   13  sufficient legitimacy to be reported as a potential
14   14  deal?
15   15    A.  Yes.
16   16    Q.  Okay.  Did you have written standards for
17   17  that?
18   18    A.  Yes.
19   19    Q.  Okay.  Where -- where did those standards
20   20  appear?
21   21    A.  I recalled -- recall writing an email at
22   22  one point, as an example, that said I wanted all
23   23  opportunities to be put into our sales tracking
24   24  system, known as OSO, Oracle Sales Online.
25   25    Q.  All right.  Regardless of the legitimacy,

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

37

```
1  00037:01 degree of legitimacy, or --
2  02    A. I would say regardless of where it was in
3  03 the sales process.
4  04    Q. Okay. Now, how did an opportunity --
5  05 please help me understand the -- the classification
6  06 method of these opportunities into this worst, most
7  07 likely, and -- and best-case categories.
8  08    MR. NADOLENCO: Objection to form.
9  09    MR. GOLDSTEIN: Join.
10 10    THE WITNESS: Are you asking what's the
11 11 definition of those three terms you just mentioned?
12 12 BY MR. DE GHETALDI:
13 13    Q. Okay. That -- I'll start with that
14 14 question.
15 15    A. Worst case meant that there's a very high
16 16 probability that we were going to get that. It
17 17 typically -- that deal. It typically meant that we
18 18 were very far along in the negotiation process with
19 19 the customer. It wouldn't be unusual that it was --
20 20 we were in contract negotiations or in fact had
21 21 signed the contract.
22 22    Most likely is -- well, let me put -- go to
23 23 best case next. In best case, it was an opportunity
24 24 that we were pursuing that may or may not happen
25 25 this quarter, and -- but we felt that the
```

38

```
1  00038:01 discussions with the customer were such that -- that
2  02 it had some chance of happening that quarter.
3  03    And then the most likely are the deals that
4  04 would fall in between those two categories.
5  05    Q. Were all opportunities classified as either
6  06 worst, most likely, or best case?
7  07    MR. GOLDSTEIN: Object to form.
8  08    THE WITNESS: No.
9  09 BY MR. DE GHETALDI:
10 10    Q. So there were other opportunities that --
11 11 that didn't reach this particular level of
12 12 confidence?
13 13    A. Yes. An example of that would be that it
14 14 would be a deal that most likely -- that was out
15 15 there but was probably a future-quarter opportunity.
16 16    Q. Okay. Now, you -- just going back for a
17 17 second, this -- this email -- well, we'll get to --
18 18 I'll get to that later.
19 19    In your forecasting process in -- in 2001,
20 20 that is, Oracle's fiscal year 2001, did you look at
21 21 any historical data to -- to help you in -- in
22 22 arriving at -- at a forecast?
23 23    A. I think you're asking two questions.
24 24    Q. Right.
25 25    A. Did I look at historical data?
```

39

```
1  00039:01    MR. NADOLENCO: Objection; compound.
2  02    MR. GOLDSTEIN: Lawyers sometimes have to
3  03 amuse themselves.
4  04    THE WITNESS: Did I look at historical
5  05 data? Yes. Did I use the historical data to -- to
6  06 arrive on a forecast? Did I use it? Very little.
7  07 BY MR. DE GHETALDI:
8  08    Q. All right. Is there a reason why you --
9  09 you did not use historical data any more than very
10 10 little in -- in your forecasting?
11 11    A. Yes. Because I had real information, or I
12 12 felt much more reliable information than a
13 13 historical, statistical data point or what we did
14 14 last year, for example. I had information about
15 15 this year, this quarter.
16 16    Q. All right. Well, you said that
17 17 you did look at historical data. What historical
18 18 data did you look at?
19 19    A. As an example, what the license sales were
20 20 same quarter the prior -- year prior.
21 21    Q. All right. Total quarter?
22 22    A. Yes.
23 23    Q. Okay. Did you look at actual license sales
24 24 in the prior quarter for particular months?
25 25    A. Yes.
```

40

```
1  00040:01    Q. Okay. Did you look at actual license sales
2  02 in the previous quarter? So, for example, in Q3 did
3  03 you look at how OPI did in Q2?
4  04    A. To the best of my recollection, I -- I
5  05 might look at it. But I didn't feel that it was a
6  06 point that was particularly relevant.
7  07    Q. All right. In -- in looking at actual
8  08 results within a quarter, that is, actual closed
9  09 deals, where did you find that information?
10 10    A. I hesitate because it was so obvious that
11 11 we won a deal. The account manager would send an
12 12 email, you know, indicating that we had won. I
13 13 might see the signed contract of the deal. I may
14 14 have talked to the customer and learned that the
15 15 deal was signed.
16 16    Q. Okay. Did you have a process for toting
17 17 those deals up?
18 18    A. Yes.
19 19    Q. Where was that information available to
20 20 you, or how did you obtain that information?
21 21    A. The finance organization, that supported my
22 22 business, was the recipient of all contracts, and
23 23 they were the ones that noted whether a deal was
24 24 closed or not --
25 25    Q. All right.
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

41

1  00041:01  A. -- and would give me that information.
2  02  Q. How often would they give you that
3  03  information?
4  04  A. When -- when are you talking about?
5  05  Q. Well, I'm talking about the first three
6  06  quarters of fiscal year 2001.
7  07  A. You know, they gave it to me as I needed
8  08  it. It -- at the beginning of the quarter it might
9  09  be as a deal was signed. Because of the way the
10  10  quarter worked, we tended to be back-end loaded.
11  11  And towards the end of the quarter, I would get a --
12  12  I might get a call or a report that showed -- was
13  13  telling me all the deals that had closed that week
14  14  or that day. So it depended on the timing of the
15  15  quarter, when I saw that information.
16  16  Q. All right. Well, was there a regular
17  17  reporting pattern on -- on closed license deals in
18  18  the first month of a quarter?
19  19  A. Yes.
20  20  Q. Okay. What was that pattern?
21  21  A. It was part of our -- of our forecasting
22  22  package, that -- that I would get. It would note in
23  23  there the closed deals.
24  24  Q. All right. Did -- did you have access to
25  25  any electronic sources for that data?

42

1  00042:01  MR. GOLDSTEIN: Objection to form.
2  02  THE WITNESS: When you say "electronic,"
3  03  what does that mean?
4  04  BY MR. DE GHETALDI:
5  05  Q. I mean you log into Oracle's server, or one
6  06  of Oracle's servers or one of Oracle's databases,
7  07  to -- to find out how you're doing at a particular
8  08  time. Were you able to do that?
9  09  A. Yes, I could go into OSO and get that
10  10  information.
11  11  Q. Okay. Did you?
12  12  A. Infrequently.
13  13  Q. All right. Was that -- other than OSO,
14  14  were you able to go anywhere else to -- to get that
15  15  information?
16  16  MR. NADOLENCO: Objection; form.
17  17  BY MR. DE GHETALDI:
18  18  Q. In electronic form.
19  19  A. In electronic form?
20  20  I might get an email with an attachment
21  21  that would have the forecast package. So that's
22  22  electronic.
23  23  Q. Okay. That's --
24  24  A. And I could access it that way.
25  25  Q. All right. Any other databases?

43

1  00043:01  A. None that I recall.
2  02  Q. OFA, or Oracle Financial Analyzer?
3  03  A. No, I didn't use that product.
4  04  Q. All right. Did you use any data warehouse
5  05  products?
6  06  A. None that I recall.
7  07  Q. In -- in the process of forecasting, during
8  08  this same time period, these -- the first three
9  09  quarters of 2001, did you look at any trends,
10  10  intraquarter trends?
11  11  MR. GOLDSTEIN: Objection to the form.
12  12  THE WITNESS: It's a -- it's a fairly broad
13  13  question. I -- what I would specific -- as an
14  14  example, it was very important to me -- trends
15  15  were -- what our pipeline looked like for the
16  16  quarter, that was a trend I watched pretty closely.
17  17  BY MR. DE GHETALDI:
18  18  Q. Okay. So in other words, you watched how
19  19  the pipeline numbers developed throughout the
20  20  quarter?
21  21  A. Right, how it changed throughout the
22  22  quarter.
23  23  Q. Okay. Did you also look at your own
24  24  license growth forecasts, to see how they'd been
25  25  changing over the quarter?

44

1  00044:01  A. Yes. And -- and just -- you'd used the
2  02  word "license." In the questions right now we're
3  03  talking only license, right?
4  04  Q. Yes. Yes.
5  05  A. Yes, I would -- well, ask that to me again,
6  06  just to make sure I answer it correctly.
7  07  Q. I asked did you also look at your own
8  08  license growth forecasts, to see how they had been
9  09  changing over the quarter?
10  10  A. Yes.
11  11  Q. Did you also look at those figures
12  12  together, that is, how the -- the license growth and
13  13  the pipeline growth numbers were behaving compared
14  14  to each other?
15  15  A. Yes.
16  16  Q. Okay. And can you tell me about that
17  17  comparison, what you did there.
18  18  A. I would look at whether the pipeline was
19  19  growing, staying the same, or declining, and I would
20  20  look what our license forecast was. And there was a
21  21  broad-based association between the two, and -- in
22  22  the sense that you would like to make sure that your
23  23  license forecast was covered by your pipeline.
24  24  Q. Okay.
25  25  A. As an example, I would look at that.

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

45

1  00045:01    Q.  Okay.  The -- the -- the -- I guess I was
2      02  asking about something slightly different.  You're
3      03  talking about the -- a more static relationship
4      04  between -- or it seems like you were talking about a
5      05  more static relationship; that is, how the pipeline
6      06  number compares to the forecast number at a given
7      07  point in time.  What I was asking about was more
8      08  trends, intraquarter, to see how the pipeline trends
9      09  were comparing to the forecasting trends.
10     10       MR. NADOLENCO:  Objection to form.
11     11       MR. GOLDSTEIN:  Join.
12     12       THE WITNESS:  I'm not sure my answer would
13     13  be any different, Dario.  I --
14     14  BY MR. DE GHETALDI:
15     15    Q.  Okay.
16     16    I would watch the pipe, for example,
17     17  pipeline, to see how it changed during the course of
18     18  the quarter.  It was not unusual, for example, that
19     19  after the quarter started the pipeline would
20     20  increase, and then as you start to substantiate
21     21  deals, the pipeline might decrease somewhat.  For
22     22  example, a deal might move out of this quarter to
23     23  the next quarter.
24     24    Q.  Okay.
25     25    A.  I would look at that.  I would look at

46

1  00046:01  license trends with the expectation -- and I think I
2      02  delivered it every quarter -- that -- that we would
3      03  deliver against the forecast for that quarter, based
4      04  on my experience.
5      05    Q.  All right.
6      06    A.  And based on my experience and the input,
7      07  of course, that I got from finance and my field
8      08  sales organization.
9      09    Q.  Right.  When a deal closed, did that deal
10     10  come out of the pipeline?
11     11       MR. GOLDSTEIN:  Objection to form.
12     12       THE WITNESS:  I smile because I -- I don't
13     13  remember.  I don't remember specifically.
14     14       MR. DE GHETALDI:  Okay.  We've been going
15     15  over an hour.  Why don't we take a break.
16     16       MR. GOLDSTEIN:  Sure.
17     17       THE WITNESS:  Sure.
18     18       THE VIDEOGRAPHER:  We're going off the
19     19  record.  The time is 10:51.
20     20       (Recess taken.)
21     21       THE VIDEOGRAPHER:  We're back on the
22     22  record.  The time is 11:05.
23     23       THE WITNESS:  I'm very sorry.
24     24       (Discussion off the record.)
25     25       THE WITNESS:  I'm sorry, Dario.

47

1  00047:01  BY MR. DE GHETALDI:
2      02    Q.  No problem.  That's all right.  Okay.  Now
3      03  we'll start.
4      04    In the first three quarters of 2001, were
5      05  big deals included in OPI's pipeline, license
6      06  pipeline?
7      07    A.  And what was the time frame, again?
8      08    Q.  The first three quarters of fiscal year
9      09  2001.
10     10    A.  Yes.
11     11    Q.  Okay.  So essentially everything went into
12     12  the pipeline, but you're not sure whether --
13     13    A.  Thank you very much.
14     14    Q.  -- closed deals came out, right?
15     15    A.  All deals went into the pipeline.  And I
16     16  can't remember the technical detail of whether a
17     17  closed deal went out of the pipeline or not.
18     18    Q.  Okay.  When we were talking about the
19     19  classification of some of the pipeline deals as
20     20  either worst, most likely, or best, I asked you what
21     21  type of deals were not classified as one -- in one
22     22  of those three categories, and you said, well, one
23     23  example is if a deal was going to close in a later
24     24  quarter.  Can you think of any other examples of
25     25  types of deals that would be in the pipeline but

48

1  00048:01  would not be in one of the worst, most likely, or
2      02  best-case categories?
3      03    A.  Other than future quarter?
4      04    Q.  Right.
5      05    A.  No.
6      06    Q.  Okay.
7      07    A.  Not that I recall.
8      08    Q.  Okay.  Before the break, we were talking
9      09  about relationships between license forecast and
10     10  pipeline numbers.
11     11    A.  Yes.
12     12    Q.  And there was actually a specific ratio
13     13  that was -- that appears in -- in a lot of Oracle's
14     14  forecasting documents, something called a coverage
15     15  ratio.  Are you familiar with that term?
16     16    A.  Yes.
17     17    Q.  And sometimes there's something that's
18     18  called a conversion rate.  Are you familiar with
19     19  that term?
20     20    A.  Yes.
21     21    Q.  Which term -- or which of those two ratios
22     22  did you tend to use personally?
23     23    A.  Coverage.
24     24    Q.  Coverage.  And so if I recall, that's the
25     25  license forecast divided by the pipeline, right,

49

1  00049:01  expressed as a percentage?
2  02    A. Yes.
3  03    Q. How -- how did you use that coverage ratio
4  04  in your forecasting?  What significance did it have?
5  05    A. I -- I used it as a broad measure to see
6  06  did we have the -- license forecast covered.  It
7  07  tended to be a more important number, for example,
8  08  in the beginning of the quarter than the end.
9  09    Q. Why?
10  10    A. Because at the beginning of the quarter,
11  11  you -- less deals were solid, so you might use
12  12  coverage to see do we really have enough in the
13  13  pipeline to cover what our forecast is.  For
14  14  example, you might have more management judgment at
15  15  the beginning of the quarter.  Towards the end I
16  16  would rely much more on the specific deals and pay
17  17  less attention to the pipeline -- less attention to
18  18  the pipeline at that point, and coverage.
19  19    Q. Okay.  Did these coverage ratios tend to
20  20  increase or decrease as the quarter progressed?
21  21    A. What I recall, not to a specific quarter,
22  22  but during the period of time we're talking about,
23  23  as well as running Latin Americas sales, so kind of
24  24  a broader data point, what would happen is you would
25  25  have a pipeline, measured in dollar amount, and it

50

1  00050:01  would tend to increase after the quarter started,
2  02  for example in the first month, because new deals
3  03  might come into the pipeline, and it might be deals
4  04  that didn't happen in the previous quarter that you
5  05  move over to the next quarter.
6  06    And then, as the quarter continued, then
7  07  there would -- the pipeline -- it was not unusual
8  08  for the pipeline to decrease over time, because, as
9  09  an example, as you -- as we worked different deals,
10  10  you would see that some deals might fall out.
11  11  They're not legitimate deals at all.  I mean, in
12  12  other words, there's not the deal there that we had
13  13  hoped; or there -- it was very -- you know, whether
14  14  it was a deal -- we may think there's a deal with
15  15  the customer; in fact there wasn't, or that there
16  16  was a deal, potential deal, with the customer but it
17  17  was not going to happen this quarter, and so you'd
18  18  move it out of the pipe for this quarter and move it
19  19  into the next quarter.
20  20    Q. Okay.  And so the pipeline would tend to
21  21  decrease, in general, towards the end of the
22  22  quarter, after a little spike at the beginning?  Is
23  23  that the way you're recalling?
24  24    A. As I recall.  As I recall.
25  25    Q. Okay.  And so that would have the effect of

51

1  00051:01  increasing the conversion rate?
2  02    MR. GOLDSTEIN:  Objection to form.  Did you
3  03  mean coverage ratio?
4  04    THE WITNESS:  Do you mean --
5  05  BY MR. DE GHETALDI:
6  06    Q. Or coverage -- coverage ratio.
7  07    MR. GOLDSTEIN:  I think I still object to
8  08  the form.
9  09    MR. NADOLENCO:  Yeah, I do --
10  10    MR. GOLDSTEIN:  But --
11  11    MR. NADOLENCO:  -- too.  Objection; form.
12  12  When?
13  13  BY MR. DE GHETALDI:
14  14    Q. To the extent that the end of the
15  15  quarter -- toward -- as the quarter progressed the
16  16  pipeline number is decreasing --
17  17    A. Correct, as I recall.
18  18    Q. -- as you recall, that -- am I -- am I
19  19  correct in -- in believing that that would have a
20  20  tendency to increase the percentage number that
21  21  results from the division of the forecast by the
22  22  pipeline?
23  23    A. As I understand the question, Dario, I
24  24  don't know that it's as scientific as you're
25  25  implying.  Forecasting really is an art in many

52

1  00052:01  ways.  But if -- you know, on one hand you could say
2  02  as -- as the quarter went along and your -- and your
3  03  pipe declined, theoretically the coverage --
4  04  coverage factor would decline; or you could argue
5  05  that it might go up, because your forecast could go
6  06  down.  And if your -- if your coverage stays high
7  07  and your forecast goes down, then that coverage
8  08  factor could go up.
9  09    So I'm not sure I'm answering your
10  10  question, but there's -- there's different things
11  11  that could happen during the -- you know, the
12  12  numbers could -- you know, both coverage and your
13  13  forecast in the end are two different numbers.
14  14  And -- and so that coverage factor can vary during
15  15  the course of the quarter.
16  16    Q. Okay.  No, and you -- you were answering my
17  17  question.  Thanks.
18  18    Did -- did you ever look at historical
19  19  coverage ratios in -- in your forecasting?
20  20    A. To some extent.
21  21    Q. Okay.  Why?
22  22    A. I might look anecdotally at what our
23  23  coverage is this quarter versus what our coverage
24  24  was same quarter last year or what it was previous
25  25  quarter, or something like that, but nothing more

53

1  00053:01 than that.

2  02    Q.  Okay.  When -- when you looked at

3  03  prior-year or prior-quarter coverage ratios, did --

4  04  did you look at what I would call the forecasted

5  05  coverage ratio at a certain point or a comparable

6  06  point within the quarter of -- the prior year or the

7  07  prior quarter, or did you look at a different

8  08  number?

9  09    A.  Typically I would look -- if I did look at

10  10  it, which I said was very infrequent, it would be

11  11  what was it for this quarter and what was it for

12  12  this same quarter a year ago.  I don't recall ever

13  13  looking at a specific point in time.

14  14    Q.  Well, when you say what was it for the same

15  15  quarter a year ago, I'm not clear on how that

16  16  calculation would be done.

17  17    A.  I might take the same quarter a year ago,

18  18  what the revenue was and what the pipe was at the

19  19  end of the quarter, look then, and -- and then I'm

20  20  now in the current quarter, and I'll look at, you

21  21  know, where we are in the coverage versus our

22  22  forecast.

23  23    Q.  Okay.  So, just so I understand, when --

24  24  when you would look at coverage ratios in prior

25  25  quarters or -- you would look at the actual revenue

54

1  00054:01 for the quarter and the pipeline at the end of the

2  02  quarter?  Is that a fair statement?

3  03    A.  I -- I don't recall specifically, Dario.

4  04  I -- I would be interested -- you know, as an

5  05  example, in the first quarter of the new year, when

6  06  we typically have had a very good fourth quarter of

7  07  the previous year -- when you start up the new year,

8  08  it's not unusual that your -- in that first quarter

9  09  your pipe is smaller.  And I might go back and say,

10  10  "What was our pipe, you know, a year ago, our

11  11  coverage a year ago?"  And I -- I'm not sure I was

12  12  as scientific as you're -- as you're implying.

13  13    Q.  Okay.

14  14    A.  Or you're asking.

15  15    Q.  Okay.  What was the source -- when you did

16  16  go back and look, do you recall what the source

17  17  of -- of the historical data was where you looked?

18  18    A.  I believe it was OSO or the pipeline

19  19  tracking system that we were using prior to OSO.

20  20    Q.  And when you did go back and look, did you

21  21  just go back one year, or did you go back and look

22  22  multiple years?

23  23    A.  At most one year.

24  24    Q.  Is there some reason why you didn't go back

25  25  further?

55

1  00055:01    A.  I'm not sure what the relevance of that

2  02  information would be.  Again, I was very fact-based

3  03  in my business, and I had information from the

4  04  account managers and the RMs and the AVPs, as well

5  05  as my own discussions with the -- the clients, in

6  06  many cases.  And I was -- because I don't get --

7  07  Oracle's success was not around coverage; Oracle's

8  08  success was around the revenue and the profitability

9  09  of the company.  And that's what I focused on for my

10  10  business.

11  11    Q.  Okay.  Now, you mentioned management

12  12  judgment, I believe.

13  13    A.  Yes.

14  14    Q.  What part does management judgment play in

15  15  this forecasting process, or did, that is, during

16  16  those first three quarters of fiscal year 2001?

17  17    A.  Management judgment was a number that I

18  18  used to -- that was the difference between what my

19  19  forecast was and what deals I felt comfortable in

20  20  that point in time that we would deliver.

21  21    Q.  Okay.  Is there a chicken-and-egg thing

22  22  happening with the forecast and the management

23  23  judgment?  In other words, what comes first,

24  24  forecast or management judgment?

25  25    A.  It typically -- typically an RM, or, more

56

1  00056:01 specifically for me, an AVP, would submit a

2  02  forecast.  And it would be based on deals that they

3  03  could articulate.  And I'm talking -- and management

4  04  judgment played a -- in my -- for my businesses,

5  05  license business, a much more important role at the

6  06  beginning of the quarter than at the end of the

7  07  quarter.  At the beginning of the quarter they might

8  08  have some deals listed, but, based on their

9  09  general -- an AVPs general feel for their business,

10  10  they're saying, "I may be at X, but I'm going to

11  11  deliver 1.5X for the quarter."  So they may actually

12  12  put that amount of judgment in there.

13  13       That would all roll up to me.  And then I

14  14  would look at the judgment that they put in.  And

15  15  sometimes I might adjust it up, management judgment,

16  16  if I felt my experience with that AVP was they're

17  17  conservative, overly conservative, and in some cases

18  18  I might adjust the management judgment down, if I

19  19  felt that they were aggressive.  But it was a

20  20  experiential number, on management judgment, based

21  21  on the pipeline and based on the deals, that fell

22  22  into worst case, most likely, and best case.

23  23    Q.  In fiscal year 2001, in the first three

24  24  quarters of that time period, which of your AVPs did

25  25  you consider to be overly conservative, if any?

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

57

```
 1  00057:01   A.  As best recall, Mike DeCesare was
 2  02  probably a little more conservative.
 3  03      Q.  All right.  And were any of your AVPs
 4  04  during that period overly aggressive, in your -- in
 5  05  your opinion?
 6  06      A.  Yes.  I -- I -- as I recall, Steve
 7  07  McLaughlin was somewhat aggressive, and Tom Thimot
 8  08  could be aggressive at times.
 9  09      Q.  Okay.  In -- in the third -- in the first
10  10  three quarters of fiscal year 2001, did Oracle's
11  11  finance department have somebody who was assigned to
12  12  OPI?
13  13      A.  Yes.
14  14      Q.  Who was that?
15  15      A.  It started with Ivgen Guner.  G-U-N-E-R.
16  16      Q.  Okay.  And at some point did that change?
17  17      A.  Yes, it did.
18  18      Q.  And who was next?
19  19      A.  Jim English.
20  20      Q.  Okay.  When did Mr. English become assigned
21  21  to OPI?
22  22      A.  I don't recall specifically.
23  23      Q.  Do you recall whether it was before the
24  24  third quarter of fiscal year 2001?
25  25      A.  I believe he was the -- was the financial
```

58

```
 1  00058:01  director that I had for OPI by the third quarter, as
 2  02  I best recall.
 3  03      Q.  Okay.  Now, who did Ivgen Guner and Jim
 4  04  English report to?
 5  05      A.  They reported in to the finance
 6  06  organization.
 7  07      Q.  Okay.  Were -- were they there as a
 8  08  resource for -- for you, or -- what was their role?
 9  09      A.  They were a resource for me.  They were --
10  10  in that role they were specifically dedicated to OPI
11  11  and would support me from a financial aspect of the
12  12  business.
13  13      Q.  So when you wanted to know a financial
14  14  question, you went to them?
15  15      A.  Correct.
16  16      Q.  How would you use them?  What -- give me
17  17  some examples of how you would use them, their
18  18  expertise.
19  19      A.  Examples would be to have them give me a
20  20  list of the closed deals, to give me the forecast
21  21  for that period, whether it was a weekly forecast or
22  22  biweekly forecast, depending on the time frame and
23  23  the quarter.  I might ask them to -- based on their
24  24  knowledge of the deals, did they have any questions
25  25  about deals that they felt were important to ask the
```

59

```
 1  00059:01  AVPs or the RMs, for example, that I may be missing.
 2  02  I treated them as a business partner.
 3  03      Q.  Okay.  During the first three quarters of
 4  04  fiscal year 2001, did you have regular meetings
 5  05  with -- with your staff, with your reports?
 6  06      A.  Yes.
 7  07      Q.  Okay.
 8  08      A.  Wait.  What do you mean by "meeting"?
 9  09      Q.  Well, either a -- I -- I asked about
10  10  "regular" meetings, okay.  And I meant either a
11  11  situation where a bunch of people gather around a
12  12  table or where they're on a conference call, on a
13  13  regular basis.
14  14      A.  Yes.
15  15      Q.  Okay.  Now, what sorts of meetings were
16  16  those; that is, did you have different meetings with
17  17  different -- regular meetings with different parts
18  18  of your organization or one meeting for license,
19  19  another meeting for consulting?  How did it work?
20  20      A.  I tended to have separate meetings for
21  21  consulting from sales, or I'd have a separate
22  22  meeting from sales from consulting, although
23  23  sometimes I would have joint meetings or invite one
24  24  from one organization to the other.  And we'd do
25  25  these on either a periodic or as-needed basis.
```

60

```
 1  00060:01      Q.  Okay.  In terms of the -- the sales
 2  02  organization, did you have regular meetings or calls
 3  03  during those first three quarters of fiscal year
 4  04  2001?
 5  05      A.  Yes.
 6  06      Q.  When did -- and what was it -- or what were
 7  07  they?  Were they meetings or -- or calls, or -- or
 8  08  what?
 9  09      A.  It could be a -- oh, "meetings or calls."
10  10      They were mostly calls.
11  11      Q.  Okay.  Were these video conferences or were
12  12  they speakerphone?
13  13      A.  Speakerphone.
14  14      Q.  All right.  And so people in the sales
15  15  organization from around the country would all call
16  16  in, and you'd all talk, right?
17  17      A.  Correct.
18  18      Q.  Okay.  Did you have --
19  19      A.  When you say we "all talk," I mean, there
20  20  was typically an agenda, and not -- typically not
21  21  everybody talked.
22  22      Q.  Okay.  Were there typically written
23  23  agendas?
24  24      A.  It might be -- to answer your question, we
25  25  might have a written agenda around programs that I
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

61

1   00061:01  would want to drive -- sales programs I'd want to
2   02  drive in OPI, or I might do that in an email, and
3   03  say this is the purpose of the call.
4   04      Q.  All right.
5   05      A.  The forecast was a very typical reason why
6   06  we called, and the agenda would be that, you know,
7   07  from 8:00 to 8:30 I'm going to talk with the East,
8   08  and 8:30 to 9:00 I'm going to talk with Central,
9   09  and, you know, et cetera.  I mean, I would lay out
10  10  time frames where I would want to go through their
11  11  forecasts, using our forecast package for OPI.
12  12      Q.  Okay.
13  13      A.  Talking about OPI specifically, sales.
14  14      Q.  Did -- did you typically circulate those
15  15  agendas, or were those something that -- that you
16  16  generated for your own personal use?
17  17      A.  It might -- it would be an email that just
18  18  simply -- and, in fact, I'm not even sure I would
19  19  sent it out.  It might be from -- from -- Jim
20  20  English, for example, would just say, "Steve
21  21  McLaughlin, you're on from 8:00 to 8:30," and it
22  22  might be a simple e-mail saying simply -- saying
23  23  that.  The -- the substance was in the forecast
24  24  package.
25  25      Q.  Okay.  So I'm getting the picture that

62

1   00062:01  there was a regular forecast call for OPI during
2   02  these first three quarters of 2001.  Yes?
3   03      A.  Correct.
4   04      Q.  Okay.  Was there a particular day of the
5   05  week when those calls took place?
6   06      A.  I -- I don't recall now, Dario.  I believe
7   07  it was either Tuesday or Wednesday, because we would
8   08  have the executive committee meetings on Monday, and
9   09  then we would have the Americas forecast calls on
10  10  Thursday; so Tuesday or Wednesday morning.
11  11      Q.  It's your recollection, then, that the OPI
12  12  forecast calls were not on either Monday or
13  13  Thursday; is that fair?
14  14      A.  To the best of my recollection, yes.
15  15      Q.  Okay.  And did these forecast calls
16  16  include -- or -- were they joint sales and
17  17  consulting calls or -- are we talking about just the
18  18  sales?  You talked about --
19  19      A.  Typically the call, if it was OPI, was --
20  20  tended to be OPI sales only, to the best of my
21  21  recollection.
22  22      Q.  All right.
23  23      A.  To be -- what I recall was, I believe at
24  24  the beginning, when I first took over OPI, I had OPI
25  25  consulting participate and report as part of the

63

1   00063:01  OPI -- OPI sales forecast -- you know, of the OPI
2   02  forecast call.  I believe later on, as Keith Block
3   03  took over responsibility for the Americas and OPI
4   04  consulting, that I got the OPI consulting forecast
5   05  through him, and so it was not part -- later on it
6   06  was not part of the OPI sales forecast call.
7   07      Q.  All right.  Generally how long did these
8   08  sales forecast calls last?
9   09      A.  They could run an hour and a half to two
10  10  hours; sometimes shorter.
11  11      Q.  All right.  And your -- your main topic of
12  12  discussion was the information that was contained in
13  13  something that you called a forecast pack or
14  14  package?
15  15      A.  Correct.
16  16      Q.  Okay.  What -- where did these forecast
17  17  packages come from?
18  18      A.  From Ivgen Guner, and then subsequently Jim
19  19  English's organization.
20  20      Q.  All right.  Do you recall what was
21  21  contained in these forecast packages?
22  22      A.  Generally speaking, yes.  If you wanted to
23  23  show me one, I could be more specific.
24  24      Q.  Okay.  Well, generally speaking did they
25  25  include forecasts for the various regions?

64

1   00064:01      A.  Yes.
2   02      Q.  Okay.  Did they include closed --
3   03      A.  Correction.  What I recall specifically,
4   04  Dario, is that it had forecasts by area.  And -- and
5   05  within the package it would provide worst case,
6   06  best -- the most likely, and best case by region.
7   07      Q.  Okay.
8   08      A.  By regional manager, in fact.
9   09      Q.  Okay.  Did it include closed-deal figures?
10  10      A.  Yes.
11  11      Q.  Okay.  And also by area?
12  12      A.  Yes.
13  13      Q.  Did they tend to include forecasts for the
14  14  subsequent quarter as well?
15  15      A.  Just to be clear here, "subsequent" is
16  16  which quarter?
17  17      Q.  The next one.
18  18      A.  The next one.  Typically not.
19  19      Q.  Okay.
20  20      A.  I -- I don't recall a time when it included
21  21  a forecast for the next quarter.
22  22      Q.  All right.  Was that something that you
23  23  tended to do, look ahead a quarter in your
24  24  forecasting?
25  25      MR. GOLDSTEIN:  Objection to form.

65

```
1  00065:01    THE WITNESS: Marginally. The focus was on
2      02  the quarter at hand.
3      03  BY MR. DE GHETALDI:
4      04    Q. Okay. Were any other documents generally
5      05  circulated for these forecast calls?
6      06    A. Any other documents --
7      07    Q. Yeah.
8      08    A. -- other than the forecast package?
9      09    Q. Right.
10     10    A. No, not that I recall.
11     11    Q. Okay.
12     12    A. Someone might -- as a correction, someone
13     13  might send me some information on a specific deal,
14     14  like Motorola.
15     15    Q. Okay.
16     16    A. You know, some detail on that. In -- but
17     17  it typically is not around the forecast information.
18     18  It might be "Here's a summary of our latest
19     19  discussion with the customer" or "Would you call
20     20  this customer," or something like that.
21     21    Q. Okay. I was asking about more regularly
22     22  produced sorts of things, rather than the --
23     23    A. No.
24     24    Q. No. Now --
25     25    A. Not that I recall.
```

66

```
1  00066:01    Q. We've been talking about the process for
2      02  forecasting license sales. Did you find the
3      03  forecasting process for license more or less
4      04  difficult than the forecasting process for
5      05  consulting?
6      06    A. More difficult.
7      07    Q. Okay. And why is that?
8      08    A. Because in consulting, you recognize
9      09  revenue as it's earned. So even if you, for
10     10  example, in consulting win a $2 million consulting
11     11  deal, you can't recognize that revenue until it's
12     12  been earned. And so in any given month, you -- if
13     13  it's a 24-month project, you get to recognize one
14     14  24th of that revenue, generally speaking, in any
15     15  given month.
16     16    On the license side, if you book a deal at
17     17  11:59 p.m. on the last day of the quarter for
18     18  $2 million, you get to recognize that $2 million for
19     19  that quarter, as long as the product's shipped.
20     20    Q. What is support? There -- there's a -- a
21     21  revenue category for support. Did OPI take in
22     22  revenue for support services?
23     23    A. What do you mean, "take in revenue"?
24     24    Q. Well, did -- did -- did -- did OPI
25     25  recognize revenue for providing support services?
```

67

```
1  00067:01    A. And you asked what is support?
2      02    Q. Yeah.
3      03    A. I mean, which -- what question would you
4      04  like me to answer first, Dario?
5      05    Q. Well, take your pick. I mean, I'm trying
6      06  to figure out -- and maybe this will help you. I'm
7      07  trying to understand what support is --
8      08    A. Okay.
9      09    Q. -- and how that differs from consulting or
10     10  license sales.
11     11    A. Okay. Got it.
12     12    Support was another profit center in the
13     13  company, or is another profit center in the company.
14     14  Support really involves two things: maintenance to
15     15  the existing product that a customer may have bought
16     16  and upgrades to that product. Maintenance might be
17     17  that if their -- if the customer has a question,
18     18  they could call -- about their product that they
19     19  have installed, they could call support and get a
20     20  question answered.
21     21    If there is a patch for a product, the
22     22  support organization provides that to the customer.
23     23  If the customer has a support contract and a new
24     24  update to the software comes out -- we may have a
25     25  new release, or whatever -- then that release would
```

68

```
1  00068:01  go to that customer. So it was a support
2      02  organization handling both applications and
3      03  technology.
4      04    Q. Okay. Okay. In your Tuesday or Wednesday
5      05  license forecast calls, did -- did somebody take
6      06  minutes?
7      07    A. The minutes, Dario, that I recall were
8      08  typically a revised forecast package. It might be
9      09  that, based on the discussion, something's gone from
10     10  best case to most likely, or some adjustment like
11     11  that, as an example. And I would either get an
12     12  adjustment -- I mean, I'd get that report after the
13     13  call, or if we were down to weekly calls, I might
14     14  not get that until the next week.
15     15    Q. Okay.
16     16    A. But that's typically how, as I recall,
17     17  minutes were taken.
18     18    Q. Okay.
19     19    A. That -- that I'm aware of. I mean, you
20     20  would have to talk to Jim English and others as to
21     21  whether they took minutes.
22     22    Q. These license forecast calls, did you have
23     23  them every two weeks during the first two months of
24     24  the quarter and then every week during the third
25     25  month of the quarter?
```

69

```
1   00069:01    A.  That's my recollection.
2   02    Q.  Okay.  Now, have -- have we gone through
3   03  the entire process of arriving at your forecast from
4   04  the -- the account representatives through the AVPs
5   05  and you, to arrive at a number?
6   06    MR. GOLDSTEIN:  Are you done?
7   07  BY MR. DE GHETALDI:
8   08    Q.  Is there something we haven't covered?
9   09    MR. GOLDSTEIN:  Objection to form.
10  10    THE WITNESS:  It's a -- in all respects,
11  11  it's a fairly broad question.  I --
12  12  BY MR. DE GHETALDI:
13  13    Q.  Sure.
14  14    A.  I can't think of anything, Dario, that I've
15  15  left out.
16  16    Q.  Okay.
17  17    A.  I mean, it really was based on feedback
18  18  from the field, up to me, and -- looking at that and
19  19  then applying judgment overall to it.  And that was
20  20  the forecast I would submit.
21  21    Q.  Okay.  And so you would submit the forecast
22  22  sometime after this Tuesday or Wednesday forecast
23  23  call?
24  24    A.  Correct.  I -- I wouldn't.  I believe Jim
25  25  English did.
```

70

```
1   00070:01    Q.  Okay.  Do you know where that -- who got
2   02  that forecast number from Mr. English?
3   03    A.  I believe it was Jennifer Minton.
4   04    Q.  Okay.
5   05    A.  I don't know if it was Jennifer
6   06  specifically, but it was somebody in Jennifer's
7   07  organization.
8   08    Q.  Okay.  But that's not something that you
9   09  have actual knowledge of, how that occurred?  Or is
10  10  it?
11  11    A.  Through deduction, I can use it; because
12  12  the forecast package would come out on Thursday for
13  13  the Americas, and it would have my information in
14  14  it.  So, through deduction, it was provided and --
15  15    Q.  All right.
16  16    A.  -- incorporated.
17  17    Q.  Okay.  So then there was -- sometime after
18  18  your Tuesday or Wednesday OPI license forecast call,
19  19  there would be another call on Thursday, right?
20  20    A.  As I recall, it was on Thursdays, yes.
21  21    Q.  All right.  And was that a -- a forecast
22  22  call for just Americas, or was it company wide?  Or
23  23  who -- who participated in those calls?
24  24    A.  It was just the Americas.  Just the
25  25  Americas.  I don't recall it ever being anything
```

71

```
1   00071:01  other than that.  And to be clear on "Americas,"
2   02  that's OSI, OPI, major accounts and general
3   03  business, sales and consulting, and Latin America.
4   04    Q.  And Latin America.  Okay.  Was there a
5   05  regular time for these Thursday calls?
6   06    A.  I seem to remember they were typically
7   07  early afternoon on Thursday.  I -- I can't be
8   08  specific as to -- I don't specifically recall
9   09  whether it was always the same time or not.
10  10    Q.  Okay.  Typically how long did those calls
11  11  last?
12  12    A.  I don't -- to the best of my recollection,
13  13  I would say an hour.  At times I would participate
14  14  in the call and after I've covered OPI would hang
15  15  up.  I'd not continue on the call.
16  16    Q.  Okay.  Who were the regular participants in
17  17  those calls?
18  18    A.  Jay Nussbaum, George Roberts, myself.  I
19  19  believe our respective finance directors would
20  20  participate as well.  Jennifer.  And it was not
21  21  unusual that Jeff Henley, Safra Catz, and sometimes
22  22  Larry would participate in those calls.  There may
23  23  be others on the call that I wasn't aware of, but
24  24  those are the people I recall.
25  25    Q.  Okay.  Were there agendas circulated for
```

72

```
1   00072:01  these Thursday forecast calls?
2   02    A.  What do you mean by "agenda"?
3   03    Q.  Well, I'm talking about a formal agenda,
4   04  where you review old -- certain items of old
5   05  business, and they're listed, and certain items of
6   06  new business, and they're listed.
7   07    A.  What I recall was, it was the -- the
8   08  Americas forecast package that was sent, and that's
9   09  what was reviewed.
10  10    Q.  All right.
11  11    A.  I don't recall a specific agenda.
12  12    Q.  Were these weekly calls?
13  13    A.  To the best of my recollection, they
14  14  parallel the calls that we had in OPI.  So I believe
15  15  they -- my -- to the best of my recollection, they
16  16  were biweekly at the beginning of the quarter, for
17  17  the first couple of months, and then were weekly for
18  18  the final month.
19  19    Q.  Okay.  Do you know whether anyone took
20  20  minutes at -- at these -- for these calls?
21  21    A.  No, I don't.
22  22    Q.  Okay.
23  23    A.  Not that I recall.
24  24    Q.  And other than the -- the Americas forecast
25  25  package, were you provided with any other reports
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

73

1  00073:01 that were regularly discussed at these meeting -- or
2  02 these calls?
3  03    A. On the Thursday calls?
4  04    Q. Yeah.
5  05    A. Something other than the Americas?
6  06    Q. Right.
7  07    A. What would be an example?
8  08    Q. Big-deal reports.
9  09    A. There would as, -- part of the forecast
10  10 package would list big deals.
11  11    Q. Okay.
12  12    A. For the Americas.
13  13    MR. DE GHETALDI:  All right.  It's time to
14  14 change the tape, and it's probably as good a time as
15  15 any to have lunch and take a walk around.
16  16    THE WITNESS:  Okay.  Thank you.
17  17    THE VIDEOGRAPHER:  This marks the end of
18  18 Videotape Number 1 in Volume I in the deposition of
19  19 Edward J. Sanderson on March 9th, 2004.  We're going
20  20 off the record.  The time is 11:47.
21  21    (Whereupon, a lunch recess was taken.)
22  22
23  23    AFTERNOON PROCEEDINGS
24  24    THE VIDEOGRAPHER:  This marks the beginning
25  25 of Videotape Number 2 in Volume I in the deposition

74

1  00074:01 of Edward J. Sanderson, Jr. on March 9th, 2004.
2  02 We're going back on the record.  The time is 1:10.
3  03 BY MR. DE GHETALDI:
4  04    Q. I think we left off talking about the
5  05 Thursday forecast calls.  And now I'd like to move
6  06 on to the -- Monday executive committee calls.
7  07    A. Okay.
8  08    Q. Do you recall participating in those Monday
9  09 executive committee calls in fiscal year 2001?
10  10    A. Yes.
11  11    Q. Did you participate on a regular basis
12  12 during that --
13  13    A. Yes, I did.
14  14    Q. -- time?
15  15    And what was the schedule of those calls?
16  16 Were they every Monday, or did they follow the --
17  17 the other -- the biweekly in the first two months
18  18 and then weekly in the third month schedule?
19  19    A. To the best of my recollection is they
20  20 were -- they tended to be every Monday.  So they
21  21 didn't follow the forecasting pattern.  But it
22  22 wasn't religious, in the sense that it was every
23  23 Monday; but it was pretty routinely every Monday.
24  24    Q. Okay.  For -- for those executive committee
25  25 meetings, there were packets handed out for those

75

1  00075:01 meetings; am I right?
2  02    A. In what -- what kind of packets are you
3  03 referring to?
4  04    Q. Well, I'm asking -- I guess were there any
5  05 packets handed out for the executive committee
6  06 meetings?
7  07    A. What I routinely remember being handed out
8  08 was a forecast package for Oracle.  And periodically
9  09 there may be something else, relative to a
10  10 particular sales program or something of that
11  11 nature.
12  12    Q. Okay.  Were these Oracle forecast
13  13 packages -- or did these Oracle forecast packages
14  14 contain the upside figures?
15  15    A. As I recall, there was a column that said
16  16 "upside."
17  17    Q. All right.  Is it your recollection that
18  18 you got -- or that -- that one of these forecast
19  19 packages for Oracle was handed out every week at the
20  20 Monday executive committee meetings?
21  21    A. I can't say specifically that it was.  But
22  22 it was routinely the case.
23  23    Q. Okay.  For those weeks in the first two
24  24 months where there hadn't been a Thursday forecast
25  25 call the week before, because of the biweekly

76

1  00076:01 schedule of those calls in the first two months, was
2  02 there any difference in the -- the matters discussed
3  03 at the executive committee meeting; that is,
4  04 different from the weeks that had followed a -- a
5  05 forecast call, a Thursday forecast call?
6  06    Do you understand what I'm asking?
7  07    A. Yeah, I do.  And I'm thinking.  I don't
8  08 recall that they were different.  Maybe we spent
9  09 less time on the forecasts on those, quote, "off"
10  10 weeks, just because there's not -- had not been an
11  11 update.
12  12    Q. All right.
13  13    A. That's -- to my best -- my best
14  14 recollection --
15  15    Q. Okay.
16  16    A. -- that's what we did.
17  17    Q. Do you recall when the executive committee
18  18 meetings were started?
19  19    A. It was -- typically, as I remember, we
20  20 targeted around 11:00.  But they actually started
21  21 when Larry -- Larry typically started his mornings,
22  22 it is my understanding, not in the office, and he
23  23 would get a call from his assistant saying that he
24  24 was on his way in.  And so it could be 11:00.  It
25  25 could be sometimes a little bit earlier, sometimes a

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

77

```
1   00077:01  little bit later.
2   02    Q.  Okay.  About how long did those executive
3   03  committee meetings tend to last?
4   04    A.  My guess is they could range from one hour
5   05  to three hours, and would vary week to week.
6   06    Q.  Did you stick around for the whole meeting
7   07  there, or did you tend to drop off once OPI had been
8   08  discussed?
9   09    A.  No, I stayed.  When you're sitting with
10  10  Larry, he doesn't appreciate you getting up and
11  11  saying, "I have other things to do."
12  12    Q.  Okay.
13  13    A.  No, no, I stayed there the whole time.
14  14    Q.  All right.  What was typically discussed at
15  15  those executive management committee meetings?
16  16    A.  It would be -- the forecast was typically
17  17  discussed for some period of time.  I mean some part
18  18  of the meeting.  It would -- we would also talk --
19  19  sometimes we might talk about a particular deal.  We
20  20  would talk about a sales program that we were
21  21  launching as a company.  I mean, it would be those
22  22  kinds of things.  We might talk about a product --
23  23  product launch or a product, you know, schedule
24  24  around the development of a product, where it stood.
25  25  We might even get a demonstration of that product.
```

78

```
1   00078:01    Q.  Okay.  Did -- did you -- you talked about
2   02  forecasts, I assume, right?
3   03    A.  Yes.
4   04    Q.  All right.  And you said you talked
5   05  sometimes about particular deals.  Did you talk
6   06  about the status of these particular deals, or -- or
7   07  what?
8   08    A.  One that I recall specifically was at
9   09  Sun --
10  10    Q.  Okay.
11  11    A.  -- Microsystems.  And we were -- and it was
12  12  one -- it was one of my accounts.  And we were in --
13  13  in the selling cycle for a particular portion of
14  14  CRM, Customer Relationship Management, which was one
15  15  of the application modules.  And it was going to be
16  16  a important customer.  I mean, when you launch a new
17  17  product, it's nice to have a big name associated
18  18  with that as an early adopter.  And I remember, for
19  19  example, specifically talking about Sun in -- in one
20  20  of those meetings with Larry.
21  21    Q.  Did you -- were actual results a regular
22  22  topic of discussion at those meetings?
23  23    A.  Actual results?
24  24    Q.  Yeah.
25  25    A.  To my recollection, typically not.
```

79

```
1   00079:01    Q.  Okay.  So there were no reports of, say,
2   02  how -- how much had come in, in December?
3   03    MR. NADOLENCO:  Object to the form.
4   04  BY MR. DE GHETALDI:
5   05    Q.  Just as an example.
6   06    A.  Yeah, let me be clear on my answer, and
7   07  then answer.
8   08    When you say "actual results," I -- I,
9   09  probably falsely, assumed you meant like actual
10  10  results for a quarter.
11  11    Q.  Oh, no.  I meant cumulative numbers on
12  12  closed deals, as -- as a means of tracking how --
13  13  how you were doing as the quarter progressed in
14  14  terms of revenue.  We talked earlier today about how
15  15  your forecast package contained information about
16  16  closed deals, and I'm wondering whether that
17  17  information was -- that sort of information was
18  18  discussed at these executive committee meetings.
19  19    MR. NADOLENCO:  Object to the form.
20  20    THE WITNESS:  If -- if I saw a package, a
21  21  forecast package, I could look at it and answer your
22  22  question better.  My recollection is, in the
23  23  forecast package it did not have closed deals.  I --
24  24  I could be wrong, but I don't believe that it had
25  25  closed deals.
```

80

```
1   00080:01    It had, I believe -- what I do recall --
2   02  and it's been several years now, and I did not keep
3   03  those packages; they were collected during the
4   04  meeting -- that it had forecasts, for example, for
5   05  OPI, and it might have an upside number in there
6   06  that finance had put in.  But I don't recall that
7   07  any of those reports showed what was sold to date.
8   08  BY MR. DE GHETALDI:
9   09    Q.  Okay.  Well, assuming that the reports that
10  10  were handed out at those executive committee
11  11  meetings did not contain closed-deal figures, my
12  12  question is really whether that subject was
13  13  discussed, whether or not it was a part of the
14  14  report.
15  15    A.  I don't recall specific discussions.  But
16  16  it -- it wouldn't -- I can't say that there weren't
17  17  times that -- I mean, notionally it seems like we
18  18  might say, "Here's where we stand this quarter in
19  19  OPI" or NAS or -- or EMEA, which is Europe, Middle
20  20  East, Africa, to just kind of gauge how we're doing
21  21  on the quarter.  But I -- I don't -- I don't recall
22  22  that as a standard practice.  It may have come up in
23  23  an ad hoc way.
24  24    Q.  Hmm.  Okay.
25  25    MR. GOLDSTEIN:  Can I just interrupt for --
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

81

1   00081:01   MR. DE GHETALDI:  Yeah.

2   02       MR. GOLDSTEIN:  -- one minute?  We -- we

3   03   need to take a very short break to consult with

4   04   Mr. Sanderson about his flight back.

5   05       MR. DE GHETALDI:  Oh, sure.

6   06       MR. GOLDSTEIN:  This will just take two

7   07   minutes.

8   08       MR. DE GHETALDI:  No problem.  Let's go off

9   09   the record.

10   10       THE VIDEOGRAPHER:  We're going off the

11   11   record.  The time is 1:20.

12   12       (Discussion off the record.)

13   13       THE VIDEOGRAPHER:  We're back on the

14   14   record.  The time is 1:21.

15   15   BY MR. DE GHETALDI:

16   16       Q.  All right.  In -- in these executive

17   17   committee meetings, Monday meetings, did the subject

18   18   of trends come up; that is, trends in -- in forecast

19   19   numbers, trends in pipeline numbers?

20   20       A.  What do you -- how do you define "trend" --

21   21       Q.  Okay.

22   22       A.  -- so I can answer better?

23   23       Q.  That's a fair question.  Behavior -- for

24   24   example, behavior of pipeline over the quarter.  If

25   25   you were in week six of the quarter and the pipeline

82

1   00082:01   had been growing steadily or declining steadily, was

2   02   that something that was likely to be a subject of

3   03   discussion at these meetings?

4   04       MR. GOLDSTEIN:  Objection to form.

5   05       THE WITNESS:  It would be -- I don't recall

6   06   any time that that -- it was discussed; but it may

7   07   be just the time lapse.  It was not a normal course

8   08   of discussion.  The -- the focus during the forecast

9   09   discussions, typically led by Larry, or led by

10   10   Larry, was around revenue.  And -- I mean

11   11   specifically around revenue.  And that was a -- that

12   12   was the primary focus.  So, you know, the -- the

13   13   pipeline for a particular business, I can't say that

14   14   it was discussed, but my recollection is -- is if it

15   15   was, it was just done in -- in passing.

16   16   BY MR. DE GHETALDI:

17   17       Q.  Okay.  I -- I just want to make sure that

18   18   we're -- we're talking about the same thing, because

19   19   there -- there seems to be a disconnect, in my mind,

20   20   with -- with what you just said about Larry's

21   21   primary focus being revenue at these meetings and an

22   22   apparent lack of discussion, or at least regular

23   23   discussion, about actual results through the

24   24   quarter.  And -- and just --

25   25       MR. GOLDSTEIN:  Wait.  Wait.  I don't hear

83

1   00083:01   a question yet.  Let him ask you a question.

2   02   BY MR. GOLDSTEIN:

3   03       Q.  And I'm trying to -- I guess I -- I don't

4   04   understand what you mean when you say Larry's

5   05   primary focus at these meetings was revenue.  And if

6   06   you could explain that, that would be helpful.

7   07       A.  He was focused on the forecasted revenue

8   08   for the quarter.

9   09       Q.  Forecasted revenue?

10   10       A.  (Witness nods head.)

11   11       Q.  All right.  Were the discussions, then,

12   12   focused on what the numbers were for the forecast or

13   13   how the forecast was going to be met?

14   14       MR. GOLDSTEIN:  Objection to form.

15   15       THE WITNESS:  It was what the forecast was.

16   16   One thing, Dario, and to make sure I answer

17   17   your question --

18   18   BY MR. DE GHETALDI:

19   19       Q.  Right.

20   20       A.  -- it was what the forecast was.  If -- I

21   21   don't recall specifically, but as an example, if

22   22   there was a fair amount of judgment, for example, in

23   23   my forecast, Larry might say "What's your judgment"

24   24   and -- and want to talk a little bit about the basis

25   25   for -- for that number.  So -- I mean, that's the

84

1   00084:01   kind of discussion that would take place.

2   02       Q.  Okay.  So Mr. Ellison would see a forecast

3   03   number from an executive vice president like

4   04   yourself and ask, "Well, what part of that is

5   05   judgment, and what part of that is from the field,"

6   06   or --

7   07       A.  No, typically he would say -- he'd see

8   08   OPI --

9   09       Q.  Right.

10   10       A.  -- and he'd see a forecasted number.

11   11       Q.  Right.

12   12       A.  150 million.  And -- and he would -- and --

13   13   and next to that, if I recall, it would have like

14   14   what's the growth over the prior year.  And so he

15   15   may comment on that.  If it was low or high, I mean,

16   16   he -- that may spawn a question from him.  And --

17   17   I'm not sure I answered your question, but, I mean,

18   18   that's the kind of thing that we would discuss in

19   19   the meetings.

20   20       He typically wouldn't get in and say,

21   21   "Well, what's your judgment in this?"  He viewed, as

22   22   his executive vice presidents running our business,

23   23   this is our forecast, and he typically wasn't into

24   24   dissecting what the components of that were:  "How

25   25   much is sold" and "How much do you think is likely,"

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

85

1  00085:01 "How much do you think is management judgment?"
2     02 That was unusual, for him to ask those kinds of
3     03 questions.
4     04    Q.  Okay.  Did you typically discuss challenges
5     05 that -- that you might be facing in meeting a
6     06 forecast?
7     07    A.  We might be talking about challenge around
8     08 a particular customer, as an example.
9     09    Q.  Okay.  Any other examples that you can
10    10 think of?
11    11    A.  "Challenges."
12    12       I don't recall any.  Because your forecast
13    13 was your forecast.  And if it was challenging, you
14    14 know, Larry might -- I mean, I don't recall this
15    15 discussion, but he'd say, "Well, then what is your
16    16 real forecast?"  And, frankly, you didn't want to
17    17 have that discussion with Larry.  You gave him what
18    18 your forecast was, and that's what you -- you know,
19    19 that's what you felt, and -- and that's the one that
20    20 you presented.
21    21       So you may have in there saying, "I've got
22    22 General Electric in this forecast."  And within
23    23 Oracle, as I think many companies have found,
24    24 General Electric is a challenging company in closing
25    25 deals.  And so I might say, "It's included in the

86

1  00086:01 forecast, and here's where we are in negotiation of
2     02 that particular contract."  And I might let Larry
3     03 know that.  He was also personally interested in GE,
4     04 so we would talk about that; not, again, routinely.
5     05 I mean, that's just an example.
6     06    Q.  Okay.  You say that the packages were
7     07 collected at the end of the meeting?
8     08    A.  What I recall was we got a fairly complete
9     09 package, complete in the sense that it covered all
10    10 the different parts of Oracle business.  And after
11    11 the discussion on forecast, it would be -- I mean, I
12    12 typically put mine in the middle of the table, and
13    13 it would be -- and that's what I recall many people
14    14 did.  And they would get collected, potentially -- I
15    15 mean sometimes during the meeting, and -- by
16    16 Jennifer, or -- or I assume after, when the meeting
17    17 was over.
18    18    Q.  Do you know why these were collected?
19    19    A.  Yeah.  It was very sensitive information.
20    20 And we had a fairly large executive committee.  And
21    21 I think in the interest of the shareholders and the
22    22 interest of the company, that because of the
23    23 sensitivity of the information, it was collected.
24    24    Q.  What in particular about the information
25    25 was sensitive?

87

1  00087:01    A.  One, it was a total look of Oracle, for
2     02 Oracle.  You asked about support earlier.  For
3     03 example, support numbers were in there, all the
4     04 financial numbers; you know, all the financial
5     05 numbers from around the world.  And I recall that
6     06 there was a summary page or cover page that actually
7     07 showed what the earnings per share were, as an
8     08 example.  I mean, it was a cover page that showed
9     09 what revenue and profitability and earnings per
10    10 share was.  And, you know, that's very sensitive
11    11 information.  And that, to me, was some of the most
12    12 sensitive; plus it was a point in time.  Because, as
13    13 we talked earlier, sales is more dynamic than
14    14 consulting.  And so what the outlook was for one
15    15 week could be different than the next week.
16    16    Q.  Okay.  Was there anything else that -- that
17    17 was sensitive about this information?
18    18    MR. NADOLENCO:  Object to the form.
19    19    THE WITNESS:  I know I'm not supposed to
20    20 ask questions.  Did -- doesn't it seem like -- I
21    21 mean, if you -- if you've got all the financial
22    22 information about a $10 billion company and it's the
23    23 forecast at that point in time, for that quarter,
24    24 that is very sensitive information.
25    25 BY MR. DE GHETALDI:

88

1  00088:01    Q.  Okay.
2     02    A.  There -- there's nothing to hide; I mean,
3     03 from -- from an executive committee standpoint.  I
4     04 mean, it was all financial data.
5     05    Q.  All right.  Did these executive committee
6     06 meetings include discussions of macroeconomic
7     07 issues?
8     08    MR. NADOLENCO:  Object to the form.
9     09    THE WITNESS:  Typically not.  But -- you
10    10 know, there -- I -- I would imagine, during the --
11    11 the dotcom falloff, as an example, that there -- and
12    12 we had a discussion -- I mean some level of
13    13 discussion at the board.  I don't recall it being an
14    14 organized discussion or, quote, an -- an agenda
15    15 item, anything like that.  It was -- but, I mean,
16    16 that kind of, you know, major macroeconomic event
17    17 you might discuss a little bit.
18    18 BY MR. DE GHETALDI:
19    19    Q.  Were dotcom companies a major element of
20    20 OPI's customer base?
21    21    A.  No.
22    22    Q.  What do you recall the macroeconomic
23    23 climate was in the United States in Oracle's 2001
24    24 fiscal year?
25    25    MR. NADOLENCO:  Object.

89

```
 1  00089:01    MR. GOLDSTEIN:  Objection to form.
 2     02      THE WITNESS:  I don't recall specifically
 3     03  when, but clearly the economic environment was
 4     04  changing.  I think some of the -- I mean dotcoms
 5     05  were starting to stumble, that kind of thing.
 6     06  That's an example.  I mean, I don't recall others
 7     07  specifically, but -- I mean, it was a -- I do recall
 8     08  it was becoming more challenging for -- on a total
 9     09  economy basis for companies in the technology
10     10  business and companies outside the technology
11     11  business.
12     12  BY MR. DE GHETALDI:
13     13     Q.  Okay.  Did that include Oracle?
14     14     A.  I can't speak for Oracle.  I can only speak
15     15  for OPI.  And in OPI, as I -- to the best of my
16     16  recollection, during those first three quarters
17     17  we -- we had very strong pipe -- pipeline, including
18     18  in -- and -- in Q3 of FY '01, very strong.
19     19     Q.  Okay.  During your time at Oracle -- I'm
20     20  talking about your entire time there -- had you
21     21  ever -- or -- or had there ever been an economic
22     22  downturn?
23     23     MR. GOLDSTEIN:  Objection to form.
24     24  BY MR. DE GHETALDI:
25     25     Q.  Macroeconomic downturn?
```

91

```
 1  00091:01  BY MR. DE GHETALDI:
 2     02     Q.  Sure.
 3     03     A.  And the fact base was that in OPI, as an
 4     04  example, I had a revenue number.  As I recall, it
 5     05  showed significant growth over the prior year,
 6     06  and -- both in forecast and in what was delivered,
 7     07  as well as I had a very strong pipeline, to the best
 8     08  of my recollection.  So, you know, you have to think
 9     09  about the macroeconomic environment, but in the end
10     10  it's -- it's about the deals and the probability and
11     11  what's worst case, most likely, and best case.
12     12     Q.  Okay.  Let me get back to my -- my
13     13  question.  I -- and the question that some people
14     14  didn't consider to be a question; but I'll try and
15     15  actually make it into one.
16     16     Did you have any -- by the third quarter of
17     17  2001, did you have any experience, within any part
18     18  of Oracle, where there was a -- where the U.S.
19     19  economy was in a down cycle?
20     20     MR. GOLDSTEIN:  Objection to form.
21     21     THE WITNESS:  I -- I know we were start --
22     22  as I recall, we were starting to feel the impact on
23     23  the dotcom business, which would -- would have been
24     24  George's -- George Roberts' business.
25     25  BY MR. DE GHETALDI:
```

90

```
 1  00090:01    MR. NADOLENCO:  Objection to form.
 2     02      THE WITNESS:  I -- I don't know.  And, you
 3     03  know, clearly, you can get economic evidence of that
 4     04  somewhere else.
 5     05  BY MR. DE GHETALDI:
 6     06     Q.  Well, I -- I'm not looking for economic
 7     07  evidence from you.  What I'm wondering about is
 8     08  whether you had experience at Oracle to compare to
 9     09  when you were in the third quarter of fiscal year
10     10  2001; that is, experience at Oracle in an economy
11     11  that was going downhill.
12     12     MR. GOLDSTEIN:  Objection to form.
13     13     MR. NADOLENCO:  Assuming that there's even
14     14  a question in there.
15     15     MR. DE GHETALDI:  Well, there is.  I'll put
16     16  a question mark at the end.
17     17     MR. GOLDSTEIN:  His voice went up a little
18     18  bit.
19     19     THE WITNESS:  I can't speak for all of
20     20  Oracle at that time.  I mean, I was -- I -- again,
21     21  at OPI I remember there was concern about the
22     22  economic environment.  I mean, within the company
23     23  there was concern about the economic environment.
24     24  But it translates to fact-based numbers about your
25     25  business.
```

92

```
 1  00092:01    Q.  Okay.  But I'm talking about before that.
 2     02  I'm -- I'm not --
 3     03     A.  Before the third quarter '01?
 4     04     Q.  Yeah.  I'm not making myself clear.  And
 5     05  this is what I tried to explain, and it didn't come
 6     06  out as a question, and there was some concern about
 7     07  that.  But I'll try it again anyway.
 8     08     A.  Okay.
 9     09     Q.  What I'm -- what I'm trying to get a sense
10     10  of is, you know, whether you had been at Oracle
11     11  during a complete economic cycle; that is, where the
12     12  economy had dipped and then come back up again or
13     13  had -- had gone up and then dipped.  And -- and in
14     14  particular, I'm wondering whether -- or what you had
15     15  in your experience to compare the effect of the
16     16  downturning economy on OPI in Q3 '01.
17     17     MR. GOLDSTEIN:  Objection to form.
18     18     THE WITNESS:  Clearly, in Q4 '01 and Q1 of
19     19  FY '02 --
20     20  BY MR. DE GHETALDI:
21     21     Q.  Well, later on, right?
22     22     A.  Yeah.  We -- we had experience -- I mean,
23     23  we started to see that even more so.  In the third
24     24  quarter it is my recollection that, you know, we --
25     25  there was this macroeconomic change.  But as far as
```

93

```
1   00093:01 having previous experience to compare it to, my
2      02 previous experience was my pipe was -- pipeline was
3      03 X during Q3 FY '01, for example, and I'm -- to the
4      04 best of my recollection, it was a substantial growth
5      05 over the pipe same quarter the previous year.
6      06    Q. Okay.
7      07    A. So while there was this economic
8      08 environment issue out there, I was actually still
9      09 experiencing good pipeline growth in the -- in the
10     10 license business for OPI.
11     11    Q. Let me -- let me try again.  You started at
12     12 Oracle in July of '95.
13     13    A. Correct.
14     14    Q. Right.  Between July of '95 and February of
15     15 2001, do you recall there being a -- an economic
16     16 downturn at any point in the --
17     17       MR. GOLDSTEIN:  Objection to form.
18     18 BY MR. DE GHETALDI:
19     19    Q. -- in the American economy?
20     20    A. Sometime in FY '01, and I don't recall
21     21 specifically, that -- you knew that there -- I mean,
22     22 you got a sense that there was an economic downturn.
23     23 You were starting to hear about dotcoms, as an
24     24 example, going belly up or not getting the -- I
25     25 mean, the same thing:  not getting the funding that
```

94

```
1   00094:01 they were after.  I don't remember a specific point
2      02 in time.  I -- I know you've asked this several
3      03 times.
4      04    Q. Yeah.
5      05    A. I'm not trying to avoid the question.  I'm
6      06 not sure I know the answer --
7      07    Q. Yeah.
8      08    A. -- to the question you're asking.
9      09    Q. I -- yeah, and I appreciate that.  And I --
10     10 I know that you're trying.  And -- and, believe me,
11     11 I'm trying to ask a clear question.  I -- and -- and
12     12 I'm actually focusing on the period between July '95
13     13 and, let's say, January 2000.  Do you -- I'm trying
14     14 to push you back farther in time --
15     15    A. Yeah.
16     16    Q. -- to see if you recall there being a
17     17 downturn in the American economy during -- or was it
18     18 all boom?
19     19       MR. GOLDSTEIN:  Objection to form.
20     20       THE WITNESS:  I don't -- I don't recall --
21     21 BY MR. DE GHETALDI:
22     22    Q. Okay.
23     23    A. -- any.  But, also, I -- I don't mean --
24     24 I'm -- not to be flip, the way -- the way it may
25     25 come across, I'm not a macroeconomics person.  When
```

95

```
1   00095:01 I'm managing a business at Oracle, you're focusing
2      02 on your customer base and those deals and that kind
3      03 of thing; I mean, facts that are relevant to that.
4      04 I -- I'm not a student of the -- of the macro
5      05 economy.  And it, you know, is interesting at a
6      06 conceptual level, but I was running a business, and
7      07 I wasn't being -- I mean, I was focused on my deals,
8      08 not concept.
9      09    Q. Okay.  In -- within the first three
10     10 quarters of fiscal year 2001, did you notice any
11     11 changes in OPI's deal cycle?
12     12       MR. GOLDSTEIN:  Objection to form.
13     13       THE WITNESS:  What does "deal cycle" mean?
14     14 BY MR. DE GHETALDI:
15     15    Q. Well, from the time -- the time -- the way
16     16 I understand it is, the time between when a deal is
17     17 put into OSO as a potential deal or as a deal in the
18     18 pipeline and the -- time -- and the date that it
19     19 closes, that --
20     20    A. To the length of the -- the sales cycle
21     21 with --
22     22    Q. Right.
23     23    A. -- with customers?
24     24    Q. Right.
25     25    A. I don't think I noticed -- I don't recall
```

96

```
1   00096:01 any until the very end of Q3 FY '01.  And there were
2      02 several deals that I had that didn't close.  But
3      03 I -- I can't point to it was an economic issue, a
4      04 macroeconomic issue, that caused it.  There were --
5      05 there were several deals that I had that I, quite
6      06 frankly, thought all the way up until the last day
7      07 were going to happen, and that didn't.
8      08    Q. Okay.
9      09    A. All the way up to the last day of that
10     10 quarter, Q3 FY '01.
11     11    Q. Right.  Did you have a sense in Q3 '01 that
12     12 you had less visibility than you had in the previous
13     13 quarters?
14     14       MR. GOLDSTEIN:  Objection to form.
15     15       THE WITNESS:  Less visibility to?
16     16 BY MR. DE GHETALDI:
17     17    Q. In terms of your ability to forecast.
18     18    A. No, you know, I -- we had the same
19     19 organization, the same systems, the same process.
20     20 And -- I mean, I had -- I had -- I don't recall
21     21 feeling like I was lacking in information or
22     22 something was less clear.
23     23    Q. Okay.  Do you recall seeing or noticing
24     24 changes in the types of products that were included
25     25 in -- in deals in Q3 '01?  And -- and by "types of
```

97

1  00097:01 products," I mean whether you noticed a different
2  02 mix between technology and applications.
3  03     A. I -- I don't recall anything specifically,
4  04 other than when we did the Covisint deal in Q3 FY
5  05 '01, which was a very large deal, it was
6  06 significantly weighted to technology, in a -- so,
7  07 potentially because of that, it -- it may have
8  08 overall indicated we had greater growth in
9  09 technology than applications that quarter.  But
10 10 other than that, I don't know of anything that --
11 11 that showed that.
12 12     Q. I've got to say you asked for it.
13 13 Hopefully this won't be too painful.
14 14     MR. GOLDSTEIN: It will be painful to
15 15 someone who has to lift the transcript.
16 16     MR. DE GHETALDI:  Yes.  Well, we'll just do
17 17 it one by one.
18 18     MR. GOLDSTEIN:  Oh.  Oh, I thought that was
19 19 all one document.
20 20 BY MR. DE GHETALDI:
21 21     Q. I'm going to hand you a document that was
22 22 previously marked Exhibit 60.  Sorry we don't have
23 23 the official copy, but --
24 24     A. I'm showing the spelling of DeCesare.
25 25     Q. No way.

98

1  00098:01     MR. GOLDSTEIN:  Do you want him to review
2  02 the whole thing, Dario?
3  03     MR. DE GHETALDI:  No, I -- I would like him
4  04 to just flip through it, to see if he -- just to see
5  05 if he recognizes it.
6  06     THE WITNESS:  I don't remember this one
7  07 specifically.  But it's the -- it was a package that
8  08 we had for -- reporting package we had for OPI.
9  09 BY MR. DE GHETALDI:
10 10     Q. Okay.
11 11     MR. GOLDSTEIN:  There's an extra one.
12 12     MR. DE GHETALDI:  Oh, thanks.
13 13     Q. Was this -- or how was this reporting
14 14 package used?
15 15     MR. GOLDSTEIN:  Objection to form.
16 16 BY MR. DE GHETALDI:
17 17     Q. Or this form of reporting package used, if
18 18 you don't remember the particular one.
19 19     A. Give me just a minute, if you don't mind.
20 20     Q. Sure.
21 21     A. Let me just look through here.
22 22     How was it used?  We used it in my biweekly
23 23 or weekly forecasts that we had for OPI.
24 24     Q. All right.  Does -- does it look -- does
25 25 this one look complete to you?  And it's not a trick

99

1  00099:01 question.  I ask you because we have a number of
2  02 similar-looking packages that are not exactly the
3  03 same in terms of content.
4  04     A. One thing I see, that I typically used,
5  05 that I don't see in here, is the worst case, most
6  06 likely, and best case report that I had, which was
7  07 an Excel spreadsheet --
8  08     Q. Okay.
9  09     A. -- that was prepared for me by the finance
10 10 people.
11 11     Q. And if you can turn to the third page,
12 12 with -- with the Bates number 36908.
13 13     A. Yes.
14 14     MR. GOLDSTEIN:  Yeah, you're there.  You're
15 15 there.
16 16 BY MR. DE GHETALDI:
17 17     Q. Right.  Oh, you actually probably have my
18 18 copy, the one that's highlighted.
19 19     A. Yeah.  Do you want to switch?
20 20     Q. No, that's fine, because it just highlights
21 21 what I -- I wanted you to look at, which is that
22 22 column on the left, first column on the left, with
23 23 the title "Closed."
24 24     A. Yes.
25 25     Q. Can you tell me what that column

100

1  00100:01 represents?
2  02     A. I don't recall today.  I don't know if
3  03 that's number of deals or revenue.  It -- it says
4  04 "Total License Revenue" way up top, and it looks like it
5  05 goes over to there.  So maybe that was revenue.
6  06     Q. And if it's revenue, would that be millions
7  07 of dollars?
8  08     A. Yeah.
9  09     Q. Okay.
10 10     A. Yeah.
11 11     Q. The -- in the -- in the center of that
12 12 page, there -- there's something called a -- or
13 13 there's a column with the title "30 Percent Revenue
14 14 Target."  Do you see that?
15 15     A. "30 Percent Revenue Target"?
16 16     Q. Right in the center.
17 17     A. Yeah, I do.  Yeah, I do.
18 18     Q. Do you know what that represents?
19 19     MR. GOLDSTEIN:  Objection to form.
20 20     THE WITNESS:  I don't recall specifically.
21 21 I -- I -- I could guess, but I -- I don't know what
22 22 it is.
23 23 BY MR. DE GHETALDI:
24 24     Q. All right.  I don't want you to guess.
25 25 Now, if you turn to the next page, which is 4 of 16,

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

101

```
1   00101:01  with the Bates number 36909 --
2   02     A. Okay.
3   03     Q. -- it -- it looks like this is the -- or a
4   04  forecast summary for the subsequent quarter, Q4 '01.
5   05     A. Yes, it is.
6   06     Q. We -- when we were talking earlier, you
7   07  didn't remember that -- that -- I think that -- that
8   08  this was done.
9   09     A. I stand corrected.
10  10     Q. Yeah. Well, no, I'm wondering about the
11  11  process, how you would -- or whether the process for
12  12  forecasting the subsequent quarter was any different
13  13  than -- than the process for forecasting the -- the
14  14  current quarter.
15  15     A. Yes, it was.
16  16     Q. And how; how so?
17  17     A. The -- to my best recollection, we had a
18  18  lot of detail around the current quarter; again, the
19  19  sheets that I've mentioned several times now, the
20  20  worst case, mostly likely, best case. And I had that
21  21  for the current quarter. I did not have that
22  22  information or ask for that information for the
23  23  subsequent quarter.
24  24     Q. All right. So there -- there would be --
25  25  is one of the effects, then, less management
```

102

```
1   00102:01  judgment in these numbers?
2   02     A. In the Q4 numbers --
3   03     Q. Yes.
4   04     A. -- or the Q3 numbers?
5   05     Q. In the Q4 numbers.
6   06     A. Less -- no, there would probably be more
7   07  management judgment.
8   08     Q. Okay. Was it -- what was the source of the
9   09  management judgment in -- in this case for the Q4
10  10  forecast?
11  11     MR. GOLDSTEIN: Objection to form.
12  12     THE WITNESS: It was probably a decision --
13  13  I don't recall specifically, but it was probably
14  14  some joint decision between me working with -- with
15  15  Jim English and putting that in.
16  16  BY MR. DE GHETALDI:
17  17     Q. All right.
18  18     A. Correction. As I think about it, my -- my
19  19  bet is a lot of that judgment was what was submitted
20  20  from the field, and that was an aggregate of theirs,
21  21  and then I may have adjusted it slightly up or down.
22  22  But my -- I would say the primary source for that
23  23  judgment would have come from the field AVPs.
24  24     Q. All right. And those would be the persons
25  25  named on the left-hand side of the page, correct?
```

103

```
1   00103:01     A. That's -- that's correct.
2   02     Q. Okay. Then if you could turn to page 7 of
3   03  16, which is -- which has the Bates number 36912.
4   04     A. Uh-huh.
5   05     Q. Can you tell me how you used the
6   06  information on this page.
7   07     MR. GOLDSTEIN: Objection to form.
8   08     THE WITNESS: I had asked that we start to
9   09  look -- at one point I had asked that we start to
10  10  look at the quarter on a monthly basis, and with the
11  11  intent to -- the objective to try to smooth out the
12  12  revenue; in other words, get less of a hockey stick.
13  13  I'd been able to do it to some extent in Latin
14  14  America, and -- and I was attempting to do it here,
15  15  and -- I think, so I was probably the source of this
16  16  format, or using this format so we could see what
17  17  the deals were.
18  18     There is -- the way that I would use it
19  19  was -- as you might imagine, it would tell me what
20  20  the total dollars were, sold, for example, in
21  21  December, which was 2 million at this point. And
22  22  since it's dated December 17th, the fields are
23  23  blank, obviously, for January and February. And
24  24  then it showed me a comparison that we had sold
25  25  around $18 million in the same month in the prior
```

104

```
1   00104:01  year -- for the same quarter of the prior year.
2   02     So I would use this as a gauge of how we're
3   03  doing, but -- one piece; and the second thing was
4   04  trying to move more of the revenue out of the last
5   05  month of the -- of the quarter, more into the first
6   06  couple of months of the quarter.
7   07  BY MR. DE GHETALDI:
8   08     Q. And the --
9   09     A. And to provide -- use this as a tool to
10  10  help provide focus on that.
11  11     Q. Okay. What -- what was the purpose behind
12  12  trying to move revenue out of the last month of the
13  13  quarter into one of the two earlier months?
14  14     A. To -- I smile because I think of things to
15  15  say that probably were inappropriate. And to help
16  16  the sanity of the process is what's going through my
17  17  head. So I'm trying to think of something more
18  18  eloquent.
19  19     MR. GOLDSTEIN: That's eloquent.
20  20     THE WITNESS: Just to help, you know, not
21  21  be sitting there in the last month of the quarter
22  22  and hope that you're going to deliver the number.
23  23  The more we put in the front -- I mean during the
24  24  quarter -- you know, during the entire quarter, the
25  25  more comfort you'd have going into the last month
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

105

1   00105:01  that you're going to deliver the number you're
2   02  forecasting.
3   03  BY MR. DE GHETALDI:
4   04      Q.  Okay.  Now, if you could turn to page -- or
5   05  the section that begins at page 9 of 16.  And it
6   06  looks like it continues to the end.
7   07      A.  Sure.
8   08      Q.  And that has the Bates number 36914.
9   09      A.  Uh-huh.
10  10      Q.  Can you tell me what -- what this part of
11  11  the package represents?
12  12      A.  It's the -- I believe it's the reports that
13  13  are presented -- printed out of OSO.  And this was
14  14  showing -- it -- depending on -- it depends on the
15  15  criteria that were used for the -- for the report,
16  16  in -- in the sense that it's like a report writer,
17  17  and so you can specify date -- you know, so "Let me
18  18  see all dates that are going to happen during this
19  19  quarter," for example.  And I'd have to study this
20  20  report to see if it focuses just on Q3, or it might
21  21  look at all deals that are out there.  Scanning the
22  22  list here, the dates all fall within Q3, so that's
23  23  what my guess was:  that was the parameter that was
24  24  put in.
25  25          I would use it to help get a sense -- if I

106

1   00106:01  was talking about a particular deal, I could -- it
2   02  would let me see the distribution of the -- the
3   03  revenue across the different products, as you see:
4   04  "CRM," "Database," "ERP," and "Tools."  It helped me
5   05  see that.  I could see -- I mean, I might focus on
6   06  "Win Probability" and "Close Date."  I would refer
7   07  to this report on an ad hoc basis.  Because, again,
8   08  I used the now often referred to report of my worst
9   09  case, most likely, and best case to -- as a
10  10  management tool, which that report that I'm
11  11  referring to was based on what was in here.
12  12      Q.  All right.
13  13      A.  It was just a nice way to synthesize it.
14  14      Q.  Can you help me understand the relationship
15  15  between the "Win Probability" column and the "Total
16  16  Selected" column?  And in particular, I -- I see the
17  17  "Win Probability" percentage going anywhere from
18  18  zero to 100.
19  19      A.  Right.
20  20      Q.  And is there -- yet in -- I guess it looks
21  21  like "BF Goodrich Aircraft Wheels & Brake," about
22  22  six or seven deals down from the top --
23  23      A.  Yes.
24  24      Q.  -- there --
25  25      A.  Yes.

107

1   00107:01      Q.  -- has a win probability of zero --
2   02      A.  Right.
3   03      Q.  -- but it looks like that deal shows up in
4   04  the "Total Selected."  So can you tell me what those
5   05  terms mean and -- and how they relate to each other?
6   06      MR. GOLDSTEIN:  Objection to form.
7   07      THE WITNESS:  I'm -- I'm not sure they
8   08  relate to each other.  "Win Probability" was the
9   09  assessment of the account manager and the RM with
10  10  input from the AVP on what the win probability was.
11  11  And the "Total Selected" column is simply a -- as I
12  12  understand it and recall, and it seems here, is that
13  13  it's simply a total of all the products added
14  14  across.
15  15  BY MR. DE GHETALDI:
16  16      Q.  Does -- does this section of the package
17  17  represent OPI's pipeline or a portion of OPI's
18  18  pipeline?
19  19      MR. GOLDSTEIN:  Objection to form.
20  20      THE WITNESS:  I -- I can't -- I mean, I'd
21  21  have to go back for that particular period and see.
22  22  My understanding was it represented the pipeline.
23  23  BY MR. DE GHETALDI:
24  24      Q.  Okay.  So you -- do -- you recall, then,
25  25  receiving reports that listed all deals in OPI's

108

1   00108:01  pipeline?
2   02      A.  Yes.
3   03      Q.  Okay.  And as best you can recall, they
4   04  looked something like --
5   05      A.  Yeah.
6   06      Q.  -- these pages here in Exhibit 60?
7   07      A.  That's correct.
8   08      Q.  Okay.  And I notice that the "Forecast"
9   09  column is blank.  I think that there's some that
10  10  we'll look at later that actually have that filled
11  11  in, and maybe that will help explain some things.
12  12  All right.
13  13      A.  Was there a question?
14  14      Q.  No, no.  No, I'm just -- just telling you.
15  15  I'm not trying to hide something from you.  But I'm
16  16  just -- okay.  This would be, then, the next exhibit
17  17  in --
18  18      A.  Should I hold onto that?
19  19      Q.  Yeah, hold on, just in case we have to go
20  20  back to it.
21  21      (Deposition Exhibit 151 was marked for
22  22  identification.)
23  23      THE WITNESS:  Did I need an exhibit on this
24  24  one?
25  25      MR. GOLDSTEIN:  No.

109

```
1   00109:01 BY MR. DE GHETALDI:
2   02   Q. No.
3   03   A. Okay.
4   04   Q. Please look at the document that's been
5   05 marked as Exhibit 151. And let me know if you
6   06 recognize this document.
7   07   A. I don't recognize this document
8   08 specifically for this date of January 6, 2001. But,
9   09 again, it's the standard document that -- or very
10  10 similar to the standard document that we used in
11  11 OPI.
12  12      MR. DE GHETALDI: Okay. Can we go off the
13  13 record for one second?
14  14      THE VIDEOGRAPHER: We're going off the
15  15 record. The time is 2:05.
16  16      (Recess taken.)
17  17      THE VIDEOGRAPHER: We're back on the
18  18 record. The time is 2:26.
19  19      MR. DE GHETALDI: Okay. Paul, do you want
20  20 to --
21  21      MR. GOLDSTEIN: Yeah. We -- just
22  22 confirming what we said off the record, Dario has
23  23 pointed out that there's a page in Exhibit 151
24  24 that -- page 1 -- 012640 -- at the bottom has a box
25  25 called "Legal Accounts Receivable Summary." And
```

110

```
1   00110:01 Dario tells me, and I'm sure he's right, that we had
2   02 earlier produced a version of this same document
3   03 with that material redacted out.
4   04      MR. DE GHETALDI: Later produced.
5   05      MR. GOLDSTEIN: Oh, later produced redacted
6   06 out. I see.
7   07      MR. DE GHETALDI: Right.
8   08      MR. GOLDSTEIN: I'm sorry. But this was an
9   09 earlier -- the exhibit reflects an earlier
10  10 production that we made which -- which included
11  11 descriptions of certain legal matters, that was
12  12 erroneously produced, without the redaction. And so
13  13 we would like to go ahead and -- and re-produce this
14  14 document in redacted form. You're welcome to use it
15  15 as an exhibit today, of course.
16  16      MR. DE GHETALDI: Okay. And we will
17  17 have -- we'll ask the court reporter to redact the
18  18 portion on the page that's Bates numbered 12640, the
19  19 box at the bottom of the page.
20  20      MR. GOLDSTEIN: Right.
21  21      MR. DE GHETALDI: And if it's okay with you
22  22 guys, if you could just give us a new version with
23  23 the same Bates number --
24  24      MR. GOLDSTEIN: We will do that.
25  25      MR. DE GHETALDI: -- but with the page --
```

111

```
1   00111:01 the single page redacted, we'll just destroy what --
2   02 those single pages and -- and substitute that.
3   03      MR. GOLDSTEIN: That's fine. We'll --
4   04      MR. DE GHETALDI: Okay.
5   05      MR. GOLDSTEIN: We'll do that. And thank
6   06 you for bringing that to our attention.
7   07      MR. DE GHETALDI: Yeah, you're welcome. I
8   08 know how that happens sometimes.
9   09      I'm sorry. Can we go off the record,
10  10 because my -- I'm not getting the feed, and that's
11  11 why it was bonking at me.
12  12      THE VIDEOGRAPHER: We're going off the
13  13 record. The time is 2:28.
14  14      (Discussion off the record.)
15  15      THE VIDEOGRAPHER: We're back on the
16  16 record. The time is 2:31.
17  17 BY MR. DE GHETALDI:
18  18   Q. All right. Now, back to Exhibit 151. And
19  19 before we had the break -- or have you had a chance
20  20 to look at Exhibit 151 by -- by now?
21  21   A. I've glanced at it briefly. I wasn't sure
22  22 what you wanted me to look at specifically, so I
23  23 scanned through it.
24  24   Q. Okay. Do you recognize this document,
25  25 Exhibit 151?
```

112

```
1   00112:01   A. Again, it's a document that the -- the
2   02 kind of document we used frequently. I don't
3   03 remember a January 6, 2001 document specifically.
4   04   Q. All right. This document has additional
5   05 parts; that is, more parts than Exhibit 60. Do
6   06 you -- and let's see if we can look at a couple of
7   07 them. In particular -- oh, gee. It looks like --
8   08 I'm not sure where Bates number 12632 came from. It
9   09 looks like it says 25 of 28 and -- up at the top
10  10 right-hand corner. And there are three pages at the
11  11 end in the same format.
12  12      Without trying to sort out, you know, if a
13  13 particular page belongs with the report or not, can
14  14 you tell me whether you recognize the format of --
15  15 of those pages?
16  16   A. Yes, I do.
17  17   Q. Can you tell -- and are -- are these the --
18  18 the worst and best case and most likely categories
19  19 that we were talking about earlier today?
20  20   A. Yes, it is.
21  21   Q. And --
22  22   A. Yes, they are.
23  23   Q. And I see that there's really no column
24  24 titled "Most Likely," but there is one titled
25  25 "Forecast." Are they equivalent in your mind?
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

113

```
1   00113:01  A. Yes, they are.
2   02    Q. All right. And just so that I understand
3   03  the format, am I correct in believing that every
4   04  deal that appears in the worst case column also
5   05  appears -- also should appear in the forecast and
6   06  best case columns?
7   07    A. Generally, yes. If I recall correctly,
8   08  we -- you may see a change in the value of the deal
9   09  in forecast and best case, because you may --
10  10    Q. Well --
11  11    A. -- have a deal that we're sure we're going
12  12  to get a million; we may get -- we're forecasting
13  13  1.5, but we may -- best case is two. So you might
14  14  see a variance like that.
15  15    Q. All right. All right. Now if I could ask
16  16  you to the page that is Bates numbered 16237.
17  17    A. 16 --
18  18      MR. GOLDSTEIN: 126 you mean?
19  19  BY MR. DE GHETALDI:
20  20    Q. I mean 12637. A little afternoon dyslexia.
21  21  Thank you. And this is the same format as one of
22  22  the pages that we looked at in Exhibit 60, but now
23  23  we're a couple weeks farther into the quarter. And
24  24  am I correct in reading this page as showing that as
25  25  of January 6, 2001 there were $64 million in total
```

114

```
1   00114:01  license closed deals for OPI?
2   02    A. Correct.
3   03    Q. Okay. And I'm assuming that a big chunk of
4   04  that is the Covisint case. Is that right?
5   05    A. That's correct.
6   06    Q. One of the things that you were not certain
7   07  of earlier in the day was whether or not the
8   08  pipeline contained closed deals. Is there some way
9   09  to -- to check between Exhibit 60 and Exhibit 151 to
10  10  settle that question?
11  11    A. Well, if I look at 151, Exhibit 151, and I
12  12  look on page 12637 --
13  13    Q. Yes.
14  14    A. -- and then I also look on 12641, and if
15  15  you see here Covisint -- it's about 60 percent of
16  16  the way down -- it's "Central." "Won" is the
17  17  status. Fikany, John Fikany, "JFIKANY."
18  18  "Covisint." Description. And if you follow it over
19  19  to the right, where it says "Forecast," it's
20  20  55.8 million. And you go back to the earlier page
21  21  that I mentioned, 12637, and you see 55 million is
22  22  there. So to answer your question, based on this,
23  23  it looks like the pipeline included closed deals as
24  24  well.
25  25    Q. Okay. Now if you'll turn, please, to pages
```

115

```
1   00115:01  with the Bates numbers 12638 and 12639. This is a
2   02  new sort of format, or at least a format that does
3   03  not appear in Exhibit 60. And can you tell me what
4   04  the purpose of this -- of these two pages of the
5   05  report --
6   06    A. Well, as I mentioned --
7   07    Q. -- is?
8   08    A. -- earlier, what I did is I had
9   09  responsibility for OPI, and as you think more about
10  10  the business and ways to make it better, one of the
11  11  things I did was introduce trying to track revenue
12  12  earlier in the quarter, than waiting until the last
13  13  month and oftentimes the last couple of weeks of the
14  14  quarter. And this is similar to the report that we
15  15  had. Is this Exhibit 60, the first one that you
16  16  asked me in the case?
17  17    Q. Yes. Yes.
18  18    A. I think you'll see that on page 36912 of
19  19  Exhibit 60, where it breaks out revenue by month,
20  20  that this is a enhanced version, or we've expanded
21  21  it to where we break it down by not only just the
22  22  raw number for each area but down to the regional
23  23  manager level and then the particular customer and
24  24  deal and show that information.
25  25    Q. Okay. And if I'm understanding it
```

116

```
1   00116:01  correctly, on page 12639 it -- it looks like the
2   02  forecast, at least as of early January 2001, was to
3   03  get about $65 million in December, $50 million in
4   04  January, and $20.6 million in February in license
5   05  revenue. Is that right?
6   06    A. Two comments, in answering your question.
7   07  First is, I believe December actually shows what was
8   08  sold. So it wasn't what was forecast; it was what
9   09  was sold.
10  10    Q. Okay.
11  11    A. Since the date of this document is January
12  12  6.
13  13      And secondly was, in my effort to implement
14  14  this new practice, because it was new to OPI, was to
15  15  allocate -- I asked the AVPs to allocate the -- the
16  16  remaining revenue for the quarter between January
17  17  and February. And this was their guess at that
18  18  point. But, again, it was a brand-new practice we
19  19  put in place. It was not something that had become
20  20  routine or institutionalized.
21  21    Q. Okay. All right. The next one I'm going
22  22  to hand you is a document that's already been marked
23  23  as Exhibit 61.
24  24    A. Okay.
25  25    Q. All right. Do you recognize Exhibit 61?
```

117

00117:01   A.  I -- it is consistent with a format that
02   continued to evolve for my forecasting.  And I
03   don't, again, remember this specific one, but I'm
04   sure that it -- for this date, but it's very
05   consistent with the kind of forecasting packages we
06   had --
07      Q.  Okay.
08      A.  -- in OPI.
09      Q.  It -- it's -- it has an email on the front
10   of it.  And it looks like it -- the email notes that
11   there are three attachments in PDF form.  One is an
12   OPI license and one is for consulting, and one is
13   for Latin America.  You see that, on the second page
14   there?
15      A.  Yes, I do.
16      Q.  Also, the -- the date is Wednesday, January
17   17th.  And it says that it's a script for -- in the
18   text on the first page, it says it's a "script for
19   tomorrow's forecast call."  Did -- did you get an
20   updated package for use with the Thursday forecast
21   calls that was different from the package that you
22   got for the Tuesday or Wednesday OPI call?
23      A.  I don't recall specifically.  Is there a
24   specific area that you're asking about?
25      Q.  Well, it's just that the format of this

118

00118:01   report is so different than Exhibits 151 and --
02      A.  And 60.
03      Q.  -- and 60.  And it -- it appears that it --
04   it's being given to you for use with the Thursday
05   forecast call.
06      A.  Right.
07      Q.  And -- and so my inference is that you --
08   you might have received a different sort of package
09   for the Thursday call.  And I'm just trying to find
10   out if my --
11      A.  Okay.
12      Q.  -- inference is correct.
13      A.  If I understand your -- your -- okay.
14   This -- looking -- for example, Exhibit 151 is the
15   format that I would use for the Tuesday/Wednesday
16   calls.  And that was for OPI.  I would also, during
17   that time, have separate forecast calls for Latin
18   America and a separate forecast call for consulting.
19   What this package, Exhibit 61, represents, the --
20   all three of those, since those are the three
21   businesses that I had responsibility for, and this
22   was the package that I would use for the Thursday
23   calls.
24      Q.  Okay.
25      A.  So in that regard it is different, in a

119

00119:01   couple ways.
02      Q.  All right.  Well -- okay.  Let's -- let's
03   look at a couple of specific pages.  Could you
04   please turn to the page that has the Bates number
05   22088.
06      A.  Okay.
07      Q.  And here again, we've got a Q4 forecast
08   summary.  Were the forecasts for Q4 a subject of
09   discussion at the -- the Thursday calls?  And this
10   is not one of the pages that's different.
11      A.  To my -- my recollection is that we spent
12   little or no time on the subsequent quarter.
13      Q.  Okay.
14      A.  The focus was on the current quarter.
15      Q.  Okay.  Did you usually get a -- a script
16   such as the -- the email text that's at the
17   beginning of Exhibit 61 in advance of the Thursday
18   forecast calls?
19      A.  As I mentioned earlier, the approach and
20   tools that I used for forecasting evolved.  I
21   obviously -- I mean not obviously; what I tried to
22   do was make them easier and better to use.  And at
23   some point I recall asking that I get a summary
24   prepared for me, to show me the different businesses
25   and the key facts about that business, so that I

120

00120:01   could use that to have the discussion -- you know,
02   to present the business I -- businesses I was
03   responsible for in the Thursday call.
04      Q.  Okay.  But you don't recall when -- or at
05   what point you -- you asked for these summaries to
06   be provided?
07      A.  No, I don't.  I don't.
08      Q.  Do you recall whether it was prior to Q3
09   '01?
10      A.  No, I -- I don't.
11      Q.  All right.  Now let's look at some of the
12   pages --
13      A.  Okay.
14      Q.  -- that are a little bit different.  If
15   you'll turn to the one with Bates number 22019,
16   and -- through 22093.  I'm sorry.
17      A.  Sorry.
18      Q.  91.  There's that --
19      MR. NADOLENCO:  Dyslexia.
20      MR. GOLDSTEIN:  What did you have for
21   lunch?
22      MR. DE GHETALDI:  You know, it happens to
23   me at soccer games when I'm refereeing.  In the
24   second half I always make a mistake on direction at
25   least once, and -- you switch sides, you know.

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

121

1  00121:01     THE WITNESS: Okay. So 91 through 93?
2  02  BY MR. DE GHETALDI:
3  03     Q.  Yes. This appears to be a summary of
4  04  something called large deals. You see that in the
5  05  upper left-hand corner?
6  06     A.  Yes, I do.
7  07     Q.  Can you tell me what the purpose of this
8  08  part of the package was?
9  09     A.  As you can see from the three different
10 10  packages we've discussed, is they've evolved and
11 11  they've changed and become more comprehensive as
12 12  we've moved forward in the calendar.
13 13     There -- as we also discussed earlier, we
14 14  tended to have larger deals in OPI, for example,
15 15  versus GB -- general business and major accounts.
16 16  And it was important for me -- to me to track those.
17 17  And this is a report that finance began to prepare
18 18  documenting -- it looks like what they were doing --
19 19  and I don't recall specifically, but what it looks
20 20  like doing is taking the worst, most likely, or
21 21  forecast, as were used in best, and try to
22 22  consolidate it onto this page with some comments
23 23  regarding that -- those same deals. So it was
24 24  another tool to help us in tracking the forecast for
25 25  the quarter.

122

1  00122:01     Q.  On page 22091, Covisint is the second deal.
2  02  And it has a rather cryptic comment.
3  03     A.  Yes.
4  04     Q.  Can you help me out and tell me what you
5  05  understand that to mean, in -- in any part?
6  06     A.  Yeah. What my -- under "Comments"?
7  07     Q.  Yeah.
8  08     A.  Yeah. What my recollection is, is OE, I
9  09  think that is the order entry number. So that was
10 10  actually, my guess is, either the contract number of
11 11  a number that was associated with the contract. And
12 12  then there is a journal entry of 4.2 million that --
13 13  I assume that was JE'd to our ISD department, which
14 14  was our telesales organization, who had participated
15 15  in the deal. And at that point, as I recall, we had
16 16  a separate HR sales organization, and we JE'd $2,000
17 17  to that HR organization, that didn't report to me.
18 18     Q.  And "HR" is "human resources"?
19 19     A.  Yeah, I'm sorry, human resources, correct.
20 20  Human resource sales organization -- sales support
21 21  organization.
22 22     Q.  Okay. Who was responsible for entering the
23 23  comments that are shown on -- on these three pages
24 24  beginning with 22091?
25 25     A.  These were comments that were captured, in

123

1  00123:01  most cases, I -- most cases from our
2  02  Tuesday/Wednesday forecast call for OPI. And
3  03  finance captured it and put them in here.
4  04     Q.  Okay. Now if you could turn, please, to
5  05  the page with Bates number 22094. And tell me --
6  06     A.  Okay.
7  07     Q.  -- what this page represents.
8  08     A.  This is a consulting forecast page.
9  09     Q.  Okay. And consulting only?
10 10     A.  Correct.
11 11     Q.  All right. And if you can turn to the next
12 12  page, the one with Bates number 22095.
13 13     A.  Okay.
14 14     Q.  And if you could tell me what this page
15 15  represents.
16 16     A.  This is a consulting forecast page as well.
17 17     Q.  Okay. And can you explain what the terms
18 18  "bookings" and "utilization" mean in the -- the
19 19  column titles.
20 20     A.  Sure. Bookings is the -- when you sign a
21 21  consulting contract -- or this was the forecast for
22 22  the quarter. For example, under "Northeast," and
23 23  you see Q3 '01 forecast of 37 million, that was
24 24  their forecasted consulting bookings for the
25 25  quarter.

124

1  00124:01     Q.  Okay. And --
2  02     A.  Bookings being a new consulting contract.
3  03     Q.  All right. And "Target," what's that
4  04  column there refer to?
5  05     A.  That may have been budget. I don't recall
6  06  specifically. But I think most likely that is what
7  07  we had for -- as a budget for that quarter.
8  08     Q.  We looked at a page on another report
9  09  earlier today that had a 30 percent growth target.
10 10  Do you think -- do you know if there's any
11 11  connection between that 30 percent growth target and
12 12  this target?
13 13     A.  No, I think the 30 percent growth target we
14 14  saw earlier was on a license -- OPI sales target;
15 15  and this is referring to consulting target. So I
16 16  don't think the numbers would be -- the percentages
17 17  would be the same. I mean, they could be.
18 18     Q.  Okay.
19 19     A.  But it would just be circumstance if they
20 20  were.
21 21     Q.  All right. What about "utilization"? What
22 22  is that phrase?
23 23     A.  Utilization is something that is very
24 24  important to track in consulting. And it's the
25 25  actual billability; in other words, the hours that

125

```
1   00125:01 could be charged to a customer of the consulting
2      02 organization, and, again, using Northeast as an
3      03 example, where it says Q3 '01 forecast, 64.1
4      04 percent.  So that was saying that that would be
5      05 their -- their billability or utilization for that
6      06 quarter --
7      07    Q.  Okay.
8      08    A.  -- forecasted.
9      09    Q.  In other words, if you had a hundred
10     10 consultants, this -- this means that 64.1 percent of
11     11 their total possible billable hours were actually
12     12 being billed?
13     13    A.  If you had a hundred -- you could think of
14     14 it a couple ways.  One unlikely way, but just to
15     15 make -- it brings it to life a bit, is you could
16     16 have a hundred consultants, and that means that 64
17     17 of them are billable, and the balance are not.
18     18    Q.  Okay.
19     19    A.  The other way to think about it is, of that
20     20 hundred consultants, they're actually billable at a
21     21 client 64 percent of their time.
22     22    Q.  Okay.  Now if you could turn to the next
23     23 page, the one with the Bates number 22096.  And tell
24     24 me what this portion of the packet refers to,
25     25 please.
```

126

```
1   00126:01    A.  This is a consulting report.  And -- I -- I
2      02 don't recall it specifically, but what it appears to
3      03 do is talk about the -- to my recollection, it -- it
4      04 talks about the variance -- change in -- in revenue
5      05 since the last forecast.
6      06    Q.  With some kind of explanation?
7      07    A.  With some -- in some cases with some kind
8      08 of explanation, correct.
9      09       MR. DE GHETALDI:  Okay.  If we could mark
10     10 this the next in order, please.
11     11       (Deposition Exhibit 152 was marked for
12     12 identification.)
13     13       MR. GOLDSTEIN:  Thanks.
14     14       THE WITNESS:  Okay.
15     15 BY MR. DE GHETALDI:
16     16    Q.  All right.  This is -- do you recognize
17     17 this document?
18     18    A.  I recognize the document.  As other
19     19 documents, it's very consistent with the forecasting
20     20 package we used.  I don't recall it for a package
21     21 specific to January 13th, 2001.
22     22    Q.  All right.  Exhibit 151, it looks like
23     23 there's a copy of a file tab on -- on the first
24     24 page.  And it says "Sanderson, Q3 '01 Oracle Product
25     25 Industries, Q3Week6b."  And this one has a similar
```

127

```
1   00127:01 heading, except it says "Q3Week7."  Does that --
2      02    A.  I see "Q3Week7."  I don't know where you --
3      03    Q.  Exhibit 151.  You have to look at the first
4      04 page of Exhibit 151.
5      05    A.  Okay.
6      06    Q.  It looks like these two reports are a week
7      07 apart.  Do you -- do you recall whether you got --
8      08 in Q3 '01 whether you got this form of report every
9      09 week?
10     10    A.  I -- I don't remember.
11     11    Q.  Okay.
12     12    A.  I don't recall.
13     13    Q.  All right.  Now, this one was previously
14     14 marked as Exhibit 62.
15     15    A.  Okay.
16     16    Q.  The -- well, do you recognize this form of
17     17 report?
18     18    A.  It's similar to the other packages we've
19     19 seen.  It -- there's some slight change in
20     20 presentation at the beginning of the report.  Again,
21     21 we continue to involve and instill processes and --
22     22 new processes or tightening the process, making it
23     23 more effective.  And here, I think, shows another
24     24 evolution of the -- of the forecasting package.
25     25    Q.  Okay.  Now, the -- this is dated January
```

128

```
1   00128:01 26th, which was -- well, it says January 26, 2000.
2      02 That's probably a typo.
3      03    A.  What page are you looking at?
4      04    Q.  I'm looking at the first page.
5      05    A.  Mine says January 27, 2001.
6      06    Q.  I'm looking at the -- on the title section.
7      07    A.  Uh-huh.  Okay.
8      08    Q.  Would you agree that that's probably --
9      09 that -- that the year there is probably a typo?
10     10    A.  I agree.
11     11    Q.  Okay.  And there is a date and time -- it
12     12 looks like it's probably a footer -- on the lower
13     13 right-hand corner of the page, which is January
14     14 27th, which was a Saturday.  Would this report have
15     15 been prepared in advance of the -- I don't know
16     16 what -- the Monday executive committee meeting?
17     17    A.  Yeah, I -- I don't recall, or I'm not even
18     18 sure I even know or knew why it would have been done
19     19 on a Saturday.
20     20    Q.  Oh.  Okay.  I'm just trying to get a sense
21     21 of the timing of these reports in connection with
22     22 the various -- the Monday or the Tuesday/Wednesday
23     23 or the Thursday meetings and when the reports were
24     24 produced in relation to those.  So --
25     25    A.  Yeah, I'm not sure it's as scientific as
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

129

1  00129:01  you might be implying.  We had a finance department
2  02  that worked very hard, and sometimes they'd get the
3  03  week -- work done during the week; and if they need
4  04  to go over the weekend, they did.  The fact that
5  05  there's a new couple of pages on page 998 and 999,
6  06  it may have been something that was implemented new,
7  07  and they ended up doing it over the weekend.
8  08  Q.  Okay.
9  09  A.  I don't know of any significance about
10  10  January 27th.
11  11  Q.  On the second page, with Bates number
12  12  36998, there's a -- a section down towards the
13  13  bottom with the monthly forecast numbers.  Do you
14  14  see that?
15  15  A.  I believe so.
16  16  Q.  Okay.  And it says -- one of the columns
17  17  there is titled "Q3 Forecast Per OSO."  Do you see
18  18  that?
19  19  A.  "Q3 Forecast Per OSO."
20  20  Q.  Right.
21  21  A.  Okay.
22  22  Q.  And then to the right of that, there's a
23  23  section that says -- or a column that's titled
24  24  "Without Covisint."
25  25  A.  Right.

130

1  00130:01  Q.  Is -- why, if you know, were those
2  02  figures -- they're apparently revenue figures,
3  03  monthly, but with the Covisint deal subtracted.
4  04  Why -- why is that a part of this report?
5  05  A.  As I recall, somebody in finance thought it
6  06  would be interesting to subtract out Covisint.
7  07  Q.  Okay.
8  08  A.  Because it was such a large deal.  And I
9  09  also remember getting very unhappy about it.
10  10  Because I think there was another report that was
11  11  produced by finance that did the same thing.
12  12  Q.  Uh-huh.
13  13  A.  And I -- I didn't understand the logic.
14  14  The logic that was presented to me:  "It was such a
15  15  large deal we should look at it -- your numbers
16  16  without it in."  And I, frankly, got quite unhappy
17  17  that somebody had decided to manipulate my numbers
18  18  in -- in that way, manipulate in the sense that they
19  19  would -- somebody would arbitrarily decide to pull
20  20  that out.  That clearly was not something I asked
21  21  for.  And my bet is that Jim English would tell you
22  22  that I got quite unhappy when somebody decided to do
23  23  that.  And it was not anybody in the line
24  24  organization; it was some staff person in finance
25  25  that thought that would be interesting.

131

1  00131:01  Q.  Okay.  All right.  Have we -- any of the
2  02  documents that we looked at here, are they documents
3  03  that you looked at yesterday in preparation for your
4  04  deposition?
5  05  A.  Let me look.  This one, no.
6  06  Q.  That is, Exhibit 62 no?
7  07  A.  Yes, I'm sorry, Exhibit 62.  I don't
8  08  remember seeing that.  I -- I believe that I saw
9  09  Exhibit 61.
10  10  Q.  All right.
11  11  A.  Now, I don't -- to complete your question,
12  12  I -- answering your question, I don't -- I don't
13  13  recall seeing the others.  I may be wrong, but I
14  14  don't think I saw the others.
15  15  Q.  All right.  Now, if you could turn, please,
16  16  to pages 37012 and 37013 of Exhibit 62.
17  17  A.  Okay.  I've got those pages.
18  18  Q.  And I'd like to contrast those numbers with
19  19  the comparable pages in Exhibit 152, which are 12668
20  20  and 12669.
21  21  A.  I -- I don't know that I -- oh, okay,
22  22  I'm -- I see what you're doing.  Okay.  Okay.
23  23  Q.  And actually, if you'd just turn to the
24  24  second -- oh, I'm sorry.  I'm -- I'm looking at --
25  25  A.  So 12669?

132

1  00132:01  Q.  12669 and 37013.  Let's focus on those two
2  02  specific pages.
3  03  A.  37013.  Okay.
4  04  Q.  All right.  And it looks like there's been
5  05  a shift in the neighborhood of $50 million --
6  06  A.  In January.
7  07  Q.  -- out of January and into February between
8  08  January 13th and January 27th.  Do you see that?
9  09  A.  Yes, I do.
10  10  Q.  Okay.  Do you recall at the time noticing
11  11  that shift?
12  12  A.  I don't recall that specific time; I mean,
13  13  a specific event, as I'd commented earlier on the
14  14  Covisint -- subtracting out Covisint.  I -- I don't
15  15  remember this.  I mean, I -- I remember this
16  16  phenomenon happening.
17  17  Q.  Okay.  What do you remember about the
18  18  phenomenon?
19  19  A.  I remember that I couldn't -- I found that
20  20  I was not very effective in changing 20 years of
21  21  legacy at Oracle with my sales reps and my
22  22  customers, from moving revenue from the last month
23  23  of the quarter and oftentimes the last two weeks of
24  24  the quarter.
25  25  Q.  Okay.  Do you recall discussions about what

133

```
 1  00133:01 happened here, you know, why $63 million was
 2     02 forecast, in mid-January, to -- to close in January,
 3     03 and then by the end of the month we're down to 13?
 4     04    A.  I'm not sure that I would characterize it
 5     05 as forecasting.  I asked the AVPs to work with their
 6     06 RMs and their account managers to distribute the
 7     07 revenue over the quarter.  This was a new practice
 8     08 which we implemented, as you have seen in the
 9     09 evolution of the reports.  And I'm sure that I had
10     10 some discussion on why it moved.  But in the end, it
11     11 was -- the fundamental issue was, I couldn't change
12     12 the sales organization like that overnight.
13     13       And, frankly, many of the customers that we
14     14 have in OPI, as you probably notice by the names,
15     15 are large customers, and many of them have been
16     16 long-term customers, and they know that they get a
17     17 bigger discount from Oracle by waiting until the end
18     18 of the quarter than Oracle would provide in the
19     19 middle of the quarter.  So that's the problem, and
20     20 that's why the revenue move to the last month, which
21     21 is very consistent with any other quarter within OPI
22     22 on a historical basis, at least during the time that
23     23 I had responsibility for it.
24     24       MR. DE GHETALDI:  All right.  I think we're
25     25 at about an hour.  How about a break?
```

134

```
 1  00134:01       MR. GOLDSTEIN:  Sure.
 2     02       MR. DE GHETALDI:  She needs to change the
 3     03 tape.
 4     04       THE WITNESS:  What's your prognosis?
 5     05       MR. GOLDSTEIN:  We can be off the record.
 6     06       THE VIDEOGRAPHER:  This marks the end of
 7     07 Videotape Number 2 in Volume I in the deposition of
 8     08 Edward J. Sanderson.  We're going off the record.
 9     09 The time is 3:11.
10     10       (Recess taken.)
11     11       THE VIDEOGRAPHER:  This marks the beginning
12     12 of Videotape Number 3 in Volume I in the deposition
13     13 of Edward J. Sanderson.  We're going back on the
14     14 record.  The time is 3:31.
15     15       MR. DE GHETALDI:  All right.  This will be
16     16 the next in order.
17     17       (Deposition Exhibit 153 was marked for
18     18 identification.)
19     19       THE WITNESS:  I'm -- I'm sorry.
20     20 BY MR. DE GHETALDI:
21     21    Q.  Okay.
22     22    A.  I -- I've looked at it.
23     23    Q.  All right.  Can you tell me what the
24     24 document that's been marked as Exhibit 153 is?
25     25    A.  It looks consistent with a document that
```

135

```
 1  00135:01 was handed out at the executive committee meetings
 2     02 on the forecast for the company.
 3     03    Q.  All right.  And this is the one that was
 4     04 collected again at the end of the meeting?
 5     05    A.  Yes, that's correct.
 6     06    Q.  All right.
 7     07       Or sometime during the meeting; but no
 8     08 later than by the end of the meeting.
 9     09    Q.  Okay.  Now, I'd like to ask you to turn to
10     10 page that's Bates numbered 3552.
11     11    A.  Okay.
12     12    Q.  And there are some footnotes there
13     13 underneath the boxed chart.  Do you see that?
14     14    A.  Yes, I do.
15     15    Q.  Do you know what -- the source of those
16     16 footnotes about OPI's -- or the effect of those
17     17 Covisint deal on OPI's revenue forecast figures?
18     18    A.  You mean -- what do you mean by "source"?
19     19    Q.  Do you know who -- who wrote those?
20     20    A.  I -- I don't know.  I would suggest you
21     21 talk to Jennifer Minton.
22     22    Q.  Okay.
23     23    A.  It certainly wasn't something I put in.
24     24    Q.  Okay.  Now, if we could turn back just
25     25 briefly to Exhibits 60 and 62.
```

136

```
 1  00136:01    A.  Okay.  So I should have three exhibits in
 2     02 front of me right now?
 3     03    Q.  No, actually just two.  We're, I think,
 4     04 done with 153.
 5     05    A.  Okay.
 6     06    Q.  It's a one-question exhibit.  It's sort of
 7     07 like a one-horse town.
 8     08    A.  Okay.  I like those exhibits.
 9     09    Q.  That's good.  If you'll turn in Exhibit 60
10     10 to the page with the Bates number 36909.
11     11    A.  Okay.
12     12    Q.  And in Exhibit 62, please turn to the page
13     13 with Bates number 37002.
14     14    A.  Okay.
15     15    Q.  All right.  And it looks like, in terms of
16     16 the -- and tell me if I'm reading this correctly.
17     17 It looks like, in terms of the license revenue
18     18 forecast for Q4, there was no change between
19     19 mid-December and late January.
20     20    A.  That appears to me the case as well.
21     21    Q.  Okay.  And --
22     22    A.  The numbers are the same.
23     23    Q.  All right.  And it looks like those numbers
24     24 would -- that is, the forecast of 167 million, was
25     25 negative 16 percent -- or would be negative 16
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

137

1   00137:01  percent growth over Q4 '00.  Is that right?
2   02    A.  According to this -- these documents,
3   03    that's what it says.
4   04    Q.  Okay.  Was -- was that something that was
5   05    of any concern to you in -- in January of 2001, the
6   06    fact that -- that is, the fact that the Q4 forecast
7   07    had not changed over the past month and it was
8   08    showing negative growth over the prior-year quarter?
9   09    A.  I think it's indicative that not a lot of
10  10    effort was put into that forecast, and -- the fact
11  11    that it didn't change at all, not only at the
12  12    summary -- you know, the total license level, but by
13  13    area, you know, it being specifically McLaughlin,
14  14    Thimot, DeCesare, and even -- or by area, the -- or
15  15    the 167.  The -- in fact, not only the 167 but the
16  16    worst, most likely, and best did not change.
17  17    Q.  Right.
18  18    A.  And, you know, the minus 16 percent growth,
19  19    this was before we had any focus on Q4.  And,
20  20    frankly, it's not surprising.  That was fairly
21  21    typical of quarters where maybe -- I mean, I -- it
22  22    was not unusual, let me put it that way, for me to
23  23    have a quarter in Latin America, OPI where, if it's
24  24    looking at a quarter ahead, that it's actually
25  25    showing a decline in revenue.  That's not surprising

138

1   00138:01  to me; let me put it that way.
2   02    Q.  All right.  Let me make sure that your
3   03    testimony is clear.  As I'm reading it, it's --
4   04    A.  What testimony are you referring to?
5   05    Q.  The one that you just gave.
6   06    A.  Okay.
7   07    Q.  Because you ran two things --
8   08    A.  Yeah.
9   09    Q.  -- together, maybe.  You said for you "to
10  10    have a quarter in Latin America, OPI" --
11  11    MR. GOLDSTEIN:  I think he said "or OPI."
12  12    BY MR. DE GHETALDI:
13  13    Q.  It's not showing up, and so I want to make
14  14    sure.
15  15    A.  So you're seeing the same thing he's
16  16    typing?
17  17    Q.  Yeah.
18  18    A.  Okay.  I didn't know that.
19  19    Q.  Yeah.  So was your testimony when you're
20  20    looking a quarter ahead in Latin America or OPI?
21  21    A.  I would say -- let me repeat it.
22  22    Q.  For Latin America and/or OPI, it would not
23  23    be surprising to me that when they're projecting a
24  24    quarter ahead, that that forecast is showing up as a
25  25    negative growth.

139

1   00139:01  Q.  All right.  All right.  Now, going back to
2   02    page 3702 of Exhibit 62 --
3   03    A.  Exhibit 62?
4   04    Q.  You have -- it's one of the pages that you
5   05    have there.
6   06    A.  Okay.  And -- okay, 37002?
7   07    Q.  Right.
8   08    A.  Okay.
9   09    Q.  This one has a little bit more information
10  10    on management judgment than the earlier one does.
11  11    And there's actually a column that seems to indicate
12  12    that -- well, it -- it has the same numbers for
13  13    management judgment as in the most likely column.
14  14    And can you explain that to me?
15  15    MR. GOLDSTEIN:  Objection to form.
16  16    THE WITNESS:  I think it's, once again,
17  17    indicative that not a lot of effort was put into
18  18    that forecast of a future quarter, not the current
19  19    quarter but of the future quarter, and the AVP's put
20  20    in, based -- looking at their overall pipe, a best
21  21    guess at that point of what it would be, and they
22  22    put it under "management judgment."
23  23    BY MR. DE GHETALDI:
24  24    Q.  Okay.  Do you recall prior -- or quarters
25  25    prior to Q3 '01 where you forecast a quarter ahead

140

1   00140:01  and that forecast was for negative growth?
2   02    A.  Now --
3   03    Q.  You said it wouldn't be unusual.  And I'm
4   04    just wondering whether you --
5   05    A.  It wouldn't be surprising to me.  I -- I
6   06    don't have any specific -- to answer your question,
7   07    do I have a specific example in mind, no.
8   08    Q.  Okay.
9   09    A.  I'm just -- we didn't put -- the field is
10  10    all about the current quarter.  They -- they only
11  11    make money when they sell a product.  And -- and
12  12    that was talking about their current quarter.  I
13  13    mean -- I'm talking about the current quarter.
14  14    There was not a lot of focus on a future
15  15    quarter, and, again, explaining why there's -- it's
16  16    under "Management Judgment" there.
17  17    MR. DE GHETALDI:  Okay.  Let's mark this
18  18    one next in order, please.
19  19    (Deposition Exhibit 154 was marked for
20  20    identification.)
21  21    BY MR. DE GHETALDI:
22  22    Q.  For the record, Exhibit 154 is a --
23  23    actually a repeat of Exhibit 73.  And it looks like
24  24    somebody had tried to bring out the contrast, in
25  25    order to make the handwritten notes more easy to

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

141

```
1   00141:01  read.  And they were illegible in Exhibit 73, so --
2   02  have -- have you ever seen a report in the form of
3   03  Exhibit 154 before today?
4   04     A.  I don't recall it specifically.  I may have
5   05  seen it, but I don't recall specifically.
6   06     Q.  Okay.  There are -- there are hand -- do
7   07  you recognize the handwriting on the bottom of the
8   08  first page of Exhibit 154?
9   09     A.  No, I don't.
10  10     Q.  There's a -- one of the -- you see over on
11  11  the left-hand side, where it says "Sandy said"?
12  12     A.  Yes, I do.
13  13     Q.  Two lines below that, it looks like it says
14  14  "Concern in East"?
15  15     A.  Uh-huh.
16  16     Q.  Do you recall any particular concern in the
17  17  East in OPI in mid-January 2001?
18  18     A.  I recall three concerns.  One is where it
19  19  refers to -- you see it a little bit lower.  It says
20  20  "Ingersoll-Rand is unraveling"?
21  21     Q.  Right.
22  22     A.  I found that -- as I recall, Steve
23  23  McLaughlin was driving that deal.  Are you
24  24  comfortable with the word "driving"?
25  25     Q.  Yes.
```

142

```
1   00142:01     A.  Driving that deal, and he -- I found out
2   02  that he -- his relationship with the client wasn't
3   03  as strong -- it wasn't strong, and in fact it was
4   04  somewhat contentious.  And I believe it was around a
5   05  prior support bill, or something like that.  It was
6   06  unrelated, as I recall, to that deal.  So that
7   07  caused some concern.
8   08        Secondly, we had some deals in the pipe
9   09  from GE, and Steve had responsibility for GE.  And
10  10  so I had some concerns around GE.
11  11        And my third concern was Steve as an AVP.
12  12  I felt like this was a challenging job for him.
13  13  And so I had some concerns in the East.  And this is
14  14  probably a comment I made on a Thursday call, would
15  15  be my guess.  And I probably chose there not to be
16  16  specific on a name.
17  17     Q.  Okay.  It looks like there -- there's --
18  18  underneath "Ingersoll-Rand is unraveling," there's
19  19  three deals listed:  Gap, U.S. Filter, and Motorola.
20  20  And it says "slipped from Q2."
21  21     A.  Uh-huh.
22  22     Q.  "Possible for this quarter."
23  23     A.  Yes.
24  24     Q.  Do you recall a discussion about those
25  25  particular deals in mid-January of 2001 at -- at one
```

143

```
1   00143:01  of the either executive committee meetings or one of
2   02  the Thursday forecast calls?
3   03     A.  I -- I don't -- I know it was during the
4   04  quarter.  I don't remember specifically it was
5   05  January.  But Gap and Motorola were discussed
6   06  several times.  Today I don't remember any
7   07  discussion about U.S. Filter.  But I do remember
8   08  discussions during the quarter about Gap and
9   09  Motorola.
10  10     Q.  Okay.  The phrase "slipped from Q2" --
11  11     A.  Right.
12  12     Q.  -- do you recall there being an unusual
13  13  number of deals that slipped from Q2 into Q3?
14  14     A.  No.  But I would also tell you it's a
15  15  definition of "slipped."  It could be that, for
16  16  example, it was on our upside list in Q2 and moved
17  17  over to our upside -- either forecasted or upside
18  18  list in Q3, and somebody within finance could,
19  19  quote -- you know, decide that that was, quote,
20  20  "slipped," it had slipped.  It was not a branded,
21  21  you know, business term in Oracle, what "slipped"
22  22  means.  So we could -- you know, it's all the
23  23  definition of "slipped."  It is not unusual that
24  24  deals move from one quarter to the next.
25  25     Q.  Okay.  I'm handing you a document that was
```

144

```
1   00144:01  previously marked as Exhibit 108.
2   02     A.  Okay.
3   03     Q.  Have you seen Exhibit 108 before?
4   04     A.  I saw it yesterday.
5   05     Q.  Okay.  Was that for the first time?
6   06     A.  I don't remember specifically seeing it 38
7   07  months ago.  But I remember a -- one aspect of it.
8   08     Q.  Okay.  And what was that?
9   09     A.  That's where the -- the growth for OPI --
10  10  I'm sorry.  This is -- I have not seen this report.
11  11  I apologize.  I've not seen this.
12  12     Q.  All right.  I -- and I don't want this to
13  13  come as a surprise to you, but I do want to point
14  14  out that you are listed as one of the recipients of
15  15  the email.  So it may -- may be something that you
16  16  don't remember, or something like that, but --
17  17     A.  Yeah, I -- I'm sorry.  I don't remember it.
18  18  I would get, on average, 150 to 200 emails a day.
19  19     Q.  Okay.  And you just don't remember seeing
20  20  this before?
21  21     A.  No, in fact, I don't -- I don't remember
22  22  this one specifically.  I don't.
23  23     Q.  Okay.
24  24     A.  And I've not seen this one before.
25  25     Q.  All right.  Do you remember seeing this
```

145

```
1   00145:01 type of document --
2   02      A.  Yes.
3   03      Q.  -- before?
4   04          All right.  Was this type of document the
5   05  subject of discussions during the Monday executive
6   06  committee meetings?
7   07      A.  I -- I don't remember, Dario, this -- this
8   08  document being discussed on Monday.  I can't say
9   09  that it was, but I don't ever remember that it -- I
10  10  don't remember that it was.
11  11          MR. DE GHETALDI:  Okay.  Can you mark this
12  12  as next in order, please.
13  13          (Deposition Exhibit 155 was marked for
14  14  identification.)
15  15          THE WITNESS:  Okay.
16  16  BY MR. DE GHETALDI:
17  17      Q.  Do you recall seeing this particular email
18  18  before today?
19  19      A.  I don't remember the email, but I remember
20  20  the topic.
21  21      Q.  Okay.  What do you recall about the topic?
22  22      A.  That -- and as a reminder, I did not have
23  23  responsibility for OPI at this point.
24  24      Q.  Right.
25  25      A.  As Larry became more engaged in the
```

146

```
1   00146:01 business, more engaged in a sense of playing a more
2   02  active role in contract approval, either through
3   03  himself or through Safra Catz -- are you familiar
4   04  with -- familiar with that name?
5   05      Q.  Yes.
6   06      A.  -- with Safra, there was a decision on the
7   07  part of -- Larry made a decision to -- to clear more
8   08  contract terms through Safra, and basically not
9   09  authorizing the -- taking some of the -- taking some
10  10  of the responsibility away from the field in -- on
11  11  some of the contracts.  And I say "responsibility."
12  12  That's probably an unfair way to put it, or an
13  13  incorrect way to put it; that -- more drawing a
14  14  line, that no contract terms get introduced -- new
15  15  contract terms get introduced to the client before
16  16  they've been approved in the headquarters.  Prior to
17  17  this, there was probably a little more flexibility
18  18  that the field might -- might introduce a term and
19  19  then go back to corporate and get approval.
20  20      Q.  Okay.
21  21      A.  And it was designed to -- to help minimize
22  22  the complexity of contracts, and in some cases, you
23  23  know, potentially more onerous conditions with
24  24  contracts.
25  25      Q.  All right.  And -- and did that new process
```

147

```
1   00147:01 have an effect on the pipeline, as expressed in
2   02  this --
3   03      A.  It would have no --
4   04      Q.  -- Exhibit 155?
5   05      A.  It would have no effect on pipeline.
6   06      Q.  Okay.
7   07      A.  Well -- well, what do you mean by
8   08  "pipeline"?
9   09      Q.  Well, in the second paragraph, or -- well,
10  10  it's not actually the second paragraph, but towards
11  11  the middle of this email, Mr. Lane says that the --
12  12  "they feel" -- I guess that's all four EVPs -- "feel
13  13  our new process is an improvement and they do not
14  14  want to go backwards, but our forecast and the
15  15  underlying volumes in the last month of Q4 are not
16  16  factored for the length and number of turnarounds
17  17  required in big deals, and the pipeline is starting
18  18  to back up."
19  19      A.  I think the pipeline there is -- is a
20  20  different definition --
21  21      Q.  Okay.
22  22      A.  -- and the pipeline here means the deals
23  23  that are flowing into corporate for approval.
24  24      Q.  All right.  And so the -- the approval
25  25  process is lengthening.  Was that a concern in Q4
```

148

```
1   00148:01 '00?
2   02      A.  It was a concern at that point.  But I
3   03  remember discussing it specifically after Q4, and I
4   04  don't recall a single deal that did not get through
5   05  the approval process.  And I don't know of any
6   06  deal -- and certainly in my business -- that was
7   07  held up because of the approval process.
8   08      Q.  All right.
9   09      A.  They added the additional horsepower to
10  10  make sure the deals got approved.
11  11          MR. DE GHETALDI:  All right.  This will be
12  12  156.
13  13          MR. NADOLENCO:  Is this previously marked,
14  14  Dario, as Exhibit 55?
15  15          MR. DE GHETALDI:  Oh, I'm sorry.  It was.
16  16  Thanks, John.  Good eye.  Can we unmark it?
17  17          THE WITNESS:  So this goes off?
18  18          (Discussion off the record.)
19  19          MR. DE GHETALDI:  Thank you.  I'm sorry.
20  20  Thanks, John.
21  21          (Discussion off the record.)
22  22          MR. GOLDSTEIN:  So what was this marked as?
23  23          MR. DE GHETALDI:  55.
24  24          MR. GOLDSTEIN:  Thank you.  Oh, it's right
25  25  there on the page.
```

149

1  00149:01     MR. DE GHETALDI:  Yeah.  That's how he
2  02 knew.
3  03     MR. GOLDSTEIN:  Oh.
4  04     MS. RIDDLE:  He doesn't have all 153
5  05 exhibits memorized.
6  06     MS. LAVALLEE:  He was getting a lot of good
7  07 credit for that.
8  08     MR. GOLDSTEIN:  Right.  Right.  Okay.
9  09     THE WITNESS:  Okay.
10 10 BY MR. DE GHETALDI:
11 11     Q.  Unfortunately, we don't have the
12 12 corresponding forecast package that you were
13 13 apparently looking at here, so I can't decipher this
14 14 email by looking at that.  And so I'm going to ask
15 15 you whether you recall the circumstances that are
16 16 described in this email.
17 17     A.  I -- I don't recall this specifically.
18 18 This is clearly part of my effort to spread the
19 19 revenue over the quarter and try to introduce that
20 20 notion --
21 21     Q.  All right.
22 22     A.  -- and break this 20-year legacy at Oracle.
23 23     Q.  Okay.  And there -- is -- is the third
24 24 paragraph a partial reflection of -- of your
25 25 previous observation, that Mr. McLaughlin tended to

150

1  00150:01 be aggressive?
2  02     A.  That was an indicator, yes.  I mean,
3  03 this -- this is -- something like this.  And I don't
4  04 remember it specifically.  But this would be an
5  05 example of the kind of concern that I had.
6  06     MR. DE GHETALDI:  Okay.  Now, this is
7  07 Exhibit 156, I hope.
8  08     (Deposition Exhibit 156 was marked for
9  09 identification.)
10 10     THE WITNESS:  Thank you.
11 11     Okay.
12 12 BY MR. DE GHETALDI:
13 13     Q.  Do you recall receiving the email that is a
14 14 part of Exhibit 156?
15 15     A.  Vaguely.  Vaguely.
16 16     Q.  Do you --
17 17     A.  I -- I recall the subject.
18 18     Q.  Okay.  What do you recall of this subject?
19 19     A.  There was a concern on Larry's part, as I
20 20 indicated here in this email, that we were being too
21 21 conservative in our forecast, and that -- and that's
22 22 what the -- the historical data shows in the back.
23 23 If you notice, for example, the -- the -- page 25233
24 24 shows actual versus what the final forecast was.
25 25 And generally speaking, it was coming in, I

151

1  00151:01 believe -- it says down here somewhere -- around 84
2  02 to 89 percent accurate.  So Larry was asking people
3  03 to try to be more accurate in their forecast, versus
4  04 the final number.
5  05     As I said here -- and I -- you know, I can
6  06 only imagine how I felt.  Because I don't like
7  07 giving a direction and not giving some guidance on
8  08 how to achieve it.  And if you notice here, I said
9  09 but I'm not -- I'm not sure -- "How, I am not sure."
10 10 Do you see that --
11 11     Q.  Sure.
12 12     A.  -- in that sentence?  Or that sentence?
13 13     I mentioned at one point forecasting is an
14 14 art, number one.  And as I indicated, you could go
15 15 at 11:59 on the last day of the quarter and book a
16 16 deal, a $50 million deal or a $1 million deal, or
17 17 whatever, and -- and you'd get -- a license -- if
18 18 it's a license deal, you'd get credit for it.  So
19 19 it's a very hard thing to predict.  And -- number
20 20 one.
21 21     Number two is, what you learned at Oracle,
22 22 as a practice, was to be accurate in your
23 23 forecasting, and if you miss, that you miss it in
24 24 the sense that you understated what your forecast
25 25 was.  You did not want to be, quote, "guilty" of

152

1  00152:01 providing a forecast and then coming under,
2  02 ultimately delivering a number less than that.
3  03 So -- and that -- you know, you -- and I think that
4  04 started, frankly, with Larry.  You know, Larry on
5  05 one hand is telling us to be more accurate in our
6  06 forecasting, but on the other hand kind of the
7  07 message was also "Don't give me a forecast that
8  08 you're not going to deliver."
9  09     Q.  Right.
10 10     A.  And I believe the first quarter that I took
11 11 over OPI, we missed our forecast.  We came in under.
12 12 And it was not a very good feeling.
13 13     Q.  Oh.  Okay.
14 14     A.  A great feeling was to deliver your number
15 15 or to exceed your number.
16 16     Q.  Right.  Okay.  Was this subject a matter of
17 17 discussion at the executive committee meetings in Q2
18 18 and Q3 of fiscal year '01?
19 19     MR. GOLDSTEIN:  Objection to form.
20 20     THE WITNESS:  I don't ever remember it
21 21 being discussed.  I -- I don't recall it being
22 22 discussed in Q2 or Q3.  What I do recall, it was a
23 23 one-time statement from Larry.
24 24     MR. DE GHETALDI:  All right.  This will be
25 25 Exhibit 157, I believe.

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

153

1   00153:01      (Deposition Exhibit 157 was marked for
2      02   identification.)
3      03      THE WITNESS: Thank you.
4      04      Okay.
5      05 BY MR. DE GHETALDI:
6      06      Q. Do you recall the email that is in Exhibit
7      07 157?
8      08      A. No, I do not.
9      09      Q. Do you recall the subject matter of that
10     10 email?
11     11      A. I don't recall -- I -- I don't recall. I
12     12 don't recall the discussion around the analyst
13     13 conference. I attended a number of those. I don't
14     14 recall that. I don't recall apparently where an
15     15 analyst was talking about Ariba and i2 losing an
16     16 exchange and IBM --
17     17      (Discussion off the record.)
18     18      THE WITNESS: I don't recall -- I'm
19     19 quoting --
20     20      MR. GOLDSTEIN: He just --
21     21      THE WITNESS: I'm --
22     22      MR. GOLDSTEIN: -- needs you to repeat --
23     23      THE WITNESS: I --
24     24      MR. GOLDSTEIN: -- what you said.
25     25      THE WITNESS: I -- right. I know. I'm

154

1   00154:01 quoting from the email. And it's a sentence I wrote
2      02 that's not particularly clear. But it said "that
3      03 tied" -- "that," T-H -- T-H-A-T; "tied," T-I-E-D --
4      04 "to Ariba/i2 losing" exchange -- "an exchange"; and
5      05 the rest of that sentence. I don't recall that.
6      06 And I don't recall having the discussion with Jeff.
7      07 This was -- you know, this was 40 months ago.
8      08      Q. Sure. Oh, yeah. That's -- the -- the
9      09 subject is "Why would we warn the market about
10     10 technology revenue?" Does that help your memory at
11     11 all?
12     12      A. No. "Is there an overall weakness." No.
13     13      Q. All right.
14     14      A. I don't recall this at all.
15     15      MR. DE GHETALDI: Okay. 158.
16     16      (Deposition Exhibit 158 was marked for
17     17 identification.)
18     18      THE WITNESS: Okay.
19     19 BY MR. DE GHETALDI:
20     20      Q. Do you recall receiving the email in
21     21 Exhibit 158 from Mr. Blotner?
22     22      A. No, I don't recall it specifically.
23     23      Q. Okay. He talks about the Q3 pipe looking
24     24 great and -- and all three areas being over two
25     25 times. Do you have any idea what he's referring to

155

1   00155:01 when he says "all three areas are over two times,
2      02 even without GM enterprise deal?
3      03      A. Yeah, "enterprise deal." Yeah, it's a
4      04 typo.
5      05      Q. Yeah.
6      06      A. Yes, he's talking about -- if you see the
7      07 previous bullet, "pipe shows 2.75 times coverage of
8      08 budget" and three point time -- or "3.8 times
9      09 compared to last year" -- so keeping -- referring
10     10 first to the "2.75x coverage of budget," what he's
11     11 saying here is when you disaggregate that down into
12     12 the three areas, each of the three areas are at
13     13 least -- have at least two times coverage for their
14     14 projected revenue for the quarter.
15     15      Q. Okay. Was there a -- a coverage ratio
16     16 that -- that you liked to see --
17     17      MR. GOLDSTEIN: Objection to form.
18     18 BY MR. DE GHETALDI:
19     19      Q. -- at a particular point in the quarter,
20     20 recognizing that that might change as the quarter
21     21 went on?
22     22      A. Well, it -- it depends on the part of
23     23 the -- I mean, which part of the quarter that you're
24     24 in. For example, at the front end of the quarter I
25     25 would like to see good coverage, good coverage of

156

1   00156:01 1.5 revenue or greater. Two made me comfortable,
2      02 very comfortable. Or I don't know if it made me
3      03 comfortable. It made me feel better. And then as
4      04 the quarter went on, and towards the end, I paid
5      05 less attention to coverage, because no matter what
6      06 your coverage is, revenue is only signed contracts.
7      07 And so that's where my focus would move towards the
8      08 end of the quarter, where I would not pay attention
9      09 to coverage at all. I'm focused on deals and where
10     10 those contracts are and are we going to close them
11     11 or not.
12     12      Q. Okay. Mr. Blotner's last bullet point is
13     13 "Q4 will still be a big challenge to show growth."
14     14 Do you see that?
15     15      A. Yes, I do.
16     16      Q. Had that been a subject of -- of
17     17 discussion?
18     18      A. It's a subject of discussion every year,
19     19 because Oracle traditionally has a blowout fourth
20     20 quarter. And it was very typical that, going into
21     21 Q4, it was going to be a tough quarter to achieve.
22     22      Q. Okay.
23     23      A. The -- the compensation for the sales reps
24     24 would have -- I mean, their compensation was
25     25 dependent on deals sold. And we had the tradition

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

157

1  00157:01  of selling a lot of business in Q4, which was
2  02  wonderful that Q4 and would have made it challenging
3  03  the next Q4.
4  04  Q. Right.
5  05  A. Year after year.
6  06  Q. Right. Okay. Had you ever seen -- had you
7  07  seen this Exhibit 158 recently, or --
8  08  A. I believe I saw it yesterday. But I'm not
9  09  sure. I may have. I -- I saw a number of things
10  10  yesterday. But I'm fairly certain I did see this
11  11  one.
12  12  MR. DE GHETALDI: All right. If we take a
13  13  ten-minute break, I think we'll still be able to
14  14  finish by 5:00.
15  15  THE WITNESS: Great.
16  16  THE VIDEOGRAPHER: We're going off the
17  17  record. The time is 4:14.
18  18  (Recess taken.)
19  19  THE VIDEOGRAPHER: We're going back on the
20  20  record. The time is 4:28.
21  21  MR. DE GHETALDI: All right. Home stretch
22  22  here.
23  23  Let's start with Exhibit 159.
24  24  (Deposition Exhibit 159 was marked for
25  25  identification.)

158

1  00158:01  THE WITNESS: Thank you.
2  02  Okay.
3  03  BY MR. DE GHETALDI:
4  04  Q. This is actually a couple of emails --
5  05  A. I see that.
6  06  Q. -- clipped together.
7  07  Do you recall sending the email that's a
8  08  part of the first page of Exhibit 159 to Safra Catz?
9  09  A. Vaguely.
10  10  Q. Okay.
11  11  A. Vaguely.
12  12  Q. Do you recall the subject of that email?
13  13  A. Jay Nussbaum had proposed a -- a special
14  14  sales incentive for Q3. And as I indicated here, he
15  15  copied George Roberts and me on it. And I responded
16  16  that with the pipeline that we had in Q3, that I
17  17  felt very good about where we were, and that I
18  18  didn't feel that it was necessary.
19  19  Q. Do you recall why Mr. Nussbaum was
20  20  proposing an incentive in Q3 2001?
21  21  A. No. You should -- you should ask him. I
22  22  don't.
23  23  Q. Well, you say here, in your email, "a
24  24  special...incentive to drive license business."
25  25  What -- what does that mean?

159

1  00159:01  A. The term?
2  02  Q. Yeah. What did you mean by that term?
3  03  A. What I meant by that was Jay was proposing
4  04  a special Q3 incentive to drive the license
5  05  business, which means that on top of the commission
6  06  that a sales rep would be paid on a deal, he was
7  07  proposing some form of additional money. And I
8  08  don't -- I don't recall what it was. I mean, it
9  09  could have been a percentage -- I mean, increasing
10  10  the percentage slightly or some lump sum dollar
11  11  amount, something like that per deal. I don't know.
12  12  But it's a -- it's an incremental dollar amount that
13  13  would go to the sales rep.
14  14  Q. Okay. Well, how -- how does that drive the
15  15  license business?
16  16  A. A sales rep is very motivated by money they
17  17  make. And this would be more money in their pocket.
18  18  Q. Do you know if Mr. Nussbaum felt there was
19  19  a special need to give extra incentives to -- to
20  20  sales personnel in Q3 '01 in order to drive license
21  21  business?
22  22  A. I don't recall what the specifics -- why
23  23  Jay would suggest it. And, again, you know, you
24  24  should -- you should talk to Jay on it. I don't.
25  25  I -- again, looking at my business, I didn't feel it

160

1  00160:01  was something I needed to consider.
2  02  Q. Okay. You say, "I may want to revisit this
3  03  in Q4, but unlikely." Why would that -- why would
4  04  you -- why did you think, in January 2001, that you
5  05  might want to revisit this idea in Q4?
6  06  A. Because I knew that we had had a -- a
7  07  blowout Q4 the previous year and it was going to be
8  08  a tough number to exceed this year --
9  09  Q. All right.
10  10  A. -- for OPI.
11  11  Q. Okay. This has already been marked as
12  12  Exhibit 56.
13  13  MR. GOLDSTEIN: "How do you know?"
14  14  MR. DE GHETALDI: John taught me his trick.
15  15  MS. RIDDLE: We have so much to learn from
16  16  John.
17  17  THE WITNESS: Okay.
18  18  BY MR. DE GHETALDI:
19  19  Q. Have you seen Exhibit 56 before today?
20  20  A. I saw it yesterday. And I -- I can't
21  21  remember. It may have been in my special litigation
22  22  committee testimony package. I can't recall at this
23  23  point.
24  24  Q. I think it was --
25  25  A. Okay.

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

161

1  00161:01   Q. -- actually, yeah.
2  02     But you never saw this document, to the
3  03 best of your recollection, in January 2001?
4  04     A. The first time I put my eyes on it was
5  05 yesterday, on the airplane up here, since it was
6  06 included in that package. I saw it then. That was
7  07 the first time I saw it.
8  08     Q. Okay. Well, Mr. English says to Jennifer
9  09 Minton, in the second paragraph, that "We have a lot
10  10 of pipe at challenging clients." Would you agree
11  11 with that assessment, as of the time that it was
12  12 written?
13  13     A. Well, I think it's -- I -- I don't know
14  14 what Jim meant by this, because I -- I didn't write
15  15 it, and I -- nor was I a party to it. What I do
16  16 know is how OPI had many challenging clients. I've
17  17 mentioned GE. Intel. HP. When you're dealing with
18  18 companies like that, they're all very challenging.
19  19 You may have done that, as well, in your legal work.
20  20 And they're -- they -- at OPI, when we -- and we
21  21 verticalized. We took a set of named accounts into
22  22 OPI. And they were the major accounts in the
23  23 different industries that we talked about at the --
24  24 towards the beginning of the deposition. And the
25  25 sheer fact that they're large alone makes them

162

1  00162:01 challenging.
2  02     Q. Okay. Mr. English also said that "One AVP"
3  03 started -- or "talked of starting to see indications
4  04 of client delays on decisions." Do you see? That's
5  05 right towards the middle.
6  06     A. Yes, I do; in the middle.
7  07     Q. Yeah. Do you recall being told that by any
8  08 of your AVPs in Q3 '01?
9  09     A. I don't recall that statement, or an AVP
10  10 saying that.
11  11     MR. DE GHETALDI: All right. Where are we,
12  12 160?
13  13     THE COURT REPORTER: Correct.
14  14     (Deposition Exhibit 160 was marked for
15  15 identification.)
16  16     THE WITNESS: Thank you.
17  17     Okay. I've glanced through it.
18  18 BY MR. DE GHETALDI:
19  19     Q. Do you recall receiving the email that's
20  20 contained in Exhibit 160?
21  21     A. I -- I remember getting a note from Tom.
22  22 It wasn't until I saw this yesterday that I saw the
23  23 specifics, since I received it back in February of
24  24 2001.
25  25     Q. Okay. This is dated February 3rd, 2001.

163

1  00163:01 When did Mr. Thimot actually resign; do you recall?
2  02     A. It was during the quarter. And I don't
3  03 recall specifically. It was obviously before the
4  04 3rd of February 2001.
5  05     Q. Do you recall approximately how long before
6  06 that?
7  07     A. No, I don't. My guess is that it wasn't
8  08 too much before this; within -- I would say it was
9  09 probably within a week before this.
10  10     Q. Okay.
11  11     A. I -- actually, I'm -- I -- I don't -- in
12  12 the end, I don't know.
13  13     Q. That's --
14  14     A. I'm speculating. And I probably shouldn't
15  15 speculate.
16  16     Q. That's fair. That's fair.
17  17     All right. 161.
18  18     (Deposition Exhibit 161 was marked for
19  19 identification.)
20  20     THE WITNESS: Thank you.
21  21     Okay. And I believe mine is missing a
22  22 page.
23  23 BY MR. DE GHETALDI:
24  24     Q. Oh.
25  25     MR. NADOLENCO: Mine, too.

164

1  00164:01     MS. LAVALLEE: Mine, too. Sorry.
2  02     THE WITNESS: I recall what it was. It was
3  03 a listing of programs and people assigned to them.
4  04 BY MR. DE GHETALDI:
5  05     Q. Okay. Well, we'll -- we'll just get
6  06 another --
7  07     A. Okay.
8  08     Q. -- another copy. And --
9  09     A. Okay.
10  10     Q. -- I'll ask you about some other things
11  11 here.
12  12     The man named Simler -- what was his first
13  13 name?
14  14     A. Gary Simler.
15  15     Q. Gary, Gary Simler. He -- was he head of
16  16 one of your consulting practice groups?
17  17     A. West consulting.
18  18     Q. West consulting. Do you recall any effect
19  19 of the dotcom bubble burst being felt in -- in the
20  20 West consulting group in the third quarter of 2001?
21  21     A. Not specifically. No.
22  22     Q. Okay. Do you recall any consulting
23  23 projects in -- in the Western region disappearing in
24  24 the third quarter of 2001?
25  25     A. Consulting projects disappearing?

165

```
1   00165:01   Q.  Right.
2   02      A.  What is -- what do you mean by
3   03   "disappearing"?
4   04      Q.  Well, companies going out of business.
5   05      A.  Not specifically, no.
6   06      Q.  Do you recall the eToys project?
7   07      A.  Very vaguely.  Very vaguely.  And more
8   08   because eToys was -- got such big press.  It was
9   09   going to be the New World.
10  10      Q.  Right.
11  11      A.  It died.
12  12      Q.  It turned out -- it turned out it didn't.
13  13      A.  Right.
14  14      Q.  Okay.  And did Mr. Gage run another of your
15  15   consulting practice groups?
16  16      A.  I -- I recognize that name.  He didn't
17  17   report to me.  He -- it's -- he may well have been
18  18   in one of my organizations.  I had responsibility
19  19   for about 7,000 people --
20  20      Q.  Sure.
21  21      A.  -- so I don't remember them all.
22  22      Q.  Sure.
23  23         Okay.  Hopefully we got all the pages to
24  24   this one.
25  25      A.  Okay.
```

166

```
1   00166:01   Q.  Didn't copy the exhibits.  This is 162.
2   02         (Deposition Exhibit 162 was marked for
3   03   identification.)
4   04      MR. DE GHETALDI:  I finally figured out why
5   05   Nicole is standing up all the time:  because I'm not
6   06   giving enough copies over there.
7   07      MR. GOLDSTEIN:  Oh, I've already --
8   08      MR. NADOLENCO:  That's the first you've
9   09   actually --
10  10      MR. GOLDSTEIN:  I've already got one,
11  11   actually.
12  12      MR. NADOLENCO:  -- figured that out now.
13  13      MR. DE GHETALDI:  It took me to the end of
14  14   the day.
15  15      MR. NADOLENCO:  That's what I mean.
16  16      THE WITNESS:  Okay.  I've had a chance to
17  17   review this, yesterday.
18  18   BY MR. DE GHETALDI:
19  19      Q.  All right.  Was yesterday the first time
20  20   that you saw Exhibit 162?
21  21      A.  Yes.  To be completely accurate, it was
22  22   FedEx'd to me in the last three to five days, is
23  23   what I would guess.  But I didn't do anything -- I
24  24   didn't read it until I was on the airplane
25  25   yesterday.
```

167

```
1   00167:01   Q.  All right.  But --
2   02      A.  So yesterday was the first time I saw it.
3   03      Q.  Okay.  Does Exhibit 162 accurately
4   04   summarize what you told the special litigation
5   05   committee in October of 2002?
6   06      MR. GOLDSTEIN:  Objection to form.
7   07      THE WITNESS:  I saw two changes that needed
8   08   to be made.
9   09   BY MR. DE GHETALDI:
10  10      Q.  Okay.  Can you show me?
11  11      A.  Yes.  On page -- the first page, the last
12  12   paragraph, third line, where it mentions "SEIC,"
13  13   that's actually SAIC.  It's about a $6 billion
14  14   company based in San Diego.  I don't recall -- I
15  15   believe it was referred to one other time as well,
16  16   and it was also the same error.
17  17      Q.  The last line on that first page, I think.
18  18      A.  Yeah, I think that may be it.
19  19         And then on page 12, last line, where it
20  20   says "the CEO of Solectron," that should say "the
21  21   CIO of Solectron."
22  22      Q.  Okay.
23  23      A.  And to the best of my recollection, those
24  24   are the only two changes.
25  25      Q.  All right.  But otherwise you think that it
```

168

```
1   00168:01   accurately reflects what -- what you told the SLC?
2   02      A.  Yes.
3   03      Q.  All right.  I just have a couple of
4   04   questions about -- on page 15, at the bottom --
5   05      A.  Okay.
6   06      Q.  -- it says -- and it continues onto
7   07   page 16.  It says, "During the Committee's interview
8   08   of Jennifer Minton, Minton mentioned that she was
9   09   contemplating a stock sale in January 2001 and
10  10   recalled discussing it with Sanderson, who,
11  11   according to Minton, was also contemplating such a
12  12   sale.  Sanderson did not recall any such discussion
13  13   with Minton."
14  14         I guess what I didn't understand about --
15  15   from the summary, from reading it, was whether this
16  16   was a case where you didn't recall the conversation
17  17   that might have taken place or you didn't recall a
18  18   conversation because to the best of your knowledge
19  19   it never took place.
20  20      A.  I don't recall having that discussion with
21  21   Jennifer.  And I feel pretty confident of that,
22  22   because I had sold my vested options.  When -- when
23  23   was this recorded?
24  24      Q.  Well, the -- the interview --
25  25      A.  It was October -- okay, so on October 2,
```

169

00169:01 2002. But in July -- I -- I don't recall correct --
02 I mean specifically, but I think I sold my options
03 in the summer of 2000.
04    Q.  Okay.
05    A.  So I had no vested options, or very few
06 vested options, at that point to sell, to even
07 consider selling. So I don't know where this would
08 come out; I mean, Jennifer would conclude that I was
09 considering selling options as well. I didn't -- I
10 may be wrong, but I don't believe I had any options,
11 or a very modest amount, that I could sell.
12    Q.  All right.  Do you -- do you recall a
13 conversation with Jennifer Minton in which you
14 expressed concern over the effect of the economy on
15 either Oracle's or OPI's business prospects?
16    A.  I don't -- I don't recall a discussion like
17 that.
18    Q.  Okay.  And, again, just so that I
19 understand, is that a -- you don't recall because --
20 but it might have happened or you don't recall and
21 you don't think that such a conversation occurred?
22    A.  I -- I -- that's probably a -- a -- more
23 specificity than I could provide. I -- I don't --
24 don't remember ever having that discussion with
25 Jennifer. So I'm not sure that it -- it could have

170

00170:01 happened. I mean, I don't recall even well enough
02 to speculate whether I may have or not.
03    Q.  Okay.  That's fair.  Now, if you could turn
04 to page 6, please.
05    A.  Okay.
06    Q.  And towards the bottom of the page, the
07 last sentence, just above the -- the heading "Monday
08 Executive Management Committee Calls," says, "For
09 example, he stated that George Roberts, head of NAS,
10 had a reputation for sandbagging his numbers in
11 order to exceed his forecasts every quarter."
12    A.  Okay.
13    Q.  Is -- was that your understanding of
14 Mr. Roberts' reputation?
15    A.  As I indicated, that with my managers that
16 reported to me in OPI, some were more aggressive in
17 their forecasts and others were more conservative.
18 George, I would describe, was a more conservative
19 forecaster. And I used the term "sandbagging" here,
20 I -- and I said, as a quote, as it says here:
21 quote, "had a reputation for sandbagging." I never
22 had gone back and looked at the numbers to see what
23 George's forecast was versus what it actually was.
24 But he had that reputation of being conservative.
25    Q.  Okay.  Did Mr. Nussbaum have a reputation

171

00171:01 in fiscal year 2001 for being conservative or
02 aggressive in his forecasting?
03    A.  You know, having a reputation, to answer
04 that is speculating.  I mean, it's --
05    Q.  Okay.
06    A.  To me it's not -- I mean, the answer is --
07 is it can be very factually answered by looking at
08 the -- the numbers. In fact, one of the exhibits we
09 have here we could go to and look at that.
10    Q.  Right.
11    A.  I would say that, that said -- and I am
12 speculating -- that he probably had a reputation of
13 being slightly aggressive.
14    Q.  Okay.  Did -- did Jennifer Minton have a
15 reputation for being either conservative or
16 aggressive in her forecasting?
17    A.  I never looked at Jennifer as being a
18 forecaster. I looked at George, Jay, and me in the
19 U.S. as the forecasters. So I didn't have an
20 opinion about Jennifer in that regard. I never -- I
21 never considered her a forecaster. I viewed her as
22 a -- the controller of the company and producing
23 financial reports.
24    Q.  All right.  If you could turn to page 7.
25    A.  Okay.

172

00172:01    Q.  The section with -- under the heading "Q3
02 of FY 2001 Forecasting" says, "Sanderson stated that
03 forecasting license sales in an uncertain economy is
04 nearly impossible and he equated Oracle's
05 forecasting visibility during Q3 of FY 2001 to a
06 plane flying in cloud cover. The pilots must rely
07 on their instrument panel to navigate through the
08 clouds just like Oracle must rely on: number one,
09 its pipeline reports; number two, historical
10 conversion rates; number three, knowledge of the
11 customer; and, four, knowledge of the deal to guide
12 it through the quarter."
13       Was -- was Q3 of 2001 actually more cloudy
14 than -- than quarters you had experienced in the
15 past, in terms of visibility?
16    MR. NADOLENCO:  Objection; form.
17    THE WITNESS:  There was an argument that
18 because the economy was growing uncertain, that -- I
19 mean -- that it was difficult -- in a good economy
20 it's -- it's difficult to forecast. In a -- in a,
21 quote, "uncertain economy," that was emerging, it's
22 difficult. And that's why I commented here that
23 you -- you can't -- you can't, in the end, get
24 caught up about the, quote, "uncertain economy."
25 You have to rely on the facts that you have, which

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

173

1   00173:01  are the facts that I mention here, to be able to
2   02  forecast.
3   03  BY MR. DE GHETALDI:
4   04      Q.  Well -- well, did you tell the SLC that --
5   05  that forecasting license sales in Q3 '01 was nearly
6   06  impossible?
7   07      MR. GOLDSTEIN:  Objection to the form.
8   08      THE WITNESS:  I don't recall that statement
9   09  specifically.  It's contained in the document.
10  10  And -- so I assume that it was translated correctly.
11  11  I -- I -- as I read it, I -- "forecasting license
12  12  sales," there's not a reference to OPI.  It is a
13  13  general statement that it is -- "forecasting license
14  14  sales in" -- "in an uncertain economy
15  15 ...impossible."  So, just as -- it's saying so
16  16  what you have to do is rely on your instruments if
17  17  you're flying.  And those instruments are the things
18  18  that I outlined in the next sentence.
19  19  BY MR. DE GHETALDI:
20  20      Q.  Right.  Okay.
21  21      A.  And I believe, if you look, I came within
22  22  one percent of my forecasts for the quarter.
23  23      Q.  You were the best.
24  24      A.  On forecasting.
25  25      Q.  On forecasting.

174

1   00174:01      Now we're going to -- now we're going to
2   02  try 161 again.
3   03      A.  Okay.
4   04      Q.  Hopefully this is --
5   05      A.  So we can -- we can -- I'm just going to
6   06  throw that one -- that's the one that was missing a
7   07  page.
8   08      Q.  That's the used pile.  And here's the --
9   09  the replacement for 161.
10  10      A.  Thank you.
11  11      Okay.
12  12      Q.  Do you -- do you recall sending this email
13  13  that's contained in Exhibit 161 out in early
14  14  February 2001?
15  15      A.  I recall the subject matter that this is
16  16  about.  I don't recall that it was specifically in
17  17  February 2001.
18  18      Q.  Okay.  And what do you recall of the -- the
19  19  subject matter?
20  20      A.  We had -- in consulting, we had been very
21  21  successful in -- I used the term "service lines"
22  22  earlier, if you recall.  That was like applications
23  23  or system performance, things of that nature.  And
24  24  we focused intellectual capital around those -- some
25  25  specific service lines and consulting, to help drive

175

1   00175:01  the business.  And it had been very successful for
2   02  us.
3   03      And when I took over OPI, there had been
4   04  some effort around some programs, service line -- I
5   05  mean, same notion as service line:  specific
6   06  program -- solutions to sell to a customer.  But as
7   07  I looked at what was being done before I -- when I
8   08  took over OPI, I felt they were too complex, and I
9   09  didn't feel that sales could relate to them.
10  10      So I launched a joint effort between sales
11  11  and some specific people in sales, our sales
12  12  consulting organization, that support salespeople on
13  13  deals, and folks out of consulting, to come up with
14  14  a set of programs that were very simple and that
15  15  drove product revenue.  And I created virtual teams
16  16  from sales and consulting, from telesales, to
17  17  jointly define what these major programs were, so
18  18  that we could be -- we could have programs that were
19  19  more programmatic, so that we could leverage reuse
20  20  and -- and use sales tools again and again to drive
21  21  business.  And I launched that in OPI, to -- to
22  22  drive more business for the company -- I mean to --
23  23  for OPI.
24  24      MR. DE GHETALDI:  Okay.  Okay, good.  Well,
25  25  it's 4:58.

176

1   00176:01      MR. GOLDSTEIN:  Yeah.
2   02      MR. DE GHETALDI:  And that's -- that's all
3   03  the questions I have.  But like with all the other
4   04  depositions, we -- we have a continuing issue about
5   05  the -- the production of documents.  And the -- the
6   06  plaintiffs and the defendants have differing views
7   07  on that.  And so with -- with that qualification,
8   08  that's all the questions that I have.
9   09      MR. GOLDSTEIN:  We have no questions today.
10  10  Thank you.  Thank you very much.
11  11      MR. NADOLENCO:  Thank you.
12  12      THE VIDEOGRAPHER:  This marks the end of
13  13  Videotape Number 3 and Volume I in the deposition of
14  14  Edward J. Sanderson.  The original videotapes will
15  15  be retained by Dan Mottaz Video Productions LLC, 182
16  16  Second Street, Suite 202, San Francisco, California
17  17  94105, (415) 624-1300.  The time is 5:02.  We're off
18  18  the record.
19  19      (Deposition concluded at 5:02 p.m.)
20  20          ---oOo---
21  21
22  22
23  23
24  24
25  25

177

```
1    00177:01          CERTIFICATE OF WITNESS
2    02
3    03
4    04
5    05        I, the undersigned, declare under penalty
6    06   of perjury that I have read the foregoing transcript
7    07   and I have made any corrections, additions, or
8    08   deletions that I was desirous of making; that the
9    09   foregoing is a true and correct transcript of my
10   10   testimony contained therein.
11   11        EXECUTED at _____, California,
12   12   this _____ day of _____, 2004.
13   13
14   14        _____
15   15        Signature of the witness
16   16
17   17
18   18
19   19
20   20
21   21
22   22
23   23
24   24
25   25
```

179

```
1    00179:01          ROBERT BARNES ASSOCIATES
2    02        San Francisco, California  94102
3    03
4    04  TO:  MR. EDWARD J. SANDERSON, JR.
5    05        Morrison & Foerster LLP
6    06        Palo Alto, California  94304-1018
7    07  RE:  ORACLE COORDINATION PROCEEDING JUDICIAL COUNCI
8    08        ACTION NO. 18751
9    09        Deposition taken March 9, 2004
10   10
11   11
12   12   taken in the above-entitled action has been prepared
13   13   correcting, and signing.  In the alternative, you
14   14   this office and all counsel in writing of any
15   15   transcript.
16   16        Your rights regarding signature of this
17   17   otherwise directed, your original deposition
18   18   code.
19   19        If you wish to make arrangements to review
20   20   contact this office during office hours, 9 to 5,
21   21
22   22
23   23
24   24             CSR No. 6862
25   25  cc:  All counsel
```

178

```
1    00178:01          CERTIFICATE OF REPORTER
2    02
3    03        I, JOHN WISSENBACH, hereby certify that the
4    04   witness in the foregoing deposition was by me duly
5    05   sworn to testify the truth, the whole truth, and
6    06   nothing but the truth in the within-entitled cause;
7    07   that said deposition was taken at the time and place
8    08   therein stated; that the testimony of said witness
9    09   was reported by me, a Certified Shorthand Reporter
10   10   and disinterested person, and was thereafter
11   11   transcribed into typewriting, and that the pertinent
12   12   provisions of the applicable code or rules of civil
13   13   procedure relating to the notification of the
14   14   witness and counsel for the parties hereto of the
15   15   availability of the original transcript of the
16   16   deposition for reading, correcting, and signing have
17   17   been met.
18   18        And I further certify that I am not of
19   19   counsel or attorney for either or any of the parties
20   20   to said deposition, nor in any way interested in the
21   21   outcome of the cause named in said caption.
22   22   DATED:
23   23
24   24        JOHN WISSENBACH, CSR No. 6862
25   25
```

EXHIBIT AA

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3                    ---o0o---
 4   IN RE ORACLE CORPORATION
     SECURITIES LITIGATION,
 5
                  MASTER FILE NO.
 6                C-01-0988-MJJ
 7   THIS DOCUMENT RELATES TO:
     ALL ACTIONS
 8   _____/
 9
10          C O N F I D E N T I A L
11       DEPOSITION OF SAFRA CATZ
12         Friday, March 23, 2007
13        Volume II (Pages 215 - 351)
14
15
16
17
18   REPORTED BY:
19   HOLLY MOOSE, RDR-CRR-CRP
     CSR NO. 6438
20
21
        SHEILA CHASE & ASSOCIATES
22           REPORTING FOR:
          LiveNote World Service
23       221 Main Street, Suite 1250
         San Francisco, CA  94105
24       Telephone: (415) 321-2300
           Fax: (415) 321-2301
25
```

215

```
 1        A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3
       LERACH, COUGHLIN, STOIA & ROBBINS
 4     BY:  MARK SOLOMON, ESQ.
            STACEY KAPLAN, ESQ.
 5          SHAWN WILLIAMS, ESQ.
            MONIQUE C. WINKLER, ESQ.
 6     100 Pine Street, Suite 2600
       San Francisco, CA  94111
 7     (415)288-4545
 8
     FOR THE DEFENDANTS AND THE WITNESS:
 9
       LATHAM & WATKINS
10     BY: GREGORY P. LINDSTROM, ESQ.
       505 Montgomery Street, Suite 1900
11     San Francisco, CA  94111
       (415)391-0600
12
13   FOR DEFENDANT ORACLE CORPORATION:
14     ORACLE CORPORATION LEGAL DEPARTMENT
       BY:  JAMES C. MAROULIS, ESQ.
15     500 ORACLE PARKWAY
       Redwood Shores, CA  94065
16     (650)506-4517
17
     ALSO PRESENT:  James Terrell, Videographer;
18       LiveNote World Services
         Eli Greenstein (via Internet feed)
19       Keith Mautner (via Internet feed)
         Ryan Guiboa (via Internet feed)
20
21   TAKEN AT:
22     LERACH, COUGHLIN, STOIA & ROBBINS
       100 Pine Street, Suite 2600
23     San Francisco, CA  94111
       (415)288-4545
24
25              ---o0o---
```

216

```
 1             I N D E X
 2
 3   DEPOSITION OF SAFRA CATZ, VOLUME II
 4
 5   EXAMINATION BY:                    PAGE
 6     MR. SOLOMON                      221
 7
 8   CATZ EXHIBITS
 9   Exhibit 43  1/19/01 e-mail to Cooperman from Catz,
              NDCA-ORCL 039432, 1 page       230
10
     Exhibit 44  1/19/01 e-mail to Wallace and Cooperman,
11            NDCA-ORCL 039431, 1 page       240
12   Exhibit 45  1/22/01 e-mail string, NDCA-ORCL
              041981-82, 2 pages             242
13
     Exhibit 46  1/29/01 e-mail string, NDCA-ORCL
14            035682-85, 4 pages             258
15   Exhibit 47  1/5/01 e-mail to Catz from Balkenhol,
              NDCA-ORCL 1053820-55, 36 pages  294
16
     Exhibit 48  1/24/01 e-mail to Catz from Lockhart,
17            NDCA-ORCL 609894, 1 page       303
18   Exhibit 49  1/24/01 e-mail to Ellison from Catz,
              NDCA-ORCL 035365, 1 page       307
19
     Exhibit 50  4/11/00 e-mail to Catz from Wallace,
20            NDCA-ORCL 014068-72, 5 pages   318
21   Exhibit 51  11/30/00 e-mail to tawillia and others
              from Mahon, NDCA-ORCL 025066-67, 2 pages 323
22
     Exhibit 52  11/19/00 License Checklist, NDCA-ORCL
23            255140, 1 page                 324
24   Exhibit 53  11/30/00 e-mail to tawillia and others
              from Mahon, NDCA-ORCL 210354-55, 2 pages 325
25
```

217

```
 1   PLAINTIFFS' EXHIBITS (CONTINUED)       PAGE
 2
 3   Exhibit 54  10/21/02 e-mail to Roberts and others
              from Quinn, no Bates numbers, 2 pages  329
 4   Exhibit 55  Spreadsheet, NDCA-ORCL 1260319-21,
              1261528-30, 6 pages            331
 5
     Exhibit 56  E-mail string, NDCA-ORCL 1056920-49
 6            21 pages                       335
 7   Exhibit 57  3/28/01 e-mail to Kender and others from
              Morrissey, NDCA-ORCL 1027932-35, 4 pages 337
 8
     Exhibit 58  3/28/01 e-mail to Wohl from Catz,
 9            NDCA-ORCL 1026868-79, 12 pages  339
10
11   INSTRUCTIONS NOT TO ANSWER
12     Page 223, Line  7
13
14
15
16
17
18
19
20
21              ---o0o---
22
23
24
25
```

218

1    BE IT REMEMBERED that, pursuant to
2    Continuation and on Friday, March 23, 2007, commencing
3    at the hour of 1:04 p.m., before me, HOLLY MOOSE, CSR
4    No. 6438, a Certified Shorthand Reporter in the State of
5    California, there personally appeared
6
7                    SAFRA CATZ,
8
9    called as a witness by Plaintiffs, who, having been
10   first duly resworn, was examined and testified as
11   hereinafter set forth:
12
13
14
15               ---o0o---
16
17
18
19
20
21
22
23
24
25

219

1    PROCEEDINGS                    1:04 P.M.
2         THE VIDEOGRAPHER:  This begins tape 1 in
3    Volume II in the deposition of Safra Catz, in the matter
4    of In Re Oracle Corporation Securities Litigation, filed
5    in the United States District Court for the Northern
6    District of California, case number C-01-0988-MJJ.
7         Today's date is March 23, 2007.  The time on
8    the video monitor is 1:04.  Video operator today is
9    James Terrell, representing LiveNote World Service,
10   located at 221 Main Street, Suite 1250, San Francisco,
11   California, 94105.  The phone number is 415-321-2300.
12   The court reporter today is Holly Moose with Sheila
13   Chase & Associates, reporting on behalf of LiveNote
14   World Service.
15        Volume II is being taken on behalf of
16   plaintiff [sic] and is taking place at 100 Pine Street,
17   San Francisco, California.
18        And will counsel please identify -- introduce
19   yourselves and state whom you represent.
20        MR. SOLOMON:  Mark Solomon, representing
21   plaintiffs.
22        MS. KAPLAN:  Stacey Kaplan, representing
23   plaintiffs.
24        MS. WINKLER:  Monique Winkler, representing
25   plaintiffs.

220

1         MR. WILLIAMS:  Shawn Williams, representing
2    plaintiffs.
3         MR. LINDSTROM:  Greg Lindstrom, representing
4    defendants and the witness.
5         MR. MAROULIS:  James Maroulis of defendant
6    Oracle Corporation for defendant Oracle Corporation.
7         THE VIDEOGRAPHER:  Thank you.  You may
8    proceed.
9         MR. SOLOMON:  Want to swear the witness in
10   again, please.
11        (Witness resworn).
12                    SAFRA CATZ,
13   having been first duly resworn, testified as follows:
14              EXAMINATION BY
15        MR. SOLOMON:  Q.  Good afternoon, Ms. Catz.
16   A.  Hello.
17   Q.  Are you still employed at Oracle Corporation?
18   A.  I was this morning, yes.
19   Q.  Okay.  And as of this morning, what was your
20   position?
21   A.  I'm president and chief financial officer.
22   Q.  Okay.  Have you had a opportunity to review
23   the transcript of the testimony that you previously gave
24   in this particular proceeding?
25   A.  Yes.

221

1    Q.  And have you corrected it to any extent?
2    A.  Oh, I don't remember if we corrected it.
3    Q.  Okay.  Have you read the complaint in this
4    matter?
5    A.  No.
6    Q.  Have you read any of the briefs in this
7    matter?
8    A.  No.
9    Q.  And have you looked at any documents in
10   preparation for this session of your deposition?
11   A.  Yes.
12   Q.  And when did you look at those documents?
13   A.  Yesterday.
14   Q.  And did you meet with your lawyers yesterday?
15   A.  I did.
16   Q.  And who did you meet with?
17   A.  I met with Greg Lindstrom and Jim Maroulis and
18   two other lawyers from Latham & Watkins.
19   Q.  Okay.  And do you know who they were?
20   A.  Yes.
21   Q.  Who were they?
22   A.  Well, Pat Gibbs is one of them.  And I know
23   she'll feel bad; I don't remember the other one's name.
24   Q.  Okay.  And how long did you meet with them
25   for?

222

1    A.  An hour and a half, two hours.

2    Q.  Okay.  How many documents did you look at?

3    A.  Two -- three.  Three.

4    Q.  Okay.  Did the documents refresh your

5  recollection in any way as to what was recorded in them?

6    A.  Not really.

7    Q.  Did the documents relate to topics that you've

8  already been questioned about in this litigation?

9    MR. LINDSTROM:  I'm going to object to that

10  question as invading the attorney/client privilege and

11  work product doctrine and instruct the witness not to

12  answer.

13    MR. SOLOMON:  Okay.

14    Q.  Have you talked to Mr. Ellison about this

15  litigation since the last session of your deposition?

16    A.  About this litigation --

17    Q.  Correct.

18    A.  -- in general?

19    Q.  Yes.

20    A.  Yes.

21    Q.  And what have you -- what have you -- describe

22  the conversations you've had with him, please.

23    MR. LINDSTROM:  Let me -- let me interpose an

24  objection.  As framed, the question would require you to

25  divulge -- potentially to divulge attorney/client

223

1  privileged communications that may have occurred with

2  Mr. Ellison and yourself while counsel was present.

3    I don't know whether any conversation -- such

4  conversations occurred.  But in responding to counsel's

5  questions, I want to admonish you to only answer as to

6  independent conversations that you may have had with Mr.

7  Ellison about the litigation, without counsel present.

8    Do you understand?

9    THE WITNESS:  Yes.

10    MR. SOLOMON:  Okay.

11    THE WITNESS:  What was the question?

12    MR. SOLOMON:  Q.  And the question is, with

13  respect to those conversations that Mr. Lindstrom just

14  described, can you describe those conversations to me.

15    A.  Yeah.

16    Q.  Okay.

17    A.  He said "Do -- let's get an update on the

18  litigation."

19    I said "Okay.  I'll call Dorian."

20    Q.  Okay.

21    A.  That's one of our lawyers.  That's about the

22  whole conversation.

23    Q.  When was that conversation?

24    A.  I don't know.  Sometime maybe six weeks ago.

25  I don't know.  Some time ago.

224

1    Q.  Okay.  Did you speak with Mr. Ellison in the

2  context that Mr. Lindstrom described about an author

3  called Matthew Symonds?

4    MR. LINDSTROM:  So you understand, just so

5  we're clear on this, we're talking about conversations

6  that you had with Mr. Ellison that were without counsel

7  present.

8    MR. SOLOMON:  Correct.

9    THE WITNESS:  Can you ask it again.

10    MR. SOLOMON:  Yes.

11    Q.  Have you spoken with Mr. Ellison about the

12  author Mr. Symonds?

13    A.  No.

14    Q.  Okay.  Are aware of an issue concerning Mr.

15  Symonds in this litigation?

16    A.  I've spoken to my lawyers.

17    Q.  Okay.  And that is the only source of your

18  awareness; is that right?

19    MR. LINDSTROM:  Well, he --

20    THE WITNESS:  Yes.  I mean, but --

21    MR. LINDSTROM:  He's -- he's -- counsel's not

22  entitled to know what your lawyers have told you.  He is

23  entitled to know if there are other sources.  So as he's

24  framed the question -- he said "that's the only source."

25  If the only source of your information about Mr. Symonds

225

1  is the lawyers, you're not permitted to respond.

2    On the other hand, he's asking a foundational

3  question.  If it turns out that there's some other

4  source besides the lawyers, then he'll want to pursue

5  that.

6    Do you understand?  Should we have the

7  question reread or reposed?

8    MR. SOLOMON:  Could we read --

9    THE WITNESS:  I have --

10    MR. SOLOMON:  -- the question, please.

11    THE WITNESS:  -- no source.

12    MR. SOLOMON:  Q.  Okay.  So your testimony is

13  the only conversation you've had with Mr. Ellison

14  outside the presence of his lawyers concerning this

15  litigation, since your last deposition testimony was

16  given, was basically "Let's ask the lawyers for an

17  update"?

18    A.  Yeah.

19    Q.  "Let's go ahead," right?  Nothing else, right?

20    A.  Yeah, "What's happening," you know.

21    Q.  Okay.  Now, other than Mr. Ellison and other

22  than your lawyers, have you spoken about this litigation

23  to anybody else?

24    A.  No.  I -- like, I told my secretary, "I'm

25  going to a deposition about this."

226

1    Q.  All right.

2    A.  And she scheduled it.

3    Q.  Okay.  We'll have marked as the -- actually,

4    it's already been marked, but I'll have another copy

5    passed over to you of your interview with the special

6    litigation committee, which appears to have taken place

7    on July 16, 2002.

8        MR. LINDSTROM:  For the record, Mark, this was

9    marked as Exhibit 10 at the previous session of

10   Ms. Catz' deposition.

11       MR. SOLOMON:  Correct.

12       THE WITNESS:  Okay.

13       MR. SOLOMON:  On page 1, is it accurate

14   that you have an MBA from Wharton and you have a JD from

15   Harvard Law School?

16   A.  No.

17   Q.  What's inaccurate about that?

18   A.  I have a undergraduate degree from Wharton

19   School of Business, and I started at the University of

20   Pennsylvania Law School and I finished at Harvard.  And

21   that would be more correct.

22   Q.  So where's your JD from, from Harvard or from

23   Penn?

24   A.  It's from Penn.

25   Q.  Okay.  And is it -- what's the title of your

1    degree from Wharton?

2    A.  A Bachelor of Science in economics.

3    Q.  Have you ever represented to anybody that you

4    had an MBA from Wharton?

5    A.  No.

6    Q.  And have you ever represented to anybody that

7    you had a JD from Harvard?

8    A.  No.  In fact, I've testified previously on

9    that same topic.

10   Q.  I want to turn -- excuse me -- to page 20.

11   The control number at the bottom of the page is 297312.

12   First, you're aware that Mr. Ellison sold shares in

13   January of 2001; is that right?

14   A.  He sold during this period, yeah.  I don't

15   remember -- I don't know what month he sold.

16   Q.  And have you ever spoken to Mr. Ellison about

17   those sales?

18   A.  I don't think so.  I don't think so.

19   Q.  Is there a reason why you've never spoken with

20   Mr. Ellison about those sales?

21   A.  No, I don't think so.

22   Q.  Just a topic that's never come up?

23   A.  The -- it came up not as a sale, but it

24   impacts the budget because of the tax impact of a sale.

25   So it impacts the CEO budget.  So it wasn't about the

1    sales, but about the impact of the sales on the budget.

2    So that's what we talked about, you know, not the sales.

3    Q.  And when you say "we," who do you mean?

4    A.  Me and the finance people.

5    Q.  And who are the finance people you're talking

6    about?

7    A.  Oh, I don't remember.

8    Q.  Are you aware that in 2000 -- in January of

9    2001 that Mr. Henley also sold stock?

10   A.  I'm aware he sold during this period now, yes.

11   Q.  And have you ever spoken to anybody about

12   Mr. Henley's stock sales?

13   A.  No.

14   Q.  Did you know the sales when they were made?

15       MR. LINDSTROM:  Could we have the question

16   reread, please.

17       (Record read as follows:

18       QUESTION:  Did you know the sales when

19       they were made?)

20       MR. SOLOMON:  Q.  Did you know of the sales

21   when they were made?

22   A.  I knew about Larry Ellison's -- I don't know

23   exactly when they were made, but that they were going on

24   at one point.  I became aware of that.  And I didn't

25   know about Mr. Henley's.

1    Q.  How did you become aware of Mr. Ellison's?

2    A.  It was talked about in the office in some way.

3    In the office I overheard something about it.

4    Q.  And who are you talking about when you say

5    that it was talked about?

6    A.  I think Carol -- Carolyn Balkenhol, you know,

7    was involved in talking about it at the time.

8    Q.  Anyone else?

9    A.  No, I don't think so.

10       MR. SOLOMON:  Have marked as the next exhibit

11   an e-mail dated January 19, 2001 from Safra Catz to Dan

12   Cooperman.

13       (Plaintiffs' Exhibit No. 43

14       marked for identification).

15       THE WITNESS:  Are we done with the previous

16   document?

17       MR. SOLOMON:  For the moment, yes.

18       MR. LINDSTROM:  This is Exhibit 43, Counsel?

19       MR. SOLOMON:  Yes, it is.

20   Q.  Do you recognize this?

21   A.  Yes.

22   Q.  And it says, "I just found out something, so I

23   don't think I should trade."

24       You wrote that, correct?

25   A.  Yes.

1    Q.   And what was it you'd found out?
2    A.   I'd found out that Mr. Ellison was selling
3 stock.
4    Q.   And how much stock had you found out he was
5 selling?
6    A.   Oh, I don't know how much he was selling. I
7 don't think I -- I don't remember what he was selling.
8    Q.   You just knew of the fact that he was selling
9 some stock?
10    A.   I had found out that that was -- that he was
11 selling or it was his intention to sell.
12    Q.   Okay. And why, as a result of simply finding
13 out that he was going to sell stock, did you think that
14 you should not trade?
15      MR. LINDSTROM: Objection. Asked and answered
16 in the prior session of her deposition.
17      THE WITNESS: Yeah.
18      MR. SOLOMON: Please answer it.
19      THE WITNESS: As I've testified previously, I
20 didn't know if it was -- if it was a material nonpublic
21 thing to know that the largest, you know, shareholder
22 was selling stock, so I didn't want to trade, knowing
23 that.
24      MR. SOLOMON: Q.   And what was it that
25 concerned you that it may be a material event, the fact

231

1 heightened the litigation risk?
2      MR. LINDSTROM: Assumes facts,
3 mischaracterizes his testimony.
4      THE WITNESS: I have no idea what he said.
5      MR. SOLOMON: Q.   What had prompted you to
6 want to sell stock in the first place?
7      MR. LINDSTROM: Asked and answered.
8      THE WITNESS: As I did in my last deposition,
9 I think in this chair, my husband had mentioned that to
10 me.
11      MR. SOLOMON: Q.   Are you aware of any
12 husbands of any other Oracle employees who were urging
13 their spouses to sell stock at the same time?
14    A.   I don't know of any.
15    Q.   Have you heard that story internally at
16 Oracle?
17    A.   No.
18      MR. LINDSTROM: Objection. Assumes facts.
19      THE WITNESS: No.
20      MR. SOLOMON: Q.   Now, going back to what was
21 Exhibit 10 of your last deposition.
22    A.   Oh, okay.
23    Q.   And as you -- if you go back to the same page,
24 which is 297312, page 20, I'm looking at the bottom, and
25 it says, "Catz said she was aware that Henley and

233

1 that Mr. Ellison was selling stock, although you didn't
2 know how much?
3      MR. LINDSTROM: Asked and answered.
4      THE WITNESS: As I told you, just the fact
5 that a large shareholder was selling -- was selling
6 stock, I didn't know if that was material or not.
7      MR. SOLOMON: Q.   Did you believe that the
8 fact that Mr. Ellison was selling implied some message?
9    A.   No, not necessarily. I just did not want to
10 trade, knowing that.
11    Q.   Did you discuss that reluctance to trade with
12 anybody?
13    A.   As I've testified before, I -- I did.
14    Q.   And who did you discuss that with?
15    A.   As I mentioned last time, I told Dan
16 Cooperman.
17    Q.   Did the fact that Mr. Selling -- Mr. Ellison
18 was selling stock alert you to the potential of a
19 litigation risk?
20    A.   I wasn't -- I wasn't thinking that much about
21 it one way or the other. I just decided not to trade
22 myself.
23    Q.   Are you aware that Mr. Cooperman has testified
24 in this litigation that when he became aware that Mr.
25 Ellison was selling stock, he believed that that

232

1 Ellison sold shares in Q3 FY01, but she has never spoken
2 with them about those trades or the reasons for them."
3 You see that?
4    A.   Yes.
5    Q.   And that's true; that's how you just
6 testified, right?
7      MR. LINDSTROM: Objection. Mischaracterizes
8 her testimony.
9      THE WITNESS: Well, this was true when I said
10 it, yeah.
11      MR. SOLOMON: Q.   Except for the tax
12 implications, right?
13    A.   Yeah. I didn't talk to them. I thought you
14 asked me had I spoken to anybody.
15    Q.   That's fine. That's fine. Then you -- they
16 go on to say, "She did not recall whether she knew of
17 the sales at the time they were made."
18      Do you see that?
19    A.   Yeah, I do.
20    Q.   Now, how is it that you couldn't recall then,
21 but in fact we have a document that says you just
22 learned something?
23      MR. LINDSTROM: Argumentative,
24 mischaracterizes her testimony.
25      THE WITNESS: As I testified last time, this

234

1  sentence is not perfectly correct.
2      MR. SOLOMON:  Okay.
3      Q.  What's wrong with --
4      A.  I did not know that Mr. Henley was trading,
5  but I did specifically know about Mr. Ellison.
6      Q.  So when it says, "She did not recall whether
7  she knew of the sales at the time they were made," it's
8  inaccurate to the extent it references back to Ellison's
9  sales; is that what you're saying?
10     MR. LINDSTROM:  Asked and answered.
11     THE WITNESS:  Yeah.  I've testified about this
12  line before.
13     MR. SOLOMON:  Q.  After you became aware that
14  Mr. Ellison was selling stock, consistent with the
15  message that you wrote on January 19th, 2001, did you
16  become involved in any way with his option exercises and
17  sales?
18     MR. LINDSTROM:  Vague and ambiguous.
19     THE WITNESS:  I don't know.  I don't remember
20  being involved.
21     MR. SOLOMON:  Q.  Well, if you were involved,
22  could you tell me how you would likely have been
23  involved?
24     A.  No, I --
25     MR. LINDSTROM:  Calls for speculation.

235

1      THE WITNESS:  I don't recall being involved.
2      MR. SOLOMON:  Q.  Okay.  You don't recall
3  asking anybody any questions in relation to his sales as
4  the sales were taking place?
5      MR. LINDSTROM:  Vague and ambiguous.
6      THE WITNESS:  I just don't remember.
7      MR. SOLOMON:  Q.  So you may have done; you
8  simply don't remember.  Is that your testimony?
9      A.  I don't remember, as I sit here now, any
10  memory of this.
11     Q.  Do you remember being concerned as to how the
12  stock of Oracle performed while Mr. Ellison exercised
13  his options and sold?
14     A.  I don't actually remember that.  I don't -- as
15  I sit here right now, I don't have any memory of -- I
16  don't have any memory of that concept in my head.
17     Q.  You're aware that these sales in aggregate
18  constitute one of the biggest insider selling binges in
19  history?
20     MR. LINDSTROM:  Argumentative.
21     MR. SOLOMON:  Q.  Are you aware of that?
22     MR. LINDSTROM:  Argumentative, assumes facts.
23     THE WITNESS:  I actually don't know how it
24  rates compared to other big founder sales.
25     MR. SOLOMON:  Q.  Do you agree that it was a

236

1  huge amount of money that was being -- huge amount of
2  money that was involved?
3      MR. LINDSTROM:  Calls for a conclusion.
4      THE WITNESS:  You know, I don't actually even
5  know the amount.
6      MR. SOLOMON:  Q.  To this date, you don't know
7  the amount?
8      A.  I don't remember the amount.  But I -- it's a
9  large amount to me.
10     Q.  You think it was more than $10 million?
11     MR. LINDSTROM:  No foundation.
12     THE WITNESS:  You know what; there's a sheet
13  that lays out exactly how much it is.
14     MR. SOLOMON:  Well, let's see if you have a
15  sense.
16     Q.  Is it more than $50 million?
17     MR. LINDSTROM:  No foundation.  She's told you
18  she doesn't know what the number is.
19     THE WITNESS:  I don't remember what the amount
20  is.
21     MR. SOLOMON:  Q.  More than $200 million, can
22  you tell me that?
23     MR. LINDSTROM:  Same objection.
24     THE WITNESS:  Yeah, I think it is more than
25  200 million.  I don't know how much more, though.

237

1      MR. SOLOMON:  Q.  More than 500 million?
2      A.  I don't know.
3      Q.  Were you aware of any floor on the price of
4  the stock that Mr. Ellison had instructed his brokers to
5  follow?
6      A.  At the time?  I don't remember any -- you
7  know, anything to do with his stock trade there.
8      Q.  Did you solicit of anybody, in the week that
9  he was trading, information as to Oracle's stock
10  performance and reasons for its performance?
11     MR. LINDSTROM:  Can we have the question
12  reread, please.
13     (Record read as follows:
14     QUESTION:  Did you solicit of anybody,
15     in the week that he was trading,
16     information as to Oracle's stock
17     performance and reasons for its
18     performance?)
19     MR. LINDSTROM:  Objection.  Vague and
20  ambiguous, compound.
21     THE WITNESS:  I don't remember doing that.
22     MR. SOLOMON:  Q.  Is it possible that you did
23  that?
24     A.  I don't know.
25     Q.  Knowing that Mr. Ellison was trading at the

238

1    time, and refraining because you thought that there was
2    a question as to its -- to the materiality of that
3    knowledge, were you interested in the stock performance
4    of Oracle as Mr. Ellison embarked on his sales?
5         MR. LINDSTROM:  Objection.  Calls for a
6    conclusion, vague and ambiguous.
7         THE WITNESS:  I tell you, I don't remember my
8    thoughts six and a half years ago during that week or
9    month or quarter.
10        MR. SOLOMON:  Q.  Is it true that you've been
11   described by Mr. Ellison as someone who is particularly
12   in command of all the facts?
13        MR. LINDSTROM:  Objection.  Vague and
14   ambiguous.
15        THE WITNESS:  I don't know.
16        MR. LINDSTROM:  Assumes facts.
17        THE WITNESS:  I don't know that he has.
18        MR. SOLOMON:  Q.  Do you believe your memory
19   is weaker than average?
20        A.  I don't know what the average memory is,
21   but --
22        Q.  Do you feel you have a good or a bad memory?
23        A.  I don't know.  I really don't know.
24        MR. SOLOMON:  Let's have marked as the next
25   exhibit an e-mail dated Friday, the 19th of January,

                                                    239

1    2001.
2         (Plaintiffs' Exhibit No. 44
3         marked for identification).
4         (Brief interruption).
5         MR. LINDSTROM:  The record should reflect that
6    it was not the witness's phone that was ringing, but she
7    has now assured that her phone is off so that we don't
8    have a similar interruption.
9         MR. SOLOMON:  Q.  Let me know if you recognize
10   this, please.
11        A.  I recognize it, now that I see it.
12        Q.  And this is -- that's your message at the top,
13   "Confirming in writing that I will not be trading during
14   this period"; is that right?
15        A.  Yes.
16        Q.  Now, you'd said in another e-mail earlier that
17   day --
18        A.  Mm-hm.
19        Q.  -- just a little bit earlier that day, that
20   you'd found something out.  And I know you've testified
21   that it was the fact that Mr. Ellison was trading.  Had
22   you found anything else out on or around January 19,
23   2001?
24        A.  No, this is --
25        MR. LINDSTROM:  That caused her not to trade?

                                                    240

1         MR. SOLOMON:  Yeah.
2         THE WITNESS:  No.  No, this is all related.
3    This what I found out.
4         MR. SOLOMON:  Q.  You hadn't discovered any
5    negative information concerning Oracle before -- before
6    this date; is that right?
7         A.  No, not at all.
8         Q.  And you hadn't noticed that there was negative
9    growth rates affecting some of Oracle's business
10   divisions reported just before -- reported internally
11   just before this date?
12        MR. LINDSTROM:  Assumes facts, argumentative.
13        THE WITNESS:  No.
14        MR. SOLOMON:  Q.  Are you aware that Mr.
15   Ellison had discovered those facts and has admitted in
16   this litigation that he had?
17        MR. LINDSTROM:  Assumes facts,
18   mischaracterizes his testimony.
19        THE WITNESS:  I don't know that to be true.
20        MR. SOLOMON:  Q.  You haven't read his
21   testimony, have you?
22        A.  I have not read any of his testimony.
23        MR. SOLOMON:  Let's have marked as the next
24   exhibit another e-mail, dated March -- excuse me --
25   Monday, 22nd of January, 2001.  Control numbers are

                                                    241

1    0419181 and 982, for the record.
2         (Plaintiffs' Exhibit No. 45
3         marked for identification).
4         MR. SOLOMON:  The prior exhibit -- what was
5    the prior exhibit, please?
6         THE REPORTER:  44.  We are now on 45.
7         MR. SOLOMON:  -- 44 has the control number
8    039431 and is also dated the 19th of January, 2001.
9         Q.  Let me know if you've seen this before.
10        A.  I don't recognize it, but let me read it, find
11   out what it is.
12        Q.  Sure.
13        A.  Okay.
14        Q.  Okay.  So you recognize this?
15        A.  I read it.  I see what it says.
16        Q.  There's a message at the top that says, "Got
17   them, will mail them back."  Is that a message from you?
18        A.  Yes.  It looks like it.
19        Q.  Okay.  And you're responding to Jonathan
20   White; is that right?
21        A.  Yes.
22        Q.  And he says, "You should have received by fax
23   the forms for exercise and selling your options."
24        You see that?
25        A.  Yes.

                                                    242

1    Q.  Now, you didn't tell him that you weren't
2  going to sell; you just said "Got them, will mail them
3  back."  Could you explain why.
4       MR. LINDSTROM:  Objection to the preface as
5  argumentative, mischaracterizes the document.
6       You may respond.
7       THE WITNESS:  Ask me again.
8       MR. SOLOMON:  Q.  You didn't tell him you
9  weren't going to sell; you just said "Got them, will
10  mail them back."  Can you explain why.
11       MR. LINDSTROM:  Same objections.
12       THE WITNESS:  Yes.
13       MR. SOLOMON:  Okay.  Please explain why.
14       THE WITNESS:  Because even though I wasn't
15  selling, I didn't think that I should tell him why I
16  wasn't selling, because it wasn't my information to
17  tell.
18       MR. SOLOMON:  Q.  Why would you have to tell
19  him why you weren't selling?
20       A.  Because I had planned on selling.
21       Q.  Well, why didn't you just tell him "I'm not
22  going to sell"?  Why instead did you say "Got them, will
23  mail them back"?
24       MR. LINDSTROM:  Objection.  Argumentative.
25       THE WITNESS:  Oh, I don't know.  That's what I

243

1  decided to do, not have a discussion about it.
2       MR. SOLOMON:  Q.  And I'm asking you why --
3       MR. LINDSTROM:  Objection.  Asked and
4  answered.
5       MR. SOLOMON:  Q.  -- no explanation.
6       MR. LINDSTROM:  I think she told you why.
7       MR. SOLOMON:  Q.  Because you decided, that's
8  why?
9       A.  'Cause I decided not to.
10       Q.  But you can't give me a reason why?
11       A.  I just told you.
12       MR. LINDSTROM:  I think she did give you a
13  reason why.
14       MR. SOLOMON:  Q.  What's your reason why
15  again?
16       MR. LINDSTROM:  The record will reflect the
17  testimony that she gave.
18       You may repeat your response.
19       THE WITNESS:  I did not want to -- I did not
20  want to have a discussion and tell him that -- my reason
21  for not wanting to sell.  So I just didn't tell him
22  anything.
23       MR. SOLOMON:  Q.  You said "Got them, will
24  mail them back."  Did you mail them back?
25       A.  Ultimately, probably, but I don't remember.

244

1       Q.  Now, you see -- if you go to the bottom of
2  that page, there's an e-mail exchange involving Wendell
3  Laidley.  Do you know who Wendell Laidley is?
4       A.  Well, I think it says who he is on the bottom
5  of this e-mail, but I didn't know who he was until I
6  read it just now.
7       Q.  Okay.  Now, did you read this on Monday, the
8  22nd of January, 2001?
9       MR. LINDSTROM:  When you say "this," can you
10  be more specific.  There are several e-mails that are
11  imbedded here.
12       MR. SOLOMON:  The message from Wendell
13  Laidley.
14       THE WITNESS:  Did I read this?
15       MR. SOLOMON:  Yes.
16       THE WITNESS:  Oh, I think -- who knows.
17  Probably.  I don't remember reading it, but ...
18       MR. SOLOMON:  Q.  Okay.  And then if you --
19  you'll see that it's addressed to CSEQ U.S. Sales.  Do
20  you know what that stands for?
21       A.  Oh, yeah -- well, I can -- I --
22       MR. LINDSTROM:  He wants to know if you know.
23       THE WITNESS:  No idea.
24       MR. SOLOMON:  Q.  It wouldn't be Credit Suisse
25  Equities, something like that?

245

1       A.  Oh, it could be --
2       MR. LINDSTROM:  Objection.  Calls for
3  speculation.
4       THE WITNESS:  I just don't know.  These are
5  little codes for something internal.
6       MR. SOLOMON:  Q.  Okay.  And then -- now,
7  halfway into that first page, you'll see there's a
8  message from Brent Thill to Wendell Laidley and others.
9       Do you see that?
10       A.  I see it.
11       Q.  And who's Brent Thill?
12       A.  I think he was a research analyst there at the
13  time.
14       Q.  Is that the only way you know him?
15       A.  Yeah, I barely know him at all.  He's still a
16  research analyst at one of the firms.  I don't know
17  that -- I don't think he's at Credit Suisse for Boston
18  anymore, though.
19       Q.  Is he related to anybody at Oracle?
20       MR. LINDSTROM:  Objection.  No foundation,
21  calls for speculation.
22       THE WITNESS:  I have no idea.
23       MR. SOLOMON:  Q.  And then above, there's a
24  message from Jonathan White.  Do you know who Jonathan
25  White is?

246

1    A.  Yes.

2    Q.  And who's Jonathan White?

3    A.  Well, he was my -- my private client account

4    executive at the time.

5    Q.  Okay.  And he says, "See below."  Do you know

6    what he's referencing?

7    A.  I guess he's telling me about this note.

8    Q.  And do you know why he's telling you about

9    that note?

10    A.  Oh --

11    MR. LINDSTROM:  Objection.  No foundation,

12    calls for speculation.

13    THE WITNESS:  I guess he thought I'd be

14    interested.

15    MR. SOLOMON:  Q.  And were you interested?

16    A.  I was kind of interested in Siebel, sure.

17    Q.  Were you interested in Oracle's stock

18    performance at that time, in light of the fact that Mr.

19    Ellison was selling?

20    A.  Was I -- you kind of asked me that before.

21    Was I interested in Oracle's stock performance.  It's

22    kind of two related things, but not really.

23    Why don't you break that question down into

24    two.

25    Q.  Well, that would -- that would remove the

247

1    relevance.  What I'm asking is, is whether because you

2    knew that Mr. Ellison was selling, you were interested

3    in Oracle's stock performance at this particular time.

4    MR. LINDSTROM:  Asked and answered.

5    THE WITNESS:  I don't -- I don't remember

6    thinking about Mr. Ellison's stock price -- trade -- the

7    stock price he was getting for his trades.  I just don't

8    remember thinking about that.

9    MR. SOLOMON:  Q.  If you go to the very top of

10    the first page, it says, "Re: FW: Oracle" and "Oracle

11    BUY," in parens.  Then it says, "Few explanations for

12    weakness today."

13    Do you see that?

14    A.  I do.

15    Q.  Were you looking for explanations for the

16    weakness in Oracle's stock at that time?

17    A.  No.  This -- this is -- this wasn't -- I don't

18    know if I was or was not.  This "few explanations for

19    weakness" is a title.  It is -- it's not related to me

20    in any way.

21    Q.  Okay.  Did you speak with Mr. Ellison at all

22    during the week beginning Monday the 22nd of January,

23    2001?

24    MR. LINDSTROM:  On any subject?

25    MR. SOLOMON:  Yeah.

248

1    THE WITNESS:  Oh, you know, I -- I don't know.

2    I'd have to look if he was in town.  But I would -- I

3    can't remember talking to him, but I would expect that I

4    spoke to him.  I just don't remember.

5    MR. SOLOMON:  Q.  Well, was he in town?

6    A.  I don't know.

7    MR. LINDSTROM:  No foundation.

8    MR. SOLOMON:  Q.  Is Mr. Ellison often sick?

9    A.  I don't know often sick.  Sometimes -- you

10    know, everyone has a cold once in a while.  But no, not

11    unusually, no.

12    Q.  Do you remember him being off sick at this

13    time?

14    A.  Oh, I have no idea.

15    Q.  And you haven't seen any documents, preparing

16    for any of your depositions in this case, that would

17    suggest that you knew that he was sick; is that right?

18    A.  That he knew that he was sick or --

19    Q.  That you knew.

20    A.  I don't remember him being sick.

21    Q.  So were you concerned or involved at all in

22    addressing any potential leakage of the information that

23    you thought perhaps might be material, that Mr. Ellison

24    was selling stock?

25    MR. LINDSTROM:  Could we have that question

249

1    reread, please.

2    (Record read as follows:

3    QUESTION:  So were you concerned or

4    involved at all in addressing any potential

5    leakage of the information that you thought

6    perhaps might be material, that Mr. Ellison

7    was selling stock?)

8    MR. LINDSTROM:  Vague and ambiguous, compound.

9    MR. SOLOMON:  So let me break that down.

10    Q.  Were you concerned about any -- sorry.  Were

11    you involved in addressing any potential leakage of that

12    information?

13    A.  If you're asking was I involved in disclosing

14    the information, I don't remember, but I may have been.

15    Q.  Have you seen any documents that refresh your

16    recollection one way or the other?

17    A.  I haven't.  But if you have some, I'd be

18    delighted to see them.

19    Q.  Were you concerned about leakage of that

20    information at that time?

21    MR. LINDSTROM:  Vague and ambiguous, calls for

22    a conclusion.

23    THE WITNESS:  I don't remember even having

24    those -- that concept, other than that I did not want to

25    be the one putting this information out.  I didn't know

250

1    if that was proper or not.
2         MR. SOLOMON:  Q.  What do you mean by "proper
3    or not"?
4         A.  I don't know -- I didn't know -- it was not my
5    information, so I didn't know if -- I didn't want to
6    tell a broker.
7         Q.  Why was Joe Lockhart fired?
8         MR. LINDSTROM:  No foundation, calls for
9    speculation, assumes facts.
10        THE WITNESS:  I don't remember that he was
11   fired, actually.
12        MR. SOLOMON:  Q.  Some of you apparently do;
13   some of you don't.  Why did Mr. Lockhart leave the
14   company?
15        MR. LINDSTROM:  Objection.  Argumentative.
16        THE WITNESS:  You know --
17        MR. LINDSTROM:  No foundation, calls for
18   speculation.
19        THE WITNESS:  -- I don't actually remember why
20   he left.  He wasn't there very long.
21        MR. SOLOMON:  Q.  Has it been said that you
22   and Mr. Ellison finish each other's sentences?
23        A.  Oh, I don't know what's said.
24        Q.  If someone were to say that, would that be
25   broadly accurate?

251

1         A.  I think it would depend what we were talking
2    about.
3         Q.  Were you involved in the hiring of
4    Mr. Lockhart?
5         A.  You know, I think I might have been.
6         Q.  How were you involved?
7         A.  I don't remember.
8         Q.  Did you assess his job performance while he
9    was there?
10        MR. LINDSTROM:  Objection.  Vague and
11   ambiguous.
12        THE WITNESS:  I'll tell you, I have so little
13   memory of him even being there.
14        MR. SOLOMON:  Q.  He was Mr. Clinton's press
15   secretary, correct?
16        A.  Yeah, he was President Clinton's press
17   spokesman.  I think so.  White House press spokesman
18   maybe.  Something like that basically.
19        Q.  Basically known by millions of people, right?
20        A.  I would think so.
21        Q.  But you have very little recollection about
22   him and his involvement at Oracle; is that your
23   testimony?
24        A.  Yeah.
25        MR. LINDSTROM:  Objection.  Argumentative.

252

1         THE WITNESS:  Yes.
2         MR. SOLOMON:  Q.  Did you discuss Mr.
3    Lockhart's departure from Oracle with Mr. Ellison?
4         A.  You know, as I sit here right now, I don't
5    have any memory of that.
6         Q.  Do you have an understanding why Mr. Ellison
7    sold -- exercised and sold the stock that he did in
8    January of 2001?
9         MR. LINDSTROM:  Could we have the question
10   reread, please.
11        (Record read as follows:
12        QUESTION:  Do you have an
13        understanding why Mr. Ellison sold --
14        exercised and sold the stock that he did in
15        January of 2001?)
16        THE WITNESS:  I don't have a full
17   understanding, but I have some understanding.
18        MR. SOLOMON:  Q.  Where have you derived that
19   understanding from?
20        A.  I'm not really sure, but I just -- I think I
21   know, and I'm not even a hundred percent sure.
22        Q.  You think you know where you derived the --
23        A.  No.
24        Q.  -- understanding from, but you're not a
25   hundred percent sure?

253

1         A.  No.  In fact, I mean I think I -- I think I
2    have an understanding, but I'm not even a hundred
3    percent sure.  But I -- but -- where did I -- I don't
4    really know where I derived that -- what I think to be
5    true.
6         Q.  So what's your less-than-100-percent
7    understanding?
8         MR. LINDSTROM:  Caution you against divulging
9    any attorney/client privileged communications you may
10   have had.  Otherwise you may respond to the question.
11        MR. SOLOMON:  I don't know how that could even
12   approach doing that, given the way I framed my question.
13        MR. LINDSTROM:  I think the way you --
14        MR. SOLOMON:  I didn't -- I'll ask the
15   question again.
16        Q.  What's your less-than-100-percent
17   understanding?
18        MR. LINDSTROM:  Well, but the point is if she
19   got it from legal counsel, then she's not -- you're not
20   entitled to have it.  If she has it from some other
21   basis, she can give it to you.
22        THE WITNESS:  I think that there were options
23   that were expiring.  That's -- that's what I, you know,
24   basically remember.
25        MR. SOLOMON:  Q.  And is that the extent of

254

1    your understanding?
2         A.   It's the extent that I can think of right now.
3         Q.   When were they expiring?
4         A.   Oh, I don't know.
5         Q.   At the time that Mr. Ellison was engaging in
6    his sales transactions in January of 2001, were you
7    familiar with the rules surrounding insider trading?
8         MR. LINDSTROM:  Vague and ambiguous.
9         THE WITNESS:  Well, I, you know, knew them
10   generally.
11        MR. SOLOMON:  Q.  And what are -- please
12   describe for me the general rules you knew at that time.
13        A.   Well, there's some -- two different ones that
14   I could think of.  But, you know, this issue of trading
15   on material nonpublic information, that you're not
16   supposed to do that, that that's a violation.
17        Q.   And you said "two different ones."  What's the
18   other one?
19        A.   There's -- you know, I should know.  I
20   should -- but there's like 16b and 10b-5.  So 10b-5 is
21   material nonpublic information.  16b is another rule
22   that applies to insiders, and I don't remember how
23   exactly it works.
24        Q.   And did you have a discussion with anybody in
25   January of 2001 about either Rule 10b-5 or Rule 16b?

255

1         A.   I don't know that I had a discussion with
2    anyone.  But when I talked to Dan Cooperman --
3         MR. LINDSTROM:  Wait a second.
4         THE WITNESS:  Oh.
5         MR. LINDSTROM:  He can ask you foundational --
6         THE WITNESS:  Right.  Oh, sorry.
7         MR. LINDSTROM:  -- questions; for example, who
8    you had discussions with.  I think everybody here knows
9    that Mr. Cooperman's the general counsel of Oracle.  So
10   I don't want you divulging privileged communications
11   that you may have had concerning that subject with
12   Mr. Cooperman.
13        So for now, just confine yourself to the
14   question which was asked, which is, as I recall it, who
15   you had such discussions with.
16        MR. SOLOMON:  Yeah, the question was did
17   you have a discussion with anyone in January of 2001
18   about either Rule 10b-5 or Rule 16b?
19        MR. LINDSTROM:  Thank you.
20        So the answer to that would be yes or no.  And
21   then we'll go to who it was.
22        THE WITNESS:  Excluding any talk with a
23   lawyer?
24        MR. LINDSTROM:  No, no.  We're going to
25   take -- because of potential waiver issues and so forth,

256

1    there are sort of -- there's a protocol that Mr. Solomon
2    and we will follow, which is he first gets to find out
3    whether you had any conversations, and then we'll go to
4    the question "With whom did you speak?"
5         So you can answer this question, including if
6    you had a conversation with a lawyer, if you recall such
7    a conversation in that time period.
8         THE WITNESS:  Well, I actually don't recall
9    either 10b-5 or 16b as a discussion -- you know, as a
10   concept mentioned necessarily.  But -- but ask that
11   again.  I'm sorry.  Maybe you should read -- can you ask
12   the question again.
13        MR. SOLOMON:  Q.  Did you have a discussion
14   with anyone in January of 2001 about either 10b-5 or
15   16b?
16        A.   I may have.
17        Q.   And who may you have had discussions with?
18        MR. LINDSTROM:  No foundation, calls for
19   speculation.
20        MR. SOLOMON:  There must be a limited
21   universe.
22        THE WITNESS:  It would be Dan Cooperman.
23        MR. SOLOMON:  Thank you.
24        Q.   Did you take or refrain from taking any action
25   as a result of your conversation with Dan Cooperman?

257

1         MR. LINDSTROM:  Vague and ambiguous.
2         THE WITNESS:  I did not "take" or "not take"
3    any action as a -- as a result of my conversation with
4    Dan Cooperman.
5         MR. SOLOMON:  Let's have marked as the next
6    exhibit an e-mail dated Monday, January 29th, 2001,
7    the control numbers 035682 through 685.
8         (Plaintiffs' Exhibit No. 46
9         marked for identification).
10        MR. LINDSTROM:  Is that 46, Counsel?
11        MR. SOLOMON:  Yes.
12        MR. LINDSTROM:  Thank you.
13        MR. SOLOMON:  Q.  Do you recognize this?
14        A.   Well, I've read it through.  I vaguely
15   remember it.
16        Q.   And you'll see on the first page it's dated
17   Monday, 29th of January, 2001.  And you write, "Larry
18   ended up out sick all last week.  I'm going to bring it
19   up at PDMC today if I can, Safra."
20        Do you see that?
21        A.   Yeah.
22        Q.   You wrote that, right?
23        A.   Definitely -- I mean, it looks like I did,
24   sure.
25        Q.   Does that help refresh your recollection about

258

1    Larry Ellison being out sick the week before that?
2        A.  Well, I say so right in the document.
3        MR. LINDSTROM:  The question is whether your
4    recollection is refreshed as a result of reading the
5    document.
6        THE WITNESS:  Not really, but I believe this
7    note.
8        MR. SOLOMON:  Q.  Do you know where Mr.
9    Ellison was while he was out sick?
10       A.  I don't remember at all.
11       Q.  You don't remember if he was vacationing in
12   Mexico?
13       A.  No.
14       Q.  If you go to the second page -- excuse me --
15   the third page of the document, you'll see that it's
16   dated the 25th of January, 2001, refers to BMC.  It's
17   from Lori Norlander.
18       First of all, can you tell me who Lori
19   Norlander is?
20       A.  I don't know her.  I don't know who she is.
21       Q.  What about Scott Little; do you know who Scott
22   Little is?
23       A.  I think I might.
24       Q.  In the context of revenue recognition, have
25   you ever heard of a pull-in?

259

1        A.  No.
2        Q.  You ever heard of sales being pulled into a
3    fiscal -- an earlier fiscal quarter in order to make the
4    numbers?
5        A.  Have I ever heard of -- of --
6        Q.  Of revenue being, quote, end quote, pulled
7    into an earlier fiscal quarter in order to make
8    forecasted numbers.
9        MR. LINDSTROM:  Assumes facts, vague and
10   ambiguous, no foundation.
11       THE WITNESS:  Maybe.
12       MR. SOLOMON:  Q.  Have you heard of that in
13   the context of accounting fraud?
14       MR. LINDSTROM:  You're talking about whether
15   she's heard of that term --
16       MR. SOLOMON:  Correct.
17       MR. LINDSTROM:  -- "pulling"?
18       MR. SOLOMON:  Correct.
19       THE WITNESS:  Pulling.  No.
20       MR. SOLOMON:  Q.  Have you ever heard of it
21   discussed in the context of fraudulent forecasting,
22   pulling in a transaction into an earlier period in which
23   to make numbers?
24       A.  No.
25       Q.  You were with DLJ for a long time, correct?

260

1        A.  Yes.
2        Q.  What did you do there?
3        A.  I was an investment banker.
4        Q.  So did you follow publicly-traded companies?
5        A.  Some.
6        Q.  Any of them in the high tech area?
7        A.  Absolutely.
8        Q.  Did you ever hear of any securities
9    litigations that involved allegations of accounting
10   fraud being committed by high-tech companies while you
11   were with DLJ?
12       A.  While I was at DLJ.  I don't remember if it
13   was while I was at DLJ.
14       Q.  Did you ever hear of channel stuffing while
15   you were at DLJ?
16       A.  Did I ever hear of the word "channel
17   stuffing"?  Yes.
18       Q.  And you know what that is?
19       A.  Yes, I think so.
20       Q.  So what is channel stuffing?
21       A.  Channel stuffing is when you sell to your
22   distributors more software than they really want.
23       Q.  And would you say that that is a good or a bad
24   practice?
25       MR. LINDSTROM:  Calls for a conclusion, vague

261

1    and ambiguous.
2        THE WITNESS:  You know, it would -- it would
3    depend on why and what and what's going on.
4        MR. SOLOMON:  Q.  Have you ever heard of
5    premature revenue recognition in connection with
6    high-tech companies that you followed when you were at
7    DLJ?
8        MR. LINDSTROM:  Premature revenue recognition?
9        MR. SOLOMON:  Mm-hm.
10       THE WITNESS:  I don't remember -- I don't
11   remember that term necessarily while I was at DLJ.
12       MR. SOLOMON:  Q.  Were you sensitive, while
13   you were at DLJ, to companies that DLJ was invested in
14   that may be accused of fraud?
15       MR. LINDSTROM:  Vague and ambiguous as to
16   "sensitive."
17       THE WITNESS:  I've -- DLJ was not an investor
18   in companies, at least not the part of the business that
19   I was involved in.
20       MR. SOLOMON:  Q.  Were you ever involved in
21   M&A?
22       A.  I was involved in mergers and acquisitions,
23   yes.
24       Q.  And as a result, you would be interested in
25   the potential for fraud at any of the companies involved

262

1  in the transactions you were dealing with; is that true?

2  MR. LINDSTROM:  Vague and ambiguous, calls for

3  a conclusion.

4  THE WITNESS:  I would be interested in

5  fraudulent behavior, of course.

6  MR. SOLOMON:  Q.  You were the CFO at Oracle

7  beginning in what year?  When did you become the CFO?

8  A.  I think about a year ago.  Someone is going to

9  know the exact date.  I don't know.  I'd say it was

10  about a year ago, maybe a little longer.

11  Q.  And for that position, is it necessary for you

12  to be familiar with basic accounting rules?

13  A.  Well, I -- I have -- I think for that

14  position, you have to have some familiarity.  However,

15  we have huge accounting staffs and outside auditors who

16  are very familiar with all the details of the accounting

17  rules.

18  Q.  You testified earlier in your last session

19  about a deal with Hewlett-Packard at the end of the

20  second fiscal quarter of 2001.  Do you recall that?

21  MR. LINDSTROM:  Does she recall the deal or

22  the testimony?

23  MR. SOLOMON:  Testimony.

24  THE WITNESS:  I recall the testimony.

25  MR. SOLOMON:  Q.  Okay.  Do you recall the

263

1  deal?

2  A.  I recall it very, very vaguely.

3  Q.  Do you recall that it was finalized late in

4  the evening of November 30th, 2000?

5  MR. LINDSTROM:  Asked and answered, no

6  foundation.

7  THE WITNESS:  I -- I recall from the previous

8  testimony and documents shown then.

9  MR. SOLOMON:  Q.  Where were you that day; do

10  you recall?

11  A.  Well, I don't actually have a memory of that

12  day, so I don't actually know where I was necessarily.

13  MR. LINDSTROM:  It's also vague as to the time

14  of day you're asking about.

15  MR. SOLOMON:  Q.  Are you aware that Mr.

16  Ellison was involved in negotiating that transaction?

17  MR. LINDSTROM:  Assumes facts, no foundation.

18  THE WITNESS:  I actually do not know that to

19  be true at all.

20  MR. SOLOMON:  Q.  Why do you not -- why do you

21  say that?

22  A.  Because I don't remember him being involved in

23  negotiating that deal.

24  Q.  And anybody that would suggest that he was

25  involved in negotiating that deal at best would be

264

1  mistaken; is that your testimony?

2  MR. LINDSTROM:  Objection.  Argumentative.

3  THE WITNESS:  I told you that I don't remember

4  him being deeply involved in the negotiation of that

5  transaction.

6  MR. SOLOMON:  Q.  Who was deeply involved in

7  the negotiation of that transaction?

8  A.  Well, there was -- there was a rep involved.

9  Mike DeCesare was involved.  I remember him being

10  involved in it.  I was involved in it.  Folks on the H-P

11  side were involved.  I just don't know who.

12  Q.  Do you have any reason to believe that Mike

13  DeCesare is anything but a truthful person?

14  A.  I don't know Mike DeCesare that well.

15  Q.  Could you answer the question.  Do you have

16  any reason to believe that Mike DeCesare is anything but

17  a truthful person?

18  MR. LINDSTROM:  No foundation.

19  THE WITNESS:  I -- I have no reason to

20  believe, as I sit here right now, that he is not

21  truthful.

22  MR. SOLOMON:  Q.  So so far from Oracle you've

23  identified Mike DeCesare and you.  Is that it?

24  A.  I just don't remember.

25  Q.  What was your involvement?

265

1  A.  You know, I remember so little about that

2  deal.  I signed it; I know that.  I saw that in the last

3  deposition.  And I probably worked on some of the

4  wording.  I just don't remember.  I really shouldn't

5  even speculate.  I don't remember.

6  Q.  What was Mr. Ellison's involvement in that

7  deal?

8  MR. LINDSTROM:  No foundation, assumes facts.

9  THE WITNESS:  I just don't remember what his

10  involvement was.

11  MR. SOLOMON:  Q.  What was Mr. DeCesare's

12  involvement?

13  A.  Well, Mr. DeCesare was coordinating it and had

14  sold the project.  And he was -- he was involved in it.

15  I don't know exactly what he did.

16  Q.  Were you begging the other side, the

17  counterparties of the Covisint deal, to finalize the

18  deal so that it could be recognized in 2Q01 at Oracle?

19  MR. LINDSTROM:  Objection.  Calls for a

20  conclusion, vague and ambiguous.

21  THE WITNESS:  I don't know about necessarily

22  begging, but probably.  We really wanted to get that

23  deal closed.  I wanted to get it closed as soon as

24  possible.  I wanted to close that deal very much.

25  MR. SOLOMON:  Q.  You said you don't know

266

1  necessarily about begging, but probably.  So you
2  probably were begging or you weren't begging?
3      A.  I was asking -- I was wanting -- we were
4  working very, very hard to get it closed.  Very hard to
5  get it closed as soon as possible.
6      Q.  Why?
7      A.  It's a big deal, and we wanted that project,
8  and we wanted to be part of Covisint.  And it was in --
9  in negotiation for months.  And we wanted to close it
10  and be part of it.
11      Q.  And didn't it end up being touch and go
12  whether or not you'd be able to actually make your
13  forecast numbers for Q201 as a result of Covisint
14  slipping?
15      MR. LINDSTROM:  Vague and ambiguous.
16      THE WITNESS:  You know what; I'd have to see,
17  you know, the numbers and how they -- how they came out.
18  So much of the quarter comes at the end that you don't
19  know if -- you know, I don't think -- actually -- I
20  don't know.  I just don't remember Q2's -- the way the
21  deals all fell in.  But I --
22      MR. SOLOMON:  Q.  Isn't it true that you've
23  already said before, concerning Q201, that you didn't
24  know until that night whether or not Oracle would make
25  it?

267

1      A.  That's what I just said right now too.  At the
2  very end -- you know, I don't remember that night
3  necessarily, but, you know, you don't know till the end.
4      Q.  Did anybody from Oracle inform the investing
5  public that Oracle just squeaked in to make the 2Q01
6  numbers?
7      MR. LINDSTROM:  Objection.  Calls for a
8  conclusion, vague and ambiguous, argumentative.
9      THE WITNESS:  No, we didn't --
10      MR. LINDSTROM:  Assumes facts also.
11      THE WITNESS:  Yeah.  It's -- we did not make
12  any disclosure about the quarter because it is a very
13  typical quarter, like every other quarter.  And it's
14  broadly known that the bulk of the business comes in at
15  the end.
16      MR. SOLOMON:  Q.  Now, what was it about cash
17  with respect to Covisint that was so important to you?
18      A.  First of all, Covisint was a consortium.  It
19  was not an actual company with a long history.  And so
20  getting the cash is obviously very important because you
21  want to -- you want to get paid.
22      And getting the cash in this case also
23  signaled that this was a true commitment.  And I worked
24  very hard to make sure that we had the cash as part of
25  our negotiation.

268

1      Q.  Who's -- who were the participants in the
2  consortium?
3      A.  General Motors and Ford for sure.  And I can't
4  remember if at that point Chrysler was in and out -- in
5  or out.  And I have a memory that Nissan was in it too.
6  But I'm not a hundred percent sure.
7      Q.  And what was wrong with their credit?
8      A.  It wasn't based on their credit.  Covisint was
9  not based on their credit.
10      Q.  Did you try to get individual -- strike that.
11      Did you try to get it based on their credit?
12      A.  Oh, I don't know.
13      MR. LINDSTROM:  Vague and ambiguous.
14      MR. SOLOMON:  Q.  Did you make any attempt?
15      A.  I don't remember.
16      Q.  Did any of them say "What's your problem?
17  We'll offer the credit of our company"?
18      A.  I don't remember that.
19      Q.  And so you were very anxious to get it into
20  Q2, but you were also very anxious that there be a cash
21  component; is that right?
22      A.  Yeah, I wanted -- I wanted the cash to -- to
23  transfer, yes.
24      Q.  Okay.  What did they want before they got the
25  cash, anything?

269

1      A.  Signed document.
2      Q.  All right.  So you must have been acting with
3  alacrity to get them a signed document so you could get
4  the cash, right?
5      A.  I'm not sure I understand your question.
6      Q.  Well, you wanted the cash; you wanted it in
7  2Q; they needed the signed document.  You were
8  working hard to get them the documents as quickly as
9  possible, right?
10      A.  We were working very hard to come to agreement
11  on the contract, yeah, and get a signed document.  We
12  were working, negotiating very hard at the time.
13      Q.  What involvement, if any, did you have in
14  Oracle's stock repurchase program in 2000 and 2001?
15      A.  I wasn't very involved, but, you know, I knew
16  about it, and I'd be asked an opinion once in a while.
17      Q.  Who would ask you opinions?
18      A.  Jeff Henley or the treasurer at the time,
19  Bruce Lange.
20      Q.  What opinions were they soliciting?
21      A.  You know, I don't remember.  I don't really
22  remember, but things like the timing, the -- I don't
23  really remember in general.
24      Q.  Do I take it from that that you don't recall the
25  opinions that you gave?

270

1    A.  Right now the opinions I gave in '99, no.
2       MR. LINDSTROM:  Actually, the question was
3    2000, 2001.
4       THE WITNESS:  Oh.
5       MR. LINDSTROM:  If that makes a difference.
6       THE WITNESS:  Oh.  It doesn't make a
7    difference, 'cause I don't remember my opinion.  I don't
8    remember the buy-back.
9       MR. SOLOMON:  Q.  What about stock repurchases
10   around the time Mr. Ellison and Mr. Henley were selling
11   their stock; do you know anything about those?
12      A.  I don't remember anything about that right
13   now.
14      Q.  Consistent with your belief that you shouldn't
15   trade because you were in possession of material
16   information, did Oracle make that same determination
17   with respect to its repurchases?
18      MR. LINDSTROM:  No foundation, calls for
19   speculation.
20      THE WITNESS:  I don't know.
21      MR. SOLOMON:  Q.  Well, you were a very senior
22   executive at the time, were you not?
23      MR. LINDSTROM:  Argumentative.
24      THE WITNESS:  I made a decision not to trade.
25   Not necessarily with your -- whatever you just assumed

271

1    in your long question there.  But I made a decision not
2    to trade, not to sell.
3       MR. SOLOMON:  Q.  And that's because you
4    didn't want to violate the law; is that right?
5       A.  I didn't know if it violated the law or not.
6    I didn't want to sell.  I didn't -- I had information.
7    I didn't know if it violated the law or not.  I didn't
8    seek counsel on that one way or the other.
9       Moment I had information of any kind, I wasn't
10   very committed to selling at all, so I didn't sell.
11      Q.  So if you didn't seek counsel, tell me
12   everything about your conversation with Mr. Cooperman.
13      A.  I didn't seek outside counsel.
14      Q.  So you sought inside counsel?
15      A.  No, I just -- I -- I just told him.
16      Q.  I don't understand your answer.
17      A.  I did not seek advice.
18      Q.  And he didn't give you advice; is that right?
19      A.  I don't remember what he said, actually.
20      Q.  And if you were concerned about your own
21   sales, why weren't you concerned with Oracle's
22   transactions?
23      MR. LINDSTROM:  Argumentative.
24      THE WITNESS:  I didn't -- I didn't think about
25   the -- I did not think they were improper.  I didn't

272

1    think it was improper.  I did not even think about it.
2       MR. SOLOMON:  Q.  Did anybody think about it?
3       MR. LINDSTROM:  No foundation, calls for
4    speculation.
5       THE WITNESS:  I have no idea.
6       MR. SOLOMON:  Q.  Did they think about it and
7    coordinate the stock repurchases to actually coincide
8    with Mr. Ellison's sales?
9       MR. LINDSTROM:  No foundation, calls for
10   speculation, assumes facts.
11      THE WITNESS:  I have no idea.
12      MR. SOLOMON:  Q.  Do you have a view as to
13   whether that would be unlawful?
14      MR. LINDSTROM:  Hypothetical, calls for a
15   legal opinion.
16      THE WITNESS:  No idea.
17      MR. SOLOMON:  Q.  Do you know that
18   Mr. Cooperman has testified that he understands the
19   insider trading rules apply to Oracle in stock
20   repurchases?
21      MR. LINDSTROM:  No foundation, assumes facts.
22      THE WITNESS:  I have no idea what he's
23   testified to.
24      MR. SOLOMON:  Q.  Were you involved with Mr.
25   Ellison in the decision made in the fall of 2000 to

273

1    change the forecasting criteria?
2       A.  I don't know that that -- that we changed any
3    forecasting criteria.  I don't have any memory of
4    changing forecasting criteria any time.
5       Q.  So if that happened in the fall of 2000, it
6    was without your knowledge?
7       MR. LINDSTROM:  Assumes facts.
8       MR. SOLOMON:  I said "if that happened."
9       THE WITNESS:  I have no idea.  I told you, I
10   don't remember that happening.  As I sit here right now,
11   I don't remember that happening.
12      MR. LINDSTROM:  It's also vague and ambiguous
13   as to "criteria."
14      MR. SOLOMON:  Q.  The H-P transaction at the
15   end of 2Q01 involved a swap; do you agree?
16      MR. LINDSTROM:  Calls for a conclusion, calls
17   for a legal opinion, no foundation.  It's also asked and
18   answered in the prior session of her deposition.
19      THE WITNESS:  I've already testified about
20   this at length.
21      MR. SOLOMON:  Q.  And did it involve a swap?
22      A.  As I --
23      MR. LINDSTROM:  Same objections.
24      THE WITNESS:  As I testified previously, it
25   involved us buying -- it involved them buying software

274

1     that they needed to buy, and some -- and it involved --
2     it involved a bunch of different things.  It was all
3     things that we were doing, planning on doing.
4         MR. SOLOMON:  Q.  In January of 2000 [sic]
5     when you became aware that Mr. Ellison was engaged in
6     trading Oracle securities, did you take any steps to
7     begin preserving documentation that may be called for in
8     any litigation?
9         MR. LINDSTROM:  Mischaracterizes her
10    testimony, assumes facts.
11        THE WITNESS:  I don't remember even -- I did
12    not -- what did you ask me?
13        MR. SOLOMON:  Q.  I said in January -- and if
14    I said of "2000," then I misspoke.  In January of 2001
15    when you became aware that Mr. Ellison was engaged in
16    trading Oracle securities, did you take any steps to
17    begin preserving documentation that may be called for in
18    any litigation?
19        A.  I didn't take any steps.  I didn't contemplate
20    litigation.
21        Q.  Okay.  Did there come a stage when you did
22    contemplate litigation concerning the events of the
23    third fiscal quarter of 2001?
24        MR. LINDSTROM:  Vague and ambiguous.
25        THE WITNESS:  I don't know when you sued us.

275

1         MR. SOLOMON:  Q.  So when we sued you was the
2     first time you contemplated litigation; is that right?
3         A.  I have no idea.  I don't even remember at all.
4     This is six years ago, this whole thing.
5         Q.  Okay.  And although it's six years ago, are we
6     not talking about something unusual in the life of
7     Oracle and its executives?
8         MR. LINDSTROM:  Vague, ambiguous, calls for a
9     conclusion.
10        THE WITNESS:  What do you mean?
11        MR. SOLOMON:  Talking about a billion dollars'
12    worth of insider selling, almost, plus Oracle missing
13    its forecast and the stock collapsing.
14        MR. LINDSTROM:  Argumentative, assumes facts.
15    What's the question?
16        THE WITNESS:  Is there a question in there?
17        MR. SOLOMON:  I've asked --
18        THE WITNESS:  Is it unusual.
19        MR. SOLOMON:  -- answered your question,
20    although I'm not being deposed.
21        Q.  Wasn't that an unusual event?
22        A.  Unusual event that we missed the quarter?
23        Q.  And that Mr. Ellison sold almost a billion
24    dollars' worth of stock within the quarter.
25        MR. LINDSTROM:  Assumes facts, argumentative,

276

1     calls for a conclusion.
2         THE WITNESS:  I don't know.  I don't know if
3     he's sold a billion dollars of stock since.  I don't
4     know.  I know we have missed quarters.
5         MR. SOLOMON:  Q.  At the time -- well, forget
6     that.
7         So you've missed quarters since, but you don't
8     know if Mr. Ellison's sold a billion dollars' worth of
9     stock within those missed quarters; is that what you're
10    saying?
11        A.  No.  I said both of those things are -- I
12    don't know if they're unusual or not.  We've missed
13    quarters.  We like to have it be unusual, but it's not
14    within our control.  And -- entirely.
15        And he's sold stock since.  I don't -- I don't
16    know the quarters have been at the same time.  And I
17    don't know how much he sold, as I sit here right now.
18        Q.  Do you know what a 10b-5-1 program is?
19        A.  Yes.
20        Q.  And is that what you're talking about when
21    you're talking about Mr. Ellison selling stock since?
22        A.  Oh, I don't know.  I don't know if he's done
23    it according to a 10b-5-1 plan.
24        Q.  In any event, you became aware of the
25    litigation at some time after we filed it, correct, the

277

1     lawsuit?  Sometime after we filed it, you became aware
2     of it, fair?
3         A.  I don't remember becoming aware of it.
4         Q.  Okay.
5         A.  It's been going for a while.
6         Q.  What was your practice in 2000 and 2001 with
7     respect to your retention of Oracle records?
8         MR. LINDSTROM:  Is this before or after your
9     lawsuit?
10        MR. SOLOMON:  Let's start with 2000.
11        Q.  What was your practice in calendar year 2000?
12        A.  I don't know.  I -- I --
13        MR. LINDSTROM:  Yeah, can we have that reread.
14    I lost track of the question.
15        MR. SOLOMON:  Q.  What was your practice in
16    calendar year 2000 with respect to your retention of
17    Oracle records?
18        A.  I'd keep some things; I wouldn't keep other
19    things.  I would keep things that I was told I had to
20    keep.
21        Q.  Like what?
22        A.  Well, like in -- then?  Oh, I don't know.  I
23    don't remember -- I don't remember 2000 at all.
24        Q.  Did you attend board meetings in 2000?
25        A.  Yep.

278

1    Q.  Did you get board packages?

2    A.  Yep.

3    Q.  How did you get them?

4    A.  Someone brought them to the office.

5    Q.  Did you file them?

6    A.  I don't know.  I don't think so.

7    Q.  So you get a board package for a particular

8    board meeting.  Did you have a practice as to what you'd

9    do with that package after the meeting?

10        MR. LINDSTROM:  Vague as to time.

11        MR. SOLOMON:  2000.

12        THE WITNESS:  In 2000, I think -- I don't

13   remember what I would do with it.  I think I would -- I

14   really don't remember if I would keep it on the shelf or

15   dispose of it.  I don't have -- I think I would not keep

16   it.

17        MR. SOLOMON:  Q.  And when you say "not keep

18   it," you're talking about a physical copy?

19   A.  Yeah.

20   Q.  What about electronic copies?

21        MR. LINDSTROM:  Of board packets?

22        MR. SOLOMON:  Correct.

23        THE WITNESS:  I don't think board packets are

24   distributed -- were distributed electronically.  I don't

25   know.  I don't remember them to be distributed, six

279

1    years or seven years ago, electronically.

2        MR. SOLOMON:  Q.  And did your practice change

3    at all in calendar 2001?

4        MR. LINDSTROM:  The practice that she

5    described?

6        MR. SOLOMON:  Mm-hm.

7        MR. LINDSTROM:  Which was that she keeps some

8    things, doesn't keep others, keeps what she's told to

9    keep?

10        MR. SOLOMON:  Whatever you answered.

11        THE WITNESS:  Yeah.

12        MR. SOLOMON:  Q.  Did your practice change?

13   A.  Not that I know of.  I'd keep what I was told

14   to keep, get rid of stuff, keep some stuff I thought

15   might be helpful.

16   Q.  But you've never had a physical sort of row of

17   files of periodic reports in your office?  You don't

18   have that habit; is that fair?

19        MR. LINDSTROM:  Vague and ambiguous.

20        THE WITNESS:  I don't.  I don't have a shelf.

21        MR. SOLOMON:  Q.  Now, after -- did there come

22   a time when you received a document preservation

23   instruction?

24   A.  I don't remember receiving one, but I believe

25   I got one.

280

1    Q.  Did you take any notice of it?

2    A.  Of course.  If it -- I don't remember

3    receiving it, but I know my own practice.

4    Q.  And -- you say your own practice.  What

5    practice are you referring to?

6    A.  I take a document preservation notice

7    extremely seriously.

8    Q.  As everybody should, correct?

9    A.  I do.

10   Q.  Do you think Mr. Ellison should take a

11   document preservation instruction seriously?

12   A.  I take one very -- I take it seriously.

13   Q.  Yes, but I'm asking you, do you think Mr.

14   Ellison should?

15   A.  I think everyone should.

16   Q.  Okay.  So tell me your practice that you

17   implemented as a result of the document preservation

18   instruction that you received.

19   A.  My regular practice.  Look around, you know,

20   the documents that I have; if I have anything, put them

21   in a pile, in a physical pile; prepare it for the

22   lawyers, to give it to them.  Anything that's related to

23   it also -- that happens afterwards goes in the pile.

24        My e-mail, I would make a file and I'd put

25   everything I had, if I had anything, in the file.  And

281

1    anything that comes in afterwards I would attempt, you

2    know, in general to put it in the file.  And then the

3    lawyers look at that file and my computer.

4    Q.  And does that include anything you send out as

5    well?  You say "anything that comes in."  But does that

6    include anything you send out?

7        MR. LINDSTROM:  Vague and ambiguous.

8        THE WITNESS:  I don't think I -- I don't

9    collect my sent -- I don't collect things I send out

10   now.  I don't know if I used to then.  I would think it

11   would if -- if I -- if I had -- if I sent it out and got

12   it.

13        MR. SOLOMON:  Q.  If you sent an e-mail to

14   somebody after March of 2001 that referred in some way

15   to the events in this litigation, did your practice

16   include a mechanism that would make sure that such

17   e-mails were preserved?

18   A.  I just don't remember at that time.  I don't

19   know.

20        (Discussion off the record.)

21        THE VIDEOGRAPHER:  This marks the end of tape

22   1 in Volume II in the deposition of Safra Catz.  At

23   2:27, going off the record.

24        (Recess taken.)

25        THE VIDEOGRAPHER:  On record at 2:39.  This

282

1  marks the beginning of tape 2 in Volume II in the
2  deposition of Safra Catz.
3      MR. SOLOMON:  Q.  Okay, Ms. Catz.  I was
4  asking you about the e-mails that you would have sent,
5  as opposed to e-mails you had received, after receiving
6  the document preservation instruction with respect to
7  this litigation.
8      And you answered that you don't remember at
9  that time, "I don't know," when I asked you whether your
10  practice postinstruction included a mechanism that would
11  make sure that such e-mails were preserved.
12      Do you recall that?
13      MR. LINDSTROM:  You're talking about sent
14  e-mails?
15      THE WITNESS:  My sent files?
16      MR. SOLOMON:  Yes.
17      THE WITNESS:  Oh, I had a sent file, and I
18  would go through it every once in a while and put the
19  stuff that I sent in that same file I mentioned before,
20  you know, the litigation preservation file.
21      MR. SOLOMON:  Q.  Okay.  So before the break,
22  you didn't remember, but now you do remember that; is
23  that right?
24      A.  No, I -- I don't remember the time frames of
25  that.  I don't remember doing that.  But that's -- that

283

1  would have been my practice.
2      Q.  Okay.  And did you advise any fellow employees
3  at Oracle that that ought to be their practice also?
4      A.  I don't remember talking about it.
5      Q.  How about with Mr. Ellison; did you ever talk
6  about it with Mr. Ellison?
7      MR. LINDSTROM:  This document preservation --
8      MR. SOLOMON:  Correct.
9      THE WITNESS:  Holding his sent file?  I don't
10  remember talking to him about it.
11      MR. SOLOMON:  Q.  Do you remember having any
12  conversation with him ever about his duty to preserve
13  documents?
14      A.  I really don't remember.
15      Q.  Would you have expected Mr. Ellison to have
16  preserved documents in this -- with respect to this
17  litigation?
18      MR. LINDSTROM:  Calls for speculation.
19      THE WITNESS:  I don't know.
20      MR. SOLOMON:  Q.  Knowing Mr. Ellison as you
21  do -- you know him well; is that right?
22      A.  I know him pretty well, yes.
23      Q.  So knowing him well, you have no idea whether
24  or not he would adhere or would not adhere to a document
25  preservation instruction with respect to this

284

1  litigation?
2      MR. LINDSTROM:  Argumentative.
3      THE WITNESS:  I would expect him to read it
4  and understand it.
5      MR. SOLOMON:  Q.  How about follow it?
6      A.  And follow it.
7      Q.  And are you aware that he did not follow the
8  preservation instruction in this litigation?
9      MR. LINDSTROM:  Assumes facts.
10      THE WITNESS:  I do not know that to be true at
11  all.
12      MR. SOLOMON:  Q.  Is it a fact you'd like to
13  know one way or the other?
14      MR. LINDSTROM:  Irrelevant.
15      THE WITNESS:  It would depend.
16      MR. SOLOMON:  Q.  Do you know what OSO is?
17      A.  Yes.
18      Q.  What's OSO?
19      A.  Oracle Sales On-line.
20      Q.  Do you have an understanding that the data
21  contained in Oracle Sales On-line as of the date of the
22  preservation instruction in this case would need to have
23  been preserved in order to adhere to the preservation
24  instruction?
25      MR. LINDSTROM:  No foundation, vague and

285

1  ambiguous.
2      THE WITNESS:  I don't know.
3      MR. SOLOMON:  Q.  Are you aware that OSO was
4  purged after we filed our lawsuit?
5      MR. LINDSTROM:  Assumes facts, no foundation,
6  argumentative.
7      THE WITNESS:  I have no idea.
8      MR. SOLOMON:  Q.  Would it surprise you to
9  learn that OSO was purged after we filed our litigation?
10      MR. LINDSTROM:  Assumes fact -- assumes facts,
11  irrelevant.
12      THE WITNESS:  Would it surprise -- I have no
13  idea how they run OSO.
14      MR. SOLOMON:  Q.  Do you know who Matthew
15  Symonds is?
16      A.  Yes.
17      Q.  Who is he?
18      A.  He's a writer.
19      Q.  Met him?
20      A.  Yes.
21      Q.  Did he interview you?
22      A.  I think so.
23      Q.  Did he record his interview with you?
24      A.  I don't know.
25      Q.  How long was his interview -- was it just --

286

1  strike that.

2       How many times did he interview you?

3   A.  You know, I barely remember being interviewed,

4  but I think he interviewed me one time.

5   Q.  How long for?

6   A.  I think not even an hour.  I mean, really

7  brief time.  I had to go.

8   Q.  And you don't remember if he had a recording

9  device with him or not?

10  A.  I don't.

11  Q.  Are you aware that there's an order in this

12  litigation that Mr. Ellison and his codefendants produce

13  tapes and transcripts that were used by Mr. Symonds with

14  respect to the book Softwar?

15      MR. LINDSTROM:  No foundation.

16      THE WITNESS:  Um ...

17      MR. SOLOMON:  Q.  Are you aware of that?

18  A.  Yes.  Kind of.

19  Q.  When you say "kind of," what do you mean?

20  A.  My lawyers.

21      MR. LINDSTROM:  Well ...

22      MR. SOLOMON:  Q.  Do you know what taking the

23  Fifth means?

24  A.  Yes.

25  Q.  Are you aware that Mr. Symonds has taken the

287

1  Fifth with respect to every question I've asked him

2  concerning his interactions with Mr. Ellison and his

3  knowledge concerning the events in this litigation?

4       MR. LINDSTROM:  Now, let me admonish you, in

5  light of your last response, that as we've discussed

6  previously on the record, he's not entitled to conduct

7  discovery as to things you only know from your lawyers.

8       So in responding to these questions, such as

9  the one now pending, you can answer according to

10  knowledge, if you have any, apart from lawyers.

11      THE WITNESS:  Can you ask it again.

12      MR. SOLOMON:  Yes.

13  Q.  Are you aware that Mr. Symonds has taken the

14  Fifth with respect to every question I've asked him

15  concerning his interactions with Mr. Ellison and his

16  knowledge concerning the events in this litigation?

17  A.  No.

18  Q.  Are you aware that I took his deposition in

19  London on Monday and Tuesday of this week?

20      MR. LINDSTROM:  No foundation.

21      THE WITNESS:  I don't know.  I don't know if

22  you did take his deposition Monday and Tuesday.

23      MR. SOLOMON:  Q.  I'll represent to you that I

24  did.  I'll represent to you that he took the Fifth with

25  respect to all the questioning.  What is the Fifth?  You

288

1  said you understood it.  What is the Fifth?

2  A.  I think it's the right against

3  self-incrimination.

4  Q.  Do you have an understanding why Mr. Symonds

5  would take the Fifth with respect to questioning in this

6  litigation?

7  A.  No.

8  Q.  Were you involved in any way in negotiating a

9  contract between Mr. Ellison and Mr. Symonds in

10  connection with the book Softwar?

11  A.  I wasn't involved in the negotiation, I don't

12  think.

13  Q.  Were you aware in late 2000, early 2001 that

14  Mr. Symonds and Mr. Ellison were talking about

15  collaborating with respect to a book?

16  A.  I don't know when I became aware of it.  I

17  became aware of it at some time, but I couldn't place

18  the time.

19  Q.  Okay.  Other than with your lawyers, have you

20  discussed the issue of the writing by Mr. Symonds of the

21  book Softwar with Mr. Ellison?

22  A.  In 2001?  In 2001?

23  Q.  Any time.

24  A.  Yeah, we talked about the book whenever it was

25  written.  I don't remember what year.  So I don't know

289

1  if it was in 2001 or '2 or '3.  But we talked about the

2  book a little bit.

3  Q.  Describe the conversation, please.

4  A.  "I'm working on the book."  "How's it going?"

5  Stuff like that.

6  Q.  Okay.  Did you ever express a view to Mr.

7  Ellison as to whether or not you thought he should be

8  participating in writing the book?

9  A.  I don't remember expressing a view.

10  Q.  Did you have a view?

11  A.  I don't remember specifically having a view at

12  that time.

13  Q.  Do you have a view now?

14      MR. LINDSTROM:  Yes or no.

15      THE WITNESS:  Yes.

16      MR. SOLOMON:  Q.  And what's your view?

17      MR. LINDSTROM:  Irrelevant.

18      THE WITNESS:  What's my view about having a

19  book written about you?

20      MR. SOLOMON:  About him.

21      THE WITNESS:  About him, I mean.

22      MR. SOLOMON:  Not about me.

23      THE WITNESS:  About a person.  My view is that

24  it's -- I don't like -- that it's not great to spend too

25  much time with the press.  That's my view.

290

```
 1      MR. SOLOMON:  Q.  Think Mr. Ellison spends too
 2   much time with the press?
 3      MR. LINDSTROM:  Irrelevant, not calculated to
 4   lead to discovery of admissible evidence.
 5      MR. SOLOMON:  Go ahead.
 6      THE WITNESS:  I don't think he spends --
 7   barely any time with the press now.
 8      MR. SOLOMON:  Q.  Is that as a result of your
 9   influence?
10      A.  I have no idea.
11      Q.  Mr. Ellison and Mr. Symonds close friends; do
12   you know?
13      MR. LINDSTROM:  No foundation, calls for a
14   conclusion.
15      THE WITNESS:  I think they're friendly.
16      MR. SOLOMON:  Q.  They socialize together?
17      MR. LINDSTROM:  No foundation.
18      THE WITNESS:  I think they might on occasion.
19   I'm not really the best person to ask, though.
20      MR. SOLOMON:  Q.  Do they know each other's
21   families?
22      MR. LINDSTROM:  No foundation.
23      THE WITNESS:  I think they might.  I just
24   don't know.
25      MR. SOLOMON:  Q.  Have you socialized with the
```

```
 1   two of them together?
 2      A.  I've been at an event where they each were.
 3      Q.  What event was that?
 4      A.  It was a party at Mr. Ellison's house.
 5      Q.  When was that?
 6      A.  I don't know.  Couple years ago, few years
 7   ago.
 8      Q.  When, to your knowledge, was the last time Mr.
 9   Ellison was in touch with Mr. Symonds?
10      MR. LINDSTROM:  No foundation.
11      THE WITNESS:  I have no idea.
12      MR. SOLOMON:  Q.  Has Mr. Ellison mentioned
13   Mr. Symonds to you within the last three or four months?
14      A.  No.
15      Q.  Has Mr. Ellison mentioned the book Softwar to
16   you in the last three or four months?
17      A.  He hasn't.
18      Q.  Who, if you know, at Oracle was involved in
19   negotiating any of the agreements concerning Softwar
20   with Mr. "Simmonds" -- Mr. Symonds?
21      A.  I don't know that anybody was involved from
22   Oracle.
23      Q.  Are there any agreements between Oracle and
24   Mr. Symonds concerning the Softwar publication?
25      MR. LINDSTROM:  No foundation.
```

```
 1      THE WITNESS:  I don't know.
 2      MR. SOLOMON:  Q.  Have you ever heard of an
 3   article entitled "The Rewards of Recklessness."
 4      A.  I don't recognize that.
 5      Q.  Do you view Mr. Ellison as reckless?
 6      MR. LINDSTROM:  Calls for a conclusion, vague
 7   and ambiguous.
 8      THE WITNESS:  I don't -- I don't -- I'm not
 9   sure what exactly it means, but basically I don't think
10   he's reckless, no.
11      MR. SOLOMON:  Q.  Do you think a description
12   of Mr. Ellison walking way out to the end of the limb
13   and then jumping up and down would be an accurate
14   description of Mr. Ellison?
15      MR. LINDSTROM:  Vague and ambiguous,
16   hypothetical, calls for speculation without any context.
17      THE WITNESS:  I wouldn't say that.
18      MR. SOLOMON:  Q.  Do you believe that the
19   rewards of recklessness are enormous?
20      MR. LINDSTROM:  Calls for a conclusion, vague
21   and ambiguous.
22      THE WITNESS:  The rewards for recklessness are
23   enormous.  I don't know.
24      MR. SOLOMON:  Q.  Is it the sort of statement
25   you'd expect Mr. Ellison to make?
```

```
 1      A.  I don't know.
 2      MR. SOLOMON:  Okay.  Let's have marked as the
 3   next exhibit -- what number is it, please?
 4      THE REPORTER:  47.
 5      MR. SOLOMON:  Thank you -- marked as Exhibit
 6   47 an e-mail from Carolyn Balkenhol to Ms. Catz, dated
 7   the 5th of January, 2001, with the control numbers
 8   1053820, 1053821 and 22.
 9      (Plaintiffs' Exhibit No. 47
10      marked for identification.)
11      THE WITNESS:  Which one are we on?
12      MR. SOLOMON:  Q.  I'm looking, first of all,
13   at the first page.  It's from Carolyn Balkenhol to you.
14   Do you see that?
15      A.  Yes.
16      Q.  And it says, "Forward: attachments for LE."
17   Do you see that?
18      A.  Yes.
19      MR. LINDSTROM:  So Counsel, are the
20   attachments attached or not?  I can't tell.  I mean, I
21   know you disassembled the document over there, and I
22   can't tell whether this is a partial exhibit or
23   whether --
24      MR. SOLOMON:  Okay.  We'll make it simple.
25   Let's add -- we'll leave it as one composite exhibit.
```

1    Let's add this to the back, and then I'll correct the
2    control numbers.  And so now Exhibit 47 is going to be
3    the same first three pages, but the control range will
4    be 1053820 through 3855.
5         (Plaintiffs' Exhibit No. 47 modified).
6         MR. LINDSTROM:  Thank you.
7         MR. SOLOMON:  Q.  So when you've had a chance,
8    just let me know whether you've seen this before.
9         MR. LINDSTROM:  I assume you're referring to
10   the entire document.
11        MR. SOLOMON:  Correct.
12   Q.  And I'll represent that this is -- I've now
13   given it to you in the manner produced by the defendants
14   in the litigation.
15   A.  There's a bunch of e-mails attached to it.
16   I'm sort of confused as to what's what.  The whole back
17   is -- it's got e-mails.  Is it all supposed to be one
18   attachment?
19   Q.  It's the way it was produced, so I can't
20   really tell you much more than that.  But if we go
21   through it, you can at least discern --
22   A.  Okay.
23   Q.  -- what, if anything, you recognize.
24   A.  Okay.
25   Q.  So on the second page, there's an exchange

1    between an Andrew and a Matthew.  Do you see that?
2    A.  Yeah.
3    Q.  Do you know who the Andrew is referring to?
4    A.  You know, I think it's an agent, like a book
5    agent or something like that.
6    Q.  Okay.
7    A.  But, you know, I'm not entirely sure.  So
8    that's -- I probably shouldn't guess.  But I think
9    that's what this is.
10   Q.  Okay.  Do you recognize having seen that
11   little exchange before?
12   A.  I actually don't recognize -- I don't
13   recognize this exchange.
14   Q.  Okay.  Let's skip the next, which has
15   information concerning Carolyn Balkenhol.
16   A.  Yeah, I don't know what that is.
17   Q.  And then the next pages, through control
18   number 1053839, appear to be a draft agreement.  Do you
19   see that?
20   A.  Yeah, it looks like a draft of a -- of the
21   book.
22        MR. LINDSTROM:  No, he's referring to --
23        THE WITNESS:  23 --
24        MR. LINDSTROM:  -- a specific set of pages.
25        THE WITNESS:  Yeah.  This one, 23 --

                                              295                                              296

1         MR. SOLOMON:  823 through 840.
2         THE WITNESS:  Oh, 40.
3         MR. SOLOMON:  I'm sorry, through 839.
4         THE WITNESS:  39.  Okay.  So I'm looking at
5    that.  And it looks like a draft of an agreement.
6         MR. LINDSTROM:  Question's whether you
7    recognize it.
8         THE WITNESS:  Vaguely.  Very vaguely.
9         MR. SOLOMON:  Q.  You've seen this before?
10   A.  I have -- you know, now that I see it, I
11   recognize it vaguely, yeah, as -- yes.
12   Q.  Now, did you review this at around the time it
13   was being circulated, which appears to be January 5,
14   2001?
15   A.  You know, I have a memory of getting it and
16   sending it on to --
17   Q.  Do you know -- go on.
18   A.  -- to Dan Cooperman.
19   Q.  Okay.  And if you go to page 840, the next
20   page, it says, "For you first.  Let me know if/when I
21   should pass along to Philip, Andy, Oracle attorneys, and
22   Joe."
23        Do you see that?
24   A.  Yeah.  Who wrote that?
25   Q.  Do you believe that's the text of the message

1    from Carolyn Balkenhol to you that is on the very
2    first -- that's -- if you look at the very first page,
3    there's those -- that addressee information.
4         MR. LINDSTROM:  No foundation, calls for
5    speculation.
6         THE WITNESS:  I would be very surprised if
7    this was her sending this to me.
8         MR. SOLOMON:  Okay.
9         THE WITNESS:  This doesn't look like the text
10   of something she would send to me.
11        MR. SOLOMON:  Okay.
12   Q.  So you don't know who "you" is referring to
13   here?
14   A.  Yeah, I don't know.
15   Q.  And if you go to the next page, you'll see
16   there's a reference -- there's a message, "Dear Larry
17   and Carolyn."
18   A.  Yeah.
19   Q.  Have you seen that before?
20   A.  I don't recognize, but I can read through
21   it.
22        MR. LINDSTROM:  Take your time.
23        THE WITNESS:  Okay.  Oh, okay.  Okay, I read
24   it.  Is there a question?
25        MR. SOLOMON:  Q.  Do you recognize that?

                                              297                                              298

1    A.  I don't -- I don't, you know, recognize it
2    until I'm reading it.  I don't actually -- I don't
3    remember it at all.
4    Q.  Okay.  And your testimony is you don't believe
5    you were involved to any significant degree in this --
6    in the -- in reviewing or advising concerning this
7    agreement?
8    A.  I don't remember being involved in that.
9    Q.  Then if you look to the next page, you'll see
10   the heading of an article is called "Softwar, The
11   Rewards of Recklessness: A Portrait of Larry Ellison and
12   Oracle Corporation at War."
13   Do you see that?
14   A.  Yeah, I do.
15   Q.  Do you recognize the title?  And that's all
16   I'm asking you right now.
17   A.  I see it.  I don't recognize it at all.
18   Q.  Okay.  If you go to page 5 of the document,
19   which is 1053846.
20   A.  Of this Softwar --
21   Q.  Yes.
22   A.  The -- say that again.  053 ...
23   Q.  The last three numbers are 846.
24   A.  846.  Okay.
25   Q.  Okay.  Now, before I go into this text, let me

299

1    ask you a question.  Have you ever heard Mr. Ellison
2    tell a lie?  Ms. Catz ...
3    A.  Yeah.  Have I ever heard him tell a lie.  No,
4    I don't think so.
5    Q.  Okay.  Have you ever heard him being referred
6    to as a serial liar?
7    MR. LINDSTROM:  As a serial liar, those words?
8    MR. SOLOMON:  Those words.
9    THE WITNESS:  No.
10   MR. SOLOMON:  Have you heard that?
11   Now, if you'd look at the text of this, you'll
12   see that in the second full paragraph, which begins,
13   "But I didn't say that" -- do you see that?
14   MR. LINDSTROM:  Why don't you give her a
15   chance to read the paragraph.
16   MR. SOLOMON:  Just focus on that paragraph.
17   THE WITNESS:  I don't even know what it's
18   referring to.  Let me read the paragraph before for a
19   second.  Okay, I see it.
20   MR. SOLOMON:  All right.  Now, have you
21   ever heard Mr. Ellison say words to the effect "But I
22   was lying.  I had no intention of doing that.  I lied
23   because I wanted to appear balanced and reasonable and
24   because I needed time.  I never had a problem lying.  I
25   knew I was right"?  Have you ever heard that?

300

1    A.  I don't remember -- I don't remember him
2    saying that ever.
3    Q.  Surprised to see it here?
4    MR. LINDSTROM:  Irrelevant.
5    THE WITNESS:  Am I surprised to see that he
6    said he -- that he -- that this is written here?  I
7    don't know.
8    MR. SOLOMON:  Q.  You don't know if you're
9    surprised or not?
10   MR. LINDSTROM:  Objection.  Irrelevant, asked
11   and answered.
12   THE WITNESS:  This -- this sentence, you know,
13   sort of speaks for itself.  It's here.
14   MR. SOLOMON:  Q.  Do you believe he said that?
15   MR. LINDSTROM:  No foundation.
16   MR. SOLOMON:  Q.  Do you believe Mr. Ellison
17   said that?
18   MR. LINDSTROM:  The words in quotes on that
19   page?
20   MR. SOLOMON:  Correct.
21   MR. LINDSTROM:  No foundation, calls for
22   speculation.
23   THE WITNESS:  If he actually said it exactly
24   this way at the time, this -- this -- whenever this
25   happened, I don't know.

301

1    MR. SOLOMON:  Q.  The answer is you don't
2    know?
3    A.  I just don't.
4    Q.  Do you think it would be of concern to the
5    average investor if a senior executive of the company
6    they're investing in didn't have a problem lying?
7    MR. LINDSTROM:  No foundation, calls for
8    speculation, conclusion, argumentative.
9    THE WITNESS:  It would depend.
10   MR. SOLOMON:  Q.  What would it depend upon?
11   MR. LINDSTROM:  Same set of objections.
12   THE WITNESS:  The context of everything.
13   MR. SOLOMON:  Q.  The context of the lies?
14   A.  The whole context.  Why don't you reask me
15   your question.
16   Q.  Yeah.  Do you think it would be of concern to
17   the average investor if a senior executive of the
18   company they're investing in didn't have a problem
19   lying?
20   MR. LINDSTROM:  No foundation, calls for
21   speculation, conclusion.
22   THE WITNESS:  It might.
23   MR. SOLOMON:  Q.  Did you discuss a press
24   release concerning Mr. Ellison's trading in January 2001
25   with Mr. Ellison?

302

1    A.  I don't remember, as I sit here right now, but
2  I think I might have.  I just don't remember.
3    Q.  Can you remember any of the contents of the
4  conversation you might have had?
5    A.  As I said --
6    MR. LINDSTROM:  No foundation.
7    THE WITNESS:  -- I don't actually even
8  remember the conversation.  But I'm -- so no, obviously.
9    MR. SOLOMON:  Q.  But you're aware there's a
10  document that indicates that you had a conversation?
11    MR. LINDSTROM:  Argumentative.
12    THE WITNESS:  You know, I don't know if there
13  is or there isn't.  But if you have one, you know, show
14  me it.
15    MR. SOLOMON:  Q.  But you haven't seen a
16  document recently that suggests that you had a
17  conversation about the press release; is that your
18  testimony?
19    A.  Yes, it is my testimony.  I haven't seen a
20  document about it.
21    MR. SOLOMON:  Okay.  Have marked as the next
22  exhibit, 48, an e-mail dated Wednesday, 24th of
23  January, 2001.
24    (Plaintiffs' Exhibit No. 48
25    marked for identification).

303

1    THE WITNESS:  Okay.
2    MR. SOLOMON:  Q.  Do you recognize this?
3    A.  Yeah, kind of.
4    Q.  And you wrote, according to this, "I discussed
5  the press release with Larry and he approved one to hit
6  the moment the SEC publishes the notice or," in parens,
7  "the news leaks out in some way."
8    Do you see that?  You wrote that?
9    A.  I appear to have, sure.
10    Q.  And then it goes on to say, "The important
11  facts."  You see that?
12    A.  Yes.
13    Q.  Who wrote that?
14    MR. LINDSTROM:  The question is who wrote
15  that.
16    MR. SOLOMON:  Yeah.
17    THE WITNESS:  I don't know.  I think I wrote
18  it.
19    MR. SOLOMON:  Okay.
20    Q.  So you write, "Larry exercised expiring
21  options for over 22 million shares."  See that?
22    A.  Yes.
23    Q.  So he had already exercised options for over
24  22 million shares; is that right?
25    A.  That's what I wrote in here.  That's what I

304

1  thought.  It's clear I had no idea because at the bottom
2  I ask, you know, is it over -- you know, clearly I have
3  no idea.
4    Q.  So 22 million shares, that's a lot of shares,
5  right?
6    A.  Yeah.
7    Q.  So when did you become aware it was 22 million
8  shares?
9    A.  I don't know.
10    MR. LINDSTROM:  Assumes facts.
11    THE WITNESS:  You know, I don't -- this is
12  what I wrote.  I must have thought it was 22 million.  I
13  don't know.  Sometime before I wrote it.
14    MR. SOLOMON:  Q.  Who told you that?
15    A.  I don't know.
16    Q.  You don't know how you learned that Mr.
17  Ellison was exercising options for over 22 million
18  shares?
19    MR. LINDSTROM:  Assumes facts, argumentative,
20  asked and answered.
21    THE WITNESS:  I don't remember, no.
22    MR. SOLOMON:  Q.  "The options would have
23  expired this year.  Worthless if not exercised."
24    You wrote that?
25    A.  Yes.

305

1    Q.  Who told you the options would have expired
2  this year, worthless if not exercised?
3    A.  I don't know.
4    Q.  You then say, "On exercise, he had an
5  immediate tax payment of" blank.  "He sold the shares in
6  same-day sales."  Did you write that?
7    A.  I wrote this whole paragraph apparently.
8    Q.  And what was the purpose of you writing this
9  paragraph?
10    A.  To prepare -- to collect the information --
11  you know, I don't remember.  So -- specifically.  But I
12  think it relates to a statement, it says -- or press --
13  putting out a press release when the SEC published the
14  notice.
15    Q.  Says, "His total share holdings are" blank
16  "after the sale."  See that?  That's your language as
17  well?
18    A.  I believe I wrote the entire paragraph.
19    Q.  At the bottom it says, "His outlook on the
20  company has not changed at all."  Do you see that?
21    A.  Yes.
22    Q.  Who told you his outlook on the company had
23  not changed at all?
24    A.  I don't know, but that's what I wrote.  That's
25  what I thought.

306

1    Q.  Says, "He sold in 1996 for similar tax
2  planning purposes."  Why did you write that?
3    A.  I don't know.
4    Q.  Who told you he sold in 1996 for similar tax
5  planning purposes?
6    A.  I have no idea.
7    MR. SOLOMON:  Mark as the next exhibit,
8  another e-mail dated Wednesday, January 24th, 2001,
9  the control number 035365.
10    (Plaintiffs' Exhibit No. 49
11    marked for identification).
12    MR. SOLOMON:  Q.  Let me know if you've seen
13  this before, after you've had a chance to look at it.
14    A.  I don't recognize it.  I don't recognize it.
15    Q.  Now, you'll see that the time says "15:24,"
16  3:24 in the afternoon.  And if you look at the prior
17  exhibit, which has the language that you wrote, the time
18  is 12:58.  Do you see that?
19    A.  Yeah.  But that's -- you know, I don't know
20  when I wrote mine.  That has no -- no time stamp, right.
21  This is when Mr. Lockhart sent an attachment.
22    Q.  Right.
23    A.  So --
24    Q.  Now, do you know if this was a further draft
25  of the language -- of the refined version of the

307

1  language that you had set forth --
2    MR. LINDSTROM:  Wait, let me understand.
3    MR. SOLOMON:  Q.  -- in Exhibit 48?
4    MR. LINDSTROM:  So you're asking if 49 is a
5  refined version of 48?
6    MR. SOLOMON:  Q.  If the content of the
7  proposed press release, Ms. Catz, is a subsequent
8  version to the version that you had drafted in Exhibit
9  48.
10    A.  I don't know if it's a subsequent version
11  necessarily, but it seems to be, to some extent, from
12  the context of that first one.  You know, I'm -- I'm
13  trying to piece it together, but -- yeah.  I mean, it
14  looks like a subsequent version.
15    Q.  And do you have any understanding as to how
16  the revisions were made?
17    A.  Well, someone wrote them.  It says here, "This
18  is the press release Joe recommends."
19    Q.  So let's -- let's see.  It's from you.  It's
20  to Larry Ellison.
21    A.  Yes.
22    Q.  And you write, "This is the press release Joe
23  recommends.  I did tell him on the phone, before he
24  wrote it, about your interest in having the details of
25  the tax payment in the release, but he chose not to

308

1  include it.  Please comment or revise or approve," in
2  bold.
3    Now, why -- did you -- you say you told Joe
4  Lockhart, before he wrote it, about Mr. Ellison's
5  interest about having the details of the tax payment in
6  the release.  You see that?
7    A.  I do.
8    Q.  What -- what did Mr. Ellison tell you about
9  his interest in having the details of the tax payment in
10  the release?
11    A.  I don't know.  But, you know, in sort of
12  piecing back what I wrote, you know, six years ago, you
13  know, it looks like he wanted all the details in the
14  release.
15    Q.  Why did he want the details of the tax payment
16  in the release?
17    MR. LINDSTROM:  No foundation.
18    THE WITNESS:  I don't know.
19    MR. SOLOMON:  Q.  Why did Mr. Lockhart choose
20  not to include it?
21    MR. LINDSTROM:  No foundation.
22    THE WITNESS:  I have no idea.
23    MR. SOLOMON:  Q.  Were you upset that
24  Mr. Lockhart chose not to include it?
25    A.  I don't remember.

309

1    Q.  Did you ever criticize Mr. Lockhart for not
2  including it?
3    A.  I don't remember doing that, no.
4    Q.  Was Mr. Ellison upset that Mr. Lockhart had
5  chosen not to include it?
6    MR. LINDSTROM:  No foundation.
7    THE WITNESS:  I have no idea.
8    MR. SOLOMON:  Q.  Did Mr. Ellison comment or
9  revise or approve the text in this exhibit?
10    A.  I don't know if he commented or he revised it
11  or he approved it.  We'd have to look at the final
12  release.  I have no idea.  But if you have the rest of
13  the documents, we can piece it together.
14    Q.  Now, you would have had no concern,
15  presumably, continuing with your sales once the news of
16  Mr. Ellison's sales had hit the market; is that right?
17    MR. LINDSTROM:  Argumentative, calls for
18  speculation.
19    THE WITNESS:  I don't know.  Concern, not
20  concern.  I'd already made the decision I wasn't
21  selling, so I wasn't selling.
22    MR. SOLOMON:  Q.  Right.  But you weren't
23  selling because you were concerned you had material
24  nonpublic information, right?
25    A.  That's what I thought -- you know, that was

310

1  the reason I didn't sell.

2      Q. And at some stage you no longer had what you

3  thought may be material nonpublic information because

4  the news of Mr. Ellison's sales hit the market, right?

5      A. Yeah.

6      Q. And did you then pursue your sales?

7      A. No.

8      Q. Why not?

9      A. I don't know. I wanted to keep the stock.

10      Q. You changed your mind. Did your husband

11  change his mind as well?

12      MR. LINDSTROM: All right. There's two

13  questions -- assumes facts, argumentative.

14      THE WITNESS: Well --

15      MR. LINDSTROM: No foundation.

16      MR. SOLOMON: Well, let's break it down.

17      Q. You changed your mind. One minute you wanted

18  to sell; now you didn't, right?

19      MR. LINDSTROM: Argumentative,

20  mischaracterizes her testimony.

21      MR. SOLOMON: All right.

22      Q. Well, it's not minutes. Okay, you tell me.

23      A. I wasn't really interested in selling at any

24  time. My husband mentioned "Gee, why don't we sell a

25  little stock." I said okay.

311

1      Then I saw that Larry was selling, so I

2  decided not to sell. Never went back to it.

3      Q. How much stock had you been contemplating

4  selling?

5      A. You know, I don't remember. I didn't have

6  very much, so ... I don't know.

7      Q. It's just as well you didn't sell, isn't that

8  right, Ms. Catz, 'cause you were in possession of

9  material nonpublic information?

10      MR. LINDSTROM: Argumentative, assumes facts

11  and calls for a legal conclusion.

12      THE WITNESS: No.

13      MR. SOLOMON: Q. So when you were talking

14  about the timing of stock repurchases for Oracle, what

15  was your expertise in that regard?

16      MR. LINDSTROM: Assumes facts,

17  mischaracterizes her testimony.

18      THE WITNESS: I was part of the management

19  team.

20      MR. SOLOMON: Q. And no one ever advised you,

21  then, at the time, that engaging in securities

22  transactions for Oracle while in possession of inside

23  information -- material information would be a violation

24  of insider trading laws?

25      MR. LINDSTROM: Assumes facts,

312

1  mischaracterizes her testimony, calls for a legal

2  conclusion.

3      THE WITNESS: There's so many pieces to your

4  question. Can you just break it down a little.

5      MR. SOLOMON: Yes.

6      Q. While you were advising on securities -- on

7  stock repurchases for Oracle and under the impression

8  that you were in possession of material insider

9  information, no one advised you to refrain or direct

10  that Oracle refrain from engaging in stock repurchases?

11      MR. LINDSTROM: Assumes facts,

12  mischaracterizes her testimony, compound, and also vague

13  and ambiguous.

14      THE WITNESS: I don't even know how to answer

15  that. It has so many pieces, there's no way to even

16  answer that question 'cause it assumes things that are

17  just not right. By the time you get to the end of the

18  question, it's not a question.

19      MR. SOLOMON: Okay. Let's see where I'm not

20  right.

21      Q. You would be asked to advise, on occasion,

22  with respect to Oracle's stock repurchases, yes or no?

23      A. I was -- I may have been asked my opinion

24  about stuff.

25      Q. Okay. And you believed that you were in

313

1  possession or may be in possession of material nonpublic

2  inside information, and that's why you didn't sell stock

3  in January of 2001, correct?

4      A. I didn't know if I was or not.

5      Q. Okay.

6      A. I made the decision I wasn't going to sell.

7      Q. Okay. But you issued no instruction to

8  anybody at Oracle that Oracle not engage in stock

9  repurchases; is that right?

10      A. I didn't issue any orders about stock

11  repurchases. It was not my role.

12      Q. And you solicited -- you neither solicited nor

13  received any advice with respect to stock repurchases;

14  is that right?

15      A. I don't solicit advice -- you know, I don't --

16  I'm not in charge of stock repurchase -- I was not, at

17  the time, in charge of stock repurchases. So I don't

18  remember even the whole -- I don't even remember

19  repurchases. I don't remember anything you're talking

20  about.

21      Q. Bruce Lange and Deb Lange husband and wife?

22      A. Not anymore.

23      Q. Were they then?

24      A. I don't think so.

25      Q. Do you know when they split up?

314

1   A.  I don't know.  Long -- I don't know when.  It
2   predated me, I believe.
3   Q.  Were they on talking terms in 2001?
4   MR. LINDSTROM:  No foundation.
5   THE WITNESS:  I don't know them not to be on
6   talking terms, no.  I don't know.
7   MR. SOLOMON:  Okay.  Let's take a break.
8   THE VIDEOGRAPHER:  Off record at 3:28.
9   (Recess taken).
10   THE VIDEOGRAPHER:  On record at 3:43.
11   MR. SOLOMON:  Q.  You mentioned earlier, Ms.
12   Catz, that there would -- you would be involved, I
13   believe, in budgeting for Mr. Ellison's projected sales;
14   is that right?
15   MR. LINDSTROM:  Mischaracterizes her
16   testimony.
17   THE WITNESS:  No.
18   MR. SOLOMON:  Okay.  Let's see if we can get
19   some agreement.
20   Q.  You testified that his sales would be
21   budgeted; is that right?
22   A.  It would impact the budget -- maybe not the
23   budget, but the actuals, the -- somehow.  I can't
24   remember at the time how it worked, but it somehow
25   impacted the -- the actual results in the 700 cost

315

1   center.
2   Q.  So as a result, there was planning involved,
3   is that right, at Oracle with respect to that impact
4   before Mr. Ellison sold stock?
5   A.  I don't know.
6   MR. LINDSTROM:  Assumes facts.
7   THE WITNESS:  I don't know if there was
8   planning.  As I said, it would -- I may have said
9   budget, but it affects the results, the actuals.  So I
10   don't -- I think there was some sort of planning in
11   general about it in quarters, but I don't -- I don't
12   actually know.
13   MR. SOLOMON:  Q.  Do you know what 700 cost
14   center refers to?
15   A.  Oh, yes.  I just used the term myself.  It's
16   the CEO cost center.  It's the CEO office cost center.
17   Q.  And describe that a little bit more, please.
18   What is the CEO office cost center?
19   A.  That's the entire description.  It's the cost
20   center in the result -- in the financial systems for
21   costs related to the CEO office -- some of the costs
22   related to the CEO office.
23   Q.  Okay.  And that -- and is there a budget
24   prepared with respect to anticipated items for that cost
25   center?

316

1   A.  You know, I am not sure how they handle the
2   CEO cost center.  But I think they make an estimate in
3   advance.  So there must be a budget, 'cause it has to
4   roll into the total budget.
5   Q.  And do you know what's in the 3Q01 budget to
6   account for the sales by Mr. Ellison that took place in
7   January of 2001?
8   MR. LINDSTROM:  For that specific item?
9   MR. SOLOMON:  Yes.
10   THE WITNESS:  In the 700 cost center?
11   MR. SOLOMON:  Yes.
12   THE WITNESS:  No.
13   MR. SOLOMON:  Q.  Do you know if that
14   information has been produced to us?
15   MR. LINDSTROM:  Assumes facts.
16   THE WITNESS:  I don't know if it exists.
17   MR. SOLOMON:  Q.  Okay.  Was there a time
18   where you -- when you thought Mr. Ellison's -- Mr.
19   Ellison had a large number of options that would expire
20   in August of 2000?
21   A.  Is there a time that I thought that?
22   Q.  Was there a time that you thought that?
23   MR. LINDSTROM:  Could we have the question
24   reread, please.
25   (Record read as follows:

317

1   QUESTION:  Was there a time where you
2   -- when you thought Mr. Ellison's -- Mr.
3   Ellison had a large number of options that
4   would expire in August of 2000?
5   THE WITNESS:  Was there a time that I knew or
6   that I thought that he had options that expired in
7   August of 2000?
8   MR. SOLOMON:  Q.  Was there a time that you
9   thought he had options -- a large number of options that
10   would expire in August of 2000?
11   A.  In August of 2000.  I don't remember.
12   MR. SOLOMON:  Have marked as the next exhibit
13   e-mails produced in this litigation, with the control
14   numbers 014068 through 72.
15   (Plaintiffs' Exhibit No. 50
16   marked for identification.)
17   MR. SOLOMON:  Q.  Do you recognize this?
18   A.  No.  I mean, I read it.  I see what it is.  I
19   don't remember it at all.
20   Q.  Okay.  Well, if you look at it, it's dated
21   Tuesday, 11th of April, 2000.  You see that?
22   A.  Yes.
23   Q.  And it appears to be from Barbara Wallace to
24   you; is that correct?
25   A.  Yes.

318

1    Q.  And it says, "Here it is.  You need to call
2    me.  My new number is," and there's a number.
3         Do you see that?
4    A.  Yes.
5    Q.  And then it says, "S. Catz wrote we need
6    Larry's whole option list.  A bunch expires this year
7    and we need to deal with them."
8         Do you see that?
9    A.  Yes.
10   Q.  And that appears to reflect that you were
11   involved in looking at his option list, identifying a
12   bunch were going to expire, and stating that you needed
13   to deal with them?
14   A.  Yes.
15   Q.  Is that right?
16   A.  Yes.
17   Q.  And then if you look over -- look at the
18   attachment, can you identify the options that you
19   thought were going to expire that year.
20   A.  That they expire in 2000?
21   Q.  Correct.
22   A.  Well, I'm looking at the expiration lists.  I
23   don't see any expiring in 2000.  I see some expiring in
24   2001 on this list.
25   Q.  All right.  Think you made a mistake?

319

1    A.  I sent this in 2000.  I guess so.  I mean -- I
2    don't know.  I don't see them on -- I don't see any
3    expiring in 2000.  So expiring this year at the end
4    of -- you know, I -- I -- I -- they were not expiring in
5    calendar year -- in the -- in that calendar year or in
6    the fiscal year that was going to end six weeks from
7    then.  So it would be expiring next fiscal year.
8    Q.  So you made a mistake, right?
9    A.  I appear to have.
10   Q.  Yeah.  And assuming he -- you were right and
11   they expired in 2000 and not 2001, in August of 2001,
12   when, as of the date of this e-mail -- as of the date of
13   this e-mail, when would Mr. Ellison's next window or
14   windows with which to exercise any options that would
15   expire in August of 2000 have been open?
16        MR. LINDSTROM:  Vague and ambiguous.
17        THE WITNESS:  I'm sorry.
18        MR. LINDSTROM:  No foundation.
19        THE WITNESS:  Can you ask the question -- when
20   would -- if what?
21        MR. SOLOMON:  Q.  Let's assume you're right
22   and there was a bunch of options expiring in August of
23   2000.
24   A.  Did I say August?  I didn't.  They expire, I
25   don't know, sometime in --

320

1    Q.  This year, right?  And you're in 2000,
2    correct?
3    A.  Yes, so sometime until the end of 2000.
4    Q.  Okay.  Right.
5    A.  So December to -- whenever.  Okay.
6    Q.  Right.
7    A.  So assuming -- so this is a hypothetical.
8    Assuming there were some that were expiring sometime in
9    calendar year 2000, when would the next window open?
10   Q.  Yes.
11   A.  From this date right here?
12   Q.  Correct, yes.
13   A.  Well, let's see.  It's April.  So I think the
14   window would be open right then and there, right?
15        I mean, unless there was some reason it wasn't
16   open.  I would -- you know, I don't remember this time
17   period at all.
18        Then there'd be some period of closed period;
19   the window would close.  And then sometime, I don't know
20   when -- I don't remember what our policy was -- after
21   earnings were announced in June, might open again.  So
22   that's ...
23   Q.  And do you recall any communication with
24   anyone in which you realized that in fact Mr. Ellison's
25   options that you were concerned about here expired in

321

1    August of 2001 and not in August of 2000?
2         MR. LINDSTROM:  Any communication other than
3    Exhibit 50?
4         MR. SOLOMON:  Correct.
5         THE WITNESS:  I don't even remember this.  Did
6    you ask me if I remember anything else?
7         MR. SOLOMON:  Yes.
8         THE WITNESS:  Oh.  If you have documents, I'd
9    be delighted to see them.  I don't even remember this
10   whole exchange.
11        MR. SOLOMON:  Q.  Okay.  Did there come a time
12   when you realized you were wrong and there were not a
13   bunch of options expiring in 2000 that you needed to be
14   concerned about?
15   A.  I don't remember being concerned, so I don't
16   remember realizing I shouldn't be concerned that
17   there -- that nothing was expiring in calendar 2000.
18   Q.  Well, you say in your e-mail, "A bunch expires
19   this year and we need to deal with them."
20   A.  Right.
21   Q.  Does that not express a concern?
22        MR. LINDSTROM:  Calls for a conclusion,
23   argumentative.
24        THE WITNESS:  No -- I don't know.  I don't
25   think it shows concern at all.  It just shows we need to

322

1    handle it.

2         MR. SOLOMON:  Q.  Okay.  Do you recall being

3    involved at the end of 2Q01 in a deal with JDS Uniphase?

4    A.  Very little.  I don't remember being

5    involved -- I vaguely remember a deal.  Actually, there

6    was another deal with JDS Uniphase, so --

7    Q.  Do you remember --

8    A.  Sometime.

9    Q.  Sorry.

10   A.  So no, I don't really remember, no.

11   Q.  And if I say that it was a deal that was

12   finalized late on the last day of the quarter, does that

13   refresh your recollection?

14   A.  No.

15        MR. SOLOMON:  Have marked as the next exhibit

16   a document produced in this litigation with the control

17   numbers 025066 and 67.

18        (Plaintiffs' Exhibit No. 51

19        marked for identification).

20        MR. SOLOMON:  Q.  Recognize this?

21   A.  I -- I -- I know what it is.  I don't actually

22   recognize it, but I know what it is, sure.

23   Q.  And you'll see that you're an addressee.  Do

24   you see that?

25   A.  Yes.

                                                            323

1    Q.  And it's dated November the 30th, 2000, at

2    17:52.

3    A.  Yeah, 5:00 -- 6:00.

4    Q.  Okay.  From Loren "Mahon."

5    A.  Loren "Man."

6    Q.  Do you recognize that?

7    A.  Mm-hm, I do.

8    Q.  And it says, "Covisint and BAE fell off."

9         Does that reflect those deals not being ready

10   to be recognized within the quarter?

11   A.  Means those deals didn't get signed.  They

12   weren't going to come in this quarter.  They're done.

13   They go in the next year.

14   Q.  And the reference "JDS Uniphase, Teradyne,

15   Kaiser are in," do you recognize that?

16   A.  I do.  Means they're in.  They're signed.

17        MR. SOLOMON:  Let's mark as the next exhibit a

18   document produced in litigation with the control number

19   255140.

20        (Plaintiffs' Exhibit No. 52

21        marked for identification).

22        MR. SOLOMON:  Q.  Let me know if you recognize

23   this document.

24   A.  No.  No.

25   Q.  Okay.  You'll see that there is reference

                                                            324

1    under "fees" of, for total net fees, $28,656,113.50.  Do

2    you see that?

3    A.  Yes, I do.

4    Q.  Okay.  And do you know what that refers to?

5    A.  It looks like the total deal size, from the

6    document.

7    Q.  And it appears that the license at the top is

8    $21,525,871.  You see that?

9    A.  Yes, I do.

10   Q.  Is it your understanding that that amount was

11   recognized in 2Q01 with respect to this transaction?

12        MR. LINDSTROM:  No foundation, calls for

13   speculation.

14        THE WITNESS:  I do not remember the size of

15   the deal or how much was recognized in the quarter.

16        MR. SOLOMON:  Okay.  Let's have marked as the

17   next exhibit another document produced in this

18   litigation with the control numbers 210354 and 355.

19        (Plaintiffs' Exhibit No. 53

20        marked for identification).

21        MR. SOLOMON:  Q.  This is an e-mail from Loren

22   Mahon dated Thursday, November the 30th, 2000.  And

23   Safra Catz is an addressee, among others.  Let me know

24   if you recognize this, when you've had a chance to look

25   at it.

                                                            325

1    A.  I do not recognize it at all.

2    Q.  You don't dispute receiving it on

3    November 30th?

4    A.  No, I don't -- excuse me.  I do not dispute

5    receiving it.

6    Q.  And you'll see that it says at the top, "Per

7    Anil, they're going to sign," and in quotes, "operating

8    lease of," and it seems to be a typo, "d" --

9    A.  No.

10   Q.  -- "document today."

11   A.  No.

12   Q.  Oh, "ofd."  I see.  What does ofd mean?

13   A.  Oracle finance division.

14   Q.  So "They're going to sign," and in quotes, "an

15   operating lease ofd document today with an option to

16   prepay later."

17        Do you see that?

18   A.  Yes.

19   Q.  Do you understand what that means?

20   A.  Yeah, they're going to lease -- they're going

21   to sign a financing agreement.

22   Q.  And is that a typical transaction at Oracle;

23   do you know?

24   A.  Yes, it is.

25   Q.  Okay.  And it goes on to say, "We will take a

                                                            326

1 small hit, a million dollars or so," in parentheses,
2 "that may come back if they agree to pay net 30 or go
3 with a more traditional finance payment plan."
4     Do you see that?
5     A.  I do.
6     Q.  Are you familiar with that being a typical
7 practice at Oracle?
8     MR. LINDSTROM:  Vague and ambiguous, assumes
9 facts.
10     THE WITNESS:  I'm not sure -- what being --
11 doing an ofd or paying net 30?
12     MR. SOLOMON:  Paying net 30.
13     THE WITNESS:  Paying net 30 I think is -- is
14 our -- is our general finance time.  Depends on a few
15 things, but I think it's net 30 in general.
16     MR. SOLOMON:  Q.  And did -- did they go with
17 the operating lease?
18     A.  I have no idea.
19     Q.  How many customers -- strike that.
20     Is there anything concerning the operating
21 lease that concerns you in terms of the propriety of the
22 transaction described here?
23     MR. LINDSTROM:  Vague and ambiguous.
24     THE WITNESS:  I don't actually have any
25 details on this -- on what's described here.  So I don't

327

1 think there's anything -- any problem with this.  I
2 don't think there ever was.  I just don't know.
3     MR. SOLOMON:  Thank you.
4     Q.  Now, in 2002, did you become aware of an issue
5 surrounding Oracle's unapplied cash?
6     MR. LINDSTROM:  Vague.
7     THE WITNESS:  In 2002?  No.
8     MR. SOLOMON:  Q.  Have you ever heard of an
9 issue arising in this litigation concerning Oracle's
10 unapplied cash?
11     A.  Yes.
12     Q.  And have you heard that outside the presence
13 of your lawyers?
14     A.  I don't think so.
15     Q.  Were you ever involved in any investigation at
16 Oracle into the unapplied cash issues?
17     MR. LINDSTROM:  This is apart from the
18 litigation?
19     MR. SOLOMON:  Correct.
20     THE WITNESS:  No, I don't think I was.
21     MR. SOLOMON:  Q.  In 2002 did you attend audit
22 committees?
23     A.  I did.  Most of them, not all of them.  Not
24 all of them.  And -- but most of them, yeah.
25     Q.  In 2002 did any of the audit committees that

328

1 you attended address the issue of the unapplied cash
2 that is a subject of this litigation?
3     A.  I don't know.  I don't have a memory of that.
4     MR. SOLOMON:  Let's have marked as the next
5 exhibit a document produced in this litigation -- excuse
6 me -- previously exhibited in this litigation as Exhibit
7 12 to the Chen deposition.  Have it marked as an exhibit
8 in this -- a further exhibit in this litigation as well,
9 please.
10     (Plaintiffs' Exhibit No. 54
11     marked for identification).
12     MR. LINDSTROM:  So will it bear Exhibit 54 as
13 part of this deposition proceeding?
14     MR. SOLOMON:  Yes.
15     Q.  Now, Ms. Catz, I know you're not an addressee
16 on this.  And what I'd like you to do is just focus
17 initially on the paragraph that says, "There are three
18 deliverables" in that first bullet point.
19     And once you've had a chance to look, then let
20 me know.
21     A.  Okay.  Okay.  I've gotten through the
22 beginning.
23     MR. LINDSTROM:  I assume your purpose here is
24 to ask her whether any of this refreshes her
25 recollection, and you're not intending to ask her about

329

1 the later parts of the document.
2     MR. SOLOMON:  That is correct.
3     Q.  And my question is, does this refresh your
4 recollection as to whether or not an audit committee you
5 attended addressed the issue of unapplied cash in
6 calendar 2000?
7     A.  2002.
8     Q.  2002, excuse me.  Thank you.
9     A.  No.  I don't -- I don't -- I don't remember
10 this.  I don't remember this discussed.  I don't
11 remember this.  I just don't remember -- as I sit here
12 right now, I don't remember it.
13     MR. SOLOMON:  Okay.  Counsel, there's a court
14 order that all of the documents concerning the cleanup
15 be produced.  We have not seen any of the audit
16 committee minutes, which presumably would reflect at
17 least some information concerning the cleanup.  We ask
18 that those be produced, reserve the right to recall Ms.
19 Catz if it turns out that she is reflected in any way on
20 the documents that we believe you should have produced
21 but have not produced up until now.
22     MR. LINDSTROM:  You've made your statement.
23     MR. SOLOMON:  I have.
24     Okay.  Let's have marked as the next exhibit
25 another document produced in this litigation with the

330

1  control numbers 1260319 through -- I'll just read the
2  numbers because it's a condensed version of a large
3  spreadsheet.  The numbers are 1260319, 320, 321, then
4  1261528, 529 and 530.
5      (Plaintiffs' Exhibit No. 55
6      marked for identification.)
7      MR. SOLOMON:  Q.  Let me know if you recognize
8  the document generally, when you've had a chance to look
9  through it.
10     A.  No.
11     Q.  If you go to the fourth page of the exhibit,
12 which is the control number 1261528, you'll see halfway
13 down the page there's a reference to JDS Uniphase and
14 there's a date in the middle column, 30 November, '02.
15 Do you see that?
16     A.  There's a whole bunch of references to JDS
17 Uniphase, and -- which date?  They've got a few dates.
18     Q.  I'm looking at 30 November, '02.  You see
19 that?
20     A.  There are three of those at least.
21     Q.  11098, excuse me, halfway down the page.
22     A.  Okay.
23     Q.  You see that?
24     MR. LINDSTROM:  And 11098 is the number in the
25 left-hand column?

331

1      MR. SOLOMON:  Correct, yes.
2      THE WITNESS:  Okay.
3      MR. SOLOMON:  Q.  Do you have any idea what
4  that refers to?
5      A.  No.
6      Q.  Okay.  Then if you go to the last page of the
7  exhibit, and you'll see there's a reference to 11098
8  again.  And you go to the far right-hand side, it says,
9  "In the hands of Safra Catz, according to support reps.
10 New agreement was signed by Andy Bailey.  Took money
11 away from support stream."
12     Do you see that?
13     A.  In -- in 11098?  No.  It's in 11099.
14     Q.  No, I'm looking at 11098.
15     A.  No, no, no.  11098 is this fat column.
16     Q.  Okay.
17     A.  And it's -- well, I don't know.
18     Q.  Well, either way, you see it's "in the hands
19 of Safra Catz"?
20     A.  Yeah, I do, but -- yeah, it's on 11099, yeah.
21     Q.  Okay.
22     A.  It's on 11099.  So I don't know what else is
23 on 11099, but whatever.  Okay.  I see it.
24     Q.  And do you know what it refers to where it
25 says, "In the hands of Safra Catz, according to support

332

1  reps.  New agreement was signed by Andy Bailey.  Took
2  money away from support stream"?
3      A.  No idea.
4      Q.  And you don't recall being involved in this?
5      A.  I don't remember this at all.  I don't even
6  know what this is.  11099 is -- what is it?  It's also
7  JDS Uniphase.  No idea what it is.
8      Q.  Do you recall whether Ms. Minton was involved
9  in investigating the unapplied cash situation at Oracle
10 in 2002?
11     MR. LINDSTROM:  No foundation.
12     THE WITNESS:  I don't know, no.
13     MR. SOLOMON:  Q.  Were you involved in
14 deciding who should address any issues involving
15 unapplied cash in 2002?
16     A.  I don't think so.
17     Q.  Do you recall in late 2000 and early 2001
18 hearing about customer complaints concerning the
19 performance of 11i?
20     A.  I wouldn't be able to place the date
21 necessarily.  But there were issues with the performance
22 of 11i in some cases.
23     Q.  Are you aware that 11i was launched too early?
24     MR. LINDSTROM:  Assumes facts.
25     THE WITNESS:  I don't think that -- I don't

333

1  know that to be true.
2      MR. SOLOMON:  Q.  Okay.  You know that Mr.
3  Ellison's admitted that it was launched too early?
4      A.  I do --
5      MR. LINDSTROM:  Assumes facts,
6  mischaracterizes his testimony, and as you framed it to
7  this witness, it's vague and ambiguous.
8      MR. SOLOMON:  I urge you to read his testimony
9  if you think that's true.
10     MR. LINDSTROM:  That's not a question.
11     THE WITNESS:  I do not know that to be true
12 one way or another.
13     MR. SOLOMON:  Q.  What do you think of the
14 practice of telling customers who were unhappy with
15 Oracle's products that if they wanted them fixed,
16 there'd have to be a reference for the product they were
17 unhappy with?
18     MR. LINDSTROM:  Assumes facts.
19     THE WITNESS:  I don't know of that practice at
20 all.
21     MR. SOLOMON:  Q.  So you don't -- you're
22 unaware that Larry Ellison's admitted engaging in that
23 practice?
24     MR. LINDSTROM:  Assumes facts,
25 mischaracterizes his testimony, no foundation,

334

1  argumentative.

2  MR. SOLOMON:  Q.  Are you aware that there are

3  documents that demonstrate Mr. Ellison engaged in that

4  practice?

5  MR. LINDSTROM:  No foundation.

6  THE WITNESS:  No, I don't know that to be

7  true.

8  MR. SOLOMON:  Let's have marked as the next

9  exhibit a document produced in this litigation with the

10  control numbers 1056920 through 6940.

11  (Plaintiffs' Exhibit No. 56

12  marked for identification).

13  THE WITNESS:  Should I read the whole thing?

14  MR. SOLOMON:  Q.  I won't ask you to read the

15  whole thing.  Let me know, first of all, if you

16  recognize the exchange on the first page.

17  A.  I don't actually recognize it, but I see what

18  it is and I can understand it.

19  Q.  Okay.  And my question, then, is going to be

20  just with respect to Xerox.  There's language there that

21  says, "They have had significant issues with CRM and

22  order management integration.  Code stability,

23  lacking" -- sorry -- "lack of quoting capability with

24  iStore and lack of integration between contracts and

25  order management have major issues for them."

335

1  Do you see that?

2  MR. LINDSTROM:  In quotes?

3  MR. SOLOMON:  In quotes, yes.

4  Q.  Do you see that?

5  A.  I don't know where you're reading.  You're

6  reading what Mr. Sanderson wrote or what I wrote?

7  Q.  I'm looking where it says, "Please approve

8  this for Xerox," and then there's quotes.

9  A.  Oh, yeah, yeah.  Oh, I'm sorry.  Yeah.

10  Q.  Do you know who wrote the language in the

11  quotes?

12  A.  I have a -- I don't know.  I think it's

13  probably further down in the document somewhere.

14  Q.  And do you --

15  A.  I could find it.

16  Q.  That's okay.

17  A.  I can look for it.

18  Q.  That's okay.  Let's not waste your time

19  looking for it.

20  A.  Oh, okay.  Oh, yeah, here it is.  Yes, "They

21  have had" -- yeah, it looks like Mr. Sanderson wrote it

22  and I'm quoting him.

23  Q.  Had you been aware at around 14th of March,

24  2001 that Xerox was reporting these problems?

25  A.  Clearly this is written to me around the

336

1  14th of March -- on the 14th of March, so I -- I

2  appear to know it, sure.

3  Q.  What I'm asking is had you known that for a

4  while, or was this new news to you?

5  A.  I don't know.  I don't remember at all.

6  Q.  Had you been involved with Xerox as a client

7  prior to March 14th, 2001?

8  A.  I don't think so.

9  MR. SOLOMON:  Let's have marked as the next

10  exhibit a document produced in the litigation with the

11  control numbers 1027932 through 7935.

12  (Plaintiffs' Exhibit No. 57

13  marked for identification).

14  MR. SOLOMON:  Q.  Recognize any of these

15  exchanges, Ms. Catz?

16  A.  No.  I don't think I'm even part of them.

17  Q.  Okay.  If you look on the third page of the

18  exhibit.

19  A.  I'm just getting there right now.  Okay.

20  Yeah, I see that.

21  Q.  You'll see that you're an addressee.

22  A.  Yeah, in the middle here.

23  Q.  All right.  And you'll see that -- at the

24  bottom, if you read under "Tactical Problem," it says,

25  "Although the 11i performance does not stop them from

337

1  conducting business, it is serious enough that Chipotle

2  has removed themselves from the reference program until

3  the," open quotes, "'reality meets the hype,'" close

4  quotes.

5  You see that?

6  A.  No, I haven't found you yet.  But I --

7  Q.  It's --

8  A.  Oh, you're all the way at the bottom,

9  "Tactical Problem."

10  MR. LINDSTROM:  Why don't you take a moment

11  and read it.

12  THE WITNESS:  Okay, 'cause I hadn't gotten to

13  this part yet, to this note even.

14  MR. SOLOMON:  Q.  I'm looking under the

15  heading "Tactical Problem."

16  A.  Yeah, I'm almost there.  Okay, I got that

17  "reality meets the hype."

18  Q.  When did -- do you know when the reality with

19  respect to 11i did meet the hype?

20  MR. LINDSTROM:  Argumentative, calls for a

21  conclusion, vague and ambiguous.

22  THE WITNESS:  You know, I didn't write this.

23  This is a quote.  This is written by someone else

24  quoting somebody else.

25  MR. SOLOMON:  Q.  Do you know that Mr.

338

1  Ellison's admitted that the 11i wasn't stable at least
2  until 2002?
3       MR. LINDSTROM:  Assumes facts, no foundation,
4  mischaracterizes --
5       MR. SOLOMON:  Q.  Are you aware of that?
6       MR. LINDSTROM:  -- his testimony.
7       THE WITNESS:  I have no idea what he said.
8       MR. SOLOMON:  Q.  Have you ever heard him
9  admit, other than what I just represented to you, that
10  11i wasn't stable until at least 2002?
11       MR. LINDSTROM:  Vague and ambiguous, calls for
12  a conclusion.
13       THE WITNESS:  Actually, I don't remember that
14  at all.
15       MR. SOLOMON:  Have marked as the next exhibit
16  another document produced in this litigation, control
17  numbers 1026868 through 879.
18       (Plaintiffs' Exhibit No. 58
19       marked for identification).
20       MR. SOLOMON:  Q.  My question is -- you'll see
21  that it's dated Wednesday, the 28th of March, 2001,
22  and its subject is "daily CRM escalated and strategic
23  information [sic] report."
24       And my question is did you receive on a
25  regular basis -- on a daily basis, I should say -- CRM

1  escalated and strategic information -- implementation
2  reports in the fourth fiscal quarter, 2001?
3       A.  I don't think so.
4       Q.  Would this be an unusual event for you to have
5  received this?
6       A.  I don't know.  I don't -- I don't remember
7  getting it daily, so I -- but I don't know if it's
8  unusual.  I don't remember getting it at all, so I don't
9  know if I got it -- I -- clearly I don't get it daily
10  'cause this thing is forwarded to me.
11       I don't know if Mr. Wohl forwarded it to me
12  every day.  I don't recognize it, and I don't remember
13  it.
14       MR. SOLOMON:  Okay.  Let's go off the record.
15       THE VIDEOGRAPHER:  Off record, 4:23.
16       (Recess taken).
17       THE VIDEOGRAPHER:  On record at 4:34.
18       MR. SOLOMON:  Q.  Ms. Catz, at EMC meetings in
19  the 2000/2001 time frame, is that true that you'd take
20  handwritten notes?
21       A.  Um ...
22       Q.  You'd make handwritten notes, excuse me.
23       A.  I would sometimes add to a to-do list.
24       Q.  Okay.  And would you write agendas for EMC
25  meetings as well?

339                                          340

1       A.  Yeah.  What I -- I would -- had a page, and I
2  would put in a list of things people told me they wanted
3  to talk about.  And I'd distribute the list.
4       Q.  Okay.  What's happened to any handwritten
5  notes of EMC meetings that you took -- or that you made,
6  excuse me -- after this litigation commenced?
7       MR. LINDSTROM:  Assumes facts.  So you're
8  talking about handwritten notes for meetings that
9  predate --
10       MR. SOLOMON:  Let me just repeat the question.
11       Q.  What happened to any handwritten notes of the
12  EMC meetings that you took -- or you made, excuse me --
13  after this litigation commenced?
14       MR. LINDSTROM:  But are the meetings after the
15  litigation commenced?
16       MR. SOLOMON:  Yes, meetings after the
17  litigation commenced.
18       THE WITNESS:  Oh.  It was a to-do list.  And
19  when I would do it, you know, it would be on these
20  little scraps of paper.  And I'd write myself a note,
21  "Call Jim about," whatever.
22       And when I'd do it, I'd just cross it out.
23  And then, you know, when the list didn't have anything
24  on it, crumple it up, throw it out.
25       MR. SOLOMON:  Q.  Okay.  So what happened with

1  respect -- did you make notes at EMC meetings,
2  handwritten notes, after this litigation commenced?
3       MR. LINDSTROM:  Okay.  So --
4       MR. SOLOMON:  It's a very simple question.
5       Q.  Did you?
6       A.  Yeah, I don't know when this litigation
7  commenced.  I don't remember.
8       Q.  Right.
9       A.  So you'd have to tell me.  I don't know what
10  year that is.
11       Q.  In March of 2001.
12       A.  Okay.  So --
13       Q.  After that quarter elapsed.
14       A.  I don't know if at that point I would do the
15  to-do list anymore.  It was something I did when I first
16  got there.
17       Q.  Might have been something you stopped doing
18  after we filed our lawsuit; is that what you're saying?
19       MR. LINDSTROM:  No.  Argumentative,
20  mischaracterizes her testimony.
21       THE WITNESS:  No, I don't know when I stopped
22  doing it.  It was something I did when I started.
23       MR. SOLOMON:  Q.  With respect to the book
24  Softwar, you're aware that Mr. Ellison wrote footnotes
25  to that book?

341                                          342

1      A.  I do know he wrote footnotes on some of the
2  pages.
3      Q.  How do you know that?
4      A.  'Cause I saw it in the book.
5      Q.  So you've read the book?
6      A.  I've read most of the book.
7      Q.  When did you read it?
8      A.  When it came out.
9      Q.  And what happened to the initial drafts of Mr.
10  Ellison's footnotes for that book?
11      MR. LINDSTROM:  No foundation.
12      THE WITNESS:  I have no idea.
13      MR. SOLOMON:  Q.  Did you see any of his
14  drafts of his footnotes?
15      A.  No.
16      Q.  Do you know why drafts of his footnotes
17  weren't produced in this litigation?
18      MR. LINDSTROM:  Assumes facts.
19      THE WITNESS:  I have no idea.
20      MR. SOLOMON:  Q.  Were you involved in the
21  antitrust litigation that occurred with respect to the
22  PeopleSoft transaction?
23      A.  Yes, I was.
24      Q.  Are you aware that Softwar was an exhibit for
25  the government in that litigation --

343

1      MR. LINDSTROM:  No foun --
2      MR. SOLOMON:  Q.  -- or at least excerpts of
3  it?
4      MR. LINDSTROM:  No foundation, calls for
5  speculation.
6      THE WITNESS:  I don't remember that, actually.
7      MR. SOLOMON:  Q.  Is it your testimony that
8  you had zero involvement in either negotiate -- well,
9  first of all, zero involvement in the negotiations of
10  the agreement with Mr. Symonds concerning Softwar?
11      A.  I don't remember being involved in the
12  negotiations with Mr. Symond [sic].
13      Q.  Okay.
14      A.  I really don't.
15      Q.  And is it your testimony that you had zero
16  involvement with respect to drafting the footnotes that
17  Mr. Ellison made?
18      A.  Yeah, I don't think I had any involvement with
19  any footnotes at all.
20      MR. LINDSTROM:  Where are we on time?
21      THE VIDEOGRAPHER:  Four and ... 30 or
22  something.  I'm not quite sure.
23      MR. LINDSTROM:  Remaining?
24      THE VIDEOGRAPHER:  Yes.
25      MR. SOLOMON:  Q.  Do you know what a debit

344

1  memo is?
2      A.  Vaguely, yes.
3      Q.  And in the context of Oracle, what is a debit
4  memo?
5      A.  It's -- it's a financial -- it's a -- moving
6  something from -- debiting one account, moving it to
7  something else.
8      Q.  And do you recall debit memos being involved
9  in the cleanup that took place in 2002 at Oracle?
10      MR. LINDSTROM:  No foundation, vague and
11  ambiguous.
12      THE WITNESS:  You know, I don't -- I don't
13  remember the details of what you're referring to.  So I
14  don't know -- debit memos or credit memos, I don't
15  exactly know.
16      MR. SOLOMON:  Q.  Have you been involved in
17  refunding any sums to customers that have been held by
18  Oracle in unapplied cash until 2002?
19      A.  Your question has really two parts.  So
20  if both things, I don't know about that second part you
21  said.  I've been involved in cases where we have given,
22  you know, some sort of a refund or something to a
23  customer, so ...
24      MR. LINDSTROM:  But he's only asking you about
25  ones in conjunction with the debit memo cleanup.

345

1      THE WITNESS:  No, see, I wouldn't know
2  anything about that.
3      MR. SOLOMON:  Q.  You know nothing about that
4  whatsoever; that's your testimony, correct?
5      A.  Refunding money to customers with -- debit
6  memo thing, no, I don't.
7      Q.  So any refunds that you've made or been
8  involved in making to customers since 2002 have not been
9  related to any of the debit memo issues that are
10  involved in this litigation; is that right?
11      A.  Yeah.  I don't even know if I've actually been
12  involved in any refunds to customers since 2002, period.
13  But definitely not -- you know, not involved with this
14  debit memo stuff that you're talking about, that I know
15  of.
16      Q.  Do you know that Mr. -- would you describe
17  many of the implementations of 11i as being significant
18  screwups for Oracle?
19      MR. LINDSTROM:  Objection.  Compound.
20      THE WITNESS:  Would I describe that?  No, I
21  would not.
22      MR. SOLOMON:  Q.  Okay.  Do you know that Mr.
23  Ellison has described such implementations as having
24  been significant screwups?
25      MR. LINDSTROM:  Assumes facts,

346

1  mischaracterizes testimony, no foundation.

2      THE WITNESS:  I have no idea -- I have no --

3  no idea that that's a true statement at all.

4      MR. SOLOMON:  Q.  Okay.  Would you be

5  interested to learn whether it's a true statement or

6  not?

7      MR. LINDSTROM:  Irrelevant.

8      THE WITNESS:  It's your call, sir.

9      MR. SOLOMON:  Q.  Since March of 2001 when we

10  filed this litigation, you have attended EMC meetings,

11  correct?

12      A.  Yes.

13      Q.  And you have written agendas; is that right?

14      A.  I don't write agendas anymore, actually.

15      Q.  So that was a practice prior to this

16  litigation that hasn't -- did not continue thereafter;

17  is that right?

18      MR. LINDSTROM:  Assumes facts.

19      THE WITNESS:  No.

20      MR. LINDSTROM:  Mischaracterizes her

21  testimony, argumentative.

22      THE WITNESS:  No, that's not right.

23      MR. SOLOMON:  Q.  So tell me what is right,

24  please.

25      A.  There were agendas for a long time.  Then I

347

1  got too busy to do them, so I stopped doing them.

2      MR. LINDSTROM:  Where are we on time?

3      THE WITNESS:  I don't know when that was,

4  though.  I don't know how that relates to your

5  litigation.

6      THE VIDEOGRAPHER:  Forty-five seconds.

7      MR. SOLOMON:  Q.  Okay.  Please tell me, with

8  respect to the H-P transaction at the end of the second

9  fiscal quarter 2001, what discussion was there at the

10  board of directors meetings in January concerning that

11  transaction?

12      MR. LINDSTROM:  No foundation, calls for

13  speculation, asked and answered at the last session.

14      THE WITNESS:  You know, I don't remember any

15  talk about the H-P deal at the board of directors

16  meeting.  I just don't have a memory of that at all.

17      MR. SOLOMON:  Excuse me.  Let me restate the

18  question -- actually, not restate the question.  I'll

19  ask you another question.

20      Q.  At a November 30 meeting of the board of

21  directors, what discussion was there concerning the H-P

22  deal?

23      MR. LINDSTROM:  No foundation, asked and

24  answered.

25      THE WITNESS:  I don't remember having a board

348

1  meeting.

2      MR. SOLOMON:  Q.  What about an executive

3  committee meeting?

4      A.  I don't know.  Executive committee meetings

5  are on Monday usually, rarely at the end of the quarter,

6  so ...

7      Q.  What executive level meeting did you ever have

8  concerning the H-P transaction?

9      A.  I don't remember --

10      MR. LINDSTROM:  No foundation.

11      THE WITNESS:  I don't remember having a

12  meeting at executive committee or otherwise about H-P.

13      MR. LINDSTROM:  So Counsel, you've consumed

14  your time.

15      MR. SOLOMON:  Reserve our rights.  Thank you

16  very much, Ms. Catz.

17      THE VIDEOGRAPHER:  This marks the end of

18  videotape 2, Volume II in the deposition of Safra Catz.

19  The original videotapes will be retained by LiveNote

20  World Service.  At 4:44, going off the record.

21      (Deposition concluded at 4:44 p.m.)

22

23      ---o0o---

24

25

349

1      CERTIFICATE OF WITNESS

2

3

4

5      I, the undersigned, declare under penalty of

6  perjury that I have read the foregoing transcript and I

7  have made any corrections, additions or deletions that I

8  was desirous of making; that the foregoing is a true and

9  correct transcript of my testimony contained therein.

10      EXECUTED this _____ day of _____,

11  200_, at _____, _____.

12

13

14

15

16

17      _____

18      Signature of Witness

19

20

21

22

23

24

25

350

1          REPORTER CERTIFICATE

2          I hereby certify that the witness in the

3     foregoing deposition was by me duly sworn to testify to

4     the truth, the whole truth and nothing but the truth in

5     the within-entitled cause; that said deposition was

6     taken at the time and place herein named; that the

7     deposition is a true record of the witness's testimony

8     as reported to the best of my ability by me, a duly

9     certified shorthand reporter and a disinterested person,

10    and was thereafter transcribed under my direction into

11    typewriting by computer; that no review of the

12    transcript was requested by the witness or any party.

13         I further certify that I am not interested in

14    the outcome of said action, nor connected with, nor

15    related to any of the parties in said action, nor to

16    their respective counsel.

17         IN WITNESS WHEREOF, I have hereunto set my

18    hand this 6th day of April, 2007.

19

20         _____

          HOLLY MOOSE, CSR NO. 6438

21

22

23

24

25

                                    351

Oracle

REPORTER CERTIFICATE

1

2        I hereby certify that the witness in the

3   foregoing deposition was by me duly sworn to testify to

4   the truth, the whole truth and nothing but the truth in

5   the within-entitled cause; that said deposition was

6   taken at the time and place herein named; that the

7   deposition is a true record of the witness's testimony

8   as reported to the best of my ability by me, a duly

9   certified shorthand reporter and a disinterested person,

10  and was thereafter transcribed under my direction into

11  typewriting by computer; that no review of the

12  transcript was requested by the witness or any party.

13       I further certify that I am not interested in

14  the outcome of said action, nor connected with, nor

15  related to any of the parties in said action, nor to

16  their respective counsel.

17       IN WITNESS WHEREOF, I have hereunto set my

18  hand this 6th day of April, 2007.

19

20  _____

     HOLLY MOOSE, CSR NO. 6438

21

22

23

24

25

                                                351

EXHIBIT BB

Matuszak, Gary  8/1/2006  9:14:00 AM

1

```
1          IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                      ---oOo---
4
5
6    In Re ORACLE CORPORATION
     SECURITIES LITIGATION
7                 FILE NO. C-01-0988-MJJ
8    This Document Relates To:

9    _____/
10
11              CONFIDENTIAL
12     VIDEOTAPED DEPOSITION OF GARY MATUSZAK
13          Tuesday, August 1, 2006
14
15        SHEILA CHASE & ASSOCIATES
16            REPORTING FOR:
17         LiveNote World Service
18        221 Main Street, Suite 1250
19        San Francisco, California 94105
20         Phone: (415) 321-2311
21          Fax: (415) 321-2301
22
23
24   Reported by:
25   ANDREA M. IGNACIO HOWARD, RPR, CSR NO. 9830
```

3

```
1    BE IT REMEMBERED that on Tuesday, August 1, 2006,
2    commencing at the hour of 9:14 a.m., at the offices of
3    Lerach, Coughlin, Stoia, Gellar, Rudman & Robbins,
4    LLP, 100 Pine Street, Suite 2600, San Francisco,
5    California, before me, ANDREA M. IGNACIO HOWARD, CSR,
6    RPR, a Certified Shorthand Reporter for the State of
7    California, personally appeared
8                 GARY MATUSZAK,
9    called as a witness by the Plaintiffs herein, who,
10   being by me first duly sworn, was thereupon examined
11   and testified as hereinafter set forth.
12                  ---oOo---
13   Appearing as counsel on behalf of Plaintiffs:
14       LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
         ROBBINS LLP
15       BY:  ELI GREENSTEIN, Esq.
             KEITH MAUTNER, CPA, CMA
16           RIVA ELTANAL
         100 Pine Street, Suite 2600
17       San Francisco, California  94111
         (415)  288-4545
18       elig@lerachlaw.com
19
     Appearing as counsel on behalf of Defendants:
20
         LATHAM & WATKINS, LLP
21       BY:  PAUL V. KONOVALOV, Esq.
         650 Town Center Drive, 20th Floor
22       Costa Mesa, California 92626
         (714)  540-1235
23       paul.konovalov@lw.com
24
25
```

2

```
1                I N D E X
2        DEPOSITION OF GARY MATUSZAK
3                   PAGE
4    EXAMINATION BY MR. GREENSTEIN           6
5    EXAMINATION BY MR. KONOVALOV          365
6                  ---oOo---
7
8              E X H I B I T S
9
10   DESCRIPTION                   PAGE
11   Exhibit  1  Bates NDCA-ORCL 081711 - 814    94
12   Exhibit  2  Bates NDCA-ORCL 050370 - 382   208
13   Exhibit  3  Bates AA 000041 - 1086      289
14   Exhibit  4  Bates NDCA-ORCL 313777 - 784   301
15   Exhibit  5  Bates NDCA-ORCL 055957 - 962   320
16   Exhibit  6  Bates NDCA-ORCL 020844 - 848   320
17   Exhibit  7  Bates NDCA-ORCL 020839 - 843   320
18   Exhibit  8  Bates NDCA-ORCL 025018      320
19   Exhibit  9  Bates NDCA-ORCL 033954 - 978   352
20   Exhibit 10  Bates NDCA-ORCL 068221 - 244   360
21   Exhibit 11  Bates NDCA-ORCL 133613 - 654   360
22
23       REFERENCED EXHIBITS PREVIOUSLY MARKED
24   Chen Exhibit Nos. 2, 3, 4, 12
25
```

4

```
1    (Appearances continued.)
2
     Appearing as counsel on behalf of Gary Matuszak:
3
         CHADBOURNE & PARKE, LLP
4        BY:  ROBERT SIDORSKY, Esq.
         30 Rockefeller Plaza
5        New York, New York 10112
         (212)  408-5100
6        rsidorsky@chadbourne.com
7
     Also present:  Gary Brewer, Videographer.
8
9
                  ---oOo---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Matuszak, Gary  8/1/2006  9:14:00 AM

5

1    THE VIDEOGRAPHER: Here begins the videotaped
2  deposition of Gary Matuszak, tape one, Volume I, in
3  the matter of In Re Oracle Securities Litigation, in
4  the United States District Court, Northern District of
5  California, Case No. C-01-0988 MJJ.
6        Today's date is August 1st, 2006, and the
7  time is 9:15 a.m.
8        The video operator today is Gary Brewer
9  representing LiveNote World Service, located at
10  221 Main Street, Suite 1250, San Francisco, California
11  94105. Phone number (415) 321-3200.
12        The court reporter is Andrea Howard,
13  reporting on behalf of LiveNote World Service.
14  Today's deposition is being taken on behalf of the
15  plaintiff and is taking place on 100 Pine Street,
16  San Francisco, California.
17        Counsel, would you please introduce
18  yourselves and state whom you represent.
19        MR. GREENSTEIN: Good morning.
20  Eli Greenstein with Lerach, Coughlin, Stoia, Geller,
21  Rudman & Robbins, representing plaintiffs, and with me
22  are Keith Mautner, one of our friend accountants, and
23  Riva Eltanal, who is a law clerk at our firm.
24        MR. SIDORSKY: Robert Sidorsky of
25  Chadbourne & Parke, LLP on behalf of the nonparty,

6

1  Mr. Matuszak.
2        MR. KONOVALOV: Good morning.
3  Paul Konovalov, Latham & Watkins for the defendants.
4        THE VIDEOGRAPHER: Would the court reporter
5  please swear in the witness.
6              GARY MATUSZAK,
7        having been sworn as a witness,
8        by the Certified Shorthand Reporter,
9        testified as follows:
10        THE VIDEOGRAPHER: You may begin.
11
12        EXAMINATION BY MR. GREENSTEIN.
13        MR. GREENSTEIN: Q.  Good morning,
14  Mr. Matuszak.
15    A  Good morning.
16    Q  Could you please state your full name and
17  address for the record.
18    A  Full name is Gary Howard Matuszak. Address
19  is 4347 Lombard Avenue in Fremont, California.
20    Q  Okay. Thanks for being here today. We
21  appreciate your time.
22        Have you ever had your deposition taken
23  before?
24    A  Yes.
25    Q  Approximately how many times?

7

1    A  Twice, to my recollection.
2    Q  Okay. What kinds of cases were those?
3    A  Securities litigation.
4    Q  Okay. Were those both securities fraud
5  litigation?
6    A  I don't recall.
7    Q  Okay.
8    A  Class action lawsuits.
9    Q  Okay. And were those against companies
10  that -- that Arthur Andersen represented or were they
11  against Arthur representatives?
12        MR. SIDORSKY: Objection to form.
13        THE WITNESS: They were cases where the
14  company was charged, and I believe in both situations
15  Andersen was a named defendant as well.
16        MR. GREENSTEIN: Okay.
17    Q  Do you remember the company defendants in
18  those cases?
19    A  I do.
20    Q  Start with the first one.
21    A  The first one was Oracle.
22    Q  Okay. And when was that litigation?
23    A  Approximately early '90s.
24    Q  And it was a shareholder class action against
25  Oracle; correct?

8

1    A  That's correct.
2    Q  And Arthur Andersen was a named defendant in
3  that case?
4    A  That's correct.
5    Q  Okay. Do you know if that was a case
6  involving a financial restatement?
7    A  There was a financial restatement on or
8  around the early '90s, so probably was as a result of
9  that. I don't recall the specifics of the lawsuit.
10    Q  Okay. Do you know what the resolution of the
11  lawsuit was? Did it go to trial?
12    A  No.
13    Q  Okay. Do you know if it settled out of
14  court?
15    A  Yes.
16    Q  Okay.
17    A  It settled out of court.
18    Q  So the case against Andersen wasn't
19  dismissed. It settled out of court; right?
20    A  I believe that Oracle and Andersen both
21  settled out of court.
22    Q  Okay. Now, the second litigation that you
23  were deposed in, what company was that involving?
24    A  Digital Microwave.
25    Q  Approximately when was that litigation?

Matuszak, Gary  8/1/2006  9:14:00 AM

9

1     A   Again, I would say in the mid '90s, early to
2   mid '90s.
3     Q   And Andersen, Arthur Andersen -- from now on
4   I'm going to just refer to it as Andersen, sometimes
5   Arthur Andersen.
6         Was Arthur Andersen a defendant in that case
7   as well?
8     A   Yes.
9     Q   And what was the resolution of that
10  litigation, if you know?
11    A   Again, it was settled out of court for both
12  Digital Microwave and Andersen.
13    Q   Okay.  And the Oracle litigation, were there
14  any other defendants besides Oracle and
15  Arthur Andersen?  Do you recall?
16    A   Don't recall.
17    Q   Okay.  How about Digital Microwave
18  litigation?
19    A   Don't recall.
20    Q   And you were deposed in both of those cases?
21    A   That's correct.
22    Q   Okay.  Were they just one-day depositions?
23    A   One or two days.  I don't -- it's -- I don't
24  recall how long I was there --
25    Q   Okay.

10

1     A   -- to be honest.
2     Q   So you probably are aware of the procedure
3   that occurs during a deposition, but I'm just going to
4   go over some ground rules, just so we get it on the
5   record, just so we understand each other.
6         The court reporter on your right is going to
7   be taking down everything you say here today -- all my
8   questions, and all your answers, and the objections
9   that the attorneys may make.
10        I would ask that you speak verbally.  No head
11  nods, no hand gestures, no "uh-huh," "huh-uhs."  It
12  makes it hard for the court reporter to -- to get
13  everything down.
14        So I'd just ask that you answer audibly, as
15  clearly as you can.
16        I'd also ask that we don't talk over each
17  over.  So let me finish a question before you answer.
18  I'll try to do the same, let you finish your answer
19  before I follow up with a question.  It gets muddled
20  when we talk over each other.
21        Again, for the sake of the court reporter,
22  I'd ask that you don't do that.
23        Do you understand that?
24    A   Yes.
25    Q   Okay.  And you understand that the oath that

11

1   you're taking here today is the same oath that you
2   would be taking if you were sitting in a court of law
3   testifying?
4     A   I do.
5     Q   During the course of the deposition,
6   Mr. Sidorsky, your attorney, will be likely to make
7   objections.  He could object to every question that I
8   ask here.  He could object to one or two.  Those
9   objections are for lawyers to hash out later.
10        I would ask that you answer any question that
11  I ask, unless Mr. Sidorsky instructs you specifically
12  not to answer.
13        Mr. Konovalov represents Oracle.  He's also
14  here.  He might make some objections.  Without getting
15  into the standing that he may or may not have for
16  making objections.  He might do it.
17        Again, though, if I ask a question, I'm going
18  to expect that you answer the question, unless
19  Mr. Sidorsky instructs you not to answer; do you
20  understand that?
21    A   Yes.
22    Q   Okay.  If you don't understand any questions
23  that I ask here today, just tell me, and I'll try to
24  rephrase it.  But if you answer the question, I'm
25  going to assume that you understand what I was asking;

12

1   is that fair?
2     A   Okay.
3     Q   Now, if you don't remember something in
4   response to one of my questions and then later you
5   take a break, something jogs your memory, you're
6   always entitled to come back and clarify an answer
7   that you already made, or say, "You know, I remember
8   something that I didn't remember before.  Something
9   jogged my memory."  You're allowed to do that.
10        Do you understand that?
11    A   Yes.
12    Q   At the end of the deposition, you're going to
13  have a chance to review the transcript, and you can
14  make any slight changes, misspellings, you know, any
15  changes to your testimony.  Not substantive changes
16  but just minor changes, and you can make those
17  corrections and send it back.
18        So don't feel like you have to be absolutely
19  perfect with every spelling or, you know, every word
20  here today; do you understand that?
21    A   Yes.
22        MR. SIDORSKY:  I don't totally agree with
23  your characterization, but okay.  We could deal with
24  that later if there was ever an issue.
25        MR. GREENSTEIN:  Okay.

13

1     Q  And this is my favorite question: Are you
2  under the influence of any alcohol, or drugs, or
3  medication that would inhibit your ability to
4  competently testify here today?
5     A  No.
6     Q  Okay.  So when did you first learn you were
7  being deposed in this case?
8     A  I don't recall the specific date.  It was
9  some time in early -- early to mid June.  Someone
10  showed up at my home to try to serve a deposition.
11    Q  A subpoena?
12    A  A subpoena.  Excuse me.
13    Q  Okay.
14    A  Yeah.
15    Q  And what did you do after you received the
16  subpoena?  And again, when I ask these questions about
17  the subpoena or any questions for that matter, I don't
18  want to know anything you ever told to your lawyer,
19  any conversation you had with your lawyer.
20       So I might ask you, you know, if you took
21  action, or, you know, when did you -- when did you
22  talk to your lawyer, but I don't want to know any
23  specific communications between you and your lawyer;
24  do you understand that?
25    A  Yes.

14

1     Q  So when you received the subpoena, you said
2  it was around June of this year?
3     A  Yes.
4     Q  -- and what did you do after you received the
5  subpoena?
6     A  I actually -- I received a phone call from an
7  attorney at Andersen first, because I was out of town.
8  She informed me that --
9       MR. SIDORSKY:  Again, I don't believe you
10  have to discuss the substance of --
11      THE WITNESS:  Okay.
12      MR. SIDORSKY:  -- what was -- what was told
13  to you by Andersen's lawyer.
14      THE WITNESS:  Okay.
15      MR. GREENSTEIN:  Q.  So you were contacted by
16  an attorney before you got the subpoena?
17    A  Yes, just to notify me that I might be served
18  a subpoena.
19    Q  Okay.  Was that -- was that attorney
20  Mr. Sidorsky?
21    A  No.
22    Q  Do you know -- who was it?
23    A  I don't recall her name.
24    Q  Okay.  And she told you -- well, strike that.
25       And then approximately how long after that

15

1  conversation did you receive the subpoena?
2     A  Two to three days.
3     Q  Okay.  And once you received the subpoena,
4  did you call your lawyers?
5     A  I called the attorney at Andersen and faxed
6  her a copy of the deposition, and I also left a phone
7  message for Mr. Cooperman at Oracle notifying him that
8  I received a subpoena as well, just so he was aware.
9     Q  Okay.  Why did you -- why did you so call
10  Mr. Cooperman?
11    A  Just out of courtesy.
12    Q  Just because it was -- it was involving
13  Oracle?
14    A  Yeah.
15    Q  Okay.  Do you know Mr. Cooperman?
16    A  Well, he was general counsel at the company
17  while I was the audit partner there.
18    Q  Okay.  Well, were you friends with him?
19    A  I knew him professionally.  We were not
20  friends.
21    Q  Okay.
22    A  I haven't spoken to him in quite some time.
23    Q  So did you have his phone number?  Once you
24  got the subpoena, did you have his phone number in
25  your rolodex, or how did you get in touch with him?

16

1     A  I believe I had his phone number.  Yeah, I
2  called the company --
3     Q  Okay.
4     A  -- and just left him a message.
5     Q  And what did you say to him?
6     A  Just notifying him that I had received a
7  subpoena in the Oracle class action litigation and
8  wasn't sure what it related to but wanted him to be
9  aware that I had received one.
10    Q  Okay.  Did he call you back?
11    A  He left a message for one of his other
12  attorneys who did return the phone call, and I never
13  returned his call.
14    Q  And do you -- do you recall the name of that
15  other attorney?
16    A  No.
17    Q  Okay.  So did you ever talk to Mr. Cooperman
18  from the time you received the subpoena until today?
19    A  No.
20    Q  Okay.  Did you ever talk to any Oracle
21  lawyers after --
22    A  No.
23    Q  -- the time you received the subpoena --
24    A  No.
25    Q  -- until today?

Matuszak, Gary  8/1/2006  9:14:00 AM

17

1    A  No.
2    Q  Okay.  So other than lawyers for Oracle, and
3  other than Mr. Sidorsky, or any lawyers for
4  Mr. Sidorsky's firm, did you speak to anybody about
5  the subpoena from the time you received it until
6  today?
7    MR. SIDORSKY:  Object to the form.
8    I think that's a little confusing and
9  compound, but you can go ahead and answer.
10    MR. GREENSTEIN:  Your objection is noted, and
11  I'm going to ask -- I'm going to ask that when you
12  make an objection, as you know, the rules only entitle
13  you to make your objection saying.
14    Saying it's confusing or trying to coach the
15  witness is not proper under the Federal Rules of Civil
16  Procedure, so I'd just ask that you make your
17  objection.
18    MR. SIDORSKY:  Well, that's not coaching.
19  You're entitled, I think, to briefly state the nature
20  of your objection, but I -- I hear your concerns, so I
21  will --
22    MR. GREENSTEIN:  Okay.  Thank you.
23    MR. SIDORSKY:  -- be careful.
24    THE WITNESS:  The only attorneys I spoke with
25  were the Andersen attorney and Mr. Sidorsky.

18

1    MR. GREENSTEIN:  Okay.
2    Q  And when was the first time you spoke with
3  any Andersen attorney?
4    A  As I mentioned before, I received a voice
5  message prior to receiving the subpoena and then spoke
6  with her briefly within a day or two of that.
7    Q  Okay.  And did you ever -- what was the next
8  conversation you had with an Andersen attorney?  When
9  was it?
10    A  I don't recall.
11    Q  Okay.  Did you --
12    A  After I received the subpoena?
13    Q  Right.
14    Did you ever have any meetings with your
15  attorney regarding the subpoena?
16    A  Which attorneys?
17    Q  Any.
18    A  Mr. Sidorsky.
19    Q  Okay.  And when was the first meeting?
20    A  We met face-to-face yesterday.
21    Q  Okay.  For approximately how long?
22    A  The afternoon, five hours.
23    Q  Okay.  Did you review any documents yesterday
24  with Mr. Sidorsky?
25    A  Yes.

19

1    Q  Okay.  And approximately how -- what was the
2  volume of the documents you reviewed?
3    A  About three inches.
4    Q  Okay.
5    A  Two to three.
6    Q  And did -- did any of those documents that
7  you reviewed refresh your recollection about things
8  that occurred at Oracle during the, let's say, 2000,
9  2001 time frame?
10    A  General recollection.  Not specific
11  recollection.
12    Q  Okay.  And -- so it refreshed your
13  recollection generally.  How did it do that?  How did
14  reviewing the documents help you refresh your
15  recollection generally?
16    MR. SIDORSKY:  Objection to form.
17    THE WITNESS:  It's been five or six years, so
18  just looking at those documents refreshed me on some
19  of the accounts, some of the, you know, ways that
20  Oracle accounted for stuff, so....
21    MR. GREENSTEIN:  Okay.
22    Q  When you say "some of the accounts," what --
23  did it refresh your recollection about any specific
24  accounts at Oracle during that time?
25    A  No, just in going through the -- the work

20

1  papers.  We looked at some of the, you know, accounts
2  that -- receivable accounts, deferred revenue
3  accounts.  So just reading through some of the work
4  papers at Andersen refreshed my memory of what the
5  accounts were.
6    Q  Okay.  Did -- did reviewing any of those
7  documents refresh your recollection about certain ways
8  that Oracle accounted for certain transactions?
9    MR. KONOVALOV:  Objection; vague and
10  ambiguous.
11    MR. SIDORSKY:  Same objection.
12    THE WITNESS:  Yes.
13    MR. GREENSTEIN:  Q.  And how so?
14    MR. SIDORSKY:  Same objection; overly vague
15  and ambiguous.
16    THE WITNESS:  Just the way they accounted for
17  transactions.
18    MR. GREENSTEIN:  Okay.
19    Q  Well, did you look at -- did you look at the
20  work papers and you thought to yourself, "I remember
21  the way they accounted for transactions," or did you
22  look at the work papers and refresh your recollection
23  about, you know, maybe a specific type of accounting,
24  let's say, during 2000, 2001 time period?
25    MR. SIDORSKY:  Same objection; lacks

21

```
1    foundation.
2         THE WITNESS: It was a recollection of how
3    they accounted for various types of transactions.
4         MR. GREENSTEIN: Okay.
5         Q  Now, can you narrow that down to a category
6    or a type of accounting?
7         A  Well, most of the work papers that I looked
8    at were in the receivable section, and in the deferred
9    revenue section, customer advances and deferred
10   revenue.  So, by definition, my recollection would
11   have been refreshed in those two areas.
12        Q  Okay.  Now, when you -- you just said, I
13   think, "customer advances and deferred revenue."  Did
14   you mean customer advances and unearned revenue?
15        A  Sure.
16        MR. SIDORSKY: Objection to form.
17        MR. GREENSTEIN: Okay.
18        Q  So you looked at some work papers yesterday.
19   Did you look at any other documents, any e-mails that
20   helped refresh your recollection about accounting at
21   Oracle?
22        A  No.
23        Q  Okay.  Was it just work papers?
24        A  Just work papers, what, that I reviewed?
25        Q  Yes.
```

22

```
1         A  I reviewed the -- certain work papers.  I was
2    also provided a copy of the actual complaint that I
3    briefly reviewed and a copy of Mr. Sevier's
4    deposition, which I briefly reviewed.
5         Q  Okay.  And who is Mr. Sevier?
6         A  Jason Sevier.  He was the manager at Andersen
7    on the Oracle engagement and was deposed on or about
8    June 28th on this matter.
9         Q  Now, did you -- so did you read the whole
10   deposition yesterday?
11        A  No.
12        Q  Okay.  Are you aware that that deposition has
13   been marked "Confidential" in this case?
14        A  I guess I saw the -- the -- it did say
15   "Confidential" on it, yes.
16        Q  Okay.  Did reading Mr. Sevier's deposition
17   transcript refresh your recollection about any
18   specific topics related to Oracle in the 2000, 2001
19   time frame?
20        A  No more or less than reviewing the work
21   papers.
22        Q  So it was more general.  It refreshed your
23   recollection generally more than about specific
24   issues?
25        A  Yeah.
```

23

```
1         Q  Okay.
2         A  I didn't read through it in great detail.
3         Q  You said you looked at a complaint in this
4    action yesterday; correct?
5         A  I received a copy of the complaint, and I
6    walked through certain sections of it.  Again, I did
7    not review the entire complaint.
8         Q  Okay.  Did you walk through the sections on
9    the accounting allegations in this case?
10        A  I did review those.
11        Q  Okay.  Did that help you refresh your
12   recollection about the issues raised in the complaint?
13        A  Well, that's the only recollection I've had
14   were the issues raised in the complaint.
15        Q  Okay.  So prior to reading the complaint, you
16   were not aware of the allegations that were raised in
17   the complaint?
18        A  No.
19        Q  Okay.  Prior to receiving the subpoena in
20   this case, were you aware that this litigation existed
21   at all?
22        A  Yes, I believe I was.
23        Q  Okay.  And how did you know about it?
24        A  Well, I believe the litigation started prior
25   to my departure from Andersen.  So while I was still
```

24

```
1    involved with the Oracle -- Oracle account while at
2    Andersen, so -- but I haven't tracked it.
3         Q  Okay.  When did Andersen -- when did --
4    you're the senior part -- you were the senior partner
5    at Arthur Andersen during the 2000, 2001 time frame;
6    correct?
7         MR. SIDORSKY: Objection to form.
8         THE WITNESS: I was the -- the -- the lead
9    audit partner on the engagement.  I'm not sure what
10   "senior partner" means.
11        MR. GREENSTEIN: Okay.
12        Q  Well, does lead audit partner mean you were
13   the highest ranking audit partner on the engagement?
14        A  That would be correct.
15        Q  Okay.  So what do you recall about -- when
16   you were at Andersen, you said you became aware of
17   this litigation; correct?
18        A  I -- I believe it was this litigation.
19        Q  Okay.
20        A  I don't recall specifically.
21        Q  Okay.  Well, I'll represent to you the
22   complaint -- the first complaint filed in this case
23   was March 2001.  Were you at Andersen in March 2001?
24        A  Yes.
25        Q  Were you working on an Oracle engagement at
```

25

1   that time?
2       A   I was.
3       Q   Okay.  And how did you learn about this
4   litigation, if you remember?
5       A   From conversations with the company.
6       Q   Okay.  What conversation -- and without
7   talking -- and -- well, what conversations were those?
8       A   I don't recall the specific conversations.
9       Q   Did someone come in and say, "Hey, Oracle is
10  being sued," and that's it, or do you remember
11  anything about it?
12      A   I don't recall.
13      Q   Okay.  You just remember hearing about a
14  litigation?
15      A   That's correct.
16      Q   Okay.  Do you remember any specific people
17  that you talked to about it?
18      A   I don't recall specific conversations, so....
19      Q   Okay.
20      A   No.
21      Q   Were you -- when did Andersen's engagement
22  with Oracle end?
23      A   We were replaced on or around April of 2002.
24      Q   Okay.  And why were you replaced in April of
25  2002?

26

1       A   Because our firm was going out of business.
2       Q   Okay.  Were you -- were you -- was Andersen
3   fired by Oracle?
4       MR. SIDORSKY:  Objection to form.
5       THE WITNESS:  We were dismissed.  We were
6   replaced.  You can define it any way you want.
7       MR. GREENSTEIN:  Okay.
8       Q   Was that the time of the Enron -- the time
9   that the Enron case was -- was coming to light?
10      A   It was after Andersen --
11      MR. KONOVALOV:  Objection; vague and
12  ambiguous.
13      MR. SIDORSKY:  Yeah, I'll object to that.
14      THE WITNESS:  It was after Andersen was
15  indicted.
16      MR. GREENSTEIN:  Okay.
17      Q   So just to close the loop, have you ever
18  spoken to anybody -- besides your attorneys and
19  besides the general conversations you had while you
20  were at Andersen -- spoken with anybody about this
21  litigation?
22      A   No.
23      Q   Okay.  Now, after April 2002, when Andersen
24  was dismissed, do you recall having any discussions
25  with anybody about accounting allegations against

27

1   Oracle around the 2000, 2001 time frame?
2       MR. SIDORSKY:  Could I hear that question
3   again, I'm sorry.
4       (Whereupon, record read by the Reporter as
5   follows:
6       "Question:  Okay.  Now, after April 2002,
7       when Andersen was dismissed, do you recall
8       having any discussions with anybody about
9       accounting allegations against Oracle around
10      the 2000, 2001 time frame?"
11      MR. GREENSTEIN:  Q.  You can answer.
12      A   No.
13      Q   Okay.  And other than your attorneys, have
14  you spoken to anybody about this deposition, anybody
15  from Oracle?
16      A   No.
17      Q   Okay.  Now, did you write any e-mails, other
18  than to people -- well, strike that.
19      Have you written any e-mails to anyone other
20  than your attorneys about this deposition?
21      A   Nope.
22      Q   Okay.  Have you received any e-mails other
23  than from your attorneys about this deposition?
24      A   No.
25      Q   Okay.  So other than work papers, and the

28

1   complaint, and the Sevier deposition transcript, do
2   you -- what -- did you review any other types of
3   documents yesterday?
4       A   Yes.  We actually briefly reviewed a couple
5   of sections of a couple of their public filings, some
6   of the form 10-Q during a couple of the quarters in
7   fiscal '01.
8       Q   Okay.  Do you remember which quarters?
9       A   Well, we had copies of all three quarters.
10  We actually spent very little time looking at them.
11      Q   Okay.  Did you -- oh, sorry.  You finished?
12      Did you look at any specific line items in
13  the 10-Qs?
14      A   I think all I looked at was the balance sheet
15  and some selected financial data on the income
16  statement.
17      Q   Okay.  So when you looked at a balance sheet,
18  did you just look at the balance sheet generally, or
19  did you look at any specific line items on the balance
20  sheet?
21      MR. SIDORSKY:  I'm going to object to that;
22  objection to form.
23      THE WITNESS:  Generally looked at the balance
24  sheet and then looked at the customer advances and
25  unearned revenue, I think you called it, and then

29

```
1    looked at the receivable line item.
2         MR. GREENSTEIN:  Okay.
3         Q  So you looked at the line item in the balance
4    sheet in the 10-K, which was called customer advances
5    and unearned revenue; is that right?
6         A  Oh, go ahead.
7         MR. SIDORSKY:  Objection to form.
8         MR. GREENSTEIN:  Q.  Is that right?
9         A  I don't recall if it was the 10-K or 10-Q,
10   but --
11        Q  Okay.
12        A  -- I mean --
13        Q  I'm sorry.
14        A  -- I looked at the balance sheet.  Your eyes
15   focus in on a couple of accounts.
16        Q  So did your eyes just focus on it, or were
17   you -- is that something that you -- that when you saw
18   it, you remembered that specific line item?
19        A  Well --
20        MR. SIDORSKY:  Objection to form.
21        THE WITNESS:  -- those were the work papers
22   that I was asked or that I was given to look at, so --
23        MR. GREENSTEIN:  Okay.
24        Q  So is it fair to say --
25        A  -- that would be the only reason to look at
```

30

```
1    those line items.
2         Q  Okay.  So is it fair to say you looked at
3    line items on the balance sheet and the income
4    statement that pertained to the issues that you
5    reviewed in the work papers?
6         A  Those are the two line items that I looked
7    at.
8         Q  Okay.  And the accounts receivable line item,
9    that's the one you looked at on the balance sheet?
10        A  Yeah.
11        Q  Okay.  On the income statement, were there
12   particular line items that you focused in on?
13        A  I don't believe I looked at the income
14   statement.
15        Q  So you just looked at the balance sheet?
16        A  Yes.
17        Q  Okay.  Did you look at the statement of cash
18   flows at all?
19        A  No.
20        Q  Okay.  Now, looking at those line items that
21   helped your recollection about any issues involving
22   those two line items, customer advances, and unearned
23   revenue, or accounts receivable, that occurred at
24   Oracle during 2000, 2001?
25        A  No.
```

31

```
1         Q  Okay.  I'm going to switch gears a little
2    bit.  I'd just like to know a little bit about your
3    educational background, so why don't you tell me from
4    high school -- well, from college until now what your
5    education has been.
6         A  Okay.  I graduated from college from the
7    University of Wisconsin at Oshkosh in May of 1979 with
8    a bachelors in business administration with a
9    concentration in accounting, and that was my last
10   formal education.
11        Q  Do you have any -- do you have a CPA?
12        A  I do.
13        Q  Do you?
14        Do you have any other types of licenses or
15   certifications related to accounting?
16        A  No.
17        Q  Okay.  Any other training related to
18   accounting?
19        A  I don't know what you mean by "training."
20        Q  Strike that.
21        Any formal training of any type related to
22   accounting?
23        A  No.
24        Q  Okay.  And when were you first employed by
25   Arthur Andersen?
```

32

```
1         A  July of 1979.
2         Q  And what was your position at the time you
3    were hired?
4         A  I was hired as a staff accountant.
5         Q  And were you -- obviously you were promoted
6    at some point; correct?
7         A  Correct.
8         Q  And -- well, let's say, how long were you a
9    staff accountant?
10        A  Well, define -- depends on what you would
11   define as the next promotion.
12        Q  Well, how would you define the next
13   promotion?
14        A  The next formal promotion will be a promotion
15   to manager.
16        Q  Okay.  Is it just called manager or account
17   manager?
18        A  Just audit manager.
19        Q  Audit manager.
20        And do you remember what year that was?
21        A  1985.
22        Q  Okay.  And then how long were you a manager?
23        A  Various levels of a manager until I made
24   partner.
25        Q  Okay.  And when did you make partner?
```

33

1    A  1993.

2    Q  And did you make partner -- you talked about

3  a litigation involving Oracle in the early '90s. At

4  the time of that litigation, were you -- were you a

5  partner, or were you some -- or were you a level of

6  manager?

7    A  At the time of the -- well, define what you

8  mean by time of litigation.  The time period for the

9  class period?  The time that I was deposed?

10    Q  The time period for the class period.

11    A  I would have been a manager on the

12  engagement.

13    Q  Okay.  At the time you were deposed, were you

14  a partner?

15    A  I don't recall.  I told you when I made

16  partner, 1993, but I don't recall the date of the

17  deposition.

18    Q  Okay.  And are there various levels of

19  partners at Andersen?

20    MR. SIDORSKY:  Objection to form.

21    THE WITNESS:  Not formally, no.

22    MR. GREENSTEIN:  Okay.

23    Q  Well, did you -- once you became partner in

24  1993, did you get promoted after that time?

25    A  Around 2000, I assumed the responsibility of

34

1  the managing partner of the Silicon Valley office.

2  That would have been the only formal promotion.

3    Q  Okay.  Do you -- do you recall when Andersen

4  was hired by Oracle?

5    A  Long before I was involved.

6    Q  Okay.  Is it fair to say that Andersen was

7  Oracle's auditor from approximately 19 -- early 1990s

8  through the time that they were dismissed in

9  April 2002?

10    A  No, it would not have been early 1990s.  It

11  would have been early 1980s, probably.

12    Q  1980s, okay.

13    Now, during that time, early 1980s to

14  April 2002, did Andersen do all of the fiscal year

15  audits for Oracle?

16    A  Since the time we were appointed, whenever

17  that was, up until the time we were dismissed in April

18  of 2002, we were the auditors of record for Oracle.

19  So we would have, you know, signed their audit

20  reports.  So we would have -- if that's what you mean,

21  yes.

22    Q  Okay.  Well, what I mean is did you conduct

23  the fiscal year audit and sign off on the fiscal year

24  and financial statements?

25    A  Oracle -- I mean, Andersen did, yes.

35

1    Q  Okay.  And during that time, did Andersen

2  also conduct all quarterly reviews of Oracle?  When I

3  say that, I mean the review of their financials in

4  connection with the filing of their 10-Qs.

5    MR. SIDORSKY:  Objection to form.

6    MR. KONOVALOV:  Same objection.

7    THE WITNESS:  We would have performed

8  quarterly reviews during that time period.  You know,

9  if you ask me specifics on early '80s, I -- I have no

10  way to respond.

11    MR. GREENSTEIN:  All right.

12    Q  But you don't recall any other audit firm

13  coming in and doing a quarterly review while you were

14  there; do you?

15    A  I don't recall.

16    Q  Okay.  And when did you -- when did you first

17  become involved with the Oracle account?

18    A  Late 1989.  I'd say late '89 or early '90.

19    Q  So you were a manager on the Oracle account

20  for a number of years; correct?

21    A  I was the manager on the oral -- Oracle

22  account.  I don't know what you mean by "a number of

23  years," but I was the manager on the Oracle account

24  for a period of time.

25    Q  So why don't you just describe for me if --

36

1  when you were -- when you were a manager working on

2  Oracle -- the Oracle account.  What would you do --

3    MR. SIDORSKY:  Objection.

4    MR. GREENSTEIN:  Q. -- generally?

5    MR. SIDORSKY:  Objection to form.

6    THE WITNESS:  That's a very open-ended

7  question.  I supervised part of the audit work.

8    MR. GREENSTEIN:  Okay.

9    Q  What -- what does that mean, supervise part

10  of the audit work?

11    A  Well, we would divide up the work and

12  people -- certain people would look at certain

13  sections, other people would look at other sections.

14  I don't recall specifically what parts of the work I

15  would have had responsibility for or reviewed, but I

16  was a manager on the engagement.

17    Q  Do you remember being in charge of any

18  particular account during -- you know, let's say from

19  the time you started working on the Oracle account

20  until April 2002, do you ever recall focusing on a

21  specific area with respect to an audit?

22    A  I'm sorry --

23    MR. SIDORSKY:  Well, let him finish the

24  question, but are you finished with the question?

25    MR. GREENSTEIN:  Yes.

37

1     MR. SIDORSKY: Okay. I object to the form.
2  It's -- it's overly broad. It's vague. It's
3  ambiguous.
4     MR. GREENSTEIN: Q. You can answer.
5     A  Can you -- could you repeat the question or
6  define the time period?
7     Q  Okay. When you were a manager on the -- on
8  the Oracle account, do you remember focusing on any
9  specific parts or specific issues with respect to
10  Oracle audits?
11     A  Some.
12     MR. SIDORSKY: Same objection.
13     THE WITNESS: I -- I don't know about issues.
14  You know, I can't answer with respect to that,
15  specific areas of the work. I -- I don't recall
16  looking at specific work papers, if that's what
17  you're -- you're asking, but I know that I worked with
18  many areas of the audit, including receivables,
19  revenue.
20     A lot of our, you know, audit tests that were
21  performed in those areas I would have looked at, and
22  there are other areas as well looking at international
23  clearances, looking at the 10-K. You know, there's a
24  lot of different things we go through.
25     MR. GREENSTEIN: Okay.

38

1     Q  Well, why don't I back up and just ask you if
2  you could just describe the difference between an
3  audit of Oracle and a quarterly review. I guess we
4  could start with -- well, why don't you just tell me
5  the difference between those two types of engagements.
6     MR. SIDORSKY: Objection to form.
7     THE WITNESS: You're -- you're -- I'm sorry.
8     MR. SIDORSKY: Objecting -- objection to the
9  form of the question.
10     THE WITNESS: You're speaking in general,
11  not --
12     MR. GREENSTEIN: Correct.
13     THE WITNESS: -- referencing any particular
14  period?
15     MR. GREENSTEIN: Q. Actually, yeah. Why
16  don't we focus on the 2000, 2001 time frame.
17     A  Okay.
18     Q  You -- well, let me back up.
19     Andersen did all the quarterly reviews in the
20  fiscal -- fiscal year 2001; right?
21     A  That's correct.
22     Q  And it conducted the year-end audit in the
23  fiscal 2001; correct?
24     A  Correct.
25     Q  You signed the audit opinion that was

39

1  included with the 10-K for the fiscal year 2001 for
2  Oracle; correct?
3     A  That's correct.
4     Q  Okay. So focusing on that time period,
5  what's the difference generally between what Andersen
6  did for a quarterly review and what it did for an
7  audit?
8     MR. KONOVALOV: Objection; vague and
9  ambiguous.
10     MR. SIDORSKY: Same objection to form.
11     THE WITNESS: Well, a review is substantially
12  less in scope than an audit. We don't form an opinion
13  on the financial statements or any portion of the
14  financial statements in a review.
15     Our responsibility is to perform high-level
16  analytical review and some discussions with
17  management.
18     MR. GREENSTEIN: Okay.
19     Q  When you say you don't form an opinion, you
20  just mean you don't actually sign a formal audit
21  opinion like you do with a -- a year-end audit;
22  correct?
23     MR. SIDORSKY: Objection to form.
24     THE WITNESS: No, we -- we do not form an
25  opinion. We do not issue -- we do not form an audit

40

1  opinion on the financial statements.
2     MR. GREENSTEIN: Right.
3     Q  And what I'm asking is -- but do you form any
4  opinion at all, informal opinion, about your review?
5     MR. SIDORSKY: Objection to form.
6     THE WITNESS: When you say "opinion," to me,
7  I think of an audit opinion.
8     MR. GREENSTEIN: Okay.
9     Q  What I'm trying to get at, you said you
10  didn't form an opinion for quarterly reviews.
11     A  That's correct.
12     Q  What I'm asking is, do you mean you don't for
13  a -- you don't sign a formal audit opinion during the
14  quarters? Correct?
15     MR. SIDORSKY: Objection to form.
16     THE WITNESS: Correct. We do not perform an
17  audit and do not issue an audit opinion on the
18  quarters.
19     MR. GREENSTEIN: Right.
20     Q  But you do form some sort -- you do form
21  opinions about what you reviewed for the quarters;
22  right?
23     MR. KONOVALOV: Objection; misstates the
24  witness's testimony.
25     MR. SIDORSKY: Yeah, objection to form.

41

1    THE WITNESS: We have discussions with
2    management, and based on that, we form a view as to
3    whether we become aware of any material adjustments
4    that would need to be made to the financials based on
5    a fairly limited amount of work.
6        MR. GREENSTEIN: Okay.
7        Q  Why don't you just take me through. Let's
8    focus in on, let's say, the second quarter of 2001.
9        Do you remember that time period?
10       A  Generally.
11       Q  Okay. Now, do you remember what Andersen did
12   in connection with the review of that quarter?
13       MR. SIDORSKY: Objection to form.
14       THE WITNESS: Not -- not specifically. We
15   performed a quarterly review.
16       MR. GREENSTEIN: Right.
17       Q  So during a quarterly review, you said you
18   don't form an opinion. You speak with management, and
19   I think you talked about you look at any adjust --
20   adjustments made; is that fair to say?
21       MR. SIDORSKY: Objection; misstates the
22   record, and the record speaks for itself.
23       THE WITNESS: That's not what I said.
24       MR. GREENSTEIN: Okay.
25       Q  What did you say?

42

1        A  Could you repeat what I said?
2        Q  Well, why don't -- why don't you just tell
3    him what you did in -- what Andersen did in the second
4    quarter of 2001 in performing their quarterly review.
5        MR. SIDORSKY: Objection to form.
6        I don't think the witness is obligated to
7    repeat his -- his prior answer. Why don't you -- why
8    don't you --
9        MR. GREENSTEIN: I just asked --
10       MR. SIDORSKY: You got a record.
11       MR. GREENSTEIN: Is that an objection?
12       MR. SIDORSKY: Yes, it's an objection.
13       MR. GREENSTEIN: What's the objection?
14       MR. SIDORSKY: It's asked. It's answered.
15   We're not -- you can't keep asking the same question
16   when a witness has already answered the question,
17   but -- but go ahead.
18       MR. GREENSTEIN: Asked and answered is a
19   proper objection under the Federal Rules. Now,
20   everything you just said after that is not a proper
21   objection. So again, I'd ask that you make your
22   objection, and then let the witness answer.
23       MR. SIDORSKY: I think that's what I'm doing,
24   Eli.
25       MR. GREENSTEIN: So --

43

1        MR. SIDORSKY: It is a proper objection, but
2    go ahead. I'm trying to let you get it out there.
3        Go ahead.
4        MR. GREENSTEIN: Thank you. I appreciate it.
5    I appreciate it.
6        Q  Do you recall what Andersen did in connection
7    with its quarterly review of the second quarter 2001?
8        A  Again, that's a very broad question, and so I
9    find it difficult to define how you want me to answer
10   that.
11       I mean, what did we do? We performed a
12   quarterly review. What does a quarterly review
13   entail? It includes -- entails discussions with
14   management and high-level analytics. Do I recall
15   specifically what we did in that quarter? No.
16       Q  Okay. When you say "high-level analytics,"
17   what do you mean by that?
18       A  We would look at, you know, some of the
19   accounts. We would look at variation analysis in
20   certain areas. Would not look at detail that would
21   support account balances on a quarterly basis, and we
22   would have discussions with management, and at the end
23   of the quarter receive a representation letter from
24   management representing to us, you know, their
25   responsibility for the financial statements.

44

1        Q  Okay. You said you look at "variation
2    analysis in certain areas," but you would not look at
3    "detail that would support account balances on a
4    quarterly basis."
5        What do you mean by that?
6        MR. SIDORSKY: Objection to form. It --
7    it --
8        THE WITNESS: Well, in an audit -- audit
9    testing includes, on certain accounts, testing the
10   detail of the account balances.
11       In a review, we don't test the detail. You
12   look at the top-level financial statement balances or
13   general ledger account balances in some cases and have
14   some discussions with management on those, and that's
15   it.
16       MR. GREENSTEIN: Okay.
17       Q  So correct me if I'm wrong. So if you're
18   looking at a particular account, like a revenue
19   account, you look at the top line. You look at the
20   variations between quarters, but you wouldn't dig down
21   into that particular account and perform an analysis
22   on it; is that fair to say?
23       MR. SIDORSKY: Objection to form.
24       THE WITNESS: It's a -- you're correct in
25   your discussion. I mean, revenue is probably a bad

45

1  example for it.
2      MR. GREENSTEIN:  Okay.
3      Q   Just in general, if you look at an account --
4  what I'm trying to get at is or what I'm asking is, if
5  you look at a particular account, let's say an
6  accounts receivable account, during a quarterly
7  review, what -- what did you mean when you said you
8  look at the top line but you wouldn't look at the
9  detail of the account?
10     MR. SIDORSKY:  Objection to form.
11     THE WITNESS:  Well, if you take a -- I don't
12  know -- any particular line item, a general ledger
13  account balance on an audit, depending upon the nature
14  of the account, the materiality of the account, the
15  risks involved with that particular account, you may
16  look at the detail that supports that account and test
17  it.  You would not do that on a quarterly review.
18     MR. GREENSTEIN:  Okay.
19     Q   So what -- what would you do on a quarterly
20  review?
21     MR. SIDORSKY:  Objection; asked and answered
22  about three times now.
23     THE WITNESS:  I think I've already said we
24  would do variation analysis.
25     MR. GREENSTEIN:  Q.  Again, what does that

46

1  mean?  What does "variation analysis" mean?
2      A   Look at variations between quarters, and
3  based upon our -- you know, our understanding of the
4  company, would explain those variations --
5      Q   Okay.
6      A   -- have discussions with management.
7      Q   Okay.  And when you say "variations between
8  quarters," you mean if you look at a certain account
9  and it went up or down, you would discuss with
10  management why that occurred?
11     MR. SIDORSKY:  Objection to form.  Again,
12  it -- it lacks foundation; hypothetical.
13     THE WITNESS:  Possibly.
14     MR. GREENSTEIN:  Okay.
15     THE WITNESS:  Without having a specific work
16  paper, or schedule, or account balance that you're
17  referencing to, my answer would be hypothetical.
18     MR. GREENSTEIN:  Okay.
19     Q   Well, I'm just asking generally.  I'm trying
20  to get a sense of what the difference between a
21  quarterly review and an audit are.
22     So what I'm asking is, if you -- when you say
23  "variation analysis," what does that mean, generally?
24     MR. SIDORSKY:  He's answered the question
25  generally, I think, a couple of times.

47

1      MR. GREENSTEIN:  Q.  What --
2      MR. SIDORSKY:  You can answer again now.
3      MR. GREENSTEIN:  Q.  -- what kind of
4  discussions do you have with management when you
5  perform a variation analysis?
6      MR. SIDORSKY:  Again, objection to --
7  objection to the form; lacks foundation; calls for
8  speculation.
9      THE WITNESS:  There would be different levels
10  of discussion.  If it was a schedule that was
11  prepared, the staff accountants on the engagement
12  would discuss it with management, levels of
13  management, prepare the schedule, prepare explanations
14  on the schedule that would be reviewed by an
15  engagement senior, an engagement manager, possibly a
16  partner.  So there could be a number of different
17  discussions that occurred.
18     MR. GREENSTEIN:  Q.  So what is it when you
19  say a schedule was prepared?  What do you mean by
20  "schedule"?
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  An audit work paper.
23     MR. GREENSTEIN:  Okay.
24     Q   Well, I didn't know that, that a schedule
25  meant an audit work paper.  I'm not an accountant.

48

1      So you mean a schedule, in general, means a
2  work paper?
3      MR. SIDORSKY:  Objection to form.
4      THE WITNESS:  In the context of my answer,
5  yes.
6      MR. GREENSTEIN:  Okay.
7      Q   What are the different -- does the schedule
8  mean something else in a different context?
9      MR. SIDORSKY:  Objection to the vagueness of
10  the question.
11     THE WITNESS:  It depends on the question you
12  ask and what I'm answering to.
13     MR. GREENSTEIN:  Q.  But what's a schedule?
14  You said -- you said if it was a schedule that was
15  prepared, the staff accountants on the engagement
16  would discuss it with management.  So when you said
17  that, what did you mean by "schedule"?
18     A   Okay.  An audit work paper schedule.
19     Q   Okay.  And that occurs during the quarterly
20  reviews; correct?
21     A   In the context of the question you're asking
22  about a quarterly review, yes.
23     Q   Okay.  Now, were you a senior -- were you the
24  lead auditor or the lead partner on the Oracle
25  engagement in -- in the first quarter fiscal year

Matuszak, Gary  8/1/2006  9:14:00 AM

49

1  2001?
2      MR. SIDORSKY: Objection to form.
3      THE WITNESS: Yes, I would have been the
4  senior audit partner on the engagement.
5      MR. GREENSTEIN: Okay.
6      Q  And as the senior audit partner, what would
7  your specific duties be when Andersen conducted a
8  quarterly review?
9      A  I would spend time with our team in the field
10  getting at the client.  And as we were performing our
11  work, had various discussions with our team, review
12  selected areas of the work papers, and participate in
13  discussions with management.
14      Q  Okay.  And were you the primary liaison
15  between Oracle's upper management and Andersen, or did
16  everybody speak to or communicate with management?
17      MR. SIDORSKY: Objection --
18      THE WITNESS: Could you--
19      MR. SIDORSKY: -- to form.
20      THE WITNESS: -- define who you mean by
21  "upper management"?
22      MR. GREENSTEIN: Larry Ellison.
23      MR. SIDORSKY: Objection.
24      THE VIDEOGRAPHER: You can continue.
25      THE WITNESS: Okay.  We did not speak with

50

1  Larry Ellison.
2      MR. GREENSTEIN: Q.  Have you ever spoken
3  with Larry Ellison in connection with an engagement?
4      A  An audit engagement?  Review engagement?
5  Which one?
6      Q  Either one.
7      A  What do you mean by "engagement"?
8      Q  Either one.
9      A  No.
10      Q  Have you ever talked to Larry Ellison at all?
11      A  Briefly.
12      Q  Okay.  And when was that?
13      A  I don't recall the specifics, but I attended
14  an event, along with several other people, at his home
15  at one point.
16      Q  Did you ever make presentations to Oracle
17  management while Larry Ellison was there?
18      A  Actually, I take that -- we -- was had one
19  other session I believe Larry was in when management
20  was making a presentation on a particular matter, and
21  we were in attendance, and I believe Larry was in that
22  meeting, but --
23      Q  Okay.
24      A  -- don't ask me the specifics, because I -- I
25  remember being in a room with Ray Lane and others, and

51

1  I believe Larry was in the meeting as well.
2      Q  Okay.  Do you remember when that was?
3      A  No.
4      Q  Do you remember generally what the issue --
5  you said it was an issue.
6      A  I didn't say it was an issue.  I just --
7  well, if I did, I correct myself.  There was -- there
8  was a matter that they were discussing, you know, and
9  I don't recall the specifics of the topic.
10      Q  Okay.  Do you recall generally what the
11  matter was?
12      A  No, I said I don't.
13      Q  Was it an accounting matter?
14      A  Yeah, it would have been something related to
15  accounting, or financial reporting, or else we
16  wouldn't have been there.
17      Q  Okay.  Was that unusual to have such a
18  meeting?
19      MR. SIDORSKY: Objection to form.
20      THE WITNESS: Again, I don't recall the
21  specifics of the meeting.
22      MR. GREENSTEIN: Okay.
23      Q  Well, but how many meetings have you
24  attended, if you know, where Larry Ellison was
25  present?

52

1      A  I believe that was the only one.
2      Q  Right.
3      So what I'm asking, if that's un -- it's
4  obviously unusual to attend a meeting with
5  Larry Ellison --
6      MR. KONOVALOV: Objection --
7      MR. GREENSTEIN: Q.  -- right?
8      MR. KONOVALOV: -- misstates the witness's
9  testimony.
10      MR. SIDORSKY: Yeah, objection to form.
11      THE WITNESS: I wouldn't say it's unusual.  I
12  just -- we -- we've not -- we didn't have occasion to
13  meet with him.
14      MR. GREENSTEIN: Okay.
15      Q  Do you remember anything about -- anything
16  that was discussed in that meeting?
17      A  No.
18      Q  Do you remember approximately even the year
19  that it occurred?
20      A  No.
21      Q  Okay.  Was it when you were a senior audit
22  partner?  Do you remember that?
23      A  I believe I was the audit partner when that
24  was going on, so....
25      Q  Okay.  Do you remember if it was after you

53

1 learned about a lawsuit against Oracle that you
2 described earlier?
3     A  I believe it was before this, the time period
4 of this complaint.
5     Q  Okay.  Well, the complaint was filed in March
6 of 2001, the first complaint.  Do you recall if it was
7 before or after that?
8     A  I believe it was before that.
9     Q  Before that; okay.
10        And you say Ray Lane was there.  Do you
11 remember anybody else that attended?
12     A  Just the finance people, a couple of the
13 finance people that were there.
14     Q  Who was -- oh, sorry.
15     A  I think Jeff Henley was there, Tom Williams
16 was there, Jennifer Minton was there.
17     Q  And do you recall Ray Lane -- who is
18 Ray Lane?
19     A  Ray Lane was the president of the company for
20 a period of time.  I believe he left before this
21 complaint was filed, which is why I think the meeting
22 occurred prior to this complaint being filed.
23     Q  Makes sense.
24        And where do you work now?
25     A  I'm a partner at KPMG.

54

1     Q  Okay.  And when did you -- did you -- did you
2 join KPMG right after Andersen was dismissed, or when
3 did you join KPMG?
4     A  June of 2002.
5     Q  Okay.  So a couple of months after Oracle
6 dismissed Andersen; correct?
7     A  Correct.
8     Q  Okay.  And what's your function now for KPMG?
9     A  I'm the global chair of one of our lines of
10 business.
11     Q  Which line of business?
12     A  We call it ICE, Information Communication and
13 Entertainment.
14     MR. GREENSTEIN:  We've been going about an
15 hour.  Why don't we go off the record.
16     THE VIDEOGRAPHER:  We're going off the
17 record.  The time is 10:07 a.m.
18     (Short break taken.)
19     THE VIDEOGRAPHER:  We are back on the record.
20 The time is 10:21 a.m.
21     MR. GREENSTEIN:  Q.  Mr. Matuszak, earlier we
22 were talking about quarterly reviews and the kinds of
23 things that Andersen does during quarterly reviews.
24        I'm wondering what kind of documentation
25 there is of -- of the quarterly reviews that after a

55

1 quarterly review that you could look at to determine
2 what occurred.
3     MR. SIDORSKY:  Objection to form.
4     THE WITNESS:  Well, we prepared audit --
5 excuse me -- we prepared work papers for audits and
6 quarterly reviews.  So there would have been work
7 papers generically referred to as audit work papers,
8 but there would have been work papers prepared for the
9 quarterly review.
10     MR. GREENSTEIN:  Right.
11     Q  So is it safe to say when you say "audit work
12 papers" you may mean quarterly work papers, as well as
13 year-end work papers?
14     A  I'll try to be clear.
15     Q  Okay.  So once a quarterly review occurs,
16 there is some review work papers that are generated;
17 correct?
18     A  Correct.
19     Q  Okay.  And what do those work papers entail?
20     THE VIDEOGRAPHER:  I'm sorry, Counsel.  You
21 got the microphone on the back of your tie.  If you
22 can put it on your shirt.  Thank you.  Sorry.
23     THE WITNESS:  I'm sorry.
24        Could you repeat your question?
25     MR. GREENSTEIN:  Q.  So for quarterly work --

56

1 I'm trying to get a sense of what quarterly work
2 papers consist of.
3     A  It would have been the -- the documentation
4 of the discussions and work performed during our field
5 work and our representation letters from management,
6 any work we performed on the 10-Q public filing.
7     Q  Okay.  Do the work papers include
8 communications, e-mails that may have been sent or
9 received between Oracle and Andersen?
10     A  Certain of the communications in the work
11 papers could have been via e-mail that were printed
12 out and put in the work papers, but it's not to imply
13 that any and all e-mail communication would be in the
14 work papers.
15     Q  Okay.  And you talked about management
16 representation letters.  What are those?
17     A  There's a representation letter obtained at
18 the end of every quarterly review and one obtained at
19 the end of the audit as well that is signed by senior
20 levels of typically financial management that spells
21 out to the auditor the company's responsibility with
22 respect to the accuracy of the financial statements
23 and representing to us that they told us certain
24 things that, you know, certain account balances are
25 correct, or adequate, accurate, et cetera.

Matuszak, Gary  8/1/2006  9:14:00 AM

57

1    Q  And is that -- what form does that take?  Is
2  that an actual letter that says, you know, Dear
3  Mr. Matuszak, or Dear Andersen, or is it some other
4  form?
5    A  It would be addressed to Arthur Andersen.
6    Q  Okay.  And do you recall if you received
7  those or Andersen received those letters from Oracle
8  management in 2000, 2001?
9    A  We should have.  I haven't looked at the work
10  papers or seen them, but they should be in the work
11  papers.
12    Q  And does it -- so you said that it -- it may
13  represent that certain balances in certain accounts
14  are correct; did you say that?
15    MR. SIDORSKY:  Objection to form.  It's on
16  the record what he said, you know.
17    THE WITNESS:  I -- I don't recall the
18  specifics of what's in the rep letter.  I mean, it's
19  a -- I believe a three- or four-page letter or two- or
20  three-page letter.  So, in general, it would say that
21  the financial statements are accurate, that, you know,
22  they're an accurate reflection of the -- the
23  activities of the company.
24    We typically put in some other special
25  representations on certain areas, depending on, you

58

1  know, what was going on.
2    MR. GREENSTEIN:  Q.  When you say you put
3  them in, you're saying --
4    A  Andersen.
5    Q  -- Andersen puts them in the representation
6  letter?
7    A  Yes.
8    Q  Okay.  So -- but isn't the letter coming from
9  Oracle to Andersen?
10    MR. SIDORSKY:  Objection to form.
11    THE WITNESS:  The -- the letter is a letter
12  from Oracle to Andersen.  The content of the letter by
13  and large is dictated by the AICPA standards and other
14  specific representations that the auditors may request
15  of the company, so the letter is typically drafted.
16  The content of the letter is drafted by the auditor,
17  given to the company, who puts in writing their
18  representation to the auditor.
19    MR. GREENSTEIN:  Okay.
20    Q  And with respect -- the fiscal year 2001,
21  those quarterly reviews, did you participate at all in
22  drafting those participation letters?
23    MR. SIDORSKY:  Objection to form.
24    THE WITNESS:  I most likely would have
25  reviewed those letters either in draft or in final

59

1  form.
2    MR. GREENSTEIN:  Q.  But do you recall
3  actually participating in drafting the language as
4  opposed to review?
5    A  I don't -- I don't recall, no.
6    Q  Okay.  Do you recall who would be -- who
7  drafted those representation letters?
8    A  No.
9    Q  Typically would it be -- what -- what
10  position at Andersen would have the authority to draft
11  those?  Would it be a partner?  A senior manager?
12    A  It would be -- well, let me clarify.
13    The letter doesn't change that significantly
14  from quarter to quarter.  So you'd start with the
15  prior quarter level -- letter and then determine if
16  there were any changes that needed to be made to that
17  letter.
18    Q  Okay.  My question is, do you recall who had
19  the authority to -- to make changes or draft that
20  letter during the fiscal year 2001 for Oracle?
21    A  The -- the changes would have been reviewed
22  and approved by the engagement manager and possibly
23  the partner.
24    Q  Okay.  When you say changes were made --
25    A  Excuse me.

60

1    Q  -- strike that.
2    So in any of these engagement letters, do you
3  draft certain language about particular accounts, or
4  is it more general as to the financial statements and
5  accuracy of the financial statements?
6    MR. SIDORSKY:  Objection to form.  I also
7  think you meant to say representation letter, but --
8  but objection to form.
9    THE WITNESS:  There are representations in
10  the letter that are drafted which would be specific to
11  a particular client, whether it would be Oracle or
12  others.  So there would be things in -- in the Oracle
13  letter that were unique to Oracle.
14    MR. GREENSTEIN:  Okay.
15    Q  And do you recall any specific types of
16  things that were in those representation letters for
17  Oracle?
18    MR. KONOVALOV:  Are we speaking about the
19  2000, 2001 time frame still?
20    MR. GREENSTEIN:  Yeah.
21    MR. KONOVALOV:  Thank you.
22    THE WITNESS:  I don't recall specifically
23  with respect to that time frame what was in there.
24    MR. GREENSTEIN:  Okay.
25    Q  Well, since you worked on Oracle for a long

61

1    period of time, do you recall any specific things that
2    were put in those representation letters that were
3    unique to Oracle?
4        A  They were outside of the standard letter.  I
5    wouldn't -- I don't know if they were unique to
6    Oracle.  They may have been in other client's letters
7    as well, but I do know or my recollection is we had
8    representations in the -- in the Oracle letter as to
9    revenue contracts.  For example, that all contracts
10   were executed prior to the end of the quarter.
11       Q  Okay.  Well, is that something that's in
12   every representation letter for every client of
13   Andersen?
14       MR. SIDORSKY:  Objection; asked and answered.
15       THE WITNESS:  It's not part of the standard
16   representation letter, and it would not be in every
17   letter for every client.
18       MR. GREENSTEIN:  Okay.
19       Q  Why not?
20       A  Because it's not applicable to certain
21   industries, not as applicable.
22       Q  Okay.  So why would -- why would you put that
23   kind of language regarding revenue recognition in the
24   Oracle representation letter versus another company?
25       MR. SIDORSKY:  Objection to form.

62

1        THE WITNESS:  In -- in software companies, so
2    I'll speak more broadly than Oracle, there's a
3    requirement that you have evidence of an arrangement.
4    The evidence of the arrangement/the user contract is a
5    contract that's executed by both parties at the end of
6    the quarter.  So we -- we can't be on site to review
7    every signed contract at the end of the quarter.
8        MR. GREENSTEIN:  Q.  That's an element of
9    SOP 97-2; correct?
10       A  That's correct.
11       Q  Okay.  So is it fair to say that with respect
12   to software clients, you may add language regarding
13   revenue recognition because of the complexity of
14   SOP 97-2?
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  That's -- that's a fair
17   statement, that we would do that more frequently on a
18   software company than in any companies in any other
19   industries.
20       MR. GREENSTEIN:  Right.
21       Q  And do you recall adding that specific
22   language in the representation letters in connection
23   with the quarterly reviews of Oracle during fiscal
24   year 2001?
25       A  I don't recall the -- the specific letters.

63

1    In general, I recall that that was one of the --
2    the -- the specific provisions that was included in
3    the Oracle representation letter.
4        Q  Okay.  Do you recall, was there ever any
5    specific language about a specific transaction or
6    specific deal in a particular quarter?
7        In other words, Oracle is representing that
8    this particular deal was signed, had a signed contract
9    by both parties.
10       MR. SIDORSKY:  Objection to form.
11       THE WITNESS:  I don't believe so.
12       MR. GREENSTEIN:  Q.  Are you not sure of
13   that, or just don't recall it?
14       A  I don't recall ever seeing it.  I don't
15   recall ever putting it in or requesting that we have
16   language as to a specific contract being executed at
17   the end of the quarter.
18       Q  Okay.  Do you recall any -- in any management
19   representation letter Andersen asking Oracle to
20   represent that -- that a specific transaction met all
21   the requirements of revenue recognition?
22       MR. SIDORSKY:  Objection to form.
23       MR. KONOVALOV:  Vague and ambiguous.
24       THE WITNESS:  That's a pretty vague question.
25       MR. GREENSTEIN:  Q.  Well, do you recall any

64

1    specific transaction that was -- that had to be
2    addressed in one of those representation letters with
3    respect to a specific transaction or customer?
4        MR. KONOVALOV:  Same objection.
5        THE WITNESS:  I -- I don't recall.
6        MR. GREENSTEIN:  Okay.
7        Q  Do you recall ever requesting that a
8    transaction with Hewlett-Packard was ever addressed in
9    a representation letter?
10       A  I don't recall that.
11       Q  Okay.
12       A  I don't recall that being added to a rep
13   letter.
14       Q  Okay.  Do you recall whether Andersen ever
15   requested that, with respect to revenue recognition,
16   that all contracts met another element of SOP 97-2
17   other than that there was a signed contract by both
18   parties?
19       MR. KONOVALOV:  Objection; vague and
20   ambiguous.
21       MR. SIDORSKY:  Yeah, objection to form.
22       THE WITNESS:  You know, I -- I -- you asked
23   me for an example, and I gave you an example.  I don't
24   recall all of the provisions in every paragraph that
25   were in the letter.

65

1    MR. GREENSTEIN:  Q.  But generally do you
2  recall ever -- that Andersen ever requested that, say,
3  the delivery element of SOP 97-2, that they represent
4  that the delivery element for every transaction during
5  that quarter was met?
6    MR. SIDORSKY:  Objection to form.
7    THE WITNESS:  I -- I don't recall whether
8  we -- whether that was in the rep letter or not.
9    MR. GREENSTEIN:  Q.  It could have been?
10   MR. KONOVALOV:  Objection: misstates the
11  witness's testimony.
12   THE WITNESS:  I don't recall.
13   MR. GREENSTEIN:  Okay.
14   Q.  Do you recall any of the other elements of
15  97-2 being addressed in a representation letter
16  specifically?
17   MR. SIDORSKY:  Objection to form.
18   THE WITNESS:  Not specific representations as
19  to the requirements of 97-2.  I don't -- I don't
20  recall those being specifically in the rep letter.
21   MR. GREENSTEIN:  Q.  But generally you recall
22  anything being in the rep letter with respect to the
23  elements of SOP 97-2?
24   MR. SIDORSKY:  Objection to form.
25   THE WITNESS:  I -- I don't recall it.

66

1    MR. GREENSTEIN:  Okay.
2    Q.  Do you remember ever having issues or
3  problems that led to a specific request by Andersen to
4  -- that Oracle represent certain things with respect
5  to 97-2 in the rep letters?
6    A.  Again, I apologize, but I don't recall.
7    Q.  Well, since we're on 97-2, you talked
8  about -- well, is one of the elements of 97-2 that a
9  arrangement exists?  Correct?
10   A.  That's correct.
11   Q.  Okay.  And what does that mean?
12   A.  That there's a -- a meeting of the minds, an
13  agreement between the customer and the vendor.  In
14  this case, the vendor being Oracle, and that that
15  evidence is documented in the form of whatever their
16  standard business practice is.
17   Q.  Okay.  And if their standard business
18  practice is a contract, would that require that the
19  contract be signed by both parties?  Correct?
20   A.  That's correct.
21   Q.  And do you recall that that was a standard
22  requirement for Oracle in the fiscal year 2001?
23   MR. KONOVALOV:  Objection; lacks foundation;
24  assumes facts not in evidence.
25   THE WITNESS:  That would be part of their

67

1  revenue recognition policy.
2    MR. GREENSTEIN:  Okay.
3    Q.  But do you recall that during the fiscal year
4  2001 for Oracle that there was a requirement, a
5  standard requirement from Oracle to have a signed
6  contract by both parties in order to meet the element,
7  the arrangement element of SOP 97-2?
8    MR. KONOVALOV:  Objection: lacks foundation;
9  assumes facts not in evidence.
10   THE WITNESS:  I think I answered that
11  question.  It was part of the revenue recognition
12  policy which would be the requirements that they would
13  need to meet in order to recognize revenue.
14   MR. GREENSTEIN:  Okay.
15   Q.  Well, did they ever go beyond their policy?
16   MR. KONOVALOV:  Objection; calls for
17  speculation.
18   MR. SIDORSKY:  Yeah, objection to form.
19   MR. GREENSTEIN:  Q.  Well, if it -- if there
20  was a requirement in their policy that required
21  contracts signed by both parties, is it fair to say
22  that all their transactions during a quarter had to
23  meet that requirement?
24   MR. KONOVALOV:  Objection; incomplete
25  hypothetical; assumes facts not in evidence, and calls

68

1  for speculation.
2    MR. SIDORSKY:  Same objection.
3    THE WITNESS:  There -- they would either have
4  to meet all the requirements of the policy or for some
5  reason there would have to have been an approval --
6  approved approval or exception to the policy, so I....
7    MR. GREENSTEIN:  Okay.
8    Q.  So it wasn't required that Oracle has to meet
9  its revenue recognition policy during the fiscal year
10  2001?
11   MR. SIDORSKY:  Objection to form.
12   THE WITNESS:  No, that's not what I said.
13   MR. SIDORSKY:  Thank you.  Let me object.  I
14  think that mischaracterizes the witness's testimony,
15  and it again is -- is completely lacking in any
16  foundation.
17   MR. KONOVALOV:  It's vague and ambiguous.
18   THE WITNESS:  What I said was they have to
19  follow the company policy.  If there was an exception
20  to the policy and there was a reason to approve an
21  exception to the policy, it would need to be approved
22  by senior financial management.
23   MR. GREENSTEIN:  Okay.
24   Q.  Senior -- approved by senior Oracle
25  management?

69

1     A  Senior Oracle management.
2     Q  Did you -- did Andersen have to approve
3   exceptions to the revenue recognition policy?
4        MR. SIDORSKY:  Objection to form.
5        THE WITNESS:  They're not part of management.
6        MR. GREENSTEIN:  Okay.
7     Q  Did Andersen have to approve exceptions to
8   the revenue recognition policy?
9        MR. KONOVALOV:  Objection; lacks foundation;
10  calls for speculation.
11       MR. SIDORSKY:  And just asked and answered.
12       THE WITNESS:  No.
13       MR. GREENSTEIN:  Q.  So management could
14  decide to recognize revenue on a deal that went beyond
15  its revenue recognition policy without talking to
16  Arthur Andersen?
17       MR. SIDORSKY:  Objection to form.  That --
18  you're just, you know, putting words in the witness's
19  mouth.  Objection to form.
20       MR. GREENSTEIN:  Okay.  That's not a proper
21  objection.
22       MR. SIDORSKY:  It is.
23       MR. GREENSTEIN:  "Putting words in the
24  witness's mouth."
25       Well, if you could tell me, what if the --

70

1   where the Federal Rules say that's a proper objection
2   then, you know --
3        MR. SIDORSKY:  Leading is a -- leading --
4   improperly leading and mischaracterizing a witness's
5   testimony is a problem objection.
6        MR. KONOVALOV:  I'll make my proper
7   objection.  Calls for speculation and lacks
8   foundation.
9        MR. GREENSTEIN:  Okay.  Noted.
10    Q  You can answer the question.
11    A  Could you repeat the question?
12       MR. GREENSTEIN:  Could you read it back,
13  please?
14       (Whereupon, record read by the Reporter as
15  follows:
16       "Question:  So management could decide to
17       recognize revenue on a deal that went beyond
18       its revenue recognition policy without
19       talking to Arthur Andersen?")
20       MR. KONOVALOV:  Same objections.
21       THE WITNESS:  That would be correct, unless
22  it was a transaction that either we were -- it was
23  part of our audit testing or one that they chose to
24  talk to us about.
25       MR. GREENSTEIN:  Okay.

71

1     Q  And back to the arrangement element of 97-2.
2     A  Excuse me.
3     Q  Are you aware that Oracle's revenue
4   recognition policy required a signed contract by both
5   parties to meet that element in --
6        MR. KONOVALOV:  Objection; lacks --
7        MR. GREENSTEIN:  Q. -- in fiscal year 2001?
8        MR. KONOVALOV:  Sorry.  Objection; lacks
9   foundation.
10       MR. SIDORSKY:  Objection to form.
11       THE WITNESS:  I believe that's true.
12       MR. GREENSTEIN:  Okay.
13    Q  So if there was a case where on the last day
14  of the quarter Oracle did not have a signed contract
15  from a customer for a software license as of the night
16  on the last day of the quarter, would that preclude
17  revenue recognition under the terms of that --
18       MR. KONOVALOV:  Objection; assumes facts not
19  in evidence; incomplete hypothetical.
20       MR. SIDORSKY:  Objection to form.
21       THE WITNESS:  Generally, yes.
22       MR. GREENSTEIN:  Okay.
23    Q  So I think you testified earlier that in
24  April of 2002 Andersen was dismissed by Oracle;
25  correct?

72

1     A  Correct.
2     Q  Now, who took over as auditor for Oracle
3   after that time?
4     A  Ernst & Young.
5     Q  Okay.  Now, was there any sort of transition
6   that occurred between Andersen and Ernst & Young?
7        In other words, what did you have to do or
8   did you have to do anything in order to transition the
9   work to EY?
10    A  There was a transition that occurred.
11    Q  Okay.  And what occurred or -- yeah, what
12  occurred?
13    A  Well, the -- the standard practice is that
14  the auditor being replaced, in this case Andersen,
15  makes available to the -- the new auditor our audit
16  work papers, typically for the last year we audited.
17  So in this year we would have made our work papers
18  available for fiscal 2001, as well as the quarters
19  during fiscal 2001, and they would review those.
20       In this case, since we had also been the
21  auditors of record for the first three quarters of
22  fiscal 2002, we made those records available to
23  Ernst & Young as well, or those work papers available
24  to Ernst & Young as well.
25       However, ultimately Ernst & Young had to take

73

1    responsibility for all of the quarters and the
2    year-end audit in 2002. So I don't know what basis,
3    if any, they placed upon the work we had performed,
4    but -- but at the time the 10-K was filed for '02,
5    Ernst & Young had taken responsibility for the
6    quarterly reviews for 2002.
7       Q. Okay. But you provided the work papers for
8    2002, the first three quarters, at least, to Ernst &
9    Young; right?
10      A. That's correct.
11      Q. Okay. Now, other than providing them with
12   documents, do you have -- did you have any discussions
13   or meetings with Ernst & Young where you had to talk
14   about the transition or any issues with respect to
15   Oracle?
16      A. It is customary for the auditors to meet as
17   part of the transition process. I can tell you that
18   we did meet with representatives of Ernst & Young.
19   They were in our office looking at work papers,
20   various members of our teams had discussions with
21   them, including myself.
22      Q. Okay. So when -- and did that occur roughly
23   April 2002?
24      A. Whenever -- yeah, whenever we were replaced.
25      Q. Okay. How long -- oh, sorry.

74

1        How long after Andersen was dismissed did it
2    take, or how long did it take to transition to Ernst &
3    Young?
4        In other words, when was it that Andersen was
5    officially not Oracle's auditor and Ernst & Young took
6    over, and there were no more discussions, no more
7    exchange of documents?
8       MR. SIDORSKY: Objection to form.
9       THE WITNESS: To my knowledge, it all
10   happened fairly quick. Certainly no later than
11   June 1st, because there was nobody in the Silicon
12   Valley office of Andersen after June 1st.
13      MR. GREENSTEIN: Okay.
14      Q. So you said you -- or Ernst & Young employees
15   would come into your office and discuss work papers;
16   is that right?
17      A. That's correct.
18      Q. Okay. Do you remember who came into your
19   office to look at work papers?
20      A. No.
21      Q. Okay. Do you remember -- know who
22   John Banker is?
23      A. I know John. I know the name. I met him
24   once or twice.
25      Q. Okay. Did you ever talk to him in connection

75

1    with the transition between Andersen and EY?
2       A. To be honest, I don't recall if he was in the
3    meetings or not.
4       Q. Okay. Well, do you recall any discussions
5    with John Banker after April 2002 regarding Oracle?
6       A. I -- I -- I believe I spoke to John once. I
7    believe he may have been on the phone in one of the
8    meetings we held in our office with Ernst & Young, but
9    I don't believe I met him face-to-face during the
10   transition.
11      Q. Okay. What -- what did you -- what was
12   discussed during that meeting that he was on the
13   phone?
14      A. Transition. I mean --
15      Q. Do you recall any other -- anything that was
16   discussed during that meeting?
17      A. I don't recall specifics of the discussion.
18      Q. Okay. Do you -- do you recall discussing --
19   discussing unapplied cash at any time with anyone at
20   Ernst & Young?
21      A. No.
22      Q. Do you recall discussing debit memos at any
23   time with Ernst & Young?
24      A. No.
25      Q. Do you recall discussing this lawsuit at any

76

1    time with Ernst & Young?
2       A. Nope.
3       Q. Do you know if anybody -- well, I'll ask
4    these questions with respect to do you know if anybody
5    spoke to Ernst & Young from Andersen about this
6    lawsuit?
7       A. No.
8       Q. During the quarterly reviews of 2001, the
9    fiscal year 2001 reviews, were there any sort of
10   frequently held meetings between Andersen personnel
11   and Oracle personnel that would occur?
12      MR. SIDORSKY: Objection to form.
13      THE WITNESS: I -- I don't know what you mean
14   by "frequently held meetings."
15      MR. GREENSTEIN: Okay.
16      Q. Were there any meetings that were held on a
17   particular schedule for each quarter? In other words,
18   for the first quarter, there would be a meeting on
19   such and such date, and then another meeting on this
20   date, on another date, and that would happen for each
21   quarter?
22      A. You know, informally there were meetings. I
23   wouldn't say frequently. I would say recurring
24   meetings that would happen each quarter, yes.
25      Q. Okay. And those informal meetings, would

77

1　those be with -- do you recall any informal meetings
2　occurring during the quarters, the fiscal year 2001,
3　any of those quarters?
4　　A　Well, it -- it's hard for me to understand
5　and define what you're -- what you're looking for,
6　what you mean.
7　　　So, for example, every -- you know, every
8　quarter when someone goes to do a discussion of
9　certain accounts, they're going to go talk to someone
10　from Oracle. So that meeting will happen every
11　quarter.
12　　　You know, every quarter we're going to review
13　our revenue contracts. So we're going to have
14　discussions with people in the Oracle group at --
15　revenue group at Oracle. So, I mean, it -- the
16　question is very broad.
17　　　There will be meetings that will occur every
18　quarter as part of the either quarterly review or the
19　year-end audit
20　　Q　Okay. But what I'm asking is, were there any
21　regularly held meetings, such as audit and finance
22　committee meetings, things that were regularly held
23　during a quarter that were held every quarter?
24　　MR. KONOVALOV: Objection.
25　　MR. SIDORSKY: Objection to form.

78

1　　MR. KONOVALOV: Vague and ambiguous.
2　　THE WITNESS: Well, you mentioned the audit
3　and finance committee. The company held an audit and
4　finance committee meeting every quarter. That is --
5　that is true.
6　　　We would attend a portion of that meeting.
7　Meaning, representatives from Andersen. Every quarter
8　we would have a quarterly sign-off meeting with senior
9　financial management on the results of our work either
10　as part of the end of the quarter or part of the end
11　of the year-end audit.
12　　MR. GREENSTEIN: Okay.
13　　Q　So those quarterly sign-off meetings, when
14　would those occur?
15　　　Let's say for the second quarter 2001, which
16　ended November 30, 2000, when would that, quote,
17　"sign-off meeting occur," or when did it occur?
18　　MR. SIDORSKY: Objection to form.
19　　THE WITNESS: I -- I don't know the specific
20　dates. I can tell you, in general, they occurred
21　prior to the company's quarterly or year-end earnings
22　release.
23　　MR. GREENSTEIN: Okay.
24　　Q　Do you recall if it occurred a week before
25　the quarterly earnings -- actually, strike that.

79

1　　When you say quarterly earnings release, do
2　you mean the actual press release which usually occurs
3　after the quarter is long past? Or do you mean before
4　the end of the -- the physical end of the quarter?
5　　A　No. I mean the former, the quarterly
6　earnings release after the end of the quarter.
7　　Q　Okay. So do you recall if it would occur a
8　week prior to that earnings release?
9　　A　It would not occur that early. It would most
10　likely have occurred a day or two before the company's
11　earnings discussion and press release.
12　　Q　Okay. And when you said sign-off meetings,
13　what -- did you mean that Andersen had to sign off on
14　the quarterly earnings statement to the market?
15　　MR. SIDORSKY: Objection to form.
16　　THE WITNESS: Let's call it a -- a conclusion
17　of our work meeting.
18　　MR. GREENSTEIN: Okay.
19　　Q　What would occur during that quarterly
20　meeting two days before the earnings release?
21　　A　We would meet with financial management and
22　discuss the -- the observations/items we noted during
23　the course of our work.
24　　Q　Okay. Now, focusing on the quarters in
25　fiscal year 2001 with Oracle, who from Oracle would

80

1　attend those sign-off meetings?
2　　MR. SIDORSKY: Objection to form.
3　　THE WITNESS: I can tell you the people who
4　generally attended. Whether they attended all the
5　meetings, I don't know.
6　　MR. GREENSTEIN: That's fair.
7　　THE WITNESS: But Jeff Henley would attend.
8　Jennifer Minton would attend. Tom Williams would
9　attend by telephone. Deborah Lange, who is the VP of
10　tax, would attend, and I believe the assistant
11　controller, Larry Garnick, would attend. There may be
12　other people, but I think I've captured most of them.
13　　MR. GREENSTEIN: Okay.
14　　Q　And those people generally would attend each
15　of the sign-off meetings for the quarters in 2001?
16　　A　Generally, yes.
17　　Q　Okay. Now, who from Andersen would attend
18　those meetings?
19　　A　Typically myself, the other engagement audit
20　partner, and typically the managers on the engagement.
21　So typically there would have been two managers, one
22　or two managers in attendance, and occasionally the
23　tax partner would attend as well.
24　　Q　Do you remember who the other partner would
25　be during that time period?

81

1    A  During fiscal 2001, I believe it was
2  Angelica Caicedo.
3    Q  Now, during those meetings, would Oracle show
4  you a copy of the earnings press release that they
5  were going to achieve through investors?
6    A  No, not as part of that meeting.
7    Q  At any time?
8    A  We would typically look at the financial
9  information, you know, the income statement and
10  balance sheet that was going into the press release
11  for purposes of ensuring that it agreed with the
12  information that was in our work papers.
13       Oftentimes we looked at the verbiage, the
14  accompanying verbiage in the press release, but we
15  typically did not see the last draft of it, so we
16  would have looked at an earlier draft.
17    Q  When you say "the verbiage," what do you mean
18  by that?  What -- what kinds of verbiage did you
19  have -- did you review?
20    A  Well, normally in a press release there's the
21  cover sheet which includes a discussion of the summary
22  financials, you know, that Oracle released earnings
23  through the quarter, and revenues were X compared to
24  Y, and earnings were X compared to Y, and they have a
25  comment in it from some of the executives at the

82

1  company.
2    Q  Okay.  And you'd also make sure that the
3  numbers being published to invest -- to the market
4  were -- comported with the numbers that you concluded
5  as a result of your review in the work papers; right?
6    MR. SIDORSKY:  Objection to form.
7    THE WITNESS:  We would agree the information
8  in the press release to what was included in our
9  quarterly review work papers.
10    MR. GREENSTEIN:  Okay.
11    Q  Did Larry Ellison ever attend any of these
12  sign-off meetings?
13    A  No.
14    Q  Okay.  Did Sandy Sanderson ever attend any of
15  those sign-off meetings?
16    A  No.
17    Q  Okay.  Going back to finance and audit
18  committee meetings, you said you -- that Andersen
19  would come in during certain portions of the meetings;
20  right?
21    A  That's correct.
22    Q  Okay.  And what portions of the meetings
23  would they attend?
24    A  The portion where it was the report of
25  Arthur Andersen would be certainly where we would be

83

1  there.  At times we would be invited to attend other
2  portions of the meeting as well.
3       So, for example, if there was going to be a
4  presentation on tax matters and it was something they
5  wanted us there to provide input on or hear, we may
6  stay.  Sometimes there was presentation by internal
7  audit, and we may stay.
8       So it -- it wasn't necessarily consistent
9  from quarter to quarter other than we were there for
10  the portion where the report of the auditors was on
11  the agenda.
12    Q  Okay.  Did that occur on a regular basis or
13  was there -- during each quarter, how many finance and
14  audit committee meetings were there?
15    MR. KONOVALOV:  Objection; calls for
16  speculation.
17    THE WITNESS:  We -- we were invited to one
18  meeting per quarter.
19    MR. GREENSTEIN:  Q.  And was that after,
20  following the fiscal end of the quarter?
21    A  It was following the end of the quarter, and
22  following the company's earnings or press release.
23    Q  Okay.  And what was discussed?  When -- when
24  Andersen presented, what did they -- what was
25  discussed?

84

1    MR. SIDORSKY:  Objection to form.
2    THE WITNESS:  The -- in general what was
3  discussed was the highlights from the results of our
4  work.
5    MR. GREENSTEIN:  Okay.
6    Q  But why would that occur after the press
7  release already went out and earnings were already
8  published to the market?
9    MR. SIDORSKY:  Objection to form.
10    THE WITNESS:  You'd -- you'd have to ask the
11  company that.
12    MR. GREENSTEIN:  Okay.
13    Q  When you say the highlights, what do you mean
14  by that, the highlights of your work?
15    A  Well, we would have an agenda that we would
16  put together.  It was typically fairly similar to the
17  closing meeting agenda that I referenced earlier, not
18  identical, but some of the stuff was similar, and we
19  would lead a discussion to the audit committee
20  regarding observations during the course of our
21  rework.  I'm not sure what else you're looking for.
22    Q  So who would -- other than -- well, did the
23  same people that attended the -- well, the quarterly
24  sign-off meetings, did those people also attend the
25  audit and finance committee meetings, that you

85

1   remember, in 2001? I'm going to be talking about the
2   2001 quarters.
3       A   Not all those people would attend the finance
4   and audit committee meeting, no.
5       Q   Okay. Well, do you remember who the audit
6   committee was during fiscal year 2001 for Oracle?
7       A   My recollection, Mr. Lucas, Mr. Boskin and
8   Mr. Berg, if I remember right.
9       Q   And they would obviously attend those
10   quarterly -- well, generally they would be attending
11   those finance and auditing committee meetings;
12   correct?
13      A   Generally.
14      Q   Who else would typically attend those
15   meetings from Oracle?
16      A   Generally, again, Jeff Henley, Safra Catz,
17   Dan Cooperman, Jennifer Minton, Deborah Lange. I
18   believe that the director of internal audit would
19   attend. I don't -- I think that was Annica Magnusson
20   during that time period. Those are the people that,
21   quote, "generally attended."
22      Q   Okay. Did Larry Ellison ever attend any of
23   those meetings?
24      A   Nope.
25      Q   Now, you referenced the internal audit for

86

1   Oracle. Are you aware that during fiscal year 2001
2   Oracle had an internal auditor?
3       A   They did.
4       Q   Okay. And was Anna (sic) Magnusson, is
5   that -- was she kind of the head of the internal
6   audit?
7       A   I believe she was during that time period.
8       Q   Okay. What's the role? As far as you know,
9   what's the role of the internal auditor, let's say,
10   fiscal year 2001?
11      MR. KONOVALOV: Objection; calls for
12   speculation.
13      MR. SIDORSKY: Objection to form.
14      MR. GREENSTEIN: Q. Did Andersen ever work
15   with them in conducting their reviews or audit?
16      A   I don't believe that we looked at or relied
17   upon the work of internal audit as part of our work.
18      Q   Okay. Well, what was the work of the
19   internal audit?
20      MR. KONOVALOV: Objection; calls for
21   speculation.
22      MR. SIDORSKY: Objection; form.
23      THE WITNESS: Again, you'd have to ask the
24   company broadly what -- you know, what their purpose
25   was and what their scope of work was.

87

1       MR. GREENSTEIN: Right.
2       Q   But I think you just said that you didn't
3   rely upon their work. I'm just wondering what you
4   meant. What didn't you rely upon?
5       MR. SIDORSKY: Well, same objection.
6       MR. KONOVALOV: Calls for speculation; lacks
7   foundation.
8       THE WITNESS: The -- the -- there's a
9   question, in order for the auditor to rely on work of
10   internal audit, it would have to be something that was
11   part of the scope of our work, and they would be
12   performing it on our behalf, and we would have to then
13   test their work on a sample basis, and what I'm
14   suggesting or explaining is that we didn't do that on
15   a quarterly basis. So our year-end audit as part of
16   the Oracle audit.
17      MR. GREENSTEIN: Okay.
18      Q   Now, during the audit and finance committee
19   meetings, do you recall any specific discussions
20   during 2001, or the fiscal year 2001? Any specific
21   discussions about revenue recognition issues?
22      MR. SIDORSKY: Objection to form.
23      MR. KONOVALOV: Vague and ambiguous.
24      THE WITNESS: Our quarterly agenda items,
25   quarterly meeting agendas, included certain revenue

88

1   contracts that we would discuss with management. I
2   don't know what you mean by "revenue issues," but
3   there were revenue contracts that we would typically
4   discuss with management in our closing meeting, and
5   then some of those we would discuss with the audit
6   committee.
7       MR. GREENSTEIN: Okay.
8       Q   So you would discuss those before the
9   earnings press release went out and also discuss them
10   after the earnings press release went out in the
11   finance and audit committee meetings; right?
12      MR. SIDORSKY: Objection to form.
13      THE WITNESS: Yes, there were contracts we
14   would discuss as part of our closing meeting with
15   management. Some of those may then be -- have been
16   discussed with the audit committee as well.
17      MR. GREENSTEIN: Okay.
18      Q   Now, do you recall during fiscal year 2001
19   any specific contracts discussed at the quarterly
20   sign-off meetings?
21      A   I don't --
22      MR. SIDORSKY: Is the terminology sign-off
23   meeting or closing meeting? I just want to make sure
24   we're consistent.
25      MR. GREENSTEIN: Okay. Is that an objection?

89

1    MR. SIDORSKY:  Well, I'm trying to understand
2  if we're using the same terminology or not.
3    MR. GREENSTEIN:  Okay.  Well --
4    MR. SIDORSKY:  It's a potential objection.
5  I'm trying to be consistent.
6    MR. GREENSTEIN:  I'm sorry to say there is no
7  rule that allows you to make a potential objection,
8  but do you have an objection?
9    MR. SIDORSKY:  Well, I'm trying to be clear
10  though.  There is -- there is -- there is an
11  understanding and it's important to be clear on the
12  record, and that's what I'm trying to do; okay.  If
13  you want, I'll object to the form.  I'm suggesting we
14  should be clear.
15    MR. GREENSTEIN:  Thank you.
16    MR. SIDORSKY:  All right.
17    THE WITNESS:  So just to be clear, I would
18  call it a closing meeting.
19    MR. GREENSTEIN:  Okay.
20    Q  So during the closing meetings, do you
21  recall -- in fiscal year 2001, do you recall any
22  specific contract being discussed?
23    A  I don't recall the specifics of any
24  particular contract.
25    Q  Okay.  But I'm asking if you recall a

90

1  discussion of any contract -- not the specifics of any
2  contract -- of any contract during those closing
3  meetings?
4    A  Okay.  Let me answer it this way:  When I
5  reviewed yesterday some of the work papers, they
6  contained audit committee agendas, audit and finance
7  committee agendas for Arthur Andersen's presentation.
8  There were contracts that were referenced in there
9  that were part of our agenda.
10    As I was looking at those, I do recall some
11  of those contracts, and I recall that they would have
12  been contracts we would have discussed.
13    Q  Okay.  And what contracts were those?
14    MR. SIDORSKY:  Objection to form.
15    THE WITNESS:  You mentioned HP earlier.  I
16  know that was on one of the agendas.  I don't recall
17  specifically what other contracts would be on there.
18    MR. GREENSTEIN:  Okay.
19    Q  So other than the closing meetings and the
20  audit and audit committee and finance meetings, were
21  there any other regularly scheduled meetings that
22  occurred every quarter during fiscal year 2001?
23    MR. KONOVALOV:  Objection; calls for
24  speculation.
25    MR. SIDORSKY:  Objection to the extent it's

91

1  already been covered and answered.
2    THE WITNESS:  You know, again, I don't know
3  what you mean by regularly scheduled meetings.
4    MR. GREENSTEIN:  Q.  Yeah.  I don't -- I
5  don't mean informal conversations that would happen
6  during the course of a review.  I'm just talking
7  about, you know, a meeting that is regularly held like
8  the closing meetings and like the finance and audit
9  committee meetings.
10    MR. KONOVALOV:  Involving Andersen?
11    MR. GREENSTEIN:  Yes.
12    MR. KONOVALOV:  Okay.
13    THE WITNESS:  Formal meetings, no.  I mean,
14  we would meet with, for example, Jennifer Minton
15  typically and Tom Williams to prepare for the closing
16  meetings.  The -- you know, the closing meeting we
17  would have with Jeff.
18    So we would walk through some of the agenda
19  items with them, so we didn't walk into the meeting
20  and them not know what was on our agenda.  So, again,
21  that's -- that's why I have difficulty answering your
22  question, because yes, we would meet with people in
23  advance of that.  Yes, we would meet with people to go
24  through the results of our revenue or contract
25  testing.  It all leads up to the final closing

92

1  meeting.
2    Q  Okay.  So when you -- the -- the meetings
3  that you are talking about with Minton and
4  Tom Williams that occurred before you met with
5  Jeff Henley, were those -- were those meetings held
6  each of the quarters in fiscal year 2001?
7    A  There would have been various meetings with
8  Jeff and Tom -- excuse me -- Jennifer and Tom
9  throughout the quarter, yes.
10    Q  Well, meetings --
11    A  Informal meetings.
12    Q  Right.
13    Without Jeff Henley; correct?
14    A  Yes.
15    Q  And is that because the meeting -- is that
16  because Jeff Henley only attended the -- the closing
17  meetings?
18    MR. SIDORSKY:  Objection to form.
19    MR. KONOVALOV:  Misstates the witness's
20  testimony.
21    THE WITNESS:  I don't know.
22    MR. GREENSTEIN:  Q.  Did you ever have
23  meetings with Jeff Henley of the type that you're
24  talking about with Jennifer Minton and Tom Williams?
25    MR. SIDORSKY:  Objection to form.

93

1    THE WITNESS: Not that I recall.
2    MR. GREENSTEIN: Okay.
3    Q   So is it fair to say that Jeff Henley
4  attended, or, as far as you know, the only meetings
5  that Jeff Henley would attend would be the closing
6  meetings and the finance and audit committee meetings?
7    MR. SIDORSKY: Objection.
8    MR. GREENSTEIN: Q. Is that fair to say?
9    A   Yeah.
10    MR. KONOVALOV: Misstates the witness's
11  testimony.
12    THE WITNESS: The -- the formal interaction
13  between Andersen and Jeff Henley at Oracle consisted
14  of the quarterly closing meeting and the finance and
15  audit committee meeting; okay. I'm just trying to be
16  clear on, you know, the formal regularly scheduled
17  meetings.
18    MR. GREENSTEIN: That's exactly what I wanted
19  to know.
20    Q   So other than those two meetings, there
21  weren't, as far as you know, regularly scheduled
22  meetings between Andersen and Oracle, other than
23  the -- the informal-type meetings you had with
24  Jennifer Minton?
25    MR. SIDORSKY: Objection to form.

94

1    THE WITNESS: I can't provide any more
2  clarification than I already have.
3    MR. GREENSTEIN: Okay.
4    Q   Were there any other meetings where Andersen
5  would do formal presentations to Oracle?
6    A   Not as part of our normal quarterly review
7  work or year-end audit work.
8    Q   Okay. I'd like to mark this as Matuszak
9  No. 1. For the record -- well....
10    (Document marked Exhibit No. 1
11      for identification.)
12    MR. GREENSTEIN: Q. For the record, this is
13  a January 5th, 2001 -- appears to be a finance and
14  audit committee meeting agenda. It's Bates stamped
15  NDCA-ORCL 081711 through 081814.
16    I'm actually going to direct your attention
17  to certain pages. So you don't have to look through
18  the whole thing. You can thumb through it.
19    The way this was produced, it appears there
20  was tabs attached to this, and all these documents
21  were part of this packet.
22    MR. SIDORSKY: For the record, could you just
23  tell us who produced these documents?
24    MR. GREENSTEIN: Oh, any -- any document that
25  bears the NDCA-ORCL Bates stamp were produced by

95

1  Oracle.
2    Q   So if you can just generally look at the
3  first two pages.
4    A   You're referring to page 12 and 13?
5    Q   Yeah.
6    A   Excuse me. Okay.
7    Q   Looking at page 13, so are these -- does this
8  document -- was this the type -- or have you ever seen
9  this document before?
10    A   I believe I may have seen it yesterday, but
11  prior to that, no.
12    Q   Okay. Did you receive these types of
13  documents before finance and audit committee meetings?
14    A   I did not receive the -- Andersen did not
15  receive the contents and everything went to that audit
16  finance committee.
17    Q   Okay. And if you turn to the Bates stamp
18  ending in 13, see how it says "Finance and Audit
19  Committee Meeting Agenda" at the top?
20    A   Yes.
21    Q   You see it's January 5th, 2001; right?
22    A   Uh-huh.
23    Q   So is it fair to say that this -- since the
24  quarter -- the second quarter fiscal year 2001 ended
25  on November 30th, is this -- is this the agenda for --

96

1  for the presentation on that quarter?
2    MR. KONOVALOV: Objection; lacks foundation.
3    THE WITNESS: Well, it would have been the
4  presentation that we gave for the results of our Q2
5  review. What else was discussed at the meeting, I
6  would be speculating.
7    MR. GREENSTEIN: Okay.
8    Q   Now, do you recall this meeting?
9    A   I don't recall the meeting specifically, no.
10    Q   But is this the type of meeting where you
11  were describing earlier where Andersen would come in
12  and make a presentation and maybe stay for parts of
13  the meeting but wouldn't attend the whole meeting?
14    A   That's correct.
15    Q   Okay. And you see there kind of halfway down
16  the page it says Arthur Andersen LLP Q2 fiscal year
17  '01 review? You see that?
18    A   Yes.
19    Q   And do you see your name there?
20    A   Yes.
21    Q   And it looks like it -- well, it looks like
22  there is a time there. Approximately -- well, a
23  little less than an hour. Maybe 45 minutes; you see
24  that?
25    A   Yes.

97

1    Q. Okay. Do you recall -- well, what does the
2    Q2 fiscal year '01 review -- what does that mean? Do
3    you know?
4    A. That would have been the results of the
5    review that we perform for the quarter ending
6    November 30th, 2001.
7    Q. Okay. Let me back up a little bit. I'm
8    going to jump around a little bit.
9         The representation letters that you testified
10   about earlier, were those -- did you see any of those
11   in the documents you reviewed yesterday?
12   A. I did not.
13   Q. Okay. Now, looking at this document ending
14   Bates 13, do you recall making a presentation on
15   January 5th, 2001, about the second quarter fiscal
16   year review?
17   A. If you're asking whether I specifically
18   recall, have recollection of the meeting, no. If
19   you're asking me whether I attended this meeting, I
20   believe I did.
21   Q. Okay. Do you remember making a slide
22   presentation to the attendees of this meeting on or
23   around January 5th, 2001?
24   A. If I looked at the slide presentation, I
25   could tell you.

98

1    Q. So without looking at the slide presentation,
2    do you remember any specifics about what you discussed
3    during that presentation?
4    A. No.
5    Q. Okay. You see how there it says "Auditor
6    Independence" under Q2 fiscal '01 review?
7    A. Yes.
8    Q. Did you present on a topic regarding "Auditor
9    Independence" on or about January 5th, 2001?
10   A. I don't recall.
11   Q. Okay. You see down there it says internal
12   audit quarter two, fiscal year '01 operations review?
13   A. Uh-huh.
14   Q. And the audit schedule progress, and then
15   it's presented -- well, appears to be presented by
16   Annica Magnusson; you see that?
17   A. Yes.
18   Q. She was the head of internal audit at Oracle?
19   A. I believe at the time that's correct.
20   Q. Okay. Did you attend this portion of that
21   meeting, this presentation?
22   A. I don't recall.
23   Q. But generally it's talking about the audit
24   schedule progress. So is it fair to say that
25   typically if that was being discussed, Andersen would

99

1    attend?
2         MR. SIDORSKY: Objection to form.
3         MR. KONOVALOV: Objection; lacks foundation;
4    calls for speculation; the document speaks for itself.
5         THE WITNESS: Do I need to answer?
6         MR. SIDORSKY: You should answer.
7         THE WITNESS: I believe that what's
8    referenced under here is internal audit. So they're
9    talking about the internal audit Q2 FY '01 operating
10   review in the internal audit schedule, not the
11   Andersen audit schedule.
12        MR. GREENSTEIN: Okay.
13        THE WITNESS: So no, I did not, would not
14   have been there for that. Would not be required to be
15   there for that.
16        MR. GREENSTEIN: Okay.
17   Q. So do you recall in any of these -- in any
18   quarterly finance and audit committee meeting ever
19   listening to a presentation made by Annica Magnusson?
20   A. I believe that we attended meetings where she
21   presented after us, and we would stay in while she was
22   presenting.
23   Q. Okay.
24        THE VIDEOGRAPHER: I need to change the tape.
25        MR. GREENSTEIN: Oh, he's got to change the

100

1    tape, so take a five-minute break.
2         Go off the record.
3         THE VIDEOGRAPHER: We are going off the
4    record. Here marks the end of videotape number one,
5    Volume I, in the deposition of Gary Matuszak.
6         (Short break taken.)
7         THE VIDEOGRAPHER: We are back on the record.
8    The time is 11:28 a.m. here marks the beginning of
9    videotape number two, Volume I, in the deposition of
10   Gary Matuszak.
11        MR. GREENSTEIN: Q. So, Mr. Matuszak, we
12   were looking at what's been marked as Matuszak No. 1,
13   which is a January 5th, 2001, finance and audit
14   committee meeting packet of documents.
15        It looks to be a briefing package, and we
16   were focused on Bates page 081713, and we were talking
17   about the issue there where it said Arthur Andersen
18   LLP Q2 fiscal '01 review; do you see that there?
19   A. Yes.
20   Q. Okay. Do you recall during that second
21   quarter fiscal year '01 review, do you recall ever
22   presenting any issues discussing revenue recognition
23   in the second quarter?
24        MR. KONOVALOV: Objection; vague and
25   ambiguous.

101

1     MR. SIDORSKY: Objection to form.
2     THE WITNESS: I recall discussing -- well,
3 let me rephrase that.
4     We would have normally discussed revenue
5 contracts during our meetings with the audit
6 committee. So if you're asking whether we discussed
7 revenue contracts, the answer would be yes. Again,
8 you -- you used the term "revenue issues," and I'm not
9 sure what that refers to
10    MR. GREENSTEIN: Okay.
11    Q Well, if you turn to page -- actually turn to
12 page 081715, and actually this appears to be minutes
13 of the previous audit and finance committee meeting
14 from the -- from the first quarter. See how it's
15 dated October 13th, 2000? Do you see that?
16    A Yes.
17    Q And if you look down on point number five,
18 you see it says "Arthur Andersen LLP"?
19    A Yes.
20    Q It says "Gary Matuszak and Guy Johnson from
21 Arthur Andersen LLP joined the meeting and presented
22 information about the results of their audit of the
23 Company's financial statements for the quarter ended
24 August 31, 2000."
25    Do you see that?

102

1    A Yes.
2    Q So this appears to be minutes from a meeting,
3 finance and audit committee meeting, for the first
4 quarter where you and Guy Johnson presented on the
5 results of the first quarter of '01; right?
6    MR. KONOVALOV: Objection; lacks foundation.
7    THE WITNESS: Yes, it -- it would have been.
8 It is what it says. We -- we presented the results of
9 our quarter for the -- it says "results of their audit
10 for the quarter." That's incorrect. It would have
11 been results of the review for the quarter.
12    MR. GREENSTEIN: Okay.
13    Q So that language where it says "their audit"
14 is not right, because Andersen didn't perform an audit
15 of that quarter; right?
16    A That's correct.
17    Q Well, sorry. At this time, there hadn't been
18 done an audit of this quarter, but eventually there
19 would in connection with your fiscal year 2001 audit;
20 right?
21    MR. SIDORSKY: Objection to form.
22    THE WITNESS: That's not technically correct
23 either.
24    MR. GREENSTEIN: Q. Well, as part of the --
25 as part of the year-end fiscal 2001 audit, you looked

103

1 at the first quarter. You audited the first quarter
2 fiscal year 2001; right?
3    MR. KONOVALOV: Objection; assumes facts.
4    MR. SIDORSKY: Objection to form.
5    Yeah, assumes facts not in evidence, and
6 incorrect facts.
7    THE WITNESS: Again, that's not correct.
8    MR. GREENSTEIN: Okay.
9    Q So as part of the fiscal year 2001 audit of
10 Oracle's financial statements, did Andersen audit the
11 results of the first quarter of 2001?
12    A No, we did not.
13    Q Okay. As -- and why is that?
14    MR. SIDORSKY: Objection to form.
15    THE WITNESS: We do not audit the quarters
16 within the year.
17    MR. GREENSTEIN: Okay.
18    Q So as part of the year-end audit, do you go
19 back and review all of the different quarters?
20    MR. SIDORSKY: Objection to form.
21    THE WITNESS: The -- the quarterly reviews
22 are performed concurrent with the end of the quarter.
23 When that quarter is finished, we're done with the
24 work on that quarter. It's a quarterly review. Not
25 an audit.

104

1    Our audit is for the fiscal year ending, in
2 this case, May 31, 2001. There is never an audit
3 performed on quarters.
4    MR. GREENSTEIN: Right. Understood.
5    Q What I'm asking is, during the audit, the
6 fiscal year-end audit, is there any analysis? Do you
7 go back and do any analysis of each individual
8 quarter?
9    MR. SIDORSKY: Objection to form.
10    THE WITNESS: No, I don't believe so.
11    MR. GREENSTEIN: Q. So -- so during -- let's
12 take the fiscal year 2001 audit for Oracle.
13    In performing that audit, Andersen didn't go
14 back and review the first quarter, second quarter, or
15 third quarter, or fourth quarter results?
16    MR. SIDORSKY: Objection to form.
17    THE WITNESS: Not as part of the -- the
18 year-end audit.
19    MR. GREENSTEIN: Okay.
20    Q But you do do an analysis of the fourth
21 quarter, right, because you didn't do a quarterly --
22 it's wrapped up in the audit? That review of the
23 fourth quarter hasn't been done as it was with the
24 three previous quarters; right?
25    MR. SIDORSKY: Objection to form.

105

1    MR. KONOVALOV:  Vague and ambiguous.
2    THE WITNESS:  As -- as part of the audit
3 testing on Q4, auditors will normally perform some
4 type of quarter-to-quarter variation analysis, but
5 we're already looking at the May 31st financials
6 information, the year-end financial information and
7 auditing that information, and so that's more in scope
8 than review, so it becomes somewhat redundant.
9    MR. GREENSTEIN:  Q.  So during the fiscal
10 year 2001 audit, did Andersen review the quarterly
11 work papers as part of that audit?
12    MR. SIDORSKY:  Objection to form.
13    THE WITNESS:  I'm trying to be as clear as I
14 can.  We -- we perform what is called a timely review
15 of the interim financial statements.  Meaning, we
16 perform that review when the quarter ended.
17    So we performed it in September for the
18 August quarter, December for the November quarter.
19 That work is completed, and we -- we do not go back
20 and look at those quarters as part of our audit work.
21    MR. GREENSTEIN:  Okay.
22    Q  But what I was asking was as part of
23 Andersen's audit, year-end audit, fiscal year 2001 of
24 Oracle, did Andersen go back and look at the quarterly
25 review work papers?

106

1    MR. SIDORSKY:  It's been asked about three
2 times now.  Objection; objection to form.
3    THE WITNESS:  Not for purposes of looking at
4 reassessing the results of the quarterly reviews.
5    MR. GREENSTEIN:  Okay.
6    Q  For what purposes would Andersen look at
7 those work papers?
8    MR. SIDORSKY:  Object; objection to form.
9    THE WITNESS:  It is customary practice to
10 have work papers with you in the field, prior
11 quarter's work papers, the prior year's work papers
12 in the event that you want to refer to something from
13 a prior period.
14    So the work papers would have been there.
15 Would someone have referred to them?  I can't tell you
16 that nobody opened up those work papers during the
17 course of our audit, but we would have not formally
18 looked at them for purposes for reassessing the
19 results from prior quarters.
20    THE VIDEOGRAPHER:  Counsel, pardon me.  Your
21 Blackberry is just starting to really -- I'm sorry.  I
22 don't know why.
23    MR. KONOVALOV:  It hasn't moved.
24    THE VIDEOGRAPHER:  It's increased in volume.
25 I'm very sorry, but if I don't, you know --

107

1    MR. KONOVALOV:  Okay.
2    THE VIDEOGRAPHER:  -- correct it.  Sorry.
3    MR. SIDORSKY:  Wouldn't want to do this
4 again.
5    MR. GREENSTEIN:  Q.  So as part of the fiscal
6 year 2001 audit of Oracle, Andersen reviewed the --
7 did an assessment of the quarterly financial
8 statements for the fourth quarter; right?
9    MR. SIDORSKY:  Let me hear that question,
10 please.
11    THE WITNESS:  Yes, I understood --
12    MR. SIDORSKY:  Could I hear that before you
13 answer.  I want to hear the question, yeah.
14    (Whereupon, record read by the Reporter as
15 follows:
16    "Question:  So as part of the fiscal year
17    2001 audit of Oracle, Andersen reviewed
18    the -- did an assessment of the quarterly
19    financial statements for the fourth quarter;
20    right?")
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  There's very limited work or
23 little work that's done actually on the fourth quarter
24 of the fiscal year because of the fact that we're
25 already auditing the balance sheet information as of

108

1 that date, and we've already reviewed the balance
2 sheet and results for the prior quarter.
3    MR. GREENSTEIN:  Q.  For the third quarter;
4 right?
5    A  Yeah.
6    Q  Well, how do you ensure that the earnings
7 results and the income statement, the -- the numbers
8 on the income statement which are not -- which are
9 different than the items on a balance sheet -- how do
10 you ensure that those numbers are accurate for the
11 fourth quarter if you don't do any assessment of them?
12    MR. SIDORSKY:  Objection.
13    MR. KONOVALOV:  Objection; vague and
14 ambiguous.
15    MR. SIDORSKY:  Yeah, objection to form.  It
16 really mischaracterizes the witness's testimony and
17 the --
18    MR. GREENSTEIN:  I'll reask the question.
19    MR. SIDORSKY:  Okay.
20    MR. GREENSTEIN:  Q.  You just talked about
21 the balance sheet, and I'm asking whether during
22 fiscal year 2001 audit of Oracle, did Andersen do any
23 sort of assessment of the earnings of Oracle during
24 the fourth quarter?
25    A  Very limited.

109

1    Q  So -- but in prior quarters, let's say the
2  second quarter, quarterly review fiscal year 2001, did
3  Andersen do an assessment of the earnings in that
4  quarter?
5    MR. SIDORSKY: Objection to form.
6    THE WITNESS: I think I stated we performed
7  timely quarterly reviews. So we would have performed
8  a quarterly review for the August quarter, the
9  November 2000 quarter, and the February 2001 quarter,
10  and we would have performed those reviews prior to the
11  company issuing their earnings press release after the
12  end of the quarter.
13    MR. GREENSTEIN: Q. So would you perform the
14  same type of timely quarterly review of the fourth
15  quarter prior to the earnings press release coming out
16  for the fourth quarter and fiscal 2001 results?
17    A  We performed an -- an audit of the year-end
18  numbers, okay. So there's really not a lot more to do
19  for the fourth quarter.
20    Q  Okay. But --
21    A  And those numbers don't show up in a -- in a
22  public filing. It's not -- you don't file a 10-Q for
23  your fourth quarter.
24    Q  Right. But --
25    A  You file your audit information for the year

110

1  end.
2    Q  Sorry.
3    But when you issue the earnings press
4  release, doesn't Oracle break out its fourth quarter
5  earnings results, its revenues for that quarter, and
6  its earnings for that quarter? Doesn't it
7    MR. SIDORSKY: Objection to form.
8    MR. KONOVALOV: Lacks foundation.
9    THE WITNESS: You're asking me a factual
10  question. Yes, they break the quarterly results out
11  in their -- in the company's press release, that's
12  correct.
13    MR. GREENSTEIN: Right.
14    Q  For the fourth quarter? And they did that
15  for the fourth quarter 2001; right?
16    A  Presumably, yes.
17    Q  Because they do it every quarter; right?
18    A  That's why I said, "Presumably, yes."
19    Q  All right.
20    So -- and you said before that, before the
21  earnings press releases went out, typically Andersen
22  would meet with Oracle in those closing meetings to
23  discuss the press release and the numbers, the
24  quarterly numbers in it; right?
25    MR. SIDORSKY: Objection to form; asked and

111

1  answered.
2    THE WITNESS: We would meet with management
3  and go over the results of our work. So in May we
4  would meet with management and walk through the
5  results of our audit testing for the fiscal year
6  ending May 31st.
7    MR. GREENSTEIN: Okay.
8    Q  But earlier you said during a particular
9  quarter, say, second quarter 2001, Andersen would meet
10  with Oracle and go over the second quarter results as
11  reflected in a public press release before the press
12  release went out; right?
13    MR. SIDORSKY: Objection to form.
14    THE WITNESS: We -- well, we would meet with
15  management and go through the results of our work,
16  which were testing either through review or audit of
17  the financial statements for that period, yes.
18    MR. GREENSTEIN: Right.
19    Q  But I think you said you also looked at the
20  numbers, the actual results, and made sure that it
21  comported with the testing work that you did and the
22  work paper, the quarterly work papers --
23    MR. KONOVALOV: Objection --
24    MR. GREENSTEIN: Q. -- right?
25    MR. SIDORSKY: -- misstates the witness's

112

1  testimony.
2    MR. SIDORSKY: And objection; the record --
3  the record speaks for itself. You're really trying to
4  now --
5    MR. GREENSTEIN: Q. Did you --
6    MR. SIDORSKY: -- restate the record.
7    MR. GREENSTEIN: Q. -- did you state that
8  during these closing meetings, Andersen would meet
9  with Oracle and look at the quarterly press release
10  and the numbers in it and make sure that it comported
11  with your testing of the quarter and the work papers?
12    MR. SIDORSKY: It's --
13    MR. GREENSTEIN: Q. -- for that quarter?
14    MR. SIDORSKY: -- not a proper question.
15  Either he did or he didn't. It's reflected on the
16  record.
17    MR. GREENSTEIN: That's not a proper
18  objection. I just asked a question. That has nothing
19  to do with prior questions. I just asked a specific
20  question. So if you have an objection, make it.
21    I didn't refer to a previous question. I
22  asked a specific question.
23    Can you read it back?
24    MR. SIDORSKY: I don't think it's a proper
25  question to ask someone, did you state earlier in the

113

1  deposition this or that? I mean he either did or
2  didn't. You should move on.
3      MR. GREENSTEIN: What's the -- what's the
4  objection?
5      MR. SIDORSKY: Ask a question. Ask a -- ask
6  a -- ask a question.
7      MR. GREENSTEIN: I did. I'm asking you what
8  objection under the Federal Rules of Civil Procedure
9  are you making with respect to that question?
10     MR. SIDORSKY: That it's been asked and
11 answered. It's been asked and answered several times.
12 It's on the record what the test -- the witness's
13 testimony is.
14     MR. GREENSTEIN: Okay. Again, I'm going to
15 ask that you don't make long, speaking objections,
16 because I don't want to have to bring Mr. Matuszak
17 back to the extent that it's wasting time.
18     Can you -- can you read the question back,
19 please.
20     (Whereupon, record read by the Reporter as
21 follows:
22     "Question: Did you state that during these
23         closing meetings Andersen would meet with
24         Oracle and look at the quarterly press
25         release and the numbers in it and make sure

114

1         that it comported with your testing of the
2         quarter and the work papers?")
3      MR. SIDORSKY: All right.
4      So just for the record, I'm objecting to the
5  form. I'm actually suggesting that we move on and
6  make some progress, but you can answer the question
7  certainly.
8      THE WITNESS: Okay. So let me -- let me be
9  clear, because I don't know if what you said is what I
10 said. I don't believe what you said is accurate.
11     We would have our quarterly closing meeting,
12 okay. We didn't, as part of that closing meeting, tie
13 information from the press release into financial
14 data. Separately from that closing meeting, we would
15 receive a copy of the company's press release.
16     Prior to the press release going out, we
17 would take the press release and physically tick
18 information in there to the consolidating or
19 consolidated lead schedules that were in our quarterly
20 review work papers, and so....
21     MR. GREENSTEIN: Q. But wouldn't you discuss
22 the -- the result -- the actual financial results in
23 the press release? Didn't you say -- well, would you
24 discuss, during those closing meetings with Oracle,
25 those numbers and whether they were accurate or not?

115

1      A  We would discuss results for the quarter. We
2  typically didn't bring the financial statements or
3  press release or anything into the meeting with us.
4  We would have our agenda which would include a summary
5  of the results of our work. It would not include
6  sitting down in the, you know, closing session with
7  Jeff and talking about revenues, operating expenses,
8  balance sheet items. No, we would not do that.
9      Q  Okay. Well, when you made those tick marks
10 on the press release, where -- were you making those
11 by nonfinancial statements in the press release
12 or were you making them ticking off the financial --
13 the actual financial information in it, or both?
14     MR. SIDORSKY: Objection to form.
15     MR. KONOVALOV: Vague and ambiguous.
16     THE WITNESS: I don't know what you mean by
17 financial versus nonfinancial, so let me explain to
18 you what we did.
19     MR. GREENSTEIN: Okay.
20     THE WITNESS: Which is the balance sheet and
21 income statement would be tied into our work papers,
22 and if the summary verbiage on the press release
23 included a revenue number, or net income number, or
24 earnings per share number, we would physically check
25 those. It's a clerical check of the press release.

116

1  We would check those into our work papers.
2      MR. GREENSTEIN: Okay.
3      Q  Let's take revenue, for example.
4      If the press release said Oracle earned two
5  billions dollars in revenue for a particular quarter,
6  okay, what -- would you -- would you -- and -- would
7  you tick off that number?
8      A  Typically it would be checked into our work
9  papers, yes.
10     Q  Right.
11     Because you would -- you would -- you would
12 make sure that the number that was actually in the
13 press release comported with the numbers in the
14 quarterly work papers; right?
15     A  Yeah. Agree to the numbers in the company's
16 books and records, a copy of which the consolidating
17 income statement or consolidated income statement -- a
18 copy of which would be in our work papers.
19     Q  Okay. Now, for the fourth quarter, did you
20 do that same -- strike that.
21     Was the process the same for the fourth
22 quarter?
23     A  In the fourth quarter, we would tie in the
24 year-to-date information, and we most likely had a
25 schedule in our work papers that calculated the fourth

Matuszak, Gary  8/1/2006  9:14:00 AM

117

1  quarter separate earnings release by, you know, a
2  company prepared schedule that would have calculated
3  what the fourth quarter was, or a summary of the four
4  quarters for the year that you could have derived the
5  fourth quarter stand alone earnings.
6      Q  So there was some type of assessment done of
7  the fourth quarter revenues and earnings as part of
8  the audit --
9      MR. SIDORSKY: Objection.
10     MR. GREENSTEIN: Q. -- is that fair to say?
11     MR. SIDORSKY: Objection to form.
12     THE WITNESS: I think I stated earlier that
13  was a very high-level assessment of just looking at
14  the fourth quarter, and I don't recall what that would
15  have been, but it's very limited.
16     MR. GREENSTEIN: Okay.
17     Q  But as part of the audit, you're auditing
18  the -- the 2001 total revenues for the company; right?
19     MR. SIDORSKY: Objection to form.
20     MR. KONOVALOV: Objection; vague and
21  ambiguous.
22     THE WITNESS: Well, we issue an opinion on
23  the financial statements as a whole. We don't issue
24  an opinion on revenue, or any single line item, or any
25  single footnote in any of the statements. So our

118

1  opinion is issued on the consolidated financial
2  statements of Oracle.
3      MR. GREENSTEIN: Right.
4      Q  And the consolidated financial statements --
5  well, the consolidated income statement for the year
6  includes the revenues and earnings from the fourth
7  quarter; right?
8      A  It includes a revenue earnings for all four
9  quarters. It includes it for the year. So yes it
10  includes it for the fourth quarter.
11     Q  Right.
12     So?
13     A  Our audit opinion does not cover the fourth
14  quarter earnings. Our audit opinion covers the
15  consolidated financial statements for the year.
16     Q  Right.
17     So it covers the total revenues and earnings,
18  the total consolidated income statement numbers for
19  the year?
20     A  That's correct.
21     Q  Okay. And based on your work at Oracle, was
22  the fourth quarter the quarter in which there were --
23  Oracle generated the most revenues for the year?
24     A  Historically, Oracle's revenue in the fourth
25  quarter was larger than it was in the other quarters

119

1  within that fiscal year.
2      Q  Okay. During -- during the fiscal 2001
3  year-end audit, did Andersen perform any comparison
4  between a balance in an account in the fourth quarter
5  as compared to what it was in the third quarter?
6      MR. SIDORSKY: Can -- can I hear that
7  question again? Sorry.
8      (Whereupon, record read by the Reporter as
9  follows:
10     "Question: Okay. During -- during the
11     fiscal 2001 year-end audit, did Andersen
12     perform any comparison between a balance in
13     an account in the fourth quarter as compared
14     to what it was in the third quarter?")
15     THE WITNESS: I don't recall specific
16  schedules. But, in general, we would have done some
17  comparative analysis that would have looked at Q4
18  versus Q3 or, you know, prior year Q4.
19     MR. GREENSTEIN: Q. You know, the variance
20  or the changes between the -- the -- the balance at
21  the end of the third quarter and the balance at
22  end of the fourth quarter, you do some kind of
23  assessment of that generally; right?
24     MR. SIDORSKY: Objection to form.
25     THE WITNESS: I believe some level of review,

120

1  yes.
2      MR. GREENSTEIN: Q. And by some level, do
3  you mean high-level review?
4      A  Yes.
5      Q  Okay. Do you know what account 25005 at
6  Oracle was during that time?
7      A  I recall what it is based upon some review of
8  information I did yesterday.
9      Q  Okay. Now, did that refresh your
10  recollection about any analysis performed back in --
11  during the audit of 2001, an analysis of the changes
12  in the 25005 account from the third quarter to the
13  fourth quarter?
14     MR. SIDORSKY: Objection to form.
15     MR. KONOVALOV: Assumes facts not in
16  evidence.
17     THE WITNESS: Did not refresh my memory on
18  specifics.
19     MR. GREENSTEIN: Q. Did it refresh your
20  memory generally about any analysis performed on --
21  during the audit of the 25005 account and the variance
22  between the third quarter and the fourth quarter?
23     A  No.
24     Q  Okay. If you turn to -- I'd like to direct
25  your attention to Bates 081752. And, for the record,

121

1  this appears to be a slide presentation. It has
2  Arthur Andersen on the top. It says "Audit Committee
3  Meeting January 5, 2001."
4      Actually it goes -- it appears that it
5  goes -- well, I'll just direct your attention to that
6  page ended 752, and I'll take you through the pages
7  that I want you to look at.
8      A  Okay.
9      Q  So if you look at the -- well, have you seen
10  this?
11      Well, if you flip through, it appears to be a
12  slide presentation made by Arthur Andersen at the
13  finance and audit committee meeting; am I correct? Is
14  that right?
15      A  Yes.
16      Q  Have you seen this slide presentation before?
17      A  I did.
18      Q  Did you make this slide presentation to
19  Oracle?
20      A  Most likely I did.
21      Q  All right.
22      Is this the -- is this kind of the standard
23  presentation that you would make during each -- during
24  the finance and audit committee meetings in the
25  quarters fiscal year 2001?

122

1      MR. SIDORSKY: Objection to form.
2      THE WITNESS: This looks familiar in terms of
3  the overall format and the content of what we would
4  cover in our quarterly meetings with the audit
5  committee.
6      MR. GREENSTEIN: Okay.
7      Q  And it appears that it was made on
8  January 5th, 2001; right?
9      A  That's correct.
10      Q  So that would be -- well, if you turn to the
11  next page, 081753, see how it says "Results of Second
12  Quarter Review"?
13      A  Yes.
14      Q  And it says "Overall Results. No adjustments
15  proposed"; do you see that?
16      A  Yes.
17      Q  What is -- okay. What does that mean, "No
18  adjustments proposed"?
19      A  That means that as part of our quarterly
20  review, we did not come up with any differences
21  between what the company recorded in the financial
22  statements and what we felt should have been recorded
23  in the quarterly financial statements. So we didn't
24  propose an adjustment to -- reflect changes in the
25  financial statements.

123

1      Q  So no adjustment was made to the final
2  numbers that Oracle presented as part of their
3  earnings press release at the end of the quarter --
4      MR. SIDORSKY: Objection --
5      MR. GREENSTEIN: Q. -- right?
6      MR. SIDORSKY: -- to form.
7      THE WITNESS: I think that's -- yes, that's
8  correct.
9      MR. GREENSTEIN: Q. So, in other words,
10  the -- does that mean that during those closing
11  meetings when you -- when you're discussing the
12  quarter -- the quarterly results, financial results,
13  that Andersen didn't have any adjustments to those
14  results that were in that press release?
15      MR. SIDORSKY: Objection to form.
16      THE WITNESS: I -- yes, I believe that's
17  correct based on your -- your question.
18      MR. GREENSTEIN: Okay.
19      THE WITNESS: We did not propose adjustments
20  to change the balance sheet or income statement
21  presented in the press release.
22      MR. GREENSTEIN: Q. Well, is that -- is that
23  just the balance sheet and the income statement, or
24  does that mean any -- any information, any financial
25  information in the press release?

124

1      MR. SIDORSKY: Objection to form.
2      THE WITNESS: Well, this review is the result
3  of our quarterly review which entails the balance
4  sheet and the income statement. The information in
5  the press release is the company's information, not
6  ours. We don't have responsibility with respect to
7  the press release.
8      MR. GREENSTEIN: Q. But you tick -- you go
9  through the information and tick it, and you help
10  craft the language/the verbiage, as you said, in the
11  press release before it goes out; right?
12      MR. SIDORSKY: That is not what he said, and
13  I'm going to object to rehashing what has been clearly
14  been stated on the record now several times that you
15  persist in going back over and misstating, so --
16      MR. GREENSTEIN: I'll withdraw the question
17  so you don't continue to talk.
18      MR. SIDORSKY: Yeah.
19      MR. GREENSTEIN: Q. Do you see on 081753,
20  the second -- kind of the second prong of the overall
21  results. You see where it says "Quality of Earnings
22  discussion - no issues"?
23      A  I do see that.
24      Q  What does that mean?
25      A  My recollection is at some point in time

125

1  there became a requirement under the AICPA or some
2  standard for the auditor to discuss with management
3  the overall quality of earnings as part of our
4  discussion with the audit committee.  I don't remember
5  if it was AICPA or who it came from.
6      So that is the intent of this bullet, to
7  address that requirement, to have a general discussion
8  with the audit committee regarding the quality of
9  earnings.
10     Q  And when it says "no issues," does that mean
11 that Andersen is representing that the -- that there
12 are no issues with respect to the quality of earnings?
13     A  What it means is based upon the -- your
14 limited review of that quarter, we did not become
15 aware of any quality of earnings issues.  Doesn't mean
16 there were or weren't any, it just means as a result
17 of our work we didn't become aware of any.
18     Q  Okay.  At this time, after this presentation,
19 did you ever become aware of any issues?
20     MR. SIDORSKY:  Objection to form.
21     THE WITNESS:  On this quarter?  On what?
22     MR. GREENSTEIN:  Q.  On this quarter.
23     A  No.
24     Q  Okay.  On any quarter?
25     A  No.

127

1      THE WITNESS:  I don't recall any issues, no.
2      MR. GREENSTEIN:  Okay.
3      Q  I just want to be clear.  So you don't --
4  after making this presentation, you don't recall any
5  issues relating to the quality of earnings that arose
6  with respect to Oracle at any time?
7      A  With respect to this quarter, no.  With
8  respect to the other quarters in the fiscal year, no.
9      Q  With respect to any quarter in any fiscal
10 year?
11     A  I'm saying I don't -- I don't recall any.
12 So, I mean, it's -- it's a very broad question.
13     Q  Okay.  But why -- it seems like you're trying
14 to distinguish between 2001, the quarters in 2001 and
15 some other period, and so I'm just asking if that --
16 if you're making that distinction for some reason.
17     A  My distinction is I'm trying to -- to -- to
18 draw a distinction between the quarters which appear
19 to be the subject of the litigation versus saying any
20 quarter in the company's history which I have no basis
21 to respond to many of those quarters.
22     I'm just trying to be accurate in my
23 response.  So if you go, you know, into -- you know,
24 outside of those quarters, or outside of quarters
25 where I was involved with the engagement, I'd have no

126

1      Q  Well, why did, when I asked that question,
2  you said, "On this quarter"?  So was there another --
3  was there an issue?  I'm just asking if there was an
4  issue.
5      A  Because your question was vague.
6      Q  Agreed.
7      So was there any issue related to quality of
8  earnings that you learned of after -- with respect to
9  any quarter after this presentation was made?
10     MR. SIDORSKY:  Could you read the question
11 back?  I was distracted by the siren.  I assume we're
12 okay here.
13     THE WITNESS:  It's the noon whistle.
14     (Whereupon, record read by the Reporter as
15 follows:
16     "Question:  So was there any issue related to
17     quality of earnings that you learned of
18     after -- with respect to any quarter after
19     this presentation was made?")
20     THE WITNESS:  So our discussion that he's
21 been focussed on, fiscal 2001, so I'll answer with
22 respect to that, and the answer is no.
23     MR. GREENSTEIN:  Okay.
24     Q  So what about any fiscal year?
25     MR. SIDORSKY:  Objection to form.

128

1  basis to respond to most of those.  So I'm just trying
2  to be factually correct, since I'm under oath.
3      Q  I understand that, and I'm not asking about
4  the early '90s or, you know, time periods ten years
5  ago.
6      I'm asking about, let's say, 2000, 2001,
7  2002, did you become aware of any issues with respect
8  to quality of earnings during that period?
9      A  No.
10     Q  Did -- did you become aware of any issues
11 with respect to quality of issues after 2002?
12     A  I wasn't involved with Oracle after April of
13 2002.
14     Q  Right, but I'm asking if you became aware of
15 any issues.
16     MR. SIDORSKY:  Well, objection to form.
17     MR. KONOVALOV:  Calls for speculation.
18     THE WITNESS:  No.
19     MR. GREENSTEIN:  Q.  So after -- after 2002,
20 you did not become aware of any issues with respect to
21 quality of earnings at Oracle from 2002 until today?
22     A  Nope.
23     Q  Are there any issues that you want to testify
24 about that you recall hearing about?
25     MR. KONOVALOV:  Objection; it's overbroad;

129

1   it's vague and ambiguous.
2       THE WITNESS:  No.
3       MR. GREENSTEIN:  All right.
4       THE WITNESS:  I'm --
5       MR. GREENSTEIN:  Q.  Did you have any
6   discussions after you left -- after Andersen was
7   dismissed as Oracle's auditor, did you have any
8   discussions with anybody about quality of earnings
9   issues?
10      A   When you say "anybody," company personnel?
11      Q   No.  I mean anybody.
12      A   "Anybody" is a broad -- no.
13      Q   You didn't have any -- okay.  I'm going to
14  ask the question again, because it's -- it sounds like
15  there may be discussion.  I'm not just getting to
16  them.  I don't know.
17      I'm asking if after Andersen was dismissed
18  from the Oracle -- by Oracle, did you ever have any
19  discussions with anybody about quality of earnings
20  issues at Oracle?
21      MR. KONOVALOV:  Objection; asked and
22  answered.
23      THE WITNESS:  No.
24      MR. GREENSTEIN:  Q.  You didn't have any
25  discussions with anyone?

130

1       MR. KONOVALOV:  Same objection.
2       MR. SIDORSKY:  Yeah.  Come on.  It has really
3   been answered now.  Asked and answered several times.
4       THE WITNESS:  I think I answered this
5   question several times.
6       MR. GREENSTEIN:  Okay.
7       Q   Did you see any document that -- that made
8   you aware of any quality of earnings issues?
9       MR. KONOVALOV:  Objection; assumes facts not
10  in evidence.
11      THE WITNESS:  No.  Understand, that I really
12  have paid little or no attention to Oracle since April
13  of 2002.
14      MR. GREENSTEIN:  Q.  So have you had any
15  discussions at all about Oracle since Andersen left in
16  2002?  Have you had any discussions about quality of
17  earnings issues after that time?
18      A   No.  Other than, you know, than a general
19  discussion of the purpose for this deposition
20  yesterday.
21      Q   Okay.  See in the second bullet point it says
22  "Judgmental Reserves and Accruals"?
23      A   Yes.
24      Q   What does that mean?
25      A   It means that one of the items we would

131

1   routinely discuss with management and with the audit
2   committee, in this case, was discussing some of the --
3   you know, the judgmental reserves and accruals.  I
4   think you'll see this on most of our agendas.
5       Q   Right.  I actually have seen them on most of
6   them.
7       The term "judgmental reserves," does that
8   mean -- is that discussing some sort of judgment made
9   by Oracle with respect to reserves, or does that mean
10  some sort of judgment made by Andersen?
11      A   Oracle.
12      Q   Oracle.
13      And what types of reserves have a judgmental
14  aspect to them, let's say, in 2001, if you remember?
15      MR. SIDORSKY:  Objection to form.
16      MR. KONOVALOV:  Vague and ambiguous.
17      MR. GREENSTEIN:  Actually, in this
18  quarter.  I'll focus in on this quarter.
19      A   Let me -- let me answer more generally,
20  because I don't know that I can answer specifically
21  with this quarter.
22      Q   Okay.
23      A   But there are certain accounts in the
24  financial statements that I'll use accounts payable.
25  If you get an invoice, you book the invoice.  If

132

1   you're talking about an accrual for, you know, a
2   number, if it's a litigation accrual, a warranty
3   accrual, some of those items require more judgment
4   from management because they have to base it on less
5   precise information.
6       The same would be true for a receivable
7   reserve where you're trying to estimate the
8   realizability or recovery of receivables that have
9   been recorded in the books but not yet collected.
10  It's less precise, so there's more judgment involved.
11  That's -- that's what's intended to -- we intend to
12  mean by the -- the caption "Judgmental Reserves and
13  Accruals."
14      Q   Okay.  And you see the bullet point there
15  where it says "Domestic Reserves"?
16      A   Uh-huh.
17      Q   And it has "A/R judgment reserves," "Sales
18  return reserves," and "Accruals."
19      A   Yes.
20      Q   What does "A/R judgment reserves" mean?
21      A   I believe it refers to the account receivable
22  reserve.  And the overall reserve, I believe there was
23  a component of it that required more -- required more
24  judgment.  The whole reserve required judgment, but
25  this would be one that was not identified with

Matuszak, Gary  8/1/2006  9:14:00 AM

133

1 specific accounts.
2     Q   Okay.  What do you mean by that?
3         MR. SIDORSKY:  Objection to form.
4         MR. GREENSTEIN:  Q.  You said there was a
5 component of it that required more judgment.  The
6 whole reserve required judgment, but this would be one
7 that was not identified with specific accounts, and
8 I'm wondering what was the component of it that
9 required more judgment?
10    A   Well, wait.  Let me clarify.
11        I don't -- I don't recall the specific
12 discussion on this, but it says "A/R judgment
13 reserve."  It doesn't say A/R reserve, so let me
14 clarify.  I -- I'm implying, guessing, if you will,
15 that this is not related to the entire reserve.
16    Q   And when you say "entire reserve," what do
17 you mean by that?  What is the entire reserve?
18    A   Well, the reserve for collectability of
19 receivables would typically entail a portion of the
20 reserve that is very specific customer accounts, a
21 customer in bankruptcy, something along that nature
22 which would be specifically reserved, and then there
23 would be a calculation of reserves to cover items not
24 specifically identified which would typically require
25 more judgment because it's based on less precise

134

1 information.  Estimates in terms of prior history and
2 things like that.
3     Q   So when you say "estimates," do you mean a
4 reserve?  Say you were taking a reserve for
5 uncollectibles, or Oracle was, and they wanted to
6 determine what percentage of their receivables they
7 would reserve for.
8         Is that -- is that the type of judgment
9 reserve that you're talking about?
10        MR. SIDORSKY:  Objection to form.
11        THE WITNESS:  In general, yes.
12        MR. GREENSTEIN:  Okay.
13    Q   Well, what are the -- what are -- what are
14 the different types of reserves that you can think of?
15 Actually, withdraw that.
16        You said there was a type of reserve that
17 required more judgment.  There was a component of a
18 reserve that required more judgment.
19        Do you remember any specific reserve that
20 required more judgment?
21    A   No.  I mean, other than what I'll call
22 nonspecific reserves.  So reserves that aren't for a
23 specific account.  If there would be a reserve -- you
24 know, the overall reserve was based on specific
25 reserves, and then a calculation of what I'll more

135

1 broadly call general reserve, meaning, it does not
2 relate to a specific account, but it's based on prior
3 experience.
4     Q   Okay.  When you say a reserve, that doesn't
5 -- that doesn't relate to a specific account, what do
6 you mean by that?  What account?  What do you mean by
7 "account"?
8         MR. SIDORSKY:  Objection to form.  Objection
9 to form.
10        THE WITNESS:  Yeah, let me clarify by
11 "account."  I meant customer account or customer
12 invoice.
13        MR. GREENSTEIN:  Q.  Well, can you just
14 explain to me how a reserve is related to a customer
15 account or a customer invoice?
16        MR. SIDORSKY:  That's been asked and
17 answered.
18        THE WITNESS:  In general?
19        MR. GREENSTEIN:  Q.  Yeah.  I just don't
20 understand what that means.
21        MR. SIDORSKY:  Objection to form.
22        THE WITNESS:  Okay.  Do I need to answer?
23 Right?
24        So a company sells a widget.  They book a
25 receivable for the sale of that.  At a later point in

136

1 time, the customer goes bankrupt.  So that invoice,
2 that specific invoice, is deemed uncollectible and is
3 reserved for.  A reserve is set aside in the company's
4 reserve analysis.  That would be an example of a
5 specific reserve.
6         MR. GREENSTEIN:  Okay.
7     Q   And if that reserve -- and that's a reserve
8 taken to write -- is that a reserve taken to write off
9 an accounts receivable that can no longer be collected
10 because the company went bankrupt?
11    A   Just to clarify, what I was talking about
12 would be an adjustment made to reserve for potential
13 uncollectible account.  The write-off of the account
14 is a separate entry.
15    Q   Right.
16        So let's say you are establishing a reserve
17 for uncollectibles in general.  Do you know what the
18 general entries are for that?
19        MR. SIDORSKY:  I'm going to object to the
20 form as -- as overly broad and hypothetical.
21        MR. KONOVALOV:  It's an incomplete
22 hypothetical.
23        THE WITNESS:  Generally I know.  Yes, I know
24 what the entries would be for that.
25        MR. GREENSTEIN:  Okay.

Matuszak, Gary  8/1/2006  9:14:00 AM

137

1    Q   What are they?
2    A   Typically, if it's a bad debt expense, it's
3  a -- it's a debit, if you will, to what I'll broadly
4  call SGAE, Selling General Administrative Expense.
5  Typically, it's down in the NG&A, and a credit for
6  allowance to doubtful accounts or, quote, "reserve."
7    Q   Okay.  Is it fair to say that the entry --
8  that journal entry would be -- when you say a debit to
9  SGAE, are you talking about bad debt expense?
10   A   Yes.
11   Q   Okay.  So the debit would be bad debt
12 expense, the credit would be allowance for doubtful
13 accounts, which is a contrast for that; right?
14   A   Correct.
15   Q   Okay.  So when that reserve is taken for
16 uncollectible accounts and there's a debit to a bad
17 debt expense, a debit of an expense means it
18 increases; right?
19   A   That's correct.
20   Q   Okay.  Now, the second transaction that you
21 were describing was when you write off a bad debt.
22 And do you know the journal entries that would occur
23 for that type of write-off?
24   A   Yes.
25       MR. SIDORSKY:  Same objection.  Now, we're

138

1  really -- it's not a -- it's -- it's not an
2  appropriate question given the lack of foundation or
3  context.
4        MR. GREENSTEIN:  Q.  Do you know the journal
5  entries to writing -- to write off bad debt at
6  Oracle --
7        MR. KONOVALOV:  Objection.
8        MR. GREENSTEIN:  Q.  -- during 2001?
9    A   I don't -- I don't know the specific journal
10 entries that were made at Oracle, no.
11   Q   Okay.  But, in general, based on what you
12 know with working at Oracle for what, 20 years, do you
13 know typically what a journal entry would be to write
14 off bad debt?
15       MR. KONOVALOV:  Objection; calls for
16 speculation.
17       MR. SIDORSKY:  Objection.
18       MR. GREENSTEIN:  Sorry.  I'll withdraw that.
19   Q   In general, you just gave any general entries
20 for establishing a reserve for uncollectibles; right?
21   A   Uh-huh.
22   Q   So I'm asking generally, what would the
23 journal entries be for writing off a bad debt?
24       MR. SIDORSKY:  Objection to form.
25       THE WITNESS:  Generally, you would debit the

139

1  allowance or reserve account and credit the actual
2  accounts receivable account that whatever the -- the
3  invoice was, whatever account it resided in.
4        MR. GREENSTEIN:  Q.  And that would reduce
5  the receivable; right?
6    A   Well, the -- it -- it would have no impact on
7  the net receivable.
8    Q   Okay.  What do you mean by that?
9    A   There would be -- if you're looking at the
10 financial statement caption accounts receivable, the
11 fiscal journal entry to actually write off an account
12 would normally have no impact on that account balance.
13   Q   Would normally you say?  Would any -- would
14 there be any cases where it would have an impact on
15 that account balance?
16       MR. KONOVALOV:  Objection; calls for
17 speculation.
18       MR. SIDORSKY:  Same objection.
19       THE WITNESS:  Generally, no.  There shouldn't
20 be any, but I -- you know, again, I'm trying to be
21 factual without overstating my answer.
22       MR. GREENSTEIN:  I understand.
23   Q   So focusing on Oracle in 2001, the fiscal
24 year 2001, do you recall what the journal entries were
25 for establishing a reserve for uncollectibles?

140

1    A   Again, just in general what they would be.
2    Q   Well, yeah.  I'm talking about in general
3  with respect to Oracle, how they would establish --
4  what would the journal entries be for Oracle to
5  establish reserve for uncollectibles?
6    A   Well, I've never actually traced the entries
7  in, but -- so I'm speculating, but it would be debit
8  to bad debt expense and credit to the allowance for
9  doubtful accounts.
10   Q   Okay.  And then with respect to write-offs at
11 Oracle, would -- would it be the same journal entries
12 that you described earlier with respect to accounts
13 receivable and allowance for doubtful accounts?
14       MR. KONOVALOV:  Objection; calls for
15 speculation.
16       THE WITNESS:  It should be.
17       MR. GREENSTEIN:  Okay.
18   Q   But was there ever a case where journal
19 entries would be made that would affect revenue with
20 respect to writing off bad debts?
21       MR. KONOVALOV:  Objection; calls for
22 speculation; lacks foundation.
23       THE WITNESS:  You know, again, I -- I don't
24 recall the specifics, but there -- I believe that some
25 of the entries, like if they were going to record

141

1  possibly a sales return because there are sales return
2  reserves that are listed here, a sales return listed
3  would be different than a bad debt allowance.  A sales
4  return would normally result in a reduction of revenue
5  and not an increase in bad debt expense.
6      MR. GREENSTEIN:  Okay.
7      Q  I'm focusing on reserves for doubtful
8  accounts, or reserves for uncollectible receivables.
9      Would that -- would the journal entries
10  associated for the establishment for those types of
11  reserves ever impact revenue?
12      MR. KONOVALOV:  Objection; lacks foundation;
13  calls for speculation.
14      MR. SIDORSKY:  Objection to form.
15      THE WITNESS:  They should not.
16      MR. GREENSTEIN:  Q.  They should not?
17      A  They should not.  No, I can't answer
18  specifically in terms of looking at every entry Oracle
19  made.
20      Q  That's fair.
21      Now, why should -- why should it not affect
22  revenue?
23      MR. SIDORSKY:  Objection to form.
24      THE WITNESS:  Because an allowance for
25  doubtful accounts is typically deemed as a credit in

142

1  collection or collectability matters, and common
2  practice is to record that as a bad debt expense.
3      MR. GREENSTEIN:  Q.  Now, would there ever be
4  a reason -- instead of crediting bad debt expense,
5  would there ever be a reason to reduce revenue?  So
6  debit allowance for doubtful accounts and -- sorry --
7  credit for allowance of doubtful accounts and debit
8  revenue?
9      MR. SIDORSKY:  Objection to form.
10      MR. KONOVALOV:  Objection; vague and
11  ambiguous.
12      THE WITNESS:  Would there ever be a reason to
13  do that?  I don't know.
14      MR. GREENSTEIN:  Q.  Do you know if Oracle
15  ever -- in establishing its reserves for doubtful
16  accounts -- ever made entries that impacted revenue
17  during 2001, fiscal year 2001?
18      A  I don't recall.
19      MR. SIDORSKY:  Objection to form.
20      THE WITNESS:  I don't recall.
21      MR. GREENSTEIN:  Q.  Do you remember any
22  discussions regarding establishment of reserves or
23  write-offs of bad debt that impacted revenue?
24      MR. SIDORSKY:  Objection to form.
25      MR. KONOVALOV:  Vague and ambiguous.

143

1      THE WITNESS:  I don't recall any
2  conversations to that -- that direct.  You know, I
3  mean, I don't recall any conversations about that
4  specific topic.
5      MR. GREENSTEIN:  Okay.
6      Q  Do you recall any discussions at all about
7  the impact to revenue of either establishing a bad
8  debt reserve or writing off bad debt?
9      MR. SIDORSKY:  Objection to form.
10      THE WITNESS:  No, I don't.
11      MR. GREENSTEIN:  Okay.
12      Q  From 2000 until this deposition, do you
13  recall ever having any discussions with anybody about
14  potential inaccuracies in Oracle's publicly stated
15  financial statement?
16      MR. KONOVALOV:  Objection; assumes facts not
17  in evidence.
18      MR. SIDORSKY:  Objection to form.
19      THE WITNESS:  No, I don't.
20      MR. GREENSTEIN:  Q.  Have you ever had any
21  discussions from 2000 until today about potential
22  accounting fraud occurring at Oracle?
23      MR. KONOVALOV:  Objection; assumes facts not
24  in evidence.
25      THE WITNESS:  I don't know.

144

1      MR. SIDORSKY:  Objection to form.
2      THE WITNESS:  Excuse me.  No, I don't.
3      MR. GREENSTEIN:  Q.  Do you recall any
4  discussion from 2000 to today about -- that any of
5  Oracle's financial statements were inaccurate?
6      MR. KONOVALOV:  Objection; assumes facts not
7  in evidence.
8      THE WITNESS:  Any conversations?  No.
9      MR. GREENSTEIN:  Okay.
10      Q  Anything?  Any documents or anything besides
11  conversations about -- from 2000 -- 2000 until today
12  about the inaccuracy of Oracle's financial statements?
13      MR. KONOVALOV:  Same objection.
14      THE WITNESS:  Yes; I read the complaint
15  yesterday.
16      MR. GREENSTEIN:  Okay.
17      Q  Besides --
18      A  That's it.
19      Q  Okay.  Anything besides reading the complaint
20  yesterday?
21      A  No.
22      Q  If you turn to the next page, it's Bates
23  stamped 081754.  You see the first bullet point.  It
24  says "Revenue Review."
25      A  Yes.

145

1    Q  And it says "No changes in Scope or
2  Procedures"; do you see that?
3    A  Yes.
4    Q  So what does that mean in the context of the
5  second quarter 2001?
6    A  In the context of the quarter, what it means
7  is that we had a -- a standard scope that we would use
8  for reviewing license agreements each quarter, a
9  standard scope that we would have for reviewing
10  consulting agreements each quarter, and we would
11  typically put this in and say, if there were no
12  changes, we would reiterate to the audit committee
13  that we did not change the scope or the procedures we
14  performed, and we'd sometimes then reiterate verbally
15  what those procedures were, but this was to highlight
16  that we didn't change the scope of the work.
17    Q  Okay.  So where it says "License revenue -
18  tested 37%," is that fair to say that Andersen
19  reviewed 37 percent of the license revenue deals
20  during the second quarter of 2001?
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  Let me be -- try to be more
23  factually accurate.
24    We would have reviewed contracts where
25  license revenue recognized under those contracts would

146

1  have equated to 37 percent of domestic revenue,
2  domestic license revenue.
3    MR. GREENSTEIN:  Okay.
4    Q  And testing 37 percent, what does -- what --
5  what do you mean by "tested"?  What do you test?
6    A  Well, we had a number of fairly standard
7  audit procedures we would go through with a revenue
8  contract.
9    Q  Okay.  So "audit procedures."
10    Did you mean to say quarterly review
11  procedures?
12    A  No.
13    Q  Okay.  So there were audit procedures you
14  went through to test revenue contracts; right?
15    A  Yeah, so let me clarify.  We performed our
16  revenue testing.  Our audit testing of revenue was
17  performed throughout the year.  So when we tested
18  revenue contracts, instead of coming in and auditing
19  all of the revenue in May of 2001, our process
20  included testing them on a quarterly basis so that we
21  could do them on a -- on a timely basis, so it's not a
22  requirement for a quarterly review.
23    Q  Okay.  So Andersen -- but Andersen performed
24  some sort of testing of 30 percent of the license
25  contracts during Q2 '01; right?

147

1    A  That's correct.
2    Q  Okay.  And how did Andersen go about
3  determining that 37 percent?
4    MR. SIDORSKY:  Asked -- asked and answered,
5  or -- well, objection to form.
6    THE WITNESS:  We had a -- what I'll call a
7  scope that was set as to which contracts we would
8  review.  I don't recall if it was a number of
9  contracts as in the top 20 contracts or whether it was
10  a dollar threshold in -- in terms of all contracts
11  over X million dollars, but that's how our scope was
12  set.
13    So the 37 percent was not the scope.  That
14  percentage would and did vary from quarter to quarter
15  depending upon the significance of those particular
16  contracts that we looked at.
17    MR. GREENSTEIN:  Okay.
18    Q  But how did Andersen determine which license
19  revenue contracts that it would test?  Was it random,
20  or some sort of statistical analysis, or was it by
21  amount of the contract?
22    A  For purposes of this bullet point, the
23  testing of license revenue that we done, you know, on
24  a timely basis during the quarters and at year end,
25  that was a quarterly scope that was -- it was not

148

1  random.  As I said, it was based either on a specific
2  number of contracts, or a dollar threshold cutoff on
3  contracts, and I don't recall which it was.
4    Q  Okay.  You recall that it was the top 20
5  license revenue contracts during second quarter of
6  '01?
7    MR. SIDORSKY:  Objection to form.
8    THE WITNESS:  I just said I don't recall.
9    MR. GREENSTEIN:  Okay.
10    Q  Did you ever -- did Andersen ever receive,
11  during the second quarter of '01, a -- some
12  documentation regarding the top 20 license contracts
13  during that quarter?
14    A  Again, I'm trying to be clear.  We had a
15  scope.  If that was 20 contracts, we would have
16  received the documentation for 20 contracts.  If it
17  was 15, we would have received it for 15.
18    So, you know, I've already answered the
19  question.  I don't know how many we looked at.  It was
20  whatever our scope was.
21    Q  Okay.  But you recall receiving documentation
22  on whether it was 15 or 20.  You just recall Andersen
23  receiving documentation from Oracle on certain revenue
24  contracts during that quarter that you would test;
25  right?

149

1     A  Yes.  The contracts within our scope, we
2  would have received a package of information from the
3  company on those.
4     Q  Okay.  And how would you go about testing
5  those contracts?
6     A  Let me just pause for one second.  Are we
7  going to break soon for lunch?
8     MR. SIDORSKY:  Yeah, why don't we go off the
9  record for one second.
10     MR. GREENSTEIN:  Well, actually, I just want
11  to finish this one question.
12     MR. SIDORSKY:  Yeah.  Okay.  All right.
13     So there's a question pending, so why don't
14  you answer that, and then we'll -- we'll --
15     MR. GREENSTEIN:  Right.
16     MR. SIDORSKY:  -- pause.
17     MR. GREENSTEIN:  Okay.
18     THE WITNESS:  Sorry to interrupt.
19     MR. GREENSTEIN:  No, it's okay.
20     Q  So during the second quarter of '01 wherein
21  you tested 37 percent of the contract, the license
22  contracts, and you received the documentation with
23  respect to some contracts for that quarter, what did
24  you do to test them?
25     A  Okay.  So there's -- there's a number of

150

1  procedures we would go through.  Whether I accurately
2  recollect and state all those or not, I don't know,
3  but the -- the -- the procedures would include a
4  review of the actual contract itself, a review of the
5  company's extract.  They would prepare a -- a memo
6  that, in their view, summarized the accounting for
7  that agreement, what the license revenue should be,
8  what other components of the revenue would be, and
9  whether that was recognized or deferred during the
10  quarter.
11     So we would look at their analysis of it.  I
12  believe we would trace it to the credit to make sure
13  that the customer was credit approved.  We would trace
14  the entries into, you know, the accounts.  If there
15  were deferred revenue, we would trace them -- that the
16  revenue, they said it was deferred, it was, in fact,
17  deferred.
18     I don't re -- recall what other -- what other
19  we would have done.
20     Q  Okay.  Would you look at whether the
21  contracts, the revenue con -- license contracts met
22  the requirements of SOP 97-2?
23     A  Yes.
24     Q  So you would go through the process of the
25  four elements:  Whether arrangement existed, delivery,

151

1  the fee was fixed and determinable, and whether
2  collectability was reasonably assured?  You'd go
3  through that with respect to whatever amount of deals
4  that you deemed proper during that quarter; right?
5     MR. SIDORSKY:  Objection to form.
6     THE WITNESS:  We -- we would review or
7  conclude each of those four requirements under
8  SOP 97-2.
9     MR. GREENSTEIN:  Q.  And in the second
10  quarter, do you remember doing that with respect to
11  the 37 percent of the license revenue contracts?
12     A  Do I recall specifically?  No.
13     Q  Okay.  Do you recall doing that with respect
14  to a license revenue contract with Hewlett-Packard?
15     MR. SIDORSKY:  Objection to form.
16     THE WITNESS:  I don't recall the specific
17  testing or the documentation on any particular
18  contract.  That's why I'm answering in terms of the
19  general procedures we would perform.
20     MR. GREENSTEIN:  Right.
21     Q  But there was a deal with Hewlett-Packard in
22  the second quarter of '01 that was part of those that
23  were tested in the second quarter; right?
24     MR. KONOVALOV:  Objection; lacks foundation.
25     MR. SIDORSKY:  Objection to form.

152

1     THE WITNESS:  If -- if you're telling me
2  there was in there, then I'm supposing that it was in
3  there.
4     MR. GREENSTEIN:  Q.  And I'm asking if you're
5  aware that during the second quarter of '01 Andersen
6  reviewed the top 20 license revenue contracts for that
7  quarter and that one of them was with Hewlett-Packard?
8     A  I recall, based on the review I did
9  yesterday, one of the audit committee meeting agendas
10  included an HP contract.  Now, I haven't flipped the
11  page on this, so I don't know if HP is in Q2, Q1, Q3.
12     Q  Actually, why don't you flip the page, and
13  for the record, it's Bates 081755, and it says "HP
14  30 million hardware purchase guarantee"; do you see
15  that?
16     A  Yep.
17     Q  Does this refresh your recollection, that in
18  the second quarter of '01, as part of that 37 percent
19  testing of license revenue contracts, Andersen tested
20  this deal with HP?
21     A  It, yes, refreshes my memory that it was in
22  Q2.
23     Q  And Andersen did test this deal with HP in
24  the second quarter of '01, whether it met their
25  requirements of SOP 97-2; right?

Matuszak, Gary  8/1/2006  9:14:00 AM

153

1    MR. SIDORSKY: Objection to form.
2    THE WITNESS: By virtue of the fact that it's
3  in this audit committee discussion, the answer to that
4  would be yes.
5    MR. GREENSTEIN: Okay.
6    Q  If I show you a document of the top
7  20 license revenue contracts for the second quarter of
8  '01, and it had those 20 contracts and summaries of
9  the deal for the second quarter of '01, is it fair to
10 say that every contract on there was tested by Oracle
11 to see if it was -- met the requirements of SOP 97-2?
12   MR. KONOVALOV: Objection; vague and
13 ambiguous. I think you may have meant Oracle --
14 Andersen, not Oracle.
15   MR. SIDORSKY: Objection to form.
16   MR. GREENSTEIN: Q. I meant Andersen
17 testing.
18   A  Oracle or Andersen?
19   Q  Andersen's testing of the top 20 license
20 contracts in 2Q (sic) '01.
21   A  There should be documentation in there
22 regarding the HP contract.
23   Q  And that -- so if that document, if that
24 documentation exists, that means Andersen reviewed the
25 HP deal and determined that it met the requirements of

154

1  SOP 97-2; right?
2    MR. SIDORSKY: Objection to form.
3    THE WITNESS: That would be correct.
4    MR. GREENSTEIN: Okay. We can take lunch, if
5  you want.
6    THE VIDEOGRAPHER: Off the record. The time
7  is 12:34 p.m.
8    (Lunch break taken.)
9    THE VIDEOGRAPHER: We are back on the record.
10 The time is 1:37 p.m.
11   MR. GREENSTEIN: Q. Good afternoon,
12 Mr. Matuszak. Earlier we were talking about Andersen would
13 management representation letters that Andersen would
14 help draft and that Oracle would actually send to
15 Andersen in connection with quarterly reviews.
16   Do you recall testifying about that?
17   A  Excuse me. Yes, I recall the conversation.
18   Q  Now, who signed those representation letters
19 for fiscal year 2001 on behalf of Oracle? Do you
20 recall?
21   A  I believe they were signed by Jeff Henley,
22 Jennifer Minton, and Tom Williams, and that's my
23 recollection.
24   Q  Okay. And -- and do you know why
25 Larry Ellison didn't sign those?

155

1    MR. SIDORSKY: Objection to form.
2    THE WITNESS: I -- I believe the -- the
3  letter was typically signed by the chief financial
4  officer and corporate controller. I don't believe
5  there was a requirement that you had the CEO or
6  chairman sign those letters.
7    MR. GREENSTEIN: Okay.
8    Q  Now, you said you read a copy of the
9  complaint in this litigation yesterday in your meeting
10 with Mr. Sidorsky; right?
11   A  We --
12   MR. SIDORSKY: Objection to form.
13   THE WITNESS: We reviewed some portions of
14 the complaint. I did not read the entire complaint.
15   MR. GREENSTEIN: Okay.
16   Q  And forgive me if I've asked -- I've already
17 asked this question, but did reading the complaint
18 refresh your recollection about anything that occurred
19 at Oracle during fiscal year 2001?
20   A  No, not the portions of the complaint that I
21 read.
22   Q  Okay. Did the -- did seeing the complaint at
23 all refresh your recollection about events that
24 occurred at Oracle in fiscal year 2001?
25   A  No.

156

1    Q  Okay. Going back to Matuszak No. 1, I'd like
2  to point you to page 081755.
3    A  Okay.
4    Q  So earlier we were talking about a deal with
5  Hewlett-Packard in the second quarter of 2001, and
6  this appears to be a presentation, or you discuss that
7  deal; is that fair to say?
8    MR. KONOVALOV: I'm just going to make a
9  standing objection here. This is well outside of the
10 scope of what's alleged in the complaint. I've given
11 you substantial latitude. Judge Infante talked about
12 the scope of this deposition.
13   At some point, you know, we're going to have
14 to be reasonable about how much you're going to
15 explore. The periphery is fine, but you've devoted a
16 good deal of time to it, so I want the standing
17 objection on the record.
18   MR. GREENSTEIN: Okay. That's noted.
19   Just for the record -- well, your objection
20 is noted.
21   MR. KONOVALOV: I mean -- I just -- I'm
22 not -- the issue is expressly addressed by
23 Judge Infante at the motion to quash for this
24 particular deposition.
25   MR. GREENSTEIN: Well, I was at that hearing,

157

1  and it wasn't.  His order said that we were entitled
2  to take a deposition on the discovery plan which was
3  the accounting issues related to the discovery plan.
4  That includes debit memos.  It includes the
5  November 17, 2000, on account cleanup.
6          MR. SIDORSKY:  But he expressly talked about
7  the issue of the scope --
8          MR. GREENSTEIN:  Hold on.
9          MR. SIDORSKY:  -- of this deposition.
10         MR. GREENSTEIN:  I'm not done.
11         And there are 148 debit memos that are
12  attributed to Hewlett-Packard.  There -- there's also
13  at least one credit memo that we know about that
14  relates to those debit memos, and therefore I think
15  that Hewlett-Packard is -- is reasonably calculated to
16  lead to discovery of admissible evidence related to
17  the scope of Judge Infante's order, so --
18         MR. SIDORSKY:  We disagree.  I understand
19  your position.  We're going to have to agree to
20  disagree.  I just want the objection noted.
21         MR. GREENSTEIN:  Okay.
22     Q   So looking at this first bullet point where
23  it says "30 million hardware guarantee," do you see
24  that?
25     A   Yes.

158

1      Q   Well, let me back up.
2          Why were you -- why in this presentation were
3  you singling out this transaction?
4      A   Most likely because of the -- the purchase
5  commitment, the $30 million purchase commitment, being
6  entered into on or around the same time as the license
7  agreement.
8      Q   Okay.  When you say "purchase commitment," do
9  you mean Oracle was committing to purchase 30 million
10  in hardware from HP in connection with HP's agreement
11  to purchase software licenses from Oracle?  Right?
12     A   Well, I wouldn't say that it was in
13  connection with.  It was on or around the same time.
14     Q   Okay.  So are you testifying that the
15  commitment from Oracle to purchase 30 million in
16  hardware was not related to or not contingent upon
17  HP's -- sorry.  Let me strike that.
18         Are you testifying that Oracle's commitment
19  to purchase 30 million in hardware from
20  Hewlett-Packard was not in any way contingent upon
21  HP's commitment to purchase Oracle software?
22         MR. KONOVALOV:  Objection; assumes facts not
23  in evidence, and vague and ambiguous as to
24  "contingent."
25         MR. SIDORSKY:  Objection to form.

159

1          THE WITNESS:  What I'm suggesting is that I
2  don't think it was explicit that either one of them
3  were contingent upon the other.  Again, I don't have
4  the documents in front of me, but your -- your
5  statement, I believe, indicated that one was
6  contingent upon the other, and I don't know that
7  that's a factually correct statement.
8          There were two agreements that were entered
9  into on or around the same time.  Without the
10  agreements in front of me, it would be speculating to
11  say that one was contingent upon the other.
12         MR. GREENSTEIN:  Okay.
13         THE WITNESS:  I was trying to clarify that.
14         MR. GREENSTEIN:  Okay.
15     Q   You said expressly contingent.  So if there
16  was some implied contingency between the two companies
17  that the purchase by Oracle for 30 million of hardware
18  was contingent upon HP purchasing a certain amount of
19  software -- let me strike that question.
20         Were you aware, during this presentation, of
21  any implied contingency between Oracle's commitment to
22  purchase HP hardware and HP's commitment to purchase
23  Oracle software?
24         MR. KONOVALOV:  Objection; vague and
25  ambiguous as to "implied."  Assumes facts not in

160

1  evidence.
2          MR. SIDORSKY:  Objection to form.
3          THE WITNESS:  Again, I can't testify as to
4  contingency or implied contingency.  What I can
5  testify is to the factual statement that there were
6  two agreements that were entered into on or around the
7  same time.  Whether one was contingent upon the other,
8  I don't recall if it was, nor would I speculate
9  without specific recollection.
10         MR. GREENSTEIN:  Okay.
11     Q   Well, does it matter under SOP 97-2 if the
12  two commitments were contingent upon each other?  Does
13  that affect the analysis at all?
14         MR. SIDORSKY:  Objection to form.
15         MR. KONOVALOV:  Objection; incomplete
16  hypothetical.
17         THE WITNESS:  Without reading the specific
18  contract and reading the wording as to the
19  contingency, and what that contingency said, it would
20  be -- be speculation as to whether or not that would
21  impact the -- the revenue recognition.
22         MR. GREENSTEIN:  Q.  Well, but if -- if
23  Oracle agreed to purchase -- if Oracle agreed to
24  purchase 30 million in hardware from HP because HP
25  agreed to purchase a certain amount of software from

161

1 Oracle, would that affect your analysis under 97-2 of
2 whether revenue could be recognized on that
3 transaction?
4     MR. KONOVALOV:  Well, objection.  It's a
5 hypothetical, and it assumes facts not in evidence.
6     THE WITNESS:  We would have reviewed the --
7 the transactions as being concurrent transactions
8 entered into on or about the same time.
9     If there was specific guarantee language in
10 there, would it have impacted it?  I mean, specific,
11 you know, contingent -- one contingent on the other
12 would have impacted it, I don't know.  Possibly not.
13     MR. GREENSTEIN:  Q.  But it could potentially
14 impact it; right?
15     MR. SIDORSKY:  Objection to form.
16     THE WITNESS:  I -- I said possibly not.  So
17 possibly so, possibly not.
18     MR. GREENSTEIN:  Okay.
19     Q  Now, you said looking at the contract.  Now,
20 what if there was -- what if there was a contingent --
21 an agreement that wasn't in the contract that made the
22 purchase from HP contingent upon HP's purchase from
23 Oracle?
24     MR. KONOVALOV:  Objection.
25     MR. GREENSTEIN:  Q.  Would that affect the

162

1 analysis?
2     MR. KONOVALOV:  Sorry.  Objection; incomplete
3 hypothetical; assumes facts not in evidence.
4     MR. SIDORSKY:  Objection to form.
5     MR. KONOVALOV:  Calls for speculation.
6     THE WITNESS:  I'm sorry.  I don't -- I don't
7 understand the question.
8     MR. GREENSTEIN:  Okay.
9     Q  My question is, if -- setting aside the terms
10 of the actual contract, if you --
11     A  The license contract?
12     Q  Yes.
13     If you knew, at that time, that there was
14 some -- there was some agreement between Oracle and HP
15 that wasn't in the contract that made Oracle's
16 purchase of HP's hardware contingent upon HP's
17 purchase of Oracle's software, if you knew that, would
18 that affect your analysis under 97-2?
19     MR. SIDORSKY:  Objection; incomplete
20 hypothetical; assumes facts not in evidence; calls for
21 speculation; lacks foundation.
22     MR. KONOVALOV:  Objection to form.
23     THE WITNESS:  If we're aware that -- of the
24 two agreements, we would have considered the existence
25 of both agreements when we looked at the revenue

163

1 recognition on the contract.
2     The -- the fact that the first bullet under
3 there says $30 million hardware purchase implies that
4 we were aware of it and it factored into our analysis
5 of revenue recognition under that contract in the
6 quarter.
7     MR. GREENSTEIN:  Right.
8     Q  But what I'm asking is a little different.
9 What I'm asking is, if there was an agreement between
10 HP and Oracle outside of the expressed terms of the
11 contract, there was an agreement that made Oracle's
12 purchase of HP hardware contingent upon a certain
13 amount of software being purchased by HP, would that
14 affect your analysis as an auditor or reviewing this
15 quarter under 97-2?
16     MR. KONOVALOV:  Same objections.
17     MR. SIDORSKY:  Same objection.
18     THE WITNESS:  I'm sorry.  Could you repeat
19 that?  Just read back that question.  I want to make
20 sure I clearly understand, because you were talking
21 about a couple of different things.
22     (Whereupon, record read by the Reporter as
23 follows:
24     "Question:  But what I'm asking is a little
25     different.  What I'm asking is, if there was

164

1     an agreement between HP and Oracle outside
2     of the expressed terms of the contract,
3     there was an agreement that made Oracle's
4     purchase of HP hardware contingent upon a
5     certain amount of software being purchased
6     by HP, would that affect your analysis as an
7     auditor or reviewing this quarter under
8     97-2?")
9     MR. KONOVALOV:  Same objections.
10     THE WITNESS:  Purchase of -- excuse me --
11 purchase of HP's hardware contingent upon them
12 licensing Oracle's software.
13     MR. GREENSTEIN:  No, let me -- let me just
14 withdraw that.  What I meant to say --
15     A  That's what I'm trying to clarify.  That's
16 what your question said.
17     Q  Sorry.
18     What I meant to say was, if outside the terms
19 of the contract there was evidence that HP's purchase
20 of Oracle's software was contingent upon Oracle buying
21 hardware from HP, would that affect your analysis in
22 second quarter of '01 under 97-2 as to whether the
23 revenue could be recognized?
24     MR. KONOVALOV:  Incomplete hypothetical;
25 assumes facts not in evidence.

165

1      MR. SIDORSKY: Objection to form.
2      THE WITNESS: I don't -- I don't know. I --
3  certainly we would have considered that factual
4  evidence. You know, being right here, I don't know
5  specifically how that would have impacted it if one
6  was directly contingent on the other.
7      MR. GREENSTEIN: Oh, okay.
8      THE VIDEOGRAPHER: I was hearing tapping. It
9  sounds like a clock.
10      MR. GREENSTEIN: Okay. Sorry.
11      THE WITNESS: Nor do I know whether that's
12  factually correct or not in this case.
13      MR. GREENSTEIN: Okay.
14      THE WITNESS: So I prefer not to -- to
15  speculate on the facts or the answer.
16      MR. GREENSTEIN: Okay.
17      Q  So when -- before you made this presentation
18  where -- this presentation here about this deal, what
19  did -- what did Andersen review to provide you with
20  support to make this presentation?
21      A  You mean what did Oracle present us to
22  review?
23      Q  Yeah.
24      What -- what did Andersen review in
25  connection with this transaction in the second quarter

166

1  of '01?
2      A  Well, my assumption, I don't know
3  specifically what we reviewed, would have been that we
4  would have looked at the license agreement, and we
5  would have looked at whatever agreement evidenced
6  the -- their commitment to purchase hardware.
7      The license agreement between Oracle and
8  Hewlett-Packard, and then whatever the other agreement
9  was that evidenced the commitment to purchase
10  $30 million, Oracle's commitment to purchase
11  $30 million of hardware from Hewlett-Packard.
12      Q  Okay. And if that evidence -- well, strike
13  that.
14      What evidence did you review, do you recall,
15  in the second quarter of '01?
16      A  Well, if you're asking me do I specifically
17  recall the agreements I reviewed, the answer is no, I
18  don't; okay. All I -- all I know is we -- we would
19  have received documents and agreements from Oracle,
20  and we would have reviewed them. I don't recall, you
21  know, five years after the fact what specific
22  documents I reviewed and what they looked like.
23      Q  Okay. But based on your experience, you
24  would review at least the license contract itself;
25  right?

167

1      A  That's correct. We would have reviewed the
2  license agreement.
3      Q  Okay. Now, would you have reviewed any
4  e-mail from Oracle to HP to determine what the
5  contingencies were, if there were any, between the two
6  commitments?
7      MR. KONOVALOV: Objection; incomplete
8  hypothetical.
9      MR. SIDORSKY: Yeah, objection. That --
10  that's really lacking in foundation; hypothetical;
11  calls for speculation.
12      MR. GREENSTEIN: Okay.
13      Q  Did you review any e-mails back in the second
14  quarter of '01 in connection with this transaction?
15      A  I don't recall.
16      Q  Okay. Do you know if anybody reviewed any
17  e-mails between HP and Oracle regarding the
18  commitments involved in this transaction?
19      MR. SIDORSKY: Anyone from Arthur Andersen?
20      MR. KONOVALOV: Objection; vague and
21  ambiguous as to "commitment."
22      THE WITNESS: Again, I don't recall what
23  specific documents were reviewed as a part of this
24  transaction.
25      MR. GREENSTEIN: Okay.

168

1      Q  Do you recall any conversations at all about
2  this deal in the second quarter of '01?
3      A  I recall having discussions regarding this
4  contract. I don't recall specific conversations we
5  had surrounding this contract.
6      Q  Okay. Well, what do you recall even
7  generally about your discussions about this contract?
8      A  Well, I recall trying to obtain an
9  understanding of the commitment to purchase
10  $30 million of hardware, understanding what Oracle's
11  normal procurement budget was for capital equipment,
12  for servers and, you know, other hardware equipment,
13  what they normally purchased from Hewlett-Packard,
14  what the price was on the equipment they purchased
15  from Hewlett-Packard, and how that related to the
16  price that they would purchase equipment under this
17  arrangement; and based upon all of the discussions we
18  had and documents we reviewed, this $30 million
19  purchase was -- you know, other than the fact that it
20  was signed at the same time as the license agreement,
21  it was a normal hardware purchase.
22      They purchased a significant amount of
23  hardware from Hewlett-Packard, and the prices weren't
24  any different. My recollection is the prices weren't
25  any different than any of the other purchases they had

169

1 with Hewlett-Packard.
2 Q. Okay. So is it fair to say that Andersen's
3 conclusion after reviewing all the evidence and all
4 the documents provided to you regarding this deal --
5 was it Andersen's conclusion that the $30 million
6 hardware purchase -- sorry -- that HP's purchase of
7 Oracle's software was not contingent at all in any way
8 upon Oracle's $30 million hardware purchase from HP?
9     MR. KONOVALOV: Objection.
10    MR. SIDORSKY: Objection to form.
11    MR. KONOVALOV: Vague and ambiguous.
12    THE WITNESS: So earlier you asked me how I
13 would respond if it was contingent. I told you I
14 didn't know. Now you're asking me whether if this is
15 contingent, was it contingent, and how we conclude it?
16    So my answer is, I don't know that it was
17 contingent, but management concluded that it was
18 appropriate to recognize revenue under that license
19 arrangement. And Andersen, after reviewing all the --
20 the evidence that was provided to us, concurred with
21 management's agreement.
22    MR. GREENSTEIN: Okay.
23    Q But I'm asking you if in concurring with
24 management's decision, did you conclude that there was
25 any contingency between HP's purchase of software and

170

1 Oracle's purchase of hardware?
2     MR. SIDORSKY: Objection to form.
3     THE WITNESS: And again I -- I think I've
4 responded that I don't know whether one was
5 specifically contingent upon the other.
6     MR. GREENSTEIN: Q. But I'm asking what your
7 conclusion was in order to -- to agree with
8 management.
9     In order to agree with management, Oracle's
10 management, to recognize revenue, didn't you have to
11 either conclude -- didn't you have to conclude that
12 they weren't contingent?
13    MR. SIDORSKY: Objection.
14    MR. GREENSTEIN: Q. The purchases weren't
15 contingent under the -- under SOP 97-2?
16    MR. SIDORSKY: Objection.
17    MR. KONOVALOV: Objection; vague and
18 ambiguous; it's argumentative.
19    MR. SIDORSKY: Yeah, objection to form. It's
20 been asked and answered. It is calling for
21 speculation. It's based on facts and evidence.
22 It's -- it's -- it's assuming things that -- without
23 foundation. Objection to form.
24    THE WITNESS: I -- I don't know that we had
25 to specifically conclude that they were not

171

1 contingent, because I don't have the documents in
2 front of me.
3     As I said, we -- we reviewed the license
4 agreement in an effort to determine if there was value
5 associated with it. We reviewed the license -- excuse
6 me -- the purchase commitment to see if there was
7 value associated with it. We reviewed the license
8 agreement for its compliance under rev -- Oracle's
9 revenue policy.
10    MR. GREENSTEIN: Okay.
11    Q Did Andersen ever do a determination or an
12 analysis of whether the licenses sold to
13 Hewlett-Packard were for functionality that existed at
14 the time of the purchase?
15    MR. KONOVALOV: Objection; vague and
16 ambiguous.
17    MR. SIDORSKY: Objection to form.
18    THE WITNESS: I can't answer with respect to
19 this specific agreement, but part of our procedures on
20 the quarterly revenue would be to look at the products
21 that were licensed and shipped under the agreement and
22 to see if they were part of the currently available
23 list of products.
24    MR. GREENSTEIN: Okay.
25    Q What if they weren't part of the currently

172

1 available listed product?
2     MR. SIDORSKY: Objection; incomplete
3 hypothetical.
4     THE WITNESS: Well, then that would impact
5 their revenue recognition.
6     MR. SIDORSKY: Objection to form.
7     MR. GREENSTEIN: Q. That would preclude it?
8     THE REPORTER: I'm sorry. You were double --
9 you said, "Well then," and you said, "Objection"?
10    MR. SIDORSKY: Objection to form.
11    MR. GREENSTEIN: Q. That would preclude
12 revenue recognition; wouldn't it?
13    A If a product is not available, it can't be
14 shipped. If a product cannot be shipped, it cannot be
15 recorded as revenue.
16    Q Okay. See there on the second bullet point
17 where it says 11th month -- "11 month term
18 license/lease that converts to the perpetual final
19 payment."
20    Do you see that?
21    A Yes.
22    Q Now, what does that mean, "License/lease that
23 converts to the perpetual final payment"?
24    THE REPORTER: I need to change my disc after
25 the answer.

173

1    THE WITNESS: My recollection of this
2  agreement is that the payment terms were somewhat
3  unique and that it was an 11th -- a 11-month -- the
4  structure of it was in the form of a lease, but at the
5  end of the final payment it converted to a perpetual
6  license.
7    MR. GREENSTEIN: Okay.
8    Q  So -- I'm sorry. Go ahead.
9    A  Go ahead.
10   Q  Do you need -- all right. Should we go off
11  the record?
12   THE VIDEOGRAPHER: This is a good time to
13  change the tape as well. So we are going off the
14  record. Here marks the end of videotape number two,
15  Volume I, in the deposition of Gary Matuszak. The
16  time is 2:01 p.m.
17   (Short break taken.)
18   THE VIDEOGRAPHER: We're back on the record.
19  The time is 2:06 p.m.
20   Here marks the beginning of videotape three,
21  Volume I, in the deposition of Gary Matuszak.
22   MR. GREENSTEIN: Q. Mr. Matuszak, I'm
23  looking at 081755 again.
24   A  Yes.
25   Q  We were talking about the "11 month term

174

1  license/lease that converts to the perpetual final
2  payment."
3    A  Yes.
4    Q  I think you testified that that was -- it was
5  a lease which at the end of -- which at the end of the
6  lease converted to the actual purchase of a license;
7  right?
8    MR. KONOVALOV: Objection; misstates the
9  witness's testimony.
10   THE WITNESS: Well, I'm not sure what you
11  mean by "purchase," so let me clarify what I -- what I
12  said is it was -- the -- the form of the agreement was
13  a lease, but at the end of the 11th payment, is my
14  recollection, the lease automatically -- the license
15  automatically converted into a perpetual license
16  agreement.
17   MR. GREENSTEIN: Q. And it converted if the
18  final payment was made; right?
19   A  Correct.
20   Q  So what if a final payment wasn't made?
21   MR. KONOVALOV: Objection; incomplete
22  hypothetical.
23   MR. SIDORSKY: Objection to form.
24   MR. KONOVALOV: Calls for speculation.
25   THE WITNESS: The license agreement would

175

1  have terminated, or the lease would have terminated.
2    MR. GREENSTEIN: Okay.
3    Q  So under 97-2 -- well, strike that.
4    So are you aware that Oracle recognized all
5  the revenue with respect to this license/lease in the
6  second quarter of '01?
7    MR. KONOVALOV: Objection; vague and
8  ambiguous, and assumes facts not in evidence.
9    MR. SIDORSKY: Objection to form.
10   THE WITNESS: My recollection is they -- they
11  recognized license revenue under this agreement. I
12  don't know how much, whether it was all of it,
13  but.....
14   MR. GREENSTEIN: Q. Now, if it was just a --
15  if it was just a pure lease transaction, in other
16  words, there was no conversion with the final payment,
17  would Oracle be able to recognize the revenue in the
18  second quarter, or would they have to recognize it
19  ratably over the period of the lease?
20   MR. KONOVALOV: Objection; incomplete
21  hypothetical.
22   MR. SIDORSKY: Yeah, objection to form; just
23  hypothetical accounting questions; objection.
24   THE WITNESS: I don't recall. I'm not
25  being -- I don't recall how the leases or a lease

176

1  versus a license fit into 97-2 or their revenue
2  policy.
3    MR. GREENSTEIN: Q. Weren't you a member of
4  the AICPA task for -- on SOP 97-2 at one point?
5    A  I was, yes.
6    Q  Okay. So just based on -- on your experience
7  on that task force and your experience, you know, as a
8  senior partner at Andersen, just generally, do you
9  know how a lease -- how the revenue for a lease
10  agreement is recognized?
11   MR. SIDORSKY: I'm going to object. The
12  witness is not here as an expert to testify about
13  abstract and hypothetical questions on SOP 97-2 or
14  other accounting issues. He's really here as a a --
15  a fact witness, so I object, and objection to the
16  form.
17   Do you have the question?
18   THE WITNESS: Yeah, yeah. I'm trying to
19  remember.
20   MR. SIDORSKY: Okay.
21   THE WITNESS: I'm not sure that the -- that
22  the form of the arrangement is -- is that critical,
23  whether it was a 11-month term agreement or an
24  11-month lease.
25   So it would depend upon the term of the

177

1  arrangement and whether or not -- yeah, it would
2  depend upon the term of the arrangement, because you
3  could recognize license upfront on a term license
4  arrangement.  If that was structured in the form of a
5  lease, I'm not sure that it would matter that you're
6  leasing versus licensing for a period of time.
7      Q.  Okay.  Are you aware that this 11-month
8  license/lease in the second quarter of '01 only
9  converted to a perpetual license if HP paid a
10  $2.1 million final payment?
11      MR. KONOVALOV:  Objection; assumes facts not
12  in evidence.
13      THE WITNESS:  I don't know what the -- the
14  payment terms were over the 11-month term, so I don't
15  know what the payment -- whether it was two -- I don't
16  know.
17      MR. GREENSTEIN:  Okay.
18      Q.  Did you know at the time you made this
19  presentation what the terms of the payments were?
20      MR. SIDORSKY:  Objection to form.
21      THE WITNESS:  The -- the payment terms would
22  have been included in as part of the license
23  arrangement, presumably.  So it's speculation that we
24  would have been aware of the payment terms when we
25  reviewed the -- the agreement.

178

1      MR. GREENSTEIN:  Okay.
2      Q.  So in the context of this deal, if -- if at
3  the end of -- strike that.
4      Are you aware that as part of this 11-month
5  term license lease, that the final payment was -- that
6  would convert it, that would purportedly convert it,
7  was due more than 12 months after the date that the
8  contract was entered into?  Do you know that?
9      MR. KONOVALOV:  Objection; assumes facts not
10  in evidence; lacks foundation.
11      THE WITNESS:  I don't recall the specific
12  payment terms.
13      MR. GREENSTEIN:  Okay.
14      Q.  If you knew that there was a, what you call,
15  a license/lease that converts to a perpetual with a
16  final payment and that -- that contract was signed on
17  the last day of the quarter, and then the final
18  payment wasn't due until more than 12 months after
19  that, the date that the contract was signed, would
20  that affect your analysis of whether the revenue could
21  be recognized under SOP 97-2?
22      MR. KONOVALOV:  Objection; incomplete
23  hypothetical.
24      MR. SIDORSKY:  Objection to form.
25      MR. KONOVALOV:  It's improperly seeking an

179

1  expert opinion from a lay witness.
2      THE WITNESS:  In the -- well, it would depend
3  on if you're -- in the case of Oracle, I believe the
4  answer is no.
5      MR. GREENSTEIN:  Q.  So that wouldn't -- you
6  wouldn't -- that fact wouldn't be part of your
7  analysis of whether to recognize revenue on a deal
8  with Oracle?
9      MR. SIDORSKY:  Objection to form.
10      MR. KONOVALOV:  Same objections.
11      THE WITNESS:  Well, Oracle had a number of
12  contracts with payment terms beyond 12 months, and the
13  license revenue was recorded on those contracts,
14  assuming they met all the other criteria of 97-2,
15  irrespective of the fact that some of the payments
16  were beyond 12 months.
17      MR. GREENSTEIN:  Okay.
18      Q.  Were there any license/leases that converted
19  to perpetual that had those terms?
20      MR. KONOVALOV:  Objection; calls for
21  speculation.
22      THE WITNESS:  I don't recall.
23      MR. GREENSTEIN:  Okay.
24      Q.  Well, if Oracle recognized -- say the final
25  payment -- the terms of the license agreements said

180

1  that the final payment was 2.1 million, and that HP
2  had the option of either, you know, making that
3  payment or not, now, if they decided not to make that
4  payment, to convert it from a lease to a license
5  agreement, would Oracle be able to recognize that
6  final payment revenue upfront in the second quarter?
7      MR. KONOVALOV:  Objection; incomplete
8  hypothetical; assumes facts not in evidence.
9      MR. SIDORSKY:  Objection; same objection.
10      THE WITNESS:  You know, I -- I don't know.  I
11  don't recall.  I'm not -- not sure how to answer your
12  question.  You're asking me a hypothetical question.
13      MR. GREENSTEIN:  Okay.
14      Q.  What if I -- well, if at the time you
15  analyzed this deal, if you knew that the contract was
16  signed on November 30th, 2000, and it was a 11-month
17  term license/lease that converted to a perpetual with
18  final payment, and that final payment, the terms of
19  that final payment, were that HP would pay 2.1 million
20  in December 2001, which is more than 12 months after
21  this -- the date that the contract was entered into,
22  if you knew those facts, would that affect your
23  analysis of whether that deal could be booked as
24  revenue in the second quarter of '01?
25      MR. KONOVALOV:  Objection; asked and

Matuszak, Gary  8/1/2006  9:14:00 AM

181

1 answered; assumes facts not in evidence; incomplete
2 hypothetical.
3 　　MR. SIDORSKY: Same objection.
4 　　THE WITNESS: If the payment terms were
5 greater than 12 months, it would -- I don't think it
6 would have impacted our conclusion.
7 　　MR. GREENSTEIN: Q. So the fact that HP
8 could decide not to make the final 2.1 million
9 payment, the fact that they had that ability to do
10 that, that didn't affect whether that 2.1 million
11 could be recognized upfront?
12 　　MR. KONOVALOV: Objection; assumes facts not
13 in evidence.
14 　　MR. SIDORSKY: Objection to form; asked and
15 answered as well.
16 　　THE WITNESS: Well, your question was whether
17 or not the payment terms are greater than 12 months.
18 Now you're asking me the question of what would happen
19 if the final payment terms were contingent. Those are
20 two different questions.
21 　　MR. GREENSTEIN: Okay.
22 　　Q  Let's take the latter.
23 　　MR. KONOVALOV: What's the question? Is
24 there a pending question?
25 　　MR. GREENSTEIN: Yeah, let me reask it.

182

1 　　MR. KONOVALOV: Thank you.
2 　　MR. GREENSTEIN: Q. If you knew at the time
3 that you analyzed this deal that the contract was
4 signed on November 30, 2000, and that it had -- in the
5 terms of the deal it gave HP the right to make a final
6 payment of 2.1 million, more than 12 months later,
7 gave them that right, and that if they didn't purchase
8 it, that it would just -- it would never convert from
9 a lease, would that affect your analysis of revenue
10 recognition under 97-2?
11 　　MR. KONOVALOV: Objection; incomplete
12 hypothetical; it's improperly seeking an expert
13 witness from this witness who is not here in an expert
14 capacity.
15 　　MR. SIDORSKY: Objection to the incomplete
16 hypothetical and same continuing objection.
17 　　THE WITNESS: You know, we certainly would
18 have considered it. I -- I -- you know, sitting here
19 today, I don't know how it would have impacted it.
20 You're asking me, you know, hypothetical questions or
21 questions on transactions.
22 　　You know, it's been six years since I looked
23 at this. And, you know, I'm no longer signing audit
24 reports, so I haven't even looked at SOP 97-2 in
25 probably two years. I don't want to speculate as to

183

1 an answer on something that I'm not even sure is
2 factual.
3 　　MR. GREENSTEIN: Okay.
4 　　THE WITNESS: I just --
5 　　MR. GREENSTEIN: Q. So prior to this
6 presentation or during the -- during -- during Q2 '01,
7 did you ever -- Andersen ever look at the -- the terms
8 of the final payment of the 2.1 million, the option to
9 purchase -- buy out the lease?
10 　　MR. KONOVALOV: Well, objection; misstates
11 the evidence.
12 　　MR. SIDORSKY: Objection to form.
13 　　THE WITNESS: Well, what I can tell you is we
14 reviewed agreements, license agreement, and presumably
15 there would have been payment terms in the license
16 agreement; management also reviewed it, management
17 concluded that it was appropriate to recognize
18 revenue.
19 　　We reviewed it and discussed it amongst our
20 team, and we also, I believe, concluded that it was
21 appropriate to recognize the revenue. Beyond that,
22 what the specific terms were and how you would -- how
23 your accounting would change if terms were different
24 is all speculation.
25 　　MR. GREENSTEIN: Okay.

184

1 　　Q  Earlier you testified that if the -- under
2 97-2, if the product that was -- license that was
3 sold -- if the functionality was not available, then
4 it couldn't be delivered; do you remember testifying
5 about that?
6 　　MR. SIDORSKY: Objection to form.
7 　　THE WITNESS: That was a response to one of
8 your questions, yes.
9 　　MR. GREENSTEIN: Okay.
10 　　Q  Now I have a little bit of a different
11 question, which is, if -- if a license is sold by
12 Oracle to a customer and the -- what is sold under
13 that license is available but it doesn't work, would
14 that change the analysis under 97-2, the delivery
15 element?
16 　　MR. KONOVALOV: Objection; incomplete
17 hypothetical.
18 　　MR. SIDORSKY: Yeah, I'm going to object to
19 the incomplete hypothetical, and again it really is
20 calling for these abstract expert opinions under 97-2
21 which is not a part of Mr. Matuszak's deposition and
22 outside of the scope.
23 　　MR. GREENSTEIN: Q. You can answer.
24 　　A  It's -- it's a hypothetical question. As it
25 related to Oracle, we looked to see whether the

185

```
1    product was on the currently available product list,
2    which meant that it went through the company's normal
3    QA testing, including beta testing and other testing
4    with customers before it was released in final
5    version.
6         Q.  Okay.  So -- but did you ever perform an
7    analysis with respect to this deal as to whether the
8    functionality promised to Hewlett-Packard actually
9    worked?
10        MR. KONOVALOV:  Same objections.  Also,
11   assumes facts not in evidence.
12        MR. SIDORSKY:  Same objection.
13        THE WITNESS:  That was not within the scope
14   of our work.
15        MR. GREENSTEIN:  Okay.
16        Q.  So you would look to see if it was available,
17   and how would you do that, to see if it was available?
18        A.  We would have a product and price list as of
19   the date that the contract was executed and look to
20   see if whatever products they ordered were on the
21   currently available product list.
22        Q.  Okay.  And -- and that's what you did with
23   respect to this?  You looked at the current product
24   list to make sure that the -- that the license
25   purchase existed, that the functionality that HP
```

186

```
1    purchased existed --
2         MR. SIDORSKY:  Objection.
3         MR. GREENSTEIN:  Q.  -- or was currently
4    available; correct?
5         MR. SIDORSKY:  Objection to form.
6         THE WITNESS:  My assumption, based on the
7    testing we normally perform, is that with respect to
8    the HP contract, we would have looked -- checked for
9    product availability.
10        Checking for product availability in the HP
11   contract would have meant that we looked at the -- you
12   know, the list that the company had of currently
13   available products and verified that the license --
14   the products licensed under the HP agreement were on
15   that -- on that list.
16        MR. GREENSTEIN:  Okay.
17        Q.  And you wouldn't perform any analysis of
18   whether the products or the module of that product on
19   that list actually worked or had been developed;
20   right?
21        MR. SIDORSKY:  Objection to form.
22        THE WITNESS:  No.
23        MR. GREENSTEIN:  Okay.
24        Q.  Would it change your analysis at all if you
25   looked -- if the products listed on Oracle's available
```

187

```
1    products list, if some of those hadn't even been
2    developed yet, would that change your analysis if you
3    knew that at the time?
4         MR. KONOVALOV:  Objection; assumes facts not
5    in evidence; incomplete hypothetical.
6         MR. SIDORSKY:  Yeah, I'm going to object to
7    the form, too, and also on the scope.
8         THE WITNESS:  If there were unavailable
9    products in the license agreement, that certainly
10   would have been a factor we would have considered.
11        MR. GREENSTEIN:  Okay.
12        Q.  You see the third bullet point on Bates
13   No. 0814755?  It says "Remix/exchange rights on
14   migrated licenses."  Do you know what that means?
15        A.  Generally, yes.
16        Q.  Okay.  What does that mean?
17        A.  Well, remix rights or exchange rights,
18   sometimes they're called, are a provisional license
19   agreement whereby the customer may license a large
20   portfolio of products, but the amount of products they
21   can use are limited to a certain dollar amount based
22   either on list price or some other formula, but the
23   customer has the right to, quote, "remix" what they
24   use within the currently available products that
25   they've licensed under that agreement, but they're not
```

188

```
1    allowed to ever exceed the dollar amount of products
2    they've licensed.
3         Q.  Okay.  Did Andersen perform an analysis or
4    did they perform any analysis or assessment of the
5    terms of that remix exchange prior to this or in
6    2Q (sic) prior to Oracle's recognition of revenue on
7    the deal?
8         A.  Well, I'm not sure what you mean by
9    "analysis."
10        Q.  Well, how did you -- why is that -- why did
11   you have that bullet point in this presentation?
12        A.  Remix and exchange rights/remix rights were
13   not uncommon in the software industry.  However, my
14   recollection is that Oracle did not have a significant
15   amount of these, so it was something we hadn't seen
16   much of, so we thought it was worthy to call it to
17   management's attention that they had remix rights in
18   this agreement.
19        Q.  And what did management say?
20        A.  I don't recall.
21        Q.  Don't remember.
22        Do you remember any specific discussions with
23   Oracle management about this deal in the second
24   quarter of '01?
25        MR. SIDORSKY:  Objection to form.
```

189

1    THE WITNESS: I don't -- I can recall
2    specific comments or conversations. I know we
3    discussed the Hewlett-Packard transaction with
4    management.
5    MR. GREENSTEIN: Okay.
6    Q  Did you ever discuss it with Larry Ellison?
7    A  No.
8    Q  Did you ever discuss it with Jeff Henley?
9    A  This contract would have been on our closing
10   agenda, and the audit committee agenda, both meetings
11   at which Mr. Henley attended.
12   Q  Okay. But do you remember any general
13   discussions you had with him personally about this
14   deal?
15   A  There would have been no personal
16   discussions. It would have been discussions in those
17   meetings, and I don't recall the specifics of the
18   discussions.
19   Q  Okay. You know what, I'd like to go off the
20   record and take a five-minute break.
21   THE VIDEOGRAPHER: Off the record. The time
22   is 2:28 p.m.
23   (Short break taken.)
24   THE VIDEOGRAPHER: We're back on the record.
25   The time is 2:38 p.m.

190

1    MR. GREENSTEIN: Q. Mr. Matuszak, is it --
2    is it typical for Andersen's audit clients to submit
3    management representation letters that are not signed
4    by the CEO?
5    A  Yes.
6    Q  So that's not a unique thing that
7    Larry Ellison didn't sign the representation letter;
8    right?
9    A  No.
10   Q  Okay. Now, earlier you were testifying about
11   we were talking about payment terms under 97-2, and I
12   was asking about what if a payment term or what if a
13   payment was to be made greater than 12 months after
14   the contract was entered into. Do you recall talking
15   about that?
16   A  I do.
17   Q  And I think you said that Oracle had -- was a
18   company where the payment terms under a contract were
19   not always -- the terms -- the payment terms and their
20   contracts weren't always within 12 months; is that
21   fair to say?
22   A  That's correct. They had payment terms at
23   times that extended beyond 12 months.
24   Q  Okay. And my -- under 97-2 -- well, strike
25   that.

191

1    Isn't one of the requirements of SOP 97-2
2    that fees are fixed and determinable? Right?
3    MR. SIDORSKY: Objection to form.
4    THE WITNESS: That's correct.
5    MR. GREENSTEIN: Q. And isn't -- within that
6    umbrella -- within that element, doesn't SOP 97-2
7    require that the payment terms be within 12 months?
8    MR. SIDORSKY: Objection to form.
9    THE WITNESS: The -- I can't quote the
10   literature. But, in general, the requirement is that
11   in order to be fixed and determinable, you have to
12   have a history of collecting, and any payment terms
13   beyond 12 months are -- are presumed to be not fixed
14   or determinable unless a company has a history of
15   entering into contracts with payment terms beyond
16   12 months and collecting those without a history of
17   concessions.
18   MR. GREENSTEIN: Okay.
19   Q  And when you say "history," do you mean with
20   that particular customer that has that extended
21   payment term or in general?
22   MR. SIDORSKY: Objection to form.
23   THE WITNESS: It's not a customer specific
24   requirement.
25   MR. GREENSTEIN: Q. So you're saying if

192

1    Oracle has a history of being able to collect payments
2    that are made beyond 12 months, then that is an
3    exception to the fixed and determinable requirement of
4    SOP 97-2?
5    MR. SIDORSKY: Objection to form; calling for
6    expert testimony.
7    THE WITNESS: No, I wouldn't say it's an
8    exception to the requirement of fixed and
9    determinable, that they still have to have the
10   payments as fixed and determinable, but they -- they
11   could be deemed to be fixed or determinable if the
12   payment terms were -- were beyond 12 months as long as
13   the company had a history of doing those types of
14   arrangements and collecting on them.
15   MR. GREENSTEIN: Okay.
16   Q  Now, what if a payment term went beyond
17   12 months and -- and the customer had the option of
18   paying it or not? Would that meet the fixed and
19   determinable element of SOP 97-t?
20   MR. KONOVALOV: Objection.
21   MR. SIDORSKY: Again, objection; it's -- it's
22   an incomplete hypothetical; it's calling for
23   speculation and really asking for expert-type
24   testimony.
25   MR. KONOVALOV: Join in all those objections.

193

1       THE WITNESS:  Beyond 12 months, and they had
2   the option of paying for it, it may impact the revenue
3   recognition, yes.
4       MR. GREENSTEIN:  Q.  It may preclude it;
5   right?
6       MR. KONOVALOV:  Same objections.
7       THE WITNESS:  It may impact it and preclude
8   it on that final payment.  It may impact it, yes.
9       MR. GREENSTEIN:  Okay.
10      Q  Have you ever heard of account 25005 entitled
11  "Customer Overpayments" with respect to Oracle?
12      MR. SIDORSKY:  We -- we did touch on that
13  this morning.  You did ask that, I believe, Eli, but
14  okay.
15      MR. GREENSTEIN:  Okay.  So the objection is
16  asked and answered; right?
17      MR. SIDORSKY:  Correct.
18      MR. GREENSTEIN:  Great.  Thank you.
19      THE WITNESS:  I'm generally aware of that
20  account, yes.
21      MR. GREENSTEIN:  Okay.
22      Q  Do you -- and do you know -- how are you
23  aware of that account?  Is it because of your
24  experience back in 2001 or -- strike that.
25      How did you become aware of account 25005,

194

1   customer overpayments?
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  Well, I was -- I was aware of
4   it in 2001, and my memory was refreshed as I reviewed
5   the work papers yesterday as to the account and the
6   general reason for the account.
7       MR. GREENSTEIN:  Q.  And what do you know
8   about account 25005?  What's the purpose of it?
9       MR. SIDORSKY:  Objection to form.
10      THE WITNESS:  Well, my recollection is that
11  it is used for payments which the company receives
12  from the customer which cannot, at the time the
13  payment is received, be identified with either a
14  particular customer, or possibly a customer but not a
15  specific invoice.  So they're -- they're put into this
16  account because it cannot be applied to a particular
17  receivable balance.
18      MR. GREENSTEIN:  Okay.
19      Q  And how do you know that that's the purpose
20  of the account?
21      MR. SIDORSKY:  Objection to form.
22      THE WITNESS:  From reviewing the audit
23  papers.
24      MR. GREENSTEIN:  Okay.
25      Q  I'm sorry.  Reviewing them yesterday or

195

1   reviewing them at the time?
2       A  Well, I know I reviewed them yesterday, and
3   I'm generally familiar with the nature of -- or was
4   familiar with the nature of the accounts.  But, you
5   know, my -- my recollection was refreshed yesterday.
6       Q  Okay.  Are you aware -- strike that.
7       Is account 25005 rolled up into any line item
8   on Oracle's financial statements?
9       MR. KONOVALOV:  Objection; vague and
10  ambiguous.
11      THE WITNESS:  Well, it's -- it's the line
12  item that we referred to earlier this morning.  I
13  believe it's called customer deposits and unearned
14  revenue.
15      MR. GREENSTEIN:  Okay.
16      Q  Did you mean customer advances and unearned
17  revenue?
18      A  That's probably what it's called.
19      Q  Okay.  So account 25005, customer
20  overpayments, is part of the line item customer
21  advances and unearned revenue on Oracle's balance
22  sheet?  Is that fair?
23      A  Yes.
24      Q  Okay.
25      A  Yes.

196

1       Q  Is that an asset or liability?
2       A  It's a liability.
3       Q  And why is it considered a liability?
4       A  Well, because unless or until they can have
5   some reasonable basis to say that it might be a
6   payment of a receivable, they may have to refund the
7   money.  So it's -- it's -- it's a liability in terms
8   of they may not have the right to that cash.
9       Q  Right.
10      Because until they -- until they're able to
11  figure out an invoice to apply to -- a customer to
12  apply that payment to, it's not Oracle's money yet;
13  right?
14      MR. SIDORSKY:  Objection.
15      MR. KONOVALOV:  Objection; calls for a legal
16  conclusion.
17      MR. SIDORSKY:  Yeah, objection to form.
18      THE WITNESS:  Well, I would say that they
19  have to have some basis for whether they classify it
20  as an asset or, excuse me, as a liability or a
21  reduction of an asset in the financial statements, but
22  we're talking about a classification on the balance
23  sheet, just to be clear.
24      MR. GREENSTEIN:  Right.
25      Q  And I was just asking why -- why it's

197

1  classified as a liability rather than an asset. I
2  think you said because until it's -- well, correct me
3  if I'm wrong -- until it's -- until it can be applied
4  to an invoice or linked to a customer, it's -- it
5  might have to be refunded, because it's not Oracle's
6  money yet; is that right?
7      MR. KONOVALOV:  Objection; misstates the
8  witness's testimony.
9      MR. SIDORSKY:  Yeah, objection. What he said
10  is -- is on the record. You asked, and you got the
11  answer, and you now try and sort of restate the
12  answer, so objection to form.
13      MR. GREENSTEIN: I'll ask the question again.
14      MR. SIDORSKY:  All right.
15      MR. GREENSTEIN:  The objection can be asked
16  and answered.
17      Q  But why is 25005 classified as a liability
18  rather than an asset?
19      MR. KONOVALOV:  Objection; asked and
20  answered.
21      THE WITNESS:  Because they receive payment
22  presumably from customers that are making payments to
23  them, and until they can either identify specifically
24  what customer or invoice that relates to or have some
25  other reasonable basis for classification on the

198

1  balance sheet, they would classify it as a customer
2  overpayment.
3      MR. GREENSTEIN:  Okay.
4      Q  And what happens if they can't, if a payment
5  comes into that account, and they can't apply it to an
6  invoice or associate it to a customer?
7      MR. SIDORSKY:  Objection to form.
8      THE WITNESS:  Hypothetical?
9      MR. GREENSTEIN:  Yeah.
10      THE WITNESS:  Well, at some point in time,
11  if -- well, if they're no longer doing business with
12  that customer, presumably at some point in time they
13  would refund them the money.
14      MR. GREENSTEIN:  Okay.
15      Q  Now, why is account 25005 classified as
16  unearned revenue on the balance sheet?
17      MR. KONOVALOV:  Objection; calls for
18  speculation.
19      THE WITNESS:  Well, I think we clarified the
20  caption of the account is customer advances and
21  unearned revenue. So this would presumably be a
22  customer advance if they don't have -- if they can't
23  identify it with a specific invoice or possibly a
24  specific account.
25      MR. GREENSTEIN:  Okay.

199

1      Q  Do you recall ever doing an analysis during
2  the quarterly reviews or the audit -- doing an
3  analysis of the balances in account 25005?
4      MR. SIDORSKY:  Objection to form.
5      THE WITNESS:  I -- I don't recall specific --
6  I don't recall, at the time, doing an analysis of
7  either variations between quarters or an analysis of
8  what's physically in that account. I -- I know that
9  some work was done as part of the year-end audit with
10  the composition of that account.
11      MR. GREENSTEIN:  Okay.
12      Q  What work was done as part of the audit?
13      A  My recollection is we reviewed the detail,
14  some of the detail of that account, and the offsetting
15  contra-asset account that some of it gets classified
16  into.
17      Q  And are you referring to account 12018 called
18  unapplied cash?
19      A  Yes.
20      Q  Okay.  And so what analysis did you do as
21  part of the audit in connection with those two
22  accounts?
23      MR. SIDORSKY:  Objection to form.
24      THE WITNESS:  We typically reviewed the
25  detail of 12018, I believe you said, as part of the

200

1  audit, not the quarters, just to see what was in there
2  and make sure that the -- the amount that was in 12018
3  was a reclassification of some of the items in the
4  population of the, you know, customer overpayment
5  account.
6      So we would look at that to make sure that,
7  you know, they were, in fact, in there in terms of
8  what was being reclassified out to a reduction of
9  receivables.
10      MR. GREENSTEIN:  Okay.
11      Q  And you didn't do any analysis of account
12  12018 or 25005 or during the quarterly reviews; is
13  that fair to say?
14      MR. SIDORSKY:  Objection to form.
15      THE WITNESS:  That's correct. We wouldn't
16  look at the components of what was in those accounts
17  on the quarters.
18      MR. GREENSTEIN:  Okay.
19      Q  Now, can you just describe -- I think you
20  called it reclassification from items in 2505 (sic) to
21  12018.
22      Can you just describe what you mean by
23  "reclassification"?
24      A  Sure.  The -- the balance in 25005 -- I'm
25  sorry. I don't remember all of the account numbers --

201

1    is a credit balance, and so some of the amounts in
2    there were used.  They were treated as a reduction of
3    that credit balance and were moved over as a
4    contra-receivable, so a credit over on the receivable
5    side.
6         So it had the impact of lowering net
7    liabilities, excuse me, lowering current liabilities
8    and lowering current assets but had no impact on net
9    current assets.
10        Q   Okay.  What -- what does that mean?  Why
11   would it have no impact on net current assets?
12        A   Well, current -- net current assets are
13   current assets less current liabilities or working
14   capital.  Some people call it working capital.
15        Q   Uh-huh.
16        A   If you reduce one side the same as you reduce
17   the other side, the difference between the two is
18   still going to be the same.
19        Q   Okay.  Because 1 -- because 25005 is a
20   liability account and 12018 is an asset account, and
21   the debit and credit cancels out; is that what you're
22   saying?
23        A   That's right.
24        Q   Okay.  Andersen didn't do any analysis of
25   those reclassifications on a quarterly basis; did

202

1    they?
2         MR. SIDORSKY:  Objection to form.
3         THE WITNESS:  I don't believe we did.
4         MR. GREENSTEIN:  Okay.
5         Q   And -- but did you -- did Andersen do a
6    fiscal year 2001 analysis of those reclassifications?
7         MR. SIDORSKY:  Objection to form.
8         THE WITNESS:  I believe that the testing that
9    I was explaining earlier was the testing performed as
10   part of the May 31, 2001, audit.
11        MR. GREENSTEIN:  Okay.
12        Q   What did you -- what did Andersen conclude as
13   a result of that analysis?
14        MR. SIDORSKY:  Objection to form.
15        THE WITNESS:  I believe we concluded that
16   we -- we believe the reclassification was appropriate.
17        MR. GREENSTEIN:  Okay.
18        Q   And what is that?  Is that based on your
19   review of work papers?
20        A   Yes.
21        Q   Okay.  And based on your review yesterday of
22   work papers?
23        A   Yeah, yes.
24        Q   Okay.  Do you remember -- other than looking
25   at the work papers, do you recall back during the

203

1    audit where an analysis of the reclassifications was
2    performed?
3         A   No.  Until I looked at the work papers
4    yesterday, I mean, the work papers refreshed my memory
5    on what was there, what work we performed during those
6    time periods.
7         Q   Okay.  Now, as a senior audit partner, would
8    you have been involved in the analysis of those
9    reclassifications at the time of the audit, or was
10   that something you would learn by looking at the work
11   papers?
12        A   I certainly would not have been involved in
13   looking at the detail, performing the testing.  May
14   have been involved in reviewing those particular work
15   papers or the particular explanation for where it was
16   discussed, what work we did.
17        Q   Okay.  Do you recall any issues arising in
18   connection with the customer overpayments account
19   during the quarterly reviews or audit in 2001?
20        MR. KONOVALOV:  Objection; vague and
21   ambiguous.
22        THE WITNESS:  Yeah, I don't -- don't know
23   what you mean by "problems," but I -- I don't recall
24   there being any issues or unusual items related to
25   those.  I don't recall seeing them on our audit

204

1    committee agenda.
2         MR. GREENSTEIN:  Okay.
3         Q   But, I mean, I'm just asking, as you sit here
4    today, do you recall any -- I said issues.  I didn't
5    say problems, actually -- but any issues or problems
6    with the 25005 account during any of the quarters in
7    2001 or during the audit?
8         A   I don't recall any.
9         MR. SIDORSKY:  Objection to form.
10        THE WITNESS:  Sorry.
11        MR. SIDORSKY:  Asked and answered.
12        MR. GREENSTEIN:  I'm sorry.
13        Q   You said you don't recall any; right?
14        A   That's correct.
15        Q   Do you recall any issues or problems arising
16   with respect to account 12018 during any of the
17   quarterly reviews or the fiscal year 2001 audit?
18        A   I do not.
19        Q   Now, during any of the quarterly reviews, did
20   Andersen ever look at the -- the total amount of
21   unapplied cash that was sitting in 25005?
22        MR. SIDORSKY:  Objection to form.
23        THE WITNESS:  When you say look at the total
24   amount, I don't -- don't know what -- we wouldn't have
25   looked at the detail of the amount.  The account

Matuszak, Gary  8/1/2006  9:14:00 AM

205

1  balance would have been on a schedule that we were
2  provided by the company, so we would have been aware
3  of what the balance was.
4       MR. GREENSTEIN:  Q.  And would Andersen
5  ever -- I think earlier you -- well, what happens if a
6  payment comes in from a customer and it's put into
7  account 25005 and then it's never reclassified to
8  12018 because they can't apply it to an invoice or
9  they can't apply it to a particular customer because
10  the customer may no longer be in existence?
11       What would -- what would happen to that
12  payment?
13       MR. KONOVALOV:  Objection; calls for
14  speculation.
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  It -- it is a hypothetical
17  question.  I mean, what -- what happened is the
18  payments that went into that account were the
19  responsibility of credit and collections to follow up
20  on where that payment came from, what customer it
21  applied to, and specifically what invoice it applied
22  to.
23       To ask me what they would do specifically
24  with a payment received from a company that went out
25  of business, I -- I'd be speculating.

206

1       MR. GREENSTEIN:  Okay.
2       Q.  I'm just wondering if Andersen ever did any
3  analysis of -- of what collection -- Oracle
4  collections was doing with respect to payments that
5  were put into 25005.
6       MR. SIDORSKY:  Objection to form.
7       THE WITNESS:  I -- I don't recall if we did
8  any testing on that as part of our year-end audit
9  work.
10       MR. GREENSTEIN:  Q.  Well, you certainly
11  didn't do it in the quarterly reviews; right?
12       A  Correct.
13       Q  Because -- okay.
14       Now, have you ever seen a report generated by
15  Oracle which has a complete list of all the items in
16  the 25005 account?
17       MR. SIDORSKY:  Objection to form.
18       THE WITNESS:  I have not.
19       MR. GREENSTEIN:  Okay.
20       Q  Do you know if anybody at Andersen has ever
21  seen such a report?
22       A  It's somewhat speculation, but I -- if we're
23  going to test the balance at the end of the fiscal
24  year, I would believe someone would have had to look
25  at the detail of that account in order to do any

207

1  testing on it.
2       Q  And so as part of the testing for the -- the
3  2001 audit, do you recall who was in charge of doing
4  the testing with respect to account 25005?
5       A  I do not.
6       Q  Okay.  Would that be an account that -- well,
7  strike that.
8       Do you recall any specific testing done on
9  that account during the year-end audit 2001?
10       MR. SIDORSKY:  Objection to form.
11       THE WITNESS:  I don't recall any testing done
12  specifically on that account, no.
13       MR. GREENSTEIN:  Okay.
14       Q  Generally on that account?
15       A  Well, generally would be only the
16  discussion -- the answer I gave before with respect to
17  the reclassification out of that account into
18  the -- the contra-receivable account.
19       Q  Okay.  But as part of the -- of the 2001
20  audit testing, did you ever -- did Andersen ever do an
21  assessment of the items in 25005 and whether those
22  have been sitting there for many years?
23       MR. SIDORSKY:  Objection to form.
24       MR. KONOVALOV:  Objection; assumes facts not
25  in evidence.

208

1       THE WITNESS:  I don't believe so.
2       MR. GREENSTEIN:  Okay.
3       Q  So, in other words, Andersen wouldn't do an
4  assessment of -- wouldn't look at whether the items in
5  25005 were supposed to be there?  They would look at
6  the reclassification from 25005 to 12018; right?
7       MR. SIDORSKY:  Objection to form.
8       MR. KONOVALOV:  Objection; vague and
9  ambiguous.
10       THE WITNESS:  I don't recall, as I said,
11  doing any testing of components of that -- that
12  account balance.
13       MR. GREENSTEIN:  Okay.  I'd like to mark this
14  next as -- I think it's Matuszak No. 2.
15       (Document marked Exhibit No. 2
16        for identification.)
17       THE WITNESS:  Thank you.
18       MR. GREENSTEIN:  Q.  For the record, this is
19  Bates stamped NDCA-ORCL 050370 through 050382.  It's
20  an "Account Analysis Report.  Period:  August 1991 to
21  May 1992."  Just take a look at it.  Let me know when
22  you're finished.
23       A  The entire exhibit?
24       Q  No, the type of report.
25       A  Okay.

209

1    Q  See how it says "Account Analysis Report"?
2    A  Yes.
3    Q  Have you ever seen this document before?
4    A  No.
5    Q  Okay.  Have you ever seen this type of report
6  before, account analysis reports?
7    A  I don't believe I have.
8    Q  Okay.  You see how it says -- it says
9  "Accounts From," and then it has some digits, and then
10  has 25005?  Do you see that?
11    A  Yes.
12    Q  And based on your experience at Oracle, does
13  this -- this appears to be a report, an account
14  analysis report of account 25005; right?
15    MR. KONOVALOV:  Objection; lacks foundation.
16    MR. SIDORSKY:  Objection to form.
17    THE WITNESS:  Yeah, I'm not sure what this
18  is.  I -- I don't know.
19    MR. GREENSTEIN:  Okay.
20    Q  But it appears to be an account analysis
21  report of 25005?
22    MR. KONOVALOV:  Objection; lacks foundation.
23    THE WITNESS:  I don't know.  It says
24  "Accounts From," and underneath that it says "To," so
25  I don't know --

210

1    MR. GREENSTEIN:  Right.
2    THE WITNESS:  -- if this is activity for an
3  account, and 25005 is sitting in amongst a number of
4  different zeros and digits.  So if you're telling me
5  factually that's what it is, okay.  But if you're
6  asking me what it is, I'm going to tell you I don't
7  know.
8    MR. GREENSTEIN:  Okay.
9    Q  You see how it says "Ending Balance," and it
10  has $0.26 there as a debit?
11    A  Yes.
12    Q  Based on your experience, auditing Oracle,
13  does that indicate that the ending balance for this
14  month where it says "Period August '91" the balance
15  was $0.26 in 25005?
16    MR. SIDORSKY:  Objection; lacks foundation;
17  calls for speculation; the document speaks for itself.
18    MR. SIDORSKY:  Same objections.
19    THE WITNESS:  Again, I've already gone on
20  record with saying I don't know what this piece of
21  paper is.
22    MR. GREENSTEIN:  Okay.
23    THE WITNESS:  Now you're asking me to
24  conclude on whether the ending balance represents the
25  ending -- ending GL balance for a particular account,

211

1  so I think my first answer answers that question.
2    MR. GREENSTEIN:  Okay.  Fair enough.
3    Q  So are you aware that -- well, Andersen was
4  Oracle's auditor in the early '90s; right?
5    A  In the early '90s, yes.
6    Q  And it was Oracle's auditor until April 2002;
7  right?
8    A  Correct.
9    Q  Okay.  And are you aware that the balance in
10  the 25005 account in the early '90s was smaller than
11  the balance in, say, 2001?
12    MR. KONOVALOV:  Objection; assumes facts not
13  in evidence.
14    MR. SIDORSKY:  Objection to form.
15    THE WITNESS:  I -- I would have no basis to
16  answer that.
17    MR. GREENSTEIN:  Okay.
18    Q  Were you -- were you aware that the -- the
19  balance in 25005 ever increased drastically during
20  your time at Andersen?
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  I don't recall the specific
23  balances.  The account fluctuated, but it could
24  fluctuate from quarter to quarter, but it would be
25  based on specific payments that came in from

212

1  customers.
2    It could be large payments that came in at
3  the end of the quarter which would cause it to be
4  larger at the end of the quarter.  Certain quarters
5  had more activity than others.
6    MR. GREENSTEIN:  Right.
7    THE WITNESS:  You know, it's not reasonable
8  to -- to answer as to generally a balance going up or
9  down.  Particularly for this account.
10    MR. GREENSTEIN:  I'd like to mark this as
11  Matuszak No. 3.
12    (Document remarked Exhibit No. 3
13    for identification.)
14    THE WITNESS:  Thank you.
15    MR. GREENSTEIN:  Q.  For the record, actually
16  this was previously marked, why don't we stick with
17  that and take off the sticker, and we'll just call it
18  Chen No. 3.
19    MR. SIDORSKY:  Is it 3 or 2?
20    MR. GREENSTEIN:  No. 3.
21    MR. SIDORSKY:  I think it's Chen 2; right?
22    MAUTNER:  I have 2.
23    MR. GREENSTEIN:  Okay.  Well, why don't
24  you -- why don't you put that aside for now, and
25  I'll -- let's see.

213

1      So this, actually we won't mark this at all.
2   This is -- well, they spelled it wrong. It's actually
3   Chan No. 3. It was marked at the deposition of
4   Julie Chan. They spelled her name wrong, and they
5   spelled it Chen.
6         MR. SIDORSKY: It's already been marked.
7         MR. KONOVALOV: Are you going to have these
8   all attached even though they were previously marked?
9         MR. GREENSTEIN: All what?
10        MR. KONOVALOV: Attached to the deposition.
11        MR. GREENSTEIN: Sure. I don't know how that
12   works, but --
13        MR. KONOVALOV: Is that your normal?
14        THE REPORTER: Yes.
15        MR. GREENSTEIN: Yeah. Take a look at it
16   just generally, and I'll refer you to specific areas.
17      Q   For the record, this was marked as Exhibit 4
18   to the deposition of Julie Chan, and it is Bates
19   stamped. It starts AA 15 and the last page is
20   AA 000181.
21      It's not in consecutive -- well, it's in
22   consecutive order, but there are some missing pages,
23   but this is how it was marked in that deposition.
24   Just let me know when you've --
25      A   Oh, I'm ready, unless you want me to look at

214

1   something specific.
2      Q   Okay. Have you seen this document before?
3      A   Not this particular document. I -- I believe
4   this -- the information in here was part of what I
5   reviewed yesterday with counsel, with my counsel.
6      Q   Okay. Do you recognize this type of document
7   as work papers relating to Andersen's quarterly review
8   of Q1 fiscal year 2001?
9      A   In general, they look familiar.
10      Q   Okay. Where it says "Description" of this
11   file, it says Q1 FY 2001 on the first page?
12      A   Correct.
13      Q   So this appears to be a compilation of
14   documentation related to the quarterly review of
15   Q1 fiscal year 2001; right?
16      A   The cover sheet implies that if these are all
17   from that file, then that would be a correct
18   statement.
19      Q   Okay. Well, you see the signature there? It
20   says "Manager approved for filing"; do you see that?
21      A   Yes.
22      Q   Do you know who that is?
23      A   It appears to be the signature of
24   Lance Taylor.
25      Q   Okay. And who is Lance Taylor?

215

1      A   Lance Taylor was the manager on the
2   engagement at that time period.
3      Q   When it says approved for filing, what does
4   that mean? Filing -- what does "filing" mean?
5      A   That meant that the -- from the perspective
6   of Andersen, the work on that particular file was
7   complete and that it was ready to go into our filing
8   system, so no -- no -- no further documentation or
9   work was required on that file.
10      Q   Okay. And you see the date? It says
11   November 2000 there --
12      A   Yes.
13      Q   -- on the signature?
14      A   Yes.
15      Q   So it appears that these work papers or that
16   that signature of these work papers occurred in the
17   Oracle second fiscal quarter 2001; right?
18      A   Yes.
19      Q   Okay. So it was prepared after the actual
20   quarter had ended, when Q1 had ended; right?
21        MR. SIDORSKY: Objection to form.
22        THE WITNESS: Well, the -- the date that it
23   was approved for filing was subsequent. It was during
24   the second quarter which would have been the point in
25   time that all of our work was completed.

216

1         MR. GREENSTEIN: Right. Sorry. Yeah.
2      Q   But the work was actually performed during
3   the first fiscal quarter, right, or shortly
4   thereafter?
5      A   Most likely shortly thereafter.
6      Q   Or concurrently; right?
7         MR. SIDORSKY: Object.
8         MR. GREENSTEIN: Okay. Yeah.
9         MR. SIDORSKY: Objection to form. All right.
10   I don't -- I don't think the --
11        MR. GREENSTEIN: Q. So is this what the
12   quarterly review work papers generally look like?
13      A   This is what the file cover normally looks
14   like.
15      Q   Right. Okay.
16      If you turn to AA 19, which is actually
17   horizontal, it's a variation analysis of the accounts
18   receivable as of August 31st, 2000, and you've seen
19   this before; right?
20      A   Yes.
21      Q   Okay. And you see how in the top left-hand
22   corner it says "Variation Analysis Accounts
23   Receivable; right?
24      A   I'm sorry. Where?
25      Q   In the top left-hand corner.

217

1    A  Yes.
2    Q  What does that mean, "variation analysis"?
3    A  It -- it was a schedule that listed balances
4  from one quarter to the next along with the variances,
5  and then there was a discussion that we held with
6  management on certain of those variances.
7    Q  Okay.  And how do you know there was a
8  discussion with management on certain of those
9  variances?
10   A  Because at the top right-hand corner it says
11  "Per discussion with Julie Chan, Senior -- Senior
12  Revenue Manager."
13   Q  Okay.  Now, do you -- did you ever work --
14  did you work on this work paper at the time?
15   A  I would have reviewed this work paper.
16   Q  Okay.  Do you recall reviewing it?
17   A  I re -- I recognize a couple of my comments
18  on the work paper.
19   Q  Okay.  Which comments are -- do you recognize
20  that are your comments?
21   A  Under comment B, on the right-hand side,
22  "Other receivables tech support," there is a comment
23  at the end that says "and large Q4 renewals."
24   Q  And that's your handwriting that says "and
25  large Q4 renewals"?

218

1    A  I believe that's my handwriting.
2    Q  Now, do you see any other handwriting on this
3  page?
4    A  Down at the bottom, next to the letter H,
5  where the note says "This reduction is based upon
6  relative activity for the second quarter and
7  consistent with," and appears that some comments are
8  dropped off.  I believe that's my handwriting that
9  says "and consistent with" the two words "prior
10  years."
11   Q  Okay.  Down there it says "See further
12  discussion B15"; you see that?
13   A  Yes.
14   Q  Is that your handwriting?
15   A  That is not.
16   Q  Does that appear to be "JM," whoever that
17  initial is, their handwriting?
18   A  I wouldn't know.
19   Q  Okay.  Do you know who JM is?
20   MR. KONOVALOV:  Objection; lacks foundation
21  that it is JM.
22   MR. SIDORSKY:  Yeah, I think there was
23  some -- there was -- all right.  Objection to form.
24  I'm not -- I think that's right.  I'm not sure it is
25  JM.

219

1    THE WITNESS:  I don't know.  I don't know who
2  that is or what that is.
3    MR. GREENSTEIN:  Okay.
4    Q  So since you wrote the term "prior years" on
5  there, you -- is it fair to say you reviewed this "H,"
6  this summary in "H"?
7    A  Yes.
8    Q  Okay.  And do you know when you reviewed it?
9    A  Not specifically.
10   Q  Well, or if you look at -- see the top -- or
11  sorry.  Below there which has a "B" notation on it,
12  and then it has a "PA," it looks like, and a "TM," and
13  then it has 9/01.  Do you see that?
14   MR. SIDORSKY:  Where are you now?
15   MR. GREENSTEIN:  Q.  Right in the bottom
16  right-hand corner, the notation.
17   MR. SIDORSKY:  Okay.
18   THE WITNESS:  Yeah, I see a "PA," and it
19  looks -- it could be a "9/01."  I'm not sure.
20   MR. GREENSTEIN:  Q.  Right.
21   A  But yes.
22   Q  Do you know what that means, the "B" there?
23   A  "B" would be the work paper index, I believe.
24   Q  But does "B" refer to anything?  Does it
25  refer to accounts receivable, or is it associated with

220

1  accounts receivable?
2    A  "B" would be associated with accounts
3  receivable.
4    Q  Do you know what "PA" is, or what that means?
5    A  Well, I can speculate based on the file
6  cover.  It is most likely Pam Arquelada.
7    Q  Okay.  Well, seeing those dates there --
8  well, the signatures that it looks like -- at least
9  one of them looks like to be 9/01, does that help you
10  refresh your recollection about when you reviewed this
11  particular --
12   A  Well --
13   MR. SIDORSKY:  Objection to form.
14   MR. KONOVALOV:  Lacks foundation that it says
15  9/01.
16   MR. GREENSTEIN:  Q.  Well, does it say 9/01?
17  Does it look like that to you?
18   A  I don't know what it says.  It could be 9/01,
19  I mean.
20   Q  Or it could be what else?
21   A  If this is our Q1 review, it is likely that I
22  reviewed this work paper as part of our quarterly
23  review which would have been in September of 2000.  So
24  9/01 wouldn't make sense given that this is the
25  August 31, 2000, quarter.

221

1    Q  So you said it would be in 9/2000 or
2  September 2000?
3    A  Yes.
4    Q  Okay.  Now, did you write this provision "H"
5  here, the typed notes, or was that just your
6  handwriting that said "prior years"?
7    A  That's just my handwriting at the end.
8    Q  Did you type any of these notes on here?
9    A  I did not.
10    Q  Okay.  Do you see any other of your
11  handwriting of yours on this work paper?
12    A  I do not.
13    Q  Okay.  Now, do you see where that -- this
14  subpart H is associated with the account allowance for
15  bad debt/returns?  Do you see that?
16    A  Yes.
17    Q  Okay.  Is that -- is that comment there --
18  does that relate to that line, "Allowance for bad debt
19  returns"?
20    A  It appears it does.
21    Q  Okay.  And do you know what account 12601 is
22  in those parenthesis under the title "Allowance for
23  bad debt returns"?
24    A  I don't know.  I don't know specifically what
25  any of those accounts are for other than it appears

222

1  that they roll up into the total of the allowance for
2  bad debt/returns.
3    Q  Okay.  Well, do you know, sitting here today,
4  what account 12601 is or was at Oracle during that
5  time period?
6    A  No.
7    Q  Okay.  Do you recall any -- any discussions
8  during your quarterly reviews or audit about that
9  account 12601?
10    A  I don't.  I don't know what it relates to,
11  so --
12    Q  Okay.
13    A  -- how could I recall discussions on it.
14    Q  Okay.  So you wrote here "prior years."  So
15  it says "Decreases as a result of the following:
16  Reduction in management judgement from Q4 to Q1 from
17  26 million to 14 million.  This reduction is based
18  upon relative activity for the quarter and consistent
19  with prior years."
20    Do you see that?
21    A  Yes, I do.
22    Q  So why did -- why did you write that "prior
23  years"?  What does that mean "This reduction is based
24  upon relative activity for the quarter and consistent
25  with prior years"?

223

1    A  The fourth quarter was normally the largest
2  quarter for the company's fiscal -- within their
3  fiscal quarters.  So they would normally have the
4  largest receivable balance at the end of the quarter,
5  and the receivable balance at the end of Q1 would
6  typically be less than it was at the end of the fourth
7  quarter, the prior fourth quarter.
8    So you would anticipate or not be -- not find
9  it unusual to have some corresponding reduction in the
10  reserve along with a reduction in receivables.
11    Q  Okay.  Because there's less receivables, it
12  would -- it's fair to say that there would most likely
13  be less allowance for bad debts on those receivables;
14  right?
15    A  It's -- that's -- it -- it would be
16  reasonable to expect that, yes.
17    Q  Okay.  You see at the top where it says right
18  above the part where it says "Per discussion with
19  Julie Chan," it says "Greater than $5 million variance
20  discussion; you see that?
21    A  Yes.
22    Q  Does that mean everything in here relates to
23  items greater than 5 million?
24    MR. SIDORSKY:  Objection to form.
25    MR. GREENSTEIN:  Q.  What does that mean?

224

1    A  I -- I believe it means that either within an
2  account level or a subaccount or account, you know,
3  subtotal, we would have looked at variations greater
4  than 5 million and had some discussion with
5  Julie Chan.
6    Q  Does this mean that you -- that Andersen
7  didn't have any discussions related to items less than
8  5 million?
9    A  Yeah, most likely that's true.
10    Q  Okay.  If you can turn the page, and it's
11  AA 20.
12    A  Okay.
13    Q  You see this is an Arthur Andersen memo dated
14  September 11th, 2000?  Do you see that?
15    A  Yes.
16    Q  And you see it appears to be -- it says "The
17  purpose of this memorandum is to summarize the
18  significant accounts and accounts receivable"; do you
19  see that?
20    A  Yes.
21    Q  And then it has a list of accounts, and they
22  start with "12"; do you see that?
23    A  Yes.
24    Q  Does that refresh your recollection that the
25  accounts related to accounts receivable all had

225

1  prefixes that began with "12"?
2      A  Generally, yes.
3      Q  Okay.  Now, turn the page to AA 21.
4          You see how there's a -- at the bottom it's
5  "Account 12018 unapplied cash"?
6      A  Yes.
7      Q  Do you see that?
8      A  Yes.  Sorry.
9      Q  Okay.  Now, who -- well, who drafts these
10  descriptions?  Is this something that Andersen drafts?
11     A  Well, this is -- this is an Andersen memo.
12  So I believe it would have been prepared by one of the
13  staff people on the engagement.  Most likely a
14  schedule that was carried forward and updated from
15  quarter to quarter.
16     Q  Okay.  And who's -- is Pamela Arquelada --
17  who was she at the time?
18     A  She's on the front file as one of the
19  experienced staff on the engagement.
20     Q  Okay.  So you didn't draft these
21  descriptions, the account descriptions; did you?
22     A  I did not.
23     Q  Okay.  Did you ever in any of the quarterly
24  reviews -- well, have you ever drafted any of these
25  descriptions of Oracle accounts that are -- that's in

226

1  this memo?
2      A  I did not.
3          MR. SIDORSKY:  Objection to form.
4          THE WITNESS:  Sorry.
5          MR. GREENSTEIN:  Q.  Did you ever review them
6  as part of a quarterly review?
7      A  I probably did at some point.  I don't -- I
8  don't know specifically.
9      Q  Okay.  So you don't recall.
10         Well, during any of the quarterly reviews in
11  fiscal year 2001, do you recall ever having any
12  discussions about any of these accounts?
13     A  The account descriptions in this memo?
14     Q  Yeah, or any of the accounts listed in this
15  memo.
16         MR. SIDORSKY:  I'm going to object as overly
17  broad; vague and ambiguous.
18         THE WITNESS:  Well, it's doubtful that I
19  would have had description of the -- you know, the --
20  the discussion or description of the accounts that are
21  included on B-3.  It appears that I reviewed schedule
22  B.  And whether I had specific discussions with any of
23  our staff or managers or other partners on these, I
24  don't recall.
25         MR. GREENSTEIN:  Okay.

227

1      Q  And you said it appears you saw schedule B or
2  reviewed schedule B.  How do you -- why do you think
3  that?
4      A  Well, I think we already substantiated that
5  my handwriting is on it.
6      Q  Well -- oh, on?
7      A  On B, not B-3.  Sorry.
8      Q  Oh, on the -- on the previous page AA 19;
9  right?
10     A  Yes.
11     Q  Okay.  So that means you reviewed AA 20 as
12  well?
13         MR. SIDORSKY:  Objection to form.
14         THE WITNESS:  20, no, no.
15         MR. GREENSTEIN:  Okay.
16     Q  I just want to make sure.  You don't see any
17  handwriting on -- on AA 20 that would indicate that
18  you reviewed this; right?
19     A  I do not.
20     Q  Okay.  Do you recall reviewing these account
21  descriptions in the first quarter of 2001?
22     A  I do not.
23     Q  Okay.  Do you recall -- if you turn to 21,
24  and if you look at 12018 again, unapplied cash, that
25  was the account we talked about earlier; right?

228

1      A  Yes.
2      Q  Okay.
3      A  One of the accounts.
4      Q  One of the accounts, right.
5          And you see where it says "Consistent"?  In
6  the middle of it says "Consistent with the prior
7  periods, when customer overpayments are received, they
8  are posted to account 25005 - Customer Overpayments";
9  do you see that?
10     A  I see that.
11     Q  Is that consistent with your earlier
12  testimony about what you believe to be the reason for
13  account 25005?
14         MR. SIDORSKY:  Objection to form.
15         THE WITNESS:  Well, it says here "Customer
16  Overpayments."  It could just be customer payments
17  that are not yet applied to a particular invoice.
18         MR. GREENSTEIN:  Right.
19     Q  But the account is entitled "Customer
20  Overpayments"; right?
21         MR. KONOVALOV:  Objection; assumes facts not
22  in evidence.
23         THE WITNESS:  It appears as if the account is
24  entitled "Customer Overpayments."
25         MR. GREENSTEIN:  Right.

229

1    Q  Okay.  So see at the bottom, last sentence,
2  it says "When a related set of invoices are
3  identified, these overpayments are reclassified to
4  account 12018."
5        Do you see that?
6    A  I do.
7    Q  Now, do you know what it means when it says
8  "a related set of invoices are identified"?
9    A  Well, I think this is consistent with my
10  previous testimony and discussion, that when cash is
11  received for which they cannot identify a specific
12  invoice, it goes into 25005, which is entitled in the
13  GL system "Customer Overpayments."
14        Those payments are then analyzed, and when
15  they are identified with a specific customer or
16  otherwise, the company has a reasonable basis to
17  reclassify them, they're reclassified out of the
18  liability account and into account 12018 which is a
19  contra-asset account.
20    Q  Okay.  And what happens if -- it says "When a
21  related set of invoices are identified, those
22  overpayments are reclassified to account 12018"?  Do
23  you see that?
24    A  I do.
25    Q  What happens if a related set of invoices are

230

1  not identified?  What happens to those overpayments?
2        MR. SIDORSKY:  Objection to form.
3        MR. KONOVALOV:  Objection; incomplete
4  hypothetical.
5        THE WITNESS:  Yeah, this is consistent with
6  the discussion we had before.  I -- I don't know what
7  happens if, you know, they would not be reclassified.
8  The payments are investigated by credit and collection
9  to find out what customer they came from and what
10  particular invoice they came from.  If they are never
11  identified, I could only speculate on what the company
12  did.  Presumably they would refund the money.
13        MR. GREENSTEIN:  Okay.
14    Q  And were you aware of any such refunds during
15  your engagements in 2001 with Oracle?
16        MR. SIDORSKY:  Objection to form.
17        MR. KONOVALOV:  It's vague and ambiguous.
18        THE WITNESS:  The -- that was not an area
19  that we -- we focused on during our audit.  Meaning,
20  that what went out or what ultimately was the
21  disposition of overpayments or unidentified payments
22  in 25005.
23        MR. GREENSTEIN:  Okay.
24    Q  And you said as part of your audit you didn't
25  do that, so I'm assuming you didn't do that as part of

231

1  the quarterly review either?
2    A  That's correct.
3    Q  Okay.  If you turn to page AA 23.  By the
4  way, the previous document that we were looking at,
5  was that a lead sheet?
6    A  Which?
7    Q  Which is page --
8    A  Which document?
9    Q  Previous page, AA 19.
10    A  I believe this would have been the lead sheet
11  for domestic receivables.
12    Q  Okay.  Now, if you look at AA 23, does this
13  appear to be the lead sheet for unearned revenue?
14    A  It does.
15    Q  Okay.  And unearned revenue, is that a -- is
16  that the liability line item that we talked about
17  earlier?
18    A  Yes.
19    Q  It doesn't say customer advances on there;
20  does it?
21        MR. SIDORSKY:  The document speaks for
22  itself.
23        THE WITNESS:  It -- it does not in the -- in
24  the heading for the schedule, no.
25        MR. GREENSTEIN:  Okay.

232

1    Q  You see how it has account "25005 Customer
2  Overpayments" there?
3    A  Yes.
4    Q  You see that's underneath "USA Unearned
5  Revenue Accounts"; right?
6    A  That's correct.
7    Q  So why is 25005 classified as an unearned
8  revenue account?
9        MR. KONOVALOV:  Objection; lacks foundation.
10        MR. SIDORSKY:  Yeah, I think it's --
11  objection, also asked and answered a couple of times,
12  but anyway, objection to form.
13        THE WITNESS:  Well, these accounts all rolled
14  up into the same line item in the financial statements
15  which I believe we've clarified was called something
16  like customer advances on unearned revenue.
17        MR. GREENSTEIN:  Okay.
18    Q  You see how it has the balances for 53100 and
19  83100?
20    A  Yes.
21    Q  And there's a variance; do you see that?
22    A  Yes.
23    Q  Now, is it fair to say that's the variance or
24  the difference between the balances as of May 31,
25  2000, and 8/31/2000; right?

233

1    A  Yes.  Between 5/31 -- so end of fiscal year
2  -- fiscal year 2000 and the first quarter of fiscal
3  2001.
4    Q  Right.
5       And it appears that 25005 customer
6  overpayments increased by approximately 70 million;
7  right?
8       MR. KONOVALOV:  Objection; misstates the
9  evidence in the case.
10      THE WITNESS:  On this schedule it appears
11  that way.
12      MR. GREENSTEIN:  Okay.
13    Q  Is there any other schedule that would tell
14  you how much 25005 increased by?
15      MR. KONOVALOV:  Objection; calls for
16  speculation.
17      You can put the document in front of the
18  witness.
19      THE WITNESS:  I know that there was a
20  reclassification of approximately $75 million that
21  reduced this, so there was very little variation
22  between quarters.
23      MR. GREENSTEIN:  Q.  And how do -- how do you
24  know that?
25    A  Well, right now I know it because I looked at

234

1  the Q2 work papers yesterday.
2    Q  So that's in the Q2 work paper?
3    A  I believe -- well, let me restate that.  It
4  was in some work papers I reviewed yesterday.
5    Q  Okay.  Do you see any handwriting on here
6  that's yours?
7    A  I do.
8    Q  Where is that?
9    A  Next to explanation D.
10    Q  Okay.
11    A  The dark handwriting.  This is due to the out
12  of balance from Q4 which was reserved in Q1 of '01.
13    Q  Okay.  So -- and that's under the account
14  "25011 Unearned Revenue Education"; right?
15    A  That's right.
16    Q  And the note says, under D, it says "During
17  Q1 reserves were increased by 20 million," and then
18  your handwriting says "This is due to the, quote, 'out
19  of balance,' unquote, from Q4 which was reserved in Q1
20  '01"; is that what it says?
21    A  That's what it appears to say.
22    Q  Okay.  And what does that mean?
23    A  I don't recall the specifics.
24    Q  Well, what does it mean to be "out of balance
25  from Q4 which was reserved in Q1"?

235

1       MR. SIDORSKY:  Objection to form.
2       THE WITNESS:  I'm trying to remember.
3  There -- there would have been something that was,
4  quote, "out of balance," meaning, probably did not
5  reconcile to the detail, general ledger balance not
6  reconciling to the detail.  So when it was noticed, a
7  reserve was set up to -- until it was further
8  investigated and resolved.
9       MR. GREENSTEIN:  Okay.
10    Q  Do you know what the -- was it ever resolved?
11    A  Again, I -- I don't recall this specific
12  comment.
13    Q  Okay.  But to be out of balance to you means
14  what?
15       MR. SIDORSKY:  Objection; asked and answered.
16       MR. GREENSTEIN:  I'll withdraw that.
17    Q  You see above there on -- on the 25005
18  customer overpayments account, you see there's a
19  letter "A"?
20    A  I do.
21    Q  Okay.  Do you -- well, did you type any of
22  these comments here?
23    A  I did not.
24    Q  Okay.  Do you know who did?
25    A  I do not.

236

1    Q  Okay.  See how it says "Increased over Q4 due
2  to greater cash collections from higher Q4 activity
3  which had not been identified to specific accounts
4  receivable balances.  The increase was offset by the
5  adjustment for the accounts receivable out of balance
6  of 11.2 million"?  Do you see that?
7    A  Yes.
8    Q  So it appears that there was an increase in
9  25005 due to greater cash collections which had not
10  been identified to specific error balances; is that
11  right?
12    A  That's what the note says.
13    Q  Okay.  Do you know what that -- what that
14  means?
15    A  Not other than what it says.
16    Q  Well, what does it mean to you, sitting here
17  today, being the senior audit partner on this --
18       MR. SIDORSKY:  Well, I'm going to object to
19  the form.  I mean, it's written in -- in English, and
20  I don't -- I don't -- you know, I don't quite
21  understand what -- what do you mean what does it mean
22  other than what it says, but objection to form.
23       MR. KONOVALOV:  Objection; document speaks
24  for itself.
25       THE WITNESS:  It -- it implies that there

237

```
1   were greater cash collections in or around the end of
2   Q1 because receivables are higher at the end of Q4,
3   because there are a number of transactions that the
4   company executes near the end of the quarter, near the
5   end of the fiscal year end quarter, so the end of May.
6   So those payments would be received some time in the
7   first quarter of the subsequent fiscal year.
8       MR. GREENSTEIN: Okay.
9       Q   Now, do you know -- did -- do you know what
10  Andersen -- what evidence Andersen had to support this
11  statement that is here under letter "A"?
12      MR. SIDORSKY: Objection to form.
13      THE WITNESS: There's -- there's no notation
14  on the schedule as to who these variances were
15  discussed with.
16      MR. GREENSTEIN: Okay.
17      Q   Did you discuss this particular letter "A,"
18  this increase in 25005, with anybody at the time?
19      A   Well, I don't recall.
20      Q   Okay.
21      A   But I did not prepare this schedule.
22      Q   Okay. You see how it says "The increase was
23  offset by the adjustment for the accounts receivable
24  out of balance for 11.2 million"?  Do you see that?
25      A   I do.
```

238

```
1       Q   What does it mean when it says "To address
2   for the A/R out of balance of 11.2 million"?
3       MR. KONOVALOV: Objection; lacks foundation;
4   calls for speculation.
5       THE WITNESS: Again, I believe that the,
6   quote, "A/R out of balance," end quote, refers to the
7   general ledger balance being different than the
8   accounts receivable trial balance to the extent of
9   11.2 million.
10      MR. GREENSTEIN: Okay.
11      Q   If you turn to AA 81, which is the next page,
12  you see how it appears to be a slide presentation from
13  Arthur Andersen made at an audit committee meeting?
14  It says "Audit Committee Agenda October 2000"; do you
15  see that?
16      A   Yes.
17      Q   So it appears -- is this a slide presentation
18  provided to the audit committee for the first quarter
19  of 2001?
20      A   Yes. It would have been the Andersen
21  presentation or discussion document that was discussed
22  as part of our meeting with the audit committee
23  meeting for Q1.
24      Q   Okay. And this, if you recall, Matuszak
25  No. 1, was a similar presentation with respect to the
```

239

```
1   second quarter; do you recall that?
2       A   Yes.
3       Q   Okay. Is this kind of the similar
4   presentation that you made quarterly?
5       A   This would have been, yes, the -- the similar
6   presentation, but in this case done for the first
7   quarter versus the second quarter.
8       Q   Okay. And so you see -- the next page is AA
9   82.
10      A   Yes.
11      Q   And it says "Results of first quarter
12  review," and it says "Overall results.  No adjustments
13  proposed.  Quality of earnings discussion.  No
14  issues"; do you see that?
15      A   I do.
16      Q   That's the same language that was in the
17  second quarter presentation; right?
18      A   That's correct.
19      Q   And so it would mean the same thing as you
20  testified about earlier with respect to second
21  quarter; right?
22      A   That's correct.
23      Q   And again, did you ever have any discussions
24  with anybody about any issues with the quality of
25  earnings in this quarter?
```

240

```
1       MR. SIDORSKY: Objection; asked and answered.
2       THE WITNESS: Again, the -- I believe the
3   question was did you have -- did you ever have any
4   discussions with anybody?
5       Well, we would have had discussions with
6   management and certainly with the audit committee
7   because it's on this agenda.  If you're asking whether
8   I had discussions with anyone outside of the Andersen
9   engagement team or general discussions, my answer from
10  this morning still stands.  The answer is no.
11      MR. GREENSTEIN: Okay.
12      Q   This says "Quality of earnings discussion, no
13  issues."  What I'm asking is if there was any
14  discussion of actual issues that pertained to the
15  quality of earnings?
16      MR. SIDORSKY: I think that is what we went
17  through this morning, so objection; asked and
18  answered.
19      THE WITNESS: There would not have been any.
20      MR. GREENSTEIN: Okay.
21      Q   And you see it says "Judgmental reserves and
22  accruals," that appears to be the same language that
23  was in the second quarter presentation --
24      A   Yes.
25      Q   -- right?
```

Matuszak, Gary  8/1/2006  9:14:00 AM

241

1    So it has the same meaning as you testified
2  about earlier?
3    A  Yes.
4    Q  And looking at AA 83, which is the next page,
5  "Revenue Review --"
6    A  Uh-huh.
7    Q  -- you see it has the same language, "No
8  changes in scope or procedures"?  That was -- that was
9  the same language that was in the quarterly 2 -- or
10  the second quarter '01 presentation; right?
11    A  That's correct.
12    Q  And it appears that it says license revenue
13  tested 32 percent.  That's the similar testing that
14  you described with respect to the second quarter, but
15  in second quarter presentation it said you tested
16  37 percent; right?
17    A  That's correct.
18    Q  Now, what's the reason for testing 32 percent
19  in the first quarter and 37 percent in the second
20  quarter?
21    A  Again, I -- I -- my testimony from this
22  morning indicated that we did not have -- our scope
23  was set to review a certain number of contracts or
24  contracts above a certain dollar amount, so it
25  depended, you know, what percentage those were for

242

1  total domestic license revenue.  So the percentage
2  varied from quarter to quarter.
3    Q  Right.
4    And the number of customers or contracts you
5  may have reviewed per quarter was changed also; right?
6    MR. SIDORSKY:  Objection to form.
7    THE WITNESS:  You know, again, it may or may
8  not.  I just don't recall what our scope was.
9    MR. GREENSTEIN:  Okay.
10    THE WITNESS:  Whether it was set out, you
11  know, as you implied this morning, 20 contracts a
12  quarter, 15 contracts a quarter or whether it was set
13  at all contracts over $5 million.  I -- I don't recall
14  what the scope was.
15    MR. GREENSTEIN:  Okay.
16    Q  But the percentage number here means
17  percentage of what?
18    A  This means percentage of domestic license
19  revenue.
20    Q  Okay.  And that -- the procedures, when it
21  says "tested," that percent, the testing procedures
22  were the same procedures that you testified with
23  respect to Q2 '01; right?
24    A  That's correct.
25    Q  And it says "No change in scope of

243

1  procedure," so -- right?
2    A  That's correct.
3    Q  Have you ever had -- heard of the term "on
4  account" at Oracle?
5    MR. SIDORSKY:  Objection to form.
6    THE WITNESS:  I -- I don't know what you mean
7  by the term "on account."
8    MR. GREENSTEIN:  Q.  Well, do you -- do you
9  have an understanding of what "on account" means at
10  Oracle?
11    A  No, I don't.
12    Q  Have you ever heard the terminology, quote,
13  "on account," unquote, during your quarterly reviews
14  or audits at Oracle?
15    MR. SIDORSKY:  Objection to form.
16    THE WITNESS:  I don't know what context
17  you're asking the question in.  So, I mean, I don't
18  recall specific discussions of anyone saying
19  something, you know, "What is an 'on account?'"
20    I mean if you said to me, you know, customer
21  ABC made a payment on account, then I would assume
22  they made a payment on their account.  So I don't know
23  that I can testify that no one ever would have said
24  those two words put together in the entire tenure of
25  my engagement at Oracle.

244

1    MR. GREENSTEIN:  Right.
2    Q  But --
3    A  If you're implying it means something
4  specific, I don't know what --
5    Q  Okay.
6    A  -- your question is.
7    Q  Yeah.  I'm not talking about the words "on
8  account" meaning used in the normal course.  I mean a
9  specific terminology used by Oracle that something is
10  designated, quote, "on account."
11    MR. SIDORSKY:  Objection to form.
12    THE WITNESS:  I don't recall that
13  terminology.
14    MR. GREENSTEIN:  Okay.
15    Q  Now, are you aware -- from your experience
16  during the 2001 audit and quarterly reviews, are you
17  aware that any unapplied cash items were designate --
18  designated, quote, "on account"?
19    MR. SIDORSKY:  Objection to form.
20    THE WITNESS:  I -- I don't recall that
21  terminology.
22    MR. GREENSTEIN:  Okay.  Why don't we take
23  five minutes and go off record.
24    THE VIDEOGRAPHER:  This is a good time to
25  change the tape.

245

1    We are going off the record.  The time is
2  3:45 p.m.  Here marks the end of videotape number
3  three, Volume I, in the deposition of Gary Matuszak.
4    (Short break taken.)
5    THE VIDEOGRAPHER:  We are back on the record.
6  The time is 4:00 p.m.  Here marks the beginning of
7  videotape number four, Volume I, in the deposition of
8  Gary Matuszak.
9    MR. GREENSTEIN:  Q.  Mr. Matuszak, we were
10  looking at what's been previously marked as Chen
11  Exhibit No. 3, which is the quarter one fiscal year
12  2001, some work papers related to that quarter.  I'd
13  like to direct your attention to AA 181.  It's the
14  last page of the document.
15    A  Okay.
16    Q  Actually, if you just kind of flip back and
17  look at AA 23, the kind of --
18    A  Okay.
19    Q  You see the note associated with 25005
20  "Customer Overpayments," you know, on the right-hand
21  side, letter "A"; do you see that?
22    A  Yes.
23    Q  And the last sentence says "The increase was
24  offset by the adjustment for the A/R out of balance of
25  11.2M"; do you see that?

246

1    A  Yes.
2    Q  When it says "The increase," does that mean
3  the increase in the level of 25005 was offset by an
4  adjustment to the accounts receivable out of balance
5  of 11.2 million?  That's what the increase means;
6  right?
7    MR. SIDORSKY:  Objection; the document speaks
8  for itself.
9    THE WITNESS:  That's what it appears to say,
10  yes.
11    MR. GREENSTEIN:  Q.  So, in other words, the
12  increase of 74 million there was -- sorry -- the
13  increase from the balance on May 31st, '00, and the
14  balance of 8/31st 2000, that increase was then offset
15  by 11.2 million which resulted in the variance between
16  those quarters; right?
17    MR. KONOVALOV:  Objection; misstates --
18    MR. SIDORSKY:  Objection to form.
19    MR. KONOVALOV:  -- misstates the witness's
20  testimony and the evidence in the case, but --
21    THE WITNESS:  It -- it appears as if the
22  account balance was reduced by 11.2 million.
23    MR. GREENSTEIN:  Q.  That's -- oh, sorry.
24    A  I'm not -- I'm not sure actually what -- what
25  it refers to, whether there was --

247

1    Q  Okay.  Why don't you look at the last page,
2  which is AA181?
3    A  Okay.
4    Q  I think it will provide some clarity of the
5  11.2 million.
6    You see kind of in the middle of the page
7  where it has a letter "A --"
8    A  Yes.
9    Q  -- there?
10    You see it has 11.2, roughly 11.2 million?
11  You see that?
12    A  Yes.
13    Q  And then you see there's another "A" down at
14  the box there, and it says "JE done in August for
15  11.2 million to collect part of the out of balance."
16    You see that?
17    A  Yes.
18    Q  And it says "JE was correcting entry to
19  invoice --" and there's a number, invoice number --
20  and then it says "BAD."  You see that?
21    A  Yes.
22    Q  Do you know what an invoice that has "BAD"
23  after it means?
24    MR. KONOVALOV:  Objection; misstates the
25  document.

248

1    MR. SIDORSKY:  Yeah, objection to form.
2    THE VIDEOGRAPHER:  Counsel, your microphone.
3    THE WITNESS:  I don't know what that means.
4    MR. GREENSTEIN:  Okay.
5    Q  When you say that, you mean what it means
6  when there's an invoice number followed by the -- the
7  word "BAD"?
8    MR. SIDORSKY:  I'm not sure that's the word
9  "bad."  It's -- it's -- you know, it's a number, and
10  then there's letters B-A-D.
11    MR. GREENSTEIN:  Okay.
12    Q  To the extent that it's B-A-D, have you ever
13  seen that before?
14    A  No.
15    Q  If it was B-A-D, would that mean anything to
16  you if it was an invoice number followed by B-A-D?
17    A  No.
18    Q  Okay.  So you didn't type this; did you?
19    A  No.
20    Q  Okay.  Now, you see at the beginning -- well,
21  the beginning sentence says "JE, journal entry"; does
22  that mean that?  Right?
23    A  I'm sorry?
24    Q  The beginning of the sentence in that box
25  says "JE done."

249

1    A  Yes.
2    Q  That means "journal entry"; right?
3    A  I believe it means journal entry.
4    Q  Okay.  So it says "Journal entry done in
5  August for 11.2 million to correct part of the out of
6  balance"; do you see that?
7    A  Yes.
8    Q  And you see how above that it has a
9  description of an A/R agings audit trails account;
10  right?
11    A  Yes.
12    Q  And then a GL balance of account 1210; right?
13    A  1210.
14    Q  10.
15    A  Dash something.  Account 1210-12108.
16    Q  Okay.  I only -- okay.  My copy of it looks
17  like it just says account 1210, offset.  You see that?
18  I'm looking at the far left-hand side under
19  "Description."
20    A  Oh, it appears that that's what it says.
21  It's hard to read the paper.
22    Q  And then at the bottom it says "Out of
23  balance between A/R and GL"; do you see that?
24    A  Yes.
25    Q  So based on what you know of these types of

250

1  work papers or documents, and given that this was
2  produced by Andersen, does that appear that in that --
3  in the box where it says "JE done in August for
4  11.2 million to correct part of the out of balance,"
5  does that refer to the out of balance between the
6  accounts receivable and GL amount that's there,
7  14 million, approximately 14 million?
8    MR. KONOVALOV:  Objection; lacks foundation.
9    MR. SIDORSKY:  Objection to form.
10    THE WITNESS:  It appears that the out of
11  balance is the difference between the A/R aging trial
12  balance and the GL account.
13    MR. GREENSTEIN:  Q.  Well -- sorry.
14    A  What I can't tell, because I can't read the
15  numbers on there, is which one is higher.
16    Q  Right.
17    Now, so the out of balance between A/R and GL
18  appears to be approximately 14.2 million; right?
19    A  That's what it says.
20    Q  And then the entries or the -- in the box it
21  says the journal entry for 11.2 million is then part
22  of the out of balance; right?
23    A  That's what it says.
24    Q  You see how, if you look farther to the
25  right, where it has "A" there, it says manual JEs at

251

1  the top; you see that?
2    A  I do.
3    Q  Does that mean manual journal entries?
4    A  I believe that's what it means.
5    Q  So it appears that this 11.2 million was a
6  manual journal entry made to reduce that out of
7  balance of 14.2 million; right?
8    A  That's what it appears.
9    Q  Because if you go down farther, the
10  difference is at the far right-hand side, it says
11  3.1 million approximately?
12    A  That's correct.
13    Q  Okay.  So you see in the box where it says --
14  after it says -- second sentence says "JE was
15  correcting entry to invoice," a number, "BAD," it
16  appears, and says "DR was to 25005 invoice SOL and D
17  out of A/R but still hit GL."
18    Do you see that?
19    A  It appears that's what it says.  I'm -- I'm
20  having a difficult time actually reading it because
21  it's very small.
22    Q  Right.
23    Do you know what that means, DR was to 25005?
24  Does that mean debit was to the account 25005?
25    A  I would presume that that's what it means,

252

1  yes.
2    Q  And what does "Invoice SOL or SQL and D out
3  of A/R but still hit GL"?  Do you know what that
4  means?
5    A  No, I don't.
6    Q  Okay.  And then the second line of the box
7  says "Original out of balance was in 12019 also"; do
8  you see that?
9    A  Yes.
10    Q  Do you know what 12019 is?
11    A  I don't.
12    Q  But is that an account number, so if you look
13  back to AA19, if you look back, there's an account
14  called 12019.  It says "Deals clearing"; you see that?
15    A  Yes, I do.
16    Q  Going back to the last page, so that appears
17  to be where it says "out of balance" was in that
18  account; right?
19    A  That's what it says.
20    MR. KONOVALOV:  Document speaks for itself.
21    MR. GREENSTEIN:  Okay.
22    Q  So it appears to be that account in accounts
23  receivable?
24    MR. KONOVALOV:  Same objection.
25    THE WITNESS:  That's what it appears to be

253

1    referring to.
2        MR. GREENSTEIN:  Okay.
3        Q   And then it says "However, Dave O processed
4    an entry moving the out of balance to the 25005
5    account"; do you see that?
6        A   I see that.
7        Q   Do you know who Dave O is?
8        A   I do not.
9        Q   Okay.  Now, do you know what it means to
10   process an entry moving the out of balance to the
11   25005 account?
12       A   Well, I -- I don't know specifically what it
13   means.  I'm -- I'm -- it appears as if it means that
14   the -- the one account was out of balance, so they
15   moved that out of balance over into -- to -- to this
16   account or into a different account, so....
17       Q   Into 25005?
18       A   Yeah, that's what it appears, or into 25005.
19       Q   Okay.  What did -- how -- how does that
20   occur?
21       MR. KONOVALOV:  Objection.
22       THE WITNESS:  It appears they recorded a
23   journal entry to move it.
24       MR. GREENSTEIN:  Q.  To move --
25       A   He said he processed an entry, which I would

254

1    assume is a journal entry.
2        Q   Moving the out of balance, so that means the
3    14.2 million to the 25005 account; right?
4        A   Well, I don't know that it's 14.2 million.  I
5    think he might be referring to the 11.2 million that's
6    the reference in the note.
7        Q   Okay.  So moving the 11.2 million out of
8    balance to the 25005 account?
9        A   Right, moving it from one balance sheet
10   account to another.
11       Q   Moving it from 25005 to the out-of-balance
12   amount; right?
13       MR. SIDORSKY:  Objection to form.
14       MR. KONOVALOV:  Vague and ambiguous.
15       THE WITNESS:  Well, moving it from one
16   account, 25005, into this account, which appears to
17   be -- you know, whether it's 1210 or 12008, I'm not
18   sure.
19       MR. GREENSTEIN:  Right.
20       Q   But it's moving 11.2 million from 25005 to
21   the out of balance which was in 12019 deals clearing;
22   right?
23       MR. SIDORSKY:  Objection to form.
24       THE WITNESS:  Well, it appears that there was
25   an out of balance in 12019, and they moved that out of

255

1    balance into the 25005 account.
2        MR. GREENSTEIN:  Q.  No, no.  Is -- well,
3    doesn't it appear that from 11.2 million is -- is
4    coming from the 25005 and applying it to an accounts
5    receivable invoice which is in 1210/12008; right?
6        MR. SIDORSKY:  Objection to form.
7        MR. KONOVALOV:  Mischaracterizes the
8    witness's testimony, and the document speaks for
9    itself.
10       THE WITNESS:  I'm sorry.  Can you -- I'm not
11   sure where we're at.
12       MR. GREENSTEIN:  Q.  Can you see on the top
13   left-hand corner it says "Account 1210-12008"?
14       A   I see that.
15       Q   It says as of Q1 2001; right?
16       A   Yes.
17       Q   And then it has a description of, you know,
18   the A/R agings audit trails and GL balances for
19   account 1210.  And as we said before, it appears that
20   the out of balance from those two accounts is
21   14.2 million, approximately; right?
22       A   Yes.
23       Q   And then it looks like 11.2 million from
24   25005 was applied to that out of balance to reduce it
25   so that it ended as 3.1 million on the right-hand

256

1    side; right?
2        MR. SIDORSKY:  Objection to form.
3        MR. KONOVALOV:  The document speaks for
4    itself.
5        MR. GREENSTEIN:  Q.  In other words, you see
6    where it says "DR was to 25005"?
7        A   Yes.
8        Q   Well, since that's -- that's a liability, so
9    debit would reduce it; right?
10       A   That's correct.
11       Q   Okay.  So, in other words, money was taken
12   from 25005 to offset this out of balance of
13   14 million, right, which -- which ended up then being
14   the difference which is 3.1 million?
15       A   Well, the fact that they -- I mean, the fact
16   that they process the journal entry to move an out of
17   balance out of here and into another account, I mean,
18   they would still have to reconcile the detail in
19   account 25005 to whatever the detail the customer
20   overpayments was.  So I don't know from that what they
21   did.
22       Yes, they processed the journal entry, but I
23   don't know what they did with the balance of account
24   25005, whether that means that the detail -- the
25   journal ledger in that balance was different than the

257

1  detail, or whether they -- they wrote off or refunded
2  some of the detail in -- in just process the entry to
3  net the two down.
4      I don't -- don't -- without understanding the
5  complete trail of the journal entries, I don't know
6  that I can conclude exactly what happened here.
7      Q  Okay.
8      MR. KONOVALOV:  I'm not trying to interfere.
9      Would it help to look at the next couple of
10 lines outside the box?  Would that help the witness?
11     MR. GREENSTEIN:  Yeah.
12     Q  Why don't you look at that.  It says "This
13 entry was done to clean up amounts that had been
14 sitting in account 25005 Customer Overpayments since
15 fiscal year 2000 due to an IT problem"; do you see
16 that?
17     A  Yes.
18     Q  Do you know whose handwriting that is?
19     A  I do not.
20     Q  Okay.  Do you know what that means, that the
21 entry was done to clean up amounts that had been
22 sitting in 25005 since fiscal year 2000?
23     A  Other than what it says there, I don't know.
24     Q  Okay.  Do you know what it is to clean up
25 accounts that reside in 25005?

258

1      A  Well, presumably they're trying to, you know,
2  clean -- clean up or dispose of some of the amounts
3  that had been sitting in an account for quite some
4  time.
5      Q  Right.  So --
6      A  So reconcile it, or -- or somehow dispose of
7  it.  I don't know.
8      Q  Right.
9      But it appears you as an auditor looking at
10 this, it appears that -- so to reduce 25005, they took
11 11.2 million to apply it to this out of balance
12 between those other two receivable accounts; right?
13     MR. SIDORSKY:  Objection to form.
14     MR. KONOVALOV:  The document speaks for
15 itself.
16     THE WITNESS:  Yeah, I -- I really don't know
17 what all this means in terms of what all -- all
18 entries were made.
19     MR. GREENSTEIN:  Okay.
20     Q  Do you know where it says "Due to an IT
21 problem," do you know what that IT problem was?
22     A  No, I don't.
23     Q  Did you ever have any discussions about that
24 IT problem?
25     A  No, I haven't.

259

1      Q  You see in the top left-hand corner it says
2  "Prepared by Greg Myers"; do you see that?
3      A  I do.
4      Q  Do you know who Greg Myers is?
5      A  No, I don't.
6      Q  Have you ever had any discussion with
7  Greg Myers?
8      A  I have not.
9      Q  But it says "Prepared by Greg Myers," so this
10 appears that this -- do you recognize any of the
11 handwriting on here as an Andersen employee?
12     A  I do not.
13     Q  Okay.  Does it appear that this document --
14 well, it was produced by Arthur Andersen.  It has --
15 see in the corner, bottom right-hand corner, it has
16 B60 and has PA9/00?  You see that?
17     A  I do.
18     Q  It appears that Andersen looked at this, and
19 it was part of the work papers for quarter one; right?
20     A  Yes.
21     Q  Okay.
22     A  But Greg Myers is not an Andersen employee.
23     Q  Right.
24     I'll represent to you that he's an Oracle
25 employee.

260

1      A  Okay.
2      Q  But this was -- this appears to be prepared
3  by Greg Myers and then was reviewed by Andersen;
4  right?
5      A  That's correct.
6      Q  Okay.  Now, is there anything -- looking at
7  the 11.2 million that appears to have been taken from
8  25005 to -- to offset this out of balance, do you see
9  any connection, or do you know of any connection
10 between that 11.2 million that was sitting in 25005 in
11 connection between that and this out of balance for
12 these account receivable accounts?
13     MR. KONOVALOV:  Objection; vague and
14 ambiguous.
15     MR. SIDORSKY:  Objection to form.
16     THE WITNESS:  Yeah.  I mean, I -- I really
17 don't know where we're going with this whole
18 discussion.  You know, it -- I'm confused as to what
19 you're trying to get to, or how these accounts worked,
20 or this entry, what they did with the entry.
21     I don't know that I would get any more
22 clarity on it from continuing to ask questions about
23 the two sentences that are in there.
24     MR. GREENSTEIN:  Okay.
25     Q  I'm just wondering if you, just looking at

Matuszak, Gary  8/1/2006  9:14:00 AM

261

1  this and what is written here, if you understand what
2  occurred?
3      A   I don't understand completely what occurred,
4  no.
5      Q   Well, what is your best --
6      A   I told you I don't understand.
7      Q   Okay.  Put that aside.
8          I want to mark -- actually, I don't want to
9  mark this.  It's been previously marked as Chen No. 4.
10         For the record, this is a packet of work
11  papers related to the second quarter 2001 review.
12  It's Bates stamped AA 24 and the last pages AA 1638.
13         Mr. Matuszak, have you seen these documents
14  before today?
15     A   I believe that -- that these -- these
16  documents appear to be similar to the ones that were
17  provided to me by my counsel.
18     Q   Okay.  And you see on AA 27 -- well, strike
19  that.
20         And it appears that -- that this is -- well,
21  if you look down at the -- there's kind of a bar --
22  there's a bar code there, and then it has at the
23  bottom it says "Q2 FY Review 11/30/2000"; you see
24  that?
25     A   Yes.

262

1      Q   So it appears -- well, at least this page is
2  related to work papers for the Q2 review; right?
3      A   That's right.  It appears that this is the
4  file cover for the 11/30/2000 quarterly review.
5      Q   Right.
6          So if you look at AA 27, which is the fourth
7  page, you see how this appears to be the same slide
8  presentation that we looked at earlier, which is
9  Matuszak -- part of Matuszak No. 1; right?
10     A   Yes.
11     Q   Is there a reason why this presentation is a
12  part of -- well, appears to be a part of the work
13  papers for that quarter?  Do you -- was that typical?
14     A   Yes.
15     Q   Okay.  You see on AA 28, it has the same
16  language in Matuszak 1; right?
17     A   Yes.
18     Q   So it would have the same meaning?
19     A   Yes.
20     Q   You see -- if you turn to page AA 34, and you
21  see how it says "Q4 - Q1 follow-up items"?
22     A   Yes.
23     Q   And you see it says "A/R aging to GL
24  reconciliation"?
25     A   Uh-huh.

263

1      Q   Do you know what that means?
2      A   Well, I'm assuming it means at the end of Q4
3  there was a -- that the A/R aging was out of balance
4  from the GL.  So we followed up on it as part of our
5  Q1 review.  So that Q4/Q1 to me means follow-up items
6  that -- from Q4 that we followed up on in Q1.
7      Q   Okay.  And is that -- is that related to the
8  document we just looked at which had an out of balance
9  from A/R aging?
10     A   Most likely, yes.
11     Q   Okay.  And you see it says "Unearned
12  education revenue reconciliation"?
13     A   Yes.
14     Q   What does that mean?  Do you know?
15     A   Yeah, I could speculate that there's a
16  reconciliation they're doing on the detail of one of
17  the unearned education accounts.
18     Q   Okay.  Do you recall in the second quarter
19  though that -- that there was this analysis done to
20  reconcile unearned education revenue?
21     A   I'm sorry.  Let me -- let me back up one
22  second.
23         This is the results -- this is the audit
24  committee agenda for Q2.
25     Q   Right.

264

1      A   So this Q4/Q1 would have been follow-up items
2  from Q4 or Q1 that we were discussing during Q2 --
3      Q   Right.
4      A   -- or after our Q2, so I misspoke before.
5      Q   Okay.  So do you recall what was done to
6  reconcile unearned education revenue --
7      A   I don't.
8      Q   -- during Q2?
9          Do you recall what was done to -- or was any
10  analysis done with respect to A/R aging to GL
11  reconciliation?
12     A   I don't know.
13     Q   Okay.  Turn to the next page, AA 35, and does
14  this appear to be the accounts receivable lead sheet
15  for the second quarter variation analysis of accounts
16  receivable accounts?
17     A   It does.
18     Q   And it's similar to the one we looked at in
19  the quarter one work papers as far as what the
20  document purports to be; right?
21     A   It appears that way, yes.
22     Q   And do you see any of your handwriting on
23  here?
24     A   I do not.
25     Q   Do you recall reviewing this work paper

265

1 during the second quarter?
2     A  Not specifically.
3     Q  Generally, do you recall reviewing this?
4     A  I would likely have reviewed it.
5     Q  Because that was typical in every quarter to
6 review these types of work papers; right?
7     MR. SIDORSKY:  Objection to form.
8     THE WITNESS:  I -- I would not review all
9 work papers, but normally I would review the
10 receivable lead schedule.
11     MR. GREENSTEIN:  Okay.
12     Q  Why was that?
13     A  Because I would normally review some of the
14 work that was in revenue and receivables.
15     Q  Okay.  Were those critical areas at Oracle?
16     MR. KONOVALOV:  Objection; vague and
17 ambiguous.
18     THE WITNESS:  They were areas --
19     MR. SIDORSKY:  Objection to form.
20     THE WITNESS:  -- of focus.
21     MR. GREENSTEIN:  Q.  Areas of focus; right?
22     A  Areas of focus.
23     Q  Right.
24     Now, you see account 12018 unapplied cash
25 again?  Do you see that?

266

1     A  I do.
2     Q  And you see where it says "Cash payments
3 generally decrease the end of Q2 versus Q1.  As Q4
4 deals have aged 90 days as of the end of Q1 there is a
5 greater influx of cash received compared to collection
6 and receipt of Q1 transactions in Q2"; do you see
7 that?
8     A  I do.
9     Q  Now, do you know what that means?
10     MR. SIDORSKY:  Objection to form.
11     THE WITNESS:  Yes, generally.
12     MR. GREENSTEIN:  Okay.
13     Q  What does -- what does it mean generally?
14     A  Well, I think consistent with the discussion
15 or testimony I gave when we looked at this account for
16 Q1 earlier, you normally expect a larger amount of
17 payments in Q1 versus Q2 because there's -- are larger
18 revenue transactions in Q1 that's typically the
19 company's largest revenue quarter of their fiscal year
20 as contrasted to the August quarter which, for a
21 number of different reasons, is typically a -- a lower
22 revenue quarter, so I believe that's what this note is
23 trying to explain.
24     Q  Okay.  And why does that -- well, it appears,
25 doesn't it, that the balance of 12018 unapplied cash

267

1 went from 86 million to 64 million?
2     A  That's correct.
3     Q  All right.
4     And so what -- does that mean that -- well,
5 why -- why would the -- why would the description
6 there support that -- that decrease, that amount
7 decrease?
8     A  The -- what the description says is cash
9 payments generally decrease at the end of Q2 versus
10 Q1.  So in Q4 there are a number of large transactions
11 done in Q4.  That cash would be collected at the end
12 of Q1, and so there's a greater influx of cash
13 payments in Q1 versus Q2.
14     In Q2, you're collecting much of the revenue
15 from Q1, and there was less revenue in Q1, so there
16 are less receivables to collect.
17     Q  Okay.  You see down at the bottom where it
18 has allowance for bad debt returns, and it has three
19 accounts and one of them is -- says 12, I think, 600,
20 12601, and 12604?  Do you see that?
21     A  I do.
22     Q  Do you see how that -- that balance from the
23 end of the first quarter to the end of the second
24 quarter or -- yeah, the end of the first quarter to
25 the end of the second quarter increased by 26 million?

268

1 Do you see that?
2     A  I do.
3     Q  And then it says "Increase in the allowances
4 primarily result of greater activity from Q2 to Q1,
5 and the number of deals funded in-house or were
6 financed"; do you see that?
7     A  Yes.
8     Q  Do you know what that means?
9     A  Certain of the transactions that were funded
10 in-house, they would reserve for versus if they sold
11 the receivable in a nonrecourse basis, therein
12 transferring the risk of collectability to the finance
13 company.
14     Q  So why would that increase the bad debt --
15 the allowance for bad debt returns accounts?
16     A  Well, it increases their receivable balance
17 on those types of transactions.
18     Q  Okay.  You see there where it says "The
19 reserve for receivables in litigation also increase
20 greater emphasis by the collections group to refer
21 uncollectible receivables to legal and a greater
22 number of emergent companies have experienced
23 financial difficulties"?  Do you see that?
24     A  I do.
25     Q  You know whose hand -- or strike that.

269

1      So does that mean that the increase in the
2  allowance for bad debt was partially a result of a
3  greater number of companies, Oracle's customers,
4  having financial difficulties at that time?
5      A  I don't know about a greater number of
6  Oracle's customers having financial difficulty.
7  Certainly a greater number.  It says a greater number
8  of emerging companies had experienced financial
9  difficulties.
10      Q  Okay.  Oh, sorry.
11      A  Oracle did license their software to a number
12  of companies that were, you know, younger companies.
13      Q  Right.
14      And what this is saying is that there was
15  greater -- an increase in the allowance for bad debt
16  because there was an emphasis by the collections group
17  to -- to refer uncollectible receivables to legal, and
18  there were a greater number of emergent companies that
19  were experiencing financial difficulties, and
20  therefore Oracle couldn't collect on those deals;
21  right?
22      A  That's what it appears, so they appropriately
23  increased their allowance for bad debts.
24      Q  Okay.  Now, do you know if there's any
25  support for that statement there, any evidence that

270

1  Andersen had to support that?
2      A  I wouldn't know without -- no, I don't know.
3      Q  Okay.  You see how it says "See further
4  discussion of reserves at B15"?
5      A  Yes.
6      Q  Do you know -- did you see B15 yesterday when
7  you looked -- when you reviewed the document with
8  counsel?
9      A  I did not.
10      Q  Is that --
11      A  If it wasn't in this group, I likely didn't
12  look at it.
13      Q  Do you recall back during this time, and it
14  appears that this work paper was around December '00,
15  if you look at the bottom right-hand corner --
16      A  Yes.
17      Q  -- do you recall that there were a greater
18  number of emergent companies having experienced
19  financial difficulties such that Oracle had to
20  increase their reserves for uncollectibles?
21      MR. SIDORSKY:  Objection to form.
22      MR. KONOVALOV:  Calls for speculation.
23      THE WITNESS:  I don't recall specifically,
24  no.
25      MR. GREENSTEIN:  Okay.

271

1      Q  And turn to the next page, AA 36, it appears
2  to be a memo dated December 11th, 2000, from
3  Pamela Arquelada, and it says "Accounts receivable
4  account description"; do you see that?
5      A  Yes.
6      Q  Does there appear to be the same type of memo
7  that we looked at the first quarter where it has the
8  descriptions of the various accounts receivable
9  accounts?
10      A  It appears to be a similar memo.
11      Q  Okay.  And if you turn to the next page,
12  AA 37, see how there's an account called "12601 Bad
13  Debt Write-offs"?
14      A  Yes.
15      Q  And it has a number of other accounts, it
16  says "Reserve for Uncollectible Accounts."
17      A  Yes.
18      Q  And it says these are the -- "These accounts
19  are the standard accounts used to write-off and
20  provide for bad debts respectively"; do you see that?
21      A  I see that.
22      Q  Do you recall any issues arising during the
23  quarterly reviews for fiscal year 2001 audit at Oracle
24  that involved the account 12601?
25      A  I do not.

272

1      Q  Or any problems related to account 12601?
2      A  I do not.  Let me just go back to see if it's
3  on here what 12601 is.  That's one of the reserve
4  accounts.  I don't recall anything specifically with
5  that account, no.
6      Q  Or anything general?
7      A  No.
8      Q  Do you recall ever being made aware that
9  Oracle's collection staff had over time transferred
10  customer overpayments from 2505 to account 12601?
11      MR. KONOVALOV:  Objection; assumes facts not
12  in evidence.
13      THE WITNESS:  I don't recall that
14  conversation or ever being told that.
15      MR. GREENSTEIN:  Okay.
16      Q  Do you recall any documents or any evidence
17  during your quarterly reviews and audits of Oracle at
18  any time where you learned that transfers were made
19  from 25005 to 12601?
20      MR. KONOVALOV:  Same objections.
21      MR. SIDORSKY:  Yeah, I'm going to object to
22  the scope of that question.
23      THE WITNESS:  I don't recall any, no.
24      MR. GREENSTEIN:  Okay.
25      Q  If you turn to AA 39, and you see how it's

273

1   a -- it's another account 1210 document related to
2   that account and prepared by Greg -- Greg Myers; do
3   you see that?
4     A  I do.
5     Q  It has the similar A/R aging audit trails and
6   GL balances; you see that?
7     A  Yes.
8     Q  It has another out of balance between A/R and
9   GL of 947 -- looks like thousand; do you see that?
10    A  Yes.
11    Q  And then you see on the right-hand side of
12   that amount is 1.8 million?
13    A  Yes.
14    Q  Or approximately 1.9 million?
15    A  Yes.
16    Q  And you see the note under there it says
17   "Unreconciled Difference"? It says "AA LLP." That's
18   Arthur Andersen; right?
19    A  That's correct.
20    Q  "Noted a 1.9 difference between GL and A/R
21   aging as of or on November 30th, 2000"; do you see
22   that?
23    A  I do.
24    Q  "The company has had unreconciled difference
25   in this account since fiscal year '00 due to an IT

274

1   problem"; do you see that?
2     A  I do.
3     Q  Now, is that the same IT problem that we
4   looked at in the last set of work papers which was
5   discussing the out of balance between these two
6   accounts?
7     MR. KONOVALOV:  Objection; lacks foundation.
8     THE WITNESS:  I don't know specifically, but
9   it would appear that it is since it's the same
10   schedule.
11    MR. GREENSTEIN:  Right.
12    Q  Now, did you -- is that your handwriting
13   there?
14    A  Under the note one?
15    Q  Yeah.
16    A  Under note, no, it is not.
17    Q  Okay.  Do you know whose it is?
18    A  I do not.  The schedule is initial PA which
19   presumably is Pam Arquelada.
20    Q  Okay.  Now, were you made aware of this 1.9
21   million difference between the GL and A/R aging that's
22   referred to under this note?  Were you made aware of
23   that at the time?
24    MR. SIDORSKY:  Can I hear that?
25    MR. GREENSTEIN:  I'll ask it again.

275

1     Q  Were you -- around this time, were you --
2   which is the second quarter of '01 -- were you made
3   aware of the issue described by this note here?
4     A  I believe I was aware of that issue.
5     Q  Okay.  What do you remember?  How did you
6   become aware of it?
7     A  Well, I believe part of this package was the
8   audit committee agenda.  On there, there was a item
9   that said Q4/Q1 follow-up items, one of which is A/R
10   aging to GL reconciliation.
11     So presumably we covered it in some form with
12   the audit committee which would imply I was aware of
13   the difference.  The company had been working on
14   reconciling that difference, and it was now down to
15   1.9 million.
16     Q  Okay.  Why was -- why -- but didn't they
17   recon -- didn't they already work on that in the first
18   quarter?
19    MR. KONOVALOV:  Objection; lacks foundation.
20    MR. GREENSTEIN:  Q.  And they reduced it --
21   they reduced the out of balance of those two accounts
22   by transferring 11.2 million of unapplied cash or of
23   customer overpayments from 25005; right?
24    MR. SIDORSKY:  Objection to form.
25    MR. KONOVALOV:  Lacks foundation.

276

1     THE WITNESS:  They -- they reduced the
2   balance a certain amount in Q1, and it looks like they
3   reduced it further in Q2.
4    MR. GREENSTEIN:  Q.  So there was still an
5   out of balance in Q2; right?
6    MR. KONOVALOV:  Objection; lacks foundation.
7    THE WITNESS:  It appears that there was an
8   out of balance of 1.9 million as of November 30th,
9   2000.
10    MR. GREENSTEIN:  Q.  See how it says "Per
11   discussion," and then a note at the bottom, it says,
12   "Per discussion with Greg Myers A/R manager, the
13   company will focus its efforts to gradually reduce
14   this effort in the future"; do you see that?
15    A  I do.
16    Q  Do you know -- did you discuss this with
17   Greg Myers?
18    A  Nope.
19    Q  Because you never talked with Greg Myers;
20   right?
21    A  That's correct.
22    Q  Do you know who did talk with Greg Myers?
23    A  Again, as I said, the schedule is initialed
24   by PA, which I'm assuming is Pam Arquelada.
25    Q  Okay.

277

1    A  So I would speculate that that is her
2  handwriting, and she's -- therefore, she's the one
3  that discussed it with Greg Myers.
4    Q  Okay.  Did you ever have a discussion with
5  Pam or anybody at Andersen about this issue here?
6    A  I don't recall specific conversations.
7    Q  Okay.  Do you recall general conversations
8  about this issue?
9    A  I recall, in general, that we -- we spoke
10 about the A/R out of balance and about, you know, our
11 concern and our desire for the company to get it
12 reconciled down to a negligible amount.
13   Q  Okay.  Why were you concerned?
14   A  Because the A/R was out of balance with the
15 GL, so you would like for the A/R trial balance to
16 agree to the GL balance.
17   Q  And the AR balance is ultimately disclosed in
18 Oracle's public financial statements; right?
19   A  The A/R --
20   MR. SIDORSKY:  Objection to form.
21   THE WITNESS:  The A/R GL balance, correct,
22 net of any reserves.
23   MR. GREENSTEIN:  Q.  And do you know if the
24 company focused -- if Oracle focused its effort to
25 gradually reduce the difference in the future?

278

1    A  I don't recall as to the future.
2    Q  Okay.  Turn to the next page.
3    Does this appear to be the lead schedule for
4  variation analysis of the unearned revenue accounts as
5  of the end of the second quarter?
6    A  It does.
7    Q  It's similar to the unearned revenue lead
8  sheet that we looked at with quarter one; right?
9    A  I -- I believe it is similar; yes.
10   Q  Okay.  And do you see customer overpayments
11 line, 25005?  You see how it says that the balance
12 went from -- from August 31, 2000, to the end of the
13 second quarter, November 30, 2000, it went from
14 73 million to 125 million?  Do you see that?
15   A  I do.
16   Q  That's a difference variance of 51 million;
17 right?
18   A  That's correct.
19   Q  You see next to that it says "Letter A
20 increase as a result of a 100 million --" looks
21 like "-- wire transfer received by Oracle to Delphi";
22 do you see that?
23   A  I do.
24   Q  Is that your handwriting?
25   A  It is not.

279

1    Q  Do you recall a $100 million wire transfer to
2  Oracle received by Delphi during this quarter?
3    A  I don't specifically, no.
4    Q  Do you remember generally discussing this
5  100 million wire transfer?
6    A  Generally, no, I don't.
7    Q  So you don't remember discussing it at all;
8  right?
9    A  Nope.
10   Q  Okay.  You see where it says "The variance is
11 offset by an 11 million debit booked to this account
12 to correct a reclassification entry between 25005 and
13 1208"?  Do you see that?
14   A  I do.
15   Q  And what does it mean to correct a
16 reclassification entry between 25005 and 1208?
17   A  To correct.  Well, other than what it says
18 there, I don't know.
19   Q  Okay.  And you see how it has handwritten --
20 or it says "The balance was also offset by additional
21 cash applications," and it says in handwriting -- it
22 says "AA LLP notes that last quarter there was a SAJE
23 of 75 million.  As such, the balance was 148 million
24 approximately previous to the CAJE"; is that right?
25   A  Correct.

280

1    Q  Is that what it appears to say?
2    A  Yes.
3    Q  And CAJE is what?
4    A  Client -- client adjusting journal entry.
5    Q  Okay.  So what does this mean, that
6  Arthur Andersen notes that last quarter there was a
7  client or a CAJE of 75 million?
8    A  Well, I believe the purpose of this is to try
9  to tie the prior quarter amounts into the prior
10 quarter work papers.  So if you look at the balance
11 that's labeled 8/31/00, and you go down, and you'll
12 see there's a double tick mark next to most of the
13 numbers, there is not one next to the 73 million,
14 because that balance does not agree to the prior
15 quarters.
16   So I believe this note is explaining that,
17 and you'll see a double tick mark next to the
18 148,616,273, in the handwritten comments.  So it's
19 trying to point out that that balance doesn't tie to
20 the prior work papers because of this closing
21 adjusting entry that was made as part of the Q1 close.
22   So it was -- it was booked subsequent to the
23 client delivering to us the review work papers for Q1.
24   Q  Subsequent to the -- so what do you mean when
25 you say it was booked subsequent to the client

Matuszak, Gary  8/1/2006  9:14:00 AM

281

1  delivering to us the review of work papers?
2      MR. SIDORSKY: Objection to form.
3      THE WITNESS: Well, at some point the company
4  would do a closing of their books, you know, first
5  pass, second pass, whatever it was, and they would
6  give to us the work papers that we would use for our
7  quarterly review.
8      That doesn't mean that they were necessarily
9  complete with all of their internal analysis and
10  reconciliation. So they would continue to do work,
11  and in this case the results of that work resulted in
12  an adjusting journal entry of $75 million which was
13  not reflected in our work papers because it occurred
14  subsequent to us getting the work papers for the
15  August review.
16      Q  You didn't know about it until Oracle
17  provided you with the information; right?
18      A  That's correct. Now, whether that was in the
19  August quarter or the November quarter, I don't
20  recall.
21      Q  Okay. And you see at the bottom there it has
22  another "A" with a tick mark, and it says "Continued.
23  AA LLP notes that PDW Cynthia Chavez treasury.
24  The 100 million is a loan and should not be classified
25  as unearned revenue. The adjustment will be posted

282

1  before the end of Q3."
2      And then it has a CAJE debit of 100 --
3  revenue of 100 million and credit of intracompany, it
4  looks like, receivable for 100 million; do you see
5  that?
6      A  That's correct.
7      Q  Now, what does that mean, the 100 million is
8  a loan and should not be classified as unearned
9  revenue?
10      A  Well --
11      MR. SIDORSKY: Objection to form.
12      THE WITNESS: I believe that the -- that --
13  that Delphi is a wholly owned subsidiary of Oracle.
14  So they received a payment from Delphi that appears to
15  have been misclassified and should have been treated
16  as an inner-company transaction, an inner-company
17  loan, and therefore they needed to correct that entry.
18  Otherwise, the books of Oracle Corporate and Delphi
19  would not have balanced and eliminating consolidation.
20      MR. GREENSTEIN: Okay.
21      Q  It says "The adjustment will be posted before
22  the end of Q3." Does that mean the adjustment wasn't
23  posted at the end of Q2?
24      MR. KONOVALOV: Objection; lack of
25  foundation.

283

1      MR. GREENSTEIN: Q. In other words, that
2  adjustment, that 100 million debit and credit, was not
3  made before the results of -- 2Q '01 were released;
4  right?
5      MR. KONOVALOV: Same objections.
6      THE WITNESS: I don't believe that's
7  necessarily true.
8      MR. GREENSTEIN: Okay.
9      Q  What does it mean the adjustment will be
10  posted before the end of Q3?
11      A  Well, can we look and see if F-6 is in here?
12      Q  Sure.
13      Is it fair to say you need F-6 to properly
14  analyze this -- these issues here?
15      A  Yes. I -- it appears it's 1638 in this file,
16  in this package of information.
17      Q  Okay. And it says -- on AA 1638, it says
18  under letter "A, Oracle booked an adjustment to
19  decrease cash and increase intracompany receivable by
20  100 million because Delphi did not record a cash
21  required transfer from Delphi to Oracle US in
22  October 2000"; do you see that?
23      A  Yes.
24      Q  It says "Reasonable"; right?
25      A  Yep.

284

1      Q  It was signed off by Andersen; right?
2      A  Yes.
3      So referring back to Schedule DD, which is
4  040, I believe what is meant by this note, and to
5  clarify the word posted, I mean, I believe that the
6  word "posted" means posted to the actual GL account
7  versus recorded in a client adjusting journal entry
8  which may not have been "posted," quote, to the GL,
9  but posted at a top level to accurately reflect it in
10  the consolidated financial statements.
11      That's why I believe that the schedule that
12  we just looked at with the entry was the schedule of
13  adjusting journal entries that were made as -- during
14  the actual final close for the quarter. It's just
15  that it did not get, quote, "posted," end quote, to
16  the GL account
17      Q  Well, if it doesn't get posted to the GL
18  account, how does it actually impact the financial
19  statements that are released?
20      MR. SIDORSKY: Objection to form.
21      MR. KONOVALOV: Yeah, objection; vague and
22  ambiguous.
23      THE WITNESS: You can record an entry without
24  actually recording it and posting it into the general
25  ledger account.

285

1   MR. GREENSTEIN:  Q.  So if you record the
2  entry, does that mean that it's actually changing the
3  publicly issued financial statements?
4   MR. SIDORSKY:  Objection to form.
5   THE WITNESS:  Yes.  I believe that this entry
6  was -- was recorded in the November quarter to
7  accurately reflect the external reported results, but
8  not technically, quote, "posted" to the actual general
9  ledger account.
10   MR. GREENSTEIN:  Okay.
11   Q  Why would it actually need to be posted to
12  the general ledger account later?
13   A  Well, at some point it would have to be
14  posted to the right GL account, or it would continue
15  to be out of balance in perpetuity.
16   Q  Okay.  You can put that -- what section is
17  it?  What is section "F"?  What does that mean?  I
18  think we said "B" refers to accounts receivable.  What
19  does "F" mean?
20   A  In what reference?  I'm sorry.
21   Q  F-6, when you said you need to look at F-6.
22   A  Oh, "F" was typically the section of the
23  audit work papers where we would have the financial
24  reporting.  So that would be the top-level
25  consolidation.  Any client adjusting entries would be

286

1  summarized up there as well.
2   Q  Okay.  I want to mark the next one or
3  actually this is Chan --
4   A  Are we done with this one?
5   Q  Yeah.  Oh, so "Section F" that you just
6  described, that's not -- it's not reflected in those
7  work papers that you just looked at; right?
8   MR. SIDORSKY:  Objection to form.
9   MR. KONOVALOV:  Misstates the witness's
10  testimony.
11   MR. GREENSTEIN:  Q.  Oh.  Is it reflected in
12  those work papers?
13   MR. SIDORSKY:  Same -- same objections.
14   MR. GREENSTEIN:  How much time left?  Time?
15   THE WITNESS:  Well, it's unclear, because
16  we -- we have a scheduling in here.
17   THE VIDEOGRAPHER:  About six hours.
18   MR. GREENSTEIN:  Okay.
19   Q  I'm sorry?
20   A  We have a schedule in here which explains the
21  100 million, but there -- and there is something in
22  the upper right-hand corner, but it's not legible.
23  Presumably that's an index.
24   Q  Okay.
25   A  And I -- you know, I would hope or -- well,

287

1  it might say F-6.
2   Q  Right.
3   But you can't be sure; right?
4   A  Well, I can't see it.
5   Q  Okay.
6   MR. SIDORSKY:  Well, I think that has to do
7  with the photocopying, quite frankly.
8   THE WITNESS:  No, I agree.
9   MR. SIDORSKY:  I mean --
10   THE WITNESS:  What I'm saying --
11   MR. SIDORSKY:  That's right, but I think that
12  the -- I think Mr. Greenstein probably does have a
13  copy where it's more legible.  It's just because it's
14  a series of photocopies.  Maybe it's not showing the
15  number there.
16   MR. GREENSTEIN:  Okay.
17   Q  Yesterday during your meetings with
18  attorneys, did you review all the work papers for the
19  fiscal 2001 audit and quarterly reviews?
20   A  No.
21   Q  Did you have a full set available to you to
22  review, or were you just reviewing parts of it?
23   MR. SIDORSKY:  Objection to form.
24   THE WITNESS:  I'm sorry.  The full set of
25  audit and quarterly work papers from Andersen?

288

1   MR. GREENSTEIN:  Right.
2   THE WITNESS:  No.
3   MR. GREENSTEIN:  Okay.  I want to mark
4  this -- oh, actually, I'm marking this one as Matuszak
5  No. 3.
6   (Document remarked Exhibit No. 3
7   for identification.)
8   MR. GREENSTEIN:  For the record, this is --
9  starts with AA 41, and the last page is AA 1086.
10   Q  Just looking at this, Mr. Matuszak, does
11  there appear to be the -- the quarterly review work
12  papers or parts of them for the third quarter of
13  fiscal year '01?
14   A  That's what it appears, yes.
15   Q  If you turn to AA 49, you see it has a
16  description of -- you see it has a description of
17  12018 again?
18   A  Yes.
19   MR. SIDORSKY:  I think -- I don't want to --
20  I mean, it's your record, Eli, but I think this is
21  maybe your notes or someone's notes on this document.
22  I'm a little --
23   MR. GREENSTEIN:  Yeah.  You know what --
24   MR. SIDORSKY:  You may want to get --
25   MR. GREENSTEIN:  Yeah, I want to get those

Matuszak, Gary  8/1/2006  9:14:00 AM

289

1   back.
2        THE WITNESS: I was going to say I don't
3   recall seeing this in our work product.
4        MR. GREENSTEIN: Why don't we take a
5   five-minute break.
6        THE VIDEOGRAPHER: Off the record. The time
7   is 4:55 p.m.
8        (Short break taken.)
9        (Document remarked Exhibit No. 3
10       for identification.)
11       THE VIDEOGRAPHER: We are back on the record.
12   The time is 5:11 p.m.
13       MR. GREENSTEIN: Q. Mr. Matuszak, if you
14   look at what's been marked as Matuszak No. 3, which --
15   just quickly look through it. It's Bates stamped AA
16   41, and the last page is AA 1086. Does this appear to
17   be the quarter three '01 work papers?
18       A  It does.
19       Q  Okay. And the quarterly review work papers
20   similar to the ones we looked at for Q1 and Q2;
21   correct?
22       A  Yes.
23       Q  Okay. Put that aside.
24       I've also handed you what's been marked as
25   Chen Exhibit No. 2, and it's AA 1, and then it ends

290

1   with AA 1945, and does this appear to be the work
2   papers for the fiscal 2001 year-end audit?
3       A  Yes. It appears to be sections from that
4   audit, yes.
5       Q  Okay. And if you turn to -- I want to direct
6   your attention to AA 1925. It says "Bad debt reserve
7   reconciliation."
8       A  Okay.
9       Q  Now, have you seen this document before?
10      A  I -- I -- I reviewed it yesterday.
11      Q  Okay. Do you remember -- before you reviewed
12   it yesterday, do you recall seeing this document?
13      A  Not specifically, but I do recall, you know,
14   this. You know, seeing schedules like this.
15      Q  Okay. Did you review this particular
16   document during the fiscal year 2001 audit for Oracle?
17      A  I don't -- I don't know. Don't recall.
18      Q  Okay. And you see -- is any of the
19   handwriting here yours that you could tell?
20      A  I don't know. There's a -- there's a little
21   comment between the "B" and the "C" on the side that
22   might be mine.
23      Q  Okay.
24      A  I don't even know what it says.
25      Q  Okay.

291

1       A  But it's possibly my comment. I don't know.
2       Q  Okay. And you see this is a bad --
3   appears to be a bad debt reserve reconciliation for
4   the fiscal year 2001 audit; right?
5       A  Yes, it's a -- it's a roll forward -- it's a
6   roll forward of the reserve from balances at the end
7   of the third fiscal quarter to the balance as of the
8   end of the fiscal year, so it's a quarterly roll
9   forward.
10      Q  Okay. And you see how, as part of these
11   accounts on the left-hand side of the box, it has
12   "12/6/01 bad debt write-offs"?
13      A  Yes.
14      Q  Do you see that?
15      And it has a number of other accounts
16   receivable accounts relating to reserves; right?
17      A  Yes.
18      Q  Okay. And it has a total reserve.
19      Now, looking down in the notes, the
20   handwritten notes, you see where it says "A"?
21      A  Yes.
22      Q  And it says "Account 12601 bad debt
23   write-off"; you see that?
24      A  Yes.
25      Q  And it says "The company reviewed application

292

1   of cash receipts in 25005 customer overpayments and
2   noted that has been aggressive in applying cash to
3   previously written off invoices. As a result, it
4   reversed 9.5 million of reserves for which the company
5   has collected cash after they had previously written
6   off the balances"; do you see that?
7       A  I do.
8       Q  Now, were you made aware of this at the time
9   that this was written, that Oracle had been aggressive
10   in applying cash to previously written off invoices?
11      MR. SIDORSKY: Objection to form.
12      THE WITNESS: I'm not sure what's meant by
13   the word "aggressive."
14      MR. GREENSTEIN: Q. Well, it appears that
15   after Andersen reviewed transfers of or application of
16   cash to previously written off invoices, that it
17   reversed 9.5 million of reserves; right?
18      A  Now, so the way I understand this note, the
19   company was -- was actively trying to review the --
20   the accounts or, you know, the invoices in account
21   25005 and tried, to the extent that it could, to apply
22   them to particular invoices; okay.
23      If some of those invoices were invoices that
24   had already been written off, since the write-off
25   would have reduced the reserve, if they're reversing

293

1   the write-off, it would increase the reserve; okay.
2       Q   It would have increased the reserve in 12601;
3   right?
4       A   It would have increased the reserve in 12601;
5   that's correct.
6       Q   So it would increase -- as a result, if you
7   increase the reserve, I think you said you also
8   increase bad debt expense; right?
9       MR. SIDORSKY:  Objection to form.
10      THE WITNESS:  Well, it -- not -- not in this
11  case.  So if I understand this note right, so when
12  they wrote off an invoice, the write-off of the
13  invoice would have reduced the bad debt reserve.
14      After researching account 25005, they found
15  that some of the payments residing in that account
16  actually related to invoices they had written off.  So
17  in order to record that entry, the entry would be to
18  debit account 25005 and credit the allowance for
19  doubtful accounts; okay.
20      Now, that entry increases the reserve by
21  $9.5 million, but there is no reserve requirement for
22  the $9.5 million.  So the only way through the, you
23  know, accounting entries to get that out of the
24  reserve, because it doesn't need to be in the reserve,
25  would be to reverse the reserve for cash that they had

294

1   collected after they had written off the balances.
2       MR. GREENSTEIN:  Okay.
3       Q   And so -- and this says that Oracle had been
4   aggressive in applying customer overpayments from
5   25005 to previously written off invoices, and as a
6   result it reversed 9.5 million, which the companies
7   collected cash after they previously written off the
8   balances; right?
9       A   Right.
10      Q   So -- and you see up at the top, well, up in
11  that box, it has 12601 bad debt write-offs; right?
12      A   Yes.
13      Q   You see that?
14      You see in the darkened shaded box, it has --
15  it appears to say 9.5 million in there?
16      A   Yeah, I can't see what's in the shaded box,
17  but I -- in order for this schedule to roll forward
18  properly, it would have to be roughly 9.9 or
19  9. -- whatever it is -- 9.5.
20      Q   Okay.  So that -- that 9.5 reversal was taken
21  to 12601 bad debt write-offs account; right?
22      MR. KONOVALOV:  Objection: misstates the
23  document.
24      THE WITNESS:  Well, there was a -- there was
25  an adjustment made to the account that resulted in a

295

1   decrease in the reserve, but I -- but I'm -- I'm not
2   suggesting that it's an inappropriate entry.
3       MR. GREENSTEIN:  Okay.
4       Q   What I'm asking is that it appears that the
5   9.5 million of reserves that was reversed related to
6   12601; right?
7       A   Well, what I'm suggesting is that when they
8   collected the cash, it probably increased 12601, or I
9   won't say collected the cash.
10      When they recorded the payments, in order to
11  apply those payments, since they had previously
12  written off the invoices, the entry to record those
13  payments would be to debit 25005 and credit 12601.  So
14  somewhere in the activity for the quarter there's an
15  increase in 12601 of $9.5 million, but it doesn't need
16  to be there as of the end of the quarter, because
17  there are no receivables that require that
18  $9.5 million reserve.
19      So the company appropriately reduced the
20  reserve by $9.5 million to bring it in line with their
21  actual reserve requirements.
22      Q   Reduce 12601 by 9.5 million?
23      A   That's what it occurs.
24      Q   Okay.  So, in other words, during the course
25  of the quarter, they had been aggressive in applying

296

1   money, 25005 customer overpayments, to increase 12601,
2   and then as a result that it was too aggressive --
3       A   No, no.
4       Q   -- they reduced 12601 by 9.5 million?
5       MR. KONOVALOV:  Misstates the witness's
6   testimony.
7       MR. SIDORSKY:  Objection to form.
8       THE WITNESS:  I did not suggest that it was
9   inappropriate.  I don't know what is meant by the word
10  "aggressive," but it does not imply it's
11  inappropriate.
12      MR. GREENSTEIN:  Okay.
13      Q   I'll back up.  I don't think I said
14  inappropriate.
15      What I think I said is what you just
16  testified was that during the course of the quarter,
17  that Oracle had been applying amounts of -- applying
18  cash, it says, from 25005 customer overpayments, and
19  you said that increased in applying it such that it
20  increased 12601; right?
21      MR. KONOVALOV:  Objection; mischaracterizes
22  the witness's testimony.
23      MR. SIDORSKY:  Well, again, I -- I think the
24  question, to the extent you asked that question,
25  that's been answered, so let's try and --

297

1       THE WITNESS: Again --
2       MR. SIDORSKY: -- move to a -- to a question,
3   a new question. Objection; asked and answered.
4       THE WITNESS: I'm not suggesting that what
5   they did was, quote, "aggressive" or incorrect. It
6   doesn't say that they inappropriately applied customer
7   overpayments to previously written off invoices.
8       MR. GREENSTEIN: Right.
9    Q  I'm not --
10   A  It just says that's what they did.
11   Q  I'm not talking --
12   A  I'd rather not focus on the word
13  "aggressive."
14   Q  Okay. Well, setting "aggressive" aside, what
15  I think you just said was they were applying cash from
16  25005 customer overpayments to 12601, thereby
17  increasing that account 12601, and that at the end of
18  it, they decided to reverse that by 9.5 million such
19  that they would reduce 12601 by 9.5 million which is
20  what is in this box up here --
21      MR. KONOVALOV: Objection; vague and
22  ambiguous, but --
23      MR. GREENSTEIN: Q. -- right?
24   A  That's -- that's correct, but --
25   Q  Okay.

298

1    A  -- it's not inappropriate.
2    Q  Okay. Well, that's nonresponsive. I just
3   asked you if that's what happened, and you said that's
4   correct. I didn't ask about the appropriateness of it
5   or not, but somebody appears to think that it was too
6   aggressive; right?
7       MR. KONOVALOV: Objection; mischaracterizes
8   the witness's testimony and the document, and it's
9   argumentative.
10      You're quibbling with the witness now.
11      MR. SIDORSKY: Objection to form.
12      MR. GREENSTEIN: Q. Well, do you know who
13  wrote that, that it was aggressive?
14   A  I don't know.
15   Q  But somebody from Andersen thought that it
16  had been aggressive, and that as a result they
17  reverse -- they forced Oracle to reverse it by
18  9.5 million?
19      MR. KONOVALOV: Objection; misstates the
20  witness's testimony.
21      MR. SIDORSKY: No, that does mischaracterize
22  the witness's testimony.
23      THE WITNESS: You mischaracterized what I
24  said.
25      MR. GREENSTEIN: Okay. Well, I'll withdraw

299

1   that last question.
2    Q  So what does "aggressive" mean to you in the
3   context of applying cash receipts to account 12601?
4    A  This note to me means that they were actively
5   trying to clean up account 25005 and identify those
6   customer overpayments with actual invoices. And some
7   of those invoices, because there was stuff in 25005
8   that may have been there for quite some time and
9   hadn't been adequately or accurately identified with a
10  particular invoice, those invoices had been --
11  actually been written off by the company.
12      So they're no longer in the accounts
13  receivable trial balance, they're no longer in the
14  accounts receivable balance sheet item. So the only
15  way to get them out of account 25005 is to debit that
16  account, and it would be inappropriate to credit
17  accounts receivable, so they credited account 12601
18  which is where the original write-off went to.
19   Q  Right.
20      When you say "the original write-off," that
21  means it increases 12601; right?
22   A  It increases 12601 as a result of the journal
23  entry they made; that's correct.
24   Q  Okay.
25   A  But that's not to imply that as a result of

300

1   these journal entries that the company's bad debt
2   reserve requirements increased by $9.5 million.
3    Q  Okay. Did you ever have any discussions
4   about -- about this note here that -- that somebody
5   thought that the application of cash receipts in
6   account 25005, applying that cash to previously
7   written off invoices was, quote, "aggressive"? Did
8   you ever have any discussions about that?
9    A  I don't recall.
10   Q  But I think --
11   A  I don't know what you mean by -- again, by
12  the word "aggressive."
13   Q  Well, I'm just wondering if you ever had a
14  discussion about this particular 9.5 million reversal
15  as a result of the type of transactions that occurred
16  here.
17      MR. KONOVALOV: Objection; mischaracterizes
18  the document.
19      THE WITNESS: Well, I don't recall if I had
20  specific comments or specific discussions regarding,
21  you know, items on this schedule.
22      MR. GREENSTEIN: Okay.
23   Q  Generally, do you recall discussing the
24  company's application of cash receipts in account
25  25005 customer overpayments to previously written off

Matuszak, Gary  8/1/2006  9:14:00 AM

301

1    invoices?  Do you recall discussing that?
2        A    No, not specifically.
3        Q    Generally do you recall?
4        A    No.
5        Q    Okay.  Now, do you -- here -- is there any
6    support -- why was it a 9.5 reversal?  Do you know if
7    there was any evidence that supported that 9.5
8    million?
9        A    I can't tell from this -- from -- from this
10    document what, if any, detail was reviewed in terms of
11    how the 9.5 million was calculated.
12        Q    So you're not aware of any calculation done
13    by Andersen to come up with that 9.5 million; right?
14        A    No.
15        Q    Okay.  I'm going to mark this as Matuszak
16    No. 4; is it?
17        (Document marked Exhibit No. 4
18        for identification.)
19        THE WITNESS:  Thank you.
20        MR. GREENSTEIN:  Q.  For the record, this is
21    Bates stamped NDCA-ORCL 313777 through 313784.
22    Interview No. 1 memo of Thomas Williams dated
23    11/12/02.
24        A    Okay.
25        Q    I'll represent to you this is an interview

302

1    memorandum of a purported interview taken by Oracle's
2    Special Litigation Committee of Tom Williams, and you
3    can see on the second page of this it says "On
4    Tuesday, November 12, 2002, counsel at the Special
5    Litigation Committee of Oracle developed a further
6    follow-up interview of Tom Williams, Vice President of
7    Finance Operations"; you see that?
8        A    Yes.
9        Q    Okay.  Now, this appears to be a
10    memorialization of that interview; is that fair to
11    say?
12        MR. KONOVALOV:  Objection; lacks foundation.
13        THE WITNESS:  Well --
14        MR. SIDORSKY:  Yeah, objection.
15        MR. GREENSTEIN:  I think the document does
16    speak for itself, so --
17        MR. SIDORSKY:  It's all right.  You can
18    represent what the document is.  I mean, as you know,
19        MR. GREENSTEIN:  Q.  I'd like to direct your
20    attention to the last sentence in there where it says
21    "He had learned --" it's the third line up.
22        It says, "He had learned from Mike Quinn and
23    Greg Myers, who were responsible for conducting the
24    investigation, that certain persons in Oracle's
25    Collections Department had, apparently on an ad hoc

303

1    basis over time, moved certain items from Oracle's
2    unapplied cash account to its bad debt reserve
3    account."
4        Do you see that?
5        A    I do.
6        Q    So were you aware of -- when you were -- as a
7    result of your reviews and audit work for Oracle, were
8    you aware that certain persons in Oracle's collection
9    department had, on an ad hoc basis over time, moved
10    certain items from Oracle's unapplied cash account to
11    its bad debt reserve account?
12        A    Nope.
13        Q    You were never aware of that?
14        A    Nope.
15        Q    Do you know if anybody at Andersen was aware
16    of that?
17        A    I have no idea.
18        Q    You had no discussions about that?
19        A    Nope.
20        Q    Would that be something -- well, strike that.
21        If you turn to page 313781, please.
22        A    I'm sorry.  Which page?
23        A    313781.
24        A    313781; okay.
25        Q    And I'm directing your attention to the first

304

1    full paragraph.  Well, it's the small paragraph.  It
2    says "Williams also explained"; do you see that?
3        A    Yes.
4        Q    And you see it says "Williams also explained
5    that Oracle had moved certain cash receipts to Account
6    12601.  These receipts were entered on the credit side
7    of the account"; do you see that?
8        A    I do.
9        Q    Then it says, "These credits potentially
10    decrease bad debt expense when Oracle calculates its
11    reserve.  Thus, Williams explained, if there is a net
12    credit balance in 12601 for the quarter, potentially
13    less bad debt expense will be incurred if Oracle
14    decides it has to increase their reserve.  The less
15    bad debt required the smaller expenses, and therefore
16    income is correspondingly higher.
17        "In this way, Williams explained that the
18    transfers from unapplied cash to 126601 could
19    potentially have the effect from making income larger
20    than it would have been without the transfers."
21        Do you see that?
22        A    I do.
23        Q    Were you aware that there were -- at Oracle,
24    the collection staff had transferred unapplied cash
25    receipts to account 12601 such that it had the effect

305

1  of making income larger than it would have been
2  without the transfers?
3     MR. KONOVALOV:  Objection; assumes facts not
4  in evidence and mischaracterizes the record in this
5  case. The witness has testified about the specific
6  document. So it's distorted putting it in front of
7  the witness and then asking him whether or not he
8  agrees with the statements that have been disavowed.
9     Subject to that, you can answer the question.
10    MR. SIDORSKY:  Objection to form.
11    THE WITNESS:  I'm not aware of any of the
12  activities that you just read to me from the document.
13    MR. GREENSTEIN:  Okay.
14    Q  So you never had any discussions about this
15  type of activities that I just read; right?
16    A  No.
17    MR. SIDORSKY:  Objection to form.
18    MR. GREENSTEIN:  Okay.
19    MR. SIDORSKY:  Vague.
20    MR. GREENSTEIN:  Q.  Earlier you testified
21  that you weren't aware of any transfers made of
22  unapplied cash to 12601 that you recall; right?
23    MR. SIDORSKY:  Just objection to form.
24    THE WITNESS:  Inappropriate entries, no, I
25  was not aware of any.

306

1     MR. GREENSTEIN:  Q.  So were you aware of
2  appropriate transfers from 25005 to 12601?
3     A  Well, I think we just spent several minutes
4  discussing an entry that from the documentation in our
5  work papers appears appropriate. Whether it was or
6  not, I mean, we just discussed an entry that was made
7  from those two accounts, and I'm not suggesting that
8  entry was inappropriate.
9     Q  Okay. But wasn't it true that in that
10  document it was talking about transfers that were made
11  of -- from 25005 that were then decided by Andersen
12  that they were -- needed to be reversed; right?
13    MR. SIDORSKY:  Objection.
14    MR. KONOVALOV:  Objection; misstates the
15  document and the witness's testimony.
16    THE WITNESS:  That's not what the note says.
17    MR. GREENSTEIN:  Okay.
18    Q  But again, if you're looking at these two
19  paragraphs on 313781, what I just read to you, you
20  weren't aware of this occurring at Oracle?
21    MR. KONOVALOV:  Objection; assumes facts not
22  in evidence.
23    MR. SIDORSKY:  And mischaracterizes what the
24  witness just testified about. Objection to form.
25    THE WITNESS:  I'm -- I'm not aware of any of

307

1  the items or practices that Mr. Williams is discussing
2  in this memorandum.
3     MR. GREENSTEIN:  Okay.
4     Q  And if you look down where -- at the bottom
5  where it has the heading "Transfers of unapplied cash
6  to 12601," do you see that?
7     A  Yes.
8     Q  And it says, "As Williams --" second
9  sentence "-- As Williams had noted earlier, he learned
10  of these transfers following the allegations in the
11  SAC."
12    I'll represent to you that the SAC is the
13  second amended complaint filed by plaintiffs in the
14  securities fraud litigation.
15    Did you ever learn after the filing of the
16  SAC that -- of the type of transfers that he was
17  describing on this page?
18    A  No.
19    MR. KONOVALOV:  Objection; lacks foundation;
20  calls for speculation; assumes facts not in evidence.
21  The document speaks for itself.
22    MR. GREENSTEIN:  Q.  I'm sorry. Did you say
23  no?
24    MR. SIDORSKY:  Same objection.
25    MR. GREENSTEIN:  Q.  Did you say no?

308

1     A  I said no.
2     Q  Okay. If you turn the page -- actually, if
3  you just start on the next line, it says -- or the --
4  sorry. The -- last sentence, beginning sentence,
5  where it says "Williams said that the transfers --"
6  and then go to the next page "-- Williams said the
7  transfers were accomplished by designating the cash
8  receipt as 'on account,' then executing a
9  miscellaneous cash receipt to move the funds from
10  25005 to 12601"; do you see that?
11    A  I do see that.
12    Q  Now, were you aware of -- that transfers were
13  accomplished by designating cash receipts as on
14  account and executing a miscellaneous cash receipt to
15  move funds from 25005 to 12601?
16    MR. KONOVALOV:  Same objections.
17    MR. SIDORSKY:  Objection to form.
18    THE WITNESS:  No.
19    MR. GREENSTEIN:  Q.  And you don't know
20  what -- see where it says "on accounts" in quotes?
21  You don't know what that meant or means?
22    A  I believe I already testified to that earlier
23  today, but I would reiterate that no, I do not know
24  what that means.
25    Q  Okay. If you turn the page to 313783, see

309

1  where it says "Amount of the Transfers"?
2       A  I do.
3       Q  You see down at the -- the second full
4  paragraph after that heading, it says, "Williams
5  stated that he believed that the aggregate amount of
6  the transfers in the two-year period from August 2000
7  to August 2002 was approximately $48 million"; do you
8  see that?
9       A  I do see that.
10      Q  Were you aware that there was an aggregate
11  amount of transfers from 25005 to 12601 during that
12  period of 48 million?
13      MR. KONOVALOV:  Objection; assumes facts not
14  in evidence; lacks foundation.
15      MR. SIDORSKY:  Objection to form.
16      THE WITNESS:  Now, I think I've already
17  stated I wasn't aware of any of the transfers
18  discussed or any activity discussed in this
19  memorandum.  So, by definition, I was not aware of
20  quantifying what it would be.  I wasn't aware that
21  they happened.
22      MR. GREENSTEIN:  Okay.
23      Q  Was anybody at Andersen aware of this
24  activity that we've just been talking about?
25      MR. KONOVALOV:  Objection; calls for

310

1  speculation.
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  I -- I -- I don't know.
4       MR. GREENSTEIN:  Okay.
5       Q  Well, did you ever discuss it with anybody
6  during the audit or quarterly reviews in 2001?
7       A  I did not.
8       Q  Did you ever discuss it with anybody after
9  you left Andersen?
10      A  I did not.
11      Q  You see -- see there on the last sentence of
12  that second or the last full paragraph, it says
13  "Williams said he had prepared a spreadsheet that he
14  would share with the committee showing the transfers
15  from 25005 to 12601 from August 2000 to August 2002"?
16  Do you see that?
17      A  I do.
18      Q  And have you ever seen that spreadsheet that
19  he refers to there?
20      A  I have not.
21      Q  Okay.
22      A  I just want to point out that the -- the
23  ending period of that spreadsheet is after Andersen
24  was terminated as the auditors for Oracle.
25      Q  Right.

311

1       A  So the schedule was prepared after I left.
2       Q  Okay.  But the activity obviously goes from
3  August 2000 through August 2002 at which time --
4  actually, withdraw that.
5       So all of the things I just read to you out
6  of this memorandum, in conducting your audit and
7  quarterly reviews for Oracle in 2001, would you have
8  wanted to know that this was occurring --
9       MR. KONOVALOV:  Objection.
10      MR. GREENSTEIN:  Q.  -- during those reviews?
11      MR. KONOVALOV:  Sorry.  Objection; assumes
12  facts not in evidence.
13      MR. SIDORSKY:  Objection to form.
14      THE WITNESS:  I would have wanted to know,
15  yes.
16      MR. GREENSTEIN:  Okay.  For the record, I'm
17  going to mark the next exhibit.  Well, it's actually
18  already been marked as Chen No. 12.
19      Q  And just to back up, why would you have
20  wanted to know that the activities that were referred
21  to there were occurring?
22      MR. KONOVALOV:  Objection; assumes facts not
23  in evidence.
24      MR. SIDORSKY:  Yeah, objection to the --
25  objection to form.

312

1       MR. GREENSTEIN:  Actually, you know what,
2  I'll withdraw that.
3       Q  Looking at Chen 12, which is a October 21st,
4  2002, e-mail from Michael Quinn to Ryan Roberts and
5  Greg Myers, cc:  Tom Williams, if you could just go
6  ahead and read that.
7       Actually, if you could stop by where it says
8  "What needs to be done."
9       A  Okay.
10      Q  You finished?
11      A  Almost.  Okay.
12      Q  Have you ever seen this e-mail before?
13      A  No.
14      Q  Do you know who Michael Quinn is?
15      A  I do.
16      Q  And did you ever have any discussions with
17  Michael Quinn about the con -- the -- these three
18  first bullet points in this e-mail?
19      A  No, I did not.
20      Q  Okay.  You see how it says "Ryan, Greg, Below
21  is the action plan for addressing the problems
22  surrounding the unapplied cash issues that you guys
23  worked on last week."
24      Do you see that?
25      A  I see that, yes.

313

1    Q   Were you aware during the quarterly reviews
2   or audit of Oracle's 2001 results that there were any
3   problems surrounding unapplied cash?
4    A   I was not.
5    Q   You see it says "There are three
6   deliverables," and it says "We need to provide an
7   update to the Audit Committee (a subcommittee of
8   Oracle's Board of Directors) in regards to what
9   Revenue Impact this process of taking unapplied cash
10  receipts to the reserve will have on our financial
11  statements.  In addition, we need to provide what
12  impact this process has had on revenue in each of the
13  last 8 quarters"; do you see that?
14   A   I do.
15   Q   So the last eight quarters, if you look at
16  the e-mail, it's October 21st, 2002.  So that would
17  take you back approximately two years, if you were
18  looking at the impact of the past eight quarters;
19  correct?
20       MR. KONOVALOV:  Objection; assumes facts not
21  in evidence; lacks foundation.
22       THE WITNESS:  It appears that it would go
23       back into fiscal 2001, yes.
24       MR. GREENSTEIN:  Right.
25   Q   And you see where it says "what Revenue

314

1   Impact this process of taking unapplied cash receipts
2   to the reserve will have on our financial statements"?
3       Now, nobody at Oracle told you during the
4   fiscal 2001 reviews audit or the reviews that there
5   were unapplied cash receipts taken to the reserve
6   which potentially could impact revenue?
7       MR. KONOVALOV:  Objection.
8       MR. GREENSTEIN:  Q.  Were you ever told that?
9       MR. KONOVALOV:  Assumes facts not in
10  evidence; misstates evidence.
11      MR. SIDORSKY:  Objection to form.
12      THE WITNESS:  No, I was not.
13      MR. GREENSTEIN:  Okay.
14   Q   Were you ever told about any of the issues in
15  this first bullet point during your time at Andersen?
16   A   No, I was not.
17      MR. SIDORSKY:  Objection to form.
18      MR. GREENSTEIN:  Q.  You see where it says in
19  the second bullet point -- or sorry -- you see in the
20  first bullet point it says "We need to provide what
21  impact this process has had on the revenue in each of
22  the last eight quarters," and you were never informed
23  that there was any possible impact of taking unapplied
24  cash receipts to the reserve that would impact revenue
25  in the prior eight quarters; right?

315

1       MR. KONOVALOV:  Objection; assumes facts not
2   in evidence.
3       MR. SIDORSKY:  Objection to form.
4       MR. KONOVALOV:  The document -- the witness
5   testified he has never seen the document before.
6   You've got no foundation for any of these questions.
7       MR. GREENSTEIN:  Q.  And what I'm asking is,
8   were you ever made aware that there was a potential
9   impact of a process of taking unapplied cash receipts
10  to the reserve in that it could potentially impact the
11  quarterly financial statements that Andersen
12  audited --
13      MR. KONOVALOV:  Objection; assumes --
14      MR. GREENSTEIN:  -- and reviewed?
15      MR. KONOVALOV:  -- facts not in evidence.
16      MR. SIDORSKY:  Objection to form.
17      THE WITNESS:  No, I was not aware.
18      MR. GREENSTEIN:  Okay.
19   Q   Were you ever made aware at any time after
20  you left Oracle -- Andersen?
21   A   No.
22   Q   Would you have wanted to know this in
23  conducting your quarterly reviews and audit -- would
24  you have wanted to know if this was, in fact,
25  occurring and it would, in fact, have an impact on

316

1   revenue?
2       MR. KONOVALOV:  Same objection.
3       MR. SIDORSKY:  Objection to form.
4       THE WITNESS:  Yes, I would have liked to have
5   known about it while we were out doing our review and
6   audit work.
7       MR. GREENSTEIN:  Right.
8    Q   You see in the second bullet point where it
9   says "We need to clean up the ENTIRE problem prior to
10  the end of October by moving cash receipts to the
11  proper buckets (unapplied, customer overpayments, or
12  on account) as appropriate.  We need to establish new
13  policies and procedures to ensure this never happens
14  again"?
15      Were you ever made aware of this problem that
16  he's referring to here or that Oracle needed to
17  establish new policies and procedures to ensure that
18  that never happened again?
19   A   No.
20      MR. KONOVALOV:  Same objections.
21      MR. GREENSTEIN:  Q.  You weren't aware of any
22  of this in these two bullet points here; right?
23      MR. KONOVALOV:  Same objections.
24      THE WITNESS:  No.
25      MR. GREENSTEIN:  Q.  But you would have

317

1  wanted to know if Oracle had to change its policies
2  and procedures to ensure that the problem never
3  happened again? That would be something you wanted to
4  know as Oracle's auditor in conducting your audit;
5  right?
6          MR. SIDORSKY: Objection to form.
7          MR. KONOVALOV: Same objection.
8          MR. MERCHANT: I think I already testified on
9  this memo and Mr. Williams' memo that I would like to
10  have known about this practice if it had been
11  occurring.
12          MR. GREENSTEIN: Okay.
13      Q  You see in the last paragraph -- well,
14  sorry -- the fourth bullet point says "What needs to
15  be done," it says "For items currently 'On Account,'
16  we need to continue to work through each item over
17  $10,000 to determine what should have happened to the
18  cash receipt and make the correction and put it in the
19  right place"; do you see that?
20      A  I see that, yes.
21      Q  Were you ever made aware during 2001 or
22  during 2000, 2001 -- were you ever made aware that
23  there were items currently on account at Oracle that
24  needed to be determined where -- what should have
25  happened to the cash receipt?

318

1          MR. KONOVALOV: Same objections.
2          MR. SIDORSKY: Objection to form.
3          THE WITNESS: No.
4          MR. GREENSTEIN: Okay.
5      Q  Do you see the paragraph under those last
6  three bullet points where it says "Greg," and that
7  refers to Myers, "For the Miscellaneous Offset Report,
8  I need you to add the date the item was moved to
9  12601. We need to accumulate the error by quarter."
10          You see that?
11      A  I do.
12      Q  And were you aware -- were you aware that
13  Oracle tried to -- ever -- that Oracle tried to
14  accumulate the error by quarter as it relates to items
15  being moved to 12601?
16          MR. KONOVALOV: Same objections.
17          MR. SIDORSKY: Objection to form.
18          THE WITNESS: I think I've already testified
19  that I wasn't aware of any of the activities in this
20  memo or Mr. Williams' memo.
21          MR. GREENSTEIN: Okay.
22          THE WITNESS: So I was -- you keep asking me
23  the same questions over and over again. I'm not aware
24  of it.
25          MR. GREENSTEIN: Okay.

319

1      Q  If you turn to the second page, the paragraph
2  that says "Greg, Please confirm that ALL ability to
3  move anything to 12601 via On Account or creating a
4  Misc receipt write-off has been turned off."
5          Do you see that?
6      A  I do.
7      Q  Were you ever aware in 2000, 2001, or any
8  time, that there was an ability to move unapplied cash
9  to 12601 via on account?
10          MR. KONOVALOV: Same objections.
11          MR. SIDORSKY: Objection to form.
12          THE WITNESS: No.
13          MR. GREENSTEIN: Okay.
14      Q  Because I think you testified you didn't know
15  what "on account" meant, so you wouldn't know that
16  there was any ability to move anything to 12601 on
17  account; right?
18          MR. SIDORSKY: Objection to form.
19          THE WITNESS: That would be correct.
20          MR. GREENSTEIN: Q. And were you ever aware
21  that this -- that Oracle ever attempted to turn off
22  the ability to move unapplied cash to 12601 via on
23  account?
24          MR. KONOVALOV: Same objections.
25          THE WITNESS: No.

320

1          MR. GREENSTEIN: Put that aside. I think I'm
2  going to take a five-minute break and then finish off.
3          THE VIDEOGRAPHER: Off the record. The time
4  is 5:47 p.m.
5          (Short break taken.)
6          (Documents marked Exhibit Nos. 5 - 8
7           for identification.)
8          THE VIDEOGRAPHER: We are back on the record.
9  The time is 6:05 p.m. This marks the end of videotape
10  number four, Volume I in the deposition of
11  Gary Matuszak.
12          (Short break taken.)
13          THE VIDEOGRAPHER: We are back on the record.
14  The time is 6:09. Here marks the beginning of
15  videotape number five, Volume I, in the deposition of
16  Gary Matuszak.
17          MR. GREENSTEIN: Q. Mr. Matuszak, we just
18  finished talking about two documents, one was a
19  interview memorandum of Thomas Williams and the other
20  was an e-mail from Mike Quinn, and they were
21  discussing certain transfers from -- of unapplied cash
22  to 12601; do you recall talking -- having that
23  discussion?
24      A  In this deposition.
25          MR. SIDORSKY: Objection to form.

321

1     THE WITNESS: I recall the discussion we just
2  had as part of the deposition, yes.
3     MR. GREENSTEIN: Right.
4     Q  Now, I think I asked you if you would have
5  wanted to know if that what was reflected in those two
6  documents was actually occurring during the time that
7  you were auditing and reviewing the -- Oracle's
8  financial statements.  Do you remember me asking that?
9     MR. SIDORSKY: Objection to form.
10     THE WITNESS: Generally, yes.
11     MR. GREENSTEIN: Q.  And you said you would
12  have wanted to know -- you would have liked to know
13  that at the time you were auditing Oracle's financials
14  and reviewing the quarterly financials; right?
15     A  Yes.
16     MR. SIDORSKY: Objection; asked and answered.
17     MR. GREENSTEIN: Q.  And I just wanted to
18  know why you would have wanted to know that if those
19  issues were actually occurring during your audit and
20  quarterly reviews?
21     MR. KONOVALOV: Well, objection; vague, and
22  assumes facts not in evidence.
23     THE WITNESS: Based upon the documents we
24  just went through, it -- it's unclear whether this was
25  appropriate activity or not.  It appears as if some of

322

1  it may have been inappropriate activity, and therefore
2  I would want to be aware of it.
3     MR. GREENSTEIN: Okay.
4     Q  Are you aware of -- that on November 17th
5  Oracle created 46,000 -- well, strike that.
6     Do you know what a debit memo is?
7     MR. SIDORSKY: Objection to form.
8     THE WITNESS: Generally, yes.
9     MR. GREENSTEIN: Okay.
10     Q  Well, with respect to Oracle, do you know
11  what a debit memo was around the 2000 and 2001 time
12  frame?
13     A  Not specifically, no.
14     Q  Generally, what do you know a debit memo to
15  be?
16     A  A credit memo would be a reversal of an
17  invoice.  A credit memo, an invoice.  So a debit memo
18  would be an increase.  I don't know if it was an
19  increase in an invoice or debit to a customer account.
20  I -- I don't know specifically what they meant by a
21  debit memo, how it impacted a particular customer
22  account.
23     Q  Okay.  Are you aware that -- that plaintiffs
24  allege in this lawsuit that there were 46,000 --
25  approximately 46,000 debit memos created on or around

323

1  November 17th, 2000?
2     A  I recall that that was stated in the -- in
3  the complaint, yes.
4     Q  Okay.  So other than seeing that in the
5  complaint, were you ever aware around 2000 -- were you
6  ever made aware, at any time, that there were
7  46,000-plus debit memos created on or around
8  November 17, 2000, at Oracle?
9     A  No.
10     Q  Okay.  Were you ever aware that Oracle
11  conducted a, quote, "on account" clean up for USA data
12  in connection with the creation of those debit memos
13  on or around November 17, 2000?
14     MR. KONOVALOV: Objection; vague and
15  ambiguous.
16     MR. SIDORSKY: Objection to form.
17     THE WITNESS: No.
18     MR. GREENSTEIN: Q.  Were you aware of an on
19  account cleanup at Oracle while you were there?
20     MR. SIDORSKY: Objection to form.
21     THE WITNESS: No.
22     MR. GREENSTEIN: Okay.
23     Q  Do you know if anybody at Andersen was aware
24  of any on account cleanup relating to debit memos
25  while you were at Andersen?

324

1     A  I'm not aware.  I don't know.
2     Q  So other than seeing it in the complaint --
3  strike that.
4     In front of you I've marked a few documents,
5  first of which is Matuszak No. 5, and it's a
6  November 9th, 2000, e-mail from -- the subject is "HP
7  Q2 Execution Plan Update for November 10 Thursday"
8  from Michael DeCesare at Oracle, to Ed Sanderson and
9  Frank Varasano.
10  You've had a chance to review that; right?
11     MR. SIDORSKY: Objection to form.  How has --
12  he hasn't had a chance to review it.
13     MR. GREENSTEIN: Q.  While we were off the
14  record, were you reading this?  You read this?
15     A  I did -- I did not read this --
16     Q  Okay.
17     A  -- no.
18     Q  If you could just go ahead and read the first
19  paragraph there in that first e-mail, and for the
20  record, this is Bates stamped NDCA-ORCL 055957 through
21  055962.
22  Have you had a chance to read the first
23  e-mail in the string?
24     A  Yes.
25     Q  Have you seen this e-mail, by the way?

Matuszak, Gary  8/1/2006  9:14:00 AM

325

1     A  No.
2     Q  Or any of the string of e-mails?
3     A  No.
4     Q  Okay.  And do you see where it says
5  "Sandy/Frank"?  Do you know who Sandy was?
6     A  I believe Sandy Sanderson was one of the
7  executives in the sales group.
8     Q  Okay.  You see there it says "HP confirmed
9  today that they will try to pull the CRM portion of
10  the order off providing we deliver what we have
11  outlined in Development and Production systems"?  You
12  see that?
13     A  I do.
14     Q  You see where it says "Since they don't need
15  ALL the license users right now they are hedging on
16  how big an order they will do until they see how much
17  production hardware Oracle comes back with.  If this
18  turns out to be a large number we could get the entire
19  order."
20        Do you see that?
21     A  I do.
22     Q  So in reading this, doesn't it appear that --
23  that this deal with HP in the second quarter, that
24  there was a -- a contingency for HP to purchase Oracle
25  products -- was based on -- in part on Oracle's

326

1  agreement to purchase AP -- HP products; right?
2        MR. KONOVALOV:  Objection; misstates the
3  document; document speaks for itself.
4        MR. SIDORSKY:  Objection to form.
5        MR. KONOVALOV:  Lacks foundation as well.
6        THE WITNESS:  It -- it -- it appears they're
7  working concurrently on two transactions.
8        MR. GREENSTEIN:  Q.  Right, but I'm not
9  saying -- well, but it -- it doesn't just appear that
10  these two transactions are occurring -- are occurring
11  concurrently.
12        Doesn't it appear from this e-mail that --
13  that HP is hedging on how big an order they will place
14  with Oracle until they see how much hardware Oracle
15  will purchase from HP?
16        MR. KONOVALOV:  Objection; it's
17  argumentative; it lacks foundation.
18        MR. SIDORSKY:  Yeah.
19        MR. KONOVALOV:  Calls for speculation.
20        MR. SIDORSKY:  Same objections.
21        This is -- this is not a document the witness
22  has seen.  It's not appropriate to ask him to
23  interpret a document he has no involvement with.
24  Objection to form.
25        THE WITNESS:  I -- I -- I read the document

327

1  the same as everyone else here, and it says they're
2  hedging on how big an order they will do until they
3  see how much production hardware we're going to buy,
4  so....
5        MR. GREENSTEIN:  Okay.
6     Q  So if you saw this e-mail at the time you
7  reviewed the Hewlett-Packard deal in the second
8  quarter, and you saw this language about hedging on
9  how big an order HP will do until they see how much
10  Oracle will purchase, would that be something that you
11  would find important in determining whether SOP 97-2
12  was met?
13        MR. SIDORSKY:  Objection to form.
14        MR. KONOVALOV:  Objection; incomplete
15  hypothetical.
16        THE WITNESS:  I don't know.  Possibly.  I
17  mean, both -- both agreements were executed by the end
18  of the quarter.
19        MR. GREENSTEIN:  Right.
20     Q  But that's not what I'm asking.  I'm asking
21  would you have wanted to know if HP was hedging on how
22  big an order they would place from Oracle until they
23  saw how much hardware Oracle would purchase from HP?
24        MR. KONOVALOV:  Objection; assumes facts not
25  in evidence.

328

1        MR. SIDORSKY:  Objection to form; calls for
2  speculation.
3        THE WITNESS:  Possibly.  I mean, it -- it
4  would have been nice to know.  I don't know if or how
5  it would have impacted the ultimate revenue recognized
6  on the transaction.
7        MR. GREENSTEIN:  Right.
8     Q  But why would you say it would have been nice
9  to know this?
10     A  Well, we like to have as much information and
11  background as we can.
12     Q  Right.
13        But this particular e-mail, why would it be
14  nice to know what -- what is --
15     A  I think I just stated it would be nice to
16  have this as background information to understand that
17  they were negotiating a license software to HP at the
18  same time HP was negotiating a purchase of hardware
19  from Oracle.
20     Q  Right.
21        But would you want to know -- do you see
22  where it says "If this turns out to be a large number
23  we can get the entire order"?
24        Now, just on the face of that, doesn't that
25  appear that what he's saying here is that if -- what

329

1 Oracle -- if it turns out that Oracle agrees to buy a
2 large number from HP, then Oracle could get the entire
3 order from HP?  Isn't that -- isn't that what it looks
4 like on the face of this?
5       MR. KONOVALOV:  Objection; I'm not sure who's
6 testifying at this point; the document speaks for
7 itself; the question lacks foundation.
8       MR. SIDORSKY:  Yeah, same objection.  You're
9 trying to interpret a document that -- that the
10 witness has no particular knowledge and has never seen
11 before, so he can't add anything.  Objection to form.
12      THE WITNESS:  Well, you're asking me to -- to
13 read a document and -- and try to interpret what it
14 means.  You know, other than reading the document, I
15 have no basis to do anything other than read the
16 document.
17      MR. GREENSTEIN:  Okay.
18      Q  Well, if you saw this document during the
19 second quarter, when you were analyzing the HP deal
20 and reviewing it for compliance with SOP 97-2, would
21 this e-mail, this document -- would it -- would it
22 have changed your analysis at all that it was proper
23 to recognize that revenue during quarter -- the second
24 quarter?
25      MR. SIDORSKY:  Objection to form.

330

1       MR. KONOVALOV:  Objection; asked and
2 answered; it's also an incomplete hypothetical.
3       THE WITNESS:  I don't know whether it would
4 have impacted our conclusion.  It may have.  It may
5 not have.
6       MR. GREENSTEIN:  Q.  But if there was, in
7 fact, a -- if -- if there was a contingency as part of
8 this deal whereby Oracle or HP's purchase of Oracle
9 product was contingent upon the amount purchased by
10 Oracle of HP hardware, if there was that contingency,
11 would that have precluded revenue recognition under
12 97-2?
13      MR. KONOVALOV:  Q.  I'm going to renew my
14 objection to this entire line of questioning.  It's
15 Judge Infante's rule that this is off limits.
16      In any event, it's asked and answered; it's
17 an incomplete hypothetical; assumes facts not in
18 evidence; the document speaks for itself.
19      MR. SIDORSKY:  Same objection.
20      THE WITNESS:  Again, I'll repeat my answer.
21 I don't know what impact this would have had on our
22 ultimate conclusion.
23      MR. GREENSTEIN:  Q.  But you would have liked
24 to know these facts; right?
25      MR. KONOVALOV:  Objection; asked and

331

1 answered.
2       THE WITNESS:  I believe I've already answered
3 that question.
4       MR. GREENSTEIN:  Q.  And that answer was yes;
5 right?
6       A  I believe it was.
7       Q  Okay.  Now, do you see where it says "Since
8 they don't need ALL of the license users right now"?
9 Do you see that?
10      A  I do see that.
11      Q  Is it proper under SOP 97-2 to recognize
12 revenue on a deal where the purchaser doesn't need all
13 the license users right now --
14      MR. KONOVALOV:  Objection; assumes facts.
15      MR. GREENSTEIN:  Q.  -- or at the time of the
16 purchase?
17      MR. KONOVALOV:  Sorry.  Objection; assumes
18 facts not in evidence.
19      MR. SIDORSKY:  Objection to form.
20      THE WITNESS:  It's not necessarily rel --
21 relevant to revenue recognition on the license
22 arrangement.
23      MR. GREENSTEIN:  Q.  So it's possible to
24 recognize revenue under 97-2 if -- even if the
25 purchaser doesn't need the license users at the time

332

1 they buy the product?
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  Yeah.
4       MR. GREENSTEIN:  Okay.
5       Q  If you look at the next document, which is
6 Matuszak No. -- actually, stay with that one.
7       If you look at the second page, 055958, and
8 I'll just direct your attention to the top portion of
9 that page.  You see where it says "As you'll see in
10 the note below from Kurt Graustein, there is a lot of
11 production data that will eventually reside in Ili
12 that may make the HP sizing effort more complex
13 because of application change."
14      It says "HP confirmed again today they're
15 willing to do a Q2 CRM deal in some amount if we can
16 pull together machine requirements into a binding PO
17 and resolve the development issues we're working on."
18      Then it says "According to Phil May, HP is
19 willing to buy as much CRM from Oracle as we buy in
20 HW --" which I think means hardware "-- Support and
21 other requirements from HP."
22      So my question is, looking at that last
23 sentence I just read, does that -- where it says
24 "According to Phil May, HP is willing to buy as much
25 CRM from Oracle as we buy in HW, Support and other

333

1 requirements from HP," doesn't that indicate that
2 there was some type of contingency between the two,
3 that the purchase from Oracle was -- the purchase from
4 HP was contingent on the -- Oracle's purchase of HP
5 hardware?
6         MR. KONOVALOV:  Objection; misstates the
7 document; lacks foundation.
8         MR. SIDORSKY:  Objection to form.
9         THE WITNESS:  It -- you can read the document
10 the same way I can.  I mean, it says what it says.
11        MR. GREENSTEIN:  Right.
12    Q  But I'm asking you your understanding --
13    A  You're asking --
14    Q  -- reading this, if this, to you, as an
15 auditor, and a -- and a -- and knowledgeable about SOP
16 97-2, if reading this statement leads you to believe
17 that there was some sort of contingency in the deal
18 that occurred between HP and Oracle in the second
19 quarter of 2001?
20        MR. KONOVALOV:  Same objections.
21        MR. SIDORSKY:  Objection to form; asked and
22 answered; same objections.
23        THE WITNESS:  It appears that the
24 contingency, if it -- if it did exist, was that they
25 execute a purchase order to purchase equipment from

334

1 HP.
2         MR. GREENSTEIN:  Okay.
3    Q  If you move to Matuszak No. 6, for the
4 record, this is an e-mail dated November 28th, 2000,
5 and Bates stamped 020844 through 020849 from
6 Mike DeCesare to Larry Ellison, Sandy Sanderson,
7 Safra Catz and CCing other people.
8         If you could just go ahead and read the --
9 read this e-mail, please.
10        Actually, I want to focus your attention on
11 the first page.  You see where it says in the first
12 bullet point "Production Spend - Consistent with
13 Larrys conversations with Carly, HP will expect a
14 purchase order for the following amounts.  They will
15 expect this purchase order to be binding and commit
16 Oracle to using the full amounts by the dates we
17 promise"?
18        Do you see that?
19    A  I do.
20    Q  Now, reading that, does that indicate to
21 you -- well, look at the date November 28th, 2000; do
22 you see that?
23    A  Yes.
24    Q  That was two days before the close of the
25 deal; right?

335

1    A  Yes.
2    Q  And you see where it says "HP expects -- will
3 expect a purchase order for the following amounts"?
4         Now, does that indicate to you that there was
5 some type of contingency between -- whereby Oracle had
6 to agree to purchase certain amounts from HP before HP
7 would agree to the -- to purchase product from Oracle?
8         MR. KONOVALOV:  Objection; lacks foundation;
9 assumes facts not in evidence; the document speaks for
10 itself.
11        MR. SIDORSKY:  Objection to form; same
12 objections.
13        THE WITNESS:  Well, it -- it appears to me to
14 suggest that they were expecting that Oracle would
15 issue a purchase order that would bind them to the
16 purchase of HP equipment.  It does not suggest that
17 once both of those documents are executed, that the
18 payment of the license fee is contingent upon Oracle
19 executing under their obligations under the purchase
20 order.
21        MR. GREENSTEIN:  Okay.
22    Q  Well, if you turn to the next page, you
23 see -- you see where it says in the first bullet
24 "Order to Oracle.  Background - Over the past 8 weeks
25 Oracle (Mike DeCesare) and HP (Phil May --" et

336

1 cetera "-- have been working on a series of
2 concessions that has been requested by HP before they
3 move forward on the purchase of the additional CRM
4 licenses"?
5         Do you see that?
6    A  I see that.
7    Q  It says "It has been understood that this
8 would not been executed until all of the HP
9 deliverables are completed"; do you see that?
10   A  I do see that.
11   Q  So -- so doesn't it indicate that it looks
12 like there have to be concessions made by Oracle that
13 were requested by HP before they moved forward on the
14 purchase of additional CRM licenses?
15        MR. KONOVALOV:  Objection; lacks foundation;
16 assumes facts not in evidence; the document speaks for
17 itself.
18        MR. SIDORSKY:  Objection to form.
19        THE WITNESS:  Well, the -- the e-mail says
20 "concessions," so I guess I don't know what that term
21 means.  But reading the document, that's what it -- it
22 would imply.  There are concessions that have been
23 requested by HP.
24        MR. GREENSTEIN:  Right.
25   Q  Before they purchase Oracle products, there

337

1  have to be concessions made by Oracle to HP; right?
2  　　　MR. SIDORSKY: Objection to form.
3  　　　THE WITNESS: Prior to purchase of the
4  product.
5  　　　MR. GREENSTEIN: Right.
6  　Q  So doesn't that indicate that the purchase by
7  HP of Oracle product is contingent on certain
8  concessions made by Oracle to HP --
9  　　　MR. KONOVALOV: Objection; misstates the
10  document.
11  　　　MR. GREENSTEIN: Q. -- right?
12  　　　MR. SIDORSKY: Objection to form.
13  　　　THE WITNESS: Well, it implies that the
14  concessions would be prior to the purchase of the
15  product, not concessions subsequent to the purchase of
16  the product.
17  　　　MR. GREENSTEIN: Q. But what I'm asking is
18  that it appears that the concessions are -- that
19  the -- before HP moves forward on a purchase, that
20  there have to be concessions made. So, in other
21  words, the purchase is contingent on the concessions;
22  is that fair to say?
23  　　　MR. KONOVALOV: Objection; misstates the
24  document; the word "contingency" is nowhere in any of
25  these documents.

338

1  　　　MR. SIDORSKY: Objection to form.
2  　　　THE WITNESS: Yeah, you keep using the word
3  "contingency," but there's a number of negotiations
4  that go on in any business arrangement, any license
5  agreement, any other business arrangement, and those
6  conditions have to be met.
7  　　　So, you know, you can imply that every deal
8  has a contingency, because until the parties have a
9  meeting of the minds and it comes together in a legal
10  contract, you know, there would be a contingency
11  involved in the event that if one didn't agree to the
12  other party's terms and conditions they wouldn't
13  execute the agreement.
14  　　　So I'm struggling with what -- you keep
15  throwing out the word "contingency," and I -- I don't
16  know what you're trying to imply or mean by that.
17  Now, I can read the e-mail the same way you can.
18  　　　MR. GREENSTEIN: Okay.
19  　Q  Were you aware of any concessions that were
20  what's written here, that there were concessions that
21  HP was requesting before they move forward on the
22  purchase in Q2?
23  　A  I've not seen this memo before and so --
24  　Q  But were you aware -- okay. Sorry?
25  　A  -- so I'm not aware of these concessions.

339

1  　Q  Okay. Were you aware of any concessions that
2  HP was requesting from Oracle that had to be met
3  before HP would agree to make the purchase in Q2?
4  　　　MR. KONOVALOV: Objection; assumes facts not
5  in evidence.
6  　　　THE WITNESS: Not that I recall.
7  　　　MR. GREENSTEIN: Okay.
8  　Q  Would you have wanted to know that in
9  reviewing this transaction under SOP 97-2? Would you
10  have wanted to know that there were concessions that
11  HP was requiring from Oracle before they would
12  purchase their product?
13  　　　MR. SIDORSKY: Objection to form.
14  　　　THE WITNESS: I would likely want to be aware
15  of them. I'm not -- it's not clear to me that any of
16  them would impact my conclusion on revenue
17  recognition.
18  　　　MR. GREENSTEIN: Right.
19  　Q  But what I was asking is, would you have
20  wanted to know that at the time you were reviewing it
21  under SOP 97-2?
22  　　　MR. KONOVALOV: Objection; vague and
23  ambiguous.
24  　　　MR. SIDORSKY: Objection to form.
25  　　　THE WITNESS: I would like to know the items

340

1  that would impact revenue recognition, and if some of
2  the concessions would impact, yes, I would like that.
3  　　　MR. GREENSTEIN: Q. Some concessions could
4  potentially impact the revenue recognition; right?
5  　　　MR. KONOVALOV: Objection; vague and
6  ambiguous.
7  　　　THE WITNESS: It's unclear whether -- if
8  they -- if HP is requesting them to do something, and
9  they do it prior to executing the license agreement,
10  whether it has any impact on the revenue recognition.
11  　　　MR. GREENSTEIN: Right.
12  　Q  But what I'm asking is -- is, would you want
13  to know that in making this determination? And I
14  think you said yes, because it could potentially
15  impact revenue recognition; right?
16  　　　MR. KONOVALOV: Objection; misstates the
17  witness's testimony.
18  　　　MR. SIDORSKY: Objection to form.
19  　　　THE WITNESS: I believe what I said is I
20  would like to understand what concessions may exist
21  that may have an impact on the revenue recognition.
22  　　　MR. GREENSTEIN: Okay.
23  　Q  Now, if you look down to the bullet point,
24  it's kind of indented, and there's handwritten notes
25  next to it; you see that?

341

1     It says "The payments have now been moved to
2  the operating lease that will keep the expense for HP
3  out of the current quarter and align the payments and
4  expense recognition of these licenses with when HP
5  will be going live.  This will be offered at no
6  additional expense to AP -- HP"; do you see that?
7     A  I do.
8     Q  Now, based on your understanding of SOP 97-2,
9  is it normal for payments or expenses to be kept out
10  of a current quarter and aligned with actual payments
11  of the licenses in a trans -- software transaction?
12     MR. KONOVALOV: Objection; lacks foundation;
13  assumes facts not in evidence.
14     MR. SIDORSKY: Objection to form.
15     MR. KONOVALOV: The document speaks for
16  itself.
17     THE WITNESS: You're asking me to testify
18  under oath to something that I have no basis to
19  testify on.
20     MR. GREENSTEIN: Okay.  Fair enough.
21     Q  Would you have wanted to know what's written
22  in this bold paragraph at the time you were analyzing
23  the propriety of the revenue recognition for the HP
24  deal in the second quarter of '01?  Would you have
25  wanted to know what's written here, these facts, if

342

1  they were, in fact, true?
2     MR. SIDORSKY: Objection to form.
3     MR. KONOVALOV: Same objections.
4     THE WITNESS: Not necessarily.
5     MR. GREENSTEIN: Q.  And why is that?
6     A  Because what HP does and how HP accounts for
7  this transaction is not of concern to me.  This is
8  talking about HP.
9     Q  Okay.
10     A  What would be of -- of importance to me is
11  the payment terms contained in the license agreement.
12     Q  Okay.  And this paragraph talks about the
13  payments.  Well, it talks about the timing of the
14  payments vis-a-vis the expense recognition; right?
15     A  Well --
16     MR. SIDORSKY: Objection to form.
17     THE WITNESS: -- it -- it appears to, yes.
18     MR. GREENSTEIN: Okay.
19     Q  And you see down in the last bullet point, it
20  says "CRM development document"?  It says
21  "Background - To incent HP to move on the Oracle Order
22  in November and to get closer to HP as a partner
23  Oracle has committed to move the entirety of our CRM
24  development environment to HP."
25     You see that?

343

1     A  I do.
2     Q  Now, would you have wanted to know -- if
3  that's, in fact, true, would you have wanted to know
4  that fact in doing your determination under SOP 97-2?
5     MR. SIDORSKY: Objection to form.
6     THE WITNESS: Again, possibly.
7     MR. GREENSTEIN: Q.  And why would you
8  possibly want to know that?
9     A  Well, if -- if -- if -- if Oracle was
10  planning to move their platform to another hardware
11  vendor, and that's something they were planning to do
12  irrespective, that was something they were planning as
13  part of their normal product development and R&D
14  efforts to do, that -- that may not be important to
15  me.
16     Q  But if it was -- if -- if they committed to
17  move the entirety of CRM to -- development to HP in
18  return for HP's purchase of Oracle products, that
19  would potentially be improper; right?
20     MR. KONOVALOV: Objection; mischaracterizes
21  the document.
22     MR. SIDORSKY: Objection to form.
23     THE WITNESS: Not necessarily.
24     MR. GREENSTEIN: Q.  Well, but it could be;
25  right?

344

1     MR. SIDORSKY: Objection to form.
2     MR. KONOVALOV: Objection; argumentative.
3     THE WITNESS: I just said not necessarily.
4     MR. GREENSTEIN: Okay.
5     Q  Would you have wanted to know -- if Oracle
6  committed to move their entire CRM development to HP,
7  would you have wanted to know, at the time you're
8  reviewing this deal, whether that commitment was in
9  return for a commitment by HP to purchase Oracle
10  products?
11     MR. SIDORSKY: Objection to form.
12     MR. KONOVALOV: Assumes facts not in
13  evidence.
14     THE WITNESS: Not necessarily.
15     MR. GREENSTEIN: Q.  You wouldn't have wanted
16  to know if those commitments were quid pro quo?
17     A  Well --
18     MR. KONOVALOV: Same objection.
19     THE WITNESS: -- you're asking me a bunch of
20  hypothetical questions, and to answer them in a
21  30-second time period is not appropriate; okay.  I
22  mean, normally you take all the facts together, not
23  piecemeal facts, all the written documents, and you'd
24  analyze them in discussions with the company and
25  conclude on the accounting.  You're asking me very

345

1  piecemeal questions --
2      MR. GREENSTEIN: Q. Understood.
3      A  -- at the end of a long day on documents that
4  I can't -- I've never seen before.
5      Q  Okay. What I'm asking is -- so were you ever
6  made aware of this commitment that's talked about here
7  at the time you were reviewing the deal?
8      MR. KONOVALOV: Objection; lacks foundation;
9  assumes facts not in evidence.
10     MR. SIDORSKY: Objection to form.
11     THE WITNESS: I don't recall.
12     MR. GREENSTEIN: Okay.
13     Q  You see in the -- on the first page, going
14  back to the first page, where it says "CRM Functional
15  Issues - There are 14 show stoppers that HP feels are
16  keeping them from being able to achieve their global
17  rollout which is scheduled between April and October"?
18  Do you see this?
19     A  I do.
20     Q  Were you aware, at the time your reviewed the
21  HP deal in the second quarter of '01, that there were
22  14 show stoppers that Hewlett-Packard felt were
23  keeping them from being able to achieve their global
24  rollout?
25     A  I was not.

346

1      Q  Okay. If you look at Exhibit 7, Matuszak
2  Exhibit 7, please.
3      For the record, this is Bates stamped 017624.
4      MR. KONOVALOV: Actually, it's the lower
5  Bates number.
6      MR. GREENSTEIN: Oh, sorry. 020839 through
7  020843.
8      Q  For the record, this appears to be -- well,
9  if you look at 841, you see two signatures there. It
10  appears to be a letter agreement between HP and Oracle
11  on November 30th, 2000.
12     If you could just -- have you ever seen this
13  agreement before?
14     A  I don't recall.
15     Q  Okay. Well, in conducting your analysis of
16  this transaction in the second quarter of '01, do you
17  recall looking at this agreement? If you look on the
18  page 841, it appears to be signed by HP and
19  Safra Catz of Oracle; do you see that?
20     A  I do.
21     Q  And do you see on the first page it says
22  "Letter agreement between Oracle and Hewlett-Packard
23  on November 30th, 2000"? Do you see that?
24     A  I do.
25     Q  And that's the last day of the second quarter

347

1  '01; is that right?
2      A  That's correct.
3      Q  Does that refresh your recollection about --
4  that you reviewed or Andersen reviewed this agreement?
5      A  Yes, we likely reviewed this agreement as
6  part of the HP transaction, yes.
7      Q  Okay. Do you see in the second term there it
8  says "Oracle will schedule delivery dates for these
9  products as follows: $10.0 million in products; that
10  are not later than January 31, 2001; and $5.0 million
11  of products, that are not later than April 30, 2001"?
12  Do you see that?
13     A  I do.
14     Q  Now, under SOP 97-2, doesn't that -- doesn't
15  the delivery element require that the delivery of the
16  software occur at the time the contract or at the time
17  the revenue is recognized?
18     MR. SIDORSKY: Objection to form.
19     MR. KONOVALOV: Could you read that question
20  back, please?
21     (Whereupon, record read by the Reporter as
22  follows:
23     "Question: Now, under SOP 97-2, doesn't
24     that -- doesn't the delivery element require
25     that the delivery of the software occur at

348

1      the time the contract or at the time the
2      revenue is recognized?")
3      MR. KONOVALOV: It's vague and ambiguous.
4      THE WITNESS: You know, I -- I may be
5  mistaken, but I believe this is referring to Oracle's
6  scheduling delivery of the HP equipment to Oracle, not
7  the licensed from Oracle to HP.
8      MR. GREENSTEIN: Okay.
9      Q  Well, if this -- if -- if there was a term in
10  the contract which -- which allowed delivery of Oracle
11  products to HP at a time after November 30th, would
12  that -- would that meet the delivery element of SOP
13  97-2?
14     MR. KONOVALOV: Objection; lacks foundation;
15  incomplete hypothetical; assumes facts not in
16  evidence.
17     MR. SIDORSKY: Same objection.
18     THE WITNESS: I'm not sure it's relevant
19  to -- to this agreement. This agreement is
20  referencing delivery of HP hardware to Oracle.
21     MR. GREENSTEIN: Okay.
22     Q  See in point four where it says "If Oracle
23  does not complete the commitments in 1 through 3
24  above, then Oracle will pay a cancellation fee of
25  $15,000,000 (less the invoiced amount of products

349

1   delivered from this blanket purchase order and paid
2   for by June 15, 2001)"?  You see that?
3       A   I do.
4       Q   Do you recall that there was a 15 million --
5   do you recall that $15 million cancellation fee
6   provision in this agreement?
7       A   I don't recall any -- I don't recall the
8   specifics of this letter agreement, no.
9       Q   Well, do you recall that $15 million
10  cancellation fee?
11      A   I don't.  I just said I don't recall the
12  specifics.
13      Q   Okay.  Well, does that -- if there is a
14  cancellation fee that's assessed for 15 million, if
15  Oracle doesn't complete the commitments, does that --
16  strike that.
17      See on the left-hand side of the handwriting.
18  Do you recognize that handwriting?
19      A   I do not.
20      Q   Do you see where it says "Is -- this at the
21  bottom "-- Is this the way we are going to do deals?
22  Each has to buy something."  Do you see that?
23      MR. KONOVALOV:  Objection; lacks foundation.
24      THE WITNESS:  I do.
25      MR. GREENSTEIN:  Q.  So would you have wanted

350

1   to know, at the time you assessed this transaction
2   with HP, would you have wanted to know if the -- the
3   agreement required that each party had to buy
4   something from the other?
5       MR. SIDORSKY:  Objection to form.
6       MR. KONOVALOV:  Assumes facts not in
7   evidence.
8       THE WITNESS:  Well, I think we were aware at
9   the time that there were concurrent transactions
10  between HP and Oracle, so I don't know that there's
11  any further relevance to that comment.
12      We were aware that there was an agreement by
13  Oracle to buy HP equipment and that there was an
14  agreement by HP to license Oracle software.
15      MR. GREENSTEIN:  Okay.
16      Q   Were you aware at the time that Oracle's --
17  that HP's purchase of Oracle software was contingent
18  at all in any way upon Oracle buying a certain amount
19  of hardware from HP?  Were you aware of that?
20      MR. SIDORSKY:  Objection to form; that's
21  about the 20th time this has been answered, and I
22  don't -- you know, to the extent we've been over this
23  and its -- the witness has testified at length about
24  the various issues and that the need for a complete
25  record, I just, you know, object to the form of the

351

1   question.
2       MR. KONOVALOV:  Objection; assumes facts not
3   in evidence, and but for the fact we're now at 6:45 we
4   would have been calling Infante on this.  This is
5   beginning to border on the absurd.
6       MR. SIDORSKY:  Yeah, I mean, it really is
7   beyond the scope.  I mean, we've let it go for a
8   while, but this is getting to be too much.  Objection
9   to form.
10      THE WITNESS:  You keep referencing the word
11  "contingent" without putting it into any perspective
12  or basis.  Again, both of these transactions were
13  executed.  So the fact that one may have been
14  contingent on the other isn't necessarily relevant,
15  because they both have been executed.
16      MR. GREENSTEIN:  Okay.
17      Q   If you look at Matuszak No. 8, for the
18  record, this is a one-page document, 025018, dated
19  November 30th from Safra Catz to Thomas Williams.
20      If you could just read the -- it's one
21  paragraph.  Do you see that?
22      A   Yes, I do.
23      Q   Have you ever seen this e-mail before?
24      A   No.
25      Q   Were you ever aware that -- of what is being

352

1   said here, that -- were you ever aware that
2   Larry Ellison and Carly Fiarone were discussing HP's
3   purchase of Oracle products in second quarter if
4   Oracle committed to purchase 20 to 30 million of HP's
5   products over the next 18 to 24 months?
6       MR. KONOVALOV:  Objection;
7   mischaracterizes --
8       MR. GREENSTEIN:  Q.  Were you aware of that?
9       MR. KONOVALOV:  Sorry.  Objection;
10  mischaracterizes --
11      THE WITNESS:  I don't recall.
12      MR. GREENSTEIN:  Q.  Would that be
13  something -- if, in fact, that discussion occurred,
14  would that be something that you would have wanted to
15  know at the time you analyzed this transaction under
16  SOP 97-2?
17      MR. SIDORSKY:  Objection to form.
18      THE WITNESS:  Possibly, but not necessarily.
19      MR. GREENSTEIN:  Okay.  I'd like to mark
20  this, I think, as the last one, Matuszak No. 9.
21      (Document marked Exhibit No. 9
22       for identification.)
23      THE WITNESS:  Can I ask how long we've been
24  on the record?
25      THE VIDEOGRAPHER:  40 minutes.  Four zero.

353

1  40 minutes.
2      THE WITNESS:  In total?
3      THE VIDEOGRAPHER:  Oh, you mean today?  Seven
4  hours and 20 minutes or something.
5      MR. GREENSTEIN:  I only have a few more
6  minutes.  Again, Rob, I don't -- I think there were a
7  lot of speaking objections which held us up today.
8      MR. SIDORSKY:  Well --
9      MR. GREENSTEIN:  I only have a few more
10  minutes.
11      MR. SIDORSKY:  Listen, I don't agree with
12  that, because, you know, people have to make the
13  objections that are appropriate, and I think that's
14  all we did.
15      I mean, you ran over a little.  I'm not --
16  you know, Mr. Matuszak is -- you know, has been very
17  generous with his time.  If you finish up in the next
18  five or ten minutes --
19      GREENSTEIN:  Okay.
20      MR. SIDORSKY:  -- then let's do it; all
21  right.
22      MR. GREENSTEIN:  I do appreciate that.  I
23  apologize.
24      Q  If you could just take a look at this.  It's
25  been marked as Matuszak No. 10.

354

1      THE REPORTER:  It's 9.
2      MR. KONOVALOV:  Did you say 10 or 9?
3      THE REPORTER:  It's 9.
4      MR. GREENSTEIN:  Oh, sorry.  9.
5      Q  For the record, this is NDCA-ORCL 033954
6  through 033978.  It says "Top 20 License Contracts
7  Revenue Recognition Review."  If you -- actually, I
8  just want to direct your attention to the first page.
9      A  Okay.
10      Q  Okay.  Have you ever seen this document
11  before?
12      A  I -- I can't reference this specific
13  document, but this appears to be the information that
14  we would -- the package we would get from the company
15  for the -- for our revenue review during the quarter.
16      Q  Okay.  And you see how Hewlett-Packard is
17  listed as number three there?
18      A  I do, yes.
19      Q  And you see how it's for revenue recognized
20  18 million there?
21      A  I do.
22      Q  Okay.  If you turn to the fifth page there,
23  it says "Hewlett-Packard."
24      A  Okay.
25      Q  Okay.  You see -- does this appear to be a

355

1  summary provided by Oracle of the Hewlett-Packard deal
2  that was provided to Andersen in -- when they were
3  conducting their second quarter review?
4      A  It most likely is, yes.
5      Q  Okay.  And they -- they draft this language
6  and give it to Andersen; right?
7      A  That's correct.
8      Q  Okay.  See how in the issues it says "Issued
9  and signed concurrently with this transaction was a
10  blanket purchase order and letter agreement between
11  Oracle and HP for the purchase of 30 million in HP
12  hardware for Oracle's production and development
13  environments"?  Do you see that?
14      A  I do.
15      Q  It says "In consideration for this
16  commitment, HP agreed to increase the discounts from
17  our previous purchase agreement from 40 to 50 percent
18  for production hardware and from 12 to 17 percent for
19  certain classes of products within the production and
20  development environment."
21      Do you see that?
22      A  I do.
23      Q  And then the next paragraph says "Also
24  accompanying the transaction was a nonbinding letter
25  of understanding that discussed Oracle's intention to

356

1  move its CRM development environments to HP hardware.
2  The signed agreement and blanket purchase order
3  mentioned above as a result of this letter"; do you
4  see?
5      A  I do.
6      Q  Do you remember reviewing that, those two
7  paragraphs, in doing your assessment of this
8  transaction the second quarter of '01?
9      A  I -- I would have reviewed this, this page,
10  yes.
11      Q  Okay.  But do you remember reviewing that
12  specific language that says that "In consideration for
13  Oracle's commitment, HP agreed to --" what's listed
14  there?
15      A  Not specifically, but I -- I -- I'm sure
16  I would have read it.
17      Q  Okay.  If you just keep that in front of you.
18  I'm going to mark this as Matuszak 11 or 10, sorry.
19      This actually appears to be a copy of the
20  same document, but there's some differences.  These
21  were both produced by Oracle.  And if you can just
22  turn to page four, it's the same summary of the --
23  well, it's the same type of summary for the
24  Hewlett-Packard; do you see that?
25      A  I don't have the document.

Matuszak, Gary  8/1/2006  9:14:00 AM

357

1  Q  Oh, sorry.
2  MR. KONOVALOV:  Which page, Eli?
3  MR. SIDORSKY:  Page five.
4  THE WITNESS:  Sorry. Which page?
5  MR. GREENSTEIN:  Q.  Page -- well, it's
6  actually Bates stamped 068225.
7  MR. SIDORSKY:  Page five.
8  MR. GREENSTEIN:  Yeah, five.
9  Q  If you put it next to the other document.
10  You see how -- where it says "Issues" in this
11  -- the -- in Matuszak No. 10?
12  A  Yes.
13  Q  Okay. And you see how if you just look at
14  those four paragraphs, do you see anywhere in that
15  document the -- the -- the language that talks about
16  the commitments made by Oracle in consideration for
17  HP's agreements?
18  MR. SIDORSKY:  Objection to form; the
19  document speaks for itself.
20  If you want to tell us it's not there, you
21  don't need the witness to -- to compare the two.
22  MR. KONOVALOV:  It lacks foundation.
23  THE WITNESS:  Well, this -- the second
24  document does not have the same language as the first
25  document. That's a factual statement.

358

1  MR. GREENSTEIN:  Okay.
2  Q  Do you remember which document -- well, did
3  you review the second document in the second quarter
4  when assessing the HP deal?
5  A  I don't know which document I reviewed. I
6  don't recall reviewing either document specifically.
7  But what I can tell you is, going through the audit
8  committee agenda, there's a discussion in there of the
9  HP purchase.
10  So I think it's fair to say that Andersen was
11  aware of the HP purchase agreement and had reviewed
12  the agreement. So I would have to speculate as to
13  which one of these is a first draft and which one is a
14  final draft.
15  Q  Okay. Without speculating, did you know,
16  looking at Matuszak No. 9, the first paragraph, did
17  you -- were you aware of these facts in that first
18  paragraph at the time that you gave that presentation
19  regarding HP to the audit committee?
20  A  Possibly. I mean, most likely, yes.
21  Q  Well, why would you say "most likely"?
22  Because these two doc -- you're not sure which of
23  these two you read.
24  So I just want to make sure that -- do you
25  recall one way or another whether you were aware of

359

1  these facts in the first paragraph on Matuszak No. 9
2  at the time you gave that presentation in the second
3  quarter?
4  MR. SIDORSKY:  Could I hear that question
5  again? Sorry.
6  (Whereupon, record read by the Reporter as
7  follows:
8  "Question: Well, why would you say "most
9  likely"? Because these two doc -- you're
10  not sure which of these two you read.
11  So I just want to make sure that -- do you
12  recall one way or another whether you were
13  aware of these facts in the first paragraph
14  on Matuszak No. 9 at the time you gave that
15  presentation in the second quarter?")
16  MR. KONOVALOV:  Objection; mischaracterizes
17  the witness's testimony.
18  MR. SIDORSKY:  Objection to form.
19  THE WITNESS:  Yeah, I don't recall. I'd be
20  speculating. So if there's a copy of one of these in
21  our work papers and -- you know, I don't know which
22  one it is.
23  MR. GREENSTEIN:  Okay.
24  Q  And one last question. Earlier we looked at
25  the letter agreement between HP and Oracle, and there

360

1  was a $15 million cancellation provision; do you
2  recall that?
3  A  I do.
4  Q  Now, were you aware at the time you gave that
5  presentation of that 15 million cancellation
6  provision?
7  A  I don't recall. But again, if it was in the
8  agreement we reviewed, then I would have been aware of
9  it.
10  Q  Okay. This is actually the last. I promise.
11  I just want this to be authenticated. This will be
12  Matuszak No. 11.
13  (Documents marked Exhibit Nos. 10 - 11
14  for identification.)
15  THE WITNESS:  Thank you.
16  MR. GREENSTEIN:  Q.  If you could, just for
17  the record, this is NDCA-ORCL 133613 to 133654. It
18  says "Software Revenue Recognition International
19  Finance Conference October 13, 1999," and it has
20  Gary H. Matuszak.
21  Now, Mr. Matuszak, I just want to -- have you
22  seen this document before?
23  A  I generally recall the document, yes.
24  Q  Okay. And this appears to be a presentation
25  made by you on October 13th, 1999, regarding software

361

1    revenue recognition; right?
2        A    That's correct.
3        Q    If you turn to the second page, it says
4    "Update on basic principles of SOP 97-2"; do you see
5    that?
6        A    Yes.
7        Q    And then the next -- the following page has
8    the four elements of SOP 97-2; do you see that?
9        A    Yes.
10       Q    And I think if you flip through it, it
11   appears to have each of the elements and discussions
12   about each of the elements of 97-2; is that fair to
13   say?
14       A    That's correct.
15       Q    Okay.  Do you recall giving this presentation
16   in '99?
17       A    Generally, yes.  I'm trying -- I -- I don't
18   remember this particular -- this specific
19   presentation, but I do recall having been invited to
20   the Oracle International Finance Conference on two or
21   three different occasions as an invited guest, and
22   typically as part of that they would ask me to give
23   a -- a discussion of some of the things that were
24   happening with revenue recognition at the task force.
25       Q    Okay.  Because you were a member of the

362

1    rev -- of the task force on initiatives with SOP 97-2;
2    right?
3        A    The AICPA task force, that's correct.
4        Q    Right.
5            Is that because your knowledge -- extensive
6    knowledge of software revenue recognition and your
7    experience with --
8        A    It -- it would have been as a result of my
9    firm's request that I sit on the task force, which
10   presumably was made because they felt I was qualified
11   to sit on the task force.
12       Q    Okay.  I just have -- so if you look at the
13   third -- if you look at the second, third page here,
14   and you see the third element, it says "The vendor's
15   fee is fixed or determinable."
16       A    I do.
17       Q    All right.
18           Now, when we looked at the letter agreement
19   between HP and Oracle and there was a $15 million
20   cancellation penalty if Oracle didn't fulfill its
21   commitments, doesn't that mean that -- that -- that
22   Oracle's fee from HP in that deal was not fixed and
23   determinable?
24       MR. KONOVALOV:  Objection; mischaracterizes
25   the evidence.

363

1        MR. SIDORSKY:  Yeah, objection to form;
2    misstates the record and lacks foundation.
3            I guess that's the signal.
4        MR. KONOVALOV:  It must be time to leave.
5        MR. SIDORSKY:  Yeah.
6        THE WITNESS:  The -- the fee in the license
7    agreement did not have any contingencies.  The
8    purchase order that was issued for the purchase of the
9    hardware did have a cancellation fee.
10           What I don't recall is how exactly all that
11   was addressed and resolved in the course of our review
12   of the contract.
13       MR. GREENSTEIN:  Okay.
14       Q    But a 15 million cancellation fee would --
15   would that be something you would assess and determine
16   whether Oracle's fee was fixed and determinable?
17       MR. SIDORSKY:  Objection to form.
18       THE WITNESS:  It is not a cancellation fee on
19   the license agreement.  There's no cancellation
20   privileges related to the license agreement.
21       MR. GREENSTEIN:  Okay.
22       Q    What do you mean by that?
23       A    Meaning --
24       MR. SIDORSKY:  I think the witness has made
25   clear what he means by this.  He's answered it very

364

1    clearly a number of times now.  Eli, really --
2        THE VIDEOGRAPHER:  Also, I have to interject.
3    We're having a technical problem.  This light coming
4    through the window is really wrecking the video.  I
5    was anticipating you're going to wrap it up, but if
6    we're going to continue for any length, we'll have to
7    take a break.
8        MR. GREENSTEIN:  Okay.  I just have one last
9    question.
10       Q    Were these slides that we're looking at, the
11   different elements of SOP 97-2, are these accurate
12   slides based on what you believe to be the
13   rules/principles of SOP 97-2 at the time you made this
14   presentation?
15       A    That would be factually correct.
16       MR. GREENSTEIN:  Okay.  I'm done.
17       MR. KONOVALOV:  I actually do have a couple
18   of minutes of questions so --
19       THE VIDEOGRAPHER:  Well, if a couple of
20   minutes is a couple of minutes, we'll be fine.  If
21   we're going to take 15, 20 minutes, we'll have to take
22   a half hour break for me to reset up.
23       MR. SIDORSKY:  Well, we're not going to do
24   that.
25       THE VIDEOGRAPHER:  I can't -- if you look at

365

1   the image, you'll see it is thoroughly ruined by the
2   striations of the light.
3           MR. GREENSTEIN:  The light.
4           THE VIDEOGRAPHER:  It's not just that.  It's
5   the sunlight moving through.
6           MR. KONOVALOV:  Let's move forward so we can
7   get Mr. Matuszak on his way.
8           THE VIDEOGRAPHER:  Mr. Matuszak, if you can
9   continue to move forward.
10          THE WITNESS:  Do you want the light on?
11          THE VIDEOGRAPHER:  That would be great.  If
12  you can pass him the microphone, that would be
13  wonderful.
14          MR. KONOVALOV:  Eli, why don't we switch.  If
15  you want to move your papers, and I can face the
16  witness so he's not looking in a different direction.
17          MR. GREENSTEIN:  Yeah, that would be fine.
18          THE VIDEOGRAPHER:  We're still on the record.
19          MR. KONOVALOV:  Yeah, just quickly.
20          MR. GREENSTEIN:  I know.  I know all the
21  stuff you've probably seen or heard.
22          THE VIDEOGRAPHER:  If you'd put that on your
23  tie.
24          EXAMINATION BY MR. KONOVALOV
25          MR. KONOVALOV:  Sure.

366

1           Q   Mr. Matuszak, I'm Paul Konovalov.
2           THE VIDEOGRAPHER:  Counsel, get it on your
3   tie first.
4           MR. KONOVALOV:  Q.  Counsel for the
5   defendants.  I very much appreciate your time today.
6   I know it's been a long time.  I'm going to try to
7   keep this quick, if that's fine with you.
8           A   That's fine.
9           Q   I want to take you back to a couple of
10  documents that were previously marked.  The first one
11  I'd like you to pull out is what Chen or Chan, now
12  I'm doing it, Chan Exhibit 2.
13          A   Okay.
14          Q   Okay.  If you could turn to the pages Bates
15  No. AA 1925.  Just a couple from the back.
16          THE VIDEOGRAPHER:  Counsel, you're knocking
17  your documents on the microphone.
18          MR. SIDORSKY:  Sorry.
19          THE WITNESS:  Okay.
20          MR. KONOVALOV:  Q.  And you may recall,
21  Mr. Matuszak, we -- you answered a number of questions
22  with respect to the handwritten note that is next to A
23  towards the bottom third of that page.
24          A   Yes.
25          Q   Do you recall that?

367

1           Counsel, through his questions, asked you a
2   number of times about the meaning of the word
3   "aggressive" here, suggesting that it, in fact,
4   suggested it was something nefarious or inappropriate.
5           I just want to understand clearly.  Your
6   testimony is not there is anything improper about
7   these -- about this reversal of the reserves; correct?
8           MR. GREENSTEIN:  Objection; I don't want to
9   mischaracterize my questions; mischaracterizes the
10  testimony; lacks foundation; calls for speculation;
11  vague and ambiguous.
12          MR. KONOVALOV:  Q.  You can answer my
13  question.
14          A   That's correct.  The -- could you repeat the
15  question.
16          (Whereupon, record read by the Reporter as
17  follows:
18          "Question:  Counsel, through his questions,
19          asked you a number of times about the
20          meaning of the word "aggressive" here,
21          suggesting that it, in fact, suggested it
22          was something nefarious or inappropriate.
23          I just want to understand clearly.  Your
24          testimony is not there is anything improper
25          about these -- about this reversal of the

368

1           reserves; correct?")
2           THE WITNESS:  Okay.  Thank you.
3           MR. KONOVALOV:  Q.  Why don't I try to
4   restate.
5           A   No.  That is correct.  I stated a number of
6   times that I don't believe there was anything
7   inappropriate with the -- with the activity or the --
8   what they're discussing in this note.
9           Q   Indeed the use of the word "aggressive" could
10  really, instead of being a synonym for something
11  improper, it could be a synonym for just simply
12  suggesting that the company was active or proactive;
13  correct?
14          MR. GREENSTEIN:  Objection; form.
15          THE WITNESS:  That's correct.
16          MR. KONOVALOV:  Q.  That's correct?
17          A   That's the way I interpreted the word
18  "aggressive."
19          Q   Okay.  Thank you.
20          Then if you could pull out from the pile here
21  what is Matuszak No. 4.  It was the interview memo
22  from the Special Litigation Committee's interview of
23  Thomas Williams.
24          A   Thomas Williams, yes.
25          Q   Exactly.

369

1    You've never seen this document before that
2  was shown to you today here as an exhibit; correct?
3    A  That's correct.
4    Q  If you look at the first page of text, so at
5  the end of the first full paragraph, the last sentence
6  towards the end there reads "It is not and does not
7  purport to be a verbatim account of what was said"; do
8  you see that?
9    A  I do.
10    Q  Okay.  Counsel for plaintiffs asked you some
11  questions about whether or not you were aware of
12  certain statements contained in this interview memo;
13  correct?
14    A  That's correct.
15    Q  Have you ever spoken with Tom Williams about
16  any of the information contained in this interview
17  memo?
18    A  I have not.
19    Q  As you sit here today, do you have reason to
20  know one way or the other whether or not any
21  statements contained in here were attributed to
22  Thomas Williams are true?
23    MR. GREENSTEIN:  Objection to form.
24    THE WITNESS:  I do not.
25    MR. KONOVALOV:  Okay.

370

1    Q  Are you aware of the fact that
2  Thomas Williams has given testimony about this
3  document in which he has, in fact, pointed out that
4  there are a number of inaccuracies in the statements
5  that are attributed to him in this document?
6    MR. GREENSTEIN:  Objection; I think that
7  mis -- completely mischaracterizes the document and
8  the testimony.  I think it lacks foundation; calls for
9  speculation; is vague and ambiguous.
10    THE WITNESS:  I am not aware of that.
11    MR. KONOVALOV:  Okay.
12    Q  So as you sit here today -- well, strike
13  that.
14    The last thing I wanted to have you pull out,
15  please, is what is the e-mail.  It's Chan Exhibit 12.
16    A  Yes.
17    Q  Prior to today, you have not seen this
18  document before; correct?
19    A  That's correct.
20    Q  Okay.  As you sit here today, do you have any
21  way to know one way or the other whether or not any of
22  the statements that are contained in here are true?
23    MR. GREENSTEIN:  Objection; form.
24    THE WITNESS:  I do not.
25    MR. KONOVALOV:  Q.  For instance, if you look

371

1  at the middle of the page where it says "What needs to
2  be done," there are various bullets there which
3  identify items, dollar amounts, and the like, you
4  don't know one way or the other whether or not that
5  information is true; correct?
6    MR. GREENSTEIN:  Objection; form.
7    THE WITNESS:  That's correct.
8    MR. KONOVALOV:  That's correct.
9    Q  Do you happen to know to the -- let me back
10  up.
11    To the extent that any of the information or
12  items that are referenced in this document are
13  accurate, do you happen to know how they were
14  ultimately resolved?
15    MR. GREENSTEIN:  Objection; form.
16    THE WITNESS:  I do not.
17    MR. KONOVALOV:  Okay.
18    Q  Are you aware of Oracle having ever restated
19  any of its financial statements for fiscal year 2000?
20    MR. GREENSTEIN:  Objection; form.
21    THE WITNESS:  To my knowledge, they have not.
22    MR. SIDORSKY:  Okay.
23    Q  How about for fiscal year 2001?
24    MR. GREENSTEIN:  Same objection.
25    THE WITNESS:  To my knowledge, they have not.

372

1    MR. KONOVALOV:  Q.  How about fiscal year
2  2002.
3    MR. GREENSTEIN:  Same objection.
4    THE WITNESS:  To my knowledge, they have not.
5    MR. KONOVALOV:  Okay.  I think that's all I
6  have.  Thank you, Mr. Matuszak.  I appreciate it.
7    THE WITNESS:  Thank you.
8    THE VIDEOGRAPHER:  Okay.  We are --
9    MR. SIDORSKY:  I'm sorry.  If we're going to
10  go off the record, I think we should designate this --
11  this deposition transcript confidential.  I assume you
12  have no objections to that.
13    MR. GREENSTEIN:  I don't.
14    MR. SIDORSKY:  And I'd also like to make
15  clear on the record that I -- there is an order in
16  place regarding the scope of this deposition, and it's
17  very difficult during the deposition to -- to object
18  to each question on -- on the grounds of whether or
19  not it exceeds the -- the scope of the deposition, the
20  order, and I tried not to do that.
21    But we do reserve all our rights obviously
22  under the order to the extent that the deposition
23  covered areas or exceeded the scope of Judge Infante's
24  order.
25    MR. GREENSTEIN:  Okay.  That's noted.

373

1   Plaintiffs believe everything covered here was either
2   relevant or reasonably calculated to lead to the
3   discovery of admissible evidence regarding the topics
4   set forth in the order and/or that it was relevant to
5   the subject matter of those topics under Rule 26, and
6   therefore we think it was proper.
7       MR. KONOVALOV:  Okay.  Mr. Matuszak, thank
8   you for your time.
9       MR. GREENSTEIN:  Thank you.
10      THE VIDEOGRAPHER:  This is the end of
11   videotape five, Volume I, in the deposition of
12   Gary Matuszak.  The original videotapes will be
13   retained by LiveNote World Service.
14       Going off the record, the time on the monitor
15   is 7:09.
16      THE REPORTER:  Do you need a copy?
17      MR. SIDORSKY:  No, that's okay.
18       (WHEREUPON, the deposition ended at 7:09 p.m.)
19          ---oOo---
20
21
22
23
24
25

374

1           CERTIFICATE OF WITNESS
2
3       I, GARY MATUSZAK, the undersigned witness,
4   declare under penalty of perjury that I have read the
5   foregoing transcript, and I have made any corrections,
6   additions or deletions I was desirous of making; that
7   the foregoing is a true and correct transcription of
8   my testimony contained therein.
9       EXECUTED this_____day of _____,2006,
10   at _____. _____.
        (City)          (State)
11
12
13
        _____
14          GARY MATUSZAK
15
16
17
18
19
20
21
22
23
24
25

375

1           CERTIFICATE OF REPORTER
2
3       I, ANDREA M. IGNACIO HOWARD, hereby certify
4   that the witness in the foregoing deposition was by me
5   duly sworn to tell the truth, the whole truth, and
6   nothing but the truth in the within-entitled cause;
7
8       That said deposition was taken in shorthand
9   by me, a Certified Shorthand Reporter of the State of
10   California, and was thereafter transcribed into
11   typewriting, and that the foregoing transcript
12   constitutes a full, true and correct report of said
13   deposition and of the proceedings which took place;
14
15       That I am a disinterested person to the said
16   action.
17
18       IN WITNESS WHEREOF, I have hereunto set my
19   hand this     day of August 2006.
20
21   _____
22   ANDREA M. IGNACIO HOWARD RPR, CSR No. 9830
23
24
25

376

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

1

2

3       I, ANDREA M. IGNACIO HOWARD, hereby certify

4  that the witness in the foregoing deposition was by me

5  duly sworn to tell the truth, the whole truth, and

6  nothing but the truth in the within-entitled cause;

7

8       That said deposition was taken in shorthand

9  by me, a Certified Shorthand Reporter of the State of

10 California, and was thereafter transcribed into

11 typewriting, and that the foregoing transcript

12 constitutes a full, true and correct report of said

13 deposition and of the proceedings which took place;

14

15      That I am a disinterested person to the said

16 action.

17

18      IN WITNESS WHEREOF, I have hereunto set my

19 hand this 14 day of August 2006.

20

21 _____

22 ANDREA M. IGNACIO HOWARD CSR No. 9830

23

24

25

# EXHIBIT CC

1

```
 1
 2      IN THE UNITED STATES DISTRICT COURT
 3    FOR THE NORTHERN DISTRICT OF CALIFORNIA
 4
      In re:
 5    Oracle Corporation Securities  )
      Litigation.            ) Case No. C010988 MJJ
 6    This Document Relates To:  All )
      Actions.             )
 7    ----------------------------)
 8
 9            Wednesday, June 28, 2006
10            9:09 a.m.
11
12    *** C O N F I D E N T I A L ***
13
14       Confidential Videotaped Deposition
15    of JASON SEVIER, held at the offices of
16    David Feldman Worldwide, Inc., 805 Third
17    Avenue, New York, New York 10022, pursuant
18    to Subpoena, before Otis Davis, a Notary
19    Public of the State of New York.
20
21
22
23
24
25
```

3

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND
 6    AGREED, by and among counsel for the
 7    respective parties hereto, that the
 8    filing, sealing and certification of
 9    the within deposition shall be and
10    the same are hereby waived.
11          IT IS FURTHER STIPULATED AND
12    AGREED that all objections, except as
13    to the form of the question, shall be
14    reserved to the time of the trial.
15          IT IS FURTHER STIPULATED AND
16    AGREED that the within deposition may
17    be signed before any Notary Public
18    with the same force and effect as if
19    signed and sworn to before the Court.
20
21
22
23
24
25
```

2

```
 1    A P P E A R A N C E S :
 2      LERACH COUGHLIN STOIA GELLER RUDMAN &
 3      ROBBINS, LLP
 4      Counsel for Plaintiff
 5         100 Pine Street, Suite 2600
 6         San Francisco, California  92101
 7      BY:  SHAWN A. WILLIAMS, ESQ.
 8         shawnw@lerachlaw.com
 9      AND:  KEITH MAUTNER, CPA, CMA
10      AND:  ASHAR AHMED, Summer Associate
11
12      LATHAM & WATKINS, LLP
13      Counsel for Defendants
14         650 Town Center Drive, 20th Floor
15         Costa Mesa, California  92626
16      BY:  PAUL V. KONOVALOV, ESQ.
17         paul.konovalov@lw.com
18      CHADBOURNE & PARK, LLP
19      Counsel for the Witness Jason Sevier
20         30 Rockefeller Plaza
21         New York, New York  10112
22      BY:  ROBERT SIDORSKY, ESQ.
23
24    ALSO PRESENT:
25         MANUEL ABRU, Legal Video Specialist
```

4

```
 1
 2          THE VIDEOGRAPHER:  This is tape
 3    number 1 of the videotaped deposition
 4    of Jason Sevier, in the matter Oracle
 5    Securities Litigation, In re:
 6          This deposition is being held
 7    at the offices of David Feldman
 8    Worldwide, Inc., 805 Third Avenue, New
 9    York, New York, on June 28, 2006 at
10    approximately 9:09 a.m.
11          My name is Manuel Abru, and I
12    am the legal video specialist.  The
13    court reporter is Otis Davis.
14          Will counsel please introduce
15    themselves.
16          MR. WILLIAMS:  Shawn Williams,
17    Lerach Coughlin Stoia Geller Rudman &
18    Robbins on behalf of plaintiffs.
19          MR. MAUTNER:  Keith Mautner
20    with Lerach Coughlin.
21          MR. WILLIAMS:  With me also is
22    Ashar Ahmed of Lerach Coughlin.
23          MR. KONOVALOV:  Good morning.
24    Paul Konovalov of Latham & Watkins for
25    the defendants.
```

249

1      Jason Sevier - Confidential
2   accounting jargon.
3      A.   I do not.
4      Q.   Earlier you -- withdrawn.
5         Do you know what a debit memo
6   is?
7         MR. SIDORSKY:  Objection to
8   form.
9         In general?
10        MR. WILLIAMS:  Yeah, in
11   general.
12        MR. SIDORSKY:  I am going to
13   object to this kind of general
14   question unrelated to any context of
15   the audit or the work papers.
16     A.   In general, no.
17     Q.   Have you ever used the term
18   "debit memo"?
19     A.   Myself personally?
20     Q.   Yes.
21     A.   No.
22     Q.   I am going to ask you to turn
23   to AA 001938, it's the second to the last
24   page.
25     A.   Okay.

250

1      Jason Sevier - Confidential
2      Q.   You see in that first row with
3   all the column headings --
4      A.   Yes.
5      Q.   Well, tell me what this
6   document is first?
7      A.   Once again, this is consistent
8   with the documents we have seen previously,
9   which it looks like it's a -- it's showing
10   a balance per the A/R aging and the balance
11   per the general ledger, which shows a
12   $500,000 difference.
13     Q.   Do you see where --
14        Do you see the column heading
15   that says Debit Memos?
16     A.   Yes, I see it.
17     Q.   Do you know what that means?
18     A.   I do not.
19     Q.   Or what it refers to?
20     A.   Do not.
21     Q.   You indicated earlier that you
22   saw a copy of the Complaint in this action.
23   Was it yesterday or during a meeting with
24   your lawyer?
25     A.   When I first met --

251

1      Jason Sevier - Confidential
2      MR. SIDORSKY:  I don't know
3   that you have to answer if you saw it
4   with me or how he saw it.
5      MR. WILLIAMS:  I think he
6   testified to that.
7      MR. SIDORSKY:  He did testify
8   to it.  So that's what I'm saying.
9   It's whatever he said -- I don't think
10   you are entitled to get more into
11   detail than that.
12        MR. WILLIAMS:  No, I'm not.
13     A.   Can you repeat the question.
14     Q.   I'm just asking you if you
15   recall testifying that you saw a copy of
16   the Complaint in this action.
17     A.   Yes.
18     Q.   Was that yesterday or a few
19   weeks ago?
20     A.   A few weeks ago.
21     Q.   You indicated you read some
22   allegations in there, but not all.
23     A.   Yes, I read some.
24     Q.   Do you recall reading the
25   allegations regarding the creation of many

252

1      Jason Sevier - Confidential
2   thousand debit memos in November of 2000?
3      A.   I recall reading something to
4   that effect in the Complaint.
5      Q.   Did you know prior to reading
6   the Complaint that Oracle had created
7   46,000 debit memos in November 2000?
8      A.   Did not.
9      Q.   No one mentioned that to you --
10        MR. SIDORSKY:  Objection to
11   form.
12     Q.   -- prior to you seeing that
13   Complaint, aside from your attorney?
14        MR. SIDORSKY:  Objection to
15   form.
16     A.   I don't have it in front of me,
17   but the Subpoena may have said something to
18   that effect.  I don't remember
19   specifically, but prior to receiving the
20   subpoena, I had no knowledge of debit
21   memos.
22     Q.   Did anybody on your engagement
23   team mention anything about debit memos
24   created in November of 2000 to you?
25     A.   No one did.

Sevier, Jason  6/28/2006  9:09:00 AM

273

```
1
2          *** ERRATA SHEET ***
3     NAME OF CASE:  Oracle Securities Litigation
4     DATE OF DEPOSITION:  June 28, 2006
5     NAME OF WITNESS:  JASON SEVIER
6     PAGE  LINE      FROM        TO
7     ____|____|_____|_____
8     ____|____|_____|_____
9     ____|____|_____|_____
10    ____|____|_____|_____
11    ____|____|_____|_____
12    ____|____|_____|_____
13    ____|____|_____|_____
14    ____|____|_____|_____
15    ____|____|_____|_____
16    ____|____|_____|_____
17    ____|____|_____|_____
18    ____|____|_____|_____
19    ____|____|_____|_____
20
21              _____
22                 JASON SEVIER
23    Subscribed and sworn to before me
24    This ____ day of _____, 2006.
25    _____    _____
```

275

```
1                    OTIS DAVIS
2
3     -----------------I N D E X-----------------
4     WITNESS      EXAMINATION BY        PAGE
5     J. SEVIER      MR. WILLIAMS       5, 270
6              MR. KONOVALOV         269
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

274

```
1     (Notary Public)        My Commission Expires:
2
3         C E R T I F I C A T E
4     STATE OF NEW YORK    )
5                : ss.
6     COUNTY OF NEW YORK   )
7
8         I, OTIS DAVIS, a Notary Public
9     within and for the State of New York, do
10    hereby certify:
11        That JASON SEVIER, the witness
12    whose deposition is hereinbefore set
13    forth, was duly sworn by me and that such
14    deposition is a true record of the
15    testimony given by the witness.
16        I further certify that I am not
17    related to any of the parties to this
18    action by blood or marriage, and that I
19    am in no way interested in the outcome of
20    this matter.
21        IN WITNESS WHEREOF, I have hereunto
22    set my hand this 5th day of July 2006.
23
24
25              _____
```

Oracle

Page  273 - 275

274

1

2                      C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                          : ss.

5    COUNTY OF NEW YORK    )

6

7              I, OTIS DAVIS, a Notary Public

8         within and for the State of New York, do

9         hereby certify:

10             That JASON SEVIER, the witness

11        whose deposition is hereinbefore set

12        forth, was duly sworn by me and that such

13        deposition is a true record of the

14        testimony given by the witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage, and that I

18        am in no way interested in the outcome of

19        this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 5th day of July 2006.

22

23

24

25                        OTIS DAVIS