PAGES 1 – 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

IN RE ORACLE CORPORATION          )
SECURITES LITIGATION,             )
                                  ) NO. C 01-0988 SI
(THIS DOCUMENT RELATES TO ALL     )
ACTIONS                           )
                                  )  SAN FRANCISCO, CALIFORNIA
                                  )  FRIDAY, FEBRUARY 13, 2009
_____)


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF**          COUGHLIN, STOIA, GELLER, RUDMAN &
                              ROBBINS, LLP
                           655 WEST BRAODWAY, SUITE 1900
                           SAN DIEGO, CALIFORNIA  92101
                   BY:  **MARK SOLOMON, ESQUIRE**
                        **DOUGLAS R. BRITTON, ESQUIRE**


                           COUGHLIN, STOIA, GELLER, RUDMAN &
                              ROBBINS, LLP
                           100 PINE STREET, 26TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94111
                   BY:  **SHAWN A. WILLIAMS, ESQUIRE**
                        **ELI GREENSTEIN, ESQUIRE**
                        **DANIEL PFEFFERBAUM, ESQUIRE**
                        **WILLOW RADCLIFFE, ESQUIRE**
                        **STACEY KAPLAN, ESQUIRE**

(FURTHER APPEARANCES ON FOLLOWING PAGE)


REPORTED BY:    JOAN MARIE COLUMBINI, CSR 5435, RPR
                OFFICIAL COURT REPORTER, U.S. DISTRICT COURT

**APPEARANCES (CONTINUED):**

**FOR DEFENDANT**          LATHAM & WATKINS
                          505 MONTGOMERY STREET, SUITE 1900
                          SAN FRANCISCO, CALIFORNIA  94111
                    BY:   **PETER A. WALD, ESQUIRE**
                          **PATRICK GIBBS, ESQUIRE**

                          LATHAM & WATKINS
                          2133 SOUTH WACKER DRIVE
                          CHICAGO, ILLINOIS  60606
                    BY:   **SEAN BERKOWITZ, ESQUIRE**

                          ORACLE CORPORATION
                          500 ORACLE PARKWAY
                          REDWOOD SHORES, CALIFORNIA  94065
                    BY:   **JAMES MAROULIS, ESQUIRE**

```
1              PROCEEDINGS; FRIDAY, FEBRUARY 13, 2009

2

3         THE CLERK:  CALLING CIVIL 01-0988, IN RE:  ORACLE.

4         COUNSEL, IF YOU COULD EITHER APPROACH THE PODIUM WHEN

5  YOU ARE ARGUING OR MAKE SURE YOUR MICS ARE TURNED ON SO THE

6  COURT REPORTER CAN HEAR.  BUT I NEED YOU ALL TO STATE YOUR

7  APPEARANCE FOR THE RECORD.

8         MR. SOLOMON:  GOOD MORNING, YOUR HONOR.  MARK SOLOMON

9  FROM COUGHLIN, STOIA FOR PLAINTIFFS.

10        THE COURT:  GOOD MORNING.

11        MR. WILLIAMS:  GOOD MORNING, YOUR HONOR.  SHAWN

12 WILLIAMS, COUGHLIN, STOIA ON BEHALF OF THE PLAINTIFFS.

13        THE COURT:  GOOD MORNING.

14        MR. PFEFFERBAUM:  GOOD MORNING, YOUR HONOR.  DAN

15 PFEFFERBAUM FROM COUGHLIN, STOIA ON BEHALF PLAINTIFFS.

16        THE COURT:  GOOD MORNING.

17        MS. RADCLIFFE:  GOOD MORNING, YOUR HONOR.  WILLOW

18 RADCLIFFE FROM COUGHLIN, STOIA ON BEHALF OF PLAINTIFFS.

19        THE COURT:  GOOD MORNING.

20        MR. GREENSTEIN:  GOOD MORNING, YOUR HONOR.  ELI

21 GREENSTEIN, COUGHLIN, STOIA ON BEHALF OF PLAINTIFFS.

22        THE COURT:  GOOD MORNING.

23        MR. BRITTON:  GOOD MORNING, YOUR HONOR.  DOUG

24 BRITTON, COUGHLIN, STOIA ON BEHALF OF PLAINTIFFS.

25        MS. KAPLAN:  GOOD MORNING, YOUR HONOR.  STACEY
```

1  KAPLAN, COUGHLIN, STOIA ON BEHALF OF PLAINTIFFS.

2          **THE COURT:**  GOOD MORNING.

3          **MR. WALD:**  GOOD MORNING.  PETER WALD, LATHAM &

4  WATKINS ON BEHALF OF THE DEFENDANTS.

5          **MR. BERKOWITZ:**  GOOD MORNING, YOUR HONOR.  SEAN

6  BERKOWITZ ON BEHALF OF THE DEFENDANTS FROM LATHAM & WATKINS.

7          **MR. MAROULIS:**  GOOD MORNING, YOUR HONOR.  JAMES

8  MAROULIS FROM ORACLE CORPORATION FOR DEFENDANT ORACLE

9  CORPORATION.

10         **MR. GIBBS:**  GOOD MORNING, YOUR HONOR.  PATRICK GIBBS

11 FROM LATHAM & WATKINS FOR DEFENDANTS.

12         **THE COURT:**  GOOD MORNING.

13         WELL, WELCOME TO YOU ALL.  WE ARE HERE TODAY ON

14 MOTIONS FOR SUMMARY JUDGMENT AND DAUBERT MOTIONS.  EACH SIDE HAS

15 MADE SOME OF EACH.  AND I'M PREPARED TO LISTEN TO ANYTHING YOU

16 WOULD LIKE TO ADD TO YOUR PAPERS.  I WILL REMARK THAT YOUR

17 PAPERS ARE ABOUT AS VOLUMINOUS AS PAPERS CAN GET.

18         SO, WE HAVE HAD AN OPPORTUNITY TO REVIEW A LOT OF

19 MATERIALS, BUT IF THERE'S INFORMATION YOU WOULD LIKE TO ADD TO

20 WHAT YOU'VE ALREADY GIVEN ME, YOU MAY DO SO.

21         MR. WALD?

22         **MR. WALD:**  THANK YOU, YOUR HONOR.

23         YOUR HONOR, MAY I HAND THIS UP?

24         **THE CLERK:**  DO YOU HAVE TWO?  ONE FOR THE LAW CLERK,

25 PERHAPS?

1          **MR. WALD:**  WE WILL GET YOU ANOTHER ONE.  I'M SORRY.

2          YOUR HONOR, AS THE COURT HAS OBSERVED, THERE WERE,

3  OBVIOUSLY, A LOT OF MOTIONS THAT HAVE BEEN FILED, AND HAVING

4  APPEARED BEFORE THIS COURT, I KNOW THAT YOU'VE READ ALL THE

5  MATERIAL, AND WE ARE PREPARED, SUBJECT TO QUESTIONS FROM YOUR

6  HONOR, OR RESPONSES TO WHAT THE OTHER SIDE HAS TO SAY, TO

7  SUBMIT.

8          THERE IS ONE ISSUE THAT WE BELIEVE CUTS ACROSS

9  EVERYTHING IN THIS CASE AND ENTITLES THE DEFENDANTS TO SUMMARY

10 JUDGMENT ON ALL OF THE CLAIMS IN THE CASE, INCLUDING THE 20(A)

11 CLAIM.  THIS HAS, OF COURSE, BEEN THE SUBJECT OF EXTENSIVE

12 BRIEFING, BUT WE WANTED TO TAKE THE OPPORTUNITY TODAY, YOUR

13 HONOR, TO CALL OUT AND FRAME FOR YOU OUR SUBMISSION ON THE

14 ELEMENT OF LOSS CAUSATION AND WHAT THAT IMPLIES FOR ALL OF THE

15 MOTIONS THAT ARE BEFORE THE COURT.

16         IN A WORD, YOUR HONOR, THE DEFENDANT SUBMITS THAT

17 THERE IS NO GENUINE ISSUE OF DISPUTED MATERIAL FACT CONCERNING

18 LOSS CAUSATION, AND THAT UNDER THE APPLICABLE LAW AND THE

19 FRAMEWORK GOVERNING THE ANALYSIS OF LOSS CAUSATION, WE ARE

20 ENTITLED TO SUMMARY JUDGMENT.

21         WITH THAT, LET ME GO THROUGH THE SLIDES, YOUR HONOR.

22 I THINK THE FIRST SLIDE JUST SHOWS THE POINT THAT, FROM A

23 FRAMEWORK POINT OF VIEW, YOUR HONOR, THE LOSS CAUSATION ELEMENT

24 CONTROLS NOT ONLY SECTION 10(B) CLAIMS, BUT THE SECTION 20(A)

25 CLAIMS AND THE SECTION 20(A) CONTROLLING PERSON CLAIMS AS WELL.

1          THE ISSUE, YOUR HONOR, IS WHETHER PLAINTIFFS CAN

2    DEMONSTRATE LOSS CAUSATION ON THEIR FORECASTING, ECONOMY, SUITE

3    11I, OR ACCOUNTING CLAIMS.  THIS IN TURN DEPENDS UPON WHETHER

4    THE PLAINTIFFS HAVE SHOWN EVIDENCE OF A DIRECT DISCLOSURE BY

5    ORACLE THAT ANY PRIOR STATEMENTS WERE, IN FACT, FALSE, OR,

6    WHETHER THEY HAVE SHOWN EVIDENCE IF THE MARKET UNDERSTOOD, THAT

7    THERE WAS MARKET AWARENESS THROUGH SOME INDIRECT DISCLOSURE THAT

8    PRIOR STATEMENTS WERE FALSE.

9          THIS IS THE FRAMEWORK THAT HAS BEEN, AT THIS POINT, I

10   BELIEVE, WELL ESTABLISHED IN THE CASE LAW.

11         YOUR HONOR, I DON'T THINK THERE'S A DISPUTE THAT

12   PLAINTIFFS BEAR THE BURDEN OF PROOF ON LOSS CAUSATION.  NOR IS

13   THERE ANY DISPUTE, YOUR HONOR, THAT LOSS CAUSATION REQUIRES

14   DISCLOSURE OF THE RELEVANT TRUTH.

15         I THINK IT'S WORTH PAUSING FOR JUST A SECOND ON THAT

16   CONCEPT.  THE RELEVANT TRUTH, OBVIOUSLY COMING FROM THE SUPREME

17   COURT'S DECISION IN *DURA*.

18         WHAT IS THE RELEVANT TRUTH?  THE RELEVANT TRUTH IS

19   THE TRUTH THAT WAS CONCEALED BY THE ALLEGED MISREPRESENTATIONS

20   AND/OR OMISSIONS AND BECAME, QUOTE, "GENERALLY KNOWN."  AND

21   THAT'S THAT MARKET AWARENESS POINT, YOUR HONOR.  IT CAN BE

22   GENERALLY KNOWN OR BECOME GENERALLY KNOWN BECAUSE THE DEFENDANTS

23   OR SOME PARTY DIRECTLY DISCLOSE IT, OR THE PLAINTIFFS CAN SHOW

24   EVIDENCE THAT THE MARKET, TYPICALLY THROUGH ANALYSTS' REPORTS,

25   WHICH WE ARE GOING TO COME TO, UNDERSTOOD THAT THE INFORMATION

1   THAT WAS BEING RELEASED REVEALED THE FALSITY OF PRIOR

2   STATEMENTS.  BUT THAT'S THE KEY ELEMENT, YOUR HONOR.  THAT

3   EVIDENCE HAS TO EXIST IN ORDER TO SHOW LOSS CAUSATION.

4            NOW, THE CASES HAVE BEEN VERY CLEAR, YOUR HONOR, THAT

5   IF A PLAINTIFF GETS THROUGH THE CRUCIBLE OF THE PSRLA PLEADING

6   STANDARD BY ALLEGING SPECIFIC FRAUDS AND BY STATING FACTS THAT

7   GIVE RISE TO PARTICULARIZED ALLEGATIONS, THAT WHEN IT COMES TO

8   THE PROOF STAGE, THE COURTS HOLD THE PLAINTIFFS TO THEIR PROOF

9   ON THOSE FRAUDS, AND SO THERE CAN'T BE A BAIT AND SWITCH, YOUR

10  HONOR.

11           THE SPECIFIC FRAUDS THAT ARE ALLEGED THAT HAVE

12  SURVIVED PLEADING CHALLENGE ARE THE FRAUDS THAT THE PLAINTIFFS

13  HAVE TO SHOW BECAME GENERALLY KNOWN IN THE MARKETPLACE, AND SO

14  IT'S VERY IMPORTANT TO TIE THOSE TWO THINGS TOGETHER.  SO SAYS

15  THE NINTH CIRCUIT, THE THIRD CIRCUIT, THE SEVENTH CIRCUIT, AND

16  MANY CASES THAT HAVE LOOKED AT THAT.

17           THIS IS A VERY INTERESTING AND IMPORTANT POINT, YOUR

18  HONOR, SLIDE 7, BECAUSE THE NINTH CIRCUIT HAS EXPRESSLY REJECTED

19  PLAINTIFFS' ARTICULATION OF THE LOSS CAUSATION RULE.  THEY SAY

20  IN THEIR BRIEF, AND I QUOTE THEIR OPPOSITION IN 45:

21               "PLAINTIFFS NEED ONLY PRESENT ENOUGH

22               EVIDENCE FROM WHICH A REASONABLE JURY COULD

23               CONCLUDE THAT THE DISCLOSURE CAUSED THE

24               DECLINE."

25           WELL, YOUR HONOR, THAT'S JUST NOT SO.  THAT IS A

1  MISSTATEMENT OF LAW.  WE ARE IN VIOLENT AGREEMENT, YOUR HONOR,

2  THAT ORACLE'S MARCH 1ST ANNOUNCEMENT CAUSED THE DECLINE IN

3  ORACLE'S STOCK PRICE.  THERE'S NO DOUBT ABOUT THAT.  AND AS I'LL

4  COME TO, AND AS YOUR HONOR IS ALREADY AWARE FROM READING THE

5  BRIEFS, IT CAUSED THE DECLINE OF THE ENTIRE INDUSTRY'S STOCK

6  PRICE, BECAUSE IT WAS THE HARBINGER OF WHAT TURNED OUT TO BE A

7  MAJOR RECESSION IN THIS COUNTRY, WHAT AT THE TIME SEEMED LIKE A

8  MAJOR RECESSION --

9        **THE COURT:**  EVERYTHING BEING RELATIVE.

10       **MR. WALD:**  EXACTLY.

11        SO IT IS NOT RIGHT THAT THE PLAINTIFFS NEED ONLY

12  PRESENT ENOUGH EVIDENCE FROM WHICH A REASONABLE JURY COULD

13  CONCLUDE THAT THE DISCLOSURE CAUSED THE DECLINE.  THE CRITICAL

14  QUESTION, YOUR HONOR, IS WHETHER WHAT WAS IN THE DISCLOSURE

15  REVEALED THE RELEVANT TRUTH.

16        DID THE RELEVANT TRUTH BECOME GENERALLY KNOWN?  OR,

17  INSTEAD, DID STOCK PRICES DECLINE BECAUSE ORACLE, AS THE

18  BELLWETHER FOR THE ENTIRE INDUSTRY, REPORTING FIRST A MONTH OUT

19  AHEAD OF ALL OF ITS COMPETITORS BECAUSE OF ITS FISCAL YEAR,

20  SIGNAL TO THE MARKET AND TO THE ANALYSTS WHO FOLLOW ORACLE AND

21  ALL OF THESE OTHER COMPANIES THAT, INDEED, THE UNITED STATES WAS

22  ABOUT TO HEAD INTO A RECESSION.  THAT, OF COURSE, CAN, AND IN

23  THIS CASE DID, CAUSE STOCK PRICE DECLINE, BUT IT DID NOT REVEAL

24  A RELEVANT TRUTH IN THE TERMS OF *DURA*.

25        NOW, YOUR HONOR, COURTS HAVE ROUTINELY GRANTED

1  SUMMARY JUDGMENT WHERE THE PLAINTIFFS HAVE FAILED TO ESTABLISH

2  LOSS CAUSATION AT THE SUMMARY JUDGMENT STAGE.  WE'VE CITED THESE

3  IN OUR BRIEFS.  THERE ARE THREE IN PARTICULAR, AND I WILL COME

4  TO THEM, YOUR HONOR, THAT WE WOULD URGE THE COURT TO REVIEW IN

5  CONNECTION WITH THE OPINION THAT WILL BE ISSUED, THREE DISTRICT

6  COURT CASES THAT WE THINK ANALYZE THIS ISSUE QUITE EFFECTIVELY

7  AND THOROUGHLY.

8          ONE IS THE *FLOWSERVE VERSUS RYAN* CASE WHICH WE CITED

9  AND WHICH IS PARTICULARLY INTERESTING, YOUR HONOR, BECAUSE THE

10 PLAINTIFFS' EXPERT HERE, MR. BJORN STEINHOLT, WAS ALSO THE

11 PLAINTIFF'S EXPERT IN *RYAN VERSUS FLOWSERVE*, AND THE COURT DEALS

12 BOTH WITH MR. STEINHOLT'S EXPERT OPINION, AS WELL AS THE ISSUE

13 OF LOSS CAUSATION.

14         THE OTHER TWO DISTRICT COURT CASES, YOUR HONOR, THAT

15 WE WOULD COMMEND TO THE COURT WOULD INCLUDE *MCKOWAN* AND *IKON*.

16         NOW, TURNING TO THE ANNOUNCEMENT ITSELF, YOUR HONOR,

17 AND IN THIS CASE, AS THE COURT KNOWS, THERE'S REALLY ONLY ONE

18 ANNOUNCEMENT, WHICH IS ALLEGED TO BE CORRECTIVE OR WHICH IS

19 ALLEGED TO GIVE RISE TO THE CLAIM OF LOSS CAUSATION, AND THAT'S

20 THE MARCH 1, 2001 ANNOUNCEMENT.  SO IF FRAUD BE REVEALED, YOUR

21 HONOR, IT NEEDS ON THE REVEALED IN THAT ANNOUNCEMENT.

22         AND WHAT DID THE ANNOUNCEMENT SAY?  IT SAID:

23              "TODAY, ORACLE CORPORATION ANNOUNCED

24         ESTIMATED EARNINGS FOR ITS FISCAL THIRD QUARTER

25         FEBRUARY 28TH, 2001, BASED UPON PRELIMINARY

1               FINANCIAL RESULTS FOR THE QUARTER.  PRELIMINARY

2               THIRD QUARTER RESULTS INDICATE EARNINGS PER

3               SHARE GREW OVER 20 PERCENT TO TEN CENTS PER

4               SHARE, UP FROM EIGHT CENTS PER SHARE IN Q3 LAST

5               YEAR, EXCLUDING INCLUDING INVESTMENT GAINS.

6               APPLICATIONS REVENUE GROWTH IS ESTIMATED AT

7               APPROXIMATELY 50 PERCENT, AND DATABASE REVENUE

8               GROWTH IS ESTIMATED TO BE FLAT TO SLIGHTLY

9               NEGATIVE."

10          LET ME JUST PAUSE THERE, YOUR HONOR, AND NOTE, AS I'M

11     SURE THE COURT IS AWARE, THAT ALL OF THE ALLEGATIONS IN THIS

12     CASE ABOUT SUITE 11I PERTAIN TO APPLICATIONS ISSUES, NOT TO

13     DATABASE.  AND, AS WE'LL SEE, TO THE EXTENT THAT THERE WERE

14     PROBLEMS IN ORACLE'S EARNINGS MISS, MOST OF THE ANALYSTS WHO

15     LOOKED AT THAT ATTRIBUTED THEM TO THE DATABASE, NOT TO THE

16     APPLICATION SOFTWARE ABOUT WHICH PLAINTIFFS COMPLAIN.

17          THE ANNOUNCEMENT, YOUR HONOR, GOES ON TO SAY:

18               "LICENSE GROWTH WAS STRONG IN THE FIRST TWO

19               MONTHS OF Q3, AND OUR SPEAKER SALES FORECAST

20               LOOKED GOOD UP UNTIL THE LAST FEW DAYS OF THE

21               QUARTER.  HOWEVER, A SUBSTANTIAL NUMBER OF OUR

22               CUSTOMERS DECIDED TO DELAY IT SPENDING BASED ON

23               THE ECONOMIC SLOWDOWN IN THE UNITED STATES.  THE

24               PROBLEM IS THE U.S. ECONOMY."

25          SO THAT'S WHAT ORACLE TOLD THE WORLD, YOUR HONOR;

1 THAT THE PROBLEM WAS THE U.S. ECONOMY, THAT SALES HAD FALLEN OUT

2 IN THE LAST FEW DAYS OF THE QUARTER, AND THAT IT WAS SUDDEN AND

3 UNEXPECTED.

4       ON THE ANALYST CALL THAT SAME DAY, YOUR HONOR, ORACLE

5 CONTINUED TO TELL THE SAME FACTS TO THE MARKET, AND SLIDE 11

6 SHOWS THAT.

7       "GOING IN AS LATE AS FRIDAY, WE STILL FELT

8       VERY GOOD ABOUT QUARTER, AND THEN ON FRIDAY WE

9       STARTED TO SEE A FEW CRACKS."

10 WE'VE INCLUDED THE EXHIBITS, YOUR HONOR.

11       "SENIOR MANAGERS ARE DEFERRING EXPENSES AND

12       PUSHING OUT IT EXPENDITURES IN LIGHT OF THE

13       UNCERTAIN U.S. ECONOMY.

14       "A BUNCH OF DEALS WERE ALREADY APPROVED AT

15       THE MID-HIGH LEVEL.  ONCE IT GOT UP TO THE CFO,

16       CEO LEVEL, THEY WERE PUSHED OFF.  THEY'RE JUST

17       LOOKING AT THE ECONOMY."

18       AND, FINALLY:

19       "WE HAD A VERY STRONG DECEMBER.  WE WERE

20       WELL AHEAD OF OUR NUMBERS AT THE END OF JANUARY.

21       AND THE PIPELINE LOOKED TERRIFIC GOING INTO

22       FEBRUARY.  AND WE REALLY DIDN'T SEE IT IN OUR

23       BUSINESS UNTIL THE LAST FEW DAYS."

24       SO, AGAIN, WHAT ORACLE TOLD THE MARKET, BOTH IN ITS

25 PRESS RELEASE AND IN THE ANALYST CALL WAS THAT THIS WAS A

1    FUNCTION OF THE ECONOMY AND IT WAS A FUNCTION OF AN ECONOMIC

2    CHANGE OF CIRCUMSTANCES THAT MANIFESTED -- IN ORACLE'S SYSTEM

3    MANIFESTED TO ORACLE AND MANIFESTED IN ORACLE'S SYSTEM IN THE

4    LAST FEW DAYS OF THE QUARTER IN FEBRUARY.  BEARING IN MIND, YOUR

5    HONOR, THAT MR. ELLISON'S LAST DAY OF TRADING, AS YOU KNOW, WAS

6    JANUARY 31ST.

7            NOW, YOUR HONOR, ORACLE WAS EXTENSIVELY COVERED BY

8    FINANCIAL AND INDUSTRY ANALYSTS.  THIRTY-ONE SEPARATE FINANCIAL

9    ANALYSTS COVERED ORACLE DURING THE CLASS PERIOD.  NUMEROUS

10   INDUSTRY ANALYSTS COVERED ORACLE DURING THE CLASS PERIOD.  AND

11   ORACLE WAS MENTIONED IN OVER 3,000 ARTICLES COVERED BY DOW

12   JONES, BLOOMBERG AND REUTERS AT THE RATE OF NEARLY 60 ARTICLES

13   PER TRADING DAY.

14           I THINK THE IMPORTANCE OF THAT, YOUR HONOR, IS THERE

15   WAS A WIDE GROUP OF LEARNED PROFESSIONALS WHO KNEW A LOT ABOUT

16   ORACLE AND A LOT ABOUT ITS BUSINESS WERE VERY FOCUSED ON ORACLE,

17   UNDERSTOOD ORACLE'S PLACE IN THE FIRMAMENT, IF I COULD USE THAT

18   EXPRESSION, AS A BELLWETHER FOR THE INDUSTRY, AND WERE TRAINED

19   TO ASK QUESTIONS AND TO DRAW CONCLUSIONS ABOUT WHAT HAD

20   HAPPENED.

21           AND I THINK IT GOES WITHOUT SAYING, YOUR HONOR, THAT

22   THAT'S THE REASON THESE CASES ALL LOOK VERY CAREFULLY AT

23   ANALYSTS REPORTS IN THE LOSS CAUSATION CONTEXT TO DECIDE WHAT IT

24   IS THE MARKET UNDERSTOOD IN A CASE WHERE THERE'S NO DIRECT

25   DISCLOSURE OF THE ALLEGED FRAUDS.

```
 1              ON THAT ISSUE, YOUR HONOR, AS THESE EXHIBITS MAKE

 2    CLEAR, THE MARKET CLEARLY UNDERSTOOD ORACLE'S MARCH 1, 2001

 3    ANNOUNCEMENT AS THE HARBINGER OF A SUDDEN INDUSTRY-WIDE

 4    DOWNTURN, AND ALL OF THE REPORTS AND THE EXHIBITS ON SLIDE 13,

 5    YOUR HONOR, SHOW THAT.  AND I'M JUST GOING TO WALK THROUGH A FEW

 6    OF THEM, BECAUSE THE LANGUAGE FROM THESE REPORTS IS STUNNING IN

 7    ITS UNIFORMITY AND IN ITS CLEAR REFLECTION OF WHAT THE MARKET

 8    DID UNDERSTAND, WHICH WAS THAT ORACLE WAS RIGHT, THAT THEY

 9    CREDITED ORACLE'S EXPLANATION FOR THE REASONS FOR THE THIRD

10    QUARTER EARNINGS MISS, AND IT HAD NOTHING TO DO WITH THE FOUR

11    SPECIFIC ALLEGED FRAUDS THAT THE PLAINTIFFS CLAIM.

12              B OF A ON MARCH 2, 2001, QUOTE:

13                  "WE CONTINUE TO BELIEVE (AND ORACLE'S

14                  SHORTFALL SEEMS TO BEAR THIS OUT) THAT AT THE

15                  11TH HOUR, IN AN UNCERTAIN ECONOMY SOME

16                  TECHNOLOGY BUYERS WILL DEFER THEIR PURCHASES."

17                  EXHIBIT 406.

18                  MORGAN STANLEY, SAME DATE, QUOTE:

19                  "THIS DOWNTURN IS WORSE THAN PAST DOWNTURNS

20                  IN THE SUDDENNESS AND SEVERITY.  ALL SOFTWARE

21                  PURCHASES ARE DISCRETIONARY, AND MANAGEMENTS

22                  WILL ONLY REGAIN CONFIDENCE TO BUY TECHNOLOGY

23                  PRODUCTS WHEN THEY SEE STABILIZATION AND AN

24                  UPTURN IN THEIR OWN BUSINESS PROSPECTS." EXHIBIT

25                  407.
```

1          NEXT IS NEEDHAM & COMPANY, THAT SAME DAY, MARCH 2ND,

2    QUOTE:

3               "ORACLE WAS TRULY ON A ROLL.  OUR FIELD

4               CHECKS CONFIRMED MANAGEMENT'S COMMENTARY THAT

5               BOTH DECEMBER AND JANUARY RESULTS WERE STRONG

6               AND ABOVE BUDGET."

7          PAUSE, YOUR HONOR.  I MEAN, HERE IS SOMEBODY SAYING

8    THEY WENT OUT AND CONFIRMED EXACTLY WHAT IT WAS THAT ORACLE WAS

9    TELLING THE MARKET, AND THEY'RE REPORTING THEY CONFIRMED WITH

10   ORACLE CUSTOMERS THAT WHAT ORACLE HAD BEEN SAYING WAS TRUE.

11          GOING ON:

12               "THE COMPANY'S APPLICATIONS SOLUTION STACK

13               WAS MATURING AND APPEARED SET TO ENTER THE

14               TORNADO OF GROWTH.  AS THE LAST WEEK IN FEBRUARY

15               APPROACHED, DEALS THAT HAD BEEN OKAYED BY

16               DIVISION MANAGERS WERE SIMPLY DELAYED WHEN THEY

17               REACHED THE DESK OF CFO OR CEO."

18          AND THAT'S WORTH NOTING AS WELL, YOUR HONOR.

19          IF THERE WAS SOME SUDDEN PROBLEM WITH PRODUCT 11I

20   THAT WOULD HAVE CAUSED THESE DEALS TO FALL OUT, THEY WOULDN'T

21   HAVE GOTTEN TO THIS DESK OF THE CEO AND CFO.  THAT'S NOT WHEN

22   DEALS GET KILLED OR NEVER GET GOING, BECAUSE OF PRODUCT

23   PROBLEMS.

24          THE NATURE OF WHAT THESE ANALYSTS ARE SAYING ABOUT

25   THE WAY THAT THE DEALS FELL OUT AT THE END CONFIRMS THAT IT WAS

1  AN ECONOMIC ISSUE AND NOT A PROBLEM WITH THE PRODUCTS

2  THEMSELVES.

3          GOING ON, SSB, ON MARCH 2ND, QUOTE:

4              "AFTER CONSIDERABLE STRENGTH IN DECEMBER AND

5              JANUARY, THE COMPANY BEGAN TO SEE SIGNIFICANT

6              DEFERRALS AS COMPANIES BECAME CAUTIOUS ABOUT THE

7              U.S. ECONOMIC OUTLOOK.  IF ORACLE IS SEEING A

8              DEFERRAL OF THIS MAGNITUDE, WE BELIEVE THE

9              COMPANY'S SHORTFALL IS AN OMEN FOR OTHER NAMES

10             IN OUR UNIVERSE."  EXHIBIT 410.

11         WITSOUNDVIEW, MARCH 2ND, QUOTE:

12             "ALTHOUGH WE ARE OBVIOUSLY DISAPPOINTED, WE

13             SEE THE MISS AS ENTIRELY DUE TO THE

14             DETERIORATION IN THE ECONOMY."  EXHIBIT 467.

15         THOMAS WEISEL PARTNERS, MARCH 2ND, QUOTE:

16             "GIVEN THAT EVIDENCE OF A SHORTFALL DID NOT

17             SURFACE UNTIL VERY LATE IN Q3 AND THE WEAKNESS

18             WAS SO BROAD-BASED, WE FEAR INVESTORS WILL FLEE

19             OTHER SOFTWARE COMPANIES."

20         YOUR HONOR, I WON'T READ SLIDE 16, BUT IT'S MORE OF

21  THE SAME.  IT'S THREE MORE ANALYSTS WHO FOLLOWED THE COMPANY ON

22  A REGULAR BASIS AND HAD THE ABILITY TO CONFIRM WITH THE

23  COMPANY'S CUSTOMERS WHAT WAS GOING ON, THEIR REPORT TO THE

24  MARKET THAT THIS IS ABOUT THE ECONOMY, THAT THIS IS THE LEADING

25  EDGE OF THE RECESSION.

1          ALL RIGHT.  SO, THAT'S WHAT THE ANALYSTS SAID.  AND

2   WHEN YOU ARE TALKING ABOUT MARKET AWARENESS, YOUR HONOR, AS

3   THESE CASES MAKE CLEAR, THAT'S WHERE THE COURTS GO.  THEY GO TO

4   THE TRAINED PROFESSIONALS, THE PEOPLE WHOSE JOB IT IS TO FOLLOW

5   THESE COMPANIES IN THE INDUSTRY, AND THEY ASK WHAT DID THOSE

6   PEOPLE UNDERSTAND BASED ON ALL OF THE EVIDENCE THAT WAS

7   AVAILABLE TO THEM.

8          NOW, NOT SURPRISINGLY, GIVEN THIS, YOUR HONOR, THE

9   ANALYSTS REDUCED GUIDANCE FOR ORACLE'S COMPETITORS.  THAT'S

10  QUITE IMPORTANT, BECAUSE IT'S A FUNNY KIND OF FRAUD, ISN'T IT,

11  THAT, IN FACT, RESULTS IN REDUCED GUIDANCE AND MISSED EARNINGS

12  FOR AN ENTIRE INDUSTRY AND A STOCK PRICE DECLINE FOR AN ENTIRE

13  INDUSTRY.  IF THIS FRAUD WAS ABOUT SECTION 11I, WHY IS IT THAT

14  ALL THESE OTHER COMPANIES SUFFERED SIMILARLY.

15         SLIDE 18 -- AND, AGAIN, I WON'T READ THEM, YOUR

16  HONOR, BUT WE'VE SET THEM OUT.  WHAT THESE SLIDES SHOW, SLIDES

17  18 AND SLIDE 19, ANALYST AFTER ANALYST REDUCING GUIDANCE, NOT

18  JUST FOR ORACLE, BUT FOR ALL OF THE COMPANIES, AND SAYING THAT

19  WE UNDERSTAND AND VIEW ORACLE'S EARNINGS MISS AS A HARBINGER FOR

20  AN INDUSTRYWIDE DOWNTURN THAT IS GOING TO AFFECT ALL OF THESE

21  OTHER COMPANIES.

22         NOW, BEFORE MARCH 1, 2001, ORACLE AND ITS COMPETITORS

23  EXCEEDED EXPECTATIONS, YOUR HONOR.  THIS IS INTERESTING JUST

24  BECAUSE OF THE TIMING.  ORACLE'S THIRD QUARTER, AS THE COURT

25  KNOWS, COVERED THE MONTHS OF DECEMBER '00, JANUARY '01,

1    FEBRUARY '01.  SO IT IS INTERESTING TO SEE WHAT COMPANIES WERE

2    REPORTING DURING THAT PERIOD.

3            ARIBA ON JANUARY 11TH, ITS FISCAL YEAR ENDED 12/31,

4    ANNOUNCED RECORD RESULTS FOR THE FIRST QUARTER OF FISCAL YEAR

5    2001, ENDED DECEMBER 31, 2000.  SO ARIBA'S LAST MONTH OF ITS

6    FISCAL YEAR WAS THE FIRST MONTH OF THE THIRD QUARTER OF '01 FOR

7    ORACLE, AND ARIBA IS REPORTING STRONG RESULTS JUST LIKE ORACLE

8    EXPERIENCED IN DECEMBER.

9            SAME THING FOR I2 WHO SAYS:

10           "WE HAVEN'T SEEN MUCH OF THE TALKED ABOUT

11           ECONOMIC SLOWDOWN."

12           COMMERCE ONE:

13           "COMMERCE ONE IS SEEING CONTINUED STRONG

14           DEMAND DESPITE THE U.S. ECONOMIC SLOWDOWN."

15           THESE ARE ORACLE'S COMPETITORS, YOUR HONOR.

16           AND, AGAIN, EMBRACING UP THROUGH 12/31.

17           AND BEA IS REALLY INTERESTING, BECAUSE THEIR FISCAL

18   YEAR ENDS 1/31, SO THEY COVERED JANUARY.  THEY SAY, QUOTE:

19           "COMPANIES CONTINUE TO BUILD THEIR

20           E-BUSINESSES, RESULTING IN INCREASED REVENUE

21           EVEN IN THIS CHALLENGE ECONOMIC CLIMATE."

22           AGAIN THE EXHIBITS ARE THERE, YOUR HONOR.

23           AND THAT GOES THROUGH 1/31, THE SECOND MONTH OF

24   ORACLE'S QUARTER.

25           THIS IS AN INTERESTING SLIDE, YOUR HONOR, 21, BECAUSE

```
 1   IT SHOWS THAT BEFORE ORACLE ANNOUNCED -- PREANNOUNCED ITS

 2   EARNINGS MISS ON MARCH 1, ITS COMPETITORS ACHIEVED THEIR EPS

 3   GUIDANCE, BUT AFTER THE PREANNOUNCEMENT, THEIR COMPETITORS WENT

 4   ON TO MISS THEIR GUIDANCE, AND IN SO DOING, WHAT'S INTERESTING,

 5   YOUR HONOR, AS SLIDE 22 AND THE NEXT ONE SHOW, THEY CITED THE

 6   SAME UNFORESEEN ECONOMIC FORCES THAT ORACLE BLAMED.

 7            SO ARIBA SAID ON APRIL 3RD, THIS IS SLIDE 23, QUOTE:

 8            "AT THE END OF THE QUARTER, WE EXPERIENCED A

 9            LARGE UNEXPECTED DROPOFF IN OUR SALES CLOSURE.

10            SPENDING DECISIONS AT THE EXECUTIVE LEVEL WERE

11            POSTPONED AS CUSTOMERS EVALUATED THEIR BUDGETS

12            IN LIGHT OF THE PREVAILING ECONOMIC

13            UNCERTAINTY."

14            COGNOS SAID, QUOTE:

15            "IN THE LATTER PART OF FEBRUARY, WE STARTED

16            TO EXPERIENCE HESITANCY ON THE PART OF

17            COMMERCIAL CUSTOMERS IN NORTH AMERICA TO MAKE

18            LARGE COMMITMENTS IN LIGHT OF THE CURRENT

19            ECONOMIC OUTLOOK."

20            I2 SAID ON APRIL 2ND:

21            "ALTHOUGH, WE CONTINUE TO SEE HEALTHY DEMAND

22            FOR OUR SOLUTIONS, SOME OF OUR CUSTOMERS ARE

23            DELAYING PURCHASING DECISIONS DUE TO UNCERTAINTY

24            IN THE MARKET."

25            AND, YOUR HONOR, SLIDE 24 CONTAINS FURTHER QUOTES
```

1   FROM COMMERCE ONE AND HYPERION, AGAIN, EXPLAINING THAT IN THE

2   LAST MONTH OF THEIR QUARTER -- OF THEIR FISCAL QUARTER, WHICH

3   WOULD HAVE BEEN THE MARCH QUARTER, THEY EXPERIENCED THE SAME

4   THING THAT ORACLE EXPERIENCED.

5           NOW, YOUR HONOR, AFTER THE EARNINGS MISS, ANALYSTS

6   CONTINUED TO EXPRESS CONFIDENCE IN ORACLE'S APPLICATIONS

7   BUSINESS.  SO AGAIN TO THE QUESTION OF MARKET AWARENESS, WHAT

8   DID THE MARKET UNDERSTAND.

9           SLIDE 26, FAC/EQUITIES SAID ON MARCH 2ND:

10              "WE DO NOT THINK COMPETITIVE OR EXECUTION

11              ISSUES WERE INVOLVED IN THE SHORTFALL.  THE

12              BOTTOM LINE IS THAT WE SEE NO REASON TO PANIC

13              OVER THIS QUARTER'S RESULTS, ESPECIALLY IN LIGHT

14              OF OUR BELIEF THAT ORACLE REMAINS IN STRONG

15              COMPETITIVE POSITION."

16          LEHMAN BROTHERS ON MARCH 2ND SAYS, QUOTE:

17              "WE CONTINUE TO BELIEVE THAT ORACLE REMAINS

18              THE DOMINANT PLAYER IN THE MARKETPLACE AND THAT

19              THE COMPANY IS GAINING SHARE IN THE APPLICATIONS

20              SPACE."

21          PRUDENTIAL SAYS ON THE SAME DAY:

22              "WE CONTINUE TO BELIEVE ORACLE IS IN A

23              STRATEGICALLY ENVIABLE POSITION AND SHOULD

24              EMERGE FROM THIS ECONOMIC SLOWDOWN WITH

25              INCREMENTAL MARKET SHARE."

1          AND SLIDE 27, YOUR HONOR, GOES ON TO LIST THREE MORE

2   ANALYSTS WHO ALL SAY THE SAME THING.  AND SORT OF INTERESTING TO

3   SEE GOLDMAN SACHS AS LATE AS MARCH 16 SAYING:

4               "WE DO NOT BELIEVE COMPETITIVE ISSUES ARE

5               LEADING CONTRIBUTORS TO THE CURRENT PROBLEMS

6               GIVEN HOW SUDDEN THE FALLOFF IN REVENUES HAS

7               BEEN."

8          SO TO THE QUESTION OF WHAT THE MARKET UNDERSTOOD,

9   YOUR HONOR, WE SUBMIT THAT THIS EVIDENCE IS VERY, VERY POWERFUL.

10         NOW, YOUR HONOR, WHAT ACTUALLY HAPPENED, AS WE NOW

11  KNOW WITH THE BENEFIT OF HISTORY, IS THAT THE UNITED STATES

12  ECONOMY DID, IN FACT, ENTER INTO A RECESSION STARTING IN MARCH,

13  AND THE NATIONAL BUREAU OF ECONOMIC RESEARCH, WHICH, AS WE HAVE

14  COME TO LEARN, IS THE BODY IN THIS COUNTRY THAT ANALYZES THE

15  DATA AND ANNOUNCES WHEN EXPANSION AND CONTRACTIONS OF THE

16  ECONOMY ACTUALLY BEGIN, DETERMINED THAT:

17              "...A PEAK IN BUSINESS ACTIVITY OCCURRED IN

18              U.S. ECONOMY IN MARCH 2001.  A PEAK MARKS THE

19              END OF AN EXPANSION AND THE BEGINNING OF A

20              RECESSION.  THE DETERMINATION OF A PEAK DATE IN

21              MARCH IS, THUS, A DETERMINATION THAT THE

22              EXPANSION THAT BEGAN IN MARCH 1991 ENDED IN

23              MARCH 2001 AND A RECESSION BEGAN.  THE EXPANSION

24              LASTED EXACTLY TEN YEARS, THE LONGEST IN THE

25              NBER'S CHRONOLOGY."

```
 1              SO, AS YOU CAN SEE, YOUR HONOR, ORACLE'S MARCH 1

 2   ANNOUNCEMENT WAS EXQUISITELY POISED ON THE PRECIPICE OF WHAT

 3   TURNED OUT TO BE A MAJOR ECONOMIC RECESSION.  THAT'S THE

 4   BACKGROUND, YOUR HONOR.

 5              TURNING TO LOSS CAUSATION, THERE'S REALLY TWO

 6   ELEMENTS TO THE ANALYSIS, TO THE LEGAL ANALYSIS, YOUR HONOR.

 7              FIRST, THERE WAS NO DIRECT DISCLOSURE OF THE RELEVANT

 8   TRUTH IN THE MARCH 1 ANNOUNCEMENT.  NOTHING IN THAT ANNOUNCEMENT

 9   REVEALED TO THE MARKET AN ACKNOWLEDGMENT BY ORACLE THAT IT MADE

10   FALSE STATEMENTS.

11              AND, SECONDLY, THERE WAS NO INDIRECT DISCLOSURE OF

12   THE RELEVANT TRUTH EITHER.

13              AS NOTED, COURTS HAVE GRANTED SUMMARY JUDGMENT TO

14   DEFENDANTS WHERE THE EVIDENCE FAILS TO ESTABLISH DIRECT OR

15   INDIRECT DISCLOSURE OF THE RELEVANT TRUTH, AND, YOUR HONOR,

16   THESE ARE THE THREE DISTRICT COURT CASES THAT I'VE CALLED OUT.

17              SLIDE 31, YOUR HONOR, SHOWS THAT COURTS CONDUCT AN

18   INDEPENDENT ANALYSIS OF THE ALLEGED CORRECTIVE DISCLOSURES IN

19   THE ANALYSTS' REPORTS IN MAKING THEIR SUMMARY JUDGMENT

20   DETERMINATIONS.  THEY ANALYZE WHETHER CORRECTIVE DISCLOSURES

21   REVEAL THE FALSITY OF THE ALLEGED MISSTATEMENT.

22              AND THE QUOTE FROM *FLOWSERVE* IS INSTRUCTIVE I THINK,

23   YOUR HONOR.  THE COURT SAYS, QUOTE:

24              "A STRAIGHTFORWARD COMPARISON BETWEEN THE

25              ALLEGATIONS AND THE ALLEGED CORRECTIVE
```

1          DISCLOSURES INDICATE NO CREDIBLE RELATION."

2          SO THAT'S A FUNCTION THAT THE COURT TAKES ON.

3          SECOND, COURTS REVIEW ANALYSTS' REPORTS TO ASSESS

4    MARKET AWARENESS.  AND, AGAIN, AS THE FLOWSERVE COURT NOTED,

5    QUOTE:

6               "REPORTS OF MARKET ANALYSTS SERVE AS A GOOD

7               INDICATION OF THE KNOWLEDGE OF THE MARKET AS A

8               WHOLE."

9          AND THIRD:

10              "COURTS MAKE AN INDEPENDENT DETERMINATION AS

11              TO WHETHER A 'RELEVANT TRUTH' BECAME 'GENERALLY

12              KNOWN'."

13         AND THAT'S *FLOWSERVE* AND *MCKOWAN* AND *IKON* AND THE

14   OTHER CASES THAT WE'VE CITED, YOUR HONOR.

15         TURNING TO THE FACTS OF THIS CASE ON SLIDE 32,

16   DEFENDANTS HAVE ALLEGED EXACTLY FOUR CATEGORIES OF SECURITIES

17   FRAUD, AND THEY NEED TO BE HELD TO THOSE FOUR CATEGORIES FOR

18   PURPOSES OF LOSS CAUSATION AT SUMMARY JUDGMENT.

19         FIRST, PLAINTIFFS CLAIM THAT DEFENDANTS HAD NO

20   REASONABLE BASIS FOR THE THIRD QUARTER '01 GUIDANCE GIVEN OR

21   WERE AWARE OF UNDISCLOSED FACTS SERIOUSLY UNDERMINING THAT

22   GUIDANCE.

23         SECOND, PLAINTIFFS CLAIM THAT DEFENDANTS FRAUDULENTLY

24   ASSURED THE MARKET THROUGHOUT THE THIRD QUARTER THAT ORACLE WAS

25   ON TRACK TO MEET ITS GUIDANCE.

1          THIRD, PLAINTIFFS CLAIM THAT PROBLEMS, PRESUMABLY

2    UNDISCLOSED PROBLEMS, WITH SUITE 11I CAUSED ORACLE TO MISS ITS

3    GUIDANCE BECAUSE THE PRODUCT WAS SO DEFECTIVE, "IT SIMPLY DID

4    NOT WORK."

5          AND LET ME PAUSE THERE, YOUR HONOR, AND JUST SAY THAT

6    THERE IS NO DISPUTE IN THIS CASE THAT ORACLE SOLD ONE BILLION

7    DOLLARS, ONE BILLION DOLLARS, OF SUITE 11I PRODUCT DURING ITS

8    2001 FISCAL YEAR.  AND IN THE QUARTER FOLLOWING THE EARNINGS

9    MISS, THEY SOLD $338 MILLION AT A TIME WHEN, ACCORDING TO THE

10   PLAINTIFFS, THE PRODUCT WAS SO DEFECTIVE THAT IT DIDN'T WORK.

11         RETURNING TO SLIDE 32, THE PLAINTIFFS' FOURTH CLAIM

12   THAT ORACLE'S SECOND QUARTER '01 FINANCIAL RESULTS WERE

13   ARTIFICIALLY INFLATED.  NOW, AS THE COURT KNOWS, ON 33, IN ORDER

14   TO BE CORRECTIVE, A DISCLOSURE MUST REVEAL THE FALSITY OF A

15   MISSTATEMENT.  MANY, MANY CASES HAVE SAID THAT, OF COURSE.

16         TURNING TO THE MARCH 1, 2001, ANNOUNCEMENT, CLEARLY,

17   YOUR HONOR, IT WAS NOT A CORRECTIVE DISCLOSURE.  IT HAD NOTHING

18   TO DO OR NOTHING TO SAY ABOUT ANY OF THE FOUR ALLEGED FRAUDS,

19   AND SO NOT EVEN PLAINTIFFS, YOUR HONOR, TAKE A SERIOUS STAB AT

20   ARGUING THAT THERE WAS A CORRECTIVE DISCLOSURE.

21         INSTEAD, PLAINTIFFS PIN THEIR ENTIRE HOPES ON THE

22   CLAIM THAT THE MARKET UNDERSTOOD, THE MARKET INTERPRETED THE

23   MARCH 1ST ANNOUNCEMENT AS AN INDIRECT DISCLOSURE THAT ORACLE HAD

24   LIED IN THE WAYS THAT PLAINTIFF CLAIMS THAT ORACLE HAD LIED.

25         AND HERE, YOUR HONOR, THE NINTH CIRCUIT'S RECENT

1    *METZLER* DECISION IS REALLY QUITE IMPORTANT, BECAUSE THE NINTH

2    CIRCUIT OBSERVED IN *METZLER*, QUOTE:

3                   "PLAINTIFF IS CORRECT TO OBSERVE THAT

4                   NEITHER *DAOU* NOR *DURA* REQUIRE AN ADMISSION OR

5                   FINDING OF FRAUD BEFORE LOSS CAUSATION CAN BE

6                   PROPERLY PLED.  BUT THAT DOES NOT ALLOW A

7                   PLAINTIFF TO PLEAD LOSS CAUSATION THROUGH

8                   'EUPHEMISM' AND THEREBY AVOID ALLEGING THE

9                   NECESSARY CONNECTION BETWEEN DEFENDANT'S FRAUD

10                   AND THE ACTUAL LOSS."

11             AND, YOUR HONOR, I HAD PAUSED ON THE PLAINTIFFS'

12   ARTICULATION OF THE LEGAL STANDARD GOVERNING LOSS CAUSATION

13   BEFORE, IF I CAN FIND IT.  YES, IT'S ON SLIDE 7.  THIS IS

14   EXACTLY WHAT THE PLAINTIFFS ARE DOING, EXACTLY WHAT HAS BEEN

15   PROSCRIBED BY THE NINTH CIRCUIT IN *METZLER*, WHERE THEY SAY:

16                   "PLAINTIFFS NEED ONLY PRESENT ENOUGH

17                   EVIDENCE FROM WHICH A REASONABLE JURY COULD

18                   CONCLUDE THAT THE DISCLOSURE CAUSED THE

19                   DECLINE."

20             THAT IS NOT RIGHT.  THAT IS PLEADING BY EUPHEMISM.

21   THAT IS PROOF BY EUPHEMISM.  THEY NEED TO SHOW THE MARKET

22   UNDERSTOOD SPECIFIC FRAUDS HAD BEEN REVEALED.

23             JOHN, COULD WE GO TO 36, PLEASE?

24             THIS IS PICKED UP, YOUR HONOR, BY THE COURTS THAT

25   HAVE EXAMINED THE ISSUE:

1    "WHEN FRAUD IS REVEALED THROUGH INDIRECT

2    DISCLOSURE, PLAINTIFFS MUST PROVIDE PROOF THAT

3    THE MARKET RECOGNIZED A RELATIONSHIP BETWEEN THE

4    EVENT DISCLOSED AND THE FRAUD TO ESTABLISH LOSS

5    CAUSATION."

6    THAT'S FROM *FLOWSERVE*.

7    AND *MCKOWAN* SAYS:

8    "DISCLOSURE OF THE FRAUD NEED NOT ORIGINATE

9    WITH A DEFENDANT AND MAY BE INDIRECT.  IN THAT

10    CASE, PLAINTIFFS MUST PROVIDE PROOF THAT THE

11    MARKET RECOGNIZED A RELATIONSHIP BETWEEN THE

12    EVENT DISCLOSED AND THE FRAUD."

13    TURNING NOW TO THE SPECIFIC FRAUDS THAT HAVE BEEN

14 ALLEGED.

15    FIRST, THERE WAS CLEARLY NO INDIRECT DISCLOSURE THAT

16 ORACLE'S 3Q01 FORECAST WAS FALSE, YOUR HONOR, WITHIN THE MEANING

17 OF *ADOBE* AND *SAFE HARBOR* AND EVERYTHING ELSE.

18    PLAINTIFFS HAVE FAILED TO IDENTIFY A SINGLE ANALYST

19 WHO ATTRIBUTED ORACLE'S 3Q01 EARNINGS MISS TO DEFECTS IN

20 ORACLE'S FORECASTING PROCESS.  INDEED, THERE IS NO EVIDENCE THE

21 MARKET EVER LEARNED OF ANY ALLEGED DEFECTS REGARDING ORACLE'S

22 3Q01 FORECAST.  AND THEY DON'T, YOUR HONOR, EVEN MAKE AN ATTEMPT

23 IN THE EVIDENCE THAT THEY DO RECITE, WHICH I'M GOING TO COME TO

24 IN A SECOND, TO ARGUE THAT THAT PARTICULAR FRAUD WAS REFLECTED

25 IN SOME ANALYST'S REPORT.

```
 1                SECONDLY, WITH RESPECT TO THE ACCOUNTING CLAIMS, THEY
 2    FAIL TO IDENTIFY A SINGLE ANALYST WHO ATTRIBUTED ORACLE'S 3Q01
 3    EARNINGS MISS TO ANY ALLEGED MISSTATEMENT IN ORACLE'S 2Q01
 4    FINANCIAL STATEMENTS.  INDEED, YOUR HONOR, THERE'S NO EVIDENCE
 5    THAT ANYONE EVER BELIEVED THE SECOND QUARTER '01 FINANCIAL
 6    STATEMENTS WERE WRONG OR INCORRECT.  AS THE COURT KNOWS, THEY'D
 7    NEVER BEEN RESTATED.  THERE'S NO INDICATION THAT ANYONE EVER
 8    BELIEVED THAT THEY WERE MATERIALLY INCORRECT IN ANY WAY, AND
 9    CERTAINLY NO ANNOUNCEMENT TO THAT AFFECT, AND NO ANALYST SAYING
10    THAT.  SO, AGAIN, NO INDIRECT DISCLOSURE, NO EVIDENCE OF MARKET
11    AWARENESS OF THIS FACT, ALLEGED CLAIM.
12                THE THIRD ONE ARE THE ECONOMY STATEMENTS.  THE
13    PLAINTIFFS ALLEGE THAT THE DEFENDANTS HAD FRAUDULENTLY ASSURED
14    THE MARKET THROUGHOUT THE THIRD QUARTER THAT ORACLE WAS ON TRACK
15    TO MEET ITS GUIDANCE.  WELL, IN ORDER TO SHOW THERE WAS MARKET
16    AWARENESS THAT THAT WAS UNTRUE, YOU WOULD HAVE TO COME FORWARD
17    WITH EVIDENCE POST MARCH 1 OF ANALYSTS WHO SAID, YOU KNOW, WE'VE
18    LOOKED AT THIS, AND WE'RE VERY SURPRISED.  ORACLE HAD BEEN OUT
19    THERE THE ENTIRE QUARTER SAYING THEY WEREN'T SEEING THE IMPACT
20    ON THEIR BUSINESS, AND IT'S NOW CLEAR THAT THIS WAS A PROBLEM
21    THROUGHOUT THE QUARTER.
22                WELL, AS YOUR HONOR SAW FROM THE EVIDENCE THAT WE'VE
23    SHOWN YOU, THAT'S EXACTLY THE OPPOSITE OF WHAT THE ANALYSTS
24    CONCLUDED.  THEY WENT OUT, DID THEIR OWN FIELD CHECKS, TALKED TO
25    ORACLE'S CUSTOMERS THEMSELVES AND CAME BACK AND CONFIRMED WHAT
```

1  ORACLE HAD SAID, WHICH WAS THIS WAS A FALLOFF WITHIN THE LAST

2  FEW DAYS, LAST WEEK OF FEBRUARY, WHICH, OF COURSE, IS VERY

3  CONSISTENT WITH THE NBER'S FINDING.

4           BY THE WAY, THE NBER'S FINDING IN NOVEMBER.  TOOK

5  THEM EIGHT MONTHS, SIX MONTHS TO UNDERSTAND WHAT HAPPENED, THAT

6  THE EXPANSION ENDED AT THE END OF FEBRUARY AND THE RECESSION

7  BEGAN IN MARCH.

8           LASTLY, YOUR HONOR, AND THERE'S BEEN A LOT OF BLOOD

9  SPILLED AND INK, I SUPPOSE I SHOULD SAY, SPILLED ON THE QUESTION

10 OF SUITE 11I AND WHAT IT ALL MEANS.  THE PLAINTIFFS SAY THAT

11 PROBLEMS WITH SUITE 11I CAUSED ORACLE TO MISS ITS GUIDANCE

12 BECAUSE THE PRODUCT WAS SO DEFECTIVE THAT IT SIMPLY DIDN'T WORK.

13          AS THE COURT KNOWS FROM THE NINTH CIRCUIT'S OPINION

14 ON THE MOTION TO DISMISS, THE COURT FOUND IT SIGNIFICANT THAT

15 THE PLAINTIFFS SAID THEY WERE GOING TO PROVE THAT ORACLE WAS

16 AWARE THAT $186 MILLION WORTH OF DEALS HAD FALLEN OUT RIGHT AT

17 THE BEGINNING OF THE QUARTER AND THAT WAS -- THAT THEY WERE

18 PUMPING UP THE QUARTER AS THE QUARTER WENT ALONG, KNOWING FULL

19 WELL THAT PROBLEMS WITH 11I, YOU KNOW, HAD CAUSED THOSE

20 PROBLEMS.

21          EVIDENCE HAS SHOWN, YOUR HONOR, DISCOVERY HAS SHOWN

22 THERE WAS NEVER ANY TRUTH TO THAT CLAIM, AND THERE'S NO EVIDENCE

23 OF IT WHATSOEVER, AND WE'RE CLEARLY ENTITLED TO SUMMARY JUDGMENT

24 ON THAT ISSUE.

25          SO ONE OF THE VERY BASES FOR WHAT THE NINTH CIRCUIT

1   DID, WHICH WAS THE EXPECTATION THAT THERE WAS GOING TO BE

2   EVIDENCE OF LOST DEALS AT THE BEGINNING OF THE QUARTER, YOU

3   KNOW, NEVER MATERIALIZED.  SAME ON THE ACCOUNTING CLAIMS, YOUR

4   HONOR.  AND THE PLAINTIFFS WALKED AWAY FROM THE ACCOUNTING CLAIM

5   THAT THE NINTH CIRCUIT RELIED UPON.

6           SO WHAT DOES THAT LEAVE US WITH SUITE 11I?  IT LEAVES

7   US WITH SOME UNARTICULATED CLAIM THAT THE MARKET BECAME AWARE

8   THAT ORACLE HAD SOMEHOW LIED BECAUSE SUITE 11I WAS, IN FACT,

9   IMPACTING ITS SALES THROUGHOUT THE QUARTER AND THEY WERE UNABLE

10  TO MAKE SALES BECAUSE OF, YOU KNOW, VARIOUS UNDISCLOSED PROBLEMS

11  WITH SUITE 11I AND THAT THAT CAUSED THE EARNINGS MISS.

12          YOUR HONOR, A RAID AGAINST THE OVERWHELMING BODY, ON

13  SLIDE 41, OF ANALYSTS' REPORTS THAT WE'VE SHOWN YOU, AND,

14  FRANKLY, THERE ARE OTHERS THAT AREN'T IN THIS BOOKLET, THE

15  PLAINTIFFS HAVE COME UP WITH FIVE PIECES OF EVIDENCE THAT THEY

16  SAY SUPPORTS LOSS CAUSATION.  AND THIS IS TAKEN, YOUR HONOR,

17  FROM THEIR REPLY BRIEF IN SUPPORT OF THEIR 20(A) MOTION FOR

18  SUMMARY JUDGMENT AT 18.  AND I SUBMIT, YOUR HONOR, THAT WE

19  BELIEVE THIS IS THEIR HIGHEST AND BEST ARTICULATION OF THE

20  EVIDENCE THAT SUPPORTS THEIR LOSS CAUSATION CLAIM, BECAUSE IT'S

21  THE LAST BRIEF THEY FILED, WITH FULL KNOWLEDGE OF ALL THE

22  ARGUMENTS THAT WE HAD MADE AND FULL KNOWLEDGE OF ALL THE

23  EVIDENCE WE HAD CITED.

24          AND THEY CITE EXACTLY FIVE PIECES OF EVIDENCE, YOUR

25  HONOR, TWO NEWSPAPER ARTICLES, ONE ANALYST REPORT, ONE, AND THEN

1  AN EXCERPT FROM MATTHEW SYMONDS' BOOK *SOFTWAR*, CLEARLY HEARSAY,

2  AS WE'LL COME TO, WRITTEN IN 2003, AND IT DOESN'T PROVE THE

3  POINT FOR WHICH IT'S SUBMITTED IN ANY EVENT, AND AN INTERNAL

4  ORACLE E-MAIL.  THAT IS THE SUM AND SUBSTANCE, YOUR HONOR, OF

5  THE PLAINTIFFS' SHOWING ON LOSS CAUSATION.

6          SO LET'S TAKE THESE ONE AT A TIME.  THE FIRST IS THE

7  MARCH 2ND, 2001 L.A. TIMES ARTICLE, AND THE CLAIM, I THINK, YOUR

8  HONOR, IS THAT IT SHOWS THAT THE MARKET WAS AWARE THAT ORACLE

9  HAD LIED.  LET'S LOOK AT WHAT THE ARTICLE SAYS.  WHAT THE

10  ARTICLE SAYS IS, QUOTE:

11              "IN DECEMBER THE COMPANY SAID IT WASN'T

12              BEING HURT BY THE SLOWDOWN BECAUSE CORPORATIONS

13              WERE BUYING ITS APPLICATIONS SOFTWARE TO CUT

14              COSTS AND BOOST EFFICIENCY."

15          THE ARTICLE DOES SAY THAT, ORACLE DID SAY THAT, AND

16  THE ARTICLE DOESN'T SAY IT WAS WRONG.  IT JUST REPORTS WHAT

17  ORACLE SAID.  MANY CASES, YOUR HONOR, MANY, MANY CASES SAY THAT

18  WHERE THE ALLEGED EVIDENCE OF THE CORRECTIVE DISCLOSURE OF THE

19  MARKET AWARENESS DOES NOTHING MORE THAN REPEAT THAT WHICH IS

20  CLAIMED TO HAVE BEEN FRAUDULENT.  THAT'S NOT MARKET AWARENESS OF

21  FRAUD AT ALL.  SO HERE THE L.A. TIMES IS SIMPLY REPEATING WHAT

22  ORACLE SAID.  THEY GO ON TO SAY:

23              "A SUBSTANTIAL NUMBER OF CUSTOMERS CUT

24              COMPUTER-RELATED SPENDING, WITH SENIOR

25              EXECUTIVES REFUSING TO SIGN OFF ON SOFTWARE

1               PURCHASES THAT HAD BEEN APPROVED BY

2               SUBORDINATES, ORACLE SAID.  THERE'S A GENERAL

3               NERVOUSNESS CAUSED BY UNCERTAINTY."

4               THIS IS SIMPLY A REPUBLICATION, YOUR HONOR, OF THE

5  INFORMATION THAT ORACLE ITSELF GAVE TO THE MARKET, NOT A

6  CORRECTIVE DISCLOSURE, AS THE CASES CITED TO THE COURT MAKE VERY

7  CLEAR.

8               SECOND, THE WALL STREET JOURNAL ARTICLE, THIS ALSO

9  DOES NOT SHOW AN INDIRECT DISCLOSURE OR A MARKET AWARENESS OF

10  THE RELEVANT TRUTH.  THE WALL STREET JOURNAL ARTICLE SAYS:

11              "THE REASONS FOR THE SHORTFALL WERE AT

12               LEAST AS TROUBLING TO ANALYSTS AS ITS MAGNITUDE.

13               WHILE DATABASE SALES HAVE BEEN SLOWING AT ORACLE

14               FOR MANY QUARTERS, ANALYSTS WERE SURPRISED BY

15               THE ABRUPTNESS OF THE LATEST DOWNTURN."

16              SO THE FOCUS OF THE ARTICLE, YOUR HONOR, IS THE

17  FAILURE IN THE DATABASE BUSINESS, WHICH IS PARENTHETICALLY WHAT

18  THE MARKET UNDERSTOOD.

19               ARTICLE GOES ON TO SAY:

20              "ORACLE ALSO SAID ITS LINE OF APPLICATIONS

21               SOFTWARE LIKELY GREW 50 PERCENT IN THE QUARTER,

22               WELL BELOW EARLIER PREDICTIONS THAT THE BUSINESS

23               MIGHT GROW BY 75 TO A HUNDRED PERCENT."

24               THEN IT GOES ON TO RECITE WHAT WAS SAID BY THE

25  COMPANY IN THE MIDDLE OF FEBRUARY BEFORE THE RESULTS OF THE LAST

1   THREE DAYS BECAME CLEAR.

2           AS SLIDE 44 SHOWS, YOUR HONOR, WHEN YOU LOOK AT WHAT

3   THE WALL STREET JOURNAL ARTICLE DOES, THE SECOND PIECE OF

4   EVIDENCE THE PLAINTIFFS CITE, IT SIMPLY REPEATS WHAT ORACLE HAS

5   SAID.  SO IT SHOWS:

6               "ORACLE SAID A SPUTTERING ECONOMY SLOWED

7               SALES, CUTTING FISCAL THIRD QUARTER PROFIT BELOW

8               WALL STREET EXPECTATIONS.

9               "ON WEDNESDAY, THE FINAL DAY OF THE QUARTER,

10              WE JUST HAD A SIGNIFICANT NUMBER OF DEALS THAT

11              WERE DEFERRED.

12              "IN MANY CASES, THE DEALS FOR SOFTWARE

13              PURCHASES HAD BEEN APPROVED AT A VICE-PRESIDENT

14              LEVEL, BUT CEO'S AND CFO'S AT THE LAST MINUTE

15              DECIDED TO DELAY MAKING A COMMITMENT."

16              AND, FINALLY, QUOTE:

17              "WE HAVE A LOT OF NERVOUS SENIOR EXECUTIVES

18              LOOKING AT THIS ECONOMY AND BEING VERY

19              CAUTIOUS."

20              THEN WHAT THE ARTICLE DOES IS TO REPEAT ORACLE'S

21  EXPLANATIONS FOR WHAT HAPPENED.

22          **THE COURT:**  EXCUSE ME ONE MINUTE.

23                  (PAUSE IN PROCEEDINGS.)

24          **THE COURT:**  THANK YOU.

25          **MR. WALD:**  THANK YOU, YOUR HONOR.  THAT'S THE

1   MARCH 2ND, THAT'S THE SECOND PIECE OF EVIDENCE, YOUR HONOR, AND

2   CERTAINLY NO QUOTATION IN THIS ARTICLE FROM ANY OF THE ANALYSTS

3   WE LOOKED AT SAYING, GOSH, NOW THAT WE'VE CHECKED WITH OUR

4   SOURCES AND LISTENED TO WHAT ORACLE SAID, IT'S CLEAR TO US THAT

5   THEY WEREN'T TELLING THE TRUTH.

6           ALL RIGHT.  THE THIRD PIECE OF EVIDENCE THAT THEY

7   CITE IS, IN FACT, AN ANALYST REPORT.  IT'S THE UBS WARBERG

8   REPORT, AND, YOUR HONOR, THIS CERTAINLY DOESN'T SHOW MARKET

9   AWARENESS THAT UNDISCLOSED PROBLEMS WITH SUITE 11I CAUSED THE

10  EARNINGS MISS.  LET'S GO THROUGH IT.

11          THEY, THE PLAINTIFFS, CITE FOR THE FOLLOWING

12  LANGUAGE:

13              "WE ALSO BELIEVE THAT THE WEAKNESS IN

14              ORACLE'S APPLICATIONS BUSINESS IS BECAUSE THE

15              COMPANY'S APPLICATIONS ARE NOT YET READY FOR

16              PRIME TIME.  LAST WEEK WE LEARNED THAT OVER 200

17              PATCHES HAD BEEN DEVELOPED FOR THE CRM PRODUCT

18              FOR THE LATEST VERSION.  ALTHOUGH FEEDBACK FROM

19              THESE CUSTOMERS SUGGESTED THEY WERE IMPRESSED

20              WITH THE IDEA OF A FULLY INTEGRATED SUITE, WE

21              WERE UNABLE TO FIND ANY THAT HAD FULLY

22              INTEGRATED AND GONE LIVE ON THE SUITE."

23          BEARING IN MIND THAT, AT THIS POINT, YOUR HONOR, THE

24  END OF THE THIRD QUARTER, I THINK THE TOTAL SALES OF 11I WERE

25  ROUGHLY $750 MILLION.

1          NOW, WHEN YOU ACTUALLY TAKE A LOOK AT WHAT THE

2    WARBERG REPORT SAID, WHAT IT SAYS IS, QUOTE:

3               "THE MAJOR SHORTFALL CAME FROM THE DATABASE

4               BUSINESS, WE HAVE THOUGHT FOR SOME TIME THAT THE

5               RECENT GROWTH OF ORACLE'S DATABASE MARKET WAS

6               NOT SUSTAINABLE."

7          THEN IRONICALLY, YOUR HONOR, THE REPORT GOES ON TO

8    SAY, QUOTE:

9               "ON A SOMEWHAT MORE POSITIVE NOTE, THE

10              APPLICATIONS BUSINESS DID CONSIDERABLY BETTER

11              THAN THE DATABASE BUSINESS."

12         WHATEVER YOU WANT TO MAKE OF IT, YOUR HONOR, THIS IS

13   NOT EVIDENCE OF MARKET AWARENESS OF A LIE ABOUT SUITE 11I OR,

14   OR, EVIDENCE OF MARKET AWARENESS THAT UNDISCLOSED PROBLEMS WITH

15   SUITE 11I CAUSED THE EARNINGS MISS ON MARCH 1ST.

16         AND THE *FLOWSERVE* OPINION IS ILLUSTRATIVE, YOUR

17   HONOR, AS YOU GO THROUGH THAT, BECAUSE THERE ARE, OBVIOUSLY,

18   LOTS OF ANALYSTS' REPORTS, LOTS OF NEWSPAPER ARTICLES THAT THE

19   COURTS ARE COMPELLED TO REVIEW IN DOING THIS ANALYSIS, AND

20   NOTWITHSTANDING THE NEAR UNIFORMITY OF THE VIEWS IN THIS CASE,

21   SOMEBODY MAY SAY SOMETHING IN AN ANALYST REPORT, AND THE

22   QUESTION IS HOW DO YOU EVALUATE THAT FOR PURPOSES OF SUMMARY

23   JUDGMENT.

24         AND WHAT THE *FLOWSERVE* COURT SAID IS:

25              "PROVIDING A SCINTILLA OF EVIDENCE IS NOT

1           ENOUGH.  THERE MUST BE EVIDENCE ON WHICH THE

2           JURY COULD REASONABLY FIND FOR THE PLAINTIFF.

3           NOTHING IN THE REPORT INDICATES THAT THE MARKET

4           DREW A CONNECTION BETWEEN THE DISCLOSURE AND

5           ALLEGED FALSE STATEMENTS."

6           AND CERTAINLY, YOUR HONOR, WHATEVER THE PHRASE "NOT

7    READY FOR PRIME TIME" MEANS IN THE CONTEXT OF A PRODUCT THAT

8    UNDENIABLY HAD $750 MILLION IN SALES AND THAT THE VERY REPORTER

9    OR ANALYST SAID, YOU KNOW, HAD DONE BETTER THAN THE DATABASE

10   BUSINESS, WHATEVER THAT PHRASE MEANS, IT IS NOT ILLUSTRATIVE OF,

11   QUOTE, "COLLECTED ANALYST OPINION" IN THIS CONTEXT.

12           YOUR HONOR, THAT'S IT FROM PAGE 18 FOR THE MARKET.

13   WE NOW COME TO A PIECE OF EVIDENCE THAT I THINK IS POIGNANT AND

14   IMPORTANT BECAUSE, WITH RESPECT, YOUR HONOR, IT UNDERSCORES THE

15   INFIRMITY OF PLAINTIFFS' SHOWING ON THE LOSS CAUSATION EVIDENCE

16   PIECE.  I MEAN THE FOURTH PIECE OF EVIDENCE THAT THEY CITE IS A

17   QUOTE FROM MATTHEW SYMONDS WRITTEN IN 2003, AND I KNOW THE

18   COURT, YOU KNOW, HAS OBVIOUSLY ALREADY BECOME FAMILIAR WITH

19   MR. SYMONDS AND HIS BOOK ON MR. ELLISON WRITTEN TWO YEARS AFTER

20   ALL OF THIS, AND THEY QUOTE HIM AS SAYING:

21           "IT DIDN'T TAKE A GENIUS TO SEE THAT NOT

22           EVERYTHING THAT WAS GOING ON COULD BE EXPLAINED

23           BY THE WEAKENING ECONOMY AND EDGY CEO'S WAITING

24           FOR VISIBILITY TO RETURN.  FOR ANYONE WHO WANTED

25           TO SEE, THERE WAS MOUNTING EVIDENCE THAT IT

1          WASN'T ONLY THE ECONOMY THAT PROSPECTIVE ORACLE

2          APPLICATIONS CUSTOMERS WANTED SEE STABILIZED."

3          YOUR HONOR, OF COURSE AS WE KNOW, SUMMARY JUDGMENT

4  MOTIONS HAVE TO BE DECIDED ON THE BASIS OF ADMISSIBLE EVIDENCE.

5  WE HAVE MOVED TO EXCLUDE THIS OUT OF COURT STATEMENT WHICH HAS

6  BEEN OFFERED AND NO HEARSAY EXCEPTIONS APPLY.  THOSE MOTIONS

7  HAVE ALREADY BEEN FILED, YOUR HONOR.

8          BUT TURNING TO THE SUBSTANCE OF WHAT MR. SYMONDS

9  SAYS, QUOTE:

10          "THE EVIDENCE FALLS FAR SHORT OF

11          DEMONSTRATING MARKET AWARENESS."

12          MR. SYMONDS DOES NOT IDENTIFY ANY SUCH MOUNTING

13  EVIDENCE IN THIS PARAGRAPH.  THERE'S NO INDICATION THAT

14  MR. SYMONDS HAD ANY IDEA WHAT CAUSED THE MISS.  HIS SPECULATION

15  IN THE CONTEXT OF INVESTIGATIVE AND SOME MIGHT SAY A BIT OF

16  SENSATIONALIST JOURNALISM YEARS AFTER THE FACT IS IRRELEVANT TO

17  WHAT THE MARKET UNDERSTOOD AS OF MARCH 2ND, 2001.  AND HIS

18  SPECULATION, WHICH IS HEARSAY, IS INCONSISTENT WITH

19  CONTEMPORANEOUS ANALYST COMMENTARY.

20          THAT LEAVES US WITH THE FIFTH PIECE OF EVIDENCE, YOUR

21  HONOR, THE INTERNAL ORACLE E-MAIL.  AND THIS THE PLAINTIFFS CITE

22  AT THE TOP OF SLIDE 50:

23          "ADDITIONALLY, WE HAVE SEEN -- "

24          THIS IS AN INTERNAL ORACLE E-MAIL SEVERAL DAYS, I

25  THINK, YOUR HONOR, AFTER THE MARCH 1 ANNOUNCEMENT.

1              "ADDITIONALLY, WE HAVE SEEN SEVERAL STORIES

2              RECENTLY IN THE U.S. THAT LINK OUR LOWER THAN

3              EXPECTED APPLICATIONS SALES TO QUALITY ISSUES

4              WITH SUITE 11I."

5          AND THEY STATE THAT FOR THE PROPOSITION THAT THAT IS

6    EVIDENCE OF MARKET AWARENESS THAT UNDISCLOSED PROBLEMS WITH

7    SUITE 11I CAUSED THE EARNINGS MISS.

8          NOW, FIRST OF ALL, AGAIN, THIS EVIDENCE IS

9    INADMISSIBLE HEARSAY TO THE EXTENT THAT IT IS OFFERED TO PROVE

10   MARKET AWARENESS, YOUR HONOR.  OBVIOUSLY, THE DISCUSSIONS

11   BETWEEN ORACLE EMPLOYEES MAY BE ADMISSIONS, BUT TO THE EXTENT

12   THAT THEY PURPORT TO CHARACTERIZE SOME THIRD PARTY STORIES,

13   THOSE ARE OBVIOUSLY HEARSAY.

14         LET'S SEE THE STORIES THEMSELVES, YOUR HONOR, AND I'M

15   GOING TO COME TO THAT.

16         WHAT THE PLAINTIFFS DIDN'T QUOTE IS THAT THE E-MAIL

17   GOES ON TO SAY:

18              "OUR GROWTH WAS HAMPERED NOT BY COMPETITIVE

19              PRESSURES OR SOFTWARE QUALITY ISSUES BUT WITH

20              THE SLOWING U.S. ECONOMY.  A REPORTER ONLY NEEDS

21              TO LOOK AT OTHER INDUSTRY LEADERS TO CONFIRM THE

22              U.S. ECONOMY IS HAVING AN EFFECT ON TECHNOLOGY

23              COMPANIES."

24         YOUR HONOR, THIS E-MAIL PROVES NOTHING ABOUT LOSS

25   CAUSATION, AS WE SHOW ON SLIDE 51.

1           "THE E-MAIL DOES NOT SUGGEST MARKET

2           AWARENESS THAT THE EARNINGS MISS WAS CAUSED BY

3           PROBLEMS WITH SUITE 11I."

4           AS YOUR HONOR KNOWS FROM READING THE VOLUMINOUS

5   PAPERS SUBMITTED, THE MARKET WAS WELL AWARE THAT SUITE 11I AS A

6   REVOLUTIONARY NEW SOFTWARE PRODUCT HAD MANY, MANY BUGS.  IT'S

7   INEVITABLE.  IT'S UBIQUITOUS IN THIS KIND OF A PRODUCT RELEASE.

8   IT WAS A REVOLUTIONARY, FULLY INTEGRATED, INTEROPERABLE SET OF

9   ERP AND CRM FUNCTIONS, AND IT WAS THE FIRST ROLLOUT OF THIS KIND

10  OF A MAJOR PRODUCT, AND THE MARKET WAS WELL AWARE THERE WERE

11  GOING TO BE BUGS.  AND, IN FACT, MANY OF THE CUSTOMER COMPLAINTS

12  THAT THE PLAINTIFFS CITE COME FROM PEOPLE WHO HAD, IN FACT,

13  PURCHASED THE SUITE ALREADY.  IT WASN'T PEOPLE WHO WEREN'T

14  PURCHASING THE SUITE AND WERE HAVING FIRST USER, FIRST MOVER

15  IMPLEMENTATION PROBLEMS.

16          FAR CRY, YOUR HONOR, FROM SAYING THAT THERE'S

17  EVIDENCE THAT THE MARKET UNDERSTOOD THAT THE PROBLEMS WERE SO

18  OVERWHELMING THAT THEY CAUSED THE MISS, AND, AND THIS IS

19  IMPORTANT, THAT ORACLE WAS AWARE OF THAT, AS THE PLAINTIFFS TOLD

20  THE NINTH CIRCUIT THEY WOULD PROVE, THAT ORACLE WAS AWARE OF

21  THIS AT THE BEGINNING OF THE THIRD QUARTER OF 2001 AT A TIME

22  BEFORE MR. ELLISON SOLD.

23          SO THE E-MAIL DOESN'T SUGGEST MARKET AWARENESS.  THE

24  E-MAIL DOESN'T SUGGEST, IN FACT, THAT PROBLEMS WITH SUITE 11I

25  CAUSED THE EARNINGS MISS.  IN FACT, THE INDIVIDUALS WHO WROTE

1    THE E-MAIL GO ON TO SAY THAT THAT'S TRUE.

2            MOST IMPORTANTLY, YOUR HONOR, NEITHER THE E-MAIL, NOR

3    THE PLAINTIFFS HAVE IDENTIFIED ANY SUCH ARTICLES, NOR DESCRIBED

4    WHEN THEY WERE PUBLISHED.  I MEAN, PRESUMABLY, IF THESE ARTICLES

5    WERE OUT THERE AND REFLECTED THE KIND OF MARKET AWARENESS THAT

6    THE PLAINTIFFS URGE, THEY WOULD BRING THEM FORWARD, INSTEAD OF

7    RELYING ON A HEARSAY DOCUMENT FROM THE FILES.  SO THAT'S IT.

8    YOUR HONOR, THAT'S THE EVIDENCE ON PAGE 18 THAT THE PLAINTIFFS

9    CITE.

10           IT IS -- I SUBMIT, YOUR HONOR, THAT ANY FAIR-MINDED

11   READING OF THE CASES THAT WE HAVE SUBMITTED WHERE THE DISTRICT

12   COURTS HAVE VERY CAREFULLY GONE THROUGH THE ALLEGED FRAUDS AND

13   THEN THE EVIDENCE WHICH HAS BEEN SUBMITTED IN SUPPORT OF CLAIMS

14   OF LOSS CAUSATION.  THE *IKON* CASE, THE *MCKOWAN* CASE, AND THE

15   *FLOWSERVE* CASE.  THEY DEAL WITH EVIDENCE LIKE THAT, YOUR HONOR,

16   AND THEY PUT IT IN THAT FRAMEWORK AND CONCLUDE THAT THE

17   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT.

18           NOW, YOUR HONOR, AS WE SAID AT THE BEGINNING, AND I'M

19   ALMOST FINISHED HERE, THIS FAILURE OF PROOF ON LOSS CAUSATION

20   CUTS THROUGH ALL OF PLAINTIFFS' CLAIMS.  IT ENTITLES THE

21   DEFENDANTS TO SUMMARY JUDGMENT ON THE 10(B)(5) CLAIMS.  THAT, IN

22   TURN, OF COURSE, YOUR HONOR, ENTITLES THE DEFENDANTS TO SUMMARY

23   JUDGMENT ON THE PLAINTIFFS' 20(A) CLAIM.

24           AS THIS COURT HAS ITSELF HELD IN THE *CONNECTICS* CASE,

25   BASED ON THE NINTH CIRCUIT'S DECISION IN *JOHNSON VERSUS ALIJIAN*

1   AND MANY, MANY OTHER DECISIONS, CLAIMS UNDER 20(A) ARE

2   DERIVATIVE AND REQUIRE AN INDEPENDENT VIOLATION OF THE EXCHANGE

3   ACT.  THAT CLEARLY INCLUDES THE ELEMENT OF LOSS CAUSATION.  SO

4   IF WE'RE CORRECT ABOUT THIS, YOUR HONOR, AND WE SUBMIT VERY

5   STRONGLY THAT WE ARE, THIS CASE SHOULD BE OVER ON ALL OF THESE

6   CLAIMS.

7           THE PLAINTIFFS, IN FACT, CONCEDE, YOUR HONOR, THAT

8   LOSS CAUSATION IS AN ELEMENT OF 20(A), AND IF YOU LOOK AT THEIR

9   20(A) BRIEF, YOU SEE THEY SPEND TIME TALKING ABOUT LOSS

10  CAUSATION AND THE EVIDENCE THAT THEY SAY ESTABLISHES A TRIABLE

11  ISSUE OF FACT.  YOUR HONOR, THE FIVE PIECES OF EVIDENCE THAT I

12  SAID WAS THEIR HIGHEST AND BEST ARTICULATION CAME FROM THEIR

13  REPLY BRIEF IN SUPPORT OF THEIR 20(A) MOTION.  SO THEY,

14  OBVIOUSLY, UNDERSTAND THAT THEY NEED TO DEMONSTRATE THIS.

15          SLIDE 56, YOUR HONOR, SHOWS WITH RESPECT TO THE 20(A)

16  CONTROLLING PERSONAL CLAIM, THE PLAINTIFF MUST SHOW A PRIMARY

17  VIOLATION WAS COMMITTED.  I DON'T THINK THERE'S ANY CONTROVERSY

18  ABOUT THAT.

19          FINALLY, YOUR HONOR, THE PLAINTIFFS CANNOT RELY UPON

20  THE ADVERSE INFERENCE TO CURE THEIR FAILURE OF PROOF ON LOSS

21  CAUSATION.  AS YOUR HONOR RECOGNIZED IN HER SEPTEMBER 2ND, 2008

22  ORDER, WHATEVER THE SCOPE OF THE ADVERSE INFERENCE, IT HAS NO

23  BEARING ON LOSS CAUSATION AND DOES NOT PREVENT THE ENTRY OF

24  SUMMARY JUDGMENT.  AND, IN FACT, THIS WAS SOMETHING THAT THE

25  COURT IN *GORDON PARTNERS* RECOGNIZED, YOUR HONOR, WHERE THERE WAS

1  A MUCH, MUCH UGLIER SET OF FACTS ON SPOLIATION, IF I MAY USE

2  THAT PHRASE, YOUR HONOR, 44 KEY PLAYERS WHOSE E-MAILS, I THINK,

3  WERE NOT SAVED OR WHATEVER.  OBVIOUSLY, THAT'S NOT FOR ME TO

4  DECIDE.  IT IS FOR THE COURT TO DECIDE.  IN ANY EVENT, IT WAS A

5  SITUATION WHERE THE COURT FOUND ADVERSE INFERENCE SANCTIONS TO

6  BE APPROPRIATE, BUT WENT AHEAD AND GRANTED SUMMARY JUDGMENT ON

7  LOSS CAUSATION GROUNDS, SAYING:

8              "THE ADVERSE INFERENCES AS TO FALSITY AND

9              SCIENTER ARE IRRELEVANT TO THE SEPARATE ELEMENT

10             OF LOSS CAUSATION.  THUS, THE ADVERSE INFERENCE

11             IS MOOT AS TO THE COURT'S SUMMARY JUDGMENT LOSS

12             CAUSATION ANALYSIS."

13         SO, YOUR HONOR, THAT IS OUR PRESENTATION ON LOSS

14  CAUSATION.  THERE ARE, OBVIOUSLY, A NUMBER OF OTHER MOTIONS THAT

15  HAVE BEEN FILED, BUT I DON'T WANT TO OVERSTAY MY TIME UP HERE,

16  AND I'LL BE HAPPY TO ANSWER ANY QUESTIONS.

17         **THE COURT:**  THAT'S FINE.  THANK YOU, COUNSEL.

18         **MR. WILLIAMS:**  I'LL TRY NOT TO GET IN THE WAY OF THE

19  PROJECTOR HERE.

20         GOOD MORNING, YOUR HONOR.

21         **THE COURT:**  GOOD MORNING.

22         **MR. WILLIAMS:**  YOUR HONOR, CLEARLY, WE VIEW BOTH THE

23  LAW AND THE FACTS IN THIS CASE VERY DIFFERENTLY STARTING WITH

24  THE BASIC PREMISE OF WHAT THE LAW OF LOSS CAUSATION IS.

25         THE DEFENDANTS' VIEW APPEARS TO BE THAT LOSS

1   CAUSATION IS DEFINED BY WHAT THE DEFENDANTS DETERMINE IS THE

2   APPROPRIATE MESSAGE TO DISCLOSE TO THE MARKET, AND IF THERE'S NO

3   ADMISSION OF FRAUD, OR IF THERE'S NO STATEMENT THAT A PRIOR

4   REPRESENTATION WAS FALSE, THEN LOSS CAUSATION SIMPLY CAN'T BE

5   FOUND, AND THAT'S JUST INCORRECT.

6          I THINK THAT *DURA* CORRECTLY HELD THAT -- WHICH IS

7   FOLLOWED BY *DAOU*:

8               "TO PROVE LOSS CAUSATION, THE PLAINTIFFS

9               MUST DEMONSTRATE A CAUSAL CONNECTION BETWEEN THE

10              DECEPTIVE ACTS THAT FORM THE BASIS OF THE

11              SECURITIES CLAIM OF FRAUD AND THE INJURY

12              SUFFERED BY THE PLAINTIFF.  PLAINTIFF MUST PROVE

13              THAT THE DEFENDANTS' MISREPRESENTATION OR OTHER

14              CONDUCT OR OTHER FRAUDULENT CONDUCT PROXIMATELY

15              CAUSED PLAINTIFFS' ECONOMIC LOSS."

16         THAT'S THE STANDARD.  THAT'S WHAT *DAOU* SAYS.  THAT'S

17  WHAT *CORINTHIANS* SAID.  THAT'S WHAT *GILEAD* SAYS.  I HAVEN'T SEEN

18  ANY OF THE CASES THAT INDICATE THAT DEFENDANTS CONTROL WHAT THE

19  INFORMATION IS TO THE MARKET, AND THAT INFORMATION IS WHAT

20  DETERMINES WHETHER LOSS CAUSATION CAN BE FOUND.

21         **THE COURT:**  NO, BUT THE DEFENDANTS DISCLOSED

22  SOMETHING, AND THAT'S WHAT YOU'VE GOT TO FOCUS ON.

23         **MR. WILLIAMS:**  THAT'S RIGHT.  THAT DISCLOSURE MAY

24  TRIGGER THE STOCK PRICE DECLINE, BUT IT'S NOT THE SUBSTANCE OF

25  THAT DISCLOSURE ALONE THAT MAKES THE DETERMINATION AS TO WHETHER

1  OR NOT PLAINTIFFS CAN PROVE LOSS CAUSATION.

2           IT'S INTERESTING BECAUSE THE DEFENDANTS' CLAIM, OR

3  DEFENDANTS' ARGUMENT RELIES IN LARGE PART ON THE *FLOWSERVE* CASE.

4  AND THE *FLOWSERVE* CASE IS A CASE OUT OF THE NORTHERN DISTRICT OF

5  TEXAS.  WE ACTUALLY HAVE A CLIENT IN THAT CASE, AND MY PARTNER

6  SANDY SVETCOV ACTUALLY ARGUED IN FRONT OF THE FIFTH CIRCUIT ON

7  THIS VERY ISSUE IN *FLOWSERVE* TWO WEEKS AGO.  I HAVE THE

8  TRANSCRIPT FOR YOU.  I'LL HAND IT UP TO YOUR HONOR IN JUST A

9  MOMENT.

10          JUSTICE O'CONNOR WAS ACTUALLY ON THAT PANEL, AND SHE

11 KNOWS A LITTLE BIT ABOUT *DURA* AND WHAT *DURA* MEANT.

12          THE DEFENDANTS IN THAT CASE MADE THE SAME ARGUMENT

13 THAT MR. WALD IS MAKING, WHICH IS, A, THERE WAS A DISCLOSURE

14 THAT THE PLAINTIFFS BELIEVE TRIGGERED A LOSS, AND THAT THAT

15 DISCLOSURE DIDN'T MENTION THE FRAUD THAT PLAINTIFFS CLAIM,

16 THEREFORE, THERE'S NO LOSS CAUSATION.

17          AND JUSTICE O'CONNOR HAD SOME VERY INTERESTING

18 COMMENTS.  BASICALLY, WHAT SHE SAID WAS, WELL, THAT SEEMS TO

19 REWARD CONCEALMENT; THAT MEANS YOU SIMPLY DON'T HAVE TO TELL THE

20 TRUTH.  I ACTUALLY WANT TO HAND UP THE TRANSCRIPT OF THAT

21 HEARING TO THE COURT.  JUST A MOMENT.

22          YOUR HONOR, THIS IS A TRANSCRIPT OF THE FEBRUARY 2ND

23 APPELLATE ARGUMENT IN THE *FLOWSERVE* ACTION THAT DEFENDANTS MOST

24 HEAVILY RELY UPON, AND IF YOU GO TO PAGE 7 -- I'M SORRY --

25 PAGE 8, JUSTICE O'CONNOR BEGINS HER INITIAL COMMENTS AND

1    QUESTIONS IN RESPONSE TO THE ARGUMENT THAT IF THE DISCLOSURE

2    ITSELF DOESN'T STATE THAT THERE WAS A MISREPRESENTATION EARLIER,

3    THERE WAS NO -- THERE'S NO LOSS CAUSATION.  SHE SAYS:

4              "IF WE ASSUME FOR A MINUTE THAT THE INITIAL

5              MISREPRESENTATIONS MADE HERE WERE FALSE AND

6              FRAUDULENT, IS THERE ANY QUESTION THAT THEY

7              CAUSED THE LOSS?"

8              AND COUNSEL FOR THE DEFENDANTS WENT ON TO MAKE AN

9    ARGUMENT THAT, YES, INDEED, THERE WAS A QUESTION, BECAUSE, IN

10   THEIR VIEW, IF THERE WAS NO DISCLOSURE OF THE FRAUD, THERE COULD

11   BE NO LOSS CAUSATION.

12             LATER ON, AT THE BOTTOM OF THE PAGE, JUSTICE O'CONNOR

13   STATES:

14             "THAT'S A PECULIAR RULE THAT THE DISTRICT

15             COURT APPLIED, BECAUSE IT REWARDS DEFENDANTS FOR

16             FAILING TO COME CLEAN.  IT'S AN ODD RULE."

17             SHE GOES ON ON THE NEXT PAGE TO SAY:

18             "I DON'T UNDERSTAND IT.  IT SAYS, IF YOU

19             DON'T REVEAL WHAT YOU'VE DONE YOU'RE SAFE.  SO

20             YOU DON'T EVER HAVE TO TELL THE TRUTH."

21             AND, FINALLY, ON PAGE 10, AFTER CONTINUING THE

22   ARGUMENT, JUSTICE O'CONNOR SAYS:

23             "YOUR THEORY REWARDS CONCEALMENT."

24             THAT'S EXACTLY WHAT THE DEFENDANTS HERE ARE ARGUING,

25   THAT SIMPLY BECAUSE THEY DID NOT ADMIT TO THE FRAUD THAT'S

1    ALLEGED HERE, PLAINTIFFS CAN'T PROVE LOSS CAUSATION.  THAT'S NOT

2    THE LAW.  THAT'S NOT WHAT *DURA* SAYS, NOT WHAT *DAOU* SAYS, NOT

3    WHAT *GILEAD* SAYS, NOT WHAT *CORINTHIANS* SAYS.

4            NOW, WHEN YOU LOOK AT THE DISCLOSURES THEMSELVES, IT

5    IS CLEAR THAT EVEN THOUGH WE DON'T NEED IT, THERE'S ALMOST A

6    ONE-TO-ONE CORRELATION BETWEEN WHAT WE ALLEGE TO BE THE

7    MISREPRESENTATION AND THE ULTIMATE DISCLOSURE.  SO WHAT ARE

8    THE --

9            **THE COURT:**  BEFORE YOU GET TO THE ALMOST

10   ONE-TO-ONE --

11           **MR. WILLIAMS:**  SURE.

12           **THE COURT:**  WHAT DO YOU THINK THE RULE IS THAT I'M

13   SUPPOSED TO APPLY?

14           **MR. WILLIAMS:**  I THINK THE RULE IS THAT PLAINTIFFS

15   HAVE TO DEMONSTRATE A CONNECTION BETWEEN THE FRAUD THAT'S

16   ALLEGED AND THE ULTIMATE STOCK PRICE DECLINE.

17           **THE COURT:**  CAUSAL CONNECTION?

18           **MR. WILLIAMS:**  A CAUSAL CONNECTION BETWEEN THE FRAUD

19   AND THE ULTIMATE STOCK PRICE DECLINE.

20           **THE COURT:**  WHAT'S THE FRAUD HERE?

21           **MR. WILLIAMS:**  THE FRAUD HERE IS MISREPRESENTATIONS

22   ABOUT THE SECOND QUARTER 2001 FINANCIAL RESULTS;

23   MISREPRESENTATIONS CONCERNING THE THIRD QUARTER FORECASTS OF 12

24   CENTS PER SHARE, 75 PERCENT APPLICATIONS GROWTH; THE

25   MISREPRESENTATIONS ABOUT THE FUNCTIONALITY OF SUITE 11I THAT'S

1  PREINTEGRATED, INTEROPERABLE OUT OF THE BOX, GETS IMPLEMENTED

2  FAST, AND IT'S GOING TO SAVE CUSTOMERS MONEY.  THAT'S -- THOSE

3  ARE THE MISREPRESENTATIONS.

4            **THE COURT:**  SO THEY HAVE TO HAVE CAUSED THE LOSS?

5            **MR. WILLIAMS:**  THEY HAVE TO HAVE CAUSED THE LOSS.

6            **THE COURT:**  AND THE LOSS HAPPENS WHEN THE MARKET

7  DROPS?

8            **MR. WILLIAMS:**  THE LOSS HAPPENS WHEN THE MARKET

9  LEARNS THE TRUE FINANCIAL CONDITION OF THE COMPANY, IN THIS CASE

10 ON MARCH 1ST WHEN THEY ANNOUNCE THE EARNINGS MISS.

11           NOW, THE MARKET CLEARLY UNDERSTOOD THAT THE ECONOMIC

12 CONDITION OF THIS COMPANY WAS NOT WHAT THEY REPRESENTED IT TO BE

13 DURING THAT TIMEFRAME.

14           **THE COURT:**  SO WHAT YOU'RE SAYING THEN IS THE MARKET

15 HAD TO HAVE UNDERSTOOD THAT THERE WAS A MISSTATEMENT, NOT THAT

16 THERE WAS --

17           **MR. WILLIAMS:**  EXACTLY.

18           **THE COURT:**  -- NOT THAT THEY MISSED A PENNY ON THE

19 EARNINGS; THAT CAN'T BE THE REASON FOR THE DROP.

20           **MR. WILLIAMS:**  NO, ABSOLUTELY NOT.  THERE'S NO WAY

21 FOR THE MARKET TO UNDERSTAND OR TO KNOW THE DETAILS OF THE FRAUD

22 THAT'S ALLEGED.  WHAT THE MARKET CLEARLY UNDERSTOOD WAS THIS

23 COMPANY IS NOT WHAT THEY SAID IT WAS.  IT IS NOT WORTH WHAT THEY

24 SAID IT WAS, AND THAT CAME OUT ON MARCH 1ST.

25           **THE COURT:**  SO THERE HAS TO BE A MARKET INCORPORATION

1  OF AN UNDERSTANDING THAT THERE HAD BEEN MISSTATEMENTS?

2           **MR. WILLIAMS:**  ABSOLUTELY.

3           **THE COURT:**  OKAY.

4           **MR. WILLIAMS:**  ABSOLUTELY.

5           THERE IS SOME MISREPRESENTATION THAT CAUSED THE STOCK

6  PRICE TO BE ARTIFICIALLY INFLATED DURING THAT PERIOD, AND THIS

7  DISCLOSURE REVEALED THE TRUE FINANCIAL CONDITION OF THE COMPANY

8  WHICH CAUSED THE STOCK PRICE TO DECLINE.

9           NOW, IT'S UP TO US TO PROVE THE CASE.  WE'VE GOT TO

10 PROVE FALSITY.  WE'VE GOT TO PROVE SCIENTER.  WE'VE GOT TO PROVE

11 LOSS CAUSATION, OF COURSE, AND DAMAGES.  THOSE ARE FOUR

12 ELEMENTS.  WE'VE GOT TO PROVE THEM ALL, NOT JUST LOSS CAUSATION.

13 IF YOU LOOK AT THE LOSS CAUSATION PIECE BY ITSELF, THEN IT MAKES

14 SENSE THEN TO ASSUME THE SAME FALSITY.

15          **THE COURT:**  YEAH, IF YOU ARE GOING TO ISOLATE IT --

16          **MR. WILLIAMS:**  IF YOU ARE GOING TO ISOLATE IT, YOU

17 HAVE TO ASSUME FIRST FALSITY.

18          **THE COURT:**  SO GO AHEAD AND TELL ME ABOUT YOUR ALMOST

19 ONE-TO-ONE CONFERENCE HERE.  I'M ASSUMING FALSITY OF ALL THE

20 PRIOR STATEMENTS.

21          **MR. WILLIAMS:**  SURE.  IF YOU ASSUME THE FALSITY OF

22 THE REPRESENTATIONS THAT WE'RE GOING TO MAKE 12 CENTS PER SHARE

23 ON DECEMBER 14, 2001, WHEN THEY ANNOUNCE THAT, OOPS, NO, WE'RE

24 NOT, WE'RE ONLY GOING TO MAKE TEN CENTS PER SHARE, THAT IS AN

25 INDICATION THAT'S LOSS CAUSATION.

```
1              NOW, WE HAVE TO PROVE UP THE FACTS OF THE FRAUD IN

2   BETWEEN, BUT ONCE YOU ASSUME THAT THAT STATEMENT IS FALSE, AND

3   IT'S ADMITTED THAT THEY'RE NOT GOING TO MAKE IT IN THE STOCK

4   PRICE DECLINES, I THINK THAT YOU'VE ACTUALLY -- YOU'VE ALLEGED

5   AND YOU'VE COME A LONG WAY TO PROVING THAT THE MISREPRESENTATION

6   WAS CONNECTED TO THE LOSS.

7              THE COURT:  WELL, I GUESS THAT'S CRYSTALLIZING THE

8   QUESTION IN MY MIND, BECAUSE YOU ASK ME TO, AND FOR THESE

9   PURPOSES I WILL, ASSUME THAT IT WAS A MISREPRESENTATION, THE 12

10  CENTS.

11             MR. WILLIAMS:  MM-HMM.

12             THE COURT:  AND THEN THE MARKET IS AWARE THAT

13  PREVIOUSLY THEY HAD ANTICIPATED 12 CENTS, AND NOW THEY ARE

14  COMING OUT WITH TEN.  SO THEY UNDERSTAND THERE'S A DIFFERENTIAL

15  THERE.

16             BUT DOES THE MARKET HAVE TO ATTRIBUTE THE

17  DIFFERENTIAL TO A FALSE STATEMENT, FRAUD, SOMETHING BAD, AS

18  OPPOSED TO, WE MISSED IT?

19             MR. WILLIAMS:  NO, THE MARKET DOESN'T HAVE TO

20  ATTRIBUTE IT TO FRAUD.  THE MARKET HAS TO RECOGNIZE THAT THE

21  REPRESENTATIONS OF THE FINANCIAL CONDITION OF THIS COMPANY WERE

22  NOT WHAT THEY SAID IT WAS, AND IT'S UP TO US -- IT'S UP TO US TO

23  DEMONSTRATE THAT FRAUD CAUSED THE LOSS.

24             IF THE MARKET UNDERSTOOD AT THE VERY BEGINNING THAT

25  IT WAS, INDEED, FRAUD, THEN ONE COULD SIMPLY FILE A COMPLAINT
```

1    AND GO TO SUMMARY JUDGMENT.  THERE WOULD BE NO NEED FOR

2    DISCOVERY IN BETWEEN.

3            **THE COURT:**  WELL, I MEAN, I DON'T KNOW IF YOU ARE

4    RIGHT.  I DON'T KNOW IF YOU ARE RIGHT THAT THE MARKET DOESN'T

5    HAVE TO ATTRIBUTE IT TO SOMETHING BAD AS OPPOSED TO MERELY

6    MISSING THE NUMBER.

7            **MR. WILLIAMS:**  WE MISUNDERSTOOD EACH OTHER.

8    CERTAINLY, THE MARKET HAS TO ATTRIBUTE IT TO SOMETHING BAD,

9    WHICH IS DEFENDANTS SAID THAT THIS COMPANY WAS WORTH X, OR THE

10   FUTURE FINANCIAL CONDITION WOULD BE WORTH X, AND THAT DISCLOSURE

11   INDICATED THAT THE REPRESENTATIONS BY THE COMPANY DIDN'T APPEAR

12   TO BE TRUE.  AND IT CAUSED THE STOCK PRICE DECLINE.

13           I THINK THIS IS A PERFECT CASE THAT DEMONSTRATES WHAT

14   JUSTICE O'CONNOR WAS TALKING ABOUT, REWARDING DEFENDANTS FOR NOT

15   COMING CLEAN.

16           IF I COULD HAND UP A FEW EXHIBITS FOR YOUR HONOR TO

17   TAKE A LOOK AT?

18           **THE COURT:**  A FEW.

19           **MR. WILLIAMS:**  WE'VE GIVEN YOU 400 EXHIBITS, AND I

20   THINK THAT WE WERE TRYING TO MAKE THIS A LITTLE BIT MORE

21   CONVENIENT FOR YOU, BUT, CLEARLY, A LARGE CHUNK OF THIS CASE IS

22   ABOUT THE MISREPRESENTATIONS CONCERNING SUITE 11I, AND ONE OF

23   THE -- LET ME JUST GET TO IT.  JUST A MOMENT.

24           CAN YOU PULL UP 135, PLEASE?

25           IF YOUR HONOR WILL TAKE A LOOK AT EXHIBIT 135?  IT IS

1 ATTACHED TO OUR OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY

2 JUDGMENT.  THIS IS AN INTERNAL MANAGER'S REVIEW REGARDING Q301,

3 THE QUARTER IN QUESTION.  IF YOU TURN TO PAGE 32, YOU'LL SEE

4 WHAT MR. STEPHEN ENEVOLD VIEWS AS THE WEAKNESSES IN THE

5 COMPANY'S OPERATIONS IN Q301.

6             BULLET POINT THREE, ISSUES WITH OUR APPLICATIONS

7 AFFECTING SALES, STABILITY AND INTEGRATION.  NOW, THESE ARE TWO

8 THINGS, AT LEAST THE INTEGRATION, THAT'S WHAT THE COMPANY AND

9 LARRY ELLISON SAID WAS, YOU KNOW, ALREADY IN PLACE.  SUITE 11I

10 WAS PREINTEGRATED, INTEROPERABLE OUT OF THE BOX, READY FOR SALE,

11 AND WOULD SAVE CUSTOMERS MONEY.  THAT SIMPLY WASN'T TRUE.  WE'LL

12 GET TO THE MERITS OF THAT IF YOUR HONOR WANTS TO GO THERE, YOU

13 KNOW, SHORTLY.

14             BUT, CLEARLY, HERE MR. ENEVOLD IS RECOGNIZING THAT

15 THE ISSUES WITH THE APPLICATIONS WERE AFFECTING SALES AND THAT

16 INDEED WAS INTEGRATION.

17             I WANT TO JUST GO TO EXHIBIT NO. 152.  THIS IS A

18 DECEMBER 9 E-MAIL, YOUR HONOR.  IT IS, IN PART, WRITTEN BY

19 MR. SERGIO GIACOLETTO.  HE'S AN EXECUTIVE VICE PRESIDENT OF THE

20 COMPANY HANDLING EUROPE, MIDDLE EAST AND ASIA, SELLING SUITE

21 11I, ERP AND CRM.

22             JUST DAYS BEFORE THE CLASS PERIOD, IF YOU GO DOWN TO

23 THE BOTTOM OF THE PAGE, HE TALKS ABOUT THE RISKS AND

24 OPPORTUNITIES GOING RIGHT INTO THE CLASS PERIOD, ERP FINANCIALS

25 AND HRMS, WHICH IS HUMAN RESOURCES.

1          THEN HE GOES DOWN TO TALK ABOUT CRM.  HE SAYS:

2               "WE ARE LOSING A BIT OF MOMENTUM.

3          SALESPEOPLE ARE RELUCTANT TO ENGAGE TO THE

4          PRODUCT PROBLEMS, LACK OF REFERENCES AND LOCAL

5          LANGUAGE ISSUES.  WE'RE LOSING MANY PEOPLE TO

6          SIEBEL, STILL, AND WE ARE SHORT OF 50 SALES

7          CONSULTANTS ACROSS EMEA.  HOPEFULLY, THE

8          SITUATION WILL TURN IN JANUARY ONCE WE GET

9          11.5.3 RUNNING IN LOCAL LANGUAGE."

10          ONE OF THE ALLEGATIONS IS, YOUR HONOR, THAT AS -- IN

11     ADDITION TO MISREPRESENTING THAT SUITE 11I WAS PREINTEGRATED,

12     INTEROPERABLE OUT OF THE BOX, THEY TOLD THE MARKET IT WAS ALSO

13     WRITTEN IN AT LEAST 23 LANGUAGES, AND THAT, TOO, WAS GOING TO

14     DRIVE SALES.  JUST WASN'T TRUE.

15          AND HERE'S SERGIO GIACOLETTO TELLING LARRY ELLISON,

16     LOOK, WE NEED TO GET 11I WORKING IN THESE LOCAL LANGUAGES,

17     OTHERWISE, IT'S GOING TO HURT SALES.

18          IF YOU GO TO EXHIBIT 153?  RIGHT IN THE CENTER OF THE

19     CLASS PERIOD, JANUARY 21, MR. GIACOLETTO AGAIN SAYING, TOWARD

20     THE BOTTOM OF THE PAGE, DISCUSSING SOME PRODUCT PROBLEMS, SAYS:

21               "I'M SURE THOSE PROBLEMS ALSO EXIST IN THE

22          U.S.A., BUT THERE WE HAVE NO LANGUAGE ISSUE, AND

23          WE HAVE A CRITICAL MASS AND MORE HELP FROM

24          DEVELOPMENT.  IN ORDER FOR US TO ACHIEVE

25          30 PERCENT GROWTH OVERALL, WE NEED TO GROW

1            APPLICATIONS AT LEAST 65 PERCENT EACH QUARTER,

2            AND WE NEED TO FIX THOSE ISSUES."

3        YOU GO TO THE NEXT PAGE -- I'M SORRY, JUST THE BOTTOM

4   OF THE FIRST PAGE, AND ROLLING OVER TO THE NEXT:

5            "FOR EXAMPLE, 11.5.3 NLS WILL NOT BE FULLY

6            TRANSLATED, INCLUDING HELP, UNTIL MAY 2001 FOR

7            THE FIRST LANGUAGES AND AUGUST 2001 FOR THE LAST

8            LANGUAGE."

9        WELL, WAIT A SECOND.  THEY SAID THIS WAS ALREADY

10  WORKING IN ALL OF THESE LANGUAGES.  MR. GIACOLETTO, WHO RUNS

11  EUROPE, THE MIDDLE EAST AND ASIA SAYS IT'S NOT.

12       IF YOU GO DOWN TO THE NEXT PARAGRAPH, IT'S

13  HIGHLIGHTED:

14           "WE JUST COMPLETED TESTING OF TRANSLATION OF

15           11.5.1 NLS," THAT'S NATURAL LANGUAGES, "AND WE

16           FOUND ALMOST 5,000 TRANSLATION ISSUES TO BE

17           FIXED.  THIS PROBLEM THIS IS A PROBLEM FOR OUR

18           MID MARKET STRATEGY WHERE NLS IS CRITICAL."

19       PROBLEMS ARE CONTINUING WITH SUITE 11I.

20       IF YOU GO TO EXHIBIT NO. 254, I THINK THIS TELLS THE

21  STORY.  MARCH 13TH, 2001, IT'S ABOUT 12 DAYS AFTER THE CLASS

22  PERIOD ENDS, ABOUT 12 DAYS AFTER ORACLE ISSUES ITS MARCH 1ST

23  FIRST EARNINGS RELEASE WHERE IT SAYS, WE MISSED OUR EARNINGS

24  RESULTS, WE MISSED APPLICATIONS GROWTH, WE MISSED DATABASE

25  GROWTH.

1          MR. LARRY GARNICK, WHO IS ONE OF THE INTERNAL

2    FINANCIAL PEOPLE SENDS AN E-MAIL TO DEFENDANT HENLEY.  HE

3    SAYS -- HE'S TALKING ABOUT EUROPE:

4                "THE ODDITY IS EUROPE WHERE SERVER IS WAY UP

5                AND APPS ARE WAY DOWN."

6                APPS IS 11I.

7                "TRENDING, YOU WOULD HAVE EXPECTED $55 TO

8                $60 MILLION IN APPS REVENUE IN EUROPE, BUT

9                ACTUAL WAS CD 38 MILLION.  THE APPS FORECAST WAS

10               45 MILLION'S."

11               SO, HE'S ACKNOWLEDGING THEY MISSED THE FORECAST.

12               AND HERE'S SERGIO GIACOLETTO, AND HE RESPONDS, AND HE

13   SAYS:

14               "I HAVE A SIMPLE INTERNAL ONLY EXPLANATION.

15               GIVEN THE RELEASE 11I PROBLEMS IN Q1 AND Q2,

16               MANY OF OUR SALESPEOPLE DECIDED TO FOCUS ON

17               TECHNOLOGY TO MAKE THEIR QUOTA AND WAIT FOR THE

18               PRODUCT TO BE STABLE."

19               THAT'S EXACTLY WHAT HAPPENED.  THAT'S WHAT JUSTICE

20   O'CONNOR WAS TALKING ABOUT.

21               THEY DIDN'T DETAIL IN THE FIRST -- IN THE Q1 -- I'M

22   SORRY -- IN THE 3Q01 FINANCIAL CONFERENCE CALL THAT, INDEED, IT

23   WAS SUITE 11I THAT CONTRIBUTED TO THE EARNINGS MISS INTERNALLY.

24               **THE COURT:**  BUT THE THING IS, IF YOU -- I DON'T KNOW

25   WHAT SHE WAS TALKING ABOUT --

1            MR. WILLIAMS:  SURE.

2            THE COURT:  BUT IF YOU DON'T TELL PEOPLE BAD NEWS,

3    THEN PEOPLE CAN'T DROP THE PRICE OF YOUR STOCK ON ACCOUNT OF THE

4    BAD NEWS.

5            MR. WILLIAMS:  I THINK THEY DID TELL PEOPLE BAD NEWS.

6    THEY SAID, SUITE 11I, WE FORECASTED 75 PERCENT GROWTH, WE ONLY

7    CAME IN AT 50, AND IN TRUTH IT WAS 25.  THAT WAS JUST A HALF

8    TRUTH.  THEY TOLD THE MARKET, WE'RE GOING TO MAKE 75 PERCENT

9    GROWTH, THEY CAME IN AT 50.  THEY DIDN'T SAY, WELL, THE REASON

10   WAS THE PRODUCT DIDN'T WORK THE WAY THAT WE SAID IT WAS -- THE

11   WAY WE SAID IT DID.  THAT DOESN'T MEAN THAT WE CANNOT PROVE LOSS

12   CAUSATION.

13           WE KNOW, BASED JUST ON THIS E-MAIL, THAT ONE OF THE

14   REASONS WHY THEY MISSED THE APPLICATIONS GROWTH NUMBER WAS

15   BECAUSE SUITE 11I DIDN'T WORK, NOTWITHSTANDING THE FACT THAT

16   THROUGHOUT THE CLASS PERIOD THEY SAID IT IS PREINTEGRATED,

17   INTEROPERABLE OUT OF THE BOX, DRIVING SALES, AND IT'S GOING TO

18   HELP US SURVIVE THIS DOWNTURNING ECONOMY.

19           SO, THIS IS DIRECT EVIDENCE, A DIRECT RELATIONSHIP

20   BETWEEN MISREPRESENTATION AND THE ULTIMATE STOCK PRICE DECLINE.

21           THE COURT:  WELL, I GUESS I'M STILL BOTHERED ABOUT

22   WHETHER YOU THINK THAT YOU CAN MISS A PROJECTION BECAUSE YOUR

23   WORKFORCE WAS LAZY, OR YOU CAN MISS A PROJECTION BECAUSE YOUR

24   PRODUCT TURNED OUT NOT TO BE THAT GREAT, OR YOU CAN MISS A

25   PROJECTION BECAUSE YOU WERE LYING ABOUT SOMETHING AND IT DIDN'T

1  COME TO PASS, THEN WHEN YOU MISS A PROJECTION, THE MARKET REACTS

2  IN SOME WAY.

3          **MR. WILLIAMS:**  SURE.

4          **THE COURT:**  DO YOU THINK IT MATTERS FOR PURPOSES OF A

5  FRAUD LAWSUIT WHETHER THE MARKET'S REACTION WAS TO MISSING YOUR

6  NUMBERS ON THE ASSUMPTION THAT YOU JUST -- THAT YOU MISSED YOUR

7  NUMBERS BY ACCIDENT OR SLOPPINESS, AS OPPOSED TO YOU MISSED YOUR

8  NUMBERS BECAUSE YOU HAD BEEN LYING ABOUT THINGS?  DO YOU THINK

9  IT MATTERS?

10          **MR. WILLIAMS:**  WHETHER THE MARKET UNDERSTANDS THAT?

11          **THE COURT:**  YES.

12          **MR. WILLIAMS:**  I THINK IT DOES MATTER, BUT ONLY TO A

13  CERTAIN EXTENT, BECAUSE THE MARKET COULD ONLY BE EXPECTED TO

14  UNDERSTAND SO MUCH.  I THINK WHAT THE MARKET UNDERSTANDS IS THAT

15  THERE WERE REPRESENTATIONS CONCERNING WHAT THE COMPANY WAS GOING

16  TO DO.  THOSE REPRESENTATIONS TURNED OUT NOT TO BE TRUE.  SOME

17  PEOPLE MAY ATTRIBUTE IT TO FRAUD LIKE THEY DID -- NOT FRAUD, OR

18  MISREPRESENTATIONS LIKE THEY DID HERE.

19          I MEAN, MR. WALD TALKED ABOUT 25 ANALYSTS THAT

20  BASICALLY REPEATED WHAT LARRY ELLISON AND JEFF HENLEY SAID IN

21  THE MARCH 1ST CONFERENCE CALL.  OF COURSE, THERE WERE OTHERS

22  WHICH WE CITED TO YOU IN OUR PAPERS THAT SAID, LOOK, WE THINK

23  THE REASON FOR THE SHORTFALL IS BECAUSE OF THE DEFECTS IN SUITE

24  11I, AND, IN FACT, THAT TURNED OUT TO BE TRUE.

25          OTHER ANALYSTS SAID, WE THINK THE REASON FOR THE

1   SHORTFALL IS BECAUSE SUITE 11I IS NOT READY FOR PRIME TIME.

2           THEY SAY THEY DON'T UNDERSTAND WHAT PRIME TIME MEANS,

3   BUT GEORGE ROBERTS DOES.  WHAT HE SAID ON FEBRUARY 13TH, 2001,

4   JUST TWO WEEKS BEFORE THIS ANNOUNCEMENT OF A SALES SHORTFALL, HE

5   TOLD INVESTORS, INSTITUTIONAL INVESTORS, AT AN INVESTOR

6   CONFERENCE THAT, LOOK, SUITE 11I IS PREINTEGRATED, INTEROPERABLE

7   OUT OF THE BOX, AND, YOU KNOW WHAT, IT'S READY FOR PRIME TIME.

8   THAT'S WHAT THE MARKET UNDERSTOOD, AND THAT'S -- IT'S NOT ONE OF

9   THE EXHIBITS THAT I'VE ACTUALLY HANDED UP TO YOU, BUT IT IS IN

10  THE RECORD AND I THINK -- WHAT NUMBER IS IT?

11          **MR. PFEFFERBAUM:**  217.

12          **MR. WILLIAMS:**  IT'S 217.

13          THEY DEFINED PRIME TIME TO INVESTORS.  LATER THE

14  ANALYST SAID, WE DON'T THINK IT'S READY FOR PRIME TIME.  THAT'S

15  WHY THEY MISSED THE EARNINGS AND APPLICATIONS PROJECTIONS.  THE

16  MARKET UNDERSTOOD WHAT THAT MEANT.

17          SO I HOPE THAT I'VE ANSWERED THE QUESTION.

18          **THE COURT:**  I THINK.  I THINK YOU HAVE.

19          **MR. WILLIAMS:**  I'D LIKE TO CONTINUE INTO ANOTHER AREA

20  DIRECTLY RELATED TO LOSS CAUSATION AND --

21          **THE COURT:**  ALL RIGHT.

22          **MR. WILLIAMS:**  ONE OF THE REPRESENTATIONS THAT THE

23  COMPANY MADE WAS THAT THEY HAD IMPLEMENTED SUITE 11I INTERNALLY

24  AND THAT THEY WERE ACTUALLY -- AND ORACLE WAS ACTUALLY SAVING

25  MONEY BECAUSE SUITE 11I WAS BEING IMPLEMENTED INTERNALLY.  WHAT

1    THEY DIDN'T TELL THE MARKET IS RIGHT IN THE CENTER OF THE CLASS

2    PERIOD, THEY ATTEMPTED TO IMPLEMENT SUITE 11I ORDER MANAGEMENT

3    CONTRACTS MODULE.  THIS IS IN OUR PAPERS.

4           WHAT HAPPENED?  WHAT HAPPENED WAS WHAT HAPPENED WITH

5    A LOT OF THE OTHER CUSTOMERS THAT WERE ACTUALLY TRYING TO

6    IMPLEMENT THE SOFTWARE.  IT DIDN'T WORK, AND IT CAUSED A

7    SHORTFALL IN THE COMPANY'S SHORT REVENUES DIRECTLY.  INTERNAL

8    IMPLEMENTATION, THE PRODUCT DIDN'T WORK PROPERLY; IT CAUSED US

9    TO MISS OUR INTERNAL FORECASTS FOR SALES.  THAT'S A DIRECT

10   RELATIONSHIP BETWEEN THE EARNINGS MISS AND THE

11   MISREPRESENTATIONS CONCERNING SUITE 11I.

12          MR. WALD DIDN'T MENTION THAT.  HE DIDN'T MENTION IT

13   DURING THE HEARING WE HAD A YEAR AGO IN FRONT OF JUDGE JENKINS.

14   ACTUALLY, I MISSPOKE.  HE DID MENTION IT.  HE ADMITTED IT.  HE

15   ADMITTED IT WAS TRUE, BUT HE JUST SAID, WELL, IT DIDN'T REALLY

16   MATTER.  SO ANOTHER DIRECT RELATIONSHIP BETWEEN

17   MISREPRESENTATIONS ABOUT THE FUNCTIONALITY OF SUITE 11I AND THE

18   ACTUAL EARNINGS MISS ON MARCH 1ST.

19          OF COURSE, THEY DIDN'T TELL THE MARKET THAT WE TRIED

20   TO IMPLEMENT THIS STUFF AND IT DIDN'T WORK, SO THE MARKET DIDN'T

21   UNDERSTAND THOSE PARTICULARIZED FACTS, BUT DID THEY CAUSE THE

22   STOCK PRICE, OR DID THEY CAUSE THE MISS?  YES.  DID THE MISS

23   CAUSE THE STOCK PRICE DECLINE?  YES.  THAT'S OUR JOB.  WE'VE GOT

24   TO PROVE UP THOSE CONNECTING FACTS, WHICH I THINK WE HAVE, AND

25   FOR THIS PURPOSE TODAY AND FOR YOUR HONOR'S REVIEW NOW, IT'S

1  JUST A GENUINE ISSUE OF MATERIAL FACT.  WE DON'T HAVE TO PROVE

2  THE CASE TODAY IN FRONT OF YOUR HONOR.

3           I THINK THAT, YOU KNOW, MR. WALD SORT OF MIXED APPLES

4  AND ORANGES A BIT BY TELLING THE COURT THAT WE'VE GOT 50

5  ANALYSTS REPORTS AS OPPOSED TO PLAINTIFFS' FIVE.  WELL, THE

6  COURT'S JOB AT THIS STAGE IS NOT TO WEIGH THE EVIDENCE.  IT'S

7  JUST TO DETERMINE WHETHER OR NOT THE PLAINTIFFS HAVE

8  DEMONSTRATED THAT THERE IS, INDEED, A GENUINE ISSUE OF MATERIAL

9  FACT WITH RESPECT TO THE CLAIMS ALLEGED, AND WE'VE DONE SO.

10          **THE COURT:**  CAN I ASK YOU ONE LAST QUESTION ABOUT

11  THIS --

12          **MR. WILLIAMS:**  SURE.

13          **THE COURT:**  -- LEGAL ISSUE?

14          MR. WALD SAYS, IN HIS PRESENTATION, HE QUOTES FROM

15  YOUR OPPOSITION BRIEF AT PAGE 45, AND HE SAYS THAT YOU SAID

16  PLAINTIFFS NEED ONLY PRESENT ENOUGH EVIDENCE FROM WHICH A

17  REASONABLE JURY COULD CONCLUDE THAT THE DISCLOSURE CAUSED THE

18  DECLINE, AND HE SAYS, WELL, THAT'S NOT THE RIGHT STANDARD.  DO

19  YOU DISAGREE --

20          **MR. WILLIAMS:**  WHAT PAGE IS IT IN HIS PRESENTATION

21  AGAIN?

22          **THE COURT:**  IN HIS PRESENTATION IT'S PAGE 7.

23          **MR. WILLIAMS:**  AND HE'S --

24          **THE COURT:**  AND HE'S QUOTING FROM PAGE 45.

25          **MR. WILLIAMS:**  OF OUR OPPOSITION?

1          **THE COURT:**  RIGHT.

2          **MR. WILLIAMS:**  COULD I JUST TAKE A LOOK AT OUR

3  OPPOSITION?

4          **THE COURT:**  OH, SURE.  ABSOLUTELY.  YOU ARE QUOTING

5  FROM *MOTOROLA* RIGHT AT THE TOP.

6          **MR. WILLIAMS:**  PAGE 47 OF OUR OPPOSITION BRIEF

7  DOESN'T CITE --

8          **THE COURT:**  FORTY-FIVE.  I'M SORRY.  IT'S 45, RIGHT

9  AT THE TOP.

10          **MR. WILLIAMS:**  OKAY.  SO THE QUESTION -- THE QUESTION

11  WAS WHETHER OR NOT HE WAS RIGHT OR WRONG IN FRAMING --

12          **THE COURT:**  HE SAYS THAT'S THE WRONG STANDARD.

13          **MR. WILLIAMS:**  I THINK HE'S WRONG.  I MEAN, CERTAINLY

14  IF THE COURT FOUND THAT THERE WAS NO EVIDENCE, OR THERE WAS NOT

15  ENOUGH EVIDENCE BY WHICH A REASONABLE JURY COULD FIND IN OUR

16  FAVOR, THEN THE COURT COULD GRANT SUMMARY JUDGMENT.

17          **THE COURT:**  WELL, HE'S SAYING IT'S NOT ENOUGH TO SHOW

18  THAT THE ANNOUNCEMENT PRECIPITATED THE LOSS.  YOU HAVE TO SHOW

19  THAT THE PART OF THE ANNOUNCEMENT THAT EMBRACED THE -- REVEALING

20  THE PREVIOUSLY MISREPRESENTED FACTS, MISSTATEMENTS CAUSED THE

21  LOSS.

22          **MR. WILLIAMS:**  I DON'T RECALL EXACTLY WHAT HE SAID,

23  BUT I REMEMBER SITTING HERE AND DISAGREEING WITH HIM.

24          **THE COURT:**  OKAY.  I'LL PUT DOWN "DISAGREES."

25          **MR. WILLIAMS:**  I THINK THAT *DURA*, *DAOU*, AND *GILEAD*

1  APPROPRIATELY AND CORRECTLY SET THE PARAMETERS OF WHAT

2  PLAINTIFFS MUST SHOW AND PROVE.  WE DON'T HAVE TO PROVE THAT THE

3  ANNOUNCEMENT, THE ADMISSION OR THE DISCLOSURE GOVERNED BY THE

4  DEFENDANTS ACTUALLY ADMITS TO THE FRAUD OR SAYS, HEY, A PRIOR

5  FINANCIAL STATEMENT WAS FALSE.  YOU JUST DON'T HAVE TO DO THAT.

6  THAT WOULD BE LIKE THE FOX GUARDING THE HENHOUSE.

7          SO THE STANDARD THAT THEY ARE ACTUALLY POSITING IS

8  ONE THAT, YOU KNOW, MISREPRESENTATIONS CAN BE MADE BY THEM, THEN

9  THEY GET TO DECIDE WHETHER OR NOT ANYONE CAN FILE A LAWSUIT, AND

10 THEY GET TO DETERMINE WHETHER OR NOT THE FACTS ACTUALLY

11 DEMONSTRATE THAT A LAWSUIT COULD ULTIMATELY BE WON.  THAT'S JUST

12 NOT THE LAW.

13         SO I THINK WHAT WE'VE DONE, YOUR HONOR, IS WE'VE

14 DEMONSTRATED FOR YOU AT THIS STAGE, AND I THINK WE ARE GOING TO

15 PROVE IT AT TRIAL, THAT THE ULTIMATE STOCK PRICE DECLINE WAS

16 RELATED BOTH DIRECTLY AND INDIRECTLY TO THE MISREPRESENTATIONS

17 THAT WERE MADE THAT WE ALLEGE IN THE COMPLAINT.

18         IT SEEMED LIKE THOSE WERE THE ONLY QUESTIONS YOUR

19 HONOR HAD FOR ME.

20         **THE COURT:**  IT REALLY WAS.  I HAVE ONE OTHER

21 QUESTIONS, WHICH IS, DO YOU HAVE ANY IDEA HOW LONG THE FIFTH

22 CIRCUIT GENERALLY TAKES TO DECIDE CASES?

23         **MR. WILLIAMS:**  NO.  I THINK -- NO, I DON'T KNOW HOW

24 LONG IT TAKES.

25         ARE THERE QUESTIONS YOU WANT ME TO ADDRESS RELATED TO

1  *FLOWSERVE*, BECAUSE I THINK THAT --

2            **THE COURT:**  NO, I DON'T MEAN TO CUT YOU OFF, BUT I

3  ACTUALLY DO HAVE TO CUT YOU ALL OFF PRETTY QUICK.  SO I DON'T

4  HAVE FURTHER QUESTIONS RIGHT NOW, BUT I'LL BE HAPPY TO LET YOU

5  CONCLUDE IF YOU LIKE.

6            **MR. WILLIAMS:**  IT SEEMED LIKE THE ONLY ISSUE TODAY

7  WAS LOSS CAUSATION, YOUR HONOR.

8            **THE COURT:**  THAT'S ALL WE HAVE REALLY BEEN --

9            **MR. WILLIAMS:**  IF THERE'S ANYTHING WE HAVE NOT, YOU

10 KNOW, PARTICULARLY ADDRESSED THAT YOU NEED ADDRESSED, WE'RE

11 HAPPY TO DO SO.

12           **THE COURT:**  OKAY.

13           **MR. WILLIAMS:**  JUST LET US KNOW.

14           **THE COURT:**  IF I COME TO THAT, I WILL LET YOU KNOW,

15 AND, LIKEWISE, FOR THE DEFENDANTS.

16           **MR. WILLIAMS:**  THANK YOU, YOUR HONOR.

17           **THE COURT:**  YOU'VE GIVEN ME A LOT TO CHEW ON, AND I

18 APPRECIATE IT.

19           DO YOU WANT ONE MINUTE?

20           **MR. WALD:**  ONE MINUTE, YOUR HONOR.  VERY QUICKLY,

21 YOUR HONOR.

22           MR. WILLIAMS SPOKE ABOUT TWO EXHIBITS.  I THINK ONE

23 WAS 254, AND I THINK ONE WAS EXHIBIT 40.

24           IF YOUR HONOR -- WHEN YOUR HONOR LOOKS AT THOSE

25 EXHIBITS, YOU'LL SEE THEY'RE TALKING ABOUT EUROPE AND ABOUT

1  SUPPORT REVENUES.  NEITHER OF THOSE IS THE SUBJECT OF

2  PLAINTIFF'S FRAUD CLAIM.  POINT ONE.

3          POINT TWO, YOUR HONOR, MR. WILLIAMS, THROUGHOUT HIS

4  PRESENTATION, CONFLATES FALSITY WITH LOSS CAUSATION, AND AS THE

5  COURT IN *FLOWSERVE* SAYS, QUOTE:

6              "PLAINTIFF'S ATTEMPT TO USE A MERITS-BASED

7              ARGUMENT AS A BRIDGE FOR THE GAP IN RELATEDNESS

8              BETWEEN THE ALLEGED FRAUD AND THE JULY AND

9              SEPTEMBER STATEMENTS IS WITHOUT SUPPORT.  SUCH

10             EVIDENCE THAT WAS NEVER DISCLOSED TO THE PUBLIC

11             WOULD NOT PRODUCE MARKET REACTION, ANALYST

12             COMMENTARY AND HARM TO INVESTORS.  THE USE OF

13             UNDISCLOSED INTERNAL KNOWLEDGE TO IMPUTE

14             IMPLICIT MARKET KNOWLEDGE UNDERMINES THE ACTUAL

15             EFFECT REQUIREMENTS."

16         AND THAT CRYSTALLIZES THE LEGAL ISSUE VERY CLEARLY,

17 YOUR HONOR.

18         FINALLY --

19         **THE COURT:**  WELL, A POINT THAT MR. WILLIAMS MADE THAT

20 HAS MADE ME THINK IS THAT YOU RELIED VERY HEAVILY ON THIS

21 *FLOWSERVE* ANALYSIS.

22         **MR. WALD:**  YES, YOUR HONOR.

23         **THE COURT:**  AND, INDEED, YOU SEEM TO BE URGING ME TO

24 PAY ATTENTION TO THE WAY THEY STRUCTURED THE OPINION TO DEAL

25 WITH THE LOSS CAUSATION ISSUE.  SO SHOULD I WAIT AND FIND OUT

1   WHAT THE FIFTH CIRCUIT DOES?

2        **MR. WALD:**  WELL, YOUR HONOR, ON THAT QUESTION, WE'VE

3   CITED YOU I THINK NINE CASES THAT GRANT SUMMARY JUDGMENT.

4        **THE COURT:**  I KNOW.

5        **MR. WALD:**  FOLLOWING ANALYSIS.

6        **THE COURT:**  EVEN TODAY YOU TALKED A LOT ABOUT THIS

7   ONE.

8        **MR. WALD:**  WE THINK *FLOWSERVE* IS AN IMPORTANT CASE,

9   YOUR HONOR.  THERE'S NO QUESTION ABOUT IT.  THE *IKON* CASE AND

10  THE *MCKOWAN* CASE FOLLOW EXACTLY THE SAME RATIONALE.

11        I WOULDN'T PURPORT TO TELL THE COURT WHAT IT SHOULD

12  DO.

13        IN TERMS OF NINTH CIRCUIT JURISPRUDENCE, NINTH

14  CIRCUIT JURISPRUDENCE REQUIRES EXACTLY THE SAME RELATEDNESS,

15  YOUR HONOR.  IT REQUIRES A DISCLOSURE TO THE MARKET; OTHERWISE,

16  THERE'S NO SEPARATION BETWEEN THE FALSITY PRONG AND LOSS

17  CAUSATION.  THAT WAS WHAT *DURA* WAS ALL ABOUT.  THERE MUST BE A

18  DISCLOSURE OF THE SPECIFIC FRAUD THAT WAS ALLEGED IN ORDER FOR

19  LOSS CAUSATION TO HAVE INDEPENDENT MEANING AS AN ELEMENT OF A

20  10(B)(5) CLAIM.  *DURA* SAYS THAT.  *DAOU* SAYS THAT.  *GILEAD* SAYS

21  THAT.  *GILEAD* TALKS ABOUT WHAT THE ANALYSTS UNDERSTOOD, AGAIN,

22  IN THAT FRAMEWORK.  AND, OF COURSE, *METZLER* SAYS THAT.

23        SO WHEN MR. WILLIAMS STANDS UP HERE AND SAYS, WELL,

24  IT WASN'T WORTH WHAT THEY SAID IT WAS WORTH -- WHAT HAPPENED ON

25  MARCH 1 WAS THAT THE ANALYSTS REALIZED THAT THE COMPANY'S FUTURE

1  CASH FLOWS WERE GOING TO BE IMPACTED, SO THEY TOOK THE STOCK

2  PRICE DOWN, BUT NOT BECAUSE OF THE DISCLOSURE OF A FRAUD, BUT

3  BECAUSE IT WAS THE HARBINGER OF AN INDUSTRY-WIDE DOWNTURN.

4  THAT'S WHY THE PLAINTIFFS' ARTICULATION OF THE LEGAL STANDARD ON

5  PAGE 45 OF THE OPPOSITION IS WRONG.

6        OF COURSE, THE DISCLOSURE CAUSED THE DECLINE.  THE

7  QUESTION IS, DID THE ALLEGED FRAUD CAUSE THE DECLINE?  AND AS TO

8  THAT, THE MARKET HAD TO BE AWARE THAT THERE WAS FALSE

9  STATEMENTS.

10        SO WITH RESPECT TO *ADOBE*, FOR EXAMPLE, WITH RESPECT

11  TO STATEMENT THAT WE'RE GOING TO GIVE GUIDANCE, OKAY, AND IT WAS

12  GOING TO BE 12 CENTS, THE FACT THEY DIDN'T REACH THE GUIDANCE

13  UNDER THE JURISPRUDENCE THAT THIS COURT KNOWS VERY WELL, DOESN'T

14  MEAN THAT STATEMENT WAS FALSE.  THE QUESTION IS WHETHER IT HAD A

15  REASONABLE BASIS WHEN IT WAS MET.

16        SO LET'S ASSUME FOR THESE PURPOSES THAT IT DIDN'T

17  HAVE A REASONABLE BASIS.  OKAY?  THAT THEY MET THE FALSITY

18  PRONG.  DID THE MARKET UNDERSTAND ON MARCH 1ST THAT THE EARNINGS

19  MISS, WHICH IS WHAT'S IMPORTANT TO FOCUS ON, THAT THE EARNINGS

20  MISS WAS CAUSED BY THE FACT THAT THE DEFENDANTS DIDN'T HAVE A

21  REASONABLE BASIS THAT IT WAS FALSE?

22        **THE COURT:**  THAT GETS BACK TO JUSTICE O'CONNOR'S

23  QUESTION THEN, DOESN'T IT?

24        **MR. WALD:**  YOUR HONOR, WITH GREAT RESPECT FOR JUSTICE

25  O'CONNOR --

1            **THE COURT:**  GOOD.

2            **MR. WALD:**  ABSOLUTELY.

3        WITH GREAT RESPECT FOR JUSTICE O'CONNOR, THERE ARE

4   MANY COURTS WHICH SAY, WHICH SAY, THAT THE LOSS CAUSATION

5   ELEMENT DOES REQUIRE THAT DISCLOSURE, AND THAT IF IT ISN'T

6   DISCLOSED TO THE MARKET, THEN IT'S NOT A 10(B)(5) VIOLATION.  IT

7   MAY BE SOMETHING ELSE, AND IT MAY BE A DIFFERENT CLASS PERIOD

8   LATER ON WHEN IT EVER DOES GET DISCLOSED TO THE MARKET, BUT WE

9   ARE AREN'T GOING TO ALLOW PEOPLE TO SUE UNDER 10(B)(5) WITHOUT

10  THAT KIND OF DISCLOSURE.

11       JUSTICE O'CONNOR'S CONCERN IS TAKEN CARE OF THROUGH

12  THE WHOLE CONCEPT OF INDIRECT DISCLOSURE.  IN OTHER WORDS, WE'RE

13  NOT SAYING THAT THE DEFENDANTS HAVE TO ADMIT THAT WHAT THEY SAID

14  PREVIOUSLY WAS FALSE, BUT WE ARE SAYING IT'S AN EFFICIENT

15  MARKET, YOUR HONOR.  WE ARE SAYING THERE ARE LITERALLY SCORES OF

16  ANALYSTS' REPORTS OUT THERE.  THERE ARE MANY, MANY PEOPLE WHO

17  ARE VITALLY INTERESTED IN THE COMPANY'S RELEASES.

18       ONE WOULD HAVE THOUGHT THAT IF THESE STATEMENTS THEY

19  ALLEGE WERE FALSE, THAT THOSE ANALYSTS WOULD HAVE SO CONCLUDED.

20  THAT'S WHAT HAPPENED IN MANY OF THE CASES WHERE THE COURTS HAVE

21  FOUND THAT THERE WAS AN INDIRECT DISCLOSURE AND THE MARKET WAS

22  AWARE OF THE FALSITY OF THE STATEMENTS FROM THAT WHICH WAS

23  RELEASED.  THAT'S THE WHOLE GENESIS, IF YOU WILL, OF THAT PART

24  OF THE ANALYSIS.  YOU'D NEVER GET TO THAT PART OF THE ANALYSIS

25  IF COURTS DIDN'T RECOGNIZE THAT THAT'S HOW THAT CAN COME OUT.

1          THAT TAKES CARE OF JUSTICE O'CONNOR'S CONCERN,

2    BECAUSE IF THAT COMES OUT INTO THE MARKETPLACE, IF THE

3    DEFENDANTS ADMIT THROUGH A RESTATEMENT, FOR EXAMPLE, YOUR HONOR,

4    THAT'S AN EASY ONE, OKAY?  THERE'S NO ISSUE.  THE MARKET'S BEEN

5    TOLD THERE WAS A FALSE STATEMENT PREVIOUSLY, THEN YOU HAVE

6    ISSUES OF SCIENTER OR OTHER THINGS LIKE THAT.  BUT WHERE THE --

7    WHERE ORACLE DOESN'T SAY IT AND WHERE NOBODY LOOKING AT ALL OF

8    THE EVIDENCE IN THE MARKETPLACE CONCLUDES THAT THE PRIOR

9    STATEMENTS THAT THEY CHALLENGE WERE FALSE, THEN YOU DON'T HAVE

10   LOSS CAUSATION.

11         AND I WOULD FLIP JUSTICE O'CONNOR'S CONCERN.  IN

12   OTHER WORDS, THE WHOLE PREMISE IS, WELL, BUT IT REWARDS LYING.

13   ON THE CONTRARY, YOUR HONOR.  IT IS ANOTHER CHECK ON THE

14   ALLEGATION THAT THERE WAS LYING.  YOU WOULD EXPECT THAT IF THERE

15   WAS LYING, PEOPLE -- THAT'S EXACTLY WHAT WOULD HAVE COME OUT

16   INTO THE MARKETPLACE.

17         IT'S EQUALLY PLAUSIBLE THAT THE REASON THAT NO ONE

18   BELIEVES THAT THERE WAS A MISSTATEMENT IS BECAUSE PEOPLE DID

19   THEIR OWN CHECKING IN THE CHANNELS.  PEOPLE DID THEIR OWN

20   DISCUSSION WITH THIRD-PARTY CUSTOMERS, AND THEY CONCLUDED THAT

21   WHAT THIS WAS ABOUT WAS THE ECONOMY.  SO IN THAT SENSE, IT PUTS

22   THE LIGHT TO THE ALLEGATION THAT THERE WAS A FALSEHOOD IN THE

23   FIRST PLACE.

24         BUT YOU DON'T HAVE TO DECIDE THAT, YOUR HONOR, IN

25   TERMS OF LOSS CAUSATION.  THE LAW IS VERY WELL ESTABLISHED.  IT

1    NEEDS TO COME OUT IN THE MARKETPLACE DIRECTLY OR INDIRECTLY, AND

2    IF THE PLAINTIFFS -- IF THE PLAINTIFFS CANNOT ADDUCE EVIDENCE,

3    IF THEY DON'T HAVE EVIDENCE THAT SHOWS THAT IT CAME OUT DIRECTLY

4    OR INDIRECTLY, THIS 10(B)(5) LAWSUIT HAS TO BE FINISHED.  IF

5    THERE'S SOME OTHER LAWSUIT OUT THERE, THAT'S DIFFERENT, BUT

6    *DURA*, *DAOU* AND *METZLER* SAY THAT'S THE STANDARD.

7              **THE COURT:**  OKAY.

8              **MR. WALD:**  THANK YOU, YOUR HONOR.

9              **THE COURT:**  THANK YOU.  THE MATTER WILL BE SUBMITTED.

10   YOU'LL HEAR FROM ME.

11                    (PROCEEDINGS ADJOURNED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4        I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

5  UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6  CERTIFY THAT THE FOREGOING PROCEEDINGS IN C 01-0988 SI, IN RE:

7  ORACLE SECURITIES LITIGATION, WERE REPORTED BY ME, A CERTIFIED

8  SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY

9  DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL,

10  COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT

11  THE TIME OF FILING.

12         THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

13  TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

14  COURT FILE.

15

16                   /S/ JOAN MARIE COLUMBINI

17              JOAN MARIE COLUMBINI, CSR 5435, RPR

18               WEDNESDAY, FEBRUARY 18, 2009

19

20

21

22

23

24

25