# EXHIBIT A

--- F.3d ----  Page 1
--- F.3d ----, 2009 WL 388048 (C.A.10 (Okla.))
**(Cite as: 2009 WL 388048 (C.A.10 (Okla.)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Tenth Circuit.
In re WILLIAMS SECURITIES LITIGATION-WCG SUBCLASS.
No. 07-5119.

Feb. 18, 2009.

Appeal from the United States District Court for the Northern District of Oklahoma (D.C. No. 02-CV-72-SPF-FHM).

Jonathan E. Bridges, Susman Godfrey LLP, Dallas, TX (William Christopher Carmody, John W. Turner, and Jeremy J. Brandon, Susman Godfrey LLP, Dallas, TX; Joshua H. Vinik, Matthew A. Kupillas, and Kent A. Bronson, Milberg Weiss LLP, New York, NY; and Behram V. Parekh, Yourman Alexander & Parekh LLP, Los Angeles, CA, with him on the briefs), for Plaintiffs-Appellants.

James L. Kincaid, Crowe & Dunlevy, Tulsa, OK (Michael J. Gibbens, Victor E. Morgan, Susan E. Huntsman, Crowe & Dunlevy, Tulsa, OK and Mary H. Tolbert, Crowe & Dunlevy, Oklahoma City, OK, with him on the brief) for Defendants-Appellees Howard E. Janzen, Scott E. Schubert, Kenneth Kinnear II, Matthew W. Bross, Bob F. McCoy, Howard S. Kalika, John C. Bumgarner Jr., and Frank M. Semple.

Theodore J. Boutrous, Jr., Gibson, Dunn & Crutcher LLP, Los Angeles, CA (Julian W. Poon, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; Timothy K. Roake and Ethan D. Dettmer, Gibson, Dunn & Crutcher LLP, Palo Alto, CA; and Graydon Dean Luthey, Jr. and Sarah Jane Gillett, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, with him on the brief), for Defendants-Appellees The Williams Companies, Inc. and Keith E. Bailey.

Before McCONNELL, ANDERSON, and BALDOCK, Circuit Judges.

McCONNELL, Circuit Judge.

\*1 On July 24, 2000, The Williams Companies, Inc. ("WMB") announced that it would be spinning off its telecommunications subsidiary, Williams Communications Group ("WCG"), in a move that it called "the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth that each enjoys."Not two years later, on April 22, 2002, WCG filed for bankruptcy and its stock hit $0.06. A nationwide class of plaintiffs who purchased stock or notes issued by WCG between those dates brought fraud claims under § 10(b) and § 20(a) of the Securities Exchange Act and Rule 10b-5. The district court found genuine issues of material fact as to falsity, materiality, and scienter in connection with numerous alleged misrepresentations, but granted the defendants' motion for summary judgment on the issues of loss causation and damages. The plaintiffs had attempted to prove the latter with the expert testimony of Dr. Blaine Nye, but the court found his testimony unreliable under *Daubert* because his theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events. The plaintiffs appeal the exclusion of Dr. Nye's testimony and the grant of summary judgment.[FN1] We affirm.

> FN1. Plaintiffs have also appealed the district court's award of deposition and copying costs to Defendants under 28 U.S.C. § 1920. *See In re Williams Securities Litigation,* Case No. 08-5100. That issue was separately briefed and will be addressed in a separate opinion.

### I. BACKGROUND

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

### A. The Rise and Fall of WCG

As an energy company that produces and transports natural gas, WMB owns a large network of pipelines. In the 1980s, it began running fiber-optic cable through decommissioned pipelines and formed a telecommunications subsidiary that built a coast-to-coast network. It sold that subsidiary in 1995 and entered into a temporary non-compete agreement that prevented it from reentering the telecommunications industry until 1998. During this interim, telecommunications stocks continued to rise, with the Telecom Index growing from 215.71 at the beginning of 1997 to 306.60 by that year's end, an increase of 42%. When the non-compete agreement expired, WMB formed a new subsidiary, WCG, that set out to build a nationwide fiber-optic network using the decommissioned pipeline that WMB still owned. In October, 1999, when the Telecom Index had reached 616.80, WCG conducted an IPO to raise additional capital for its network expansion. Over the next few months both WCG's share price and the Telecom Index climbed even higher, with WCG peaking at $61.81 on March 7, 2000, and the Telecom Index peaking three days later at 1248.06.

At that point, WCG's stock price began to decline, and by July 21, 2000 had fallen more than 50% to $29.38. During that same period the Telecom Index declined 28%. On July 24, 2000-the first day of the class period-WMB announced that it would spin off WCG, making it a stand-alone company. WCG's stock was trading at $28.50 that day.

The plaintiffs allege that WMB, WCG, and various corporate officers publicly misrepresented the reasons for the spin-off, the prospects for WCG's survival as a stand-alone company, and the adequacy of WCG's capitalization. Publicly, for instance, WMB issued a press release saying, "Our energy and communications businesses have tremendous opportunities before them. Creating the most effective and efficient access to capital will help fuel that growth, and we believe that can best be achieved by creating two independent businesses." Private discussions within the WMB board, however, seem to show that the true reason for the spin-off was that WCG's growing capital needs were a drain on WMB's balance sheet, and that WMB needed to "heave the junk called WCG overboard as fast as possible." WMB's CEO, Defendant Keith Bailey, told shareholders that WCG was "strongly positioned for success" with "the financial resources in place to enable it to deliver on the promise of a very bright future." He announced that WCG was "pre-funded for their capital needs ... to carry them to that point of EBITDA positive," and during the road show, senior executives said that the spin-off "better enables each company to execute its respective business plan"; "optimizes access to capital"; and "creates a Win-Win for WMB and WCG shareholders." Internally, however, there seems to have been much more pessimism about the continuing availability of enough capital to satisfy WCG's appetite. Officers were warning that WCG was "still approximately $800 million under-funded through the end of 2001," and that WCG did not have "any choice at this point other than going on a rigid, essential need only capital diet while [it] restore[d] capital capacity through operating performance and selling non core assets." In short, Plaintiffs allege that the Defendants' public statements painted a rosy view of WCG's future prospects as an independent company, when in reality its need for capital and growing debt not only called future profitability into doubt, but was indeed the motivation for the spin-off itself.

**\*2** This gap between the public statements and internal assessments continued up to and after the spin-off occurred on April 23, 2001. In August 2001, for instance, WCG publicly announced that it "continues to project ... becoming free cash flow positive by year-end 2003," and its CEO, Howard Janzen, said that, "With funding that takes us into 2004, a plan to be free cash flow positive by the end of 2003, and the right team and strategy in place, we are positioned to not only survive the current shakeout, but thrive in the years to come." At

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the same time, internal assessments recognized that WCG's lack of funding was growing more and more worrisome in light of its large amount of debt. A presentation to the board in August 2001 said that, "[f]rom a financial standpoint we realize the cash generated from our business is insufficient to service our debt." The WCG board considered a number of options for generating additional cash to service the company's debt, but none seemed feasible. WCG's stock price continued to decline, and by the end of 2001 it was trading at $2.35 per share. The Telecom Index had fallen to 236.63.

On January 29, 2002, WMB issued a press release announcing the delay of its 2001 earnings report pending assessment of WMB's contingent obligations with respect to WCG. WCG's stock fell from $1.63 to $1.34. That same day, one of WCG's competitors wrote down $3.2 billion worth of assets, and the day before another of WCG's competitors announced bankruptcy. Also that day, Milberg Weiss filed the first of the lawsuits that would later be consolidated into the present case. On February 4, 2002, WCG issued a press release announcing that its lenders had informed WCG that it might be in default, and that WCG was performing a review of the possible impairment of its long-lived assets. The stock price fell from $1.42 to $1.00. On February 25, 2002, WCG issued another press release. This time it announced that it was considering the potential benefits of a Chapter 11 bankruptcy. The stock price fell to $0.22. After the market closed on April 22, 2002, WCG filed for bankruptcy. At the end of the next day, its stock closed at $0.06.

### B. Dr. Nye's Testimony

The controversy in the present case concerns the Plaintiffs' ability to present a theory of loss causation. While the district court agreed that triable issues of fact existed with regard to whether the defendants made misrepresentations, whether they knew they were false, and whether those misrepresentations were material, the Plaintiffs also bore the burden of demonstrating that the decline in the price of WCG stock and notes was attributable to a draining of the fraud premium. Their one expert on the subject, Dr. Nye, presented two basic scenarios.[FN2]

> [FN2]. Dr. Nye actually presented three scenarios to explain the loss causation as related to the stock-Scenario 1, Scenario 2, and Scenario 2-alternative-and two similar scenarios to explain loss causation as related to the notes-Notes Scenario 1 and Notes Scenario 2. Scenario 2 and Scenario 2-alternative were both premised on a "corrective disclosure" theory, but Scenario 2 used a "constant percentage" method for measuring damages while Scenario 2-alternative used a "constant dollar" method. The Plaintiffs do not appeal the district court's rejection of Scenario 2's constant percentage method.

#### 1. Scenario 1

In Scenario 1, Dr. Nye used a "leakage theory" to identify the losses that could be attributed to the disclosure of the fraud. Under this theory, the fraud was not revealed to the market by a single corrective disclosure, but instead "the leakage of WCG's true financial condition and prospects during the Class Period revealed the risks that had been concealed by the prior misrepresentations." Nye Rpt. ¶ 110. The losses "were caused by the materialization of the concealed risks, specifically that WCG's assets were overstated, that WCG was in default of its debt covenants, and that there was significant uncertainty about WCG's ability to continue as a going concern." *Id.* Scenario 1 posited that WCG's true value, had the defendants not made their rosy statements about WCG's prospects, was its value upon declaring bankruptcy. Dr. Nye therefore began with the $0.06 at which WCG was trading upon filing for bankruptcy, and then incorporated the movements of the market and industry back to July 24, 2000, the first day of the class period. Doing this, he concluded that WCG's true value on the day

WMB announced the spin-off was not $28.50, but $0.56. *Id.* at ¶ 108. Under Scenario 1, Dr. Nye attributed almost all of WCG's value-ninety-eight percent-to the fraud, and assumed that almost the entire decline in price was the result of the truth gradually leaking into the market, despite the fact that the decline in WCG share price closely correlated with the overall decline in the telecommunications industry as a whole.

**\*3** The district court found Scenario 1 an unreliable method for identifying the loss attributable to the alleged fraud. For one thing, while Dr. Nye claimed to remove the market and industry effects on the value of WCG stock and notes, he "[did] not even purport, in Scenario 1, to have removed the effects of '[n]onfraud company-specific information.' " Dist. Op. at 113. Instead, Scenario 1 attributed any decline in WCG's value that was independent of market and industry effects to the exposure of the fraud. This "fail[ed] to differentiate between losses rooted in causes cognizable under loss causation doctrine, on one hand, and, on the other hand, losses attributable to industry-specific stresses, the meltdown in the telecommunications sector, and other negative developments unrelated to the alleged fraud." *Id.* at 114. The district court's second objection to Scenario 1 was that Dr. Nye had not identified any public disclosures before January 29, 2002 that even arguably alerted the market to the fraud, other than to say that disclosures occurred "every day." *Id.* at 113. "Thus, remarkably, he has not identified either fraud or non-fraud related news (much less parsed the effects of the two) for the class period through January 28, 2002," even though loss causation requires proof that a market decline was the result of the revelation of a misrepresentation or omission. *Id.* at 114.

### 2. Scenario 2-alternative

Scenario 2-alternative (and the corresponding Notes Scenario 2) was based upon a "corrective disclosure" theory. Here, Dr. Nye focused on the price declines after four specific public disclosures: WMB's delay of its earnings report on January 29; WCG's February 4 announcement that it might be in default; WCG's February 25 announcement that it was considering bankruptcy; and WCG's actual filing for bankruptcy on April 25, 2002. Dr. Nye calls these four announcements "partial disclosures," as they did not precisely mirror the alleged misrepresentations but nonetheless "revealed the risks that had been concealed by the prior misrepresentations and omissions," and therefore "Plaintiffs' losses were caused by the materialization of the concealed risks." Nye Rpt. at ¶ 121. Dr. Nye attributed the decline in value after each corrective disclosure, net of market and industry effects that he purported to isolate through a regression analysis,[FN3] to the revelation of fraud.

> [FN3]. One distinction between the second scenario as applied to the notes and the stock is that Dr. Nye did not apply this regression analysis to the notes and therefore did not attempt to remove market and industry effects. *See* Nye Rpt. ¶ 138.

The district court found Scenario 2-alternative unreliable because "it is not supported by a showing of material, new, company-specific and fraud-related information that became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by plaintiffs." Dist. Op. at 121. The "new" was in reference to the fact that Milberg Weiss had filed the *Cali* complaint on that day, alleging the very fraud that was allegedly exposed. The district court believed that if the information had been sufficiently exposed such that Milberg Weiss was able to file its detailed allegations of fraud, then Dr. Nye's claim that "new" information was being revealed to the market was dubious-especially considering that the share price did not significantly drop. *Id.* at 116-18. Furthermore, Scenario 2-alternative suffered from the same flaws as Scenario 1: Dr. Nye did not distinguish between declines attributable to disclosures of fraud and declines attributable to non-fraud-related company-specific inform-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ation.

### C. Summary Judgment

**\*4** After excluding Dr. Nye's expert testimony as unreliable under *Daubert,* the district court determined that the Plaintiffs had "failed to present evidence sufficient to raise a triable issue as to loss causation."*Id.* at 162.For largely the same reasons that it excluded Dr. Nye's testimony, the court found that the Plaintiffs had failed to present evidence of a causal connection between the decline in value and the exposure of the misrepresentations, and had failed to separate fraud-related losses from losses attributable to other factors. It therefore granted the Defendants' motion for summary judgment. *Id.* at 163.The Plaintiffs now appeal both the court's *Daubert* ruling and the grant of summary judgment.

### II. DISCUSSION

### A. Loss Causation Under *Dura*

In a private securities fraud action the plaintiff must prove that the defendants (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that the plaintiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 128 S.Ct. 761, 768 (2008). The sixth element is commonly referred to as "loss causation." *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir.2003) ("Loss causation ... is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."); *cf. Pasley v. Freeman,* 100 Eng. Rep. 450, 457 (1789) ("If, indeed, no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action.").

Before 2005, there was some confusion amongst the courts as to what exactly plaintiffs had to show in order to prove loss causation, with the Ninth Circuit holding that a plaintiff need only show "that the price on the date of purchase was inflated because of the misrepresentation," *Knapp v. Ernst & Whinney,* 90 F.3d 1431, 1438 (9th Cir.1996), and other circuits holding that an "allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement." *Emergent Capital,* 343 F.3d at 198. The Supreme Court resolved the confusion in *Dura Pharmaceuticals, Inc. v. Broudo* by rejecting the Ninth Circuit approach and holding that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." 544 U.S. 336, 342 (2005). Alleging that price has been inflated as a result of a misrepresentation is not enough-even if the plaintiff has suffered a loss-unless the plaintiff can identify a "causal connection" between the loss and the misrepresentation. *Id.* at 347.

Even if the truth has made its way into the marketplace, *Dura* requires that a plaintiff show that it was this revelation that caused the loss and not one of the "tangle of factors" that affect price. *Id.* at 343.

**\*5** When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

*Id.* at 342-43.The securities laws are not meant to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."*Id.* at 345.The plaintiff bears the burden of showing that his losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price. Without showing a causal connection that specifically links losses

to misrepresentations, he cannot succeed.

### B. Dr. Nye's Testimony

Before expert testimony can be admitted, Federal Rule of Evidence 702 requires the district court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993)."In performing this gatekeeper role, the judge must assess the reasoning and methodology underlying the expert's opinion, then determine whether it is scientifically valid and applicable to a particular set of facts." *Burlington Northern and Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1030 (10th Cir.2007).*See also Daubert,* 509 U.S. at 591 (instructing district courts to consider the relevance, or "fit," of the testimony in resolving the factual dispute). The question before us is whether either of Dr. Nye's methods could reliably link the class's losses to the revelation of the alleged misrepresentations, as *Dura* requires. We review the district court's decision to admit or deny testimony for abuse of discretion. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143 (1997); *Burlington Northern,* 505 F.3d at 1030.

### 1. Scenario 1

Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops-assuming, of course, that the plaintiff could isolate the effects from any other intervening causes that could have contributed to the decline. *See, e.g., In re Winstar Commc'ns,* 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006).*Dura* did not suggest that this was the only or even the preferred method of showing loss causation, though; it acknowledged that the relevant truth can "leak out," *Dura,* 544 U.S. at 342, which would argue against a strict rule requiring revelation by a single disclosure. See *In re Seitel, Inc. Sec. Litig.,* 447 F.Supp.2d 693, 711 (S.D.Tex.2006) ("[T]he Supreme Court did not adopt the argument that a plaintiff must show that the stock price declined due to a specific corrective disclosure or financial restatement."); *In re Bradley Pharm., Inc. Sec. Litig.,* 421 F.Supp.2d 822, 828 (D.N.J.2006) (rejecting argument that *Dura* mandates a corrective disclosure method for proving loss causation); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 439 F.Supp.2d 692, 701 (S.D.Tex.2006). By premising Scenario 1 on a leakage theory rather than a corrective disclosure theory, therefore, Dr. Nye's methodology does not automatically run afoul of *Dura.*

**\*6** To satisfy the requirements of *Dura,* however, any theory-even a leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure-will have to show some mechanism for how the truth was revealed. *See In re Worldcom, Inc. Sec. Litig.,* 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005) ("[Plaintiff must] establish that his losses were attributable to *some form of revelation to the market* of the wrongfully concealed information") (emphasis added). A plaintiff cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud. The inability to point to a single corrective disclosure does not relieve the plaintiff of showing how the truth was revealed; he cannot say, "Well, the market *must* have known."

It was precisely this failure to describe how the market was alerted to the fraud between July 24, 2000 (the first day of the class period) and January 29, 2002 (the day of the first potential corrective disclosure) that led the district court to reject Scenario 1 as unreliable. At one point Dr. Nye argued that a number of tiny corrective disclosures occurred each and every day of the class period, which had the cumulative effect of gradually disclosing the fraud.

A [Dr. Nye]: I think under Scenario 1 I say that corrective disclosures are throughout the Class Period on the beginning of the Class Period.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Q: Okay. And on what days were there corrective disclosures under Scenario 1?

A: Scenario 1, every day. In other words, the whole thing is a manipulated period.

Nye Dep. 51. He even submitted a 1300-page compendium of news articles, reports, and SEC filings that was supposed to show "numerous instances of leakage of corrective information concerning WCG's true financial condition."Dist. Op. 99 The majority of these allegedly corrective disclosures, however, were actually either news that was generally applicable to the telecommunications industry as a whole, or was an upbeat rather than negative statement about WCG. Dist. Op. 99-100. As it would be difficult to characterize an announcement that contained no negative information about WCG as revelatory of the truth about WCG's grim prospects, we cannot say that the district court abused its discretion in rejecting the theory that these disclosures leaked the truth to the market.

The primary justification for Scenario 1, however, was not that any specific disclosure alerted the market to the fraud, but that the fraud was revealed once the previously concealed risks materialized. According to Dr. Nye, "Plaintiffs' losses were caused by the materialization of the concealed risks, specifically that WCG's assets were overstated, that WCG was in default of its debt covenants, and that there was significant uncertainty about WCG's ability to continue as a going concern."Nye. Rpt. ¶ 110. The problem is that Dr. Nye identifies no point between July 24, 2000 and January 29, 2002 when these concealed risks *did* materialize. While the truth could be revealed by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists, *see Lentell v. Merrill Lynch & Co ., Inc., 396 F.3d 161, 173 (2d Cir.2005)* (loss can be caused by "materialization of the concealed risk"), any theory of loss causation would still have to identify when the materialization occurred and link it to a corresponding loss.

**\*7** Plaintiffs argue that Scenario 1 was "reasonable in light of Nye's premise that WCG's true, non-inflated share price on each day of the class period was very low."Aplt. Br. 60. In other words, because Dr. Nye opined that WCG's true value was at the level the company was trading on the day it declared bankruptcy, any decline in price before bankruptcy must have resulted from the draining of the fraud premium. While an expert's testimony that a security's value has been inflated by fraud throughout the class period could be relevant for showing transaction causation, it does not show loss causation. *See Lentell,* 396 F.3d at 175 (allegations that "market price of [the] securities was artificially inflated" and that "securities were acquired at 'artificially inflated prices' " may establish transaction causation, but do not establish loss causation). Loss causation requires a showing of more than an artificially inflated price and subsequent decline. *Dura,* 544 U .S. at 342. Until the fraud is revealed the purchasers actually *benefit* from the inflation and therefore have no legally compensable injury.

Dr. Nye's Scenario 1 bootstraps from the conclusion that WCG was essentially valueless from the start to a scenario where any decline was a "recognition" of this truth and therefore a draining of the fraud premium. He fails, however, to identify any causal link between the revelation of the truth and the decline in price from July 24, 2000 to January 28, 2002. WCG's share price fell from $28.50 to $1.63 during that period, and while Dr. Nye could not explain how the market learned of the fraud over that year-and-a-half, he claimed that the decline must have resulted from its revelation and not from the "tangle of factors" that affect a company's stock price-despite the fact that the same period witnessed the bankruptcies of WCG competitors, a decline in the telecommunications industry as a whole, and the overall market declines that followed the 9/11 terrorist attacks. *See Dura,* 544 U.S. at 343 ("Other things being equal, the longer the time between the purchase and sale, the more likely that ... other factors caused the loss."). This

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

failure to show a causal connection between the fraud and the loss would turn the securities laws into just the sort of "broad insurance against market losses" that *Dura* rejected. *Id.* at 345. We cannot say that the district court abused its discretion in finding that Dr. Nye's failure to explain how the truth was revealed to the market and failure to then link the revelation of truth to a corresponding loss made his theory unreliable.

### 2. Scenario 2-Alternative

While Plaintiffs preferred Scenario 1 because it would allow them to recover for the entire decline in WCG stock price, including the year-and-a-half decline from $28.50 to $1.63, Dr. Nye also provided a more modest method for demonstrating loss causation that would identify specific corrective disclosures rather than conclusively assert a leakage of the relevant information. He identified four such disclosures that occurred in the early months of 2002: WMB's January 29 announcement that it was assessing its contingent obligations related to WCG; WCG's February 4 announcement that its lenders had informed WCG that it might be in default; WCG's February 25 announcement that it was considering Chapter 11; and WCG's April 22 filing for said bankruptcy. The district court found Dr. Nye's attempt at identifying corrective disclosures inadequate, however, because Scenario 2-alternative was "not supported by a showing of material, new, company-specific and fraud-related information that became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by the plaintiffs." Dist. Op. at 121. In other words, Dr. Nye had not shown why these disclosures should be considered "corrective" such that corresponding losses could be reliably attributed to the revelation of fraud rather than other factors.

**\*8** Any reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation caused the resulting decline in price. To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company. *See Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 649 (7th Cir.1997) (stating that loss causation can be proved by showing defendant "made a fraudulent misstatement and that *this misstatement* was responsible for its damage") (emphasis added). Dr. Nye himself, however, could not tie these four particular disclosures to any of the alleged misrepresentations or describe why they should be considered "corrective." In his deposition, he admitted, "I have not tied those four things specifically to allege[d] misrepresentations." Nye Dep. at 140. Plaintiffs offer an explanation for his failure: that these four disclosures revealed the same relevant truth, which was that "WCG likely would not be able to repay its debt as scheduled and, therefore, its assets likely would not provide a return to equity investors." Aplt. 47.

At its heart, Scenario 2-alternative suffers from the same defect as Scenario 1: because Dr. Nye begins with the assumption that WCG was virtually valueless and that any decline in value drained the fraud premium, he labels any negative information about WCG a corrective disclosure and attributes all resulting losses to the revelation of fraud rather than other possible factors. As with Scenario 1, we must again be careful not to connect each and every bit of negative information about a company to an initial misrepresentation that overstated that company's chances for success. *See In re Motorola Sec. Litig.,* 505 F.Supp.2d 501, 546 (N.D.Ill.2007) ("[T]he standard cannot be so lax that every announcement of negative news becomes a potential 'corrective disclosure.' "). At the same time, if we are too exacting in our demands for a connection between the initial misrepresentation and subsequent revelation-for instance, by imposing a mirror image requirement, or insisting that the sources of the two disclosures be the same-then we would eliminate the possibility of 10b-5 claims altogether. The Second Circuit has described the balancing act

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

as asking whether "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell, 396 F.3d at 173 (italics omitted).

Scenario 2-alternative alleges that the fraud was revealed by four public announcements that gradually unveiled the truth that WCG was virtually worthless. While the scenario depends upon the cumulative effect of all four disclosures, we will discuss each of them individually. A close inspection of each allegedly corrective disclosure shows that the district court did not abuse its discretion in finding that the truth they revealed was not sufficiently within the zone of risk such that Dr. Nye could show that it was the revelation of the fraud, and not other factors, that caused the subsequent declines in price.

### a. January 29, 2009 Disclosure

**\*9** Dr. Nye's first corrective disclosure is a press release in which WMB announced it would delay the reporting of its fourth-quarter and year-end financial statements while it re-evaluated the status of certain contingent liabilities it had with respect to WCG. The share price fell 17.8% that day, from $1.63 to $1.34, though Dr. Nye acknowledges that "it was not a significant [negative] return as the market fell 2.5% that day, and the industry was down that day."Nye Rpt. 43. That same day, Milberg Weiss filed its *Cali* complaint, the first suit in the present case, which, as the district court said, "read together with the Milberg, Weiss press release of the same date, leaves very little to the imagination."Dist. Op. 116. The coincidence of the *Cali* complaint with Dr. Nye's first identified corrective disclosure calls into question whether that day's drop in price can reliably be attributed to the revelation that WMB and WCG had misrepresented WCG's financial viability and not some other factor.

While an announcement that WCG could be in default on its debt obligations might fall within the zone of risk obfuscated by the alleged misrepresentations, the district court questioned whether Dr. Nye had any basis for saying that the January 29 announcement revealed new information to the market such that the disclosure can be said to have caused that day's loss. The fact that Milberg Weiss was able to assemble a complaint that very day and identify the very misrepresentations in question would suggest that the market already had at least some knowledge of the fraud. Dr. Nye himself admits as much in his deposition:

Q: ... Did you ever consider whether the clients who have hired you in this case if they were able to make those allegations on January 29th, 2002, whether the rest of the market had information that they could have reached the same conclusions on that date?

A [Dr. Nye]: Did I ever think that?

Q: Yes.

A: Well, to the extent that Milberg Weiss came to that conclusion based on public information, then I-then I suppose the market could, too. Is that what the question was?

Q: Yes.

A: Seems like it, yeah. If indeed these are based on public information, then it's public information.

Q: And under your definition of an efficient market, [the *Cali* ] lawsuit and the factual allegations of that lawsuit would have been factored into the market price of WCG's securities, correct?

A: I think my definition of efficiency is the same pretty much as the definition of efficiency, and that is that the price-the market price reflects all publicly available information. So by definition, if it's publicly available information, it would be reflected in the market price.

Nye Dep. 38-39. Dr. Nye's acknowledgment that the market already knew of the alleged misrepres-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

entations on the very day of the first corrective disclosure is in some tension with his claim that the market's movements that day were a reaction to the disclosure and not something else.

**\*10** There is of course a difference between public speculation of potential misrepresentation and insider confirmation. WMB's acknowledgment that WCG might be in default would likely affect the market more than the hunches of investors. That being said, this expert admittedly believed that the market *did* know this information prior to the January 29 disclosure, and the fact that the market seems already to have had at least some knowledge of the true condition of WCG's debt does suggest that an analysis of the January 29 drop should carefully consider whether other factors might have been at play. In fact, we know of at least one factor that was certainly at play-the filing of this lawsuit. Cf. *Teachers' Retirement Sys. of La. v. Hunter,* 477 F.3d 162, 187-88 (4th Cir.2007) (holding that the losses following the filing of a lawsuit were not a result of the facts disclosed in that suit but "more logically occurred because the market feared that a lawsuit" would independently harm the corporation). Scenario 2-alternative, however, makes no allowance for other non-fraud related causes for the January 29 losses. Thus, despite the fact that Dr. Nye believed that the market already had at least some knowledge of the fraud and the fact that he knew of other non-fraud related negative events that day, he made no attempt to show why those losses were entirely attributable to the revelation of fraud and nothing else. This is another manifestation of his belief that all negative information about WCG was a revelation of the fraud-he saw no need to separate fraud-related from non-fraud-related losses, because he assumed any and all losses were of the former variety.

### b. February 4, 2002 Corrective Disclosure

Dr. Nye's second corrective disclosure was a WCG press release that contained two announcements: 1) that WCG's lenders had informed the company that it might be in default under its credit arrangements, and 2) that WCG was performing a review of the possible impairment of its long-lived assets. Again, as with the January 29 announcement, Dr. Nye's attribution of all of that day's losses to the revelation of fraud without considering other factors is unreliable, especially when there were clear indicators that other factors were at play. While Dr. Nye believed that by February 4 the market had at least some knowledge of the misrepresentations, and while the February 4 announcement included a significant piece of information that was unrelated to the fraud-that WCG was reviewing the possible impairment of its long-lived assets-he nonetheless drew a causal link between that day's decline in price and the market's learning of the fraud. He offered no explanation for why one would allot all of the February 4 decline to the revelation of fraud and not to another significant piece of negative information that was released that day. Cf. *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 158 (2d Cir.2007) ( "Plainitffs have not alleged facts to show that [Defendant's] misstatements, among others ... that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [Defendant's] misstatements."); *In re Omnicom, Inc. Sec. Litig.,* 541 F.Supp.2d 546, 553 (S.D.N.Y.2007) ("Plaintiffs nevertheless cannot demonstrate that the market reacted negatively to the disclosures, rather than to other information simultaneously released to the market."). Dr. Nye's failure to show why the February 4 losses should be attributed to the revelation of fraud and not other non-fraud related news renders his methodology unreliable.

### c. February 25 and April 22 Corrective Disclosures

**\*11** Dr. Nye's final two corrective disclosures were WCG's February 25 announcement that it was considering bankruptcy and its April 22 decision to actually file for Chapter 11. Plaintiffs argue that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

WCG's bankruptcy was within the zone of risk concealed by its earlier misrepresentations and that the losses that followed the bankruptcy can therefore be attributed to the revelation of the fraud. The risks had not fully materialized, they contend, until WCG actually filed for bankruptcy.

The zone of risk, however, is not infinite in size. The causal connection between false statements about a company's prospects and that same company's eventual bankruptcy years later is too remote to constitute a corrective disclosure. *Cf. D.E. & J. Ltd. P'ship v. Conaway,* 133 Fed. App'x 994, 1000 (6th Cir.2005) ("[T]he filing of a bankruptcy petition by itself does not a security fraud allegation make."). Bankruptcy might have been a possibility from the moment of the spinoff, and might even have been a likely possibility, but there are simply too many potential intervening causes to say that bankruptcy was WCG's legally foreseeable destiny such that its trading price at bankruptcy equaled its true value on the day the spinoff was announced. The alleged misstatements involved the risks of defaulting on debt and the true reasons that WCG was spun off from WMB; they did not involve the certainty of a bankruptcy. There are too many intervening factors at play-including the total meltdown of the telecommunications industry-to allow Dr. Nye to reliably equate bankruptcy with the risks that the original misstatements concealed. To do so would transform the securities laws into the kind of downside insurance policy that *Dura* warned against.

Like his leakage theory, Dr. Nye's corrective disclosure theory fails to identify the mechanism by which fraud was revealed to the market. Though he points to four disclosures, he simultaneously concedes that the market knew of the misrepresentations even before those disclosures, and also makes no account for the fact that these disclosures contained non-fraud related information that would have also affected WCG's value. The district court did not abuse its discretion in finding Scenario 2-alternative an unreliable method for proving loss causation.

### C. Summary Judgment

Plaintiffs argue that even if the district court did not abuse its discretion in excluding Dr. Nye's expert testimony, there was still a genuine issue of material fact as to loss causation such that the case should have proceeded to the jury. They contend that the jury could have reasonably drawn the very conclusions that Dr. Nye did and found that the losses were a result of either the leakage of the truth or the revelations made in the four corrective disclosures. These conclusions, however, would be no less speculative and unreliable if reached by jurors than when reached by Dr. Nye. The fatal flaw still remains, which is that Plaintiffs have failed to present evidence suggesting that the declines in price were the result of the revelation of the truth and not some other factor. Given the evidence that the parties have presented, there is "simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss." *In re Omnicrom,* 541 F.Supp.2d at 554 (granting summary judgment). As Plaintiffs are unable to meet their burden under *Dura Pharmaceuticals,* we find that the district court appropriately granted the defendants summary judgment on the issue of loss causation.

### III. CONCLUSION

**\*12** The scenarios that Plaintiffs offered to explain loss causation failed to identify a causal nexus between the revelation of the previously-concealed truth and the decline in value of WCG securities. Because loss causation demands that plaintiffs show that their losses were caused by a revelation of the fraud and not some non-compensable cause, these scenarios do not adequately address the issue of loss causation. We therefore **AFFIRM** the district court's exclusion of Dr. Nye's expert testimony which employed these scenarios, and **AFFIRM** the grant of summary judgment for Defendants.

C.A.10 (Okla.),2009.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.


In re Williams Securities litigation - WCG Subclass
--- F.3d ----, 2009 WL 388048 (C.A.10 (Okla.))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.