1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  PATRICK J. COUGHLIN (111070)
   MARK SOLOMON (151949)
3  DOUGLAS R. BRITTON (188769)
   SCOTT H. SAHAM (188355)
4  STACEY M. KAPLAN (241989)
   SARAH R. HOLLOWAY (254134)
5  655 West Broadway, Suite 1900
   San Diego, CA  92101
6  Telephone:  619/231-1058
   619/231-7423 (fax)
7  patc@csgrr.com
   marks@csgrr.com
8  dougb@csgrr.com
   scotts@csgrr.com
9  staceyk@csgrr.com
   sholloway@csgrr.com
10         – and –
   SHAWN A. WILLIAMS (213113)
11 WILLOW E. RADCLIFFE (200087)
   ELI R. GREENSTEIN (217945)
12 DANIEL J. PFEFFERBAUM (248631)
   100 Pine Street, Suite 2600
13 San Francisco, CA  94111
   Telephone:  415/288-4545
14 415/288-4534 (fax)
   shawnw@csgrr.com
15 willowr@csgrr.com
   elig@csgrr.com
16 dpfefferbaum@csgrr.com

17 Lead Counsel for Plaintiffs

18                        UNITED STATES DISTRICT COURT

19                       NORTHERN DISTRICT OF CALIFORNIA

| 20 | In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) | Master File No. C-01-0988-SI |
|---|---|---|---|
| 21 | | ) | <u>CLASS ACTION</u> |
| 22 | This Document Relates To: | ) ) ) | PLAINTIFFS' MOTION FOR ADMINISTRATIVE RELIEF TO SUBMIT |
| 23 | ALL ACTIONS. | ) ) | REPLY BRIEF IN RESPONSE TO DEFENDANTS' OPPOSITION TO |
| 24 | | | PLAINTIFFS' MOTION FOR ADMINISTRATIVE RELIEF |

1     At the February 13, 2009 hearing on the defendants' motion for summary judgment, the Court asked in the context of discussing loss causation: (1) "What do you think the rule is that I'm supposed to apply?" and; (2) Does the market have to attribute the disclosure to a previously made false statement or fraud? Declaration of Patrick J. Coughlin in Support of Plaintiffs' Motion for Administrative Relief to Submit Reply Brief in Response to Defendants' Opposition to Plaintiffs' Motion for Administrative Relief ("Coughlin Decl."), Ex. 1 at 44, 47. In an attempt to more fully answer these questions plaintiffs submitted *Huberman v. Tag-It Pacific, Inc*., No. 07-55648, 2009 U.S. App. Lexis 2780 (9th Cir. Jan. 16, 2009), a recent Ninth Circuit case reversing the grant of summary judgment in a securities fraud action for failure to submit evidence raising a triable issue of fact on the element of loss causation. Defendants' protestations about *Huberman* in response are telling. They go to great lengths to distinguish *Huberman*, but the fact is that *Huberman* is consistent with *Dura* and other Ninth Circuit law on causation. Accordingly, plaintiffs respectfully request leave of the Court to submit the following short reply, limited to five pages, to make clear their position. Because the case law is developing on the standards for proving loss causation, briefing is justified because of the importance of the issue.

     The rule, as set forth in *Huberman*, the statute and *Dura*, is that: "'[L]oss causation'" is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citation omitted); 15 U.S.C. §78u-4(b)(4). The concept of loss causation is analogous to the common-law doctrine of proximate cause: "*Dura* culls from the common law the black letter law that a fraud plaintiff must show that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007). As Judge Alsup held in *In re Charles Schwab Corp. Securities Litigation*, No. C 08-01510 WHA, 2009 U.S. Dist. LEXIS 8125 (N.D. Cal. Feb. 4, 2009), "a plaintiff may establish loss causation by alleging 'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered;' that defendants' 'misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security.' *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173,

177 (2d Cir. 2005) (citation omitted; emphasis in original). That is: 'the loss must be caused by the "materialization of the concealed risk." [citing *Lentell*, 396 F.3d at 173.]'" *Id.* at *21.[1]

Here, defendants concealed and actually denied that the economy was impacting Oracle. The defendants also misrepresented the readiness of Oracle's new applications program 11i. The risks of the deteriorating economy and the defects in 11i materialized at the end of 2Q01, the beginning of the Class Period, as defendants began falsifying the financial results upon which 3Q01 projections were to be based.[2] The concealment and denial of these risks led to Oracle belatedly, after Ellison sold nearly a billion in stock, admitting the economy was impacting Oracle's financial results and 11i would not meet projected growth.

What did the market have to know – only that the truth as to Oracle's operations was different than as previously represented and, as a result, depreciation in share value occurred. *See Dura*, 544 U.S. at 397 (citing Restatement (Second) of Torts §548A cmt. *b*).[3] It is then for plaintiffs to prove that the disclosures are related to the misstatements alleged. Thus, even if a disclosure said

---

[1] The Court in *Dura* declined to adopt the argument, urged by Dura Pharmaceuticals and its *amici*, that loss causation requires that there always exist a corrective disclosure specifically linked to a final stock drop. Instead, the Supreme Court explained in *Dura*'s "proof" discussion that plaintiffs' economic loss may occur as the "relevant truth begins to leak out," or as "the truth makes its way into the marketplace." *Dura*, 544 U.S. at 342. Importantly, the Court did not require an explicit corrective disclosure as the mechanism by which the truth "leaked" out. *Id.* "At oral argument, Justice Breyer recognized the truth might come out in 'subtle ways as well as direct ways.'" Patrick J. Coughlin, Eric Alan Isaacson & Joseph P. Daley, "What's Brewing in *Dura v. Broudo*?," 37 Loy. U. Chi. L.J. 1, at *42 n.144 (2005).

[2] Plaintiffs established that the accounting manipulations in 2Q01 were inextricably connected to the loss – defendants masked Oracle's true financial condition in 2Q01 and its forecasts in 3Q01 by fabricating over $40 million in improper revenue from the illegal transfer of customer overpayments to earnings (using fake debit memo invoices) and an improper roundtrip swap deal with HP. These accounting manipulations not only falsified the growth rate of 11i sales (via the HP deal) and concealed illegal conduct (the debit memo scheme), but they also allowed Oracle to manufacture a penny per share in fake earnings (tens of millions of dollars) to beat Wall Street expectations in 2Q01, which formed the basis for the inflated 3Q01 forecasts.

[3] As the Restatement makes clear: "[O]ne who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented." Restatement, *supra*.

nothing about a prior quarter's accounting overstatements, if plaintiffs can prove that a reduced earnings announcement was causally related to the prior quarter accounting, they meet their burden of proving loss causation under the PSLRA statute. The proof of causation is not confined to the four corners of the disclosure – all evidence of causation may be considered. For example, the fraud in *Daou* was ***improper revenue recognition***, but the corrective disclosure was simply an ***earnings miss*** and revelation of the true financial condition. *In re Daou Sys.*, 411 F.3d 1006, 1026-27 (9th Cir. 2005). There was absolutely no disclosure or comment about revenue recognition, no disclosure of accounting manipulations, and no disclosure about the underlying fraud. Nor did the market "understand" the miss as being linked to fraud. All the market knew was that the company missed its earnings. *Daou* illustrates the concept that the market need not "understand" that anything was fraudulent, it must simply realize the ***economic consequences*** of the new and different information. The causal connection is not based on the market's "understanding," it's in the evidence that plaintiffs present in court to causally connect the disclosure of the relevant truth to prior misrepresentations, as plaintiffs have done here.

This said, there may be market realization that previously concealed or denied risks materialized and the timing or magnitude of the announcement calls into question the accuracy or truthfulness of earlier disclosures by the market. This, of course, makes plaintiffs' job easier and it is this type of direct connection which occurred here. Throughout the Class Period Oracle led the market to believe it was not being impacted by the economy, 11i was working and Oracle would exceed 2Q01 earnings by tens of millions of dollars. When the significant impact of the economy deterioration in 11i growth and earnings miss were announced, the market questioned both the magnitude and abruptness of the miss.[4]

---

[4] The market (*Wall Street Journal*) did question the Company's candor as to previous assertions dealing with the economy's impact and 11i growth:

> ***The reasons for the shortfall were at least as troubling to analysts as its magnitude*** . . . . While database sales have been slowing at Oracle for many quarters, analysts were surprised by the abruptness of the latest downturn. ***Oracle also said its line of application software likely grew 50% in the quarter, well below earlier predictions that the business might grow by 75%-100%.*** . . . *Last week in New*

1    In general, however, the market is impersonal and digests all material information – good or
2 bad – true or false. The market need only determine that the facts are different than as previously
3 represented and, as a result, the stock price has declined precipitously.[5] To establish loss causation,
4 plaintiffs must offer evidence in court to connect the relevant truthful information disclosed to the
5 previous false representations. The market may wonder, as it did here, about the timing and
6 magnitude of the negative economic news, but it is the economic consequence of the announcement,
7 not whether it was occasioned by fraud, that the market reacts to in revaluing the Company. Thus,
8 defendants' assertion at the hearing that "there must be a disclosure of the specific fraud that was
9 alleged in order for loss causation to have independent meaning as an element of the 10[b-5] claim"
10 is simply wrong. Coughlin Decl., Ex. 1 at 62.

11   Under the rule described above, Oracle's March 1, 2001 revelation of its deteriorating
12 financial condition, which had caused the Company to miss 3Q01 earnings expectations by over
13 $100 million, is the announcement that forces the market to revalue Oracle by more than 20%.
14 Defendants concede that Oracle's March 1, 2001 press release disclosed that it was the economy that
15 negatively impacted Oracle's business causing the quarterly miss leading to nearly a $5 stock price
16 decline. Coughlin Decl., Ex. 2. Thus, the only issues of material fact remaining for the jury on this
17 claim relate to the falsity of defendants' previous assertions and defendants' state of mind when
18 making those assertions. This is the connection to the ultimate disclosure of the relevant truth that

---

> *Orleans, in fact, the company hosted thousands of customers for a tradeshow that highlighted its application business. At the show, Oracle Chief Executive Larry Ellison gave a bullish assessment of the application business, saying it was "really starting to take off."*

Declaration of Shawn A. Williams in Support of Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Revised Motion for Summary Judgment ("Williams Decl."), Ex. 436. So, in fact here the market made the connection between Oracle's previous announcements and the March 1, 2001 disclosure. UBS also found it "particularly puzzling to attribute a $200M shortfall to the last couple of days of the quarter to a change in the economic environment." *Id.*, Ex. 426 at 2.

[5] The majority of the time, the loss is indicated by the drop in the stock. But inflation may be removed otherwise as noted by the Solicitor General in *Dura*: "'[F]raud can be revealed by means other than a corrective disclosure, and a drop in the stock price may not be a necessary condition for establishing loss causation in every fraud-on-the-market case. To the extent courts or litigators have suggested otherwise, they are mistaken.'" *See* Coughlin, *supra*, at *22-*23 & *42 n.153.

1 closes the loop and connects the loss to the fraud.[6]

2 The March 1, 2001 Press Release also contained a clear **connection** to the Company's problems with 11i as it revealed for the first time that Oracle had missed applications growth targets by 1/3. SJ Opp. at 46. It was the correction of the market's expectations about 11i's growth prospects that caused the loss.[7] Plaintiffs' burden is to connect this loss to the fraud. Clearly, a reasonable fact-finder could conclude that the failure to meet projected applications growth targets was **connected** to the problems the Company was experiencing with the 11i product. And, in fact, defendants' own internal documents, as well as the market, made this connection.[8] *See, i.e.*, SJ Opp. at 12-23.

DATED: February 25, 2009                                        Respectfully submitted,

                                                                                         s/Patrick J. Coughlin
                                                                                         PATRICK J. COUGHLIN

---

[6] Defendants contend that they did not become aware until the last days of the quarter, when big deals did not close, that the economy was impacting deals and Oracle would miss its numbers. Plaintiffs have proffered evidence that defendants were aware of this fact in December 2000 when they concealed Oracle's real miss of 2Q01 guidance by engaging in the round-trip transaction with HP and by improperly applying customer overpayments to artificially inflate earnings. *See, i.e.*, Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Revised Motion for Summary Judgment ("SJ Opp.") at 4-9. Plaintiffs have also proffered additional evidence that Oracle and Ellison were further made aware of the impact of the economy on Oracle's business when Oracle's actual results for December were circulated. S*ee, i.e.*, *id.* at 27-36, 40-42; Williams Decl., Ex. 277. Upon receipt of this report, Ellison traded $900 million worth of his stock in mid to late January 2001. *See, i.e.*, Plaintiffs' Notice of Motion and Motion for Summary Judgment Against Lawrence Ellison for Trading on the Basis of Material Non-Public Information at 3-24.

[7] The market did question the disclosures as the *Los Angeles Times* noted that Oracle's March 1, 2001 announcement had sent its shares down 21%. Williams Decl., Ex. 419. The article contrasted the disclosure to earlier boasting by Ellison that Oracle was not being hurt by the slowing economy because of 11i's functionality and efficiencies: "Redwood City, Calif.-based Oracle is one of the last major technology companies to reduce forecasts because of slowing economic growth. In December, the company said it wasn't being hurt by the slowdown ***because corporations were buying its applications software to cut costs and boost efficiency***." *Id.*

[8] At the close of the Class Period, Oracle admitted internally that Oracle's inability to demo 11i continued to impact its conversion rate, *i.e.*, sales. *See* Williams Decl., Ex. 261. The memo goes on to say that "hopefully Larry will get sick [of losing prospects] and put more pressure on getting [11i] fixed." *Id.* On March 2, 2001, UBS issued a report on the Company's pre-announcement tying the earnings miss directly ***to defects and gaps in 11i applications*** and stated that it could not identify a single customer that had "gone live" on a fully integrated 11i. *Id.*, Ex. 426.

|   |   |
|---|---|
| 1 | |
| 2 | COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP |
| 3 | PATRICK J. COUGHLIN<br>MARK SOLOMON |
| 4 | DOUGLAS R. BRITTON<br>SCOTT H. SAHAM |
| 5 | STACEY M. KAPLAN<br>SARAH R. HOLLOWAY |
| 6 | 655 West Broadway, Suite 1900<br>San Diego, CA 92101 |
| 7 | Telephone: 619/231-1058<br>619/231-7423 (fax) |
| 8 | COUGHLIN STOIA GELLER |
| 9 | RUDMAN & ROBBINS LLP<br>SHAWN A. WILLIAMS |
| 10 | WILLOW E. RADCLIFFE<br>ELI R. GREENSTEIN |
| 11 | DANIEL J. PFEFFERBAUM<br>100 Pine Street, Suite 2600 |
| 12 | San Francisco, CA 94111<br>Telephone: 415/288-4545 |
| 13 | 415/288-4534 (fax) |
| 14 | Lead Counsel for Plaintiffs |

Document1

PLTS' MOT FOR ADMIN RELIEF TO SUBMIT REPLY BRF IN RESPONSE TO DEFS' OPP TO PLTS' MOT FOR ADMIN RELIEF - C-01-0988-SI — - 6 -

CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 25, 2009.

    s/ Patrick J. Coughlin
PATRICK J. COUGHLIN

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:patc@csgrr.com

## Mailing Information for a Case 3:01-cv-00988-SI

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com

- **Jennie Lee Anderson**
  jennie@andrusanderson.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Scott H Saham**
  scotts@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Peter Allen Wald**
  peter.wald@lw.com,#sfdocket@lw.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Corey D. Holzer
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

Raymond Lane
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

PRG-Schultz USA, Inc.
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

Darren Jay Robbins
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Sanna Rachel Singer
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

Monique C. Winkler
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
```