# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
**(Cite as: 2009 WL 736802 (C.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
In re DOWNEY SECURITIES LITIGATION.
No. CV 08-3261-JFW (RZx).

March 18, 2009.

**PROCEEDINGS (IN CHAMBERS): ORDER
GRANTING MOTION OF DEFENDANT MAU-
RICE L. McALISTER TO DISMISS FIRST
AMENDED CONSOLIDATED COMPLAINT
AND JOINDER IN MOTIONS TO DISMISS
FILED BY DEFENDANTS DANIEL D.
ROSENTHAL AND BRIAN E. COTE [filed
12/15/08; Docket No. 43];**

**ORDER GRANTING MOTION OF DEFEN-
DANT DANIEL D. Rosenthal TO DISMISS
FIRST AMENDED CONSOLIDATED COM-
PLAINT AND JOINDER IN MOTIONS TO
DISMISS FILED BY DEFENDANTS MAURICE
L. McALISTER AND BRIAN E. COTE [filed
12/15/08; Docket No. 45]; and**

**ORDER GRANTING MOTION OF DEFEN-
DANT BRIAN E. COTE TO DISMISS FIRST
AMENDED CONSOLIDATED COMPLAINT
AND JOINDER IN MOTIONS TO DISMISS
FILED BY DEFENDANTS MAURICE L.
McALISTER AND DANIEL D. ROSENTHAL
[filed 12/15/08; Docket No. 47]**

JOHN F. WALTER, District Judge.

**\*1 Shannon Reilly Courtroom Deputy**

On December 15, 2008, Defendant Maurice L.
McAlister ("McAlister") filed a Motion to Dismiss
First Amended Consolidated Complaint and Joinder in
Motions to Dismiss Filed by Defendants Daniel D.
Rosenthal and Brian E. Cote. On December 15, 2008,
Defendant Daniel D. Rosenthal ("Rosenthal") filed a
Motion to Dismiss First Amended Consolidated
Complaint and Joinder in Motions to Dismiss Filed by

Defendants Maurice L. McAlister and Brian E. Cote.
On December 15, 2008, Defendant Brian E. Cote
("Cote") (collectively, McAlister, Rosenthal, and
Core will be referred to as "Individual Defendants")
filed a Motion to Dismiss First Amended Consoli-
dated Complaint and Joinder in Motions to Dismiss
Filed by Defendants Maurice L. McAlister and Daniel
D. Rosenthal. On January 12, 2009, Lead Plaintiff
Waterford Township General Employees Retirement
System ("Plaintiff" or "Waterford") filed its Opposi-
tion. On January 26, 2009, the Individual Defendants
filed a Reply.<sup>FN1</sup>Pursuant to Rule 78 of the Federal
Rules of Civil Procedure and Local Rule 7-15, the
Court found the matter appropriate for submission on
the papers without oral argument. The matter was,
therefore, removed from the Court's February 9, 2009
hearing calendar and the parties were given advance
notice. After considering the moving, opposing, and
reply papers, and the arguments therein, the Court
rules as follows:

> FN1. On March 16, 2009, the Individual
> Defendants submitted a Notice of Additional
> Authority Relevant to Pending Motions to
> Dismiss.

**I. Factual and Procedural Background**

On May 16, 2008, Plaintiff Waterford filed a class
action complaint on behalf of all purchasers of
Downey Financial Corp. ("Downey") securities be-
tween October 16, 2006, and March 14, 2008, against
Downey and certain of its current and former officers
and/or directors. On June 2, 2008, Plaintiff Stephen J.
Mihalacki ("Mihalacki") filed a separate putative class
action on behalf of all purchasers of Downey securi-
ties between October 16,2006, and March 14, 2008,
with virtually identical factual allegations, and alleg-
ing the same claims for relief, as the *Waterford* Com-
plaint. On August 14, 2008, the Court consolidated the
two actions, appointed Waterford as lead plaintiff, and
appointed lead counsel. On September 29, 2008,
Plaintiff filed its Consolidated Complaint for Viola-
tion of the Federal Securities Law. On November 12,
2008, pursuant to a stipulation entered into by the
parties and approved by the Court, Plaintiff filed its
First Amended Consolidated Complaint ("FACC").

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
**(Cite as: 2009 WL 736802 (C.D.Cal.))**

In the FACC, Plaintiff alleges claims for relief for (1) violation of Section 10(b) of the 1934 Act and Rule 10b-5; and (2) violation of Section 20(a) of the 1934 Act. In short, Plaintiff alleges that the decline in Downey's shareholder value resulted from alleged misrepresentations made to the investing public by Downey's current and former officers and/or directors, and not from the current economic climate.

## A. The Individual Defendants and Their Alleged Misrepresentations

### 1. Daniel D. Rosenthal

*2 Rosenthal served as Downey's Chief Operating Officer ("CEO") and a member of its Board of Directors, including the Executive Committee. As CEO, Rosenthal certified quarterly and annual reports filed with the SEC under Section 302 of the Sarbanes-Oxley Act. Rosenthal also was one of ten members of Downey's Internal Asset Review Committee, which met "quarterly to review and determine asset classifications and recommend any changes to asset valuation allowances."

The FACC identifies two allegedly false statements made by Rosenthal. The first allegedly false statement was a general statement about Downey's "strong" capital position that appeared in several press releases and SEC filings between January and October 2007. The second allegedly false statement was a quote regarding the extent of Downey's subprime loan portfolio, which appeared in an April 2007 press release. In the press release, Rosenthal is quoted as saying, "[Downey's] subprime portfolio has declined and represents less than 6% of our loan portfolio."

### 2. Maurice L. McAlister

McAlister co-founded Downey Savings and Loan Association in 1957. In 1994, Downey incorporated and, following regulatory approval, became the holding company of Downey Savings and Loan Association. McAlister served as Chairman of the Board of Downey from 1994 and throughout the putative class period. He also was a member of the Executive Committee and the Nominating and Corporate Governance Committee, which made recommendations to the Board regarding Director, President, and CEO candidates.

The FACC identifies one allegedly false statement made by McAlister. During a speech accepting a lifetime achievement award from University of California, Irvine, McAlister made a statement that was reported in the September 17, 2007 Orange County Business Journal as follows:

"Like other lenders, Downey is feeling the effects of the mortgage and housing downturn, which has hurt profits and seen some borrowers miss payments on loans. Downey's shares are off about 10% in the past year, though not nearly as bad as other lenders on Wall Street."McAlister called the situation minor."We have a little bit of a problem, but not very much," he said.

There are no allegations in the FACC that this statement or the September 17, 2007 article in the Orange County Business journal-a weekly, regional periodical-was widely disseminated to the public market.

### 3. Brian E. Cote

In March 2006, Cote was appointed Chief Financial Officer ("CFO") of Downey. Cote was never a member of Downey's Board of Directors. As CFO, Cote certified Downey's quarterly and annual reports filed with the SEC under Section 302 of the Sarbanes-Oxley Act. Cote also was one of ten members, along with Rosenthal, of Downey's Internal Asset Review Committee.

The FACC identifies one allegedly false statement made by Cote. In a January 14, 2008 press release, Cote is quoted as stating: "As of year-end 2007, the estimated level of non-performing assets as a percent [*sic*] of total assets increased to 7.8%."

### 4. Misrepresentations Not Attributable to Any One Individual Defendant

*3 The main focus of the FACC is that Downey's SEC filings misrepresented the quality of Downey's loan portfolio and its underwriting practices. Plaintiff alleges in the FACC that: (1) Downey's Option ARM loans were "exotic" and "toxic"; (2) Downey misstated the factors that it considered to determine whether a loan was adequately secured by the property and the borrower's credit; (3) Downey misstated the

percentage of loans it made to "subprime" borrowers; and (4) Downey failed to disclose the extent to which it made loans without verifying either the property value or the borrower's income, or both. Specifically, Plaintiff alleges that Downey and its current and former officers and/or directors made misrepresentations with respect to the following areas: (1) earnings releases and financial results; (2) lending practices; (3) compliance with an Interagency Guidance; (4) risk exposure; (5) loan loss reserves; (6) loan sales to the secondary market; (7) accounting for certain troubled debt restructurings; (8) subprime lending; (9) capital position; (10) GAAP compliance; and (11) adequacy of controls. Plaintiff also assert that each of the Individual Defendants should be held liable for the allegedly false statements in Downey's SEC filings based on each Individual Defendant's position at Downey and/or his signing of the SEC filings.

## II. Legal Standard

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") govern the pleading requirements for claims under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. See *Yourish v. California Amplifier,* 191 F.3d 983, 993 (9th Cir.1999); *Cooper v. Pickett,* 137 F.3d 616, 628 n. 2 (9th Cir.1997); *see also* William W. Schwarzer, A. Wallace Tashima, & James M. Wagstaffe, California Practice Guide, *Federal Civil Procedure Before Trial* § 8:45.10.

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b). The heightened pleading requirements of Rule 9(b) are designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken,* 6 F.3d 666, 671 (9th Cir.1993). In order to provide this required notice, "the complaint must specify such facts as the times, dates, places, and benefits received, and other details of the alleged fraudulent activity." *Id.* at 672.Further, "a pleader must identify the individual who made the alleged representation and the content of the alleged representation." *Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 100 F.Supp.2d 1086, 1094 (C.D.Cal.1999).

The PSLRA requires a heightened pleading standard for allegations regarding misleading statements and omissions that is similar to the heightened pleading standard required by Rule 9(b)."The purpose of this heightened pleading requirement was ... to put an end to the practice of pleading 'fraud by hindsight.' " *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084-85 (9th Cir.2002) quoting *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 988 (9th Cir.1999). The PSLRA specifically provides:

*4 [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

In addition, the PSLRA requires a heightened pleading standard for state of mind: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2); *see also Silicon Graphics,* 183 F.3d at 974 ("We hold that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct")."To allege a 'strong inference of deliberate recklessness,' [the plaintiff] 'must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.' " *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir.2002) quoting *Silicon Graphics,* 183 F.3d at 974. "[R]ecklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct." *Silicon Graphics,* 183 F.3d at 976-77.

## III. Discussion

### A. Violation of Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful:

[t]o use or employ, in connection with the purchase or

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
(Cite as: 2009 WL 736802 (C.D.Cal.))

sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce:
(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In a typical section 10(b) or Rule 10b-5 private action, a plaintiff must prove: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005); *Stoneridge Investment Partners, LLC. v. Scientific-Atlanta, Inc.,* 128 S.Ct. 761, 768 (2008).

**1. Plaintiff failed to plead that the Individual Defendants made a material misstatement or omission.**

*5 Generally, only those defendants who actually make a false or misleading statement will be liable under section 10(b) or Rule 10b-5. See *In re Hansen Natural Corporation Securities Litigation,* 527 F.Supp.2d 1142, 1153 n. 3 (C.D.Cal.2007).“The Ninth Circuit has interpreted this limitation to mean that an individual may become a primary violator through ‘substantial participation or intricate involvement in the preparation of fraudulent statements' even if he did not actually make the statements.” *Communications Workers of America Plan for Employees' Pensions and Death Benefits v. CSK Auto Corporation,* 2007 WL 951968, *3 (D.Ariz. Mar. 28, 2007) (quoting *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1061 n. 5

(9th Cir.2000)). Thus, courts have dismissed defendants who did not actually make a false or misleading statement or who did not substantially participate or who were not intricately involved in the preparation of the fraudulent statements. *See, e. g., Communications Workers of America Plan for Employees' Pensions and Death Benefits,* 2007 WL 951968 at *3 (dismissing President and Chief Operating Officer because the allegations were not sufficient to show he substantially participated or was intricately involved in preparing the misrepresentations); *In re Cylink Securities Litigation,* 178 F.Supp.2d 1077, 1081 (N.D.Cal.2001) (dismissing the former Vice President of Sales and Marketing, because he did not sign the financial statements, and he was not alleged to have substantially participated or been intricately involved in preparing the statements); *accord In re Metawave Communications Corp. Securities Litigation,* 298 F.Supp.2d 1056, 1088 (W.D.Wash.2003) (sales executive who allegedly authorized the return of product despite knowing that the transactions were being improperly booked as actual sales liable only for the single alleged misstatement he actually made and not other alleged misstatements).

Recently, in *Stoneridge Investment Partners, LLC v. Scientific-Atlantic, Inc.,* the Supreme Court cautioned that conduct itself can be deceptive, and that a specific oral or written statement is not necessarily required to be liable under section 10(b) or Rule 10b-5. 128 S.Ct. 761, 769 (2008). The Supreme Court did not elaborate on the type of deceptive conduct required, but found that the deceptive conduct at issue did not have the requisite proximate relation to the investors' harm to satisfy the reliance requirement, stating:

In effect petitioner contends that in an efficient market investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect. Were this concept of reliance to be adopted, the implied cause of action would reach the whole marketplace in which the issuing company does business; and there is no authority for this rule.

*Id.* at 770.The Supreme Court also admonished that “the § 10(b) private right should not be extended beyond its present boundaries.”*Id.* at 773.

*6 Accordingly, courts since *Stoneridge* have continued to dismiss actors (including insiders) who have

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
**(Cite as: 2009 WL 736802 (C.D.Cal.))**

not made any misleading statements, either explicitly or implicitly because plaintiffs could not prove reliance on their actions. *See, e.g., In re Dura Pharmaceuticals, Inc. Securities Litigation,* 2008 WL 483613, *11 (S.D.Cal. Feb. 20, 2008)* (dismissing the Senior Vice President of Sales & Marketing in part because he did not make any materially false statements); *Katz v. Image Innovations Holdings, Inc.,* 2008 WL 762105, *2-3 (S.D.N.Y. Mar. 24, 2008)* (dismissing claims against certain insider defendants, where the Amended Complaint failed to particularize any material misstatements or omissions by these defendants, and failed to explain how the alleged actions of these defendants were relied upon by purchasers of the company's stock).

In this case, there is not a single actionable misrepresentation or omission in the 161 pages of the FACC attributed to the Individual Defendants. For example, Rosenthal's statements regarding Downey's "strong" capital position, which the Individual Defendants contend were true, are "far too vague to be actionable under the PSLRA." *In re Calpine Corporation,* 288 F.Supp.2d 1054, 1088 (N.D.Cal.2003)* (holding that words such as "strong", "healthy", and "solid" could not "form a basis for Plaintiffs' Exchange Act claims."); *In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d 857, 880 (N.D.Cal.2004)* (dismissing as "inactionable puffery" characterizations of business as "solid"); and *In re Wet Seal, Inc. Sec. Litig.,* 518 F.Supp.2d 1148, 1168 (C.D.Cal.2007)* ("Statements are not actionable if they ... constitute run-of-the-mill corporate optimism on which no reasonable investor would rely.") (quotations and citations omitted). Similarly, the statement made by McAlister during a speech that was reported in the September 17, 2007 Orange County Business Journal was nothing more than a statement "of hope, opinion, or belief" about Downey's "future performance or general market conditions" and is "not actionable under the securities laws." *In re Duane Reade Inc. Sec. Litig.,* 2003 WL 22801416, *4 (S.D.N.Y. Nov. 25, 2003); *In re Caere Corporate Sec. Litig.,* 837 F.Supp. 1054, 1058 (N.D.Cal.1993)* ("Even if Defendants were aware of facts suggesting that [the company's earnings] might be depressed, they easily could have 'genuinely believed' that [the company's] long-term outlook was good, and there could have been a 'reasonable basis' for their belief"); and *In re Syntex Sec. Litig.,* 855 F.Supp. 1086, 1096 (N.D.Cal.1994), *aff'd* 95 F.3d 922 (9th Cir.1996)* (finding that optimistic statements are not actionable when those statements are "so

vague or amorphous that no reasonable investor could rely on them.").

In addition, Rosenthal's statement in an April 18, 2007 press release that Downey's subprime portfolio "represents less than 6% of our loan portfolio" is not actionable because, when "viewed in context", Downey had clearly defined subprime borrowers as those with FICO scores of less than 620 in its public filings, including its Form 10-Q for the first quarter of 2007-filed a mere 16 days after Rosenthal's April 18, 2007 statement-which disclosed that, consistent with Rosenthal's statement, five percent of Downey's borrowers had a FICO score of 620 or below at origination.[FN2] *See, e.g., In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 933* (finding statements not actionable when viewed in context of other statements made in the same documents from which the challenged statements came and the surrounding events). Plaintiff argues that Rosenthal's statement was false because subprime borrowers should include everyone with a FICO score below 660. However, not only did Downey publicly define its subprime borrowers as including only those with a FICO score below 620, Downey's definition appears to be widely used in the mortgage industry. *See, e.g.,* Scott Frame, et al., *A Snapshot of Mortgage Conditions with an Emphasis on Subprime Mortgage Performance,* at 2 (August 27, 2008)* ("A subprime mortgage is one made to a borrower with a poor credit history (e.g., a FICO score below 620)."); and *The Handbook of Mortgage-Backed Securities* 368 (Frank J. Fabozzi ed., 6th ed. 2006)* ("FICO scores below 620 place borrowers squarely in the subprime category.").

> FN2. Similarly, when "viewed in context" of the financial information Downey was disclosing during the same time period, the statement made by McAlister during a speech that was reported in the September 17, 2007 Orange County Business would not be actionable.

*7 With respect to the statement made by Cote in a January 14, 2008 press release, Plaintiff fails to plead what is false about the statement or otherwise plead any particularized facts demonstrating that the statement was false and that Cote knew it was false when the statement was made. *See, e.g., In Re Hansen Natural Corporation Sec. Litig.,* 527 F.Supp.2d 1142, 1153-65 (C.D.Cal.2007)* (finding that the PSLRA and

Rule 9(b) require a plaintiff to allege the "who, what, when, where, and how" of his fraud allegations).

Furthermore, Plaintiff's general allegations of Downey's purported misrepresentations in both financial and non-financial statements, fail to allege the "who, what, when, where, and how" as required by the PSLRA and Rule 9(b). _Id._ at 1153. Instead, Plaintiff has alleged nothing more than conclusory allegations against "Downey" or "defendants." For example, Plaintiff has alleged that Downey's loan loss reserves were falsely understated, because, in part, Downey's financial metrics (e.g., such as negative amortization balances, non-performing assets, default rates, anticipated recasts, etc.) suggested the reserves should have been greater. However, Plaintiff then simply assumes that Downey ignored the financial metrics in setting its reserves without alleging any particularized facts that Downey did, in fact, ignore its own publicly-disclosed information when setting its reserves.[FN3] _See, e.g., In re Countrywide Fin. Corp. Derivative Litig.,_ 544 F.Supp.2d 1044, 1069-70 (C.D.Cal.2008) (finding that plaintiff had not adequately pled that statements about the reserve were false despite the fact that the committee that set the reserve was cognizant of exponentially rising negative amortization and the tripling of delinquency rates).

> FN3. While there are many other examples of merely conclusory allegations that are not alleged with the specificity required by the PSLRA and Rule 9(b), because, for the reasons discussed _infra,_ these allegations cannot be attributed to any of the Individual Defendants, the Court need not discuss each of these allegations individually.

In addition, Plaintiff generally alleges that every purportedly false statement in Downey's SEC filings, including Form 10-Ks for 2006 and 2007 and quarterly and annual reports, should be attributed to the Individual Defendants because they signed and/or certified these filings. However, as this Court previously held, the mere signing of financial documents is not enough to plead falsity where there are no allegations that the particular defendant "played any role whatsoever in the preparation or dissemination of any allegedly false statements." _In Re Hansen Natural Corporation Sec. Litig.,_ 527 F.Supp.2d at 1153.

Finally, the general allegations against Downey can-

not be attributed to the Individual Defendants under the group pleading doctrine [FN4], because, as this Court also previously held, the group pleading doctrine did not survive the PSLRA. _In Re Hansen Natural Corporation Sec. Litig.,_ 527 F.Supp.2d at 1153-54 ("A defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).").

> FN4. The group pleading doctrine allowed a presumption that false and misleading information disseminated through documents were made by the collective action of the corporation's officers. _In re GlenFed, Inc.,_ 60 F.3d 591, 593 (9th Cir.1995).

**2. Plaintiff failed to plead scienter adequately.**

To adequately plead scienter under the PSLRA, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud." _Ernst & Ernst v. Hochfelder,_ 425 U.S. 185, 193 n. 12 (1976); _In re Silicon Graphics,_ 183 F.3d 970, 975 (9th Cir.1999). Plaintiffs must plead "at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." _In re Silicon Graphics,_ 183 F.3d at 979. To satisfy this pleading requirement, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless[,] false or misleading nature of the statements when made." _Ronconi v. Larkin,_ 253 F.3d 423, 432 (9th Cir.2001). In addition, the Supreme Court recently described the appropriate method for determining if the "strong inference" requirement for alleging scienter had been met:

*8 It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21 D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, ... but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable

explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21 D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2504-2505 (2007). In deciding if scienter has been adequately pled, "[t]he inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2509 (2007) (citations omitted); *see, also, Zucco Partners, LLC v. Digimarc Corp.,* --- F.3d ----, 2009 WL 311070, *1 (Feb. 10, 2009) (holding that the Supreme Court's "decision in Tellabs does not materially alter the particularity requirements for scienter claims established in our previous decisions, but instead only adds an additional 'holistic' component to those requirements").

In this case, Plaintiff's allegations in the FACC, when considered collectively, do not give rise to a strong inference of scienter. In fact, "there is a total absence of factual allegations that would permit a strong inference that" the Individual Defendants knew that their representations with respect to Downey "were false or misleading when made" or that the Individual Defendants "acted in deliberately reckless disregard of their truth or falsity." *In re Vantive Corp. Sec. Litig.,* 283 F.3d at 1089. "Without corroborating facts, it is impossible to conclude that such allegations rest on more than hind-sight speculation."*Id.* (Citing *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 988 (9th Cir.1999)). Considering plausible opposing inferences, as required by *Tellabs,* the inference of scienter is not "as compelling as any opposing inference."*Tellabs,* 127 S.Ct. At 2510. Moreover, the allegations do not satisfy the specificity requirement of Rule 9(b) or of the PSLRA. The allegations neither identify what roles each Individual Defendant played in the alleged fraud nor allege facts giving rise to a strong inference of scienter on the part of each Individual Defendant in any context.

**a. The Individual Defendants' corporate positions do not give rise to a strong inference of scienter.**

**\*9** Plaintiff alleges that a strong inference of scienter

can be shown by the Individual Defendants' high-level positions within Downey. However, the FACC alleges no facts that give rise to a strong inference that any of the Individual Defendants either knew that various public filings were false or that they were in any way participated in a scheme to falsify those documents. *See, e.g., In re Zoran Corp. Deriv. Litig.,* 2007 WL 1650948, at *20 (N.D.Cal. June 5, 2007) (pleading specific facts about each individual defendants' role in the options granting process, including statements from confidential witnesses). Instead, the FACC includes only vague and conclusory allegations about the Individual Defendants. For example, the FACC alleges that McAlister "knew Downey's public filings were false because of his position as Downey's Chairman of the Board."FACC, ¶ 286.

However, the high rank of various Individual Defendants within Downey is insufficient, without more, to infer a strong inference of scienter. *See, e.g., In re Oak Tech. Sec. Litig.,* 1997 WL 448168, at *11 (N.D.Cal. Aug. 1, 1997) (allegations of knowledge based on positions within a company are "insufficient to establish [defendants'] liability for alleged misstatements"); *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 282 (3d Cir.2006) ("[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company") (citation omitted). It also is insufficient to demonstrate a strong inference of scienter for Plaintiff to allege that certain of the Individual Defendants held positions on various committees, such as the executive, internal asset review, and nominating and corporate governance committees. *See, e.g. In re Lockheed Martin Corp. Sec. Litig.,* 272 F.Supp.2d 944, 956 (C.D.Cal.2003) (dismissing complaint and finding that plaintiff had failed to allege scienter because "asserting that the men are members of Lockheed's executive committee, without describing the duties of the committee or how these defendants participated in it, does not demonstrate active involvement in day-to-day operations"). Therefore, Plaintiff "must do more than allege that ... key officers had the requisite knowledge by virtue of their 'hands on' positions; a ruling to the contrary would eliminate the necessity for specially pleading scienter as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 844 (N.D.Cal.2000) (internal quotations and citation omitted). Plaintiff has failed to allege any specifics with respect to the Individual Defendants' knowledge or an adequate description of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
**(Cite as: 2009 WL 736802 (C.D.Cal.))**

Page 8

their duties on various committees.

Plaintiff also alleges that the Individual Defendants had access to adverse non-public information about Downey's business and operations. However, Plaintiff cannot base an inference of scienter on unspecified documents and conversations. Instead, Plaintiff must allege "the date on which any such communication occurred, how [Plaintiff] learned of such a communication, the form in which such contact or communication was had, or specifics concerning information provided or received during such contact." _In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F.Supp.2d 1059, 1079-80 (N.D.Cal.2001)_. Again, Plaintiff has failed to allege any specifics with respect to information gained by the Individual Defendants due to their access to the alleged non-public information.

**b. The Individual Defendants' signatures on Downey's public filings do not give rise to a strong inference of scienter.**

*10 Plaintiff attempts to argue that certain of the Individual Defendants' signatures on various Downey public filings gives rise to strong inference of scienter. However, if that were true, "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." _Central Laborers' Pension Fund v. Integrated Electrical Services, Inc., 497 F.3d 546, 555 (5th Cir.2007)_ (quoting _Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir.2006)_); _In re Interpool, Inc. Sec. Litig., 2005 WL 2000237, at *16 (D.N.J.Aug.17, 2005)_ ("the fact that Defendants signed financial disclosures indicating that they complied with GAAP does not imply that they made misstatements with scienter"); _In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig., 103 Fed.Appx. 465, 470 (3d Cir.2004)_ (signature on financial disclosures stating that defendants complied with GAAP does not show that they knew procedures violated GAAP); _see, also, Communications Workers of America Plan for Employees; Pensions and Death Benefits v. CSK Auto Corp., 2007 WL 951968, at *8 (D.Ariz. Mar. 28, 2007)_ ("Sarbanes-Oxley certifications, by themselves, do not support a strong inference of scienter."); _In re Loudeye Corp. Sec. Litig., 2007 WL 2404626, at *7 (W.D.Wash. Aug. 17, 2007)_ ("Even if Defendants' Sarbanes-Oxley certifications later proved to be incorrect, that does not create a

strong inference that Defendants knew such certifications were false or misleading at the time they were made."). Without allegations that each of the Individual Defendants that signed various Downey public filings knew those public filings contained misstatements, the Individual Defendants' signatures on those public filings alone does not give rise to a strong inference of scienter.

**c. Resignations and terminations, including the resignation of McAlister, do not give rise to a strong inference of scienter.**

Resignations or terminations by themselves do not support a strong inference of scienter. _See, e.g., In re Cornerstone Propane Partners, L.P. Securities Litigation, 355 F.Supp.2d 1069, 1093 (N.D.Cal.2005)_ ("The court finds that whether they were terminated or resigned, these notable departures are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions."); _In re U.S. Aggregates, Inc. Securities Litigation, 235 F.Supp.2d 1063, 1074 (N.D.Cal.2002)_ ("[A]fter a restatement of earnings and a subsequent loan default, it is unremarkable that the Company would seek to change its management team. Plaintiff can point to no particularized allegations refuting the reasonable assumption that Defendant [ ] was fired simply because the errors that lead to the restatement occurred on his watch or because he failed to adequately supervise his department."); _Communications Workers of America Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp., 2007 WL 951968, at * 6 (D.Ariz. Mar. 28, 2007)_ ("[O]fficers and employees can be terminated for negligence or incompetence as well as fraud.").

*11 A resignation or termination provides evidence of scienter only when it is accompanied by additional evidence of the defendant's wrongdoing. _See, e.g., In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248, 1273-74 (N.D.Cal.2000)_ (finding strong circumstantial evidence of fraud from multiple public statements by the new chairman and CEO stating that the terminated executives were fired for cause because they knew or should have known of the fraudulent accounting practices); _Middlesex Ret. Sys. v. Quest Software Inc., 527 F.Supp.2d 1164, 1188 (C.D.Cal.2007)_ (finding support for scienter where officer resigned specifically to avoid cooperating with

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

internal investigation); *In re Impax Laboratories, Inc. Sec. Litig.,* 2007 U.S. Dist. Lexis. 52356, at *9 (N.D.Cal. Jul. 18, 2007) (finding "minimal, non-dispositive supporting evidence of scienter" where defendant interfered with ongoing investigation and his retirement was announced in close proximity to the news of the company's restatement).

In this case, Plaintiff alleges that five resignations and one termination over a 21-month period in a large, publicly-traded company give rise to a strong inference of scienter, but fail to allege any facts that suggests the resignations and terminations were connected to any purported wrongdoing or fraudulent activity. FACC, ¶¶ 305-12 & 314. For example, it is impossible to conclude that McAlister's resignation, at the age of 83 and after more than 50 years of service to Downey, could be characterized as unusual or suspicious in the absence of additional facts. In addition, Plaintiff's conclusion that "the closure of Downey's wholesale loan department on or about October 6, 2008 also reinforces scienter" is unwarranted in the absence of any facts to support that conclusion. FACC, ¶ 313.

**d. Plaintiff's allegations of GAAP violations do not give rise to a strong inference of scienter.**

GAAP violations, by themselves, are an insufficient basis to infer scienter. *See, e.g., In re Cornerstone Propane Partners, L.P. Securities Litigation,* 355 F.Supp.2d 1069, 1091 (N.D.Cal.2005) ("The majority of circuits have clearly held that standing alone, allegations of violations of GAAP or SEC regulations do not establish scienter."); *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.").

Such violations, even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state. *See In re U.S. Aggregates, Inc. Securities Litigation,* 235 F.Supp.2d 1063, 1073 (N.D.Cal.2002) ("[T]hese cases found an inference of scienter not only from the magnitude of the restatement but also from additional, specific allegations that the defendants had actual knowledge of relevant facts from which scienter could be inferred."); *In re Cornerstone Propane Partners, L.P. Securities Litigation,*

355 F.Supp.2d 1069, 1091 (N.D.Cal.2005) ("Allegations of GAAP violations thus provide some measure of support for the present plaintiffs' ultimate allegation of scienter, but they must be underpinned by other particularized allegations that defendants possessed the requisite mental state."); *Wojtunik v. Kealy,* 394 F.Supp.2d 1149, 1167 (D.Ariz.2005) (in considering GAAP violations, finding allegations of scienter sufficient against defendants who "personally directed" company officials to fraudulently book a bogus sale, but finding them insufficient against certain defendants "given the lack of specific allegations about those defendants' personal involvement").*Cf. In re Daou Systems, Inc.,* 411 F.3d 1006, 1023 (9th Cir.2005) (partially relying on specific allegations that defendant executives actually directed the improper revenue recognition in violation of GAAP as evidence of scienter).

*12 In this case, Plaintiff alleges GAAP violations related to loan loss reserves and troubled debt restructuring. None of these allegations give rise to a strong inference of scienter. For example, Plaintiff, with respect to the troubled debt restructuring, argues that "[b]ecause defendants restated their non-performing assets [including loans modified pursuant to the Borrower Retention Program] under GAAP, defendants knew or should have known at the time that Downey's third quarter 2007 Form 10-Q was filed that their reported non-performing assets were materially understated."FACC, ¶ 275. However, the issuance of a restatement by itself is not an admission that a defendant knew a financial report was false when made. *See, e.g., In re Connectics Sec. Litig.,* 542 F.Supp.2d 996, 1012 (N.D.Cal.2008) ("Defendants correctly argue that the restatements and acknowledgments of GAAP violations are not enough to show scienter."); *In re Marvell Technology Group Ltd. Sec. Litig.,* 2008 WL 4544439, *6 (N.D.Cal. Sept. 29, 2008) (finding that the plaintiffs "cannot show scienter solely by pointing to the fact that Marvell restated its financial statements."). In addition, the restatement of Downey's non-performing assets in the third quarter of 2007 does not demonstrate that any Individual Defendant knew that non-performing assets were understated at the time Downey filed its Form 10-Q for the third quarter of 2007.

Plaintiff alleges that Downey also purportedly violated a laundry list of generic GAAP requirements. FACC, ¶ 343. However, such general allegations are

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
(Cite as: 2009 WL 736802 (C.D.Cal.))

inadequate to support a strong inference of scienter. *See, In re Daou Sys. Sec. Litig.,* 411 F.3d at 1019 (finding that, without detailed information regarding the alleged GAAP violations, the Court could not determine "whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue."). Moreover, with respect to general GAAP and other accounting errors, Plaintiff has provided no reasonable basis for the Court to conclude that any of the purported accounting mistakes were anything other than innocent and unintentional. *See In re Hypercom Corp. Sec. Litig.,* 2006 WL 726791, at *5 (D.Ariz. Mar. 9, 2006) ("[E]ven assuming that establishing the obviousness of a GAAP error could in fact establish a strong inference of scienter, Plaintiffs have not alleged sufficient facts to make such a showing."). Accordingly, Plaintiff must provide "additional, specific allegations that the defendants had actual knowledge of relevant facts from which scienter could be inferred." *In re U.S. Aggregates, Inc. Sec. Litig.* 235 F.Supp.2d 1063, 1073 (N.D.Cal.2002).

**e. The allegations of the confidential witnesses do not give rise to a strong showing of scienter.**

Statements of confidential witnesses may be considered in determining the adequacy of a complaint under the PSLRA if "the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains adequate corroborating details." *In re Daou Sys.,* 411 F.3d 1006, 1015-16 (9th Cir.2005); *see, also, Zucco Partners,* 2009 WL 311070, *10 ("As we have explained in *Daou,* a complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements."). That a court may consider a confidential witness's statements, however, does not mean that the information conveyed gives rise to a strong inference of scienter. *Metzler,* 540 F.3d at 1069 n. 13 ("The problem for Metzler is not that the confidential witnesses are inadequately identified-the problem is that these witnesses do not convey information sufficient to support the strong inference of scienter that the PSLRA requires."). Moreover, the statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation. *See, In re Hypercom Sec. Litig.,* 2006 WL 1836181, at * 5 (D.Ariz. Jul. 5, 2006) ("[C]onfidential witnesses' un-

reliable or conclusory allegations will not be considered ... ); *Metawave Communications Corp. Sec. Litig.,* 298 F.Supp.2d 1056, 1070 (W.D.Wash.2003) ("[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough.").

**\*13** In this case, the statements of the thirteen confidential witnesses lack the requisite specificity and, thus, do not give rise to a strong showing of scienter. The FACC does not adequately describe each confidential witness's job description and responsibilities, but merely states each confidential witness's general job title and, on occasion, the name and title of the confidential witness's supervisor. Many of the statements do not relate to any of the Individual Defendants, and are not only vague and conclusory, but also based on rumor or hearsay. For example, CW1, who was a broker who worked for a company that brokered loans with Downey between 2004 and 2006, stated that he or she spoke to various Downey employees in 2007 who told CW1 that Downey lacked "adequate reserves to repay the problem loans" and "could not modify the loans of all borrowers in trouble."FACC, ¶ 114. However, CW1's statements, which are based on conversations that allegedly took place approximately one year after CW1's company stopped brokering loans for Downey, are hearsay and do not reflect any Individual Defendants' state of mind or a common belief. Similarly, CW10, who left Downey in July 2005, states that "there was a standard report run for the Board at least once a month regarding non-performing assets based on current delinquencies."FACC, ¶ 289. However, because CW10 left Downey well before the start of the class period, it is unknown, based on the vague allegations of the FACC, how CW10 knew about the existence and dissemination to the Board of this report during the class period, or whether or not the Board reviewed and discussed this report.

In addition, CW4, a senior underwriter in the Scottsdale branch office, alleges that "all of the top executives at Downey knew that dangerously loose underwriting was occurring."FACC, ¶ 63; *see, also,* FACC ¶¶ 65-66. However, this vague and conclusory allegation is not supported by any facts or additional statements of confidential witnesses. Likewise, vague and conclusory statements by CW8 and CW12 that Rosenthal regularly attended meetings is not probative

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:01-cv-00988-SI   Document 1612-3   Filed 04/02/09   Page 12 of 14

Not Reported in F.Supp.2d                                                     Page 11
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
(Cite as: 2009 WL 736802 (C.D.Cal.))

of scienter, particularly in the absence of additional facts, such as whether the confidential witnesses attended those same meetings and/or what was discussed at those meetings. Similar vague allegations about McAlister's attendance at Board meetings are alleged by CW8.

Moreover, with respect to McAlister, CW4 states that "McAlister had a home in Bullhead City, Arizona and that everyone knew that any loan that came from Bullhead was to be approved."However, this statement does not give rise to a strong inference of scienter because it is based on mere rumor and speculation, and does not allege any misconduct by McAlister. Moreover, assuming *arguendo* that the allegation is true, it fails to provide any specifics regarding who authorized or approved the directive, the number of loans from Bullhead City, or whether any of the Bullhead City loans ever became non-performing assets for Downey.

### f. The lack of stock sales negates any inference of scienter.

*14 A strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989) (holding that despite sales of $84 million in shares, the defendants still retained such a large percentage of their holdings-92 percent-that an inference of scienter was functionally negated); *In re Silicon Graphics*, 183 F.3d at 987-88 (no scienter where despite over $13.8 million in stock sales, the defendants still retained over 90 percent of their holdings); *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1177-78 (C.D.Cal.2007) ("while allegations of insider sales are not required in securities fraud cases, the lack of *any* tangible, personal benefit here further weighs against the Officer Defendants having scienter") (internal citations omitted).

In this case, any inference of scienter is negated by the lack of stock sales by the Individual Defendants during the class period. In fact, McAlister, who beneficially owned more than 5.6 million shares of Downey stock, did not sell any shares during the class period. As a result, McAlister suffered losses of approximately $307.6 million by the end of the class period and over $400 million by the date of Downey's bankruptcy filing. Likewise, Rosenthal, who beneficially owned 100,000 shares of Downey stock, did not

sell any shares during or subsequent to the class period. As a result, Rosenthal's holdings declined by approximately $5.5 million by the end of the class period, and by approximately $7.3 million by the date of the FACC. Therefore, the substantial losses suffered by McAlister and Rosenthal due to their failure to sell any stock during the class period negates any inference of scienter that may have been raised by other allegations of the FACC. *Tripp v. Indymac Financial Inc.*, 2007 WL 4591930, *4 (C.D.Cal. Nov. 29, 2007)* (holding that "the individual Defendants retained such a large percentage of their stock that an inference of scienter is functionally negated").

### 3. Plaintiff failed to plead loss causation adequately.

Under the PSLRA, Plaintiff must demonstrate loss causation by showing that "the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages."15 U.S.C. § 78u-4(b)(4). The analysis of loss causation "is governed by the decisions of the Supreme Court in *Dura Pharmaceuticals* and of the Ninth Circuit in *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir.2005)." *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278, *6 (N.D.Cal. July 30, 2007)*. "In *Dura Pharmaceuticals*, the Supreme Court held that the fact that a purchase price was inflated, by itself, does not establish causation of economic loss."*Id.*"Instead, the Supreme Court reaffirmed the principle that a securities plaintiff must allege both cause and loss."*Id.; see, also, Dura*, 544 U.S. at 345, 125 S.Ct. 1627 (securities fraud actions do not exist "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause")."In *Daou Systems*, the Ninth Circuit described the loss causation inquiry as considering whether 'the misrepresentations or omissions caused the harm.' " *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278 at *6 (citing Daou Systems, 411 F .3d at 1025). "In that case, the court found a lack of loss causation: 'if the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages.' " *Id.* (citing Daou Systems, 411 F.3d at 1026). "The court concluded that a loss suffered in an earlier period could not be considered causally related to the alleged fraudulent conduct because that stock drop occurred

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
(Cite as: 2009 WL 736802 (C.D.Cal.))

when 'the true nature of Daou's financial condition had not yet been disclosed.' " *Id.* (*citing Daou Systems,* 411 F.3d at 1027). As the Fourth Circuit recently held in affirming the dismissal of a complaint on loss causation grounds:

*15 [T]he drop in Cree's share price on June 13, 2003, more logically occurred because the market feared that a lawsuit launched by the founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations. That loss, however, is not one for which the plaintiffs in this case are entitled to compensation.

*Teachers' Retirement System of La. v. Hunter,* 477 F.3d 162, 187-88 (4th Cir.2007); *see, also, Metzler Inv. GmbH v. Corinthian Colleges, Inc.,* 534 F.3d 1049, 1063 (9th Cir.2008) ("Plaintiffs adequately pled loss causation in Daou because their complaint alleged that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.").

In this case, Plaintiff alleges that Downey's earnings releases and financial reports during the class period and Downey's January 14, 2008 press release regarding the restatement of $99 million in loans modified under its newly-initiated Borrower Retention Program as troubled debt restructurings caused Downey's stock price to fall between October 16, 2006 and July 28, 2008. However, the public disclosures referenced in the FACC do not contain a disclosure of wrongdoing, and, at best, demonstrate only that the market learned of and reacted to Downey's "poor financial health" rather than any alleged fraud. *Id.*

**B. Violation of Section 20(a)**

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). As discussed above, Plaintiff has failed to state a claim for a primary violation of the securities law.

In addition, Plaintiff has failed to plead that the Individual Defendants exercised the requisite control for a Section 20(a) claim. Plaintiff has failed to make any particularized allegations that the Individual Defendants exercised control over Downey or any person in an effort to induce them to engage in acts that violated the securities laws, or the times, dates, and places that such control allegedly occurred. Instead, the FACC merely alleges that the Individual Defendants, by reason of their position in Downey and their ownership of Downey stock, had the power to cause Downey to engaged in the alleged conduct. FACC, ¶ 385. However, this boilerplate allegation is insufficient to state a claim for control person liability. *In re Digital Island Sec. Litig.,* 223 F.Supp.2d 546, 561 (D.Del.2002), *aff'd* 357 F.3d 322 (3d Cir.2004) ("the court concludes that the plaintiffs unsupported allegations regarding management responsibilities fail to allege with the requisite specificity that the individual defendants played a role in the alleged nondisclosures").“[E]ven a CEO is not automatically a ‘controlling person’ under Section 20(a)."*Id.*(*citing Paracor Fin. Inc. v. GE Capital Corp.,* 96 F.3d 1151, 1163 (9th Cir.1996) (concluding that the plaintiff must allege that the CEO exercised direct or indirect control over the transaction in question.)); *see, also, In re Middlesex Retirement System v. Quest Software Inc.,* 527 F.Supp.2d 1164, 1194 (C.D.Cal.2007) ("[F]or Plaintiff to establish Garn's control person liability, Plaintiff must provide factual support that Garn was in a position to control a primary violator.").

**IV. Conclusion**

*16 For all the foregoing reasons, the Individual Defendants' Motions to Dismiss are **GRANTED** and the FACC is **DISMISSED with leave to amend** as to each of the Individual Defendants. The Second Amended Consolidated Complaint shall be filed by April 1, 2009. In addition to delivering to Chambers the required two copies of the Second Amended Consolidated Complaint, Plaintiff shall also deliver to Chambers two redlined versions of the Second Amended Consolidated Complaint, indicating all the additions and/or deletions of material. If Plaintiff fails to file the Second Amended Consolidated Complaint by April 1, 2009, this action will be dismissed with prejudice.

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 13
Not Reported in F.Supp.2d, 2009 WL 736802 (C.D.Cal.)
**(Cite as: 2009 WL 736802 (C.D.Cal.))**


C.D.Cal.,2009.
In re Downey Securities Litigation
Not Reported in F.Supp.2d, 2009 WL 736802
(C.D.Cal.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.