Exhibit B



LEXSEE 2009 U.S. APP. LEXIS 7452

**BILLY LORMAND, Plaintiff-Appellant v. US UNWIRED, INC; WILLIAM L. HENNING, JR; ROBERT W. PIPER; JERRY E. VAUGHN, Defendants-Appellees**

**No. 07-30106**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*2009 U.S. App. LEXIS 7452*

**April 9, 2009, Filed**

**PRIOR HISTORY:** [*1]
    Appeal from the United States District Court for the Eastern District of Louisiana.
*Romero v. US Unwired, Inc., 2006 U.S. Dist. LEXIS 60589 (E.D. La., Aug. 11, 2006)*

**DISPOSITION:**    AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

**COUNSEL:** For BILLY LORMAND, Plaintiff - Appellant: Sanford Svetcov, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P., San Francisco, CA; Douglas Wilens, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P., Boca Raton, FL.

For US UNWIRED INC, Defendant - Appellee: James Richard Swanson, Lance Christian McCardle, Fishman, Haygood, Phelps, Walmsley, Willis & Swanson, New Orleans, LA.

For WILLIAM L HENNING, JR., ROBERT W PIPER, JERRY E VAUGHN, Defendants - Appellees: N Scott Fletcher, Vinson & Elkins, Houston, TX; James Richard Swanson, Lance Christian McCardle, Loretta Gallaher Mince, Fishman, Haygood, Phelps, Walmsley, Willis & Swanson, New Orleans, LA; William Raley Alford, III, Stanley, Flanagan & Reuter, New Orleans, LA; Thomas More Flanagan, Flanagan Partners LLP, New Orleans, LA; Michael C. Holmes, Vinson & Elkins, Houston, TX.

**JUDGES:** Before BARKSDALE, DENNIS, and SOUTHWICK, Circuit Judges.

**OPINION BY:** DENNIS

**OPINION**

DENNIS, Circuit Judge:

    The plaintiff brings this putative class action on behalf of persons who allegedly (1) bought the common stock of US Unwired, Inc. ("US Unwired" or "the [*2] Company") between May 23, 2000 and August 13, 2002, at prices falsely inflated by the defendants' material misrepresentations that violated *Sections 10(b)* and *20(a)* of the Securities and Exchange Act of 1934 and *Rule 10b-5*; and (2) suffered economic loss when the true facts about the company's operations and programs were publicly disclosed and its stock price declined as a result. The defendants are US Unwired and a number of its executive officers and directors. [1] The plaintiff alleges two main fraud claims: (a) a claim regarding defendants' implementation of subprime subscriber programs; and (b) a claim regarding defendants' drastic alteration of the relationship between US Unwired and the Sprint network, of which US Unwired is an affiliate. They moved to dismiss the plaintiff's second amended complaint ("SAC") on grounds that (1) the alleged misleading statements are not actionable as a matter of law; (2) the facts pleaded do not give rise to a strong inference that the defendants acted with scienter; (3) the complaint fails to allege "loss causation," i.e., a causal connection between the alleged misrepresentations and the stock's subsequent depreciation; and (4) the complaint [*3] did not plead with sufficient particularity the factual basis for their allegations of misrepresentation. The district court granted the defendants' motion to dismiss under *Rule 12(b)(6)* after concluding that (1) some of the alleged misleading statements were not actionable because they are protected by the "safe harbor" provision of the Private Securities Litigation Reform Act ("PSLRA"), and (2) the plaintiff's SAC fails to sufficiently allege loss causation. Reviewing the defendants' motion to dismiss *de novo*, we conclude that the plaintiff's SAC adequately pleads the sub-

prime subscriber program claim upon which relief can be granted, but fails to adequately plead loss causation as to his other claim. The district court's decision must be reversed in part and the case remanded for further proceedings. [2]

> 1   The individual defendants are: William L. Henning Jr., who was the Chairman 1 n of US Unwired's Board of Directors during the class period; Robert Piper, who was the Chief Executive Officer ("CEO") [*4] of US Unwired from 2000 until the end of the class period and Chief Operating Officer from 1995 to 2000; and Jerry E. Vaughn, who was the Chief Financial Officer during the class period.
>
> 2   The plaintiff also appeals the district court's denial of its motion for leave to amend before the district court dismissed the case with prejudice. Because we reverse the 12(b)(6) dismissal, we do not reach the subsequent denial of the motion for leave to amend. "Because we find a claim has been sufficiently stated to withstand *12(b)(6)*, we need not reach the question of the trial court's denial of leave to amend [the plaintiff's] complaint." *Xerox Corp. v. Genmoora Corp., 888 F.2d 345, 358 n.70 (5th Cir. 1989).*

1. Factual and Procedural Background

We review *de novo* a district court's dismissal for failure to state a claim under *Rule 12(b)(6). Cuvillier v. Taylor, 503 F.3d 397, 401 (5th Cir. 2007).* Motions to dismiss under *Rule 12(b)(6)* "are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 570 (5th Cir. 2005).* When faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim [*5] on which relief can be granted, accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007)* (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)).* We must also draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Lovick v. Ritemoney, Ltd., 378 F.3d 433, 437 (5th Cir. 2004).* "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief -- including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier, 503 F.3d at 401* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)).*

The plaintiff's SAC alleges the following facts: [3]

> 3   All references to admissions, testimony, corporate documents, internal emails, 3 s, and depositions are references to quotations from documents, prior testimony or depositions found in the complaint and its attached exhibits. *See FED. R. CIV. P. 10(c).*

In the mid-1990s, Sprint Corporation ("Sprint"), a nationwide telecommunications company, obtained licenses [*6] from the Federal Communications Commission ("FCC") to establish a wireless communications network. Sprint established an "affiliate program" through which it contracted with third-party affiliates to construct networks in designated areas in exchange for the exclusive right to sell Sprint products and services in each area. Sprint offered three types of affiliations (Types I, II, and III) that involved varying levels of Sprint control over the third party affiliate's operations. Type III affiliation granted an affiliate the maximum amount of autonomy and control over its operations and customer base. Types I and II affiliations, in effect, gave Sprint control of an affiliate's customer care, servicing and billing.

In 1998, US Unwired, a Louisiana corporation, contracted with Sprint to become a Type III affiliate, rejecting Type I and II affiliations because US Unwired's management knew US Unwired's success depended on maintaining direct control of operations, billings, revenues, and customer relations. In exchange, Sprint granted US Unwired the exclusive right to provide Sprint products and services to over 500,000 customers in parts of 14 states.

As the complaint details: in 1999, Sprint [*7] began to pressure US Unwired to convert to a Type II affiliation by improperly delaying US Unwired's ability to market new services and the latest products, such as Wireless Web technology. Sprint allowed its Type I and II affiliates to market these new services first. As a result, US Unwired, as a Type III affiliate, became out-of-sync with the nationwide marketing of Sprint services and programs. Sprint then demanded that US Unwired pay some $ 30 million to finance its integration into the Sprint systems. But Sprint offered to waive this fee if US Unwired converted to a Type II affiliate. US Unwired initially elected to remain a Type III affiliate and attempt to negotiate more favorable terms for the cost and scope of its integration with Sprint. US Unwired was determined to retain control over its customer billings and service, which it knew was essential to its business plan. Throughout the negotiations, US Unwired's management internally voiced numerous concerns to its board about Sprint's coercive tactics aimed at forcing US Unwired into a Type II affiliation. For example, in July 2000, Henning wrote to the Board recommending that the Board put the company up for sale rather   [*8] than

transfer its core functions to Sprint as a Type II affiliate. However, each time US Unwired disagreed with Sprint, Sprint threatened to declare that US Unwired had breached its affiliation contract.

According to the complaint, at a March 10, 2000 meeting, Sprint conducted a presentation that effectively informed US Unwired that if US Unwired did not convert into a Type II affiliate, it would face a future of exorbitant fees, threatened contractual breach, and indefinite withholding of products. In a separate instance, US Unwired signaled its desire to operate a Type III affiliate out of Jackson, Mississippi. Sprint wanted a Type II affiliate to service the Jackson market. In an effort to force US Unwired to serve the Jackson market as a Type II affiliate, Sprint threatened to issue a public letter declaring US Unwired in breach of its contract for failing to supply Wireless Web technology to its customers even though Sprint's refusal to supply the technology to US Unwired, unless exorbitant integration fees were paid, was the cause of the failure. Such a public letter would have devastated US Unwired's public offering plans.

On May 23, 2000, US Unwired (after filing its Securities [*9] & Exchange Commission ("SEC") registration on May 17, 2000) issued 8 million shares of its common stock at the price of $ 11 per share. US Unwired received net proceeds of $ 80.6 million after an underwriting discount of $ 6.2 million and expenses of $ 1.2 million. In the prospectus for the stock offering filed with the SEC (attached as an exhibit to the complaint), US Unwired noted that it planned to use the proceeds to "accelerate the construction" of its network and "for other general corporate purposes." Throughout the class period, US Unwired subsequently conducted several stock offerings to fund its corporate acquisitions.

After protracted negotiations, Sprint and US Unwired still could not agree on the details of the integration plan. In order to force concessions, Sprint stopped all marketing activities for US Unwired. On July 22, 2000, US Unwired informed Sprint that it wanted to remain a Type III affiliate. Sprint refused to accept this decision and threatened to declare US Unwired in breach unless US Unwired fully funded the integration plan.

The complaint asserts that ultimately, in September 2000, US Unwired succumbed to Sprint's coercive economic pressure and abusive tactics, [*10] and agreed to become a Type II affiliate, thus giving Sprint control of US Unwired's customer service and billing operations. In becoming a Type II affiliate, US Unwired ceded to Sprint control of billing and the receipt of customer payments, which amounted to approximately $ 300 million dollars annually. Sprint thereby gained control of US Unwired's cash-flow and its relationships with its subscribers. US Unwired no longer had direct access to sub-

scriber payments and data. With control over US Unwired's cash-flow, Sprint withheld payments or underpaid US Unwired based on Sprint's revenue estimates rather than its actual collections from US Unwired customers.

Despite fierce economic struggles and the personal acrimony between US Unwired and Sprint management, US Unwired's officers, throughout the class period in this case, disseminated positive public representations. For example, as alleged in the complaint, in a November 8, 2000 press release, US Unwired noted that integration into Sprint would "position[] [US Unwired] to fully capitalize on Sprint's successes. . . ." US Unwired publicly disclosed the transfer of billing and customer services to Sprint, but never accurately disclosed [*11] the known risks involved. In fact, US Unwired stated, in an August 8, 2001 press release, that any success could be attributed to an "adherence to the sound fundamentals of our business plan over the last two years. . ." even when management knew at the outset that the forced migration of customer care, billing and cash flow control to Sprint would be disastrous for the company. In a March 5, 2002 report filed with the SEC, US Unwired disclosed some of the general risks involved with the transfer of customer care and billing to Sprint, but did not disclose the potential magnitude of those risks nor the fact that some of those risks had already materialized.

The complaint notes that in May 2001, Sprint instituted a nationwide calling program for subprime credit class customers called the "no-deposit account spending limit," or the NDASL. Sprint launched this program to increase its national market share by targeting the subprime credit class customers. Prior to this program, Sprint required sub-prime credit class customers to pay a deposit of $ 125 to $ 250 as a condition of subscription. Under NDASL, Sprint would waive the deposit except in extraordinary circumstances. The "ClearPay" [*12] program soon replaced the NDASL program. Under "ClearPay," customers could subscribe without a deposit or a credit check. Instead, as long as their accounts were current, customers would be able to use the phone within spending limits.

The complaint alleges that based on US Unwired's previous unsatisfactory experience with sub-prime credit class customers, US Unwired's management adamantly protested the decision to implement these programs in its designated areas. Piper noted that US Unwired viewed the ClearPay program as a "colossal mistake." US Unwired's management knew that it was not going to work and told Sprint that it did not want to offer the ClearPay program. Piper also noted that US Unwired told Sprint that these programs would generate bad debt and churn [4] levels beyond the levels the company could support. US Unwired was concerned about the implementation of

these programs in its service areas, because those areas contained a higher percentage of potential sub-prime credit subscribers as compared to other markets and other Sprint affiliates.

> 4   "Churn" is the "number of customers that drop service" in a given period. *See* BARBARA J. ETZEL, WEBSTER'S NEW WORLD FINANCE AND INVESTMENT [*13] DICTIONARY 222 (2003) ("net adds")(emphasis in the original).

The complaint alleges that US Unwired saw huge increases in deactivations and a significant rise in churn and debt levels for its sub-prime credit class customers after the programs' implementation. A former employee later testified that US Unwired, at the time, knew that many of these sub-prime credit class subscribers used their initially allotted minutes and then never paid for them, causing increased bad debt and churn, or turnover, of subscribers. However, as a recent Type II convert, US Unwired no longer had the ability to refuse implementation.

Nevertheless, its management, from the outset, sought to renegotiate for permission from Sprint to stop offering the programs. The complaint provides several examples: Piper, in an August 2, 2001 letter to Clint Slusher, Sprint's Director of Affiliate Management, noted that the no-deposit program produced "unacceptable and inconclusive results" for US Unwired in test trials. In that same letter, Piper warned that, by adding so many no-deposit subscribers, the Company expected "high churn rates and bad debt percentages" that would cause "our business plan to fail.'" Piper also  [*14] stated that, if forced to take such subscribers, US Unwired "will do all [it] can to limit the appeal of [the no-deposit program]." In an internal email to US Unwired executives on August 7, 2001, Piper stated his belief that "it is critically important to stop the sale of [the no deposit program] immediately" because "[b]th no-deposit program]. . . has the potential for double-digit churn . . . ." In early 2002, a former Director of US Unwired had a conversation with Piper wherein they agreed that US Unwired needed to "sell to quality customers" and not just focus on the quantity of subscribers, an ongoing problem with Sprint's no-deposit initiative that was aimed at creating subscriber growth with sub-prime credit class customers. In a January 21, 2002 email to Sprint and US Unwired representatives, Piper stated, "Our position on NDASL has been clear from the beginning. We have never approved of eliminating the deposit." Despite US Unwired's protests, Sprint refused US Unwired's requests for permission to stop the program. Finally, in February 2002, Sprint permitted US Unwired to reinstate the deposit for NDASL and ClearPay customers. Nevertheless, US Unwired continued to offer by  [*15] choice the no-deposit

program in certain areas and US Unwired continued to face ClearPay and NDASL's ill effects.

Despite the foregoing, in a March 2002 public conference call, which is referenced and quoted in the complaint, US Unwired's management continued to tout the no-deposit programs' long-term benefits. As the complaint alleges, in this call, Piper misrepresented to the public that "[w]e think these [no-deposit] customers are necessary to reach our full market penetration potential and we think you can do it profitably." In the same press conference, and in connection with the no-deposit customer market, Piper also misrepresented that "we think we're still getting our market share and we think our growth opportunity is alive and well." Moreover, Piper, reinforcing his public predictions of positive growth, indicated that the churn rate "top[ped] out" at 3.5% in the first quarter. Chief Financial Officer Vaughn also indicated in the same call that the churn rate "will start to decrease" in subsequent quarters. However, soon thereafter, on July 24, 2002, Piper sent a private letter to Chuck Levine, Sprint's President, noting that US Unwired's conversion to Type II affiliation  [*16] created long-term challenges and US Unwired was still "reeling from the damage" caused by ClearPay and NDASL.

At about the same time, between June 6, 2002 and August 13, 2002, several public disclosures reached the marketplace related to the no-deposit and ClearPay programs' detrimental effects upon US Unwired's financial condition, causing its stock price to decline from $ 4.94 to $ 0.90 per share.

Throughout the class period, after US Unwired began implementing the no-deposit programs in May 2001, US Unwired engaged in a series of acquisitions using its stock price revenues. On February 28, 2001, US Unwired purchased from Cameron Corporation its minority interest in Louisiana Unwired in exchange for approximately 4.63 million Class A shares of common stock for a total price of $ 36.5 million. On the same day, US Unwired purchased a 20% minority interest in Texas Unwired with 307,664 shares of Class A common stock for a purchase price of approximately $ 2.4 million. On December 20, 2001, US Unwired acquired all outstanding shares of IWO Holdings and issued a public offering of approximately 45.9 million shares with an aggregate value of $ 459 million based on US Unwired's December 19,  [*17] 2001 stock price of $ 10.00 per share to cover the acquisition. On February 11, 2002, US Unwired acquired another Sprint affiliate, Georgia PCS. US Unwired issued approximately 5.5 million shares of common stock with a value of $ 35.7 million based on US Unwired's closing price on February 8, 2002 of $ 6.49. Pursuant to an October 1, 1999 agreement with its lenders, US Unwired's ability to obtain credit with those lenders was specifically tied to its ability to maintain a

certain level of subscriptions. During the class period, US Unwired's ability to issue debt to fund its acquisitions and to obtain credit from lenders was directly dependent on its maintaining certain levels in both its customer subscriptions and its stock prices.

During the class period, members of US Unwired management also sold over 463,000 of their personally-owned shares at inflated prices ranging from $ 5 to $ 13 and pocketed more than $ 4.94 million. Henning, Piper, and Vaughn sold 73%, 82%, and 100% respectively of their actual stock holdings at inflated prices. [5]

> [5]   In July 2003, US Unwired filed an action against Sprint 5 in the United States District Court of the Western District of Louisiana claiming Racketeer  [*18] Influenced and Corrupt Organizations ("RICO") Act violations, breach of fiduciary duty, breach of contract, and fraud. The SAC incorporates some of the fraud allegations from that action along with the alleged facts that support those allegations, such as: factual details regarding the strife between Sprint and US Unwired and deposition testimony discussing management's knowledge and beliefs during the affiliation conversion and the no-deposit programs' implementation. After extensive litigation, the parties settled; under the terms of the settlement agreement, Sprint acquired US Unwired for approximately $ 1.3 billion dollars in 2005.

In a private email in October 2002 shortly after the class period, Piper recounted management's state of mind when the no-deposit program was rolled-out and its collective foresight that the program would cause US Unwired's stock to decline. This email, sent to Tom Mateer, Sprint's Vice President of the Affiliations group, as quoted in the complaint, stated that:

> US Unwired finds itself in a precarious position today. Our growth rate has declined to almost zero, our churn and bad debt lead the industry, our free cash flow timeline has been pushed out indefinitely, [*19] and our stock and bonds are perceived to be virtually worthless. This is exactly the business environment US Unwired (USU) predicted it would be in when Sprint rolled out NDASL. USU's plea with Sprint not to offer NDASL fell on deaf ears.

On August 12, 2004, plaintiff Clodile Romero filed a securities fraud class action against US Unwired and certain directors of the company -- the named individual defendants -- seeking to recover for persons who purchased US Unwired securities between May 23, 2000 and August 13, 2002, i.e., the class period. Later, Billy Lormand became the lead plaintiff and amended the complaint to add claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated pursuant to the Exchange Act. On August 25, 2004, Don Feyler filed a shareholder  [*20] derivative action on behalf of US Unwired against the same defendants for breach of fiduciary duties, abuse of control, mismanagement, waste of corporate assets, unjust enrichment, and against Sprint for aiding and abetting a breach of fiduciary duty. On November 11, 2004, the Lormand and Feyler actions were consolidated. After the Supreme Court decision on securities pleadings in Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) issued, Lormand successfully moved to amend his consolidated complaint, which is now the second amended complaint ("SAC") filed on September 16, 2005.

In sum, the plaintiff's SAC alleges that US Unwired and the individual defendants misled the public by concealing material facts of which they were aware, viz., that Sprint was forcing US Unwired against its will and business judgment to enlist low income and credit risky subscribers without deposits or credit checks; and that, as the defendants knew from previous experience, this business strategy would be financially disastrous for US Unwired, given the demographics of its designated network areas. The plaintiff also alleges the defendants misrepresented to the public the nature of US Unwired's relationship  [*21] with Sprint and concealed the fact that Sprint had coerced US Unwired into a Type II affiliation, which enabled Sprint to force US Unwired to adopt the subprime credit class strategy and to take away from US Unwired its control over customer care, billing, and cash-flow. The plaintiff alleges that the defendants also continued to mislead the public regarding the financially harmful nature of these programs even as they received adverse financial information confirming their dire predictions in respect to the affiliation conversion and the no-deposit programs. The plaintiff alleges that the concealment and misrepresentation of these facts caused US Unwired's stock to be falsely inflated and that the later disclosures of the truth caused a stock decline from a high of $ 4.94 to a low of $ 0.90 per share.

In response, the defendants filed motions to dismiss for failure to state a claim relying on four arguments: (1) the complaint does not plead with sufficient particularity the factual basis for their allegations of misrepresentation; (2) the alleged misleading statements are not actionable as a matter of law, because the PSLRA's safe harbor applies to their alleged misrepresentations  [*22] and the defendants had no duty to disclose the alleged

2009 U.S. App. LEXIS 7452, *

material omissions; (3) the facts pleaded do not give rise to a strong inference that the defendants acted with scienter; (4) the complaint fails to allege loss causation, i.e., a causal connection between the alleged misrepresentations and the stock's subsequent depreciation. On August 11, 2006, the district court "dismissed without prejudice" Lormand's complaint pursuant to *Rule 12(b)(6)* after ruling on three of the defendants' arguments.

The district court: (1) decided that plaintiff's SAC satisfied the particularity requirement; (2) decided that some of the alleged misrepresentations were not actionable as they were protected under the PSLRA's safe harbor provision; (3) pretermitted deciding whether, under the SAC's charges, the defendants had a duty to disclose the alleged material omissions in the misrepresentations; (4) pretermitted deciding whether plaintiff's SAC adequately alleged scienter; (5) decided that the SAC failed to sufficiently plead loss causation under *Rule 12(b)(6)*.

Plaintiff then requested leave to amend the complaint for a third time, but the district court denied leave to amend, concluding that any further [*23] amendment would be futile. Based on its decision that further amendment would be futile, the district court dismissed the case with prejudice. The plaintiff timely appealed.

2. Discussion

Private federal securities fraud actions are based on federal securities statutes and their implementing regulations. *Dura, 544 U.S. at 341. Section 10(b)* of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment]. . .of any. . .deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." *15 U.S.C. § 78j(b)*. Commission *Rule 10b-5* forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." *17 C.F.R. § 240.10b-5 (2004)*.

The courts have implied from these statutes and *Rule 10b-5* a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation. *Dura, 544 U.S. at 341* (citing *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 744, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976))*. [*24] Congress has imposed statutory requirements on that private right of action. *Id.*

In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements are: (1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss. *Id. at 341-42.*

In addition to pleading these basic elements, a plaintiff must also comply with the standards of the PSLRA, codified at *15 U.S.C. § 78u-4*. Among other things, the PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called "particularity" requirement. *15 U.S.C. § 78u-4(b)(1)*. The PSLRA also provides that a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*.

Only the last requirement alters [*25] the usual contours of a *Rule 12(b)(6)* ruling. Usually, under *Rule 12(b)(6)*, we must draw all reasonable inferences in the plaintiff's favor. However, for scienter only, as required by the PSLRA, "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 533 (5th Cir. 2008)* (citing *Tellabs, 127 S.Ct. at 2509*). "The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.'" *Id.* (quoting *Tellabs, 127 S.Ct. at 2510*).

In the present case, the defendants do not contend that the plaintiff's SAC fails to allege the basic elements of: a connection with the purchase or sale of a security, reliance or transaction causation, or economic loss. The defendants challenge only the SAC's allegations of actionable material misrepresentations or omissions, scienter, and loss causation. [6]

> 6   The district court concluded that plaintiff's pleadings satisfied the PSLRA's particularity requirement. The district court stated: "[c]onsidering plaintiff's detailed, 81-page second amended complaint and without weighing the substance [*26] of plaintiff's allegations, the Court finds the plaintiff has plead[ed] his claims with sufficient particularity." The defendants do not contend on appeal that plaintiff's complaint pleads with insufficient particularity. Considering the detail of the allegations, we agree with the district court that the complaint satisfies the particularity requirement.

**I. Pleading Material Misrepresentations and Omissions**.

*A. Specific allegations of misrepresentations and omissions.*

Cognizant of the strictures of the PSLRA and *Fed. R. Civ. P. 9(b)*, the plaintiff alleges that the defendants made twenty-four specific material misrepresentations and omissions in press releases, conference calls, interviews, and filings with the SEC, [7] as follows:

> 7   These documents are referenced and quoted in the complaint and/or attached as exhibits to the complaint.

1. On April 4, 2000, US Unwired filed a registration statement with the SEC promoting an initial public offering of its common stock, which included statements emphasizing the beneficial relationship between US Unwired and Sprint. It listed the benefits of its affiliation contract with Sprint, essentially its access to Sprint's marketing, national network, [*27] handset availability, traveling services, and technology.

2. The same April 4, 2000 filing also discussed US Unwired's rights under its contract with Sprint, including the possibility of selling US Unwired's business to Sprint or of buying a license from Sprint if Sprint breached the contract.

3. The same April 4, 2000 filing also discussed US Unwired's reliance on Sprint and its contract with Sprint, noting that US Unwired was dependent on Sprint and had to maintain a good relationship with Sprint or else its "business may not succeed."

The plaintiff alleges these statements were materially misleading because US Unwired was already embroiled in a bitter dispute with Sprint. Sprint had threatened to declare US Unwired in breach of its affiliation contract and had demanded that US Unwired either undertake ruinous costs to integrate its operations or become a Type II affiliate and thereby give up control of its operations. The defendants, through these factual misrepresentations and concealments, artificially inflated the stock price. Thus, On June 14, 2000, Credit Suisse First Boston initiated coverage of US Unwired with a "Buy" rating and a 2001 target price of $ 25, stating that "[s]imilar [*28] to other Sprint PCS affiliates, we believe US Unwired will benefit financially and strategically from its relationship with Sprint."

4. On August 9, 2000, US Unwired issued a press release announcing record record second quarter revenues for the period ending June 30, 2000. Piper publicly commented: "We had a very productive second quarter. Operationally, we launched Sprint PCS service in nine new markets and added 109 cell sites to the network. Our sales team brought 11,000 new PCS subscribers onto the system. Financially, we executed a successful public offering during a very difficult market."

5. On August 11, 2000, US Unwired filed with the SEC its Form 10-Q for the period ending June 30, 2000, which repeated the financial results reported in the August 9, 2000 press release and several of the positive statements from the April 4, 2000 registration statement concerning US Unwired's beneficial relationship with Sprint PCS.

The plaintiff alleges that these statements were materially misleading because the defendants failed to disclose and otherwise omitted that Sprint had intensified its pressure on US Unwired to convert to a Type II affiliate by threatening to declare it in default of the [*29] affiliation contract and giving it a deadline of August 31, 2000 to either convert or pay an exorbitant fee of up to $ 30 million to obtain access to Sprint systems. The stock price continued to be artificially inflated during this period. On September 6, 2000, First Union Securities issued a report on US Unwired, rating it as a "Strong Buy," and concluding that "US Unwired's affiliation with Sprint . . . coupled with its attractive market footprint, allows it to receive many of the benefits of a national wireless service provider . . . ." On October 2, 2000, Hibernia Southcoast Capital rated US Unwired a "Strong Buy" and concluded that "[a]s a network partner, [US Unwired] should be able to leverage its relationship with [Sprint], the fastest growing nationwide wireless provider, to grow its subscriber base faster than the industry average." On October 6, 2000, Morgan Keegan also reviewed favorably US Unwired's adoption of Sprint's "pricing strategies."

6. On November 8, 2000, US Unwired issued a press release touting the benefits of migrating customer care and billing functions to Sprint. US Unwired noted that the migration would "help [US Unwired] to more fully use [Sprint's] [*30] national sales efforts," "to capitalize on [Sprint's] successes," and "to achieve full network compatibility."

7. On November 9, 2000, US Unwired reported very good financial numbers and increased subscriptions. Piper publicly commented on the results noting that US Unwired had "executed [its] business plan."

8. On November 13, 2000, US Unwired filed its Form 10-Q. It disclosed the migration of customer and billing services to Sprint only insofar as it noted that US Unwired "amended [its] management agreements with" Sprint, and that Sprint "will begin providing substantially all of [US Unwired's] billing and customer care services."

The plaintiff alleges that these statements were materially misleading, because the defendants knowingly concealed that Sprint had forced them into the new Type II relationship that fundamentally altered US Unwired's business plan and its contractual relationship with Sprint.

The defendants knowingly concealed their knowledge that the transfer of control of US Unwired's billing and customer care -- a consequence of the affiliation conversion -- risked US Unwired's financial failure. On December 14, 2000, investor advisory company Johnson Rice said US Unwired [*31] was a buy, because it stood out among other wireless stocks due to its growth potential.

9. On January 17, 2001, US Unwired issued a press release reporting strong subscriber growth. Piper publicly commented that "US Unwired employees did a fantastic job in continuing to accelerate the expansion of [its] consumer base."

10. On February 22, 2001, US Unwired issued a press release touting its rapid growth in subscriptions. Piper commented that US Unwired "exceeded all the growth components of [US Unwired's] business model."

The plaintiff alleges that these statements are materially misleading because they ignored the known problems associated with the Type II conversion and omitted the known risks associated with conversion to its business model.

11. On March 26, 2001, US Unwired filed its Form 10-K Annual Report. It briefly reiterated without comment the fact that US Unwired had migrated billing and customer care functions to Sprint.

The plaintiff alleges that this statement was materially misleading, because it omitted the known risk associated with the forced migration of these functions to Sprint, and the magnitude of that risk, i.e., the certain or high potential for company failure.

12. [*32] On May 7, 2001, US Unwired issued a press release announcing large net subscriber additions. Piper praised the reduced churn rate in the release.

13. On May 8, 2001, US Unwired filed with the SEC its Form 10-Q stating that US Unwired had migrated billing and customer care functions to Sprint.

The plaintiff alleges that these statements were materially misleading, because they omitted disclosure of the company's forced conversion to Type II affiliation and the defendants' knowledge that US Unwired's loss of control of its customer care, billing and cash flow functions would be financially disastrous for the company.

14. On August 8, 2001, US Unwired issued a press release stating that "[o]ur outstanding operational performance and adherence to the sound fundamentals of our business plan over the last two years positioned us for the early achievement of [earnings before interest, taxes, depreciation, amortization, and non-cash compensation]."

15. [*33] Also on August 8, 2001, US Unwired filed with the SEC a Form 10-Q, which generally discussed the relationship with Sprint and the migration of billing and customer service operations, but omitted any specific discussion of risks and their magnitude.

16. On August 9, 2001, US Unwired hosted a conference call celebrating its positive earnings. Piper publicly noted that the conversion to Type II affiliation was "going quite well." First Union Securities reacted by labeling US Unwired as a "strong buy."

17. On November 8, 2001, US Unwired issued a press release that discussed the completion of the migration of customer service and billing operations to Sprint.

18. On November 8, 2001, US Unwired filed with the SEC its Form 10-Q. US Unwired noted that because Sprint was responsible for customer service and billing, it depended on Sprint for the "reporting of a significant portion" of US Unwired's "service and revenues and certain operating, selling, and administrative expenses."

The plaintiff alleges that these statements in the Form 10-Q and the press release were materially misleading, because members of US Unwired's management knew that the transfer of services was contentious, coerced, [*34] and would cause enormous problems. US Unwired would depend on Sprint for the reporting of revenue, costs, and subscriber data and thus, the transfer of these functions would be financially disastrous for US Unwired as it would lose control over its core functions. They omitted any mention of that known risk and the magnitude of that risk.

19. On March 5, 2002 US Unwired issued a press release noting significant gains in subscriptions and a churn rate of approximately 2.5%.

20. On March 5, 2002 US Unwired filed with the SEC its Form 10-K Annual Report for 2001. The report reiterated previous statements regarding the benefits associated with Sprint affiliation.

21. In the same 10-K Report, US Unwired disclosed new potential risks associated with Sprint affiliation, including possible adoption of business decisions not in US Unwired's best interests and the migration of customer service's possible effects on customer satisfaction.

22. On March 6, 2002, US Unwired hosted a conference call with investors. Piper touted the "very successful conversion to Sprint's billing and customer services." He noted that US Unwired management thought subprime credit class customers "are necessary to reach [*35] [US Unwired's] full market penetration potential and we think we can do it profitably."

The plaintiff alleges that these statements were materially misleading, because the US Unwired manage-

ment was aware that Sprint was forcing US Unwired against its will and business judgment to enlist low income and credit risky subscribers without deposits or credit checks; that, as the defendants knew from previous experience, this business strategy would be financially disastrous for US Unwired, given the demographics within its designated network areas; that the defendants continued to mislead the public regarding the viability of this strategy even as they received adverse financial information confirming their dire predictions in respect to the no-deposit programs; that Sprint forced US Unwired to turn over control of its critical core functions of customer care, billing, and cash-flow; and that management knew relinquishing control over those core functions would lead to financial disaster. Piper's comments in the public conference call misrepresented management's view concerning the migration of billing and customer services to Sprint and the compelled marketing of these plans to sub-prime [*36] credit class customers. Piper continued to tout the past success and potential for both the forced migration of its core functions and coerced implementation of the no-deposit programs.

23. On May 9, 2002, US Unwired reported favorable increases in subscriber growth in a press release, which Piper publicly attributed to US Unwired's "continued focus on operational excellence."

24. On May 9, 2002, US Unwired filed with the SEC its Form 10-Q. In this filing, US Unwired discussed its allowances for subscribers canceling their subscriptions and also the debt collections costs in its accounting disclosures. US Unwired also noted that these allowance estimates were consistent with "historical trends."

The plaintiff alleges that these statements were materially misleading, because these statements failed to disclose the defendants' certain knowledge from previous experience that the no-deposit programs would increase churn and bad debt because of US Unwired's subscribers' demographics; that subscriber growth figures were based on no-deposit subscribers who had a potential for high churn, and therefore were misleading; and that no-deposit programs would lead to higher costs caused by the increased [*37] churn and bad debt, and such costs would not be consistent with historical trends.

A reasonable person may draw the plausible inferences from the foregoing allegations that the defendants made the material misrepresentations and omissions as described above. The defendants do not dispute this conclusion; instead, the defendants contend that the alleged misrepresentations are not actionable because the representations are protected by PSLRA's safe harbor and, alternatively, the defendants were under no duty to disclose the omitted information.

*B. Safe Harbor.*

The defendants argue that certain of the misrepresentations and omissions were not actionable because they were "forward-looking" and subject to the "Safe Harbor" clause of the PSLRA; and that some of the omissions were not material because the defendants had no duty to disclose the omitted information.

Under the Safe Harbor clause, a "forward-looking" statement is not actionable if: (1) the statement is "identified as . . . forward-looking . . .and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially. . ."; (2) it is "immaterial;" or (3) "the plaintiff [*38] fails to [plead] that the forward-looking statement. . . was made with actual knowledge. . . that the statement was false or misleading." *15 U.S.C. § 78u-5(c)(1)(A-B); see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 371-72 (5th Cir. 2004)* (applying clause to securities fraud allegations). The district court applied the safe harbor provision to alleged misrepresentations 6 through 10. [8]

> 8   The district court pretermitted the safe harbor analysis for the rest of the claims based on the other misrepresentations because it ultimately dismissed them for failure to plead loss causation, which is discussed below.

As we noted earlier, the plaintiff's SAC alleges that US Unwired and the individual defendants misled the public by concealing from it material facts of which they were aware, viz., that Sprint was forcing US Unwired against its will and business judgment to enlist low income and credit risky subscribers without deposits or credit checks; and that, as the defendants knew from previous experience, this business strategy would be financially disastrous for US Unwired, given the demographics of its designated network areas. The plaintiff also alleges the defendants [*39] misrepresented to the public the nature of US Unwired's relationship with Sprint and concealed that Sprint had coerced US Unwired into a Type II affiliation, which enabled Sprint to force US Unwired to adopt the sub-prime credit class strategy and took away US Unwired's control over customer care, billings, and cashflow. The plaintiff alleges that the defendants also continued to mislead the public regarding the financially harmful nature of these programs and the affiliation conversion even as they received adverse financial information confirming their dire predictions.

Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations. *See 15 U.S.C. § 78u-5(c)(1)(A)-(B)* (noting that the "safe harbor" would apply only if "the plaintiff fails to [plead] that the forward-looking statement. . . was made with

actual knowledge. . . that the statement was false or misleading."); *Southland Sec. Corp., 365 F.3d at 371-72*.

The district court erroneously rejected this argument, stating that "beyond the blanket assertions by plaintiff that defendants   [*40] knew that these statements had already become false when they were made, the Court can find no other suggestions of this alleged fraud." The district court did not reach the issue of scienter in its opinion and provides no basis for its determination that the defendants did not know the statements were false as the plaintiff alleges. The district court is in error, because we must accept as true the well-pleaded factual allegations in the complaint during the pleadings stage. *See Twombly, 127 S.Ct. at 1965; Tellabs, 127 S.Ct. at 2509; Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 550 (5th Cir. 2007)*. The defendants do not defend this part of the district court's reasoning on appeal; instead they contend that the plaintiff fails to sufficiently plead scienter, and, for the same reasons, would lack actual knowledge. We address and reject this argument in the scienter section below.

Even if the plaintiff had failed to plead actual knowledge, the safe harbor provision still would not apply here, because the alleged misrepresentations are not accompanied by "meaningful cautionary language." *See 15 U.S.C. § 78u-5(c)(1)(A)(i)* (authorizing the application the safe   [*41] harbor only if forward-looking statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement").

The district court concluded that US Unwired's generic disclaimer that accompanied the forward-looking statements amounted to meaningful cautionary language. The disclaimer says that US Unwired's statements in its documents are "not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them." We disagree with the district court's conclusion, because the language urged here is boilerplate and does not qualify as meaningful cautionary language.

Congress clearly intended that boilerplate cautionary language not constitute "meaningful cautionary" language for the purpose of the safe harbor analysis. Private Securities Reform Act of 1995, Conference Report, H. Rep. No. 104-369 (1995), *reprinted in* Fed. Sec. L. Rep. (CCH) P 85,710, at 87,209 (1995); *Southland Sec. Corp., 365 F.3d at 372* ("The requirement for 'meaningful' cautions   [*42] calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.").

The disclaimer language cited by the district court is very similar to language we determined to be boilerplate and not meaningfully cautionary in *Plotkin v. IP Axess, Inc., 407 F.3d 690 (5th Cir. 2005)*. In *Plotkin*, we considered the following broad disclaimer found in a company's press releases to constitute boilerplate cautionary language: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results." *Id. at 694*.

The disclaimer in this case is similarly generic and formulaic, and, likewise, is also boilerplate and not meaningful cautionary language. As further evidence that the disclaimer is mere boilerplate, the disclaimer, only with slight variations, was used in conjunction with *each* alleged misrepresentation the district court exempted from analysis under the safe harbor provision.

The district court, in effect, granted blanket safe harbor protections for the statements, because   [*43] each was perfunctorily accompanied by essentially nothing more than the same boilerplate language.. The district court therefore erroneously neglected to address how each excluded statement (or portions of those statements) is specifically and meaningfully protected by the safe harbor. Each statement that benefits from the safe harbor must be addressed individually. *Cf. Southland Sec. Corp., 365 F.3d at 379* (examining an individual statement and concluding that "[w]hile this is a forward looking statement, it cannot be ascertained from the record whether it was accompanied by meaningful cautionary language"); *Kapps v. Torch Offshore, Inc., 379 F.3d 207, 215 n.11 (5th Cir. 2004)* ("[C]ourts must assess the communication on a case-by-case basis.") (quoting *In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993))*. Here, in not one instance did this generic language amount to "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances" specifically described in any of the alleged misrepresentation so as to constitute meaningful cautionary language. *See Southland Sec. Corp., 365 F.3d at 372*. The generic   [*44] language is merely a "litany of generally applicable risk factors" applied as boilerplate to every alleged misrepresentation the district considered to be protected under PSLRA's safe harbor. *Id*. The district court fell into legal error in its application of the safe harbor provision to misrepresentations 6-10.

Moreover, the defendants do not defend this part of the district court's analysis on appeal. Instead, the defendants point to different disclaimers in documents (attached as exhibits to the complaint) that contain the alleged misrepresentations and contend that those disclaimers meaningfully warn about or fully disclose the

potential specific risks allegedly omitted in the misrepresentations. The disclaimers they rely on provide:

(1) "Our agreements with Sprint PCS are central to our business plan . . . . These agreements give Sprint PCS a substantial amount of control over the conduct of our business. Sprint PCS may make decisions that adversely affect our business like setting the prices for its national plans at levels that may not be economically sufficient for our business."

(2) "We will rely on Sprint PCS's internal support systems, including customer care, billings and backoffice [*45] support, in some of our markets . . . . Problems with Sprint PCS's internal support systems could cause: delays or problems in our own operations or service[,] delays or difficulty in gaining access to customer and financial information[,] a loss of Sprint PCS customers[, and] an increase in the costs of customer care, billing and back-office services."

(3) "We currently have employees to handle billing, customer care, accounting, treasury and legal services in our markets where we currently offer PCS service and in most of our new markets. We believe that providing these functions ourselves is more cost-effective than having third parties provide them. In a limited number of markets, however, Sprint PCS will provide us on a contract basis with selected back office functions like billing and customer care. We anticipate that we may over time transfer control of these functions to Sprint PCS if Sprint PCS can provide them more cost effectively and efficiently than we can."

(4) "Changes in technology could adversely affect us . . . . If Sprint PCS changes its standard, we will need to change ours as well, which will be costly and time consuming. If we cannot change our standard, we may [*46] not be able to compete with other systems."

(5) "Each Sprint management agreement requires us to follow program requirements that are used throughout the nationwide Sprint PCS network. We must continue to follow these program requirements if Sprint PCS changes them. The program requirements involve . . . our participation in Sprint PCS distribution programs on a national and regional basis [and] adherence to Sprint technical program requirements . . . . We will comply with Sprint PCS's program requirements for technical standards, customer service standards, national and regional distribution, national accounts programs and traveling and inter-service area services. Sprint PCS can adjust the program requirements from time to time."

(6) "Our PCS business may suffer because more subscribers generally disconnect their service in the PCS industry than in the cellular industry . . . . We plan to keep our subscriber churn down by expanding network coverage, improving network reliability, marketing affordable plans and enhancing customer care. We cannot assure that these strategies will be successful. A high rate of PCS subscriber churn could harm our competitive position and the results of [*47] operations of our PCS services."

(7) "US Unwired is a leading proponent of prepaid products in the wireless industry. Industry experts believe that 70% of all new wireless activations will be prepay by 2002."

After surveying these warnings, and after drawing inferences in favor of the plaintiff, we conclude that the referenced precautionary language only warned the public that US Unwired's affiliation conversion may cause a limited, general, and vague risk to customer satisfaction and to US Unwired's independent discretion in business decisions in limited areas on a case-by-case basis. The cautionary language disclaimer (1) uses the phrase Sprint "may make decisions that adversely affect *our business*," (emphasis added) which is a very vague and general warning. Disclaimer (2) stated that "[p]roblems with Sprint[]'s internal support systems could cause" delays and costs to customer service, and disclaimer (5) represents that Sprint's contractual authority over US Unwired was both limited in scope ("can adjust the program") and limited temporally ("from time to time"). These disclaimers also limit the possible risk to certain areas, "delays and costs to customer service," with a limited [*48] temporal scope. These warnings did not disclose that defendants knew from past experience that the sub-prime subscriber programs and US Unwired's loss of control of customer care, billings and service posed an imminent threat of business and financial ruin and that some damage from these risks had already materialized. For example, cautionary language disclaimers (3) and (4) merely disclose the possibility of transferring functions to Sprint without disclosing any material risks.

As for the no-deposit program, US Unwired publicly stated that its management believed the program would generally succeed and was necessary. Cautionary language disclaimer (7) actually promotes an impression that the nodeposit programs, if considered to be a prepaid program, [9] was necessary. Cautionary language disclaimer (6) states that US Unwired's business "may suffer" as a result of churn, but also noted that they "plan to keep our subscriber churn down." This warning does not disclose the specific risks and their magnitude, such as the sub-prime subscriber programs' alleged certain grave threat to US Unwired's entire business, which it was powerless to control, caused primarily by severe churn and bad [*49] debt. Morever, warnings about the risks associated with the no-deposit programs were glossed over as a future risk of *limited* magnitude that would be

averted rather than certain dangers that had already begun to materialize.

> 9   The plaintiff states in his complaint that there is some confusion as to whether the no-deposit programs are "pre-pay programs." The plaintiff alleges in his complaint that the no-deposit programs were sometimes erroneously characterized as "pre-pay programs."

These warnings failed to correct the false impression created by the defendants' public statements or to supply the truth that they omitted, viz., that the defendants knew that the no-deposit programs and affiliation conversion threatened to severely harm the company financially by increasing churn and bad debt; that this insidious damage process had already begun; and that US Unwired was unable to contain it because its core operations had been transferred to Sprint. From the context of the alleged misrepresentations and drawing all inferences in favor of the plaintiff, these warnings, while somewhat specific, do not provide sufficiently meaningful caution about clearly present danger that was materializing. [*50] *See Rubinstein v. Collins, 20 F.3d 160, 167-68 (5th Cir. 1994)* (noting that alleged misrepresentations and cautionary language must be analyzed in context and the presence of cautionary language is not *per se* dispositive) ("Under our precedent, cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law."); *see also Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996), superseded on other grounds by statute as recognized in Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999)* (noting how the "surrounding context" failed to caution "against such an implication with sufficient clarity to be thought to bespeak caution"). Viewing all of the statements in context, we conclude that the defendants' safe harbor argument is without merit. The misrepresentations and omissions were not accompanied by specific, concrete explanations that clearly identified and quantified the clearly present financial dangers to US Unwired, i.e., the disastrous effects of the no-deposit programs and US Unwired's loss of control of customer care, billings and cash flow. [10]

> 10   Furthermore, many of the alleged misrepresentations, [*51] such as the statements in misrepresentations 6-10, are not necessarily "forward-looking," which is one requirement for safe harbor protection. *15 U.S.C. § 78u-5(c)(1)(A)*. In many of these statements, US Unwired's management discusses past events along with future projections, such as their recent "execution" of their business plan, recent efforts to migrate functions to Sprint, and the current state of their relationship with Sprint. *See 15 U.S.C. § 77z-2(i)(1)*

(defining "forward-looking" statements as statements that are projections about future financial status, future operations, and future economic performance).

Because "reasonable minds could ... disagree as to whether the mix of information in the [allegedly actionable] document is misleading," the statutory safe harbor provision cannot provide the basis for dismissal as matter of law. *Shaw, 82 F.3d at 1214* (citation omitted). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment [pursuant to *Rule 12(b)(6)*] that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly, 127 S.Ct. at 1969 n.8.* [11]

> 11   This [*52] does not foreclose the safe harbor's possible applicability in latter stages of these proceedings. *See Asher v. Baxter Int'l, Inc., 377 F.3d 727, 734 (7th Cir. 2004)* ("Thus this complaint could not be dismissed [at the pleading stage] under the safe harbor, though we cannot exclude the possibility that if after discovery [the defendant] establishes that the cautions did reveal what were, *ex ante*, the major risks, the safe harbor may yet carry the day.").

*C. Materiality - Duty to Disclose*. [12]

> 12   The defendants' argument focuses on whether they had a "duty to disclose" the omitted information as alleged. The defendants' argument is, in effect, an argument that the omitted information is not "material." *See Banc One Capital Partners Corp. v. Kneipper, 67 F.3d 1187, 1192 n.3 (5th Cir. 1995)* ("The issue of whether a fact is material as a matter of law will also turn on . . . whether the defendant has a duty to disclose."). The district court did not reach this argument.

"[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of [*53] information made available.'" *Basic v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* (quoting *TSC Indus. v. Northway, Inc.,, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*). Accordingly, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers. *Cf. Isquith ex rel. Isquith v. Middle S. Utils., Inc., 847 F.2d 186, 203 (5th Cir. 1988)* (noting that "emphasis and gloss can, in the right circumstances create liability" under *Rule 10b-5*).

The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action. *See Milton v. Van Dorn Co., 961 F.2d 965, 969-70 (1st Cir. 1992); see generally SEC v. Merchant Capital, LLC, 483 F.3d 747, 768-71 (11th Cir. 2007); Kowal v. MCI Commc'ns, 305 U.S. App. D.C. 60, 16 F.3d 1271, 1277 (D.C. Cir. 1994).* [13] Once the defendants engaged in public discussions concerning the benefits of Type II affiliation and the no-deposit programs, they had a duty to disclose a "mix of information" that is not misleading.

> [W]e have long held under *Rule 10b-5*, a duty to speak the [*54] full truth arises when a defendant undertakes a duty to say anything. Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction.

*Rubinstein, 20 F.3d at 170* (internal quotations and citations omitted).

> 13   For securities fraud cases, "[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact." *First Va. Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977).* Here, the disparity as pleaded is obvious. The plaintiff alleges the company misrepresented to the public the viability and promise of corporate actions that company officials knew would be disastrous.

As discussed earlier, the plaintiff sufficiently alleges that the defendants omitted serious risks inherent to the no-deposit initiatives and the company's conversion to Type II affiliation when they made statements regarding their benefits. They omitted known risks of severe magnitude, such as the known risk that long-term subscriber growth fueled by sub-prime credit class customers would almost certainly lead towards disaster. Their [*55] statements touting the benefits of US Unwired's conversion to Type II affiliation also omitted known risks of severe magnitude to their business plan as a result of the transfer of core services and customer billing to Sprint. Company officials publicly touted the migration of services and the use of no-deposit programs although they recognized signs that the dangers they privately predicted had already materialized (i.e., churn, bad debt, lack of independent control) and they had protested privately to Sprint regarding both actions; further, they continued to tout the programs and the conversion even after re-

instating deposits for certain customer areas. *See Rubinstein, 20 F.3d at 171* ("'To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'") (quoting *Huddleston v. Herman & MacLean, 640 F.2d 534, 543-44 (5th Cir. 1981)); id. at 170 n.41* ("[A]t least facially, it appears that defendants have a duty under *Rule 10b-5* to correct statements if those statements have become materially misleading in light of subsequent events."). [*56] We have also noted that:

> Perception of future events may take on a different cast as the future approaches, and, what is more important, later correspondence may act to bury facts previously disclosed. A balance once struck will not ensure a balance in the future. As new communications add a dash of recommendation, a pinch of promise, and a dusting of repetition, the scale may be tipped. To prevent an injustice to the shareholders, the elements must be weighed each time that the shareholders are requested (or encouraged) to make a new decision.

*Smallwood v. Pearl Brewing Co., 489 F.2d 579, 605-06 (5th Cir. 1974).*

Here, the total mix of information was misleading, because it was highly skewed toward the promised benefits of Type II affiliation and the marketing and subscriber growth fueled by the sub-prime credit classes. The defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized. These "omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Basic, 485 U.S. at 231-32.* [*57] [14]

> 14   The defendants rely on a Massachusetts district court opinion, *In re Boston Tech., Inc. Sec. Litig., 8 F. Supp.2d 43, 59 (D. Mass. 1998)* in arguing that the defendants had no duty to disclose those omitted future risks. In *Boston Tech*, the district court ruled that "[the defendant's] announcement is not alleged to have been false, and it strictly concerned the past. It is therefore not actionable. . . . An issuer is not obliged, when reporting past [] results, to inform the public that future [results] appear less rosy." *Id. at 61.* Lormand's complaint is distinguishable. Here, the al-

leged material omissions about future performance concern company statements that actually proffer misleading opinions regarding the promise and future performance of the no-deposit program, Type II affiliation, and the migration of company functions to Sprint. Unlike *Boston Tech*, the plaintiff alleges material omissions of known risks in future performance in relation to representations that actually concern the future and do not just describe the past.

The defendants also argue that the alleged misrepresentations are mere "puffery." Statements "are non-actionable puffery [if] they are 'of the vague [*58] and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation.'" *Southland Sec. Corp., 365 F.3d at 372* (ellipsis in original) (quoting *Lain v. Evans, 123 F. Supp.2d 344, 348 (N.D. Tex. 2002))*. We reject the defendants' argument, because the plaintiff alleges concrete factual and material misrepresentations and omissions concerning statements that discuss the very specific benefits of the no-deposit programs and Type II affiliations; these alleged misrepresentations and omissions are not "vague" or "generalizations" and therefore cannot be considered mere "puffery." *See Nathenson v. Zonagen Inc., 267 F.3d 400, 419 (5th Cir. 2001)*.

The defendants argue that their internal discussions regarding the inevitable failure of the no-deposit initiatives and Type II affiliation constituted solely their own personal (and dissenting) beliefs that need not be disclosed to the public. *See Cooperman v. Individual, Inc., 171 F.3d 43, 51 (1st Cir. 1999)* ("[D]isclosure of the business strategy supported by the majority of the Board did not obligate defendants also to disclose the fact that [the dissenter] -- a distinct minority of [*59] a multimember Board -- opposed that strategy."). We disagree. Unlike the situation in *Cooperman*, the plaintiff here alleges that the entire management team of the company knew that disastrous effects would result from no-deposit initiatives and Type II affiliation. Accepting all alleged facts as true and drawing all inferences in favor of the plaintiff, a reasonable person could infer that the alleged views were neither an "isolated" nor a minority viewpoint. *See id. at 51 & n.12* (noting that the Cooperman complaint "makes clear that [the dissenter] was 'isolated' in his views regarding the strategic direction the Company should take."). Accordingly, we reject the defendants' arguments that they had no duty to disclose the truth underlying their misleading statements pertaining to the no-deposit programs and the company's loss of control of its customer care, billing and cash-flow functions.

## II. Pleading Scienter or Wrongful State of Mind

At trial, a plaintiff alleging fraud in a § 10(b) action must prove her case, including the element of scienter, by a preponderance of the evidence. *Tellabs, 127 S.Ct. at 2513*. That is, "she must demonstrate that it is more likely than not that the [*60] defendant acted with scienter." *Id.* (citing *Herman v. MacLean v. Huddleston, 459 U.S. 375, 390, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983)*(emphasis in original)). At the pleading stage, however, a plaintiff alleging fraud in a § 10(b) action must only "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Id.* (emphasis in original).

Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," *Tellabs, 127 S.Ct. at 2508* (quoting *15 U.S.C. § 78u-4(b)(1)*); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.*(quoting *15 U.S.C. § 78u-4(b)(2)*). In the instant case, the District Court held that the plaintiff met the first of the two requirements: The complaint sufficiently specified that the defendants alleged misleading statements or omissions and the reasons why they were misleading; and the defendants have not challenged that holding on appeal. But the district court pretermitted [*61] whether the plaintiff, as required by *15 U.S.C. § 21D(b)(2)*, "state[d] with particularity facts giving rise to a strong inference that [the defendants] acted with [scienter]," *§ 78u-4(b)(2). See Tellabs, 127 S.Ct. at 2508*. Because the defendants presented arguments on this issue both here and below, we now address it *de novo*.

"The required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness." *Ind. Elec. Workers' Pension Trust, 537 F.3d at 533* (internal quotations omitted). [15] In addition to accepting all of the factual allegations in the complaint as true, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, 127 S.Ct. at 2509* (citing 5B WRIGHT & MILLER § 1357 (3d ed. 2004 and Supp. 2007)). The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Id.* (citing [*62] *Abrams v. Baker Hughes Inc., 292 F.3d 424, 431 (5th Cir. 2002)*; *Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002))*. "Allegations of circumstantial evidence

justifying a strong inference of scienter will suffice." *Goldstein v. MCI WorldCom, 340 F.3d 238, 246 (5th Cir. 2003).*

> 15   In *Tellabs*, the Supreme Court stated that "[t]o establish liability under § 10(b) and *Rule 10b-5*, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *127 S.Ct. at 2507* (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94, 96 S. Ct. 1375, 47 L. Ed. 2d 668 & n. 12 (1976)).* But the Court also noted that it had previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and *Rule 10b-5, id. at 2507 n.3,* and recognized that every Court of Appeals that has considered the issue has held a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required. *Id.* (citing *Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 344 (4th Cir. 2003)*) (collecting cases).

Further, in determining whether the pleaded [*63] facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. In § 21D(b)(2), Congress did not merely require plaintiffs to provide a factual basis for their scienter allegations from which an inference of scienter rationally could be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a "strong" -- *i.e.*, a powerful or cogent -- inference. [16] *Tellabs, 127 S.Ct. at 2510.* However, it "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* (internal quotation marks and citations omitted). "To qualify as 'strong' within the intendment of § 21D(b)(2), . . . an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id. at 2504-05.*

> 16   The Court elaborated that "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative. . . ." *Tellabs, 127 S.Ct. at 2510* (footnote and internal citations omitted).

Reviewing the issue *de novo*, we conclude that the plaintiff satisfied the PLSRA's requirement [*64] that he state with particularity facts giving rise to a strong inference that the defendants acted with scienter or the required state of mind; that is, the plaintiff's SAC survives the Rule 12(b)(6) motion for dismissal because, when the allegations are accepted as true and taken collectively, a reasonable person would deem the plausible inference of scienter cogent and at least as strong as any opposing inference one could draw from the facts alleged. *See id. at 2510-11.*

The plaintiff's SAC alleges that the defendants acted with scienter or the required state of mind, i.e., intentionally or with severe recklessness, in respect to two principal types of misrepresentations or omissions of material facts. First, the defendants knew at the time of their public statements to the contrary that US Unwired's offering of no-deposit and ClearPay programs to lower income and credit risky subscribers had been forced on US Unwired by Sprint, would not be beneficial to US Unwired, and would almost certainly lead to the company's severe economic harm or disaster. Second, the defendants knew at the time of their public statements to the contrary that US Unwired's conversion to a Sprint Type II affiliate [*65] had been coerced by Sprint, that the conversion would not be beneficial to US Unwired, that it entailed US Unwired's loss of control of its customer care, billing and cash flow functions, which had been key to US Unwired's prior business and financial success, and that it would and did severely hamper US Unwired's ability to cope with the disastrous effects of the no-deposit and ClearPay programs that Sprint forced on the company. When these allegations are accepted as true and taken collectively, we conclude that a reasonable person would deem the plausible inference of the defendants' scienter to be cogent and at least as strong as any opposing inference.

Contrary to their public statements applauding US Unwired's conversion from a Type III to a Type II Sprint affiliate, Piper and Henning contemporaneously but privately admitted repeatedly, as quoted and referenced in the pleadings, that US Unwired's management disapproved and strongly protested to Sprint against US Unwired's conversion to Type II affiliation. Most importantly, Henning drafted a long memo to US Unwired's Board in July of 2000 in which he predicted in detail the detrimental impact on the company should the Board decide [*66] to switch to Type II affiliation and thus cede control of billing and customer service operations to Sprint. He wrote, as quoted in the complaint, that "[t]he heart of our system is the billing system. To remove the heart from our system and make a transplant to Sprint billing would have a devastating effect on our subscribers and employees." The plaintiff also alleges that the US Unwired's corporate comptroller immediately recognized the detrimental effects on US Unwired's finances after switching to Type II affiliation -- US Unwired lost control over the billing system and control over its cashflow. In later admissions as alleged, Piper confirmed that the management recognized these clearly present dangers at the time of their alleged misrepresentations.

The SAC's allegations also give rise to a strong inference that the defendants acted with scienter in concealing their knowledge that US Unwired's use of the no-deposit programs in its demographic areas would inevitably be severely harmful or disastrous economically for the company. The complaint alleges that the defendants predicted publicly that US Unwired's use of the no-deposit programs would bring it long-range benefits and success, [*67] even though they knew the programs were a colossal mistake and would be economically disastrous for the company. As alleged, Piper and Vaughn testified that from the beginning, and at the time US Unwired's management made the foregoing public misrepresentations and omissions, they had privately protested against Sprint's assumptions and projections regarding the no-deposit plans. As quoted in the complaint, Piper testified that Sprint "ignored our pleas not to require [US Unwired] to offer it." In a January 14, 2002 email from Piper to Sprint and US Unwired representatives, as quoted in the complaint, he stated that "we have never approved of eliminating the deposit." Plaintiff quotes from corporate documents in his complaint indicating that US Unwired's managers misrepresented or concealed the truth because they knew that the no-deposit program would be harmful rather than beneficial to US Unwired. Piper noted in an August 2, 2001 letter to Clint Slusher, Sprint's Director of Affiliate Management, that the no-deposit program produced "unacceptable and inconclusive results" for US Unwired in test trials. In that same letter discussing the test trials result, "Piper warned that, by [*68] adding so many [nodeposit] subscribers, the Company expected 'high churn rates and bad debt percentages' would cause 'our business plan [to] fail[].'" Piper also stated in the letter that, if forced to take such subscribers, US Unwired "will do all [it] can to limit the appeal of [the no-deposit program]." In an internal email to US Unwired executives, including Vaughn, on August 7, 2001, Piper stated his belief that "it is critically important to stop the sale of [the no deposit program] immediately" because "[the no deposit program]. . . has the potential for double-digit churn . . . ." The plaintiff also alleges that in early 2002, a former Director of US Unwired had a conversation with Piper wherein they agreed that US Unwired needed to "sell to quality customers" and not just focus on the quantity of subscribers, an ongoing problem with Sprint's no-deposit initiative that was aimed at creating subscriber growth with sub-prime credit class customers. In an email shortly after the class period, as quoted in the complaint, CEO Piper recounted the management's beliefs at the time of the roll-out of the no-deposit program. He wrote in a private October 2002 email to Tom Mateer, Sprint's [*69] Vice President of the Affiliations group, that:

US Unwired finds itself in a precarious position today. Our growth rate has declined to almost zero, our churn and bad debt lead the industry, our free cash flow timeline has been pushed out indefinitely, and our stock and bonds are perceived to be virtually worthless. This is exactly the business environment US Unwired (USU) predicted it would be in when Sprint rolled out NDASL. USU's plea with Sprint not to offer NDASL fell on deaf ears.

The current pleadings sufficiently establish a compelling inference of scienter that the defendants knew at the outset the no-deposit initiatives and the affiliation conversion would be detrimental to the company and that they intentionally made contrary public representations and omitted this material information from their public disclosures. The defendants contend the pleadings support a competing inference that while the defendants knew about the problems with the no-deposit programs and the affiliation conversion, they did not intend to deceive the public because they believed the information was not material or otherwise subject to public disclosure. The defendants' argument does not accurately [*70] reflect the plaintiff's allegations because: (a) based on our materiality discussion, the alleged omissions would have "been viewed by the reasonable investor as having significantly altered the "total mix" of information made available" and therefore was material, *Basic, 485 U.S. at 231-32* (citation omitted); and (b) the plaintiff clearly alleges the defendants had direct knowledge and vociferously protested the affiliation conversion and no-deposit programs privately while they touted them positively in public.

In the exhibits to his complaint, the plaintiff provides numerous contemporaneous documents, such as internal emails and memos, that support a strong inference that the defendants had a wrongful state of mind at the time of their representations. The plaintiff also provides admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails). The contemporaneous documents and post-period admissions both consistently tell the same story: the defendants privately knew, at the time of the representations, that the no-deposit programs and Type II affiliation conversion [*71] would be disastrous for the company but continued to tout their benefits publicly.

Contrary to the defendants' argument, the plaintiff's partial reliance on alleged facts dating from the post-

class period does not amount to "fraud by hindsight"; that is, it does not "infer[] earlier knowledge based only on the situation that later came to pass." *Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007).*

> This is not the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly. Nor is this a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later.

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 91 (1st Cir. 2008)* (internal citation omitted); *see also ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 62 (1st Cir. 2008)* (applying "fraud by hindsight" because "[t]here is nothing in the amended complaint to establish that the defendants were aware of facts, at the time they made their predictions, that would have made those predictions unreasonable, if they were unreasonable").

Here, [*72] the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn out badly. *Cf. Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1020 n.4 (5th Cir. 1996).* Here, "[t]he plaintiff['s] claim, then, was neither one of second-guessing decisions by management nor one alleging fraud by hindsight because the plaintiffs had identified specific facts known to the defendants that had been omitted . . ." *United States v. Morris, 80 F.3d 1151, 1164 (7th Cir. 1996)* (internal quotations and citations omitted).

The inference of intentional deception is, at the very least, equally as compelling as any alternative inference, and a tie favors the plaintiff. [17] *Tellabs, 127 S.Ct. at 2510* ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and *at least* as compelling as any opposing inference one could draw from the facts alleged.") (emphasis added).

> 17  Because the allegations of direct knowledge sufficiently support a compelling [*73] inference of scienter even in absence of insider trading, we need not address the plaintiff's allegations of insider trading and company acquisitions with stock sale revenues that may bolster this inference, see *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc., 497 F.3d 546, 552-53*

*(5th Cir. 2007)* ("Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts."); *Rothman v. Gregor, 220 F.3d 81, 93-95 (2d Cir. 2000).*

## III. Pleading Loss Causation

### A. Legal Standards

The PSLRA provides that a private plaintiff who claims securities fraud has the burden of proving that the defendant's fraudulent act or omission caused the loss for which the plaintiff seeks to recover. [18] The PSLRA does not, however, specifically answer the question of what must a plaintiff allege in a complaint in order to plead the "loss causation" element of such a claim for relief. The Supreme Court, in *Dura*, rejected the Ninth Circuit's answer to this question and identified the basic principles of pleading loss causation under *Federal Rule of Civil Procedure 8(a)(2). 544 U.S. at 345-46.* Later, in *Twombly*, the Court, partially relying on *Dura*, decided [*74] that *Rule 8(a)(2)* implies a "plausibility" standard that any complaint must meet in order to state a claim for relief. *127 S.Ct. at 1965.* Both *Dura's* and *Twombly's* reading of what *Rule 8(a)(2)* requires must be applied here to determine whether the plaintiffs pleading of loss causation is sufficient.

> 18  *15 U.S.C. § 78u-4(b)(4)* provides: "Loss causation. In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."

In *Dura*, the Ninth Circuit held that in a fraud-on-the-market case plaintiffs can satisfy the "loss causation" pleading and proof requirements simply by alleging in the complaint and subsequently proving that "the price" of the security "on the date of purchase was inflated because of the misrepresentation." *Broudo v. Dura Pharms., Inc.., 339 F.3d 933, 938 (9th Cir. 2003).* The Supreme Court reversed, holding that the Ninth Circuit was wrong, both "[1] in respect to what a plaintiff must prove and [2] in respect to what the plaintiff's complaint here must allege." *544 U.S. at 338.*

Rather, to *prove* loss causation [*75] in such a case, the Court in *Dura* held, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id. at 342.* Based on logic, precedent and the common law roots of the securities fraud action, the Court concluded that the federal securities statutes and regulations "permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id. at 346.* In other words, the federal laws

require "that a plaintiff prove that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Id*. In order to establish this proximate causation, the plaintiff must *prove* that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss. *Id. at 342, 346*.

The *Dura* Court's articulation of the proof of loss causation requirement in a private securities fraud-on-the-market case is very similar to that adopted by this court prior to *Dura in Greenberg v. Crossroads Systems, Inc., 364 F.3d 657, 666 (5th Cir. 2004)*. [*76] [19] The only difference, if any, is that in *Greenberg*, we required the plaintiff to prove that the truth that emerged was "related to" rather than "relevant" [20] to the defendants' fraud and that the same truth proximately caused the depreciation in price and plaintiff's economic loss. [21] *Compare Dura, 544 U.S. at 342 with Greenberg, 364 F.3d at 666*.

[19]   In reviewing a summary judgment, rather than a Rule 12(b)(6) dismissal, we described in detail in *Greenberg* what a plaintiff must *prove* on the merits in respect to "loss causation" to recover on a securities fraud claim. We held that:

[I]n order for plaintiffs to show that a stock's price was actually affected through evidence of a significant price decrease following the revelation of the alleged "truth" of earlier false statements, plaintiffs must demonstrate: (1) that the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.

*Greenberg, 364 F.3d at 666*.
[20]   "Relevance" may require [*77] more than "relatedness," but even if it does, neither are steep or difficult standards to satisfy. At most, "relevance" here may require something similar to the evidentiary "relevance" test, i.e., that the truth disclosed must simply make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true). *Cf. FED.*

*R. EVID. 401* ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").
[21]   Prior to *Greenberg*, we had said that the plaintiff was only required to prove that the defendant's misrepresentation "touches upon the reasons for the investment's decline in value." *Huddleston, 640 F.2d at 549*. That test was expressly overruled by *Dura. See Dura, 544 U.S. at 343*.

From the requirements for the "proof" of loss causation, the *Dura* Court reasoned, for a plaintiff's complaint to adequately *allege* or *plead* these requirements, it need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," pursuant to *Federal Rules of Civil Procedure 8(a)(2)*, [*78] and provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *544 U.S. at 346* (citing *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80(1957)*). In *Dura*, the complaint was held to be inadequate because the plaintiffs merely alleged they "paid artificially inflated prices for Dura['s] securities and suffered damage[s]." *Id. at 347*. On the other hand, the Court indicated that the pleadings would have been adequate if they had "claim[ed] that Dura's share price fell significantly after the truth became known," *id*., or had otherwise "provid[ed] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]" Id. The Court further indicated that ordinary pleading rules are not burdensome but call "for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. The Court observed that "allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would . . . [permits] the routine filing of lawsuits [*79] . . . with only [a] faint hope that the discovery process might lead eventually to some *plausible cause of action*. . . .rather than [a lawsuit based on] a *reasonably founded hope* that the [discovery] process will reveal relevant evidence." *Id*. (emphasis added) (internal quotations omitted). [22]

[22]   The Court cited the following sources for the concept of weeding out claims 22 ms that fail to show "reasonably founded hope" of leading to a "plausible cause of action": (1) *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)*("The potential for possible abuse of the liberal discovery provisions . . . may likewise exist in this type of case to a greater extent than they do in other litigation. . .

. [T]o the extent that it permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit."); and (2) the PSLRA's legislative history as reflected in H.R. Conf. Rep. No. 104-369, p. 31 (1995) (criticizing "abusive" practices including [*80] "the routine filing of lawsuits . . .with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action").

Subsequently, in *Twombly*, the Court drew upon the "reasonably founded hope" and "plausible cause of action" requisites alluded to by *Dura* to formulate a "plausibility" [23] standard that a complaint must satisfy in order to show that the pleader is entitled to relief under *Rule 8(a)(2)*: [24] The complaint (1) on its face [25] (2) must contain enough factual matter [26] (taken as true) (3) to raise a reasonable hope or expectation [27] (4) that discovery will reveal relevant evidence of each element of a claim. [28] "Asking for [such] plausible grounds to infer [the element of a claim] does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]." *Twombly, 127 S.Ct. at 1965* (emphasis added).

[23]  In discerning the "plausibility" standard from *Rule 8(a)(2)* 23 and general pleadings jurisprudence, the *Twombly* Court explicitly disavowed and "retired" the oft-quoted statement in *Conley, 355 U.S. at 45-46*: the generally "'accepted [*81] rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief.'" *127 S.Ct. at 1968-69* (quoting *Conley, 355 U.S. at 45-46*) (emphasis added).

[24]  Though *Twombly* is an anti-trust case, it interprets *Rule 8(a)(2)* and how it applies generally. *See infra* note 29.

[25]  *Twombly, 127 S. Ct. at 1974*.

[26]  The *Twombly* Court cites to 5 C. WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202, at 94, 95 (3d ed. 2004), which states that *Rule 8(a)* "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it." *See Twombly, 127 S.Ct. at 1965 n.3*.

[27]  The *Twombly* Court stated "[f]actual allegations must be *enough to raise a right to relief* above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *127 S.Ct. at 1965*. (emphasis added). The *Twombly* Court quotes Wright and Miller for support. See *127 S.Ct. at 1965* (quoting 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, [*82] pp. 235-36 (3d ed. 2004) ("[T]he pleading must contain something more. . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")(citing some sixty-four federal court of appeals and district court cases for this proposition)).

[28]  The *Twombly* Court referred to *Dura* when it concluded that with its "plausibility" pleading standard, "[the Court] can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence.'" *127 S.Ct. at 1967* (quoting *Dura, 544 US at 347* (quoting *Blue Chip Stamps, 421 U.S. at 741*)).

Although *Twombly* provides new insight into *Rule 8(a)(2)* by reading the Rule as implying a "plausibility" standard, it merely explicates, rather than alters, the meaning of the Rule. *See Twombly, 127 S.Ct. at 1964-65, 1973 n.14*. [29]

[29]  The *Twombly* Court pointed out that its "plausibility" standard is not a heightened pleading standard beyond what the Federal Rules of Civil Procedure had always required. *Twombly, 127 S.Ct. at 1973 n.14*. Changes to general pleading requirements "can only be accomplished 'by the process of amending the Federal [*83] Rules, and not by judicial interpretation.'" *Id*. (quoting *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)). Twombly's* merger of the "plausibility" standard with the general pleading jurisprudence and the Federal Rules indicates that it is a gloss on *Rule 8(a)(2)*, and therefore generally applies to all complaints. *See generally Iqbal v. Hasty, 490 F.3d 143, 157-58 (2nd Cir. 2007)* (describing the standard as a "flexible plausibility standard" of general applicability to all areas of law) (applying *Twombly* to a *Bivens* claim). We have applied the "plausibility" standard to many different areas of the law. *See, e.g., Lane v. Halliburton, 529 F.3d 548, 557 (5th Cir. 2008)* (state law fraud and other tort claims); *Cuvillier, 503 F.3d at 401 (§ 1983* suit). Other circuits have applied *Twombly* to securities cases. *See, e.g., N.J. Carpenters*

*Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 44 (1st Cir. 2008); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 & n.2 (2d Cir. 2007) (applying the "plausibility" standard to securities fraud cases).

In the present case, from *Dura's* holding about the need to allege and prove proximate causation and economic loss, as well as [*84] *Twombly's* explanation of the plausibility standard, we conclude that *Rule 8(a)(2)* requires the plaintiff to allege, in respect to loss causation, a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss, see *Dura, 544 U.S. at 342*; or, as *Twombly* indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation. *127 S.Ct. at 1965*.

B. Application to the Plaintiff's Second Amended Complaint

Applying these principles to the plaintiff's second amended complaint, we conclude that it sufficiently alleges loss causation in respect to a certain number, but not all, of the alleged misrepresentations. The plaintiff's second amended complaint (SAC) alleges the following:

i. *Background*

Beginning on or about May 12, 2001, Sprint made a concerted nationwide effort to target lower income and credit [*85] risky subscribers as a way to fuel subscriber growth and increase its national market share. Specifically, Sprint, through its affiliates, began to offer no-deposit (service without requiring deposits) and ClearPay (service without credit checks) programs. It is reasonable to infer from the alleged facts that consumers, analysts, and investors had knowledge of the Sprint affiliates' enrollment of lower income and credit risky subscribers nationwide without the requirement of deposits or credit checks during the class period.

The defendants privately knew from previous experience that the no-deposit and ClearPay programs would prove to be a colossal mistake for Sprint and its affiliates because of their propensity to produce excessive churn and bad debt, and that the programs would be particularly devastating for US Unwired because of the high percentage of lower income and credit risky potential subscribers in its designated service areas. The defendants privately warned Sprint of these dangers but intentionally concealed this material information from the market. Ultimately, the negative impacts of the no-

deposit and ClearPay programs were financially devastating to both Sprint and [*86] its affiliates, including US Unwired.

Because Sprint's no-deposit and ClearPay programs initially created subscriber and revenue growth, and, because the defendants concealed from the market the harmful effects they would cause to US Unwired by increased churn and bad debts, the defendants' material omissions of these facts caused US Unwired's stock prices to artificially inflate. During the class period the market for US Unwired's stock was an efficient market for the reasons set forth in detail in the SAC. As a result, the market for the stock digested information regarding US Unwired from all publicly available sources and reflected this information in the stock prices. Thus, the plaintiff unknowingly bought US Unwired stock at fraudulently and artificially inflated prices.

ii. *The pertinent actionable misrepresentations.*

Throughout this period, US Unwired issued positive statements related to the no-deposit and ClearPay programs, *i.e.*, misrepresentations 12, 14, 19, 22-24 as discussed earlier. US Unwired (1) issued press releases noting significant gains in subscriptions and a low churn rate; (2) hosted a conference call with investors touting the "very successful conversion to Sprint's [*87] billing and customer services" and that sub-prime credit class customers "are necessary to reach [US Unwired's] full market penetration potential and we think we can do it profitably"; (3) issued reports of favorable increases in subscriber growth attributed to US Unwired's "continued focus on operational excellence" and praised its "adherence to the sound fundamentals of our business plan"; and (4) an SEC filing concluding that allowances for subscribers canceling their subscriptions and also the debt collections costs were consistent with "historical trends." As we noted in our discussion of materiality, these representations omitted material information that distorted the mix of information presented.

iii. *Leaking of the truth*

When the truth about the artificial inflation of US Unwired's stock leaked out or made its way into the marketplace, its revelation caused the stock price to drop significantly. As a result of the revelation of the truth, and the corresponding decline in the US Unwired stock, the investors who bought the stock during the class period were proximately caused to suffer actual economic loss. Specifically, the plaintiff's SAC alleges that the truth about the inflation [*88] of US Unwired's stock leaked out or made its way into the marketplace through a series of disclosures: On June 6, 2002, shares of US Unwired's common stock fell from an opening high of $ 4.94 to a low of $ 3.69 in response to a warning issued by AirGate PCS, another Sprint affiliate, that it would

2009 U.S. App. LEXIS 7452, *

not meet its subscriber growth forecast due to the reinstatement of the deposit requirement for its ClearPay customers. On June 13, 2002, several analysts downgraded their ratings of US Unwired and industry participants. For example, Morgan Keegan & Company issued a report downgrading US Unwired "due to continued industry uncertainties surrounding growth and profitability." Similarly, J.P. Morgan Securities issued a report "downgrading US Unwired to Market Perform from Long Term Buy after Sprint PCS drastically reduced guidance for 2Q02 net adds." [30] On or about June 21, 2002, Moody's Investor Service placed the ratings for Sprint affiliates, including US Unwired, on review for possible downgrade and changed its outlook on the entire wireless industry to negative. On July 19, 2002, US Unwired issued a press release revealing that during 2Q02 it added 19,600 subscribers and 24,000 post-pay [*89] customers, and its churn for post-pay customers was up to 3.4%. On August 13, 2002, Piper in a US Unwired press release revealed that: "Historically, demand for new wireless services has been weak in our markets during the second quarter. This year, that softness was compounded as we curtailed demand by requiring a deposit from credit-challenged customers in our southern markets and experienced high involuntary disconnects in our sub-prime credit classes." On August 13, 2002, US Unwired's Form 10-Q filed with the SEC stated: "Churn was 3.4% for the three-month period ended June 30, 2002 compared to 2.2% for the three-month period ended June 30, 2001. The increase is due to adding a higher number of credit challenged subscribers in 2002 that elected voluntarily to not continue using our service or that were involuntarily terminated from using our service because of non-payment." At the end of the day on August 13, US Unwired's stock price fell to $ 0.90.

[30]   "Net adds" is defined as "[t]he number of new subscribers, or gross adds, minus the number of customers that drop service, which is called *churn*. Though this term can be used in many different contexts, it is frequently used in the [*90] telecom industry." BARBARA J. ETZEL, WEBSTER'S NEW WORLD FINANCE AND INVESTMENT DICTIONARY 222 (2003) (emphasis in the original).

*iv. Relationship Between the Misrepresentations, the Truth, and the Loss*

These alleged disclosures of relevant truth concern only subscriber growth and the sub-prime credit marketing strategy. We therefore agree with the defendants that the plaintiff fails to allege any disclosure that relates to US Unwired's conversion to Type II affiliation or the transfer of core functions to Sprint. Although the plaintiff sufficiently alleges that the defendants made material

misrepresentations and omissions about the dangers inherent in US Unwired's conversion to Type II affiliation and the transfer of its core functions to Sprint, none of the SAC's alleged disclosures plausibly suggests that a significant part of the stock price's decline and plaintiff's consequent economic loss was caused by a revelation of truth about that conversion or transfer. Accordingly, we conclude that the plaintiff's allegations are not sufficient to provide the defendants with notice of the plaintiff's loss causation theory in respect to the affiliation conversion and the transfer of core [*91] functions claims and thereby fails to plead loss causation in respect to those claims. For this reason, we have limited the "loss causation" discussion to only alleged misrepresentations related to subscriber growth and the sub-price credit marketing strategy.

Combined with the allegations of the facts that the defendants knew that the no-deposit and ClearPay programs would be disastrous for US Unwired, but intentionally omitted and concealed those facts from the market, the alleged series of disclosures that revealed the suppressed truth, at first partially but ultimately in full, satisfies *Twombly's* plausibility standard by giving rise to a reasonable expectation that discovery will lead to further evidence of loss causation. As *Dura* recognizes, a plaintiff may recover under § 10(b) by pleading and proving that the relevant truth "leak[ed] out" and "ma[de] its way into the marketplace" if all the other elements are satisfied. *See Dura*, 544 U.S. at 342. Thus, loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation. [31]

[31]   The courts that have [*92] confronted this issue acknowledge the possibility that loss causation may be pleaded on a theory of partial disclosures. *See, e.g., Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 n.6 (9th Cir. 2008); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026-27 (9th Cir. 2005); *In re Bradley Pharms. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D. N.J. 2008) (citation omitted); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 2008 WL 3884384, at *14 (S.D. N.Y. 2008) (unpublished) ("It is also clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events."); *In re Motorola Sec. Litig.*, 505 F. Supp.2d 501, 533 (N.D. Ill. 2007); *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp.2d 729, 746 (N.D. Ill. 2006); *In re Apollo Group, Inc. Secs. Litig..*, 509 F. Supp. 2d 837, 845, 847 (D. Ariz. 2007); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 & n.9

*(D. D.C. 2006)* (citing more cases); *Greater Penn. Carpenters Pension Fund v. Whitehall Jewellers, Inc., No. 04-C-1107, 2005 U.S. Dist. LEXIS 12971, 2005 WL 1563206 (N.D. Ill. June 30, 2005)* (crediting as "partial disclosures of prior misrepresentations and omissions" the company's [*93] issuance of a press release announcing a lawsuit, a SEC and a DOJ investigation against the defendants); *In re Vivendi Universal S.A., 2004 U.S. Dist. LEXIS 7015, 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004)* (unpublished) (finding loss causation adequately pleaded when a complaint alleged that a series of corrective disclosures was followed by a material price decline, and the price decline was attributable to the series of corrective disclosures).

Plausibly, the series of disclosures here began with the revelation that AirGate, a sister Sprint affiliate in substantially the same business, a company in substantially the same business as US Unwired, and having substantially the same relationship with Sprint as US Unwired, had been seriously damaged by the same sub-prime customer programs implemented by US Unwired and consequently had been forced to terminate those programs and reinstate the deposit requirement for its ClearPay or sub-prime credit class customers. The AirGate disclosure provided the initial indication to the market that the nationwide programs aimed at the sub-prime credit-class market had failed and caused severe damage to one Sprint affiliate.

The AirGate disclosures were soon followed by partially [*94] revealed truth from disclosures regarding Sprint's drastically reduced guidance for 2Q02 net adds. Sprint's reduced guidance gives rise to a plausible inference that highly elevated churn rates caused by the nation-wide sub-prime customer programs that Sprint implemented through its affiliates had severely infected its entire network system.

Following these disclosures, expert stock analysts considered downgrading US Unwired stock and even the entire wireless industry because they viewed the previous disclosures as evidence that the sub-prime customer programs was having a severe and widespread impact on Sprint affiliates, including US Unwired, and other similar businesses. This series of disclosures culminated in the final and completing disclosures on April 13, 2002 wherein US Unwired explicitly discussed the continuation of high churn and high involuntary disconnects as a consequence of the sub-prime credit class programs. These final disclosures squarely aligned US Unwired with previous disclosures concerning the severe negative effect of the sub-prime credit class programs on similarly situated sister Sprint affiliate companies and the entire Sprint network. The final public disclosures [*95] completed the revelation of the truth, viz., that the defendants omitted and concealed from the market that they knew at the outset that the sub-prime programs would be particularly devastating for US Unwired and that the programs in fact wreaked havoc with the company's business and financial plans during the class period. The price of US Unwired stock dropped from $ 4.94 on June 6, 2002 (the date of the AirGate disclosure) to $ 0.90 on August 13, 2002 (the date of the final disclosures).

The disclosures regarding continued high churn rates and continued lower subscriber growth in, first, a sister affiliate, then, the Sprint network, and finally, US Unwired specifically, plausibly reveals, as a whole, the leaking out of the truth underlying US Unwired's prior misrepresentations that US Unwired's churn had topped out, churn would start to decrease, and the sub-prime credit class market still presented a great and necessary growth opportunity. The two final disclosures on August 13, 2002 completed the revelation of the truth that had been omitted and concealed by the defendants, viz., that the sub-prime subscriber programs would and did produce churn and bad debts that were financially [*96] devastating to US Unwired. The complaint also explicitly links this series of disclosures to a significant stock price drop from $ 4.94 to $ 0.90.

C. Pleading of Loss Causation is Adequate under *Dura* and *Twombly*.

Rather than changing the meaning of *Rule 8(a)(2)*, both *Dura* and *Twombly* purport only to explain why the complaints in those cases failed to satisfy the rule's requirements and had to be dismissed. In *Dura*, because the complaint alleged nothing more than that the prices of the securities the plaintiff purchased were artificially inflated, the complaint failed to "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." *544 U.S. at 347*. In *Twombly*, under the plausibility standard, plaintiff's complaint was insufficient because it was bare of any factual allegation that suggested an antitrust conspiracy or that raised a reasonable expectation that discovery would reveal evidence of such an illegal agreement. *Twombly, 127 S.Ct. at 1970 n.10*.

The plaintiff's SAC sufficiently pleads loss causation and is clearly distinguishable from the inadequate complaints in *Dura* [*97] and *Twombly*. The plaintiff clearly (1) provided the defendants with notice of what the relevant economic loss might be and of what the causal connection might be between that loss and the defendants' alleged misrepresentations by describing how the leaking of the relevant truth underlying those misrepresentations caused the loss, as required by Dura; and (2) alleged enough facts to raise a reasonable hope or expectation

that discovery will reveal evidence that the elements of loss causation existed, as required by *Twombly*.

The SAC here, unlike the complaint in *Dura*, contains more than the mere allegation that the prices the plaintiff paid for his stock was artificially inflated by the defendants' omissions and misrepresentation. Rather, as required by *Dura*, the SAC provides the defendants with notice of what the relevant loss might be, viz., from a high of $ 4.94 on June 6, 2002 to $ 0.90 on August 13, 2002 (a decline of $ 4.04) (approximately 82%), and of what the causal connection might be between that loss and the defendants' misrepresentations. Thus, under *Dura*, the complaint has enough factual matter (taken as true) to give the defendants fair notice of the theory of loss causation [*98] that the plaintiff has in mind: a causal relationship between (1) the defendants' knowing omission and concealment that the sub-prime credit class customer programs were bound to be disastrous for US Unwired; (2) the disclosure of relevant or related truth regarding the severe negative effects of the sub-prime credit class programs that were clearly foreseen and readily observed by the defendants; and (3) a consequent significant drop in the US Unwired stock. *Dura, 544 U.S. at 347*. Furthermore, under *Dura* and *Greenberg*, the plaintiff alleges a plausible nexus (whether of "relatedness" or "relevance") between the revelation that the entire Sprint network, including US Unwired, had been seriously damaged by the sub-prime customer programs, and the defendants' misrepresentations that those programs would be beneficial to US Unwired and that it was necessary to continue them. Unlike the complaint in *Dura*, the plaintiff pleads all elements of loss causation -- the alleged misrepresentations, the disclosures, the attendant loss, and their inter-relationships.

The complaint likewise sufficiently pleads loss causation under *Twombly*, because it clearly presents enough factual allegations (taken [*99] as true) to give rise to a reasonable hope or expectation that discovery will lead to evidence that the elements of loss causation existed. *127 S.Ct. at 1965*. Unlike the complaint in *Twombly*, the plaintiff pleads enough facts (taken as true) to give rise to such a reasonable expectation, because it provides the defendant and the court with particular facts that identify the specific misrepresentations, the disclosures of the truth omitted, and the attendant loss. *Compare Twombly, 127 S.Ct. at 1970 n.10* (justifying the 12(b)(6) dismissal of the plaintiffs' pleadings, because "[a]part from identifying a seven-year span" they "mentioned no specific time, place, or person involved in the alleged conspiracies" and gave the defendant "little idea where to begin" his answer to the plaintiff's "conclusory allegations"). Each disclosure considered together with the others illumines the entire series or pattern of disclosures and, as a whole, alleges sufficient facts (taken as true) that raise a

reasonable expectation that discovery will reveal evidence of loss causation.

D. The District Court's Erroneous Analysis

The district court concluded, however, that the alleged disclosures did not constitute [*100] emerging truth sufficient to show that defendants' alleged misrepresentations proximately caused the drop in US Unwired's share price during the class period. The district court dismissed the plaintiff's complaint stating that "Lormand has failed to detail the statements made during the class period that would have revealed the truth about defendants' alleged misrepresentations and shown these misrepresentations to be the proximate cause of plaintiff's losses." *Romero v. US Unwired, Inc., 2006 U.S. Dist. LEXIS 60589, 2006 WL 2366342, at *8 (E.D. La. August 11, 2006)*. Specifically, the district court reasoned: (1) The first three alleged disclosures "refer to statements that were not made by defendants"; (2)"In its next allegation, plaintiff notes that, in a press release, defendants 'failed to disclose any known information about the Company's relationship with Sprint PCS or the true state of the Company's financial condition'; there is no discussion, however, as to how defendants' failure to disclose information may have caused the truth regarding defendants' alleged misrepresentations to emerge"; and (3) "Neither of [the two April 13, 2002 disclosures] appears to suggest that any of defendants' previous statements [*101] may have been misleading" or that they "necessarily contradict[]" the defendants' previous representations. *2006 U.S. Dist. LEXIS 60589, [WL] at *8-*9* (footnotes omitted).

We do not agree with the district court's analysis. First, nothing in the Federal Rules, the Supreme Court's decisions or our precedents bars a private securities fraud plaintiff from pleading loss causation based on alleged facts constituting circumstantial rather than direct evidence. *See Herman & MacLean v. Huddleson, 459 U.S. 375, 390-91, 103 S. Ct. 683, 74 L. Ed. 2d 548 & n.30 (1983)*. Accordingly, we conclude that a plaintiff in such a case may plead loss causation based on truth about the alleged fraud disclosed to the market by persons other than the defendants. We agree with the great weight of federal courts, which have held that *Dura* does not prevent a plaintiff from alleging or proving loss causation by showing partial or indirect disclosures of such truth by persons other than the defendants. [32]

> 32   To require that a plaintiff can successfully allege loss causation only by alleging [32] the fact or evidence of a confession or statement out of the defendant's own mouth would narrow the pleading requirement for loss causation in a way not authorized by *Rule 8(a)(2)* or anything [*102]

contained in *Dura* pertaining to pleading loss causation. *See In re Winstar Commc'ns, No. 01-CV-3014, 2006 U.S. Dist. LEXIS 7618, 2006 WL 473885 (S.D. N.Y. Feb. 27, 2006)* (unpublished) (stating that in *Dura*, "[t]he Court did not address the means by which the information is imparted to the public. Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality."). *Dura* uses the term "leak out," which contemplates the release of information from third-parties outside the company's official lines of communication. *See In re Intelligroup Sec. Litig., 527 F. Supp.2d 262, 297 n.18 (D. N.J. 2007).* The courts that have addressed this question unanimously reject the district court's approach here. *See, e.g., Hunt v. Enzo Biochem, Inc., 530 F.Supp. 2d 580, 597 (S.D. N.Y. 2008); In re Williams Sec. Litig., 496 F. Supp.2d 1195, 1265 (N.D. Okla. 2007); In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 297 & n.237 (S.D. N.Y. 2006)* ("*Dura* imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion."); *In re Enron Corp. Sec., Derivative and ERISA Litig., No. MDL-1446, 2005 U.S. Dist. LEXIS 41240, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005)* [*103] ("[B]esides a formal corrective disclosure by a defendant . . . the market may learn of possible fraud from a number of sources [such as] whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc."); *In re Worldcom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 2005 WL 2319118, at *23 (S.D. N.Y. 2005)* (to satisfy loss causation under *Dura*, plaintiff must "establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information").

Second, the district court was required to consider plaintiff's fourth alleged disclosure regarding the company's July 19, 2002 press release in its entirety, to accept all factual allegations as true, and to draw all reasonable plausible inferences from the complaint in favor of the plaintiff. But its analysis deviates from these standards in several important respects. The plaintiff's SAC alleged that:

> On July 19, 2002, US Unwired issued a short press release announcing that, during the second quarter of 2002, [US Un-

wired] added 19,600 PCS subscribers and 24,400 post-pay [*104] customers, and its churn rate for post-pay customers was approximately 3.4%. The Company further stated that it would discuss the quarterly financial results several weeks later on August 13, 2002. Defendants **failed to disclose any known information about the Company's relationship with Sprint PCS or the true state of the Company's financial condition** resulting from Sprint PCS' imposition of the "financially disastrous" NDASL and ClearPay programs.

(emphasis added). Considering all of the foregoing allegations together with other facts alleged in the complaint, a reasonable person could draw the plausible inferences that US Unwired's excessive churn rate was a partial emergence of the truth about defendants' alleged fraud, viz., that they had knowingly omitted and concealed from the programs' outset that the NDASL (no-deposit) and ClearPay programs would and did severely harm the company through excessive churn and bad debts; and that their prior positive assurances about the programs were intentionally false. Further, the foregoing allegations gave rise to a reasonable expectation that discovery would reveal evidence that this partial emergence of truth, combined with the others alleged, [*105] proximately caused at least a significant part of the decline in stock price as well as plaintiff's alleged economic loss. In its opinion, however, the district court acknowledged and addressed only the statement in bold italics in the block quotation above, passing over the other relevant alleged facts in silence. Consequently, the district court erroneously failed to accept all of the facts alleged as true, to consider them in the context of all facts alleged by the complaint and to draw all plausible inferences favorable to the plaintiff. Also, the district court's opinion disregards that loss causation may be pleaded, as plaintiff does, by alleging that Defendants omitted material facts in their public statements, which falsely inflated stock values (or at least skewed the mix of information previously presented), and that the subsequent public revelation of the truth concealed or misrepresented by Defendants caused the stock price's decline and plaintiff's consequent economic loss. Contrary to the district court's conclusion, the complaint contains ample discussion of how defendants' suppression of the truth caused both the artificial inflation of the stock price and its later [*106] decline when relevant truth emerged into the marketplace.

Third, plaintiff's SAC alleges that on August 13, 2002, US Unwired's press release revealed that it had begun to withdraw from the no-deposit program by rein-

stating the requirement of a deposit from credit-challenged customers in its southern markets, which had caused it to experience high involuntary disconnects in its sub-prime credit classes and compound a softness in the demand for new wireless services; and that on August 13, 2002, the US Unwired's 10-Q SEC form stated: "Churn was 3.4% for the three-month period ended June 30, 2002 as compared to 2.2% for the three-month period ended June 30, 2001. The increase is due to adding a higher number of credit challenged subscribers in 2002 that elected voluntarily to not continue using our service or that were involuntarily terminated from using our service because of non-payment." In response, on August 13, 2002, the price of US Unwired stock dropped to $ 0.90 per share. Combined with the SAC's allegations of the four preceding partial disclosures, together with the defendants' intentional omission and concealment of material facts, viz., the disastrous effects that would result [*107] from the no-deposit and ClearPay programs, as well as the materialization of such damage during the class period, these August 13, 2002 disclosures plausibly suggest that the truth of defendants' fraud, which had gradually been leaking out, had completely emerged causing the decline of the stock price and the plaintiff's consequent economic loss.

The district court, however, disregarded the plaintiff's allegations that defendants omitted and concealed the material facts from the market that they knew the sub-prime subscriber programs would be financially disastrous for US Unwired. Instead, it found that the August 13, 2002 disclosures did not constitute emerging relevant truth because they did not "appear to suggest that any of defendants' previous statements may have been misleading" or "necessarily contradict[ory]" of defendants' previous alleged misrepresentations. *Romero, 2006 U.S. Dist. LEXIS 60589, 2006 WL 2366342, at *9*. Thus, the district court overlooked that the plaintiff had alleged a claim based on the defendants' omissions of material facts that skewed the mix of information previously presented to the public thereby creating the misrepresentations. Consequently, the court either erred legally in not [*108] recognizing that a plaintiff can state a claim based on material omissions that created the misrepresentations or again failed to accept as true all factual allegations in the complaint and to attribute to the plaintiff the benefit of all plausible favorable inferences. *15 U.S.C. § 78u-4(b)(4)* ("Loss causation") ("[T]he plaintiff shall have the burden of proving that the act *or omission* of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages") (emphasis added); *see also Dura, 544 U.S. at 342*.

For these reasons, we conclude that the plaintiff has successfully pleaded loss causation with respect to his claim based on the defendants' omissions and misrepre-

sentations pertaining to US Unwired's use of the no-deposit and ClearPay programs.

Echoing the district court's erroneous conclusions, the defendants also contend on appeal that the plaintiff does not allege a necessarily contradictory relationship between the disclosures and the defendants' material misrepresentations and omissions concealing the known threat and later materialization of financial harm to the company by the sub-prime subscriber credit programs. Their argument is [*109] without merit because the alleged disclosures considered with the entire complaint reveals the relevant truth about these misrepresentations and omissions by defendants.

The defendants also contend that other market forces and events caused all of the plaintiff's economic loss. [33] The thrust of this argument is that the defendants believe that a more plausible alternate inference may be drawn as to the proximate cause of all of the plaintiff's economic loss. [34] As we have explained, however, under *Rules 8(a)(2)* and *12(b)(6)*, at the pleading stage, the plaintiff is only required to plead a plausible cause of action; we are not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PSLRA. See *Tellabs, 127 S.Ct. at 2510*; *Twombly, 127 S.Ct. at 1965* ("Asking for plausible grounds [for an element of a claim] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [that element]."); *Dura, 544 U.S. at 347-48*; *see also Scheuer, 416 U.S. at 236* [*110] ("When a federal court reviews the sufficiency of a complaint . . . its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."); *Leatherman, 507 U.S. at 168-69* ("[The] federal courts and litigants must rely on *summary judgment* and control of discovery to weed out unmeritorious claims. . .") (emphasis added); *Swierkiewicz, 534 U.S. at 512* (noting that the "simplified notice pleading standard" of the Federal Rules "relies on liberal *discovery* rules and *summary judgment* motions to define disputed facts and issues and to dispose of unmeritorious claims.") (emphasis added). [35]

---

33   The defendants also argue that the plaintiff's SAC fails to plead loss causation because one disclosure was followed immediately by a stock price increase rather than a decrease. This argument deals with the actual timing of the loss, and not whether the plaintiff pleaded a plausible

causal relationship between the defendants' fraud and the plaintiff's economic loss. The market [*111] could plausibly have had a delayed reaction; a delayed reaction can still satisfy the pleading requirements for "loss causation" though *proof* of causation may be more difficult when significant time elapses before the market allegedly reacts. *See Dura, 544 U.S. at 343*. The actual timing issue is a factual question, and is not enough to dismiss a complaint that *alleges* a specific causal link, as is the case here, under *Rule 12(b)(6). See, e.g., In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1058 (9th Cir. 2008)*("A limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible."); *In re Cardinal Health, Inc. Sec. Litigs.., 426 F. Supp. 2d 688, 760-61 & n.75 (S.D. Ohio 2006)* ("[T]his Court is convinced that this issue of timing alone is not enough to defeat Plaintiffs' allegations of loss causation where they have clearly specified causal connections between [the defendants'] misstatements over the four-year Class Period and their resulting damages."). The plaintiff alleges that the stock dropped after the last disclosure in the series of disclosure events.  [*112] This is sufficient for pleading purposes here, because increases in stock prices after a partial disclosure that is within a series of disclosures does not preclude a final showing of loss causation. *See, e.g., In re Take-Two Interactive Sec. Litig., 551 F. Supp.2d 247, 289-90 (S.D. N.Y. 2008); In re Seitel, Inc. Sec. Litig., 447 F. Supp.2d 693, 712-13 (S.D. Tex. 2006); see also In re Daou Sys., Inc., 411 F.3d at 1026-27; In re Apollo Group Inc. Sec. Litig., 509 F. Supp. 2d at 845, 847; Ong ex rel. Ong, 459 F. Supp.2d at 746; In re Bristol Myers Squibb Co., 586 F. Supp. 2d 148, 2008 WL 3884384, at *14; Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Systems, Inc., 411 F. Supp.2d 1172, 1177-78 (N.D. Cal. 2005); In re Vivendi Universal S.A., 2004 U.S. Dist. LEXIS 7015, 2004 WL 876050, at *7* (finding loss causation adequately pleaded when a complaint alleged that a series of corrective disclosures was followed by a material price decline, and the price decline was attributable to the series of corrective disclosures); *see also In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1319 (3d Cir. 2002)*. The plaintiff thereby alleges a plausible causal relationship between the series of disclosure events and this final loss.

34  In addition,  [*113] the defendants argue that the March 2002 conference call disclosed the material omissions in full, and therefore subsequent disclosures could not have caused the loss. For similar reasons stated earlier in the safe harbor section, we disagree with the defendants' characterization of the conference call as a full disclosure of all material risks associated with the no-deposit and ClearPay programs. The conference call continued to tout the benefits of these programs and omitted the serious risk that these programs would be disastrous. Despite some limited disclosures, the defendants arguably skewed the mix of information regarding the no-deposit programs, particularly its future prospects.

35  Moreover, several circuit courts and district courts point out that it is often inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over "loss causation." *See In re Gilead Scis., 536 F.3d at 1057*; *McCabe v. Ernst & Young, LLP, 494 F.3d 418, 427 n.4 (3rd Cir. 2007)* (citing authorities for concluding that "loss causation becomes most critical at the proof stage" (internal quotation marks omitted)); *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)* [*114] (noting that loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss"); *accord In re Coca-Cola Enters. Inc. Secs. Litig., 510 F. Supp.2d 1187, 1204 n.5 (N.D. Ga. 2007)* ("Finally, several previous securities fraud cases have held that proof of loss causation is not an issue that typically should be resolved on a motion to dismiss.") (citing *In re PSS World Med., Inc. Secs. Litig.., 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002)*; *In re Rent-Way Secs. Litig.., 209 F. Supp. 2d 493, 513 (W.D. Pa. 2002)*); *see also* 3 HAZEN, SECURITIES REGULATION § 12.11[3] ("Loss causation issues can be highly factual, thus frequently precluding judgment on the pleadings.").

## 3. Conclusion

For these reasons, the district court's judgment is affirmed in part and reversed in part. Accordingly, the district court's judgment dismissing without prejudice the plaintiff's claims pertaining to US Unwired's conversion from a Type III to Type II affiliate and transfer of its core functions to Sprint is AFFIRMED. [36] The district court's judgment dismissing the plaintiff's claims pertaining to US Unwired's use of the no-deposit and ClearPay programs is REVERSED, and the case is remanded [*115] to the district court for further proceedings consistent with this opinion. [37]

36  Because we are reversing in part and affirming in part the Rule 12(b)(6) dismissal, we do not

reach the district court's denial of leave to amend and subsequent dismissal with prejudice of the claims. *See Genmoora Corp., 888 F.2d at 358 n.70*. The district court's denial of leave to amend on futility grounds and subsequent dismissal with prejudice of the claims was dependent on its *Rule 12(b)(6)* dismissal without prejudice, which we now reverse in part. We remand with reservation of the possibility that the district court may grant leave to amend under *Fed. R. Civ. P. 15* so as to cure any deficiencies in respect to other potential claims after considering our guidance from this opinion. *See, e.g., Buckey v. County of Los Angeles, 968 F.2d 791, 794 (9th Cir. 1992)* (remanding to allow district court to consider if plaintiff should be able to amend complaint after claims were dismissed without prejudice).

37   *See Plotkin, 407 F.3d at 702* (reversing in part and affirming in part a 12(b)(6) dismissal in a securities fraud action). For these reasons, we also reverse in part the dismissal of the derivative controlling  [*116] person liability *§ 20(a)* claim for the same reasons that we reverse in part the district court's dismissal without prejudice the § 10(b) claim. *See Rosenzweig v. Azurix Corp., 332 F.3d 854, 863 (5th Cir. 2003)* (noting that the *§ 20(a)* claim is a derivative claim of the § 10(b) claim).

   AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.