Pages 1 - 47

United States District Court

Northern District of California

Before The Honorable Martin J. Jenkins, Judge

Nursing Home Pension,        )
                             )
            Plaintiff,       )
                             )
   vs.                       )           No. C01-0988 MJJ
                             )
Oracle Corporation,          )
                             )
            Defendant.       )
_____)

San Francisco, California
Thursday, March 16, 2006

**Reporter's Transcript Of Proceedings**

**Appearances**:


For Plaintiff:          Lerach Coughlin Stoia
                        Geller Rudman & Robbins
                        401 B Street, Suite 1700
                        San Diego, California  92101
                   By:  **Mark Solomon, Esquire**
                        **Douglas Britton, Esquire**
                        **Valerie L. McLaughlin, Esquire**


                        Lerach Coughlin Stoia
                        Geller Rudman & Robbins
                        100 Pine Street, Suite 2600
                        San Francisco, California  94111
                   By:  **Shawn A. Williams, Esquire**
                        **Willow E. Radcliffe, Esquire**


(Appearances continued on next page.)

*Reported By:*          *Sahar McVickar, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

(Computerized Transcription By Eclipse)

**Appearances, continued:**

For Defendant:           Latham & Watkins
                         135 Commonwealth Drive
                         Menlo Park, California  94025-1105
               **By:  Patrick E. Gibbs, Esquire**

                         Oracle Corporation
                         500 Oracle Parkway
                         M/S  50P7
                         Redwood Shores, California  94065
               **By:  James C. Maroulis, Esquire**
                     **Senior Corporate Counsel**
                         Litigation, Trademark and Copyright


                    **---o0o---**

 1    **Thursday**, **Mark 16**, **2006**                    **9:30 a.m.**

 2                      P R O C E E D I N G S

 3              **THE CLERK:**  Calling civil matter number 01-0988,

 4    United States -- Oracle Corporation Securities Litigation.

 5              You may step forward and state your appearances.

 6              **MR. GIBBS:**  Patrick Gibbs from Latham & Watkins on

 7    behalf of defense.

 8              **MR. MAROULIS:**  James Maroulis on behalf of Oracle.

 9              **MR. FARTHING:**  Andrew Farthing from Latham &

10    Watkins.

11              **MR. SOLOMON:**  Good morning, Your Honor.

12              Mark Solomon on for the plaintiffs.

13              **MR. WILLIAMS:**  Good morning, Your Honor.

14              Sean Williams on behalf of plaintiffs.

15              **MR. BRITTON:**  Doug Britton on behalf of plaintiffs.

16              **MS. MCLAUGHLIN:**  Good morning, Your Honor.

17              Valerie McLaughlin on behalf of plaintiffs.

18              **THE COURT:**  So we just got a TRO, and that is in

19    part why we are starting a little late.  And these proceedings

20    may be preempted, but we'll -- you are first on deck and we

21    will make sure we get to you.  Just the way things work around

22    here sometime.

23              Okay, so let me give you a sense of what my concerns

24    are, the questions that I have, and then I think, you know,

25    give you folks a period of time, I think you can probably tell

1  me what you need to in probably twenty minutes a piece, as you

2  have briefed it pretty thoroughly, I think.  And I'm going to

3  put you on the concerns that I have, which is why you are here.

4  So you can have a seat.

5           The -- I think it's important, since there is a

6  fairly in-depth discussion with respect to the standard that

7  obtains to this motion and under Rule 23 and the comments about

8  Advisory Committee comments, it strikes me that clearly the

9  Court is to conduct a rigorous analysis of the pleadings and

10  even to look to the merits to the degree sufficient to inform

11  the Court's decision as to whether or not there is -- the

12  predicates under Rule 23 A and B, are met.

13           And I think I said before in other orders on this

14  question that just really trying to discern whether or not the

15  evidence is sufficiently probative to allow a finding that the

16  predicates are met.  It's certainly not a preponderance

17  standard, in my view, and the Ninth Circuit hasn't spoken on

18  that question.  So I wanted to make sure that you understood

19  that, because I think that, then, informs some of the

20  discussion, for instance, with respect to the issue of lost

21  causation, for example.

22           The -- my recollection is that the current pleading

23  probably hasn't been vetted in terms of what would be a 12(c)

24  motion -- or what I expect to see, actually, would be a better

25  way of dealing with it would probably be ultimately in a Rule

1    56 motion.

2            That does not mean that, you know, I don't consider

3    the issue of lost causation and how it may rear its head with

4    respect to, you know, the issue of predominance, which

5    sometimes merges into common questions of law and fact and

6    typicality, too.  That doesn't mean I don't consider it, but I

7    consider it with respect to whether or not there is some degree

8    of individualization that would impact the predominance

9    analysis or might indicate that there are manageability

10   questions or superiority issues with respect to Rule 23(b) --

11   (b)(3).

12           And so what I want to do is sort of start there.

13   I'm going to start with lost causation and give you some sense

14   of how I see that issue, and then we'll go on from there and

15   talk about some of the inquiry notice issues and potential to

16   rebut the presumption of the fraud on the market theory and how

17   that may relate to potential defense that you have and how that

18   relates to the Rule 23(b)(3) question and then, ultimately,

19   just give you a few of my concerns about the

20   adequacy/typicality concerns you've raised with respect to the

21   class representatives here then to hear you out.  That should

22   take care of it.

23           So starting with lost causation, here, I disagree

24   with the defendant that there is any case that draws a line in

25   the sand and says that they have to -- the plaintiff has to

1    establish a corrective disclosure.  I don't think -- the **Dura**

2    case doesn't say that, and **In re: Daou** certainly doesn't hold

3    that.  But what is clear is that there has to be, for pleading

4    purposes -- and, now, where are the cases that I had -- there

5    has to be a -- and that doesn't mean that some courts haven't

6    interpreted it that way, but it doesn't appear to me that the

7    Ninth Circuit is interpreting it that way.

8            If you read the accounting fraud case, which is the

9    subtext of **In re: Daou**, I think it's pretty clear that they are

10   required that there be an indication of the loss and the causal

11   connection for pleading purposes, and that that loss then be

12   connected to the scheme that is afoot that gave rise to the

13   material misrepresentations or omissions.  And I just don't

14   think that there is any more required.  But there has to be

15   something in the record that would -- by allegation that would

16   indicate, you know, what the linkage is, it seems to me.

17           Now, I say that because the issue, for purposes of

18   this motion, is whether or not the -- I think the methodology

19   for the proof of the -- of lost causation is one that is

20   susceptible to class-wide proof.  And so in that regard, it

21   appears to me that what I have, and the defense really hasn't

22   had a chance to respond to this, but it appears to me that what

23   I have is a clearly generalized methodology from Steinberg

24   *(sic)* as to how the plaintiff would go about proof of lost

25   causation in the case.

1            And the question that I have is can I look behind

2    that and make a determination as to which of the experts I

3    think is correct?  Because clearly Boedeker, based on his tying

4    the ebb and flow of the stock in the market during the class

5    period to what's transpiring on the NASDAQ, that is not all he

6    relies on, but that is in large measure what he relies on, and

7    also indicating that on some of the dates of the asserted

8    misrepresentations there was really no impact to the stock

9    itself.

10            So he has that methodology, and Steinholt has his

11   methodology.  And I'm not saying it's a as simple as that, but

12   that is the focus that the Court, I think, looks at to discern

13   whether or not the methodology would be susceptible to

14   class-wide proof.

15            Now, the plaintiffs raise an issue as to what facts

16   you have marshaled that would indicate that the manner of proof

17   of lost causation would be individualized.  What are the facts,

18   what declaration, what evidence is there in the record to

19   establish that other than the argument that, as you walked

20   through in your brief, that they really have not alleged lost

21   causation.

22            But those are two different things, the allegations

23   in the pleading versus whether or not the manner of proof is

24   susceptible to class-wide proof.  So I would be interested in

25   hearing what individualizes that methodology in a way that

1    affects or should affect the Court's analysis of predominance

2    and/or whether or not the class action vehicle is not superior

3    in the proof of these claims.  So that would be helpful.

4           In addition, there is -- there are some assertions

5    by Mr. Steinholt.  For instance, he says that there is evidence

6    that the third quarter miss was by as much as 66 percent.  And

7    I think he initially says something in the 30 percent and then

8    66 percent.  But what I'm interested in is if, in fact, the

9    partial truth is disclosed to the market by the miss on

10   March 1st, how do those statements coincide and affect, are

11   linked to what transpired on March 1st?  Timing-wise, where

12   does this information about the miss that seems subsequent, how

13   do we tie that back to what is transpiring on March 1st?  It's

14   just a question that I have so I can understand your theory as

15   to why you provide these facts to me.

16          So I think that is what I would like to hear on the

17   lost causation issue, just work through that and tell me how

18   it's individualized and why it wouldn't be susceptible.

19   Although the individual plaintiffs may be, in terms of their

20   ultimate damage, impacted differently, but the methodology for

21   proving lost causation, why would that be of an individual

22   nature?

23          So then the next issue we move to is the issue of

24   the -- what was in the public domain that might relate to or

25   cause constructive inquiry notice, and ultimately, because

1  there is this -- the opportunity for the defense to rebut the

2  fraud on the market theory, looking at that question and

3  whether or not we have a predominance issue that might defeat

4  certification.

5          One, it seems pretty clear that the -- there are

6  lots of cases that continue to indulge the fraud on the market

7  theory, notwithstanding the fact that there is information in

8  public domain.  In fact, a few of the cases that I read, even

9  the *Zimmerman* case, which is pretty basic, the saturation in

10  that market with information that would certainly have put

11  those plaintiffs on notice.  I'm not sure if this record

12  coincides with that.

13          Secondly, that raises the question of -- that

14  Judge Shindlin, I think, in the *IPO* decision that plaintiffs

15  cite to me, she -- and I'm just interested in your view,

16  because she takes the position that, you know, that itself, to

17  establish that the market is that saturated is in itself a

18  question that should be dealt with by way of a common

19  presentation of proof.  And it's almost self-referential,

20  because ultimately what she says is that either you can prove

21  it collectively that the market was so saturated and that

22  impacts the claims or not, but It's still capable of general

23  proof.  And so I would be interested in the defense's view of

24  that.  And I don't think *Zimmerman* helps me so much.

25          And it does appear to me that the fraud on the

 1  market theory is still in play here with respect to the issue

 2  of common proof and the presumption of reliance.  So I've tried

 3  to give that to you in a couple of different ways.  And I think

 4  we can beat that up a little bit.  Let me hear what your

 5  response is to that.

 6          In that regard, there is a citation to the **_Hanon_**

 7  case, the Ninth Circuit case, and while **_Hanon_** doesn't

 8  specifically address class certification, it does drop a

 9  footnote that it borrows from the class certifications, the

10  fraud on the market analysis, and says it's equally applicable

11  in a Rule 56 context because we derive it from the Rule 23

12  certification context.  So I would be interested in your

13  respective views in that regard.

14          Then, with respect to the -- and I think you have a

15  sense of where I'm headed, where I'm leaning, even, that it

16  strikes me that these notice issues are, even if you are right,

17  are subject to common class-wide proof.

18          Now, with respect to the adequacy of the class

19  representatives, a couple of things.  I'm not sure that

20  1199SEIU, the precursor to them, the nursing home entity, I'm

21  not sure that I think that there is really an issue here as to

22  whether or not they -- whether that entity is marched down the

23  road with the Lerach firm so much that an institutional

24  investor like that, that I have real concerns about whether or

25  not there is some degree of professional plaintiff status that

```
 1   would in some way be in conflict with or they wouldn't look out

 2   for the best interests of its own constituency and other class

 3   members, too.  I'm not so sure that I think that's the case.

 4          There are lots of cases that go both ways with

 5   respect to the utilization of, ostensibly, an in pro per agent,

 6   Turner Investments, to make the sales.  To be quite honest with

 7   you, courts have gone either way on that question.  It strikes

 8   me that -- that they probably pass muster here in my view.  On

 9   the standing issue that you have raised notwithstanding, I

10   mean, I think that Judge Patel's decision in the *Terayon* cases,

11   the factual record there is quite a bit different than what we

12   have here.

13          I think it's -- I'm interested in your respective

14   views of Judge Illston's decision in *Crowson*, the value of the

15   options inferentially and directly relate to the value of the

16   common stock with respect to holding short, put options, that

17   analysis, where you see that breaking down, if you do, in terms

18   of trying to assess adequacy of that particular class

19   representative.

20          It does seem to me that there is evidence in the

21   record I've checked it, as to -- and I know this doesn't

22   foreclose your argument, but there is some indication on

23   reliance on the statements that were made during the class

24   period in the record.

25          With respect, Sawyer, it's interesting; I looked at
```

```
 1  your briefs several times on the plaintiff's side, and I don't
 2  see where you address the defense's reliance on the Boedeker
 3  declaration.  And you probably address this in a more general
 4  way.  Boedeker says that, essentially, Sawyer sold more shares
 5  than he brought and raises the question of injury or actual
 6  damage.  And it strikes me that you actually take that on by
 7  saying, look, Your Honor, even if that's the case, **_Blackie_**
 8  **_versus Barrack_** and some of those cases basically say that the
 9  actual quantum of damage issue doesn't defeat certification.
10  So we know we have that line of cases.
11          But I'm interested in your frontal attack on -- if
12  you have one, or rejoinder to whether or not litigation
13  involving Mr. Sawyer and whether or not he sustained an injury
14  is the kind of conflict or antagonism that would suggest that
15  he not serve as a class representative.  I think the issue is a
16  bit different than you have actually addressed in more general
17  fashion.
18          So I think that's enough to get us started.  And
19  it's your motion, and you have the burden of proof.  Many of
20  the questions really go to the defense side because they didn't
21  get a sur-reply, and you raised a lot of these.  Your initial
22  brief was as general as general can be, and so you haven't
23  really had a chance, I think, on the defense side to respond.
24          So if you want to, you don't have to, if you want to
25  sort of waive your opening and let me hear from the defense,
```

1   and we can join some of these issues and I'll hear what you

2   have to say.

3              **MR. SOLOMON:**  Just for your information, they did,

4   in fact, file a sur-reply.

5              **THE COURT:**  I didn't see a sur-reply.

6              I certainly want to make sure I digest that before I

7   rule.

8              I think we can go forward, and you will be parroting

9   some of what is in your reply.

10             How voluminous is it?

11             **THE COURT:**  Let me just look at.

12             **MR. GIBBS:**  It's very thin.

13             Your Honor, our recollection is there was an order

14   granting --

15             **THE COURT:**  Oh, yeah, I don't question that.

16             Okay.  So most of what I read in the reply, really,

17   is an argument that -- it goes to the inadequacy of the

18   methodology.  I think it joins the same issue.  I looked at the

19   reply, so let's go forward.

20             **MR. SOLOMON:**  So would you like me to go first, or

21   should --

22             **THE COURT:**  I'll leave that to you.

23             You have the questions, I certainly want those

24   answered.

25             **MR. SOLOMON:**  I will answer them, but I'll let

1    defendants go first.

2              **THE COURT:**  Okay.

3              **MR. GIBBS:**  Thank you, Your Honor.

4              Again, Patrick Gibbs on behalf of the defendants.

5              We certainly agree, Your Honor, that a rigorous

6    analysis is required.  And we certainly agree that the Court is

7    not required to simply accept at face value the plaintiff's

8    allegations but it does need to engage in the facts, at least

9    to the degree necessary to determine if the requirements for

10   certification are met.

11             I don't disagree with Your Honor that a claim of a

12   corrective disclosure is not necessarily required.  There has

13   been a lot of discussion of that issue in the papers.  But I

14   agree, that is not, per se, required.  It is, however, by far

15   the most common way of proving up lost causation on a

16   class-wide basis in a securities class action.

17             **THE COURT:**  Well, if we had something that was as

18   absolute and as approximate as in some ways your papers

19   suggest, you probably would have settled this case now.

20             **MR. GIBBS:**  That's probably right, although I don't

21   know whether there is any circumstances under which these

22   defendants would settle this case.

23             **THE COURT:**  All right.

24             **MR. GIBBS:**  So we agree that a corrective disclosure

25   is not necessarily required.  It is the most common way of

1    proving up lost causation on a class-wide basis.  And if

2    plaintiffs are not going to rely on a corrective disclosure, we

3    believe, in the class certification context, it is incumbent on

4    the plaintiffs to explain how they are going to prove it up on

5    a class-wide basis.

6           And so our point is not that a corrective disclosure

7    is absolutely required, it's just that's the most common way.

8    And if they're not going to use that method, they need to tell

9    the Court and they need to tell us what alternative method they

10   are going to use.

11          **THE COURT:**  And the methodology they provided you

12   believe is wanton?

13          **MR. GIBBS:**  I believe it is.

14          **THE COURT:**  Won't withstand rigorous analysis.

15          **MR. GIBBS:**  I don't think so.  And it leaves open a

16   lot of ambiguity of how exactly they are going to prove lost

17   causation.

18          The most fundamental gap is the lack of any

19   indication about exactly what events they are going to claim

20   caused the losses.  As you will know, the class period, the

21   proposed class period runs from December 14th, when Oracle

22   announced its forecast of the earnings for third quarter 2001

23   up until March 1st, when Oracle announced that it was not going

24   to meet that forecast.

25          Now, plaintiffs have never clearly said, to my

1   knowledge, that they intend to rely solely on the March 1st

2   disclosure to prove lost causation.  In other words, I think

3   they are leaving open the possibility of trying to prove lost

4   causation based on events or disclosures that predated the

5   March 1st disclosure.

6          *THE COURT:*  Well, you're right.  They would have a

7   problem there.

8          Under any reading of, you know, _Dura_ or

9   _**In Re:  Daou**_.  That is why I asked the other question.  I don't

10  know that they are relying just on March 1st.  I see some

11  ramifications.  For instance, the question I asked about the

12  percentage of the miss, it strikes me they are relying on those

13  kinds of statements also or actually disclosure of how the

14  company actually did.

15         And it raised for me at least a question of how we

16  circle back to the, you know, sort of the -- for lack of a

17  better way of describing it the indication, the partial

18  disclosure of the fraud that was operational.  We have to draw

19  on a continuum and pinpoint to March 1st, seems to me, under

20  their theory and to rely on -- because when we look at what

21  transpired with the stock and March 1st and what transpired

22  thereafter, it gets a little more speculative about what is

23  actually infusing that drop in stock, what is related to it.

24         *MR. GIBBS:*  We agree.  And we think that if they are

25  trying to rely on any disclosures or events that predate the

```
 1   March 1st disclosure, then you have extraordinarily complicated

 2   questions of commonality and predominance because you have

 3   people coming in and out of the class buying the stock, selling

 4   the stock, at different points in time when the mix of

 5   information is very, very different.  And that is not just the

 6   damages issue, as the plaintiffs have suggested, that goes to

 7   lost causation.

 8              THE COURT:  Right.

 9              MR. GIBBS:  And so we think the Court needs to know

10   for sure exactly what events the plaintiffs are relying on to

11   show lost causation.  They cannot leave that issue ambiguous

12   and yet meet the requirement for class certification, because

13   the Court would not be able to say for sure that the

14   requirements are met, that that methodology can be proved up on

15   a class-wide basis, which I think is exactly the right issue

16   for the Court to be grappling with here.  It's a methodological

17   question, it's not a question of whether they have, in fact,

18   proved lost causation at this stage.

19              In terms of the experts that you've asked about,

20   again, consistent with the rigorous analysis standard, we think

21   you can look to those expert affidavits and make decisions

22   about the different methodologies.  I don't think you need to

23   resolve factual disputes about which expert's view of the world

24   is correct or not.  We think our expert's affidavit raises very

25   serious questions about how lost causation could be proved in
```

```
1   this case, and we think it's incumbent on the plaintiffs to

2   answer that --

3              THE COURT:  He seems to raise more questions, at

4   least about, as you have argued, what may have been transpiring

5   without defining exactly what it is that caused the market to

6   become aware of the scheme.  Without pinpointing that in time,

7   he seems -- he extrapolates from that that there is certainly

8   the possibility of different proof methodologies, as you try to

9   walk through and see when the inflation begins to become

10  dissipated because that.  He certainty does that.  Of course,

11  the lynch pin to that is what is the corrective disclosure,

12  right?

13             MR. GIBBS:  That's exactly right.

14             THE COURT:  Yeah.

15             MR. GIBBS:  Or other event.  If they are going to

16  use some other event other than a corrective disclosure, we

17  need to know that.  We need to look at whether or not one can

18  prove that as establishing lost causation --

19             THE COURT:  Now, Steinholt seems to indicate at --

20  in his declaration, for instance, in paragraph 8, he says -- he

21  talks about the 20 percent decline, the statistical

22  significance of that.  And then he tries to account for the

23  fact that there is not an admission, kind of a true, absolute

24  corrective disclosure.  He says, "I know of no reason why the

25  damage described above could not be used to provide a
```

reasonable estimate of the damages."  He doesn't give a

specific methodology, is your argument.

       *MR. GIBBS:*  It is.  And the estimate of the damages

is not to issue, the issue is what actually caused the losses.

So we think he is speaking to the wrong issue.

       Now, plaintiff's expert's declaration focuses

entirely on the 20 percent stock drop in the wake of the

March 1st disclosure but does not come right out and say this

is how we're going to prove lost causation.  That's an example

of my point that they have not been clear enough about their

road map.

       *THE COURT:*  It's inferable, though, isn't it?

       *MR. GIBBS:*  We think it needs to be expressed before

the Court can make the findings required to support class

certification.  It needs to be clear what this case is about.

       *THE COURT:*  It says in paragraph 10(b),

"Mr. Boedeker simply ignores the price decline that ends the

class period as if it did not occur, and it only concludes that

class-wide damages may not be able to be identified or be

segregated.  The price decline in any class is often the most

important price decline to examine.  It's not to be ignored."

       So that is why I'm saying, he is wrapping it around

the -- it may be that that is not going to allow him to

segregate in a way to account for other market factors.  He

says relying on general principles of proof of lost causation,

1    you can do it.

2              MR. GIBBS:  He does, but he doesn't say how he is

3    going to do it.  And again, even the language Your Honor quoted

4    talking about the 20 percent drop, he says that the drop at the

5    end of the class period is often the most important.  He

6    doesn't say that is the one we are going to use to prove lost

7    causation.  And there is an enormous difference, from a class

8    certification standpoint between using a single corrective

9    disclosure on March 1st versus a slow leakage or series of

10   disclosures --

11             THE COURT:  But what if he were relying on that?

12             MR. GIBBS:  On the March 1st disclosure?

13             THE COURT:  Yeah.

14             MR. GIBBS:  Then think he would have problems with

15   the connection point that you have made with regard to the *Daou*

16   case.  And I know Your Honor looked at that issue in the

17   context of the *Gilead* case not long ago, and the question is

18   whether or not the single disclosure that allegedly caused the

19   loss has any connection or relationship to the alleged fraud.

20             THE COURT:  See, but aren't we raising a question,

21   then, of whether or not I think persuasively he will be able to

22   do it as opposed to whether or not he offers a methodology that

23   suggests that he can?

24             MR. GIBBS:  I think that's a very fair question.

25   And our point is not that he has to prove to you by a

1   preponderance of the evidence that there is that relationship,

2   but I do think they need to offer a road map to how they are

3   going to prove that relationship so the Court can decide

4   whether that methodology is susceptible of class-wide proof.

5           **THE COURT:**  Okay.

6           **MR. GIBBS:**  That's --

7           **THE COURT:**  Okay.

8           **MR. GIBBS:**  Your Honor, did you want me to work

9   through the rest of the issues?

10          **THE COURT:**  Oh, yeah.  Let's just go through while I

11  got you here.

12          **MR. GIBBS:**  Okay.

13          On the question of what was in the public domain, we

14  think this case is very, very different from a typical

15  securities class action.  Typically, you are talking about the

16  alleged nondisclosure of internal information, financial

17  information, accounting information that is not known and could

18  not be known to shareholders at large.

19          This case has at least two elements to it that are

20  very different from a typical securities class action.  One is

21  that it is based on statements regarding Oracle's products that

22  are widely discussed in the press, discussed by the Oracle

23  application user group, very large communities of people

24  talking about these products, industry analysts issuing reports

25  talking about the product after it's released.

1           And the second piece is the general statements about

2    the economy and its effect on Oracle.  And those, again, are

3    facts that are external to the company.  And so there is a very

4    serious question in this case as to whether or not the fraud on

5    the market presumption can be rebutted.

6           Again, our point is not to ask the Court to resolve

7    that factual argument --

8           *THE COURT:*  Um-hmm.

9           *MR. GIBBS:*  -- as to whether or not the presumption

10   is, in fact, rebutted, our point is that this case is unlike a

11   typical case, and that raises very serious questions about the

12   propriety of class certification.  And we think the burden

13   remains on the plaintiffs to demonstrate to the Court that this

14   is not going to cause a problem from the standpoint of class

15   certification.  That, we think, is the issue here.

16          *THE COURT:*  So what's your view of Judge Shindlen's

17   take on this very question that she actually had in the *IPO*

18   case?

19          *MR. GIBBS:*  I think that under appropriate

20   circumstances with the right factual showing it may be that the

21   truth on the market defense is susceptible of class-wide proof,

22   but we think that will vary from case to case, and it depends

23   on the particular factual scenario in that case.

24          So the fact that Judge Shindlen found that the

25   market saturation in that case was susceptible to class-wide

 1    proof, I don't think that means it's always susceptible to

 2    class-wide proof.

 3              **THE COURT:**  No, but the assertions there were pretty

 4    similar to what you have here in terms of inquiry notice, they

 5    were very similar.

 6              **MR. GIBBS:**  They are similar, although I think there

 7    is a difference in degree, if perhaps not in kind.  And I think

 8    that does affect whether you are really talking about --

 9              **THE COURT:**  Give me the factual permutation that

10    suggests there is a difference in degree.

11              **MR. GIBBS:**  Well, in the **IPO** cases there were

12    national news stories talking about this practice of dolling

13    out shares.

14              **THE COURT:**  *Wall Street Journal* articles.

15              **MR. GIBBS:**  I read many of those articles.

16              And so she really was talking about truly saturating

17    the market for information, whereas here you have information

18    in the public domain.  I don't think it's disseminated quite as

19    widely, and so it may very well raise more individualized

20    questions.

21              For example, Oracle's products are covered by

22    industry analysts who issue reports, those reports get read by

23    people interested in these types of products.  They are not the

24    same as the *Wall Street Journal*.  They are not read by a wide

25    swath of investors in Oracle stock in the same way that the

```
 1    issue -- that the information at issue in the IPO cases wasn't
 2    available.  So I think that depending --
 3              THE COURT:  A little speculative.
 4              MR. GIBBS:  Excuse me?
 5              THE COURT:  A little speculative.
 6              MR. GIBBS:  We think it's the plaintiff's burden to
 7    establish that the requirements are met.
 8              THE COURT:  They do, and they rely on the general
 9    presumption.
10              MR. GIBBS:  And our response to that is --
11              THE COURT:  You have a right to raise it.
12              MR. GIBBS:  Yes.
13              THE COURT:  And that's why I am trying to pierce
14    through and see how, really, it would affect my ability to
15    manage this case.  How, really, does it affect the predominance
16    question in conducting that rigorous analysis you have asked me
17    to conduct?
18              MR. GIBBS:  We think that we have shown that there
19    are significant questions about the extent to which the
20    information about Oracle's products, for example, may have been
21    known to the public, may have been known to certain class
22    members but not necessarily all of them.  And we think that is
23    enough to raise enough of a question to defeat plaintiff's
24    attempt to meet their burden.
25              THE COURT:  Okay.
```

1      **MR. GIBBS:**  In terms of the adequacy of the proposed

2   representatives, I understand what Your Honor is saying.  As to

3   the pension fund plaintiff, I think the only thing I would

4   point out is the lack of any information about whether or not

5   the lawsuit was even the client's idea or the lawyer's idea, I

6   understand the point of institutional plaintiffs being

7   different from the typical professional plaintiffs --

8      **THE COURT:**  There is a degree of sophistication

9   there.  And not only that, but it seems to me that there is an

10  obligation to sort of protect the -- the value of the

11  portfolio, too, in a way that coincides with the other putative

12  members of the class.

13     **MR. GIBBS:**  I think that's fair, but I also think

14  there are serious questions about whether the pension fund is

15  actually going to direct the lawyers or the other way around

16  when there is a serious question about who actually decided to

17  or thought about filing the lawsuit.  That is the only point I

18  would make about that.

19     **THE COURT:**  You think, honestly, that they're

20  subject to sort of being led around by the nose by these folks

21  sitting here to my right?

22     **MR. GIBBS:**  I don't know that I would put it in such

23  pejorative terms.  I don't know the folks who run the nursing

24  home pension fund --

25     **THE COURT:**  All right.

1      *MR. GIBBS:*  -- but I do think there is a very

2   serious issue if the client didn't even think, "I think I've

3   been frauded *(sic)*, I want to bring a lawsuit," but instead was

4   contacted by lawyers saying, "Do you want to bring a lawsuit?"

5      *THE COURT:*  What about this overlay of the best

6   practices and the Department of Labor compliance with making

7   sure that that -- as a basis for bringing the lawsuit and their

8   continued involvement in it on the question you have just

9   raised about, you know, the lawyers here sort of presented this

10  case to them and said that you should -- they have some

11  competing obligations, it seems to me that at least resonate

12  with respect to the exercise of discretion about how they go

13  forward.

14      *MR. GIBBS:*  I understand.  I don't know that there

15  would be any reason for the nursing home not to accept the

16  invitation to file a lawsuit under the circumstances.  They

17  have experienced a loss on their position in the stock.  And so

18  the fact that they have an obligation to try to maximize the

19  investment I think doesn't necessarily speak to the issue of

20  who is actually directing the lawsuit.

21      *THE COURT:*  All right, but if they have concerns

22  about how to effectively deal with the loss, it strikes me that

23  what goes along with that is some scrutinization of what is

24  transpiring in the lawsuit.

25      *MR. GIBBS:*  One would hope.  We put the record that

 1   we have in front of Your Honor.

 2              **THE COURT:**  Okay.

 3              **MR. GIBBS:**  I don't know I have much more that I can

 4   add to that.

 5              **THE COURT:**  Okay.

 6              **MR. GIBBS:**  On the investment advisory point, I

 7   would say that, again, our point is not that the Court should

 8   resolve the standing issue today on that basis.

 9              **THE COURT:**  Right.

10              **MR. GIBBS:**  Our point is that having used an

11   investment advisor, that particular plaintiff may be subject to

12   different defenses, may be caught up in issues that do not

13   affect the vast majority of the class.  And so I think even if

14   the courts that have found standing, notwithstanding the use of

15   investment advisors are correct, there are serious questions

16   about whether that plaintiff should be the representative for

17   the class because there are different issues that they are

18   going to have to contend with.

19              **THE COURT:**  Judge Patel seemed to indicate that the

20   **Terayon** decision, you know, that is probably part and parcel

21   the way that most people invest.  That is just the lay of the

22   land today.

23              Of course, if that were the case, it might be

24   difficult to find anybody that could serve in a capacity --

25   it's the old floodgates kind of argument.  But she posits that

1    in that decision.  What is your rejoinder?

2         *MR. GIBBS:*  I respectfully disagree with her about

3    the makeup of the shareholders as a group.  I don't think most

4    shareholders are working through investment advisors that way.

5         My guess is if you could round up this proposed

6    class, I don't think they would all say, "Yes, I have a

7    professional advisor who actually makes my stock selection

8    decisions for me."  But Judge Patel disagrees with me on that,

9    you may as well.

10        *THE COURT:*  Okay.  All right.

11        *MR. GIBBS:*  In terms of the short put options

12   trading, again, I understand Judge Illston's point, I

13   understand the plaintiff's expert's point about --

14        *THE COURT:*  I mean, logically does that point, does

15   it make sense that there is at least a bottom line -- as we,

16   you know, sort of analyze it through, there is an impact from

17   -- because there is a relationship with respect to the value of

18   the stock to the different investment strategies that are being

19   utilized, including the one just indicated.

20        *MR. GIBBS:*  I think as a general matter options and

21   derivatives do have their value tied to the value of an

22   underlying security, so I can't disagree with that general

23   principle.  I don't think that means there is no difference

24   between a derivative or an options trading plaintiff and a

25   purely stock trading plaintiff, because it goes to questions of

1  investment strategy, for example.

2          The fact that the price of the option or the

3  derivative is tied to the underlying security doesn't tell you

4  much about the plaintiff's stock trading strategy.  And that

5  strategy may well distinguish a shareholder from the rest of

6  the class because the shoulder may well be actually betting

7  against the stock or making a different bet on the stock than a

8  typical shareholder who could credibly claim to be relying on

9  the marketplace in the sense that ***Basic*** and the rest of the

10  cases suggest.

11          ***THE COURT:***  Um-hmm.

12      ***MR. GIBBS:***  If an options or derivative trading

13  plaintiff has got a different strategy that doesn't rely on

14  that then I think they've got problems in terms of adequacy and

15  typicality.  And that has nothing to do with the question of

16  whether the underlying security affects the price of the option

17  or the derivative.

18          ***THE COURT:***  Different questions, as it were?

19      ***MR. GIBBS:***  Yes, exactly right.

20          ***THE COURT:***  All right.

21      ***MR. GIBBS:***  And then on Sawyer, I think that

22  question was directed primarily to the plaintiffs.

23          ***THE COURT:***  Right, I'll hear from the plaintiff.

24      ***MR. GIBBS:***  Thank you, Your Honor.

25          ***THE COURT:***  Okay, thank you.

1              **MR. SOLOMON:**  Thank you, Your Honor.

2         I don't think yet I've heard anything that you have

3    said that I disagree with, but I feel we may get to that point

4    in a few minutes, I hope we don't.

5              This is not an extraordinarily different sort of

6    class action than other class actions.  This is a class action

7    that has lots of complicated ingredients, but the broad strokes

8    for class certification are the same as in many, many, many

9    class -- class actions.

10             The defendants try in their briefs to suggest that

11   this is an extraordinarily long class period.  They say it's

12   not days or weeks, it's two and a half months.  Well, it's ten

13   weeks.  It's an extraordinarily short class period compared to

14   most.  Many class periods, you may be aware, are a year two or

15   even three years.  This is ten discreet weeks.

16             And in those weeks, the defendants make

17   representations to the market that the economy was not

18   affecting them adversely.  They made statement to the market

19   that the 11I was a great product that was selling well, and

20   that it was being used effectively.  They said that they were

21   on track to meet with their forecasted revenues.  And they said

22   those facts repeatedly.  They in the meantime engaged in

23   historic inside sellings up to that amount approaching

24   $1 billion.

25             By the end of the class period, there was a

1  disclosure on March 1st, and that disclosure told the market

2  that they were going to miss their forecasts, their

3  applications, database and license.  And in a conference call,

4  they told the market that the economy had done them in.

5           Two weeks later, they came back for more.  They

6  said, "Sorry, it's even worse than we thought."  And they said

7  the economy's done us in.  Applications are down."

8           **THE COURT:**  Are you relying on any disclosure prior

9  to March 1st?

10          **MR. SOLOMON:**  I am not, Your Honor.

11          Each occasion there were these specific.

12          **THE COURT:**  There you have it.

13          **MR. GIBBS:**  I appreciate that.

14          **MR. SOLOMON:**  Each occasion there was a 20 percent

15 drop in the stock of the price, and compared to miniscule drops

16 on the NASDAQ.

17          **THE COURT:**  Right.  I think these are things in your

18 brief.  You indicate I have to look at the historical pattern,

19 and they haven't missed in three years.

20          I read your papers.

21           **MR. SOLOMON:**  Correct.

22          We believe that just based on what I just told you

23 lost causation is clearly indicated appropriately.  There is a

24 straw man or a red herring that they have used throughout their

25 briefing to try and undermine the lost causation argument we

```
 1   make.  And that is, they say, the accounting claims, they also
 2   say the design claims, which I'll get into, the accounting
 3   claims have no lost causation; well, that is interesting.  We
 4   don't really know, to be quite honest, about the accounting
 5   claims.  It could be a continuing fraud.  It may well be a
 6   case --
 7              THE COURT:  What are you saying?
 8              MR. SOLOMON:  Okay.  The second quarter --
 9              THE COURT:  No I understand what you -- what aspect
10   of the claim you are -- the accounting claim, but are you
11   saying you don't know if there is a causal relationship?
12              MR. SOLOMON:  What I'm saying is that there was no
13   disclosure on either March 1st or March 15 that actually said
14   we have been in error in our accounting, and that is part of
15   the reason why --
16              THE COURT:  They never made a misstatement --
17              MR. SOLOMON:  They didn't.  No, they didn't.
18   However, we discovered, as you are aware, what appears to be a
19   huge accounting fraud at the end of the second quarter before
20   the class period begins.  And we have alleged it.  And the
21   Ninth Circuit has found it an important allegation, just as the
22   Ninth Circuit has found that the other allegations are
23   important, allegations that they weren't being adversely
24   affected by the economy, allegations concerning 11I and
25   allegations concerning the forecast.
```

1          Now, whether or not they have disclosed the fraud we

2   allege with respect to the accounting allegations is of no

3   moment to class certification, because we have alleged that the

4   other misrepresentations they made during the class period were

5   directly related to the partial disclosure and the next -- what

6   we still say was a partial disclosure, to some extent.

7          **THE COURT:**  Why wouldn't I certify a class that only

8   deals with your methodology for proving up what you have

9   alleged -- by looking at the complaint you can establish loss

10  of causation for, and that methodology would apply

11  appropriately there.

12         **MR. SOLOMON:**  Well, what I'm saying is the

13  accounting fraud is in the case certainly to establish

14  Scienter.  It's very powerful fact pattern if, in fact, we are

15  right.

16         **THE COURT:**  Right.

17         **MR. SOLOMON:**  -- to establish Scienter.

18         **THE COURT:**  Your position, though, is that won't

19  defeat certification.

20         **MR. SOLOMON:**  Correct.

21         **THE COURT:**  Because you otherwise pled lost

22  causation.

23         **MR. SOLOMON:**  Correct, that is our position.

24         Now, it may well be that part of the --

25         **THE COURT:**  Was that your position in the papers?

1           **MR. SOLOMON:**  Well, I think to be fair, our position

2    in the papers was we know that these -- the 11I and the economy

3    and the forecasting misrepresentations were tied to the

4    disclosures.  We are not saying there is a direct connection

5    between the accounting fraud and the disclosures.  It may well

6    be that there have been reversals in the third quarter of what

7    they did, to some extent in the second quarter, that may have

8    affected the results that may actually establish some lost

9    causation.  We are not there yet, Your Honor, we don't know.

10          I don't want to give you a discovery dispute, and I

11    won't, but the fact of the matter is we have not got to the

12    bottom yet of the accounting fraud, and we are working very

13    hard trying to do that.  But what I'm trying to say to you,

14    Your Honor, is that has nothing to do with whether or not you

15    should certify this class.  It's a red herring.

16          **THE COURT:**  So let's talk about the methodology you

17    provide for how you plan to at least establish the causal

18    relationship, which I suspect you do agree is an issue that I

19    need to grapple with.

20          **MR. SOLOMON:**  Absolutely.

21          **THE COURT:**  Okay.

22          **MR. SOLOMON:**  And, obviously, Mr. Steinholt has

23    suggested that we would use an event study, that that event

24    study would be looking at events, representations in the class

25    period, it would be looking at the stock price movement, and in

1    particular, it would be looking to the effect of the

2    disclosures on March 1 and March 15 and the cause of them.

3           And we believe that it will be readily established

4    that those disclosures were made necessary by the fact that,

5    number one, the pipeline that they pretended was so robust was

6    not, and they knew it.  The performance of the company that

7    they pretended was not being hindered by the economy was being

8    hindered by the economy, and they knew it, and the 11I was not

9    even ready for sale.

10          There is going to be an issue as to whether they

11   should have recognized any revenues concerning sales of the 11I

12   in that timeframe, Your Honor.  That, we believe, is directly

13   tied to those March 1st and March 15 statements, and it would

14   be the provocation by those statements that form the damages in

15   this case.

16          **THE COURT:**  And that would be susceptible to

17   class-wide proof.

18          **MR. SOLOMON:**  And that would be susceptible to

19   class-wide proof, Your Honor.

20          Now, as to the argument that there was some truth in

21   the market, well, first of all, just --

22          **THE COURT:**  Are you required to put more flesh on

23   your methodology at this juncture for Rule 23 purposes than you

24   have?

25          **MR. SOLOMON:**  I don't believe so.  I believe

1    Mr. Steinholt has given you sufficient -- in terms of his

2    declaration, Your Honor.

3           **THE COURT:**  What I think you are, at least for

4    purposes of discerning whether or not I conducted the -- a

5    sufficient rigorous analysis, it just strikes me that you have

6    to show that there is at least a methodology that would sort of

7    withstand scrutiny that would allow for an inference, a

8    probative inference that that methodology is one that is not

9    flawed and susceptible to class-wide proof; would you agree?

10          **MR. SOLOMON:**  I think that's fair, Your Honor, yes.

11          **THE COURT:**  Okay.

12          And counsel says that the flaw is that you primarily

13   rely on an event, the March 1st disclosure.  That certainly

14   indicates that there was some impact on the value of the stock,

15   but how is that tied back to, methodologically, how is that

16   tied back to the manner in which you want to present class-wide

17   proof to establish lost causation?

18          **MR. SOLOMON:**  I agree, Your Honor.  And I believe

19   that Mr. Steinholt, in describing the event study, demonstrates

20   that what we would be doing would be looking back at the

21   representations in the class period, estimating the inflation

22   that is created as a result of various allegedly false

23   statements.  He would then look at the actual disclosures on

24   March 1 and March 15 and taking the inflation that he has

25   estimated for -- accompanying the misrepresentations together

1    with the drop --

2              **THE COURT:**   So he'll see to it to parse out other

3    variables to see if he can --

4              **MR. SOLOMON:**   Correct, Your Honor.

5              **THE COURT:**   Come to some reasonable probability of

6    what is actually affecting or causing the loss?

7              **MR. SOLOMON:**   Correct, Your Honor.

8              **THE COURT:**   Related to -- okay.  All right.  Well

9    it's general, but I think this is probably an issue that --

10   with respect to dueling methodologies, perhaps.

11             **MR. SOLOMON:**   And, Your Honor, I do think it's

12   appropriate to give a sign, an indication here, and I believe

13   to.  But the fact of the matter is that expert testimony is

14   deferred at the moment in this case to the end of fact

15   discovery.  And that event, of course, will happen.  And you

16   will have another opportunity to revisit that.

17             **THE COURT:**   Well, yes, but I have to pierce through

18   enough --

19             **MR. SOLOMON:**   I agree, Your Honor.

20             **THE COURT:**   To satisfy myself that there is an

21   appropriate methodology at work here that is susceptible to

22   class-wide proof.

23             You are not asking me to abrogate that

24   responsibility, are you?

25             **MR. SOLOMON:**   Absolutely not.

1          **THE COURT:**  -- by the argument that you haven't

2    gotten through expert discovery in the case.

3          **MR. SOLOMON:**  No, no.

4          **THE COURT:**  Otherwise, I can't imagine you would

5    submit a declaration in the first instance.

6          **MR. SOLOMON:**  That is why I said it's appropriate to

7    give you that indication, Your Honor.

8          **THE COURT:**  Okay.

9          **MR. SOLOMON:**  So if you adopt the common sense

10   position that **Blackie** mandates and **Dura** and **Daou**, and you saw

11   in **Dukes** have promoted, I think there is little doubt that this

12   is a paradigm case that is suitable for class certification,

13   and the lost causation is adequately alleged.  And we have

14   given you a sufficient road map as to how we are going to prove

15   it.

16          As to the adequacy and typicality of the plaintiffs,

17   we believe that defense counsel has come close to conceding the

18   adequacy of 1199.

19          **THE COURT:**  Well, I don't know if he's done that.  I

20   think he's been very candid.  I don't read it as a concession.

21          I am interested, though, in your view of -- if you

22   have anything else to tell me with respect to Mr. Sawyer.

23          **MR. SOLOMON:**  Yes.  Mr. Sawyer sustained a loss.

24   The loss is in the thousands of dollars.  Mr. Sawyer wants to

25   represent the class.  He knows sufficiently about the action --

1   excuse me --

2         **THE COURT:**  But does -- isn't -- just focusing on

3   his investment strategies, isn't there some degree of potential

4   conflict with him in terms of the adequacy of his ability to --

5   in pursuing his interest?  Given what I'm told in the Boedeker

6   declaration about the number of shares he sold, it looks like

7   he is actually the beneficiary of any inflation based on the

8   misrepresentations, and that is not necessarily consistent with

9   the other putative class members, is it?

10        **MR. SOLOMON:**  Well, of course, what you haven't got

11  in front of you is his preclass period holdings to allow you to

12  make the determination that there is a precise loss, that there

13  is a loss as opposed to a gain in his class period of trading.

14            I understand that --

15        **THE COURT:**  Do you disagree with the representation

16  as to most specifically in terms of number of shares he sold

17  and the representation that -- I think the way it's stated is

18  that there is -- Boedeker says that he -- it's highly unlikely

19  there's any injury that was sustained.

20        **MR. SOLOMON:**  I understand Mr. Boedeker says it's

21  highly unlikely.  He is not precise, he doesn't come up with a

22  number.  What I'm telling you is that we have come up with a

23  damage number, and he has sustained a loss.  Once you look at

24  all the relevant trading, he sustained losses within the class

25  period.

1              Now, whether or not you believe that the fact that

2    someone sold more stock in a particular class period than he

3    purchased is in and of itself something that is individuated

4    and problematic.  I don't know if that is your view --

5              **THE COURT:**  That's part of the argument.

6              **MR. SOLOMON:**  I don't see why that would necessarily

7    be a problem so long as we can establish he suffered a loss.  I

8    have no doubt that if he suffered a gain he is inappropriately

9    placed in this litigation, but he did not.

10             **THE COURT:**  So it's a matter of degree.  And as far

11   as you read it, it doesn't disqualify him.

12             **MR. SOLOMON:**  Absolutely not, Your Honor.

13             **THE COURT:**  Okay.

14             What else?

15             **MR. SOLOMON:**  I would also recommend **CV Therapeutics**

16   with respect to day traders and --

17             **THE COURT:**  You cited it to me, and I read it.

18             **MR. SOLOMON:**  One fact that you ought to know is

19   that each of these plaintiffs purchased common stock aside from

20   the other securities.

21             **THE COURT:**  Which I think you say in your reply.

22             Anything else?

23             **MR. SOLOMON:**  Yes.  Overall --

24             **THE COURT:**  I don't think you have addressed the

25   inquiry issue.

1              **MR. SOLOMON:**  Are you talking about truth on the

2    market?

3              **THE COURT:**  I'm talking about -- yeah.

4              **MR. SOLOMON:**  First of all, the expression, "truth

5    on the market," I think suggests that it lends itself to

6    class-wide proof.  We are talking about --

7              **THE COURT:**  Counsel just stood here flat-footed and

8    argued to me that the dissemination of his information in the

9    case is sort of different than some of the case that have been

10   cited to me.  And because -- it's interesting, there may not

11   have been the kind of coverage -- this is a slippery slope --

12   there may not have been the kind of coverage that might suggest

13   individualized factual disputes with respect to what each of

14   their respective class members knew, and they have a right to

15   put that on.

16             Now, we contrast that with sort of a baseline, in

17   terms of the rebuttal, the presumption seems to require that

18   the market be saturated in a way that would impute that kind of

19   notice.  When I look at what was said, I see the kinds of

20   cautionary things that, you know, with respect to expected

21   forecasted results, I see those kinds of things.  So I have

22   concerns about, one, about whether or not the individualization

23   that I'm being told is a possibility, I can pierce through and

24   really see that that is the case.

25             Two, a variety of cases that has continued to

```
1   indulge, for the purposes of these motions, the fraud on the

2   market presumption.  And three, I think, and as importantly,

3   the suggestion that to the extent that you try to establish

4   from sort of a unitary, or several instances of information

5   that was provided to the market, do we run head long into an

6   argument that -- that generally covers a class of people which

7   is susceptible to common proof?

8              MR. SOLOMON:  The answer is no.

9              I think what defense counsel is saying is because in

10  these sort of obscure areas, it was gossip or word that 11I

11  wasn't functioning well or some people were speculating that

12  the economy may be adversely affecting Oracle, because that

13  there were some individuated issues, well, each time, to the

14  extent there were any communications like that or statements

15  like that, the company issued -- made representations directly

16  to the opposite.

17             THE COURT:  So that is a saturation argument.  To

18  me, that's what that is.

19             MR. SOLOMON:  But the intensity with which --

20             THE COURT:  Well, that's exactly what I'm

21  suggesting.

22             MR. SOLOMON:  Right.  That is subject to class-wide

23  proof and also subject to expert testimony.  I certainly don't

24  see how, on the one hand --

25             THE COURT:  So you agree with Judge Shindlin in that
```

1    regard?

2              **MR. SOLOMON:**  I do.

3               **THE COURT:**  Yeah.  Okay.  That is what I was

4    asking.  Maybe there were too many subparts to the question.

5          Okay.

6              **MR. SOLOMON:**  Your Honor, I think that overall, the

7    March disclosures revealed the true financial condition of the

8    company.  Even if the disclosures did not specifically identify

9    the accounting fraud, we do believe that there is sufficiently

10   pled lost causation with respect to that because of the

11   revelation of the true condition.

12            However, I want to emphasize that whether or not you

13   agree with that, the specific statements in this case were

14   clearly tied to the misrepresentations that we alleged other

15   than the accounting fraud without question.  And I want to

16   emphasize that, because I don't want that --

17             **THE COURT:**  That is where we started a half hour

18   ago.

19             **MR. SOLOMON:**  I don't want that red herring to lead

20   you in the wrong direction.

21             **THE COURT:**  Right, well, I think I got it.

22             **MR. SOLOMON:**  Any other questions?

23             **THE COURT:**  No.

24          Do you have anything else?

25             **MR. GIBBS:**  Just briefly, Your Honor.

1           **THE COURT:**  Okay.

2           **MR. GIBBS:**  I might as well pick up where we just

3    left off.

4           On the accounting issues, I think Mr. Solomon's

5    discussion of those issues highlights exactly my point, which

6    is we need to know exactly what this case is about before we

7    certify it as a class action.

8           I thought I heard Mr. Solomon say that the

9    accounting claims are in the case to prove Scienter, among

10   other things, and that's fine.  We disagree with the accounting

11   claims on the merits.  We disagree about Scienter on that, but

12   that is not what we are talking about here today.  But we need

13   to know whether the accounting claims are a separate damages

14   claim as well.  Before we can certify this as a class action,

15   we need to know exactly what is the nature of the claim.

16          And I think Mr. Solomon has told you they don't know

17   right now whether those accounting claims tie in any way to the

18   March 1st disclosure about the earnings miss.  And I don't

19   think you can certify a class action that includes within it

20   any claim for damages based on the accounting allegations

21   without being told that that tie exists and without being told

22   how they intend to prove it on a class-wide basis.  I think

23   that is a critical fact.

24          We have the same problem with the product design

25   allegations.  We need to know whether the product design

1   allegations are meant solely to explain one of the reasons for

2   the earnings miss or are instead, as counsel has characterized

3   them at certain point in time, as a stand-alone claim of some

4   kind, in which case we need to know how they are going to tie

5   those allegations to the March 1st disclosure and do so a

6   class-wide basis.  We still don't know that.

7                    **THE COURT:**  Okay.

8            I won't belabor the point on Mr. Sawyer.  It's well

9   briefed, and we'll leave it at that.

10                   **THE COURT:**  Okay.

11           Anything else?

12           **MR. SOLOMON:**  Very briefly, Your Honor, we just

13  don't think that you need the road map that he is requesting.

14  You have a sufficient road map to certify the class, and we

15  believe that we have demonstrated that, Your Honor.

16                   **THE COURT:**  All right.

17           Okay, the matter is submitted.  We will get you an

18  order out.  I -- my inclination is that they are not sufficient

19  individualized issues, and that the concerns that you are

20  talking about, to be honest with you, Counsel, the statute

21  allows the Court to sculp and shape going forward, to be quite

22  honest with you.  So I'm not sure that that would be a

23  sufficient basis.

24           But what I do want to do is track through the

25  methodology and make sure I've given that the kind of scrutiny

1    that I should.  And we'll get you something out in short order

2    that gives you the benefit of the Court's thinking.

3              I appreciate it.  I thought, other than missing the

4    reply brief, that you pitched the arguments in a way that

5    allowed me to make what transpired out here a little more

6    illuminating for ultimately resolving, so I appreciate that.

7              Okay.

8              **MR. SOLOMON:**  Thank you, Your Honor.

9              **MR. MAROULIS:**  Thank you, Your Honor.

10             **MR. GIBBS:**  Thank you, Your Honor.

11             **MR. WILLIAMS:**  Thank you, Your Honor.

12                  **(Proceedings adjourned at 11:02 a.m.)**

13

14                        **---o0o---**

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

**Sahar McVickar, RPR, CSR No. 12963**

**March 16, 2006**